UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC. )<br><br>Plaintiff, )<br><br>v. )<br><br>PRESIDENT AND FELLOWS OF HARVARD )<br>COLLEGE (HARVARD CORPORATION) )<br><br>Defendant. ) | Civil Action No: 1:14-cv-14176 |

## JOINT STATEMENT PURSUANT TO
## FED. R. CIV. P. 26(f) AND LOCAL RULE 16.1(d)

Pursuant to Federal Rule of Civil Procedure 26(f) and Local Rule 16.1(d), Plaintiff, Students for Fair Admissions, Inc. ("SFFA") and Defendant, President and Fellows of Harvard College ("Harvard") submit this Joint Statement. Pursuant to the Court's electronic order dated March 18, 2015 (Dkt. 25), the initial scheduling conference for this matter is currently scheduled for April 30, 2015 (the "Scheduling Conference").

## I.   PRELIMINARY STATEMENT OF THE CASE

### A. SFFA's Position

This action challenges Harvard's undergraduate admissions policies under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et. seq.* The claims set forth in the Complaint, broadly speaking, fall into two categories. First, SFFA asserts that Harvard has engaged in a campaign of invidious racial discrimination by intentionally limiting the number of Asian Americans admitted each year. Second, irrespective of its mistreatment of Asian-American applicants, SFFA asserts that the manner in which Harvard employs race as a factor in its undergraduate admissions program is in violation of the Equal Protection Clause and the

Supreme Court's decisions interpreting that guarantee. Harvard has filed an Answer and, having done so, has acknowledged that SFFA's Complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 29 (1st Cir. 2010) (Souter, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Harvard's defense of its admissions practices is beside the point. If Harvard believed that the Complaint did not include credible allegations of intentional racial discrimination, or if Harvard believed the Complaint was legally defective for some other reason, it would have sought dismissal. It did not. Hence, it is the nature of the allegations set forth in the Complaint—not Harvard's disagreement with them—that is salient for purposes of establishing a discovery schedule.

Of particular importance, Harvard has admitted that it considers an applicant's race in its admissions process. Answer ¶ 147. Harvard's actions therefore are subject to strict scrutiny. "Strict scrutiny is a searching examination, and it is the government [or institution subject to the Fourteenth Amendment through Title VI] that bears the burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2419 (2013). It "remains at all times the University's obligation to demonstrate, and the Judiciary's obligation to determine, that admissions processes 'ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application.'" *Id.* at 2420. Because strict scrutiny applies, the Court must ensure that the factual record is fully developed. Harvard's preliminary statement does not even mention strict scrutiny, as clarified by *Fisher*, let alone acknowledge its impact on the scope of permissible discovery.

SFFA thus is "entitled to broad discovery" in this "civil rights action." *Sacramona v. Bridgestone/Firestone, Inc.*, 152 F.R.D. 428, 430 (D. Mass. 1993) (citing *Santiago v. Fenton*, 891 F.2d 373, 379 (1st Cir. 1989)). Indeed, it is settled law that "[f]ederal policy favors broad discovery in civil rights actions" because such cases "should be resolved by a determination of the truth rather than a determination that the truth shall remain hidden." *Inmates of Unit 14 v. Rebideau*, 102 F.R.D. 122, 128 (N.D.N.Y. 1984); *see also Steinberg v. Mount Sinai Med. Ctr., Inc.*, No. 12 CIV. 51 SLT VMS, 2014 WL 1311572, at *6 (E.D.N.Y. Mar. 31, 2014) ("It is well-established that federal law favors broad discovery, particularly in civil rights cases."); *Floyd-Mayers v. Am. Cab Co.*, 130 F.R.D. 278, 278-79 (D.D.C. 1990) ("Clearly, the scope of discovery in federal civil cases is broad."); *Martin v. Conner*, 287 F.R.D. 348, 354 (D. Md. 2012) (same); *Wolfe v. Green*, 257 F.R.D. 109, 112 (S.D.W. Va. 2009) (same); *Farley v. Farley*, 952 F. Supp. 1232, 1240 (M.D. Tenn. 1997) (same); *Jackson v. Beard*, No. 3:CV-11-1431, 2014 WL 3868228 at *5 (M.D. Pa. Aug. 6, 2014) (same); *Scott v. Clarke*, No. 3:12-CV-00036, 2013 WL 6158458, at *5 n.4 (W.D. Va. Nov. 25, 2013) (same); *Grenier v. Jonas*, No. 1:09-CV-121-JGM, 2011 WL 1791093, at *2 (D. Vt. May 10, 2011) (same). To be sure, courts will not permit limitless discovery even in civil rights cases. But there can be no doubt that the nature of the action informs the scope of permissible discovery. As a result, this legal background appropriately frames SFFA's proposed discovery plan and will inform SFFA's position on certain discovery disputes the parties anticipate litigating early in that process.

