# EXHIBIT A

No. 14-

IN THE

# Supreme Court of the United States

---

ABIGAIL NOEL FISHER,

*Petitioner,*

*v.*

UNIVERSITY OF TEXAS AT AUSTIN, *et al.*,

*Respondents.*

_____

ON PETITION FOR A WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

## PETITION FOR A WRIT OF CERTIORARI

WILLIAM S. CONSOVOY
THOMAS R. MCCARTHY
J. MICHAEL CONNOLLY
CONSOVOY MCCARTHY PLLC
3033 Wilson Boulevard
Suite 700
Arlington, VA 22201

PAUL M. TERRILL
THE TERRILL FIRM, P.C.
810 W. 10th Street
Austin, TX 78701

BERT W. REIN
  *Counsel of Record*
CLAIRE J. EVANS
BRENDAN J. MORRISSEY
WILEY REIN LLP
1776 K STREET NW
WASHINGTON, DC  20006
(202) 719-7000
brein@wileyrein.com

*Attorneys for Petitioner*

Date: February 10, 2015

257806



COUNSEL PRESS

(800) 274-3321 • (800) 359-6859

*i*

## QUESTION PRESENTED

Whether the Fifth Circuit's re-endorsement of the University of Texas at Austin's use of racial preferences in undergraduate admissions decisions can be sustained under this Court's decisions interpreting the Equal Protection Clause of the Fourteenth Amendment, including *Fisher v. University of Texas at Austin*, 133 S. Ct. 2411 (2013).

*ii*

## PARTIES TO THE PROCEEDING
## AND RULE 29.6 STATEMENT

Petitioner in this case is Abigail Noel Fisher.

Respondents are the University of Texas at Austin; Pedro Reyes, Executive Vice Chancellor for Academic Affairs in His Official Capacity; Daniel H. Sharphorn, Vice Chancellor and General Counsel in His Official Capacity; William Powers, Jr., President of the University of Texas at Austin in His Official Capacity; Board of Regents of the University of Texas System; R. Steven Hicks, as Member of the Board of Regents in His Official Capacity; William Eugene Powell, as Member of the Board of Regents in His Official Capacity; Ernest Aliseda, as Member of the Board of Regents in His Official Capacity; Alex M. Cranberg, as Member of the Board of Regents in His Official Capacity; Brenda Pejovich, as Member of the Board of Regents in Her Official Capacity; Robert L. Stillwell, as Member of the Board of Regents in His Official Capacity; Wallace L. Hall, Jr., as Member of the Board of Regents in His Official Capacity; Paul L. Foster, as Chair of the Board of Regents in His Official Capacity; Jeffery D. Hildebrand, as Member of the Board of Regents in His Official Capacity; Susan Kearns, Interim Director of Admissions in Her Official Capacity; William H. McRaven, Chancellor of the University of Texas System in His Official Capacity.

Plaintiff-Appellant below Rachel Multer Michalewicz is being served as a respondent herein.

*iii*

## TABLE OF CONTENTS

*Page*

QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . . . .i

PARTIES TO THE PROCEEDING
    AND RULE 29.6 STATEMENT . . . . . . . . . . . . . . ii

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . .iii

TABLE OF APPENDICES . . . . . . . . . . . . . . . . . . . . . .v

TABLE OF CITED AUTHORITIES . . . . . . . . . . . . . vii

PETITION FOR A WRIT OF CERTIORARI. . . . . . . .1

OPINIONS BELOW. . . . . . . . . . . . . . . . . . . . . . . . . . . .2

JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

CONSTITUTIONAL PROVISION INVOLVED. . . . . .3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . .3

   A.  UT's Use Of Race In Admissions Decisions . . . .3

   B.  Procedural History And This Court's Ruling. . .8

   C.  Proceedings On Remand . . . . . . . . . . . . . . . . . . .11

*iv*

*Table of Contents*

*Page*

REASONS FOR GRANTING THE PETITION.....13

I.   The Court Should Grant Certiorari Because The Fifth Circuit Did Not Follow Its Instruction To Apply Strict Scrutiny On Remand..............................14

II.  The Court Should Grant Certiorari Because UT's Newly Minted "Qualitative" Diversity Rationale Cannot Survive Strict Scrutiny...........................19

     A.  UT's "Qualitative" Interest Is Not Clear, Legitimate, Or Narrowly Tailored. ......19

     B.  UT's "Qualitative" Interest Is Not A Last Resort Necessary To Achieve An Educational Goal That This Court Has Found Compelling.......25

III. Review Is Essential To Permit Strict Scrutiny To Play Its Intended Role In Ensuring That Racial Preferences Do Not Trample The Right To Equal Protection......29

CONCLUSION ................................33

*v*

## TABLE OF APPENDICES

*Page*

APPENDIX A — OPINION OF THE UNITED
STATES COURT OF APPEALS FOR THE
FIFTH CIRCUIT, DATED JULY 15, 2014 . . . . . .1a

APPENDIX B — ORDER OF THE
UNITED STATES COURT OF
APPEALS FOR THE FIFTH
CIRCUIT, DATED JULY 15, 2014. . . . . . . . . . . .91a

APPENDIX C — ORDER DENYING
PETITION FOR REHEARING EN BANC
OF THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT,
DATED NOVEMBER 12, 2014 . . . . . . . . . . . . . . .94a

APPENDIX D— OPINION OF THE SUPREME
COURT OF THE UNITED STATES, DATED
JUNE 24, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . . . .99a

APPENDIX E — OPINION OF THE
UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT,
DATED JANUARY 18, 2011 . . . . . . . . . . . . . . . .147a

APPENDIX F — OPINION AND ORDER
OF THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT
OF TEXAS, AUSTIN DIVISION,
DATED AUGUST 17, 2009. . . . . . . . . . . . . . . . . .261a

*vi*

*Table of Appendices*

*Page*

APPENDIX G — ORDER DENYING PETITION FOR REHEARING EN BANC OF THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT, DATED JUNE 17, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .318a

*vii*

## TABLE OF CITED AUTHORITIES

*Page*

**Cases**

*Adarand Constructors, Inc. v. Peña,*
    515 U.S. 200 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . .15, 21

*Calhoun v. United States,*
    133 S. Ct. 1136 (2013) . . . . . . . . . . . . . . . . . . . . . . . . .22

*City of Richmond v. J.A. Croson Co.,*
    488 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . . . *passim*

*CLS v. Martinez,*
    561 U.S. 661 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Fisher v. University of Texas at Austin,*
    133 S. Ct. 2411 (2013) . . . . . . . . . . . . . . . . . . . . . . . . .2

*Grutter v. Bollinger,*
    539 U.S. 306 (2003) . . . . . . . . . . . . . . . . . . . . . . *passim*

*Heller v. Doe,*
    509 U.S. 312 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Icicle Seafoods, Inc. v. Worthington,*
    475 U.S. 709 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . .18

*In re Sanford Fork & Tool Co.,*
    160 U.S. 247 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Maine v. Taylor,*
    477 U.S. 131 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . .18

*viii*

*Cited Authorities*

*Page*

*Parents Involved in Community Schools v.*
*Seattle School District No. 1,*
551 U.S. 701 (2007). . . . . . . . . . . . . . . . . . . . . .27, 28, 30

