**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC.,<br><br>               Plaintiff,<br><br>v.<br><br>PRESIDENT AND FELLOWS OF HARVARD<br>COLLEGE (HARVARD CORPORATION),<br><br>               Defendant. | Civil Action No. 1:14-cv-14176-ADB |

## HARVARD'S MEMORANDUM IN OPPOSITION TO SFFA'S MOTION TO COMPEL

Making good on its promise to seek "broad sweeping discovery" in this case (Tr. of July 21, 2015 Status Conference at 26, 28 (Dkt. 84)), Plaintiff Students for Fair Admissions, Inc. ("SFFA") has moved to compel Defendant President and Fellows of Harvard College ("Harvard") to produce (a) 6,400 complete student application files, (b) the names of, and contact information for, more than 5,000 alumni interviewers who are not parties to this action and who play a limited role in the admissions process, and (c) detailed information about transfer admissions.[1]

The motion should be denied.  In support of its first demand, SFFA has argued that it requires the applicant files to conduct a statistical analysis described by its expert.  However, SFFA does not need the sensitive personal information contained in hundreds of thousands of pages' worth of applicant files to conduct the statistical analysis that it proposes to undertake. That analysis can be conducted with information contained in the Admissions Office database—

---

[1]     If the Court grants Harvard's pending Motion to Stay (Dkt. 58), it can defer ruling on this Motion (or deny the Motion without prejudice), except as necessary in delimiting the scope of any limited discovery the Court permits during the pendency of the stay.

an approach that would be less costly for the parties and more useful for both the parties and the Court, as it would not require statistical sampling of the files at all.  Because information from the database will give SFFA what it needs for the statistical analysis it proposes, the "burden or expense" of producing such a large number of applicant files (and redacting them to shield students' identities) would significantly "outweigh[]" the "likely benefit" of doing so, Fed. R. Civ. P. 26(b)(2)(C).  And because the files are protected by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, SFFA bears a "'significantly heavier'" burden to justify their production.  *See, e.g.*, *Black v. Kyle-Reno*, 2014 WL 667788, at *2 (S.D. Ohio Feb. 20, 2014).  Especially given the personal, indeed intimate, nature of the information in the files, SFFA cannot meet that burden.

The Court should also deny SFFA's request for the personal contact information of more than 5,000 non-party alumni interviewers, who are of marginal relevance to this litigation and who would be subjected to "annoyance, embarrassment, or oppression," Fed. R. Civ. P. 26(c)(1), if haled into it.  These alumni each volunteer a few hours each year to interview a handful of applicants to Harvard College; they should not be dragged into this litigation as a cost of that assistance.  Moreover, any information that SFFA might obtain from alumni interviewers is of little relevance to the central issue in this case, which concerns Harvard's Admissions Office's practices.  Alumni interviewers do not participate in that Office's admissions decisions; rather, they assign numerical ratings to the applicants, which are recorded in the database, and file narrative reports.  Thus, the database—together with the 160 files Harvard has agreed to provide and any depositions of Admissions Office personnel SFFA is permitted to take—will provide SFFA with a full understanding of the role played by alumni interviews in the admissions process.

Finally, the Court should deny SFFA's request for information about the transfer admission process because it is irrelevant to this action, which challenges Harvard's decision-making in admitting its freshman classes.  SFFA has not challenged any decision by Harvard to deny transfer admission, and none of SFFA's members has applied for transfer admission. Moreover, because only a very small number of applicants are admitted as transfer students in any year, the transfer process does not materially affect the composition of the overall class. Any connection between the transfer admission process and this action is therefore too attenuated to justify the discovery that SFFA seeks.

