UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No: 1:14-cv-14176 |
| ) | |
| PRESIDENT AND FELLOWS OF HARVARD ) | |
| COLLEGE (HARVARD CORPORATION) ) | |
| ) | Leave to File Granted August 7, 2015 |
| Defendant. ) | (Dkt. 93) |
| ) | |

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO COMPEL**

Harvard's Opposition to SFFA's Motion to Compel reveals its deep confusion about the legal rules governing this case. Harvard has elected to use race as part of its admissions process. Harvard must therefore accept the burden of proving that it can satisfy strict scrutiny. The Supreme Court has made crystal clear its expectations about this analysis: "[s]trict scrutiny does not permit a court to accept a school's assertion that its admissions process uses race in a permissible way *without a court giving close analysis to the evidence of how the process works in practice.*" *Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2421 (2013) (emphasis added). Indeed, this Court is obligated to ensure the record contains the evidence necessary to make a "judicial determination that the admissions process meets strict scrutiny *in its implementation.*" *Id.* at 2419-20 (emphasis added). Faithful application of strict scrutiny is essential to incentivize universities "to make the existing minority admissions schemes transparent and protective of individual review." *Grutter v. Bollinger*, 539 U.S. 306, 394 (Kennedy, J., dissenting).

With these constitutional requirements in mind, Harvard's Opposition should be seen for what it is: an attempt to misdirect the parties and the Court, to avoid its obligations under the

Federal Rules of Civil Procedure, and to obstruct SFFA and this Court from obtaining the discovery necessary to conduct the required "searching review" of how the admissions process "works in practice." More than five months after it answered the Complaint, Harvard continues to delay its production of *any* responsive materials, essentially assuming for itself the power to grant a stay. It continues to withhold from SFFA and the Court relevant information bearing upon this motion. And it seeks to insulate important parts of its admissions process from any review at all.  Respectfully, this Court should grant SFFA's motion, as modified below:

*First*, with respect to SFFA's request that Harvard abide by its prior commitment to produce a statistically significant sample of application files, Harvard does not challenge the statistical and legal basis for SFFA's proposed sample. Instead, Harvard blithely reneges on its offer, asserting that sampling is unnecessary because SFFA's expert can conduct his statistical analysis with Harvard's electronic admissions database. Harvard supports this view with a declaration of its own expert, who reviewed "one year" of the admissions database, and pronounced himself satisfied. But Harvard has refused to disclose the actual contents of its admissions database to SFFA (or the Court)—despite its prior agreement that its database was relevant and would be produced, and despite SFFA's specific request for more information in order to determine whether it may be able to adjourn or reduce its request for files. Essentially, Harvard has said that SFFA and this Court should trust its expert's opinion that all of the information needed is in the database, but it refuses to provide even the most basic information about what that database contains.

SFFA is willing to adjourn its motion to compel production of the application files if Harvard *promptly* produces the databases responsive to its Request for Production No. 1. *See* Strawbridge Decl. in Support of Opening Memo., Ex. C at 11-12. This would permit SFFA and

its expert to review the data and determine whether the database material alone is sufficient to conduct its analysis. To be clear, SFFA ultimately will require a statistically significant sample of files—and certainly Harvard has not disagreed with the obvious proposition that SFFA cannot be denied access to materials which Harvard intends to use to defend its admissions process. *See* Opening Memo. at 16-17. But it makes little sense for SFFA and the Court to guess about the completeness and sufficiency of the database that Harvard has shown to its expert but withheld from SFFA. Instead, Harvard should produce that data promptly and permit SFFA to determine if its request for a sample of files can be modified.[1]

*Second*, Harvard has failed to justify its intention to withhold the identities of its alumni interviewers in this litigation. Harvard's attempt to downplay the significance of these potential witnesses is refuted by both public statements emphasizing the importance of the interview process, and by Ms. McGrath's prior testimony, which acknowledged that alumni interviewers have raised questions about Harvard's use of race in the interview process. Harvard's speculation about alleged future harassment in discovery are premature at best and patently insufficient to resist discovery of this relevant and accessible information.

