1                   UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3     * * * * * * * * * * * * * *
      STUDENTS FOR FAIR              *
4     ADMISSIONS, INC.,              *
              Plaintiff,             *
5                                    *
                 vs.                 *        CIVIL ACTION
6                                    *        No. 14-14176-ADB
      PRESIDENT AND FELLOWS OF       *
7     HARVARD COLLEGE, et al,        *
              Defendants.            *
8     * * * * * * * * * * * * * *

9           BEFORE THE HONORABLE ALLISON D. BURROUGHS
                   UNITED STATES DISTRICT JUDGE
10                    **STATUS CONFERENCE**

11    A P P E A R A N C E S

12

13            CONSOVOY McCARTHY PARK PLLC
              Ten Post Office Square, 8th Floor
              Boston, Massachusetts 02109
14            for the plaintiff
              By: Patrick Strawbridge, Esq.
15

16

17            CONSOVOY McCARTHY PARK PLLC
              3 Columbus Circle, 15th Floor
              New York, New York 10024
18            for the plaintiff
              By: Michael H. Park, Esq.
19

20

21
                                 Courtroom No. 17
22                               John J. Moakley Courthouse
                                 1 Courthouse Way
23                               Boston, Massachusetts 02210
                                 February 25, 2016
24                               11:10 a.m.

25

1  <u>**APPEARANCES CONTINUED**</u>

2

3          BURNS & LEVINSON LLP
           One Citizens Plaza, Suite 1100
4          Providence, Rhode Island 02903
           for the plaintiff
5          By:  Benjamin C. Caldwell, Esq.

6

7          WILMER CUTLER PICKERING HALE and DORR LLP (Bos)
8          60 State Street
           Boston, Massachusetts 02109
9          for the defendants
           By: Felicia H. Ellsworth, Esq.

10

11

12  ALSO PRESENT:  Matthew Fox, Esq., Harvard Office of
                   General Counsel

13

14

15

16

17

18

19              CAROL LYNN SCOTT, CSR, RMR
                 Official Court Reporter
20            One Courthouse Way, Suite 7204
               Boston, Massachusetts 02210
21                 (617) 330-1377

22

23

24

25

1                    <u>P R O C E E D I N G S</u>

2              **THE CLERK:**  All rise.

3              **THE COURT:**  Good morning, everyone.

4              **VOICES:**  Good morning, Your Honor.

5              **THE CLERK:**  Court is in session.  Please be

6      seated.

7          This is Civil Action 14-14176, *Students for Fair*

8      *Admissions versus President and Fellows of Harvard*.

9          Will counsel identify themselves for the record.

10             **MR. STRAWBRIDGE:**  Yes, Patrick Strawbridge

11     from Consovoy McCarthy Park on behalf of the plaintiff

12     Students for Fair Admissions.  I'm here with my colleague

13     Michael Park, and Ben Caldwell from Burns & Levinson.

14             **MS. ELLSWORTH:**  Good morning, Your Honor.

15     Felicia Ellsworth for President and Fellows of Harvard

16     College.  And I'm here with Matthew Fox from the Office of

17     General Counsel at Harvard.

18             **THE COURT:**  Are you replacing Ara or is this

19     just a cameo?

20             **MR. FOX:**  Just for today.  Thank you, Your

21     Honor.

22             **THE COURT:**  All right.  So when I actually

23     looked at this file last night and I thought we had gotten

24     out a draft order between the status and the last

25     conference, and then I realized there was so much paper

1    flying back and forth that we hadn't but we're going to get

2    out an order very quickly after this.  It is largely a draft

3    now.  It will be informed by what happens today and we will

4    get an order out.  If anyone was expecting it, my apologies

5    for that.

6           So I am going to try and go through this sort of

7    methodically and then deal with whatever else you all have

8    on your minds today.  But just as sort of a general

9    commentary, the Students For Fair Admissions,

10   Mr. Strawbridge, your paperwork is written as if if you

11   don't get it today you're never going to get it and that is

12   just not the case.  There is a lot of the stuff that you're

13   asking for that you're not going to get today but I fully

14   anticipate you will get eventually once we sort of tailor

15   things after *Fisher*.

16          Of course, I feel like the -- I don't know whether

17   to call the death of Scalia untimely or just his death but

18   whatever -- after, of course, I felt appropriate sympathy

19   for him and his family and then my mind went right to

20   *Fisher*.  So who knows what is going to happen with that,

21   what kind of time frame we are dealing with now.  I don't

22   know if this is one of those cases that is going to turn out

23   to be four/four up there, I don't know, but it seems to me

24   this could extend our time frame on this.

25          *And,* but nonetheless, while we are waiting for

*Fisher* I want to get as much done as I can but what I am --
with some exceptions.  No depositions and no email searches.
I just don't want that, those things to be done more than
once.  So I would like it if we could spend the time to come
up with some parameters on what your email searches are
going to be but I am not going to have email searches done
now and then more different or more email searches done
after *Fisher*.

So, anyway, and for Harvard's part of this, there
is a negotiated protective order here and I want to respect
that.  It was negotiated between the parties but it is clear
from their paperwork and from, I think from the volume that
Harvard has designated as "highly confidential," and I
understand your rationale for it, but they, I think that
they sort of bought a pig in a poke, right.  They weren't
fully anticipating how much that was going to limit their
ability to share the information with their client.

And I agree that their client is not your typical
sort of client.  This case is politicized in some ways and I
am not inclined to give them full access to these things but
I am inclined to enforce the terms of the protective order
and the way that it has been negotiated at this point; but I
am just asking you to be reasonable and careful about what
you are designating because you're making it difficult for
them to do their jobs at this point.

1         And if it gets, if I feel like it gets to the point

2    where I need to take a more interventionist approach to

3    that, I will; but I saw that you undesignated some things

4    and I'm a little unclear what -- I think you both

5    represented different things in the paperwork.  But are they

6    allowed to discuss the highly confidential documents with

7    their client or they're not?

8         **MS. ELLSWORTH:**  I'll speak to our

9    interpretation of that which is that the protective order

10   allows them to advise their client based on the highly

11   confidential information.  You know, the language which

12   Mr. Strawbridge I think pointed out for you is pretty clear

13   that you can't show the actual documents and you can't give

14   the actual contents.  I think in our view a reasonable

15   reading of that is that you can discuss and advise your

16   client on the contours of the information that you've

17   learned from it.

18        You know, I mean, this is a restriction that we

19   dealt with in other cases in the past.  And one certainly

20   has to be careful and we are not suggesting that we want

21   them to be uncareful in how they interpret that but the idea

22   behind that provision in the protective order is to sort of

23   allow for the very accommodation that I think SFFA thinks it

24   needs.

25        **THE COURT:**  So what she just said I think you

1    should be able to live with.

2                 **MR. STRAWBRIDGE:**  I don't think it's what the

3    protective order says.

4                 **THE COURT:**  Well, that's her interpretation of

5    the protective order.  And if that turns out to be sort an

6    oral modification of the protective order between the two of

7    you, so be it.  I mean, I'm not weighing in on that but her,

8    what she just said should allow you to function with your

9    client.

10                **MR. STRAWBRIDGE:**  I am not -- I wish I shared

11   the Court's confidence.  I'm afraid that I don't.  I mean,

12   we do need to be mindful of it.  I really don't want to put

13   myself in a situation where we can be accused of having

14   violated the protective order.  It's why we made this

15   request and we've gone through this rationale to try to be

16   very deliberate.

17                I mean, I understand what Your Honor is saying

18   about the negotiations and encouraging them to be careful

19   but on a fundamental level this is really where it begins.

20   I don't think it's where it ends.  You know, a tremendous

21   amount of this case and how the case is going to be

22   presented is going to revolve around expert analysis as to

23   how this admissions process works.

24                And under the terms of the protective order right

25   now, and I don't think that Ms. Caldwell (sic) --

1    Ms. Ellsworth, I'm sorry, has been entirely clear about the

2    extent to which they're taking a different view now.  We

3    can't even disclose the existence of the materials that our

4    expert is looking at let alone the expert's analysis and

5    conclusions based on his review.

