

3033 Wilson Boulevard
Suite 700
Arlington, VA 22201
703.243.9423
www.consovoymccarthy.com

April 29, 2016

**VIA ECF**

Hon. Allison D. Burroughs
U.S. District Court, District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, MA 02210

Re:   *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
      No. 1:14-cv-14176-ADB

Dear Judge Burroughs,

Plaintiff Students for Fair Admissions, Inc. ("SFFA") submits this opposition to Harvard's April 15 motion seeking production of what it mischaracterizes as "basic documents and information relating to SFFA's operations." Harvard Motion ("Mot.") at 1. Harvard seeks to discover the identity of every SFFA member, details about every financial contribution to SFFA, all documents concerning SFFA's governance and strategy, and every communication between SFFA and its members, prospective members, and donors. This sweeping request far exceeds the scope of permissible discovery and should be denied.

SFFA has already produced the documents relevant to establishing its associational standing (the only matter at issue). Specifically, SFFA has produced the names of (and relevant information about) the members on whose behalf this action is brought, its application to become an IRS-approved 501(c)(3) entity, the IRS's approval letter, its Articles of Incorporation and Bylaws, its Annual Report, and numerous other documents. It also has provided interrogatory responses describing its members' rights and its organizational structure. Federal courts uniformly agree that any further inquiry into the plaintiff's internal operations is improper when, like SFFA, it is a voluntary membership association. But even if the material Harvard seeks were relevant, the First Amendment would protect it from disclosure. As the appended declarations show, SFFA's associational rights would be significantly chilled, and Harvard cannot come close to establishing any compelling need for this information.

SFFA—like the NAACP, the ACLU, the Sierra Club, and all voluntary membership associations—should not be subjected to the sweeping discovery Harvard seeks. Indeed, we are aware of no such association that has ever been forced to submit to this kind of intrusive and abusive investigation merely because it brought litigation on behalf of its injured members. Simply put, Harvard's discovery requests are unprecedented and should be rejected.

### I. The Information Harvard Seeks Is Not Relevant To SFFA's Standing.

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Thus, discovery requests that are "irrelevant" and which have "no bearing on the jurisdictional analysis" must be denied. *Noonan v. Winston Co.*, 135 F.3d 85, 94-95 (1st Cir. 1998); *Salk Inst. v. Acceleron Pharma, Inc.*, 2013 WL 6622946, at *2 (D. Mass. Dec. 12, 2013) (denying motion to compel because "the discovery sought is not relevant" and the "issues can be decided without [such] exhaustive production"). "Moreover, the party seeking discovery information over an adversary's objection has the burden of showing the information's relevance." *Waugh v. BJ's Wholesale Club, Inc.*, 2014 WL 458203, at *3 (D. Mass. Feb. 3, 2014). The issue thus is not which party will prevail on the merits of the standing question. Mot. at 2 n.3. It is whether the documents Harvard seeks are relevant to associational standing. As explained below, they are not.

#### A. SFFA has provided Harvard with documents in its possession that are relevant to associational standing.

By definition, relevance must be measured against the governing legal standard. "An association may assert standing on behalf of its members if: (1) at least one of its members possesses standing to sue in its own right (by meeting the Article III requirements, including, *inter alia*, injury-in-fact); (2) the interests that the suit seeks to vindicate are germane to the organization's objectives; and (3) neither the claim asserted nor the relief demanded necessitates the participation of individual members." *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 55 (1st Cir. 1998). SFFA has produced responsive documents relevant to that standard.

*First*, SFFA has produced the names of (and relevant information about) the members on whose behalf it has sued. In particular, SFFA has identified four Asian-American members rejected by Harvard, five who intend to apply to Harvard, and six parents of rejected or future applicants. "[O]ne form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007). That is the injury SFFA alleges on behalf of its members. As to those members whom Harvard rejected, any further information that could possibly be relevant is already in Harvard's possession (*e.g.*, admissions files containing those applicants' race, grades, test scores, and rejection letter). As to members who plan to apply to Harvard or their parents (who may bring a claim on their behalf, *see id.*), SFFA has produced the relevant responsive documents. Thus, nothing Harvard's motion seeks is relevant to whether "at least one of [SFFA's] members possesses standing to sue in [his or her] own right." *Sea Shore Corp.*, 158 F.3d at 55.

