1
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3    * * * * * * * * * * * * * *
     STUDENTS FOR FAIR           *
4    ADMISSIONS, INC.,           *
              Plaintiff,         *
5                                *
              vs.                *         CIVIL ACTION
6                                *         No. 14-14176-ADB
     PRESIDENT AND FELLOWS OF    *
7    HARVARD COLLEGE, et al,     *
              Defendants.        *
8    * * * * * * * * * * * * * *

9            BEFORE THE HONORABLE ALLISON D. BURROUGHS
                  UNITED STATES DISTRICT JUDGE
10                    **STATUS CONFERENCE**

11   A P P E A R A N C E S

12

13           CONSOVOY McCARTHY PARK PLLC
             Ten Post Office Square, 8th Floor
             Boston, Massachusetts 02109
14           for the plaintiff
             By: Patrick Strawbridge, Esq.
15

16

17           WILMER CUTLER PICKERING HALE and DORR LLP (Bos)
             60 State Street
             Boston, Massachusetts 02109
18           for the defendants
             By: Felicia H. Ellsworth, Esq.
19

20

21                                   Courtroom No. 17
                                     Robing Room
22                                   John J. Moakley Courthouse
                                     1 Courthouse Way
23                                   Boston, Massachusetts 02210
                                     September 6, 2016
24                                   9:30 a.m.

25

1   **APPEARANCES CONTINUED**

2

3

            WILMER CUTLER PICKERING HALE and DORR LLP
4           1875 Pennsylvania Avenue, NW
            Washington, D.C. 20006
5           for the defendant
            By: Daniel Winik, Esq.
6

7

8           LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND
            ECONOMIC JUSTICE
9           61 Batterymarch Street, Fifth Floor
            Boston, Massachusetts 02110
10          for the intervenor defendant
            By: Oren M. Sellstrom, Esq.
11

12

13

14

15

16

17

18

19

20

21

22                  CAROL LYNN SCOTT, CSR, RMR
                      Official Court Reporter
23                 One Courthouse Way, Suite 7204
                    Boston, Massachusetts 02210
24                       (617) 330-1377

25

```
1                    P R O C E E D I N G S
2              THE CLERK:  This is civil action 14-14176,
3      Students for Fair Admissions versus President and Fellows of
4      Harvard College.  Will counsel identify themselves for the
5      record.
6              MR. STRAWBRIDGE:  Patrick Strawbridge for
7      SFFA.
8              MR. SELLSTROM:  Oren Sellstrom from the
9      Lawyers' Committee for Civil Rights on behalf of the Student
10     MB.
11              MS. MADGE:  Sara Madge for Harvard.
12              MS. ELLSWORTH:  Felicia Ellsworth on behalf of
13     Harvard.
14              MR. WINIK:  Daniel Winik on behalf of Harvard.
15              THE COURT:  Okay.  The reason I jammed this in
16     this week is that this is my law clerk Kelly who has been on
17     this case from the beginning, this is her last week so I
18     wanted to see what we could wrap up while she was still here
19     and we had some institutional knowledge on the case.  Monica
20     is starting today.  I need to assign a new law clerk to this
21     case.  Both of my incoming law clerks went to Harvard.  And
22     you went for undergrad and law school; right?
23              THE LAW CLERK:  Yes.
24              THE COURT:  Did Sarah go just law school or
25     did she go undergrad and law school too?  She just went to
```

```
 1    law school; right?
 2                THE LAW CLERK:  I think she went to both.
 3                THE COURT:  All right.  So one of them is
 4    going to be assigned to the case.  Monica tells me this
 5    morning that she did some work in the Admissions Office as a
 6    freshman essentially opening mail and various ministerial
 7    tasks.  She would normally be assigned to this just by the
 8    way I assign the odd and even cases but because she spent
 9    time in the Admissions Office, if you prefer the other law
10    clerk, I'm fine with that.
11                MS. ELLSWORTH:  I don't have a preference.  I
12    don't think that will create an issue in terms of
13    impartiality.  I'm fine either way.
14                MR. STRAWBRIDGE:  If it's low-level work, I
15    doubt it.  On the other hand, she's probably going to know
16    some of the people who will be involved in the case and some
17    of the things -- I guess I'm not going to overlay Your
18    Honor's view as to --
19                THE COURT:  I mean, honestly my assumption was
20    that you would prefer the other law clerk so you --
21                MR. STRAWBRIDGE:  Maybe that will take all the
22    issues out of it so --
23                THE COURT:  I mean, I just, I have not had
24    this discussion with her so for all I know she also worked
25    in the Admissions Office.  Monica told me this morning so.
```

1          **MR. STRAWBRIDGE:**  I suppose that, I mean, if

2    they both worked in the Admissions Office, then maybe we

3    have to revisit the question; but if there, given, it just

4    seems like be it might be easier --

5          **THE COURT:**  No, I don't dispute that.  So

6    you're certainly more than welcome to sit in today but I

7    think all things being whole, we'll swap it, okay.  It just

8    seems more fair.

