# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS
# BOSTON DIVISION

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC.,<br><br>       Plaintiff,<br><br>   v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>       Defendant. | Civil Action No. 1:14-cv-14176-ADB |

## PLAINTIFF'S MEMORANDUM OF REASONS
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Adam K. Mortara
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
312.494.4400
adam.mortara@bartlit-beck.com

John M. Hughes
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
303.592.3100
john.hughes@bartlit-beck.com

Paul M. Sanford BBO #566318
BURNS & LEVINSON LLP
One Citizens Plaza, Suite 1100
Providence, RI 02903
617.345.3000
psanford@burnslev.com

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
703.243.9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com

Patrick Strawbridge BBO #678274
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
617.227.0548
patrick@consovoymccarthy.com

Michael H. Park
CONSOVOY MCCARTHY PARK PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
212.247.8006
park@consovoymccarthy.com

June 15, 2018

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    STANDARD OF REVIEW ......................................................................................3

III.   LEGAL BACKGROUND ........................................................................................3

IV.    ARGUMENT ............................................................................................................4

       A.    Harvard intentionally discriminates against Asian Americans. ......................5

             1.    SFFA's expert identified statistically significant discrimination against
                   Asian-American applicants. .....................................................................6

             2.    Harvard's own internal investigation found that its admissions system
                   is biased against Asian-American applicants. ......................................11

             3.    There is ample corroborating evidence of discrimination against
                   Asian Americans.....................................................................................20

             4.    Harvard has a history of intentional discrimination against minorities. .........23

             5.    No rational factfinder could accept Harvard's justifications for its
                   discrimination against Asian-American applicants...............................26

       B.    Harvard engages in racial balancing...............................................................33

       C.    Harvard is not using race to achieve critical mass. ........................................39

       D.    Harvard neither gave serious, good faith consideration to nor took advantage
             of workable race-neutral alternatives. ............................................................42

V.     CONCLUSION .......................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*,
    696 F.3d 128 (1st Cir. 2012) .................................................................................5

*Anderson ex rel. Dowd v. City of Boston*,
    375 F.3d 71 (1st Cir. 2004)..............................................................................5, 6

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..........................................................................................1

*Bailey v. Dart Container Corp. of Mich.*,
    980 F. Supp. 560 (D. Mass. 1997)...................................................................3

*Baker v. City of Kissimmee, Fla.*,
    645 F. Supp. 571 (M.D. Fla. 1986)................................................................15

*Bird v. Glacier Elec. Coop., Inc.*,
    255 F.3d 1136 (9th Cir. 2001)........................................................................32

*Borges ex rel. S.M.B.W. v. Serrano-Isern*,
    605 F.3d 1 (1st Cir. 2010)................................................................................3

*Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.*,
    768 F.2d 5 (1st Cir. 1985)................................................................................3

*Columbus Bd. of Educ. v. Penick*,
    443 U.S. 449 (1979)........................................................................................15

*Conway v. Electro Switch Corp.*,
    825 F.2d 593 (1st Cir. 1987) ..........................................................................32

*Council of Ins. Agents & Brokers v. Juarbe-Jiménez*,
    443 F.3d 103 (1st Cir. 2006) ............................................................................4

*Davis v. District of Columbia*,
    949 F. Supp. 2d 1 (D.D.C. 2013) ..................................................................15

*Fisher v. Univ. of Tex. at Austin* ("*Fisher I*"),
    570 U.S. 297 (2013) ................................................................................passim

*Fisher v. Univ. of Tex. at Austin* ("*Fisher II*"),
    136 S. Ct. 2198 (2016) ...................................................................................39

*Garcia-Garcia v. Costco Wholesale Corp.*,
    878 F.3d 411 (1st Cir. 2017) ............................................................................3

*Grutter v. Bollinger,*
  539 U.S. 306 (2003) ...........................................................................................passim

*Hall v. Ala. Ass'n of Sch. Bds.,*
  326 F.3d 1157 (11th Cir. 2003) ..................................................................................33

*Hodgens v. Gen. Dynamics Corp.,*
  144 F.3d 151 (1st Cir. 1998) .........................................................................................4

*Hsu By and Through Hsu v. Roslyn Union Free Sch. Dist. No. 3,*
  85 F.3d 839 (2d Cir. 1996) ............................................................................................5

*Loving v. Virginia,*
  388 U.S. 1 (1967) ............................................................................................................5

*McCleskey v. Kemp,*
  481 U.S. 279 (1987) ........................................................................................................6

*Mhany Mgmt., Inc. v. Cty. of Nassau,*
  819 F.3d 581 (2d Cir. 2016) ........................................................................................25

*Miller v. Johnson,*
  515 U.S. 900 (1995) ......................................................................................................26

*Pagán v. Calderón,*
  448 F.3d 16 (1st Cir. 2006) ............................................................................................5

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
  551 U.S. 701 (2007) ......................................................................................................33

*Perkins v. City of W. Helena, Ark.,*
  675 F.2d 201 (8th Cir. 1982) ......................................................................................25

*Personnel Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979) ......................................................................................................26

*Reeves v. Sanderson Plumbing Prods., Inc.,*
  530 U.S. 133 (2000) ......................................................................................................18

*Regents of Univ. of Cal. v. Bakke,*
  438 U.S. 265 (1978) ................................................................................................33, 39

*Reno v. Bossier Parish Sch. Bd.,*
  520 U.S. 471 (1997) ........................................................................................................6

*Rice v. Cayetano,*
  528 U.S. 495 (2000) ........................................................................................................3

*Robinson v. Runyon,*
   149 F.3d 507 (6th Cir. 1998) ................................................................................................32

*SBT Holdings, LLC v. Town of Westminster,*
   547 F.3d 28 (1st Cir. 2008) ...................................................................................................27

*Schmidt v. Boston Hou. Auth.,*
   505 F. Supp. 988 (D. Mass. 1981) .........................................................................................6

*Smith v. Univ. of Wash.,*
   392 F.3d 367 (9th Cir. 2004) ................................................................................................39

*Spencer v. Zant,*
   715 F.2d 1562 (11th Cir. 1983) .............................................................................................6

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College (Harvard Corp.),*
   261 F. Supp. 3d 99 (D. Mass. 2017) .....................................................................................4

*Thomas v. Eastman Kodak Co.,*
   183 F.3d 38 (1st. Cir. 1999) ..................................................................................................5

*United States v. Greene,*
   36 M.J. 274 (C.M.A. 1993) ..................................................................................................31

*United States v. Singleterry,*
   29 F.3d 733 (1st Cir. 1994) ....................................................................................................6

*United States v. Yonkers,*
   96 F.3d 600 (2d Cir. 1996) ...................................................................................................15

*Valentin v. Hosp. Bella Vista,*
   254 F.3d 358 (1st Cir. 2001) ..................................................................................................4

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) ..................................................................................................6

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ...................................................................................................6, 25, 32, 33

*Washington v. Davis,*
   426 U.S. 229 (1976) ...........................................................................................................5, 6

*Washington v. Seattle Sch. Dist. No. 1,*
   458 U.S. 457 (1982) ...............................................................................................................5

*Wessmann v. Gittens,*
   160 F.3d 790 (1st Cir. 1998) ................................................................................................33

*Woods v. City of Greensboro,*
  855 F.3d 639 (4th Cir. 2017)............................................................................................................32

*Yick Wo v. Hopkins,*
  18 U.S. 356 (1886)............................................................................................................................5

## I.      INTRODUCTION

Students for Fair Admissions ("SFFA") is entitled to summary judgment on all four counts. The parties have engaged in extensive discovery and, in cases of this type, summary judgment is often inappropriate. But sometimes, as here, the record is "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). No rational factfinder could conclude that Harvard's admissions system complies with Title VI of the Civil Rights Act.

*First*, Harvard intentionally discriminates against Asian-American applicants. Incontrovertible evidence shows that Harvard's admissions policy has a disproportionately negative effect on Asian Americans *vis-a-vis* similarly-situated white applicants that cannot be explained on non-discriminatory grounds. Harvard discriminates both in subjective scoring and selection for admission to limit the number of Asian Americans that attend the college. Not only did SFFA's expert make this finding, Harvard did too. In 2013, Harvard's Office of Institutional Research—its highly regarded research division—conducted an internal investigation and found that Harvard's admissions system is biased against Asian Americans. But instead of taking even the most minor steps to address this problem, or conducting any further investigation, Harvard killed the investigation and buried the reports. Faced with this (and other) damning evidence, Harvard, sadly, contests the findings on the basis that the analysis misses a key fact: Asian-American applicants—as a group—have less attractive "personal qualities" than white applicants. It turns out that the suspicions of Asian-American alumni, students, and applicants were right all along: Harvard today engages in the same kind of discrimination and stereotyping that it used to justify quotas on Jewish applicants in the 1920's and 1930's.

*Second*, Harvard engages in racial balancing. It is unusual for a civil-rights defendant to confess. Yet Harvard admits its goal is to ensure racial balance, and that it has engineered the admissions process to achieve that illegal goal. Moreover, statistical evidence independently confirms that Harvard has set a floor on the admissions rate for African-American applicants. Harvard's system for achieving

racial balance is straightforward. Harvard uses "ethnic stats" and other tools to manipulate the process so that it achieves essentially the same racial balance year over year. If, at the end of the admissions process, Harvard has admitted more (or less) of any racial group than it did the year before (what it deems, in violation of Title VI, to be "too many" or "too few"), then it reshapes the class to remedy the problem. This transparent regime of racial balancing is a flagrant violation of settled law.

*Third*, Harvard is not using race to achieve critical mass. Here too, Harvard's brazenness is astonishing. Harvard concedes that it has no interest in achieving critical mass and has never given the concept serious thought. Harvard is adamant that racial preferences are indispensable to its mission—and always will be. What Harvard will not admit—but what the record shows—is that race is not only an important factor, it is the dominant consideration in admitting Hispanics and African Americans. An Asian-American applicant with a 25% chance of admission, for example, would have a 35% chance if he were white, a 75% chance if he were Hispanic, and a 95% chance if he were African American. Harvard understands that, under Supreme Court precedent, racial preferences must be time-limited and can be no more than a "plus" factor in admissions. It just does not seem to care.

*Fourth*, Harvard has not considered race-neutral alternatives in good faith. It is hard to fathom a less serious, after-the-fact charade. Harvard never even considered race-neutral alternatives until this litigation was threatened. It then formed a committee, quickly abandoned it, and then formed a new committee at the close of discovery that, almost comically, was comprised of only three people and whose work was almost entirely outsourced to counsel. And when that committee was presented with alternatives to racial preferences—alternatives that would make Harvard more diverse and would open the door of opportunity to more disadvantaged students of all races—the response was cynical, self-serving, and self-contradictory. The whole process, in sum, was emblematic of Harvard's longstanding approach to racial preferences: dissembling from top to bottom to ensure it can continue to racially engineer its admissions process in direct contravention of Title VI.

