# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:14-cv-14176-ADB |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | |
| Defendant. | |

## EXPERT REPORT OF RICHARD D. KAHLENBERG

i

# TABLE OF CONTENTS

I.   Professional Qualifications ................................................................................................ 1

II.   Purpose ............................................................................................................................. 3

III.   Summary of My Opinions ................................................................................................ 4

IV.   Experience and academic research show that colleges and universities can maintain or increase diversity through race-neutral alternatives without sacrificing academic quality ........... 5

    A.   Experience at selective public universities shows that race-neutral strategies can produce racial, ethnic, and socioeconomic diversity. ...................................................................... 5

    B.   Academic research shows that selective universities (including elite private universities) can employ effective race-neutral strategies. ................................................... 10

    C.   Well-crafted race-neutral strategies do not compromise academic quality. .............................. 13

V.   Harvard failed to fully consider any of the numerous race-neutral alternatives that could achieve the educational benefits of diversity. ......................................................... 15

    A.   Harvard could increase socioeconomic preferences. ..................................................... 17

        1.   Socioeconomic factors such as income and wealth are highly correlated with race. .......... 17

        2.   Harvard's socioeconomic diversity is deeply lacking. ............................................. 20

        3.   Harvard could make critical socioeconomic data available to admissions officers. ............ 23

        4.   Harvard could increase the weight it gives to socioeconomic factors ................................. 25

    B.   Harvard could increase financial aid ............................................................................. 29

    C.   Harvard could reduce or eliminate preferences that favor non-minorities. ............................. 31

        1.   Legacy preferences ................................................................................................ 31

        2.   Donor preferences ................................................................................................... 33

        3.   The Z-list ................................................................................................................ 34

        4.   Faculty and staff preferences ................................................................................. 36

    D.   Harvard could adopt admissions policies utilizing geographic diversity, including percentage plans and the use of zip codes. ............................................................ 36

ii

E.   Harvard could increase its recruitment efforts. ........................................................... 39

F.   Harvard could increase its admission of community college transfers. ...................... 41

G.   Harvard could end early admissions. ............................................................................ 42

VI.   Simulations of Harvard's data show that workable race-neutral alternatives exist. ................. 45

A.   A careful simulation indicates that Harvard could achieve the educational benefits of
racial, ethnic, and socioeconomic diversity without sacrificing academic quality. ................... 45

B.   Through inclusion of additional socioeconomic factors and better recruiting of
low-income students, the simulation could predict even greater racial and ethnic diversity.. 51

VII.   Conclusion ................................................................................................................................. 53

VIII.   Appendices ................................................................................................................................. 55

A.   Appendix A – Curriculum Vitae .................................................................................... 55

B.   Appendix B – Documents Relied Upon or Considered in Forming Opinion ....................... 73

C.   Appendix C – Simulations ............................................................................................. 75

iii

## I.   Professional Qualifications

My name is Richard D. Kahlenberg.  I am a senior fellow at The Century Foundation, a non-profit, non-partisan research organization founded in 1919. The views expressed in this report are solely my own, and this report is submitted on my own behalf and not on behalf of any organization.

I am the author or co-author of six books and the editor of ten books. (For the full list, see my Curriculum Vitae in Appendix A.) Most relevant here, I am the author of *The Remedy: Class, Race, and Affirmative Action* (Basic Books, 1996), which was described by Harvard University's William Julius Wilson in the New York Times as "by far the most comprehensive and thoughtful argument thus far for . . . affirmative action based on class."[1] The book was named one of the best books of the year by the Washington Post.[2]

In 2003, Diverse Issues in Higher Education, a widely read industry magazine on diversity issues, called me "arguably the nation's chief proponent of class-based affirmative action in higher education admissions."[3] In 2013, The New York Times identified me as "perhaps the most prominent self-described progressive with doubts about the current version of affirmative action."[4] And in 2016, reflecting on my time researching and writing about higher education, William G. Bowen, the former president of Princeton University, and Michael S. McPherson, the former president of Macalester

---

[1] William Julius Wilson, "Class Consciousness," New York Times Book Review, July 14, 1996.

[2] Norman Ornstein, "Social Issues," Washington Post Book World, December 8, 1996.

[3] Ronald Roach, "Class-Based Affirmative Action," Diverse Issues in Higher Education, June 19, 2003.

[4] David Leonhardt, "The Leading Liberal Against Affirmative Action," New York Times, March 9, 2013.

College, wrote that I deserve "more credit than anyone else for arguing vigorously and relentlessly for stronger efforts to address disparities by socioeconomic status."[5]

I am also the editor of four books that address, in part or in whole, race-neutral affirmative action strategies:

- *America's Untapped Resource: Low-Income Students in Higher Education* (Century Foundation, 2004);
- *Rewarding Strivers: Helping Low-Income Students Succeed in College* (Century Foundation, 2010);
- *Affirmative Action for the Rich: Legacy Preferences in College Admissions* (Century Foundation, 2010); and
- *The Future of Affirmative Action: New Paths to Higher Education Diversity after Fisher v. University of Texas* (Century Foundation/Lumina Foundation, 2014).

My law review articles on race-neutral alternatives to racial preferences include:

- "Getting Beyond Racial Preferences:   The Class-Based Compromise," 45 *American University Law Review* 721 (February 1996);
- "Class-Based Affirmative Action," 84 *California Law Review* 1037 (July 1996); and
- "Reflections on Richard Sander's Class in American Legal Education," 88 *Denver University Law Review* 719 (September 2011).

I also have researched and published numerous articles on race-neutral alternatives to racial preferences in prominent publications, including The New York Times, The Wall Street Journal, The Washington Post, and The New Republic. (See all publications in Appendix A). Over the years, I have served on numerous conference panels giving me an opportunity to interact with college admissions officers at a number of selective colleges.

Before coming to The Century Foundation, I was a Fellow at the Center for National Policy, a visiting associate professor of constitutional law at George Washington University, and a legislative

---

[5] William G. Bowen & Michael S. McPherson, Lesson Plan: An Agenda for Change in American Higher Education (Princeton University Press, 2016), p. 35.

assistant to Senator Charles S. Robb (D-VA). I graduated from Harvard College and Harvard Law School.

I also serve on the advisory boards of the Pell Institute and the Albert Shanker Institute, as well as the Research Advisory Panel of the National Coalition for School Diversity. In 2013, I was the winner of the William A. Kaplin Award for Excellence in Higher Education Law and Policy Scholarship.

## II.   Purpose

In 2014, I was retained in this matter by Students for Fair Admissions, Inc. (SFFA) to provide an opinion regarding the availability and feasibility of race-neutral alternatives to Harvard's use of race as a factor in undergraduate admissions. In particular, I was asked to examine whether Harvard could implement workable race-neutral alternatives that would produce the educational benefits of diversity. The rate for my services in this matter is $295 an hour.

In making my opinions, I draw first upon my extensive knowledge of the history and study of race-neutral alternatives. See Section I, *supra*, and Appendix A. I have authored, co-authored, edited, or reviewed virtually every major study or analysis on race-neutral alternatives from the past 20 years. I have also reviewed substantial portions of the voluminous evidence that has been produced by Harvard in this case, including numerous deposition transcripts and several internal reports from Harvard's Office of Institutional Research (OIR). A full list of the documents and transcripts I reviewed is provided at Appendix B. Finally, I have reviewed and had access to the admissions data, analysis, and conclusions from SFFA's other expert witness, Duke Professor Peter Arcidiacono.

It is also important to understand what I have not reviewed. I did not have access to some of the data that I would have liked to review—either because Harvard has declined to maintain the information or because the Court permitted Harvard to withhold the information from SFFA. This

includes, among other things, precise data about student income, wealth, and zip code of residence. These data would have been helpful to me, as they would have allowed me to consider additional race-neutral strategies and evaluate whether they would be workable as possible replacements for Harvard's use of race in admissions decisions. Nevertheless, I am confident about the opinions I am able to state below.

I have not testified as an expert at trial or deposition in the past four years.

## III. Summary of My Opinions

The U.S. Supreme Court has long stated that student body diversity—by race and also by socioeconomic status—offers important educational benefits.[6] But because of the heavy costs associated with using race in governmental decision making, the Fourteenth Amendment "forbids the use even of narrowly drawn racial classifications except as a last resort."[7] In *Fisher v. University of Texas*, therefore, the Supreme Court held that colleges cannot employ racial preferences unless "no workable race-neutral alternatives would produce the educational benefits of diversity."[8] Indeed, in pursuing the compelling goal of diversity, universities bear "the ultimate burden of demonstrating, before turning to racial classifications, that available workable race-neutral alternatives do not suffice."[9]

With these guideposts in mind, I am prepared to give testimony on three main opinions to a reasonable degree of professional certainty.

---

[6] Grutter v. Bollinger, 539 U.S. 306, 330 (2003).

[7] City of Richmond v. J.A. Croson Co., 488 U.S. 469, 519 (1989) (Kennedy, J., concurring in part and concurring in the judgment).

[8] 133 S. Ct. 2411, 2420 (2013).

[9] Id.

4

First, there is extensive empirical evidence and academic research documenting the myriad (and innovative) ways in which colleges and universities such as Harvard can use race-neutral alternatives to produce the educational benefits of diversity.

Second, it is apparent from my review of the deposition testimony and relevant evidence produced that, in the years between *Fisher I* and the filing of this lawsuit, Harvard failed to fully consider any of the numerous available race-neutral alternatives that could achieve the educational benefits of diversity. These include:

- Increasing socioeconomic preferences;
- Increasing financial aid;
- Reducing or eliminating preferences for legacies, donors, and relatives of faculty and staff;
- Adopting policies using geographic diversity, including percentage plans and the use of zip codes;
- Increasing recruitment efforts;
- Increasing the admission of community college transfers; and
- Eliminating the Early Action admissions option.

Finally, after reviewing Harvard's admissions data and other relevant socioeconomic data, I have concluded that there are race-neutral alternatives available that could provide Harvard with the educational benefits of diversity without the use of racial preferences.

## IV. Experience and academic research show that colleges and universities can maintain or increase diversity through race-neutral alternatives without sacrificing academic quality.

### A. Experience at selective public universities shows that race-neutral strategies can produce racial, ethnic, and socioeconomic diversity.

For years, supporters of racial preferences argued that no workable alternatives existed for creating racial diversity. In the words of Justice Blackmun in his 1978 *Bakke* opinion, "I suspect that it would be impossible to arrange an affirmative action program in a racially neutral way and have it

successful. To ask that this be so is to demand the impossible. In order to get beyond racism, we must first take account of race. There is no other way."[10]

Since then, however, numerous universities have proven him wrong. In 2012, my colleague Halley Potter and I examined ten leading universities where racial preferences had been banned and found that seven of the ten—the University of Texas at Austin, Texas A&M, the University of Washington, the University of Florida, the University of Georgia, the University of Nebraska, and the University of Arizona—had used race-neutral alternatives to meet or exceed the racial diversity levels they had obtained in the past using racial preferences.[11] These schools obtained such results through a variety of approaches, including creating plans to encourage geographic and socioeconomic diversity, bolstering financial aid policies, adopting programs that could attract disadvantaged students from underrepresented demographics with the promise of financial support, and building partnerships with K-12 schools to increase the pool of college-ready applicants.[12]

Many of these colleges had been adamant that race-neutral alternatives could never succeed. For example, in 1998, the University of Washington was forced to abandon racial preferences after a ballot initiative was passed banning the practice. At the time, Richard McCormick, the president of the University of Washington, spoke out strongly against the referendum and made dire predictions about its effect on racial diversity. But the University ultimately crafted new approaches to achieve diversity, including recruiting at predominantly minority high schools, expanding financial aid, and

---

[10] Regents of University of California v. Bakke, 438 U.S. 265, 407 (1978) (Blackmun, J., concurring).

[11] Richard D. Kahlenberg & Halley Potter, A Better Affirmative Action: State Universities that Created Alternatives to Racial Preferences (Century Foundation), pp. 26-61.

[12] Id. at 76.

6

considering such factors as "personal adversity" and "economic disadvantage" in its admissions decisions. By 2004, "the racial and ethnic diversity of the UW's first-year class had returned to its pre-1999 levels," when race was still considered in admissions, and the new admissions policy also increased economic diversity among the student body.[13]

Similarly, in 2000, the University of Georgia adopted a number of race-neutral strategies after a federal court struck down the university's use of race in admissions.[14] In particular, the university began using a number of socioeconomic factors in its admissions process, including parental education and high school environment, began admitting the valedictorian and salutatorian from every high school class, and stopped giving preference to children of alumni. Although alumni opposed the end of legacy admissions, the university "has not encountered noticeable fundraising challenges as a result of the change."[15] Although minority enrollment initially dropped after the ban on using race in admission, it has since moved upward and "the years since 2000 have shown the university moving in the right direction, toward increased racial, ethnic, socioeconomic, linguistic, and geographic diversity on campus."[16]

The other three universities we examined—the University of Michigan, UCLA, and the University of California Berkeley—had not reached their prior levels of racial diversity. As an initial

---

[13] Richard L. McCormick, "Converging Perils to College Access for Racial Minorities: Examples of Responses that Work from Washington State and New Jersey," in The Future of Affirmative Action: New Paths to Higher Education Diversity after Fisher v. University of Texas, ed. Richard D. Kahlenberg (New York: Century Foundation/Lumina Foundation, 2014), *supra*, p. 118.

[14] See Johnson v. Board of Regents, 106 F. Supp. 2d 1362 (S.D. Ga. 2000).

[15] Nancy G. McDuff & Halley Potter, "Ensuring Diversity Under Race-Neutral Admissions at the University of Georgia," in The Future of Affirmative Action, *supra*, p. 126.

[16] Id. at 123.

matter, the data on African-American enrollment at Michigan are problematic. In 2010, the Department of Education changed its methodology for categorizing students by race and ethnicity, requiring colleges to report separately students who are members of two or more races. "So a drop in the number of black students reported at a university from 2009 to 2010," a Chronicle of Higher Education article noted, "doesn't *necessarily* mean that there were actually fewer black students."[17] In fact, when the new "mark one or more" races methodology was proposed, civil rights groups raised concerns that it would result in an artificial decline in African-American and Hispanic representation in government statistics.[18]

To the extent that race-neutral alternatives have not been fully effective at these universities, however, it is mostly because of their failure to utilize them fully.[19] Michigan still gives preferences in admission to the children of alumni (who, at selective colleges, tend to be disproportionately non-

---

[17] Jonah Newman, "What Does the Education Dept. Know About Race?" Chronicle of Higher Education, April 28, 2014.  Consider, also, the case of the University of Virginia (UVA), which is not subject to a voter-imposed ban on racial preferences and continues to use race as a factor in admissions. In 2008, before students could use the multi-race category, UVA enrolled 1,199 African-American students. By 2012, after the change in categories was put in place, the number of African Americans was 946, suggesting a dramatic 21.1 percent drop. But when the 2012 data includes the 206 students who identified as African American and some other ethnicity (for a grand total of 1,152 African Americans under the old methodology), the drop was 3.9 percent. In other words, about 80 percent of the apparent decline in black enrollment at UVA was due to reporting changes. McGregor McCance, "Analysis of U.Va.'s Incoming Class Shows Consistent Quality with Dynamic Change," UVA Today, May 16, 2013. Harvard has also seen changes in its methodology of reporting race and ethnicity. See Fitzsimmons deposition, pp. 93-101.

[18] See Kim M. Williams, Mark One or More: Civil Rights in Multicultural America (University of Michigan Press, 2008).

[19] U.C. Berkeley, UCLA, and the University of Michigan have also faced a special disadvantage in recruiting minority students because they have a national pool of applicants and restrictions on using race that were imposed by a state referendum rather than a federal court. As a result, out-of-state competitors could continue to use racial preferences.

minority)[20] and still provides substantial "merit" aid to wealthy students, thereby diverting funds from need-based aid.[21] U.C. Berkeley and UCLA currently employ only family income as the primary determinant of economic disadvantage and thus are not using more accurate measures of socioeconomic disadvantage.[22] As discussed further below, using wealth alongside income would better capture economic disadvantage than does income alone and could lead to greater racial diversity.

It is significant to note that these types of race-neutral approaches also produce much higher levels of socioeconomic diversity than do race-based admissions.[23] The enhancement of socioeconomic diversity that flows from these plans is critical from an educational and legal perspective, because the educational benefits of diversity arise from the interchange of ideas and experiences with those from different financial circumstances just as surely as those from different racial backgrounds.[24]

---

[20] John Brittain & Eric L. Bloom, "Admitting the Truth: The Effect of Affirmative Action, Legacy Preferences, and the Meritocratic Ideal on Students of Color in College Admissions," in Affirmative Action for the Rich: Legacy Preferences in College Admissions, ed. Richard D. Kahlenberg (Century Foundation Press, 2010), pp. 127-32.

[21] Richard D. Kahlenberg, "A Fresh Chance to Rein in Racial Preferences," Wall Street Journal, October 13, 2013.

[22] Richard Sander, "The Use of Socioeconomic Affirmative Action at the University of California," in The Future of Affirmative Action, *supra*, p. 101 (that U.C. campuses look at parental education and income).

[23] See Matthew N. Gaertner, "Advancing College Access with Class-Based Affirmative Action: The Colorado Case," in The Future of Affirmative Action, *supra*, p. 181, Table 14.3; Anthony P. Carnevale, Stephen J. Rose, & Jeff Strohl, "Achieving Racial and Economic Diversity with Race-Blind Admissions Policy," in The Future of Affirmative Action*, supra,* p. 192, Table 15.2.

[24] See Grutter, 539 U.S. 306, 324 (2003); Bakke, 438 U.S. 265, 316 (1978). Harvard admissions Dean Bill Fitzsimmons also testified that "economic background is a vital piece of putting together a class that is educationally beneficial for all its members." Fitzsimmons deposition, pp. 421-24.

In California, for example, students from economically disadvantaged backgrounds were significantly more likely to be admitted to universities in California after the State banned racial preferences.[25] Likewise, when UCLA Law School adopted a socioeconomic affirmative action program, the proportion of students who were the first in their families to attend college roughly tripled.[26]

It seems hardly an accident, therefore, that the University of California dominates the list of schools "doing the most for low-income students" in the *New York Times'* "College Access Index" in 2015.[27] Similarly, of the top seven institutions for social mobility, six were from the UC system, and the seventh, the University of Florida, has also implemented race-neutral strategies in the face of a racial preference ban.[28]

### B. Academic research shows that selective universities (including elite private universities) can employ effective race-neutral strategies.

In the wake of Supreme Court rulings on affirmative action, think tanks and the academic community have been examining in earnest the use of race-neutral strategies to promote racial, ethnic, and socioeconomic diversity on campuses. For example, the Lumina Foundation teamed up with The Century Foundation to produce a 299-page volume (which I edited) that brought together both supporters and skeptics of racial preferences to consider the meaning of the Supreme Court's rulings

---

[25] See Kate Antonovics & Ben Backes, "The Effect of Banning Affirmative Action on College Admissions Policies and Student Quality," The Journal of Human Resources 49, no. 2 (Spring 2014): p. 306.

