# EXHIBIT 01

# In The Matter Of:

*Students for Fair Admissions, Inc. v.*
*President and Fellows of Harvard College, et al.*

---

*Marlyn Elizabeth McGrath*
*June 18, 2015*
*Highly Confidential*

---

*195 State Street • Boston, MA 02109*
*Nationwide - Worldwide*
*888.825.3376 - 617.399.0130*
*www.court-reporting.com*



O'BRIEN & LEVINE
Court Reporting Services
*Making Your Case*

Original File Marlyn Elizabeth 6-18-15.txt
Min-U-Script® with Word Index

1     Q.   Okay.  What's the -- what's the next one that you

2   can think of?

3     A.   Well, another one that overlaps is the program

4   that each athletic coach conducts to identify promising

5   athletes who might be suitable for Harvard College.

6     Q.   And how is -- what are the mechanics of the

7   identification of those students?

8              MR. WOLFSON:  Objection.

9              Go ahead.  To the extent you know, go

10         ahead and answer.

11    Q.   To the admissions office, how about that.

12             MR. WOLFSON:  Right.

13    A.   We have 42 intercollegiate sports in a Division 1

14   program, the largest of any institution.  Each of those

15   sports has a different method of identifying potential

16   athletes who might be plausible candidates for Harvard.

17    Q.   And how -- I guess, at what point does the

18   admissions office get involved in identifying and

19   recruiting those candidates?

20    A.   Each sport of those 42 sports has a liaison, a

21   member of my -- a member of my staff, who acts as, as I

22   say, as a liaison with the coach of the sport, and the

23   relationship, the sharing of communication, the sharing of

24   information between the coach and the liaison is different

1     Q.    -- interviewers?

2     A.    Yes.

3     Q.    And Ms. Weaver's responsible for maintaining the

4  substance of that database?

5     A.    Correct.

6     Q.    After that information is entered into the

7  database, what steps does the admissions office take with

8  respect to reaching out to the alumni interviewer or

9  bringing them into the admissions process?

10     A.    We have a regular program of electronic

11  communication, and we also provide, by virtue of having

12  them in that database, access to, for example, the handbook

13  for interviewers and the handbook for schools committee

14  chairs, materials we discussed a moment ago.

15     Q.    And who actually schedules alumni interviews?

16     A.    A combination of the schools committee chair and

17  the actual person who is going to do the interview.

18     Q.    And does the admissions office have input into

19  that scheduling process?

20     A.    Not typically.

21     Q.    Does the admissions office identify for the

22  schools committee chair or the alumni interviewer who the

23  candidates they would like to have interviewed are?

24     A.    Yes.

1    Q.    And who does that?

2    A.    That is done via the database administered by

3    Caroline Weaver.

4    Q.    How -- is an alumni interview mandatory for

5    applicants to Harvard?

6    A.    No.

7    Q.    Who decides whether or not an alumni interview

8    should take place?

9    A.    Often the decision is a regional one.  That is to

10   say, in some areas, every applicant is interviewed, without

11   exception, which has been our traditional approach up until

12   recent years when the numbers grew very large.  Some areas

13   do it on -- do it -- a few areas do it by waiting for us to

14   say, "It's very important that you interview these ten

15   viable candidates."  In other areas they do it when it's

16   possible for them, and there may be some variation in

17   practice.

18   Q.    Is the variation in practice in these areas just a

19   function of numbers?

20   A.    Usually, and location.

21   Q.    So it used to be the process that basically

22   everybody got an alumni interview.  Was it mandatory at

23   that time?

24   A.    We have never used the word "mandatory," to my

1        Q.    And who oversees that program?

2        A.    That has this year been overseen by Charlie --

3   Charlene is really her name -- Kim.  And Pharen with a P-h,

4   Pharen Bowman.  This year it was overseen jointly by those

5   two people.

6        Q.    Before this year, who was it overseen by?

7        A.    I think just by Charlie Kim.

8        Q.    Okay.  Any other programs in addition to HFAI and

9   the Undergraduate Minority Recruitment Program that sort of

10  exist as dedicated efforts?

11       A.    Oh, yes.  We have something called UAC.  And UAC

12  stands for University Admissions Council.  I did not choose

13  the words.  And it predates my time in the office.  That

14  is --

15       Q.    Yes, please.

16       A.    And that's an organization of students who do a

17  variety of recruitment things.  I think of them as an

18  umbrella program that also works with the HFAI recruitment

19  and the UMRP recruitment program, but they're known for

20  their ability to provide housing, hosting opportunities for

21  students who visit us when we're able to do that.  And they

22  play a role in the visiting student program when students

23  are admitted.

24       Q.    What determines whether or not a student needs to

1   be hosted?  I assume we're talking about overnight when a

2   student has to be hosted.

3       A.   Yes.

4       Q.   What determines whether or not they're provided an

5   overnight hosting accomodation?

6       A.   Availability, chiefly.  We say on our website that

7   if a student is a senior and is thinking about applying to

8   Harvard that we may be able to provide accommodation

9   overnight for one night during term time.  And we -- the

10  possibility of that is determined largely by availability

11  and timing, and so on.

12      Q.   Who oversees the UAC program?

13      A.   A team of people, but I think the right person to

14  name is Kaitlin, with a K, Howrigan.

15      Q.   Are there additional sort of dedicated programs

16  within the admissions office other than the ones that we've

17  discussed?

18      A.   Those are the ones.  Those are our programs.  I

19  can't think of any others.

20      Q.   Are you familiar with the standing faculty

21  committee on admissions?

22      A.   I am.

23      Q.   Can you tell me what that committee's role is?

24      A.   Well, the name of the committee is Standing

1   Committee on Admissions and Financial Aid, just for formal.

2   And, yes, I can tell you about that committee.  It includes

3   about 20 senior members of the faculty, teaching faculty,

4   and a large handful of 30 or something senior

5   administrators.

6       Q.   Does that include administrators in the admissions

7   office?

8       A.   Ex officio it does.

9       Q.   And who are the ex officio admissions personnel

10  whom --

11      A.   Dean Fitzsimmons, Sally Donahue, the director of

12  financial aid, and myself.

13      Q.   Who's Andrea Balian?

14      A.   Balian.  She's my staff assistant.

15      Q.   Does she serve as an administrative support role?

16      A.   She is the administrative support to that

17  committee.

18      Q.   And what does the -- what does the standing

19  faculty committee do with respect to the admissions

20  process?

21               MR. WOLFSON:  Objection.

22               Go ahead.

23      A.   I describe them or think of them as the -- as a

24  kind of oversight committee.  In practical terms, they do

1      Q.    What are those meetings?

2      A.    All of the meetings of the -- of the in-house

3   office admissions committee, the administrative folks who

4   comprise the working admissions committee to whom, in

5   effect, that standing committee has delegated that, it's a

6   word we've used, the day-to-day responsibility for

7   assessing candidates.

8      Q.    So let me -- so who's on the in-house admissions

9   committee?

10     A.    The people I refer to as admissions officers or

11  senior admissions officers or, which we haven't talked

12  about, those members of the financial aid staff who also

13  have an admissions role also carry responsibility for

14  areas.

15     Q.    So let's just talk about that right now.  Who are

16  those people who are on the financial aid staff but have a

17  role with the admissions committee?

18     A.    Certain members of the financial aid staff whose

19  title is in addition financial aid officer or senior

20  financial aid officer or associate director, may include

21  financial aid in it, a number of them, probably ten or

22  perhaps over ten, also carry responsibilities for areas

23  which they handle as admissions officers.

24     Q.    And what sort of responsibilities would that

1    include?

2        A.    Same in that role as admissions person, the same

3    as other people who were pure, if you will, admissions

4    officers.

5        Q.    Okay.  So they would --

6        A.    The full service.

7        Q.    They would participate in reading files and

8    working with --

9        A.    Working with alumni and working with schools.

10       Q.    They'd be assigned to a docket area?

11       A.    Uh-huh.

12       Q.    That's a yes?

13       A.    Yes.

14       Q.    Yes.  And is anyone from the standing faculty

15   committee actually a member or participant of the in-house

16   admissions committee?

17       A.    They're all -- we consider them all members,

18   because we consider us their delegatees.  They vary greatly

19   in their participation in the subcommittee meetings and the

20   actual meetings of the committee.

21       Q.    And are there members of this standing faculty

22   committee who take a more active role specifically with

23   respect to the in-house admissions committee sessions?

24       A.    Yes.  There are some who are more often present in

1    the meetings.

