# EXHIBIT 02

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3                  BOSTON DIVISION

4    * * * * * * * * * * * * * * * * *

5    STUDENTS FOR FAIR ADMISSIONS,     *

6    INC.,                             *

7              Plaintiff,              *

8    v.                                *   Civil Action

9    PRESIDENT AND FELLOWS OF HARVARD  *  No. 14-cv-14176

10   COLLEGE (HARVARD CORPORATION),    *      (ADB)

11             Defendant.              *

12   * * * * * * * * * * * * * * * * *

13

14       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15       Rule 30(b)(6) Notice to Students for Fair

16                  Admissions, Inc.

17       Videotaped Deposition of EDWARD J. BLUM

18              Tuesday, July 12, 2016

19                    9:05 a.m.

20       Wilmer Cutler Pickering Hale and Dorr LLP

21              60 State Street - 26th Floor

22              Boston, Massachusetts 02109

23

24   ----------- J. Edward Varallo, RMR, CRR  ----------

25           Registered Professional Reporter

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                    Page 73

1    email exchange and phone calls with friends and

2    allies.

3         A.    Yes.  The other -- Did I include

4    designing, helping to design a website?

5         Q.    Nope.  Tell me about that.

6         A.    Okay.  I helped Engage design a website.

7         Q.    So you together with EngageDC helped

8    design the website?

9         A.    Correct.

10        Q.    What was your role in that?  What did you

11   do?

12        A.    Described what the website should do, what

13   we wanted to accomplish, and reviewed the various

14   designs that were submitted to us.

15        Q.    And when you say the website, which

16   website are you referring to?

17        A.    Students for Fair Admissions.

18        Q.    And what about the Harvard Not Fair

19   website?

20        A.    That as well.

21        Q.    So part of the launch of SFFA was to

22   design the Harvard Not Fair website?

23        A.    Not exactly.  The Harvard Not Fair, UNC

24   Not Fair and UW Not Fair really preceded sort of the

25   launch of Students for Fair Admissions.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 88

1       A.      I guess that would be me.

2       Q.      And what about in the 2013 time frame, who

3    was primarily responsible for membership

4    recruitment?

5       A.      Primarily probably me.

6       Q.      And in 2014 who was primarily responsible

7    for membership recruitment?

8       A.      Primarily me.

9       Q.      The interrogatory response also talks

10   about day-to-day operations of SFFA on page 4 and

11   indicates that you are responsible for those

12   operations.  Do you see that?

13      A.      Yes.

14      Q.      And that was in July 2015, this particular

15   interrogatory.

16      A.      Okay.

17      Q.      Are you still primarily -- Are you still

18   responsible for the day-to-day operations of SFFA?

19      A.      Yes.

20      Q.      And what do those operations entail?

21      A.      Communicating with members, communicating

22   with the board, and communicating with counsel.

23      Q.      And prior to July of 2015, were you also

24   responsible for the day-to-day operations of SFFA?

25      A.      Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 89

1     Q.     Is there anybody else at SFFA who is

2   responsible for the day-to-day operations?

3     A.     No.

4     Q.     Is Mr. Fisher responsible for any day-to-

5   day operations?

6     A.     No.

7     Q.     Is Ms. Fisher responsible for any day-to-

8   day operations?

9     A.     No.

10     Q.     Are counsel responsible for any day-to-day

11   operations?

12     A.     Oh, yes.

13     Q.     Without disclosing any consultation with

14   counsel, can you describe to me any actions that

15   counsel are responsible for in connection with the

16   day-to-day operations of SFFA?

17          MR. STRAWBRIDGE:  And I'll object on

18   grounds of privilege and instruct the client that he

19   may answer this question only to the extent that he

20   does not reveal the actions or advice of counsel.

21     A.     Every question of substance is discussed

22   with counsel.

23     Q.     Can you provide without disclosing advice

24   of counsel, can you provide detail on what you mean

25   by a question of substance?  I just don't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 102

1      A.    All right.

2      Q.    Sorry, through 73, really, with the

3    signature pages.  Have you seen this document

4    before?

5      A.    Yes.

6      Q.    And what do you understand this document

7    to be?

8      A.    This is our, sort of our founding document

9    to organize our organization.

