# EXHIBIT 38

**Supplemental Expert Report Regarding the Final Report of the Committee to Study Race-Neutral Alternatives**

**Richard D. Kahlenberg**

In April 2018, long after I submitted my expert rebuttal report in Students for Fair Admissions v. Harvard, Harvard College produced a "Report of the Committee to Study Race-Neutral Alternatives."[1] The report is the work product of a committee consisting of three senior Harvard officials: William Fitzsimmons, Dean of Admissions and Financial Aid; Rakesh Khurana, Dean of Harvard College; and Michael D. Smith, Dean of the Faculty of Arts and Sciences.

The Committee concludes, after reviewing expert reports in the litigation and other materials, that "at present, no workable race-neutral admissions practices could promote Harvard's diversity-related educational objectives as well as Harvard's current whole-person race-conscious admissions program while also maintaining the standards of excellence that Harvard seeks in its student body."[2]

Because this report—produced at this late date in the litigation—provides new information that I was unable to include in my opening or rebuttal reports, I have prepared this brief supplemental report.

There are numerous issues I take issue with in the Committee report (many of which echo points I have made in my prior reports), but I will limit myself to five critical points.

**1. The Committee Tacitly Accepted My Race-Neutral Alternatives on Diversity Grounds.**

The Committee does not explicitly reject race-neutral alternatives I outlined on diversity grounds. In my expert reports, I described several simulations—including Simulations 3, 4, 5, 6, and 7—which involved modest shifts in the shares of African American and Hispanic students but largely maintained overall levels of racial diversity. Each of these simulations also projected large increases in socioeconomic diversity.[3]

The Committee did suggest that a plan that eliminates the use of race—and puts no alternatives in place—would be unacceptable because it would result in a nearly 50% drop in the population of students who identify as underrepresented minorities. African-American representation would drop from 14% to 6%, and Hispanic or Other students would drop from 14% to 9%.[4] By contrast, the

---

[1] HARV00097310-00097328.

[2] HARV00097327.

[3] See, e.g., Kahlenberg Opening Report and Rebuttal Report, Simulations 3, 4, 5, 6, and 7.

[4] HARV00097317.

1

Committee did not suggest that my simulations failed to produce adequate levels of diversity.

It would have been very difficult for the Committee to reject my simulations on diversity grounds for two reasons. First, the Committee never provided a concrete definition of what level of diversity would be acceptable. To the contrary, the Committee said it does not have "in mind a specific number of students of any given racial or ethnic background who must be on campus in order for Harvard's diversity-related objectives to be satisfied."[5] Having staked out this ground, it would have been difficult to reject my simulations as unacceptable on diversity grounds for failing to meet a nonexistent standard. Indeed, when asked specifically if he would reject a race-neutral alternative that produced a class in which 10% of students identified as African American, Dean Michael Smith testified, "We were not looking for any particular number."[6]

The reluctance to reject my alternatives is surely bolstered by the large rise such policies would produce in socioeconomic diversity. In the admitted class of 2019, only 17.4% of students came from roughly the bottom two-thirds of the socioeconomic distribution; that rises to 54.3% in Simulation 4. In considering the educational benefits of diversity, this much-needed increase in socioeconomic diversity is critical. As the Committee appropriately acknowledged, "Students from modest socioeconomic backgrounds may have distinct perspectives to share with their peers in and outside the classroom, and a class that is diverse in socioeconomic backgrounds is an essential part of the diversity of a student body that Harvard strives to achieve."[7]

2. **The Committee Incorrectly Suggests Race-Neutral Alternatives Compromise Academic Quality.**

Having failed to discredit my race-neutral alternatives on the basis of diversity, the Committee instead alleges that the alternatives reviewed are unworkable because they fail to maintain "the standards of excellence that Harvard seeks in its student body."[8] For instance, the Committee rejects one alternative involving socioeconomic preferences, even though it produces a share of underrepresented minorities "comparable to that of the current class" because "the proportion of admitted students with the highest academic ratings (as assigned by admissions officers)

---

[5] HARV00097317.

[6] Michael Smith deposition, April 23, 2018, p. 125.

[7] HARV00097322.

[8] HARV00097327.

would be expected to drop from 76% to 66%."[9]  Although the Committee does not identify the simulation in question, this description matches Simulation 4.[10]

But consider the actual impact of Simulation 4 using objective academic indicators that are typically employed in academic research on the viability of race-neutral alternatives (rather than a slice of Harvard's internal ratings).  The average composite SAT score is quite comparable, moving from the 99th percentile (2239) to the 98th percentile (2191).  Average converted GPA actually rises slightly from 77.0 to 77.1.[11]  These changes would hardly seem to represent a threat to "the standards of excellence that Harvard seeks in its student body."[12]

Moreover, in considering the modest change in percentage of students receiving an academic rating of 1 or 2 (10 percentage points, from 76% to 66%), surely it is relevant that many more of the students admitted would have overcome socioeconomic obstacles.  Indeed, the Committee itself argues that academic accomplishments should be considered in the context of hurdles a student has had to surmount.  "Harvard understands that excellence can be found in all quarters of society, and students who excel or show promise of excelling despite limited access to educational and other resources often show the kind of determination and resilience that makes them likely to benefit greatly from what Harvard has to offer students—and show that they will in turn have much to offer Harvard," the Committee observed.[13]  At another point in the report, the Committee observed that SAT scores should be considered "in light of an applicant's background and ability to prepare."[14]  The report continued: Harvard has "never sought to … maximize the SAT scores of the admitted class."[15]

Presumably, the same reasoning would be applied to ratings on factors such as extracurricular activities.  A student responsible for helping to support her family through a job waiting on tables might not be expected to assemble an array of extracurricular activities as polished as an advantaged student who can devote all her time to participating in such activities.

