# UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS
### BOSTON DIVISION

STUDENTS FOR FAIR ADMISSIONS, INC.,

Plaintiff,

v

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE (HARVARD CORPORATION),

Defendant.

Civil Action No. 1:14-cv-14176-ADB

**Motion to File Under Seal Granted
June 14, 2018 [Dkt. 411]**

---

## LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ALL REMAINING COUNTS

**I.     Admission To Harvard**

    **A.     Harvard's Competitive Admissions Pool**

    1.     More than 37,000 people applied to Harvard College for undergraduate admission to the Class of 2019.  Declaration of Felicia H. Ellsworth in Support of Defendant's Motion for Summary Judgment ("Ellsworth Declaration"), Ex. 33 ¶ 29 (Card Report).[1]

    2.     2,003 applicants were offered admission to the Class of 2019.  Ex. 33 ¶ 29 (Card Report).

    3.     42,749 people applied for undergraduate admission to the Class of 2022.  Ex. 82 (Harvard Gazette, *1,962 Admitted to Class of '22* (Mar. 28, 2018)).

---

[1]     "Ex." citations refer to exhibits to the Declaration of Felicia H. Ellsworth in Support of Defendant's Motion for Summary Judgment.

4.      1,962 applicants were offered admission to the Class of 2022.  Ex. 82 (Harvard Gazette, *1,962 Admitted to Class of '22* (Mar. 28, 2018)).

5.      There were approximately 26,000 domestic applicants for admission to the Class of 2019.  Ex. 33 ¶ 30 & Card Ex. 1 (Card Report).

6.      More than 8,000 domestic applicants to the Class of 2019 had perfect converted GPAs (according to Harvard's GPA index, which creates a standardized metric across high schools).  Ex. 33 ¶ 31 & Card Ex. 2 (Card Report).

7.      Approximately 3,500 domestic applicants to the Class of 2019 had perfect SAT math scores; approximately 2,700 had perfect SAT verbal scores; and approximately 2,300 had perfect SAT writing scores.  Ex. 33 ¶ 31 & Card Ex. 2 (Card Report).

8.      In total, more than 5,000 domestic applicants to the Class of 2019 had a perfect math or verbal SAT score.  Ex. 33 ¶ 31 & Card Ex. 2 (Card Report).

9.      625 domestic applicants earned a perfect composite score on the ACT and 361 domestic applicants earned a perfect 2400 on the SAT.  Ex. 33 at ¶ 31 & Card Ex. 2 (Card Report).

10.     Of the domestic applicants to the Class of 2019, approximately 15,000 had an average SAT Subject Test score at or above 700.  Ex. 33 ¶ 31 & Card Ex. 2 (Card Report).

**B.      The Application Folder**

11.     Students may apply to Harvard through the Early Action program, which typically has a November 1 deadline, or Regular Decision, which typically has a January 1 deadline.  Ex. 75 (Application Timeline, Harvard College Admissions & Financial Aid).

12.     The process for considering applications does not meaningfully differ depending on whether the application is submitted in the Early Action or the Regular Decision round.  Ex. 1 at 208:14-20 (McGrath 2015 Dep.); Ex. 33 ¶ 45 n.22 (Card Report).

2

13.     Applicants may submit a Common Application, Universal College Application, or Coalition Application.  These applications are accepted by more than 400 colleges and universities.  Ex. 55 at HARV00001405 (Interviewer Handbook, 2014-2015); Ex 74 (Harvard College Admissions & Financial Aid, Application Requirements).

14.     Harvard requires applicants to complete a short supplement to indicate their interest—and the strength of that interest—in a field of academic study, career, and particular extracurricular activities.  Ex. 55 at HARV00001405 (Interviewer Handbook, 2014-2015).

15.     Applicants may submit scholarly work, recordings of music or dance performances, or artwork.  Ex. 55 at HARV00001405 (Interviewer Handbook, 2014-2015); Ex. 1 at 95:14-23, 98:11-18, 181:17-182:2 (McGrath 2015 Dep.); Ex. 48 at HARV00005430 (Harvard 2015 Application Supplement).

16.     The Common Application, Universal College Application, and Coalition Application permit applicants to disclose their race or ethnic background in their application. Ex. 1 at 145:11-147:12 (McGrath 2015 Dep.); Ex 49 at HARV00003562 (The Common Application); Ex. 50 at HARV00003557 (Universal College Application); Ex. 95 (Coalition Application).

17.     Applicants may also include information about their race or ethnicity in other parts of their applications, such as the personal essay.  Ex. 1 at 150:7-23 (McGrath 2015 Dep.).

18.     Harvard does not require applicants to disclose their race when applying, and approximately 10,000 domestic applicants to the Classes of 2014 to 2019 chose not to disclose their race.  Ex. 1 at 145:11-147:12, 149:18-150:23, 152:19-153:2 (McGrath 2015 Dep.); Ex. 33 ¶¶ 7, 111 (Card Report).

19.     Harvard does not publish any guidelines regarding how applicants should disclose their race or ethnicity if they choose to do so.  *See* Ex. 26 at 239:18-240:2 (Fitzsimmons Dep.); Ex. 1 at 145:11-147:12, 149:18-150:23, 152:19-153:2 (McGrath 2015 Dep.).

20.     Applicants may select more than one race or ethnicity in their application.  Ex 49 at HARV00003562 (The Common Application); Ex. 50 at HARV00003557 (Universal College Application); Ex. 95 (Coalition Application).

21.     Most applicants are interviewed by a Harvard alumnus or alumnae, who then submits an interview report to the Admissions Office.  Ex. 55 at HARV00001425-27 (Interviewer Handbook 2014-2015); Ex. 1 at 55:4-56:7 (McGrath 2015 Dep.).

22.     A complete application file or folder will typically include:

- the applicant's name, age, sex, address, citizenship, place of birth, and race (if the applicant chooses to disclose it);

- information about the applicant's family, including the educational attainment of the applicant's parents and siblings and the occupation of the applicant's parents;

- the applicant's scores on standardized tests, including the SAT or ACT, SAT Subject Tests, and AP Exams;

- the applicant's high school transcripts, as well as the applicant's reported grade point average;

- a document prepared by the applicant's high school that provides information about the high school, such as the number of students who go on to college, the courses available at the high school, the economic and demographic profile of the community served by the school, the percentage of students who receive free or reduced-price lunch, and other pertinent information;

- one or more essays written by the applicant;

- a letter from the applicant's high school guidance counselor;

- at least two letters of recommendation from high school teachers, and frequently additional letters of recommendation from teachers, mentors, supervisors, or others;

- in many cases, a detailed, multi-page evaluation from a Harvard alumni interviewer who has met with the applicant in person; and

- the applicant's answers to questions about his or her intended academic concentration, extracurricular and athletic participation, and expected post-college career.

Ex. 1 at 94:15-96:1, 126:11-127-21 (McGrath 2015 Dep.); Ex. 48 (Harvard 2015 Application Supplement); Ex. 50 (Universal College Application); Ex 49 (The Common Application); Ex. 55 at HARV00001429-38 (Interviewer Handbook 2014-15); Ex. 57 (Reading Procedures, Class of 2018); *see generally* Ex. 61 (redacted application files).

### C.    Admissions Office Review

23.    Most applicants are academically qualified to attend Harvard.  Ex. 55 at HARV00001401 (Interviewer Handbook 2014-2015).

24.    A significant portion of applicants present strong personal and extracurricular credentials.  Ex. 55 at HARV00001401 (Interviewer Handbook 2014-2015).

25.    To select candidates for admission, Harvard takes an individualized approach to admissions that accounts for the whole person.  Ex. 26 at 50:16-20, 51:24-52:20, 233:12-234:12 (Fitzsimmons Dep.); Ex. 52 (2012 Casebook); Ex 53 (2012 Casebook Discussion Guide); Ex. 55 at HARV00001400-02 (Interviewer Handbook 2014-2015).

26.     Each file is viewed "individually based on achievement and areas of excellence." Ex. 12 at 60:23-24 (Donahue Dep.); *see also* Ex. 16 at 172:22-173:8.

27.     Harvard considers each applicant's academic, extracurricular, and other accomplishments within the context they were achieved, which includes socioeconomic circumstances, family background, parental education levels and occupation, high school quality and opportunities, geography, and much more.  Ex. 26 at 55:14-21, 200:24-202:10, 233:23-234:12 (Fitzsimmons Dep.); Ex. 12 at 46:6-48:5 (Donahue Dep.); Ex. 1 at 231:9-233:15 (McGrath 2015 Dep.); *see also* Ex. 55 at HARV00001400-02 (Interviewer Handbook 2014-2015).

28.     Harvard looks for "distinguishing excellences," which may be reflected in (among other things) ███████████████████████████████████████████ ████████████████████████████████████████████████████ Ex. 55 at HARV00001400-02 (Interviewer Handbook 2014-2015); *see also* Ex. 26 at 261:19-262:14 (Fitzsimmons Dep.).

29.     Harvard takes an expansive approach to distinguishing excellences, which "could be an excellence of any kind one could imagine."  Ex. 26 at 261:21-22 (Fitzsimmons Dep.).

30.     New admissions officers participate in a rigorous training program that lasts for many months, which includes reading and discussing past files, having a second admissions officer read and evaluate the new admissions officer's first 50 to 100 application files, and additional monitoring for a year or more to ensure that the new admissions officer is properly evaluating files.  Ex. 26 at 234:20-236:2 (Fitzsimmons Dep.).

31.     Training for admissions officers emphasizes the need to take an individualized approach to evaluating applicants by considering all factors in the application and considering

how the applicant will contribute to the overall class.  Ex. 52 (2012 Casebook); Ex 53 (2012 Casebook Discussion Guide); Ex. 6 at 33:12-35:1; Ex. 26 at 234:15-236:2, 238:4-12, 238:23-239:17 (Fitzsimmons Dep.).

