# EXHIBIT 1

# In The Matter Of:

*Students For Fair Admissions, Inc. v.*
*President and Fellows of Harvard College, et al.*

---

*Roger Banks*
*May 4, 2017*
*Highly Confidential - For Attorneys' Eyes Only*

---

*195 State Street • Boston, MA 02109*
*888.825.3376 - 617.399.0130*
*Global Solutions*
*court-reporting.com*



Original File Roger Banks 5-4-17.txt
Min-U-Script® with Word Index

1      A.   Well, one sort of instance I can cite is one

2    program -- one prong of the program was to send

3    current undergraduates back to their high schools to

4    talk to students, and all students were welcome to

5    attend those -- those presentations and seminars, et

6    cetera.

7      Q.   Okay.  So some of the programming is open to

8    students regardless of their race?

9              MS. ELLSWORTH:   Objection.

10     A.   Correct.

11     Q.   Okay.  Can you tell me how the program is

12   structured?

13     A.   Well, let's see.  There was a director at the

14   top.

15     Q.   That's you?

16     A.   That would be -- that was me.

17     Q.   Was you.

18     A.   And a team of ten undergraduate coordinators

19   representing five different demographic segments, two

20   students per segment.

21     Q.   Okay.  What are those five demographic

22   groups?

23     A.   African-American, Asian-American, Latino or

24   Hispanic, Mexican-American, and Native American.

1   Q.   Why does Mexican get a separate category from

2   Latino?

3             MS. ELLSWORTH:   Objection.

4   A.   I think, best I can -- best I can say, and

5   this can be traced to demographics at Harvard College

6   and the first substantial vanguard of Hispanic

7   students who matriculated at the college were

8   Mexican-American, and it's a very distinct self-

9   identified cultural unit, different from other

10  Hispanic students, at least as they were so

11  classified, self-classified, and so expressed.

12  Q.   Okay.   Do those categorizations track ethnic

13  categorizations that are used by the admissions

14  office more broadly?

15            MS. ELLSWORTH:   Objection.

16  A.   I don't understand the question.

17  Q.   So do you understand what a URM is?

18            MS. ELLSWORTH:   Objection.

19  Q.   Let me rephrase.   What's your understanding

20  of the acronym URM?

21  A.   I don't know.

22  Q.   Have you heard of the term "underrepresented

23  minority"?

24  A.   Yes.

1      Q.   Okay.   Do you know if the amounts allocated

2   are approximately equivalent for the five groups?

3              MS. ELLSWORTH:   Objection.

4      A.   I do not know.

5      Q.   How would one find that out?

6      A.   By talking to our budget office.

7      Q.   Okay.   Who in the budget office would have

8   that information?

9      A.   Cheryl Frodermann, who's head of our budget.

10     Q.   And I guess last in terms of the -- my last

11  question in terms of the reach of this program is:

12  What groups are not encompassed by the UMRP?

13             MS. ELLSWORTH:   Objection.

14     A.   I don't think I quite understand the

15  question.

16     Q.   Well, are -- are white students recruited by

17  the UMRP?

18             MS. ELLSWORTH:   Objection.

19     Q.   I know you said that they're welcome to

20  attend some of the events, but are they -- you know,

21  do they receive phone calls and emails and visits in

22  the way that the other demographic groups do?

23             MS. ELLSWORTH:   Objection.

24     A.   No.

1    Q.   Okay.  And why is that?

2              MS. ELLSWORTH:  Objection.

3    A.   Well, the program was built on, predicated on

4    the assumption that it was minority students in

5    specific who needed more encouragement to apply and

6    perhaps matriculate than their Caucasian peers.

7    Q.   Okay.  So I want to start with the first of

8    the three phases that you mentioned earlier, the

9    recruitment pre-application phase.  How are students

10   identified for outreach by the program?

11   A.   Well, any number of students are self-

12   identified, which is to say that they get in touch

13   with us without any sort of prompting from our

14   office.  But in many cases our office writes to

15   students directly, either through email or, you know,

16   regular mail.

17   Q.   And my question is:  How are the students

18   identified to receive letters or phone calls?

19             MS. ELLSWORTH:  Objection.

20   A.   They -- students who take the standardized

21   tests, either the SAT or the ACT, provide baseline

22   information relating to their test results and self-

23   reported grade point average, and those data are

24   purchased by our office for use in recruitment.

1      A.   Today I would be less familiar with that

2  precisely since I'm no longer director of the

3  program.   I could only speak to what it was like when

4  I was director.

5      Q.   Okay.  Let's talk about when you were the

6  director.  Generally, what was UMRP's role in -- in

7  hosting or otherwise recruiting admitted students?

8                 MS. ELLSWORTH:  Objection.

9      A.   Well, our role was to contact admitted

10  students, initiate conversations, answer questions.

