# EXHIBIT 2

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 1

1                          Erica J. Bever

2                               Volume I
                                Pages 1 to 363
3                               Exhibits 1 to 23

4               UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
5
    - - - - - - - - - - - - - - - - -x
6                                     :
     STUDENTS FOR FAIR ADMISSIONS,    :
7    INC.,                            :
                    Plaintiff,        :
8                                     :  Civil Action
          vs.                         :  No.
9                                     :  1:14-cv-14176-ADB
     PRESIDENT AND FELLOWS OF         :
10   HARVARD COLLEGE (HARVARD         :
     CORPORATION),                    :
11                  Defendant.        :
    - - - - - - - - - - - - - - - - -x
12
             DEPOSITION OF ERICA J. BEVER, a witness
13   called on behalf of the Plaintiff, taken pursuant to
     the Federal Rules of Civil Procedure, before
14   Alexander K. Loos, Registered Diplomate Reporter and
     Notary Public in and for the Commonwealth of
15   Massachusetts, at the Offices of WilmerHale, 60
     State Street, Boston, Massachusetts, on Thursday,
16   July 13, 2017, commencing at 9:00 a.m.

17   PRESENT:

18

19        HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

20

21

22

23

24   Reported By: Alexander K. Loos

25   Job No: 127040

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 22

1                    ERICA J. BEVER

2    Q.    Okay.  Where did you attend college?

3    A.    Wellesley College.

4    Q.    And did you earn a degree there?

5    A.    I did.

6    Q.    In what year?

7    A.    2002.

8    Q.    Okay.  What was your degree in?

9    A.    Economics and English literature.

10   Q.    And did you obtain employment following

11   your graduation from Wellesley?

12   A.    I did.

13   Q.    Where?

14   A.    At McKinsey & Company.

15   Q.    What is McKinsey & Company?

16   A.    A management consulting firm.

17   Q.    Okay.  And what was your job at McKinsey &

18   Company?

19   A.    I was a research analyst.

20   Q.    Okay.  And as a research analyst, what were

21   your specific duties?

22   A.    To respond to client service team requests

23   for information.

24   Q.    And what types of information would you --

25   would you provide upon request?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 23

1                    ERICA J. BEVER

2      A.    It varied.

3      Q.    Okay.  What was the basic?  Were you doing

4  business analysis?  Or was there a particular area

5  in which your research was focused?

6            MS. ELLSWORTH:  Objection.

7      A.    It varied.

8      Q.    Okay.  Give me some examples of the types

9  of research that you would do at your job at

10  McKinsey.

11     A.    Demographic data, census bureau data,

12  company profiles.

13     Q.    And why would -- why, for example, would

14  your job require you to look at demographic data?

15            MS. ELLSWORTH:  Objection.

16     A.    For client service team request.

17     Q.    And when you say "demographic data," what

18  type of data do you mean?

19     A.    Population data.

20     Q.    Did it include data about ethnicity or race

21  of people?

22     A.    I do not recall.

23     Q.    And what would you do with this data?

24  Would you just -- would you just find it and -- and

25  send it on?  Or would you sometimes analyze the

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 24

1                    ERICA J. BEVER

2    data?

3              MS. ELLSWORTH:  Objection.

4        A.    It varied.

5        Q.    Okay.  On occasion would you -- would you

6    engage in analysis of data at the request of

7    clients?

8        A.    Not at the request of clients.

9        Q.    Okay.  At the request of anybody?

10       A.    Yes.

11       Q.    At whose request would you sometimes engage

12   in data analysis?

13             MS. ELLSWORTH:  Objection.

14       A.    At the request of a consultant.

15       Q.    Okay.  And how often did that happen when

16   you were at McKinsey, approximately?

17       A.    Multiple times a day.

18       Q.    Okay.  And what tools would you use to

19   analyze data?

20             MS. ELLSWORTH:  Objection.

21       A.    Excel.

22       Q.    Anything else?

23       A.    No.

24       Q.    Did you ever use Access, for example?

25       A.    No.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 25

1                    ERICA J. BEVER

2      Q.    Any other database management outside of

3  Excel?

4      A.    No.

5      Q.    Did you obtain any certifications during

6  your time at McKinsey?

7            MS. ELLSWORTH:  Objection.

8      A.    Could you explain what you mean by

9  "certifications"?

10     Q.    Were there any professional instruction

11  classes that you took or completed?

12     A.    Within the firm, yes.

13     Q.    Okay.  In what areas did you receive

14  instruction within the firm?

15     A.    Training called basic consulting readiness,

16  teamwork training.

17     Q.    Okay.

18     A.    I attended training on a methodology called

19  social network analysis.

20     Q.    Anything specific with respect to data

21  analysis?

22     A.    I don't recall.

23     Q.    Okay.  How long did you work at McKinsey

24  for?

25     A.    Four years.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 26

1                        ERICA J. BEVER

2       Q.    Was that here in Boston?

3       A.    No.

4       Q.    Where were you employed?

5       A.    In Waltham.

6       Q.    In Waltham.

7             Did your job title ever change during your

8    four years at McKinsey?

9       A.    Yes.

10      Q.    Okay.  Did you start out as a research

11   analyst?

12      A.    No.

13      Q.    Okay.  What was your initial job title?

14      A.    Junior research analyst.

15      Q.    Okay.  And so was it a promotion to become

16   a research analyst?

17      A.    Yes.

18      Q.    Okay.  And when did that happen?

19      A.    I don't recall.

20      Q.    Okay.  Did you obtain any other titles

21   during your time at McKinsey?

22      A.    Yes.

23      Q.    What -- what was your next title after

24   research analyst?

25      A.    I believe knowledge analyst.

HIGHLY CONFIDENTIAL -   ATTORNEYS EYES ONLY

Page 27

1                          ERICA J. BEVER

2       Q.    Okay.  And did your duties change when you

3   became a knowledge analyst?

4       A.    Yes.

5       Q.    How did they change?

6       A.    I joined a functional practice at McKinsey,

7   and so I focused on different types of tools.

8       Q.    And can you give me an example of what

9   types of tools you focused on when you became a

10   knowledge analyst?

11       A.    Social network analysis.

12       Q.    All right.

13            When you say social network analysis, what

14   does that -- what does that mean?  What were your

15   day-to-day duties?

16            MS. ELLSWORTH:   Objection.

17       A.    So we could take data from a client on

18   team-based activities and examine the relationships

19   between teams.

20       Q.    How people were interacting with one

21   another?

22       A.    Correct.

23       Q.    And clients would -- clients would want

24   this information because they would, I presume, use

25   it to better understand where they might gain

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 28

1                      ERICA J. BEVER

2    efficiencies in their business?

3           MS. ELLSWORTH:  Objection.

4       A.   I'm not sure how clients would use this

5    data.

6       Q.   Okay.  You don't have any idea?

7           MS. ELLSWORTH:  Objection.

8       A.   Not with certainty.

9       Q.   Do you have a general inclination, not with

10   absolute certainty?  Did you have any understanding

11   as to how clients might use the data that you

12   provided?

13          MS. ELLSWORTH:  Objection.

14      A.   Yes.

15      Q.   And what was your general understanding?

16      A.   To improve functions between teams.

17      Q.   Anything else?

18      A.   No.

19      Q.   Did you obtain any titles after knowledge

20   analyst?

21      A.   No.

22      Q.   Okay.  And you said you worked at McKinsey

23   for four years; is that correct?

24      A.   That is correct.

25      Q.   Okay.  And then why did you leave McKinsey?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 29

1                          ERICA J. BEVER

2       A.    To attend graduate school.

3       Q.    And where did you attend graduate school?

4       A.    The Harvard Graduate School of Education.

5       Q.    Okay.  And where is was there any

6   particular reason why you decided to go back to

7   school?

8       A.    No.

9       Q.    Just interested in obtaining a graduate

10   degree generally or something specific about the

11   education field?

12             MS. ELLSWORTH:  Objection.

13       A.    Yes.

14       Q.    What was it?

15       A.    I was interested in obtaining a graduate

16   degree and looking to switch to move into a career

17   in education.

18       Q.    Okay.  And did you obtain a graduate degree

19   in education from Harvard?

20       A.    I did.

21       Q.    Okay.  Was it just a master's?  Does it

22   have any specific title other than master's of

23   education?

24       A.    It is master's in higher education.

25       Q.    Master's in higher education.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 39

1                    ERICA J. BEVER

2      Q.    Okay.  Did it take a significant portion of

3  your time?

