# EXHIBIT 3

Highly Confidential Attorneys' Eyes Only

Page 1

1

2   HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY

3      IN THE UNITED STATES DISTRICT COURT

4       FOR THE DISTRICT OF MASSACHUSETTS

5      Civil Action No:  1:14-cv-14176-ADB

    ---------------------------X

6

    STUDENTS FOR FAIR ADMISSIONS,

7   INC.,

8                    Plaintiff,

9        v.

10  PRESIDENT AND FELLOWS OF

    HARVARD COLLEGE

11  (HARVARD CORPORATION),

12                   Defendant.

13  ---------------------------X

14          VIDEOTAPED DEPOSITION OF

15            DAVID CARD, Ph.D.

16            Washington, DC

17            April 27, 2018

18              9:07 AM

19

20

21  Reported by:

22  Karen Brynteson, RMR, CRR, FAPR

23  Job No. 139809

24

25

Highly Confidential Attorneys' Eyes Only

Page 27

1          D. Card

2          MS. ELLSWORTH:  Object to the

3     form.

4          THE WITNESS:  I have read the

5     phrase, and I have some

6     understanding of it.

7  BY MR. STRAWBRIDGE:

8     Q.    You're aware that that's --

9  that's -- that's the phrase that Harvard

10 applied to its own admissions process, I

11 assume?

12    A.    I am, yes.

13    Q.    Okay.  Have you written any

14 papers that actually analyze the -- the

15 extent to which various factors play a

16 role in admission under a holistic

17 admissions process?

18    A.    Well, if one interprets

19 holistic to mean evaluating different

20 characteristics of students, potentially,

21 I studied that indirectly, but I have not

22 written any papers, I believe, that would

23 use the word holistic admissions in them.

24    Q.    Have you looked at -- have you

25 written any papers that are specific to

Highly Confidential Attorneys' Eyes Only

Page 28

                        D. Card

1   the question of how race affects college

2   admissions decisions by universities?

3               MS. ELLSWORTH:  Object to the

4       form.

5               THE WITNESS:  I have written a

6       paper on the effect of ending

7       affirmative action policies in

8       Texas and California on the

9       probabilities that students send

10      their SATs to different colleges,

11      which would indirectly affect that,

12      what colleges can do, I guess.

13  BY MR. STRAWBRIDGE:

14      Q.    Am I right that that paper was

15  about basically analyzing applicant

16  behavior?

17      A.    Yes.

18      Q.    It wasn't -- it wasn't about

19  analyzing what colleges did with those

20  applications once they were received, was

21  it?

22      A.    Well, indirectly.  There are

23  -- there are figures and tables in that

24  paper which show the changes in admission

Highly Confidential Attorneys' Eyes Only

Page 29

1                    D. Card

2    rates of different groups.  So it has

3    evidence on that.

4         Q.    Did you -- did you purport in

5    that paper to analyze the strength of

6    various factors that were actually used

7    by the Admissions Department in deciding

8    who to admit and who to reject?

9         A.    Well, indirectly I -- I guess

10   it does show that because it has changes

11   in admission rates of different racial

12   groups as a result of the end of

13   affirmative action policies.

14        Q.    Did you build a multivariate

15   logit model to analyze the admissions

16   processes for the universities that were

17   the subject of that study?

18        A.    No.

19        Q.    You just basically reported

20   how the -- how the rates of -- the

21   admission rates of various groups changed

22   in two different periods of time?

23        A.    Among other things, yeah.

24        Q.    What else?

25        A.    Well, there was many

                    D. Card

1  institutions involved and there was

2  multiple periods before and after.

3      Q.    But until this case, I guess

4  what I'm getting at, is have you ever

5  been involved in the creation of a -- of

6  a -- of a multivariate logit model to

7  estimate the effects of factors on

8  college admissions decisions?

9      A.    I don't believe so, no.

10     Q.    On -- have -- and I guess

11 because my earlier questions were about

12 papers you have written, I assume that

13 your answer that you haven't built that

14 kind of a model to measure the effect on

15 college admissions of various factors

16 necessarily means you haven't published

17 any papers on that question either?

18         MS. ELLSWORTH:  Object to the

19         form.

20         THE WITNESS:  Well, if I

21         haven't written them, they haven't

22         published them, yes, that's

23         correct.

24 BY MR. STRAWBRIDGE:

Highly Confidential Attorneys' Eyes Only

Page 47

D. Card

1
2    should exclude any other variables based
3    on the potential that race was affecting
4    them?
5        A.    I -- when I was finishing my
6    -- in the process of trying to finish my
7    rebuttal report, it was very clear that
8    there were a number of disagreements
9    between Professor Arcidiacono and me on a
10   couple of issues.
11             And so I -- I was able to ask
12   Dean Fitzsimmons directly in a telephone
13   conversation if race was involved in the
14   personal rating, for example, and he said
15   no.
16       Q.    Did you do anything to verify
17   his testimony?
18             MS. ELLSWORTH:  Object to the
19       form.
20             THE WITNESS:  No.
21   BY MR. STRAWBRIDGE:
22       Q.    You're familiar with what it
23   means to interact a variable in the
24   multivariate logit model?
25       A.    In general terms, yes.

