# EXHIBIT 8

# In The Matter Of:

*Students For Fair Admissions, Inc. v.*
*President and Fellows of Harvard College, et al.*

---

*Catherine Drew Gilpin Faust*

*March 10, 2017*

*Highly Confidential - For Attorneys Eyes Only*

---

*195 State Street • Boston, MA 02109*
*888.825.3376 - 617.399.0130*
*Global Solutions*
*court-reporting.com*



Original File Catherine Drew Gilpin Faust 3-10-17.txt

Min-U-Script® with Word Index

1        A.   No.

2        Q.   When were you appointed as president of

3    Harvard University?

4        A.   I took office on July 1st, 2007.

5        Q.   As president of the university, are you

6    ultimately responsible for all aspects of the

7    university's operations?

8        A.   Yes.

9        Q.   Does that include the admissions office?

10               MS. ELLSWORTH:   Objection.

11       A.   I'm ultimately responsible for the academic

12   and educational excellence of Harvard, for its

13   fiduciary strength and its reputational strength.

14       Q.   Do your oversight responsibilities extend to

15   the dean of the admissions office?

16       A.   Not directly, no.

17       Q.   Indirectly?

18       A.   I'm responsible for everything at Harvard.

19       Q.   Which would include admissions?

20       A.   I'm responsible for everything at Harvard.

21       Q.   You're aware that this case is brought as a

22   challenge to the legality of Harvard's admissions

23   practices?

24               MS. ELLSWORTH:   Objection.

1       Q.   Are you aware of that?

2       A.   I'm aware of the contents of the case.

3       Q.   Have you reviewed the complaint in this case?

4       A.   Yes, I have.

5       Q.   And so you understand that this case

6   challenges Harvard's decision to use as part of its

7   admissions decisions the race of applicants to the

8   university?

9       A.   I've read the complaint in the case.

10      Q.   So you're aware that it includes a challenge

11  to the legality of the use of race in the --

12      A.   Yes.

13      Q.   -- applications process?

14      A.   Yes, I am.

15      Q.   Undergraduate admissions?

16      A.   Yeah.

17      Q.   And do you support Harvard's use of race as a

18  factor in the admissions process?

19      A.   I support our admissions policy, yes.

20      Q.   Including the decision to use race as one of

21  the factors?

22      A.   Yes, I do.

23      Q.   And what is your understanding as to why

24  Harvard uses race as one of the factors in deciding

1    students who are diverse on a variety of realms so

2    that they play as important a part in educating one

3    another through their experience together as we play

4    in what we offer them within a classroom.

5        Q.   But I guess my question is:   Have the reasons

6    that you're using race changed since the Bakke

7    litigation?

8                MS. ELLSWORTH:   Objection.

9        A.   That's a question that's impossible to answer

10   because times have changed; people have changed.   The

11   Supreme Court has issued various statements about the

12   nature of what is required of us.   And so it's -- so

13   much has changed that it's hard to say that somebody

14   who operated in 1977 is operating with exactly the

15   same set of presumptions that somebody who's

16   operating in 2017 is operating with, so.

17       Q.   Is Harvard's use of race tied to an interest

18   in obtaining a critical mass of minority students on

19   campus?

20               MS. ELLSWORTH:   Objection.

21       A.   We approach our admissions process looking at

22   each individual student, assessing that student and

23   that student's potential contribution.   So what we

24   have in mind is the pathway to a class via individual

1   evaluations, not to some preset assumption about a

2   mass.

3       Q.   Are you familiar with the term "critical

4   mass" as it's used in some of the Supreme Court cases

5   governing the use of race in admissions?

6       A.   It's not a concept that I have studied.  And

7   certainly I've read it, but I don't understand the

8   legal documents.

9       Q.   Is it a concept that you've ever heard anyone

10  at Harvard discuss with respect to Harvard's

11  admissions rules?

12      A.   No.

13      Q.   Do I understand your testimony to be that

14  Harvard's admissions process is not concerned with

15  what the overall racial makeup of the class is?

16            MS. ELLSWORTH:   Objection.

17      A.   My understanding is that we want the most

18  diverse and exciting group of students over a wide

19  set of variables and that that is the foundation for

20  our admissions process.  Race is one of those

21  variables, but there are many others as well.

