# EXHIBIT 9

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3

4    _____

5    STUDENTS FOR FAIR ADMISSIONS, INC.,

6              Plaintiff,

7     v.                              No. 1:14-cv-14176

8    PRESIDENT AND FELLOWS OF

9    HARVARD COLLEGE

10   (HARVARD CORPORATION),

11             Defendant.

12   _____

13

14

15

16         VIDEO DEPOSITION of WILLIAM FITZSIMMONS

17                  Boston, Massachusetts

18                   August 3, 2017

19

20

21

22

23   Reported by:

24   Dana Welch, CSR, RPR, CRR, CRC

25   Job #127104

FITZSIMMONS

1
2  Harvard alumni who are interested in helping
3  Harvard raise money for financial aid and other --
4  and various other unrestricted purposes to do the
5  fundraising for Harvard, to talk with people in
6  their geographic areas, to talk with classmates or
7  any others who might be interested in helping out.
8      Q.  So your role was an administrative role?
9      A.  Yes.
10     Q.  You said you were asked to become director
11 of the fund?
12     A.  I was asked to apply.  The job was open.
13     Q.  By whom?
14     A.  Principally by Thomas Reardon.
15     Q.  Thomas Reardon?
16     A.  Reardon.
17     Q.  And who is that?
18     A.  I believe at the time he was vice
19 president for alumni affairs and development.
20     Q.  Okay.  How long did you serve at the
21 Harvard Fund?
22     A.  I'd say about a year and a half.
23     Q.  And why did you leave that job?
24     A.  The dean of admissions and financial aid
25 job came open after Fred Jewett was asked to apply

1                    FITZSIMMONS

2    and received the position of dean of Harvard

3    College.

4        Q.  And so you applied for the job at that

5    time?

6        A.  Yes.

7        Q.  Do you remember approximately when that

8    was?

9        A.  During periods of 1986, as I recall.

10       Q.  All right.  And I assume you took the job?

11       A.  I did.

12       Q.  And you've served as dean ever since?

13       A.  Yes.

14       Q.  How long -- do you know whether you're the

15   longest-tenured admissions dean in the college's

16   history?

17           MS. ELLSWORTH:  Objection.

18       A.  I don't for certain, but I've been told

19   that I am.

20       Q.  Who do you report to?

21       A.  The dean of the faculty, Michael Smith.

22       Q.  And before Michael Smith, who was in that

23   role?

24       A.  Various people.  Jeremy Knowles, Bill

25   Kirby.  I'm just trying to go back here a little

FITZSIMMONS

1

2   try to get people to apply to Harvard?

3        MS. ELLSWORTH:   Objection.

4   A.   Yes.   But it's to reach out specifically

5   to outstanding students from the widest possible

6   variety of backgrounds to make certain that, we

7   would hope, every student in America who would have

8   a chance of being a happy and successful Harvard

9   student that that person would at least consider

10  Harvard.

11       Q.   Does the associate dean for recruitment

12  also have responsibilities with respect to trying

13  to convince admitted students to attend Harvard?

14       A.   Yes.

15       Q.   Okay.   And is that through the same forms

16  of outreach that you were just discussing?

17       A.   Partially.

18       Q.   What types of outreach?

19       A.   For example, for all of our admitted

20  students we have several opportunities to get to

21  know Harvard better after they've been admitted.

22            Now, one of the major changes just in the

23  past few years has been what we call a virtual tour

24  of Harvard.   And that is even if a student is not

25  able to visit Cambridge, the student can use the

1                         FITZSIMMONS

2    virtual tour to become much better informed about

3    Harvard.

4          And that, as you can see with any -- given

5    the fact that Harvard changes a great deal, we're

6    always trying to improve Harvard.  That's a video

7    that needs to be constantly updated.

8          But the other part would be inviting

9    students to come to Cambridge for what we call

10   Visitas, but it's a program that starts on a

11   Saturday in April and ends on Monday in April as to

12   the -- for all the admitted students.

13         And in a typical year, you know, perhaps

14   12- or 1,300, sometimes nearly 1,400 of the

15   students who are admitted -- you know, roughly, a

16   little over 2,000 people typically would be

17   admitted -- are invited to come to Cambridge.  And,

18   as you can imagine, that's a very complicated

19   endeavor, to make certain that these, you know,

20   very interesting and diverse students have an

21   opportunity to get to know Harvard and get all

22   their questions answered about Harvard during that

23   time.

24         So the student groups I mentioned, the

25   four student groups are a very important part of

FITZSIMMONS

1
2 helping that weekend become successful.  But, you
3 know, we have to call on lots of students to room
4 students and also to conduct events for the
5 students so that they can get to know Harvard well.
6 And, you know, what we really want is to make sure
7 that they understand how Harvard might be a good
8 match for them, whether it's the best match for
9 them relative to many other good colleges.
10      Another thing that happens that weekend --
11 and it was, I guess, demonstrated in fairly stark
12 terms the year of the Boston Marathon tragedy that
13 that occurred -- the events after the marathon led
14 us to have to cancel the visiting program just as
15 it was beginning.  And so one of the things we were
16 able to do because we had such a comprehensive
17 program in place we were able to, working with our
18 undergraduate student groups -- the four I
19 mentioned but also other students, to produce what
20 we called a virtual Visitas.  In other words, a
21 virtual visiting weekend so that even though most
22 of the students couldn't be with us that weekend
23 because of situations in Boston, we were able to
24 present to them, you know, what Harvard was all
25 about.

FITZSIMMONS



1                        FITZSIMMONS



FITZSIMMONS



FITZSIMMONS



FITZSIMMONS



FITZSIMMONS



FITZSIMMONS



FITZSIMMONS



FITZSIMMONS



FITZSIMMONS



FITZSIMMONS



FITZSIMMONS



1                           FITZSIMMONS

2    things they do.

3         Q.   Other than people who contact Harvard and

4    the test result purchases, how do they go about

5    identifying the targets of that recruitment?

6              MS. ELLSWORTH:  Objection.

7         A.   Some of them, as an example, will go back

8    to their home towns during school breaks, for

9    example, or attend summer programs in various

10   locations.  So there are a variety of things that

11   they would do.

12        Q.   Do you know, for example --

13             MR. STRAWBRIDGE:  Strike that.

14        Q.   Did you say that UMRP, current students at

15   Harvard who are UMRP recruiters, did you say that

16   they are -- are they assigned students of the same

17   ethnic background to recruit?

18        A.   Generally.

19        Q.   Why is that?

20        A.   Oftentimes in recruiting, if you can

21   envision yourself in -- with the person you are

22   talking to, it can be helpful in making a case to a

23   student that Harvard would be a comfortable place

24   for a potential Harvard student.

25        Q.   Do you know how many UMRP recruiters there

1                    FITZSIMMONS

2    individual?

3            MS. ELLSWORTH:  You can answer the

4    question at a general level.

5        A.  Yes.

6        Q.  It will be positive?

7        A.  Yes.

8        Q.  Has Harvard used race, considered the race

9    of applicants as part of its admissions

10   decision-making during the entirety of your time in

11   the admissions office?

12           MS. ELLSWORTH:  Objection.

13       A.  Yes.

14       Q.  Has the way in which it uses race changed

15   over the years?

16           MS. ELLSWORTH:  Objection.

17       A.  Not to my knowledge.

18       Q.  At any point in time has race been given a

19   lesser or greater weight in the evaluation of

20   candidates?

21           MS. ELLSWORTH:  Objection.

22       A.  Not in my estimation.

23       Q.  What about in your personal practice of

24   reading your own files?

25       A.  No.

1                           FITZSIMMONS

2        Q.   Has the way in which Harvard uses race

3   changed since the filing of this lawsuit?

4             MS. ELLSWORTH:   Objection.

5        A.   No.

6        Q.   And has the way in which Harvard uses race

7   changed since --

8             MR. STRAWBRIDGE:   Strike that.

9        Q.   Are you familiar with the website Harvard

10  Not Fair?

11       A.   I've heard of it.

12       Q.   Are you aware that there was a website

13  launched in the spring of 2014 entitled "Harvard

14  Not Fair"?

15       A.   Yes.

16       Q.   Has the way in which Harvard uses race

17  changed at all since the launch of that website?

18            MS. ELLSWORTH:   Objection.

19       A.   No.

20       Q.   Why does Harvard think race or ethnicity

21  should be considered as a factor in the admissions

22  process?

23            MS. ELLSWORTH:   Objection.

24       A.   We believe that the backgrounds of

25  students, including their ethnic backgrounds, is

1                        FITZSIMMONS

2         MS. ELLSWORTH:   Objection.

3    A.   Our reports are generated for the -- you

4    know, for the federal reporting purposes and for

5    information to our -- anybody in our community who

6    is interested in the general idea of where we are.

7         Q.   In fact, is Harvard's internal reporting

8    limited only to the federal method of racial

9    reporting?

10        MS. ELLSWORTH:   Objection.

11   A.   I'm not sure what you mean by Harvard

12   reporting.

13        Q.   Are you familiar with IPEDS methodology?

14   A.   Yes.

15        Q.   What's the IPEDS methodology?

16   A.   That's the integrated postsecondary

17   education material that we provide to the federal

18   government.

19        Q.   And that's the standard under which

20   information about ethnic identity is provided for

21   federal government reporting purposes, correct?

22   A.   For federal purposes.

23        Q.   Right.

24        And the IPEDS method of determining racial

25   identity depends, I guess, on a single algorithm

1                          FITZSIMMONS

2    about choices that one makes when filling out

3    racial identity information, correct?

4         A.  Yes.

5         Q.  In other words, the first question asks if

6    you are Hispanic or not, I believe.  Is that the

7    first question?

8         A.  That's my understanding.

9         Q.  Right.  And if you check the box that you

10   are Hispanic, you then go into the Hispanic

11   category for federal reporting purposes, correct?

12        A.  Yes.

13        Q.  And then if you don't check that box,

14   you're given a series of other choices, and you can

15   check multiple boxes if you wish, correct?

16             MS. ELLSWORTH:  Objection.

17        A.  Yes.

18        Q.  And for IPEDS purposes, if you check more

19   than one box you are identified as multiracial,

20   correct?

21             MS. ELLSWORTH:  Objection.

22        A.  Yes.

23        Q.  If you check only one box, then you are

24   reported out as whatever the one box that you

25   checked was, correct?

1                          FITZSIMMONS

2          MS. ELLSWORTH:   Objection.

3     A.   I'm not sure that's technically correct.

4     Q.   Why?   What do you think's wrong about

5     that?

6     A.   If you identified yourself as Hispanic --

7     Q.   Right.

8     A.   -- that would be the only ethnicity

9     report.

10    Q.   Right.   If you checked yourself as

11    Hispanic and white, for example, you would be

12    reported as Hispanic and not multiracial?

13    A.   My understanding.

14    Q.   But if you identify yourself as white and

15    Asian, you would be reported as multiracial?

16         MS. ELLSWORTH:   Objection.

17    A.   That's my understanding.

18    Q.   Does Harvard, when it does its own

19    internal reports, confine itself to the IPEDS

20    methodology?

21         MS. ELLSWORTH:   Objection.

22    A.   No.

23    Q.   No.   In fact, Harvard does report for its

24    own internal recordkeeping purposes racial results

25    in manners that diverge from the IPEDS method,

1                          FITZSIMMONS

2      correct?

3                MS. ELLSWORTH:   Objection.

4           A.   We use both IPEDS and a more comprehensive

5      system.

6           Q.   And the more comprehensive system has

7      changed recently, correct?

8           A.   Yes.

9           Q.   There used to be an old methodology?

10          A.   Yes.

11          Q.   And now there's one that's called,

12     fittingly enough, the new methodology?

13          A.   Yes.

14          Q.   What was the old methodology?

15          A.   It's old enough so I'm not sure I can be

16     absolutely precise about what -- how it was

17     constructed.  It was a system in which the area

18     person tried to represent the background of the

19     applicant as comprehensively as possible.

20          Q.   And was there a hierarchy for the old

21     methodology?

22                MS. ELLSWORTH:   Objection.

23          A.   Depending on the year, there was

24     occasionally a -- I'm not sure I would call it a

25     hierarchy, but there was a set of choices.

FITZSIMMONS

1
2     Q.   For example, if someone checked themselves
3   as black and Asian under the old methodology, how
4   would they be characterized for Harvard internal
5   reporting purposes?
6     A.   It would depend on not simply the fact
7   that two boxes were checked, but it would also
8   depend on a thorough reading of the application.
9     Q.   Do you know, is this the -- whatever the
10  reader determined was the most accurate
11  representation of the ethnic background, is that
12  what Harvard would put in the ethnic group code
13  field of its database?
14          MS. ELLSWORTH:   Objection.
15    A.   Whatever the reader put was a starting
16  point and then the folder, of course, would go
17  through the normal reading process and then go
18  through the committee process, at which point it's
19  possible that the committee might decide that a
20  different coding would make sense.
21    Q.   Under that system, was essentially
22  everybody characterized as one race as opposed to
23  multi races?
24    A.   Generally.
25    Q.   Can you think of exceptions?

1                           FITZSIMMONS

2       A.   I can certainly remember times when people

3  were considered to be too complex to use one

4  category so that for operational purposes, as

5  students were considered, they were considered as

6  bringing educational value from a variety of

7  different backgrounds.

8       Q.   And how would they be counted for purposes

9  of the reports that Harvard would generate?

10      A.   I'm not precisely sure in those cases.

11 It's been a while.

12      Q.   Do you know whether it's still required

13 just as a matter of data tracking to pick one race?

14           MS. ELLSWORTH:   Objection.

15      A.   It is not now.

16      Q.   No -- then.  I'm talking about the old

17 methodology.

18      A.   I couldn't say precisely.

19      Q.   What's the new methodology?

20      A.   The new methodology simply reflects the

21 choices the student made when he or she was filling

22 out the common application.  We also get some

23 information from the testing services as well, but

24 this is all self-identification.

25      Q.   And so under the new methodology, if

                          FITZSIMMONS

1    someone identifies themselves as white and Asian,

2    are they counted as both for Harvard reporting

3    purposes?

4         A.  Yes, best of my knowledge, yeah.

5         Q.  Does Harvard's new methodology have a

6    multiracial category?

7         A.  I believe it does.

8         Q.  And what distinguishes between whether

9    someone is designated as multiracial or multiple

10   individual racial identities?

11        A.  It would be a judgment call on the part of

12   the staff member and, perhaps, the committee later.

13        Q.  Does -- so in any event, the new

14   methodology, among other things, the new

15   methodology does have a statistical difference in

16   that it will count people twice for purposes of

17   some of the reports, correct?

18        A.  It could, yes.

19        Q.  In other words, if you were to run a

20   report of the number of Asian applicants and the

21   number of white applicants, someone who had been

22   identified as white and Asian, who had identified

23   themselves as white and Asian would be counted in

24   both categories?

1                      FITZSIMMONS

2          MS. ELLSWORTH:  Objection.

3     A.  It's my understanding that the faculty was

4 consulted in a variety of ways.

5     Q.  Basically through anecdotal reporting?

6     A.  I don't remember precisely how that was

7 done.

8     Q.  Is there a level of racial diversity that

9 Harvard thinks is needed in order to obtain those

10 benefits?

11         MS. ELLSWORTH:  Objection.

12    A.  There's no way we could ever measure that

13 kind of thing.

14    Q.  You previously told me, I think, that it's

15 very important to Harvard to have people from a

16 wide variety of racial backgrounds on campus; is

17 that right?

18    A.  Yes.

19    Q.  Is it very important to have a particular

20 amount of people from those racial backgrounds on

21 campus?

22         MS. ELLSWORTH:  Objection.

23    A.  There isn't any way one could try to

24 quantify something like that.

25    Q.  Could you put a rough range on it?

1                         FITZSIMMONS

2         MS. ELLSWORTH:  Objection.

3     A.  I really can't.

4     Q.  Would one person from each racial

5  background be enough?

6         MS. ELLSWORTH:  Objection.

7     A.   I -- again, there's no way for me to try

8  to quantify with any number or range or anything of

9  that sort.

10    Q.  Is it possible that one person from each

11 racial background would be enough?

12        MS. ELLSWORTH:  Objection.

13    A.  I don't know.

14    Q.  You don't know?  You can't say?

15        MS. ELLSWORTH:  Objection.

16    Q.  No?

17    A.  Again, I believe that it's not possible to

18 quantify this kind of thing.

19    Q.  All right.  So can you say whether or not

20 Harvard could achieve the educational benefits from

21 racial diversity if its campus were 80 percent

22 white, 10 percent black, 10 percent Hispanic, and

23 10 percent Asian?

24        MS. ELLSWORTH:  Objection.

25        (Simultaneous speaking.)

FITZSIMMONS

1

2    A.   Did you get 110 percent?

3    Q.   Let's make it 70 percent white.

4    A.   Are you double counting?

5    Q.   One of us didn't go to Harvard, for sure.

6   That's what I get for following my notes.

7        Let's go 70 percent white, 10 percent

8   black, 10 percent Hispanic, and 10 percent Asian.

9   Can you opine as to whether that would be

10  sufficient to achieve the educational benefits of

11  racial diversity?

12       MS. ELLSWORTH:  Objection.

13   A.   I don't think there's any way to quantify

14  that kind of thing.  We know Harvard provides a

15  much richer educational experience today than it

16  did during my time at Harvard as an undergraduate

17  because we have such a wide range of people from so

18  many different ethnic backgrounds.

