# EXHIBIT 14

# In The Matter Of:

*Students for Fair Admissions, Inc. v.*
*President and Fellows of Harvard College*

---

*Christopher J. Looby*
*June 30, 2017*

---

*195 State Street • Boston, MA 02109*
*888.825.3376 - 617.399.0130*
*Global Solutions*
*court-reporting.com*



O'BRIEN & LEVINE
COURT REPORTING SOLUTIONS

Original File Christopher Looby 6-30-17.txt
Min-U-Script® with Word Index

```
 1       A.    I do.

 2       Q.    Can you describe to me generally what it

 3  is?

 4       A.    That would be reading procedures tied to

 5  the class of 2019.

 6       Q.    And what are "reading procedures"?

 7       A.    This would be a document that staff may

 8  refer to when evaluating applications for

 9  admissions.

10       Q.    Is this a guide for how admissions

11  officers should review students?

12             MS. SANDALS:   Objection.

13             (Pause.)

14       A.    That's correct.

15       Q.    After reviewing this document, is this

16  generally how you would go about reviewing an

17  application?

18             MS. SANDALS:   Objection.

19       A.    I would use this as a reference if needed.

20       Q.    Did you see anything in here fundamentally

21  at odds with how you would normally review an

22  application?

23             MS. SANDALS:   Objection.

24       A.    Nothing jumped out.
```

1    provided, GPA if provided, parent information, any

2    reader profiles, interest of area studied in

3    college, interest with regards to extracurricular

4    participation.

5           There would be a case number.  There would

6    be pros provided by individuals that provided

7    profiles.  There would be extracurricular

8    involvement, the years of that extracurricular

9    involvement, any siblings, if they're financial aid

10   applicants.  That's all I can remember at this time.

11       Q.    Would gender be listed?

12       A.    Thank you, yes.  Gender.

13       Q.    Would race be listed?

14             MS. SANDALS:  Objection.

15       A.    I believe so.

16       Q.    Would religion be listed?

17             MS. SANDALS:  Objection.

18       A.    Not that I recall.  I believe citizenship,

19   too.

20       Q.    You mentioned that it might be used for

21   the presentation of an application.  Can you

22   describe generally how a summary sheet would be used

23   in that manner?

24             MS. SANDALS:  Objection.

1      A.   I think it provides the committee with a

2  quick snapshot of the entire application.

3      Q.   Would the committee receive a handout of a

4  summary sheet?

5           MS. SANDALS:   Objection.

6      A.   Not necessarily, no.

7      Q.   How would the committee receive this

8  information?

9           MS. SANDALS:   Objection.

10      A.   It's electronic, so they would have the

11  capability to pull up that application on their

12  computer.

13      Q.   During committee, would most people have

14  laptops?

15           MS. SANDALS:   Objection.

16      A.   Yes.

17      Q.   Is the general practice that when the

18  committee is discussing an individual, an admissions

19  officer will use his or her laptop to view the

20  summary sheet?

21           MS. SANDALS:   Objection.

22      A.   Yes.

23      Q.   Do you ever put a summary sheet on a

24  projection screen?

1      A.   Yes, we do.

2      Q.   As a general matter, are all applicants'

3 summary sheets placed on a projection screen?

4           MS. SANDALS:   Objection.

5      A.   No.

6      Q.   Is there a reason why some applicants

7 would have their summary sheet on a projection

8 screen but others would not?

9           MS. SANDALS:   Objection.

10     A.   We don't have time to look at 35,000

11 applications during a full committee process.

12     Q.   If the committee was ever discussing an

13 applicant as a general matter, would that

14 applicant's summary sheet be on a projection screen?

15          MS. SANDALS:   Objection.

16     A.   As far as I can remember, yes.

17     Q.   So going back to this notation, would it

18 be your practice to add a student's race to a

19 summary sheet if the student had provided it on the

20 application but it was not showing up on the summary

21 sheet?

22          MS. SANDALS:   Objection.

23     A.   I don't recall.

24     Q.   But do -- do I have it right that this is

1  completed application a score in one of these six

2  categories?

3      A.   As far as I can remember, yes.

4      Q.   And after reviewing these pages, does the

5  description in each of these categories align with

6  how you would rate an applicant for each of these

7  categories?

