# EXHIBIT 17

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3   _____

4   STUDENTS FOR FAIR ADMISSIONS, INC.,

5          Plaintiff,

6    v.                        No. 1:14-cv-14176

7   PRESIDENT AND FELLOWS OF

8   HARVARD COLLEGE

9   (HARVARD CORPORATION),

10          Defendant.

11   _____

12

13               VOLUME II

14      HIGHLY CONFIDENTIAL- ATTORNEYS' EYES ONLY

15

16          DEPOSITION of MARLYN McGRATH

17            Boston, Massachusetts

18             August 1, 2017

19

20

21

22   Reported by:

23   Dana Welch, CSR, RPR, CRR, CRC

24   Job #127107

25

1   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

2          MS. ELLSWORTH:  Objection.

3      A.  No, I don't know that.

4      Q.  You don't know one way or the other?

5      A.  No.

6      Q.  Same with personal.  In your experience,

7   do Asian Americans as a group lack attractive

8   personal characteristics compared to other

9   applicants?

10          MS. ELLSWORTH:  Objection.

11      A.  No, I don't think so.

12      Q.  Can you think of any reason why somebody's

13   race would affect their personal rating?

14          MS. ELLSWORTH:  Objection.

15      A.  No, not in our system.

16      Q.  The personal ratings -- if I recall

17   correctly from your prior testimony, the personal

18   rating is intended to just kind of be an analysis

19   as how likeable is this person, does this person

20   seem like a good person to be around?

21          MS. ELLSWORTH:  Objection.

22      A.  That's part of it.

23      Q.  What else is included?

24      A.  Depends on the case.  And the source for

25   that judgment, which I'll get to, is from several

1   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

2   sources.  But I would say that it includes perhaps

3   likability, also character traits, such as

4   integrity, helpfulness, courage, kindness,

5   characteristics of personality and character that

6   may be demonstrated over a student's -- to others

7   during a student's experience in the college and

8   during the student's experience with the admissions

9   process.

10      Q.  And none of those characteristics, in your

11  view, have any correlation with race, correct?

12          MS. ELLSWORTH:  Objection.

13      A.  Correct.

14      Q.  The fourth model here lists the projected

15  admitted student pool once the demographics are

16  added in, which according to the prior slide was

17  race and gender, correct?

18          MS. ELLSWORTH:  Objection.

19      A.  Yes.

20      Q.  And that says that when you add in

21  demographics, the Asian share of the class goes

22  down to slightly under 18 percent, 17.97; is that

23  correct?

24          MS. ELLSWORTH:  Objection.

25      A.  That's according to these data, yes,

1    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

2    this document.

3            MS. ELLSWORTH:  For the record, it's three

4    [sic] documents.

5            MR. STRAWBRIDGE:  I think it was produced

6    as a collection of documents, but that's neither

7    here nor there.

8        A.  Yes, I have seen this in preparation for

9    the deposition.

10       Q.  Before preparing for this deposition, do

11   you remember this correspondence?

12       A.  I actually don't remember the

13   correspondence from the time that apparently it was

14   sent.

15       Q.  All right.  Is this basically -- is this

16   document a collection of, you know, a letter from

17   an alum of Harvard along with some e-mails and,

18   ultimately, a response that was sent out under your

19   name?

20       A.  Yes.

21       Q.  Do you know whether, in fact, you authored

22   the response that's under your name?

23           MS. ELLSWORTH:  Objection.

24       A.  I think I did.

25       Q.  I would assume you did so by the fact that

1    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

2    you're the person who signs that letter?

3         A.  Yes.  And that is my signature.

4         Q.  Let's start with the letter that was sent

5    by the alum on April 4th or dated April 4th, 2012.

6         A.  Yes.

7         Q.  Letter to President Faust, correct?

8         A.  Yes.

9         Q.  And this alum is sharing some views he has

10   with respect to -- he or she has with respect to

11   the admissions office, correct?

12        A.  Yes, correct.

13        Q.  And if you look at -- if you look at the

14   second paragraph on page 2 of his letter, which has

15   a Bates suffix of 29944, the alum writes, "Another

16   aspect of the admissions policy should, in my mind,

17   be based on informal quotas.  Other colleges I know

18   have quotas.  The quotas would include foreign

19   students and the country of their origin.  For

20   example, I would limit the number of Japanese

21   students to a certain percentage or number.

22   I think it is also important to have a quota based

23   on religious affiliation and skin color.  None of

24   this, of course, has to go beyond the confines of

25   the dean's office."

