# EXHIBIT 18

Highly Confidential - ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3    --------------------------------x

     STUDENTS FOR FAIR ADMISSIONS,    )

4    INC.,                            )

                                      )

5                    Plaintiff,       )

                                      )

6              vs.                    ) Civil Action No.

                                      ) 1:14-cv-14176-ADB

7    PRESIDENT AND FELLOWS OF         )

     HARVARD COLLEGE (HARVARD         )

8    CORPORATION),                    )

                                      )

9                    Defendant.       )

                                      )

10   --------------------------------x

11

12

13        VIDEOTAPED DEPOSITION OF LUCERITO ORTIZ

14             Los Angeles, California

15            Wednesday, June 14, 2017

16

17        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18

19

20

21

22

23   Reported By:

24   SUSAN A. SULLIVAN, CSR #3522, RPR, CRR

25   Job No. 125187

Highly Confidential - ATTORNEYS' EYES ONLY

Page 22

1    Would you take a student's race into account

2 when deciding his or her rating under the "Personal

3 Qualities" category?

4    A    No.

5    Q    Okay.  Would you also give a student who you

6 were viewing a, quote, "overall rating"?

7    A    Yes.

8    Q    Okay.  Would you take a student's race into

9 account when deciding that student's overall rating?

10    MR. DULBERG:  Objection.

11    THE WITNESS:  Race was one of many factors

12 taken into account.

13    Q    BY MR. CONNOLLY:  Was it always taken into

14 account?

15    MR. DULBERG:  Objection.

16    THE WITNESS:  It would depend on the

17 student.

18    Q    BY MR. CONNOLLY:  Have you ever reviewed a

19 student where you did not take his or her race into

20 account when deciding his or her overall rating?

21    MR. DULBERG:  Objection.

22    THE WITNESS:  I don't recall specific

23 applications.

24    Q    BY MR. CONNOLLY:  So sitting here today you

25 cannot remember ever reviewing a student and not

Highly Confidential - ATTORNEYS' EYES ONLY

Page 23

1  taking his or her race into account when determining

2  that student's overall rating; is that correct?

3          MR. DULBERG:  Objection.

4          THE WITNESS:  I don't recall reviewing

5  specific applications.

6    Q   BY MR. CONNOLLY:  So the answer is no?

7          MR. DULBERG:  Objection.

8          THE WITNESS:  I don't recall reviewing

9  specific applications.

10   Q   BY MR. CONNOLLY:  You don't recall ever

11 reviewing any specific students' applications in the

12 five years that you were an admissions officer at

13 Harvard?

14         MR. DULBERG:  Objection.

15         THE WITNESS:  I don't recall reviewing

16 specific applications.

17   Q   BY MR. CONNOLLY:  So that's a yes, you don't

18 recall a single application when you were at

19 Harvard?

20         MR. DULBERG:  Objection.

21         THE WITNESS:  I don't recall reviewing

22 specific applications.

23   Q   BY MR. CONNOLLY:  That just seems incredible

24 to me.  You were there for five years and you don't

25 remember a single student that you reviewed?

Highly Confidential - ATTORNEYS' EYES ONLY

Page 24

1          MR. DULBERG:  Objection.

2          THE WITNESS:  I don't recall reviewing

3     specific applications.

4      Q   BY MR. CONNOLLY:  So -- but you do recall

5     taking race into account for some students; is that

6     correct?

7      A   I don't recall reviewing specific

8     applications.

9      Q   Right.  But you just told me that race is

10    one of many factors that you take into account; is

11    that correct, when reviewing a student's

12    application?

13     A   Yes.

14     Q   How do you know that you took it into

15    account if you don't remember a single application?

16         MR. DULBERG:  Objection.

17         THE WITNESS:  I don't recall reviewing

18    specific applications.

19     Q   BY MR. CONNOLLY:  That wasn't my question.

20         How do you know that you took race into

21    account if you don't remember reviewing a single

22    student application?

