# EXHIBIT 21

Page 1

1                 UNITED STATES DISTRICT COURT

                   DISTRICT OF MASSACHUSETTS

2

     STUDENTS FOR FAIR             §
3    ADMISSIONS, INC.              §
                                   §
4             Plaintiff,           §
                                   §      CIVIL ACTION NO.
5    VS.                           §      1:14-cv-14176-ADB
                                   §
6    PRESIDENT AND FELLOWS OF      §
     HARVARD COLLEGE (HARVARD      §
7    CORPORATION)                  §
                                   §
8             Defendant.           §

9

10        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11          ORAL AND VIDEOTAPED DEPOSITION OF

12                    RUTH SIMMONS

13                   April 11, 2018

14                   Houston, Texas

15

16

17

18

19

20

21

22

23

24    REPORTED BY:  Linda Russell, CSR

25    JOB NO:  139807

Highly Confidential - Attorneys' Eyes Only

1          R. SIMMONS - 4/11/2018

2          I think, to be sure, the use of race

3    as one factor in the admission process has in

4    fact been important and has created a better

5    learning environment on campuses where that is

6    the policy.  I'm absolutely certain of that.

7          Q.  (BY MR. CONNOLLY)  Do you support

8    giving preferences in the admissions process to

9    legacies?

10         A.  I'm not sure I would call it a

11   preference.  I certainly support considering

12   legacy as an element of the admission process.

13         Q.  Yeah, and I saw that language in the

14   report a couple of times, quote, "consider

15   legacy."  And I think another phrase you used was

16   "pay attention to legacy status."  And I guess

17   I'm confused about what -- what do you mean by

18   "consider legacy status?"

19         A.  So, again, in the admission process,

20   and if you've looked at an application recently,

21   you see that there are all kinds of things

22   involved that we -- all kind of information we

23   gather in the admission process.

24          When I'm looking at whether or not a

25   student can benefit from and contribute to a

Highly Confidential - Attorneys' Eyes Only

Page 73

1                    R. SIMMONS - 4/11/2018

2     particular educational environment, I'm looking

3     for their academic strength, I'm looking at their

4     curiosity, I'm looking at their volunteer

5     activity, I'm looking at their economic class,

6     I'm looking at hardships maybe they've endured,

7     I'm looking at whether they've traveled, I'm

8     looking -- I'm looking at so many different

9     factors.

10                   One of those factors can be whether

11    or not they are familiar with my university

12    because members of their family have been to the

13    university.

14                   And, again, I'm looking at all manner

15    of information to determine whether or not they

16    will benefit from the environment that we offer.

17         Q.   In your experience, was the fact that

18    a student was a legacy, was that ever a negative

19    factor that harmed the student's chances of

20    getting into the school?

21         A.   I don't -- I can't think of an

22    instance in which it would have, because there

23    are so many other factors being included in the

24    assessment of a student's qualifications.

25         Q.   All right.  So I guess I'm just

Highly Confidential - Attorneys' Eyes Only

1                   R. SIMMONS - 4/11/2018

2    trying to understand why -- why the hesitancy to

3    just say at Brown we gave an admissions tip to

4    the children of alumni?  Why not just -- I mean,

5    it happens; why not just admit it?

6               MR. ADEGBILE:  Objection.

7         A.  Because what you're saying isn't the

8    case.

9               So, I wouldn't say that we gave an

10   admission tip.  I think that's the way you put

11   it.  What I would say is that all other things

12   being equal, there are a number of different

13   things in the admission process that you're

14   looking at.  But you're always looking at the

15   core value of what the applicant brings in terms

16   of academics, in terms of extracurriculars, in

17   terms of all of the other things, before you get

18   to the point where you look at something like

19   whether a member of their family has gone to the

20   university.

21              And so I don't think it's a tip.  I

22   think the student is fully qualified.  And in the

23   judgment that you deploy in putting together a

24   class, just as you might use your judgment to

25   decide that you want the student from South

Highly Confidential - Attorneys' Eyes Only

R. SIMMONS - 4/11/2018

1     

2  Dakota over another student from New York, you

3  might decide it would be good to have someone

4  with the legacy experience as a part of the

5  class.

6       Q.  So the hypothetical situation, you

7  have a student who is fully qualified to attend

8  Brown.  And is it your testimony that the fact

9  that he or she is a legacy might be one of the

10 factors that helps that student get into Brown?

11      A.  It's one of the factors that might

12 make them qualified for admission.  Absolutely.

13      Q.  Do you think if Harvard or Brown

14 stopped, in your words, considering legacies,

15 that the number of students who are legacies

16 attending Brown or attending Harvard would

17 decrease?

18        MR. ADEGBILE:  Objection.

19      A.  I don't know.

20      Q.  (BY MR. CONNOLLY)  Then I guess I

21 don't -- why is it so important, then, to

22 consider -- how can you say it's really important

23 to consider legacies -- whether an individual

24 is a legacy if you don't know how it will affect

25 the class?

Highly Confidential - Attorneys' Eyes Only

Page 76

1                    R. SIMMONS - 4/11/2018

2          A.   That's not the question you asked.

3          Q.   Okay.

4          A.   Okay?

5               So, again, our belief over time --

6     and for some of us that's literally hundreds of

7     years; hundreds of years -- what we have

8     experienced is that the involvement of families

9     over time in our institutions adds a dimension to

10    the university that is very important and very

11    desirable.  In truth, I think it's one of the

12    reasons that these are highly selected

13    institutions.

14         Q.   Do -- excuse me.  Do you think the

15    level of alumni involvement at an institution

16    like Harvard would decrease if Harvard stopped

17    considering or giving preferences to legacies?

18         A.   I think it might.  Here's what we do

19    know -- here's what I know:  Parents follow their

20    children.

21         Q.   I'm sorry.  Follow their children...?

22         A.   Follow their children's choices.  And

23    so if I decide -- if I go -- my granddaughter

24    goes to Prairie View, my interest and my

25    philanthropy will follow her.

