# EXHIBIT 56

| | |
|---|---|
| **From:** | Faust, Drew Gilpin [/O=HARVARD UNIVERSITY/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=DGF291] |
| **Sent:** | Tuesday, July 02, 2013 10:23:33 PM |
| **To:** | Iuliano, Robert |
| **Subject:** | FW: op-ed on the Fisher decision |
| **Attachments:** | tk-jr op-ed final.docx |

---

**Redacted:**
**Attorney-Client Privilege**

---

**From:** Jim Ryan [mailto:jryan@virginia.edu]
**Sent:** Tuesday, July 02, 2013 5:00 PM
**To:** Faust, Drew Gilpin
**Subject:** Fwd: op-ed on the Fisher decision

Hi Drew,

I hope you are well and that you enjoyed your recent travels. I've had an enjoyable and informative couple of weeks getting to know HGSE, and I'm looking forward to seeing you next week at the retreat.

In the meantime, I'm sending along the draft of an op-ed that Tom Kane and I put together in the wake of the Fisher decision, regarding affirmative action. I thought you might be interested in seeing it. Tom and I are hoping that the op-ed might encourage some colleges and universities to conduct research into the effects of race-neutral alternatives on their admissions policies, which CEPR might be able to help accomplish.

I don't think you'll find anything objectionable in the piece, other than some slightly rough writing that needs editing, but if I'm wrong about this, please do not hesitate to tell me. Thanks.

Best,

Jim

# Heeding the Court's Warning in Fisher

In Fisher v. University of Texas, the Court affirmed a decades-old principle that universities may use race-based affirmative action plans in order to enroll a diverse student body. In order to consider race in admissions, however, universities must prove to courts that race-neutral alternatives—such as relying on socioeconomic status or where students live—will not work. In the Court's words, universities must prove that "no workable race-neutral alternatives would produce the educational benefits of diversity." Most commentators greeted *Fisher* with a yawn, or a sigh of relief or disappointment, concluding that the Court changed very little.

Lower courts and universities may ultimately beg to differ, as the Court's emphasis on race-neutral alternatives represents a subtle but potentially significant shift. No longer may lower courts simply defer to the good faith decisions of universities regarding the necessity of explicitly considering race in admissions decisions rather than some proxy for race. Universities instead must attempt to prove, and lower courts must determine, what counts as a "workable" race-neutral alternative. This is much harder than it might seem. It also raises questions that go to the heart of a university's mission and stretch the institutional competence of courts.

To begin, in order to determine whether a race-neutral alternative is "workable," one obviously has to know the ultimate goal of the affirmative action plan—and know how much racial diversity is "enough." The larger the group of minority students sought to be enrolled, for example, the less "workable" race-neutral alternatives are likely to be. Yet the Court gave no hint in *Fisher* as to how to decide if an alternative which produced 60 percent as many minority students was sufficient. In the past, the Court has suggested that universities can strive to enroll a "critical mass" of minority students, but that is hardly a precise concept. And the Court has simultaneously muddied the waters by warning repeatedly that universities cannot attempt to enroll a proportionate number of minority students, as that would constitute a quota, which the Court forbids.

Assuming that first question is answered and a diversity goal is established, the next task is to determine whether a race-neutral alternative is "workable." But "workable" in what sense? Universities that adopt race-based affirmative action plans are trying to balance racial diversity and academic selectivity. It is easy to imagine all sorts of race-neutral plans that increase diversity but do so only at the expense of academic selectivity—a lottery for admission to a state university, for example, would be great for diversity but would destroy academic selectivity. In the past, the Court has held that universities need not choose between racial diversity and competitive admissions policies, but that too offers only vague guidance.

The unavoidable reality is that, if racial diversity is a goal, no race-neutral proxy will work as well as race in producing it, and all proxies will impose costs. For instance, economically disadvantaged minorities are by definition a minority of all young people and, regrettably, a very small minority of the most academically prepared applicants. If family income is used as a proxy for race, therefore, universities will have to accept and enroll many

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

more low-income students in order to "yield" the same number of minority students. If class size is held constant, a university could not avoid changing its admission standards somewhere else. The same is true with respect to other proxies for race, such as place of residence, parental education level, or growing up in a first-generation family. All require a similar trade-off between diversity and academic selectivity. The Court sometimes seems to labor under the belief that there is some magical combination of race-neutral proxies that will produce *exactly* the same group of students in a university class admitted under a race-based plan. Admissions officers know differently, and they understand that any alternative requires trade-offs among different student characteristics and therefore will produce a different student body.

So which trade-offs are worth the price? That is a genuinely difficult question to answer, and one that is particularly difficult for courts to answer because it is fundamentally an education question, not a legal one.

It is nonetheless possible to see a silver lining in the Court's decision. Universities must now work to educate courts regarding the choices they have made in their admissions policies. In order to do so, they will have to be clear-eyed in assessing the choices they have made and must be prepared to articulate the rationale for those choices. What is the overall goal of their admissions policy? How much diversity, roughly speaking, are universities seeking to achieve and along what dimensions? Why? Perhaps all universities have already answered these questions, but we suspect some have not, and to the extent the *Fisher* decision prompts this sort of internal review, that is all to the good.

Beyond clarifying goals, universities should also be prepared to defend their consideration of race, which means explaining why race-neutral alternatives are not sufficient. This will entail justifying, in educational terms, the diversity goals that have been established. Universities might do so, for instance, by collecting survey evidence on whether or not students felt comfortable voicing their perspective in class and whether students from other groups heard the contributions of their classmates.

Defending affirmative action policies will also entail explaining to courts the costs of race-neutral alternatives. To quantify such costs, universities could review their admission folders (or, at least, a representative sample of them) and have admission officers flag the family background factors—such as parental income, education and high school—which are potential race-neutral alternatives. Analysts could then estimate how much those factors would have to be weighted in order to produce the outcomes currently produced with race-based admissions. They could then compare the results of race-conscious and race-neutral policies on individual dimensions—such as test scores or high school grades—or on combinations of traits such as academic indices. This would at least make clear to courts that race-neutral alternatives come at a price.

In addition, it may be useful for universities to demonstrate their seriousness of purpose in minimizing the need to consider race. Many disadvantaged youth, even those who have the academic preparation to succeed at selective colleges and universities, still do

HARV00007312

not apply to the institutions where they might be admitted.   Institutions should join the College Board and other organizations trying to change this.

Because the University of Texas admission policy was not overturned, it would be tempting to interpret the *Fisher* decision as a return to the status quo ante.   That would be a mistake.  Few institutions are currently prepared to answer the questions that courts will soon be asking.   If they fail to prepare convincing answers, they will lose.  And, having been put on notice, responsibility for that loss will be with our university leaders, not the courts.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00007313