# EXHIBIT 116



UNITED STATES DEPARTMENT OF EDUCATION
REGION I
JOHN W. McCORMACK POST OFFICE AND COURTHOUSE, ROOM 222
POST OFFICE SQUARE
BOSTON, MASSACHUSETTS 02109

October 4, 1990

OFFICE FOR
CIVIL RIGHTS

Mr. Derek Bok
President
Harvard University
Massachusetts Hall
Cambridge, Massachusetts  02138

Re:  Compliance Review No. 01-88-6009

Dear President Bok:

I am pleased to inform you that the Office for Civil Rights (OCR) has completed its review of Harvard University's undergraduate admissions program. The purpose of our investigation was to determine whether Harvard discriminated against Asian American applicants to the Harvard-Radcliffe undergraduate program, in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. Section 2000d et seq., and its implementing regulation at 34 C.F.R. Part 100 (Title VI). OCR has responsibility for enforcing Title VI, which prohibits discrimination on the basis of race, color, or national origin in programs and activities that receive Federal financial assistance. As a recipient of Federal financial assistance from the U.S. Department of Education, Harvard is subject to the provisions of Title VI.

As discussed more fully below, and in the enclosed Statement of Findings, we have concluded that Harvard has not violated Title VI with respect to the admission of Asian American applicants to the undergraduate program. Over the last ten years Asian American applicants have been admitted at a significantly lower rate than white applicants, however, we have concluded that this disparity is not the result of discriminatory policies or procedures. We found no evidence of the existence or use of quotas, nor did we find that Asian Americans were treated differently than white applicants in the implementation of the admissions process. From information provided by Harvard and our file review and statistical analyses, we determined that the primary cause of the disparity was the preference given to children of alumni and recruited athletes, which adversely affected Asian Americans. However, after examining Harvard's reasons for the preferences, we concluded that they were legitimate and not a pretext for discrimination. Consequently, based on our determination of compliance, we are closing our review as of the date of this letter.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## SUMMARY OF FINDINGS

OCR determined that Asian American applicants were admitted at a statistically significant lower rate than white applicants in seven out of the last ten years. (OCR reviewed data from the classes of 1983-1992). Over the entire 10 year review period, we found that Asian American applicants were admitted at a 13.2% rate, while whites were admitted at a 17.4% rate. OCR compared the qualifications of Asian American and white applicants to determine whether weaker credentials might have accounted for the lower Asian American admit rate. As a result of comparing SAT scores, secondary school records, and Admissions staff and alumni ratings of Asian American and white applicants, we found that Asian American applicants tended to be slightly stronger on academic criteria, while whites were slightly stronger on non-academic criteria. Overall, statistical analyses suggested that the two groups were similarly qualified, and consequently disparate admit rates could not be explained by weaker credentials.

Accordingly, we then looked at whether the disparity was the result of the use of a numerical quota or ceiling on the number of Asian American applicants who could be admitted. We reviewed documents and interviewed ten members of the Harvard Admissions staff, including the Dean of Admissions, the Director of Admissions, the Minority Recruitment Director, and several senior and other Admissions Officers. Each of the staff members interviewed stated that he or she was unaware of any numerical quotas or goals having been mentioned in the admissions process with respect to the admission of Asian Americans or members of any other racial or ethnic group. We also interviewed Harvard alumni, who served on alumni admissions committees, who similarly stated that they knew of no numerical goals or quotas used by Harvard with respect to the admission of specific racial or ethnic minority groups. Additionally, we interviewed former Harvard Admissions staff, and former students who worked with the Admissions Office minority programs and were knowledgeable about admissions practices. Finally, we interviewed numerous Asian American community leaders who were involved with the issue of Asian American admissions. None of the individuals interviewed provided any substantive evidence or information to suggest that Harvard imposed numerical restrictions or quotas limiting the admission of Asian American students.

Further, in analyzing admission trends, OCR found that both the number of Asian Americans admitted each year, and the percentage of Asian Americans in each freshman class, have increased every year during the 10 year review period. This pattern of increase continued for the classes of 1993 and 1994. The evidence revealed that Asian Americans have gone from being 5.5% of the class in 1983 to being 19.7% of the class of 1994. This data does not support a hypothesis that ceilings are placed on the number of Asian Americans admitted.

OCR next investigated Harvard's established admissions policies and procedures to determine whether Asian Americans were being treated differently than whites in the admissions process. In order to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3 - Mr. Derek Bok, Compliance Review No. 01-88-6009

evaluate Harvard's policies and procedures, we obtained and reviewed copies of Harvard's application for admissions as well as all printed brochures describing the admissions process. We also reviewed ten years of annual reports on Admissions from the Office of Admissions and Financial Aid, as well as written descriptions of the admissions policies and process that were submitted by the Dean of Admissions in response to our data request. Additionally, OCR interviewed ten members of the Admissions staff.

As a result, we found two significant differences in Harvard's policies and procedures in terms of the treatment of Asian Americans. First, Harvard indicated that it provides an extra reading of Asian American applications by an Admissions Officer who is knowledgeable and sensitive to the Asian American cultures and experiences. Second, Harvard stated that Asian American ethnicity can be a positive factor in the admissions process, which might make a difference in a situation where all other factors are considered equal. We determined that these differences in the treatment of Asian Americans were consistent with the requirements of Title VI.

