# EXHIBIT 190

REPORT OF THE COMMITTEE TO STUDY RACE-NEUTRAL ALTERNATIVES

## I.      The Committee's Charge

Harvard University's fundamental purpose is the pursuit and dissemination of knowledge. We accomplish this purpose through two principal activities: research and education. One of the most important ways we disseminate knowledge is through the education of our undergraduates who will, in turn, serve our nation and the larger world through their chosen professions and as citizens and citizen-leaders.

For decades, Harvard University has recognized the critical importance of diversity and a diverse student body to achieving success in its principal activities. More than twenty years ago, University President Neil Rudenstine wrote that such diversity is "the substance from which much human learning, understanding, and wisdom derive." Neil Rudenstine, *The President's Report 1993-1995*, 53. To ensure that students will reap the greatest possible benefit from their undergraduate experience and will be challenged to reexamine their preconceptions, Harvard College seeks a student body that reflects the broadest possible range of backgrounds and experiences. To achieve that diversity, and many other institutional and educational goals, Harvard College implements a whole-person admissions process that considers all aspects of each application, including, as one of many factors, the applicant's self-identified race or ethnicity.

Our goal is to admit students who are undeniably extraordinary—students who excel in a range of different ways; who will take advantage of the opportunities available at Harvard; who will contribute through their diversity of experiences, backgrounds, and interests to the quality and vitality of life at the College, both inside and outside the classroom; who will enhance Harvard long after they graduate; who will engage our faculty; and who will become citizen-leaders in the world beyond Cambridge.

In a series of decisions, the United States Supreme Court has examined the permissibility of considering race in admissions to institutions of higher education. In 1978, the Court approved the consideration of race in admissions as one factor among many to attain a diverse student body, while rejecting the use of racial quotas. *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978). In 2003, the Court held that a university may consider an applicant's race, as one among many factors, provided that the university makes the "educational judgment" that student body diversity, including racial diversity, "is essential to its educational mission." *Grutter v. Bollinger*, 539 U.S. 306 (2003). If a university chooses to consider race in its admissions process, it must ensure that its consideration is "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant," and that "each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Id.* at 334, 337. The Court also made clear that a university need not "choose between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups." *Id.* at 339. Harvard College has long maintained an application process that conforms to these requirements, and indeed when the Supreme Court initially examined the consideration of race in university admissions in the *Bakke* case, Justice Powell's lead opinion indicated that a flexible, whole-person approach based on Harvard's admissions program would be permissible.

1

HARV00097310

In 2013, the Court held that educational institutions choosing to consider race in their admissions processes must examine whether doing so is actually necessary to achieve their diversity-related educational goals—or, alternatively, whether any race-neutral admissions approaches could promote the university's diversity-related educational objectives "about as well" as the consideration of race "and at tolerable administrative expense." *Fisher v. University of Texas at Austin*, 570 U.S. 297 (2013). The Court also made clear that universities should periodically review the necessity of their race-conscious admissions practices.

In light of those decisions, in 2014, Harvard undertook once again to examine the importance of student body diversity and the role that consideration of race plays in the undergraduate admissions process. That reexamination follows President Rudenstine's exploration of those issues in his 1996 report and the University's ongoing efforts to attain a diverse student body through many ways, not just consideration of race, including extensive recruiting efforts and a robust financial aid program.

In 2014, Harvard convened a University-wide committee chaired by James Ryan, Dean of the Graduate School of Education. That committee was charged with examining the importance of student-body diversity at the University and with evaluating whether the University could achieve the educational benefits of a diverse student body without considering the race or ethnicity of its applicants. That committee paused its work when Students for Fair Admissions, Inc. ("SFFA") filed a lawsuit against Harvard challenging Harvard College's consideration of race in undergraduate admissions. Recognizing that the litigation would include an extensive discovery process in which experts would conduct in-depth empirical analyses of the College's admissions processes and proposed changes to it, Harvard decided to evaluate whether it could achieve the educational benefits of diversity without considering race in admissions in the College in a way that would be informed by the race-neutral alternatives proposed in the SFFA complaint and the analysis of those and other alternatives anticipated to be prepared by the parties' expert witnesses.

That process has proceeded in two steps. First, a new committee, the Committee to Study the Importance of Student Body Diversity, chaired by Rakesh Khurana, Danoff Dean of Harvard College, considered again the importance of a diverse student body to Harvard College's educational goals. Second, this committee was convened to undertake, with assistance from Harvard University's Office of the General Counsel, the second step in the analysis required by *Grutter* and *Fisher*: whether Harvard College's pursuit of its diversity-related educational objectives still requires it to consider the race and ethnicity of undergraduate applicants (among many other factors), or whether Harvard could accomplish those objectives without taking race into account.

With regard to the first step, based on a report generated by the Committee to Study the Importance of Student Body Diversity, the Faculty of Arts and Sciences unanimously reaffirmed in February 2016 that "the University's long-held view that student body diversity—including racial diversity—is essential to our pedagogical objectives and institutional mission," and that such diversity is "fundamental to the effective education of the men and women of Harvard College." Nevertheless, as that committee recognized, some of the educational benefits that flow from a diverse student body remain elusive at Harvard, and substantial work remains to be done. In 2014, for example, the "I, Too, Am Harvard" play cast light on the reality that far too many black students at Harvard experience feelings of isolation and marginalization. In 2015, the College Working

CONFIDENTIAL

HARV00097311

Group on Diversity and Inclusion set forth a series of recommendations to achieve "a more diverse and inclusive future for Harvard." In 2016, Dean Khurana's committee reported student survey data showing that only half of Harvard undergraduates believe that the housing system fosters exchanges between students of different backgrounds. In March 2018, the Presidential Task Force on Inclusion and Belonging proposed organizational recommendations to achieve a more inclusive community. Issues of diversity and inclusion thus continue to challenge our community, notwithstanding Harvard's decades-long commitment to student body diversity and success in attracting exceptional students from broadly diverse backgrounds. As a result, President Faust has already started work to implement many of the task force's recommendations.

