# EXHIBIT 238

CONFIDENTIAL--FOR USE OF SCHOOLS AND
SCHOLARSHIP COMMITTEES

## HARVARD COLLEGE ADMISSION POLICY

The following statement of the criteria used in selecting students for admission to Harvard College has been drawn up in response to a request made at a recent meeting in Cambridge by the representatives of the Harvard Club Committees on Scholarships and Schools. It describes as comprehensively and specifically as is possible in brief compass the policies that have been followed for many years by the Harvard College Committee on Admission. We hope it will be useful to the alumni who interview our applicants.

The Committee selects candidates for admission on the basis of certain broad criteria: (1) academic promise; (2) personal qualities of character, all-round effectiveness, stability, and purpose; (3) health and participation in athletic activities; (4) geographical distribution; and (5) Harvard parentage. In the paragraphs that follow we shall try to make clear how these criteria are defined, how they are related to one another, and how much importance is attached to each.

Admission to Harvard College is not so much admission versus rejection as it is selection of those best qualified from a large group of applicants. The process of selection necessarily rests on the informed judgment of the Committee, and involves a weighing of all the factors to be considered.

(1) Academic Promise. The matter of primary concern is whether the candidate will be able to do Harvard work and how well he will do it. An estimate of the student's academic promise is made by examining his secondary school record and his College Board test scores. These factors are summarized, for the use of the Committee, in a single index--the Probable Rank List (PRL),

2-

a statistical device based on the actual records in the freshman year of students who came to Harvard in previous years. Categories are established according to class standing in school combined with the results of College Board tests. Each entering student is assigned a PRL in accordance with the most typical standing of students with similar admission records in the past. Obviously this device gives only a rough approximation, and the Committee's estimate of an individual's academic promise is frequently modified by other evidence supplied by interviewers, school authorities, and others familiar with the applicant's intellectual qualities.

Ordinarily, a candidate of high academic promise has a better chance of admission than a candidate of lower promise, and the higher it is, the more important it is likely to become in the decision to admit. When the candidate's PRL is in the middle or lower ranges, other criteria assume increasing importance. No one is admitted, however impressive he may be in other respects, unless in the Committee's judgment, he has a reasonable chance of achieving at Harvard a satisfactory record ( 3 C's and a D) without damage to his personality because of excessive pressure of work and worry. Only in exceptional cases will a candidate be accepted whose PRL is below 6.0 ( i.e. Group 6).

(2) Personal Qualities. The difficult criterion of personal qualities is of major importance. It includes such intangibles as strength of character, emotional stability, personal and social adjustment, capacity for leadership, and motivation. Clearly it is not possible to appraise these qualities with a high degree of precision. Concrete indications of outstanding leadership, moral courage, high integrity, strong idealism and a sense of responsibility to the community carry great weight. Similarly, evidence of an unusually attractive

and well-adjusted personality counts heavily in favor of the candidate. A candidate of moderate academic promise may prove acceptable for admission if he has one or more outstanding personal qualities to his credit. The candidate who is definitely lacking in these qualities is not necessarily accepted, in spite of high academic standing.

In appraising the candidate's personal qualities, the Committee is careful not to confuse mere social immaturity resulting from a limited background with fundamental personality defects.

It is in the evaluation of these intangible personal qualities that **alumni representatives** can be most helpful to the College. Reports from the schools vary in the completeness of their information. For every candidate we need as much unbiased information as can be obtained--and this is likely to come best from our own alumni representatives who have an intimate knowledge of what Harvard wants and an interest in having the most desirable students at Harvard. It is important, particularly when there is strong evidence either way, that the interviewer's report shall contain positive statements with a citing of specific evidence to support them, if possible.

(3) <u>Health and Athletic Activities</u>. Health and physical vigour are factors in selection, but of less importance than those already mentioned. The presence of any significant health problem should be reported to the Committee. It will not necessarily lead to rejection. In fact, the Committee has gone out of its way to admit applicants with certain kinds of physical handicaps when, in the judgment of our doctors and the Committee, they could meet our requirements despite these handicaps. For the protection of the applicant and the College, however, the facts should be reported.

4 -

Outstanding athletic ability is a strong point in favor of a candidate. Regardless of how promising an athlete a candidate may be, however, he will not be admitted unless he is of sound character and has the required academic promise and the will to profit from a Harvard education. In fairness to the candidate it is particularly important that one who has athletic promise but limited means should not be encouraged to come to Harvard unless his budget plans enable him to meet college expenses without excessive strain.

(4) <u>Geographic Distribution</u>. The Admission Committee has set up no geographic quotas. Special preference, however, is given to residents of Cambridge and to areas from which we draw comparatively few students such as rural regions and small towns throughout the country. The purpose of this policy is to maintain, and extend Harvard's character as a national college, which contributes to the educational value of undergraduate experience at Harvard and to the service which the College renders to the country. Unless weight were given to geographic distribution in the selection of applicants, Harvard would have fewer students from the more distant parts of the country where our drawing power is naturally smaller. The geographic factor is of course only one of the several considerations which the Committee takes into account.

(5) <u>Harvard parentage</u>. Although no candidate is admitted solely because his father is a graduate of Harvard, nevertheless it is customary to admit sons of alumni provided they qualify academically and appear to have good character, a stable personality, and a sincere desire to obtain a liberal education at Harvard. If they are academically marginal, the fact of Harvard parentage carries less weight with the Committee.

The same policy is followed for sons of the Harvard faculty and non-academic staff.

The existence of a Harvard brother or a Harvard ancestor other than a father has a somewhat smaller effect on the Committee's decisions, but it is taken into account.

December 12, 1949

## FAIR EDUCATIONAL PRACTICES LAW

The Massachusetts legislature enacted in 1949 a Fair Educational Practices Act which forbids discrimination because of race, religion, creed, color or national origin in the selection of applicants for admission to an educational institution. The law also forbids schools and colleges to make or cause to be made any written or oral inquiry concerning the race, religion, color or national origin of a person seeking admission.

Harvard is in full agreement with the purpose of this act and intends to obey it both in letter and in spirit. The policy embodied in the law is one which Harvard has tried to follow in admissions, in awarding scholarships, and in the treatment of students. The law specifically states that it is not intended "to limit or prevent an educational institution from using any criteria other than race, religion, color or national origin in the admission of students." We intend, therefore, to continue to select in accordance with the policies explained above which we have followed for many years.

It is important that all who assist in any way in the work of the Scholarship and Admission Committees be aware of the provisions of the law and take pains to comply with its requirements. Not only should they be careful, as they have been, not to be influenced by the considerations mentioned above, but they must not make any inquiries about any of these matters or give any information to the College about them.