# EXHIBIT 257

# AFFIRMATIVE ACTION AND THE HARVARD COLLEGE DIVERSITY-DISCRETION MODEL: PARADIGM OR PRETEXT?

ALAN M. DERSHOWITZ
LAURA HANFT*

## INTRODUCTION

The Supreme Court's long-awaited decision in *Regents of the University of California v. Bakke*[1] has spawned an endless stream of commentary, criticism, and analysis, as college administrators, lawyers, and legislators attempt to decipher its 150 pages of studied ambiguity.[2]

The quest for the definitive interpretation of this effort by nine men to confront a set of perplexing social, moral, legal, and political issues within the narrow confines of a contrived judicial case and controversy is a futile one.[3] It would be a tragedy if the important debate over the role of race-specific affirmative action programs were to be deflected into such a quest.

This article does not attempt a systematic interpretation of the Justices' opinions, either individually or collectively. Nor does it purport to answer the fundamental constitutional question left open by the court: To what extent and under what circumstances may a state consider race *qua* race in the allocation of benefits among its citizens? Its purpose is to raise questions about some of the implications of *Bakke* and more specifically about Mr. Justice Powell's selection of the Harvard College admissions process as a model of fairness and constitutionality.

---

\* Mr. Dershowitz is Professor of Law at Harvard, where he has never served on any admissions committee. He was of counsel on the amicus curiae brief in *Bakke* submitted by The American Jewish Congress, American Jewish Committee, and several other organizations. Ms. Hanft is a student at Harvard Law School and was a college admissions officer elsewhere.

[1] 438 U.S. 265 (1978).

[2] Since *Bakke* was decided, in June 1978, there have been many law review commentaries analyzing the opinion. Among the more notable are several symposia of articles on issues raised by the *Bakke* decision. *E.g., A Symposium*: Regents of the University of California v. Bakke, 67 CALIF. L. REV. 1 (1979); Bakke *Symposium: Civil Rights Perspectives*, 14 HARV. C.R.-C.L. L. REV. 1 (1979); *Symposium: Equality in America: A Color-Blind Constitution?* 21 HOW. L.J. 481 (1978).

[3] *See* Brief of Amici Curiae for the National Urban League et al., Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265 (1978), arguing in opposition to grant of certiorari that petitioners attempted to stipulate to jurisdiction, *id.* at 13-19, and claiming that "the University's primary aim was to 'set the stage' for a judicial determination," *id.* at 16 n.10, and including correspondence between Bakke and Peter Storandt, Assistant to the Dean of Student Affairs/Admissions at the University of California at Davis, suggesting that Bakke apply a second time and that he consider legal action if not accepted, *id.* at app. A.

Sometimes Supreme Court decisions are far more important for what they could have done, but did not do, than for what they actually did. *Bakke* is such a case. Numerous briefs urged the Justices to legitimate racial quotas.[4] Other briefs urged them to strike down all affirmative action programs.[5] The Court collectively—though not all of the Justices individually—steered a middle course: it did not legitimate explicit racial quotas that disqualify certain individuals—on the basis of their race, religion, or ethnicity—from competing for a reserved number of places in a university class. Nor did it strike down affirmative action programs in which the minority racial status of a candidate is given some positive weight in the selection process.[6]

The delphic words of the Justices' opinions—though they may not contain any more wisdom than the millions of other words written about affirmative action[7]—stand as the only authoritative judicial

---

[4] Of the more than 50 briefs submitted amicus curiae in *Bakke*, those urging the legitimation of quotas, or as they are more innocuously termed, "targets," included the briefs of: Cleveland State University Chapter of the Black American Law Students Association; The Society of American Law Teachers; Asian American Bar Association of the Greater Bay Area; Fair Employment Practice Commission of the State of California; NAACP Legal Defense and Educational Fund; National Association of Minority Contractors et al.; National Fund for Minority Engineering Students; Black Law Students Union of Yale University Law School; Lawyers Committee for Civil Rights Under Law; NAACP; National Association of Churches of Christ et al.; Council on Legal Education Opportunity; Antioch School of Law; Legal Services Corporation; Native American Law Students of the University of California at Davis et al.; Mexican American Legal Defense and Educational Fund et al.; and the American Association of University Professors.

