UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC.,<br><br>      Plaintiff,<br><br>  v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION),<br><br>      Defendant. | Civil Action No. 1:14-cv-14176-ADB |

## DECLARATION OF ROBIN WORTH

I, Robin Worth, hereby state under the penalty of perjury that the following statements are true and accurate to the best of my knowledge, and that I could testify to these matters if called to do so:

1. I am the Director of International Admissions and a Senior Admissions Officer for the Harvard College Office of Admissions and Financial Aid.

2. I am submitting this Declaration to explain why certain information that the parties have filed with the Court should remain under seal, and why the disclosure of that information would cause harm to Harvard, its applicants, its alumni, its employees, or others.

3. The statements made herein are based on my personal knowledge and experience, and upon information made available to me in my official capacity as Director of International Admissions.

4. I joined Harvard's Office of Admissions and Financial Aid ("Admissions Office") in 1981 as an admissions officer and assumed the position of Director of International Admissions in 1990. I have held that position from 1990 to 1996 and from 2002 through the present.

5. In my capacity as Director of International Admissions, I help oversee the work of the Admissions Office. Among other things, I help manage the process of evaluating freshman and transfer applicants for admission to Harvard College, participate in that process directly, supervise and guide the work of admissions officers, run Admissions Committee meetings, recruit potential applicants for admission, and participate in the development of policies and guidelines for Harvard College's admissions process. By virtue of my position, I have an understanding about what information about the admissions process has been made public and the extent to which such information remains confidential.

**Admission to Harvard**

6. Harvard College admits very few applicants each year. More than 42,000 domestic and international students applied for admission to Harvard's Class of 2022; we admitted just over 2,000. In my experience, applicants to Harvard College expect and trust that Harvard College will keep all information disclosed in their applications confidential. We take our obligation to protect applicant privacy very seriously, and do not publicly distribute any student application files. Indeed, even within Harvard, access to application files is strictly limited. Students typically submit their applications electronically, and the applications are maintained in an Admissions Office database that has numerous safeguards in place to ensure the security of the data contained therein. The Admissions Office also has policies designed to ensure that any confidential applicant information located outside the database is stored securely.

7. Because admission to Harvard is so competitive, high school students often spend a great deal of time and money attempting to determine how best to position their applications for success. There is, indeed, an entire industry of independent, for-profit college counseling services, beyond the counseling made available by most secondary schools, that caters to these

desires.  To the extent information about the Harvard admissions process becomes public through this litigation, applicants and counselors who become aware of that information will undoubtedly try to use it to achieve a competitive advantage in the admissions process.

8.     Many families do not have the financial resources or social capital to avail themselves of these independent, for-profit college counseling services.  If confidential information about the admissions process emerges in this litigation, a few applicants with resources will gain access to that information and may derive a competitive advantage from that information, while applicants with fewer resources will not.

9.     Below, I address the specific risks posed by the disclosure of certain categories of information that I understand have been filed in connection with summary judgment submissions in this case, and that I understand the plaintiff, Students for Fair Admissions, Inc. ("SFFA"), seeks to file publicly rather than under seal.

**Admissions Officer Training Materials**

10.    The Admissions Office is able to evaluate tens of thousands of applicants each year only through the coordinated efforts of approximately 40 admissions and financial aid officers.

11.    Training of admissions officers includes both formal and informal components. Among the materials our admissions officers receive is a document updated annually known as the "Reading Procedures."  The Reading Procedures provide specific guidance to admissions officers on how to read application files, and include "coding guidelines" that describe the numerical rating system our office utilizes in evaluating application files.  Among other things, the Reading Procedures explain when to provide an application file to another officer for further review.

12. Admissions officers also receive a document known as the "Casebook." The Casebook consists of more than one hundred pages of edited student applications. Although the applicant names and high schools are changed, in some cases, the application materials (including essays, teacher recommendations, guidance counselor recommendations, and alumni interview reports) are largely unchanged. As part of the training process, we discuss the applications compiled in the Casebook with our admissions officers, using a separate document known as the Casebook Discussion Guide. The Casebook Discussion Guide describes the strengths and weaknesses of each applicant whose case is presented in the Casebook and describes how the actual applicant fared in the admissions process. For example, the discussion of the eleventh applicant in the 2012 Casebook Discussion Guide (Ellsworth Ex. 53 at HARV00018176) identifies the applicant's background, academic qualities, and extracurricular achievements, and assesses the ways in which these attributes stand out in the applicant pool and how they would allow the applicant to contribute to campus and take advantage of the opportunities Harvard offers.

13. These Admissions Office training materials have been developed over a period of many years. They are unique to Harvard, and Admissions Office employees understand that the Casebook and Casebook Discussion Guide are based on, in some instances, lightly edited student applications that were provided to Harvard in confidence. If disclosed publicly, I believe that it may be possible to identify some of the individuals whose applications are included in the Casebook, thus compromising applicant privacy. To my knowledge, all of the Admissions Office training materials are not readily publicly available.

