# EXHIBIT 99

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 2 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
                              HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 150

```
                    HIGHLY CONFIDENTIAL
                    ATTORNEYS' EYES ONLY


              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
    ---------------------------------
    STUDENTS FOR FAIR ADMISSIONS,   )
    INC.,                           )
              Plaintiff,            )
                                    ) CIVIL ACTION NO.
         V.                         ) 1:14-cv-14176
                                    )
    PRESIDENT AND FELLOWS OF        )
    HARVARD COLLEGE (HARVARD        )
    CORPORATION),                   )
              Defendant.            )
    ---------------------------------



                    D E P O S I T I O N
                          - of -
                   CAROLINE A. WEAVER
                       VOLUME II


     taken on behalf of the Plaintiff on Monday,
     March 6, 2017, at the offices of Langrock,
     Sperry & Wool, L.L.P., 210 College Street,
     Burlington, Vermont, commencing at 9:53 AM.



        COURT REPORTER:  JOHANNA MASSÉ, RMR, CRR
```

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 3 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 191

1    A.   I believe it was 1 to 4 as well.

2    Q.   1 being the best, 4 being the worst?

3    A.   1 would be the highest personal quality rating

4  you could achieve, and 4 would be the lower end.

5    Q.   Were there guidelines circulated to you as to

6  what -- as to how to score within these four

7  subcategories that we just mentioned?

8         MS. MOONEY:  Objection.

9    A.   Admissions officers received training on how

10  to read and review an application file.

11   Q.   Which included how to properly score each

12  subcategory that we just mentioned?

13   A.   The scoring was included in the training, yes.

14   Q.   And you had that training at the beginning of

15  your time at the Harvard admissions office?

16   A.   There was a -- an official training that we

17  went through; however, we were constantly receiving

18  feedback.

19   Q.   Going back to the personal score, what goes

20  into that score?

21        MS. MOONEY:  Objection.

22   A.   Personal qualities would be decided based on

23  many different things that were covered in the

24  application.

25   Q.   Such as what?

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 4 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 192

1    A.   A student's teacher recommendations could play
2  a role.
3    Q.   Would you agree that an applicant's race can
4  sometimes factor into the personal score?
5         MS. MOONEY:  Objection.
6    A.   No.
7    Q.   Why not?
8         MS. MOONEY:  Objection.
9    A.   An individual's personal qualities are
10 separate from their race.
11   Q.   After scoring each of these four areas, the
12 first reader would assign an overall score that is
13 independent of the component scores, correct?
14   A.   Could you repeat the question, please?
15   Q.   Sure.  After scoring each of the four areas,
16 being academic, athletic, extracurricular, and
17 personal, the first reader would then assign an overall
18 score that is independent of the component grades,
19 correct?
20        MS. MOONEY:  Objection.
21   A.   An applicant would also receive an overall
22 score that was not simply a summation of the individual
23 components.
24        And I'm ready for a break.
25        MR. CALDWELL:  Let's just go off the record.

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 5 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 194

1    Q.   How does one as a first reader compute the
2    number for the overall score?
3         MS. MOONEY:   Objection.
4    A.   The overall score would be -- would reflect
5    your recommendation to move forward with an application
6    or not.
7    Q.   If you wanted -- if you thought the
8    application should move forward in the process, what
9    score or scores would you assign the application?
10        MS. MOONEY:   Objection.
11   A.   A score of a 3 or higher, so a 3, 2, or 1,
12   would reflect an admissions officer's desire to have
13   continued conversations about the application.
14   Q.   How does the applicant's race factor into the
15   overall score?
16        MS. MOONEY:   Objection.
17   A.   I wouldn't say that it factors in directly.
18   Q.   But it does factor in indirectly in instances?
19        MS. MOONEY:   Objection.
20   A.   An applicant's race becomes important in cases
21   where the applicant makes that an important part of
22   their folder, if it's an important part of their
23   identity and the way they express themselves in their
24   application.
25   Q.   How do you determine whether an applicant's

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 6 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                    Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 197

1    Q.   What effect does legacy status have on
2  admissions at Harvard?
3    A.   Legacy status is one small factor that is
4  acknowledged amidst a wide range of other qualities and
5  qualifications for an applicant.
6    Q.   Is it acknowledged positively?
7         MS. MOONEY:  Objection.
8    A.   I wouldn't generalize that legacy status is
9  always viewed as positively, no.
10   Q.   So you're saying if a student had legacy
11 status, if his parents or her parents or grandparents
12 went to Harvard, that could be viewed as negatively?
13        MS. MOONEY:  Objection.
14   A.   Legacy status related only to the student's
15 biological parents, I believe.  You said grandparents.
16 That would not apply.
17   Q.   So -- thank you for clarifying.  So when we're
18 talking about legacy status, that would only apply to
19 the student's biological parents?
20   A.   I'll say parents.  I'm not sure if biological
21 is important or not.
22   Q.   It's noted.  Would that ever be viewed
23 negatively towards an applicant?
24        MS. MOONEY:  Objection.
25   A.   I wouldn't use the words "negatively" or

