# EXHIBIT 101

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. 1:14-cv-14176

-----------------------------------------x

STUDENTS FOR FAIR ADMISSIONS, INC.,

Plaintiff

vs.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION),

Defendant

-----------------------------------------x

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEPOSITION OF ELIZABETH YONG, a witness called on behalf of the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure, before Deborah G. Rumson, RPR, CSR, and Notary Public, in and for the Commonwealth of Massachusetts, at the Offices of Wilmer Cutler Pickering Hale and Dorr, LLP, 60 State Street, Boston, Massachusetts, on Friday, March 24, 2017, commencing at 9:02 a.m.

around for the class?

MR. WOLFSON: Objection.

A. I do not know exactly why.

Q. But that's not atypical volume of missing alumni interviewer scores, in your experience?

MR. WOLFSON: Objection.

A. That's correct.

Q. Do you know whether there's any significance to why a student would or would not have an alumni interview?

A. No.

Q. Were alumni interviews done when you were reading files?

A. Yes.

Q. And were there occasions when you would have a competitive applicant who would not get an alumni interview?

A. I cannot remember.

Q. You cannot remember if there ever were, or one way or the other?

A. One way or the other.

Q. In your experience, does the existence of a alumni interview say anything about the

quality of the applicant?
A. No.
Q. Do you ever recall, in your time as a reader, specifically requesting that an applicant receive an alumni interview?
A. Yes.
Q. Why would you do that?
A. To make sure that I had the alumni interview before presenting my case.
Q. Why would you want the alumni interview?
A. It was a requirement. And back in, when I was doing admissions, an alumni interview was a requirement, especially for areas where we had large numbers of alumni.
Q. It's your understanding it's no longer a requirement?
MR. WOLFSON: Objection.
A. I do not know because I have not done committee work since 1992.
Q. When the alumni interview scores are entered into the database, is there also information about the identity of the alumni interviewer that's captured?
A. What time frame are you referring to?

A. That's correct.
Q. Recruited athletes, is that something that's typically tracked on the one-pagers?
A. Yes.
Q. Where did that information come from?
A. A recruited athlete is an athlete that has been contacted by the athletic department, and we would get that designation from them.
Q. That's a field that you track in the database that you administered?
A. Yes.
Q. It's just a box, yes or no, recruited athlete?
A. No. It was a box with a rating.
Q. Do you recall what the field was titled?
A. Ath status or ath stat.
Q. What would the ratings be for ath status?
A. 1, 2, or 3 for a recruited athlete.
Q. Which is for a recruited athlete?
A. 1, 2, or 3, and it would be ath status.
Q. So any one of those ratings still corresponds to the recruited athlete?
A. That is correct.
Q. Is a 1 better than a 3?

MR. WOLFSON: Objection.
A. According to the coach.
Q. The coaches would assign the 1, 2, or 3 levels?
A. That's correct.
Q. There's the reference here to citizenship. Is that information that came from the Common App?
A. That is correct.
Q. Then we have three separate categories of ethnic identity identifications?
A. Yes.
Q. These are old methodology, new methodology, and IPEDS?
A. Yes.
Q. What is the differences between these three groupings?
MR. WOLFSON: Objection.
A. The old methodology is the methodology that has been used since we started tracking ethnicity.
The new methodology counts every check box that is downloaded from the Common App.

issue," do you see that language?
A. Yes.
Q. Do you have a recollection as to what that's about?
A. No.
(Document marked as Exhibit 16 for identification)
Q. I'm going to hand you a document that's been marked as Exhibit 16.
A. (Witness reviews exhibit)
Q. Have you had a chance to review this?
A. Yes.
Q. Do you recognize this exchange?
A. No.
Q. Does it appear to be an e-mail chain between you and Dan Zupan?
A. Yes.
Q. Who was Dan Zupan?
A. He was the director of information services after me.
Q. When you were serving in the projects coordinator role?
A. Yes.
Q. In the top part of this chain, the last

