# EXHIBIT 102

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

--------------------------------x

STUDENTS FOR FAIR ADMISSIONS, INC.,

Plaintiff,

Civil Action No. 1:14-cv-14176

vs.

PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION); and THE HONORABLE AND REVEREND ^ THE BOARD OF OVERSEERS,

Defendants.

--------------------------------x

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEPOSITION OF GRACE CHENG

Friday, April 7, 2017

Boston, Massachusetts

BY: DEBORAH ROTH, CSR/RPR

JOB NO.: 72659

09:32:16 daily, probably daily with Ms. McGrath. I'm
09:32:20 asking the same type of questions for those
09:32:22 that reported to you after 2012. What was
09:32:25 the extent of your communication with those
09:32:28 who reported to you?
09:32:29 MS. ELLSWORTH: Objection.
09:32:29 A. Probably daily communication.
09:32:48 Q. About what?
09:32:51 MS. ELLSWORTH: Objection.
09:32:51 A. Whatever issues they wanted to talk
09:32:56 about.
09:32:59 Q. Okay. What were your duties as the
09:33:01 associate director of admissions?
09:33:03 A. I was responsible for training new
09:33:18 admissions officers and onboarding new
09:33:26 officers.
09:33:27 Q. Are those separate things, training
09:33:30 and onboarding?
09:33:31 A. Yes.
09:33:35 Q. Okay. Can you explain what each of
09:33:36 those is?
09:33:37 A. Onboarding is literally the logistical
09:33:49 arrangements to welcome a new staff member.
09:33:59 Training was only for people who were going

to read admissions files.

Q. Okay. Let's focus on the 2012 to 2015 time period. How many people reported to you?

A. Between six and nine.

Q. Okay. And you were responsible for training all of them; is that right?

MS. ELLSWORTH: Objection.

A. Only in reading procedures.

Q. Okay. And so what did the training in reading procedures of application files entail?

A. Using old real admissions cases to acclimate readers as to what an application looked like, the different sections of a file, and how to evaluate each file.

Q. Is there training about the use of race in an application file?

MS. ELLSWORTH: Objection.

A. No.

Q. Is there any discussion about an applicant's race in the training of new readers?

MS. ELLSWORTH: Objection.

A. Yes.

Q. Can you tell me what is discussed about race in the training of new readers?

MS. ELLSWORTH: Objection.

A. It is one data point that is self-reported by the applicant that a reader may receive and is part of a holistic evaluation.

Q. Is that documented anywhere?

A. Yes.

Q. Where?

A. The reading procedures document.

Q. Did you draft that?

A. No.

Q. Who drafted that document?

A. I don't know.

Q. Did you make any changes to the procedures while you were associate director of admissions?

MS. ELLSWORTH: Objection.

A. I believe so.

Q. Do you recall anything specific about those changes?

A. Changing dates.

10:14:23 A. Probably.
10:14:26 Q. And at these roundtable discussions you described, how were the numbers shared? In other words, orally, or was there a piece of paper that was -- or pieces of paper that were passed around, or something else?
10:14:44 MS. ELLSWORTH: Objection.
10:14:44 A. Orally.
10:14:52 Q. And what numbers were shared orally?
10:14:54 MS. ELLSWORTH: Objection.
10:14:54 A. I don't remember. I was not the person who had the numbers.
10:15:03 Q. I'm not asking specifically what the numbers were. I'm asking what the categories of the numbers that were presented were?
10:15:11 A. Again, I don't remember the specifics, and I don't know if that's how they do it these days.
10:15:26 Q. When you attended -- you said you attended twice, right?
10:15:31 A. Yes.
10:15:31 Q. In these meetings, you said numbers were shared orally about admissions from the

