# EXHIBIT 113

Page 1

1        UNITED STATES DISTRICT COURT
2          DISTRICT OF MASSACHUSETTS
3  ---------------------------------x
   STUDENTS FOR FAIR ADMISSIONS,    )
4  INC.,                            )
                                    )
5                 Plaintiff,        )
                                    )
6            vs.                    ) Civil Action No.
                                    ) 1:14-cv-14176-ADB
7  PRESIDENT AND FELLOWS OF         )
   HARVARD COLLEGE (HARVARD         )
8  CORPORATION),                    )
                                    )
9                 Defendant.        )
                                    )
10 ---------------------------------x
11
12
13         DEPOSITION OF BROCK WALSH
14           Los Angeles, California
15         Wednesday, June 28, 2017
16
17
18
19
20
21
22
23 Reported By:
24 SUSAN A. SULLIVAN, CSR #3522, RPR, CRR
25 Job No. 125864

Page 53

1  them - to ensure standards scrutiny for all
2  applicants, whether they are presented first or last
3  on a docket."
4     Q   Is that section you just read and in
5  particular how the subcommittee would review the
6  docket several times an accurate statement of the
7  work you would do in a subcommittee?
8          MR. DULBERG:  Objection.
9          THE WITNESS:  Yes.
10    Q   BY MR. CONNOLLY:  So when you were on a
11 subcommittee would there be times when you would
12 finish a review of a docket and had tentatively
13 admitted more students than you had hoped to admit?
14         MR. DULBERG:  Objection.
15         THE WITNESS:  No.  I hope to admit them all.  :45
16         MR. CONNOLLY:  Let me take a step back.
17    Q   When you were in subcommittee did you have a
18 target number of students who you were supposed to
19 tentatively admit?
20         MR. DULBERG:  Objection.
21         THE WITNESS:  The chair would convey to
22 committee members a range that would be reasonable
23 so as to get us thinking correctly.
24    Q   BY MR. CONNOLLY:  And if you are over that
25 range would you then go back through the docket and

1  review the students again?

2          MR. DULBERG: Objection.

3          THE WITNESS: Yes.

4      Q   BY MR. CONNOLLY: And was the goal of that

5  review to get students, to get a number of students

6  within the range requested by the docket chair?

7          MR. DULBERG: Objection.

8          THE WITNESS: Yes.

9      Q   BY MR. CONNOLLY: Would you refer to that

10 process as lopping or is lopping something that

11 happens at another time?

12         MR. DULBERG: Objection to the form.

13         THE WITNESS: I didn't hear.

14         MR. DULBERG: Objection.

15         You can answer. Did you hear the question?

16         THE WITNESS: I heard the question, I just

17 didn't hear the -- sorry. That is accurate. That

18 is the lop process.

19     Q   BY MR. CONNOLLY: When you would do this

20 lopping process in the subcommittee would it ever

21 happen that you would say upon further reflection a

22 candidate who you had tentatively admitted was not

23 as strong as the rest of the candidates that you had

24 admitted?

25         MR. DULBERG: Objection.

1    Q   BY MR. CONNOLLY:  Would you take it into
2   account in your decision-making?
3           MR. DULBERG:  Objection.
4           THE WITNESS:  Decision making is at the end
5   of the process.  In the beginning, in the middle of
6   the process is accumulation of information.  Would I
7   know the student's race?  Yes, I would.  Would I
8   know many other things about them?  Of course I
9   would.  When considering their viability I'm
10  considering a great many things all at once, no one
11  thing, all things at once, that's the job.  So
12  consider it as one factor or one data point among
13  hundreds, I suppose so, but never isolated.
14       Q   BY MR. CONNOLLY:  If you knew a student's
15  race how would it affect your decision-making?
16          MR. DULBERG:  Objection.
17          THE WITNESS:  I would have to answer this
18  question in much the same way I answered the
19  previous question.  Most likely I would know the
20  child's race, I would know it because it is present
21  on the summary form or it is not there because the
22  student elected to not check the box.  And how it
23  would affect my decision, is that the question?
24       Q   BY MR. CONNOLLY:  Yes.
25       A   No more or less than many others of other

1  answer such as will the student succeed at Harvard?
2  Is there generally a type of person that you are
3  looking for?
4         MR. DULBERG:  Objection.
5         THE WITNESS:  Me specifically.
6     Q   BY MR. CONNOLLY:  Yes, you specifically.
7     A   Without limiting what I might be looking for
8  because it is difficult to enumerate until you see
9  it, very often it just appears to you and you just
10 see it, you see this amazing person and you say I
11 want to advocate this person because they're
12 amazing.  But bright, talented, humane, somebody who
13 is going to take full advantage of the place,
14 someone who is going to contribute a great deal,
15 someone who is going to be a good listener, someone
16 who is going to be a good roommate, someone who is
17 going to care for the brokenhearted.  You know,
18 there's a thousand things you are looking for.  Very
19 often you don't know it until you see it and then
20 you're amazed and then you are a champion and then
21 you are going for it.  That's the best I can do.
22    Q   Do you think you could find these students
23 if you didn't know the student's race?
24         MR. DULBERG:  Objection.
25         THE WITNESS:  I would try my very best to

1    the people that were on the lop list?
2             MR. DULBERG:  Objection.
3             THE WITNESS:  No.
4        Q    BY MR. CONNOLLY:  Would you ever take a
5    student's race into account when deciding whether
6    the student should be lopped?
7             THE WITNESS:  No.
8             MR. DULBERG:  Objection.
9        Q    BY MR. CONNOLLY:  Why not?
10            MR. DULBERG:  Objection.
11            THE WITNESS:  The deliberations in a lop
12   discussion were no different from any other
13   discussion.  We discussed the whole candidate, no
14   one matter is more important than the other, we tell
15   their story, you advocate for them as best you can
16   as their area admissions person and then you put it
17   to a vote.
18       Q    BY MR. CONNOLLY:  Did you consider a
19   student's race an important factor in your
20   decision-making --
21            MR. DULBERG:  Objection.
22       Q    BY MR. CONNOLLY:  -- about whether to admit
23   the student?
24            MR. DULBERG:  Sorry.  Objection.
25            THE WITNESS:  No more important than

1  students?

