# EXHIBIT 120

Page 1

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3

4    _____

5    STUDENTS FOR FAIR ADMISSIONS, INC.,

6              Plaintiff,

7     v.                          No. 1:14-cv-14176

8    PRESIDENT AND FELLOWS OF

9    HARVARD COLLEGE

10   (HARVARD CORPORATION),

11             Defendant.

12   _____

13

14

15

16        VIDEO DEPOSITION of WILLIAM FITZSIMMONS

17             Boston, Massachusetts

18              August 3, 2017

19

20

21

22

23   Reported by:

24   Dana Welch, CSR, RPR, CRR, CRC

25   Job #127104

                              FITZSIMMONS

1   kind of thing for all minority students.

2          Again, the -- one of Anne's

3   responsibilities is to ensure that, that as much in

4   addition that we do in recruiting -- so this isn't

5   limited to what I've mentioned already.  But the

6   thrust of your question that was that -- Anne's

7   responsibilities, as you can see, are very

8   important because one of the things you want to

9   make sure is that with such a broad and vigorous

10  outreach that it is well coordinated.  So that's,

11  you know, to give you some idea what -- now, she

12  also is a -- has some admissions responsibilities

13  as well, so her job is not simply to help us

14  coordinate recruitment.

15       Q.  Does she read files, for example?

16       A.  Yes.

17       Q.  Just as the other directors do as well?

18       A.  Yes.

19       Q.  She participates in the subcommittee and

20  committee meetings?

21       A.  Yes.

22       Q.  You described her responsibilities largely

23  with respect to, I think you called them, outreach

24  initiatives.  By outreach do you mean efforts to

                         FITZSIMMONS

1

2     Q.   Yes.   Other than the way in which it

3     purchases testing results, are there any other

4     distinctions made between how the UMRP goes about

5     recruiting students of Asian descent versus

6     students of Hispanic descent, for example?

7          MS. ELLSWORTH:   Objection.

8     A.   Well, for example, the Asian American

9     undergraduate minority recruiters would recruit

10    Asian students -- Asian Americans students from all

11    backgrounds and at a wide variety of testing

12    levels.

13    Q.   And is it your testimony that any Asian

14    student who reaches out to Harvard for information

15    will be added to the Asian UMRP group?

16    A.   I believe that's the case.

17    Q.   What else does the UMRP program do to

18    recruit minority students?

19    A.   They will send out communications of

20    various kinds.   They will give information sessions

21    to visiting groups of students from various

22    backgrounds.   They may also even do some middle

23    school outreach to encourage students in middle

24    schools to take strong courses in high school and

25    consider college later on.   There are lots of

1                          FITZSIMMONS

2   things they do.

3        Q.   Other than people who contact Harvard and

4   the test result purchases, how do they go about

5   identifying the targets of that recruitment?

6             MS. ELLSWORTH:   Objection.

7        A.   Some of them, as an example, will go back

8   to their home towns during school breaks, for

9   example, or attend summer programs in various

10  locations.   So there are a variety of things that

11  they would do.

12       Q.   Do you know, for example --

13            MR. STRAWBRIDGE:   Strike that.

14       Q.   Did you say that UMRP, current students at

15  Harvard who are UMRP recruiters, did you say that

16  they are -- are they assigned students of the same

17  ethnic background to recruit?

18       A.   Generally.

19       Q.   Why is that?

20       A.   Oftentimes in recruiting, if you can

21  envision yourself in -- with the person you are

22  talking to, it can be helpful in making a case to a

23  student that Harvard would be a comfortable place

24  for a potential Harvard student.

25       Q.   Do you know how many UMRP recruiters there

1                   FITZSIMMONS

2    are?

3         A.   Depending on the time of year, there can

4    be -- my best recollection, possibly 15 to 20

5    different recruiters.

6         Q.   Are they paid?

7         A.   Yes.

8         Q.   Okay.  Do you know how many Asian UMRP

9    recruiters there are?

10         MS. ELLSWORTH:  Objection.  I'll remind

11    the witness not to disclose the names of any

12    current students at Harvard.  But you may answer

13    the question.

14         A.   We have about the same number for each

15    group.

16         Q.   So it's equally divided, basically, among

17    Hispanic --

18         A.   Best of my recollection.

19         Q.   Is that on purpose?

20         A.   We feel it's important to get outstanding

21    students from all of these ethnic backgrounds.

22         Q.   So you want to evenly divide your efforts?

23         MS. ELLSWORTH:  Objection.

24         A.   It's one way to start.

25         Q.   Do you provide annual performance

1                    FITZSIMMONS

2     characteristics of the class?

3          A.   It would use the new methodology.

4          Q.   And does Harvard use the new methodology

5     when it prepares its own internal reports of the

6     admissions class?

7               MS. ELLSWORTH:   Objection.

8          A.   Our office, for its internal purposes,

9     would use the new methodology.

10         Q.   All right.   You know what a one- --

11         A.   We would also be aware of the IPEDS.

12         Q.   Do you know what a one-pager is?

13         A.   I do.

14         Q.   What's a one-pager?

15         A.   It would be a very incomplete but rough

16     idea of statistics regarding a class, typically

17     comparing one year to the next.

18         Q.   And one-pagers are actually reports that

19     are generated in the midst of the admissions

20     process, correct?

21              MS. ELLSWORTH:   Objection.

22         A.   Generally, yes.

23         Q.   Sometimes on a daily basis during the

24     committee process?

25              MS. ELLSWORTH:   Objection.

1                    FITZSIMMONS

2       A.  I certainly don't request daily

3   one-pagers.  I don't know if they're produced daily

4   or not.

5       Q.  On the one-pagers, is it IPEDS or the new

6   methodology?

7           MS. ELLSWORTH:  Objection.

8       A.  In recent years it would be both.

9       Q.  Okay.  Did it used to be the old

10  methodology?

11      A.  It could include all three.

12      Q.  Did you adopt the new methodology after

13  IPEDS was introduced?

14      A.  I don't remember the exact timing.

15      Q.  I guess -- so that brings me back to the

16  original question, which is if Harvard has created

17  various methodologies that diverge from the federal

18  reporting methodology, then why doesn't Harvard

19  include the more specific granular racial identity

20  information on its internal report?

21          MS. ELLSWORTH:  Objection.

22      A.  That's a very different thing from the new

23  methodology and very different from IPEDS.

