EXHIBIT 123

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3        Civil Action No. 1:14-cv-14176-ADB

4    _____

5    STUDENTS FOR FAIR ADMISSIONS, INC.,

6              Plaintiff,

7     v.

8    PRESIDENT AND FELLOWS OF

9    HARVARD COLLEGE

10   (HARVARD CORPORATION),

11              Defendant.

12   _____

13

14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16          DEPOSITION of MICHAEL SMITH

17            Boston, Massachusetts

18             April 23, 2018

19

20

21

22   Reported by:

23   Dana Welch, CSR, RPR, CRR, CRC

24   Job Number: 140867

25

1          HIGHLY CONFIDENTIAL - AEO - SMITH

2     plans to step down?

3          MS. ELLSWORTH:  Object to the form.

4     A.  I do not.

5     Q.  Do you know if Sally Donohue has any plans

6     to step down?

7          MS. ELLSWORTH:  Object to the form.

8     A.  Sally Donohue has announced that she's

9     retiring.

10    Q.  Do you know when that will happen?

11    A.  Not specifically.  I don't remember the

12    date.

13    Q.  Do you know if Marlyn McGrath has any

14    plans to step down?

15         MS. ELLSWORTH:  Object to the form.

16    A.  I don't know.

17    Q.  How long have you been at Harvard?

18    A.  I passed my 25-year anniversary back in

19    November.  1992.

20    Q.  I was told there wouldn't be math.

21         Since 1992, have you served on any

22    committees?

23    A.  I have.

24    Q.  And can you tell me the committees you've

25    served on?

1          HIGHLY CONFIDENTIAL - AEO - SMITH

2          MR. CONNOLLY:  Can we go off the record.

3          (Proceedings interrupted at 9:19 a.m. and

4      reconvened at 9:39 a.m.)

5          (Exhibit 2, HARV00097310 - 97328, marked

6      for identification.)

7  BY MR. CONNOLLY:

8      Q.  I am introducing as Exhibit 2, a document

9  with the Bates number ending in 97310, with the

10  title Report of the Committee to Study Race Neutral

11  Alternatives.

12          Do you recognize this report?

13      A.  I do.

14      Q.  And what is it?

15      A.  I believe it is the final report of the

16  committee that was put together, as it says in the

17  title, to study race neutral alternatives.

18      Q.  Were you on this committee?

19      A.  I was.

20      Q.  Who else was on the committee that created

21  this report?

22      A.  There are three members of the committee,

23  all listed on page whatever it is -- page 19:

24  William Fitzsimmons, who's our dean for admissions

25  and financial aid; Rakesh Khurana, who's the dean

1          HIGHLY CONFIDENTIAL - AEO - SMITH

2    for Harvard College; and then myself, who was the

3    chair of the committee.

4         Q.  Whose idea was it to create this

5    committee?

6              MS. ELLSWORTH:  Object to form.

7         A.  The committee came out of a conversation

8    amongst myself, the president of the university,

9    and our counsel.

10        Q.  And which counsel was that?

11        A.  Combination of the in-house, office of

12   general counsel, and consultation with WilmerHale.

13        Q.  Who in particular in the office of general

14   counsel?

15        A.  I believe it was Bob Iuliano.  And at some

16   other conversations, Ara Gershengorn was there,

17   too; I couldn't say which ones.

18        Q.  And which attorneys at Wilmer?

19             MS. ELLSWORTH:  Object to the form.

20        A.  I couldn't say who was at the first

21   conversation from WilmerHale.

22        Q.  Was this an in-person meeting when this

23   decision to create this committee was made?

24             MS. ELLSWORTH:  Object to the form.

25        A.  As far as I remember, it was in person.

HIGHLY CONFIDENTIAL - AEO - SMITH

1

2  Q.  Where was the meeting?

3  A.  In University Hall.

4      Sorry, take that back.  In Mass Hall.

5  Sorry.  Wrong building.

6  Q.  And that's on Harvard's campus?

7  A.  Correct.

8  Q.  When did this meeting occur?

9  A.  Sometime in the June time frame of last

10  year.

11  Q.  Before that time frame, had you had any

12  discussions with anyone about creating this

13  committee?

14      MS. ELLSWORTH:  Objection.  I'll remind

15  the witness not to reveal communications with

16  counsel in answering the question.  But otherwise,

17  you may answer the question.

18  A.  The only conversations we had about

19  creating a committee were with counsel.

20  Q.  When was the first time you had a

21  conversation about creating this committee?

