# EXHIBIT 124

1

2    HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY

3       IN THE UNITED STATES DISTRICT COURT

4        FOR THE DISTRICT OF MASSACHUSETTS

5        Civil Action No:  1:14-cv-14176-ADB

     ---------------------------X

6

     STUDENTS FOR FAIR ADMISSIONS,

7    INC.,

8                         Plaintiff,

9           v.

10   PRESIDENT AND FELLOWS OF

     HARVARD COLLEGE

11   (HARVARD CORPORATION),

12                        Defendant.

13   ----------------------------X

14             VIDEOTAPED DEPOSITION OF

15               DAVID CARD, Ph.D.

16               Washington, DC

17               April 27, 2018

18                  9:07 AM

19

20

21   Reported by:

22   Karen Brynteson, RMR, CRR, FAPR

23   Job No. 139809

24

25

Highly Confidential Attorneys' Eyes Only

Page 45

                    D. Card

1

2   particular rating as your basis for

3   excluding it from the model?

4       A.    Yes.

5       Q.    Did you do anything else to

6   determine whether there were any other

7   variables in the admissions process

8   that -- in which race played a role and,

9   thus, should be excluded from your model?

10      A.    I don't understand the

11  question.

12      Q.    Did you see any other

13  deposition testimony that suggested

14  anything else should be excluded from

15  your model because race was considered as

16  part of assigning a particular rating or

17  other variable?

18      A.    I'm aware of the fact that in

19  the deposition testimony you and your

20  colleagues asked a number of admissions

21  officers and the Dean directly on some of

22  the other components of the ratings

23  system.

24      Q.    And if anyone had -- had

25  answered that -- that race influenced

Highly Confidential Attorneys' Eyes Only

Page 46

1                    D. Card

2    those other components, you would have

3    considered it appropriate to exclude them

4    from the model?

5              MS. ELLSWORTH:  Object to the

6         form.

7              THE WITNESS:  Well, Dean

8         Fitzsimmons stated very clearly

9         that race was used in part to

10        determine the overall rating, but

11        that that was not the case with the

12        other pro -- profile ratings.

13              And several other of the

14        admissions officers concurred with

15        that very strongly on direct

16        question.

17   BY MR. STRAWBRIDGE:

18        Q.    And you believed them?

19              MS. ELLSWORTH:  Object to the

20        form.

21              THE WITNESS:  I had no reason

22        not to believe them.

23   BY MR. STRAWBRIDGE:

24        Q.    You didn't see any other

25   evidence that made you think that you

Highly Confidential Attorneys' Eyes Only

1                    D. Card

2     should exclude any other variables based

3     on the potential that race was affecting

4     them?

5          A.    I -- when I was finishing my

6     -- in the process of trying to finish my

7     rebuttal report, it was very clear that

8     there were a number of disagreements

9     between Professor Arcidiacono and me on a

10    couple of issues.

11              And so I -- I was able to ask

12    Dean Fitzsimmons directly in a telephone

13    conversation if race was involved in the

14    personal rating, for example, and he said

15    no.

16         Q.    Did you do anything to verify

17    his testimony?

18              MS. ELLSWORTH:  Object to the

19         form.

20              THE WITNESS:  No.

21    BY MR. STRAWBRIDGE:

22         Q.    You're familiar with what it

23    means to interact a variable in the

24    multivariate logit model?

25         A.    In general terms, yes.

Page 99

D. Card

1

2   Q.    And from that baseline, you

3   then do a number of simulations that

4   analyze the effect of various

5   race-neutral alternatives, correct?

6   A.    Correct.  I do the kind of

7   simulations that have been done in the

8   literature before and that Professor

9   Arcidiacono performs for Mr. Kahlenberg

10  as well, yeah.

11  Q.    And, in fact, your method

12  closely follows that used by Mr.

13  Kahlenberg, assisted by Professor

14  Arcidiacono.  Right?

15  A.    Right, but this is a method

16  that is pretty standard in the literature

17  and was used by several of the other

18  papers in the area.

19  Q.    There were two key

20  differences, I think, between your

21  approach with -- between your approach

22  and those of Mr. Kahlenberg's, at least

23  in your initial report?

24            MS. ELLSWORTH:  Object to the

25       form.

