**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**BOSTON DIVISION**

|  |  |  |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:14-cv-14176-ADB |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | ) ) ) ) | |
| Defendant. | ) ) ) | |

**BRIEF OF *AMICI CURIAE* AMERICAN COUNCIL ON EDUCATION**
**AND 36 OTHER HIGHER EDUCATION ORGANIZATIONS**
**IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AND IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Of Counsel:

Peter G. McDonough
AMERICAN COUNCIL ON EDUCATION
One Dupont Circle
Washington, DC 20036
(202) 939-9300
pmcdonough@acenet.edu

Stephanie J. Gold
Jessica L. Ellsworth
Joel Buckman
Matthew J. Higgins
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5496
stephanie.gold@hoganlovells.com

Natashia Tidwell (BBO #657679)
HOGAN LOVELLS US LLP
100 High Street, 20th Floor
Boston, MA 02110
(617) 371-1076
natashia.tidwell@hoganlovells.com

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

INTEREST OF *AMICI CURIAE* ....................................................................................1

ARGUMENT ....................................................................................................................3

   I.    WITHIN BROAD LIMITS, THE LAW ALLOWS EACH INSTITUTION TO
        DEFINE THE DIVERSITY THAT WILL PRODUCE THE EDUCATIONAL
        BENEFITS IT SEEKS .......................................................................................5

        A.    Campus Diversity Yields Critical And Lasting Benefits .........................5

        B.    Courts Owe Considerable Deference To Each Institution's Concept Of
               Diversity...................................................................................................9

  II.    HOLISTIC REVIEW IS CRITICAL TO ACHIEVING THE EDUCATIONAL
        BENEFITS OF DIVERSITY ...........................................................................13

        A.    Holistic Review Is What Allows An Institution To Fully Evaluate
               An Applicant, Including The Applicant's Potential Contribution to
               Campus Diversity...................................................................................13

        B.    Admissions Decisions Under A Holistic Review Framework
               Cannot Be Reduced To An Easy-To-Predict Formula .........................18

CONCLUSION.................................................................................................................22

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Fisher v. University of Texas*,
570 U.S. 297 (2013)............................................................................................8, 9

*Fisher v. University of Texas*,
136 S. Ct. 2198 (2016)........................................................................... *passim*

*Gratz v. Bollinger*,
539 U.S. 244 (2003)............................................................................................3, 21

*Grutter v. Bollinger*,
539 U.S. 306 (2003)............................................................................... *passim*

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
551 U.S. 701 (2007)...............................................................................................11

*Regents of University of California v. Bakke*,
438 U.S. 265 (1978)............................................................................... *passim*

*Sweezy v. New Hampshire*,
354 U.S. 234 (1957)...............................................................................................10

*United States v. Fordice*,
505 U.S. 717 (1992)..........................................................................................10, 11

*United States v. Lopez*,
514 U.S. 549 (1995)...............................................................................................12

OTHER AUTHORITIES:

*About NMMI*, New Mexico Military Instit., https://www.nmmi.edu/about-nmmi/
(last visited July 25, 2018)...................................................................................20

Amy N. Addams et al., Ass'n of Am. Med. Colls., Roadmap to Diversity:
Integrating Holistic Review Practices into Medical School Admissions
Processes (2010), *available at*
https://members.aamc.org/eweb/upload/Roadmap%20to%20Diversity%20Inte
grating%20Holistic%20Review.pdf .......................................................................11

Admission Review Factors and Process, Univ. of Md.,
https://admissions.umd.edu/apply/admission-review-factors-and-process (last
visited July 25, 2018)...........................................................................................16

**TABLE OF AUTHORITIES**—Continued

Page(s)

Philip G. Altbach, Comparative Higher Education: Knowledge, the University,
and Development (1998) ........................................................................................ 12

Anthony Lising Antonio et al., *Approaching Diversity Work in the University:
Lessons from an American Context*, *in* As the World Turns: Implications of
Global Shifts in Higher Education for Theory, Research and Practice (Walter
R. Allen et al. eds., 2012) ...................................................................................... 7

Natasha Bach, *Why the University of Chicago Is Dropping Its SAT/ACT Test
Requirement*, Fortune (June 15, 2018),
http://fortune.com/2018/06/15/university-of-chicago-drops-act-sat-test-
requirement-for-admissions/ ................................................................................. 18

Joseph R. Betancourt et al., *Defining Cultural Competence: A Practical
Framework for Addressing Racial/Ethnic Disparities in Health and Health
Care*, 118 Pub. Health Rep. 293 (2003) ............................................................... 19

Lee C. Bollinger, *Why Diversity Matters*, Chronicle of Higher Ed. (June 1, 2007),
*available at* https://www.chronicle.com/article/Why-Diversity-Matters/9152 ....... 7

William G. Bowen et al., Equity and Excellence in American Higher Education
(2005) ..................................................................................................................... 10

Nicholas A. Bowman, *College Diversity Experiences and Cognitive
Development: A Meta-Analysis*, 80 Rev. Educ. Res. 4 (2010) .............................. 7

Arthur L. Coleman et al., Coll. Bd. Advocacy & Policy Ctr., A Diversity Action
Blueprint: Policy Parameters and Model Practices For Higher Education
Institutions (September 2010), *available at*
https://professionals.collegeboard.org/pdf/10b2699diversityactionblueprintwe
b100922.pdf .......................................................................................................... 10

Nida Denson & Mitchell J. Chang, Racial Diversity Matters: The Impact of
Diversity-Related Student Engagement and Institutional Context, 46 Am.
Educ. Res. J. 322 (2008) ....................................................................................... 7

Lorelle L. Espinosa et al., Am. Council on Educ., Race, Class, & College Access:
Achieving Diversity in a Shifting Legal Landscape (2015), *available at*
http://www.acenet.edu/news-room/Documents/Race-Class-and-College-
Access-Achieving-Diversity-in-a-Shifting-Legal-Landscape.pdf .......................... 17

Nisha C. Gottfredson et al., *Does Diversity at Undergraduate Institutions
Influence Student Outcomes?*, 1 J. Diversity Higher Educ. 80 (2008) .................. 7

## TABLE OF AUTHORITIES—Continued

**Page(s)**

Patricia Gurin et al., *Diversity and Higher Education: Theory and Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330 (2002)........................................................5, 6

Sylvia Hurtado & Linda DeAngelo, Linking Diversity and Civic-Minded Practices with Student Outcomes: New Evidence from National Surveys, 98 Liberal Educ., no. 2, 2012 at 14 ..............................................................................................7

David F. Labaree, *A System Without A Plan: Emergence of An American System of Higher Education in the Twentieth Century*, 3 Int'l J. Historiography Educ. 46 (2013) ..............................................................................................................................12

Letter from Timothy C.J. Blanchard, U.S. Dep't of Educ., Office for Civil Rights, Region II, to Christopher L. Eisgruber, President, Princeton Univ. (Sept. 9, 2015), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/investigations/02086002-a.pdf ...............................................................................................................................18, 20

Jerome A. Lucido, How Admissions Decisions Get Made, in Handbook of Strategic Enrollment Management (Don Hollser, Bob Bontrager & Assocs. eds., 2015)..............................................................................................................................15, 16

*Penn State Undergraduate Admissions: Application Review Process for First-Year Students*, Penn. State Univ., https://admissions.psu.edu/info/future/firstyear/applicationreview/ (last visited July 25, 2018)......................................................................................................................16, 17

