**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 1:14-cv-14176-ADB |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF REASONS IN OPPOSITION
TO HARVARD'S MOTION FOR SUMMARY JUDGMENT**

Adam K. Mortara
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
312.494.4400
adam.mortara@bartlit-beck.com

John M. Hughes
BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
303.592.3100
john.hughes@bartlit-beck.com

Paul M. Sanford BBO #566318
BURNS & LEVINSON LLP
One Citizens Plaza, Suite 1100
Providence, RI 02903
617.345.3000
psanford@burnslev.com

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
703.243.9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com

Patrick Strawbridge BBO #678274
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
617.227.0548
patrick@consovoymccarthy.com

Michael H. Park
CONSOVOY MCCARTHY PARK PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
212.247.8006
park@consovoymccarthy.com

July 30, 2018

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

STANDARD OF REVIEW ........................................................................................................1

ARGUMENT ..............................................................................................................................2

I.     SFFA has Article III standing. ..........................................................................................2

II.    Harvard is not entitled to summary judgment on the merits. ...........................................8

       A.     Harvard intentionally discriminates against Asian Americans. .......................8

              1.     There is significant documentary and testimonial evidence of
                     intentional discrimination against Asian Americans. ..........................8

              2.     There is overwhelming statistical evidence of intentional
                     discrimination against Asian Americans. .............................................14

       B.     Harvard engages in racial balancing. ...............................................................19

       C.     Harvard is not using race merely as a "plus" factor to achieve student body
              diversity. ...........................................................................................................25

       D.     Harvard neither gave serious, good faith consideration to nor is taking
              advantage of workable race-neutral alternatives. ............................................31

CONCLUSION ..........................................................................................................................37

# TABLE OF AUTHORITIES

## Cases

*Adorno v. Port Auth.*,
258 F.R.D. 217 (S.D.N.Y. 2009).................................................................................................13

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013).........................................................................................................................5

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).......................................................................................................................1

*Bauer v. Bailar*,
647 F.2d 1037 (10th Cir. 1981)..................................................................................................17

*Blackwell v. Thomas*,
476 F.2d 443 (4th Cir. 1973).......................................................................................................17

*Bob Jones Univ. v. Johnson*,
396 F. Supp. 597 (D.S.C. 1974)...................................................................................................2

*Cavalier ex rel. Cavalier v. Caddo Par. Sch. Bd.*,
403 F.3d 246 (5th Cir. 2005).......................................................................................................19

*Christianson v. Colt Indus. Operating Corp.*,
486 U.S. 800 (1988).......................................................................................................................2

*EEOC v. Md. Ins. Admin.*,
879 F.3d 114 (4th Cir. 2018).........................................................................................................9

*Evans v. City of Houston*,
246 F.3d 344 (5th Cir. 2001).......................................................................................................10

*Fini v. Remington Arms Co.*,
No. 97-12, 1998 WL 299358 (D. Del. May 27, 1998)...........................................................10

*Fisher v. University of Texas at Austin*,
136 S. Ct. 2198 (2016)..................................................................................................24, 28, 34

*Fisher v. University of Texas at Austin*,
570 U.S. 297 (2013)...............................................................................................................*passim*

*Fowle v. C & C Cola, a Div. of ITT-Continental Baking Co.*,
868 F.2d 59 (3d Cir. 1989)..........................................................................................................17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000).......................................................................................................................5

*Fuentes v. Perskie*,
32 F.3d 759 (3d Cir. 1994)..........................................................................................................10

*Gratz v. Bollinger*,
539 U.S. 244 (2003)................................................................................................................. 3, 27

*Grutter v. Bollinger*,
539 U.S. 306 (2003).............................................................................................2, 18, 25, 34

*Hamilton v. Geithner*,
  666 F.3d 1344 (D.C. Cir. 2012) .................................................................10

*Harlow v. Children's Hosp.*,
  432 F.3d 50 (1st Cir. 2005) ........................................................................2

*Harrington v. Aggregate Indus. Ne. Region, Inc.*,
  668 F.3d 25 (1st Cir. 2012) ........................................................................9

*Holcomb v. Iona Coll.*,
  521 F.3d 130 (2d Cir. 2008) ......................................................................13

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ...................................................................................2

*In re Tyco Intern., Ltd.*,
  340 F. Supp. 2d 94 (D.N.H. 2004) .............................................................7

*Jefferson Ins. Co. v. Roberts*,
  349 F. Supp. 2d 101 (D. Mass. 2004) ........................................................2

*Lewis v. Continental Bank Corp.*,
  494 U.S. 472 (1990) ...................................................................................4

*Lowery v. Circuit City Stores, Inc.*,
  206 F.3d 431 (4th Cir. 2000) ......................................................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ...................................................................................2

*Natural Resources Defense Council v. Mineta*,
  No. 04-5380, 2005 WL 1075355 (S.D.N.Y. May 3, 2005) .........................6

*Parents Involved in Community Schools v. Seattle School Dist. No. 1*,
  551 U.S. 701 (2007) ..............................................................................6, 19

*Pegues v. Mississippi State Employment Serv. of Mississippi Employment Sec. Comm'n*,
  699 F.2d 760 (5th Cir. 1983) ....................................................................17

*Perrea v. Cincinnati Public Schools*,
  709 F. Supp. 2d 628 (S.D. Ohio, Apr. 20, 2010) .....................................19

*Piercy v. Maketa*,
  480 F.3d 1192 (10th Cir. 2007) ..................................................................9

*Pintro v. Pai*,
  273 F. Supp. 3d 264 (D.D.C. 2017) ..........................................................10

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989) .................................................................................20

*Purkett v. Elem*,
  514 U.S. 765 (1995) ...................................................................................9

*Regents of the Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978) ...................................................................................2

*Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*,
    199 F.3d 26 (1st Cir. 1999)................................................................................5

*Rich v. Martin Marietta Corp.*,
    522 F.2d 333 (10th Cir. 1975)........................................................................13

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
    490 U.S. 477 (1989).........................................................................................25

*Schuette v. Coalition to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equality*
*by Any Means Necessary (BAMN)*,
    134 S. Ct. 1623 (2014)....................................................................................26

*Sherman v. AI/FOCS, Inc.*,
    113 F. Supp. 2d 65 (D. Mass. 2000) ..............................................................20

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*,
    261 F. Supp. 3d 99 (D. Mass. 2017) ........................................................*passim*

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*,
    No. 14-14176, 2017 WL 2407254 (D. Mass. June 2, 2017) ............................25

*Town of Barnstable v. O'Connor*,
    786 F.3d 130 (1st Cir. 2015) ............................................................................5

*Valentin v. Hospital Bella Vista*,
    254 F.3d 358 (1st Cir. 2001) ............................................................................7

*Weston-Smith v. Cooley Dickinson Hosp., Inc.*,
    282 F.3d 60 (1st Cir. 2002)........................................................................19, 20

*Wisconsin Educ. Ass'n Council v. Walker*,
    705 F.3d 640 (7th Cir. 2013)............................................................................9

*Woods v. City of Greensboro*,
    855 F.3d 639 (4th Cir. 2017)..........................................................................15

*Zambrana-Marrero v. Suarez-Cruz*,
    172 F.3d 122 (1st Cir. 1999) ............................................................................1

## INTRODUCTION

Harvard's motion is just what one would expect from a party that, quite remarkably, asked the Court to prohibit Students for Fair Admissions ("SFFA") from exercising its right to seek summary judgment. Harvard leads with an issue (Article III standing) that the Court has already decided against it, buries the most important issue in the case (intentional discrimination against Asian Americans) at the very end of its brief, and fills the pages in between with circular talking points about "whole-person review," instead of confronting the powerful evidence that it is violating Supreme Court precedent governing how, when, and why race may be used in admissions. Harvard's motion thus confirms why it wanted to do everything possible to bypass this stage of the case. However, that is not how civil litigation works under the Federal Rules. Harvard cannot survive to trial if, based on the record evidence, no reasonable factfinder could decide the case in its favor. That is the case here. As set forth in SFFA's motion and further explained below, SFFA is entitled to summary judgment and nothing in Harvard's motion undermines that conclusion.

## STANDARD OF REVIEW

SFFA's memorandum sets forth the standard of review. Plaintiff's Memorandum of Reasons in Support of Its Motion for Summary Judgment ("SFFA Mem.") 3. The issue is not whether material facts are in dispute—some are. The issue is whether a "reasonable fact-finder" could view the dispute over those facts as "genuine." Memorandum in Support of Defendant's Motion for Summary Judgment on All Remaining Counts ("Harvard Mem.") 3. As the Supreme Court has explained, "the 'genuine issue' summary judgment standard is 'very close' to the 'reasonable jury' directed verdict standard" because "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir. 1999). "'Where the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Jefferson Ins. Co. v. Roberts*, 349 F. Supp. 2d 101, 105 (D. Mass. 2004) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## ARGUMENT

Harvard's summary judgment motion should be denied. First, as the Court has already ruled, SFFA has Article III standing. Second, it is SFFA—not Harvard—that is entitled to summary judgment because of the overwhelming evidence that Harvard is in violation of Title VI.[1] SFFA Mem. 4-45. But even if the Court disagrees, the record evidence clearly is not so one-sided in Harvard's favor as to entitle Harvard to summary judgment. Far from it, Harvard is—at best—hanging on by a thread. Even if Harvard somehow survives to trial, it faces a steep uphill battle.

## I.     SFFA has Article III standing.

Harvard's renewed challenge to SFFA's Article III standing is meritless. *See* Harvard Mem. 11-15. The Court has already ruled that SFFA meets all of Article III's requirements, *see Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 261 F. Supp. 3d 99 (D. Mass. 2017) ("*SFFA*"), and that ruling remains the law of the case, *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988); *Harlow v. Children's Hosp.*, 432 F.3d 50, 55 (1st Cir. 2005).

