## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **STUDENTS FOR FAIR ADMISSIONS, INC**, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:14-cv-14176-ADB |
| vs. | ) ) | |
| **THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION),** | ) ) ) ) | Leave to File Granted on July 31, 2018 |
| Defendant. | ) ) ) | |

**BRIEF OF *AMICI CURIAE* THE ASIAN AMERICAN LEGAL FOUNDATION
AND THE ASIAN AMERICAN COALITION FOR EDUCATION
(REPRESENTING 156 AFFILIATED ASIAN AMERICAN ORGANIZATIONS)
IN SUPPORT OF PLAINTIFF**

RANDAZZA | LEGAL GROUP

# TABLE OF CONTENTS

I.    THE INTEREST OF AMICI CURIAE. ................................................................ 1

II.   SUMMARY OF ARGUMENT ........................................................................... 4

III.  HARVARD MAINTAINS ITS QUOTAS BY RAISING THE ADMISSIONS BAR HIGHER FOR ASIAN AMERICANS, AND BY USING THE SAME ODIOUS STEREOTYPES HISTORICALLY USED TO JUSTIFY DISCRIMINATION AGAINST THIS ETHNIC GROUP. ..................................................................................... 6

IV.   THE LONG HISTORY OF DISCRIMINATION AGAINST ASIAN AMERICANS IN THIS COUNTRY. ........................................................................................... 8

   A.   PERSECUTION OF ASIAN AMERICANS WAS THE NORM THROUGHOUT MOST OF AMERICAN HISTORY. ................................................................................................. 8
   B.   THE HISTORY OF DISCRIMINATION AGAINST ASIAN AMERICANS IN EDUCATION. ................. 9
   C.   THE CHINESE EXCLUSION ACT. ................................................................................... 10
   D.   INTERNMENT OF JAPANESE AMERICAN FAMILIES. ........................................................ 11

V.    THE HO CASE AND OTHER PRESENT-DAY BATTLES AGAINST DISCRIMINATION IN CALIFORNIA AND BEYOND. .................................. 12

VI.   THE PRESENT AND FUTURE OF LEGALIZED DISCRIMINATION AGAINST ASIAN AMERICANS. ....................................................................................... 13

   A.   ASIAN AMERICANS AS THE "NEW JEWS" IN HIGHER EDUCATION. ..................................... 13
   B.   THE BURDEN OF HARVARD'S "HANDICAPPING" FALLS HEAVIEST ON THOSE INDIVIDUALS LEAST ABLE TO BEAR IT. ........................................................................ 15
   C.   THE TERRIBLE EFFECT ON THE DIGNITY AND SELF WORTH OF ASIAN AMERICANS WHO KNOW THEY AND THEIR CHILDREN WILL BE SUBJECTED TO UNEQUAL TREATMENT BECAUSE OF THEIR RACE. ............................................................................................ 16

VII.  HARVARD'S COVERT PROGRAM OF DISCRIMINATION SHOULD BE BROUGHT TO AN END. .............................................................................. 20

   A.   HIDDEN "TRADE SECRETS" SHOULD NOT BE ALLOWED TO JUSTIFY OBVIOUS DISCRIMINATION. ...................................................................................................... 20
   B.   HARVARD DID NOT EVEN TRY TO USE RACE-NEUTRAL ALTERNATIVES TO ACHIEVE ITS VIEW OF DIVERSITY. ................................................................................................ 20

VIII. CONCLUSION. ............................................................................................. 21

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Adarand Constructors v. Pena*,
    515 U.S. 200 (1995)...................................................................................... 15

*Fisher v. Univ. of Tex.*,
    570 U.S. 297, 133 S. Ct. 2411 (2013)............................................................ 21

*Gong Lum v. Rice*,
    275 U.S. 78 (1927)........................................................................................ 10

*Hirabayashi v. United States*,
    320 U.S. 81 (1943)........................................................................................ 11

*Hirabayashi v. United States*,
    828 F.2d 591 (9th Cir. 1987) ........................................................................ 11

*Ho Ah Kow v. Nunan*,
    12 F. Cal. 252 (C.C.D. Cal. 1879) ................................................................. 8

*Ho v. San Francisco Unified Sch. Dist.*,
    147 F.3d 854 (1998)............................................................................. *passim*

*In re Ah Chong*,
    2 F. 733 (C.C.D. Cal. 1880) ........................................................................... 8

*In re Lee Sing*,
    43 F. 359 (C.C.D. Cal. 1890) ......................................................................... 9

*In re Tiburcio Parrott*,
    1 F. 481 (C.C.D. Cal. 1880) ........................................................................... 9

*Korematsu v. United States*,
    584 F. Supp. 1406 (N.D. Cal. 1984) ............................................................ 11

*Lee v. Johnson*,
    404 U.S. 1215 (1971).................................................................................... 10

*Parents Inv. In Comm. Sch. v. Seattle School No. 1*,
    127 S. Ct. 2738 (2007).................................................................................... 6

*People v. Hall*,
    4 Cal. 399 (1854) ............................................................................................ 7

*Plessy v. Ferguson*,
    163 U.S. 537 (1896)...................................................................................... 10

*Rice v. Cayetano*,
    528 U.S. 495 (2000)...................................................................................... 16

*Richmond v. Croson*,
 488 U.S. 469 (1989)..............................................................................16

*S.F. NAACP v. S.F. Unified Sch. Dist.*,
 576 F. Supp. 34 (N.D. Cal. 1983) .......................................................12

*Shelley v. Kraemer*,
 334 U.S. 1 (1948)..................................................................................15

*Tape v. Hurley*,
 66 Cal. 473, 6 P. 12 (1885) ...................................................................9

*United States v. Wong Kim Ark*,
 169 U.S. 649 (1898)................................................................................9

*Wong Him v. Callahan*,
 119 F. 381 (C.C.N.D. Cal. 1902) .........................................................10

*Yick Wo v. Hopkins*,
 118 U.S. 356 (1886)................................................................................9

**OTHER AUTHORITIES**

Akane Otani, *Tips From the Princeton Review: Act Less Asian, Add Pics if You're Black,*
 Bloomberg, Nov. 21, 2014, *found at* https://www.bloomberg. com/news/articles/2014-11-
 21/princeton-review-tells-asians-to-act-less-asian-and-black-students-to-attach-photos (last
 visited 7/29/2018) ................................................................................18

Alan M. Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-
 Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385-399 (1979)............ 13, 15

Bella English, *To Get Into Elite Colleges, Some Advised To 'Appear Less Asian,'* The Boston
 Globe, June 1, 2015, *found at* https://www.bostonglobe.com/lifestyle/2015/06/01/ college-
 counselors-advise-some-asian-students-appear-less-asian/Ew7g4JiQMiqYNQ
 lIwqEIuO/story.html (last visited 7/30/2018) ......................................18

Charles McClain, *In Search of Equality* (Univ. of Cal. Press 1994) .........................................8, 9

*Chinese Immigration and the Chinese Exclusion Acts,* at
 https://history.state.gov/milestones/1866-1898/chinese-immigration (last visited 7/27/2018)  10

Daniel Golden, *The Price of Admission: How America's Ruling Class Buys Its Way into
 Elite Colleges—and Who Gets Left Outside*, Chapter 7: The New Jews
 (Three Rivers Press, 2007)...................................................................14

Elmer Clarence Sandmeyer, *The Anti-Chinese Movement in California*
 (Univ. of Ill. Press 1991)........................................................................8

