# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS
# BOSTON DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| Plaintiff, | Civil Action No. 1:14-cv-14176-ADB |
| v. | |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | |
| Defendant. | |

# HARVARD'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR
# <u>SUMMARY JUDGMENT ON ALL REMAINING COUNTS</u>

## <u>TABLE OF CONTENTS</u>

ARGUMENT .......................................................................................................................1

I.    SFFA LACKS STANDING ................................................................................................1

II.   HARVARD DOES NOT DISCRIMINATE AGAINST ASIAN-AMERICAN APPLICANTS .................4

      A.    There Is No Documentary Or Testimonial Evidence Of Discrimination ...............4

            1.    SFFA's reliance on the OIR documents is unavailing ...............................4

            2.    SFFA's reference to statistical trends is erroneous ...................................7

      B.    There Is No Statistical Evidence Of Discrimination .................................................8

III.  HARVARD DOES NOT ENGAGE IN RACIAL BALANCING .....................................................12

IV.   HARVARD CONSIDERS RACE IN THE MANNER PERMITTED BY SUPREME COURT
      PRECEDENT .................................................................................................................17

V.    HARVARD COULD NOT ACHIEVE ITS EDUCATIONAL OBJECTIVES WITHOUT
      CONSIDERING RACE .....................................................................................................22

CONCLUSION ................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Postal Workers Union v. Frank*, 968 F.2d 1373 (1st Cir. 1992) ....................................2

*Cavalier ex rel. Cavalier v. Caddo Parish School Board*, 403 F.3d 246 (5th Cir. 2005) ....................................................................................................................................13

*Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016) ...........................17, 18, 21, 22, 24

*Gill v. Whitford*, 138 S. Ct. 1916 (2018)..........................................................................................2

*Gratz v. Bollinger*, 539 U.S. 244 (2003)....................................................................................3, 21

*Grutter v. Bollinger*, 539 U.S. 306 (2003).......................................................3, 13, 14, 19, 20, 21

*Harrington v. Aggregate Industries Northeast Region*, 668 F.3d 25 (1st Cir. 2012) ....................7

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ..........................2

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................................................................1, 2

*Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007) ....................................................................................................................12, 13

*Perrea v. Cincinnati Public Schools*, 709 F. Supp. 2d 628 (S.D. Ohio 2010).............................13

*Purkett v. Elem*, 514 U.S. 765 (1995) ..........................................................................................6, 7

*Refuse & Environmental Systems, Inc. v. Industrial Services of America*, 120 F.R.D. 8 (D. Mass. 1988).........................................................................................................4

*Regents of the University of California v. Bakke*, 438 U.S. 265 (1978) .......................................14

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018)........................................................................................2

*Washington Legal Foundation v. Leavitt*, 477 F. Supp. 2d 202 (D.D.C. 2007) .............................4

## RULES

Fed. R. Civ. P. 23(a)(4)......................................................................................................................4

SFFA's opposition brief is laden with invective, mischaracterizations, and in some cases outright misrepresentations of the record, but its overcharged rhetoric fails to compensate for the lack of evidence supporting SFFA's claims.  Harvard's admissions practices are entirely consistent with the law and necessary to build the diverse community critical to the success of its students.  No reasonable factfinder could conclude that Harvard intentionally discriminates against Asian-American applicants, engages in racial balancing, considers race in a manner beyond what the Supreme Court has permitted, or could achieve its educational objectives without considering race.  And SFFA's last-minute attempts to salvage its standing highlight why it has never been a proper plaintiff.  The Court should enter summary judgment for Harvard.

## ARGUMENT

## I.   SFFA LACKS STANDING

There are two independent reasons why SFFA lacks standing to pursue this action.  First, SFFA is not a genuine membership organization that can sue on behalf of its members; rather, it is a litigation vehicle designed to advance the ideological objectives of its founder, Edward Blum.  Second, none of SFFA's "standing members" would have standing themselves to bring this case.  SFFA's recent filing illustrates even more clearly the deficiency of its theory of standing and demonstrates that this Court lacks subject-matter jurisdiction.

SFFA tries to circumvent these concerns by arguing (at 7) that this Court should simply "confirm that the Article III issue has been resolved and it is not a matter for trial."  That is wishful thinking.  The Court's ruling on Harvard's motion to dismiss did not "definitively resolve[] the issue of Article III standing" for all time, as SFFA argues; it resolved only whether SFFA could proceed past the pleading stage.  As the plaintiff, SFFA bears the burden of showing the elements of standing, and because those elements "are not mere pleading requirements but rather an indispensable part of [its] case, each element must be supported in the same way as any

other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *see also, e.g.*, *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018). Where, as here, discovery makes clear that a plaintiff does not have standing, the defendant is entitled to summary judgment even if the plaintiff's allegations sufficed at the pleading stage. *See Lujan*, 504 U.S. at 561. And in any event, courts at all stages have an independent duty to assure themselves of jurisdiction. *E.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2415-2416 (2018).[1]

SFFA's latest filing shows why it is so keen to avoid judicial scrutiny of its standing. SFFA concedes that most of its prior standing members do not have a redressable injury because they are no longer eligible to transfer. *See* Pltf.'s Resp. to Deft.'s Statement of Undisputed Material Facts (Dkt. 452), Resps. to ¶¶ 260-265. It quibbles (at 6-7) with Harvard's arguments about the testimony of the only two prior standing members who could arguably have retained their eligibility to transfer. But even if (as SFFA unpersuasively argues) those students were willing to transfer at the time of their depositions, that was more than a year ago, when they had not begun their studies elsewhere. It is even less plausible now that either would seek to transfer, and SFFA adduces no evidence to that effect. Mere conclusory allegations are not sufficient to meet SFFA's burden to establish standing.

---

[1]  SFFA tries to flip the burden of proof by characterizing the question as one of mootness, not standing. That is incorrect. SFFA's standing to maintain this litigation depends on its having (at all times) members who have suffered cognizable injuries that would be redressed by a judgment in its favor. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (association can have standing only if members would "have standing … in their own right"); *Lujan*, 504 U.S. at 561 (standing requires injury that would "be redressed by a favorable decision" (internal quotation marks omitted)); *see also American Postal Workers Union v. Frank*, 968 F.2d 1373, 1376-1377 (1st Cir. 1992). An individual who no longer has the desire or ability to transfer could not have his or her asserted injury redressed by the forward-looking relief that SFFA seeks.

