# EXHIBIT 166

HIGHLY CONFIDENTIAL

Page 1

1           UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF MASSACHUSETTS
3  -------------------------------------
4  STUDENTS FOR FAIR ADMISSIONS, INC.,
5       Plaintiff,
6  vs.                                    CIVIL ACTION NO.:
7  PRESIDENT AND FELLOWS OF HARVARD       1:14-cv-14176-(ADB)
   COLLEGE (HARVARD CORPORATION)
8
        Defendants.
9  -------------------------------------
10
11
12   HIGHLY CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE
13                      ORDER
14  VIDEOTAPED DEPOSITION OF PETER SEBASTIAN ARCIDIACONO
15                  April 12, 2018
16                    8:29 a.m.
17        Parker Poe Adams & Bernstein, LLP
18       301 Fayetteville Street, Suite 1400
19              Raleigh, North Carolina
20
21
22
23
24  Reported by:  Audra M. Smith, RPR, FCRR
25  Videotaped:   John Roberts

HIGHLY CONFIDENTIAL

Page 96

1   Q.   And then there are a series of categories
2   for which there are tips, correct?
3   A.   That is correct.
4   Q.   And we can agree that the handbook is
5   explicitly using the concept of tips as you just
6   described it to me a few minutes ago, correct?
7   A.   Correct.
8   Q.   Now, the list includes, if we turn to the
9   next page, "Harvard and Radcliffe parentage."
10  Correct?
11  A.   Correct.
12  Q.   That would include legacies and lineage
13  applicants, correct?
14  A.   Correct.
15  Q.   It also includes athletic ability,
16  correct?
17  A.   Correct.
18  Q.   And that would include what you
19  characterize as the athletes, correct?
20  A.   Correct.
21  Q.   And both categories, you have excluded
22  from your baseline model?
23  A.   That is correct.
24  Q.   Now, let's look at the other tips.  Turn
25  back to page 1401.  Do you have it?  The handbook

Page 97

1 suggests that there's a tip for outstanding and
2 unusual intellectual ability?
3     A.   Correct.
4     Q.   Do you understand that to be true?
5         MR. STRAWBRIDGE: Object to the form of
6    the question.
7     A.   I understand that Harvard values those
8 with -- who have higher intellectual ability, yes.
9 BY MR. LEE:
10     Q.   Do you understand that Harvard gives a tip
11 to those folks?
12     A.   Well, a "tip," you know, of course they're
13 going to value having those with higher test
14 scores, those with higher accomplishments. There's
15 no question about that.
16     Q.   But you haven't eliminated them from your
17 baseline model, correct?
18     A.   Correct.
19     Q.   The next category, "Unusually Appealing
20 Personal Qualities."
21        Do you see that?
22     A.   Correct. Yes.
23     Q.   And it specifically refers to "An
24 applicant's unusual effervescence, charity,
25 maturity or strength of character in addition to

HIGHLY CONFIDENTIAL

Page 98

1     academic and extracurricular accomplishment."
2              Correct?
3        A.    Correct.
4        Q.    And the document says there's a tip for
5     that as well, correct?
6        A.    Correct.
7        Q.    And you haven't tried to eliminate -- you
8     even haven't tried to identify the people in your
9     pool who receive that tip, correct?
10             MR. STRAWBRIDGE:  Object to the form of
11         the question.
12       A.    Well, I guess I'm not sure what you mean
13    by that tip.  So do you mean the people that got a
14    1 on the personal rating as the people who got that
15    tip?
16   BY MR. LEE:
17       Q.    I think it's less important what I mean
18    and more important what you mean.
19       A.    I'm just trying to understand what you
20    mean.
21       Q.    If you don't understand, you should tell
22    me.  I asked you what the special procedures were
23    that you referred to in page 69 of your report; do
24    you remember that?
25       A.    Yes.

