**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PRESIDENT AND FELLOWS<br>OF HARVARD COLLEGE,<br><br>Defendant. | Civil Action No. 1:14-cv-14176-ADB |

***AMICUS CURIAE* BRIEF OF 531 SOCIAL SCIENTISTS AND SCHOLARS
ON COLLEGE ACCESS, ASIAN AMERICAN STUDIES, AND RACE
IN SUPPORT OF DEFENDANT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTEREST OF *AMICI CURIAE* ........................................................................................... 1

INTRODUCTION .................................................................................................................... 2

ARGUMENT ............................................................................................................................ 3

I.    Asian American Applicants Benefit from Harvard's Whole-Person Review Process ........... 4

    A.   Asian Americans Comprise an Extremely Diverse Population ........................................ 4

    B.   Harvard's Whole-Person Review in Admissions Takes Account of the
        Diverse Experiences and Qualities of Asian American Applicants ................................ 6

    C.   As a Group, Asian Americans Support Race-Conscious Admissions Policies ................ 9

II.   Research Shows That Plaintiff's Excessive Focus on Numerical Measures of
    Academic Success Is Unwarranted and Unwise .................................................................... 11

III.  Plaintiff Fails to Provide Any Evidence of Discrimination Against Asian
    Americans, Relying Instead on Myths of an "Asian Penalty," the "Model Minority"
    Stereotype, and Misleading Reports of "Personality" Ratings ............................................. 13

    A.   The Myth of an Asian Penalty ...................................................................................... 14

    B.   Plaintiff's Contention That Academic Metrics Should Matter Most in
        Choosing Among Academically Qualified Applicants Relies on and
        Reinforces Racial Stereotypes ...................................................................................... 15

    C.   Plaintiff Mischaracterizes the Role That Harvard's Personal Rating Plays in
        Whole-Person Review ................................................................................................... 19

CONCLUSION ......................................................................................................................... 20

APPENDIX:  List of *Amici Curiae*

## TABLE OF AUTHORITIES

### Cases

*Fisher v. Univ. of Tex. at Austin,*
    136 S. Ct. 2198 (2016)................................................................. 3, 11, 12, 13

*Gratz v. Bollinger,*
    539 U.S. 244 (2003)................................................................................ 3

*Grutter v. Bollinger,*
    539 U.S. 306 (2003)............................................................................. 3, 7

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007)............................................................................. 4, 18

*Regents of the Univ. of Calif. v. Bakke,*
    438 U.S. 265 (1978)........................................................................... 11, 13

### Other Authorities

AAPIData et al., *An Agenda for Justice:  Contours of Public Opinion Among Asian
    Americans* (2014)................................................................................. 10

AAPIData et al., *Inclusion, Not Exclusion:  Spring 2016 Asian American Voter Survey*
    (2016)................................................................................................. 10

Brian P. An, *The Relations Between Race, Family Characteristics, and Where Students
    Apply to College*, 39 Soc. Sci. Res. 310 (2010).......................................... 19

Asian Am. Ctr. for Advancing Justice, *A Community of Contrasts:  Asian Americans in
    the United States:  2011*........................................................................ 4, 5

Michael N. Bastedo et al., *Information Dashboards and Selective College Admissions:
    A Field Experiment* (Oct. 9, 2017), http://www-personal.umich.edu/~bastedo/papers/
    ASHE2017.paper.pdf............................................................................. 9

Michael N. Bastedo et al., *What Are We Talking About When We Talk About Holistic
    Review?  Selective College Admissions and Its Effects on Low-SES Students*,
    89 J. Higher Educ. 782 (2018)............................................................... 8

Ronald Brownstein, *White People Are Skeptical About the Value of a College Degree*,
    Atlantic (Nov. 7, 2013).......................................................................... 18

Mitchell J. Chang et al., *Beyond Myths: The Growth and Diversity of Asian American
    College Freshman, 1971-2005* (2007)...................................................... 19

Muzaffar Chishti & Stephen Yale-Loehr, Migration Policy Inst., *The Immigration Act of
    1990: Unfinished Business a Quarter-Century Later* (2016) ........................... 17

College Board, *2017 SAT Suite of Assessments Annual Report, Total Group* (2017)........... 11, 12

Greg J. Duncan & Richard J. Murnane, *Growing Income Inequality Threatens American
    Education*, Kappan Mag., Mar. 2014 ...................................................... 12

FairTest, More Than 1000 Accredited Colleges and Universities That Do Not Use
ACT/SAT Scores to Admit Substantial Numbers of Students into Bachelor-Degree
Programs, https://www.fairtest.org/university/optional ........................................................ 12

Anemona Hartocollis, *Harvard Rated Asian-American Applicants Lower on Personality
Traits, Suit Says*, N.Y. Times (June 16, 2018) ...................................................... 19

Harvard College, Admissions Statistics,
https://college.harvard.edu/admissions/admissions-statistics .................................................. 14

Harvard College, Mission, Vision, and History,
https://college.harvard.edu/about/mission-and-vision ............................................................ 7

Madeline Y. Hsu & Ellen D. Wu, *"Smoke and Mirrors": Conditional Inclusion, Model
Minorities, and the Pre-1965 Dismantling of Asian Exclusion*, J. Am. Ethnic Hist.,
Summer 2015 ............................................................................................................................ 16

Jane Junn, *From Coolie to Model Minority: U.S. Immigration Policy and the
Construction of Racial Identity*, 4 Du Bois Rev. 355 (2007) ............................................... 16

Rakesh Kochhar & Anthony Cilluffo, Pew Research Ctr., *Key Findings on the Rise in
Income Inequality Within America's Racial and Ethnic Groups* (2018) ................................. 5

