IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

STUDENTS FOR FAIR ADMISSIONS, INC.,

Plaintiff,

v.

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE (HARVARD CORPORATION),

Defendant.

No. 1:14-cv-14176-ADB

**REDACTED**

**UNITED STATES' STATEMENT OF INTEREST IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

ARGUMENT ........................................................................................................................... 5

I.   HARVARD HAS FAILED TO DEMONSTRATE THAT ITS USE OF RACE IS
     NARROWLY TAILORED TO SERVE A COMPELLING INTEREST ............................ 5

   A.  Harvard Provides No Meaningful Criteria To Guide Its Voluntary Use of Race in
       Admissions Decisions ................................................................................................ 7

   B.  Direct and Circumstantial Evidence Indicates That Harvard Considers Race in Scoring
       Its Vague Personal Rating That Harms Asian-American Applicants ........................... 11

      1.  Testimony from Admissions Officers and Harvard's Own Documents Demonstrate
          That Harvard Uses Race in the Personal Rating ......................................................... 12

      2.  Harvard Admits That It Scores Asian-American Applicants Lower on the Personal
          Rating on Average and That the Personal Rating Is a Driving Factor in Many
          Admissions Decisions ................................................................................................. 15

      3.  Harvard Brushed Aside Its Own Internal Evidence That the Personal Rating May Be
          Infused with Racial Bias ............................................................................................. 18

   C.  The Record Contains Substantial Evidence That Harvard Engages in Racial
       Balancing .................................................................................................................. 20

      1.  The Record Contains Substantial Evidence That Harvard Engineers Its Admissions
          Process To Replicate the Previous Year's Racial Balance ........................................ 22

      2.  The Record Contains Substantial Evidence That Harvard Constantly Monitors and
          Manipulates the Formulating Class To Achieve Its Preset Racial Balance ................ 25

      3.  The Remarkably Stable Racial Balances in Harvard's Admitted Classes Provide
          Substantial Evidence of Racial Balancing ................................................................. 27

II.  THE RECORD CONTAINS SUBSTANTIAL EVIDENCE THAT HARVARD IS
     DETERMINED TO CONTINUE ITS USE OF RACE INDEFINITELY DESPITE
     AVAILABLE RACE-NEUTRAL ALTERNATIVES ..................................................... 28

   A.  Both of Harvard's Committees Failed To Engage in Good Faith Consideration of Race-
       Neutral Alternatives ................................................................................................. 29

   B.  Harvard Has Not Defined Its Diversity-Related Goals but Nonetheless Rejects Race-
       Neutral Alternatives as Inadequate To Achieve Them ............................................. 31

   C.  Harvard Has Failed To Retailor Its Use of Race for at Least the Last 45 Years ........... 35

CONCLUSION ....................................................................................................................... 37

The American public funds Harvard College ("Harvard") at a cost of millions of taxpayer dollars each year.  With every taxpayer dollar that it accepts, Harvard promises not to discriminate "on the ground of race, color, or national origin" in "any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Nonetheless, Harvard acknowledges that it voluntarily uses race as a factor in deciding whether to offer certain young adults admission to, and the substantial educational benefits of, its elite institution.  Harvard seeks to justify this use of race to award educational opportunities as necessary to its pursuit of the "educational benefits of diversity."  Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 36, ECF No. 435 ("Harv. Opp.").  But Harvard has failed to carry its demanding burden to show that its use of race does not inflict unlawful racial discrimination on Asian Americans.  To the contrary, the record evidence demonstrates that Harvard's race-based admissions process significantly disadvantages Asian-American applicants compared to applicants of other racial groups— including both white applicants and applicants from other racial minority groups.  The evidence, moreover, shows that Harvard provides no meaningful criteria to cabin its use of race; uses a vague "personal rating" that harms Asian-American applicants' chances for admission and may be infected with racial bias; engages in unlawful racial balancing; and has never seriously considered race-neutral alternatives in its more than 45 years of using race to make admissions decisions.  The United States therefore files this Statement of Interest in opposition to Harvard's Motion for Summary Judgment, in order to "assur[e] that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice."  *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (plurality opinion).

"Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."  *Rice v.*

*Cayetano*, 528 U.S. 495, 517 (2000) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100

(1943)).  "[I]t demeans the dignity and worth of a person to be judged by ancestry instead of by

his or her own merit and essential qualities."  *Id.*  Thus, "[a]t the heart of the Constitution's

guarantee of equal protection lies the simple command that the Government must treat citizens as

individuals, not as simply components of a racial, religious, sexual or national class."  *Miller v.

Johnson*, 515 U.S. 900, 911 (1995) (internal quotation marks omitted).  "Race-based assignments

embody stereotypes that treat individuals as the product of their race, evaluating their thoughts

and efforts—their very worth as citizens—according to a criterion barred to the Government by

history and the Constitution."  *Id.* at 912 (citation and internal quotation marks omitted).

Accordingly, "[a]ny preference based on racial or ethnic criteria must necessarily receive a most

searching examination."  *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 223 (1995).

Harvard specifically agreed to abide by these strict prohibitions on racial discrimination

as a condition of receiving taxpayer funding.  *See* 42 U.S.C. § 2000d; *Gratz v. Bollinger*, 539

U.S. 244, 275-76 & n.23 (2003) ("[D]iscrimination that violates the Equal Protection Clause of

the Fourteenth Amendment committed by an institution that accepts federal funds also

constitutes a violation of Title VI.").  Thus, under governing Supreme Court precedent, Harvard

bears the burden to satisfy strict scrutiny by showing that its voluntary use of race is "narrowly

tailored" to achieve a "compelling" government interest.  *Parents Involved in Cmty. Sch. v.

Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007).

Harvard has failed to prove that its use of race survives strict scrutiny.  For at least four

reasons, the Court should deny Harvard's Motion for Summary Judgment.

*First*, Harvard admits that it voluntarily uses race in all three phases of its admissions

process:  when its admissions officers assign each applicant an overall rating, when its

admissions subcommittees decide whether to recommend an applicant for admission, and when its full admissions committee makes final admissions decisions. But Harvard identifies no meaningful criteria to cabin its voluntary use of race in any of these phases. For this reason alone, Harvard cannot demonstrate that its use of race—and the resulting harm to Asian Americans—is narrowly tailored to achieve a compelling interest.

*Second*, direct and circumstantial evidence indicates that a driving factor in Harvard's admissions process, the vague and elusory "personal rating," may be infected with racial bias against Asian Americans. Based solely on a cold review of the applicant's file, Harvard uses the personal rating to score each applicant on "subjective" factors such as a "positive personality," "likability," and being a "good person" with "human qualities." SFFA SOF ¶ 90, ECF No. 414-2. Harvard admits that, on average, it scores Asian-American applicants lower on the personal rating than white applicants. Yet when an internal Harvard report pointed out that the personal rating may be infused with racial bias and sought authorization to study the issue further, Harvard buried it. On this record, a fact finder could reasonably conclude that the personal rating at worst reflects racial stereotypes against Asian Americans and at best encompasses an intentional and unexplained use of race. Either way, Harvard makes no attempt to argue that its use of the personal rating satisfies strict scrutiny, so the Court should deny its Motion.

*Third*, substantial record evidence demonstrates that Harvard deploys its standardless use of race by admissions officers, subcommittees, and the full committee to engage in the "facially invalid" practice of "assur[ing] within its student body some specified percentage of a particular group merely because of its race or ethnic origin." *Regents of the Univ. of Calif. v. Bakke*, 438 U.S. 265, 307 (1978) (opinion of Powell, J.). Harvard engages in this "racial balancing," *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003), through constant monitoring and manipulation of the

3

racial makeup of its formulating class.  The result is remarkably stable racial demographics in

Harvard's admitted classes from year to year.  Such "racial balancing [is] patently

unconstitutional" and unlawful, *id.*, and alone requires denial of Harvard's Motion.

*Finally*, Harvard has been using race to make admissions decisions for more than 45

years—but substantial record evidence demonstrates that, even now, it has never engaged in

"serious, good faith consideration of workable race-neutral alternatives."  *Id.* at 339-40.  Instead,

Harvard attempts to have it both ways.  It contends that its voluntary use of race is necessary to

capture "the educational benefits of diversity," Harv. Opp. at 36, but disclaims any ability either

to "measure" the "level of racial diversity that Harvard thinks is needed in order to obtain" those

benefits or to identify "what form [of] evidence" would justify ending its voluntary use of race,

SFFA Ex. 9 (Fitzsimmons Dep. 114:8-114:13); U.S. Ex. 1 (Fitzsimmons Dep. 134:14-135:6).

