# U.S. EXHIBIT 1

1               UNITED STATES DISTRICT COURT
2                DISTRICT OF MASSACHUSETTS
3
4   _____
5   STUDENTS FOR FAIR ADMISSIONS, INC.,
6            Plaintiff,
7    v.                                No. 1:14-cv-14176
8   PRESIDENT AND FELLOWS OF
9   HARVARD COLLEGE
10  (HARVARD CORPORATION),
11           Defendant.
12  _____
13
14
15
16       VIDEO DEPOSITION of WILLIAM FITZSIMMONS
17              Boston, Massachusetts
18                August 3, 2017
19
20
21
22
23  Reported by:
24  Dana Welch, CSR, RPR, CRR, CRC
25  Job #127104

Page 25

1      FITZSIMMONS
2      Q. In what capacity?
3      A. As a lecturer and then as an assistant
4  professor of sociology at Holy Cross college.
5      Q. Over in Worcester?
6      A. Yes.
7      Q. And after you earned your doctorate, what
8  was your next professional employment?
9      A. One year as a full-time assistant
10 professor, as I recall, but it could also have been
11 at the end of that year my first job in the
12 admissions office at Harvard.
13     Q. When you say one year as assistant
14 professor, where was that?
15     A. At Holy Cross College, Worcester.
16     Q. At Holy Cross?
17     A. I was also employed part-time as a,
18 I guess, it would be a lecturer at the Boston
19 College evening school.
20     Q. Okay. And you think sometime at the end
21 of that first year is when you began employment in
22 the Harvard admissions office?
23     A. Yes.
24     Q. And so that would have been around 1972?
25     A. Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO FEB. 2018 AGREEMENT REGARDING CONFIDENTIALITY AND FOIA EXEMPTIONS
HARV_DOJ00004225

1           FITZSIMMONS

2     Q.  And what was your role in the Harvard
3  admissions office?
4     A.  I believe the first title was assistant
5  director of admissions.
6     Q.  Okay.  How did you come to be employed
7  within that office?
8     A.  I'd heard there was a position available.
9  I interviewed for the job and was lucky enough to
10 get it.
11    Q.  Had you previously done any work in
12 Harvard admissions when you were enrolled at the
13 college?
14    A.  While I was a graduate student at Harvard,
15 I was a freshman proctor-advisor living in the
16 dorms, and I was a part-time interviewer in the
17 admissions office, I believe one year, possibly two
18 years during that time.
19    Q.  And what was your job responsibilities as
20 assistant director?
21    A.  To be a regular admissions officer
22 covering a variety of territories, also to be an
23 administrative person who worked very closely with
24 what was then a very different world.  Today -- the
25 computer person, and he and I together, among other

