# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | Civil Action No. 1:14-cv-14176-ADB |
| v. | ) | |
| | ) | |
| PRESIDENT AND FELLOWS OF | ) | |
| HARVARD COLLEGE (HARVARD | ) | |
| CORPORATION), | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**AMICUS CURIAE BRIEF OF
THE ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
AND OTHER ASIAN AMERICAN EDUCATION AND YOUTH-SERVING
ORGANIZATIONS AND HIGHER EDUCATION FACULTY IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

INTERESTS OF AMICI CURIAE............................................................................... 1

INTRODUCTION .................................................................................................... 2

ARGUMENT ........................................................................................................... 3

    A.    Asian Americans Benefit From Race-Conscious Admission Programs.............. 3

        1.  The Benefits of Diversity Accrue to All Students. ......................................... 4

        2.  There Is Substantial Diversity Within the Asian American Community. ...... 5

        3.  Individualized Admissions Policies Prevent Asian Americans from Being
           Improperly Grouped Into A Single "Asian" Category. ................................. 7

    B.    SFFA's Arguments Do Not Advance the Goals of Asian Applicants. ................ 9

        1.  SFFA Conflates Negative Action and Race-Conscious Admissions............ 10

        2.  SFFA's Arguments Treat Asian Americans as a Monolithic Group, Thereby
           Perpetuating the "Model Minority" Myth..................................................... 11

        3.  SFFA's Requested Remedy—the Elimination of Race-Conscious
           Admissions—Will Mostly Benefit White Candidates, not Asian American
           Candidates................................................................................................... 13

    C.    Plaintiff and Its Amici Have Not Established Negative Action Against
        Asian Americans in Harvard's Admissions Process.......................................... 14

        1.  Standardized Test Score Data at Harvard Do Not Show Negative Action
           Against Asian Americans. ........................................................................... 15

        2.  Plaintiff's Assumed Bias in the Personal Score is Not Supported by the
           Data. ….......................................................................................................... 19

CONCLUSION........................................................................................................ 20

ADDENDUM ……………………………………………………………….…..A1

## TABLE OF AUTHORITIES

<u>Page</u>

### Cases

*Fisher v. Univ. of Tex.*,
  136 S. Ct. 2198 (2016) ........................................................................................ 2, 4

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ...................................................................................... 2, 4, 14

*Parents Involved in Community Schools v. Seattle School Dist.*,
  No. 1, 551 U.S. 701 (2007) ...................................................................................... 4

*Regents of the University of California v. Bakke*,
  438 U.S. 265 (1978) ............................................................................................ 2, 4

*Smith v. University of Washington Law School*,
  392 F.3d 367 (9th Cir. 2004) ................................................................................... 7

### Statutory Authorities

Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978 ....................................... 5

### Other Authorities

Sigal Alon & Marta Tienda, *Diversity, Opportunity, and the Shifting Meritocracy in Higher Education*, 72 Am. Soc. Rev. 487 (2007) ........................................................... 17

Ben Backes, *Do Affirmative Action Bans Lower Minority College Enrollment and Attainment? Evidence from Statewide Bans*, 47 J. Hum. Resources 435 (2012) ..................................... 13

Joan Biskupic, *Special Report: Behind U.S. Race Cases, a Little Known Recruiter*, REUTERS, Dec. 4, 2012, http://www. reuters.com/article/us-usa-court-casemaker-idUSBRE8B30V220121204 ......................................................................................... 9

William G. Bowen & Derek Bok, *The Shape of the River: Long-Term Consequences of Considering Race in College and University Admissions* 16 (2d ed. 2000) ........................ 16

Department of Homeland Security, *Yearbook of Immigration Statistics: 2016* at 27-28, *available at* https://www.dhs.gov/sites/default/files/publications/2016 %20Yearbook%20of%20Immigration%20Statistics.pdf...................................................... 5

William T. Dickens & Thomas J. Kane, *Racial Test Score Differences as Evidence of Reverse Discrimination: Less Than Meets the Eye*, 38 Indus. Rel. 331 (1999) ................................ 16

Mark E. Engberg & Sylvia Hurtado, *Developing Pluralistic Skills and Dispositions in College: Examining Racial/Ethnic Group Differences*, 82 J. Higher Educ. 416 (2011) ..................... 4

Thomas J. Espenshade, *Moving Beyond Affirmative Action, The New York Times* (Oct. 4, 2012), available at http://www.nytimes.com/2012/10/05/opinion/moving-beyond-affirmative-action.html ........................................................................................ 17

FairTest, National Center for Fair and Open testing, "Optional List," (Current as of Summer 2018), *available at* http://www.fairtest.org/university/optional ............................................. 15

Claude S. Fischer et al., *Inequality by Design: Cracking the Bell Curve Myth* (1996) ............. 16

V.W. Franks, *Defining Promise: Optional Standardized testing Policies in American College and University Admissions*, National Association for College Admissions Counseling (Feb. 5, 2014) .................................................................................................................................... 15

Patricia Gurin et al., *Diversity and Higher Education: Theory and Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330 (2002) ............................................................................. 4

Scott Jaschik, *The Power of Race, Inside Higher Ed* (Nov. 3, 2009), available at https://www.insidehighered.com/news/2009/11/03/elite ....................................................... 16

Jerry Kang, *Negative Action Against Asian Americans: The Internal Instability of Dworkin's Defense of Affirmative Action*, 31 Harv. C.R.-C.L. L. Rev. 1 (1996) .................................... 10

William C. Kidder, *Misshaping the River: Proposition 209 and Lessons for the Fisher Case*, 39 J.C. & U.L. 53 (2013) ...................................................................................................... 16

William C. Kidder, *Situating Asian Pacific Americans in the Law School Affirmative Action Debate: Empirical Facts about Thernstrom's Rhetorical Acts,* 7 Asian Am. L.J. 29 (2000) ........................................................................................... 10, 13

Iosk Kim and Wooksoo Kim, *Post-resettlement Challenges and Mental Health of Southeast Asian Refugees in the United States*, 10 Best Practices in Mental Health 63 (2014) ............. 6

Jennifer L. Kobrin et al., *Historical View of Subgroup Performance Differences on the SAT Reasoning Test*, 19 (The College Board 2007), available at http://research.collegeboard.org/sites/default/files/ (The College Board 2007) ................... 16

Stacey Lee and Kevin Kumashiro, *A Report on the Status of Asian Americans and Pacific Islander in Education: Beyond the "Model Minority" Stereotype*, National Education Association, at xi (2005) ...................................................................................... 5, 11, 12

Goodwin Liu, *The Causation Fallacy: Bakke and the Basic Arithmetic of Selective Admissions*, 100 Mich. L. Rev. 1045 (2002) ........................................................................ 16

