# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS
# BOSTON DIVISION

STUDENTS FOR FAIR ADMISSIONS, INC.,

       Plaintiff,

       v.

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE (HARVARD
CORPORATION),

       Defendant.

Civil Action No. 1:14-cv-14176-ADB

# BRIEF OF AMICI CURIAE THE AMERICAN CIVIL LIBERTIES UNION AND THE
# ACLU OF MASSACHUSETTS, INC. IN OPPOSITION TO PLAINTIFF'S MOTION
# FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................................ii

INTEREST OF THE AMICI .......................................................................................................... 1

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 3

    I.   Holistic, Race-Conscious Admissions are a Permissible Means of Achieving the
        Educational Benefits of Diversity, and None of SFFA's Claims Justify the Colorblind
        Remedy SFFA Seeks. ...................................................................................................... 3

        A.  Consideration of race as one factor in a holistic review is permissible where
            narrowly tailored to achieve diversity......................................................................... 3

        B.  Even if Plaintiff were to prevail on its remaining claims, the remedy it seeks
            would not be warranted................................................................................................. 5

    II.  Barring Any Consideration of Race Would Undermine Harvard's First-Amendment-
        Protected Academic Freedom to Assemble a Diverse Student Body. ............................... 6

    III. Narrowly Tailored Consideration of Race Furthers Equality and Dignity Values
        Within and Beyond the University. .................................................................................. 9

CONCLUSION............................................................................................................................. 17

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Adarand Constructors, Inc. v. Peña*,
515 U.S. 200 (1995) ............................................................................................................ 1, 3

*Ballard v. United States*,
329 U.S. 187 (1946) ................................................................................................................ 8

*Bob Jones University v. United States*,
461 U.S. 574 (1983) ................................................................................................................ 9

*Brown v. Board of Education*,
347 U.S. 483 (1954) ................................................................................................................ 5

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989) ................................................................................................................ 1

*Fisher v. University of Texas at Austin* (*Fisher II*),
136 S. Ct. 2198 (2016) .................................................................................................... passim

*Fisher v. University of Texas at Austin* (*Fisher I*),
570 U.S. 297 (2013) .......................................................................................................... 1, 16

*Gratz v. Bollinger*,
539 U.S. 244 (2003) .................................................................................................... 1, 9, 17

*Grutter v. Bollinger*,
539 U.S. 306 (2003) ........................................................................................................ passim

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
385 U.S. 589 (1967) ................................................................................................................ 7

*Milliken v. Bradley*,
418 U.S. 717 (1974) ................................................................................................................ 5

*Regents of the University of California v. Bakke*,
438 U.S. 265 (1978) ........................................................................................................ passim

*Sweatt v. Painter*,
339 U.S. 629 (1950) ................................................................................................................ 8

*Sweezy v. State of N.H. by Wyman*,
354 U.S. 234 (1957) ................................................................................................................ 7

*Taylor v. Louisiana*,
419 U.S. 522 (1975) ................................................................................................................ 8

## Other Authorities

Angus Chen, *Women Die More from Heart Attacks Than Men—Unless the ER Doc Is Female*, Sci. Am. (Aug. 6, 2018), https://www.scientificamerican.com/article/women-die-more-from-heart-attacks-than-men-mdash-unless-the-er-doc-is-female ......................... 11

Brief of Dean Robert Post & Dean Martha Minow as Amici Curiae in Support of Respondents, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) (No. 14-981), 2015 WL 6735850 ................................................................................ 14

Brief of the American Civil Liberties Union et al. as Amici Curiae in Support of Respondents, *Tex. Dep't of Hous. & Cmty Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507 (2016) (No. 13-1371), 2014 WL 7405733 ............................................ 12

Brief of the University of California et al. as Amicus Curiae in Support of Respondents at 31–34, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016) (No. 14-981), 2015 WL 6735847 ................................................................................ 14

Darrell L. Hudson, et al., *Are Benefits Conferred with Greater Socioeconomic Position Undermined by Racial Discrimination Among African American Men?*, 9 J. Men's Health 127 (June 2012), https://www.sciencedirect.com/science/article/pii/S1875686712000292 .. 16

Frank R. Dillon, et al., *A Dyadic Study of Multicultural Counseling Competence*, 63 J. Counseling Psychology 57 (2016) ............................................................ 11

Gina Kolata, *The Secret to Keeping Black Men Healthy? Maybe Black Doctors*, N.Y. Times (Aug. 20, 2018), https://www.nytimes.com/2018/08/20/health/black-men-doctors.html. ...... 11

