**UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION**

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, | |
| Plaintiff, | Civil Action No. 1:14-cv-14176-ADB |
| v. | |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | |
| Defendant. | |

**MEMORANDUM OF AMICI CURIAE STUDENTS IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

DISTINCT INTEREST OF AMICI.................................................................................................. 3

ARGUMENT .................................................................................................................................. 4

I.     Harvard's race-conscious holistic admissions policy is narrowly tailored and its flexible consideration of race does not unduly favor underrepresented ethno-racial minorities at the expense of Asian Americans................................................................. 4

     A.     Harvard's consideration of race is narrowly tailored because Asian American applicants can also receive a "plus" due to their race. ........................... 7

     B.     SFFA's statistical analyses are predicated on false premises of merit and do not show Harvard affords any undue preference for Black and Hispanic students. ................................................................................................................ 8

     C.     Harvard's consideration of race is narrowly tailored because it has a minimal effect on the selection rate of Asian Americans. .................................... 13

     D.     Harvard's race-conscious admissions policy is narrowly tailored because it does not afford Black and Hispanic students an undue preference. ..................... 15

II.     Any negative effect for Asian Americans observed in the admissions process is caused by admissions practices that benefit white applicants and not race-conscious admissions. ...................................................................................................... 16

     A.     The relevant comparison for an intentional discrimination claim is between Asian Americans and similarly situated white applicants. ...................... 16

     B.     SFFA must prove that Harvard's current holistic process has a discriminatory effect, is motivated by a discriminatory purpose, and that there is some connection between the discriminatory motive and challenged policy. ............................................................................................... 19

     C.     Applying the *Arlington Heights* framework reveals that SFFA is not entitled to summary judgment on its intentional discrimination claim................ 20

          1.     There are genuine disputes over whether Harvard has any policies advantaging white students over Asian Americans that have a discriminatory effect. .............................................................................. 20

          2.     SFFA has not demonstrated that any disparate effect in Asian American admission rates comes from a discriminatory purpose as set forth in the *Arlington Heights* factors................................................. 24

i

D.      A finding of intentional discrimination against Asian Americans would not justify banning race-conscious admissions since such a ban would not remediate the harm caused by a white admissions advantage. ............................ 27

CONCLUSION ................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
 138 S. Ct. 2305 (2018) ..........................................................................................26

*Anderson ex rel. Dowd v. City of Boston,*
 375 F.3d 71 (1st Cir. 2004) ...................................................................................26

*Fisher v. Univ. of Texas at Austin,*
 136 S. Ct. 2198 (2016) (*Fisher II*) ................................................................5, 15

*Fisher v. Univ. of Texas at Austin,*
 570 U.S. 297 (2013) (*Fisher I*) ..............................................................................5

*Fudge v. City of Providence Fire Dept.,*
 766 F.2d 650 (1st Cir. 1985) .................................................................................21

*Grutter v. Bollinger,*
 539 U.S. 306 (2003) ..................................................................................... *passim*

*Jones v. City of Boston,*
 752 F.3d 38 (2014) ................................................................................................21

*McGuire v. Reilly,*
 386 F.3d 45 (1st Cir. 2004) ...................................................................................20

*Milliken v. Bradley,*
 433 U.S. 267 (1977) ..............................................................................................27

*Mobile v. Bolden,*
 446 U.S. 55 (1980) ................................................................................................26

*Regents of the Univ. of Cal. v. Bakke,*
 438 U.S. 265 (1978) ..............................................................................4, 5, 15, 17

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
 429 U.S. 252 (1977) ..................................................................................... *passim*

**Other Authorities**

Adam R. Pearson *et al.*, *The Nature of Contemporary Prejudice: Insights from
 Aversive Racism*, Soc. & Personality Psychol. Compass, no. 3, 2009 ....................28

Angela Duckworth et al., *Grit: Perseverance and Passion for Long-Term Goals*,
 92 J. Personality & Soc. Psychol. 1087 (2007) ........................................................11

Anthony P. Carnevale & Jeff Strohl, "How Increasing College Access is
  Increasing Inequality, and What to Do About It," in *Rewarding Strivers:
  Helping Low Income Students Succeed in College* (Richard D. Kahlenberg
  ed., 2010), https://www.luminafoundation.org/files/resources/increasing-
  inequality.pdf. ....................................................................................................................11

Bic Ngo & Stacey J. Lee, *Complicating the Image of Model Minority Success: A
  Review of Southeast Asian American Education*, 77 Rev. of Educ. Res. 415
  (2007)....................................................................................................................12

Brief of Columbia University, Harvard University, Stanford University and the
  University of Pennsylvania as Amici Curiae, *Regents of the Univ. of Cal. v.
  Bakke*, 438 U.S. 265 (1978) (No. 76-811), 1976 WL 181278 ................................25

Christopher Wolsko et al., *Framing Interethnic Ideology: Effects of Multicultural
  and Color-Blind Perspectives on Judgments of Groups and Individuals*, 78 J.
  Personality & Soc. Psychol. 635 (2000) .................................................................28

Daniel Kahneman, *Thinking, Fast and Slow* (2011).....................................................29

Eric E. Noftle & Richard W. Robbins, *Personality Predictors of Academic
  Outcomes:  Big Five Correlates of GPA and SAT Scores*, 93 J. Personality &
  Soc. Psychol. 116 (2007) ........................................................................................11

Faye Crosby et al., *Cognitive Biases in the Perception of Discrimination: The
  Importance of Format*, 14 Sex Roles 637 (1986) ....................................................29

Gary Orfield et al., Alternative Paths to Diversity: Exploring and Implementing
  Effective College Admissions Policies (2017) ........................................................28

Geoffrey Beattie et al., *An Exploration of Possible Unconscious Ethnic Biases in
  Higher Education: The Role of Implicit Attitudes on Selection for University
  Posts*, 197 Semiotica 171 (2013) ...........................................................................29

Goodwin Liu, *The Causation Fallacy:* Bakke *and the Basic Arithmetic of
  Selective Admissions*, 100 Mich. L. Rev. 1045 (2002) ...........................................14

Gregory M. Walton and Steven J. Spencer, *Latent Ability: Grades and Test
  Scores Systematically Underestimate the Intellectual Ability of Negatively
  Stereotyped Students*, 20 Psychological Sci. 1132 (2009)......................................11

J.W. Schofield, *Causes and Consequences of the Colorblind Perspective* in
  Prejudice, Discrimination, and Racism 231-254 (J.F. Dovidio & S.L.
  Gaertner, eds., 1986)..............................................................................................28

James J. Heckman &Tim Kautz, *Fostering and Measuring Skills: Interventions
  that Improve Character and Cognition*, National Bureau of Economic
  Research 3-4 (Nov. 2013), http://www.nber.org/papers/w19656............................11

Jennifer A. Richeson & Richard J. Nussbaum, *The Impact of Multiculturalism Versus Color-Blindness on Racial Bias*, 40 J. Experimental Soc. Psychol. 417 (2004)...........................................................................................................28

Jeremy Ashkenas, Haeyoun Park & Adam Pearce, *Even With Affirmative Action, Blacks and Hispanics Are More Underrepresented at Top Colleges Than 35 Years Ago*, N.Y. Times (August 24, 2017) ............................................................17

Jerry Kang, *Negative Action Against Asian Americans: The Internal Instability of Dworkin's Defense of Affirmative Action,* 31 Harv. C.R.-C.L. L. Rev. 1 (1996)...................17

Jerry Kang, Rachel D. Godsil & John V. Wintermute, Brief of Experimental Psychologists as *Amici Curiae* in Support of Respondents, at 4, *Fisher v. Univ. of Texas at Austin*, 136 S.Ct. 2198 (Nov. 2, 2015) (No. 14-981), 2015 WL 6774020 .........................................................................................................10, 11, 12

Kimberly West-Faulcon, *Obscuring Asian Penalty with Illusions of Black Bonus*, 64 UCLA L. Rev. 590 (2017) ........................................................................14, 21

Laurie A. Rudman et al., *"Unlearning" Automatic Biases: The Malleability of Implicit Prejudice and Stereotypes*, 81 J. Personality & Soc. Psychol. 856 (2001)..........................................................................................................28

Meike Bonefeld & Oliver Dickhäuser, *(Biased) Grading of Students' Performance: Students' Names, Performance Level, and Implicit Attitudes*, Frontiers in Psychology (May 9, 2018), https://www.frontiersin.org/articles/10.3389/fpsyg.2018.00481/full#B46............................10

Patricia G. Device et al., *A Gender Bias Habit-Breaking Intervention Led to Increased Hiring of Female Faculty in STEMM Departments* (2017), https://psyarxiv.com/tdvy7.............................................................................29

Paul Jargowsky, *Concentration of Poverty in the New Millennium: Changes in Prevalence, Composition, and Location of High Poverty Neighborhoods*, The Century Foundation and Rutgers Center for Urban Research and Education 5 (Dec. 2013), https://tcf.org/assets/downloads/Concentration_of_Poverty_in_the_New_Mill ennium.pdf .....................................................................................................13

Phoebe C. Ellsworth & Samuel R. Sommers, *How Much Do We Really Know About Race and Juries? A Review of Social Science Theory and Research*, 78 Chicago-Kent L. Rev. 997 (2003)...............................................................28

