**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC.,<br>Plaintiff,<br>v.<br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br>Defendant. | Civil Action No. 1:14-cv-14176-ADB |

**PLAINTIFF SFFA'S MOTIONS IN LIMINE**

## I. MOTION IN LIMINE NO. 1: TO PRECLUDE HARVARD FROM CALLING EDWARD BLUM AS A WITNESS

Harvard wants to shift the focus of this trial onto anything but its own admissions practices. As one of the many attempts to turn the spotlight away from itself, Harvard has disclosed its intention to call Edward Blum as a witness. (*See* Ex. 1.) Mr. Blum serves as the President of Students for Fair Admissions, Inc. (SFFA). But he has no relevant information to offer at this trial.

In a case about whether Harvard violates Title VI in its undergraduate admissions practices, Mr. Blum has nothing to add. He has no personal knowledge about Harvard's admissions practices. Nor could he. Mr. Blum has never worked at Harvard, let alone worked in Harvard's admissions office. And he did not apply to or attend Harvard. Yet, Harvard wants to cross-examine Mr. Blum about his political beliefs and motivations in founding SFFA, neither of which have any relevance to the issues before the Court. Under Harvard's reasoning, the presidents of membership associations like the NAACP, ACLU, or Sierra Club could be called in every case those associations bring on behalf of members to be questioned about their political beliefs. The Court should not set such a precedent here.

Aside from trying to explore Mr. Blum's protected exercise of free speech, the only other explanation Harvard could offer for calling Mr. Blum is to take yet another shot at revisiting this

Court's standing ruling. But this Court has already ruled that SFFA meets all of Article III's standing requirements. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 261 F. Supp. 3d 99 (D. Mass. 2017). And contrary to Harvard's claim at the summary judgment stage, the Court did not merely decide that SFFA's standing "allegations sufficed at the pleading stage." (D.I. 484 at 4–5.) Instead, the Court recognized it was "not restricted to the four corners of the Complaint and 'may consider whatever evidence has been submitted, such as the depositions and exhibits'" that Harvard relied upon in its motion. *Students for Fair Admissions*, 261 F. Supp. 3d at 103; *see also id.* at 105–06. The Court's decision that SFFA "meets the prerequisites laid out in *Hunt* and has the associational standing necessary to pursue this litigation" continues to be law of the case. *See id.* at 11; *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988); *Harlow v. Children's Hosp.*, 432 F.3d 50, 55 (1st Cir. 2005).

Accordingly any testimony from Mr. Blum about SFFA, its mission, its members, or its communications with its members relates to an issue this Court has already resolved. So that testimony is not relevant to any fact that is of consequence in determining the remaining issues in this action. *See* Fed. R. Evid. 401. For those reasons, SFFA does not intend to call Mr. Blum at trial, and the Court should not allow Harvard to do so either.

In addition, the Court has also already determined that testimony about the content of SFFA's communications with members, its board discussions, and its internal operations are all irrelevant to the question of associational standing. *See Students for Fair Admissions, Inc.*, 261 F. Supp. 3d at 111 n.15; *see also* D.I. 151. Testimony along those lines would infringe upon the First Amendment rights of SFFA and its members. *See, e.g.*, *NAACP v. Ala. Ex rel. Patterson*, 357 U.S. 449, 460 (1958); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009).

No matter how much Harvard wants to stick its head in the sand to try to ignore this Court's standing ruling, the ruling remains. Standing is no longer an issue that will be addressed at trial. Mr.

Blum has no relevant testimony to offer concerning any of the remaining issues in the case. Harvard should not be permitted to call him.

## II. MOTION IN LIMINE NO. 2: TO PRECLUDE EVIDENCE OR ARGUMENT THAT PORTIONS OF APPLICATIONS HARVARD REFUSED TO PRODUCE EXPLAIN THE OBSERVED ASIAN PENALTY ON THE PERSONAL RATING

A defendant cannot show up to trial averring that evidence within its possession proves its case when it refused to produce that evidence and assured the Court and its opponent that it would not rely on it. But that is just what Harvard proposes to do. Against the undisputed evidence that Asian-American applicants fare more poorly on Harvard's subjective "personal rating" than all other racial groups, Harvard's expert complains:

> Prof. Arcidiacono's personal ratings model cannot control for all information that Harvard relies on when assigning personal ratings (including but not limited to the personal essay, the full text of teacher and guidance counselor recommendation letters, any supplemental recommendation letters, and any comments from alumni interviewers that have arrived before the personal rating is assigned).

(Ex. 2, Card Rebuttal Report ¶ 7.) Notably, there is no evidence in the record that Asian-American applicants fare more poorly in any of these categories—zero—other than the personal rating itself. In other words, Harvard is taking the absence of these portions of the applications from the record as permitting an inference that Asian-American applicants were outperformed by other applicants on these metrics.

