**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**
**BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br>                 Plaintiff, <br><br>     v. <br><br> PRESIDENT AND FELLOWS OF HARVARD <br> COLLEGE (HARVARD CORPORATION), <br><br>                 Defendant. | Civil Action No. 1:14-cv-14176-ADB |

**HARVARD'S SUPPLEMENTAL MEMORANDUM IN RESPONSE TO**
**THE UNITED STATES' STATEMENT OF INTEREST**

## TABLE OF CONTENTS

ARGUMENT ...................................................................................................................1

I. THE GOVERNMENT IGNORES SUPREME COURT PRECEDENTS THAT ENDORSE HARVARD'S
FLEXIBLE, NON-MECHANICAL CONSIDERATION OF RACE ...................................................1

II. THE GOVERNMENT'S ASSESSMENT OF THE PERSONAL RATING IS FLAWED .......................4

III. THE GOVERNMENT'S RACIAL BALANCING ARGUMENTS LAY BARE ITS WHOLESALE
ADOPTION OF SFFA'S FALSE NARRATIVE ...........................................................................8

IV. THE GOVERNMENT'S ARGUMENTS CONCERNING RACE-NEUTRAL ALTERNATIVES ARE
MERITLESS.........................................................................................................................11

CONCLUSION.............................................................................................................13

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Fisher v. University of Texas at Austin* (*Fisher II*),
   136 S. Ct. 2198 (2016) ................................................................................................1, 3, 11

*Gomillion v. Lightfoot*,
   364 U.S. 339 (1960) .................................................................................................................7

*Gratz v. Bollinger*,
   539 U.S. 244 (2003) .................................................................................................................3

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) .............................................................................................................1, 3

*Regents of the University of California v. Bakke*,
   438 U.S. 265 (1978) .............................................................................................................2, 3

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977) .........................................................................................................6, 7, 8

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886) .................................................................................................................7

### STATUTES

28 U.S.C. § 517 ................................................................................................................................1

When the Department of Justice deems it appropriate to appear in cases to "attend to the interests of the United States," 28 U.S.C. § 517, it is important that the Department's statements reflect its evenhanded appraisal of the public interest.  In this case, however, instead of reflecting a dispassionate analysis of the record, the government's brief uncritically adopts SFFA's flawed narrative.  It relies almost exclusively on SFFA's Statement of Material Facts for supposedly undisputed points that are in fact hotly contested—frequently without even acknowledging Harvard's account of the facts, let alone reflecting a careful assessment of the factual disputes.

Where the government's brief is not merely duplicative of SFFA's filings, it is unreliable in its analysis and application of Supreme Court decisions that have upheld race-conscious admissions.  Indeed, the brief is in large part a thinly veiled attack on those precedents.  Not once does the government acknowledge that *three times* the Supreme Court has approved the consideration of race in university admissions, as long as that consideration is part of the university's evaluation of the applicant as a whole person, is only one of several factors the university considers, and does not overwhelm other factors.  That is exactly what Harvard does.

The government's outcome-driven brief adds no weight to the faulty arguments SFFA has already made.  For the reasons discussed in Harvard's prior filings, and below, Harvard is entitled to summary judgment on all remaining claims.

## ARGUMENT

### I.    THE GOVERNMENT IGNORES SUPREME COURT PRECEDENTS THAT ENDORSE HARVARD'S FLEXIBLE, NON-MECHANICAL CONSIDERATION OF RACE

The government first argues (at 7-11) that Harvard provides insufficient "criteria to cabin or carefully guide its" consideration of race in the admissions process.  That argument studiously ignores the Supreme Court's decisions that upheld race-conscious practices quite similar to Harvard's in *Fisher v. University of Texas at Austin* (*Fisher II*), 136 S. Ct. 2198 (2016), *Grutter*

*v. Bollinger*, 539 U.S. 306 (2003), and *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978).  In essence, the government takes what the Supreme Court has characterized as a virtue—Harvard's flexible and non-mechanical consideration of race as one of many factors—and tries to frame it as a vice.

