UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC. | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 14-cv-14176-ADB |
| | * | |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), | * | |
| | * | |
| | * | |
| | * | |
| Defendant. | * | |

## <u>MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

BURROUGHS, D.J.

This case involves allegations that Defendant President and Fellows of Harvard College ("Harvard") maintains an undergraduate admissions program that discriminates against Asian Americans in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"). The remaining claims asserted by Plaintiff Students for Fair Admissions Inc. ("SFFA") are: "Intentional Discrimination against Asian Americans" (Count I); "Racial Balancing" (Count II); "Failure to Use Race Merely as a 'Plus' Factor in Admissions Decisions" (Count III); and "Race-Neutral Alternatives" (Count V). [ECF Nos. 1, 325]. On June 15, 2018, the parties filed cross-motions for summary judgment on all counts. [ECF Nos. 412, 417]. The motions were opposed on July 27 and July 30, 2018 [ECF Nos. 435, 449], and reply briefs were filed on August 27 and August 30, 2018. [ECF Nos. 484, 510]. Several interested non-parties have appeared as *amici curiae* in support of or in opposition to the summary judgment motions. A bench trial on the issue of liability is scheduled to begin on October 15, 2018.[1] [ECF No. 405].

---

[1] The parties have agreed to defer any further litigation of the issue of remedies until after liability is determined. [ECF Nos. 386, 387].

For the reasons stated herein, the cross-motions for summary judgment are <u>denied</u> on all counts without prejudice to the parties reasserting their arguments at trial, consistent with this order. The Court will also further consider the arguments raised in the amicus briefs at trial.[2]

## I.      BACKGROUND

In February and April 2018, prior to the June 15 deadline for filing dispositive motions, the Court suggested to the parties that since the remaining claims appeared to require a fact-intensive inquiry, as well as the evaluation of conflicting expert testimony, summary judgment could be a time-consuming and duplicative effort for the parties and the Court, and perhaps not warranted in light of the upcoming bench trial. [ECF Nos. 384, 402]. Although Harvard agreed, SFFA contended that some or all of the claims could be resolved on summary judgment, while acknowledging that it would be reasonable for the Court to take any dispositive motions under advisement and proceed to trial. [ECF No. 384]. <u>See</u> <u>Grutter v. Bollinger</u>, 539 U.S. 306, 317–18 (2003) (district court took cross-motions for summary judgment under advisement and conducted 15-day bench trial before ruling on the motions). The Court ultimately permitted the parties to file dispositive motions [ECF No. 387], but cautioned that if the motions presented material factual disputes, the parties should expect a summary order of denial. [ECF No. 402].

Both parties have now moved for summary judgment on all counts. SFFA submitted in support of its motion a 900-paragraph statement of allegedly undisputed facts [ECF No. 414-2] ("SFFA Facts"), approximately 700 of which are at least partially in dispute [ECF No. 437]

---

[2] Certain organizations that are affiliated with Harvard were permitted to appear as *amici curiae* [ECF No. 465] under the same or similar terms as the individual students who were previously allowed to participate in dispositive motion practice. [ECF Nos. 52, 244]. SFFA has since sought to strike portions of these organizations' amicus briefs and their related sworn declarations. [ECF Nos. 471, 479]. The Court declines to strike these documents at this time, as their inclusion in the record does not bear on the resolution of the summary judgment motions. The Court will further assess the extent to which the students and other organizations may participate at trial, if at all. [ECF Nos. 52, 518, 532].

("Harvard Response"). SFFA disputes [ECF No. 452] ("SFFA Response") approximately half of Harvard's 278-paragraphs of allegedly undisputed facts [ECF No. 420] ("Harvard Facts"), and nearly all of Harvard's 45-paragraph supplemental statement of material facts that allegedly preclude summary judgment for SFFA. [ECF Nos. 437, 511]. Further, the parties' expert witnesses—David Card [ECF Nos. 419-33, 419-37], Ruth Simmons [ECF Nos. 419-28, 419-34], Peter S. Arcidiacono [ECF Nos. 415-1, 415-2, 415-3], and Richard D. Kahlenberg [ECF Nos. 416-1, 416-2, 416-3]—have each produced multiple expert reports that raise a plethora of conflicting opinions on key substantive issues in the case.

Except as otherwise noted, the following facts are not in dispute.

### A.      Harvard's Admissions Office

Located in Cambridge, Massachusetts, Harvard is a liberal arts college and the oldest institution of higher learning in the United States. SFFA Facts ¶ 4. It receives federal financial assistance and is therefore subject to Title VI. SFFA Facts ¶ 9. For the Class of 2019, more than 37,000 people applied for undergraduate admission to Harvard, 26,000 of whom were domestic applicants.[3] Harvard Facts ¶¶ 1, 5. Over 8,000 domestic applicants had perfect converted GPAs and over 5,000 domestic applicants achieved a perfect math or verbal SAT score. Harvard Facts ¶¶ 6−8. Harvard offered admission to 2,003 applicants for the Class of 2019. Harvard Facts ¶ 2.

The Office of Admissions and Financial Aid at Harvard ("Admissions Office") is tasked with making admissions decisions. SFFA Facts ¶ 6. This office employs approximately 40 admissions officers who, under the guidance of the Admissions Office's leadership, handle most of the day-to-day operations of the admissions program.[4] SFFA Facts ¶¶ 6, 13−14.

---

[3] SFFA does not challenge Harvard's undergraduate admissions program with respect to international applicants.

[4] For the purposes of this litigation, the leadership of the Admissions Office includes William Fitzsimmons as the Dean of Admissions and Financial Aid, Marlyn McGrath as the Director of

### B.        Applying to Harvard

Students apply to Harvard either through the Early Action program, which typically has a November 1 deadline, or through the Regular Decision program, which typically has a January 1 deadline, but the same procedures for reviewing applications generally apply regardless of whether a student has applied for Early Action or Regular Decision. Harvard Facts ¶¶ 11−12. Students apply by submitting a Common Application, Universal College Application, or Coalition Application. Harvard Facts ¶ 13. They must complete a short supplement to indicate their interest and the strength of that interest in an academic field, a career, and extracurricular activities. Harvard Facts ¶ 14. Applicants may submit scholarly work, artwork, or recordings of music or dance performances. Harvard Facts ¶ 15. The Common Application, Universal College Application, and Coalition Application permit all students to identify their race (and students may choose more than one), but Harvard does not require them to do so. Harvard Facts ¶¶ 16−18, 20. Applicants may also include information about their race in other parts of the application, such as in their personal essay. Harvard Facts ¶ 17. After submitting an application, most students are interviewed in person by a Harvard alumnus who reports his or her feedback to the Admissions Office. Harvard Facts ¶ 21. In sum, a complete application file typically includes:

---

Admissions, and Sally Donahue as the Director of Financial Aid, although Ms. Donahue retired in July 2018 and Jake Kaufman now serves as Director of Financial Aid. SFFA Facts ¶¶ 13−15; Harvard Response ¶ 15. Other members of Harvard's leadership include Drew G. Faust, the former President of Harvard from 2007 to June 30, 2018, and Lawrence Bacow, the current President of Harvard, who were or are responsible for overseeing all of Harvard's degree-granting schools; Michael D. Smith, the Dean of the Faculty of Arts and Sciences, who is responsible for overseeing the administrative, financial, and human resources aspects of Harvard's Faculty of Arts and Sciences and the Admissions Office, among other schools and departments; and Rakesh Khurana, the Dean of Harvard College, who reports to Dean Smith and is responsible for the undergraduate education and residential experience of Harvard students. SFFA Facts ¶¶ 10−15; Harvard Response ¶¶ 10−11.

1.  The applicant's name, age, sex, address, citizenship, place of birth, and race (if disclosed);
2.  Information about the applicant's family;
3.  The applicant's standardized test scores;
4.  The applicant's high school transcripts and reported grade point average;
5.  Information provided by the applicant's high school about the school itself, such as the number of students that attend college, the available courses, the percentage of students that receive free or reduced-price lunch, and the economic and demographic profile of the community;
6.  One or more essays written by the applicant;
7.  A letter from the applicant's high school guidance counselor;
8.  At least two letters of recommendation from high school teachers, and often additional recommendation letters from teachers, supervisors, or others;
9.  In many cases, a detailed, multi-page evaluation from a Harvard alumni interviewer; and
10. The applicant's answers to questions about his or her intended academic concentration, extracurricular and athletic participation, and post-college career.

Harvard Facts ¶ 22.

### C.    Application Review

Harvard organizes its review of application files into approximately twenty (eighteen domestic and two international) geographical regions referred to as "dockets," which vary widely in geographic scope but cover a roughly similar number of applications. Harvard Facts ¶¶ 36−37; SFFA Facts ¶¶ 65−66. A subcommittee of admissions officers—usually three to six "first readers" that are assigned to specific areas within the docket and a senior admissions officer serving as the "docket chair"—is responsible for the initial evaluation of all candidates within a particular docket. Harvard Facts ¶¶ 38−40.

