**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br>        Plaintiff, <br><br>    v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE, <br><br>        Defendant. | Civil Action No. 1:14-cv-14176-ADB |

## SFFA'S OPPOSITION TO HARVARD'S MOTIONS IN LIMINE

I.   **HARVARD'S HISTORY OF DISCRIMINATION AGAINST JEWISH APPLICANTS IS RELEVANT TO ITS DISCRIMINATION AGAINST ASIAN-AMERICAN APPLICANTS USING THE SAME ADMISSIONS POLICIES[1]**

There is a stunning similarity between Harvard's admissions practices that were designed to discriminate against Jewish applicants in the 1920s and Harvard's current admissions practices that are being used to discriminate against Asian-American applicants today. In the 1920s, Harvard's President Lawrence Lowell feared that the increasing number of Jewish students would "ruin the college." (Ex. 1 at 1.) So President Lowell changed the admissions process to limit the number of Jewish students using a new criteria that evaluated an applicant's "personal qualities." *See* Jereome Karabel, The Chosen: The Hidden History of Admission and Exclusion at Harvard, Yale, and Princeton 130 (2005) ("We can reduce the number of Jews by talking about other qualifications than those of admission examinations. If the object is simply to diminish the Jews, this is merely an indirect method of avoiding a problem in American life which is really important."). Today Harvard scores applicants with a "personal rating" that achieves the same effect just on a different high-achieving minority group: Asian Americans. The parallels don't end there.

Harvard valued alumni input both then and now, even when alumni expressed borderline racist opinions. In response to receiving a letter in 1925 from an alumnus complaining about the "shock" of Harvard having "become so Hebrewized," President Lowell responded with polite agreement. (Ex. 2 at 1; Ex. 3 at 1 ("I am glad to see from your letter . . . that the alumni are beginning to appreciate that I was not wholly wrong three years ago in trying to limit the proportion of Jews.").) In response to a letter from an alumnus in 2012 bemoaning the    Redacted

---

[1] As the Court will see from this response, SFFA agrees with the Court that this historical background "'is one evidentiary source' of intent" and intends on using it to only a limited degree as described below. (D.I. 566 at 29 n.18.) SFFA is open to the Court taking judicial notice of these facts as it suggested in its Memorandum and Order on Cross-Motions for Summary Judgment. (*Id.*)

Redacted      at Harvard, Director of Admissions Marlyn McGrath responded in a markedly similar fashion and thanked the alumnus for his "thoughtful observations." (Ex. 4 at 1, 5.)

In both instances, surprising groups of alumni came forward to try to defend Harvard's discriminatory practices. President Lowell found Jewish Harvard alumni to support his discriminatory scheme—most famously journalist Walter Lippman. *See* Jerome Karabel, The Chosen, at 99 ("[W]hen Harvard's 'Jewish problem' erupted into public view, Lippmann's first inclination was to find a discreet way to reduce the number of Jews."). And today Harvard has found Asian-American alumni to support its admissions practices. (D.I. 471 (Amicus Br. of Harvard-Radcliff Asian Am. Ass'n, Harvard-Radcliff Asian Am. Women's Ass'n & Harvard-Radcliffe Chinese Students Ass'n et al. in Supp. of Def.' Mot. for Summ. J.).)

Finally, Harvard's attempt to minimize public protest with a media strategy that advertised race as but "one factor" in reviewing the "whole record" of an applicant remains the same today as it was under President Lowell's leadership. When President Lowell suggested implementing a quota on Jewish students, he realized that "the press was hot with denunciation of" him. (Ex. 3 at 1.) So President Lowell found another avenue to accomplish his goal while avoiding public outcry by implementing a system that supposedly made race just a part of "the whole record" of an applicant. (Ex. 16 at 2; *see also id.* at 3 ("If there should result in fact any substantial change in the proportion of groups in the college following the application of [this] test, this will be due not to race discrimination or any quota system, but to the failure of particular individuals to possess. as individuals, those evidences of character, personality, and promise . . . .").) Today in the face of criticism Harvard's public relations team has explained that Harvard's admissions officers "consider many factors, including race, to evaluate each applicant *as a whole person*." (Ex. 8 at 1 (emphasis added).) The history of admissions procedures at Harvard explains why these examples of similarities, and many others, exist between the past and present.