SFFA's position on the matters before the Court also is shaped by the size and scope of this case. Harvard admissions officials review roughly 35,000 applicants per admissions cycle. The President and Provost supervise an Admissions Office that employs a Dean of Admissions, a Director of Admissions, other senior officials, and approximately 35 admissions officers at any

given time. Harvard also has a Standing Committee for Admissions and Financial Aid that includes roughly 30 members, largely comprised of faculty, which has primary authority for determining admissions policy. Further, approximately 15,000 Harvard alumni conduct applicant interviews throughout the country at the Admissions Office's direction. Put simply, the system challenged here is massive, even without considering the fact that SFFA's claims require it to examine application files and aggregate statistical data from multiple admissions cycles.

Harvard does not dispute the size and scale of its undergraduate admissions operation, the number of people involved, or that SFFA appropriately seeks information and testimony about multiple admissions cycles. Rather, Harvard appears to base its defense of its proposed 8-month fact-discovery plan on an assumption that it will prevail in defeating document production requests and depositions requests that have yet to be propounded, let alone properly litigated in motions practice before this Court. Harvard is therefore putting the cart before the horse. The issue at this juncture is not who will prevail in each and every anticipated discovery dispute, but instead who has proposed a more reasonable timeframe, particularly in light of the discovery motion practice that this case will likely involve.

Indeed, only after full briefing and argument could the Court fairly resolve the litany of factual and legal issues Harvard inappropriately seeks to litigate at this stage. To take just one example, much of Harvard's position relies on its assertion that the production of application files will require massive, time-consuming redaction and that those application files are otherwise protected from disclosure. In so arguing, Harvard relies heavily upon the Family Educational Rights and Privacy Act ("FERPA"). But FERPA has no relevance to applicants who do not matriculate at Harvard. 20 U.S.C. § 1232g(a)(6) (providing that the definition of "student … does not include a person who has not been in attendance at such agency or institution").

Also, FERPA does not limit the discovery of information about matriculating students when "such information is furnished in compliance with judicial order, or pursuant to any lawfully issued subpoena, upon condition that parents and the students are notified of all such orders or subpoenas in advance of the compliance therewith by the educational institution or agency." *Id.* § 1232g(b)(2)(B); *see also Rios v. Read*, 73 F.R.D. 589, 600 (E.D.N.Y. 1977) ("In view of the significant role of private lawsuits in ending various forms of discrimination in school systems, FERPA should not serve as a cloak for alleged discriminatory practices."). Moreover, SFFA is willing to enter into a protective order that would cover all sensitive information. Thus, Harvard's claim that production of documents would be too burdensome is not only premature, but it is significantly overblown.

Regardless, Harvard's proposal is unreasonable even assuming Harvard wins *every* discovery dispute and it is correct as to the level of redaction production will require. As an initial matter, the time it will take to litigate these discovery disputes will consume a substantial portion of the eight months Harvard has allocated for fact discovery. Furthermore, Harvard has proposed to produce "a statistically significant sampling" of applications. As Harvard concedes, given that over 140,000 applications are involved, producing, redacting, and reviewing even that fractional amount will be time-consuming. Harvard also takes the view that SFFA should be limited to ten party depositions notwithstanding the number of Harvard officials involved in its process. But even if Harvard succeeds in that effort, the number of non-party depositions involved here, which will include not only experts, but alumni interviewers, former employees, high school officials, and college admissions advisory bodies such as Princeton Review, will bring the deposition total easily above twenty. Even under Harvard's unreasonably narrow view of this case, then, its 8-month fact-discovery proposal is unrealistic.