*Planned Parenthood of Southeastern Pennsylvania v.*
*Casey,*
510 U.S. 1309 (1994) . . . . . . . . . . . . . . . . . . . . . . . . .15

*Plessy v. Ferguson,*
163 U.S. 537 (1896). . . . . . . . . . . . . . . . . . . . . . . . .29-30

*Regents of University of California v. Bakke,*
438 U.S. 265 (1978). . . . . . . . . . . . . . . . . . . . . . . .10, 27

*Schuette v. BAMN,*
134 S. Ct. 1623 (2014) . . . . . . . . . . . . . . . . . . . .21, 29, 32

*Shaw v. Hunt,*
517 U.S. 899 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . .16

*United States Railroad Retirement Board v. Fritz,*
449 U.S. 166 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . .16

*United States v. Virginia,*
518 U.S. 515 (1996) . . . . . . . . . . . . . . . . . . . . . . . .16, 24

*Wygant v. Jackson Board of Education,*
476 U.S. 267 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . .15

ix

*Cited Authorities*

*Page*

**Statutes and Other Authorities**

10A Charles Alan Wright & Arthur R. Miller,
    Federal Practice & Procedure, § 2716
    (3d ed. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

28 U.S.C. § 1254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*Brief of Respondents, Fisher v.*
    *University of Texas at Austin,*
    No. 11-345 (Aug. 6, 2012) . . . . . . . . . . . . . . . . . . . . . . .9

Dr. Larry Faulkner, *The "Top 10 Percent Law" is*
    *Working for Texas* (Oct. 19, 2000) . . . . . . . . . . . . . . . .5

*Supplemental Brief for Appellees, Fisher v.*
    *University of Texas at Austin,*
    No. 09-50822 (5th Cir. Oct. 25, 2013). . . . . . . . . . . .11

Supreme Court Rule 10(c). . . . . . . . . . . . . . . . . . . . . . .13

Tex. Educ. Code § 51.803 . . . . . . . . . . . . . . . . . . . . . .4, 7

*The University of Texas at Austin reacts to*
    *the Supreme Court's affirmative action*
    *decisions* (June 23, 2003) . . . . . . . . . . . . . . . . . . . . . .5

U.S. Const. amend. XIV, § 1. . . . . . . . . . . . . . . . . . . . . .3

1

## PETITION FOR A WRIT OF CERTIORARI

Petitioner Abigail Noel Fisher respectfully submits this petition for a writ of certiorari to review the judgment of the United States Court of Appeals for the Fifth Circuit. The Court's prior decision in this case ("*Fisher I*") reaffirmed that traditional strict scrutiny applies when a university's use of racial preferences in its admissions process is challenged. The Fifth Circuit's initial ruling instead deferred to the University of Texas at Austin ("UT"). The Court vacated that ruling and remanded the case to the Fifth Circuit to determine whether UT had offered sufficient record evidence to satisfy that exacting standard.

A panel of the Fifth Circuit, this time over the vigorous dissent of Judge Garza, again failed to apply traditional strict scrutiny. Essentially ignoring the Court's admonition to hold UT to the demanding burden articulated in its Equal Protection Clause precedent, the Fifth Circuit approved UT's program under what amounts to a rational-basis analysis. The panel deferred to UT's post hoc speculation that racial preferences served a "qualitative" diversity interest that was never studied, evaluated, or articulated when UT added racial preferences to its admissions program. Worse still, the interest is based on demeaning and unfounded stereotypes about less-privileged applicants from minority communities. Without any evidence that such an interest is educationally compelling, that consideration of race is necessary to advance it, that UT's use of race is narrowly tailored to achieve it, or that the end point of such an amorphous and unbounded pursuit could ever be subject to judicial review, the Fifth Circuit held that UT's use

2

of racial preferences somehow survived the demanding scrutiny that *Fisher I* mandates.

If not reviewed, the Fifth Circuit's decision will signal to universities and courts throughout the nation that strict scrutiny is a *pro forma* exercise and that *Fisher I* is a green light for racial preferences in admissions decisions. The Court should grant the petition, strike down UT's unjustified use of race, and once again make clear that the Equal Protection Clause does not permit the use of racial preferences in admissions decisions where, as here, they are neither narrowly tailored nor necessary to meet a compelling, otherwise unsatisfied, educational interest.

## OPINIONS BELOW

The opinion of the United States Court of Appeals for the Fifth Circuit is reported at 758 F.3d 633 and is reproduced in the Appendix ("App.") at 1a-90a. The Fifth Circuit's order denying rehearing en banc is reported at 771 F.3d 274 and is reproduced at App. 94a-98a. The Fifth Circuit's earlier opinion is reported at 631 F.3d 213 and is reproduced at App. 147a-260a. The Fifth Circuit's earlier order denying rehearing en banc and the opinion dissenting from the denial of rehearing en banc are reported at 644 F.3d 301 and are reproduced at App. 318a-330a. This Court's opinion vacating the Fifth Circuit's earlier opinion is reported at 133 S. Ct. 2411 and is reproduced at App. 99a-146a. The opinion of the United States District Court for the Western District of Texas is reported at 645 F. Supp. 2d 587 and is reproduced at App. 261a-317a.

3

## JURISDICTION

The United States Court of Appeals for the Fifth Circuit rendered its decision on July 15, 2014. App. 91a. A timely petition for rehearing en banc was denied on November 12, 2014. App. 94a. This Court has jurisdiction under 28 U.S.C. § 1254(a).

## CONSTITUTIONAL PROVISION INVOLVED

The Fourteenth Amendment to the United States Constitution provides in relevant part:

> No State shall … deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

## STATEMENT OF THE CASE

### A.  UT's Use Of Race In Admissions Decisions

The Court previously described the evolution of UT's admissions program from one that considered race as an independent factor to one that generated substantial minority admissions through race-neutral measures to the system challenged in this case where race is again explicitly and pervasively considered in admissions and placement decisions. App. 100a-104a.

Under the first system, which operated prior to 1997, admission to UT turned on "two factors: a numerical score reflecting an applicant's test scores and academic performance in high school (Academic Index or AI), and

4

the applicant's race." App. 100-101a. In 1997, UT adopted
the second system in response to a Fifth Circuit decision
invalidating UT's use of racial preferences under the Equal
Protection Clause. App. 101a. Admission to UT under the
new race-neutral system still turned on two factors, but
a Personal Achievement Index (or "PAI") replaced racial
preferences. *Id.* The PAI measured a "student's leadership
and work experience, awards, extracurricular activities,
community service, and other special circumstances," *id.*,
including some that "disproportionately affect minority
candidates, [such as] the socio-economic status of the
student's family, language other than English spoken at
home, and whether the student lives in a single-parent
household," App. 267a. UT coupled its AI/PAI system
with expanded minority outreach programs. App. 101a.
These race-neutral efforts resulted in a 1997 entering
class that was 15.3% African-American and Hispanic.
App. 267a-268a.