## I.      SFFA's Request For A Large Number Of Applicant Files Should Be Denied

The Court should deny SFFA's request for the production of 6,400 applicant files for two reasons.  First, with respect to SFFA's contention that it needs applicant files in order to conduct statistical analysis, SFFA does not need *any* applicant files to conduct the statistical analysis its expert proposes; rather, information from the database will enable SFFA to conduct that statistical analysis.  Second, the "burden or expense" of producing those files would significantly "outweigh[]" the "likely benefit"  of doing so, Fed. R. Civ. P. 26(b)(2)(C), particularly in light of the need to redact the files, which contain intensely personal information that applicants have entrusted to Harvard in the utmost confidence.  Indeed, applicant files are protected from disclosure under both federal and Massachusetts law, and SFFA has not met the high threshold of justifying their wholesale production in this litigation.

### A.      SFFA Does Not Need Applicant Files To Conduct Its Proposed Analysis

SFFA proposes to use the applicant files to conduct "a statistically defensible analysis of the extent to which race is playing a factor" in Harvard's admissions process.  Pls.' Mem. in Support of Mot. to Compel 10, ECF No. 65 ("Pls.' Mem.").  In particular, SFFA proposes that "this analysis can be done by assigning values to Harvard's criteria for scoring applicants and

then determining, through regression analysis, the extent to which race, rather than the other

criteria, appears to be influencing the admissions process." *Id.* at 10-11.  SFFA's expert, Dr.

Peter Arcidiacono, explains: "With the raw files in hand, we can code the various factors

Harvard describes as important in determining application subscores (for example, creating an

indicator variable for whether the student was a valedictorian).  We can then use regression

analysis to see, for example, whether Asians received lower subscores conditional on the factors

that Harvard describes as important for that subscore."  Declaration of Patrick Strawbridge, Ex.

A ¶ 28, Dkt. No. 66-1 ("Arcidiacono Decl.").

Harvard disputes the notion that SFFA's proposed methodology is statistically

appropriate or that it could demonstrate any improper use of race in Harvard's admissions

process.  But whatever the substantive merits of the analysis described by SFFA's expert, SFFA

does not need applicant files to conduct it, because the Admissions Office database contains

information sufficient for that purpose.  Indeed, because the database contains detailed

information about *every* applicant to Harvard, review of information in the database is superior

for the purposes of this analysis to the statistical-sampling method that SFFA proposes.  *See*

Declaration of Justin McCrary ("McCrary Decl.").  For example, Dr. Arcidiacono suggests (at

¶ 28) that "[w]ith the raw files in hand," SFFA could "creat[e] an indicator variable for whether

the student was a valedictorian."  But SFFA can create that variable just as easily, if not more so,

by looking at the database, which will include information reported to Harvard about applicants'

class rank, as well as applicants' self-reported honors and awards.  McCrary Decl. ¶ 34.[2]  Dr.

---

[2]      Professor Arcidiacono's reference to valedictorian status as a metric is confusing, because students are typically named valedictorians when they graduate from high school—that is, after their application has been submitted and in most cases after admission decisions have been made.  To the extent that an applicant might disclose valedictorian status among his or her honors and awards, however, the database would capture that information.

Arcidiacono also suggests (at ¶ 34) that "SFFA will need to 'score' the extracurricular activities of numerous applicants along various dimensions."  Again, SFFA does not need the files for that exercise.  The database contains information about extracurricular activities that SFFA can use for the analysis that Dr. Arcidiacono describes: the title of the applicant's position, the duration of the applicant's participation (grade levels, hours per week, and weeks per year), an indicator of whether the applicant plans to continue the activity in college, and the applicant's narrative description of the activity.  McCrary Decl. ¶ 35.

In addition, the database contains a depth and richness of information about each applicant that will assist SFFA in conducting its expert's proposed analysis.  The database contains hundreds of fields, including, for example:

- Applicants' demographic information, including race and ethnicity

- Applicants' intended careers and academic concentrations

- Applicants' GPAs and standardized test scores

- Applicants' academic honors

- The occupations and educational background of the applicants' parents

- Information indicating that the applicant may be financially disadvantaged

- Applicant ratings assigned by admissions officers and alumni interviewers

McCrary Decl. ¶ 36.  Dr. Arcidiacono identifies nothing of relevance to the analysis he proposes that SFFA could glean from full application files but not from the database.