*Third*, Harvard attempts to minimize the importance of its transfer process. But Harvard cannot dispute the fact that the Complaint raises issues relevant to the transfer admissions. Nor can Harvard dispute that it uses race in that process. Evidence probative of racial discrimination is no less relevant or permissible when it affects only a few hundred applicants competing for a few dozen spots. SFFA's motion to compel should be allowed.

---

[1] To the extent the Court in this case orders a partial stay in response to Harvard's pending Motion to Stay, SFFA is willing to modify its prior submission to this Court (Dkt. No. 83) and forego the production of application files at this time.

I.  **SFFA Is Willing To Adjourn Its Motion for Files If Harvard Timely Produces the Database So SFFA's Expert Can Examine Its Sufficiency.**

At the beginning of this case, Harvard told the Court and SFFA, in what appeared to be good faith, that it was willing to produce a statistically significant sample of files to augment electronic data that all parties agreed was relevant and discoverable in this case. *See* Dkt No. 26, at 13. SFFA accepted Harvard's proposal, requesting a sample of approximately four percent from the pool of relevant files. Opening Memo. at 7-8. SFFA's approach to sampling, and its requested sample size, was well within the range of sampling deployed in many other cases, including cases as complex and with file populations as large as this one. *Id.* at 8-12. Harvard responded by offering an unrepresentative sample that was statistically worthless. *Id.* at 13.

In Opposition to the pending Motion to Compel, Harvard has not challenged the statistical or legal principles underlying SFFA's sampling approach. Indeed, as expected, Harvard does not bother to claim that 160 files, half of which are cherry-picked by Harvard, are of any statistical use at all. *See* Opening Memo. ¶¶ 13-14. Nor does Harvard take issue with the importance of stratification, or contest the fact that numerous courts have ordered comparable—if not larger—samples in a variety of other cases.

Instead, Harvard's primary argument with respect to application files is simply that the *undisclosed* database alone is sufficient for SFFA's purposes. Opposition at 3-7. To support this argument, it offers the hearsay declaration of its own expert, Mr. McCrary, who has been provided access to "one year" of this data, and contends it has all the information Dr. Arcidiacono needs to conduct his analysis. *Id.*, McCrary Decl. ¶¶ 18. But neither Mr. McCrary nor Harvard describes the contents of this information beyond high-level generalities (and two specifics directed at a couple of examples that Dr. Arcidiacono raised—without the benefit of reviewing this database).

Mr. McCrary's declaration raises many questions. Which specific year of application data did he review? Does the same amount of data exist for the four cycles for which SFFA requested this data? What, precisely, are the 900 fields that Mr. McCrary "understands" are available for the year reviewed? Did this understanding come from something other than his personal review? Do any of these fields include the text of, or excerpts from, the personal statements or teacher recommendations? Is there any information that Harvard uses for its admissions decisions that is not in the database? How is this data entered? Does it accurately reflect the paper submissions?

Because Harvard's representations have been entirely opaque and uncooperative, SFFA requested that Harvard provide basic information about the database's contents. Strawbridge Decl. Ex. A. This request was more than reasonable, given that Harvard agreed back on June 15, 2015, that it would produce relevant databases and the fields and variables contained therein. *See* Strawbridge Decl. in Support of Opening Memo., Ex. C at 11-13 (Request Nos. 1 and 3).[2] But, as it has with respect to every other one of SFFA's document requests, Harvard still refuses to produce *a single responsive document*, notwithstanding that discovery has been pending for three months, and its request for a stay has not been granted. Nonetheless, SFFA hoped that Harvard would recognize the absurdity of the parties and Court guessing at the contents of a database and produce the information necessary for SFFA to determine if it could narrow or forego, at least for now, its request for application files.