6         If it's about not giving him access to the

7    database, my client doesn't want access to the database

8    itself.  He doesn't have any interest in looking at the

9    database.  But the organization needs to be able to

10   understand what it is talking about.

11        And the only other point I'd make on this is if you

12   read *Crutter*, if you read *Gratz*, we're not looking to

13   litigate this case in a closed courtroom.  The Supreme Court

14   is not going to consider that case in a sealed proceeding.

15   This stuff is going to come in.  And to shut off our access

16   at this stage of the litigation is really troublesome.

17        **THE COURT:**  Some of it is going to come in and

18   we don't know which of that it is going to be until after

19   *Fisher* in fairness.  So, and it is not, it is not impeding

20   your ability to use the information with your expert.  What

21   it's doing is impeding your ability to show and maybe

22   discuss the documents with your client.  And that's, you

23   know, that was always going to be the case with this

24   protective order.  It is always the case with almost any

25   protective order, right, that, and, I mean, your client is

 1    not a competitor but they're a partisan in this and it is

 2    understandable that they don't want to share that level of

 3    information with your client.

 4           Now, if they're, whether -- I mean, it is a

 5    negotiated arm's-length protective order but obviously many

 6    and highly competent lawyers.  The only issue that concerns

 7    me in there is if they're over-designated.  I just told them

 8    I don't want them to over-designate.  And if it turns out

 9    that they're over-designating and that really hampers you in

10    some way, we'll visit it again; but I would like to kick

11    that can down the road until after *Fisher* if I can, because

12    once, and not to mix a bunch of bad metaphors, but once the

13    cat is out of the bag, it is out of the bag, right.  The

14    information has been shared with your client who, you know,

15    I can't undo that so --

16                **MR. STRAWBRIDGE:**  Respectfully, Your Honor --

17                **THE COURT:**  Of course.

18                **MR. STRAWBRIDGE:**  None of the case law I think

19    supports the kind of conjectural concern when there is a

20    noncompetitive situation and this is --

21                **THE COURT:**  But you signed -- you negotiated

22    and entered into that protective order.

23                **MR. STRAWBRIDGE:**  Without merely understanding

24    the scope to which they were going to be --

25                **THE COURT:**  Well, that is why I am -- that is

1    the nub of it; right?  And I just said to them I am not

2    doing anything about this now but if they designate or

3    over-designate or whatever you want to call it to the point

4    where it really begins to hamstring you as this progresses

5    in a more fulsome way later down the road I will have to

6    deal with it but for the time being I am not inclined to

7    interfere with an arm's-length negotiated protective order

8    that -- I don't see the problem as being the protective

9    order.  I see the problem as being the amount of

10   designation.  And if it continues at that pace and it

11   hamstrings you, then I'll have to wade into it, but --

12            **MR. STRAWBRIDGE:**  Well, let me just cut, so we

13   at least have something on the record, let me just pose the

14   question.  Is it Harvard's position today that we can

15   discuss the analysis that our expert makes of the database

16   material that they have produced as long as we do not

17   disclose the actual underlying database material itself to

18   our client?

19            **MS. ELLSWORTH:**  Mr. Strawbridge and I have

20   discussed this in the past.  It's a little hard for us to

21   answer that question without knowing what the analysis looks

22   like, right.  So I think there is an interpretation of the

23   protective order that would say that certain analysis that

24   is at a very high level and showing, you know, race (ph.)

25   analyses and things like that, that would probably be okay

1   if the analysis is there were X number of this and Y number

2   of that, that seems to us to get to close to actually

3   disclosing the contents of the database.

4          THE COURT:  What I think she is saying and

5   what I would courage and what is reasonable to me is that if

6   you're running an analysis of that database, then you should

7   be able to share with your clients the conclusions of that

8   analysis, right.  This is what the overall statistics look

9   like, what you put in your PowerPoint, right, but that you

10  probably should be way more careful about sharing things

11  like we took this information from that document and this

12  information from that document and we did this with it and

13  came out with that number, right?

14         And I don't think they need to know, your client, I

15  mean -- and, again, I'm not trying the case -- but it seems

16  to me that the conclusions of the expert, the results of the

17  analysis should be what your client needs.  He doesn't need

18  to know the nitty gritty of how you got there.  And I never

19  had a client that even wanted to know how anybody got there

20  so.

21         MR. STRAWBRIDGE:  I mean, I suppose there is,

22  there is some uncertainty as to where you draw those two

23  lines between what is nitty gritty and what is a conclusion

24  and what is the basis for a conclusion.  And that's where it

25  gets very complicated.

1          I mean, I respectfully disagree that our client

2     doesn't need to know this, that we don't need to have the

3     ability to share this with one client representative.  If

4     Your Honor's mind is made up on this, you know, I would

5     inquire as to whether it is going to be addressed in the

6     draft order, because we have requested some relief on this

7     that will at least allow us to consider whether we want to

8     seek further review?

9               THE COURT:  Let me see.  So this was largely

10    drafted after our last -- it is not addressed in the current

11    draft exactly but if you want me to put something in there

12    I will.

13              MR. STRAWBRIDGE:  Yes, we just --

14              THE COURT:  I mean --

15              MR. STRAWBRIDGE:  I would respectfully just

16    ask the Court to, you know, if you look at the language of

17    *Danny V* (ph.), if you look at some of the First Circuit's

18    discussion of what sort of standard is necessary and how

19    important it is that clients not be overly restricted, I

20    think when you pull that all together we'd ask you to just

21    take a look at it.

22          But if Your Honor is of the view that our client

23    cannot be given access at least on equal footing with their

24    in-house counsel --

25              THE COURT:  I am of that view.

1          **MR. STRAWBRIDGE:**  And we'd request that it be

2     in the order, please.

3          **THE COURT:**  That's fine.  I am happy to put

4     that in the order.  You don't have to preface anything with

5     "respectfully" or "honestly" because I really expect, I

6     assume both of those two things.

7          All right.  So let me try and wade through this all

8     and you can tell me what I have left out.

9          So it -- so on policies, manuals and guidelines,

10    Ms. Ellsworth, are you now willing to produce 1 through 14,

11    17 and 20?  I'm talking about 17 and 20.  They ask for 1

12    through 14.  You say you are producing it but you don't

13    actually identify 1 through 14.

14         **MS. ELLSWORTH:**  Yeah, 1 through 14 and --

15    well, one relates to either electronic databases, printed

16    databases and manuals and guidebooks in connection with the

17    same.

18         What we have agreed to produce is, I think probably

19    the closest RFP to it is probably RFP two which is code

20    books and guide books from the database information that's

21    already been produced.

22         Other database information to the extent it exists

23    has not been produced to them.  I'm not sure any code books

24    or guidebooks exist as to that.  So what we've said is that

25    essentially any code books, guidebooks, manuals, et cetera,

1    for the information that has already been produced under

2    Your Honor's order we will be happy to produce at this point

3    as to that RFP.

4              THE COURT:  So I want to make sure that the

5    order is clear.  So are you -- is that yes to 1 through 14

6    or do you want me to say it --

7              MS. ELLSWORTH:  It's not 1 through 14 because

8    1 through 14 would be much broader.  It would be two I

9    think.

10             THE COURT:  Okay.  Two on the RFP?

11             MS. ELLSWORTH:  Correct.

12             THE COURT:  And then 17 and 20?

13             MS. ELLSWORTH:  Correct, subject to our other

14   objections.

15             THE COURT:  So 2, 17 and 20.  Does that

16   satisfy you, Mr. Strawbridge?

17             MR. STRAWBRIDGE:  I think with the caveat that

18   we may want to revisit it after *Fisher*, I think that that's

19   satisfactory.  I understand the qualification with respect

20   to 1 and 2 is with respect to the data being produced here,

21   they're going to produce the associated data books or guide

22   books, whatever exists, so that's fine.

23             THE COURT:  Okay.  You can come back on that

24   if it doesn't work out.