*Second*, SFFA has produced detailed information showing that this suit is germane to its mission. The "requirement of germaneness is undemanding; mere pertinence between litigation subject and organizational purpose is sufficient." *Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138,

148 (2d Cir. 2006) (quoting *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000)); *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010) (describing germaneness as a "low threshold"); *Presidio Golf Club v. National Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998) ("[C]ourts have generally found the germaneness test to be undemanding"). The requirement's limited purpose is to keep suits that have "nothing whatsoever to do with the association's area of competence or reason for existence" out of federal courts. *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 57 (D.C. Cir. 1988).

SFFA has produced the responsive documents relevant to this inquiry, including its application to become a 501(c)(3) entity, the IRS approval letter, its Articles of Incorporation, and its Bylaws. These documents explain that SFFA's purposes "are to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and other lawful means." SFFA-Harvard 000002, 000059. SFFA's IRS-approved application further describes it as a "coalition of prospective applicants and applicants to higher education institutions who were denied admission to higher education institutions, their family members, and other individuals who support the organization's purpose and mission of eliminating racial discrimination in higher education admissions." SFFA-Harvard 000041. The Bylaws provide that SFFA has a five-member Board (one of whom the members elect), that members (other than initial members) pay dues, and that SFFA has a President, Secretary, and Treasurer. SFFA-Harvard 000053, 000059-000063. SFFA also has produced its Annual Report, which describes in detail the association's activities, membership, and institutional goals. SFFA-Harvard 000119-000122.

These are the documents relevant to assessing SFFA's associational standing. *See, e.g., Ctr. for Sustainable Economy v. Jewell*, 779 F.3d 588, 598 (D.C. Cir. 2015) ("CSE's bylaws, along with the declarations of CSE's members and its President, adequately demonstrate that it is an organization eligible to assert associational standing."). Indeed, SFFA's production likely is already cumulative given the limited showing needed to establish associational standing. *See, e.g., Gay-Straight Alliance of Okeechobee High Sch. v. Sch. Bd. of Okeechobee Cty.*, 477 F. Supp. 2d 1246, 1248, 1251-52 (S.D. Fla. 2007) ("unincorporated, voluntary association of students" called the "Gay-Straight Alliance of Okeechobee High School" had standing to challenge high school policies).

*Third*, and last, there are no documents responsive to whether SFFA members must participate individually because the First Circuit has decided the issue as a matter of law. A "request for declaratory relief … does not require any individual member's participation as a party. Such declaratory relief turns on a question of law which is not particular to each member of the Association …. The same is true for injunctive relief which parallels the declaration." *Playboy Enters., Inc. v. Pub. Serv. Comm'n of Puerto Rico*, 906 F.2d 25, 35 (1st Cir. 1990). Here, SFFA seeks only declaratory and injunctive relief. Doc. 1 at 119 (Complaint).

In sum, Harvard's assertion that "SFFA's production to date is woefully insufficient" is unfounded. Mot. at 1. SFFA has produced the documents relevant to the three-part test for associational standing. That there are not more than 114 such documents is unsurprising. The key question is whether the association has members who have been injured by Harvard's admissions policies—and Harvard has the documents relevant to that issue. Beyond that, the purpose of the associational-standing test is merely to ensure that the "injury to an association's members has some reasonable connection with the reason the members joined the organization and with the objectives of the organization." *Hodel*, 840 F.2d at 59. SFFA has produced the documents relevant to assessing whether the association can meet this "modest but sensible standard." *Id*.

### B. Harvard's proposed "*bona fide* membership organization" test misstates applicable precedent and would authorize defendants to conduct abusive and irrelevant discovery in all cases brought by voluntary membership associations.

Harvard nevertheless claims that it is entitled to discovery relating to whether SFFA is a "*bona fide* membership organization," including "documents and information relating to SFFA's operations, including the recruitment and selection of members, the sources of its funding, and how members participate in the organization." Mot. at 1. Harvard's position has no legal support. The top-to-bottom audit that Harvard proposes to conduct is irrelevant to associational standing when the plaintiff is an IRS-approved, 501(c)(3) voluntary membership association.

In seeking far-reaching and irrelevant discovery, Harvard confuses the discovery rules for non-membership organizations with the rules for voluntary membership associations like SFFA. The Supreme Court's decision in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977), makes this distinction clear. In *Hunt*, the Washington State Apple Advertising Commission, a State agency with no members, brought suit on behalf of Washington state apple growers and dealers. *Id*. at 341-42. That raised a novel issue. Although the Court had "recognized that an association may have standing to assert the claims of its members even where it has suffered no injury from the challenged activity, the Commission [was] not a traditional voluntary membership association such as a trade association, for it had no members at all." *Id*. at 342. "If the Commission were a voluntary membership association—a typical trade association—its standing to bring this action would be clear under prior decisions of this Court." *Id*.