9          All right.  So that's the first thing.

10         The second thing is I know you still have a motion

11   pending on organizational standing and I just haven't had a

12   chance to look at it so I will get back to that hopefully in

13   the next week or two.  I really, we looked at it pretty

14   closely the first time so I don't anticipate making any

15   changes to it but I will go back to it.  I just haven't had

16   a chance to do it.

17         On the, I am just trying to --

18         **MR. STRAWBRIDGE:**  I just wanted to remind Your

19   Honor, you probably recall this, but you asked us not to

20   respond to their motion for reconsideration.

21         **THE COURT:**  Yes.

22         **MR. STRAWBRIDGE:**  And I'm happy not to give

23   you any response unless something piqued your interest.

24         **THE COURT:**  Yeah, I mean, I just, I haven't

25   looked at their motion thoroughly.  I read in when it came

1    in but not much beyond that.  I just, I just know we looked

2    at it pretty closely the first time around so we'll -- but I

3    will look at it again.

4              **MS. ELLSWORTH:**  That's fine.

5              **THE COURT:**  So what I've done is I tried to

6    pick through all these letters that I have and see if I can

7    tee up what all the issues are.  If I missed any, you all

8    can let me know before we go but -- so so far Harvard has

9    agreed to and I assume is producing or has produced two

10   years of admissions data.  You've asked for an additional

11   six years for eight total; correct?

12             **MR. STRAWBRIDGE:**  Correct.

13             **THE COURT:**  My reading of *Fisher* says that

14   three years is not enough and that raises the issue what is

15   enough.  Kelly who you will probably be glad to see depart

16   after this thinks that you should get all eight.  I was

17   thinking more like six.  So, but what I would like to

18   understand is how much more burdensome it is to produce

19   years seven and eight.  Is it just the same button or --

20             **MS. ELLSWORTH:**  It's not.  So it depends on

21   which direction we're going.  So the year 2020 which is

22   only, the only existing year now until a new cycle starts,

23   it's a totally new platform called Slate which is different

24   from what we've been producing from for the two years that

25   were produced.

```
 1              So going backwards it is, it's not just the push of
 2      a button but it is a similar format.  Some of the fields
 3      won't exist in earlier years, right.  Some things were
 4      added.  Some field names might change but it is easier to go
 5      backwards than forward from the administrative --
 6              THE COURT:  So how about this as a compromise.
 7      I give you the eight years but only make them go
 8      backwards --
 9              MR. STRAWBRIDGE:  That's fine with us.  I
10      suppose, I think Harvard had more of an interest in having a
11      more recent year but I think we view pre-employment (ph.)
12      years as more probative anyway.
13              MS. ELLSWORTH:  We're certainly happy to go
14      backwards.  We still think eight is too many and we suggest
15      maybe doing individualized data fields for whatever number
16      of years you might honor and then some -- that you order,
17      excuse me, and some aggregate data back, further back, back
18      eight years.  I'm not sure why we need a line item for
19      each --
20              THE COURT:  I'm definitely going back to six
21      because *Fisher* says three isn't enough and, so it's not
22      going to be, it's going to be between six and eight but what
23      about that six years going backwards with the aggregate data
24      for the seventh and eighth years?
25              MR. STRAWBRIDGE:  Obviously we prefer eight
```

1    but six years going backwards is certainly a good start.  I

2    guess --

3                    THE COURT:  All right.  Let's do this.  Six

4    years going backwards, aggregate data for seven and eight.

5    If there is anything in the aggregate data that looks

6    anomalous to you, you can raise it and we'll see about

7    digging deeper into that, okay.

8                    MR. STRAWBRIDGE:  Okay.  So just to make sure

9    I understand, we're talking about the six years prior to the

10   years that they've already produced?

11                   THE COURT:  They produced the two most recent

12   years, right?