## II.     STANDARD OF REVIEW

"A grant of summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017). "An issue is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party." *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010). Disputes over material facts do not create a triable issue when the evidence is "so one-sided that no reasonable person could decide" the issue in favor of the non-moving party. *Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.*, 768 F.2d 5, 8 (1st Cir. 1985); *see Bailey v. Dart Container Corp. of Mich.*, 980 F. Supp. 560, 566 (D. Mass. 1997) ("[D]isputes among the experts do not necessarily create a genuine issue of material fact." (citation and quotations omitted)).

## III.    LEGAL BACKGROUND

Under the Equal Protection Clause, racial "classifications are constitutional only if they are narrowly tailored to further compelling governmental interests." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 309-10 (2013) ("*Fisher I*"); *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (same for Title VI). Harvard "must make a showing that its plan is narrowly tailored to achieve the only interest [the Supreme] Court has approved in this context: the benefits of student body diversity that 'encompasses a ... broa[d] array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.'" *Fisher I*, 570 U.S. at 314-15. In other words, Harvard must be using race to "enroll a 'critical mass' of minority students." *Grutter*, 539 U.S. at 329. It should go without saying, then, there is no legitimate interest in intentionally discriminating for its own sake—the chief evil the Equal Protection Clause outlawed. *See Rice v. Cayetano*, 528 U.S. 495, 517 (2000). Nor can there be a legitimate interest in "racial balancing, which is patently unconstitutional." *Grutter*, 539 U.S. at 330.

Furthermore, to be narrowly tailored, the use of race in admissions must be "necessary ... to the accomplishment of [the university's] purpose." *Fisher I*, 570 U.S. at 309. Racial preferences are not

necessary if, among other things, "a nonracial approach ... could promote the substantial interest about as well and at tolerable administrative expense." *Id.* at 312. The university may not employ racial preferences unless it has first engaged in "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339. Put simply, "strict scrutiny imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Fisher I*, 570 U.S. at 312.

Because Harvard uses race as a factor in admissions decisions, SMF ¶¶ 155-290, and accepts federal funds, SMF ¶ 9, it is subject to Title VI. Harvard thus shoulders the heavy burden of strict scrutiny. The Court, as a result, must give "close analysis to the evidence of how the process works in practice," *Fisher I*, 570 U.S. at 312-13, to determine whether: Harvard intentionally discriminates against Asian-American applicants; Harvard engages in racial balancing; Harvard's use of race is narrowly tailored to achieving "critical mass"; Harvard has given serious, good faith consideration to nonracial approaches; and, there are, in fact, no workable, race-neutral alternatives.

## IV.   ARGUMENT

"No rational factfinder could reasonably conclude" that Harvard complies with Title VI. *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 172 (1st Cir. 1998). First, Harvard intentionally discriminates against Asian-American applicants. Second, Harvard engages in racial balancing. Third, Harvard's admissions system is not narrowly tailored to achieving critical mass. Fourth, Harvard neither gave "serious" and "good faith" consideration to—nor took advantage of—workable alternatives that could achieve its claimed interest in diversity without discriminating against applicants on the basis of race.[1]

---

[1] The Court already examined the record and ruled that SFFA has Article III standing. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College (Harvard Corp.)*, 261 F. Supp. 3d 99 (D. Mass. 2017). The Court thus should reiterate that Article III standing is no longer a live issue should Harvard seek to relitigate it. *See Council of Ins. Agents & Brokers v. Juarbe-Jiménez*, 443 F.3d 103 (1st Cir. 2006); *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363-65 (1st Cir. 2001). Indeed, there have been no factual developments since the Court ruled to justify revisiting the issue. SFFA has Article III standing. SMF ¶¶ 1-3.

### A.     Harvard intentionally discriminates against Asian Americans.

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment," and hence Title VI, "is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976). Intentional discrimination for its own sake has long been illegal. *Pagán v. Calderón*, 448 F.3d 16, 35-36 (1st Cir. 2006). "The use of heightened scrutiny for all cases of racial and sex discrimination implements both the suspicion that such discrimination is almost always invidious, and the policy that only the strongest reasons justify advantages based on race or sex." *Hsu By and Through Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 868 (2d Cir. 1996) (citing *Loving v. Virginia*, 388 U.S. 1, 10-11 (1967)). In this case, Harvard offers no justification for why it legitimately may discriminate against Asian-American applicants; instead, Harvard denies it discriminates against Asian Americans at all. The issue, as a result, is straightforward: does Harvard intentionally penalize Asian-American applicants?

On its face, Harvard's "holistic" admissions policy does not discriminate against Asian Americans. But facial neutrality will not save a policy when the "intent" is "to accord disparate treatment on the basis of racial considerations." *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 484-85 (1982). A violation therefore may be shown through proof that "the facially neutral policy is applied in a discriminatory manner." *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 82 (1st Cir. 2004) (citing *Yick Wo v. Hopkins*, 18 U.S. 356, 373-74 (1886)). Because "'smoking gun' evidence is rarely found in today's sophisticated ... world." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 58 n.12 (1st. Cir. 1999), SFFA "may meet [its] burden through circumstantial evidence." *Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 138 (1st Cir. 2012). Given that intentional racial discrimination is "rarely explicit and thus rarely the subject of direct evidence," it "may be proven through the elimination of other plausible non-discriminatory reasons until the most plausible reason remaining is discrimination." *Thomas*, 183 F.3d at 61.

Courts "apply the framework articulated" in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-68 (1977), to determine whether a facially neutral policy has "a discriminatory purpose," *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016); *see, e.g.*, *Dowd*, 375 F.3d at 83. "Under the *Arlington Heights* criteria an 'invidious discriminatory purpose' can be gleaned from," *inter alia*, "a consideration of the following factors: the discriminatory impact of the decision; the historical background of the attacked decision; the sequence of events leading up to the challenged action; departure from normal procedural sequences which may afford evidence of improper purpose and departure from normal substantive considerations." *Schmidt v. Boston Hous. Auth.*, 505 F. Supp. 988, 993 (D. Mass. 1981). Here, "the totality of the relevant facts, including the fact ... that the [policy] bears more heavily on" Asian-Americans applicants, *Davis*, 426 U.S. at 242, demonstrates that Harvard is intentionally discriminating.

### 1.    SFFA's expert identified statistically significant discrimination against Asian-American applicants.

Statistical evidence of disproportionate effect is a central feature of *Arlington Heights*. In rare cases, a "'stark' statistical pattern may serve 'as the sole proof of discriminatory intent under the Constitution.'" *United States v. Singleterry*, 29 F.3d 733, 741 (1st Cir. 1994) (quoting *McCleskey v. Kemp*, 481 U.S. 279, 293 (1987)). That is, the "statistical evidence of racially disproportionate impact may be so strong that the results permit no other inference but that they are the product of a racially discriminatory intent or purpose." *Spencer v. Zant*, 715 F.2d 1562, 1581 (11th Cir. 1983). But even where the statistical pattern is not that stark, evidence showing a disproportionate effect on a particular racial group, is the "'important starting point' for assessing discriminatory intent under *Arlington Heights*" and its progeny. *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 489 (1997) (quoting *Arlington Heights*, 429 U.S. at 266). *Arlington Heights* thus requires examination of "the degree of disproportionate racial effect, if any, of the policy" and "the justification, or lack thereof, for any disproportionate racial effect that may exist." *Dowd*, 375 F.3d at 83.

After reviewing six years of admissions data, Duke Professor Peter Arcidiacono (SFFA's expert) found overwhelming evidence that Harvard's admissions process disproportionately harms Asian-American applicants. SMF ¶¶ 573-677. Harvard scores applicants on a scale of 1 to 6 (with 1 being the best); admissions officers also can assign a plus or a minus for scores of 2 or 3 to indicate strength. For example, a "2+" is better than a "2," which is better than a "2-." SMF ¶ 79. Each applicant is given four component ratings and an overall score by the Admissions Office: (1) academic; (2) extracurricular; (3) athletic; (4) personal; and (5) overall. SMF ¶¶ 80-90. The last, "overall" score, is not a formulaic compilation of the scores in the other ratings. Instead, Harvard instructs readers to assign the score by "stepping back and taking all the factors into account and then assigning that overall rating." SMF ¶ 99. Harvard selects students for admission from among those applicants with the most competitive overall scores. SMF ¶¶ 113-119, 124-137.

Professor Arcidiacono found that Harvard's admissions system discriminates against Asian-American applicants in at least three respects.  First, he found discrimination in the personal rating. SMF ¶¶ 606-616. Asian-American applicants are significantly stronger than all other racial groups in academic performance. SMF ¶¶ 595-597. They also perform very well in non-academic categories and have higher extracurricular scores than any other racial group. SMF ¶¶ 598-605. Asian-American applicants (unsurprisingly, therefore) receive higher overall scores from alumni interviewers than all other racial groups. SMF ¶¶ 603, 616. And they receive strong scores from teachers and guidance counselors—scores that are nearly identical to white applicants (and higher than African-American and Hispanic applicants). SMF ¶ 604. In sum, Professor Arcidiacono found that "Asian-American applicants as a whole are stronger on many objective measures than any other racial/ethnic group including test scores, academic achievement, and extracurricular activities." SMF ¶ 605.

Yet Harvard's admissions officials assign Asian Americans the lowest score of any racial group on the personal rating—a "subjective" assessment of such traits as whether the student has a "positive

personality" and "others like to be around him or her," has "character traits" such as "likability …

helpfulness, courage, [and] kindness," is an "attractive person to be with," is "widely respected," is a

"good person," and has good "human qualities." SMF ¶ 90. Importantly, Harvard tracks two different

personal ratings: one assigned by the Admissions Office and another by alumni interviewers. SMF ¶¶

86-88, 92-93. When it comes to the score assigned by the Admissions Office, Asian-American

applicants are assigned the lowest scores of any racial group. SMF ¶¶ 606-616. There is no excuse for

this, and Harvard cannot offer a single exculpatory explanation that a rational factfinder could accept.

Asian-American applicants to Harvard are just as "helpful," "courageous," and "kind" as white

applicants. By contrast, alumni interviewers (who actually meet the applicants) rate Asian Americans,

on average, at the top with respect to personal ratings—comparable to white applicants and higher

than African-American and Hispanic applicants. *See infra* at 9, 30.

Any explanation Harvard does offer would be a thinly veiled racial stereotype about Asian

Americans. An example would be the stereotype that Asian Americans are one-dimensionally focused

on academics. Not so. As noted, Asian-American applicants outperform every racial group in the

extracurricular category. But more to the point, the Admissions Office assigns a lower personal rating

to Asian Americans across the entire academic spectrum—from the top of the high school class to

the lowest academic performers who still seek admission to Harvard. SMF ¶¶ 611-613. The disparity

is stark. Asian-American applicants are given a personal rating of 2 or better 22% of the time only in

the top academic-index decile.[2] By comparison, white applicants receive a personal rating of 2 or better

22% of the time in each of the top five deciles; Hispanic applicants received this score in each of the

top six deciles; and African-American applicants received this score in each of the top eight deciles.

---

[2] Harvard assigns each applicant an academic index, which is an objective measure of the applicant's academic qualifications. SMF ¶ 78. In organizing the data that Harvard produced, Professor Arcidiacono sorted the applicants by their academic indexing and then divided them into deciles, or ten-percent increments.