[26] Sander, "The Use of Socioeconomic Affirmative Action," *supra*, p. 105.

[27] David Leonhardt, "California's Upward-Mobility Machine," New York Times, September 16, 2015.

[28] Id.; Kahlenberg & Potter, A Better Affirmative Action, *supra*.

and to examine the efficacy of race-neutral strategies.[29] The College Board's Access and Diversity Collaborative produced papers on race-neutral policies, including "The Playbook: A Guide to Assist Institutions of Higher Education in Evaluating Race-and Ethnicity-Neutral Policies in Support of the Mission-Related Diversity Goals."[30] And the American Council on Education surveyed 338 colleges on their use of race-neutral strategies.[31]

    As a result, valuable research has emerged identifying concrete ways in which universities can increase racial diversity through race-neutral means. For example, in 2014, Professors Anthony Carnevale, Stephen Rose, and Jeff Strohl of Georgetown University examined how socioeconomic affirmative action programs, percentage plans, or a combination of the two, could work at the nation's most selective 193 institutions.[32] The authors found that if these schools used class-based affirmative action—which would include a mix of socioeconomic considerations (such as parental education, income, savings, and school poverty concentrations)—the combined African-American and Hispanic representation would *rise* from 11% to 13%—all without the use of racial preferences. Under a different simulation (in which the top 10% of test takers in every high school was among the pool

---

[29] Kahlenberg (ed), The Future of Affirmative Action, *supra*.

[30] See, e.g., Arthur L. Coleman, Teresa E. Taylor, & Katherine E. Lipper, "The Playbook: A Guide to Assist Institutions of Higher Education in Evaluating Race- and Ethnicity-Neutral Policies in Support of the Mission-Related Diversity Goals," College Board and Education Counsel, October 2014, http://educationcounsel.com/wp-content/uploads/2015/06/ADC%20Playbook%20October%202014%20(for%20posting%20to%20website).pdf.

[31] Lorelle L. Espinosa, Matthew N. Gaertner, & Gary Orfield, "Race, Class, and College Access: Achieving Diversity in a Shifting Legal Landscape" American Council on Education, 2015, http://www.acenet.edu/news-room/Documents/Race-Class-and-College-Access-Achieving-Diversity-in-a-Shifting-Legal-Landscape.pdf.

[32] Carnevale, Rose, & Strohl, "Achieving Racial and Economic Diversity with Race-Blind Admissions Policy," in The Future of Affirmative Action, *supra*; see also David Leonhardt, "If Affirmative Action Is Doomed, What's Next?" New York Times, June 17, 2014.

admitted to this collection of schools) the authors found that African-American and Hispanic representation would rise from 11% to 17%. Under each of these scenarios, socioeconomic diversity and mean SAT scores would also rise.[33]

Similarly, in 2014, Matthew Gaertner examined admissions at the University of Colorado at Boulder and found that a sophisticated socioeconomic affirmative action plan that gave considerable weight to economic disadvantage could achieve even *more* racial diversity than using racial preferences. Based on national research, the University of Colorado devised an index of socioeconomic disadvantage that looked at a number of factors, including "the applicant's native language, single-parent status, parents' education level, family income, the number of dependents in the family, whether the applicant attended a rural high school, the percentage of students from the applicant's high school eligible for free or reduced-price lunch (FRL), the school-wide student-to-teacher ratio, and the size of the twelfth-grade class." Under the hypothetical program, the university gave socioeconomically disadvantaged students a preference in admissions that was larger than what African-American and Hispanic students had been provided in the past. When simulations were run, Gaertner found that not only would socioeconomic diversity increase, but the acceptance rates of underrepresented

---

[33] Carnevale, Rose, & Strohl, "Achieving Racial and Economic Diversity with Race-Blind Admissions Policy," in The Future of Affirmative Action, *supra*, p. 192, Tables 15.1, 15.2. The study's breakdown is as follows:  Status quo (4% African American, 7% Hispanic; 14% from the bottom socioeconomic half; 1230 mean SAT); Admissions by test score (1% African American, 4% Hispanic; 15% bottom socioeconomic half; 1362 mean SAT); Socioeconomic affirmative action (3% African American, 10% Hispanic; 46% from bottom socioeconomic half; 1322 mean SAT); Top 10% of test takers from every high school (6% African American, 11% Hispanic; 31% from bottom socioeconomic half; 1254 mean SAT). Id.

12

minority applicants would also increase—from 56 percent under race-based admissions to 65 percent under class-based admissions.[34]

In addition, in a 2015 study, Professor Sigal Alon found that if the most selective 115 American universities instituted broad reform—including effectively eliminating[35] legacy, athletic, and racial preferences—a socioeconomic boost "could not only replicate the current level of racial and ethnic diversity at elite institutions but even increase it."[36] Professor Alon's model looked at three variations: (1) a "socioeconomic status" model, which looks at family-based economic disadvantages; (2) a "structural" model, which looks at neighborhood-based economic disadvantages; and (3) a "multidimensional" model, which looks at both. Professor Alon found that racial diversity would meet or exceed current admissions and socioeconomic diversity would increase under all three models. Meanwhile, because mean SAT scores would remain steady, "all this could be done without jeopardizing academic selectivity."[37]

### C.    Well-crafted race-neutral strategies do not compromise academic quality.

Critics may argue that race-neutral alternatives will reduce academic standards. But experience and research refute that claim. For example, after UCLA Law School adopted a socioeconomic

---

[34] Gaertner, "Advancing College Access with Class-Based Affirmative Action," *supra*, p. 181, Table 14.3.

[35] Alon effectively eliminates athletic, legacy, and racial preferences by replacing those students in the weakest academic quartile—whom she presumes includes those for whom preferences were decisive—with the most academically competitive economically disadvantaged students of all races.

[36] Sigal Alon, Race, Class, and Affirmative Action (Russell Sage Foundation, 2015), pp. 254-56.

[37] Id. at 256.

preferences program, the school's California bar exam passage rate rose to an all-time high.[38] Likewise, in a national simulation, Professors Carnevale and Rose found that top universities could nearly quadruple the proportion of students from the bottom socioeconomic half (from 10% of all students, the level they found in their research, to 38%) without any change in graduation rates.[39]

These studies are buttressed by a growing body of research on "undermatching," in which highly qualified students do not apply to selective colleges. Professor Caroline Hoxby of Stanford and Professor Christopher Avery of Harvard have found that 35,000 low-income students are high achieving, but that only one-third apply to one of the country's 238 most selective colleges. Of those low-income, high-achieving students, roughly 2,000 are African American and 2,700 are Hispanic.[40] Additional research has found that 43 percent of students who are academically qualified to gain admission to selective colleges undermatch, and that many are Hispanic and African American.[41] In raw numbers, that translates into 4,000 Hispanic and 2,000 African-American SAT takers who have the strongest academic credentials yet do not attend a highly selective school.[42] This research indicates that there is enormous potential to increase socioeconomic and racial diversity without in any way

---

[38] Sander, "The Use of Socioeconomic Affirmative Action at the University of California," *supra*, p. 107.

[39] Anthony P. Carnevale & Stephen J. Rose, "Socioeconomic Status, Race/Ethnicity, and Selective College Admissions," in America's Untapped Resource: Low-Income Students in Higher Education, ed. Richard D. Kahlenberg (The Century Foundation Press, 2004), pp. 148-49.

[40] Caroline M. Hoxby & Christopher Avery, "The Missing 'One-Offs': The Hidden Supply of High-Achieving, Low Income Students," NBER Working Paper no. 18586, December 2012, p. 34.

[41] Alexandria Radford & Jessica Howell, "Addressing Undermatch: Creating Opportunity and Social Mobility," in The Future of Affirmative Action, *supra*, p. 134,

[42] Id.

sacrificing academic quality if colleges were aggressively to recruit high-achieving, low-income students.

## V.  Harvard failed to fully consider any of the numerous race-neutral alternatives that could achieve the educational benefits of diversity.

The Supreme Court's instructions regarding race-neutral alternatives are clear. Colleges must prove that "no workable race-neutral alternatives would produce the educational benefits of diversity."[43] This requirement has been widely discussed in the academic community.[44] Indeed, in a 2013 article in the Chronicle of Higher Education, Harvard professor Thomas Kane and current Harvard Education School Dean James Ryan noted that the *Fisher* decision means that "[t]o consider race in admissions . . . institutions must prove to courts that race-neutral alternatives—such as relying on socioeconomic status or where students live—will not work."[45] The two Harvard faculty members then suggested ways in which schools could assess the availability of race-neutral alternatives.[46] They warned that "few universities and colleges are prepared to answer the questions that courts will soon be asking. If they fail to prepare convincing answers, they will lose. And, having been put on notice,

---

[43] Fisher, 133 S. Ct. 2411, 2420 (2013).

[44] See, e.g., Arthur L. Coleman & Teresa E. Taylor, "Emphasis Added: Fisher v. University of Texas and Its Practical Implications for Institutions of Higher Education," in The Future of Affirmative Action, *supra*, 50-51.

[45] Thomas J. Kane and James E. Ryan, "Why 'Fisher' Means More Work for Colleges," Chronicle of Higher Education, July 29, 2013.

[46] They noted: "To quantify such costs, colleges could review their admissions folders (or at least a representative sample of them) and have admissions officers flag the family-background factors that are potential race-neutral alternatives. Analysts could then estimate how much those factors would have to be weighted (and other factors diminished) in order to produce the outcomes now produced with race-conscious admissions. They could then compare the results of race-conscious and race-neutral policies on individual dimensions—like test scores or high-school grades—or on combinations of traits such as academic indices." Id.

15

responsibility for that loss will be with our college and university leaders, not our courts."[47] Evidence in this case shows that the professors sent a draft of this article to Dean Fitzsimmons seeking his input in advance of publication.[48]

Despite all this, it appears that Harvard—one of the nation's great research universities—conducted no investigation to see whether race-neutral strategies could yield the educational benefits of diversity, as required by law. Dean Fitzsimmons testified that Harvard has conducted no formal analysis of how race-neutral alternatives might work at the college or what would happen if the school transitioned to a race-blind system.[49] Similarly, Director McGrath testified that she could not recall any discussion of the possibility of going to a race-blind admissions system.[50] And Sally Donahue, Director of Financial Aid, testified that she could not recall ever discussing alternatives to using race in admissions, such as socioeconomic status.[51] It appears that the sum total of Harvard's investigation into race-neutral alternatives is a disbanded committee led by Dean James Ryan and the establishment of a new committee with just three members (Dean Fitzsimmons, Dean Michael Smith, and Dean Rakesh Khurana) that as of August 3, 2017 had met only once.[52]

---

[47] Id.

[48] Harvard documents, 7799-7802.

[49] Fitzsimmons deposition, pp. 137, 168, 180-81.

[50] McGrath deposition, pp. 255, 369.  See also Faust deposition, pp. 50-51; Smith deposition, pp. 62-64.

[51] Donahue deposition, pp. 70-72.

[52] Fitzsimmons deposition, pp. 213-14, 224-26; Harvard's Response to Plaintiff's Second Set of Interrogatories, pp. 18-19.  See also Harvard documents, 72381 (Dean Smith memo calling the formation of the committee on June 9, 2017).

Throughout this period of time, there were numerous race-neutral alternatives available that have the potential to obtain the educational benefits of diversity, and which Harvard certainly could have considered and potentially adopted. I discuss these options below.

### A.    Harvard could increase socioeconomic preferences.

#### 1.    Socioeconomic factors such as income and wealth are highly correlated with race.

Well-crafted race-neutral alternatives, while not providing a racial preference, are nevertheless cognizant of the ways in which past and present racial discrimination shapes opportunities in America. Race-neutral alternatives based on socioeconomic factors work to produce racial diversity because economic disadvantage is often influenced by the legacy of racial discrimination. This helps explain why African Americans and Hispanics on average have lower incomes and smaller savings than whites do, and why even middle-class blacks live in neighborhoods with higher poverty rates than low-income whites.[53]

Research finds that when socioeconomic affirmative action programs are constructed using a wide variety of variables—not just parental income, but factors such as wealth/net worth, and neighborhood and school levels of poverty that are correlated with race—they can produce substantial racial and ethnic diversity, because this wider array of socioeconomic factors better captures the economic impact of ongoing and past racial discrimination than does income (or race) alone.

For example, Professor Dalton Conley of New York University finds that a family's wealth (rather than income) better reflects the nation's legacy of slavery and segregation because wealth is

---

[53] John R. Logan, "Separate and Unequal: The Neighborhood Gap for Blacks, Hispanics and Asians in Metropolitan America," US2010 Project, July 2011, p. 5.

handed down from generation to generation.[54] African Americans typically have incomes that are 70% of white incomes, but African-American wealth is just 10% of white wealth.[55] Moreover, parental wealth and education are far more powerful predictors of college completion than race or income, Conley finds.[56] Wealth matters more than income because "educational advantages are acquired through major capital investments and decisions," such as purchasing a home in a neighborhood with good public schools.[57] And because concentrated poverty is highly correlated with race, a student's family's wealth will capture the lasting effects of discrimination in the housing market.[58] Colleges that give a preference to students growing up in concentrated poverty will acknowledge the challenges that, in the aggregate, poor minority children face much more often than poor white children.

UCLA Law School is an exemplar of an institution that examined factors such as wealth and concentrated poverty to obtain racial diversity. In the fall 2011 entering class, African Americans were 11.3 times as likely to be admitted under the socioeconomic status (SES) program as other programs, and Latinos were 2.3 times as likely to be admitted. African Americans constituted 20.4% of those admitted under the SES program (22 of 108) compared with 0.8% of admissions for non-SES

---

[54] Dalton Conley, "The Why, What, and How of Class-Based Admissions Policy," in The Future of Affirmative Action, *supra*, p. 209. See also Lisa J. Dettling, Joanne W. Hsu, Lindsay Jacobs, Kevin B. Moore, & Jeffrey P. Thompson, "Recent Trends in Wealth-Holding by Race and Ethnicity: Evidence from the Survey of Consumer Finances," Federal Reserve FEDS Notes, September 27, 2017 (Black median family wealth was 10.3% of white median family wealth in 2016, and Hispanic wealth was 12.1% of white wealth. Meanwhile, black median family income was 57.8% of white median family income and Hispanic income was 62.9% of white income.).

[55] Conley, "The Why, What, and How of Class-Based Admissions Policy," *supra*, p. 209.

[56] Id. at 206.

[57] Id. at 207.

[58] Logan, "Separate and Unequal," *supra*, pp. 4-6.

programs (12 of 1,363). Likewise, Hispanics constituted 35.2% of SES admits (38 of 108) compared with 5.5% for non-SES admits (75 of 1,363). Even though the SES program admitted 108 students, compared with 1,363 under non-SES, the absolute number of African Americans admitted under the SES program (22) exceeded the number admitted under other programs (12).[59] Similarly, Professor Richard Sander and Aaron Danielson of UCLA found in a 2014 analysis that richer measures of socioeconomic status, above and beyond income to include factors such as wealth and neighborhood poverty levels, significantly increased the correlation between race and socioeconomic status and the racial dividend of class-based affirmative action.[60]

Some criticize race-neutral alternatives as subterfuges seeking a desired racial result covertly. But this thinking has it exactly backwards because the beneficiaries are a very different subset of African-American and Hispanic students than those who usually benefit from racial preferences. The new beneficiaries are more likely to be working-class and actually to live in segregated neighborhoods. As Georgetown University Law Professor Sheryll Cashin notes, place-based approaches help "those who are actually disadvantaged by structural barriers" rather than enabling "high-income, advantaged blacks to claim the legacy of American apartheid."[61]

Class-based preferences also avoid two important costs associated with racial preferences: a reinforcement of negative stereotypes and an increase in racial and ethnic antagonism.[62] Polls find that

---

[59] Kahlenberg & Potter, "A Better Affirmative Action," p. 14, *supra*.

[60] Richard Sander & Aaron Danielson, "Thinking Hard About 'Race-Neutral' Admissions," 47 University of Michigan Journal of Law Reform 967, 990-991 (2014).

[61] Sheryll Cashin, Place Not Race: A New Vision of Opportunity in American (Boston: Beacon Press, 2014), p. 78.

[62] Bakke, 438 U.S. 265, 298-99.

most Americans (including a majority of black respondents) oppose the use of race or ethnicity as a factor in college admissions, but large majorities favor the consideration of economic disadvantage.[63] Because students of all races who have overcome economic disadvantage are seen as deserving of special consideration, such students are unlikely to face the stigma or resentment that has been directed toward recipients of racial preferences.[64]

### 2.  Harvard's socioeconomic diversity is deeply lacking.

Both external studies and internal data from Harvard suggest that Harvard's student body is deeply lacking in socioeconomic diversity. Most notably, in 2017, Professor Raj Chetty (a former Harvard professor now at Stanford University) and colleagues examined a unique data set of 30 million college students and financial data from the IRS and concluded that "approximately 3% of children at Harvard in the 1980-82 birth cohorts come from the lowest income quintile of families, compared with more than 70% from the top quintile."[65] Put differently, Harvard had *23 times* as many high-income students as low-income students. The authors further found that "15.4% of students at Harvard come from families in the top 1% of the income distribution—about the same number as

---

[63] Scott Jaschik, "Poll: Public Opposes Affirmative Action," Inside Higher Ed, July 8, 2016 (citing Gallup poll finding 63%-36% opposition to race as a factor in college admissions, but 61%-39% support for considering family economic circumstances in admissions).

[64] Paul M. Sniderman & Thomas Leonard Piazza, The Scar of Race (Harvard University Press, 1993), pp. 102-04. See also Robert P. Jones, Daniel Cox, Betsy Cooper, & Rachel Lienesch, "Anxiety, Nostalgia and Mistrust: Findings from the 2015 American Values Survey," Public Religion Research Institute, November 17, 2015, p. 5 (finding resentment associated with racial preferences).

[65] Raj Chetty, John N. Friedman, Emmanuel Saez, & Nicholas Turner, and Danny Yagan, "Mobility Report Cards: The Role of Colleges in Intergenerational Mobility," July 2017, p. 14, http://www.equality-of-opportunity.org/papers/coll_mrc_paper.pdf.

from the bottom three quintiles combined."[66] In other words, about as many students at Harvard came from the top 1% of the income distribution as the bottom 60%. Similarly, looking at data from the cohort born in 1991 (most of whom ended up in the class of 2013), Chetty found that more Harvard students came from the most affluent 10% of the population than came from the bottom 90%.[67]

Harvard testimony and evidence in this case reinforces these findings. According to Sally Donahue, the number of students who qualify for Harvard Financial Aid Initiative (with family incomes at or below $80,000) has remained at roughly the 25% level for a decade.[68] This means that roughly the bottom half of the income distribution (among 45-54 year olds)[69] has just a 25% representation at Harvard—and this proportion has remained constant over time. According to Harvard documents, in the class of 2011, 302 students came from families making less than $60,000, and a total of 430 below $80,000 in a class of more than 1600.[70] In addition, Harvard's documents show that in the freshman year class of 2011, 38% of Harvard students were "full pay," meaning they came from families in the top 4% of the income distribution.[71]

---

[66] Id.