2         Q.    Who are the faculty members on the committee who

3    are most often present?

4         A.    The most frequent attender is professor of German,

5    Peter Burgard.

6         Q.    Other members who are more frequent in their

7    participation?

8         A.    There is, although he was not active this year,

9    but there is a physicist named Amir Yacoby, who has on a

10   number of occasions come to committees -- come to

11   committee.

12        Q.    I'm going to ask you to spell Amir Yacoby.

13        A.    A-m-i-r, Y-a-c-o-b-y.

14        Q.    Thank you.

15        A.    Ordinarily, they don't come to the -- to those.

16   Ordinarily they -- their participation in the committee

17   deliberations is usually through reading, reviewing

18   folders, and giving us their comments on applicants.

19        Q.    When you say "they," are you talking --

20        A.    I mean the members of the teaching faculty who are

21   on the Standing Committee on Admissions and Financial Aid.

22        Q.    Do all members of the committee review and read

23   files?

24        A.    That's a role that they're all supposed to take.

1    So ordinarily, yes.

2         Q.    Okay.  Are there, besides Mr. Burgard and Mr.

3    Yacoby, are there other faculty members who take a more

4    active role on a comparative basis than the rest of the

5    committee?

6         A.    Do you mean in reading or in --

7         Q.    So let's -- let me rephrase the question.

8              Are there members of the faculty committee who are

9    more active with respect to reading files than other

10   members?

11        A.    Yes.

12        Q.    Okay.  And who are the members of the committee

13   who are most active in reading files?

14        A.    The ones who are most active in reading files

15   typically are in the sciences.  Although Professor Burgard

16   and one other humanist have read a large number this past

17   couple of years.

18        Q.    Who's the other humanist?

19        A.    Professor Thomas in classics.  But typically the

20   biggest load of reading has been done by the people in the

21   natural sciences.

22        Q.    And can you think of three or four names of the

23   people who are --

24        A.    Yes.  Professor Guidotti, which is

1   G-u-i-d-o-t-t-i.  Professor Woollacott.  I'm trying to

2   think of others here.  I'm losing my capacity for

3   remembering which one had the most this year.  Professor

4   Mitzenmacher.  Those are three who read quite a lot this

5   year.  We can, if necessary, we can come up with other

6   names if that would be helpful.

7       Q.   Is -- are the -- are comments from faculty members

8   who review files accorded any additional significance in

9   the admissions process?

10      A.   Yes.  They're accorded great significance.

11           May I add a name to the list of --

12      Q.   Please.

13      A.   -- people I gave you that was just too obvious for

14  me to notice.  A guy named Joe Harris, who's a

15  mathematician, who reads a very large numbers of

16  mathematics.

17      Q.   They're accorded great significance?

18      A.   Yes.

19      Q.   And why is that?

20      A.   In those cases where the distinguishing excellence

21  of the candidate is going -- seems likely to be unusual

22  academic talent or achievement, that determination is

23  always made by a member of the faculty committee, or a

24  member of the faculty at least.

```
1                   MR. WOLFSON:  So in the future, don't
2            reveal the discussions that you have with
3            counsel.
4                   THE WITNESS:  Oh, I'm sorry.  I
5            didn't --
6   BY MR. STRAWBRIDGE:
7       Q.   I'm not so sure that you actually revealed any
8   privileged information.
9       A.   I took advice.
10      Q.   But let me just preface this, and I probably
11  should have said this at the beginning.  If at any point
12  your answer depends entirely on information that was
13  provided to you on advice of counsel, please note that.
14      A.   I was aware of this.  I shouldn't have made that
15  mistake.  I was aware of the general point.
16      Q.   That's all right.
17           And does the three-year retention policy continue
18  until this day?
19      A.   Yes.
20      Q.   As part of this litigation, did you receive
21  instructions to maintain documents?
22      A.   Yes.  Yes.
23      Q.   And that includes any physical files --
24      A.   Yes.
```

1    Q.    -- that otherwise would have been --

2    A.    Right.  Right.

3    Q.    -- slated for destruction?

4    A.    Right.  Yes, that's correct.

5    Q.    And so back to the sort of the original question,

6  up until what point -- strike that.

7         These files typically, the admissions files,

8  whether admitted and going on to become essentially the

9  student file, or maintaining for three years because the

10  student either didn't get in or turned Harvard down --

11    A.    Right.

12    Q.    -- these were actually maintained as a physical

13  hard copy file?

14    A.    Yes.

15    Q.    And what would go in that file?

16    A.    The materials submitted to us by the student, the

17  application and our application supplement, and any other

18  additional materials submitted by the student, you know,

19  copy of the poems she wrote or additional material the

20  student wanted to provide for us to explain her case.

21         In addition to that, the SSR, the secondary school

22  report, which includes a letter of recommendation on behalf

23  of the school, whether it's written by the guidance

24  counselor or the principal, and a transcript.  If the

1    student has been in more than one school in four years, we

2    have the corresponding material from the other school as

3    well.  And two teacher letters of recommendation.  We

4    invite people -- we ask them to do it, and so we have

5    those.  Test scores, which are submitted directly to us

6    electronically by the testing agencies.

7              At the point when an interview has been reported

8    and when we have an interview report, that interview report

9    is part of the folder, electronic now, but paper formerly.

10             And any other material that people want to send.

11   I mean somebody's, you know, priest can write or somebody's

12   godmother can write, or you know, anything else that's sent

13   to us we read, and we include in the folder.

14             Some materials don't fit in a folder, and -- so a

15   student, for example, who submits for our review a musical,

16   a recording of a musical performance, a note is put in the

17   file that such a -- such a piece of evidence has been

18   provided.  Sometimes if a student provides slides of

19   artwork, that may find its way into the file, or it may be

20   too big and be in a drawer, and then there will be a note

21   in the file that there is such a thing in the file and

22   either the actual or the signed -- or a notation that

23   somewhere in the office is additional material.

24             So it should include all of the materials that are

1   available for the review of the committee.

2       Q.   In addition to the report from the interviewer, I

3   assume you meant the alumni interviewer?

4       A.   Yes, I did.  But I should have -- could have noted

5   that if there was a staff interview done as well, if the

6   student happened to come on the first-come, first-served

7   basis that we offer staff interviews, any other interviews

8   would be included.

9       Q.   What about any additional analysis of the -- of

10  the application from people in your office?

11      A.   People in my office.  There's -- there is a space

12  on the electronic thing, and there's a piece of paper in

13  the paper version, where people, as they review, once the

14  folder's complete that I just described, once that's

15  complete and begun to be read, the people who read the

16  folder, the readers make their comments on a sheet of

17  paper, which then is available to the subsequent readers

18  and to the full committee.

19      Q.   Is that sometimes referred to as a summary sheet?

20      A.   Yes.

21      Q.   And are comments from admissions officers or other

22  people in your office always placed on the summary sheet

23  either in the electronic or paper format, depending on

24  timing?

1      A.    That's the idea, yes.

2      Q.    Are they ever, you know, written in the margins or

3  otherwise notated in the file?

4      A.    People do note -- do annotate files.  It's not as

5  easy online.  But people may write comments in the -- in

6  the corner of the essay or the corner of the recommendation

7  alert.

8      Q.    And are those comments always picked up into the

9  summary sheet?

10     A.    No.  There's -- but the entire folder is available

11 for any reader who is reading it.

12     Q.    Besides any comments written in the margin as well

13 as the summary sheet, is there any other documents that

14 would go into a file at any point in time during the

15 admissions process?

16     A.    I should have mentioned those candidates who were

17 recruited athletes, there will be a review sheet, an

18 assessment sheet, talking about what the strengths of

19 the -- the athletic strengths of the case are.  And in the

20 case -- in those cases that are sent for review by members

21 of the faculty, that's six or seven hundred cases or

22 something in a year, those comments are submitted to the

23 file and are available to the readers of the folder.

24     Q.    Are the athletic strengths, those comments, were

1   because the area person asked me -- wanted me to know and

2   asked me about whether they should go.

3        Q.   You don't remember the name of this person?

4        A.   I don't.

5        Q.   Do you remember who the area coordinator was?

6        A.   Yes, I do, I think.  The person who told it to me

7   was Chris Looby is his name.  I think he was the area

8   person who heard it directly.