10     Q.    And it is signed by the three members of

11   the board of directors on that date in 2014.  Is

12   that right?

13     A.    That's right.

14     Q.    Who are Richard Fisher, Abigail Fisher,

15   and yourself?

16     A.    Correct.

17     Q.    The document on Bates 68 -- the Bates

18   number is the number in the bottom right of the

19   page, in case you're not familiar -- is a unanimous

20   written consent in lieu of an organizational

21   meeting.  Do you see that?

22     A.    Yes.

23     Q.    And what do you understand that to mean,

24   that title?

25             MR. STRAWBRIDGE:  Objection, calls for a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 104**

```
 1   of SFFA?

 2        A.    Yes.

 3        Q.    And was there discussion between you and

 4   Abigail Fisher about her becoming the secretary of

 5   SFFA?

 6        A.    Yes.

 7        Q.    And did she agree to become the secretary?

 8        A.    She did.

 9        Q.    Who appointed -- Who appointed yourself as

10   president of SFFA?

11        A.    It was a collaborative understanding

12   between the three of us and it was kind of a

13   direction that we took informally leading up to this

14   establishment.

15        Q.    When you say the direction that you took,

16   do you mean you were serving, playing the role of a

17   president-type role before this was officially

18   enacted?  Or maybe I'll just ask you to explain what

19   you meant by that last answer.

20        A.    I was the leader, if you will, of the

21   organization of this group.

22        Q.    And I asked who appointed you as president

23   of SFFA.  It was yourself and Mr. Fisher and

24   Ms. Fisher?

25        A.    We all agreed that I would be president.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 105

1      Q.     Was anybody else involved in that

2  decision?

3      A.     No.

4      Q.     And who appointed Abigail Fisher as

5  secretary?

6      A.     She agreed to serve in that capacity after

7  consultation with myself and Richard Fisher.

8      Q.     Was anybody else involved in that

9  decision?

10      A.     No.

11      Q.     And who appointed Richard Fisher as

12  treasurer?

13      A.     He agreed to serve in that capacity after

14  consultation with myself.

15      Q.     And with Ms. Fisher as well?

16      A.     And with Abby.

17      Q.     And was anybody else involved in that

18  decision?

19      A.     No.

20      Q.     Did you consult with anybody, any members

21  or nonmembers of SFFA, before this August 6th

22  organizational action was taken?

23            MR. STRAWBRIDGE:   That is a yes or no

24  question.   You may answer that question yes or no.

25      A.     So the question is, did I consult with

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 108

1      Q.    So who are the affiliate -- Without giving

2   me any names, are there members of SFFA that are not

3   affiliate members?

4           MR. STRAWBRIDGE:  Object to the form of

5   the question.  You may answer.

6      A.    So all members of SFFA at the time of the

7   adoption of these bylaws were affiliate members.

8      Q.    Thank you.  That was my question.  There

9   were no other type of members at that time?

10     A.    No other type of members.

11     Q.    And so affiliate members did not have any

12  voting rights at the time of the adoption of the

13  bylaws.  Correct?

14     A.    They did not have voting rights at the

15  time of the adoption.

16     Q.    And they did not have voting rights at the

17  time the complaint was filed in this litigation.

18  Correct?

19     A.    That's correct.

20     Q.    Did the affiliate members have any role in

21  electing any of the officers of SFFA?

22     A.    No.

23     Q.    Did the affiliate members when these

24  bylaws were in effect have any role in appointing

25  any of the directors of SFFA?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 109

1      A.     No.

2      Q.     Did the affiliate members at the time

3    these bylaws were in place have the right to vote on

4    anything involving the purpose or the mission of

5    SFFA?

6             MR. STRAWBRIDGE:   I'll object to the form

7    of the question.

8      A.     No.

9      Q.     Did they have the right to vote to modify

10   SFFA's purpose?

11     A.     No.

12     Q.     Did they have the right to ratify any

13   action that SFFA took?

14             MR. STRAWBRIDGE:   I will object to the

15   form of the question.

16     A.     No.

17     Q.     What was the purpose of SFFA at the time

18   that these bylaws were in effect?

19     A.     To further our mission, which was to end

20   the use of race in the admissions process through

21   litigation and through advocacy.