---

[9] HARV00097323.

[10] Card Opening Report, p. 193.

[11] Card Opening Report, p. 193.

[12] HARV0097327.

[13] HARV00097322.

[14] HARV00097327.  See also Dean Michael Smith deposition, p. 147.

[15] HARV00097327.

3

### 3. The Committee Incorrectly Rejects Place-Based Approaches to Achieving Diversity.

On principle, the Committee rejects race-neutral alternatives that focus on admitting top students from geographic areas because it says Harvard's nuanced admission system does not make it possible to admit "the single 'best'" student.[16] But Harvard engages in difficult judgments to determine the students it deems best qualified every year.

Moreover, when using as geographic units the 33 College Board Neighborhood Clusters that I employ in my simulations, Harvard could pick roughly the 50 best enrolled students from each cluster, rather than "the single best."

Finally, if Harvard believes that such a commitment to geographic diversity is too constraining, it is possible, instead, to achieve racial, ethnic, and socioeconomic diversity and to maintain high standards, through a race-neutral system that avoids a place-based element. I model such approaches in Simulations 6 and 7.

### 4. The Committee Incorrectly Rejects Socioeconomic Preferences Because They May Risk Undermining Harvard's Diversity Goals.

Although many members of the public may see African-American and Hispanic students who have overcome economic obstacles as especially worthy of consideration, the Committee raises a concern about a system "in which many of the non-White students would come from modest socioeconomic circumstances."[17] This approach, the Committee says, could "undermin[e] rather than advanc[e] Harvard's diversity-related educational objectives."[18]

A close examination of the data, however, suggest that Harvard's student body is hardly lacking in advantaged underrepresented minority students, nor would it be so under a system of socioeconomic preferences.

Harvard admissions officers tag as "disadvantaged" students who come from families with annual incomes below $80,000 or whose parents lack a four-year college degree.[19] In other words, this group includes not only students who might conventionally be thought of as disadvantaged but also many students from middle-class families. Roughly speaking, about two-thirds of all Americans would be characterized by Harvard as "disadvantaged."[20]

---

[16] HARV0009720.

[17] HARV00097323.

[18] HARV00097323.

[19] Kahlenberg Report, p. 46.

[20] Kahlenberg Report, p. 22.

4

Because African-American and Hispanic students are more likely to be disadvantaged than the average American, substantially more than two-thirds are likely to be so categorized by Harvard. Indeed, according to the Committee, fully 70% of African Americans and 60% of Hispanics nationally are disadvantaged enough to be eligible for zero parental contribution under Harvard's financial aid program (earning less than $65,000 annually).[21] An even higher percentage of these students, therefore, would qualify for the disadvantaged tag (which has an $80,000 cut off and also includes families making more than $80,000 where the parents lack a four year college degree).

While the vast majority of African-American and Hispanic students nationally would be considered disadvantaged by Harvard's reckoning, in the current admitted class of 2019, only 29% of underrepresented minorities were tagged as disadvantaged. This number would rise to approach the national averages under the race-neutral alternatives I outlined in my report. In Simulation 4, for example, 21% of underrepresented minority students would be advantaged, and 79% disadvantaged. In other words, Harvard would move from its current system, which is tilted heavily toward relatively privileged underrepresented minority students, to a situation where the socioeconomic breakdown of underrepresented minority students would be much closer to the national average. It thus would increase socioeconomic diversity both within racial groups and more generally at Harvard.

### 5. The Committee Disingenuously Raises New Concerns about Expanding Financial Aid.

For the first time in this litigation, the Committee raises a new concern: that "Harvard could not significantly increase its financial aid budget without detracting from other commitments."[22]

This is an audacious claim for the nation's richest university, whose $37 billion endowment exceeds the GDP of more than half the countries in the world.[23]  This new claim of financial inadequacy also rings hollow in light of the earlier testimony of leading Harvard officials. Financial Aid director Sarah Donahue testified that Harvard has no maximum or cap on the amount of money available for financial aid. She said that it would not present a problem if the number of students eligible for the Harvard Financial Aid Initiative doubled (from roughly 25% of the class to 50%). Dean Fitzsimmons testified that Harvard's charge is to admit "the best, most interesting students" and that there is no constraint on the number of students Harvard can admit through its financial aid initiative.[24]

---

[21] HARV00097319.

[22] HARV00097320.

[23] Kahlenberg Report, p. 31.

[24] Kahlenberg Report, p. 30.

Dated: April 26, 2018                    */s/Richard D. Kahlenberg*
                                          Richard D. Kahlenberg