32.     Guidelines for alumni interviewers emphasize the need to take an individualized approach to evaluating applicants by considering all factors in the application and considering how the applicant will contribute to the overall class.  HARV00001400-02, HARV00001424-25 (Interviewer Handbook 2014-2015).

33.     Harvard has a Standing Committee on Admissions and Financial Aid in Harvard College ("the Standing Committee"), which comprises College faculty members.  Ex. 1 at 70:20-71:12 (McGrath 2015 Dep.); Ex. 94 (Standing Committees Listed Alphabetically, Harvard University Office of the Secretary).

34.     The Standing Committee's primary responsibility is the determination of admissions and financial aid policy and the representation of that policy to the faculty.  *See* Ex. 1 at 70:20-72:17 (McGrath 2015 Dep.); Ex. 94 (Standing Committees Listed Alphabetically, Harvard University Office of the Secretary).

35.     The Standing Committee meets twice per year.  Ex. 1 at 72:4-17 (McGrath 2015 Dep.).

36.     Harvard organizes its review of application files into approximately 20 geographical regions referred to as "dockets."  Ex. 6 at 42:18-23; Ex. 1 at 177:9-19 (McGrath 2015 Dep.); Ex. 55 at HARV00001407 (Interviewer Handbook 2014-2015); Ex. 26 at 231:14-233:7 (Fitzsimmons Dep.); Ex. 51 at HARV0000371 (Reading Schedule).

37.     Each docket is intended to include a roughly similar number of applications.  Ex. 55 at HARV00001407 (Interviewer Handbook 2014-2015).

38.     A subcommittee of admissions officers is responsible for the initial evaluation of all candidates from a particular docket.  Ex. 55 at HARV00001407-08 (Interviewer Handbook 2014-2015); Ex. 6 at 42:18-23.

39.     A subcommittee generally includes three to six area representatives and a docket chair, who is a senior admissions officer.  Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015).

40.     Admissions officers are assigned to specific areas within their dockets, and they are frequently described as the "area representative," "area person," or "first reader."  Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015).

41.     As applications are received, the area person reads all the application folders from high schools in his or her area.  Ex. 55 at HARV00001408 (Interviewer Handbook 2014-15); Ex. 1 at 158:12-21, 172:11-173:9: (McGrath 2015 Dep.); Ex. 26 at 233:8-14 (Fitzsimmons Dep.).

42.     Admissions officers develop a deep understanding of the high schools in their assigned areas, which allows them to develop and apply specific knowledge about schools, courses, and teachers, regarding academic rigor, grading practices, and school recommendations. Ex. 26 at 231:16-234:12 (Fitzsimmons Dep.).

43.     After carefully reviewing all the material in the application folder, the first reader assigns academic, extracurricular, athletic, and personal ratings to the applicant.  Ex. 57 at HARV00015414-15 (Reading Procedures, Class of 2018); Ex. 26 at 238:23-239:17 (Fitzsimmons Dep.); Ex. 1 at 158:12-159:5 (McGrath 2015 Dep.).

44.     The first reader also rates the strength of recommendations written by the high school guidance counselor and at least two teachers.  Ex. 57 at HARV00015416 (Reading Procedures, Class of 2018); Ex. 26 at 239:7-9 (Fitzsimmons Dep.).

45.    The first reader also assigns an overall rating to each applicant.  Ex. 57 at HARV00015414 (Reading Procedures, Class of 2018).

46.    The numerical ratings assigned to applicants generally range between 1 and 4 in all categories.  Ex. 1 at 159:6-23 (McGrath 2015 Dep.).

47.    The numerical rating of 1 is the best rating that can be assigned.  Ex. 1 at 159:24-160:12 (McGrath 2015 Dep.); *see also* Ex. 57 at HARV00015414-16 (Reading Procedures, Class of 2018).

48.    Admissions officers may add a plus or a minus to the numerical rating, and a plus is better than a minus (*i.e.*, a "2+" is better than a "2-").  Ex. 1 at 159:24-160:12 (McGrath 2015 Dep.).

49.    The academic rating summarizes the applicant's academic achievement and potential based on grades, testing results, letters of recommendation, academic prizes, and any submitted academic work.  Ex. 1 at 161:12-162:1 (McGrath 2015 Dep.); Ex. 57 at HARV00015414-15 (Reading Procedures, Class of 2018).

50.    A "1" academic rating is characterized as ███████████████████ ███████████████████████████████████████████████████ ██████████████████████  Ex. 57 at HARV00015414 (Reading Procedures, Class of 2018); *see also* Ex. 1 at 168:17-169:3 (McGrath 2015 Dep.).

51.    In many circumstances, an applicant receiving a "1" academic rating has submitted academic work of some kind that is reviewed by a faculty member.  *See* Ex. 1 at 168:17-169:3 (McGrath 2015 Dep.).

52.     An applicant receiving a "2+" academic rating is typically an applicant with perfect, or near-perfect, grades and testing, but no evidence of substantial scholarship or academic creativity.  Ex. 1 at 168:8-169:3 (McGrath 2015 Dep.).

53.     The extracurricular rating summarizes the strength of the applicant's involvement in activities during high school and potential to contribute outside the classroom at Harvard.  Ex. 1 at 163:5-15 (McGrath 2015 Dep.); Ex. 57 at HARV00015415 (Reading Procedures, Class of 2018).

54.     A "1" extracurricular rating is characterized as ███████████████████ ████████████████████████████████████████████ ███████████████████████████  Ex. 57 at HARV00015415 (Reading Procedures, Class of 2018); *see also* Ex. 1 at 169:7-11, 170:7-16 (McGrath 2015 Dep.).

55.     An applicant who receives a "2" extracurricular rating is typically an applicant with significant school, and possibly regional accomplishments:  for example, an applicant who was the student body president or captain of the debate team and the leader of multiple additional clubs.  Ex. 57 at HARV00015415 (Reading Procedures, Class of 2018); Ex. 1 at 169:23-170:6 (McGrath 2015 Dep.).

56.     An extracurricular rating of 5 is used to indicate that the applicant has family responsibilities at home or very limited resources that make it unlikely that the applicant could participate in extracurricular or other activities.  Ex. 1 at 159:10-14 (McGrath 2015 Dep.); Ex. 57 at HARV00015415 (Reading Procedures, Class of 2018).

57.     The athletic rating summarizes the strength of the applicant's potential contributions to athletics at Harvard, as well as the applicant's degree of participation in high

school.  Ex. 1 at 163:16-164:8 (McGrath 2015 Dep.); Ex. 57 at HARV00015415 (Reading

Procedures, Class of 2018).

58.     A "1" athletic rating is used to refer to an athlete recruited by a Harvard varsity

team.  Ex. 57 at HARV00015415 (Reading Procedures, Class of 2018); Ex. 1 at 163:18-164:3

(McGrath 2015 Dep.).

59.     The personal rating summarizes the applicant's personal qualities based on all

aspects of the application, including essays, letters of recommendation, the alumni interview

report, personal and family hardship, and any other relevant information in the application.  Ex. 1

at 164:11-165:2 (McGrath 2015 Dep.); Ex. 26 at 245:18-246:20 (Fitzsimmons Dep.).

60.     Many characteristics are valued in the assignment of the personal rating, and

admissions officers may assign ratings based on their assessment of the applicant's humor,

sensitivity, grit, leadership, integrity, helpfulness, courage, kindness and many other qualities.

Ex. 1 at 164:11-165:2 (McGrath 2015 Dep.); Ex. 25 at 359:24-360:9 (McGrath 2017 Dep.); *see

also* Ex. 55 at HARV00001401-1402 (Interviewer Handbook 2014-2015).

61.     Admissions officers do not take race into account when assigning the personal

rating.  Ex. 1 at 165:3-18 (McGrath 2015 Dep.); Ex. 25 at 359:12-15 (McGrath 2017 Dep.); Ex.

17 at 60:14-61:11; Ex. 3 at 192:3-10; Ex. 6 at 72:10-21; Ex. 14 at 21:25-22:4; Ex. 9 at 80:13-

81:1.

62.     The ratings for recommendations, referred to as "school support" in the

Admissions Office, characterize the strength of counselor and teacher recommendations.  Ex. 57

at HARV00015416 (Reading Procedures, Class of 2018).

63.     A "1" rating for school support signals ███████████████████████████

███████████████████████████████ Ex. 57 at HARV00015416 (Reading

Procedures, Class of 2018).

64.     The overall rating summarizes the strength of the application taking all

information into account.  Ex. 57 at HARV00015414 (Reading Procedures, Class of 2018); Ex.

26 at 249:6-25 (Fitzsimmons Dep.); Ex. 1 at 172:5-173:24 (McGrath 2015 Dep.).

65.     The overall rating is "not a formula" and does not involve "adding up" other

ratings.  Ex. 26 at 249:18-25 (Fitzsimmons Dep.).

66.     After close review of the application, the first reader may also write short prose

comments about the applicant.  Ex. 57 at HARV00015414 (Reading Procedures, Class of 2018).

67.     After the first reader's review is complete, the first reader may send the file to the

docket chair for further review.  Ex. 1 at 173:18-21 (McGrath 2015 Dep.).

68.     If the file is passed on for further review, the chair will also read the file closely,

assigning ratings in the same categories as the first reader and adding additional written

comments.  Ex. 1 at 173:21-24, 178:18-179:1 (McGrath 2015 Dep.).

69.     The first reader and chair may assign different scores.  Ex. 1 at 173:21-24,

178:18-179:1 (McGrath 2015 Dep.).

70.     The first reader's and the chair's scores as well as comments from any other

readers are reflected on the application.  Ex. 55 at HARV00001408 (Interviewer Handbook

2014-2015); Ex. 1 at 174:18-7 (McGrath 2015 Dep.); Ex. 61 (redacted application files)

71.     If the applicant has submitted material that Admissions Office staff believe would

be best evaluated by a Harvard faculty member, such as an academic paper or a recording of a

musical performance, the application may be sent to a faculty member (frequently but not always

a member of the Standing Committee) for review and assessment.  That faculty member's review (sometimes referred to as a "faculty read") is also included in the admissions folder.  Ex. 1 at 75:20-78:3, 98:9-18, 170:7-16 (McGrath 2015 Dep.); Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015).