11  And in terms of hosting, ask students whether or not

12  they wanted to be or would prefer to be hosted by a

13  member of their racial group.

14      Q.   How is that contact made?

15                 MS. ELLSWORTH:  Objection.

16      A.   By telephone.

17      Q.   And do admitted students typically request a

18  preference?

19                 MS. ELLSWORTH:  Objection.

20      A.   Yes.

21      Q.   Okay.  And then, continue.  After they

22  indicate that preference, what happens next?

23                 MS. ELLSWORTH:  Hold on.

24          Objection.

```
 1   conversations was?
 2              MS. ELLSWORTH:  Objection.
 3      A.   I didn't -- I can't classify an upshot.
 4      Q.   Well, you mentioned, you know, what various
 5   institutions would look like without affirmative
 6   action, and, you know, I guess, do you remember what
 7   you discussed?
 8              MS. ELLSWORTH:  Objection.
 9      A.   One of the things I recall is that shortly
10   after President Rudenstine was inaugurated, he issued
11   a report which included a conversation about race in
12   higher education, noting that the military didn't
13   desegregate until the late '40s and that schools like
14   Harvard took much longer to take these matters
15   seriously.  But that's the time frame was really
16   after -- after that, the publication of that piece,
17   that prompted discussion among friends of mine and
18   colleagues and ...
19      Q.   Okay.  Do you remember discussing what the
20   racial composition of Harvard's student body would
21   look like without considering race?
22              MS. ELLSWORTH:  Objection.
23      A.   No.
24      Q.   You mentioned corporations earlier, and do
```

1              of counsel or advice of counsel.  If

2              you can answer the question without

3              doing so, you may.

4     A.   No.

5     Q.   No, you're not familiar with Harvard ever --

6     A.   I do not know.

7     Q.   Okay.  We were talking before the break a

8  little bit about discussions you've had in the past

9  about what Harvard and other institutions might look

10 like without affirmative action.  And following up on

11 that, I'm wondering, have you ever had conversations

12 about what the racial composition of Harvard or other

13 schools would look like if race were not considered?

14             MS. ELLSWORTH:  Objection.  The

15             same instruction.

16    A.   No.

17    Q.   No, you've never discussed it before?

18    A.   No, I have not speculated on what the racial

19 composition would look like.

20    Q.   Okay.  Have you ever seen any studies or

21 analyses about that?

22             MS. ELLSWORTH:  Objection.

23             And, again, remind the witness not

24             to disclose any communications with

```
1              counsel.  If you can answer the
2              question without doing so, you may.
3      A.   No.
4      Q.   Sitting here today, do you have a sense of
5  what the racial/ethnic composition of the Harvard
6  student body would be if race were not considered in
7  the admissions process?
8                   MS. ELLSWORTH:   Objection.
9      A.   No.
10     Q.   No, you don't have --
11     A.   No, I don't have an idea.
12     Q.   -- any idea?
13     A.   No.
14     Q.   Do you think it would look the same as it
15  currently does?
16                  MS. ELLSWORTH:   Objection.
17     A.   I don't know.
18     Q.   I guess my question is asking you to
19  speculate, and so I guess if you were to speculate
20  about what the admitted class would look like without
21  considering race in the admissions process, do you
22  think it would look the same as it currently does?
23                  MS. ELLSWORTH:   Objection.
24     A.   I can't speculate on that.
```



1      A.   He would provide that to the chair, and the

2   chair would provide that to the committee members.

3      Q.   Okay.  Was there any guidance along with a

4   number that was provided, such as characteristics of

5   students that the full committee needed more or fewer

6   of, or was it just a number?

7           MS. ELLSWORTH:   Objection.

8      A.   It was a straight-up number.

9      Q.   Okay.  During the lopping process, did you

10  ever have an understanding as to whether certain

11  racial groups needed to be lopped more than others?

12          MS. ELLSWORTH:   Objection.

13     A.   No.

14     Q.   And let me be more pointed about it.  Did you

15  ever hear during the lopping process of having too

16  many Asians?

17          MS. ELLSWORTH:   Objection.

18     A.   No.

19     Q.   Do you ever recall a focus in the lopping

20  process of reducing the number of Asians?

21     A.   No.  Not in my experience.

22     Q.   Were you aware during the admission cycle of

23  the relative numbers of racial groups that had been

24  accepted?

1    like, just generally?

2              MS. ELLSWORTH:   Objection.

3        Q.   How did -- who attended; you know, how long

4    do they run; you know, who was presiding or who

5    talked, in what order?   Just generally please talk me

6    through it.

7              MS. ELLSWORTH:   Objection.

8        A.   The full committee is composed of all

9    admissions and financial aid officers, director of

10   financial aid, the director of admissions, the

11   director of recruitment, associate dean for

12   recruitment.   It is chaired by the dean of admissions

13   and financial aid, Bill Fitzsimmons.