4      A.    It did.

5      Q.    Okay.  For how long?

6      A.    A year and a half.

7      Q.    It sounds like accreditation is not a small

8  matter for the university, if they staffed 20 people

9  on it and it took you a year and a half.

10           MS. ELLSWORTH:  Objection.

11     Q.    Do you agree with that?

12           MS. ELLSWORTH:  Objection.

13     A.    I don't know.

14     Q.    Okay.  Do you know how often Harvard goes

15  through accreditation?

16     A.    Every decade.

17     Q.    Once every ten years?

18     A.    Correct.

19     Q.    Okay.  Do you know what the consequences

20  are if it were to lose its accreditation?

21     A.    Yes.

22     Q.    What would the consequences be?

23     A.    We would lose the federal funding for

24  financial aid, Title IV funding.

25     Q.    Do you know how much Title IV funding

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 40

1                     ERICA J. BEVER

2    Harvard takes advantage of in a given year?

3                MS. ELLSWORTH:  Objection.

4    Q.   You may answer.

5    A.   Yes.

6    Q.   And how much, approximately?

7    A.   Less than $10 million.

8    Q.   Any other consequences from losing

9    accreditation?

10               MS. ELLSWORTH:  Objection.

11   A.   I'm not sure.

12   Q.   All right.  Other than -- well, strike

13   that.

14               When sort of -- what sort of analysis was

15   required as part of the self study in the

16   accreditation process?

17               MS. ELLSWORTH:  Objection.

18   A.   I -- I'm not sure.

19   Q.   Was there any analysis of the admissions

20   office as part of that process?

21               MS. ELLSWORTH:  Objection.

22   A.   No.

23   Q.   Okay.  Was there any analysis of admissions

24   procedures or qualifications?

25   A.   No.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 62

1                    ERICA J. BEVER

2   initiative?

3      A.   No.

4      Q.   When did you leave the Office of

5   Institutional Research?

6      A.   In the summer of 2014.

7      Q.   And why did you leave in summer of 2014?

8      A.   Because I had another job opportunity.

9      Q.   And where was that?

10      A.   In the office of admissions and financial

11   aid.

12      Q.   Were you recruited to join the office of

13   admissions and financial aid?

14           MS. ELLSWORTH:  Objection.

15      A.   No.

16      Q.   Were you encouraged to apply for the

17   opening in that office?

18      A.   No.

19           MS. ELLSWORTH:  Objection.

20      Q.   Why did you decide to apply for it?

21      A.   Because it was interesting.

22      Q.   You had worked with Sally Donahue?

23      A.   I had.

24      Q.   Okay.  And you had worked with Dean

25   Fitzsimmons?

HIGHLY CONFIDENTIAL -   ATTORNEYS EYES ONLY

Page 64

1                      ERICA J. BEVER

2      Q.    Yes.

3      A.    I don't recall working with anyone else.

4      Q.    Okay.  And how did you hear about the job

5   opening?

6      A.    I saw it on Aspire.

7      Q.    And what is Aspire?

8      A.    The job posting board for Harvard

9   University.

10     Q.    For internal positions that are available

11  at Harvard?

12     A.    Yes.

13           THE WITNESS:  Would you mind if I got some

14  water?

15           MR. STRAWBRIDGE:  That's fine.  We can take

16  a couple of minutes.

17           (Discussion off the record)

18  BY MR. STRAWBRIDGE:

19     Q.    Ms. Bever, we were talking about your

20  moving to the admissions office in the summer of

21  2014.  You testified that you applied after you saw

22  an opening on the internal Harvard website?  For job

23  postings; is that correct?

24     A.    Yes.

25     Q.    Okay.  And what was the role that you were

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 65

1                    ERICA J. BEVER

2    applying for?

3        A.   Director of research for admissions and

4    financial aid and senior admissions officer.

5        Q.   Okay.  Do you know whether that was -- do

6    you know who held that role before?

7             MS. ELLSWORTH:  Objection.

8        A.   Yes.

9        Q.   Who was that?

10       A.   No one.

11       Q.   Okay.  Do you know was it a new role?

12       A.   Yes.

13       Q.   Okay.  Did it -- did it -- were the duties

14   that were associated with this position formally --

15   formerly assigned to somebody else in the admissions

16   office, to your knowledge?

17       A.   I do not know.

18       Q.   Okay.  Do you know why the role was

19   created?

20            MS. ELLSWORTH:  Objection.

21       A.   I do not.

22       Q.   Okay.  Do you know whether anyone else

23   applied for this position?

24       A.   Yes.

25       Q.   Okay.  Do you know who else applied for

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 69

1                    ERICA J. BEVER

2     A.   A docket is the San Francisco Bay Area at

3   large.

4     Q.   Okay.  And the V docket?

5     A.   Is the -- was the international docket.

6     Q.   It's not anymore?

7     A.   It is.

8     Q.   Okay.  And did those assignments change

9   during your time in the admissions office?

10     A.   Yes.

11     Q.   Okay.  And what -- how did they change?

12     A.   I no longer serve on V docket.

13     Q.   Do you still serve on A docket?

14     A.   I do.

15     Q.   Do you serve on any other dockets?

16     A.   I do not.

17     Q.   Okay.  Do you know about how many

18   applications a year you read for A docket?

19     A.   Yes.

20     Q.   How many?

21     A.   500.

22     Q.   Okay.  Other than serving as a senior

23   admissions officer -- officer, what other

24   responsibilities did you have when you began your

25   job in the admissions office?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 70

1                    ERICA J. BEVER

2       A.    I conduct analysis at the request of

3   various people in the office.

4       Q.    Okay.  And what types of analysis do you

5   conduct?

6       A.    It varies.

7       Q.    Can you give me some examples?

8       A.    I have analyzed the relationship between

9   our recruitment efforts and application behavior.

10      Q.    Okay.  What other analysis have you done?

11      A.    A survey of admitted students.

12      Q.    Anything else?

13      A.    The relationship between the new SAT and

14   the old SAT.

15      Q.    Anything else?

16      A.    An analysis of assets.

17      Q.    When you say "assets," what are you

18   referring to?

19      A.    Wealth of families.

20      Q.    The wealth of families?

21      A.    Yes.

22      Q.    As opposed to income this is a broader

23   analysis than an income analysis?

24            MS. ELLSWORTH:  Objection.

25      A.    I would not characterize it that way.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 71

1                        ERICA J. BEVER

2       Q.    Is it just analysis of family income?

3       A.    No.

4       Q.    Okay.  What -- when you say "wealth," what

5   do you mean?

6       A.    I mean a family as assets.

7       Q.    So real estate holdings they might have?

8       A.    I mean savings accounts.

9       Q.    How did you go about doing that analysis?

10      A.    I was given data by the financial aid

11  office.

12      Q.    Why were you -- why were you analyzing

13  assets?

14            MS. ELLSWORTH:  Objection.

15      A.    To understand when the financial aid office

16  should lower a family's income because the family

17  had not sufficiently saved in order to increase

18  their grant award.

19      Q.    And were -- were there any -- at whose

20  request did you do this analysis?

21      A.    Sally Donahue's.

22      Q.    Okay.

23      A.    And Jake Kaufman's.

24      Q.    And were any actions taken with respect to

25  financial aid eligibility based on this analysis?

HIGHLY CONFIDENTIAL -   ATTORNEYS EYES ONLY

Page 72

1                       ERICA J. BEVER

2            MS. ELLSWORTH:   Objection.

3     A.    Financial aid eligibility?   How would you

4   define that?

5     Q.    I guess why don't you just strike that.

6            Were any policy changes made in response to

7   your analysis?

8            MS. ELLSWORTH:   Objection.

9     A.    Yes.

10     Q.    And what policy was changed?

11     A.    The financial aid office clarified under

12   what circumstances a family would be given a low

13   asset allowance.

14     Q.    And what are those circumstances?

15     A.    When the family has saved below benchmarks.

16     Q.    And what are those benchmarks?

17     A.    They are based on actual financial aid

18   applicant data.

19     Q.    Okay.  And that was -- that was data that

20   was given to you by the financial aid office?

21     A.    Correct.

22     Q.    Okay.  Other analysis that you've done?

23            MS. ELLSWORTH:   Objection.  I'll just

24   remind the witness in answering the question not to

25   disclose any communications with counsel or actions

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 75

1                    ERICA J. BEVER

2    direction of counsel.

3           If you can answer the question without

4    doing so, you may.

5       A.    So putting aside any work done for or at

6    the direction of counsel, I have not.

7       Q.    Okay.  So that essentially means you did no

8    such analysis before the fall of 2014?