Highly Confidential Attorneys' Eyes Only

Page 53

1                     D. Card

2      a difference in a model?

3                 MS. ELLSWORTH:  Sorry.  Object

4          to the form.

5                 THE WITNESS:  Well, I think I

6          just showed that it does make a

7          small difference.  So I think

8          that's self-evident from what I

9          just said.

10     BY MR. STRAWBRIDGE:

11         Q.    You and Professor Arcidiacono,

12     I think you just acknowledged, you made

13     some adjustments to your models after

14     reviewing each others' reports in this

15     case?

16         A.    Yes.

17         Q.    Okay.  For example, in your

18     rebuttal report you adopted Professor

19     Arcidiacono's ratings methodology?

20         A.    Yes.

21         Q.    That had the effect of

22     dropping many, but not all, of the

23     perfect predictions from your model?

24         A.    Yes.

25         Q.    Do you know about how many

Highly Confidential Attorneys' Eyes Only

Page 54

1            D. Card

2   perfect predictions are still in your

3   model, even after making that change?

4        A.    No, not precisely.  There is

5   some perfect predictions that are perfect

6   predict admits, so some people who would

7   be predicted to get in with 100 percent

8   probability, and there is some who would

9   be predicted to not get in with

10   100 percent probability.

11        Q.    Do you know what the relative

12   breakdown is between the perfect predicts

13   of admission and the perfect predicts of

14   rejection?

15            MS. ELLSWORTH:  Object to the

16        form.

17            THE WITNESS:  Not precisely,

18        no.

19            (Card Deposition Exhibit 7,

20   New Hard Models printout, was marked

21   for identification.)

22   BY MR. STRAWBRIDGE:

23        Q.    I have handed you what has

24   been marked as Exhibit 7.  I will

25   represent to you that this is information

Page 55

                    D. Card

1

2    that's taken from your workpaper that

3    just shows the number of perfect

4    predictions both for admits and rejects

5    in your new model versus your old model.

6              And I will also note for the

7    record, and apologize that this should

8    have been printed landscape form, so you

9    kind of have to tear the two pages apart

10   and hold them next to each other to read

11   the exhibit.

12             If you flip over, if you are

13   looking for the final in the old models,

14   you have to flip over the page.

15        A.    Okay.

16        Q.    Sorry about that.  Do you have

17   any reason to doubt that these numbers

18   accurately reflect the number of perfect

19   predictions in your models?

20        A.    If it is accurately taken from

21   my workpaper, then it is correct, yeah.

22        Q.    I will represent that it has

23   been.

24        A.    Okay.

25        Q.    Certainly if that's wrong, I'm

1                      D. Card

2    sure the folks on the other side of the

3    table will let us know.

4              But this indicates that for

5    the old models that you used, that a

6    number of perfect predictions was 29,445

7    perfect predictions of reject; is that

8    right?

9         A.    Right.

10        Q.    And 527 perfect predictions of

11   admit?

12        A.    Correct.

13        Q.    And in the new model, the

14   number of perfect predictions of reject

15   is 5,675?

16        A.    Yes.

17        Q.    And the number of perfect

18   predictions of admit is one.

19        A.    Right.

20        Q.    So that shows that the vast

21   majority of perfect predictions both in

22   your old model and in your new model, if

23   this is accurate, were for rejects,

24   correct?

25        A.    Correct.

Highly Confidential Attorneys' Eyes Only

1                    D. Card

2       Q.    You also updated your model to

3   incorporate the activity variables for

4   extracurricular activities that Professor

5   Arcidiacono used?

6       A.    In one of the robustness

7   analysis, I did, I used his preferred

8   measures, yes.  This would be Exhibit 16

9   of my rebuttal report.

10      Q.    And is it your testimony that

11  that adjustment is -- is in your new

12  preferred model or only for one of the

13  robustness models?

14          MS. ELLSWORTH:  Object to the

15      form.

16          THE WITNESS:  I believe that

17      the full set of his preferred

18      specification is -- is in

19      Exhibit 16, his robustness

20      analysis.

21  BY MR. STRAWBRIDGE:

22      Q.    Did -- do any -- strike that.

23          Professor Arcidiacono's models

24  in both his first report and his second

25  report include two different samples,

Highly Confidential Attorneys' Eyes Only

Page 63

1                    D. Card

2          any difference for the statistical

3          analysis, so.

4    BY MR. STRAWBRIDGE:

5          Q.    And athletes is the only group

6    that you do that for?