22      Q.   I guess my question is:  Is it your testimony

23  that Harvard has no interest in whether the

24  individual consideration of applications leads to any

1    dispositive factor in admissions?

2        A.   It prevents any single characteristic from

3    being dispositive.

4        Q.   Do you know --

5        A.   They are all seen in a broad context.

6        Q.   Do you know how -- do you know that -- what

7    do you know about the origin of Harvard's holistic

8    admissions process?

9        A.   I know it's been around for a long time.

10       Q.   Are you familiar with the work of Jerome

11   Karabel?

12       A.   Yes.

13       Q.   Are you familiar with his book The Chosen?

14       A.   I am.  I have not read it.  I know of it.

15       Q.   Are you -- are you generally aware that the

16   holistic admissions process was used for a time in

17   the 20th century to discriminate against Jewish

18   applicants?

19            MS. ELLSWORTH:  Objection.  I

20            object to the entire line of

21            questioning.

22            MR. STRAWBRIDGE:  The objection's

23            noted.

24       Q.   Do you know whether that's true?

1      A.   I'm a historian.   I would not rely on the

2   interpretation of a single historian unchallenged.   I

3   have not done that historical work myself, and

4   therefore I would not presume to make judgment about

5   its accuracy.

6      Q.   Do you know whether Harvard has ever

7   acknowledged that its holistic admissions process was

8   used to discriminate against Jewish applicants in the

9   early 20th century?

10                MS. ELLSWORTH:   Objection.

11      A.   I do not know.

12      Q.   Okay.   Do you know whether prior Harvard

13   presidents have acknowledged that the use of a

14   holistic admissions process was inappropriate with

15   respect to Jewish applicants during the 20th century?

16                MS. ELLSWORTH:   Objection.

17      A.   I do not know.

18      Q.   Do you agree that it would be inappropriate

19   to use a holistic admissions process to discriminate

20   against Jewish applicants, for example?

21                MS. ELLSWORTH:   Objection.

22      A.   I believe that the holistic admissions

23   process is one that, by looking at the whole student

24   and the variety of dimensions that make up a class,

1      A.  Yes, I did.

2      Q.  From when?

3      A.  I arrived at Harvard in January of 2001.

4      Q.  And do you think that racial relations on

5  campus are better today than in 2001, when you

6  arrived?

7                   MS. ELLSWORTH:  Objection.

8      A.  Yes, I do.

9      Q.  And why do you think that?

10     A.  The same reason:  I think people are more

11  comfortable being here; groups are more willing to

12  claim their place at Harvard.

13     Q.  Do you know whether -- strike that.

14          Since you have become president of Harvard,

15  has Harvard reconsidered whether it should use race

16  in the admissions process or not?

17     A.  We've had a number of discussions and

18  considerations of issues relating to race and

19  challenged ourselves to fully understand and

20  communicate the principles on which we base our

21  commitment to diversity.

22     Q.  And so has -- has part of those discussions

23  been whether or not Harvard should stop using race in

24  the admissions process?

1          MS. ELLSWORTH:   Objection.

2     A.   The conversations have been broad, and we've

3  talked about why diversity is important to us and how

4  we achieve it.

5     Q.   Has there been any discussion about going to

6  an admissions process that does not take into account

7  the race of a student?

8          MS. ELLSWORTH:   Objection.

9     A.   Not explicitly.

10    Q.   Implicitly?

11    A.   We've talked about understanding how our

12 admissions process works and why our goals are for a

13 diverse student body.

14    Q.   But as part of those discussions, nobody has

15 ever -- has anybody ever asked the question as to

16 whether or not Harvard should just simply stop using

17 race?

18          MS. ELLSWORTH:   Objection.

19    A.   Not directly, to my knowledge.

20    Q.   When you say that there have been various

21 discussions, are these formal or informal

22 discussions?

23    A.   Both.

24    Q.   Okay.  Let's start with the formal

1      Q.  Do you think that -- do you think that the

2   explicit consideration of race in the admissions

3   process is the only way a college can achieve

4   diversity on its campus?

5              MS. ELLSWORTH:  Objection.

6      A.  I think it's been a very effective way.

7      Q.  Do you think it's the only way?

8              MS. ELLSWORTH:  Objection.

9      A.  It's the way we have followed and committed

10   ourselves to, and it's worked extremely well.

11      Q.  Have you ever asked whether it's the only

12   way?