19   Q.   Do you think that Harvard has any

20  particular interest in ensuring that --

21       MR. STRAWBRIDGE:  Strike that.

22   Q.   Do you have any view as to whether or not

23  the educational benefits of diversity are being

24  realized over at MIT?

25       MS. ELLSWORTH:  Objection.

Page 143

1                          FITZSIMMONS

2        Q.   Yes.

3        A.   No.

4        Q.   Do you know how many applications, on

5   average, contain that information in those

6   statements?

7             MS. ELLSWORTH:   Objection.

8        A.   There's no way to estimate that.

9        Q.   So do you think that Harvard could reach a

10  holistic admissions decision about a candidate that

11  had not provided information about their race?

12       A.   Not one that would be consistent with the

13  educational mission of Harvard College, which is to

14  educate future leaders from every ethnic background

15  and have those students educate each other over the

16  four years and go out and do -- we hope to become

17  citizens and citizen leaders in the world later.

18       Q.   So you think race is an essential piece of

19  an application file?

20            MS. ELLSWORTH:   Objection.

21       A.   Yes.

22       Q.   Does Harvard make admissions decisions

23  with respect to people who have not identified

24  their race?

25            MS. ELLSWORTH:   Objection.

1                          FITZSIMMONS

2    Harvard can stop using race in the admissions

3    process --

4            MS. ELLSWORTH:  Objection.

5        Q.  -- and still achieve its mission?

6        A.  There's nothing I -- no evidence I've seen

7    over the years, especially given the fact that we

8    have reached out aggressively in so many ways to

9    get people that would -- using, you know, means

10   that many people would call race-neutral.

11       Q.  You're familiar with Martin Luther King

12   Junior's speech regarding one day he hopes his

13   children can be considered for the content of their

14   character and not the color of their skin?

15       A.  I'm not familiar with the specific

16   wording.  You have it in front of you?

17       Q.  We can get it.  Have you heard that quote

18   before?

19       A.  I've heard that quote.

20       Q.  Do you agree with the idea?

21       A.  The idea in my -- as I heard the speech

22   initially, and as I've heard the speech over the

23   years, the way I would hear the speech would be

24   that you would not be discriminated against on the

25   basis of the color of your skin and that your

FITZSIMMONS

1

2    about whether Harvard should stop using race, can

3    you conceive of a world in which you think that

4    Harvard could stop using race in the admissions

5    process?

6         MS. ELLSWORTH:  Objection.

7         A.  It's impossible to predict, you know, what

8    the future might hold.  People who, you know, try

9    to do so are often quite wrong.

10        Q.  Is Harvard attempting to obtain critical

11   mass of any particular ethnic group at the college?

12        A.  I'm not sure what you would mean by

13   critical mass.

14        Q.  Have you heard that term before?

15        A.  I've heard it in physics.  I've heard it

16   in, you know, in -- you know, I've heard the term

17   before.

18        Q.  Have you heard it used with respect to the

19   use of race in college admissions?

20        A.  Occasionally.

21        Q.  Is it ever used at Harvard?

22        MS. ELLSWORTH:  Objection.

23        A.  I have never used it.

24        Q.  Have you ever used it to describe what

25   Harvard's attempting to achieve?

1                         FITZSIMMONS

2        A.  No.

3        Q.  I take it, then, that Harvard does not

4   have its own definition of what constitutes

5   critical mass?

6             MS. ELLSWORTH:  Objection.

7        A.  I certainly don't.

8        Q.  And if I understand your testimony

9   previously, you can't provide any range or

10   quantification of what level of racial diversity is

11   sufficient to achieve Harvard's educational goals?

12             MS. ELLSWORTH:  Objection.

13        A.  That would be correct.

14        Q.  When Harvard considers the race of

15   applicants for admission, does it consider the race

16   of every student who provides that information?

17        A.  We'd be aware of it.

18        Q.  Is it something that would actually factor

19   into your decision-making?

20        A.  In an individual case, it could be one

21   piece of information that, among many, that --

22   pieces of information that people would look at as

23   it votes.  You know, 40 people vote on -- to admit

24   people.

25        Q.  Is that true with respect to white

Page 157

                          FITZSIMMONS

1

2    Q.  In your experience, is race sometimes a

3  decisive factor?

4         MS. ELLSWORTH:  Objection.

5    A.  It's impossible to say in any individual

6  case.

7    Q.  You don't think -- in all your years in

8  the office, you don't think that race or ethnicity

9  was the thing that pushed a candidate over the edge

10  into the admitted pool?

11         MS. ELLSWORTH:  Objection.

12    A.  Again, candidates are admitted for a whole

13  variety of different reasons, not simply because

14  they're from one ethnic group or another.

15         There are students who perhaps have been

16  particularly active in cultural activities and so

17  on.  But, again, there's no way to, you know, when

18  40 people are listening in some cases for half an

19  hour or more to a single application and discussing

20  that application, exactly why they would choose to

21  admit that applicant -- just impossible to quantify

22  that kind of thing.

23    Q.  Is it your testimony that a student's

24  white ethnicity is a factor that is considered in

25  the admission process?

                        FITZSIMMONS

1

2       Q.  The question, again, this is for the time

3    frame prior to the filing of this lawsuit in

4    2000- --

5       A.  Oh, I see, okay.  Before --

6       Q.  Yeah.  Did you -- yes or no?  Had you done

7    any analysis as to what would happen if Harvard

8    stopped using race in the admissions process?

9          MS. ELLSWORTH:  Objection.

10      A.  It's a hard question to answer.  Just say

11   it again.  Just frame it again for me.

12         MR. STRAWBRIDGE:  Why don't I ask the

13   reporter to read this one back.

14         THE WITNESS:  Okay.  Sorry.

15         (Preceding question read.)

16      A.  The answer would technically be no, but we

17   analyze every year what it is we have done.  You

18   know, there was no formal study, but we review

19   carefully what we do every year and we, again,

20   believed every year, especially after all the

21   massive changes that we've made, that it was still

22   vital for us to be able to use race and ethnicity

23   in the admissions process.

24      Q.  And when you say you look at what you did

25   and made this decision, is that a formal process?

1                         FITZSIMMONS

2          And in the end, did the subject or the

3    term ever come up in conversations with staff or

4    with others?  I'm sure that it probably did.  I

5    don't remember it specifically.  But in the end I

6    think we were, you know, we simply, you know, there

7    was no evidence after making all these changes that

8    cost Harvard many, many millions of dollars -- you

9    know, our financial aid budget has rocketed skyward

10   since we've made many of these changes and so on,

11   in all kinds of different ways -- and still we feel

12   it's absolutely vital to be able to use race and

13   ethnicity as we both recruit and assemble and then

14   admit the best possible class every year.

15       Q.  Do I understand your testimony to be you

16   do not remember any specific discussion about

17   whether these changes meant that Harvard could stop

18   using race in the admissions process?

19       MS. ELLSWORTH:  Objection.

20       A.  I don't remember a specific formal

21   discussion on the subject, but because it's so much

22   a part of what all colleges do, it was certainly

23   one concept that has certainly informed the work

24   we've done over the years.

25       Q.  Do you remember any specific informal

1                          FITZSIMMONS

2    discussion on the topic?

3           MS. ELLSWORTH:  Objection.

4        A.  Again, it's so much a part of what we do,

5    I don't remember the specific -- I don't have a

6    scene in my mind that would, you know, where this

7    topic was discussed.  But it's such an integral

8    concept in college admissions.

9        Q.  Were any of these endeavors that you just

10   described adopted with the goal of ceasing the use

11   of race in the admissions process?

12          MS. ELLSWORTH:  Objection.

13       A.  Many of these were simply designed to

14   allow us to further our efforts to get the best

15   possible class that we could across the board, and

16   that would include, you know, getting the strongest

17   minority students that we could get from every

18   background.

19       Q.  Were they adopted with the goal of ceasing

20   the use of race in the admissions process?

21          MS. ELLSWORTH:  Objection.

22       A.  The goal was really to get the best class

23   that we could get and get the class that would be

24   comprised of the best educators of others.

25       Q.  But was one of the goals to stop using

FITZSIMMONS

1
2   achieved without using race in the admissions
3   process?
4        MS. ELLSWORTH:  Objection.
5     A.  Again, I think any reasonable person would
6   have an open mind in receiving any new information
7   that -- any reasonable person or institution, I
8   think, would take into account new information.
9     Q.  And today your testimony is you can't
10  imagine what it would take for you to be convinced
11  that you should stop using race in the admissions
12  process?
13       MS. ELLSWORTH:  Objection.
14    A.  That would be true.
15    Q.  Was that any different four years ago?
16    A.  Four years ago?  No.
17    Q.  Was it any different three years ago?
18    A.  Could you ask the question again?  Just
19  make sure I understand it.
20    Q.  Yes.
21       Four years ago, could you imagine evidence
22  that would change your mind as to whether or not
23  Harvard should stop using race in the admissions
24  process?
25       MS. ELLSWORTH:  Objection.

1                         FITZSIMMONS

2        A.   You know, I think -- again, I think a

3   reasonable person or reasonable institution would

4   always keep an open mind about anything.   I mean,

5   new information comes in but that despite massive

6   efforts that people would reasonably call

7   race-neutral efforts to make a difference, there's

8   still no case in our minds that, despite all the

9   things that we've done that we could achieve our

10  goal of having a diverse class and an effective

11  educational experience without using race.

12       Q.   You keep saying that these are efforts

13  that people could reasonably call race-neutral

14  alternatives.   Did you ever call them race-neutral

15  alternatives at the time you were considering them?

16            MS. ELLSWORTH:   Objection.

17       A.   I -- certainly in my own mind, we're well

18  aware of the fact that all of these -- lots of

19  articles have been written, certainly, that all of

20  these kinds of things were -- were changes that

21  would be reasonably labeled race-neutral.

22       Q.   Do you ever remember using that label to

23  describe these specific efforts that were

24  implemented at Harvard?

25       A.   I don't recall specifically.

1                         FITZSIMMONS

2       Q.  Do you recall anybody else in the

3  admissions office using that label specifically to

4  describe these initiatives prior to the filing of

5  this lawsuit in 2014?

6       A.  I don't have a specific recollection, but

7  I know I and others were certainly aware that

8  that's what these things were called by many

9  people.

10      Q.  Are you aware of any formal analysis on

11  paper that purports to analyze how these could be

12  used and what the result of them would be instead

13  of using race?

14          MS. ELLSWORTH:  Objection.

15      A.  Formal analysis?

16      Q.  Something in writing.

17      A.  Something that doesn't -- nothing as

18  specific as what you're describing comes to mind.

19      Q.  Does Harvard provide -- has Harvard --

20  strike that.

21          Since this lawsuit, are you aware of any

22  such formal analysis?

23          MS. ELLSWORTH:  Objection.  I'll remind

24  the witness not to disclose anything learned from

25  counsel or actions taken at the direction of

1                         FITZSIMMONS

2      counsel in answering the question.  If you can

3      answer the question without disclosing that

4      information, you may do so.

5           A.  I think the answer to that question would

6      be in the interrogatory regarding -- I believe, if

7      I understand your question, the Ryan committee and

8      then the committee that Dean Khurana and Dean Smith

9      and I are on.

10          Q.  Other than the output of that committee,

11     are you aware of any other analysis that's been

12     done with respect to race-neutral alternatives?

13          A.  At Harvard?

14          Q.  At Harvard?

15          MS. ELLSWORTH:  Again, I'll give the same

16     instruction or reminder not to disclose any action

17     taken at the direction of counsel or communication

18     of counsel in answering that question.  If you can

19     answer the question without disclosing that

20     information, you may.

21          A.  The question again, I'm sorry.

22          Q.  Other than the output of those committees,

23     are you aware of any formal analysis?

24          A.  Not any that immediately come the mind.

25          Q.  If you had some time to think about it

FITZSIMMONS

1
2     Q.  Do you remember when you had these
3  conversations with Ms. Bever?
4     A.  I don't specifically, but she's worked
5  with us for three years.
6     Q.  Do you know if it was at the beginning or
7  later in your tenure?
8     A.  It's hard to say in the always busy --
9  any three-year period is very busy in our world.
10  I would guess it was somewhere in the middle, but
11  that's just a guess.
12     Q.  You think it's work she's done since she
13  came over to the admissions office?
14     A.  My guess is yes because it wasn't possible
15  before then.
16     Q.  Has Harvard analyzed whether it could
17  achieve racial diversity by curtailing or ending
18  the tip that it gives to legacy admits?
19          MS. ELLSWORTH:  Objection.
20     A.  Could you repeat that.
21     Q.  Has Harvard analyzed whether it could
22  achieve racial diversity by curtailing the tip or
23  ending the tip that it gives to legacy admits?
24          MS. ELLSWORTH:  Objection.
25     A.  Using legacy status as one factor among

1                      FITZSIMMONS

2    many as we make our admissions decisions is

3    essential to Harvard's well-being in a number of

4    different ways.  And so it is not a factor that

5    we're looking at right now in terms of making a

6    change.

7         Q.  Have you ever looked at in terms of making

8    a change?

9              MS. ELLSWORTH:  Objection.

10        A.  Not specifically with that goal in mind.

11        Q.  Do you know, in fact, if you ended the

12   legacy preference, what effect that would have on

13   the racial composition of the admitting class?

14             MS. ELLSWORTH:  Objection.  Again, I'll

15   remind the witness not to disclose any

16   communications with counsel or actions taken at the

17   direction of counsel in answering the question.

18        A.  Some -- some of the information that I

19   have was conducted at the direction of counsel, so

20   I feel that I cannot disclose that.

21        Q.  Is there any information you can disclose

22   that was not directed by counsel?

23        A.  Not that comes to mind.

24        Q.  You would agree that as a whole, the

25   legacy applicant pool is, on average, less

1                        FITZSIMMONS

2      ethnically diverse than the non-legacy applicant

3      pool?

4            MS. ELLSWORTH:   Objection.

5      A.   Currently that would be the case.

6      Q.   Is the legacy applicant pool roughly

7      70 percent white today?

8      A.   I don't have a specific number.

9      Q.   Do you know if that sounds anywhere close?

10           MS. ELLSWORTH:   Objection.

11     A.   I don't, off the top of my head.

12     Q.   Do you know what the other ethnic

13     breakdown of the legacy pool would be?

14           MS. ELLSWORTH:   Objection.

15     A.   What do you mean by the other?

16     Q.   By other ethnicities?

17           MS. ELLSWORTH:   Objection.

18     A.   Not specifically.

19     Q.   Do you know generally?

20     A.   Only that there are -- as every year goes

21     by there are more and more alumnae, alumni sons and

22     daughters who come from minority backgrounds of all

23     kinds.

24     Q.   Do you think that the importance of --

25           MR. STRAWBRIDGE:   Strike that.

                          FITZSIMMONS

1

2        Q.   Why do you think it's important to Harvard

3    to maintain a legacy preference?

4        MS. ELLSWORTH:   Objection.

5        A.   There are really many reasons why that

6    would be so.  Alumnae, alumni are vitally important

7    in Harvard Club activities, Harvard Alumni

8    Association activities around the country and

9    around the world in helping advance Harvard's

10   mission in the world.

11            As an example, there are over 10,000

12   alumnae and alumni who help us with recruiting and

13   interviewing candidates, so just that piece of it

14   alone is very, very important.

15            There are also alumnae and alumni who help

16   us -- really, I guess the thing to think about

17   would be Harvard Club activities generally and with

18   what we call the schools and scholarship piece, the

19   10,000 alumnae and alumni.  We would -- without

20   them we certainly would not end up with the strong

21   and diverse classes that we have because their help

22   in reaching out to students, going to college

23   nights, doing all kinds of very important things to

24   help strengthen and diversify our pool, you know,

25   is very, very important.

                    FITZSIMMONS

1
2       In April, after students are admitted, for

3   example, they are very important in terms of

4   conducting admit parties for people from their

5   local areas and also in some cases sending people

6   to Cambridge for visits.  So that part of it is

7   very important.

8       It's also the case that alumnae and alumni

9   make an enormous difference in our ability to have

10  a strong financial aid program, and by advancing,

11  for example, Harvard's cutting-edge research and

12  advancing Harvard's mission across the board,

13  without the financial help both in terms of giving

14  money and raising money, Harvard would be nowhere

15  near the strong institution it is today and we

16  would be -- you know, Harvard would be,

17  unfortunately, a very different place.  It would be

18  far less diverse socioeconomic, ethically, and

19  poorer in every way.  And we would be in a much

20  worse position in advancing our research agenda

21  that we believe is very important, not just in the

22  life sciences, but really across the board.

23      Q.  Are you aware of any empirical evidence

24  about the number of school committee members who

25  would stop interviewing if the department ceased

1                        FITZSIMMONS

2    giving a legacy tip?

3           MS. ELLSWORTH:  Objection.

4        A.  I have not seen a particular study on

5    that.

6        Q.  Are you aware of any empirical evidence

7    with respect to the extent to which Harvard alumni

8    would stop donating to Harvard if the admissions

9    office ceased giving a legacy tip?

10          MS. ELLSWORTH:  Objection.

11       A.  Again, no specific study on that

12   particular dimension.

13       Q.  Are you aware of any analysis as to

14   the extent to which Harvard alums would stop

15   participating in other activities besides financial

16   donation and alumni interviews if Harvard stopped

17   giving a legacy tip?

18          MS. ELLSWORTH:  Objection.

19       A.  There have not been formal studies.  There

20   have certainly been people who have ceased being a

21   part of Harvard in various ways because a son or

22   daughter was not admitted.