8              MS. SANDALS:   Objection, and if you

9  need to review these pages before you answer, you

10 should do that.

11             (Reviewing document.)

12     A.   Generally speaking, yes.

13     Q.   Do you know of any other document that

14 would describe how an admissions officer should

15 score candidates in these categories?

16     A.   Not that I can think of, no.

17     Q.   When you would score students in these

18 categories, would you take a student's race into

19 account when assigning him a score in any of these

20 categories?

21             MS. SANDALS:   Objection.

22     A.   It's one of my factors that I consider.

23     Q.   For every category?

24             MS. SANDALS:   Objection.

Christopher J. Looby - June 30, 2017                    40

1        A.    I'm looking at the applicant as a whole.

2        Q.    How would you take a student's race into

3    account when assigning him a rating in the academic

4    category?

5              MS. SANDALS:   Objection.

6        A.    Again, it's one factor of many.

7        Q.    How does a student's race affect his

8    academic score?

9              MS. SANDALS:   Objection.

10       A.    I'm looking at many factors within the

11   application; not just one particular component.

12       Q.    Have you ever taken a student's race into

13   account when assigning a student a score in the

14   academic category?

15             MS. SANDALS:   Objection.

16       A.    Again, I'm looking at many factors when

17   I'm assigning numbers.

18       Q.    Can you answer that yes or no?

19             MS. SANDALS:   Objection.

20       A.    I feel -- I feel like my answer's my

21   answer.

22       Q.    That -- I don't understand your answer

23   then.   Can you answer that yes or no?  Have you ever

24   taken a student's race into account when assigning

1  him or her a score in the academic rating?

2             MS. SANDALS:  Objection.  Mike, I

3  think he's answered your question.

4             MR. CONNOLLY:  No, he hasn't.

5     A.    I can't answer that yes or no.  I take

6  many factors.

7     Q.    Why can you not answer that question?

8             MS. SANDALS:  Objection.

9     A.    There's far more to an application than

10  just one particular thing.

11     Q.    Can you describe in your ten years at

12  Harvard an instance in which you took a student's

13  race into account when deciding the score he or she

14  should receive in an academic rating?

15             MS. SANDALS:  Objection.

16     A.    Not that I recall.

17     Q.    Can you describe in your ten years at

18  Harvard a time when you took a student's race into

19  account when giving that student a score in the

20  overall rating?

21             MS. SANDALS:  Objection.

22     A.    Not that I recall.

23     Q.    Then how do you know you took race into

24  account when giving a student a score in these

1    categories?

2        A.   As I said previously, I'm looking at many

3    factors; not just one factor.

4        Q.   But you can't remember a single time when

5    you did so?

6             MS. SANDALS:   Objection.

7        A.   I look at the entire application when I

8    review and I score.

9        Q.   Can you give me an example of how a

10   student's race might change his or her score in the

11   academic category?

12            MS. SANDALS:   Objection.

13       A.   Again, I can't because there's many

14   factors that go into providing scores for all of our

15   applicants or all of my applicants, I should say.

16       Q.   Do you use test scores as a component of

17   an academic rating?

18       A.   One component, yes.

19       Q.   Why?

20       A.   Just provides -- provides an understanding

21   of the academic horsepower a student might exhibit.

22       Q.   And do you take a student's GPA into

23   account when deciding a student's score in the

24   academic rating?

1                    MS. SANDALS:  Objection.

2       A.    Again, there's many components for every

3   score that we give.

4       Q.    Can you answer that yes or no?

5       A.    Yes, we do.

6       Q.    And why do you take grades into account

7   when assigning a rating in the academic category?

8                    MS. SANDALS:  Objection.

9       A.    The same reason I gave you for the test

10  scores.

11      Q.    Can you -- can you repeat it again?

12      A.    It provides us a good understanding of the

13  academic horsepower a student has exhibited.

14      Q.    And why do you take race into account when

15  deciding a student's academic rating?

16                   MS. SANDALS:  Objection.  Asked and

17  answered, Mike.

18                   (Pause.)

19      A.    Could you repeat that, please?

20                   MR. CONNOLLY:  Could you repeat the

21  question?

22                   (Question read back.)

23      A.    Again, it's another component.  It's one

24  of many factors that we're looking at when assigning

1    all of these numbers.