Page 375

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

1
2          Did I read that correctly?

3     A.   You did.

4     Q.   And then the next paragraph from this alum

5 says, "The last time I was in Cambridge, it seemed

6 to me that there were a large number of Oriental

7 students, for example.  I think they probably

8 should be limited to five percent, as should other

9 criteria.  I know, in fact, that other colleges

10 actually do have stated quotas, and I see no reason

11 why Harvard should not have private, informal

12 quotas.

13         Did I read that correctly?

14    A.   You did.

15    Q.   Do you remember -- I think you testified

16 you don't actually remember this correspondence

17 from the time.

18    A.   From the time, I do not remember it.

19    Q.   Is it apparent that Ms. -- or President

20 Faust, President Faust's office reached out to you

21 to ask if the admissions office would respond?

22    A.   Yes.  Her office asked me to respond.

23    Q.   And that results in the letter that you

24 drafted at April 19th, 2012, correct?

25    A.   Yes, correct.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

1

2    Q.  And do you believe that this letter was,

3  in fact, sent?

4        MS. ELLSWORTH:  Objection.

5    A.  I believe that it was sent.

6    Q.  In your view, did this alum deserve a

7  response?

8        MS. ELLSWORTH:  Objection.

9    A.  I was asked to give a response by the

10  person to whom his letter was sent and she felt

11  that it deserved a response, and I provided that

12  response.

13    Q.  Did you do so against your own will?

14    A.  No.  I do that as part of my role, my

15  professional role.

16    Q.  Does every alum who writes in get a

17  response if they make suggestions about the

18  admissions office?

19        MS. ELLSWORTH:  Objection.

20    A.  I think the answer is yes, we think so.

21    Q.  And so is there literally nothing an alum

22  could write that wouldn't get a polite response

23  from Harvard?

24        MS. ELLSWORTH:  Objection.

25    A.  I have never seen an example of something

1    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

2    written by an alum that would not get a response

3    from us.

4        Q.  So is it your belief that Harvard, every

5    time it receives a letter like this from an alum,

6    has always sent a response?

7            MS. ELLSWORTH:  Objection.

8        A.  I can't speak for other parts of Harvard.

9        Q.  Every time that you received a letter or

10   were sent a letter from someone else at Harvard

11   regarding the admissions process, you would always

12   give a polite response?

13           MS. ELLSWORTH:  Objection.

14       A.  Whenever I was sent such a letter and

15   asked to respond to it by a colleague at Harvard

16   that bears on something in our office, I respond to

17   it.

18       Q.  Okay.  What about letters that are just

19   sent to the admissions office, do you respond to

20   all those letters?

21           MS. ELLSWORTH:  Objection.

22       A.  That is our -- that's our goal.

23       Q.  Is that only a goal with respect to alums?

24       A.  We answer letters from the general public.

25       Q.  And is it your policy to answer letters

Page 378

1    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH
2    from the general public?
3         MS. ELLSWORTH:  Objection.
4    A.  It is our general practice, and it is our
5    expectation that we do that.
6    Q.  Okay.  Can you think of any occasions when
7    you have not done that?
8         MS. ELLSWORTH:  Objection.
9    A.  You know, offhand, I can't -- I can't
10   think of an example.
11   Q.  Let's look at the response that you
12   signed, dated April 19th, 2012.  You're replying to
13   the person who had written this letter and you say,
14   "President Faust has asked me to respond to your
15   April 4th letter, in which you offer many
16   thoughtful observations about Harvard college
17   students and the results of the admissions
18   process."
19        Did I read that correctly?
20   A.  Yes, you did.
21   Q.  Do you really think that these were
22   thoughtful observations?
23        MS. ELLSWORTH:  Objection.
24   A.  Do I personally think that?
25   Q.  Yes.

1   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

2       A.  I think he thought about it.  I mean, in

3   that sense they're thoughtful.  I mean, I do not

4   necessarily regard that as a compliment.  I mean,

5   I --

6       Q.  You certainly thank him, right?

7       A.  I do.

8       Q.  I mean, why not just ignore suggestions

9   that Harvard have a quota based on skin color?

10          MS. ELLSWORTH:  Objection.

11      A.  You could argue that this letter ignores

12  the suggestion itself.

13      Q.  Does this letter actually take issue and

14  explain to him that a quota would be wrong?