23         MR. DULBERG:  Objection.

24         THE WITNESS:  I don't recall reviewing

25    specific applications but in general there were many

Highly Confidential - ATTORNEYS' EYES ONLY

Page 25

1  factors considered when evaluating an applicant.

2      Q   BY MR. CONNOLLY:   How do you know this?

3      A   Can you specify?

4      Q   How do you know that there were many factors

5  considered, one of which was race?

6      A   In my -- in general in my review of

7  applications I would take many factors into

8  consideration when making those evaluations.   I

9  cannot recall specifically individual applicants

10 with reference to how any individual factor played

11 into my review of them.

12     Q   Okay.   So you as a general matter you would

13 use race in an admissions process when evaluating

14 students.   Do I have that correct?

15     A   Race was one of many factors considered.

16     Q   Okay.   Was it always a factor?

17         MR. DULBERG:   Objection.

18     Q   BY MR. CONNOLLY:   Was race always a factor

19 when you were assigning a student's overall rating?

20         MR. DULBERG:   Objection.

21         THE WITNESS:   I don't know.

22     Q   BY MR. CONNOLLY:   Why don't you know?

23     A   I don't recall specific, reviewing specific

24 applications.

25     Q   In your experience did you take a student's

Highly Confidential - ATTORNEYS' EYES ONLY

Page 56

1  can you recall an instance where you used the

2  student's race as a positive factor any deciding

3  whether to admit him or her to Harvard?

4          MR. DULBERG:  Objection.

5          THE WITNESS:  Can you clarify what you mean

6  by positive factor?

7     Q   BY MR. CONNOLLY:  A factor that increased

8  the likelihood that the student would be admitted to

9  Harvard.

10     A   A student's race alone would not signify

11  anything as independent from the rest of his or her

12  application so it is difficult for me to

13  characterize for you the impact that a student's

14  race had as separate from the context in the rest of

15  his or her application.

16     Q   So can you answer that question yes or no?

17          MR. DULBERG:  Objection.

18          THE WITNESS:  Can you repeat the question?

19          MR. CONNOLLY:  Could you repeat the

20  question.

21          (Record read)

22          MR. CONNOLLY:  That's it right there.

23     Q   Can you answer that question yes or no?

24          MR. DULBERG:  Objection.

25     Q   BY MR. CONNOLLY:  Sorry.  Can you answer

Highly Confidential - ATTORNEYS' EYES ONLY

Page 57

1   that question with an answer of yes or no?

2       A   I don't feel comfortable responding with a

3   yes or a no.

4       Q   Why not?

5       A   I'm unclear as to -- I'm unclear as to what

6   you mean.  As mentioned, a student's race in and of

7   itself does not implicate positively or negatively

8   outside of the context of the rest of his or her

9   application so the way in which race may or may not

10  have been considered would not be a standalone

11  question so it is difficult for me to provide a

12  yes-or-no answer in the way that it is being framed.

13      Q   Okay.  Are you saying that how you used race

14  in the admissions process is unmeasurable?

15          MR. DULBERG:  Objection.

16          THE WITNESS:  I would not know how to

17  quantify it.

18      Q   BY MR. CONNOLLY:  Was a student's race ever

19  a decisive factor when you were deciding whether to

20  admit a student to Harvard?

21          MR. DULBERG:  Objection.

22          THE WITNESS:  Can you clarify what you mean

23  by decisive factor?

24      Q   BY MR. CONNOLLY:  In other words, the fact

25  that you knew the student's race is the reason why

Highly Confidential - ATTORNEYS' EYES ONLY

Page 58

1  he or she was admitted.

2      A    No.

3      Q    Do you think you could make effective

4  admissions decisions without knowing a student's

5  race?

6          MR. DULBERG:  Objection.

7          THE WITNESS:  Can you clarify?

8      Q    BY MR. CONNOLLY:  What would you like me to

9  clarify?