Highly Confidential - Attorneys' Eyes Only

Page 77

R. SIMMONS - 4/11/2018

1
2          And what I've seen over the years
3    from people who went to other institutions who
4    have transferred their allegiances to Brown is
5    that they followed their children to Brown.
6    Their interest followed their children to Brown.
7          Q.  But presumably you don't need a
8    preference in order to get parents interested in
9    following their children.  Whoever you enroll,
10   their parents will be interested in following
11   their children, as you say.
12          MR. ADEGBILE:  Objection.
13          A.  I think their interest is not as
14   deep, not as lasting, because those parents tend
15   to leave when their children leave.
16          So a great advantage of legacy, in my
17   view, though, as I've tried to explain, I don't
18   see it so much as a preference for legacies, I
19   see it as a factor that is very important in the
20   admission process insofar as we are trying to
21   consider all factors and creating a class that
22   will inure to the benefit of the educational
23   values that we have.
24          So, as you know, I'm very much an
25   advocate of involving alumni.  I believe,

Highly Confidential - Attorneys' Eyes Only

1          R. SIMMONS - 4/11/2018

2    personally, that it is the difference between --

3    literally the difference between the success of

4    educational institutions and the standing of

5    educational institutions.

6          Q.  And I guess your testimony is, that

7    level of involvement -- alumni involvement at a

8    school --

9          A.  Over time.

10         Q.  -- over time at a school like Harvard

11   would decrease if there were not certain legacy

12   preferences?

13              MR. ADEGBILE:  Objection.

14         A.  Again, I don't see it as legacy

15   preferences, because I think if you -- if it were

16   legacy preferences, there would be more legacies.

17   A lot of legacies out there.

18         Q.  (BY MR. CONNOLLY)  So I'll replace it

19   with legacy consideration.

20         A.  Oh, thank you.  Okay.  So, yes, I

21   think it would decrease --

22         Q.  Okay.

23         A.  -- without that.

24         Q.  And why do you think that?

25         A.  As I say, I think that over time

Highly Confidential - Attorneys' Eyes Only

R. SIMMONS - 4/11/2018

1

2    people tend to be considerate of what

3    institutions have meant in their lives over time.

4            My observation is that that has been

5    the case even though individuals may not be in

6    every year devoted to that, over time they tend

7    to remain invested very heavily because of what

8    that education meant to them.  And I worry about

9    the loss of that commitment and involvement,

10   because I think it is what clearly differentiates

11   institutions.

12          Q.  So is it your fear that if an alumni

13   of -- or an alumnus of Harvard or Brown feels

14   that his or her child, that the legacy aspect

15   will not be considered maybe ten years down the

16   road when the child is applying, that will make

17   them less likely to be involved with the

18   university?

19          A.  I don't know, but -- but it could.

20   Most of us who have been presidents have

21   experienced the ire of parents whose children

22   have been denied admission.  That is actually a

23   more prominent feature of our experience than

24   actual number of legacies admitted, because far

25   more are denied than admitted.  And so we come to

Highly Confidential - Attorneys' Eyes Only

1                  R. SIMMONS - 4/11/2018

2    experience what it feels like in a family when

3    students don't have a chance -- legacies don't

4    have a chance of being considered.

5              On the other hand, if people are

6    aware that their children will be at least

7    considered, they are -- they are certainly

8    happier with that possibility than with the fact

9    that they cannot be considered.

10        Q.  Well, and it's not just that the

11   student will be considered, it's that the legacy

12   aspect will be considered, correct?

13        A.  Of course.

14        Q.  Yeah.

15             THE WITNESS:  Excuse me.

16        Q.  (BY MR. CONNOLLY)  Has the student

17   who is a legacy done anything personally to

18   deserve this, in your words, consideration?

19        A.  To be admitted, they have to.

20        Q.  Right.  But to receive the -- the,

21   quote, legacy consideration, has the student done

22   anything?

23        A.  Well, the --

24             MR. ADEGBILE:  Objection.

25        A.  The student in South Dakota hasn't

Page 81

1                R. SIMMONS - 4/11/2018

2      done anything either.

3               So -- so, my point is that we -- we

4      use many different attributes in the admission

5      process.

6               Often the students haven't done

7      anything in their particular area to suggest that

8      they should get the nod in admission, it's just

9      that they happen to be in a pool of students in a

10     given year in which either their state or their

11     region or their school or their circumstances

12     become important in the admission process and

13     they haven't done anything to merit it on the

14     basis of that singular attribute.  So that's

15     not -- that's not so unusual in the admission

16     process.

17          Q.  (BY MR. CONNOLLY)  You mentioned the

18     consideration of someone from South Dakota.

19     They're -- so I would call that I guess a

20     geographic consideration.  Is there anyone you

21     can think of who would not receive

22     consideration -- one of these special types of

23     considerations?

24          A.  Any one?

25               MR. ADEGBILE:  Objection.

Highly Confidential - Attorneys' Eyes Only

Page 82

1       R. SIMMONS - 4/11/2018

2       Q.  (BY MR. CONNOLLY)  Any -- any type

3   of -- any type of person.

4           MR. ADEGBILE:  Objection.

5       A.  I'm not talking about a type of

6   person, I'm talking about a particular attribute

7   of a person.

8           So maybe you can say a bit more?

9       Q.  (BY MR. CONNOLLY)  Sure.  So, you

10  know, how about a middle class white student from

11  the Bronx, can you think of any special

12  consideration that student would receive at

13  Harvard?

14          MR. ADEGBILE:   Objection.

15      A.  It's hard to say, without knowing

16  the -- without knowing -- but if that student,

17  for example, is from the Bronx High School of

18  Science, you know, they might be highly sought

19  after.

20          Let me give you an example.  I write

21  letters of recommendation all the time from Texas

22  to Ivy League universities.  And my argument

23  often is, "You need more students from Texas."

24  And my argument is, "Here's" -- "Here are the

25  reasons that this particular student from Texas

Highly Confidential - Attorneys' Eyes Only

Page 83

1          R. SIMMONS - 4/11/2018

2    should be considered."

3          Now, I'm doing that because I

4    actually believe that more students from Texas

5    would benefit from an education in these

6    institutions, but also because I think that we,

7    as Texans, bring something different to those

8    environments.

9          So it's both cultural and academic.

10   A student from Bronx might bring a cultural

11   dimension that would be very important to

12   Harvard, for all I know.  It depends on the

13   student.