OCR then conducted a comprehensive file review to determine whether Asian American and white applicants were similarly treated in the implementation of established policies and procedures. We reviewed 400 full applicant files randomly selected from the Classes of 1991 and 1992, including an equal number of Asian American and white files. In addition, we reviewed approximately 2,000 Summary Sheets from applicant files, which contained narrative evaluations and numerical ratings developed by the readers. These narratives and ratings summarize the readers' reviews of an applicant file.

The primary purpose of OCR's review of complete files was to determine whether Asian American and white applicants with similar qualifications, as demonstrated by the documentation in the applicants' files, received similar reader ratings. Readers evaluated applicants on the criteria of academics, extracurricular activities, athletics, and personal qualities, and also generated a preliminary overall rating (POR) reflecting a reader's judgment of applicants' likelihood of admission. In addition, the review of Summary Sheets provided additional information on the consideration of ethnicity and other factors in the rating process.

Our review showed that there was the greatest consistency among readers' ratings in the academic and extracurricular categories. We found that the readers consistently applied the standards found in the Reading Procedures in these areas. OCR found that there was less consistency among readers' ratings in the athletic and personal categories. We noted, however, that while different readers' ratings varied slightly from other readers' ratings, there was no evidence to suggest that Asian American applicants and white applicants with similar credentials were given different ratings. With respect to the POR, Harvard explained that it represents a reader's individual judgment of the strength of a candidate based on all factors and information available, not only the four rating areas.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

As such, it was difficult to determine exactly why an applicant received a particular POR. Nonetheless, it did not appear that Asian American and white applicants were treated differently in the assignment of PORs.

We next sought to determine whether the disparity between Asian American and white admission rates were due to specific criteria or factors considered in the admissions process which might have a negative impact on Asian American applicants. Through statistical analyses, we concluded that differences between Asian American and white applicants on ten admissions variables (four reader ratings, SAT Math and Verbal, Alumni, Counselor and Teacher ratings, and Class Rank or Percentage) did not account for the disparity.

We then turned our attention to the preferences Harvard gives to certain groups of applicants in the admissions process. One of Harvard's objectives in admissions is to select a diverse group of students from a wide range of varied backgrounds, including those from different socio-economic, racial and ethnic groups. In fact, Harvard's catalogue states that "diversity is the hallmark of the Harvard/Radcliffe experience." In an effort to achieve its goal of diversity among its student body, Harvard actively recruits certain group of applicants and gives members of those groups positive weight or consideration (i.e. "tips") in the admissions process. With respect to "tips" in general, Harvard stated that a "tip" is a preference which may help in some situations where all other factors are substantially equal for two candidates, but it does not ensure admission. Harvard also stated that the admissions process is not based on a mathematical formula, and that the "tips" have no numerical weight.

There are three major categories of applicants for whom preferences or "tips" are given: (1) racial/ethnic minority groups; (2) children of alumni (legacies); and (3) recruited athletes (This category is distinct from the reader "athletic" rating.) With respect to the racial/ethnic groups preference, ethnicity is simply one of many considerations in the admissions process which may serve as a positive factor (but never a negative factor) in reviewing an application. Admissions staff agreed that Asian American ethnicity was most significant when the applicant demonstrated that he or she overcame severe obstacles that resulted from his/her ethnicity, or when the applicant was significantly involved in community organizations and activities, or if the applicant described the influence and effect of ethnicity on his or her life through the application essay. There is no formula or specific criteria for measuring or assessing ethnicity, nor are there instructions for determining how much weight is given to ethnicity, or where the weight is to be applied in the admissions process.

Harvard has no separate instructions describing how the preference is given to legacies. However, all legacy applicants are routinely referred to the Dean of Admissions for reading, according to Harvard's procedures.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00023646

A recruited (talented) athlete is given special weight or consideration in the admissions process as follows. Athletes are recruited based upon their athletic accomplishments, talents and their predicted ability to contribute to the athletic programs at Harvard. Harvard's coaches develop lists of priority applicants for their respective teams, and these lists are considered or weighed by the Admissions subcommittees and the full Admissions committee in making their decisions. Other than to suggest that the higher an applicant was on a coach's priority list, the greater the weight attributed in the admissions process, Harvard did not have specific guidelines governing the preference given to recruited athletes. It should be noted that Harvard maintained that all applicants were viewed in light of what they would bring or contribute to the University, and that all ultimately had to demonstrate that they were qualified for admission to Harvard in the eyes of the full committee.

As a result of the file review and interviews with admissions staff, OCR found a great deal of evidence suggesting that the preferences or "tips" given to children of alumni and recruited athletes were significant factors in the admissions process. Conversely, however, OCR also found little or no evidence of an ethnic "tip" being given to Asian American applicants. There were no readers' comments that suggested that an applicant's Asian ethnicity was a significant or important factor in deciding to admit the applicant in the same way that being a legacy or a recruited athlete was instrumental in admitting applicants. While the various "tips" or preferences could not be weighed or defined precisely, it was clear that the ethnic tip for Asians was significantly less instrumental than "tips" for legacies and recruited athletes in the determining whether or not to admit an applicant. Notwithstanding this conclusion, however, the decision to give a "tip" to Asian American applicants is a matter of institutional policy, and the failure to do so does not constitute a violation of Title VI.