In light of that work and those continuing challenges, this committee was convened to examine whether Harvard could achieve its diversity-related educational objectives through the application of race-neutral alternatives. Formed in June 2017, this committee's members are committee chair Michael D. Smith, Edgerley Family Dean of the Faculty of Arts and Sciences, Rakesh Khurana, the Danoff Dean of Harvard College, and William Fitzsimmons, Dean of Admissions and Financial Aid. Those three members were chosen because of their responsibilities and experience with issues relating to student body diversity and its role in college education. Dean Smith has responsibility for supervising the Faculty of Arts and Sciences, which includes Harvard College and the Graduate School of Arts and Sciences. Dean Khurana has direct responsibility for Harvard College and has deep experience with the role of diversity in education and student life at the College. Dean Fitzsimmons, with more than forty years of experience in admissions at Harvard, has unparalleled knowledge about admissions practices at Harvard and in higher education generally.

This committee held seven meetings between August 2017 and April 2018. Three considerations guided our discussions when evaluating alternative admissions practices: (1) the impact alternatives would have on the overall diversity of backgrounds, experiences, and interests of the entire group of students who share a common educational experience; (2) whether alternatives would be consistent with other institutional commitments and goals; and (3) whether alternatives could reasonably be implemented given their resource and administrative requirements. To inform our work, the committee reviewed social-science and other literature on race-neutral means of pursuing diversity and collected information from several offices of Harvard College including the Office of Admissions and Financial Aid. As anticipated by the decision to pause the work of the committee led by Dean Ryan, this committee also benefited significantly from access to and consideration of the materials produced in the ongoing litigation between SFFA and Harvard, including the complaint and certain of the expert reports filed in the SFFA litigation. Specifically, the committee reviewed the reports submitted by SFFA's expert Richard Kahlenberg, which claim that Harvard could achieve its diversity-related educational objectives without considering race, and reports submitted by Harvard's expert Professor David Card, which illuminate the tradeoffs associated with eliminating the consideration of race and adopting various race-neutral alternatives. Together those reports detail the effects that abandoning consideration of race and certain other practices in admissions would have on the academic, demographic, and other characteristics of the Harvard College student body. They also detail the effects on these characteristics of then adopting one or more race-neutral alternatives.

The expert reports from the SFFA litigation inform, but do not nearly complete, our analysis; it falls to this committee to assess whether any race-neutral means, singly or in combination, would

CONFIDENTIAL

HARV00097312

or would not enable Harvard to achieve its diversity-related educational objectives. This report addresses that question against the backdrop of the statement of diversity-related educational objectives adopted by the Faculty of Arts and Sciences in 2016, with which the committee wholeheartedly agrees. This report summarizes the conclusions the committee reached following careful deliberation.

## II.      Harvard's Existing Efforts To Increase Diversity

As set forth in the Report of the Committee to Study the Importance of Student Body Diversity, Harvard has for decades sought to assemble a student body that is diverse across many dimensions, including race and ethnicity, because it believes that a diverse student body is essential to the education it provides. One way Harvard seeks to achieve the benefits of diversity (and many other educational objectives) is through a whole-person admissions process that takes into account, among many other factors, the self-identified race or ethnicity of each applicant. Harvard's admissions process gives thoughtful consideration of each applicant as a whole person—taking into account all of the information each applicant provides.

But Harvard's pursuit of diversity neither begins nor ends with any one factor, including the consideration of race. Rather, Harvard seeks—and has long sought—to increase the diversity of its student body in many ways and across many dimensions. As this report now explains, Harvard pursues many ways to attain a diverse student body that do not involve consideration of race or ethnicity when considering applications for admission to the College.

For example, the College undertakes extensive efforts to encourage a diverse pool of applicants to seek admission to Harvard. Harvard seeks to identify strong applicants from modest economic backgrounds and encourages them to apply through, among other things, targeted mailings of promotional materials about Harvard and its generous financial aid program. Harvard representatives, including admissions officers, undergraduates, and alumni, conduct numerous recruitment events throughout the United States, including events targeting students who come from secondary schools and geographic areas that do not frequently send students to Harvard. Harvard regularly enhances its website and electronic communications, and revises its publications to further these efforts.

In the past five years, Harvard has also undertaken a particularly concerted effort to encourage students from the first generation of their family to attend a four-year college to apply and matriculate through its First Generation program. That program includes electronic communications, promotional materials, and the ability to correspond directly with current first-generation students attending Harvard.

Harvard also encourages applications from a racially diverse pool through its Undergraduate Minority Recruitment Program ("UMRP"), which originated in the early 1970s. The UMRP sends targeted mailings to many potential applicants of different racial and ethnic backgrounds (including African-American, Hispanic, and Asian-American students), coordinates online communications, sends staff to schools and events around the nation, and enlists current students to talk with prospective applicants.

4

Having made these efforts to encourage a body of students diverse across many dimensions to apply for admission, Harvard then seeks in the admissions process itself to identify promising students from modest economic backgrounds, first-generation college students, and other students who would contribute to the diversity of the student body in many ways. The Admissions Office carefully reviews applications from such students to ensure that they are not disadvantaged in the application process because of their lack of resources and opportunities or their educational background, and to recognize the particular achievement of students who have excelled when coming from a modest background.[1]

Once it has admitted a diverse group of students, Harvard encourages them to matriculate. Harvard does not award merit or athletic scholarships; its financial aid program is entirely need-based, and is designed to ensure that financial circumstances will not prevent any admitted student from matriculating. Harvard publicizes its financial aid policies widely, prominently discussing them on its website and in promotional materials. Harvard's Net Price Calculator, featured on its website, is designed to be simple to use and gives prominence to important details about the financial aid program. Harvard also encourages all staff, faculty, students, and alumni involved in recruitment to talk about and explain the generous financial aid program to students and families.