[5] Among the groups submitting briefs opposing all special programs for designated minorities were: Queens Jewish Community Council et al.; Order of Sons of Italy in America; Young Americans for Freedom; Anti-Defamation League of B'nai B'rith; Pacific Legal Foundation; Fraternal Order of Police et al.; Committee on Academic Nondiscrimination and Integrity et al.

[6] The Supreme Court, moreover, is not obliged to decide each of the sticky and divisive issues generated by its plethora of ambiguous phrases and footnotes. Among the most important powers possessed by the Supreme Court is the power to decide not to decide. This doctrine is most clearly articulated in Ashwander v. TVA, 297 U.S. 288, 346-49 (1936) (Brandeis, J., concurring). *See also* A. BICKEL, THE LEAST DANGEROUS BRANCH 69-72, 111-98 (1962). By the exercise of its discretion to review or not to review the decision of lower courts, the Supreme Court can allow these lower courts—both state and federal—to muddle through with inconsistent decisions until the Justices deem the occasion ripe for yet another foray into the admissions thicket. *See id.* at 126-27.

[7] *See, e.g.*, 438 U.S. at 288 n.25, 315 n.50 (citing Ely, *The Constitutionality of Reverse Racial Discrimination*, 41 U. CHI. L. REV. 723 (1974); Greenawalt, *Judicial Scrutiny of "Benign" Racial Preference in Law School Admissions*, 75 COLUM. L. REV. 559 (1975); Kaplan, *Equal Justice in an Unequal World: Equality for the Negro*, 61 NW. U.L. REV. 363 (1966); Karst & Horowitz, *Affirmative Action and Equal Protection*, 60 VA. L. REV. 955 (1974); O'Neil *Racial Preference and Higher Education: The Larger Context*, 60 VA. L. REV. 925 (1974); Posner, *The DeFunis Case and the Constitutionality of Preferential Treatment of Racial Minorities*, 1974 SUP. CT. REV. 1; Redish, *Preferential Law School Admissions and the Equal Protection Clause: An Analysis of the Competing Arguments*, 22 U.C.L.A. L. REV. 343 (1974);

guideline available to university officials and will inevitably have a significant impact on the course of university admissions for the foreseeable future.[8] These words will be all the more important if other guidance is not forthcoming from the Court.[9]

---

Sandalow, *Racial Preferences in Higher Education: Political Responsibility and the Judicial Role*, 42 U. CHI. L. REV. 653 (1975); Sedler, *Racial Preference, Reality and the Constitution:* Bakke v. Regents of the University of California, 17 SANTA CLARA L. REV. 329 (1977); Seeburger, *A Heuristic Argument Against Preferential Admissions*, 39 U. PITT. L. REV. 285 (1977)).

[8] Although various guidelines and interpretations of the *Bakke* decision have appeared since June 1978, the task of admissions officers has not been notably clarified. The Office for Civil Rights of the Department of Health, Education and Welfare, for instance, recently published its own guideline for university officials. HEW, Nondiscrimination in Federally Assisted Programs; Title VI of the Civil Rights Act of 1964; Policy Interpretation, 44 Fed. Reg. 58,509 (1979) [hereinafter cited as Policy Interpretation]. This guideline, which was sent to the presidents of 3000 colleges, outlines permissible techniques that institutions of higher education may use to comply with the *Bakke* decision while continuing and expanding affirmative action programs under Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-4 (1974). The policy interpretation may, however, exacerbate the confusion. For example, while it notes quite correctly that "*Bakke* prohibits an institution from setting aside a fixed number of places for minority students," Policy Interpretation, *supra*, at 58,510, the interpretation nevertheless allows an educational institution to "[e]stablish and pursue numerical goals to achieve the racial and ethnic composition of the student body it seeks," *id.* at 58,511. The interpretation does not indicate how such numerical goals are to be actively pursued without producing, in practice, precisely the kind of racial set-aside that was declared unconstitutional in *Bakke*, 438 U.S. at 315-20. *See H.E.W. Offers Guide on Bakke Decision,* N.Y. Times, Oct. 11, 1979, at A15, col. 6.