14. The broad public dissemination of internal documents used to train admissions officers, including those described above, would have multiple adverse consequences to Harvard and its applicants. First, publication of the Casebook and Casebook Discussion Guide would compromise applicant privacy because some of the applications in the Casebook are thinly fictionalized. Separately, the for-profit college counseling industry would be very interested in these materials, as would future Harvard applicants, because they reveal how the Admissions Office considers applications in ways that could help applicants secure a competitive advantage. The possibility that applicants may change their behavior based on their knowledge of the inner-workings of the Admissions Office is profoundly troubling, not only because it will diminish the legitimacy of the admissions process, but because it could benefit those applicants with the most resources. Moreover, to the extent any applicant presents misleading information in an application based on his or her assessment of Harvard's internal documents and secures admission based, in part, on that false representation, the excellence of the Harvard student body may be diminished and the integrity of the admissions process jeopardized.

**Correspondence with Alumni**

15. Harvard College is fortunate to have a large number of alumni who volunteer each year on its behalf to conduct interviews of applicants for freshman admission. Admissions officers routinely communicate with alumni who serve as interviewers. These communications are maintained in confidence by the Admissions Office, consistent with the expectations of alumni who write to us.

16. Admissions officers also routinely correspond with alumni who do not serve as interviewers, but who write us regarding a range of topics such as their admission to Harvard, individual applicants to Harvard College, the Harvard College admissions process, and college

admissions in general. These communications are also maintained in confidence by the Admissions Office, consistent with the expectation of the alumni who write to us.

17. The public disclosure of communications between Harvard and its alumni as a result of this litigation would adversely affect the ability of the Admissions Office to carry out its mission, in at least two ways. First, full and frank communication with our alumni interviewers, including communication relating to applicants, is essential to the successful operation of our admissions process. If alumni fear that their communications might be disclosed, they will not convey their impressions of applications with the candor that we require. Second, even to the extent communications do not concern applicants, their public disclosure may well subject alumni to harassment and other invasions of their privacy. That will create a chilling effect that will make alumni less likely to assist Harvard in the future.

**Statistical Information**

18. The Admissions Office periodically generates documents that contain statistical information regarding applicant sex, geographic region, intended concentration, legacy status, socioeconomic status, and race. As to each of these characteristics, the documents typically indicate the number of applicants in each category, the number of students admitted from each category, and the rate of admission of applicants in that category.

19. The publication of these documents would have deleterious consequences for Harvard. Harvard does not publish the number of applicants falling into the categories listed on these documents, nor does it publish the admission rates for students within these categories. If this information is disclosed, applicants and independent, for-profit college consultants may attempt to reverse-engineer various aspects of the admissions decisionmaking process and the factors Harvard values. Applicants may then modify their behavior in some way (for example,

by falsely representing their intended concentration) in an effort to achieve a strategic advantage in the admissions process, which would undermine the legitimacy of the process. Further, those applicants who would be more likely to be advantaged by such efforts are those with the resources to afford independent for-profit college consultants.

20. Moreover, because these documents are essentially a series of snapshots of the tentatively admitted class—raw data pulled from Harvard's admissions database at different moments in time during the admissions cycle—their disclosure would provide Harvard's competitors with unprecedented insight into the inner workings of Harvard's admissions process. This presents competitive risk, as Harvard competes with its peers for a small number of elite applicants around the world.

21. I understand that SFFA seeks to publicly file additional documents that present statistical analysis of Harvard's applicant pool, of its tentatively admitted class, and of its admitted class. SFFA also seeks to publicly file documents that include granular information about admissions rates and yield rates, and the potential number of applicants Harvard could admit from each docket.

22. Harvard does not publish the information contained in these documents, and maintains these documents in confidence. The publication of these data could be harmful to Harvard in a number of ways, including the risks I described above.

**Other Admissions Office Process Documents**

23. I understand that in connection with its motion for summary judgment, SFFA seeks to publicly file a series of additional documents relating to the inner-workings of the Admissions Office. This includes handwritten notes used to lead admissions officer training

sessions, documents reflecting the criteria we use to identify high school students whom we wish to recruit through a direct mail campaign, and correspondence regarding individual applicants.

24. None of these documents is public. These documents, and the information contained therein, are maintained in confidence by the Admissions Office. They are not distributed beyond the Admissions Office.

25. The publication of these documents and the information contained within them could be harmful to Harvard in a number of ways. For example, as one part of its recruitment program, Harvard sends letters to a certain number of high school students. The number of letters Harvard sends, and the criteria our office uses to identify the students we recruit, are highly sensitive non-public information that would be valuable to Harvard's competitors, and could be leveraged to harm Harvard's competitive position. Separately, speaking notes from admissions officer training sessions contain references to individual applicants and matriculants who had every expectation of privacy. Finally, correspondence regarding individual applicants—whether with alumni interviewers, high school college counselors, parents, or internally—is also conducted with an expectation of privacy.

**Admissions Office Staff**

26. The Admissions Office has approximately 75 employees total, of whom approximately 40 serve on the Admissions Committee charged with making admissions decisions. The senior leadership of the office includes Dean of Admissions and Financial Aid William Fitzsimmons, Director of Admissions Marlyn McGrath, and Griffin Director of Financial Aid Sally Donahue. The three senior leaders frequently serve as the face of the Admissions Office to the press. Most of the office's staff do not have a similar role. For many admissions office employees, this is their first job after graduating from college. None of the

office's staff expected that working in the office would subject them to highly publicized and unfounded allegations like those advanced by SFFA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day, June 22, 2018.

*Robin M. Worth*
Robin Worth
Director of International Admissions
Harvard College Office of Admissions & Financial Aid