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 7 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                    Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 200

1    Q.   What is donor status in the context of Harvard
2    admissions?
3    A.   What do you mean?  Could you rephrase the
4    question?
5    Q.   Sure.  For any applicants, is it marked on
6    their folder that someone affiliated with the applicant
7    is a donor to Harvard?
8    A.   No.
9    Q.   Is that scored in any particular way for an
10   applicant?
11   A.   No.
12   Q.   And you may have already answered this, but is
13   it noted in any way, either on or off the applicant's
14   folder, that an applicant is affiliated with a donor?
15        MS. MOONEY:  Objection.
16   A.   Not that I can recall.
17   Q.   And do you recall any instance in which an
18   applicant being affiliated with a donor influenced the
19   admissions decision -- admission office's decision on
20   the applicant?
21        MS. MOONEY:  Objection.
22   A.   Not specifically, no.
23   Q.   So you're saying if an applicant was
24   affiliated with a major Harvard donor, you as an
25   admissions officer wouldn't know that?

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 8 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 201

1           MS. MOONEY:  Objection.
2      A.   Correct.  We would not necessarily have known.
3      Q.   But in some cases you would know, correct?
4           MS. MOONEY:  Objection.
5      A.   It's possible.
6      Q.   And when you do know that an applicant is
7  affiliated with a major Harvard donor, is that factored
8  into whether the applicant gets into Harvard?
9           MS. MOONEY:  Objection.
10     A.   No, it does not change the way that a
11 student's application is reviewed.
12     Q.   Are applicants who are affiliated with donors
13 disproportionately white?
14          MS. MOONEY:  Objection.
15     A.   I don't know.
16     Q.   Could Harvard achieve a more racially diverse
17 class if it stopped taking into account donor status of
18 applicants?
19          MS. MOONEY:  Objection.
20     A.   That question implies that Harvard does in
21 fact take account of donor status.  That's not
22 something that I was made aware of when I was reading
23 folders.
24     Q.   Are you familiar with something called the
25 dean's list in the context of the admissions office?

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 9 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 202

1    A.   Many students achieved dean's list honors at
2    their high school.  We had a very qualified academic
3    pool of applicants.
4         Q.   Are you familiar with anything called the
5    director's list that was used to identify certain
6    applicants in the admissions process?
7         A.   Not that I can recall.
8         Q.   Would a dean or a director of Harvard ever
9    give the admissions officer a list of applicants that
10   he or she wanted to promote during the admissions
11   process?
12        A.   Can you repeat the question, please?
13        Q.   Sure.
14             MR. CALDWELL:  Can you read it back.
15             (The record was read as follows:  "Would a
16        dean or a director of Harvard ever give the
17        admissions officer a list of applicants that
18        he or she wanted to promote during the
19        admissions process?")
20             THE WITNESS:  Thank you.
21             I never received a list of applicants from a
22   dean or director.
23   BY MR. CALDWELL:
24        Q.   Are you aware of any such lists?
25        A.   Could you clarify what dean you're talking

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 10 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                    Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 203

1    about?  Is this a dean of Harvard College?
2         Q.   I'm referring to any dean affiliated with
3    Harvard.
4         A.   I believe that Dean Fitzsimmons had a list of
5    cases that he was interested in.
6         Q.   What do you know about that list?
7         A.   Very little.
8         Q.   Tell me what you do know about that list.
9              MS. MOONEY:  Objection.
10        A.   I would only be speculating.
11        Q.   Do you know if applicants on that list go
12   through the same process as a standard applicant
13   through Harvard admissions?
14             MS. MOONEY:  Objection.
15        A.   The applicants would be treated fairly and
16   equitably through the process.
17        Q.   Would they be treated the same, or do you
18   know?
19        A.   I never experienced a time in which I was
20   asked to give an applicant different treatment in the
21   way that I reviewed all of the other applicants.
22        Q.   And you have no personal knowledge what, if
23   any, different treatment the list of applicants on the
24   list for Dean Fitzsimmons which you just mentioned had
25   compared to the other applicants; you don't know one