**Elizabeth Yong - March 24, 2017**  **201**
**Highly Confidential - For Attorneys' Eyes Only**

[Page redacted]

**Elizabeth Yong - March 24, 2017** 202
**Highly Confidential - For Attorneys' Eyes Only**

[Page content redacted]

admissions office?
A. She is an admissions officer, and I think she oversees the operational part and data analysis.
Q. Do you recall meeting with them on February 25, 2013?
A. No.
Q. But you said you did sort of recognize the substance of this e-mail?
A. Yes.
Q. How do you recognize it?
A. It describes the files that we send to OIR at the end of the admissions or what we used to send to them at the end of the admissions process.
Q. And so do you recall, in particular, why he was asking for some changes to these files going forward?
A. I do not recall, in particular, why he was asking for changes.
Q. Do you know whether any particular task or project prompted these requests?
A. I do not know.
Q. Do you recall responding to his questions in

applicants?
A. Yes.
Q. Hundreds of applicants?
A. Yes.
Q. Thousands?
A. I can't remember how many folders I read.
Q. It was more than 100?
A. Yes.
Q. Do you know about how many folders were -- do you know how many folders are in each docket?
A. It depends on the docket. Some dockets are bigger than others.
Q. Aren't they attempted to roughly equalize the reading level?
A. Yes.
Q. Do you know what the rule of thumb is for what, approximately, is a docket?
MR. WOLFSON: Objection.
A. No. I cannot recall.
Q. Do you think that Asian-Americans are as a group on average not as personality appealing -- are not as personally appealing as other ethnicities?
MR. WOLFSON: Objection.

A. No.
Q. Do you think that they are not as good at extracurricular activities?
A. No.
Q. Does it bother you that this seems to suggest that, when you factor in those two things, Asian-American admissions rate goes down?
MR. WOLFSON: Objection.
A. No.
Q. Why not?
MR. WOLFSON: Objection.
A. Because everybody is rated on extracurricular and personal qualities. It's not like we are just rating Asian students on extracurricular and personal qualities.
Q. When you factor in Model 3, which includes the extracurricular and personal scores, every other ethnic group goes up in terms of their projected admit rate, except for the Asian-American, who go down by more than 2 points?
A. Right.
Q. Why isn't that an implication that the scores are disfavoring the Asian-American

applicants?

MR. WOLFSON: Objection.

A. How could you tell if it is disfavoring or if it is the fact that, perhaps, certain students are not as involved extracurricularly or -- you can't tell from a number whether it is a disfavor or if it is a fact.

Q. That's true. But you just told me that, based on your experience of reading, you didn't think that they were weaker at extracurricular activities?

MR. WOLFSON: Objection.

A. I said based on my experience of reading from my group of students.

Q. So you think other people in the office were seeing that Asian-Americans as a group were less accomplished at extracurricular activities?

MR. WOLFSON: Objection.

A. I do not know.

Q. Do you know whether other people who were reading files found that the Asian-American applicants as a group were less personally

appealing?
A. I do not know.
Q. It wasn't your experience, though?
A. It was not my experience.
Q. Did the admissions office, in your experience, ever do any analysis to see whether or not its scoring system was yielding uniform results across applications?
MR. WOLFSON: Objection.
A. Could you explain that.
MR. WOLFSON: When you're answering that -- I would like you to repeat the question. But when you're answering that, don't reveal the substance of any communications you had with counsel or work that you did at the direction of counsel.
Q. My question is, and I will rephrase it, does the admissions office conduct any regular assessments to ensure that ratings assigned by its readers can be reconciled with one another, that there's consistency across the reading process?
MR. WOLFSON: Objection.
A. Anything that was not asked by counsel, I

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS

I, Deborah G. Rumson, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that pursuant to appropriate notice of taking deposition, there came before me the following-named person, to wit: ELIZABETH YONG, who was by me duly sworn; that she was thereupon examined upon her oath and her examination reduced to writing by me; and that the deposition is a true record of the testimony given by the witness.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 27th day of March, 2017.

My commission expires:
November 20, 2020

Notary Public