10:15:40 early action process from each school; is
10:15:42 that right?
10:15:42 A. Yes.
10:15:43 Q. And were those numbers the admissions
10:15:49 -- the applicants who were admitted broken
10:15:51 down by race?
10:15:53 MS. ELLSWORTH: Objection.
10:15:53 A. From what I recall, yes.
10:16:02 Q. Were there any other numbers that were
10:16:04 shared?
10:16:04 A. Overall numbers.
10:16:11 Q. Overall what?
10:16:12 A. Total number of applicants, admits.
10:16:22 Q. Okay. What else was discussed at
10:16:28 these meetings?
10:16:31 MS. ELLSWORTH: Objection.
10:16:32 A. Honestly, I don't remember.
10:16:35 Q. Well, let's start with the roundtable
10:16:42 meeting.
10:16:43 After the numbers were shared, was
10:16:45 there a discussion?
10:16:47 A. Not that I recall.
10:16:51 Q. So is it your memory that each
10:16:53 school's representative would share the

10:16:55 numbers by race, and then the overall
10:16:59 numbers, go around the table, and then the
10:17:02 meeting was over?
10:17:04 MS. ELLSWORTH: Objection.
10:17:04 A. From what I remember, from the one
10:17:11 meeting I attended before 2009, yes.
10:17:15 Q. How about the other meeting?
10:17:16 A. I was not present for the roundtable
10:17:20 after 2012.
10:17:21 Q. Okay. Did people take notes at these
10:17:25 meetings?
10:17:26 MS. ELLSWORTH: Objection.
10:17:26 A. I don't remember.
10:17:28 Q. Do you remember people writing down
10:17:29 the numbers?
10:17:30 MS. ELLSWORTH: Objection.
10:17:30 A. I don't remember.
10:17:34 Q. Do you have any understanding of why
10:17:35 the numbers were shared orally?
10:17:38 A. I do not know.
10:17:46 Q. Did you ever ask why the numbers were
10:17:47 not shared in writing?
10:17:48 MS. ELLSWORTH: Objection.
10:17:49 A. No.

10:17:51 Q. What's your understanding -- it seems unusual to me that people would go into a room and share numbers orally, and then leave that room. What's your understanding as to why that was the way the information was transmitted?

10:18:04 MS. ELLSWORTH: Objection.

10:18:05 A. I have no idea.

10:18:08 Q. And nothing about that strikes you as unusual?

10:18:11 MS. ELLSWORTH: Objection.

10:18:11 A. I don't know. I was a junior counselor at the time.

10:18:22 Q. What was the purpose of sharing those numbers?

10:18:26 MS. ELLSWORTH: Objection.

10:18:26 A. I don't know.

10:18:27 Q. What was your understanding of the purpose?

10:18:29 A. To get some sort idea of what was happening at peer institutions.

10:18:50 Q. And what would you do with that information?

10:18:52 MS. ELLSWORTH: Objection.

10:18:54 A. I don't remember. I didn't have the information.
10:19:04 Q. Was it Roger Banks who brought that information to the meeting that you attended?
10:19:09 A. If he attended, he was the Harvard institutional representative.
10:19:28 Q. So do you recall Mr. Banks collecting those numbers in advance of the ABAFAOILSS meeting?
10:19:40 A. I do not know how he got the numbers.
10:19:43 Q. Okay. Do you recall Mr. Banks writing down the numbers from the other schools at this meeting?
10:19:51 MS. ELLSWORTH: Objection.
10:19:51 A. I don't remember.
10:19:52 Q. Do you recall any conversation with Mr. Banks about what was shared at the meeting?
10:19:57 A. I do not recall.
10:19:58 Q. What's your understanding as to why schools who attended this meeting were sharing those numbers?
10:20:12 MS. ELLSWORTH: Objection.

A. I don't know.

Q. What's your understanding as to why Mr. Banks would attend this meeting and share those numbers?

MS. ELLSWORTH: Objection.

A. I don't know.

Q. You don't know why this meeting took place?

MS. ELLSWORTH: Objection.

A. It's -- in my opinion, it's a networking opportunity meeting.

Q. Well, I mean you can network by, you know, having drinks with folks at these conferences. What you've described here in this particular meeting does not sound like a networking opportunity. Am I missing something?