2        MR. DULBERG:  Objection.

3        THE WITNESS:  It was the responsibility of a
4  local chairperson to assign interviews to their
5  interviewers.

6     Q   BY MR. CONNOLLY:  Would the Harvard
7  admissions office send a list of the names of
8  students who needed to be interviewed to that
9  person?

10       MR. DULBERG:  Objection.

11       THE WITNESS:  The local chairperson would
12  receive such a list.

13    Q   BY MR. CONNOLLY:  And who would that list
14  generally come from?

15    A   It was a computerized system by which a
16  completed application would trigger a student's name
17  being included in the system and spit it out to the
18  appropriate parties.

19    Q   So as a general matter would every student
20  who applied to Harvard have the opportunity for an
21  alumni interview?

22    A   It was our goal to offer an interview to
23  every prospective applicant.  However, that never
24  happened perfectly.  Situations came up where either
25  the applicant made themselves unavailable or there

1  wasn't an interviewer available in whatever region.
2      Q   So it sounds like the initial way in which a
3  local chairperson received the list of students to
4  be interviewed happened automatically and required
5  no input from a Harvard admissions officer.  Do I
6  have that correct?
7          MR. DULBERG:  Objection.
8          THE WITNESS:  There was an office inside of
9  our larger office whose responsibility it was to
10 data input and computer knowledge to whom this
11 responsibility would have been fallen or overseen by
12 but it certainly wasn't my responsibility.
13     Q   BY MR. CONNOLLY:  Would admissions officers
14 have an option to assign a level of importance in
15 terms of receiving an interview for a student?
16     A   Yes.
17     Q   Do you remember how an admissions officer
18 would go about letting that opinion be known?
19         MR. DULBERG:  Objection.
20         THE WITNESS:  There was on a form -- I'm
21 sorry, I can't identify what that form is -- a means
22 of designating the priority and that form would get
23 to someone with some authority to convey it.
24     Q   BY MR. CONNOLLY:  So would an admissions
25 officer reach out to the local chairperson and say I

1   not do.
2       Q   BY MR. CONNOLLY:  Do you recall taking any
3   action in regards to this individual?
4           MR. DULBERG:  Objection.
5           THE WITNESS:  My guess is we'll get there.
6   I don't recall.  I don't recall even having reviewed
7   the document with counsel.  I can't remember if I
8   responded or not.
9       Q   BY MR. CONNOLLY:  Do you know if that
10  individual was allowed to continue interviewing?
11          MR. DULBERG:  Objection.
12          THE WITNESS:  Specifically, no.  I hope not.
13      Q   BY MR. CONNOLLY:  Why do you hope not?
14      A   Because I think it speaks to a bias.
15      Q   How so?
16      A   We all as admissions, admissions people and
17  interviewers try to keep ourselves open to all
18  people and not make assumptions based on their race
19  or assumptions about policy based on race.  We try
20  to read every application to find the great kid no
21  matter their race because greatness exists,
22  excellence exists everywhere, so someone who
23  announces their bias thusly would call into question
24  their openness to all applicants no matter what
25  their color.

1    MR. DULBERG:  Objection.
2    THE WITNESS:  I believe this would have been
3 a list of applicants or actually two lists, I see
4 second list written down here so two lists, created
5 to provide the S docket with a list of names of
6 applicants which we had designated through some
7 deliberation as vulnerable to a lop, candidates for
8 a lop, some of which would have been lopped, some of
9 which would not be.
10   Q   BY MR. CONNOLLY:  Would you have filled out
11 a form like this?
12   MR. DULBERG:  Objection.
13   THE WITNESS:  Would I have?  Did I create
14 this form, is that the question?
15   Q   BY MR. CONNOLLY:  Have you ever filled out a
16 form such as this?
17   A   No.
18   Q   Do you know who would have filled out this
19 form?
20   MR. DULBERG:  Objection.
21   THE WITNESS:  Do I know who did fill out
22 this form?
23   Q   BY MR. CONNOLLY:  Sure.
24   A   No.
25   Q   Can you read to me the title of the four

Page 149

1  REPORTER'S CERTIFICATE

2

3       I, SUSAN A. SULLIVAN, CALIFORNIA CSR No.
4  3522, RPR, CRR, do hereby certify:
5       That prior to being examined BROCK WALSH,
6  the witness named in the foregoing deposition, was,
7  before the commencement of the deposition, duly
8  administered an oath in accordance with C.C.P.
9  Section 2094;
10       That the said deposition was taken before
11  me at the time and place therein set forth, and was
12  taken down by me in shorthand and thereafter
13  transcribed into typewriting under my direction and
14  supervision; that the said deposition is a true and
15  correct record of the testimony given by the
16  witness;
17       I further certify that I am neither counsel
18  for, nor in any way related to any party to said
19  action, nor in any way interested in the outcome
20  thereof.
21       IN WITNESS WHEREOF, I have subscribed my
22  name on this 5th day of July, 2017.
23
24       _____
             SUSAN A. SULLIVAN, CSR
25