24      Q.  What's a very different thing?

25      A.  If I understand, you're asking why we

1                         FITZSIMMONS

2    with staff members using such things before.  But

3    I'm very familiar with the term.

4         Q.  Do you consider yourself an expert in

5    statistical analysis?

6         A.  No, no.

7         Q.  Do you consider yourself reasonably

8    informed with modern statistical techniques?

9             MS. ELLSWORTH:  Objection.

10        A.  I'm no expert, but I'm reasonably well

11   informed.

12        Q.  Do you subscribe to any journals that

13   cover the statistics field?

14            MS. ELLSWORTH:  Objection.

15        A.  Not that is simply devoted to statistics

16   that I'm aware of.

17        Q.  Have you taken any educational courses on

18   statistics in the last 30 years?

19        A.  No.

20        Q.  You referred earlier to race-neutral

21   alternatives.

22            Do you remember that?

23        A.  Yes.

24        Q.  Prior to November 2014, what studies --

25            MR. STRAWBRIDGE:  Strike that.

                              FITZSIMMONS

1

2      Q.  Had Harvard College conducted any studies

3   as to whether there were race-neutral alternatives

4   that could be adopted instead of using race in the

5   admissions process?

6          MS. ELLSWORTH:  I'll just remind the

7   witness in answering the question not to disclose

8   any communications with counsel.  You may answer

9   the question without disclosing that information.

10  You may do so.

11     Q.  To be clear, my question is a yes-or-no

12  question:  Had Harvard done this?

13         MS. ELLSWORTH:  And I'll also object to

14  the form.

15     A.  A formal study?

16     Q.  Any study.

17     A.  I'm a little unclear what you mean by a

18  study.  So it's hard for me to answer yes-no to

19  that.

20     Q.  Had it ever analyzed in any way, shape, or

21  form, whether or not there were alternatives to the

22  use of race in the admissions process that would

23  achieve its educational interest in diversity?

24         MS. ELLSWORTH:  Objection and the same

25  warning.

1                          FITZSIMMONS

2       A.   And you're asking prior to 2014?

3       Q.   Prior to November 2014.

4       A.   We have certainly been aware of the issue

5   of race-neutral admissions for a very long time.

6   It's been out in the public, you know, for a very

7   long time.

8            And we have therefore conducted our

9   recruiting and done a wide variety of things that

10  people now use the term -- they'll use the term

11  race-neutral alternatives, and I know that --

12  I think it was in interrogatory number 11 we

13  outlined a -- I could go through them if you want,

14  but a wide variety of procedures, including robust

15  financial aid, all the changes that we had in

16  recruiting, giving up early admission to try to,

17  you know, see if any of these things would make a

18  difference.

19           And so we have worked hard, you know, to

20  sort of see, you know, as -- to do everything

21  possible to recruit people in every conceivable way

22  that we heard about, anyway, that might help

23  produce the kind of diverse applicant pool, and

24  therefore we hope, ultimately, the diverse college

25  that we aspire to have.

1                         FITZSIMMONS

2          And nothing worked other than our ability

3     in the end, despite all of these massive changes

4     that we've made over the past -- especially in the

5     past 10 or 15 or 20 years and even going up until

6     the, you know, the past couple of years, with

7     further changes on financial aid and further

8     electronic outreach.

9          And in the end, we still believe it is in

10    Harvard's vital educational interest to be able to

11    use race as one factor among many as we admit our

12    students.

13       Q.  At any point in doing all these other

14    activities you described that are referenced in the

15    interrogatory, did you stop using race in the

16    admissions process?

17       A.  No.

18       Q.  At any point did you perform an analysis

19    to see what you thought would happen if you stopped

20    using race in the admissions process?

21          MS. ELLSWORTH:  Objection.  Again I'll

22    remind the witness not to disclose any actions

23    taken at the direction of counsel or information

24    learned from counsel in answering the question.

25       A.  Can you repeat the question again?

1                          FITZSIMMONS

2        Q.   The question, again, this is for the time

3    frame prior to the filing of this lawsuit in

4    2000- --

5        A.   Oh, I see, okay.  Before --

6        Q.   Yeah.  Did you -- yes or no?  Had you done

7    any analysis as to what would happen if Harvard

8    stopped using race in the admissions process?

9             MS. ELLSWORTH:  Objection.

10       A.   It's a hard question to answer.  Just say

11   it again.  Just frame it again for me.

12            MR. STRAWBRIDGE:  Why don't I ask the

13   reporter to read this one back.

14            THE WITNESS:  Okay.  Sorry.

15            (Preceding question read.)

16       A.   The answer would technically be no, but we

17   analyze every year what it is we have done.  You

18   know, there was no formal study, but we review

19   carefully what we do every year and we, again,

20   believed every year, especially after all the

21   massive changes that we've made, that it was still

22   vital for us to be able to use race and ethnicity

23   in the admissions process.

24       Q.   And when you say you look at what you did

25   and made this decision, is that a formal process?

1                        FITZSIMMONS

2            MS. ELLSWORTH:  Objection.

3       A.  I'm not sure what you mean by formal.

4       Q.  Is there a meeting where you sat down and

5   you looked at everything you did and you openly

6   discussed whether or not it's time to stop using

7   race in the admissions process?

8            MS. ELLSWORTH:  Objection.

9       A.  We always examine, you know, some cases

10  just simply with our staff, but we're always open

11  to improving our process in any way we can and we

12  always will talk about ways to improve the process.

13  But I'm not sure that answers your question.

14       Q.  I don't believe it does.

15       A.  Could you --

16       Q.  Yeah.  Did you have any formal discussion

17  where you specifically addressed the question

18  should we stop using race in the admissions

19  process?

20            MS. ELLSWORTH:  Objection and, again, I'll

21  remind the witness not to disclose communications

22  with counsel in answering the question.

23       A.  I think we see just in the way our process

24  works any time we look at it that we see in every

25  aspect of our work that using race is absolutely

1                           FITZSIMMONS

2    essentially to achieving the educational mission of

3    the college, that we've seen no case to be made for

4    not using race and ethnicity in the admissions

5    process.

6        Q.  Do you remember specifically discussing

7    whether there was a case to be made prior to the

8    filing of this lawsuit?

9        MS. ELLSWORTH:  Objection, same reminder

10   in terms of communications with counsel.

11       A.  You know, again, I think it's a

12   hypothetical question that I'm having trouble

13   parsing.