22      MS. ELLSWORTH:  Objection, asked and

23  answered.

24  A.  To the best of my recollection, it was in

25  the June of 2017 time frame when we were talking

1    HIGHLY CONFIDENTIAL - AEO - SMITH

2  about constituting this specific committee.

3    Q.  When was the first time you had a

4  conversation about creating any committee to

5  examine the availability of race neutral

6  alternatives at Harvard?

7    MS. ELLSWORTH:  Object to the form.

8    A.  All conversations that we've had about

9  putting a committee together at the university have

10  been with counsel.  The time frame is uncertain to

11  me because it has been raised over time as the

12  university has thought about how to proceed in this

13  space.

14    Q.  Did you ever discuss putting together a

15  committee to examine the availability of race

16  neutral alternatives before November of 2014?

17    MS. ELLSWORTH:  One second, please.  I'll

18  object to the form.

19    You may answer the question, but as

20  always, please don't reveal the substance of any

21  communications with counsel.  But the question is

22  when or a timing question.  You can answer that if

23  you're able.

24    A.  I have -- I don't have any recollection of

25  specific times when the university has, with

1          HIGHLY CONFIDENTIAL - AEO - SMITH

2     Q.  Which individuals were at this committee?

3         MS. ELLSWORTH:  Object to the form.

4     A.  I'm not sure I understand your question.

5     Q.  Yeah.  Let me rephrase it.

6         Which individuals attended the meetings

7 related to this committee?

8         MS. ELLSWORTH:  Object to the form.

9     A.  When we had committee meetings, three

10 individuals were always there:  myself, Dean

11 Fitzsimmons, Dean Khurana.  And then we had a range

12 of members of counsel at different meetings, not

13 necessarily always the same individuals, and

14 sometimes we had a guest who was there to present

15 information to the committee.

16    Q.  So which individuals from the office of

17 general counsel at Harvard ever attended a meeting?

18    A.  Bob Iuliano was there for some, Ara was

19 there for some.  I couldn't say for certain if any

20 other members of our office of general counsel or

21 in-house counsel were there.

22    Q.  And which individuals from WilmerHale

23 attended these meetings?

24        MS. ELLSWORTH:  Object to the form.

25    A.  Felicia, Drew, and other members who I

1        HIGHLY CONFIDENTIAL - AEO - SMITH
2   alternatives outside of the presence of counsel?
3        A.  No.  I have been very careful to make sure
4   -- and committees should be running this way --
5   that the discussions that take place are
6   discussions with the entire counsel there so that
7   all members of the committee benefit from the
8   discussion.
9        Q.  To be clear, attorneys were not officially
10  members of the committee; is that right?
11       A.  That is right.
12       Q.  Have you ever exchanged e-mails about the
13  availability of race neutral alternatives in which
14  counsel from Harvard was not included on the
15  e-mail?
16       MS. ELLSWORTH:  Object to the form.  Time
17  frame?  Do you mean in connection with the
18  committee or...
19       Q.  Since June 2017.
20       THE WITNESS:  So do you mind reading the
21  question?
22       Q.  I can try again.
23       Since the committee was formed, did you
24  ever exchange e-mails where the topic was the
25  availability of race neutral alternatives and

HIGHLY CONFIDENTIAL - AEO - SMITH

1   counsel was not included on the e-mail?

2       A.   There's one recent e-mail exchange in

3   which I remember not including counsel, and that

4   was on one of the drafts, early work on one of the

5   drafts that was being exchanged between Dean

6   Fitzsimmons, Dean Khurana, and myself as we were

7   passing the document back and forth to be edited.

8   Counsel happened not to be on that one.

9       Q.   Is that the only e-mail you can recall?

10          MS. ELLSWORTH:  Object to the form.

11          THE WITNESS:  I'm not sure what that

12  means.  Is that something I should be --

13          MS. ELLSWORTH:  Oh, I'm sorry.  I object

14  to the form.  You can answer.  Sorry.

15          THE WITNESS:  I'm sorry.  I thought you

16  said check to the form.  Sorry.

17      A.   I can't recall anything else that was done

18  without including counsel.

19      Q.   When did you reach your conclusions as a

20  committee?

21      A.   I like to approach these questions with a

22  very open mind.  So from my perspective, it was not

23  until after we had received the last expert witness

24  report and we started to then have our discussions

1    HIGHLY CONFIDENTIAL - AEO - SMITH

2  within committee about what our report would look

3  like, how we were addressing each one of the race

4  neutral alternatives that have been considered, how

5  does it play off against the criteria that we had

6  decided upon as we move forward.  And that

7  discussion took place in committee.