Highly Confidential Attorneys' Eyes Only

```
 1                   D. Card
 2           THE WITNESS:  There were a
 3       number of differences, yeah.
 4  BY MR. STRAWBRIDGE:
 5       Q.    Let me ask you this:  Was one
 6  of the big differences the broader
 7  measure of socioeconomic disadvantage
 8  that you deployed?
 9       A.    Yes.
10       Q.    Another difference between the
11  two of you is, at least in one of his
12  simulations, Mr. Kahlenberg kept a
13  preference for athletes, correct?
14       A.    Right.
15       Q.    Other than those two
16  differences, do you remember any other
17  differences in how you went about
18  generating your race-neutral simulations?
19       A.    Yes.  I'm -- I'm using my
20  model and Mr. Kahlenberg is -- is
21  basically using Arcidiacono's model.
22       Q.    Right.
23       A.    Well, actually not
24  Arcidiacono's model, as I recall, because
25  Arcidiacono's model was fed pooling
```

Highly Confidential Attorneys' Eyes Only

1                    D. Card

2      across multiple years.  And I think for

3      this simulation he refit his model just

4      on the last year, more in the way that I

5      would normally do.

6              So I believe for this analysis

7      he actually fit a separate model for

8      2019.

9          Q.   Because we had to generate a

10     class in this case for a specific year's

11     example?

12              MS. ELLSWORTH:  Object to the

13          form.

14              THE WITNESS:  Yes, and there's

15          a problem with his modeling

16          strategy of not fitting a model

17          year-to-year, which is it doesn't

18          work very well for fitting one

19          particular class.

20              And so the advantage of my

21          class of always fitting a model

22          year-by-year, you don't have to do

23          that whereas he had to reestimate

24          his model, so that's a difference.

25     BY MR. STRAWBRIDGE:

Page 146

                    D. Card

1
2    your rebuttal report, go to paragraph
3    192.  I just have to find mine.
4         A.    Right.
5         Q.    Looking at paragraph 192 of
6    your rebuttal report.
7         A.    Yes.
8         Q.    You agree that simulations 6
9    and 7 are based upon your models?
10        A.    Yes.
11        Q.    The one adjustment that he
12   makes is -- well, he makes a few
13   adjustments.  He keeps the athletic
14   preference in both models, correct?
15        A.    Yes.
16        Q.    So that means putting them
17   back in, compared to your model, which
18   excluded them, right?
19        A.    Yes.
20        Q.    In number 6 he eliminates the
21   advantage associated with early action?
22             MS. ELLSWORTH:  Object to the
23        form.
24             THE WITNESS:  I believe that's
25        correct, yeah.

Highly Confidential Attorneys' Eyes Only

Page 147

1                    D. Card

2      BY MR. STRAWBRIDGE:

3          Q.    And, again, I'm just staying

4      in paragraph 192.

5          A.    He eliminates the preferences,

6      yeah, and he changes the -- the four SES

7      characteristics slightly.

8          Q.    Right.  And you determined

9      that these simulations, you know, as he

10     -- as he -- as he makes those

11     adjustments, are insufficient because the

12     race-neutral alternative "produces a

13     class that is different from the current

14     class in the dimensions I understand

15     Harvard cares about."

16              That's in paragraph 195,

17     correct?

18         A.    Yes, that's what I say, yes.

19         Q.    All right.  So looking at the

20     Exhibit 26 in your report.

21         A.    Okay.

22         Q.    Which differences in your view

23     render this as insufficient because it

24     produces a class that is different from

25     the current class in dimensions that you

Highly Confidential Attorneys' Eyes Only

Page 152

1                    D. Card

2        Q.    It's 26 percent compared to

3    the 30 percent drop that you termed as

4    dramatic, correct?

5        A.    Right.

6        Q.    But, again, do you -- do you

7    have a -- do you have any understanding

8    of what difference would be acceptable to

9    Harvard, even if it were a decline in any

10   of these racial categories?

11               MS. ELLSWORTH:  Object to the

12         form.

13               THE WITNESS:  No.

14   BY MR. STRAWBRIDGE:

15       Q.    And you don't have a personal

16   understanding as to what you think is an

17   acceptable or not acceptable decline for

18   purposes of a race-neutral alternative?

19               MS. ELLSWORTH:  Object to the

20         form.

21               THE WITNESS:  No.

22   BY MR. STRAWBRIDGE:

23       Q.    Did the committee tell you

24   that an African American class that

25   represents 10 percent of the admitted

1                        D. Card

2      pool is insufficient to meet its goals of

3      obtaining the educational benefits of

4      racial diversity?

5                MS. ELLSWORTH:  Object to the

6          form of the question.

7                THE WITNESS:  The committee --

8          the only information I received

9          from the committee was, I believe,

10         via counsel, which was a request

11         for more information on the

12         characteristics of the class under

13         alternative scenarios.

14     BY MR. STRAWBRIDGE:

15         Q.    And what information in

16     particular do you recall getting that

17     request about?

18         A.    About the fractions with the

19     profile ratings of 1 or 2, and I believe

20     concentration, in particular, but I can't

21     -- those ones stick in my mind.  I don't

22     remember whether they also asked about

23     geography at some point.