Dawn Rhodes, *University of Chicago To Stop Requiring ACT and SAT Scores for Prospective Undergraduates*, Chi. Trib. (June 14, 2018), http://www.chicagotribune.com/news/local/breaking/ct-university-chicago-sat-act-20180614-story.html ............................................................................................18

Gretchen W. Rigol, Coll. Bd., Admissions Decision-Making Models: How U.S. Institutions of Higher Education Select Undergraduate Students (2003), *available at* https://files.eric.ed.gov/fulltext/ED562589.pdf ............................................14, 15

Diane N. Ruble, *A Phase Model of Transitions: Cognitive and Motivational Consequences*, 26 Advances Experimental Soc. Psychol. 163 (1994) .....................................6

Cecilia Capuzzi Simon, *The Test-Optional Surge*, N.Y. Times (Oct. 28, 2015), https://www.nytimes.com/2015/11/01/education/edlife/the-test-optional-surge.html.........................................................................................................................19

Patrick T. Terenzini et al., *Racial and Ethnic Diversity in the Classroom: Does It Promote Student Learning?* 72 J. Higher Educ. 509 (2001)......................................................5

# <u>TABLE OF AUTHORITIES</u>—Continued

**Page(s)**

*The Brown Degree: Grade Options*, Brown Univ.,
   https://www.brown.edu/academics/college/degree/policies/grade-options (last
   visited July 25, 2018)...............................................................................................20

Martin Trow, Federalism in American Higher Education, in Higher Learning in
   America, 1980-2000 (Arthur Levine ed., 1993) ....................................................10

Undergraduate Admission: Admission Philosophy, Carnegie Mellon Univ.,
   http://coursecatalog.web.cmu.edu/servicesandoptions/undergraduateadmission
   / (last visited July 25, 2018)..................................................................................16

*Undergraduate Admission*, Brown Univ.,
   https://www.brown.edu/admission/undergraduate/undergraduate-admission
   (last visited July 25, 2018)....................................................................................20

# INTEREST OF *AMICI CURIAE*[1]

*Amici* are 37 associations of colleges, universities, educators, trustees, and other representatives of higher education in the United States.   *Amici* represent public, independent, large, small, urban, rural, denominational, non-denominational, graduate, and undergraduate institutions and faculty.  American higher education institutions enroll over 17 million students. For decades, *amici* have worked to advance student diversity and to open wide the gates of higher education to talented students of all races and backgrounds.

Amicus American Council on Education ("ACE") represents all higher education sectors. Its more than 1,700 members reflect the extraordinary breadth and contributions of degree-granting colleges and universities in the United States.  Founded in 1918, ACE seeks to foster high standards in higher education, believing a strong higher education system to be the cornerstone of a democratic society.  Among its initiatives, ACE had a major role in establishing the Commission on Minority Participation in Education and American Life, chaired by former Presidents Ford and Carter, which issued One-Third of a Nation (1988), a report on minority matriculation, retention, and graduation.

ACE is joined in this amicus brief by the following organizations, who are described in more detail in the Addendum: the Accreditation Council for Pharmacy Education (ACPE); the American Association of Colleges for Teacher Education (AACTE); the American Association of Colleges of Nursing (AACN); the American Association of Collegiate Registrars and Admissions Officers (AACRAO); the American Association of Community Colleges (AACC); the American Association of State Colleges and Universities (AASCU); the American

---

[1] Counsel for Plaintiff and Defendant both indicated their blanket assent to the filing of amicus briefs in a joint filing on July 24, 2018.  That same day, the Court granted leave to file this amicus brief.

Association of University Professors (AAUP); the American College Personnel Association (ACPA) College Student Educators International; the American Dental Education Association (ADEA); the American Indian Higher Education Consortium (AIHEC); the American Speech-Language-Hearing Association (ASHA); the Association of American Universities (AAU); the Association of American Colleges and Universities (AAC&U); the Association of American Law Schools (AALS); the Association of American Medical Colleges (AAMC); the Association of Catholic Colleges and Universities (ACCU); the Association of Community College Trustees (ACCT); the Association of Governing Boards of Universities and Colleges (AGB); the Association of Jesuit Colleges and Universities (AJCU); the Consortium of Universities of the Washington Metropolitan Area (CUWMA); the Council for Opportunity in Education (COE); the Commission on Institutions of Higher Education of NEASC; the Council of Graduate Schools (CGS); the Council of Independent Colleges (CIC); EDUCAUSE; the Graduate Management Admission Council (GMAC); the Law School Admission Council (LSAC); the Middle States Commission on Higher Education (MSCHE); the National Association for College Admission Counseling (NACAC); the National Association of College and University Business Officers (NACUBO); the National Association of Diversity Officers in Higher Education (NADOHE); the National Association of Independent Colleges and Universities (NAICU); the National Association of Student Financial Aid Administrators (NASFAA); Phi Beta Kappa; the Student Affairs Administrators in Higher Education (NASPA); and the WASC Senior College and University Commission (WSCUC).

*Amici* are neither fact-finders in this case nor positioned to parse and assess its substantial factual record. *Amici* submit this brief to share perspectives and experience on issues of diversity

2

and admissions in higher education overall in ways that are important to understand as the Court evaluates the parties' positions.

*Amici* believe that a diverse student body is essential to educational objectives of colleges and universities, and that each institution should be able to exercise its academic judgment to determine within broad limits the diversity that will advance its own particular mission. *Amici* also believe that holistic review remains a cornerstone for the consideration of race in admissions because it gives each applicant individualized consideration and reduces no one to his or her race. These principles, taken together with the presentations in the parties' summary judgment briefs, lead *amici* to conclude that Plaintiff's motion for summary judgment should be denied and Harvard's motion for summary judgment should be granted.

## ARGUMENT

This lawsuit is nothing more than the first step in a backdoor attempt to achieve the sweeping relief sought—and denied—in *Fisher v. University of Texas*, 136 S. Ct. 2198 (2016) ("*Fisher II*"): the end of the consideration of race in college admissions and the restriction of a university's ability to assemble a diverse student body. *Amici* think it is more than coincidence that this suit was filed against the very university that the Supreme Court has specifically cited approvingly—dating back to *Regents of University of California v. Bakke*, 438 U.S. 265 (1978)—for its appropriate use of race as a part of individualized considerations in admissions.[2] The Court should reject this latest attempt to eliminate the narrowly tailored use of race for college admissions, just as the Supreme Court has rejected the attempts that came before this case. At a minimum, Plaintiff's motion for summary judgment should be denied.

---

[2] Indeed, the majority decisions in both *Gratz v. Bollinger*, 539 U.S. 244 (2003), and *Grutter v. Bollinger*, 539 U.S. 306 (2003), cited to Harvard's holistic admission plan favorably. *See Gratz*, 539 U.S. at 272-273; *Grutter*, 539 U.S. at 335-337.