First, SFFA is a "'traditional voluntary membership organization.'" *SFFA*, 261 F. Supp. 3d at 109 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344-45 (1977)). Second, "SFFA

---

[1] Harvard suggests that it should have greater freedom to discriminate on the basis of race under Title VI because it is a private university. Harvard Mem. 16 n.12. But precedent forecloses the argument. Title VI bans "racial classifications that would violate the Equal Protection Clause or the Fifth Amendment." *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (citation omitted). If the Supreme Court is inclined to revisit this issue—at Harvard's urging or otherwise—SFFA will argue that Title VI is *more* restrictive than the Equal Protection Clause. *See Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 415-18 (1978) (Stevens, J., concurring in the judgment in part and dissenting in part) (Title VI is "colorblind" and "has independent force, with language and emphasis in addition to that found in the Constitution. ... Race cannot be the basis of excluding anyone from participation in a federally funded program."). Regardless, Harvard does not need judicial approval to secure the freedom to discriminate on the basis of race. It can stop accepting federal funds. *See Bob Jones Univ. v. Johnson*, 396 F. Supp. 597, 606 (D.S.C. 1974).

has provided the affidavits of a subset of its members, referred to as Standing Members, which demonstrate that at least some of these individuals, the rejected applicants, would have standing to sue on their own." *Id.* at 109-10 (citing *Gratz v. Bollinger*, 539 U.S. 244, 262-63 (2003)). Third, "the lawsuit is germane to SFFA's purpose because, as stated in its Bylaws, SFFA's mission is 'to defend human and civil rights secured by law, including the right of individuals to equal protection under the law.'" *Id.* at 110. Fourth, "SFFA requests only declaratory and injunctive relief, and obtaining such relief, based on the claims in this case, would not require individual participation by its members." *Id.* (citation omitted). Thus, "SFFA meets the prerequisites laid out in *Hunt* and has the associational standing necessary to pursue this litigation." *Id.* at 111. The Court could not have been clearer.

Harvard's argument is mostly a halfhearted request for reconsideration. To that end, Harvard claims that certain facts—namely, that SFFA amended its Bylaws after initiating this lawsuit, that only one Board member is elected; that a "tiny fraction" of the members pay dues; that SFFA receives non-member donations; and that Mr. Blum runs SFFA's daily operations—prove that SFFA is not a "true" membership association. Harvard Mem. 11-13. But Harvard made these arguments before. *See* Mem. in Support of Defendant's Mot. to Dismiss for Lack of Subject Matter Jurisdiction, Dkt. No. 184 (filed Sept. 23, 2016) at 4 (amended Bylaws); *id.* at 12 (election of one Board member); *id.* at 13-14 (members paying dues); *id.* at 14 (non-member donors); *id.* at 14-15 (Mr. Blum's responsibilities). The Court rejected them all. *SFFA*, 261 F. Supp. 3d at 103-11.

What actually matters for purposes of SFFA's Article III standing, as this Court has explained, is that:

- A "substantial part of SFFA's mission is to end race-based admissions policies at American universities."

- "SFFA clearly communicated its mission, which has stayed consistent since its founding, to prospective members through its website and in its outreach efforts."

3

- "SFFA's members voluntarily join the organization, presumably knowing its purpose, by providing their name and contact information and paying a small fee."

- "The Bylaws plainly lay out who qualifies as a member and what a member's role is and permit members to vote for one member of the Board of Directors, who participates in Board decisions, thereby granting members more direct access to SFFA's management."

- SFFA "members can voluntarily donate funds, in addition to the one-time, ten dollar contribution (required since June 2015) as a way of influencing the organization."

- The "Standing Members each stated that the SFFA does in fact represent their interests."

- SFFA submitted declarations "which show that SFFA leadership communicates with members about this litigation and that the Standing Members have given input concerning the case."

*Id.* at 110-11. Discovery postdating the Court's ruling has not called any of these factual findings into doubt. Plaintiff's Statement of Additional Facts ("SAF") ¶¶ 5, 10-13, 18, 24, 30, 36, 42, 48, 56, 67, 68, 78, 85, 92, 99, 106, 113, 120, 127, 134, 140, 147.[2]

Finally, Harvard argues that "discovery has since established that SFFA's so-called 'standing members' lack the required individual standing" to satisfy Article III. Harvard Mem. 11. Specifically, Harvard claims that neither ▆▆▆▆▆ nor ▆▆▆▆▆▆▆—SFFA members who were deposed and "remain eligible to apply to transfer to Harvard"—"manifests any serious interest in doing so." *Id.* at 14. Harvard is incorrect.

---

[2] In passing, Harvard suggests the testimony shows that "SFFA's 'members' are completely disconnected from the organization" because "they have not attended any SFFA meetings and refused on counsel's instructions to testify about whether they have voted in any SFFA election." Harvard Mem. 12 (citing Harvard SMF ¶¶ 249-250). But neither issue bears on—let alone undermines—SFFA's standing. *SFFA*, 261 F. Supp. 3d at 111. The Standing Members continue to communicate with SFFA's leadership and have the ability to provide substantive input. SAF ¶¶ 18, 24, 30, 36, 42, 48, 56, 67, 68, 78, 85, 92, 99, 106, 113, 120, 127, 134, 140, 147. ▆▆▆▆▆ for example, testified: "I've been very curious about this, asked a lot of questions, and they've answered them thoroughly. And having input and direction, I have suggested things to them about, like, possible arguments to make in the lawsuit or—I've actually had more input—I've given them more input about future lawsuits to bring." SAF ¶ 68. Furthermore, SFFA communicates regularly with its members—including through email updates, letters, one-on-one communications, and members-only conference calls—about this litigation and other aspects of its mission that are important to members. SAF ¶ 16-17. SFFA is not required to hold an annual convention to qualify as a voluntary membership association under *Hunt* and its progeny.

As an initial matter, Harvard's argument is not about standing—it is about mootness. To be sure, the "case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990). The court, accordingly, must determine whether the plaintiff "had Article III standing at the outset of the litigation." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). After that point, the issue is whether the case has become "moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—" because "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted). Harvard does not point to this testimony to argue that SFFA lacked Article III standing when it brought this action, or even when the Court ruled on the motion to dismiss. Harvard instead argues that the testimony shows there is no longer a live controversy—*i.e.*, that the case is moot.

The distinction matters. The "standing and [] mootness ... inquiries differ." *Friends of the Earth, Inc.*, 528 U.S. at 180. "In contrast to standing, the burden of establishing mootness rests on the party raising the issue." *Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 34 (1st Cir. 1999) (citations omitted); *see also Town of Barnstable v. O'Connor*, 786 F.3d 130, 142 (1st Cir. 2015) ("The Supreme Court has placed the 'heavy burden of persuasion' with respect to mootness on the party advocating for it.") (citation and quotations omitted). Harvard cannot come close to carrying that burden. Both Standing Members declared under oath that they are "able and ready to apply to transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and to cease its intentional discrimination against Asian Americans." SAF ¶¶ 61, 73. And both of them testified that their declarations were true and accurate and that they remain ready and able to apply if Harvard stops discriminating on the basis of race. SAF ¶¶ 62, 74. No more was required to establish their standing under this Court's ruling. *SFFA*, 261 F. Supp. 3d at 109-10.

Harvard's mischaracterization of their testimony is troubling. Harvard claims that when asked whether he would "apply to transfer," ▮▮▮▮▮ responded: "I don't anticipate that at the moment, no." Harvard Mem. 14 (quoting Ex. 19 at 44:5-9). But the implication Harvard seeks to draw from this selected testimony—*i.e.*, that ▮▮▮▮▮ was recanting ▮ readiness to apply—is misleading. As Harvard knows, ▮▮▮▮▮ further explained that "if Harvard were to stop using its use of race and ethnicity in admissions, I would think my chances of being admitted had risen enough, because of that change, that I would apply again for transfer to see if I could get in under the new system." SAF ¶ 63. Indeed, Harvard made sure there was no confusion on this point: "Q. But under the current system you have no intent to apply to transfer; is that correct? A. That's correct. Q. Is it just if Harvard were to cease the use of race as an admissions process, then you would intend to apply to transfer to Harvard? A. Yes." SAF ¶ 64.

Harvard likewise misrepresents ▮▮▮▮▮ testimony. Harvard Mem. 14. He too made clear that he remains ready and able to apply to Harvard if Harvard stops discriminating on the basis of race: "Q. If Harvard does cease the use of race or ethnicity as an admissions preference, would you plan to apply to transfer?... A. As the document says, I'm able and ready to apply to transfer, were it to cease the use of race." SAF ¶ 75. As Harvard knows, when ▮▮▮▮▮ testified that it was "highly speculative" that he would apply to transfer, it was under the assumption that Harvard did *not* cease using race. *See* Connolly(2nd) Dec., Ex. 276, ▮▮▮▮▮ 52:22-53:19 ("Q. If it doesn't cease the use of race or ethnicity during your time at ▮▮▮ in the next four years, do you plan to apply to transfer?.").

But even if Harvard could show that both ▮▮▮▮▮ and ▮▮▮▮▮ were not interested in transferring, the case still would not be moot. SFFA has submitted with this motion (as it is entitled to do, *see, e.g.*, *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 718 (2007); *Natural Resources Defense Council v. Mineta*, No. 04-5380, 2005 WL 1075355 (S.D.N.Y. May 3, 2005)),

seven more declarations from members who were denied admission in 2017 or 2018 and who are ready and able to reapply if Harvard ends its discriminatory practices, SAF ¶¶ 49-56, 79-85, 86-92, 93-99, 100-106, 107-113, 114-120. Harvard would have to prove that they are *all* insincere. The Court then would also have to reject SFFA's argument that "prospective college students, who have not yet applied, or the parents of applicants have standing to sue"—an argument the Court already determined it did not need to address. *SFFA*, 261 F. Supp. 3d at 110 n.12. The Court should not permit Harvard to continue wasting "judicial and party resources," *id.* at 111 n.14, in its hopeless attempt to prove that SFFA lacks "at least one member" who would "have standing to sue in his own right," *id.* at 110 n.12. SFFA does not now—nor will it ever—lack for injured members.