RANDAZZA | LEGAL GROUP

Evan P. Schultz, *Group Rights, American Jews, and the Failure of Group Libel Laws*, 66 Brook. L. Rev. 71, 111-12 (Spring 2000) ................................................................................ 13

George Oiao, *Why Are Asian American Kids Killing Themselves?* Plan A Magazine, Oct. 3, 2017, *found at https://planamag.com/why-are-asian-american-kids-killing-themselves-477a3f6ea3f2* (last visited 7/29/2018) ................................................................ 18

*Handicap (Horse Racing),* Wikipedia, *found at* https://en.wikipedia.org/wiki/Handicap_(horse _racing) (last checked 7/27/2018) ........................................................................... 15

Jason P. Riley, *The New Jews of Harvard Admissions* (*Wall Street Journal*, May 19, 2015) ..... 14

Jerry Kang, *Negative Action Against Asian Americans: The Internal Instability Of Dworkin's Defense Of Affirmative Action*, 31 Harv. C.R.-C.L. L. Rev. 1, 36 (Winter 1996) .................... 13

Johann N. Neem, *The Founding Fathers Made Our Schools Public. We Should Keep Them That Way,* The Washington Post, Aug. 20, 2017, *found at* https://www.washingtonpost.com/news/ made-by-history/wp/2017/08/20/early-america-had-school-choice-the-founders-rejected-it/?utm_term=.815adf5587ba (last visited 7/27/2018) ............................................... 9

Julian Guthrie, *S.F. School Race-Bias Case Trial Starts Soon*, San Francisco Examiner, at C-2 (Feb. 14, 1999) ..................................................................................................... 17

Kate Murphy, *California Affirmative Action Revival Bill Is Dead* (San Jose Mercury News, March 18, 2014) *at* http://www.mercurynews.com/education/ci_25361339/california-affirmative-action-challenge-is-dead? (last checked 7/27/2018) .............................. 13

Lawrence Siskind, *Racial Quotas Didn't Work in SF Schools,* op-ed, San Francisco Examiner (July 6, 1994), *found at* http://heather.cs.ucdavis.edu/pub/ AffirmativeAction/Siskind.html (last visited 7/29/2018) ........................................................................................ 13

Lee Cheng, *Group Preferences and the Law*, U.S. House of Representatives Sub-Committee on the Constitution Hearings (June 1, 1995), p. 241, *found at* http://www.archive.org/stream/ grouppreferences00unit/grouppreferences00unit_djvu.txt (last checked 7/27/2018) .............. 17

Leo Rennert, *President Embraces Minority Programs*, Sacramento Bee (Metro Final) at A1 (April 7, 1995) ..................................................................................................... 14

Nathan Glazer, *Diversity Dilemma*, The New Republic (June 22, 1998) .............................. 13, 14

Pat K. Chew, *Asian Americans: The "Reticent" Minority and Their Paradoxes*, 36 Wm. & Mary L. Rev. 1, 61-64 (Oct. 1994) ................................................................................ 14

Peter Arcidiacono, Thomas Espenshade, Stacy Hawkins & Richard Sander, *A Conversation on the Nature, Effects, and Future of Affirmative Action in Higher Education Admissions,* 17 U. Pa. J. Const. L. 683, 694-695 (2015), *located at* https://scholarship.law.upenn.edu/jcl/vol17/iss3/2 (lasted visited 7/27/2018) ......................... 7

Peter S. Menell, *Tailoring a Public Policy Exception to Trade Secret Protection*, Cal. L. Rev., Vol 105, Iss. 1, at 6 (Feb. 1, 2017), *found at*

https://scholarship.law.berkeley.edu/cgi/viewcontent.cgi?article=4346&context=californialawr eview (last visited 7/29/2018) ................................................................................. 20

*Race-Neutral Alternatives in Postsecondary Education: Innovative Approaches to Diversity, U.S. Department of Education Office for Civil Rights,* March 2003, *found at* https://www2.ed.gov/about/offices/list/ocr/edlite-raceneutralreport.html (visited 7/29/2018)  21

Randall Fitzgerald, *The Hundred Year Lie,* p. 24 (Dutton, 2006) ................................................ 20

Ron Unz, *The Myth of American Meritocracy: How Corrupt are Ivy League Admissions?* (The American Conservative, Dec. 2012), *at* http://www.theamericanconservative .com/articles/the-myth-of-american-meritocracy/ (last checked 7/27/2018) .................................................. 14, 18

Ron Unz, *The Myth of American Meritocracy: How Corrupt are Ivy League Admissions?,* pgs. 17-22 (The American Conservative, Dec. 2012), *at* http://www.theamericanconservative .com/articles/the-myth-of-american-meritocracy/ (last checked 7/27/2018) ............................ 5

Scott Jaschik, *Pressure to Build the Class: 2016 Survey of Admissions Directors,* Inside Higher Education, September 22, 2016, *found at* https://www.insidehighered. com/news/survey/pressure-build-class-2016-survey-admissions-directors (last visited 7/30/2018) ................................................................................................................................ 15

Selana Dong, *"Too Many Asians": Challenge of Fighting Discrimination Against Asian-Americans and Preserving Affirmative Action*, 47 Stan. L. Rev. 1027, 1057 n.36 (May 1995) ............................................................................................................................................ 14

The Free Dictionary, *found at* https://idioms.thefreedictionary.com/ Chinaman%27s+chance (last visited July 20, 2018) ......................................................................................................... 8

Thomas J. Espenshade and Alexandra Walton Radford, *No Longer Separate, Not Yet Equal: Race and Class in Elite College Admission and Campus Life* (Princeton University Press, 2009) ...................................................................................................................................... 14

Victor Low, *The Unimpressible Race* (East/West Publishing Co. 1982) ...................................... 8

Yii-Chen (Jenny) Wu, *Admission Considerations in Higher Education Among Asian Americans,* American Psychological Association, *found at* http://www.apa.org/pi/oema/resources/ethnicity-health/asian-american/article-admission.aspx (last checked 7/29/2018) .................................................................................................... 19

## CONSTITUTIONAL PROVISIONS

Cal. Const. Art. I § 31(a)........................................................................................................... 12

RANDAZZA | LEGAL GROUP

I.       **THE INTEREST OF AMICI CURIAE.**

The outcome of this litigation is of critical importance to *Amici Curiae* and their constituents, who are Americans of Asian ethnic origin, many of whom have children who may one day aspire to attend Harvard College or a school using similarly discriminatory admissions practices.  The members of this ethnic group have a special interest in this case: they have historically faced blatant discrimination in education and presently face the same by one of America's oldest and most prestigious educational institutions.  Harvard's discriminatory practices have been copied and emulated by countless other educational institutions as the gold standard for achieving skin-deep diversity; but unfortunately, scrutiny reveals that underneath the thin layer of gilt lies nothing but the same old racism.

The Asian American Legal Foundation ("AALF"), a non-profit organization based in San Francisco, was founded to protect and promote the civil rights of Asian Americans.  Its focus is on a particular niche where, as here, Asian Americans are discriminated against for a purportedly benign purpose and many famous and high-profile groups and individuals deny that discrimination even exists.  Members of AALF were instrumental in the struggle to end discrimination against Chinese American students in the San Francisco, California public school system, discrimination that was also imposed for supposedly benign reasons.  *See Ho v. San Francisco Unified Sch. Dist.,* 147 F.3d 854 (1998). AALF and its members have been active in many cases and campaigns where the rights of Asian Americans were at issue, particularly in education. More information on AALF and its mission can be found on its website at http://www.asianamericanlegal.com.