In an effort to paper over those fatal deficiencies, SFFA tacks on boilerplate declarations from an additional seven standing members, none of whom Harvard has had the opportunity to depose, and six of whom joined SFFA only in June 2018—presumably after SFFA realized its standing was in jeopardy in light of Harvard's summary-judgment brief.  Connolly Exs. 277, 278, 280, 281, 282, 283.  Before either party sought summary judgment, in response to Harvard's inquiry whether SFFA had any changes to its roster of standing members, SFFA represented that it did not.  Yet now, SFFA not only seeks to rely on these seven new individuals; it has refused even to identify in response to Harvard's request whether these seven are the *only* new standing members.  The result is that Harvard knows next to nothing about the individuals whose claims are supposedly being litigated.  It has not had the opportunity to test whether the new standing members would genuinely seek to transfer if SFFA were to prevail. And for all Harvard knows, SFFA may show up on the first day of trial and announce a whole new set of never-before-identified standing members.

SFFA's approach appears designed to evade the framework of Rule 23, which might have allowed a plaintiff to sue for injunctive relief on behalf of a putative class, as in *Grutter v. Bollinger*, 539 U.S. 306 (2003), and *Gratz v. Bollinger*, 539 U.S. 244 (2003).  A class action would have allowed the parties and the Court to handle this case in an ordered way, with well-defined processes for identifying the class and ensuring the propriety of class treatment.  Instead, Mr. Blum founded an organization that is no more than a mailing list and sued purportedly on behalf of its members, even though those members exercise no control over the organization.[2]

---

[2]      In a footnote (at 4 n.2), SFFA suggests that its standing members "communicate with [its] leadership and have the ability to provide substantive input," and that "SFFA communicates regularly with its members."  But SFFA, having resisted Harvard's attempts to test the extent of such communications or elicit such information during depositions, *see, e.g.*, Ellsworth Ex. 163 at 40:7-14, 63:20-64:4; Ex. 164 at 13:16-14:2, 24:7-20, 114:13-19; Ex. 165 at 36:17-21, 47:15-

*Cf. Washington Legal Found. v. Leavitt*, 477 F. Supp. 2d 202 (D.D.C. 2007) (similar association lacked standing).  And it is now clear why Mr. Blum chose that course:  Given the amicus briefs demonstrating support for Harvard's use of race-conscious admissions among members of the Asian-American community, including current Harvard students (Dkts. 440-1, 455-1), he could not credibly have argued that a class action plaintiff would "fairly and adequately protect the interests of" Asian-American applicants, Fed. R. Civ. P. 23(a)(4).

SFFA has been on notice since it filed this suit that Harvard would hold it to its burden of establishing standing, *see* Tr. of Apr. 30, 2015 Status Conference (Dkt. 43) at 21:12-22:14, and SFFA has time and again tried to evade that burden.  Now that the problems wrought by SFFA's strategy have become too clear to ignore, the Court should rule that SFFA lacks standing.

## II.  HARVARD DOES NOT DISCRIMINATE AGAINST ASIAN-AMERICAN APPLICANTS

### A.  There Is No Documentary Or Testimonial Evidence Of Discrimination

There is no direct evidence in this case—either documentary or testimonial—that forty members of Harvard's Admissions Office engaged in a systemic effort to limit the number of Asian Americans at Harvard.  It is simply implausible that such a wide-ranging scheme could have existed without a single document or a single piece of testimony attesting to it.  SFFA's arguments all try—and fail—to close that yawning gap in its case.

#### 1.    SFFA's reliance on the OIR documents is unavailing

SFFA persists in arguing that Harvard's response to the limited and incomplete analyses prepared by several employees in the Office of Institutional Research (OIR) shows an intent to

---

48:16; Ex. 160 at 218:6-14; Ex. 162 at 24:16-25:3; Ex. 161 at 64:5-19, can hardly rely on information that it prevented Harvard from testing in discovery.  *See, e.g.*, *Refuse & Envtl. Sys., Inc. v. Indus. Servs. of Am.*, 120 F.R.D. 8, 12 (D. Mass. 1988) ("Defendants may not shield from inquiry during the pretrial phase … communications on the ground of privilege, then pull these communications out of the hat shortly before or during the trial, as a part of their defense.").

discriminate.  But the OIR analyses neither inquired whether Harvard was discriminating against Asian-American applicants nor reached any conclusion that it was.  *See* Mem. in Support of Def.'s Mot. for S.J. (Dkt. 418) ("Harvard SJ Mem.") 38; Def.'s Mem. in Opp. to Pltf.'s Mot. for S.J. (Dkt. 435) ("Harvard SJ Opp.") 19-23.  And OIR lacked far too much information—as the analysts themselves realized—to draw reliable conclusions about the admissions process.  *Id.*

SFFA claims that Harvard's characterization of how certain officials reacted to the OIR documents is itself proof of intentional discrimination, deriding it as "implausible and contradictory."  That argument is both factually and legally incorrect.

SFFA misstates the facts in numerous ways.  SFFA initially claims (at 10-11) that Harvard officials who saw the OIR documents did not criticize or question them at the time.  The record shows the opposite; Dean Fitzsimmons testified that when he saw OIR's analyses, he "explained to" the OIR analysts the "incomplete" nature of their work.  Connolly Ex. 9 at 402:22-403:5.  Dean Khurana did not see the analyses until long after they were created, under circumstances in which it would have made little sense for him to criticize or question them.  He was shown them upon becoming Dean of Harvard College, *see* Connolly Ex. 13 at 253:21-254:4, merely as an example of the work OIR had conducted with respect to Harvard College, *see* Connolly Ex. 162, and did not believe they were addressing a question of bias in the admissions process.  Ellsworth Ex. 159 at 259:15-21.

SFFA next accuses Harvard (at 9-12) of relying in other contexts on OIR documents that, like the documents SFFA invokes here, were labeled "preliminary."  But it is not just the fact that the OIR analyses in question were *labeled* "preliminary" that demonstrates the incompleteness of those analyses; the documents on their face make plain that they reflected only a limited understanding of the admissions process—a point confirmed by testimony from the

analysts who worked on them.[3]  SFFA makes no attempt to show, nor could it, that the other

analyses it points to had similar limitations.  The facial disclaimers in the admissions-related OIR

documents also explain why Dean Fitzsimmons and Dean Khurana were able to perceive the

shortcomings of OIR's analysis without any "further inquiry," Opp. 11.

SFFA is also incorrect to suggest (at 11) that Dean Fitzsimmons fully embraced parts of

OIR's admissions analysis even as he supposedly disregarded the part concerning race.  For the

proposition that the Dean "found OIR's work" on low-income applicants "to be trustworthy and

reliable," SFFA relies not on any statement from Dean Fitzsimmons, but rather on an exchange

between then-OIR Director Erin Driver-Linn and a member of Harvard's Public Affairs and

Communications office.  Opp. 11 (citing Pltf.'s Statement of Undisputed Material Facts (Dkt.