HIGHLY CONFIDENTIAL

Page 99

1   Q.  You told me that the procedure you could
2   identify is -- are the tips?
3       MR. STRAWBRIDGE:  Object to the form of
4       the question.
5   BY MR. LEE:
6   Q.  Remember that?
7   A.  What I told you was there were tips given
8   for these particular groups, yes.
9   Q.  And you agree with me that there are tips
10  given for other groups, correct?
11  A.  There are -- yes.
12  Q.  The document says in black and white there
13  are?
14  A.  Yes, correct.
15  Q.  And so you have eliminated from your
16  baseline model some of the categories or the groups
17  who received tips but not all, correct?
18  A.  That is correct.
19  Q.  And for the groups that you eliminated
20  from your baseline, you had said in your rebuttal
21  report at page 69, "Harvard doesn't discriminate
22  against Asian-Americans in those categories."
23      That's what you said, correct?
24  A.  Correct.
25  Q.  Okay.  Now, some of the other tips are for

HIGHLY CONFIDENTIAL

Page 305

1   African-Americans, correct?
2       A.   Correct.
3       Q.   And you weren't -- you opined that this
4   gap was significant for 2019, correct?
5       A.   Correct.
6       Q.   And for the period as a whole, correct?
7       A.   Correct.  And that's not what the errata
8   is referring to.
9       Q.   I understand.  I'm just trying to get down
10  the series of events that led to the errata.  All
11  right?
12           Now, in your rebuttal report, you defined
13  "significant" to be statistically significant at the
14  95 percent level, correct?
15      A.   For this table, yes.
16      Q.   All right.  And the 95 percent level is
17  the threshold level that you used throughout your
18  first two reports, correct?
19      A.   I mention the 90 percent level at various
20  times, but the primary one I used was the
21  95 percent level.
22      Q.   Fair enough.  You mentioned the 95 percent
23  confidence level on occasion?
24      A.   90 percent.
25      Q.   90 percent.  But 95 percent is the

Page 306

1    confidence level that you used throughout your
2    tables in your report, correct?
3        A.   For most of the tables, yes.
4        Q.   All right.  Now, in his rebuttal report,
5    Dr. Card suggested that you had made an error in
6    calculating the statistical significance in the
7    analysis of single-race African-American, correct?
8        A.   He's -- it's only for the last number.
9        Q.   Right.  And he pointed that out in his
10   rebuttal report at page 81, correct?
11       A.   I'd have to look up the page number, but
12   yes, he did point it out, so --
13       Q.   And he argued that you had miscalculated
14   the statistical significance of those differences,
15   correct?
16       A.   Of the double difference, yes.
17       Q.   Now, he didn't suggest that you were
18   trying to mislead anybody, did he?
19       A.   No.
20       Q.   He suggested there had been an error?
21       A.   Yes.
22       Q.   Okay.  Now, you then submitted an errata
23   to your report, correct?
24       A.   Correct.
25       Q.   And in your errata, which is Exhibit 5,

1   STATE OF NORTH CAROLINA )

2   COUNTY OF FORSYTH       )

3                REPORTER'S CERTIFICATE

4          I, Audra Smith, Registered Professional Reporter in

5   and for the above county and state, do hereby certify that the

6   deposition of the person hereinbefore named was taken before me

7   at the time and place hereinbefore set forth; that the witness

8   was by me first duly sworn to testify to the truth, the whole

9   truth and nothing but the truth; that thereupon the foregoing

10  questions were asked and the foregoing answers made by the

11  witness which were duly recorded by me by means of stenotype;

12  which is reduced to written form under my direction and

13  supervision, and that this is, to the best of my knowledge and

14  belief, a true and correct transcript.

15         I further certify that I am neither of counsel to

16  either party nor interested in the events of this case.

17         IN WITNESS WHEREOF, I have hereto set my hand

18  this 16th day of April 2018.

19  Audra Smith

20

21  *[signature: Audra Smith]*

22

23  Audra Smith, RPR, FCRR

24  Notary Number:  201329000033

25