Jennifer Lee, *From Undesirable to Marriageable: Hyper-Selectivity and the Racial
Mobility of Asian Americans*, Annals Am. Acad. Pol. & Soc. Sci., Nov. 2015 .................... 17

Stacey J. Lee, *Behind the Model-Minority Stereotype:  Voices of High- and Low-
Achieving Asian American Students*, 25 Anthropology & Educ. Q. 413 (1994) ................... 15

Jennifer Lee & Min Zhou, *From Unassimilable to Exceptional: The Rise of Asian
Americans and "Stereotype Promise,"* 16 New Diversities, no. 1, 2014 ............................. 16

Pei-te Lien et al., *The Politics of Asian Americans: Diversity and Community* (2004) .............. 10

Arun Peter Lobo & Joseph J. Salvo, *Changing U.S. Immigration Law and the
Occupational Selectivity of Asian Immigrants*, 32 Int'l Migration Rev. 737 (1998) ........... 16

Krista Mattern et al., ACT, Inc., *ACT Composite Score by Family Income* (2016) .............. 11, 12

Samuel D. Museus & Peter N. Kiang, *Deconstructing the Model Minority Myth and How
It Contributes to the Invisible Minority Reality in Higher Education Research*,
New Directions for Institutional Research, Summer 2009 .................................................. 15

Rema Nagarajan, *Only 10% of Students Have Access to Higher Education in Country*,
Times of India (Jan. 5, 2014) ................................................................................................ 17

Nat'l Asian Am. Survey, *Where Do Asian Americans Stand on Affirmative Action?*
(June 24, 2013) ..................................................................................................................... 10

Nat'l Comm'n on Asian Am. & Pac. Islander Research in Educ., *Federal Higher
Education Policy Priorities and the Asian American and Pacific Islander Community*
(2010) ..................................................................................................................................... 5

Nat'l Comm'n on Asian Am. & Pac. Islander Research in Educ., *The Relevance of Asian
Americans and Pacific Islanders in the College Completion Agenda* (2011) .................... 5, 6

Yoon K. Pak et al., *Asian Americans in Higher Education: Charting New Realities* (2014)....................................................................................................... 15

Julie J. Park, *Race on Campus: Debunking Myths with Data* (forthcoming Oct. 2018) ............. 20

Jerry Z. Park et al., *Exceptional Outgroup Stereotypes and White Racial Inequality Attitudes Toward Asian Americans*, 78 Soc. Psychol. Q. 399 (2015) ................................... 18

Pew Research Ctr., *The Rise of Asian Americans* (Apr. 4, 2013)........................................... 12, 17

OiYan Poon et al., *A Critical Review of the Model Minority Myth in Selected Literature on Asian Americans and Pacific Islanders in Higher Education*, 86 Rev. Educ. Res. 469 (2016)........................................................................................................... 15

OiYan Poon et al., *Asian Americans, Affirmative Action, and the Political Economy of Racism: A Multidimensional Model of Racial Ideologies* (Nov. 2017), https://www.oiyanpoon.com/projects .................................................................. 10

Press Release, Asian American Legal Defense and Education Fund, AALDEF Exit Poll of 4,600 Asian American Voters Reveals Robust Support for Democratic Candidates in Key Congressional and Senate Races (Nov. 9, 2006) ........................................ 10

Neil G. Ruiz, *The Geography of Foreign Students in U.S. Higher Education: Origins and Destinations* (Aug. 2014)............................................................................... 17

*State Propositions: A Snapshot of Voters*, L.A. Times (Nov. 7, 1996) ........................................ 10

Robert T. Teranishi et al., *The College-Choice Process for Asian Pacific Americans: Ethnicity and SocioEconomic Class in Context*, 27 Rev. Higher Educ. 527 (2004) ............. 16

U.S. Census Bureau, Quick Facts, Population Estimates, https://www.census.gov/quickfacts/fact/table/US/PST045217 (2017) .......................................................... 14

U.S. Citizen & Immigration Servs., *Characteristics of H1B Specialty Occupation Workers: Fiscal Year 2012 Annual Report to Congress, October 1, 2011-September 30, 2012* (2013)....................................................................................................... 17

Kaidi Wu et al., *Frogs, Ponds, and Culture: Variations in Entry Decisions*, 9 Soc. Psychol. & Personality Sci. 99 (2018)........................................................................... 20

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are 531 social scientists and scholars with doctoral degrees who have extensively studied education issues related to Asian Americans, college access, and race in postsecondary institutions and society.[1]  Collectively, *amici* represent researchers and scholars employed at 240 different institutions and organizations, including more than 220 colleges and universities across the United States.  Their work extends across numerous fields and disciplines—education, sociology, anthropology, psychology, public policy, political science, and history—with at least one third having substantial expertise on the Asian American population.  Numerous *amici* have been recognized with the highest national honors and awards in their field.  Eleven *amici* are members of the National Academy of Education, and 15 are past or current presidents of national organizations, including the American Educational Research Association, the Association for the Study of Higher Education, and the Association for Asian American Studies.

*Amici* have an interest in providing the Court with social science research findings that address the educational judgments Harvard considers as it designs and implements its whole-person review process.  The brief draws upon *amici*'s original research and their review of the literature, including the most extensive and up-to-date body of knowledge about how race-conscious admissions processes benefit Asian Americans.  As scholars committed to policies and practices informed by research-based evidence, *amici* are deeply concerned by Plaintiff's arguments in this case.  Those arguments promote an excessive focus on numerical measures of academic success that research has shown to be unreliable as isolated measures of merit and that rely on the myth of an Asian penalty and on problematic stereotypes of Asian Americans.  The research

---

[1]  A list of *amici* is included in the Appendix.  Institutional affiliation is provided for identification purposes only and does not reflect the views or the endorsement of the institution.

discussed, coupled with a review of the facts of this case, lead *amici* to conclude that Plaintiff's motion for summary judgement should be denied.