Harvard thus has stacked the deck to reject race-neutral alternatives and to "[e]nshrin[e]" some

unspecified and unprovable level of diversity "as a permanent justification for racial preferences"

that harm Asian Americans.  *Grutter*, 539 U.S. at 342.  Such an open-ended use of race is

precisely what the Supreme Court foreclosed when it stressed that race-based admissions policies

must be "temporary" and rigorously reviewed against race-neutral alternatives.  *Id.* at 342-43.

The Court should deny Harvard's Motion.[1]

---

[1] In this Statement of Interest, the United States explains why the record evidence
forecloses granting Harvard's Motion for Summary Judgment under current Supreme Court
precedent.  *But see Grutter*, 539 U.S. at 342-43 (noting that the Supreme Court has "limited" its
approval of the voluntary use of race in university admissions policies to a "temporary" period
and that its approval will end when such policies are "no longer . . . necessary").  The United
States files this Statement of Interest under 28 U.S.C. § 517.  The United States has a substantial
interest in this case because its resolution could have a significant impact on the United States
Department of Justice's pending investigation into Harvard's admissions policy, as well as on the
interpretation and scope of the Equal Protection Clause, Title VI of the Civil Rights Act of 1964,
42 U.S.C. § 2000d *et seq*., and other anti-discrimination laws that the United States enforces, *see*,

**ARGUMENT**

## I.  HARVARD HAS FAILED TO DEMONSTRATE THAT ITS USE OF RACE IS NARROWLY TAILORED TO SERVE A COMPELLING INTEREST

Despite its legal duty not to discriminate "on the ground of race," 42 U.S.C. § 2000d,

Harvard acknowledges that it voluntarily uses race as a factor to decide whether to offer certain

applicants admission to its elite educational institution, *see* Mem. in Supp. of Def.'s Mot. for

Summ. J. at 21-25, ECF No. 418-2 ("Harv. Mem."); Harv. Opp. at 35-39.  Harvard contends that

its use of race is justified to capture "the educational benefits of diversity."  Harv. Opp. at 36.

Judicial review of Harvard's admissions practices "must begin from the position that any official

action that treats a person differently on account of his race or ethnic origin is inherently

suspect." *Fisher v. Univ. of Texas*, 570 U.S. 297, 310 (2013) ("*Fisher I*").  Moreover, even if

Harvard establishes a compelling interest, "there must still be a further judicial determination

that the admissions process meets strict scrutiny."  *Id.* at 311.

That searching examination places on Harvard the demanding burden to show that its use

of race is "narrowly tailored" to achieve a "compelling" government interest.  *Parents Involved*,

551 U.S. at 720.  The purpose of the narrow tailoring requirement is to ensure that "'the means

chosen "fit" th[e] compelling goal so closely that there is little or no possibility that the motive

for the classification was illegitimate racial prejudice or stereotype.'"  *Grutter*, 539 U.S. at 333

(quoting *Croson*, 488 U.S. at 493 (plurality opinion)).  Indeed, "racial classifications, however

compelling their goals, are potentially so dangerous that they may be employed no more broadly

---

*e.g.*, 42 U.S.C. § 2000c-6 (enforcement of the Equal Protection Clause in the context of institutions of higher learning); 20 U.S.C. § 1681 *et seq*. (Title IX of the Education Act Amendments of 1972); *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) ("[The Supreme] Court has interpreted Title IX consistently with Title VI."); *see also* U.S. Notice of Interest in Public Access to Summ. J. Briefing and Materials, ECF No. 395.

than the interest demands." *Id.* at 342. "[R]acial classifications are simply too pernicious to permit any but the *most exact* connection between justification and [racial] classification." *Adarand*, 515 U.S. at 236 (emphasis added) (citation omitted); *see also Bakke*, 438 U.S. at 289-91 (opinion of Powell, J.) ("Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination.").

Harvard can carry its demanding strict-scrutiny burden at summary judgment only by showing that there is no genuine dispute as to any material fact, *see Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017), that its use of race bears "the most exact connection" to a compelling interest, *Adarand*, 515 U.S. at 236. Harvard has failed to carry that burden here. In the first place, Harvard identifies no meaningful criteria that guide, and fails to explain with particularity, its voluntary use of race in making admissions decisions. Moreover, Harvard fails to overcome the record evidence that its personal rating—which significantly diminishes Asian-American applicants' chances of admission—is unjustifiably infused with race. And Harvard also fails to overcome the substantial evidence that it is engaging in racial balancing. As explained more fully below, each of these failures requires denial of Harvard's summary judgment motion.[2]

---

[2] Harvard alludes to a possible future argument that Title VI might not prohibit the same level of racial discrimination for private universities as the Equal Protection Clause prohibits for public universities. *See* Harv. Mem. at 16 n.12. Similarly, some *amici* suggest that the First Amendment requires that courts defer to a university's decision to engage in racial classifications or discrimination. *See* Amicus Br. of Brown Univ. et al. in Supp. of Defs. at 14-15, ECF No. 445. These arguments are meritless. Given that Harvard has not developed either argument, the United States will address these arguments fully if and when Harvard attempts to advance them meaningfully.

### A.  Harvard Provides No Meaningful Criteria To Guide Its Voluntary Use of Race in Admissions Decisions

The Court should deny Harvard's Motion for Summary Judgment because Harvard points to no meaningful criteria to guide its use of race.  Harvard acknowledges that it uses "race" as "one factor" in making admissions decisions.  Harv. Opp. at 37.  Harvard further concedes that it may consider an applicant's race at all three phases of its admissions process:  the first review by an admissions officer, the review and recommendation by a subcommittee assigned to one of approximately twenty geographic dockets, and the final decision by the full admissions committee.  Harv. Mem. at 6 & 23; *see also* SFFA SOF ¶¶ 236-238, 248-250, 256-258.

In particular, Harvard admits that "an applicant's self-identified race" is "one of many factors that affects the overall rating" assigned by its admissions officers.  Harv. Mem. at 23.  As Harvard explains, "[t]o facilitate the evaluation and comparison of applicants," an admissions officer "assigns numerical ratings to applicants on four dimensions:  academic, extracurricular, athletic, and personal."  *Id.* at 6.  The numerical scores on these four profile ratings "typically range from 1 to 4, with 1 being the best score."  *Id.*  Admissions officers "also assign applicants an overall rating, which takes into account the [four profile] ratings, but is not determined by any particular formula and may take into account information not reflected in any other ratings," such as the applicant's race.  *Id.* at 6 & 23.  Harvard further admits that the subcommittee, in making admission recommendations, may consider race separate and apart from the overall rating and that the full committee, in making final decisions, may again consider race separate and apart from both the overall rating and the subcommittee recommendation.  *See, e.g.*, Harv. Resp. to SFFA SOF ¶¶ 251 & 264, ECF No. 437; Harv. SOF ¶¶ 75-76 & 80, ECF No. 420.

Harvard, however, provides no meaningful criteria to cabin or carefully guide its use of race in any of these phases.  Unsurprisingly, then, Harvard fails to explain with any particularity

how it uses, employs, or weighs an applicant's race among the constellation of factors that it

claims to "consider[] flexibly in the admissions process."  Harv. Opp. at 37; *see also* Harv. Mem.

at 23.  Without such criteria or precise explanation, Harvard cannot demonstrate that its use of

race bears the "most exact connection" to its goal of capturing the educational benefits of

diversity, *Adarand*, 515 U.S. at 236, or that race is not being used in illegal ways that "demean[]

the dignity and worth" of applicants, *Rice*, 528 U.S. at 517.  Harvard's Motion should be denied.

Indeed, Harvard points to no record evidence of any meaningful standards guiding its

consideration of race in making admissions decisions.  The best that Harvard can muster is the

statement of one admissions officer that "the consideration of race in the overall rating 'depends

on the individual case,' and may be done 'to reflect the strength of the case and to provide a

slight tip for some students.'"  Harv. Mem. at 23.  Similarly, the Dean or Director of Admissions

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████.  SFFA

SOF ¶ 249.  But Harvard never explains how its admissions officers or the full committee

identifies which "individual case[s]" have sufficient "strength" to warrant this racial "tip," or

how this "strength" or "tip" actually affects an applicant's chances for admission compared to an

applicant who receives no racial "tip."  *See* Harv. Mem. at 23.  Leaving a standardless use of race

to the vagaries of individual admissions officers' subjective preferences "depend[ing] on the

individual case," *id.*, is not the kind of rigorous cabining of the voluntary use of race that strict

scrutiny demands, *see, e.g.*, *Grutter*, 539 U.S. at 333; *Adarand*, 515 U.S. at 236; *Croson*, 488

U.S. at 493 (plurality opinion).