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO FEB. 2018 AGREEMENT REGARDING CONFIDENTIALITY AND FOIA EXEMPTIONS
HARV_DOJ00004226

```
                                                          Page 134
 1                        FITZSIMMONS
 2        Q.   Is that in her role as a data person in
 3   the office?
 4        A.   Yes.
 5        Q.   By data person, I suppose someone who was
 6   responsible for managing databases?
 7             MS. ELLSWORTH:  Objection.
 8        A.   Among other things.
 9        Q.   And therefore would have been the person
10   who would have been the liaison for providing
11   information for any such study?
12        A.   She would certainly be part of any such
13   study.
14        Q.   Does Harvard intend to stop using race in
15   its admissions process?
16        A.   No.
17        Q.   No?
18        A.   I'm sorry.  I didn't realize you didn't
19   finish your question.  I apologize.
20        Q.   That's okay.  The answer is no?
21        A.   No.
22        Q.   At any point in time?
23             MS. ELLSWORTH:  Objection.
24        A.   There is no evidence for that.
25        Q.   And what evidence would it take to
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO FEB. 2018 AGREEMENT REGARDING CONFIDENTIALITY AND FOIA EXEMPTIONS
HARV_DOJ00004334

1                    FITZSIMMONS
2      convince you that Harvard should no longer use race
3      in the admissions process?
4              MS. ELLSWORTH:  Objection.
5         A.  I haven't seen any evidence, and I don't
6      know what form such evidence might take.
7         Q.  If Harvard were to conduct a pilot study
8      of a race-blind admissions program and found it
9      could achieve the exact same level of racial
10     diversity that it achieves today without using race
11     in the admissions process, would that convince you
12     that Harvard should stop using race?
13             MS. ELLSWORTH:  Objection.
14        A.  So could you repeat that again?  Is this
15     about using so-called, did you say, race-neutral?
16        Q.  What I said was if Harvard were to do a
17     pilot study of its holistic process from which
18     information about race was screened off from the
19     readers and the results of this pilot study were
20     that it admitted a class of identical racial
21     diversity that it does today, would that convince
22     you that Harvard should stop using race in the
23     admissions process?
24             MS. ELLSWORTH:  Objection.
25        A.  That's really an impossible hypothetical

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO FEB. 2018 AGREEMENT REGARDING CONFIDENTIALITY AND FOIA EXEMPTIONS
HARV_DOJ00004335

1        FITZSIMMONS
2   question to answer in the abstract.  You know, we
3   would have to see, you know, exactly all the
4   different dimensions of such a study.
5       Q.  Do you think that -- so you can't say
6   whether or not that would, that hypothetical would
7   convince you to stop using race in the admissions
8   process?
9           MS. ELLSWORTH:  Objection.
10      A.  It would certainly have to be -- you'd
11  have to see a highly detailed study and have lots
12  of additional information with such a study.
13      Q.  Has Harvard conducted any such study?
14          MS. ELLSWORTH:  Objection.
15      A.  So the study, could you just outline again
16  the kind of study you thought.  Because you had set
17  up a hypothetical.
18      Q.  Let me break it down.  So let's start back
19  to the hypothetical.  Let me just answer it to see
20  if your answer changes.  If Harvard did a pilot
21  study where information about race was screened off
22  from the readers and it resulted in a class not
23  only of identical racial diversity but essentially
24  an identical class, the same set of kids who would
25  have been admitted under Harvard's current process

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO FEB. 2018 AGREEMENT REGARDING CONFIDENTIALITY AND FOIA EXEMPTIONS

HARV_DOJ00004336

1                    FITZSIMMONS
2    would be admitted in that process in every
3    dimension.
4              Would that convince you that Harvard
5    should stop using race in the admissions process?
6              MS. ELLSWORTH:  Objection.
7         A.   It's just impossible for me to envision
8    such a hypothetical study occurring and producing
9    the kinds of results you suggest.
10        Q.   Has Harvard ever thought about doing a
11   more limited study of what would happen under a
12   race-blind reading system?
13             MS. ELLSWORTH:  Objection.  I'll remind
14   the witness not to disclose any communications with
15   counsel or actions taken at the direction of
16   counsel when answering the question.
17             If you can answer the question without
18   disclosing that information, you may.
19        A.   Could you repeat the question?
20        Q.   Yes.  Has Harvard ever considered doing
21   some kind of study that involved reading admissions
22   on a race-blind basis?
23        A.   Reading on -- we have not conducted such
24   studies.
25        Q.   But I just want to make sure I understand

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO FEB. 2018 AGREEMENT REGARDING CONFIDENTIALITY AND FOIA EXEMPTIONS                    HARV_DOJ00004337

1                     FITZSIMMONS

2          MS. ELLSWORTH: I'm just reminding you not
3     to disclose communications with counsel in
4     answering the question. But if you can answer the
5     question without disclosing communications with
6     counsel, you may answer.
7          A. So can you give me the question again?
8          Q. Yes. What was discussed at the meeting
9     you attended?
10         MS. ELLSWORTH: And the same warning.
11         A. I just don't recall specifically the, you
12    know, the set of topics other than going over the
13    charge of the committee. Be very much along the
14    lines of, you know, the document that I just read.
15    So that would lead me to believe that perhaps I
16    only was there for the first meeting because I do
17    have a very extensive travel schedule. But I don't
18    remember exactly.
19         Q. Did the committee discuss any actual
20    race-neutral alternatives?
21         MS. ELLSWORTH: Objection.
22         A. I don't recall specific ones that were
23    discussed.
24         Q. Was there any discussion of race-neutral
25    alternatives?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO FEB. 2018 AGREEMENT REGARDING CONFIDENTIALITY AND FOIA EXEMPTIONS
HARV_DOJ00004421

Case 1:14-cv-14176-ADB   Document 497-1   Filed 08/30/18   Page 10 of 15

Page 222

1                      FITZSIMMONS

2            MS. ELLSWORTH:  Objection.

3       A.   Again, I don't remember specific items of

4   that meeting.

5       Q.   Okay.  What about the other meetings,

6   whether you were there or not?  Have you taken

7   steps to educate yourself on the work of the Ryan

8   committee?

9            MS. ELLSWORTH:  Objection.