Stephanie Mencimer, *Meet the Brains Behind the Effort to Get the Supreme Court to Rethink Civil Rights*, Mother Jones, March/April 2016, https://www.motherjones.com/politics/2016/04/edward-blum-supreme-court-affirmative-action-civil-rights/ ................................................................................................................. 9

Samuel Museus and Peter Kiang, *Deconstructing the Model Minority Myth and How It Contributes to the Invisible Minority Reality in Higher Education Research*, 142 New Directions for Inst. Res. 5 (2009) .................................................................................. 11, 12

NYU CARE, *Asian Americans and the Benefits of Campus Diversity: What the Research Says* 1 (2012), *available at* http://care.gseis.ucla.edu/wp-content/uploads/2015/08/CARE-asian_am_ diversity_D4.pdf .............................................................................................. 4

J. Owens and D.S. Massey, *Stereotype Threat and College Academic Performance: A Latent Variables Approach*, 40 Soc. Sci. Res. 150 (2011) ............................................................. 18

OiYan Poon et al., *A Critical Review of the Model Minority Myth in Selected Literature on Asian Americans and Pacific Islanders in Higher Education*, 86 Rev. of Educational Research 469 (2016) ........................................................................................................... 5, 9

V. Purdie-Vaughns, *Social Identity Contingencies: How Diversity Cues Signal Threat or Safety for African Americans in Mainstream Institutions*, 94 J. Pers. Soc. Psychol. 615 (2008) ................................................................................................................................ 18

Jay Rosner, *Disparate Outcomes by Design: University Admissions Test*, 12 Berkeley La Raza L.J. 377 (2001) .............................................................................................................. 17

Maria Veronica Santelices & Mark Wilson, *Unfair Treatment?: The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 Harv. Educ. Rev. 106 (2010) ..................................................................................................................... 16

T. Schmader et al., *An Integrated Process Model of Stereotype Threat Effects on Performance*, 115 Psychol. Rev. 336 (2008) ....................................................................................... 18

Robert T. Teranishi et al *Heterogeneity among Asian Americans: Implications for Using Standardized Test Scores to Estimate Discriminatory College Admissions Practices*, CARE (Nov. 2015) .................................................................................................................... 17

Robert T. Teranishi, *Asians in the Ivory Tower: Dilemmas of Racial Inequality in American Higher Education* 26 (2010) ......................................................................................... 5

U.S. Census Bureau, *2016 American Community Survey 1-Year Estimates*, *available at* http://factfinder. census.gov/ ...................................................................................... 6

KaYing Yang, *Southeast Asian American Children: Not the "Model Minority,"* 14 The Future of Children 127 (2004) ……………………………………………………………………….6

**INTERESTS OF AMICI CURIAE**

The Asian American Legal Defense and Education Fund ("AALDEF"), headquartered in New York City and founded in 1974, is a national organization that promotes the civil rights of Asian Americans.  By combining litigation, advocacy, education, and organizing, AALDEF protects the rights of Asian Americans and supports educational equity in higher education. AALDEF has an interest in this litigation because its work with community-based youth advocates across the country has revealed that Asian American students benefit from individualized race-conscious admissions policies as well as from diverse educational settings. AALDEF opposes any cap, quota, or negative action against Asian Americans.  However, AALDEF believes that narrowly tailored, individualized admissions programs strongly benefit the Asian American community.

AALDEF is joined in this amicus brief by the following organizational entities and higher education faculty members, who are described in more detail in the Addendum: 18MillionRising.org (18MR.org), the Asian American Federation (AAF), the Asian American Psychological Association, Asian Americans United, the Asian Law Alliance, the Asian Pacific American Labor Alliance (APALA), AFL-CIO, the Asian Pacific American Network (APAN), the Asian Pacific American Women Lawyers Alliance (APAWLA), Asian Pacific Islander Americans for Civic Empowerment, Chinese for Affirmative Action, the Chinese Progressive Association, Coalition for Asian American Children & Families, GAPIMNY, the Japanese American Citizens League, LEAP (Leadership Education for Asian Pacifics), the National Coalition for Asian Pacific American Community Development (National CAPACD), the National Korean American Service & Education Consortium, the National Queer Asian Pacific Islander Alliance (NQAPIA), OCA - Asian Pacific American Advocates, Southeast

1

Asia Resource Action Center (SEARAC), Vichet Chhuon, Ph.D., Gabriel J. Chin, J.D., LLM, Tarry Hum, MCP, Ph.D., Anil Kalhan, J.D., MPPM, Nancy Leong, J.D., Shirley Lung, J.D, Mari J. Matsuda, J.D., LLM, Kevin Nadal, Ph.D., Philip Tajitsu Nash, J.D., Cathy J. Schlund-Vials, Ph.D., Sona Shah, M.A., John Kuo Wei Tchen, Ph.D., Margaret Y.K. Woo, J.D., LLM, and K. Wayne Yang, Ph.D.

## INTRODUCTION

AALDEF and its co-amici are committed to the fight for freedom, justice, and equality for all. As part of their commitment to equality, AALDEF and its co-amici support the use of race-conscious admissions programs that are narrowly tailored with individualized consideration. Amici believe that such programs strongly benefit the Asian American community. The inequities faced by Asian students who are members of certain Asian subgroups are frequently hidden by the aggregation of data into a single, monolithic "Asian" category. Students from these subgroups have faced pervasive social and economic disadvantages, low educational attainment, and even racial intimidation and harassment.

The Supreme Court has long upheld as constitutional the use of race in college admissions and, notably, has pointed to Harvard's admissions policy as a model. Justice Powell did so in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), and appended Harvard's policy to his opinion. That policy was again discussed approvingly in *Grutter v Bollinger*, 539 U.S. 306 (2003) and *Fisher v. Univ. of Tex.*, 136 S. Ct. 2198, 2207 (2016) ("Fisher II") ("the consideration of race, within the full context of the entire application, may be beneficial to any UT Austin applicant—including whites and Asian-Americans") (citing Brief for Asian American Legal Defense and Education Fund et al. as *Amici Curiae* at 12). The record evidence indicates that Harvard's admissions policy, contrary to the arguments

2

of SFFA and its Amici, considers race and ethnic origin on an individualized basis within the context of a student's entire application.  This kind of individualized treatment thwarts the harmful "model minority" myth that masks vast diversity within the Asian American community.

SFFA's arguments ignore the diversity within the Asian American community as well as the many benefits of diversity that accrue to Asian Americans.  Although SFFA alleges that there has been negative action against Asian Americans in Harvard's admissions process, AALDEF has not identified any record evidence showing intentional discrimination against Asian Americans.  Moreover, rather than vindicating the rights of Asian Americans, SFFA's apparent true aim is to dismantle race-conscious admissions altogether.  AALDEF believes that the Plaintiff's broad-based attack will harm all minorities, including Asian Americans and especially those Asian American applicants in communities struggling with low educational attainment and low socioeconomic status.