Gov't Accountability Off., *K-12 Education: Better Use of Information Could Help Agencies Identify Disparities and Address Racial Discrimination* (April 2016), https://www.gao.gov/assets/680/676745.pdf. ....................................................... 12

Inst. of Medicine, *In the Nation's Compelling Interest: Ensuring Diversity in the Health Care Workforce* (2004) ................................................................................ 10

Inst. of Medicine, *Unequal Treatment: Confronting Racial and Ethnic Disparities in Health Care* (2003) ................................................................................ 10

Jessica Martin, *Racial Discrimination Lessens Benefits of Higher Socio-Economic Status*, The Source (June 14, 2012), https://source.wustl.edu/2012/06/racial-discrimination-lessens-benefits-of-higher-socioeconomic-status-video/ ....................................... 16

Raj Chetty et al., *Race and Economic Opportunity in the United States* (2018), http://www.equality-of-opportunity.org/assets/documents/race_paper.pdf ........................... 16

Richard Rothstein, *The Making of Ferguson: Public Policies at the Root of its Troubles*, Economic Policy Institute (Oct. 15, 2014), https://www.epi.org/publication/making-ferguson/ ................................................................................ 13

*See* Marcella Alsan et al., *Does Diversity Matter for Health? Experimental Evidence from Oakland* (Nat'l Bureau of Econ. Research, Working Paper No. 24787,  2018), http://www.nber.org/papers/w24787. ................................................................................... 11

U.S. Dep't of Health and Human Servs., *HHS Action Plan to Reduce Racial and Ethnic Health Disparities: Implementation Progress Report 2011-2014* (Nov. 2015) ............... 10, 11

## INTEREST OF THE AMICI[1]

The American Civil Liberties Union (ACLU) is a nationwide, nonprofit, nonpartisan organization with nearly 2 million members dedicated to the principles of liberty and equality embodied in the Constitution and this nation's civil rights laws. In support of these principles, the ACLU has appeared both as direct counsel and amicus curiae in numerous racial justice cases, including *Fisher v. University of Texas at Austin* (*Fisher II*), 136 S. Ct. 2198 (2016), *Fisher v. University of Texas at Austin* (*Fisher I*), 570 U.S. 297 (2013), *Gratz v. Bollinger*, 539 U.S. 244 (2003), *Grutter v. Bollinger*, 539 U.S. 306 (2003), *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995), *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989), and *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978). The ACLU of Massachusetts, Inc., is a statewide affiliate of the national ACLU.

## INTRODUCTION

At the outset of this case, filed in 2014, Students for Fair Admissions ("SFFA") alleged that any consideration of race in admissions violates Title VI. Following the Supreme Court's 2016 decision in *Fisher v. University of Texas at Austin* (*Fisher II*), 136 S. Ct. 2198 (2016), which reaffirmed that narrowly tailored race-conscious admissions practices are permissible under the Equal Protection Clause, this Court granted judgment for Harvard on this count and one other. Op., ECF No. 325. SFFA continues to allege that Harvard, through its admission process, intentionally discriminates against Asian Americans, and considers race in a manner that is not narrowly tailored as required by the Equal Protection Clause. Compl. ¶¶ 101–109, 112–

---

[1] No counsel for either party authored this brief in whole or in part, and no person other than amici and their counsel made any monetary contribution toward the preparation and submission of this brief.

114, ECF No. 1. The parties have filed cross motions for summary judgment on the remaining counts.

Defendant and numerous amici have argued in detail that the cross-motions for summary judgment should be decided in Defendant's favor. In submitting this brief in support of Harvard's opposition to SFFA's motion for summary judgment, amici limit their consideration to the question of remedy.[2] Plaintiff SFFA asks the Court to issue "a permanent injunction requiring Harvard to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission." Compl. ¶ 119. Yet in *Fisher II*, the Supreme Court reaffirmed that a college may engage in narrowly tailored race-conscious admissions to further its interests in the educational benefits of diversity. Moreover, Plaintiff's request that this Court require Harvard to ignore the role that race plays in contributing to campus diversity is unmoored to the claims on which they seek summary judgment; even if they were to prevail on any of those claims, the requested remedy would be unjustified. To impose such a straitjacket on the admissions process where not required by equal protection would violate the university's First-Amendment-protected academic freedom. And because a diverse student body furthers equality beyond the university's walls, integration within, and the dignity of each student, barring the limited consideration of race that Harvard—like virtually all other universities—deems necessary to achieve diversity would have widespread deleterious effects.