Randall Kennedy, *Blacks and the Race Question at Harvard* in *Blacks at Harvard: A Documentary History of African-American Experience at Harvard and Radcliffe* (Werner Sollors et al., eds. 1993) ....................................26

Samuel D. Museus & Rican Vue, *Socioeconomic Status and Asian American and Pacific Islander Students' Transition to College: A Structural Equation Modeling Analysis*, 37 The Rev. of Higher Educ. 45 (2013).....................................................11

See Olga Khazan, *Ending the Extracurricular Privilege, One Man's Mission to Make College Admissions Sane (and Fair) Again*, The Atlantic (Dec. 21, 2016), https://www.theatlantic.com/education/archive/2016/12/ending-extracurricular-privilege/511307/ ...........................................................................................13

Sherick Hughes et al., *Causation Fallacy 2.0: Revisiting the Myth and Math of Affirmative Action*, 30 Educ. Pol'y 63 (2016)........................................................................14

Sylvia P. Perry et al., *Modern Prejudice: Subtle, But Unconscious?  The Role of Bias Awareness in Whites' Perceptions of Personal and Others' Biases*, 61 J. Experimental Soc. Psychol. 64 (2015)...................................................................................29

William C. Kidder, *How Workable Are Class-Based and Race-Neutral Alternatives at Leading American Universities?*, 64 UCLA L. Rev. Disc. 100 (2016)...............................................................................................................................28

William Kidder & Angela Onwuachi-Willig, *Still Hazy After All These Years: The Data and Theory Behind Mismatch*, 92 Tex. L. Rev. 895 (2014) ...........................................28

## INTRODUCTION AND SUMMARY OF ARGUMENT

SFFA's strategy of using Asian Americans as a cover to eviscerate race-conscious admissions is not only divisive, it is misleading both legally and factually and wholly insufficient for summary judgment.  SFFA blurs two entirely different claims: (1) that Harvard intentionally discriminates against Asian Americans to the benefit of white students and (2) that Harvard's race-conscious policy admitting ethno-racial minorities unduly edges out Asian American applicants.  But these two claims must be de-coupled. They call for distinct legal standards, involve different facts, and compel different remedial interventions.

*Students* reject SFFA's attempt to conflate these two distinct claims—intentional discrimination versus the validity of race-conscious admissions—and *Students* urge this Court to distinguish them.  This brief is structured to assist in that task.

*Section I* demonstrates that SFFA is not entitled to summary judgment on its claims that Harvard's race-conscious policy violates the narrow tailoring framework set by the Supreme Court.  Harvard more than satisfies this standard.  Importantly, Harvard's flexible consideration of race does not unduly favor underrepresented minorities at the expense of Asian Americans.  SFFA's arguments mischaracterize the record and misconstrue the meaning of merit.  *Students* concur with Harvard's conclusion that race-conscious admissions is essential for assessing an applicant's true potential and for cultivating a campus community that facilitates  "new ways of understanding," prevents "ongoing feelings of isolation," and prepares students to "assume leadership roles."[1]  Asian Americans are not unduly harmed by such a consideration.  In fact, the record and research indicate that as a community Asian Americans benefit from it. *Students* acknowledge that a policy that values greater ethno-racial diversity may impact admissions

---

[1] Report of the Committee to Study the Importance of Student Body Diversity, Dkt. 419, Ex. 45 at 8, 23; Report of The Committee to Study Race-Neutral Alternatives, Dkt. 419, Ex. 47 at 9.

decisions for a small number of applicants, just as any attribute valued by a university may tip the balance in some applicants' favor.  As the Supreme Court has recognized, this type of limited impact is not discriminatory so long as the process meets certain criteria: it does not insulate individuals from comparison, it flexibly considers all pertinent elements of diversity, and it ensures race does not become the defining feature of an application.  The record indicates that Harvard's policy promoting ethno-racial diversity satisfies all of these elements.

*Section II* addresses SFFA's intentional discrimination claim by clarifying the appropriate analytical framework (which SFFA obscures) and highlighting factual disputes.  For SFFA's intentional discrimination claim the only comparison that matters is between Asian Americans and whites, not other ethno-racial groups.  The reason is simple: the Supreme Court has permitted giving a "plus" to underrepresented racial minorities when such a process is narrowly tailored.  But giving white students a "plus" over Asian Americans based on race is never constitutional since it does not promote racial diversity or reduce racial isolation.  Instead, the governing legal standard is one where SFFA must establish that Harvard intended to discriminate against Asian Americans to the benefit of whites.  Indeed, SFFA acknowledges that the relevant comparison for intentional discrimination involves Asian Americans *vis a vis* whites, not other minority groups.  (Dkt. No. 413 at 7.) ("First, Harvard intentionally discriminates against Asian-American applicants.  Incontrovertible evidence shows that Harvard's admissions policy has a disproportionately negative effect on **Asian Americans vis-a-vis similarly-situated white applicants** . . ." ) (emphasis added).

Second, in *Section II*, *Students* identify numerous factual disputes which compel proceeding to trial rather than granting SFFA summary judgment.  SFFA has provided virtually no material evidence on the *Arlington Heights* factors, except for discriminatory effect, which is

an important factor but not sufficient to establish discriminatory intent.   As to discriminatory effect, any bias is most attributable to preferences afforded to "ALDC" applicants—recruited athletes, children of Harvard College or Radcliffe alumni, applicants on the Dean's or Director's interest lists, and children of Harvard faculty and staff members—not race-conscious admissions because when SFFA's expert excludes those applicants, the data show there is little difference between the white admission rate and the Asian-American admission rate.   The record is clear that any systemic disadvantage that Asian Americans do face is predominantly benefitting whites in admissions, not ethno-racial minorities.   In short, SFFA's divisive strategy of trying to pit marginalized groups against each other is not even borne out by its own data.   Finally, any finding of intentional discrimination does not call for the remedy SFFA proposes: prohibiting any consideration of race in admissions.   An outright ban would exceed this court's remedial authority since the violation would not relate to Harvard's race-conscious policy.

## DISTINCT INTEREST OF AMICI

As articulated in *Students'* July brief and incorporated herein,[2] *Students* stand together as a broad cross-section of ethno-racial minorities—identifying as Asian American, Black, Latino, Native American, and Pacific Islander—to defend Harvard's right to cultivate racial diversity and reduce racial isolation to the full extent allowed by law.[3]   *Students* are situated differently than both SFFA and Harvard in this litigation in light of their lived experiences as ethno-racial

---

[2] Dkt. No. 440

[3] *Students* were permitted to participate as prospective, current, and now alumni students who identify as racial minorities and who wish to defend Harvard's right to consider race to the full extent allowed by law.   (Memorandum and Order on Proposed Defendant-Intervenors' Motion to Intervene, Dkt. 52 at 23 (June 15, 2015).)   At this stage in the litigation, *Students* have submitted over a dozen declarations to support their position and assist the Court.   (*See* Dkt. 31, Ex. 1; Dkt. 230, Ex. 1, Ex. 2.; Dkt. 440, Ex. 1.)   Numerical limits were never placed on *Students'* participation, but *Students* remain mindful of the impending trial.   *Students* note that they will soon be moving to participate at trial, and pending this Court's decision on trial participation, *Students* would be prepared to submit declarations from additional students and/or several *Students'* individual application files which reflect the readers' comments and scores.

minorities living in a country that still reckons with its racist past and present.   Importantly, *Students* depart from both parties with regard to SFFA's intentional discrimination claim. *Students* condemn any discrimination that exists, but fundamentally disagree with the remedy SFFA seeks: a blanket ban on "any use of race or ethnicity in the educational setting" in a manner that "does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission."  (Dkt. 1 at 119.)  Unlike Harvard, *Students* note the data in the record that suggests "ALDC" preferences disadvantage Asian Americans (as well as other ethno-racial groups) in the admissions process *vis a vis* whites.

Though varied in background, *Students* have a shared—and distinct—interest in ensuring credible allegations of white advantage are thoroughly investigated, redressed, and not confused with race-conscious policies promoting diversity.

## ARGUMENT

I.   **Harvard's race-conscious holistic admissions policy is narrowly tailored and its flexible consideration of race does not unduly favor underrepresented ethno-racial minorities at the expense of Asian Americans.**

SFFA contends that Harvard's admissions policy—which the Supreme Court previously cited as the model for constitutional, whole-person review[4]—is not narrowly tailored on three grounds: (1) Harvard purportedly engages in racial balancing, (2) uses race as more than a "plus" factor in admissions, and (3) could achieve racial diversity through race-neutral policies.  (Dkt. 1 at 104-109, 112-114; *see also* Dkt. 413 at 7-8.)  As articulated in *Students'* July Brief, the record compels summary judgment in Harvard's favor on all counts challenging its race-conscious holistic admissions policy,[5] and *Students* incorporate their arguments herein.  This brief offers

---

[4] *See Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 323 (1978); *Grutter v. Bollinger*, 539 U.S. 306, 334-35 (2003).
[5] *See generally* Dkt. 440.

additional observations to further expose fallacies in SFFA's assertions, specifically their claim that race operates as a predominant factor in admissions. SFFA's flawed allegations only serve to incite divisions among ethno-racial minorities—they are far too deficient to warrant summary judgment.