That is an odd inference to be sure—faced with overwhelming evidence that race matters to the personal score, Harvard assures us race does not matter and it must be something else. Something else that they failed to identify any direct evidence of throughout hundreds of pages of expert analysis. This is called assuming the conclusion—Asian-American applicants' personal essays, teacher recommendations, and guidance counselor recommendations must be worse than those from white applicants because of course Harvard does not discriminate against Asian Americans. This type of argument is impermissible. Harvard was required to explain why "'missing' variables"

when "properly organized and accounted for" proved that "there was no significant disparity" between Asian-American and white applicants. *Bazemore v. Friday*, 478 U.S. 385, 404 n.14–15 (1986). Dr. Card did not even try to meet this obligation. Instead, he wants to "declare simply that many factors go into" the personal score and have that accepted as evidence that the personal score is unaffected by race. *Id.* It would be "clear error" to allow him to do so. *Id.* at 404; *see also Palmer v. Shultz*, 815 F.2d 84, 101 (D.C. Cir. 1987) ("Implicit in the *Bazemore* holding is the principle that a mere conjecture or assertion on the defendant's part that some missing factor would explain the existing disparities between men and women generally cannot defeat the inference of discrimination created by plaintiffs' statistics.").

It is also an inference that breaks Harvard's promise in discovery. SFFA specifically requested a statistically significant sample of application files. (*See, e.g.*, D.I. 94 at 2 (Aug. 7, 2015, SFFA Reply re Motion to Compel).) Even back then SFFA noted that "Harvard [had] not disagreed with the obvious proposition that SFFA cannot be denied access to materials which Harvard intends to use to defend its admissions process." (*Id.*) Harvard said so itself, through its counsel at the July 20, 2016 Status Conference. (D.I. 173 at 26–27 ("They're going to put on their case and we have to defend against it and we can't haul out at trial something that we have refused to produce to them, and Your Honor has upheld, as a way of defending the case.").) As the Court knows, SFFA never got the requested statistically significant sample of full application files. And yet, with the nuance of a lawyer, Harvard now says it can argue that the data it did not produce supports its case precisely because it did not produce that data. In other words, Harvard thinks it is not "haul[ing] out at trial something [it has] refused to produce" if it just says "the evidence in the full application files that we refused to produce, *if we did produce it*, could show Asian Americans have worse essays."

When a party willfully destroys discoverable evidence, an adverse inference results. *United States v. Laurent*, 607 F.3d 895, 902 (1st Cir. 2010) ("A 'spoliation' instruction, allowing

an adverse inference, is commonly appropriate in both civil and criminal cases where there is evidence from which a reasonable jury might conclude that evidence favorable to one side was destroyed by the other."). Harvard wants to argue for a bizarre cousin of the adverse inference—that there should be a positive inference from evidence neither expert saw and Harvard refused to produce. That positive inference allows Harvard's expert to assume that the missing data explains the otherwise "unexplained gap" between Asian Americans and Whites. (Ex. 2, Card Rebuttal Report ¶ 51.)

Harvard's expert cannot point to the personal essays and recommendations as a potential explanation for why Harvard rated Asian Americans worse than Whites, in the absence of any evidence to support that assumption. It is no different than hauling those papers out at trial and saying that they show such a thing. Actually it is worse, as there is no opportunity for SFFA to subject that evidence to counter-analysis or cross-examination. The Court should bar Harvard from making that argument.

The Court should similarly bar Dr. Card's assurances that the personal rating is not tainted by race discrimination that merely dress up Harvard's naked and conclusory denials with the gossamer of expert jargon. Dr. Card admitted he only believes race does not influence the personal score because Harvard's Dean of Admissions assured him it did not. (Ex. 3, Card Dep. at 47:11–20 (recounting telephone call and admitting no independent analysis to verify Dean Fitzsimmons assertion).) Dr. Card never engaged in any expert analysis of the personal essays or teacher recommendations to inform an opinion that Asian Americans are behind in any of those categories. He just gets there from assuming that his client is innocent of the very charges the Court is here to adjudicate. Incantation of "omitted variable bias," does not substitute for analysis. (Ex. 2, Card Rebuttal Report ¶¶ 7, 38-43.) *Cf. Roger Edwards, LLC v. Fiddes & Son Ltd.*, 437 F.3d 140, 143 (1st Cir. 2006) (affirming sanctions imposed for district court motion under Rule 60(b) asserting fraud

supported with "conclusory inference by the expert that alleged mistakes must have been dishonest because there were a lot of technical problems with the labeling").

In sum, Dr. Card assumed the conclusion that the personal score is unaffected by race and then engaged in a novel positive inference from evidence he did not see. This is not expert testimony, it is evasion of Harvard's commitments made to SFFA and the Court during discovery.