As Harvard has explained, the Harvard College Admissions Committee may consider an applicant's self-identified race or ethnicity—when the applicant has chosen to disclose it—as one among the many factors that have influenced the applicant's background and experience and informed her identity.  Harvard does not try to reduce that inherently open-ended undertaking to an algorithm; nor should it.  Rather, the 40 or so members of the Admissions Committee, based on their collective judgment and experience, strive to learn as much as possible about each applicant and then decide which of the many qualified applicants would contribute most to and benefit most from Harvard's vibrant educational environment.

The government tries to frame the non-mechanical nature of Harvard's process as a flaw. It castigates Harvard (at 7-8) for not identifying precisely how the Admissions Committee "uses, employs, or weighs an applicant's race" among the factors that play a role in the process; for not specifying "which 'individual case[s]' have sufficient 'strength' to warrant [a] racial 'tip'"; and for not explaining "how this 'strength' or 'tip' actually affects an applicant's chances for admission compared to an applicant who receives no racial 'tip.'"  But the government never explains what "meaningful criteria" it thinks Harvard *should* impose "to cabin or carefully guide its use of race" (Br. 7).

The reason for the government's reticence is obvious:  It is Harvard's process, not the more mechanistic alternative to which the government alludes, that satisfies the standards set forth by the Supreme Court.  Time and again, the Court has emphasized that institutions may

consider race *only* when they do so in a flexible, non-mechanical way.  In *Bakke*, Justice

Powell's controlling opinion pointed to Harvard's admissions process as the paradigm of

compliance with the Equal Protection Clause—a process that "treats each applicant as an

individual" and that "is flexible enough to consider all pertinent elements of diversity in light of

the particular qualifications of each applicant."  438 U.S. at 317-318 (opinion of Powell, J.).

Justice Powell rightly viewed Harvard's non-rigid consideration of race as a strength, not a

weakness.

        In *Grutter*, the Court again invoked Harvard's process as a paradigm of the appropriate

use of race and again emphasized the need for "truly individualized consideration" in which race

plays "a flexible, nonmechanical" role.  539 U.S. at 334-335.  The Court praised the University

of Michigan Law School for "engag[ing] in a highly individualized, holistic review of each

applicant's file, giving serious consideration to all the ways an applicant might contribute to a

diverse educational environment," and for not employing "mechanical, predetermined diversity

'bonuses' based on race or ethnicity."  *Id.* at 337.  And in *Fisher II*, the Court noted approvingly

that the University of Texas at Austin considered race in a "contextual" manner, not "as a

mechanical plus factor for underrepresented minorities."  136 S. Ct. at 2207.  By contrast, the

admissions program held unconstitutional in *Gratz v. Bollinger*, 539 U.S. 244 (2003), failed to

pass muster because it did *not* resemble "the individualized selection process described in" the

Harvard College Admissions Program appended to Justice Powell's *Bakke* opinion; instead, it

"automatically distribute[d]" a fixed number of "points" to applicants from "'underrepresented

minority' group[s] as defined by the University."  *Id.* at 271-273.

        The government makes no effort to engage with those precedents.  It asserts (at 10-11)

that Harvard cannot establish the legality of its practices on the ground that its consideration of

race "comports with other educational insitutions' use of race in prior cases." But the Supreme Court's precedents strongly underscore that Harvard's practices are lawful, particularly because the Court favorably compared the approved practices *to Harvard's*. The government's criticisms of Harvard's contextual consideration of race may reflect its distaste for the Supreme Court's validation of Harvard's approach. But the Department of Justice, like this Court, is bound by the law.

## II.    THE GOVERNMENT'S ASSESSMENT OF THE PERSONAL RATING IS FLAWED

The government next argues (at 11-20) that the personal ratings assigned to applicants by admissions officers are influenced by race and operate to the detriment of Asian-American applicants. Those arguments are unmoored from the facts and the law.

1.    The government's factual arguments about the personal rating are lifted almost wholly from the inaccurate narrative SFFA has offered, and most therefore require little discussion beyond Harvard's prior briefs. Some of the government's positions, however, are so lacking in record support as to warrant a brief response.