The written guidelines as to how admissions officers should review application files are contained in the Admissions Office's "Reading Procedures," which are distributed to the admissions officers each year. SFFA Facts ¶ 68. The Reading Procedures set forth, among other things, criteria for assigning numerical ratings to each application. SFFA Facts ¶ 69. Harvard also conducts an in-person orientation and training program for all newly hired admissions

officers. SFFA Facts ¶ 70. After participating in orientation, new admissions officers are typically required to share the first 50 to 100 application files that they read with a more senior admissions officer who provides feedback on the ratings assigned by the new admissions officer. Harvard Facts ¶ 30; SFFA Facts ¶ 71. The work of new admissions officers is closely monitored by more senior admissions officers during their first few years of employment. SFFA Facts ¶ 71.

1.      First Reader and Docket Chair

To begin the application evaluation process, a first reader reviews the application files from the high schools in his or her area within the docket. Harvard Facts ¶ 41. First readers conduct the review using a "summary sheet," which is a two to three-page document that is prepopulated with information from a particular student's application, including that student's high school, citizenship, test scores, GPA, class rank, and race. SFFA Facts ¶ 74. The summary sheet also contains three blank sections that may be completed by the first reader: "Ratings," "Notes," and "Reader Comments." SFFA Facts ¶ 74. The Ratings section contains fourteen boxes representing the following categories in which an applicant may receive numerical scores: overall, academic, extracurricular, athletic, personal, teacher recommendation (up to four possible), a school support recommendation, two staff interview ratings (overall and personal), and two alumni interview ratings (overall and personal).[5] SFFA Facts ¶ 75. The Notes section may be used to briefly summarize the application or other pertinent information, and the Comments section may be used to provide a more extensive discussion of the application. SFFA Facts ¶¶ 76−77.

---

[5] Alumni and admissions officers assign ratings following an interview with an applicant based on criteria similar to the criteria used by first readers to assign their ratings. SFFA Facts ¶¶ 92−95.

After reviewing an application file, the first reader assigns academic, extracurricular, athletic, personal, and overall ratings to the applicant, and rates the strength of the teacher and guidance counselor letters of recommendation. Harvard Facts ¶¶ 43−45. The numerical ratings generally range between 1 and 4 in all categories, with 1 being the best rating. Harvard Facts ¶¶ 46−47. Admissions officers may add a plus or a minus to a numerical rating of 2 or 3; a 2+ is better than a 2 which is better than a 2-. Harvard Facts ¶ 48; SFFA Response ¶ 48.

The academic rating summarizes the applicant's academic achievement and potential based on grades, test scores, letters of recommendation, academic prizes, and any submitted academic work. Harvard Facts ¶ 49. The extracurricular rating captures the strength of the applicant's involvement in activities during high school and his or her potential to contribute at Harvard outside of the classroom. Harvard Facts ¶ 53. The athletic rating takes into account the strength of the applicant's potential contributions to athletics at Harvard, as well as the applicant's athletic activity in high school. Harvard Facts ¶ 57. According to Harvard, the personal rating "summarizes the applicant's personal qualities based on all aspects of the application, including essays, letters of recommendation, the alumni interview report, personal and family hardship, and any other relevant information in the application," and admissions officers assign the personal rating based on their assessment of the applicant's "humor, sensitivity, grit, leadership, integrity, helpfulness, courage, kindness and many other qualities."[6] Harvard Facts ¶¶ 59−60. The ratings for recommendations, referred to as "school support," are meant to evaluate the strength of counselor and teacher recommendations. Harvard Facts ¶ 62; SFFA Response ¶ 62. Finally, the overall rating is intended to summarize the strength of the

---

[6] SFFA admits that first readers determine the personal rating by examining a variety of subjective factors, but also contends that other unlisted factors, such as an applicant's race, affect the personal rating. SFFA Response ¶ 60.

application as a whole, although it is not determined by a formula and does not involve adding up the other ratings. Harvard Facts ¶¶ 64−65. Harvard instructs first readers to assign the overall rating by "stepping back and taking all the factors into account." SFFA Facts ¶ 99. Admissions officers may consider race in assigning the overall rating, but are not supposed to consider race when assigning the academic, extracurricular, athletic, and personal ratings. Harvard Facts ¶ 119; SFFA Facts ¶ 214; Harvard Response ¶ 214.

After the first reader completes his or her evaluation, the application file may be sent to the docket chair for further review. Harvard Facts ¶ 67. The docket chair may assign ratings in the same categories as the first reader and add written comments. Harvard Facts ¶¶ 68−69. The first reader and the docket chair's scores, as well as any comments from other readers, are reflected in the application file. Harvard Facts ¶ 70.

    2.    Subcommittee and Full Committee Meetings

After each application has been reviewed by a first reader, the subcommittees meet to further evaluate the applications in their dockets. SFFA Facts ¶ 113. The first reader of an application pending before the subcommittee summarizes the strengths and weaknesses of that applicant's candidacy. Harvard Facts ¶ 72. Subcommittee members then discuss the applicant and decide as a group what recommendation and level of support to convey to the full admissions committee regarding admission. Harvard Facts ¶¶ 73, 75. Dean Fitzsimmons also allegedly visits the subcommittee meetings to support applicants on the "Dean's Interest List," which is a list of applicants that may be of interest to Harvard. SFFA Facts ¶¶ 294−295; SFFA Response ¶ 73.

After all of the subcommittees have decided which applications to recommend for admission, the full admissions committee (approximately 40 people) meets to make the final

decisions on those applications.[8] Harvard Facts ¶ 76; SFFA Facts ¶ 125. The full committee

includes, among others, all the admissions officers who read application files, as well as Dean

Fitzsimmons, Director McGrath, and the Director of Financial Aid. Harvard Facts ¶¶ 77−78.[9] At

a full committee meeting, the first reader of the application being discussed makes a presentation

to the committee, typically emphasizing the applicant's strengths. Harvard Facts ¶ 79. After the

discussion is complete, the full committee decides whether to admit, reject, or waitlist the

candidate. Harvard Facts ¶ 80. In both the subcommittee and full committee meetings, each

admissions officer has one vote, and a majority vote controls whether a student is admitted, wait-

listed, or rejected. Harvard Facts ¶ 81; SFFA Facts ¶ 128. The subcommittee and full committee

members can potentially consider race as a factor in deciding which candidates to recommend or

vote to admit, deny, or waitlist. SFFA Facts ¶¶ 236, 250; Harvard Response ¶¶ 251, 264; [ECF

No. 419-1 at 52−53].

　　　Near the end of the full committee meetings, Dean Fitzsimmons and Director McGrath

confirm the final target number of admitted students and determine whether any applicants must

be "lopped" or removed from the class of students on the "admit" list to reach that target. SFFA

Facts ¶ 134; Harvard Response ¶ 134.

---

[8] The parties dispute whether every application is discussed at the full committee meetings or
only those that the subcommittees recommend for admission or that are otherwise competitive.
See SFFA Facts ¶¶ 125−26; Harvard Response ¶¶ 125−26.

[9] Prior to beginning the full committee process, Dean Fitzsimmons and Director McGrath receive
a document referred to as a "one-pager" that contains statistics and information about the to-be
admitted class and the prior year's admitted class, including information about gender,
geographic region, expected concentration, financial aid, citizenship, race, and other
characteristics. SFFA Facts ¶¶ 130, 239; Harvard Response ¶¶ 130, 239. The parties dispute the
extent to which one-pagers are used in the admissions process.

### 3.   Post-Admission Review

After the admissions decisions are made, Harvard undertakes certain recruiting efforts to encourage admitted students to attend Harvard, including through the Visitas Program which allows admitted students to visit the campus and learn about Harvard. SFFA Facts ¶¶ 138−139; Harvard Facts ¶ 142. Admitted students have until May 1 to accept their offers of admission. SFFA Facts ¶ 140. If there are spaces available in the incoming class after May 1, the full admissions committee meets to fill the remaining spots with applicants from the waitlist. SFFA Facts ¶ 141. Harvard also offers some applicants deferred admission for the following class year. SFFA Facts ¶¶ 145−146; Harvard Response ¶¶ 145−146.

### D.   Harvard's Stated Mission and Pursuit of Diversity

Harvard states that its mission "is to educate the citizens and citizen-leaders for our society . . . through . . . the transformative power of a liberal arts and sciences education," and believes that "[t]hrough a diverse living environment, where students live with people who are studying different topics, who come from different walks of life and have evolving identities, intellectual transformation is deepened and conditions for social transformation are created." Harvard Facts ¶¶ 82−83. "From this [Harvard] hope[s] that students will begin to fashion their lives by gaining a sense of what they want to do with their gifts and talents, assessing their values and interests, and learning how they can best serve the world." Harvard Facts ¶ 83. According to Harvard, to achieve its educational mission, it "seeks to admit a class with diverse socioeconomic, geographic, and racial backgrounds; a broad range of academic, intellectual, and extracurricular interests and talents; and a variety of different life experiences that include overcoming hardship, engaging in public service, and much more." Harvard Facts ¶¶ 84−85. In

1996, Harvard's then-President, Neil Rudenstine, drafted a report in which he explained the importance of diversity to Harvard's mission:

> Our commitment to excellence also means that we will seek out—in all corners of the nation, and indeed the world—a diversity of talented and promising students. Such diversity is not an end in itself, or a pleasant but dispensable accessory. It is the substance from which much human learning, understanding, and wisdom derive. It offers one of the most powerful ways of creating the intellectual energy and robustness that lead to greater knowledge, as well as the tolerance and mutual respect that are so essential to the maintenance of our civic society.