Harvard's admissions system today is a close relative to the system that was used to discriminate against Jewish applicants. That makes the earlier abuse of the system relevant and admissible. Moreover, Harvard's current witnesses' incredulous testimony about Harvard's past makes it relevant to an evaluation of Harvard's defenses in this case and those witnesses.

## A. The Admissions System Harvard Uses Today Evolved from President Lowell's Policies Against Jewish Applicants

The evolution of Harvard's current admissions process shows how it can be misused. Early in its history, Harvard admitted every applicant who passed a required examination. (Ex. 5 at 1.) But by the 1920s, Harvard leaders like President Lowell were alarmed by the growing number of Jewish students passing the examination and enrolling at Harvard. (Ex. 1 at 1 ("[T]he Hebrew question is a knotty one, and a source of much anxiety.").) President Lowell considered implementing a quota on Jewish students but concluded that it would cause too much "protest." (*Id.* at 2.) So instead of a quota, President Lowell proposed limiting the number of Jewish students in a "less obvious" way by starting to evaluate applicants' personal "qualities" and rating those with Jewish-like personal qualities lower:

> I suspect, however, that the Faculty, and probably the Governing Boards, would prefer to make a rule whose motive was less obvious on its face, by giving to the Committee on Admission authority to refuse admittance to persons who possess qualities described with more or less distinctness and believed to be characteristic of the Jews. This is what Professor Holcomb's motion was intended to do. Its object was to diminish the number of Jews in the college. He merely did not want it to be supposed that the Jews were excluded simply because they were Jews, but because they possessed the qualities common to Jews, although not absolutely universal.

(*Id.*) So in 1926, Harvard implemented the first iteration of what is now known as the personal rating. (*See* Ex. 6 at 1.) In applying this new criteria, Harvard made clear that it was taking race into account but insisted that it was reviewing the "whole record" of an applicant and not denying admission to some solely based on their race:

> Race is part of the record. It is by no means the whole record and no man will be kept out on grounds of race. But those racial characteristics which make for race isolation

will, if they are borne by the individual, be taken into consideration as a part of that individual's characteristics *under the test of character, personality, and promise.*

(Ex. 7 at 1 (emphasis added).)[2]

Contrary to its assurances at the time, Harvard now confesses that the admissions policies put in place in the 1920s were used to discriminate against Jewish applicants. (*See* Ex. 9 at 5 ("Under the presidency of Abbott Lawrence Lowell (1909-1933), the Harvard administration restricted the numbers of Jewish students . . . .").) Even Harvard College's current dean Rakesh Khurana admits that "one of the reasons" Harvard adopted its holistic admissions process was to "discriminate[] against people who identified as Jewish." (Ex. 10 at 124:14–127:2.)

The "holistic" admissions process Harvard uses today remains largely the same as the one instituted in the 1920s to achieve a discriminatory purpose. Harvard explains to its alumni interviewers that it "scrutinizes applications for extracurricular distinction and *personal qualities*" because Harvard "believes that the 'best' freshman class is more likely to result if [it] bring[s] evaluation of character and personality into decisions." (Ex. 11 at 10 (emphasis added).) And just as the assessment of personal qualities was used to discriminate against applicants with Jewish-like personalities in the 1920s, today both Harvard's internal analysis and SFFA's expert's analysis of the data produced in this lawsuit show that Asian-American applicants are mysteriously and consistently receiving lower personal scores than any other race or ethnicity. (Ex. 12 at 5; Ex. 13 at 37.)

Despite this history and these statistics, Harvard's witnesses incredibly deny even the possibility that its admissions procedures could result in discrimination. For example, Harvard's Dean of Admissions and Financial Aid William Fitzsimmons claims that it would be "impossible to abuse" Harvard's "admissions process":

---

[2] This press release issued by Harvard in the 1920s has an eerily similar ring to Harvard's public statements about this case. (*See, e.g.,* Ex. 8 at 1 ("Harvard's lawful admissions policies consider many factors, including race, to evaluate each applicant as a whole person . . . .").)