Finally, SFFA's proposed discovery plan takes into consideration this case's complexity. Intentional racial discrimination is notoriously difficult to root out. Accordingly, "determining the existence of a discriminatory purpose demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). That type of evidence necessarily requires extensive deposition testimony and broad production of relevant documents. *See Raza v. City of New York*, 998 F. Supp. 2d 70, 82 (E.D.N.Y. 2013) ("Limiting the scope of discovery is especially inappropriate when, as here, the central fact at issue, discriminatory intent, is difficult to establish."). Proving SFFA's claim of invidious racial discrimination against Asian Americans, as well as its others claims relating to Harvard's use of race in undergraduate admissions, likewise requires extensive statistical discovery and testimony from multiple expert witnesses. *Washington v. Davis*, 426 U.S. 229, 242 (1976) ("Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."); *see, e.g.*, *Eng'g Contractors Ass'n of S. Florida, Inc. v. Metro. Dade Cnty.*, 943 F. Supp. 1546, 1555 (S.D. Fla. 1996) (explaining that "a significant statistical disparity" can support "an inference of discriminatory exclusion"). Harvard's proposal fails to acknowledge that this case involves a claim of invidious discrimination and the kind of discovery such cases routinely entail.

The path of the *Gratz/Grutter* litigation (which did not even include the fact-intensive claim of discrimination against Asian Americans raised here) illustrates the point. Both cases featured discovery periods that initially encompassed approximately 15 months and ultimately lasted well over two years. The *Gratz* complaint was filed on June 14, 1997; the district court heard summary judgment argument on November 16, 2000—nearly three and half years later. The *Grutter* complaint was filed on December 3, 1997; the district court heard summary

judgment argument on December 22, 2000—also more than three years later. These cases show that a federal civil rights challenge to university admissions is an extensive and complex undertaking. SFFA thus believes that its proposed discovery schedule provide a reasonable timetable in order to help ensure a fair and just resolution of this matter without undue expense or delay. Harvard claims that the *Gratz/Grutter* litigation is distinguishable because it was delayed by interlocutory appeals. Even without those appeals, however, the original discovery period in each case was approximately 15 months and would have lasted over two years.

Further, Harvard's comparison to *Fisher* is inapt. *Fisher* involved a claim concerning the University of Texas at Austin's ("UT") failure to employ one specific race-neutral alternative. Neither party used an expert witness and there was almost no need for fact discovery because the parties stipulated to virtually all of the relevant facts. Furthermore, UT published a wide array of statistical information that Harvard has never made public, there was no claim of invidious discrimination against Asian-American applicants, and the parties were litigating under a strict-scrutiny standard that the Supreme Court ultimately made far more stringent *in that very case*. And even that litigation took roughly ten months to reach summary judgment.

In sum, SFFA's proposal reasonably estimates the time it will take to litigate this case, thus obviating repeated trips to the Court to seek extensions that inevitably will be needed under Harvard's plan. SFFA's schedule provides the time needed: (a) to resolve big-picture discovery disputes at the beginning of the case; (b) to engage in what by any measure will be a substantial document production; and (c) to conduct and coordinate a large number of depositions involving witnesses from across the country and lawyers from five different states. Last, SFFA's proposal will ease the burden on Harvard's Admissions Office, as the schedule will provide the flexibility needed to accommodate their busy schedules.

**B. Harvard's Position**

For decades, Harvard has considered diversity to be essential to its mission of educating the future leaders of a complex world. Diversity is fundamental to Harvard's view of effective pedagogy and as such is rooted in the considered academic judgment and experience of its faculty and academic leadership. Harvard wants—indeed, expects—its students to learn from each other in the classroom, in the residence halls, on the stage, in the dining hall, and on the athletic fields, among other venues. In assembling a class of fewer than 1700 from the tens of thousands of qualified applicants in its applicant pool, Harvard employs a process designed to consider the full array of personal characteristics that inform each applicant's ability to take full advantage of a Harvard College experience, to contribute to the academic and social life of the campus, and to contribute to a class that is more than the sum of its individual parts. The race or ethnicity of each applicant is just one of those many salient characteristics—one that cannot be erased from the full picture of who an applicant is and the life experiences he or she will bring to campus. By considering the race or ethnicity of applicants in this holistic manner—rather than enforcing a quota, engaging in "racial balancing," or treating race as the defining characteristic of each application—Harvard does precisely what the Supreme Court has repeatedly held that public universities may do, consistent with the Equal Protection Clause. As a private university, Harvard is entitled to even greater deference in determining how best to further its educational mission. And Harvard has no workable way to achieve the diversity that is fundamental to its educational mission without considering the race or ethnicity of its applicants.