A year later, the Texas Legislature supplemented
the AI/PAI system with the Top 10% Law, which grants
automatic admission to in-state students in the top ten
percent of their high school class. App. 101a-102a; *see also*
H.B. 588, Tex. Educ. Code § 51.803 (1997). The AI/PAI
calculations retained a vital role in UT's process, however,
because they determined admission for students that
were not automatically admitted under the Top 10% Law
and determined placement in schools and majors for all
applicants, including those admitted pursuant to the Top
10% Law. App. 102a.

As this Court noted, UT's "revised admissions
process, coupled with the operation of the Top Ten Percent
Law, resulted in a more racially diverse environment

5

at the University." App. 102a. In 2004, without racial preferences, UT enrolled a freshman class that was 21.4% African-American and Hispanic; in 1996, with racial preferences, UT had enrolled a freshman class that was 18.6% African-American and Hispanic. *Id.* And importantly, the race-neutral system produced students that succeeded academically. According to UT, minorities "earned higher grade point averages … than in 1996 and [had] higher retention rates."[1]

In spite of the success of its race-neutral program, UT announced on the day that this Court decided *Grutter v. Bollinger*, 539 U.S. 306 (2003), that it would "modify its admissions procedures" to incorporate "affirmative action."[2] Shortly thereafter, UT created a "Proposal To Consider Race and Ethnicity in Admissions" ("Proposal"), which gave "formal expression" to UT's "plan to resume race-conscious admissions." App. 102a.

As this Court recognized, UT's Proposal advocated a return to racial preferences "in substantial part" because "a study of a subset of undergraduate classes containing between 5 and 24 students ... showed that few of these classes had significant enrollment by members of racial minorities." App. 103a. UT also relied on "what it

---

1. Dr. Larry Faulkner, *The "Top 10 Percent Law" is Working for Texas* (Oct. 19, 2000), *available at* http://www.utexas.edu/president/past/faulkner/speeches/ten_percent_101900.html (last visited Feb. 9, 2015).

2. *The University of Texas at Austin reacts to the Supreme Court's affirmative action decisions* (June 23, 2003), *available at* http://www.utexas.edu/news/06/23/nr_affirmativeaction/ (last visited Feb. 9, 2015).

6

called 'anecdotal' reports from students regarding 'their interaction in the classroom,'" *id.*, and on "significant differences between the racial and ethnic makeup of the University's undergraduate population and the state's population," App. 292a. The Proposal did not include any analysis of the background or individual characteristics of the minority admissions that its race-neutral system produced. It instead faulted the race-neutral system for not ensuring greater racial diversity at the classroom level (without investigating any other reasons—such as student choice—for that problem) and assumed that increasing total minority admissions by considering race would ameliorate the problem. App. 291a-292a. UT's own study, however, showed that its measure of classroom diversity decreased while minority enrollment was increasing steadily between 1996 and 2002. App. 293a.

The Texas Board of Regents approved UT's proposal to add racial preferences to the PAI calculation in fall 2004. App. 103a. Race was added to the first page of each admissions file, and "reviewers are aware of it throughout the evaluation." App. 280a. Every applicant is thus labeled by race, and each can be affected by the racial preferences because AI/PAI scores determine admissions for non-Top 10% Law applicants and placement in schools and majors for all applicants. App. 102a-103a.

Notwithstanding the prevalence of race in its revised admissions program, adding race to the AI/PAI calculation has produced negligible increases in minority enrollment. At the admissions stage, the only applicants potentially affected by race were non-Top 10% students.[3]

_____
3. In 2008, roughly 81% of the class was automatically admitted under the Top 10% Law, significantly reducing the pool of applicants that can be admitted based on race. App. 3a. During

7

The vast majority of those students would have been admitted irrespective of racial preferences. A comparison of the percentage of non-Top Ten "underrepresented" minority students enrolled when race was not part of the admissions calculus to the percentage of non-Top Ten "underrepresented" minority students enrolled in 2008 illustrates the point. From 1998 to 2004, when race was not a factor in admissions, an average of 15.2% of the non-Top Ten Texas enrollees each year were African-American or Hispanic. In 2008, 17.9% of the non-Top Ten Texas enrollees were African-American or Hispanic. Even if this percentage increase were entirely attributable to UT's consideration of race rather than changing demographics of the applicant pool or other AI and PAI factors, UT's consideration of race would have been decisive for only 33 African-American and Hispanic students combined. That represented approximately 0.5% of the 6,322 in-state students enrolled in UT's 2008 freshman class, and a far lower percentage of the tens of thousands of in-state applicants that year, all of whom were classified by race.

The post-discovery summary judgment record does not include any data showing the background or individual characteristics of minorities admitted because of the Top 10% Law or through AI/PAI review. It does show, however, that "underrepresented" minority enrollment under the Top 10% Law continued to increase through 2008, allowing UT to enroll a 2008 in-state class that was 25.5% African American and Hispanic. App. 19a.

---

this litigation's pendency, the Texas Legislature amended the Top 10% Law to limit the number of applicants admitted through this path at 75% of UT's overall freshman class. *See* Tex. Educ. Code § 51.803(a-1). Under this amendment, the 75% cap will be lifted if a court ruling prohibits UT from using race as a factor in undergraduate admissions. *See id.* § 51.803(k)(1).

8

### B.  Procedural History And This Court's Ruling

Petitioner filed this suit under the Equal Protection Clause and 42 U.S.C. § 1983 after she was denied admission to the entering class of 2008. App. 2a-3a. UT defended its system as equivalent to the system affirmed in *Grutter* and relied on its Proposal to argue that its efforts to increase minority enrollment properly pursued a compelling educational interest in reducing demographic disparities and increasing diversity in small classrooms. App. 290a-294a. The district court agreed, found UT's use of race consistent with *Grutter*, and granted summary judgment to UT. App. 315a.

The Fifth Circuit affirmed, holding that UT was "due deference" on its good-faith judgment that race-based policies were necessary to increase minority enrollment because of the demographic and classroom diversity issues and finding that UT's use of race was narrowly tailored because it resembled the system approved in *Grutter*. App. 147a-260a. Judge King concurred to emphasize that no party to the litigation had challenged "the validity or the wisdom of the Top Ten Percent Law." App. 218a. Judge Garza specially concurred, regretfully agreeing that *Grutter* required deference to UT. App. 218a-260a. Absent deference, Judge Garza saw no constitutional justification for UT's program, which classified every applicant by race yet "had an infinitesimal impact on critical mass in the student body as a whole." App. 253a.

The Fifth Circuit denied rehearing en banc. App. 318a-330a. In dissent, then-Chief Judge Jones objected to the deferential review provided by the panel and concluded that UT's system could not be sustained under traditional

9

strict scrutiny. App. 320a-330a. She found that UT's use of racial preferences was "gratuitous" as they produced a "tiny" increase in minority admissions. App. 328a. Judge Jones further concluded that UT's classroom diversity rationale was "without legal foundation, misguided and pernicious to the goal of eventually ending racially conscious programs." App. 330a.