Harvard has agreed to produce information from the Admissions Office's database in response to SFFA's Request for Production No. 1.  That is more than sufficient for SFFA to conduct the statistical analysis its expert proposes.  Notably, SFFA's expert himself acknowledges that an analysis based on a database covering the full universe of freshman

applicants is "preferable" to an analysis based on a mere sample of files.  *See* Arcidiacono Decl. ¶ 19 ("Analyzing the whole population is preferable but tends to be costly.").  There is no need for the second-best option of sampling where SFFA will have access to extensive information about *every* applicant in any class to conduct the analysis that Dr. Arcidiacono proposes. McCrary Decl. ¶ 37.

SFFA criticizes Harvard for the supposed inconsistency between Harvard's discovery response and its proposal in the Joint Rule 26(f) Statement (at 13) to "produc[e] a statistically significant sampling of redacted applications."  But there is no inconsistency.  At the time that the parties filed their Joint Rule 26(f) statement, Harvard's counsel had not examined the database in detail and was not aware of the scope of the information contained within the database.  As the extent of the information in the database became clear, it also became clear that that information would be sufficient for the statistical analyses in this case and that 160 files would be sufficient to provide context for those analyses, and for other purposes: to help explain how Harvard conducts its admissions process, to describe the holistic review undertaken by the Admissions Office, and to provide a picture of the diverse and exceptional group of applicants that apply to Harvard every year, only a few of whom can be offered admission.  Indeed, referring to *more* than 160 files for these purposes would likely be unmanageable.  Harvard therefore has proposed to produce 160 files, with 80 chosen by Harvard and 80 by SFFA, selected in whatever manner each party prefers.  Harvard's use of the phrase "statistically significant" in the Rule 26(f) statement may have been infelicitous, but the Court was not confused; it read that phrase quite correctly to refer simply to a sample large enough to allow the parties to understand and describe the admissions process.  *See* Tr. of April 30, 2015 Scheduling Conference 5-6 (Dkt. 43) (initial comments of the Court, describing Harvard's proposal to

conduct "representative samplings of those applications").[3]  Those objectives will be satisfied by producing information from the database along with 160 applicant files, without resorting to the more burdensome, more intrusive, and less useful approach of producing an even larger number of applicant files.

**B.**    **SFFA Cannot Justify The Production Of A Large Number Of Files Even If They Are Marginally Relevant To Its Proposed Analysis**

Any marginal benefit that applicant files might offer to SFFA's analysis would be heavily outweighed by the cost and burden of producing the files—a burden to be borne both by Harvard and by the applicants whose private information would be revealed.  *See* Fed. R. Civ. P. 26(b)(2)(C)(iii).  It is particularly extraordinary that SFFA thinks the 6,400 files it seeks would be only a "*preliminary*" sample, as it made clear in its Requests for Production and repeatedly throughout its brief (at 2, 3, 8, 11-13, 15).[4]  The Court should not authorize this unnecessary intrusion.

**1.**    **The burden and expense of producing a large number of files, including the intrusion on student privacy, would outweigh the benefit**

Applicant files are replete with personal information of the utmost sensitivity—not just grades and test scores but deeply personal essays and recommendation letters that touch on financial hardships, medical conditions and treatments of applicants and their families,

---

[3]    Citing one footnote of an unpublished, out-of-circuit district court opinion, SFFA argues that "statements in [a] 26(f) report constitute judicial admissions."  Pls.' Mem. 3 n.3 (citing *Carter v. Reiner, Reiner & Bendett, P.C.*, No. 06-cv-988, 2007 WL 2221432, at *1 n.1 (D. Conn. July 30, 2007)).  But the footnote in *Carter* concerns a *factual* statement in a Rule 26(f) report. Even if parties are bound by the *facts* they state in a Rule 26(f) report, that hardly implies—as SFFA suggests—that no party may ever revisit a discovery proposal made in a Rule 26(f) report at the very outset of litigation.