Harvard, however, has refused to provide even the most basic information to answer these obvious questions, even though it may have helped to resolve this dispute. Strawbridge

---

[2] SFFA's Request No. 1 sought "All Electronic Databases from any time that include information concerning early action applications, early action admissions, other freshman applications, other freshman admissions, transfer applications, transfer admissions, freshman enrollment, and total undergraduate enrollment."

Request No. 3 sought "Documents sufficient to show the fields or variables included within the Electronic Databases responsive to Request No. 1."

Decl., Ex. A. Instead, Harvard doubled down on its prior position that it would not produce any documents at all pending a decision on its request for a stay—even though it agreed from day one of this case that these databases are responsive and must be produced. *Id.* For all practical purposes, Harvard has granted itself a stay. There is no reasonable excuse why, five months after its filing of the Answer in this case, Harvard has refused to exchange a single responsive document with SFFA, despite SFFA's repeated requests that the parties exchange discovery.

Despite Harvard's obstinance, SFFA believes that it is appropriate to sequence its request for application files in light of the new information about the contents of the database (which Harvard could have provided months ago). If Harvard produces the database for the four years requested by SFFA (encompassing the four admissions cycles from 2011-12 to 2014-15), then SFFA will review the database and determine whether it needs the files after all, and, if so, whether it can make do with fewer files than it initially thought. The sooner this information is produced, the sooner the parties can resolve these differences and make meaningful progress in this case.

Again, SFFA believes that its originally requested sample of application files may ultimately be necessary. But in light of Harvard's new claims about the alleged breadth and depth of data, SFFA believes the sampling question can be litigated with a better factual understanding of what the data does, and does not, include. Because Harvard has refused to provide this data to SFFA or the Court, SFFA respectfully requests that the Court order its production within 30 days.[3] This timeline is more than reasonable, given the electronic and readily accessible nature of the data and the limited need for any individual redaction effort.

---

[3] Harvard raises a number of arguments about the alleged burden of the Family Educational Rights and Privacy Act ("FERPA"). SFFA strongly disagrees with Harvard's claims about the requirements and burden of FERPA, especially given the Protective Order and

## II.  Harvard's Alumni Interviewers Are Witnesses with Discoverable Information.

SFFA is entitled to discover the "identity and location of persons who know of any discoverable matter." Fed. R. Civ. P. 26(b)(1). This straightforward principle has been repeatedly upheld by this Court. *See, e.g., Massachusetts v. First Nat'l Supermarkets, Inc.*, 112 F.R.D. 149, 152 (D. Mass. 1986) ("It is clear that the plaintiff is entitled to discover the … identity and location of persons having knowledge of any discoverable matter.") (quoting Rule 26(b)(1)); *Clark v. General Motors Corp.*, 1975 U.S. Dist. LEXIS 12095, at *4 (D. Mass. 1975).

Harvard tries to convince this Court that information possessed by its alumni interviewers is of "limited relevance" (Opposition at 13) and that these reports have "only a very small effect on the ultimate composition of a Harvard class" (Opposition at 14). This Court should not be fooled. Ms. McGrath's deposition made it crystal clear that a significant number of alumni interviewers are likely to have information directly relevant to this case. For example, Ms. McGrath testified that alumni interviewers "have certainly had questions" and are "often asking us questions about race in the process." Strawbridge Decl. Ex. B 124:2-4, 13-18.  Harvard's alumni interviewers "often" tell Harvard admissions personnel that "[y]ou admitted too many of this" or "too few of that. This could be any kind of characteristic, and it certainly has been applied to race." *Id.* at 124:22-125:7. Moreover, Ms. McGrath recalled some specific occasions where alumni interviewers raised specific concerns about discrimination against Asian-Americans. *Id.* at 125:12-126:18. And contrary to Harvard's suggestions, Ms. McGrath and other Harvard personnel have previously indicated that alumni interviews, in fact, played an important