25             The application files for SFFA members, they agreed

1  to produce that once they've gotten consent from those

2  people.  Is that accurate?

3          **MS. ELLSWORTH:**  Correct.

4          **THE COURT:**  And I assume that satisfies you

5  with regard to those?

6          **MR. STRAWBRIDGE:**  Yes.  I'll confer with my

7  counterpart here as to whether there is a particular form

8  they want it but that's fine.

9          **THE COURT:**  Okay.  No. 15 which is documents

10 concerning the racial composition of the pool of applicants.

11 And we, I think we talked about at our last one that if such

12 a thing existed in sort of a generic form that you would

13 produce those to them.  Where are we on that?

14         **MS. ELLSWORTH:**  So, Your Honor, what we've

15 indicated in our letter from a couple days ago is that to

16 the extent that what SFFA is looking for is the aggregate,

17 you know, applicant and admit data, that's discernible from

18 the database that's already been produced.  It has the

19 racial information and it has whether someone was admitted

20 or not for those two years' of data that's already been

21 produced so that has already been produced.

22         So, there is also a request for enrolled students'

23 data that the plaintiff agreed to and we didn't agree to

24 produce any enrolled students' data as to anything in our

25 RFP responses and we're happy to discuss that.  I am not

 1  sure where Your Honor is on that.

 2          THE COURT:  Well, do you agree that what they

 3  produced to date allows you to extract the information you

 4  are looking for?

 5          MR. STRAWBRIDGE:  I don't think that what

 6  they've produced is sufficient and, Your Honor, I'm happy,

 7  if I could approach very briefly --

 8          THE COURT:  Sure.

 9          MR. STRAWBRIDGE:  -- I think I'd like to show

10  you.

11          THE COURT:  Sure.

12      (Whereupon, a document was handed to the Court.)

13          MR. STRAWBRIDGE:  I have handed you page two

14  of two from a deposition in this case.  It has been marked

15  "highly confidential" so I am not going to disclose the

16  contents of it other than to note that this page describes a

17  particular document, a set of documents prepared during the

18  admissions process.

19          THE COURT:  Where are you?  Start me on a

20  line.

21          MR. STRAWBRIDGE:  It's basically the entire,

22  if you start at the first question on line seven and

23  follow --

24          THE COURT:  Give me a second here.

25      (Pause in proceedings while the Court read the

1          document.)

2                **THE COURT:**  Okay.  And that leads to, your

3     position is this document exists.  I assume you are about to

4     tell me they haven't given it to you.

5                **MR. STRAWBRIDGE:**  And I would, the one point I

6     would also make is that there is a big difference between

7     the ability to look at a database after the fact and discern

8     where it all ended up as opposed to contemporaneous evidence

9     as to how they were using race during the admissions

10    process.  That's the evidence that this document in

11    particular captures.

12               And this is the kind of document that I think Your

13    Honor said at the last hearing was the sort of thing they

14    ought to produce.  We would ask that this set of documents

15    generated during the admission cycles, particular periods

16    during the admissions cycles be produced.

17               **MS. ELLSWORTH:**  Your Honor, RFP 15 asks for

18    all documents from a relevant period concerning the racial

19    composition of the pool of applicants, admitted students or

20    enrollees.  And our response and objection was that we would

21    produce documents sufficient to show the racial composition

22    of the pool of applicants, admitted students, and admitted

23    students, so that's the objection that we made there.

24               If there is a specific back and forth about this

25    specific RFP, I think where we are on this, what we've

1     agreed to produce is sufficient to show the composition of

2     the class, which they can get that.  Now, I'm not denying

3     that the document that is the subject of this testimony

4     exists or some document like this --

5               **THE COURT:**  Your position is that they haven't

6     asked for it?

7               **MS. ELLSWORTH:**  My position is that that's the

8     type of, within the process kind of the granular

9     information, at least our interpretation of Your Honor's

10    rulings so far is the type of information that should await

11    *Fisher II* and the contours of the case as opposed to we're

12    looking for just the aggregate, the breakdown.  They have

13    the database and they can play with it whatever way they're

14    able to do so.

15               **THE COURT:**  I don't, I haven't seen this

16    document.  I don't really know what it says but this seems

17    to me to be a generic sort of document that doesn't identify

18    individual students that should go over unless there is

19    some --

20               **MS. ELLSWORTH:**  The document that is the

21    subject of this testimony, you're right, Your Honor, at

22    least most of it that I am aware of would not identify

23    individual students.

24               **THE COURT:**  I think that they should get that

25    document if they have asked for it.  Have you asked for it?

1     **MR. STRAWBRIDGE:**  Oh, yes, we have asked for

2     it.  Her position is that they had not yet agreed to produce

3     it when we were initially exchanging objections and

4     responses but we certainly have asked for this document.

5     It's encumbered by our request.

6          **THE COURT:**  So, you know, I mean, my

7     presumption is that documents should go over except email

8     searches.  I think we should wait to define the search terms

9     because I don't think that should be done more than once, or

10    that identifies private student information.

11         So I don't see any reason why a document like this

12    would not go over at this point to them.

13         **MS. ELLSWORTH:**  Okay, Your Honor.  I mean, I

14    hear you and we'll find, locate any versions of this

15    document from the time period that we've been producing

16    from.

17         I do think this sways into the EIS searching but I

18    hear your order and we're happy to find it.

19         **THE COURT:**  I mean, this doesn't seem to me

20    like it is, I mean, I view the EIS searching where you're

21    doing a word search and you come up with a million documents

22    and someone has to go through them to weed out which 300,000

23    were actually responsive, that's what I am trying to avoid.

24         But where you have an identifiable document,

25    they're probably sitting in a folder someplace, it is not

1    going to require any real discretion about what goes over

2    and what doesn't, when you pull that group of documents, I

3    think those are the things that should go over.

4           I don't want you to have to engage in sort of a

5    massive document review and production before we know what

6    the parameters of *Fisher* are going to be; but where there is

7    discrete sets of documents that don't require that sort of

8    review function, I would like those to go over, unless they

9    reveal confidential student information or some other trade

10   secret or whatever Harvard wants to call their process at

11   this point.

12          **MS. ELLSWORTH:**  Okay.  I understand the

13   Court's view on that.

14          **THE COURT:**  Okay.  I am actually, I am going

15   to go back through all of these documents but I happen to

16   have them in front of me right now, Harvard's most recent

17   one which is the order, I'm marching through these, but

18   we'll go back and capture whatever is not in this one.

19          Documents concerning race and admission process

20   which are SFFA's request 22, 23, 32 and 33.  I'm not

21   prepared to order those be produced now.  I think those are

22   the types of documents that should wait until after *Fisher*,

23   unless *Fisher* gets to be extremely protracted which maybe we

24   can revisit some of this, but these all seem like they would

25   require email searches.  I think they are premature at this

1    point in the process.

2          I guess I should say that is 22, 23 and 32.   33

3    which is what -- those are documents that, what are you --

4    it's your, you are correlating academic performance to

5    demographic characteristics, is that what 33 asks for?

6          **MR. STRAWBRIDGE:**  Yes, Your Honor, the

7    Complaint discusses, and it will be Harvard's burden to show

8    that whatever, however they're using race in their

9    admissions process, that it's going to be effective in

10   achieving their stated goal which presumably is a diverse

11   campus climate that stretches beyond the date of admission.

12   And, therefore, we had asked for, among other things,

13   academic performance data broken down by ethnicity, you

14   know, for the four-year period at least covering the

15   material when we had initially made this request.

16         Harvard submitted that they would consider

17   producing it on an aggregate basis, not a specific anonymous

18   student basis.  We said we were interested in that aggregate

19   data.  At that point Harvard asserted the stay and basically

20   shut down the discussions but we think that's highly

21   relevant information.  It's going to be necessary to the

22   Court's consideration.  And because it does not identify

23   students on a specific level and it can be easily discerned

24   from the existing electronic records, we think that should

25   be produced.