The issue thus was whether "the Commission's status as a state agency, rather than a traditional voluntary membership association, preclude[d] it from asserting the claims of the Washington apple growers and dealers who form its constituency." *Hunt*, 432 U.S. at 344. Under those unusual facts, it was appropriate to examine the Commission further to see whether it "performs the functions of a traditional trade association representing the Washington apple industry." *Id*. The Court held that the agency "possess[ed] all of the indicia of membership in an organization." *Id*. The

Court emphasized that this examination was appropriate only "[u]nder the circumstances presented" to ensure "form" was not misused to deny standing to an "association representing individual growers and dealers who collectively form its constituency." *Id*. at 345. In short, *Hunt* did not alter the settled rule that applies here: standing for a voluntary membership association is judged under the three-part test without any further examination of its operations.

*Parents Involved* confirms the distinction. "Parents Involved in Community Schools" was "a nonprofit corporation comprising the parents of children who have been or may be denied assignment to their chosen high school in the district because of their race." *Parents Involved*, 551 U.S. at 713. At no point did the Supreme Court or the lower courts allow the kind of intrusive investigation into the association's activities that Harvard demands here. Parents Involved was not required to disclose the name of every member. *Id.* at 718-20. Nor was there any discovery into its fundraising, membership involvement in day-to-day decision-making, or communications. As a voluntary membership association, Parents Involved could sue because one of its members was injured, *id*. at 718-19, and because it met "the other requirements for associational standing," *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 377 F.3d 949, 958 (9th Cir. 2004) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 181 (2000)).

No Supreme Court decision draws a different line. The unprecedented audit-via-discovery that Harvard seeks here was not performed on the associational plaintiff seeking to defend racial preferences in *Schuette v. Coalition to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equality By Any Means Necessary (BAMN)*, 134 S. Ct. 1623 (2014). Indeed, no discovery of the kind Harvard seeks here was conducted even though BAMN's standing was litigated in the district court. *See Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equality By Any Means Necessary v. Schuette*, 539 F. Supp. 2d 924, 947 (E.D. Mich. 2008). Friends of the Earth likewise was not subjected to this intrusive scrutiny in *Laidlaw*. *See* 528 U.S. at 181-88. In fact, Harvard can point to no Supreme Court case in which the standing inquiry went beyond the three-part test when the plaintiff was a voluntary membership association.

*Camel Hair and Cashmere Institute of America v. Associated Dry Goods Corp.*, 799 F.2d 6 (1st Cir. 1986), the only First Circuit case upon which Harvard relies, reaches the same conclusion. The Institute was a voluntary membership association formed "to promote the use of camel hair and cashmere fibers and to safeguard the interests of the cashmere and camel hair industry." *Id.* at 7. The Institute had no employees; the executive director was an attorney; and it only had six members. *Id*. The First Circuit upheld the Institute's right to sue over a labeling issue, rejecting a challenge to its associational standing. As the court explained, "suits by associations operate to the benefit of the individuals represented and the judicial system as a whole." *Id*. at 11. "[T]he very forces causing individuals to band together in association provide some guarantee that the association will work to promote the members' interests." *Id*. "Given this strong endorsement of the associational standing doctrine," *id.*, the Court

rejected the challenge under the three-part test, *id.* at 11-12. The First Circuit did not endorse the kind of discovery Harvard seeks here.

The other cases upon which Harvard relies similarly provide it no support. In each, the plaintiff was ***not*** a voluntary membership association. *See Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25-26 (D.C. Cir. 2002) ("informal consortium" with no "discrete, stable group of persons with a definable set of common interests"); *American Legal Found. v. FCC*, 808 F.2d 84, 87-88 (D.C. Cir. 1987) ("nonprofit media law center" representing "all members of the public who regularly watch ABC News"); *Washington Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2010) ("public interest law firm, not a representative of a special group"); *Group Health Plan, Inc. v. Philip Morris, Inc.*, 86 F. Supp. 2d 912, 915 (D. Minn. 2000) (HMOs); *Health Res. Group v. Kennedy*, 82 F.R.D. 21, 24-25 (D.D.C. 1979) (public-interest organizations with no members). In one other case, standing failed mainly for lack of "injury to any individual member of the organization." *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Wiley*, 2007 WL 951559, at *6 (N.D.N.Y. 2007).