13                   MR. STRAWBRIDGE:  Right.

14                   THE COURT:  So six years prior, so four years

15   complete data prior and then two years of aggregate data.

16                   MR. STRAWBRIDGE:  Okay.

17                   MS. ELLSWORTH:  So we're producing four more

18   years going backwards?

19                   THE COURT:  Yes.

20                   MS. ELLSWORTH:  And then for aggregate data --

21                   THE COURT:  So you guys can sort out aggregate

22   data.  And if it ends up being easier for you to produce all

23   six years in the same way, that's fine too.  But I do have

24   concerns about, you know, there is a view, even a view in my

25   chambers that, you know, two complete four-year cycles is

1    what makes the most sense.  I'm sort of looking at it less

2    as four-year snapshots as more like individual year

3    snapshots.

4              MS. ELLSWORTH:  That's certainly how the

5    Admissions Office looks at it.

6              THE COURT:  So six years seems, six years

7    seems fine to me and I feel like the older, the further we

8    go back kind of the less probative it is; but that seems

9    like a reasonable compromise to me, six years going

10   backwards altogether, so it's four more years plus two years

11   aggregate data unless you decide that it's easier to just

12   produce all the data because coming up with some model for

13   the aggregate data might turn out to be more of a pain in

14   the butt than it's worth.

15             MR. STRAWBRIDGE:  Yeah, I think we will have

16   to work through what's included in that aggregate data.  We

17   may have different concepts of what's sufficiently detailed

18   enough although still aggregated versus what's not.

19             MS. ELLSWORTH:  We can try and work that

20   out --

21             THE COURT:  Try and work it out.  I'll tell

22   you this:  If you can't work it out, I'm going to be

23   inclined to just say produce the full eight years because

24   that, it's just not worth spending a lot of time trying to

25   compose a whole different data set.  If it's easy to do and

1    it gives you what you're looking for, we'll do it.  If not,

2    go with the whole eight.  Okay?

3              **MS. ELLSWORTH:**  Okay.

4              **THE COURT:**  All right.  So we'll get back to

5    the database fields after Mr. Sellstrom leaves.

6         All right.  So this data about academic

7    performance, so I did go back and look at my transcript and

8    I had initially sort of suggested that I was inclined to let

9    you dig into that.  And now upon further reflection and

10   after reading *Fisher* I don't see how it's actually relevant.

11   I don't see that -- unless, unless you can make an argument

12   to me that Harvard's reasons for affirmative action are to

13   have some sort of impact on academic performance and I don't

14   think that that is the purpose of their affirmative action

15   program so I don't think that academic performance is

16   relevant to the analysis.

17             **MR. STRAWBRIDGE:**  So, a couple of responses to

18   that.

19        I don't know and I think it's way too early in the

20   case to know what all of Harvard's reasons are for its

21   affirmative action programs and so I think it's premature to

22   just determine that it has no relevance or that we

23   understand what the purpose of its use raises.  So I think

24   it's premature to kind of make an assessment on that.

25        Secondly, I would just refer the Court to the

1    language in *Fisher II* which specifically notes the

2    University's ongoing need to, among other things, quote,

3    Identify the affects, both positive and negative, of the

4    affirmative action measures the University deems necessary

5    And what's happening once these students are admitted, what

6    their retention rate is like, are they staying in the majors

7    they were admitted in?  What's happening with respect to the

8    performance in the field is highly relevant as to whether or

9    not the use of race is achieving the purported goals.

10             **THE COURT:**  Well, they say, I mean, they say

11   the purported goals are a diverse class regardless of how

12   all of those people performed, unless they're dropping out I

13   guess.

14             **MR. STRAWBRIDGE:**  I mean, that's relevant.

15             **THE COURT:**  What do you think about that?  I

16   don't -- go ahead.

17             **MS. ELLSWORTH:**  I mean, I think you sort of

18   accurately encapsulated Harvard's position and goals here

19   which is, as you said, not related to academic performance

20   necessarily but a diverse campus community and diverse

21   student body so that is the academic goal that Harvard is

22   attempting to achieve with race-conscious admissions.  So

23   how individual people do or even how in the aggregate people

24   do academically or in their majors, Latin Honors, et cetera,

25   is sort of irrelevant to Harvard's goal; right.

1    **THE COURT:**  So what if you, what if, you know,

2    some enormous percentage of the candidates in a certain

3    program drop out, so then your class is a lot less diverse

4    in year four than it was in year one.