SMF ¶¶ 614-615. Professor Arcidiacono found nothing in the data Harvard produced that could account for these low ratings for Asian-American applicants. SMF ¶¶ 606-623.

Second, Professor Arcidiacono found discrimination in the overall score, which, like the personal rating, is subjective. SMF ¶¶ 624-628. Asian-American applicants receive overall scores lower than white applicants in every decile. Indeed, Asian-Americans receive overall scores similar to white applicants that are one academic decile lower. SMF ¶ 626. More dramatically, African Americans are significantly more likely to be given a 2 in the overall score than Asian Americans in the same academic index decile. African Americans, for example, are more than 17 times more likely to be given a 2 than Asian Americans in the fourth decile, more than 13 times more likely to be given that score in the sixth decile, more than 8 times more likely to be given that score in the eighth decile, and more than 3 times more likely to be given that score in the top decile. SMF ¶ 627.

As with the personal rating, the Admissions Office penalizes Asian Americans in the overall score, but alumni interviewers do not. For example, Asian-American applicants receive overall scores by alumni interviewers virtually identical to those of white applicants in the top (most competitive) decile. And, as noted, the same is true of the ratings assigned based on the recommendations of teachers and guidance counselors. Professor Arcidiacono found nothing in the data Harvard produced that could account for the low ratings the Admissions Office gives Asian-American applicants on the overall score. SMF ¶¶ 624-628.

Third, Professor Arcidiacono found discrimination against Asian Americans in the selection of applicants for admission. SMF ¶¶ 629-647. If Harvard admitted students based only on their academic index, Asian Americans would comprise over 50% of the admitted class. SMF ¶ 637. Yet the Asian-American admit rate is below the total admit rate for every year between 2000 and 2019. SMF ¶¶ 629-633. That is stunning given that candidates from the higher academic deciles are more likely to be admitted. SMF ¶ 639. Asian-American admit rates also lag behind the admit rates for other

racial groups within every decile except one. SMF ¶¶ 640. Even among those applicants with the *same* overall score, Asian Americans are less likely to be admitted than any other racial group. SMF ¶¶ 645-647. Here too, Professor Arcidiacono found nothing in the data that Harvard produced that could account for these low ratings. SMF ¶¶ 629-647. Thus, even taking "Harvard's scoring of applicants at face value, Harvard imposes a penalty against Asian Americans as compared to whites" that "has a significant effect on an Asian-American applicant's probability of admission." SMF ¶ 669.

Professor Arcidiacono estimated models to test whether the ratings penalty observed in the data could be explained by other applicant characteristics in the data Harvard produced. The modeling confirmed bias against Asian-American applicants in the personal rating and overall score. SMF ¶¶ 650-663. If Asian-American applicants were treated like white applicants, their chances of receiving a 2 or better on the personal rating would increase by 21%. SMF ¶ 658. Similarly, if Asian-American applicants were treated like white applicants, their chances of receiving a 2 or better on Harvard's overall score would increase by 8%. SMF ¶ 660. The change in the overall score is especially important. The probability of admission (for all racial groups) increases by over 50% when an applicant's overall score moves from 3+ to 2. Put another way, moving from a 3+ to a 2 means that the applicant changes from likely being rejected to likely being admitted to Harvard. SMF ¶ 662.

Professor Arcidiacono also estimated models confirming that Asian Americans are penalized in selection for admission. An Asian-American male applicant with a 25% chance of admission would see his chance increase to 31.7% if he were white—even including the biased personal rating. SMF ¶ 666. Excluding the biased personal rating from the model, an Asian-American applicant's chance would increase to 34.7% if he were white. SMF ¶ 665. Looking at the number of Asian Americans denied admission because of the bias against them underscores the magnitude of the penalty. If they had been treated like white applicants, an average of approximately 44 more Asian Americans per year would have been admitted to Harvard over the six-year period the experts analyzed. SMF ¶¶ 675.

2.      **Harvard's own internal investigation found that its admissions system is biased against Asian-American applicants.**

Harvard's own internal investigation reached the same conclusion as Professor Arcidiacono. SMF ¶¶ 348-572. In 2013, in the wake of national media allegations that Harvard discriminates against Asian-American applicants, Harvard's Office of Institutional Research (OIR)—its highly regarded, in-house research division—conducted an investigation into Harvard's treatment of Asian Americans. The investigation examined a wealth of admissions data, and was conducted in consultation with the Admissions Office. OIR produced three reports that examined whether Harvard's admissions system is biased against Asian Americans. SMF ¶¶ 389-528. Using logistic regression models, OIR concluded that Harvard's admissions system is, in fact, biased against Asian Americans and that there is no neutral explanation for it.

In conjunction with its first report, OIR produced the following chart:



|  | Academics Only | Legacy and Athlete | Extracurricular and Personal | Demographics | |
|---|---|---|---|---|---|
|  | **Model 1** | **Model 2** | **Model 3** | **Model 4** | **Actual** |
| Asian | 43.04% | 31.40% | 25.99% | 17.97% | 18.66% |
| African American | 0.67% | 1.83% | 2.36% | 11.12% | 10.46% |
| International | 7.27% | 5.86% | 7.39% | 7.68% | 8.90% |
| Hispanic | 2.42% | 2.62% | 4.07% | 9.83% | 9.46% |
| Native American | 0.21% | 0.32% | 0.41% | 1.21% | 1.23% |
| Unknown | 8.02% | 9.93% | 9.14% | 8.11% | 8.09% |
| White | 38.37% | 48.03% | 50.63% | 44.08% | 43.21% |

SMF ¶ 402. As the chart reflects, OIR found that Asian Americans would comprise 43.4% of the admitted class under an academics-only model, compared to their actual 18.7% share; it would be 31.4% even after accounting for Harvard's preference for recruited athletes and legacies; and it would be 26.0% even after also accounting for applicants' extracurricular and personal ratings. SMF ¶¶ 403-416. In other words, Asian-American admissions rates should be substantially higher even accepting the personal rating at face value. OIR was able to model Harvard's admissions process accurately only after adding a "demographics" category. SMF ¶¶ 418. Like Professor Arcidiacono, moreover, OIR zeroed in on the personal rating, concluding that it "may provide further insight." SMF ¶ 423.

In its second report, OIR focused on whether Asian Americans are disadvantaged *vis-a-vis* similarly situated white applicants by comparing the admission rates for "non-legacy, non-athlete" ("NLNA") applicants. SMF ¶¶ 432-465. OIR produced the following charts:



*Difference in Average Test Scores and Ratings for White and Asian Applicants*



*Logit Coefficients for Main Effect Logistic Model*

SMF ¶¶ 437, 453.

OIR's findings are alarming. OIR found that Asian-American admit rates were lower than white admit rates every year over a ten-year period even though, as the first of these two charts shows, white applicants materially outperformed Asian-American applicants only in the personal rating. SMF ¶¶ 438-439. Indeed, OIR found that the white applicants were admitted at a higher rate than their Asian-American counterparts at every level of academic-index level. SMF ¶¶ 441-443. But it is even worse than that. As the second chart shows, being Asian American actually *decreases* the chances of admissions. SMF ¶ 455. Like Professor Arcidiacono, OIR found that preferences for African-American and Hispanic applicants could not explain the disproportionately negative effect Harvard's admission system has on Asian Americans.

13

OIR also was unable to provide any explanation for why there is a penalty in the admissions process for being Asian American. SMF ¶ 456. Nor could OIR explain why, of the four major racial groups, Asian Americans were the *only* one that had this negative association with admissions chances. SMF ¶ 451. OIR's report had a section titled "Conclusions." It was left blank. The report had a section titled "Possible Explanations." It also was left blank. SMF ¶¶ 459-460.

The third report was issued as part of an OIR study into how low-income applicants fared in the admissions process. SMF ¶¶ 472-512. A draft of the report found that although "low income students clearly receive a 'tip' in the admissions process, our model also shows that the tip for [legacy, athletes, etc.] is larger. On the flip side, we see a negative effect for Asian applicants." SMF ¶ 485. To help explain its findings, OIR produced the following table:

**Table: Logistic Regression Predicting Admission from Classes 2009 through 2016**

| Variable | Coefficient Estimate | P-value |
|---|---|---|
| Athletic rating of 1 | 6.33 | 0.00 |
| Personal Rating 1 or 2 | 2.41 | 0.00 |
| Legacy | 2.40 | 0.00 |
| African American | 2.37 | 0.00 |
| Native American | 1.73 | 0.00 |
| Extracurricular 1 or 2 | 1.58 | 0.00 |
| Academic 1 or 2 | 1.31 | 0.00 |
| Standardized Academic Index | 1.29 | 0.00 |
| Hispanic | 1.27 | 0.00 |
| CSS self-reported income less than or equal to $60K | 0.98 | 0.00 |
| International | 0.24 | 0.00 |
| Asian | -0.37 | 0.00 |
| Constant | -6.23 | 0.00 |
| Unknown/Other | -0.03 | 0.41 |
| Female | 0.00 | 0.87 |
| *N=192,359; Pseudo R2 = 0.45 | | |

SMF ¶ 502. The table confirms OIR's previous finding that Harvard penalizes Asian Americans in the admissions process. SMF ¶ 504. In particular, OIR found that "Asian applicants with an academic 1 or 2 are admitted 12% of the time compared against an admit rate of 18% for non-Asian applicants"; in other words, "Asian high achievers have lower rates of admission." SMF ¶ 509. OIR again was unable to find an explanation for why being Asian was negatively associated with the likelihood of being admitted. SMF ¶ 510.

But not only are OIR's findings proof of intentional discrimination, a decision to maintain a policy "having foreseeable and anticipated disparate impact" is independent "evidence to prove the ultimate fact, forbidden purpose." *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979). Employing a policy that has a disproportionate effect on Asian Americans is bad. "Adherence to a ... policy or practice," however, "with full knowledge of the predictable effects of such adherence" is far worse. *Id.*; *see United States v. Yonkers*, 96 F.3d 600, 612 (2d Cir. 1996); *Davis v. District of Columbia*, 949 F. Supp. 2d 1, 11 (D.D.C. 2013); *Baker v. City of Kissimmee, Fla.*, 645 F. Supp. 571, 587 (M.D. Fla. 1986). Even beyond that, evidence of a culpable state of mind includes the concealment of data from supervisory and peer authorities and refusal to investigate further.