[67] See "Economic Diversity and Student Outcomes at Harvard University," New York Times, http://www.nytimes.com/interactive/projects/college-mobility/harvard-university (summary of Chetty data).

[68] Donahue deposition, pp. 102-03.

[69] See Bernadette D. Proctor, Jessica L. Semega, & Melissa A. Kollar, "Income and Poverty in the United States: 2015," U.S. Census Bureau, September 2016, pp. 6-7, http://www.census.gov/newsroom/press-releases/2016/cb16-158.html. (For those headed by individuals ages 45-54—a typical age for parents with college aged students—the median income was $73,857 in 2015.)

[70] Harvard documents, 77540.

[71] Harvard documents, 77593, 77605.

By comparison, at top flagship public universities such as U.C. Berkeley and UCLA, Chetty's data show only about a quarter of the percentage of students came from the top 1% by income as at Harvard. A larger percentage came from the bottom 20% of the income distribution and a substantially lower percentage from the top 20%.[72]

Harvard's own data also show that the proportion of students who are first generation hovered around just 10% for the classes of 2007-2016. Stunningly, in every one of those classes, the number of legacy students outnumbered the number of first-generation students.[73] This is remarkable in a nation where there are *382 times* as many American adults age 25 and older without a college degree (143 million) as adults in the world with a Harvard degree (375,000).[74] If African-American students were as underrepresented in Harvard's population as first-generation college students currently are, blacks would constitute just 2.25% of the undergraduate student body—something Harvard would presumably find intolerable.[75]

Another way to consider socioeconomic diversity is eligibility for the federal Pell grant for students needing financial aid to pay for college. Using federal data, U.S. News & World Report found

---

[72] See "Economic Diversity and Student Outcomes at the University of California, Berkeley," New York Times, http://www.nytimes.com/interactive/projects/college-mobility/university-of-california-berkeley (summary of Chetty data); See "Economic Diversity and Student Outcomes at the University of California, Los Angeles," New York Times, http://www.nytimes.com/interactive/projects/college-mobility/university-of-california-los-angeles (summary of Chetty data).

[73] Harvard documents, 65583.

[74] Camille L. Ryan & Kurt Bauman, "Educational Attainment in the United States: 2015," U.S. Census Bureau, March 2016, p. 2, Table 1; Christina Pazzanese, "Harvard's Alumni Impact," Harvard Gazette, December 8, 2015.

[75] Ryan & Bauman, "Educational Attainment in the United States: 2015" (68% of adults age 45-64 lack a bachelor's degree, compared with 10% of Harvard undergraduates who are first generation college students. This 15% representation rate, if applied to African Americans (who make up 15% of the population) would yield a student body that is 2.25% black.)

that the proportion of Harvard undergraduates receiving Pell grants in the 2015-2016 school year was 18%. By comparison, at U.C. Berkeley, 33% received Pell grants, and at UCLA the figure was 37%, more than double Harvard's proportion. (While some Ivy League colleges had even fewer Pell recipients than Harvard, one member of the Ivy League, Columbia University, had considerably more: 32% of students received Pell grants.)[76]

### 3.   Harvard could make critical socioeconomic data available to admissions officers.

Because Harvard has adopted "need-blind" admissions, it has placed a firewall between the admissions and financial aid offices that prevents admissions officers from knowing the family income or wealth of applicants.[77] This policy creates an enormous barrier to implementing a central race-neutral strategy used at numerous other colleges: one that provides a preference in admissions to low-income and low-wealth applicants.

When asked about implementing "race-blind" admissions, President Faust dismissed the idea because "reducing information in a file does not help advance an understanding of the whole person."[78] Yet in the case of socioeconomic status, admissions officers lack a full picture of the students and so must piece together clues about whether a student is economically disadvantaged. Accordingly, admissions officers try to make educated guesses by examining whether a student

---

[76] "Economic Diversity: National Universities," US News & World Report, http://www.usnews.com/best-colleges/rankings/national-universities/economic-diversity. Harvard reports on its website that "16% of the roughly 6,600 current undergraduate students are Pell Grant recipients." Harvard College Griffin Financial Aid Office, "Fact Sheet," http://college.harvard.edu/financial-aid/how-aid-works/fact-sheet.

[77] Donahue deposition, pp. 36 -38.

[78] Faust deposition, p. 44.



According to Sally Donahue, Harvard has never discussed providing this information to admissions officers.[82] But withholding critical information about a student's specific family income and assets makes it impossible for Harvard to implement a sophisticated socioeconomic affirmative action program as a race-neutral alternative for attaining the educational benefits of racial, ethnic, and socioeconomic diversity. Because HFAI eligibility extends to families making up to $80,000 a year, knowing a student is HFAI-eligible does not allow an admissions officer to discern whether the

---

[79] Donahue deposition, p. 47; Harvard's Response to Plaintiff's Second Set of Interrogatories, p. 21.

[80] Donahue deposition, p. 41. See also Fitzsimmons deposition, p. 203; Harvard's Response to Plaintiff's Second Set of Interrogatories, p. 22; Kaitlin Howrigan deposition, p. 207.

[81] Donahue deposition, pp. 40-41. By contrast, Harvard does not have to guess whether underrepresented minority students are "likely" to be African American or Hispanic.

[82] Donahue deposition, pp. 57-58.

student comes from a very disadvantaged family making less than $10,000 a year, compared with one making as much as $80,000,[83] which is above the national median.[84] Harvard's current admissions system thus asks admissions officers to treat the bottom half of the U.S. income distribution as an undifferentiated mass.

Moreover, admissions officers have no solid information about a family's assets. As discussed above, that is a critical omission because wealth is an important determinant of opportunity. Indeed, for the purposes of race-neutral analysis, wealth has a much higher correlation with race than does income, which means the potential racial dividend of using wealth is substantially greater than it is for using income.[85]

### 4. Harvard could increase the weight it gives to socioeconomic factors.

Harvard has long claimed to "give significant favorable consideration" to economically disadvantaged students in pursuit of socioeconomic alongside racial and ethnic diversity.[86] But statistical analyses from both Harvard and SFFA's expert refute that claim.

---

[83] There is some ambiguity regarding the HFAI admissions "flag." The HFAI program is for students that come from families making $80,000 or less, but Director McGrath testified that Harvard considers families making $85,000 or less to be low-income. McGrath deposition, p. 25.

[84] See Proctor, Semega, and Kollar, "Income and Poverty in the United States: 2015," *supra*, pp. 5-6, Table 1. In 2015, the median household income in the United States was $56,516. Id. at 5. For those households headed by individuals ages 45-54—a typical age for parents with college-aged students at Harvard—the median income was $73,857. Id. at 6, Table 1. Households headed by individuals ages 45-54 is the metric Harvard has used in national comparisons. See Harvard documents, 77544.

[85] Conley, "The Why, What, and How of Class-Based Admissions Policy," *supra*, p. 209.

[86] See "Brief of Harvard University, Brown University, The University of Chicago, Dartmouth College, Duke University, The University of Pennsylvania, Princeton University, and Yale University as Amicus Curiae Supporting Respondents," U.S. Supreme Court in Grutter v. Bollinger and Gratz v. Bollinger, February 18, 2003, p. 22, n.13.

First, in May 2013, Harvard's Office of Institutional Research (OIR) examined the preferences in admissions provided to students in the classes of 2009-2016. Looking at data from 192,359 applicants, the Harvard researchers ran a logistic regression to estimate the size of the probability of admissions for such factors as athletic rating, legacy status, race, and income. Setting aside ratings that were based on academic, extracurricular, or personal characteristics (which most would consider legitimate criteria for admission),[87] preferences mattered in the following order of size as denoted by the coefficient (the larger the coefficient, the bigger the size of the preference):

| Preference | Coefficient |
| --- | --- |
| Athletic rating of 1 | 6.33 |
| Legacy | 2.40 |
| African American | 2.37 |
| Native American | 1.73 |
| Hispanic | 1.27 |
| Income less than $60,000 | 0.98 |
| International | 0.24 |
| Asian | -0.37 |

Given these findings, the authors understandably conclude that "[c]ompared to athletes and legacies, the size of the advantage for low income students is relatively small."[88]

In addition, OIR also noted that another way of expressing the relative weights provided for various preferences is the increased chances of admissions, controlling for academic ability. Among students receiving the highest academic ratings (1 or 2),[89] OIR concluded that

---

[87] Personal rating includes teachers, guidance counselor and alumni interview evaluations along with the student essay. Harvard documents, 65755.

[88] Harvard documents, 23549.

[89] According to testimony from Director McGrath, an academic ranking of 1 is rare and roughly translates into SATs in the 700s, excellent high school grades, and award-winning distinctions. An academic rank of 2 is typically SATs in the 680s to high 700s. An academic rating of 3 is typically SATs

- Recruited Athletes received a 67-percentage point boost (83% chance of admission vs. 16% for nonathletes).

- Legacies received a 40-percentage point boost (55% chance of admission vs. 15% for nonlegacies).

- Low-income students received a 9-percentage point boost (24% chance of admission vs. 15% for non-low income).

Second, SFFA's expert witness, Peter Arcidiacono of Duke University, provides similar (and confirming) analysis. Arcidiacono reviewed data from the 216,334 applicants from the class of 2014 to the class of 2019 admissions cycles, of which 150,701 were identified as an appropriate dataset. He provides logit estimates of admission (with the largest numbers suggesting the largest boost). In rank order of importance, his results (using his Model 6) show the relative weight of certain preferences in Harvard's admissions:

| Preference | Logit Estimate of Admission |
|---|---|
| Recruited Athlete | 7.849 |
| African American | 2.659 |
| Legacy | 1.84 |
| Faculty/Staff Dependent | 1.704 |
| Hispanic | 1.419 |
| Early Action | 1.282 |
| Disadvantaged | 1.083 |
| First-Generation | 0.023 |
| Asian | -0.271 |

Moreover, Arcidiacono finds that while Harvard provides a preference for disadvantaged applicants, that preference is smaller for Hispanics, who already receive a large bump, and non-existent for African Americans. A perverse effect of giving such a big preference for race is that it negates the

---

in the 600s and B grades. An academic rating of 4 is 500 SATs or below. McGrath deposition, pp. 167-69.

incentive to give minorities a socioeconomic preference. Indeed, Arcidiacono's analysis of the six-year period covering the classes of 2014-2019 finds that 70.5% of underrepresented minority students are advantaged.

Finally, it is worth noting that these findings are in line with prior studies examining similar schools (including Harvard). Empirical research—from four sets of *supporters* of racial preferences—suggest that universities do not in fact provide much of a leg up to economically disadvantaged students, at least so long as direct racial preferences are available to them.

- In a 2004 study of the nation's most selective 146 institutions, Georgetown professors Anthony Carnevale and Stephen Rose found that race-based preferences on average triple the representation of blacks and Hispanics students compared to admission based on grades and test scores, but that universities do nothing to boost socioeconomic representation.[90] In fact, the representation of poor and working class students is slightly lower than if grades and test scores were the sole basis for admissions, the researchers found.[91] Harvard was among the institutions included.

- In a 2005 study of highly selective institutions, the Mellon Foundation's William Bowen and colleagues found that being an underrepresented minority increases one's chance of admissions by 27.7 percentage points; that is, an applicant with a 40% chance of admissions has a 68% chance if she is African American, Hispanic, or Native American. By contrast, being in the bottom income quartile (relative to the middle quartiles) has no positive effect.[92] Harvard was among the 13 colleges examined.[93]

- A 2009 analysis by Thomas Espenshade of Princeton and Alexandria Radford finds that, at highly selective private institutions, the boost provided to African-American applicants is worth 310 SAT points (on a 1600 scale), compared with 130 points for poor students, 70 points for working-class applicants, and (distressingly) 50 points for upper-middle class

---

[90] Carnevale & Rose, "Socioeconomic Status, Race/Ethnicity, and Selective College Admissions," *supra*, p. 135.

[91] Id. at 142.

[92] William G. Bowen, Martin A. Kurzweil, & Eugene M. Tobin, Equity and Excellence in American Higher Education (University of Virginia Press, 2005), p. 105, Table 5.1.

[93] Id. at 289, Appendix Table 5.1.

students, relative to middle-class pupils.[94] The authors did not disclose the identity of the institutions studied.[95]

- A 2015 study of 40 selective colleges by Sean Reardon of Stanford and colleagues using 2004 data concludes that "racial affirmative action plays (or played, in 2004) some role in admissions to highly selective colleges but SES-based affirmative action did not."[96]

In the end, these regression analyses indicate that Harvard is dramatically undervaluing socioeconomic status compared with race.

### B.    Harvard could increase financial aid.

In 2007, Harvard made headlines by announcing it would require no parental contribution for families making less than $60,000 and would cap tuition at 10% of income for families making between $80,000 and $180,000.[97] Since then, however, Harvard has "scaled back" its commitment to families making between $150,000 and $180,000, as Sally Donahue testified.[98] Likewise, the cutoff for Harvard's financial aid program (which now stands at $80,000) has not been updated for several years, failing to keep up with inflation, even as the "free college" movement has become more prominent nationally.

These reductions in aid obviously matter for socioeconomic diversity but they also matter for racial diversity. Unaided students come from the wealthiest families in the country, so it is relevant to

---

[94] Thomas J. Espenshade & Alexandria Walton Radford, No Longer Separate, Not Yet Equal (Princeton University Press, 2009), p. 92, Table 3.5.

[95] Id. at 411.

[96] Sean F. Reardon, Rachel Baker, Matt Kasman, Daniel Klasik, & Joseph B. Townsend, "Can Socioeconomic Status Substitute for Race in Affirmative Action College Admissions Policies? Evidence From a Simulation Model," Educational Testing Service, 2015, p. 6.

[97] "Harvard Announces Sweeping Middle-Income Initiative," Harvard Gazette, December 10, 2007, http://news.harvard.edu/gazette/story/2007/12/harvard-announces-sweeping-middle-income-initiative.

[98] Donahue deposition, p. 84.

note that whites constitute 96.2% of the nation's top 1% of earners and African Americans just 1.4%.[99] Overall, Harvard has seen a decline in the number of aided freshman students since a peak for the class of 2012, when 68% of students received financial aid. By the freshman class scheduled to graduate in 2017, the proportion of aided students declined to 55%.[100] Reductions in financial aid were projected to save Harvard $46 million for freshmen entering in the class of 2022.[101]

Harvard may claim that increasing financial aid would be too expensive. But Harvard officials repeatedly testified that the institution could handle the expenses related to providing financial aid for more economically disadvantaged students. Sally Donahue testified that Harvard has no maximum or cap on the amount of money available for financial aid. Indeed, she said, it would not present a problem if the number of HFAI students doubled.[102] (Doubling would take HFAI students from 25% to 50% of the class.) Likewise, Dean Fitzsimmons testified that Harvard's charge is to recruit and admit "the best, most interesting students," and that there is no economic restraint on the number of students Harvard can admit through its financial aid initiative.[103]

---

[99] Shartia Brantley, "Who Are the Black '1 Percent'?" The Grio, November 21, 2011 (based on calculations from Federal Reserve data).

[100] Harvard documents, 7807.

[101] Harvard documents, 7810.

[102] Donahue testimony, pp. 43-44.  See also id. at 95-96.

[103] Fitzsimmons deposition, pp. 46, 203. See also Howrigan deposition, p. 204.

That Harvard has the financial means to significantly increase its financial aid awards is not surprising. Harvard's endowment is $37.1 billion.[104] This is the largest endowment in the nation, exceeding the GDP of more than half the countries in the world.[105]

### C. Harvard could reduce or eliminate preferences that favor non-minorities.

Harvard also insists on retaining a number of preferential programs that disproportionately benefit wealthy and white students—policies whose elimination would increase socioeconomic and racial diversity. These include preferences for the children of alumni, donors, and faculty and staff. I discuss each in turn.

### 1. Legacy preferences

Harvard has a long and shameful history of using legacy preferences for the offspring of alumni. As Peter Schmidt of the Chronicle of Higher Education has noted, Harvard began using legacy preferences for the children of alumni as a strategy for reducing the admissions of Jewish students.[106] To this day, legacy preferences disproportionately benefit white students to the detriment of Asian-American, African-American, and Hispanic students. Recall that Harvard's own analysis shows that legacies received a 40% boost in their chances of admissions (compared with just a 9% boost for low-

---

[104] N.P. "Narv" Narvekar, "Message from the CEO," Harvard Management Company, Inc., September 2017, 1, p. 1, http://www.hmc.harvard.edu/docs/Final_Annual_Report_2017.pdf.

[105] Adam Vaccaro, "Harvard's Endowment Is Bigger Than Half the World's Economies," Boston.com, September 25, 2014, http://www.boston.com/news/business/2014/09/25/harvards-endowment-is-bigger-than-half-the-worlds-economies.

[106] See Peter Schmidt, "A History of Legacy Preferences and Privileges," in Affirmative Action for the Rich: Legacy Preferences in College Admissions, ed. Richard D. Kahlenberg (New York: Century Foundation press, 2010), p. 42.

income students).[107] And Arcidiacono's analysis finds legacy status provided a bigger boost than other preferences except for African Americans and recruited athletes.

Harvard persists in promoting legacy preferences despite ample evidence that doing so undermines its efforts to promote racial and socioeconomic diversity. As the former chief counsel for the Lawyers Committee for Civil and Human Rights, John Brittain, and his coauthor Eric Bloom have noted, at Harvard, only 7.6% of legacy admits in 2002 were under-represented minorities, compared with 17.8% of all students. The authors note that "affirmative action does not offset legacy preference: the use of legacy preference, in fact, requires college admission officers to rely more heavily on affirmative action."[108] Likewise, Harvard's own data show that legacies are disproportionately wealthy. In the six years for the classes of 2009-2014, 12% of the class consisted of legacies, and of legacies, an astonishing 76% did not apply for financial aid.[109] Arcidiacono's modeling suggests eliminating legacy would have a small, but positive influence on African-American representation and on Hispanic representation.

Finally, it should be noted that eliminating legacy preferences is a workable race-neutral strategy. Among the top 10 universities in the widely-cited Shanghai rankings, four (Caltech, U.C. Berkeley, Oxford, and Cambridge) do not employ legacy preferences.[110] Research also finds that the existence of legacy preferences does not increase alumni donations to an institution. In an examination of the top 100 universities in U.S. News & World Report, Chad Coffman of Winnemac Consulting

---

[107] Harvard documents, 23550.

[108] Brittain & Bloom, "Admitting the Truth," *supra*, p. 132.

[109] Harvard documents, 77643.