9        Q.   Do you recall when this was?

10       A.   I think it was -- I think it was two years ago.

11  It may have been last spring.  It may have been a year ago.

12  I mean, you know, a year ago, but it may also have been two

13  years ago.  It was after the process was over.  Also, the

14  Connecticut Club, the only other one I remember is that the

15  Connecticut Club had a similar, they wanted to discuss the

16  topic because some member of the club, who I never knew who

17  it was, didn't ask, felt that this was a topic for

18  discussion.

19       Q.   Before we go on to the Connecticut Club, do you

20  remember what the basis of the alumnus who was in New York

21  State, the basis of her complaint was?

22       A.   No, I don't.  I don't think I ever knew that,

23  actually.

24       Q.   And is that also true with respect to the

```
 1   Connecticut Club?
 2       A.   Yes.  Yes.
 3       Q.   Who would have had responsibility for
 4   communications with the Connecticut Club?
 5       A.   I don't remember who this was, actually, who
 6   brought this to my attention.  It could have been Grace
 7   Cheng, but I think I'm remembering that wrong.  I don't
 8   remember.  It came to me indirectly.
 9       Q.   How did it come to you?
10       A.   Some member of my staff.  Might have been Grace.
11       Q.   I'd like to hand you a document that I'm going to
12   ask the reporter to mark as Exhibit 1.
13                    (Exhibit 1, Harvard University fall
14           2015 application supplement, marked.)
15                    MR. WOLFSON:  Be sure you look
16           carefully at the exhibit.
17       Q.   I'd ask you to review the exhibit and let me know
18   when you've had a chance to look it over.  (Pause.)  Have
19   you had a chance to review this?
20       A.   Yes, I have.
21       Q.   Do you recognize this document?
22       A.   I do.
23       Q.   What is this document?
24       A.   That's what's known as the Harvard supplement.
```

1    Q.    Is there anybody else who you can think of who has

2  more than one-off communication with you regarding

3  admissions to students at Harvard?

4    A.    The president from time to time is contacted by

5  people, lots of people who have children or, you know,

6  people applying and they wish to advocate, and whatever

7  commentary comes to the president, she passes along to me.

8    Q.    Is that communication generally included in an

9  applicant's file?

10   A.    Yes.

11   Q.    Is it always included in an applicant's file?

12   A.    Yes, it is.

13   Q.    The same with communications from the Office of

14  Government and --

15   A.    Yes.

16   Q.    -- Community Affairs?

17   A.    Yes.

18   Q.    And the same with information communicated from

19  the alumni association or the office of development?

20   A.    If it's substantive and specific, it might be

21  included as part of the file.  If it's partly just going

22  over a list of names to watch, we probably would -- we

23  might not put it in the folder.  We might simply watch that

24  candidate, make sure that -- it might not be in the file.

```
 1                    MR. STRAWBRIDGE:  This is a good

 2            stopping point for me.

 3                    MR. WOLFSON:  Sure.  Okay.

 4                    MR. STRAWBRIDGE:  We can take lunch

 5            right now.  Thank you so much.

 6                    THE WITNESS:  You're welcome.

 7                    (Recess:  12:35 p.m. to 1:17 p.m.)

 8   BY MR. STRAWBRIDGE:

 9       Q.   Okay.  Good afternoon --

10       A.   Good afternoon.

11       Q.   -- Ms. McGrath.

12            When an applicant fills out the Common Application

13   or the Universal College Application, they have the

14   opportunity to indicate their race or ethnic background?

15       A.   They do.

16       Q.   Okay.  And do you know what categories they are

17   presented to select?

18       A.   I always have to remind myself.  It's a drop-down

19   menu, as I understand it.

20       Q.   Let me make sure that's actually on the --

21                    MR. STRAWBRIDGE:  I'm going to ask

22            the court reporter to mark this as Exhibit

23            No. 2.  I ask the court reporter to mark

24            this as Exhibit 2 and this as Exhibit 3.
```

1              (Exhibit 2, Universal College

2          Application five-year admissions

3          application, marked.)

4              (Exhibit 3, The Common Application

5          first-year application, marked.)

6     Q.    Starting with Exhibit No. 2, Ms. McGrath, which is

7     the Universal College Application, I think if you turn to

8     the second page at the very top --

9     A.    Yes.

10    Q.    -- that's the section that includes ethnicity?

11    A.    Yes.

12    Q.    And it asks two questions; correct?

13    A.    Yes.

14    Q.    The first is whether you are Hispanic or Latino?

15    A.    Right.

16    Q.    And the second says, "How would you describe your

17    racial background?"  And then it lists "Asian," "Black or

18    African-American," "American Indian or Alaskan Native,"

19    "Native Hawaiian or Other Pacific islander" or "White"; is

20    that accurate?

21    A.    Yes.

22    Q.    And with respect to the Common Application, which

23    is Exhibit No. 3, under the "Demographics" section on page

24    1 --

1      A.    Yes.

2      Q.    -- the right column, it again -- well, not again,

3  but it also asks, "Are you Hispanic/Latino?"  And then it

4  says, "Regardless of your answer to the prior question,

5  please indicate how you identify yourself."  And, again, it

6  gives the option "American Indian or Alaskan Native,"

7  "Asian (including Indian subcontinent and Philippines),"

8  "Black or African-American (including Africa and

9  Caribbean)," "Native Hawaiian or Other Pacific Islander,

10  (Original Peoples)," or "White (including Middle Eastern)";

11  is that accurate?

12      A.    Yes.

13      Q.    When -- you mentioned earlier that when Harvard

14  receives information from standardized testing services, it

15  records information regarding ethnic identities of

16  potential targets, or it collects information, I suppose,

17  of ethnic identities and potential targets for recruitment;

18  correct?

19      A.    The testing agency?

20      Q.    The testing agency collects them and provides them

21  to Harvard?

22      A.    Yes.

23      Q.    And does Harvard enter that information into its

24  database?

1      A.   Yes.

2      Q.   Okay.  Does Harvard also enter into its database

3  the indications that applicants make with respect to their

4  race or ethnic identity under the questions we just

5  reviewed --

6      A.   Yes.

7      Q.   -- on the common applications?

8      A.   Yes.

9      Q.   And do you know what -- are the categories that

10 are listed on the Common Application and the Universal

11 College Application the categories Harvard uses in its

12 database?

13     A.   These are, yes.

14     Q.   Okay.  Do you have -- are there any other race or

15 ethnic category, categories, that are not included on these

16 applications that Harvard tracks on its database?

17     A.   We sometimes see "Other."  And I think that in

18 some of our reporting, that may be "White," but I'm not

19 sure.  That's not a question I can answer with confidence.

20     Q.   Okay.  Do you know whether or not Harvard ever

21 receives conflicting information from the standardized test

22 services and the actual applications received about a

23 particular recruitment target's racial identification?

24     A.   I understand that we do.

1    Q.   And what does it do to resolve that conflict, if

2    anything?

3    A.   We don't really resolve the conflict.  The

4    question -- we don't really resolve the conflict.

5    Q.   Okay.  So what does it do when it gets either

6    conflicting or additional information?

7    A.   For the database for applications, the one that is

8    the -- the racial preference choice associated with that

9    candidate is whatever he or she indicates at the time that

10   she applied on the application, Universal or Common

11   Application.  I understand that we retain in our database

12   all information pertaining to ethnicity, but we don't

13   attempt to reconcile it.

14   Q.   So the information that Harvard would use going

15   forward for its own reporting purposes would be the

16   information reported on the equivalent of Exhibits 2 and 3?

17   A.   Yes.

18   Q.   What does Harvard do if an applicant does not

19   indicate an ethnicity on either of these applications?

20              MR. WOLFSON:  Objection.

21              Go ahead.

22   A.   We don't necessarily do anything.

23   Q.   Does Harvard make any attempt to ascertain the

24   race of an applicant through other parts of its

1    field where Harvard tracks for its own purposes the

2    ethnicity it has identified through the other materials?

3         A.    Not to my knowledge, not a field.

4         Q.    Would Harvard -- does Harvard report the

5    identification of race that -- of the applicants that it

6    admits and enrolls to the federal government?

7         A.    Yes, we do.

8         Q.    And is the basis for that reporting a database

9    that the admissions office maintains?

10        A.    Yes.

11        Q.    So is it your testimony that in all instances, the

12   data reported to the federal government will match

13   precisely the data that was self-reported on the Common

14   Application or Universal College Application?

15        A.    I can't tell you that with confidence.

16        Q.    Okay.  Well, why can you not say that with

17   confidence if Harvard makes no other change to its database

18   apart from what the candidate self-identifies on one of the

19   two common applications?