22     Q.     And members, affiliate members of SFFA at

23   the time these bylaws were in effect, were they

24   required to agree with that mission to become a

25   member?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 166

1      Q.    Okay.  So we'll go ahead and play the

2   first clip, please.  And let us know if you can't

3   see or hear.

4              THE WITNESS:  I can see it.

5              MR. STRAWBRIDGE:  Counsel, for the record,

6   can we just, are these all clips taken from the

7   video that's represented in this exhibit?

8              MS. ELLSWORTH:  They are all clips from

9   the video represented in this exhibit which is on

10  YouTube.

11             MR. STRAWBRIDGE:  Okay, thank you.

12             (Video clip played as follows:

13             "So I needed plaintiffs; I needed Asian

14  plaintiffs.  And finding plaintiffs to challenge the

15  Ivy League admissions policies, Harvard in

16  particular, is not an easy thing to do, so

17  I started -- I designed three websites,

18  HarvardNotFair.org, UNC, University of

19  NorthCarolinaNotFair.org, and UWNotFair.org."

20             (End of video clip.)

21             THE WITNESS:  So painful to watch.

22  BY MS. ELLSWORTH:

23      Q.    Mr. Blum, that was you speaking that we

24  just presented.  Is that correct?

25      A.    Yes, it was.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 325

1    now.

2         Q.    Okay.

3         A.    There were considerably more than 16,000,

4    but we used 16,000 as sort of a safe harbor because

5    we wanted to verify that perhaps, you know, all of

6    them were accurate and correct and could be

7    legitimate members of SFFA.

8         Q.    So when the interrogatory response was

9    given on July 2nd of 2015, was that before

10   Mr. Connolly had completed his task of reviewing

11   that big influx of numbers?

12        A.    I don't know.

13        Q.    What was the reason for providing this

14   safe harbor that you just testified to?

15        A.    Concern about providing information that

16   was inaccurate.

17        Q.    And was that concern driven by this

18   technological situation that had arisen with the

19   influx of new members in June 2015?

20        A.    Yes.

21        Q.    Do you know now what a more accurate

22   number would have been in July of 2015?

23        A.    I have an estimate of that.

24        Q.    What is that estimate?

25        A.    Slightly over 20,000.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 326

1      Q.    So the overwhelming of EngageDC's system

2   was by about 20,000 new members?

3      A.    That's correct.

4      Q.    In a how-many-week period or how-many-day

5   period?

6      A.    I'm unsure exactly how many, but it was a

7   relatively short number of days.

8      Q.    Was it less than a week?

9      A.    About a week, I would think.

10      Q.    And then once the payment process was put

11   in place on July 30th, is it fair to say that the

12   membership growth slowed substantially?

13      A.    It did.

14      Q.    Do you see the new members

15   contemporaneously now?

16      A.    I do.

17      Q.    About how frequently do new members flow

18   in?

19      A.    So there are two things that flow to me

20   contemporaneously:  people who contact us through

21   SFFA without joining and then people who contact us

22   through SFFA and join.  So there are a lot of people

23   that contact us through SFFA without joining, but

24   I see both of those categories contemporaneously.

25      Q.    What is the email address that they use to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 349**

1              COURT REPORTER'S CERTIFICATE

2              I, J. Edward Varallo, RMR, CRR, Registered

3    Professional Reporter and Notary Public in the

4    Commonwealth of Massachusetts (my commission expires

5    12/09/2022), hereby certify that the deposition of

6    Edward J. Blum taken on July 12, 2016, in the matter

7    of Students for Fair Admissions v. President and

8    Fellows of Harvard College (Harvard Corporation);

9    and The Honorable and Reverend the Board of

10   Overseers, was recorded by me stenographically and

11   transcribed; that before being sworn by me, the

12   deponent provided satisfactory evidence of

13   identification as required by Executive Order 455

14   (03-13) of the Governor.

15             I certify that the deposition transcript

16   produced by me is true and accurate to the best of

17   my ability.

18             I certify further that I am not counsel,

19   attorney, or relative of any party litigant, and

20   have no interest, financial or otherwise, in the

21   outcome of this suit.

22

23

24                         _____

25   DATED:  7/15/2016            J. Edward Varallo