72.     The subcommittees then discuss applicants in meetings where the first reader summarizes for the subcommittee the strengths and weaknesses in each component of each candidate's application.  Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015); Ex. 1 at 182:19-187:16 (McGrath 2015 Dep.).

73.     Subcommittee members discuss the case, and then decide as a group what recommendation to offer the full committee.  Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015); Ex. 1 at 190:20-191:24 (McGrath 2015 Dep.).

74.     The subcommittee examines each application several times to ensure that every application receives the same scrutiny, regardless of whether it was presented first or last.  Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015).

75.     The subcommittee decides as a group whether to recommend to the full Admissions Committee that the applicant be admitted, and the degree of support expressed for candidates is also noted.  Ex. 55 at HARV00001408 (Interviewer Handbook 2014-2015).

76.     After all subcommittees have decided which applications to recommend for admission, the full Admissions Committee, which includes approximately 40 members, meets to discuss and reach final decisions on applications.  Ex. 1 at 190:11-19 (McGrath 2015 Dep.).

77.     The full committee includes all the admissions officers who read files, including Dean Fitzsimmons, Director McGrath, and the Director of Financial Aid.  Ex. 12 at 227:24-228:15 (Donahue Dep.); Ex. 1 at 187:17-188:5 (McGrath 2015 Dep.).

78.     Members of the Standing Committee are invited to participate in all Admissions Office subcommittee meetings and all meetings of the full Admissions Committee when applicants are discussed.  Ex. 1 at 74:14-75:14, 187:17-188:5 (McGrath 2015 Dep.).

79.     At the full Admissions Committee meeting, the area person who first read the application at issue presents the file, typically emphasizing the applicant's strengths.  Ex. 1 at 193:16-194:3, 197:6-198:4 (McGrath 2015 Dep.).

80.     After the discussion is complete, the full committee decides whether to admit, reject, or waitlist the candidate.  Ex. 1 at 193:16-194:5 (McGrath 2015 Dep.); Ex. 55 at HARV00001410 (Interviewer Handbook 2014-2015).

81.     In both the subcommittee and full committee process, each admissions officer has an equal vote.  Ex. 1 at 180:1-9, 193:16-194:5 (McGrath 2015 Dep.); Ex. 26 at 51:24-52:12 (Fitzsimmons Dep.).

## II.     Diversity And Harvard's Mission

82.     The Harvard College mission "is to educate the citizens and citizen-leaders for our society … through … the transformative power of a liberal arts and sciences education."  Ex. 68 (*Mission Vision and History*, Harvard College, Harvard University).

83.     Harvard believes that "[t]hrough a diverse living environment, where students live with people who are studying different topics, who come from different walks of life and have evolving identities, intellectual transformation is deepened and conditions for social transformation are created.  From this we hope that students will begin to fashion their lives by gaining a sense of what they want to do with their gifts and talents, assessing their values and interests, and learning how they can best serve the world."  Ex. 68 (*Mission Vision and History*, Harvard College, Harvard University).

84.     Harvard seeks to admit "students who are diverse on a variety of realms so that they play as important a part in educating one another through their experience together as we play in what we offer them within a classroom." Ex. 4 at 24:1-4 (Faust Dep.).

85.     To achieve its educational mission, Harvard seeks to admit a class with diverse socioeconomic, geographic, and racial backgrounds; a broad range of academic, intellectual, and extracurricular interests and talents; and a variety of different life experiences that include overcoming hardship, engaging in public service, and much more. Ex. 8 at 71:18-22 (Khurana Dep.); Ex. 26 at 55:14-21, 200:24-201:22 (Fitzsimmons Dep.); Ex. 4 at 196:3-8 (Faust Dep.); Ex. 1 at 232:8-16 (McGrath 2015 Dep.); Ex. 55 at HARV00001401 (Interviewer Handbook 2014-2015).

86.     In 1996, Harvard's then-President, Neil Rudenstine, wrote a report in which he explained the importance of diversity to Harvard's mission. Ex. 41 at HARV00030419, HARV00030450 (Rudenstine Report).

87.     In 2015, Harvard College established a Committee to Study the Importance of Student Body Diversity, chaired by Dean Khurana. Ex. 45 at HARV00008048, HARV00008069 (Khurana Report); Ex. 8 at 163:19-164:10 (Khurana Dep.).

88.     The Committee examined how "diversity in the student body helps catalyze the intellectual, social, and personal transformations that are central to Harvard's liberal arts and science education." Ex. 45 at HARV00008049 (Khurana Report).

89.     The Committee "emphatically embrace[d] and reaffirm[ed] the University's long-held view that student body diversity—including racial diversity—is essential to our pedagogical objectives and institutional mission." Ex. 45 at HARV00008069 (Khurana Report).

90.     The Committee determined that diversity "enhances the education of all of our students, it prepares them to assume leadership roles in the increasingly pluralistic society into which they will graduate, and it is fundamental to the effective education of the men and women of Harvard College."  Ex. 45 at HARV00008069 (Khurana Report).

91.     The full Harvard Faculty of Arts and Sciences unanimously adopted the Committee's report.  Ex. 71 (*Support for a Diverse Student Body*, Harvard Gazette (Feb. 16, 2016), https://news.harvard.edu/gazette/story/2016/02/support-for-a-diverse-student-body); Ex. 70 (*Faculty Unanimously Endorse Student Body Diversity*, Harvard Crimson (Feb. 3, 2016)).

92.     The Faculty of Arts and Sciences includes Harvard College, the Graduate School of Arts and Sciences, the School of Engineering and Applied Sciences, and the Division of Continuing Education.  Ex. 78 (Harvard Faculty of Arts and Sciences, *What is FAS?*).

### III.     Variation In The Racial Composition Of The Admitted Class

93.     Harvard does not seek to maintain any specified minimum or maximum percentage of any racial group.  Ex. 7 at 78:14-24 (Smith 2017 Dep.); Ex. 26 at 335:20-336:15 (Fitzsimmons Dep.); Ex. 1 at 194:6-10 (McGrath 2015 Dep.).

94.     The proportion of students in Harvard's admitted class who are White varies from year to year.  Ex. 33 ¶¶ 193-194 & Card Ex. 31 (Card Report); Ex. 35 at 58 (Arcidiacono Rebuttal).

95.     The proportion of students in Harvard's admitted class who are Asian American varies from year to year.  Ex. 33 ¶¶ 193-194 & Card Ex. 32 (Card Report); Ex. 35 at 58 (Arcidiacono Rebuttal).

96.     The proportion of students in Harvard's admitted class who are African American varies from year to year.  Ex. 33 ¶¶ 193-194 & Card Ex. 33 (Card Report); Ex. 35 at 58 (Arcidiacono Rebuttal).

97.     The proportion of students in Harvard's admitted class who are Hispanic or Other varies from year to year.  Ex. 33 ¶¶ 193-194 & Card Ex. 34 (Card Report); Ex. 35 at 58 (Arcidiacono Rebuttal).

98.     In recent decades, Harvard has used three methodologies to report the race of applicants and students.  Ex. 26 at 95:23-96:19 (Fitzsimmons Dep.).

99.     The federal government requires Harvard to use the Integrated Postsecondary Education Data System ("IPEDS") methodology for reporting to the federal government.  Ex. 26 at 93:13-22 (Fitzsimmons Dep.); Ex. 23 at 37:15-17 (Driver-Linn Dep.); Ex. 58 at HARV00065450 (A Note on the Collection and Reporting of Data on Race and Ethnicity).

100.     IPEDS counts applicants who choose to identify their race in a single category:  if the applicant selects only a single category, then he or she is counted in that category; if the applicant selects "Hispanic" and another category, then he or she is always counted as Hispanic no matter what other categories he or she selects; if the applicant selects multiple non-Hispanic categories, then he or she is counted as "multiracial."  Ex. 5 at 135:2-19.

101.     Harvard has at various points used two other methods to report race, which it refers to as the "New Methodology" and the "Old Methodology."  Ex. 26 at 96:9-19, 98:19-99:8 (Fitzsimmons Dep.); Ex. 59 at HARV00030509-30510.

102.     The Old Methodology counts applicants in a single category the applicant chooses to identify on his or her application.  Ex. 33 ¶ 188 (Card Report).

103.     The New Methodology counts applicants in as many categories as the applicant chooses to identify on his or her application.  Ex. 5 at 134:22-24; Ex. 33 ¶ 188 (Card Report).

104.     Harvard implemented the IPEDS methodology for federal reporting in 2010, for the Class of 2014.  Ex. 58 at HARV00065450 (A Note on the Collection and Reporting of Data on Race and Ethnicity); Ex. 27 at 243:3-14 (Arcidiacono Dep.).

105.     For the Classes of 2014, 2015, and 2016, the IPEDS admissions rate for African American applicants differed from the rate for all other applicants.  Ex. 27 at 244:25-245:10 (Arcidiacono Dep.).

106.     In light of the three methods for reporting race and the six-year time period for which Harvard produced admissions data, there would have been 92 opportunities to identify a stretch of three years in which the admission rate for any particular racial group matched the admission rate for all other groups.  Ex. 37 ¶ 161 (Card Rebuttal).

107.     SFFA's expert calculated a 0.2% chance that a single group's average admission rate would match that of other applicants.  Assuming the chance is the same (0.2%) for each of the other racial groups, with 92 opportunities there would be a 17% chance of finding a three-year match of admissions rates for one racial group within the six-year period.  17% is much higher than the 5% threshold typically used by statisticians to reject the possibility that an event occurred by chance.  Ex. 37 ¶ 161 (Card Rebuttal).

108.     When Harvard publishes in the Harvard Gazette the racial composition of an admitted class, it uses the "New Methodology."  Ex. 5 at 137:15-138:6; Ex. 26 at 100:23-101:9 (Fitzsimmons Dep.); Ex. 33 ¶ 190 (Card Report); Ex. 37 ¶ 153 (Card Rebuttal).