14       Q.   So is that a couple dozen people in the room?

15       A.   That's at least 40 people in the room.

16       Q.   Okay.  And was somebody responsible for the

17   agenda of the meetings?

18              MS. ELLSWORTH:   Objection.

19       A.   The dean was responsible for the agenda.

20       Q.   So the dean runs the meetings?

21       A.   Yes.

22       Q.   And did they -- were -- strike that.

23            What was the sequence in which applicants

24   were discussed in committee meetings?

1      Q.   So for an applicant to receive a "likely"

2  letter, the entire file would have been reviewed by

3  the admissions office?

4      A.   The entire file would have been viewed and

5  vetted by the entire admissions committee.

6      Q.   And the applicant would have received an

7  admission decision, but it was tagged as likely due

8  to NCAA regulations?

9      A.   Yeah.

10          MS. ELLSWORTH:   Objection.

11     A.   Yes.

12     Q.   Okay.  In this email, back to the document,

13 it says that -- the author says, "I have a student

14 who is being promised admission even without a likely

15 and is wary of my advice to move on to other schools

16 who have guaranteed her a spot on their team.  It

17 would be great to hear from someone at Harvard to

18 confirm that this is not the case."

19          Do you see that?

20     A.   I do.

21     Q.   Do you remember what this was about?

22     A.   I don't.

23     Q.   Why would an athlete have the impression that

24 they were promised admission even without a "likely"?

1    Ortiz, have been able to access the ABAFAOILSS

2    website?

3                    MS. ELLSWORTH:   Objection.

4        A.   I don't.

5        Q.   Let me direct your attention to the -- to the

6    last page ending in 777.  Do you recognize this

7    document?

8        A.   Yes.

9        Q.   Do you remember the round robin process?

10       A.   I do.

11       Q.   Can you tell me what the round robin meetings

12   were?

13                   MS. ELLSWORTH:   Objection.

14       A.   It is a segment of the ABAFAOILSS conference

15   during which the institutional liaisons report

16   demographic information resulting from the admissions

17   cycle both early and regular.

18       Q.   Okay.  Do you recall how many people attended

19   the round robin meetings?

20                   MS. ELLSWORTH:   Objection.

21       A.   No.  Not -- typically it would be one

22   institutional liaison per institution.

23       Q.   So roughly 20 people?

24       A.   Maybe less than 20, probably.

1    Q.   Okay.   Who ran that meeting?

2              MS. ELLSWORTH:   Objection.

3    A.   I don't easily recall.

4    Q.   It wasn't typically the ABAFAOILSS chair or

5    someone with an official role in the organization?

6              MS. ELLSWORTH:   Objection.

7    A.   I don't recall exactly.

8    Q.   Okay.   What do you recall about what was

9    discussed in the meetings?

10   A.   Discussed, reported in the meetings were

11   application, acceptance, and enrollment data, and any

12   transient recruitment, transient acceptance or

13   matriculation that might be generalizable in any way,

14   useful in any way to the group, by institution.

15   Q.   Okay.   So do the attendees go around the

16   table during the meeting and read off the numbers so

17   that the other attendees could fill in the chart on

18   pages 774 and 775?

19   A.   Yes.

20   Q.   Okay.   Why was it done this way?

21             MS. ELLSWORTH:   Objection.

22   A.   It was the traditional way in which this

23   information was collected and shared.

24   Q.   What do you mean by "traditional"?

1      A.   It was a practice that we inherited from

2   since the beginning of the organization, as far as I

3   can recall.

4      Q.   Was there ever any discussion about sharing

5   the information electronically so that you wouldn't

6   have to go through the exercise of calling out and

7   writing down every number?

8              MS. ELLSWORTH:   Objection.

9      A.   I recall a minor discussion of that, yes.

10     Q.   And what was the outcome of that discussion?

11     A.   Concerns about safety and security,

12  electronic hacking of materials, et cetera.

13     Q.   Do you recall when that conversation was?

14     A.   The best I can recall, within the past three

15  years.

16     Q.   Do you remember who raised the issue?

17     A.   I raised the issue.

18     Q.   How did you raise the issue?

19     A.   I raised the issue with concerns about safety

20  and security and the process of writing down numbers

21  and yet the difficulty of committing these sorts of

22  numbers to any sort of electronic database without

23  massive safeguards attached to them.

24     Q.   So were you proposing a change or -- or

1    advocating for keeping it the way it has

2    traditionally been done?

3                MS. ELLSWORTH:  Objection.

4        A.   I was advocating for a discussion of what I

5    viewed as a practical dilemma.

6        Q.   Okay.  Did you fill out these charts when you

7    attended the round robin meetings?