9           MS. ELLSWORTH:  Objection.

10      A.    That I can recall.

11      Q.    Who do you report to today in the

12   admissions office?

13      A.    Dean Fitzsimmons.

14      Q.    Does anyone report to you?

15      A.    Yes.

16      Q.    Who?

17      A.    Diane Tolis.

18      Q.    And what is her -- what is Diane Tolis'

19   role?

20      A.    Senior data and reporting analyst.

21      Q.    Okay.  Anybody else?

22      A.    Yes.

23      Q.    Who?

24      A.    Ian Anderson.

25      Q.    What is Ian Anderson's role?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 83

1                    ERICA J. BEVER

2    not to answer the question.

3        Q.   Are you going to follow that instruction?

4        A.   Yes.

5        Q.   Sitting here today, do you recall any

6    analysis that you performed in response to the

7    claims made in the Ron Unz article?

8        A.   I do not.

9        Q.   Did you review any such analysis in

10   preparation for your deposition?

11            MS. ELLSWORTH:  Objection.

12       A.   Yes.

13       Q.   Okay.  Do you have any -- and what did you

14   review?

15       A.   Presentations put together around the time.

16       Q.   And looking at those presentations doesn't

17   refresh your recollection about the work that you

18   may have done?

19            MS. ELLSWORTH:  Objection.

20       A.   It did not.

21       Q.   Based on your preparation for this

22   deposition, what analysis or presentations did you

23   do related to the Ron Unz article?

24            MS. ELLSWORTH:  Objection.

25       A.   I do not know.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 84

1                    ERICA J. BEVER

2      Q.   You don't know?

3           Do you recall -- other than at the advice

4  or direction of counsel, do you recall, during your

5  time at OIR, engaging in any analysis with respect

6  to how race is used in the admissions process at

7  Harvard?

8      A.   No.

9      Q.   That's true with respect to analysis done

10  in response to the Unz article or any other

11  analysis?

12           MS. ELLSWORTH:  Objection.

13      A.   That I can recall, correct.

14      Q.   Do you know who Rakesh Khurana is?

15      A.   I do.

16      Q.   Who is Rakesh Khurana?

17      A.   The dean or Harvard College.

18      Q.   And have you ever had occasion to meet with

19  Rakesh Khurana?

20      A.   I have.

21      Q.   Did you ever meet with Rakesh Khurana

22  during your time at OIR?

23           MS. ELLSWORTH:  Objection.

24      A.   I cannot recall.

25      Q.   Do you know who Michael Smith is?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 119

                            ERICA J. BEVER

1

2   recollection one way or the other with respect to

3   the preparation of the following chart on Page 35?

4        A.   Yes.

5             MS. ELLSWORTH:  Objection.

6        Q.   In other words, you don't remember -- other

7   than Mark Hansen showing you some version of this

8   chart which may or may not have been the same, you

9   don't have any memory of your recollection to seeing

10  this?

11            MS. ELLSWORTH:  Objection.

12       A.   I don't remember this.

13       Q.   And you don't remember having any

14  discussion with it at this point in time other than

15  with or at the direction of counsel?

16            MS. ELLSWORTH:  Objection.

17       A.   That is correct.

18       Q.   Okay.  Do you remember talking about this

19  with Dean Fitzsimmons at any point in time, this

20  analysis?

21       A.   I do not.

22       Q.   On Page 36, there is -- the slide is

23  titled, "What have we learned?"

24            Do you see that?

25       A.   I see that.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 122

1                    ERICA J. BEVER

2      Q.   Did you receive any instruction about

3  whether or not race should ever be incorporated into

4  the personal score when you were trained as an

5  admissions officer?

6      A.   I did not.

7      Q.   Is it -- do you know why you don't take

8  race into account when you assign personal scores?

9           MS. ELLSWORTH:   Objection.

10     A.   That is not what I am trying to assess when

11  I review personal qualities and character.

12     Q.   Do you know what's meant by -- or do you

13  know why this report wanted details about the

14  personal rating?

15          MS. ELLSWORTH:   Objection.

16     A.   I do not.

17     Q.   You don't remember because you don't

18  remember anything about this report?

19     A.   That is correct.

20     Q.   Other than Mark Hansen showing it to you at

21  some point in your office?

22          MS. ELLSWORTH:   Objection.

23     A.   Showing me slides.   Not this report.

24     Q.   Okay.   When you say "slides," what --

25  what's the distinction between slides and this

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 134

1                      ERICA J. BEVER

2       A.   It does not.

3       Q.   "Framing from Drew," do you see that?

4       A.   I do.

5       Q.   Okay.  Do you know what that means?

6       A.   I do not.

7       Q.   Okay.  Do you know who wrote that?

8       A.   I do not.

9       Q.   Okay.  If I represent to you that this

10   document bears a file name that includes your

11   initials, do you have any reason to believe that's

12   inaccurate?

13           MS. ELLSWORTH:  Objection.

14       A.   I do not.

15       Q.   Okay.  So is it very possible that you, in

16   fact, did prepare this document?

17           MS. ELLSWORTH:  Objection.

18       A.   It is possible.

19       Q.   Did you have any other questions with the

20   report that we've looked at that have come to your

21   mind today?

22           MS. ELLSWORTH:  Objection.

23       A.   Could you clarify?

24       Q.   Yeah.  You said that you can ask questions

25   based on what you've seen today about this report,

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 135

1                        ERICA J. BEVER

2    correct?

3         A.   Yes.

4         Q.   And one of the questions that you raised

5    was whether or not data was misinterpreted or was

6    incomplete --

7              MS. ELLSWORTH:  Objection.

8         A.   Yes.

9         Q.   -- correct?

10             Do you have any other questions about that

11   analysis?

12        A.   Those are my most significant questions.

13        Q.   Okay.  And do you have any basis to believe

14   that data would have been incomplete?

15        A.   Yes.

16        Q.   And why is that?

17        A.   Because since I have moved to admissions

18   and financial aid, I have a better understanding of

19   admissions data.

20        Q.   And what in particular do you think you

21   have an understanding of now that you didn't know

22   then?

23        A.   The process.

24        Q.   And what in particular -- how in particular

25   does that affect the reliability of the data that

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 136

1                     ERICA J. BEVER

2   OIR would have used in 2013?

3       A.   We oversimplified the process.

4       Q.   And what do you mean by "oversimplified the

5   process"?

6       A.   So in that analysis we just reviewed only

7   four ratings were included.

8       Q.   And -- and why does that oversimplify the

9   process?

10      A.   There are many other factors we review in

11  admissions.

12      Q.   Such as?

13      A.   There are many factors in the admissions

14  process.

15      Q.   When you say only four ratings were

16  considered, what is your basis for saying only four

17  ratings are considered?

18           MS. ELLSWORTH:  Well, if you're going to

19  ask questions about the document --

20           MR. STRAWBRIDGE:  Feel free to look at it.

21           I want to know why she feels only four

22  ratings were used in this analysis since she doesn't

23  remember anything about it.

24           MS. ELLSWORTH:  Is that a question to the

25  witness?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 138

1                    ERICA J. BEVER

2        Q.   Okay.  And how is that process done?

3        A.   By the reader, and the chair if the file is

4   passed.

5        Q.   Okay.  And was that information that would

6   have been available to OIR at the time that this

7   these reports were prepared?

8        A.   I do not recall.

9        Q.   You don't know whether it was or not?

10       A.   I do not recall.

11       Q.   But you think that a more complete analysis

12   would have taken those ratings into account?

13       A.   I do.

14       Q.   And you think -- and that leads to you

15   question the conclusions in here even though you

16   don't remember having those questions at the time?

17       A.   That is correct.

18            MR. STRAWBRIDGE:  Okay.  Can I have

19   Exhibit 24, please.

20            MR. CONNOLLY:  Not 45?

21            MR. STRAWBRIDGE:  Not 45.

22               (Document marked as Bever

23               Exhibit 3 for identification)

24            THE WITNESS:  Thank you.

25

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 160

                              ERICA J. BEVER

1

2    Q.   Do you have any idea whether or not this

3    was actually created in 2012 or in 2013?

4    A.   I do not.

5    Q.   Okay.  In preparation for this deposition,

6    did you review any documents that indicated that

7    the -- the effect of the admissions process on Asian

8    Americans was actually analyzed in the first half of

9    2012 by the OIR?

10   A.   I do not recall.

11   Q.   So the first bullet point on Page 2 of this

12   document says, quote:

13             "Athletes and legacies explain the

14             difference in raw admit dates for Asian and

15             white applicants."