7          A.    Yes.

8          Q.    Okay.  And the reason why, and

9    I guess you say it right -- right --

10   right here in footnote 97, that your

11   understanding is that recruited athletes

12   are part of the same admissions process

13   as all other applicants.  Is that

14   correct?

15         A.    Yes.

16         Q.    I'm sorry, before we go there,

17   let me just ask:  Other than this model

18   that you are referencing in footnote 97,

19   you don't do any other modeling in either

20   of your reports that looks separately at

21   the non-ALDC population from the ALDC

22   population?

23         A.    No, because as I explain in my

24   original report and, again, in my

25   rebuttal report, I believe that there is

Highly Confidential Attorneys' Eyes Only

Page 64

                    D. Card

1    a variety of evidence from the

2    documentary -- or from the evidence from

3    the depositions and from the other

4    sources, including my direct query to the

5    dean by telephone.

6             But also there is a question

7    that was asked that shows up on a web

8    site, asking about whether athletes at

9    Harvard are part of the regular

10   admissions process.

11            Anyway, my understanding is

12   that these four groups are all part of

13   the regular admissions process.

14   Q.   And when you say on the web

15   site, whose web site do you mean?

16   A.   I believe it was on the

17   Harvard admissions web site.

18   Q.   And the dean himself told you

19   that they are part of the regular

20   admissions process?

21            MS. ELLSWORTH:  Object to the

22       form.

23            THE WITNESS:  I asked him if

24       they were.  He said they were.

Highly Confidential Attorneys' Eyes Only

Page 99

1                    D. Card

2        Q.    And from that baseline, you

3    then do a number of simulations that

4    analyze the effect of various

5    race-neutral alternatives, correct?

6        A.    Correct.  I do the kind of

7    simulations that have been done in the

8    literature before and that Professor

9    Arcidiacono performs for Mr. Kahlenberg

10   as well, yeah.

11       Q.    And, in fact, your method

12   closely follows that used by Mr.

13   Kahlenberg, assisted by Professor

14   Arcidiacono.  Right?

15       A.    Right, but this is a method

16   that is pretty standard in the literature

17   and was used by several of the other

18   papers in the area.

19       Q.    There were two key

20   differences, I think, between your

21   approach with -- between your approach

22   and those of Mr. Kahlenberg's, at least

23   in your initial report?

24            MS. ELLSWORTH:  Object to the

25       form.

Highly Confidential Attorneys' Eyes Only

Page 123

                          D. Card

1

2        Q.      But in your -- I guess I just

3   -- I just want to understand.  You're on

4   record as saying that this doesn't, this

5   simulation, does a poor job of generating

6   racial diversity.

7              Do you think it does a poor

8   job of generating socioeconomic

9   diversity?

10              MS. ELLSWORTH:  Objection.

11              THE WITNESS:  Well, the

12        difference is that these are the

13        categories of race that I'm using

14        in this analysis.

15              Now, there are other

16        categories of race, but -- and

17        other ways of counting, for

18        example, who is Asian American or

19        who is African American.

20              But in socioeconomic

21        diversity, for instance, I have, in

22        my preferred specification of the

23        model, I would like to take account

24        of, in the admissions process, I

25        would really like to take account

Highly Confidential Attorneys' Eyes Only

Page 124

                    D. Card

1       of parental occupation.  You might

2       also want to take account of

3       parental education.

4           So socioeconomic status is a

5       very, very broad category, very

6       important for understanding things.

7           These are the categories that

8       I was able to come up with quickly,

9       but -- in this analysis, come up

10      with in this analysis, but you

11      could -- I would be reluctant to

12      make an assessment of socioeconomic

13      diversity just on these four

14      numbers.

15  BY MR. STRAWBRIDGE:

16      Q.   So basically the size of the

17  increases here are not sufficient to

18  convince you that this scenario does a

19  good job of increasing socioeconomic

20  diversity?

21          MS. ELLSWORTH:  Objection,

22      asked and answered.

23  BY MR. STRAWBRIDGE:

24      Q.   That's your testimony?

Highly Confidential Attorneys' Eyes Only

Page 147

                        D. Card

1

2     BY MR. STRAWBRIDGE:

3          Q.    And, again, I'm just staying

4     in paragraph 192.

5          A.    He eliminates the preferences,

6     yeah, and he changes the -- the four SES

7     characteristics slightly.

8          Q.    Right.  And you determined

9     that these simulations, you know, as he

10    -- as he -- as he makes those

11    adjustments, are insufficient because the

12    race-neutral alternative "produces a

13    class that is different from the current

14    class in the dimensions I understand

15    Harvard cares about."

16           That's in paragraph 195,

17    correct?