13              MS. ELLSWORTH:  Objection.

14      A.  We certainly have made efforts to broaden our

15   pool, broaden access.  We've dramatically extended

16   financial aid over the last decade or so to reinforce

17   the kinds of diversity and the presence of diversity

18   in our applicant pool.

19      Q.  Have you ever discussed ways in which

20   colleges seek to obtain diversity, other colleges,

21   without the explicit use of race?

22              MS. ELLSWORTH:  Objection.

23      A.  I'm aware of some of those.

24      Q.  Have you ever discussed them with people at

```
 1   Harvard as to whether or not that was an option for

 2   Harvard?

 3        A.   Not explicitly as an option for Harvard.

 4        Q.   Have you ever implicitly discussed as to

 5   whether it's an option with Harvard?

 6             MS. ELLSWORTH:   Objection.

 7        A.   No.

 8        Q.   Have you ever thought to yourself that it was

 9   something that was worth exploring as to whether it

10   was an option at Harvard?

11             MS. ELLSWORTH:   Objection.

12        A.   The mechanisms that I'm aware of would simply

13   not work at Harvard.

14        Q.   And why?  What mechanisms are you talking

15   about?

16        A.   Texas takes top 10 percent of every high

17   school in Texas.  This would not work for Harvard.

18        Q.   Why not?

19             MS. ELLSWORTH:   Objection.

20        A.   Would we take the top 10 percent of every

21   high school in the United States?  That's one

22   question.  Secondly, it completely obliterates the

23   holistic commitments that we have at looking at more

24   than simply grade point average or an academic
```

1    those two things.

2        Q.   Maybe there isn't a difference between those

3    two things.

4            You don't know whether you had any

5    discussions or not?

6        A.   I have no recollection of the content of

7    discussions of graduate admissions.

8        Q.   And so before becoming president of Harvard,

9    you never had any responsibility with respect to

10   undergraduate admissions at any of your prior jobs?

11       A.   That's correct.

12       Q.   What specifically are your responsibilities

13   with respect to the Office of Admissions at Harvard?

14       A.   I'm the president of the university.   I'm

15   responsible for the elements that we described at the

16   outset.

17       Q.   Do you know who the dean of admissions at

18   Harvard is?

19              MS. ELLSWORTH:   Objection.

20       A.   I do.

21       Q.   And who's that?

22       A.   William Fitzsimmons.

23       Q.   Okay.   Does he report directly to you?

24       A.   No, he doesn't.

1      Q.   Okay.   Who does he report to?

2      A.   He reports to Dean Mike Smith in the Faculty

3   of Arts & Sciences.

4      Q.   All right.   And then does Mike Smith report

5   directly to you?

6      A.   Yes, he does.

7      Q.   And who do you report to?

8      A.   I report to the Harvard Corporation.

9      Q.   And am I correct in saying that Harvard has

10   two boards that essentially oversee parts of its

11   responsibilities?

12      A.   That's correct.

13      Q.   Can you tell me the difference between the

14   two boards?

15               MR. WAXMAN:   How long do you have?

16      Sorry.

17      A.   It's a matter of considerable confusion.   The

18   corporation is the major fiduciary board that

19   operates with the advice and consent on certain

20   elements of its mission, such as approval of the

21   president, when that president is appointed, of the

22   Overseers.

23      Q.   And the Overseers is the other board --

24      A.   Yes.

1      Q.  -- that's next to the corporation board?

2      A.  Yes.

3      Q.  Okay.  And the Overseers serves in an advice

4   and consent role sometimes to the -- to the

5   corporation board?

6      A.  Yes.  And consistent with their name,

7   Overseers, they also undertake a series of oversights

8   of programs and schools and report on those

9   evaluations.

10     Q.  Do any of those boards exercise oversight

11  regarding Harvard's admissions policies?

12            MS. ELLSWORTH:  Objection.

13     A.  Insofar as the corporation is the -- has the

14  broad oversight of the whole university, admissions

15  would be part of that broad oversight.

16     Q.  And would the corporation board have the

17  power, if it so desired, to make changes to the

18  admissions policies at Harvard?

19     A.  It could.

20     Q.  Do you report on admissions information to

21  either of the boards?

22     A.  Not on a regular basis apart from the general

23  report that is composed by the dean of admissions

24  shared with the boards.