23       Q.  Have there been people who have kept

24   giving even when their son or daughter was not

25   admitted?

                         FITZSIMMONS

1

2      A.   I'm not sure that -- my simple answer

3  would be no, but perhaps I don't understand the

4  question.

5      Q.   I thought you just said a lot of these

6  people are very qualified and could get into

7  Harvard anyway?

8           MS. ELLSWORTH:  Objection.

9      A.   First of all, they may well not have

10 applied had they not had some association with

11 Harvard in the first place.  And so that is one of

12 the things that actually gets -- some of the very

13 best students we have had in recent memory, in

14 fact, have been alumni, alumnae sons and daughters.

15          So it would certainly hurt our efforts to

16 get the strongest possible class if some of -- if

17 we did not have some of these students who had

18 applied because they knew that that was one factor

19 among many.

20     Q.   Can you say what it would take to convince

21 you that the legacy tip could go away?

22          MS. ELLSWORTH:  Objection.

23     A.   No.

24     Q.   Does Harvard give socioeconomic -- does

25 Harvard give socioeconomically challenged

                    FITZSIMMONS

1

2   applicants a positive tip in the admissions

3   process?

4        MS. ELLSWORTH:  Objection.

5        A.  It would be one factor among many that

6   could be seen by individual readers and voters as a

7   reason to vote favorably for a student from such a

8   background.

9        Q.  How does Harvard determine whether or not

10  an applicant is socioeconomically disadvantaged?

11       A.  It's complex.  We'd know from the

12  application, obviously, whether or not the student

13  had applied for financial aid.  We also have

14  information at the outset about the parents'

15  educational and professional backgrounds.  We also,

16  because we have an area-person system, among other

17  things, oftentimes the people who are the first

18  readers or certainly those on subcommittees might

19  have a sense of where the person came from

20  geographically and within a geographic area that

21  might give information about the socioeconomic

22  background.

23            There is often additional information that

24  we are able to get from some of the preliminary

25  research that Erica Bever conducted to taking a

1                      FITZSIMMONS

2      Q.  And do you know why the Ryan committee was

3  asked to look at race-neutral admissions?

4      MS. ELLSWORTH:  Objection.  Reminder not

5  to disclose communication with counsel in answering

6  the question.

7      A.  I don't really know, based -- I don't know

8  what discussions, you know, Dean Ryan had with

9  others, so I simply don't know.

10     Q.  How often did the Ryan committee meet?

11     A.  I believe it met perhaps three times.

12     Q.  Before the Ryan committee, are you aware

13  of any other committee at Harvard that was tasked

14  with analyzing race-neutral admissions?

15     MS. ELLSWORTH:  Objection.

16     A.  No committee with that specific charge.

17     Q.  Are you aware of any committee that

18  specifically discussed race-neutral admissions to

19  replace the use of race in Harvard's admissions

20  process?

21     MS. ELLSWORTH:  Objection.

22     A.  I don't.

23     Q.  Do you expect that you would be aware of

24  any such committee, given your role as dean of

25  admissions?

1                        FITZSIMMONS

2          MS. ELLSWORTH:  Objection.

3     A.  Yes.

4          (Exhibit 2, HARV00007486 - 7488, marked for

5     identification.)

6          MR. STRAWBRIDGE:  Let me know if you

7     recognize this document.

8          THE WITNESS:  I do.

9     Q.  What is this document?

10         MS. ELLSWORTH:  Why don't you read the

11    document.

12    A.  I should read it first.

13    Q.  Did you look at this document in prep?

14    A.  I believe I did, but I would like to

15    review it again.

16    Q.  Do you need to read the whole thing?

17    A.  It would be helpful.  Just give it...

18    Q.  You had a chance to review this?

19    A.  Yes.

20    Q.  Okay.  Is it an invitation to you to serve

21    on the Ryan committee?

22    A.  Yes.

23    Q.  And in the cover e-mail, do you see, this

24    is an e-mail from Drew Faust?

25    A.  Yes.

1                          FITZSIMMONS

2   Not Fair was one of the reasons why the Ryan

3   committee was put together?

4           MS. ELLSWORTH:  Objection.  You can answer

5   that as a yes-or-no question.

6       A.  I don't know.

7       Q.  You don't know.

8           You said the committee met three times?

9       A.  I believe.

10      Q.  Did you go to all three meetings?

11      A.  I don't think so.

12      Q.  And why don't you think so?

13          MS. ELLSWORTH:  Objection.

14      A.  Because I can't recall whether I attended

15  all three.

16      Q.  Did you go to some of the meetings?

17      A.  I know I attended at least one.

18      Q.  What was discussed at the meeting you went

19  to?

20          MS. ELLSWORTH:  Objection.  Again, I'll

21  remind the witness not to disclose communications

22  with counsel.  You can otherwise answer the

23  question.

24      A.  See if I understand.  The committee was --

25  there was counsel present, and --

1                        FITZSIMMONS

2       Q.   Which counsel?

3       A.   I don't remember specifically because I've

4   been in lots of meetings with lots of people.

5       Q.   Was anyone from WilmerHale there?

6       A.   I don't recall anyone from WilmerHale

7   there.

8       Q.   Can you say for sure whether anyone from

9   WilmerHale was at any of the Ryan committee

10  meetings?

11      A.   I cannot say.

12      Q.   The Ryan committee, did you speak to Jim

13  Ryan to prepare for today's testimony?

14      A.   No.

15      Q.   You said the Ryan committee; you're no

16  longer a member of the Ryan committee?

17      A.   I don't know the status of -- the Ryan

18  committee's work was suspended because of this

19  litigation.

20      Q.   And why was that?

21      A.   I don't --

22           MS. ELLSWORTH:  Objection.  I won't allow

23  the witness to answer the question.

24           THE WITNESS:  You will or won't?

25           MS. ELLSWORTH:  I will not allow the

1                        FITZSIMMONS

2     witness to answer the question.  So I'm instructing

3     you not to answer the question.

4          Q.  Can you tell me anything --

5          MR. STRAWBRIDGE:  Strike that.

6          Q.  When was the last time the committee did

7     anything with respect to race-neutral alternatives?

8          MS. ELLSWORTH:  Objection.

9          A.  I don't know.

10         Q.  Okay.  And can you tell me anything about

11    why the committee suspended its work without

12    disclosing information that your attorney is

13    asserting violates the privilege of

14    attorney-client?

15         MS. ELLSWORTH:  I'm not sure the witness

16    can answer the question that way.

17         MR. STRAWBRIDGE:  Let me try it another

18    way.

19         Q.  Have you seen any written documents that

20    describe why the Ryan committee ceased work?

21         A.  No.

22         Q.  Are you aware that there is any written

23    explanation as to why the Ryan committee ceased

24    work?

25         A.  I'm not aware.

1                          FITZSIMMONS

2       Q.   Whose decision was it to suspend the work

3  of the Ryan committee?

4            MS. ELLSWORTH:   Objection.

5       A.   I don't know.

6       Q.   Do you believe the Ryan committee produced

7  any work product during its life?

8            MS. ELLSWORTH:   Objection.

9       A.   I don't know.

10      Q.   Are you familiar with a new committee that

11  was recently impaneled by Michael Smith to study

12  race-neutral alternatives?

13      A.   Yes.

14      Q.   Who's on that committee?

15      A.   Dean Smith, Dean Khurana, and myself.

16      Q.   Is there anyone else on that committee?

17      A.   Not that I know of.

18      Q.   Is there any intention to add anyone else

19  to that committee?

20      A.   I don't know.

21      Q.   Has that committee met?

22      A.   Yes.

23      Q.   How many times has that committee met?

24      A.   Once.

25      Q.   When was that meeting?

1                          FITZSIMMONS

2    would include everything about an application.

3        Q.  Is there any written training that's

4    specific to how race should be used in the

5    admissions process?

6            MS. ELLSWORTH:  Objection.

7        A.  I don't have the written training

8    materials in front of me, but it's quite possible.

9        Q.  Do you know?

10       A.  I don't specifically.

11       Q.  If it is, it's in the handbook or

12   guidebook that's given to readers?

13           MS. ELLSWORTH:  Objection.

14       A.  It might well be.

15       Q.  Are you aware of any other places where

16   there is written instruction given on how to use

17   race in the admissions process?

18           MS. ELLSWORTH:  Objection.

19       A.  There may be some information in the

20   alumnae-alumni handbook for our interviewers and

21   recruiters.

22       Q.  Do you give any particular instruction

23   every year to the admissions office about how race

24   should be used?

25           MS. ELLSWORTH:  Objection.

1                          FITZSIMMONS

2        A.  Not that I can recall.

3        Q.  Is there a specific training session that

4   everyone's required to attend on a regular basis

5   that reviews what is legally permissible with

6   respect to the use of race in the admissions

7   process?

8            MS. ELLSWORTH:  Objection.

9        A.  That really would be part of the

10  comprehensive training program.

11       Q.  Are you aware that it's specifically

12  included every year on the training program?

13           MS. ELLSWORTH:  Objection.

14       A.  The intention of the training program is

15  to give a comprehensive overview of how to evaluate

16  an application.

17       Q.  Is it your understanding that that

18  includes specific training on how race should be

19  used?

20       A.  If it isn't in writing, it could well also

21  be done in discussion.

22       Q.  Are you sure that it is?

23       A.  I don't know for sure.

24           MS. ELLSWORTH:  Objection.

25       Q.  Do you take any steps to ensure that it

1                        FITZSIMMONS

2        Q.   Okay.  And what are the scores that the

3   reader assigns?

4        A.   There are numerical scores for the overall

5   rating.  There is one for academic potential, one

6   for extracurricular, one for athletic, one for

7   personal qualities and character.  There is -- the

8   two teacher reports and the counselor report are

9   also given a rough numerical rating.  Any

10  interviews the -- there's the staff interview or

11  alumnae-alumni interview, personal qualities

12  rating, and the overall rating would be recorded.

13        Trying to think if I may be missing one.

14  But, anyway, those are the central ones.  So each

15  staff member has to, whether it's a first reader,

16  second reader, third reader, has to use these

17  ratings.

18        Q.   At the time that the applicant is reading

19  the application, is the race of the applicant

20  available to the reader?

21        MS. ELLSWORTH:  Objection.

22        A.   Generally.

23        Q.   As long as the applicant has provided that

24  information in some form in their application, is

25  it available to the reader?

Page 244

FITZSIMMONS

1

2   A.   It is certainly -- it was a subject that

3   has come up at different times simply because,

4   again, test scores and grades are helpful really

5   only at the very high and the very low end.  For

6   most people they're not particularly helpful or

7   hurtful.  And -- but the truth is that we deal with

8   so many different kinds of secondary schools,

9   homeschoolers, people from all around the world.

10       So we would consider, as our testing

11  commission said, standardized tests are a very

12  rough, crude yardstick that gives you a very rough

13  idea of what people might do in a college setting.

14      Q.   Does race or ethnicity factor into the

15  extracurricular rating?

16      MS. ELLSWORTH:  Objection.

17      A.   If a student had been particularly active

18  in, for example, a community activity connected to

19  race or ethnicity.  And that student wouldn't

20  necessarily have to be a minority student.  But

21  that kind of activity could be something -- help

22  make a case that that student would be a good

23  educator of others during his or her four years at

24  Harvard.

25      Q.   But that's because of the activity, not

                          FITZSIMMONS

1

2    the race of the student, right?

3        A.  Yes.

4        Q.  So if a white student were active in the

5    NAACP, you wouldn't rate that any differently as an

6    extracurricular component than you would an African

7    American student?

8            MS. ELLSWORTH:  Objection.

9        A.  No.

10       Q.  Can you think of any occasion where race

11   would factor into an athletic rating?

12           MS. ELLSWORTH:  Objection.

13       A.  No.

14       Q.  Can you think of a situation where race

15   would affect the personal quality rating?

16           MS. ELLSWORTH:  Objection.

17       A.  Not race per se.

18       Q.  What goes into the personal quality

19   rating?

20       A.  It would really be a holistic view

21   based -- the reader, readers and then ultimately

22   the committee because the committee, you know,

23   could get new information, say, an interview may

24   come in during committee.

25           It would be looking at everything in the

1                        FITZSIMMONS

2      A.   I'm not quite sure what you meant by that.

3      Q.   I thought one of the purposes for

4  Harvard's use of race in the admissions process was

5  to ensure that it would assemble a class full of

6  racially diverse students who would be leaders and

7  teach one another?

8           MS. ELLSWORTH:   Objection.

9      Q.   Is that not or --

10     A.   Yeah, as I understand what you're saying.

11  But that is something you could certainly

12  understand from reading an application.

13     Q.   So it's --

14     A.   Precisely it's a -- precisely what the

15  student had done, again, whether or not that

16  student was from a minority background.  But you

17  might have a person from a minority background who,

18  based on all of the information that you have on

19  the application, you would have a good sense that

20  this person could turn out to be a very valuable,

21  interesting leader while at Harvard and perhaps

22  beyond.

23     Q.   But not because -- I mean, I guess I just

24  don't understand.  Is race something that you can

25  take into account when assigning that personal

1                         FITZSIMMONS

2      quality, taking everything in the folder into

3      account?

4           MS. ELLSWORTH:   Objection.

5       A.   It's simply one part of a person's life.

6       Q.   Is it a part that can be taken into

7      account when assigning a personal score?

8           MS. ELLSWORTH:   Objection.

9       A.   It depends on how that person -- let's

10     say, for example, you had a student who had been

11     the subject of discrimination as a result of racial

12     and ethnic background.  And, say, a teacher in the

13     school talks about how that student had overcome

14     that prejudice and had, let's say for example, gone

15     on to try to help other students who had been the

16     victims of discrimination and prejudice and perhaps

17     helped some of the students who had been a part of

18     discrimination and/or harassment in the first

19     place.  That -- I'm just giving you an example how

20     a person's race might have interacted with

21     circumstances in his or her life, whether it's in

22     secondary school or beyond, that would indicate

23     that that person might turn out to be a valuable

24     leader and classmate at Harvard.

25       Q.   So, in that case, are you evaluating the

1                        FITZSIMMONS

2    actions of the student, or are you evaluating the

3    student's race?

4        A.   You're evaluating the actions of the

5    student that occurred because of race.

6        Q.   What about in the overall rating?  How

7    does that differ from the personal qualities

8    rating?

9            MS. ELLSWORTH:  Objection.

10       A.   It's different in the sense that it really

11   does put all the factors together.  You could have

12   a person who seems wonderful in personal terms but

13   might be among that 10 or 15 percent of the

14   applicant pool who would struggle at Harvard.  So

15   it's possible to have a high personal qualities

16   rating and then have a low overall rating, if that

17   is what you were asking.

18       Q.   Does the overall rating take into account

19   the other ratings that we just discussed?

20       A.   It takes them into account, but it's not a

21   formula.  It's not adding up things or anything of

22   that sort.  It's looking at not just the four --

23   you know, the four ratings, but again, stepping

24   back and taking all the factors into account and

25   then assigning that overall rating.

FITZSIMMONS

1

2      So there's nothing automatic.  There's

3  nothing formulaic, no little formula that would

4  work here.

5      Q.  Can an applicant's race or ethnicity

6  affect their overall rating?

7      MS. ELLSWORTH:  Objection.

8      A.  It's hard to get inside the mind of a

9  particular evaluator or even, you know, when the

10  admissions committee is going through the process.

11  It's hard to know, just given the example I gave

12  you previously, how much, you know, when someone

13  were to -- would assign an overall rating, how much

14  of that had to do with what the person had checked

15  on the box.  What was more important, you know,

16  it -- make all the -- really is what happens, is

17  what the person has accomplished.

18      Q.  Well, correct me if I'm wrong; I thought

19  you said earlier that Harvard's use of race was not

20  limited only to those whose application indicated

21  that they had had a particular experience or

22  overcome a particular obstacle because of their

23  race; is that correct?

24      A.  Say that again, and just make sure that I

25  can unders- --

                          FITZSIMMONS

1

2   admissions, and we find it really vital in terms of

3   the mission of Harvard College, so that in general

4   terms, yes.  We are looking at people who, you

5   know -- vital to our educational mission to have

6   people from a wide variety of ethnic backgrounds

7   be -- you know, it -- because certainly, it's

8   critical to the education our students receive.

9   But it's also -- in a society that's increasingly

10  diverse and pluralistic, it might enable a student

11  to, you know, become a, you know, even better or

12  greater citizen leader later.

13      Q.  I guess I still just don't know the answer

14  to this question:  Is it okay, when assigning an

15  overall rating, for a reader to use race among

16  other factors in their head when they're assigning

17  that score?

18      MS. ELLSWORTH:  Objection.  Asked and

19  answered.

20      A.  You know, race is certainly one of many

21  factors that we take into account as we make

22  admissions decisions, and I would -- it's quite

23  possible that a reader would also have that on his

24  or her mind as they would put together an overall

25  rating.  But it's complicated.  It's much more

1                          FITZSIMMONS

2     complicated than, you know, simply looking at that

3     alone.

4          Q.  You keep saying it's one of many factors.

5          A.  Yes.

6          Q.  So how do you know that it's only one of

7     many factors if you don't know to what extent a

8     particular reader is taking it into account?