2        Q.    Does a student's race give you an

3    understanding of the academic horsepower that he or

4    she might bring to Harvard?

5               MS. SANDALS:   Objection.

6        A.    It's one factor of many.

7        Q.    So it might?

8               MS. SANDALS:   Objection.

9        A.    I don't know.

10              MS. SANDALS:   Mike, we've been going

11   for over an hour.   Is this a good time for a break?

12              MR. CONNOLLY:   Sure.

13              (A break was taken from

14                 10:06 a.m. to 10:18 a.m.)

15       Q.    Welcome back.   Did you discuss the

16   substance of your testimony during the break?

17       A.    Did not.

18       Q.    Can you, once again, describe to me how

19   you would use race in the admissions process when

20   assigning a score in each of these categories?

21              MS. SANDALS:   Objection.

22       A.    Again, we're looking at many factors in an

23   application; not one specific component of the

24   application.

1      Q.    And how does race fit into that?

2            MS. SANDALS:   Objection.

3      A.    One of many factors.  We're looking at

4  many factors.

5      Q.    Was there any discussion in this document

6  about how you should use race in the admissions

7  process?

8            MS. SANDALS:   Objection.

9      A.    Not that I recall, no.

10     Q.    Do you know why there's no discussion

11  about how you should use race in this document?

12           MS. SANDALS:   Objection.

13     A.    I don't know why.

14     Q.    These are reading procedures for how

15  admissions officers such as yourself should review

16  an application, is that correct?

17           MS. SANDALS:   Objection.

18     A.    That's correct.

19     Q.    Your discussion about how to use race in

20  the admissions process, do you know of any other

21  written document that would have laid out such a

22  policy?

23           MS. SANDALS:   Objection.

24     A.    What policy are you referring to?

1      Q.   About how to use race in the admissions

2  process.

3                 (Pause.)

4      A.   I don't recall reading in this document

5  anywhere saying policy with regards to using race in

6  admissions.

7      Q.   Do you recall ever reading a document that

8  outlines how you as an admissions officer should use

9  race in the admissions process?

10     A.   This is the only document that I can

11 recall that discusses how we should consider race.

12     Q.   Okay.  Then how did you learn how to

13 consider or use race in the admissions process?

14            MS. SANDALS:  Objection.

15     A.   I'm looking at all parts of the

16 application.

17     Q.   Right.  But that wasn't my question.

18 How did you learn how you should use race in the

19 admissions process when reviewing applications?

20            MS. SANDALS:  Objection.

21     A.   I just code my applications how I read the

22 application.

23     Q.   Did anyone ever teach you how to use race

24 in the admissions process when you were making your

1    admissions decisions?

2                   MS. SANDALS:   Objection.

3        A.    I don't recall.

4        Q.    Can you, once again, describe to me how

5    you use race in the admissions process?

6                   MS. SANDALS:   Objection.   Asked and

7    answered.

8        A.    Sure.   It's one component of many in a

9    student's application for admissions.

10       Q.    Did you come up with that phrase yourself?

11                  MS. SANDALS:   Objection.

12       A.    That's how I view it.

13       Q.    Where did you learn that that's how you

14   should review an application?

15                  MS. SANDALS:   Objection.

16       A.    The reading instructions outlie all of the

17   components of an application.

18       Q.    Yes, but there's no discussion here about

19   how you should use race when reviewing an

20   application, so how did you learn that race is one

21   of many factors that you should use in the

22   admissions process?

23                  MS. SANDALS:   Objection.

24       A.    It's on the first page here.   It's one of

1    the components of the reading procedures.

2        Q.   Can you point to me where you see this on

3    the page?

4                    (Reviewing document.)

5        A.   That would be towards the middle of Page 1

6    all the way to the top of Page 2.

7        Q.   And what do you see on those sections of

8    this document?

9        A.   Ethnic codes and categories.

10       Q.   What does that tell you about how you

11   should use race in the admissions process?

12                MS. SANDALS:   Objection.

13       A.   As I've previously stated, it's one

14   component of many that we see on the application.

15                (Pause.)

16       Q.   Can you recall from your time at Harvard

17   anyone ever telling you that race is one factor

18   among many that you should use in the admissions

19   process?

20                MS. SANDALS:   Objection.

21                (Pause.)