15          MS. ELLSWORTH:  Objection.

16      A.  No, it does not.

17      Q.  Does this letter tell him that, you know,

18  that his view as to the imposition of quotas based

19  on skin color or nationality is not consistent with

20  Harvard's mission?

21          MS. ELLSWORTH:  Objection.

22      A.  Does this letter say that to him?

23      Q.  Yes.

24      A.  No, it does not.

25      Q.  Why not?

Page 380

1    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

2             MS. ELLSWORTH:  Objection.

3        A.   I think that we made the judgment that it

4    would not be productive.  There could be other

5    reasons as well.

6        Q.   What are the other reasons you're thinking

7    of?

8             MS. ELLSWORTH:  Objection.

9        A.   It didn't see -- it would not have seemed,

10   I suspect at the time, like a fruitful -- a

11   fruitful correspondence.

12       Q.   Whether it's fruitful or not, isn't it

13   important that Harvard take a strong stand against

14   any kind of imposition of racial quotas or

15   discrimination in the admissions process?

16            MS. ELLSWORTH:  Objection.

17       A.   I can't say that I would use the

18   correspondence that I do on the president's behalf

19   to alumni to argue a case either way.

20       Q.   You don't think it's important to kind of

21   stand up for the --

22            MR. STRAWBRIDGE:  Strike that.

23       Q.   How do you think current students at

24   Harvard would view this kind of a letter being sent

25   in response to these suggestions?

1    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

2            MS. ELLSWORTH:  Objection.

3        A.  I have no idea.

4        Q.  Would you have sent the same letter if

5    he'd specifically argued that there were too many

6    black students on campus?

7            MS. ELLSWORTH:  Objection.

8        A.  I can't speculate.

9        Q.  Yes or no?  Do you think you would have

10   sent the same letter consistent with your policy to

11   provide a polite response?

12           MS. ELLSWORTH:  Objection.

13       A.  I might have.  I might have.

14       Q.  What if he had used, actually, racial

15   slurs in the letter?  Would you have sent a

16   response thanking him for his thoughtful

17   observations in that circumstance?

18           MS. ELLSWORTH:  Objection.

19       A.  You know, I can't speculate on that.

20       Q.  Do you think there's something that is so

21   offensive that you wouldn't respond to it?

22           MS. ELLSWORTH:  Objection.

23       A.  Yes, I think there probably is.

24       Q.  Is there something that is so offensive

25   that you'd actually write back and say we cannot

1    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

2    share this view?

3             MS. ELLSWORTH:  Objection.

4        A.  I'm writing on behalf of the president,

5    and I would want in any such extreme case to want

6    to be sure that that's the reply she wanted me to

7    send on her behalf.  And I can't speculate.

8        Q.  Do you agree in this instance with the

9    president's desire to send a response to this

10   letter?

11            MS. ELLSWORTH:  Objection.

12       A.  I can't disagree with her wish to have the

13   letter answered.

14       Q.  Who decided what the actual wording of the

15   letter would be?

16       A.  I think I must have.

17       Q.  You don't think that this is so extreme of

18   a letter that it doesn't deserve a polite response?

19            MS. ELLSWORTH:  Objection.

20       A.  What you have here is the evidence of the

21   reply that I thought the letter, all things

22   considered, warranted.

23       Q.  Do you regret sending this letter?

24            MS. ELLSWORTH:  Objection.

25       A.  I have no regret or no -- or regret -- no,

1   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

2   I don't regret it.

3       Q.  You'd send this letter again tomorrow if

4   the same views were provided to you?

5           MS. ELLSWORTH:  Objection.

6       A.  I don't know because we're not -- I'm not

7   there, but I can't -- I don't know.

8       Q.  Do you think this is an appropriate

9   response from Harvard?

10          MS. ELLSWORTH:  Objection.

11      A.  It's the letter I sent.  It's the only

12  thing I can tell you truthfully.  It's the letter

13  that I seem to have sent.

14      Q.  But I guess my question is do you think it

15  was an appropriate response?

16          MS. ELLSWORTH:  Objection.

17      A.  It was the response that I thought was

18  appropriate at the time.

19      Q.  And do you have a different view today?

20          MS. ELLSWORTH:  Objection.

21      A.  About the letter?

22      Q.  About the propriety of the response.

23          MS. ELLSWORTH:  Objection.

24      A.  I have no different letter -- no different

25  opinion about that today.

Page 384

1    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

2        Q.  Do you recall receiving other letters that

3    suggested quotas with respect to Asian Americans?

4        A.  I don't specifically remember any.

5        Q.  Do you know anything about the recipient

6    of this letter?