10     A    What you mean by effective admissions

11 decisions.

12     Q    Would you feel comfortable determining that

13 a student belonged at Harvard if you didn't know his

14 or her race?

15         MR. DULBERG:  Objection.

16         THE WITNESS:  Can you clarify what you mean

17 by belonged at Harvard?

18     Q    BY MR. CONNOLLY:  Should be admitted to

19 Harvard.

20     A    Can you restate the question with the new

21 phrasing?

22         MR. CONNOLLY:  Could you repeat the last

23 question.

24         (Record read)

25         THE WITNESS:  I would make the best decision

Highly Confidential - ATTORNEYS' EYES ONLY

Page 70

1        THE WITNESS:  I wasn't.

2        Q    BY MR. CONNOLLY:  You weren't chosen to give

3    it?

4        A    No.

5        Q    Okay.  Did you volunteer?

6        A    I requested time at a staff retreat.

7        Q    So it was your idea to give this

8    presentation?

9        A    Yes.

10        Q    Okay.  Why did you want to give the

11    presentation?

12        A    I wanted to provide additional context for

13    admissions officers in their review of application

14    files.

15        Q    What do you mean by context?

16        A    Information that I thought might be helpful

17    to admissions officers.

18        Q    Okay.  Helpful when making their admissions

19    decisions?

20        A    In a variety of ways, yes.

21        Q    So the answer is yes, it would be helpful to

22    them in making their decisions, making their

23    admissions decision?  Sorry, I didn't understand

24    your answer.

25        MR. DULBERG:  Objection.

Page 71

1    THE WITNESS:  I thought this type of

2  information could be helpful as admissions officers

3  were evaluating applicants.

4    Q   BY MR. CONNOLLY:  Why would it be helpful?

5    A   I thought this information could help

6  provide additional context in supporting admissions

7  officers' understandings, potential understandings

8  of individual students.

9    Q   And I'm struggling to understand what you

10  mean by context.  Can you provide any other

11  description of what you mean by context?

12    MR. DULBERG:  Objection.

13    THE WITNESS:  Additional information.

14    Q   BY MR. CONNOLLY:  Let's take a look at the

15  email.  The second line down, I will start on the

16  second sentence of the first paragraph where it

17  says, "We're still filling in the data and exactly

18  what we will talk about (lots of information to sift

19  through), but at present, we plan to break up the 45

20  minutes we have into three main sections:

21    "Testing/achievement data:  drawn from the

22  college board, looking at testing data and

23  percentile breakdowns by race to provide context for

24  casework, etc."

25    So as an initial matter by casework you mean

Page 74

1    Q   Did anyone ever instruct you as to how to
2  use race in the admissions process?
3           MR. DULBERG:  Objection.
4           THE WITNESS:  Not that I recall.
5    Q   BY MR. CONNOLLY:  Then how did you know how
6  to do it?
7           MR. DULBERG:  Objection.
8           THE WITNESS:  I was given general training
9  on how to review applications, I received feedback
10  on a set number of applications, and I sought
11  feedback additionally to help in developing my
12  approach to evaluating applicants.
13    Q   BY MR. CONNOLLY:  Do you recall receiving
14  any written documentation about how you should use
15  race in the admissions process?
16    A   I don't recall.
17    Q   But you do recall receiving oral training as
18  to how to use race in the admissions process; is
19  that correct?
20           MR. DULBERG:  Objection.
21           THE WITNESS:  I recall receiving oral
22  training on how to evaluate applicants.  I don't
23  recall the specific substance of that training
24  and -- I don't recall a specific substance of my
25  training.

Page 78

1   the demographics & experiences of the students we

2   may see in our pool"?

3           MR. DULBERG:  Objection.

4           THE WITNESS:  I don't know who wrote this.

5   I think what may have been intended is to

6   communicate the hope that this information could be

7   helpful to admissions officers as they evaluated

8   applicants.