14          MR. CONNOLLY:  One more exhibit and

15   then break for lunch, if you're fine with that.

16          MR. ADEGBILE:  If you wouldn't mind

17   describing it for the record.

18          MR. CONNOLLY:  Sure.  This is --

19   Exhibit 3, an article entitled, "The

20   Self-Destruction of the 1 Percent," from the

21   New York Times, October 14th, 2012.

22          In particular, I'll be focusing on

23   page 2 around the halfway point is where

24   President Simmons has a quote.

25          (Exhibit 3 marked for identification.)

Highly Confidential - Attorneys' Eyes Only

Page 84

1          R. SIMMONS - 4/11/2018

2          (Witness reviewing document.)

3          Q.  (BY MR. CONNOLLY)  If you could turn

4    to page 2.  About halfway down, there's a

5    paragraph that starts off with, "At the World

6    Economic Forum."  And halfway through that

7    paragraph is a sentence that starts,

8    "Dr. Simmons."  Do you see that?

9          A.  Yeah, I do.

10          Q.  Could you read the rest of that

11    paragraph for me?

12          A.  The rest of it meaning starting with,

13    "Dr. Simmons"?

14          Q.  Yes, starting with, "Dr. Simmons."

15          A.  "Dr. Simmons, a Harvard-trained

16    literature scholar, worked hard to make Brown

17    more accessible to poor students, but when I

18    asked whether it was a time to abolish legacy

19    admissions, the Ivy League's own Book of Gold,

20    she shrugged me off with a laugh:  'No, I have a

21    granddaughter.  It's not time yet.'"

22          Q.  Do you think this type of thinking

23    from people in power is why consideration of

24    legacy in the admissions process still exists?

25          MR. ADEGBILE:  Objection.

R. SIMMONS - 4/11/2018

1

2          A.  Are you putting me in that group?

3          Q.  (BY MR. CONNOLLY)  You were the

4    President of the university.

5          A.  No, no.  Let me, if I may, point you

6    to the quote --

7          Q.  Sure.

8          A.  -- which is with a laugh I said, "No,

9    I have a granddaughter.  It's not time yet."  It

10   was a joke.

11          So, how do you -- so I'm trying to

12   figure out how you're characterizing that.

13          Q.  The idea that people who are in

14   charge of Ivy League universities also have

15   children, do you think that affects the leaders

16   of these institutions' decisions to perpetuate

17   the consideration --

18          A.  Absolutely not.

19          Sorry.  I usually don't talk over

20   people, but when it's really absurd, I have to

21   inter -- intervene.  No, I don't.

22          Q.  I'm sorry, if I can ask you one --

23   ask it again.

24          Do you think the fact that the

25   leaders of these institutions, who most likely

Highly Confidential - Attorneys' Eyes Only

Page 86

                         R. SIMMONS - 4/11/2018

1

2  also have children, do you think that fact is a

3  reason why legacy consideration continues today?

4        A.  I don't.  I really don't.

5        Q.  Why not?

6        A.  Well, I'm actually trying to remember

7  anyone in my experience whom I've known as a

8  president who had a child eligible for admission.

9  I don't know -- I don't know of one.

10        Q.  Well, and you talked about, you know,

11  how much alumni care about sending their children

12  to their alma maters, and it seems to me that

13  that -- those beliefs and those desires would

14  hold equally for the leaders of those

15  universities.  And so I don't know why they would

16  be immune from the desire to, in your words,

17  continue giving consideration to legacy students.

18        A.  I'm just saying that I don't think it

19  has anything to do with their personal

20  circumstances.  I think they do it -- or they may

21  believe it or they may promote it for entirely

22  legitimate reasons that has nothing to do with

23  their own situation.  I certainly didn't advise

24  my children to go to institutions where I was.

25              So, I -- I don't know.  I mean, I

Highly Confidential - Attorneys' Eyes Only

                    R. SIMMONS - 4/11/2018

1    think it isn't something to which I've given

2    consideration.  But I -- as you can see from my

3    reaction, I find it an odd -- I find the

4    postulation of it odd because of my own

5    experience in not having known anybody whose

6    opinion was shaped because of that reason, mostly

7    because of age, I suppose.  They are beyond the

8    age, for the most part, where their children

9    would have been a part of the decision-making

10   process -- their children's situation would have

11   been a part of the decision-making process.

12              THE WITNESS:  Excuse me.

13        Q.  (BY MR. CONNOLLY)  And it just seems

14   to me that if you look at the -- if you take

15   Brown or you take Princeton and you think about

16   who is in charge of making certain decisions, be

17   it the president or the director of admissions or

18   whoever, they have most likely -- in most cases

19   those individuals have children.  And one would

20   reason that they would stand to benefit from

21   legacy consideration, in your words.

22              And so I guess my question is whether

23   you think that these university leaders can put

24   their own personal desires aside when deciding

Highly Confidential - Attorneys' Eyes Only

Page 88

```
 1                   R. SIMMONS - 4/11/2018
 2   whether to continue using consideration of
 3   legacies, because I think I would find that -- I
 4   won't -- I'll stop right this.
 5              MR. ADEGBILE:  Objection.
 6        A.   Well, for the most part -- I don't
 7   know what the situation is at Harvard today, but
 8   for the most part having graduated from the
 9   university is not a requirement to be in the
10   leadership position, for the most part.
11              I not only did not go to Brown, I had
12   never even been to Brown before I was announced
13   as the incoming president.
14              So there may be some who feel that
15   way in the leadership group, but the question as
16   whether it governs, I don't -- I don't know.  I
17   suppose that would depend on the institution and
18   on the era.  I don't know.
19              MR. CONNOLLY:  Shall we take a break?
20              MR. ADEGBILE:  Sure.
21              THE VIDEOGRAPHER:  Going off the
22   record -- going off the record.  The time is
23   12:21.
24              (A break was taken from 12:21 p.m. to
25              1:19 p.m.)
```

Highly Confidential - Attorneys' Eyes Only

Page 106

R. SIMMONS - 4/11/2018

1

2      Q.   And how come?

3      A.   Because the reality that I have

4  certainly experienced is that in order to be

5  considered, all applicants have to be qualified.