OCR conducted several statistical analyses to determine the effect of these preferences on Asian American and white admit rates. Through these analyses, OCR found a strong and distinct correlation between the preferences or positive weight given to children of alumni and recruited athletes, and the disparity in Asian American and white admit rates. Based on these analyses taken together with the file review, we have concluded that the disparity in admit rates between Asian American and white applicants can largely be explained by the preference given to legacies and recruited athletes, groups that are predominantly white. When legacies and recruited athletes are removed from the data, the difference between the Asian American and white admit rates is not statistically significant in seven of the ten years we reviewed. In two of the remaining three years, Asian Americans had significantly higher admit rates than white applicants within the restricted sample.

Because the preferences to legacies and recruited athletes resulted in a disparity in the admit rates between Asian Americans and whites, OCR scrutinized Harvard's reasons for giving these preferences. Harvard has been giving a preference to applicants who are children of alumni and to talented athletes back to at least the beginning of the century. OCR noted that these preferences

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

HARV00023647

were given long before there was a significant number of Asian American applicants. Also, it is clear that preferences for legacies and athletes are not unique to Harvard. Consequently, we found no evidence to suggest that these preferences were instituted to intentionally or deliberately limit the number of Asian Americans at Harvard. Because of the disparate impact that these preferences have on Asian Americans, however, OCR proceeded to analyze the legitimacy of their use in the admissions process.

Harvard asserted that its primary reasons for giving a preference to children of alumni were (1) to encourage alumni volunteer services (such as recruiting prospective students for Harvard), (2) to encourage alumni financial contributions, and (3) to maintain community relations. In support of these assertions, Harvard provided information demonstrating that last year, for example, alumni contributed over 36 million dollars to the Harvard College Fund, much of which is used to provide financial aid and scholarships to needy students. Additionally, Harvard provided data which indicated that over 4,000 alumni serve on Schools and Scholarship Committees that participate in recruitment and admissions activities. Also, Harvard stated that the more than 37,000 dues-paying members of the Harvard and Radcliffe Clubs contribute to the University in a variety of ways, including raising scholarship funds and sponsoring Schools and Scholarship Committees. Harvard maintained that its alumni's time, energy, money and intellectual resources were essential to maintaining the excellence of the institution.

With respect to athletic preferences, Harvard explained that its athletic programs, like the academic programs at Harvard, seek the very best applicants who could contribute to those programs. Consequently, in the same way that unusually strong math or science scholars would be looked upon favorably in the admissions process for the contributions they could make to the math or science programs, talented athletes are looked upon favorably for the contributions they could make to the athletic programs. Further, Harvard maintained that a varsity sports program was an integral part of American college life, benefiting athletes and other students as well.

OCR reviewed current case law and found no legal authority to suggest that giving preferences to legacies and recruited athletes was legally impermissible. In fact, the case law suggests that if schools are to possess a desirable diversity, officials must retain wide discretion, with respect to the manner of selecting students. The courts have generally been reluctant, if not unwilling to dictate what considerations or methods of selection are to be given priority in college admissions. OCR finds that the reasons or goals provided by Harvard for giving preferences to children of alumni and recruited athletes are legitimate institutional goals, and not a pretext for discrimination against Asian Americans. Additionally, Harvard asserted, and OCR accepts, that there are no alternatives to these preferences that could effectively accomplish the same legitimate goals.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

In light of the evidence, and the lack of any legal authority suggesting that such preferences are impermissible, OCR finds that Harvard's use of preferences for children of alumni and recruited athletes, while disproportionately benefitting white applicants, does not violate Title VI of the Civil Rights Act of 1964 or its implementing regulation at 34 C.F.R. Part 100. Further, as a result of all the evidence and information evaluated during this compliance review, it is OCR's overall conclusion that Harvard did not discriminate against Asian American applicants to its undergraduate program, in violation of Title VI of the Civil Rights Act of 1964 or its implementing regulation at 34 C.F.R. Part 100. Please be advised that this letter is not intended nor should it be construed to cover any other issues regarding compliance with Title VI not addressed in this letter.

As previously agreed, we are returning the computer data tape and the copies of full and edited Summary Sheets that were provided by Harvard for our mutual administrative convenience. Under the Freedom of Information Act, 5 U.S.C. Section 552, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, we will seek to protect, to the extent provided by law, personal information which, if released, could reasonably be expected to constitute an unwarranted invasion of privacy.

Please express to your staff, particularly Dean William R. Fitzsimmons, my appreciation for the courtesy and cooperation extended to this office throughout the course of our lengthy investigation. If you have any questions regarding this letter, please feel free to telephone me at (617) 223-9662.

Sincerely,

Thomas J. Hibino
Acting Regional Director

Enclosures