In addition to its generous financial aid program, Harvard makes additional efforts to encourage admitted students from diverse backgrounds to matriculate at Harvard. Harvard's Visitas weekend for admitted students invites all admitted students to campus and offers them the chance to meet their future classmates and professors, learn more about life at Harvard, and explore the campus. Harvard provides need-based aid to help all admitted students travel to Visitas. During Visitas, Harvard encourages admitted students to meet with current students, including those from similar backgrounds, to gain an understanding of the importance that the College places on diversity. For example, since 2015, Harvard has hosted an Economic Diversity and First Generation Students Reception, which offers admitted students the opportunity to meet enrolled students from the First Generation Student Union, the Harvard First Generation Program, and the Harvard Financial Aid Initiative. In addition, there is a multicultural reception for students interested in meeting members of the Undergraduate Minority Recruitment Program and leaders from a variety of student organizations.

Harvard continually evaluates these practices and considers ways to improve them. Within the past decade, this iterative review process has led to significant changes in admissions policies and practices designed to enhance diversity.

For example, Harvard has in the past decade reexamined and experimented with its Early Action admissions program in the hope of achieving several goals, including the goal of promoting diversity. Some have argued that early admission programs place students from less privileged backgrounds at a disadvantage, in part because those students may need more time to prepare for the college admissions process. In 2006, Harvard announced that it would eliminate its Early Action program in the 2007-08 admissions cycle (*i.e.*, with applicants to the Class of 2012).

---

[1]     Harvard's admissions practices are sometimes referred to as "need-blind" admissions. That phrase is meant to signify not that the Admissions Office is unaware of an applicant's financial circumstances, but rather that an applicant's inability to pay is not an impediment to admission.

CONFIDENTIAL

HARV00097314

Harvard hoped that eliminating Early Action would encourage an even greater number of diverse students to apply and matriculate. After a number of admissions cycles without Early Action, Harvard evaluated the effects of this change, and determined that eliminating Early Action did not create a more diverse application pool and in fact reduced Harvard's ability to attract a broadly diverse and academically excellent class. In 2011, Harvard therefore reinstated a non-binding Early Action program.

As another example, Harvard has repeatedly expanded the resources it dedicates to the students in its financial aid program over the past decade and a half. In 2004, Harvard announced the Harvard Financial Aid Initiative ("HFAI"), offering students from families with annual incomes below $40,000 (and typical assets) the opportunity to attend Harvard at no cost to their families, while expecting a significantly reduced parental contribution for students with family incomes between $40,000 and $60,000. (Harvard does not consider the family's home equity in calculating family resources.) Two years later, Harvard expanded the HFAI so that no parental contribution was expected from students whose families earned up to $60,000, and a limited contribution was expected from students whose families earned up to $80,000. In 2008, Harvard again made Harvard College more affordable by vastly expanding the range of students who could attend Harvard without paying the full cost of tuition. Since 2012, Harvard has expected zero parental contribution from families with earnings less than $65,000, and a contribution of not more than 10% of family income for students whose families earn between $65,000 and $150,000. Even families earning up to $180,000 or more are not expected to pay the full cost of tuition, if they are faced with unusual expenses. These generous policies are designed to ensure that students from all socioeconomic strata can attend Harvard, promoting both economic and racial diversity.

In sum, to achieve its diversity-related educational objectives, Harvard devotes considerable resources to recruiting, admitting, and enrolling candidates who are diverse across many dimensions, in addition to taking applicants' race into account as one among many factors in the admissions process. The College has engaged in all of those efforts because it has concluded that each of them is helpful in contributing to the broad diversity that the College is seeking. The committee now considers whether, despite already engaging in all of the efforts described above, there remain race-neutral measures, including those identified in the challenge to Harvard's admissions practice posed in the SFFA litigation, that could be effective in at attaining diversity without undermining Harvard's other foremost educational and institutional objectives.

## III.    Race-Neutral Alternatives Considered

The committee understands that the Supreme Court has indicated that universities need not "exhaust[] every conceivable race-neutral alternative" before considering race in admissions to promote diversity; their obligation is to analyze whether any workable race-neutral admissions practices could achieve their diversity-related educational objectives about as well as the consideration of race, and at tolerable administrative expense. By reviewing literature, as well as the expert reports filed in the SFFA litigation, the committee identified the following list of practices to consider:

- Increasing efforts to recruit racially and socioeconomically diverse students
- Establishing partnerships with schools or organizations that serve applicants of modest socioeconomic backgrounds

6

HARV00097315

- Increasing financial aid
- Adopting place-based preferences, such as admitting the top student or students from each high school or ZIP code
- Increasing transfer admissions
- Affording greater weight to the fact that an applicant comes from a socioeconomically disadvantaged background
- Eliminating Early Action
- Ending the practice of offering some candidates deferred admission to a subsequent class
- Eliminating the consideration of whether an applicant's parent attended Harvard or Radcliffe
- Eliminating the consideration of whether an applicant's parent is a member of Harvard's faculty or staff
- Eliminating the consideration of whether an applicant is a recruited athlete
- Eliminating any consideration of whether an applicant's family has donated or has the capacity to donate to Harvard
- Eliminating the consideration of applicants' standardized test scores

## IV.   Evaluation Of Race-Neutral Alternatives

In the committee's judgment, none of these alternative admissions practices—either alone or in combination—would enable Harvard to achieve its diversity-related educational objectives without significant and unacceptable sacrifice to other institutional imperatives. As explained below, some of the proposed alternatives would simply be not practicable for Harvard, regardless of their potential effect on diversity. Others would be ineffective at attaining a student body that would provide students with the educational and other benefits of diversity. Still others, though perhaps more likely to generate a racially diverse student body, would impose too high a cost on Harvard's other important educational and institutional objectives—a cost the committee understands the Supreme Court to have made clear in *Grutter* and *Fisher II* that universities are not required to pay.