Similarly, the HEW guidelines approve the use of goals and affirmative programs based on race "to overcome the effects of conditions that have resulted in limited participation by persons of a particular race." Policy Interpretation, *supra*, at 58,511. In *Bakke*, Justice Powell explicitly found that *neither* the goal of increasing the numbers of traditionally disfavored minorities in medical schools *nor* the goal of countering the effects of societal discrimination was compelling enough to justify the use of race-based admissions. 438 U.S. at 305-10.

A recent study by the Anti-Defamation League of B'nai B'rith provides further evidence that the *Bakke* mandate may be widely misunderstood and misinterpreted. Answers received by June 1979 from 272 professional schools to a questionnaire about admissions policy and practice revealed that:

> Sixteen schools maintain facially discriminatory admissions procedures based on ethnic/racial classifications clearly in violation of *Bakke*. Another twenty schools maintain admissions procedures that are visibly suspect with respect to the ethnic/racial classifications made illegal by *Bakke*. These procedures range from fixed quotas and goals (or their numerical equivalents) to a stated special consideration or special preference policy for minority groups.

*A Study of Post-Bakke Admissions Policies in Medical, Dental & Law Schools Throughout the United States*, RIGHTS, Summer 1979, at 1 (*Rights* is a periodic report of the Anti-Defamation League of B'nai B'rith, 823 United Nations Plaza, New York, N.Y. 10017) [hereinafter cited as ADL Study].

One conclusion to be drawn from these reports is that the impact of the *Bakke* decision on admissions practice may be less than anticipated. Universities may either ignore it entirely, or, with the encouragement of HEW, ignore part of its substance by pursuing "numerical goals" and other race-based admissions procedures.

[9] Last term, in United Steelworkers v. Weber, 99 S. Ct. 2721 (1979), the Supreme Court interpreted the legislative history and context of § 703(a) and (d) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(d) (1974), to permit a voluntary affirmative action plan that was collectively bargained by an employer and a union to reserve for black employees 50% of

Perceived through a morass of rhetoric, citations, footnotes, and dicta, the bottom line seems to be that a five-man majority of the Supreme Court has held—for a variety of irreconcilable reasons—that the type of admissions program used by Davis Medical School of the University of California does not pass constitutional and/or statutory muster, while the type used by Harvard College does. Justice Powell—whose opinion contained the judgment of the Court—expressly singled out the Harvard College admissions system for approval.[10] He quoted extensively from the description of the Harvard program contained in the amici curiae brief submitted by Harvard, Columbia, Stanford, and Pennsylvania Universities[11] and concluded:

> In such an admissions program, race or ethnic background may be deemed a "plus" in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats. . . . In short, an admissions program operated in this way is flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight.[12]

Thus, instead of attempting to define the factors that would satisfy the constitutional and statutory standards, Justice Powell apparently found it easier to refer to an existing system.[13]

---

the openings in an in-plant training program. In its opinion the Court emphasized the differences between Title VII (relating to employment and passed under commerce clause powers) and Title VI, at issue in *Bakke* (relating to education and passed as part of the government's power to regulate the use of federal funds) noting that the two "cannot be read *in pari materia*," 99 S. Ct. at 2729 n.6. The *Weber* decision was thus explicitly narrow in scope and its application restricted to the employment context. As such, it is substantially irrelevant to the issues of educational policy and statutory interpretation in *Bakke*.

[10] Section V-A of Powell's opinion focuses on the "illuminating example" of Harvard College. 438 U.S. at 315-19.