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 11 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017    Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 204

1  way or the other, correct?
2          MS. MOONEY:  Objection.
3     A.   My experience in the admissions office was
4  that all candidates were reviewed in the same form.
5     Q.   If an applicant has a familial or personal
6  connection to a Harvard employee, is that fact
7  considered as part of the admissions process?
8     A.   There is a place on the student's application
9  where they can check whether or not they're related to
10 a faculty or staff member at Harvard.
11    Q.   How is -- how significant is that factor
12 considered?
13         MS. MOONEY:  Objection.
14    A.   It's one small factor among a list of many
15 that are considered for a student's candidacy.
16    Q.   Do you recall instances of whether an
17 applicant who has a familial or personal connection to
18 a Harvard employee was -- was -- let me rephrase.
19         Do you recall an instance of where an
20 applicant who has a familial or personal connection to
21 a Harvard employee, whether that fact increased his or
22 her chances of getting into Harvard based on that?
23         MS. MOONEY:  Objection.
24    A.   Again, it's one very small component, and it
25 would depend entirely on the individual applicant, but

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 12 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017          Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 248

1    and every spot counted.  Sometimes it came down to one
2    or two people at the end of the process that needed to
3    be taken out to hit the correct number for admitted
4    applicants.
5        Q.   So when exactly in the process is the lop list
6    generated?
7        A.   It could happen at a couple different points
8    throughout the process.
9        Q.   What's the first point in the -- in the
10   admissions process in which you recall a lop list being
11   generated?
12       A.   When I was there, at the end of my
13   subcommittee meetings, we would sometimes compile a lop
14   list.
15       Q.   And when else do you recall a lop list being
16   compiled further on in the process?
17       A.   At one point when I was there during full
18   committee, some of my subcommittees met to produce an
19   additional list of vulnerable candidates in case we
20   would have to reduce the size of the class.
21       Q.   Was that at the directive of someone within
22   the full committee?
23       A.   I'm not sure.
24       Q.   What information besides the applicant's
25   identity is included within the lop list?

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 13 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 249

1    A.   As far as I can recall, the lop list was
2    simply a list with the name of the student and perhaps
3    the page of the docket they were on.
4         Q.   Would the lop list include an applicant's
5    ethnicity?
6         A.   I don't remember including ethnicity on any of
7    my own lop lists.
8         Q.   When you say "your own lop lists," are you
9    referring to lop lists applicable to an entire
10   subcommittee?
11        A.   Different subcommittees had different
12   processes for creating lop lists.
13        Q.   Would you ever have a lop list created only
14   for candidates which you were a first reader on which
15   were specific to you as an admissions officer?
16        A.   Yes, that could have happened.
17        Q.   And were lop lists also created for an entire
18   subcommittee?
19        A.   Yes, that could also happen.
20             MR. CALDWELL:   7 and 8.
21             (Deposition Exhibit Nos. 7-8 were
22             marked for identification.)
23   BY MR. CALDWELL:
24        Q.   All right, Ms. Weaver.  You've just been
25   handed what has been marked as Exhibits 7 and 8.

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 14 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 250

1    Starting with 7, can you take a look at this two-page
2    document.  Take some time, review it, and let me know
3    when you're done reviewing it.
4         A.   Okay.  I've reviewed Exhibit 7.
5         Q.   Okay.  Starting with the first page, can you
6    describe what this is?
7         A.   This is the first time I'm seeing this
8    document.
9         Q.   So you've never seen a document like this
10   during your time at -- at Harvard?
11        A.   I don't recall seeing this specific document.
12        Q.   Do you recall seeing a document which
13   contained the same information as this document?
14        A.   This appears to be a lop list.  When I was
15   there in the two years, there were times that I created
16   my own lop lists and submitted them.
17        Q.   All right.  Turning to page two of the
18   exhibit, do you recognize this form at all?
19        A.   This is the first time I've seen this specific
20   form.
21        Q.   When you were asked to create your own lop
22   lists, did you work off a standardized form, or did you
23   create a form?
24        A.   I did not work off a standardized form.
25        Q.   So you created your own form?