MS. ELLSWORTH: Objection.

A. I just don't know the reason why this discussion happened or the roots of...

Q. Okay. Is it your understanding that this meeting took place at the ABAFAOILSS conference every year?

MS. ELLSWORTH: Objection.

A. To the best of my knowledge, yes.
Q. How about the second time you attended when Harvard hosted. Did you attend this meeting?
A. No.
Q. Was there a similar meeting of ABAFAOILSS after the regular admissions process had concluded?
MS. ELLSWORTH: Objection.
A. I do not believe so.
Q. Who organized these meetings?
MS. ELLSWORTH: Objection.
A. There is a ABAFAOILSS executive board.
Q. And how would the ABAFAOILSS executive board communicate with its members?
A. There is a Google group and mass email.
Q. What is the Google group?
MS. ELLSWORTH: Objection.
A. I actually don't know.
Q. But it's a Google address?
A. I believe so.
Q. Going back to the meeting at Dartmouth, do you recall approximately how

10:44:13 Q. And "late breaking issues." What does that mean?
10:44:21 A. That is all encompassing of any new information.
10:44:39 Q. "New" meaning after the application was submitted?
10:44:43 MS. ELLSWORTH: Objection.
10:44:46 Q. What does new mean? What do you mean by "new"?
10:44:50 A. Any information that we learn about that we did not get from the application.
10:45:00 Q. And how would the admissions office learn of such information?
10:45:05 A. That could be from a teacher, a counselor, the interview report, as I indicate here.
10:45:25 Q. And what is an "IV report" or "4 report"?
10:45:29 A. Interview.
10:45:32 Q. For No. 3 do you see where it says "standard strong"?
10:45:36 A. Yes.
10:45:37 Q. What does that phrase mean?
10:45:39 MS. ELLSWORTH: Objection.

10:45:39 A. That is an office-specific adjective.
10:46:15 It is the average student who applies to
10:46:18 Harvard with qualities that make the student
10:46:40 an appropriate applicant to the school. We
10:46:44 just can't admit everyone qualified to be
10:46:48 there.
10:46:50 Q. Does that mean that the majority of
10:46:55 standard strong designated applicants were
10:46:57 rejected?
10:46:58 MS. ELLSWORTH: Objection.
10:47:07 A. I would say the majority of standard
10:47:09 strong applicants were not admitted.
10:47:20 Q. So I'm trying to understand why you
10:47:22 answered the question differently than I
10:47:24 asked it.
10:47:25 Does that mean that the remainder
10:47:27 were waitlisted? I'm trying to get an
10:47:32 understanding of what "standard strong"
10:47:34 typically means?
10:47:34 MS. ELLSWORTH: Objection.
10:47:34 A. I was answering that there's other
10:47:39 admissions decisions than just rejection.
10:47:42 Q. Okay. And what's your understanding
10:47:50 about the typical admissions result for a

13:24:29 guess based on your experience looking at
13:24:34 these numbers what it might mean?
13:24:35 MS. ELLSWORTH: Objection.
13:24:36 A. No. I have no idea.
13:24:40 Q. Do you ever recall hearing the notion
13:24:43 of saving a space while you were in the
13:24:52 admissions office at Harvard?
13:24:53 A. No.
13:25:02 Q. We talked a minute ago about PR admits
13:25:06 being previous admits. Was this also
13:25:11 referred to as the Z list?
13:25:13 MS. ELLSWORTH: Objection.
13:25:14 A. They're not the same.
13:25:21 Q. What's the Z list?
13:25:23 A. Zs are students who are offered
13:25:38 admission, but are asked to matriculate the
13:25:45 following fall.
13:25:49 Q. Why might somebody be offered
13:25:53 admission for the following fall?
13:25:55 MS. ELLSWORTH: Objection.
13:25:55 A. There are a multitude of reasons.
13:25:59 Q. Do you recall a few common ones?
13:26:05 MS. ELLSWORTH: Objection.
13:26:05 A. These are students that Harvard would

love to admit, and we just didn't have space for them.