14       Q.  No, I'm sorry.  It's not a hypothetical

15   question.  I'm asking you do you remember having

16   this discussion?

17       A.  Which discussion?

18       Q.  Whether or not it was time or Harvard

19   should consider to stop using race in the

20   admissions process?

21       MS. ELLSWORTH:  Objection, asked and

22   answered.  And I'll remind the witness not to

23   disclose communications with counsel in whatever

24   response that you may choose to give.

25       THE WITNESS:  I think maybe -- could I --

1                          FITZSIMMONS

2    is there -- it possible for me to talk with

3    Counsel.

4          MS. ELLSWORTH:  We can halt on a privilege

5    issue here.

6          MR. STRAWBRIDGE:  Well, I want to make

7    sure --

8          THE WITNESS:  I'm not -- I mean, I just

9    want to make sure I understand the question.

10         MR. STRAWBRIDGE:  That's fine.  Let's try

11   this on the record first.  If we need to go off the

12   record, we can.

13      Q.  The question is just yes or no:  Do you

14   remember having these discussions?

15         I'm not asking you what the substance of

16   the discussions were.  I'm just asking you, prior

17   to the filing of this lawsuit, do you remember

18   having such a discussion, the specific topic of

19   which was, "Should we stop using race in the

20   admissions process?"

21         MS. ELLSWORTH:  So before you answer the

22   question, please let me look at this.

23         I think this question has been asked and

24   answered.

25         MR. STRAWBRIDGE:  It has not been

1                        FITZSIMMONS

2    answered.

3          MS. ELLSWORTH:   Again, I'm going to again

4    remind the witness not to disclose communications

5    with counsel.

6          If you can answer the question, you may do

7    so.

8       A.   I think I'm having trouble -- I think I've

9    answered it, but let me just try -- so as we made

10   all these massive changes that we outlined in

11   interrogatory 11, certainly part of that, if this

12   is part of what you're thinking about, is that

13   how -- we were, you know, trying to achieve the

14   best possible applicant pool and ultimately make it

15   possible to admit, you know, the best student body

16   we could admit.

17         And, you know, I think certainly anybody

18   in our field, you know, been aware for a long time

19   of the concept of race-neutral, and we thought that

20   all -- many -- all those items that we -- I won't

21   go through them all because I know you have them in

22   interrogatory 11, you know, which certainly

23   provides lots of evidence that we certainly were

24   aware of the concepts and were doing everything

25   possible.

1                          FITZSIMMONS

2          And in the end, did the subject or the

3     term ever come up in conversations with staff or

4     with others?  I'm sure that it probably did.  I

5     don't remember it specifically.  But in the end I

6     think we were, you know, we simply, you know, there

7     was no evidence after making all these changes that

8     cost Harvard many, many millions of dollars -- you

9     know, our financial aid budget has rocketed skyward

10    since we've made many of these changes and so on,

11    in all kinds of different ways -- and still we feel

12    it's absolutely vital to be able to use race and

13    ethnicity as we both recruit and assemble and then

14    admit the best possible class every year.

15        Q.  Do I understand your testimony to be you

16    do not remember any specific discussion about

17    whether these changes meant that Harvard could stop

18    using race in the admissions process?

19        MS. ELLSWORTH:  Objection.

20        A.  I don't remember a specific formal

21    discussion on the subject, but because it's so much

22    a part of what all colleges do, it was certainly

23    one concept that has certainly informed the work

24    we've done over the years.

25        Q.  Do you remember any specific informal

1                         FITZSIMMONS

2    discussion on the topic?

3              MS. ELLSWORTH:  Objection.

4       A.   Again, it's so much a part of what we do,

5    I don't remember the specific -- I don't have a

6    scene in my mind that would, you know, where this

7    topic was discussed.  But it's such an integral

8    concept in college admissions.

9       Q.   Were any of these endeavors that you just

10   described adopted with the goal of ceasing the use

11   of race in the admissions process?

12             MS. ELLSWORTH:  Objection.

13      A.   Many of these were simply designed to

14   allow us to further our efforts to get the best

15   possible class that we could across the board, and

16   that would include, you know, getting the strongest

17   minority students that we could get from every

18   background.

19      Q.   Were they adopted with the goal of ceasing

20   the use of race in the admissions process?

21             MS. ELLSWORTH:  Objection.

22      A.   The goal was really to get the best class

23   that we could get and get the class that would be

24   comprised of the best educators of others.

25      Q.   But was one of the goals to stop using

1                    FITZSIMMONS

2    race in the admissions process?

3            MS. ELLSWORTH:  Objection.

4        A.  One of the -- certainly many of the --

5    I won't go again, go through the long list again,

6    but we were making what I would call a massive

7    good-faith effort to do everything that seemed to

8    be effective that we hear about, around and about,

9    to gather together in what some would term a

10   race-neutral process.

11           And ultimately it didn't work because in

12   the end we felt we still needed to use race and

13   ethnicity as part of what we do.

14       Q.  Are you aware of any written document

15   prior to the filing of this lawsuit that

16   specifically looked at any of the alternatives

17   you're describing as, whether they would be

18   sufficient to achieve diversity such that Harvard

19   could stop using race?

20           MS. ELLSWORTH:  Objection.  That's a

21   yes-or-no question.  You may answer that question

22   yes or no.

23           THE WITNESS:  Does it have to be yes

24   or no?

25           MS. ELLSWORTH:  Yes.  Don't disclose

1                        FITZSIMMONS

2     communications with counsel.

3             THE WITNESS:  I -- I'm -- excuse me --

4     no -- excuse me.

5             MS. ELLSWORTH:  Just don't disclose

6     information learned from counsel or communications

7     with counsel in answering the question.  But go

8     ahead.

9         A.  Could you ask the question again?

10        Q.  Are you aware of any document that looks

11    at any of these efforts that you've just described

12    as being undertaken to determine whether Harvard

13    could stop using race in the admissions process

14    prior to the filing of this lawsuit?

15        A.  There certainly had been studies done of

16    the various steps we've taken.  I honestly don't --

17    you could argue, you know, among other things, that

18    it -- these kinds of changes, you know, would

19    certainly be part of a massive good-faith effort to

20    do anything that seemed reasonable to come up --

21    what are called race-neutral alternatives.

22            I don't know if that answers your

23    question.  Probably it doesn't.