8          And we then worked our way toward

9  consensus, produced early drafts, and continued

10  discussion of the different alternatives as the

11  draft started to represent what the committee as a

12  whole thought.

13          And so I would say, to answer your

14  question, it was very near the end of the process

15  by the time the committee had decided its mind

16  about the different race neutral alternatives.

17     Q.  Had you reached tentative conclusions

18  before that?

19     A.  I did not run the committee where I was

20  asking members of the committee to state their

21  opinions about the different race neutral

22  alternatives and whether they would be appropriate

23  for Harvard early in the process.  Certainly some

24  of that might come out as we had our discussions.

25  But I feel strongly that I should not be asking

1        HIGHLY CONFIDENTIAL - AEO - SMITH

2   people to make up their minds before all the data

3   appeared.

4        Q.  Had you personally made any tentative

5   conclusions before, I think you said, the second to

6   last committee meeting?

7        A.  I had not.  I approached it with a very

8   open mind, more than willing to see if there was an

9   alternative that we should be thinking about using

10  at Harvard.

11       Q.  During your committee meetings, was there

12  ever any disagreement among you, Dean Khurana, or

13  Dean Fitzsimmons?

14       A.  Disagreement in what way?

15       Q.  Disagreement as to any matter of substance

16  that you were analyzing.

17       MS. ELLSWORTH:  Object to the form.

18       A.  I think in trying to answer your question,

19  I would say that it's my opinion each of us took

20  the assignment that we had extremely seriously.  We

21  looked through the material.  We had questions

22  about how different race neutral alternatives might

23  change the way we approach things, and so we

24  debated that.  I'm not sure I would ever go to

25  characterize it as disagreements.  But we each

1          HIGHLY CONFIDENTIAL - AEO - SMITH

2    A.  Again, I don't know exactly which members

3 of our counsel were involved in pulling together

4 the first draft.

5    Q.  And just to be clear, do you know whether

6 any individuals from WilmerHale assisted in the

7 drafting of this report?

8     MS. ELLSWORTH:  Object to the form.

9    A.  Again, I don't know who was involved.  I

10 can tell you that the committee discussed the

11 report in a number of our meetings and how we would

12 like to see it put together.  And then, as is

13 typically done in a Harvard committee like this,

14 the person staffing the meeting usually pulls the

15 first draft so that the committee has something to

16 react to.  Whether it was just -- at that time, I

17 think it was Drew that was taking notes.  Whether

18 it was just Drew or not, I can't say for certain.

19    Q.  So for whoever was drafting the initial

20 report, how did the committee convey what it wanted

21 to be drafted?

22    A.  I think it gets conveyed through multiple

23 avenues.  First of all, the committee had a number

24 of different discussions that were captured through

25 the notes as we went through.  And we reviewed some

1           HIGHLY CONFIDENTIAL - AEO - SMITH

2    of those different race neutral alternatives in

3    multiple meetings, coming to a preliminary kind of

4    outcome after we thought about it.

5           And then we spent time, I think, in at

6    least two committee meetings talking about how we

7    would go from where we were to producing a report.

8    And so those discussions, counsel was there and the

9    staff were there to hear how the committee's

10   thinking about it.

11          And then the way typically the university

12   committees work, somebody goes off and pulls it

13   together.  And then the committee members get the

14   report back, and we react it to, and we make

15   changes to it, and we edit it, and that

16   collaborative effort ends up with the final report.

17   Q.  So someone, at some point, must have said

18   we're going to go draft this report.

19          MR. CONNOLLY:  Let me phrase this as a

20   question.

21   Q.  Did anyone ever tell you that a particular

22   individual was going to take the initial steps of

23   drafting this report?

24          MS. ELLSWORTH:  Object to the form.

25   A.  I would say it actually happened the other

                    HIGHLY CONFIDENTIAL - AEO - SMITH

1    way, where I finally said, okay, the committee

2    needs a draft of this report that we've been

3    discussing.  Could we please have it before the

4    next committee meeting.

5            I did not ask, knowing where you're going,

6    to a particular individual that I would like it to

7    be written by you.

8        Q.  So do you remember a committee where you

9    asked for this report to be drafted?

10           MS. ELLSWORTH:  Object to the form.

11   Committee meeting I think you mean.

12       Q.  Committee meeting.

13       A.  I do remember asking or stating that I

14   think it is time for us to have a draft at our next

15   committee meeting.  I couldn't tell you off the top

16   of my head exactly which one it was, but it was one

17   of the ones toward the end.