24         Q.    I should probably just

25     clarify.  This is my fault.  I was

Page 216

D. Card

1

2    A.    Yes.

3    Q.    And that is, in fact, what

4    this exhibit suggests, correct?

5    A.    Yes.

6    Q.    Okay.  Did you ever construct

7    a model of the personal rating in either

8    of your reports?

9    A.    No.

10    Q.    You referred several times to

11    Professor Arcidiacono's model, but you

12    did not do your own model of personal

13    rating, correct?

14    A.    Correct.

15    Q.    And is that because you felt

16    that there was not enough observables in

17    the data to estimate a reliable model of

18    the personal rating?

19    A.    I personally felt like we

20    could use the personal rating and the

21    academic rating and the extracurricular

22    rating as ratings.  We could include the

23    other variables, some of the other

24    variables that go into the determination

25    of those ratings, and that it would be

D. Card

1
2    preferable to do that than -- but -- so I
3    don't -- my -- I also believe that
4    Professor Arcidiacono's model of personal
5    rating has significant weaknesses.
6        Q.    And is -- and is one of those
7    weaknesses the -- the presumed role that
8    unobservables would play if they could be
9    incorporated into the data and the model?
10           MS. ELLSWORTH:  Object to the
11        form.
12           THE WITNESS:  Yes.  His -- his
13        model is relatively sparse.  It
14        doesn't include, in fact, some of
15        the variables that I would argue
16        should be included in the overall
17        admissions model.
18           And it also has a relatively
19        low explanatory power.
20    BY MR. STRAWBRIDGE:
21        Q.    When you say "relatively low,"
22    what do you mean?
23        A.    Well, there's a standard
24    measure of explanatory power, a pseudo
25    R-squared statistic.

Highly Confidential Attorneys' Eyes Only

1                    D. Card

2  is a standard problem in any kind of

3  statistical analysis that there is

4  unobservable components.  And one of the

5  reasons why statistical analysis of this

6  kind, an observational statistical

7  analysis can't prove a causality or

8  prove, definitively prove discrimination,

9  for example, is that we don't really know

10  what's the unobservable components that

11  are driving things.

12      Q.   Well, you cite some of them in

13  your report, correct?

14      A.   I cite some of the potential

15  factors, yes, but I don't -- I don't

16  think I would claim that -- well, I know

17  I would not claim that that's a

18  definitive list.

19      Q.   Right.  But -- but, for

20  example, you cite the personal essay as a

21  missing data in this analysis, right?

22          MS. ELLSWORTH:  Object to the

23      form.

24          THE WITNESS:  I give that as

25      an example of an input that I

1                      D. Card

2           believe would be important in

3           assigning the personal rating that

4           is missing from Professor

5           Arcidiacono's personal rating model

6           and is also missing from our --

7           from the database entirely.

8                 So there is not much we can do

9           about that.

10   BY MR. STRAWBRIDGE:

11          Q.    And is it your assumption that

12      if we had that information, it would

13      close the gap in the personal rating

14      between Asians and whites?

15                MS. ELLSWORTH:  Object to the

16           form.

17                THE WITNESS:  I don't have

18           direct evidence on that.  What I do

19           know is that the personal rating

20           assigned to whites is higher than

21           the personal rating assigned to

22           Asians, conditional on the observed

23           factors.  And so one of the

24           conjectures would be that that

25           might be part of the story.

Highly Confidential Attorneys' Eyes Only

Page 282

1                    D. Card

2     incentives of Harvard.

3                    And I disagree with that type

4     of analysis -- that type of conclusion on

5     the basis of statistical evidence.

6                    MR. STRAWBRIDGE:  Can we take

7          a short break?

8                    MS. ELLSWORTH:  Okay.

9                    THE VIDEO OPERATOR:  The time

10         is 3:13.  We are off the record.

11                   (A recess was taken at

12     3:12ï¿½p.m., after which the deposition          39

13     resumed at 3:28 p.m.)

14                   THE VIDEO OPERATOR:  The time

15         is 3:28.  We are back on the

16         record.

17    BY MR. STRAWBRIDGE:

18         Q.    Do you think that Asian

19    Americans on average have less attractive

20    personal qualities than white applicants

21    in Harvard's application pool?

22                   MS. ELLSWORTH:  Objection.

23         Are you asking for a personal

24         opinion?

25                   MR. STRAWBRIDGE:  No.

Page 283

1                    D. Card

2          THE WITNESS:  I have no way of

3      knowing that.

4  BY MR. STRAWBRIDGE:

5      Q.   Can you think of -- do you

6  have any reason to believe that Asian

7  Americans are not as effervescent as

8  whites in Harvard's applicant pool?