Harvard's motion for summary judgment explains that while Harvard considers race flexibly and contextually in pursuit of its goal to assemble a talented, diverse incoming class, the University also uses many race-neutral means to pursue diversity and that its notion of diversity is far, far broader than race-alone.  The Supreme Court has made clear many times over that higher education institutions may, within broad limits, define the diversity that will produce the educational benefits they seek for all students and use their admission processes to further that goal.  Harvard is doing that.  The Supreme Court has also approved the use of holistic review of applicants, recognizing that it is a critical component of achieving the educational benefits of diversity.  Harvard, again, is doing that.  Harvard's motion explains that it does not engage in racial balancing or use quotas, but rather it considers race flexibly, along with many other factors.  Harvard also explains that it identified no workable race-neutral alternatives that would allow it to achieve its compelling interest in diversity while advancing its fundamental institutional objectives, including academic excellence.  Thus, Harvard, unlike the plaintiff, offers the court a sound basis for granting its motion for summary judgment.

Plaintiff's theory rests on the assumption that college admissions decisions can be reduced to a formula.  They cannot.  Admissions criteria substantially vary between institutions and incorporate a range of quantitative and qualitative factors.  The admissions process involves academic judgments, and the point of holistic review is to provide applicants with individualized consideration based on the totality of the circumstances.  Reaching a final decision is far from a formulaic process.  Plaintiff's motion for summary judgment, in substance, asks the Court to require fundamental changes to university admissions processes, and to mandate a more mechanical process in which educators' ability to choose which academic and other criteria they wish to use, weigh, and apply play next to no role.  That shift would undermine the recognized

freedom of a university to assemble a class that, in the university's judgment, will best advance

that university's particular mission.  The Court should reject Plaintiff's effort to upset decades of

Supreme Court precedent that has approved of holistic and individualized admissions processes

and should deny Plaintiff's motion for summary judgment.  Harvard's motion for summary

judgment outlines the University's careful efforts to consider race as one of many factors as it

pursues its compelling interest in a diverse student body.  Harvard's motion should be granted.

I.      **WITHIN BROAD LIMITS, THE LAW ALLOWS EACH INSTITUTION TO DEFINE THE DIVERSITY THAT WILL PRODUCE THE EDUCATIONAL BENEFITS IT SEEKS.**

  A.      **Campus Diversity Yields Critical And Lasting Benefits.**

Student diversity, including racial diversity, advances learning, enriches campus

environments, and prepares students to thrive in an increasingly diverse workforce and society.

Student diversity improves learning outcomes and promotes academic success—the core of

higher education's mission.  *See* Patricia Gurin et al., *Diversity and Higher Education: Theory

and Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330, 360 (2002) (Campus diversity

is "necessary [for] . . . higher education to achieve its educational goals.").  Both inside and

outside the classroom, interactions between students of different backgrounds introduce them to

new ideas and perspectives—the raw material of learning—and prompt them to reconsider their

own views in a reasoned and analytical way.  Studies show that in-class diversity significantly

enhances students' abilities both to problem-solve and to work on group projects.  *See* Patrick T.

Terenzini et al., *Racial and Ethnic Diversity in the Classroom: Does It Promote Student

Learning?* 72 J. Higher Educ. 509, 527 (2001).  The educational gains of student diversity in less

formal settings are often even greater.  In dormitories or dining halls, "informal interaction with

diverse peers [is] consistently influential [and positive] on all educational outcomes."  Gurin et

al., 72 Harv. Educ. Rev. at 359; *see also id.* at 351 ("[I]nformal interactional diversity [is]

especially influential in accounting for higher levels of intellectual engagement and self-assessed academic skills . . . .").

These results are not surprising. Students develop their analytical and intellectual abilities through exposure to new theories and different perspectives. And when a peer presents an unexpected perspective or new information, it is absorbed differently and more fully than if it had been presented in a lecture. *See, e.g.*, Diane N. Ruble, *A Phase Model of Transitions: Cognitive and Motivational Consequences*, 26 Advances Experimental Soc. Psychol. 163, 171 (1994). Such student-to-student encounters facilitate intellectual exchange, which in turn promotes complex and abstract thinking. Moreover, "[d]iversity enables students to perceive differences both within and between groups," Gurin et al., 72 Harv. Educ. Rev. at 360, heightening their abilities for nuanced understanding and further refining their analytical skills.

Exposing students to an array of peer life experiences and perspectives is no less critical to their personal development. So much of the education the "college experience[]" has to offer occurs outside of the classroom. *Id.*; *see also Bakke*, 438 U.S. at 312 n.48 ("[A] great deal of learning occurs informally . . . through interactions among students . . . ." (citation omitted)). In diverse environments, students are more able to forge friendships with people different from themselves. When new friends and classmates have unfamiliar perspectives or beliefs, students are forced to challenge their own. In doing so, students decide which beliefs and values to retain—and cultivate—and which to reconsider in favor of a newly discovered truth. This process is essential to personal growth and the development of one's identity.

And campus diversity prepares students to participate more effectively in our increasingly diverse and interconnected society—another one of higher education's core missions. "The experience of arriving on a campus to live and study with classmates from a

diverse range of backgrounds is essential to students' training for this new world, nurturing in them an instinct to reach out instead of clinging to the comforts of what seems natural or familiar." Lee C. Bollinger, *Why Diversity Matters*, Chronicle of Higher Ed. (June 1, 2007).[3] As the Supreme Court has noted, "major American businesses have made clear that the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints." *Grutter*, 539 U.S. at 330.[4] As these businesses themselves recognize, "[t]he rich variety of ideas, perspectives, and experiences to which both minority and nonminority students are exposed in a diverse university setting, and the cross-cultural interactions that they experience, are essential to the students' ability to function in and contribute to the increasingly diverse community in the United States." Brief of Fortune-100 and Other Leading American Businesses as *Amici Curiae* in Support of Respondents 9-10, *Fisher II*, 136 S. Ct. 2198 (No. 14-981). Further, businesses increasingly "operate and compete in a global environment, and therefore need employees who can effectively serve and work together with people from many different cultures." *Id.* at 11.[5] Top military officials have echoed: "More so

---

[3] *Available at* https://www.chronicle.com/article/Why-Diversity-Matters/9152.

[4] Since *Grutter*, the academic studies underpinning the Supreme Court's pronouncement have continued to accumulate. *See, e.g.*, Anthony Lising Antonio et al., *Approaching Diversity Work in the University: Lessons from an American Context*, *in* As the World Turns: Implications of Global Shifts in Higher Education for Theory, Research and Practice 371 (Walter R. Allen et al. eds., 2012); Sylvia Hurtado & Linda DeAngelo, *Linking Diversity and Civic-Minded Practices with Student Outcomes: New Evidence from National Surveys*, 98 Liberal Educ., no. 2, 2012 at 14; Nicholas A. Bowman, *College Diversity Experiences and Cognitive Development: A Meta-Analysis*, 80 Rev. Educ. Res. 4 (2010); Nida Denson & Mitchell J. Chang, *Racial Diversity Matters: The Impact of Diversity-Related Student Engagement and Institutional Context*, 46 Am. Educ. Res. J. 322 (2008); Nisha C. Gottfredson et al., *Does Diversity at Undergraduate Institutions Influence Student Outcomes?*, 1 J. Diversity Higher Educ. 80 (2008).