For all these reasons, the Court should confirm that the Article III issue has been resolved and it is not a matter for trial. The Court examined the record evidence and definitively resolved the issue of Article III standing. *See Valentin v. Hospital Bella Vista*, 254 F.3d 358, 364-65 (1st Cir. 2001). The Court rightly understood that it did not have to convert the Rule 12(b)(1) motion into a Rule 56 motion to decide the issue, *SFFA*, 261 F. Supp. 3d at 103, and that "[i]f the disputed jurisdictional facts are separable from the merits," it "should resolve the jurisdictional question immediately," *In re Tyco Int'l, Ltd.*, 340 F. Supp. 2d 94, 97 (D.N.H. 2004) (citing *Valentin*, 254 F.3d at 363). Indeed, the First Circuit has emphasized that a district court should leave the Article III issue "unresolved until the time of trial" only if it "is inextricably intertwined with the merits." *Id.* at 97 (citing *Valentin*, 254 F.3d at 363 n.3). The mootness issue, therefore, also should not be deferred to trial. Harvard's hapless argument on this point is not intertwined with the merits, and SFFA continues to have members who would have standing to sue in their own right. In sum, Harvard's motion for summary judgment on Article III standing should be denied because Harvard has already fully litigated and lost that jurisdictional issue.

## II.     Harvard is not entitled to summary judgment on the merits.

### A.     Harvard intentionally discriminates against Asian Americans.

Harvard is not entitled to summary judgment on SFFA's Count I. Harvard Mem. 35-45. The record evidence instead shows that SFFA is entitled to summary judgment. SFFA Mem. 5-33. If the Court disagrees, then a trial is needed to resolve genuine factual disputes that are material to resolution of this count.

Harvard's premise is that SFFA's claim of discrimination against Asian-American applicants "is entirely statistical." Harvard Mot. 35. According to Harvard, because there is no "documentary or testimonial support for SFFA's accusation that Harvard systematically seeks to limit the number of Asian Americans or discriminates against them," *id.*, SFFA must establish a "gross disparity" in the effect of Harvard's admissions policies on Asian Americans "to survive summary judgment on its claim of intentional discrimination based on statistics alone," *id.* at 36. As explained below, Harvard's argument fails at every step.

### 1.     There is significant documentary and testimonial evidence of intentional discrimination against Asian Americans.

Harvard wishes it were otherwise, but SFFA's case is not entirely statistical. There is significant documentary and testimonial evidence showing a pattern of intentional discrimination against Asian Americans. SFFA Mem. 11-23. Chief among this evidence is Harvard's reaction to OIR's investigation showing that the admissions system is biased against Asian Americans. As SFFA has explained, any responsible university, business, charity, professional association, or social club, confronted with reports like these would have addressed their shocking findings. At a bare minimum, follow-up questions would have been asked, the reports would have been probed and examined, additional research would have been performed, key admissions staff would have been questioned, and remedial action would have been considered. In other words, university leadership would have acted like this was news to them. Instead, Harvard's official response to a report that said its admissions system

discriminates against Asian Americans was that its system is working as intended—*i.e.*, Harvard did nothing at all.

Confronted with proof of discrimination against Asian Americans, university leadership asked no questions, buried the reports, and killed the investigation. SFFA Mem. 15-20. This is precisely the kind of evidence from which an inference of intentional discrimination often is—and should be— drawn. *See id.* at 15 (collecting cases); *see also Lowery v. Circuit City Stores, Inc.,* 206 F.3d 431, 439 (4th Cir. 2000) ("Lowery and Peterson also demonstrated racial animus on the part of Circuit City by introducing evidence that Zierden 'buried' two internal reports ... that were critical of Circuit City's promotion policies and diversity results."); *id.* at 445-46 ("Countering Circuit City's evidence of its alleged good-faith efforts to comply with § 1981 is evidence in the record ... that one of [its] top executives buried two internal reports reflecting a negative attitude on behalf of Circuit City against racial minorities and failed to take any remedial action in response to the negative findings in the reports.").

Harvard's excuse for its response—that OIR's "analysis was incomplete, preliminary, and based on limited inputs"—digs an even deeper hole. Harvard Mem. 38 (citing Harvard SMF ¶ 213). As the Supreme Court has explained, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 768 (1995); *see also Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 33 (1st Cir. 2012) ("Weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffer can give rise to an inference of pretext.") (citations and quotations omitted); *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) ("In establishing pretext, an employee can show 'the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief.'") (citation omitted); *Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 666 (7th Cir. 2013) ("[A]n implausible explanation is treated as a pretext, which allows a reasonable inference of unlawful discrimination").

That is the situation here. SFFA Mem. 17-19. No rational factfinder could accept Harvard's implausible and contradictory explanation.

At the time, not one Harvard official who saw the OIR reports—including Dean Fitzsimmons and Dean Khurana—criticized them at the time as "incomplete, preliminary, and based on limited inputs." SFFA SMF ¶¶ 427, 552, 557. In fact, they offered no criticism at all. *Id.* These are not bashful people who are shy about sharing their views. *See, e.g., id.* ¶¶ 359-361. If Fitzsimmons, Khurana, or anyone else had concerns with OIR's work, they would have said so at the time. But Erin Driver-Linn (the head of OIR) and her team had a meeting with Dean Fitzsimmons to present OIR's findings in which no such concerns were raised *by anyone. Id.* ¶ 426. And OIR circulated the reports fully aware of how explosive the findings were. *See, e.g., id.* ¶¶ 487-491, 492, 518, 539. Fitzsimmons and Khurana said nothing and did nothing that would suggest that the findings should be questioned. *Id.* ¶¶ 428-31, 468-71, 514-17, 525-28, 540-43. The lack of any contemporaneous support for Harvard's explanation creates a strong inference of intentional discrimination. *See EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 123 (4th Cir. 2018); *Hamilton v. Geithner*, 666 F.3d 1344, 1355-57 (D.C. Cir. 2012); *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001); *see, e.g., Fini v. Remington Arms Co.*, No. 97-12, 1998 WL 299358, at *7 (D. Del. May 27, 1998) ("Given the dearth of objective, contemporaneous evidence, the court concludes that a factfinder reasonably could infer from the evidence that defendant's proffered nondiscriminatory reason 'was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is pretext).'") (quoting *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994)).

The problem for Harvard, however, is far worse than a "dearth" of evidence supporting its justification. A wealth of contemporaneous evidence actually contradicts Harvard's *post hoc* story. As many courts have explained, contemporaneous evidence that contradicts the defendant's proffered

justification is especially powerful evidence of discriminatory intent. *See, e.g.*, *Pintro v. Pai*, 273 F. Supp. 3d 264, 273 (D.D.C. 2017).

In particular, the evidence contradicts Harvard's claim that the OIR reports were disregarded because they were "preliminary." Many OIR reports upon which Harvard has relied to make important institutional decisions were also labeled "preliminary." SFFA SMF ¶¶ 383-84. An OIR "Preliminary Draft" report on early action, for example, was "sent to President Faust and Dean Smith and then ultimately to the members of the Harvard Corporation," and it was then relied upon by Harvard to reinstate early action. *Id.* ¶ 383. Harvard also made the important decision to increase tuition based on a "Preliminary Draft" of an OIR report analyzing "the effect of potential changes to financial aid." *Id.* ¶ 384. It is unsurprising, then, that no one doubted or questioned the decision to rely on these OIR studies because they were marked as "preliminary." Indeed, OIR circulated the reports to Harvard leadership on several occasions, covering a period greater than a year, with no substantive revisions. *Id.* ¶¶ 532-33, 539. Harvard chose poorly in manufacturing this "preliminary" excuse after the fact for a decision that, at the time, obviously was made for other reasons.

Harvard's assertion that it disregarded OIR's work because of its completeness or quality also does not withstand scrutiny. No official questioned OIR about the nature of its methodological approach or the data used to perform its analysis. Yet Harvard suggests that Fitzsimmons and Khurana were able to conclude—immediately upon being shown detailed and extensive regression studies that took months to complete—that the findings were untrustworthy without asking *any* questions, without *any* further inquiry, and without mentioning this to *anyone*. SFFA Mem. 16-18. Yet when these same OIR reports—using the same methodology and data—showed favorable results as to policies concerning low-income applicants, Fitzsimmons found OIR's work to be trustworthy and reliable. SFFA SMF ¶ 483. Suddenly, there were no concerns. Indeed, Dean Fitzsimmons had hoped to publicly release the findings, prompting Driver-Linn to ██████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ SFFA SMF ¶¶ 483, 487-491. The idea that the

completeness or quality of OIR's work had anything to do with Harvard's decision to kill the internal

investigation and bury the reports is not just farfetched and devoid of record support—it is a *post hoc*

fabrication designed to excuse damning evidence of intentional discrimination.

Regardless, Harvard's excuses for not responding to OIR's "preliminary" findings, even if

taken at face value, just beg the question: where are the "final" reports? Does Harvard expect a

reasonable factfinder to believe that its decision not to pursue the OIR "preliminary" findings in any

way whatsoever is evidence of benign motives? Harvard's ostrichism on OIR's findings, in this day

and age, proves intentional discrimination.

Moreover, Harvard's non-reaction to the OIR investigation and reports is not SFFA's only

documentary and testimonial evidence of intentional discrimination. Far from it. SFFA Mem. 20-23.

Harvard employees, alumni, applicants, and students have made claims of discrimination. SFFA SMF

¶¶ 325-333. Harvard officials have made or condoned offensive comments about Asian-American

applicants, have shown startling indifference to Asian-American claims of discriminatory treatment,

and have countenanced racially offensive statements directed at Asian Americans that never would

have been tolerated if directed at African Americans or Hispanics. SFFA SMF ¶¶ 333-345. The

"summary sheets" also exhibit intentional discrimination against Asian-American applicants. SFFA

SMF ¶¶ 678-698. Harvard's ill-conceived attempt to wave this evidence away as "a handful of isolated

comments" is telling. Harvard Mot. 37 n.25. The evidence supports SFFA's allegation that Harvard

intentionally discriminates against Asian Americans.[3]

---

[3] Harvard also ignores its history of Jewish discrimination. SFFA Mot. 23-26. That is unsurprising given that President Faust and Dean Fitzsimmons could not even bring themselves to admit that it occurred. *See id.* at 25 n.5.