The Asian American Coalition for Education ("AACE") is a non-political, non-profit, national organization devoted to promoting equal rights for Asian Americans in education and education-related activities.  The leaders of AACE and its supporting organizations are Asian American community leaders, business leaders and, most importantly, parents. They are not professional "civil rights advocates" and do not get funding from large corporations and multibillion dollar foundations, but were forced to become civil rights advocates to stop and

prevent the discrimination against their children that the "professionals" ignore, downplay and facilitate.

In May 2015, the founders of AACE united more than 60 Asian American organizations to file a complaint with the Department of Justice and the Department of Education regarding Harvard University's discriminatory practices against Asian American applicants. It was one of the largest joint actions ever taken by Asian American organizations in pursuit of equal education rights.

AACE represents some 156 affiliated Asian American organizations in this present amicus effort including: 1441 Manufactured-Home Residents Association, 80-20 Education Foundation, 80-20 Initiative DC Chapter, AAACC Educational Foundation, AE & LY Medical Associates, PLLC, Allstar Institute, America Earlier Education Center LLC, American Asian Contractor Association, American Chinese Medicine Association, American Hindu Coalition, American Society of Engineers of Indian Origin-NCC, American Sports Development Committee, ANJ International, Asian American Civic Engagement Alliance, Asian American Community Association, Asian American GOP Coalition, Asian American Rights Association, Asian Americans Against Affirmative Action, AsianAmericanVoters.org, Association for Education Fairness, Austin Chinese Professional Association, Bay Area Homeowner Network, Bergen Chinese Group, Boston Forward Foundation, Brookline Asian American Foundation, Carolinas Asian American Alliance, Cast Vote, CeeHuang Daoist RC, Center for Chinese Learning at Stony Brook, CHESSanity, China Rainbow Network, Chinese American Alliance, Chinese American Alliance For Trump, Chinese American Association of Bedford, Chinese American Association of Orange County, Chinese American Association of the Andovers, Chinese American Association of Tulsa, Chinese American Citizens Alliance (CACA Boston Lodge), Chinese American Economic & Culture Association, Chinese American Equalization Association (HQH), Chinese American Heritage Association, Chinese -American Nail Salon Association, Chinese American Parent Association of Howard County, Chinese American Parents Association of Montgomery County, Chinese American Republicans of Massachusetts,

Chinese Americans of Lexington (CALex), Chinese Association for Progress and Equality, Chinese Association of Northwest Arkansas, Chinese Association of Science, Education and Culture of South Forida (CASEC), Chinese Association, Inc., Chinese Civil Rights League, Inc., Chinese Freemasons (NY), Chinese Freemasons in Las Vegas, Chinese Social Service Center, Confucius Foundation, Councils of Maryland Korean Churches, D4Sue Inc, Dallas Fort Worth Chinese Alliance (DFWCA), Dallas Fort Worth Political Action Committee (DFWPAC), Emerald Parents Association, Epoch Investment LLC, Evergreen Chinese American Association, Excellent Chinese School, Florida Acupuncture Association, Fuzhou Tingjiang Huaqiao Alumni Associated USA, Gang Chen for City Council 2018, Global Exchange Education Center, Global Organization of People of India Origin (GOPIO), Greater Charlotte Chinese American Conservatives, Greater Orlando Chinese Professionals Association, Greater San Antonio Chinese Society of Professionals, Greater Shanghai Alliance of American, Green Bees Multicultural LLC, Harrison Chinese Association, Hotel Chinese Association of USA,, Houston Chinese Alliance, Houston Guangxi Association, Huaxia Chinese School of Greater New York, HuaYi Education, Huazhong University of Sci & Tech Alumni Association of Southern California, Hubei Association of Florida, INDOUS  Chamber of commerce of NE  Florida, iNegotiate LLC, Jade  Springs, J-Cheng Gene LLC, Jilin Jilin Fellowship Group, JYC holdings, LLC, KAJI  & ASSOCIATES, LAVA Electronics Inc., Law Offices of Michael W. Lu, LLC, Livingston Chinese Association, Long Island Chinese American Association (LICAA), Long Island School of Chinese, Lonma Leather LLC, Maryland Chinese American Network (MD-CAN), Metro Star Media, Michigan Chinese Alliance, Michigan Chinese Conservatives Alliance, Mid-Missouri Chinese Association, Millburn Institute of Talent, Montgomery County GOP Asian American Association (MCGOP-AAA), Nanjing University Alumni Association Florida Chapter, National Council of Chinese Americans (NCCA), National Federation of Indian American Associations, New Hyde Park Chinese Association, New York Chinese United League, Newton Alliance of Chinese Americans, NJ  Chinese Media LLC, Noah Decoration LLC, Noble Tree Publishing Inc., North American Economic Herald, North American Maple Cultural Center of Florida,

Northern California Chinese Culture Athletic Federation (NCCCAF), Orange County Chinese Ladies Group, Orange County Herald Center, Orlando Chinese Association, Overseas Alumni Association of Shanghai Second Medical University (SJTUMS), Pakistan Policy Institute, Pakistani American Volunteers, Philadelphia Tristate Chines American Association (PTCAA), Plano Table Tennis Club, Project and Knowledge Concepts, Promising Analytical Consisting, Queenberry, Inc., Rotary Club of Huaren in Silicon  Valley, San Diego Asian Americans For Equality, SCV Chinese School, Shangder Academy of Classical Chinese,  Shanxi  Association of Silicon Valley, Silicon Valley women alliance, Sino - America New York Brooklyn Archway Association Corp., South Florida Chinese Business Association, Student Partner In Learning, SVCA Foundation, Texas Guizhou Association, The Chinese Nail Salon Association of East American, The Orange Club, The Shanghai Association of America, Inc., Tingling High School Alumnus Association of America, United Chinese Association of Utah, United Federation of Indo Americans of California, United for a Better Community (UBC), University of California Alumni Association, US Chinese Learning Foundation, USTC Alumni Association SoCal, V Care Home Health Services, Venus Chinese School, Washington RiZing Economics And Fintech Educational Organization, Wei Bo learning Organization, Welcome Family Medicine, PA, Wen's Pearls, West Windsor-Plainsboro Education Support Association, Xiangtan University Alumni Association of North America, Yi-radio, Youth Education Success, and Zhengyuan Culture Bridge.

The members and constituents of AALF and AACE are deeply concerned about the outcome of the case now before this court. They believe that it is vital that the Court understand their concerns and why it is so important to them that the Court uphold the right of Asian Americans to be treated as individuals by Harvard College, equal to other individuals in the admissions process and not judged by a separate standard.

## II.      SUMMARY OF ARGUMENT

*Amici Curiae*, the Asian American Legal Foundation ("AALF") and the Asian American Coalition for Education ("AACE"), respect Harvard as one of the world's foremost institutions

of higher education.  However, *Amici* deplore Harvard's treatment of Asian American applicants in the college admissions process, which is contrary to the Constitution's mandate that all individuals enjoy equal protection of the laws.  Evidence that is beyond reasonable dispute establishes Harvard treats Asian American applicants differently from others, holding them to a higher bar in order to maintain very obvious racial quotas for admissions.[1]

Particularly troubling is the fact that Harvard accomplishes its racial balancing in large part by having its admissions officers assign Asian American applicants a significantly lowered "Personal" rating in a secretive, "black box" process to counter their otherwise above-average academic and extracurricular achievements.  While this may be a convenient method of controlling the number of Asian Americans admitted, it provides an eerie parallel with the negative stereotyping that has in the past been used to justify discrimination against members of this historically disadvantaged group.  It is also similar to what Harvard did in the past to Jewish Americans using similar processes and excuses.