414) ("SFFA SJ SMF") ¶ 483).  But that exchange shows (Connolly Ex. 163), and SFFA

acknowledges, that "OIR … had not yet shared its full analysis with Dean Fitzsimmons."  SFFA

SJ SMF ¶ 484.  When the Dean saw the actual OIR analysis, he recognized it had "limitations."

*See* Connolly Ex. 9 at 426:18-427:9.

SFFA's legal argument is equally misguided.  SFFA cites cases (at 9-10) saying that if a

decisionmaker offers an implausible or unsupported justification for an allegedly discriminatory

action, the weakness of the asserted justification can show the intent to discriminate.  *See, e.g.*,

*Purkett v. Elem*, 514 U.S. 765, 767-768 (1995) (addressing prosecutor's asserted race-neutral

---

[3]     *See, e.g.*, Connolly Ex. 145 at HARV00065753-54 ("Conclusions" and "Possible
Explanations" left blank); *id.* at HARV00065757 (listing admissions factors missing from the
OIR models); Connolly Ex. 134 at HARV00031718 ("The following analysis is **preliminary**
and for discussion."); *id.* at HARV00031722 (listing "factors that quantitative data is likely to
miss or ratings do not capture"); Connolly Ex. 112 at HARV00023548 (noting limitations of the
data sources); *id.* at HARV00023549 (describing "several limitations" of OIR's approach); *id.*
("Our analysis should not be considered exhaustive."); Ellsworth Ex. 23 at 196:8-10 (testimony
of Erin Driver-Linn); Ellsworth Ex. 116 at 137:20-138:21 (testimony of Mark Hansen).

explanation for striking a juror); *Harrington v. Aggregate Indus.-Ne. Region, Inc.*, 668 F.3d 25, 32-33 (1st Cir. 2012) (addressing employer's asserted "facially legitimate, nonretaliatory reason for discharging the" plaintiff). But Harvard's explanation for how the OIR documents were handled is *not* its justification for the admissions outcomes of Asian-American candidates; indeed, Harvard's point is that the OIR documents shed little light on that question.[4] SFFA's cases are therefore inapposite.

### 2.    SFFA's reference to statistical trends is erroneous

SFFA also suggests (at 13) that Harvard must have discriminated by comparing the proportion of Asian-American students in the Class of 2011 and the Class of 2018, and then claiming the share of Asian-American admitted students rose for the Classes of 2019 through 2022, after this suit was filed. But in citing figures for the Classes of 2011 and 2018, SFFA obscures the fact that over the period of years spanned by those two Classes, the proportion of Asian-American admitted students fluctuated considerably, between 17.5% for the Class of 2013 and 20.5% for the Class of 2016—a swing of more than 17%. Connolly Ex. 231. The Class of 2016 figure is also almost identical to the first post-lawsuit figure for the Class of 2019 (21.0%)—fatally undermining SFFA's theory that Harvard changed course upon being sued.[5] And the growth in the proportion of Asian-American admitted students in recent years continues

---

[4]    SFFA briefly points (at 12) to what it calls "documentary and testimonial evidence of intentional discrimination"—scattered summary sheets and correspondence. But that evidence does not come close to showing intentional discrimination, *see* Harvard SJ Opp. 23-27, which explains why SFFA discusses it so halfheartedly.

[5]    SFFA also errs in arguing (at 13 n.4) that Harvard supposedly manipulated the proportion of Asian-American admitted students during the Department of Education investigation in the late 1980s (which found no discrimination). The proportion of Asian-American students rose from 13.3% in the Class of 1992 (admitted in 1988, when the investigation began) to 17.9% in the Class of 1994 (admitted in 1990, when it ended). Connolly Ex. 231. But that also reflected a growth trajectory that had begun long before any investigation—from 3.4% in the Class of 1980, to 7.5% in the Class of 1984, to 9.1% in the Class of 1988. *Id.* During the same time, the Asian-American proportion of the *applicant pool* grew sharply. *Id.*

a long upward trend, which is similar to trends for African-American and Hispanic students.  *See*

Ellsworth Ex. 62.  Those trends do not show discrimination; they show the success of Harvard's

laudable efforts, including recruiting and financial aid, to build the learning community it values.

###### B.   There Is No Statistical Evidence Of Discrimination

Given the absence of documentary or testimonial evidence that could allow its intentional

discrimination claim to survive summary judgment, SFFA must rest instead on the analysis

submitted by its statistical expert, Dr. Arcidiacono.  But Dr. Arcidiacono's analysis is far too

unreliable to allow SFFA's claim to proceed to trial.  SFFA's attempt to distract from the flaws

of Dr. Arcidiacono's analysis by attacking Dr. Card cannot remedy those flaws.

First, SFFA argues (at 15) that Dr. Card had "no justification" for including in his model

a group the experts refer to as ALDC applicants—"'recruited athletes, applicants whose parent or

parents attended Harvard or Radcliffe as an undergraduate, applicants whose names appeared on

a 'Dean's interest' or 'Director's interest' list, and children of Harvard faculty and staff.'"  SFFA

argues that those applicants should be excluded because they are "not similarly situated to the

rest of the pool," in the sense that they are admitted at higher rates than other applicants.  That is

fundamentally incorrect.  Applicants who fall into those groups may have a greater likelihood of

admission relative to otherwise similar applicants outside the groups—but, as Dr. Arcidiacono

conceded, so do other kinds of applicants whom he did not exclude.  *See* Ellsworth Ex. 166 at

96:24-99:18.  The correct way to account for the effect on an applicant's likelihood of admission

of falling within one of the ALDC categories is to *control* for that fact (as Dr. Card does), not to

exclude all applicants in those categories (as Dr. Arcidiacono does).  *See* Harvard SJ Opp. 7-8.

Dr. Arcidiacono's decision to exclude ALDC applicants—but not applicants who possess

other characteristics that increase their likelihood of admission—is transparently directed toward

finding a negative effect of Asian-American ethnicity.  For ALDC applicants, both experts agree,

Asian-American ethnicity has if anything a *positive* effect on the likelihood of admission, so excluding ALDC applicants from the analysis causes Dr. Arcidiacono's estimate of the effect of Asian-American ethnicity to become more negative.  *See* Ellsworth Ex. 35 at 69; Ellsworth Ex. 37 ¶ 98, ¶ 105 & Card Ex. 13; Harvard SJ Opp. 7.  In effect, Dr. Arcidiacono was able to achieve the result he desired by purposefully omitting from his analysis subsets of the applicant pool in which Asian-American applicants perform especially well.