## INTRODUCTION

High achieving Asian American applicants benefit from Harvard's individualized whole-person review because it treats each applicant as an individual and inhibits the influence of racial biases and assumptions. Plaintiff's arguments to the contrary are largely premised on racial stereotypes of Asian Americans as a monolithic group with uniformly high test scores and high school GPAs—and on related negative stereotypes about African American and Latino students' academic abilities. Asian Americans comprise an incredibly diverse population, with a variety of national origins, economic circumstances, and educational opportunities. But, ironically, Plaintiff treats Asian Americans as a homogenous population, never pausing to acknowledge the immense diversity within that group. Harvard, in contrast, treats each Asian American applicant (like applicants of every other race) as an individual person whose achievements along multiple axes reflect the individual's personal context and life experience.

At bottom, Plaintiff fails to produce any evidence of discrimination on the basis of race against Asian American applicants. Plaintiff's argument depends on its view that, among the many thousands of academically qualified applicants, Harvard should admit only students with the highest quantifiable measures of achievement, measured by a limited and deficient set of criteria—and that any deviation from that course necessarily reflects racial bias. But it is up to Harvard, not Plaintiff, to decide what qualities it values among its many academically qualified applicants. And nothing in Plaintiff's proffered evidence suggests that Harvard is intentionally discriminating on the basis of race when it chooses to consider all aspects of an applicant's achievements and potential to contribute, rather than focusing on the narrow range of limited criteria Plaintiff prefers.

Indeed, research-based evidence demonstrates that the criteria Plaintiff would have this Court require Harvard to rely on are themselves infected with biases and stereotypes.

Because Asian American applicants, like applicants of all races, benefit from Harvard's whole-person review process, Plaintiff's motion for summary judgment should be denied.

## ARGUMENT

It is by now beyond doubt that an institution of higher education such as Harvard has a compelling interest in enrolling a diverse student body. *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2210 (2016); *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003). It is also beyond doubt that an institution seeking to enroll a diverse student body may consider race as one factor among many when assessing who among the universe of academically qualified students will best contribute to the institution's overall educational goals. *Fisher*, 136 S. Ct. at 2205; *Grutter*, 539 U.S. at 334-340. In evaluating the constitutionality of state schools' consideration of race as a factor in admissions, the Supreme Court has repeatedly emphasized "the importance of considering each particular applicant as an individual, assessing all of the qualities that individual possesses, and in turn, evaluating that individual's ability to contribute to the unique setting of higher education." *Gratz v. Bollinger*, 539 U.S. 244, 271 (2003). Harvard's whole-person approach to undergraduate admissions does just that—it considers "each characteristic of a particular applicant . . . in assessing the applicant's entire application." *Ibid.* Critically, qualified applicants of *all* races benefit from Harvard's whole-person approach—because *every* applicant is assessed on his or her own merits, understood with reference to his or her life experience—and *all* students admitted to Harvard benefit from being part of a community that is diverse across multiple dimensions.

I.    **Asian American Applicants Benefit from Harvard's Whole-Person Review Process.**

Every year, the number of academically qualified applicants who seek admission to Harvard's freshman class exceeds by tens of thousands the number of available slots.  In choosing among that vast pool of well-qualified applicants, Harvard considers "each applicant as an individual, and not simply as a member of a particular racial group."  *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 722 (2007).  The entire Harvard community benefits from that whole-person approach to admissions—including Asian American students.  Plaintiff's arguments to the contrary are based on false premises and stereotypes.  Plaintiff's arguments have no basis in social-science research—and in many respects contradict such research.

A.    **Asian Americans Comprise an Extremely Diverse Population.**

*Unlike Harvard*, Plaintiff fails to treat Asian American applicants as individuals.  Plaintiff ignores the incredible range of diversity among Asian American applicants, instead treating them as a homogenous group that excels and contributes in only a narrow range of human activity.  In reality, the individuals covered by Plaintiff's category of "Asian Americans" represent a broad array of national origins, ethnicities, cultural heritages, economic and educational circumstances and opportunities, and American experiences.  In short, they are individuals, each with his or her own story—and that is exactly how Harvard treats them.

As one 2011 study explains:  "Asian Americans come from all walks of life.  Some are doctors or lawyers; others work in restaurants or nail salons.  Many were born in the United States; most are immigrants . . . from many countries, including Bangladesh, Burma, Cambodia, China, India, Indonesia, Japan, Korea, Laos, Malaysia, Nepal, Pakistan, the Philippines, Sri Lanka, Taiwan, Thailand, and Vietnam."  Asian Am. Ctr. for Advancing Justice, *A Community of Contrasts: Asian Americans in the United States:  2011*, at 2.  Asian Americans have been among the "nation's

4

fastest growing racial groups since discriminatory immigration quotas were eliminated in 1965 and now make up 6% of the country's total population." *Ibid.*

Asian Americans are also "the most economically divided racial or ethnic group in the U.S.," displaying the most extreme degree of within-group income inequality. Rakesh Kochhar & Anthony Cilluffo, Pew Research Ctr., *Key Findings on the Rise in Income Inequality Within America's Racial and Ethnic Groups* 2 (2018). A natural consequence of such a wide range of family income levels is an equally broad degree of disparities in educational opportunities and achievement. Studies show, for example, that many Asian Americans who have roots in Southeast Asia (*i.e.*, Cambodians, Hmong, Laotians, and Vietnamese) and who trace their family's arrival in the United States to wartime displacement have comparatively low rates of college entry and completion. Nat'l Comm'n on Asian Am. & Pac. Islander Research in Educ., *Federal Higher Education Policy Priorities and the Asian American and Pacific Islander Community* 6 (2010). Those data stand in stark contrast to the educational achievement rates of Asian Americans with roots in India, who display relatively high rates of college entry and completion. *Ibid.*

Due in part to disparities in educational opportunities among Asian American K-12 students, moreover, there are large disparities among different Asian American populations in rates of college attendance. One study derived from the Census Bureau's American Community Survey reveals that a relatively large proportion of Asian American adults with Southeast-Asian ethnicities (between 51 and 65%) have not attended college, while the same is true for a much smaller percentage (between 20 and 34%) of Asian Americans with South- and East-Asian ethnicities. Nat'l Comm'n on Asian Am. & Pac. Islander Research in Educ., *The Relevance of Asian Americans and Pacific Islanders in the College Completion Agenda* 8 (2011). Even among Asian Americans who

do attend college, a large proportion (47%) attend community colleges, contrary to the common racial stereotype suggesting that Asian Americans primarily attend elite private colleges. *Id.* at 9.