Even Harvard's own internal guidelines confirm that it has failed to achieve narrow

tailoring in its voluntary use of race, but instead allows its admissions officers to deploy race

without meaningful standards or limitations.  Those guidelines fail to provide its alumni interviewers and admissions officers with anything but vague, open-ended permission to use race in the admissions process.  For example, Harvard cites to its Interviewer Handbook for alumni interviewers and the Reading Procedures for admissions officers as guidance on the use of race in Harvard's admissions process.  *See* Harv. Opp. at 27; Harv. Resp. to SFFA SOF ¶¶ 198 & 199; *e.g.*, Harv. SOF ¶¶ 43, 59-60 & 64.  The Interviewer Handbook, however, merely lists race as one of the factors that might provide an applicant with an admissions "tip," but it provides no criteria as to when, where, or how interviewers must incorporate or otherwise weigh a racial "tip."  Harv. SOF ¶ 28; SFFA SOF ¶ 262; *see generally* Harv. Ex. 55 (Interviewer Handbook 2014-2015) at HARV00001400-1402.

Harvard's Reading Procedures indicate ████████████████████████ ████████████, but otherwise provide no criteria ████████████████████ ████████████ in the admissions process.  *See generally* Harv. Ex. 57 (Reading Procedures, Class of 2018) at HARV0015410-15411.  Harvard's Reading Procedures provide no instructions for admissions officers on whether or how to use race when assigning numerical scores on any ratings, including the four profile ratings and the overall rating, and no instructions to the subcommittee or the full committee on how to consider race in making their decisions.  *See* SFFA SOF ¶¶ 69, 75, 79-88, 97-99, 237-238 & 250; *see generally* Harv. Ex. 57 (Reading Procedures, Class of 2018) at HARV0015410-15411.

Harvard also relies on admissions officers' scattered, post-hoc testimony as a source of limitations on its use of race, but that testimony merely recites the elusory concept that Harvard considers race as one non-tailored factor among many.  Harv. SOF ¶ 117.  Harvard points to training materials that it claims to provide to its admissions officers, but those materials also

provide no meaningful instruction on how or when to use race. *See* Harv. SOF ¶ 31 (citing Harv. Ex. 52 (2012 Casebook); Harv. Ex. 53 (2012 Casebook Discussion Guide)).  Admissions officers further confirmed that they had no memory of any training on how to use race in scoring applications, formulating recommendations, or making final decisions. *See* U.S. Ex. 2 (Ortiz Dep. 73:18-74:25); *see also* SFFA Ex. 5 (Cheng Dep. 34:10-35:12 (confirming no training on use of race)).  The Dean of Admissions testified that he does not give instructions on how race should be used and does not know if training materials or other documents give any such instructions or address the legal restrictions on the use of race.  U.S. Ex. 1 (Fitzsimmons Dep. 234:15-237:2; 237:17-237:23).

Despite this lack of instruction, Harvard claims that its admissions officers may consider an applicant's race when assigning the overall rating but not any of the four profile ratings, Harv. Mem. at 23; Harv. SOF ¶ 61; Harv. Resp. to SFFA SOF ¶ 214, although record evidence exists that admissions officers also consider race when scoring the personal rating, *see infra* Part I.B. But in all events, Harvard's failure to cabin with clear and meaningful standards its acknowledged use of race in the overall rating, and by the subcommittees and the full committee, cannot survive strict scrutiny and is fatal to its summary judgment motion. *See, e.g.*, *Adarand*, 515 U.S. at 236; *Grutter*, 539 U.S. at 333; *Parents Involved*, 551 U.S. at 720; *Fisher I*, 570 U.S. at 310.

Harvard seeks refuge for its race-infused admissions process in the Supreme Court's prior upholding of "flexible" admissions practices that included consideration of race "in the context of individualized consideration of each and every applicant."  Harv. Mem. at 21 (quoting *Grutter*, 539 U.S. at 334).  But a "flexible" admissions process is not the same thing as a standardless and unexplained use of race.  Moreover, Harvard's conclusory assertions that its use

of race comports with other educational institutions' use of race in prior cases are insufficient to satisfy its demanding strict-scrutiny burden. "Strict scrutiny does not permit a court to accept a school's assertion that its admissions process uses race in a permissible way without a court giving close analysis to the evidence of how the process works in practice." *Fisher I*, 570 U.S. at 313. Harvard has failed to provide any sort of "close analysis" of its use of race, *id.*, so the Court should deny its Motion for Summary Judgment.

**B. Direct and Circumstantial Evidence Indicates That Harvard Considers Race in Scoring Its Vague Personal Rating That Harms Asian-American Applicants**

The Court also should deny Harvard's Motion for Summary Judgment because direct and circumstantial evidence indicates that its vague personal rating—which harms Asian-American applicants' chances for admission—may be infected with racial bias. Courts often look to the factors articulated in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 265-68 (1977), to expose the use of race when a defendant denies such use. That framework "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," and examines such factors as "[t]he impact of the official action [and] whether it bears more heavily on one race than another," "[t]he specific sequence of events leading up the challenged decision," and "[d]epartures from" "normal procedur[es]." *Id.* at 266-67.

Here, "circumstantial and direct evidence"—including statements from Harvard's Dean of Admissions and admissions staff and Harvard's own documents—indicates that Harvard intentionally considers race in scoring the personal rating. *Id.* at 266. Moreover, the "impact" of the personal rating "bears more heavily" on Asian-American applicants than on applicants of other races. *Id.* Even Harvard admits that, on average, it scores Asian Americans lower on the personal rating than white applicants—and, as explained below, the personal rating significantly

diminishes Asian-American applicants' chances for admission.  Harv. Ex. 33 (Card Rep.) ¶ 73; SFFA SOF ¶ 90.  Moreover, when an internal Harvard study found that the personal rating might be infected with racial bias against Asian Americans, Harvard "depart[ed] from . . . normal procedur[es]" and brushed it aside.  *Arlington Heights*, 429 U.S. at 267.  This "sequence of events" indicates that Harvard's personal rating may encompass an intentional and unexplained use of race or, worse yet, racial stereotypes against Asian Americans.  *Id.*

Either way, Harvard has made no effort to show that the personal rating, or any use of race within that rating, is narrowly tailored to its diversity-related goals.  Harvard most likely cannot meet that demanding burden:  narrow tailoring "requires that a race-conscious admissions program not unduly harm members of any racial group," *Grutter*, 539 U.S. at 341, yet the personal rating's significant negative effect on Asian-American applicants' chances of admission and its determinative weight in many admissions decisions appear to work just such undue harm on Asian Americans.  The Court should deny Harvard's Motion.

### 1.   Testimony from Admissions Officers and Harvard's Own Documents Demonstrate That Harvard Uses Race in the Personal Rating

The admissions officer assigning a personal rating ordinarily has not met the applicant in person.  Harv. Ex. 35 (Arcidiacono Rebuttal Rep.) at 6; *see also* SFFA SOF ¶ 96.  Rather, the personal rating reflects the admissions officer's "subjective" assessment of the applicant's personal traits based on a cold review of the applicant's file.  SFFA SOF ¶ 90; Harv. SOF ¶ 43. That "subjective" assessment attempts to discern whether the applicant has a "positive personality" and "others like to be around him or her;" has "character traits" such as "likability . . . helpfulness, courage, [and] kindness;" is an "attractive person to be with," "widely respected," and a "good person;" and has good "human qualities."  SFFA SOF ¶ 90.

Harvard asserts that "[a]dmissions officers do not take race into account when assigning the personal rating," Harv. SOF ¶ 61, but "circumstantial and direct evidence" indicates otherwise, *Arlington Heights*, 429 U.S. at 266. Harvard's Dean of Admissions testified that race sometimes can be taken into account when assigning the personal rating. SFFA Ex. 9 (Fitzsimmons Dep. 248:1-249:5). Other admissions staff also testified that race is considered in assigning not only the personal rating, but all four of the profile ratings, including the academic and athletic ratings. SFFA SOF ¶ 216.