10      A.   Anything that would have been sent my way

11  from either Dean Ryan or someone else about the

12  meetings, I would certainly review it.

13      Q.   Did you review minutes of the other

14  meetings?

15      A.   I don't recall.

16      Q.   In preparation for this deposition?

17      A.   Did I -- was it review the minutes of the

18  meeting?

19      Q.   Correct.  In order to prepare yourself for

20  this deposition today.

21      A.   I don't recall.

22      Q.   Did you discuss the work of the committee

23  with anybody else who was there for those other

24  meetings?

25           MS. ELLSWORTH:  Objection.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO FEB. 2018 AGREEMENT REGARDING CONFIDENTIALITY AND FOIA EXEMPTIONS
HARV_DOJ00004422

1                    FITZSIMMONS
2     of school, you know, throughout his or her life,
3     getting to know the school, the opportunities
4     within the school, academically, extracurricularly,
5     and in other ways, what they might learn from
6     fellow students, all the usual things that you
7     might look for in a college that would be of
8     interest.
9              And also is interesting for the -- helpful
10    for readers to understand which courses might be
11    tougher than others, things of that sort, the full
12    context.
13         Q.   The readers --
14              MR. STRAWBRIDGE:  Strike that.
15         Q.   Does the admissions office provide any
16    written instructions to readers on how they're to
17    use race and ethnicity when evaluating an
18    application for admission?
19              MS. ELLSWORTH:  Objection.
20         A.   There is a rigorous training program.
21    That takes place, actually, over many months, you
22    could even argue for the first year or two of a new
23    staff member's career.
24              So the training, including reading past
25    years' files or what we call case book files that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO FEB. 2018 AGREEMENT REGARDING CONFIDENTIALITY AND FOIA EXEMPTIONS

HARV_DOJ00004434

1                    FITZSIMMONS
2      would be particularly illustrative, so there's a
3      going through things such as the reading
4      instructions, you know, looking at Harvard
5      documents that talk about, you know, for example,
6      the mission of Harvard College.  There are the
7      whole range of reading and then discussions that
8      take place.  In addition, helpful training for new
9      staff members about how to recruit in a particular
10     area, how to take part effectively in an
11     information session, so a whole variety of
12     information, you know, that would certainly
13     include, you know, the values of Harvard College,
14     valuing a strong and diverse student body.
15             And then as a -- once the new person comes
16     back off the road from recruiting and begins to
17     read applications, so there would be Early Action
18     time.  So that person would then read the first 50
19     or 100 or so applications.  A new staff member
20     would read, would also have those applications read
21     by at least one other staff member, possibly the
22     chair of the subcommittee.
23             And then there'd be a constant monitoring
24     during the entire year of how well that person was
25     doing in evaluating applications, you know, which

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO FEB. 2018 AGREEMENT REGARDING CONFIDENTIALITY AND FOIA EXEMPTIONS

HARV_DOJ00004435

1                    FITZSIMMONS
2    would include everything about an application.
3        Q.  Is there any written training that's
4    specific to how race should be used in the
5    admissions process?
6            MS. ELLSWORTH:  Objection.
7        A.  I don't have the written training
8    materials in front of me, but it's quite possible.
9        Q.  Do you know?
10       A.  I don't specifically.
11       Q.  If it is, it's in the handbook or
12   guidebook that's given to readers?
13           MS. ELLSWORTH:  Objection.
14       A.  It might well be.
15       Q.  Are you aware of any other places where
16   there is written instruction given on how to use
17   race in the admissions process?
18           MS. ELLSWORTH:  Objection.
19       A.  There may be some information in the
20   alumnae-alumni handbook for our interviewers and
21   recruiters.
22       Q.  Do you give any particular instruction
23   every year to the admissions office about how race
24   should be used?
25           MS. ELLSWORTH:  Objection.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO FEB. 2018 AGREEMENT REGARDING CONFIDENTIALITY AND FOIA EXEMPTIONS
HARV_DOJ00004436

1                      FITZSIMMONS

2        A.   Not that I can recall.

3        Q.   Is there a specific training session that

4   everyone's required to attend on a regular basis

5   that reviews what is legally permissible with

6   respect to the use of race in the admissions

7   process?

8             MS. ELLSWORTH:  Objection.

9        A.   That really would be part of the

10  comprehensive training program.

11       Q.   Are you aware that it's specifically

12  included every year on the training program?

13            MS. ELLSWORTH:  Objection.

14       A.   The intention of the training program is

15  to give a comprehensive overview of how to evaluate

16  an application.

17       Q.   Is it your understanding that that

18  includes specific training on how race should be

19  used?

20       A.   If it isn't in writing, it could well also

21  be done in discussion.

22       Q.   Are you sure that it is?

23       A.   I don't know for sure.

24            MS. ELLSWORTH:  Objection.

25       Q.   Do you take any steps to ensure that it

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO FEB. 2018 AGREEMENT REGARDING CONFIDENTIALITY AND FOIA EXEMPTIONS

HARV_DOJ00004437

1                          CERTIFICATE
2    Commonwealth of Massachusetts
3    Suffolk, ss.
4
5           I, Dana Welch, Registered Professional
6    Reporter, Certified Realtime Reporter and Notary
7    Public in and for the Commonwealth of
8    Massachusetts, do hereby certify that WILLIAM
9    FITZSIMMONS, the witness whose deposition is
10   hereinbefore set forth, was duly sworn by me and
11   that such deposition is a true record of the
12   testimony given by the witness.
13          I further certify that I am neither related
14   to nor employed by any of the parties in or counsel
15   to this action, nor am I financially interested in
16   the outcome of this action.
17          In witness whereof, I have hereunto set my
18   hand and seal this 15th day of August, 2017.
19
20                           _____
                             Dana Welch
21                           Notary Public
                             My commission expires:
22                           October 6, 2017
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
SUBJECT TO FEB. 2018 AGREEMENT REGARDING CONFIDENTIALITY AND FOIA EXEMPTIONS
HARV_DOJ00004656