## ARGUMENT

### A.    Asian Americans Benefit From Race-Conscious Admissions Programs.

SFFA's arguments incorrectly presume that race-conscious admissions programs like Harvard's only benefit Black and Latino applicants, not Asian Americans.  To the contrary, students of all races benefit from a diverse student body, which provides a range of cognitive and social benefits.  Moreover, individualized admissions policies like Harvard's directly benefit Asian American applicants by taking into account the vast diversity within the Asian community.  Asian American subgroups differ significantly by ethnicity, language, socioeconomic status, immigrant status, and religion; lumping all subgroups together as a

single "Asian" monolith fails to capture the complex reality of their experiences.  Harvard's admissions process specifically recognizes these differences, treating Asian applicants as individuals.

### 1.      The Benefits of Diversity Accrue to All Students.

The benefits of student body diversity accrue to all students, including Asian Americans.  Studies have demonstrated that interactions with a diverse student body lead to higher levels of intellectual and civic engagement among Asian American college students.[1] These benefits continue as students graduate and enter an "increasingly diverse workforce." *See Grutter*, 539 U.S. at 330 (citation omitted).  Student diversity also has positive social effects on the campus as a whole.  *See Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 797-98 (2007) (Kennedy, J., concurring); *Grutter*, 539 U.S. at 328-29; *Bakke*, 438 U.S. at 312-13.  A diverse student body "promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races." *Fisher II*, 136 S. Ct. at 2210 (2016) (internal quotations omitted).  Asian Americans and other groups come to see each other more favorably, which leads to improved intergroup relations and reduced racial stereotyping.  *See Grutter*, 539 U.S. at 328-29.

---

[1] *See* NYU CARE, *Asian Americans and the Benefits of Campus Diversity: What the Research Says* 1 (2012), *available at* http://care.gseis.ucla.edu/wp-content/uploads/2015/08/CARE-asian_am_ diversity_D4.pdf; Patricia Gurin et al., *Diversity and Higher Education: Theory and Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330, 351-353, 354 tbl.3 (2002); Mark E. Engberg & Sylvia Hurtado, *Developing Pluralistic Skills and Dispositions in College: Examining Racial/Ethnic Group Differences*, 82 J. Higher Educ. 416, 434 (2011) (observing that while "the effects of intergroup learning on the pluralistic measure were significant for all other groups," Asian American students "seem to demonstrate the strongest benefit").

### 2.      There Is Substantial Diversity Within the Asian American Community.

The term "Asian American" refers to a diverse population with over 50 ethnic subgroups, 100 languages, and a broad range of socio-historical, cultural, religious, and political experiences.[2]   Some Asian Americans are multi-generation Americans, some are from immigrant families, some are refugees, and some are the adopted children of non-Asian parents.   Students from these different subgroups face vastly differing socioeconomic and educational realities; while some achieve great academic and professional success, others struggle to obtain high school diplomas.[3]   It is impossible to generalize a single "typical" Asian experience.[4]

In particular, the different immigration histories of Asian American subgroups have shaped their socioeconomic experiences in the United States.   For example, many East Asian and South Asian immigrants from countries like India, Korea, China, and Taiwan traveled voluntarily to the United States as highly-educated professionals.[5]   Many spoke fluent English prior to their arrival, and were admitted under immigration policies giving employment preference to professionals who "hold[] advanced degrees" or have "exceptional ability."   *See, e.g.*, Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978.   These immigrants arrived with substantial social capital that "often correlated with educational and social mobility."[6]

---

[2] Stacey Lee and Kevin Kumashiro, *A Report on the Status of Asian Americans and Pacific Islander in Education: Beyond the "Model Minority" Stereotype*, National Education Association, at xi (2005).

[3] OiYan Poon et al., *A Critical Review of the Model Minority Myth in Selected Literature on Asian Americans and Pacific Islanders in Higher Education*, 86 Rev. of Educational Research 469, 472 (2016).

[4] Robert T. Teranishi, *Asians in the Ivory Tower: Dilemmas of Racial Inequality in American Higher Education* 26 (2010).

[5] Lee and Kumashiro, *Report, supra,* at 2.

[6] Teranishi, *Asians in the Ivory Tower, supra*, at 31. In 2016, the United States admitted 81,288 immigrants from Asia under the employment-based preference.  *See* Department of Homeland Security, *Yearbook of Immigration Statistics: 2016* at 27-28, *available at* https://www.dhs.gov/sites/default/files/publications/2016

By contrast, many Southeast Asian Americans arrived as refugees from Cambodia, Laos, Vietnam, and Myanmar.[7]   Most started their new lives in America with few material goods or local connections, and many were traumatized by war, their escape, or years in refugee camps.   Once here, they were forced to navigate unfamiliar social and education systems with limited English language skills.   Today, nearly three decades after Southeast Asian refugees began arriving in America, many continue to struggle with long-term poverty, literacy issues, and post-traumatic stress disorder.   For example, in 2016, 21.7 percent of Hmong, 16.1 percent of Cambodians, and 25.2 percent of refugees from Myanmar lived below the poverty line, as compared to 14.0 percent of all Americans.[8]

Southeast Asians also lag behind other Asian American subgroups in educational attainment.   In 2010, over 30 percent of Hmong, Cambodian, Vietnamese, and Laotian individuals over the age of 25 did not have a high school diploma, as compared to 15 percent of all Asian Americans.[9]   These discrepancies are due to a variety of barriers facing Southeast Asian children, including poverty, limited English, feelings of alienation in the classroom, and persistent miscommunication between students, teachers, and parents.[10]   Even American-born Southeast Asian children can have limited English language skills when they first begin

---

%20Yearbook%20of%20Immigration%20Statistics.pdf.  Twenty five per-cent of the admittees were from India, 25% were from China, and 17% were from South Korea.  In contrast, only 1,261 individuals (1.55%) were admitted under the employment-based preference from Vietnam.

[7] le Kim and Wooksoo Kim, *Post-resettlement Challenges and Mental Health of Southeast Asian Refugees in the United States*, 10 Best Practices in Mental Health 63, 64 (2014).

[8] U.S. Census Bureau, *2016 American Community Survey 1-Year Estimates*, *available at* http://factfinder. census.gov/.

[9] ACS 1-Year Estimates, *supra*.

[10] KaYing Yang, *Southeast Asian American Children: Not the "Model Minority,"* 14 The Future of Children 127, 127 (2004)

school, because English is not spoken at home.[11]  This can lead to later difficulties, especially

on high-stakes testing like the SATs, which require a high level of English proficiency.[12]

> ### 3. Individualized Admissions Policies Prevent Asian Americans from Being Improperly Grouped Into A Single "Asian" Category.