In short, the Equal Protection Clause does not require universities to close their eyes to the operation of race in our society. The reality is that racial identity continues to matter, in large part because of historic and continuing racial discrimination, both explicit and implicit,

---

[2] Amici do not address the merits of SFFA's or Harvard's respective motions for summary judgment in any other respect.

2

conscious and unconscious. The mere consideration of race in order to achieve a diverse student body does not conflict with the principles of equal protection, so long as it is narrowly tailored, as the Supreme Court's affirmative action cases demonstrate. To hold otherwise would make strict scrutiny "fatal in fact," and undermine, not further, equality. As the Court stated in *Adarand Constructors, Inc. v. Peña*, "we wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.' The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." 515 U.S. 200, 237 (1995) (internal citation omitted). Nor are universities disqualified from considering race in admissions to help construct a diverse student body, so long as they do so in a narrowly tailored fashion. Well settled precedent clearly rejects the remedy Plaintiff seeks.

## ARGUMENT

I. **Holistic, Race-Conscious Admissions are a Permissible Means of Achieving the Educational Benefits of Diversity, and None of SFFA's Claims Justify the Colorblind Remedy SFFA Seeks.**

A. **Consideration of race as one factor in a holistic review is permissible where narrowly tailored to achieve diversity.**

It is well settled that a university pursuing the compelling "educational benefits that flow from a diverse student body" may consider race as one factor among many in a holistic admissions process. *Fisher II*, 136 S. Ct. at 2210 (quoting *Fisher v. University of Texas at Austin* (*Fisher I*), 570 U.S. 297, 310 (2013)); *see also Grutter v. Bollinger*, 539 U.S. 306, 325 (2003); *Regents of the University of California v. Bakke*, 438 U.S. 265, 311–12 (1978). A university is entitled to substantial deference in "the decision to pursue the educational benefits that flow from student body diversity," provided that it "'gives a reasoned, principled explanation' for the

decision." *Fisher II*, 136 S. Ct. at 2208 (quoting *Fisher I*, 570 U.S. at 310). Harvard has asserted

a reasoned, principled explanation for its decision to pursue diversity. *See* Ellsworth Decl. Ex.

45, at 1, ECF No. 419-45 (Rakesh Khurana et al., *Report of the Committee to Study the*

*Importance of Student Body Diversity* (2016)). Its objectives include the "curricular goal of

exposing students to new ideas, new ways of understanding, and new ways of knowing," and the

desire to "prepare its students to assume leadership roles in the increasingly pluralistic society

into which they will graduate." Def.'s Mem. Supp. Summ. J. 18, ECF No. 418-2 (internal

citations omitted). With good reason, SFFA has not questioned Harvard's compelling interest in

the educational benefits of diversity. "Both 'tradition and experience lend support to the view

that the contribution of diversity is substantial.'" *Grutter*, 539 U.S. at 324 (quoting *Bakke*, 438

U.S. at 313).

      The principles articulated by Harvard in support of its interest in pursuing student body

diversity align with those previously recognized by the Supreme Court. Diversity strengthens the

educational experience for all students in many important ways. "Enrolling a diverse student

body 'promotes cross-racial understanding, helps to break down racial stereotypes, and enables

students to better understand persons of different races.'" *Fisher II*, 136 S. Ct. at 2210 (quoting

*Grutter*, 539 U.S. at 330). Additionally "student body diversity promotes learning outcomes, and

better prepares students for an increasingly diverse workforce and society." *Id.* (quoting *Grutter*,

539 U.S. at 330).

      The educational benefits of diversity carry beyond the classroom and beyond any

individual student's experience. The Supreme Court has repeatedly emphasized the importance

of education as "pivotal to 'sustaining our political and cultural heritage' with a fundamental role

in maintaining the fabric of society." *Grutter*, 539 U.S. at 331 (quoting *Plyler v. Doe,* 457 U.S.

202, 221 (1982)). Education, as the Court expressed in *Brown v. Board of Education*, "is the very foundation of good citizenship." 347 U.S. 483, 493 (1954). "Effective participation by members of all racial and ethnic groups in the civil life of our Nation" therefore depends acutely on effective participation in higher education. *Grutter*, 539 U.S. at 331–32. A diverse student body furthers these values in part by demonstrating to "[a]ll members of our heterogeneous society" that they can "have confidence in the openness and integrity" of a university. *Id.* at 332.