The constitutional inquiry for evaluating SFFA's claim begins with whether "a university may institute a race-conscious admissions program as a means of obtaining 'the educational benefits that flow from student body diversity.'" *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198, 2210 (2016) (*Fisher II*) (quoting *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 310 (2013)) (*Fisher I*). Once a university offers a "reasoned, principled explanation" for its pursuit of the educational benefits of diversity, that decision is entitled to deference. *Fisher II,* 136 S. Ct. at 2208. Here, Harvard asserts that student body diversity, including racial diversity, is "integral" to its pedagogical objectives and institutional mission.[6] Such diversity exposes Harvard's students to "new ideas, new ways of understanding, and new ways of knowing," "prepares [them] to assume leadership roles in the increasingly pluralistic society," and prevents the "ongoing feelings of isolation and alienation among racial minorities in [its] community."[7] Harvard has clearly articulated a "constitutionally permissible goal," *Bakke*, 438 U.S. at 311 (1978), that has resulted in an increasingly diverse campus even though the full benefits of diversity have not been attained.[8]

Thus, the primary inquiry is whether Harvard's consideration of race in its holistic admissions policy is narrowly tailored to achieve the benefits of student diversity. *Grutter*, 539 U.S. at 334. The Supreme Court has indicated that an "admissions program cannot use a quota

---

[6] Report of the Committee to Study the Importance of Student Body Diversity, Dkt. 419, Ex. 45 at 5.
[7] Report of the Committee to Study the Importance of Student Body Diversity, Dkt. 419, Ex. 45 at 8, 23; Report of The Committee to Study Race-Neutral Alternatives, Dkt. 419, Ex. 47 at 9.
[8] *See generally* Dkt. 440.

system," but it may consider race or ethnicity "as a 'plus' in a particular applicant's file" as long as the applicant is not "insulat[ed] . . . from comparison with all other candidates." *Id.* at 334 (internal citations omitted). The process should employ a "highly individualized, holistic review" which flexibly considers "all pertinent elements of diversity . . . although not necessarily according them the same weight." *Id.* at 309. Individualized review ensures that an applicant's race is not the "defining feature of his or her application." *Id.* at 337. Narrow tailoring also requires that the university determines in "good faith" that "workable race-neutral alternatives" would not suffice and undertakes "periodic reviews" to ensure racial preferences remain necessary. *Id.* at 339, 342.

Harvard has submitted evidence demonstrating that its admissions process is an individualized, whole person review where race is considered flexibly as one of many factors.[9] Indeed, *Students* who reviewed their application file observed how their race was considered alongside their class, other identity characteristics, academic and artistic accomplishments, and extracurricular activities and leadership positions.[10]  *Students* submit the following arguments below:  (1) race is considered a plus factor for Asian American applicants, too; (2) SFFA's statistical arguments are based on faulty premises which incorrectly define merit; (3) Harvard's consideration of race has a notably small effect on the Asian American selection rate; and (4) race is not the predominant reason as to why African American and Hispanic applicants are admitted. Accordingly, SFFA is not entitled to summary judgment on Counts II, III, V.

---

[9] *See generally* Dkt. 435 at 39-43.
[10] *See, e.g.*, Dkt. 440-1, Ex. 1.1 at 5 (Decl. of A.A.); Dkt 440, Ex. 1.3 at 17 (Decl. of D.I.); Dkt. 440-1, Ex. 1.6 at 30 (Decl. of S.C.) Dkt. 440-1, Ex. 1.8 at 37 (Decl. of T.D.).

A.   **Harvard's consideration of race is narrowly tailored because Asian American applicants can also receive a "plus" due to their race.**

SFFA asserts that the ethnicity of Asian American applicants is "rarely seen as a positive factor in the chances of admissions" and such applicants are dismissed as "uninteresting and indistinguishable" from other Asian American applicants.  (Dkt. 413 at 20.)  Yet these claims are undermined by substantial evidence in the record.

Under Harvard's policy, no applicant is excluded from discussing how race or ethnicity has influenced their interests, goal or experiences.[11]  Testimony reveals that all applicants, including Asian Americans (who, as a group, are represented at nearly twice the level of Black, Latino, and Native American candidates[12]), are subject to Harvard's individualized and holistic consideration in which race may be deemed a positive factor. (Dkt. 435 at 29-30.)  Therefore, admission officers view each candidate as an individual and recognize, for example, that a Vietnamese applicant is a "very deserving" first generation student; a Nepalese student would offer a "fascinating perspective" on campus; and an Indian student could positively "add to the mix" at Harvard.  (Dkt. 435 at 29-30.)  Admissions officers also remark on the racialized experiences and activities of Asian American applicants in a positive way, which would be lost if SFFA prevailed on its requested remedy.  For example, admissions officers noted a student's essay on the plight of exiled Tibetans and her parents' refugee status and highlighted another applicant's involvement in the Asian community as editor of a local journal.  (Dkt. 435 at 29-30.)

Similarly, *Students* contend that Harvard viewed their racial and ethnic background as a positive factor—including those students who identify as Asian American.  For example,  D.L. identified himself as a Chinese American on his application to Harvard.  His admission file

---

[11]  Dkt. 435 at 41-42 and n. 13-14.
[12]  *See, e.g.,* Dkt. 419, Ex. 33 at 107 (showing racial composition of admitted class of 2019: 14% African American, 14% Hispanic or Other, 24% Asian American, and 40% white).

revealed that his interviewer was "particularly impressed" by his discussion of race and how the "model minority myth perniciously uses Asian Americans as a measuring stick, which hurts all people of color." (Dkt. 440, Ex. 1.3 at 17.) The interviewer observed that this called for a "sophisticated understanding of equality and discrimination," and D.L. was ultimately offered early admission to Harvard. (Dkt. 440, Ex. 1.8 at 17.) T.D. is a first-generation Vietnamese American who wrote extensively about his experience as an immigrant, the challenges he faced as an English Learner, and his racial and ethnic identity in his personal statement. When he reviewed his application file, he saw comments on his essay that he had a "strong sense of []self" and saw that his immigrant Vietnamese identity was highlighted on his summary sheet. (Exhibit 1 at 2.) When S.C. viewed her application file, she discovered that her leadership abilities and diverse academic interests, which drew largely from her Chinese heritage and low-income status, weighed strongly in favor of admission as positive indications of her "humor, empathy, and humility." (Dkt. 440, Ex. 1.6 at 29.) She believes that she benefitted from Harvard's admissions policy which allowed Harvard to "look at [her] as a whole person and view [her] qualifications in the context of both [her] class and race." *Id.* These students' collective experiences directly contradict SFFA's assertions that Asian Americans do not benefit from Harvard's race conscious admissions process and that Harvard's holistic process systematically disadvantages Asian American applicants as a group.

**B.     SFFA's statistical analyses are predicated on false premises of merit and do not show Harvard affords any undue preference for Black and Hispanic students.**

Much of SFFA's argument is premised on the view that academic scores—predominantly SAT scores and grades—are the benchmark for determining whether an admission system is fair

to students of different races.[13]   Using Harvard's academic index (not its academic rating), which

is 98% based on SAT scores and grades (Dkt. 421, Ex. 145 at 16), Dr. Arcidiacono pools

applicants for the six years he studied and then ranks them by academic decile from lowest to

highest.  (Dkt 419-31 at 40-42.)  Asian American students fare the best in the academic index,

followed by white students; Hispanic and African American students lag behind.  (*Id.*)  He then

performs a series of analyses showing that *based on their academic decile* Asian American

students have a low likelihood of admission compared to Hispanic and African American

students.  (*Id.* at 44-53.)  He proceeds to show some correlation between academic index deciles

and other factors Harvard uses. (*Id.*)  He concludes this section by summarily arguing that there

is a "*significant penalty against Asian-American students as compared to other racial groups,*

*including whites, and a significant preference given to African-American and Hispanic*

*applicants in both the personal and overall rating.*" (*Id.* at 53) (emphasis in original).

This is the heart of SFFA's argument in this case, and it fails because it is based on a

faulty premise.  While grades and SAT scores are appropriate considerations in assessing merit,

they do not define merit in themselves.  Though Dr. Arcidiacono and SFFA characterize these

factors as "objective,"[14] they are subject to their own biases that tend to "penalize" African

---

[13] As a corollary to SFFA's argument regarding the academic index, SFFA claims that Asian American applicants fair better on other "observable" measures, such as extracurricular ratings and alumni ratings.  Setting aside the issue that these factors are observable and therefore objective in the eye of SFFA, SFFA's position is belied by their own data.  For example, SFFA misleadingly asserts that Asian American applicants have "higher extracurricular ratings than any other racial group." Dkt. 414 at 123.  But notably, SFFA selectively chooses to ignore that African Americans have the highest share of applicants with the top extracurricular score in the top decile. Dkt. 414 at 123. SFFA is similarly misleading when it summarily asserts that Asian Americans receive "higher overall scores from alumni interviewers than all other racial groups."  Dkt. 413 at 13.  The data presents a much more complex picture. SFFA's own table shows that in the top five deciles of the academic index—which SFFA elsewhere claims include the most competitive applicants, Dkt. 413 at 15—African Americans actually have the highest share of high "overall" scores from alumni and Hispanics have the next highest share.
[14] *See, e.g.*, Dkt. 413 at 13.