## III. MOTION IN LIMINE NO. 3: TO PRECLUDE UNDISCLOSED EXPERT TESTIMONY ABOUT THE OFFICE OF INSTITUTIONAL RESEARCH'S CONCLUSION THAT HARVARD'S ADMISSIONS SYSTEM IS BIASED AGAINST ASIAN AMERICANS

Harvard proffered a single economist as an expert to conduct a statistical analysis of its admissions data in this case, David Card. Having disclosed only Dr. Card, the Court should not allow Harvard to elicit undisclosed expert testimony on this subject from other witnesses at trial.

Both Harvard's Office of Institutional Research (OIR) and Dr. Card performed logit regressions to estimate the relationship between race and admissions outcomes—albeit at different times and for different purposes. OIR concluded based on its analysis that Harvard's admissions system is biased against Asian Americans. In fact, in the following chart OIR showed that being Asian American is the only race or ethnicity that decreases an applicant's chances of admissions:

***Logit Coefficients for Main Effect Logistic Model***

High Personal Rating
African American
Legacy
Native American
High Extracurricular Rating
Early Applicant
High Academic Rating
Hispanic
z-Academic Index
First Generation
Class of 2008
Class of 2012
Class of 2014
Class of 2013
Class of 2011
Class of 2010
Class of 2009
Class of 2015
Average SAT II
Average SAT I
Unknown
International
Female
Class of 2016
Asian
Other

-1 -0.5 0 0.5 1 1.5 2 2.5

(Ex. 4, Trial Ex. P9 at 9.) Despite these results, Dr. Card said next to nothing about OIR's logit regression in his report.

In the over 300 pages of his initial and rebuttal reports, Dr. Card tries to dismiss OIR's logit regression as "basic" and "preliminary" in just one page. (Ex. 2, Card Rebuttal Report ¶ 54 (containing the entirety of Dr. Card's response to OIR's conclusions from both his initial and rebuttal reports).) The only "basic" and "preliminary" analysis is Dr. Card's own attempt at rebutting the findings of Harvard's internal research office that spent significant time and resources studying the issue of bias against Asian-American applicants. Given how little attention Harvard's lone economist devoted to trying to rebut OIR's conclusion, SFFA is concerned that Harvard may try to elicit undisclosed expert testimony concerning OIR's analysis.

At trial Harvard intends on calling Dean Rakesh Khurana, who has a background in organizational sociology. During his deposition, Dean Khurana held himself out as having expertise in logit regressions by offering off-the-cuff criticisms of OIR's conclusion. He claimed that there are "a lot of limitations to doing what are called fitted models" like the one OIR used. (Ex. 5, Khurana Dep. at 253:19–20.) And according to Dean Khurana, "models like this violate statistical and hypothesis testing." (*Id.* at 256:13–14.) But of course, Dean Khurana was never identified as an expert in this case. And he never issued an expert report explaining why he believes OIR's logit regression "violate[s] statistical and hypothesis testing." *See* Fed. R. Civ. P. 26(a)(2)(B) (requiring experts to disclose a "complete statement of all [their] opinions . . . and the basis and reasons for them"); *see also id.* 26(a)(2)(C) (requiring even non-retained experts to disclose a "summary of the facts and opinions" they expect to testify about). So Harvard should be precluded from offering opinion testimony trying to undermine OIR's analysis through Dean Khurana. *See* Fed. R. Evid. 701 (prohibiting fact witnesses from testifying "based on scientific, technical, or other specialized knowledge"); *see also Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 286 (1st Cir. 1993) (reversing a district court that admitted "the testimony of a previously undisclosed medical expert").

Dated: September 17, 2018

Respectfully submitted,

*/s/ John M. Hughes*

Adam K. Mortara
J. Scott McBride
Krista J. Perry
Bartlit Beck Herman Palenchar & Scott LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
312.494.4400
adam.mortara@bartlit-beck.com
scott.mcbride@bartlit-beck.com
krista.perry@bartlit-beck.com

John M. Hughes
Katherine L.I. Hacker
Meg E. Fasulo
Bartlit Beck Herman Palenchar & Scott LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
303.592.3100
john.hughes@bartlit-beck.com
kat.hacker@bartlit-beck.com
meg.fasulo@bartlit-beck.com

William S. Consovoy
Thomas R. McCarthy
Michael H. Park
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
703.243.9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
park@consovoymccarthy.com
mike@consovoymccarthy.com

Patrick Strawbridge BBO #678274
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
617.227.0548
patrick@consovoymccarthy.com

Paul M. Sanford BBO #566318
BURNS & LEVINSON LLP
One Citizens Plaza, Suite 1100 Providence,
RI 02903
617.345.3000
psanford@burnslev.com
bcaldwell@burnslev.com

*Attorneys for Plaintiff Students for Fair Admissions, Inc.*

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule 7.1(a), the undersigned conferred with counsel for Defendant on September 14, 2018, and Defendant objects to this motion.

*/s/John M. Hughes*

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 17th day of September, 2018.

*/s/John M. Hughes*