First, the government's argument (at 11-15) that "Harvard intentionally considers race in scoring the personal rating" is grievously uninformed by the record. The government largely relies (at 13-14) on the fact that Harvard's written guidelines for admissions officers "do not *prohibit* … [them] from" considering race in the personal rating. The government argues that the personal rating could in theory be influenced by race, since it may reflect "'the applicant's background and life story.'" *Id.* (emphasis omitted). And the government argues (at 14) that "the personal rating is vague, subjective, and open-ended," so that admissions officers *might* be considering race in assigning it. But the government ignores the record evidence that illuminates whether the personal rating actually *does* consider race—and shows it does not.

For example, the government ignores the virtually uniform testimony of admissions officers that the personal rating does not reflect the applicant's race.  *See* Ellsworth Ex. 98 at 165:3-18 (McGrath); Ex. 3 at 192:3-10 (Weaver); Ex. 6 at 72:10-21 (Cheng); Ex. 9 at 80:13-81:1 (Banks); Ex. 14 at 21:25-22:4 (Ortiz); Ex. 17 at 60:14-61:11 (Walsh); Ex. 25 at 359:12-15 (McGrath).  Grasping to find snippets of testimony at odds with that consensus, the government claims that "Harvard's Dean of Admissions testified that race sometimes can be taken into account when assigning the personal rating."  Br. 13 (citing Connolly Ex. 9 at 248:1-249:5).  But Dean Fitzsimmons said no such thing.  What he actually said is that a student's race could lead to circumstances in her life that might illuminate her personal qualities:  For example, a student might receive a higher personal rating if she "had been the subject of discrimination as a result of" her race and one of her teachers had written a letter talking about how she "had overcome that prejudice and had, … for example, gone on to try to help other students who had been the victims of discrimination[.]"  Connolly Ex. 9 at 248:6-19.  In such cases, the Dean testified, the personal rating would reflect not the student's race but rather "the actions of the student that occurred because of race."  *Id.* at 248:25-249:5.  The government also claims that "*[o]ther admissions staff* … testified that race is considered in assigning … all four of the profile ratings[.]"  Br. 13 (emphasis added).  But just a single admissions officer so stated—not multiple "admissions staff," as the government incorrectly states.

The government also criticizes (at 17) the analysis by Harvard's expert, Dr. David Card, who explained that any estimated effect of race on the personal rating is more likely due to factors that cannot be statistically observed.  *See* Ellsworth Ex. 33 ¶¶ 145-154; Ellsworth Ex. 37 ¶¶ 35-56.  How could it be, the government asks, that Dr. Card cannot identify an *observable* factor that explains the slight average difference in personal ratings between White and Asian-

American applicants?  But the answer to that question is plain:  Little of what informs the personal rating *can* be statistically observed, given that it largely reflects qualitative information such as essays, interviewer comments, and teacher and guidance counselor recommendations.

The government's other arguments about the personal rating are equally misinformed. The government claims that "Harvard … admits … the personal rating is the driving factor in many admissions decisions."  Br. 16.  That is untrue; Harvard has consistently explained that no single consideration is "the driving factor" in its highly individualized process.  *See, e.g.*, Mem. in Support of Def.'s Mot. for S.J. (Dkt. 418) ("SJ Mem.") 22-25.  Even SFFA does not go so far as to make that argument.  *See* Ellsworth Ex. 27 at 279:21-280:4 (Dr. Arcidiacono, recognizing that many factors can be "determinative" for competitive applicants).  The personal rating does matter in Harvard's admissions process—as it necessarily should, given Harvard's interests in admitting students who will contribute to a rich and vibrant campus community.  Calling it "the driving factor," let alone claiming that Harvard has somehow conceded such a charcterization, is grossly inaccurate.

The rest of the government's argument about the personal rating largely recapitulates SFFA's position; Harvard has already explained the inaccuracies in that account.  *See* SJ Mem. 38; Def.'s Mem. in Opp. to Pltf.'s Mot. for S.J. (Dkt. 435) ("SJ Opp.") 19-23; Harvard's Reply Mem. in Support of its Mot. for S.J. (Dkt. 484) ("SJ Reply") 4-7.

2.      The government's analysis of this case through the lens of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), is equally erroneous. If anything, faithful application of *Arlington Heights* underscores the conclusion that Harvard should be granted summary judgment.