Harvard Facts ¶ 86; [ECF No. 419-41 at 56]. In 2015, Harvard established a Committee to Study the Importance of Student Body Diversity, chaired by Dean Khurana, which was tasked with examining how "diversity in the student body helps catalyze the intellectual, social, and personal transformations that are central to Harvard's liberal arts and science education." Harvard Facts ¶¶ 87−88.[10] The committee endorsed former President Rudenstine's report and "emphatically embrace[d] and reaffirm[ed] [Harvard's] long-held view that student body diversity—including racial diversity—is essential to [Harvard's] pedagogical objectives and institutional mission." Harvard Facts ¶ 89; [ECF No. 419-45 at 3]. The committee's report described the ways in which student body diversity positively impacts the curriculum, residential and classroom experiences, extra-curricular activities, athletics, and other learning experiences at Harvard. [ECF No. 419-45 at 8−18]. The committee ultimately concluded that student body diversity "enhances the education of all of our students, it prepares them to assume leadership roles in the increasingly pluralistic society into which they will graduate, and it is fundamental to the effective education

---

[10] Harvard also had previously, in June 2014, convened a university-wide committee chaired by James Ryan, Dean of the Graduate School of Education, which was charged with examining the importance of student-body diversity at Harvard and with evaluating whether Harvard could achieve the educational benefits of a diverse student body without considering race (the "Ryan Committee"). Harvard Facts ¶ 145. The Ryan Committee ceased meeting in late 2014. Harvard Facts ¶ 146; SFFA Response ¶ 146.

of the men and women of Harvard College." Harvard Facts ¶ 90. The full Harvard Faculty of Arts and Sciences unanimously adopted the committee's report. Harvard Facts ¶ 91.

In 2017, Harvard established a separate committee to Study Race Neutral Alternatives in Harvard College Admissions, which was chaired by Dean Smith, with Dean Fitzsimmons and Dean Khurana serving as the other committee members (the "Smith Committee"). Harvard Facts ¶ 147. The Smith Committee was charged with evaluating whether race-neutral alternatives are available and workable for achieving the benefits that flow from student body diversity at Harvard. Harvard Facts ¶ 151. In April 2018, after meeting seven times over the course of nine months, Harvard Facts ¶ 154, the Smith Committee produced a report explaining that it considered social science and other literature, the Complaint and the expert reports produced in this litigation, as well as other information collected from several offices of Harvard, in reaching the following conclusions:

(1) If Harvard stopped considering race in the admissions process, the proportion of African American and Latin American students in the admitted class would dramatically decline, notwithstanding all the other efforts that Harvard makes to enroll a diverse class, while the proportion of white students would dramatically increase and the proportion of Asian American students would slightly increase. Harvard Facts ¶¶ 156−57.

(2) The "significant decline in racial diversity that would flow from eliminating the consideration of race in the admissions process would prevent Harvard from achieving its diversity-related educational objectives" because "students in a significantly less diverse class will have diminished opportunities to engage with and learn from classmates who come from widely different backgrounds and circumstances . . . [which] would leave students ill prepared to contribute to and lead in our diverse and interconnected nation and world." Harvard Facts ¶ 159.

(3) No combination of race-neutral practices,[11] including broader efforts to recruit a diverse class; increased financial aid; further emphasis on geographic diversity; admitting more transfer students; eliminating Early Action or deferred admission; affording greater weight to applicants' modest socioeconomic background; and ceasing to consider applicants' test scores, legacy status, parents' employment at Harvard, recruited athlete status, or inclusion on the Dean's or Director's interest list,[12] would practicably allow Harvard to achieve the educational benefits of a diverse student body without unacceptably sacrificing other important educational and institutional objectives. Harvard Facts ¶¶ 164−212.

### E.   Alleged Discrimination against Asian Americans

The following facts are largely in dispute, but warrant discussion to provide a more complete view of the case. In November 2012, Harvard came under pressure to respond to allegations of perpetuating an "anti-Asian admissions bias" following the publication of a magazine article written by a Harvard alumnus, which described anecdotal and statistical evidence of prejudice against Asian Americans in Harvard's admissions program. SFFA Facts ¶¶ 348−357. Harvard's Office of Institutional Research ("OIR") conducted an analysis of the

---

[11] Harvard currently employs certain race-neutral practices to achieve diversity: (1) mailing materials about Harvard and its financial aid program to certain applicants of modest economic backgrounds; (2) holding recruitment events throughout the United States, including in geographic areas that do not frequently send students to Harvard; (3) maintaining a First Generation program to encourage students who are from the first generation in their families to attend a four-year college to apply to Harvard; (4) implementing an Undergraduate Minority Recruitment Program to encourage a racially diverse applicant pool; (5) offering an entirely need-based financial aid program, and (6) hosting admitted students for the Visitas program which is designed to expose admitted students to life at Harvard. Harvard Facts ¶¶ 127−144. SFFA largely disputes the effectiveness of Harvard's implementation of these practices. SFFA Response ¶¶ 127−144.

[12] Dean Fitzsimmons keeps a list of applicants that may be of interest to Harvard. SFFA Facts ¶¶ 294−295. Although the parties refer to a "Director's Interest List" that also allegedly identifies candidates of particular interest to Harvard, it is unclear from the record who creates the Director's List or how that list compares to the Dean's Interest List. [ECF No. 415-1 at 6].

article's allegations of discrimination. SFFA Facts ¶¶ 362−364.

In February 2013, the OIR produced a report showing that the admission rate for Asian Americans was highest in a simulation where the criteria for admission was academics only, and that the admission rate for Asian Americans progressively declined as more variables were added to the simulation, such as extracurricular activities, personal rating, legacy status, recruited athlete status, gender, and race. SFFA Facts ¶¶ 399−421. The OIR found that when adding the consideration of race to the admissions criteria, "the share of Asian American students . . . fall[s] by more than 8 percentage points, representing a 32 percent decrease in their share of the overall class. This . . . represent[s] the largest drop of any racial group." SFFA Facts ¶ 416. Dean Fitzsimmons and Dean Khurana were apparently presented with the findings in this report but neither of them requested additional research from the OIR or discussed the February 2013 report with anyone else in the Admissions Office. SFFA Facts ¶¶ 427−431, 537−543.

In a second report completed in 2013, the OIR found that non-legacy, non-athlete ("NLNA") Asian American applicants performed significantly better than NLNA White applicants in SAT scores, the alumni overall rating, and the academic rating, as well as slightly better than NLNA White applicants in the extracurricular rating, and the same as NLNA White applicants in the alumni personal rating, the guidance counselor rating, and teacher ratings. SFFA Facts ¶ 438. The only category in which NLNA White applicants performed significantly better than NLNA Asian American applicants was the personal rating, and the OIR provided no explanation as to why NLNA White applicants received higher personal ratings than NLNA Asian American applicants. SFFA Facts ¶¶ 439−440. The OIR also found that NLNA White applicants were admitted at a higher rate than NLNA Asian American applicants with roughly the same academic scores, and found a negative association between being admitted to Harvard

14

and being Asian American, although no similar link was observed with any other racial group. SFFA Facts ¶¶ 442−446, 450−51. Dean Fitzsimmons received this second 2013 report, but again did not request any additional research from the OIR or discuss the report with anyone in the Admissions Office. SFFA Facts ¶¶ 466−471. Dean Fitzsimmons and Dean Khurana were similarly nonresponsive when the OIR presented them with a separate memorandum created in May 2013 that found that being Asian American was negatively associated with the likelihood of admission to Harvard. SFFA Facts ¶¶ 504−509, 513−517, 537−543.

In addition to the 2012 and 2013 OIR documents, SFFA contends that the admissions data produced in this litigation confirms Harvard's bias against Asian Americans. SFFA Facts ¶¶ 581−82. Consistent with this Court's orders, Harvard produced applicant-by-applicant admissions data for the Classes of 2014 through 2019, aggregate information on the Classes of 2000 through 2017, and 480 application files and 640 summary sheets from the Classes of 2018 and 2019. SFFA Facts ¶¶ 582−584. In analyzing this data, SFFA's statistical expert, Professor Arcidiacono, concluded that while Asian American applicants are, as a group, stronger than applicants of other racial backgrounds in the academic and extracurricular ratings, SFFA Facts ¶¶ 595−601, and receive personal ratings from alumni interviewers comparable to White applicants, SFFA Facts ¶ 610, they have the lowest share of applicants receiving better than 3+ on the personal ratings given by admissions officers. SFFA Facts ¶ 609. Further, Asian Americans at every level of academic achievement receive lower personal ratings than applicants of all other racial groups. SFFA Facts ¶ 613. Professor Arcidiacono similarly found bias against Asian American applicants in the overall ratings assigned by admissions officers, SFFA Facts ¶¶ 624−26, and that Asian Americans were ultimately admitted into Harvard at rates lower than any other racial group from the Class of 2000 through the Class of 2019, even though Asian

Americans had higher test scores than all other racial groups during this period of time. SFFA

Facts ¶¶ 630−632. In short, Professor Arcidiacono concludes, based on his analysis, that the

assignment of personal ratings and overall ratings is biased against Asian Americans and that all

things being equal, an Asian American applicant has a lower chance of admission than a White

applicant. SFFA Facts ¶¶ 656−669.