Q.   Do you think it's impossible for anybody to ever abuse a holistic admissions process?

. . .

A.   I think it would be impossible to abuse the admissions process that -- that we have.

(Ex. 14 at 410:18–22.) Although Harvard's current president Catherine Drew Gilpin Faust acknowledges that "it's important for Harvard to understand its history," President Faust disclaims all knowledge of Harvard using its holistic admissions process to discriminate against Jewish applicants. (Ex. 15 at 33:22–23; *see also id.* at 30:6–32:2.) The Court should evaluate the credibility of these witnesses and Harvard's motion seeks to immunize its witnesses from being confronted on these prior statements.

### B.   Harvard's History of Discriminating Against Jewish Applicants Is Relevant to Intent and to the Credibility of Harvard's Witnesses

The "federal rules of evidence set a very low bar for relevance, allowing admission if the evidence has *any* tendency to make a material fact more or less likely." *United States v. Acevedo-Hernández*, 898 F.3d 150, 168 (1st Cir. 2018). Evidence about Harvard's history of discriminating against Jewish applicants is relevant to the question of Harvard's intentional discrimination today and relevant to impeaching some of Harvard's witnesses. As the Supreme Court has explained, in discrimination cases "the historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). So recent voting-rights cases have explained that a history of racial discrimination must be taken into account in determining whether a discriminatory intent exists. *See N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 226–27 (4th Cir. 2017) ("The district court clearly erred in ignoring or dismissing this historical background evidence, all of which supports a finding of discriminatory intent."). In addition, "when a statement that would be the

subject of impeachment 'is logically relevant to the merits of the case as well as the witness's credibility,'" it is admissible. *United States v. Catalan-Roman*, 585 F.3d 453, 469 (1st Cir. 2009) (citing 1 McCormick on Evidence § 49 (6th ed. 2006)).

That the very system Harvard uses in admissions today was created to achieve a discriminatory purpose has a tendency to prove that the system could be used today to discriminate against Asian-American applicants. It shows that Harvard could use the same subjective criteria, "personal qualities," to discriminate against a high-achieving minority group. That evidence coupled with the data showing that Harvard's admissions officers do score Asian-American applicants lower on the personal rating helps prove Harvard's discriminatory intent. And when Harvard witnesses like Dean Fitzsimmons deny even the possibility that Harvard's admissions procedures could be abused, Harvard's history of discrimination becomes not just relevant but necessary for SFFA to be able to impeach those witnesses. Although SFFA does not plan on making this history the centerpiece of its case, SFFA should not be forced to confront testimony touting the infallible nature of Harvard's admissions system with its hands tied behind its back. For these reasons, testimony about Harvard's history of discriminating against Jewish applicants clears the low bar of relevance.

C. **The Probative Value of Harvard's History of Discriminating Against Jewish Applicants Is Not Substantially Outweighed by a Danger of Unfair Prejudice or Undue Delay**

This relevant historical evidence could only be excluded under Rule 403 if "its probative value is substantially outweighed by the danger of . . . unfair prejudice." Fed. R. Evid. 403. "[T]his rule protects defendants only against evidence that would produce *unfair* prejudice, as by design, all evidence is meant to be prejudicial." *United States v. Breton*, 740 F.3d 1, 14 (1st Cir. 2014) (internal citations omitted). But in this case there is less of a need for concern about unfair prejudice. In a bench trial, "excluding relevant evidence on the basis of 'unfair prejudice' is a useless procedure.