Harvard's holistic admissions process complies fully with the demands of Title VI. Indeed, as SFFA's Complaint acknowledges, the Department of Education's Office of Civil Rights has investigated similar allegations, and after a careful and thorough review concluded

8

that Harvard did not discriminate on the basis of race and was in full compliance with Title VI. (SFFA contends that by answering the Complaint and flatly denying its allegations, Harvard has somehow "acknowledged" the Complaint's factual allegations as a basis for its liability. Harvard has done nothing of the sort, as its Answer vigorously denies SFFA's allegations and asserts the affirmative defense that SFFA fails to state a claim upon which relief may be granted. The authority on which SFFA relies for that proposition is irrelevant: The language that SFFA quotes from *Sepulveda-Villarini* simply recites the standard for resolving a motion to dismiss, which is not before the Court. Furthermore, SFFA's contention that the allegations set forth in its Complaint form the basis for establishing the discovery schedule is incorrect. As Federal Rule of Civil Procedure 26(b) makes clear, the scope of discovery on nonprivileged matters is informed by the claims and defenses of the parties, not the bare allegations of a complaint.)

Given Harvard's holistic admissions process, which requires an individual review of every application to Harvard, SFFA's sweeping discovery proposal is clearly excessive. The discovery that SFFA proposes is virtually unfettered and would be unprecedented in higher-education litigation and exceedingly burdensome on Harvard. SFFA seeks, among other things, production of every undergraduate application that Harvard has received for the past four years (which, until this year, were maintained only in hard-copy form). Harvard receives more than 35,000 applications every year, and each application contains approximately forty pages of materials and information. SFFA's request for applications alone would therefore require Harvard to produce approximately 5.6 million pages.

What is more, each application is filled with highly sensitive personal information provided to Harvard in the utmost confidence. Application files include not just applicants' high-school grades, test scores, and demographic information but also, for example, intensely

personal essays from the applicants themselves as well as frank evaluations of applicants from teachers, counselors, and interviewers.   The Family Educational Rights and Privacy Act ("FERPA") reflects Congress's determination that the information contained in student materials is highly sensitive.   This determination should not be lightly disregarded.   Additionally, the critical confidentiality issues presented here extend well beyond the bounds of FERPA, and Harvard therefore strongly disagrees with SFFA's position that it is entitled to unfettered access to the sensitive information included in application materials—whether the applicant files belong to matriculated students or non-matriculated applicants.   Congress's decision not to extend FERPA rights to applicants who do not matriculate arose from a belief that those files deserve *more* protection from outside review, not less.   FERPA grants to students (but not rejected applicants) a right to review their education records on demand; however, FERPA does not give "the rejected applicant for admission … the right … to see and challenge his letters of recommendation, nor does [FERPA] give him the right to challenge the institution's decision not to admit him." *Tarka v. Franklin*, 891 F.2d 102, 105-06 (5th Cir. 1989) (quoting 120 Cong. Rec. 39,863 (1974)).   Congress intended its protection of the confidentiality of the non-admitted applicants to be every bit as strong as that accorded to admitted students.

SFFA's request for "academic reports and records involving certain matriculating students," in addition to being well beyond the scope of permissible discovery, also raises grave privacy concerns implicating matriculated students' rights under FERPA.   What is more, as SFFA acknowledges, every admitted student whose admissions file may be produced in this case would be entitled to prior notice of the disclosure and an opportunity to object. Providing such notice, and opening the floor to such objections, from approximately 6,500 current students would be an enormous waste of time and this court's resources.

SFFA's "demands are like a bulldozer that levels an entire hill in the hopes of finding some specks of gold," which is particularly problematic given that SFFA "seeks to bulldoze nonparty academic records." *Alig-Mielcarek v. Jackson*, 286 F.R.D. 521, 527 (N.D. Ga. 2012). Courts have repeatedly "imposed a 'significantly heavier burden' on a party requesting the discovery of educational records to show its interests in obtaining the records outweighs 'the significant privacy interest of the students.'" *Black v. Kyle-Reno*, No. 1:12-cv-503, 2014 WL 667788, at *2 (S.D. Ohio Feb. 20, 2014). Discovery of such sensitive information, without the sort of compelling need that SFFA cannot show, is disfavored. *See Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1034 (9th Cir. 1990) (affirming district court's limitation on discovery of employment files where plaintiffs "fail[ed] to show that discovery of the actual files was necessary" and "the confidential nature of the . . . files suggests that opening the files to the plaintiffs for a general search could reach well beyond the legitimate inquiries necessary to this litigation"); *Whittingham v. Amherst Coll.*, 164 F.R.D. 124, 127-128 (D. Mass. 1995) ("[W]hile discovery is usually broad, Plaintiff has not demonstrated that the [employee] files he seeks, even if marginally relevant, outweigh the privacy interests of these individuals.").