This Court granted certiorari. In its merits brief and at oral argument, UT abandoned its demographic and classroom diversity interests in favor of an entirely new interest in "diversity within racial groups." Br. of Respondents 33, *Fisher v. Univ. of Texas at Austin*, No. 11-345 (Aug. 6, 2012) ("Resp. Br.").[4] Instead of arguing (as it had previously) that UT needed to use racial preferences to increase minority enrollment, UT argued that it needed racial preferences so that it could enroll minorities with the characteristics it prefers. *Id.* at 33-34. For example, UT argued that racial preferences would allow it to enroll minority students from "integrated high school[s]" and more affluent socio-economic backgrounds over those who are the "first in their families to attend college." *Id.* Doing so, UT claimed, would "dispel stereotypical assumptions" instead of "reinforc[ing]" them. *Id.* at 34.

This Court vacated the Fifth Circuit's deferential decision and remanded the case for review of the summary

---

4.   Regarding demographics, UT took the position that it "does not use its admissions process to work backwards toward any demographic target—or, indeed, any target at all." Resp. Br. 20; *id.* at 28-29. Regarding classroom diversity, UT claimed to have "never asserted a compelling interest in any specific diversity in every single classroom." Oral Arg. Tr. 34:20-22; *see also* Resp. Br. 39 ("UT's objective was far broader than the interest in 'classroom diversity' attacked by petitioner.").

10

judgment record under traditional strict scrutiny to determine "whether the University has offered sufficient evidence that would prove that its admissions program is narrowly tailored to obtain the educational benefits of diversity." App. 114a. The Court emphasized that the review on remand must look to "th[e] record—and not 'simple ... assurances of good intention.'" *Id.* (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989)). This is because "[s]trict scrutiny is a searching examination, and it is [UT] that bears the burden to prove 'that the reasons for any racial classification are clearly identified and unquestionably legitimate.'" App. 108a (quoting *Croson*, 488 U.S. at 505).

The Court restated the steps required by strict scrutiny review under prevailing case law. App. 108a-109a. In so doing, the Court emphasized that "[s]trict scrutiny requires the university to demonstrate with clarity that its 'purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary … to the accomplishment of [that] purpose.'" App. 107a (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 305 (1978)). The only academic judgment to which a court may defer is "that a diverse student body would serve its educational goals." App. 110a. Even then, deference is not unlimited; "[a] university is not permitted to define diversity as some specified percentage of a particular group merely because of its race or ethnic origin …. That would amount to outright racial balancing, which is patently unconstitutional." *Id.* (quotations and citations omitted).

11

## C.  Proceedings On Remand

On remand, the Fifth Circuit again affirmed the grant of summary judgment to UT, this time relying on UT's newfound interest in enrolling a sufficient number of minorities from "integrated" high schools with more favorable socio-economic backgrounds. App. 31a-40a.[5] The Fifth Circuit found that UT's new approach "is not a further search for numbers but a search for students of unique talents and backgrounds." App. 40a. UT disclaimed the interest in seeking the demographic parity and classroom diversity it had relied on in its Proposal and through the initial round of litigation. Indeed, UT went so far as to tell the Fifth Circuit that the "objectives" of "demographic parity" and "classroom diversity" had been "concocted by Fisher." Supplemental Brief for Appellees 39, *Fisher v. University of Texas at Austin*, No. 09-50822 (5th Cir. Oct. 25, 2013).

The Fifth Circuit found that racial preferences were constitutionally justified by UT's claimed need to enroll under-represented minority students from majority-white high schools who, among other things, have "demonstrated qualities of leadership and sense of self" that were purportedly lacking in the minority students admitted pursuant to the Top 10% Law. App. 39a. Yet the record contained no evidence or evaluation of the background of students admitted under the Top 10% Law capable of supporting this finding. The Fifth Circuit just speculated

---

5.  On remand, UT raised the same standing argument it had raised before this Court. Resp. Br. 16-17 n.6. The majority held the argument was foreclosed by the mandate rule. App. 8a-10a. Judge Garza rejected the standing argument on the merits. App. 58a-61a.

12

based on SAT averages and its own demographic research that students admitted under the Top 10% Law do not have the "unique talents and higher test scores," App. 48a, required to "enrich the diversity of the student body," App. 40a, because their admission is "measured solely by class rank in largely segregated schools," App. 49a, that do not offer "the quality of education available to students at integrated high schools," App. 35a. The Fifth Circuit further held that UT's system is narrowly tailored because it does not operate as a quota, affects few admissions decisions, and furthers an interest that cannot be satisfied through the race-neutral Top 10% Law, which depends "upon segregated schools to produce minority enrollment." App. 51a.

Judge Garza dissented. App. 57a-90a. In his view, the Fifth Circuit had again "defer[red] impermissibly to [UT's] claims" and, absent deference, UT could not prevail. App. 57a. Judge Garza specifically rejected UT's new claim that racial preferences are required to "promot[e] the *quality* of minority enrollment—in short, diversity within diversity" by identifying "the most 'talented, academically promising, and well-rounded' minority students." App. 73a.

First, Judge Garza found that UT did not establish that such an interest is compelling. The "stated ends are too imprecise to permit the requisite strict scrutiny analysis," App. 74a, because there is no way for a court "to determine when, if ever, [this] goal (which remains undefined) for qualitative diversity will be reached," App. 78a.

13

Second, Judge Garza chastised the majority for failing to require evidence from UT that racial preferences are needed to further it, even if the interest were cognizable. UT did not investigate, evaluate, or "assess whether Top Ten Percent Law admittees exhibit sufficient diversity within diversity" before "deploying racial classifications to fill the remaining seats." App. 74a. Instead, UT created a litigation position that requires the court "to *assume* that minorities admitted under the Top Ten Percent Law ... are somehow more homogenous, less dynamic, and more undesirably stereotypical than those admitted under holistic review." App. 75a. That assumption alone is "alarming" as it "embrace[s] the very ill that the Equal Protection Clause seeks to banish" by stereotyping students solely because they reside in "majority-minority communities." App. 76a. It also is unsupported by any "evidence in the record," which strict scrutiny requires. App. 75a.

The Fifth Circuit denied rehearing en banc by a vote of 10-5. App. 95a. Joined by four dissenting judges, Judge Garza reiterated the objections to UT's program that he detailed in his panel dissent. *Id.*

## REASONS FOR GRANTING THE PETITION

Certiorari should be granted because the Fifth Circuit "has decided an important federal question in a way that conflicts with relevant decisions of this Court." SUP. CT. R. 10(c). This Court acknowledged the case's importance when it granted review the first time. The case has only gained importance since then, as the Fifth Circuit's decision on remand overrides this Court's *Fisher I* mandate and strict scrutiny precedent by endorsing an

14

essentially unreviewable post hoc "qualitative" diversity rationale that is premised on the very racial stereotypes that the Equal Protection Clause banished. The Court should grant the petition and reverse the Fifth Circuit's judgment.

## I. The Court Should Grant Certiorari Because The Fifth Circuit Did Not Follow Its Instruction To Apply Strict Scrutiny On Remand.

This Court's decision in *Fisher I* could not have been more clear. On remand, the Fifth Circuit was to review the record under the traditional and demanding constraints of strict scrutiny. App. 114a-115a. The Court reiterated the ground rules of strict scrutiny at length and in painstaking detail. App. 108a-112a. And the Court emphasized that "[s]trict scrutiny must not be strict in theory but feeble in fact." App. 115a. The Fifth Circuit did not follow the Court's instructions.