[4]    SFFA cites various cases (at 12-13) in which courts have approved the sampling of a comparable proportion of the overall population.  But in this case, sampling is not necessary *at all* for the purposes of the statistical analysis that SFFA and its expert propose.

information about troubled familial relationships, and the applicants' most deeply held beliefs and aspirations.  That is, on its own, a reason to limit the production of applicant files to the minimum necessary for the parties to litigate this case.  *See, e.g.*, Fed. R. Civ. P. 26(c)(1) (court may restrict discovery "to protect a party or person from annoyance, embarrassment, [or] oppression"); *Briddell v. Saint Gobain Abrasives Inc.*, 233 F.R.D. 57, 61 (D. Mass. 2005) ("Courts have routinely limited discovery to protect the privacy interests of parties and non-parties alike."); *Whittingham v. Amherst Coll.*, 164 F.R.D. 124, 127-128 (D. Mass. 1995) ("[W]hile discovery is usually broad, Plaintiff has not demonstrated that the [employee] files he seeks, even if marginally relevant, outweigh the privacy interests of these individuals.").

Moreover, Harvard's obligations to protect the privacy of its applicants and students requires it to make significant redactions of each application file produced.  Harvard estimates that, just to remove information directly identifying students and others (such as students' family members), each application file produced will require, on average, more than 100 separate redactions.  That is reason enough for the Court to limit the number of files that Harvard is required to produce.  *See, e.g.*, *United States ex rel. Gelfand v. Special Care Hosp. Mgmt. Corp.*, No. 05-cv-6079, 2010 WL 2399693, at *2 (E.D.N.Y June 10, 2015) (limiting discovery of sensitive substance abuse treatment records in recognition that the "heavy burden of redaction and production … rests primarily with the defendant institution[]").

The production of any files, even with redactions, injures the privacy interests of Harvard's past applicants and could well chill the candor of future applicants, who might reasonably fear that their highly personal self-reflections could themselves be turned over to opposing counsel in litigation.  To mitigate these concerns, the Court should limit SFFA to the

8

discovery of the minimum number of files necessary to litigate this case—an objective fully satisfied by the 160 files Harvard has agreed to produce.

## 2.    FERPA sets an especially high bar for the production of educational records

An explicit purpose of FERPA is "'to protect [students'] rights to privacy by limiting the transferability of their records without their consent.'" *Frazier v. Fairhaven School Comm.*, 276 F.3d 52, 67 (1st Cir. 2002) (quoting 120 Cong. Rec. 39858, 39862 (1974) (joint statement of Sens. Pell and Buckley)). FERPA  codifies "the strong public policy of protecting the privacy of student records." *Moeck v. Pleasant Valley Sch. Dist.*, 2014 WL 4988274, at *2 (M.D. Pa. Oct. 7, 2014); *see also Brown v. Univ. of Kansas*, 2012 WL 612512, at *2 (D. Kan. Feb. 27, 2012) ("[T]he law recognizes an important privacy interest for students."); *Smyth v. Lubbers*, 398 F. Supp. 777, 796 (W.D. Mich. 1975) ("Congress has … recognized the extreme importance of a student's 'record' by closely regulating the circumstances under which student records may be released by school authorities.").[5]

Harvard's application files both constitute and contain educational records protected by FERPA. Application files for enrolled students are themselves educational records maintained by Harvard. *See* 20 U.S.C. § 1232g(a)(6) (defining "student" to include "any person with respect to whom an educational … institution maintains education records or personally identifiable information"); 34 C.F.R. § 99.3 (similar). SFFA acknowledges this, but argues (Pls.' Mem. 15) that FERPA does not apply to "a large percentage of the produced files" because they will be

---

[5]     The application files are also arguably subject to the protections of the Massachusetts Privacy Act, which provides that "[a] person shall have a right against unreasonable, substantial, or serious interference with his privacy." Mass. Gen. Laws c. 214, § 1B; *see Menten v. Starbucks Corp.*, No. 09-cv-11545, 2012 WL 1466780, at *9 (D. Mass. Apr. 26, 2012) (Act applies to private entities); *Wagner v. City of Holyoke*, 241 F. Supp. 2d 78, 100 (D. Mass. 2003) (Act applies to disclosures that are not "to the broad public"); *Cefalu v. Globe Newspaper Co.*, 8 Mass. App. Ct. 71, 77 (1979) (Act applies to "manuscripts" and "private letters").