---

the statute's authorization to produce even *unredacted* student records so long as notice is given to students. *See* 20 U.S.C. § 1232g(b)(2)(B); 34 C.F.R. § 99.31(a)(9); *see also Doe v. Ohio*, 2013 WL 2145594, at *5 (S.D. Ohio May 15, 2013). Because Harvard's arguments are all directed at the application files, and not the databases, *see* Opposition 9-12, there is no need to address the FERPA issues in detail at this time.

role in the admissions process. *See* Opening Memo. at 18.[4] In light of this testimony, it is disingenuous for Harvard to claim that it "cannot conceive of a reason why" alumni interviewers might have relevant information in this case. Opposition at 14.

Learning the mere "identity and location" of a witness who may have discoverable information that is in Harvard's possession does *not* subject that witness to "annoyance, embarrassment, or oppression." The one case Harvard relies upon for that strained proposition— *Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998)—is wholly misplaced. That decision involved a subpoena raising "fundamental First Amendment value[s]," in which a party sought production of research materials (including notes, tapes and transcripts) from third-party academic investigators for use in an antitrust case (i.e., far more than just the *identities* of witnesses SFFA now seeks). *Id.* at 712, 717. Harvard cannot preemptively wall off an entire category of people with relevant information by asserting that they are "volunteers" and speculating about the potential effects if a handful of relevant witnesses are ultimately deposed.[5] The interviewers can resist discovery if and when requests are made, and the fact that they are volunteers does not insulate them from inquiry into their role in a racially discriminatory process.

---

[4] *See also* William R. Fitzsimmons, *Guidance Office: Answers from Harvard's Dean, Part 1*, N.Y. Times, Sept. 10, 2009, at http://thechoice.blogs.nytimes.com/2009/09/10/ harvarddean-part1/ (noting that "[s]tudents' intellectual imagination, strength of character, and their ability to exercise good judgment" are the "critical factors in the admissions process" and are "revealed not by test scores" but, in part, by "alumni/ae and staff interview reports").

[5] Harvard's suggestion that SFFA intends to depose thousands of interviewers is absurd. In any event, Harvard will receive notice before SFFA sends any third-party subpoenas, and will thus have the opportunity to object or seek relief in this Court if it has any concerns about the scope of that discovery. But Harvard cannot withhold information in its own possession at this stage based on its rank speculation about what might happen in the future, and the effect it might have on some of the recipients. Even more absurd is Harvard's claim that it can conceal the most basic information about the interview process, but place the burden on SFFA to come back with "with a targeted request" for interviewer discovery and "explanation of that need."

More importantly, this Court has an obligation to ensure the record permits thorough examination of Harvard's admissions process, in practice. *Fisher*, 133 S. Ct. at 2421. Alumni interviewers are a key part of that process. Preventing SFFA from learning the names of a subset of those personnel most likely to have relevant information is inconsistent with the responsibility to provide a full record from which to determine whether Harvard can satisfy strict scrutiny. Again, it is Harvard's decision to use race that has rendered this discovery essential. Any chilling effect on alumni interviewers is secondary to the Supreme Court's clear requirement of close scrutiny when a university makes its decision in part on the race of its applicants.

### III. Harvard's Transfer Student Admissions Process Is Encompassed by and Relevant to This Litigation.

Any matters "relevant to any party's claim or defense" are within the scope of party-controlled discovery. Fed. R. Civ. P. 26(b)(1). Harvard pretends that its transfer student admissions process is not encompassed within SFFA's Complaint, but that document speaks for itself. *See* Complaint ¶ 24 (describing SFFA members who "seek to transfer to Harvard when it ceases the use of race or ethnicity as an admissions preference"); *id.* ¶ 300 (alleging that Harvard's transfer process may be used to further improper racial balancing and preserve a specific racial composition of students); ¶¶ 334-38 (describing how Harvard's transfer student process could constitute a race-neutral alternative to its race-based admissions process). The Complaint puts the transfer admissions process directly at issue, and that is all that is required to bring it within the realm of discovery under Fed. R. Civ. P. 26(b).