1          **THE COURT:**  So in your letter you actually

2     address all of their points except this one, at least I

3     didn't see it here.  So what is Harvard's view on 33?

4          **MS. ELLSWORTH:**  On 33, Your Honor, I mean,

5     again, this, there are many different subparts of this:  The

6     application rate of high school students to Harvard; the

7     rate at which applicants are admitted.  This is seeking

8     documents that seek to measure, estimate or predict using

9     race how people will apply, how people might enroll, how

10    enrolled students may perform once they actually matriculate

11    at Harvard.

12         First of all, I would note that, again, this I

13    think will require an EIS search for us to determine whether

14    any documents are responsive to this request.  I'm not

15    certain how we had intended to respond to their objections,

16    or our objections and responses.

17         And, secondly, again, on enrolled students, we

18    don't view that as being an appropriate part of this case.

19    We regard that information very zealously and are very

20    cognizant of the privacy intrusion on enrolled students from

21    this case which is really about the admissions process.

22         So I think trying to -- I don't believe that these

23    fall into a category of some discrete document or data set

24    that we could pull from.  It's about predicting or using

25    race to predict performance.  You know, again, we don't

1    agree that's appropriately part of the case but certainly as

2    a sort of more functional discovery matter it would be very

3    difficult to obtain at this point in time.

4            **THE COURT:**  I am not so interested in the

5    predictive part of that.  I think that gets saved.  But if

6    you have raw statistical anonymous data on how different

7    demographic groups are performing, does that exist?

8            **MS. ELLSWORTH:**  Once enrolled at Harvard?

9            **THE COURT:**  Well, I am going to hold back on

10   the predictive stuff; but, yes, they claim in their

11   Complaint that you, you allege -- I think I have this

12   right -- that you allege that candidates that are let in on

13   sort of an affirmative action type of theory underperform

14   others; right?

15           **MR. STRAWBRIDGE:**  Correct, and ultimately have

16   a negative effect both on the quality and the quantity --

17           **THE COURT:**  I mean, at some point they are

18   going to be entitled to that information.  And I, the

19   predictive part of it I am going to hold back on.  I have

20   taken that off the table for now but it's the statistical

21   analysis of how those demographic groups are performing at

22   Harvard, to address that issue in their Complaint.  Do those

23   sorts of documents exist?

24           **MS. ELLSWORTH:**  So as to enrolled students, I

25   want to make sure I understand the question.  Whether there

1    is information in Harvard's possession about enrolled

2    students, majors or GPA, things like that?

3              **THE COURT:**  Enrolled students, I mean, I'm not

4    sure, what are you talking about?  Are you talking about

5    students that have already graduated?  Is that going to

6    be --

7              **MR. STRAWBRIDGE:**  I think that we would like

8    to look at this aggregate data over a time period, at least

9    four years, probably maybe a little bit longer, to see how,

10   you know, the admissions process actually manifests itself

11   once the students get on campus and go through the process.

12             I think Your Honor has identified what the issue is

13   and we obviously need a rolling basis for a period of time.

14   We have been negotiating and discussing how that could be

15   produced on an aggregate basis by ethnicity.  Obviously

16   there are a lot of parameters and functions but it's our

17   understanding that all this information can be gleaned from,

18   you know, enrollment records.

19             **THE COURT:**  Do you have it or -- at this point

20   I am not going to -- well, do you have it?  How is that

21   information kept?

22             **MS. ELLSWORTH:**  I mean, the Office of the

23   Registrar has certain information about enrolled students.

24             **THE COURT:**  Do you keep that data someplace?

25   Do you look at that data?

1        **MS. ELLSWORTH:**  Does Harvard look at that

2    data?  To be honest, Your Honor, I don't know the answer to

3    that question.

4        **THE COURT:**  Have they kept documents that

5    capture that?  I'm not going to ask you to make something

6    for them.

7        **MS. ELLSWORTH:**  I would have to confer as to

8    whether there are documents that are currently in existence

9    versus simply a database that somebody could query.

10        **THE COURT:**  I mean, if somebody has done a

11    statistical analysis that shows that this group performed in

12    this way, that group performs in that way, whatever that

13    information is, however it's kept, historical information,

14    historical anonymized information.  I am not so concerned

15    about the distinction between currently enrolled.  I am more

16    inclined to protect the currently enrolled to be, to -- but

17    if you keep that historical information and it is anonymous

18    and it is available, that should probably go to them unless

19    you can, unless there is some way in which it falls out of

20    the parameters I articulated that I hadn't thought of.

21        **MS. ELLSWORTH:**  Well, I don't think it

22    necessarily falls out of the parameters of discovery as Your

23    Honor has been suggesting today.

24        I think our larger concern there is that we don't

25    believe the performance data about either currently enrolled

1   or previously enrolled students is actually something that

2   should be produced in this case.

3               THE COURT:  Well, why?  Because they have

4   alleged it in their Complaint?  Why would they not be

5   allowed to explore it in discovery?

6               MS. ELLSWORTH:  We simply don't think that it

7   is relevant to the question before the Court as to the race

8   in the admissions process and the permissible --

9               THE COURT:  Well, that is an interesting

10  point.  So under current case law they would be entitled to

11  that information but what I am extrapolating from what you

12  are saying is that *Fisher* may change those parameters in

13  which case the performance may not become so relevant.

14              MS. ELLSWORTH:  It may, and I think that even

15  under current case law it is not clear as to how relevant

16  this -- I think it's what academics call the mismatched

17  theory.  It's not the theory that we buy into.  I understand

18  that the plaintiffs have made allegations in their

19  Complaint; but from our point of view the relevant question

20  for this Court is the admission process as it was conducted

21  by Harvard and whatever information goes into that process.

22              THE COURT:  Well, the admissions process is

23  conducted by, they're allowed to consider race for certain

24  limited purposes.  And what he is saying is that however

25  Harvard is currently considering race in its admission

1    process, they want to argue that it is not achieving those

2    purposes, right.  So they can't make that argument unless

3    they see the data.

4          So, you know, my expectation is that at some point

5    they are going to get it but now I am thinking about how

6    *Fisher* might impact that and I may, I may have them hold off

7    on 33 too but --

8              **MR. STRAWBRIDGE:**  If I can just push --

9              **THE COURT:**  Yes, go ahead.

10             **MR. STRAWBRIDGE:**  Just --

11             **THE COURT:**  Respectfully push, and honestly.

12         (Laughter.)

13             **MR. STRAWBRIDGE:**  Now you are making fun of me

14   I think.

15         (Laughter.)

16             **MR. STRAWBRIDGE:**  I mean, what we are looking

17   for here is not I don't think particularly burdensome.  This

18   is aggregate data that's available in the Registrar's

19   Office.  It is just pulling a subset of electronic data that

20   they already have so that we can do some basic analysis on.

21   It is relevant and, you know, there is a tendency in this

22   case I'm afraid for Harvard to insist that *Fisher* is going

23   to change everything without actually putting any meat on

24   those bones or explaining specifically how *Fisher* might

25   change it.  I mean --

1          **THE COURT:**  You know, you are going to get it,

2     right.  I mean, I am not, this is not a ruling for all time.

3     I will tell you, I mean, to be perfectly honest, which I

4     always try to be, you know, I want, I am sensitive to the

5     issues that they have raised but I am also sensitive to, you

6     know, some of the other issues in this.  And if, you know,

7     if you are going to suggest that certain demographic groups

8     perform or underperform or over-perform other demographic

9     groups, I mean, that can have sort of political implications

10    that I am not entirely comfortable putting out there unless

11    we need to I guess is the way I will put that.

12          **MR. STRAWBRIDGE:**  I guess my response to that

13    is we're under a legal regime that today and after *Fisher* is

14    still going to require strict scrutiny to the use of race.

15    Whether it's a politically uncomfortable conversation or not

16    has no bearing on whether they can meet that standard.  It

17    is one of the asserted bases for their use of race and it

18    needs to be tested.

19          **THE COURT:**  Let me interrupt you.  What if

20    *Fisher* says you cannot consider race and Harvard says, Okay,

21    we are not going to consider race anymore in any way, shape,

22    or form?