Harvard claims that this discovery is relevant because "an association can have standing to assert its members' interests in court only if it meaningfully represents them." Mot. at 3. But germaneness already takes that into account. Harvard's claim that it is entitled to "documents and information sufficient to identify all of SFFA's members, not the few cherry-picked by SFFA" misses the mark too. *Id*. at 3-4. The members SFFA identified were not "cherry-picked"; they are the members on whom SFFA relies for standing. Harvard has no more right to the name of every SFFA member than States have to the name of every NAACP member in that group's challenge to voter-ID laws. *See, e.g., North Carolina State Conf. of NAACP v. McCrory*, 997 F. Supp. 2d 322 (M.D.N.C. 2014). The same goes for the requests for "documents relating to SFFA's recruitment and selection of members," SFFA's communications with members, and "SFFA's sources of funding and its communications with donors." Mot. at 4-5. All of these requests far exceed the permissible scope discovery on germaneness.

That is why courts agree that the discovery Harvard seeks here is irrelevant. *See, e.g.*, *Jewell*, 779 F.3d at 596-599; *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 416 (S.D.N.Y. 2012); *Cal. Sportfishing Prot. All. v. Diablo Grande, Inc.*, 209 F. Supp. 2d 1059, 1066 (E.D. Cal. 2002). The "inquiry into the 'indicia of membership,'" or what Harvard terms the inquiry into whether SFFA is a *bona fide* membership organization, "is necessary only when an organization is not a 'traditional membership organization.'" *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 29 (D.D.C. 2009).

These courts understand that this is not a trivial matter. Granting Harvard's motion would have profound ramifications. If this Court were to hold that Harvard is entitled to this discovery, then ***every*** voluntary membership association could be subjected to this same probing discovery into its operations in ***every*** case it brings on behalf of its members. That means the NAACP, ACLU, Sierra Club, League of

Women Voters, Conservation Law Foundation, and the Brady Center, to name a few, also would be forced to produce all "documents and information relating to [their] operations, including recruitment and selection of members, the sources of [their] funding, and how members participate in [their] organization[s]." Mot. at 1. That discovery would include the names of, contact information for, and communication with members, all member recruitment communications, all documents concerning organizational governance and strategy, and all fundraising documents. That would be unimaginable.

That result must be avoided. "[F]ederal courts are not to reach constitutional issues where alternative grounds for resolution are available." *ACLU v. U.S. Conf. of Catholic Bishops*, 705 F.3d 44, 52 (1st Cir. 2013). "A court should interpret a statute to avoid a serious constitutional flaw unless such a saving construction plainly contradicts the clear intent of Congress." *United States v. Shields*, 522 F. Supp. 2d 317, 336 (D. Mass. 2007) (citing *Zadvydas v. Davis*, 533 U.S. 678, 689, 696-97 (2001)). That duty applies with equal force to discovery disputes, *see, e.g.*, *City of Greenville v. Syngenta Crop Prot., Inc.*, 2011 WL 5118601, at *3 (C.D. Ill. Oct. 27, 2011), and makes this an easy case. Not only would granting Harvard's motion run contrary to the entire body of judicial precedent on associational standing, it would, as explained below, violate the First Amendment.

## II.   The First Amendment Protects SFFA's Membership Lists, Financial Information, And Internal Communications.

Even if the materials Harvard seeks were somehow deemed relevant to SFFA's associational standing, the First Amendment would shield them from production. The First Amendment protects the "freedom to engage in association for the advancement of beliefs and ideas." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). That freedom "is entitled to no less protection than any other First Amendment right." *Bates v. City of Little Rock*, 361 U.S. 516, 528 (1960) (Black & Douglas, JJ., concurring). As a result, once a litigant makes "a prima facie showing of a first amendment infringement" of its associational rights, "the burden then shifts to the [discovery proponent] to show both a compelling need for the material sought and that there is no significantly less restrictive alternative for obtaining the information." *United States v. Comley*, 890 F.2d 539, 544 (1st Cir. 1989). Harvard's discovery requests must be denied under this standard. The significant threat to SFFA's associational freedom far outweighs any alleged need Harvard has for the information it seeks.

### A.   Granting Harvard's invasive discovery requests would chill the First Amendment associational rights of SFFA and its members.

There can be no dispute that Harvard's discovery requests implicate SFFA's First-Amendment rights. "[W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). To that

end, the Supreme Court, in *NAACP v. Alabama*, sustained the NAACP's constitutional challenge to a discovery order requiring production of a list of its members. The Court "recognized the vital relationship between freedom to associate and privacy in one's associations," and held that "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." 357 U.S. at 462. Finding that Alabama had not shown "a controlling justification for the deterrent effect on the free enjoyment of the right to associate which disclosure of membership lists is likely to have," the Court reversed the order. *Id.* at 466.