5    **MS. ELLSWORTH:**  I mean, the graduation rates

6    in the aggregate is something I think we can probably

7    produce.  We're not -- we're happy with our graduation rates

8    so that's --

9    **THE COURT:**  Okay.  So let's do that.  Let's

10   start with that.

11   **MR. STRAWBRIDGE:**  Your Honor, I just wanted to

12   be clear also because I think this may address all of the

13   concerns that you have.

14        Our request at the moment, you've agreed to limit

15   it to only aggregate academic performance across, you know,

16   ethnicity because we're not interested in getting individual

17   student performance.  We don't care how individual students

18   perform.  But if they're using race, we'd like to see

19   whether, you know, we ought to care about what happens on

20   graduation day.

21   **THE COURT:**  All right.  So let's go with the

22   aggregate data on graduation day.  I am way less concerned

23   with majors changing, et cetera, et cetera; but if the point

24   is a diverse class and the class ends up way less diverse on

25   the last day than that is on the first day, that might be

1   something that is relevant.

2             MR. STRAWBRIDGE:  I mean, is there anything

3   short of, I mean, I guess when we talk about graduation

4   there's also things like academic suspension and transfer

5   and that sort of stuff, not within majors but transferring

6   out of Harvard.

7             THE COURT:  If they transferred out, they're

8   not going to graduate.

9             MR. STRAWBRIDGE:  Okay.  So we're looking at

10  just graduation rates by ethnicity as directed by Harvard --

11            THE COURT:  Yes.  If there is some other

12  demographic that you're interested in that they can easily

13  put their hands on, that's fine too but --

14            MR. STRAWBRIDGE:  All right.  I'd like to

15  think about that.  I would just like to, if in the course of

16  discovery we find other purported bases for the use of

17  race --

18            THE COURT:  If you find out that their view,

19  that their goal is to whatever, that's somehow related to

20  academic permanence, then come back.

21            MR. STRAWBRIDGE:  Okay.  All right.

22            MS. ELLSWORTH:  And to clarify, Your Honor,

23  the graduation rates aggregate by race for what time period?

24            THE COURT:  Let's do that same, let's do the

25  same eight years we've been talking about.  That's aggregate

1    data.

2             **MR. STRAWBRIDGE:**  Yeah, the only caveat I have

3    about that is obviously for four years we don't have

4    graduation statistics so I'd like to maybe have them for the

5    last eight years for which they have a graduation rate.

6             **THE COURT:**  Do you have any problem with that?

7             **MS. ELLSWORTH:**  I'm just trying to think.  So

8    that's going back to --

9             **THE COURT:**  I'm actually not, I don't want to

10   extend past that eight years we already talked about.  I'm

11   already as far back as I want to go so let's do it that way

12   and see where we are.

13            **MR. STRAWBRIDGE:**  All right.

14            **MS. ELLSWORTH:**  And we'll supplement as the

15   class graduates.

16            **THE COURT:**  Or if there is some, if we look at

17   the data and there is something that suggests a pattern or

18   an anomaly in the data, whatever, we can go back and revisit

19   that.

20            ESI custodians.  All right.  So Harvard has agreed

21   to produce 11.  SFFA is looking for 25.  I think the North

22   Carolina case agreed to 24; right?

23            **MS. ELLSWORTH:**  I think that was, my

24   understanding was that was an initial proposal.  I don't

25   know, you would know more about it than me.

1              MR. STRAWBRIDGE:   That was North Carolina's

2       initial proposal.

3              THE COURT:   How many have been agreed to

4       there?

5              MR. STRAWBRIDGE:   We have agreed to those 24.

6       We actually have an exploratory deposition in a couple weeks

7       and we reserved the right to request additional ones --

8              THE COURT:   All right.   Just an act of sheer,

9       sheer, I don't want to call it "laziness" but "expediency,"

10      I'm going to give you the same 24 that North Carolina has.

11             MR. STRAWBRIDGE:   You're going to leave it to

12      us to --

13             THE COURT:   If you can't sort it out, come

14      back but -- come back but that's where we're going to start.

15             MR. STRAWBRIDGE:   Okay.   I hope that we can

16      sort it out.

17             THE COURT:   The history of Jewish

18      discrimination at Harvard.   No.

19             MR. STRAWBRIDGE:   May I just, if I may just

20      inquire as to why -- the current admissions process is an

21      offshoot of -- the history of discrimination is relevant to

22      our claim for invidious discrimination.