That is what happened. These reports were shared with, among others, William Fitzsimmons (Dean of Admissions and Financial Aid) and Rakesh Khurana (Dean of Harvard College). Faced with an internal investigation showing systemic discrimination against Asian-American applicants, Harvard killed the study and quietly buried the reports. In February 2013, OIR met with Fitzsimmons and others to discuss the first report's findings. SMF ¶¶ 426-431. Fitzsimmons sat there silently, "pausing and reflecting" on what he had just heard. SMF ¶ 427. He asked no questions. He did not request additional analysis. And he did not discuss OIR's findings with anyone—not his direct supervisor, Michael Smith (Dean of the Faculty of Arts and Sciences), nor his close colleague of decades, Marlyn McGrath (Director of Admissions). SMF ¶¶ 428-431. Later, OIR presented Fitzsimmons with its

second report, which also found bias against Asian Americans. SMF ¶¶ 466-67. When shown these findings, Fitzsimmons again asked no questions. He again made no request for further inquiry. He again refrained from discussing OIR's findings with anyone, including Smith and McGrath. SMF ¶¶ 468-471. Then, as noted above, the issue arose for a third time in the course of OIR's investigation into low-income applicants. When OIR showed Fitzsimmons the results regarding low-income applicants, he was initially ███████████████████████████████ SMF ¶ 483. But he had not yet seen OIR's finding that these same data showed a "negative effect for Asian applicants." SMF ¶ 485. Once he was, Fitzsimmons asked no questions, sought no further analysis, and discussed the findings with no one. SMF ¶¶ 525-528. Harvard never released its findings regarding Asian-American applications.[3]

Finally, in May 2014, Erin Driver-Linn (Associate Provost for Institutional Research) sent Khurana a memo "highlight[ing] the Harvard College-related work [OIR] has done since my tenure began in the office" in advance of him becoming Dean two months later. OIR's reports concerning discrimination against Asian Americans were included. SMF ¶¶ 537-538. On July 11, 2014, OIR met with Khurana to discuss the findings. SMF ¶ 539. Like Fitzsimmons, Khurana asked no questions, sought no additional analysis, and did not discuss the reports with anyone. SMF ¶¶ 540-543.

Harvard's excuses for killing the internal investigation into bias against Asian-American applicants are embarrassing. As an initial matter, Harvard's witnesses developed amnesia on the entire subject at their depositions. When questioned about OIR's first report, for example, Fitzsimmons answered: "Some of this information is familiar, but we have lots of interactions with different parts of Harvard." So, he was then asked, "[t]he only memory you have about this document is a vague

---

[3] Another meeting—entitled "Fisher v. University of Texas Discussion #2"—was held in October 2013. It is unclear who attended, but the invitation list included Fitzsimmons, McGrath, and Harvard's general counsel. SMF ¶¶ 529-535. It is unknown what happened at this meeting because Harvard has asserted the attorney-client privilege, and therefore cannot rely on the meeting or anything that may have been said at it. In any event, there is no evidence that Harvard took any action in response to this meeting. SMF ¶ 536.

recollection of seeing it sometime?" Fitzsimmons answered: "That's the only thing I can say with any certainty." SMF ¶ 549. Driver-Linn was asked: "Was OIR asked to do some sort of investigation into whether or not Asian-Americans were disadvantaged by Harvard's admissions process?" She responded: "I don't know." SMF ¶ 547. And, Erica Bever (Assistant Director of the Office of Institutional Research) was asked: "do you recall, during your time at OIR, engaging in any analysis with respect to how race is used in the admissions process at Harvard?" She answered: "No." SMF ¶ 544. Indeed, Bever testified that she was drawing "a complete blank on this particular topic." SMF ¶ 545. Finally, she was asked: "can you explain why you remember all of those details about this analysis of financial aid from the middle of your tenure at OIR, but you have absolutely no recollection of the work that was done with respect to analyzing the effect of being Asian in the admissions process for more than a year in drafts that you shared and distributed throughout OIR?" Bever answered: "I cannot." SMF ¶ 546. Khurana's memory was similarly hazy. SMF ¶ 552.

Conveniently, after being prepared to provide deposition testimony, the one thing those key Harvard witnesses all now claim to remember thinking at the time is that the reports were flawed. Fitzsimmons called OIR's work "incomplete." SMF ¶ 555. Khurana recalls thinking that the analysis was not "done appropriately" because there are "a lot of limitations to doing what are called fitted models like this." SMF ¶ 556. For her part, Driver-Linn now believes that OIR had been too "reductive" in trying "to quantify what's a very complicated set of things." SMF ¶ 554. But those key witnesses never said any of these things in real time, or before extensive consultation with outside counsel. They did not question the quality or thoroughness of OIR's findings when they were made. They did not ask OIR to collect more data, perform further analysis, or conduct a more thorough

investigation. They just sat there and did nothing as OIR informed them at least *four different times* that the Admissions Office is biased against Asian Americans.[4]

But Mark Hansen, the (now former) OIR employee remembers far more. He remembers working with others in OIR on the project. He remembers gathering data, conducting the regression analysis, collaborating with colleagues, coordinating with the Admissions Office, and discussing the results of OIR's investigation with Fitzsimmons and others on multiple occasions. SMF ¶¶ 561-563. Hansen expressed no concerns with the quality and thoroughness of OIR's statistical work. Moreover, he has a clear understanding of the implications of OIR's findings. Hansen testified that the reports show that Asian Americans "are disadvantaged in the admissions process at Harvard." SMF ¶ 564. And when asked: "Do you have any explanation other than intentional discrimination for your conclusions regarding the negative association between Asians and the Harvard admissions process?" Hansen responded: "I don't." SMF ¶ 565.

In the end, Fitzsimmons's deposition testimony about his response to the OIR investigation tells the whole story:

> Q. What evidence of Asian discrimination do you think would be sufficient to make you concerned and conduct a further investigation?
>
> MS. ELLSWORTH: Objection.
>
> A. We are very careful in our admissions process to review each application with great care of students from all backgrounds. And we discuss these applicants holistically and with all the information that we have with our 40 admissions committee members and faculty members, and we would always be vigilant about any suggestion of discrimination against any person.

---

[4] During this litigation, Harvard discovered a new excuse: the OIR reports were "preliminary." Faust testified: "So I would say this is an exercise. I would not give it more credibility than being an exercise until I had someone—they say it's preliminary, for discussion." SMF ¶ 558. Harvard's expert similarly emphasized that "OIR understood that its models were 'basic' and 'preliminary.'" SMF ¶ 559. Before trotting out this new excuse, however, Harvard must have forgotten that OIR reports on various topics are almost always marked preliminary. The report Harvard relied on to reintroduce early action was marked that way. SMF ¶ 383. As was the report on which Harvard relied to change tuition. SMF ¶ 384. And, as noted, the low-income findings that ███████████████████ were marked "preliminary" too. SMF ¶ 483. This kind of implausible justification creates a strong inference of discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

Q. Do you think that your testimony about how you reacted to these reports and the follow-up that did or did not happen is consistent with statement just now that you would always be vigilant about allegations of discrimination?

MS. ELLSWORTH: Objection.

A. Yes.

Q. Do you think you exercised vigilance, sir?

MS. ELLSWORTH: Objection.

A. Yes.

Q. And do you think it was consistent with the exercise of vigilance not to send any of this information to anyone else in the admissions office?

MS. ELLSWORTH: Objection.

A. It was not my report.

Q. Do you think it was consistent with the exercise of vigilance not to discuss the information in these reports about the effect on being Asian in the admissions process with anyone else in the admissions office?

MS. ELLSWORTH: Objection.

A. Could you repeat that question?

MR. STRAWBRIDGE: You can read it back.

(Preceding question read).

A. Yes.

Q. Do you think it was consistent with vigilance for any allegation of discrimination against Asian Americans not to ask the Office of Institutional Research to do further work on these reports?

MS. ELLSWORTH: Objection.

A. Yes.

Q. Do you have any view as to what a non-vigilant response would look like?

MS. ELLSWORTH: Objection.

A. No.

Q. Can you explain how it would be any different than what your response was?

MS. ELLSWORTH: Objection.

A. I would not be in a position to make an evaluation.

SMF ¶¶ 566-572.

No rational factfinder could believe that Harvard's response to the OIR report was "vigilant."

No rational factfinder could believe that Harvard sought to understand what OIR had found or to

address it. Harvard's concealment and non-response to the OIR report is powerful—likely decisive—evidence that its intentional discrimination against Asian-American applicants was and remained exactly that: intentional.

**3.    There is ample corroborating evidence of discrimination against Asian Americans.**

There is additional evidence that, both individually and in combination, confirms that Harvard systematically discriminates against Asian Americans. *First*, "summary sheets" reveal discrimination. SMF ¶¶ 678-686 A summary sheet is a short document that is prepopulated with applicant information (including race) and has a space for comments. SMF ¶ 74. On these sheets, "Harvard readers use the label 'Standard Strong' to characterize an application that had strong qualities but not strong enough to merit admission." SMF ¶ 678. Professor Arcidiacono found that: "A review of these summary sheets reveals that Harvard applies the label 'Standard Strong' disproportionately to Asian-American applicants. Further, the Asian-American applicants who are labeled this way are substantially more qualified academically than 'Standard Strong' applicants from other racial groups." SMF ¶ 680. "The 'Standard Strong' designation," in particular, "is applied 25% more often to Asian-American applicants than white applicants." SMF ¶ 683. "This evidence serves to underscore how the operation of racial/ethnic preferences penalties work to the detriment of Asian-American applicants." SMF ¶ 684.

*Second*, even from the small (and cherry-picked) sample of summary sheets that Harvard was required to produce in this case, specific comments on the summary sheets reveal discrimination against Asian-American applicants. Asian Americans are described as smart and hardworking yet uninteresting and indistinguishable from other Asian-American applicants. They are described, for example, as "busy and bright," SMF ¶ 688, but will "need to fight it out with many similar to [him or her]." SMF ¶ 690. Their race is rarely seen as a positive factor in the chances of admissions. SMF ¶ 691. By contrast, admissions officers often emphasize the race/ethnicity of African-American and Hispanic applicants as a positive factor and a reason to admit an applicant. SMF ¶¶ 692-698.

*Third*, Harvard's reaction to claims of discrimination (and OIR reports showing discrimination) against Asian Americans contrasts starkly with how it responds to complaints from other minority groups. When Native Americans raised concerns about their representation on campus, they were taken seriously. As were the concerns that Latinos and Latinas raised about their representation on campus. SMF ¶ 345. And when African Americans raised concerns about the campus environment, Harvard's response kicked into high gear; Drew G. Faust (President of Harvard University) even wrote an editorial. SMF ¶ 346.

Asian-American alumni, students, and applicants, and even at least one Harvard employee, have been raising similar concerns for many years. SMF ¶¶ 325-333. In 2010, an OIR employee told Driver-Linn that the admissions process was biased against "his people." The employee drew that conclusion after reviewing and analyzing Harvard's admissions data by race. Driver-Linn told no one and took no steps to investigate this allegation. SMF ¶ 333. Alumni interviewers also have raised concerns with Harvard. In an email to Harvard, one wrote:

> [M]y feelings towards Harvard have been slowly changing over the years. I've been interviewing for the college for almost 10 years now, and in those ten years, none of the Asian American students I've interviewed has been accepted (or even wait-listed). I'm 0 for about 20. This is the case despite the fact that their resumes are unbelievable and often superior to those of the non-Asian students I've interviewed who are admitted. I've also attended interviewer meetings where Asian candidates are summarily dismissed as "typical" or "not doing anything anyone else isn't doing" while white or other minority candidates with similar resumes are lauded.