[110] Richard D. Kahlenberg, "Introduction," in Affirmative Action for the Rich, *supra*, p. 8.

and colleagues found "no evidence that legacy preference policies themselves exert an influence on giving behavior."[111]

In his testimony, Dean Fitzsimmons suggested that providing legacy preferences is "essential to Harvard's well-being."[112] Nevertheless, Fitzsimmons could not point to any empirical evidence that legacy preferences had boosted alumni giving at Harvard.[113] Dean Khurana's testimony on the purported educational benefits of legacy preferences seemed particularly strained. He suggested it was important for Harvard to favor the children of alumni in order to bring students who "have more experience with Harvard" together with "others who are less familiar with Harvard." The ability of these different groups to "exchange perspectives, points of view," he claimed, would make "them more effective citizens and citizen leaders for society."[114] I am aware of no research to support this claim.

### 2.   Donor preferences

Harvard also generally provides preferential admissions to the children of major donors. Director McGrath testified that applicants related to substantial donors are noted by admissions officers.[115] ███████████████████████████████████

████████████████████████████████████████████████

---

[111] Chad Coffman, Tara O'Neil, & Brian Starr, "An Empirical Analysis of Legacy Preferences on Alumni Giving at Top Universities," in Affirmative Action for the Rich, *supra*, p. 113.

[112] Fitzsimmons deposition, p. 189.

[113] Fitzsimmons deposition, pp. 192-94.  By contrast, Dean Smith testified that he did not think of legacy admissions as tied to alumni giving.  Smith deposition, p. 236.

[114] Khurana deposition, p. 247.

[115] McGrath deposition, p. 207.

██████████████████████████████ According to Daniel Golden's book, The Price of Admission, Harvard has formalized this system for the wealthiest donors, those giving $1 million or more, through the creation of Harvard's Committee on University Resources (COUR). Golden found that 336 children of COUR members have gone on to attend Harvard, "an astonishing enrollment rate of one child per major donor."[117] Ending admissions preferences to the children of donors obviously would help increase socioeconomic diversity.

### 3.   The Z-list.

Relatedly, Harvard operates a unique form of admissions known as the "Z-list" in order to admit a group of mostly advantaged students, including legacies, who would probably not be admitted through the ordinary course.[118] The Z-list is a method by which Harvard admits a select group of students but only on the condition that they take a year off before enrolling at Harvard. As Golden explained, "If wealthy or well-connected aren't admitted to Harvard in the standard fashion, they need not despair... They may be placed on the 'Z-list'—a Harvard admissions office term for a little-known policy that compromises standards in the interest of alumni and donors, enabling their children to enter America's most famous university by a side door."[119]

Harvard's admissions data confirm Golden's analysis:

---

[116] Fitzsimmons deposition, pp. 275-78.

[117] Daniel Golden, The Price of Admission: How America's Ruling Class Buys Its Way into Elite Colleges—and Who Gets Left Outside the Gates (Crown Publishers, 2006), p. 26.

[118] Id.

[119] Id. at 37.

34

**Admissions Statistics for Deferred Admits (Z-List)**

**Admission Numbers Combined (2014-2019)** / **Admission Rates Combined (2014-2019)**

| race | Reject | Admit | Deferred Admit | Total | race | Reject | Admit | Deferred Admit |
|------|--------|-------|----------------|-------|------|--------|-------|----------------|
| White | 57,756 | 4,782 | 238 | 65,895 | White | 0.414 | 0.446 | 0.696 |
| Black | 14,823 | 1,393 | 7 | 19,106 | Black | 0.106 | 0.130 | 0.020 |
| Hispanic / Mexican / | 17,224 | 1,278 | 15 | 20,271 | Hispanic / Mexican / | 0.123 | 0.119 | 0.044 |
| Asian | 38,910 | 2,410 | 49 | 42,213 | Asian | 0.279 | 0.225 | 0.143 |
| American Indian | 1,360 | 131 | 2 | 1,656 | American Indian | 0.010 | 0.012 | 0.006 |
| Hawaii / Pacific Isla | 296 | 30 | 0 | 2,064 | Hawaii / Pacific Isla | 0.002 | 0.003 | 0.000 |
| Missing | 9,264 | 702 | 31 | 8,771 | Missing | 0.066 | 0.065 | 0.091 |
| Total | 139,633 | 10,726 | 342 | 159,976 | | | | |

**Admission Variables Combined (2014-2019)**

| Variable | Reject | Admit | Deferred Admit |
|----------|--------|-------|----------------|
| Disadvantaged | 0.119 | 0.170 | 0.012 |
| First Generation | 0.086 | 0.072 | 0.018 |
| Legacy | 0.021 | 0.129 | 0.465 |
| Staff Child | 0.001 | 0.007 | 0.029 |
| Faculty Child | 0.000 | 0.006 | 0.003 |
| Dean/Director | 0.010 | 0.078 | 0.588 |
| SAT Math (z-score) | -0.037 | 0.441 | 0.281 |
| SAT Verbal (z-score) | 0.096 | 0.559 | 0.460 |
| Academic Index (z-score) | -0.026 | 0.581 | 0.278 |

**Admission Variables for Deferred Admits By Year**

| Variable | Only Deferred Admit | | | | | |
|----------|------|------|------|------|------|------|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Disadvantaged | 0.000 | 0.000 | 0.000 | 0.042 | 0.000 | 0.031 |
| First Generation | 0.041 | 0.000 | 0.017 | 0.014 | 0.020 | 0.000 |
| Legacy | 0.486 | 0.600 | 0.475 | 0.394 | 0.431 | 0.375 |
| Staff Child | 0.014 | 0.036 | 0.017 | 0.042 | 0.020 | 0.063 |
| Faculty Child | 0.000 | 0.000 | 0.000 | 0.014 | 0.000 | 0.000 |
| Dean/Director | 0.514 | 0.582 | 0.695 | 0.563 | 0.549 | 0.688 |
| SAT Math (z-score) | 0.280 | 0.323 | 0.213 | 0.285 | 0.308 | 0.281 |
| SAT Verbal (z-score) | 0.505 | 0.423 | 0.404 | 0.449 | 0.465 | 0.539 |
| Academic Index (z-score) | 0.228 | 0.274 | 0.137 | 0.331 | 0.433 | 0.295 |
| White | 0.770 | 0.746 | 0.678 | 0.690 | 0.608 | 0.625 |
| Black | 0.014 | 0.000 | 0.000 | 0.042 | 0.020 | 0.063 |
| Hispanic | 0.027 | 0.055 | 0.034 | 0.028 | 0.078 | 0.063 |
| Asian | 0.122 | 0.091 | 0.170 | 0.155 | 0.177 | 0.156 |
| N | 74 | 55 | 59 | 71 | 51 | 32 |

In the six years covered in Arcidiacono's database, Harvard admitted on average almost 60 students each year through the Z list. While Harvard boasts of having a majority-minority student population overall, 70% of Z-list students were white, 14% were Asian, 4% were Hispanic, and just 2% black. A whopping 58.8% were on the special "Dean's Interest" list and 46.5% were legacies. By contrast, just 1.2% were disadvantaged, and 1.8% first generation. Grace Cheng, a former Harvard admissions officer, explained the Z-list is not designed for students of modest means. "We had concerns of lower income, underresourced students not knowing what to do for a year, for a year off

35

of traditional schooling."[120] Academically, Z-list admits fell far below the typically admitted student; indeed, their academic records on average fall about as close to rejected students as they do to admitted students. Eliminating this preferential program for largely white, wealthy, and well-connected students would be an important way to increase Harvard's racial and socioeconomic diversity.

### 4.  Faculty and staff preferences

Harvard also provides a substantial preference in admissions to the offspring of faculty and staff. According to Arcidiacono's analysis, the boost provided for this favored category of applicants is bigger than that provided to Hispanics, those applying early admission, disadvantaged students, and first-generation students. Arcidiacono also observes that the applicants receiving the faculty and staff are disproportionately white, and that African-American and Hispanic applicants are underrepresented compared to their share in the applicant pool as a whole..

### D.  Harvard could adopt admissions policies utilizing geographic diversity, including percentage plans and the use of zip codes.

Harvard says it seeks geography diversity in its student body, but the commitment appears to be weak, which in turn undercuts its efforts to promote student body diversity. For example, the 2010 U.S. Census finds that 37% of Americans (and 55% of African Americans) live in the South.[121] Nevertheless, in the class of 2021, just 18.8% of Harvard students came from the South.[122]

---

[120] Cheng deposition, p. 141-42.

[121] U.S. Census Bureau, "2010 Census Shows Black Population has Highest Concentration in the South," September 29, 2011, http://www.census.gov/newsroom/releases/archives/2010_census/cb11-cn185.html; U.S. Census Bureau, "Population by Region," http://www.census.gov/popclock/data_tables.php?component=growth.

[122] Harvard University, "Admissions Statistics," http://college.harvard.edu/admissions/admissions-statistics.

Dean Fitzsimmons testified that Harvard has not conducted a formal analysis into the use of precise geographic factors, including zip codes.[123] This omission is remarkable given that the race-neutral zip code strategy has been championed by Harvard Professor Danielle Allen, who holds one of the school's prestigious university professorships, Harvard's "highest faculty honor."[124] According to Professor Allen, programs that enhance geographic diversity (and thus leverage the unfortunate reality of residential and high school segregation by race and class for a positive purpose) can promote integration in higher education. Professor Allen has noted that zip codes provide an important way for national universities to provide geographic diversity and also contribute to racial, ethnic, and socioeconomic diversity.[125] Allen has described how "[g]eographically based structures for seeking talent are tried and true" and "the pursuit of geographic diversity in admissions is our best hope of merging the goals of diversity and excellence."[126] Such geographic diversity could "be taken to the level of ZIP codes and, in particular, to the level of the ZIP+4 system, which divides the United States into geographic units as small as a city block or group of apartments."[127] Professor Allen suggests that a university might sort students through a "geographic diversity algorithm" and then "review the identified admits, case-by-case, confirming or disconfirming [each] selection."[128] A university might

---

[123] Fitzsimmons deposition, p. 184.

[124] Anna Steinbock, "Danielle Allen Named University Professor," Harvard Gazette, November 14, 2016, http://news.harvard.edu/gazette/story/2016/11/danielle-allen-named-university-professor/. For a related idea, see Cashin, Place Not Race, *supra*.

[125] See Danielle Allen, "Talent is Everywhere: Using ZIP Codes and Merit to Enhance Diversity," in The Future of Affirmative Action, *supra*.

[126] Id. at 147.

[127] Id.

[128] Id. at 148.

also "determine the combination of SAT score and GPA that would constitute its entrance threshold" and then choose the highest performing applicants within specific ZIP codes.[129] Given the increasing number of "ethnic census tracts," in which certain minority groups constitute more than 25% of the tract population, Professor Allen expects that "at selective colleges and universities a stronger orientation toward geographic diversity could well support diversification of student populations by ethnicity, thereby permitting us to slip free of the contested terrain of affirmative action."[130]

Such methods have already been put into action. For example, Halley Potter and I have written about public charter schools in San Diego, California, which have used zip codes to ensure socioeconomic and racial diversity.[131] Such geographic and socioeconomic diversity can succeed because, unfortunately, concentrated poverty is often highly correlated with race. African Americans and Hispanics are much more likely to live in neighborhoods with concentrated poverty than whites. For example, while 6% of young whites live in neighborhoods with more than 20% poverty rates, 66% of African Americans live in such neighborhoods.[132] Indeed, Carnevale's simulation, noted above, finds that a comparable approach—admitting high test scorers within schools—promotes socioeconomic and racial diversity.[133] Harvard's failure to examine excellence within zip codes—what

---

[129] Id. at 147.

[130] Id. at 155-56.

[131] See Richard D. Kahlenberg & Halley Potter, A Smarter Charter: Finding What Works for Charter Schools and Public Education (Teachers College Press, 2014), p. 186.

[132] See Patrick Sharkey, Stuck in Place: Urban Neighborhoods and the End of Progress Toward Racial Equality, Figure 2.1 (University of Chicago Press, 2013), p. 27.

[133] Carnevale, Rose, & Strohl, in "Achieving Racial and Economic Diversity with Race-Blind Admissions Policy," *supra*.

might be considered a private university alternative to the Texas top 10 percent plan—represents a major missed opportunity.

### E.    Harvard could increase its recruitment efforts.

Although Harvard touts its recruitment of underrepresented minorities, it exerts far less effort to recruit *economically disadvantaged* applicants, many of whom are underrepresented minorities. For example, Dean Fitzsimmons testified that while Harvard purchases information from institutions such as the College Board to recruit high achieving underrepresented minority students (those scoring between 1100-1600 on the SAT), it does not appear to make a similar effort to purchase information about high achieving but socioeconomically disadvantaged students.[134] Harvard fails to purchase this information despite Fitzsimmons' testimony that there are socioeconomically disadvantaged students who could succeed at Harvard who are not currently in the applicant pool.[135]

Harvard does an especially poor job of recruiting into its applicant pool students whose parents do not have a college degree. For the classes of 2007-2011, such students comprised just 12.5% of all applicants. For the class of 2016, the percentage was 12.7%.[136] By comparison, as noted above, 68% of adults age 45-54 lack a college degree.[137] Looking at very high achieving students (SAT scores of 1450 and higher), nearly half (43%) of those students from families making more than

---

[134] Fitzsimmons deposition, pp. 59-67.

[135] Fitzsimmons deposition, p. 207.

[136] Harvard documents, 31726.

[137] Ryan & Bauman, "Educational Attainment in the United States: 2015," *supra*, p. 2, Table 1.

$100,000 applied to become members of the Harvard class of 2009. By contrast, less than a quarter of those very high test scorers making less than $100,000 applied.[138]

Part of Harvard's problem is that it recruits disproportionately from areas that have few high-achieving low-income students. For example, the Midwest and Mountain states produce 21.2% of high-achieving low-income students, which is six times as many as exist in New England (3.5%).[139] Yet in the class of 2021 Harvard enrolled *more* students from New England (16.5%) than in all of the Midwest and Mountain states combined (13.4%).[140]

More specifically, Harvard relies heavily on a relatively small number of "feeder" schools to fill a significant part of its class. For the classes of 2007-2016, 20.3% of matriculates and 12.9% of applicants, came from schools that represent just 0.6% of American high schools.[141] Viewed through the lens of the College Board's high school cluster designations, which sort schools by demographics, Harvard's data produced in this case reveals that it recruits 54.5% of domestic students from just two of 29 clusters.[142]

This failure to recruit high-achieving, low-income students, including thousands who are African American and Hispanic, is an enormous missed opportunity. As discussed above, there is a very large reservoir of such students whom Harvard, the nation's oldest and wealthiest university, is not recruiting.

---

[138] Harvard documents, 77538.

[139] Cashin, Place Not Race, *supra*, p. 47.

[140] "Harvard Statistics," https://college.harvard.edu/admissions/admissions-statistics

[141] Harvard documents, 32982.

[142] For background on College Board's 29 high school clusters, see College Board, "Segment Analysis Service: An Educationally Relevant Geodemographic Tagging Service," 2011, p. 4, http://media.collegeboard.com/mSSS/media/pdf/segment-analysis-service-overview.pdf.

### F.      Harvard could increase its admission of community college transfers.

Harvard also fails to provide the opportunity for a meaningful number of high-achieving community college students to transfer to Harvard—a strategy used by many selective public and private colleges to promote socioeconomic and racial diversity in their student bodies. Community colleges have many more African-American, Hispanic, and low-income students than selective four-year colleges.[143] According to the American Association of Community Colleges, "the majority of Black and Hispanic undergraduate students in this country study at [community] colleges."[144]

While other colleges began ramping up community college transfers, Harvard has for years lagged in this arena.[145] For the Classes of 2014 through 2019, only *two* community college students transferred to Harvard. By contrast, Amherst College, a highly competitive institution, enrolls between 12 and 15 community college transfer students annually to its undergraduate population of 1790.[146] If Harvard, which has an undergraduate population of 6700, adopted a similarly scaled program, it would include between 44 and 55 community college transfer students per year. This rate would translate into about 300 community college transfers over a six-year period, rather than the two actually

---

[143] See Bridging the Higher Education Divide: Strengthening Community Colleges and Restoring the American Dream – Report of The Century Foundation Task Force on Preventing Community Colleges from Becoming Separate and Unequal (Century Foundation Press, 2013), pp. 18-21.

[144] American Association of Community Colleges, "Students at Community Colleges," http://www.aacc.nche. edu/AboutCC/Trends/Pages/studentsatcommunitycolleges.aspx.

[145] See Arianna Markel, "Harvard Lags in Community College Recruitment," The Harvard Crimson, December 12, 2007.

[146] Jennifer Glynn, "Opening Doors: How Selective Colleges and Universities Are Expanding Access for High-Achieving, Low-Income Students," (Jack Kent Cooke Foundation, April 2017), p. 37; see www.jkcf.org/assets/1/7/JKCF_Opening_Doors_Executive_Summary.pdf.

admitted.[147] The failure represents another missed opportunity to add racial and socioeconomic diversity to Harvard.

### G.    Harvard could end early admissions.

Finally, Harvard could increase racial, ethnic, and socioeconomic diversity if it were to drop its "early admissions" program that disproportionately benefits wealthy and white students. Early admissions is a practice in which schools allow students to submit their application in the early Fall if they apply to only one school. For several years, Harvard eliminated early admissions, citing the unfairness to low-income and minority students. But then, in 2011, it abruptly reversed course, reinstating a policy that advantages the already advantaged. According to Arcidiacono's model, applying early has a positive logit estimate of 1.282 at Harvard—meaning that students who apply early receive a bigger boost than Harvard provides to first-generation and disadvantaged students.

Early admission programs, like Harvard's program, usually benefit wealthier and better-informed students because these students have the resources to submit their application early and do not need to hold out for the prospect of financial aid.[148] By contrast, low-income students and minorities face a disadvantage under early admissions because they often receive inadequate information and counseling and lack the economic resources to commit to a school so early in the process. According to a 2011 study by Julie J. Park of Miami University and M. Kevin Eagan of the UCLA Higher Education Research Institute, students who applied early-action to 290 colleges and

---

[147] Harvard at a Glance, https://www.harvard.edu/about-harvard/harvard-glance.

[148] See Alan Finder & Karen W. Arenson, Harvard Ends Early Admission, New York Times, September 12, 2006, http://www.nytimes.com/2006/09/12/education/12harvard.html.

universities across the country are more economically advantaged and more likely to be white than those who did not apply early.[149]

Because early admissions undermine the chances of low-income and minority applicants, Harvard terminated early admissions in 2006. According to Harvard's then-President Derek Bok: "We hope that doing away with early admission will improve the process and make it simpler and fairer. Early admission programs tend to advantage the advantaged. . . . Students from more sophisticated backgrounds and affluent high schools often apply early to increase their chances of admissions, while minority students and students from rural areas, other countries and high schools with fewer resources miss out."[150] Similarly, Dean Fitzsimmons supported ending early admissions, noting: "An early admission program that is less accessible to students from modest economic backgrounds operates at cross-purposes with our goal of finding and admitting the most talented students from across the economic spectrum."[151] Nevertheless, in 2011, Harvard reinstated early admissions. Harvard did so because it was concerned that its yield rate (those accepting their offer of admission) had declined. The decline occurred among white and Hispanic students, while yield among African-American students remained steady and increased for Asian students.