20        A.    What I thought I was answering was the question

21   about our own database.

22        Q.    Okay.  So please explain.

23               MR. WOLFSON:  Objection.

24               Go ahead.

1      A.    The reporter to the -- the registrar is, I

2    believe, the transmitter of -- of those data to the

3    government, and I'm not certain, but that's what I think is

4    true, that the reason I couldn't tell you for certain was

5    that if it's the registrar, I can't tell you what other

6    sources they may have.

7      Q.    Does your office provide its database to the

8    registrar's office?

9      A.    Yes.  We provide the -- we provide to the

10   registrar's office at the time that we're conveying the --

11   conveying the student to freshman status, we provide the

12   registrar's office and the freshman dean's office with the

13   data that we have concerning the applicants who are about

14   to enroll.

15     Q.    That would occur at the time that the applicant

16   has accepted Harvard's invitation to enroll?

17     A.    Yes.  After the applicant is accepted.

18     Q.    What does Harvard do -- strike that.

19           In a situation where the applicant does not self-

20   identify on one of the universal applications but Harvard

21   learns through other materials submitted of the applicant's

22   race or ethnic background, what does Harvard do with that

23   information?

24     A.    We -- we bear it in mind.  We do not change the

1    Q.    Is there any other part in the admissions process

2    where an applicant is -- would be asked to identify their

3    race, apart from the universal applications and/or their

4    testing service information that's conveyed to Harvard?

5    A.    Not asked to be identified.

6    Q.    And I assume -- am I right to assume that your

7    distinction about being not asked, there may be occasions

8    for them to volunteer or provide that information?

9    A.    Yes.

10    Q.    If the person does not self-identify in one of the

11    universal applications but is later determined to, for

12    example, be African-American through other materials they

13    submit as part of their application, is that person's race

14    taken into account with respect to Harvard's conclusions

15    regarding the candidate's merits for increasing Harvard's

16    diversity?

17    A.    You know, every bit of information we have or are

18    told gets taken into account.

19    Q.    So that would include information about race

20    that --

21    A.    It could well, yes.

22    Q.    -- that may have arisen outside of the self-

23    identification?

24    A.    Yes.

1     Q.   I'd like to talk a little bit about how the office

2   basically goes through the admissions process.  And perhaps

3   why don't you tell me if this is correct.  The logical

4   starting point, from my perspective, might be to talk a

5   little bit about the early action program.  Is that -- in a

6   particular admissions cycle, is that essentially the first

7   wave of admissions decisionmaking?

8     A.   It is.

9     Q.   Can you describe to me how early applications are

10   handled in your office from the time they are received

11   until decisions are made?

12     A.    The -- the first person to read a completed folder

13   is the area person, the area officer in charge of

14   candidates from that geographic region and that group of

15   schools, who would review the folder, read all the material

16   it contains at that moment, and write comments about the

17   case and also make, for the purposes of clarity, certain

18   numerical annotations, which we call a profile, for various

19   elements, aspects, of the candidacy.  So as the area person

20   reads it, he would make ratings of various aspects of the

21   candidate.

22     Q.   What are the aspects of the candidate that are

23   rated numerically?

24     A.    There are -- for the candidate himself, there are

1  four:  Academic, extracurricular, not including athletic,
2  athletic, and personal.  And then there is reflecting some
3  combination, not an average or anything, an overall, an
4  overall rating made considering all of those elements.  But
5  those are the four -- the four aspects, the four angles.
6      Q.   And what are the numerical options that are used
7  to rate those four categories?
8      A.   We always -- the training materials, I suspect,
9  say 1, 2, 3, 4, 5, 6.  The ones that we use to evaluate
10  degree of excellence or participation are 1, 2, 3, 4.  5 is
11  a special placeholder to indicate family responsibilities
12  at home or very limited resources that would make it
13  unlikely that the person could do extracurricular
14  activities or academic or athletic activities.
15          But the evaluation of what has been done is
16  typically 1 through 4, with 1 being very unusually strong
17  and 4 being either a negative or a blank.  A person who
18  participated in no athletics, it would be a 4, but that's
19  not necessarily a negative.  It's just the absence of
20  participation.
21      Q.   So each of the categories is typically rated 1
22  through 4?
23      A.   1 through 4.  1 through 4.
24      Q.   And a lower number is a stronger candidate?

1      A.    A lower -- yes, a lower number is a stronger

2  candidate, and yet a plus, which you might think takes you

3  closer -- well, a 1 plus is better than a 1, and a 1 minus

4  is more like a 2, even though 2 is a larger number, if you

5  see what I mean.

6      Q.    Yes.  Was this scoring system in place when you

7  took over the office?

8      A.    It was.

9      Q.    So a 1 plus is better than a 1?

10      A.    Yes.

11      Q.    In terms of a stronger candidate?

12      A.    Yes.

13      Q.    Are -- is the athletic category rated only for

14  people who are candidates for athletic scholarships?

15      A.    The reason we maintain that data cell is that we

16  want to be able to derive -- we don't have athletic

17  scholarships, by the way.

18      Q.    Thank you for correcting me on that.

19      A.    But we -- but we do generate at the end of the

20  process when the admissions thing is complete, among other

21  things, the list I told you about that we share with the

22  Ivy League, so we want to be sure we can report faithfully

23  all of the people who were technically recruited athletes.

24  And a 1 in the athletic column is by definition a recruited

1  athlete.  But a 2 could mean a really, really good athlete

2  in school, but not recruited by us.  And a 3 could mean

3  quite an active, good athlete.

4      Q.   So participation or accomplishments in athletics,

5  apart from being a recruited athlete at Harvard, are still

6  rated?

7      A.   Yes.  But a 1 means one thing, which is recruited

8  athlete, so you can root that out.

9      Q.   And no one would get a 1 if they're not a

10 recruited athlete regardless of --

11     A.   No, no one would get a 1.

12     Q.   So what goes into the academic category

13 assessment?

14     A.   So each of these assessments is made by an

15 individual reader.  Each reader gets -- at least each of

16 the scheduled, assigned readers gets to fill out that

17 rating himself.  The senior member and the -- what goes

18 into the academic one is all of the academically relevant

19 material we have in the folder, which would include grades

20 and scores and letters of recommendation.  There are two

21 typically from teachers.  And perhaps additional

22 information, such as winning physics prizes or being an

23 olympiad or winning mathematics prizes or winning a poetry

24 prize or something like that.  That may inform the academic

1   rating.

2       Q.   I guess that maybe leads to the next question,

3   which is:  What is the difference between, you know, some

4   sort of what I would think of as an academic

5   extracurricular accomplishment and the extracurricular

6   category?  How do you divide those two things?

7       A.   Well, with judgment, and not always consistently.

8   For a lot of -- again, because the formula does not

9   determine admission, it's a guide, some members of the

10  staff will put all of that information, all of that

11  assessment in the first column, and typically that would be

12  the way to do it.  But sometimes if someone is a writer and

13  that's where they spend all of their so-called

14  extracurricular non-class time, the reader might well say

15  that's -- instead of making them a 2 academic, that might

16  make you a 2 extracurricular.  It is a matter of judgment.

17      Q.   Are there any written guidelines that inform the

18  exercise of judgment in trying to determine what's an

19  academic event versus an extracurricular event?

20      A.   Yes.  Generally speaking, but it's not terribly

21  detailed, in the reader sheet -- I mean in the reading

22  instructions, there are comments about what's, you know,

23  what goes in the academic column, what goes in the

24  extracurricular column.  I think the training materials may

1   or may not have anything in writing about that, but that is

2   a topic for training people.

3        Q.   So what are some examples that you can give me of

4   things that would go into the extracurricular column?

5        A.   It might be poetry for some reader and some

6   candidate.  It might be debating.  It might be, you know,

7   any of the sort of nonathletic things that people often do,

8   musical activities, performance or participation in chorus

9   kinds of events.  Political -- political organizational

10  activities, you know, community service activities.  Being

11  president of the student body at a school that's bigger

12  than four would be typically a 2 extracurricular.

13  Otherwise, it might not be.  But that would be a

14  significant position of both trust and -- probably time,

15  time commitment.

16       Q.   Athletics, I take it, is fairly self-explanatory;

17  it's some kind of --

18       A.   It sounds as though it's self-explanatory, and it

19  is, as I said, the 1 is clear, which is recruited athlete

20  status.  If you know it at the time.  You may not.  And

21  most other sports are fairly common sports that we've heard

22  of, you know, fencing, maybe, and baseball, in someone.