109.     From the Class of 2000 to the Class of 2017, the number of applicants to Harvard College increased from 18,183 to 35,023.  Ex. 62 at HARV00032509-511.

110.     Asian-American applicants were 20.3% of the applicants to the Class of 2000 and 20.4% of the applicants to the Class of 2017.  Ex. 62 at HARV00032509-511.

111.     African-American applicants were 5.3% of the applicants to the Class of 2000 and 9.8% of the applicants to the Class of 2017.  Ex. 62 at HARV00032509-511.

112.     Hispanic applicants were 6.3% of the applicants to the Class of 2000 and 10% of the applicants to the Class of 2017.  Ex. 62 at HARV00032509-511.

113.     The percentage of Asian-American students in the admitted class has grown by 29% in the last decade to nearly 23% of admitted students.  *See* Ex. 82 (Harvard Gazette, *1,962 Admitted to Harvard College Class of '22* (Mar. 28, 2018)); Ex. 79 (Harvard Gazette, *Financial Aid Program Draws Record Number of Applicants* (Apr. 2, 2009)).

## IV.     Harvard's Consideration Of Race

114.     Harvard applicants may choose to disclose information about their race and ethnicity in their application.  Ex. 26 at 145:19-20 (Fitzsimmons Dep.).

115.     If an applicant chooses not to disclose his or her race, Harvard makes no attempt to determine his or her race.  Ex. 26 at 240:3-11 (Fitzsimmons Dep.); Ex. 9 at 190:10-14.

116.     If an applicant chooses to disclose information about his or her race, Harvard does not attempt to verify the information disclosed by the applicant.  Ex. 1 at 148:20-150:22 (McGrath 2015 Dep.); Ex. 6 at 114:9-115:18; Ex. 9 at 190:10-14.

117.     When disclosed by the applicant, race is considered as one factor among many in the admissions process.  Ex. 26 at 336:12-15 (Fitzsimmons Dep.); Ex. 1 at 42:19-24 (McGrath 2015 Dep.); Ex. 13 at 83:12-84:2; Ex. 3 at 239:13-15; Ex. 14 at 54:11-23; Ex. 17 at 63:9-13; Ex. 18 at 207:21-23.

118.     Admissions officers do not take race into account when assigning the four profile ratings—academic, extracurricular, athletic, and personal—or the ratings for school support.  Ex. 1 at 165:3-18 (McGrath 2015 Dep.); Ex. 25 at 359:12-15 (McGrath 2017 Dep.); Ex. 17 at 60:14-

61:11; Ex. 3 at 192:3-10; Ex. 6 at 72:10-21; Ex. 14 at 21:25-22:4; Ex. 9 at 80:13-81:1; Ex. 13 at 23:12-17.

119.    Admissions officers may take race into account in assigning the overall rating. Ex. 26 at 253:13-254:2 (Fitzsimmons Dep.); Ex. 3 at 194:14-24; Ex. 13 at 28:14-21; Ex. 16 at 33:19-34:13.

120.    To the extent race is taken into account in the overall rating assigned to an applicant, it is taken into account only flexibly, not automatically or mechanically. Ex. 26 at 158:24-159:8, 251:11-21 (Fitzsimmons Dep.).

121.    To be admitted to Harvard, applicants must have multiple areas of strength in addition to being academically qualified. Ex. 37 ¶ 136 (Card Rebuttal); Ex. 4 at 224:11-17, 225:3-5 (Faust Dep.); Ex. 26 at 132:5-8 (Fitzsimmons Dep.).

122.    Race alone does not determine whether or not an applicant is admitted, and numerous other characteristics of applicants are much better predictors of Harvard's admissions decisions. Ex. 37 ¶¶ 137, 140 & Card Ex. 22 (Card Rebuttal); *see also* Ex. 33 ¶ 178 & Card Ex. 27 (Card Report).

123.    The profile ratings used by the Harvard Admissions Office—academic, extracurricular, athletic, and personal—explain a much larger proportion of the variability in admission outcomes than race. Ex. 33 ¶ 178 & Card Ex. 27 (Card Report); *see also* Ex. 37 ¶¶ 65, 140 & Card Ex. 22 (Card Rebuttal).

124.    Factors such as College Board high school and neighborhood variables, parental occupation, and intended career explain more of the variability in admissions outcomes than race. Ex. 33 ¶ 178 & Card Ex. 27 (Card Report).

125.    For the most competitive applicants, the marginal effect of race on an applicant's likelihood of admission is comparable to that of other factors, such as top academic, extracurricular, or personal ratings.  Ex. 37 ¶¶ 140-145 & Ex. 23 (Card Rebuttal); Ex. 27 at 279:21-280:4 (Arcidiacono Dep.).

## V.    Race-Neutral Alternatives

### A.    Current Race-Neutral Practices In Pursuit Of Diversity

126.    Harvard employs numerous race-neutral practices to pursue diversity.  Ex. 47 at HARV00097313-97314 (Smith Committee Report).

127.    Harvard seeks to identify strong applicants from modest economic backgrounds and encourage them to apply through, among other things, targeted mailings of materials about Harvard and its generous financial aid program.  Ex. 47 at HARV00097313 (Smith Committee Report).

128.    Harvard representatives, including admissions officers, undergraduates, and alumni, conduct numerous recruitment events throughout the United States, including events targeting students who come from secondary schools and geographic areas that do not frequently send students to Harvard.  Ex. 47 at HARV00097313 (Smith Committee Report).

129.    Harvard seeks to admit and enroll students who are from the first generation in their families to attend a four-year college.  Harvard's First Generation program encourages such students to apply and matriculate.  Ex. 47 at HARV00097313 (Smith Committee Report).

130.    Harvard's First Generation program includes electronic communications, promotional materials, and the ability to correspond directly with current first-generation students attending Harvard.  Ex. 47 at HARV00097313 (Smith Committee Report).

131.    Harvard's Undergraduate Minority Recruitment Program ("UMRP"), which originated in the early 1970s, attempts to encourage a racially diverse applicant pool.  Ex. 47 at HARV00097313 (Smith Committee Report).

132.    The UMRP sends targeted mailings to many potential applicants of different racial and ethnic backgrounds (including Asian-American, African-American, Hispanic, and Native American students), coordinates online communications, sends representatives to schools and events around the nation, and enlists current students to talk with prospective applicants.  Ex. 47 at HARV00097313 (Smith Committee Report); *see* Ex. 60 at HARV00036381 (UMRP Coordinator Manual); Ex. 9 at 16:22-17:16, 18:21-24.

133.    Harvard seeks in the admissions process to identify promising students from modest economic backgrounds, first-generation college students, and other students who would contribute to the diversity of the student body in many ways.  Ex. 47 at HARV00097314 (Smith Committee Report).

134.    The Admissions Office carefully reviews applications from such students to ensure that they are not disadvantaged in the application process because of their lack of resources and opportunities or their educational background, and to recognize the particular achievement of students who have excelled when coming from a modest background.  Ex. 47 at HARV00097314 (Smith Committee Report).  When reviewing applications, admissions officers flag applicants who appear to be socioeconomically disadvantaged or eligible for aid under the Harvard Financial Aid Initiative.  *E.g.*, Ex. 57 at HARV00015424 (Reading Procedures, Class of 2018); Ex. 18 at 84:14-24.

135.    Harvard offers an entirely need-based financial aid program—among the most generous in the country—designed to ensure that financial circumstances will not prevent any

admitted student from matriculating.  Ex. 47 at HARV00097314 (Smith Committee Report); *see also* Ex. 80 (*Fact Sheet*, Griffin Financial Aid Office, Harvard College).

136.    Harvard expects no financial contribution from the parents of a student whose family earns less than $65,000 annually and has typical assets, and a contribution of 10% or less of family income from the parents of a student whose family earns between $65,000 and $150,000 annually and has typical assets.  Ex. 47 at HARV00097315 (Smith Committee Report); *see also* Ex. 80 (*Fact Sheet*, Griffin Financial Aid Office, Harvard College).

137.    Harvard's policies are designed to ensure that students from all socioeconomic circumstances can attend Harvard, promoting both economic and racial diversity.  Ex. 47 at HARV00097315 (Smith Committee Report).

138.    55% of students at Harvard College receive need-based scholarship aid.  Ex. 72 (*Harvard at a Glance*, Harvard University).

139.    Students who qualify for need-based scholarship aid pay an average of $12,000 to attend Harvard each year.  Ex. 72 (*Harvard at a Glance*, Harvard University).

140.     Harvard publicizes its financial aid policies widely, prominently discussing them on its website and in promotional materials.  Ex. 47 at HARV00097314 (Smith Committee Report).

141.    For example, Harvard provides a "Net Price Calculator" on its website that allows prospective applicants to estimate their likely cost of attending Harvard.  Ex. 47 at HARV00097314 (Smith Committee Report); *see also* Ex. 81 (*Net Price Calculator*, Griffin Financial Aid Office, Harvard College).

142.    Each year Harvard hosts admitted students for the Visitas program, which is designed to expose all admitted students to life at Harvard by enabling them to meet professors

and students and explore Harvard's campus.  Ex. 47 at HARV00097314 (Smith Committee Report).

143.    Harvard provides need-based aid to help admitted students travel to Visitas.  Ex. 47 at HARV00097314 (Smith Committee Report).

144.    During Visitas, Harvard facilitates meetings between admitted students and current students of similar backgrounds.  Ex. 47 at HARV00097314 (Smith Committee Report).

### B.    Consideration of Alternative Practices

145.    In June 2014, Harvard convened a University-wide committee chaired by James Ryan, Dean of the Graduate School of Education, and charged with examining the importance of student-body diversity at the University and with evaluating whether the University could achieve the educational benefits of a diverse student body without considering applicants' race or ethnicity.  Ex. 47 at HARV00097311 (Smith Committee Report); Ex. 42 at HARV00072365-368.