8        A.   I did.

9        Q.   And what did you do with those charts?

10               MS. ELLSWORTH:  Objection.

11       A.   What did I do with the charts when I was --

12       Q.   After you filled them out, would you -- well,

13   what would you do with them after you filled them

14   out?

15               MS. ELLSWORTH:  Objection.

16       A.   I would tuck them back in my briefcase.

17       Q.   Okay.  And then what would happen to them

18   from there?

19       A.   My briefcase would go back to my office.

20       Q.   Okay.  And at any point, did you share the

21   contents of these charts with anyone else in your

22   office?

23               MS. ELLSWORTH:  Objection.

24       A.   I can recall sharing the data with the dean

1    on a couple of occasions.

2        Q.  A couple of occasions because it was sporadic

3    or because that's just what you remember sitting

4    here?

5                MS. ELLSWORTH:  Objection.

6        A.  Because it was sporadic.

7        Q.  Okay.  What was the dean interested in about

8    the chart?

9                MS. ELLSWORTH:  Objection.

10       A.  I would describe his interest as being

11   comprehensive in nature.

12       Q.  Do you recall discussing anything in

13   particular about the chart with the dean?

14       A.  No, not really, no.

15       Q.  What did you do with the charts after

16   discussing them with the dean?

17                MS. ELLSWORTH:  Objection.

18       A.  They would return to my briefcase.

19       Q.  Do they exist somewhere today?

20                MS. ELLSWORTH:  Objection.

21       A.  Yes.

22       Q.  Where?

23       A.  In one of my many briefcases.

24       Q.  So you've kept the filled-in charts from your

1    and Native Americans.

2                  MS. ELLSWORTH:  Mike, when you

3           have a natural breaking point.  We've

4           been going for a while.

5                  MR. PARK:  Yeah.  Let me just

6           finish up with this document and we can

7           take a break.

8      Q.   Going back to the last page of the document,

9    number 8 says, "The Round Robin is confidential and,

10   therefore, it is expected that the information

11   presented will not be distributed."

12                 Do you see that?

13     A.   Yes.

14     Q.   Do you know if other participant schools in

15   the round robin maintained the confidentiality of

16   information that was presented in the meetings?

17     A.   As far as I know, yes.

18     Q.   Can you think of any other information that

19   you have shared with others in a fashion like this

20   where you get into a conference room and call out

21   numbers and everyone writes it down by hand?

22                 MS. ELLSWORTH:  Objection.

23     A.   No.

24     Q.   Does this strike you as unusual in any way?

1              MS. ELLSWORTH:   Objection.

2      A.   Not really, no.

3      Q.   And you mentioned that you met with the dean

4  afterwards sometimes to discuss the round robin

5  meetings; is that right?

6      A.   On a couple of occasions, yes.

7      Q.   And do you remember whether he asked about

8  any specific numbers?

9      A.   He did not.

10     Q.   Did he look at the chart that you had?

11     A.   He did.

12     Q.   Okay.  Do you remember how long those

13  meetings lasted?

14             MS. ELLSWORTH:   Objection.

15     A.   Yes.

16     Q.   Roughly?

17     A.   Three to five minutes.

18     Q.   Okay.  So quick ones.

19         Did anyone else from the Harvard admissions

20  office discuss the round robin numbers from the chart

21  with you?

22     A.   No.

23             MR. PARK:   Okay.  I'd like to mark

24         as Exhibit 12 a document Bates labeled

1          HARV 14627 and 14628, which is an email

2          from Elizabeth Yong to Roger Banks

3          dated January 7, 2013.

4                    (Exhibit 12, 1/7/13 email and

5          attachment Bates stamped HARV00014627

6          through 14628, marked.)

7      Q.   Do you recognize this document?

8      A.   I do.

9      Q.   What is this document?

10     A.   It's a one-page summary of demographic and

11  other information pertaining to early action admits

12  for the classes of 2016 and 2017.

13     Q.   And why is Ms. Yong sending you this one-

14  pager?

15               MS. ELLSWORTH:   Objection.

16     A.   Because I had asked for it.

17     Q.   What did you do with this document?

18     A.   I used it in preparation for round robin

19  discussions.

20     Q.   Okay.   Were the numbers on page 2 of this

21  document the numbers you would read when it was your

22  turn in the round robin meeting?

23               MS. ELLSWORTH:   Objection.

24     A.   Yes.

1    Q.   And which numbers would those be that you

2    read?

3    A.   I would read the second set of numbers, the

4    racial and ethnic groups.

5    Q.   And did you provide any additional commentary

6    in connection with reading the numbers, or did you --

7    or not?

8           MS. ELLSWORTH:   Objection.

9    A.   Usually not.

10   Q.   Do you recall ever saying anything in

11   addition to the numbers?

12   A.   I can recall one or two situations in which

13   the numbers appeared to vary from the year before,

14   but that's all.