16        Do you see that?

17   A.   I do.

18   Q.   Do you know what that's referring to?

19   A.   I don't.

20   Q.   Okay.  Do you remember doing -- do you

21   remember having discussions with somebody about

22   whether or not the difference in admission rates for

23   Asian and white applicants could be explained by

24   their status as legacy students or athletes?

25             MS. ELLSWORTH:  Objection.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 161

1                        ERICA J. BEVER

2          I'll remind the witness not to disclose

3  communications with counsel or at the direction of

4  counsel in answering the question.

5          If you can answer without disclosing that

6  information, you may do so.

7     A.    Putting aside anything I have done at the

8  direction of counsel, I do.

9     Q.    And what do you remember?

10    A.    I remember a discussion -- discussions with

11 Dean Fitzsimmons.

12    Q.    And when -- what do you remember about

13 those discussions?

14    A.    Him summarizing work that had been done by

15 the office of civil rights.

16    Q.    Analyzing the -- the comparative advantage

17 that -- strike that.

18          Analyzing whether or not legacy and athlete

19 students made the difference between -- made up the

20 difference between the raw admission rates of Asian

21 applicants and white applicants, that was the

22 analysis that had been done for OCR?

23          MS. ELLSWORTH:  Objection.

24    A.    That is not how he explained it.

25    Q.    How did he explain it?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 162

                        ERICA J. BEVER

1

2      A.    That once you took out athletes and

3   legacies, there was no difference in raw admit

4   rates.

5      Q.    Okay.  Do you know whether this report was

6   prepared to -- to examine that proposition further?

7           MS. ELLSWORTH:  Objection.

8      A.    I do not.

9      Q.    Okay.  Do you -- would you generally agree

10  that -- strike that.

11          Do you know whether Harvard today analyzes

12  admission rates in some cases by excluding the

13  legacy and the athlete students?

14          MS. ELLSWORTH:  Objection.

15          Again, I'll remind the witness not to

16  disclose communications with counsel or actions

17  taken at the direction of counsel in responding to

18  the question.

19     A.    Could you repeat the question.

20     Q.    Well, let me try it this way:

21          Are you familiar with the acronym NLNA?

22     A.    Yes.

23     Q.    Does that stand for non-legacy,

24  non-athlete?

25     A.    That does.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 177

ERICA J. BEVER

1

2      A.   I don't agree with the word "advantage."

3      Q.   Okay.  The admission rate for the whites

4   remains consistently higher than Asians at that

5   point in the graph forward?

6      A.   Yes.

7      Q.   Okay.  And that's, again, an analysis that

8   excludes legacy and athlete students, correct?

9      A.   That is what it says.

10      Q.   Do you know what's depicted on Page 8 of

11   this exhibit?

12      A.   Yes.

13      Q.   And what is that?

14      A.   "Odds Ratios for Main Effect Logistic

15   Model."

16      Q.   Do you know what an odds ratio means?

17      A.   I actually have to look it up every time.

18      Q.   Do you ever any inclination sitting here

19   today what odds ratio means?

20         MS. ELLSWORTH:  Objection.

21      A.   In general.

22      Q.   And what's that?

23      A.   It's the odds of an event happening.

24      Q.   Okay.  And so in this case, does this -- is

25   this basically suggesting that the higher the number

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 178

1                        ERICA J. BEVER

2      that's indicated here, the greater the odds are with

3      respect to likelihood of being admitted?

4                 MS. ELLSWORTH:  Objection.

5           A.   I don't know.

6           Q.   Okay.  Do you know what else this would be

7      trying to say other than -- other than the extent of

8      which the factors listed here influence the odds of

9      being admitted?

10                MS. ELLSWORTH:  Objection.

11          A.   I do not.

12          Q.   Okay.  Do you remember anything about the

13     preparation of this chart?

14          A.   I do not.

15          Q.   Would you agree with me that the highest --

16     whatever this odds was measuring, the highest odds

17     are for a high personal rating; is that correct?

18          A.   It is.

19          Q.   And then the second highest odds ratio is

20     for being African American?

21          A.   Yes.

22          Q.   And the lowest single odds ratio is

23     "other."

24               Do you know what that refers to?

25          A.   I do not.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 179

ERICA J. BEVER

1

2     Q.    The second lowest odds ratio is being

3     Asian; is that correct?

4     A.    That is correct.

5     Q.    Do you know what's shown on Page 9?

6     A.    "Logit Coefficients for Main Effect

7     Logistic Model."

8     Q.    And do you know what "logit coefficient"

9     means?

10    A.    Yes.

11    Q.    What does it refer to?

12    A.    A coefficient of a logit model.

13    Q.    And what does the coefficient signify in a

14    logit model?

15    A.    The probability of something.

16    Q.    So does that mean that these

17    characteristics would be associated with a higher

18    probability of whatever event is being modeled?

19          MS. ELLSWORTH:  Objection.

20    A.    Yes.

21    Q.    In other words, the higher the number on

22    the right, the higher the probability that the event

23    being measured would take place?

24    A.    Assuming the model was constructed -- was

25    constructed that way, yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 189

ERICA J. BEVER

1

2     Q.    Do you know whether or not the potential

3   yield of students by ethnicity is a factor that's

4   used to determine whether or not admission offers

5   should be made to individual students?

6     A.    I do not know.

7     Q.    You don't know one way or the other?

8     A.    I do not know.

9     Q.    Do you remember ever looking at yield or

10  raising yield questions in trying to decide whether

11  to recommend a candidate for admission?

12          MS. ELLSWORTH:  Objection.

13    A.    I did not.

14    Q.    Okay.  Does docket A have a target that

15  it's supposed to hit when it comes to committee

16  meetings?

17          MS. ELLSWORTH:  Objection.

18    A.    Could you please clarify?

19    Q.    Are there a number of students who are to

20  be recommended for admission that is identified as a

21  target for A docket in any given admission cycle at

22  the beginning?

23    A.    Not at the beginning.

24    Q.    Okay.  At some point in time is there a

25  target established?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 190

1               ERICA J. BEVER



HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 193

1                    ERICA J. BEVER



2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 195

1                    ERICA J. BEVER

2          MS. ELLSWORTH:  Objection.

3     A.   I do not.

4     Q.   Do you have any other basis, sitting here

5  today, to analyze or critique the methodology that

6  produced Exhibit 3?

7     A.   Exhibit 3?  You mean the entire document?

8     Q.   Right.

9          MS. ELLSWORTH:  Objection.

10     A.   Could you repeat your question?

11     Q.   Yes.

12          Sitting here today, do you have any basis

13  to critique the analysis that's contained in

14  Exhibit 3?

15     A.   No.

16          MR. STRAWBRIDGE:  We may take a lunch break

17  now.

18                    (Luncheon recess taken

19                    at 12:37 p.m. to 1:25 p.m.)

20

21

22

23

24

25

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 211

1                    ERICA J. BEVER

2   I'm sorry.  The last sentence of the paragraph we

3   were reading says, quote:

4                 "I won't have time to get to that

5            before tomorrow, so we might just bring

6            these slides."

7            Did I read that correctly?

8   A.   You did.

9   Q.   Do you know where you were bringing these

10  slides to?

11  A.   I do not.

12  Q.   Do you know who you were meeting with?

13  A.   I do not.

14            MR. STRAWBRIDGE:  31.

15            (Document marked as Bever

16            Exhibit 8 for identification)

17  BY MR. STRAWBRIDGE:

18  Q.   As you review what's being marked as

19  Exhibit 8, I will represent to you that according to

20  the data Harvard produced with this document you are

21  listed as the author.

22            Have you had a chance to review this?

23  A.   Yes.

24  Q.   Do you recognize this document?

25  A.   I do not.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 212

ERICA J. BEVER

1

2    Q.   Did you review this document in advance of

3  this deposition?

4    A.   I did not.

5    Q.   Okay.  Does this appear to be -- well,

6  strike that.

7         According to the cover, this is a

8  confidential draft dated October 8th, 2013?

9    A.   Correct.

10   Q.   And does it otherwise appear to be, in

11  substance, similar or identical to the previous

12  exhibit we've been looking at?

13        MS. ELLSWORTH:  Objection.

14   A.   Similar.

15   Q.   Yes?

16        Let's talk about the last page of this

17  document, Page 7.  Or before I get to Page 7,

18  looking at this document, do you have any

19  independent recollection of why you would have

20  prepared this document?

21   A.   I do not.

22   Q.   Do you remember whether it was for any

23  meeting or not?

24   A.   I don't.

25   Q.   The first bullet here says under "potential

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 213

1                    ERICA J. BEVER

2    next steps," quote:

3                    "Identify additional factors that

4              might be alternatives to race in

5              admissions.