18         A.    Yes, that's what I say, yes.

19         Q.    All right.  So looking at the

20    Exhibit 26 in your report.

21         A.    Okay.

22         Q.    Which differences in your view

23    render this as insufficient because it

24    produces a class that is different from

25    the current class in dimensions that you

Highly Confidential Attorneys' Eyes Only

Page 152

                        D. Card

1

2    Q.    It's 26 percent compared to

3    the 30 percent drop that you termed as

4    dramatic, correct?

5    A.    Right.

6    Q.    But, again, do you -- do you

7    have a -- do you have any understanding

8    of what difference would be acceptable to

9    Harvard, even if it were a decline in any

10   of these racial categories?

11           MS. ELLSWORTH:  Object to the

12       form.

13           THE WITNESS:  No.

14   BY MR. STRAWBRIDGE:

15   Q.    And you don't have a personal

16   understanding as to what you think is an

17   acceptable or not acceptable decline for

18   purposes of a race-neutral alternative?

19           MS. ELLSWORTH:  Object to the

20       form.

21           THE WITNESS:  No.

22   BY MR. STRAWBRIDGE:

23   Q.    Did the committee tell you

24   that an African American class that

25   represents 10 percent of the admitted

Highly Confidential Attorneys' Eyes Only

Page 180

1                    D. Card

2    table?

3         A.    So if we look in my Exhibit

4    13.

5         Q.    Your Exhibit 13?

6         A.    Um-hum.  We can see how

7    starting with -- with my model at the

8    bottom, now this is -- already I'm

9    including ALDCs in my analysis, how the

10   effect of interactions and personal

11   rating and so on, of parental occupation,

12   changes the -- changes the coefficients

13   in my model and gets you from my model to

14   Professor Arcidiacono's model.

15        Q.    Right.  Do you actually cite

16   Table 4.2N anywhere in your rebuttal

17   report?

18        A.    I can't say for sure I do cite

19   that table directly, but I cite or

20   address each of the issues, I think, that

21   he is trying to address here.

22        Q.    Setting aside the

23   disagreements that I know you have with

24   Professor Arcidiacono about his modeling

25   choices, anywhere in your expert report

Highly Confidential Attorneys' Eyes Only

Page 181

```
1                    D. Card

2    do you challenge the calculations on

3    Table 4.2N?

4              MS. ELLSWORTH:  Object to the

5         form.

6              THE WITNESS:  So, in other

7         words, you're asking me if we took

8         what Professor Arcidiacono says is

9         his model and estimated it the way

10        he says he's doing it here, you

11        would get these numbers?

12   BY MR. STRAWBRIDGE:

13        Q.    Right.

14        A.    Yes, I believe that's correct.

15        Q.    I mean, do you think he is

16   misstating his model?  Not -- not do you

17   disagree with his modeling decisions, but

18   do you think he is not actually

19   reflecting -- do you think his

20   calculations somehow reflect a

21   misunderstanding of his own model?

22              MS. ELLSWORTH:  Object to the

23        form.

24              THE WITNESS:  Well, this is

25        not his model.  This is his
```

Highly Confidential Attorneys' Eyes Only

Page 182

1                    D. Card

2          adjustments to my model in my

3          original report.

4    BY MR. STRAWBRIDGE:

5          Q.    Thank you.  Thank you.  That's

6    correct.  So I guess my question is do

7    you think he is misstating your -- you

8    referred to his understanding of the

9    model.  Like I guess my question is do

10   you think that, setting aside the

11   modeling choices, there's something in

12   here that makes the calculations

13   incorrect because he is not accurately

14   reflecting the data that underlies your

15   model?

16         A.    I think these calculations are

17   correct.  I would have to read carefully

18   to understand if these -- if his row

19   descriptions are a complete description

20   of everything he has done, but my

21   understanding, for example, row 1, tells

22   us that right from the beginning, this is

23   different than my -- the model in my

24   original report because he has excluded

25   the ALDCs.  And then row 2 says he is

Highly Confidential Attorneys' Eyes Only

Page 183

                        D. Card

1    doing interactions and so on.

2         Q.    Right.  But he didn't -- he

3    didn't, as far as you know, and I guess

4    your report doesn't contain any challenge

5    to the calculations of the numbers that

6    are reported here?

7         A.    I don't believe we found any

8    errors in this, I found any errors in

9    this calculation, no.

10        Q.    Okay.  You mention the fact

11   that you do what you call a robustness

12   analysis.  And that's set forth in

13   Exhibits 14 through 16 of your report or

14   18 of your report, rebuttal report?

15        A.    And sometimes in the footnotes

16   and other places, yes.

17        Q.    Right.  So let me just ask you

18   about Exhibit 13, which you just referred

19   to.

20        A.    Yes.

21        Q.    This is -- this is -- this is

22   a chart in which you purport to

23   demonstrate that if you make adjustments

24   to Professor Arcidiacono's model, it has

Highly Confidential Attorneys' Eyes Only

                          D. Card

1
      A.    Yes.

2
      Q.    And that is, in fact, what

3
this exhibit suggests, correct?