1    those materials have been compiled and before the

2    meeting so that, in case I have any questions about

3    them.

4        Q.   Besides meetings that relate to the

5    admissions of Ivy League athletes, do you have

6    meetings with Dean Fitzsimmons about the admissions

7    process?

8        A.   I've had occasional meetings with him about

9    specific issues, but I don't regularly meet with him.

10       Q.   Can you tell me what -- what types of issues

11   you have met with him about?

12       A.   For example, when we were proposing to expand

13   our financial aid program, we met and looked at the

14   analytics and decided what the right shape of that

15   expansion should be.  A second time or -- a set of

16   occasions that I met with him was around the shift

17   back to early action.  A third recent time, set of

18   occasions, and there -- I think there were two

19   meetings related to this, we introduced a new program

20   called startup grants that would add to the resources

21   available to our students who have least financial

22   means to just give them a little more wherewithal

23   when they arrived to spend on things like going to

24   the movies or whatever.  So we talked about adding

1    that to the financial aid package.  So those were the

2    three -- those are three occasions when I met with

3    Dean Fitzsimmons.

4        Q.  When you say analytics with respect to when

5    you were meaning to expand financial aid, what do you

6    mean by "analytics"?

7        A.  If we -- the program that we put in place

8    said that for certain families under a certain

9    income, there would be no parental contribution.  It

10   said that up to a certain income, we would anticipate

11   a family with average wealth or ordinary wealth would

12   not pay more than 10 percent of their income.  And so

13   we wanted to know what students are we targeting with

14   this, what would it cost us, how should we shape the

15   program, what were the right cutoffs, all of that.

16       Q.  Does -- was that information prepared by the

17   admissions office?

18                MS. ELLSWORTH:  Objection.

19       A.  It's my understanding that it was prepared by

20   a combination of the admissions office and the Office

21   of Institutional Research.  They work very closely

22   together.

23       Q.  What is the Office of Institutional Research?

24       A.  It's an office within the provost's office

1   that does data analytics on whatever dimension of

2   Harvard we need data analytics on.

3        Q.   Has it in the past prepared analytics

4   regarding the admissions and financial aid policies

5   of the university?

6        A.   Yes, it has.

7        Q.   Have you reviewed those reports before?

8        A.   Those are the ones that I've described here.

9        Q.   Do you recall any meetings with Dean

10  Fitzsimmons to discuss the use of race in the

11  admissions process?

12       A.   Apart from issues relating to the

13  litigation --

14            MS. ELLSWORTH:  So I'll remind the

15            witness not to discuss anything --

16            discussions in the presence of counsel

17            or at the direction of counsel.

18            Otherwise, if you can answer, you may.

19       A.   Otherwise not.

20       Q.   Okay.  And to clarify, I think -- I think you

21  can disclose or you can answer questions about the

22  occurrence of meetings as long as you don't describe

23  the contents of any discussions of those meetings.

24            MS. ELLSWORTH:  If you can answer

1          MS. ELLSWORTH:   Objection.

2     A.   These are usually responded to with a form

3 letter that says, "The president doesn't involve --

4 get involved in admissions, but I'm forwarding this

5 to the admissions office."

6     Q.   And does the fact that the request was made

7 of your office, does that play any role in the

8 consideration of an applicant for admission?

9          MS. ELLSWORTH:   Objection.

10    A.   That would be a question the admissions

11 office would have to respond to.

12    Q.   Do you know whether the admissions office

13 accords it any significance if a request came to you

14 about the admission of a particular applicant?

15    A.   You would have to ask the admissions office

16 how it handles these.

17    Q.   You don't know?

18    A.   I don't know.

19    Q.   Do you know whether admissions decisions are

20 sometimes made on the basis of large financial

21 contributions to Harvard?

22         MS. ELLSWORTH:   Objection.

23    A.   I know that the admissions office is aware --

24 is made aware of when donors are involved in the

1    admissions process, yes.

2        Q.   And do you know whether that sometimes makes

3    a difference in the admissions decision?

4                  MS. ELLSWORTH:   Objection.

5        A.   I don't know exactly how those are taken into

6    account.

7        Q.   But you are aware that sometimes it is taken

8    into account?

9                  MS. ELLSWORTH:   Objection.

10       A.   It's a piece of information that is

11   considered together with all the others.