9               MS. ELLSWORTH:  Objection.

10         A.  Well, because it's always one of many

11    factors in any individual.  We're not talking about

12    dry concepts here.  We're talking about real flesh

13    and blood human beings who have -- come from a

14    certain economic background, have a certain ethnic

15    background, you know, all the usual variables.  So,

16    there -- you know, there's really no way to

17    simplify this or codify it, you know, numerically.

18         Q.  How do you know individual readers aren't

19    giving it outsize influence?

20              MS. ELLSWORTH:  Objection.

21         A.  The committee as a whole goes through a

22    very exhaustive process after the readings have

23    taken place.

24              So all of the information in that

25    application is put up on a screen, so if we were in

1                        FITZSIMMONS

2    will have opinions on a person's extracurricular or

3    community commitments.

4         But it's really the reader's job to try to

5    convey the strength objectively and, in a sense,

6    try to determine what that person is really trying

7    to say about the applicant.

8    Q.  As far as the decision that the Harvard

9    reader makes in assigning a school support rating,

10   does the ethnicity of the applicant play any role

11   in that?

12        MS. ELLSWORTH:  Objection.

13   A.  Not as I understand what you're saying.

14   Q.  What about legacy status?  Is that

15   factored into any of the scoring?

16        MS. ELLSWORTH:  Objection.

17   A.  Into a teacher report or something like

18   that?  Is that what you mean?  I thought you meant

19   that on the first -- previous -- are you still on

20   teacher reports?

21   Q.  Well, any of the ratings, so teacher

22   reports, personal, overall, academic,

23   extracurricular?

24   A.  I certainly don't believe that the -- I've

25   seen a different kind of teacher rating because a

1                          FITZSIMMONS

2    person was a legacy, for example.

3        Q.  What about the overall rating?

4        A.  The overall rating, again, it could be

5    because legacy, to use that term, is one factor

6    among many as the committee reviews applications.

7            It could be a factor that people would

8    have in mind as they're looking at a case, say, in

9    full committee or subcommittee or at any point.

10       Q.  So it's something that a reader might take

11   into account when assigning the overall score?

12       A.  It's possible.  Again, looking

13   holistically at everything, understanding that, you

14   know, that legacy cases are and have to be fully

15   qualified to be at Harvard.  But, again, one factor

16   among many, they, people might not factor it in.

17       Q.  But not for the academic rating, right?

18       A.  No.

19       Q.  Not for the athletic rating?

20           MS. ELLSWORTH:  Objection.

21       A.  No.

22       Q.  Not for the extracurricular rating?

23           MS. ELLSWORTH:  Objection.

24       A.  Not that I know of unless...

25       Q.  And not for the personal rating?

1                         FITZSIMMONS

2          MS. ELLSWORTH:  Objection.

3     A.   Not -- no.  Not -- not --

4          MR. STRAWBRIDGE:  Why don't we take a

5     short break.

6          THE VIDEOGRAPHER:  Time now is 1442 and

7     we're off the record.

8          (Proceedings interrupted at 2:42 p.m. and

9          reconvened at 3:03 p.m.).

10         THE VIDEOGRAPHER:  Time now is 1503.

11    We're on the record.

12    BY MR. STRAWBRIDGE:

13    Q.   Did you talk with your counsel about the

14    substance of your answers during the break?

15    A.   No.

16    Q.   Are you familiar with the phrase "standard

17    strong" as it's used in the reading process?

18    A.   I am familiar with the phrase.

19    Q.   What does standard strong mean?

20    A.   I would say pretty much what the words

21    mean in standard usage.  We have, as I indicated

22    before, many, many strong candidates and many

23    people who present extremely strong standardized

24    tests and grades, so that would certainly be a --

25    someone who might be described as standard strong.

1                          FITZSIMMONS

2      It's not a term that I use myself, particularly,

3      but it certainly indicates, you know, some real

4      strength to be in that pool, to be standard strong.

5          Q.  What makes it standard?

6          A.  There may not yet be something that might

7      make that person quite as strong an educator of

8      others or quite as strong as an applicant overall

9      as some others because it is, you know, it is a

10     competition where there's lots of strength.  But

11     that would probably be the best description I could

12     give.

13         Q.  Is that something else, that other thing,

14     sometimes referred to in the admissions office as a

15     "distinguishing excellence"?

16         A.  It could be.

17         Q.  Or DE?

18         A.  It could be.

19         Q.  What's a distinguishing excellence?

20             MS. ELLSWORTH:  Objection.

21         A.  It would be -- it could be an excellence

22     of any kind one could imagine, but it would be an

23     additional factor that might help the admissions

24     committee understand better what kind of a

25     contribution this particular applicant might make

1                            FITZSIMMONS

2     with biological sciences and medical?

3          A.   Simply because the coding used to use

4     alphabetic -- you know, use the alphabet to

5     indicate certain concentrations.  I'm not sure

6     those are the same letters that are used today, but

7     certainly there are people around who would use

8     that.  I think, B, I think, was humanities for

9     example.  I may be wrong on that.

10         Q.   But that's an artifact, essentially, of

11    the former database system?

12         A.   Yes, it probably is an artifact at this

13    point.

14         Q.   What is the "dean's interest list"?

15         A.   The dean's interest list is something that

16    I would use to make certain that I'm aware of what

17    eventually might happen to that application.

18         Q.   And how would one go about getting on the

19    dean's interest list?

20              MS. ELLSWORTH:  Objection.

21         A.   There are -- for example, I, in my

22    recruiting process as I go out on the road, I might

23    meet a person at one of the evening meetings,

24    recruiting events, and think just on an impression

25    that this is a person who, you know, might be of

1                        FITZSIMMONS

2  interest to the admissions committee.  So I might

3  put that person on my interest list.

4      Q.  If one -- if a candidate is of interest to

5  a donor to Harvard, is that something that might

6  land them on the interest list?

7          MS. ELLSWORTH:  Objection.

8      A.  It is possible because, again, no matter

9  what decision we might make on an application, it

10 would be good for us to be in a position to field

11 phone calls after the fact, for example.

12     Q.  How do you use the donor's interest list?

13         MS. ELLSWORTH:  Objection.

14     A.  Donor's interest list?

15     Q.  I'm sorry.  The dean's interest list.

16     A.  So I am aware of it and I, you know, would

17 accumulate people on the list I happen to run into

18 or get information about throughout the year.

19         And then when subcommittees are in

20 session, I might call some or all or none,

21 depending on the situation of these people, to the

22 attention of the subcommittee and also possibly in

23 the full committee process.

24         Again, just so that I would be in a

25 position, ultimately, to understand, you know, what

FITZSIMMONS



FITZSIMMONS



1                             FITZSIMMONS



1                        FITZSIMMONS

2          MS. ELLSWORTH:  Objection.

3     A.   Yes.

4     Q.   So a one is a strong rating?

5     A.   A strong rating, yes.

6     Q.   And, in this case, can you tell from here

7  who would have assigned that rating?  Would it be

8  the alumni club or the development office?

9          MS. ELLSWORTH:  Objection.

10    A.   We have a meeting of the -- this is myself

11 and some senior admissions staff members -- with

12 people connected to the Harvard Alumni Association

13 and the University Development Office, and in that

14 meeting we would discuss the person.

15         There's nothing automatic about a number,

16 so we would discuss the person and what the person

17 had done over the years.  And so we would come to a

18 consensus on what we think the rating should be,

19 usually in that meeting.

20    Q.   Is the rating related at all to the

21 applicants' ratings from the normal admissions

22 process, or this is a distinct rating?

23         MS. ELLSWORTH:  Objection.

24    A.   This is a distinct rating.

25    Q.   And are you rating the applicant, or are

1                          FITZSIMMONS

2      you rating the level of interest that other people

3      at the university have in this applicant's

4      admission prospect?

5               MS. ELLSWORTH:  Objection.

6      A.   The latter.

7      Q.   And the development office is the chief

8      fundraising office of the university, right?

9      A.   Yes.

10     Q.   So is there any way to tell in here who

11     the people who were put on this list because of the

12     development office are?

13     A.   Not without more information.

14     Q.   Is that information tracked on any

15     spreadsheet or document in the office?

16              MS. ELLSWORTH:  Objection.

17     A.   It's -- yes.

18     Q.   Okay.  And how would you figure that out?

19     A.   It's tracked on this list.

20     Q.   Okay.  Is it any of the columns that's

21     listed here?

22     A.   I'm sorry.  I don't know what you mean by

23     tracking.  So this is the list I would use.

24     Q.   Right.  And I'm trying to say, like,

25     looking at this list --

1                          FITZSIMMONS

2       A.  Right.

3       Q.  Is there any way to -- I asked if there

4    was any way to identify who was put on here by the

5    development office?

6       A.  No.  No.

7       Q.  Okay.

8       A.  Because it's done with a number of people,

9    as I suggested.  We would make the decision,

10   ultimately, and as a consensus with the people in

11   the room what we think the right rating would be.

12      Q.  Would it surprise you to learn that

13   according to the data Harvard has produced, being

14   on the dean's interest list is very highly

15   correlated with admissions at Harvard?

16          MS. ELLSWORTH:  Objection.

17      A.  I had never -- wouldn't have had an

18   estimate of that.

19      Q.  But this is your list, right?

20      A.  Yes.

21      Q.  And you'd said that one of the purposes of

22   this list is to track people who might have to be

23   called with decisions?

24      A.  Right.  But these, the people on this

25   list -- in some ways the applicants themselves are

FITZSIMMONS

highly self-selected in the sense that oftentimes a
person who has had family members attend Harvard to
be, you know, be part of Harvard, many of the --
those people who, you know, would have less of a
chance of getting in won't apply.

            So typically, what would happen is that
people of this sort, especially if the family had
been very involved in Harvard Alumni Association or
schools and scholarship work or development work
over the years, they would tend to have a very good
sense of how difficult the admissions competition.
So they're unlikely to apply unless they are strong
applicants.  And, in general, alumnae-alumni sons
and daughters are stronger, on average, at least on
measures such as test scores and grades than the
average applicant.

    Q.  Well, then, I mean, do you have any idea
how many people tend to get in off the dean's
interest list just in your own experience?

    MS. ELLSWORTH:  Objection.

    A.  I don't have a precise number in mind.

    Q.  Given your experience in all the years
you've been in the admissions office, would you
expect that the vast majority of the people on the

Page 273

1                         FITZSIMMONS

2    dean's interest list are going to get admitted?

3          MS. ELLSWORTH:  Objection.

4       A.  I don't really know.  For example, the

5    example I gave you originally, I wouldn't normally

6    put a person on the interest list, say, that I had

7    met in my recruiting unless that person was a

8    strong candidate to begin with.  So I would say

9    that that kind of an applicant wouldn't surprise me

10   if applicants of that sort were to get in at a

11   higher rate.

12      Q.  Would you put them on the interest list if

13   the development office asked you to, regardless of

14   whether or not you assessed them be a strong

15   candidate for admission?

16         MS. ELLSWORTH:  Objection.

17      A.  Yes.  The two ratings are separate, as we

18   said before.

19         MR. STRAWBRIDGE:  Would you please mark

20   this as an exhibit?

21         (Exhibit 4, HARV00004890, marked for

22      identification.)

23         THE WITNESS:  Are we through with this for

24      the moment?

25         MR. STRAWBRIDGE:  For the moment.

FITZSIMMONS



1                         FITZSIMMONS



FITZSIMMONS



1                          FITZSIMMONS

2    people who the development office recommends?

3              MS. ELLSWORTH:  Objection.

4         A.  Do you mean by "typically"?

5         Q.  So if the development office contacts you

6    or you learn about from the development office

7    about a candidate to go on the interest list, will

8    you ultimately obtain a rating from the development

9    office for that candidate?

10             MS. ELLSWORTH:  Objection.

11        A.  Not always.

12        Q.  What influences whether you do or do not?

13        A.  They may not have the information.

14        Q.  Okay.  Is the amount that the donor has

15   given or a donor has given, the amount of

16   contribution that's been made, is that a factor

17   that is considered in the rating?

18             MS. ELLSWORTH:  Objection.

19        A.  It would be one factor.

20        Q.  And is this like some of the other

21   testimony you've given, in that the ultimate rating

22   can be based on a combination of one or many

23   factors?

24             MS. ELLSWORTH:  Objection.

25        A.  Yes.

1                       FITZSIMMONS

2        Q.  So does that mean that the larger the size

3   of the relative financial contribution, the more in

4   a particular individual case it might affect the

5   ultimate rating?

6            MS. ELLSWORTH:  Objection.

7        A.  It would tend to go that way.

8        Q.  Is there a director's interest list?

9        A.  I don't know if Marlyn keeps one or not.

10       Q.  Have you ever heard of one or not?

11       A.  I think she has mentioned that she -- I

12  don't know whether she calls it an interest list,

13  but I, just given the volume of applications, I

14  think it's possible that she might have some sort

15  of a list.

16       Q.  Who presents the cases on the dean's list

17  in committee?

18           MS. ELLSWORTH:  Objection.

19       A.  The area person would always present the

20  case.

21       Q.  And is that seen simply by the initials

22  here under "staff" --

23       A.  Exhibit 2?

24       Q.  -- the prior exhibit, yes, sorry.

25       A.  Yes.

1                    FITZSIMMONS

2        Q.   Will you sometimes provide information to

3   the committee about the rating that has been

4   provided to you for this candidate?

5            MS. ELLSWORTH:   Objection.

6        A.   Yes.

7        Q.   Is that information provided in

8   subcommittee?

9            MS. ELLSWORTH:   Objection.

10       A.   It could be.

11       Q.   How would that information get

12  communicated to the subcommittee chair for a

13  subcommittee that wasn't yours?

14       A.   I might talk directly to the area person;

15  I might talk directly to the chair; I might go into

16  the subcommittee and talk to everyone.   It varies.

17       Q.   Before the subcommittee process begins,

18  does each docket receive a target number?

19       A.   Yes.

20           MS. ELLSWORTH:   Objection.

21       Q.   And how is that target number calculated?

22       A.   It's the roughest of rough estimates based

23  on the quality of the applicants the previous year

24  from that area with the information about number of

25  applicants, the number of people admitted from that

1                     FITZSIMMONS

2    particular area, which would be a measure of the

3    quality.

4           And then you would have the information

5    this year of any variations in the application

6    numbers.  And then, depending on where you are in

7    the process, you would have the admits so far,

8    which would be, again, a rough measure of -- this

9    is on, say, a one-pager as we had talked about

10   before.

11          So it's a very, very, very rough way to

12   start, just to -- but because our recruiting is so

13   comprehensive and because every year we are

14   writing, as you know, and communicating with

15   thousands and thousands of applicants in very much

16   the same way from year to year, we will tend to

17   have -- from one year to the next, you tend to have

18   the roughly the same number and then roughly the

19   same quality from an area.

20          Although, and the reason I use the word

21   rough, very rough to describe the targets is that

22   until you actually read the applications, you --

23   and go through committee, you don't really know

24   what the quality is this year.

25          So the targets are just a starting point

1                        FITZSIMMONS

2    that we all know may end up not at all representing

3    the quality this year versus last year.

4        Q.  So let me just back up a little bit.  Are

5    the targets -- the targets, as I understand your

6    testimony, are allocated based on what happened

7    with last year's class?

8        A.  Yes.

9        Q.  Docket by docket?

10       A.  Sorry.  Yeah.

11       Q.  Adjusted, perhaps, for any change in the

12   application numbers this year; is that correct?

13           MS. ELLSWORTH:  Objection.

14       A.  More or less.

15       Q.  Okay.  And how?  When you say more or

16   less, what do you mean?

17           MS. ELLSWORTH:  Objection.

18       A.  We might take a look at, again, look at

19   what last year's experience with the application

20   numbers and then the number of admits ultimately,

21   so at the end of the whole process.  And normally

22   we would simply proportionately use the last year's

23   admits as a way to get into this year's targets.

24           If there was a variation, you know, the

25   number of applications, you might increase a target

1                          FITZSIMMONS

2    or decrease a target slightly with that information

3    in hand.

4        Q.   Is it the same -- well, is the projected

5    yield factor in, to setting the targets?

6        A.   Only in the most collective sense, and

7    that is that we know one year to the next that the

8    yield in different areas tends to be roughly

9    similar to the previous year.  And we obviously

10   want very much not to have too many people who end

11   up saying yes, so that we would be overcrowded.

12        So if you add up, and this is the way it

13   would work, if you look at the bottom, I suppose,

14   of how many you admitted last year, the yield in a

15   funny way would be figured in by literally what

16   happened last year and then applied proportionately

17   to what we have in front of us this year.  But we

18   know that yields can vary overall, and they can

19   vary by docket from year to year.

20        Q.   To account for that, do you set a target

21   that is below the number of seats that you'll have,

22   based on whatever yield assumption you're applying?

23        A.   Well, in all cases, you know, every

24   docket, again figured out by looking at last year.

25   But we know that no matter how hard we try,

FITZSIMMONS

1

2    there'll still be anywhere, you know -- this year,

3    you know, 16 or 17 percent of the people we

4    admitted turned us down.  And the year before, the

5    number was more like 21 percent of the people

6    turned us down.

7        Q.  Right.  But I guess my --

8        A.  So the whole number would always be, of

9    admits, will always be more than the ones we expect

10   to show up.

11       Q.  Okay.  How many seats do you have in a

12   given class?

13       A.  1,662.

14       Q.  Okay.  And for regular action, you have

15   the benefit of the Early Action numbers.

16           Is your yield assumption that you use to

17   generate the targets, if it comes out right, does

18   that equal 1,662?