22       A.   I believe so.

23       Q.   Who would have told you that?

24       A.   I believe that would be the Dean of

```
 1   Admissions.
 2        Q.    When would he have told you that?
 3              MS. SANDALS:  Objection.
 4        A.    I don't recall.
 5              (Pause.)
 6        Q.    Do you know if this is how other
 7   admissions officers use race in the admissions
 8   process?
 9              MS. SANDALS:  Objection.
10        A.    I don't know.
11        Q.    Why don't you know?
12              MS. SANDALS:  Objection.
13        A.    My colleagues don't tell me all of their
14   thoughts.
15              (Pause.)
16        Q.    Turn to Page 1444.  Do you see the
17   notation that says "Personal"?
18        A.    Yes, I do.
19        Q.    What is that a reference to?
20        A.    It would be personal qualities.
21        Q.    Would you rate an applicant with regard to
22   his or her personal qualities?
23              MS. SANDALS:  Objection.
24        A.    As we perceive them after reading an
```

1    application, yes.

2        Q.    What is the -- what are you trying to

3    assess when determining an applicant's personal

4    qualities?

5        A.    Who that person is.

6        Q.    And what do you mean by that?

7        A.    What that person brings to our community.

8        Q.    What are the types of things you're

9    looking to have a student bring to your community?

10                 MS. SANDALS:   Objection.

11       A.    Positive contributions.

12       Q.    What are the positive contributions that

13   you're looking to have a student bring to your

14   community?

15                 MS. SANDALS:   Objection.

16       A.    To bring collaboration.

17       Q.    What do you mean by "collaboration"?

18       A.    Ability to work well with others.

19       Q.    Anything else?

20       A.    I'd say the ability to create meaningful

21   relationships.

22       Q.    Relationships with whom?

23       A.    His or her peers.

24       Q.    Anything else?

1       A.    Just personality.  I'd say personality, a

2   positive personality.

3       Q.    What do you mean by "personality"?

4       A.    Again, who someone is.

5       Q.    Can you give any more explanation for what

6   you mean by "personality"?

7                 MS. SANDALS:  Objection.

8       A.    Just the type of that person that

9   individual is, do others like to be around him or

10  her.

11                (Pause.)

12      Q.    Would you take a student's race into

13  account when assessing his or her personal

14  qualities?

15                MS. SANDALS:  Objection.

16      A.    Just like with the academic rating, it's

17  one factor of many I consider.

18      Q.    Can you give me an example of how a

19  student's race might affect his or her ability to

20  work well with others?

21                MS. SANDALS:  Objection.

22      A.    Could you please repeat that?

23                MR. CONNOLLY:  Could you please repeat

24  the question?

1                    (Question read back.)

2       A.    Not specifically, no.

3       Q.    Can you give me an example of how a

4  student's race might affect whether he or she is the

5  type of person that others would like to be around?

6                    MS. SANDALS:   Objection.

7       A.    Not specifically, no.

8                    (Pause.)

9       Q.    Can you describe to me what you mean or

10  how you would assess a student's score in the school

11  support category?

12                    MS. SANDALS:   Objection.

13       A.    We're just trying to understand what the

14  letters of recommendation have to say about that

15  particular student.

16       Q.    So you're looking at how strongly a

17  teacher or a guidance counselor is recommending a

18  student?

19       A.    That's correct.

20       Q.    And would you take a student's race into

21  account when assessing a score in the school support

22  category?

23                    (Pause.)

24       A.    Not that I recall, no.

1  that assuming all things continue in the same

2  direction, that student would be admitted when

3  decisions are sent out.

4      Q.   And why does Harvard send likely letters?

5           MS. SANDALS:   Objection.

6      A.   It can be a valuable recruitment tool.

7      Q.   Have you ever recommended that anyone

8  receive a likely letter?

9      A.   I have.

10     Q.   And without telling me the student's name,

11 why, in general, would you recommend that someone

12 receive a likely letter?

13          MS. SANDALS:   Objection.   I'll remind

14 the witness also not to disclose information that

15 would enable the identification of any applicants.

16     A.   The student would be a recruited athlete.

17     Q.   Do you ever send likely letters to

18 students who are not athletes?