7            MS. ELLSWORTH:  Objection.

8        A.  I don't now.  I don't remember if I did --

9    I probably knew something then.  I don't know.

10       Q.  Like, do you know, for example, whether

11   this person gives a lot of money to Harvard?

12           MS. ELLSWORTH:  Objection.

13       A.  I don't know.

14       Q.  Do you know whether this person, you know,

15   has siblings or continues to have family

16   connections to Harvard?

17           MS. ELLSWORTH:  Objection.

18       A.  Um, no, I don't know.  I don't know.

19       Q.  Do you know whether this alum has ever

20   done alumni interviews?

21           MS. ELLSWORTH:  Objection.

22       A.  No, I don't know that.

23           (McGrath Exhibit 12, HARV00024781 - 24782,

24   marked for identification.)

25       Q.  Hand you Exhibit 12.  See if you recognize

1      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

Page 401

1     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH



1     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH



Page 406

1    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

2       Q.  And what is that?

3       A.  I would -- my general idea is somewhere

4    from between a dozen and perhaps 20-something.

5       Q.  Is the Z list sometimes used for

6    politically sensitive cases?

7            MS. ELLSWORTH:  Objection.

8       A.  We would not, not ever use it for a

9    politically sensitive case, but that's not a

10   standard usage, I would say.

11      Q.  When you say "not not," that means

12   sometimes it is used for political issues?

13      A.  I would say that it could be.

14      Q.  And sometimes it is?

15           MS. ELLSWORTH:  Objection.

16      A.  I don't remember that it has -- what do

17   you mean by political?

18      Q.  I mean by political, I mean, to handle a

19   candidate for whom there is pressure for Harvard to

20   admit the candidate for reasons other than their

21   merit.

22           MS. ELLSWORTH:  Objection.

23      A.  I would say that we don't use it in just

24   that way.  There are some candidates who are good

25   and admissible or we would not admit them under any

Page 407

1    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH

2   circumstances, who, in the committee's view -- this

3   is a voting process, in the committee's view are

4   less strong than others.  And some who fall short

5   but who seem nevertheless good candidates might be

6   offered -- are standardly, I mean, are from time to

7   time offered a place, a deferred admit.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY - McGRATH



Page 416

1    ERRATA SHEET

2    NAME OF CASE: SFFA v. Harvard College

3    DATE OF DEPOSITION: August 1, 2017

4    NAME OF WITNESS:  Marlyn McGrath

5    Reason codes: **SEE ATTACHED SHEET.**

6            1.   To clarify the record.

7            2.   To conform to the facts.

8            3.   To correct transcription errors.

9    Page _____ Line _____ Reason _____

10   From _____ to _____

11   Page _____ Line _____ Reason _____

12   From _____ to _____

13   Page _____ Line _____ Reason _____

14   From _____ to _____

15   Page _____ Line _____ Reason _____

16   From _____ to _____

17   Page _____ Line _____ Reason _____

18   From _____ to _____

19   Page _____ Line _____ Reason _____

20   From _____ to _____

21   Page _____ Line _____ Reason _____

22   From _____ to _____

23   Page _____ Line _____ Reason _____

24   From _____ to _____

25            Marlyn McGrath _____

**August 1, 2017 Deposition of Marlyn E. McGrath – Errata Sheet**

| Page | Line | Instruction | Reason for Change |
|------|------|-------------|-------------------|
| 310 | 6 | Change "there were" to "there were such allegations" | Clarification |
| 320 | 4-5 | Change "with legal conclusion on that" to "with a legal conclusion on that" | Grammar |
| 322 | 7 | Change "can't without" to "can't answer without" | Clarification |
| 328 | 25 | Change "can't without" to "can't answer without" | Clarification |
| 330 | 12 | Change "any such" to "any such analyses" | Clarification |
| 361 | 25 | Change "that being true" to "it being true" | Mistranscription |
| 370 | 9 | Change "alternative" to "alternatives" | Grammar |
| 372 | 2 | Change "ammo, what I meant by ammo" to "'ammo,' what I meant by 'ammo'" | Grammar |
| 380 | 18 | Change "president's" to "President's" | Capitalization |
| 382 | 4 | Change "president" to "President" | Capitalization |
| 387 | 12 | Change "president's" to "President's" | Capitalization |
| 392 | 23 | Change "Would you mind repeating that." to "Would you mind repeating that?" | Grammar |
| 399 | 16 | Change "couple in" to "couple, and" | Mistranscription |