9       Q   BY MR. CONNOLLY:  Turn to 13775.  Can you

10  tell me what is depicted on this slide?

11          MR. DULBERG:  Objection.

12          THE WITNESS:  I believe it is a breakdown of

13  the approximate number of students scoring above 650

14  on any given section, on a given section of the SATs

15  by race.

16      Q   BY MR. CONNOLLY:  Why did you provide this

17  information at this presentation?

18      A   I thought it could be helpful in providing

19  context as admissions officers evaluated applicants.

20      Q   Can you give me an example of how it would

21  be helpful?

22      A   It would help provide a backdrop for

23  understanding what part a student's scores may look

24  like relative to their peers'.

25      Q   Peers of the same racial group?



Page 80



Highly Confidential - ATTORNEYS' EYES ONLY

Page 122

1      Q    BY MR. CONNOLLY:   Would an ABAFAOILLS

2   conference typically last more than a day?

3           MR. DULBERG:   Objection.

4           THE WITNESS:   To my recollection ABAFAOILLS

5   meetings would be more than one day.

6      Q    BY MR. CONNOLLY:   Okay.   Did you ever attend

7   a round-robin meeting?

8           MR. DULBERG:   Objection to the form.

9           THE WITNESS:   Yes.

10      Q    BY MR. CONNOLLY:   Could you tell me what

11   happened at round-robin meetings?

12           MR. DULBERG:   Objection to the form.

13           THE WITNESS:   It would vary.

14      Q    BY MR. CONNOLLY:   Generally what would

15   happen?

16           MR. DULBERG:   Objection.

17           THE WITNESS:   Institutions would share

18   information with the group.

19      Q    BY MR. CONNOLLY:   Which institutions?

20      A    All institutions present.

21      Q    What do you mean by institutions?

22   Universities?

23      A    Colleges.

24      Q    Colleges.

25           Other ivy league colleges?

Highly Confidential - ATTORNEYS' EYES ONLY

Page 123

1      A    Among others.

2      Q    What type of information would they share?

3           MR. DULBERG:  Objection to the form.

4           THE WITNESS:  I don't recall specifically

5      the information that was shared.

6      Q    BY MR. CONNOLLY:  Would they share

7      admissions numbers with the group?

8           MR. DULBERG:  Objection.

9           THE WITNESS:  Can you clarify what you mean

10     by admissions numbers?

11     Q    BY MR. CONNOLLY:  Students that the

12     university or the college had admitted.

13          MR. DULBERG:  Objection.

14          THE WITNESS:  Individual student information

15     was not revealed at these meetings.

16     Q    BY MR. CONNOLLY:  Would institutions reveal

17     categories of information about admissions?

18          MR. DULBERG:  Objection.

19          THE WITNESS:  I recall a variety of -- I

20     recall a variety of information being shared about

21     various demographics.

22     Q    BY MR. CONNOLLY:  Did you ever share

23     information from Harvard?

24          MR. DULBERG:  Objection.

25          THE WITNESS:  I don't recall.

Highly Confidential - ATTORNEYS' EYES ONLY

Page 124

1    Q   BY MR. CONNOLLY:  Do you ever remember
2  hearing admissions numbers broken down by race?
3         MR. DULBERG:  Objection.
4         THE WITNESS:  I recall hearing numbers
5  broken down by race.  I don't recall specifically
6  whether those were admissions numbers.
7    Q   BY MR. CONNOLLY:  Do you recall a University
8  ever or a college ever stating the number of
9  applicants who had applied broken down by race?
10   A   I recall information being provided by race.
11 I don't recall specifically what category of
12 information was shared.
13   Q   And how many round-robin meetings did you
14 attend?
15        MR. DULBERG:  Objection.
16        THE WITNESS:  I don't recall.
17   Q   BY MR. CONNOLLY:  More than one?
18   A   Yes.
19   Q   Do you know why you attended these round-
20 robin meetings?
21        MR. DULBERG:  Objection.
22        THE WITNESS:  Can you clarify?
23   Q   BY MR. CONNOLLY:  What would you like me to
24 clarify?
25   A   What do you mean by why I attended?