6  But because there's so many highly qualified

7  students, certainly a surfeit of students that

8  the university can accommodate, that judgments

9  have to be made about the class.

10          And among the judgments one can make

11  with a very qualified group of individuals is

12  that if you have a student who happens to be a

13  children of an employee, it's perfectly

14  appropriate to acknowledge that that could be a

15  good thing in the mix.

16          And, frankly, I've seen the children

17  of the lowest paid workers, for example, admitted

18  to universities and the boost that that gives --

19  gives to the campus when that happens is -- is a

20  wonderful thing to see and very advantageous to

21  the university.  But it's a rare -- it's a very

22  small number always admitted.

23      Q.   If you'd turn the page back to

24  page 21, four lines up from the bottom starting

25  with, "That is."  Can you read -- can you read

Page 107

1          R. SIMMONS - 4/11/2018

2     that sentence for me?

3          A.   "That is, eliminating consideration

4     given to the children of faculty and staff would

5     be unlikely to yield any meaningful benefit to

6     campus diversity while it would threaten to

7     impose substantial costs in terms of faculty and

8     staff morale."

9          Q.   Have you ever seen that situation

10    where denying the child of a faculty member

11    caused morale to decrease among the faculty?

12         A.   I've seen situations where they were

13    denied and it caused faculty, parents in

14    particular, to either leave or certainly to be

15    disheartened.  And in a situation in which a

16    department wants badly to retain a very important

17    faculty member, department very quickly becomes

18    disheartened by the action of the university.

19         Q.   Do you think this idea hold -- would

20    hold merit outside of the university context?

21    So, for example, do you think companies should

22    consider whether the child of a senior executive

23    can get a job at that company?  Do you think

24    that's something that should be considered?

25              MR. ADEGBILE:  Objection.

Highly Confidential - Attorneys' Eyes Only

Page 108

1                    R. SIMMONS - 4/11/2018

2          A.   I know it is considered.

3          Q.   (BY MR. CONNOLLY)  You've seen it at

4     companies?

5          A.   Oh, yes.

6          Q.   And do you think that's a good thing?

7               MR. ADEGBILE:  Objection.

8          A.   I don't think it's deleterious.

9          Q.   (BY MR. CONNOLLY)  Why not?

10         A.   In companies where outstanding work

11    is valued, I would say it's no different from a

12    university where outstanding achievement is

13    valued.  And that is, they are unlikely to

14    survive if they don't perform at the requisite

15    level.  And if they're not qualified, they're

16    unlikely to be appointed, from what I've seen.

17    Also, from my vantage point, it's been

18    de minimis, as it is in universities.

19               MR. CONNOLLY:  What exhibit is this?

20               THE COURT REPORTER:  Four.

21         (Exhibit 4 marked for identification.)

22         Q.   (BY MR. CONNOLLY)  Exhibit Number 4

23    is a copy of your rebuttal report.  When you're

24    ready, could you turn to page 9, please.

25               Six lines down towards the right side

Highly Confidential - Attorneys' Eyes Only

R. SIMMONS - 4/11/2018

1  there is a sentence that starts with, "For

2  example."  Can you -- I'd like you to read about

3  three sentences worth.  And I'll let you know --

4      A.  Stop me when I --

5      Q.  Okay.

6      A.  "For example, during my time at

7  Brown, I was involved in situations where I tried

8  to recruit a new professor or faculty member to

9  the school.  Inevitably, if that individual had a

10 child near college age, the individual would ask

11 whether their child would be able to go to Brown.

12 If we did not see a possibility of admitting

13 their child based on a preview of their

14 qualifications, the recruit often chose to go to

15 a different institution."

16     Q.  So if I'm understanding you right,

17 when Brown would be engaged in the recruitment

18 process for faculty, it would often take a look

19 at the professor's child and make a determination

20 about whether that child was likely to be

21 admitted to Brown?

22     MR. ADEGBILE:  Objection.

23     A.  Keep in mind, when somebody is making

24 a decision to move let's say all the way across

Highly Confidential - Attorneys' Eyes Only

Page 110

1                   R. SIMMONS - 4/11/2018

2  the country or wherever, and they want to know

3  whether or not the likelihood is that their child

4  would be eligible to be considered, it's not

5  difficult to do.

6            If you can look at a child's

7  qualifications and, for example, if that child

8  happened to have low grades and a poor profile,

9  it would be pretty clear that they wouldn't be

10 likely to be looked on favorably by -- in the

11 admission process, given the pool of applicants

12 that we have.

13            So it's possible to look at their

14 qualifications and say, "It doesn't look very

15 likely that they would compete with the pool of

16 applicants that we have."  Sure.

17            Only if the applicant -- the

18 candidate wanted to know that and it was going to

19 be critical in their decision-making process.

20       Q.  Then would Brown essentially ask for

21 some basic facts about the student, like GPA,

22 test scores, extracurricular --

23       A.  Typically you'd get a transcript.

24       Q.  Uh-huh.

25       A.  Sure.

Page 111

R. SIMMONS - 4/11/2018

1

2       Q.  Do you know if Harvard does this?

3       A.  I have no idea.

4       Q.  And in your experience, are you aware

5   of a professor -- and I'll caution that I'm not

6   interested in the name of the professor --

7       A.  Okay.

8       Q.  -- who turned down the opportunity to

9   teach at Brown because he was not given an

10  indication that his child would have a good shot

11  at getting into Brown?

12      A.  It would be hard to tell, because

13  there are a lot of different factors when people

14  make their decisions.

15          I don't recall one who said the only

16  factor was that their child would not be able to

17  go to Brown.  So I don't know whether that was

18  the -- that was the only factor, but I do know of

19  instances in which they did not come.

20      Q.  And by the statement in your report,

21  is it your testimony that you think at least one

22  of the reasons why they chose not to come to

23  Brown was because of that indication you gave

24  them?

25      A.  Yes.

Highly Confidential - Attorneys' Eyes Only

Page 112

R. SIMMONS - 4/11/2018

1

2      Q.  Do you know where such professors,

3 the type of institutions they would -- they would

4 go to after that?  Would they go to another Ivy

5 League school or would they go to a state school?

6      A.  I don't really know.  Typically a

7 professor who is able to go to Brown would be --

8 would have a lot of choices.