The committee recognizes that the Supreme Court's decisions in *Grutter* and *Fisher* challenge universities to be certain that, if they consider race in college admissions, they do so in the narrowest way. Based on the committee's review of the materials generated in the SFFA litigation, other literature, and its own experience with the Harvard admissions process, the committee is convinced that Harvard does so. Harvard's admissions process treats every applicant as an individual and explores every application in depth to ascertain how the applicant and Harvard would benefit from each other. Consideration of an applicant's race is part—but only a part—of that process, and the Admissions Office's whole-person review ensures that consideration does not overwhelm other factors that bear on the College's admissions process, including the imperative that the College remain an academically outstanding institution. By contrast, the proposals discussed below are unworkable, either because they are not practicable, they are not effective, or they would impose too great a cost to our institutional objectives. Some of them would also be unduly mechanistic at the expense of Harvard's whole-person admissions process.

7

### A.    What Would Happen If Harvard Stopped Considering Race?

The committee considered as an initial matter the likely effect on Harvard's student body if it were to stop considering race in its admissions process, while continuing to engage in the other practices in pursuit of diversity described above. As the expert report submitted by one of Harvard's experts in the SFFA litigation, Professor David Card, explains, the number of African-American and Hispanic students on campus would decline dramatically, notwithstanding all the other efforts that Harvard takes to recruit a broadly diverse class. Specifically, Professor Card estimates that the elimination of race in its race-conscious admissions program would reduce the population of students who self-identify as African-American, Hispanic, or "Other" racial or ethnic background by nearly 50%.[2] Relative to the admitted Class of 2019, for example, the proportion of African-American students would be expected to drop from 14% to 6%, and the proportion of Hispanic or Other students would be expected to drop from 14% to 9%.

This decrease would produce a corresponding increase in students of other races, primarily White students. Overall, the non-White percentage of the student body would decline substantially absent the consideration of race.

The committee believes that the significant decline in racial diversity that would flow from eliminating the consideration of race in the admissions process would prevent Harvard from achieving its diversity-related educational objectives. In particular, we are concerned that students in a significantly less diverse class will have diminished opportunities to engage with and learn from classmates who come from widely different backgrounds and circumstances, both in the classroom and in all other dimensions of campus life. This, in turn, would leave students ill-prepared to contribute to and lead in our diverse and interconnected nation and world. The issues of diversity and inclusion that Harvard faces today—including what the committee understands to be ongoing feelings of isolation and alienation among racial minorities in Harvard's community—would only be exacerbated by a significant decline in African-American and Hispanic enrollment.

This is not to say that Harvard has in mind a specific number of students of any given racial or ethnic background who must be on campus in order for Harvard's diversity-related educational objectives to be satisfied. It does not. But the committee is convinced that a significant reduction in the number of African-American and Hispanic students on campus would inhibit the ability of Harvard's students and faculty to glean the benefits of a diverse student body and significantly undermine our educational mission and broader institutional objectives.

### B.    Individualized And Aggregate Analysis Of Race-Neutral Alternative Practices

We next discuss our assessments of whether, if Harvard were to eliminate consideration of race in the admissions process and suffer the resulting decline in racial diversity, any of the race-neutral practices set forth above could (either alone or in combination) enable Harvard to recover a degree of racial diversity sufficient to achieve its diversity-related educational objectives, while still being

---

[2]    In Professor Card's report, the "Other" racial or ethnic background includes applicants who self-identified as Native American, Hawaiian, or Pacific Islander in their applications to Harvard.

CONFIDENTIAL                                                     HARV00097317

practicable for Harvard and without compromising its other important educational or institutional objectives.

For convenience, we group these proposals into two kinds of practices. First, we consider a series of practices that Harvard could undertake that, without involving a direct consideration of race, might nonetheless increase the racial diversity of either the applicant pool or the student body at Harvard (or both). Second, we consider the possibility that Harvard might abandon certain of its existing admissions practices that have been criticized for negative effects on student body diversity.

Ultimately, we conclude that none of these proposals, singly or in combination, are practicable for Harvard or would allow Harvard to achieve the educational benefits of a diverse student body without unacceptable cost to other important educational and institutional objectives.

### 1.    Proposals to Increase the Diversity of the Applicant Pool or Student Body

- *Increasing efforts to recruit racially and socioeconomically diverse students to apply*

Harvard already undertakes extensive efforts to recruit students who would contribute to the diversity of its class, both at the application stage and at the matriculation stage. As noted above, Harvard students and admissions personnel visit hundreds of locations across the United States, devote extensive resources to the recruitment of minority students served by the UMRP, recruit students from the first generation of their families to attend college, and engage in extensive social media campaigns designed to expand the admissions pool. This outreach effort—which equals or exceeds the efforts of Harvard's peer institutions. And includes the assistance of more than 10,000 alumni located throughout the nation and the world—requires an extensive commitment of human and financial resources. Harvard also purchases lists from the College Board and ACT that allow it to send multiple letters and electronic communications to more than 100,000 high school students across the country who, based on reported high school grades and standardized test scores, show promise as having the academic ability and interest to succeed at Harvard.

Harvard constantly seeks to improve its recruitment efforts, and the Dean of Admissions meets at least twice a year with the Dean of the Faculty of Arts and Sciences and often discusses how that process might be improved. But Harvard does not seek a large applicant pool as an end in itself; Harvard's recruitment process must be directed at students who show promise of succeeding at the College. Recruiting students who are not likely to be accepted would have little effect other than to increase the number of disappointed applicants and discourage promising younger students at their schools from applying to Harvard in the future.

Moreover, as we discuss later in this report, Professor Card's simulations of the effects of various race-neutral alternatives show that, even if increased recruitment could double the number of socioeconomically disadvantaged students who apply to Harvard—an assumption we regard as extremely unrealistic—a race-neutral admissions process still could not achieve a student body comparable in diversity to current classes without unacceptably compromising other important institutional objectives. If Harvard were to place so much weight on socioeconomic background as to achieve levels of racial diversity commensurate with those at the College today, the collateral

CONFIDENTIAL                                                                                      HARV00097318

effect would be that the proportion of matriculants who are *most* exceptional—with the highest academic, extracurricular, personal, and athletic ratings—would decline precipitously.