[11] *Id.* at 316-17 (quoting Brief of Columbia University, Harvard University, Stanford University and the University of Pennsylvania as Amici Curiae [hereinafter cited as Universities Amici Curiae Brief]. A four-page description of the Harvard College admissions process was included as an appendix to both the Powell opinion, 438 U.S. at 321 app., and the amici curiae brief submitted by the four universities, Universities Amici Curiae Brief, *supra*, at app.

[12] 438 U.S. at 317 (footnote omitted).

[13] The Harvard diversity model rejects the notion of quotas in favor of a selection process that evaluates each applicant individually on the basis of his or her unique qualities. One would expect the percentage of specified minority enrollees produced by such a system to vacillate widely from year to year, reflecting changes in each year's applicant pool.

It is questionable, however, whether Harvard University follows *in practice* the dictates of its own "diversity-discretion model." An article in the undergraduate newspaper reported these percentages for black students:

1979] AFFIRMATIVE ACTION 383

It is the thesis of this article that Justice Powell erred seriously in selecting the Harvard College admissions system as the guidepost of constitutionality. To begin with, there are three technical reasons why Justice Powell blundered in selecting Harvard College as a model for other colleges and professional schools. First, an admissions system developed in the context of Harvard's unique abundance of wealth and enormous pool of applicants will necessarily have only limited applicability at institutions with lesser resources.[14] Second, an *undergraduate* admissions system is hardly the appropriate model for

| Class | Percentage of Black Students |
|---|---|
| 1963 | 1 |
| 1969 | 3 |
| 1972 | 3 |
| 1973 | 7 |
| 1974 | 7 |
| 1975 | 7 |
| 1976 | 7 |
| 1977 | 7 |
| 1978 | 7 |
| 1979 | 7 |
| 1980 | 8 |
| 1981 | 7 |

Melnick, *Minority Recruitment at Harvard: Still a Ways to Go*, Harvard Crimson, Jan. 23, 1978, at 2, col. 1, at 3, cols. 1-4.

The inference is inescapable that a decision to increase the number of black students was made in the late sixties (the class of 1973 started college in 1969). Since that time, the percentage of black students—with the single exception of the class of '80—has not varied even one percentage point in either direction.

In the face of such stubbornly constant percentages, it is difficult to avoid the inference that some sort of implicit racial "target" or "quota" may be operating in the admissions process.

[14] Over the last sixty years, Harvard has developed and refined an admissions model that capitalizes on its advantages. *See* P. Feldman, Recruiting an Elite: Admission to Harvard College (1975) (unpublished Ph.D. dissertation in Harvard archives). Because almost all of Harvard's thousands of applicants present uniformly high academic credentials, discrimination among applicants can be made on some basis other than a straightforward selection of the most academically qualified. And because Harvard is the wealthiest school in the world, it need not accept most of its financially able applicants in order to assure the university's economic stability. Free of qualitative and economic constraints that are essential elsewhere, Harvard has the luxury of developing an admissions philosophy that emphasizes less essential criteria such as diversity, personal talents, and character traits.

Institutions with severely limited financial resources and inadequate numbers of applicants will continue to make their decisions with proportionately less selectivity, and such schools will not find much of practical value in Harvard's approach. Although every admissions office in the country will now paraphrase and purport to follow the *Bakke* mandate, most admissions decisions will continue to be made on the basis of the same limited spectrum of factors that have informed them in the past. *See* ADL Study, *supra* note 8 (documenting universities' unresponsiveness to *Bakke*).

professional or graduate schools.[15] Third, Harvard University is a private institution whose legal obligation not to discriminate derives from statutes such as Title VI of the 1964 Civil Rights Act;[16] the

---

[15] Justice Powell's Harvard analogy is flawed because the diversity-discretion system described at length by Powell is simply not a description of the selection process at Harvard Medical School, Harvard Law School, or, in fact, at any of Harvard's graduate programs. Instead, it describes the admissions model used to admit freshmen to Harvard College and ignores completely the enormous and crucially relevant differences between the admissions policies of elite professional schools and those of elite undergraduate colleges.