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 15 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                    Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 251

1    A.   If I was asked to submit a list of vulnerable
2    candidates, I would write it on a piece of paper.
3    Q.   And when a subcommittee you were involved with
4    was asked collectively to create a lop list, did those
5    subcommittees use standardized forms or create their
6    own form?
7         MS. MOONEY:  Objection.
8    A.   I'm not sure.  You'd likely have to discuss
9    that process with the chair of the docket.
10   Q.   Well, do you have any personal knowledge as a
11   member of subcommittees which were asked to create lop
12   lists what was done in response to the request?  Was a
13   standardized form filled out, or was a new form
14   created?
15        MS. MOONEY:  Objection.
16   A.   I don't know.
17   Q.   Was that a document you were privy to?
18   A.   I don't believe there was a case in which I
19   saw a chair's final lop list.
20   Q.   I'm looking at the first page of this exhibit.
21   Underneath "Chair," do you see the column which is
22   "ETH"?
23   A.   Yes.
24   Q.   Is that shorthand for ethnicity?
25   A.   It could be.

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 16 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                    Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 296

1        certain percentage of Asian admittees in a
2        given year?")
3             THE WITNESS:  Based on my experience, I can't
4   think of a way in which the process could be
5   manipulated.
6   BY MR. CALDWELL:
7        Q.   What about through the lop list that we
8   discussed earlier?
9             MS. MOONEY:  Objection.
10       A.   A lop list is not intended nor can I think of
11  a way in which it would be designed to manipulate the
12  admissions process.
13       Q.   Well, if students were listed by their
14  ethnicity on a lop list, couldn't that be used as a way
15  potentially to lop students off of a certain ethnicity?
16            MS. MOONEY:  Objection.
17       A.   You're proposing that it's possible.  I'm
18  telling you that in my experience there in the two
19  years that I was working that's not how the lop list
20  was used.
21       Q.   Understood.  But it's possible that it could
22  be used in that way, correct?
23            MS. MOONEY:  Objection.
24       A.   I don't think it's possible, because
25  individuals who were submitted on a lop list were not

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 17 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 297

1    necessarily lopped, and the entire full committee then
2    reviewed the individual application before a student
3    was voted to stay in the class or removed from the
4    class.
5        Q.   But the individuals on the lop list, their
6    ethnicity is tracked on that list, correct?
7             MS. MOONEY:   Objection.
8        A.   You showed me a document that was collected
9    from Harvard.  That was not a document that I was
10   familiar with.
11       Q.   You'd agree that those documents -- you're
12   referring to the lop list exhibits that were previously
13   marked, correct?
14       A.   Yes.
15       Q.   You'd agree that both those documents had the
16   abbreviation ETH on them, correct?
17       A.   They had that as a column header.
18       Q.   I want to return to discussing your role as
19   alumni liaison.  Okay?
20       A.   Okay.
21       Q.   One of your responsibilities at Harvard
22   admissions was working with the alumni interviewers,
23   correct?
24       A.   "Working with them" is a very general term.
25       Q.   You were one of two alumni liaisons, correct?

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 18 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017                Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 314

1    inappropriate personally?
2         A.   Could you repeat that?
3              MS. MOONEY:  Objection.
4         Q.   Do you think the way race is used in Harvard's
5    admissions process is inappropriate?
6              MS. MOONEY:  Objection.
7         A.   No, I do not think it's inappropriate.  It's a
8    small factor that's considered for some applicants
9    depending on the student's individual application.
10        Q.   Personally, do you question the
11   appropriateness of Harvard's use of legacy in the
12   admissions process?
13             MS. MOONEY:  Objection.
14        A.   I don't personally question the use of legacy,
15   either.
16        Q.   And you don't find the use of legacy
17   inappropriate in any way?
18             MS. MOONEY:  Objection.
19        A.   I don't find it inappropriate, no.
20             MR. CALDWELL:  That's all the questions I have
21   for you at this time.  Thank you, Ms. Weaver.
22             THE WITNESS:  Thank you.
23             MS. MOONEY:  No questions on our end.
24             (The deposition concluded at 3:01 PM.)
25

Case 1:14-cv-14176-ADB   Document 438-2   Filed 07/27/18   Page 19 of 19

Weaver, Caroline A. - Vol. II - 3/6/2017     Students for Fair Admissions, Inc. v. President and Fellows of Harvard College
HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 316

C E R T I F I C A T E

    I, Johanna Massé, RMR, CRR, Court Reporter and Notary Public, do hereby certify that the foregoing pages, numbered 154 through 314, inclusive, are a true and accurate transcription of my stenographic notes of the Deposition of Caroline A. Weaver, who was first duly sworn by me, taken before me on Monday, March 6, 2017, commencing at 9:53 AM, in the matter of Students for Fair Admissions, Inc. v. President and Fellows of Harvard College (Harvard Corporation), Civil Action No. 1:14-cv-14176, as to which a transcript was duly ordered.

    I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this transcript was produced, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

_____
JOHANNA MASSÉ, RMR, CRR
Comm. expires: 2/10/19