Q. Did they -- strike that.

Did Z list students -- strike that.

When were students designated as Z list applicants?

MS. ELLSWORTH: Objection.

A. From my recollection, during the final days of full committee.

Q. So is it fair to say that the class had sort of been filled out, and there are other students that are qualified, but there wasn't space for, so they were offered admission for the following year? That's what you're referring to as "the Z list"?

MS. ELLSWORTH: Objection.

Q. Is that a fair characterization?

A. To clarify, there's really no point in time when the committee deems the class admitted as full. The committee admitted as it saw fit, and then there would be a realization that given a predicted yield percentage for the entire class, too many students may have been preliminarily

13:28:13 admitted. So students would have to be
13:28:22 rediscussed to be taken out of the class.
13:28:30 Q. What factors would go into putting a
13:28:34 student on the Z list?
13:28:38 MS. ELLSWORTH: Objection.
13:28:38 A. The same factors that are used to
13:28:44 consider a student for admission would be
13:28:49 used to advocate for putting a student on the
13:28:57 Z list rather than reject or waitlist.
13:29:02 Q. I think you said that Z list
13:29:04 candidates were qualified, but it was more a
13:29:08 question of timing.
13:29:10 So I'm getting -- I'm asking what
13:29:11 factors would go to the timing component of
13:29:15 it as opposed to the qualifications?
13:29:18 MS. ELLSWORTH: Objection.
13:29:18 Q. You can answer if you understand what
13:29:21 I'm asking you.
13:29:22 A. I want to clarify that the timing
13:29:32 aspect could have applied to many, many more
13:29:40 students who unfortunately needed to be taken
13:29:44 out of the preliminary list of admits.
13:29:49 So students could have ended up on
13:29:52 the waitlist or rejected or on the Z list,

13:30:01 and it would all depend on the first reader
13:30:09 or the subcommittee to advocate.
13:30:13 Q. Well, presumably somebody who got
13:30:16 admitted would be stronger than somebody who
13:30:18 got waitlisted who would be stronger than
13:30:20 somebody who got rejected; is that fair?
13:30:23 MS. ELLSWORTH: Objection.
13:30:23 A. Let me clarify that.
13:30:29 A student could have been
13:30:31 preliminarily admitted, and based on the
13:30:38 final number of admitted students Harvard
13:30:42 wanted to give an offer of admission to, the
13:30:46 committee had to move students out of the
13:30:51 admit category to waitlist, for example.
13:30:57 Q. What factors would the committee
13:31:03 consider in making the decision to move
13:31:05 students in the way that you just described?
13:31:07 A. So this would encompass the holistic
13:31:13 discussion all over again. Many, many
13:31:19 factors would be presented, and the committee
13:31:26 would have to make a subjective decision
13:31:28 where the student would ultimately land.
13:31:34 Q. Well, the committee wouldn't
13:31:38 reconsider every student in deciding who to

15:01:11
15:01:13
15:01:16
15:01:19
15:01:24
15:01:25
15:01:28
15:01:30
15:01:30
15:01:46
15:01:50
15:01:55
15:01:59
15:02:04
15:02:06
15:02:08
15:02:21
15:02:22
15:02:54
15:03:06
15:03:08
15:03:10
15:03:10
15:03:18



Grace Cheng - April 7, 2017
Highly Confidential - For Attorneys' Eyes Only 187

15:03:20
15:03:20
15:03:26
15:03:30
15:03:39
15:03:42
15:03:46
15:03:50
15:03:53
15:03:53
15:04:00
15:04:04
15:04:07
15:04:09
15:04:14
15:04:15
15:04:16
15:04:21
15:04:24
15:04:26
15:04:29
15:04:32
15:04:33
15:04:33

O'Brien & Levine Court Reporting Solutions
888.825.3376 - mail@court-reporting.com

MS. ELLSWORTH: Objection.
A. Not that I recall.
Q. Geographical imbalance?
A. Not that I remember.
Q. How about too few of a particular group? I think my question was phrased as too many. I guess I'm asking the flip side of that. Were you ever given guidance in terms of a group being too underrepresented?
A. Not that I remember.
Q. Did you know the numbers by race of the preliminarily admitted class before the lopping process began?
A. No.
Q. Do you know if that information was tracked during the admissions process?
MS. ELLSWORTH: Objection.
A. I don't know.
Q. Okay. Then let's go back to -- with the lopping process. The first reader would consider holistically people who are vulnerable, and then would the subcommittees prepare a list of recommendations for lopping?