24        Q.  I'm not asking you about what could be

25    argued.  I'm asking is there a document that you're

1                         FITZSIMMONS

2    aware of prior to 2014 that specifically addressed

3    the question of whether any of these initiatives

4    could be used instead of race in the admissions

5    process?

6         A.  I don't remember, for example, if Neil

7    Rudenstine's report did that.

8         Q.  Are you aware of any other document other

9    than possibly Neil Rudenstine's report?

10        A.  Not off the top of my head, but...

11        Q.  When you undertook these efforts, were you

12   doing so with an open mind to ceasing the use of

13   race in the admissions process?

14             MS. ELLSWORTH:  Objection.

15        A.  We would always have an open mind on

16   anything.  But, again, I think our focus was on

17   achieving and getting a class that really would be

18   diverse in all ways, including ethnicity, and

19   therefore, make it a better educational experience

20   for people during the four years.  But not sure

21   it's specifically framed the way you would say it.

22        Q.  Did you ever -- when you were undertaking

23   these initiatives that you've described and that

24   are in the interrogatory response, were you open to

25   the possibility that the best class could be

1                         FITZSIMMONS

2    achieved without using race in the admissions

3    process?

4            MS. ELLSWORTH:  Objection.

5       A.  Again, I think any reasonable person would

6    have an open mind in receiving any new information

7    that -- any reasonable person or institution, I

8    think, would take into account new information.

9       Q.  And today your testimony is you can't

10   imagine what it would take for you to be convinced

11   that you should stop using race in the admissions

12   process?

13           MS. ELLSWORTH:  Objection.

14      A.  That would be true.

15      Q.  Was that any different four years ago?

16      A.  Four years ago?  No.

17      Q.  Was it any different three years ago?

18      A.  Could you ask the question again?  Just

19   make sure I understand it.

20      Q.  Yes.

21           Four years ago, could you imagine evidence

22   that would change your mind as to whether or not

23   Harvard should stop using race in the admissions

24   process?

25           MS. ELLSWORTH:  Objection.

1                        FITZSIMMONS

2       A.   You know, I think -- again, I think a

3  reasonable person or reasonable institution would

4  always keep an open mind about anything.  I mean,

5  new information comes in but that despite massive

6  efforts that people would reasonably call

7  race-neutral efforts to make a difference, there's

8  still no case in our minds that, despite all the

9  things that we've done that we could achieve our

10 goal of having a diverse class and an effective

11 educational experience without using race.

12      Q.   You keep saying that these are efforts

13 that people could reasonably call race-neutral

14 alternatives.  Did you ever call them race-neutral

15 alternatives at the time you were considering them?

16           MS. ELLSWORTH:  Objection.

17      A.   I -- certainly in my own mind, we're well

18 aware of the fact that all of these -- lots of

19 articles have been written, certainly, that all of

20 these kinds of things were -- were changes that

21 would be reasonably labeled race-neutral.

22      Q.   Do you ever remember using that label to

23 describe these specific efforts that were

24 implemented at Harvard?

25      A.   I don't recall specifically.

1                    FITZSIMMONS

2        Q.  Do you recall anybody else in the

3   admissions office using that label specifically to

4   describe these initiatives prior to the filing of

5   this lawsuit in 2014?

6        A.  I don't have a specific recollection, but

7   I know I and others were certainly aware that

8   that's what these things were called by many

9   people.

10       Q.  Are you aware of any formal analysis on

11  paper that purports to analyze how these could be

12  used and what the result of them would be instead

13  of using race?

14            MS. ELLSWORTH:  Objection.

15       A.  Formal analysis?

16       Q.  Something in writing.

17       A.  Something that doesn't -- nothing as

18  specific as what you're describing comes to mind.

19       Q.  Does Harvard provide -- has Harvard --

20  strike that.

21            Since this lawsuit, are you aware of any

22  such formal analysis?

23            MS. ELLSWORTH:  Objection.  I'll remind

24  the witness not to disclose anything learned from

25  counsel or actions taken at the direction of

1                         FITZSIMMONS

2    counsel in answering the question.  If you can

3    answer the question without disclosing that

4    information, you may do so.

5         A.  I think the answer to that question would

6    be in the interrogatory regarding -- I believe, if

7    I understand your question, the Ryan committee and

8    then the committee that Dean Khurana and Dean Smith

9    and I are on.

10        Q.  Other than the output of that committee,

11   are you aware of any other analysis that's been

12   done with respect to race-neutral alternatives?

13        A.  At Harvard?

14        Q.  At Harvard?

15        MS. ELLSWORTH:  Again, I'll give the same

16   instruction or reminder not to disclose any action

17   taken at the direction of counsel or communication

18   of counsel in answering that question.  If you can

19   answer the question without disclosing that

20   information, you may.

21        A.  The question again, I'm sorry.

22        Q.  Other than the output of those committees,

23   are you aware of any formal analysis?

24        A.  Not any that immediately come the mind.

25        Q.  If you had some time to think about it

1                          FITZSIMMONS

2    would your answer change?

3            MS. ELLSWORTH:  Objection.

4        A.  I don't know.

5        Q.  You are designated as a 30(b)(6) witness

6    on this topic, right?

7        A.  Right.  Right.

8        Q.  So you did prepare for this deposition to

9    understand what Harvard had done with respect to

10   race-neutral alternatives, did you not?

11       A.  Yes.  And that --

12       Q.  Okay.  So nothing comes to mind?

13       A.  I must -- I -- no, but I could be

14   informed.

15       Q.  Has Harvard considered using geographic

16   preference in its admissions process as an

17   alternative to race?

18           MS. ELLSWORTH:  Objection and, again, the

19   same reminder to the witness not to disclose any

20   actions taken at the direction of counsel or

21   communications with counsel.  If you can answer the

22   question without disclosing that information, you

23   may.

24       A.  So the question is using geographic

25   preference as a substitute?

1                    FITZSIMMONS

2      Q.  Correct.

3      A.  What we know of the diversity of the

4  country, and as we have -- obviously I've been in

5  admissions for a very long time -- there has not

6  been a formal study of such a proposal.  But what

7  we know of the diversity of, within -- and the lack

8  of diversity, actually, as well, in different parts

9  of the country, it certainly does not seem

10  reasonable that that could be a substitute.

11      Q.  Has Harvard ever used ZIP Codes to help

12  identify students who could perform well at Harvard

13  from under-recruited areas?