18       Q.  And did anyone respond in the affirmative

19   that they would get you a draft of this initial

20   report?

21           MS. ELLSWORTH:  Objection.

22       A.  To the best of my recollection, many

23   people did.  I wish I could be easier with your

24   question, but that's the truth.

25

HIGHLY CONFIDENTIAL - AEO - SMITH

1

2    Q.  So which individuals do you remember

3 telling you that the committee will soon have a

4 draft of the report?

5    A.  I honestly have a hard time remembering

6 who exactly is in each of our meetings.  I can --

7 best of my recollection is that a number of the

8 individuals in that meeting, not of the committee

9 meeting, but the counsel said, sure, we'll get you

10 a draft for next time.

11    Q.  Do you recall anyone in particular telling

12 you that you would have a draft soon?

13       MS. ELLSWORTH:  Objection, asked and

14 answered.

15    A.  I'm sorry, since I wasn't thinking about

16 asking a particular person, I wasn't looking to see

17 that a particular person answered me.

18    Q.  When did you first see a draft of this

19 report?

20    A.  I can't say for certain the date when I

21 saw the first draft.

22    Q.  Do you have a month?

23    A.  It was either March or April.  And

24 hopefully it is made more clear through the agendas

25 when we stopped talking about the need to produce

1          HIGHLY CONFIDENTIAL - AEO - SMITH

2     Q.  Which individuals do you believe assisted

3  in creating the first draft of this report?

4     A.  So my understanding is that Drew and Ara

5  had a hand in the first draft.

6     Q.  And just so the record is clear, Ara

7  Gershengorn?  Are you referring to Ara Gershengorn?

8     A.  I am.

9     Q.  And does she work at Harvard's office of

10  general counsel?

11     A.  She does, as far as I understand.

12     Q.  When you say Drew, are you referring to

13  Andrew Dulberg?

14     A.  I am.

15     Q.  And does he work at WilmerHale?

16     A.  As far as I understand.

17     Q.  I'm sorry.  Is he an attorney at

18  WilmerHale?

19     A.  As far as I understand.

20     Q.  Any other individuals in addition -- are

21  you aware of any other individuals that assisted in

22  the drafting of this initial report?

23          MS. ELLSWORTH:  Object to the form.

24     A.  I do not know if others assisted in the

25  drafting.

1          HIGHLY CONFIDENTIAL - AEO - SMITH

2     so?

3          A.  I believe we cc'd counsel.

4          Q.  How many drafts do you recall receiving of

5     this report?

6          MS. ELLSWORTH:  Object to the form.

7          A.  It depends on how you're asking that

8     question.  I would say we received one initial

9     draft, and then the committee worked on it and had

10    several drafts produced through work of the

11    committee.

12         Q.  Once you received the initial draft, did

13    counsel suggest any other -- suggest or make any

14    other changes to the report?

15         MS. ELLSWORTH:  Object to the form.

16         A.  Certainly toward the end of the process --

17    I ran a very open committee meeting in which I was

18    taking suggestions from not only members of the

19    committee, proper members of the committee, but

20    also any thoughts that happened to come out of

21    counsel that were in the room.  And we had shared a

22    draft of the report with the president, and the

23    president had sent back some suggested edits.

24         Q.  Did she send back suggested edits through

25    a hard copy?

1          HIGHLY CONFIDENTIAL - AEO - SMITH

2     A.  I believe so.

3     Q.  Did you ever have --

4          MR. CONNOLLY:  Strike that.

5     Q.  When you were reviewing these drafts, did

6  you make edits, suggestions, or comments on the

7  document, either electronically or in hard copy?

8     A.  Simple answer, yes.

9     Q.  Were you aware that your notes and

10 comments would be produced through this litigation?

11         MS. ELLSWORTH:  Object to the form.

12    A.  It was my understanding that whatever we

13 did during this committee, including edits and

14 notes that we made on documents, could be shared

15 with you, opposing counsel.

16    Q.  When was the report finalized?

17    A.  May I look at it?

18    Q.  Yes.

19    A.  Sometime in April 2018.  Clearly we didn't

20 put a day on it.  There's no day on it.

21    Q.  Did the committee have the final version

22 of this report at its last meeting?

23    A.  We did not have -- as best of my

24 recollection, we did not have the final version at

25 its last committee meeting.

1    HIGHLY CONFIDENTIAL - AEO - SMITH

2        Q.   Do you know why you did not have the final

3    version?