9          MS. ELLSWORTH:  Objection.

10         THE WITNESS:  I have no way of

11     knowing that.

12  BY MR. STRAWBRIDGE:

13     Q.   So it could be true?

14         MS. ELLSWORTH:  Objection.

15         THE WITNESS:  May or may not

16     be true.

17  BY MR. STRAWBRIDGE:

18     Q.   It is one possible explanation

19  for the difference in their personal

20  ratings?

21         MS. ELLSWORTH:  Object to the

22     form.

23         THE WITNESS:  Well, if -- if

24     effervescence was, indeed, a

25     significant determinative personal

Page 284

                        D. Card

1
2      rating conditional on the other
3      factors then -- and you could
4      measure effervescence and you found
5      that, I guess I would -- then I
6      would say, well, you found that and
7      I would agree with it, but no one
8      has done that exercise so I don't
9      really know what to say.
10  BY MR. STRAWBRIDGE:
11      Q.    Well, someone's assigned
12  personal ratings to all of the
13  applicants?
14      A.    They are, yes.
15      Q.    Right.  So I am just asking,
16  do you -- do you think that an
17  explanation for the gap in the personal
18  ratings between Asian Americans and white
19  applicants is a lack of effervescence in
20  the Asian American pool?
21          MS. ELLSWORTH:  Object to the
22      form.
23          THE WITNESS:  I think the --
24      my understanding is that the
25      readers look for something they

Page 285

```
 1                    D. Card
 2        call personal qualities.  And I
 3        don't exactly know what those are,
 4        but they -- they talk about that in
 5        some of the materials I've seen.
 6             And so I think that what I
 7        would probably believe to be true
 8        is that they see slightly fewer
 9        personal qualities conditional on
10        academic qualities.  Again, this is
11        all conditional on academic
12        qualities.
13   BY MR. STRAWBRIDGE:
14        Q.   And why do you think that's
15   the case?
16        A.   I don't know exactly.
17        Q.   Well, you can't rule out the
18   fact that it is racial bias.  What other
19   explanation could there be for why the
20   white applicants in Harvard's pool
21   receive higher personal ratings than the
22   Asian American applicants?
23             MS. ELLSWORTH:  Objection.
24             THE WITNESS:  I don't really
25        -- I haven't really given that any
```

1                   D. Card

2          thought directly.

3     BY MR. STRAWBRIDGE:

4          Q.    Isn't that the entire question

5     that we need to answer when we decide

6     whether the personal ratings should be

7     included in the model?

8                   MS. ELLSWORTH:  Object to the

9          form.

10                  THE WITNESS:  No, not at all,

11         because we see a difference between

12         Asian applicants and white

13         applicants in their extracurricular

14         rating and their academic rating,

15         statistically significant positive

16         gap.

17                  I don't think that -- and, in

18         fact, I would never conclude that

19         that means that there is positive

20         racial bias in favor of Asian

21         applicants.  So the presence of a

22         significant coefficient doesn't say

23         that there is a racial animus

24         against whites in the assignment of

25         academic credentials.

Highly Confidential Attorneys' Eyes Only

Page 287

1                        D. Card

2     BY MR. STRAWBRIDGE:

3          Q.    But there are other ways to

4     check that, right?  We can look at

5     academic index, right?

6          A.    Well, this is from Professor

7     Arcidiacono's model, which controls for,

8     among other things, academic index

9     variables and all the components of that.

10    So even conditional on all those things,

11    what his model shows is that Asian

12    Americans receive a statistically higher

13    academic rating.

14              And I conclude, and he

15    concludes, he agrees with me, that that's

16    the most likely explanation for that is

17    unobserved characteristics of the

18    candidate.  And I don't have an

19    explanation for what those are either.

20              But I'm -- as is very standard

21    in the, you know, statistical analysis

22    and attempts to make inferences from

23    observational data of this type, I don't

24    really think that I can speculate exactly

25    what the differences are.

Page 288

                    D. Card

1                   Q.    Do you think that -- well, did

3      you review the depositions in this case?

4                   A.    I reviewed the ones that are

5      described in the -- in my appendix.

6                   Q.    Did you see any testimony from

7      any Harvard admissions officer that the

8      Asian Americans were lacking in the

9      personal qualities that they evaluated in

10     assigning a personal rating as a group?

11                  MS. ELLSWORTH:  Object to the

12          form.

13                  THE WITNESS:  I didn't

14          specifically look at that, but I'm

15          not aware of that one way or the

16          other.

17     BY MR. STRAWBRIDGE:

18                  Q.    You'd assume that to be true,

19     right?

20                  A.    No, not necessarily because my

21     interpretation of the -- of that would be

22     are they different conditional on -- so

23     there is two questions you could ask.