[5] *See also* Brief of DuPont, IBM, Intel, and the National Action Council for Minorities in Engineering in Support of Respondents 9-12, *Fisher II*, 136 S. Ct. 2198 (No. 14-981) (applying similar argument to underrepresentation of women and minorities in STEM fields).

than before," recent international conflicts "have required our military to perform a variety of civil-military functions that called for increased cultural awareness and a greater sensitivity to some of the ethnic and religious issues underlying military conflicts—qualities enhanced by diverse leadership, and developed in a . . . diverse educational environment."  Brief of Former Military Leaders as *Amici Curiae* in Support of Respondents 3-4, *Fisher II*, 136 S. Ct. 2198 (No. 14-981).  Finally, effective civic participation also requires exposure to a variety of viewpoints; a robust exchange of ideas makes students better-informed jurors, voters, and leaders.  *Grutter*, 539 U.S. at 331-332.  When college students learn how to break down racial and other stereotypes and consider different perspectives, they carry those lessons with them their whole lives.  The individual students and society-at-large then reap the benefits, as our citizens are better able to consider different perspectives or opposing viewpoints and see commonality with those from different backgrounds.

In view of these facts, the Supreme Court has recognized the paramount importance of campus diversity and has granted universities the freedom to pursue it within broad limits.  Forty years ago, the Court explained that campus diversity is one of the very few "compelling interests" that can justify the government's consideration and use of race.  *See Bakke*, 438 U.S. at 320.  In the last four decades, the Court has repeatedly confirmed *Bakke*'s central ruling.  In *Grutter*, the Court recognized that campus diversity's educational benefits were "not theoretical, but real," and accordingly granted the University of Michigan Law School's request to reaffirm that "in the context of higher education, [there is] a compelling state interest in student body diversity."  539 U.S. at 328, 330.  By 2013, campus diversity's status as a compelling interest was so entrenched that the parties in *Fisher v. University of Texas* did not even "ask the Court to revisit that aspect of *Grutter*'s holding."  570 U.S. 297, 311 (2013) ("*Fisher I*").  A few years

later, the Court removed all doubt, affirming once more that benefits of campus diversity, such as "the destruction of stereotypes, the promotion of cross-racial understanding, the preparation of a student body for an increasingly diverse workforce and society, and the cultivation of a set of leaders with legitimacy in the eyes of the citizenry" deserve the highest regard under the Fourteenth Amendment's framework. *Fisher II*, 136 S. Ct. at 2211 (internal quotation marks and brackets omitted). The importance of student diversity and its status as a compelling interest cannot be seriously disputed.

### B. Courts Owe Considerable Deference To Each Institution's Concept Of Diversity.

Because the compelling interest at stake is fundamentally educational in nature and requires educational judgment, courts grant colleges and universities "[c]onsiderable deference" to decide whether to pursue diversity and how to define it. *Id*. at 2214. In the context of higher education, student diversity "takes many forms," often including, but extending well beyond race. *Id*. at 2210 ("[R]acial classifications may sometimes fail to capture diversity in all of its dimensions . . . .").

Although colleges and universities may not use racial quotas or engage in racial balancing, they are entitled to decide for themselves the characteristics of a class most conducive to the pursuit of their unique missions. Fifteen years ago, the Court held in *Grutter* that a university's "educational judgment" that "diversity is essential to its educational mission is one to which we defer." 539 U.S. at 328. *Fisher I* and *Fisher II* cemented this principle as a core component of black-letter constitutional law. There, the Court held that once "a university gives a 'reasoned, principled explanation' for its decision" to pursue diversity-related goals, "deference must be given" to that "academic judgment," *Fisher II*, 136 S. Ct. at 2208 (quoting *Fisher I*, 570 U.S. at 310). *Fisher II*—decided just two years ago—could not have put it more plainly:

9

"Considerable deference is owed to a university in defining . . . intangible characteristics, like student body diversity, that are central to its identity and educational mission."  136 S. Ct. at 2214.

Universities "occupy a special niche in our constitutional tradition."  *Grutter*, 539 U.S. at 329.  Because universities protect the bedrock "freedoms of speech and thought," *id.*, courts have long refrained from second-guessing their educational judgments.[6]  That deference naturally extends to admissions criteria and decisions, which are paradigmatic academic judgments.  *See Bakke*, 438 U.S. at 312 (explaining that one of the "'four essential freedoms' of a university" is "to determine for itself on academic grounds . . . who may be admitted to study") (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in the result)).  Courts understand that each institution realizes its mission *through* its students.  *See, e.g.*, Arthur L. Coleman et al., Coll. Bd. Advocacy & Policy Ctr., A Diversity Action Blueprint: Policy Parameters and Model Practices For Higher Education Institutions 15 (September 2010)[7] (explaining how admissions practices further mission-related goals).  As such, courts grant universities the freedom "to make [their] own judgments as to . . . the selection of [their] student body," *Grutter*, 539 U.S. at 329 (quoting *Bakke*, 438 U.S. at 312), including whether to pursue diversity, including racial diversity, and how to conceive of it.  *Fisher II*, 136 S. Ct. at 2214.

These legal principles are grounded in practical realities.  The Nation's colleges and universities are themselves diverse and "highly decentralized."  William G. Bowen et al., Equity and Excellence in American Higher Education 68 (2005); *see also United States v. Fordice*, 505

---

[6] *See, e.g.*, Martin Trow, *Federalism in American Higher Education*, *in* Higher Learning in America, 1980-2000, at 39 (Arthur Levine ed., 1993).

[7] *Available at* https://professionals.collegeboard.org/pdf/10b2699diversityactionblueprint web100922.pdf.

U.S. 717, 749 (1992) (Thomas, J., concurring) (describing higher education as a "diverse assortment of institutions").  *Amicus* ACE alone represents more than 1,500 institutions, each of which has its own mission, history, geography, location, curriculum, capabilities, and faculty. Institutions can be public or private, small or large, urban or rural, focused on professions or the liberal arts, religious or secular, or anything in between—factors that shape how an institution interacts with and influences the broader world.  Even within a single institution, school- or program-specific missions can vary tremendously.  What works for one graduate or professional school may not work for an undergraduate college or a different graduate school at the same university.  *See* Amy N. Addams et al., Ass'n of Am. Med. Colls., Roadmap to Diversity: Integrating Holistic Review Practices into Medical School Admissions Processes ix-x (2010).[8] By necessity, then, each university's unique mission and context may call for the need to evaluate differently certain characteristics, experiences, and backgrounds of various prospective students in order to achieve the university's educational mission.

Courts therefore permit universities to pursue the version of diversity that best suits their mission and goals, including through the limited consideration of race.  *See Fisher II*, 136 S. Ct. at 2214 (a university is free to seek its "own definition of . . . diversity"); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 792 (2007) (Kennedy, J., concurring in part and concurring in the judgment) (noting that the First Amendment affords universities "particular latitude in defining diversity").  As far back as *Bakke*, the Supreme Court has ruled that "[t]he diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element."  438 U.S. at 315.  Since then, the Court's precedent has only further pressed higher

---

[8] *Available at* https://members.aamc.org/eweb/upload/Roadmap%20to%20Diversity%20Integra ting%20Holistic%20Review.pdf.

education to "assemble a student body that is not just racially diverse, but diverse along all of the qualities valued by the university." *Grutter*, 539 U.S at 340; *see also id.* at 321 (universities must evaluate the "broad range of qualities and experiences that may be considered valuable contributions to student body diversity.").

The different forms of student diversity are nearly limitless, incorporating, for example, those who have "lived or traveled widely abroad, are fluent in several languages, have overcome personal adversity and family hardship, have exceptional records of extensive community service, and have had successful careers in other fields." *Id.* at 338. Moreover, campus diversity not only varies between institutions; it is also "multi-dimensional" and layered—flexible enough to allow the same college or graduate school to pursue several of its many different forms. *See Fisher II*, 136 S. Ct. at 2214 (citation omitted).