Finally, Harvard points to the fact that "the percentage of self-identified Asian-American students in the admitted class has grown by 29% in the last decade to nearly 23% of admitted students" as evidence that it does not "limit the number of Asian-American students." Harvard Mem. 2 (citing Harvard SMF ¶ 113.3). Not only does this point improperly rely on facts outside the record, *see* SFFA Mem. 28-29, but it actually proves the opposite. Most of this growth occurred *after* SFFA's lawsuit was filed. In March 2007, 19.6% of the admitted class was Asian-American. SAF ¶ 148. In March 2014, just before SFFA filed suit, Harvard reported that 19.7% of the admitted class was Asian-American. *Id.* ¶ 149. Following the launch of SFFA's lawsuit in November 2014, the percentage of the admitted class that was Asian-American mysteriously grew to its highest levels ever: 21.0% in 2015, to 22.1% in 2016, to 22.2% in 2017, and to 22.7% in 2018. *Id.* ¶¶ 150-153.[4]

This kind of manipulative behavior is evidence of discrimination. "If post filing conduct is to be taken into account at all, it might tend to show the existence of prior discrimination and an effort to repair the harm after discovery." *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 346 (10th Cir. 1975); *see Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008) ("a reasonable finder of fact might determine that the college hired a black coach as a way of concealing its prior discrimination"); *Adorno v. Port Auth.*, 258 F.R.D. 217, 233 (S.D.N.Y. 2009) ("a reasonable jury could find the high numbers of Sergeant promotions in 2005 and 2006 were motivated to conceal past discrimination in promotions from 2002 to 2004"). Harvard's attempt to blunt the case SFFA has built by temporarily increasing the number of Asian Americans it admits will not help its cause. Such behavior confirms that Harvard knows it is caught red-handed and is looking for a way out.

---

[4] Interestingly, this tinkering with the admissions system in response to public scrutiny appears to be a pattern. During the period Harvard was being investigated by the Office of Civil Rights ("OCR") for discrimination against Asian Americans (1988-1990), it similarly increased the number of Asian Americans it admitted. *See* Connolly Dec., Ex. 231, HARV00023177; SFFA SMF ¶¶ 314-15.

2.    **There is overwhelming statistical evidence of intentional discrimination against Asian Americans.**

Because SFFA's case is not entirely statistical, it need not show a "gross disparity," Harvard Mem. 36, to support an inference of intentional discrimination, SFFA Mem. 6. Regardless, Professor Arcidiacono found overwhelming evidence of intentional discrimination against Asian-American applicants. *Id.* at 7-10. He found discrimination in the personal rating. SFFA SMF ¶¶ 606-623. He found discrimination in the overall rating. SFFA SMF ¶¶ 624-628. And he found discrimination in the selection of applicants for admission. SFFA SMF ¶¶ 629-647. Harvard's systematic discrimination against Asian Americans dramatically reduced their chances of admissions and their share of the class. SFFA SMF ¶¶ 648-669. The level of discrimination Professor Arcidiacono found is stark.[5]

In response, Harvard touts Professor Card's finding "that the average marginal effect of Asian-American ethnicity on applicants' likelihood of admission ... was statistically indistinguishable from zero" and his finding of "a *positive* (though statistically insignificant) association between Asian-American ethnicity and the likelihood of admission for women applicants in four of six years (and overall), and a similar positive (though statistically insignificant) association for all applicants from California, which has the highest concentration of Asian-American applicants, in five of six years (and overall)." Harvard Mem. 39-40 (citations omitted). But those findings are the direct result of Professor Card's modelling choices. He was able to make these findings only by including in his model special-category applicants, the personal rating, the unreliable parental occupation variable, and by ignoring racial interactions with disadvantaged status. SFFA SMF ¶¶ 750-786. Professor Card has conceded that, absent those modelling choices, he can neither defend his own findings nor dispute Professor

---

[5] Harvard mischaracterizes Professor Arcidiacono's analysis as finding that Harvard imposes a penalty on certain dockets irrespective of the race of the applicants. Harvard Mem. 40 n.29. Professor Arcidiacono found that certain dockets were disproportionately *affected* by Harvard's campaign of intentional discrimination against Asian Americans. His point was that dockets with high concentrations of Asian Americans exhibit more discrimination than dockets with low numbers of Asian Americans for the obvious reason that such dockets, given the academic qualifications of Asian-American applicants, are especially competitive. Arcidiacono Rebuttal 44, 77-78.

Arcidiacono's finding of statistically-significant discrimination against Asian Americans across all six years. SFFA SMF ¶¶ 787-790.

Professor Card's modelling choices are indefensible. SFFA Mem. 26-32. First, there was no justification—other than diluting the effect of race—for including "recruited athletes, applicants whose parent or parents attended Harvard or Radcliffe as an undergraduate, applicants whose names appeared on a 'Dean's interest' or 'Director's interest' list, and children of Harvard faculty and staff." Harvard Mem. 41. They were excluded from Professor Arcidiacono's preferred model for the same reason Professor Card insisted on including them: they are not similarly situated to the rest of the applicant pool and, as a consequence, including them would only serve to mask the discrimination against Asian Americans. SFFA Mem. 26-27. Take for example, applicants who receive an academic rating of 2. Of applicants with that academic rating, the probability of admission for recruited athletes is 70.63%; for special-category applicants who are not recruited athletes (*i.e.*, legacy, Dean's and Director's Interests List, and children of faculty or staff) it is 42.98%; for all other domestic applicants it is 7.87%. Connolly(2nd) Dec., Ex. 284 ("Arcidiacono(2nd) Dec.") at 3-4, ¶ 5. Clearly, these applicants are apples and oranges.[6]

That Harvard would treat the small number of Asian Americans who qualify for this special treatment better than those who are not fortunate enough to be legacies or athletes is anything but a "strange scheme." Harvard Mem. 42. It is exactly how one would expect a university determined to restrict the number of Asian Americans it admits to behave. SFFA Mem. 32-33 (citing *Woods v. City of Greensboro*, 855 F.3d 639, 651-52 (4th Cir. 2017)).

---

[6] Harvard's claim that Professor Arcidiacono concluded that special category applicants are admitted through a "separate admissions processes" mischaracterizes his report. Harvard Mot. 41-42. Professor Arcidiacono said no such thing. Instead, Professor Arcidiacono explained that those applicants were not similarly situated to other applicants because they receive procedural and, more importantly, substantive benefits in the application process that makes the use of race operate differently for these applicants than it does for other applicants. SMF ¶¶ 750-755.

Second, Professor Card should not have included the personal score in his model. Harvard Mem. 42-43. There is no justification for including a variable that is tainted by racial discrimination. SFFA Mem. 28-32. Harvard argues that "personal qualities can distinguish the few truly exceptional students who are admitted from the thousands of accomplished and talented students who apply but who cannot be offered admission." Harvard Mem. 42. But all Harvard can say about those "qualities" is that they "reflect[] a wide range of important"—but "statistically unobservable"—"information that admissions officers take into account." *Id.* at 43. For some reason, though, only Asian-American applicants consistently lack these "unobservable" qualities. SFFA SMF ¶¶ 606-623. Professor Card's unfortunate and unsubstantiated assertion that the personal rating reflects systematic deficiencies in Asian-American applicants instead of racial stereotyping and discrimination—especially when the ratings given by alumni interviewers do not exhibit this pattern—is baseless. SFFA Mem. 29-32. Not one witness in this case, including (when pressed at his deposition) Professor Card himself, was willing to stand behind that explanation.

Harvard claims that Professor Arcidiacono's attack on the personal rating is flawed because it would necessarily mean that there is "bias *in favor* of Asian-Americans in academic and extracurricular ratings" because they "show an estimated *positive* and statistically significant effect of Asian-American ethnicity." Harvard Mem. 43. This critique makes no sense. As Professor Arcidiacono explained, "the case for discrimination is very strong when a group of applicants is strong on the observed characteristics associated with a particular rating, yet faces a penalty." Arcidiacono Dec., Ex. B ("Arcidiacono Rebuttal") 26. But the observed characteristics associated with the academic and extracurricular ratings show that Asian Americans compare favorably to other applicants. SFFA Mem. 7. Accordingly, there is an obvious non-discriminatory reason for why they excel in these categories and, in turn, no reason to suspect that unobserved discrimination in favor of Asian Americans is the

true reason for the positive effect. Asian Americans get higher academic and extracurricular scores because they objectively have better credentials.

The same cannot be said for the personal rating. "Asian-American applicants have observed characteristics associated with higher personal ratings, yet receive a penalty in their personal ratings." Arcidiacono Rebuttal 27. Harvard, therefore, needed to offer an explanation for why non-discriminatory unobserved factors—as opposed to bias—yielded this unlikely result. In other words, what is Harvard's explanation for why its admissions staff systematically concludes that Asian-American applicants have less "humor, sensitivity, grit, leadership, integrity, helpfulness, courage, kindness and many other qualities" than all other applicants? Harvard SMF ¶ 60. Once again, all Harvard was able to come up with was a racial-stereotyping argument that no witness would support. SFFA Mem. 28-30. Professor Arcidiacono thus had every reason to reject "the proposition that the same explanation" for why Asian-American applicants excel in the academic and extracurricular ratings "applies to the personal rating." Harvard Mem. 43. The *only* rational conclusion to be drawn from the record is that "intentional discrimination is the cause of the perceived association between race and personal ratings." *Id.*

Moreover, it is obvious why discrimination would gravitate toward the personal rating, the overall rating, and the full-committee selection process. The academic and extracurricular ratings are based on objective criteria that leave little or no room for the kind of discrimination that would be difficult to detect. SFFA SMF ¶¶ 81-83. The personal rating, in contrast, is based on "a variety of 'subjective' factors, including whether the student has a 'positive personality' and 'others like to be around him or her,' has 'character traits' such as 'likability … helpfulness, courage, [and] kindness,' is 'humor[ous],' an 'attractive person to be with,' and 'widely respected,' is a 'good person,' and has good 'human qualities.'" SFFA SMF ¶ 90 (internal citations omitted). According to Harvard, the admissions staff "'sort of add it all up and get a feeling.'" *Id.* (citation omitted). The overall rating and the full-

committee process likewise depend on subjective judgments that can easily mask intentional racial discrimination. SFFA SMF ¶¶ 99, 124-129.