Throughout their long history in this country, Asian Americans have faced persecution and discrimination. Negative stereotypes were used to justify discrimination, like calling Asians Americans faceless members of a "yellow horde" lacking the values and human attributes of other Americans.  Case after case bears witness to the long struggle of Asian Americans for equal treatment.  It is now disheartening to see this type of discrimination used again against Asian Americans, and this time by one of America's oldest and most respected universities.

---

[1]    For instance, the percentage of Asian Americans applications admitted into each Harvard class has remained remarkably constant during a multi-decade period of time where the total number of Asian American applicants has grown dramatically. (Plaintiff's Memorandum of Reasons In Support Of Its Motion For Summary Judgment ("Plaintiffs' Memo") at 34; Ron Unz, *The Myth of American Meritocracy: How Corrupt are Ivy League Admissions?,* pgs. 17-22 (The American Conservative, Dec. 2012), *at* http://www.theamericanconservative .com/articles/the-myth-of-american-meritocracy/ (last checked 7/27/2018). Significantly, each time Harvard has been subject to a complaint or investigation, the percentage of Asian American admits has increased the following year.

The discrimination in education against Asian American applicants causes real and tangible harm. It causes Asian Americans to feel that they are not valued as much as other citizens. It causes many young Asian Americans to feel a sense of inferiority, hopelessness and anger. Asian American students feel they have to work even harder in order just to have a chance of acceptance, leading to anxiety, depression and increased rates of suicide.

For these and other reasons set forth herein, the Court should grant summary judgment to Plaintiff and put an end to Harvard's unlawful discrimination.

**III.    HARVARD MAINTAINS ITS QUOTAS BY RAISING THE ADMISSIONS BAR HIGHER FOR ASIAN AMERICANS, AND BY USING THE SAME ODIOUS STEREOTYPES HISTORICALLY USED TO JUSTIFY DISCRIMINATION AGAINST THIS ETHNIC GROUP.**

Harvard is causing the harm the Supreme Court warned of through its misguided and illegal efforts to maintain what it considers a "proper" balance of races in its student body. "We have many times over reaffirmed that '[r]acial balance is not to be achieved for its own sake.'" *Parents Inv. In Comm. Sch. v. Seattle School No. 1*, 127 S. Ct. 2738, 2757 (2007) (citing cases). Evidence that is beyond reasonable dispute establishes that Harvard raises the bar higher for applicants identified as Asian American, requiring them to score higher in most ratings during the admissions process to stand a chance of being admitted. (Plaintiffs' Memo. at 7-10.) Indeed, an internal investigation by the Harvard Office of Institutional Research confirms the systematic discrimination against Asian American applicants. (Plaintiffs' Memo. at 11-15).

*Amici Curiae* and their constituents find it particularly disturbing that, in order to achieve the desired outcome while ostensibly applying the same admissions criteria to everyone, Harvard's admissions staff devalue Asian American applicants in the admissions process by assigning them a Personal rating—which is allegedly an assessment of character traits and human qualities—that is inexplicably on average significantly lower than the ratings given applicants of all other ethnic groups. (Plaintiffs' Memo. at 8.) This method of countering Asian American applicants' otherwise above-average admissions metrics allows Harvard to depress Asian American matriculation, but at the cost of reinforcing negative stereotypes about and insulting all Asian Americans.

*Amici Curiae* cannot accept the baseless claim that Asian Americans are deficient in character and human qualities compared to applicants from all other ethnic groups.[2] Significantly, Harvard alumni interviewers, who actually meet with the applicants (unlike the admissions staff), rate Asian American applicants on average as high as applicants of other ethnicities in terms of character and personal attributes.  (Plaintiffs' Memo. at 8, 30.)  That their assessment is the correct one is supported, not just by common sense, but by a study of 100,000 undergraduate applicants to UCLA over three years, which found, as one might expect, "essentially no correlation" between race and personal attributes.  Peter Arcidiacono, Thomas Espenshade, Stacy Hawkins & Richard Sander, *A Conversation on the Nature, Effects, and Future of Affirmative Action in Higher Education Admissions,* 17 U. Pa. J. Const. L. 683, 694-695 (2015), *located at* https://scholarship.law.upenn.edu/jcl/vol17/iss3/2 (lasted visited 7/27/2018).

Harvard admissions officers no doubt find the application of lower Personal ratings a highly-effective method to lower the overall score given otherwise high-scoring individual Asian American applicants in the admissions process, allowing them to maintain a "proper" racial balance.  However, because the Personal score supposedly reflects the personal attributes of the applicant, the use of it to devalue Asian American applicants promotes the idea that Asian Americans are inferior to and worth less than applicants of all other races, perpetuating negative stereotypes that have historically been used to justify discrimination against Asian Americans.

One hundred and sixty-four years ago, in *People v. Hall,* 4 Cal. 399, 404-05 (1854), the California Supreme Court invalidated the testimony of Chinese American witnesses to a murder, explaining that Chinese were "a distinct people … whose mendacity is proverbial; a race of people whom nature has marked as inferior, and who are incapable of progress or intellectual development beyond a certain point, as their history has shown; differing in language, opinions,

---

[2]    Only the top decile of Asian applicants are given a high "1" or "2" rating by Harvard admissions staff compared to the top seven deciles of Hispanic applicants and the top 8 deciles of black applicants.   (Plaintiffs' Memo. at 8-9.)    Are Hispanic and black applicants so overwhelmingly more interesting and personable than Asian applicants?

color, and physical conformation; between whom and ourselves nature has placed an impassable difference." It is absolutely outrageous that Harvard is today projecting a very similar sentiment through the method it uses to "balance" its student body.

## IV.   THE LONG HISTORY OF DISCRIMINATION AGAINST ASIAN AMERICANS IN THIS COUNTRY.

### A.   Persecution of Asian Americans Was the Norm Throughout Most of American History.

Asian Americans have been discriminated against in this country due to their race almost as long as there have been Asians in America. *See, e.g.,* Charles McClain, *In Search of Equality* (Univ. of Cal. Press 1994); Elmer Clarence Sandmeyer, *The Anti-Chinese Movement in California* (Univ. of Ill. Press 1991); Victor Low, *The Unimpressible Race* (East/West Publishing Co. 1982). Often forced into dangerous work that nobody else wanted and denied the opportunities open to other Americans, their treatment was so dismal it gave rise to the expression "a Chinaman's Chance," a term meaning, "Little or no chance at all; a completely hopeless prospect." The Free Dictionary, *found at* https://idioms.thefreedictionary.com/Chinaman%27s+chance (last visited July 20, 2018).[3]

Discrimination against Asian Americans was often supported by luminaries and "experts" of the times who proffered justifications based on the national interest or Asian's supposedly inferior personal qualities. The many court cases in which Asian Americans struggled for equal treatment provide a historical record that is tragic, outrageous and impossible to refute.

In *Ho Ah Kow v. Nunan,* 12 F. Cal. 252 (C.C.D. Cal. 1879) (No. 6,546), a district court invalidated San Francisco's infamous "Queue Ordinance" on equal protection grounds.

In *In re Ah Chong,* 2 F. 733 (C.C.D. Cal. 1880), the court found unconstitutional a law forbidding Chinese Americans from fishing in California waters.