SFFA also fails to grapple with the fact that—even if one credits Dr. Arcidiacono's flawed methodological choices—his model *still* would not support an inference of intentional discrimination based on race, absent some explanation of why that discrimination would be manifested only among a subset of Asian-American applicants (*i.e.*, non-ALDC applicants). Neither SFFA nor Dr. Arcidiacono tries to explain that pattern.  SFFA instead argues (at 15) that it is unsurprising "[t]hat Harvard would treat the small number of Asian Americans who qualify for this special treatment [as ALDC applicants] better than those who are not fortunate enough to be legacies or athletes."  But that misses the point.  The pattern SFFA needs to explain is not that Asian-American applicants in an ALDC category are admitted at a higher rate than Asian-American applicants who are not in those categories; that is unsurprising, since ALDC applicants generally have a higher rate of admission than non-ALDC applicants.  Rather, the finding SFFA cannot explain is that—according to both experts—Asian-American ALDC applicants are treated at least as well as White ALDC applicants.  *See* Ellsworth Ex. 35 at 69; Ellsworth Ex. 37 ¶ 98. SFFA also ignores that Dr. Card took what Dr. Arcidiacono acknowledged was an alternative approach to dealing with the possibility that the effect of ALDC attributes might vary by race: He included interactions between race and the ALDC variables.  *See* Ellsworth Ex. 37 ¶ 99. When he did so, his results were materially unchanged.  *See id.*; *id.* ¶ 107 & Card Ex. 14.

Second, SFFA attacks (at 16-18) Dr. Card's inclusion of the personal rating, on the flawed theory that the rating reflects bias against Asian-American applicants.  SFFA bases that argument largely on Dr. Arcidiacono's finding of a statistical association between Asian-American ethnicity and lower personal ratings.  But there is no basis to infer that that association reflects bias, rather than merely the effects of unobserved non-academic factors.  *See* Harvard SJ Mem. 42-44; Harvard SJ Opp. 10-15.  In modeling the academic and extracurricular ratings, for example, Dr. Arcidiacono found a statistical association between Asian-American ethnicity and higher ratings—but he attributed that effect not to pro-Asian bias but to unobserved factors.  There is no reason that correct interpretation should not also be attributed to his personal-rating regression.  *See* Harvard SJ Mem. 43-44; Harvard SJ Opp. 11-12.[6]

SFFA tries (at 17) to justify Dr. Arcidiacono's inconsistent interpretations by arguing that "'Asian-American applicants have observed characteristics associated with higher personal ratings.'"  As a result, SFFA argues, one can assume that Asian-American applicants are also stronger than White applicants in *unobserved* characteristics associated with higher personal ratings—and thus, it argues, Dr. Arcidiacono's finding cannot be explained by unobserved factors.  But SFFA's premise is faulty:  As Dr. Card explains, the applications submitted by Asian-American applicants were slightly *weaker* than those of White applicants across observed non-academic measures of the sort that inform the personal rating.  *See* Ellsworth Ex. 37 ¶ 46.

The data make that clear in several ways.  First, Dr. Card showed that Asian-American applicants were slightly less strong than White applicants, on average, across the full range of

---

[6]      SFFA misunderstands Harvard's argument about Dr. Arcidiacono's attempts to model the academic, extracurricular, and personal ratings.  According to SFFA (at 16), "Harvard claims that Professor Arcidiacono's attack on the personal rating is flawed because it would necessarily mean that there is 'bias *in favor* of Asian-Americans in academic and extracurricular ratings[.]'"  But Harvard's actual point, as discussed above, is that *none* of the ratings reflects bias.

non-academic factors included in the model—even when he excluded any effect of the personal rating or of ALDC attributes. *Id.* ¶ 53 & Card Ex. 8. Second, Dr. Arcidiacono's own model of the personal rating shows that, as non-academic factors are added to the model, the estimated negative effect of Asian-American ethnicity shrinks—suggesting that, if the model were able to control fully for non-academic factors, the supposed bias would disappear. *Id.* ¶ 46; Ellsworth Ex. 33 ¶ 148. Third, Dr. Card showed Asian-American applicants received lower ratings than White applicants, in aggregate, from alumni interviewers and from admissions officers assessing the recommendation letters submitted by teachers and guidance counselors. *See* Ellsworth Ex. 37 ¶ 48 & Card Exs. 4, 5. That information is fundamental to the personal rating. *Id.* ¶ 49.

Finally, SFFA attacks Dr. Card (at 18-19) for his choice to model the admissions process on a year-by-year basis. Again, SFFA is disregarding core statistical concepts. SFFA first argues (at 18) that Dr. Arcidiacono's model "captures any year-to-year variations in the competitiveness of the applicant pool" because it "control[s] for [the] application cycle." But that half-measure does not solve the problem with Dr. Arcidiacono's approach, because controlling for the year does not fully capture year-to-year variations in the process; it still makes the implausible assumption that the effect of each factor in the admissions process is the same from year to year (for example, that Harvard values certain intended concentrations equally from year to year). *See* Ellsworth Ex. 33 ¶¶ 104-105 (explaining the flaw in that assumption); *see also* Ellsworth Ex. 37 ¶ 84 (explaining that Dr. Arcidiacono's selective use of interaction terms does not solve the problem). SFFA also wrongly argues (at 18-19) that pooling allows Dr. Arcidiacono's model to have greater statistical precision. Dr. Card's approach—averaging the results of his year-by-year models across all six years—actually achieves greater precision than Dr. Arcidiacono's. *See* Ellsworth Ex. 37 ¶¶ 81-82.

In sum, SFFA's attacks on Dr. Card cannot rescue Dr. Arcidiacono's flawed analysis. SFFA lacks evidence sufficient to proceed to trial on its intentional discrimination claim.

## III.   HARVARD DOES NOT ENGAGE IN RACIAL BALANCING

SFFA also fails to show how a reasonable factfinder could rule in favor of its racial balancing claim.  There is no evidence—documentary, testimonial, or statistical—that Harvard seeks any particular racial composition of its admitted class.

1.      SFFA's argument is replete with blatantly false statements—(1) that "Harvard concedes that it sets racial targets and engineers its process … to ensure that it hits those targets," Opp. 19; (2) that Director McGrath "confessed that Harvard intentionally shapes its class in the very way the Supreme Court and the First Circuit have condemned as illegal," *id.* at 21; and (3) that Dean Fitzsimmons "testified that Harvard sets racial targets and never misses them," *id.*  For the first accusation, SFFA cites only its own brief; for the latter two, SFFA cites nothing.