Plaintiff thus errs in treating Asian American applicants to Harvard as a homogeneous block. The purpose of employing a whole-person review process like the one Harvard uses is to account for the diverse range of experiences—including the role race may have played in a person's experience—among Americans of all races and backgrounds. There is no sound reason to ignore the equally diverse range of experiences *within* the group of Asian American applicants that Plaintiff treats as a unit. Differences in educational and economic opportunity, in social and familial circumstances, and in personal experiences of discrimination all inform a complete understanding of an individual applicant's academic and nonacademic achievements. By employing a system that accounts for such differences on an individual level, Harvard is able to view each applicant's talents, achievements, experiences, perspectives, and potential within the context of the applicant's broader life experience. And in so doing, Harvard can more accurately assess the contributions each applicant would likely make to the undergraduate population and experience.

Significantly, not all qualified Asian American applicants fit the stereotype of perfect test scores, perfect high school GPAs, and assumed cognitive and cultural advantages. And the many qualified Asian American applicants who fall outside that stereotype but nevertheless have the potential to make enormous contributions to the campus community benefit greatly from holistic review processes like Harvard's. As with the applicant pool more generally, quantifiable measures alone do not offer full, reliable, or valid measures of the diversity of achievements among the myriad talented applicants to Harvard and other selective colleges and universities.

### B. Harvard's Whole-Person Review in Admissions Takes Account of the Diverse Experiences and Qualities of Asian American Applicants.

Harvard's review process seeks to assemble a body of students who will learn from and

challenge each other, creating a diverse environment in which "to educate the citizens and citizen-leaders for our society."   Harvard College, Mission, Vision, and History, https://college.harvard.edu/about/mission-and-vision (last visited Aug. 30, 2018).  Critical to that mission is providing students with "a diverse living environment, where students live with people who are studying different topics, who come from different walks of life and have evolving identities," to "deepen[]" "intellectual transformation" and "create[]" "conditions for social transformation."  *Ibid.*

In service of its mission, Harvard employs a robust process of whole-person review that permits students, including Asian Americans, to demonstrate the *full range* of contributions each applicant can make to Harvard's educational environment.  Even when assessing an applicant's academic potential, Harvard does not limit itself to considering traditional metrics of academic achievement like high school grades and test scores.  Harvard also considers teacher and counselor recommendations, submitted student work, the relative academic strength of an applicant's high school, the types of classes an applicant took in high school, and academic and career interests, among other factors.  Doc. 420, Defendant's Statement of Material Facts (Def. SMF) ¶¶ 22, 49; Doc. 419-33, Report of David Card, Ph.D. (Card Report) ¶¶ 53-54.  Because academic potential is *not* the only metric Harvard values, the admissions process also considers an applicant's personal history, non-academic achievements, personal goals, and any other available information that would inform a full assessment of how each applicant can contribute to the Harvard community. Although consideration of race is certainly an element of Harvard's whole-person review, the "current admissions program considers race as one factor among many, in an effort to assemble a student body that is diverse in ways broader than race."  *Grutter*, 539 U.S. at 340.

Critically, Harvard's whole-person review process takes into account diversity in individual applicants' contexts of achievement, values a diverse range of interests and accomplishments,

and considers how each applicant might contribute to the university's educational environment. The process uses four categories of ratings—academic, athletic, extracurricular, and personal—in addition to an overall rating that summarizes the strengths of the applicant and takes into account all information about how an applicant may contribute to the campus educational environment, including considering the applicant's race as one factor among many.  Def. SMF ¶¶ 64, 118-125. That process benefits Asian American applicants by allowing for consideration of the array of contexts from which each applicant—and his or her achievement credentials—emerged.  Educational researchers have explained that a whole-person review process such as Harvard's fosters a greater understanding of each applicant by using a broad range of factors, including academic performance, personal traits, and school, community, and family contexts, to recognize a wide array of talents and qualities in all students, including Asian Americans.

Research demonstrates that this approach to admissions, also known as whole-context review, transcends "individual characteristics to consider environmental factors such as socioeconomic background, racial identity, and school and family context that have shaped a student's academic and extracurricular achievements."  Michael N. Bastedo et al., *What Are We Talking About When We Talk About Holistic Review?  Selective College Admissions and Its Effects on Low-SES Students*, 89 J. Higher Educ. 782, 793 (2018).  Such a contextual consideration of each applicant's achievements permits admissions officers to "contemplate[] how applicants maximize available educational offerings and push themselves academically within their unique contexts." *Ibid.*  As one admissions officer who participated in that research explained, "it is impossible to understand the achievements of a student without also understanding the various external influences—school setting, socioeconomic status, ethnic background, geographic background, and family background—that have contributed to his or her journey."  *Ibid.*  Because the analysis of

Plaintiff's expert Professor Arcidiacono fails to take account of the full range of comprehensive applicant data that Harvard considers, it does not accurately reflect or model the actual process of holistic review at Harvard.