Harvard's own internal guidelines further suggest that its admissions officers consider race as part of the personal rating. As explained above, *see supra* Part I.A, those guidelines provide no meaningful criteria regarding the use of race—and do not *prohibit* admissions officers from using race in scoring an applicant's personal rating. *See generally* Harv. Ex. 55 (Interviewer Handbook 2014-2015) at HARV00001400-1402; Harv. Ex. 57 (Reading Procedures, Class of 2018) at HARV0015410-15411. Harvard's Reading Procedures indicate ███████████████████████████████████████████████, but otherwise provide no criteria ███████████████████████████████████████████████ in the application process. *See generally* Harv. Ex. 57 (Reading Procedures, Class of 2018) at HARV0015410-15411. Harvard's Reading Procedures provide no instructions for admissions officers on whether or how to use race when assigning numerical scores on any ratings, including the four profile ratings and the overall rating. *See generally id.*

Harvard's Reading Procedures thus suggest that Harvard *permits* admissions officers to consider race in the personal rating—and that many may choose to do so. Indeed, Harvard directs its "admissions officers [to] carefully consider each applicant *in his or her entirety*, seeking a *full picture of the whole person* in context." Harv. Opp. at 37 (emphases added).

13

Harvard further represents that "the admissions officer's personal rating reflects a . . . broad[]

range of information, including the applicant's essays, the recommendations of teachers and

counselors who may have known the applicant for years, *and everything else in the application*

*file related to the applicant's background and life story*." *Id.* at 13 (emphasis added).  Harvard's

capacious instructions to its admissions officers—particularly when combined with its avowed

goal "to ensure that its students come from broadly diverse backgrounds—geographically,

socioeconomically, and *racially*," Harv. Mem. at 7 (emphasis added)—pave the way for

admissions officers to consider race in assessing the personal rating.  Indeed, if Harvard did not

want its admissions officers to consider race in the personal rating, it could have clearly directed

them not to do so.  Instead, it has instructed its admissions officers to consider "everything . . .

related to the applicant's *background* and life story," Harv. Opp. at 13 (emphasis added), as part

of its effort to admit students from "racially" "diverse *backgrounds*," Harv. Mem. at 7 (emphasis

added).

Finally, the personal rating is vague, subjective, and open-ended, further underscoring

that admissions officers can consider race as part of it.  Harvard acknowledges that the personal

rating reflects "intangible and unquantifiable factors" even though it quantifies them in the score.

*See* Harv. Opp. at 11.  The Reading Procedures list a vague scoring rank without any explanation

of the personal qualities being scored.  SFFA SOF ¶¶ 87-89; Harv. Ex. 57 (Reading Procedures,

Class of 2018) at HARV0015415 ("1. ███████ 2. ███████ 3. █████████ 4.

█████████████ 5. ███████████ 6. ████

███████" ); *accord* SFFA Ex. 29 (Reading Procedures, Class of 2019) at

HARV00001444 (eliminating score "6" to ████████ "5. ████████████

████████").  The Interviewer Handbook references "distinguishing excellences"—

without explaining how these factors may relate to the personal rating—and includes considerations that fit within other scores, such as "Athletic ability."  Harv. SOF ¶ 28; Harv. Ex. 166 (Arcidiacono Dep. 96:1-96:20); Harv. Ex. 55 (Interviewer Handbook 2014-2015) at HARV00001400-1402.

Harvard's Director of Admissions admitted that these guidelines are "█████████████" and that admissions officers "████████████████████."  SFFA SOF ¶ 89.  Harvard's proffered statistical expert, Dr. Card, confirmed that he did not "exactly know" what personal qualities admissions officers were looking for.  SFFA SOF ¶ 768.  Not surprisingly then, given the lack of guidance provided on how to use the "personal rating," admissions staff asked in depositions about this key admissions criterion gave varied answers as to what subjective elements they thought the personal rating was supposed to consider.  *See* SFFA SOF ¶ 90.  This testimony only bolsters the other testimony from Harvard's own employees that admissions officers consider race in the personal rating (as well as possibly the other three profile ratings). *See, e.g.*, SFFA Ex. 9 (Fitzsimmons Dep. 248:1-249:5); SFFA SOF ¶ 216.

### 2. Harvard Admits That It Scores Asian-American Applicants Lower on the Personal Rating on Average and That the Personal Rating Is a Driving Factor in Many Admissions Decisions

"The impact" of the personal rating also "bears more heavily" on Asian-American applicants than on applicants of "[]other" races.  *Arlington Heights*, 429 U.S. at 266.  Harvard's admissions process generally results in acceptance of Asian-American applicants at the lowest rate of any major racial group.  Arcidiacono Rep. at 31-32, ECF No. 415-8.  Moreover, even Harvard acknowledges that, on average, it scores Asian-American applicants lower on the personal score than white applicants.  *See* Harv. Opp. at 11-12.  Harvard's own expert and internal documents prepared by its Office of Institutional Research ("OIR") confirm that admissions officers assign Asian-American applicants lower personal ratings than white

applicants.  Harv. Ex. 33 (Card Rep.) ¶ 73; SFFA Ex. 145 (Admissions Part II Report) at
HARV00065745; *see also* Arcidiacono Rep. at 10 & 37.  In fact, Asian-American applicants
have the lowest scores of the four largest racial groups on Harvard's personal rating despite their
superiority in the academic rating.  SFFA SOF ¶ 606.

Harvard also admits that the personal rating is the driving factor in many admissions
decisions.  Harvard agrees that "[w]hen an applicant is strong in other respects, including
academics and extracurricular activities, the applicant's personal qualities—as evidenced by
teacher recommendations, the secondary school report, personal statement, and the alumni
interview report—may distinguish an applicant's candidacy for admission."  Harv. SOF ¶ 232.
Harvard's own proffered expert, Dr. Card, determined that the personal rating is a key factor in
Harvard's admissions decisions and has a larger impact on his model's explanatory power than
either the academic or the extracurricular rating.  Harv. Ex. 37 (Card Rebuttal Rep.) at Ex. 22.
OIR's analysis also shows that the personal rating is a driving factor in Harvard's admissions
decisions.  SFFA Ex. 145 (Admissions Part II Report) at HARV00065742 ("Personal rating is
important in models of the admissions process and drive[s] some of the demographic differences
we see."); *id.* at HARV00065748 (listing "High Personal Rating" as the top factor associated
with being admitted to Harvard); SFFA Ex. 112 (May 1, 2013, Report) at HARV00023549
("The variables with the largest effects on the probability of admission are athletic rating,
personal rating, and legacy status."); SFFA Ex. 157 (May 30, 2013, Report) at HARV00069766-
69767 (indicating that a personal rating of 1 or 2 is one of the top three variables predicting the
probability of admission).  And SFFA's expert, Dr. Arcidiacono, ███████████ the
personal rating ███████ in Harvard's admissions decisions.  Harv. Ex. 27
(Arcidiacono Dep. 279:21-280:9).

16

Thus, Harvard uses as a driving factor in its admissions process a personal rating that systematically scores Asian-American applicants lower than applicants of other races and thereby significantly diminishes Asian Americans' chances for admission.  SFFA SOF ¶¶ 90 & 606.  The parties dispute whether Harvard's personal rating encompasses an unexplained use of race or, worse yet, pernicious racial stereotypes against Asian Americans.  But for the reasons explained above, Harvard's primary argument that the personal rating does not encompass a use of race is unpersuasive.  *See supra* Parts I.A-B.1.  Moreover, even while he disputes the existence of racial bias against Asian Americans in the personal rating, Harvard's own expert could not rule it out.  Harv. Ex. 33 (Card Rep.) ¶ 19; SFFA SOF ¶ 769.  Instead, he attempts to explain away the personal rating's negative effect on Asian Americans as the result of "individualized 'unobservable' factors" among Asian-American applicants.  SFFA SOF ¶¶ 761-762.