Narrowly-tailored, individualized admissions programs like Harvard's are uniquely

equipped to take into account the vast diversity of the Asian American community.  *See, e.g.,*

*Smith v. University of Washington Law School*, 392 F.3d 367, 378 (9th Cir. 2004) (upholding

admissions program that recognized "different cultures, back-grounds, and languages" of

"applicants whose families or who themselves originated from the Philippines, Viet Nam,

Cambodia, Taiwan and the People's Republic of China").  Harvard's admissions process

considers each applicant as a whole person, comparing their qualifications with those of all

other applicants, and assessing them in the context of the opportunities and challenges they

have faced.  *See* Report of David Card, Ph.D, Ex. 33 to Decl. of Felicia H. Ellsworth in Supp.

of Harvard's Mot. for Summ. J. ("Card Rep.") at 16, 19.  Race is one consideration among

multiple variables, including standardized test scores, an alumni interviewer evaluation, letters

of recommendation, applicant essays, the academic strength of applicants' high schools, the

economic and demographic profile of applicants' communities, parents' level of education,

extracurricular activities, and optional submissions of scholarly work, artwork, or recordings of

music or dance performances. *See* Harvard Stmt. of Material Facts ("Harvard's SMF") ¶¶ 15,

22.

---

[11] *Id.*

[12] *Id.*

Individualized admissions programs like Harvard's prevent Asian Americans from being grouped into one monolithic "Asian" category, blurring the different socioeconomic realities that different ethnic subgroups face.  In fact, Harvard specifically considers these differences when examining Asian American applicants.  *See, e.g.,* Ellsworth Ex. 141 (comment that "[applicant] is a very deserving student from a first generation Vietnamese background who is valedictorian for this city-wide magnet school"); Ellsworth Ex. 131 (applicant of Nepali descent "[c]ertainly would bring a fascinating perspective to campus"); Ellsworth Ex. 142 ("Tug for BG [background] here, she writes well about the plight of exiled Tibetans and T2 [second teacher recommendation] lets us know that both of her parents were born in Tibetan refugee camps in India."); Ellsworth Ex. 130 ("B/G [background] of interest as he [applicant of Indian origin] would be someone who would add to the mix at H.").

Other Amici, Students in Support of Harvard, have submitted affidavits explaining how Harvard's admissions process considers differences in the Asian American community.  For example, a declaration by one Harvard junior, a Vietnamese American who immigrated to the United States at age eight, explained how he believed his personal statement about his experiences as an immigrant and English learner helped overcome his less-than-competitive SAT score.  *See* Declaration of T.D., Ex. 1.8 to Mem. Of *Amici Curiae* in Supp. of Harvard's Mot. for Summ. J. ("Students").  A declaration by a Harvard sophomore, a Chinese American, discussed how she was stereotyped as "Asian" in her high school, where everyone assumed she "must be good at everything," which made it difficult for her to ask for academic assistance. Although her  grades were "middle-of-the road—high enough to meet the minimum requirements, but not outstanding compared to other students at [her] school," she too believed she was admitted to Harvard in part on the strength of her personal essay, which discussed her

relationship with her sister and her love of astronomy.   *See* Students Ex. 1.1.   These declarations illustrate the individualized admissions process at Harvard.

**B.      SFFA's Arguments Do Not Advance the Goals of Asian Applicants.**

SFFA makes a number of arguments that suggest its ultimate goal is not the protection of Asian American applicants, but the dismantling of race-conscious admissions.[13]   First, SFFA conflates the question of whether Harvard's race-conscious admissions policy is permissible with the question of whether Asian American applicants face bias during the admissions process.   These two concepts—race-conscious policies versus negative action—are substantively distinct.   Second, SFFA treats Asian Americans as a monolithic group, focusing on their perceived academic prowess and thereby buying into the harmful "model minority" stereotype that lumps Asian applicants into one stereotypical group.   The model minority stereotype not only erases significant differences between Asian American subgroups, but has long been used as a tool of racial wedge politics to punish other marginalized groups of color and undermine legitimate race-conscious admissions policies.[14]   Finally, contrary to SSFA's claims, its proposed remedy—the elimination of Harvard's race-conscious admissions process—would mostly benefit *white* students, not Asian American students. *See infra* at B.3.

---

[13] Given the identity of SFFA's founder, Edward Blum, and his explicit and relentless campaign to eliminate race-conscious admissions, it is unsurprising that SFFA's arguments fail to earnestly advance the rights of Asian American students.   *See* Joan Biskupic, *Special Report: Behind U.S. Race Cases, a Little Known Recruiter*, REUTERS, Dec. 4, 2012, http://www. reuters.com/article/us-usa-court-casemaker-idUSBRE8B30V220121204; Stephanie Mencimer, *Meet the Brains Behind the Effort to Get the Supreme Court to Rethink Civil Rights*, Mother Jones, March/April 2016, https://www.motherjones.com/politics/2016/04/edward-blum-supreme-court-affirmative-action-civil-rights/.

[14] OiYan Poon et al., *A Critical Review of the Model Minority Myth*, *supra*, at 19.

1.    **SFFA Conflates Negative Action and Race-Conscious
Admissions Policies.**

Negative action and race-conscious admissions are two distinct concepts.[15]
Discrimination against a particular group (negative action) is fundamentally different from a
race-conscious admissions policy that recognizes the importance of diversity.  Here, SFFA
conflates the question of whether Asian American applicants face negative action with the
question of whether Harvard's race-conscious admissions policy is permissible.  But SFFA has
not shown how Harvard's purported negative action against Asian American applicants results
from its efforts to create a diverse student body through race-conscious admissions,[16] nor how
negative action would be eliminated by ending race-conscious admissions.  SFFA's conflation
of these two distinct concepts is particularly problematic because it uses the alleged
discrimination against Asian American applicants as a tool to attack a policy that *benefits* both
Asian Americans and other minorities.

SFFA's analytical error disregards leading scholarship by Asian American researchers,
which emphasizes the importance of distinguishing between race-conscious admissions and
negative action.[17]  These publications in law, ethnic studies and sociology point out that there
are two major problems with failing to distinguish race-conscious policies and negative action.
First, the conflation creates the false impression that Asian Americans would be the
beneficiaries of dismantling race-conscious admissions.  Second, it fails to confront the more

---

[15] *See* William C. Kidder, *Situating Asian Pacific Americans in the Law School Affirmative Action Debate:
Empirical Facts about Thernstrom's Rhetorical Acts*, 7 Asian Am. L.J. 29, 33, 60 (2000); Jerry Kang, *Negative
Action Against Asian Americans: The Internal Instability of Dworkin's Defense of Affirmative Action*, 31 Harv.
C.R.-C.L. L. Rev. 1, 3-4 (1996).