Harvard's interest in diversity is indisputably compelling. The Supreme Court is clear that race can be considered in furthering this compelling interest so long as it is narrowly tailored. SFFA's request to eliminate *any* consideration of race therefore is not supported by the Equal Protection Clause.

### B.   Even if Plaintiff were to prevail on its remaining claims, the remedy it seeks would not be warranted.

The remedy Plaintiff seeks is also unmoored from its remaining claims. The scope of any remedy is defined by the scope of the violation. *Milliken v. Bradley*, 418 U.S. 717, 738, 744 (1974). The Court has already dismissed Plaintiff's contention that Harvard's bare consideration of race violates Equal Protection (Count VI). *See* Op., ECF No. 325. In its motion for summary judgment, SFFA advances three principal arguments: that Harvard discriminates against Asian Americans; that Harvard engages in racial balancing; and that Harvard failed to consider sufficiently race-neutral alternatives. Even if SFFA were to prevail on any of these claims, the extreme remedy it seeks would not be warranted.

If the Court were to conclude that Harvard has discriminated against Asian Americans, the remedy tailored to that violation would require it to halt any such discrimination. Consideration of race in admissions does not necessarily lead to discrimination against Asian

Americans. Thus, even a finding of intentional discrimination would not warrant an order barring any consideration of race.

Likewise, if Harvard were found to be engaged in racial balancing, or quotas, the remedy would be to preclude it from those particular practices—not to bar it from considering race in any way. Consideration of race is permissible so long as it is not implemented through quotas and is one factor in a process that reviews each individual holistically.

SFFA also argues that Harvard has not adequately considered race-neutral measures. But even if the Court were to conclude that there are race-neutral approaches that Harvard has not assessed, the remedy would be to order that it assess those approaches—not that it blind itself altogether to race in the admissions process.

Thus, there is no basis for the remedy SFFA seeks in existing case law, and it would not even be warranted were SFFA to prevail on any of the claims in its motion for summary judgment.

## II.    Barring Any Consideration of Race Would Undermine Harvard's First-Amendment-Protected Academic Freedom to Assemble a Diverse Student Body.

SFFA's proposed remedy to remove consideration of race from admissions would also interfere with Harvard's First Amendment right of academic freedom. A university's academic freedom affords it substantial, though not unlimited, discretion to determine the composition of its student body. *See Fisher II*, 136 S. Ct. at 2208. This allows a university to create an environment that facilitates a robust exchange of diverse ideas. *See id.* at 2211. Academic freedom encompasses the university's decision that an individual's multifaceted identity, including her race, is relevant to her contributions to the university. Where, as here, the Equal Protection Clause does not require preclusion of the narrowly tailored consideration of race, the First Amendment forbids the imposition of such a remedy.

6

Academic freedom is "a special concern of the First Amendment," and includes a university's "selection of its student body." *Bakke*, 438 U.S. at 312; *see also Grutter,* 539 U.S. at 329 ("In announcing the principle of student body diversity as a compelling state interest, Justice Powell invoked our cases recognizing a constitutional dimension, grounded in the First Amendment, of educational autonomy."); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us . . . That freedom is therefore a special concern of the First Amendment . . . ."); *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957) ("The essentiality of freedom in the community of American universities is almost self-evident."). A university's prerogative to determine "who may be admitted to study" is one of the "four essential freedoms of a university," along with the freedoms to determine "on academic grounds who may teach, what may be taught, [and] how it shall be taught." *Sweezy*, 354 U.S. at 263 (Frankfurter, J., concurring) (internal quotation marks omitted).

Academic freedom allows a university "to provide that atmosphere which is most conducive to speculation, experiment and creation," *id.*, making the classroom "particularly the marketplace of ideas" and thereby training the Nation's future leaders "through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues.'" *Keyishian*, 385 U.S. at 603 (quoting *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (Hand, J.)).

Harvard's judgment that a candidate's multifaceted identity, including race, is a relevant component of its admission decisions is thus a constitutionally protected expression of its educational autonomy. An otherwise qualified student "with a particular background—whether it be ethnic, geographic, culturally advantaged or disadvantaged—may bring to a professional

7

school . . . experiences, outlooks, and ideas that enrich the training of its student body and better

equip its graduates to render with understanding their vital service to humanity." *Bakke*, 438 U.S.

at 314.

The insight that the racial composition of a student body affects education is not new.