American, Hispanic, and other groups of students with less privilege and educational opportunity (including certain Asian American students).

As discussed extensively in the Amicus Brief by Harvard Student Associations, standardized tests are "tainted by racial bias" and "artificially depress[]" the scores of people of color without adding predictive value.[15]  Moreover, high school GPA is subject to grade inflation and also can be affected by racial bias.[16]  Much of the test bias and grade inflation that systematically disadvantages underrepresented ethno-racial minorities can be explained by a specific, well-documented phenomenon called stereotype threat, which is the pressure that people feel when they fear that their performance could confirm a negative stereotype about a group with which they identify or belong.[17]  Because intellectual stereotypes are ubiquitous, relying on standardized test scores and grades as an indicator of academic achievement and capacity will "systematically underestimate" the ability of many stigmatized minorities by nearly two-tenths of a standard deviation.[18]  Racial disparities in achievement are "not the consequence of the inherent capacities of students; rather, this is a consequence of the educational environment."[19]

Further undermining the claim that test scores and high school grades are equivalent to merit, studies show these academic metrics are not an accurate predictor of college performance. One study found that "[t]est scores and high school grades explain less than half the differences

---

[15] Dkt. No. 455-1 at 16-23.

[16] Meike Bonefeld & Oliver Dickhäuser, *(Biased) Grading of Students' Performance: Students' Names, Performance Level, and Implicit Attitudes*, Frontiers in Psychology (May 9, 2018), https://www.frontiersin.org/articles/10.3389/fpsyg.2018.00481/full#B46.

[17] Jerry Kang, Rachel D. Godsil & John V. Wintermute, Brief of Experimental Psychologists as *Amici Curiae* in Support of Respondents, at 4, *Fisher v. Univ. of Texas at Austin*, 136 S.Ct. 2198 (Nov. 2, 2015) (No. 14-981), 2015 WL 6774020, at **7-8.

[18] Kang, supra, 2015 WL 6774020, at *5.

[19] Kang, supra, 2015 WL 6774020, at *22.

in college freshman grades, and are even weaker determinants of the likelihood of graduation."[20] Another found that achievement tests "predict only a small fraction of the variance in later-life success" and may not adequately capture the character skills valued in school and other domains.[21]   Moreover, a growing body of empirical research shows that character skills rival cognition in predicting educational attainment[22] and such skills *do not* necessarily move in the same direction as academic factors.  For example, a 2007 study found that a lower SAT score is associated with a greater degree of grit, which in turn, is associated with a higher GPA at an elite institution.[23]   A related study found grit predicted completion of a "rigorous" summer training program for incoming freshman at West Point better than any other measure, including high school class rank and SAT scores.[24]   Grit has also been found to predict success better than involvement with extracurricular activities.[25]   Another study concluded that conscientiousness and a willingness to work hard matter more than SAT scores and high school GPA in determining college GPA.[26]

In sum, research confirms that the most promising students are not always the ones with the highest SAT scores or the best high school grades.[27]   While the result of holistic admissions

---

[20] Anthony P. Carnevale & Jeff Strohl, "How Increasing College Access is Increasing Inequality, and What to Do About It," in *Rewarding Strivers: Helping Low Income Students Succeed in College,* 71, 110 (Richard D. Kahlenberg ed., 2010), https://www.luminafoundation.org/files/resources/increasing-inequality.pdf.

[21] James J. Heckman &Tim Kautz, *Fostering and Measuring Skills: Interventions that Improve Character and Cognition*, National Bureau of Economic Research 3-4 (Nov. 2013), http://www.nber.org/papers/w19656.

[22] Heckman & Kautz, at 4.

[23] Angela Duckworth et al., *Grit: Perseverance and Passion for Long-Term Goals*, 92 J. Personality & Soc. Psychol. 1087, 1093 (2007).

[24] Duckworth, at 1095.

[25] Duckworth, at 1099.

[26] Eric E. Noftle & Richard W. Robbins, *Personality Predictors of Academic Outcomes:  Big Five Correlates of GPA and SAT Scores*, 93 J. Personality & Soc. Psychol. 116, 126 (2007).

[27] Kang, supra, 2015 WL 6774020, at *24.  *See* Gregory M. Walton and Steven J. Spencer, *Latent Ability: Grades and Test Scores Systematically Underestimate the Intellectual Ability of Negatively Stereotyped Students*, 20 Psychological Sci. 1132, 1337 (2009) (finding that both test scores and classroom grades are influenced by bias associated with psychological threat such that these measures of academic performance underestimate the true intellectual ability and potential of ethnic minority students); Samuel D. Museus & Rican Vue, *Socioeconomic*

may be an incoming class with seemingly lower academic measures, accounting for stereotype threat by considering race as a plus factor for ethno-racial minorities (including underrepresented Asian American ethno-racial groups) permits universities to implement an admissions process that more closely represents a true meritocracy.[28]

Fadhal Moore, an African American graduate of Harvard (class of 2015), can testify to this fact through his own experience:

> "When I applied [to Harvard] some seven years ago, I had a great SAT score but it was below the average Harvard freshman's. My application, just like everybody else's, had to be looked at holistically. That includes my race, which has unfortunately been the source of many of the hardships my family has endured. For those who say I did not 'deserve' my spot, I would encourage them to look at the A's I earned while I was there."[29]

Harvard recognizes that its academic and extracurricular scores alone do not adequately capture an applicant's strengths or future capacity for success.[30]   Accordingly, Harvard assigns applicants a personal rating that summarizes all of the different aspects of the application, including essays, letters of recommendation, the alumni interview report, personal and family hardship, and any other relevant information in the application, *many of which are not considered in any other rating*.   (Dkt. 420 at 11.)   It represents an admissions officer's assessment of a student's qualities and character, such as "humor, sensitivity, grit, leadership, integrity, helpfulness, courage, kindness and many other qualities."   (Dkt. 420 at 11.) Admissions officers do not specifically consider race when assigning the personal rating.  (Dkt. 420 at 11.)

---

*Status and Asian American and Pacific Islander Students' Transition to College: A Structural Equation Modeling Analysis*, 37 The Rev. of Higher Educ. 45, 50 (2013) (noting "research on AAPIs suggests that even positive racial stereotypes can pose a threat and lead to negative outcomes because they can result in anxiety, fear of failure to conform to that stereotype [of the model minority]. . ."); Bic Ngo & Stacey J. Lee, *Complicating the Image of Model Minority Success: A Review of Southeast Asian American Education*, 77 Rev. of Educ. Res. 415, 443 (2007).

[28] Kang, supra, 2015 WL 6774020, at *24-25.

[29] Dkt. 440, Ex. 1.11, at ¶8 (Decl. of Fadhal Moore).

[30] *See* Dkt. 418 at 10.

The personal rating may be vulnerable to implicit bias and other distortions, but it is a mistake to assume that these ratings are biased just because they do not correlate with academic and extracurricular scores.[31]   As discussed above, academic characteristics may run counter to personal ones.   Moreover, grades, standardized test scores, and extracurricular involvement[32] tend to be inherently biased against Hispanic and African American students. Just as academic and extracurricular measures provide some information about merit, so do personal factors.   The solution is not to exclude the personal rating or the overall rating, but to monitor for bias.

### C.   Harvard's consideration of race is narrowly tailored because it has a minimal effect on the selection rate of Asian Americans.

Harvard's race-conscious admissions policy has a notably small impact on the percentage of Asian American applicants admitted to Harvard.   This is not only because Harvard's use of race is limited—it is also simple math.   Harvard does not admit enough African American and Hispanic students to have much impact on Asian American students as a whole.

One way of determining whether a particular admission policy has a significant effect is to examine that policy's effect on selection rates.   A selection rate is the number of successful

---

[31] Relatedly, *Students* note that any admissions system can contain elements that are vulnerable to bias.  This is true of both "subjective" as well as "objective" criteria.  Institutions, including Harvard, have an obligation to critically examine their own practices in case they reveal indications of bias or lack a sufficient nexus to legitimate mission-driven goals.