Under *Arlington Heights*, courts assessing the intent of a decisionmaker may look to "[t]he historical background of the decision," "[t]he specific sequence of events leading up to the … decision," "[t]he legislative or administrative history" of a decision made by a legislature or agency, and any "[d]epartures from the normal procedural sequence" of similar decisions.  429 U.S. at 267-268.  They may also examine whether the decision "'bears more heavily on one race than another,'" but such evidence can show discriminatory intent only in "rare" cases where the pattern of disparate impact is "stark" and "unexplainable on grounds other than race."  *Id.* at 266.  As examples of sufficiently "stark" disparities, *Arlington Heights* points to *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)—which involved a facially race-neutral ordinance under which laundry operating permits were granted to almost no Chinese-American applicants but were granted to virtually all others, *id.* at 374—and to *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), in which the boundaries of Tuskegee, Alabama were redrawn "from a square to an uncouth twenty-eight-sided figure" that "remove[d] from the city all save only four or five of its 400 Negro voters while not removing a single white voter or resident," *id.* at 340-341.  *See Arlington Heights*, 429 U.S. at 266.

The government's application of the *Arlington Heights* framework is misguided.  For example, the government argues (at 15-18) that "'[t]he impact' of the personal rating … 'bears more heavily' on Asian-American applicants than on applicants of '[]other' races."  But all the government can mean is that Asian-American applicants receive, on average, slightly lower personal ratings than applicants of other races.  *See, e.g.*, Ellsworth Ex. 33 ¶ 73 & Card Ex. 8.  That is neither a "stark" disparity, *Arlington Heights*, 429 U.S. at 266, akin to those in *Yick Wo* or *Gomillion*, nor (as explained in Harvard's summary-judgment papers) one that is "unexplainable on grounds other than race."  *See* SJ Mem. 43-44; SJ Opp. 11-15; SJ Reply 10-

11.  The government's nonquantitative argument is equally deficient.  The government argues (at 18-20), for example, that Harvard's handling of the OIR documents "'depart[ed]' from 'normal procedur[es].'"  But what is relevant, under *Arlington Heights*, is whether an allegedly discriminatory decision was rendered through a decisionmaking process that "[d]epart[ed] from the normal procedural sequence."  *Cf. Arlington Heights*, 429 U.S. at 267, 269-270 (noting that the zoning decision under challenge did not depart from the way the defendant had made previous similar decisions).  Even if Harvard's handling of the OIR documents had "'depart[ed]' from 'normal procedur[es]'"—though the government points to no evidence to that effect—it was not a procedural irregularity in rendering the allegedly discriminatory decision.

In sum, superimposing the *Arlington Heights* framework on top of this litigation does nothing to improve SFFA's nonexistent evidence of intentional discrimination.  SFFA's claim is deficient no matter what analytical framework is applied.

## III.   THE GOVERNMENT'S RACIAL BALANCING ARGUMENTS LAY BARE ITS WHOLESALE ADOPTION OF SFFA'S FALSE NARRATIVE

The government next argues (at 20-28) that Harvard engages in racial balancing.  Again, the government largely repeats SFFA's position; its few additional points are meritless.

The government argues (at 21-22) that Harvard improperly "considers race in setting its overall admissions target" each year.  For that assertion, the government relies on the fact that Harvard is aware that admitted students of different races tend to accept offers of admission at different rates (as do students who differ in other ways, such as in their states of residence).  There is nothing remotely nefarious about that fact.  As a residential college with a fixed number of undergraduate beds, Harvard must be cognizant of the likely yield from its offers to be certain that its incoming freshman class is not oversubscribed.  Understanding the evolving demographic characteristics of the tentatively admitted class, and how students with those characteristics have

historically yielded, permits the College to estimate the likely size of its matriculated class. There is nothing unusual or discriminatory about that practice. In fact, if the Admissions Office targeted a consistent racial composition of the class from year to year, it would have no need to update its estimate of the yield rate on the basis of race as the admissions process progressed, for it would know in advance how the racial composition of the admitted class would affect its yield.[1]