      As discussed further below, SFFA's assertions are allegedly supported by other statistics,

documents, and testimonial evidence of Harvard's discrimination or impermissible consideration

of race in admissions.

## II.    PROCEDURAL HISTORY

      On November 17, 2014, SFFA filed the operative complaint asserting six causes of action

based on Harvard's alleged violation of Title VI: "Intentional Discrimination against Asian

Americans" (Count I); "Racial Balancing" (Count II); "Failure to Use Race Merely as a 'Plus'

Factor in Admissions Decisions" (Count III); "Failure to Use Race to Merely Fill the Last 'Few

Places' in the Incoming Freshman Class" (Count IV); "Race-Neutral Alternatives" (Count V);

and "Any Use of Race as a Factor in Admissions" (Count VI). [ECF No. 1]. On March 11, 2016,

the Court stayed this action pending the Supreme Court's ruling in <u>Fisher v. University of Texas</u>

<u>at Austin</u>, 136 S. Ct. 2198 (2016). [ECF No. 146]. After the Supreme Court issued its ruling on

June 23, 2016, Harvard moved to dismiss this case for lack of standing [ECF No. 187] and

separately moved for judgment on the pleadings as to Counts IV and VI because those claims

were inconsistent with Supreme Court precedent [ECF No. 185]. On June 2, 2017, the Court

denied the motion to dismiss [ECF No. 324] but granted judgment on the pleadings for Counts

IV and VI [ECF No. 325]. The remaining claims (Counts I, II, III, and V) are the subject of the

pending cross-motions for summary judgment.

## III.    LEGAL STANDARD

Neither party has suggested that this Court should deviate from the ordinary standard of review for summary judgment. This is also not a case in which "the parties cross-moved for summary judgment, yet both agreed that there was no dispute over the basic facts of the case," United Paperworkers Int'l Union Local 14, AFL-CIO-CLC v. Int'l Paper Co., 64 F.3d 28, 31 (1st Cir. 1995), such that the Court may be "entitled to 'engage in a certain amount of factfinding, including the drawing of inferences.'" TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007) (quoting United Paperworkers, 64 F.3d at 31). Here, the parties filed summary judgment motions to resolve the case or to potentially narrow the scope of fact-finding at the upcoming bench trial. Accordingly, they "have intended to treat summary judgment as a separate phase," before "proceed[ing] to a bench trial." Jewelers Mut. Ins. Co. v. N. Barquet, Inc., 410 F.3d 2, 10 (1st Cir. 2005). As another district court has suitably described the interplay between the summary judgment and bench trial phases of a case:

> In ruling on motions for summary judgment, the Court's role is limited. "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "A judge does not sit as a trier of fact when deciding a motion for summary judgment even if the case is scheduled to be heard without a jury." Med. Inst. Of Minn. v. Nat'l Ass'n of Trade & Technical Schs., 817 F.2d 1310, 1315 (8th Cir. 1987). Furthermore, "even if the facts are undisputed, summary judgment may not be granted where there is disagreement over inferences that can be reasonably be drawn from those facts." In re Unisys Sav. Plan Litig., 74 F.3d 420, 433 (3rd Cir. 1996).
>
> In contrast, after a bench trial, the Court is required to weigh the evidence and make credibility determinations. In re French, 499 F.3d 345, 359 (4th Cir.2007). Rather than deciding whether a genuine issue of material fact exists, the Court makes findings of fact by evaluating the persuasiveness of conflicting evidence and "decid[ing] which is more likely true." Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999) (en banc).

F.T.C. v. Ross, No. 08-cv-3233-RDB, 2012 WL 2126533, at *4 (D. Md. June 11, 2012) (quoting

Waterkeeper Alliance, Inc. v. Alan & Kristin Hudson Farm, No. 10-cv-487-WMN, 2012 WL

13005672, at *1–2 (D. Md. Mar. 1, 2012)). Under the circumstances here, summary judgment is

appropriate "if there is no genuine issue as to any material fact and the undisputed facts show

that the moving party is entitled to judgment as a matter of law." Borges ex rel. S.M.B.W. v.

Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2)). "An issue is

'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either

party. A fact is 'material' if its existence or nonexistence has the potential to change the outcome

of the suit." Id. at 4–5 (citation omitted). The Court "must view 'the facts in the light most

favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'"

Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002) (quoting Barbour v.

Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995)). Given that both parties have moved

for summary judgment, the Court "consider[s] each motion separately, drawing inferences

against each movant in turn." United Paperworkers, 64 F.3d at 31 n.2 (quoting E.E.O.C. v.

Steamship Clerks Union, Local 1066, 48 F.3d 594, 603 n.8 (1st Cir. 1995)).

## IV.    DISCUSSION

### A.    Subject Matter Jurisdiction

On June 2, 2017, the Court denied Harvard's motion to dismiss for lack of subject matter

jurisdiction [ECF No. 324], concluding that SFFA had the associational standing necessary to

litigate this action. See Students for Fair Admissions, Inc. v. President & Fellows of Harvard

Coll. (Harvard Corp.), 261 F. Supp. 3d 99, 111 (D. Mass. 2017). SFFA filed this lawsuit on

behalf of its membership which included, among others, applicants and prospective applicants to

institutions of higher education, including at least one Asian American student who was denied

admission to Harvard but intended to apply to transfer there if Harvard stopped using its race-conscious admissions policy (the "Applicant"). Id. at 103. "Following the filing of the Complaint, SFFA's membership continued to grow and it added additional members, including several that it identifie[d] as 'Standing Members,'" some of whom were Asian American applicants that were rejected from Harvard.[13] Id. at 103 n.4. Based on their affidavits, the Court concluded that these Standing Members had individual standing to sue Harvard, which SFFA was required to demonstrate to establish associational standing. Id. at 109−10. Harvard now reasserts its Article III challenge on the grounds that the individual members on whom SFFA's standing rests are no longer eligible to transfer to Harvard or lack "any serious interest in doing so." [ECF No. 418 at 20]. See Gratz v. Bollinger, 539 U.S. 244, 262–63 (2003) (holding that rejected applicant "able and ready" to transfer "has standing to seek prospective relief with respect to the [u]niversity's continued use of race in undergraduate admissions").

As SFFA recognizes, Harvard's motion does not challenge whether SFFA had standing when it initiated this action but whether the case has become moot as SFFA's Standing Members have arguably become ineligible or disinterested in transferring to Harvard. Mootness is "the doctrine of standing set in a time frame: [t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997) (quoting United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)). "Mootness usually results when a plaintiff has standing at the beginning of a case, but, due to intervening events, loses one of the

---

[13] Other than the Applicant's father, the Applicant was the only Standing Member at the time that the Complaint was filed. Harvard Facts ¶ 258; SFFA Response ¶ 258. As the Court previously stated, "the Court does not address the issue of whether prospective college students, who have not yet applied, or the parents of applicants have standing to sue." Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.), 261 F. Supp. 3d 99, 110 n.12 (D. Mass. 2017).

elements of standing during litigation." WildEarth Guardians v. Pub. Serv. Co. of Colorado, 690

F.3d 1174, 1182 (10th Cir. 2012). "Intervening events must 'have completely and irrevocably

eradicated the effects' of the parties' conduct in order for a case to be deemed moot." Town of

Barnstable v. O'Connor, 786 F.3d 130, 142 (1st Cir. 2015) (quoting Cnty. of Los Angeles v.

Davis, 440 U.S. 625, 631 (1979)); see Ramirez v. Sanchez Ramos, 438 F.3d 92, 100 (1st Cir.

2006) ("[I]ntervening events [must] have blotted out the alleged injury and established that the

conduct complained of cannot reasonably be expected to recur."). "The Supreme Court has

placed the 'heavy burden of persuasion' with respect to mootness on the party advocating for it."

Town of Barnstable, 786 F.3d at 142 (quoting United States v. Concentrated Phosphate Exp.

Ass'n, 393 U.S. 199, 203 (1968)).

Harvard asserts, and SFFA does not dispute, that the Applicant is no longer eligible to

transfer to Harvard. Harvard nonetheless acknowledges that two Standing Members, who applied

and were rejected from Harvard, remain eligible for transfer admission. Harvard nonetheless

argues that, based on their deposition testimony, these members have no serious intention of

transferring to Harvard. When asked, "Do you intend to apply to transfer . . . to any other college

or university," Standing Member #1 said, "I don't anticipate that at the moment, no." [ECF 419-

15 at 4]. Standing Member #2 was asked a similar question and responded, "I mean . . . this is

highly speculative. You never know what the circumstances are" that would make him or her

willing to transfer. [ECF No. 419-19 at 5]. Standing Member #2 also stated in a deposition that

he or she would consider applying to transfer to Harvard "[i]f it was not a burden." Id.