Rule 403 assumes a trial judge is able to discern and weigh the improper inferences . . . , and then balance those improprieties against probative value and necessity." *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981); *see also United States v. Raymond*, 697 F.3d 32, 39 n.6 (1st Cir. 2012) ("It is at least arguable that, in a bench trial, a district court has wider latitude in the admission of Rule 404(b) evidence."); *Bic Corp. v. Far E. Source Corp.*, 23 F. App'x 36, 39 (2d Cir. 2001); *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 497 (D. Del. 2005). Even one of the cases cited by Harvard in its motion shows that a Rule 403 challenge has "no merit" in a bench trial. *See Abbott Labs. v. TorPharm, Inc.*, No. 97 C 7515, 2003 WL 22462614, at *25 n.15 (N.D. Ill. Oct. 29, 2003) ("Given the Court's recommendation that a bench trial be held, the Court finds no merit in TorPharm's Rule 403 challenge to the *Alra* decision.").

The probative value of this evidence is high given that it explains how Harvard came to use the admissions procedures this case focuses on. And the danger of unfair prejudice is low. Even if this evidence was being presented to a jury, it would not carry substantial unfair prejudice. This is a chapter of history that Harvard as an institution acknowledges (even if some individuals refuse to). Like all evidence, this chapter of history might reflect better or worse on one party in this case than the other. But that does not make it prejudicial. More importantly, it is not being presented to a jury. SFFA is confident that the Court can separate any prejudice of this evidence and instead focus on its probative value to the question of whether Harvard could use the admissions process it set up to discriminate against Jewish applicants in the past to discriminate against a similarly situated minority group today.

To the extent that Harvard argues that this evidence should be excluded under Rule 403 because of the risk of "undue delay," the Court can deal with that concern at trial. Harvard is proposing in the parties' pre-trial memorandum that the Court spend hours listening to deposition

designations being read into the record. So Harvard's worries about "undue delay" should not be taken seriously. Moreover, SFFA represents that it will spend very limited time on this subject.

### D. Harvard's Hearsay Objection to this Entire Group of Testimony and Exhibits Provides No Basis for Granting this Motion *in Limine*

Finally, Harvard's passing reference to this evidence being hearsay oversimplifies the issues. (D.I. 547 at 6.) A number of different types of evidence document Harvard's history on this issue, from testimony of current Harvard officials to letters written by President Lowell to ancient documents, periodicals, and treatises. Each type of evidence is admissible for different reasons. For example, testimony of current Harvard officials about their understanding of Harvard's history might not be hearsay at all. Letters written by President Lowell would not be hearsay as they are admissions by a party opponent. Fed. R. Civ. P. 801(d)(2)(D). And ancient documents, periodicals, and treatises could qualify as exceptions to hearsay. *Id.* R. 803(16), (18). But the Court does not need to deal with these issues now. Instead, it can deal with any hearsay objections on an individual basis in the context of the specific testimony or exhibit being offered at trial. That is not a reason to exclude all the relevant evidence about Harvard's historical discrimination against Jewish applicants on this motion.

## II. HARVARD'S ASSERTION OF THE ATTORNEY-CLIENT PRIVILEGE IS RELEVANT AND ADMISSIBLE FOR SOME LIMITED PURPOSES

SFFA will not argue for an adverse inference at trial based on Harvard's assertion of the attorney-client privilege as Harvard fears, but there are instances in which the fact that Harvard sought legal advice can be used as evidence. Harvard cherry-picks a handful of statements from the hundreds of pages of summary judgment briefs to create the impression that SFFA plans on arguing that the Court should interpret Harvard's assertion of the attorney-client privilege as an attempt to hide its discriminatory intent. But Harvard stretches those statements too far. For example, one of Harvard's selective quotes where SFFA supposedly "gratuitously laments" Harvard's privilege

assertion was actually SFFA making clear that Harvard should not be able to use privilege as both a sword and a shield:

> Another meeting—entitled "Fisher v. University of Texas Discussion #2"—was held in October 2013. It is unclear who attended, but the invitation list included Fitzsimmons, McGrath, and Harvard's general counsel. It is unknown what happened at this meeting because Harvard has asserted the attorney-client privilege, and *therefore cannot rely on the meeting or anything that may have been said at it.*

(D.I. 413 at 16 n.3 (emphasis added).)