Any production of application files will require extensive review and redaction to protect the privacy interests of Harvard's applicants and matriculated students. Harvard's initial review suggests that at least one hundred separate redactions would be required before any single application file could be produced, meaning that well in excess of ten million redactions would be required if Harvard were to produce to SFFA more than 140,000 application files, as SFFA believes it is entitled to obtain. Moreover, under any view of the law, SFFA's request for production of individual matriculated students' academic records is improper.

Discovery of this unprecedented breadth would be plainly unacceptable in most contexts, but SFFA seeks to justify it here on the theory that in civil rights cases, prudential limitations on discovery simply do not apply.  That is not the law: Courts routinely place reasonable limits on discovery in civil rights cases.  In the employment discrimination context, for example, the First Circuit has held that parties "ought not to be permitted to use broadswords where scalpels will suffice, nor to undertake wholly exploratory operations in the vague hope that something helpful will turn up."  *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 187 (1st Cir. 1989); *see also Woodward v. Emulex Corp.*, 714 F.3d 632, 636-637 (1st Cir. 2013) ("Given the alternative—a fishing expedition into possibly barren waters—the district court did not abuse its discretion by limiting discovery to [similarly situated employees].").  Discovery may be limited "to avoid unduly burdensome requests," *Tyler v. Suffolk Cnty.*, 256 F.R.D. 34, 37 (D. Mass. 2009) (prisoner rights), to "protect the privacy interests of . . . individuals," *Whittingham*, 164 F.R.D. at 127 (employment discrimination), and to reduce the hardship faced by defendants "when weighed against the absence of facts alleged to support . . . liability," *Santiago v. Fenton*, 891 F.2d 373, 379-80 (1st Cir. 1989) (wrongful and abusive arrest).  Each of those rationales for limiting discovery applies here.

Indeed, many of SFFA's own cases on this issue explain that reasonable limits on discovery are appropriate in civil rights actions, including on grounds of burden, relevance, and privacy.  *See Jackson v. Beard*, No. 3:11-1431, 2014 WL 3868228, at *5 (M.D. Pa. Aug. 6, 2014) ("Courts will not permit discovery where a request is made in bad faith, unduly burdensome, irrelevant to the general subject matter of the action, or relates to confidential or privileged information."); *id.* at *6 ("[T]he vast majority of the document requests made to Defendants are wholly overbroad in scope, and seek much information that is not relevant to the

issues remaining in this action."); *Steinberg v. Mount Sinai Med. Ctr., Inc.*, No. 12 Civ. 51, 2014 WL 1311572, at *6 (E.D.N.Y. Mar. 31, 2014) ("[T]he privacy and other policy concerns underlying [state child abuse law] offer compelling reasons to limit discovery[.]"); *Inmates of Unit 14 v. Rebideau*, 102 F.R.D. 122, 128 (N.D.N.Y. 1984) ("A most important factor to be considered in the determination as to whether particular evidence should be discovered is the importance of the evidence to the plaintiffs' case.").

In contrast to the unduly burdensome discovery of all application files proposed by SFFA, Harvard proposes producing a statistically significant sampling of redacted applications, which will be sufficient to evaluate SFFA's claims. Harvard cannot be required to produce more than 140,000 applications when a sampling of redacted application files would be sufficient. *See Lamphere v. Brown Univ.*, 491 F. Supp. 232, 233 (D.R.I. 1980) (in a class action brought by faculty members alleging discrimination under Title VII, the court required the university only to allow each faculty member to access his or her own file); *Santiago*, 891 F.2d at 379 (the "authority to limit discovery is within the trial judge's broad discretion in determining pretrial matters"). Indeed, the Office of Civil Rights conducted its investigation into Harvard's admissions practices in the 1990s by sampling only a few hundred application files, and the plaintiffs in *Grutter* and *Gratz* requested and received only a sampling of application files in that litigation. Most recently, in *Fisher v. University of Texas*, the plaintiffs—represented by several of the same counsel as SFFA—proceeded to judgment without any discovery of application files.

SFFA has no need for discovery that is exponentially more burdensome than the discovery afforded in these prior actions. This is not a class action; SFFA claims to represent one (as yet unidentified) unsuccessful applicant to Harvard and perhaps a handful of students who intend to apply to Harvard in the future. Although SFFA purports to be a membership

13

organization representing the interests of those former and potential applicants, it has no greater right to discovery than those applicants would have if they proceeded singly.   Given the holistic nature of Harvard's admissions process and the highly selective nature of admissions at Harvard, no disappointed single applicant could use his or her case to demand an examination of every applicant file and every student's grades at Harvard over the last four years; SFFA's status as a membership organization does not give it any greater entitlement to discovery than its individual members would have.   SFFA has standing only to the extent that it is asserting the claims of its individual members (or member).   *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) (an association can have "standing to bring suit on behalf of its members"); *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 37 (1st Cir. 2005) (an "association's standing may derive from its members' standing").