This Court explicitly instructed the Fifth Circuit to conduct strict-scrutiny review without deferring to UT. App. 110a-111a. "Strict scrutiny does not permit a court to accept a school's assertion that its admissions process uses race in a permissible way without a court giving close analysis to the evidence of how the process works in practice." App. 113a. As Judge Garza thoroughly explained, however, deference pervades the remand opinion. App. 57a, 68a, 89a, 90a (Garza, J., dissenting). Shifting from rational-basis terminology to the rhetoric of strict scrutiny is not enough to satisfy *Fisher I* or any other strict-scrutiny precedent from this Court. The reviewing "court's actual analysis must demonstrate that 'no deference' has been afforded." App. 68a (Garza, J., dissenting).

15

There can be no question that the Fifth Circuit's decision "is squarely at odds with the central lesson of *Fisher*." App. 57a (Garza, J., dissenting). At every turn, the majority was "persuaded" by UT's circular legal arguments, post hoc rationalizations for its decision to reintroduce racial preferences, and unsupported factual assertions. *See infra* at 17-18. "[T]his Court has a special interest in ensuring that courts on remand follow the letter and spirit of [its] mandates[.]" *Planned Parenthood of Se. Pa. v. Casey*, 510 U.S. 1309, 1311 (1994) (Souter, J.) (citing *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255-56 (1895)). That institutional interest is triggered here as the Fifth Circuit applied strict scrutiny in name only.

More specifically, this Court directed the Fifth Circuit to seek "additional guidance … in the Court's broader equal protection jurisprudence" as "[t]he higher education dynamic does not change the narrow tailoring analysis of strict scrutiny applicable in other contexts." App. 113a-114a (citing precedent including *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995), *Croson*, 488 U.S. 469, and *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986)). But not only are those decisions "entirely absent" from the opinion, App. 70a (Garza, J., dissenting), the Fifth Circuit contravened them in multiple ways. Instead of forcing UT to defend its use of racial preferences under the heavy burden of strict scrutiny, the Fifth Circuit once again allowed UT to make the kind of arguments only available in rational-basis review.

First, strict scrutiny demands that UT's "justification" for reintroducing racial preferences in 2004 and for using race to Ms. Fisher's detriment in 2008 be "genuine, not hypothesized or invented post hoc in response to

16

litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996); *see also Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) ("[T]he State must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification.") (citation omitted). Under rational-basis review, by contrast, it is "constitutionally irrelevant [what] reasoning in fact underlay the … decision." *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) (citation and quotations omitted).

The Fifth Circuit did not hold UT to the Proposal's demographic parity and classroom diversity justifications; it permitted UT to replace them with the "qualitative" rationale raised for the first time on appeal. It is clear why UT, facing strict scrutiny for the first time, would have abandoned the actual reasons for its decision to reintroduce racial preferences. App. 320a-330a (Jones, J., dissenting from the denial of rehearing en banc); App. 218a-260a (Garza, specially concurring); App. 78a-81a (Garza, J., dissenting). That the handwriting was on the wall, however, neither licensed UT to defend its program on a post hoc rationale nor empowered the Fifth Circuit to countenance that prohibited tactic. UT's decision to rely exclusively on a rationale that was invented years after Ms. Fisher applied and was rejected from UT alone should have resulted in judgment in her favor. The Fifth Circuit's contrary approach violated the established rules of strict scrutiny.

Second, strict scrutiny required the Fifth Circuit to ensure that UT "at the time it acted had a strong basis in evidence to support [its] conclusion" that the use of race was necessary to achieve its asserted goal of "qualitative" diversity. *Shaw*, 517 U.S. at 915. This Court

17

thus instructed the Fifth Circuit to "assess whether [UT] has offered sufficient evidence that would prove that its admissions program is narrowly tailored to obtain the educational benefits of diversity." App. 114a. If rational-basis review applied, by contrast, UT would have been under "no obligation to produce evidence to sustain [the] rationality" of the classification as the "burden is on the one attacking [it] to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller v. Doe*, 509 U.S. 312, 320-21 (1993).

Not surprisingly, UT could point to *no* record evidence, let alone strong evidence, to substantiate its asserted unmet need for "qualitative" diversity that was invented when the case was on appeal. The studies underlying the Proposal tried to examine whether UT was failing to meet its demographic and classroom diversity goals; no study attempted to measure whether UT was failing to meet an interest in "qualitative" diversity. Nor did UT produce such evidence during discovery or submit any other contemporaneous evidence to substantiate this interest during the summary judgment proceedings. Accordingly, even setting aside the fact that the "qualitative" diversity interest is an improper post hoc rationale, the lack of any record evidence showing the need to advance it by racial preferences also should have meant judgment in Ms. Fisher's favor.

Refusing to strike down UT's use of race in 2008 for lack of record evidence, the Fifth Circuit "venture[d] far beyond the summary judgment record," App. 75a n.15 (Garza, J., dissenting), and conducted its own research in an attempt to engineer a factual basis for UT's "qualitative" diversity goal, *see* App. 23a-24a n.70, App.

18

25a-26a n.73, App. 32a-33a nn. 97-98, App. 34a-38a nn. 101, 103-120, App. 43a nn. 123-26. But not only was the appellate factfinding fruitless, *see infra* at 21-25, it violated the Court's instructions, which directed the Fifth Circuit to "assess whether *the University has offered* sufficient evidence" to sustain the admissions program on remand, App. 114a (emphasis added); *see also id.* (directing the Court of Appeals to review "this record").[6] UT had every opportunity to develop the record. The appeal needed to be decided based only upon that evidence. *CLS v. Martinez*, 561 U.S. 661, 676-78 (2010). That record did not contain any constitutionally acceptable rationale for the use of racial preferences in 2008 or any evidence substantiating the need to use race in pursuit of a post hoc "qualitative" diversity rationale. The Fifth Circuit thus failed to fulfill its responsibility to strictly scrutinize UT's program in this respect as well.

At base, the Fifth Circuit's failure to follow this Court's instruction to apply strict scrutiny on remand strikes a blow at the heart of the Fourteenth Amendment. As the Court has explained many times, "because racial characteristics so seldom provide a relevant basis for disparate treatment, the Equal Protection Clause demands that racial classifications be subjected to the

---

6. The Fifth Circuit's factfinding expedition also violated basic rules of appellate procedure. "[F]actfinding is the basic responsibility of the district courts, rather than the appellate courts." *Maine v. Taylor*, 477 U.S. 131, 144-45 (1986). On summary judgment, therefore, the court of appeals "can consider only those papers that were before the trial court." 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE, §2716 (3d ed. 1998); *see also Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

19

most rigid scrutiny." App. 108a (citations, quotations, and alterations omitted). The Court should grant review to ensure that this important promise is kept.

## II. The Court Should Grant Certiorari Because UT's Newly Minted "Qualitative" Diversity Rationale Cannot Survive Strict Scrutiny.

The Court should review this case for an additional important reason: the Fifth Circuit's decision accepted a novel "qualitative" diversity interest that cannot withstand rigorous judicial review and is not the educational interest in enrolling a "critical mass" of minority students that *Grutter* found compelling.