"for students who never enrolled at Harvard." SFFA is incorrect. The application files of non-enrolled applicants do contain records covered by FERPA, including, for example, high-school transcripts. FERPA's implementing regulations make clear that its restrictions apply not only to the initial disclosure of information (for example, Harvard's disclosure of information from a Harvard student's educational record), but also to the *redisclosure* of information that an educational institution has received (for example, Harvard's redisclosure of a transcript it has received from a high school). *See* 34 C.F.R. § 99.33(a)(1) (an educational institution "may disclose personally identifiable information from an education record" only under certain conditions); *see also id*. § 99.33(b)(2) (noting that redisclosures may be made only under certain circumstances); Letter from LeRoy S. Rooker, Dir., Family Policy Compliance Office, U.S. Department of Education (Aug. 16, 2007), *available at* http://www2.ed.gov/policy/gen/ guid/fpco/ferpa/library/vasexoffenderlaw081607.html ("[A]n institution that receives information (such as a transcript) on an applicant from a high school or from another postsecondary institution is required to protect that information and may not redisclose the information except in according with … the FERPA regulations.").[6]

The gravity with which federal and state law treats the disclosure of records like these is ample evidence that the Court should not indulge SFFA's blunderbuss request for 6,400 records that it does not need to conduct the analysis that its expert proposes. Courts have long recognized that FERPA "places a heavy burden on a party seeking access to student records to demonstrate a genuine need which outweighs the student's privacy interest." *Smith v. Duquesne University*, 612 F. Supp. 72, 80 (W.D. Pa. 1985); *see also, e.g.*, *Moeck*, 2014 WL 4988274, at *2 (explaining that in determining whether to require disclosure of FERPA-covered records, "[c]ourts balance

---

[6]     Counsel for Harvard informed counsel for SFFA of this guidance, and provided a copy of Director Rooker's letter, before SFFA filed its motion to compel.

the potential harm to the privacy interests of students with the importance and relevance of the sought information to resolving the claims before the court," and that "policy concerns sometimes require the withholding" of even "relevant information … over disclosure to a party who argues that the information is needed for his case"); *Black*, 2014 WL 667788, at *2 ("Courts have imposed a 'significantly heavier burden' on a party requesting the discovery of educational records to show its interests in obtaining the records outweighs 'the significant privacy interest of the students.'"); *Zaal v. State*, 326 Md. 54, 72 (Md. 1992) ("[W]hen the issue before the court is whether to allow disclosure of education records covered by the FERPA, a trial judge … must conduct a balancing test in which the privacy interest of the student is weighed against the genuine need of the party requesting the information."); *Rios v. Read*, 73 F.R.D. 589-598 (E.D.N.Y. 1977) ("Congressional policy expressed in [FERPA] places a significantly heavier burden on a party seeking access to student records to justify disclosure than exists with respect to discovery of other kinds of information, such as business records.").

SFFA cannot meet this high burden by making a sweeping, unfocused request for the production of 6,400 files—again, just as a "preliminary" matter.  Rather than identifying precisely the number of files that are truly essential to its case, SFFA asks the Court to order the production of 6,400 applicant files  in the hope that it might turn up *something* of relevance in those files.  But FERPA does not allow "demands … like a bulldozer that levels an entire hill in the hopes of finding some specks of gold," particularly demands "to bulldoze nonparty academic records."  *Alig-Mielcarek v. Jackson*, 286 F.R.D. 521, 527 (N.D. Ga. 2012).  SFFA has not pointed to *anything* contained in the files, and not contained in the database, that it needs for the analysis that Dr. Arcidiacono proposes.  But even if SFFA can identify some bits of information contained in applicant files (and not contained in the database) that might to some degree inform

Dr. Arcidiacono's proposed statistical analysis, it cannot bear its heavy burden to show that its need for more than 160 files *outweighs* the applicants' privacy interests.