Missing from Harvard's opposition is any mention of the conceded fact that its transfer student admissions process uses the same "holistic" approach, including the use of race, that applies to freshman applicants. *See* Opening Memo. at 19-20 (quoting Answer ¶ 186).

Information concerning the transfer student admissions process is just as relevant to SFFA's claims as is its identical freshman admissions process.[6]

Harvard further contends that transfer admissions "play a tiny role in the composition of any Harvard undergraduate class." Opposition at 15. But Harvard's own witness concedes that more than a thousand students compete for one or two dozen slots each year. The unlawful use of race is not excused simply because the competition for these slots is substantial.[7] Because Harvard's transfer process is derivative of its freshman application process *and* because both processes use race in identical fashion, discovery on this topic is likely to uncover information that will assist in illuminating and clarifying the fundamental issues in this case. SFFA's motion to compel information about the transfer admissions process should be allowed.

## CONCLUSION

For the foregoing reasons and those expressed in SFFA's Opening Memorandum, SFFA respectfully requests that the Court: (a) order Harvard to comply with SFFA's Requests for Production Nos. 19 and 24; (b) order Harvard to produce documents regarding its transfer admissions process on the same terms it produces information regarding its freshman admission process in response to SFFA's discovery request; and (c) grant further relief as the Court sees fit.

---

[6] Harvard appears to believe that SFFA's membership must include a current applicant who already has applied to transfer in order to challenge its use of race in that context. *See* Opposition at 14-15. But an applicant may challenge a university's admissions process if she demonstrates that she "was 'able and ready' to apply as a transfer student should the University cease to use race in undergraduate admissions." *Gratz v. Bollinger*, 539 U.S. 224, 262 (2003). *Gratz rejected* the argument that a party had to submit a transfer application, especially where the "use of race in undergraduate transfer admissions does not implicate a significantly different set of concerns than does its use of race in undergraduate freshman admissions." *Id.* at 264.

[7] Harvard's admissions rate on transfer students ranges between 1 and 2 percent, *see* McGrath Decl. ¶¶ 7-8, while its overall freshman admissions rate is roughly 5.5 percent. *See, e.g.,* https://college.harvard.edu/admissions/admissions-statistics. In both cases, Harvard admits "relatively few" applicants; and it overstates the differences when it claims its transfer admissions rate is "not comparable to the rate for freshman applications." Opposition at 14.

Respectfully submitted,

By: /s/ William S. Consovoy

| | |
|---|---|
| Paul M. Sanford BBO #566318<br>Benjamin C. Caldwell BBO #675061<br>BURNS & LEVINSON LLP<br>One Citizens Plaza, Suite 1100<br>Providence, RI 02903<br>Tel: 617-345-3000<br>Fax: 617-345-3299<br>psanford@burnslev.com<br>bcaldwell@burnslev.com | William S. Consovoy<br>Thomas R. McCarthy<br>J. Michael Connolly<br>CONSOVOY MCCARTHY PARK PLLC<br>3033 Wilson Boulevard, Suite 700<br>Arlington, Virginia 22201<br>Tel: 703-243-4923<br>Fax: 703.243.4923<br>will@consovoymccarthy.com<br>tom@consovoymccarthy.com<br>mike@consovoymccarthy.com |
| Dated: August 7, 2015 | Patrick Strawbridge<br>BBO #678274<br>CONSOVOY MCCARTHY PARK PLLC<br>Ten Post Office Square<br>8th Floor South PMB #706<br>Boston, MA 02109<br>Tel: 617-227-0548<br>patrick@consovoymccarthy.com<br><br>*Counsel for Plaintiff Students for Fair Admissions, Inc.* |

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Benjamin C. Caldwell

4846-3986-1286.1