23          **MR. STRAWBRIDGE:**  Well, that would be a

24    victory for Students For Fair Admissions.

25          **THE COURT:**  And then that data would never,

1    the data would become irrelevant.

2            **MR. STRAWBRIDGE:**  I guess at some point, Your

3    Honor, if we are going to try to move some part of the case

4    forward, this seems like a pretty reasonable and narrow and

5    non-specific student way to move part of the case forward

6    during *Fisher*.  If Your Honor's inclination is to wait

7    because of all the potential ramifications that *Fisher* might

8    have, then Your Honor will make her decision.

9            But I just, this seems to us like a small ask and

10   something that is easily done on a nonspecific basis and is

11   the kind of appropriate way to make progress on the case

12   during the next few months.

13           **THE COURT:**  Yes, I mean, I am pretty

14   comfortable with the progress that I am pushing you to make

15   during *Fisher*.  I know you are thinking it is not merely

16   enough but they are thinking it is way more than they want

17   to do so the fact that everyone is equally unhappy gives me

18   some assurance that I am reasonably on the right track.

19           So I think I am going to hold off on 33.  I do

20   think 33, assuming that *Fisher* doesn't completely

21   reconfigure the landscape, is something you are going to be

22   entitled to.  I mean, they are going to be entitled to it

23   so, you know, assuming you decide you want to give them now

24   sort of statistical trending information, that is up to you

25   but I am going to hold off on it until we have *Fisher*.

1          So I am going to hold off on 22, 23, 32 and 33.  I

2    am also going to hold off on 37 and 38 which is

3    consideration of the race neutral activities.  Really I

4    think that is like the heart of *Fisher*.

5          All right.  On the over designation of documents, I

6    hope it doesn't get to this point but I will review the

7    documents in camera individually if I have to.  I mean, I

8    will just put that out there but I would really rather not

9    but if you all can't -- I am just, I am so disinclined to

10   modify the terms of the protective order at this point that

11   it seems like the only available remaining alternative is to

12   review the documents and we will do that.

13         SFFA asked for a redaction log.  I am not really, I

14   guess I don't really understand this one.  Are you producing

15   redacted document, is that what you are doing?

16         **MS. ELLSWORTH:**  Certain of the documents have

17   the student information redacted from them.

18         **THE COURT:**  Is there anything being redacted

19   besides student information?

20         **MS. ELLSWORTH:**  Well, for privilege, although

21   I don't believe that's actually implicated here, but student

22   name, address and other information.  Mr. Strawbridge is

23   probably, I'll preview what he might be saying, which is

24   that certain of the information that we've redacted from

25   hard copy documents that are produced is the subject of the

1    dispute on the database fields as to, for example, high

2    school, so there is some interplay between those two

3    questions I think.

4            **THE COURT:**  Does the protective order require

5    a redaction log?

6            **MS. ELLSWORTH:**  No, it doesn't.  It doesn't

7    speak to it one way or the other, I don't think.

8            **MR. STRAWBRIDGE:**  I'll say this.  The

9    protective order anticipates that they are permitted to

10   redact certain sensitive information which we were willing

11   to agree to not realizing how it was ultimately going to

12   manifest itself.

13           So, and the modification, our request on the

14   redaction log, if they're redacting a word here or there and

15   you can see, you can discern from the document what

16   information has been redacted, we don't need a redaction log

17   on this.  But our concern was at one point there was a

18   17-page, approximately, a document that was redacted in its

19   entirety.  And if that's what's going to happen going

20   forward, if we can make sense of redactions, I mean, our

21   view here is going forward we need some kind of way in which

22   we can discern what these documents are and what the

23   information being redacted is.

24           And so for the non-contextual redactions, when

25   they're redacting entire pages of documents, we think a log

1    is necessary.

2         (Whereupon, the Court and the Clerk conferred.)

3              **THE COURT:**  Is that, what he says accurate?

4              **MS. ELLSWORTH:**  Yeah, there was one document

5    which was an application file that was part of a training

6    binder I believe so it was an actual student application

7    file and that was redacted in full.

8         All the other documents I believe one can tell from

9    context what the, what it was that was being redacted so I

10   think the modification that Mr. Strawbridge has requested

11   is, aside from this one document, is consistent with what

12   has been done.

13             **THE COURT:**  I am going to hold off on ordering

14   a log at this point; but if you are producing lots of

15   redacted documents in such a way that they can't figure out

16   what you're redacting, I will order some sort of limited log

17   on that.

18        So my suggestion is that maybe you can use labels,

19   student application or whatever.  I am not going to require

20   a formal log.  I think it is a reasonable request that when

21   you are redacting entire documents such that you can't

22   figure out what it is that you should get some help.

23             **MS. ELLSWORTH:**  I appreciate that and I,

24   understood.

25             **THE COURT:**  Okay.  All right.  These data

1   fields that you all are arguing about, some of these I just

2   can't understand like what is --

3            **MS. ELLSWORTH:**  Your Honor, before we get too

4   into the weeds on the database fields, there are individuals

5   in the courtroom who are not affiliated with the case.

6   These are pretty highly sensitive.  I don't know how Your

7   Honor wants to handle that but it is not --

8            **THE COURT:**  Okay.  Let's hold off on that.

9   Let's see what else we can do here.

10           **MS. ELLSWORTH:**  Thank you, Your Honor.

11           **THE COURT:**  Let me make sure I am covering

12   everything.  I am going backward on these letters.

13           All right.  So now I have in front of me, I am

14   moving backwards with these letters, now I have SFFA's

15   letter of February 10th which is document 134-1.  And stop

16   me if I go into things that shouldn't be discussed in this

17   setting but I think that they make a pretty good argument on

18   zip code and the high school information.

19           And I know what your response is or I anticipated

20   that there are many high schools that only have one

21   applicant and they say that satisfies as -- that makes it

22   reveal too much information.  But that, I don't think that

23   that point, that's sort of FERPA covered information, right.

24   So I think FERPA is the issue but -- and they argue, and I

25   think fairly persuasively, that there is other, that they

1    are not intending on identifying specific students, that

2    they're precluded from going and talking to those students

3    anyway even if they did identify them.  But, you know, zip

4    code and the high school is not itself personally

5    identifying information about anybody.

6            And I guess I want to hear your thoughts on that.

7            **MS. ELLSWORTH:**  Thank you, Your Honor.  I

8    mean, our argument is as we've laid it out which is that

9    particularly in conjunction with the information that has

10   already been produced and in conjunction with the fact that,

11   you know, for I think it's approximately half of the

12   admitted class, and they are the only students from their

13   high school, either admitted or in certain cases applied,

14   that goes beyond high school, for some it is in towns, for

15   some it's in the entire state, so it does come very close to

16   really making clear who these individuals are.

17           And we think, again, to Your Honor's point about

18   this, this is not a situation for all time, particularly

19   during the pendency of *Fisher II*, this type of information

20   going over perhaps unnecessarily is we think an intrusion on

21   the student and applicant privacy.  Whether it's covered by

22   FERPA or not, it is still an intrusion on that privacy and

23   we think at this time it's not warranted.

24           That's our position on high school and zip code.  I

25   understand Your Honor's view that it is not necessarily on

1    its own individually identifying but in conjunction with the

2    other information, in conjunction with the sort of context,

3    we think it does actually render many of the applicants

4    quite easily identifiable and that is the --

5            THE COURT:  How hard would it be -- their

6    basic argument is that -- I think, correct me if I am wrong,

7    Mr. Strawbridge -- but if you had two students from the same

8    high school applying and they look alike and one is admitted

9    and one isn't, they want to know if that's been a racial

10   distinction; right?  Am I right about that?

11           MR. STRAWBRIDGE:  We think that that's the

12   obvious example where it is going to be easiest to kind of

13   weed out any complicating factors, you've got the most

14   similarly situated to people in that case.

15           THE COURT:  And I know you said, what did you

16   tell me the last name, that half of all the students are the

17   only persons from their high school to apply?