Since *NAACP v. Alabama*, courts have routinely relied on the First Amendment to prohibit invasive discovery requests like Harvard's here. Courts routinely reject attempts to gain access to rank-and-file membership lists. *See, e.g.*, *FEC v. Machinists Non–Partisan Political League*, 655 F.2d 380, 389, 397 (D.C. Cir. 1981); *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 2-3 (D.D.C. 2002); *Sierra Club v. Union Elec. Co.*, 2015 WL 9583394, at *4 (E.D. Mo. Dec. 31, 2015). Courts also reject attempts to obtain: internal communications, *see, e.g.*, *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009); *Sexual Minorities of Uganda v. Lively*, 2015 WL 4750931, at *2, *4 (D. Mass. Aug. 10, 2015); information about financial contributions, *see, e.g.*, *Int'l Action Ctr.*, 207 F.R.D. at *3; *Tree of Life Christian Sch. v. City of Upper Arlington*, 2012 WL 831918, at *4 (S.D. Ohio Mar. 12, 2012); and information concerning governance and strategy, *see, e.g.*, *Perry*, 591 F.3d at 1163-65; *Sierra Club*, 2015 WL 9583394, at *5. In other words, *all* of the discovery Harvard seeks squarely implicates the First Amendment rights of SFFA and its members.

The issue, therefore, is not whether SFFA has associational rights under the First Amendment. It does. The issue is whether granting Harvard's motion may result in "(1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights." *Perry*, 591 F.3d at 1160. The prima facie showing SFFA must make in this regard is "light"—"[a] party resisting discovery need not make a showing of harm or other coercion[] but … must at least articulate some resulting encroachment on their liberties." *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989); *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 492 (10th Cir. 2011) (Kelly, J., concurring) ("[T]he burden for establishing this prima facie showing is not difficult when supported by available evidence."); *Christ Covenant Church v. Town of Sw. Ranches*, 2008 WL 2686860, at *6 (S.D. Fla. June 29, 2008) ("[I]n making a *prima facie* case of harm, the burden is light in view of the crucial place speech and associational rights occupy under our constitution.").

This "light" burden is typically satisfied through submission of declarations or other evidence suggesting "that enforcement of the disclosure requirement will result in harassment of current members, a decline in new members, or other chilling of associational rights." *Comley*, 890 F.2d at 544. The burden also is satisfied by

submitting evidence that "the requested information would ... stifle full and frank discussions within and among the trade associations." *In re Motor Fuel*, 641 F.3d at 490. Declarations or letters from members describing their intention to curtail their participation in the event of compelled disclosure are generally sufficient to meet the association's prima facie burden. *See, e.g.*, *Perry*, 591 F.3d at 1163; *AFL-CIO v. Fed. Election Comm'n*, 333 F.3d 168, 176-78 (D.C. Cir. 2003); *Dole v. Serv. Emps. Union, AFL-CIO, Local 280*, 950 F.2d 1456, 1460 (9th Cir. 1991). The appended declarations clearly make out a prima facie case of a potential chilling effect.

*First*, SFFA members reasonably fear harassment, including even threats of physical violence, if Harvard can compel disclosure of their names. SFFA's President has been called a white supremacist, regularly receives threatening or vile emails and text messages, and has twice received death threats for his advocacy work against racial preferences. Exhibit C, Declaration of Edward Blum ("Blum Decl.") ¶ 22. An SFFA Board member who is a named plaintiff in a similar case against the University of Texas is being subjected to an online campaign of harassment. Exhibit D, Declaration of Abigail Fisher ("Fisher Decl.") ¶ 6. She has been called vile and sexist names, been told to "kill yourself," and been the subject of other threats of physical violence. *Id.* ¶¶ 4-6. There is every indication that SFFA members will be subjected to the same if their identities are disclosed. Indeed, opponents of this suit have already begun to engage in these deplorable tactics. Blum Decl*.* ¶ 8. This type of harassment would lead any reasonable person to reconsider their involvement in challenges to the use of race in college admissions. Fisher Decl. ¶¶ 11-12.

*Second*, if the names of rank-and-file members or donors are disclosed to Harvard, it would likely deter participation in and contributions to SFFA. Disclosure and the potential for retaliation by Harvard is a major concern of SFFA's membership; the assurance of confidentiality was essential to securing members' participation and contributions to the organization. Blum Decl. ¶¶ 9-12, 20-21; Exhibit E, Declaration of John Doe ("John Doe Decl.") ¶¶ 7, 9, 11. SFFA Members and donors similarly (and justifiably) fear retaliation from other universities, graduate schools, prospective employers, and current employers. Blum Decl. ¶¶ 15-16; Fisher Decl. ¶¶ 8-10; John Doe Decl. ¶¶ 8-9. The First Amendment privilege is designed to shield associations from having to bear these heavy costs.