23             THE COURT:   History is old and there has been

24      many miles between the history and now.   It just seems very

25      unlikely to reveal probative information in this case.

1      **MR. STRAWBRIDGE:**  So, I mean, I guess -- I'm

2  struggling a little bit because when we come back with our

3  invidious discrimination, you know, argument at summary

4  judgment and/or a trial, we're going to be -- there is a

5  burden upon us to raise the question as to whether they have

6  a history of invidious discrimination.

7      **THE COURT:**  First of all, I think that what

8  happened then is pretty well documented, right?  I mean, I

9  don't even know how you're going to do discovery on this at

10  this point.  This is all, like, in the '40s.

11      **MR. STRAWBRIDGE:**  I don't think it's all in

12  the '40s.  Certainly there are documents that are more

13  recent with respect to --

14      **THE COURT:**  '50s?  I mean, I don't think we

15  get to the '60s; right?

16      **MR. STRAWBRIDGE:**  I'm not entirely sure.

17  There has obviously been a lot of scholarship on it.  I

18  don't think that a lot of that documentation is disputed.

19  We would be happy to take a stipulation as to the fact that

20  it happened, it was a long time ago but the facts aren't

21  disputed.

22      To the extent that they're disputing the facts of

23  the history of discrimination, we'd like to be able to have

24  some ability to bring documents forth.  And if we can't get

25  those documents from public sources, Harvard is the source

1    of letters that their dean was writing to alumni.  This is

2    where the holistic admissions process comes from.  I don't

3    think it's entirely irrelevant.  I agree, like a lot of it

4    isn't in dispute and we ought to be able to stipulate to it

5    but Harvard hasn't offered to do that and failing that I

6    need access to these letters if they're not in public

7    sources.

8             THE COURT:  See what is out there.  I mean, I

9    just think this is so old and so remote and so, it's going

10   to be so hard to link to what's happening now anyway that is

11   going to, that gives probative evidence, I just think it is

12   a red herring time suck.

13            What do you think?

14            MS. ELLSWORTH:  I agree.

15            THE COURT:  Is that how you would have phrased

16   it, "time suck"?

17            MS. ELLSWORTH:  You took the words right out

18   of my mouth.

19            (Laughter.)

20            THE COURT:  All right.  Prior allegations of

21   Asian discrimination.  So Harvard is agreeing to two years.

22   SFFA wants more.  How much more are you looking for?

23            MR. STRAWBRIDGE:  Well, I mean, I think there

24   are different categories, right.  Like, I don't want email

25   going back 20 years of when someone complained about the

1    fact that they didn't get in but I do think that when

2    there -- there was a DOE investigation in the '80s, for

3    example, that we referred to in one of our letters.  And I

4    think that, you know, the results of that information

5    Harvard has regarding that investigation is probative to our

6    invidious discrimination claim.  It is far more recent.

7         There is a newer investigation within the last, you

8    know, two or three years that also looked into those issues

9    so, I mean, anything that they have, you know, I would be

10   completely reasonable in terms of how they identify the

11   documents but I think anything over, you know, going back to

12   that DOE investigation --

13        **THE COURT:**  When was the DOE investigation?

14        **MS. ELLSWORTH:**  It was 1990, 1988 to '90.  The

15   official OCR investigation and then -- I'm not sure what

16   allegations of Asian discrimination you're making precisely.

17   I understand Mr. Strawbridge to be saying he's not asking us

18   to search email but that could take a lot of different

19   forms.  If we're talking about the two formal open OCR

20   investigations, that's one thing.

21        **THE COURT:**  Certainly the two open OCR

22   investigations they should have.  And you're talking about

23   sort of systemic allegations, like sort of group allegations

24   or --

25        **MR. STRAWBRIDGE:**  I wouldn't limit it to that

1    but I would be willing to come up with a reasonable way to

2    identify formal allegations.  I mean, they obviously have

3    people who have been in the Admissions Office for a long

4    time and whenever people have raised issues at the board

5    level or at the director level, they go beyond this one

6    particular applicant's.

7            Now, I do think the two-year period is relevant

8    for, you know, more -- the search of ESI, for example, the

9    search terms are going to hit on those anyway.

10           **MS. ELLSWORTH:**  They should.