SMF ¶ 325. Another alumni interviewer explained that Harvard has "made clear to alumni/ae interviewers ... that certain African-American or Hispanic candidates were of special interest to Harvard, and that we should make every effort to recruit and convince those candidates to matriculate to Harvard," but that "[n]o such directive, instruction or guidance" had ever been "given for any Asian-American candidate." SMF ¶ 331. Yet when Faust was directly asked whether she believes that "concerns that Harvard's admissions process disadvantages Asian-Americans need to be addressed," she did not mince words: "No, I don't." SMF ¶ 347.

Harvard's attitude is unsurprising given how admissions officials talk about Asian-American applicants when they think no one's listening. SMF ¶ 334-345. Three examples stand out. In January 2014, the Utah alumni chapter notified Harvard that they had "met this morning to discuss and rank the Utah applicants who applied regular action for the Class of 2018, as well as the early action applicants who were deferred." SMF ¶ 338. The committee then identified the students who received their highest ranking. McGrath, who chairs Docket B (which includes Utah), forwarded the email to

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████ SMF. ¶ 339. That year, Harvard admitted ███ students from Utah. Only ███ were Asian American. SMF ¶ 340.

In April 2014, a high-school student from New York, wrote Faust to express deep concern about media reports of discrimination against Asian Americans, and to seek assurances that Harvard— a university she had "always admired"—was not discriminating against Asian Americans. SMF ¶ 335. Upon receiving the letter, Harvard officials (inaccurately) questioned whether she "really [was] a high school student" because the letter was so well-written. Harvard decided to send the student a "generic response ... saying that the President's Office is not involved in admissions, and [she] should contact the Admissions Office." McGrath, in turn, promised to "give our own dumb answer if she contacts us." SMF ¶ 336.

Finally, in 2012, Faust received a letter from an alumnus making racist statements about Asian-American applicants. Specifically, the alumnus urged Harvard to adopt "informal quotas." Such quotas "would include foreign students and the country of their origin. For example, I would limit the number of Japanese students to a certain percentage or number .... None of this, of course, has to go beyond the confines of the dean's office. The last time I was in Cambridge it seemed to me that there were a

large number of oriental students, for example. I think they probably should be limited to 5%.... I would appreciate hearing what you might think of my comments." SMF ¶ 341. McGrath responded (with a carbon copy to Faust): "President Faust has asked me to respond to your April 4 letter, in which you offer many thoughtful observations about Harvard College students and the results of the admissions process.... All of us at Harvard appreciate your thoughtful letter, as well as your loyalty over the years." SMF ¶ 342.

Faust was comfortable with McGrath sending this "polite and respectful response" because "[t]his is a letter from a 90-year-old alum who's given some kind of support to scholarships. He graduated with the class of 1942. He probably went off and fought in World War II. His letter is preposterous, but there's just no reason to tell him his letter is preposterous." SMF ¶ 343. At her deposition, Faust refused to answer whether a letter saying the same thing about African Americans would have deserved a similar "polite and respectful" response. Nor would she speculate how Asian-American students might react to the letter, because they "have not seen these letters …. [T]hese are matters of personal correspondence that are not matters of public scrutiny." SMF ¶ 344. McGrath likewise has "no regret" about her response. *Id.*

### 4. Harvard has a history of intentional discrimination against minorities.

Harvard's discrimination against Jewish students is the original sin of holistic admissions. SMF ¶¶ 21-38. In the early 1920s, Harvard's leaders (including President Abbott Lawrence Lowell) and prominent alumni became increasingly alarmed by the growing number of Jewish students who were passing the required examinations and enrolling at Harvard. SMF ¶¶ 22-27. To evaluate the "problem," Harvard, *inter alia*, adopted a system for identifying which students were Jewish. Those who were suspected of being Jewish were identified as "J.1," "J.2," or "J.3," depending on Harvard's view of how likely they were to be Jewish. SMF ¶ 28. According to President Lowell:

> [T]he Hebrew question is a knotty one, and a source of much anxiety…. The summer
> hotel that is ruined by admitting Jews meets its fate, not because the Jews it admits are

23

of bad character, but because they drive away the Gentiles, and then after the Gentiles have left, they leave also. This happened to a friend of mine with a school in New York, who thought, on principle, that he ought to admit Jews, but who discovered in a few years that he had no school at all…. In all these cases it is not because Jews of bad character have come; but the result follows from the coming in large numbers of Jews of any kind, save those few who mingle readily with the rest of the undergraduate body.

SMF ¶ 23.

President Lowell eventually came to understand that openly setting a quota on Jewish students would trigger opposition and resistance. Harvard's faculty and governing boards thus "would prefer to make a rule whose motive was less obvious on its face, by giving to the Committee on Admission authority to refuse admittance to persons who possess qualities described with more or less distinctness and believed to be characteristic of the Jews." SMF ¶ 25. Harvard took three steps to hide but still achieve its discriminatory goal. First, Harvard limited its incoming class to 1,000 students. Second, Harvard eliminated a rule that had required it to admit students who were in the top seventh of their graduating class. Third, Harvard resolved to place "greater emphasis on selection based on character and fitness, and the promise of the greatest usefulness in the future as result of a Harvard education." SMF ¶ 36.

In 1926, Harvard implemented its new admissions system, and released a statement explaining its decision:

> The whole record does include evidences of the candidate's character, personality, and promise …. Race is a part of the record. It is by no means the whole record and no man will be kept out on grounds of race. [I]f there should result in fact any substantial change in the proportion of groups in the College following application of [this] test, this will be due, not to race discrimination or any quota system, but to the failure of particular individuals to possess as individuals those evidence of character, personality and promise which weighed with other evidences render them more fit than other individuals to receive all that Harvard has to offer. Of course there will be criticisms. It will be said that Harvard is discriminating on grounds of race. That will not be true.

SMF ¶ 37.

This was a lie. In 2015, Harvard finally acknowledged that "[u]nder the presidency of Abbott

Lawrence Lowell (1909-1933), the Harvard administration restricted the numbers of Jewish students"

admitted to Harvard. SMF ¶ 40. Lowell is still held in high honor by Harvard. Lowell House, one of

the twelve undergraduate houses at Harvard University, bears his family name. A bust of President

Lowell sits in Lowell Courtyard and his portrait hangs for all students to see in the Lowell Dining Hall.

SMF ¶ 46.[5]

Harvard's discriminatory past is more distant than in many cases in which history is used as

an *Arlington Heights* factor. *But see Perkins v. City of W. Helena, Ark.*, 675 F.2d 201, 211 (8th Cir. 1982).

At the same time, "the parallels are striking." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 608 (2d

Cir. 2016). Harvard uses essentially the same admissions system Lowell implemented and refined

between 1926 and 1933 for the precise purpose of limiting the number of Jewish students. SMF ¶ 39.

That "holistic" system has kept Asian-American admissions at or under 20% year over year (except

for minor increases in the wake of enforcement proceedings and civil litigation) despite every neutral

criterion indicating that their share of the admitted class should be much higher.

Yet Fitzsimmons testified, without any hint of irony, that there is no cause for concern because

it simply is "impossible to abuse" Harvard's "admissions process." SMF ¶ 45. That answer is a farce.

The process is readily subject to manipulation, as history and the data amply demonstrate. The data

showed massive discrimination against Asian Americans—and Harvard knew it. However, Harvard's

response (unlike its aggressive response to concerns other minority groups raised) was to kill the

investigation and bury the findings. Instead of taking this seriously, officials traded emails about top

---

[5] Bizarrely, Faust and Fitzsimmons refused to acknowledge Harvard's anti-Semitic history. Faust stated: "I'm a historian. I would not rely on the interpretation of a single historian unchallenged. I have not done that historical work myself, and therefore I would not presume to make judgment about its accuracy." SMF ¶ 42. Faust claimed to "not know" that Harvard had researched those allegations and had admitted them *during her presidency. Id.* Of course, when it came to "mismatch" research, *i.e.*, studies showing that minority students "were being admitted to institutions for which they were not qualified and that this was disservice to them," Faust was quick to call the work "entirely discredited" even though she had not researched it herself. SMF ¶ 43. Fitzsimmons was familiar with the allegations but had no "independent corroboration" of them. SMF ¶ 44.

Utah candidates being ███████████████████████ for ██████████ and felt comfortable referring to a letter pushing for "informal quotas" on Asian Americans as "thoughtful" because, like Lowell, they assumed no one would see their "personal correspondence." And that was merely the evidence SFFA was lucky enough to uncover because Harvard's email archive captured it.

5.   **No rational factfinder could accept Harvard's justifications for its discrimination against Asian-American applicants.**

In light of this evidence, especially the disproportionate effect of Harvard's policy on Asian-American applicants, Harvard must prove that it can all "be plausibly explained on a neutral ground." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 275 (1979). But Harvard cannot come close to creating a triable issue—let alone cobbling together a case strong enough to win. Harvard's response is, frankly, pathetic. The only conclusion for a rational factfinder to draw is that the harm Asian-American applicants suffer as a result of Harvard's admissions policies is "unexplainable on grounds other than race." *Miller v. Johnson*, 515 U.S. 900, 913 (1995).

Harvard essentially relies on *one* witness: its expert, Professor David Card. Importantly, Professor Card does not dispute Professor Arcidiacono's mode of analysis or his calculations. SMF ¶¶ 746-747. He agrees that Asian Americans have strong qualifications across every category except the personal rating, and he does not dispute that Professor Arcidiacono's findings comport with OIR's findings. SMF ¶ 746. Professor Card also acknowledges that, applying Professor Arcidiacono's assumptions, there is a statistically significant disproportionate effect on Asian-American applicants. SMF ¶ 789. Professor Card just makes different "modeling choices." SMF ¶ 748. But his choices are indefensible. All "Professor Card has demonstrated [is] that it is possible to mask the true effects of race in Harvard's admission process by changing the scope of the analysis in incorrect ways and choosing inappropriate combinations of control variables." SMF ¶ 790.

*First*, Professor Card refuses to exclude "special category" applicants—recruited athletes, children of faculty and staff, applicants who are on the Dean's List or Director's List, and legacies—

from his data set. SMF ¶ 750. Of course, before there was litigation, OIR did exactly what Professor Card now refuses to do in his analysis. The reason that OIR and Professor Arcidiacono excluded these groups is evident. The task here is to determine whether "similarly situated" applicants have been treated differently on the basis of race; "apples should be compared to apples." *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 34 (1st Cir. 2008). Because certain applicants are in a special category, it is important to analyze the effect of race without them included. Excluding them allows for the effect of race to be tested on the bulk of the applicant pool (more than 95% of applicants and more than two-thirds of admitted students) that do not fall into one of these categories, *i.e.*, the similarly-situated applicants. SMF ¶ 592. For special-category applicants, race either does not play a meaningful role in their chances of admission or the discrimination is offset by the "significant advantage" they receive. SMF ¶ 753. Either way, they are not apples.