Part of the rationale for restoring early admission, according to internal documents, was that Harvard was losing out to other colleges in the competition for students from certain high schools. "At some of Harvard's most productive 'feeder' high schools . . . up to 90% of students apply early

---

[149] Julie J. Park & M. Kevin Eagan, "Who Goes Early? A Multi-Level Analysis of Enrolling via Early Action and Early Decision Admissions," Teachers College Record, 2011.

[150] Harvard documents, 77577-77578.

[151] Harvard documents, 77579.

somewhere. By not offering an admission option, therefore, Harvard has placed itself at odds with trends in the market."[152] Yet Harvard's data showed that even without early admissions, it was winning the competition for students who were also admitted to Yale, Stanford, and Princeton two-thirds of the time.[153] Regardless, it appears that Harvard's concerns about its place in the market outweighed its earlier stated concerns about equity.

In 2013, after the introduction of early admissions, Harvard analyzed its admissions process and found that significant differences remained between the types of students who applied for early versus regular admissions. White students and legacy students were more likely to apply early than a typical student. African-American students, Hispanic students, international students, those whose parents had no college degree, and those seeking a fee waiver were all more likely to apply regular admission than the typical student.[154] Harvard could increase student body diversity by eliminating early admissions as several other selective colleges have.[155]

---

[152] Harvard documents, 77565.

[153] Harvard documents, 77587.

[154] Harvard documents, 65579. The differences were statistically significant in all these cases in 2016 except for African Americans and Hispanics. In 2016 African Americans represented 8.9% of the early action pool and 9.9% of the regular pool. Hispanics represented 9.0% of the early action pool and 10.3% of the regular pool. Harvard documents, 65609.

[155] Christopher Avery & Jonathan Levin, "Early Admission at Selective Colleges," Stanford Institute for Economic Policy Research, March 2009, p. 4 (noting that the University of Michigan, and four top University of California colleges did not employ early admissions).

**VI.     Simulations of Harvard's data show that workable race-neutral alternatives exist.**

**A.     A careful simulation indicates that Harvard could achieve the educational benefits of racial, ethnic, and socioeconomic diversity without sacrificing academic quality.**

To simulate the likely results of adopting race-neutral strategies at Harvard, Professor Arcidiacono tested the results of a few race-neutral options using the admissions data provided by Harvard. At my request, he conducted simulations of multiple race-neutral alternatives to forecast the likely outcomes thereof.[156] These simulations, and the underlying assumptions, are set forth in the charts set forth in detail in Appendix C.[157] For discussion purposes in this report, I will focus on Simulation 4.

To replicate as closely as possible Harvard's existing system of admissions, Arcidiacono began by using the model he developed that accounts for numerous criteria for admission and characteristics of the applicants, including Harvard's four-part rating system, which rates applicants on in four areas: academics, extracurricular activities, athletics, and personal ratings.[158] I asked Arcidiacono to exclude

---

[156] I have worked in the past with researchers such as Anthony Carnevale at Georgetown University to measure the effectiveness of race-neutral alternatives through similar simulations. See *supra* Section IV.B.

[157] Some of the simulations include an "expanded pool," in which I assume that Harvard—through increased recruiting efforts focused on socioeconomically disadvantaged areas and high schools—could double the number of disadvantaged students in its applicant pool. This assumption is reasonable, given data that suggest that in the past, Harvard had twice as many high-achieving, high-income students apply as high-achieving, lower-income students. Harvard documents, 77538 (Among high achieving students (SAT scores of 1450 and higher), nearly half (43%) of those students from families making more than $100,000 applied to become members of the Harvard class of 2009. By contrast, less than a quarter of those very high test scorers making less than $100,000 applied.) The expanded pool scenarios assume that the expanded pool would contain students with characteristics identical to Harvard's current socioeconomically disadvantaged pool.

[158] This is based upon Model 6 illustrated in Table B.8.2 in the Arcidiacono report, with two adjustments. In addition to race interacted with year, the model also contains an interaction between disadvantaged and year. Second, the overall rating is excluded as a control.

from the model Harvard's overall rating, which may reflect admissions preferences. The advantage associated with the various preferences were then "turned off"—specifically, the preferences for race, legacy, recruited athlete, early decision, faculty and student children, the Dean/Director list, fee waiver, first generation, and financial aid recipients. With those preferences off, admissions probabilities could be generated and the applicants could be ranked in order of strength under the remaining aspects of Harvard's admissions process. This approach allows for simulating the effects of a variety of race-neutral options on racial diversity, socioeconomic diversity, and academic readiness.

Before beginning Simulation 4, Arcidiacono turned Harvard's existing preferences for recruited athletes back "on." He did this at my direction, because I have found that removing athletic preferences in connection with race-neutral alternatives is sometimes perceived as radical. This particular simulation thus avoids any concern that eliminating recruited athletes is unworkable or otherwise inappropriate when seeking a race-neutral alternative.

The first step in the simulation involved providing a preference to students that Harvard has designated as economically "disadvantaged." The disadvantaged tag is one applied by admissions counselors through a somewhat subjective process: it would include those students whose parents do not have a bachelor's degree, whose family income is likely to be $80,000 or lower, who live in a neighborhood admissions officers deem disadvantaged, or who requested a fee waiver on the application.[159]

---

[159] See *supra* Section V.A.3. Because the disadvantaged tag doesn't identify where family income falls in the range from $0 to $80,000 or the net worth/wealth of applicants, the broad designation does not allow for consideration of the available economic data that is most highly correlated with race. As a result, the simulations likely form a lower bound estimate of the racial dividends of these strategies. Better data could produce higher levels of racial diversity.

The magnitude of the preference for disadvantaged students in the simulation is somewhat larger than the one currently provided to African-American students, but only half the size provided to recruited athletes (who currently receive the largest preference). The simulated preference is larger than that provided to African Americans because evidence suggests that socioeconomic obstacles to academic achievement are greater in magnitude than racial obstacles. An economically disadvantaged student who managed to overcome hurdles may have a more promising future than her academic profile on paper.[160] Moreover, as William Bowen, the former President of Princeton University, has noted, SAT scores do not over-predict the college grades of low-income students as they do those of African-American students.[161] At the same time, the preference is calibrated to be smaller than those provided to recruited athletes. Even though Harvard recruited athletes are, on average, fairly wealthy,[162] they receive a very large preference that, if provided in a simulation to economically disadvantaged students, would overwhelm the freshman class with such students.

This first step by itself underestimates the potential of Harvard to create race-neutral strategies to promote diversity because it does not directly consider geographic residence of applicants. As noted above, a number of leading state universities have created racial diversity by employing "percentage

---

[160] See, e.g., Anthony P. Carnevale & Jeff Strohl, "How Increasing College Access Is Increasing Inequality, and What To Do About It," in Rewarding Strivers 170, Table 3.7 (Century Foundation, 2010), p. 170, Table 3.7 (estimating the SAT scores socioeconomically disadvantaged students on average are 399 points below socioeconomically advantaged students, while for African American students, the expected score is 56 points lower).

[161] Bowen, Kurzweil, & Tobin, Equity and Excellence in Higher Education, *supra*, p. 118 (SAT's do not over-predict college grade point average for low-income students); and William Bowen and Derek Bok, The Shape of the River, p. 77 (SAT's over-predict college grade point average for African American students.)

[162] See Harvard documents, 77643. (In the six-year period for the classes of 2009-2014, 53% of varsity athletes did not apply for financial aid.)

plans" that enroll top students in a variety of high schools.[163] Harvard could take top students from various geographic locales, as Harvard professor Danielle Allen has suggested.[164] Although Harvard refused to provide zip code data of applicants, it ultimately did provide data on whether applicants reside in one of 33 "Educational Neighborhood Clusters," provided by the College Board.[165] This approach is consistent with Harvard's stated commitment to socio-geographic diversity.

The second step of Simulation 4 combines a commitment to geographic diversity, which admits top-ranked students within each neighborhood cluster, and a preference for socioeconomically disadvantaged students. After disadvantaged students are given a boost equivalent to half of that given to athletes, applicants are then sorted according to rank and year within a neighborhood cluster. An even number of the top applicants are then selected from each cluster, so that the total number of admits in each year approximates the observed number of admits in each year.[166] This combination of approaches provides a sizable increase in socioeconomic diversity and maintains racial diversity to a remarkable degree, yielding a net plus in overall diversity, while maintaining academic excellence. See Appendix C for the full results (Simulation 4). But take the most recent class of 2019 as an example:

---

[163] See *supra* Section IV.B.

[164] See *supra* Section V.D.

[165] See College Board, "Segment Analysis Service: An Educationally Relevant Geodemographic Tagging Service," 2011, p. 4; College Board, "Descriptor PLUS: Cluster Description Guide— Educational Neighborhood Clusters; High School Clusters," 2011.

[166] A small percentage (3.5%) of the applicants considered in this model were not listed with a neighborhood cluster. To ensure full representation of these students, they were merged with the smallest cluster.

48

| Harvard – Admitted Class of 2019 | | | |
|---|---|---|---|
| Status Quo Race-Based Admissions | | Simulation Race-Neutral Admissions | |
| White | 40.4% | White | 39.6% |
| African American | 13.6% | African American | 10.1% |
| Hispanic | 12.9% | Hispanic | 13.5% |
| Asian American | 23.7% | Asian American | 27.6% |
| Other minority | 9.3% | Other minority | 9.2% |
| Disadvantaged | 17.4% | Disadvantaged | 54.3% |
| Advantaged | 82.6% | Advantaged | 45.7% |
| Academic Index | 227.8 | Academic Index | 225.9 |

Several observations about these findings are worth highlighting.

First, under the simulation, socioeconomic diversity would increase considerably, with the "advantaged" proportion of the admitted class dropping from 82.6% to 45.7%. In considering these numbers, it is important to recognize that "disadvantaged" in the context of Harvard's extremely wealthy student body would be thought of as a "typical American family" in any other context. The "disadvantaged" designation covers more than two-thirds of American families headed by individuals between the ages of 45 and 54 because simply having parents who lack a bachelor's degree earns the disadvantaged tag. This is in addition to those students with a parent holding a college degree making less than $80,000 (roughly the median family income for adults age 45-54) or who live in a disadvantaged neighborhood.[167] At 54.3% of the admitted class, these "disadvantaged" students would still be underrepresented compared with the general population, but far less than under the status quo.

Second, under the simulation, overall racial and ethnic diversity would hold basically stable, with Hispanic students rising from 12.9% to 13.5% of the class and African-American students declining from 13.6% to 10.1% of the class. (The "other minority" category would remain basically

---

[167] See *supra* Section V.E.

even.) The small decline in African-American representation could be addressed by using a wealth measure (see discussion below). But it is important to recognize that this level of African-American representation is not unusual for Harvard or in relation to other schools. A 10.1% representation is greater than the representation found at Harvard throughout most of the affirmative-action era. Harvard has prided itself for decades on providing the educational benefits of diversity, boasting that "diversity is the hallmark of the Harvard experience."[168] Yet in the classes graduating in the 1970s and early 1980s, Harvard's African-American representation ranged from 7-8%, which seemed to satisfy Harvard's claimed interest.[169] Even accounting for yield rates, this simulation would result in comparable representation. In any event, Harvard President Drew Faust testified (repeatedly) that the particular racial composition of the Harvard class is of no interest to Harvard officials.[170] Moreover, this simulation would greatly increase the share of disadvantaged African-American and Hispanic students.

Third, in looking at the educational benefits of diversity, the Supreme Court—and Harvard officials—have repeatedly suggested that both racial and socioeconomic diversity are important.[171] While media reports often focus solely on the racial impact of alternatives, the critical measure is the net impact on socioeconomic and racial diversity taken together. Given the large increase in

---

[168] Elizabeth Bangs, "Harvard Adds Another 'Hallmark' 'Distinction and Diversity' Now Central to Your College Experience," Harvard Crimson, September 16, 1994 (noting Harvard touting diversity "for years").

[169] Alan M. Dershowitz & Laura Hanft, "Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext?" 1 Cardozo Law Review 379, 383 (1979).

[170] Faust deposition, pp. 25-26, 91, 107-08.

[171] See Grutter, 539 U.S. 306, 324 (2003); Bakke, 438 U.S. 265, 316 (1978); Fitzsimmons deposition, pp. 421-23; McGrath deposition, p. 231; Faust deposition, p. 196; Khurana deposition, pp. 66, 75; Smith deposition, p. 48.

socioeconomic diversity and the mixed effect on racial diversity, the simulation suggests a substantial net increase in the educational benefits of diversity.

Fourth, it is important to put the impact on the "academic index" finding—a modest drop from 227.8 to 225.9—in context. The 225.9 academic index is well within Harvard's range of what it considers to be academically qualified: it is comparable to the average academic index of Hispanic students for the classes of 2014-2019 (225.9) and exceeds the average academic index of African-American students and athletes (221.5 and 213.5 respectively). Indeed, Harvard officials repeatedly testified that all students at Harvard—including the lowest scoring—are academically qualified. President Faust, for example, said none of the current students were academically mismatched because Harvard "would not want to have any students on the campus who were not able to thrive and succeed in our academic environment."[172]

This simulation is not the only way that Harvard could achieve its goals without the use of race. But it confirms—using information about Harvard's current process, and data already available to Harvard—that such alternatives are both available and workable. Harvard no doubt could identify alternative methods, if it were committed to doing so.

**B.      Through inclusion of additional socioeconomic factors and better recruiting of low-income students, the simulation could predict even greater racial and ethnic diversity.**

As noted above, this simulation could have achieved a more robust racial dividend if I had access to additional information about critical socioeconomic factors the Court permitted Harvard to

---

[172] Faust deposition, pp. 225-26, 228, 291-93, 295-96, 304.  See also Khurana deposition, pp. 194-95 (that academic mismatch is not a problem at Harvard College.)

withhold from SFFA or which Harvard could not make available, or if Harvard had recruited more aggressively.

**More accurate income data.** I was limited to using Harvard's economic disadvantage flag, which includes roughly the bottom half of the income distribution among 45-54 year olds nationally. This metric, however, masks considerable variation. For instance, I could not model providing a bigger boost in the analysis to a remarkable student who performed well academically despite coming from a very disadvantaged household compared to a student near the median income nationally. This limitation has important implications for the racial dividend of class-based affirmative action because African-American and Latino students are far more likely to be in the bottom quarter of the country's income distribution. In 2016, the median income of white families was $61,200 but median family income for black families was $35,400 and for Hispanic families was $38,500.[173]

**Wealth data.** Second, I did not have access to data on the wealth of applicants. As discussed earlier, these data have enormous implications for the racial dividend of class-based affirmative action. While African Americans make roughly 60% of what whites make in annual income, the median wealth of African Americans is just 10% the median wealth of whites.[174]

**Better recruitment.** Third, the simulation necessarily understates the racial and socioeconomic dividend of the alternatives studied because it was limited to the existing pool of applicants even though evidence suggests that Harvard does a poor job of recruiting disadvantaged

---

[173] See Dettling, Hsu, Jacobs, Moore, & Thompson, "Recent Trends in Wealth-Holding by Race and Ethnicity," *supra.*

[174] Id.

students to apply.[175] Recall that for the class of 2009, for example, Harvard found that roughly twice as many very high achieving applicants from families making more than $100,000 applied to Harvard than similar students from families making less than $100,000.[176] (There are more than 20,000 very high achieving low-income applicants who do not attend any of the most selective 238 colleges, much less Harvard.)[177] A more robust applicant pool thus likely could have increased the racial divided in our simulations.

## VII.   Conclusion

Under the Fourteenth Amendment, Harvard bears "the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice."[178] Harvard officials have claimed the college is "doing everything possible" to use race-neutral strategies to promote socioeconomic and racial diversity, and has engaged in "a massive good-faith effort to do everything that seemed to be effective."[179]

The record refutes that assertion. Experience and research demonstrates that there are numerous ways that universities can achieve the educational benefits of racial and socioeconomic diversity without using race. Despite all of its financial and academic resources, Harvard has failed to take even the most rudimentary steps to determine whether there are workable race-neutral strategies

---

[175] See *supra* Section V.A.1.

[176] Harvard documents, 77538.

[177] Hoxby & Avery, "The Missing 'One-Offs,'" *supra*, p. 35 (finding that two-thirds of 35,000 high achieving low income students do not attend a selective colleges); see David Leonhardt, Better Colleges Failing to Lure Talented Poor, New York Times, March 16, 2013, http://www.nytimes.com/2013/03/17/education/scholarly-poor-often-overlook-better-colleges.html?pagewanted=all.

[178] Fisher, 133 S. Ct. 2411, 2420.

[179] Fitzsimmons deposition, pp. 172, 175.  See also id. at 176, 179, 204.

53

available. Moreover, a careful investigation of Harvard's admissions data and practices confirms that Harvard has at its disposal viable race-neutral alternatives that would provide a net increase in racial and socioeconomic diversity without requiring the use of race.

Dated:  October 16, 2017                                     s/ Richard D. Kahlenberg

                                                             Richard D. Kahlenberg

VIII.   Appendices

A.      Appendix A – Curriculum Vitae

**RICHARD D. KAHLENBERG**

Senior Fellow
The Century Foundation
2040 S Street, N.W.
Washington, D.C. 20009
202-683-4883
kahlenberg@tcf.org

## EDUCATION

1986-1989    **Harvard Law School,** Cambridge, Massachusetts.
J.D., *cum laude*, June 1989.

1985-1986    **University of Nairobi School of Journalism**, Nairobi, Kenya.
Certificate, Mass Communications, June 1986.
Rotary International Fellowship.

1981-1985    **Harvard College**, Cambridge, Massachusetts.
A.B. in Government, *magna cum laude*, June 1985.
Senior Honors Thesis "Coalition Building and Robert Kennedy's 1968 Presidential Campaign"

## EMPLOYMENT HISTORY

1998-        **The Century Foundation** (formerly Twentieth Century Fund), Washington, D.C.
Senior Fellow.  Coordinating programs involving elementary, secondary and higher education and organized labor.

1996-1998    **Center for National Policy**, Washington, D.C.
Fellow. Coordinated project on New Strategies to Promote Equal Opportunity.

1994-1995    **Professorial Lecturer and Independent Writer**, Washington, D.C.
Taught Cases in Public Policy, George Washington University Department of Public Administration and completed book on affirmative action.

1993-1994    **George Washington University National Law Center,** Washington, D.C.
Visiting Associate Professor of Law.  Taught Constitutional Law.

1989-1993    **Senator Charles S. Robb**, Washington, D.C.
Legislative Assistant.  Advised Senator on issues relating to Crime, Energy, Environment, Judicial Appointments, Campaign Finance, and Civil Rights.

56

## PUBLICATIONS

## I. BOOKS

***A Smarter Charter: Finding What Works for Charter Schools and Public Education***
(coauthored with Halley Potter) (Teachers College Columbia University Press, 2014).  *The Washington Post* called *A Smarter Charter*, "A remarkable new book...Wise and energetic advocates such as Kahlenberg and Potter can take the charter movement in new and useful directions."