23  But a student who is an equestrian person, a horseback

24  rider or something, there are -- for some people that will

1   turn up in the athletic column.  For many of the rest of

2   us, it would turn up in the extracurricular column.  Again,

3   it's a question of the judgment of the reader.

4          But generally speaking, that's -- athletic is

5   construed by the person reading it, and we have some

6   guidelines, again, about what would be a 3, what would be a

7   3 plus, perhaps, what would be a 2.  And we know what a 1

8   is and we know what a 4 is.

9      Q.    And then the last category was personal.

10     A.    Uh-huh.

11     Q.    Can you give me an example of what goes in the

12  personal column?

13     A.    Yes.  That can have various elements.  If the

14  student in writing about himself or herself presents a very

15  appealing personal picture, and that can mean -- appealing

16  can be a wide variety of appeal, you know, a sensitive

17  writer, a person with humor, a person who seems very

18  outward directed, and that's appealing, and if that or some

19  other attractive personal elements are echoed or

20  supplemented, reinforced by the other materials in the

21  folder, typically the SSR, the secondary school report, the

22  counselor letter, who may give us -- which may give us a

23  good deal of information or may not about the candidate's

24  personal style, personal affect, relationships to other

1   is a 3 and who is a 2 and who is a 1?

2       A.   We give guidelines.  Cutoffs is something we don't

3   have, but we do give guidelines.

4       Q.   And what are those guidelines?

5           MR. WOLFSON:  Objection.

6           Go ahead.

7       A.   The reading instructions have some guidelines,

8   which go something like this:  That a 4 academic --

9   starting at the end now, a 4 academic is someone with

10  scores, you know, 500 or below or something -- this is

11  again, it explicitly says "rough guide," but someone who

12  has scores and/or grades that would make -- that would feel

13  like the equivalent of a 500 or below.

14          So, for example, a person who has 650 scores but

15  has C's and D's is probably a 4 academic.  So you have to

16  look at both of those things at once.  A 3 academic is

17  someone more in the sort of 600's, scores in the 600 range,

18  and, you know, call it B's on the transcript, something

19  like that.

20      Q.   When you're talking about the 600's range, are you

21  talk about a particular set of test scores?

22      A.   Well, I'm using -- yes.  Thank you for asking.

23  I'm using the language of the College Board of the ETS, but

24  the equivalent -- and the equivalent number -- and we have

1    conversion chart -- the equivalent number in ACT's.

2        Q.    Some take the SAT's, or is it ACT only?

3        A.    We take both, you know, which is why we have this

4    conversion chart.  And they're, you know, as you know,

5    scaled differently, which makes it harder for people.

6        Q.    And the scale changes from time to time as well.

7        A.    Yes, and we've got the scale changing.

8              And then 2 academic would be someone who would

9    have scores in the, you know, 680 to high 700's to, you

10   know, one or two in the 800 region.  For many members of

11   the staff, a 2 plus academic -- remember I told you the 2

12   pluses are better than 2's -- would be someone who had, you

13   know, a bunch of 800s and straight A scores but no evidence

14   of the next one I'll tell you about, which is the 1

15   academic.

16       Q.    And what would that be?

17       A.    And a 1 academic is someone who we have good

18   reason to believe, based on, say, awards won, the awards

19   that we're familiar with, which are a fair number of

20   awards, and/or, along with good scores.  The scores can be,

21   you know, somewhere in the 700s, excellent grades, and some

22   real academic distinction attested somewhere elsewhere of

23   the kind that we can really trust, might be a 1 academic.

24   And they -- in addition to that, for many of these people

1    as an overlap, a 1 academic would be someone who our

2    faculty said is truly unusual.  So that would be a 1 in the

3    first column, the academic column.

4        Q.   Let's talk about the 1 through 4 scale for extra-

5    curricular activities.  What are the guidelines the office

6    uses for those?

7        A.   So for extracurricular activities, it's pretty

8    rare, I think, to use -- empirically to see a 1

9    extracurricular, but that's someone who would be, you know,

10   the national debate champion.  Someone might think that was

11   worthy of calling it a 1 extracurricular.

12            In making judgments in the extracurricular column,

13   we always have some -- or pay some attention to the time

14   that the student reports spending on something.  So if a

15   student was a one-shot in winning some -- you know, having

16   some great activity and then only spent two hours a week on

17   it, we might decide that it's not quite as high to rate.

18   And these are subjective, as everything in the folder is

19   kind of a subjective reading of one person, because someone

20   else might not agree with that.  So I'm giving you a sense

21   of how I might -- might think of something.  Other people

22   might do it a little differently.

23            But, anyway, to answer your question, so a 2 would

24   be someone who had really -- you know, who was the student

1   20 hours a week taking care of his little sister.  Then

2   you're going to give him a kind of credit, which is the way

3   we think about it, saying, you know, we can't expect or we

4   couldn't expect; we're happy to see this other activity.

5   So that's a flag in a way to other readers that that reader

6   who assigned that was going through and thinking of that as

7   a kind of value judgment, but different, and putting it in

8   that folder.

9       Q.   And then are there guidelines with respect to the

10  allocation of the 1 through 4 standard in the personal

11  category?

12      A.   Yes.  They're not terribly helpful.  I think

13  "unusual appeal" is I think the phrase we use in their

14  reading instructions.  And, you know, again, readers will

15  construe that in different ways.  And 2 is -- and I'm not

16  going to get the words for that one right; it's something

17  like "very appealing," you know, a very attractive person

18  to be with and have in your school community and widely

19  respected.  And 3 means, you know, just fine.  I mean we

20  have better language than this.  I don't know what it is.

21  But there are some guidelines for it, yes.  4 has a

22  meaning.

23      Q.   4 has what, I'm sorry?

24      A.   4 is a kind of negative.

1    Q.    So the initial read goes through and assigns

2    numerical notations to each of these four categories for

3    each application; correct?

4    A.    Yes.

5    Q.    And then is there any significance given to the

6    total of the score?

7                   MR. WOLFSON:   Objection.

8    A.    So the -- I like the way that -- not -- not a

9    total, but there is, as I mentioned before, an overall

10   rating.

11   Q.    Okay.   So how does the overall rating work?

12   A.    So the overall rating is -- and, again, the

13   instruction reading instructions say something about this.

14   Having read the folder, everything that is in the folder at

15   the time that you read it, and having thought about what

16   the strengths of the folder are, the area person is asked

17   to make an overall rating of the excellence and

18   competitiveness, sort of combined, of that candidate.

19          So having read the person who has, you know, good

20   scores and good grades and a high level of, you know, high

21   level of activity in the school, whether it's athletic or

22   whatever it is, and very, very warm, positive admiring for

23   character, whatever it is, personal ratings, that might be

24   some form of a 2 or it might be some form of a 3, depending

1   on the strength of the support, taking into account how

2   strongly the school is endorsing the candidate, how

3   strongly the extra person who wrote in.

4          So it's a combination of -- it's a standing back

5   from the folder and saying, I think this case is at the

6   moment, with only first reading, let's say for the first

7   reader, this strong, and then the second reader will come

8   in and go through the same exercise, perhaps with new

9   information and perhaps not.

10  Q.   The overall rating score is the same 1 through 4

11  analysis?

12  A.   Yes.  1 through 4.

13  Q.   It's just not necessarily calculated with specific

14  reference to the component pieces?

15  A.   Exactly, yes.

16  Q.   And you say a second reader comes in and basically

17  does the exact same exercise?

18  A.   For a case that is strong enough in the first

19  reader's judgment to be considered in committee, presented

20  in committee and considered in committee, that folder will

21  go to the chairman of the docket, who will also read it and

22  similarly write comments and give his, which might be

23  different, assessment of those various aspects of a case as

24  well as an overall rating.

1    Q.    -- which would be the --

2    A.    That would normally be true.

3    Q.    And what about an assessment of 2?

4    A.    Normally go to the third, to the chairman.

5    Q.    Okay.  What about an assessment of 3, an overall

6    assessment of 3?

7    A.    One of two things would be likely to happen,

8    either to go, by the judgment of the first reader, to the

9    chairman anyway, or it might be not expected to be

10   presented in committee.  It could be later, but it might

11   not be one of the cases that you send on believing that it

12   was absolutely going to seem competitive enough.

13   Q.    So I guess that maybe leads me to a different

14   question, which is:  At some point, is someone's

15   application, essentially the process stops for that

16   application because it's evident that they're unlikely to

17   gain admission?