146.    After its initial meetings had taken place, the committee chaired by Dean Ryan paused its work in late 2014 when this litigation commenced.  Ex. 47 at HARV00097311 (Smith Committee Report).  Recognizing that this litigation would include extensive discovery in which experts would conduct in-depth empirical analyses of the College's admissions processes and proposed changes to it, Harvard decided to evaluate whether it could achieve the educational benefits of diversity in the College without considering race in admissions in a way that would be informed by those analyses.  *Id.*

147.    In 2017, Harvard established a Committee to Study Race Neutral Alternatives in Harvard College Admissions.  Ex. 47 at HARV00097310-97311 (Smith Committee Report).  Michael Smith, the Edgerley Family Dean of the Faculty of Arts and Sciences, chaired the Committee.  The Committee's other members were William Fitzsimmons, the Dean of

24

Admissions and Financial Aid; and Rakesh Khurana, the Dean of Harvard College, Marvin

Bower Professor of Leadership at Harvard Business School, and Faculty Dean of Cabot House.

*Id.* at HARV00097328.

148.    Dean Smith is the Dean of the Faculty of Arts and Sciences, which is responsible

for academics at Harvard College and supervises the Admissions Office.  Ex. 47 at

HARV00097312 (Smith Committee Report).

149.    Dean Khurana is the Dean of Harvard College and is responsible for issues of

student life at the College.  Ex. 47 at HARV00097312 (Smith Committee Report).

150.    Dean Fitzsimmons is responsible for the Admissions Office.  Ex. 47 at

HARV00097312 (Smith Committee Report).

151.    The Committee was charged with evaluating whether proposed race-neutral

alternatives are available and workable for achieving the benefits that flow from student body

diversity at Harvard College.  Ex. 46 at HARV00072381 (Race Neutral Alternatives Committee

Charge).

152.    The Committee considered social-science and other literature on race-neutral

means of pursuing diversity and collected information from several offices of Harvard College

including the Office of Admissions and Financial Aid.  Ex. 47 at HARV00097312 (Smith

Committee Report).

153.    The Committee also considered materials produced in this litigation, including the

complaint and expert reports submitted by both parties, which analyze the effects that

abandoning consideration of race and certain other practices in admissions would have on the

academic, demographic, and other characteristics of the Harvard College student body.  Ex. 47 at

HARV00097312 (Smith Committee Report).

154.    After meeting seven times over the course of nine months, and after considering voluminous materials and deliberating extensively, the Committee memorialized its conclusions in a report in April 2018.  Ex. 47 at HARV00097310-97328 (Smith Committee Report).

155.    The Committee recommended that Harvard reexamine in five years whether it remains necessary to consider race in the admissions process to achieve the benefits of diversity. Ex. 47 at HARV00097328 (Smith Committee Report).

### 1.   Effect Of Eliminating Race-Conscious Admissions

156.    If Harvard stopped considering race in the admissions process, the proportion of African-American and Hispanic students in the admitted class would decline dramatically, notwithstanding all the other efforts that Harvard takes to recruit a broadly diverse class.  Ex. 47 at HARV00097317 (Smith Committee Report); *see* Ex. 33 ¶ 228 & Card Ex. 36 (Card Report) (relative to Class of 2019, African-American share of admitted class would decrease from 14% to 6%, and Hispanic share would decrease from 14% to 9%).

157.    If Harvard stopped considering race in the admissions process, the proportion of White students in the admitted class would increase dramatically.  Ex. 33 ¶ 228 & Card Ex. 36 (Card Report) (relative to Class of 2019, White share of admitted class would increase from 40% to 48%).  The proportion of Asian-American students in the admitted class would increase slightly.   Ex. 33 ¶ 228 & Card Ex. 36 (Card Report) (relative to Class of 2019, Asian-American share of admitted class would increase from 24% to 27%).

158.    Harvard does not have in mind a specific number of students of any given racial or ethnic background who must be on campus in order for Harvard's diversity-related educational objectives to be satisfied.  Ex. 47 at HARV00097317 (Smith Committee Report); *see* Ex. 7 at 57:7-22 (Smith 2017 Dep.).

159.    Harvard has concluded that the "significant decline in racial diversity that would flow from eliminating the consideration of race in the admissions process would prevent Harvard from achieving its diversity-related educational objectives" because "students in a significantly less diverse class will have diminished opportunities to engage with and learn from classmates who come from widely different backgrounds and circumstances … [which] would leave students ill prepared to contribute to and lead in our diverse and interconnected nation and world."  Ex. 47 at HARV00097317 (Smith Committee Report).

160.    Harvard has concluded that "a significant reduction in the number of African-American and Hispanic students on campus would inhibit the ability of Harvard's students and faculty to glean the benefits of a diverse student body and significantly undermine [Harvard's] educational mission and broader institutional objectives."  Ex. 47 at HARV00097317 (Smith Committee Report).

161.    Harvard recognizes that there is much more work to do to ensure that it can become a truly inclusive community.  Ex. 69 (Dean Rakesh Khurana, *Letter to Harvard College Students* (Nov. 19, 2015)).

162.    In 2015, for example, the Harvard College Working Group on Diversity and Inclusion produced a report outlining the challenges that Harvard continues to face in ensuring that all members of its community feel included and engaged.  Ex. 44 at HARV00007944-7982.

163.    Harvard expressed concern that "[t]he issues of diversity and inclusion that [it] faces today—including … ongoing feelings of isolation and alienation among racial minorities in [its] community—would only be exacerbated by a significant decline in African-American and Hispanic enrollment."  Ex. 47 at HARV00097317 (Smith Committee Report).

## 2. Potential Race-Neutral Alternatives

164.    Harvard has concluded that no combination of race-neutral practices would practicably allow it to achieve the educational benefits of a diverse student body without unacceptable cost to other important educational and institutional objectives.  Ex. 47 at HARV00097318 (Smith Committee Report).

165.    Harvard considered practices set forth by SFFA and its expert, Richard Kahlenberg.  Ex. 47 at HARV00097312 (Smith Committee Report).  It also considered practices set forth in the relevant social science literature.  *Id.*

### a)    Potential New Practices

166.    Harvard considered the possibility of increased efforts to recruit a diverse class. Ex. 47 at HARV00097318 (Smith Committee Report).

167.    Harvard already undertakes extensive efforts to recruit students who would contribute to the diversity of its class.   Ex. 47 at HARV00097318-97319 (Smith Committee Report).

168.    Harvard's outreach efforts equal or exceed the efforts of its peer institutions and include the assistance of more than 10,000 alumni located throughout the nation and around the world.  Ex. 47 at HARV00097318 (Smith Committee Report).

169.    Harvard has concluded that, "even if increased recruitment could double the number of socioeconomically disadvantaged students who apply to Harvard—an assumption [it regards] as extremely unrealistic—a race-neutral admissions process still could not achieve a student body comparable in diversity to current classes without unacceptably compromising other important institutional objectives."  Ex. 47 at HARV00097318 (Smith Committee Report).

170.    Harvard considered the possibility of increased financial aid.  Ex. 47 at HARV00097319-97320 (Smith Committee Report).

171.    Harvard currently offers among the most generous financial aid of any higher education institution in America. Ex. 47 at HARV00097319 (Smith Committee Report).

172.    Harvard's current financial aid program is already so generous that it makes Harvard more affordable, especially to low-income applicants, than many public institutions. Ex. 47 at HARV00097319 (Smith Committee Report).

173.    The most recent expansion of financial aid, in 2016, did not result in significant increases in the number of African-American or Hispanic applicants or admitted students. Ex. 47 at HARV00097320 (Smith Committee Report); *see also* Ex. 33 ¶¶ 278-285 & Card Exs. 55-59 (Card Report); Ex. 37 ¶ 199 (Card Rebuttal).

174.    Most African-American and Hispanic households are already eligible for zero parental contribution under Harvard's financial aid program. Ex. 33 ¶ 280 (Card Report).

175.    There is nothing to suggest that members of any racial or ethnic group are choosing to attend other schools instead of Harvard on the basis of the need-based financial aid available at those institutions, and thus no reason to believe that further increases in financial aid will materially increase the diversity of Harvard's student body. Ex. 47 at HARV00097319 (Smith Committee Report).

176.    Harvard could not significantly increase its financial aid budget without detracting from other commitments—to a four-year residential experience, cutting edge research facilities, faculty and staff, and operations—that are essential to maintaining Harvard as one of the world's leading institutions of higher learning. Ex. 47 at HARV00097320 (Smith Committee Report).

177.    Harvard considered the possibility of incorporating geographic considerations more extensively in the admissions process. Ex. 47 at HARV00097320-97321 (Smith Committee Report).

178.     Harvard determined that "the adoption of an admissions regime using rigid place-based preferences would greatly lessen Harvard's undergraduate student body of qualities that Harvard has long thought important," because it would compel Harvard "to deny admission to the second or third excellent applicant from one location simply because a formula points to an applicant in another place." Ex. 47 at HARV00097320 (Smith Committee Report).

179.     Harvard considered the possibility of increasing the number of students admitted to transfer to Harvard after one or more years of undergraduate study at another institution. Ex. 47 at HARV00097321-97322 (Smith Committee Report).

180.     Harvard concluded that increasing transfer admissions is unlikely to help Harvard achieve its diversity-related educational goals and would impair its pursuit of academic excellence. Ex. 47 at HARV00097322 (Smith Committee Report).

181.     Harvard's class size is limited by the available student housing, because the residential system is an essential aspect of Harvard's undergraduate experience, 98% of students live on campus, and few students leave Harvard before graduation. Ex. 47 at HARV00097321 (Smith Committee Report).

182.     Harvard concluded that building new housing would be infeasible at present. Ex. 47 at HARV00097321-97322 (Smith Committee Report).

183.     Harvard found that "[t]here is no good reason to admit fewer freshmen for the purpose of reserving spots for transfer students" because there is no reason to believe that the transfer pool is stronger than the freshman pool of applicants, particularly when "Harvard already rejects thousands of incredibly talented students who could thrive at the College, including many racially diverse applicants." Ex. 47 at HARV00097321 (Smith Committee Report).