15   Q.   Do you remember in particular what number

16   and -- or anything else about it?

17   A.   No.  No, I don't.

18   Q.   But sitting here today, a significant

19   variation might require some additional explanation?

20          MS. ELLSWORTH:   Objection.

21   A.   If I -- if I thought a variation was

22   significant, I might suggest further commentary on

23   it.

24   Q.   But sitting here today, you don't recall any

```
 1              MR. PARK:  I'd like to mark as

 2         Exhibit 15 a document Bates labeled

 3         HARV 40267 to 42099.  It's entitled "T,

 4         U & Z Dockets - Official # 1 Class of

 5         2018."

 6              (Exhibit 15, dockets Bates stamped

 7         HARV00042067 through 42099, marked.)

 8    Q.   Take a look at this document.  You don't have

 9    to review the details of every applicant on here, but

10    feel free to spend as much time as you need to to get

11    comfortable with the document.  I'm going to ask

12    about a few of them.

13    A.   (Pause.)  Okay.

14    Q.   Do you recognize this document?

15    A.   I recognize its nature, yes.

16    Q.   Okay.  And what is the -- the form of the

17    document, I guess?

18    A.   This is information extracted from a working

19    admissions docket.

20    Q.   Okay.  And at what point would you have -- in

21    the admissions process -- would you have seen this

22    document?

23              MS. ELLSWORTH:  Objection.

24    A.   As we begin meeting in subcommittee.
```

1    Q.   Okay.  Do all the subcommittee members

2  receive the full version of this document?

3                 MS. ELLSWORTH:   Objection.

4    A.   Yes.   Yes.   And let me go back, because we

5  would have a copy of this document, as I now

6  reconstruct it, at least a couple of days before

7  entering the subcommittee process.   In order to

8  prepare to go into subcommittee to discuss cases,

9  we'd have a copy of the docket.

10    Q.   Okay.  And what is on this docket?  Is it a

11  listing of all of the students that are being read

12  prior to the subcommittee meeting?

13    A.   It's a listing of all the applicants by

14  school typically.   In this case, early action for the

15  class of 2018.

16    Q.   On the first -- or, I guess, the second page

17  of the document, ending in 68, the second entry has

18  your initials next to it.  Do you see that?

19    A.   Yes.

20    Q.   I guess I'm -- well, can you just walk me

21  through the fields and explain what each one is?

22  This is a foreign document to me, and I'd just

23  appreciate some guidance on understanding kind of

24  what the things mean and, you know, what you're

Roger Banks - May 4, 2017
Highly Confidential - For Attorneys' Eyes Only

184

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24





Roger Banks - May 4, 2017
**Highly Confidential - For Attorneys' Eyes Only**







Roger Banks - May 4, 2017
Highly Confidential - For Attorneys' Eyes Only

189



1      Q.   Okay.   Do you have a sense of how common that

2    is?

3                  MS. ELLSWORTH:   Objection.

4      A.   I don't.

5      Q.   Have you heard that it is -- that Asian

6    students are increasingly not reporting ethnicity?

7                  MS. ELLSWORTH:   Objection.

8      A.   I have heard that Asian students -- some

9    Asian students do not report their ethnicity.

10     Q.   When students do not report the ethnicity, is

11   there any effort to find out from other parts of the

12   application what the ethnicity is?

13                 MS. ELLSWORTH:   Objection.

14     A.   No.

15     Q.   Okay.   What about the S -- the handwritten S

16   to the left of that?

17     A.   That indicates deferral, that the recommended

18   action on the case is defer from early action, to be

19   considered -- to be considered through regular

20   action.

21     Q.   What does S stand for?   It's kind of counter-

22   intuitive.

23     A.   I don't know.   It's -- it's, you know,

24   admissions code.   I don't think it stands for

1   anything except for -- the only translation that I

2   was ever given was that S means "deferred."

3        Q.   I'll take your word for it.

4             The A above it, does that mean "accept"?

5        A.   That means "admit."

6        Q.   "Admit."   And then what would be the code for

7   deny?

8        A.   R.

9        Q.   Okay.   For the high school statistics, it

10  lists the prior year applicant's admits, early

11  matriculants, and wait list; right?

12       A.   Yes.

13       Q.   Why is that information significant?

14             MS. ELLSWORTH:   Objection.

15       A.   Oh, I think just as a kind of -- just to give

16  the reader a sense of the school history in one

17  year's snapshot.

18       Q.   Is there an effort by the admissions office

19  to try to maintain consistent numbers from particular

20  high schools?

21       A.   No.

22       Q.   For the "disadvantage" and "fee waiver"

23  fields, the admissions process is supposed to be need

24  blind; right?