6                    "Socioeconomic status...

7                    "Geography (zip code).

8                    "Others?"

9              Did I read that correctly?

10    A.    You did not.

11    Q.    Did I leave out a parenthetical of "(fee

12    waiver)"?

13    A.    You did.

14    Q.    Thank you for policing me.

15          Do you know why you were listing potential

16    next steps to identify factors that might be

17    alternatives to race in admissions?

18    A.    I do not.

19    Q.    Do you remember earlier when I asked you if

20    you had ever done any analysis on race neutral

21    alternatives to the use of race in the admissions

22    process?

23    A.    I do.

24    Q.    Does this refresh your recollection that

25    you did have those discussions with somebody in

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 219

1                     ERICA J. BEVER

2           MS. ELLSWORTH:  Objection.

3      A.   Yes, it is.

4      Q.   But you're telling us, sitting here today,

5  under the penalty of perjury, that you don't have

6  any recollection whatsoever of any discussions about

7  this apart from one time when Mark Hansen showed you

8  some slides in your office?

9           MS. ELLSWORTH:  Objection.

10     A.   That is correct.

11     Q.   How many OIR projects of 6 to 12 pages did

12 you do in a given year?

13     A.   Many.

14     Q.   Like how many?

15     A.   Many.

16     Q.   Thousands?

17     A.   Possibly.

18     Q.   You think you did thousands of these types

19 of reports in one year?

20           MS. ELLSWORTH:  Objection.

21     A.   Probably not in one year.

22     Q.   Hundreds?

23     A.   Possibly.

24     Q.   You think you did hundreds of these types

25 of reports in one year?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 220

1                    ERICA J. BEVER

2      A.    Yes.

3      Q.    Okay.  Do you think when we ask Mark Hansen

4   he's going to say that he doesn't remember any of

5   this stuff, either?

6           MS. ELLSWORTH:  Objection.

7      A.    I don't know.

8      Q.    Do you think...

9           Do you have any reason as to why you

10   wouldn't remember the particular reports we've been

11   looking at?

12           MS. ELLSWORTH:  Objection.

13      A.    I do not.

14      Q.    Do you think they just didn't take up very

15   much of your time?

16      A.    I don't remember.

17      Q.    I mean, you remembered a lot of other

18   reports that you did during this time period,

19   correct?

20      A.    Correct.

21      Q.    And you've agreed that the -- the

22   allegations of racial discrimination are something

23   that people at Harvard would take pretty seriously,

24   correct?

25           MS. ELLSWORTH:  Objection.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 221

1                      ERICA J. BEVER

2      A.   Correct.

3      Q.   And you remembered other occasions when you

4  met with Dean Fitzsimmons to talk about issues

5  relating to admissions, correct?

6      A.   Correct.

7      Q.   But somehow you have a complete blank on

8  this particular topic?

9           MS. ELLSWORTH:  Objection.

10     A.   I do not recall.

11               (Document marked as Bever

12               Exhibit 9 for identification)

13 BY MR. STRAWBRIDGE:

14     Q.   Go ahead and review what's been marked as

15 Exhibit 9, see if you recognize this document.

16          Have you had chance to review this?

17     A.   Yes.

18     Q.   Do you recognize this document?

19     A.   Yes.

20     Q.   And what -- how do you recognize this

21 document?

22     A.   I was shown a version in preparation for

23 this deposition.

24     Q.   Apart from your preparation for this

25 deposition, do you have any memory of the analysis

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 268

1                    ERICA J. BEVER

2    to him on May 1st that contained information with

3    the negative probabilities of admission that was

4    associated with being Asian.  Why do you think he

5    didn't receive the e-mail you sent him?

6              MS. ELLSWORTH:  Objection.

7         A.   I don't know.

8         Q.   You don't know why you don't think that?

9         A.   I have no proof that he received it.

10        Q.   Did the e-mail ever bounce back to you?

11             MS. ELLSWORTH:  Objection.

12        A.   I don't know.

13        Q.   Do you recall situations where you sent

14   e-mail to people at Harvard and they never received

15   them?

16        A.   I don't know.

17        Q.   Do you think he didn't receive that e-mail?

18        A.   I don't know.

19        Q.   Are you aware of any changes that were made

20   to the Harvard admissions process specifically with

21   respect to concerns about effects it had on Asian

22   American applicants?

23             MS. ELLSWORTH:  Objection.

24        A.   I am not.

25        Q.   Anyone ever tell you they took any steps to

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 269

1                    ERICA J. BEVER

2  make sure that Asians were not being disadvantaged

3  by the admissions process?

4            MS. ELLSWORTH:  Objection.

5       A.   I have never heard anyone say that.

6       Q.   Are you aware of anyone -- of any work

7  someone did outside of OIR, other than at the

8  direction or advice of counsel, to ensure that Asian

9  Americans were not, in fact, being disadvantaged by

10  the admissions process?

11       A.   I do not know.

12            THE REPORTER:  15.

13                 (Document marked as Bever

14                 Exhibit 15 for identification)

15  BY MR. STRAWBRIDGE:

16       Q.   Have you had a chance to review this

17  document?

18       A.   I have.

19       Q.   Is this an e-mail that you sent to Dean

20  Fitzsimmons on June 3rd, 2013?

21            MS. ELLSWORTH:  Objection.

22       A.   It appears to be.

23       Q.   And you're writing to:

24                 "... follow-up from our last

25                 conversation on income and admissions (with

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 272

1                      ERICA J. BEVER

2    as Exhibit 16.

3            Before you do, I'll represent that this is

4    a document produced by Harvard that shares the same

5    file name as listed at the bottom of the prior

6    Exhibit 15.

7            MS. ELLSWORTH:  Do you have another copy?

8            MR. CONNOLLY:  I don't, actually.

9    BY MR. STRAWBRIDGE:

10       Q.   Have you had a chance to review this

11   document?

12       A.   Yes.

13       Q.   Do you recognize this document?

14       A.   I recognize the parts that appear similar

15   to other documents we've reviewed.

16       Q.   And in particular some of the charts and

17   low income presentation, the May 1st memo that we

18   just looked at?

19       A.   Yes.

20       Q.   Okay.  And specifically Page 7 of this

21   document has some coefficient information?

22       A.   It does.

23       Q.   Can you go back to the May 1st memo,

24   actually?

25           MS. ELLSWORTH:  Which version?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 273

                        ERICA J. BEVER

1

2      Q.   The one that was sent on May 1st.  I think

3  it's 13.  It might be --

4      A.   No.

5      Q.   It's 11.

6      A.   11?

7      Q.   Yeah.

8      A.   Okay.

9      Q.   That's the one that was sent to Dean

10  Fitzsimmons, correct?

11      A.   Yes.

12      Q.   Okay.  Can you look at the coefficient

13  chart in that document?

14          Could you tell me what the Asian

15  coefficient in the May 1st version was listed as?

16      A.   Negative 0.37.

17      Q.   And what is it in this document in the --

18  in Exhibit 16?

19      A.   Negative .429.

20      Q.   Do you know why that number has changed in

21  this chart?

22      A.   Yes.

23      Q.   Why?

24      A.   We added an interaction term for being

25  Asian and low income.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 274

ERICA J. BEVER

1

2     Q.    Okay.  And so what effect did that have?

3     A.    That changed the effect size for being

4  Asian and high income.

5     Q.    Okay.  And so in this case, the analysis of

6  Asian people who are Asian but not Asian and low

7  income?

8     A.    That is correct.

9     Q.    Okay.  So in other words, your low income

10  Asian, there is a positive coefficient, but it

11  created a negative coefficient for being Asian and

12  high income?

13         MS. ELLSWORTH:  Objection.

14     Q.    A more negative coefficient, I should say?

15         MS. ELLSWORTH:  Objection.

16     A.    For that particular group, yes.

17     Q.    Okay.  Did you -- did you model any other

18  of the ethnic groups by low income?

19     A.    I don't know.

20     Q.    According the this chart, does it look like

21  you did?

22     A.    We did not.

23     Q.    Okay.  Would that analysis be consistent

24  with Exhibit 15 that we were looking at a moment

25  ago?  I'm sorry, Exhibit 12.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 278

1                    ERICA J. BEVER

2      A.   That is what the e-mails say.

3      Q.   You didn't -- you didn't provide -- you

4  didn't answer Dean Fitzsimmons' query about that

5  with information that you knew to be unreliable at

6  the time, did you?

7           MS. ELLSWORTH:  Objection.

8      A.   I don't know.

9      Q.   Does that sound like something you would

10  have done?