4

5
      A.    Yes.

6
      Q.    Okay.  Did you ever construct

7
a model of the personal rating in either

8
of your reports?

9
      A.    No.

10
      Q.    You referred several times to

11
Professor Arcidiacono's model, but you

12
did not do your own model of personal

13
rating, correct?

14
      A.    Correct.

15
      Q.    And is that because you felt

16
that there was not enough observables in

17
the data to estimate a reliable model of

18
the personal rating?

19
      A.    I personally felt like we

20
could use the personal rating and the

21
academic rating and the extracurricular

22
rating as ratings.  We could include the

23
other variables, some of the other

24
variables that go into the determination

25
of those ratings, and that it would be

Highly Confidential Attorneys' Eyes Only

Page 272

1                    D. Card

2    BY MR. STRAWBRIDGE:

3         Q.    But it could also be because

4    of racial bias?

5              MS. ELLSWORTH:  Object to the

6         form.

7              THE WITNESS:  Well, I can't

8         actually rule that out.

9    BY MR. STRAWBRIDGE:

10        Q.    Can you come up with a logical

11   explanation as to why the essays would

12   explain that difference?

13             MS. ELLSWORTH:  Objection.

14             THE WITNESS:  No.  I haven't

15        really given any thought to that.

16        I -- it's pretty standard in this

17        kind of statistical analysis to

18        have unobserved components and to

19        be carefully thinking about what

20        exactly is missing and how that

21        could potentially play a role, but

22        it's -- in my experience it isn't

23        always useful to speculate much

24        more beyond that, just other than

25        to notice that there are lots of

Highly Confidential Attorneys' Eyes Only

Page 277

D. Card

1  look at is Professor Arcidiacono's model,

2  correct?

3

4      A.    Correct, because I'm -- my

5  personal view is that we should use the

6  personal rating, rather than a model of

7  the personal rating.  You should take the

8  personal rating as given.

9      Q.    Because Dean Fitzsimmons told

10  you race doesn't affect it?

11          MS. ELLSWORTH:  Object to the

12      form.

13          THE WITNESS:  Well, because

14      among other pieces of evidence in

15      the records, it seems like the

16      general belief is that race is not

17      a component of a personal rating,

18      yeah.

19  BY MR. STRAWBRIDGE:

20      Q.    Do you think that -- do you

21  think that -- do you agree that there is

22  a gap in the personal ratings that white

23  applicants receive versus Asian

24  applicants?

25      A.    Yes.  Well, that's what we

Highly Confidential Attorneys' Eyes Only

Page 282

1                       D. Card

2       incentives of Harvard.

3              And I disagree with that type

4       of analysis -- that type of conclusion on

5       the basis of statistical evidence.

6              MR. STRAWBRIDGE:  Can we take

7          a short break?

8              MS. ELLSWORTH:  Okay.

9              THE VIDEO OPERATOR:  The time

10         is 3:13.  We are off the record.

11             (A recess was taken at

12      3:12ï¿½p.m., after which the deposition          39

13      resumed at 3:28 p.m.)

14             THE VIDEO OPERATOR:  The time

15         is 3:28.  We are back on the

16         record.

17      BY MR. STRAWBRIDGE:

18         Q.   Do you think that Asian

19      Americans on average have less attractive

20      personal qualities than white applicants

21      in Harvard's application pool?

22             MS. ELLSWORTH:  Objection.

23         Are you asking for a personal

24         opinion?

25             MR. STRAWBRIDGE:  No.

Highly Confidential Attorneys' Eyes Only

Page 283

```
 1                    D. Card
 2          THE WITNESS:  I have no way of
 3       knowing that.
 4   BY MR. STRAWBRIDGE:
 5       Q.   Can you think of -- do you
 6   have any reason to believe that Asian
 7   Americans are not as effervescent as
 8   whites in Harvard's applicant pool?
 9          MS. ELLSWORTH:  Objection.
10          THE WITNESS:  I have no way of
11       knowing that.
12   BY MR. STRAWBRIDGE:
13       Q.   So it could be true?
14          MS. ELLSWORTH:  Objection.
15          THE WITNESS:  May or may not
16       be true.
17   BY MR. STRAWBRIDGE:
18       Q.   It is one possible explanation
19   for the difference in their personal
20   ratings?
21          MS. ELLSWORTH:  Object to the
22       form.
23          THE WITNESS:  Well, if -- if
24       effervescence was, indeed, a
25       significant determinative personal
```

Highly Confidential Attorneys' Eyes Only

Page 284

D. Card

1
2      rating conditional on the other

3      factors then -- and you could

4      measure effervescence and you found

5      that, I guess I would -- then I

6      would say, well, you found that and

7      I would agree with it, but no one

8      has done that exercise so I don't

9      really know what to say.