12       Q.   Do you know how -- how -- strike that.

13           Is it your testimony that you don't know how

14   big of a -- how much weight that information is given

15   in the admissions process?

16       A.   That's correct, I don't know how much weight.

17       Q.   Have you ever involved yourself in any

18   discussions about how much weight should be given to

19   that information?

20       A.   No, I have not.

21       Q.   Either generally or with a specific

22   applicant?

23       A.   No, I have not.

24       Q.   What about -- what about legacy status?  Do







1             MS. ELLSWORTH:   Objection.

2       A.   Saying it's a social construct does not mean

3   it's socially constructed individually by every human

4   being.  A social construct is a shared perception

5   that has elements that extend well beyond the

6   experience of a single individual.

7       Q.   A shared perception by who?

8       A.   A social construct means that it's shared in

9   society.

10       Q.   Or among -- among groups of similarly

11   situated people?

12             MS. ELLSWORTH:   Objection.

13       A.   Shared in society, socially constructed.

14       Q.   Do you think that the members of the Harvard

15   student body have common perceptions themselves about

16   other racial groups?

17       A.   I think the perceptions vary considerably,

18   but I think those perceptions are also shaped by a

19   history and a set of experiences that have built the

20   society in which we currently find ourselves.

21       Q.   Do you think a particular level of

22   representation is required in order to counteract any

23   of those shared perceptions amongst society?

24             MS. ELLSWORTH:   Objection.

1      A.   I don't think any particular designated level

2   of presence is -- is the -- is required.

3      Q.   For any individual student or applicant, do

4   you think knowing information about their race tells

5   you anything about their perspective?

6              MS. ELLSWORTH:   Objection.

7      A.   I think knowing about an individual's race is

8   one element in understanding the variety of factors

9   that have influenced that individual's development.

10     Q.   Do you think by itself it tells you anything

11  about any individual applicant?

12             MS. ELLSWORTH:   Objection.

13     A.   I don't think any individual trait in a human

14  being can be separated from every single other trait.

15  It has to be understood as part of a complex whole.

16     Q.   Do you think -- do you think knowing an

17  individual's race is essential to understanding

18  anything about an individual?

19             MS. ELLSWORTH:   Objection.

20     A.   I think it's an important dimension of

21  understanding an individual.

22     Q.   Do you think there are aspects of a person's

23  experiences that have no relation to their race?

24             MS. ELLSWORTH:   Objection.

1  what I would be concerned about.

2      Q.  So if the admissions office came to you and

3  said, "We did the holistic process, we looked at

4  everyone as an individual, we took everything into

5  account, and these are the results," you'd sleep at

6  night; you'd be satisfied?

7              MS. ELLSWORTH:  Objection.

8      A.  You're presenting me with a situation that

9  doesn't exist and asking me to speculate beyond the

10  realm of where I am and --

11     Q.  You're certainly capable of expressing an

12  opinion as to whether or not a class of this

13  percentage would bother you or not.  That's all I'm

14  asking you to do.

15             MS. ELLSWORTH:  Objection.

16     A.  I don't represent the nature of the Harvard

17  class in terms of statistics.  It's a matter -- just

18  as we were speaking a moment ago, I don't want to

19  reduce individuals to numbers of this kind, but,

20  rather, to represent the variety and intersection of

21  a variety of elements that make up that class and

22  make up the individuals within it.

23     Q.  So at the end of the day, as long as the

24  holistic process is followed, is the racial

1    breakdown, the result of the class, is that

2    irrelevant to you?

3         A.   It's important that we have a class that

4    represents diversity along a number of dimensions,

5    and race is one of those dimensions.  Economic status

6    is another.  Artistic ability is another.  Life

7    experience is another.  Interest in a variety of

8    fields that we represent is another.

9         Q.   So does the percentage matter to you?

10                MS. ELLSWORTH:  Objection.

11        A.   The reality of those -- the presence of those

12   different factors matters to me.  It doesn't matter

13   to me in the expression of a particular number.

14                THE WITNESS:  Can we take a break?

15                MS. ELLSWORTH:  Yeah.  Let's take

16          a break.

17                MR. STRAWBRIDGE:  That's fine.

18                (Recess:  1:56 p.m. to 2:08 p.m.)