19       MS. ELLSWORTH:  Objection.

20       A.  We would hope.  It's always -- we would

21   hope to be able to use the waiting list each year.

22   So I think our hope, let's say in April, adding up

23   the early admits and the regular action admits, our

24   hope is that we would end up on May 1st, May 5th,

25   you know, when we get final responses from people,

Page 284

FITZSIMMONS

1

2  that we would have somewhat fewer than 1,662 so

3  that we could then go to the waiting list and admit

4  people.

5      Q.  How many people have come in off the

6  waiting list in recent years?

7      A.  It has been zero some years, and there was

8  one year -- I believe it was the year we came back

9  from early admit -- with early admission, I think

10  we ended up taking way over a hundred off the

11  waiting list.  A normal year would be 40 to 60.

12      Q.  Have you ever had years where you had more

13  than 1,662 people accept?

14      MS. ELLSWORTH:  Objection.

15      A.  Yes.

16      Q.  What happens then?

17      MS. ELLSWORTH:  Objection.

18      A.  We have to find a place for them to live.

19      Q.  Those people will not be denied the

20  opportunity to enroll at Harvard?

21      A.  No.

22      Q.  What do you do to find a place for them to

23  live?

24      MS. ELLSWORTH:  Objection.

25      A.  We would look at any available space in

                        FITZSIMMONS

1    information, so they would say at this time we will

2    prefer to come in under target, and we'll get the

3    late information and see where all this goes.

4        Q.  In the full committee process, can some

5    spots shift between dockets, so one docket ends up

6    with more than what their initial target was and

7    one docket ends up with less?

8            MS. ELLSWORTH:  Objection.

9        A.  Yes.

10       Q.  Does that happen a lot?

11           MS. ELLSWORTH:  Objection.

12       A.  Yes.

13       Q.  And how big is that shift?

14       A.  I'd say in aggregate it's typically about

15   a hundred or more.

16       Q.  At the subcommittee level -- you run a

17   subcommittee, correct?

18       A.  I do.

19       Q.  And which docket is that?

20       A.  P docket.  P.  Local area.

21       Q.  Boston-area schools?

22       A.  Sort of eastern Massachusetts, Boston

23   area.

24       Q.  At the subcommittee meeting does the

Page 288

FITZSIMMONS

1
2    subcommittee, when they are deciding which cases to

3    bring to full committee with whatever

4    recommendation, is race something that is discussed

5    about the applicants?

6         MS. ELLSWORTH:  Objection.

7    A.   It would be one part of, you know, of an

8    individual case, one factor among many.

9    Q.   And when you're reviewing the

10   subcommittee, you know, in the subcommittee

11   meeting, information about the race of each

12   applicant is available, correct?

13        MS. ELLSWORTH:  Objection.

14   A.   All candidates have, you know, information

15   about race or absence of information about race.

16   Q.   Is the subcommittee conducted using a

17   printed-out paper, you know, docket sheet?

18   A.   I'm not sure what you mean.

19   Q.   In prior years would there be a

20   printed-out sheet that listed summary information

21   about every candidate for admission in that

22   subcommittee?

23   A.   That would be the docket itself.

24   Q.   Right.

25   A.   As I understand it.

1                          FITZSIMMONS

2        Q.   Is the docket brought to subcommittee

3   meeting physically?

4            MS. ELLSWORTH:   Objection.

5        A.   Yes.

6        Q.   And are notes made on it by the committee

7   chair?

8        A.   Yes.

9        Q.   Okay.   And is that information

10  ultimately -- or is that copy of the docket then

11  brought to the full committee meeting as the record

12  of the subcommittee's decisions?

13       A.   Along with the electronic record.

14       Q.   Right.   So when is the electronic record

15  updated?   Is it during the subcommittee meeting?

16           MS. ELLSWORTH:   Objection.

17       A.   Generally, yes.

18       Q.   And when you're taking notes in P docket

19  subcommittee meetings, for example, are your notes

20  intended to record your view of the candidate's or

21  the subcommittee's view?

22           MS. ELLSWORTH:   Objection.

23       A.   It could be both.

24       Q.   If someone says something about an

25  applicant or makes a particular interest in --

1                          FITZSIMMONS

2    would you write a note in the margin?

3         A.  I might.

4         Q.  Would you have made notes in the margin on

5    the docket without telling everybody else in the

6    subcommittee that you made those notes?

7         A.  Well, we're in close proximity to one

8    another, so I think we're all aware of what I'm

9    doing and what everyone else is doing.

10        Q.  And so your testimony is, is that

11   ethnicity or race --

12             MR. STRAWBRIDGE:  Strike that.

13        Q.  We were talking about the targets.  Is

14   information about the ethnicity of the applicants

15   used in setting the targets?

16             MS. ELLSWORTH:  Objection.

17        A.  Not these days, no.

18        Q.  Did it used to be?

19        A.  I don't know prior to my becoming dean.

20        Q.  Do you think it might have been?

21             MS. ELLSWORTH:  Objection.

22        A.  I don't know.

23        Q.  I guess, why are you qualifying that when

24   you say not these days?

25             MS. ELLSWORTH:  Objection.

1                          FITZSIMMONS

2       A.   No.   No.   They might simply tell me that

3   they had, for example, if you were in the Midwest,

4   let's say on E docket or something of that sort

5   that there were lots of small-town rural

6   applicants, for example.

7       Q.   My question is about ethnicity.

8       A.   Right.

9       Q.   So let's just stick to that example.

10      A.   Okay.

11      Q.   You said there were some examples where

12  you'd seen questions or had conversations about

13  ethnicity?

14           MS. ELLSWORTH:   Objection.

15      A.   Occasionally, yes.

16      Q.   So what did they have?   Did they have a

17  handwritten sheet?   Did they have a printed-out

18  report?   What was the information they had?

19           MS. ELLSWORTH:   Objection.

20      A.   What I can recall is just simply, you

21  know, a statement that this year we, you know, did

22  extremely well and -- or badly or whatever it might

23  be in regard to one thing or another.

24      Q.   And when they say extremely well or badly,

25  were they typically comparing it to the prior year?

1                          FITZSIMMONS

2        A.   That would be the benchmark because there

3   are variations from year to year, and we expect

4   variations from year to year.

5        Q.   When you're in full committee, does every

6   single candidate for -- application get a vote?

7             MS. ELLSWORTH:   Objection.

8        A.   No.

9        Q.   Who decides which candidates should be

10  brought up for a vote?

11            MS. ELLSWORTH:   Objection.

12       A.   There would be three -- at least three

13  ways, four ways, whatever.  That would be -- area

14  person would be the first one you'd think of who

15  might want us to consider a case.  Now, when you

16  say bring up, do you mean a person who is not

17  admitted currently?

18       Q.   I suppose I should say a person -- who

19  decides who's brought up for discussion in full

20  committee?

21       A.   So the way it would work -- so I chair

22  full committee, so and, of course, there are plenty

23  of other people in the room, including senior

24  admissions officers.

25            So one of the things that we want to be

1                         FITZSIMMONS

2    you disagree with that?

3          MS. ELLSWORTH:  Objection.

4      A.  I certainly wouldn't have any use for it

5    on a daily basis.

6      Q.  Okay.  But do you know whether it's

7    updated on a daily basis?

8          MS. ELLSWORTH:  Objection.

9      A.  Well, we update the numbers on a daily --

10   as we go through the -- at the end of each docket

11   we record what happened, and as the dockets are

12   reviewed in full committee we'll record that.  So

13   if you ran an interest list, you'd get different

14   information from one day to the next.  I'm not sure

15   what you would do with it, why it would be

16   important.

17     Q.  I'm not talking about the interest list.

18   We're talking about the --

19     A.  I'm sorry.  I'm sorry.  Yeah.  You're

20   right.  The one-pager.

21         MS. ELLSWORTH:  Why don't we take a quick

22   break.

23         MR. STRAWBRIDGE:  Do you want to take a

24   break?

25         MS. ELLSWORTH:  Yeah.

1                        FITZSIMMONS



FITZSIMMONS



FITZSIMMONS



FITZSIMMONS



Page 318

1                          FITZSIMMONS

2        A.   It's part of the full committee where we

3    ensure that we send out the number of admissions

4    that will, we hope, not overcrowd our class.

5        Q.   Is it the point where decisions have to be

6    made to pare back the class to get to the target

7    number?

8             MS. ELLSWORTH:   Objection.

9        A.   It's one way of looking at it.

10       Q.   Are lops distributed evenly amongst the

11   dockets in proportion to the number of admits who

12   are beyond the target?

13       A.   That would be the goal.

14       Q.   Every subcommittee receives a lop number?

15       A.   Yes.

16       Q.   And is required to fill out a form

17   recommending lops?

18       A.   Yes.

19       Q.   Does that form request information about

20   the ethnicity of the candidates who are being

21   proposed for lops?

22       A.   As I recall.

23            (Exhibit 6, HARV00004924 - 4927, marked for

24        identification.)

25            MR. STRAWBRIDGE:   Look at this document and

1                          FITZSIMMONS

2      tell me if you recognize it.

3      Q.  Do you recognize this document?

4      A.  Yes.

5      Q.  Is this an example of a one-pager?

6      A.  Part of it is.

7      Q.  Is that the first page of the data that's

8  presented here?

9      A.  Yes.

10         (Exhibit 7, HARV00021585, marked for

11     identification.)

12         MR. STRAWBRIDGE:  Going to hand you what's

13     been marked as Exhibit 7.

14         MS. ELLSWORTH:  Can we have a copy,

15  please?  Thank you.

16         THE WITNESS:  Yes.

17     Q.  Do you recognize this document?

18     A.  I recognize what it is.  I had not seen it

19  before.

20     Q.  This is an e-mail from Kaitlin Howrigan to

21  Elizabeth Yong on March 19th, 2013; is that

22  correct?

23     A.  Yes.

24     Q.  And I'll represent to you that calendars

25  produced by Harvard in this case indicate that

Page 320

FITZSIMMONS

1

2   March 19th was scheduled to be the final day of the

3   full committee meeting that year.

4         Do you have any reason to disagree with

5   that representation?

6         MS. ELLSWORTH:  Objection.

7    A.  It's likely that was the final day or

8   close to it.

9    Q.  Ms. Howrigan writes to Ms. Yong, "We just

10  finished up our first pass, and WRF was hoping he

11  could get a one-pager and his ethnic stats so we

12  can look at where -- it looks like we need to take

13  28 more right now for the lop needs."

14        Did I read that correctly?

15   A.  Yes.

16   Q.  What are your ethnic stats?

17        MS. ELLSWORTH:  Objection.

18   A.  So this is not part of that.  This is all

19  Early Action, this document.

20        MR. LEE:  You ought to state he's

21  referring to Exhibit --

22        THE WITNESS:  I'm sorry.  This --

23        MR. LEE:  He's got two in front of him

24  right now.

25        MR. STRAWBRIDGE:  Right.  You should --

1                          FITZSIMMONS

2    I'm referring to Exhibit 7.

3              THE WITNESS:  Right.  So this is

4    March 19th.  This is full committee.  This is not

5    related.

6              MR. STRAWBRIDGE:  You can put Exhibit 6

7    aside.

8              THE WITNESS:  Okay.  Yes.

9    Q.  Right.  What are your ethnic stats?

10             MS. ELLSWORTH:  Objection.

11   A.  It would -- any statistics that would give

12   us a sense of where we are in the class regarding

13   ethnicity at that moment.

14   Q.  Including a comparison to the prior year?

15   A.  It looks that way from the --

16   Q.  And that was typically what was included

17   with the one-pagers, correct?

18             MS. ELLSWORTH:  Objection.

19   A.  Ethnic stats?

20   Q.  Comparisons to the prior year?

21   A.  That would -- they would be on a

22   one-pager.

23   Q.  Is there a distinction between the

24   one-pager and the ethnic stats that is being

25   referred to in this document?

1                         FITZSIMMONS

2        A.   I'm not sure what she means by the ethnic

3   stats.

4        Q.   The one-pager that we looked at does, in

5   fact, contain statistics about ethnicity, correct?

6        A.   Yes.

7        Q.   And that's typical for the one-pagers?

8        A.   Yes.

9        Q.   Ethnicity is -- I believe you testified

10  ethnicity is information that is asked for

11  specifically on the form on which admissions

12  officers identify their lops?

13             MS. ELLSWORTH:   Objection.

14        A.   Be one factor.

15        Q.   And ethnicity is something that is

16  available to the committee when it's designating

17  people to lop; is it not?

18        A.   Along with all the information that anyone

19  might request.

20        Q.   Is all that other information on the lop

21  form?

22        A.   Not all the information.

23        Q.   Just a few pieces of information?

24        A.   Some pieces of information.

25        Q.   Legacy?

1                         FITZSIMMONS

2          MS. ELLSWORTH:  Objection.

3      A.  Yes.

4      Q.  Ethnicity?

5          MS. ELLSWORTH:  Objection.

6      A.  Yes.

7      Q.  Anything else you can think of?

8      A.  I'd have to see a one-pager.

9      Q.  A one-pager or a lop form?

10     A.  Oh, I'm sorry.  You're talking about the

11  lop form.

12     Q.  I'm talking about the lop form.

13     A.  I'm sorry.  Could you repeat the question

14  again?

15     Q.  What's asked for on the lop form?

16         MS. ELLSWORTH:  Objection.

17     Q.  Besides ethnicity and legacy status?

18     A.  I would have to see the most recent one.

19  Forms have changed.

20     Q.  When have they changed?

21     A.  I don't remember.

22     Q.  Before or after this lawsuit?

23         MS. ELLSWORTH:  Objection.

24     A.  I don't recall.

25     Q.  Do ethnicities yield at different rates?

1                    FITZSIMMONS

2       A.   I'm not sure I know what you mean by

3  often.

4       Q.   Do you have occasion to receive reports

5  that include this type of demographic information

6  over the course of four years?

7            MS. ELLSWORTH:   Objection.

8       A.   I have seen four-year data before, simply

9  because it would be a current cohort.

10      Q.   And by current cohort, you mean it would

11  be the entire student body of Harvard for a

12  particular year?

13      A.   Yes.

14      Q.   The bottom sort of third of this chart,

15  does that display yield rates by ethnicity for the

16  classes of 2014 through 2017?

17            MS. ELLSWORTH:   Which page are you on?

18            THE WITNESS:   Page one?

19            MR. STRAWBRIDGE:   The first page.

20            MS. ELLSWORTH:   1859?

21            MR. LEE:   Yes.

22            MS. ELLSWORTH:   Okay.

23      Q.   Do you see that?

24      A.   Yes.

25      Q.   All right.   And so, for example, let's

1                        FITZSIMMONS

2    just look at the most recent class on this chart,

3    the class of 2017.  That indicated that Asian

4    Americans had an 83.8 percent yield that year?

5        A.  Yes.

6        Q.  And the prior year it was 87.5 percent for

7    Asian Americans?

8        A.  Yes.

9        Q.  And it was over 80 percent for both the

10   classes of '14 and '15, was it not?

11       A.  Yes.

12       Q.  And African American yield in 2017 was 67

13   percent, correct?

14       A.  Yes.

15       Q.  16 points lower?

16           MS. ELLSWORTH:  Objection.

17       Q.  Give or take a decimal?

18       A.  Yes.

19       Q.  And for the year before that, it was 13

20   points, 13 and a half points lower?

21           MS. ELLSWORTH:  Objection.

22       A.  Yes.

23       Q.  And for the year before that, 16.8 percent

24   lower?

25           MS. ELLSWORTH:  Objection.

1                        FITZSIMMONS

2      A.  Yes.

3      Q.  And for the year before that, it was

4  63.6 percent compared to 81.5 percent for Asian

5  Americans, right?

6      A.  Yes.

7      Q.  The Hispanic American numbers, do you see

8  those?

9      A.  Yes.

10     Q.  Also in -- it was 71.1 percent in 2017?

11         MS. ELLSWORTH:  Objection.

12     A.  Yes.

13     Q.  12 points lower than the listed Asian

14  Americans yield rate?

15         MS. ELLSWORTH:  Objection.

16     A.  Yes.

17     Q.  And in 2016 it was actually 21 points

18  lower than the Asian American yield rate?

19         MS. ELLSWORTH:  Objection.

20     A.  Nearly.

21     Q.  And for both '15 and '14, the yield rate

22  for Hispanic Americans was again in the 60 percent

23  range, right, in the 60s?

24     A.  Yes.

25     Q.  All right.  So, I mean, a difference of

1                         FITZSIMMONS

2    20 points in some cases, that's a fairly

3    substantial difference in yield, right?

4            MS. ELLSWORTH:  Objection.

5        A.  Yes.

6        Q.  For a hundred given people, it's the

7    difference between -- you know, it could be as many

8    as 20 people not coming, right?

9        A.  Correct.

10       Q.  So you testified earlier how important the

11   number of seats are in the class when you're

12   setting targets, right?

13       A.  Yes.

14       Q.  We just talked about the fact that you

15   look at the one-pagers at various points during the

16   process, correct?

17           MS. ELLSWORTH:  Objection.

18       A.  Yes.

19       Q.  Does Harvard make sure that the ultimate

20   ethnic composition of its class doesn't vary too

21   widely from the previous year?

22           MS. ELLSWORTH:  Objection.

23       A.  No.

24       Q.  Does it matter to Harvard if in a given

25   year, for example, the class through the full

1                        FITZSIMMONS

2    committee meeting process yields a 40 percent Asian

3    class?