19          MS. SANDALS:   Objection.

20     A.   We do.

21     Q.   And why would you do that in those cases?

22          MS. SANDALS:   Objection.

23     A.   Again, we find it can be an effective

24 recruitment tool.

1      Q.    Do you know why it would be an effective

2   recruitment tool?

3      A.    Given how a particular application can

4   read, this might be -- not this particular student

5   but a student that we recommend for a likely letter,

6   we have reason to believe many other schools would

7   be pursuing that same individual.

8      Q.    And how would you make that determination?

9            MS. SANDALS:   Objection.

10     A.    That's not a decision that's made by just

11  myself.   It's a committee discussion.

12     Q.    Would you vote to recommend that someone

13  receives a likely letter?

14           MS. SANDALS:   Objection.

15     A.    That's correct.

16     Q.    So how would you, personally, decide

17  whether a student is likely to be highly sought

18  after?

19           MS. SANDALS:   Objection, and I'll just

20  remind the witness not to disclose the identity of

21  any applicants or information that would enable the

22  identification of any applicants.

23     A.    Just based on the information in that

24  particular application and the strength of that

1    be the math teacher, it would seem.  If you look

2    lower in the box, it's identified.

3         Q.    "ECs"?

4         A.    Extracurriculars.

5         Q.    "E1"?

6               MS. SANDALS:  Objection.

7         A.    The first essay that the student wrote.

8         Q.    The letter "H" right below there?

9               MS. SANDALS:  Objection.

10        A.    You're talking the second-to-last

11   sentence?

12        Q.    Yes.

13        A.    That would be Harvard.

14        Q.    So do you know in the "Notes" box, what

15   general type of information would you write in the

16   "Notes" box?

17               MS. SANDALS:  Objection.

18        A.    I would summarize the application and the

19   applicant.

20        Q.    Is there a reason why, for example, in

21   this one the -- this type of information would be

22   highlighted over others?

23               MS. SANDALS:  Objection.

24        A.    This isn't my writing.  I don't know.

1        Q.    Did you ever receive any instructions

2    about what to put in your notes?

3        A.    I believe so.

4        Q.    Do you recall generally what those

5    instructions would have been?

6                   MS. SANDALS:   Objection.

7        A.    I believe that it was summarize the case

8    as best you can.

9        Q.    What's the difference between notes and

10   reader comments as far as the type of information

11   you would generally put on a summary sheet?

12                  MS. SANDALS:   Objection.

13       A.    I think that notes allow for quicker

14   information to be provided, whereas the reader

15   comments allows for a more robust assessment of the

16   application.

17                  MR. CONNOLLY:   Thank you.

18                  (Pause.)

19                  (Exhibit 3; so marked.)

20       Q.    I'll mark as Exhibit 3 a document ending

21   in 71271, and I'll represent that this is the first

22   three pages of a much larger document.

23                  (Reviewing document.)

24       Q.    Does this also appear to be a summary

1  discuss the yield.  You see that Tuesday, May 7th

2  staff meeting.  We'd be getting an overview from the

3  folks that run the upper-class renewal process.

4      Q.   What is the type of information you would

5  receive regarding the yield of the class?

6              MS. SANDALS:   Objection.

7      A.   How many people we accepted, how many

8  people said yes.

9      Q.   Would you ever receive that information

10 broken down by race?

11             (Pause.)

12     A.   I can't recall.

13     Q.   Do you ever recall hearing statistics

14 about the yield rates for various racial groups?

15             MS. SANDALS:   Objection.

16     A.   I do.

17     Q.   What type of information do you recall?

18             MS. SANDALS:   Objection.

19     A.   Statistics tied to the makeup of the next

20 incoming class.

21     Q.   Do you know when -- strike that.  Do you

22 know who would have been providing you that

23 information?

24     A.   The Dean of Admissions.

1      Q.    And do you know generally when you would

2  have been receiving that?

3      A.    Sometime after decision day.

4      Q.    And then we have a "Wait List full

5  committee" on May 9th, May 10th.  Do you know what

6  that refers to?

7      A.    Yes.

8      Q.    And what is that?

9      A.    That would be looking at our wait-listed

10  students.

11      Q.    And would you make admissions decisions on

12  these days to admit students who were on the wait

13  list?

14      A.    I can't confirm on these two dates that we

15  would or wouldn't.