Highly Confidential - ATTORNEYS' EYES ONLY

Page 125

1    Q    Why were you there?

2         MR. DULBERG:  Objection.

3         THE WITNESS:  To attend the ABAFAOILLS

4    meeting which included the round-robin.

5    Q    BY MR. CONNOLLY:  Did someone ask you to

6    attend the round-robin meeting?

7         MR. DULBERG:  Objection to the form.

8         THE WITNESS:  I don't recall whether or not

9    I was ever asked to attend the round-robin meeting.

10   Q    BY MR. CONNOLLY:  Okay.  Do you know the

11   purpose of these round-robin meetings?

12   A    I don't know.

13   Q    Do you recall writing down the information

14   you heard at these meetings?

15   A    I don't recall.

16   Q    Do you recall ever doing anything with the

17   information you learned at these meetings?

18        MR. DULBERG:  Objection.

19        THE WITNESS:  I don't recall.

20   Q    BY MR. CONNOLLY:  So you attended multiple

21   round-robin meetings but you have no idea why you

22   went to them; is that right?

23        MR. DULBERG:  Objection.

24   Q    BY MR. CONNOLLY:  Is that right?

25        MR. DULBERG:  Objection.

Highly Confidential - ATTORNEYS' EYES ONLY

Page 126

1          THE WITNESS:  I was in attendance at

2     round-robin meetings as a part of my attendance at

3     ABAFAOILLS meetings.

4        Q   BY MR. CONNOLLY:  Okay.  Why did you go to

5     ABAFAOILLS meetings?

6          MR. DULBERG:  Objection.

7          THE WITNESS:  Because I wanted to attend.

8        Q   BY MR. CONNOLLY:  And why did you want to

9     attend.

10         MR. DULBERG:  Objection.

11         THE WITNESS:  I thought them to be good

12    professional opportunities.

13       Q   BY MR. CONNOLLY:  What type of individuals

14    would you meet at ABAFAOILLS meetings?

15         MR. DULBERG:  Objection to the form.

16         THE WITNESS:  A variety of individuals.

17       Q   BY MR. CONNOLLY:  Such as?

18       A   Other admissions officers.

19       Q   Were they all minorities?

20         MR. DULBERG:  Objection.

21         THE WITNESS:  Can you clarify what you mean

22    by minorities?

23       Q   BY MR. CONNOLLY:  What do you think minority

24    means?

25         MR. DULBERG:  Objection.

Highly Confidential - ATTORNEYS' EYES ONLY

Page 139

1    Q   BY MR. CONNOLLY:  Did it happen on a

2  frequent basis?

3         MR. DULBERG:  Objection.

4         THE WITNESS:  It would depend.

5    Q   BY MR. CONNOLLY:  Did you ever request or

6  did you ever ask an admitted student whether he or

7  she would like to stay with a host of the same race?

8         MR. DULBERG:  Objection.

9         THE WITNESS:  During what timeframe?

10   Q   BY MR. CONNOLLY:  For Visitas.

11        MR. DULBERG:  Objection.

12        THE WITNESS:  During what timeframe?

13   Q   BY MR. CONNOLLY:  Any timeframe.

14        MR. DULBERG:  Objection.

15        THE WITNESS:  Yes.

16   Q   BY MR. CONNOLLY:  Why would you have done

17  that?

18        MR. DULBERG:  Objection.

19        THE WITNESS:  To collect information that

20  could be helpful in finding a host match for the

21  student.

22   Q   BY MR. CONNOLLY:  Would a student's

23  preferences affect the -- strike that.