9      Q.  Did having a child of a faculty

10 member improve the learning environment at a

11 place like Brown?

12      A.  To the extent that we were able to

13 hold outstanding instructors/professors,

14 absolutely.

15      Q.  So the benefit was because of the --

16 the child's parents, that's how the university

17 benefited?

18      A.  The benefit of retention and

19 recruitment for -- because, of course, the

20 defining element of the quality of education on

21 the university campus is a composition of the

22 faculty, as well as the general environment in

23 terms of the students who are recruited.  You

24 have to have outstanding faculty to attract

25 outstanding students.

Highly Confidential - Attorneys' Eyes Only

Page 113

1          R. SIMMONS - 4/11/2018

2          So, as my mantra has always been, and

3    is today, it's about recruiting the best if you

4    want to have a very successful educational

5    environment that's -- those are the ingredients.

6          So fighting hard for the best

7    faculty, fighting hard to keep the best faculty

8    is what -- that's what great universities do.

9    It's absolutely central to their mission to do

10   that.

11        Q.  And is it -- is that mission so

12   important that the consideration of their

13   children in admitting their children to Brown

14   when they might not otherwise have gotten in,

15   does the importance of that -- of retaining those

16   faculty members justify that admission decision?

17        MR. ADEGBILE:  Objection.

18        A.  As I've said, the children have to be

19   qualified on the same basis as the applicant

20   pool -- the successful students in the applicant

21   pool, otherwise you'd turn them down.  And so

22   this matter of judgment in the admission process

23   really is all about shades of difference.  And

24   any admission officer is going to want to make

25   sure that if an admission decision is made --

Highly Confidential - Attorneys' Eyes Only

1                    R. SIMMONS - 4/11/2018

2  positive admission decision is made, that the

3  student is qualified to do the work.

4             As educators, you become an educator

5  because you want every young person to be

6  successful.  And it's one of the worst things in

7  the world as an educator if you feel that you're

8  making decisions for the wrong reason and that

9  for whatever reason, as a consequence of your

10  decision, a student will fail.

11             So, again, the first obligation is to

12  make sure that the students are qualified.

13        Q.  Do you recall any students, without

14  telling me their names, where the fact that his

15  or her parent was a faculty member was sort of

16  the deciding factor that got them into Brown?

17        A.  Well, since I don't sit on the

18  admission committee, it's very hard -- it's very

19  hard to say, because here's the way the process

20  would work.  If you were -- if you thought there

21  was a person who was considering coming to Brown

22  and they had a child who was in the admission

23  pool, the -- the admission office would be

24  notified of that.  But then you'd stop short

25  there, because the admission office has to be

Highly Confidential - Attorneys' Eyes Only

Page 115

1                   R. SIMMONS - 4/11/2018

2   able to do its work with integrity.  And so you'd

3   then wait to see whether or not that student,

4   that child, was able to be admitted.

5              Because we are pretty familiar with

6   our students and we know what the standards are,

7   a preview would give you a good guess as to

8   whether or not they are in that -- in that group,

9   but it would not tell you whether or not the

10  admission committee would make the decision,

11  because the admission committee is independent

12  and they make their decisions based on the class

13  that they see, not based on whether or not it's

14  going to affect one particular part of the

15  university.

16              MR. CONNOLLY:  Should we take a

17  break?

18              MR. ADEGBILE:  Sure.

19              MR. CONNOLLY:  We've been going about

20  an hour.

21              MR. ADEGBILE:  Sure.

22              THE VIDEOGRAPHER:  Going off the

23  record.  The time is 2:15.

24         (A break was taken from 2:15 p.m. to

25         2:24 p.m.)

Highly Confidential - Attorneys' Eyes Only

Page 129

```
 1                    R. SIMMONS - 4/11/2018
 2    read it internally and then I'll ask you a --
 3           A.   Oh, internally.   Okay.
 4                (Witness reviewing document.)
 5           A.   Okay.   Just to the end of that
 6    answer?
 7           Q.   Yeah.
 8           A.   Okay.
 9           Q.   And you already read part of the
10    question.   In your time spent in universities,
11    have you ever heard the concern that Asian
12    Americans are, quote, taking over student bodies?
13           A.   Never.   It would be wonderful to have
14    information about the author, about the
15    interviewer, because I can't find anything here
16    that indicates it.   But it's -- no, never.
17           Q.   Okay.   And taking a step back.   You
18    said Fred Hargadon is the -- was the --
19           A.   Dean.
20           Q.   -- Dean of Admissions at Princeton.
21                Can you read the second paragraph of
22    his answer starting with, "You don't have to be."
23           A.   "You don't have to be looking for
24    class presidents or captains of teams to realize
25    that a part of the culture in many Asian American
```

Highly Confidential - Attorneys' Eyes Only

R. SIMMONS - 4/11/2018

1

2    families was not to have the child participate in

3    extracurricular activities" --

4            Do I have to go on?

5        Q.  Yes, please.  The whole paragraph.

6        A.  Okay.  -- "but largely to devote

7    himself to and concentrate on academics.  There's

8    no doubt that that's an extremely positive

9    feature.  It's very cultural.  Asian Americans

10   put a very high premium on education and doing

11   well.  But in colleges that also put a premium on

12   diversity in terms of energy level outside the

13   classroom, of taking part in activities, that has

14   turned out for many Asian American students to be

15   a handicap.  That is, they were not going to show

16   up as well.  There are many great exceptions to

17   this, of course."

18       Q.  Do you agree with his assessment of

19   Asian Americans?

20       A.  I think it's balderdash.

21       Q.  Did you ever hear Dean Hargadon

22   express these sort of opinions while you were at

23   Princeton?

24       A.  I didn't interact with Fred a lot,

25   but I never heard him express these opinions.