- *Expanding partnerships with schools or organizations that serve applicants of modest socioeconomic backgrounds*

Harvard already engages in significant outreach efforts with community-based organizations across the country. Harvard does not restrict its efforts to a small number of organizations by giving them a "pipeline" to the College; instead, Harvard has developed and maintains a broad base of relationships with community-based organizations that strive to advance underserved students across the country. Harvard admissions officers are in touch with community-based organizations in their designated areas and foster relationships with those organizations to ensure that their top students apply to Harvard. Harvard also invites community-based organizations to participate at its annual summit on undergraduate admissions (the Harvard Summer Institute on College Admissions), and numerous community-based organizations attend the program.

Although Harvard is always considering ways to increase its efforts in this area, the committee has concluded that the current efforts are so substantial that we do not believe that seeking out additional partnerships of this nature, or deepening current partnerships, could yield more than an incrementally small number of applicants who would be admitted to Harvard and would not otherwise have applied. Furthermore, favoring specific pipeline programs would not be consistent with our goal of attracting the most diverse set of applicants independent of their ability to access a particular pipeline program. In summary, the committee does not believe that an increased effort to target so-called "pipeline" organizations would meaningfully contribute to the diversity of the applicant pool or the enrolled student body, and favoring specific pipeline programs would be inconsistent with our institutional goals.

- *Increasing financial aid*

Harvard currently offers among the most generous financial aid of any higher education institution in America. Attending the College is free to students whose families earn below $65,000. Families earning up to $150,000—which, according to the most recent census data, represents 87% of American households—pay no more than 10% of their income each year. These financial aid policies aim to ensure that no student will be unable to attend Harvard because of financial considerations. Harvard commits nearly $200 million to support financial aid each year.

There is no reason to believe, however, that further increases in financial aid will materially increase the diversity of Harvard's student body. The committee has seen nothing to suggest that members of any racial or ethnic group are choosing to attend other schools instead of Harvard on the basis of the need-based financial aid available at those institutions. Harvard's current financial aid program is already so generous that it makes Harvard more affordable, especially to low-income applicants, than many public institutions. According to calculations from the Office of Admissions and Financial Aid, 90% of families would pay the same or less to send their children to Harvard as they would to a state school. As Professor Card notes, approximately 70% of African-American households and more than 60% of Hispanic households are already eligible for zero parental contribution under Harvard's current financial aid program.

CONFIDENTIAL
HARV00097319

These data indicate that Harvard's financial aid program is already capable of reaching most potential African-American and Hispanic applicants. In fact, Professor Card's analysis shows that the most recent expansions of financial aid, in 2012 and 2016, did not result in significant increases in the number of African-American or Hispanic applicants or admitted students. Although Harvard is always interested in additional ways to make attendance at the College affordable, increasing financial aid is not likely at this time to make the student body more racially diverse.

Moreover, even Harvard has limits to the amount of financial aid it can offer. The committee believes it is simplistic to assume, as many do, that based on the size of Harvard's endowment, Harvard can afford to spend any amount of money on financial aid that it would like. The reality is much more complicated. In fact, the endowment covers only 65% of the $200 million required to fund undergraduate financial aid. Harvard could not significantly increase its financial aid budget without detracting from other commitments—to a four-year residential experience, cutting-edge research facilities, faculty and staff, and operations—that are essential to maintaining Harvard as one of the world's leading institutions of higher learning.

- *Adopting place-based preferences*

In the committee's judgment, Harvard could not—and should not—select its class by admitting even the single top student from each high school or ZIP code. The concept is fundamentally incompatible with the core mission of the Harvard admissions process, which is to recruit, admit, and enroll the most extraordinary students in the world, wherever they may be found. Although Harvard does value geographical diversity and has long sought to recruit and admit students from across the country (and more recently around the world), it should not be compelled to deny admission to the second or third excellent applicant from one location simply because a formula points to an applicant in another place. Resorting to such a mechanical place-based system is contrary to the nuanced and individualized review that Harvard has always employed.

Limiting Harvard's ability to admit multiple applicants from a single high school or ZIP Code, in favor of admitting the single "best" student from a large number of high schools or ZIP Codes, would force Harvard to pass up globally excellent students who in its judgment would bring more to campus than the sum of the locally best students. This would not merely be true of an admissions protocol that required Harvard to admit, at most, not more than one student per ZIP Code; it would equally be true of the suggestion in Mr. Kahlenberg's report in the SFFA litigation that Harvard should endeavor to admit roughly the same number of top students from each of the College Board's "Educational Neighborhood Clusters." Excellence in all of the dimensions Harvard seeks is not equally distributed in that manner. In this committee's opinion, the adoption of an admissions regime using rigid place-based preferences would greatly lessen Harvard's undergraduate student body of qualities that Harvard has long thought important. It would replace a global search for excellence with a mechanical system of admission by numbers, the costs of which would vastly exceed the benefits.

The proposal is also beset by practical difficulties. There are more than 36,000 high schools and 43,000 ZIP Codes in the United States. Harvard does not have room to admit even one student from every one of those schools or ZIP Codes. In addition, identifying the "top student" in a high school class or ZIP code is problematic. One approach to that task would be an algorithmic assessment of students' quantitative academic credentials such as high school grades and test

11

HARV00097320

scores. But Harvard has long believed that metrics like grades and test scores, although informative and important, are of limited value in identifying students who would contribute many and varied forms of excellence to Harvard's campus community. Even if Harvard were to apply its whole-person admissions process to applicants within each high school or ZIP code, it would *still* be impossible to identify the single "top" applicant, because there is no single dimension on which Harvard ranks its applicants. Some applicants may bring exceptional academic promise to campus; others, while academically excellent, may shine even more brightly in other pursuits. None of these types of students is necessarily the single "best."

Indeed, the analysis prepared by Professor Card in connection with the SFFA litigation shows that the subset of applicants who are the "top students" in their high school are weaker than Harvard's admitted class. Specifically, relative to the pool of admitted students, the "top students" have lower SAT and ACT scores as well as lower academic index ratings and academic, extracurricular, personal, and athletic ratings. The committee believes that adopting a place-based admissions regime would therefore diminish, to an unacceptable degree, the excellences that are a hallmark of our student body.