Some colleges purport to seek diversity among the musical and athletic talents, subject matter interests, backgrounds, and genealogies of their students (though the motive behind this quest for diversity is by no means "without controvery"). Universities Amici Curiae Brief, *supra* note 11, at 12. Law schools and medical schools have traditionally paid far less attention to such diversifying considerations, with the possible exception of geography. Indeed, the Harvard Law School in particular has prided itself over the years—and has been praised—for its almost single-minded commitment to a meritocratic admissions policy.

Although Justice Powell may not be expected to be familiar with the ins and outs of university admissions, the same excuse cannot be made for the attorneys who wrote the amici brief on behalf of Harvard, Columbia, Pennsylvania and Stanford Universities, from which Powell quotes so extensively. *See* note 11 *supra* & accompanying text. These attorneys included the deans of the *law* schools at each of these universities, acting in their "individual" capacities as lawyers. *See* Universities Amici Curiae Brief, *supra* note 11, at 2 n.1.

In Section I of the brief, which argues that "the Inclusion of Qualified Minority Group Members in a Student Body Serves Important Educational Objectives," *id.* at 11-14, the general discussion of factors which contribute to student diversity is followed by the conclusion that "[a]cademic ability has not, therefore, been the sole criterion for selecting students at our institutions." *Id.* at 12. This conclusory statement seems to imply that the principle of diversity is actively applied in professional school admissions as well as in freshman admissions. Yet the appendix describing Harvard College admissions, relied on in the body of the brief as the source for all conclusions about Harvard's successful diversity-seeking program, describes only freshman admissions. *Id.* at app. Also, the seemingly inclusive footnote to the text pointing out that the Harvard description "applies generally to the selection of undergraduates at the other three amici institutions," *id.* at 12 n.5, actually serves the purpose of excluding all graduate and professional schools from the ambit of the Harvard description. Another footnote observes with apparently studied vagueness that "some of our professional schools give great weight to predicted academic performance and hence relatively less weight than our undergraduate and other professional schools to the other factors mentioned here." *Id.* at 12 n.4. In fact, a close reading of the brief discloses that the actual factors relied on at Harvard in the medical school admissions process, presumably at issue in the *Bakke* case, are never described specifically at all.

Thus, although the Universities Amici Curiae Brief contained the technically necessary caveats disclosing that there are differences between professional and undergraduate admissions policies, *id.* at 11-12, these differences were made to seem like mere matters of degree when—in fact—they are plainly matters of kind.

It is fair to ask why law school professors and deans, undoubtedly familiar with the critical differences between graduate and undergraduate admissions, nevertheless chose to highlight the admissions policy of an undergraduate college in cases involving law school and medical school admissions programs. The most probable answer, in light of the obvious differences between the two, is that the policies of their own professional schools were not described because they would probably not have supported the diversity argument the brief-writers were seeking to make.

[16] 42 U.S.C. §§ 2000d to 2000d-4 (1974).

Davis Medical School, on the other hand, is a state institution governed directly by the United States Constitution.[17] But Mr. Justice Powell's focus on the Harvard College admissions process was worse than a simple blunder. By approving the Harvard College system—the paradigm of the "diversity-discretion model" of admissions—Mr. Justice Powell legitimated an admissions process that is *inherently capable* of gross abuse and that, as we will demonstrate, *has in fact been deliberately* manipulated for the specific purpose of perpetuating religious and ethnic discrimination in college admissions.