15:22:13 A. Yes.
15:22:16 Q. And then what happened next?
15:22:18 MS. ELLSWORTH: Objection.
15:22:18 A. What happened to the lists?
15:22:26 Q. Right. So the subcommittees could come back and come up with a lop list. Would they go back into a full committee or something else?
15:22:36 MS. ELLSWORTH: Objection.
15:22:36 A. They would go back into full committee.
15:22:41 Q. And then how would the process proceed from there?
15:22:44 A. When I was there -- and things may have changed since then -- we would proceed alphabetically docket by docket and look at each docket's identified names to come out of the class.
15:23:10 Q. Okay. Then after that process, did the full committee have some type of -- what was the committee's -- strike that.
15:23:29 After that process, what was the committee's information about groups by race of the prospectively admitted class at that

15:23:38 point?
15:23:39 MS. ELLSWORTH: Objection.
15:23:39 A. From what I remember, we were never
15:23:49 told the breakdown.
15:23:51 Q. So when did you learn the breakdown of
15:24:00 an admitted class by race?
15:24:02 A. Usually in the press release to the
15:24:05 public once the class was admitted.
15:24:10 Q. So is it your testimony that from the
15:24:17 beginning of the process until the press
15:24:19 release, the full committee did not have in
15:24:25 front of it the numbers of the prospectively
15:24:29 admitted class by race?
15:24:30 MS. ELLSWORTH: Objection.
15:24:31 A. From what I recall, yes.
15:24:37 Q. How were the lop lists maintained in
15:24:42 terms of documentation?
15:24:50 MS. ELLSWORTH: Objection.
15:24:50 A. Again, from what I remember, when I
15:25:01 was there, Dean Fitzsimmons kept a copy from
15:25:06 each docket and each docket chair had a copy.
15:25:11 Q. Okay. And what did that copy look
15:25:14 like?
15:25:16 MS. ELLSWORTH: Objection.

16:44:37 charge of the search.
16:44:41 Q. Do you know how the search was
16:44:44 tailored to target underrepresented
16:44:48 minorities?
16:44:49 MS. ELLSWORTH: Objection.
16:44:49 A. Colleges are able to ask for names by
16:45:08 self-reported minority affiliation.
16:45:12 Q. Did you have any involvement in
16:45:15 identifying the parameters for requesting
16:45:19 names?
16:45:20 A. Not that I recall.
16:45:27 Q. I want to switch to athletics for a
16:45:31 little bit. What does it mean to be an
16:45:34 athletic liaison?
16:45:38 A. That is the person on the admissions
16:45:41 committee who is responsible for interacting
16:45:46 with the coach or coaches to know who is
16:45:55 applying each year.
16:45:58 Q. Okay. And is the admissions process
16:46:01 different for athletes than for nonathletes?
16:46:05 MS. ELLSWORTH: Objection.
16:46:05 A. No. The process of holistic admission
16:46:17 is the same.
16:46:18 Q. How is an applicant's athletic

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS )

COUNTY OF SUFFOLK )

I, Deborah Roth, a Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify: That Grace Cheng, the witness whose deposition is hereinbefore set forth, was duly identified and sworn by me, and that the foregoing transcript is a true record of the testimony given by such witness to the best of my ability.

I further certify that I am not related to any of the parties in this matter by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 10th day of April 2017.

____________________

Deborah Roth, CSR: 14700-S, RPR: 34250

My Commission Expires: December 31, 2021