14      A.  It has been something that we have talked

15  about and something that we -- that's been used in

16  some other recruiting pieces as well.  I think

17  including the -- I believe the Hoxby Turner efforts

18  with the College Board.

19      Q.  Do you use those now?

20      A.  We're aware of ZIP Code analysis.

21      Q.  Do you use ZIP Code analysis now?

22          MS. ELLSWORTH:  Objection.

23      A.  We have found it to be not particularly

24  effective.  But, again, one piece of information

25  among many.

1                     FITZSIMMONS

2     Q.  And how have you found it?  Had you used

3 it before?

4          MS. ELLSWORTH:  Objection.  What's the

5 question, exactly?

6          THE WITNESS:  Yeah.

7     Q.  Do you use ZIP Code analysis to try to

8 identify students?

9     A.  If you mean a formal analysis, no, but we

10 would be aware that certain ZIP Codes are, you

11 know, different one from the other.  But there's

12 also a great deal of, for example, diversity within

13 ZIP Codes.

14     Q.  Have you previously used ZIP Codes to help

15 identify students who could succeed at Harvard?

16          MS. ELLSWORTH:  Objection.

17     A.  I'm not sure how the ZIP Code would help a

18 student succeed at Harvard.

19     Q.  Do you recall using College Board

20 databases to search for kids from ZIP Codes that

21 were socioeconomically challenged?

22     A.  We are exploring that possibility.  It is

23 not a perfect science, by any means.

24     Q.  Aside from exploring that possibility, is

25 that something that you once did before?

1                     FITZSIMMONS

2      A.  We have had it as part of what we've done,

3  as I recall.

4      Q.  And when was that?

5      A.  Within the past few years, I believe.

6      Q.  Starting when?

7      A.  I don't remember exactly.

8      Q.  2013?

9      A.  I don't remember precisely.

10      Q.  And has there been a report that analyzes

11  why using ZIP Codes is not useful, I guess?

12          MS. ELLSWORTH:  Objection.

13      A.  I believe that Erica Bever had conducted

14  some research which I believe included ZIP Code.

15  And if I'm correct in that, which I might not be,

16  I think we found it to be of some use but rather

17  limited use.

18      Q.  Back in the '80s, did the College Board

19  have a system that allowed people to search by ZIP

20  Code for high-performing students?

21          MS. ELLSWORTH:  Objection.

22      A.  Certainly there was a time in the past

23  when that was possible, but then it was

24  discontinued for a long period of time.

25      Q.  Do you know when it was discontinued?

1                      FITZSIMMONS

2        A.   I don't, off the top of my head.

3        Q.   Do you know when it was reinstated?

4        A.   Relatively recently.  I would say within

5    the past five or six or seven years.

6        Q.   Is that in the form of the College Board

7    cluster data?

8        A.   I believe that's part of what they do.

9        Q.   Has Harvard used the College Board cluster

10   data in its admissions office?

11       A.   We're certainly aware of it, and we're

12   studying it.

13       Q.   Have you actually looked at whether it

14   would allow you to identify a diverse class of

15   applicants or admittees without -- instead of the

16   use of race?

17            MS. ELLSWORTH:  Objection.

18       A.   The analysis has not gone very far at this

19   point.

20       Q.   Has it specifically analyzed what it would

21   do as an alternative to the use of race?

22            MS. ELLSWORTH:  Objection.  Again, I'll

23   remind the witness --

24            THE WITNESS:  Not specifically.

25            MS. ELLSWORTH:  I'll remind the -- wait,

1                          FITZSIMMONS

2    wait, wait -- not to disclose information learned

3    from counsel or communications with counsel in

4    answering the question.

5         A.  The question again?

6              MR. STRAWBRIDGE:  Can you read it back?

7              (Preceding question read.)

8              MS. ELLSWORTH:  Want to put a time frame

9    on that question, maybe?

10             MR. STRAWBRIDGE:  Since the reintroduction

11   of the socioeconomic cluster data.

12             MS. ELLSWORTH:  Again, I'll just remind

13   the witness not to disclose communications with

14   counsel when answering the question.

15        A.  There's certainly been no definitive

16   analysis that we have been -- that has come to our

17   attention that would indicate that that would be

18   any kind of a reasonable substitute.

19        Q.  Has Harvard conducted any nondefinitive

20   analysis of that question?

21             MS. ELLSWORTH:  Objection.

22        A.  I don't recall how far Erica -- if that's

23   one of the things she was working on.  And I know

24   she and I talked about it, whether or not she got

25   very far on that.

Page 188

1                        FITZSIMMONS

2       Q.  Do you remember when you had these

3   conversations with Ms. Bever?

4       A.  I don't specifically, but she's worked

5   with us for three years.

6       Q.  Do you know if it was at the beginning or

7   later in your tenure?

8       A.  It's hard to say in the always busy --

9   any three-year period is very busy in our world.

10  I would guess it was somewhere in the middle, but

11  that's just a guess.

12      Q.  You think it's work she's done since she

13  came over to the admissions office?

14      A.  My guess is yes because it wasn't possible

15  before then.

16      Q.  Has Harvard analyzed whether it could

17  achieve racial diversity by curtailing or ending

18  the tip that it gives to legacy admits?

19          MS. ELLSWORTH:  Objection.

20      A.  Could you repeat that.

21      Q.  Has Harvard analyzed whether it could

22  achieve racial diversity by curtailing the tip or

23  ending the tip that it gives to legacy admits?

24          MS. ELLSWORTH:  Objection.

25      A.  Using legacy status as one factor among

1                    FITZSIMMONS

2        A.  Not that I can recall.

3        Q.  Is there a specific training session that

4   everyone's required to attend on a regular basis

5   that reviews what is legally permissible with

6   respect to the use of race in the admissions

7   process?

8            MS. ELLSWORTH:  Objection.

9        A.  That really would be part of the

10   comprehensive training program.

11        Q.  Are you aware that it's specifically

12   included every year on the training program?

13            MS. ELLSWORTH:  Objection.

14        A.  The intention of the training program is

15   to give a comprehensive overview of how to evaluate

16   an application.

17        Q.  Is it your understanding that that

18   includes specific training on how race should be

19   used?

20        A.  If it isn't in writing, it could well also

21   be done in discussion.

22        Q.  Are you sure that it is?

23        A.  I don't know for sure.

24            MS. ELLSWORTH:  Objection.

25        Q.  Do you take any steps to ensure that it

1                         FITZSIMMONS

2   is?