4        A.   I do.

5        Q.   Why is that?

6        A.   We had an extensive meeting where we went

7    through what we hoped would be the last sets of

8    edits, one at a time, paragraph by paragraph.  To

9    the best of my recollection, we had one section

10   toward the back that instead of trying to edit that

11   short section in committee, we would have that

12   section be cleaned up and sent to all the committee

13   members.  And then the committee members would give

14   that final okay, though we had given our support

15   for the rest of the document at that point.

16       Q.   Do you know which individuals were going

17   to write this new language?

18       MS. ELLSWORTH:  Object to the form.

19       A.   To the best of my understanding, it was

20   going to be Drew.

21       Q.   Do you recall the substance of this final

22   issue that Drew was rewriting?

23       A.   I will admit my memory isn't perfect, but

24   I believe it was the paragraph on page 17 or

25   whatever you call the other number, 97326, the

1      HIGHLY CONFIDENTIAL - AEO - SMITH

2  paragraph starting "the practice of deferred

3  admission."

4      Q.  Do you recall the change he was going to

5  make?

6      A.  As I mentioned, there wasn't a specific

7  set of words that he was going to just insert.  It

8  was a discussion that we had with respect to that

9  paragraph and then an editing of the paragraph to

10  make sure it said what we had discussed.

11        But there was a process put in place to

12  make sure that whatever -- if it was Drew -- did,

13  that each of the committee members had another

14  opportunity to read through it and state if they

15  agreed with it or not.

16      Q.  So how did the final vote on this report

17  occur?

18      MS. ELLSWORTH:  Object to the form.

19      A.  So we did not take formal vote.  But as I

20  mentioned, we went through what we hoped would be

21  the last version of the report with the sets of

22  edits each of us had, which were hopefully small,

23  made decisions on each of those edits, having gone

24  through the report paragraph by paragraph, hit that

25  one section, to the best of my recollection, and

HIGHLY CONFIDENTIAL - AEO - SMITH

1  decided it was not appropriate for us to try and

2  decide and finalize that one there in committee,

3  but to allow us to have a bit more time with it.

4  But then I had an explicit ask of each of the

5  members of the committee if they agreed with the

6  rest of the report, and they told me yes.

7       Q.  So the other members of the committee

8  never officially signed off on the explicit

9  language in this final report; is that correct?

10          MS. ELLSWORTH:  Objection.

11      A.  I would say that they did.  Maybe I misled

12  you there.

13          We went through, we made all the changes

14  we were making, pulling that one paragraph out to

15  be held.  And then I turned to each committee

16  member one at a time and said, do you have any

17  other changes, do you accept the report as it is

18  written.  And I got a yes.  And then I turned to

19  the next person, asked the same set of questions to

20  him.  And then stated my opinion.

21      Q.  But the final paragraph had yet to be

22  written when those --

23      A.  Yes.

24      Q.  Sorry.  The final paragraph had yet to be

1      HIGHLY CONFIDENTIAL - AEO - SMITH

2          So based on what you just said, it sounds

3   like you do not have a plan to keep this report

4   confidential; is that correct?

5          MS. ELLSWORTH:  Object to the form.

6      A.  For me personally, I do not have any such

7   plans.

8          MR. CONNOLLY:  All right.  Shall we break?

9          MS. ELLSWORTH:  Yes.

10         (Proceedings interrupted at 12:03 p.m. and

11     reconvened at 12:40 p.m.)

12         MS. ELLSWORTH:  And the parties just

13  wanted to put a clarification on the record that

14  this deposition, while it is not a 30(b)(6)

15  deposition, Dean Smith is being offered and is

16  prepared to testify in his capacity as chair of the

17  committee to study race neutral alternatives and is

18  being presented in that capacity today.  He's

19  prepared to talk about the work that the committee

20  did.

21         MR. CONNOLLY:  That's correct.

22  BY MR. CONNOLLY:

23     Q.  Do you recall any meetings of this

24  committee in which an individual from the office of

25  general counsel was not at the committee?

1        HIGHLY CONFIDENTIAL - AEO - SMITH

2        A.  Yes.

3        Q.  Do you know how many committees that

4    was -- or how many meetings that would have

5    happened?

6        A.  I can certainly recall one.

7        Q.  Do you know the reason why someone from

8    the office of general counsel was not there?

9            MS. ELLSWORTH:  Object to the form.

10       A.  I couldn't state why the office of general

11   counsel chose not to come.