24                  More or less the kind of

25     questions we were discussing before the

1                       D. Card

2      break, one question would be:  Do Asian

3      Americans as a whole have higher or lower

4      or the same personal qualities as, say,

5      white Americans?

6             But that's not really what's

7      relevant for my statistical model.  And I

8      -- my interpretation of how someone might

9      answer that would be they might be

10     thinking, well, as a whole, they are the

11     same, but when I'm assigning the personal

12     rating, what's relevant is I have got

13     some of these characteristics that I can

14     see, and some that I can't.  There is a

15     deficit on some of the ones that I can't

16     see.

17            So that could contribute to a

18     negative coefficient for Asians in that

19     assignment, just as there must be some or

20     there -- my interpretation is there must

21     be some unobserved characteristics of the

22     academic credentials of Asian Americans,

23     conditional on this broad set of other

24     academic qualities that we can observe in

25     the data and that Professor Arcidiacono

Highly Confidential Attorneys' Eyes Only

1                      D. Card

2      puts into his model that leads the --

3      leads the admissions people to give them

4      a higher assignment.

5      BY MR. STRAWBRIDGE:

6          Q.    So you would not accept the

7      testimony from Harvard's admissions

8      officers that they don't see any

9      difference between the Asian American

10     applicants with respect to their personal

11     qualities and the white applicants?

12              MS. ELLSWORTH:  Objection.

13              THE WITNESS:  I would have to

14          see how the question was asked, and

15          I would have to think about

16          whether, if they are asking that

17          about the overall characteristics,

18          not conditional on their other

19          characteristics that are, say,

20          included in these models, I would

21          have to think about that.

22              Because I think several of

23          these documents are really focusing

24          on the difference between the

25          unconditional, in other words, the

Highly Confidential Attorneys' Eyes Only

Page 309

1               D. Card

2          Nevertheless, there is a

3     significant positive, so there must

4     be, according to Professor

5     Arcidiacono's argument, there must

6     be unobserved factors there.

7  BY MR. STRAWBRIDGE:

8          Q.    But I asked you about the

9  personal characteristics.  What do you

10  think they are in the personal

11  characteristics, not the academics, the

12  personal?

13             MS. ELLSWORTH:  Object to the

14     form.  I believe he already --

15             THE WITNESS:  I have no idea.

16     I believe I have stated that

17     clearly.

18  BY MR. STRAWBRIDGE:

19          Q.    Inclusion of parental

20  occupation is important to your model?

21          A.    I believe it should be

22  included in the analysis of admissions,

23  yes.

24          Q.    How many variables did you --

25  did that add to your model?

Page 310

D. Card

1
2      A.    Let me look at my -- the

3   appendix -- you don't have tabs on

4   appendices here, so I am having a little

5   bit of trouble finding the right tabs.

6      Q.    If I told you it was 46, does

7   that number sound more or less correct?

8      A.    46 per year?

9      Q.    46 parental occupations.

10      A.    It seems to show in my

11   Exhibit 28 of my -- of my rebuttal report

12   that there is 28 categories -- 23

13   categories, excuse me.

14      Q.    23 categories for fathers,

15   right?

16      A.    Yes.

17      Q.    And 23 categories for mothers?

18      A.    Yes.

19      Q.    So that's 46, right?

20      A.    Correct.  And then there is

21   one omitted for each.

22      Q.    So 47?

23      A.    44.

24      Q.    48?

25      A.    44.

Highly Confidential Attorneys' Eyes Only

Page 311

D. Card

1

2     Q.    44, I'm sorry.  Thank you.

3     It's a long day.

4             When you use the occupations

5     in your model, are they the same

6     occupations that are listed on Harvard's

7     summary sheets?

8     A.    Not necessarily, to the best

9     of my knowledge.

10    Q.    In fact, did you have to use a

11    code to translate the parental

12    occupations into different categories?

13            MS. ELLSWORTH:  Object to the

14        form.

15            THE WITNESS:  As I explain, I

16        think fairly clearly in Appendix B

17        of my rebuttal report, there's a

18        procedure that I developed to

19        classify the different categories

20        that are used in the -- first of

21        all, there is two occupation

22        categories that are used, and one

23        of those is more prevalent in one

24        year; then the other one is more

25        prevalent in later years, but small

Page 312

                       D. Card

1              fractions of the data in later

3              years continue to be coded in the

4              -- in the first method, as far as I

5              can tell.

6                    So I make a table or an

7              algorithm to construct them all

8              into a coherent set of categories.

9    BY MR. STRAWBRIDGE:

10             Q.    Did you use -- and that

11   algorithm involves more than 100 lines of

12   code that you had to write?

13             A.    That the staff at Cornerstone

14   wrote under my direction, yeah.