As a result, college and universities use diversity in distinct ways to advance their vastly different identities, goals, and approaches to education. That freedom has made college campuses the "laboratories for experimentation" that they are. *Id.* (quoting *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring)). And it has helped establish American higher education as the greatest in the world. *See, e.g.*, David F. Labaree, *A System Without A Plan: Emergence of An American System of Higher Education in the Twentieth Century*, 3 Int'l J. Historiography Educ. 46, 46 (2013) (concluding that university autonomy has contributed to American higher education's "global reach and broad esteem"); Philip G. Altbach, Comparative Higher Education: Knowledge, the University, and Development 55 (1998) (American higher education is the most productive in the world "in terms of research, knowledge

production and distribution, and training of high-level personnel.").[9]

## II.   HOLISTIC REVIEW IS CRITICAL TO ACHIEVING THE EDUCATIONAL BENEFITS OF DIVERSITY.

### A.   Holistic Review Is What Allows An Institution To Fully Evaluate An Applicant, Including The Applicant's Potential Contribution to Campus Diversity.

Holistic review is a "highly individualized" process that permits universities to pursue

their own conceptions of campus diversity.  *Grutter*, 539 U.S. at 337.  It is a comprehensive

evaluation, which "giv[es] serious consideration to *all the ways* an applicant might contribute" to

a campus community.  *Id.* (emphasis added).  Relevant admissions criteria, which can include a

student's race, are "flexibl[y] assess[ed]" in their totality, not treated as various inputs in an

"admissions formula."  *Id.* at 315, 343.  The process is evidence-based, data-informed, and

rigorous.  It is guided by well-developed (but nonetheless constantly evolving) evaluation

systems and informed by professional judgment in undergraduate, graduate, and professional

school admissions.

Because holistic review focuses on individual applicants, the Supreme Court has held that

consideration of race as one aspect of this process is permissible.  *See id*. at 337; *Fisher II*, 136 S.

Ct. at 2205 (reaffirming *Grutter*'s holding to allow "the University of Michigan Law School's

system of holistic review").  In contrast to racial quotas or formulas, which the Supreme Court

has struck down as overly broad and mechanical, holistic review does not treat "an applicant's

race or ethnicity [as] the defining feature of his or her application."  *Grutter*, 539 U.S. at 337.  At

most, it reflects the consideration of multiple background factors that may include race,

---

[9] *See also* Brief of the College Board, AACRAO, NACAC, and LSAC *Amici Curiae*, Supporting Respondents, *Fisher II*, 136 S. Ct. 2198 (No. 14-981) ("College Board Amicus Br.").

"ensur[ing] that all factors that may contribute to student body diversity are meaningfully considered alongside race in admissions decisions." *Id.*

With holistic review the institution focuses on no single, dispositive feature of an application. High school grades and standardized test scores alone cannot convey all that an applicant can offer to a campus community.[10] These numeric indicators say little, for example, about a student's character and may understate a student's potential. *Id.* at 315 (approving an admissions policy that "requires admissions officials to look beyond grades and test scores to other criteria that are important to the Law School's educational objectives"). Extracurricular activities as well are often only a "single metric . . . [that] will capture certain types of people and miss others." *Fisher II*, 136 S. Ct. at 2213. Individual subjective factors, too, often touch on only one piece of a candidate's overall profile and merit.

Each institution that uses holistic review therefore strives to consider the whole of each applicant, looking to a broad spectrum of academic and non-academic considerations. By way of example, College Board's Admissions Models Project identified nearly 30 academic factors and almost 70 non-academic factors. *See generally* Gretchen W. Rigol, Coll. Bd., Admissions Decision-Making Models: How U.S. Institutions of Higher Education Select Undergraduate Students (2003).[11] The academic factors naturally include quantitative metrics, such as class rank and standardized test scores, but also can incorporate qualitative measures, such as "[i]ntellectual curiosity" and "[g]rasp of world events." *Id.* at 75 (Appendix D). Non-academic factors are even more wide-ranging. They account for an applicant's personal background, like her upbringing and life experiences, or whether she will be the first generation in her family to

---

[10] *See* College Board Amicus Br., *supra* note 9, at 13-15 ("Academic factors represent only one dimension of the ultimate decision to admit.").

[11] *Available at* https://files.eric.ed.gov/fulltext/ED562589.pdf.

go to college.  *Id.* at 75-77.  Extracurricular activities and achievements are often considered,

along with unusual obstacles an applicant may have overcome, such as family problems, health

challenges, frequent moves, or responsibility for raising a family—to name just a few.  *Id.*

Holistic review even looks to geography, accounting for whether the prospective student is from

a disadvantaged area or far-away state or went to a high school with few or no previous

applicants.  *Id.*  Lastly, universities may consider the race of an applicant, but only when treated

as a narrowly tailored "plus" factor as an aspect of the student's life experience within the all-

embracing contextual, holistic review of an individual applicant.  *Grutter*, 539 U.S. at 334.

Because every institution has a distinct mission, the factors that each considers—and how

heavily they are weighed—vary across universities and even across academic years.  *See* Jerome

A. Lucido, *How Admissions Decisions Get Made*, *in* Handbook of Strategic Enrollment

Management 147, 148-149 (Don Hollser, Bob Bontrager & Assocs. eds., 2015).  Even though

holistic review flexibly considers the totality of intersecting factors, it must begin within each

institution's own context.  As such, no two schools will have exactly the same holistic review

process.  *See* Rigol, *supra*, at 1 ("[T]here are almost as many different approaches to selection as

there are institutions.").  Indeed, each university's particular mission and characteristics,

academic approaches and philosophies, academic and non-academic programs, and projections

and targets for the "yield" of admitted students are all taken into account.  Lucindo, *supra*, at

147-149.[12]

Although each institution applies holistic review differently in the particulars,

"individualized consideration" of the applicant is always the lodestar.  *Grutter*, 539 U.S. at 334,

337; *Bakke*, 438 U.S. at 318 n.52 ("denial . . . of this right to individualized consideration" is the

---

[12] *See also* College Board Amicus Br., *supra* note 9.

"principle evil").[13]  Accordingly, each applicant stands on equal "footing for consideration."

*Grutter*, 539 U.S. at 334, 337 (citation omitted).  Holistic review recognizes that each individual

factor provides the most value when viewed in combination with other application elements.

*See, e.g.*, *Fisher II*, 136 S. Ct. at 2213 (discussing the importance of considering non-quantitative

factors, such as "a family crisis" that could have harmed a student's academic performance).  For

that reason, no single consideration is sufficient to disqualify a candidate or guarantee their

admission.  *See Grutter*, 539 at 315 ("[E]ven the highest possible score does not guarantee

admission to the Law School. Nor does a low score automatically disqualify an applicant."

(internal citation omitted)); *id.* at 337 ("There is no policy, either *de jure* or *de facto,* of

automatic acceptance or rejection based on any single 'soft' variable.").[14]  Indeed, universities

review applications not simply to evaluate a student's accomplishments or presentation, but to

determine how an applicant took advantage of opportunities.  *See* Lucido, *supra*, at 157

(Universities "seek to understand the conditions under which each applicant has performed and

to make judgments based on the context of those conditions.").