"Obviously subjective decision making provides an opportunity for unlawful discrimination." *Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981); *see also Pegues v. Mississippi State Employment Serv. of Mississippi Employment Sec. Comm'n*, 699 F.2d 760, 765 (5th Cir. 1983) ("Selection processes which rely on subjective judgments, despite the corralling by objective standards, provide the opportunity for the intentional discrimination cognizable in a disparate treatment action."); *Blackwell v. Thomas*, 476 F.2d 443, 447 n.7 (4th Cir. 1973) (explaining that "subjective tests" create "wide opportunity for intentional racial discrimination"). In sum, "evaluations that a plaintiff lacks these [subjective] qualities are more susceptible of abuse and more likely to mask pretext." *Fowle v. C & C Cola, a Div. of ITT-Continental Baking Co.*, 868 F.2d 59, 64 (3d Cir. 1989). It does not take a detective—or a Ph.D—to understand why Harvard's mistreatment of Asian-American applicants happens to occur in the three aspects of its process that are most likely to mask racial discrimination.

Finally, Harvard argues that Professor Arcidiacono's decision to use a pooled model instead of a yearly model is "methodologically unsound" because the admissions process is a "year-by-year process in which applicants to a particular class compete against each other." Harvard Mem. 44. But Professor Arcidiacono's modelling *does* control for application cycle, and it thereby captures any year-to-year variations in the competitiveness of the applicant pool. Arcidiacono Rebuttal 34-35. Indeed, his modelling quite accurately predicts variations of this kind. Thus, Professor Arcidiacono's methodology captures the purported benefits of the yearly-model approach Professor Card touts.

Moreover, Professor Arcidiacono's methodology avoids the key defect in Professor Card's yearly-modeling approach, which disregards basic statistics principles. "Statistics is largely driven by the law of large numbers…. In any analysis of discrimination, it is logical and important to use the largest sample that is relevant to the comparisons involved." *Id.* at 34. That is why Professor Card

prefers his yearly approach: "treating each year separately decreases the sample size and thus makes it more difficult to measure the effects of race in Harvard's admissions decisions." *Id.* at 39. By using a yearly model, "Professor Card achieves results that weaken the effect of race in Harvard's admissions process by adding noise to the estimated racial preferences and penalties." *Id.* at 35.[7] And, lest the Court forget, Harvard's own OIR used a pooled model—before Harvard developed a litigation-inspired reason to oppose such a thing. SAF ¶ 154.

### B.   Harvard engages in racial balancing.

Harvard is not entitled to summary judgment on SFFA's Count II. *See* Harvard Mem. 18-21. The record evidence instead shows that SFFA is entitled to summary judgment. *See* SFFA Mem. 33-39. If the Court disagrees, then a trial is needed to resolve genuine factual disputes that are material to resolution of this count.

Harvard incorrectly claims there is no evidence that it "targets a particular racial composition of the admitted class" or "that anyone at Harvard took steps to manipulate admissions rates." Harvard Mem. 20. But the record is replete with this evidence. Harvard concedes that it sets █████████ and engineers its process (including through the use of "one pagers" during the full-committee process) to ensure that it hits those targets. SFFA Mem. 34-36.[8] Harvard then reshapes the admitted class at the end of the full-committee process (through the "lopping" process and other means) if the racial balance is off. *Id.* at 37. This is not conjecture. It is the testimony of Dean Fitzsimmons and Director McGrath. *See id.* at 34-38.

---

[7] Regardless, even using Professor Card's yearly approach confirms that Harvard imposes a statistically significant penalty against Asian-American applicants, once the key flaws in his model are corrected. Arcidiacono Rebuttal 39-44.

[8] Harvard's attempt to distinguish the University of Michigan Law School's use of use of daily reports fails. *See* Harvard Mem. 19 n.13. The Court in *Grutter* excused this practice because "the Law School's admissions officers testified without contradiction that they never gave race any more or less weight based on the information contained in these reports." *Grutter*, 539 U.S. at 336. But that is not the case here. Fitzsimmons and McGrath ████████████████████████████████████████████████████████████████. SFFA SMF ¶¶ 246-255.

Harvard tries to sweep aside this evidence in a footnote, Harvard Mem. 19 n.13, but it cannot escape the facts: the Admissions Office takes steps to ensure ██████████████████████████████ ████████████████████████████ that there is not a ████████████████████████████████ ██████, and that ████████████████████████████████████████ ██████████. SFFA SMF ¶¶ 168-170, 258. Harvard's admissions process is the very definition of "working backward to achieve a particular type of racial balance rather than working forward from some demonstration of the level of diversity that provides the purported benefits." *Parents Involved*, 551 U.S. at 729.

Harvard incorrectly argues that SFFA cannot win on its racial balancing claim unless it can prove that the university "freeze[s] the representation of various racial groups" or aims for a precise numerical target for each racial group. Harvard Mem. 19-20. The Supreme Court has never held that the prohibition on racial balancing is violated only if a school shapes the class with surgical precision. Indeed, the Supreme Court found racial balancing in *Parents Involved* where the school district sought "black enrollment of no less than 15 or more than 50 percent." 551 U.S. at 726. That is because it violates Title VI no less when "the racial balance at the school falls within a predetermined range" than if the school picks a more specific target. *Id.* at 710; *see also Cavalier ex rel. Cavalier v. Caddo Par. Sch. Bd.*, 403 F.3d 246, 248 (5th Cir. 2005) (finding a school policy requiring "a racial mix of 50% white and 50% black, plus or minus 15 percentage points" to constitute racial balancing); *Perrea v. Cincinnati Public Schools*, 709 F. Supp. 2d 628, 635, 645-46 (S.D. Ohio, Apr. 20, 2010) (a policy requiring the racial makeup of the staff be "as close as possible" and at most "within plus or minus 10% of the representative teacher work force" to be racial balancing) (citing *Parents Involved*, 551 U.S. at 712).

Nor is there any legal authority supporting Harvard's assertion that SFFA is "limited to" claims "discussed in [its] expert reports." Harvard Mem. 21 n.15. Circumstantial evidence (including expert statistical analysis) is unnecessary if there is "direct evidence of discrimination." *Weston-Smith v. Cooley*

20

*Dickinson Hosp., Inc.*, 282 F.3d 60, 64-65 (1st Cir. 2002). Evidence is "'direct,'" *inter* alia, if it shows that the "'decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" *Sherman v. AI/FOCS, Inc.*, 113 F. Supp. 2d 65, 70 (D. Mass. 2000) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)). McGrath's testimony is plainly direct evidence of racial balancing. She confessed that Harvard intentionally shapes its class in the very way the Supreme Court and the First Circuit have condemned as illegal. The same goes for Fitzsimmons. He testified that Harvard sets racial targets and never misses them. To be sure, such remarkable testimony is "rarely" secured. *Weston-Smith*, 282 F.3d at 65. But it was here. And it decisively proves that Harvard engages in racial balancing.

Indeed, with one notable exception, *see infra* 21-24, SFFA does not claim that Harvard has pursued racial balance with mathematical precision. As SFFA has explained, Harvard's objective is to keep each racial group with a certain range year over year. SFFA Mem. 34. Viewed in this light, Harvard's claim that the "racial breakdown of Harvard's admitted class of students fluctuates considerably from year to year" falls apart. Harvard Mem. 19-20. For the Classes of 2014 through 2019, the six years for which SFFA received database information, the admitted share of each minority racial group was stable: the admitted share of African Americans was always between 10% and 11.7%; the admitted share of Hispanics was always between 8.8% and 11.6%; and the admitted share of Asian Americans was always between 19.1% and 20.6%. Arcidiacono(2nd) Dec. at 1-2, ¶ 2; Arcidiacono Rep. B.1.1-B.1.4. No expert statistical analysis is needed to show that this is not considerable fluctuation.

The one notable exception is the admission rate for African Americans. For that racial group, Harvard *did* act with mathematical precision. As explained, SFFA Mem. 38-39, Professor Arcidiacono found that "Harvard maintained a floor on the admission rate for single-race African Americans in the classes of 2017, 2018, and 2019." SFFA SMF ¶ 717. In each of these years, the admission rate for

21

single-race African Americans was "virtually identical" to the admission rate of all other domestic applicants (a difference of -0.025%, 0.064%, and -0.025% for the classes of 2017, 2018, and 2019, respectively). *Id.* ¶ 718. According to Professor Arcidiacono, the probability that this pattern occurred by chance is "less than two-tenths of one percent." SFFA SMF ¶ 720. Importantly, Harvard does not dispute Professor Arcidiacono's findings. Harvard Mem. 20-21. Instead, Harvard throws out various theories for why this was all due "simply to chance." Connolly Ex. 253, Card Rebuttal Report ("Card Rebuttal") 80; Harvard Mem. 21. None of Harvard's theories has merit.

Harvard claims, for example, that SFFA lacks "documentary support" indicating that Harvard purposefully implemented a floor on single-race African Americans. Harvard Mem. 20. Of course, when SFFA has strong documentary support, Harvard protests that the evidence is irrelevant because the proof must be statistical. *See supra* 20. But Harvard is wrong in any event. First, in early 2013, when the floor was first implemented, Harvard officials internally expressed concern at the public perception that Harvard was admitting a low number of African Americans. SFFA SMF ¶¶ 726-728. Harvard's concern stemmed from the federal methodology for reporting admissions statistics by race—the Integrated Postsecondary Education Data System ("IPEDS"). Unlike Harvard's "new methodology," the IPEDS reporting system requires Harvard to report a student as African American *only* if the student is single-race African American—*i.e.*, the student is not also Hispanic or multiracial. SFFA SMF ¶¶ 180, 725. In an article drafted in early 2013, Dean Fitzsimmons lamented that "[t]he IPEDS reporting system leads to significantly underreported percentages for all ethnicities except Hispanic Americans" and, in particular, "self-identified Asian Americans and African Americans make up a significantly greater portion of Harvard College's class of 2016 than reported by the federal government." SFFA SMF ¶ 727; *compare* Connolly Ex. 139 at HARV000032520 *with* HARV000032521.