---

[3]   "There have been several explanations about the origin of this odious phrase, all arising from Chinese immigrants working in the American West. One is that they were given the most dangerous jobs, such as setting and igniting explosives. Another is that judges and juries routinely convicted Chinese defendants on the flimsiest of evidence. A third is that Chinese miners were allowed to work gold claims only after others had taken the best ore." *Id.*

In *In re Tiburcio Parrott,* 1 F. 481 (C.C.D. Cal. 1880), the court declared unconstitutional a provision of California's 1879 constitution that forbade corporations and municipalities from hiring Chinese American workers.

In *Yick Wo v. Hopkins,* 118 U.S. 356 (1886), the Supreme Court ruled that Chinese were "persons" under the Fourteenth Amendment and could not be singled out for unequal burden under a San Francisco laundry licensing ordinance.

In *In re Lee Sing,* 43 F. 359 (C.C.D. Cal. 1890), the court found unconstitutional the "Bingham Ordinance," which had mandated residential segregation of Chinese Americans.

In *United States v. Wong Kim Ark,* 169 U.S. 649 (1898), the Supreme Court ruled that a Chinese American boy, born in San Francisco, could not be prevented by San Francisco officials from returning to the city from a trip abroad.

### B.    The History of Discrimination Against Asian Americans in Education.

After the 1776 Revolution, Americans quickly came to agree with Thomas Jefferson "that the future of the republic depended on an educated citizenry," and that universal public education should be provided to all citizens.  Johann N. Neem, *The Founding Fathers Made Our Schools Public. We Should Keep Them That Way,* The Washington Post, Aug. 20, 2017, *found at* https://www.washingtonpost.com/news/ made-by-history/wp/2017/08/20/early-america-had-school-choice-the-founders-rejected-it-/?utm_term=.815adf5587ba (last visited 7/27/2018).    Alas, the sentiment did not extend to Asian Americans. For most of the nation's history, they have faced formidable discrimination in education.  The discrimination began with outright exclusion, then tracked the evolution of the "separate but equal" doctrine as applied to education, and finally evolved into the racial balancing schemes such as the one at issue here.

In *Tape v. Hurley,* 66 Cal. 473, 6 P. 12 (1885), it took a court battle to force San Francisco public schools to admit a Chinese American girl who was denied entry because, as stated by the State Superintendent of Public Instruction, public schools were not open to "Mongolian" children.  *See McClain, supra,* at 137.  In response, the California legislature authorized "Chinese" schools to which Chinese American schoolchildren were restricted by law until well into the twentieth century.  *See Ho,* 147 F.3d at 864; *see also Kuo, supra,* at 207-208.

It is not widely known, but Asian American schoolchildren were among the first targets of the "separate-but-equal" doctrine created in *Plessy v. Ferguson,* 163 U.S. 537 (1896).  The Supreme Court created the *Plessy* doctrine in a case where a black passenger attempted to board a "white" railway car.  *Id.*  In *Wong Him v. Callahan,* 119 F. 381 (C.C.N.D. Cal. 1902), this doctrine was applied to schools, when a district court agreed that Chinese American children in San Francisco could be barred from "white" schools because the "Chinese" school in Chinatown was "separate but equal."

In *Gong Lum v. Rice,* 275 U.S. 78 (1927), the Supreme Court affirmed that the separate-but-equal doctrine applied to schools, finding that a nine-year-old Chinese American girl residing in Mississippi could be denied entry to the local "white" school because she was a member of the "yellow" race.  *Id.* at 87.

Recognizing this history, in *Lee v. Johnson,* 404 U.S. 1215, 1215-16 (1971), Supreme Court Justice Douglas wrote that: "Historically, California statutorily provided for the establishment of separate schools for children of Chinese ancestry.  That was the classic case of *de jure* segregation involved in *Brown v. Board of Education*….  *Brown v. Board of Education* [which abolished the separate-but-equal doctrine] was not written for blacks alone.  It rests on the Equal Protection Clause of the Fourteenth Amendment, one of the first beneficiaries of which were the Chinese people of San Francisco."  Harvard appears to either disagree with Justice Douglas' assessment or otherwise disregard it.

## C.     The Chinese Exclusion Act.

In 1882, in an extraordinary and shameful attack on equal protection, Congress passed the Chinese Exclusion Act, the first national law enacted to prevent an ethnic group from immigrating to the United States.  *See Chinese Immigration and the Chinese Exclusion Acts,* at https://history.state.gov/milestones/1866-1898/chinese-immigration (last visited 7/27/2018).  Fueled by anti-Chinese hysteria and supported by a broad spectrum of leaders and society of the time, it prohibited all entry of Chinese laborers.  *Id.*

As aptly described by opponent Republican Senator George Frisbie Hoar in 1882, this Act was "nothing less than the legalization of racial discrimination."  *Id.*

The Act was not repealed until 1943, during World War II, when China was an ally of the United States in the war against Japan.  *Id.*

### D.        Internment of Japanese American Families.

One of the most egregious modern infringements of the constitutional rights of Asian Americans occurred during World War II when, pursuant to presidential and military orders, entire families of Japanese Americans were removed from their West Coast homes and placed in internment camps.[4] Backed up by the statements of authorities and experts, who solemnly stated the measure was necessary, the internment of Americans on American soil was allowed by the United States Supreme Court.  *See Hirabayashi v. United States*, 320 U.S. 81 (1943).

Today, of course, it is universally acknowledged that there was no justification for this abrogation of the rights of American citizens.  *See Korematsu v. United States*, 584 F. Supp. 1406, 1420 (N.D. Cal. 1984); *Hirabayashi v. United States*, 828 F.2d 591 (9th Cir. 1987).  The 1980 Commission on Wartime Relocation and Internment of Civilians found that exclusion orders had been motivated by "racism" and "hysteria" and not "military necessity."  *See Korematsu*, 584 F. Supp at 1416. "[T]he government deliberately omitted relevant information and provided misleading information in papers before the court."  *Id.* at 1420.

The lesson taught, time and again, is that, in cases such as the one before it now, courts should be wary of the statements of luminaries and experts who line up to support a program of racial discrimination. Such proffered justifications for the infringement of individual rights have never stood the test of time.

---

        4        Executive Order No. 9066 was issued on February 19, 1942. It authorized the Secretary of War and certain military commanders "to prescribe military areas from which any persons may be excluded as protection against espionage and sabotage." Congress enacted § 97a of Title 18 of the United States Code, making it a crime for anyone to remain in restricted zones in violation of such orders. Military commanders then, under color of Executive Order No. 9066, issued proclamations excluding Japanese Americans from West Coast areas, and sending them to internment camps.  *See Korematsu v. United States*, 584 F. Supp. 1406, 1409 (N.D. Cal. 1984).

V. **THE *HO* CASE AND OTHER PRESENT-DAY BATTLES AGAINST DISCRIMINATION IN CALIFORNIA AND BEYOND.**

Use of race in education did not end with *Brown v. Board of Education.*  Today, schools at all levels use supposedly "benign" racial balancing or diversity programs to discriminate against Asian Americans.  The most striking example of such "good-intentioned" discrimination occurred in San Francisco—in the state where, ironically, much of the historical discrimination against Asian Americans had taken place.  Late in the supposedly enlightened 20th century, San Francisco's Chinese American schoolchildren were forced to turn to the courts in order to end the school district's policy of assigning them to the city's K-12 schools on the basis of their race. *See Ho v. San Francisco Unified Sch. Dist.,* 147 F.3d 854; *Ho,* 59 F. Supp. 2d 1021 (on remand).