The reason SFFA cites no evidence is that it has none.  There is no evidence that even a single employee of the Admissions Office, let alone anyone serving on the 40-person Admissions Committee over many years, sought to admit a class with any preordained racial composition.  *See* Harvard SJ Opp. 30-34.  To the contrary, the record shows beyond dispute that the Admissions Committee has no racial targets.  Director McGrath, for example, testified that the Admissions Office seeks broad racial diversity and is "not ever looking for a particular number or percentage."  Ellsworth Ex. 98 at 240:18-19; *see also id.* 252:4-10.  The only targets that exist are overall targets for the number of admitted students—an uncontroversial practice necessary given the set number of beds on campus.  *See* Harvard SJ Opp. 32.

SFFA insists (at 20) that it need not prove the Admissions Committee "aims for a precise numerical target for each racial group."  In the cases on which SFFA relies, the racial goals at issue were defined as numerical ranges.  *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist.*

*No. 1*, 551 U.S. 701, 726 (2007); *Cavalier ex rel. Cavalier v. Caddo Par. Sch. Bd.*, 403 F.3d 246, 248 (5th Cir. 2005); *see also Perrea v. Cincinnati Pub. Sch.*, 709 F. Supp. 2d 628, 635 (S.D. Ohio 2010). But they were still numerical goals, which required race to be considered in a formulaic, outcome-determinative way, rather than the "flexible, nonmechanical way" used by Harvard in accordance with Supreme Court precedent, *Grutter*, 539 U.S. at 334.

SFFA has supplied not a shred of evidence that Harvard sets racial targets, or even targeted ranges. Dean Fitzsimmons and Director McGrath consider information regarding the composition of the tentatively admitted class—in many dimensions, not just race, *see* Harvard SJ Opp. 33—for various purposes. One is to estimate the overall proportion of admitted students who are likely to accept their offers of admission, since students from different groups tend to accept their offers at different rates. *See id.* at 32. Another is to see whether there has been "a dramatic dropoff" from the prior year's representation of any group. Connolly Ex. 16 at 269:11-270:4. If there is "a dramatic change, not corresponding to a dramatic change in the number of applicants" from that group, Dean Fitzsimmons or Director McGrath might "raise the question of whether" the Committee was "giving good, careful consideration to those candidates from that group that seemed to be doing less well." *Id.* at 240:6-19; *see also* Ellsworth Ex. 98 at 201:19-202:6; Ellsworth Ex. 120 at 313:5-6. That is entirely proper. Under no circumstances does the Committee aim to achieve "a particular number or percentage" of students from the group in question. Ellsworth Ex. 98 at 240:18-19.

The Supreme Court has recognized that "'[s]ome attention to numbers' … does not transform a flexible admissions system into a rigid quota." *Grutter*, 539 U.S. at 336. Indeed, the Court observed—quoting the Harvard admissions plan appended to Justice Powell's opinion in *Bakke*—that "there is of course 'some relationship between numbers and achieving the benefits

to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted.'" *Id.* (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 323 (1978) (opinion of Powell, J.)).  That is why the *Grutter* Court was untroubled by the University of Michigan Law School's practice of consulting reports that kept "track of the racial and ethnic composition of the class" on a daily basis, *id.*—far more frequently than the leaders of the Harvard Admissions Office consult "one pagers," *see* Harvard SJ Mem. 19 n.13.[7] Their periodic consultation of statistics—in an effort to seek broad diversity through an individualized admissions process that considers race flexibly as one among many factors—is exactly the kind of "'attention to numbers'" that *Grutter* approved, 539 U.S. at 336.

The *Grutter* Court also noted that the year-to-year variation in the racial composition of the law school's enrolled classes was "inconsistent with a quota."  539 U.S. at 336.  Again, the same is true here:  The racial composition of Harvard's admitted classes fluctuated meaningfully over 19 years.  Ellsworth Ex. 33 ¶¶ 193-194 & Card Ex. 31-34.  SFFA's own expert admitted that the data showed "changes in the fraction of admitted students by race/ethnicity over time" and never suggested those changes were statistically insignificant.  Ellsworth Ex. 35 at 58. SFFA responds (at 21) that "the admitted share of each minority racial group was stable" across "the six years for which SFFA received database information."  But SFFA's statistics contradict

---

[7]      SFFA argues (at 19 n.8) that unlike in *Grutter*—where "the Law School's admissions officers testified without contradiction that they never gave race any more or less weight based on the information contained in [the daily] reports," 539 U.S. at 336—Dean Fitzsimmons and Director McGrath use the one-pagers "extensively to give race more weight in order to achieve the desired racial balance."  Continuing a pattern, the only source SFFA cites for that accusation is its own Rule 56.1 statement, SFFA SJ SMF ¶¶ 246-255.  But the assertions in that statement— even if taken at face value, *contra* Harvard's Response to SFFA's Local Rule 56.1 Statement (Dkt. 437)—reflect only Harvard's flexible, nonmechanical consideration.  They do not suggest that Dean Fitzsimmons or Director McGrath—let alone the 40-member Admissions Committee as a whole—uses the one-pagers to "give race more weight" or seek a "desired racial balance" for the admitted class.

its claim.  For example, SFFA notes that "the admitted share of Hispanics was always between 8.8% and 11.6%"—neglecting to acknowledge that that is a difference of *more than 30%.*

2.      SFFA then turns (at 21-25) to the only theory of racial balancing its expert did attempt to support—namely that, during a particular three-year period, Harvard supposedly sought to equalize the admission rate of African-American applicants, as defined by a particular method for categorizing applicants by race (IPEDS), with the overall admission rate.  SFFA has as little evidence to support that theory as one would expect given its implausibility.

The foundation of SFFA's flawed theory is the argument, offered by Dr. Arcidiacono, that there is only a 0.2% probability that the observed alignment of admission rates occurred by chance.  SFFA argues (at 22) that, rather than "disput[ing] Professor Arcidiacono's findings," Harvard "throws out various theories for why this was all due 'simply to chance.'"  To the contrary, Harvard very much "dispute[s] Professor Arcidiacono's findings," as the likelihood that the alignment of admission rates occurred by chance is far greater than 0.2%.