Data demonstrate, moreover, that Harvard's whole-person review process benefits Asian American applicants.  Among non-ALDC (athletes, lineage, dean/director lists, and children of faculty/staff) applicants for the years under review in this case, Asian American applicants were admitted at a higher rate (5.15%) than white applicants (4.91%).  Def. SMF ¶ 229; Doc. 414-2, Plaintiff's SMF ¶ 638.  And the proportion of Asian Americans in each admitted class at Harvard has increased by 29% in the last decade.  Def. SMF ¶ 113.  Those statistics confirm research finding that considering race as one of many factors (rather than as a determinative factor) in admission through a holistic review process like Harvard's can increase rates of admission among Asian American applicants and other students of color.  For example, a recent study demonstrated that holistic review practices that account for individual applicants' educational and life contexts (including race) can increase the odds of admission for Asian Americans at elite universities, while also maintaining high academic metrics of achievement within an admitted class.  Michael N. Bastedo et al., *Information Dashboards and Selective College Admissions:  A Field Experiment* 3 (Oct. 9, 2017), http://www-personal.umich.edu/~bastedo/papers/ASHE2017.paper.pdf.

### C.   As a Group, Asian Americans Support Race-Conscious Admissions Policies.

As explained, Plaintiff's argument fails to account for the diversity of experiences in the Asian American population, instead treating Asian Americans as a bloc that excels along a particular axis of success.  But Plaintiff's approach is also out of step with the views of Asian Americans as a community.  A number of studies, conducted in multiple Asian languages and including an array of different Asian national-origin groups, confirm that Asian Americans as a whole support

the use of race-conscious admissions practices.  That support likely reflects the benefits that Asian American applicants reap from processes that evaluate them as individuals who can potentially contribute to a campus community in unlimited ways.

Social-science data—spanning different samples during different periods of time—confirms that a majority of Asian Americans support race-conscious admissions.  Multiple surveys conducted between 2001 and 2016 of Asian American adults in at least five different national-origin groups have asked whether race-conscious admissions measures are good or bad for Asian Americans or whether the respondents support such programs.  And each of those surveys has revealed strong support for such programs among Asian Americans—support ranging from 61% to 70%.  Pei-te Lien et al., *The Politics of Asian Americans: Diversity and Community* 17, 191 (2004); AAPIData et al., *Inclusion, Not Exclusion:  Spring 2016 Asian American Voter Survey* A25 (2016); AAPIData et al., *An Agenda for Justice:  Contours of Public Opinion Among Asian Americans* 8-9 (2014); Nat'l Asian Am. Survey, *Where Do Asian Americans Stand on Affirmative Action?* 1-2 (June 24, 2013).  Exit-poll data also reveal strong opposition among Asian Americans to race-blind admissions practices:  61% of Asian American voters in California opposed a 1996 ballot measure that prohibited the consideration of race in public college admissions, and 75% of Asian American voters in Michigan opposed a similar 2006 ballot initiative in that State.  *State Propositions:  A Snapshot of Voters*, L.A. Times (Nov. 7, 1996); Press Release, Asian American Legal Defense and Education Fund, AALDEF Exit Poll of 4,600 Asian American Voters Reveals Robust Support for Democratic Candidates in Key Congressional and Senate Races (Nov. 9, 2006).  In fact, even Asian American opponents of race-conscious admissions policies support principles of whole-person review like the one at Harvard.  OiYan Poon et al., *Asian Americans,*

*Affirmative Action, and the Political Economy of Racism: A Multidimensional Model of Racial Ideologies* 23 (Nov. 2017), https://www.oiyanpoon.com/projects.

Thus, Plaintiff's narrative in this case does not reflect concerns actually held by Asian Americans as a community.  That is no surprise given the benefits individual members of that community derive from race-conscious, whole-person admissions practices like Harvard's.

## II.    Research Shows That Plaintiff's Excessive Focus on Numerical Measures of Academic Success Is Unwarranted and Unwise.

The Supreme Court has long recognized that colleges and universities may consider all manner of "qualities" that are "likely to promote beneficial educational pluralism," "includ[ing] exceptional personal talents, unique work or service experience, leadership potential, maturity, demonstrated compassion, a history of overcoming disadvantage, ability to communicate with the poor, or other qualifications deemed important." *Regents of the Univ. of Calif. v. Bakke*, 438 U.S. 265, 317 (1978) (opinion of Powell, J.).  More recently, the Court explained that one measure of academic success (there, class rank), "like any single metric, . . . will capture certain types of people and miss others." *Fisher*, 136 S. Ct. at 2213.  The Court went on to explain that "privileging one characteristic above all others does not lead to a diverse student body.  Indeed, to compel universities to admit students based on [one academic metric] alone is in deep tension with the goal of educational diversity as this Court's cases have defined it." *Ibid.*  But that is exactly what Plaintiff asks for—to compel Harvard to admit students based only on the narrow range of factors that Plaintiff values.

A large body of research shows that standardized test scores are not impartial measures of academic talent.  Data from the organizations that sponsor standardized admissions tests show that scores are in large part a reflection of parental education and family income.  Krista Mattern et al., ACT, Inc., *ACT Composite Score by Family Income* 1 (2016); College Board, *2017 SAT Suite of*

*Assessments Annual Report, Total Group* 3 (2017); *see also* Greg J. Duncan & Richard J. Murnane, *Growing Income Inequality Threatens American Education*, Kappan Mag., Mar. 2014, at 8, 10. Particularly relevant to this case, Asian Americans on average exhibit the highest group levels for both educational access and income. Pew Research Ctr., *The Rise of Asian Americans* 2 (Apr. 4, 2013). Levels of family income and parental education vary across the Asian American community, but on average, those features help, rather than hurt, Asian American students.[2] No one argues that Harvard should admit students based primarily on family resources, but that would, to a large degree, be the practical effect of Plaintiff's preferred approach to admissions. Significantly, such an approach would harm lower-income applicants of all races, including Asian Americans.