Nonetheless, Harvard contends that the personal rating does not "reflect 'offensive racial stereotyping,'" but instead "cannot reliably be modeled because so many factors that inform the rating are difficult to quantify."  Harv. Opp. at 12.  But that is precisely the point:  out of the "many" factors in its personal rating, *id.*, Harvard has been unable to point to even a single "[]observable factor[]" that explains the personal rating's penalty against Asian-American applicants, *see* SFFA SOF ¶¶ 761-762.  On this record, a fact finder could conclude that the personal rating—echoing Harvard's deplorable past discrimination against Jewish applicants, *see, e.g.*, Pl.'s Mem. of Reasons in Supp. of Its Mot. for Summ. J. at 23-26, ECF No. 413-2— reflects racial stereotypes that Asian-American applicants are "subjective[ly]" less "likab[le]," "good," "human," or desirable on the myriad other factors Harvard considers in the personal rating than applicants of other races, SFFA SOF ¶ 90.  Alternatively, a fact finder could conclude

that the vague and elusory personal rating encompasses an intentional and unexplained use of race among its "many" factors, Harv. Opp. at 12, despite Harvard's protestations to the contrary, *see supra* Part I.B.1; *see also Arlington Heights*, 429 U.S. at 266-67.  In either event, the personal rating significantly harms Asian-American applicants' chances for admission despite their superiority in the academic rating, SFFA SOF ¶ 606, and Harvard has failed even to attempt to defend the personal rating as narrowly tailored to a compelling interest.  The Court should deny Harvard's Motion for Summary Judgment.

### 3. Harvard Brushed Aside Its Own Internal Evidence That the Personal Rating May Be Infused with Racial Bias

Finally, when confronted with evidence that the personal rating may be infused with racial bias, Harvard "depart[ed]" from "normal procedur[es]" and took no action. *Arlington Heights*, 429 U.S. at 267.  On November 28, 2012, Ron Unz, a Harvard alumnus, published an article entitled "The Myth of American Meritocracy" ("Unz Article") that concluded that statistical evidence showed "an anti-Asian admissions bias" in Harvard's admissions process. SFFA SOF ¶¶ 348-350.  Harvard was aware of this article and held a number of meetings to consider how it should respond.  Shortly after the article came out, Harvard's researchers, including OIR, and public affairs staff were "hard at work doing a variety of analyses."  SFFA SOF ¶ 372 (citing SFFA Ex. 111 at HARV00023432).

OIR's reports further confirmed that the personal rating is elusory and may be infused with racial bias.  OIR collects, synthesizes, and analyzes Harvard's institutional data and produces reports for Harvard's leaders on issues including admissions policies and practices. SFFA SOF ¶ 8.  In 2013, OIR analyzed Harvard's admissions process, including the impact that the personal rating and Asian-American ethnicity had on the admissions process, and provided its analysis to Harvard's leadership.  *See* SFFA Exs. 112 (May 1, 2013, Report), 134 (February

2013 Report), 145 (Admissions Part II Report) & 157 (May 30, 2013, Report); *see also* SFFA

SOF ¶¶ 426, 466-467, 492 & 518.

OIR specifically sought to determine whether Harvard's admissions process

"disadvantage[s]", and is "bias[ed]" against, Asian-American applicants.  SFFA Ex. 134 at

HARV00031689 & HARV00031724.  OIR eventually produced three reports that indicated that

Asian-American ethnicity is negatively correlated with admission to Harvard.  SFFA Exs. 112 at

HARV00023550, 145 at HARV00065749, and 157 at HARV00069766.  The Admissions Part II

Report further showed a negative correlation between the personal rating and Asian-American

ethnicity.  SFFA Ex. 145 at HARV00065745.  Based on its findings, OIR concluded that further

analysis was necessary to gain a better understanding of these negative correlations.  SFFA Ex.

134 at HARV00031722 & HARV00031724.

In particular, OIR stated in the February 2013 Report, "With current data, we explain a

significant amount of the variation in admission, but further details (especially around the

personal rating) may provide further insight."  SFFA Ex. 134 at HARV00031722.  OIR

continued, "We'd like to better understand . . . [t]he role of the personal statement/essay," and

asked "[t]o further address the question of bias, is there more data to elaborate our understanding

of the role of the personal essay and other factors?"  SFFA Ex. 134 at HARV00031722 &

HARV00031724.  In its Admissions Part II Report, OIR concluded that, with the current data,

the numerical value of the personal rating does not capture the full picture of the applicant.

SFFA Ex. 145 at HARV00065755.  OIR found that the alumni interview ratings, teacher ratings,

and guidance counselor ratings accounted for only 20% of the variation in the personal ratings.

*Id.*  OIR provided no explanation for what factors were accounting for the other 80% of the

variation in the personal rating.  *See id.*

Faced with this evidence and these lingering questions, Harvard apparently had no interest in that further analysis, and did not undertake it, despite its legal obligation to ensure that its admissions process does not discriminate on the basis of race. *See* 42 U.S.C. § 2000d. Harvard's leadership neither took action, nor requested that OIR take further action, to determine whether Harvard's admissions process unduly harms Asian-American applicants. SFFA SOF ¶¶ 426-431, 466-471, 513-517, 525-528. Harvard could have asked OIR to conduct further analysis of the personal rating and steps that could be taken to ensure that the personal rating is not racially biased. Or at the very least, Harvard could have had OIR complete the reports that Harvard now argues were incomplete drafts. *Cf.* Harv. Opp. at 19 (characterizing the OIR reports as containing "preliminary and incomplete analysis"). Harvard did none of that. Instead, it left in place a personal rating that harms Asian-American applicants' chances for admission, weighs heavily in Harvard's admissions process, and may be infused with a use of race that Harvard has made no effort to justify.

Harvard may claim that it undertook that analysis through Dr. Card's "more comprehensive, informed, and reliable work," *id.*, but such analysis of an expert retained in response to litigation does not change the fact that Harvard—years before, when the question was first raised—undertook no voluntary effort to explore, in good faith, whether its admissions process was discriminating against Asian-American applicants. The Court should deny Harvard's Motion. *See Arlington Heights*, 429 U.S. at 267.

**C. The Record Contains Substantial Evidence That Harvard Engages in Racial Balancing**

Harvard's Motion for Summary Judgment fails for another reason as well: the record contains substantial evidence that Harvard is engaging in unlawful racial balancing in formulating each year's admitted class. Even where the Supreme Court has upheld the narrowly

tailored use of race in university admissions, it has made clear that a university may not pursue the "facially invalid" purpose of "assur[ing] within its student body some specified percentage of a particular group merely because of its race or ethnic origin." *Bakke*, 438 U.S. at 307 (opinion of Powell, J.); *accord Grutter*, 539 U.S. 329-30.  Accordingly, a university's "admission program cannot use a quota system." *Grutter*, 539 U.S. at 334.  So, too, is "outright racial balancing . . . patently unconstitutional" because it would "insulat[e]" individual applicants "from comparison with all other candidates for the available seats." *Id.* at 330 & 334 (citation omitted).  The prohibition against racial balancing is a "principle . . . of substance, not semantics." *Parents Involved*, 551 U.S. at 732 (plurality opinion).  A university cannot transform racial balancing "from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" *Fisher I*, 570 U.S. at 311 (quoting *Parents Involved*, 551 U.S. at 732 (plurality opinion)).

As explained above, Harvard employs a standardless use of race in its overall rating, subcommittee recommendations, and final admissions decisions—and likely in its vague personal rating that harms Asian-Americans' chances for admission. *See supra* Parts I.A-I.B. Substantial evidence further shows that, with this elusory use of race, Harvard engineers its admissions process to produce an admitted class that replicates its desired racial balance year in and year out.  Harvard considers race in setting its overall admissions target and constantly monitors and shapes the racial percentages of the formulating class with the result of remarkably stable racial demographics in Harvard's admitted classes from year to year.  For this reason as well, the Court should deny Harvard's Motion.

## 1. The Record Contains Substantial Evidence That Harvard Engineers Its Admissions Process To Replicate the Previous Year's Racial Balance

Substantial record evidence shows that Harvard's racial balancing begins with its selection of an admissions target for the incoming class.  Every January, after the submission of all regular decision applications, the admissions office calculates a target number of applicants to whom it will offer admission that year.  SFFA SOF ¶¶ 103-104 & 106.  To fill its freshman class, Harvard offers admission to more students than its fixed class size (approximately 1660) can accommodate because a percentage of those applicants will decline their admission offers.  Harvard projects the percentage of applicants it estimates will accept admission offers—known as the "yield"—and uses the percentage to compute a target number of admission offers that will "yield" admission acceptances that match the fixed class size.  SFFA SOF ¶¶ 106 & 109.