[16] SFFA's own briefing concedes that the alleged bias against Asian American applicants is not caused by any
benefit Harvard's race-conscious policy may have on Black and Latino admission rates, implicitly acknowledging
the difference between negative action and race-conscious admissions.  *See* SFFA Br. at 13.

[17] Kidder, *Situating Asian Pacific Americans*, *supra*, at 608.

logical focus of activism: ending negative action.[18]   As Asian American scholars point out, ending negative action itself would "yield a much higher payoff in terms of increasing educational opportunities" than focusing criticism on race-conscious policies.[19]   Here, SFFA attempts to distract the Court in the same manner by suggesting that ending race-conscious admissions at Harvard would end the alleged discrimination against Asian applicants.   The two concepts are distinct.

**2.      SFFA's Arguments Treat Asian Americans as a Monolithic Group, Thereby Perpetuating the "Model Minority" Myth.**

The treatment of any racial population as monolithic is problematic and promotes racial stereotyping.   Here, SFFA adopts the "model minority" stereotype by focusing on Asian American applicants' perceived academic prowess over other minority groups.   *See* Plaintiff's Mem. In Supp. of Summ. Judg. ("SFFA Br."), Dkt. No. 413, at 7, 9.   The model minority myth is the notion that Asian Americans have achieved universal academic and professional success through hard work and adherence to Asian cultural norms.[20]   Although the model minority myth is often seen as harmless, or even positive, it has numerous negative effects for Asian Americans and other students of color.   For example, not only does the myth hide the diversity of the Asian American experience, but Asian American studies scholars have long noted that it has been used strategically by opponents of race-conscious policies "to support the notion of meritocracy" and promote the idea that racial discrimination "does not impede the educational and occupational progress of racial/ethnic minorities."[21]   It is no coincidence

---

[18] *Id.* at 616.

[19] *Id.* at 616.

[20] Lee and Kumashiro, *Report, supra*, at xi.

[21] Samuel Museus and Peter Kiang, *Deconstructing the Model Minority Myth and How It Contributes to the Invisible Minority Reality in Higher Education Research*, 142 New Directions for Inst. Res. 5, 6 (2009).

11

that the myth first gained widespread popularity during the Civil Rights Era, when it was used as a tool to silence Black activists' claims of racial inequality.[22]

The model minority myth is based on three key misconceptions about the Asian experience: (1) all Asian Americans are the same; (2) Asian Americans do not face major challenges because of their race; and (3) Asian Americans do not require resources or support but can overcome discrimination solely based on their own efforts.[23]  These assumptions are demonstrably false.  As discussed above, Asian Americans are a diverse and complex group with vastly different levels of education and economic attainment.  Many face similar challenges to those facing Black and Latino students—discrimination, structural inequality, poverty, lack of access to education—and require support accordingly.  To pretend otherwise diverts attention from the real and pervasive racial inequalities facing the Asian American community.

SFFA's arguments contain all the hallmarks of the model minority myth.  SFFA focuses on Asian American applicants' supposedly universal academic success, failing to distinguish between the different levels of education attainment of different subgroups.  *See* SFFA Br. at 7, 9.  SFFA's proposed remedy—the abolishment of race-conscious admissions at Harvard—rests on the assumption that either Asian Americans do not face any challenges that allow them to benefit from race-conscious admissions, or do not require any resources or support to remedy the structural inequalities they face.  Finally, like so many other opponents of race-conscious admissions, there is substantial reason to believe that SSFA is employing the model minority myth to eliminate legitimate race-conscious policies entirely.  The Court

---

[22] Lee and Kumashiro, *Report, supra,* at xi.

[23] Museus and Kiang, *Deconstructing the Model Minority Myth, supra*, at 7-13.

should recognize SFFA's arguments for what they are: distortions of the Asian American experience designed to promote a specific agenda.

### 3. SFFA's Requested Remedy—the Elimination of Race-Conscious Admissions—Will Mostly Benefit White Candidates, not Asian American Candidates.

There is a significant disconnect between SFFA's claims and its proposed remedy. Although purporting to address harm to Asian American applicants, SFFA's proposed remedy—the elimination of all race-conscious admissions—does not vindicate the rights of Asian American students. First, as discussed above, negative action and race-conscious policies are distinct concepts. Ending race-conscious admissions does not address negative action. Furthermore, like other racial minorities, Asian American students benefit from individualized race-conscious admissions programs like Harvard's that allow admissions officers to consider how race and ethnicity have shaped an applicant's experiences. Second, eliminating race-conscious admissions policies primarily benefits *white* applicants, not Asian Americans.[24] For example, after Proposition 209 put an end to race-conscious admissions in California in 1996, Asian American enrollment at UC Law Schools remained flat, while white enrollment rose significantly.[25]

The results would be the same here. According to Harvard's expert, eliminating all considerations of race increases white students' share of the admitted class by 8 percentage points, from 40 percent to 48 percent. Card Rep. at 103. By contrast, Asian American students' share increases by only 3 percentage points, from 24 to 27. *Id.* SFFA's proposed remedy does not align with its purported goals, further calling into question SFFA's objectives

---

[24] *See, e.g.*, Ben Backes, *Do Affirmative Action Bans Lower Minority College Enrollment and Attainment? Evidence from Statewide Bans*, 47 J. Hum. Resources 435, 448-50 (2012).

[25] Kidder, *Situating Asian Pacific Americans*, *supra*, at 40.

in this challenge and its good faith in claiming to advance the best interests of Asian American students.

### C.     Plaintiff and Its Amici Have Not Established Negative Action Against Asian Americans in Harvard's Admissions Process.

In its effort to obtain the educational benefits that result from student diversity, Harvard uses race within the context of "a highly individualized, holistic review" that gives "serious consideration to all the ways an applicant might contribute to a diverse educational environment." *See Grutter*, 539 U.S. at 337. Harvard undertakes its individualized holistic review by evaluating candidate information across six categories, including academic, extra-curricular, athletics, personal, strength of recommendations, and overall. Harvard SMF at ¶¶ 43-45. Harvard maintains that it considers race, if at all, when undertaking the "overall" review.

In claiming that Harvard has intentionally discriminated against Asian American applicants, Plaintiff and its Amici[26] make two central arguments. First, Plaintiff's Amici imply that standardized test scores are a determinative indicator of comparative merit. Second, the Plaintiff argues that Harvard takes negative action against Asian American applicants by intentionally awarding them lower scores on the personal category to limit the percentage of admitted Asian Americans. Both arguments are flawed. Standardized test score data are inherently unreliable as a measure of comparative merit and provide no evidence that Harvard has established a goal, target, or other quantitative objective for the admission of any particular group. Further, the Plaintiff's argument regarding the personal category rests on unsupported assumptions and a mistaken view of the evidence.