Since *Bakke*, the Supreme Court has expressly recognized that "the interest of diversity is

compelling in the context of a university's admissions program." 483 U.S. at 314. Even earlier,

the importance of racial diversity was one of the reasons the Court held that a "law school for

Negroes" did not offer substantial equality in educational opportunities. The Court found that

such a law school would not allow Black students to interact with white students, where white

people comprised "85% of the state and include most of the lawyers, witnesses, jurors, judges,

and other officials with whom [the applicant] will inevitably be dealing." *Sweatt v. Painter*, 339

U.S. 629, 634 (1950). What the Supreme Court has recognized with respect to gender is equally

true of race: although people of a particular race or gender do not necessarily "act as a class," the

"truth is" that people with different racial or gender identities are "not fungible," and "a

community made up exclusively of one is different from a community composed of both; the

subtle interplay of influence one on the other is among the imponderables." *Ballard v. United

States*, 329 U.S. 187, 193–94 (1946) (holding that the exclusion of women from the panel from

which juries were drawn required dismissal of indictment); *see also Taylor v. Louisiana,* 419

U.S. 522, 530 (1975) ("Restricting jury service to only special groups or excluding identifiable

segments playing major roles in the community cannot be squared with the constitutional

concept of jury trial.").

The First Amendment interest of a university in selecting its student body does not entitle

it to implement *any* admissions policy. When a university's academic judgment in creating a

student body violates the constitutional rights of others, it must give way. Thus, in *Bob Jones University v. United States*, the Supreme Court held that the Internal Revenue Service could deny tax-exempt status to a university that employed racially discriminatory admissions standards, even though the university claimed this admissions policy was compelled by its religious principles and protected by the First Amendment. 461 U.S. 574 (1983). The Court explained that "the Government has a fundamental, overriding interest in eradicating racial discrimination in education—discrimination that prevailed, with official approval, for the first 165 years of this Nation's history. That governmental interest substantially outweighs whatever burden denial of tax benefits places on petitioners' exercise of their religious beliefs." *Id.* at 604. Similarly, the Court has invalidated affirmative action programs that it deemed too rigid and not individualized. *Gratz,* 539 U.S. at 275; *Bakke,* 438 U.S. at 320.

At the same time, an appropriately narrowly tailored, race-conscious holistic admissions process does not violate equal protection, and is properly within the exercise of a university's academic freedom. A university's judgment that considering aspects of an applicant's identity, including race, are relevant to achieving a diverse student body has long been recognized by the Supreme Court as valid. Thus, to preclude any consideration of race is not only not required by the Equal Protection Clause, but would impermissibly infringe on Harvard's academic freedom.

### III. Narrowly Tailored Consideration of Race Furthers Equality and Dignity Values Within and Beyond the University.

Because diversity serves important values of equality, inclusion, and dignity, SFFA's requested relief, barring any consideration or even awareness of race, would directly undermine those important values

Diversity within the university contributes to diversity, inclusion and equality beyond campus.[3] A diverse student body helps achieve "[e]ffective participation by members of all racial and ethnic groups in the civic life of our Nation." *Grutter*, 539 U.S. at 332. To take just one example, from the area of health, an increasing body of evidence "demonstrates that greater diversity among health professionals is associated with improved access to care for racial and ethnic minority patients, greater patient choice and satisfaction, better patient–provider communication, and better educational experiences for *all* students while in training." Inst. of Medicine, *In the Nation's Compelling Interest: Ensuring Diversity in the Health Care Workforce* 5 (2004); *see* Inst. of Medicine, *Unequal Treatment: Confronting Racial and Ethnic Disparities in Health Care* 201 (2003) (citing study of nursing students that found that negative attitudes about racial/ethnic minorities was related to the absence of prior exposure to a diverse population).[4] A recent study found "strong" and "unambiguous" results that black men seeing

---

[3] Harvard's educational mission expressly concerns training our nation's residents and leaders. *See* Ellsworth Decl. Ex. 45, at 1, ECF No. 419-45 (Rakesh Khurana et al., *Report of the Committee to Study the Importance of Student Body Diversity* (2016)) ("The mission of Harvard College is to educate the citizenry and citizen leaders for our society" and this mission is "fostered through a diverse residential environment where our students live with peers who are studying different subjects, who come from different walks of life, and have different identities.").