[32] Participation in extracurricular activities is influenced by privilege and should not be viewed as an objective measure of merit.  Richard Weissbourd, a senior lecturer at Harvard, proposes a "healthy and fair admissions process" that redefines achievement in ways that create "greater equity and access for economically diverse students" who may vary widely by race, culture and class.  See Olga Khazan, *Ending the Extracurricular Privilege, One Man's Mission to Make College Admissions Sane (and Fair) Again*, The Atlantic (Dec. 21, 2016), https://www.theatlantic.com/education/archive/2016/12/ending-extracurricular-privilege/511307/.  Since Black and Latino families are more likely to live in neighborhoods with concentrated poverty, it logically follows that they face even higher hurdles in acquiring what Weissbourd describes as "laundry lists of achievements and activities" which tend to track social privilege. *Id.*; Paul Jargowsky, *Concentration of Poverty in the New Millennium: Changes in Prevalence, Composition, and Location of High Poverty Neighborhoods*, The Century Foundation and Rutgers Center for Urban Research and Education 5 (Dec. 2013), https://tcf.org/assets/downloads/Concentration_of_Poverty_in_the_New_Millennium.pdf.

applicants by race divided by the number of total applicants from that race.  This measure is used by SFFA's expert Dr. Arcidiacono as well as several academics.[33]

In a 2002 law review article, then-Professor and now-California Supreme Court Justice Goodwin Liu, discussed what he called *Causation Fallacy* where he debunked the myth that affirmative action materially impacts white applicants' likelihood of admission.[34]  Subsequent academics have built on Justice Liu's research and applied it to the admissions rates of Asian students as well as white students.[35]  Indeed, the authors of *Causation Fallacy 2.0* provided updated data to show that if *no* African American or Latino students were admitted to Harvard, the admission rate for all other students would only increase by one percentage point: from 5.84% to 6.84%.[36]  Using the data from the experts in the case, the effect of Harvard's race-conscious admissions policy on Asian American applicants is probably less than that.  Harvard's expert Dr. Card estimates that if Harvard removed consideration of race, the Asian percentage of Harvard's class would increase by 3 percentage points[37] which, given Harvard's typical number of admits (about 2,000),[38] would increase the number of Asian American admits by around 60 students.  Applying this to the class of 2018 admissions data for Asian Americans (where 400 Asian Americans were admitted out of 7,806[39]), the number of admitted Asian Americans would

---

[33] Dkt. 419-31 at 109-10, Tables B.2-1 and B. 2-2; Goodwin Liu, *The Causation Fallacy: Bakke and the Basic Arithmetic of Selective Admissions*, 100 Mich. L. Rev. 1045, 1075 (2002); Sherick Hughes et al., *Causation Fallacy 2.0: Revisiting the Myth and Math of Affirmative Action*, 30 Educ. Pol'y 63, 81 (2016); Kimberly West-Faulcon, *Obscuring Asian Penalty with Illusions of Black Bonus*, 64 UCLA L. Rev. 590,  600 (2017); Dkt.415, Ex.1 at 112.
[34] Goodwin Liu, *The Causation Fallacy: Bakke and the Basic Arithmetic of Selective Admissions*, 100 Mich. L. Rev. 1045, 1095 (2002).
[35] *See, e.g.,* Sherick Hughes et al., Causation Fallacy 2.0: Revisiting the Myth and Math of Affirmative Action, 30 Educ. Pol'y 63 (2016); Kimberly West-Faulcon, *Obscuring Asian Penalty with Illusions of Black Bonus* 64 UCLA L. Rev. Disc. 590 (2017).
[36] Sherick Hughes et al., *Causation Fallacy 2.0: Revisiting the Myth and Math of Affirmative Action*, 30 Educ. Pol'y 63, 82 (2016).
[37] Dkt. 419, Ex. 33 at 110.
[38] *See* Dkt. 420 at 1-2.
[39] HARV0023177.

increase from 400 to 460 and correspondingly increase the selection rate of admitted Asian American applicants from 5.1% to 5.9%.

This impact is small and also entirely consistent with constitutional principles which permit a flexible "plus" for racial minorities to achieve sufficient representation on campus. Established Supreme Court precedent recognizes that race—like any other attribute valued by a university—may tip the scale in favor of admission among qualified candidates, but this does not render the policy unconstitutional. *See, e.g., Bakke,* 438 U.S. at 317-18. Narrow tailoring is especially evident when, as here, the number of impacted seats is notably small. As *Fisher II* reflected: "The fact that race consciousness played a role in only a small portion of admissions decisions should be a hallmark of narrow tailoring, not evidence of unconstitutionality." *Fisher II*, 136 S. Ct. at 2212.

> **D.     Harvard's race-conscious admissions policy is narrowly tailored because it does not afford Black and Hispanic students an undue preference.**

The constitutional rationale for implementing a race-conscious admissions program is to achieve "the educational benefits that flow from student body diversity." *Fisher II,* 136 S. Ct. at 2210. As such, an effective program will necessarily increase ethno-racial diversity on campus. The question is not whether race has an effect in some admissions decisions. It will. Rather, the question is whether race is the "predominant" or "defining" feature of an application. *Grutter,* 538 U.S. at 320, 337. Here, it is not. Beyond the fact that Harvard's consideration of race for ethno-racial minorities minimally affects Asian Americans' selection rate (by one percentage point or less), those who do receive a "tip" from race-conscious admissions do not receive an undue preference.

The data shows that Harvard is not admitting African American and Hispanic applicants solely because of their race. Rather, the data shows Harvard is admitting *highly qualified*

Hispanic and African American students, and in some cases, giving them a nudge because of their race.  Harvard's expert Dr. Card analyzed the probability of admissions for African American and other underrepresented minority students (including Hispanic applicants, but excluding Asian Americans).  Ranking such students by probability of admission (considering all relevant factors, not just academics), Dr. Card considered how these underrepresented applicants compared to white candidates with similar qualifications. (Dkt. 419, Ex. 33 at 84.)  His analysis showed that for eight of the ten deciles, the positive effect of race was minimal.  (Dkt. 419, Ex. 33 at 86.)   It was only in the top two most competitive deciles that race had a notable positive effect on admissions for African American or other minority students.  (Dkt. 419, Ex. 33 at 83-84.)  He further found that for 94% of the African American candidates and 96% of the other underrepresented minority candidates, admissions decisions were more attributable to "unobserved characteristics" (i.e. unquantifiable factors) than to race.  (*Id.* at 85-86.)  In other words, race mattered less than other factors in the admissions process.  SFFA's claim that race is the predominant factor in admissions is clearly refuted by the record.[40]

## II.   Any negative effect for Asian Americans observed in the admissions process is caused by admissions practices that benefit white applicants and not race-conscious admissions.

### A.   The relevant comparison for an intentional discrimination claim is between Asian Americans and similarly situated white applicants.

As discussed above, the Supreme Court has permitted universities to consider race as a "plus factor" so long as the process is narrowly tailored to harness the benefits of student body diversity.  *See, e.g., Grutter,* 539 U.S. at 334.  Accordingly, there is nothing inherently

---

[40] *Students* note that SFFA engages in a series of dubious race "changing" exercises to suggest Asian American applicants would have a higher rate of admissions if treated like Black or Hispanic applicants. *See, e.g.,* Dkt. 413 at 46-47. *Students* restate the arguments made in their July brief that this analysis misconstrues the proper legal standard and is unreliable due to the significant limitations of Dr. Arcidiacono's modeling decisions. *See generally* Dkt. 435 at 10-15.

unconstitutional at play if a university admits a highly qualified, but lesser-represented minority student—commonly Black, Latino, and Native American students—over a similarly situated Asian American student.  *See id.; Bakke,* 438 U.S. 265, 317–18.  The constitutionality of such an action must be evaluated under the narrow tailoring standard set by *Bakke, Grutter,* and *Fisher.*

However, the Supreme Court has not permitted universities to give a relative "plus" to white applicants over similarly situated non-white applicants, based on race.  The reason is simple: at today's elite institutions, giving white students a "plus" based on race would not further racial diversity.[41]  White students are also the most relevant comparison for exploring whether a university's policy intentionally acts as an admission "ceiling."  The logic is once again straightforward: at top universities such as Harvard, white students comprise the overwhelming majority of applicants.[42]  Correspondingly, the proportion of ethno-racial minority students is notably small.[43]  As such, any intentional scheme to effectively limit the number of Asian Americans on campus would predominantly preserve more seats for white students.  For all these reasons, the relevant comparison for the intentional discrimination claim is between Asian Americans and white students, not other ethno-racial minority students.[44]

---

[41] For example, a recent New York times analysis revealed that white students continue to make up the overwhelming plural majority of all eight ivy league schools. For example, the data shows that in 2015 white students comprised the following shares of the incoming freshman class: 52% at Brown University, 40% at Columbia University, 45% at Cornell University, 56% at Dartmouth University, 47% at Harvard University, 49% at Princeton University, 50% at University of Pennsylvania, and 51% at Yale University.  The 2017 article also noted that "black and Hispanic students are more underrepresented at the nation's top colleges and universities than they were 35 years ago." Indeed, the data showed that in 2015, the Black share of the incoming freshman class remained below 10% at all eight school and the Hispanic share remained below 20% despite their increasing share of the college-age population. Jeremy Ashkenas, Haeyoun Park & Adam Pearce, *Even With Affirmative Action, Blacks and Hispanics Are More Underrepresented at Top Colleges Than 35 Years Ago,* N.Y. Times (August 24, 2017), https://www.nytimes.com/interactive/2017/08/24/us/affirmative-action.html.

[42] *See* Jeremy Ashkenas, Haeyoun Park & Adam Pearce, *supra*; *see also* Dkt. 415, Ex. 1 at 112 (showing that over six years of applicant data, white applicants are the overwhelming plurality comprising 40% of the applicant pool)

[43] Dkt. 415, Ex. 1 at 112 (showing that over six years of applicant data, Black applicants make up approximately 11% of the pool and Hispanic applicants make up 12% of the pool).