According to the government (at 26-27), Harvard cannot claim "it pursues no preset race-based goals" because Harvard has concluded that adopting certain race-neutral practices instead of considering race would not allow it to achieve its educational goals, given that doing so would cause the proportion of African-American and Hispanic students to drop precipitously. There is no inconsistency in those positions. Harvard has never taken the position that a particular racial composition of the student body is necessary to achieve its educational objectives. Rather, Harvard's Committee to Consider Race-Neutral Alternatives explained that "a *significant* reduction in the number of African-American and Hispanic students on campus would inhibit the ability of Harvard's students and faculty to glean the benefits of a diverse student body and

---

[1]    The government repeats (at 25-27) SFFA's claim that the "one-pagers" that Dean Fitzsimmons and Director McGrath receive at various points during the admisssion cycle demonstrate the Admissions Office's intention to seek a consistent racial composition of the class from year to year. Harvard has already responded to that assertion. *See* SJ Mem. 19 n.13; SJ Opp. 33-34; SJ Reply 13-14 & n.7. The government additionally argues (at 23) that the "electronic database" in which decisions are recorded "allows the admissions officers to see how the racial makeup of the admitted class is forming and to make adjustments to that makeup." That contention is unsupported by the record; indeed, it goes beyond even SFFA's tendentious reading of the facts. SFFA states that the database allows "Dean Fitzsimmons and Director McGrath" to "receive one-pagers at" various "points throughout the admissions cycle" but that those one-pagers "were *not* disseminated to the entire Admissions Office." Pltf.'s Statement of Undisputed Material Facts ("SFFA SJ SMF") (Dkt. 414) ¶¶ 122-123 (emphasis added). In other words, even SFFA has not made the claim that admissions officers learn the racial composition of the class in real time by examining the Admissions Office's electronic database.

- 9 -

significantly undermine [Harvard's] educational mission and broader institutional objectives." Ellsworth Ex. 47 at HARV00097317 (emphasis added); *see also, e.g.*, *id.* at HARV00097325; SJ Mem. 28.  Harvard does not need to have a specific number—or even a specific range of numbers—in mind to recognize that cutting the number of African-American and Hispanic students on campus by half would dramatically alter the educational experience of all of its students and would impair its students' ability to reap the benefits of diversity.  The committee members' decades of experience in admitting and educating students allowed Harvard to reach that conclusion.

The government insists (at 27) that data from four years show a "remarkably stable" racial composition of the admitted class.  But even during the government's selectively chosen four-year span, the proportion of Asian-American students varied between 17.6% and 20.5%, Connolly Ex. 139 at HARV00032520—a range the government tries to compress by showing the numbers as rounded to 18% and 20%.  That is a difference of more than 15%, surely a substantial variation by any reasonable standard.  During the same years, the proportion of African-American students similarly varied by more than 15%, the proportion of Hispanic students by more than 20%, and the proportion of White students by more than 10%.  Connolly Ex. 139 at HARV00032520.  Similar variations exist beyond the government's narrow four-year frame.  Ellsworth Ex. 33 ¶¶ 193-194 & Card Ex. 31-34.

The government does not try to explain how fluctuations of 10 to 20 percent over a four-year span could show "remarkabl[e] stab[ility]."  Because the racial composition of the applicant pool is similar from year to year, *see* Connolly Ex. 139, there would be no reason to expect dramatic variations in the racial composition of the admitted class.  The fact that the variations

are as large as they are makes clear that Harvard is not trying to impose stability on the student body's racial composition.

## IV.    THE GOVERNMENT'S ARGUMENTS CONCERNING RACE-NEUTRAL ALTERNATIVES ARE MERITLESS

The government's final argument (at 28-36) is that Harvard has not shown it needs to consider race to achieve its educational objectives.  The government's few points that do not parrot SFFA's are meritless.

Much of the government's argument (at 31-34) stems from the premise that, to satisfy *Fisher II*, Harvard must define diversity-related educational objectives in a quantitative manner and must "'measure' the 'level of racial diversity'" it needs to attain those objectives.  That is incorrect.  In *Fisher II*, the Supreme Court held that "[a] university's goals cannot be elusory or amorphous," but it went on to approve the following goals as sufficiently "concrete and precise": "the destruction of stereotypes, the promotion of cross-racial understanding, the preparation of a student body for an increasingly diverse workforce and society, and the cultivation of a set of leaders with legitimacy in the eyes of the citizenry."  136 S. Ct. at 2211 (brackets and internal quotation marks omitted).  Those objectives are no more quantitative than the similar ones Harvard has expressed, *see* Ellsworth Ex. 45 (Report of the Committee to Study the Importance of Student Body Diversity).