These discrete statements, culled from the deposition transcripts, do not satisfy Harvard's

heavy burden. Standing Member #1 also testified that he or she remains "able and ready to

transfer to Harvard were it to cease the use of race or ethnicity as an admissions preference and

20

to cease its intentional discrimination against Asian Americans." [ECF No. 454-14 at 5–6]. That member explained, "if Harvard were to stop using its use of race and ethnicity in admissions, I would think my chances of being admitted had risen enough, because of that change, that I would apply again for transfer to see if I could get in under the new system." Id. at 6. The testimony that Standing Member #1 did not anticipate transferring from his or her current enrollment "at the moment," while Harvard maintains its race-conscious admissions policy, presents no inconsistency with being able and ready to transfer if Harvard's admissions policy were to be materially revised.

Standing Member #2 similarly testified, "I'm able and ready to apply to transfer [to Harvard], were it to cease the use of race," and further explained that "were [Harvard] to cease the use of race or ethnicity, I think those chances [of admission] would be improved and it would be worth the effort to apply for a transfer at that point." [ECF No. 454-15 at 5–6]. The testimony that he or she would be willing to transfer to Harvard "[i]f it was not a burden" and might depend on circumstances that are "highly speculative" at this point, does not adequately show that this student does not seriously intend to transfer. After noting the speculative nature of the question about his or her willingness to transfer, Standing Member #2 responded "Yes" when asked "Do you think you would apply to transfer to Harvard?" [ECF No. 419-19 at 5].

Accordingly, Harvard has not established that the case has become moot based on the Standing Members' alleged disinterest in transferring. Harvard's other challenges—(1) that SFFA amended its bylaws after filing this lawsuit to enlarge the board of directors and allow its membership to fill just one seat; (2) that only a fraction of SFFA's members pay dues in comparison to the substantial number of unidentified donors that make contributions; and (3) that SFFA's founder controls the organization's daily operations—were considered at the motion to

dismiss stage and ultimately deemed insufficient to undermine SFFA's associational standing

under the circumstances.[14] Harvard has not presented any evidence that warrants reconsideration

of the Court's prior conclusion that this case is not a situation "in which the adequacy of an

organization's representativeness is so seriously in doubt" that the Court should consider

additional criteria to evaluate associational standing. Students for Fair Admissions, Inc., 261 F.

Supp. 3d at 110. Therefore, Harvard's motion for summary judgment for lack of subject matter

jurisdiction is denied.[15]

### B.     SFFA's Claims

SFFA's remaining claims challenge several aspects of Harvard's race-conscious

admissions program that allegedly violate Title VI and Supreme Court precedent on the

consideration of race in the higher education admissions process. Title VI states that "[n]o person

in the United States shall, on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "The statute allows a private

---

[14] Harvard also adds here that the Standing Members "have not attended any SFFA meetings and refused on counsel's instructions to testify about whether they have voted in any SFFA election." [ECF No. 418 at 18]. Even assuming that these assertions were accurate, they do not demonstrate that SFFA fails to adequately represent its membership or that SFFA members do not participate in the organization. As the Court stated in its prior order, the Standing Members' declarations showed "that SFFA leadership communicates with members about this litigation and that the Standing Members have given input concerning the case." Students for Fair Admissions, Inc., 261 F. Supp. 3d at 111. For example, Standing Member #1 testified that he or she participated in a telephone conference to which all SFFA members were invited in December 2016 and that SFFA has thoroughly answered Standing Member #1's questions about the case and afforded Standing Member #1 the opportunity to have input and provide direction concerning this litigation. [ECF No. 454-14 at 7−8].

[15] The Court need not address at this time the question of whether the seven new Standing Members identified by SFFA have standing. SFFA may renew its argument at trial, should Harvard raise a meritorious jurisdictional challenge to Standing Members #1 and #2. The Court might also consider under such circumstances whether an exception to mootness applies if the alleged wrongful conduct is reasonably expected to recur.

plaintiff to obtain both injunctive relief and damages when intentionally discriminated against by a federal-funds recipient on account of race, color, or national origin." Branson v. St. Elizabeth Sch. of Nursing, No. 15-cv-87-TLS, 2017 WL 2418396, at *3 (N.D. Ind. June 5, 2017) (citing Alexander v. Sandoval, 532 U.S. 275, 280 (2001)). Harvard does not dispute that it receives federal funds and is subject to Title VI.[16] Harvard Response ¶ 9. In the context of Harvard's undergraduate admissions program, "because racial characteristics so seldom provide a relevant basis for disparate treatment, . . . [r]ace may not be considered [by a university] unless the admissions process can withstand strict scrutiny." Fisher v. Univ. of Texas at Austin, 136 S. Ct. 2198, 2207–08 (2016) ("Fisher II") (quoting Fisher v. Univ. of Texas at Austin, 570 U.S. 297, 309 (2013) ("Fisher I")). "Strict scrutiny requires the university to demonstrate with clarity that its 'purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary . . . to the accomplishment of its purpose.'" Id. (quoting Fisher I, 570 U.S. at 309).

      1.    Count I: Intentional Discrimination

To state a claim for intentional discrimination under Title VI, the plaintiff "must demonstrate, *inter alia,* that the defendant discriminated on the basis of race, the discrimination

---

[16] Harvard notes that the Supreme Court has only addressed race-conscious admissions policies of public universities, and suggests that there are "good reasons to think that" the applicable Supreme Court precedent does not apply in the same manner to private universities like Harvard that are subject to Title VI. Because Harvard does not identify any specific reasons for distinguishing public universities from federally-funded private universities, or explain how the analytical framework would differ for private versus public litigants, the Court at this stage places Harvard on equal footing with a public university in applying Grutter and its progeny. See Grutter, 539 U.S. at 343 ("[T]he Equal Protection Clause does not prohibit the Law School's narrowly tailored use of race in admissions decisions to further a compelling interest in obtaining the educational benefits that flow from a diverse student body. Consequently, petitioner's statutory claims based on Title VI . . . also fail."); id. ("Title VI . . . proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment" (citing Regents of Univ. of California v. Bakke, 438 U.S. 265, 287 (1978))).

was intentional, and the discrimination was a substantial or motivating factor for the defendant's actions." Goodman v. Bowdoin Coll., 380 F.3d 33, 43 (1st Cir. 2004) (citing Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001)); see Scaggs v. New York Dep't of Educ., No. 06-cv-0799-JFB-VVP, 2007 WL 1456221, at *11 (E.D.N.Y. May 16, 2007) (same). In reviewing a uniformly applied facially neutral policy, "[d]etermining whether invidious discriminatory purpose was a motivating factor [in its adoption] demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Anderson ex rel. Dowd v. City of Boston, 375 F.3d 71, 83 (1st Cir. 2004) (quoting Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)). Here, SFFA and Harvard's cross-motions for summary judgment on Count I are essentially mirror images of one another. Each party relies on its own expert reports to show the presence or absence of a negative effect of being Asian American on the likelihood of admission, highlights the purported flaws of its opponent's statistical analysis, and claims that there is substantial—or zero—documentary and testimonial evidence of discriminatory intent.

Under the circumstances of this case, the parties' heavy reliance on statistical evidence and expert testimony precludes summary judgment on Count I. Each nonmoving party at this stage is "entitled 'to have the credibility of *[its]* evidence as forecast assumed, [its] version of all that is in [genuine] dispute accepted, [and] all internal conflicts in [the evidence] resolved favorably to [it] . . . .'" Blanchard v. Peerless Ins. Co., 958 F.2d 483, 489 (1st Cir. 1992) (quoting Rodriguez–Garcia v. Davila, 904 F.2d 90, 94 (1st Cir.1990)). It is likewise "not the Court's role on summary judgment to assess the relative credibility of expert testimony." Tamposi v. Denby, 136 F. Supp. 3d 77, 128 (D. Mass. 2015). "At summary judgment, . . . courts normally assume that the trier of fact would credit the expert testimony proffered by the nonmovant." Den Norske Bank AS v. First Nat'l Bank of Bos., 75 F.3d 49, 58 (1st Cir. 1996). "Even assuming, *arguendo,*

that this Court were to conclude that 'the factual underpinning of [either party's] expert's opinion [was] weak,'" the challenges by SFFA and Harvard affect "the weight and credibility of the testimony" to be evaluated at trial when the Court assumes its fact-finding role. Pac. Indem. Co. v. Dalla Pola, 65 F. Supp. 3d 296, 304 (D. Mass. 2014) (quoting Milward v. Acuity Specialty Prods. Group, Inc., 639 F.3d 11, 22 (1st Cir.2011)); see Casas Office Machines, Inc. v. Mita Copystar Am., Inc., 42 F.3d 668, 686 (1st Cir. 1994) ("[w]eighing the evidence" and "assessing the credibility of the experts" are tasks "that must be left to the trier of fact" after summary judgment); S. Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc., 183 F. Supp. 3d 197, 225 (D. Mass. 2016) (same).