Despite what Harvard claims using exaggerated versions of SFFA's actual statements, SFFA is not trying to relitigate this Court's privilege ruling. SFFA will not ask witnesses about the substance of privileged conversations. And SFFA will not inquire into what happened during privileged meetings like the "meeting organized by Harvard's general counsel regarding 'Fisher v. University of Texas.'" (D.I. 547 at 8.) But it is relevant and permissible for SFFA to establish the fact that this *Fisher* meeting and others like it occurred. *See Methode Elecs., Inc. v. Finisar Corp.*, 205 F.R.D. 552, 556 (N.D. Cal. 2001) ("The attorney-client privilege extends to *communications* between client and attorney for the purpose of obtaining legal advice. It does not cover the fact (or not) of whether one sought legal advice.") (citation omitted).

In addition, courts across the country, including in this district, allow privilege logs to be admitted into evidence to establish dates and the fact of the occurrence of privileged communications or meetings like the ones at issue here. *See, e.g.*, *Mut. Ins. Co. v. Murphy*, 630 F. Supp. 2d 158, 168 & n.2 (D. Mass. 2009) (relying on "multiple entries in the privilege log provided by" the plaintiff to establish a timeline of events and noting that "the privilege logs of [the plaintiff] can be deemed an admission of a party opponent"); *see also, e.g.*, *Heckler & Koch, Inc. v. German Sports Guns GmbH*, No. 1:11-cv-01108-SEB-TAB, 2014 WL 12756372, at *6 (S.D. Ind. May 15, 2014) (allowing defendant to use privilege log "to support inferences regarding when and to what extent [defendant] knew about [plaintiff's] assignment of its IP rights"). At the very least, privilege logs can be used to

impeach witnesses or refresh their recollection about dates of the communications reflected in the logs. *See Huawei Techs. Co. v. T-Mobile US, Inc.*, No. 2:16-cv-00052-JRG-RSP, 2017 WL 7052463, at *1 (E.D. Tex. Sept. 20, 2017) ("If, for example, T-Mobile would like to establish that on a particular date, a Huawei employee communicated with an attorney about a 'legal assessment' of a patent-in-suit, as the amended privilege log suggests, then the privilege log might be admissible for purposes of impeachment if a witness denied that fact."); *Kellogg v. Nike, Inc.*, No. 8:07CV70, 2008 WL 4216130, at *3 (D. Neb. Sept. 12, 2008) ("The privilege log may be used for purposes of impeachment.").

In line with these cases, SFFA plans on using Harvard's privilege log at trial only to establish that certain meetings or communications occurred and the dates on which they occurred. Nothing more. Once again, given that this is a bench trial if Harvard believes that SFFA is going beyond establishing those basic facts, then it can raise its objection at the time and the Court can deal with the objection at trial. There is no need to issue a ruling *in limine* that could limit SFFA's ability to use Harvard's privilege logs as appropriate under *Murphy*, 630 F. Supp. 2d 158.

Dated: October 1, 2018                    Respectfully submitted,

_/s/ Adam K. Mortara_
Adam K. Mortara
J. Scott McBride
Krista J. Perry
Bartlit Beck Herman Palenchar & Scott LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
312.494.4400
adam.mortara@bartlit-beck.com
scott.mcbride@bartlit-beck.com
krista.perry@bartlit-beck.com

John M. Hughes
Katherine L.I. Hacker
Meg E. Fasulo
Bartlit Beck Herman Palenchar & Scott LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
303.592.3100
john.hughes@bartlit-beck.com
kat.hacker@bartlit-beck.com
meg.fasulo@bartlit-beck.com

William S. Consovoy
Thomas R. McCarthy
Michael H. Park
J. Michael Connolly
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
703.243.9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
park@consovoymccarthy.com
mike@consovoymccarthy.com

Patrick Strawbridge BBO #678274
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
617.227.0548
patrick@consovoymccarthy.com

Paul M. Sanford BBO #566318
BURNS & LEVINSON LLP
One Citizens Plaza, Suite 1100 Providence,
RI 02903
617.345.3000
psanford@burnslev.com
bcaldwell@burnslev.com

*Attorneys for Plaintiff Students for Fair Admissions, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 1st day of October, 2018.

/s/ Adam K. Mortara
_____