Similarly, the length of the discovery period proposed by SFFA is far more extensive than necessary.   The litigation history of several prior cases concerning university admissions, far from supporting SFFA's proposal (as it contends), underscores the unreasonableness of SFFA's proposed discovery schedule.   In *Fisher*, roughly ten months passed between the filing of the complaint and the submission of summary judgment motions.   The longer discovery periods in *Grutter* and *Gratz* were attributable largely to the delay occasioned by an interlocutory appeal, in which the Sixth Circuit reversed the denial of motions to intervene, and to the extension of discovery on remand to accommodate the intervenors.   SFFA has shown no need for an initial discovery plan that allows two years to pass between the date of the complaint and the submission of summary judgment motions.   This drawn-out period will result in undue expense and burden on the parties and the Court.   Indeed, the schedule proposed by SFFA would

encompass an entire admissions cycle at Harvard, which would place a significant burden on Harvard's admissions staff.

The schedule proposed by Harvard, which would allow for eight months of fact discovery, followed by expert discovery and then summary judgment motions due approximately 18 months after the complaint was filed, provides the parties with a more than reasonable amount of time in which to conduct discovery and does not depend on Harvard's prevailing in discovery disputes, as SFFA claims. Eight months will allow SFFA to review a sampling of applicant files, depose representative admissions officers, and review documents relating to Harvard's admission policies and practices. Discovery beyond these bounds is unnecessary for SFFA to attempt to prove its case, and the invasive and breathtakingly broad discovery sought by SFFA seems intended more to conduct a fishing expedition, disrupt Harvard's admissions cycle, and attract media attention than to obtain information relevant to its claims—which is decidedly improper.

## II.    OBLIGATION OF COUNSEL TO CONFER

Pursuant to Federal Rule of Civil Procedure 26(f) and Local Rule 16.1(b), counsel for the parties conferred to discuss the matters herein through telephone conferences held on March 13, 2015 and April 3, 2015.

## III.   SETTLEMENT PROPOSALS

Pursuant to Local Rule 16.1(c), on April 15, 2015, more than fourteen days prior to the Scheduling Conference, SFFA presented a written settlement proposal to Harvard.

## IV.   PROPOSED PRETRIAL SCHEDULE

SFFA and Harvard have agreed to exchange initial disclosures on April 27, 2015, prior to the Scheduling Conference.

15

The parties have also agreed that: (1) 45 days following the conclusion of fact discovery, SFFA will serve its expert disclosures; (2) 45 days after SFFA's expert disclosures, Harvard will serve its expert disclosures; (3) there will then be a 45-day period for expert depositions; and (4) initial briefs for dispositive motions will be due 45 days after the close of expert discovery. Harvard reserves its right to notice depositions of any expert designated by SFFA at any time after SFFA's expert disclosures; SFFA reserves its right to object to any such deposition notices and takes the position that expert depositions should not commence until both parties have disclosed their experts.

The parties have a significant disagreement as to the amount of time that will be needed for fact discovery.

Based on SFFA's view of the complexity of fact issues and magnitude of the scope of potential discovery, SFFA proposes a fifteen (15) month period of fact discovery following the Scheduling Conference. SFFA believes this is a practical, realistic period that provides the parties adequate time to resolve anticipated discovery motions (relating to applicant files and ESI) and to conduct the extensive discovery this matter necessitates.  SFFA believes the discovery in this civil rights case will go far beyond the discovery event limitations set forth in Local Rule 26.1.  Specifically, SFFA will seek to (a) undertake far more than 10 depositions, and (b) issue far more than 25 interrogatories and 25 requests for admissions.  SFFA's proposed fact discovery timeframe is also mindful of the Harvard Admissions Office's schedule and that the attorneys of record hail from five different jurisdictions.