### A. UT's "Qualitative" Interest Is Not Clear, Legitimate, Or Narrowly Tailored.

The Fifth Circuit's failure to follow the ground rules for strict scrutiny enabled it to endorse a novel "qualitative" diversity interest that foreclosed rigorous judicial review. UT should have borne the "burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." App. 108a (quotations and alterations omitted). Had the Fifth Circuit followed that instruction it would have discovered that UT's "qualitative" diversity rationale is neither.

A "qualitative" diversity interest is not a "clearly identified" educational goal that allows a court to determine whether "the means chosen by the University to attain diversity are narrowly tailored to that goal." App. 110a. UT "has not provided any concrete targets for admitting more minority students possessing these

20

unique qualitative-diversity characteristics—that is, the 'other types of diversity' beyond race alone." App. 74a (Garza, J., dissenting). Nor has it defined "[a]t what point ... this qualitative diversity target [would] be achieved." *Id.* Indeed, UT "offers no method for this court to determine when, if ever, its goal (which remains undefined) for qualitative diversity will ever be reached." App. 78a (Garza, J., dissenting). As Judge Garza put it, UT's "qualitative" diversity interest is just "too imprecise to permit the requisite strict scrutiny analysis." App. 74a.

The Fifth Circuit failed in its attempt to help UT define what its interest actually is and when it would be achieved. The majority disclaimed any quantitative evaluation of the interest because, in its view, UT's interest is "*not* a further search for numbers but a search for students of unique talents and backgrounds." App. 40a (emphasis added). Yet the majority found racial preferences necessary because "numbers" while "not controlling" are "relevant," and "minority representation ... remained largely stagnant ... rather than moving towards a critical mass of minority students." App. 48a, 30a. The majority never was able to explain precisely why enrollment numbers have constitutional relevance to a qualitative interest that is "not a further search for numbers" and has "no fixed upper bound" or "minimum threshold." App. 46a. As a consequence, the majority did not (and could not) offer a cogent response to Judge Garza's charge that the "qualitative" diversity interest has no termination point because it is in the subjective control of University administrators.

*Fisher I* did not demand "clarity" from UT for form's sake. App. 107a. Clarity of purpose "ensures that the means

21

chosen 'fit' [the] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493. Accepting UT's amorphous, unbounded, and subjective "qualitative" interest as compelling would amount to the very same deference to UT's use of racial preferences the Fifth Circuit first accorded and this Court rejected. If UT is permitted to determine for itself when its "qualitative" admissions goals are met, there will be no way to "'smoke out'" whether this program is "illegitimate." *Adarand*, 515 U.S. at 226. UT instead will have the absolute discretion to use race for as long as it wishes. Any resemblance between strict scrutiny and such a legal regime is purely coincidental.

Rigorous judicial review would have revealed that UT's "qualitative" diversity interest is in fact illegitimate. It depends on an assumption that, as a group, minorities admitted through the Top 10% Law "are inherently limited in their ability to contribute to the University's vision of a diverse student body," App. 75a, merely because many come from "'majority-minority communities,'" App. 77a (Garza, J., dissenting). That rank stereotyping is the "very ill that the Equal Protection Clause seeks to banish." App. 76a (Garza, J., dissenting). Just as "[i]t cannot be entertained as a serious proposition that all individuals of the same race think alike," *Schuette v. BAMN*, 134 S. Ct. 1623, 1634 (2014), it cannot be assumed that all minorities admitted via the Top 10% Law uniformly lack the "unique talents and backgrounds" UT claims to value, App. 40a. UT may be willing to conclude that this entire body of minority students lacks a "skill set" UT needs in order to achieve some version of diversity based on nothing more than minor differences in average SAT scores and

22

the fact that many did not matriculate from "majority white" high schools. App. 53a. But the Equal Protection Clause does not allow UT to "substitute racial stereotype for evidence, and racial prejudice for reason." *Calhoun v. United States*, 133 S. Ct. 1136, 1137 (2013) (Sotomayor, J., respecting denial of certiorari).

Even assuming UT's qualitative diversity goal were legitimate, which it is not, UT still could not meet its narrow-tailoring burden. Strict scrutiny requires that UT show that its interest in "qualitative" diversity cannot be satisfied through race-neutral means. *See* App. 111a-112a ("The reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity."). Here, then, UT must show that the "qualitative" characteristics it seeks are uniquely present among minority applicants that receive racial preferences and gain admission through the "holistic" AI/PAI process because of them. Yet nothing in the record shows that "qualitative diversity is absent among the minority students admitted" through the operation of the race-neutral Top 10% Law. App. 74a (Garza, J., dissenting). Nor does the record even show "that any minority students admitted under holistic review come from majority-white schools" where UT claims the needed characteristics are developed. App. 77a n.17 (Garza, J., dissenting). An array of unproven and counter-intuitive assumptions cannot satisfy UT's narrow tailoring burden.

Indeed, UT does not even "evaluate the diversity present in [the Top 10% Law] group before deploying racial classifications to fill the remaining seats." App. 74a (Garza, J., dissenting). That is, UT "does not assess"

23

whether Top 10% Law "admittees exhibit sufficient diversity within diversity, whether the requisite 'change agents' are among them, and whether these admittees are able, collectively or individually, to combat pernicious stereotypes." *Id.* UT instead asks the Court "to *assume* that minorities admitted under the" Top 10% Law "are somehow more homogenous, less dynamic, and more undesirably stereotypical than those admitted under holistic review." App. 75a (Garza, J., dissenting). But because UT "offers no evidence in the record to prove this," and because the assumption is itself noxious, the Court "must therefore refuse to make this assumption." *Id.* In short, UT has utterly failed to substantiate the necessity of using racial preferences to achieve "qualitative" diversity.

The Fifth Circuit's own factfinding fares no better. It compiled aggregate data about Texas high school districts, which shows only that certain Texas school "districts serve majority-minority communities." App. 77a (Garza, J., dissenting). It did not attempt to identify students from those districts that enrolled at UT or consider their individual characteristics. Instead, the Fifth Circuit simply confirmed that majority-minority communities exist, and then accepted UT's "standing presumption that minority students admitted [from them] under the Top Ten Percent Law do not possess the characteristics necessary to achieve a campus environment defined by 'qualitative diversity.'" *Id.*

The Equal Protection Clause forbids courts, no less than litigants, from relying on "overbroad generalizations about the different talents, capacities, or preferences" of minority children based solely on the racial makeup of their community and average SAT scores. *Virginia*,

24

518 U.S. at 533. Such generalizations are not a substitute for "persuasive evidence" that racial preferences are necessary to achieve diversity. *Id.* at 539. By accepting UT's decision to view minority students admitted via the Top 10% Law this way, "the majority engages in the very stereotyping that the Equal Protection Clause abhors." App. 77a (Garza, J., dissenting).