> **3.      SFFA is not entitled to limitless discovery because it has sued under Title VI**

SFFA is wrong in suggesting that it is entitled to discovery of boundless scope and breadth simply because it has brought suit under Title VI.  Courts routinely place reasonable limits on discovery in civil rights cases.  In the employment discrimination context, for example, the First Circuit has held that parties "ought not to be permitted to use broadswords where scalpels will suffice, nor to undertake wholly exploratory operations in the vague hope that something helpful will turn up."  *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 187 (1st Cir. 1989); *see also Woodward v. Emulex Corp.*, 714 F.3d 632, 636-637 (1st Cir. 2013) (district court permissibly limited discovery to avoid "a fishing expedition into possibly barren waters"). Discovery may be limited in civil rights cases as in any other type of case "to avoid unduly burdensome requests," *Tyler v. Suffolk Cnty.*, 256 F.R.D. 34, 37 (D. Mass. 2009) (prisoner rights), to "protect the privacy interests of . . . individuals," *Whittingham*, 164 F.R.D. at 127 (employment discrimination), and to reduce the hardship faced by defendants "when weighed against the absence of facts alleged to support . . . liability," *Santiago v. Fenton*, 891 F.2d 373, 379-80 (1st Cir. 1989) (wrongful and abusive arrest).  Indeed, although SFFA cites *Raza v. City of New York*, 998 F. Supp. 2d 70, 82 (E.D.N.Y. 2013), for the proposition that discovery in civil rights cases should be broad, the court in that case "limited discovery only to those documents *necessary* for Plaintiffs to prove their case because of the sensitive nature of the requested discovery."  Thus, the fact that SFFA is suing under Title VI does not entitle it to intrusive discovery where "the burden or expense of the proposed discovery outweighs its likely benefit" to the adjudication of this case.  Fed. R. Civ. P. 26(b)(2)(C).

**II.     SFFA's Request For The Names And Contact Information Of Alumni Interviewers Should Be Denied**

SFFA has demanded that Harvard produce the names and contact information of all Harvard alumni who have conducted admissions interviews since September 1, 2011, in eleven different, heavily populated states and regions.  Producing this information for just the last two admissions cycles would require Harvard to provide SFFA with the names and contact information of more than 5,000 alumni.  Declaration of Marlyn E. McGrath ("McGrath Decl.") ¶ 11.  This request should be denied because granting the request could subject these individuals to "annoyance, embarrassment, or oppression." Fed. R. Civ. P. 26(c); *see, e.g.*, *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.").  SFFA's request is particularly unwarranted because any information SFFA might obtain from contacting alumni interviewers is of marginal relevance to this case.

Harvard's alumni interviewers are volunteers who agree to take time from their busy schedules to interview a handful of students in a particular year and then to prepare an online report on the interview.  To ensure that alumni remain willing to participate in the interview process, Harvard requests only a modest time commitment of them.  Alumni interviewers are not employees of Harvard and certainly do not expect to be entangled in litigation of this nature when they agree to conduct interviews.  If alumni knew that, by agreeing to conduct interviews, they might be involuntarily injected into litigation, they might well hesitate in the future to participate in this important process.  McGrath Decl. ¶ 12.

Further, any information that might be obtained from alumni interviewers is of, at most, limited relevance to this case.  Alumni interviewers do not review any part of the application files and do not participate in the Admissions Office's discussion of applicants.  Moreover, the

alumni interview is only one part of the many facets of the application considered by the Office. Therefore, any one interviewer's report necessarily has only a very small effect on the ultimate composition of a Harvard class.