18           MS. ELLSWORTH:  Something like that, yes.

19           THE COURT:  So the information was only, if

20   you have only one person from a high school applying, the

21   information is irrelevant to you.

22           MS. ELLSWORTH:  I should correct, Your Honor,

23   have for only the person admitted, not to apply.  I don't

24   know if that matters.

25           THE COURT:  So if you only have one person,

1    you have no comparison.

2              MR. STRAWBRIDGE:  Well, until you get to the

3    fact that there are multiple admission cycles.  I mean,

4    right, admitted one this year, only had one person apply

5    this year but the previous applicants for prior years.

6         I mean, so, two, second, we don't think it's

7    irrelevant.  It is still going to be a basis to determine

8    similarly-situated people from the same state, from the same

9    city, from, who have other similarities.

10             THE COURT:  What I am wondering is if there is

11   some way to give them generally what they want but exclude

12   the schools with really small numbers.

13             MR. STRAWBRIDGE:  Can I make one point, Your

14   Honor?

15             THE COURT:  Yes.

16             MR. STRAWBRIDGE:  I just want to make sure

17   that Your Honor is clear, because we did put this in the

18   letter.

19        Not only has the protective order prohibited us

20   from trying to contact these students, the protective order

21   actually prohibits us from making any effort to take the

22   information that's produced to us and identify them as in

23   trying to determine who from this high school applied that

24   year.

25             THE COURT:  Right, I get that.  I mean, the

1    point I was trying to make was that the information is

2    fairly generically identified and that there is multiple

3    levels of protection even after that information.

4         But it also seems to me that where you are dealing

5    with an individual student, we have one student each year,

6    that the information is not of much use.  What is more

7    useful to you is when you have two or three people from the

8    same school or the same zip code; right?

9              MR. STRAWBRIDGE:  I'm certainly not prepared

10   to sit here and say that a student's high school, that this

11   is the only context in which a student's high school is

12   relevant.  There are a lot of ways in which high school

13   might be relevant and which it might be useful to know.

14             THE COURT:  Is there some way to segregate out

15   the data so they get that information on high schools that

16   have more than five applicants?

17             MS. ELLSWORTH:  Doing that would require a

18   cell-by-cell review and comparison against other data to

19   find out whether that this particular high school had

20   more --

21             THE COURT:  You can't just sort by that, you

22   can't sort by number of people from a school and cut it?

23             MS. ELLSWORTH:  To my knowledge I don't know

24   that we could do that in a way that would be reliable.  I

25   mean, we certainly have fields that relate to the number of

1     people who applied from a given school.  I am just not, I'm

2     not aware if we can cut in that way.  I don't know that we

3     would be comfortable relying on that.  I think we would feel

4     incumbent upon us to actually review and determine what

5     could be produced and what couldn't which would be quite a

6     burdensome undertaking at this point in time.

7              THE COURT:  I mean, I think in some form, I

8     mean, they're going to be entitled to that information and

9     the only question is whether we do it now or we hold off on

10    that.

11             MR. STRAWBRIDGE:  Just on that point, Your

12    Honor, this is information that is essential to analyzing

13    the material that we've already received so, I mean, this

14    is, we're just cleaning up on material that has already been

15    produced pursuant to an order of this Court.  I don't think

16    that waiting for *Fisher* is going to achieve very much in

17    terms of protecting their privacy.

18             THE COURT:  I am inclined to agree with him.

19    There are other ones of these that are discussed further in

20    this letter that I am inclined to not give them.  That seems

21    like more personally a subset of information but I'd like to

22    find a way to give them the basic geographical information

23    that they're looking for in some form or another.

24             But if it's possible to be sensitive to your, you

25    know, your representation that there are schools where it is

1    only one person, I think that -- it is not covered by FERPA.

2    I don't think it is really personally identifying

3    information but I am sensitive to the issue anyway.  So if

4    there is some way to give them a meaningful sample of that,

5    I am inclined to do it.  And if there is not, I still may be

6    inclined to order all but I just want to think about it.  So

7    what --

8            MS. ELLSWORTH:  I think I have to confer on

9    whether we can do a meaningful sample.  I just don't, I

10   don't have that information.  And, again, I do think it

11   would ultimately require us to do a manual review.

12           THE COURT:  Is this like, I mean, I am

13   envisioning some sort of massive Excel spreadsheet.

14           MS. ELLSWORTH:  There is, but to determine

15   whether that person is the only person who applied and the

16   only person who admitted, was admitted, again, it may be

17   that this can be all done mechanically.

18           As to other of these fields I am certain that is

19   not the case.  As to high school and zip I am just not, I

20   don't have enough facility to be honest with how it might or

21   may not be cut to achieve what Your Honor is trying to

22   achieve in terms of the middle ground.

23           MR. STRAWBRIDGE:  I don't understand the

24   burden argument.  This is a burden that -- there is already

25   protections in place.  This burden is entirely self-created

1    and we're trying to sort through this.  I think that the

2    easiest and least burdensome way is just to produce the

3    information and trust that the parties are not going to risk

4    an order of contempt.

5              **THE COURT:**  I knew that that would be the

6    easiest and the least burdensome but they have some other

7    reservations about that that I am trying to accommodate

8    because they don't seem -- I think what they don't want to

9    produce here seems to me to be the least relevant

10   information to you.

11             I get that it is still relevant and you want it but

12   it seems less useful than some of the other information that

13   we are talking about.  I mean, if you have ten applicants

14   from high school, you can figure out which three are getting

15   in and which seven aren't.  That's what you want to be

16   looking at; right?

17             **MR. STRAWBRIDGE:**  Certainly.  I don't disagree

18   that it's particularly persuasive evidence but it is not the

19   only relevant evidence.  I guess that's where I am just --

20             **THE COURT:**  No, I am not --

21             **MR. STRAWBRIDGE:**  -- reservation.

22             **THE COURT:**  I am not suggesting that what you

23   are looking for is irrelevant; but the closer we get to

24   being able to identify a student, now or in the future, the

25   more careful I want to be, but I still want to give them

```
1    enough to work with.  And it seems to me that if there is a

2    big group of kids from high school, you should be able to

3    look at that information and figure out who is getting in

4    and who isn't, right?

5              MR. STRAWBRIDGE:  This is all highly

6    confidential.  The attorneys are protected.  I don't think

7    the risk of --

8              THE COURT:  I may give this to you but if they

9    can come up with a way that protects against the interests

10   that they're concerned about and isn't an onerous amount of

11   work, I am inclined to parse it out that way.

12             MS. ELLSWORTH:  So, Your Honor, what would be

13   the most useful way to proceed from here?

14             THE COURT:  Why don't you let me know what you

15   can do, right.  I mean, and then I will decide what I am

16   going to do about it.

17             MS. ELLSWORTH:  Okay.

18             THE COURT:  If you tell me you can't do it, we

19   will make an evaluation of it.  But if there is an easy way

20   to do it, I'd like to know that.

21             MS. ELLSWORTH:  Okay.  We will submit a letter

22   in very short order one way or the other.

23             THE COURT:  Okay.  Are you prepared in this

24   format to discuss the UMRP information?

25             MS. ELLSWORTH:  I am prepared to discuss it
```

 1    but I would ask that the individuals not associated with

 2    this case be excused from the courtroom, if Your Honor is

 3    willing to do that.

 4              THE COURT:  I am not willing to do that so why

 5    don't you submit in writing on that also.

 6              MR. SKWRAO:  I can, Your Honor.  I can address

 7    at a high level --

 8              THE COURT:  That is fine.  Is there personally

 9    identifying information in that field?

10              MS. ELLSWORTH:  Is this the

11    "Visitas_Student_Host" table that Your Honor is looking at

12    on page five of the February 10th letter?

13              THE COURT:  It is -- which letter are you --

14              MS. ELLSWORTH:  It's the February 10 -- I'm

15    sorry, I don't have the docket number, Your Honor.