*Third*, the disclosure of internal communications is also likely to lead SFFA members and leaders to substantially curtail their discussions or limit their participation. Blum Decl. ¶¶ 12, 15, 17-19; John Doe Decl. ¶ 11. Forcing SFFA to reveal to Harvard its internal communications, which may include strategic planning involving this and other litigation, is no different than forcing NAACP to reveal its communications in its voter-ID challenges. There is no doubt that the defendants in those cases would be interested in discovering what is discussed at NAACP board meetings, the nature of the communications between the NAACP and its standing members, communications revealing how the NAACP identified members lacking voter-ID, and

communications revealing which State the NAACP may next sue. But allowing such discovery would obviously chill that organization's associational rights. So too here.

Harvard's responses are meritless. Harvard incorrectly argues that SFFA's evidence is "speculative" and "boilerplate." Mot. at 6. To the contrary, the declarations draw upon personal experience and are based on repeated and deplorable incidents of harassment. They are precisely the kind of evidence sufficient to make out a prima facie case. *See, e.g.*, *NAACP v. Alabama*, 357 U.S. at 462 (possibility of "threat(s) of physical coercion, and other manifestations of public hostility"); *Bates*, 361 U.S. at 524 ("harassment and threats of bodily harm"). Likewise, courts have routinely credited statements that discovery would lead members to limit or withdraw their participation. *See, e.g.*, *Perry*, 591 F.3d at 1163; *In re Motor Fuel*, 641 F.3d at 490. There is no doubt that Harvard's far-reaching requests for SFFA's membership list, its list of all financial contributions, and its non-public communications infringe its members' right to freedom of association. Had Harvard genuinely engaged in the meet-and-confer process, SFFA would have welcomed the chance to share this evidence of harassment, which corroborates counsel's representations. *See* Exhibit B, SFFA Letter dated Apr. 15, 2016.[1]

Harvard also contends that the existence of the protective order eliminates any First Amendment threat. Mot. at 6. Harvard is in no position to advance this argument. Harvard has argued—often successfully—that the protective order is insufficient to meet the generic privacy concerns it has raised in resisting discovery of anonymous data that might identify a few individuals if it is misused or inadvertently disclosed. *See, e.g.*, Harvard Letter to Court dated Feb. 5, 2016, at 7 (arguing that disclosure under the protective order "will inevitably—even if [the recipient] makes best efforts to avoid it—leach into his public commentary and litigation activity"); Feb. 25, 2016 Conf. Tr. at 34:7-23 (counsel for Harvard arguing against disclosure of documents under the terms of protective order as nonetheless "an intrusion on the student and applicant privacy"). Basic principles of fairness and estoppel preclude Harvard from having it both ways. *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004). If the protective order cannot solve Harvard's derivative concerns, it clearly cannot remedy SFFA's First Amendment objections to disclosing the actual identities of its members and contributors.

Regardless, Harvard's argument fails on its own terms. SFFA's submissions show that the protective order is incapable of safeguarding the First Amendment rights of SFFA and its members. It is difficult for many members to appreciate the practical distinction between disclosure to Harvard's attorneys and disclosure to Harvard itself or to the public. Blum Decl. ¶ 13. Indeed, it is disclosure to Harvard and the prospect of retaliation by Harvard that is most feared by SFFA's members. *Id*. ¶¶ 9,

---

[1] Harvard wrongly implies that SFFA is withholding responsive documents. Mot. at 3 n.4. To the contrary, SFFA was willing to consider producing some additional documents, notwithstanding their irrelevance, to avoid burdening the Court with unnecessary disputes. Harvard declined to pursue that compromise and instead filed this Motion. *See* Exhibit A.

11, 14-15; John Doe Decl. ¶ 9. Members' communications, which may include information about organizational strategy, also will be chilled by the knowledge that opposing counsel is effectively listening in on these conversations and reviewing documents of this nature. Blum Decl. ¶¶ 18-19.

More fundamentally, SFFA's leadership and members are right to conclude that the protective order cannot guarantee that this sensitive information will not be made public. After all, Harvard wants this discovery to challenge SFFA's associational standing. The "right of access" to judicial filings "extends to materials on which a court relies in determining the litigants' substantive rights." *In re Providence Journal Co.*, 293 F.3d 1, 9-10 (1st Cir. 2002). "Only the most compelling reasons can justify non-disclosure of judicial records." *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987). Accordingly, "a protective order may not prevent disclosure of information produced in discovery that is used to underpin a judicial decision." *City of Greenville*, 2011 WL 5118601, at *10. This Court thus has emphasized its independent duty to scrutinize confidentiality designations at later stages of this case. *See* Doc. 55 at 1. There can be no guarantee that depositions, exhibits, and other discovery will remain sealed in this action. The distinct possibility of future disclosure is enough to chill SFFA's associational rights.