11           **MR. STRAWBRIDGE:**  So, but for the larger more

12   institutional ones, I think the OCR is a good start but if

13   there is any -- they know better than I do if they've had

14   any internal investigations, if they've ever received

15   complaints that have come through other sources that

16   prompted some kind of level of review or investigation at

17   the department level but --

18           **THE COURT:**  Can you figure out how many

19   incidents there were to which Harvard responded at an

20   institutional level?  So an investigation and inquiry --

21           **MS. ELLSWORTH:**  If I -- okay.

22           **THE COURT:**  Not individual students.

23           **MS. ELLSWORTH:**  Right.  What I'm aware of

24   right now are the two OCR investigations.  What we can go

25   and look for in response to this is anything, as you put it,

1     that Harvard responded to on an institutional level, not

2     individual allegations.

3                    THE COURT:  Like board level -- I don't know

4     what "director level" means but -- I don't know what "board

5     level" means.

6                    MR. STRAWBRIDGE:  There's two boards at

7     Harvard, one that says the inside board and the inside board

8     is the Fellows and -- but I guess what I meant is something

9     that comes to their attention.  I mean, the senior officials

10    in the Admissions Department have been there since the

11    1980s, anything that has come to the level of their

12    attention that goes beyond individual students ought not be

13    too hard for them to recall.

14                   MS. ELLSWORTH:  We can -- I mean, so we would

15    be looking to see what the Dean of Admission has responded

16    to.

17                   MR. STRAWBRIDGE:  Or the Director.

18                   MR. SELLSTROM:  Or the Director of Admissions.

19    I mean, I think any response from that office would have

20    come from one of those two either way.  I'm not sure that's

21    going to allow us to narrow it that much.  But if we're

22    talking about not an individual complaint of discrimination

23    but more a systemic complaint, we can look to see other than

24    the two OCR investigations if there are other systemic

25    responses from either the Dean or Director over Admissions.

1          **THE COURT:**  Okay.  So let's do that.

2          **MS. ELLSWORTH:**  I'm sorry, since the 1990s;

3     right?  Since the first OCR investigation?

4          **THE COURT:**  I think that's far enough; right?

5     From 1990 forward?

6          **MR. STRAWBRIDGE:**  I think that's --

7          **THE COURT:**  Or the late '80s.

8          **MR. STRAWBRIDGE:**  I think that's fine for the

9     search.

10         **THE COURT:**  The number of depositions per

11    side.  I don't think it's actually ripe because I don't

12    think anyone has taken ten depositions yet; but that being

13    said, I don't think ten depositions per side is going to be

14    enough so what are you looking for, Mr. Strawbridge?

15         **MR. STRAWBRIDGE:**  I think our initial proposal

16    was 20.  I don't want to take any more depositions than I

17    have to.  I've got this case and I've got another case so

18    I'm not looking to add to my work load.  I think that, you

19    know, 20 would probably be sufficient.  We had carved out

20    third-party depositions.  I don't anticipate a tremendous

21    number of third-party depositions but there may be a few.

22    If we're talking about party Harvard depositions, I think 15

23    to 20 is a good starting point.  We have 24 custodians.

24         **MS. ELLSWORTH:**  So if we're going to -- I

25    guess the ten that we agreed to before which I understand

```
1   was before a lot of water went under the bridge here was
2   only Harvard.  If we're going to up that number, I'm not
3   sure we'd be willing to say only Harvard so 15 Harvard
4   custodians, 20 total, including third parties, and then --
5              THE COURT:  Let's start with that.  I was
6   thinking 15.  I hadn't factored in the third parties so
7   let's do that, 15 Harvard and five third party.
8              MR. STRAWBRIDGE:  Subject to our ability to --
9              THE COURT:  Yes.
10             MR. STRAWBRIDGE:  Thank you.
11             THE COURT:  It just struck me that ten wasn't
12  going to be enough and I'd rather give you more general
13  parameters and have you go off and do it than have to be in
14  here what about this one, what about that one.  I think it
15  lets you plan better and I think it will keep us better on
16  the discovery schedule.
17         I think the last thing that I have on my list
18  besides the fields are the confidentiality designations.
19  You want me to review the documents that they're --
20             MR. STRAWBRIDGE:  I think I have to ask, I
21  don't want you to review -- I wish we could work this out
22  but, really, at this point I think we want some input
23  because I don't think the protective order really provides
24  just how do you want us to put these in front of you.  Do
25  you want me to send over a binder?  Do you want me to bring
```

1    them into court one day?  Do you want argument on each of

2    the documents?