Professor Card's inclusion of these applicants reflects his position that "there is no penalty against Asian-American applicants unless Harvard imposes a penalty on *every* Asian-American applicant." SMF ¶ 750. But he is not a lawyer and he is wrong. It is illegal to discriminate against *any* Asian-American applicant or subset of applicants on the basis of race. Professor Card cannot escape that reality by trying to dilute the dataset. The claim here is not that Harvard, for example, "penalizes recruited athletes who are Asian-American because of their race." The claim "is that the effects of Harvard's use of race occur outside these special categories." SMF ¶ 751. Professor Arcidiacono thus correctly excluded special-category applicants to isolate and highlight Harvard's discrimination against Asian Americans. Professor Card, by contrast, includes "special recruiting categories in his models" to "obscure the extent to which race is affecting admissions decisions for those not fortunate enough to belong to one of these groups." SMF ¶ 752. At bottom, SFFA's claim is that Harvard penalizes Asian-American applicants who are not legacies or recruited athletes. Professor Card has shown that he is unwilling and unable to contest that claim.

*Second*, Professor Card also refused to exclude Harvard's personal rating in his models—despite the clear finding yielded by Professor Arcidiacono's analysis (and OIR) that this rating is tainted by strong evidence of racial bias. SMF ¶ 759. Instead, he accepts the personal rating as non-discriminatory on the assumption that Asian-American applicants have weaker "personal qualities" based on "individualized 'unobservable' factors that cannot be quantified by a statistical model." SMF ¶¶ 761-762. In his view, "unobserved factors" like "recommendation letters and the applicants' personal essays"—not racial bias—explain the difference in personal ratings between Asian-American and white applicants, and, in turn, the difference in their chances of admission. SMF ¶¶ 762-763. Professor Card finds that white applicants are more likely to be multi-dimensional than their Asian-American counterparts and hence are more attractive candidates. SMF ¶ 761. Again, by candidates with more attractive personal qualities, he means Asian Americans have, among other things, a less "positive personality," "others like to be around" them less, they have worse "character traits" such as "likability … helpfulness, courage, [and] kindness," they are not "attractive [people] to be with," they are not "widely respected," and they have worse "human qualities." SMF ¶ 90. According to Professor Card, it is not that Asian Americans are victims of racial discrimination. They suffer in the admissions process because white applicants have better personalities. Professor Card's claim is not only offensive racial stereotyping, but it is legally and factually untenable.

Legally, Harvard has conceded that it may not rely on information concerning aspects of its admissions process not produced in discovery. Harvard resisted producing a statistically significant sample of application files that would have afforded SFFA access to essays, recommendations, and other information not captured by the data Harvard turned over to SFFA instead. In so doing, Harvard recognized that it would be "constrained in the same way" as SFFA, that this is a balance and we have to live by whatever it is that the Court rules just as the other side does." Doc. No. 173, July 20, 2016 Hearing Transcript at 25-26 (statement of Harvard counsel). Harvard understood that, by resisting

production of this information, it would not be permitted to "haul out at trial something that we have refused to produce to them, and Your Honor has upheld, as a way of defending the case." *Id.* at 27. Yet that is precisely what Professor Card's report does. "For example," Card asserts, "testimony in the record indicates that the applicant's essay is an important consideration in the personal rating, but there is no quantifiable measure of the essay in the data I analyze. This means that the disparity Prof. Arcidiacono labels 'bias' may very well be explained by factors other than race that the model does not include." SMF ¶ 764. Essentially, Professor Card claims that SFFA's expert analysis is incomplete because it fails to consider the very information Harvard fought, and was permitted, to withhold (yet now seeks to rely on).

Regardless, no rational factfinder could accept this finding that Asian-American applicants have inherently worse personal qualities than white applicants. Professor Card's hypothesis is rebutted by every relevant fact witness. SFFA asked Fitzsimmons, McGrath, and other Harvard officials whether Asian Americans have personal qualities that make them, as a group, less attractive candidates. SMF ¶¶ 617-623. They all flatly disclaimed the suggestion. *See id.* When Fitzsimmons was asked whether "Asian Americans have fewer attractive personal qualities than white students," he responded: "That wouldn't be my impression." SMF ¶ 617. "In your experience," McGrath was asked, "do Asian Americans as a group lack attractive personal characteristics compared to other applicants?" She answered: "No, I don't think so." SMF ¶ 618. The other testimony is all the same. SMF ¶¶ 619-623. Indeed, one of Harvard's own experts, Dr. Ruth Simmons, former President of Brown University, described concerns that Asian Americans were not as well rounded because of their cultural focus on academics as "balderdash," and testified that, in her experience, Asian-American students were not any less personable than other racial groups. SMF ¶ 620. Not one witness—including Admissions Office leadership—would testify in support of Professor Card's assumption that Asian Americans

have weaker "personal qualities" based on "individualized 'unobservable' factors that cannot be quantified by a statistical model." SMF ¶ 762.

A study of Stuyvesant High School in New York is illustrative. SMF ¶¶ 702-715. Stuyvesant is considered one of the top high schools in the country. SMF ¶ 702. What makes Stuyvesant especially relevant here, however, is that over 70% of its students are Asian American and it is considered a Harvard feeder school, routinely sending over ten students per year to Harvard—but generally less than half of whom are Asian American. SMF ¶¶ 702, 713-715. Therefore, the fact that Stuyvesant's white students have a far better chance of being admitted to Harvard than their Asian-American peers, SMF ¶¶ 714-715, is deeply troubling. When shown these data in her deposition, Stuyvesant's Director of College Counseling broke down in tears. To her, this looks "like there's discrimination, and I love these kids and I know how hard they work. So these just look like numbers to all of you guys, but I see their faces." And she firmly rejected the notion that "the Asian kids are less well rounded than the white kid." Ultimately, Stuyvesant's Director of College Counseling agreed that "it's hard to think of anything other than discrimination that could account for this." SMF ¶ 716.

Moreover, as noted above, ratings given by alumni interviewers "do not show this pattern." SMF ¶ 616. Alumni interviewers, who actually meet the applicants, found that Asian Americans have personal qualities on par with white applicants. The scores submitted by teachers and counselors, who likewise interact with the students, also show Asian-American applicants as having personal qualities that are comparable to white applicants. SMF ¶ 604. It is only the Admissions Office's staff—who rarely if ever meet these applicants—who systematically rate Asian Americans as having less attractive personal qualities. This discrepancy is all the more concerning because, absent a logical reason, it is expected that unobserved characteristics will move in the same direction as observed characteristics. SMF ¶ 765. That is, because Asian Americans have stronger academic and extracurricular ratings than any other racial group, they ordinarily would be expected to have stronger personal ratings too. *See id.*

But "Asian-American applicants have observed characteristics associated with higher personal ratings yet receive a penalty in their personal ratings, and African-American and Hispanic applicants have observed characteristics associated with lower personal ratings yet receive a preference in their personal ratings." *Id.*

When confronted with this evidence, Professor Card instead claimed that it is not "relevant for [his] statistical model" because there "must be some unobserved characteristics" that drive the differences in personal ratings between white and Asian-American applicants. SMF ¶ 765. But when pressed to state directly what those characteristics might be, he demurred. When asked why Asian Americans might have "less attractive personal qualities than white applicants," Professor Card confessed he had "no way of knowing that." SMF ¶ 766. When asked if he has "reason to believe that Asian Americans are not as effervescent as whites in Harvard's applicant pool," Professor Card said he had "no way of knowing that." SMF ¶ 767. He just said his "understanding is that the readers look for something they call personal qualities. And I don't exactly know what those are but they—they talk about that in some of the materials I've seen. And so I think that I what would probably believe to be true is that they see slightly fewer personal qualities conditional on academic qualities." SMF ¶ 768. But when asked "why do you think that's the case," Professor Card said: "I don't know exactly." SMF ¶ 766. And when asked what reason other than racial bias "could there be for why the white applicants in Harvard's pool receive higher personal ratings than the Asian American applicants," Professor Card threw up his hands: "I don't really—I haven't really given that any thought directly." SMF ¶ 770. Professor Card was confident because he "was able to ask Dean Fitzsimmons directly in a telephone conversation if race was involved in the personal rating ... and he said no." But when asked: "Did you do anything to verify his testimony?" Professor Card answered: "No." SMF ¶ 772.

Professor Card's claim that Asian-American applicants, as a group, have weaker personal qualities than white applicants is sad but predictable. Because of the damning statistical evidence,

Harvard is forced to argue that the wealth of data maintained in its database for each applicant somehow fails to account for the fact that there really is something systematically inferior about the personal qualities of Asian-American applicants. These are the "gross racial stereotype[s] or anecdotal generalization[s]" courts often see from those confronted with proof of their own bias. *United States v. Greene*, 36 M.J. 274, 279 (C.M.A. 1993). It is disquieting—but not surprising—that Harvard would indulge racial stereotypes to preserve their "self-concept as nonprejudiced persons." Thomas E. Ford, *Effects of Stereotypical Television Portrayals of African-Americans on Person Perception,* 60 Soc. Psychol. Q. 266, 272 (1997). But the Court may not indulge Harvard's self-deception. "Racial stereotyping cannot be condoned in civil cases." *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1151 (9th Cir. 2001). No rational factfinder could accept this kind of disreputable testimony over Professor Arcidiacono's compelling empirical findings.[6]

*     *     *

The *Arlington Heights* framework exists because of "the reality that intentional discrimination is often difficult to prove without significant reliance on circumstantial evidence. Rarely will there be direct evidence from the lips of the defendant proclaiming his or her racial animus." *Robinson v. Runyon*, 149 F.3d 507, 513 (6th Cir. 1998). That is especially true when the discrimination is attributable to racial stereotyping, which is notoriously difficult to prove through direct evidence. It "can often be of such a subtle, insidious character that a plaintiff may only be able to offer circumstantial evidence to buttress his or her claim." *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir. 1987). "Indeed, it is unlikely today that an actor would explicitly discriminate under all conditions; it is much more likely that, where discrimination occurs, it does so in the context of more nuanced decisions that can be explained based upon reasons other than illicit bias, which, though perhaps implicit, is no less

---

[6] Professor Card has other minor quibbles with a few of the Professor Arcidiacono's modeling choices. SMF ¶¶ 773-786. These quibbles all miss the mark. *See id.* But they are immaterial, in any event, unless Professor Card somehow prevails in including both "special category" applicants *and* the personal rating. SMF ¶¶ 787-790.

intentional." *Woods v. City of Greensboro*, 855 F.3d 639, 651-52 (4th Cir. 2017). "Invidious discrimination steeped in racial stereotyping" thus "is no less corrosive of the achievement of equality than invidious discrimination rooted in other mental states." *Id.* at 651. "It is the very assumption that persons are, inevitably, readily identifiable as typical examples of a particular culture or creed, that defines a stereotype, and reveals prejudice in the mind of a proponent of that stereotype." *Hall v. Ala. Ass'n of Sch. Bds.*, 326 F.3d 1157, 1171 (11th Cir. 2003).

So it is here. Something more insidious than racial stereotyping may be at work—at least among Harvard's leadership. Ultimately, though, SFFA is not required to prove that Harvard acted with an evil heart or to find a smoking gun to prevail on summary judgment. The legal issue, applying the *Arlington Heights* framework, is whether it is more likely than not that Harvard discriminates against Asian-American applicants. In light of the statistical, documentary, and testimonial evidence amassed against Harvard, no rational factfinder could conclude otherwise.