***Why Labor Organizing Should Be a Civil Right: Rebuilding a Middle-Class Democracy by Enhancing Worker Voice*** (coauthored with Moshe Z. Marvit) (Century Foundation Press, 2012).  The book was called "a must read" by NAACP President and CEO Benjamin Todd Jealous and "a persuasive roadmap for extending the protections of the Civil Rights Act to workers who want to organize a union" by American Federation of Teachers President Randi Weingarten.

***Tough Liberal: Albert Shanker and the Battles Over Schools, Unions, Race and Democracy***
(Columbia University Press, 2007).  The Wall Street Journal called the book "a well researched and engaging biography," and Slate labeled it a "stirring account."  The book has also been reviewed in The Nation, The American Prospect, The Weekly Standard, Newsday, New York Sun, City Journal, Publishers Weekly, and The Washington Monthly.  The book was written with the support of the Hewlett, Broad and Fordham foundations.  It was named one of the Five Best Books on Labor in the Wall Street Journal

***All Together Now: Creating Middle Class Schools through Public School Choice*** (Brookings Institution Press, 2001).  The book, labeled "a clarion call for the socioeconomic desegregation of U.S. public schools" by Harvard Educational Review, was said by the Washington Post to make "a substantial contribution to a national conversation" on education.  The book was also reviewed in Teachers College Record, Education Next, and National Journal.  One author called Kahlenberg "the intellectual father of the economic integration movement."

***The Remedy: Class, Race, and Affirmative Action*** (Basic Books, 1996).  The book was named one of the best of the year by the Washington Post and William Julius Wilson's review in the New York Times called it "by far the most comprehensive and thoughtful argument thus far for...affirmative action based on class."  The book was also reviewed in The American Lawyer, The New Yorker, The Progressive, The Washington Monthly, The Detroit News, National Review, Legal Times, The Atlanta Journal-Constitution, and Publishers Weekly

***Broken Contract: A Memoir of Harvard Law School*** (Hill & Wang/Farrar, Straus & Giroux, 1992).  The book, which details the way in which idealistic liberal law students are turned to corporate law, was called "a forceful cri de coeur" by the L.A. Times.  The book was reviewed in The New York Times, The Washington Post Book World, The Harvard Law Review, The Washington Monthly, Legal Times, The Boston Globe, The Hartford Courant, The Baltimore Evening Sun, The St. Petersburg Times, The Detroit News, The Cleveland Plain Dealer, The Dallas Morning News, and Publishers Weekly.  In 1999, the book was reissued by University of

Massachusetts Press with a new afterword.  The book has also been translated into Japanese and Chinese.

**Editor,** ***The Future of Affirmative Action: New Paths to Higher Education Diversity after Fisher v. University of Texas*** (Century Foundation Press, 2014).  Chapters include, "Defining the Stakes," by Nancy Cantor and Peter Englot; "Promoting Economic Diversity for College Affordability," by Sara Goldrick-Rab; "Fisher v. University of Texas and Its Practical Implications for Institutions of Higher Education," by Arthur L. Coleman and Teresa E. Taylor; "New Rules for Affirmative Action in Higher Education," by Scott Greytak; "Transitioning to Race-Neutral Admissions," by Halley Potter; "Striving for Neutrality," by Marta Tienda; "The Use of Socioeconomic Affirmative Action at the University of California," by Richard Sander; "Converging Perils to College Access for Racial Minorities," by Richard L. McCormick; "Ensuring Diversity Under Race-Neutral Admissions at the University of Georgia," by Nancy G. McDuff and Halley Potter; "Addressing Undermatch," by Alexandria Walton Radford and Jessica Howell; "Talent is Everywhere," by Danielle Allen; "Reducing Reliance on Testing to Promote Diversity," by John Brittain and Benjamin Landy; 'Advancing College Access with Class-Based Affirmative Action," by Matthew N. Gaertner; "Achieving Racial and Economic Diversity with Race-Blind Admissions Policy," by Anthony P. Carnevale, Stephen J. Rose, and Jeff Strohl; "The Why, What, and How of Class-Based Admissions Policy," by Dalton Conley; "A Collective Path Upward," by Richard Sander; and "Increasing Socioeconomic Diversity in American Higher Education," by Catharine Hill.

**Executive Director (and primary author and editor),** ***Bridging the Higher Education Divide: Strengthening Community Colleges and Restoring the American Dream*** (Century Foundation Press, 2013.)  The task force on community colleges, cochaired by Anthony Marx and Eduardo Padron, included John Brittain, Walter Bumphus, Michele Cahill, Louis Caldera, Patrick Callan, Nancy Cantor, Samuel Cargile, Anthony Carnevale, Michelle Asha Cooper, Sara Goldrick-Rab, Jerome Karabel, Catherine Koshland, Felix Matos Rodriguez, Gail Mellow, Arthur Rothkopf, Sandra Schroeder, Louis Soares, Suzanne Walsh, Ronald Williams, and Joshua Wyner.  In addition, the volume included background papers by Sandy Baum and Charles Kurose; Sara Goldrick-Rab and Peter Kinsley; and Tatiana Melguizo and Holly Kosiewicz.

**Editor,** ***The Future of School Integration: Socioeconomic Diversity as an Education Reform Strategy*** (Century Foundation Press, 2012).  Chapters include, "Housing Policy is School Policy: Economically Integrative Housing Promotes Academic Success in Montgomery County, Maryland," by Heather Schwartz; "Socioeconomic Diversity and Early Learning: The Missing Link in Policy for High-Quality Preschools," by Jeanne L. Reid; "The Cost-Effectiveness of Socioeconomic School Integration," by Marco Basile; "The Challenge of High-Poverty Schools: How Feasible is Socioeconomic School Integration?" by An Mantil, Anne G. Perkins, and Stephanie Aberger; "Can NCLB Choice Work? Modeling the Effects of Interdistrict Choice on Student Access to Higher-Performing Schools," by Meredith P. Richards, Kori J. Stroub, and Jennifer Jellison Holme; "The Politics of Maintaining Balanced Schools: An Examination of Three Districts," by Sheneka M. Williams; and "Turnaround and Charter Schools that Work: Moving Beyond Separate but Equal," by Richard Kahlenberg.

**Editor,** ***Affirmative Action for the Rich: Legacy Preferences in College Admissions*** (Century Foundation Press, 2010).  Chapters include "Legacy Preferences in a Democratic Republic," by Michael Lind; "A History of Legacy Preferences," by Peter Schmidt; "An Analytical Survey of Legacy Preferences," by Daniel Golden; "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," by Chad Coffman, Tara O'Neil and Brian Starr; "Admitting the Truth: The Effect of Affirmative Action, Legacy Preferences, and the Meritocratic Ideal on Students of Color in College Admissions," by John Brittain and Eric Bloom; "Legacy Preferences and the Constitutional Prohibition of Titles of Nobility," by Carlton Larson; "Heirs of the American Experiment: A Legal Challenge to Preferences as a Violation of the Equal Protection Clause of the Constitution and the Civil Rights Act of 1866," by Steve Shadowen and Sozi Tulante; "Privilege Paving the Way for Privilege: How Judges Will Confront the Legal Ramifications of Legacy Admissions to Public and Private Universities," by Boyce F. Martin Jr. with Donya Khalili; and "The Political Economy of Legacy Admissions, Taxpayer Subsidies, and Excess 'Profits' in American Higher Education: Strategies for Reform," by Peter Sacks.

**Editor,** ***Rewarding Strivers: Helping Low-Income Students Succeed in College*** (Century Foundation Press, 2010).  Chapters include: "The Carolina Covenant," by Edward B. Fiske, and "How Increasing College Access is Increasing Inequality and What to do About It," by Anthony P. Carnevale and Jeff Strohl. William Fitzsimmons called the book part of Century's "trailblazing mission to prevent the tragic waste of human talent that threatens America's future," while Anthony Marx declared, "Kahlenberg again gathers the best thinkers on how to challenge this status quo; what to do, what works, and what does not."

**Editor,** ***Improving on No Child Left Behind: Getting Education Reform Back on Track*** (Century Foundation Press, 2008).  Chapters include: an analysis of the under-funding of the No Child Left Behind Act, by William Duncombe, John Yinger and Anna Lukemeyer; a discussion of the rights of students in low performing schools to transfer to better performing public schools across district lines, by Amy Stuart Wells and Jennifer Holme; and an exploration of how to improve the accountability provisions of the act, by Lauren Resnick, Mary Kay Stein, and Sarah Coon.  Diane Ravitch called *Improving on No Child Left Behind* "the best of the books on this topic."

**Editor,** ***America's Untapped Resource: Low-Income Students in Higher Education*** (Century Foundation Press, 2004).  The chapters include: "Socioeconomic Status, Race/Ethnicity, and Selective College Admissions," Anthony P. Carnevale and Stephen J. Rose; "Improving the Academic Preparation and Performance of Low-Income Students in American Higher Education," by P. Michael Timpane and Arthur M. Hauptman; and "Low-Income Students and the Affordability of Higher Education," by Lawrence E. Gladieux.  Carnevale and Rose's finding, that 74% of students at selective colleges come from the top socioeconomic quartile and 3% from the bottom quartile is widely cited.

**Editor,** ***Public School Choice vs. Private School Vouchers*** (Century Foundation Press, 2003). The volume consists of a compilation of new and previously published materials, including articles by Edward B. Fiske, Helen F. Ladd, Sean F. Reardon, John T. Yun, Amy Stuart Wells, Richard Just, Ruy Teixeira, Thad Hall, Gordon MacInnes, Richard C. Leone, and Bernard Wasow.

**Executive Director (and primary author and editor),** ***Divided We Fail: Coming Together Through Public School Choice.  The Report of The Century Foundation Task Force on the Common School,*** (Century Foundation Press, 2002).  The task force on school integration, chaired by Lowell Weicker, included Joseph Aguerrebere, Ramon Cortines, Robert Crain, John Degnan, Peter Edelman, Christopher Edley, Kim Elliott, Jennifer Hochschild, Helen Ladd, Marianne Engelman Lado, Leonard Lieberman, Ann Majestic, Dennis Parker, Felipe Reinoso, Charles S. Robb, David Rusk, James Ryan, Judi Sikes, John Brooks Slaughter, Dick Swantz, William Trent, Adam Urbanski, Amy Stuart Wells, and Charles V. Willie.  In addition, the volume included background papers by Duncan Chaplin, David Rusk, Edward B. Fiske, William H. Freivogel, Richard Mial, and Todd Silberman.

**Editor,** ***A Notion at Risk: Preserving Public Education as an Engine for Social Mobility*** (Century Foundation Press, 2000).  The book identifies individual sources of inequality and proposes concrete public policy remedies.  The chapters include:  "Summer Learning and Home Environment" by Doris Entwisle, Karl Alexander and Linda Olson of Johns Hopkins; "Equalizing Education Resources for Advantaged and Disadvantaged Children" by Richard Rothstein of the Economic Policy Institute; "High Standards: A Strategy for Equalizing Opportunities to Learn?" by Adam Gamoran of the University of Wisconsin; "Inequality in Teaching and Schooling: Supporting High-Quality Teaching and Leadership in Low Income Schools" by Linda Darling-Hammond and Laura Post of Stanford;  "Charter Schools and Racial and Social Class Segregation: Yet Another Sorting Machine?" by Amy Stuart Wells, Jennifer Jellison Holme, Alejandra Lopez, and Camille Wilson Cooper of UCLA; "Student Discipline and Academic Achievement" by Paul Barton of the Educational Testing Service; and  "Critical Support: The Public View of Public Education," by Ruy Teixeira of the Century Foundation

## II. BOOK CHAPTERS

"The Bipartisan, and Unfounded, Assault on Teachers' Unions," in Michael B. Katz and Mike Rose (eds.), *Public Education Under Siege* (Philadelphia: University of Pennsylvania Press, 2013.)

"Socioeconomic Integration and Segregation," in James A. Banks (ed.), *Encyclopedia of Diversity in Education* (Thousand Oaks, CA: Sage Publications, 2012).

"Socioeconomic School Integration: Preliminary Lessons from More than 80 Districts," in Erica Frankenberg and Elizabeth DeBray-Pelot (eds.), *Integrating Schools in a Challenging Society: New Policy and Legal Options for a Multiracial Generation*, (Chapel Hill, N.C.: University of North Carolina Press, 2011)

"Combating School Segregation in the United States," in Guido Walraven, Dorothee Peters, Eddie Denessen and Joep Bakker (eds.), *International Perspectives on Countering School Segregation* (Dutch National Knowledge Centre for Mixed Schools, 2010).

"Levelling the School Playing Field: A Critical Aim for New York's Future," in Jonathan P. Hicks and Dan Morris (eds.), *From Disaster to Diversity*: *What's Next for New York City's Economy?* (New York: Drum Major Institute, 2009).

"Higher Education Access," in Robert McKinnon (ed), *Actions Speak Loudest* (Guilford, CT: Globe Pequot Press, 2009)

"Socioeconomic School Integration," in Marybeth Shinn and Hirokazu Yoshikawa (eds), *Toward Positive Youth Development: Transforming Schools and Community Programs* (New York: Oxford University Press, 2008).

"The History of Collective Bargaining Among Teachers," in Jane Hannaway and Andrew J. Rotherham (eds) *Collective Bargaining in Education: Negotiating Change in Today's Schools* (Cambridge, MA: Harvard Education Press, 2006).

"Socioeconomic School Integration: A Symposium," in Chester Hartman (ed), *Poverty and Race in America: The Emerging Agendas* (New York: Rowman and Littlefield, Publishers, 2006).

"The Return of 'Separate but Equal,'" in James Lardner and David Smith (eds), *Inequality Maters: The Growing Divide in America and Its Poisonous Consequences* (New York: New Press, 2005).

"Economic School Integration," in Stephen J. Caldas and Carl L. Bankston III (eds), *The End of Desegregation?* (New York: Nova Science Publishers Inc., 2003).

"President Clinton's Race Initiative: Promise and Disappointment," and "How to Achieve One America: Class, Race, and the Future of Politics," in Stanley A. Renshon (ed), *One America? Political Leadership, National Identity and the Dilemmas of Diversity* (Washington DC: Georgetown University Press, 2001).


## III. LAW REVIEW ARTICLES

"'Architects of Democracy': Labor Organizing as a Civil Right," (with Moshe Marvit) 9 *Stanford Journal of Civil Rights & Civil Liberties* 213 (June 2013).

"Reflections on Richard Sander's Class in American Legal Education," 88 *Denver University Law Review* 719 (September 2011).

"Socioeconomic School Integration," 85 *North Carolina Law Review* 1545 (June 2007).

"Remarks: Symposium – Brown v. Board of Education at Fifty: Have We Achieved Its Goals?" 78 *St. John's Law Review* 295 (Spring 2004).

"Socioeconomic School Integration Through Public School Choice: A Progressive Alternative to Vouchers," *45 Howard Law Journal* 247 (Winter 2002).

"Class-Based Affirmative Action," 84 *California Law Review* 1037 (July 1996).               .

61

"Getting Beyond Racial Preferences:  The Class-Based Compromise," 45 *American University Law Review* 721 (February 1996).

## IV. PERIODICAL ARTICLES

Have written articles in the popular press for the American Educator, American Prospect, American School Board Journal, Atlantic Monthly, Baltimore Sun, Boston Globe, Boston Review, Chicago Sun Times, Christian Science Monitor, Chronicle of Higher Education, Civil Rights Journal, Education Next, Education Week, Educational Leadership, Forward, Inside Higher Education, Jurist, Journal of Blacks in Higher Education, Journal of Commerce, Legal Affairs, Legal Times, New Labor Forum, Nation, New Republic, New York Daily News, New York Times, Orlando Sentinel, Philadelphia Inquirer, Political Science Quarterly, Poverty and Race, Principal Magazine, Slate, Wall Street Journal, Washington Monthly, Washington Post and Wilson Quarterly.

Articles on Affirmative Action:

4/3/95        Author, "Class, Not Race:  A Liberal Case for Junking Old-Style Affirmative Action in Favor of Something that Works," The New Republic (cover story).

7/17/95        Author, "Affirmative Action by Class," Washington Post, A19

7/17/95        Author, "Equal Opportunity Critics: Class vs. race, round 2," New Republic.

2/96        Author, "Getting Beyond Racial Preferences: The Class-Based Compromise," American University Law Review.

6/2/96        Author, "Bob Dole's Colorblind Injustice: On Affirmative Action, He Caves to Big Business," Outlook Section, *Washington Post*.

7/96        Author, "Class-Based Affirmative Action," *California Law Review*.

8/23/96        Author, "The Sound of Affirmative Action," The Forward.

9/13/96        Author, "Dishonest Defenders of Racial Preferences," *Wall Street Journal*.

10/7/96        Author, "Goal Line," (re Jack Kemp and affirmative action), *The New Republic*.

11/4/96        Author, "Need-based affirmative action," *Christian Science Monitor*.

12/96        Author, "Defend It, Don't Mend It: Clinton's affirmative action man has little bad to say about racial preferences," *The Washington Monthly*.

12/2/96        Author, "A Sensible Approach to Affirmative Action," *The Washington Post*.

4/20/97        Author, "Need-based affirmative action in the spotlight," Orlando Sentinel.

1/19/98        Author, "Affirmative Action? Yes: But let's base it on need rather than on race," Philadelphia Inquirer.

Spring '98     Author, "Class-Based Affirmative Action: A Natural for Labor," New Labor Forum.

6/98           Author, "In Search of Fairness: A Better Way," *The Washington Monthly*.

11/98          Author, "Style, not Substance," *The Washington Monthly,* pp. 45-48.

1/19/99        Author, "Class-based affirmative action," *The Boston Globe*.

9/21/99        Author, "The Colleges, the Poor, And the SATs" *Washington Post*, A19.

7-8/00         Author, "Class Action: The good and the bad alternatives to affirmative action," *The Washington Monthly*, 39-43.

9/15/01        Author, "President Clinton's Racial Initiative: Promise and Disappointment," (Chapter 4); and "How to Achieve One America: Class, Race, and the Future of Politics," (Chapter 11), in Stanley A. Renshon (ed) *One America?  Political Leadership, National Identity, and the Dilemmas of Diversity* (Georgetown University Press)

Spring/02      Author, Review of John David Skrentny "Color Lines," *Political Science Quarterly*, pp. 144-145.

9/9/03         Author, "The Conservative victory in Grutter and Gratz," *Jurist* (symposium with Derick Bell, Peter Schuck, Susan Low Bloch and others).

1/14/04        Author, "Q&A: Low-income college students are increasingly left behind," *USA Today*, p.7D.

3/19/04        Author, "Toward Affirmative Action for Economic Diversity," *Chronicle of Higher Education*.

5/05           Author, "Class Action: Why education needs quotas for poor kids," *Washington Monthly*

11/10/06       Author, "Time for a New Strategy," [re the Michigan affirmative action vote] *Inside Higher Education*.