18   A.    It's funny.  It actually doesn't stop, because

19   throughout the process, and throughout the committee

20   process, which is the next element of the, next chapter of

21   this, we have something called a docket, which is a

22   physical docket, which actually lists all of the applicants

23   and, in annotated form, which we all know how to read,

24   quite a lot of information about that student.

1            And fairly often an area of a person presenting

2    two cases from a slate of a school that had four cases,

3    someone on the docket might say, "But what about her?  She

4    looks interesting to me."  And then what the area person

5    will do is to put that all up on the screen and take the

6    subcommittee or the committee through it.  So it's not --

7    and often new information will change the area person's

8    judgment about that case in either direction.

9        Q.   And this is all done -- the process we're talking

10   about here is all done, you know, specifically within a

11   particular geographic area, the docket?

12                   MR. WOLFSON:  Objection.

13                   Go ahead.

14       A.   The first and fullest presentation of cases is

15   often -- the first one is always in subcommittee.

16       Q.   And what do you mean by "subcommittee"?

17       A.   By the -- by the geographic -- I'm sorry -- the

18   geographic regional committee, the one of 20, say,

19   subcommittees we have which are regionally organized.

20       Q.   All right.  So who tends to get or what kind of

21   application profile is going to more often than not get a

22   second read before it goes to the docket head?

23       A.    It's much rarer than it used to be.  And it really

24   is for people who -- well, in case of a new reader, a new

1  member of the staff, they have to send their first couple

2  hundred folders to a second reader no matter what.  That's,

3  in a sense, part of the training exercise.  And, yes,

4  that's what happens in early action, because that's almost

5  always their first event, their first round.  So there are

6  those.

7        But a case where, let's say, there's poetry in the

8  folder and the school likes the poetry, and you know that

9  somebody else in the docket who's not the chair loves to

10 read poetry, you would make sure that she got to see that.

11 Or someone who had a special interest in certain kinds of

12 mathematical stuff or certain kinds of scientific stuff.

13 So if you knew the special reason why another member of the

14 docket, not the chair, could illuminate and find reasons to

15 help that case go more forward, which is always the impulse

16 throughout this process, to find reasons to admit, then you

17 might well go for a second reading before the third.

18     Q.   Once the docket head reads -- does the docket

19 head, the third reader, perform the same numerical

20 analysis?

21     A.   Yes.

22     Q.   And all the same scores, categories, guidelines,

23 apply?

24     A.   Yes.  But the judgment of the person may have a

1   different opinion.

2       Q.   The result may be different?

3       A.   The result may be different, yes.

4       Q.   Applied by different --

5       A.   But the same thinking.

6       Q.   And what happens at that point?

7            MR. WOLFSON:  Objection.

8       A.   Procedurally, after the second reader, the

9   chairman has read the folder, he or she codes it out, that

10  is to say, assigns his own overall rating form, and then

11  typically moves the folder to, depending on his or her

12  judgment of the folder, moves it to -- well, to committee

13  review, which means that at the time that we prepare for

14  actual presentation of cases in committee, the area person,

15  who's now deciding which cases to pull and review, refresh

16  himself on for committee, will know those ratings, and it

17  will be available again to the -- to the -- to the person

18  to present in committee.  So what happens is that that's

19  the last -- typically the last reading in the reading

20  process before committee.

21      Q.   And when it's coded out, does the code, as it goes

22  up to committee, is that only the docket head's code, or

23  does that include both --

24      A.   It includes both.  So you see them both.

1    Q.   And are the docket heads given any greater

2  significance than the first reader in terms of how it's

3  evaluated down the road?

4    A.   Not really.  Because our committee process is a

5  one-man/one-vote process.  People will vote -- first of

6  all, people don't tend to take other people's authorities

7  as a judgment.  They want to hear the case.  But I don't

8  think that it matters.  I don't think that either is

9  weighted in either direction, no.

10    Q.   And you said at the point that it goes to

11  committee, a physical docket is prepared?

12    A.   A physical docket is prepared.

13    Q.   And what does that look like?

14    A.   It has a list of names.  They're sorted by schools

15  within states.  And many dockets have several states, so

16  they're, you know, the region, and then states within it,

17  and then schools organized within that, and then a list of

18  the candidates alphabetically, a list of the candidates

19  from that school with certain salient information like test

20  scores, grades, parents alive/dead, college graduates from

21  when, parental occupation, ethnicity, citizenship, intended

22  field of concentration if we know it from the candidate,

23  intended extracurricular activities if we know it from the

24  candidate, and some coding, which I can also mention, of

1    the readers' estimates of the strength of the other

2    components of the folder, like the three letters I've

3    mentioned, the secondary school letter and the two teacher

4    letters, which are coded for strength of endorsement.

5         Q.    Is all this information drawn from the --

6         A.    Drawn from the folder and from the evaluations

7    made by the readers we've been talking about.

8         Q.    Okay.  Would there be any new information that

9    appears for the first time on the docket that wouldn't be

10   in the applicant file?

11        A.    Well, it would all be in the file, but it's

12   possible, for example, that the last time it was read by

13   one of the people on the docket, it's possible that after

14   that time, the music rating will have come in, and that

15   will be, we have a place for that, 1 or a 2, we have a

16   place for new information that's evaluated.

17        Q.    When you said --

18        A.    So music and dance --

19        Q.    Would send in an evaluation from a faculty member

20   or somebody who --

21        A.    Yes.

22        Q.    -- specializes in that area?

23        A.    Somebody who specializes in music or dance.  We

24   actually don't use a number to interpret the faculty

1  comment.  We use the commentary.  They don't typically use

2  numbers.

3      Q.  Why is the docket organized by school?

4      A.  Because that's the way that we present the cases.

5  We do it geographically.  And then we're comparing, you

6  know, teachers who may have seen all the same candidates,

7  we're comparing -- typically they have the same guidance

8  counselor or some number of guidance counselors who know

9  more than one candidate.

10      Q.  As part of the admissions process, does Harvard

11  take into account how students line up in an individual

12  school and how they compete with one another?

13      A.  We look at class rank, not as a determinant,

14  because we're not -- it doesn't determine anything, but we

15  like to see how people compared to other candidates.  We

16  also like to see when we're looking at extracurriculars, we

17  can see who the people were who were more significant in

18  the school's common life, perhaps.

19      Q.  So what happens as part of the committee process?

20            MR. WOLFSON:  Objection.

21            Go ahead.

22      A.  The area person presents the cases that he thinks

23  are strong or that anybody else in the committee wants to

24  hear about.

1    Q.   Let me actually stop right there.  Who is on the

2  committee?  Who constitutes the committee?

3    A.   So this committee we're describing, this

4  subcommittee, this regional committee, that's the same

5  thing, are the several members of our staff who have

6  admissions responsibilities for candidates from those

7  areas, including the area person or persons from that

8  docket, and the -- and the chairman of the docket who has

9  read all of the stronger cases, all of the cases sent by

10  any of the readers who thought that these were cases to

11  compare.

12    Q.   And is the docket head the one who actually

13  presents the cases to the group?

14    A.   The person who presents the cases is the first

15  reader, the person who really owns the relationship with

16  that school.

17    Q.   And are readers assigned to specific schools?  In

18  other words --

19    A.   Yes.

20    Q.   -- will the same first reader --

21    A.   Yes.

22    Q.   -- read all of the applicants from --

23    A.   Yes.

24    Q.   Just try to wait until I'm done.

1     A.    Yes.

2     Q.    -- from one high school?

3     A.    Yes.

4     Q.    The -- does this -- is this an actual meeting

5     around a table?  Is this how the committee does its

6     business?

7     A.    Yes.

8     Q.    And then what -- what is the consideration process

9     and/or outcome of the committee meeting and the

10    presentation?

11    A.    In a case that is appealing enough in that

12    committee's judgment to forward to the full committee,

13    which is the next stage, we take a series of votes to

14    see -- to see whether most people on the committee, which

15    could be this big, how many people would vote to admit this

16    person, as a tentative recommendation, and how many people

17    would not.  And if most people on the committee would vote

18    to forward this person to the full committee, then we make

19    notes on the docket and notes in the database that, at that

20    moment, this person is going to be recommended to be

21    considered by the full committee.  That's at this

22    presentation stage of cases.

23    Q.    I don't mean to go back in time, but let me just

24    jump back to the initial assessment in the four categories,

1   academic, personal.  In the academic category, is any of

2   that scoring altered on account of the race or ethnicity of

3   an applicant?