184.     The pool of transfer applicants to Harvard College is less racially diverse than the pool of freshman applicants, and transfer applicants have lower academic ratings (on average) than freshman applicants.  Ex. 47 at HARV00097321 (Smith Committee Report); *see also* Ex. 33 ¶ 252 (Card Report).

185.     Harvard considered the possibility of affording even greater weight to the fact that an applicant comes from a modest socioeconomic background.  Ex. 47 at HARV00097322-97324 (Smith Committee Report).

186.     Harvard concluded that it cannot achieve both its diversity-related educational objectives and its other educational objectives by giving greater weight to the fact that an applicant comes from a modest socioeconomic background, even in combination with the elimination of practices alleged to reduce diversity.  Ex. 47 at HARV00097323 (Smith Committee Report).

187.     If Harvard stopped considering race and eliminated practices alleged to inhibit the pursuit of diversity, it would need to award a boost to applicants from lower socioeconomic backgrounds that is larger than the boost given to candidates with the strongest academic, extracurricular, personal, and athletic ratings in order to admit a comparable proportion of African-American students to Harvard.  Ex. 47 at HARV00097322-97323 (Smith Committee Report); Ex. 33 ¶¶ 232-243 (Card Report).  A boost of that magnitude would lead to significant changes in the composition of the admitted class, including a reduction in academic and other forms of excellence.  Ex. 47 at HARV00097323 (Smith Committee Report); Ex. 33 ¶¶ 232-243 (Card Report).

188.     If Harvard gave sufficient weight to socioeconomic status to avoid significant changes in the proportion of African-American, Hispanic, and Other students, the proportion of

admitted students with the best academic ratings (1 or 2) would drop from 76% to 66%.  Ex. 47 at HARV00097323 (Smith Committee Report); *see* Ex. 33 ¶¶ 240-241 & Card Exs. 36, 38 (Card Report).

189.    If Harvard gave sufficient weight to socioeconomic status to avoid significant changes in the proportion of African-American, Hispanic, and Other students, the proportion of students with the highest extracurricular, personal, and athletic ratings would also decline.  Ex. 47 at HARV00097323 (Smith Committee Report); *see* Ex. 33 ¶¶ 240-241 & Card Exs. 36, 38 (Card Report).

190.    Harvard concluded that such a decline in academic and other qualities is incompatible with its educational mission.  Ex. 47 at HARV00097323 (Smith Committee Report).

### b)    Eliminating Various Existing Practices

191.    Harvard considered the possibility of eliminating Early Action.  Ex. 47 at HARV00097324 (Smith Committee Report).

192.    In 2006, Harvard announced that it would eliminate its Early Action program in the hope that doing so would encourage an even more racially diverse group of students to apply and matriculate.  Ex. 47 at HARV00097314-97315 (Smith Committee Report); *see* Ex. 64 at HARV00030303-HARV00030332 (Memorandum to Members of the Corporation).

193.    The Classes of 2012 through 2015 were admitted without an Early Action process.  Ex. 47 at HARV00097314-97315 (Smith Committee Report); *see also* Ex. 73 (*Let the Admissions Begin*, Harvard Gazette (Dec. 15, 2011)).

194.    When Early Action was not offered, Harvard found that the share of self-identified African-American, Hispanic, and Other applicants to Harvard did not rise and that the yield rate for African-American, Hispanic, and Other applicants declined, as many of the most

promising African-American, Hispanic, and Other applicants opted to attend universities that continued to offer them early admission.  Ex. 47 at HARV00097324 (Smith Committee Report); Ex. 64 at HARV00030303, 30306 (Memorandum to Members of the Corporation).

195.    Harvard reinstated a non-binding Early Action program for the Class of 2016 admissions cycle and found that the yield rate for applicants of all racial groups increased.  Ex. 47 at HARV00097324 (Smith Committee Report); Ex. 33 ¶¶ 291-292 (Card Report).

196.    There is no reason to believe that abolishing Early Action again would contribute to diversity on campus, let alone restore to a meaningful degree the diversity that would be lost by eliminating consideration of race, and the abolition of Early Action would damage Harvard's ability to compete effectively for top candidates, hindering its educational goals.  Ex. 47 at HARV00097324 (Smith Committee Report).

197.    Harvard considered the elimination of certain practices alleged by SFFA or others to inhibit diversity, including the practice of deferred admission, the consideration of whether an applicant's parents attended Harvard College or Radcliffe, the consideration of whether an applicant's parent is employed by Harvard, the consideration of whether the applicant is a recruited athlete, and the consideration of whether the applicant is on the Dean's or Director's interest list.  Ex. 47 at HARV00097325-97326 (Smith Committee Report).

198.    If Harvard eliminated consideration of race in the admissions process, and also eliminated the practice of deferred admission, the consideration of whether an applicant's parents attended Harvard College or Radcliffe, the consideration of whether an applicant's parent is employed by Harvard, the consideration of whether the applicant is a recruited athlete, and the consideration of whether the applicant is on the Dean's or Director's interest list, the resulting class would have just half the number of students who identify as African-American, Hispanic,

or Other.  Ex. 47 at HARV00097325 (Smith Committee Report); Ex. 33 ¶¶ 229-231 & Card Ex. 35 (Card Report).

199.     Harvard regards a significant decline in the number of students who identify as African-American, Hispanic, or Other as inimical to its educational objectives.  Ex. 47 at HARV00097325 (Smith Committee Report).

200.     Athletic excellence is one of many attributes that Harvard values in its students. Ex. 47 at HARV00097325 (Smith Committee Report).

201.     Harvard's student-athletes are also among the most dedicated alumni and contribute in many ways to the University after they graduate, and athletic activities foster a sense of community on campus.  Ex. 47 at HARV00097325 (Smith Committee Report).

202.     Considering whether applicants have parents who attended Harvard College or Radcliffe cements strong bonds between the College and its alumni and encourages alumni to remain engaged with the University for the rest of their lives, including by volunteering as alumni interviewers.  Ex. 47 at HARV00097325-97326 (Smith Committee Report).

203.     Alumni provide financial support that is essential to Harvard's position as a leading institution of higher learning and helps make possible the financial aid polices that contribute to the diversity and excellence of the College's student body.  Ex. 47 at HARV00097326 (Smith Committee Report); *see also* Ex. 96 (Simmons Declaration); Ex. 34 ¶ 55 (Simmons Report).

204.     Considering whether an applicant's parent is a member of Harvard's faculty or staff aids in the retention of talent in the University workforce; eliminating that consideration would place Harvard at a significant competitive disadvantage in recruiting personnel.  Ex. 47 at HARV00097326 (Smith Committee Report); *see also* Ex. 34 ¶ 56 (Simmons Report).

205.     To the extent the Admissions Committee currently considers other aspects of service to Harvard, including whether an applicant's family has donated or has the capacity to donate to Harvard, it does so in a very small number of cases—far too small for the cessation of any such practice to contribute meaningfully to campus diversity.  Ex. 47 at HARV00097326 (Smith Committee Report).

206.     Harvard considered the possibility of eliminating consideration of standardized test scores.  Ex. 47 at HARV00097327 (Smith Committee Report).

207.     Harvard has concluded that standardized tests are imperfect measures of academic excellence and aptitude but that—when considered in light of an applicant's background and ability to prepare—the tests provide useful information that the Admissions Office would lose if it excluded any consideration of them.  Ex. 47 at HARV00097327 (Smith Committee Report).

208.     Although a correlation exists between standardized test scores and socioeconomic background, Harvard has concluded that that correlation does not render standardized test scores irrelevant and provides no reason to prevent admissions officers from considering them while taking into account the applicant's resources. Ex. 47 at HARV00097327 (Smith Committee Report).

209.     Mr. Kahlenberg proposed a set of admissions practices that in his view "would provide a viable path for Harvard."  Ex. 36 at 34 (Kahlenberg Rebuttal).

210.     Mr. Kahlenberg's proposed set of practices would produce a class with 30% fewer African-American students than the admitted Class of 2019.  Ex. 37 ¶ 193 & Card Ex. 26 (Card Rebuttal).

211.     Mr. Kahlenberg's proposed set of practices would reduce the proportion of admitted students with academic, personal, and extracurricular ratings of 1 or 2.  Ex. 37 ¶ 193 &

Card Ex. 26 (Card Rebuttal) (identifying reductions of 19% for top academic ratings, 13% for top extracurricular ratings, and 13% for top personal ratings).

212.    In sum, Harvard has concluded that, at present, no available, workable race-neutral admissions practices could promote Harvard's diversity-related educational objectives as well as Harvard's current whole-person race-conscious admissions program while also maintaining the standards of excellence that Harvard seeks in its student body.  Ex. 47 at HARV00097327 (Smith Committee Report).

## VI.    Claim Of Discrimination Against Asian-American Applicants

213.    Staff within Harvard's Office of Institutional Research ("OIR") conducted preliminary and limited analyses of Harvard's admissions process in 2013.  Ex. 65 at HARV00031687, 31718 ("The following analysis is **preliminary** and for discussion."); Ex. 66 at HARV00065741 (presentation marked "PRELIMINARY DRAFT"); Ex. 67 at HARV00023548-23549 (describing modeling exercise as having "several limitations"); Ex. 23 at 195:21-196:10 (Driver-Linn Dep.) (OIR was "[r]educing what's a very complicated thing into … a quant model" and its analyses were "iterative, exploratory, preliminary, and limited"); Ex. 20 at 196:7-18 (OIR modeling "d[id] not take socioeconomic status into account" and "[t]here are other factors and data that are not reflected in these models").

214.    The OIR analyses were not designed to evaluate whether Harvard was intentionally discriminating against Asian-American applicants and reached no such conclusion. *E.g.*, Ex. 20 at 193:24-194:4; Ex. 23 at 163:19-166:13 (Driver-Linn Dep.).