Roger Banks - May 4, 2017
Highly Confidential - For Attorneys' Eyes Only

1              MS. ELLSWORTH:  Objection.

2      A.   It is supposed to be need based, and the

3  admissions process itself is supposed to be -- could

4  you rephrase the question?

5      Q.   Well, my understanding was that the

6  admissions process was supposed to be need blind, and

7  those two fields would look like they indicate or

8  they provide some indication about the means of a

9  student's family.  Can you reconcile those two

10 things?

11             MS. ELLSWORTH:  Objection.

12     A.   Well, the information is very general in

13 nature, actually.

14     Q.   Okay.  So there's no tension in your mind

15 between those two things?

16             MS. ELLSWORTH:  Objection.

17     A.   No.

18     Q.   Okay.  On the first row, there's some

19 handwriting.  Do you recognize whose handwriting that

20 is?

21     A.   I recognize some of it.

22     Q.   What do you recognize about some of it?

23     A.   Well, I recognize that the -- the profile,

24 what we call a profile of numbers, summarizing the

1    candidate appear to have been written in by the chair

2    of the docket.

3         Q.  Who was Ms. McGrath?

4         A.  Who was Marlyn McGrath, right.

5         Q.  So the handwriting, the numbers in the upper

6    left of the page look to you like Ms. McGrath's

7    handwriting?

8         A.  Yes.

9         Q.  Okay.  Just a general question on the next

10   page.  At the bottom row, it has your initials there

11   from Brooklyn Tech.  Do you see that?

12        A.  Yes.

13        Q.  The numbers there appear to be somebody

14   else's handwriting.  Do you recognize that

15   handwriting?

16             MS. ELLSWORTH:  Objection.

17        A.  No.

18        Q.  Okay.  Do you know if your handwriting would

19   be on this document?

20             MS. ELLSWORTH:  Objection.

21        Q.  And I'm not asking you to go through all of

22   it, but just as a matter of practice.

23        A.  As a matter of practice, no.

24        Q.  Why is that?

1      A.   Because I would not be keeping the chair's

2   docket.  I would be keeping my own docket.

3      Q.   Okay.  So is there a similar such document

4   that has your own notations on it?

5      A.   Yes.

6      Q.   And where would that be?

7      A.   That would be in my office.

8      Q.   Has anybody asked you for that?

9           MS. ELLSWORTH:  Objection.

10          I'll instruct the witness not to

11      answer the question.

12     A.   Can't answer that question.

13          MR. PARK:  It's a yes-or-no

14      question that doesn't call for attorney

15      advice.

16          MS. ELLSWORTH:  I'm instructing

17      the witness not to answer the question.

18      I think the method by which the lawyers

19      are conducting document collection is

20      not something you can get into.

21          MR. PARK:  Okay.  So you're

22      refusing to answer the question.

23     Q.   Back to the first page, on the first entry at

24   the top that's ethnicity, it says "BLK" and "XCB."

Roger Banks - May 4, 2017
**Highly Confidential - For Attorneys' Eyes Only**

195

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24







1              MS. ELLSWORTH:  Objection.

2      A.   The area person would determine whether or

3    not a candidate should be discussed.

4      Q.   And then if a candidate were discussed, how

5    would that conversation proceed?

6              MS. ELLSWORTH:  Objection.

7      A.   The area person would begin with an overall

8    summary of the case, its significant features,

9    academically and extracurricularly, arguments to

10    admit, and proceed to point the committee toward

11    evidence to support those arguments.

12      Q.   Would the members have any other materials

13    that they're looking at during that conversation, or

14    is it just what's presented here?

15      A.   It would be what's presented here in addition

16    to supplemental information, music tapes, visual art

17    supplements, academic papers, things of that kind.

18      Q.   How would those such materials enter into the

19    conversation?

20              MS. ELLSWORTH:  Objection.

21      A.   Well, those materials would be used to

22    marshal the arguments for admission and would be

23    pulled up electronically and/or physically in the

24    meeting.

1     Q.  Okay.  Is there any other information that's

2  put up on a screen or distributed at the meeting for

3  each candidate as you're going through?

4              MS. ELLSWORTH:  Objection.

5     A.  The full contents of the applicant's

6  application are projected on to a screen for the

7  committee to consider, to review and observe.

8     Q.  Okay.  What do you mean by the full contents

9  of the application?

10    A.  A full application would consist of the

11 candidate's essays, extracurricular activities,

12 recommendations, interview reports, other

13 documentation.

14    Q.  Well, I mean that sounds like a lot of stuff.

15 What would be on the screen that you're describing?

16             MS. ELLSWORTH:  Objection.

17    A.  Anything that the area person considered

18 important to marshalling the arguments for admission.

19    Q.  So there wasn't like a standard -- a

20 standard, I guess, slide for each applicant that the

21 committee would look at as they're going through the

22 docket list?