11          MS. ELLSWORTH:  Objection.

12     A.   It does not.

13     Q.   Do you think it's possible that you sent

14  Dean Fitzsimmons an analysis that you considered to

15  be unreliable at the time without noting it as such?

16          MS. ELLSWORTH:  Objection.

17     A.   I do not.

18     Q.   Anyway, does this chart, does this model

19  indicate that being African American and low income

20  is negatively associated with an admissions outcome

21  at Harvard?

22          MS. ELLSWORTH:  Objection.

23     A.   Within admissions outcome, yes.

24     Q.   In fact, being African American and low

25  income is most -- has the largest negative

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 279

1                    ERICA J. BEVER

2   coefficient other than international students,

3   correct?

4       A.   Yes.

5       Q.   But being African American has the second

6   highest coefficient other than being an athlete,

7   correct?

8       A.   That is correct.

9       Q.   Okay.  And by African American in this case

10  we mean African American and high income, right?

11      A.   Holding all other things constant.

12           And the cumulative effect of the way of

13  reading an interaction effect is actually to combine

14  the variables for low income, the race of interest

15  and the interaction term.

16      Q.   So what does that mean?

17      A.   That would mean you would take all the

18  coefficients together and evaluate the differences

19  being those combined things.

20      Q.   So I don't understand.  How would you take,

21  for example, being African American and high income

22  and African American and low income together?

23  You're either one or the other.

24           MS. ELLSWORTH:  Objection.

25      A.   So African American here is relative to a

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 280

1                        ERICA J. BEVER

2    white student who is not low income and all other

3    things being constant.  So these are constants as --

4    or these are variables that, for everything --

5    holding all other things to their zero, more or

6    less.

7        Q.    So with respect to African-American and low

8    income, your testimony is that's compared to a white

9    student who's low income?

10       A.    No.  That's compared to the constant

11   student who is -- I'm not sure what the admitted

12   group in this category is; it looks like white; I

13   don't see a coefficient for white -- and other

14   things, non-athlete, a non-personal 1 or 2.  A

15   non-extracurricular 1 or 2.

16       Q.    Okay.  So does that mean that the

17   coefficient for African American low income would be

18   compared to a white student who does not have high

19   academic extracurricular or personal scores?

20            MS. ELLSWORTH:  Objection.

21       A.    Again, the way to do that comparison is not

22   shown on this chart.

23       Q.    Okay.  But it's something that you're

24   familiar with?

25       A.    It's something I can do statistically.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 296

1                    ERICA J. BEVER

2      the other as to whether Harvard would benefit from

3      greater socioeconomic diversity?

4           A.   I do not know.

5           Q.   What about racial diversity?  Do you think

6      that Harvard is sufficiently racially diverse?

7                MS. ELLSWORTH:  Objection.

8           A.   I don't think of it that way.

9           Q.   Why not?

10          A.   I don't.

11          Q.   When you're reading admissions files, are

12     you trying to achieve racial diversity as one of the

13     goals of the admissions process?

14               MS. ELLSWORTH:  Objection.

15          A.   I'm trying to look for students who will

16     benefit from Harvard and who Harvard will benefit

17     from.

18          Q.   And do you think that there is a level of

19     racial diversity that is essential to achieve that

20     benefit for the Harvard student body?

21               MS. ELLSWORTH:  Objection.

22          A.   I do not know.

23          Q.   You don't know whether there is any level

24     of racial diversity that's important for Harvard to

25     obtain?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 309

                      ERICA J. BEVER

1        have been made to this report from February 2013,

2        between February 2013 and July of 2014?

3        A.   I am not.

4        Q.   Do you know whether or not this

5        incorporates any of the analysis we saw from October

6        of 2013?

7              MS. ELLSWORTH:  Objection.

8        A.   I do not.

9        Q.   Okay.  Do you know why you included this

10       report on the agenda under the section heading of

11       additional OIR analysis on Harvard College students?

12       A.   I do not.

13       Q.   Okay.  Was it because it was important to

14       make Dean Khurana aware of OIR's analysis regarding

15       the potential disadvantaging of Asians in Harvard's

16       admissions process?

17             MS. ELLSWORTH:  Objection.

18       A.   I do not know.

19       Q.   Okay.  Do you agree with me that

20       originally -- initially the evaluating factors in

21       the admission excerpt that we see here was part of a

22       much larger report?

23             MS. ELLSWORTH:  Objection.

24       A.   I don't know where these slides came from.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 311

1                    ERICA J. BEVER

2    on July 11th, 2014?

3              MS. ELLSWORTH:  Objection.

4        A.   I do not recall discussing any of these

5    topics with Dean Khurana.

6        Q.   Do you -- can you say for sure they weren't

7    discussed?

8        A.   I cannot.

9        Q.   Do you recall Dean Khurana criticizing any

10   aspect of this analysis?

11       A.   I did not recall discussing these analysis

12   with Dean Khurana.

13       Q.   So after the meeting, do you recall Dean

14   Khurana ever letting you know that he thought this

15   wasn't an appropriate statistical analysis?

16             MS. ELLSWORTH:  Objection.

17       A.   I do not recall discussing this ever with

18   Dean Khurana.

19       Q.   Do you recall anyone else telling you later

20   that they talked to Dean Khurana and he said this

21   wasn't an appropriate statistical analysis?

22       A.   I do not recall that.

23       Q.   Okay.  Do you recall talking about this

24   analysis with anyone other than Dean Khurana after

25   July 2014, other than in the presence or at the

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 319

1                        ERICA J. BEVER

2    the two things that you happened to show Dean

3    Khurana shortly after he became dean of Harvard

4    College, two of the three things that you chose to

5    show him were this report, each of which was more

6    than a year old, that included analysis of how the

7    admissions process disadvantaged Asians; is that

8    correct?

9              MS. ELLSWORTH:  Objection.

10    A.    I would not characterize those analyses

11    that way.

12    Q.    Well, you would agree that one of the

13    analyses specifically focused on the effect of being

14    Asian under four different models, correct?

15    A.    One of them shows the correlation between

16    being Asian and an admissions outcome, in four

17    different models.

18    Q.    Right.  And another one analyzes a number

19    of factors, including -- and specifically remarks

20    upon the negative effect of being Asian under the

21    coefficient analysis?

22              MS. ELLSWORTH:  Objection.

23    Q.    Right?

24    A.    It shows there is a negative relationship

25    between that variable and being -- and admission,

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 320

1                    ERICA J. BEVER

2    holding all other things constant.

3        Q.    It includes, in Exhibit 4, a chart that

4    specifically analyzes what the effect of being a

5    high achieving Asian is versus being legacy, athlete

6    or low income?

7        A.    It shows the admissions rates.

8        Q.    The average admit rates for top academic

9    achievers with select ethnic demographic

10   characteristics?

11       A.    Correct.

12       Q.    The only select demographic factor on that

13   chart is being Asian?

14       A.    That's correct.

15       Q.    That is the chart that indicates that Asian

16   high academic achievers have lower rates of

17   admission?

18       A.    That does show that.

19       Q.    You can't say why of all the work that you

20   did at OIR these were the particular documents that

21   you chose to show Dean Khurana?

22            MS. ELLSWORTH:  Objection.

23       A.    I believe that we sent Dean Khurana a large

24   number of analyses prior -- or following his start

25   as dean that was a record of all the work we had

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 322

                        ERICA J. BEVER

1

2      A.   I just have a vague memory of sending a

3  whole bunch of documents to him, and it's feasible

4  we missed some.

5      Q.   Okay.  Why would you make that an agenda

6  item for a meeting?

7      A.   Assuming he hadn't had a chance to see

8  them.  I don't know.  I'm guessing.

9      Q.   You're completely guessing?

10     A.   Yes.

11     Q.   So it's possible this isn't the reason at

12  all?

13     A.   That is correct.

14     Q.   These could have been added to the agenda

15  for different reasons?

16     A.   Yes.

17     Q.   And you can't say what, if any, discussion

18  took place about the findings in these reports

19  because you don't remember one way or the other?

20     A.   That is correct.

21     Q.   If someone else were to testify to these

22  reports were discussed extensively, you wouldn't be

23  able to contest that testimony, would you?

24          MS. ELLSWORTH:  Objection.

25     A.   I would not.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 330

1                    ERICA J. BEVER

2      Q.   That's what you wrote to Dean Fitzsimmons?

3      A.   Yes.

4      Q.   Okay.  So what are you referring to here?

5      A.   I have no idea.

6      Q.   You have no idea at all?

7      A.   I have no idea at all.

8      Q.   You take it from this that he had raised

9  the possibility of you and him talking in advance of

10  this meeting at some point in time?