10   BY MR. STRAWBRIDGE:

11        Q.    Well, someone's assigned

12   personal ratings to all of the

13   applicants?

14        A.    They are, yes.

15        Q.    Right.  So I am just asking,

16   do you -- do you think that an

17   explanation for the gap in the personal

18   ratings between Asian Americans and white

19   applicants is a lack of effervescence in

20   the Asian American pool?

21             MS. ELLSWORTH:  Object to the

22        form.

23             THE WITNESS:  I think the --

24        my understanding is that the

25        readers look for something they

Highly Confidential Attorneys' Eyes Only

Page 285

1                    D. Card

2          call personal qualities.  And I

3          don't exactly know what those are,

4          but they -- they talk about that in

5          some of the materials I've seen.

6                And so I think that what I

7          would probably believe to be true

8          is that they see slightly fewer

9          personal qualities conditional on

10         academic qualities.  Again, this is

11         all conditional on academic

12         qualities.

13    BY MR. STRAWBRIDGE:

14         Q.    And why do you think that's

15    the case?

16         A.    I don't know exactly.

17         Q.    Well, you can't rule out the

18    fact that it is racial bias.  What other

19    explanation could there be for why the

20    white applicants in Harvard's pool

21    receive higher personal ratings than the

22    Asian American applicants?

23              MS. ELLSWORTH:  Objection.

24              THE WITNESS:  I don't really

25         -- I haven't really given that any

Page 286

1                       D. Card

2        thought directly.

3    BY MR. STRAWBRIDGE:

4        Q.    Isn't that the entire question

5    that we need to answer when we decide

6    whether the personal ratings should be

7    included in the model?

8                 MS. ELLSWORTH:  Object to the

9           form.

10                THE WITNESS:  No, not at all,

11          because we see a difference between

12          Asian applicants and white

13          applicants in their extracurricular

14          rating and their academic rating,

15          statistically significant positive

16          gap.

17                I don't think that -- and, in

18          fact, I would never conclude that

19          that means that there is positive

20          racial bias in favor of Asian

21          applicants.  So the presence of a

22          significant coefficient doesn't say

23          that there is a racial animus

24          against whites in the assignment of

25          academic credentials.

Highly Confidential Attorneys' Eyes Only

D. Card

1  break, one question would be:  Do Asian
2  Americans as a whole have higher or lower
3  or the same personal qualities as, say,
4  white Americans?
5
6          But that's not really what's
7  relevant for my statistical model.  And I
8  -- my interpretation of how someone might
9  answer that would be they might be
10  thinking, well, as a whole, they are the
11  same, but when I'm assigning the personal
12  rating, what's relevant is I have got
13  some of these characteristics that I can
14  see, and some that I can't.  There is a
15  deficit on some of the ones that I can't
16  see.
17          So that could contribute to a
18  negative coefficient for Asians in that
19  assignment, just as there must be some or
20  there -- my interpretation is there must
21  be some unobserved characteristics of the
22  academic credentials of Asian Americans,
23  conditional on this broad set of other
24  academic qualities that we can observe in
25  the data and that Professor Arcidiacono

                        D. Card

1

2        A.    Let me look at my -- the

3    appendix -- you don't have tabs on

4    appendices here, so I am having a little

5    bit of trouble finding the right tabs.

6        Q.    If I told you it was 46, does

7    that number sound more or less correct?

8        A.    46 per year?

9        Q.    46 parental occupations.

10       A.    It seems to show in my

11   Exhibit 28 of my -- of my rebuttal report

12   that there is 28 categories -- 23

13   categories, excuse me.

14       Q.    23 categories for fathers,

15   right?

16       A.    Yes.

17       Q.    And 23 categories for mothers?

18       A.    Yes.

19       Q.    So that's 46, right?

20       A.    Correct.  And then there is

21   one omitted for each.

22       Q.    So 47?

23       A.    44.

24       Q.    48?

25       A.    44.

Highly Confidential Attorneys' Eyes Only

Page 315

                    D. Card

1    prevent them from performing a stronger

2    role as they would in the model, if I had

3    some measures that did not have that

4    misclassification error.

5        Q.    We discussed this earlier, but

6    I just want to make sure I understand.

7    When you were deciding to put the

8    parental occupations in, did you test for

9    statistical significance?

10       A.    I'm not entirely sure of

11   whether, at what stage of the analysis

12   that kind of exercise would have been

13   done, so I can't say for sure.

14       Q.    You don't dispute that some of

15   the parental occupation categories vary

16   substantially from year to year?

17            MS. ELLSWORTH:  Object to the

18            form.

19            THE WITNESS:  I don't dispute

20            that, for example, the category

21            unemployed disappears in some

22            years, and so one of the reasons --

23            or is much less frequent in some

24            years.