19   BY MR. STRAWBRIDGE:

20        Q.   While we were out there, did you discuss the

21   substance of your answers to any questions in the

22   deposition with your attorneys?

23        A.   No, I didn't.

24        Q.   Did you discuss it with anybody else?

1      Q.   And the response here I note does not

2   specifically respond to the comments regarding

3   limiting students on the basis of race.

4      A.   Yes, that's correct.

5      Q.   You agree with that?

6           But it does make a number of other responses

7   to the concerns raised by our correspondent.  And in

8   particular, the first line says, "President Faust has

9   asked me to respond to your April 4th letter, in

10  which you offer many thoughtful observations about

11  Harvard College students and the results of the

12  admissions process."

13          Did I read that correctly?

14     A.   You did.

15     Q.   Do you think that those comments were that

16  thoughtful?

17     A.   This is a letter from a 90-year-old alum

18  who's given some kind of support to scholarships.  He

19  graduated with the class of 1942.  He probably went

20  off and fought in World War II.  His letter is

21  preposterous, but there's just no reason to tell him

22  his letter is preposterous.  This is a polite and

23  respectful response to an elderly man who has ideas

24  that she doesn't respond to because they're so beyond

1    the pale of anything we would consider or think

2    about.

3        Q.   I mean I guess why does this kind of letter

4    deserve a polite response?

5        A.   Because he's --

6                  MS. ELLSWORTH:  Objection.

7        A.   The man is -- he's an alum who graduated 70

8    years ago.  He's from a different generation, a

9    different era.  We obviously don't believe in any of

10   these things he's putting forth, but --

11       Q.   But you wanted to give him a polite response?

12       A.   A polite response, yes.

13       Q.   Did you review Ms. McGrath's letter before it

14   went out?

15       A.   I don't believe so.  I have no recollection

16   of doing so.  She cc's me, so that assumes I saw it

17   afterwards.

18       Q.   Would you have sent the same response if he

19   had made these comments about other racial groups on

20   campus?

21                  MS. ELLSWORTH:  Objection.

22       A.   The model of responding politely to elderly

23   people who make outrageous comments but have long

24   ties with the Harvard community is not unusual.

1      Q.  So the exact same response would have gone

2   out if he'd said the same thing about black students?

3               MS. ELLSWORTH:  Objection.

4      A.  I don't have such a letter, so I don't have

5   an example of it.  But this is not a letter that is a

6   result of the particular group that he chose to

7   insult.

8      Q.  So you would have sent the same letter?

9               MS. ELLSWORTH:  Objection.

10     A.  I don't have the condition to face where I

11  would be asked to send the same letter or not.

12     Q.  You don't know if you would have sent the

13  same letter?

14     A.  Well, first of all, this letter --

15              MS. ELLSWORTH:  Objection.

16     A.  -- isn't from me in the first place.  It's

17  from Marlyn McGrath.  So you might have to ask her if

18  she would send the same letter.  But the --

19  responding to outrageous claims in letters is -- you

20  know, we don't necessarily take on every outrageous

21  claim in acknowledging correspondence.

22     Q.  Do you respond to every single letter from an

23  alum?

24     A.  I would guess that most of them, yes.

1      Q.   Regardless of what they say?

2               MS. ELLSWORTH:   Objection.

3      A.   Yes.   Most of my correspondence gets answers.

4      Q.   Do you know whether Asian-American students

5    on campus would appreciate the response that Ms.

6    McGrath sent?

7               MS. ELLSWORTH:   Objection.

8      Q.   You can answer the question.

9      A.   Asian-American students have not seen this

10   letter.

11     Q.   Would you be comfortable explaining it if

12   they did?

13              MS. ELLSWORTH:   Objection.

14     A.   I get letters that say the most outrageous

15   things about me as a woman, and I respond in similar

16   terms.   These are matters of personal correspondence

17   that are not matters of public scrutiny.

18     Q.   Would your responses be different if they

19   were matters of public scrutiny?

20              MS. ELLSWORTH:   Objection.

21     A.   They aren't.   They're personal

22   correspondence.

23     Q.   Do you write things differently when they're

24   a subject of public consumption than when they're

1   private correspondence?