4            MS. ELLSWORTH:  Objection.

5       A.  We simply admit the best students.

6       Q.  And if in a given year the best students

7    yielded a class that's 40 percent Asian, that's

8    fine with you, right?

9            MS. ELLSWORTH:  Objection.

10      A.  Again, we simply admit the best students

11   and hope we can get them.

12      Q.  You'd be okay with that?

13           MS. ELLSWORTH:  Objection.

14      Q.  Right?

15      A.  If we -- yes.

16      Q.  So if that were to happen in a given year,

17   wouldn't that pretty much blow the targets?

18           MS. ELLSWORTH:  Objection.

19      A.  I'm not sure I quite understand.  You mean

20   come in over?

21      Q.  Right.  If one year the Asian Americans

22   went from 20 percent of the class to 40 percent of

23   the class, right, and they yielded consistent with

24   what this chart shows, you'd have more people

25   accepting the offers?

1                           FITZSIMMONS

2           MS. ELLSWORTH:  Objection.

3      A.   There's really no way to predict what

4  might happen with an additional number of admits.

5      Q.   Well, isn't that what this is doing?  I

6  mean, you track yield rate, correct?

7           MS. ELLSWORTH:  Objection.

8      A.   Yes.

9      Q.   And you predict yield rate to set the

10  targets at the beginning of the process?

11      A.   Yes.

12      Q.   And if -- the prediction is based on the

13  prior year's statistics, right?

14      A.   Yes.

15      Q.   And those predictions, in turn, those

16  statistics reflect significant differences by

17  ethnicity in yield rates, then does it stand to

18  reason if the final 1,660 some-odd people selected

19  by the full committee is significantly more Asian

20  American than last year, you're going to have more

21  people accept their offers of admission than you

22  were planning?

23           MS. ELLSWORTH:  Objection.

24      A.   It's possible.  But, again, one of the

25  things we do in our recruiting process is look for

                        FITZSIMMONS

1
2    people from a wide range of backgrounds, including

3    ethnicity, so that it's unlikely, if you continue

4    to do the kind of strong recruitment that we have

5    done, that you would end up in exactly the

6    situation we've been in.

7        Q.  So your expectation based on the

8    recruiting that you do is that you're going to end

9    up with a pool and a final class that's similar to

10   what you've had before?

11       MS. ELLSWORTH:  Objection.

12       A.  Given the strength of the recruitment

13   efforts across the board which we have described in

14   various ways today and in the interrogative, we

15   would expect to get an extremely strong and diverse

16   applicant pool.  And given the vital importance of

17   having a class that is diverse ethnically and in

18   every other way for the educational value of our

19   undergraduates, it is very unlikely that the

20   hypothetical that you raise would ever occur.

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24       MS. ELLSWORTH:  Objection.

25       A.  I'm not sure what would happen in that

1                        FITZSIMMONS

2      case.

3         Q.  You just told me that recruitment efforts

4      are what drives your expectations about the

5      relative extent to which people apply to the

6      school, correct?

7              MS. ELLSWORTH:  Objection.

8         A.  Yes.  But we recruit lots of people, as

9      you know, and not all of them apply.

10        Q.  And so, when you're trying to inform your

11     recruiting, is it with a mind toward ensuring that

12     the applicant pool remains in the same range as

13     what it's at today with respect to ethnic

14     distribution?

15             MS. ELLSWORTH:  Objection.

16        A.  No.

17     ████████████████████████████████████████████████

18     ████████████████████████████████████████████████

19             MS. ELLSWORTH:  Objection.

20        A.  We need to send recruitment letters to

21     people from all different ethnic backgrounds and

22     then consider their applications carefully once

23     they apply.  So I'm -- we certainly don't want to

24     send so many recruitment letters out across the

25     board so that we would not, you know, end up with

1                        FITZSIMMONS

2    lots of people who might not be strong enough to

3    get through the admissions process.

4         Q.  But what about -- the start of this

5    discussion was talking about how you make sure that

6    your admissions process doesn't produce a class

7    that yields a much higher rate than the prior

8    classes did, and so you started talking about how

9    you go about recruiting to ensure that you're not

10   going to have any unexpected changes in the pool,

11   such that when you go through the process, you're

12   not going to have a situation where, all of a

13   sudden, you have 40 percent of the class being

14   Asian when you set targets expecting a class that

15   was only 20 percent Asian?

16             MS. ELLSWORTH:  Objection.

17        Q.  Is that your testimony?

18             MS. ELLSWORTH:  Misstates testimony and

19   not a question.

20             But go ahead.

21        A.  Could you repeat the question?

22        Q.  Is your testimony that the way that you

23   ensure you don't end up with a class that yields at

24   a much higher rate than the prior year's predicted

25   rate when you set targets is you recruit carefully

1                        FITZSIMMONS

2   to ensure you keep getting the same type of class

3   that you've had?

4         MS. ELLSWORTH:  Objection.

5     A.  The point of recruitment is to get the

6   strongest possible class across many dimensions,

7   including ethnicity.  The point of the process is

8   to do just that and not simply have a higher yield.

9     Q.  Right.  If you had a significantly higher

10  yield than you predicted, you'd be oversubscribed,

11  correct?

12    A.  Yes.

13    Q.  Something that's happened once in your

14  tenure as dean?

15    A.  Yes.

16    Q.  And something that creates real logistical

17  problems with respect to how many beds you have,

18  correct?

19    A.  It could.

20    Q.  So what is it about your recruiting

21  process that helps to ensure that the ultimate

22  class is not 40 percent Asian?

23        MS. ELLSWORTH:  Objection.

24    A.  It is certainly not a goal of ours to

25  limit ethnicity.  A goal of ours is to ensure that

1                          FITZSIMMONS

2    question.

3        Q.  Yes.  Since you're fine with variations

4    and you're not managing to any particular

5    ethnicity, in a given year when the number of Asian

6    Americans in the class jumped 10 percent, at the

7    end of the committee meeting how did you deal with

8    that?

9        MS. ELLSWORTH:  Objection.

10       A.  It would simply mean that you should make

11   certain that you admit fewer people overall.

12       Q.  Right.  Is that what you did when that

13   happened before?

14       MS. ELLSWORTH:  Objection.

15       A.  It would be one strategy, but it would

16   depend on what else was going on.  It's not that

17   simple.

18       Q.  Do you remember that happening with Asian

19   Americans in any given year?

20       MS. ELLSWORTH:  Objection.

21       A.  I don't have a -- just looking at this,

22   I don't have a crystal-clear recollection of that.

23       Q.  In the number of years that you've been

24   dean at Harvard, has the number of Asian Americans

25   in any given class ever jumped by 10 percent, year

1                        FITZSIMMONS

2    over year?

3         MS. ELLSWORTH:  Objection.

4         A.  I don't know the answer to that off the

5    top of my head.  There are variations from year to

6    year.

7         Q.  Any variations that required you to cut

8    other people from the class?

9         MS. ELLSWORTH:  Objection.

10        A.  If that number were to jump, that would --

11   again, depending on what else, there might have

12   been a countervailing component of the admitted

13   group that might have suggested a lower yield.

14   So you might not have had to change the target for

15   the number of people you sent out for admits.

16        Q.  Is that one of the reasons why you're

17   asking for ethnic information in the lot process?

18   To make sure you don't blow your targets?

19        MS. ELLSWORTH:  Objection.

20        A.  That's one piece of information that we

21   would use.

22        Q.  Is that the only reason you're asking for

23   ethnic information?

24        MS. ELLSWORTH:  Objection.

25        A.  That would be the only reason.

1                           FITZSIMMONS

2       Q.   That's the only reason?  To make sure you

3  don't blow the targets?

4       MS. ELLSWORTH:  Objection.

5       A.   And also, as with anything else you want

6  to understand the strength of the applicant pool in

7  the current year that you're looking at.

8       Q.   Were you dean at Harvard College when the

9  Office of Civil Rights for the Department of

10  Education conducted a compliance review with

11  respect to Harvard's admission of Asian Americans?

12      A.   In the late '80s?

13      Q.   Yes.

14      A.   Yes.

15      Q.   And do you remember what prompted that

16  compliance review?

17      A.   I don't really recall specifically.

18      Q.   Do you remember at the time that there was

19  a lot of information in the press raising questions

20  about Harvard's treatment of Asian Americans?

21      MS. ELLSWORTH:  Objection.

22      A.   I do have a recollection of articles in

23  the press.

24      Q.   Did that prompt Harvard to issue a

25  statement regarding Asian American admissions at

1                       FITZSIMMONS

2          MS. ELLSWORTH:  Objection.

3      A.  I think there are -- I don't have an exact

4  answer to the question.  I think there are great

5  similarities.

6      Q.  Do you think that there's anything about

7  being Asian that is associated with lesser

8  performance in extracurricular activities?

9      A.  No.

10      Q.  What about personal qualities?  In your

11  experience, do you think Asian Americans have fewer

12  attractive personal qualities than white students?

13          MS. ELLSWORTH:  Objection.

14      A.  That wouldn't be my impression.

15      Q.  We're talking about things like

16  leadership.  Is that a personal quality?

17      A.  One of many.

18      Q.  Friendliness?  Outgoing natures?

19          MS. ELLSWORTH:  Objection.

20      A.  Again, one of many, many variables.

21      Q.  And so you have no reason to believe that

22  there's any reason why Asian Americans have those

23  qualities, you know, to a lesser degree than white

24  applicants, do you?

25          MS. ELLSWORTH:  Objection.

Page 348

                              FITZSIMMONS

1

2       A.   No.

3       Q.   Who's Thomas Hibino?

4       A.   He was, I believe, the principal

5    investigator for the government for the Asian

6    American review you had asked about earlier.

7       Q.   And is that the first time that you met

8    him?

9       A.   Yes.

10      Q.   Okay.  And what was the outcome of the OCR

11   investigation?

12           MS. ELLSWORTH:  Objection.

13      A.   Harvard was found to be in full compliance

14   with the law regarding their investigation.

15           (Exhibit 9, HARV00018463 - 18470, marked

16           for identification.)

17           MR. STRAWBRIDGE:  Handing you what's been

18           marked as Exhibit 9.  I'm going to ask you

19           about some parts of this.  Why don't you take a

20           quick look at the document as a whole and see

21           if you recognize it.

22           MS. ELLSWORTH:  If you're going to ask him

23    about the document, I'd like him to read the

24    document.

25           MR. STRAWBRIDGE:  Would you like him to

1                       FITZSIMMONS

2  year over year results with respect to admits?

3           MS. ELLSWORTH:  Objection.

4       A.  Yes.

5       Q.  It has nothing to do with any concern

6  about ensuring a particular ethnic mix amongst the

7  class?

8           MS. ELLSWORTH:  Objection, asked and

9  answered.

10      A.  Yes.

11      Q.  If the stability of African American

12 admissions over the same 20-year period were

13 identical, would you feel just as comfortable with

14 that explanation?

15          MS. ELLSWORTH:  Objection.

16      A.  Yes.

17      Q.  And that's true even if the number of

18 African Americans who had applied to Harvard had

19 doubled in that time?

20          MS. ELLSWORTH:  Objection.

21      A.  Yes.

22      Q.  Mr. Hibino from OCR, do you consider him

23 to be a friend?

24      A.  Today, yes.

25      Q.  When did he become your friend?

Page 363

1                           FITZSIMMONS

2        A.  Especially after his retirement.

3        Q.  When did he retire?

4        A.  I'm not sure precisely.  Within the past

5   few years.

6        Q.  Before he retired did you go out to meals

7   with him?

8            MS. ELLSWORTH:  Objection.

9        A.  Occasionally.

10       Q.  Did you ever go out the dinner with him?

11       A.  Recently.

12       Q.  Before he retired?

13       A.  I don't recall dinner.

14       Q.  Did he oversee any other OCR

15   investigations of Harvard during your time as dean

16   of admissions?

17           MS. ELLSWORTH:  Objection.

18       A.   I don't recall whether he -- you used the

19   term "oversee."  I'm aware that there were other

20   situations with Harvard that his office was

21   involved in.  I don't recall his particular role.

22       Q.  Do you remember him speaking with you in

23   regard to those investigations?

24       A.  I have a vague recollection of some

25   general conversations.

1                    FITZSIMMONS

2       A.   I would say it explains some of the

3  difference.

4       Q.   How much of the difference?

5            MS. ELLSWORTH:   Objection.

6       A.   I wouldn't be able to quantify that

7  without looking at a particular report.

8       Q.   Do you think it's most of the difference?

9            MS. ELLSWORTH:   Objection.

10      A.   I think it's very hard to say.

11      Q.   Are you familiar with an article published

12  by Ron Unz in November 2012 entitled "The Myth of

13  the American Meritocracy"?

14      A.   Yes.

15      Q.   Do you remember when that article was

16  published?

17           MS. ELLSWORTH:   Objection.

18      A.   Not precisely.

19      Q.   Does November 2012 sound right?

20      A.   That sounds in the ballpark.

21      Q.   Do you remember, among other things, that

22  article making allegations about Harvard's

23  treatment of Asian American applicants?

24      A.   Yes.

25      Q.   And do you recall whether or not that

1                              FITZSIMMONS

2     article prompted a number of inquiries to the

3     Harvard admissions office about the allegations

4     that Mr. Unz was making?

5              MS. ELLSWORTH:  Objection.

6        A.   Yes.

7        Q.   Do you recall inquiries from the press?

8        A.   Yes.

9        Q.   Do you recall inquiries from alumni?

10       A.   Yes.

11       Q.   Do you remember inquiries from other

12    professors or faculty members at Harvard?

13             MS. ELLSWORTH:  Objection.

14       A.   I don't recall specific faculty members.

15       Q.   What did you do to respond to Mr. Unz's

16    allegations?

17             MS. ELLSWORTH:  Objection.  I'll remind

18    the witness not to disclose communications with

19    counsel in responding to the question.

20       A.   One of the things I -- and I did request

21    communication, a meeting with Counsel, and so I

22    don't know in that context whether it would be

23    appropriate for me to --

24             MS. ELLSWORTH:  So the question was what

25    did you do to respond, and I'm just reminding you

1                          FITZSIMMONS

2        Q.  At some point did you ask the Office of

3    Institutional Research to begin investigating

4    whether Asian Americans -- whether the admissions

5    process at Harvard was biased against Asian

6    Americans?

7            MS. ELLSWORTH:  Objection.

8        A.  I don't recall making that specific

9    request.

10       Q.  You say you don't remember?  Are you

11   testifying under oath that you didn't ask them to

12   do that?

13           MS. ELLSWORTH:  Objection.

14       A.  I don't have a recollection of making that

15   specific request.

16       Q.  Is it possible -- so do you have a

17   recollection of making any requests relating to

18   Asian American discrimination?

19           MS. ELLSWORTH:  Objection.  A request of

20   whom?  I need to know whether to give a counsel

21   instruction, so I'm asking, was there a request of

22   whom?

23           MR. STRAWBRIDGE:  He said he doesn't

24   remember making that specific request, so I'm

25   asking --

1                        FITZSIMMONS

2          MS. ELLSWORTH:  I'm just asking you to

3    clarify your question so I can instruct the witness

4    or not.

5          MR. STRAWBRIDGE:  Does he remember making

6    any request?

7          MS. ELLSWORTH:  Objection.  I'll instruct

8    the witness not to disclose any communications with

9    counsel in responding to the question.

10         A.  I have a recollection of making a request

11   regarding early admission.

12         Q.  And when was that?

13         A.  I don't recall exactly.

14         Q.  Were you making a request with respect to

15   discrimination against Asian Americans, or --

16         A.  No.  The subject simply was trying to

17   analyze the effect of not having and then having

18   early admission programs, not to do with Asian

19   Americans.

20         Q.  And was that when Harvard was trying to

21   make a decision about whether to reintroduce Early

22   Action admissions?

23         MS. ELLSWORTH:  Objection.

24         A.  I believe so.

25         Q.  That was before Mr. Unz published his

                         FITZSIMMONS

1    PowerPoint.  I'm not going to ask you questions

2    about the back half, which I understand to be

3    identical to the front half.

4           THE WITNESS:  Looks that way.

5        Q.  Do you recognize this document?

6        A.  I have a recollection of it.

7        Q.  What do you remember about this document?

8        A.  I remember, among other things, how

9    incomplete the analysis was, just given -- as the

10   report indicates, there are a number of levels,

11   that there are lots of information that they

12   clearly didn't have in putting together a model.

13       Q.  So what do you --

14       A.  So the -- so these --

15          MR. LEE:  Ask him to let her --

16          MR. STRAWBRIDGE:  Well, no.  She can make

17   her objections.

18          MR. LEE:  Well, I --

19          MS. ELLSWORTH:  Let the witness --

20          MR. LEE:  I'm talking to her.

21          MR. STRAWBRIDGE:  Well, I just want to

22   start because -- I'm going to give the witness a

23   full chance to explain, but I just want to start

24   there.

1                    FITZSIMMONS

2        MS. ELLSWORTH:  Well, the witness was in

3  midsentence, and now we've interrupted him.

4        Q.  What do you recall about when you first

5  saw this document?

6        A.  I'm not sure what you mean.

7        Q.  Did you see this document in 2013?

8        A.  I'm not sure when I first saw it.

9        Q.  Is your recollection of seeing this

10  document based on your prep for this deposition?

11        MS. ELLSWORTH:  Objection.

12        A.  The prep had nothing to do with what I

13  remembered or didn't remember.

14        Q.  You remember seeing this document before

15  you prepped for this deposition?