16      Q.    Is it possible that on these earlier dates

17  you might just be discussing them but maybe later

18  you would make an official decision?

19              MS. SANDALS:   Objection.

20      A.    That's fair, yes.

21      Q.    By June -- June 3rd and June 4th there are

22  more wait list full committee meetings.  Do you know

23  what those refer to?

24      A.    That would be the same process we were

```
 1                  4:44 p.m. to 4:56 p.m.)
 2       Q.    In the full committee process, did you
 3   ever recall hearing that a student's family member
 4   had donated to Harvard?
 5                 MS. SANDALS:  Objection.
 6       A.    Yes.
 7       Q.    How would you have received that
 8   information?
 9       A.    As information.  Or do you mean by whom?
10       Q.    By whom.
11       A.    That would be the Dean.
12              (Pause.)
13       Q.    Do you ever recall giving a tip to an
14   applicant because of his or her race?
15                 MS. SANDALS:  Objection.
16              (Pause.)
17       A.    I don't recall doing that specifically for
18   race, no.
19       Q.    Do you recall doing it for other things?
20                 MS. SANDALS:  Objection.
21       A.    Again, if the application as a whole reads
22   as a strong application, it could be one factor that
23   I'm taking into consideration.
24       Q.    So you might give a -- an admissions tip
```

Christopher J. Looby - June 30, 2017                210



```
 1        A.    Just how I was trained.

 2                    (Exhibit 11; so marked.)

 3                    MR. CONNOLLY:   I'll mark as Exhibit 11

 4   a document with the Bates No. 40757, and I will

 5   represent that this is a section of a much larger

 6   document.

 7                    (Reviewing document.)

 8        Q.    Do you recognize this document?

 9        A.    I'm familiar with this.

10        Q.    And what is it?

11        A.    This would be an excerpt from a docket.

12        Q.    Do you know whose handwriting this would

13   be?

14                    MS. SANDALS:   Objection.

15                    (Reviewing document.)

16        A.    I believe I do.

17        Q.    And whose would it be?

18                    MS. SANDALS:   Objection.

19        A.    That would be the chair of N-docket.

20        Q.    And who is that?

21        A.    Sally Harty.

22        Q.    Will you turn to the last page, 41726.

23   Do you see at the top "Ethnic Groups" is circled?

24        A.    Mh-hmm.
```

1                    (Exhibit 12; so marked.)

2                    MR. CONNOLLY:   I'll mark as Exhibit 12

3     a document Bates No. 62494 and represent that this

4     is an excerpt of a much larger document.

5                    (Reviewing document.)

6         Q.    Do you recognize this document?

7         A.    I noticed the makeup of it, but I'm not

8     familiar with this particular document.

9         Q.    Do you know generally what it is?

10        A.    Yes, I do.

11        Q.    And what is it?

12        A.    This is another excerpt from a docket.

13        Q.    On Page 62786, do you see where it says

14    "'1' piano - 4 have accepted"?

15        A.    I do.

16        Q.    And do you see to the left where it says

17    "R"?

18        A.    I do.

19        Q.    Do you know what that "R" means?

20        A.    I do.

21        Q.    What does it mean?

22        A.    Reject.

23        Q.    And do you know what was meant by

24    "'1' piano - 4 have accepted"?

Christopher J. Looby - June 30, 2017                          214



1   committee?

2            MS. SANDALS:  Objection.

3       A.   I don't understand your question.

4       Q.   Do you ever recall being in a wait list

5   committee and receiving similar information about

6   the types of students who had accepted their offer

7   to enroll in Harvard?

8            MS. SANDALS:  Objection.

9       A.   Still very vague.  I'm not quite sure what

10  you mean.

11      Q.   Which part is vague?

12      A.   The information received on accepted

13  students, I'm not clear on exactly what you mean.

14      Q.   Did you ever -- would you ever look at an

15  application for whether a person should come off the

16  wait list and know that exceptional dancers had

17  already accepted their offer of admission and so

18  maybe it would affect a student who was also a

19  dancer?

20            MS. SANDALS:  Objection.

21      A.   It could.

22      Q.   Why would that type of information affect

23  your decision?

24            MS. SANDALS:  Objection.

1     A.    The decision that's made is a committee

2   decision.   This isn't my decision.

3     Q.    Your decision in particular.

4             MS. SANDALS:   Objection.

5             (Pause.)