24        Did you ever assign a host of the same race

25  of an admitted student because that admitted student

Highly Confidential - ATTORNEYS' EYES ONLY

Page 140

1    requested it?

2            MR. DULBERG:  Objection.

3            THE WITNESS:  Yes.

4       Q    BY MR. CONNOLLY:  Why would you have done

5    that?

6       A    To honor the student's request.

7       Q    Did you ever consider not assigning hosts on

8    the basis of race?

9            MR. DULBERG:  Objection.

10           THE WITNESS:  Can you clarify?

11      Q    BY MR. CONNOLLY:  What would you like me to

12   clarify?

13      A    What you mean by on the basis of race.

14      Q    Did you ever consider just finding admitted

15   students housing and not asking their preferences,

16   their racial preferences for their host?

17           MR. DULBERG:  Objection.

18           THE WITNESS:  Under what context?

19      Q    BY MR. CONNOLLY:  For Visitas.

20      A    For the UMRP?

21      Q    Yes.

22      A    No.

23      Q    Do you ever -- did the UMRP program ever

24   have alumni call admitted students?

25      A    Not to my recollection.

Highly Confidential - ATTORNEYS' EYES ONLY

Page 141

1    Q   Are you aware of something called a Harvard

2   Latino admit phonation?

3    A   Yes.

4    Q   And what is that?

5    A   It was a phonation in which Latino Harvard

6   alumni called admitted students.

7    Q   Is that -- was that something different from

8   my original question?

9         MR. DULBERG:  Objection.

10        THE WITNESS:  I don't recall the phonation

11  being a part of the UMRP.

12   Q   BY MR. CONNOLLY:  Okay.  So what was it a

13  part of?

14        MR. DULBERG:  Objection.

15        THE WITNESS:  It was a separate initiative.

16   Q   BY MR. CONNOLLY:  Under the admissions

17  office -- who led this initiative?

18   A   I did.

19   Q   Did you start this initiative?

20   A   Yes.

21   Q   Why did you start it?

22   A   I wanted to provide an additional

23  opportunity for admitted students to connect in

24  particular with alumni.

25   Q   Was there a similar program for members of

Highly Confidential - ATTORNEYS' EYES ONLY

Page 142

1    any other race?

2             MR. DULBERG:  Objection.

3             THE WITNESS:  During what timeframe?

4        Q    BY MR. CONNOLLY:  When you were there in the

5    admissions office.

6        A    I don't know specifically.

7        Q    Was there ever an African-American alumni

8    phonation?

9             MR. DULBERG:  Objection.

10            THE WITNESS:  I don't -- I believe so.

11       Q    BY MR. CONNOLLY:  Was there ever an Asian

12   alumni phonation?

13            MR. DULBERG:  Objection.

14            THE WITNESS:  I don't know.

15       Q    BY MR. CONNOLLY:  Was there a reason why

16   African-Americans and Latinos would receive phone

17   calls from alumni but members of other racial groups

18   would not?

19            MR. DULBERG:  Objection.

20            THE WITNESS:  I was only responsible for the

21   Latino alumni phonation so I can't speak as to why

22   or why not other groups would be contacted.

23       Q    BY MR. CONNOLLY:  Would student coordinators

24   within the UMRP program also reach out to admit

25   students?

Highly Confidential - ATTORNEYS' EYES ONLY

Page 153

1    document before?

2         A    Yes.

3         Q    Do you know what this document is?

4         A    Yes.

5         Q    What is it?

6         A    It is notes for a presentation that Tia Ray

7    and I gave to admissions staff.

8         Q    Did you write down these notes?

9              MR. DULBERG:   Objection.

10             THE WITNESS:   I participated in writing

11   these notes.  I don't recall specifically which of

12   these I wrote.

13        Q    BY MR. CONNOLLY:   Okay.  Did you use these

14   notes when giving your presentation?

15        A    I don't recall.

16        Q    Did you have any reason to believe you were

17   not supposed to use these notes when giving your

18   presentation?