Highly Confidential - Attorneys' Eyes Only

```
 1                 R. SIMMONS - 4/11/2018
 2     Had I heard him, I would have certainly
 3     challenged these notions.  But I don't remember
 4     his ever saying it in my presence.  But we didn't
 5     typically meet.
 6          Q.  In your experience teaching at a --
 7     and working at a variety of Ivy League schools,
 8     are Asian American students any less personable
 9     than other -- than students of other racial
10     groups?
11          A.  No.
12          Q.  In your experience, do Asian American
13     students tend to participate in fewer
14     extracurricular activities than other students?
15          A.  I don't know the data on it, but as
16     a -- I would say generally they are very similar
17     to other students on -- on the campus in their
18     interests.
19          (Exhibit 8 marked for identification.)
20          MR. CONNOLLY:  Exhibit 8 is a copy of
21     the Expert Report of Richard Kahlenberg.  And as
22     you know, it's very long.  I will point you --
23     there's only one to two pages I want you to look
24     at.  Page 35, please, of his expert report.
25          A.  I don't have it.
```

Highly Confidential - Attorneys' Eyes Only

1                    R. SIMMONS - 4/11/2018

2    admission was a good way for us to maintain our

3    standing.  And in truth, if you look at the

4    profile of the university over time, it has

5    become more and more selective over time -- that

6    is to say our university, Brown -- it has become

7    more and more selective over time.

8                    MR. CONNOLLY:  Marking as Exhibit 9

9    an article entitled, "Sticking to Their Own,"

10   from the Washington Post, October 26, 1997.

11              (Exhibit 9 marked for identification.)

12              (Witness reviewing document.)

13        Q.  (BY MR. CONNOLLY)  Could you read to

14   me the last two paragraphs on page 2.

15        A.  "Simmons, who attended both a

16   historically black college and such predominantly

17   white institutions as Harvard University and

18   Wellesley College, knows what it feels like to be

19   an outsider.  'I know how hard it is to confront

20   some of the pain of interacting with people who

21   think you are less than they or have faculty who

22   talk about your culture in ways that are

23   insulting and denigrating.'

24              "But, she says, the solution is not

25   separate housing.  'My" -- "'most people in this

Highly Confidential - Attorneys' Eyes Only

1                    R. SIMMONS - 4/11/2018

2      country live a very segregated existence.  They

3      go to church and synagogue with people in their

4      community, and live a lovely insular existence,'

5      Simmons says.  'But colleges are not set up to

6      sustain that way of life.  It's supposed to be an

7      opportunity to learn something about life and the

8      people of the world.  Segregated housing is the

9      antithesis of what we do in the academy.'"

10          Q.  Do you still hold this view about the

11     problems with segregated housing on campus?

12          A.  I do.

13          Q.  And how come?

14          A.  How come.  It goes back to the

15     purpose of education, as I see it, to have the

16     opportunity to learn about things outside of what

17     we know is the single most important thing about

18     what we do in the academy.

19               And so, you know, I've been very

20     outspoken on this point and very consistent on

21     this point for all of my career, including when

22     students propose and promote the idea to me.  I'm

23     very direct about my opposition to it.

24               MR. CONNOLLY:  Shall we take another

25     quick break before I go into another section?

Highly Confidential - Attorneys' Eyes Only

```
 1                  R. SIMMONS - 4/11/2018
 2                  MR. ADEGBILE:  Sure.  How are you
 3      doing for time?
 4                  THE COURT REPORTER:  Do you want to
 5      go off the record?
 6                  MR. ADEGBILE:  Sure.
 7                  THE VIDEOGRAPHER:  Going off the
 8      record.  The time is 3:16.
 9             (A break was taken from 3:16 p.m. to
10             3:26 p.m.)
11                  THE VIDEOGRAPHER:  Media Number 6.
12      On the record at 3:26.
13             Q.  (BY MR. CONNOLLY)  Do you support
14      giving preferences in the admission process to
15      the children of individuals who donate to that
16      university?
17                  MR. ADEGBILE:  Objection.
18             A.  I support considering those students
19      if they are qualified in the context of the pool,
20      the admission pool.
21             Q.  (BY MR. CONNOLLY)  How would you
22      support, quote, considering the fact that their
23      parent donated to the university?
24             A.  How would I consider them?
25             Q.  Yeah.  Would it be a negative?
```

Highly Confidential - Attorneys' Eyes Only

Page 140

1          R. SIMMONS - 4/11/2018

2          MR. ADEGBILE:  Objection.

3     A.  Would it be a negative?  Well, there

4 is -- there is no negative if you are in the

5 applicant pool and you're highly qualified,

6 there's no particular negative, period.  And, no,

7 there's no negative associated with being the

8 child of a parent who has donated to the

9 university.

10     Q.  (BY MR. CONNOLLY)  So when you say

11 you would consider this fact, is it your

12 testimony that it's okay for a school like

13 Harvard or Brown to give an admissions tip to

14 someone whose parent donated to the university?

15     A.  If they're high --

16          MR. ADEGBILE:  Objection.

17          THE WITNESS:  Sorry.

18     A.  If they are highly qualified, there

19 is no reason not to admit them.

20     Q.  (BY MR. CONNOLLY)  And you would be

21 fine if Harvard gave, quote, consideration to the

22 fact that such students had their parents donate

23 to the school?

24     A.  As long as they did not donate for

25 the purpose of getting their children in.  As

Highly Confidential - Attorneys' Eyes Only

Page 141

R. SIMMONS - 4/11/2018

1
2  long as there was sufficient distance between
3  those actions, I would feel fine about it,
4  provided that the student was as qualified as the
5  normal pool required.
6      Q.  If you could pull out your rebuttal
7  expert report.
8      A.  What number is it?
9      MR. ADEGBILE:  I'll tell you in a
10 second.  Four.
11      THE WITNESS:  Okay.  One, two,
12 three -- okay.  Four is somewhere else out of
13 order.  Excuse me.  One, two, three -- oh, there
14 it is.  Missed it.
15      A.  Okay.
16      Q.  (BY MR. CONNOLLY)  If you could turn
17 to the bottom of page 7, please.  Can you read
18 the first sentence of paragraph 17?
19      A.  "Nor is it illegitimate to give some
20 consideration in admissions to the likelihood
21 that an applicant or his family will lend
22 financial support to the university."
23      Q.  Can you explain why you don't think
24 that's a problem?
25      A.  One of the most important factors in

Highly Confidential - Attorneys' Eyes Only

Page 142

R. SIMMONS - 4/11/2018

1 the strength of a university is its ability to

2 endure over time over a period of time that

3 allows its excellence to increase.  And our

4 universities are, as I said, being hundreds of

5 years old, it's no accident that they are highly

6 valued and have a proven record of success,

7 because they've been able over time through the

8 support of their alumni base and others to build

9 on their strengths.