- *Increasing transfer admissions*

Because Harvard believes that a residential system is fundamental to the undergraduate experience, as reflected by the fact that 98% of undergraduates live on campus, Harvard's admissions process is necessarily confined by the number of beds on campus. Very few students take leaves of absence or otherwise leave Harvard every year, and thus Harvard has usually been able to admit only an extremely small number of excellent upperclassmen each year as transfer students—and sometimes, none at all. In recent years, for example, Harvard was able to admit just twelve transfer students from among more than 1,400 applicants. Nor does Harvard admit transfer students who have completed more than two years of study at another institution: the degree would be diminished if it could be earned without taking at least half of one's classes at the College.

In theory, Harvard could create more room for transfer students by admitting a smaller freshman class, essentially reserving spots for transfer students to join the school after their freshman year at other institutions. Harvard could also theoretically expand the size of its sophomore, junior, or senior classes by building additional housing. At this time, the committee does not consider either approach to be workable.

There is no good reason to admit fewer freshmen for the purpose of reserving spots for future transfer students. Harvard already rejects thousands of incredibly talented students who could thrive at the College, including many racially diverse applicants.  Rejecting even more applicants for freshman admission to reserve additional spots for transfer admissions would only make sense if the pool of transfer students was somehow stronger than the pool of students who apply to Harvard for freshman admission. There is no reason to think this is true; in fact, as discussed below, Professor Card reports that the transfer pool is less diverse and less impressive than the pool of freshman applicants.

With respect to expanding the size of the sophomore, junior, and senior classes to accommodate additional transfer students, Harvard's ability to undertake that effort is significantly constrained by its physical plant: to do so, Harvard would need to build additional housing. At present, and for

12

the foreseeable future, Harvard is engaged in a House Renewal effort that involves renovating and modernizing the existing Houses, some of which are nearly 100 years old. After the House Renewal project is complete, as the College considers the possibility of expanding its housing stock, it may then be appropriate to evaluate whether additional space can or should be preserved for transfer students.

In the meantime, additional considerations counsel against increasing transfer admissions as a race-neutral means of attempting to pursue diversity. In Professor Card's expert report in the SFFA litigation, he notes that the pool of transfer applicants is actually *less* racially diverse that the pool of freshman applicants, and transfer applicants have lower academic ratings (on average) than freshman applicants. Given Harvard's limited ability to enroll a significant number of transfer students, increasing transfer admissions would have an immaterial impact on the racial diversity of the student body. Thus, the committee concluded that increasing transfer admissions is unlikely to help Harvard achieve its diversity-related educational goals, and would impair its pursuit of academic excellence.

- *Increased weight for socioeconomic background*

In the expert reports he submitted in the SFFA litigation, Professor Card examined whether Harvard could achieve diversity by increasing the weight that it gives to the fact that an applicant comes from less privileged socioeconomic circumstances, *in addition to* eliminating the practices discussed above. That analysis was done through a process of statistical modelling, in which he conducted extensive simulations of the projected composition of the Harvard freshman class if Harvard were to change its admissions practices in those ways. The simulations show that Harvard could not *both* achieve its diversity interests *and* achieve other equally important educational objectives, such as academic excellence.

Harvard has long given particular consideration to applications from students who come from modest socioeconomic backgrounds and circumstances, for many reasons. Harvard understands that excellence can be found in all quarters of society, and students who excel or show promise of excelling despite limited access to educational and other resources often show the kind of determination and resilience that makes them likely to benefit greatly from what Harvard has to offer its students—and show that they in turn will have much to offer Harvard. Students from modest socioeconomic circumstances may have distinct perspectives to share with their peers in and outside the classroom, and a class that is diverse in socioeconomic backgrounds is an essential part of the diversity in a student body that Harvard strives to achieve. Although Harvard does not assign any particular defined weight to an applicant's socioeconomic circumstances, those circumstances are important factors that the admissions process considers. But just as Harvard does not elevate racial diversity over all other considerations in the admissions process, so too does it not elevate socioeconomic considerations over all others. Harvard looks for excellence above all, and believes that excellence can and should be found in all backgrounds. A focus on socioeconomic circumstances that outweighed all other factors could equally reduce the depth and breadth of the Harvard class as well as its excellence in many dimensions.

It has been suggested that Harvard could attain a racially diverse student body by giving increased consideration to applicants' modest socioeconomic circumstances rather than considering their race or ethnicity. Doing so, however, would not be a simple matter of substituting one

13

                                                                    HARV00097322

consideration for another. According to Professor Card's simulations, if Harvard stopped considering race and eliminated the practices discussed below, it would need to award a boost to applicants from lower socioeconomic backgrounds that is larger than the boost given to candidates with the strongest academic, extracurricular, personal, and athletic ratings in order to reach the current level of African-American, Hispanic, and Other students admitted to Harvard.

Such a course would overwhelm other considerations in the admissions process, leading to significant changes in the composition of the admitted class, some of which would be incompatible with Harvard's educational mission. As Professor Card's report in the SFFA litigation also shows, if Harvard were to greatly increase the weight given to socioeconomic circumstances in the manner discussed above, it would run a significant risk of diminishing the academic excellence of the class.

For example, if Harvard afforded weight sufficient to produce a combined proportion of African-American, Hispanic, and Other students comparable to that of current classes, the proportion of admitted students with the highest academic ratings (as assigned by admissions officers) would be expected to drop from 76% to 66%. That is true under each of the simulations that SFFA's expert in the litigation, Mr. Kahlenberg, embraces. In fact, the ultimate combination of race-neutral alternatives that Mr. Kahlenberg deems workable for Harvard would, if adopted, result in a 19% drop in the proportion of admitted students with the highest academic ratings. That is a pronounced decline in a dimension of excellence that Harvard considers essential to its educational mission. Moreover, in both simulations of race-neutral alternatives that have been submitted in the SFFA litigation, where those experts give greater weight to applicants' socioeconomic backgrounds, the proportion of students given the highest extracurricular, personal, and athletic ratings by the Harvard Admissions Office would also decline substantially. Although some of the proposed race-neutral practices reflected in those simulations could therefore achieve a significant degree of racial diversity, Harvard does not seek diversity to the exclusion of all its other objectives—nor does the committee understand that Harvard is required to do so. Academic excellence across the student body remains an institutional imperative.