Indeed, the historical evidence points inexorably to the conclusion that the current Harvard College admissions system was *born* out of one of the most shameful episodes in the history of American higher education in general, and of Harvard College in particular. We will attempt to demonstrate that, aside from the origins and past abuses of the Harvard College admissions model, its present use—for the ostensible purpose of enhancing the educational diversity of the student body—serves largely as a pretext for the commendable, but legally questionable and politically controversial, goal of simply increasing the number of minority persons in the universities and in the professions that these universities feed. We will argue that Harvard's current claim to be seeking diversity as a means of improving

---

[17] This public/private distinction means that the University of California, as an arm of the state, must obey the 5th and 14th amendments of the Constitution by not violating due process and by not denying equal protection to any student, faculty member, or administrator, and it must also obey statutes which proscribe discriminatory behavior "under color of state law." The policies and acts of a private university such as Harvard, however, have been held not to be "state action" and not subject to constitutional scrutiny. *See, e.g.,* Krohn v. Harvard Law School, 552 F.2d 21, 25 (1st Cir. 1977) (holding Harvard Law School admissions policies not "state action" for purposes of an attack under the Civil Rights Act of Apr. 20, 1871, 42 U.S.C. § 1983 (1974)).

This distinction may, however, mean less in the *Bakke* context than would appear at first blush. Because Harvard, like most private universities, accepts federal funds for educational purposes, it is subject to the nondiscrimination requirement of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-4 (1974). Justice Powell, at the outset of his opinion in *Bakke* found that the legislative history of the Act showed that Title VI incorporated a constitutional standard, and that it "must be held to proscribe only those racial classifications that would violate the Equal Protection Clause [of the fourteenth amendment] or the Fifth Amendment." 438 U.S. at 287. The opinion goes on to find that the University of California's system violates the 14th amendment, 438 U.S. at 320, while a student processed by a system of "individual consideration" such as Harvard's "would have no basis to complain of unequal treatment under the Fourteenth Amendment," 438 U.S. at 318.

Whether the equal protection standard is applied to the state university as part of a straightforward 14th amendment analysis, or whether it is applied to a private university by incorporation into Title VI, the result appears to be the same: the University of California at Davis program is not permissible, but the Harvard program is. Thus the *Bakke* mandate would appear to apply equally to all schools that either are state-run or accept federal funds.

the educational experience of its students obscures the real issue in the debate over race-specific affirmative action admissions policies, and further that the Court's acceptance of that claim as a sufficient justification for considering race *qua* race in an admissions process creates an unnecessary and dangerous constitutional precedent. We will conclude that the Court should have approached the issues in a more explicit and direct manner by deciding whether the admirable goal of increasing the number of minority persons in the universities and professions could be achieved by less race-specific alternatives than the consideration of race as such in the admissions process.

Part I of this article will document the origins and history of the current Harvard College admissions system;[18] Part II will demonstrate that the "diversity-discretion" model is still being employed to mask its true purposes;[19] Part III will argue that Justice Powell, by accepting the claim for diversity as a sufficiently compelling ground for considering race, has trivialized the real issues and created a dangerous precedent;[20] and Part IV will suggest some alternative approaches that could have been—and in our view, should have been—explored by the Court before it legitimated the consideration of race as a factor in the admissions decision.[21]

## I. THE UNSAVORY ORIGIN OF THE HARVARD COLLEGE "DIVERSITY-DISCRETION" MODEL OF ADMISSIONS

An understanding of the unsavory origin of the twin concepts—diversity and discretion—is essential to an evaluation of the admissions process legitimated by Justice Powell's opinion in *Bakke*.

Before the mid-1920's, admission to Harvard College was open to anyone who met the relatively stringent academic requirements and who, with the exception of a few scholarship students, could afford to pay the tuition.[22]

Between 1890 and 1920, admissions requirements began to be standardized and made more academically rigorous.[23] This movement, which was designed in part to enable boys from public high schools around the country to apply to Harvard, produced the so-

---

[18] *See* text accompanying notes 22-68 *infra*.
[19] *See* text accompanying notes 69-87 *infra*.
[20] *See* text accompanying notes 88-103 *infra*.
[21] *See* text accompanying notes 104-32 *infra*.
[22] P. Feldman, *supra* note 14, at 1, 7. *See also* S. STEINBERG, THE ACADEMIC MELTING POT 20 (1974).
[23] F. RUDOLPH, THE AMERICAN COLLEGE AND UNIVERSITY 436-38 (1962).