3           MS. ELLSWORTH:  Objection.

4       A.  I review very carefully as chair of the

5   full committee and a chair of one of the large

6   subcommittees, I look very carefully at what new

7   staff members -- how they're evaluating

8   applications as they come through committee.

9           And I also would talk to the chairs of our

10  various subcommittees to ensure that they believe

11  that any new staff member understands completely

12  what it is that we're trying to do.

13      Q.  Do you recall any specific discussions

14  about a staff member using race inappropriately?

15          MS. ELLSWORTH:  Objection.

16      A.  Not off the top of my head, no.

17      Q.  Do you recall any discussions with any

18  staff members about concerns that race was not

19  being used consistently with Harvard's guidelines?

20          MS. ELLSWORTH:  Objection.

21      A.  No specific instances come to mind, but

22  it's a busy office.

23      Q.  When the readers are reading a file, do

24  they assign it scores?

25      A.  Yes.

1                        FITZSIMMONS

2       Q.   Will you sometimes provide information to

3   the committee about the rating that has been

4   provided to you for this candidate?

5            MS. ELLSWORTH:   Objection.

6       A.   Yes.

7       Q.   Is that information provided in

8   subcommittee?

9            MS. ELLSWORTH:   Objection.

10      A.   It could be.

11      Q.   How would that information get

12  communicated to the subcommittee chair for a

13  subcommittee that wasn't yours?

14      A.   I might talk directly to the area person;

15  I might talk directly to the chair; I might go into

16  the subcommittee and talk to everyone.   It varies.

17      Q.   Before the subcommittee process begins,

18  does each docket receive a target number?

19      A.   Yes.

20           MS. ELLSWORTH:   Objection.

21      Q.   And how is that target number calculated?

22      A.   It's the roughest of rough estimates based

23  on the quality of the applicants the previous year

24  from that area with the information about number of

25  applicants, the number of people admitted from that

1                          FITZSIMMONS

2    particular area, which would be a measure of the

3    quality.

4          And then you would have the information

5    this year of any variations in the application

6    numbers.  And then, depending on where you are in

7    the process, you would have the admits so far,

8    which would be, again, a rough measure of -- this

9    is on, say, a one-pager as we had talked about

10   before.

11         So it's a very, very, very rough way to

12   start, just to -- but because our recruiting is so

13   comprehensive and because every year we are

14   writing, as you know, and communicating with

15   thousands and thousands of applicants in very much

16   the same way from year to year, we will tend to

17   have -- from one year to the next, you tend to have

18   the roughly the same number and then roughly the

19   same quality from an area.

20         Although, and the reason I use the word

21   rough, very rough to describe the targets is that

22   until you actually read the applications, you --

23   and go through committee, you don't really know

24   what the quality is this year.

25         So the targets are just a starting point

1                        FITZSIMMONS

2    that we all know may end up not at all representing

3    the quality this year versus last year.

4        Q.  So let me just back up a little bit.  Are

5    the targets -- the targets, as I understand your

6    testimony, are allocated based on what happened

7    with last year's class?

8        A.  Yes.

9        Q.  Docket by docket?

10       A.  Sorry.  Yeah.

11       Q.  Adjusted, perhaps, for any change in the

12   application numbers this year; is that correct?

13           MS. ELLSWORTH:  Objection.

14       A.  More or less.

15       Q.  Okay.  And how?  When you say more or

16   less, what do you mean?

17           MS. ELLSWORTH:  Objection.

18       A.  We might take a look at, again, look at

19   what last year's experience with the application

20   numbers and then the number of admits ultimately,

21   so at the end of the whole process.  And normally

22   we would simply proportionately use the last year's

23   admits as a way to get into this year's targets.

24           If there was a variation, you know, the

25   number of applications, you might increase a target

1                        FITZSIMMONS

2    or decrease a target slightly with that information

3    in hand.

4        Q.  Is it the same -- well, is the projected

5    yield factor in, to setting the targets?

6        A.  Only in the most collective sense, and

7    that is that we know one year to the next that the

8    yield in different areas tends to be roughly

9    similar to the previous year.  And we obviously

10   want very much not to have too many people who end

11   up saying yes, so that we would be overcrowded.

12            So if you add up, and this is the way it

13   would work, if you look at the bottom, I suppose,

14   of how many you admitted last year, the yield in a

15   funny way would be figured in by literally what

16   happened last year and then applied proportionately

17   to what we have in front of us this year.  But we

18   know that yields can vary overall, and they can

19   vary by docket from year to year.

20       Q.  To account for that, do you set a target

21   that is below the number of seats that you'll have,

22   based on whatever yield assumption you're applying?

23       A.  Well, in all cases, you know, every

24   docket, again figured out by looking at last year.

25   But we know that no matter how hard we try,

1                    FITZSIMMONS

2    there'll still be anywhere, you know -- this year,

3    you know, 16 or 17 percent of the people we

4    admitted turned us down.  And the year before, the

5    number was more like 21 percent of the people

6    turned us down.

7        Q.  Right.  But I guess my --

8        A.  So the whole number would always be, of

9    admits, will always be more than the ones we expect

10   to show up.

11       Q.  Okay.  How many seats do you have in a

12   given class?

13       A.  1,662.

14       Q.  Okay.  And for regular action, you have

15   the benefit of the Early Action numbers.

16           Is your yield assumption that you use to

17   generate the targets, if it comes out right, does

18   that equal 1,662?

19           MS. ELLSWORTH:  Objection.

20       A.  We would hope.  It's always -- we would

21   hope to be able to use the waiting list each year.

22   So I think our hope, let's say in April, adding up

23   the early admits and the regular action admits, our

24   hope is that we would end up on May 1st, May 5th,

25   you know, when we get final responses from people,

1                         FITZSIMMONS

2   any of the buildings near Harvard Yard or in other

3   locations.

4       Q.  How many times has that happened in the

5   last 10 or 15 years?

6           MS. ELLSWORTH:  Objection.

7       A.  Once.

8       Q.  Just once?  Obviously, it's something you

9   try to avoid?

10      A.  Yes.

11      Q.  So the targets that get generated through

12  this series of assumptions and calculations you

13  just described, those are distributed to each

14  docket chair?

15      A.  Yes.

16      Q.  And are those docket chairs, do they

17  consider those to be hard or soft targets?