12       Q.  At that meeting, was there an attorney

13   from WilmerHale at that meeting?

14       A.  No.

15       Q.  So at this meeting, there were no counsel

16   present; is that correct?

17       A.  Yes.

18       Q.  Did that happen more than once?

19           MS. ELLSWORTH:  Object to the form.

20       A.  I don't recall any other meetings without

21   counsel.

22       Q.  Do you know why counsel was not present at

23   that meeting?

24           MS. ELLSWORTH:  Object to the form.

25       A.  I do not know why they chose not to come.

1      HIGHLY CONFIDENTIAL - AEO - SMITH

2      Q.  Did any counsel dial in through a

3  conference call for this meeting?

4      A.  No.

5      Q.  So did anyone take notes at this meeting?

6      A.  There was a meeting in which we discussed

7  a draft of the report, and we took notes on the

8  draft.

9      Q.  And so at this meeting, was it just you,

10  Dean Khurana, and Dean Fitzsimmons?

11      A.  That's correct.

12      Q.  Do you recall when this meeting was?

13      A.  Sometime in the spring:  February, March,

14  April.  I'm not sure which of the meetings.

15      Q.  To be clear, aside from this one meeting,

16  do you recall any other meetings in which no

17  counsel was present?

18      A.  I do not.

19      Q.  You said at this meeting you discussed the

20  draft; is that correct?

21      A.  Yes.

22      Q.  And how did you take notes about the

23  draft?

24      A.  So how did we take notes about the draft?

25      Q.  Or if that's not clear, how did you edit

1          HIGHLY CONFIDENTIAL - AEO - SMITH

2    or provide comments about the draft?  Was it in

3    hard copy?  Was it through -- did you have access

4    to Microsoft Word?  How did you do it?

5          MS. ELLSWORTH:  Object to the form.

6     A.  So Dean Khurana took notes on the, I'm

7    assuming it was Microsoft Word version of the

8    draft.

9     Q.  Did he have a laptop?

10    A.  He did.

11    Q.  Anyone else have a laptop?

12    A.  I do not recall seeing Dean Fitzsimmons

13   with a laptop, and I had my iPad.

14    Q.  Were you providing any edits or comments

15   on the draft on your iPad?

16    A.  I had made marks on my iPad that I then

17   communicated to Dean Khurana as we went through the

18   draft.

19    Q.  So was Dean Khurana in charge of pulling

20   together everybody's comments and putting them into

21   one document?

22    A.  He was -- he had volunteered to take the

23   notes as we went through our discussion, and as we

24   were concluding the meeting we all decided that he

25   would take the next pass at edits based on our

1        HIGHLY CONFIDENTIAL - AEO - SMITH

2   conversation.

3        Q.  Do you know what the Ryan committee is?

4        A.  If you're referring to the committee that

5   was chaired by Dean Ryan to consider race neutral

6   alternatives, yes.

7        Q.  And what is your understanding of the

8   purpose of that committee?

9        A.  My understanding was that committee was

10  tasked to look at race neutral alternatives with

11  respect to admissions across the university.

12       Q.  Were you on the Ryan committee?

13       A.  I was not.

14       Q.  When did you first learn about the

15  existence of the Ryan committee?

16       A.  I can't say for certain when it was from a

17  calendar year point of view.

18       Q.  Did you learn about the Ryan committee

19  after this litigation was initiated?

20       A.  No.

21       Q.  So I take it you were aware of the Ryan

22  committee before the complaint was filed in this

23  case?

24            MS. ELLSWORTH:  Object to the form.

25       A.  As I remember the timing of the two

1      HIGHLY CONFIDENTIAL - AEO - SMITH

2      Q.  Yes.

3           Have you ever heard of the practice of

4      deferred admission being referred to as the Z list?

5      A.  I have.  Though we have through the end of

6      this process talked about it as deferred admission

7      and not the Z list, hence my confusion.

8      Q.  Can you tell me what the practice of

9      deferred admission is at Harvard?

10     A.  I can tell you in general.  I'm not

11     involved in the day-to-day aspects of it.  But it

12     is the, in general, admitting of a student not for

13     the incoming class, but for a subsequent class,

14     typically a year later, so that student has time to

15     take a gap year, which quite a bit of literature --

16     I'm not an expert on it -- has stated that this is

17     a benefit for a number of students coming out of

18     high school to take time before they head off to

19     college so that they are better prepared to take

20     advantage of the opportunities that college

21     presents to them.