15             Q.    And you agree that at least on

16   one occasion, the code in your data does

17   not actually match what the summary

18   sheets that were produced by Harvard?

19                  MS. ELLSWORTH:  Object to the

20             form.

21                  THE WITNESS:  My understanding

22             is that that's true, yes.

23   BY MR. STRAWBRIDGE:

24             Q.    Led you to in at least in one

25   instance to report unskilled laborer as a

Highly Confidential Attorneys' Eyes Only

Page 313

D. Card

1
2       skilled tradesperson?

3           A.     It led me to put them in the

4       same bucket in the classification system,

5       but, as I say in this appendix,

6       recategorizing labor into that group into

7       the low skilled mix, essentially no

8       difference to any of my conclusions.

9           Q.    Well, that's assuming that

10      they are all -- that they are all -- that

11      all the data is correct, right?

12          A.     Well, this is -- first of all,

13      it is not entirely clear who is filling

14      out the forms for the common application,

15      the universal application.  Oftentimes,

16      in fact, if you look on the -- on the

17      Internet, there is questions about how to

18      fill out the common application form.

19              So I am not necessarily

20      claiming, and nor is it necessary for my

21      analysis, that occupations are reported

22      exactly the way that some expert in

23      occupation coding would assign them on an

24      individual basis, but even with an expert

25      assigning occupation codes, there are

Highly Confidential Attorneys' Eyes Only

1           D. Card

2    known to be some slippage in assignment

3    of complicated variable like occupation.

4           Some people fit into

5    occupations which are between the lines.

6    I have done in the course of my career

7    studies of the effect of -- this is a

8    problem that arises in lots of variables

9    measured in economic analyses.  We call

10   it misclassification error.

11          It means that different

12   algorithms, slightly different algorithms

13   or slightly different people who are

14   doing the assignment would reach slightly

15   different conclusions.

16          And my view is based on my

17   professional work in the past, looking at

18   this kind of problem, that that does not

19   in any way invalidate the use of the

20   occupation codes.  In fact, the fact that

21   there may be some slippage in the

22   assignment of the -- of an occupation

23   code, if anything, would give the

24   measured occupation codes that I have a

25   little bit less statistical power and

Highly Confidential Attorneys' Eyes Only

Page 315

1                    D. Card

2    prevent them from performing a stronger

3    role as they would in the model, if I had

4    some measures that did not have that

5    misclassification error.

6        Q.   We discussed this earlier, but

7    I just want to make sure I understand.

8    When you were deciding to put the

9    parental occupations in, did you test for

10   statistical significance?

11       A.   I'm not entirely sure of

12   whether, at what stage of the analysis

13   that kind of exercise would have been

14   done, so I can't say for sure.

15       Q.   You don't dispute that some of

16   the parental occupation categories vary

17   substantially from year to year?

18           MS. ELLSWORTH:  Object to the

19       form.

20           THE WITNESS:  I don't dispute

21       that, for example, the category

22       unemployed disappears in some

23       years, and so one of the reasons --

24       or is much less frequent in some

25       years.

Highly Confidential Attorneys' Eyes Only

Page 316

```
 1                    D. Card

 2           And so one of the reasons why

 3      I fit a model, a year-by-year model

 4      is to allow the coefficients

 5      assigned to the occupation

 6      variables to change from year to

 7      year, just like many of the other

 8      characteristics change from year to

 9      year in the mean or prevalence in

10      the sample.

11           For example, the disadvantaged

12      flag variable, which is assigned by

13      Harvard readers, and would seem to

14      be not subject to some of these

15      same issues, nevertheless, the

16      fraction of students that have that

17      code changes substantially between

18      2018 and 2019.

19  BY MR. STRAWBRIDGE:

20      Q.    And do you understand why that

21  is?

22      A.    No.

23      Q.    Did you read Sally Donohue's

24  deposition?

25      A.    No.
```

Page 317

1              D. Card

2       Q.    And do you know whether or not

3    there is any testimony that gave a

4    specific reason as to why the

5    disadvantaged flight changed on that

6    level in 2019?

7            MS. ELLSWORTH:  Object to the

8        form.

9            THE WITNESS:  No.

10   BY MR. STRAWBRIDGE:

11      Q.    Do you have any explanation as

12   to why there would be no unemployed

13   people in the Harvard data pool for some

14   of the years?

15           MS. ELLSWORTH:  Object to the

16       form.

17           THE WITNESS:  My guess is

18       because the questions that were

19       employed in the common application

20       and universal application did not

21       collect it in that way.  That

22       category wasn't available.