---

[13] This individualized review is critical to college admissions system throughout the country. *See, e.g.*, *Undergraduate Admission: Admission Philosophy*, Carnegie Mellon Univ., http://coursecatalog.web.cmu.edu/servicesandoptions/undergraduateadmission/ (last visited July 25, 2018) (stating the university makes all necessary efforts to "treat every applicant as an individual and take great care to make [the university's] admission decisions fair, thorough and sensitive."); *Admission Review Factors and Process*, Univ. of Md., https://admissions.umd.edu/apply/admission-review-factors-and-process (last visited July 25, 2018)  ("The undergraduate admissions process is rigorous and individualized. As the university must make fine distinctions among large numbers of highly qualified applicants, the ability to assess consistently all information presented in the application becomes increasingly important.").

[14] Once again, specific college admissions policies bear out these statements.  *See, e.g.*, *Penn State Undergraduate Admissions: Application Review Process for First-Year Students*, Penn. State Univ., https://admissions.psu.edu/info/future/firstyear/applicationreview/ (last visited July 25, 2018) ("There are no such things as 'cut offs.' We review students in a holistic manner, taking into account a full range of factors.").

This individualized process is rigorous, with colleges and universities usually relying on multi-tiered review processes to assess an applicant's qualities on a case-by-case basis. Commonly, after initial readers weigh dozens of factors to make preliminary determinations, second readers or admissions committees assess the ways an individual applicant is likely to contribute to a campus community. And universities are constantly re-evaluating their processes and decision-making, working to improve and build upon their outcomes year over year. This thorough, individualized, and ever-evolving process allows schools to identify more accurately and admit students who will further their own school-specific missions.

Of course, as suggested above, holistic review is not just for the Ivy League. According to a recent ACE study, 76 percent of all participating institutions, including 92 percent of more selective schools, reported using holistic review in their admissions process. *See* Lorelle L. Espinosa et al., Am. Council on Educ., Race, Class, & College Access: Achieving Diversity in a Shifting Legal Landscape 31-32 (2015).[15] Even schools with unusually large student bodies and applicant pools use holistic review to admit the students that will best further their educational missions.[16] Although holistic review is not always the most expedient way to assemble a class, it is an indispensable tool for colleges to achieve their diversity goals, advance their missions, and comply with the law.

---

[15] *Available at* http://www.acenet.edu/news-room/Documents/Race-Class-and-College-Access-Achieving-Diversity-in-a-Shifting-Legal-Landscape.pdf.

[16] As just one example, Pennsylvania State University receives over 70,000 undergraduate applications, yet gives each a "holistic assessment," looking to "academic courses, grades and levels of those courses and standardized test scores, plus additional factors that may include an audition, a portfolio review, the geographic and cultural background of the student, the personal statement, and the activities list." *Penn State Undergraduate Admissions*, *supra* note 14.

### B.   Admissions Decisions Under A Holistic Review Framework Cannot Be Reduced To An Easy-To-Predict Formula.

Admitting a class is both a science and an art.  Although the process is informed by objective data, there are often qualitative factors that are decisive for one candidate or another.  Thousands of applicants to Harvard and other highly selective colleges have literally perfect academic credentials, served as high school valedictorians, and earned the very top standardized test scores.  *See* Def.'s Mot. Summ. J. 3-4 & n.4, ECF No. 418 (noting that more than 5,000 domestic applicants to the Class of 2019 had a perfect math or verbal SAT score, more than twice the number ultimately admitted (citing SMF ¶¶ 1-2, 5-9)); *see also* Letter from Timothy C.J. Blanchard, U.S. Dep't of Educ., Office for Civil Rights, Region II, to Christopher L. Eisgruber, President, Princeton Univ. 13 (Sept. 9, 2015) ("Princeton Compliance Review Letter") (noting similar statistics for Princeton).[17]  There are more applicants with top academic scores than available seats.  Because of that fact—and the fact that Harvard and other selective institutions are looking for students who can contribute more than quantitative academic acumen— admissions committees *must* look to a wide range of additional factors to assemble a class that best suits their needs and goals.

These additional factors are increasingly important across all of higher education.  Over 1,000 accredited four-year undergraduate colleges no longer require applicants to submit standardized test scores.[18]  Some institutions have even experimented with a holistic review

---

[17] *Available at* https://www2.ed.gov/about/offices/list/ocr/docs/investigations/02086002-a.pdf.

[18] Natasha Bach, *Why the University of Chicago Is Dropping Its SAT/ACT Test Requirement*, Fortune (June 15, 2018), http://fortune.com/2018/06/15/university-of-chicago-drops-act-sat-test-requirement-for-admissions/ ("More than 1,000 accredited, four year colleges and universities are now test-optional, including Bates College, Pitzer College, and Wesleyan University."); Dawn Rhodes, *University of Chicago To Stop Requiring ACT and SAT Scores for Prospective Undergraduates*, Chi. Trib. (June 14, 2018), http://www.chicagotribune.com/news/local/breaking/ct-university-chicago-sat-act-20180614-story.html.

process that does not turn on test scores *at all*.[19]  These institutions—like any other—must look

to high school grades, grade trajectory and qualitative criteria to decide whether to extend an

offer of admission.  When considering the mission of institutions to prepare students to succeed

and contribute to a diverse world, and when an institution's approach to holistic review is

combined with its attention to other admissions goals and considerations—such as sport teams

and orchestra rosters, tuition benefits to children of university employees, alumni relations, and

geographic diversity—it is not feasible to say that one characteristic or another is *the* reason a

student received an offer of admission.

Qualitative factors play an even greater role as institutions seek candidates that will best

promote their unique "mission[s]."  *Fisher II*, 136 S. Ct. at 2214; *Grutter*, 539 U.S. at 328.

These judgments are typically not susceptible to formulaic decision-making and necessarily

entail a degree of judgment by educators and admissions experts.  For example, many medical

schools advance their missions by selecting students with backgrounds and skill sets necessary to

break socio-cultural barriers to access to healthcare.  *See* Joseph R. Betancourt et al., *Defining

Cultural Competence: A Practical Framework for Addressing Racial/Ethnic Disparities in

Health and Health Care*, 118 Pub. Health Rep. 293, 297-300 (2003).  Careful exercise of such

judgment in examination of a prospective student's entire application is required to make

admission decisions.

The same is true for undergraduate admissions criteria, where each school's distinctive

mission drives qualitative factors it considers and emphasizes when assessing many more

qualified students than can be admitted.  For example, the New Mexico Military Institute (an

ACE Member) seeks to instill military-type discipline into its students through a highly

---

[19] Cecilia Capuzzi Simon, *The Test-Optional Surge*, N.Y. Times (Oct. 28, 2015),
https://www.nytimes.com/2015/11/01/education/edlife/the-test-optional-surge.html.

structured learning environment.  To further its mission, the Institute specifically seeks students who will promote "qualities of honor, integrity, and responsibility"[20]—an inherently holistic assessment.  On the other end of the spectrum, many schools seek to cultivate a less structured environment, imposing no curricular requirements and permitting students to take any class they wish pass/fail.[21]  Because not all students will thrive in that type of setting, these universities must actively identify students who "want to create and navigate their own intellectual journeys."[22]  This judgment again calls for the assessment of qualitative factors, which can be made only after considering how multiple elements of an application relate to one another.