Second, the evidence shows that Harvard took steps in early 2013 to give itself the tools to implement this floor. Before January 12, 2013, the one-pagers that Dean Fitzsimmons received did not contain IPEDS statistics. But starting in January 2013, the one-pagers contained admissions statistics by racial groups under the IPEDS methodology. In other words, the Admissions Office began regularly tracking admissions statistics for single-race African Americans at the precise time the floor was implemented. SFFA SMF ¶¶ 729-30.

Third, Harvard relaxed its standards for admitting single-race African Americans beginning with the 2017 admissions cycle—exactly when the floor is first observed. Before then, single-race African Americans admitted to Harvard on average had similar academic indexes to those of multi-racial African Americans. SFFA SMF ¶ 732. Starting in 2013 (during the cycle for the Class of 2017), however, single-race African-American admits had *lower* academic indexes than multi-racial African-American admits. *Id.* This is striking because it is just what would be expected if Harvard began imposing a floor on single-race African-American admit rates after the Class of 2016. *Id.* ¶¶ 733-734.[9]

Harvard cites Professor Card's conclusion in his rebuttal report that the probability of finding a similar pattern increases (to a still highly improbable 17%) if all the "different ways to compare admissions rates across racial groups" are searched. Harvard Mem. 21; Card Rebuttal 80 ("There are eight racial categories under the New Methodology, eight under the IPEDS methodology, and at least seven under the Old Methodology, for a total of 23 groups. With 23 racial groups and four possible three-year stretches to search over, Prof. Arcidiacono has 92 opportunities (23 multiplied by four) to find the pattern of interest."). But this argument assumes each of these 92 opportunities is equally likely; they demonstrably are not. As explained, there is documentary evidence indicating that Harvard

---

[9] As Harvard notes, Harvard Mem. 21, when Professor Arcidiacono submitted his first report, he was unaware of pre-2013 IPEDS reporting because the statistics were not included in Harvard's main data file. But this does not undermine his findings—it strengthens them. That the IPEDS data were reported differently in the admissions database for the three years of the floor reinforces that a policy change occurred in 2013. SFFA SMF ¶ 731.

implemented a floor *specifically* for single-race African Americans starting with the Class of 2017. Similarly, given the admissions *penalties* Asian American suffer and that Harvard has never expressed a "concern about having too few white people," Connolly Ex. 16, McGrath 249:15-20, it would be illogical to implement a *floor* to ensure the admission of these groups. Harvard's inclusion of these possibilities serves merely to distract from the undisputed statistical evidence of a floor.

Finally, Harvard claims that it would have no reason to impose a floor "in this particular way" because it does not report admission rates by race publicly or "report[] the racial composition of the class to the Harvard community" by the IPEDS methodology. Harvard Mem. 20; Connolly Ex. 252, Card Report ("Card Rep.") 88. But Harvard, of course, does not argue that it is implausible that it would impose *some* type of floor on the admission of African Americans. Indeed, Harvard gives African Americans enormous preferences and has warned that their share of the admitted class would fall sharply without racial preferences. *See infra* 25-31. And after Harvard implemented this floor, the share of the admitted class that was single-race African-American jumped 18% (from 7.90% for the Class of 2016 to 9.36% for the Class of 2017) and, not surprisingly, remained stable the two following years of the floor (9.65% for the Class of 2018 and 9.50% for the Class of 2019). Arcidiacono(2nd) Dec. at 3, ¶ 4. That Harvard might choose non-transparent means to achieve its discriminatory goals is not surprising at all. *See* Arcidiacono Rebuttal 56.

At base, the parties have irreconcilable explanations for why each racial group's admissions statistics stay within a narrow band year over year. In SFFA's view, the evidence proves that Harvard seeks a certain racial balance and achieves it through direct manipulation of the admissions process. Harvard counters that the evidence in no way suggests the Admissions Office is "targeting a particular composition of the admitted class." Harvard Mem. 19 n.13. Rather, the results are just the coincidental byproduct of a system of "whole-person review" that "considers the entirety of every applicant's file, subjects every applicant to the same rigorous review as all others, treats race or ethnicity as but one of

many factors that might bear on the perspective the applicant might bring to Harvard, and employs no quotas." *Id.* at 17. Harvard, in other words, expects the factfinder to believe that over the six-year period at issue here, the Admissions Office made hundreds of thousands of unique "whole person" admissions decisions and, by pure happenstance, this is how it all shook out. No rational factfinder could accept that farfetched explanation.

### C.    Harvard is not using race merely as a "plus" factor to achieve student body diversity.

Harvard is not entitled to summary judgment on SFFA's Count III. *See* Harvard Mem. 18, 21-25. The record evidence instead shows that SFFA is entitled to summary judgment. *See* SFFA Mem. 39-41. If the Court disagrees, then a trial is needed to resolve genuine factual disputes that are material to resolution of this count.

Harvard spills considerable ink explaining how much it values diversity. Harvard Mem. 7-11, 18. But SFFA does not challenge Harvard's stated belief that diversity is important to "its pedagogical mission" or that Harvard's judgment in this regard is entitled to deference under controlling precedent. *Id.* at 17. That has no bearing, however, on whether Harvard is actually pursuing that stated objective in a narrowly-tailored way. As the Supreme Court has explained, "there must still be a further judicial determination that the admissions process meets strict scrutiny in its implementation .... On this point, the University receives no deference." *Fisher v. University of Texas at Austin*, 570 U.S. 297, 311 (2013) ("*Fisher I*"). Harvard's "recitation of a 'benign' or legitimate purpose for" its use of race thus "is entitled to little or no weight. Strict scrutiny does not permit a court to accept a school's assertion that its admissions process uses race in a permissible way without a court giving close analysis to the evidence of how the process works in practice." *Id.* at 313 (citation omitted); *see, e.g.*, *Fisher v. University of Texas at Austin*, 136 S. Ct. 2198, 2208-2215 (2016) ("*Fisher II*"). Close examination of how Harvard's system works proves that it is not narrowly tailored.

Under *Grutter*, a university's use of racial preferences in admissions is narrowly tailored only if race is (1) used as a "plus factor" in order to (2) achieve "student body diversity." *Grutter v. Bollinger*, 539 U.S. 306, 335 (2003); *see also* Harvard Mem. 18, 21; SFFA Mem. 39. In seeking summary judgment, Harvard ignores entirely the requirement that race be used *only to achieve student body diversity*. Harvard Mem. 21-25; *see* Doc. 1 at 108, ¶ 461 (alleging in Count III that "Harvard is not complying with the requirement of narrow tailoring because it is not using race merely as a 'plus' factor in admissions decision in order to achieve student body diversity"). It ignores this obligation for good reason. Harvard is not pursuing the only conception of "student body diversity" the Supreme Court has ever endorsed—enrolling a "critical mass" of underrepresented minority students. *Grutter*, 539 U.S. at 318; SFFA Mem. 3, 39-40. Indeed, the Supreme Court endorsed the Harvard Plan in *Bakke* only because it was led to believe "Harvard ... had minimum *goals* for minority enrollment, even if it had no specific number firmly in mind." *Grutter*, 539 U.S. at 335-39.

If that was ever true, it no longer is. Harvard concedes that it has never considered the concept, it has not sought to achieve that goal, and it continues to have no interest in critical mass. SFFA Mem. 39-40. The words "critical mass" never even appear in Harvard's memorandum or statement of facts. To be sure, not everyone who has supported using race in admissions believed in the "critical mass" conception of diversity. *See Grutter*, 539 U.S. at 387-95 (Kennedy, J., dissenting). But, as Harvard knows, dissents are not law. Perhaps the Supreme Court someday will reconsider the "critical mass" rationale. It may even rethink the use of race in admissions altogether. Until then, however, *Grutter* controls. The Supreme Court has the "prerogative of overruling its own decisions," *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989), and lower courts must follow them until it does, *see, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, No. 14-141, 2017 WL 2407254, at *1 (D. Mass. June 2, 2017) (dismissing Count VI of SFFA's complaint because it "would require this Court to overrule Supreme Court precedent, something it decidedly

cannot do"). Harvard has boldly declared its refusal to comply with *Grutter*. The Court therefore must find Harvard in violation of Title VI.

Regardless, Harvard is not pursuing any other defensible conception of student body diversity. At a minimum, the use of racial preferences must be "'limited in time' and 'have a logical end point.'" SFFA Mem. 39 (quoting *Grutter*, 539 U.S. at 342); *see Fisher I*, 570 U.S. at 312 ("In *Grutter*, the Court approved the plan at issue upon concluding that it ... was limited in time"). Even the most ardent supporters of racial preferences accept this precondition. *See Schuette v. Coalition to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equality by Any Means Necessary (BAMN)*, 134 S. Ct. 1623, 1660 (2014) (Sotomayor, J., dissenting) ("A *Grutter*-compliant admissions policy ... must be limited in time."). Harvard cannot meet this requirement. In fact, Harvard turns this indispensable requirement on its head, adopting an institutional position that the use of race *always* will be necessary. SFFA Mem. 40. A system of racial preferences designed to operate in perpetuity—*i.e.*, that no level of minority enrollment could ever make Harvard sufficiently diverse such that the use of race would no longer be necessary—cannot be narrowly tailored.[10]

Unsurprisingly, then, Harvard cannot even decide if the level of minority enrollment matters to its ill-defined and self-made conception of diversity. At times, Harvard claims that race matters only at the individual level and that it has no aggregate racial-diversity goal at all. *See, e.g.*, Harvard Mem. 23 (asserting that "the consideration of race in the overall rating 'depends on the individual case,' and may be done 'to reflect the strength of the case and to provide a slight tip for some students'") (citation omitted). That would be consistent with President Faust's testimony that she is not "'concerned with the overall representation of particular groups,' and that "there is no 'particular designated level' of

---

[10] Harvard's suggestion that it might "reexamine the availability of race-neutral alternatives five years from now" is meaningless. Harvard Mem. 26 n.17. Harvard has nothing to "reexamine" given that it has not identified how it would (or even could) determine when its amorphous diversity interest would be met. The promise is especially implausible given that Harvard looked at race-neutral alternatives only after it was sued by SFFA. SFFA SMF ¶ 826.

representation of a racial group necessary to obtain the benefits of diversity." SFFA SMF ¶ 885 (citations omitted). At other times, Harvard argues that it does aim for a minimum level of minority enrollment and does pay "'attention to numbers.'" Harvard Mem. 19 n.13 (quoting *Grutter*, 539 U.S. at 336) (citations and alteration omitted). It is presumably on that basis that Harvard complains that a drop in "the proportion of African-American students ... from 14% to 6%, and the proportion of Hispanic or Other students ... from 14% to 9% ... would not allow [it] to achieve its educational objectives." Harvard Mem. 27-28.