Without any finding of a constitutional violation to remedy, pedagogical experts set up a racial balancing scheme with the goals of preventing "racial isolation" and providing "academic excellence."  *See Ho,* 965 F. Supp. at 1322; *see also Ho,* 147 F.3d at 859; *S.F. NAACP v. S.F. Unified Sch. Dist.*, 576 F. Supp. 34, 40-42, 58 (N.D. Cal. 1983).  The proponents ignored that the San Francisco school district was already one of the most ethnically diverse in the nation. "Caps" were imposed at each school on arbitrarily-defined racial groups, one of which was "Chinese."  *See id.; see also Ho,* 147 F.3d at 856-58.  The burden fell heaviest on students identified as "Chinese," who were most likely to be "capped out" at neighborhood schools or at magnet schools.  *See Levine, supra,* at 55-56.

After five years of vigorous litigation, the defendants were forced to agree to stop using race to assign students to schools.  *See Ho,* 59 F. Supp 2d at 1025 (approving settlement).

To prevent such discrimination from happening again, founding members of *amici* and their constituents worked to pass Proposition 209, a voter initiative that added language to the California Constitution prohibiting use of race in education.  Cal. Const. Art. I § 31(a).

The remedy secured in *Ho* and prohibition on use of race of Section 31 remain under attack by proponents of racial engineering.  In 2014, California's citizens of Asian descent were forced to mobilize to defeat California Senate Constitutional Amendment No. 5 ("SCA-5"), which would against have allowed use of race in public education.  *See* "California Senate Constitutional Amendment No. 5", Wikipedia, available at: <https://en.wikipedia.org/

wiki/Senate_Constitutional_Amendment_No.5> (last checked 7/27/2018).   The unexpected groundswell of opposition resulted in State Senator Ed Hernandez, the author of SCA-5, withdrawing the bill from consideration on March 17, 2014.  *Id.   See also* Kate Murphy, *California Affirmative Action Revival Bill Is Dead* (San Jose Mercury News, March 18, 2014) *at* http://www.mercurynews.com/education/ci_25361339/california-affirmative-action-challenge-is-dead? (last checked 7/27/2018). The slightest relaxing of vigilance, however, is likely to see this bill revived.  "'I'd like to bring it back,' Hernandez said.  'I believe in it.'"  *Id.*

**VI.       THE PRESENT AND FUTURE OF LEGALIZED DISCRIMINATION AGAINST ASIAN AMERICANS.**

**A.       Asian Americans as the "New Jews" in Higher Education.**

In an eerie historical parallel, Asian American applicants to Harvard and other elite colleges and universities today face the same formal and hidden quotas faced by Jewish Americans who applied to Harvard College and other Ivy League colleges during the first half of the 20th century.  Beginning in the 1920s, Harvard College and other prominent colleges and universities reacted to the perceived "over-representation" of Jews in their student bodies by setting up quotas for applicants of the Jewish faith that persisted through the 1950s.  *See* Evan P. Schultz, *Group Rights, American Jews, and the Failure of Group Libel Laws*, 66 Brook. L. Rev. 71, 111-12 (Spring 2000); Alan M. Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385-399 (1979); Nathan Glazer, *Diversity Dilemma*, The New Republic (June 22, 1998).  The result was that, "[i]n the 1930s, it was easier for a Jew to enter medical school in Mussolini's Italy than in Roosevelt's America."  Lawrence Siskind, *Racial Quotas Didn't Work in SF Schools,* op-ed, San Francisco Examiner (July 6, 1994), *found at* http://heather.cs.ucdavis.edu/pub/ AffirmativeAction/Siskind.html (last visited 7/29/2018).[5]

---

[5]    The arguments supporting the historical and modern-day racial balancing schemes are virtually identical. "President Lowell of Harvard called [the Jewish quota] a 'benign' cap, which would help the University get beyond race."  Jerry Kang, *Negative Action Against Asian Americans: The Internal Instability Of Dworkin's Defense Of Affirmative Action*, 31 Harv. C.R.-C.L. L. Rev. 1, 36 (Winter 1996). In the *Ho* case, proponents argued: "[T]he Chinese are the largest group at most of the best schools in the city.  They can't have it all.  If anything, I'd say lower the caps, don't raise them—otherwise we're

Quotas for Jewish students have since been eliminated, but similarly discriminatory admissions programs have been implemented with Asian Americans as the disfavored group. Many researchers have determined that Asian American applicants apply with the highest academic credentials of any identified ethnic group to most top American universities, but meet with by far the lowest acceptance rates, strongly suggesting the existence of *de facto* quotas for Asian American applicants.  *See* Jason P. Riley, *The New Jews of Harvard Admissions* (*Wall Street Journal*, May 19, 2015); Daniel Golden, *The Price of Admission: How America's Ruling Class Buys Its Way into Elite Colleges—and Who Gets Left Outside*, Chapter 7: The New Jews (Three Rivers Press, 2007); Ron Unz, *The Myth of American Meritocracy: How Corrupt are Ivy League Admissions?,* pgs. 14-51 (The American Conservative, Dec. 2012), *at* http://www.theamericanconservative.com/articles/the-myth-of-american-meritocracy/ (last checked 7/27/2018).  Examining admissions data from three elite public and four elite private colleges, Princeton researchers found that Asian American applicants have 67% lower odds of admission than white applicants with comparable test scores.  *See* Thomas J. Espenshade and Alexandra Walton Radford, *No Longer Separate, Not Yet Equal: Race and Class in Elite College Admission and Campus Life* (Princeton University Press, 2009).

The discrimination against Asian American applicants is widespread. According to a 2016 survey conducted by Inside Higher Education, 42% of admissions officers from private colleges and 39% of admissions officers from public colleges said that some colleges held Asian

---

headed back to segregated schools, only all Chinese instead of all white."  Selana Dong, *"Too Many Asians": Challenge of Fighting Discrimination Against Asian-Americans and Preserving Affirmative Action*, 47 Stan. L. Rev. 1027, 1057 n.36 (May 1995) (citation omitted) (quoting Lulann McGriff, former president of San Francisco NAACP); *see also* Levine, *supra*, at 138 (observing that to some, "the *Ho* case is about how much is 'enough' for one racial or ethnic group").  And, today, the same arguments are used to justify turning away Asian American individuals from the nation's universities.  *See* Glazer, *supra*; Dong, *supra*, at 1057, nn.4-5; Leo Rennert, *President Embraces Minority Programs*, Sacramento Bee (Metro Final) at A1 (April 7, 1995) (reporting that former President Clinton said that without race-based admissions "there are universities in California that could fill their entire freshman classes with nothing but Asian Americans").  "Today's 'damned curve raisers' are Asian Americans …."  Kang, *supra*, at 47 n.189 (cites and internal quotation marks omitted).  Again, mandated "diversity" is seen as the answer. *See* Pat K. Chew, *Asian Americans: The "Reticent" Minority and Their Paradoxes*, 36 Wm. & Mary L. Rev. 1, 61-64 (Oct. 1994) (university quotas limit Asian American enrollment).

RANDAZZA | LEGAL GROUP

American applicants to higher standards, and 30% and 41%, respectively, indicated that was true of their college.   Scott Jaschik, *Pressure to Build the Class: 2016 Survey of Admissions Directors,* Inside Higher Education, September 22, 2016, *found at* https://www.insidehighered. com/news/survey/pressure-build-class-2016-survey-admissions-directors (last visited 7/30/2018) (results from 339 admissions directors or equivalent, responding in complete anonymity).