As Dr. Card explains, the problem with Dr. Arcidiacono's analysis is that it focuses on the likelihood of observing an alignment for a *particular* racial group, using a *particular* definition of racial categories, in a *particular* three-year period.  *See* Ellsworth Ex. 37 ¶ 160. Given the divergence between Dr. Arcidiacono's bizarre theory of racial balancing and the one in SFFA's complaint (Dkt. 1 ¶¶ 288-304), it is clear Dr. Arcidiacono's theory arose when he went hunting in search of any pattern that could arguably support SFFA's claims.  But given the many places he could have looked, the likelihood of finding a statistical alignment in any one of those places considerably exceeds 0.2%.  For example, even focusing solely on rates of offers of admission, Dr. Arcidiacono could have looked for an alignment over any three-year stretch, for any racial group, by any definition of racial categories—and there are 92 such opportunities to

find the type of pattern he observes, radically increasing the odds of finding it by chance.  *See* Ellsworth Ex. 37 ¶ 161.  Thus, there is no statistical basis to conclude that the pattern Dr. Arcidiacono observed reflects deliberate manipulation as opposed to happenstance.  *Id.*

SFFA responds (at 23) that the "92 opportunities" Dr. Card considers are not "equally likely."  For example, SFFA says, there is no reason to think Harvard would adopt a "floor" in the admission rate for White applicants.  That argument by no means negates the point, however, because the 92 opportunities Dr. Card discusses are but a small fraction of the actual number of places in which Dr. Arcidiacono could have looked to find a supposedly suspicious pattern.  As Dr. Arcidiacono recognizes, if Harvard were manipulating its process by race, it might not seek to equalize the admission rate for applicants of a given race with the overall admission rate.  It might instead, more straightforwardly, seek to admit a minimum number of students of that race, or a minimum proportion of students of that race, or any of many other possibilities.  *See* Ellsworth Ex. 35 at 56; Ellsworth Ex. 37 ¶ 159.  Any such pattern would be far more probative evidence of racial balancing, yet Dr. Arcidiacono finds none.

SFFA's other supposed evidence of racial balancing (at 22-24) fares no better.  That evidence—including Dean Fitzsimmons's expression of concerns about the soundness of the IPEDS methodology, and the inclusion of IPEDS statistics on the reports he periodically received—comes nowhere close to showing racial balancing.  Moreover, SFFA's account of it is inaccurate.  Most notably, SFFA is incorrect in arguing (at 23) that "Harvard relaxed its standards for admitting single-race African Americans beginning with the 2017 admissions cycle."  Dr. Arcidiacono made that argument in his rebuttal report, Ellsworth Ex. 35 at 59-61, but as Dr. Card explained, Dr. Arcidiacono's analysis reflected "a critical calculation error … that,

when corrected, reverses his key finding." Ellsworth Ex. 37 ¶ 164; *see also id.* ¶¶ 165-166.

Indeed, Dr. Arcidiacono conceded that his calculation had been erroneous. Dkt. 415, Ex. C.[8]

SFFA's theory ultimately makes no sense. If Harvard were interested in manipulating its admissions process to achieve a particular racial balance, why would it focus on the admission *rate* of applicants of a particular group, as opposed to—for example—the number or proportion of students of that group? Why would it focus on a particular (narrow) definition of a racial category that is used for mandated federal reporting, rather than the definition used to report the racial composition of the class to the Harvard community and the public (and for that matter used by Dr. Arcidiacono in the balance of his analyses)? And why, if this nefarious manipulation actually took place, would there be not a single document evincing it and not one witness testifying about it? SFFA has no answer to any of those questions. Given the lack of evidentiary support—or logic—for its theory, SFFA's racial balancing claim cannot survive.

## IV.   HARVARD CONSIDERS RACE IN THE MANNER PERMITTED BY SUPREME COURT PRECEDENT

1.     SFFA's opposition reprises (at 26) its argument that "Harvard is not pursuing the only conception of 'student body diversity' the Supreme Court has ever endorsed—enrolling a 'critical mass' of underrepresented minority students." But as Harvard has explained (Harvard SJ Opp. 35-36), the Supreme Court rejected that argument when it was proffered to contend that the University of Texas's admissions practices were unlawful because the university had not sufficiently defined "the level of minority enrollment that would constitute a 'critical mass.'" *Fisher v. Univ. of Tex. at Austin* (*Fisher II*), 136 S. Ct. 2198, 2210 (2016). The Court explained

---

[8]     Trying to limit his concession, Dr. Arcidiacono argued the effects he found "remain[ed] significant … at an 8.4% significance level and … at a 9.3% significance level." Dkt. 415, Ex. C. But that is not the conventional threshold of statistical significance, or the one Dr. Arcidiacono used throughout his reports, Ellsworth Ex. 166 at 305:16-306:3. Dr. Arcidiacono was able to characterize the effects as statistically significant only by moving the goalposts.

that "the compelling interest that justifies consideration of race in college admissions is not an interest in enrolling a certain number of minority students," but rather an interest in "obtaining the educational benefits that flow from student body diversity." *Id.* (internal quotation marks omitted).  The Court thus repudiated SFFA's view that universities must define their objectives in terms of critical mass.

Harvard is pursuing exactly the objective the Supreme Court has validated.  For decades Harvard has articulated the importance of diversity of all kinds, including racial diversity, to the educational experience of its students.  *See* Harvard SJ Mem. 7-9.  And it recently reaffirmed those educational judgments in a report produced by a committee of Harvard faculty members and unanimously endorsed by the Faculty of Arts and Sciences.  *See id.* at 8-9 & n.7.  That is the sort of "reasoned, principled" explanation for seeking diversity that the Supreme Court has held is entitled to "deference."  *Fisher II*, 136 S. Ct. at 2208 (internal quotation marks omitted).  Moreover, the faculty report articulates exactly the sorts of objectives the Supreme Court deemed sufficiently "concrete and precise" in *Fisher II*.  *See id.* at 2211 ("the destruction of stereotypes," the "promotion of cross-racial understanding," "the preparation of a student body for an increasingly diverse workforce and society," and the "cultivation of a set of leaders with legitimacy in the eyes of the citizenry" were all "concrete and precise goals" (some internal quotation marks and alterations omitted)).

SFFA accuses Harvard of having "adopt[ed] an institutional position that the use of race *always* will be necessary."  Opp. 27 (emphasis SFFA's).  That is directly contrary to the record.  The only source SFFA cites for its assertion is its own summary-judgment brief (at 40).  That brief, in turn, cites SFFA's Rule 56.1 statement (SFFA SJ SMF ¶ 830), which in turn cites the following passage from Dean Fitzsimmons's deposition:

[Q.]     Four years ago, could you imagine evidence that would change your mind as to whether or not Harvard should stop using race in the admissions process?