Perhaps acknowledging the flaws of tests like the SAT and ACT, more than 1,000 accredited institutions of higher education (most recently the University of Chicago) have announced that they do not require standardized tests as part of their admissions practices.[3] That trend recognizes the limitations of such tests as measures of academic quality among prospective students.

Of course, test scores and high school grades were not designed to predict—and cannot predict—what contributions an applicant is likely to make to a university's broader educational goals of fostering a healthy social environment for developing good citizens and citizen-leaders with strong critical-thinking and leadership skills. *See generally* Amicus Br. of Am. Educ. Research Ass'n et al., *Fisher*, *supra* (Oct. 30, 2015), 2015 WL 6668475 (collecting and discussing research sources). To assess those intangible (but vital) dimensions of each applicant—and in part

---

[2] Data from the College Board itself shows that in 2017, students whose parents held a graduate degree achieved an average score of 1177 (out of a total of 1600 points), compared to an average score of just over 1000 for those whose parents had graduated from high school only. College Board, *supra*, at 3. In 2016, the average composite score on the ACT was 4 points higher (out of a total of 36 points) among those students whose family income was $80,000 or higher compared to those whose family income was less than $80,000—a disparity that increased from 2012 to 2016. Mattern et al., *supra*.

[3] FairTest, More Than 1000 Accredited Colleges and Universities That Do Not Use ACT/SAT Scores to Admit Substantial Numbers of Students into Bachelor-Degree Programs, https://www.fairtest.org/university/optional (last visited Aug. 30, 2018).

to correct for the biases associated with standardized tests—colleges and universities have always relied on essays and other non-quantitative measures as part of the admissions process.  Their right to do so is supported by research and 40 years of Supreme Court precedent (from *Bakke* in 1978 to *Fisher* in 2016), and it makes good sense given the biases associated with standardized tests.

III.    **Plaintiff Fails to Provide Any Evidence of Discrimination Against Asian Americans, Relying Instead on Myths of an "Asian Penalty," the "Model Minority" Stereotype, and Misleading Reports of "Personality" Ratings.**

Plaintiff contends that Harvard's 40-member admissions committee (*see* Def. SMF ¶ 76) engages in systemic intentional discrimination on the basis of race against Asian American applicants.  Lacking a smoking gun confirming such a massive illegal conspiracy, Plaintiff relies on its expert's statistical analysis of a subsection of applicants to Harvard—and purports to find that Asian American applicants score higher on supposedly objective criteria such as academic and extracurricular ratings, while scoring lower on non-quantitative criteria such as personal and overall ratings.  The only logical conclusion, Plaintiff asserts, is that Harvard is intentionally excluding Asian American applicants *because they are Asian American*.  Plaintiff is wrong at every step.

Fundamentally, Plaintiff's case is built on its assumption that the greater an applicant's past academic success (measured in a very limited manner), the greater his or her chances of admission to Harvard should be.  But that argument is premised on the assumption that *Plaintiff's* view of which personal qualities Harvard should value in the admissions process should prevail over *Harvard's* view—and, consequently, that Plaintiff's view of what type of student body belongs at Harvard should prevail over Harvard's own judgment.  If it wanted to, Harvard could admit a class comprised only of students with perfect high school GPAs, or only of students with perfect standardized test scores.  That is not what Harvard seeks to do.  Admission to Harvard College is not a reward for doing well in high school based on grades and test scores alone.  Har-

vard seeks to build a community by choosing *among the thousands of academically qualified applicants* a diverse group of individuals who will learn from and challenge each other.

### A.      The Myth of an Asian Penalty

Plaintiff's claims of discrimination rest on the false assertion that Asian American applicants are systematically penalized in the admissions process.  As Harvard's expert points out, that contention is flatly contradicted by the facts:  in three of the six years at issue in this case, Asian American ethnicity was associated with a slightly *higher* likelihood of admission to Harvard than white ethnicity was, controlling for other factors.  Doc. 419-37, Rebuttal Report of David Card, Ph.D. ¶ 103 & Ex. 12.  And even among the subset of applicants Plaintiff focuses on (*i.e.*, non-ALDC applicants), Asian Americans had a higher rate of admission than white applicants in four of the six years at issue and when all six years are considered in the aggregate.  Card Report ¶¶ 70-71 & Ex. 7.  Indeed, Plaintiff's allegation of intentional discrimination against Asian Americans—when Asian Americans comprise 6% of the U.S. population and over 20% of students admitted to Harvard—lacks a basis in common sense as well as evidentiary support.  U.S. Census Bureau, Quick Facts, Population Estimates, https://www.census.gov/quickfacts/fact/table/US/PST045217 (2017); Harvard College, Admissions Statistics, https://college.harvard.edu/admissions/admissions-statistics (last visited Aug. 30, 2018).

With the facts against it, Plaintiff supports its "Asian penalty" narrative by relying on flawed statistics, false assumptions, and racial stereotypes.  Plaintiff primarily argues that Harvard's admissions process should rely more heavily on quantitative measures of academic performance—but does not even attempt to demonstrate (nor could it) that such measures alone would provide a reliable or complete indication of future academic success, let alone that such measures correlate with other qualities that Harvard values in its student body.  Plaintiff cannot show that Harvard admits academically unqualified applicants of any race.  So the question is, among the

many thousands of qualified applicants, which students should be admitted.  Plaintiff's contention

that Harvard intentionally discriminates based on race by valuing some non-quantitative measures

of success when choosing among academically qualified applicants does not hold water.  Plaintiff

fails to establish that Asian American applicants are disadvantaged by Harvard's whole-person

review process, let alone that any disadvantage is the result of intentional race discrimination by

the 40-person admissions committee.