Harvard calculates the yield by predicting the demographic characteristics of the class it will admit and then comparing its predicted class to demographic yields of the prior year's class.  SFFA SOF ¶¶ 107-108 & 230.  Harvard ███████████████ and knows that applicants historically yield at different rates by race ████████████████████████████ ████████████████████████████████████████████████████████  █  SFFA SOF ¶¶ 230-231.  ████████████████████████████ ██████████.  SFFA SOF ¶ 234.  Prior to finalizing this total target number, Harvard attends a conference of the Association of Black Admissions and Financial Aid Officers of the Ivy League and Sister Schools ("ABAFAOILSS"), where Harvard and 15 other schools of similar reputation—such as Brown, Columbia, Cornell, Princeton, and Yale—share and discuss their non-public admissions numbers by race from the current admissions cycle.  SFFA SOF ¶¶ 219-229 (showing sharing number of applications received, admitted to date, matriculated to date).

With this information in hand, Harvard sets its total target number of applicants to admit for the year.  SFFA SOF ¶¶ 219 & 229.

Harvard then breaks the total target number down into sub-targets for each geographic subcommittee, based again on the percentage of the previous class that was admitted through the subcommittee the previous year.  SFFA SOF ¶¶ 110-111.  Harvard's admissions office sends each subcommittee a "hard target" of tentative admits that the subcommittee cannot break. SFFA SOF ¶ 112.  When considering the applicant, the subcommittee members view an applicant's "summary sheet," which summarizes the applicant's race and other critical information and ███████████████████████████████████ SFFA SOF ¶ 237. When making tentative admission decisions, it is undisputed that subcommittee members consider the applicant's self-identified race.  SFFA SOF ¶¶ 236-238.  Subcommittees contemporaneously record their tentative admissions decisions in an electronic database, which allows the admissions officers to see how the racial makeup of the admitted class is forming and to make adjustments to that makeup.  SFFA SOF ¶¶ 118-119 & 122.

The subcommittees' tentative admits then move to the full admissions committee. 

SFFA SOF ¶¶ 121, 131 & 246.

SFFA SOF ¶ 247.  the full committee meets for several days to consider each applicant, typically organized by subcommittee, to make "near-final" admit, deny, and waitlist decisions.  SFFA SOF ¶¶ 125-126.  When considering an applicant, the full committee members also view the

23

applicant's "summary sheet" that prominently displays the applicant's race.  SFFA SOF ¶ 248.

The admissions officers then expressly consider the applicant's race in deciding to accept or

reject an applicant.  SFFA SOF ¶ 250.  Indeed, the Dean or Director of Admissions ███████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████  SFFA SOF ¶ 249.  Like the

subcommittees, the full committee contemporaneously records its admission decisions in an

electronic database.  SFFA SOF ¶ 129.

     Moreover, near the end of the admissions process, █████████████████████████

█████████████████████████████████████████████████████████.

SFFA SOF ¶¶ 134-135 & 256.  ███████████  the admissions office ████████████████

█████████████  a process called "lopping."  SFFA SOF ¶¶ 134-135 & 256.  The Dean of

Admissions ████████████████████████████████████████  and assigns

each subcommittee a portion to "lop."  SFFA SOF ¶¶ 134-135.  The subcommittees meet again

to formulate their "lop lists" on a spreadsheet that contains just four considerations next to the

applicant's name:  legacy status, recruited athlete status, financial aid qualification, and race.

SFFA SOF ¶ 136.  With these "lop lists" in hand, the full committee meets again to "lop" off the

required number of applicants.  SFFA SOF ¶¶ 137 & 257.  When deciding whether to lop an

applicant, ██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████  SFFA SOF ¶¶ 258-259.

     In May, before Harvard makes waitlist decisions, Harvard again trades race admission

numbers with the other Ivy League schools at a second ABAFAOILSS meeting.  SFFA SOF

¶¶ 276-279.

### 2. The Record Contains Substantial Evidence That Harvard Constantly Monitors and Manipulates the Formulating Class To Achieve Its Preset Racial Balance

Harvard not only ████████████████████████████████████████████████████

██████, but also continually monitors the racial balance of the formulating class as compared

to the previous year's class.  Harvard's admissions office generates snapshot summaries called

"one-pagers" from the continually-updated electronic admissions database.  SFFA SOF ¶¶ 120-

122.  These "one-pagers" show the current racial balance of the tentative admits right next to the

previous year's corresponding racial statistics.  SFFA SOF ¶¶ 121, 239-240.  This side-by-side

presentation helps to ensure that the new class has a racial balance that is consistent with, or at

least not dramatically different from, the racial balance of prior admitted classes.  Indeed, the

admissions office generates these "one-pagers at critical points throughout the admissions cycle,

including after the close of the early-action and regular-decision deadlines and before, during,

and after full committee meetings," SFFA SOF ¶¶ 123 & 243, ████████████████████

████████████████████████████████████████████████████████, SFFA SOF

¶ 252.  If Harvard ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

SFFA SOF ¶¶ 253-255; *see also* SFFA SOF ¶¶ 130-133, 168-172.

At the same time, Harvard also ████████████████████████████████████████

██████████████████████████ SFFA SOF ¶ 247 (emphasis added).  Yet Harvard does

not explain why ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████.  Nor would Harvard's pursuit of "the educational benefits of diversity," Harv. Opp.

at 36, justify doing so.  That diversity-related interest allows a university to attain a *minimum*

"critical mass" of students from a particular racial group, not ████████████████████████

██████████████████████████ *Grutter*, 539 U.S. at 335-36.  Indeed, the only

conceivable reason to ████████████████████████████████████ would be to

facilitate the illicit purpose of maintaining a desired "racial balance" from year to year.  *Id.* at

330 & 334.

 Harvard's Statement of Material Facts does not mention its racial admissions targets or

"one-pagers."  Harvard's Opposition Brief downplays, but does not deny, the practices described

above.  For example, Harvard describes the process of "lopping" applicants as an unremarkable

process that every school likely employs, but fails to mention that the "lop list" spreadsheet

prominently displays applicants' races.  Harv. Opp. at 32-33.  Similarly, Harvard's Opposition

Brief concedes the use of "one-pagers," lists their contents, claims that they "hardly" show a

"myopic or undue focus on race," but fails to mention that the race portion constitutes almost

half of the page and shows ████████████████████ the racial composition of

the emerging class as compared to the previous year.  Harv. Opp. at 33-34; *cf.* SFFA Ex. 46

(one-pager comparing 2017 to 2018).

 Harvard's prominent use of race, and its effort both to keep close tabs on the racial

composition of the emerging class and to compare it to prior years' classes, support the inference

that Harvard is engaging in unlawful racial balancing.  Yet, despite the above evidence of a well-

engineered process aimed at maintaining a consistent racial balance, Harvard claims it employs

no racial numerical goals.  Harvard repeatedly claims it has no specific level of racial diversity or

other number in mind to achieve its proffered goal of obtaining the educational benefits of

diversity.  *E.g.*, Harv. SOF ¶ 158; SFFA SOF ¶ 885.  Yet at the same time, as explained below,

Harvard rejects race-neutral alternatives by pointing to the purportedly harmful change such

alternatives might cause to its current racial balance.  *See infra* Part II.B.  Harvard cannot have it

both ways:  either it pursues no preset race-based goals or it rejects race-neutral alternatives in order to maintain its preferred racial balance.  The substantial record evidence of the latter requires denial of Harvard's Motion for Summary Judgment.

### 3. The Remarkably Stable Racial Balances in Harvard's Admitted Classes Provide Substantial Evidence of Racial Balancing

The racial balance in Harvard's admitted classes over time is remarkably stable:

| Percentage of the Admitted Class by Race | | | | |
|---|---|---|---|---|
| | Class of 2014 | Class of 2015 | Class of 2016 | Class of 2017 |
| Asian American | 18% | 18% | 20% | 20% |
| African American | 11% | 12% | 10% | 11% |
| Hispanic American | 10% | 12% | 11% | 11% |
| Native American | 3% | 2% | 2% | 2% |
| White | 48% | 49% | 52% | 53% |

SFFA SOF ¶ 699 (citing SFFA Ex. 139).  This stability bolsters the other record evidence that Harvard is engaging in racial balancing.