---

[26] National Association of Scholars ("NAS") and the Asian American Legal Foundation ("AALF") and the Asian American Coalition for Education.

1.      **Standardized Test Score Data at Harvard Do Not Show Negative Action Against Asian Americans.**

SAT score statistics at Harvard do not demonstrate negative action against Asian Americans, contrary to the arguments made by Plaintiff's Amici.  *See* AALF Br, at 14; *see also* NAS Br. at 7-9.  The differences in average standardized test scores between Asian Americans and other racial or ethnic groups reflect existing disparities among Harvard applicants.  These scores can also be boosted by costly test-preparation courses, further widening the gap between students with and without financial means.  Averaging SAT scores also obscures the wide distribution of scores among Asian American candidates, scores that are often tainted by what social scientists describe as "stereotype threats."  Notably, more than 1000 accredited colleges and universities do not require standardized test scores to admit students into their bachelor-degree programs or otherwise de-emphasize the use of standardized tests. [27]

Claims about differential standardized test scores by race are often highly misleading, if not demonstrably false.  Differences in average scores among racial or ethnic groups at institutions such as Harvard reflect the racial/ethnic test score disparities already present in the applicant pool, resulting from socioeconomic differences, educational practices, and other environmental factors.  *See* Claude S. Fischer et al., *Inequality by Design: Cracking the Bell Curve Myth* 46 (1996); William G. Bowen & Derek Bok, *The Shape of the River: Long-Term Consequences of Considering Race in College and University Admissions* 16 (2d ed. 2000).

_____

[27] *See* FairTest, National Center for Fair and Open testing, "Optional List," (Current as of Summer 2018), *available at* http://www.fairtest.org/university/optional.  A four-year study of 33 private and public test-optional colleges and universities found that, of 123,000 students, 30 percent had been admitted without submitting test scores. The study concluded that there was no significant difference between nonsubmitters and submitters in graduation rates (0.6 percent lower for nonsubmitters) or cumulative G.P.A. (2.83 for nonsubmitters, 2.88 with test scores). Data also showed that nonsubmitters are more likely than submitters to be first-generation-to-college enrollees, underrepresented minorities, women, Pell Grant recipients and students with learning differences.  *See* W.C. Hiss and V.W. Franks, *Defining Promise: Optional Standardized testing Policies in American College and University Admissions*, National Association for College Admissions Counseling (Feb. 5, 2014).

They are to be expected regardless of whether race neutral or race conscious criteria are used. *See, e.g.*, Maria Veronica Santelices & Mark Wilson, *Unfair Treatment?: The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning*, 80 Harv. Educ. Rev. 106 (2010); William T. Dickens & Thomas J. Kane, *Racial Test Score Differences as Evidence of Reverse Discrimination: Less Than Meets the Eye*, 38 Indus. Rel. 331 (1999).[28] Disparities in racial/ethnic SAT score averages on par with Harvard's individualized admissions pool are found nationwide, including at other leading universities like UC Berkeley and UCLA that use race-neutral admissions.   William C. Kidder, *Misshaping the River: Proposition 209 and Lessons for the Fisher Case* 39 J.C. & U.L. 53, 95 (2013).   The College Board, which created the SAT, has itself acknowledged this phenomenon.   *See* Jennifer L. Kobrin et al., *A Historical View of Subgroup Performance Differences on the SAT Reasoning Test* 19 (The College Board 2007), *available at* http://research.collegeboard.org/sites/default/files/ publications/2012/7/researchreport-2006-5-historical-view-subgroup-performance-sat.pdf (finding that score gaps between different racial groups have "remained generally consistent" for 20 years).

Significantly, Plaintiff's Amici rely heavily on discredited data to argue that standardized tests establish the comparative merit of Asian American applicants. *See, e.g.*, AALF Br. at 14.   Specifically, Amici cite statistics from a 2009 article by Thomas J. Espenshade.   *Id.*   In a subsequent interview however, Espenshade cast doubt on the usefulness of his data to establish that there was any bias towards Asian American students in admissions. Scott Jaschik, *The Power of Race*, Inside Higher Ed (Nov. 3, 2009), *available at*

---

[28] These disparities would exist even in the extreme (but counterfactual) case of a university admitting students in rank order based *solely* on their SAT scores.  *See* Goodwin Liu, *The Causation Fallacy: Bakke and the Basic Arithmetic of Selective Admissions*, 100 Mich. L. Rev. 1045, 1064 (2002).

https://www.insidehighered.com/news/2009/11/03/elite (explaining that his data did not include "softer variables" such as recommendations, essays, and extracurricular activities that might help explain the disparity).  In 2012, Espenshade wrote in an Op-Ed in The New York Times: "To be clear, I believe that race-conscious affirmative action is necessary, and often beneficial."  Thomas J. Espenshade, *Moving Beyond Affirmative Action*, The New York Times (Oct. 4, 2012), *available at* http://www.nytimes.com/2012/10/05/opinion /moving-beyond-affirmative-action.html).

Additionally, students can improve test scores by attending test-preparation courses. Such courses are, however, generally available only to those with financial means.  Score differences might therefore result from socioeconomic disparities.  *See* Jay Rosner, *Disparate Outcomes by Design: University Admissions Test*, 12 Berkeley La Raza L.J. 377, 383-84 (2001); Sigal Alon & Marta Tienda, *Diversity, Opportunity, and the Shifting Meritocracy in Higher Education*, 72 Am. Soc. Rev. 487, 490-91 (2007).

Amici's misleading arguments based on average SAT scores also fail to account for the bimodal distribution of SAT scores among Asian Americans.  Asian Americans have the widest distribution in standardized test scores and a higher standard deviation than whites.  *See* Robert T. Teranishi et al., *Heterogeneity among Asian Americans: Implications for Using Standardized Test Scores to Estimate Discriminatory College Admissions Practices*, CARE (Nov. 2015).  In contrast to the SAT scores of white students, which have a normal distribution, the SAT scores of Asian Americans have a bimodal distribution.  *Id.*  ("Whites have a normal distribution that is consistent with how scores are distributed from the mean for other racial groups.  Asian Americans have a higher representation at the top scores, lower representation among middle-range scores, and higher representation among lower scores.").

Thus, a comparison between the SAT scores of whites compared to Asian Americans does not fully convey the distribution of SAT scores across those populations.