[4] *See also* U.S. Dep't of Health and Human Servs., *HHS Action Plan to Reduce Racial and Ethnic Health Disparities: Implementation Progress Report 2011-2014* (Nov. 2015) ("Racial and ethnic diversity in the health care workforce is associated with improved access to care."); Inst. of Medicine, *Unequal Treatment: Confronting Racial and Ethnic Disparities in Health Care* 16 (2003) ([R]acial and ethnic minority providers are more likely than their non-minority colleagues to serve in minority and medically underserved communities."); *id.* ("Racial and ethnic diversity of health professions faculty and students helps to ensure that all students will develop the cultural competencies necessary for treating patients in an increasingly diverse nation."); *id.* at 122 (Healthcare professionals from racial and ethnic minority groups have generally been more successful in recruiting minority patients to participate in clinical research. Such efforts are critical to link scientific advancements with quality service delivery in underserved communities."); *cf.* Angus Chen, *Women Die More from Heart Attacks Than Men—Unless the ER Doc Is Female*, Sci. Am. (Aug. 6, 2018), https://www.scientificamerican.com/article/women-

black male doctors were much more likely to agree to certain preventive measures than were

black men seeing doctors who were white or Asian, and concluded that "[i]f black patients were

to agree to this preventive care at these rates in the real world, the gap in cardiovascular mortality

between black men and the rest of the population could be reduced by 20 percent." Gina Kolata,

*The Secret to Keeping Black Men Healthy? Maybe Black Doctors*, N.Y. Times (Aug. 20, 2018),

https://www.nytimes.com/2018/08/20/health/black-men-doctors.html.[5] Yet "Latinos and

African-Americans comprise nearly one-third of the nation's population, but they account for

only slightly more than one-tenth of U.S. physicians." U.S. Dep't of Health and Human Servs.,

*HHS Action Plan to Reduce Racial and Ethnic Health Disparities: Implementation Progress

Report 2011-2014* (Nov. 2015).

 Similar findings exist with respect to mental health care provision: the lack of racial

diversity in mental health care also results in negative health outcomes. "When racial and ethnic

minority individuals do receive mental health care, it is often of lower quality than that received

by their White, non-Latino counterparts . . . includ[ing] client experiences of intentional or

unintentional discrimination and stereotyping." Frank R. Dillon, et al., *A Dyadic Study of

Multicultural Counseling Competence*, 63 J. Counseling Psychology 57, 57 (2016). "A social

determinant of . . . mental health disparities in the United States is a lack of multicultural

competent clinicians available to clients of color." *Id.* That the provision of healthcare is affected

by the racial identity and exposure to racial diversity of healthcare providers is but one example

---

die-more-from-heart-attacks-than-men-mdash-unless-the-er-doc-is-female ("Women make up a
mere quarter of emergency doctors in the U.S. . . . If a heart attack patient is a woman and her
emergency physician is a man . . . her risk of death suddenly rises by about 12 percent.").

[5] *See* Marcella Alsan et al., *Does Diversity Matter for Health? Experimental Evidence from
Oakland* (Nat'l Bureau of Econ. Research, Working Paper No. 24787,  2018),
http://www.nber.org/papers/w24787.

of the myriad ways the racial composition of a university's student body affects equality beyond the university.

In addition, considering race as one factor in admissions in order to achieve a racially diverse campus fosters integration in higher education. As Harvard notes, if it were required to forego any consideration of race, its Black and Latino student population would fall precipitously. Def.'s Mem. Supp. Summ. J. 27–28, ECF No. 418. In today's still-segregated society, a university can be an all-too-rare site of integration. One of the reasons race still has such salience in our society is the continuing isolation of American students on racial grounds in lower, middle, and high school. In 2010, the Government Accountability Office reported that between 2000-01 and 2013-14, "both the percentage of K-12 public schools that were high poverty and comprised of mostly Black or Hispanic students [ ] and the students attending these schools grew significantly." Gov't Accountability Off., *K-12 Education: Better Use of Information Could Help Agencies Identify Disparities and Address Racial Discrimination* 10 (April 2016), https://www.gao.gov/assets/680/676745.pdf. "The number of students attending [majority Black or Hispanic] schools more than doubled, increasing by about 4.3 million students, from about 4.1 million to 8.4 million students." *Id.* at 12.