[44] *See also generally* Jerry Kang, *Negative Action Against Asian Americans: The Internal Instability of Dworkin's Defense of Affirmative Action,* 31 Harv. C.R.-C.L. L. Rev. 1, 3 (1996) (explaining that claims of discrimination

SFFA styles its motion to confuse the relevant racial comparison by presenting data across all racial groups together.[45]  Such confusion is heightened by SFFA's inflammatory and grossly misleading suggestion that Harvard expresses favoritism towards Black, Latino, and Native American students over Asian-American students.[46]  All of Harvard's non-white students fight tirelessly to have their voices heard and their needs met on Harvard's campus.  (*See, e.g.,* Dkt. 440-1, Ex. 1.10 at ¶ 7. (Decl. of Sarah Cole).)  Any step forward made by minority students results from longstanding efforts, not favoritism.  (*Id.,* Ex. 1.8 at ¶ 10 (Decl. of T.D.); Ex. 1.12, at ¶¶ 14-15 (Decl. of Vasquez-Rodriguez .))  Moreover, gains made by one ethno-racial group often extend to others due to minority students' coalitional work and intersectional interests. (*Id.*; *see also id.,* Ex. 1.4 at ¶ 8 ( Decl. of J.L.); Ex. 1.8 at ¶ 8 (Decl. of A.Z.).)  But SFFA's passing references to other ethno-racial minorities simply serves its divisive strategy of pitting marginalized groups against each other.  It bears no relevance on its intentional discrimination claim.

Even SFFA admits that white applicants are the only pertinent benchmark for its intentional discrimination claim.  SFFA opens its summary judgment motion by alleging "Harvard's admissions policy has a disproportionately negative effect **on Asian Americans vis-a-vis similarly-situated white applicants** that cannot be explained on non-discriminatory grounds."  (Dkt. No. 413 at 7) (emphasis added.)  SFFA's calculation of the "Asian American penalty" similarly recognizes that whites are the relevant comparison group.  SFFA's expert Dr.

---

against Asian Americans in university admissions should "us[e] the treatment of Whites as a basis for comparison . . . . To be clear, Whites, not any other race, are used as the baseline.")

[45] *See, e.g.,* Dkt. 413 at 14 (comparing personal scores of Asian Americans across the academic deciles as compared to white, Hispanic, and African American applicants).

[46] For example, SFFA makes the bald assertion that "Harvard's reaction to claims of discrimination . . . against Asian Americans contrasts starkly with how it responds to complaints from other minority groups. When Native Americans raised concerns about their representation on campus, they were taken seriously. As were the concerns that Latinos and Latinas [and African Americans] raised. . . .". Dkt. 413 at 27.

Arcidiacono "remov[ed] penalties against Asian-American applicants" by calculating admissions outcomes based on if Harvard "had **treated Asian-American applicants identically to their white counterparts**." (Dkt. 414 at 143) (emphasis added.)  While *Students* disagree with SFFA on many other points, *Students* agree that evaluating whether a discriminatory "penalty" exists requires focusing on the treatment of Asian Americans *vis a vis* whites.

**B.      SFFA must prove that Harvard's current holistic process has a discriminatory effect, is motivated by a discriminatory purpose, and that there is some connection between the discriminatory motive and challenged policy.**

SFFA's motion for summary judgment makes clear that its intentional discrimination claim does not challenge Harvard's race-conscious policy, *per se*, but rather attacks Harvard's holistic admissions process in its entirety.  (*See* Dkt. 413 at 5-6.)  Since the policy does not discriminate against Asian Americans "on its face" SFFA contends that the governing framework is laid out by *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-68 (1977).  However, SFFA fails to follow the *Arlington Heights* standard and its proffered evidence falls far short of satisfying it.[47]

SFFA claims that it has met its burden of showing intentional discrimination primarily through its allegation of discriminatory effect.  (Dkt. 413 at 12.)  The legal standard for evaluating intentional discrimination claims, however, requires a showing of both discriminatory effect and discriminatory purpose.  *Arlington Heights*, 429 U.S. 252, 264-65 (1977).  The burden is on the plaintiffs to show that "discriminatory purpose was a motivating factor" in a policy. *Arlington Heights*, 429 U.S. at 270-71.  This requires demonstrating more than mere awareness. "[Intent] means more than mere knowledge by the [defendant] that a policy has a discriminatory

---

[47] *Students* do not agree that this is the appropriate standard for analyzing any differential treatment *vis a vis* other ethno-racial minorities, which should be reviewed under the narrow tailoring standard discussed above.

effect; the [defendant's] agent must have adopted the policy *because of, not despite,* its discriminatory impact." *McGuire v. Reilly*, 386 F.3d 45, 63 (1st Cir. 2004) (internal citations omitted) (emphasis added).

Under *Arlington Heights,* the court evaluates whether plaintiffs have carried their burden of proving discriminatory purpose and effect by considering various factors. "The impact of the official action [and] whether it bears more heavily on one race than another . . . may provide an important starting point." *Arlington Heights*, 429 U.S. at 266 (internal citations and quotation marks omitted). Other relevant factors include: "[t]he historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes;" "[d]epartures from the normal procedural sequence;" "[s]ubstantive departures [from the norm] . . ." and "the legislative or administrative history . . . , especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 267-68.

### C. Applying the *Arlington Heights* framework reveals that SFFA is not entitled to summary judgment on its intentional discrimination claim.

#### 1. There are genuine disputes over whether Harvard has any policies advantaging white students over Asian Americans that have a discriminatory effect.

Harvard's Opposition identifies numerous material disputes with regard to SFFA's proof of discriminatory effect. (Dkt. 435 at 5-27.)   *Students* do not repeat Harvard's criticisms here but agree that Dr. Arcidiacono's modeling choices and data manipulations are far too suspect to warrant summary judgment in SFFA's favor. In particular, Dr. Arcidiacono's choice to remove all "special category" (ALDC) applicants from his data set, rather than controlling for such characteristics, reflects a deeply flawed approach which renders the conclusions that he draws unreliable. (Dkt. 435 at 11-13.) He also erroneously combines all six years of data into one data set instead of analyzing each year separately. (Dkt. 435 at 13-14, n. 3).

These issues aside, examining differences in selection rates offers a starting point for determining whether Harvard's admissions system has a disparate effect on Asian Americans as compared to whites. This is what is done in employment discrimination cases.[48] The four-fifths test is one measure that is used to determine whether the discrepancy is substantial. The First Circuit has described the four-fifths test as a "helpful benchmark," that should not be treated as decisive. *Jones v. City of Boston*, 752 F.3d 38, 51 (2014). The benefit of the four-fifths test is that it is easy to calculate: the selection rate of the group claiming disparate impact is divided by the selection rate of the group that is allegedly favored. A result that falls below four-fifths (i.e. less than 0.8) serves as some evidence of disparate impact. *Id.* at 49. One scholar studying college admissions has suggested that the four-fifths test could be used to evaluate claims of a disparate effect between Asian American and white admissions.[49]

Based on Dr. Arcidiacono's analysis, SFFA has claimed "Harvard's admissions system discriminates against Asian American applicants in at least three respects": (i) the personal rating, (ii) the overall score and (iii) admissions decisions. (*See* Dkt. No. 413 at 13-16.) Applying the four-fifths test to Dr. Arcidiacono's preferred dataset yields the following results:

---

[48] *See e.g., Fudge v. City of Providence Fire Dept.,*766 F.2d 650, 657 (1st Cir. 1985) ("[I]n a case involving a claim that a screening test for admission to employment imposes a disparate and adverse impact on blacks, the initial inquiry must be whether there is a discrepancy in the rate of passage as between whites and blacks. If so, an intuitive judicial judgment must next be made whether the discrepancy is substantial.")

[49] Kimberly West-Faulcon, *Obscuring Asian Penalty with Illusions of Black Bonus*, 64 UCLA L. Rev. Disc. 590, 615-16 (2017).

|  | Asian American (Dr. Arcidiacono's dataset excludes (ALDC) applicants) | White (Dr. Arcidiacono's dataset excludes (ALDC) applicants) | Ratio | 4/5 test violated? |
|---|---|---|---|---|
| Personal rating by admissions officers: share receiving a two or higher[50] | 17.65% | 21.29% | 0.83 | No |
| Overall rating by admissions officers: share receiving a two or higher[51] | 4.85% | 4.44% | 1.09 | No |
| Admissions rate[52] | 4.0% | 4.2% | 0.95 | No |

Notably, none of these rates violate the four-fifths test. Thus, the differentials are not large enough to suggest racial unfairness under traditional disparate impact analysis. *Students'* use of Dr. Arcidiacono's data should not be interpreted as an endorsement of his method, which *Students* find highly problematic. Rather, *Students* use Dr. Arcidiacono's data to illustrate that SFFA is not entitled to summary judgment because its own data tables are open to divergent interpretations which should be resolved at trial.

Moreover, *Students* highlight another aspect of the data which neither party raises: when "special category" (ALDC) applicants are included—athletes, legacy applicants, dean/director's list, children of faculty/staff—the gap significantly widens between Asian Americans' and whites' admissions rates. Applying the four-fifths test to the admissions rates[53] of Asian Americans and whites across the entire pool of applicants for six years yields the following:

---

[50] Dkt. 414 at 127.

[51] Dkt. 414 at 130.