The government further errs in accusing Harvard's Committee to Study Race Neutral Alternatives (at 33) of defining "the racial balance of Harvard's current class as the benchmark for measuring whether race-neutral alternatives would adequately achieve Harvard's diversity-related goals."  That is not an accurate reading of the committee's report.  Nowhere did the committee reason that alternative practices would be unacceptable unless they created a student body identical in racial composition to the current class.  The committee did conclude that if

Harvard employed certain practices in lieu of considering race, the diversity of its student body would decline dramatically.[2]  But the government does not challenge either the quantitative analysis that informed the committee's deliberation or the committee's resulting conclusion that such a severe loss of diversity would impair the Harvard educational experience.  The committee also concluded that, if Harvard stopped considering race, then to attain diversity comparable—not identical—to that of the current student body, Harvard would have to adopt practices that would alter the characteristics of its student body in other ways inconsistent with Harvard's fundamental educational mission.[3]  Again, the government disputes neither the data on which the committee relied nor its substantive conclusion.

Finally, the government argues (at 34-35) that Harvard is "tr[ying] to have it both ways" in arguing that (1) a significant decline in diversity would be problematic and (2) it is impossible to pinpoint precisely what racial composition of the class would be required to satisfy Harvard's diversity-related educational objectives.  Those arguments are not at all inconsistent.  Harvard does not need to have a precise racial target in mind to conclude that a 50% decline in the number of African-American and Hispanic students on campus would undermine its educational objectives.

---

[2]     *See, e.g.*, Ellsworth Ex. 47 at HARV00097325 ("Professor Card's simulations show that if Harvard eliminated all of those [challenged] practices, and also eliminated consideration of race in the admissions process, the resulting class would have significantly fewer students who identify as Asian-American, Hispanic, or Other.  As discussed above, the committee regards a decline in diversity of such significant magnitude as inimical to Harvard's diversity-related educational objectives.").

[3]     *See, e.g.*, Ellsworth Ex. 47 at HARV00097323 ("[I]f Harvard afforded [socioeconomic circumstances] weight sufficient to produce a combined proportion of African-American, Hispanic, and Other students comparable to that of current classes, the proportion of admitted students with the highest academic ratings … would be expected to drop from 76% to 66%.").

Indeed, the government's argument highlights once again that its true objective here appears to be to make it legally impossible for universities to consider race in admissions.  If Harvard had tried to pinpoint what racial composition of the class would allow its educational objectives to be satisfied, the government would surely have labeled that an impermissible quota. Given the government's refusal to accept the teachings of *Bakke*, *Grutter*, and *Fisher II*, its brief offers this Court no assistance in resolving this case.

## CONCLUSION

For the reasons stated above, and in Harvard's prior summary-judgment filings, the Court should grant summary judgment to Harvard on all remaining counts of the Complaint.

Respectfully submitted,

/s/ Seth P. Waxman

William F. Lee (BBO #291960)
Felicia H. Ellsworth (BBO #665232)
Andrew S. Dulberg (BBO #675405)
Elizabeth Mooney (BBO #679522)
Sarah R. Frazier (BBO #681656)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com
sarah.frazier@wilmerhale.com

Seth P. Waxman (*pro hac vice*)
Paul R.Q. Wolfson (*pro hac vice*)
Danielle Conley (*pro hac vice*)
Brittany Amadi (*pro hac vice*)
Daniel Winik (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 663-6800
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com
danielle.conley@wilmerhale.com
brittany.amadi@wilmerhale.com
daniel.winik@wilmerhale.com

Debo P. Adegbile (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 295-6717
Fax: (212) 230-8888
debo.adegbile@wilmerhale.com

September 26, 2018

*Counsel for Defendant President
and Fellows of Harvard College*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Seth P. Waxman
Seth P. Waxman