Although competing expert reports alone do not necessarily preclude summary judgment, where, as here, SFFA and Harvard's statistical experts each present more than "merely conclusory allegations," City of Chanute, Kan. v. Williams Nat. Gas Co., 743 F. Supp. 1437, 1445 (D. Kan. 1990), aff'd, 955 F.2d 641 (10th Cir. 1992), and the "indisputable record facts" at this stage do not sufficiently "contradict or otherwise render [either side's expert] opinion[s] unreasonable," summary judgment is not appropriate. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993). On behalf of SFFA, Professor Arcidiacono concluded that the Admissions Office gives lower personal and overall ratings to Asian Americans than to any other racial group, despite finding that Asian American applicants are comparatively strong in the academic and extracurricular ratings, and that teachers, guidance counselors, and alumni interviewers score Asian American applicants roughly the same as White applicants on the personal and overall ratings. SFFA Facts ¶¶ 595−616, 624−628. He further found that Asian American applicants were admitted to Harvard at lower rates than other racial groups, and that among applicants with the same overall rating, Asian Americans were the least likely to be

admitted. SFFA Facts ¶¶ 629−647. Dr. Card, on behalf of Harvard, reviewed the same data but found no negative effect of being Asian American on the likelihood of admission to Harvard, and even noted that in certain years and geographic areas, being Asian American had a positive effect on the likelihood of admission. Harvard Facts ¶¶ 216−220. To the extent that Asian Americans are admitted at lower rates or receive lower ratings than White applicants, SFFA attributes the disparity to discrimination while Harvard points to, among other things, Dr. Card's determination that the applications of Asian Americans were "slightly less strong than those submitted by White applicants across a range of *observable* non-academic measures" and other "statistically unobserved factors." [ECF No. 435 at 10, 17].

These contradictory conclusions are at least in part the result of the experts' divergent modeling choices, including as to (1) whether to pool data across admissions cycles (Harvard Facts and SFFA Response ¶¶ 233−34); (2) whether to exclude from the regression analysis the personal rating (Harvard Facts and SFFA Response ¶¶ 230−232), the applicant's intended career (Harvard Facts and SFFA Response ¶¶ 237−38), and the occupation of an applicant's parents (Harvard Facts and SFFA Response ¶¶ 235−36); and (3) whether to include in the data pool recruited athletes, legacy applicants, children of Harvard faculty and staff members, and applicants on the Dean or Director's Interest Lists (SFFA Facts and Harvard Response ¶¶ 750−58). The parties also disagree over the probative value of statistically comparing Asian American applicants to applicants of other races with the same or similar academic credentials, and whether the personal and overall ratings from the Admissions Office can be meaningfully compared against the corresponding scores assigned by alumni interviewers, teachers, and guidance counselors. The credibility of the expert witnesses in making these critical modeling and analytical choices is best evaluated at the upcoming bench trial. See also Friends of

<u>Merrymeeting Bay v. NextEra Energy Res., LLC</u>, No. 11-cv-38-GZS, 2013 WL 149641, at *1

(D. Me. Jan. 14, 2013) ("At this point, the Court believes that Defendants' arguments are best

addressed at trial with question-specific objections and 'the adversary process' of 'competing

expert testimony and active cross-examination.'" (quoting <u>Ruiz-Troche v. Pepsi Cola of P.R.</u>

<u>Bottling Co.</u>, 161 F.3d 77, 85 (1st Cir. 1998))).

     For substantially the same reasons, the OIR reports do not justify granting summary

judgment in favor of SFFA. SFFA contends that in 2013, Harvard's in-house research division

evaluated the treatment of Asian Americans in Harvard's admissions program and reached

conclusions that were consistent with Professor Arcidiacono's analysis. SFFA Facts ¶¶ 389–390,

399–465, 492−572. Moreover, SFFA argues that Dean Fitzsimmons and Dean Khurana received

the OIR's reports but took no steps to further investigate the evidence of an admissions bias

against Asian Americans. SFFA Facts ¶¶ 426−431, 468−471, 525−528. Determining the

appropriate weight to attribute to the OIR's findings requires the consideration of opposing

expert testimony. <u>See</u> [ECF No. 435 at 23] (asserting that Dr. Card's "far more comprehensive,

informed, and reliable work" contradicts and subverts the conclusions reached by the OIR).

Moreover, while SFFA claims that Harvard's inaction in response to the OIR reports suggests an

intent to "bury" the reports and "kill" an internal investigation, Harvard presents evidence that no

further investigation took place because Harvard recognized that the OIR reports were

preliminary and incomplete and were therefore insufficient to warrant additional inquiry.

Determining whether Harvard's explanation for its response to the OIR reports is credible, or as

SFFA submits, an implausible post-hoc justification in light of this lawsuit, requires the Court to

assess the credibility of Harvard's witnesses and to consider expert testimony regarding the OIR

reports. Drawing all inferences in favor of each non-moving party, there are disputed material

facts based on Harvard's fact witnesses, the statistical evidence, and the expert opinions presented by each side that cannot be resolved before trial.[17]

SFFA's remaining non-statistical, non-expert evidence of intentional discrimination, standing alone, is insufficient to warrant summary judgment. This evidence, which includes some discrete comments in the summary sheets (SFFA Facts ¶¶ 678−686), the fact that admissions officers more often positively characterized the racial identity of African American and Latin American applicants than that of Asian American applicants (SFFA Facts ¶¶ 691−692), and Harvard's response to the complaints or comments of one OIR employee (SFFA Facts ¶ 333), a few alumni interviewers (SFFA Facts ¶¶ 325, 331), a high-school student (SFFA Facts ¶¶ 335−336), and one Harvard alumnus who made racist statements in a letter to former President Faust (SFFA Facts ¶¶ 341−42), does not constitute sufficient evidence of discriminatory intent for summary judgment. To credit SFFA's view that Harvard's inaction in response to complaints from its employees or alumni, many of which did not directly relate to any admission decision, would require drawing premature inferences in SFFA's favor. Cf. Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) ("In the first place, 'stray workplace remarks,' as well as statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus."); Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) (probative value of "stray remarks" is circumscribed "if they were made in a situation temporally remote from the date of the employment decision"); Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 583 (1st Cir. 1999) ("statement that plausibly can be

---

[17] Professor Arcidiacono's analysis of the frequency of the use of "Standard Strong" to characterize Asian American applicants also requires consideration of the competing expert testimony at trial. SFFA Facts ¶¶ 678−686.

interpreted two different ways . . . one discriminatory and the other benign" is not direct evidence of discriminatory animus), abrogated on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003). Harvard presents evidence that its admissions officers' comments on the summary sheets about Asian American applicants were on par with comments made about applicants of other races, and that the summary sheets often contained remarks that referred positively to an applicant's identity as Asian American. Moreover, as Harvard notes, the Admissions Office procedures and training documents, and the deposition testimony of its current and former employees, do not appear to suggest any intent to discriminate against Asian Americans.

In sum, whether SFFA may prove its intentional discrimination claim requires a close review of the conflicting expert testimony, the available documents, and the testimony of the Admissions Office employees in the context of a trial. See Equal Employment Opportunity Comm'n v. Texas Roadhouse, Inc., 215 F. Supp. 3d 140, 172 (D. Mass. 2016) (whether fact finder finds one party's expert more persuasive than an opposing expert "is a question for trial and not for summary judgment"); Peng-Fei Chang v. Univ. of Rhode Island, 554 F. Supp. 1203, 1206 (D.R.I. 1983) ("The Court would be remiss in granting defendants' motion for summary judgment based solely on [their expert's] statistical indices (even in the absence of [the opposing expert's] critique thereof) without subjecting those findings to the in-depth scrutiny given other types of evidence at a trial on the merits."). Therefore, the cross-motions for summary judgment are denied on Count I.[18]

---

[18] SFFA presents evidence of Harvard's discrimination against Jewish students in the early 1920s, almost a century before this case was filed. At best, the historical background of the admissions policy at issue "is one evidentiary source" of intent, and this Court has already ruled in the context of the parties' discovery disputes that such evidence has limited relevance, if any, to the claims at issue. Vill. of Arlington Heights, 429 U.S. at 267. SFFA recognizes that such evidence from the 1920s "is more distant than in many cases in which history is used as an

2.      Count II: Racial Balancing

SFFA next contends that Harvard impermissibly caps the number of Asian Americans in an admitted class. To maintain a permissible race-conscious admissions policy, Harvard may not "impose a fixed quota," Fisher II, 136 S. Ct. at 2208, or otherwise "'assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin,'" as such a practice "would amount to outright racial balancing, which is patently unconstitutional." Grutter, 539 U.S. at 329 (quoting Bakke, 438 U.S. at 307). "Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" Fisher I, 570 U.S. at 311 (quoting Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 732 (2007)).