Harvard proposes a fact discovery period of approximately eight (8) months, with fact discovery to be concluded by December 31, 2015.  Harvard believes that this is a realistic time frame that will allow the parties to complete the required discovery without unnecessary delays

and inefficiencies.  Harvard further believes the discovery limitations imposed by Local Rule 26.1 provide an appropriate framework in this case, and is willing to comply fully with the discovery limitations set forth by the Local Rules at the Court's discretion.  In the event the Court were inclined to alter those limitations, Harvard proposes that the ten (10) deposition limit should be the presumptive limit for party depositions, absent agreement of the parties or order of the Court, but that depositions of non-party witnesses (including expert witnesses) need not count towards Local Rule 26.1's ten (10) deposition limit.

The parties will be prepared to discuss at the Scheduling Conference the reasons behind each fact discovery timeframe advanced.  SFFA's and Harvard's respective proposed pretrial schedules are summarized in the below table:

| Event | SFFA's Proposed Date | Harvard's Proposed Date |
|---|---|---|
| Initial Disclosures:  The parties shall serve Initial Disclosures under Fed. R. Civ. P. 26(a). | On or before April 27, 2015. | On or before April 27, 2015. |
| Amendments to the Pleadings: Motions under Fed. R. Civ. P. 15, 19 and 20 filed. | December 31, 2015 | On or before May 30, 2015, after which further amendments will not be permitted without leave of court. |
| Close of Fact Discovery | July 29, 2016 (*i.e.*, 15 months following Scheduling Conference) | December 31, 2015 (*i.e.*, 8 months following Scheduling Conference) |
| Status Conference | April 29, 2016 (3 months prior to close of fact discovery) | September 30, 2015 (3 months prior to close of fact discovery) |
| Expert Discovery | SFFA's trial experts designated and the information required by Fed. R. Civ. P. 26(a)(2) disclosed by September 12, 2016 (45 days following close of fact discovery).<br><br>Harvard's trial experts designated and the information required by Fed. R. Civ. P. 26(a)(2) disclosed by October 27, 2016 (45 days | SFFA's trial experts designated and the information required by Fed. R. Civ. P. 26(a)(2) disclosed by February 15, 2016 (approximately 45 days following close of fact discovery, allowing for weekends and holidays).<br><br>Harvard's trial experts designated and the information required by |

| | | |
|---|---|---|
| | following SFFA's expert disclosures).<br><br>All trial experts deposed during the 45-day period following Harvard's expert disclosures. | Fed. R. Civ. P. 26(a)(2) disclosed by March 31, 2016 (45 days following SFFA's expert disclosures).<br><br>All trial experts deposed during the 90-day period following SFFA's expert disclosures. |
| Dispositive Motions:  Opening Brief Deadline | No later than January 27, 2017 (approximately 45 days following the close of expert discovery).<br><br>Opposing briefs will be filed 21 days after service of dispositive motion, as per Local Rule 56.1.<br><br>Reply briefs will be filed 14 days after service of opposing brief, as per Local Rule 56.1. | No later than May 16, 2016 (approximately 45 days following the close of expert discovery).<br><br>Opposing briefs will be filed 21 days after service of dispositive motion, as per Local Rule 56.1.<br><br>Reply briefs will be filed 14 days after service of opposing brief, as per Local Rule 56.1. |
| Final Pretrial Conference | To be scheduled by the Court. | To be scheduled by the Court. |
| Trial Date | To be scheduled by the Court. | To be scheduled by the Court. |

## V.  SCOPE OF DISCOVERY

### A.  Subjects On Which Discovery May Be Needed

Pursuant to Federal Rule of Civil Procedure 26(f)(3)(B), the parties provide the following subjects on which discovery may be needed.

SFFA

At this time, SFFA anticipates needing to take discovery involving Harvard's review and consideration of approximately 34,000-37,000 undergraduate applicant files per year for a four (4) year time period, aggregate statistical data for numerous undergraduate admissions cycles, and academic reports and records involving certain matriculating students, regarding the following subjects:

- Harvard's use of race and ethnicity within its undergraduate admissions process.

- Harvard's discrimination against Asian American applicants on the basis of race and ethnicity in its undergraduate admissions process.

- Harvard's use of quotas, proportional representation of racial or ethnic groups, and/or racial balancing either in the entering class or in the overall student body.

- Harvard's use of race beyond a "plus factor" and/or beyond filling the last "few places" in its undergraduate admissions process.

- Harvard's failure to employ race-neutral alternatives, in lieu of racial preferences, in its undergraduate admissions process.

- Harvard's policies and procedures (external and internal) concerning the use of race in its undergraduate admissions process.