UT's use of racial preferences also fails the Court's narrow tailoring requirement because UT's own AI/PAI system is at war with this alleged interest in "qualitative" diversity. UT claims to need racial preferences in order to enroll more minority applicants from "high-performing" majority-majority high schools. Resp. Br. 33-34; App. 31a-32a & nn.96-97. Yet UT has incorporated racial preferences into an AI/PAI scoring system that makes it more difficult for such students to secure admission. The PAI gives a significant race-neutral preference to socio-economically disadvantaged students that tend to come from majority-minority high schools. *See supra* at 4. Furthermore, UT's outreach and scholarship programs target "predominantly low-income student populations." App. 26a. UT cannot seriously claim that it needs to use racial preferences to enroll a cohort of applicants it has chosen to handicap in the application process.[7]

_____

7.   UT also has argued that using race in holistic admissions "giv[es] high scoring minority students a better chance of gaining admission to [UT's] competitive academic departments" than does the Top 10% Law. App. 49a. But the record evidence shows that, from 2005 to 2007, "underrepresented" minorities admitted via the Top 10% Law were accepted into the most competitive programs at substantially higher rates than minority students admitted through the holistic admissions process. In fact, no African American admitted holistically was accepted into UT's highly

25

UT's AI/PAI system therefore does not even remotely advance its claimed interest. If UT wished to enroll more minority students from affluent communities, it could have eliminated from the PAI calculation the socio-economic and other preferences that operate to their disadvantage. UT also could have awarded a preference to students from high-performing schools or made the AI scoring (which takes SAT performance into account) a greater factor in admissions decisions. Any or all of these race-neutral policies could have increased the admission chances of affluent minority applicants as much or more than layering racial preferences on top of UT's preexisting AI/PAI system. Strict scrutiny imposes on UT "the ultimate burden of demonstrating, *before turning to racial classifications*, that available, workable race-neutral alternatives do not suffice." App. 112a (emphasis added). UT has not met that burden.

**B.   UT's "Qualitative" Interest Is Not A Last Resort Necessary To Achieve An Educational Goal That This Court Has Found Compelling.**

As explained above, UT's "qualitative" diversity goal fails strict scrutiny on its own terms. But this post hoc goal suffers from an even more fundamental defect: it is not narrowly tailored to achieve any educational interest this Court has found compelling. It certainly has nothing to do with the "critical mass" interest found compelling in *Grutter*. As this Court has explained, "critical mass means

---

competitive Business, Communications, or Nursing programs from 2005 to 2007. At the same time, nearly half of all African Americans admitted via holistic review were cascaded into Liberal Arts. It is UT's race-based holistic admissions—not the Top 10% Law—that has "clustering tendencies." *Cf.* App. 50a.

26

numbers such that underrepresented minority students do not feel isolated or like spokespersons for their race." *Grutter*, 539 U.S. at 319. Having abandoned the classroom diversity study UT previously touted as showing that this interest had not been satisfied, there is no longer any argument that minorities studying at UT suffer from racial isolation on campus or feel like spokespersons for their race in the classroom or anyplace else.[8]

As a consequence, UT cannot offer any rationale for why *Grutter* would permit it to layer a system of racial preferences that "admits only a small number of minority students under race-conscious holistic review," App. 71a (Garza, J., dissenting), on top of "a race-neutral policy [that] has resulted in over one-fifth of [UT] entrants being African-American or Hispanic," App. 328a (Jones, J., dissenting from denial of rehearing en banc). As Judge Garza explained, UT "fails to explain *how* this small group contributes to its 'critical mass' objective." App. 72a. There is simply no defense under *Grutter* for a race-

---

8.  It is impossible to square UT's use of racial preferences to enroll more affluent minorities with *Grutter* for an additional reason. *Grutter* claims to look to racial diversity as a means of educating the entire student body by bringing to bear diverse life experiences, socio-economic backgrounds, and differing points of view. *See Grutter*, 539 U.S. at 330. UT's newfound qualitative interest, in contrast, is premised on the alleged need to pursue those minorities with backgrounds and experiences least divergent from those of non-minority students. UT has made no showing that less diverse socio-economic backgrounds produce more potentially enriching differences in perspective. In fact, UT adversely stereotypes minority applicants from majority-minority communities who may well have more ability to break down misperceptions than those generated from the pool of preferred minority candidates that UT claims to be pursuing.

27

based admissions system that labels every applicant by race and yet has only "an infinitesimal impact on critical mass in the student body as a whole." App. 45a (Jones, J., dissenting from denial of rehearing en banc) (citing *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 734-35 (2007)).

Indeed, the Fifth Circuit barely attempts to defend the "qualitative" diversity interest under *Grutter*; and the opinion does not grapple at all with *Parents Involved*. The majority instead claims that this "qualitative" interest follows directly from Judge Powell's opinion in *Bakke*. *See* 438 U.S. at 269-324. In its view, an admissions program using racial preferences to make a "contribution to the richness of diversity as envisioned by *Bakke*" will never make a large contribution to minority enrollment. App. 45a. But the majority ignored that UT does not employ racial preferences in the manner *Bakke* envisioned.

Justice Powell's *Bakke* opinion suggested that the use of race to make comparative decisions between qualified applicants when there were "a few places left to fill" in an entering class could be constitutionally justified to advance educational diversity. *Bakke*, 438 U.S. at 324 (Appendix to opinion of Powell, J.). But *Bakke* never contemplated the wholesale use of race in the scoring of all applicants. *Bakke* assumed an individualized marginal admissions process with head-to-head applicant comparison rather than a scoring system where race is a universal factor. At most, *Bakke* might have applied were UT to have used a system where a pool of applicants for a limited number of places was individually evaluated and race was employed as a tie breaker based on a demonstrated gap in the diversity of those admitted on a race-neutral basis. *See Grutter*, 539 U.S. at 387 (Kennedy, J., dissenting).

28

But UT did not choose that path. The undisputed record shows that each applicant file considered by UT is branded with race on its cover, that each applicant receives a PAI score in which race counts, and that the eligibility of applicants for specific schools and majors is dependent on an AI/PAI matrix. App. 102a-103a. Having chosen to label each and every applicant by race, UT was obligated to prove that the educational benefit of that system "outweigh[s] the cost of subjecting" approximately 30,000 applicants annually "to disparate treatment based solely upon the color of their skin." *Parents Involved*, 551 U.S. at 734. As in *Parents Involved*, then, "the minimal impact" of UT's "racial classifications on school enrollment casts doubt on the necessity of using racial classifications." *Id.* at 790 (Kennedy, J., concurring in part and in the judgment). Using racial preferences, which should be a "last resort," *id.*, is inherently suspect when "[t]he additional diversity contribution of [UT's] race-conscious admissions program is tiny, and far from 'indispensable,'" App. 328a (Jones, J., dissenting from denial of rehearing en banc).

The Fifth Circuit also suggested that the contribution of racial preferences was tiny only because the AI/PAI system applied to 20 percent of total admissions in 2008 and would have made a greater numerical contribution if AI/PAI applied to the 80 percent of admissions generated by the Top 10% Law. App. 22a-25a. But UT, of course, did not "choose" to limit AI/PAI admissions to this small fragment of the entering class. That limitation was in place because the Texas Legislature passed the Top 10% Law, which preceded UT's hasty decision to reintroduce racial preferences on the same day this Court announced its decision in *Grutter. See supra* at 5.