SFFA fails to explain why alumni interviewers "are likely to have relevant information about … the extent to which race drives admissions decision[s]" (Pls.' Mem. 18).  If SFFA is seeking information about Harvard's admissions policies, priorities, or practices that is communicated to alumni interviewers, that information can be obtained through discovery directed at Harvard, without the need to entangle thousands of alumni who have no obligation to participate in this litigation.  If, upon review of the discovery produced by Harvard, SFFA determines that it must identify specific alumni interviewers (though Harvard cannot conceive of a reason why it would), then SFFA can return to Harvard and the Court with a targeted request and explanation of that need.  But the Court should deny SFFA's current broad and unnecessary request that will intrude upon the lives of non-parties to the litigation who have volunteered their time to assist their alma mater.  *See United States v. Comley*, 890 F.2d 539, 544 (1st Cir. 1989) (recognizing that unduly intrusive requests of private organizations can have chilling effects that impinge upon First Amendment associational rights).

## III.    SFFA's Request For Information About Transfer Admissions Should Be Denied

SFFA's efforts to seek discovery into Harvard's transfer admissions processes should be denied because transfer admissions are irrelevant to the Complaint, which alleges that a specific student was unfairly denied admission to Harvard's *freshman* class.  SFFA has not alleged that any of its purported members was denied, or even applied for, transfer to Harvard from another institution.  Moreover, in response to a document request from Harvard, SFFA stated that it has no documents indicating that any of its current members have any intent to apply for transfer to

Harvard.  SFFA fails to explain how any of its members could benefit from any inquiry into Harvard's transfer process.

SFFA has asserted in its Complaint that one of its members, who was allegedly denied admission to Harvard in the 2013-14 cycle, would be willing to apply for transfer to Harvard *if* Harvard "ceases the use of race or ethnicity" in undergraduate admissions.  Complaint, Dkt. 1 at ¶ 24.  But that speculative possibility cannot justify the inquiry that SFFA seeks.  SFFA has not sought any preliminary injunctive relief in this case (nor could it satisfy the requirements for such relief), and there is no reason to believe Harvard will cease its entirely lawful consideration of race while this alleged member might be eligible to transfer.  The possibility of transfer is even more attenuated for other SFFA members referred to in the Complaint, who have not even yet applied to Harvard as freshmen, much less been denied admission.  *See* Compl. ¶¶ 25-26.

Finally, discovery into transfer admissions should be denied because transfers play a tiny role in the composition of any Harvard undergraduate class.  Very few transfer slots are available at Harvard because the vast majority of Harvard undergraduates complete their studies there.  Harvard's undergraduate classes have approximately 1,660 students, but in the 2013-2014 and 2014-2015 admissions cycles, Harvard admitted only 15 and 21 transfer applicants respectively.  *See* McGrath Decl. ¶¶ 7-8.  Gaining admission as a transfer student is exceptionally difficult, and the rate at which transfer applicants are offered admission (just over 1 percent) is not comparable to the rate for freshman applications.  *See* McGrath Decl. ¶¶ 6-8.  Discovery into the transfer process, therefore, will not yield any information that will assist the parties or the Court in evaluation the core allegations in this case, which focus on the use of race in Harvard's *freshman* admissions process.

## **CONCLUSION**

For the foregoing reasons, Harvard respectfully requests that SFFA's Motion to Compel be denied.

<div style="margin-left:50%">

Respectfully submitted,

/s/ Felicia H. Ellsworth
Felicia H. Ellsworth (BBO #665232)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
felicia.ellsworth@wilmerhale.com

Seth P. Waxman (*pro hac vice*)
Paul R.Q. Wolfson (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 663-6800
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com

Debo P. Adegbile (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 295-6717
Fax: (212) 230-8888
debo.adegbile@wilmerhale.com

</div>

Dated:  July 30, 2015

<div style="margin-left:50%">

*Counsel for Defendant President and Fellows of Harvard College*

</div>

16

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants on July 30, 2015.

/s/ Felicia H. Ellsworth
Felicia H. Ellsworth