16              THE COURT:  What page?

17              MS. ELLSWORTH:  Page five of the letter.

18    There is a table called "Visitas_Student_Host."  It contains

19    a variety of fields relating to the Undergraduate Minority

20    Recruitment Programs.

21              THE COURT:  Yes.

22              MS. ELLSWORTH:  So this, these are about host,

23    students who host admitted students in their dorm rooms for

24    Visitas Students weekend.  The personally identifying, it's

25    not names.  It's, as you see, gender and then there is other

1    information.

2              **THE COURT:**  These are the hosts?

3              **MR. SKWRAO:**  The hosts, the admitted -- excuse

4    me.  Yes, the admitted students, those that are considering

5    whether or not to accept the offer of admission, the

6    information that is sort of parallel to this has been

7    produced to SFFA.  This is just about the current students

8    who are opening their dorm rooms.

9              **THE COURT:**  Is that -- I didn't understand

10   that that is what that information was.  Why are you

11   thinking this is --

12             **MR. STRAWBRIDGE:**  I mean, Harvard has assigned

13   these hosts UMRP strength, UMRP deficiency -- I'm sorry, I

14   don't mean to, I apologize -- but if you look at the content

15   here, none of it is identifying information and all of it is

16   directly related to the UMRP, so that's the issue.

17             **MS. ELLSWORTH:**  But, again, as Your Honor, as

18   we've said in our letter, we fail to see the relevancy of

19   this, these database fields to any statistical analysis that

20   SFFA might want to conduct.

21             **THE COURT:**  I am inclined to agree with that.

22   What is the --

23             **MR. STRAWBRIDGE:**  I mean, I don't want to

24   be -- I want to be sensitive to the privacy concerns but I

25   think that there is a very practical argument here that this

1    is an essential element of their recruitment of

2    undergraduates.  The fields that we are looking for are very

3    specific really to only the information about the host that

4    relates to the recruitment and the use of race.  None of it

5    is identifying information.

6            If Harvard thinks that all, that these ratings are

7    important enough to assign to the hosts, then it seems like

8    it might be relevant to our analysis as to how they're

9    matching these students up, what they're doing, what is the

10   significance of some of these particular categories.  It's

11   specific only to the UMRP recruitment so we think it's

12   relevant.

13           **THE COURT:**  I am not going to order that that

14   go over now.  It just doesn't seem important enough to put

15   over before *Fisher*.

16           Let me make sure I haven't missed anything else in

17   this letter while I am here.

18           So I am deferring on the zip code and the high

19   school till I hear from you all.

20           You have withdrawn -- I'm on page five -- you have

21   withdrawn 5B.  I am not going to order production of the

22   UMRP information on page five.

23           You have withdrawn alumni interviewer fields.  I am

24   not going to require production at this point of the

25   categories identified on page 6, Section D.

1              The two categories that, there are two categories

2       that --

3                   **MR. STRAWBRIDGE:**  Your Honor, if I just may

4       interrupt?

5                   **THE COURT:**  Yes.

6                   **MR. STRAWBRIDGE:**  I just want to clarify one

7       point and that is I understand your ruling with respect to

8       all these fields, it is specific to the pre *Fisher* period?

9                   **THE COURT:**  Yes.  Then there are two

10      categories that I understand that you are still asking for.

11      I am trying to find it in these documents so I can refer

12      you.

13              One of them is -- I have these in my notes, I know

14      you asking for them but I can't find where it was.

15              I will come back to that.  I'm sure it will jump

16      out at me in the next letter.

17              If you can look at the letter, it's docket 133, the

18      February 8th letter, Appendix D.

19                  **MS. ELLSWORTH:**  D as in dog, Your Honor?

20                  **THE COURT:**  D as in dog.

21                  **MS. ELLSWORTH:**  Thank you.

22                  **THE COURT:**  The first --

23                  **MS. ELLSWORTH:**  Your Honor, I don't -- I

24      apologize.  I don't believe that -- Mr. Strawbridge can

25      correct me -- but I don't believe that Numbers one and two

1      are being requested anymore on the February 10th letter.

2                  **THE COURT:**  I'm on the February 8th letter.

3                  **MR. STRAWBRIDGE:**  The February 10th, the list

4      in the February 10th letter is our list for the time being,

5      subject to revisiting after *Fisher*.

6                  **MS. ELLSWORTH:**  Yes.

7                  **THE COURT:**  The list in the February 10th

8      letter.

9                  **MS. ELLSWORTH:**  It begins I believe on page

10     four and goes through to six, interspersed with text.

11                 **MR. STRAWBRIDGE:**  We took their appendixes

12     from the February 8th letter and dropped some of our

13     requests so what's in the February 10th letter is what we're

14     seeking --

15                 **THE COURT:**  That is why I couldn't find it in

16     that letter.

17          So if they produce zip code and high school, does

18     that functionally cover what you are looking for?

19                 **MR. STRAWBRIDGE:**  Well, there is a number of

20     fields that kind of fall into that category so I don't know

21     if we need to be more specific.  I mean, the first column on

22     page four, for example, is all high school information.

23          Most of what's in the second column is zip code or

24     postal code information, city information.  There is a few

25     other exceptions.

1          I mean, I won't, I don't know the best way to do

2     this with the courtroom being open at this time, although I

3     know that we have an objection to labeling these fields in

4     particular as highly confidential information.  But if it's

5     easier to just take five minutes in chambers to somehow

6     address them specifically, we can defer to whatever Your

7     Honor wants to do.

8          **THE COURT:**  Can we do that, can they take a

9     look at what they can easy produce on high school and zip

10    code and then whatever remains after that just put in a

11    letter, another letter?

12         **MR. STRAWBRIDGE:**  Okay.  Do we have a time?

13         **MS. ELLSWORTH:**  We can probably, we can get a

14    letter out, what we can do, high schools I'll say -- what's

15    today?  Thursday -- I'll say Monday to not over promise.

16         **THE COURT:**  We will get an order out in the

17    meantime.  We will just leave some loose ends on it.  We

18    will get that out I hope today or tomorrow.

19         **MR. STRAWBRIDGE:**  We're also happy to do

20    compromises if they'd like to.

21         **THE COURT:**  Well, I mean, if there is some way

22    to cut that so that they get what they are looking for and

23    some significant percentage of applicants, I would be

24    content with that till after *Fisher*.  If there is not, there

25    is not.  I'm happy to make a decision on it but I'm inclined

1     to give them that information.  It would be great if you can

2     figure out if there is any way to do it.

3              MS. ELLSWORTH:  In talking about high school

4     and zip code and fields that relate to that, Your Honor,

5     correct?

6              THE COURT:  Yes.  I mean, I can't actually

7     figure out what all of these --

8              MS. ELLSWORTH:  Yes, Mr. Strawbridge is

9     largely correct.  Many of them relate to high school, zip

10    codes or others relating to military status and there is a

11    set of fields relating to honors and extra curriculars.

12    There are a few other outliers here but those are the three,

13    big buckets I think right now.

14             THE COURT:  I think we've already, the honors

15    and extracurricular you sort of already resolved; right?  We

16    took care of that the last time you were here.

17             MR. STRAWBRIDGE:  I did not understand that to

18    be the case, Your Honor.  This is the name of the actual

19    fields.  My understanding is they're still refusing to

20    produce any of the honors fields.

21             THE COURT:  Okay.  I thought we had resolved

22    that.  I mean -- all right.

23             MS. ELLSWORTH:  If I could just, whether this

24    helps or not I don't know, but as to the honors fields and

25    the extracurricular related fields that are in this

1    February 10th letter, these are narrative entries so they do

2    contain the types of examples Your Honor provided at the

3    last hearing --

4            THE COURT:  I am not inclined to, I am not

5    inclined to -- I thought we resolved that.  I am not

6    inclined to have you, require you to disclose those now.