For these reasons, numerous courts have held that a protective order does not cure the First Amendment violation. "Even assuming compliance with the protective order … it is not possible to guard against all possibility of exposure." *Sexual Minorities of Uganda*, 2015 WL 4750931, at *4; *see also Perry*, 591 F.3d at 1164 (a "protective order limiting dissemination of this information will ameliorate but cannot eliminate these threatened harms"); *Tree of Life Christian Sch.*, 2012 WL 831918, at *3 ("Even assuming that a protective order would prevent public disclosure, revelation of the donor's identity will still adversely impact the associational rights of Plaintiff and its donor.").

Finally, Harvard contends that SFFA's mission to seek fairness in the admissions process waives its members' First Amendment rights—*i.e.*, that its members "should reasonably have expected that their identities would be disclosed during litigation brought by SFFA." Mot. at 7. That is wrong. Harvard may be correct as to those members whom SFFA relies on for associational standing—information SFFA has produced. But rank-and-file members and donors do not sacrifice their anonymity by joining an association that advances its mission, in part (*see* Blum Decl. ¶¶ 3-5), through litigation. In *NAACP v. Alabama*, the Supreme Court recognized that one of the NAACP's express goals was to "promote equality of rights and eradicate caste or race prejudice among the citizens of the United States" and "to advance the interest of colored citizens . . . and to increase their opportunities for securing justice in the courts[.]" 357 U.S. at 451 n.1; *see Grandbouche v. Clancy*, 825 F.2d 1463, 1467 (10th Cir. 1987) (rejecting argument that "a plaintiff waives his First Amendment privileges simply by bringing suit"). Nor could rank-and-file members and donors have realistically anticipated such an unprecedented discovery request. Blum Decl.

¶ 10. Judicial precedent (and common sense) foreclose Harvard's argument that an organization's initiation of litigation negates its associational rights.

Harvard's reliance on the district court decisions in *Nat'l Org. for Marriage v. McKee*, 723 F. Supp. 2d 236, 241-42 (D. Me. 2010), and *Nat'l Org. for Women v. Sperry Rand Corp. ("NOW")*, 88 F.R.D. 272, 275 (D. Conn. 1980), is misplaced. *McKee*'s reliance on the protective order to cure all First Amendment concerns is a distinctly minority view that cannot be reconciled with the weight of authority. Regardless, SFFA's evidence of threats, harassment, and other chilling effects is qualitatively stronger. *See McKee,* 723 F. Supp. 2d at 242-43. The same was true for the *NOW* decision. 88 F.R.D. at 274-75. Moreover, the *NOW* court limited the requested discovery to the identity of those members who were alleging an actual injury. *See id.* at 274 ("The defendant is not entitled to the requested information regarding any other member of NOW, since no injury to other members has been alleged."). Again, SFFA has already produced that information. Requiring it to comply with Harvard's requests would violate the First Amendment.

> **B.    Harvard has not demonstrated any compelling need for the information it seeks.**

To meet its burden, Harvard must demonstrate "both a compelling need for the material sought and that there is no significantly less restrictive alternative for obtaining the information." *Comley*, 890 F.2d at 544. The need must go above and beyond the ordinary rules of discovery; Harvard "must show that the information sought is *highly relevant* to the claims or defenses in the litigation—a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1)." *Perry*, 591 F.3d at 1161 (emphasis added); *Sexual Minorities of Uganda,* 2015 WL 4750931, at *4 ("The requesting party's 'interest in disclosure [of the requested information] will be relatively weak unless the information goes to "the heart of the matter," that is, unless it is crucial to the party's case'") (quoting *Black Panther Party v. Smith*, 661 F.2d 1243, 1268 (D.C. Cir. 1981)).

Harvard cannot come close to making the required showing here. Its requests are not even *relevant* to the standing inquiry, let alone crucial to it. *See supra* at 2-4. As the court in *Sierra Club v. Union Elec. Co.* recognized when facing a similar motion to compel, "the identities and communications of non-standing members are irrelevant to any issue in this case." 2015 WL 9583394, at *4; *id.* at *5 (holding that "discovery relating to Plaintiff's alleged motive for bringing this lawsuit … is irrelevant to any issue in this case").