3          I wish we weren't there but, for an example,

4    they're just sending over aggregate admission statistics for

5    racial groups and they're marking them "attorneys' eyes

6    only."  And that's exactly the kind of stuff I thought we

7    talked about earlier that shouldn't be marked "attorneys'

8    eyes only."

9          I don't know what to do at this point other than

10   the fact that we're about to get, you know, a lot of email

11   and I am anticipating a lot of the email is going to be

12   marked "attorneys' eyes only" and it's frustrating our

13   ability to manage the case.  I think it's beyond the scope

14   of what's really --

15                 **THE COURT:**  Who else do you want to have

16   access to these?

17                 **MR. STRAWBRIDGE:**  I'd like to be able to show

18   one client representative some of the most important

19   discovery in the case.

20                 **THE COURT:**  When you say "client

21   representative," what kind of person are we talking about?

22                 **MR. STRAWBRIDGE:**  I'm not sure it matters but

23   obviously Mr. Blum is the primary client representative.

24   I'm not necessarily interested in, you know, disseminating

25   this across the entire membership.  I don't necessarily need

1    to do that but the Board and/or Mr. Blum are the people who

2    would be most appropriate to, you know, provide an

3    assessment of our case including the most sufficient

4    evidence and that's what the confidential designation is

5    for.

6              THE COURT:  Okay.  So he is talking about

7    Mr. Blum who is not a student or an applicant or anything

8    like that, which I presume would raise different issues for

9    you.  He has to be able to show some stuff to his client.  I

10   thought we had agreed that aggregate data would go to the

11   client.

12             MS. ELLSWORTH:  So the aggregate data that we

13   have produced so far is not, it's not like the aggregate

14   data, it's the one-pagers that are discussed within the

15   Admissions Office throughout the process so it's not like an

16   output of aggregate data.  It's a particular document that

17   is used quite intricately in the admissions process and so

18   we think that designating it as highly confidential is the

19   inner workings of the admissions process as well as things

20   that relate to individual students that we have, you know,

21   separate reasons for the AEO designation.

22             MR. STRAWBRIDGE:  I get the individual

23   students and we've tried to be very accommodating, I think

24   we've made that clear --

25             THE COURT:  Is this like the daily sheet they

1    sort of send around with what's going on?

2              **MS. ELLSWORTH:**  It's not daily but it is --

3              **THE COURT:**  Frequent, whatever.

4              **MS. ELLSWORTH:**  It's the sheet, it is a sheet

5    that the Dean of Admissions and Director of Admissions look

6    at from time to time during the height of the admissions

7    process.

8              **MR. STRAWBRIDGE:**  Yes, exactly.  I guess I

9    feel like the inner workings of the Admissions Office is

10   what the entire case is about.  I mean, if that's the ground

11   for an attorneys' eyes only designation, then I'm not sure

12   why we have any other designation.

13             **THE COURT:**  Well, what I have tried to think,

14   the way I have tried to think about this in my own head, and

15   maybe I have it right and maybe I don't, is that -- I kind

16   of think of Mr. Blum's kid or his neighbor's kids or

17   everybody he knew is going to apply to Harvard, aggregate

18   data that's not going to give those people an advantage in

19   the admissions process he should be able to see but data

20   that gives insight such that he could figure out who is more

21   likely to get in and who wasn't is what I've sort of been

22   driving along in my own head.  Not because I think he is

23   going to do that but because that's, when I think about it,

24   that's how I think about it.  If it would help a particular

25   person to know this in terms of getting their own kid in, I

1    think that they can mark it "highly confidential;" but if

2    it's aggregate data about who's gotten in, you know, there

3    is more aggregate data that is just a reporting of

4    statistics, that I think they should have.  Can we carve

5    that line?  Do I have it wrong?

6              **MR. STRAWBRIDGE:**  I don't think that line is

7    going to be tenable as the case goes forward and in part

8    because I think that Harvard has a lot, a number of forums

9    and been quite open about the general nature and the

10   workings of its admissions process.  I don't think any of

11   the stuff really provides the kind of advantage that Your

12   Honor is concerned about, things like their reader

13   instructions and their instructions to their alumni

14   interviewers.  These are pretty widely disseminated

15   documents.

16         Secondly, the confidential designation still

17   protects it from dissemination beyond the people who have an

18   interest in seeing it and we're agreeing to further restrict

19   its dissemination to certain members of our clients who do

20   not have an ongoing stake, you know, with respect to a

21   particular student's admission.