### B.    Harvard engages in racial balancing.

Harvard is not entitled "'to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin.'" *Grutter*, 539 U.S. at 329 (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 407 (1978) (opinion of Powell, J.)). "Racial balancing," moreover, "is not transformed from 'patently unconstitutional' to a compelling ... interest simply by relabeling it 'racial diversity.'" *Fisher I*, 570 U.S. at 311 (quotation omitted). Evidence that a school seeks "proportional representation" is proof of racial balancing, *i.e.*, that the school's goal is to "achieve a racial/ethnic 'mix' that it considered desirable" instead of treating applicants as individuals. *Wessmann v. Gittens*, 160 F.3d 790, 798 (1st Cir. 1998). "This working backward to achieve a particular type of racial balance rather than working forward from some demonstration of the level of diversity that provides the purported benefits, is a fatal flaw under our existing precedent." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 729 (2007) (plurality opinion).

33

Proving racial balancing can sometimes be complicated. But not here. Harvard admits that it

███████████████████████████████████████████████████████████████████████

████ SMF ¶ 168. In other words, Harvard has a desired racial balance and aims for that target. As

McGrath testified, Harvard is ██████████████████████████████████████████████

████████████████████ SMF ¶ 169. And Harvard takes steps to ████████████████████

███████████████████████████████████████████████████████████ SMF ¶ 170.

Early in the process, then, Harvard ████████████████████████████████████████████

████████ SMF ¶ 172. This testimony is tantamount to a confession.

But this would be an easy case without Harvard's confession. The proof is in the numbers.

Year over year, Harvard's admissions statistics remain stubbornly consistent across every racial group:



| Percentage of the Admitted Class by Race | | | | |
|---|---|---|---|---|
| | Class of 2014 | Class of 2015 | Class of 2016 | Class of 2017 |
| Asian American | 18% | 18% | 20% | 20% |
| African American | 11% | 12% | 10% | 11% |
| Hispanic American | 10% | 12% | 11% | 11% |
| Native American | 3% | 2% | 2% | 2% |
| White | 48% | 49% | 52% | 53% |

SMF ¶ 699. No rational factfinder could accept that these numbers are the accidental byproduct of

holistic review. Indeed, Harvard's focus on achieving a preordained racial balance begins with

Harvard's recruitment efforts when it purchases potential applicant information based on PSAT

scores and GPAs ████████████████ SMF ¶ 190. █████████████████████████████

███████████████████████████████████████████████████████████████████████

SMF ¶¶ 191-192. Harvard does this, according to Fitzsimmons, because ███████████████████

███████████████████████████████████████████████████████████████ SMF

¶ 193. Even at this early stage, in other words, Harvard is thinking about applicants strictly competing against applicants of their own race for admission.

This process continues as Harvard meticulously balances the composition of the class through the review and subcommittee process. ████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████ That is, Harvard works from the assumption that the racial breakdown of the admitted class will ████████████████ *See id.*

Notably, right before subcommittee meetings begin (and right before Fitzsimmons ████████
███████████████████████████████████, a representative from Harvard (known as an "Institutional Liaison") attends a conference of the Association of Black Admissions and Financial Aid Officers of the Ivy League and Sister Schools ("ABAFAOILSS"). The conferences are attended by representatives from Harvard and 15 other schools, including Columbia, Cornell, Dartmouth, MIT, Princeton, Stanford, the University of Pennsylvania, and Yale. At each conference, the Institutional Liaisons attend a "Round Robin" meeting. The purpose of the Round Robin meetings is for schools to share with one another their non-public admissions numbers by race from the current admissions

cycle. Institutional Liaisons are not permitted to attend Round Robin meetings unless they are willing to share their school's admissions statistics. SMF ¶¶ 719-722.

At the meetings, admissions statistics are shared in an unusual fashion. Institutional Liaisons from the 16 schools sit around a large table and take turns reading aloud their school's admissions numbers by race. Each Institutional Liaison reads three categories of information for each racial group: the number of applications the school received, the number of admitted students to date, and the number of matriculated students to date. Institutional Liaisons provide these statistics in seven racial categories: Black, Asian, Native American, Latino, Multi-Racial, Other, and Total. As each college's admissions statistics are read aloud, Institutional Liaisons record the statistics by hand on a preprinted form. It typically takes about 30 minutes for the Institutional Liaisons to read and record admissions numbers. There is no commentary during this 30 minutes. After these numbers are read, there is 30 minutes of discussion, and then the meeting ends. SMF ¶¶ 723-728. Fitzsimmons receives the statistics from the Round Robin meetings. He testified that he finds them "useful" for understanding what is happening at Harvard's peer schools. SMF ¶ 229.

Harvard's racial balancing reaches full steam in the full-committee process. SMF ¶¶ 246-264. Periodically, and especially as the full committee is finalizing the admitted class, Fitzsimmons and McGrath receive "one-pagers" containing the current and prior year admissions statistics by race. SMF ¶¶ 239-245. ████████████████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████ Any final adjustments are then made through the "lopping

process"—Harvard's name for the "fine-tuning" that is done near the end to reduce the admitted class

to the ████████████████ The "lop list" includes five pieces of information, and race is one

of them. SMF ¶ 257. When deciding which students to lop, ████████████████████████

█████████████████████████████████████████████████████████

████████████████ As McGrath testified, ███████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████

     This is blatant racial balancing. Fitzsimmons's claim that ████████████████████████

██████████████████████████████████████████ is untenable. Not

only is there overwhelming evidence that Harvard is racially engineering the class. But that justification

is belied by Harvard's need to accurately project how many students will accept their offer—*i.e.*, the

yield rate. SMF ¶¶ 105-107. Harvard faces "real logistical problems" if too many applicants accept

Harvard's offer because it must house them all, and there is a finite number of beds. SMF ¶ 105. The

Admissions Office thus is hyper-focused on ████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████

But Fitzsimmons' pride is actually powerful evidence of discrimination. ████████████████

██████████████████████████████████████████████████████████████

Indeed, Harvard is acutely aware that different races have yield at markedly different rates:

|  | Class of 2014 Yield | Class of 2015 Yield | Class of 2016 Yield | Class of 2017 Yield |
|---|---|---|---|---|
| Asian American | ██ | ██ | ██ | ██ |
| African American | ██ | ██ | ██ | ██ |
| Hispanic American | ██ | ██ | ██ | ██ |
| Native American | ██ | ██ | ██ | ██ |
| White | ██ | ██ | ██ | ██ |

SMF ¶ 231.

Thus, a change in the racial balance of the admitted class could have a disastrous effect. If Harvard, for instance, admits ██████ Asian American and ██████ African Americans and ██ Hispanics than it has projected, about ██ more applicants would accept. SMF ¶ 232. According to Fitzsimmons, ████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██The racial numbers just always seem to work out.

Finally, Professor Arcidiacono's report confirms that Harvard engages in racial balancing. SMF ¶¶ 717-722. He explains that "Harvard maintained a floor on the admission rate for single-race African Americans ... in the classes of 2017, 2018, and 2019. In each of these years, the admit rate of single-race African Americans was virtually identical to the admit rate of all other domestic applicants." SMF ¶ 717. That is, in those years, Harvard ensured that the African-American admission rate always

approximates or exceeds the overall admission rate. "The chance of this match occurring in three consecutive years (without direct manipulation) is *less than two-tenths of one percent*—making it a near certainty that Harvard was purposely setting a floor on the admission rate of those applicants." SMF ¶ 720. Harvard broke its promise to never "set target-quotas for the number of" African Americans in order to ensure that it admits "a minimum number" of applicants from that racial group. *Bakke*, 438 U.S. at 316 (opinion of Powell, J.) (quoting Harvard Plan).

C.     **Harvard is not using race to achieve critical mass.**

Racial preferences are narrowly tailored only if they are being used to enroll a "critical mass of underrepresented minority students ... so as to realize the educational benefits of a diverse student body." *Grutter*, 539 U.S. at 318; *see Smith v. Univ. of Wash.*, 392 F.3d 367, 373 (9th Cir. 2004). A college should not "specify the particular level of minority enrollment at which it believes the educational benefits of diversity will be obtained" because critical mass is not "a goal that can or should be reduced to pure numbers." *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2210 (2016) ("*Fisher II*"). "As the Harvard plan described by Justice Powell recognized," however, "there is of course some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted." *Grutter*, 539 U.S. at 336 (citation and quotations omitted); *see, e.g.*, *Fisher II*, 136 S. Ct. at 2212 (pointing to "consistent stagnation in terms of the percentage of minority students").

It is this interest in "meaningful representation" of minority students, *Grutter*, 539 U.S. at 318, that justifies treating their race as a "'plus' factor in the context of individualized consideration of each and every applicant," *id.* at 334. Limiting the preference to a "plus factor" ensures that each person "is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Id.* at 337. And, channeling the use of race to achieve critical mass ensures that preferences are "limited in time" and "have a logical end point." *Id.* at 342. Otherwise,

there would be no need for "sunset provisions" and "periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity." *Id.*

Harvard has fashioned a system that violates both preconditions. First, Harvard concedes that it is not using race to achieve the "critical mass" interest. SMF ¶¶ 157-164. Harvard leadership has never heard the term critical mass used in the context of admissions. SMF ¶ 159. The leaders of the Admissions Office and of Harvard College do not even know what critical mass means and they have never used it as part of admissions decisions. SMF ¶¶ 160-162. Of course, then, Harvard neither has its own definition of critical mass nor has conducted any analysis of how it might obtain critical mass. SMF ¶ 163. As McGrath testified: "It's not a term of general use in our deliberations .... It's not, to my knowledge, anybody's specific goal, a critical mass per se." SMF ¶ 158. Fitzsimmons corroborated McGrath's testimony. He testified that Harvard has no "range or quantification of what level of racial diversity is sufficient to achieve Harvard's education goals." SMF ¶ 164.

That critical mass, as Faust testified, is "not a concept" she had "studied," and that she has never heard anyone at Harvard discuss is unsurprising. SMF ¶¶ 160-161. Her lack of insight is the inevitable byproduct of the way Harvard approaches admissions. For Harvard, race is indispensable. As Faust put it, evaluating applications "would be impossible" without using race "because a holistic consideration of a student would require taking race into account." SMF ¶ 167. Fitzsimmons similarly testified that race is essential to evaluating applicants—and always will be. SMF ¶ 830. The Supreme Court has held that critical mass is the only interest compelling enough to permit the use of race because, at some juncture, "use of racial preferences will no longer be necessary to further the interest" in diversity. *Grutter*, 539 U.S. at 343. Harvard simply disagrees and refuses to comply.

Second, Harvard is not using race merely as a "plus factor." Race is a "predominant factor," *Grutter*, 539 U.S. at 320, for African-American and Hispanic applicants. The Asian-American applicant who has a 25% chance of admission (and the white applicant with a 35% chance), *see supra* at 10, would

40

see his chance of admission increase to 75% if he were Hispanic and to 95% if he were African American. SMF ¶ 737. Even including the (biased) personal rating, when treated like a Hispanic applicant, the chances of admission for an Asian-American applicant increase by more than 50 percentage points. The increase would be more than 70 percentage points if he were treated like an African-American applicant. SMF ¶ 738. Race plays such a decisive role in the admissions chances of Hispanics and African Americans that the percentage of Asian Americans admitted to Harvard would increase by 40% if all racial preferences and penalties were eliminated. SMF ¶ 740.