3/07           Author, "Invisible Men: Race is no longer the unacknowledged dividing line in America.  Class Is," *The Washington Monthly*.

63

2/4/08          Author, "Obama's RFK Moment: How he could win over working class whites," *Slate.*

5/12/08         Author, "Barack Obama and Affirmative Action," *Inside Higher Education.*

5/23/08         Author, "A touch of class" (Obama and affirmative action), *Guardian America.*

11/6/08         Author, "What's Next for Affirmative Action?" *The Atlantic.*

9/30/09         Author, "The Next Step in Affirmative Action: Class-based systems can skirt court and ballot defeats – and do a better job of addressing socioeconomic diversity" *Washington Monthly Online.* [Referenced in Steve Benen, "Political Animal," *Washington Monthly.Com* 9/30/09]

12/16/09        Author (along with Julian Bond, Lee Bollinger, Jamie Merisotis and others), "Reactions: Is It Time for Class-Based Affirmative Action?" *The Chronicle of Higher Education.*

3/3/10          Author, "Disadvantages," [review of Thomas Espenshade and Alexandra Walton Radford, No Longer Separate, Not Yet Equal], *New Republic.*

4/2/10          Author, "The Affirmative Action Trap," *The American Prospect*

5/23/10         Author, "Five myths about college admissions," Outlook Section, The *Washington Post*, p. B3 [

5/30/10         Author, "Toward a New Affirmative action," *Chronicle of Higher Education Review.*

6/10/10         Author, "A Response to the Critics of Class-Based Affirmative Action," Innovations Blog, *Chronicle of Higher Education.*

6/18/10         Author, "Rewarding Strivers," Innovations Blog, *Chronicle of Higher Education.*

7/7/10          Author, "The French Twist on Affirmative Action," Innovations Blog, *Chronicle of Higher Education.*

7/20/10         Author, "Ross Douthat, White Anxiety and Diversity," Innovations Blog, *Chronicle of Higher Education.*

7/28/10         Author, "Next Week's Court Hearing on Affirmative Action," Innovations Blog, *The Chronicle of Higher Education.*

9/17/10         Author, "Colorado's Affirmative Action Experiment," Innovations Blog, *Chronicle of Higher Education.*

9/22/10         Author, "10 Myths about Legacy Preferences in College Admissions," *Chronicle of Higher Education.*

9/24/10        Author, "A Response to Supporters of Legacy Preferences," Innovations Blog, *Chronicle of Higher Education*.

11/3/10        Author, "Arizona's Affirmative Action Ban," Innovations Blog, *Chronicle of Higher Education*.

11/22/10        Author, "New Ways to Achieve Diversity in California," Innovations Blog, *Chronicle of Higher Education*.

11/24/10        Author, "South Africa's Affirmative Action Debate," Innovations Blog, *Chronicle of Higher Education*.

11/29/10        Author, "Does it Matter Where You Go to College?  Numbers Favor Top Schools," Room for Debate, *The New York Times*.

12/10/10        Author, "Oxford's Research-Based Affirmative Action," Innovations Blog, *Chronicle of Higher Education*.

1/6/11        Author, "Do Legacy Preferences Count More than Race?" Innovations Blog, *Chronicle of Higher Education*.

1/27/11        Author, "The Next Big Affirmative-Action Case," Innovations Blog, *Chronicle of Higher Education*.

2/11/11        Author, "Nick Clegg's Attack on Social Segregation in Higher Education," Innovations Blog, *Chronicle of Higher Education*.

3/3/11        Author, "Are Legacy Preferences 'Defensible Corruption?'" Innovations Blog, *Chronicle of Higher Education*.

3/10/11        Author, "Who Benefits Most from Attending Top Colleges?" Innovations Blog, *Chronicle of Higher Education*.

4/5/11        Author, "The 'Reverse Discrimination Sentiment,'" Innovations Blog, *Chronicle of Higher Education*. [cited in "Attitudes Toward Access to Higher Education Affected by Race, Study Shows," *Huffington Post*, 4/6/11]

4/29/11        Author, "The Decline of Legacy Admissions at Yale," Innovations Blog, *Chronicle of Higher Education*.

5/11/11        Author, "Purchasing Seats at Top British Universities," Innovations Blog, *The Chronicle of Higher Education*.

65

5/26/11        Author, "Restoring LBJ's Original Vision of Affirmative Action," Innovations Blog, *The Chronicle of Higher Education.*

6/21/11        Author, "Is Affirmative Action Headed Back to the Supreme Court?" Innovations Blog, *Chronicle of Higher Education.*

7/5/11        Author, "Steps Forward and Back on Affirmative Action, Innovations Blog, *Chronicle of Higher Education.*

8/4/11        Author, "Achieving Racial Diversity Without Using Race," Innovations Blog, *Chronicle of Higher Education.*

8/17/11        Author, "Race, Class and the New ACT Results," Innovations Blog, *Chronicle of Higher Education.*

9/13/11        Author, "An Affirmative Action Success," Innovations Blog, *Chronicle of Higher Education.*

9/27/11        Author, "Reflections on Richard Sander's Class in American Legal Education," *Denver University Law Review.*

9/28/11        Author, "Economic Segregation in American Law Schools," Innovations Blog, *Chronicle of Higher Education.*

10/3/11        Author, "The First Monday in October," [re Fisher v. Texas], Innovations Blog, *Chronicle of Higher Education.*

10/17/11        Author, "A Third Path on Affirmative Action?" Innovations Blog, *Chronicle of Higher Education.*

11/2/11        Author, "The Amicus Briefs on Affirmative Action," Innovations Blog. Chronicle of Higher Education [re Sander and Taylor brief]

11/13/11        Author, "Affirmative Action for the Rich," (with Stephen Joel Trachtenberg, John Brittain, Peter Sacks, Michele Hernandez, Terry Shepard and Debra Thomas), "Why Do Top Schools Still Take Legacy Applicants?" Room For Debate Blog, *New York Times.*

11/17/11        Author, "Legacy Preferences at Private Universities," Innovations Blog, *Chronicle of Higher Education.*

11/21/11        Author, "What Should Obama Do on Affirmative Action?" Innovations Blog, *Chronicle of Higher Education.*

11/29/11        Author, "The Days of Legacy Admissions May be Numbered," *Minding the Campus* Blog.

66

12/5/11        Author, "Obama's New Guidance on Diversity," Innovations Blog, *Chronicle of Higher Education*

1/8/12         Author, "The Broader Significance of Fisher v. Texas," Innovations Blog, *Chronicle of Higher Education.*

2/9/12         Author, "Waiting on Fisher v. Texas," Innovations Blog, *Chronicle of Higher Education.*

2/21/12        Author, "Fisher v. Texas: How Obama Should Talk About Affirmative Action," *Slate.*

2/22/12        Author, "Will the Supreme Court Kill Diversity?" Innovations Blog, *Chronicle of Higher Education.*

3/29/12        Author, "Three Myths about Affirmative Action," Innovations Blog, *Chronicle of Higher Education.*

4/20/12        Author, "Does the Texas Top-10%-Plan Work?" Innovations Blog, *Chronicle of Higher Education.*

5/10/12        Author, "A Bad Week for Elizabeth Warren - and Affirmative Action," *Chronicle of Higher Education.*

5/29/12        Author, "Overturning or Modifying 'Grutter v. Bollinger'?" Innovations Blog, *Chronicle of Higher Education.*

6/1/12         Author, "Asian Americans and Affirmative Action," Innovations Blog, *Chronicle of Higher Education.* [cited in Asian American Educational Foundation, 6/4/12

6/25/12        Author, "Should Colleges Consider Legacies in the Admissions Process?  No: It Hurts the Deserving," (debate with Stephen Joel Trachtenberg), *Wall Street Journal.*

7/11/12        Author, "Transparency About Legacy Preferences," (re MIT), Innovations Blog, *Chronicle of Higher Education.*

8/8/12         Author, "The University of Texas's Weak Affirmative-Action Defense," Innovations Blog, *Chronicle of Higher Education.*

8/10/12     Author, "President Obama's Affirmative Action Problem and What He Should Do About It," *The New Republic.*

8/16/12     Author, "Obama's Affirmative-Action Brief," Innovations Blog, *Chronicle of Higher Education*

9/4/12     Author, "Fisher Symposium: Race-neutral alternatives work," *SCOTUSblog.*

9/11/12     Author, "In defense of race-neutral alternative jurisprudence," Fisher Symposium, *SCOTUSblog,*
9/17/12     Author, "3 views on whether US still needs affirmative action: A middle way - Use affirmative action to help economically disadvantaged students of all races," *Christian Science Monitor.*

10/3/12     Author (with Halley Potter), "A Better Affirmative Action: State Universities that Created Alternatives to Racial Preferences," The Century Foundation.

10/3/12     Author, "A New Kind of Affirmative Action Can Ensure Diversity," *Chronicle of Higher Education.*

10/10/12     Author, "A Liberal Critique of Racial Preferences," *Wall Street Journal*, A17.

10/10/12     Author, "The Race to the Flop – The Problem with Affirmative Action," *The New Republic.*

10/11/12     Author, "The Achilles Heel of Affirmative Action," Conversation Blog, *Chronicle of Higher Education*

10/22/12     Author, "Diversity or Discretion?  Essay questions motives of U. Of Texas in affirmative action case," *Inside Higher Education.*

11/7/12     Author, "Another Nail in Affirmative Action's Coffin," The Conversation Blog, *Chronicle of Higher Education.*

11/9/12     Author, "Economic Affirmative Action," *The Washington Post*, A27. [
12/13/12     Author, "Supreme Court Double Header: The Arguments for Gay Marriage Undermine Affirmative Action," *Slate.*

12/19/12     Author (with John Brittain), "When Wealth Trumps Merit," in Room for Debate (along with Ron Unz, S.B. Woo and others), "Fears of an Asian Quota in the Ivy League," *New York Times.*

1/17/13     Author, "Where Sotomayor and Thomas Agree on Affirmative Action," Conversation Blog, *Chronicle of Higher Education.*

3/12/13     Author, "Presidents in denial on use of race-based admissions preferences," *Inside Higher Ed.*

3/19/13      Author, "The Untapped Pool of Low-Income Strivers," The Conversation Blog, *Chronicle of Higher Education.*

5/13/13      Author, "Addressing the Economic Divide," in "Diversity Without Affirmative Action?" Room for Debate (with Patricia Williams, Richard Vedder, Marta Tienda, and John Brittain), *New York Times.*

6/2/13       Author, "End race-based affirmative action? Yes: Class matters much more," *New York Daily News.*

6/24/13      Author, "The Next Affirmative Action?  Universities Should Respond to the Supreme Court Ruling by Giving a Bigger Admissions Boost to Low-Income Students," *Slate.*

6/24/13      Author, "A new affirmative action based on class," *USA Today.*

6/25/13      Author, "The Class-Based Future of Affirmative Action," *The American Prospect.*

6/26/13      Author, "Why Everyone Is Wrong about *Fisher vs. University of Texas*," *Washington Monthly* 9/2/13            Author, "A Refreshingly Honest Book About Affirmative Action," *The New Republic.*

9/27/13      Author, "The Misleading Administrative Guidance on Affirmative Action," *Chronicle of Higher Education.* [

10/14/13     Author, "A Fresh Chance to Rein in Racial Preferences: The Supreme Court's Fisher decision last spring has been largely ignored.  Now the justices can strengthen it." *Wall Street Journal*, A15.

11/21/13     Author, "In defense of proxies," (symposium with Sigal Alon, John Skrentny and others), *Contexts: American Sociological Association*, Fall 2013.

3/11/14      Author, "No Longer Black and White: Why Liberals Should Let California's Affirmative Action Ban Stand," *Slate.*

4/10/14      Author, "Good News for Low-Income Students: A campaign to challenge racial-preference policies at three universities should move higher education toward affirmative action based on class," Conversation Blog, *Chronicle of Higher Education.*

4/22/14      Author, "Did the Supreme Court Just Kill Affirmative Action?  No.  But it's clearly on its deathbed.  That might not be such a bad thing," *Politico.*

4/27/14      Author, "Affirmative Action Fail: The Achievement Gap By Income is Twice the Gap by Race," *The New Republic.*

4/27/14      Coauthor (with Halley Potter), "Focus on Class Instead," in Room for Debate, "Should Affirmative Action Be Based on Income?" *New York Times*.

6/17/14      Author, "What Sotomayor Gets Wrong About Affirmative Action," *Chronicle of Higher Education*.

7/17/14      Author, "Affirmative-Action Ruling Could Be Pyrrhic Victory for UT-Austin," *Chronicle of Higher Education*.

9/12/14      Author (with Peter Dreier), "Making Top Colleges Less Aristocratic and More Meritocratic," The Upshot Section, *The New York Times*.

11/20/14     Author, "Achieving College Diversity Without Discriminating by Race," *Wall Street Journal*, p. A17.

12/2/14      Author, "Why Labor Should Support Class-Based Affirmative Action," New Labor Forum; and "Richard D. Kahlenberg Responds" (to Julie Park), New Labor Forum.

2/13/15      Author, "Affirmative Action for the Advantaged at UT-Austin," The Conversation Blog, *Chronicle of Higher Education*.

5/18/15      Author, "For the Sake of Working-Class Students, Give 'Fisher' Another Chance," *Chronicle of Higher Education*.

6/4/15      Author, "Race-Based Admissions: The Right Goal, but the Wrong Policy" (re LBJ 50th anniversary of affirmative action), *The Atlantic*.

7/23/15      Author, "How a New Report May Hasten the End of Racial Preferences in Admissions," *Chronicle of Higher Education*.

12/8/15      Author, "Texas' college admissions policies give the well-to-do a leg up," *Los Angeles Times*.

12/8/15      Author, "The Future of Affirmative Action: How a conservative decision at the Supreme Court could lead to a liberal outcome," *The Atlantic*.

12/11/15     Author, "Right-wing judge for working-class kids: In praise of Samuel Alito's stand on affirmative action in higher education," *New York Daily News*.

12/14/15     Author, "Scalia's Rant and Alito's Reasoning: What will influence Anthony Kennedy and determine the fate of affirmative action in Fisher?" *Slate*.

12/24/15     Author (with Anthony Carnevale and Jeff Strohl) "Should Race Be a Factor in College Admissions?" Letter to Editor (re Sigal Alon oped), *New York Times*, A18.

1/11/16      Coauthor (with Jennifer Giancola), "True Merit: Ensuring Our Brightest Students Have Access to Our Best Colleges and Universities, Jack Kent Cooke Foundation.

3/14/16      Author, "Racial Diversity Without Racial Preferences: The growing case for class-based affirmative action in college admissions,", *Washington Monthly*.

6/23/16      Author, "A win for wealthy students," Fisher II Symposium*, Scotusblog*.

7/1/16      Author, "How the Legal Victory on Affirmative Action Undermines the Progressive Coalition: The University of Texas' policies make it harder to build an enduring cross-racial class-based coalition in American politics," *The Washington Monthly*.

1/4/17      Author, "How to Protect Diversity During Trump's Presidency: Liberals should expand the concept to include socioeconomic status," *The New Republic*.

4/14/17      Author, "Harvard's Class Gap: Can the academy understand Donald Trump's 'forgotten' Americans?" Harvard Magazine, May-June 2017, 35-39.

8/3/17      Author, "The right fix to affirmative action: Progressives should answer the President's apparent plans with their own reforms" *New York Daily News*.


## V. ACADEMIC/PUBLIC POLICY APPEARENCES

Have spoken before audiences in numerous settings:  government (U.S. Commission on Civil Rights; U.S. Department of Education); academic associations (American Educational Research Association; Association for Public Policy Analysis and Management); colleges and universities (American, Amherst, Centre, Columbia, Flagler, George Washington, Georgetown, Harvard, Howard, Marymount, Middlebury, Missouri Western, National Defense University, New York University, Oberlin, Pitzer, Rutgers, St. Johns, St. Louis, Stanford, Stetson, Suffolk, University of Chicago, University of Maine, University of Maryland, University of North Carolina, University of Pennsylvania, University of Richmond, University of Southern California, University of Virginia, West Chester, William and Mary, Yale); and public policy forums (American Association of Community Colleges, American Enterprise Institute, Brookings Institution, Cato Institute, Center for American Progress, Chautauqua Institution, College Board, Committee for Economic Development, Council for Opportunity in Education, Economic Policy Institute, Demos, Education Law Association, Education Sector, Ethics and Public Policy Center, Fordham Institute, Hechinger Institute, KnowledgeWorks Foundation, National Academy of Sciences Board on Testing and Assessment, National Alliance for Public Charter Schools, National Council of Educational Opportunity, New America Foundation, New York Historical Society, New York Public Library, Pioneer Institute, Progressive Policy Institute, William T. Grant Foundation, and Woodrow Wilson Center).

## VI. AWARDS

William A. Kaplin Award for Excellence in Higher Education Law and Policy Scholarship, Stetson Law School National Conference on Law & Higher Education (2013).

## VII. EXPERIENCE CONSULTING WITH SCHOOL DISTRICTS

Chicago Public Schools (Illinois) (2008-2010).   Helped school district create a socioeconomic school integration plan for magnet and selective enrollment schools.

Charlotte-Mecklenburg Schools (North Carolina) (2016).  Helped school district create a socioeconomic school diversity plan.

New Haven Public Schools (2017).  Helping school district implement a socioeconomic diversity plan for magnet schools.

Pasadena Educational Foundation (California).  (2006 and 2016).  Prepared reports for educational foundation associated with Pasadena Unified School District recommending adoption of socioeconomic diversity policies.