4               MR. WOLFSON:  Objection.

5       A.   No.

6       Q.   You said that race or ethnicity is listed as an

7   attribute on the docket for part of the subcommittee

8   hearing?

9       A.   It is present on the docket that the students --

10  the applicant's choice of ethnicity is on the docket.

11      Q.   Okay.  Is that discussed during the subcommittee

12  meetings?

13      A.   It may be.

14      Q.   How would it be discussed?

15      A.   Depending on the case.  It may be that -- that a

16  feature of the case is actually what was unusual in some

17  sense about their ethnicity or their -- how that affected

18  their experience or their perception of their experience.

19  It may be in a case in which it seemed to be a plus factor.

20      Q.   What do you mean by "a plus factor"?

21      A.   A plus factor is where it seemed to be one of the

22  attributes that makes the case attractive, like along with

23  achievements or strong support from the school.

24      Q.   As part of the subcommittee process, would there

1  be discussion and/or assessment of a plus factor with

2  respect to the ultimate class that Harvard is trying to

3  build, as opposed to the individual applicant?

4      A.   It would be entirely about the individual

5  applicant.

6      Q.   At any point during the subcommittee presentation,

7  is there a discussion about the greater balance or makeup

8  of the class that Harvard is trying to admit?

9      A.   Not in the subcommittee phase.

10      Q.   Is there a new score that comes out of the

11  subcommittee phase?

12      A.   No.

13      Q.   It's just a question of advancement, essentially,

14  to the full committee?

15      A.   Yes.

16      Q.   Either go in or you don't?

17      A.   Yes.

18      Q.   And so the next step in the process is the full

19  committee?

20      A.   Yes.  But before we get to the full committee,

21  after the subcommittee has made its series of

22  recommendations, it may go back to the beginning and say,

23  you know, in the beginning of the, let's say -- well, it's

24  a one-day meeting, in early actions, we're describing early

1    action.  "Earlier today this case seems very strong.  Now

2    she seems much less strong.  We'll have to perhaps note

3    that that case may be vulnerable."  So there may be some

4    fine-tuning to the degree of the recommendations.  But the

5    next phase is the full committee.

6         Q.   Does the subcommittee discuss any differences in

7    the individual category assessments that the first reader

8    and the third reader may have noted?

9         A.   It depends on the case.  I mean if -- the comments

10   of the readers will be clear to the committee, they'll be

11   up on the screen, or people can read them on their

12   computers now.  So if in the presentation of the case the

13   area person says, "I still think that this is a very

14   unusual school citizen," and the person who chaired the

15   committee is less impressed by that, that difference may

16   get some discussion.

17        Q.   So after the fine-tuning that you discussed, is

18   the next step the proceeding of consideration of

19   applications by the full committee?

20        A.   Yes.

21        Q.   So who's on the full committee?

22        A.   That's all of the people I mentioned to you from

23   all of the -- all of such people from all 20 -- all, call

24   it, I think it's -- that's the entire group of people who

1   have any role in reading applications, either as first

2   readers, as area people, or as docket chairs.

3       Q.   And is it the full committee meetings that members

4   of the standing committee are also invited to attend?

5       A.   They are invited to all of these meetings.

6       Q.   How often are these meetings happening during the

7   admissions cycle?

8               MR. WOLFSON:  Objection.  Are we

9           still talking about early action?

10              MR. STRAWBRIDGE:  Talking about early

11          action, yes.

12              MR. WOLFSON:  Okay.

13      A.   In early action, these meetings happen every day

14  from the beginning -- but not Sundays -- from the beginning

15  of early action, which is typically just a little before

16  Thanksgiving these days, and continues until the early part

17  of December.  Decisions are sent around the 15th of

18  December.

19      Q.   And is it subcommittee meetings in the morning and

20  full committee meetings in the afternoon or --

21      A.   No.

22      Q.   -- how is that divided up?

23      A.   The subcommittee meetings, once they are complete,

24  once the last scheduled subcommittees have met and made

1   their recommendations, we then move to the last, the final

2   phase of full committee.

3      Q.   So, for example, in the early action phase from

4   Thanksgiving through sometime in December, you're going to

5   have nothing but subcommittee meetings for the first couple

6   of weeks?

7      A.   Right.

8      Q.   And once all the subcommittee meetings are

9   complete, only then does anyone have a full committee

10   meeting?

11      A.   Yes.

12      Q.   So does everybody attend all committee and

13   subcommittee meetings?

14              MR. WOLFSON:  Objection.

15      Q.   Everybody in a particular docket area for

16   subcommittee, for example?

17      A.   Everybody on the docket that he or she is assigned

18   attends those meetings, must attend those meetings.

19      Q.   It's required?

20      A.   It's expected.

21      Q.   What if someone is sick or out of the office for a

22   vacation?

23      A.   Then you deal with it.  Vacation wouldn't be okay.

24      Q.   I assume this would not be a time of year where

1  people are expected to take vacation?

2       A.   They would be expected not to take vacation.  You

3  never know.

4       Q.   But family emergency, sickness, that might excuse

5  someone?

6       A.   We are prepared to deal with that, of course, and

7  we'll find a way to work with that.

8            And then immediately after the conclusion of the

9  final subcommittee meeting, we begin the process of full

10  committee to consider the strong cases.

11       Q.   So tell me how the full committee meeting works.

12            MR. WOLFSON:  Objection.

13            Go ahead.

14       A.   Those cases that have been recommended for

15  admission are all discussed as long as -- as well as any

16  other cases that people in that full committee, large

17  committee of perhaps 40 people, want to raise and hear

18  about.  And through a series of votes, decisions are made

19  with all of those possible candidates in mind.

20       Q.   Let me just step back to the subcommittee meeting.

21  Is there a vote -- is there a majority vote requirement to

22  admit someone to full committee, or is there somewhat of a

23  threshold?

24       A.   Yes.  Well, majority vote, but if the number is

1      Q.   With that, some subset of that 1100 number in mind

2   for the early action candidates?

3                   MR. WOLFSON:   Objection.

4      Q.   Is it 1100?  What was the number of beds, you

5   said?  I apologize.

6      A.   1664 next year.

7      Q.   1664.  Let me not make that mistake again.  I'll

8   write it down.

9      A.   But we have two phases, early and regular.

10     Q.   That's right.  And you said there is no firm

11  number for early action?

12     A.   Right.

13     Q.   In your experience, is there a general number that

14  it tends to be at these days?

15     A.   It has ranged widely.  You know, last year we had,

16  you know, about 1100 or something, I mean a thousand, we've

17  had -- in recent years, we've had fewer.  It hasn't been

18  1,000.  It was like 800 something last year.  We've had

19  fewer; we've had more.

20     Q.   Do you know what your -- what the rate at which

21  early action decisions are accepted?

22     A.   Retrospectively we do.  We look at it after the

23  process is over.

24     Q.   And what is that typically over the last four or

1    five years?

2        A.    It's a higher percentage.  It's about, you know,

3    25 percent.  I may have this wrong.  I'd have to check it,

4    because it has varied from year to year, depending on the

5    size of the pool and the strength of the pool.

6        Q.    You think it's in the overall nature of about 25

7    percent?

8        A.    Actually, I think it's in the overall nature of

9    something like 20 percent or 18 percent.  I don't remember

10   last year, actually.

11       Q.    As with the subcommittee, is there a docket, a

12   physical docket, prepared for the full committee meeting?

13       A.    Yes.

14       Q.    Does it contain all the same information?

15       A.    Yes.

16       Q.    Okay.  And how are -- how are the candidates

17   presented at the full committee meetings?

18       A.    In a way that's very similar to the presentation

19   at subcommittee.  We use screens that you can see things,

20   and you can also do this on your computer now.  We -- the

21   area person who's in charge of presenting these cases

22   determines, you know, which ones to talk about.  Other

23   people can raise questions.  And the chairman of the whole

24   thing, Dean Fitzsimmons, who runs that process of the

1     A.   If it was -- seemed to be very underrepresented

2  compared to, let's say, recent years and so on, that would

3  be mentioned or given some attention.

4     Q.   What about overrepresentation?

5     A.   Overrepresentation is in our system not a notion.

6  It's underrepresentation.

7     Q.   What is -- what is the definition of

8  underrepresentation?





1    Q.    Would the same be true with respect to a candidate

2    identified by the office of development as being related or

3    supported by a substantial donor to Harvard?