215.    The OIR analyses did not account for numerous factors relevant to the admissions process.  Ex. 65 at HARV00031722 ("There are a variety of factors that quantitative data is likely to miss or ratings do not capture.  We'd like to better understand: Exceptional talent (music, art, writing)[;] The role of context cases[;] The role of the personal statement/essay[;]

Measures of socio-economic status (HFAI Flag, Low Income Flag)[.]"); Ex. 66 at HARV00065757 (noting that model does not account for "Children [of] faculty/staff," "Search for socioeconomic diversity," "High school quality/opportunities open to student," and "[Geographic] Dockets"); Ex. 67 at HARV00023549  ("This approach has several limitations; we picked a small set of variables that would factor in admissions decisions.  The selection of a wider set of variables might result in a better fitting model, one that accounts for more of the variation in individual applicants and their potentially unique contributions to the entering class.").

216.    Harvard's expert, Dr. David Card, built a statistical model of the Harvard College admissions process based on data for domestic applicants to the Classes of 2014 through 2019 (approximately 150,000 applicants).  Ex. 97 (Card Declaration); Ex. 33 ¶¶ 7, 128 (Card Report).

217.    Dr. Card's model estimates the effects of several hundred applicant characteristics on the probability of an applicant's admission.  *See* Ex. 33 ¶¶ 95-96 (Card Report).

218.    Dr. Card's model incorporated numerous factors that OIR was not able to analyze, such as information about socioeconomic factors and high-school context.  Ex. 33 at 181-186 (Appendix E) (Card Report).

219.    Dr. Card found no statistically significant "negative effect of Asian-American ethnicity" on applicants' likelihood of admission.  Ex. 33 ¶ 92 (Card Report); *see also id.* ¶¶ 128, 134-135, 141 & Card Exs. 17-19; Ex. 37 ¶ 103 (Card Rebuttal) ("I continue to find no evidence of bias against Asian-American applicants.  The average effect of Asian-American ethnicity is statistically insignificant, both overall and in each of the six years.").

220.    Dr. Card found that the estimated effect of Asian-American ethnicity on applicants' likelihood of admission was positive (but not statistically significant) in three of the

six years studied.  Ex. 37 ¶ 103 (Card Rebuttal) ("The effect [of Asian-American ethnicity] is slightly positive in three of the six years and slightly negative in three, with an overall effect (-0.05 percentage points) that—as with the effects for each individual admission class—is statistically indistinguishable from zero.").

221.     Dr. Card found that, for female applicants, the estimated effect of Asian-American ethnicity on likelihood of admission was positive in four out of six years and positive overall, though the effect was not statistically significant either overall or in any individual year. Ex. 37 ¶ 117 & Card Ex. 19 (Card Rebuttal).

222.     Dr. Card found that, for applicants from California dockets, the estimated effect of Asian-American ethnicity on likelihood of admission was positive in five out of the six years and positive overall, though the effect was not statistically significant either overall or in any individual year.  Ex. 37 ¶ 117 & Card Ex. 20 (Card Rebuttal).

223.     Asian-American applicants who are either female or from California (or both) comprised 64% of domestic Asian-American applicants for the Classes of 2014-2019.  Ex. 37 ¶ 118 (Card Rebuttal).

224.     SFFA's expert, Dr. Peter Arcidiacono, also constructed a model attempting to estimate the effects of applicant characteristics on the probability of an applicant's admission. Ex. 35 at 1 (Arcidiacono Rebuttal).

225.     Dr. Arcidiacono's analysis excludes from his preferred model of the admissions process several categories of applicants: recruited athletes, applicants with a parent who attended Harvard College or Radcliffe, applicants whose names appeared on a "Dean's interest" or "Director's interest" list, and children of Harvard faculty and staff.  Ex. 35 at 69 (Arcidiacono Rebuttal); Ex. 37 ¶¶ 85-86 (Card Rebuttal).  Dr. Card and Dr. Arcidiacono have referred to these

applicants as "ALDC" applicants (Athletes, Lineage, Dean/Director List, Children of faculty and

staff).  Ex. 37 ¶ 85 (Card Rebuttal); Ex. 27 at 116:11-13 (Arcidiacono Dep.).

226.    The Admissions Office considers in the admissions process whether an applicant

is a recruited athlete, whether one of the applicants' parents attended Harvard College or

Radcliffe, or whether one of the applicant's parents is a member of Harvard's faculty or staff.

Ex. 55 at HARV00001402 (Interviewer Handbook 2014-2015); Ex. 1 at 97:16-23 (McGrath

2015 Dep.); Ex. 3 at 204:8-15.

227.    Dr. Arcidiacono conjectured that the Admissions Office evaluates ALDC

applicants under "special admissions procedures."  Ex. 35 at 69 (Arcidiacono Rebuttal).

228.    There is no separate admissions process for recruited athletes, applicants one of

whose parents attended Harvard College or Radcliffe, applicants who appear on the Dean's or

Director's interest list, or applicants one of whose parents is a member of Harvard's faculty or

staff.  *See e.g.*, Ex. 77 (Frequently Asked Questions) (Question:  "Is there a separate admissions

process for prospective athletes?"  Answer: "No.  We encourage students with athletic talent to

contact our Athletic Department for information about any of Harvard's 42 varsity athletic

teams."); Ex. 63 at HARV00022645 (FW: Harvard Women's Ice Hockey) (email from women's

hockey coach to admissions personnel regarding consideration of hockey recruits at "next week's

admissions meeting" and noting that "there are many qualified applicants for next year's class"

who are under consideration); Ex. 6 at 220:14-18 (Question:  "How are legacies treated

differently in the admitting process than other applicants?"  Answer: "They are not treated

differently."); Ex. 3 at 203:19-204:4 (admissions officer "never experienced a time in which

[she] was asked to give an applicant [on the Dean's interest list] different treatment" and her

"experience in the admissions office was that all candidates were reviewed in the same form");

*id.* at 204:5-205:2 (if an applicant has a connection to Harvard faculty or staff "[i]t's one small factor among a list of many that are considered for a student's candidacy" and "a connection to staff or faculty alone would not be reason enough to grant a student admission").

229.    The admission rate of domestic non-ALDC applicants to the Classes of 2014 to 2019 was 5.15% for Asian-American applicants and 4.91% for White applicants.  Ex. 33 ¶ 71 & Card Ex. 7 (Card Report).

230.    Dr. Arcidiacono also excluded the personal rating from his preferred model.  Ex. 27 at 157:22-158:10 (Arcidiacono Dep.); Ex. 35 at 25 (Arcidiacono Rebuttal).

231.    The personal rating takes into account numerous factors, many of which are not independently recorded in the admissions database.  Ex. 26 at 245:18-246:20 (Fitzsimmons Dep.); Ex. 1 at 164:11-165:2 (McGrath 2015 Dep.); Ex. 37 ¶ 40 (Card Rebuttal).  For example, the personal rating takes into account the applicant's essays, recommendation letters from at least two teachers, and a recommendation letter from the secondary school counselor; the essays and any recommendation letters beyond the required ones receive no numerical ratings in the database, and other recommendation letters receive only a unitary score that assesses the overall strength of the letter on all dimensions.  Ex. 26 at 245:18-246:20 (Fitzsimmons Dep.); Ex. 1 at 164:11-165:2 (McGrath 2015 Dep.); Ex. 5 at 40:20-23; Ex. 37 ¶ 40 (Card Rebuttal).

232.    When an applicant is strong in other respects, including academics and extracurricular activities, the applicant's personal qualities—as evidenced by teacher recommendations, the secondary school report, personal statement, and the alumni interview report—may distinguish an applicant's candidacy for admission.  Ex. 55 at HARV00001401 (Interviewer Handbook 2014-2015); Ex. 26 at 164:11-165:2 (Fitzsimmons Dep.); Ex. 1 at 164:11-165:2 (McGrath 2015 Dep.).

233.    Dr. Arcidiacono's preferred model pooled admissions data across all six annual admissions cycles for which data were produced.  Ex. 35 at 34-35 (Arcidiacono Rebuttal); Ex. 33 ¶¶ 102-104 (Card Report).

234.    The Harvard admissions process is a year-by-year process in which applicants to a particular year's class compete for spots in that class.  Ex. 27 at 122:10-14 (Arcidiacono Dep.); Ex. 33 ¶¶ 102-103 (Card Report); Ex. 37 ¶ 80 (Card Rebuttal).

235.    Dr. Arcidiacono's preferred analysis excludes data reflecting the occupations of an applicant's parents.  Ex. 35 at 31-33 (Arcidiacono Rebuttal); Ex. 27 at 190:15-18 (Arcidiacono Dep.).

236.    Harvard considers the occupations of an applicant's parents in the admissions process.  Ex. 1 at 180:14-181:4 (McGrath 2015 Dep.); Ex. 9 at 184:18-185:6; Ex.12 at 47:15-16 (Donahue Dep.); Ex. 33 ¶ 86 (Card Report); Ex. 37 ¶¶ 62-65 (Card Rebuttal).

237.    Dr. Arcidiacono omits from his analysis data reflecting an applicant's intended career.  Ex. 33 ¶ 88 (Card Report).

238.     Harvard considers an applicant's intended career in the application process.  Ex. 27 at 214:8-216:13 (Arcidiacono Dep.); Ex. 33 ¶ 88 (Card Report); Ex. 37 ¶¶ 72-73 (Card Rebuttal).

239.    Each of the methodological decisions made by Dr. Arcidiacono—including his choices to exclude ALDC applicants, pool data across admissions cycles, exclude the personal rating, exclude parental occupation data, and exclude intended career data—has the effect of increasing his estimated negative effect of Asian-American ethnicity on applicants' likelihood of admission.  Ex. 37 ¶¶ 104-105 & Card Ex. 13 (Card Rebuttal); Ex. 27 at 114:8-116:7 (Arcidiacono Dep.).