23    A.  Well, they would look at what would -- what

24 was called a summary sheet, a condensed version of

1    the application.

2        Q.   Okay.

3        A.   But then one goes very quickly into the

4    details of the folder itself.

5        Q.   Could I ask you to flip one page over ending

6    in 70.   At the top left, it looks like there's an S

7    above something that was crossed out and some

8    notations.   Do you know what's going on there?

9            MS. ELLSWORTH:   Objection.

10       A.   I -- yes.

11       Q.   Can you explain?

12       A.   Yes.   What's going on there is late-breaking

13   information regarding the student's socioeconomic

14   status, yes.

15       Q.   How can you tell?   What are you looking at

16   there?

17       A.   Well, the "FH?" refers to our trying to

18   reckon whether or not a candidate, again, would

19   qualify for scholarship money through the Harvard

20   Financial Aid Initiative.   "Check sib" would suggest

21   that this individual had a sibling who had previously

22   attended the college.   And the "FH: Likely," star,

23   would designate that the candidate indeed would

24   qualify for the Harvard Financial Aid Initiative

Roger Banks - May 4, 2017                          200
Highly Confidential - For Attorneys' Eyes Only



Roger Banks - May 4, 2017
Highly Confidential - For Attorneys' Eyes Only



1      Q.   Would that indicate that that was something

2    that was important to whoever was making the

3    notation?

4              MS. ELLSWORTH:   Objection.

5      A.   I don't know.   I didn't make the notation.   I

6    don't know.

7      Q.   Well, typically, if you see underlining or,

8    in your practice, if you underlined, would you be

9    making a notation for information that you thought

10   was noteworthy?

11             MS. ELLSWORTH:   Objection.

12     A.   I would, yes.   But may I also add?

13     Q.   Yes.

14     A.   Just in observing the handwriting, the

15   senior -- the grades themselves, that's my

16   handwriting.

17     Q.   The -- the sort of lighter "A, A-, B+" --

18     A.   Right.

19     Q.   -- those notations?

20     A.   Right.

21     Q.   Okay.   And do you know why you would be the

22   one making those notes?

23             MS. ELLSWORTH:   Objection.

24     A.   The chair might have been out of the room for



Roger Banks - May 4, 2017
Highly Confidential - For Attorneys' Eyes Only

204



1

2

3

4

5

6

7

8      Q.  Okay.  And -- okay.  Strike that.

9            MS. ELLSWORTH:  If you're moving

10      on, Mike, should we take a quick break?

11            MR. PARK:  Let me just make sure

12      I'm done with questions on this, and it

13      would be a good point then to take a

14      break.

15            MS. ELLSWORTH:  Okay.

16            MR. PARK:  (Pause.)  Okay.  Let's

17      take a break.

18            (Recess:  4:02 p.m. to 4:13 p.m.)

19  BY MR. PARK:

20      Q.  Mr. Banks, have you ever heard anyone in the

21  admissions office at Harvard raise concerns that

22  Harvard's admissions process is discriminating

23  against Asian-Americans?

24      A.  Yes.

1    Q.   Can you explain that memory?

2    A.   Well, based on the complaint that was filed,

3    the OCR investigation that took place, this case,

4    yes.

5    Q.   Just to clarify, are we talking about the

6    complaint that you mentioned from I think the '80s --

7    A.   Yes.

8    Q.   -- earlier today?

9    A.   Yes.

10   Q.   Okay.  Are you aware of any other such

11   complaints about discrimination against Asian-

12   Americans?

13   A.   No.

14   Q.   And are you aware of any studies that have

15   been done at Harvard showing discrimination against

16   Asians?

17            MS. ELLSWORTH:  Objection.

18            Just remind the witness not to

19       disclose any conversations with counsel

20       or advice of counsel.  If you can

21       answer the question without doing so,

22       you may.