11           MS. ELLSWORTH:  Objection.

12      A.   I'm not sure.

13      Q.   Well, you wrote:

14              "I'm not sure if you would still like

15           to confer beforehand," right?

16      A.   I did.

17      Q.   Okay.  That indicates that at some point

18  you thought that he might want to confer beforehand,

19  does it not?

20      A.   Yes, it does.

21      Q.   And you're asking him whether that's still

22  the case?

23      A.   Yes.

24      Q.   And do you recognize whether you actually

25  conferred with Dean Fitzsimmons before this meeting?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 346

1                    ERICA J. BEVER

2    verbal scores?

3         A.   Yes.

4         Q.   And do you have any idea at all as to

5    whether or not this information has been used by

6    anyone else in the admissions office --

7              MS. ELLSWORTH:  Objection.

8         Q.   -- during your time as a senior admissions

9    officer?

10        A.   I do not know.

11             MR. STRAWBRIDGE:  Let's take a short break.

12             (Recess taken)

13   BY MR. STRAWBRIDGE:

14        Q.   Ms. Bever, your counsel has indicated you

15   want to clarify a estimate you previously made?

16        A.   Yes.

17        Q.   Okay.  What do you want to say?

18        A.   I believe you asked me earlier if I thought

19   others had -- others in the admissions office had

20   seen the data on the distribution of SAT scores by

21   race/ethnicity.

22        Q.   Yes.

23        A.   I answered no.  I believe the correct

24   answer is yes.

25        Q.   Okay.  And who in the admissions office has

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 347

1                    ERICA J. BEVER

2  seen that data?

3      A.   I believe multiple staff.

4      Q.   Okay.  And in particular do you know the

5  names?

6      A.   I don't recall with certainty who was in

7  the room, but I believe it was shared at a staff

8  meeting.

9      Q.   Okay.  So was that with a significant

10  portion of the admissions office?

11      A.   A significant portion of the admissions

12  committee.

13      Q.   Okay.  And what's the admissions committee?

14      A.   The admissions and financial aid officers

15  who serve on the admissions committee.

16      Q.   And what is the -- what was the context of

17  the sharing of this data?

18      A.   I believe I did a descriptive analysis of

19  our applicant pool, or admitted pool, and included,

20  among other things, the distribution of scores by

21  race.

22      Q.   And why was that done?

23          MS. ELLSWORTH:  Objection.

24      A.   For the purposes of informing my

25  colleagues.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 348

1                    ERICA J. BEVER

2        Q.    Informing them about what?

3        A.    The nature of our admissions pool.

4        Q.    Okay.  And was there -- was there other

5   information shared besides distribution of SAT

6   scores by race?

7        A.    Yes.

8        Q.    What other types of information was shared?

9        A.    Distributions of students who were

10  identified as first generation, low income, staff,

11  disadvantage, requesting a fee waiver.

12            That's what I can recall.

13       Q.    This was all the distribution of SAT scores

14  by these factors?

15       A.    I don't recall.

16       Q.    Okay.  Was SAT scores for these factors

17  some of the things that was shared?

18       A.    I believe so.

19       Q.    Okay.  Was ethnicity, for example

20  disadvantaged students, is that something that was

21  shared?

22       A.    I don't recall.

23       Q.    Okay.  Did you actually prepare a

24  presentation?

25       A.    I did.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 349

1                    ERICA J. BEVER

2        Q.   And when do you think this was?

3        A.   In the fall of 2014.

4        Q.   In the fall or 2014.  Shortly after you

5    joined the admissions office?

6        A.   Yes.

7        Q.   Was this during a committee meeting?

8        A.   It was during a staff meeting.

9        Q.   During a staff meeting.  So this is before

10   the subcommittees were meeting?

11       A.   I don't recall.

12       Q.   Is there anything else that you remember

13   about that -- that information being shared?

14       A.   No.

15       Q.   Do you recall doing a project analyzing

16   potential savings for Harvard if you changed the

17   expected family contribution between households

18   making $150,000 a year and $130,000 a year?

19       A.   I do.

20       Q.   Okay.  What do you remember about that

21   analysis?

22       A.   A variety of things.

23       Q.   Such as?

24       A.   I remember working on estimating the cost

25   of reducing the ten -- or changing the ten percent

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 350

1                    ERICA J. BEVER

2   threshold at 180 down to 150 or 130.

3        Q.   Do you remember why you were looking at

4   that?

5        A.   Yes.

6        Q.   Why?

7        A.   There were concerns about the cost of our

8   financial aid program, and the growth of costs over

9   the long term.

10        Q.   Okay.  Do you remember how long you spent

11   doing that analysis?

12        A.   Not with any exactness.

13        Q.   Approximately?

14        A.   Months.

15        Q.   Months?  Like how many months?

16        A.   Several.

17        Q.   Okay.  Do you remember when you did that

18   analysis?

19        A.   Not accurately.

20        Q.   Okay.  Do you know whether it was when you

21   were at OIR, correct?

22        A.   That is correct.

23        Q.   Okay.  Do you know whether it was toward

24   the end of your tenure or at the beginning of your

25   tenure?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

1                    ERICA J. BEVER

2       A.   It was in the middle.

3       Q.   Middle of your tenure.

4            Do you know whether or not -- do you know

5   who else worked on that analysis with you?

6       A.   I don't recall.

7       Q.   Okay.  Do you recall President Faust having

8   questions about that analysis?

9       A.   I recall meetings where President Faust was

10  present.

11      Q.   And specifically where that analysis was

12  discussed?

13      A.   Yes.

14      Q.   Okay.  And what do you remember about the

15  discussion that you had with President Faust?

16      A.   I remember walking through my analysis

17  slide by slide.

18      Q.   Okay.  Do you remember her having any

19  follow-up questions?

20      A.   Yes.

21      Q.   And what were the follow-up questions?

22      A.   I do not recall.

23      Q.   But you remember that she definitely had

24  some follow-up questions?

25      A.   I do.

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 352

1                    ERICA J. BEVER

2     Q.    Okay.  What else do you remember about that

3  project?

4     A.    Could you be more specific?

5     Q.    Do you know how long the report that you

6  prepared was?

7          MS. ELLSWORTH:  Objection.

8     A.    No.

9     Q.    Okay.  Do you know whether it was reviewed

10  by Ms. Driver-Linn?

11          MS. ELLSWORTH:  Objection.

12     A.    Yes.

13     Q.    Okay.  Do you know who else might have

14  reviewed it within OIR?

15     A.    No.

16     Q.    Do you remember who else was at the meeting

17  in which President Faust attended when you walked

18  through your presentation?

19     A.    The meeting I was thinking of?

20     Q.    Yes.

21     A.    Was me, President Faust, Dean Smith.

22          There may have been one other person.  I

23  can't recall.

24     Q.    Who do you think may have been there?

25     A.    I don't remember.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 353

1                   ERICA J. BEVER

2      Q.    Okay.  But why do you think that maybe

3  another person was there?

4      A.    I just have this vague memory that someone

5  else was there.

6      Q.    Okay.  Do you remember what action, if any,

7  was taken in response to that analysis?

8            MS. ELLSWORTH:  Objection.

9      A.    Yes.

10     Q.    What action was taken?

11     A.    We modified the program so that families

12  making up to $150,000 would pay zero to ten percent,

13  and then we slightly increased the parent

14  contribution for families from 150 to $180,000,

15  $180,000.

16     Q.    Okay.  And you said at one point part of

17  that analysis was looking at what would happen if

18  you dropped it to 130 as opposed to 150?

19     A.    Yes.

20     Q.    Do you remember whether any action was

21  taken in response to ha analysis?

22            MS. ELLSWORTH:  Objection.

23     A.    No.

24     Q.    Okay.  Do you remember what the finding of

25  that analysis was?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 354

1                    ERICA J. BEVER

2     A.    That we would save more money.

3     Q.    Do you remember how much the savings was?

4     A.    I don't.

5     Q.    Okay.  So can you explain why you remember

6  all of those details about this analysis of

7  financial aid from the middle of your tenure at OIR,

8  but you have absolutely no recollection of the work

9  that was done with respect to analyzing the effect

10  of being Asian in the admissions process for more

11  than a year in drafts that you shared and

12  distributed throughout OIR?

13           MS. ELLSWORTH:  Objection.

14     A.    I cannot.

15     Q.    It's just the one thing you don't have any

16  memory of?