Highly Confidential Attorneys' Eyes Only

Page 320

                    D. Card

1
2    for each race, your model?

3        A.    No.

4        Q.    None of that is disclosed

5    anywhere in your report, I take it?

6        A.    That I --

7        Q.    There is no -- there is no

8    such estimations disclosed anywhere in

9    your report?

10            MS. ELLSWORTH:  Object to the

11        form.

12   BY MR. STRAWBRIDGE:

13        Q.    If you didn't do it, you

14   couldn't put it in your report?

15        A.    I believe that would be true.

16        Q.    It's not a trick question.

17   It's just late in the day.

18            Can you turn to Table 5.1N of

19   Mr. Arcidiacono's rebuttal report.

20        A.    Would this be in the text or

21   in the appendix?

22        Q.    It is page 47 of the report.

23        A.    Okay.

24        Q.    Did you in your rebuttal

25   report disclose any -- any dispute with

Highly Confidential Attorneys' Eyes Only

Page 321

                    D. Card

1    the calculations on this table?

3        A.    No, I don't think so.  No.

4        Q.    Is it also true with respect

5    to Table 5.2N, which is on page 50?

6        A.    I agree with the calculations

7    underlying this table, yeah.

8        Q.    And is that also true with

9    respect to 5.3N?

10            MS. ELLSWORTH:  What is the

11        question exactly?

12   BY MR. STRAWBRIDGE:

13        Q.    Does he have any dispute with

14    those calculations?

15            MS. ELLSWORTH:  Just want to

16        know if there is any dispute --

17            THE WITNESS:  I do have a

18        dispute with the calculation in

19        Table 5.3N, yes.

20   BY MR. STRAWBRIDGE:

21        Q.    Did you disclose that dispute

22    in your rebuttal report?

23        A.    No.

24        Q.    What is your dispute?

25        A.    Well, this gets to a question

Highly Confidential Attorneys' Eyes Only

Page 370

1                      D. Card

2          A.    Oh.  Yes.

3          Q.    So you conclude that the --

4     that given the years that you just

5     described and the different racial

6     categories, that the actual probability

7     of seeing a pattern over a three-year

8     period is about 17 percent?

9          A.    Assuming for the sake of

10    simplicity that there's a 0.2 chance that

11    the group's average rate matches the

12    average admission rate for other

13    applicants, so that would be the same

14    kind of calculation that he does, so

15    assume that number, then take the 92

16    combinations, that's what I did.

17         Q.    You earlier said you didn't

18    challenge that number, you hadn't

19    challenged that calculation?

20              MS. ELLSWORTH:  Object to the

21         form.

22              THE WITNESS:  That 0.2 is his

23         calculation, yes.

24    BY MR. STRAWBRIDGE:

25         Q.    The -- your calculation

Highly Confidential Attorneys' Eyes Only

Page 371

1          D. Card

2  assumes that each of those outcomes is

3  independent with one another?

4       A.    Yes.

5       Q.    Is that true?

6       A.    It would not be exactly true.

7  It would be -- it might be approximately

8  true, depending on the race group you are

9  thinking of.

10       Q.    What makes something

11  "approximately true"?

12       A.    Well, the actual calculation

13  for the permutations, I didn't try and

14  do.  I tried to do a simplified

15  calculation.  That's what I have done

16  here.

17       Q.    For example, you would agree,

18  right, that the Hispanic methodology

19  between IPEDS and the new methodology

20  does not differ?

21          MS. ELLSWORTH:  Object to the

22       form.

23          THE WITNESS:  No, I would

24       disagree with that.

25  BY MR. STRAWBRIDGE:

Page 378

1                    D. Card

2    one-pagers -- do you know what I mean by

3    a one-pager?

4         A.    I have a vague understanding

5    of what that is, yeah.

6         Q.    Have you seen any one-pagers

7    prepared by the admissions office during

8    the committee meeting process listing

9    IPED statistics before January 2013?

10             MS. ELLSWORTH:  Object to the

11        form.

12             THE WITNESS:  Repeat the

13        question again?

14   BY MR. STRAWBRIDGE:

15        Q.    Have you seen a one-pager

16   prepared by the admissions office during

17   the committee meeting process that lists

18   the IPED statistics prior to January

19   2013?

20             MS. ELLSWORTH:  Object to the

21        form.

22             THE WITNESS:  I have -- I have

23        only seen a couple of these forms,

24        and so I can't say I have done an

25        exhaustive search.  I was never

Highly Confidential Attorneys' Eyes Only

Page 379

                    D. Card

1                searching for that.  But I don't

2                believe I would have seen that.

3                    I believe the forms I looked

4                at are the ones that are referred

5                to in Professor Arcidiacono's

6                report.

7    BY MR. STRAWBRIDGE:

8                Q.    And you also referred to some

9        in some documents in your report, right?