2       A.   This is not a letter I wrote.   When I'm

3   thinking about a public -- I think about my audience

4   whatever I'm saying.   If I'm talking to

5   undergraduates, I think about what's on

6   undergraduates' minds.   If I'm talking to graduate

7   students, I think about what's on their minds.   It

8   doesn't mean that I misrepresent things.   It means

9   I'm trying to put myself in the position of the

10  person receiving the information and figure out how

11  best to communicate with that individual about

12  whatever issue I wish to raise.

13              MR. STRAWBRIDGE:   Ask the reporter

14         to mark the following document as

15         Exhibit 9.

16              (Exhibit 9, 7/24/13 email chain

17         Bates stamped HARV00032454 through

18         32455, marked.)

19              THE WITNESS:   (Pause.)   Okay.

20      Q.   Have you had a chance to read this document?

21      A.   Yes, I have.

22      Q.   What does this document appear to be?

23      A.   I'm a little puzzled by it.   It's an exchange

24  between -- well, there's an email from David Evans,

1      A.  I suppose it could be.  I -- I don't know.

2      Q.  How do you suppose it might be useful to

3  Harvard?

4      A.  Understanding student preferences and student

5  experience can -- data about that is -- can be

6  useful.  And there are various dimensions of that

7  data.

8      Q.  But as far as you know, you are not familiar

9  with any -- any compilations of that type of data --

10     A.  I'm not.

11     Q.  -- outside of the engineering program that we

12  discussed?

13     A.  That's correct.

14     Q.  Have you ever heard discussion of what's

15  known as the mismatch phenomenon?

16          MS. ELLSWORTH:  Objection.

17     A.  I have.

18     Q.  Okay.  And what is your understanding of the

19  mismatch phenomenon?

20     A.  My understanding is that there was an

21  allegation that some students were being admitted --

22  minority students were being admitted to institutions

23  for which they were not qualified and that this was a

24  disservice to them.

1     Q.  And where does your understanding of this

2  phenomenon arise from, if I may end a question with a

3  preposition?

4     A.  TV, the press, popular culture, newspapers.

5  I'm not sure.

6     Q.  Have you reviewed any of the academic work on

7  this question?

8     A.  I've heard assessments of that academic work.

9     Q.  From whom?

10    A.  From individuals who work on issues of

11  education and analysis of college prep and college

12  experience.

13    Q.  Can you think in particular of whom has

14  addressed these assessments to you?

15    A.  No.

16    Q.  Okay.  Is it people at Harvard University?

17  Harvard College?

18    A.  Probably Harvard University, actually,

19  because it may include people from the school of

20  education.

21    Q.  Okay.  And what about anyone from the law

22  school?

23         MS. ELLSWORTH:  Objection.

24    A.  I don't recall.

1        Q.   Do you know whether those assessments have

2   been related to you as the part of any investigation

3   into the possible benefits of Harvard's admission

4   policies?

5                  MS. ELLSWORTH:  Objection.

6        A.   I've never heard them in that context.

7        Q.   Do you think it's an idea that deserves some

8   study?

9                  MS. ELLSWORTH:  Objection.

10       A.   My understanding of the idea is that it has

11  been entirely discredited.

12       Q.   Entirely discredited.  And that's based on

13  what other people have told you?

14       A.   Yes.

15       Q.   You didn't need to do your own investigation?

16                 MS. ELLSWORTH:  Objection.

17       A.   No, I didn't.

18       Q.   I mean we talked earlier about the history of

19  Jewish discrimination, and you were very resistant to

20  taking someone else's word for what had happened at

21  Harvard.

22                 MS. ELLSWORTH:  Objection to the

23         characterization.

24       A.   97 percent of our students graduate.

Highly Confidential - For Attorneys Eyes Only 309

1  ATTACH TO DEPOSITION OF CATHERINE DREW GILPIN FAUST

2  CASE:   STUDENTS FOR FAIR ADMISSIONS, INC. VS.

3  PRESIDENT AND FELLOWS OF HARVARD COLLEGE, ET AL

4  DATE TAKEN:   MARCH 10, 2017

5                          ERRATA SHEET

6  Please refer to Page 308 for Errata Sheet

7  instructions and distribution instructions.

8  PAGE LINE      CHANGE        REASON

9  throughout   Catharine is misspelled

10  p.24 line 4   mistranscription - makes no sense

11  p.61 line 14  word omitted "not designed"

12  p.190 line 13  word omitted?  "don't know"?