16        A.  Some of this information is familiar, but

17  we have lots of interactions with different parts

18  of Harvard.

19        Q.  So you don't remember when you saw this,

20  but you remember how incomplete it was, is your

21  testimony?

22        MS. ELLSWORTH:  Objection.

23        A.  You asked for a general impression and

24  that would have been my impression, but I don't

25  remember precisely when I first saw it.

Page 394

FITZSIMMONS

Q.  Do you know who Mark Hansen is?

A.  I believe he is or was -- I don't know if he's still there because this was all a long time ago -- a member of the Office of Institutional Research.

Q.  And do you remember speaking to him in 2013 about this analysis?

A.  Not specifically.

Q.  Do you remember speaking with Ms. Bever about it in 2013?

A.  No.

Q.  Do you remember speaking to Ms. Driver-Linn about it in 2013?

A.  Not specifically.

Q.  Generally?

A.  I don't remember specifically with whom I talked.

Q.  Do you remember where you were the first time you saw this document?

MS. ELLSWORTH:  Objection.

A.  Not specifically.

Q.  The only memory you have about this document is a vague recollection of seeing it sometime?

1                          FITZSIMMONS

2          MS. ELLSWORTH:  Objection.

3     A.   That's the only thing can I say with any

4     certainty.

5     Q.   And when you say that you saw this

6     document, do you remember looking specifically at

7     the first five pages of this document?

8     A.   I remember generally the kind of data that

9     this represents.

10    Q.   Do you see the summary slide?

11    A.   I'm sorry.  Which page would that be on?

12    Q.   Page 2 of this document.

13    A.   Page 2.

14    Q.   The first bullet point says athletes and

15    legacies explain the difference in raw admit rates

16    for Asian and white applicants, correct?

17    A.   That's what it says.

18    Q.   Do you know why OIR was looking into the

19    differences between Asian and white applicants with

20    respect to athletes and legacies?

21         MS. ELLSWORTH:  Objection.

22    A.   I don't know specifically what their

23    motivation was.

24    Q.   Is information about the comparative

25    admission rates for athletes -- for Asians and

Page 398

1                        FITZSIMMONS

2          MS. ELLSWORTH:  Are you asking now, or are

3    you asking about a memory?

4          MR. STRAWBRIDGE:  I don't know -- he said

5    he remembered when he looked at it --

6          MS. ELLSWORTH:  I'm just asking --

7          MR. STRAWBRIDGE:  -- how incomplete it

8    was.

9          MS. ELLSWORTH:  -- if -- that was my

10   question.

11         MR. STRAWBRIDGE:  I'm asking if that's a

12   memory specific to this slide.

13         MS. ELLSWORTH:  Okay.  Object to form.

14   A.  I think whenever one creates such a model

15   just using very simple variables without having

16   information, the kind of information that we have

17   when we actually review individual applicants, you

18   are -- it is fraught with difficulty because you

19   don't really have a sense of what the real strength

20   of an application is.

21         So it's really impossible to say with any

22   certainty what this actually means without taking

23   into account the full range of information that you

24   would have in an individual application.

25   Q.  Is that your memory -- do you remember

1                          FITZSIMMONS

2    thinking that as soon as you saw this the first

3    time?

4          MS. ELLSWORTH:  Objection.

5    A.  Yes.

6    Q.  Okay.  And is that -- then why did you ask

7    OIR to look into Early Action at one point?

8          MS. ELLSWORTH:  Objection.

9    A.  We had given up Early Action at one point

10   and then we were trying to make a decision about

11   whether to reinstitute early admissions.  So we

12   asked them both before we gave up early admission

13   and then to give us some analyses during the

14   process.

15   Q.  What makes that subject to useful

16   statistical analysis, but the admissions decision

17   process not useful to the statistical analysis?

18         MS. ELLSWORTH:  Objection.

19   A.  I don't think anything is useless.

20   I think what you end up with is a limited

21   information.  And any time you posit a model, that

22   may be based on incomplete information.

23   Q.  And what information, in particular, do

24   you think that this model was missing?

25         MS. ELLSWORTH:  Objection.

Page 401

FITZSIMMONS

1

2   even with pluses and minuses would be very

3   incomplete compared to looking at a real

4   application and then comparing real applications

5   holistically with all the others and then having

6   the admissions committee vote.

7       Q.  What did you do to ensure that OIR would

8   have the complete information they needed to do

9   this analysis?

10      MS. ELLSWORTH:  Objection.

11      A.  I'm not sure what the follow-up was.

12      Q.  Do you remember doing anything?

13      MS. ELLSWORTH:  Objection.

14      A.  I don't have a specific recollection.

15      Q.  Do you have any recollection of doing

16  anything after looking at these materials?

17      MS. ELLSWORTH:  Objection.

18      A.  I don't have a specific recollection of

19  doing -- of following it up directly.

20      Q.  Your answer is that you don't have a

21  specific recollection.  I'm asking you, just so

22  we're clear, do you have any recollection of doing

23  anything?

24      MS. ELLSWORTH:  Objection.

25      A.  No.

1                           FITZSIMMONS

2        Q.  Have you seen any documents that suggest

3    you undertook any action after looking at this?

4           MS. ELLSWORTH:  Objection.

5        A.  Not that I can recall.

6        Q.  Do you remember speaking to Ms. McGrath

7    about this?

8        A.  No.

9        Q.  Do you remember speaking to Ms. Donahue

10   about this?

11       A.  About this data?

12       Q.  Yes.  And what the model said and didn't

13   say?

14          MS. ELLSWORTH:  Objection.

15       A.  I don't have a specific recollection of

16   talking with her either.

17       Q.  Did you reject the information that was

18   provided to you out of hand?

19          MS. ELLSWORTH:  Objection.

20       A.  I wouldn't categorize it in --

21   characterize it in that way.

22       Q.  Did you explain to OIR that what they did

23   was incomplete and they needed to do more work?

24          MS. ELLSWORTH:  Objection.

25       A.  We explained to them that -- the very

FITZSIMMONS

1

2  nature of what they had done.  And the very nature

3  of producing a model is always going to be

4  incomplete and they had already recognized that, as

5  you can see from the report.

6      Q.  You remember explaining that?

7      A.  In general terms.

8      Q.  And what do you remember specifically

9  about -- how specifically do you remember that?

10      MS. ELLSWORTH:  Objection.

11      A.  I remember -- if you go to page, I think

12  it was 16, I have a very vague recollection of

13  acknowledging what they had said.  And I don't

14  remember specifically whether I added, you know,

15  additional information, but that's quite possible.

16      Q.  Who do you remember talking to?

17      A.  We have many meetings with many people, so

18  I don't remember specifically who was in this

19  meeting, which was five, six years ago.

20      Q.  Did you tell them that you didn't think

21  they should pursue this anymore?

22      MS. ELLSWORTH:  Objection.

23      A.  I don't remember saying that.

24      Q.  Do you know whether, in fact, Ms. Yong

25  provided additional data to Mr. Hansen later in

1                        FITZSIMMONS

2    February 2013?

3        A.   I don't recall specifically.

4        Q.   Do you remember looking at page 5 of this

5    report?

6        A.   I don't remember specifically looking at

7    it five, six years ago.

8        Q.   Do you remember looking generally at it?

9            MS. ELLSWORTH:   Objection.

10       A.   I don't have a clear recollection of

11   looking at the table.

12       Q.   Based on your testimony earlier today,

13   I understood you to say that you don't think that

14   race has any correlation, in your experience, with

15   the personal qualities that make someone attractive

16   to Harvard?

17           MS. ELLSWORTH:   Objection.

18       A.   I believe that as you read individual

19   applications of people from different ethnic

20   backgrounds that you will find that each person is

21   different one from the other and that personal,

22   strong and -- strong personal qualities are found

23   in all people, all ethnic groups, all backgrounds.

24       Q.   Can you think of any explanation why OIR's

25   review of the data as reflected on this chart

1                         FITZSIMMONS

2    indicated that whites appeared to have higher

3    personal rating, on average, than Asian applicants,

4    at least, when limited to the NLNA pool?

5              MS. ELLSWORTH:  Objection.

6         A.   I don't.

7         Q.   Does that make any sense to you?

8              MS. ELLSWORTH:  Objection.

9         A.   I don't know how to respond to that

10   question.

11        Q.   Does it concern you that Asian applicants

12   may be being rated so much more differently than

13   white applicants on personal ratings?

14             MS. ELLSWORTH:  Objection.

15        A.   Again, each individual that we look at,

16   you know, is -- the applications would be read by

17   any number of people and then the entire admissions

18   committee would review the candidates who, you

19   know, might be admitted.

20             So there again, within every ethnic group

21   there are people with very strong personal

22   qualities.  So the focus is really always on the

23   individual and not on a category.

24        Q.   But if statistical information were to

25   suggest that Asian Americans were across the board

1                      FITZSIMMONS

2    can ask that question after a break.  It's been an

3    hour and 20 minutes.

4            THE VIDEOGRAPHER:  Time now is 1858.

5    We're off the record.

6            (Proceedings interrupted at 6:58 p.m. and

7        reconvened at 7:13 p.m.)

8            THE VIDEOGRAPHER:  Time now is 1913.

9    We're on the record.

10           MR. STRAWBRIDGE:

11   BY MR. STRAWBRIDGE:  The question before we broke

12   was:  Have you read Jerome Karabel's book The

13   Chosen?

14           MS. ELLSWORTH:  Objection.

15   A.  Yes.

16   Q.  Do you believe that he accurately

17   describes the history of Harvard's admissions

18   process?

19           MS. ELLSWORTH:  Objection.

20   A.  I read his account carefully.  I don't

21   have any independent corroboration of what was in

22   the book.

23   Q.  Is it your testimony that you don't have

24   any idea whether or not Harvard's admissions

25   process was abused in order to limit the number of

1                    FITZSIMMONS

2    Jewish students on campus?

3          MS. ELLSWORTH:  Objection.

4    Q.  Last century?

5          MS. ELLSWORTH:  Objection.

6    A.  What I was saying is that the holistic

7    admissions process of which I have been a part

8    since I arrived in the office, you know, certainly

9    is not like the one you describe.

10   Q.  But my question was just is it possible

11   that a holistic admissions process could

12   nonetheless be abused in a discriminatory fashion?

13         MS. ELLSWORTH:  Objection.

14   A.  Again, I don't know exactly whether what

15   was described in that book or what I've read in

16   other accounts was anything like holistic

17   admissions processes that exist today.

18   Q.  Do you think it's impossible for anybody

19   to ever abuse a holistic admissions process?

20         MS. ELLSWORTH:  Objection.

21   A.  I think it would be impossible to abuse

22   the admissions process that -- that we have.

23   Q.  Nothing in this report gave you any

24   concerns?

25         MS. ELLSWORTH:  Objection.

1                   FITZSIMMONS

2    allegations made in Mr. Unz's article?

3            MS. ELLSWORTH:  Objection.

4        A.  Yes.

5        Q.  And the Office of Institutional Research,

6    whether at your direction or not, presented you

7    with this report at some point in 2013?

8            MS. ELLSWORTH:  Objection.

9        A.  You mean this report?

10       Q.  Yes.

11       A.  I don't remember if it was 2013 or not.

12       Q.  Do you remember whether it was before or

13   after this lawsuit was filed?

14           MS. ELLSWORTH:  Objection.

15       A.  I don't.  I'm just looking at the date

16   here.  It's 2012 date.

17       Q.  Yeah.  I'll represent that this file has a

18   name that people in OIR have testified indicated it

19   was created in January of 2013, notwithstanding the

20   date on the cover.

21       A.  (Indicating).

22       Q.  Do you have any reason to doubt that?

23           MS. ELLSWORTH:  Objection.

24       A.  I'm looking at this, and that would give

25   me a reason to doubt it.

1                          FITZSIMMONS

2        Q.  But you don't remember when you looked at

3    this?

4        A.  No.

5        Q.  And do you remember doing any follow-up?

6            MS. ELLSWORTH:  Objection, asked and

7    answered.

8        A.  No.

9        Q.  Do you recall asking OIR to look into

10   whether or not low-income students who apply to

11   Harvard receive a tip in the admissions process?

12       A.  Yes.

13       Q.  And when did you ask OIR to look into

14   that?

15       A.  I don't recall precisely.

16       Q.  Do you recall whether or not it was in the

17   spring of 2013?

18       A.  I don't.

19       Q.  Your recollection with respect to the

20   Exhibit 17 that we were just talking about --

21       A.  Yes.

22       Q.  -- do you remember seeing that information

23   on one occasion or more than one occasion?

24       A.  My recollection would be one occasion, but

25   I don't recall precisely.

1                         FITZSIMMONS

2        Q.  Do you know whether it was at a meeting

3   that you had with the Office of Institutional

4   Research in February of 2013?

5        A.  I don't specifically.

6        Q.  But you only remember seeing and having

7   this reaction to the extent that you recall it on

8   one occasion?

9            MS. ELLSWORTH:  Objection.

10       A.  I have a general recollection that I did

11   see it on at least one occasion.

12       Q.  But do you remember seeing it on more than

13   one occasion?

14           MS. ELLSWORTH:  Objection, asked and

15   answered.

16       A.  No.

17           MR. STRAWBRIDGE:  Mark this as Exhibit 18.

18           (Exhibit 18, HARV00075060, marked for

19       identification.)

20           THE WITNESS:  Excuse me.

21           Yes.

22       Q.  Do you recognize this e-mail?

23       A.  I don't recall the e-mail.

24       Q.  Does this refresh your recollection as to

25   whether or not you asked for information about a

1                          FITZSIMMONS

2          A.  Because economic background is a vital

3     piece of putting together a class that is

4     educationally beneficial for all of its members.

5              And we believe it's very important that

6     all of our undergraduates learn from each other,

7     you know, throughout the experience so that when

8     they are out after graduation, they would become,

9     we hope, much more effective citizens and citizen

10    leaders for having been educated in a variety of

11    settings by people from economic -- very different

12    economic backgrounds, which is a very important

13    issue in America.

14         Q.  Do you remember getting the report on the

15    tip for low-income admissions?

16              MS. ELLSWORTH:  Objection.

17         A.  I do have a recollection.

18         Q.  What did you do with it?

19              MS. ELLSWORTH:  Objection.

20         A.  We shared the information with staff

21    members so that they would be equipped better when

22    they're doing their many public presentations for

23    questions about how interested Harvard is about

24    attracting students from all economic backgrounds

25    as part of our effort.

Page 424

FITZSIMMONS

1

2        It relates to our first-generation student

3   effort, our Harvard Financial Aid Initiative

4   effort, to Harvard College connection, to our

5   undergraduate recruiting program that having the

6   information that students from modest economic

7   backgrounds could certainly be reviewed with great

8   care in the process.

9        That was a very important message that we

10  felt it's critical to deliver in an America that is

11  really quite divided by economic background issues.

12      Q.  Did you share the memo itself with the

13  staff?

14      A.  Pardon?

15      Q.  Did you share the memo itself with the

16  staff?

17      A.  I don't recall specifically if I shared it

18  in paper form or whether I had someone share some

19  of the information in a slide, PowerPoint form or

20  whether we simply discussed the issue.

21      (Exhibit 20, HARV00023547 - 23555, marked

22      for identification.)

23      MR. STRAWBRIDGE:  Take a look at what's

24      been marked Exhibit 20.

25      THE WITNESS:  Yes.

1                          FITZSIMMONS

2        Q.  Did you get a chance to review this memo?

3        A.  I have.

4        Q.  Is this the memo that you received on

5   May 1st about the OIR's analysis regarding the

6   extent to which low-income students receive a tip

7   in Harvard's process?

8        A.  I didn't remember specifically it was

9   May 1st, but I accept that.

10       Q.  All right.  Having looked at this

11  document, do you remember providing this document

12  to anybody else in the admissions office?

13       A.  I don't have a specific recollection of

14  providing the whole document to others in the

15  process.

16       Q.  Do you remember providing information

17  about the document's findings regarding Asian

18  Americans and, particularly, the effect of being

19  Asian on admissions probabilities with anyone in

20  the admissions office?

21            MS. ELLSWORTH:  Objection.

22       A.  I don't have a recollection of that.

23       Q.  Did you share that with the staff so that

24  they could inform the public about how Harvard's

25  admission process works?

1                      FITZSIMMONS

2       A.   Again, I don't have a specific

3  recollection of exactly what was done with this.

4       Q.   Do you have any recollection?

5            MS. ELLSWORTH:   Objection, asked and

6  answered.

7       A.   The issue we were concerned with was the

8  issue of whether or not low-income students

9  received any special look in the admissions

10  process, so that it was a factor that could in an

11  individual case be one factor that might lead staff

12  members to evaluate an application more strongly,

13  and then, once in committee, to have people end up

14  voting for that candidate.

15            So that was really the focus, that was the

16  request, to provide information on that,

17  especially -- that was the focus.

18       Q.   And did you trust the findings that OIR

19  reported back to you?

20       A.   Again, with any statistical analysis,

21  as -- you can look, for example, on, I guess it

22  would be 23549, the researchers, you know, indicate

23  that the approach has any number of limitations.

24            So I think what we would do with any study

25  is simply look at it and note that there was a

1                        FITZSIMMONS

2    suggestion that, you know, that, you know, that the

3    research previously done using different data by

4    Bowen, Kurzweil, and Tobin that certainly, that the

5    data we looked at, we came to a different

6    conclusion, recognizing that both studies would be

7    subject to all the usual limitations with any study

8    that certainly the researchers themselves indicated

9    that.