6     A.    I think for me it would depend on the

7   distinguished excellence and how that would have an

8   impact on a community.

9             (Pause.)

10            (Exhibit 13; so marked.)

11            (Reviewing document.)

12    Q.    Do you recognize this document?

13    A.    Not this particular document, but I've

14   seen documents like this.

15    Q.    Do you know generally what this document

16   is?

17    A.    I believe I do.

18    Q.    And what is it?

19    A.    I believe given the date of this document,

20   this would be a final committee lop list.

21    Q.    So would this be the number of

22   students -- strike that.   Would this be the official

23   list of the students who had been lopped?

24            MS. SANDALS:   Objection.

1      A.   Not necessarily.

2      Q.   How so?

3                MS. SANDALS:   Objection.

4      A.   Because at this point there may be a

5  certain amount of seats left to fill in the class,

6  so we feel all of these students deserve to be

7  compared against each other for those remaining

8  seats.

9      Q.   Do you know what the designation "lop"

10 means?

11     A.   I think that's just the identifier so

12 these can all be categorized and kept in an

13 organized way.

14     Q.   So as of March 19th, 2013, these students

15 have been lopped, is that correct?

16                MS. SANDALS:   Objection.

17     A.   That is not correct.

18     Q.   How is that not correct?

19     A.   I believe that this would be the students

20 that have been voted to be compared against each

21 other as potential lops, so I don't think these are

22 the folks that ultimately were lopped, I don't

23 believe.   Again, I think these are the folks that

24 the committee felt deserved the closest scrutiny to

```
 1   fill the remaining seats.
 2       Q.    When you speak of "the committee," do you
 3   speak of the full committee?
 4                 MS. SANDALS:  Objection.
 5       A.    That's correct.
 6       Q.    Do individual members of subcommittees
 7   provide a list of potential students that can be
 8   lopped?
 9                 MS. SANDALS:  Objection.
10       A.    That varies across dockets.
11       Q.    How so?
12                 MS. SANDALS:  Objection.
13       A.    Each chair runs his or her subcommittee so
14   it's up to them how they want to do that.  Some
15   chairs feel as though they want the committees to
16   voice their opinions without having the influence of
17   anyone else on that subcommittee.
18                 Other docket chairs feel as though it is a
19   committee process and we should come up with a
20   unanimous decision together as a group.
21       Q.    So would the chair of each docket then
22   send a list of potential students to lop to the full
23   committee?
24                 MS. SANDALS:  Objection.
```

1      A.    Not necessarily, no.

2      Q.    When would they not do that?

3            MS. SANDALS:   Objection.

4      A.    I believe that lop list is sent to the

5    Dean initially.

6      Q.    Would the Dean compile all the lists he

7    received?

8            MS. SANDALS:   Objection.

9      A.    I don't know.

10     Q.    Would you being on the full committee ever

11   see all the recommendations that had been made from

12   the various chairs?

13           MS. SANDALS:   Objection.

14     A.    I believe so.

15     Q.    Would this document represent a smaller

16   subset of the individuals that were initially

17   provided by the various chairs?

18           MS. SANDALS:   Objection.

19     A.    Based on the number of individuals on this

20   list, I would say, yes, there was at one point a

21   greater list.

22     Q.    Is that generally how the lopping process

23   works?  You have this broad number that represents

24   the number provided by the chairs and then it's

1    winnowed down to maybe a smaller list like this?

2                    MS. SANDALS:   Objection.

3        A.    That's my understanding.

4        Q.    And when it's winnowed down, when you're

5    coming off of this list, does that mean that you

6    were -- that a student would be keeping his or her

7    designation of being admitted?

8                    MS. SANDALS:   Objection.

9        A.    If they're removed from this list, it

10   could be an admission or it could be a rejection or

11   it could be a wait list.

12       Q.    Once -- once a list like this was created,

13   would the full committee once again go through these

14   students to determine the students it would

15   ultimately lop?

16                   MS. SANDALS:   Objection.

17       A.    Yes.

18       Q.    And just for the record, can you tell me

19   what "lopping" means?

20       A.    I understand that to be potentially

21   cutting a student out of the class.

22                   (Pause.)