19        A    I don't recall whether or not I had these

20   notes with me while I gave this presentation.

21        Q    Okay.  But you don't recall contributing in

22   some fashion to the drafting of these notes; is that

23   correct?

24        A    Yes.

25        Q    Can you read the first bullet for me on the

Page 161

1   context that an admissions officer could take away

2   from this?

3            MR. DULBERG:  Objection.

4            THE WITNESS:  I don't know how admissions

5   officers may or may not have used or interpreted

6   this information.

7        Q   BY MR. CONNOLLY:  What's the type of context

8   you would have taken away from this?

9            MR. DULBERG:  Objection.

10           THE WITNESS:  It was helpful for me to

11  understand the distribution of scoring ranges

12  nationally so that in evaluating any individual

13  applicant I could better understand in using this

14  information perhaps along with other contextual

15  factors how the student may be performing or how the

16  student may compare in a variety of ways.

17       Q   BY MR. CONNOLLY:  Compare with members of

18  his or her base?

19           MR. DULBERG:  Objection.

20           THE WITNESS:  Among other things, yes.

21       Q   BY MR. CONNOLLY:  Is one of the things that

22  you would have taken away from this is that there

23  are not a lot of black students with above 700 on

24  the SAT in the country?

25           MR. DULBERG:  Objection.

Highly Confidential - ATTORNEYS' EYES ONLY

1    never hear information such as that during the

2    committee?

3         A    I don't recall.

4         Q    Would you ever hear anything at all about

5    the types of students that would attend Harvard?

6         A    In what context?

7         Q    In the wait list meetings.

8         A    I don't recall.

9         Q    How did you go deciding which students

10   should come off the wait list?

11            MR. DULBERG:   Objection.

12            THE WITNESS:   I did not decide whether or

13   not a student would be admitted off the wait list.

14        Q    BY MR. CONNOLLY:   How did you go about

15   making the determination about whether to vote to

16   admit a student off the wait list?

17        A    In the same way I would determine whether or

18   not to vote to admit a student during the review

19   parts of the process.

20        Q    Would you review every applicant who was on

21   the wait list before making that decision?

22            MR. DULBERG:   Objection.

23            THE WITNESS:   Can you clarify what you mean

24   by review?

25        Q    BY MR. CONNOLLY:   I can't, no.

Highly Confidential - ATTORNEYS' EYES ONLY

1          MR. DULBERG:  Objection.

2          THE WITNESS:  It would depend.

3      Q   BY MR. CONNOLLY:  What would it depend on?

4      A   The rest of the application.

5      Q   I don't know understand what that means.

6  How would a student's -- so how would the fact that

7  a student was a legacy affect his or her

8  application?

9          MR. DULBERG:  Objection.

10          THE WITNESS:  It would depend.

11      Q   BY MR. CONNOLLY:  Is it your testimony that

12  a student, that the fact that a student was a legacy

13  could affect his or her chances of getting into

14  Harvard?

15          MR. DULBERG:  Objection.

16          THE WITNESS:  A student's legacy status was

17  one factor considered.  I don't know that that would

18  change, that that factor alone would signify a

19  likelihood of acceptance or rejection.

20      Q   BY MR. CONNOLLY:  Why was it a factor that

21  you would consider when making admissions decisions?

22      A   It was my understanding that it was a factor

23  relevant for the office.