10    So in private institutions --

11 especially private institutions -- that support

12 is critical to that longevity and to being able

13 to mount the courses that will inure to the

14 stature of the university.

15    And so I would say it's very

16 important for private universities to focus on

17 contributions to the university because that is

18 their -- that assures their survival and it

19 assures their being able to build and strengthen

20 their programs.

21   Q.  If you could turn to the next page,

22 page 8.  The last paragraph of 17 starting with,

23 "Based on that experience," could you read that

24 sentences for me?

Highly Confidential - Attorneys' Eyes Only

Page 143

R. SIMMONS - 4/11/2018

1

2          A.   "Based on that experience and my

3     knowledge at competitive peer institutions like

4     Harvard, I believe the number of applicants who

5     could benefit from an admissions consideration

6     based on the financial support of non-alumni

7     family members for the institution is very

8     small."

9          Q.   So is it your -- is it your

10    contention that only -- that the fact that a

11    student's parent donated to the university is

12    only considered in a, quote, very small number of

13    instances?

14         A.   Absolutely, in my experience.

15         Q.   So I'd like to try to maybe drill

16    down on --

17         A.   Okay.

18         Q.   -- how one would go about getting

19    that consideration.

20              So, would -- do you think a million

21    dollar donation would get that type of

22    consideration for the parent's child?

23         A.   I don't think it necessarily relates

24    to a one-time donation.  There are certainly

25    people who've given much more than that whose

1                  R. SIMMONS - 4/11/2018

2      children have been denied admission.

3                  So it doesn't relate so much, as I

4      say, to one donation, but it certainly does

5      relate to the support overall that a university

6      can garner from individuals who are philanthropic

7      and who are willing to support the university.

8                  So there's no price tag associated

9      with it, no specific price tag associated,

10     because a position is not being sold.

11            Q.   Though, presumably someone who

12     gave -- who promised to write a check for $20 or

13     who had donated $20 would not -- his or her child

14     would not receive a, quote, consideration for --

15            A.   For $20?

16            Q.   For $20.

17            A.   Hard to say, but in my estimation,

18     that probably would not move me to, if I were in

19     Admission, to admit someone.

20            Q.   When a school such as Brown or

21     Harvard is, you know, considering whether to give

22     a, quote, consideration for a student who --

23     whose parent might have the means to donate to

24     the university, do you look at past donations or

25     the potential for future donations?

Highly Confidential - Attorneys' Eyes Only

1          R. SIMMONS - 4/11/2018

2          MR. ADEGBILE:  Objection.

3      A.  At Brown you could conceivably look

4   at either/or or both.

5      Q.  (BY MR. CONNOLLY)  Can you recall

6   times, without giving me the name of the

7   individual, where an individual's student

8   received this type of consideration that you're

9   discussing?

10      A.  I can.

11      Q.  And can you tell me how much that

12   individual donated to Brown?

13      A.  I can't, because I wouldn't have

14   followed -- I wouldn't have followed the

15   amount -- the amount of money.

16          One of the things you have to

17   realize, when you make an admission decision, one

18   of the reason the decisions are good and valid is

19   because of the knowledge you have that it must be

20   a good decision, because what if, in fact, you

21   never get a donation, which is obviously

22   possible.  You want to be sure that you've made

23   the right decision irrespective of what happens

24   in the future.

25          So, remind me what the nub of your

Page 146

1             R. SIMMONS - 4/11/2018

2  question was again.  Have I remembered

3  circumstances?  I have.

4        Q.  And in -- do you -- in any of these

5  circumstances, do you remember how much one of

6  the individuals donated?

7             MR. ADEGBILE:  Objection.

8        A.  No.

9        Q.  (BY MR. CONNOLLY)  At any of the

10  universities you were at, did any university ever

11  receive non-monetary donations, maybe like an art

12  collection or something like that?

13        A.  Not in my recollection.  With the --

14  with the -- I'm sorry, with this exception.

15  Influential individuals who by virtue of their

16  importance in a field, let's say, who could help

17  the university develop courses of study and

18  opportunities for students in that field because

19  of their preeminence, I mean, I would consider

20  that kind of similar.

21        Q.  How would the fact that an individual

22  has or may donate be communicated to the

23  admissions office when you were at Brown?

24        A.  So in order to insulate the admission

25  office from that process, because you never want

Highly Confidential - Attorneys' Eyes Only

1          R. SIMMONS - 4/11/2018

2   an admission office to be in the business of

3   making such a determination, typically other

4   sites in the university will bring their

5   interests to bear.  And so if it's the physics

6   department, they would say they're very

7   interested in a particular student being

8   admitted.  And so these might come from all over

9   the university, advocacy for particular

10  candidates because of some good departments feel

11  they will receive as a consequence of admitting

12  that student.

13          So I had one person who brought all

14  of those things together just to inventory them

15  to make sure that they weren't coming from all

16  over the university at the admission office,

17  putting pressure on the admission office.  Then I

18  would not allow that person to advocate instead,

19  because fundamentally an admission decision is an

20  academic decision.

21          I would then have the provost, the

22  senior -- the chief academic officer of the

23  university vet the list and based on our programs

24  and our institutional priorities, I would have

25  the provost cull that list and say, "Here are the

Highly Confidential - Attorneys' Eyes Only

Page 148

                    R. SIMMONS - 4/11/2018

1

2   things that really are important to the

3   university."

4              That was by way of ensuring a

5   de minimis number of cases and the cases that

6   were consistent with our mission and our -- our

7   strategic plan.

8         Q.  So in other words, the admissions

9   department would only maybe get a handful of

10  students every year that -- where maybe the

11  development office is saying, "This is" -- "This

12  is important" -- "These four students are

13  important for us"?