Using socioeconomic status as a proxy for race in the admissions process would also, by definition, yield a student body in which many of the non-White students would come from modest socioeconomic circumstances. Thus, even if socioeconomic status could be used to increase racial diversity, it would do so at the cost of other forms of diversity, undermining rather than advancing Harvard's diversity-related educational objectives.

In the committee's view, therefore, there is no way for Harvard to use socioeconomic factors, even in combination with the elimination of certain other practices discussed below, to achieve both its diversity-related educational objectives and its other educational objectives.

The committee also evaluated whether admissions officers should be provided with additional information relating to each applicant's socioeconomic circumstances. The committee believes that this is a proposal to solve a problem that does not exist. There is no reason to believe that Harvard currently struggles to identify low-income students during the admissions process, or that Harvard would admit more students from challenged socioeconomic circumstances if only the Admissions Office had more granular information relating to the applicant's wealth and income. Admissions officers already have access to extensive information in each application file, including extensive information bearing on applicants' socioeconomic circumstances. To the

14

extent admissions officers believe it would be helpful to know precise information about an applicant's socioeconomic background, they can and do ask for and receive that information from their colleagues who work in financial aid and are themselves part of the admissions staff.

## 2.    Proposals to Eliminate Certain Admissions Practices

- *Eliminating Early Action*

Harvard has recently experimented with eliminating Early Action, and that experience provides strong evidence that eliminating Early Action would not allow Harvard to achieve its diversity-related educational goals. Indeed, Harvard's experience shows that a well designed Early Action process contributes to diversity rather than detracts from it, and that eliminating Early Action at Harvard ultimately decreases the diversity of the class as a whole.

Like many of its peer institutions, Harvard has historically offered applicants the opportunity to apply in November of their senior year of high school and receive notice of a decision on their applications as early as December. Harvard employs a non-binding Early Action program, as opposed to a binding Early Decision program that commits applicants to attend if admitted—and it docs so because Early Decision programs can favor affluent applicants, who need not worry about the ability to compare financial aid offers from multiple schools, over less affluent applicants.

In 2006, Harvard announced that it would abolish even the non-binding Early Action program, in part as a response to a concern that such a program might favor applicants with the cultural capital and resources to prepare strong applications in time to apply early. At the time, Harvard hoped that other peer schools would follow its lead, and anticipated that the widespread elimination of Early Action across Harvard's peer institutions of higher education would result in increased socioeconomic and racial diversity for all.

That expectation was not achieved, however. Most peer universities did not follow Harvard in abolishing early admissions, and over the course of four admissions cycles without Early Action, Harvard found that the share of self-identified African-American, Hispanic, and Other applicants to Harvard did not rise and that the yield rate for African-American, Hispanic, and Other applicants declined. To make matters worse, many of the most promising African-American, Hispanic, and Other applicants opted to attend universities that continued to offer them early admission.

In response to this experience, Harvard reinstituted a single-choice Early Action program beginning with the class of 2016. As compared with the period during which Early Action was abolished, the yield rate for applicants across all racial groups increased after the return of Early Action. In sum, Harvard learned that the elimination of Early Action detracted from its ability to enroll highly talented students, including self-identified African-American, Hispanic, and Other students, and the return of Early Action enhanced that ability. Based on Harvard's direct experience and experimentation with Early Action, the committee docs not believe that abolishing Early Action again would contribute to diversity on campus, let alone restore to a meaningful degree the diversity that would be lost by eliminating consideration of race. The committee further believes that the abolition of Early Action would damage Harvard's ability to compete effectively for top candidates, hindering its educational goals.

15

- *Eliminating other practices*

In the expert reports he provided in connection with the SFFA litigation, Professor Card was able to simulate the effects of eliminating a group of practices that have been challenged in that litigation as potentially favoring White applicants: the practice of deferred admission, the consideration of whether an applicant's parents attended Harvard or Radcliffe, the consideration of whether an applicant's parent is employed by Harvard, the consideration of whether the applicant is a recruited athlete, and the consideration of whether the applicant is on the Dean's or Director's interest list.

As discussed above, Professor Card's simulations show that if Harvard eliminated all of those practices, and also eliminated consideration of race in the admissions process, the resulting class would have significantly fewer students who identify as African-American, Hispanic, or Other. As discussed above, the committee regards a decline in diversity of such significant magnitude as inimical to Harvard's diversity-related educational objectives.

Thus, to the extent elimination of these practices could even marginally increase diversity, it would not do so by nearly enough to compensate for the sharp decline in diversity that would result from eliminating consideration of race in the admissions process. For example, Professor Card's simulations show that eliminating the consideration of race, but keeping these other policies constant, would reduce the share of admitted students who are African-American to 5.6% and the share who are Hispanic or Other to 8.9%. Eliminating the consideration of race and eliminating these processes would have a negligible effect (and not always positive) on diversity, resulting in an admitted class that is 5.3% African-American and 9.3% Hispanic or Other. That is reason enough for the committee to conclude that these practices would not prevent Harvard from needing to consider race in the admissions process to achieve its diversity-related educational objectives.

In view of the criticism leveled against certain of these practices, however, the committee also considered whether the challenged practices are consistent with Harvard's broader values and interests. The committee concludes that the practices do serve important institutional values and interests:

- o  Like excellence in other extracurricular pursuits, athletic excellence is one of many attributes that Harvard values in its students. Athletic performance at a high level requires discipline, resilience, and teamwork that benefits students for the rest of their lives and prepares them for active engagement with their peers. Harvard student-athletes are also among the most dedicated alumni and contribute in many ways to the University after they graduate. In addition, Harvard's ability to field athletic teams contributes to the deep connection Harvard students and alumni form with the institution and that foster a sense of community on campus.