18          MS. ELLSWORTH:  Objection.

19      A.  I would say generally hard.

20      Q.  They're expected to come to the full

21  committee meeting --

22      A.  Oh, I see what you're saying.  I'm sorry.

23  When I said hard, I thought you meant difficult to

24  meet.  Sorry.

25          We look -- the way I would look at them is

1                          FITZSIMMONS

2    happened in the previous year's results, what might

3    have then affected what kinds of target projection

4    you might have given this year.

5          But, in the end, the docket targets really

6    don't mean much because, in the end, those

7    individual candidates -- the strongest ones who

8    didn't make it, the weakest ones who stayed in, and

9    frankly, even every person who was admitted in,

10   let's say -- take regular action as an example --

11   so even though the subcommittee admitted these

12   students, that's simply a recommendation.

13         And so, in the end, all of those students

14   are -- have to be compared against all of the other

15   people from all the other dockets, and lots of

16   times there's new information available.  You know,

17   there could be any number of new pieces of

18   information, new interview or whatever, and that

19   might make for a different case.

20         So every one ultimately gets compared to

21   everyone else in the same process that I have

22   mentioned earlier today, where you would

23   literally -- if you were, say, the area person for

24   a candidate from a school, there would be a docket

25   that people could look at but then all the

1                          FITZSIMMONS

2          THE VIDEOGRAPHER:  Time now is 1612.  Off

3     the record.

4          (Proceedings interrupted at 4:12 p.m. and

5       reconvened at 4:30 p.m.)

6          THE VIDEOGRAPHER:  Time now is 1630, and

7     we're on the record.

8     BY MR. STRAWBRIDGE:

9       Q.  Did you discuss your answers with counsel

10    during the break?

11      A.  No.

12      Q.  During the full committee meeting, you

13    received over the course of the process several of

14    the one-pagers?

15          MS. ELLSWORTH:  Objection.

16      A.  Two, perhaps, and three, counting at the

17    end, as I recall.

18      Q.  At the beginning of the process, is the

19    data about the ethnic composition of the class

20    shared with the full committee?

21          MS. ELLSWORTH:  Objection.

22      A.  Not necessary.

23      Q.  You don't read it at the beginning of the

24    full committee meeting?

25          MS. ELLSWORTH:  Objection.

1                    FITZSIMMONS

2    A.  Not in every year or every instance.

3    Q.  Do you sometimes do that?

4    A.  If there's a variation worth mentioning.

5    Q.  And do you also read the information about

6    the prior year?

7    A.  I might.

8    Q.  If -- during that process you said you'll

9    mention if there is a variation from the prior

10   year?

11   A.  I might.

12   Q.  And if there are variations in the numbers

13   compared to the prior year as the process goes

14   through, will you and Ms. McGrath use that

15   information to present candidates for

16   reconsideration by the committee?

17        MS. ELLSWORTH:  Objection.

18   A.  No.

19   Q.  Are you sure about that?

20        MS. ELLSWORTH:  Objection.

21   A.  Could you define what you mean by "use"?

22   Q.  Yes.  Would you use the information on the

23   one-pagers to help you determine whether or not

24   candidates from a particularly -- from a group that

25   appears to be particularly underrepresented should

                              FITZSIMMONS

1

2    be brought back to the committee's attention for

3    full consideration?

4         MS. ELLSWORTH:  Objection.

5    A.  Variations of any sort might be worth

6    mentioning.

7    Q.  And so would you mention that in the

8    process of bringing people back forward to the

9    committee for full consideration?

10        MS. ELLSWORTH:  Objection.

11   A.  We might provide this information.

12   Q.  And would you provide that multiple times

13   during the course of a particular full committee

14   meeting?

15        MS. ELLSWORTH:  Objection.

16   A.  Not that I recall.

17   Q.  If Ms. McGrath recalled doing it multiple

18   times during a full committee session, would you

19   disagree with her?

20        MS. ELLSWORTH:  Objection.

21   A.  I wouldn't really know what she meant by

22   that.

23   Q.  She's in the meetings with you, right?

24   A.  She may be in the subcommittee meeting.

25   Q.  And she comes to the full committee

1                        FITZSIMMONS

2    meetings, right?

3         A.  Yes.

4         Q.  She sits in all of them just like you do,

5    right?

6              MS. ELLSWORTH:  Objection.

7         A.  She sits in full committee when her

8    schedule allows.

9         Q.  And, I mean, is that most of the full

10   committee meetings?

11             MS. ELLSWORTH:  Objection.

12        A.  She sits in a large number of the full

13   committee meetings.

14        Q.  As the process goes on, is the overall

15   ethnic composition of the class as reflected in the

16   one-pagers shared with the full committee after the

17   first -- after the beginning?

18             MS. ELLSWORTH:  Objection.

19        A.  Not usually.

20        Q.  If Sally Donahue testified that it is,

21   would you disagree with her?

22             MS. ELLSWORTH:  Objection.

23        A.  I'm not sure of the context of her

24   evaluation.

25        Q.  When you say not usually, does that mean

1                        FITZSIMMONS

2        Q.   Okay.   If Ms. McGrath testified that they

3    were password-protected, do you have any reason to

4    disagree with that?

5            MS. ELLSWORTH:   Objection.

6        A.   I'm simply not aware of it.

7        Q.   Are the ethnicity stats that are used,

8    that are prepared in the one-pager used in order to

9    ensure that the committee does what it can to give

10   candidates of various ethnicities full

11   consideration and avoid any unnecessary variation

12   from the prior year's numbers?

13           MS. ELLSWORTH:   Objection.

14       A.   No.

15       Q.   If Ms. McGrath testified that the

16   committee -- that she desires to make sure that the

17   committee has a chance to give full consideration

18   and avoid any unnecessary variation, would you

19   disagree with that?

20           MS. ELLSWORTH:   Objection.

21       A.   Yes.

22       Q.   How long has she been in the office?

23           MR. LEE:   You asked that two hours ago.

24   It's the same 20 years.   Really?   Come on.   Please.

25           MR. STRAWBRIDGE:   Mr. Lee, are you

1                       FITZSIMMONS

2  defending the deposition?

3          MR. LEE:  No, but, you know, this is

4  supposed to be a professional --

5          MR. STRAWBRIDGE:  Would you like to go off

6  the record?

7          MR. LEE:  No.  I'd actually like this to

8  stay on the record.  He's going to be here for ten

9  hours.  Could you just not ask the same questions

10 again and again, please, as a professional courtesy

11 to all of us.