22     Q.  Did you ever examine what would happen to

23     the level of racial diversity at Harvard if Harvard

24     stopped the practice of deferred admission in

25     addition to stopping the use of race?

1        HIGHLY CONFIDENTIAL - AEO - SMITH

2   question.

3        A.  I do not sit in the meetings, but as far

4   as I understand, the circumstances around an

5   applicant's background is taken into account in

6   reviewing their standardized scores.

7        Q.  Does Harvard seek to maximize the SAT

8   scores of its admitted class?

9            MS. ELLSWORTH:  Object to the form.

10       A.  Not as far as I understand.

11       Q.  And was it the view of the committee that

12  it should?

13       A.  That was not a goal of the committee.

14           (Exhibit 3, HARV00072381 - marked for

15           identification.)

16           MR. CONNOLLY:  Mark as Exhibit 3 a

17  document with the Bates number ending in 72381.

18       Q.  Do you recognize this document?

19       A.  I do.

20       Q.  Did you draft this document?

21       A.  As far as I recall, I didn't draft the

22  first version of it, but I edited it before it went

23  out.

24       Q.  Do you know who drafted the first version?

25       A.  I couldn't say for certain.

1            HIGHLY CONFIDENTIAL - AEO - SMITH

2    drafting.

3        Q.  And do you recall what the discussion was?

4        A.  There was some conversation with respect

5    to the timing of the final report and how that

6    might intersect with needs of the ongoing

7    litigation.  There was discussion of the

8    alternatives that we would think about including in

9    the report.  And then the kinds of things that you

10   see in item 3 here, as I recall, simply in order

11   for us to be able to proceed with the production of

12   a final report, would we need any other information

13   that would have impact on how we put together our

14   final report.

15           (Exhibit 10, HARV00097002, marked for

16           identification.)

17           MR. CONNOLLY:  Mark as Exhibit 10 a

18   document with a Bates number ending 97002.  It is

19   an agenda for a meeting to take place on

20   March 23rd, 2018.

21       A.  Okay.

22       Q.  Do you recall this meeting?

23       A.  I do.

24       Q.  Was counsel at this meeting?

25       A.  I believe this is the meeting at which

1          HIGHLY CONFIDENTIAL - AEO - SMITH

2     counsel was not there.  It was only members of the

3     committee.

4          Q.  Is this a committee where the three of you

5     reviewed and commented on a draft of the report?

6          MS. ELLSWORTH:  Object to the form.  I

7     think you meant "meeting" in your question.

8          Q.  Is this the committee meeting where the

9     three of you commented and suggested edits to the

10    draft of the report?

11         A.  To the best of my recollection, this was a

12    committee meeting where we both discussed, as it

13    says here, the Card rebuttal report, and we had

14    received a first draft of the final report, and we

15    did take steps to edit it, and then as we talked

16    about earlier, decided who was going to have the

17    document to do the next edits and how we would pass

18    it through the committee.

19         Q.  So what were the steps that you took after

20    this meeting as far as reviewing the draft?  Did it

21    go to somebody else?

22         MS. ELLSWORTH:  Object to the form of the

23    question.

24         A.  So as I mentioned, we took time -- if you

25    don't mind, I'll start in the meeting.

1          HIGHLY CONFIDENTIAL - AEO - SMITH

2          We took time in the meeting to have a

3    general discussion about the report and how we saw

4    it, where it was strong, where we would like to see

5    changes overall without pinpointing specific

6    paragraphs or words.  We also spent some time in

7    that meeting talking about specific omissions,

8    places that we thought the report needed to be

9    expounded, other places that we thought about

10   reorganizing it.

11         Then we did a front to back walkthrough of

12   the report, making some of those edits that we

13   could, or putting notes into the report so that as

14   a committee we had recorded the kinds of work that

15   we had done.

16         And then to get to your specific question,

17   then at the end of the meeting, I suggested to the

18   committee that Dean Khurana take the first detailed

19   pass at incorporating the kinds of discussions that

20   we had at a global level, feeding in the comments

21   from the bubbles, since I'm not a big fan of doing

22   a lot of text changes in committee.

23         And when he was done with that, pass it to

24   me.  I would then add some smaller things that I

25   had written down and discussed with the committee

1           HIGHLY CONFIDENTIAL - AEO - SMITH

2      Q.  Do you recall whether this was the draft

3  that the committee took into its final meeting to

4  review?

5           MS. ELLSWORTH:  Object to the form of the

6  question.

7      A.  To the best of my recollection, this is

8  the draft that each of us reviewed with the

9  expectation we were coming in to make as close as

10  we could, if we all agreed, our final edits.