23   BY MR. STRAWBRIDGE:

24      Q.    You don't think that, like,

25   the number of unemployed people

Highly Confidential Attorneys' Eyes Only

Page 318

```
 1                    D. Card
 2    oscillated that way?
 3        A.    I don't think it does, but as
 4    I said, because I am putting a
 5    year-by-year model, I don't think it
 6    matters at all.
 7        Q.    Did you ask any of these
 8    questions of Dean Fitzsimmons when you
 9    had your conversation with him?
10             MS. ELLSWORTH:  Object to the
11        form.
12             THE WITNESS:  As I recall, I
13        asked him if the committee uses
14        parental occupation information in
15        making their assessment.  And we
16        talked over, because he is a
17        sociologist and knew quite well
18        some of the underlying literature
19        on -- on occupation and the
20        importance of occupation in the
21        sociology literature, so we had a
22        bit of a talk about that.
23    BY MR. STRAWBRIDGE:
24        Q.    And what -- and what did he
25    specifically tell you?
```

Page 319

                    D. Card

1

2        A.    He said that occupation was a

3   very important part of the process, that

4   it is on the summary sheets.

5        Q.    Is that disclosed anywhere in

6   your report?

7        A.    My discussion with --

8        Q.    Yes.

9        A.    No.

10        Q.    Did you do anything to test

11   whether or not Harvard was treating

12   different occupations differently based

13   on race?

14             MS. ELLSWORTH:  Object to the

15        form.

16             THE WITNESS:  I show that or I

17        -- I can't remember where this is

18        reported, whether it is part of my

19        original report or not.  The

20        occupations vary by race.

21   BY MR. STRAWBRIDGE:

22        Q.    Did you interact race and the

23   occupation codes in your model?

24        A.    No.

25        Q.    Did you estimate separately

1                       D. Card

2     question?

3          A.    No.

4          Q.    Were you a percipient witness

5     in the admissions office in 2013?

6               MS. ELLSWORTH:  Object to the

7          form.

8               THE WITNESS:  No, but neither

9          was Professor Arcidiacono.  And he

10         seems to want to make that kind of

11         a conclusion.

12    BY MR. STRAWBRIDGE:

13         Q.    Let me ask you this:  You set

14    forth your alternative math in paragraph

15    161 of your rebuttal report, correct, on

16    probability?

17         A.    Let me check it.  Paragraph

18    121?

19         Q.    Yes.

20         A.    In my rebuttal report?

21              MS. ELLSWORTH:  Paragraph 161,

22         I think, is what --

23    BY MR. STRAWBRIDGE:

24         Q.    I'm sorry, it was 161.  I

25    misspoke.  I apologize.

Highly Confidential Attorneys' Eyes Only

1                     D. Card

2          A.     Oh.   Yes.

3          Q.     So you conclude that the --

4     that given the years that you just

5     described and the different racial

6     categories, that the actual probability

7     of seeing a pattern over a three-year

8     period is about 17 percent?

9          A.     Assuming for the sake of

10    simplicity that there's a 0.2 chance that

11    the group's average rate matches the

12    average admission rate for other

13    applicants, so that would be the same

14    kind of calculation that he does, so

15    assume that number, then take the 92

16    combinations, that's what I did.

17         Q.     You earlier said you didn't

18    challenge that number, you hadn't

19    challenged that calculation?

20              MS. ELLSWORTH:  Object to the

21         form.

22              THE WITNESS:  That 0.2 is his

23         calculation, yes.

24    BY MR. STRAWBRIDGE:

25         Q.     The -- your calculation

Highly Confidential Attorneys' Eyes Only

Page 371

1                    D. Card

2   assumes that each of those outcomes is

3   independent with one another?

4        A.    Yes.

5        Q.    Is that true?

6        A.    It would not be exactly true.

7   It would be -- it might be approximately

8   true, depending on the race group you are

9   thinking of.

10       Q.    What makes something

11  "approximately true"?

12       A.    Well, the actual calculation

13  for the permutations, I didn't try and

14  do.  I tried to do a simplified

15  calculation.  That's what I have done

16  here.

17       Q.    For example, you would agree,

18  right, that the Hispanic methodology

19  between IPEDS and the new methodology

20  does not differ?

21            MS. ELLSWORTH:  Object to the

22       form.

23            THE WITNESS:  No, I would

24       disagree with that.

25  BY MR. STRAWBRIDGE:

Highly Confidential Attorneys' Eyes Only

1                    D. Card

2       Q.    Do you think the two things

3  differ?

4       A.    Yes, because under the new

5  methodology, individuals are allowed to

6  report multiple races.  And so someone

7  could be both Hispanic and African

8  American, for example.

9       Q.    Which outcomes do you think

10  are not independent of one another?

11       A.    Do you want me to go through

12  the permutation argument?

13       Q.    I am just asking which ones

14  you think -- you told me that you do not

15  think they are all independent of one

16  another.  So I am asking which ones.