Admissions decisions therefore cannot be reduced to a mathematical formula in which courts can look for a binary outcome based on one or a handful of characteristics alone.  Objective factors—like numerical measures of academic or extracurricular success—tell only part of the story.  And all students are evaluated individually, not as members of any particular group, racial or otherwise.  For that reason, universities "frequently accept[]" white applicants with grades and test scores lower than certain minority applicants, even though statistical models may have predicted the opposite.  *See Grutter*, 539 U.S. at 338.  Similarly, a thorough government compliance review showed that Princeton University "frequently" accepts "applicants from Asian backgrounds with grades and test scores lower than rejected non-Asian applicants."  *See* Princeton Compliance Review Letter, *supra*, at 13.  In short, both quantitative data and qualitative assessments drive admissions decisions, no variables are dispositive in all

---

[20] *About NMMI*, New Mexico Military Instit., https://www.nmmi.edu/about-nmmi/ (last visited July 25, 2018).

[21] *See The Brown Degree: Grade Options*, Brown Univ., https://www.brown.edu/academics/college/degree/policies/grade-options (last visited July 25, 2018).

[22] *Undergraduate Admission*, Brown Univ., https://www.brown.edu/admission/undergraduate/undergraduate-admission (last visited July 25, 2018).

cases, and every variable takes on new meaning when viewed in the context of an individual's entire application and in relation to other applications under review.  Statistical analyses that fail to address or inadequately address the countless variables involved in admissions decisions can paint distorted pictures that courts should not accept.

Harvard's approach to holistic admission decisions has been widely adopted throughout higher education.  Decades ago, Harvard helped establish the basic framework for holistic review.  *See Bakke*, 438 U.S. at 316, 318 (stating that Harvard's admissions policy offers an "illuminating example" of how to "treat[] each applicant as an individual in the admissions process").  And in both *Grutter* and *Bakke*, the Supreme Court identified it as a model other institutions should follow.  *See Grutter*, 539 U.S. at 337 ("Like the Harvard plan, [Michigan] Law School's admissions policy 'is flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration . . . .'" (quoting *Bakke*, 428 U.S. at 317)).[23]  Harvard's system and similar ones in place at hundreds of institutions nationwide strike the delicate balance between "the pursuit of [educational] diversity [and] the constitutional promise of equal treatment and dignity."  *Fisher II*, 136 S. Ct. at 2214.

A victory for plaintiff could upend this evolved and evolving system.  In a nation that is more connected and racially and ethnically diverse than ever, such an outcome would deprive many students of the critical benefits of campus diversity and thus the education they will need as citizens and leaders in the 21st Century.

---

[23] *See also Gratz*, 539 U.S. at 272 (favoring Harvard's admissions policy as "instructive in our consideration of" the University of Michigan's college admissions program).

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's motion for summary

judgment and grant Defendant's motion for summary judgment.

Respectfully submitted,

July 30, 2018                                  /s/ Natashia Tidwell
                                              Natashia Tidwell (BBO #657679)
                                              HOGAN LOVELLS US LLP
                                              100 High Street, 20th Floor
                                              Boston, MA 02110
                                              (617) 371-1076
                                              natashia.tidwell@hoganlovells.com

                                              Of counsel:

                                              Peter G. McDonough
                                              AMERICAN COUNCIL ON EDUCATION
                                              One Dupont Circle
                                              Washington, DC 20036
                                              (202) 939-9300
                                              pmcdonough@acenet.edu

                                              Stephanie J. Gold
                                              Jessica L. Ellsworth
                                              Joel Buckman
                                              Matthew J. Higgins
                                              HOGAN LOVELLS US LLP
                                              Columbia Square
                                              555 Thirteenth Street, NW
                                              Washington, DC 20004
                                              (202) 637-5600

                                              Attorneys for *Amici Curiae*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via mail to those indicated as non-registered participants on July 30, 2018.

/s/ Natashia Tidwell

**ADDENDUM**

# ADDENDUM – LIST OF *AMICI CURIAE*

The **Accreditation Council for Pharmacy Education (ACPE)** is the national agency for the accreditation of professional degree programs in pharmacy and providers of continuing pharmacy education.  ACPE also offers evaluation and certification of professional degree programs internationally and with ASHP accredits pharmacy technician education and training programs.

The **American Association of Colleges for Teacher Education (AACTE)** is a national alliance of educator preparation programs dedicated to high-quality, evidence-based preparation that assures educators are profession-ready as they enter the classroom. AACTE member institutions include public and private colleges and universities in every state, the District of Columbia, the Virgin Islands, and Guam. Through advocacy and capacity building, AACTE promotes innovation and effective practices that strengthen educator preparation.

The **American Association of Colleges of Nursing (AACN)**— is the national voice for academic nursing. Representing over 800 member schools offering baccalaureate and graduate programs in nursing at public and private universities nationwide, AACN works to establish quality standards for nursing education; assists schools in implementing those standards; influences the nursing profession to improve health care; and promotes public support for professional nursing education, research, and practice.

The **American Association of Collegiate Registrars and Admissions Officers (AACRAO)**, founded in 1910, is a non-profit, voluntary, professional association of more than 11,000 higher education professionals who represent approximately 2,600 institutions in more than 40 countries.  Its mission is to provide professional development, guidelines, and voluntary standards to be used by higher education officials regarding the best practices in records management, admissions, enrollment management, administrative information technology, and student services.  AACRAO represents institutions in every part of the higher education community, from large public institutions to small, private liberal arts colleges.

The **American Association of Community Colleges (AACC)** is the primary advocacy organization for the nation's community colleges.  It represents more than 1,100 two-year, associate degree-granting institutions.

The **American Association of State Colleges and Universities (AASCU)** is a Washington, D.C.-based higher education association of more than 400 public colleges, universities, and systems whose members share a learning- and teaching-centered culture, a historic commitment to underserved student populations, and a dedication to research and creativity that advances their regions' economic progress and cultural development. These are institutions Delivering America's Promise of Opportunities for All.

The **American Association of University Professors (AAUP)** is a non-profit organization of over 40,000 faculty, librarians, graduate students, and academic professionals.  Its purpose is to advance academic freedom, the free exchange of ideas in higher education, and shared university

governance; to define fundamental professional values and standards for higher education; and to ensure higher education's contribution to the common good.

The **American College Personnel Association (ACPA) College Student Educators International** is one of the largest comprehensive student affairs association. ACPA advances student affairs, engages students for a lifetime of learning and discovery, and transforms higher education through social justice advocacy. ACPA, with over 5,000 active members, supports and fosters college student learning through the generation and dissemination of knowledge, which informs scholarship, policies, practices, and programs for student affairs professionals and the higher education community.

The **American Dental Education Association (ADEA)** is The Voice of Dental Education. Its members include all 66 U.S. dental schools, over 800 allied and advanced dental education programs and more than 20,000 individuals.

The **American Indian Higher Education Consortium (AIHEC)** is the unifying voice of our nation's 38 Tribal Colleges and Universities—federally recognized public institutions working to strengthen tribal nations and make a lasting difference in the lives of American Indians and Alaska Natives.  Through public policy, advocacy, research, and program initiatives, AIHEC strives to ensure strong tribal sovereignty through excellence in American Indian higher education.

The **American Speech-Language-Hearing Association (ASHA)** is the national professional, scientific, and credentialing association for 198,000 members and affiliates who are audiologists; speech-language pathologists; speech, language, and hearing scientists; audiology and speech-language pathology support personnel; and students.