Harvard thus takes two irreconcilable positions: (1) race is an individualized—not a group-based—factor and thus Harvard "has in mind no specific number of students of any given racial or ethnic background who must be on campus in order for Harvard's diversity-related educational objectives to be satisfied"; but (2) Harvard must use racial preferences to achieve a minimum (though unstated) level of minority enrollment because it cannot become a "truly inclusive community" if there is "a significant decline in African-American and Hispanic enrollment." *Id.* at 28-29 (citations and quotations omitted). Both cannot be true. But given that it must reconcile its policies to controlling precedent with which it has never seriously sought to comply, it is understandable why Harvard would struggle to get its story straight. Harvard's failure to narrowly tailor its use of race to *Grutter*'s "critical mass" interest is, by itself, fatal under strict scrutiny.

Even if Harvard were pursuing a permissible end, however, its admissions system still is not narrowly tailored given that race is far more than a "plus factor." SFFA Mem. 40-41. Harvard's arguments to the contrary, Harvard Mem. 21-25, miss the mark. To begin, Harvard mischaracterizes the legal inquiry. According to Harvard, race is no more than a "plus factor" so long as it "does not overwhelm other considerations." *Id.* at 22. Under that approach, Harvard says, race is merely a "plus factor" even if it is given as much weight as a "high academic, extracurricular, or personal rating." *Id.* at 24-25. That is wrong. The relative size of the preference was one of the chief reasons the University

of Michigan's point-based system was unconstitutional. *See Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) (highlighting that the racial preference accounted for "one-fifth of the points needed to guarantee admission"); *see id.* at 277-78 (O'Connor, J., concurring) (same). In *Fisher II*, by contrast, the Supreme Court accepted the way the University of Texas at Austin used race because it was "but a 'factor of a factor of a factor' in the holistic-review calculus." 136 S. Ct. at 2207.

Regardless, Harvard cannot show that it uses race merely as a "plus" factor even under its own standard. Harvard contends that it uses race permissibly because, for the class of applicants as a whole, "it is not possible to offer any meaningful prediction of whether an applicant will be admitted based solely on his or her race" and other factors "explain more of the variability in admissions decisions than race." Harvard Mem. 23-24. This is a dodge. SFFA has recognized that "racial preferences are not relevant for uncompetitive applicants." Arcidiacono Rebuttal 49-50. "No one would claim otherwise, given that Harvard is a highly selective school where more than 90% of all applicants are rejected." *Id.* at 49. Moreover, by analyzing the class of applicants as a whole, Harvard ignores the relevant inquiry: the extent to which race matters for those minority groups actually receiving a preference because of their race.[11]

On this question, the answer is not in doubt. As explained, both Professor Arcidiacono and OIR found that Harvard affords massive racial preferences to African Americans and Hispanics. SFFA Mem. 40-41. Professor Arcidiacono, in particular, found that being African American more than *quadruples* an applicant's chance of admission, and being Hispanic more than *doubles* an applicant's chance of admission. Arcidiacono Rebuttal at 70-71. But the preferences for African Americans and Hispanics are massive under Professor Card's approach too. "Without making any adjustments to

---

[11] To further illustrate the point, imagine a scenario in which Harvard admitted 5% of its applicant pool through a strict racial quota and the remaining 95% through race-neutral factors. Under that scenario, it still would be true that race did not affect most applicants, but this of course would be no defense of a racial quota for 5% of the applicants. Arcidiacono Rebuttal 49.

Professor Card's approach, his models show that racial preferences are responsible for *tripling* the number of African-American admits and *doubling* the number of Hispanic admits." SFFA SMF ¶ 798 (emphasis added); Arcidiacono Rebuttal 46-47; *see* Card Rebuttal 71 (acknowledging a "relatively large effect of race for the subset of African-American applicants who are most competitive"). Harvard's use of race, accordingly, is far more than a "plus" factor even if Harvard is correct that it can be more than a "factor of a factor of a factor."

Recognizing the "large effect of race" for competitive African Americans, Card Rebuttal 71, Harvard emphasizes that factors other than race also may "determine the outcome" for the most competitive applicants. Harvard Mem. 24-25. In particular, Harvard notes, for the most competitive applicants, the effect of being African American or Hispanic on an applicant's likelihood of admission is "comparable" to the effect of obtaining a 1 on the academic, extracurricular, or personal ratings instead of a 3 on these ratings. Harvard Mem. 24-25; Harvard SMF ¶ 125. But the argument is self-defeating. This comparator just proves how large Harvard's racial preferences are.

After all, it is extremely rare to receive a 1 in these ratings. In Professor Card's model, for the Classes of 2014-2019, only 0.46% of applicants received a 1 in the academic rating, 0.30% of applicants received a 1 in the extracurricular rating, and 0.03% of applicants received a 1 in the personal rating. Arcidiacono(2nd) Dec. at 2-3, ¶ 3. For example, for the Classes of 2014-2019, only 43 applicants (out of more than 142,000) received a 1 on the personal rating during these six years, whereas more than 112,000 applicants (78.8% of applicants) received a 3 on the personal rating. *Id.*

Thus, by Professor Card's own analysis, Harvard gives preferences to African-American and Hispanic applicants that are "comparable" to the preferences it gives to its rarest applicants—those who are ██████████████████████████████████████████████████████ ███████████████████████████████████████████████ (academic rating of 1); those who have ███████████████████████████████████████

███████████████████████████████ (extracurricular rating of 1); and those with

"outstanding" personal qualities (personal rating of 1). Ellsworth Ex. 57, HARV00015414-15. A

student's race thus is not "just one factor of many factors that [are] considered in an applicant's

folder." Harvard Mem. 23 n.16 (citation omitted). For many applicants, race is determinative of their

admission to Harvard.

> **D. Harvard neither gave serious, good faith consideration to nor is taking advantage of workable race-neutral alternatives.**

Harvard is not entitled to summary judgment on SFFA's Count V. *See* Harvard Mot 25-35.

The record evidence instead shows that SFFA is entitled to summary judgment. *See* SFFA Mem. 42-

45. If the Court disagrees, then a trial is needed to resolve genuine factual disputes that are material to

resolution of this count.

Since *Grutter*, Harvard has been "required" to engage in "'serious, good faith consideration of

workable race-neutral alternatives that will achieve the diversity the university seeks.'" Harvard Mem.

25 (quoting *Grutter*, 539 U.S. at 339). Harvard did not just fail to comply with this command; Harvard

ignored it. SFFA Mem. 42-43. Indeed, Harvard admits that it did not begin to consider race-neutral

alternatives until 2017—*nearly fifteen years* after the Supreme Court imposed the obligation. Harvard

Mem. 25. Even then, Harvard's consideration of race-neutral alternatives was neither serious nor in

good faith. It instead was a *post hoc* charade designed to justify a preordained outcome. SFFA Mem.

42-44. As a result, Harvard's argument that its use of race remains necessary to achieve student body

diversity fails at the outset. *See Fisher I*, 570 U.S. at 312-14. Harvard is subject to the same legal

obligations as every other university, and it has no excuse for its blatant refusal to follow the Supreme

Court's clear instructions.

Even if Harvard had seriously considered race-neutral alternatives in good faith, its argument

for continuing to use racial preferences would still fail. "Narrow tailoring also requires ... a careful

judicial inquiry into whether a university could achieve sufficient diversity without using racial

classifications." *Id.* at 312 (internal citation omitted). "The reviewing court," in other words, "must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity. If a nonracial approach ... could promote the substantial interest about as well and at tolerable administrative expense, then the university may not consider race." *Id.* (citations and quotations omitted). Harvard cannot meet this rigorous standard given the availability of nonracial approaches that can achieve its diversity interest without engaging in the divisive practice of classifying applicants by race. SFFA Mem. 44-45.

Harvard's principal argument is that eliminating racial preferences would decrease the African-American share of the class "from 14% to 6%" and the Hispanic share of the class "from 14% to 9%." Harvard Mem. 28. But this conclusion assumes that Harvard would eliminate racial preferences without adopting any of the nonracial approaches that SFFA's expert—Richard Kahlenberg—has identified. Harvard makes a strawman argument because it knows that implementing these alternatives would keep this "sort of dramatic decline," *id.*, from occurring, SFFA Mem. 44 (citing SFFA SMF ¶¶ 858-882). Under Mr. Kahlenberg's models (Kahlenberg Simulation 6 and 7), the African-American share of the class would be 10% and the Hispanic share would *increase* to 19% or 20%. SFFA SMF ¶ 876. Even under Professor Card's model (Card Simulation 4x), the African-American share of the class would be 10% and the Hispanic share would increase to 17%. *Id.* As Harvard put it: adopting these alternatives would "avoid significant changes in the proportion of African American, Hispanic and Other students." Harvard SMF ¶ 188. In fact, the representation of these "historically underserved groups" would remain roughly the same or increase. Harvard Mem. 28. There would be no decline in minority representation—let alone a dramatic one.

Because Harvard cannot argue that adopting a race-neutral alternative policy (any of the three proposals identified by SFFA's expert) would make it less diverse, Harvard is left to argue that this

32

change in policy would lead to "an unacceptable sacrifice of Harvard's educational mission." *Id.* at 29. That claim is baseless.