As history shows, artificial attempts to mandate a racially balanced student body invariably require discrimination based on race.  *See* Dershowitz & Hanft, *supra*, at 399 ("Both then and now … such unlimited discretion makes it possible to target a specific religious or racial group—then for decrease, and now for increase …")  Thus, as the Supreme Court stated in *Adarand Constructors v. Pena*, 515 U.S. 200 (1995), there really can be no "benign" racial classifications.   "[A]ll governmental action based on race … should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed."  *Id.* at 227 (emphasis added).   The "rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the *individual*."  *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948) (emphasis added).

**B.     The Burden Of Harvard's "Handicapping" Falls Heaviest on Those Individuals Least Able to Bear It.**

The personal nature of the constitutional injury is particularly relevant here, because Harvard's admissions program, although obviously focused on maintaining a "balance" of ethnic "groups," always impacts individuals.   In fact, perversely, the burden imposed by Harvard "handicapping" Asian Americans falls heaviest on the most disadvantaged candidates identified by Harvard as Asian American.[6]  It can be no other way.

---

[6]   "A handicap race in horse racing is a race in which horses carry different weights, allocated by the handicapper," with the goal of equalizing chances of winning. *Handicap (Horse Racing)*, Wikipedia, *found at* https://en.wikipedia.org/wiki/Handicap_(horse _racing) (last checked 7/27/2018).  Leaving aside that horses are not protected by the Fourteenth Amendment, the situation at the race track is actually more equitable, because the horses are allocated weights based on prior individual performance in races, whereas at Harvard all Asian Americans are allocated the handicap.  (Plaintiffs' Memo. at 7-10.)

Thus, it would be a mistake to reason that because Asian American applicants on the average apply with higher average GPA's and test scores, that conditions are merely being "equalized" and no one is really being hurt. What actually happens is that the best prepared, typically more socioeconomically advantaged Asian American candidates may still gain entry to Harvard in spite of the ethnic handicap, but the more socioeconomically disadvantaged candidates now stand little or no chance at all. While discrimination against individuals on the basis of race is always wrong, it is particularly unfair to justify this unequal treatment by assuming that all Asian Americans are advantaged, superbly well prepared and somehow deserve to be handicapped *vis-a-vis* other candidates.

C.    **The Terrible Effect on the Dignity and Self Worth of Asian Americans Who Know They And Their Children Will Be Subjected To Unequal Treatment Because of Their Race.**

Discrimination against Asian Americans in education gives members of the Asian American community the unfortunate perception that they are not considered as valuable as individuals of other ethnic groups—and this harm extends much further than just the Asian American students who fail to get into Harvard. If skin deep diversity is the controlling virtue and determinant "achievement" in admissions, and being "diverse" in that way is an automatic positive, then the opposite is also true. If Asian American children are not "diverse" because they are Asian, then they are inferior based on their race.

As the Supreme Court warned, "it demeans the dignity and worth of a person to be judged by ancestry instead of his or her own merit and essential qualities." *Rice v. Cayetano,* 528 U.S. 495, 517 (2000). Classification by race, especially for purposes of scoring Asian American candidates as deficient in Personal characteristics, as happens at Harvard and certain other institutions, inevitably promotes feelings of "racial inferiority" and "racial hostility." *See Richmond v. Croson*, 488 U.S. 469, 493-94 (1989). Many of the members and constituents of *amici curiae* were forced to go through admissions processes where academic programs declared their Asian ethnicity less desirable because it was regarded as less "diverse." They do not wish for their children to be viewed as, or regard themselves as, inferior for the same unlawful reason.

In the San Francisco *Ho* case, the pernicious effects of racial classification on schoolchildren was evident to all. As stated by the parent of one "Chinese" youth turned away because of his ethnicity, "[h]e was depressed and angry that he was rejected because of his race. Can you imagine, as a parent, seeing your son's hopes denied in this way at the age of 14?" Julian Guthrie, *S.F. School Race-Bias Case Trial Starts Soon*, San Francisco Examiner, at C-2 (Feb. 14, 1999).

As Lee Cheng, Secretary of AALF, testified in a written statement for hearings held by the U.S. House of Representatives, Sub-Committee on the Constitution:

> Many Chinese American children have internalized their anger and pain, confused about why they are treated differently from their non-Chinese friends. Often they become ashamed of their ethnic heritage after concluding that their unfair denial is a form of punishment for doing something wrong.

Lee Cheng, *Group Preferences and the Law*, U.S. House of Representatives Sub-Committee on the Constitution Hearings (June 1, 1995), p. 241, *found at* http://www.archive.org/stream/ grouppreferences00unit/grouppreferences00unit_djvu.txt (last checked 7/27/2018).

With college admissions, the same byproducts of racial discrimination are evident in the Asian American community--even more so.  Mixed-race families have learned to try to hide the fact that one parent is Asian American, and college-admissions consultants openly tell their clients that being Asian American is today a liability in the admissions process and advise them on stratagems they can use in an attempt to mask their race:

> "Brian Taylor is director of Ivy Coach, a Manhattan company that advises families on how to get their students into elite colleges. A number of his clients are Asian American, and Taylor is frank about his strategy for them. 'While it is controversial, this is what we do,' he says. 'We will make them appear less Asian when they apply.'"
>
> . . .
>
> Chen founded Asian Advantage College Consulting 20 years ago in response to what he considers bias against top Asian students in elite college admissions. His firm, which is based in Alameda, Calif., also has clients on the East Coast, he says, including Boston. "The admissions officers are seeing a bunch of people who all look alike: high test scores, high grades, many play musical instruments and tend not to engage in more physical sports like football," Chen says.  If students come to him early in high school, Chen will direct them to "switch to

another musical instrument" or "play a sport a little bit out of their element." And for the college essay, don't write about your immigrant family, he tells them . . ."

Bella English, *To Get Into Elite Colleges, Some Advised To 'Appear Less Asian,'* The Boston Globe, June 1, 2015, *found at* https://www.bostonglobe.com/lifestyle/2015/06/01/ college-counselors-advise-some-asian-students-appear-less-asian/Ew7g4JiQMiqYNQ lIwqEIuO/story.html (last visited 7/30/2018).  The Princeton Review advises Asian students applying to selective colleges: "If you're given an option, don't attach a photograph to your application and don't answer the optional question about your ethnic background. This is especially important if you don't have an Asian-sounding surname.  (By the same token, if you do have an Asian-sounding surname but aren't Asian, do attach a photograph)."  Akane Otani, *Tips From the Princeton Review: Act Less Asian, Add Pics if You're Black,* Bloomberg, Nov. 21, 2014, *found at*  https://www.bloomberg. com/news/articles/2014-11-21/princeton-review-tells-asians-to-act-less-asian-and-black-students-to-attach-photos (last visited 7/29/2018).

Only Asian kids have to avoid being great violinists or pianists, or wanting to be doctors or scientists, for fear of appearing "too Asian."  Only they are told that it might be fatal to their chances to provide a photograph that shows their race.  This cannot be right, or moral.

Filled with despair because they have learned and know they will be judged by a different standard in the college admissions process, many aspiring Asian American students undertake overwhelming study loads, literally working themselves into ill health. They suffer high rates of anxiety and depression, and even increased suicide rates.  *See* George Oiao, *Why Are Asian American Kids Killing Themselves?* Plan A Magazine, Oct. 3, 2017, *found at https://planamag.com/why-are-asian-american-kids-killing-themselves-477a3f6ea3f2* (last visited 7/29/2018) ("Asian American college students are 1.6 times more likely than all others to make a serious suicide attempt."); Unz, Ron, *supra, The Myth of American Meritocracy*, at 21 ("[T]hese leading academic institutions have placed a rather strict upper limit on actual Asian enrollment, forcing these Asian students to compete more and more fiercely for a very restricted

number of openings…. When a far greater volume of applicants is squeezed into a pipeline of fixed size, the pressure can grow enormously.")