…

A.       You know, I think—again, I think a reasonable person or reasonable institution would always keep an open mind about anything.  I mean, new information comes in but despite massive efforts that people would reasonably call race-neutral efforts to make a difference, there's still no case in our minds that, despite all the things that we've done that we could achieve our goal of having a diverse class and an effective educational experience without using race.

Connolly Ex. 9 at 178:21-179:11.  Contrary to SFFA's erroneous characterization, the actual quotation shows Dean Fitzsimmons said that he had an "open mind" and that "new information" could "come[] in," but that he did not think at that time that Harvard could achieve its objectives without considering race.  On the basis of that answer, SFFA manages to accuse Harvard of "adopting an institutional position that the use of race will *always* be necessary"—ignoring the explicit recommendation by Harvard's own Committee to Study Race-Neutral Alternatives in Harvard College Admissions that Harvard reevaluate the need to consider race in five years, Ellsworth Ex. 47 at HARV00097328, a fact that SFFA relegates to a footnote (at 27 n.10).

SFFA next accuses Harvard (at 27-28) of adopting "irreconcilable positions" on the use of race.  How could it be, SFFA asks with mock incredulity, that Harvard (1) considers race only in a flexible and individualized way, without pursuing any numerical quota; but (2) pays enough "attention to numbers" to seek a broadly diverse class, and believes "a significant decline in African-American and Hispanic enrollment" would inhibit its educational goals?  The answer, as SFFA knows, is that Harvard is doing exactly what the Supreme Court has said universities may and must do if they consider race in admissions.  Universities may consider race only "flexibly as a 'plus' factor in the context of individualized consideration of each and every applicant," and must not "establish quotas for members of certain racial groups," *Grutter*, 539 U.S. at 334—but

"[s]ome attention to numbers, without more, does not transform a flexible admissions system into a rigid quota," *id.* at 336 (internal quotation marks omitted).

2.      SFFA next argues (at 28-31) that, "[e]ven if Harvard were pursuing a permissible end," its consideration of race would still be unlawful because race has too great an effect on admissions outcomes.  SFFA's argument is again inconsistent with Supreme Court precedent.

The parties have thoroughly explored what the data do and do not show about the effect of race in the admissions process.  It is clear that race alone explains little about the overall pattern of admissions outcomes, and that race has virtually no effect on most applicants' likelihood of admission.  *See, e.g.*, Ellsworth Ex. 33 ¶¶ 177-181; Ellsworth Ex. 35 at 49-51; Ellsworth Ex. 37 ¶¶ 137-146.  It is also true that for certain applicants—namely, African-American and Hispanic candidates who would be highly competitive regardless whether race were considered—the consideration of race does increase the likelihood of admission.  *See* Ellsworth Ex. 33 ¶¶ 180-181 & Card Ex. 28; Ellsworth Ex. 37 ¶ 143 & Card Ex. 23.  But that is little different from the effect of other meaningful factors in Harvard's admissions process, like academic, extracurricular, or personal strength.  *See* Ellsworth Ex. 37 ¶ 143 & Card Ex. 23.  And, for several reasons, it does not run afoul of Supreme Court precedent.

First, even if statistical modeling estimates that race has a substantial marginal effect on the likelihood of admission for otherwise highly competitive candidates, *see id.*, that does not mean race dictates whether any such candidate is admitted.  Even if an otherwise highly competitive applicant's likelihood of admission is estimated to rise materially as a result of the consideration of race, such an applicant might very well have been admitted without consideration of race, and might very well be denied admission notwithstanding the consideration of race.  As the Supreme Court held in *Grutter*, the fact that consideration of race

may tip the balance from denial to admission for some candidates is itself not problematic; after all, "the same could be said of the Harvard plan discussed approvingly by Justice Powell in *Bakke*, and indeed of any plan that uses race as one of many factors." 539 U.S. at 339.

Second, and relatedly, race is just one of many factors that may tip a highly competitive candidate over the line from denial to admission. *See* Ellsworth Ex. 37 ¶¶ 143-146. That would also be true, for example, of an excellent academic or extracurricular rating. *Id.* ¶ 143 & Card Ex. 23. SFFA finds that comparison problematic (Opp. 30-31), but it is hard to see why. Harvard regards diversity of all forms as central to its educational objectives, just as it regards academic excellence and a vibrant extracurricular community as central to its educational objectives. As long as the consideration of race does not overwhelm other factors, and still allows the applicant to be "evaluated as an individual," it does not "make[] an applicant's race or ethnicity the defining feature of his or her application," *Grutter*, 539 U.S. at 337.[9]

Finally, if the consideration of race did not meaningfully affect the admission chances of highly competitive candidates, it would have little effect on the diversity of the admitted class—in which case SFFA would surely argue that the consideration of race would fail strict scrutiny because it did not advance Harvard's educational objectives. In *Fisher II*, for example, the plaintiff argued "that considering race was not necessary because" it "had only a 'minimal

---

[9]     SFFA argues (at 28-29) that "[t]he relative size of the preference" for applicants of certain racial groups "was one of the chief reasons the University of Michigan's point-based system" for undergraduate admissions was held unconstitutional in *Gratz v. Bollinger*, 539 U.S. 244 (2003). That argument misstates the law. In *Gratz*, the deficiency in the admissions program centered on the fact that the preference given on the basis of race was inflexible and automatic. *See id.* at 270 (20 points were given for race "to every single 'underrepresented minority' applicant"); *id.* at 271 (the program did not provide "individualized consideration" because it "automatically distribute[d] 20 points to every single applicant from an 'underrepresented minority' group"). Here, by contrast, Harvard considers race only flexibly and in an individualized manner. *See* Harvard SJ Mem. 21-25.

impact in advancing the University's compelling interest'"—and that was in a case where the consideration of race had increased Hispanic representation by 54% among the first-year students admitted via "holistic review," and increased African-American representation in the same group by 94%.  136 S. Ct. at 2212 (some internal quotation marks and alterations omitted). The Supreme Court rightly rejected the argument, explaining that "[t]hose increases … show[ed] that consideration of race ha[d] had a meaningful, if still limited, effect on the diversity of the University's freshman class."  *Id.*  The same is true here.

## V.   HARVARD COULD NOT ACHIEVE ITS EDUCATIONAL OBJECTIVES WITHOUT CONSIDERING RACE

SFFA has noticeably little to say about the conclusions of Harvard's Committee to Study Race-Neutral Alternatives in Harvard College Admissions.  After seven months of careful study, the Committee concluded that, at present, no combination of race-neutral measures could advance Harvard's interest in obtaining the educational benefits that flow from a student body that is diverse in many ways and excellent in many dimensions.  Unable to mount a serious challenge to those judgments, SFFA resorts to collateral challenges, all of which are meritless.