**B.      Plaintiff's Contention That Academic Metrics Should Matter Most in Choosing Among Academically Qualified Applicants Relies on and Reinforces Racial Stereotypes.**

Plaintiff argues that, by choosing not to privilege numerical measures of past academic

success over all other criteria when choosing among applicants who all agree are academically

qualified to attend Harvard, the 40-person admissions committee intentionally discriminates on

the basis of race against Asian Americans.  In addition to lacking evidentiary and social-science

support, that contention is flawed because it relies on racial stereotypes about Asian Americans

and reinforces negative stereotypes about other racial minorities.

Underlying Plaintiff's argument is what social scientists call the "Model Minority Stereo-

type" (or "Model Minority Myth"), which juxtaposes two racial stereotypes:  first, that Asian

Americans are smarter and value education more than other groups, and second, that other racial

minorities do not value hard work and education.  *See*, *e.g.*, Yoon K. Pak et al., *Asian Americans*

*in Higher Education: Charting New Realities* 17, 40 (2014); OiYan Poon et al., *A Critical Review*

*of the Model Minority Myth in Selected Literature on Asian Americans and Pacific Islanders in*

*Higher Education*, 86 Rev. Educ. Res. 469, 473-476 (2016); Samuel D. Museus & Peter N. Kiang,

*Deconstructing the Model Minority Myth and How It Contributes to the Invisible Minority Reality*

*in Higher Education Research*, New Directions for Institutional Research, Summer 2009, at 5,

6-13; Stacey J. Lee, *Behind the Model-Minority Stereotype:  Voices of High- and Low-Achieving*

*Asian American Students*, 25 Anthropology & Educ. Q. 413, 413-414 (1994).  The stereotype of Asian Americans as a "model" minority in the context of education has no place in admissions decisions, however, because it (like any racial stereotype) ignores the context of each person's educational experience and ignores differences within the broader Asian American population.

Decades of scholarship in Asian American Studies helps to illuminate the political and structural origins of the educational achievement advantage demonstrated by specific ethnic groups of Asian Americans in the United States today.  *See, e.g.*, Robert T. Teranishi et al., *The College-Choice Process for Asian Pacific Americans:  Ethnicity and SocioEconomic Class in Context*, 27 Rev. Higher Educ. 527, 545-547 (2004).  That research reveals that Asian Americans' educational success is attributable to context, rather than to some innate ability or inherent cultural attitude—just as with every other racial group.  *See, e.g.*, Jane Junn, *From Coolie to Model Minority:  U.S. Immigration Policy and the Construction of Racial Identity*, 4 Du Bois Rev. 355, 362-365, 368 (2007).  The origins of the Model Minority stereotype extend even prior to the 1965 Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, which ended Asian exclusion and created two immigration priorities:  highly valued skills and family reunification.  *E.g.*, Jennifer Lee & Min Zhou, *From Unassimilable to Exceptional: The Rise of Asian Americans and "Stereotype Promise,"* 16 New Diversities, no. 1, 2014, at 7, 11-13; Madeline Y. Hsu & Ellen D. Wu, *"Smoke and Mirrors": Conditional Inclusion, Model Minorities, and the Pre-1965 Dismantling of Asian Exclusion*, J. Am. Ethnic Hist., Summer 2015, at 43, 53-54.  After 1965, the United States started to recruit highly skilled immigrants from Asia in greater numbers than ever before through employment-based preferences.  Arun Peter Lobo & Joseph J. Salvo, *Changing U.S. Immigration Law and the Occupational Selectivity of Asian Immigrants*, 32 Int'l Migration Rev. 737, 758 (1998).  Those efforts were ramped up even further after 1990, and more than half of the Asian

American population in the United States has immigrated since then.  Muzaffar Chishti & Stephen Yale-Loehr, Migration Policy Inst., *The Immigration Act of 1990: Unfinished Business a Quarter-Century Later* 2 (2016).  In recent years, more than 70% of all high-skilled visas have been allocated to immigrants from Asia.  U.S. Citizen & Immigration Servs., *Characteristics of H1B Specialty Occupation Workers:  Fiscal Year 2012 Annual Report to Congress, October 1, 2011-September 30, 2012,* at 6 (2013).  And the majority of international student visas now go to Asian immigrants.  Neil G. Ruiz, *The Geography of Foreign Students in U.S. Higher Education:  Origins and Destinations* 10 (Aug. 2014).

The United States' hyper-selective recruitment of Asian immigrants challenges the stereotype that the success of Asian Americans in the United States is due to innate intellect or ingrained cultural characteristics. If that were true, we would expect to see the same kinds of educational achievement in Asia as in the United States.  We do not.  Sociologist Jennifer Lee reports that in 2015, more than 50% of Chinese immigrants in the United States had a bachelor's degree but only 4% of adults in China did.  Jennifer Lee, *From Undesirable to Marriageable: Hyper-Selectivity and the Racial Mobility of Asian Americans*, Annals Am. Acad. Pol. & Soc. Sci., Nov. 2015, at 79, 82.  Similarly, while approximately 70% of Indian immigrants in the United States have a bachelor's degree, less than 15% of college-aged adults in India enroll in college.  Rema Nagarajan, *Only 10% of Students Have Access to Higher Education in Country*, Times of India (Jan. 5, 2014); *The Rise of Asian Americans*, *supra*, at 25.  The high degree of educational achievement of Asian Americans traces more directly to U.S. immigration policies and other contextual factors, not inherent qualities tied to race.  And Asian Americans who trace their U.S. origins to paths that do not involve recruitment of highly skilled individuals may well experience the U.S. education system in a wholly different context.  As with any other racial group, Asian Americans' access to

17

educational success and opportunity is uniquely shaped by context. Harvard's whole-person review takes into account variations in experience within that (and every) population.