Harvard attempts to spin these numbers by suggesting that they show an "11% increase" in the share of Asian-American applicants admitted.  Harv. Opp. at 29-30; *see also* Harv. Ex. 33 (Card Rep.) ¶¶ 193-194 & Card Exs. 31-34 (using same "fraction" analysis).  This is statistical hand-waving:  Harvard arrives at this percentage by using a "fraction" analysis that compares the share of Asian-American applicants admitted from one year to the next, not the share of Asian-

American applicants admitted as a total of a single year's class.[3]  Harvard cannot sidestep the fact that its "one-pagers" meticulously track the percentages provided in the chart above (rather than the "fractions" Harvard offers) and that the uncontested numbers indicate that Harvard has largely tracked its desired racial percentages year in and year out.  *Cf. Grutter*, 539 U.S. at 336 (finding difference in percentage of minorities in each class "from 13.5 to 20.1 percent [was] a range inconsistent with a quota."); *see also id.* at 389-91 (Kennedy, J., dissenting) (analyzing (not "fraction" share but) percentage of minorities in each class as a whole); *id.* at 384-85 (Rehnquist, C.J., dissenting) (analyzing difference in percentages of minorities in the applicant pool, percentages of minority admissions, and percentages of minority enrollment).  Harvard's mechanical system of "working backward to achieve a particular type of racial balance" linked to the prior year's racial makeup "is a fatal flaw."  *Parents Involved*, 551 U.S. at 729 (plurality opinion).  The Court should deny Harvard's Motion for Summary Judgment.

## II.  THE RECORD CONTAINS SUBSTANTIAL EVIDENCE THAT HARVARD IS DETERMINED TO CONTINUE ITS USE OF RACE INDEFINITELY DESPITE AVAILABLE RACE-NEUTRAL ALTERNATIVES

Harvard's failure to provide meaningful criteria to cabin its voluntary use of race, its use of a personal rating that significantly harms Asian-American applicants' chances of admission and may be infected with racial bias, and the substantial evidence that Harvard is engaging in outright racial balancing each warrant denial of Harvard's Motion for Summary Judgment.  *See supra* Part I.  The Court should deny Harvard's Motion for another reason as well:  in the more

---

[3] Notably, Harvard elsewhere has publicly characterized percentages similar to those in the chart as "slight" or "similar."  *See, e.g.*, Harv. Ex. 73 at 3 (announcing "9.6 percent of admitted students this year are African-American, compared with 7.2 percent the last time Harvard had Early Action . . . and a slight decrease for Asian Americans (22 percent vs. 23 percent)"); Harv. Ex. 82 at 4-5 (labeling "similar" female's "50.1 percent of the admitted students, compared with 49.3 percent last year").

than 45 years that Harvard has been voluntarily using race to make admissions decisions, it has never engaged in the serious, good-faith consideration of race-neutral alternatives for achieving its diversity-related goals.

Indeed, before voluntarily deciding to use—or to continue to use—racial classifications in its admissions process, Harvard must engage in "serious, good faith consideration of workable race-neutral alternatives." *Grutter*, 539 U.S. at 339-40.  It thus bears the "the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Fisher I*, 570 U.S. at 312.  This Court cannot defer to Harvard's determination, but rather must reach its own independent judgment that race-neutral alternatives will not produce the "educational benefits of diversity" "about as well and at tolerable administrative expense" as Harvard's current race-based system. *Id.* (citation omitted).  In other words, this Court must determine "that it is 'necessary' for [Harvard] to use race" and conduct a "careful judicial inquiry into whether [Harvard] could achieve sufficient diversity without using racial classifications." *Id.* (quoting *Bakke*, 438 U.S. at 305 (opinion of Powell, J.)).

Harvard has been using race to make admissions decisions for more than *45 years*—but it *never* addressed the possibility of using a race-neutral admissions process until the close of discovery in this case.  Even now, it still has never made a "serious, good faith" effort to consider race-neutral alternatives, and it has never retailored its use of race.  Rather, Harvard submits that it must continue to use race in the exact same way that it always has.  The Court should deny Harvard's Motion for Summary Judgment.

### A. Both of Harvard's Committees Failed To Engage in Good Faith Consideration of Race-Neutral Alternatives

In 2003, the Supreme Court announced in *Grutter* that universities using race-based admissions policies must engage in "serious, good faith consideration of workable race-neutral

alternatives" and that such "policies must be limited in time." 539 U.S. at 339-42. The *Grutter*

Court expected "that 25 years" from then, "the use of racial preferences will no longer be

necessary." *Id.* at 343.

Harvard waited more than a decade after *Grutter*'s directive, and only after being

prompted by the threat of litigation, to do anything about its obligation to consider race-neutral

alternatives. Harvard now points to two committees that it claims reviewed its admissions

practices, but substantial record evidence shows that Harvard generated these committees as

pretextual litigation defense tools, not for a "serious, good faith consideration" of race-neutral

alternatives. *Id.* at 339.

When this litigation appeared imminent, Harvard formed the "Ryan Committee" in 2014–

11 years after *Grutter*. Harv. SOF ¶ 145; SFFA SOF ¶¶ 813-816. The Ryan Committee

disbanded after meeting only three times and produced no work product or findings. The Dean

of Admissions did not even attend all three meetings. SFFA SOF ¶¶ 819, 822-824; SFFA Ex. 9

(Fitzsimmons Dep. 220:8-220:17). After the Ryan Committee's disbandment, the Dean of

Admissions could not remember any of the substance of the committee meetings, and senior

admissions staff could not remember the admissions office ever discussing a race-blind system.

SFFA SOF ¶ 825; *see also* U.S. Ex. 1 (Fitzsimmons Dep. 137:20-137:24 (testifying, after Ryan

Committee, that Harvard had never studied what would happen if it read applications on race-

blind basis), 221:8-222:4); SFFA Ex. 9 (Fitzsimmons Dep. 214:12-215:3).

Harvard waited until June 2017—14 years after *Grutter* and on the eve of the discovery

deadline in this case—when it formed the "Smith Committee." Harv. SOF ¶ 147; SFFA SOF

¶ 826. The Smith Committee's three members (including the Dean of Admissions) all stated

their predisposition against race-neutral alternatives and each testified, either right before or

during the Committee's existence, that they could never envision turning to race-neutral alternatives.  Harv. SOF ¶ 147; SFFA SOF ¶¶ 827-830; *see also* SFFA ¶ 167.  Indeed, in the midst of the Committee's meetings, the Dean of Admissions testified that Harvard does not intend to stop using race, that no evidence exists to support stopping its use of race at any point in time, and that he did not "know what form such evidence might take."  U.S. Ex. 1 (Fitzsimmons Dep. 134:14-135:6); *see also* SFFA Ex. 9 (Fitzsimmons Dep. 226:10-226:24 (Smith Committee met once as of deposition)).

After the Committee issued its report in April 2018, the Committee's Chair testified that Harvard intentionally linked the timing of completion of the report to when Harvard needed the report for this litigation.  U.S. Ex. 3 (Smith (2nd) (Apr. 23, 2018) Dep. 150:6-151:21).  Unsurprisingly, the Smith Committee concluded that no race-neutral alternatives exist that would allow Harvard both to meet its racial diversity goals and to maintain its reputation for excellence.  Harv. Ex. 47 ("Smith Committee Rep.") at 18.

A dilatory, highly scripted committee of three officials pre-committed to an outcome is not "serious, good faith consideration of workable race-neutral alternatives."  *Grutter*, 539 U.S. at 339.  Fifteen years after the Supreme Court directed it to do so, Harvard still has yet to give proper consideration to race-neutral alternatives.

**B.  Harvard Has Not Defined Its Diversity-Related Goals but Nonetheless Rejects Race-Neutral Alternatives as Inadequate To Achieve Them**

To satisfy its heavy burden of demonstrating "that available, workable race-neutral alternatives do not suffice" to achieve a compelling interest, Harvard must define for the Court what its diversity goals are and what actions or results would satisfy them.  *Fisher I*, 570 U.S. at 312.  Harvard, however, has failed to articulate any standards to measure achievement of its

goals and, accordingly, has failed to show that its (also undefined) use of race is narrowly tailored to those goals.

In fact, Harvard contends that its voluntary use of race is necessary to capture "the educational benefits of diversity," Harv. Opp. at 36, but disclaims any ability either to "measure" the "level of racial diversity that Harvard thinks is needed in order to obtain those benefits" or to identify "what form [of] evidence" would justify ending its voluntary use of race, SFFA Ex. 9 (Fitzsimmons Dep. 114:8-114:13); U.S. Ex. 1 (Fitzsimmons Dep. 134:14-135:6).  Harvard's approach thus turns narrow tailoring on its head:  instead of tolerating a targeted use of race to achieve specific and defined educational goals, Harvard would "[e]nshrin[e]" diversity as "a permanent justification for racial preferences" in pursuit of an unspecified and unprovable objective.  *Grutter*, 539 U.S. at 342.  This "offend[s]" "fundamental equal protection principle[s]" and requires denial of Harvard's Motion.  *Id.*

At the threshold, Harvard declares that its goal is "to pursue the educational benefits of diversity" and disavows any effort to obtain a "critical mass" of minority students.  Harv. Opp. at 35-36.  While, under current precedent, a university may not need "to specify the particular level of minority enrollment at which it believes the educational benefits of diversity will be obtained," Harvard must do more than assert an "interest in the educational benefits of diversity writ large."  *Fisher v. Univ. of Texas*, 136 S. Ct. 2198, 2210-11 (2016) ("*Fisher II*").  The *Grutter* Court also recognized that there is "some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted."  539 U.S. at 336 (quoting *Bakke*, 438 U.S. at 323 (opinion of Powell, J.)).