Moreover, SAT scores are a poor proxy for the comparative merit of applicants because, inter alia, the SAT scores of minority students are tainted by what social scientists describe as "stereotype threats." Stereotype threats are a phenomenon whereby individuals fear confirming negative stereotypes of their racial or ethnic group and said fear hurts their performance. *See* T. Schmader et al., *An Integrated Process Model of Stereotype Threat Effects on Performance*, 115 Psychol. Rev. 336, 336 (2008) ("[A] large body of work now testifies to the reliability and generalizability of stereotype threat effects on performance."). "[A]ctivating negative stereotypes about a social identity one possesses motivates individuals to try to combat that stereotype but that this creates some sort of extra situational burden that interferes with the ability to perform as well at a task as might otherwise be possible." *Id.* For example, when told questions are designed to test their intellectual ability, African American students perform worse than their white peers, but this gap diminishes when the students are told the same questions are non-diagnostic. *Id.* at 336-337. For this reason, SAT scores cannot be the whole story when evaluating potential students.[29] A college or university like Harvard seeking to admit students with the most potential must look beyond standardized test scores and consider the whole applicant, including whether other factors (e.g. race-based stereotyping) may have affected said scores.

---

[29] Stereotype threats also harm the performance of students once enrolled in college. *See* J. Owens and D.S. Massey, *Stereotype Threat and College Academic Performance: A Latent Variables Approach*, 40 Soc. Sci. Res. 150 (2011). Increased diversity minimizes the effect. Underrepresentation breeds stereotypes; however, when a group is sufficiently represented, the burden on each individual student is lessened, and stereotype threat has less of an effect. *See* V. Purdie-Vaughns et al., *Social Identity Contingencies: How Diversity Cues Signal Threat or Safety for African Americans in Mainstream Institutions*, 94 J. Pers. Soc. Psychol. 615 (2008).

### 2.   Plaintiff's Assumed Bias in the Personal Score is Not Supported by the Data.

Plaintiff concludes that Harvard intentionally discriminates against Asian American applicants because Asian Americans receive the lowest score on average of any racial group in the personal category, despite higher than average scores in other areas evaluated in the admissions process (mainly, the academic score).   SFFA Br. at 7-9.   A key element of this argument is Plaintiff's contention that Harvard employs the qualitative elements of the personal category to effectuate a stereotypical view of Asian American applicants.   The Plaintiff bolsters this contention with the assumption that high scores in the academic and extra-curricular categories should predict similarly high scores in the personal category.   The Plaintiff offers no support for this assumption and ignores the fact that the academic category also includes qualitative criteria.   For these reasons, Plaintiff's challenge based on the personal category is without merit and Plaintiff is not entitled to judgment as a matter of law.

Plaintiff's argument is flawed because the academic rating category includes a number of qualitative criteria such as criteria scored by Harvard admissions officers (the applicant's high school's characteristics, high school's curriculum, and academic prizes), Harvard faculty members (appraisals of the student's academic or written work), and the applicant's high school teachers and counselors who submit letters of recommendation.   Card Rebuttal Repot at ¶ 24.   After considering the various criteria, the admission officer then assigns an overall numerical value to the category, an exercise that is based on judgment and not a formula. Harvard SMF at ¶¶ 45, 64-65.   It is illogical and unreasonable to assume that if Harvard were engaged in negative action, it would by design use qualitative factors to disfavor Asian Americans in the personal category, but use qualitative factors to favor them in the academic category.

AALDEF and its co-Amici are well aware and disturbed by the history of discriminatory admission policies, particularly at elite private universities, affecting Jews, African Americans, Asian Americans, women, and others.   Amici would never knowingly support exclusionary admissions policies against minority applicants, including Asian Americans.  The undersigned amici would vigorously oppose any cap, quota, bias, or other kind of negative action, formal or informal, affecting Asian Americans or any other group.  For this reason, Amici urge Harvard to take immediate steps to lessen even the possibility that any of its admissions decisions, including the personal category rating, are affected by implicit biases of persons at Harvard or other outside influencers (such as teachers, coaches, counselors, or alumni interviewers).   This record does not, however, support such an undisputed finding.  Nor does room for further consideration or refinement of Harvard's admissions policy mean it is legally infirm.   SFFA has wholly failed to meet its burden and is not entitled to summary judgment.

## CONCLUSION

For the reasons stated above, AALDEF and its co-Amici maintain that the Plaintiff has failed to demonstrate that it is entitled to judgment as a matter of law.  AALDEF and its co-Amici therefore urge this Court to deny Plaintiff's motion for summary judgment .

Respectfully submitted,

Dated: August 30, 2018

*/s/ Madeleine K. Rodriguez_____*
Dean Richlin, BBO #419200
Hemmie Chang, BBO#544249
Sarah Burg, BBO#683245
Madeleine K. Rodriguez, BBO #684394
Rachel Hutchinson, BBO#696739
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
Tel: 617- 832-1000
Fax: 617-832-7000

drichlin@foleyhoag.com
hchang@foleyhoag.com
sburg@foleyhoag.com
mrodriguez@foleyhoag.com
rhutchinson@folehoag.com

Kenneth Kimerling, *pro hac vice*
admission pending
Asian American Legal Defense and
Education Fund
99 Hudson Street, 12th Floor
New York, NY  10013-2815
Tel: (212) 966-5932
kkimerling@aaldef.org


*Attorneys for Asian American Legal*
*Defense and Education Fund, et al.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/  Madeleine K. Rodriguez*

**ADDENDUM**

# ADDENDUM – LIST OF *AMICI CURIAE*

<u>Organizational Entities</u>

The **Asian American Legal Defense and Education Fund ("AALDEF")**, headquartered in New York City and founded in 1974, is a national organization that promotes the civil rights of Asian Americans.  By combining litigation, advocacy, education, and organizing, AALDEF protects the rights of Asian Americans and supports educational equity in higher education.

**18MillionRising.org (18MR.org)** brings many disparate Asian American communities together online and offline to reimagine Asian American identity with nuance, specificity, and power. It is using this Asian American identity as the foundation to build a more just and creative world where Asian American experiences are affirmed, their leadership is valued, and all of them have the opportunity to thrive.

The **Asian American Federation (AAF)** is a pan-Asian nonprofit leadership organization that represents and supports a network of nearly 70 Asian American community service organizations in New York City that work in health and human services, education, economic development, civic participation, and social justice. AAF's mission is to raise the influence and well-being of the pan-Asian American community through research, policy advocacy, public awareness, and organizational development.

The **Asian American Psychological Association** aims to promote the mental health and wellbeing of Asian Americans and Pacific Islanders across the United States.

Founded in 1985, the mission of **Asian Americans United** is to build leadership in Asian American communities to build neighborhoods and unite against oppression. AAU has worked in Philadelphia's Asian American communities and in broader multiracial coalitions around quality education, youth leadership, anti-Asian violence, immigrant rights, and folk arts and cultural maintenance.

The **Asian Law Alliance** is a non-profit law office founded in 1977 by law students from Santa Clara University School of Law. ALA's mission is to provide equal access to the justice system to Asian and Pacific Islanders and low income residents of Santa Clara County, California. ALA provides legal services in the areas of public benefits, civil rights, domestic violence, landlord and tenant law and immigration law.