Contemporary racial segregation can be traced to racial housing covenants, government redlining of housing financing for non-white neighborhoods and, most recently, predatory lending that capitalized on and exacerbated this historical discrimination and in turn contributed to a newly expanding racial wealth gap. *See* Brief of the American Civil Liberties Union et al. as Amici Curiae in Support of Respondents at 4–10, *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507 (2016) (No. 13-1371), 2014 WL 7405733; Richard Rothstein, *The Making of Ferguson: Public Policies at the Root of its Troubles*,

Economic Policy Institute (Oct. Oct. 15, 2014), https://www.epi.org/publication/making-ferguson/. Thus, by permitting institutions of higher education to construct racially diverse student bodies, the Court's affirmative action jurisprudence furthers not only diversity, but equality and integration.

Moreover, ensuring that all aspects of an applicant's character are considered in the admissions process, including race, respects the lived experiences and equal dignity of all applicants. When a university elects to pursue diversity through holistic review, it seeks "those intangible 'qualities which are incapable of objective measurement but which make for greatness.'" *Fisher II*, 136 S. Ct. at 2214 (quoting *Sweatt*, 339 U.S. at 634). To properly assess these intangible qualities, Harvard, like nearly all universities, considers each applicant across many dimensions that can affect life experience and personal outlook. Holistic review respects the equality and dignity of all applicants by considering each one across many attributes and qualifications, recognizing the contribution each may make to the diversity of the student body.

In upholding the consideration of race as one factor in holistic review, the Supreme Court recognizes that "diversity takes many forms," and that many characteristics—including race, gender, religion, sexual orientation, socioeconomic status, extracurricular activities, life experiences and cultural background—may inform an applicant's outlook, and therefore what she may have to offer to campus diversity. *Fisher II*, 136 S. Ct. at 2210; *see also Bakke*, 438 U.S. at 317(a race-conscious admissions program satisfies equal protection if it is "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration"). As the Court articulated in *Grutter*, "one's own, unique experience" of race, as of other personal characteristics, "is likely to affect an individual's views." 539 U.S. at 333.

To prohibit any consideration of race in admissions, as SFFA asks, would foreclose admissions officers from assessing applicants as whole individuals. *See* Brief of Dean Robert Post & Dean Martha Minow as Amici Curiae in Support of Respondents at 8, *Fisher II*, 136 S. Ct. 2198 (No. 14-981), 2015 WL 6735850 (arguing that to prohibit schools "from recognizing the race of applicants, even when race is unquestionably a salient aspect of an applicant's own identity and story," would "censor applicants' self-understandings"). Rejecting consideration of race devalues applicants' individual experiences. "It belittles applicants to invite their self-presentations and then to deliberately ignore aspects of their personal accounts that they believe to be important." *Id.* at 22. This is more than a remote concern for universities. Following its referendum-mandated shift to race-blind admissions, the University of California found that "underrepresented minorities [were] more likely to spurn an offer [of admission]." Brief of the University of California et al. as Amicus Curiae in Support of Respondents at 31–34, *Fisher II*, 136 S. Ct. 2198 (No. 14-981), 2015 WL 6735847 (internal quotation and citation omitted). Amici Brown University et al. further note that "the burdens of mandated race-blind admissions weigh most heavily on the shoulders of underrepresented minority students;" those who do choose to enroll at less diverse campuses are more likely to report feeling that students of their race are not respected. Br. Brown University et al. as Amicus Curiae 10, ECF No. 445. Harvard is likewise concerned about the experiences of its students of color should the campus become less diverse. Harvard's Committee to Study the Importance of Student Body Diversity found that "[t]he issues of diversity and inclusion that Harvard faces today—including . . . ongoing feelings of isolation and alienation among racial minorities in Harvard's community— would only be exacerbated by a significant decline in African-American and Hispanic

enrollment." Def.'s Mem. Supp. Summ. J. 28–29, ECF No. 418 (internal quotation marks omitted) (alternation in original).

As the Supreme Court has recognized, universities need not limit admissions criteria to test scores and grades, precisely because such an assessment fails to consider each individual as a whole person, and deprives the university of valuable data informing the construction of a diverse student body. No single metric can fully assess the range of qualities, experiences and viewpoints that may contribute to student body diversity. *Fisher II*, 136 S. Ct. at 2213 ("any single metric [ ] will capture certain types of people and miss others"). Numerical metrics are a particularly crude tool. *Id.* ("[T]o compel universities to admit students based on class rank alone is in deep tension with the goal of educational diversity"). Purely numerical metrics thwart a university's ability "to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the university." *Grutter*, 539 U.S. at 340.