[52] Dkt. 419, Ex. 31 at 35. *Students* note that Dr. Arcidiacono offers inconsistent calculations of the average admissions rate for non-ALDC applicants. His report lists the admissions rates referenced in the table above (4.0% for non-ALDC Asian Americans, and 4.2% for non-ALDC whites). But elsewhere, Dr. Arcidiacono's analysis reflects a different "average" admissions rate for Asian American and white students, appearing as 5.14% and 4.9% respectively (resulting in a 4/5 ratio of 1.04, similarly presenting no violation of the 4/5 test). Dkt. 414 at 134. Lacking the underlying data, *Students* are unable to determine what factors explain how Dr. Arcidiacono arrived at different results. But these inconsistencies in Dr. Arcidiacono's rates of admission provides further support for denying summary judgment so that factual disputes can be properly resolved at trial.

[53] *Students* only had access to the raw admissions numbers of the full applicant pool over six years, disaggregated by race. Dkt. 415, Ex. 1 at 112. This allowed them to calculate the admissions rates by racial group. But *Students* did

| | Asian American applicants (all applicants, 6 years of data) | White applicants (all applicants, 6 years of data) | Ratio | 4/5 test violated? |
|---|---|---|---|---|
| Admissions rate[54] | 5.9% | 7.9% | 0.74% | Yes |

The fact that a violation of the four-fifths test appears once "ALDC" applicants are included strongly suggests that it is preferences given to "ALDC" applicants that cause any observed disadvantage for Asian Americans in the admissions process—not race-conscious admissions. Harvard's internal OIR report made a similar observation when it noted that: "athletes and legacies explain the difference in raw admit rates for Asian and White applicants." (Dkt. 421, Ex. 145 at 3).

The raw numbers help explain why any disadvantage faced by Asian Americans face is most attributable to "ALDC" preferences. Whites overwhelmingly outnumber any other ethnic group in these "ALDC" categories. According to Dr. Arcidiacono's table, the admission numbers over a six year period are as follows[55]:

| | White (admits) | Asian American (admits) | Black (admits) | Hispanic (admits) | Total (admits) |
|---|---|---|---|---|---|
| Athlete | 817 | 101 | 124 | 54 | 1179 |
| Legacy | 1080 | 163 | 67 | 90 | 1541 |
| Faculty child | 33 | 13 | 0 | 2 | 60 |
| Staff child | 47 | 26 | 2 | 6 | 89 |
| Dean / Director's List | 701 | 133 | 29 | 59 | 1034 |
| Total Admits | 5,020 | 2,459 | 1,400 | 1,293 | 11,068 |

---

not have access to raw data on the personal and overall scores of the full applicant pool over six years, disaggregated by race. As such, *Students* could not perform a similar 4/5 test for personal and overall scores across the full applicant pool.

[54] Dkt. 415, Ex. 1 at 112. Admissions rates were calculated by dividing the total number of admitted applicants for a given racial group by the total number of applicants for a given racial group. This ratio converted to a percentage by multiplying it by 100. For example, for Asian Americans the following calculation was performed: (2459 [total Asian American admits] ÷ 41369 [total Asian American applicants]) x 100.

[55] Dkt. 415, Ex. 1 at 112.

The sheer number of white admission offers associated with these special categories (approximately 2,677[56]) roughly equals *all* admissions offers given to Asian Americans (2,459[57]) and also roughly equals *all* admissions offers given to Black and Hispanic students *combined* (1,400 and 1,293 respectively[58]).  These numbers reflect how any displacement faced by Asian Americans is much more likely attributable to "ALDC" applicants than ethno-racial minorities.

Even ignoring the impact of "ALDC" preferences, SFFA fastens onto the incorrect culprit for any observed bias against Asian Americans: Harvard's race-conscious policy promoting diversity.  But the evidence cannot support such a proposition.  Indeed, SFFA's own expert Dr. Arcidiacono explained that removing the alleged "Asian American penalty" would most substantially reduce admissions offers given to whites in terms of raw numbers, not Black and Hispanic applicants.  (Dkt. 419-35 at 122.)  Specifically, 147 fewer white applicants would be admitted over a six-year period as opposed to 42 and 51 fewer admission offers to Blacks and Hispanics respectively.  (*Id.*)  A penalty that greatly advantages white applicants hardly seems tethered to a policy designed to increase racial diversity and the presence of underrepresented ethno-racial minorities.

### 2.    SFFA has not demonstrated that any disparate effect in Asian American admission rates comes from a discriminatory purpose as set forth in the *Arlington Heights* factors.

SFFA made no serious effort to develop the other *Arlington Heights* factors, other than historical background of the decision, and it fails to show how that historical background relates to the challenged policy.  *Arlington Heights* teaches that "the historical background of the

---

[56] Dkt. 415, Ex. 1 at 112.  This calculation may include duplicate applicants.  For example, if an applicant qualifies as both a legacy and an athlete, they would appear twice in this calculation. *Students* did not have access to the raw data files and so were limited to using preexisting tables in the parties' expert reports.
[57] Dkt. 415, Ex. 1 at 112.
[58] Dkt. 415, Ex. 1 at 112.

attacked decision," 429 U.S. at 267, can shed light on whether a defendant harbored discriminatory animus. The policy attacked here—Harvard's holistic process that considers race to promote diversity—has no historical connection to the history discussed at length in SFFA's motion: Harvard's 1920s admissions policy that limited Jewish students and other racial minorities. (Dkt. 413 at 29-32; Dkt. 421, Ex. 240 at 3.)

President Lowell's exclusionary practices are historically distinct and diametrically opposed to Harvard's current diversity-driven admissions policy. As a basic matter, it is not clear to *Students* how discrimination against Jews in the 1920s proves discrimination against Asian Americans today, a different racial group and different era. But more importantly, the current holistic policy (namely, "the diversity rationale") grew out of the Civil Rights Movement in the 1960-1970s, not the 1920s.[59] This admissions policy has been driven by a motivation to create "a greater degree of openness and inclusiveness" at Harvard (Dkt. 419, Ex. 41 at 35), and by a recognition that "Harvard remained, for three centuries, committed primarily to educating the sons of New England's elite." (Dkt. 419, Ex. 44 at 8.) Harvard's current admissions process is grounded in the belief that students' different backgrounds and personal traits, including their ethno-racial identities, enhances their contributions and achievements and engenders a more diverse and vibrant academic community to the benefit of all students. (Dkt. 419, Ex. 44 at 9.) Unlike during the era under Lowell when there was abundant documentation of racial exclusion, there is no evidence that any Harvard employees seek to limit the number of Asian American students on campus. Rather, the evidence produced suggests that Harvard admissions officers view applicants' ethno-racial identities as possibly enhancing their contributions and achievements, including those of Asian-American heritage. (*See* Dkt. 435 at 35.)

---

[59] *See* Dkt. 419, Ex. 41 at 42; Brief of Columbia University, Harvard University, Stanford University and the University of Pennsylvania as Amici Curiae, *Bakke*, 438 U.S. 265 (1978) (No. 76-811), 1976 WL 181278, **3-4.

It is plain that Harvard's current inclusionary policy—which views ethno-racial diversity as an asset not a hindrance—does not resemble Lowell's exclusionary practices. As a legal matter, this historical disconnect nullifies the relevance of the history discussed by SFFA. Where there has been a clear break in the historical context of a challenged program, a court will not infer that the new program was adopted with a discriminatory intent. *See, e.g.*, *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 83 (1st Cir. 2004). The Supreme Court recently reaffirmed that "[t]he allocation of the burden of proof and the presumption of . . . good faith are not changed by a finding of past discrimination. '[P]ast discrimination cannot, in the manner of original sin, condemn . . . action that is not itself unlawful.' The 'ultimate question remains whether a discriminatory intent has been proved in a given case.'" *Abbott v. Perez*, 138 S. Ct. 2305, 2324-2325 (2018) (quoting *Mobile v. Bolden*, 446 U.S. 55, 74 (1980)) (citation omitted). SFFA has failed to show that Harvard's race-conscious admissions policy is motivated by an intent to discriminate against Asian Americans.

If anything, the ethno-racial exclusion under President Lowell is further reason to preserve holistic, race-conscious admissions, not ban it. Of note, President Lowell's antagonism towards ethno-racial minorities was not limited to Jews. He also fostered prejudice against African Americans and recent immigrants.[60]  (Dkt. 421, Ex. 240 at 3.) Harvard's exclusionary history erects even greater barriers to cultivating a welcoming, inclusive campus. Race-conscious admissions can assist in overcoming this obstacle by increasing the number of underrepresented students on campus and signaling a value for racial diversity and inclusion. For the reasons stated above, SFFA is not entitled to summary judgment on its intentional discrimination claim.

---

[60] *See generally* Randall Kennedy, *Blacks and the Race Question at Harvard* in *Blacks at Harvard: A Documentary History of African-American Experience at Harvard and Radcliffe* (Werner Sollors et al., eds. 1993).

**D.    A finding of intentional discrimination against Asian Americans would not justify banning race-conscious admissions since such a ban would not remediate the harm caused by a white admissions advantage.**

Even if SFFA were to ultimately prevail on its intentional discrimination claim, SFFA still would not be entitled to the remedy it seeks which is drastic and inapposite.  Specifically, SFFA asks this Court to "prohibit[] Harvard from using race as a factor in future undergraduate admissions decisions" and require "Harvard to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission."  (Dkt. No. 1 at 119.)  The factual record does not justify this remedy and prevailing law would not permit it.