SFFA and Harvard again present plausible but conflicting interpretations of the admissions data and testimonial evidence concerning whether Harvard uses a quota system. According to SFFA, Harvard tracks the representation of racial groups, and uses the statistics from the prior year's class as a benchmark against which the to-be admitted class is matched. During the full committee phase of the admissions process, "one-pagers" are distributed to Dean Fitzsimmons and Director McGrath to make them aware of the present representation of various racial groups as compared to the prior year. Harvard allegedly then reconsiders applications from particular racial groups, if necessary to align the current class demographics with those of the prior year. The admissions committee also allegedly takes into account whether a student is from

---

Arlington Heights factor." [ECF No. 413 at 31]. In accordance with its prior rulings, the Court is unlikely to admit evidence of Harvard's admissions policy from the 1920s, but will reserve a final evidentiary ruling for trial. [See ECF No. 547]. The Court would also consider taking judicial notice of past discrimination if the parties did not object, or would accept a joint stipulation to this effect.

a racial group that is currently underrepresented in the prospective class when trimming the number of offers of admission during the lopping process.[19]

Harvard disclaims SFFA's theory as a skewed portrayal of its admissions process. According to Harvard, what SFFA calls racial balancing is better understood as an ordinary weighing of offers of admission against available beds, with an eye toward diversity. Harvard explains that it reviews demographic information from prior classes to estimate the likely yield of acceptances from those it offers admission, which amounts at most to paying "some attention to numbers" as the Supreme Court found permissible in Grutter, 539 U.S. at 336. The one-pagers break down the number of applicants by race, but also by "gender, geography, intended concentration, whether the applicant is a recruited athlete, whether the applicant's parent attended Harvard, whether Harvard waived the applicant's application fee, whether the applicant was flagged as socioeconomically 'disadvantaged' by Harvard's admissions staff, whether the applicant applied for financial aid, citizenship, [and] permanent residency." [ECF No. 435 at 33]. Rather than using the one-pagers to precisely match the racial demographics year after year, Harvard contends that the one-pagers are used "to ascertain whether there are any significant trends worth noting and to make sure the Admissions Committee is not overlooking strong candidates." Id. The lopping process is similarly a curative measure applied when, based on the likely yield rate and the available spaces in the admitted class, Harvard has an overabundance of qualified applicants to whom it has tentatively decided to offer admission.

---

[19] SFFA accuses of Harvard of engaging in racial balancing through its alleged practice of purchasing potential applicant information based on PSAT scores and GPAs that differ by race and its participation in the conference of the Association of Black Admissions and Financial Aid Officers of the Ivy League and Sister Schools. Although the Court may allow SFFA to present evidence to support these assertions at trial to some extent, there appears to be little to no connection between the allegations of racial balancing and Harvard's purchasing of "potential applicant information" or its mere attendance and participation in the conference.

With respect to the admissions data, SFFA shows that for the classes of 2014, 2015, 2016, and 2017, the percentage of the admitted class has remained at least somewhat consistent for each racial group: Asian Americans comprised 18% of the share of the Class of 2014, 18% of the Class of 2015, 21% of the Class 2016, and 20% of the Class of 2017. SFFA Facts ¶ 699. A similar level of consistency was shown for other racial groups with White students comprising between 48% and 53% of the class, Native Americans between 2% and 3%, and Hispanic Americans and African Americans each between 10% and 12% over that same time period. SFFA Facts ¶ 699. Harvard does not dispute these percentages but asserts that they actually demonstrate significant fluctuations in the admissions of various racial groups.[20] In Harvard's view, the increase in the Asian American share of the class from 18% to 20% is a substantial "11% increase." [ECF No. 435 at 30].

The resolution of Count II depends in part on the credibility of Harvard's admissions officers and leadership as to whether its admissions procedures, including lopping, reviewing one-pagers, and setting target numbers, were intended to balance the racial demographics year after year, or to merely pay "some attention to numbers" in enrolling a diverse student body. The class share of each racial group has not been so plainly consistent or varied over time that the Court can conclude that the numbers alone establish or refute the presence of a quota. See, e.g., Grutter, 539 U.S. at 336 (noting that variation of 13.5% to 20.1% in the class shares for African American, Latin, and Native American students was "a range inconsistent with a quota"); Smith v. Univ. of Washington, 392 F.3d 367, 375 (9th Cir. 2004) (percentage of minorities varying

---

[20] SFFA also highlights Professor Arcidiacono's conclusion that Harvard "maintained a floor on the admission rate for single-race African Americans in the classes of 2017, 2018, and 2019," in which the admissions rate for single-race African Americans was "virtually identical" to the admission rate of all other domestic applicants. Harvard meanwhile notes that Dr. Card considered these findings to be unremarkable. The experts may address the significance of the alleged floor at trial.

each year from a high of 38.5% of admittees and 43.3% of enrollees to a low of 24.7% of admittees and 24.4% of enrollees was "inconsistent with the existence of a quota"). Given the material factual disputes and the need to make certain credibility determinations, the cross-motions for summary judgment on Count II are denied.

### 3.   Count III: Race as a "Plus" Factor

SFFA moves for summary judgment on Count III on the grounds that Harvard is (1) not using its race-conscious admissions policy for the specific purpose of achieving a "critical mass" of underrepresented minority students and (2) considering race as more than a mere "plus" factor when making admissions decisions. The Supreme Court has clarified that "'the decision to pursue 'the educational benefits that flow from student body diversity' . . . is, in substantial measure, an academic judgment to which some, but not complete, judicial deference [to the university] is proper.'" Fisher II, 136 S. Ct. at 2208 (quoting Fisher I, 570 U.S. at 310). Once a university gives "'a reasoned, principled explanation' for its decision" to pursue the educational benefits that flow from student body diversity, "deference must be given 'to the [u]niversity's conclusion, based on its experience and expertise, that a diverse student body would serve its educational goals.'" Id. (quoting Fisher I, 570 U.S. at 310-11). As discussed further below, the deference owed to the university's decision to pursue the educational benefits of a diverse student body does not carry over when the Court evaluates whether the use of race in pursuit of such benefits is narrowly tailored to pass strict scrutiny.

SFFA argues that Harvard's admissions program fails the test of strict scrutiny because Harvard does not expressly tailor its pursuit of the educational benefits that flow from a diverse student body to the idea of reaching a "critical mass," a term that was used in the University of Michigan Law School's admission policy at issue in Grutter and in the University of Texas at

Austin's policy at issue in <u>Fisher</u>. SFFA notes that "[t]he words 'critical mass' never even appear in Harvard's memorandum or statement of facts," [ECF No. 449 at 31], and that "Harvard leadership has never heard the term critical mass used in the context of admissions," [ECF No. 413 at 46]. Because Harvard fails to consider race specifically in pursuit of reaching a "critical mass," SFFA argues that its decision to pursue student body diversity is not well reasoned.

Contrary to SFFA's claim that the "Supreme Court has held that critical mass is the only interest compelling enough to permit the use of race," [ECF No. 413 at 46], the <u>Fisher II</u> court explained that the interest that justifies consideration of race in admissions "is not an interest in enrolling a certain number of minority students," but rather a broader interest in "obtaining 'the educational benefits that flow from student body diversity.'" <u>Fisher II</u>, 136 S. Ct. at 2210 (quoting <u>Fisher I</u>, 570 U.S. at 310). "[E]nrolling a diverse student body 'promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races.'" <u>Id.</u> (quoting <u>Grutter</u>, 539 U.S. at 330). "Equally important, 'student body diversity promotes learning outcomes, and better prepares students for an increasingly diverse workforce and society.'" <u>Id.</u> (quoting <u>Grutter</u>, 539 U.S. at 330). Although "[i]ncreasing minority enrollment may be instrumental to these educational benefits, . . . it is not . . . a goal that can or should be reduced to pure numbers." <u>Id.</u> at 2210. "Critical mass" was a term used in the specific policies at issue in <u>Grutter</u> and <u>Fisher</u>, but one that the Supreme Court left undefined. <u>See</u> <u>Grutter v. Bollinger</u>, 137 F. Supp. 2d 821, 828 (E.D. Mich. 2001), <u>rev'd</u>, 288 F.3d 732 (6th Cir. 2002), <u>aff'd</u>, 539 U.S. 306 (2003); <u>Grutter</u>, 539 U.S. at 316; <u>Fisher I</u>, 570 U.S. at 301; <u>Fisher II</u>, 136 S. Ct. at 2211; <u>see also</u> <u>Fisher II</u>, 136 S. Ct. at 2216 (Alito, J. dissenting) (noting that University of Texas at Austin "never explained what this term [critical mass] means" and that the term "remains undefined"). The Supreme Court has not imbued the phrase "critical mass" with

any special force or meaning that would make it essential to the survival of a university's race-conscious admissions policy under strict scrutiny, and this Court declines to do so here.[21]

SFFA also contends that because Harvard is not pursuing a "critical mass," its admissions policy will be used in perpetuity in violation of the Supreme Court's expectation that at some point in time "'use of racial preferences will no longer be necessary to further the interest' in diversity." Grutter, 539 U.S. at 343. The Supreme Court has not held that a "critical mass" or any specific enrollment number is what obviates the need for a university to consider race. Although Harvard "must continually reassess its need for race-conscious review" and "scrutinize the fairness of its admissions program; . . . assess whether changing demographics have undermined the need for a race-conscious policy; and . . . identify the effects, both positive and negative, of the affirmative-action measures it deems necessary," as part of its "ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies," there is no requirement that the consideration of race be eliminated within a specific time frame. Fisher II, 136 S. Ct. at 2212, 2214–15. Here, Harvard's Committee to Study Race-Neutral Alternatives in Harvard College Admissions recommended reevaluating the need to consider race in five years. Harvard's lack of express focus on achieving a "critical mass" does not mean that it will not