Harvard

At this time, Harvard anticipates conducting discovery pertaining to the corporate structure and funding of SFFA and discovery regarding its individual members.  In particular, Harvard expects to take discovery on the following subjects:

- SFFA's corporate structure and governance;

- SFFA's formation and leadership;

- SFFA's status as a bona fide membership organization;

- SFFA's sources of funding; and

- The unnamed individuals cited in SFFA's Complaint (*i.e.*, the alleged past and potential future applicants to Harvard and their parents).

**B. Phased Discovery**

SFFA does not propose to conduct phased discovery as bifurcating liability and remedy would, in reality, foster endless disputes over the scope of permissible deposition questions and will be needlessly duplicative as liability and remedy both turn on many of the same factual and legal issues. For purposes of discovery, then, SFFA does not believe separate phases advances an interest in efficiency or judicial economy. SFFA does not oppose, however, bifurcating liability and remedy for purposes of summary-judgment briefing and would not oppose further evaluation of the issue at the pre-trial conference.

Harvard proposes that these proceedings should be phased to address the question of liability before the question of remedy, because the Court's determination of liability issues may resolve the entire case, and bifurcating this case to address the question of liability first, followed by the question of remedy if necessary, would conserve resources of both the parties and the Court. Harvard further reserves the right to seek phased discovery or a stay of discovery should its discovery into SFFA's structure, funding, and membership suggest that SFFA lacks standing to pursue the claims in the Complaint.

**C. Electronically Stored Information**

The parties agree to retain and preserve all electronically stored information relevant to Plaintiff's claims, and represent that individuals likely to have relevant information have been instructed to retain and preserve such information. The parties agree to discuss the form or forms in which to produce electronically stored information, and to present any unresolved disagreements regarding ESI to the Court.

20

**D. Claims of Privilege/Confidentiality**

The parties anticipate potentially significant disagreements regarding claims of privilege or confidentiality as to Harvard's application files for undergraduate applicants (both matriculated and not admitted), as well as the academic reports and records of matriculating undergraduate students.

**E. Discovery Event Limitations**

The parties disagree on whether the scope of discovery should conform to the limitations provided under Local Rule 26.1(c).

**F. Limitations on Expert Discovery.**

The parties agree that the following provisions apply with respect to Expert Discovery (in addition to any limitations set forth in Rule 26):

- Oral and written communications between an expert witness engaged by any party or parties in relation to this case, and the party or parties (or their attorneys or representatives) engaging such expert, which are made in connection with the expert witness' engagement, are not discoverable, except to the extent that the expert relies upon them for his/her opinions offered in this case.

- Drafts of reports of testifying expert witnesses that are prepared in relation to the expert witness' engagement are not discoverable. All notes, memoranda and other writings of such testifying expert witness that are prepared in relation to the expert witness' engagement are not discoverable, except to the extent that the expert consults them while testifying at a deposition or at trial.

**G. Protective Order**

The parties anticipate the production of certain information, documents, and things that

may be claimed to be or deemed to contain sensitive, confidential and/or proprietary information. Before any such production, the parties will engage in discussions in an attempt to file a stipulated Protective Order with the Court that will include procedures for filing documents under seal, if necessary.

## VI.  TRIAL BY MAGISTRATE JUDGE

At present, the parties do not consent to trial before a United States Magistrate Judge.

## VII.  CERTIFICATION

The certifications required by Local Rule 16.1(d)(3) for both parties will be filed concurrently with this Joint Statement.

Respectfully submitted,

STUDENTS FOR FAIR ADMISSION, INC.

By its attorneys,

Date: April 23, 2015

/s/Paul M. Sanford
Paul M. Sanford BBO #566318
Benjamin C. Caldwell BBO #675061
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110
(617) 345-3000
psanford@burnslev.com
bcaldwell@burnslev.com

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
CONSOVOY MCCARTHY PLLC
3033 Wilson Boulevard
Suite 700
Arlington, Virginia 22201
(703) 243.4923
will@consovoymccarthy.com

tom@consovoymccarthy.com
mike@consovoymccarthy.com
(admitted *pro hac vice*)

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE

By their attorneys,

/s/ Felicia H. Ellsworth
Felicia H. Ellsworth BBO #665232
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel:  (617) 526-6687
felicia.ellsworth@wilmerhale.com

Seth P. Waxman (admitted *pro hac vice*)
Paul R.Q. Wolfson (admitted *pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Tel:  (202) 663-6000
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com

Debo P. Adegbile (admitted *pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel:  (212) 295-6717
debo.adegbile@wilmerhale.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/Paul M. Sanford
Paul M. Sanford BBO #566318

24