29

The Fifth Circuit's opinion is pervaded by its distaste for the Top 10% Law, which in its view restricted UT's ability to be an academically elite institution. In fact, the Court went so far as to suggest that UT might elect to use "*Grutter*'s holistic review to select 80% or all of its students" if it is not permitted to retain its current system of racial preferences. App. 22a. But the Top 10% Law is unchallenged here, App. 87a-88a (Garza, J., dissenting); App. 218a (King, J., specially concurring), and is an unquestionably legitimate enactment by the Texas Legislature, *Schuette*, 134 S. Ct. at 1638. It was not the role of the Fifth Circuit to judge that law's educational merit. The court's distaste for the Top 10% Law provided no basis for ignoring the critical mass of minority students it inevitably generated.

**III. Review Is Essential To Permit Strict Scrutiny To Play Its Intended Role In Ensuring That Racial Preferences Do Not Trample The Right To Equal Protection.**

The Fifth Circuit's refusal to honor this Court's clear instruction to apply strict scrutiny to the record is reason enough to grant the Petition. But much more is at stake here. Allowing a decision on remand to stand that endorses a noxious "qualitative" diversity interest raised for the first time on appeal and which is devoid of any record support will have ramifications far beyond this case.

There have always been those within the Court that have correctly believed that any use of racial classification outside the remedial setting conflicts with the Fourteenth Amendment's text and history. *Plessy v. Ferguson*, 163

30

U.S. 537, 552-62 (1896) (Harlan, J., dissenting); *Croson*, 488 U.S. at 520-28 (Scalia, J., concurring in the judgment); *Grutter*, 539 U.S. at 350-74 (Thomas, J., concurring in part and dissenting in part). "The moral imperative of racial neutrality is the driving force of the Equal Protection clause." *Croson*, 488 U.S. at 518 (Kennedy, J. concurring in part and in the judgment). Eliminating racial preferences in education altogether would honor "important structural goals" by eliminating "the necessity for courts to pass upon each racial preference that is enacted." *Id.*

To date, the Court has declined to act on this view of the Equal Protection Clause on the understanding that "in application, the strict scrutiny standard [would] operate in a manner generally consistent with the imperative of race neutrality, because it forbids the use even of narrowly drawn racial classifications except as a last resort." *Id.* at 519. But if "strict scrutiny is abandoned or manipulated to distort its real and accepted meaning, the Court lacks authority to approve the use of race even in this modest limited way." *Grutter*, 539 U.S. at 387 (Kennedy, J. dissenting). When the Court "does not apply strict scrutiny … it undermines both the test and its own controlling precedents." *Id.* If *Fisher I* permits UT to prevail here, the Court will need to rethink its endorsement of *Grutter*'s diversity interest given the diminished force of "*stare decisis* when fundamental points of doctrine are at stake." *Parents Involved*, 551 U.S. at 792 (Kennedy, J., concurring in part and concurring in the judgment). Put plainly, the promise of strict scrutiny is illusory if UT can invent a "qualitative" diversity rationale for its program on appeal and then successfully defend that unfortunate rationale without any supporting record evidence.

31

The inference universities will draw from the Fifth Circuit's decision is inescapable. This Court's promise of non-deferential strict scrutiny in *Fisher I* will be viewed as purely rhetorical. By invoking a "qualitative" diversity rationale, any university could evade strict-scrutiny review regardless of the level and educational contribution of minorities admitted through race-neutral means. By avoiding express quotas or defined point awards and using race in a multi-factor admissions calculus, a university could claim to satisfy narrow tailoring. The university then might assume that using race to produce an overall increase in minority admissions, however tiny, will somehow advance its qualitative goal. In sum, leaving the Fifth Circuit's decision unreviewed will render strict scrutiny a *pro forma* exercise. Qualitative diversity can mean whatever a university wants it to mean and can be unsatisfied for however long a university wants it to be unsatisfied. It is a recipe for endless racial preferences.

The proliferation of the "qualitative" diversity interest advanced by universal racial preferences thus will only heighten the concern that "each applicant" is not being "evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." App. 107a (citation and quotations omitted). UT's stated use of racial preferences in order to admit the hypothetical "African American or Hispanic child of successful professionals in Dallas" in place of Ms. Fisher, Resp. Br. 34, demonstrates that race, and race alone, is determinative when "qualitative" diversity is the goal. If that hypothetical student and Abigail Fisher come from similar family backgrounds, share the same socio-economic status, and are comparably educated through high school, they should compete equally for admission

32

and race should be no factor.  Preferring one to the other, as UT does, therefore cannot be about enrolling students from "the greatest possible variety of backgrounds." *Grutter*, 539 U.S. at 330.  So although UT may claim that it is genuinely interested in "qualitative" diversity, the answer to Justice Kennedy's question at oral argument in *Fisher I*: "So what you're saying is that what counts is race above all?," Oral Arg. Tr. 45:3-4, is of course "yes."

In *Schuette*, the Court sought to encourage a "national dialogue regarding the wisdom and practicality of race-conscious admissions policies in higher education." 134 S. Ct. at 1631. That important conversation can occur only if universities believe that use of racial preferences will be subject to strict scrutiny. Experience sadly teaches that only "[c]onstant and rigorous judicial review" will "force educational institutions to seriously explore race-neutral alternatives [that are] ... more effective in bringing about the harmony and mutual respect among all citizens that our constitutional tradition has always sought." *Grutter*, 539 U.S. at 393-95 (Kennedy, J., dissenting). Universities will view a decision leaving the Fifth Circuit's judgment undisturbed as "a green light" to use racial preferences unencumbered by meaningful judicial oversight. App. 321a (Jones, J., dissenting from the denial of rehearing en banc). And they will have absolutely no "incentive to make the existing minority admissions schemes transparent and protective of individual review." *Grutter*, 539 U.S. at 394 (Kennedy, J., dissenting).

By granting certiorari in this case and reinforcing the limiting constitutional boundaries of strict scrutiny, the Court will foster that dialogue and put an end to the

33

masking of general social justice concerns as compelling educational interests. "Prospective students, the courts, and the public" must be able to "demand that [universities] prove their process is fair and constitutional in every phase of implementation." *Grutter*, 539 U.S. at 394 (Kennedy, J., dissenting). Unless the Court is able to enforce this commitment, "[s]tructural protections may be necessities if moral imperatives are to be obeyed." *Croson*, 458 U.S. at 518 (Kennedy, J., concurring in part and concurring in the judgment).

## CONCLUSION

The Court should grant the petition.

Respectfully submitted,

WILLIAM S. CONSOVOY
THOMAS R. MCCARTHY
J. MICHAEL CONNOLLY
CONSOVOY MCCARTHY PLLC
3033 Wilson Boulevard
Suite 700
Arlington, VA 22201

PAUL M. TERRILL
THE TERRILL FIRM, P.C.
810 W. 10th Street
Austin, TX 78701

BERT W. REIN
  *Counsel of Record*
CLAIRE J. EVANS
BRENDAN J. MORRISSEY
WILEY REIN LLP
1776 K STREET NW
WASHINGTON, DC 20006
(202) 719-7000
brein@wileyrein.com

*Attorneys for Petitioner*

Date: February 10, 2015