7            MR. STRAWBRIDGE:  Well, just to clarify, Your

8    Honor, my understanding was you had, I thought that your

9    guidance from the last one was that if there were

10   nonspecific identifying information in the field

11   notwithstanding the fact that it's an entering (ph.) field,

12   they should produce it.  Their response was that it is too

13   hard to figure out so we don't want to produce anything.  I

14   don't, I am not surprised by that response from them but,

15   again, this is another example where they're imposing a

16   burden on themselves to try to restrict what they have to

17   disclose that is then being used as the basis to restrict

18   all of it.

19           THE COURT:  Well, I am sensitive to the issue

20   that if you say you have a high school class and there is a

21   class president, that you can fairly identify who that

22   student is, right?  There is only one class president and --

23           MR. STRAWBRIDGE:  If we're willing to violate

24   the protective order and the risk of contempt from Your

25   Honor, yes, we could, but we're not willing to do that.

1          **MS. ELLSWORTH:**  Your Honor, our position is

2     not that it's too difficult to figure out how to provide

3     only in a non-identifying version the honors and

4     extracurriculars, out position is that, particularly in this

5     posture of the case, it is incredibly burdensome to do so.

6     Over 70,000 fields on a cell-by-cell basis to determine

7     whether it simply says theater major or it says, you know,

8     Pippin in Pippin.

9          **MR. STRAWBRIDGE:**  I think they should produce

10    Pippin in Pippin.  We're not going to -- we don't know who

11    was Pippin at the high school.  We are not going to, we're

12    not allowed to go figure it out.  This is, I mean, with

13    all -- and there is no indication in their letter as to how

14    many of these fields specifically say this.

15         The non-burdensome -- it's obviously relevant

16    information.  Their expert identified this information as

17    information that would be useful to our expert.  It's just,

18    the protective order covers this.

19         **THE COURT:**  I mean, I take your point and I am

20    trying to accommodate you in some way; but my initial

21    thought was that pre *Fisher* we do sort of structural

22    completely non-identifying information like a creative

23    framework that would allow discovery to happen once *Fisher*

24    was resolved.  I have already myself slipped significantly

25    beyond that and I am pretty well reaching a limit where I am

1    not going to slip any further on it.

2         So only because I think that the more we do, the

3    more there is going to have to go back and be redone after

4    *Fisher* and that's what I am seeking to avoid.  I don't want

5    a complete stay because the stuff that doesn't need to be

6    redone I want to keep going forward which is sort of

7    framework stuff but you've already pushed me sort of back

8    beyond where I intended to go and I am not going much

9    further, if any further.

10        All right.  So that's -- so we will get an order

11   out.  I'm going to hold off on these fields until I

12   understand from Harvard what they can do.  And then I want

13   to think about that because I may just have talked myself

14   out of giving the high school and zip code information too

15   in terms of thinking about where I started and where I am

16   likely to end up.

17             **MR. STRAWBRIDGE:**  Just, I mean --

18             **THE COURT:**  Hold on.  Someone more important

19   than you wants to talk to me.

20             (Laughter.)

21             (Whereupon, the Court and the Law Clerk conferred.)

22             **THE COURT:**  So what Jonathan is suggesting is,

23   he is wondering if there is some way that you can identify

24   these five people went to the same high school but without

25   identifying the zip code or the high school?

1          **MS. ELLSWORTH:**  Meaning like a code inside of

2     a high school name, is that the question?

3          **THE COURT:**  Well, just some of way saying so

4     that, you know which people are grouped together, right.

5     So, I happened to go to Newton North so say Newton North.

6     You have 50 kids from Newton North and what Jonathan is

7     suggesting is to say that these 50 kids went to the same

8     high school but they don't identify the high school or the

9     zip code so you know they're similarly situated but you

10    don't know where they're similarly situated.

11         **MS. ELLSWORTH:**  I don't believe there is a

12    field that allows you to do that.  I mean, there is, as one

13    of the high school related fields, one is name, one is the

14    town of the high school, one is what's called a CBC code

15    which is the College Board Code for that high school.  So

16    one could take that information to then assign a number,

17    assign some sort of grouping to everybody who came from that

18    high school but I don't think that exists.  That's sort of a

19    standalone field.  That's a sorting process.

20         **THE COURT:**  That's interesting.  I haven't

21    thought it through.  He just sprung it on me this second

22    but, you know, that might be an interesting way to approach

23    it, right, because then you can give information like class

24    president and it's completely non-identifying.  Right?

25         **MS. ELLSWORTH:**  I think it could be.  I mean,

1    their state information has already gone over, there is

2    other information, a lot of information has been produced.

3    We're talking about a pretty small number of database fields

4    that we're left discussing here, at least at this juncture

5    of the case, so.

6            THE COURT:  It is something to think about.

7    It is an interesting idea.

8            MR. STRAWBRIDGE:  A counterpoint would be is

9    that there is some significant inefficiencies in dribbling

10   out this information over small periods of time.  If we're

11   going to deal with making progress during the case, this is

12   among the most essential information in the entire database.

13   Given the other protections in place, I think we should just

14   dispense with imposing burdens and we may just want to

15   produce this information now.

16           THE COURT:  Let me know, Ms. Ellsworth, if you

17   take a look at the data that you can easily offer.  And if

18   you want to stick to your position that you want it withheld

19   until after *Fisher*, I really haven't made up my mind but I

20   take his point that it is important information to him and

21   that, you know, it is important information to him and it

22   doesn't really implicate specific privacy interests.  But

23   why don't you take a look at it and let me know what you can

24   do and we will get an order out by -- so I'd like to get it

25   out today or tomorrow but Kelly who is the law clerk who is

1   working on this is out until Monday so we may not get it out

2   until Monday.  I may hold it off for her to take a look at

3   it but we will get out as much of an order as we can no

4   later than Monday.

5          And you all can, you'll send a letter.

6   Mr. Strawbridge, you will no doubt send a letter back and

7   we'll resolve the remaining issues.

8                    **MS. ELLSWORTH:**  Thank you, Your Honor.

9                    **THE COURT:**  What am I --

10                   **MR. STRAWBRIDGE:**  Perhaps, I have seen this

11  work in other cases, we're willing to try something new.

12  Perhaps we could meet and confer on this issue and submit a

13  joint letter, just to expedite the process.

14                   **THE COURT:**  However you all --

15                   **MS. ELLSWORTH:**  Yes, I have some homework to

16  do to figure out our technical capabilities.

17                   **THE COURT:**  All right.  Anything else today?

18                   **MS. ELLSWORTH:**  Nothing from --

19                   **THE COURT:**  Do you want to set a date for our

20  next status conference?

21                   **MS. ELLSWORTH:**  I think we would like

22  another date.

23                   **MR. STRAWBRIDGE:**  I think that's a good idea.

24                   **THE COURT:**  So six weeks, a month, what are

25  you looking for?

1                    MS. ELLSWORTH:  Four or five weeks is fine.

2                    THE CLERK:  How about Wednesday, March 30th,

3        at ten a.m.?

4                    MS. ELLSWORTH:  That's fine for me, Your

5        Honor.

6                    MR. STRAWBRIDGE:  I think that's fine with me.

7                    THE COURT:  If it is not, just let us know and

8        we can easily move it.

9                    MR. STRAWBRIDGE:  Sure.

10                   THE COURT:  The exact date is of little

11       consequence.

12              All right.  Thanks, everybody.

13                   MS. ELLSWORTH:  Thank you very much, Your

14       Honor.

15                   MR. STRAWBRIDGE:  Thank you, Your Honor.

16                   THE CLERK:  All rise.  Court is adjourned.

17

18              (WHEREUPON, the proceedings were recessed at 12:20

19              p.m.)

20

21

22

23

24

25

C E R T I F I C A T E


          I, Carol Lynn Scott, Official Court Reporter for

the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing pages

are a true and accurate transcription of my shorthand notes

taken in the aforementioned matter to the best of my skill

and ability.



          /S/CAROL LYNN SCOTT


_____

          CAROL LYNN SCOTT
         Official Court Reporter
      John J. Moakley Courthouse
    1 Courthouse Way, Suite 7204
     Boston, Massachusetts 02210
          (617) 330-1377



**DATE: March 3, 2015**