Harvard's reliance on *Natural Resources Defense Council, Inc. v. Illinois Power Resources, LLC*, 2015 WL 4910204 (C.D. Ill. Aug. 17, 2015), illustrates the flaw in its position. In that case, the district court affirmed a magistrate judge's order finding that a carefully circumscribed set of communications between an organization and its standing representatives were probative as to whether those members could credibly allege an injury from the activity of the defendants. *See id.* at *4-*5. But the

alleged injury in this case—Harvard's unconstitutional use of race in the admissions process—turns only on whether the individuals SFFA relies upon for standing have applied, or intend to apply, to Harvard if it ceases using race in admissions. *Gratz v. Bollinger*, 539 U.S. 244, 261-62 (2003). Harvard's sweeping requests for information about SFFA's membership, financial supporters, and internal communications have nothing to say about that specific question.

But even if there were some theoretical relevance to the documents in question, Harvard's requests hardly "go to the heart" of any standing challenge. As explained below, the basic information Harvard needs already has been produced in a manner that does not implicate the First Amendment rights of its members.[2]

### III. Each Of Harvard's Requests Should Be Denied.

To aid disposition of Harvard's requests, SFFA provides the following individual explanations as to why each request should be denied:

RFP No. 7 & Interrogatory No. 6

These requests seek detailed information about the identity of all past or present members of SFFA—not just those members SFFA relies upon for standing. Harvard's demand for rank-and-file membership lists seeks irrelevant information and violates the First Amendment. Indeed, this request is perhaps the most prototypical example of one that threatens to chill freedom of association and should be denied.

RFP Nos. 8(b)-(c), 8(f)

Although specific to standing members, the request for the details of any "financial contributions paid by them to SFFA," "all documents relating to their participation in the litigation," and "all communications with SFFA, its directors, officers, members, or other representatives" are irrelevant to the inquiry because they do not address these members' injuries or their membership status. SFFA already has disclosed their names, the dates they joined, and the information Harvard needs to confirm their application status. That supplies any information "crucial" to or "at the heart of" the standing inquiry; Harvard's requests threaten to chill communications within SFFA and should be denied.

RFP No. 10

This request for documents sufficient to show SFFA's finances, including "bank statements, financial statements, past and projected sources of revenue and expenditures, forecasts, and budgets," is irrelevant to associational standing and threatens to chill SFFA's activities. Moreover, SFFA already has provided Harvard

---

[2] In addition to being irrelevant and unconstitutional, Harvard's sweeping discovery requests are unduly burdensome to the extent they require SFFA to search for, review, and produce all of its internal communications, financial documents, and other information not previously compiled about every one of its thousands of members.

with an interrogatory response describing its contributor base, including the number of members (more than 500) who have contributed to it. Requiring more would violate SFFA's associational privacy for no compelling reason.

### RFP No. 11

Harvard's request for all "documents relating to SFFA's identification, recruitment, and selection of members and potential members," seeks irrelevant information and would violate the First Amendment. Notwithstanding (and without waiving) its objections, SFFA has produced published communications to others regarding its mission, goals, and the process for joining and contributing. SFFA also has described its outreach efforts in an interrogatory response.

### RFP Nos. 12 & 13

Harvard's requests for "[a]ll communications or correspondence between SFFA, its directors, officers, members, or other representatives and its donors or other financial supporters relating to the Litigation," and for "[a]ll communications or correspondence among or between SFFA and its members or potential members, its Board of Directors, POFR, or any other person relating to the Complaint or the Litigation," seek irrelevant information and would violate the First Amendment. Further, these requests seek information that is not crucial to standing. In contrast, requiring SFFA to comply with these requests will have an obviously chilling effect on all of SFFA's internal communications.

### RFP No. 15

Finally, SFFA already has produced the primary documents responsive to Harvard's request for "documents relating to membership in SFFA, including . . . membership policies; . . . all rights members may have to elect or remove SFFA's leadership, participate in its decision-making, or otherwise control its conduct; and all documents relating to SFFA members' responsibilities, if any, to pay dues, render services, or otherwise contribute to SFFA's work." Specifically, SFFA has produced its Bylaws and other corporate organizational documents, which set forth members' rights, and has described the extent of members' participation in an interrogatory response. No more is relevant to the associational standing inquiry, especially when the disclosure of SFFA's internal communications would chill members' ability to communicate within the organization.

Accordingly, Harvard's motion should be denied in its entirety.

> Respectfully submitted,
>
> /s/ William S. Consovoy
> William S. Consovoy

cc:     ECF recipients