22         But, I mean, theoretically they're going to claim

23   that any comment that any admissions officer ever makes

24   about anyone's file is information that could be used to

25   that scope and we're going to have essentially the entire

1    case tried under seal.  I just don't think that's a tenable

2    line to hold.

3                MS. ELLSWORTH:  I think there is a different

4    question as far as what we do when it comes time to actually

5    put in evidence at trial --

6                THE COURT:  I agree.

7                MS. ELLSWORTH:  -- or summary judgment so

8    that, I wouldn't -- I mean, we'll have to figure something

9    out then and we will cross that bridge when we come to it

10   but for present purposes -- and I do think Your Honor is

11   drawing the line correctly.  And as an example, the way in

12   which that could be, that line could be abused, you know,

13   the fact that only two people might apply from Montana, to

14   use a random example that is probably not correct, that is

15   hopeful to somebody in Montana or who might send their kid

16   to school in Montana to know that that's, you know,

17   potentially an easier avenue into admissions.

18          So, again, not that Mr. Blum is going to do this

19   but the point is that that's the concern.

20                MR. STRAWBRIDGE:  It think it's such -- I

21   mean, if they would agree to just let us have one client

22   designation, then I would have less concern at this point in

23   the case but since they've held the line on that even like,

24   I mean, they're going to be able to say this about almost

25   every single document that they produce in the case.  I

1    just, it's very difficult for us to get strategic guidance

2    before the trial period and to report what the strength of

3    our case is looking like, how it's shaping up if we're

4    basically just hamstrung from using any document whatsoever

5    even if it contains no information about individual

6    applicants.

7              THE COURT:  All right.  How many, like what's

8    the volume of documents we're talking about here if I was

9    inclined to look at them?

10             MR. STRAWBRIDGE:  I mean, right knew we could

11   probably limit it to a small binder and that's largely

12   because of the size of the documents as opposed to the

13   number of the documents.  When the emails start rolling in,

14   it's going to be a different story but my hope is we can get

15   some real hard and fast guidance that would allow for

16   appropriate designations that would be followed when the

17   emails come in.

18             THE COURT:  All right.  Why don't you, you can

19   give me the binder and you want to give me something that

20   says why you're designating each of those documents as

21   confidential.

22             MS. ELLSWORTH:  Yeah, I think so.  I don't

23   know exactly what's going to be in the binder right now

24   but --

25             MR. STRAWBRIDGE:  Maybe what we could do, if

1    we can just try to make it easier for everybody, is we can

2    give you a binder and we can essentially give you like, you

3    know, we'll try to limit it to a line or two about why we

4    think the designation is inappropriate and they can give a

5    line or two in response to each document and we could keep

6    it to a reasonable --

7              THE COURT:  Maybe we will just come and sit

8    here again with the binder and just go through it page by

9    page and then you'll have some idea of how I'm going to rule

10   on these things.

11             MR. STRAWBRIDGE:  Okay.

12             THE COURT:  It's hard for me when I don't know

13   what these are.

14             MR. STRAWBRIDGE:  Yeah.  I prefer not to give

15   a binder but if we've got to do that, we've got to do that.

16             THE COURT:  Is that everything but for the

17   fields?

18             MS. ELLSWORTH:  The only other issue I have is

19   alumni interviewers.

20             THE COURT:  Is that ripe at the moment?

21             MS. ELLSWORTH:  There is a pending discovery

22   request for names.

23             MR. STRAWBRIDGE:  I think the discovery field

24   discussion will get into this so I think we can probably

25   have it as part of that discussion.

1              **THE COURT:**  Okay.

2         (Pause in proceedings.)

3              **MR. SELLSTROM:**  Is it time for me to exit?

4         (Laughter.)

5              **MR. SELLSTROM:**  Thank you, Your Honor.

6         (Whereupon, Mr. Sellstrom exited the robing room.)

7         (Whereupon, the remainder of the proceedings were

8    sealed and transcribed under separate cover.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Carol Lynn Scott, Official Court Reporter for

the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing pages

are a true and accurate transcription of my shorthand notes

taken in the aforementioned matter to the best of my skill

and ability.



        /S/CAROL LYNN SCOTT



_____

                CAROL LYNN SCOTT
               Official Court Reporter
              John J. Moakley Courthouse
             1 Courthouse Way, Suite 7204
              Boston, Massachusetts 02210
                  (617) 330-1377



**DATE: September 30, 2016**