OIR's findings confirm that race is being used as more than a "plus" factor. In modeling the admissions process, OIR determined that the "biggest changes to .... class composition for black and hispanic students comes from consideration of demographics." SMF ¶ 418. In other words, it is the factor that most explains the admissions rates for African Americans and Hispanics. Specifically, adding racial preferences to Harvard's admissions system resulted in a 140% increase in the Hispanic share of the class and a 400% increase in the African-American share of the class. SMF ¶ 417. In fact, one OIR study found that being African American was the second strongest indicator of being admitted to Harvard. SMF ¶ 448. There is no way to avoid it: race has been and still is an overwhelming factor in the admissions chances of underrepresented minorities. Even Professor Card agrees that race plays a "significant role in admissions decisions at Harvard." SMF ¶ 797. He does not deny that, without making adjustments to his (flawed) approach, his models show that racial preferences triple the number of African-American admits and double the number of Hispanic admits. SMF ¶ 799.

In short, Harvard's use of race is the worst system imaginable. Harvard labels every applicant by race. Harvard uses racial preferences with no goal the Supreme Court finds compelling or logical endpoint in mind, and Harvard defiantly plans to do so forever. And, for Hispanic and African-American applicants, race is far more than a non-predominant "plus" factor. Harvard's policy simply bears none of "the hallmarks of a narrowly tailored plan." *Grutter*, 539 U.S. at 334.

**D.      Harvard neither gave serious, good faith consideration to nor took advantage of workable race-neutral alternatives.**

Harvard has not fulfilled its obligation with respect to race-neutral alternatives. *First*, Harvard did not consider non-racial approaches "*before* turning to racial classifications." *Fisher I*, 570 U.S. at 312 (emphasis added). Harvard has known since *Grutter* that it must give "serious, good faith consideration [to] workable race-neutral alternatives." 539 U.S. at 339-40. Yet between 2003 and 2014, Harvard never did so. SMF ¶¶ 806-812. McGrath was asked in her 2015 deposition: "Has the admissions office ever discussed the possibility of going to a race-blind admissions system?" She answered: "I don't recall ever a discussion on the admissions committee about that." She was then asked: "Do you have a view as to whether or not a race-blind admissions process would be beneficial or detrimental to diversity on campus?" Her response: "A. As the director of admissions? Q. Yes. A. I don't know whether it would. I can't—I don't have a hunch on that." SMF ¶ 807. Discovery confirms McGrath's testimony. Harvard never formed a committee or commissioned a study. It never even had a "formal discussion." SMF ¶ 810. Harvard just ignored the Supreme Court's instructions.

Until prodded by SFFA, Harvard did not examine race-neutral alternatives even after *Fisher I* despite the fact that James Ryan (Dean of Harvard's Graduate School of Education) implored it to do so. SMF ¶¶ 801-805. Ryan co-authored an article in the *Chronicle of Higher Education* entitled "Heeding the Court's Warning in *Fisher*" urging colleges to examine race-neutral alternatives in good-faith. SMF ¶¶ 803-805. Ryan forwarded the article to Fitzsimmons and Faust, encouraging them to heed the article's warning: "Few institutions are currently prepared to answer the questions that courts will soon be asking. If they fail to prepare convincing answers, they will lose. And, having been put on notice, responsibility for that loss will be with our university leaders, not the courts." SMF ¶¶ 802, 805.

Harvard did not begin investigating race-neutral alternatives until the day after the Harvard Not Fair website (www.harvardnotfair.org) went live on April 7, 2014. SMF ¶ 813. The following day, April 8, 2014, Harvard's General Counsel scheduled a meeting with Fitzsimmons, McGrath, and

others to discuss "*Fisher* and the possibility of a lawsuit against Harvard." This meeting occurred on April 24, 2014. SMF ¶ 814. But the effort was neither "serious" nor in "good faith." The steps Harvard took were in response to litigation—not a genuine exploration of alternatives to racial preferences. Harvard, after all, had already decided that race will always be indispensable to its process. *See supra* at 40. Indeed, Dean Smith testified that race was part of an applicant's "lived experience," and he could think of no "circumstance in which Harvard would not want to use race as a factor in the holistic admissions process." SMF ¶ 828.

Harvard thus cast out to create a record—after the fact—to support a preordained outcome. Harvard's first move was to form the "Ryan Committee" to examine race-neutral alternatives. SMF ¶¶ 816-817. Harvard has been permitted to withhold most documents relating to the Ryan Committee on attorney-client privilege grounds and instructed witnesses not to answer questions about its work. All SFFA knows is that the Ryan Committee met only three times between June 2014 and December 2014; it was disbanded in December 2014—less than a month after SFFA filed suit; it produced no written work; and it formed no conclusions (formal or otherwise) as to the availability of race-neutral alternatives. SMF ¶¶ 819-824. It is as if the Ryan Committee never existed.

It was not until June 2017 (two and a half years after the Ryan Committee disbanded and five years after *Fisher I*) that Harvard formed a new race-neutral committee chaired by Dean Smith. SMF ¶¶ 825-826. Conveniently, the Smith Committee was formed just as discovery closed. And, unlike the Ryan Committee, which had dozens of members, SMF ¶ 818, the Smith Committee had only three— Smith, Khurana, and Fitzsimmons—who often met in the General Counsel's Office. In fact, counsel attended most meetings to cloak the process with the attorney-client privilege. SMF ¶ 836.

The Committee met seven times between June 2017 and April 2018; no minutes were kept; almost no member took notes; any documentation of its work was handled by litigation counsel; and those notes have been withheld as privileged. The Committee neither collected data nor ran

simulations; it neither took testimony nor conducted interviews; it made no inquiry into whether racial preferences were helping Harvard students succeed academically; and Committee members never disagreed or recommended policy changes. The Committee instead rubber stamped the expert reports, and then instructed WilmerHale to draft a report parroting Professor Card's findings. SMF ¶ 831-848. The enterprise—from start to finish—was a charade. If this is "serious, good faith" consideration of race-neutral alternatives, then strict scrutiny is indeed "strict in theory but feeble in fact." *Fisher I*, 570 U.S. at 314. Harvard may not outsource its "academic freedom." *Grutter*, 539 U.S. at 324.

These machinations were required because there is now powerful research from across the ideological spectrum that racial preferences are not necessary to achieve diversity. SMF ¶¶ 851-852. Richard Kahlenberg (SFFA's expert) determined that Harvard is no exception. He found that Harvard can easily achieve diversity by increasing socioeconomic preferences; increasing financial aid; reducing or eliminating preferences for legacies, donors, and relatives of faculty and staff; adopting policies using geographic diversity; increasing recruitment efforts; increasing community college transfers; and/or eliminating early action. SMF ¶ 858-882.

The Smith Committee's response to Mr. Kahlenberg's proposals only highlights Harvard's bad faith. None of these alternatives is workable, the Committee claims, because: (1) African-American enrollment would drop from 14% to 6%; (2) transitioning to socioeconomic preferences would make "the proportion of admitted students with the highest academic ratings ... drop from 76% to 66%"; and, (3) Harvard "could not significantly increase its financial aid budget" in order to attract more minority applicants "without detracting from other commitments." SMF ¶ 845. Those claims are flawed. This decline in African-American enrollment would occur only if Harvard eliminated racial preferences but refused to employ race-neutral alternatives. With them, African-American enrollment remains strong. SMF ¶ 884. Harvard's academic reputation would remain undiminished. SMF ¶ 888-890. Harvard also has the financial wherewithal to increase financial aid. SMF ¶ 896.

More importantly, Harvard's claims highlight that it still cannot get its story straight after four years of litigation. Harvard claims to worry about minority representation on its campus. But when Faust was asked whether Harvard's "admissions policy is ... concerned with the overall representation of particular groups," she was emphatic it is not, and Smith testified that Harvard is "not looking for any particular number," SMF ¶ 885. Harvard repeatedly chides SFFA for emphasizing the academic qualifications of Asian-American applicants. Apparently, however, academics are paramount again when it comes to rejecting race-neutral alternatives. Harvard proclaims that its $37 billion endowment means it can be need-blind in admissions. SMF ¶ 896. But now Harvard is supposedly too poor to increase financial aid so that it may attract more disadvantaged applicants. It is difficult to imagine better evidence of pretext for racial discrimination than the Smith Committee report.

In the end, the dissembling confirms that Harvard's moral compass is broken. Race-neutral alternatives would increase socioeconomic diversity—the number of first-generation college students admitted to Harvard would more than triple, and the number of admitted disadvantaged students would more than double. They would make Harvard more racially diverse; indeed, the number of Hispanic applicants admitted to Harvard would increase. Furthermore, race-neutral policies would open the door of opportunity to disadvantaged minority applicants who Harvard's current system shuts out in favor of wealthier minority applicants from elite high schools. SMF ¶¶ 895-890. Harvard would truly become the broadly diverse community it already professes to be. But Harvard is uninterested in any of that. Because it would mean that Harvard would no longer be in the business of classifying people on the basis of their race. As the record definitively establishes, Harvard cannot begin to imagine what that world might look like.

## V.    CONCLUSION

For the foregoing reasons, SFFA respectfully requests that the Court grant it summary judgment on all counts.

Dated: June 15, 2018                                       Respectfully submitted,


                                                           /s/ William S. Consovoy
                                                           _____
Adam K. Mortara                                            William S. Consovoy
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP                  Thomas R. McCarthy
54 West Hubbard Street, Suite 300                          J. Michael Connolly
Chicago, IL 60654                                          CONSOVOY MCCARTHY PARK PLLC
312.494.4400                                               3033 Wilson Boulevard, Suite 700
adam.mortara@bartlit-beck.com                              Arlington, Virginia 22201
                                                           703.243.9423
John M. Hughes                                             will@consovoymccarthy.com
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP                  tom@consovoymccarthy.com
1801 Wewatta Street, Suite 1200                            mike@consovoymccarthy.com
Denver, CO 80202
303.592.3100                                               Patrick Strawbridge BBO #678274
john.hughes@bartlit-beck.com                               CONSOVOY MCCARTHY PARK PLLC
                                                           Ten Post Office Square
                                                           8th Floor South PMB #706
Paul M. Sanford BBO #566318                                Boston, MA 02109
BURNS & LEVINSON LLP                                       617.227.0548
One Citizens Plaza, Suite 1100                             patrick@consovoymccarthy.com
Providence, RI 02903
617.345.3000                                               Michael H. Park
psanford@burnslev.com                                      CONSOVOY MCCARTHY PARK PLLC
                                                           745 Fifth Avenue, Suite 500
                                                           New York, NY 10151
                                                           212.247.8006
                                                           park@consovoymccarthy.com


                       *Attorneys for Plaintiff Students for Fair Admissions, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

<u>/s/ William S. Consovoy</u>
William S. Consovoy