**B.**      Appendix B – Documents Relied Upon or Considered in Forming Opinion

In addition to the academic literature cited above, I considered the following facts and data specific to this case:

- SFFA Complaint
- Harvard Answer to SFFA Complaint
- SFFA Notice of Subpoena to U.S. Department of U.S. Department of Education
- Harvard's Responses to SFFA's Second Interrogatories
- Deposition Transcript of Roger Banks and Exhibits Thereto
- Deposition Transcript of Grace Cheng and Exhibits Thereto
- Deposition Transcript of Sally Donahue and Exhibits Thereto
- Deposition Transcript of Erin Driver-Linn and Exhibits Thereto
- Deposition Transcript of Drew Faust and Exhibits Thereto
- Deposition Transcript of William Fitzsimmons and Exhibits Thereto
- Deposition Transcript of Kaitlin Howrigan and Exhibits Thereto
- Deposition Transcript of Rakesh Khurana and Exhibits Thereto
- Deposition Transcript of Christopher Looby and Exhibits Thereto
- Deposition Transcript of Marlyn McGrath and Exhibits Thereto
- Second Deposition Transcript of Marlyn McGrath and Exhibits Thereto
- Deposition Transcript of Lucerito Ortiz and Exhibits Thereto
- Deposition Transcript of Tia Ray and Exhibits Thereto
- Deposition Transcript of Michael Smith and Exhibits Thereto
- Deposition Transcript of Brock Walsh and Exhibits Thereto
- HARV00002730
- HARV00007396-7398
- HARV00007799-7802
- HARV00007803-7864
- HARV00022931-22936
- HARV00023547-23555
- HARV00031687-31772
- HARV00032957-33022
- HARV00065570 -65612
- HARV00065741-65774
- HARV00072381
- HARV00075704-75715
- HARV00077521-77822

74

**C.**    **Appendix C – Simulations**

**Simulation One: Half-Athlete Preference**

Turn off Preferences: Legacy, Athlete, Race, Early Decision, Staff Kid, Faculty Kid, Dean Director, Disadvantaged, Waiver, First Gen, Fin Aid Applicant

Assign Disadvantaged Applicants Half-Athlete Preferences

Estimation is based on Extended Sample and Excludes Overall Rating

Exclude Heterogeneity in Demographic Effects

|  |  | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
|---|---|---|---|---|---|---|---|
| **Status Quo** |  |  |  |  |  |  |  |
|  | White | 0.505 | 0.474 | 0.455 | 0.431 | 0.443 | 0.404 |
|  | African American | 0.122 | 0.130 | 0.112 | 0.128 | 0.132 | 0.136 |
|  | Hispanic | 0.099 | 0.124 | 0.103 | 0.115 | 0.132 | 0.129 |
|  | Asian | 0.219 | 0.217 | 0.228 | 0.219 | 0.214 | 0.237 |
|  | Other | 0.055 | 0.055 | 0.101 | 0.106 | 0.080 | 0.093 |
|  |  |  |  |  |  |  |  |
|  | Non-Disadvantaged | 0.821 | 0.815 | 0.840 | 0.846 | 0.865 | 0.826 |
|  | Disadvantaged | 0.179 | 0.185 | 0.160 | 0.154 | 0.135 | 0.174 |
|  |  |  |  |  |  |  |  |
|  | Academic Index | 227.2 | 227.2 | 227.9 | 227.8 | 228.5 | 227.8 |
|  | Extracurricular Rating | 2.425 | 2.410 | 2.440 | 2.390 | 2.430 | 2.390 |
|  | Personal Rating | 2.253 | 2.270 | 2.270 | 2.280 | 2.260 | 2.300 |
| **Assign Half-Athlete Preferences** |  |  |  |  |  |  |  |
|  | White | 0.478 | 0.445 | 0.417 | 0.414 | 0.412 | 0.383 |
|  | African American | 0.063 | 0.068 | 0.061 | 0.063 | 0.057 | 0.066 |
|  | Hispanic | 0.094 | 0.103 | 0.105 | 0.091 | 0.108 | 0.114 |
|  | Asian | 0.325 | 0.335 | 0.307 | 0.317 | 0.341 | 0.340 |
|  | Other | 0.040 | 0.048 | 0.110 | 0.115 | 0.081 | 0.097 |
|  |  |  |  |  |  |  |  |
|  | Non-Disadvantaged | 0.637 | 0.622 | 0.625 | 0.652 | 0.653 | 0.540 |
|  | Disadvantaged | 0.363 | 0.378 | 0.375 | 0.348 | 0.347 | 0.460 |
|  |  |  |  |  |  |  |  |
|  | Academic Index | 228.56 | 228.53 | 228.54 | 229.28 | 229.53 | 228.74 |
|  | Extracurricular Rating | 2.40 | 2.35 | 2.41 | 2.35 | 2.37 | 2.38 |
|  | Personal Rating | 2.28 | 2.28 | 2.29 | 2.29 | 2.27 | 2.31 |

**Simulation Two: Half-Athlete Preference, Expanded Pool**
Turn off Preferences: Legacy, Athlete, Race, Early Decision, Staff Kid, Faculty Kid, Dean Director, Disadvantaged, Waiver, First Gen, Fin Aid Applicant
Assign Disadvantaged Applicants Half-Athlete Preferences
Estimation is based on Extended Sample and Excludes Overall Rating
Exclude Heterogeneity in Demographic Effects
When running counterfactual, double number of disadvantaged applicants

|  |  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| **Status Quo** | White | 0.505 | 0.474 | 0.455 | 0.431 | 0.443 | 0.404 |
| | African American | 0.122 | 0.130 | 0.112 | 0.128 | 0.132 | 0.136 |
| | Hispanic | 0.099 | 0.124 | 0.103 | 0.115 | 0.132 | 0.129 |
| | Asian | 0.219 | 0.217 | 0.228 | 0.219 | 0.214 | 0.237 |
| | Other | 0.055 | 0.055 | 0.101 | 0.106 | 0.080 | 0.093 |
| | | | | | | | |
| | Non-Disadvantaged | 0.821 | 0.815 | 0.840 | 0.846 | 0.865 | 0.826 |
| | Disadvantaged | 0.179 | 0.185 | 0.160 | 0.154 | 0.135 | 0.174 |
| | | | | | | | |
| | Academic Index | 227.2 | 227.2 | 227.9 | 227.8 | 228.5 | 227.8 |
| | Extracurricular Rating | 2.425 | 2.410 | 2.440 | 2.390 | 2.430 | 2.390 |
| | Personal Rating | 2.253 | 2.270 | 2.270 | 2.280 | 2.260 | 2.300 |
| | | | | | | | |
| **Assign Half-Athlete Preferences** | White | 0.428 | 0.390 | 0.373 | 0.369 | 0.370 | 0.346 |
| | African American | 0.082 | 0.091 | 0.079 | 0.083 | 0.071 | 0.080 |
| | Hispanic | 0.123 | 0.131 | 0.135 | 0.117 | 0.136 | 0.137 |
| | Asian | 0.328 | 0.338 | 0.308 | 0.320 | 0.345 | 0.345 |
| | Other | 0.039 | 0.050 | 0.104 | 0.111 | 0.078 | 0.091 |
| | | | | | | | |
| | Non-Disadvantaged | 0.415 | 0.398 | 0.401 | 0.434 | 0.438 | 0.319 |
| | Disadvantaged | 0.585 | 0.602 | 0.599 | 0.566 | 0.562 | 0.681 |
| | | | | | | | |
| | Academic Index | 227.52 | 227.29 | 227.19 | 228.06 | 228.41 | 227.65 |
| | Extracurricular Rating | 2.42 | 2.36 | 2.44 | 2.38 | 2.40 | 2.40 |
| | Personal Rating | 2.26 | 2.28 | 2.26 | 2.27 | 2.27 | 2.29 |

**Simulation Three: Neighborhood Percentage Rule**

Turn off Preferences: Legacy, Athlete, Race, Early Decision, Staff Kid, Faculty Kid, Dean Director, Disadvantaged, Waiver, First Gen, Fin Aid Applicant

Estimation is based on Extended Sample and Excludes Overall Rating

Exclude Heterogeneity in Demographic Effects

Assign even number of admits from each neighborhood cluster

|  |  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| NO SES Boost | White | 0.508 | 0.480 | 0.445 | 0.439 | 0.448 | 0.437 |
|  | African American | 0.071 | 0.079 | 0.073 | 0.077 | 0.074 | 0.077 |
|  | Hispanic | 0.099 | 0.109 | 0.093 | 0.102 | 0.105 | 0.100 |
|  | Asian | 0.284 | 0.290 | 0.277 | 0.276 | 0.295 | 0.291 |
|  | Other | 0.038 | 0.043 | 0.111 | 0.107 | 0.078 | 0.095 |
|  |  |  |  |  |  |  |  |
|  | Non-Disadvantaged | 0.812 | 0.810 | 0.801 | 0.834 | 0.840 | 0.801 |
|  | Disadvantaged | 0.188 | 0.190 | 0.199 | 0.166 | 0.160 | 0.200 |
|  |  |  |  |  |  |  |  |
|  | Academic Index | 228.41 | 228.50 | 228.84 | 229.28 | 229.80 | 229.84 |
|  | Extracurricular Rating | 2.41 | 2.34 | 2.37 | 2.33 | 2.36 | 2.34 |
|  | Personal Rating | 2.30 | 2.28 | 2.31 | 2.30 | 2.27 | 2.29 |
|  |  |  |  |  |  |  |  |
| Half Athlete Boost | White | 0.460 | 0.433 | 0.409 | 0.402 | 0.417 | 0.379 |
|  | African American | 0.095 | 0.103 | 0.098 | 0.095 | 0.087 | 0.096 |
|  | Hispanic | 0.119 | 0.131 | 0.128 | 0.122 | 0.126 | 0.137 |
|  | Asian | 0.285 | 0.288 | 0.269 | 0.276 | 0.298 | 0.295 |
|  | Other | 0.041 | 0.045 | 0.096 | 0.104 | 0.072 | 0.093 |
|  |  |  |  |  |  |  |  |
|  | Non-Disadvantaged | 0.550 | 0.530 | 0.531 | 0.557 | 0.559 | 0.431 |
|  | Disadvantaged | 0.451 | 0.470 | 0.469 | 0.443 | 0.441 | 0.570 |
|  |  |  |  |  |  |  |  |
|  | Academic Index | 226.20 | 226.45 | 226.51 | 227.03 | 227.66 | 227.00 |
|  | Extracurricular Rating | 2.47 | 2.41 | 2.45 | 2.40 | 2.43 | 2.45 |
|  | Personal Rating | 2.32 | 2.33 | 2.33 | 2.33 | 2.31 | 2.34 |
|  |  |  |  |  |  |  |  |
| Status Quo | White | 0.505 | 0.474 | 0.455 | 0.431 | 0.443 | 0.404 |
|  | African American | 0.122 | 0.130 | 0.112 | 0.128 | 0.132 | 0.136 |
|  | Hispanic | 0.099 | 0.124 | 0.103 | 0.115 | 0.132 | 0.129 |
|  | Asian | 0.219 | 0.217 | 0.228 | 0.219 | 0.214 | 0.237 |
|  | Other | 0.055 | 0.055 | 0.101 | 0.106 | 0.080 | 0.093 |
|  |  |  |  |  |  |  |  |
|  | Non-Disadvantaged | 0.821 | 0.815 | 0.840 | 0.846 | 0.865 | 0.826 |
|  | Disadvantaged | 0.179 | 0.185 | 0.160 | 0.154 | 0.135 | 0.174 |
|  |  |  |  |  |  |  |  |
|  | Academic Index | 227.2 | 227.2 | 227.9 | 227.8 | 228.5 | 227.8 |
|  | Extracurricular Rating | 2.425 | 2.410 | 2.440 | 2.390 | 2.430 | 2.390 |
|  | Personal Rating | 2.253 | 2.270 | 2.270 | 2.280 | 2.260 | 2.300 |

**Simulation Four: Half-Athlete Preference, Neighborhood Percentage Rule, Athlete Preference Turned On**

Turn off Preferences: Legacy, Race, Early Decision, Staff Kid, Faculty Kid, Dean Director, Disadvantaged, Waiver, First Gen, Fin Aid Applicant

Keep athlete preferences

Estimation is based on Extended Sample and Excludes Overall Rating

Exclude Heterogeneity in Demographic Effects

Assign even number of admits from each neighborhood cluster

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| NO SES Boost | White | 0.522 | 0.497 | 0.462 | 0.454 | 0.474 | 0.456 |
| | African American | 0.076 | 0.083 | 0.079 | 0.085 | 0.079 | 0.084 |
| | Hispanic | 0.100 | 0.109 | 0.094 | 0.099 | 0.098 | 0.100 |
| | Asian | 0.263 | 0.264 | 0.257 | 0.256 | 0.275 | 0.269 |
| | Other Minority | 0.040 | 0.048 | 0.109 | 0.106 | 0.074 | 0.091 |
| | | | | | | | |
| | Non-Disadvantaged | 0.815 | 0.814 | 0.801 | 0.840 | 0.843 | 0.805 |
| | Disadvantaged | 0.185 | 0.186 | 0.199 | 0.160 | 0.157 | 0.196 |
| | | | | | | | |
| | URM Non-Disadvantaged | 201 | 205 | 174 | 196 | 195 | 192 |
| | URM Disadvantaged | 146 | 161 | 139 | 132 | 115 | 130 |
| | | | | | | | |
| | Academic Index | 226.92 | 226.97 | 227.41 | 227.82 | 228.29 | 228.35 |
| | Extracurricular Rating | 2.49 | 2.41 | 2.44 | 2.39 | 2.43 | 2.41 |
| | Personal Rating | 2.33 | 2.30 | 2.34 | 2.33 | 2.31 | 2.31 |
| | | | | | | | |
| Half Athlete Boost | White | 0.475 | 0.451 | 0.421 | 0.424 | 0.440 | 0.396 |
| | African American | 0.099 | 0.102 | 0.104 | 0.103 | 0.093 | 0.101 |
| | Hispanic | 0.117 | 0.134 | 0.127 | 0.119 | 0.122 | 0.135 |
| | Asian | 0.267 | 0.265 | 0.253 | 0.252 | 0.276 | 0.276 |
| | Other Minority | 0.042 | 0.047 | 0.096 | 0.102 | 0.070 | 0.092 |
| | | | | | | | |
| | Non-Disadvantaged | 0.565 | 0.552 | 0.549 | 0.577 | 0.570 | 0.457 |
| | Disadvantaged | 0.435 | 0.448 | 0.451 | 0.423 | 0.430 | 0.543 |
| | | | | | | | |
| | URM Non-Disadvantaged | 119 | 118 | 100 | 117 | 117 | 85 |
| | URM Disadvantaged | 307 | 334 | 318 | 278 | 259 | 328 |
| | | | | | | | |
| | Academic Index | 224.97 | 225.26 | 225.41 | 225.90 | 226.30 | 225.92 |
| | Extracurricular Rating | 2.54 | 2.47 | 2.50 | 2.46 | 2.50 | 2.50 |
| | Personal Rating | 2.34 | 2.34 | 2.36 | 2.35 | 2.35 | 2.34 |
| | | | | | | | |
| Status Quo | White | 0.505 | 0.474 | 0.455 | 0.431 | 0.443 | 0.404 |
| | African American | 0.122 | 0.130 | 0.112 | 0.128 | 0.132 | 0.136 |
| | Hispanic | 0.099 | 0.124 | 0.103 | 0.115 | 0.132 | 0.129 |
| | Asian | 0.219 | 0.217 | 0.228 | 0.219 | 0.214 | 0.237 |
| | Other Minority | 0.055 | 0.055 | 0.101 | 0.106 | 0.080 | 0.093 |
| | | | | | | | |
| | Non-Disadvantaged | 0.821 | 0.815 | 0.840 | 0.846 | 0.865 | 0.826 |
| | Disadvantaged | 0.179 | 0.185 | 0.160 | 0.154 | 0.135 | 0.174 |
| | | | | | | | |
| | URM Non-Disadvantaged | 294 | 323 | 274 | 315 | 360 | 333 |
| | URM Disadvantaged | 144 | 165 | 120 | 124 | 108 | 133 |
| | | | | | | | |
| | Academic Index | 227.2 | 227.2 | 227.9 | 227.8 | 228.5 | 227.8 |
| | Extracurricular Rating | 2.425 | 2.410 | 2.440 | 2.390 | 2.430 | 2.390 |
| | Personal Rating | 2.253 | 2.270 | 2.270 | 2.280 | 2.260 | 2.300 |

**Simulation Five: Neighborhood Percentage Rule, Expanded Pool**

Turn off Preferences: Legacy, Athlete, Race, Early Decision, Staff Kid, Faculty Kid, Dean Director, Disadvantaged, Waiver, First Gen, Fin Aid Applicant

Estimation is based on Extended Sample and Excludes Overall Rating

Exclude Heterogeneity in Demographic Effects

Assign even number of admits from each neighborhood cluster

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|
| NO SES Boost | White | 0.492 | 0.473 | 0.441 | 0.425 | 0.440 | 0.427 |
| | African American | 0.076 | 0.084 | 0.082 | 0.081 | 0.078 | 0.081 |
| | Hispanic | 0.105 | 0.112 | 0.101 | 0.111 | 0.109 | 0.107 |
| | Asian | 0.286 | 0.288 | 0.267 | 0.281 | 0.293 | 0.293 |
| | Other | 0.040 | 0.043 | 0.109 | 0.102 | 0.080 | 0.093 |
| | | | | | | | |
| | Non-Disadvantaged | 0.702 | 0.711 | 0.696 | 0.737 | 0.745 | 0.696 |
| | Disadvantaged | 0.298 | 0.289 | 0.304 | 0.263 | 0.255 | 0.304 |
| | | | | | | | |
| | Academic Index | 228.66 | 228.49 | 228.77 | 229.33 | 229.83 | 229.89 |
| | Extracurricular Rating | 2.39 | 2.30 | 2.34 | 2.31 | 2.34 | 2.33 |
| | Personal Rating | 2.25 | 2.24 | 2.25 | 2.26 | 2.23 | 2.25 |
| | | | | | | | |
| Half Athlete Boost | White | 0.427 | 0.404 | 0.390 | 0.382 | 0.392 | 0.361 |
| | African American | 0.105 | 0.108 | 0.112 | 0.112 | 0.101 | 0.106 |
| | Hispanic | 0.140 | 0.147 | 0.141 | 0.135 | 0.143 | 0.146 |
| | Asian | 0.284 | 0.294 | 0.267 | 0.271 | 0.292 | 0.300 |
| | Other | 0.044 | 0.048 | 0.090 | 0.100 | 0.072 | 0.088 |
| | | | | | | | |
| | Non-Disadvantaged | 0.349 | 0.344 | 0.347 | 0.364 | 0.365 | 0.258 |
| | Disadvantaged | 0.652 | 0.656 | 0.653 | 0.636 | 0.635 | 0.742 |
| | | | | | | | |
| | Academic Index | 225.94 | 225.91 | 225.91 | 226.68 | 227.33 | 226.81 |
| | Extracurricular Rating | 2.47 | 2.40 | 2.44 | 2.41 | 2.44 | 2.44 |
| | Personal Rating | 2.28 | 2.29 | 2.28 | 2.29 | 2.29 | 2.30 |
| | | | | | | | |
| Status Quo | White | 0.505 | 0.474 | 0.455 | 0.431 | 0.443 | 0.404 |
| | African American | 0.122 | 0.130 | 0.112 | 0.128 | 0.132 | 0.136 |
| | Hispanic | 0.099 | 0.124 | 0.103 | 0.115 | 0.132 | 0.129 |
| | Asian | 0.219 | 0.217 | 0.228 | 0.219 | 0.214 | 0.237 |
| | Other | 0.055 | 0.055 | 0.101 | 0.106 | 0.080 | 0.093 |
| | | | | | | | |
| | Non-Disadvantaged | 0.821 | 0.815 | 0.840 | 0.846 | 0.865 | 0.826 |
| | Disadvantaged | 0.179 | 0.185 | 0.160 | 0.154 | 0.135 | 0.174 |
| | | | | | | | |
| | Academic Index | 227.2 | 227.2 | 227.9 | 227.8 | 228.5 | 227.8 |
| | Extracurricular Rating | 2.425 | 2.410 | 2.440 | 2.390 | 2.430 | 2.390 |
| | Personal Rating | 2.253 | 2.270 | 2.270 | 2.280 | 2.260 | 2.300 |