4                   MR. WOLFSON:   Objection.

5                   I'm sorry.  Go ahead.

6    A.    Yes, that might be mentioned.

7    Q.    Is it always mentioned or not always mentioned?

8    A.    Not always mentioned.

9    Q.    What influences whether it's mentioned or not, in

10   your experience?

11   A.    If the case -- if the case is a strong competitive

12   case, it may well be mentioned.  If the case is not strong

13   enough to be presented, it won't be mentioned, because the

14   case won't be presented.

15   Q.    Following the preparation of a financial aid

16   package, are there any other steps taken by the admissions

17   office other than communicating an offer of admission to

18   the early action applicants?

19   A.    You mean before -- do you mean before we notify

20   the candidate?

21   Q.    Yes.

22   A.    No.  The -- the step immediately after the

23   preparation of the letter containing financial aid would be

24   the sending of the information.

1  the cases in committee, so will everyone else on the

2  subcommittee.  But that's different from statistical.

3     Q.   When Ms. Cheng prepares her report for you and

4  Mr. --

5     A.   Fitzsimmons.

6     Q.   Sorry.  Thank you.

7     A.   That's all right.

8     Q.   -- you and Mr. Fitzsimmons, did you say that

9  report includes historic information by race and ethnicity

10 of applicant pools as well as the current applicant pool?

11               MR. WOLFSON:  Objection.

12               Go ahead.

13    A.   It may have -- it typically would have last

14 year's.

15    Q.   Okay.  Is it just last year's?  Is it typically

16 limited to that?

17    A.   Yes.  Typically it is limited to that.

18    Q.   Do you recall ever requesting that information to

19 be compiled on a basis longer than the previous year?

20    A.   Yes, we have done that.

21    Q.   Okay.  And when have you done that?

22    A.   Occasionally we have wanted to get a sense of how

23 well our recruitment was doing -- we have not done that

24 lately -- to get a sense of the growth over time.

1      Q.    Do you remember when that occurred?

2      A.    No, not recently, it has not occurred, to my

3  knowledge.

4      Q.    Can you describe how race is factored into the

5  admissions process?

6                   MR. WOLFSON:   Objection.

7      A.    Could you be a little more specific about what you

8  would like to know?

9      Q.    Well, we've talked a little bit about it, but I

10  guess I'm just trying to get from -- from sort of the

11  initial kind of highest-level perspective what -- to what

12  extent does Harvard consider race when it's making its

13  admissions decisions?

14      A.    The most important thing to say is that when an

15  applicant has applied, each applicant is really considered

16  as an individual, including -- whose candidacy will always

17  include, generally include, many factors, family

18  background, which will include whatever we know of race,

19  whatever else we know about family circumstances and

20  education, whatever we can know about the nature of the

21  school and the kind of community the student grew up in.

22  Those context features, those features of the student's

23  setting are always important to us in imagining how well

24  he's achieved in the circumstances that he started with to

1   us as a candidate.  And race or ethnicity is often -- I

2   mean is certainly part of our comprehension of that

3   candidate.

4       Q.   Besides the comprehension of an individual

5   candidate, to what extent, if any, does Harvard desire to

6   ensure that the overall makeup of a particular class

7   reflects a particular racial composition?

8       A.   We are not very interested -- we are not

9   interested in racial composition per se.  We are very

10  interested in, for each class, assembling a diverse group

11  of people along various ways you could measure that,

12  ethnicity being one, but also geography and -- things we've

13  talked about, geography, field of concentration.  We want

14  to make sure that in the final enrolling class that there's

15  a mix of -- a mix of people and a mix of experiences and,

16  we like to think, a mix of perspectives.

17      Q.   Is race a more or less important factor with

18  respect to diversity than geographic distribution?

19      A.   You know, I couldn't make a general statement

20  about that.  It really depends on the case.  In some -- for

21  some candidate, he may be a very rare example of a certain

22  kind of Alaskan candidate.  That context may be a feature

23  of the case that the area person will keep emphasizing and

24  the committee might keep responding to or not.  In another

1   admissions rate.

2       Q.   Okay.  Can you explain why Asian-American numbers

3   during this period of time reflected in this chart are

4   consistently between 17.6 percent and 20.7 percent on a

5   year-by-year basis?

6       A.   Can I explain why they vary between -- why they

7   vary across that range of whatever it is, 3 percent?

8       Q.   Can you explain why the disparities aren't greater

9   if the overall admissions rate of Asian-Americans is not

10  managed to a particular target of roughly 19 to 20 percent?

11      A.   No, I can't explain it.  I can observe that

12  whatever a chart that was accurate like this purporting --

13  that actually showed the results that this table purports

14  to show would represent, the only thing I can say certainly

15  about such a chart is that it would reflect the sum total

16  of that year's individual admissions decisions.

17      Q.   So to the extent that over the -- over a eight-

18  year period -- I'm sorry -- a nine-year period, these

19  admissions rates, for example, for Asian-Americans between

20  17.6 percent and 20.7 percent, that would be -- that's

21  merely the product of the individual assessment in each of

22  those years?

23      A.   Well, it's certainly the result, the product of

24  the individual assessment, each of which was made under

1  whatever conditions it was made under, but yes.

2      Q.    And you don't believe that an individual

3  assessment of each applicant during the years wouldn't

4  produce a much broader variance than that reflected in this

5  chart here?

6              MR. WOLFSON:  Objection.

7      A.    I would not expect it to produce a greater

8  variance.

9      Q.    Why not?

10             MR. WOLFSON:  Objection.

11     A.    In a competitive process, we have a large number

12 of very strong applicants.  Some of that is the product of

13 our own recruitment of significant numbers of strong

14 applicants.  They compete against each other.  We have

15 expressed, as we've discussed, an interest in diversity,

16 ethnic and otherwise.  And in such a competitive

17 environment, bearing in mind those things, diversity in all

18 the ways we've discussed it, I am not surprised that these

19 are, from one point of view, relatively stable numbers, but

20 from my point of view, there are differences in there.

21     Q.    When you say "they compete against each other,"

22 are Asian-American applicants, for example, assessed

23 against other Asian-American applicants in the pool in any

24 given year?

1      A.    No.  They are assessed individually.

2      Q.    Did you not testify earlier that it was important

3   for you to have basically the cream of the crop among the

4   various racial groups in any given applicant pool?

5      A.    We want to make sure that we aren't missing on --

6   one of the major considerations in recruitment is to make

7   sure that you're not missing out on reaching out to the

8   very top, you know, academic candidates from any group.

9   This is a starter for our recruitment.  So, yes, we want to

10  make sure that we have best of's, for a starter, hoping

11  that we'll have lots of people who won't have turned up on

12  those searches.

13     Q.    But in trying to achieve a racially diverse class

14  as a whole, at some point there isn't a ceiling on a number

15  of Asian-Americans that Harvard is willing to admit in a

16  given year?

17     A.    There is no ceiling on the number that we're

18  willing to admit in a given year.

19     Q.    It just so happens that every single year it's

20  gone no higher, at least on this chart, if it's correct,

21  it's gone no higher than 20.7 percent?

22          MR. WOLFSON:  Objection.

23     A.    And the number of admits in any given year from

24  any group reflecting, as it does, the sum total of the

```
 1  COMMONWEALTH OF MASSACHUSETTS                    SUFFOLK, SS.

 2

 3            I, JAMES A. SCALLY, RMR, CRR, a Certified
    Shorthand Reporter and Notary Public duly commissioned and
 4  qualified in and for the Commonwealth of Massachusetts, do
    hereby certify that there came before me on the 18th day of
 5  June, 2015, at 9:00 a.m., the person hereinbefore named,
    MARLYN ELIZABETH McGRATH, who provided satisfactory
 6  evidence of identification as prescribed by Executive Order
    455 (03-13) issued by the Governor of the Commonwealth of
 7  Massachusetts, was by me duly sworn to testify to the truth
    and nothing but the truth of her knowledge concerning the
 8  matters in controversy in this cause; that she was
    thereupon examined upon her oath, and her examination
 9  reduced to typewriting under my direction; and that this is
    a true record of the testimony given by the witness to the
10  best of my ability.
              I further certify that I am neither
11  attorney or counsel for, nor related to or employed by, any
    of the parties to the action in which this deposition is
12  taken, and further, that I am not a relative or employee of
    any attorney or counsel employed by the parties hereto or
13  financially interested in the action.

14

15      My Commission Expires:  April 8, 2022

16

17

18      _____
                          James A. Scally, RMR, CRR
19                        CSR/Notary Public

20

21

22

23

24
```