**VII.    Students for Fair Admissions and "Standing Members"**

   **A.    SFFA's Founding & Organizational Structure**

240.    SFFA was incorporated in July 2014.  Ex. 85 at SFFA-Harvard0000003 (Articles of Incorporation).

241.    SFFA's original Board of Directors consisted of Edward Blum, Abigail Fisher (the plaintiff in *Fisher v. University of Texas at Austin*), and Richard Fisher (Abigail Fisher's father).  Ex. 2 at 102:6-16 (Blum Dep.); Ex. 86 at SFFA-Harvard0000105 (Organizational Action Taken by the Sole Incorporator of Students for Fair Admissions, Inc.).

242.    The original directors appointed themselves SFFA's President, Secretary, and Treasurer, respectively.  Ex. 2 at 104:9-105:19 (Blum Dep.); Ex. 87 at SFFA-Harvard0000068 (Unanimous Written Consent).

243.    SFFA was created for the specific purpose of suing Harvard.  Ex. 2 at 73:23-25, 166:13-25 (Blum Dep.).

244.    SFFA's Articles of Incorporation, dated July 29, 2014, provided that "[t]he Corporation shall have no members."  Ex. 85 at SFFA-Harvard0000002 (Articles of Incorporation).

245.    SFFA's founding bylaws provided that "[t]he Corporation shall have no members."  Ex. 87 at SFFA-Harvard0000068, SFFA-Harvard0000075 (Unanimous Written Consent).

246.    The founding bylaws provided for "affiliate members," but afforded such members no voting rights for directors, officers, or any other purpose.  Ex. 87 at SFFA-Harvard0000075 (Unanimous Written Consent); Ex. 2 at 108:11-109:16 (Blum Dep.).

247.    On June 19, 2015, seven months after this lawsuit was filed, SFFA amended its bylaws.  Ex. 89 at SFFA-Harvard 0000052–54 (Unanimous Written Consent).

248.     The amended bylaws added two directors, one appointed by the Board and one elected by a newly created class of "General Members."  Ex. 89 at SFFA-Harvard0000060 (Unanimous Written Consent).

249.     Individuals identified by SFFA as "standing members" confirmed that they have not attended any SFFA meetings.  *See* Ex. 24 at 40:14-41:17 (██ Dep.); Ex. 21 at 35:24-36:7; 109:9-15 (██ Dep.); Ex. 22 at 38:15-17 (██ Dep.); Ex. 15 at 80:4-81:12 (██ Dep.); Ex. 19 at 22:15-23:19 (████ Dep.); Ex. 11 at 47:13-48:16 (██ Dep.).

250.     Individuals identified by SFFA as "standing members" were instructed by counsel not to answer whether they participated in any SFFA election.  *See* Ex. 24 at 40:5-13 (██ Dep.); Ex. 21 at 108:7-109:16 (██ Dep.); Ex. 22 at 63:5-15 (██ Dep.); Ex. 15 at 76:21-25 (██ Dep.); Ex. 19 at 75:10-77:3, 82:11-83:4 (████ Dep.); Ex. 11 at 55:3-57:9, 111:4-13 (██ Dep.).

251.     Initial funding for SFFA was provided by the Project on Fair Representation ("POFR"), an organization for which Mr. Blum served as the Executive Director.  Ex. 88 at SFFA-Harvard 0000044, 46 (Form 1023 (Application for Recognition of Exemption) on behalf of Students for Fair Admissions, Inc.).

252.     The amended bylaws authorized the Board to institute a one-time $10 dues requirement for new members.  Ex. 89 at SFFA-Harvard0000059-60 (Unanimous Written Consent In Lieu of a Meeting of the Board of Directors of Students for Fair Admissions, Inc., Amendment of Bylaws); Ex. 90 at SFFA-Harvard0000122 (Annual Report of Students for Fair Admissions (SFFA)).

253.     SFFA reported $430 in "[m]embership dues" for 2015, and $300 in "[m]embership dues" for 2016.  Ex. 91 at SFFA-Harvard0001973 (SFFA's 2015 IRS 990); Ex. 92 at 9 (SFFA's 2016 IRS 990).

254.     Approximately 99.6% of SFFA's 20,000 claimed members have never paid dues.  *See* Ex. 2 at 325:21-326:4 (Blum Dep.); Ex. 91 at SFFA-Harvard0001973 (SFFA 2015 IRS 990) (43 members paid the $10 dues in 2015); Ex. 92 at 9 (SFFA 2016 IRS 990) (30 members paid the $10 dues in 2016).

255.     SFFA reported $826,234 in "other contributions, gifts, grants, and similar amounts" for 2015, and $1,106,722 in such contributions for 2016.  Ex. 91 at SFFA-Harvard0001973 (SFFA 2015 IRS 990); Ex. 92 at 9 (SFFA 2016 IRS 990).

256.     Approximately 99.9% of SFFA's 2015 and 2016 revenue came from sources other than membership dues.  *See* Ex. 91 at SFFA-Harvard0001973 (SFFA 2015 IRS 990); Ex. 92 at 9 (SFFA 2016 IRS 990).

257.     Mr. Blum is "the primary fund-raiser for SFFA" and he is solely responsible for SFFA's day-to-day operations.  Ex. 10 at 149:2-5 (R. Fisher Dep.); Ex. 2 at 88:17-89:9 (Blum Dep.).

### B.     SFFA's Standing Members

258.     SFFA has identified only one "standing member" who was a member at the time the Complaint was filed: ████████.  Dkt. 1 ¶¶ 15-23; Ex. 40 at 1 (Plaintiff's Supp. Response to Interrogatory No. 5); Ex. 11 at 195:11-201:2 (████ Dep.).

259.     Harvard College admits transfer applicants only if they have completed at least one and not more than two years of undergraduate study.  Ex. 76 (Transferring to Harvard College).

260. ████ is ineligible to transfer to Harvard College because ██ has completed more than two years of undergraduate study.  As of May 16, 2017, ████ had "completed three full years of study" at the ████████████████████.  Ex. 11 at 70:5-8 (██ Dep.).

261.    The deadline for transfer applications to Harvard College is March 1 and decisions are made by June 1.  Ex. 76 (Transferring to Harvard College).

262. ████ has completed two years of undergraduate study and, therefore, can no longer apply to transfer to Harvard College.  Ex. 21 at 74:12-14 (██ Dep.) (████ had finished freshman year a year ago, as of July 20, 2017); *id.* at 81:25-82:4 (████ acknowledging that "the spring of [2018]" would be the latest ██ could transfer).

263. ████ has completed two years of undergraduate study and, therefore, can no longer apply to transfer to Harvard College.  Ex. 22 at 65:14-16 (██ Dep.) (████ had finished freshman year a year ago, as of July 24, 2017); *id.* at 73:22-23 (████ acknowledging that "[i]f I were ineligible, I would not apply to transfer").

264. ████ has completed two years of undergraduate study and, therefore, can no longer apply to transfer to Harvard College.  Ex. 24 at 65:16-17 (██ Dep.) (████ had finished freshman year a year ago, as of July 27, 2017); *id.* at 66:2-15 (████ acknowledging that ██ planned to return to ███ for his sophomore year and that "[i]f I'm no longer eligible for transfer admission, then I would not apply to transfer").

265. ████ has completed three years of undergraduate study and, therefore, can no longer apply to transfer to Harvard College.  Ex. 93 at SFFA-Harvard0001955 (Declaration of ████████) (stating that ██ had completed ██ freshman year two years ago, as of June 17, 2016).

266.    When asked whether  intended to apply to transfer to any other college or university, ▮▮▮▮▮▮▮ testified that "I don't anticipate that at the moment, no."  Ex. 15 at 37:25-38:3 (▮▮▮▮▮▮▮

267.    When asked under what circumstances ▮ would be willing to consider transferring, ▮▮▮▮▮▮▮ testified that it was "highly speculative" as to whether ▮ would apply to transfer.  Ex. 19 at 44:5-12 (▮▮▮▮▮▮ Dep.).

268.    ▮▮▮▮▮▮▮ has not yet applied to Harvard and has no intention to do so until the admissions cycle of 2019-2020, if at all.  Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

269.    SFFA has identified as a "standing member" ▮▮▮▮, the parent of ▮▮▮▮▮▮ Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

270.    The only alleged basis for ▮▮▮▮▮ standing is that ▮ is the parent of ▮▮▮▮ ▮▮▮ Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

271.    SFFA has identified as a "standing member" ▮▮▮▮▮▮, the parent of ▮▮▮▮▮▮▮.  Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

272.    The only alleged basis for ▮▮▮▮▮▮ standing is that ▮ is the parent of ▮▮▮▮▮▮.  Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

273.    SFFA has identified as a "standing member" ▮▮▮▮▮, the parent of ▮▮▮▮▮ ▮▮▮.  Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

274.    The only alleged basis for ▮▮▮▮▮ standing is that ▮ is the parent of ▮▮▮▮ ▮▮▮.  Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

275.    SFFA has identified as a "standing member" ▮▮▮▮▮▮, the parent of ▮▮▮▮ ▮▮▮ Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).



276.    The only alleged basis for ███████████ standing is that ███ is the parent of ███████████. Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

277.    SFFA has identified as a "standing member" ███████████, the parent of ███████████. Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

278.    The only alleged basis for ███████████ standing is that ███ is the parent of ███████████. Ex. 40 at 2 (Plaintiff's Supp. Response to Interrogatory No. 5).

Respectfully submitted,

/s/ Seth P. Waxman

Seth P. Waxman (*pro hac vice*)
Paul R.Q. Wolfson (*pro hac vice*)
Daniel Winik (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 663-6800
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com
daniel.winik@wilmerhale.com

Debo P. Adegbile (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 295-6717
Fax: (212) 230-8888
debo.adegbile@wilmerhale.com

William F. Lee (BBO #291960)
Felicia H. Ellsworth (BBO #665232)
Andrew S. Dulberg (BBO #675405)
Elizabeth Mooney (BBO #679522)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com

Dated:  June 15, 2018

*Counsel for Defendant President and
Fellows of Harvard College*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing, and

the sealed version of this document will be served on counsel for SFFA by email.

/s/ Seth P. Waxman
Seth P. Waxman