23   A.   No.

24   Q.   Any studies showing that Asians are admitted

```
 1              doing so, you may.
 2         A.   Not that I can really recall, no.
 3         Q.   Okay.  I want to change topics to legacy
 4    admissions.  How are legacies accounted for in the
 5    admissions process?
 6                   MS. ELLSWORTH:  Objection.
 7         A.   I'm sorry.  Could you -- accounted for in
 8    what way?
 9         Q.   Is it an advantage to have a parent who
10    attended Harvard in the admissions process?
11                   MS. ELLSWORTH:  Objection.
12         A.   I would consider it to be a plus factor, yes.
13         Q.   And how is that characteristic accounted for
14    as a plus factor in the process?
15                   MS. ELLSWORTH:  Objection.
16         A.   There are many plus factors in the admissions
17    process, legacy being but one.
18         Q.   Would African-American ethnicity count as
19    one?
20                   MS. ELLSWORTH:  Objection.
21         A.   Yes.
22         Q.   Would being Asian-American count as a minus
23    factor?
24                   MS. ELLSWORTH:  Objection.
```

```
1              version of the document produced.
2                   MR. PARK:  It does not include the
3              attachments, that's correct.  But this
4              is the complete cover email.
5       Q.   (Pause.)  Do you recognize this document?
6       A.   I do.
7       Q.   What do you recall about this correspondence?
8       A.   I recall this came from a college counselor,
9   yes.
10      Q.   And why was the college counselor reaching
11  out to you?
12                  MS. ELLSWORTH:  Objection.
13      A.   To advocate for a student about which she or
14  he felt very strongly.
15      Q.   And why was the communication directed to
16  you?
17                  MS. ELLSWORTH:  Objection.
18      A.   Because in all likelihood, the school in
19  question is one that belongs to me and one of my
20  dockets.
21      Q.   Okay.  In the fourth paragraph, third
22  sentence, I think, it says, "His dad is co-chair of
23  our $90 million Legacy Campaign, and his mom is
24  Treasurer of our Board of Trustees.  The family has
```

Roger Banks - May 4, 2017
Highly Confidential - For Attorneys' Eyes Only

212

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Roger Banks - May 4, 2017
Highly Confidential - For Attorneys' Eyes Only

213

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



Roger Banks - May 4, 2017
Highly Confidential - For Attorneys' Eyes Only

214



Highly Confidential - For Attorneys' Eyes Only

226

1   COMMONWEALTH OF MASSACHUSETTS                    SUFFOLK, SS.

2

3                    I, JAMES A. SCALLY, RMR, CRR, a
    Certified Shorthand Reporter and Notary Public duly
4   commissioned and qualified in and for the
    Commonwealth of Massachusetts, do hereby certify that
5   there came before me on the 4th day of May, 2017, at
    9:00 a.m., the person hereinbefore named, ROGER
6   BANKS, who provided satisfactory evidence of
    identification as prescribed by Executive Order 455
7   (03-13) issued by the Governor of the Commonwealth of
    Massachusetts, was by me duly sworn to testify to the
8   truth and nothing but the truth of his knowledge
    concerning the matters in controversy in this cause;
9   that he was thereupon examined upon his oath, and his
    examination reduced to typewriting under my
10  direction; and that this is a true record of the
    testimony given by the witness to the best of my
11  ability.
                    I further certify that I am neither
12  attorney or counsel for, nor related to or employed
    by, any of the parties to the action in which this
13  deposition is taken, and further, that I am not a
    relative or employee of any attorney or counsel
14  employed by the parties hereto or financially
    interested in the action.

15

16

        My Commission Expires:  April 8, 2022
17

18

19              *James A Scally*

20  _____
    James A. Scally, RMR, CRR
    CSR/Notary Public
21

22

23

24

Highly Confidential - For Attorneys' Eyes Only 225

```
1   PLEASE ATTACH TO THE DEPOSITION OF ROGER BANKS
2   CASE:  STUDENTS FOR FAIR ADMISSIONS, INC. VS.
3   PRESIDENT AND FELLOWS OF HARVARD COLLEGE, ET AL
4   DATE TAKEN:  MAY 4, 2017
5                    ERRATA SHEET
6   Please refer to Page 224 for Errata Sheet
7   instructions and distribution instructions.
8   PAGE LINE     CHANGE          REASON
        See attached sheet.
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16          I have read the foregoing transcript of my
17  deposition, and except for any corrections or changes
18  noted above, I hereby subscribe to the transcript as
19  an accurate record of the statements made by me.
20
21      Executed this  18  day of   2017   , 2017.
22
23                    _____
24                    ROGER BANKS
```

**May 4, 2017 Deposition of Roger Banks – Errata Sheet**

| Page | Line | Instruction | Reason for Change |
|------|------|-------------|-------------------|
| 13 | 14-15, 22 | Change "visitors center" to "Visitor Center" | Typographical Error |
| 14 | 3 | Change "visitors center" to "Visitor Center" | Typographical Error |
| 34 | 11 | Change "kind" to "kinds" | Grammar |
| 37 | 20 | Change "financial aid initiative" to "Financial Aid Initiative" | Typographical Error |
| 58 | 6-7 | Change "undergraduate minority recruitment program" to "Undergraduate Minority Recruitment Program" | Typographical Error |
| 68 | 23 | Change "codirector" to "co-director" | Typographical Error |
| 72 | 12 | Change "visitants" to "Visitas" | Typographical Error |
| 72 | 15 | Change "visitants" to "Visitas" | Typographical Error |
| 107 | 18 | Change "suggests" to "suggest" | Grammar |
| 134 | 24 | Change "aere" to "are" | Typographical Error |
| 140 | 24 | Change "I" to "It" | Typographical Error |
| 207 | 10 | Strike entire line | Typographical Error |