17           MS. ELLSWORTH:  Objection.

18     A.    I would not characterize it that way.

19     Q.    Okay.  But you have no memory of that,

20  right?

21     A.    That is correct.

22     Q.    Other than the one time some slides that

23  Mark Hansen showed you, right?

24     A.    That is correct.

25     Q.    Even though it was the subject of national

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 355

1                    ERICA J. BEVER

2   media coverage, right?

3              MS. ELLSWORTH:  Objection.

4      A.   Yes.

5      Q.   Ron Utz's article, correct?

6      A.   That is correct.

7      Q.   We saw some internal OIR discussion of an

8   NPR report on Asian discrimination in college

9   admissions?

10     A.   Yes.

11     Q.   There was a link to the "New York Times"

12  sent around by Mr. Hansen.

13              Do you remember looking at that?

14     A.   I do.

15     Q.   These were -- these were e-mails that were

16  drafts of the report analyzing the factors that the

17  models that predict admission for various

18  ethnicities that dated back to February, correct?

19              MS. ELLSWORTH:  Objection.

20     A.   They are correlated with admission.

21     Q.   Right.  Those drafts, but by you, and

22  e-mails by you sending those drafts around go back

23  to February 2013?

24     A.   I don't know that I created them.

25     Q.   You saw e-mails that indicated that you had

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 356

1                    ERICA J. BEVER

2   pulled that information together, didn't you?  You

3   saw those e-mails today?

4              MS. ELLSWORTH:  Objection.

5        A.   I did.

6        Q.   Okay.  But you think that maybe you didn't

7   create them?

8        A.   I don't know.

9        Q.   Okay.  Well, we saw e-mails that said that

10  you had pulled that information together, correct?

11       A.   That is correct.

12       Q.   And you sent it to Mr. Hansen and to

13  Ms. Driver-Linn?

14       A.   That is correct.

15       Q.   And at some point that information

16  according to what Harvard has produced, found its

17  way to Michael Smith, correct?

18              MS. ELLSWORTH:  Objection.

19       A.   I don't know.

20       Q.   We saw e-mails, for example, that -- that

21  showed that work was taking place on those documents

22  in October of 2013, right?

23       A.   Yes.

24       Q.   And that e-mail, in fact, was included on

25  an agenda that you set for a meeting with Dean

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 357

1                        ERICA J. BEVER

2    Khurana in July of 2014?

3             MS. ELLSWORTH:  Objection.

4        Q.   Right?

5        A.   That is correct.

6        Q.   And we saw an e-mail that indicated that

7    you participated in the drafting of a different memo

8    to Dean Fitzsimmons on low income admissions tips

9    that included analysis of the negative effects of

10   being Asian under that analysis of the admissions

11   process?

12       A.   I would not characterize it as that.

13       Q.   We saw -- we saw an analysis that being

14   Asian was associated with negative effects under the

15   analysis that OIR conducted of the admissions

16   process, correct?

17            MS. ELLSWORTH:  Objection.

18       A.   I would not characterize it as that.

19       Q.   Do you remember the paragraph in which --

20   in the memo that you wrote that indicates that there

21   were negative effects associated with certain

22   demographic groups?  Do you want to look back at

23   that?  Do you remember that paragraph?

24            MS. ELLSWORTH:  Objection.

25            Are you trying to refer the witness to a

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 358

1                  ERICA J. BEVER

2  document?

3            MR. STRAWBRIDGE:  I'm trying to ask the

4  witness if she remembers looking at that in the last

5  three hours.

6       A.   I do remember.

7       Q.   Do you remember seeing copies of that memo

8  being sent to Dean Fitzsimmons?

9       A.   I do.

10       Q.   Do you remember how we saw copies of that

11  memo that were also sent to Dean Khurana in

12  October 2014?

13            MS. ELLSWORTH:  Objection.

14       A.   I do.

15       Q.   We saw all this discussion about this issue

16  and your testimony -- just so I understand -- is

17  other than that one time in your office with

18  Mr. Hansen, you don't remember anything --

19            MS. ELLSWORTH:  Objection.

20       Q.   -- about that analysis or any discussions

21  about it with anybody at Harvard in OIR or outside

22  at any point in time other than possibly in the

23  presence of counsel after the fall of 2014?

24            MS. ELLSWORTH:  Objection.

25       Q.   Is that accurate?

HIGHLY CONFIDENTIAL -  ATTORNEYS EYES ONLY

Page 359

1                    ERICA J. BEVER

2            MS. ELLSWORTH:  Objection.

3      A.   That is correct.

4      Q.   That's your testimony under oath here

5  today?

6            MS. ELLSWORTH:  Objection.

7            Asked and answered.

8      A.   That is.

9            MR. STRAWBRIDGE:  We're going to leave this

10  deposition open in part because of serious concerns

11  we have about the preservation of documents that I

12  will address with counsel off the record.  But at

13  this point in time I do not have any questions for

14  this witness.

15            MS. ELLSWORTH:  And we do not have any

16  questions for the witness, so that concludes it.  We

17  will reserve the right to object to any attempt to

18  recall the witness if necessary.

19            MR. STRAWBRIDGE:  Okay.

20            THE WITNESS:  Thank you.

21                 (Whereupon, the deposition was

22                 suspended at 5:36 p.m.)

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 361

1     NAME OF CASE:

2     DATE OF DEPOSITION:

3     NAME OF WITNESS:

4     Reason Codes:

5          1.  To clarify the record.

6          2.  To conform to the facts.

7          3.  To correct transcription errors.

8     Page _____ Line _____ Reason _____

9     From _____ to _____

10    Page _____ Line _____ Reason _____

11    From _____ to _____

12    Page _____ Line _____ Reason _____

13    From _____ to _____

14    Page _____ Line _____ Reason _____

15    From _____ to _____

16    Page _____ Line _____ Reason _____

17    From _____ to _____

18    Page _____ Line _____ Reason _____

19    From _____ to _____

20    Page _____ Line _____ Reason _____

21    From _____ to _____

22    Page _____ Line _____ Reason _____

23    From _____ to _____

24

25                         _____

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 360

1              ERICA J. BEVER

2           C E R T I F I C A T E

3      I, ERICA J. BEVER, do hereby certify that I have

4   read the foregoing transcript of my testimony, and

5   further certify under the pains and penalties of

6   perjury that said transcript (with) without)

7   suggested corrections is a true and accurate record

8   of said testimony. See attached errata sheet.

9      Dated at  12:12  , this  22  day of  August,

10  2017.

11

12

13              ERICA J. BEVER

14

15

16

17

18

19

20

21

22

23

24

25

**July 13, 2017 Deposition of Erica Bever – Errata Sheet**

| Page | Line | Instruction | Reason for Change |
|---|---|---|---|
| 23 | 16 | Change "request" to "requests" | Grammar |
| 30 | 19-20 | Capitalize "Collaborative on Academic Careers in Higher Education" | Grammar |
| 38 | 15-16 | Capitalize "Association of Schools and Colleges" | Grammar |
| 52 | 7 | Change "of IR" to "of OIR" | Typo |
| 53 | 3 | Change "Review of work frequently" to "We reviewed our work frequently" | Clarity |
| 58 | 15 | Add "of" before "his title" | Typo |
| 59 | 13 | Change "titles" to "title" | Typo |
| 62 | 10-11 | Capitalize "Office of Admissions and Financial Aid" | Grammar |
| 63 | 19 | Change "financial" to "finance" | Typo |
| 71 | 6 | Change "family as assets" to "family's assets" | Typo |
| 77 | 2 | Change "Those are" to "For" | Typo |
| 84 | 17 | Change "dean or Harvard College" to "Dean of Harvard College" | Typo |
| 85 | 4-5 | Capitalize "Dean of the Faculty of Arts and Sciences" | Grammar |
| 91 | 16 | Capitalize "Corporation" | Grammar |
| 114 | 8 | Change "value of out" to "value out" | Typo |
| 123 | 3-4 | Change "marked here" to "Mark shared" | Typo |
| 154 | 20 | Change "if" to "the" | Typo |
| 161 | 15 | Capitalize "Office of Civil Rights" | Grammar |
| 203 | 23 | Change "appears to" to "appears to be" | Clarity |
| 228 | 5 | Delete "sic" | Clarity |
| 278 | 23 | Change "Within" to "With an" | Typo |
| 280 | 11 | Change "admitted" to "omitted" | Typo |
| 286 | 6 | Change "liability" to "reliability" | Typo |
| 286 | 15 | Change "Susan" to "Suzanne" | Typo |
| 342 | 25 | Change "a part" to "apart" | Typo |