10               A.    I did.

11               Q.    Have you -- did you see

12       Professor Arcidiacono's note that the

13       IPEDS' number was stored differently in

14       the admissions database as it was

15       produced to him before the 2017

16       admissions cycle versus after?

17               A.    I believe that there is a

18       different field that it is captured in,

19       that's right.

20               Q.    And your report doesn't

21       challenge the -- that statement in

22       Professor Arcidiacono's report?

23                    MS. ELLSWORTH:  Objection to

24               form.

Highly Confidential Attorneys' Eyes Only

Page 380

1                    D. Card

2          THE WITNESS:  I don't know

3      whether that field existed before,

4      but that's my understanding.  That

5      information has to be obtained from

6      a different field.

7  BY MR. STRAWBRIDGE:

8          Q.   You noted that there was a

9  calculation error in calculating the

10  standard error of his double difference

11  in chart 2.6N in your rebuttal report?

12          A.   Yes.

13          Q.   He has acknowledged that

14  error?

15          A.   Yes.

16          Q.   I will go ahead and mark the

17  supplemental report.

18              (Card Deposition Exhibit

19  14, Errata to Rebuttal Expert Report of

20  Peter S. Arcidiacono, was marked for

21  identification.)

22              THE WITNESS:  Yes.

23  BY MR. STRAWBRIDGE:

24          Q.   Do you dispute the math for

25  his new calculation for standard error?

Highly Confidential Attorneys' Eyes Only

Page 387

1   NAME OF CASE:

2   DATE OF DEPOSITION:

3   NAME OF WITNESS:

4   Reason Codes:

5          1.   To clarify the record.

6          2.   To conform to the facts.

7          3.   To correct transcription errors.

8   Page _____ Line _____ Reason _____

9   From _____ to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25                          _____

Highly Confidential Attorneys' Eyes Only

Page 387

1   NAME OF CASE: *SFFA v. Harvard*, D. Mass. 14-cv-14176

2   DATE OF DEPOSITION: **April 27, 2018**

3   NAME OF WITNESS: **David Card**

4   Reason Codes:

5        1.  To clarify the record.

6        2.  To conform to the facts.

7        3.  To correct transcription errors.

8   Page _____ Line _____ Reason _____

9   From **Please see attached errata sheet.** to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25                                _____

## April 27, 2018 Deposition of David Card – Errata Sheet

| Page | Line | Instruction | Reason for Change |
|------|------|-------------|-------------------|
| 34 | 14 | Change "into" to "of" | Clarification |
| 37 | 10-14 | Change "What – what we were showing was that children from – from black and Hispanic families were – of high academic ability – were" to "What we were showing was that children of high academic ability from black and Hispanic families were" | Clarification |
| 54 | 20 | Change "New Hard Models" to "New Card Models" | Mistranscription |
| 57 | 7 | Change "analysis" to "analyses" | Mistranscription |
| 67 | 7 | Change "it's a Canadian" to "as a Canadian" | Mistranscription |
| 81 | 7 | Change "the" to "an" | Clarification |
| 89 | 12 | Change "a fact" to "effect" | Mistranscription |
| 100 | 25 | Change "model was fed pooling" to "model was fit pooling" | Mistranscription |
| 101 | 21 | Change "class of always fitting" to "approach of always fitting" | Clarification |
| 107 | 10 | Change "score is not" to "score is, it is not" | Clarification |
| 118 | 11 | Change "Yes" to "Yes, 3.5 percentage points" | Clarification |
| 136 | 17 | Change "criteria, very important criteria" to "criterion, very important criterion" | Mistranscription |
| 148 | 23 | Change "unacceptable word" to "word unacceptable" | Clarification |
| 158 | 23-25 | Change "she is – she is defining – first of all, she is not – she is using as a sample, or as a" to "she is using a" | Clarification |
| 167 | 6 | Change "selectivity matric" to "selectivity matrix" | Mistranscription |
| 212 | 4 | Change "some more" to "similar" | Mistranscription |
| 274 | 13 | Change "attention to the committee" to "attention of the committee" | Clarification |
| 287 | 15 | Change "that that's" to "that" | Clarification |
| 291 | 3 | Change "rating scores and the – and the" to "rating scores and not the" | Clarification |
| 294 | 4 | Change "order probit" to "ordered logit" | Clarification |
| 294 | 6 | Change "indexes" to "indices" | Mistranscription |
| 297 | 8 | Change "coefficients" to "positive coefficients" | Clarification |
| 302 | 13 | Delete "sort of" | Clarification |

| 314 | 3 | Change "of complicated variable" to "of a complicated variable" | Clarification |
|---|---|---|---|
| 325 | 22 | Change "observable" to "unobservable" | Clarification |
| 363 | 7 | Change "IPEDS'" to "IPEDS" | Punctuation |