13  p.229 line 18  wrong word "account" not "effect"

14

15  Please see additional errata attached to this page.

16          I have read the foregoing transcript of my

17  deposition, and except for any corrections or changes

18  noted above, I hereby subscribe to the transcript as

19  an accurate record of the statements made by me.

20

21      Executed this  19  day of  April      , 2017.

22

23      _Catharine Drew Gilpin Faust_
        CATHERINE DREW GILPIN FAUST

24

**March 10, 2017 Deposition of President Faust – Errata Sheet**

| Page | Line | Instruction | Reason for Change |
|------|------|-------------|-------------------|
| Passim | Passim | Change "Catherine" to "Catharine" | Typographical error |
| 15 | 7 | Change "multiple set" to "multiplicity" | Typographical error |
| 24 | 4 | Change "as we play" to "as the part that we play" | Clarification |
| 24 | 16 | Replace ", so." with "." | Clarification |
| 48 | 12 | Change "why our goals are for" to "why our goals include achieving" | Clarification |
| 49 | 10, 13, 14 | Change "dean" to "Dean" and change "college" to "College" | Grammar |
| 51 | 16 | Change "takes top" to "takes the top" | Clarification |
| 61 | 14 | Change "designed" to "not designed" | Typographical error |
| 65 | 23 | Change "dean of admissions" to "Dean of Admissions" | Grammar |
| 68 | 23 | Change "arrived" to "arrive" | Typographical error |
| 73 | 13-14 | Change "Gruder (phon sp)." to "Grutter." | Typographical error |
| 83 | 17 | Change "talking" to "saying" | Clarification |
| 133 | 24 | Change "admissions, dean" to "Admissions, Dean" | Grammar |
| 142 | 15 | Change "Huh-uh." to "No." | Clarification |
| 145 | 19 | Change "dean" to "Dean" | Grammar |
| 179 | 11 | Change "2013." to "in 2013." | Clarification |
| 190 | 13 | Change "I know that – who" to "I don't know who" | Clarification |
| 192 | 9 | Change "dean of admissions to "Dean of Admissions" | Grammar |
| 203 | 21 | Change "dean" to "Dean" | Grammar |
| 204 | 1 | Change "dean" to "Dean" | Grammar |

| Page | Line | Instruction | Reason for Change |
|---|---|---|---|
| 204 | 5 | Change "dean" to "Dean" (both times) | Grammar |
| 204 | 9-10 | Change "dean of the college" to "Dean of the College" | Grammar |
| 209 | 8-9 | Change "dean of admissions" to "Dean of Admissions" and "dean of the" to "Dean of the" | Grammar |
| 209 | 23 | Change "dean of admissions" to "Dean of Admissions" and "dean of" to "Dean of" | Grammar |
| 224 | 8 | Delete "the" | Clarification |
| 229 | 18 | Change "effect" to "account" | Clarification |
| 248 | 18-19 | Change "admissions, by the dean of admissions, not by the president" to "Admissions, by the Dean of Admissions, not by the President" | Grammar |
| 251 | 20 | Change "inflicted" to "inflected" | Typographical error |
| 254 | 4-5 | Change "dean of admissions" to "Dean of Admissions" and change "president" to "President" | Grammar |
| 254 | 9 | Change "dean of admissions" to "Dean of Admissions" | Grammar |
| 263 | 5 | Change "president's" to "President's" | Grammar |
| 266 | 2 | Change "in" to "on" | Clarification |
| 274 | 2 | Change "dean of the college" to "Dean of the College" | Grammar |
| 275 | 1-2 | Change "dean and their president" to "Dean and their President" | Grammar |
| 277 | 8-9 | Change "faculty of arts and sciences" to "Faculty of Arts and Sciences" | Grammar |
| 283 | 22 | Change "college and the college's" to "College about the College's" | Grammar |
| 286 | 11 | Change "college" to "College" | Grammar |
| 288 | 18-19 | Change "the college" to "the College" | Grammar |
| 292 | 19-20 | Change "school of education" to "School of Education" | Grammar |
| 297 | 12 | Change "school of education" to "School of Education" | Grammar |

| Page | Line | Instruction | Reason for Change |
|------|------|-------------|-------------------|
| 305 | 18 | Change "faculty of arts and sciences" to "Faculty of Arts and Sciences" | Grammar |
| 305 | 21 | Change "president to "President" | Grammar |