10       Q.  Do you know in fact --

11            MR. STRAWBRIDGE:  Strike that.

12       Q.  Why didn't you share the information --

13            MR. STRAWBRIDGE:  Strike that.

14       Q.  Did you share the information about the

15   effect of being Asian in this study with anyone

16   else in the admissions office?

17            MS. ELLSWORTH:  Objection, asked and

18   answered.

19       A.  I don't recall sharing that specific

20   finding or other findings.

21       Q.  Did you do anything to follow up on it?

22            MS. ELLSWORTH:  Objection.

23       A.  No.

24       Q.  Did you ask to dig into it and ask OIR to

25   take another look at it?

1                          FITZSIMMONS

2          MS. ELLSWORTH:  Objection.

3     A.  Not that I recall.

4     Q.  Did you raise any concerns that you wanted

5 to make sure that what they were finding here

6 wasn't the result of discrimination?

7          MS. ELLSWORTH:  Objection.

8     A.  We always are -- look carefully at every

9 applicant and -- to be certain that we give every

10 applicant a fair and thorough hearing.

11    Q.  Did you make changes to your admissions

12 process in response to the information that was

13 presented in this report?

14    A.  No.

15    Q.  Did you make any changes to your

16 admissions process in response to the information

17 that was presented -- did you make any changes to

18 your admissions process in response to the report

19 we looked at earlier?  Exhibit 17?

20    A.  Not that I recall.

21    Q.  I guess I'm still a little unclear about

22 your testimony with respect to the finding on

23 low-income admissions from here.

24          Did you share that information with other

25 people in the office?

1                          FITZSIMMONS

2          MS. ELLSWORTH:  Objection, asked and

3    answered.

4          A.  The low-income piece?

5          Q.  Yes.

6          A.  Yes, in some form.

7          Q.  And do you remember what form that was?

8          A.  I don't.

9          Q.  Do you know whether it included the table

10   that appears on page, I guess it has the page with

11   the Bates stamp 3550 in the bottom right corner?

12         A.  3550?  I don't recall.

13         Q.  Do you know whether you shared Table 4

14   with anybody in the admissions office?  Exhibit 4,

15   I'm sorry, the last page of this document?

16         A.  I don't recall.

17         Q.  Did you ever discuss the findings in this

18   report with respect to the effect of being Asian in

19   the admissions process with Dean Smith?

20         MS. ELLSWORTH:  Objection.

21         A.  Not that I recall.

22         Q.  With President Faust?

23         MS. ELLSWORTH:  Objection.

24         A.  Not that I recall.

25         Q.  With Dean Khurana?

Page 437

1                        FITZSIMMONS

2    incomplete?

3         A.  By their very nature, all -- all studies

4    of this sort would be incomplete.

5         Q.  Did you tell anyone when you saw this

6    document that it was of no value, given how

7    incomplete it was?

8              MS. ELLSWORTH:  Objection.

9         A.  I did not say it was of no value.

10        Q.  Did you -- do you recall anyone else

11   having any reactions to this document?

12             MS. ELLSWORTH:  Objection.  I'll remind

13   the witness not to disclose any communications with

14   counsel in answering the question.

15        A.  I don't recall.

16        Q.  Do you know who else saw this document?

17             MS. ELLSWORTH:  Objection.

18        A.  I don't.

19        Q.  If you can turn to the last page of the

20   document.  Do you see that?

21        A.  Yes.

22        Q.  And it says in the first bullet point

23   there, well, the slide is entitled Potential Next

24   Steps; is that correct?

25        A.  Yes.

Page 442

                    FITZSIMMONS

1

2    the question without disclosing actions taken at

3    the direction of counsel or communications with

4    counsel.

5           So I think next question, please.

6    Q.  Are you going to follow that instruction?

7           MS. ELLSWORTH:  It's not an instruction.

8    He's given his answer.

9           MR. STRAWBRIDGE:  I thought you instructed

10   him not to answer.

11          MS. ELLSWORTH:  I didn't.

12   Q.  Do you remember seeing this report at any

13   other point in time?

14   A.  Not to my recollection.

15   Q.  The information in this report?

16          MS. ELLSWORTH:  Objection.

17   A.  I don't have a specific recollection.

18   Q.  Does anything in this report give you

19   concern about Harvard's admissions process?

20          MS. ELLSWORTH:  Objection.

21   A.  No.

22   Q.  Did it give you any concerns at the time?

23          MS. ELLSWORTH:  Objection.

24   A.  No.

25   Q.  What evidence of Asian discrimination do

1                       FITZSIMMONS

2    you think would be sufficient to make you concerned

3    and conduct a further investigation?

4          MS. ELLSWORTH:  Objection.

5     A.  We are very careful in our admissions

6    process to review each application with great care

7    of students from all backgrounds.

8          And we discuss these applicants

9    holistically and with all the information that we

10   have with our 40 admissions committee members and

11   faculty members, and we would always be vigilant

12   about any suggestion of discrimination against any

13   person.

14    Q.  Do you think that your testimony about how

15   you reacted to these reports and the follow-up that

16   did or did not happen is consistent with your

17   statement just now that you would always be

18   vigilant about allegations of discrimination?

19         MS. ELLSWORTH:  Objection.

20    A.  Yes.

21    Q.  Do you think you exercised vigilance, sir?

22         MS. ELLSWORTH:  Objection.

23    A.  Yes.

24    Q.  And do you think it was consistent with

25   the exercise of vigilance not to send any of this

1                    FITZSIMMONS

2    information to anyone else in the admissions

3    office?

4         MS. ELLSWORTH:  Objection.

5    A.  It was not my report.

6    Q.  Do you think it was consistent with the

7    exercise of vigilance not to discuss the

8    information in these reports about the effect of

9    being Asian in the admissions process with anyone

10   else in the admissions office?

11        MS. ELLSWORTH:  Objection.

12   A.  Could you repeat that question?

13        MR. STRAWBRIDGE:  You can read it back.

14        (Preceding question read.

15   A.  Yes.

16   Q.  Do you think it was consistent with

17   vigilance for any allegation of discrimination

18   against Asian Americans not to ask the Office of

19   Institutional Research to do further work on these

20   reports?

21        MS. ELLSWORTH:  Objection.

22   A.  Yes.

23   Q.  Do you have any view as to what a

24   non-vigilant response would look like?

25        MS. ELLSWORTH:  Objection.

Page 445

FITZSIMMONS

1

2      A.   No.

3      Q.   Can you explain how it would be any

4  different than what your response was?

5           MS. ELLSWORTH:   Objection.

6      A.   I would not be in a position to make an

7  evaluation.

8           MS. ELLSWORTH:   How much time do we have

9  left?

10          MR. STRAWBRIDGE:   You know what?   Why

11 don't we take a quick break.   We can probably do

12 one short segment and make this more efficient for

13 everybody.

14          THE VIDEOGRAPHER:   Time now is 2006.   Off

15 the record.

16          (Proceedings interrupted at 8:06 p.m. and

17      reconvened at 8:20 p.m.)

18          THE VIDEOGRAPHER:   The time now is 2020.

19 On the record.

20          (Exhibit 23, HARV00027658 - 27659, marked

21      for identification.)

22          MR. STRAWBRIDGE:   Handing you what's been

23      marked as Exhibit 23.

24          THE WITNESS:   Yes.

25      Q.   Have you had a chance to review this?

Page 452

1                          FITZSIMMONS

2    ABAFAOILSS meetings?

3         A.   Usually.

4         Q.   And does that representative participate

5    in the round-robin exchange at those meetings?

6              MS. ELLSWORTH:   Objection.

7         A.   I'm not sure specifically whether every

8    year our representative has participated in the

9    round-robin.

10        Q.   In the past has data from the round-robin

11   been given to you following the ABAFAOILSS

12   meetings?

13        A.   I can recall some years getting some data.

14        Q.   What did you do with that data?

15        A.   Simply noted it.

16        Q.   And why did you note it?

17             MS. ELLSWORTH:   Objection.

18        A.   As information that it would be useful in

19   getting to know what happens beyond Harvard and our

20   profession.

21        Q.   Is it useful for you to understand the

22   context of what other Ivy League schools are doing

23   with respect to their admissions?

24             MS. ELLSWORTH:   Objection.

25        A.   It could be useful.

1                       FITZSIMMONS

2      Q.   Does that include it's useful to have

3   information about the ethnic composition of their

4   admitted classes?

5           MS. ELLSWORTH:   Objection.

6      A.   It could be useful.

7      Q.   And to what use do you recall putting that

8   data from ABAFAOILSS?

9           MS. ELLSWORTH:   Objection.

10     A.   Simply to have this information.  And, of

11  course, this information would almost always be

12  publicly available.

13     Q.   Does the ABAFAOILSS information include

14  information about the applications that were filed

15  by various ethnic applicants?

16          MS. ELLSWORTH:   Objection.

17     A.   I don't recall specifically whether

18  institutions would provide that data per se.

19     Q.   Do you know whether admission rate

20  information is provided?

21     A.   I do not.

22     Q.   Does Harvard publicly report its admission

23  rate by ethnicity?

24     A.   No.

25     Q.   Why not?

1    ERRATA SHEET

2    NAME OF CASE: SFFA v. Harvard Corp.

3    DATE OF DEPOSITION: August 3, 2017

4    NAME OF WITNESS:  William Fitzsimmons

5    Reason codes:

6             1.  To clarify the record.

7             2.  To conform to the facts.

8             3.  To correct transcription errors.

9    Page _____ Line _____ Reason _____

10   From _____ to _____

11   Page _____ Line _____ Reason _____

12   From _____ to _____

13   Page _____ Line _____ Reason _____

14   From _____ to _____

15   Page _____ Line _____ Reason _____

16   From _____ to _____

17   Page _____ Line _____ Reason _____

18   From _____ to _____

19   Page _____ Line _____ Reason _____

20   From _____ to _____

21   Page _____ Line _____ Reason _____

22   From _____ to _____

23   Page _____ Line _____ Reason _____

24   From _____ to _____

25        William Fitzsimmons _____



**HARVARD COLLEGE** | Office of Admissions and Financial Aid

Page 459

1    ERRATA SHEET

2    NAME OF CASE: SFFA v. Harvard Corp.

3    DATE OF DEPOSITION: August 3, 2017

4    NAME OF WITNESS:  William Fitzsimmons

5    Reason codes:

6          1.   To clarify the record.

7          2.   To conform to the facts.

8          3.   To correct transcription errors.

9    Page _____ Line _____ Reason _____

10   From _____ to _____

11   Page _____ Line _____ Reason _____

12   From _____ to _____

13   Page _____ Line _____ Reason _____

14   From _____ to _____

15   Page _____ Line _____ Reason _____

16   From _____ to _____

17   Page _____ Line _____ Reason _____

18   From _____ to _____

19   Page _____ Line _____ Reason _____

20   From _____ to _____

21   Page _____ Line _____ Reason _____

22   From _____ to _____

23   Page _____ Line _____ Reason _____

24   From _____ to _____

25        William Fitzsimmons _____

Administrative Office 86 Brattle Street · Cambridge, Massachusetts 02138
Visitor Center Agassiz House · Radcliffe Yard · 5 James Street · Cambridge, Massachusetts 02138

August 3, 2017 Deposition of William Fitzsimmons – Errata Sheet

| Page | Line | Instruction | Reason for Change |
|------|------|-------------|-------------------|
| 6 | 11-12 | Change "dean of admissions and financial aid" to "Dean of Admissions and Financial Aid" | Grammar |
| 9 | 4 | Change "Counsel" to "counsel" | Grammar |
| 11 | 10 | Change "Counsel" to "counsel" | Grammar |
| 16 | 14 | Change "Counsel" to "counsel" | Grammar |
| 17 | 2 | Change "office of the general counsel" to "Office of the General Counsel" | Grammar |
| 17 | 18-19 | Change "Counsel" to "counsel" | Grammar |
| 18 | 5 | Change "Counsel" to "counsel" | Grammar |
| 26 | 23 | Change "with" to "in" | Clarification |
| 26 | 24 | Change "world. Today" to "world from today with" | Clarification |
| 29 | 13 | Change "the – " to "that" | Clarification |
| 31 | 21-22 | Change "Alfred Jewitt became dean of admissions and financial aid" to "L. Fred Jewett became Dean of Admissions and Financial Aid" | Typographical error |
| 33 | 18-19 | Change "vice president for alumni affairs to development" to "Vice President for Alumni Affairs and Development" | Grammar |
| 39 | 17 | Delete "that" | Clarification |
| 40 | 9 | Capitalize "College Board" | Grammar |
| 40 | 22 | Change "revolutionized" to "revolutionary" | Typographical error |
| 41 | 7 | Delete "as" | Clarification |
| 41 | 13 | Change "group, is a" to "is a group" | Typographical error |
| 42 | 7 | Change "question that was that" to "question was that" | Typographical error |
| 43 | 9 | Delete "that that person" | Clarification |
| 45 | 12 | Delete "that" | Typographical error |
| 50 | 14 | Change "attributes. So it" to "attributes, HFAI status" | Clarification |
| 87 | 15 | Change "as" to "is" | Typographical error |
| 88 | 4 | Change "as" to "if" | Typographical error |
| 91 | 8 | Change "common application" to "Common Application" | Grammar |
| 92 | 18 | Change "backgrounds. That" to "backgrounds that" | Typographical error |
| 95 | 9 | Change "report" to "reported" | Typographical error |
| 98 | 22 | Change "common application" to "Common Application" | Grammar |

| 105 | 6 | Change "common application" to "Common Application" | Grammar |
|---|---|---|---|
| 111 | 19 | Change "There are –" to "The" | Clarification |
| 125 | 11 | Change "I'm" to "I" | Clarification |
| 125 | 16 | Change "Counsel" to "counsel" | Grammar |
| 125 | 23-24 | Change "common application" to "Common Application" | Grammar |
| 133 | 25 | Delete "that" | Clarification |
| 154 | 23 | Change "it votes" to "they vote" | Clarification |
| 163 | 20 | Change "logistic" to "logistic regression" | Typographical error |
| 171 | 3 | Change "Counsel" to "counsel" | Grammar |
| 172 | 18 | Change "been aware" to "has been aware" | Typographical error |
| 176 | 20 | Change "come up --" to "come up with" | Clarification |
| 179 | 5 | Delete "that" | Clarification |
| 191 | 18 | Change "schools and scholarships" to "Schools and Scholarships" | Grammar |
| 192 | 18 | Change "socioeconomic, ethically" to "socioeconomically, ethnically" | Typographical error |
| 203 | 15-16 | Change "65,000" to "$65,000" and "80,000" to "$80,000" | Grammar |
| 204 | 7 | Omit "aid" | Clarification |
| 206 | 15 | Change "ethnic precise" to "precise" | Clarification |
| 208 | 20 | Change "It --" to "It is" | Typographical error |
| 218 | 14 | Change "Fisher one" to "Fisher I" | Grammar |
| 221 | 13 | Change "Be very much" to "It would be very much" | Typographical error |
| 229 | 10 | Change "office of the general counsel" to "Office of the General Counsel" | Grammar |
| 230 | 7-8 | Change "office of the general counsel" to "Office of the General Counsel" | Grammar |
| 234 | 9 | Change "also is" to "also it is" | Typographical error |
| 240 | 25 | Delete "net" | Typographical error |
| 241 | 13 | Change "common application" to "Common Application" | Grammar |
| 246 | 2 | Change "that" to "from" | Clarification |
| 246 | 4 | Change "anyone else say; someone who'd" to "anyone else.  Say someone had" | Clarification |
| 246 | 5 | Change "when" to "or"; change "could" to "it could" | Clarification |
| 250 | 16 | Delete "it – make all the – really is what happens," | Typographical error |
| 253 | 5 | Change "vital" to "it is vital" | Clarification |
| 253 | 7 | Delete "be -- you know, it --" | Clarification |
| 255 | 9 | Change "common application" to "Common Application" | Grammar |

| 259 | 16 | Delete "not" | Clarification |
|---|---|---|---|
| 262 | 25 | Change "Just say again" to "Again" | Clarification |
| 268 | 7 | Change "Harvard Club" to "a Harvard club" | Typographical error |
| 268 | 10 | Change "schools and scholarships" to "Schools and Scholarships" | Grammar |
| 272 | 10 | Change "schools and scholarships" to "Schools and Scholarships" | Grammar |
| 272 | 12 | Change "competition" to "competition is" | Clarification |
| 295 | 2 | Delete "—a docket with" | Clarification |
| 299 | 23 | Change "shares" to "chairs" | Typographical error |
| 305 | 2 | Change "tor" to "for" | Typographical error |
| 311 | 22 | Change "necessary" to "necessarily" | Typographical error |
| 322 | 14 | Change "Be" to "It would be" | Typographical error |
| 324 | 11 | Change "Be" to "It would be" | Typographical error |
| 332 | 14 | Change "interrogative" to "interrogatory" | Clarification |
| 375 | 21 | Change "Counsel" to "counsel" | Grammar |
| 424 | 4 | Change "connection" to "Connection" | Typographical error |
| 428 | 9 | Delete "and— " | Clarification |
| 432 | 13 | Change "by very" to "by the very" | Typographical error |
| 435 | 17 | Change "university general counsel" to "University General Counsel" | Grammar |
| 452 | 18 | Delete "it" | Clarification |
| 452 | 19 | Change "and" to "in" | Typographical error |