23       Q.    Do you ever recall an alumnus who may have

24   been Asian-American herself telling you that she

1          COMMONWEALTH OF MASSACHUSETTS

2

3
   I, SUSAN LOZZI, Registered Professional Reporter and
4  Notary Public duly and qualified in and for the
   State of Massachusetts do hereby certify that the
5  foregoing statement is a true and correct transcript
   of my original stenographic notes.

6

7  I further certify that I am neither attorney or
   counsel for, nor related to or employed by any of
8  the parties to the action in which this deposition
   is taken; and furthermore, that I am not a relative
9  or employee of any attorney or counsel employed by
   the parties hereto or financially interested in the
10 action.

11

   IN WITNESS WHEREOF, I have hereunto set my hand and
12 affixed my Notarial Seal this 12th day of July,
   2017.

13

14

15                       *Susan Lozzi*

16

17

                              SUSAN LOZZI
18                            NOTARY PUBLIC

19 My Commission Expires:  March 22, 2024.

20

21

22

23

24

```
 1   PLEASE ATTACH TO THE DEPOSITION OF

 2   CHRISTOPHER J. LOOBY

 3   CASE:   STUDENTS FOR FAIR ADMISSIONS, INC.

 4   v.

 5   PRESIDENT AND FELLOWS OF HARVARD COLLEGE

 6   (HARVARD CORPORATION).

 7   DATE TAKEN:  06/30/2017

 8                   ERRATA SHEET

 9   Please refer to Page 229 for Errata Sheet

10   instructions and distribution instructions.

11   PAGE          LINE          CHANGE          REASON

12   See attached sheet.

13

14

15

16

17       I have read the foregoing transcript of my

18   deposition, and except for any corrections or

19   changes noted above, I hereby subscribe to the

20   transcript as an accurate record of the statements

21   made by me.

22       Executed this ___ day of _____, 2017.

23   _____

24                   CHRISTOPHER J. LOOBY
```

### June 30, 2017 Deposition of Christopher J. Looby – Errata Sheet

| Page | Line | Instruction | Reason for Change |
|---|---|---|---|
| 5 | 10 | Change "Brattel" to "Brattle" | Typographical error |
| 14 | 21 | Change "production assistant" to "a Production Assistant" | Typographical error |
| 16 | 3 | Change "one-to-one" to "one-to-one paraprofessional" | Clarification |
| 32 | 2 | Change "studied" to "to study" | Typographical error |
| 32 | 6 | Change "pros" to "prose" | Typographical error |
| 39 | 22 | Change "my" to "many" | Typographical error |
| 47 | 16 | Change "outlie" to "outline" | Typographical error |
| 53 | 15 | Change "schools and scholarship chair" to "Schools and Scholarship chair" | Typographical error |
| 54 | 23 | Change "schools and scholarship" to "Schools and Scholarship" | Typographical error |
| 55 | 5 | Change "read" to "reader" | Typographical error |
| 84 | 8 | Change "HI" to "HFAI" | Typographical error |
| 85 | 15 | Change "student was" to "student who was" | Grammar |
| 90 | 3 | Change "Connecticut's" to "Connecticut is" | Grammar |
| 90 | 23 | Change "That based" to "That is based" | Typographical error |
| 91 | 9 | Change "committee" to "Committees" | Typographical error |
| 98 | 16 | Change "as" to "that" | Typographical error |
| 103 | 12 | Change "guidance counselor" to "a guidance counselor letter" | Clarification |
| 109 | 13 | Change "responsibility is" to "responsibilities" | Typographical error |
| 150 | 2 | Change "pros" to "prose" | Typographical error |
| 155 | 13 | Change "the" to "their" | Typographical error |
| 169 | 6 | Change "that's" to "it's" | Grammar |
| 182 | 10 | Change "office admissions" to "admissions office" | Grammar |
| 184 | 10 | Change "college board" to "College Board" | Typographical error |
| 184 | 16 | Change "college board" to "College Board" | Typographical error |
| 186 | 13 | Change "office" to "process" | Typographical error |
| 190 | 17 | Change "Stamford" to "Stanford" | Typographical error |
| 190 | 20 | Change "Stamford" to "Stanford" | Typographical error |
| 198 | 1 | Change "were" to "we're" | Grammar |
| 225 | 18 | Change "reached" to "reach" | Grammar |