24      Q   So was it important to the admissions office

25  that you take into account a student's legacy

Highly Confidential - ATTORNEYS' EYES ONLY

Page 207

1   ERRATA SHEET FOR THE TRANSCRIPT OF:

2

3   Case Name:  Students vs. President

4   Deposition Date:  June 14, 2017

5   Witness:  LUCERITO ORTIZ

6                        CORRECTIONS:

7   Pg.   Ln.       Now Reads        Should Read      Reason

8   ___   ___   See attached page for errata  _____   _____

9   ___   ___   _____   _____   _____

10  ___   ___   _____   _____   _____

11  ___   ___   _____   _____   _____

12  ___   ___   _____   _____   _____

13  ___   ___   _____   _____   _____

14  ___   ___   _____   _____   _____

15  ___   ___   _____   _____   _____

16  ___   ___   _____   _____   _____

17  ___   ___   _____   _____   _____

18  ___   ___   _____   _____   _____

19  ___   ___   _____   _____   _____

20  ___   ___   _____   _____   _____

21                        _____

22                        LUCERITO ORTIZ

23  Subscribed and sworn to

    before me this    day

24  of            20 .

    _____

25  (Notary Public)  MY COMMISSION EXPIRES: _____

**June 14, 2017 Deposition of Lucerito Ortiz – Errata Sheet**

| Page | Line | Instruction | Reason for Change |
|------|------|-------------|-------------------|
| 3 | 16 | Change "Sarah" to "Sara" | Typographical error |
| 6 | 1 | Change "Probably use" to "Apologies," | Typographical error |
| 13 | 10 | Change "Evelyn" to "Emelyn" | Typographical error |
| 25 | 23 | Delete "specific," | Clarification |
| 30 | 23 | Change "look" to "looked" | Typographical error |
| 64 | 18 | Delete "specific individuals on" | Clarification |
| 68 | 8 | Change "McGraff" to "McGrath" | Typographical error |
| 71 | 7 | Delete "understandings" | Clarification |
| 72 | 19 | Delete "what I sent her" | Clarification |
| 76 | 17 | Change "at this" to "at this time" | Clarification |
| 78 | 23 | Delete "part" | Typographical error |
| 80 | 1 | Change "approximate data of" to "and I don't know" | Clarification |
| 81 | 7 | Change "list" to "lists" | Typographical error |
| 82 | 9 | Change "African-American" to "Asian-American" | Typographical error |
| 82 | 16 | Change "what" to "why" | Typographical error |
| 103 | 22 | Change "queues" to "hues" | Typographical error |
| 119 | 9 | Change "reviewing" to "or viewing" | Typographical error |
| 120 | 13 | Change "Connolly" to "Dulberg" | Typographical error |
| 120 | 22 | Change "Sarah" to "Sara" | Typographical error |
| 122 | 4 | Change "ABAFAOILLS" to "ABAFAOILSS" | Clarification |
| 125 | 3 | Change "ABAFAOILLS" to "ABAFAOILSS" | Clarification |
| 126 | 3 | Change "ABAFAOILLS" to "ABAFAOILSS" | Clarification |
| 130 | 14 | Delete "be" | Typographical error |
| 134 | 11 | Change "admissions" to "admissions office's" | Clarification |
| 141 | 5, 10 | Change "phonation" to "phonathon" | Typographical error |
| 142 | 21 | Change "phonation" to "phonathon" | Typographical error |
| 147 | 8 | Delete "specifically what" | Clarification |
| 149 | 6 | Change "were visited, were not" to "for visits" | Clarification |
| 156 | 14 | Delete "it" | Clarification |
| 159 | 4 | Change "general" to "high school" | Clarification |
| 160 | 23 | Delete "will" | Typographical error |
| 162 | 7 | Change "any" to "many" | Typographical error |
| 162 | 24 | Delete "programs" | Clarification |
| 164 | 16 | Delete "being" | Clarification |
| 172 | 14 | Change "view" to "review" | Clarification |
| 173 | 12 | Change "you" to "I" | Typographical error |
| 175 | 15 | Change "Not." to "Not necessarily." | Typographical error |
| 186 | 18 | Change "review" to "regular" | Clarification |
| 188 | 2 | Change "the" to "a" | Clarification |
| 193 | 25 | Change "FH based" to "FH, and based" | Clarification |
| 201 | 23 | Change "review" to "renew" | Typographical error |