14        A.  Yeah.  And if -- they would get

15  something from the provost that said, "These

16  cases are important, but make the decision on the

17  basis of whether or not they are qualified.  If

18  they are qualified, it could be important to our

19  mission to admit these few students."

20        Q.  And then those individuals would

21  receive the, quote, consideration that you --

22        A.  Yes.

23        Q.  All right.  Do you know if that's --

24  if Harvard has a similar approach to Brown in

25  giving consideration to the children of donors?

Highly Confidential - Attorneys' Eyes Only

1           R. SIMMONS - 4/11/2018

2           A.   I would doubt very seriously that

3      they do it exactly as Brown does it, because it's

4      something I created at Brown.  But at Smith, at

5      Princeton, every place that I've been that has

6      these kinds of considerations, there's some

7      process that is devised to help make sure that an

8      excessive number of students are not admitted on

9      that basis and that a lot of different people are

10     not making that determination.

11          Q.   In that quote we read, you said, "I

12     believe the number of applicants who could

13     benefit from an admissions consideration based on

14     the financial support of non-alumni family

15     members for the institution is very small," I'm

16     curious to why you -- why you highlighted

17     non-alumni family members.  Is there a

18     distinction you're drawing there between

19     donations from non-alumni and donations from

20     alumni?"

21          A.   The only distinction is that of

22     legacy versus non-legacy.

23          Q.   Right, because I -- I guess

24     presumably someone could get two forms of

25     consideration, both that his or her parents were

Highly Confidential - Attorneys' Eyes Only

1                  R. SIMMONS - 4/11/2018

2    legacies of Harvard and that they donated or

3    might donate in the future to Harvard.  Is that

4    a -- is that a correct formulation of that?

5           A.  I don't think that they would double

6    their chances on the basis of having those two

7    considerations in the way that I don't think that

8    having a combination of other factors would

9    double your chances.  So interesting, but not --

10   not a compelling advantage.

11          MR. CONNOLLY:  Can we take a

12   two-minute break just to make sure I have nothing

13   else in my notes to ask you about?

14          THE WITNESS:  Sure.

15          THE VIDEOGRAPHER:  Going off the

16   record.  The time is 3:45.

17       (A break was taken from 3:45 p.m. to

18       3:51 p.m.)

19          THE VIDEOGRAPHER:  Media Number 7.

20   On the record at 3:51.

21          MR. CONNOLLY:  Thank you for your

22   time today.  I have no further questions at this

23   time.

24          THE WITNESS:  Is it something I did?

25          MR. ADEGBILE:  I have no questions.

Highly Confidential - Attorneys' Eyes Only

Page 153

1  NAME OF CASE:  SFFA v. Harvard

2  DATE OF DEPOSITION:  April 11, 2018

3  NAME OF WITNESS:  Ruth Simmons

4  Reason Codes:

5      1.  To clarify the record.

6      2.  To conform to the facts.

7      3.  To correct transcription errors.

8  Page _____ Line _____ Reason _____

9  From _See attached errata_ to _____

10  Page _14_ Line _11_ Reason "One" in lieu of "when"

11  From _____ to _____

12  Page _14_ Line _19_ Reason Wrong year / '71, '72 correct

13  From _____ to _____

14  Page _16_ Line _16_ Reason "league", not "leak"

15  From _____ to _____

16  Page _18_ Line _6_ Reason "for" instead of "of"

17  From _____ to _____

18  Page _28_ Line _5_ Reason incorrect. "I said it was not my job,"

19  From _____ to _____

20  Page _30_ Line _13_ Reason missing word

21  From _the president leaving_ to _the president was leaving_

22  Page _44_ Line _11_ Reason _____

23  From _professor_ to _professors_

24

25

Highly Confidential - Attorneys' Eyes Only

Page 153

1   NAME OF CASE:

2   DATE OF DEPOSITION:

3   NAME OF WITNESS:

4   Reason Codes:

5       1.   To clarify the record.

6       2.   To conform to the facts.

7       3.   To correct transcription errors.

8   Page _52_ Line _8_ Reason _Grammar_

9   From _Will fall_ to _delete_

10  Page _53_ Line _24_ Reason _Grammar_

11  From _I'm may_ to _I May_

12  Page _67_ Line _17_ Reason _Grammar_

13  From _from Northwest_ to _from the Northwest_

14  Page _69_ Line _10_ Reason _Grammar_

15  From _sometimes_ to _some time_

16  Page _74_ Line _12_ Reason _wrong word_

17  From _Selected_ to _selective_

18  Page _88_ Line _16-17_ Reason _Grammar_

19  From _as whether_ to _as to whether_

20  Page _105_ Line _16_ Reason _Grammar_

21  From _there was_ to _there were_

22  Page _164_ Line _6_ Reason _Grammar_

23  From _there's_ to _there are_

24

25

153

| Page | Line | Reason | change |
|------|------|--------|--------|
| 106 | 13 | Grammar | children → child |
| 107 | 17 | Grammar | department → the department |
| 108 | 18 | Spelling | de minimis → de minimus |
| 112 | 21 | Grammar | is a → is the |
| 133 | 20 | Spelling | emersed → immersed |
| 148 | 5 | Spelling | de minimus → de minimus |

Highly Confidential - Attorneys' Eyes Only

Page 154

```
1        STATE OF TEXAS      )

2                            )

3        COUNTY OF HARRIS    )

4

5

6             I, the undersigned, declare under penalty

7        of perjury that I have read the foregoing

8        transcript, and I have made any corrections,

9        additions or deletions that I was desirous of

10       making; that the foregoing is a true and correct

11       transcript of my testimony contained therein.

12             Executed this  7th   day of   May         ,

13       2018, at  Prairie View            ,   Texas       .
                      (City)                   (State)

14

15

16

17
                 _____
18                    RUTH SIMMONS

19

20

21       SUBSCRIBED AND SWORN BEFORE ME

22       THIS  7th   DAY OF   May      ,  2018.

23

24       Shauna L. King
         _____
25       (Notary Public)   MY COMMISSION EXPIRES:  11-5-18
```

SHAUNA L. KING
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES 11-05-2018
NOTARY WITHOUT BOND