- o  The practice of considering, among many other factors, whether an applicant's parent attended Harvard College or Radcliffe College as an undergraduate also helps to cement strong bonds between the university and its alumni. Harvard hopes that its alumni will remain engaged with the College for the rest of their lives, and this consideration is one way that it encourages them to do so. Harvard also relies to an unusual degree on the participation of its alumni in the admissions process. In every

16

HARV00097325

state and almost every country around the world, Harvard graduates volunteer their time to serve as alumni interviewers. Harvard alumni also offer generous financial support to their alma mater. That financial support is essential to Harvard's position as a leading institution of higher learning; indeed, it helps make the financial aid policies possible that help the diversity and excellence of the College's student body. Although alumni support Harvard for many reasons, the committee is concerned that eliminating any consideration of whether an applicant's parent attended Harvard or Radcliffe would diminish this vital sense of engagement and support. In addition, giving consideration to whether an applicant's parent attended the College serves a community-building function, and contributes to a sense among all undergraduates that they are part of a lifelong educational engagement. Finally, the committee notes that children of Harvard alumni tend to be very strong applicants.

o   The practice of deferred admission allows Harvard to admit excellent students who would benefit from the experiences gained in a gap year. Some of those students also have significant connections to the University, including as a result of their parent's service to the College as an employee or volunteer. Therefore, deferred admission advances the same institutional goals implicated by the practice of considering whether an applicant's parent attended Harvard College or Radcliffe College, described immediately above.

o   Considering whether an applicant's parent is a member of the University faculty or staff is important to the retention of talent in the University workforce. Eliminating that consideration would place Harvard at a significant competitive disadvantage in recruiting personnel. Applicants from the Harvard community also tend to be strong students, and their presence on campus helps build a sense of community across the generations.

o   To the extent the Admissions Committee currently considers other aspects of service to Harvard, including whether an applicant's family has donated or has the capacity to donate to Harvard, it does so in a very small number of cases—far too small for the cessation of any such practice to contribute meaningfully to campus diversity (and many of those applicants have other connections to Harvard as well). The committee wishes to emphasize that—although development efforts are both legitimate and indeed essential to any private university, and although they enable Harvard and its students and faculty to make many contributions to the public good—no student is ever admitted to Harvard simply because his or her family is able to make a donation. We further note that Harvard has a practice of not soliciting donations from families who have a child in the applicant pool.

- *Eliminating consideration of standardized test scores*

Finally, in his expert report in the SFFA litigation, Professor Card examined how eliminating consideration of standardized test scores—in addition to eliminating the practices discussed at the outset and giving increased weight to socioeconomic circumstances—would alter the characteristics of the admitted class.

17

HARV00097326

Professor Card's analyses show that this set of practices in combination could produce a comparably diverse class only at a significant cost to Harvard's other educational objectives. For example, if that increased weight for modest socioeconomic circumstances were sufficient to produce a combined proportion of African-American, Hispanic, and Other students comparable to that of Harvard's current classes, the proportion of students with the highest academic ratings would decline by 17%, and the proportion of students with the highest extracurricular or personal ratings would decline by 7%. As discussed above, the committee regards changes of this magnitude as incompatible with Harvard's educational objectives.

Furthermore, although SAT exams, SAT Subject Tests, and ACT exams are imperfect measures of academic excellence and aptitude, the Admissions Committee believes that when considered appropriately—that is, in light of an applicant's background and ability to prepare, and as one factor among many—the tests provide useful information that the committee would lose if it excluded any consideration of them. The committee notes that the SAT and other standardized tests have been modernized over the past several years, mitigating (though not eliminating) concerns that they have a racially disparate impact, and that free test preparation courses are now relatively widespread. This is not to deny the correlation between standardized test scores and socioeconomic status. Indeed, as part of its continuous effort to attract students from all economic backgrounds, Harvard recently announced that beginning with the Class of 2023, applicants would not be required to submit the essay portion of the SAT or ACT. But the correlation between standardized test scores and socioeconomic status does not render standardized test scores irrelevant, and provides no reason to prevent admissions officers from considering them, while taking into account the applicant's resources.

## V.     Conclusion

As set forth above, we conclude that, at present, no workable race-neutral admissions practices could promote Harvard's diversity-related educational objectives as well as Harvard's current whole-person race-conscious admissions program while also maintaining the standards of excellence that Harvard seeks in its student body. This is not to say that race-neutral efforts to achieve diversity are inherently futile, or could not achieve another institution's goals—only that, based on our careful review, they will not work at Harvard and at this time. Many of those who have argued otherwise—both generally in the literature and specifically as to Harvard in the SFFA litigation—proceed from an excessively narrow understanding of excellence and achievement, placing undue emphasis on test scores, or suggest contrived and unworkable approaches, such as reliance on ZIP Codes. But Harvard has never sought to maximize the number of places from which students are admitted, or to maximize the SAT scores of the admitted class. The crucial question, rather, is how Harvard can admit a class of students that are both excellent in many ways and diverse in many ways.

Ultimately, the fundamental defect of many of the proposed race-neutral alternatives is that they will not allow Harvard to achieve its goal of admitting students who are undeniably extraordinary—students who excel in a range of different ways, who will take advantage of all that Harvard can offer them, who will contribute to the education of their classmates, who will enhance Harvard's organization, who will engage its faculty, and who will become citizen-leaders in the world beyond Cambridge.

18

CONFIDENTIAL

HARV00097327

Although we have confidence in our conclusion today, it will be important to reassess, periodically, the necessity of considering race and ethnicity in the admissions process. To that end, we recommend that the College re-evaluate its consideration of race-neutral alternatives five years from now.

* * *

William Fitzsimmons, *Dean of Admissions and Financial Aid*

Rakesh Khurana, *Dean of Harvard College; Marvin Bower Professor of Leadership Development, Harvard Business School; Faculty Dean, Cabot House*

Michael D. Smith (Chair), *Edgerley Family Dean of the Faculty of Arts and Sciences; John H. Finley, Jr. Professor of Engineering and Applied Sciences*

*April 2018*

CONFIDENTIAL

HARV00097328