12         MR. STRAWBRIDGE:  I'll ask the questions

13 as I see fit, Counsel.  Thank you.

14         MR. LEE:  Well, you know, I guess we'll

15 see the judge on this after the deposition.

16     Q.  How long has she been in the admissions

17 office?

18         MS. ELLSWORTH:  Objection.

19     A.  For much of the time I've been dean.

20     Q.  And why do you think she would be wrong?

21     A.  I don't know.

22     Q.  Are you familiar with what's known as the

23 lopping process?

24     A.  Yes.

25     Q.  And what is the lopping process?

1                       FITZSIMMONS

2        A.  It's part of the full committee where we

3    ensure that we send out the number of admissions

4    that will, we hope, not overcrowd our class.

5        Q.  Is it the point where decisions have to be

6    made to pare back the class to get to the target

7    number?

8            MS. ELLSWORTH:  Objection.

9        A.  It's one way of looking at it.

10       Q.  Are lops distributed evenly amongst the

11   dockets in proportion to the number of admits who

12   are beyond the target?

13       A.  That would be the goal.

14       Q.  Every subcommittee receives a lop number?

15       A.  Yes.

16       Q.  And is required to fill out a form

17   recommending lops?

18       A.  Yes.

19       Q.  Does that form request information about

20   the ethnicity of the candidates who are being

21   proposed for lops?

22       A.  As I recall.

23           (Exhibit 6, HARV00004924 - 4927, marked for

24       identification.)

25           MR. STRAWBRIDGE:  Look at this document and

1                           FITZSIMMONS

2      strong students from all backgrounds are attracted

3      into the Harvard applicant pool and that we would

4      have the opportunity to review their applications

5      using ethnicity as one factor among many.

6            And thinking about the importance of

7      having people from a wide variety of ethnic

8      backgrounds in our class so that they can educate

9      each other to be better citizens and citizen

10     leaders and then, we hope, be strong citizens and

11     citizen leaders after graduation from Harvard.

12           So that as we review each applicant from

13     the groups we have been fortunate enough to get as,

14     you know, into our pool, we then look at background

15     as one factor among many as we make our decisions.

16     Q.   Why do you track yield rates by ethnicity?

17           MS. ELLSWORTH:  Objection.

18     A.   It's simply important for us to understand

19     not just what might happen if a class turns out to

20     be a particular -- have a particular composition

21     ethnically, but we would look at other factors,

22     geography, for example, as well.

23           So it wouldn't simply be the only factor.

24     But we, again -- once the meetings, you know, are,

25     you know, completed, we, you know, we want to make,

1                    FITZSIMMONS

2    example, as an example, people from the South tend

3    to yield at a lower rate.  If you had more people

4    from the South, you could then say you might feel

5    free to admit more people right at the end of the

6    process, if that answers the question.

7        Q.  Are you aware of any charts like this that

8    track yield rates by geographic region?

9            MS. ELLSWORTH:  Objection.

10       A.  That's information that we certainly are

11   aware of.

12       Q.  And so your testimony is that there are

13   similar charts like this that break it down by

14   geographic region, what the yield rate is?

15           MS. ELLSWORTH:  Objection.

16       A.  I have that information.  Some of it may

17   be on the one-pager.

18       Q.  Is there -- what have you done in the past

19   when you've seen the number of Asian Americans in

20   the best class that you've admitted has taken a

21   significant jump, by, like, ten percent?  How have

22   you addressed that in a given year, given your

23   yield calculations?

24           MS. ELLSWORTH:  Objection.

25       A.  I'm sorry.  Could you repeat that

1                     FITZSIMMONS

2    article?

3         A.  That might have been the case.

4         Q.  All right.  So just to make sure I

5    understand, is your testimony that you didn't make

6    a request to OIR after Mr. Unz's article to look

7    into Asian American discrimination, or is it simply

8    that you don't remember making a request?

9              MS. ELLSWORTH:  Objection.

10        A.  I don't remember making a specific request

11   to them about Asian American admissions at that

12   time.

13        Q.  Do you remember making a request to them

14   about -- a general request to them about Asian

15   American admissions?

16             MS. ELLSWORTH:  Objection.

17        A.  What's the time frame again, please?

18        Q.  After Mr. Unz published his article.

19             MS. ELLSWORTH:  Objection.

20        A.  I don't remember whether we made a

21   specific request to them for such information.

22        Q.  Is it possible that you did?

23             MS. ELLSWORTH:  Objection.

24        A.  That's hard to say.

25        Q.  You can't say one way or another?

1                        FITZSIMMONS

2    you think would be sufficient to make you concerned

3    and conduct a further investigation?

4         MS. ELLSWORTH:  Objection.

5      A.  We are very careful in our admissions

6    process to review each application with great care

7    of students from all backgrounds.

8             And we discuss these applicants

9    holistically and with all the information that we

10   have with our 40 admissions committee members and

11   faculty members, and we would always be vigilant

12   about any suggestion of discrimination against any

13   person.

14      Q.  Do you think that your testimony about how

15   you reacted to these reports and the follow-up that

16   did or did not happen is consistent with your

17   statement just now that you would always be

18   vigilant about allegations of discrimination?

19         MS. ELLSWORTH:  Objection.

20      A.  Yes.

21      Q.  Do you think you exercised vigilance, sir?

22         MS. ELLSWORTH:  Objection.

23      A.  Yes.

24      Q.  And do you think it was consistent with

25   the exercise of vigilance not to send any of this

1                    CERTIFICATE

2     Commonwealth of Massachusetts

3     Suffolk, ss.

4

5          I, Dana Welch, Registered Professional

6     Reporter, Certified Realtime Reporter and Notary

7     Public in and for the Commonwealth of

8     Massachusetts, do hereby certify that WILLIAM

9     FITZSIMMONS, the witness whose deposition is

10    hereinbefore set forth, was duly sworn by me and

11    that such deposition is a true record of the

12    testimony given by the witness.

13         I further certify that I am neither related

14    to nor employed by any of the parties in or counsel

15    to this action, nor am I financially interested in

16    the outcome of this action.

17         In witness whereof, I have hereunto set my

18    hand and seal this 15th day of August, 2017.

19

20    _____

                        Dana Welch

21                      Notary Public

                        My commission expires:

22                      October 6, 2017

23

24

25