11           Is that your question?

12      Q.  Yes.

13           If you could pull out Exhibit 2 again.

14  Turn to page 14.  Do you see the paragraph starting

15  "using socioeconomic status"?

16      A.  Yes.

17      Q.  So I notice that that paragraph is not in

18  the near final version of the draft we were just

19  looking at.

20           Was this one of the paragraphs that

21  Mr. Dulberg wrote after the conclusion of your

22  April 6th meeting?

23           MS. ELLSWORTH:  Object to the form.

24      A.  Best of my recollection, this is not the

25  paragraph that I was talking about earlier.  This

1        HIGHLY CONFIDENTIAL - AEO - SMITH

2   was, to the best of my recollection, a paragraph

3   that we talked about in the committee.

4        Q.  So do you know who typed up this language?

5        A.  If you're asking me who was doing the

6   edits while we were talking about it, it was Drew.

7        Q.  Do you know why you inserted this

8   paragraph on the last day of your committee?

9        A.  I couldn't say for certain because it was

10  not one of the edits that I had talked about, if I

11  recall correctly.  It came from one of the other

12  committee members.

13       Q.  Are you familiar with the report of the

14  Harvard Presidential Task Force on Inclusion and

15  Belonging?

16       A.  If that's the one that just was released a

17  couple of weeks ago, that's not the form I have it

18  in.  Mine looks like a booklet, two pages on,

19  that's the one I got, I think.  I have a small

20  booklet, that's my version.  Could be the same

21  thing in a different format.

22       Q.  Okay.  So let me try again.

23          Are you familiar with the Harvard

24  University Presidential Task Force on Inclusion and

25  Belonging?

1       HIGHLY CONFIDENTIAL - AEO - SMITH

2  review?

3       A.  So as I believe I answered to begin with,

4  it was a collaborative effort among counsel.

5       Q.  And you testified, I believe, that it is

6  your general practice when you chair a committee,

7  to staff that committee with individuals who might

8  be responsible for generating certain documents

9  reflecting the work of the committee; is that

10  correct?

11       A.  Yes.

12       Q.  And is that how you organized the work of

13  this committee as well?

14       A.  Yes.

15       Q.  Is it typical practice for you to staff a

16  committee with individuals who are not committee

17  members, but who are responsible for memorializing

18  the work of the committee in initial drafts of a

19  report?

20       A.  Yes.

21       Q.  Does the process that you employed with

22  this committee to study race neutral alternatives

23  differ from the process that you have followed with

24  other committees that you've chaired?

25       A.  No.

1          HIGHLY CONFIDENTIAL - AEO - SMITH

2      Q.   Would the process that you followed with

3  this committee have been any different from your

4  point of view had the committee been staffed with

5  non-committee members, but who were not attorneys?

6      A.   No.

7      Q.   Does the work of the committee and the

8  final report -- the deliberations --

9          MS. ELLSWORTH:  Strike that.

10     Q.   Does the final report that the committee

11  generated reflect the three committee members'

12  judgment on the issue that the committee was

13  charged with considering?

14     A.   I absolutely believe so.

15         MS. ELLSWORTH:  Nothing further.

16         MR. CONNOLLY:  Five minutes for me.

17         (Proceedings interrupted at 5:25 p.m. and

18     reconvened at 5:36 p.m.)

19                     EXAMINATION

20  BY MR. CONNOLLY:

21     Q.   You mentioned just now that President

22  Faust gave oral comments to the committee; is that

23  correct?

24         MS. ELLSWORTH:  Object to the form.

25     A.   What I was trying to say is that the

Page 196

1                           CERTIFICATE

2    Commonwealth of Massachusetts

3    Suffolk, ss.

4

5          I, Dana Welch, Registered Professional

6    Reporter, Certified Realtime Reporter and Notary

7    Public in and for the Commonwealth of

8    Massachusetts, do hereby certify that MICHAEL

9    SMITH, the witness whose deposition is hereinbefore

10   set forth, was duly sworn by me and that such

11   deposition is a true record of the testimony given

12   by the witness.

13         I further certify that I am neither related

14   to nor employed by any of the parties in or counsel

15   to this action, nor am I financially interested in

16   the outcome of this action.

17         In witness whereof, I have hereunto set my

18   hand and seal this 27th day of April, 2018.

19

20                       _____

                         Dana Welch

21                       Notary Public

                         My Commission Expires:

22                       September 13, 2024

23

24

25