17       A.    Well, the problem is that the

18  groups as a whole have to add up to the

19  total.  And so there's a little bit of

20  dependence between the total and the

21  averages.

22       Q.    Would that raise or lower the

23  number you put in your report?

24          MS. ELLSWORTH:  Object to the

25       form.

Page 373

1                    D. Card

2           THE WITNESS:  Off the top of

3       my head, I don't know.  I don't

4       believe it would change it much,

5       but I don't know.

6   BY MR. STRAWBRIDGE:

7       Q.    Does the definition of African

8   American differ between old methodology

9   and new methodology?

10      A.    Well, the old methodology was

11  based on applicants checking a single box

12  that were -- and a categorization based

13  on alphabetical order.  The new

14  methodology allows candidates to check

15  multiple boxes.

16      Q.    But if you were looking at the

17  admission rate of African Americans under

18  the old methodology or the new

19  methodology, just looking at African

20  Americans, you would see the exact same

21  admission rate, wouldn't you?

22           MS. ELLSWORTH:  Object to the

23      form.

24           THE WITNESS:  I don't think

25      so.  Because I think under the new

Highly Confidential Attorneys' Eyes Only

Page 377

                    D. Card

1
2        Q.    Allowing people to choose --

3    this is a question of reporting, not

4    choice.  I am just saying people -- at

5    the end of the admissions process, do you

6    know how many people have checked all the

7    boxes, 500 people in the admissions

8    process checked African American, and

9    they all also checked Hispanic.

10       A.    Well, my understanding is that

11   the admission rates for African Americans

12   under these three different methodologies

13   in any given year are -- are slightly

14   different.

15       Q.    And that's essential to the

16   math that you have done here?

17             MS. ELLSWORTH:  Object to the

18        form.

19             THE WITNESS:  Not necessarily,

20        but it is part -- under the

21        assumption I am making here, that

22        would be -- I think that would be

23        built in, yes, sir.

24   BY MR. STRAWBRIDGE:

25       Q.    Have you seen in this case any

Highly Confidential Attorneys' Eyes Only

Page 378

1                    D. Card

2    one-pagers -- do you know what I mean by

3    a one-pager?

4         A.    I have a vague understanding

5    of what that is, yeah.

6         Q.    Have you seen any one-pagers

7    prepared by the admissions office during

8    the committee meeting process listing

9    IPED statistics before January 2013?

10             MS. ELLSWORTH:  Object to the

11        form.

12             THE WITNESS:  Repeat the

13        question again?

14   BY MR. STRAWBRIDGE:

15        Q.    Have you seen a one-pager

16   prepared by the admissions office during

17   the committee meeting process that lists

18   the IPED statistics prior to January

19   2013?

20             MS. ELLSWORTH:  Object to the

21        form.

22             THE WITNESS:  I have -- I have

23        only seen a couple of these forms,

24        and so I can't say I have done an

25        exhaustive search.  I was never

Highly Confidential Attorneys' Eyes Only

Page 379

```
 1                    D. Card
 2        searching for that.  But I don't
 3        believe I would have seen that.
 4             I believe the forms I looked
 5        at are the ones that are referred
 6        to in Professor Arcidiacono's
 7        report.
 8   BY MR. STRAWBRIDGE:
 9        Q.    And you also referred to some
10     in some documents in your report, right?
11        A.    I did.
12        Q.    Have you -- did you see
13     Professor Arcidiacono's note that the
14     IPEDS' number was stored differently in
15     the admissions database as it was
16     produced to him before the 2017
17     admissions cycle versus after?
18        A.    I believe that there is a
19     different field that it is captured in,
20     that's right.
21        Q.    And your report doesn't
22     challenge the -- that statement in
23     Professor Arcidiacono's report?
24             MS. ELLSWORTH:  Objection to
25        form.
```

Page 384

1

2   DISTRICT OF COLUMBIA, to wit:

3

4        I, Karen K. Brynteson, the
     officer before whom the foregoing
5    deposition was taken, do hereby certify
     that the within-named witness
6    personally appeared before me at the
     time and place herein set out, and
7    after having been duly sworn by me,
     according to law, was examined by
8    counsel.

9

10        I further certify that the
     examination was recorded
11   stenographically by me and this
     transcript is a true record of the
12   proceedings.

13

14        I further certify that I am
     not of counsel to any of the parties,
15   nor an employee of counsel, nor related
     to any of the parties, nor in any way
16   interested in the outcome of this
     action.

17

        As witness my hand and
18   notarial seal this 9th day of May,
     2018.

19

20

21

                _____
22              KAREN K. BRYNTESON
23              Notary Public

24

     MY COMMISSION EXPIRES:  10-30-22

25