The **Association of American Universities (AAU)** is a non-profit organization, founded in 1900 to advance the international standing of United States research universities.  AAU's mission is to shape policy for higher education, science, and innovation; promote best practices in undergraduate and graduate education; and strengthen the contributions of research universities to society.  Its members include 62 public and private research universities.

The **Association of American Colleges and Universities (AAC&U)** has approximately 1,400 member institutions, including accredited public and private colleges, community colleges, and universities of every type and size.  Its mission is to advance liberal education, equity and quality in undergraduate education in service to democracy.

The **Association of American Law Schools (AALS)**, founded in 1900, is a nonprofit association of 179 law schools.  Its members enroll most of the nation's law students and produce the majority of the country's lawyers and judges, as well as many of its lawmakers.  The mission of AALS is to uphold and advance excellence in legal education.  In support of this mission, AALS promotes the core values of excellence in teaching and scholarship, academic freedom, and diversity, including diversity of backgrounds and viewpoints, while seeking to improve the legal profession, to foster justice, and to serve our many communities–local, national and international.

A2

**Association of American Medical Colleges (AAMC)**—represents all 151 accredited U.S. medical schools, nearly 400 teaching hospitals and health systems, and 90 academic and scientific societies.

The **Association of Catholic Colleges and Universities (ACCU)** serves as the collective voice of U.S. Catholic higher education.  Through programs and services, ACCU strengthens and promotes the Catholic identity and mission of its member institutions so that all associated with Catholic higher education can contribute to the greater good of the world and the Church.

The **Association of Community College Trustees (ACCT)** represents over 6,000 board members who govern community, technical, and junior colleges.

The **Association of Governing Boards of Universities and Colleges (AGB)** is the only national association that serves the interests and needs of academic governing boards, boards of institutionally related foundations, and campus CEOs and other senior-level campus administrators on issues related to higher education governance and leadership.

The **Association of Jesuit Colleges and Universities (AJCU)** represents all 28 Jesuit institutions in the U.S. and is affiliated with over 100 Jesuit institutions worldwide.

The **Consortium of Universities of the Washington Metropolitan Area (CUWMA)** is a nonprofit organization founded in 1965 to advance joint educational opportunities for students; collaborate on critical issues and shape policy in higher education; collaborate with regional governments, businesses, and organizations to ensure an educated workforce and citizenry; and increase the postsecondary attendance rates of students in the Washington, DC region. CUWMA currently has 17 members across all sectors of nonprofit higher education.

The **Council for Opportunity in Education (COE)** is a nonprofit organization, established in 1981, dedicated to furthering the expansion of college opportunities for low-income, first-generation students, and students with disabilities. Through its numerous membership services, the Council works in conjunction with colleges, universities, and agencies that host Federal TRIO Programs that help approximately 810,000 low-income students and students with disabilities each year receive college access and retention services.

The **Commission on Institutions of Higher Education of NEASC** is the regional accrediting agency for degree-granting institutions of higher education in the six New England states.  The Commission's dual roles are quality assurance to the public and quality improvement for accredited colleges and universities.

The **Council of Graduate Schools (CGS)** is an organization of approximately 500 institutions of higher education in the United States, Canada, and across the globe engaged in graduate education, research, scholarship, and the preparation of candidates for master's and doctoral degrees.

The **Council of Independent Colleges (CIC)** represents 684 private, nonprofit liberal arts colleges and universities and 83 state councils and other higher education organizations.

**EDUCAUSE** is a nonprofit association and the foremost community of information technology leaders and professionals committed to advancing higher education.  Through analysis, advocacy, and professional development, EDUCAUSE supports IT professionals and the contributions technology makes to institutional and community-wide strategic initiatives. EDUCAUSE membership includes 2,300 colleges, universities, and related organizations.

The **Graduate Management Admission Council (GMAC)** is a global, non-profit association of more than 220 leading graduate business schools.  Founded in 1953, we are actively committed to advancing the art and science of admissions by convening and representing the industry and offering best-in-class products and services for schools and students.  GMAC owns and administers the Graduate Management Admission Test® (GMAT®) exam, used by more than 7,000 graduate programs worldwide.

The **Law School Admission Council (LSAC)** is a nonprofit organization devoted to furthering access, quality, and fairness in law school admission. LSAC annually helps more than 60,000 law school candidates navigate the admission process, administers the Law School Admission Test to more than 100,000 test takers worldwide, and provides the essential admission software and data relied upon by over 220 member law schools. LSAC works actively to promote diversity, equity, and inclusion in legal education and the legal profession through a wide range of programs, including law school and prelaw programs for underrepresented populations, regional forums to connect law schools with prospective candidates, LGBTQ outreach, support for people with special needs of all types, and partnership with Khan Academy to offer free, personalized LSAT preparation for all.

The **Middle States Commission on Higher Education (MSCHE)** is the agency that accredits degree-granting institutions in the Mid-Atlantic region of the United States. The mission of MSCHE is to assure students and the public of the educational quality of higher education. The Commission's accreditation process ensures institutional accountability, self-appraisal, improvement, and innovation through peer review and the rigorous application of standards within the context of institutional mission.

The **National Association for College Admission Counseling (NACAC)**, founded in 1937, is an organization of nearly 16,000 professionals from around the world dedicated to serving students as they make choices about pursuing postsecondary education.  NACAC is committed to maintaining high standards that foster ethical and social responsibility among those involved in the transition process, as outlined in the Statement of Principles of Good Practice: NACAC's Code of Ethics and Professional Practices (SPGP:CEPP).

The **National Association of College and University Business Officers (NACUBO)**, founded in 1962, is a nonprofit professional organization representing chief administrative and financial officers at more than 2,100 colleges and universities across the country. NACUBO's mission is to advance the economic viability, business practices, and support of higher education institutions in pursuit of their missions.

A4

The **National Association of Diversity Officers in Higher Education (NADOHE)** is the preeminent voice for diversity officers in higher education.  Its membership includes more than 600 individuals representing more than 250 colleges and universities, affiliated professional organizations, and ten state/regional NADOHE chapters.

The **National Association of Independent Colleges and Universities (NAICU)** serves as the unified national voice of private, non-profit higher education in the United States.  It has more than 1,000 members nationwide.

The **National Association of Student Financial Aid Administrators (NASFAA)** represents nearly 20,000 student financial assistance professionals at approximately 3,000 colleges, universities, and career schools across the country. It provides professional development and services for financial aid administrators; advocates for public policies that increase student access and success; serves as a forum on student financial aid issues, and is committed to diversity throughout all activities.

Since its founding in 1776, **Phi Beta Kappa** has celebrated excellence in the liberal arts and sciences and championed freedom of thought and diversity of opinion. Phi Beta Kappa is a nonprofit membership organization with over 500,000 members worldwide and chapters at 286 colleges and universities in the United States. As America's most prestigious academic honor society, Phi Beta Kappa advocates for the value and benefits of liberal arts and sciences education.

The **Student Affairs Administrators in Higher Education (NASPA)** is the leading association for the advancement, health, and sustainability of the student affairs profession.

The **WASC Senior College and University Commission (WSCUC)** is a regional accrediting agency serving a diverse membership of public and private higher education institutions throughout California, Hawaii, and the Pacific as well as a limited number of institutions outside the U.S. Through its work of peer review, based on standards agreed to by the membership, the Commission encourages continuous institutional improvement and assures the membership and its constituencies, including the public, that accredited institutions are fulfilling their missions in service to their students and the public good.