To begin, Harvard argues that to admit a class that is "comparable in diversity" to its current class, it would need to increase socioeconomic preferences so much that they would "outweigh almost every consideration in the admissions process; for many applicants, the boost would be larger than that given to candidates with the most exceptional academic, extracurricular, personal, and athletic ratings." Harvard Mem. 29-30 (citations and quotations omitted). That is untrue. For example, one of Professor Card's simulations, Card Simulation 4x, provides *greater* diversity than the status quo and uses a socioeconomic preference that is *smaller* than the preference Harvard currently gives to recruited athletes. SMF ¶ 876; Card Rebuttal 96-97. Harvard reaches its conclusion by myopically defining "diversity" as replicating the level of African-American enrollment from its most recent class (to the exclusion of all other considerations). Card Rep. 107-08, ¶ 239. Race-neutral alternatives must work "about as well" as racial preferences. *Fisher I*, 570 U.S. at 312. They are not required precisely to replicate racial preferences in every respect.

Harvard also incorrectly asserts that "the proportion of admitted students receiving the highest academic ratings (1 or 2) would drop substantially, as would the fraction with top extracurricular and personal ratings," which would undermine Harvard's "reputation for academic excellence." Harvard Mem. 30 (citations and quotations omitted). Harvard's "reputation for academic excellence" would remain undiminished. Average test scores, GPA, and the Academic Index would remain virtually the same. SAT scores, for example, would average at the 98th percentile. Kahlenberg Dec., Ex. B. ("Kahlenberg Rebuttal") 26 & n.103, 33. The change in the percentage of students receiving an academic rating of 1 or 2 would be modest. Kahlenberg Dec., Ex. C ("Kahlenberg Supp. Rep.") 2-3; SFFA SMF ¶¶ 876, 890. Moreover, Harvard ignores that, as compared to its current system, many

more of the high-achieving students would have overcome socioeconomic obstacles, something Harvard claims to value. Kahlenberg Supp. Rep. 2-3.

Harvard's objection to eliminating legacy, donor, deferred admission, and faculty and staff preferences is equally weak. Harvard claims that if it "eliminated those practices, and also eliminated race conscious admissions, then (according to Dr. Card's analysis) the number of African American, Hispanic, and Other students would decrease by half from current levels." Harvard Mem. 33 (citing SMF ¶ 198). Again, that might happen only if Harvard refused to couple elimination of these practices with an increased preference based on socioeconomic status. Kahlenberg Rebuttal 10-11. SFFA has made no such proposal. Harvard cannot prove that a race-neutral alternative would be unworkable by assuming that it would not take other steps to promote student body diversity if racial preferences were no longer a permissible means of doing so. Cutting off your nose to spite your face is not a viable legal defense.

Harvard alternatively argues that eliminating these admissions preferences would jeopardize what it vaguely calls "essential institutional objectives." Harvard Mem. 29. In particular, Harvard claims that alumni would be unwilling "to volunteer for a variety of activities" or provide "financial support" if their children did not receive an admissions preference. *Id.* at 32-33. Similarly, Harvard argues that eliminating the admissions preference for children of faculty and staff "would place [it] at a significant competitive disadvantage in recruiting personnel." *Id.* at 33 (citation and quotations omitted). Each of these arguments is mistaken.

First off, preserving these "essential institutional objectives" is not a justification that would render race-neutral alternatives unworkable under *Grutter*. Race-neutral alternatives are unworkable if they would not "produce the *educational* benefits of diversity." *Fisher I*, 570 U.S. at 312 (emphasis added); *see also Fisher II*, 136 S. Ct. at 2214 (race-neutral alternatives must be "'available' and 'workable' means through which the University could have met *its educational goals*") (emphasis added). Eliminating

these kinds of preferences would in no way force Harvard to "choose between a diverse student body and a reputation for academic excellence," *Fisher II*, 136 S. Ct. at 2213, and Harvard does not even try to argue otherwise.

If such "institutional objectives" were legitimate justifications under *Grutter*, then Harvard's desire to continue admitting applicants off the Dean's/Director' Interest List and the Z-List would be legitimate justifications too. The Dean's List "identifies the applicants who have been brought to Dean Fitzsimmons' attention because of their connections or importance to Harvard," *i.e.*, their relationship with a donor or potential donor. SFFA SMF ¶¶ 294-295. If the continued financial support of alumni is essential, then collecting donations from non-alumni would be as well. Indeed, ███████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ SFFA SMF ¶ 297. The same would go for the secretive policy of offering deferred admission through the Z-List. SFFA SMF ¶ 149. Harvard presumably has some important "institutional" reason for offering deferred admission to candidates ██████████████████████████████████████████████████████████ ██████ SFFA SMF ¶ 147; *see also id.* ¶ 290 ("For the Classes of 2014-2019, 46.5% of students on the Z-List were legacies (compared to less than 3% of the applicant pool as a whole)."); *id.* ¶ 302 ("For the Classes of 2014-2019, 58.8% of Z-List students were on the Dean's/Director's Interest List.").

Harvard wisely has not defended such policies as bearing on the workability of race-neutral alternatives. But that makes its defense of legacy, faculty, and staff preferences untenable. There is no basis for distinguishing preferences for children of legacies, faculty, and staff from those for donors and other connected individuals whom Harvard deems important enough to grant special status. None of these institutional interests advances Harvard's "*educational* objectives." *Grutter*, 539 U.S. at 315 (emphasis added).

Regardless, Harvard has not offered *any* empirical support for its assertion that eliminating legacy preferences would "imperil[]" alumni donations and volunteer efforts. *See* Harvard Mem. 32-33. The Smith Committee and Dr. Simmons simply assert it to be true. *Id.* By contrast, Mr. Kahlenberg put forth evidence proving that eliminating legacy preferences is a workable race-neutral strategy. "Among the top 10 universities in the widely-cited Shanghai rankings, four (Caltech, U.C. Berkeley, Oxford, and Cambridge) do not employ legacy preferences." Kahlenberg Dec., Ex. A ("Kahlenberg Rep.") 32. In addition, an examination of the top 100 universities in U.S. News & World Report found "no evidence that legacy preference policies themselves exert an influence on giving behavior." *Id.* at 32-33.[12] Harvard's argument for retaining a preference for children of faculty and staff fails for similar reasons. There is no empirical support for the proposition that Harvard would lose out on faculty and staff if their children are forced to compete on equal footing with other applicants. The Smith Committee and Dr. Simmons again simply assert it as true. *See* Kahlenberg Rebuttal 12. That falls far short of meeting Harvard's burden under strict scrutiny.

Finally, Harvard identifies various practices that it contends it is already doing sufficiently (recruiting socioeconomically disadvantaged students and providing financial aid) or believes is an unworkable race-neutral alternative (adopting a "mechanical scheme of geographic distribution," increasing transfer students, or eliminating early action). But the efficacy of these policies is immaterial to the dispute at this stage because, with one minor exception,[13] none of the three simulations would require Harvard to adopt any of these policies. In any case, these arguments are all misplaced. Harvard

---

[12] At most, the testimony from the members of the Smith Committee indicates that, on occasion, they have seen alumni give money to Harvard only because they believed (possibly correctly) that doing so would increase the chances of their child being admitted. But even if Harvard could show that eliminating legacy preferences would have some minimally negative impact on alumni giving, its argument would still fail given the university's $37 billion dollar endowment. *See* SFFA SMF ¶ 896.

[13] Kahlenberg Simulation 6 (unlike Card 4x and Kahlenberg Simulation 7) removes the preference for early action applicants. As a comparison of Simulation 6 and Simulation 7 shows, however, this change does not make either of the modeled race-neutral alternatives unworkable. SFFA SMF ¶¶ 875-76.

could increase its recruiting efforts among less wealthy students from regions of the country to which Harvard devotes little attention, SFFA SMF ¶ 897; increase its financial aid commitment, *id.* ¶ 896; take into geography into consideration by, for instance, using zip codes, *id.* ¶ 900; Kahlenberg Supp. Rep. at 4; admit more transfers from community colleges, SFFA SMF ¶ 899; and eliminate the preference for those applying early action (as opposed to ending early action entirely), *id.* ¶ 875. Such measures would help Harvard increase student body diversity beyond current levels. *Id.* ¶¶ 895-900.

In the end, Harvard asks this Court to accept on faith that eliminating preferences that mostly benefit wealthy and white applicants would "entail an unacceptable sacrifice of Harvard's educational mission." Harvard Mem. 29, 34-35. In so doing, however, Harvard seeks the very deference that the Supreme Court found to be fundamentally incompatible with strict scrutiny. To be sure, "deference must be given to the University's conclusion, based on its experience and expertise, that a diverse student body would serve its educational goals." *Fisher II*, 136 S. Ct. at 2208 (citations and quotations omitted). But that is not the issue. This dispute is over whether "a nonracial approach could promote" the educational benefits of diversity "about as well and at tolerable administrative expense" as racial preferences. *Fisher I*, 570 U.S. at 312 (citations and quotations omitted). On that important narrow-tailoring issue, "no deference is owed" to Harvard and, accordingly, the university "bears the burden" of showing that no such alternative is "available and workable." *Fisher II*, 136 S. Ct. at 2208 (citation and quotations omitted). Absent deference to unsubstantiated and counterfactual predictions, Harvard cannot carry that heavy burden.

## CONCLUSION

For the foregoing reasons, SFFA respectfully requests that the Court deny Harvard's motion for summary judgment.

Dated: July 30, 2018 Respectfully submitted,

/s/ William S. Consovoy

Adam K. Mortara
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
312.494.4400
adam.mortara@bartlit-beck.com

John M. Hughes
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
303.592.3100
john.hughes@bartlit-beck.com

Paul M. Sanford BBO #566318
BURNS & LEVINSON LLP
One Citizens Plaza, Suite 1100
Providence, RI 02903
617.345.3000
psanford@burnslev.com

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
703.243.9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com

Patrick Strawbridge BBO #678274
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
617.227.0548
patrick@consovoymccarthy.com

Michael H. Park
CONSOVOY MCCARTHY PARK PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
212.247.8006
park@consovoymccarthy.com

*Attorneys for Plaintiff Students for Fair Admissions, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants ass identified on the Notice of Electronic Filing.

<u>/s/ William S. Consovoy</u>
William S. Consovoy