Many researchers have documented the pernicious effects that are felt throughout the Asian American community:

> The fear of self-identifying as Asian can affect one's racial/ethnic identity development and have an impact on one's mental health. Asians who did not possess a strong racial/ethnic identity rated lower scores on self-actualization and acceptance (Iwamoto & Liu, 2010), reported lower self-esteem (Tummala-Narra, Inman, & Ettigi, 2011), tended to have negative attitudes toward schooling, lower academic achievement (Lee, 2009), and could not manage race-related stress well (Yoo & Lee, 2005; Yip et al., 2008; Tummala-Narra et al., 2011). The denial of Asian heritage may also lead to the denial of Asian values, which may create cultural gaps and intergeneration conflict between the students and their parents (Ahn, Kim, & Park, 2009; Park, Kim, Chiang, & Ju, 2010). The psychological effects of this type of conflict include emotional distance between parents and children, interpersonal problems, lack of self-confidence and assertiveness, high suicidal risk, and anxiety and depression (Lee, Choe, Kim, & Ngo, 2000; Lowinger & Kwok, 2001; Kuroki & Tilley, 2012).

Yii-Chen (Jenny) Wu, *Admission Considerations in Higher Education Among Asian Americans,* American Psychological Association, *found at* http://www.apa.org/pi/oema/resources/ethnicity-health/asian-american/article-admission.aspx (last checked 7/29/2018).

The situation creates a vicious cycle for many Asian-American students: The higher the bar Harvard and other elite institutions raise for Asian-Americans, the more they have to study and excel, relative to other applicants, in order to have the same chance at admission. Therefore, Asian American students have to forego opportunities to pursue recreation and other extracurricular interests. This vicious cycle forces Asian American students into behavior closer to the negative stereotype that they are nothing but personality-less "nerds," making it easier for admissions officers to apply unfair stereotypes and deny them admission.

In the twenty-first century, American children simply should not need to feel disadvantaged by or ashamed of their ethnic heritage, and they certainly should not be disadvantaged in trying to get into school.

**VII.    HARVARD'S COVERT PROGRAM OF DISCRIMINATION SHOULD BE BROUGHT TO AN END.**

**A.    Hidden "Trade Secrets" Should Not Be Allowed to Justify Obvious Discrimination.**

Harvard has attempted to shroud the workings of its admissions process in secrecy, claiming that its practices are protected as trade secrets.  (Dkt. 422 at 12-17.)  While the argument is creative, Harvard's desperate efforts to mask its illegal admissions practices should be disregarded as a matter of public policy.  Other attempts to assert trade secret protection to conceal illegal acts have been condemned.  *See* Randall Fitzgerald, *The Hundred Year Lie,* p. 24 (Dutton, 2006) (trade secret protection asserted to conceal presence of dangerous chemicals in products); Peter S. Menell, *Tailoring a Public Policy Exception to Trade Secret Protection*, Cal. L. Rev., Vol 105, Iss. 1, at 6 (Feb. 1, 2017), *found at* https://scholarship.law.berkeley.edu/cgi/viewcontent.cgi?article=4346&context=californialawreview (last visited 7/29/2018) (tobacco companies' use of trade secret law in attempts to stifle revelations they lied to government).  Even if Harvard's admissions data and information could meet the technical definition of a protectable trade secret, when the commercial interest at stake implicates a violation of fundamental constitutional rights, the lesser commercial rights should not be upheld as a matter of public policy.

The discriminatory outcomes caused by Harvard's admissions policies are an undisputed matter of record.  It is beyond reasonable dispute that anything other than the unlawful use of race can be behind the observed results, or that the results are as Harvard planned and intended.  Unless Harvard is willing to let the light of day shine fully on its procedures and practices, so that the public can determine for itself what happens behind closed doors, Harvard's hidden "trade secrets" should, at least, not be allowed to provide a defense for conduct that classifies applicants by race in order to achieve an unconstitutional goal.

**B.    Harvard Did Not Even Try to Use Race-Neutral Alternatives to Achieve Its View of Diversity.**

As Supreme Court jurisprudence teaches, even where racial diversity is a lawful goal, the use of race to achieve that goal is allowed only where race-neutral alternatives have first been

explored.  "[S]trict scrutiny imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice."  *Fisher v. Univ. of Tex.*, 570 U.S. 297, 133 S. Ct. 2411, 2420 (2013).

Tellingly, Harvard did not even consider alternatives to its use of race until this case was filed, if even then.  (Plaintiffs' Memo. at 42-44.)  This failure is especially outrageous given that Harvard is one of the wealthiest colleges in the world.  With its reputation, resources and large pools of qualified applicants for each of its classes, as well as the capability easily to reach out and interest thousands of additional qualified candidates, Harvard should be able to do what less well-endowed institutions have done. *See Race-Neutral Alternatives in Postsecondary Education: Innovative Approaches to Diversity, U.S. Department of Education Office for Civil Rights,* March 2003, *found at* https://www2.ed.gov/about/offices/list/ocr/edlite-raceneutralreport.html (visited 7/29/2018).  Harvard could have met permissible diversity goals without resorting to racial discrimination.  Instead, largely for expedience, it chose to use race in the first instance rather than as a last resort, and in a manner that degrades all Asian Americans.

## VIII.  CONCLUSION.

The evidence is conclusive that Harvard classifies applicants by race to achieve its view of proper ethnic balances in its student body.  It is also clear that such racial discrimination severely disadvantages individual Asian American applicants in the admissions process, while stigmatizing and causing harm to the Asian American community.

Harvard may have benign or even benevolent motives for its admissions policies, but the end result is still forbidden racial engineering. Over 60 years ago, in *Brown v. Board of Education*, 347 U.S. 483, the Supreme Court recognized the inherent injury to individuals when schools assigned students on the basis of race and found that it was unlawful, whatever the stated purpose.  That same reasoning should apply here today, to bring a halt to this pervasive and blatant discrimination.

For the above reasons, the Court should grant summary judgment to Plaintiff.

Dated: July 30, 2018.                    Respectfully submitted,

                                         /s/ Marc J. Randazza
                                         Marc J. Randazza (BBO# 651477)
                                         Randazza Legal Group, PLLC
                                         P.O. Box 5516
                                         Gloucester, Massachusetts 01930
                                         Tel: (702) 420-2001
                                         Email: ecf@randazza.com

                                         Lee C. Cheng (*pro hac vice pending*)
                                         Asian American Legal Foundation
                                         11 Malta Street
                                         San Francisco, CA 94131
                                         Tel: (510) 238-9610
                                         Fax: (510) 473-0603
                                         leechcheng@gmail.com

                                         Counsel for Asian American Legal Foundation

                                         Gordon M. Fauth, Jr. (*pro hac vice pending*)
                                         Litigation Law Group
                                         1801 Clement Avenue, Suite 101
                                         Alameda, CA 94501
                                         Tel: (510) 238-9610
                                         Fax: (510) 473-0603
                                         gmf@classlitigation.com

                                         Counsel for Amici Curiae Asian American Legal
                                         Foundation and Asian American Coalition for
                                         Education

Civil Action No. 1:14-cv-14176-ADB

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on July 31, 2018.

/s/ Marc J. Randazza
Marc J. Randazza