First, SFFA charges (at 31) that "Harvard admits that it did not begin to consider race-neutral alternatives until 2017."  That is incorrect several times over.  As an initial matter, Harvard has long pursued diversity through many strategies other than the consideration of race. *See* Harvard SJ Mem. 26-27.  It has adopted a nation-leading financial aid policy to ensure that a lack of funds does not keep any student from attending Harvard.  It makes tremendous efforts to recruit a diverse applicant pool.  Admissions officers give particular consideration to lower-income applicants and those in the first generation of their families to attend college.  Once a diverse group of students has been admitted, Harvard makes extensive efforts to encourage them

to matriculate.  And Harvard regularly reviews its practices with an eye toward increasing

diversity; for example, it eliminated and then reinstated Early Action for that reason.  *Id.* at 32.

If SFFA's claim is that Harvard did not begin a formal study of the effects of ending

race-conscious admissions until 2017, that, too, is inaccurate.  A university-wide committee

began such a review in 2014, shortly after the Supreme Court decided *Fisher I*, then paused its

work, reasonably, after SFFA brought this suit.  Harvard SJ Mem. 8; Harvard SJ Opp. 41-42.

That committee's work as to Harvard College was then resumed by two new committees,

beginning shortly thereafter.  Harvard SJ Mem. 8-10; Harvard SJ Opp. 42.

In any event, because this lawsuit seeks only forward-looking relief, it is irrelevant

whether Harvard formally considered race-neutral alternatives at some point in the past.  *See*

Harvard SJ Opp. 40-41.  What matters is that, to the extent Harvard had an obligation to convene

such a formal study before considering race in the future, it has complied.  SFFA (at 31) derides

the work of the three senior deans appointed to the committee, but its invective cannot refute the

rigor of the committee's work and does not constitute actual evidence, much less evidence

sufficient to withstand summary judgment.  The committee members spent many hours

discussing relevant materials before producing a thorough report.  *See* Harvard SJ Opp. 43.

Second, to the extent SFFA does contest the committee's findings (at 32-37), its

arguments are meritless.  Those findings have ample support, especially in the reports of Dr.

Card, which the committee considered and which SFFA's reports, also carefully considered by

the committee, did not rebut.

SFFA claims that the committee did not consider what would happen if, in addition to

eliminating the consideration of race, Harvard also did everything possible to promote diversity

in race-neutral ways.  That again reflects a misstatement of the record and ignores much of the

committee's report.  The committee made clear that certain combinations of race-neutral practices could allow Harvard to achieve a comparably diverse class, but that they would unacceptably compromise other attributes of the class that are also essential to fulfilling Harvard's mission.  *See generally* Ellsworth Ex. 47.

For example, the committee considered (among others) the three combinations of possible practices that SFFA calls (at 32-33) Kahlenberg Simulations 6 and 7 and Card Simulation 4x.  All three, however, would sharply reduce the proportion of admitted applicants who rate highly on attributes of excellence important to Harvard—in particular the proportion of applicants with the highest academic, extracurricular, personal, and athletic ratings.  Ellsworth Ex. 37 ¶¶ 192-197 & Card Ex. 26.  The committee explained why those changes would be inimical to Harvard's educational objectives.  *See* Ellsworth Ex. 47 at HARV00097323.

SFFA declares (at 33) that those changes in the proportion of students receiving a top academic rating "would be modest," and that "Harvard's 'reputation for academic excellence' would remain undiminished."  But SFFA provides no basis to contest the educational judgments of senior Harvard officials responsible for student academic achievement that Harvard's academic excellence would suffer if the proportion of the most academically exceptional students declined by 13-19%.  Those officials, not SFFA, are responsible for stewardship of one of the world's leading institutions of higher learning, and the Supreme Court has repeatedly stressed that universities cannot be forced "to choose between a diverse student body and a reputation for academic excellence."  *Fisher II*, 136 S. Ct. at 2213.

SFFA then devotes several pages (at 34-36) to practices it claims inhibit diversity.  SFFA contends that Harvard did not study the effects of eliminating those practices *in addition to* undertaking other race-neutral measures to pursue diversity.  That is incorrect.  In fact, Dr. Card

not only studied the effects of eliminating those practices as an independent step; he also examined what would happen if Harvard eliminated the practices *and* undertook various other race-neutral measures, and found that doing so would not allow Harvard to achieve a class that was comparable in diversity and excellence to Harvard's current classes.  That was the purpose of the "Simulation 4x" discussed above.  *See* Ellsworth Ex. 33 ¶¶ 233, 238; *see also* Ellsworth Ex. 47 at HARV00097322-324 (committee report referencing Dr. Card's analysis).

SFFA next argues (at 34-36) that the challenged practices do not actually advance asserted objectives other than the pursuit of diversity and educational excellence, such as the maintenance of a strong alumni community, and that, if they did, those other objectives would not justify the consideration of race.  But those issues are irrelevant here, because no race-neutral alternative practices—including the elimination of the challenged practices, combined with increased consideration for applicants of lower socioeconomic status—would allow Harvard to achieve comparable diversity without compromising the academic excellence of the class.  *See* Ellsworth Ex. 33 ¶ 243; Ellsworth Ex. 47 at HARV00097327.

Finally, SFFA asserts (at 36-37) that "Harvard could increase its recruiting efforts"; "increase its financial aid commitment"; take "geography into consideration by, for instance, using zip codes"; "admit more transfers from community colleges"; or "eliminate the preference for those applying early action."  SFFA points to nothing to suggest those measures would be workable or "would help increase student body diversity beyond current levels."  And SFFA's conclusory argument wholly fails to address the committee's contrary conclusions.

## CONCLUSION

For the reasons stated above, and in Harvard's memorandum in support of its summary judgment motion, the Court should grant summary judgment to Harvard on all remaining counts of the Complaint.

Respectfully submitted,

/s/ Seth P. Waxman
Seth P. Waxman (*pro hac vice*)
Paul R.Q. Wolfson (*pro hac vice*)
Daniel Winik (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 663-6800
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com
daniel.winik@wilmerhale.com

Debo P. Adegbile (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 295-6717
Fax: (212) 230-8888
debo.adegbile@wilmerhale.com

William F. Lee (BBO #291960)
Felicia H. Ellsworth (BBO #665232)
Andrew S. Dulberg (BBO #675405)
Elizabeth Mooney (BBO #679522)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com

Dated:  August 27, 2018

*Counsel for Defendant President and Fellows of Harvard College*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Seth P. Waxman
Seth P. Waxman