Importantly, by relying on positive stereotypes of Asian Americans' educational abilities and values, Plaintiff subtly leverages negative stereotypes about African American and Latino students' experience with education. By assuming that higher average standardized test scores and grades among Asian Americans are the result of unique individual effort, Plaintiff implies that any lower average scores for other racial minorities are due to lack of individual effort. This strategy capitalizes on documented racial stereotypes. In fact, although research shows that a larger percentage of Latino and African American students believe a college degree is necessary for success than their white counterparts, Ronald Brownstein, *White People Are Skeptical About the Value of a College Degree*, Atlantic (Nov. 7, 2013), a study of white students attending elite colleges who took part in the National Longitudinal Study of Freshman showed they were more likely to view Asian Americans as "hard working," "intelligent," and more willing to "persevere[]" than African American and Latino students—and were more likely to attribute African American and Latino individuals' lack of social mobility to a lack of individual effort rather than to structural racial inequality. Jerry Z. Park et al., *Exceptional Outgroup Stereotypes and White Racial Inequality Attitudes Toward Asian Americans*, 78 Soc. Psychol. Q. 399, 404-405 (2015).

The bottom line is that racial stereotypes—whether positive or negative—often have no basis in reality and *never* take account of the diverse experiences of individuals within any racial group. Harvard's whole-person review, in contrast, "focuse[s] on each applicant as an individual, and not simply as a member of a particular racial group." *Parents Involved*, 551 U.S. at 722.

### C.     Plaintiff Mischaracterizes the Role That Harvard's Personal Rating Plays in Whole-Person Review.

Plaintiff relies on misleading characterizations of Harvard's personal rating as a tool for enabling discrimination—rather than for giving credit to academically qualified students for qualities that are vital in determining success at Harvard and later in life, such as personal commitment to the community and potential for future growth.  Although news outlets have mischaracterized the personal rating as a "personality" rating, *see*, *e.g.*, Anemona Hartocollis, *Harvard Rated Asian-American Applicants Lower on Personality Traits, Suit Says*, N.Y. Times, at A1 (June 16, 2018), it is not an assessment of how sparkling or drab an applicant's personality is.  Far from it.

When assigning a personal rating, admissions officers do not take race into account.  Def. SMF ¶¶ 61, 118.  But Plaintiff relies on an observed negative statistical correlation between Asian American ethnicity and personal rating, arguing that the only possible explanation for that correlation is intentional discrimination by Harvard's 40-member admissions committee.  Plaintiff's conclusion has no basis in logic, to say nothing of social science research or data.  There is no reason to expect that applications from a group with the highest average academic ratings would also receive the highest average ratings in every other category.  Very few of the more than 40,000 applicants to Harvard are exceptional in every area—and no racial group receives the highest ratings in every category.

Research shows distinct differences in college application patterns among different racial groups.  Asian American students are more likely than students of other racial and ethnic groups to apply to highly selective universities.  *See* Brian P. An, *The Relations Between Race, Family Characteristics, and Where Students Apply to College*, 39 Soc. Sci. Res. 310, 317 (2010).  Asian American students, particularly those from high- and middle-income families, are also more likely to apply to more colleges than the national average.  *See* Mitchell J. Chang et al., *Beyond Myths:*

*The Growth and Diversity of Asian American College Freshman, 1971-2005*, at 16 (2007).  Research suggests that Asian American applicants are more likely than white applicants to prefer being a lower-performing student in a higher-status university than to be a higher-performing student in a lower-status university, and that desire for institutional prestige may underlie the choice to apply to elite universities.  *See* Kaidi Wu et al., *Frogs, Ponds, and Culture: Variations in Entry Decisions*, 9 Soc. Psychol. & Personality Sci. 99, 101 (2018).  This research on application patterns by race suggests that Asian Americans may be more likely than other students to fill out an application to Harvard when Harvard may not be the best fit—and that the cross-section of Asian American students who apply to Harvard is likely to be materially different from the cross-section of applicants of other ethnicities.  *See* Julie J. Park, *Race on Campus: Debunking Myths with Data* (forthcoming Oct. 2018) (manuscript at ch. 4, p. 22) (on file with author).

Moreover, Plaintiff puts too much emphasis on the fact that, on average, Asian Americans exhibit higher academic scores than other racial groups.  A mean score within a group often conceals a great deal of variation.  Within the large group of academically qualified applicants, Harvard is entitled to ask whether a student with a 4.2 GPA who had to take advanced math at a community college might have more to contribute to the Harvard community than a student with a 4.5 GPA.  Harvard's whole-person review considers each applicant as an individual, not merely as a member of a group.  Thus, an Asian American applicant who, *e.g.*, shows promise in an unconventional field or hails from an unconventional place may well receive a higher personal rating than an otherwise similarly situated applicant.  Harvard's approach eschews assumptions based on statistical norms, instead valuing each applicant as a whole person.

## CONCLUSION

Plaintiff's motion for summary judgment should be denied.

Dated: August 30, 2018             Respectfully submitted,

/s/  Richard J. Rosensweig             /s/  Sarah E. Harrington

Richard J. Rosensweig (BBO #639457)   Sarah E. Harrington (*pro hac vice*)
GOULSTON & STORRS PC                  GOLDSTEIN & RUSSELL, P.C.
400 Atlantic Avenue                   7475 Wisconsin Avenue, Suite 850
Boston, Massachusetts 02110           Bethesda, MD 20814
(617) 574-3588                        (202) 362-0636
rrosensweig@goulstonstorrs.com        sharrington@goldsteinrussell.com

*Counsel for Amici Curiae 531 Social Scientists and Scholars*
*on College Access, Asian American Studies, and Race*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed on August 30, 2018, through the Court's ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Richard J. Rosensweig