Yet Harvard essentially rests on a writ-large assertion and never supplies this Court with a standard to measure achievement of its diversity-related goal.  Harvard's Memorandum rejects race-neutral alternative after race-neutral alternative by doing little more than repeating its conclusory assertions that the alternatives will not meet its "educational mission," Harv. Mem. at 29, "educational objectives," *id.* at 28, 34 & 35, or "diversity-related educational objectives," *id.* at 25, 26, 27, 28, 29 & 32.  In its Opposition brief, Harvard again repeats its *ipse dixit* that race-neutral means will not satisfy its "educational goals," Harv. Opp. at 39, "educational objectives," *id.* at 39, 41, 43 & 44, or "diversity-related educational objectives," *id.* at 44.

Harvard also never explains what actions or results would achieve "the educational benefits of diversity" it seeks, or how close to, or far from, obtaining those benefits its current admissions practices have brought it.  At most, Harvard states that "[i]ssues of diversity and inclusion . . . continue to challenge our community."  Smith Committee Rep. at 3.  The Smith Committee, however, used the racial balance of Harvard's current class as the benchmark for measuring whether race-neutral alternatives would adequately achieve Harvard's diversity-related goals.  *Id.* at 8 (measuring whether any alternatives could "enable Harvard to *recover a degree* of racial diversity sufficient to achieve its diversity-related educational objectives" (emphasis added)); *id.* at 9 (finding "a race-neutral admission process still could not achieve a student body comparable in diversity to current classes"); *id.* ("If Harvard were to place so much weight on socioeconomic background as to achieve levels of racial diversity commensurate with those at the College today . . ."); *id.* at 14 (" . . . in order to reach the current level of African-American, Hispanic, and Other students admitted to Harvard"); *id.* at 16 (". . . the resulting class would have significantly fewer students who identify as African-American, Hispanic, or Other");

*id.* at 18 (". . . sufficient to produce a combined proportion of African-American, Hispanic, and Other students comparable to that of Harvard's current classes").[4]

Employing this *de facto* quota of its current racial balance, Harvard rejects, for example, a race-blind admissions system because its proffered expert's simulations showed expected drops in the African-American portion of the admitted class from 14% to 6% and in the Hispanic or Other portion from 14% to 9%. Smith Committee Rep. at 8. Harvard's concern with the size of these forecasted drops underscores that its current voluntary use of race is not narrowly tailored. After all, these large percentage differences reveal that race plays an outsized role in a large portion of Harvard's admissions decisions, in contravention of the notion that race playing "a role in only a small portion of admissions decisions [is] a hallmark of narrow tailoring." *Fisher II*, 136 S. Ct. at 2212.

In all events, when considering these percentage drops, the Smith Committee concluded that the "significant decline in racial diversity . . . would prevent Harvard from achieving its diversity-related educational objectives." Smith Committee Rep. at 8. But Harvard nowhere identifies what change, percentage or otherwise, in its current racial balance would still allow it to achieve these objectives. *See, e.g.*, *id.*

Instead, Harvard tries to have it both ways: it concludes that the simulated numbers fail to achieve its diversity-related objectives, yet at the same time disavows any ability to quantify in any way the level of racial diversity that is necessary to meet its objectives. *E.g.*, Harv. SOF ¶ 158; SFFA ¶ 885; Harv. Opp. at 30. In fact, just prior to the Smith Committee's findings, Harvard's Dean of Admissions insisted "there's no way they could ever measure" the "level of

---

[4] The Smith Committee's commitment to the racial balance of Harvard's current class further supports the inference, sufficient to deny summary judgment, that Harvard engages in unlawful racial balancing. *See supra* Part I.C.

racial diversity that Harvard thinks is needed in order to obtain" the educational benefits of racial diversity, and that there is no "way to quantify" the necessary amount of racial diversity, even roughly.  SFFA Ex. 9 (Fitzsimmons Dep. at 114:8-115:3).  The Dean even claimed that he did not know whether "one person from each racial background would be enough."  SFFA Ex. 9 (Fitzsimmons Dep. 115:4-115:18).

Harvard acknowledges the difficulty this Court faces in analyzing Harvard's diversity-related goals and what would be required to achieve them, and it even encourages the Court simply to defer to its conclusions.  Harv. Mem. at 35 ("Indeed, it is difficult to see how the Court could decide whether Harvard would be able to achieve its educational objectives without considering race unless it gave appropriate weight to Harvard's account of its educational objectives and the student body characteristics that would or would not permit those objectives to be achieved.").  Rather than providing this Court with some idea of what its diversity-related goals are and what would satisfy them, Harvard supplies only unmeasurable goals and no indication of how Harvard can or will meet them.  This is not remotely close to what strict scrutiny requires.  Harvard therefore has failed to carry its burden to show that race-neutral alternatives would not achieve its asserted interest in the educational benefits of diversity, and the Court should deny its Motion for Summary Judgment.

### C.  Harvard Has Failed To Retailor Its Use of Race for at Least the Last 45 Years

Narrow tailoring requires Harvard to work toward a race-blind admissions process and to constantly reevaluate and retailor its program toward that race-blind goal.  *Fisher II*, 136 S. Ct. at 2215 (A university may not just "rely on that same policy without refinement," but has an "ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies."); *Grutter*, 539 U.S. at 341-43 (finding race-based admissions policies "must be limited in time," and expecting that in 25 years—in 2028—"racial preferences will no

longer be necessary"). But in the more than 45 years that Harvard has been using race to make admissions decisions, it has failed to do so. The Smith Committee performed an "all or nothing" analysis, with no consideration of, or even recommendations to study, how Harvard could *reduce* its reliance on race in its admissions decisions. Of course, Harvard's inability to explain how or what weight race plays in its admissions process makes this task difficult. *See supra* Part I.A. The Smith Committee's report and the admissions office's casting aside of the OIR reports, *see supra* Part I.B.3, show that Harvard has no interest, and has made no effort, to wean itself from its reliance on racial classifications in its admissions decisions. Indeed, in more than 45 years, all Harvard has done is one statistical forecast at the close of discovery.

Moreover, nowhere does Harvard state "that it would like nothing better than to find a race-neutral admissions formula and will terminate its race-conscious admissions program as soon as practicable." *Grutter*, 539 U.S. at 343 (citation and internal quotation marks omitted). Rather, as noted above, the Dean of Admissions testified that Harvard does not intend to stop using race. U.S. Ex. 1 (Fitzsimmons Dep. 134:14-135:6); SFFA SOF ¶ 830. In fact, the Dean went so far as to confirm that throughout the 45 years he has worked in the Harvard admissions office, Harvard has never retailored the way it uses race or the weight it gives race. SFFA Ex. 9 (Fitzsimmons Dep. 83:8-84:19); U.S. Ex. 1 (Fitzsimmons Dep. 25:20-26:5 (started in 1972)).

Thus, rather than reevaluate and retailor its race-based admissions process, Harvard has "[e]nshrin[ed]" diversity as "a permanent justification for racial preferences" for more than 45 years. *Grutter*, 539 U.S. at 342. This "offend[s] . . . fundamental equal protection principle[s]," *id.*, and requires denial of Harvard's Motion.

**CONCLUSION**

The Court should deny Harvard's Motion for Summary Judgment.


Respectfully submitted,


John M. Gore
Acting Assistant Attorney General


Sean R. Keveney
Acting Senior Counsel


*/s/ Matthew J. Donnelly -*
Matthew J. Donnelly (IL Bar #6281308)
Hilary F. Pinion (VA Bar #46872)
Attorneys
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
202-616-2788
matthew.donnelly@usdoj.gov

DATED:  August 30, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the redacted version of this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF"), and that the unredacted version of this document will be served by email on counsel for the plaintiff and defendant.

*/s/ Matthew J. Donnelly*
Matthew J. Donnelly
Attorney for the United States