Founded in 1992, the **Asian Pacific American Labor Alliance (APALA), AFL-CIO,** is the first and only national organization of Asian American and Pacific Islander (AAPI) workers, most of whom are union members, and their allies advancing worker, immigrant, and civil rights.

The **Asian Pacific American Network (APAN)** is dedicated to addressing the concerns and issues of Asian Pacific Islander Desi American (APIDA) faculty, staff, and students in higher education. APAN's purpose is to provide community, professional development, networking, and affirmation of identity for APIDA higher education/student affairs professionals. APAN represents APIDA issues and advocates for programs, services, research, and actions within the

leadership of the Coalition for Multicultural Affairs (CMA) and the American College Personnel Association (ACPA).

The **Asian Pacific American Women Lawyers Alliance (APAWLA)** is an organization that promotes inclusion, empowerment and advancement of Asian Pacific American women in the legal profession. APAWLA is devoted to advocating, educating, mentoring, networking, and developing leadership within the profession and larger community. APAWLA members work in solo practices, law firms, state and federal courts; as prosecutors, defenders, and civil practitioners; and in non-profits and government agencies; and, inspired by the great movement for Civil Rights, APAWLA shares a common goal of gender and racial equality.

**Asian Pacific Islander Americans for Civic Empowerment** envisions a just, inclusive, and progressive Washington State with racial, political, and economic equity for all people, including AAPIs. APACE expands democracy by identifying and removing barriers that prevent AAPIs from full civic engagement. It creates pathways that educate and mobilize our diverse communities to take civic action across Washington State.

**Chinese for Affirmative Action** is a community-based civil rights organization in San Francisco.  The mission of the organization is to protect the political and civil rights of Chinese Americans and to advance multi-racial democracy in the United States.

Founded in 1972, the **Chinese Progressive Association** educates, organizes and empowers the low income and working class immigrant Chinese community in San Francisco to build collective power with other oppressed communities to demand better living and working conditions and justice for all people.

**Coalition for Asian American Children & Families** is the nation's only pan-Asian children's advocacy organization. CACF improves the health and well-being of Asian Pacific American children, youth, and families in New York City by providing programs and policy campaigns that challenge stereotypes of the "Asian model minority"; speaking out on behalf of families in-need, especially immigrants struggling with poverty and limited English skills; and advocating for better policies, funding, and access to services at the city and state level.

**GAPIMNY** is an all-volunteer, membership-based community organization that empowers queer and transgender Asian Pacific Islander people in the greater New York metropolitan area. GAPIMNY is committed to advancing racial justice and LGBTQ rights for intersectionally marginalized communities, and supports affirmative action as a policy that equalizes opportunity.

The **Japanese American Citizens League**, founded in 1929, is a national organization whose ongoing mission is to secure and maintain the civil rights of Japanese Americans and all others who are victimized by injustice and bigotry. The leaders and members of the JACL also work to promote cultural, educational and social values and preserve the heritage and legacy of the Japanese American community.

**LEAP (Leadership Education for Asian Pacifics)** is a national, nonprofit organization, with

a mission to achieve full participation and equality for Asian and Pacific Islanders (APIs) through leadership, empowerment, and policy.

The **National Coalition for Asian Pacific American Community Development (National CAPACD – pronounced "capacity")** is a coalition of more than 100 local organizations that advocate for and organize in low-income AAPI communities to further the economic and social empowerment of low income AAPIs and equitable development of AAPI neighborhoods. It strengthens and mobilizes its members to build power nationally and further its vision of economic and social justice for all.

The **National Korean American Service & Education Consortium's** mission is to organize Korean and Asian Americans to achieve social, racial and economic justice. Founded in 1994 by local community-based organizations, NAKASEC's affiliates are the Korean Resource Center (Southern California), HANA Center (Greater Chicago), and NAKASEC VA (Northern Virginia).

The **National Queer Asian Pacific Islander Alliance (NQAPIA)** is a federation of lesbian, gay, bisexual, and transgender (LGBT) Asian American, South Asian, Southeast Asian, and Pacific Islander (AAPI) organizations. It seeks to build the organizational capacity of local LGBT AAPI groups, develop leadership, promote visibility, educate its community, enhance grassroots organizing, expand collaborations, and challenge anti-LGBTQ bias and racism.

**OCA - Asian Pacific American Advocates** is a national Asian American and Pacific Islander civil rights organization dedicated to advancing the economic, political, and social well-being of AAPIs. Through its chapters, OCA works to ensure that minority and low-income students have equal and equitable access to educational opportunities and experiences.

**Southeast Asia Resource Action Center (SEARAC)** is the only national civil rights organization devoted to empowering and uplifting the Southeast Asian American community. It represents the largest community of refugees ever to be resettled to America from the countries of Cambodia, Laos, and Vietnam, and works mindfully in solidarity with other communities of color and social justice movements.

<u>Higher Education Faculty</u>
(Titles and institutional affiliations provided for identification purposes only)

**Vichet Chhuon, Ph.D.**
Associate Professor of Culture & Teaching
Faculty, Asian American Studies Program
University of Minnesota-Twin Cities

**Gabriel J. Chin, J.D., LLM**
Edward L. Barrett Jr. Chair and Martin Luther King, Jr. Professor of Law
University of California, Davis School of Law

**Tarry Hum, MCP, Ph.D.**

Professor and Chair, Department of Urban Studies
Queens College CUNY

**Anil Kalhan, J.D., MPPM**
Professor of Law
Drexel University Thomas R. Kline School of Law

**Nancy Leong, J.D.**
Professor of Law
University of Denver Sturm College of Law

**Shirley Lung, J.D.**
Professor of Law
City University of New York School of Law

**Mari J. Matsuda, J.D., LLM**
Professor of Law
William S. Richardson School of Law
University of Hawai'i at Manoa

**Kevin Nadal, Ph.D.**
Professor
City University of New York

**Philip Tajitsu Nash, J.D.**
Lecturer, Asian American Studies Program and Latin American Studies Center
University of Maryland at College Park

**Cathy J. Schlund-Vials, Ph.D.**
Associate Dean for Humanities & Diversity, Equity, and Inclusion
College of Liberal Arts and Sciences
Professor of English and Asian/Asian American Studies
University of Connecticut

**Sona Shah, M.A.**
Assistant Director & Lecturer, Center for Asian American Studies
University of Texas at Austin

**John Kuo Wei Tchen, Ph.D.**
Inaugural Clement A. Price Chair of Public History and Humanities
Rutgers University - Newark

**Margaret Y.K. Woo, J.D., LLM**
Associate Dean for Research & Interdisciplinary Education
Northeastern University School of Law

A4

**K. Wayne Yang, Ph.D.**
Provost, John Muir College
Associate Professor, Ethnic Studies
University of California, San Diego