Numerical evaluations cannot possibly capture all relevant aspects of an applicant's case for admission, as the facts of this case demonstrate. Harvard receives tens of thousands of applicants each year with "outstanding grades and test scores." Def.'s Mem. Supp. Summ. J. 3, ECF No. 418-2. For the class of 2019, "approximately 3,500 [applicants] had perfect SAT math scores, approximately 2,700 had perfect SAT verbal scores, more than 8,000 had a perfect converted GPA, and nearly 1,000 earned a perfect composite score on the SAT or ACT." *Id.* at 4. Relying on these metrics alone misses much that is highly relevant to composing a diverse student body. As Harvard enrolls only about 1,600 freshmen each year, test scores and grades evidently provide insufficient information to make admissions decisions. *Id.* at 3.

Nor does consideration of socioeconomic status suffice. As Harvard and other universities have found, considering socioeconomic status in lieu of race deprives the university

of important information necessary to achieve meaningful diversity. A university that ignores

race will not capture the full diversity of its applicants. Experiences of race discrimination, which

in turn can contribute to an individual's perspective and outlook, are by no means confined to

those of lower socioeconomic status. For example, "African Americans who heavily invest in

themselves through education and working in high occupational prestige settings may be more

exposed to racial discrimination because they are more mobile—they are living in more

integrated neighborhoods, they are working in more integrated settings," leading to a greater

susceptibility to depression. Jessica Martin, *Racial Discrimination Lessens Benefits of Higher*

*Socio-Economic Status*, The Source (June 14, 2012), https://source.wustl.edu/2012/06/racial-

discrimination-lessens-benefits-of-higher-socioeconomic-status-video/.[6] Black males growing up

in the wealthiest families and neighborhoods still earn less as adults than white males growing up

in similar circumstances. Raj Chetty et al., *Race and Economic Opportunity in the United States*

(2018), http://www.equality-of-opportunity.org/assets/documents/race_paper.pdf.

   Moreover, to the extent that consideration of socioeconomic status happens to result in

racial diversity in a particular situation, it depends on the continuing subordinate socioeconomic

status of African Americans. As the Supreme Court said of Texas's use of class rank, "[t]hough

facially neutral" such an approach increases racial diversity only by relying on entrenched racial

segregation and inequality in American neighborhoods and primary and secondary schools.

*Fisher II*, 136 S. Ct. at 2213; *see also Fisher I,* 570 U.S. at 335 (Ginsburg, J., dissenting). The

furtherance of racial diversity through socioeconomic diversity is contingent on the persistence

---

[6] *See also* Darrell L. Hudson, et al., *Are Benefits Conferred with Greater Socioeconomic Position Undermined by Racial Discrimination Among African American Men?*, 9 J. Men's Health 127 (June 2012), https://www.sciencedirect.com/science/article/pii/S1875686712000292.

of racial inequality. As Justice Souter observed, this approach suffers "the disadvantage of deliberate obfuscation." *Gratz*, 539 U.S. at 297–98 (Souter, J., dissenting).

Holistic admissions programs are designed to assess a full picture of the diversity applicants will bring to a university community. To prohibit any consideration of race in holistic review would undermine equality, impede integration and inclusion, and deny the relevance of applicants' individual experiences of race to the diversity of a student body. Nothing in the Constitution or the record supports SFFA's request that the Court preclude Harvard from any consideration of race in its admissions process.

## CONCLUSION

For all of the above reasons, the Court should reject Plaintiff's request to preclude Harvard from any consideration or awareness of race in its admissions process.

Dated: August 30, 2018

                                          Respectfully submitted,


                                          */s/ Sarah Hinger*_____
                                          Sarah Hinger*
                                          Jennesa Calvo-Friedman
                                          Dennis Parker
                                          American Civil Liberties Union
                                              Foundation
                                          125 Broad Street, 18th Fl.
                                          New York, NY 10004
                                          (212) 519-7882
                                          shinger@aclu.org


                                          */s/ Matthew R. Segal*_____
                                          Matthew R. Segal, BBO 654489
                                          Ruth A. Bourquin, BBO 552985

Rahsaan D. Hall, BBO 645369
Jessie J. Rossman, BBO 670685
American Civil Liberties Union
    Foundation of Massachusetts, Inc.
211 Congress Street
Boston, MA 02110
(617) 482-3170
msegal@aclum.org

*Attorneys for Amici Curiae*

*\*Pro Hac Vice Motion Pending*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Matthew R. Segal*
Matthew R. Segal
*Attorney for Amici Curiae*

Dated: August 30, 2018