When fashioning a remedy, courts are guided by general equitable principles centered on three primary considerations: the nature and scope of the violation, restoring the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct, and reconciling public and private needs. *Milliken v. Bradley*, 433 U.S. 267, 280–81, 288 (1977). "[F]ederal court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation." *Id.* at 282 (1977). An admissions practice that advantages white applicants clearly "does not flow" from a policy designed to increase the admissions chances of ethno-racial minorities.  Stated simply, the "nature and scope of the violation" would not warrant banning race-conscious admissions.

It is clear that SFFA's proposed remedy would not place Asian Americans in the position they would have been absent the illegal conduct.  As a practical matter, a white advantage such as legacy preferences could persist irrespective of race-conscious admissions.  Moreover, experts in the field of countering racial bias advocate for fostering greater self-awareness and reflection

around race, not "blindness" to it in world where racial inequities are pervasive.[61]   As multiple researchers have found, "[i]nterventions that rely on 'color-blind' strategies, in which people are encouraged to suppress their category-based stereotypes in favor of more personalized judgments, appear to be particularly ineffective."[62]   In some cases, researchers have found that a forced "color-blind" strategy may even backfire.[63]

In further contravention of equitable principles, such a remedy would fail to reconcile public and private needs in at least three respects.   First, such a ban carries a substantial threat of exacerbating racial isolation and suppressing the benefits of a diverse campus.[64]   Second, SFFA's proposed injunction poses significant practical barriers that would render meaningful individualized review impossible, potentially preventing Harvard from: conducting interviews, recruiting applicants in person, and viewing drama, music, or other performance on video or live. It would censor student expression by jeopardizing students' ability to: submit essays and recommendations discussing how race or ethnicity has impacted their lives; list awards and activities indicating race or ethnicity; or write about their immigrant stories regardless of their

---

[61] *See* Jennifer A. Richeson & Richard J. Nussbaum, *The Impact of Multiculturalism Versus Color-Blindness on Racial Bias*, 40 J. Experimental Soc. Psychol. 417, 421 (2004) ("[E]xplicit racial bias was relatively greater after exposure to the color-blind perspective on interethnic relations, compared to the multicultural perspective…."); Phoebe C. Ellsworth & Samuel R. Sommers, *How Much Do We Really Know About Race and Juries? A Review of Social Science Theory and Research*, 78 Chicago-Kent L. Rev. 997, 1010-1016 (2003); Adam R. Pearson *et al.*, *The Nature of Contemporary Prejudice: Insights from Aversive Racism*, Soc. & Personality Psychol. Compass, no. 3, 2009, at 13.("[E]fforts to be colorblind can sometimes produce 'rebound effects,' causing biases to become activated even more.").

[62] Laurie A. Rudman et al., *"Unlearning" Automatic Biases: The Malleability of Implicit Prejudice and Stereotypes*, 81 J. Personality & Soc. Psychol. 856, 857 (2001) (citing Christopher Wolsko et al., *Framing Interethnic Ideology: Effects of Multicultural and Color-Blind Perspectives on Judgments of Groups and Individuals*, 78 J. Personality & Soc. Psychol. 635 (2000)).

[63] Rudman, *supra*, at 857 (citing J.W. Schofield, *Causes and Consequences of the Colorblind Perspective* in Prejudice, Discrimination, and Racism 231-254 (J.F. Dovidio & S.L. Gaertner, eds., 1986)).

[64] *See* Dkt. 440 at 17-23, 29-38; *see also, e.g.,* Dkt. 435 at 47-48; Gary Orfield et al., Alternative Paths to Diversity: Exploring and Implementing Effective College Admissions Policies (2017) (collection of ETS research papers); William C. Kidder, *How Workable Are Class-Based and Race-Neutral Alternatives at Leading American Universities?*, 64 UCLA L. Rev. Disc. 100, 121-26 (2016) (synthesizing numerous studies and documents and stating that SFFA's expert Dr. Richard Kahlenberg, makes empirically unfounded and misleading claims about race neutral alternatives); William Kidder & Angela Onwuachi-Willig, *Still Hazy After All These Years: The Data and Theory Behind Mismatch*, 92 Tex. L. Rev. 895, 930-34 (2014).

country of origin.  Third, and relatedly, purging all references to race would ignore a factor that is often inextricable from an applicant's formative life experiences, perversely penalizing some applicants in the name of equal protection (especially non-white applicants who disproportionately face racial barriers).[65]  As A.A., who identifies as Asian American and queer, aptly expressed: "the application reflected who I am as a person, and part of that includes my ethnic and racial identity."  (Dkt. 440-1, Ex. 1.1 at ¶ 8 (Decl. of A.A.).)

Equitable considerations plainly preclude banning race-conscious admissions.  However, the same legal principles and research can provide insight into appropriate remedies if a trial does uncover discrimination against Asian Americans *vis a vis* white applicants.   Such tested strategies for countering racial bias include:  conducting trainings around diversity and the psychological processes in decision making;[66] engaging in effortful, deliberative processing which prevents snap judgments;[67] and instituting feedback mechanisms and accountability measures, such as notetaking and tracking metrics.[68]  Harvard engages in many of these practices already,[69] but safeguards could be specifically tailored to address any undue bias faced by Asian Americans.[70]  No matter how the remedy is fashioned, SFFA's intentional discrimination claim

---

[65] *See* Dkt. 440 at 24-27.

[66] Patricia G. Device et al., *A Gender Bias Habit-Breaking Intervention Led to Increased Hiring of Female Faculty in STEMM Departments* (2017), https://psyarxiv.com/tdvy7. For more research testing effective trainings, see Sylvia P. Perry et al., *Modern Prejudice: Subtle, But Unconscious?  The Role of Bias Awareness in Whites' Perceptions of Personal and Others' Biases*, 61 J. Experimental Soc. Psychol. 64 (2015).

[67] Geoffrey Beattie et al., *An Exploration of Possible Unconscious Ethnic Biases in Higher Education: The Role of Implicit Attitudes on Selection for University Posts*, 197 Semiotica 171, 195-96 (2013). *See also* Daniel Kahneman, *Thinking, Fast and Slow* (2011).

[68] *See* Faye Crosby et al., *Cognitive Biases in the Perception of Discrimination: The Importance of Format*, 14 Sex Roles 637 (1986).

[69] *See, e.g.*, Ellsworth Ex. 127 (training presentation urging admissions officers to "be wary of aggregated data for Asian American student populations" and to "[h]onor the nuance of both identity and context").

[70] For example, trainings could be developed around common stereotypes harbored towards Asian Americans which differ in distinct ways from those of other ethno-racial minorities; data feedback loops could be implemented to track the relative personal scores of Asian Americans *vis a vis* whites throughout the admissions process making the Committee more sensitive to notable trends; and accountability pressures could be applied by conducting random

definitively does not warrant ending race-conscious admissions. Such an injunction would be both factually illogical and legally impermissible.

## CONCLUSION

As a broad cross-section of ethno-racial minorities who are prospective, current, and former students of Harvard, *Students* firmly assert that our elite institutions cannot be colorblind in a world full of color, nor may they be indifferent to a world full of difference. The constitution recognizes this need, permitting race-conscious admissions when certain requirements are met. Here, Harvard meets such requirements for narrow tailoring and certainly has placed SFFA's facts in dispute. For the foregoing reasons and those articulated in *Students'* July brief, this Court should affirm the constitutionality of Harvard's race-conscious admissions policy that promotes diversity. Even if trial is appropriate for SFFA's claim of intentional discrimination given the factual disputes in the record and indication that preferences for legacy applicants impact Asian Americans in admission, any such claim must be limited to a comparison of Asian American and white applicants.

Respectfully Submitted,

/s/ Oren M. Sellstrom
Oren M. Sellstrom (BBO #569045)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
AND ECONOMIC JUSTICE
61 Batterymarch Street, Fifth Floor
Boston, MA 02110
Tel: 617-988-0608
osellstrom@lawyerscom.org

/s/ Genevieve Bonadies Torres
Genevieve Bonadies Torres (*pro hac vice*)
Kristen Clarke

---

audits of admissions officers' files to identify any existing biases and provide feedback. These are just a few examples drawn from prevailing research on best practices.

Jon M. Greenbaum (*pro hac vice*)
Brenda Shum (*pro hac vice*)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street, NW
Washington, DC 20005
Tel: (202) 662-8600
gbonadies@lawyerscommittee.org

/s/ Nicole K. Ochi
Nicole K. Ochi (*pro hac vice*)
ASIAN AMERICANS ADVANCING JUSTICE
1145 Wilshire Boulevards
Los Angeles, CA 90017
Tel: (213) 241-0211
nochi@advancingjustice-la.org

/s/ Lawrence Culleen
Lawrence Culleen (*pro hac vice*)
Nancy Perkins (*pro hac vice*)
Steven Mayer (*pro hac vice*)
Emma Dinan (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Tel: (202) 942-5477
Lawrence.Culleen@arnoldporter.com

Dated:  August 30, 2018                    COUNSEL FOR *AMICI CURIAE*

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Local Rule 5.2(b), I hereby certify that this document filed through the ECF system on August 30, 2018 will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Lawrence Culleen<br>
Lawrence Culleen