---

[21] SFFA also asserts that Harvard has taken "irreconcilable" positions in claiming that it (1) considers race on a case-by-case basis and targets "no specific number of students" of any racial or ethnic background, but (2) must use race in its admissions policy to avoid "a significant decline in African-American and Hispanic enrollment." [ECF No. 449 at 33]. It is possible, however, to seek to enroll a diverse student body without the use of specific target numbers and in compliance with Grutter and its progeny. As the Supreme Court explained in Fisher II, 136 S. Ct. at 2210, "since the [u]niversity is prohibited from seeking a particular number or quota of minority students, it cannot be faulted for failing to specify the particular level of minority enrollment at which it believes the educational benefits of diversity will be obtained." Fisher II, 136 S. Ct. at 2210. Whether Harvard's consideration of race complies with Grutter and its progeny remains a question for trial, but summary judgment in favor of SFFA is not warranted when, reading the facts in the light most favorable to Harvard, its admissions policy adequately balances the need to avoid using quotas with permissibly seeking to enroll a diverse student body.

continually assess the need for its race-conscious admissions policy. There is no basis at this stage to find that Harvard does not intend to follow its committee's recommendation or that Harvard's conception of the benefits of student body diversity is too amorphous to satisfy strict scrutiny. Accordingly, SFFA's motion for summary judgment is denied with respect to SFFA's arguments that Harvard fails to seek a "critical mass" or ignores its continuing obligation to evaluate its admissions policies to satisfy strict scrutiny.

While Harvard's decision to pursue the educational benefits of student body diversity is entitled to deference, no deference is owed when the Court evaluates "whether the use of race is narrowly tailored to achieve the university's permissible goals." Fisher II, 136 S. Ct. at 2208 (citing Fisher I, 570 U.S. at 311). To be narrowly tailored, "[a] university may consider race or ethnicity only as a 'plus' in a particular applicant's file," while "still ensuring that each candidate 'compete[s] with all other qualified applicants.'" Grutter, 539 U.S at 334–35 (citations omitted). "In other words, an admissions program must be 'flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight.'" Id. at 334 (quoting Bakke, 438 U.S. at 317). The university must "ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application. The importance of this individualized consideration in the context of a race-conscious admissions program is paramount." Grutter, 539 U.S. at 336–37.

Here, deciding the issue of whether Harvard considers race only as a plus factor in its admissions decisions is dependent upon resolving material questions of fact and credibility. Harvard moves for summary judgment based on the consistent testimony of its admissions

officers and training documents showing that Harvard considers race flexibly along with numerous other factors. Harvard further contends that its expert, Dr. Card, found that "to be admitted to Harvard, applicants must have multiple areas of strength," and race alone is not a determinative factor. Harvard Facts ¶¶ 121, 122. Dr. Card also concluded that an applicant's academic, athletic, extracurricular, and personal ratings collectively explain a much larger proportion of the variability in admissions outcomes than race. Harvard Facts ¶¶ 123, 124. According to SFFA, however, Dr. Arcidiacono's reports and the OIR's research show that race plays a predominant role in the likelihood of admissions for certain groups of students, that race plays such a decisive role in the admissions chances of Hispanics and African Americans, and that "removing all racial preferences and penalties—treating everyone as though they were white—would raise the number of Asian Americans by [40%]." SFFA Facts ¶¶ 417−18, 448, 737−740. Like the material disputes that preclude summary judgment on Count I, the issue of whether Harvard considers race as a plus factor or more turns on the competing expert testimony regarding Harvard's admissions data, the accuracy and reliability of the OIR's research, and the credibility of the testimony of Admissions Office employees regarding the weight attributed to an applicant's race. The cross-motions for summary judgment are therefore denied on Count III.

### 4.   Count V: Race-Neutral Alternatives

SFFA asserts in Count V that Harvard has failed to fulfill its obligation to consider race-neutral alternatives to a race-conscious admissions policy. Strict scrutiny requires that the Court "verify that it is 'necessary' for a university to use race to achieve the educational benefits of diversity." Fisher I, 570 U.S. at 312. "This involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications. Although '[n]arrow tailoring does not require exhaustion of every *conceivable* race-neutral alternative,'"

id. (quoting Grutter, 539 U.S., at 339–340), nor does it require choosing "between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups," Grutter, 539 U.S. at 339, "strict scrutiny does require a court to examine with care, and not defer to, a university's 'serious, good faith consideration of workable race-neutral alternatives.'" Fisher I, 570 U.S. at 312 (quoting Grutter, 539 U.S., at 339–340). "Consideration by the university is of course necessary, but it is not sufficient to satisfy strict scrutiny: The reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity." Id. If "'a nonracial approach . . . could promote the substantial interest about as well and at tolerable administrative expense,' . . . then the university may not consider race." Id. (citation omitted).

Harvard asserts that it satisfied strict scrutiny through the work of the Smith Committee, which reviewed published social science literature, the Complaint and the expert reports in this case, and "met throughout 2017 and early 2018 to examine the extensive efforts Harvard already undertakes to attract and admit a diverse student body, as well as numerous possible alternatives to considering race in admissions." [ECF No. 418 at 31]. The Smith Committee unanimously concluded that "at present, no available, workable race-neutral alternatives could promote Harvard's diversity-related educational objectives as well as Harvard's current whole-person race-conscious admissions program while also maintaining the standards of excellence that Harvard seeks in its student body." Harvard Facts ¶ 212. Dr. Card also found that even if Harvard maintained all of its existing race-neutral efforts to achieve diversity—financial aid, recruitment of first generation and economically and racially diverse applicants, and post-admission recruitment efforts—eliminating the consideration of race would cause "the proportion of African-American and Hispanic students in the admitted class [to] decline

dramatically." Harvard Facts ¶ 156. According to Dr. Card's simulated models, if Harvard did

not consider race, the proportion of African American students in the Class of 2019 would have

dropped from 14% to 6%, and the proportion of Latin American or "Other" students would have

dropped from 14% to 9%. Harvard Facts ¶ 156. At the same time, the proportion of White

students would have dramatically increased from 40% to 48% of the class, and the proportion of

Asian American students would have slightly increased from 24% to 27% of the class. Harvard

Facts ¶ 157. The Smith Committee and Dr. Card also found that implementing or eliminating the

following race-neutral measures or existing admissions practices—(1) increased preference for

modest socioeconomic background; (2) increased recruiting of socioeconomically disadvantaged

students; (3) increased financial aid; (4) implementing a place-based preference similar to the top

10% plan in Fisher; (5) increasing the number of transfer students; (6) eliminating the Early

Action program; (7) eliminating consideration of legacy; (8) eliminating deferred admission; and

(9) eliminating the consideration of test scores—would not sufficiently promote Harvard's

interest in the educational benefits of diversity.

SFFA's expert, Mr. Kahlenberg, reached the opposite conclusion, finding that Harvard

can easily achieve diversity by increasing socioeconomic preferences; increasing financial aid;

reducing or eliminating preferences for legacies, donors, and relatives of faculty and staff;

adopting policies using geographic diversity; increasing recruitment efforts; increasing

community college transfers; and/or eliminating early action. SFFA Facts ¶¶ 858−882.

In addition, SFFA has raised a material issue as to whether Harvard's efforts to consider

race-neutral alternatives have been undertaken in serious good faith, because Harvard apparently

did not examine such alternatives until 2014, after Harvard was aware of the imminence of this

lawsuit. See Fisher I, 570 U.S. at 312 ("[S]trict scrutiny imposes on the university the ultimate

burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice."). Indeed, while Harvard has implemented several race-neutral alternatives over time, there is little evidence in the record of Harvard formally evaluating race-neutral alternatives to its race-conscious policy following the issuance of <u>Grutter</u> until around the time this case was filed.[22] In light of Harvard's recent efforts to consider race-neutral alternatives, which arguably coincided with the filing of this lawsuit, Harvard's alleged past failure to comply with <u>Grutter</u> raises a material dispute as to whether Harvard's consideration of race-neutral alternatives was undertaken seriously and in good faith. Given this material factual dispute, and that the experts have reached plausible but conflicting conclusions based on simulated models of the effectiveness of numerous race-neutral practices, the cross-motions for summary judgment are denied on Count V.

## V.    CONCLUSION

Accordingly, the cross-motions for summary judgment [ECF Nos. 412, 417] are <u>denied</u> without prejudice. Consistent with this order, the parties may renew their arguments at trial.

**SO ORDERED.**

September 28, 2018                                              /s/ Allison D. Burroughs
                                                               ALLISON D. BURROUGHS
                                                               U.S. DISTRICT JUDGE

---

[22] This may be of little relevance given that SFFA is seeking prospective relief, but "not seeking to impose independent liability on Harvard for its non-compliance with <u>Grutter</u> between 2003 and 2017." [ECF No. 510 at 26−27].