# UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., <br><br>         Plaintiff, <br><br>    v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE, <br><br>         Defendant. | Civil Action No. 1:14-cv-14176-ADB |

## JOINT PRETRIAL MEMORANDUM

# TABLE OF CONTENTS

I.    Concise Statement of the Evidence ................................................................1

    A.    Plaintiff's Summary ..............................................................................1

        1.    Intentional Discrimination Against Asian Americans ....................1

        2.    Racial Balancing ..........................................................................2

        3.    Failure to Use Race Merely as a "Plus" Factor in Admissions
            Decisions...................................................................................2

        4.    Race Neutral Alternatives............................................................3

    B.    Defendant's Summary .........................................................................3

        1.    Harvard Values Applicants Of All Races In Its Pursuit Of Diversity..............4

        2.    Harvard Does Not Engage In Racial Balancing .................................5

        3.    Harvard Considers Race Flexibly, In the Manner Long Permitted By
            The Supreme Court.....................................................................5

        4.    Harvard Could Not Achieve Its Educational Objectives Without
            Considering Race .......................................................................6

II.    Facts Established by Pleadings, Stipulation, or Admissions of Counsel....................6

    A.    Plaintiff's Facts Established by Pleadings, Stipulations, or Admission of
        Counsel ...............................................................................................6

    B.    Defendant's Facts Established by Pleadings, Stipulations, or Admission of
        Counsel ...............................................................................................8

III.    Contested Issues of Fact........................................................................11

    A.    Plaintiff's Contested Issues of Fact .........................................................11

    B.    Defendant's Contested Issues of Fact .....................................................12

IV.    Jurisdictional Questions .......................................................................13

    A.    Plaintiff's Jurisdictional Questions ........................................................13

    B.    Defendant's Jurisdictional Questions......................................................13

V.    Questions Raised by Pending Motions........................................................13

    A.    Plaintiff's Pending Motions ..................................................................13

    B.    Defendant's Pending Motions................................................................13

    C.    Other Pending Motions.........................................................................14

i

VI.   Issues of Law, Including Evidentiary Questions ...................................................14

    A.   Plaintiff's Issues of Law and Evidentiary Issues ................................14

    B.   Defendant's Issues of Law and Evidentiary Issues.............................14

VII.   Requested Amendments to the Pleadings..............................................................14

    A.   Plaintiff's Requested Amendments to the Pleadings ..........................14

    B.   Defendant's Requested Amendments to the Pleadings .......................14

VIII.   Additional Matters to Aid in Disposition of Action .............................................15

    A.   Witnesses ...........................................................................................15

    B.   Chalks ................................................................................................15

    C.   Exhibits ..............................................................................................16

    D.   Plaintiff's Matters .............................................................................17

        1.   Sequestration .........................................................................17

        2.   Sealing ...................................................................................17

        3.   Exhibits .................................................................................17

        4.   Deposition Designations ........................................................18

    E.   Defendant's Matters..........................................................................18

        1.   Sequestration .........................................................................18

        2.   Sealing ...................................................................................18

        3.   Exhibits .................................................................................19

        4.   Deposition Designations ........................................................20

IX.   Probable Length of Trial......................................................................................20

X.   Names and Addresses of Witnesses.....................................................................21

    A.   Plaintiff's Witness List ......................................................................21

    B.   Defendant's Witness List ...................................................................21

XI.   List of Proposed Exhibits ....................................................................................21

    A.   Plaintiff's Exhibit List .......................................................................21

    B.   Defendant's Exhibit List ....................................................................21

XII.   Testimony by Deposition .....................................................................................21

Pursuant to Local Rule 16.5(d) and the Court's Order Setting Case for Trial, the parties submit the following Pre-Trial Memorandum.

## I.      Concise Statement of the Evidence

### A.      Plaintiff's Summary

Plaintiff Students for Fair Admissions, Inc. (SFFA) brought this action to address Harvard's racially and ethnically discriminatory policies and procedures in its undergraduate admissions program. Harvard's actions violate Title VI of the Civil Rights Act of 1964, which prohibits Harvard from discriminating against applicants based on their race, color, or national origin: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Harvard receives the benefit of federal funds. So as a tradeoff under Title VI, it must refrain from discriminating on the basis of race, color, or national origin. Yet, Harvard's admissions policies and procedures discriminate on the basis of race and ethnicity in violation of Title VI. At trial, the parties will address the following four claims that remain at issue in this case:

#### 1.      Intentional Discrimination Against Asian Americans

Harvard's admissions policy has a disproportionately negative effect on Asian Americans vis-a-vis similarly-situated white applicants that cannot be explained on non-discriminatory grounds. Harvard discriminates both in subjective scoring and selection for admission to limit the number of Asian Americans that attend the college. Not only did SFFA's expert reach this conclusion, Harvard did too. In 2013, Harvard's Office of Institutional Research—its highly regarded research division—conducted an internal investigation and found that Harvard's admissions system is biased against Asian Americans. But instead of taking even the most minor steps to address this problem or conducting any further investigation, Harvard killed the investigation and buried the reports. Faced with this (and other) damning evidence, Harvard, sadly, contests the findings on the basis that the analysis misses a key fact: Asian-American applicants—as a group—have less attractive "personal

qualities" than white applicants. It turns out that the suspicions of Asian-American alumni, students, and applicants were right all along: Harvard engages in the same kind of discrimination and stereotyping today that it used to justify quotas on Jewish applicants in the 1920's and 1930's.

### 2. Racial Balancing

It is unusual for a civil-rights defendant to confess. Yet Harvard admits its goal is to ensure racial balance, and that it has engineered the admissions process to achieve that illegal goal. Moreover, statistical evidence independently confirms that Harvard has set a floor on the admissions rate for African-American applicants. Harvard's system for achieving racial balance is straightforward. Harvard uses "ethnic stats" and other tools to manipulate the process so that it achieves essentially the same racial balance year after year. At the end of the admissions process, if Harvard has provisionally admitted more (or less) of any racial group than it did the year before (what it deems, in violation of Title VI, to be "too many" or "too few"), then it reshapes the provisionally admitted students to remedy the problem. This transparent regime of racial balancing is a flagrant violation of settled law.

### 3. Failure to Use Race Merely as a "Plus" Factor in Admissions Decisions

Harvard is not using race to achieve critical mass. Here too, Harvard's brazenness is astonishing. Harvard concedes that it has no interest in achieving critical mass and has never given the concept serious thought. Harvard is adamant that racial preferences are indispensable to its mission—and always will be. What Harvard will not admit—but what the record shows—is that race is not only an important factor, it is the dominant consideration in admitting Hispanics and African Americans. An Asian-American applicant with a 25% chance of admission would have a 35% chance if he were white, a 75% chance if he were Hispanic, and a 95% chance if he were African American. Harvard understands that, under Supreme Court precedent, racial preferences must be time-limited and can be no more than a "plus" factor in admissions. It just does not seem to care.

### 4.       Race Neutral Alternatives

Harvard has not considered race-neutral alternatives in good faith. It is hard to fathom a less serious, after-the-fact charade. Harvard never considered race-neutral alternatives until this litigation was threatened. At that point it formed a committee, quickly abandoned it, and then formed a new committee at the close of discovery that, almost comically, was comprised of only three people and whose work was outsourced to litigation counsel. And when that committee was presented with alternatives to racial preferences—alternatives that would make Harvard more diverse and would open the door of opportunity to more disadvantaged students of all races—the response was cynical, self-serving, and self-contradictory. The whole process was emblematic of Harvard's longstanding approach to racial preferences: dissembling from top to bottom to ensure it can continue to racially engineer its admissions process in direct contravention of Title VI.

### B.      Defendant's Summary

The Supreme Court has long held that the pursuit of diversity in higher education is a compelling interest that can justify the consideration of race in admissions. *See, e.g.*, *Fisher v. University of Texas at Austin* (*Fisher I*), 133 S. Ct. 2411, 2418 (2013); *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003); *Regents of the University of California v. Bakke*, 438 U.S. 265, 315 (1978) (opinion of Powell, J.).  And the Supreme Court has repeatedly pointed to Harvard's admissions practices as the paradigm of the permissible consideration of race. *See Bakke*, 438 U.S. at 317-318 (opinion of Powell, J.); *Grutter*, 539 U.S. at 334-335; *cf. Gratz v. Bollinger*, 539 U.S. 244, 271-273 (2003) (University of Michigan's undergraduate admissions process, which the Court held unlawful, did not resemble Harvard's "individualized selection process").

Although SFFA brought this case as a frontal attack on the Supreme Court's precedents authorizing the consideration of race in admissions, the Court rightly concluded that Counts IV and VI of SFFA's Complaint were barred by those prior precedents.  Mem. and Order Granting Mot. for Partial Judgment on the Pleadings (Dkt. 325).  The remaining counts do not squarely challenge the proposition that Harvard has a compelling interest in pursuing racial and other forms of

diversity, or in considering race for that purpose, but rather argue that Harvard is considering race in a legally impermissible manner.

The evidence shows, contrary to SFFA's allegations, that the Harvard admissions process—twice identified by the Supreme Court as a model of the permissible consideration of race—continues to consider race in exactly the manner permitted by the Supreme Court.[1]

### 1.   Harvard Values Applicants Of All Races In Its Pursuit Of Diversity

Harvard's admissions process considers the self-identified race and ethnicity of every applicant as one among the panoply of factors that shed light on how the applicant would contribute to and benefit from Harvard's educational environment.  Harvard regards applicants of every race and ethnicity, including Asian-American applicants, as contributing meaningfully to the diversity of its student body.  Harvard has long recruited Asian-American students, and the number of Asian-American students at Harvard has grown considerably.

SFFA has no evidence to support its claim that Harvard's admissions process discriminates against Asian-American applicants.  Not a single document or line of deposition testimony suggests that the Harvard Admissions Office purposely limits the number of Asian Americans admitted to Harvard.  Harvard's statistical expert, Dr. David Card—one of the world's foremost scholars of econometrics and labor economics—conducted a comprehensive analysis that showed no statistically significant effect of Asian-American ethnicity on applicants' likelihood of admission, in any of the six admissions cycles that were reviewed.  Dr. Card also explained the numerous flaws in the competing analysis offered by SFFA's expert, Dr. Peter Arcidiacono.

Attempting to divert attention from the expert analyses in this case, SFFA relies heavily on a handful of documents created by employees in Harvard's Office of Institutional Research (OIR) and on the handling of those documents by others at Harvard.  SFFA mischaracterizes those documents,

---

[1] Harvard maintains that SFFA lacks standing and intends to assert that position in any appeal.  In light of the Court's summary-judgment ruling (Dkt. 566 at 18-22), however, Harvard does not intend to elicit evidence at trial as to the rights and responsibilities of SFFA's members or as to whether any of SFFA's standing members is genuinely willing and able to apply to transfer to Harvard if SFFA prevails.

however.  The OIR analyses were not the products of an "internal investigation."  They were not meant to address the question whether Harvard discriminates against Asian-American applicants.  And they reached no conclusion on that subject.  Moreover, as the analysts recognized and as the documents themselves make clear, the OIR analyses were limited and incomplete.

### 2.     Harvard Does Not Engage In Racial Balancing

As Dr. Card's analysis showed, the racial composition of Harvard's classes has varied meaningfully from year to year for many years.  It is therefore unsurprising that SFFA has adduced no evidence that Harvard engages in racial balancing—*i.e.*, that it seeks to admit classes with a consistent racial composition from year to year.  SFFA's empirical expert, Dr. Arcidiacono, notably offered no analysis to support this empirically testable claim.  He instead purported to show a "floor" on the admission rate of single-race African-American applicants, but his claim does not withstand scrutiny.

Lacking statistical evidence of racial balancing, SFFA instead focuses on supposed non-statistical evidence that Harvard sought a consistent racial composition of its classes from year to year, particularly the statistics periodically received by the Dean and Director of Admissions.  But SFFA mischaracterizes how those reports were used in the admissions process.  Harvard does not target a particular racial composition of its admitted classes, and SFFA's racial balancing claim therefore fails.

### 3.     Harvard Considers Race Flexibly, In the Manner Long Permitted By The Supreme Court

Harvard's admissions process considers race in exactly the manner long permitted by the Supreme Court: as one among many factors in a flexible, individualized consideration of how the applicant would contribute to and benefit from Harvard's educational environment.  *See, e.g., Grutter v. Bollinger*, 539 U.S. 306, 334-335 (2003) (invoking Harvard's process as a paradigm of the appropriate use of race and emphasizing the need for "truly individualized consideration" in which race plays "a flexible, nonmechanical" role).  For the vast majority of applicants to Harvard, Dr. Card's analysis shows, race has essentially no effect in the admissions process.  For the small group

of candidates who would be highly competitive for admission whether or not race was considered, race can be a relevant factor in the candidates' likelihood of admission—just as many other factors can affect admissions outcomes.  That reflects the fact that, in Harvard's highly competitive admissions process, any factor can play a role in whether a particular applicant is or is not admitted. Harvard's admissions process evaluates candidates as individuals; it does not make a candidate's race or ethnicity the defining feature of his or her application.

### 4.     Harvard Could Not Achieve Its Educational Objectives Without Considering Race

Finally, Harvard could not achieve its educational objectives, including its diversity-related objectives, without considering race in the admissions process.  Most recently, a committee including the Dean of the Faculty of Arts and Sciences, the Dean of Harvard College, and the Dean of Admissions and Financial Aid conducted a detailed review of race-neutral practices suggested by SFFA, its expert, or the literature.  The committee concluded on the basis of thorough analysis that no such practices (either alone or in combination) could enable Harvard to achieve a comparably diverse class without considering race, unless Harvard sacrificed other essential educational objectives, such as the academic excellence of its student body.  The Supreme Court has held that universities are not required to compromise such fundamental educational objectives as the cost of being permitted to consider race in pursuit of diversity.

## II.     Facts Established by Pleadings, Stipulation, or Admissions of Counsel

### A.     Plaintiff's Facts Established by Pleadings, Stipulations, or Admission of Counsel

Venue is proper in the District of Massachusetts. Defs.' Answer (D.I. 17) at ¶ 11.

The Harvard Corporation is Harvard University's senior governing board. *Id.* at ¶ 29. Harvard University is a private educational institution with its legal address in Cambridge, Massachusetts. *Id.* at ¶ 30. Harvard College is a component of Harvard University that offers undergraduate education. *Id.* at ¶ 31.

Harvard University's endowment was valued at $36.4 billion as of June 30, 2014. *Id.* at ¶ 32. Harvard University receives federal funds in various forms—including research funding—and received more than $6.6 million from such sources in 2010, more than $11.9 million in 2011, more than $20.9 million in 2012, and more than $13.4 million in 2013. *Id.* Harvard University also received federal funds from such sources in 2014. *Id.*

Harvard College enrolls a number of students who receive federal financial aid. *Id.* at ¶ 33.

Richard Gummere served as Harvard's Chairman of the Committee on Admission from 1934 to 1952. *Id.* at ¶ 101.

Harvard University was one signatory to an amicus brief in *Bakke* (filed jointly on behalf of Columbia University, Harvard University, Stanford University, and the University of Pennsylvania), and that brief included a copy of the Harvard College Admissions Program as an appendix. *Id.* at ¶ 133.

Harvard University was one signatory to an amicus brief in *Grutter* (filed jointly on behalf of Harvard University, Brown University, the University of Chicago, Dartmouth College, Duke University, the University of Pennsylvania, Princeton University, and Yale University). *Id.* at ¶ 139.

Harvard University was one signatory to an amicus brief in *Fisher* (filed jointly on behalf of Brown University, the University of Chicago, Columbia University, Cornell University, Dartmouth College, Duke University, Harvard University, Johns Hopkins University, the Massachusetts Institute of Technology, the University of Pennsylvania, Princeton University, Stanford University, Vanderbilt University, and Yale University). *Id.* at ¶ 143.

The Office of Civil Rights conducted an investigation of Harvard College's admissions practices, beginning in 1988 and ending in 1990. *Id.* at ¶ 164. The Office of Civil Rights announced its findings in October 1990. *Id.* at ¶ 166.

During an admissions cycle, the Harvard Admissions Committee reviews each student's admissions materials. Those materials include: (1) the Common Application or Universal College Application, including an essay, and the required parts of the Harvard Supplement; (2) the high school transcript, school report, and mid-year school report—all submitted by a student's guidance

counselor; (3) standardized test scores—submitted by the College Board; (4) teacher and guidance counselor recommendations; (5) optional on-campus and/or off-campus interviewer evaluation; (6) optional personal statements (found on the Harvard Supplement) in addition to the required essays; and (7) optional music tapes, artwork slides, or samples of academic work. *Id.* at ¶ 175.

On the Common Application, applicants may choose to provide information about their race or ethnicity. *Id.* at ¶ 176.

Toward the end of the admissions process, the Harvard admissions committee is typically considering more candidates for admission than it has room to admit. *Id.* at ¶ 194.

Harvard annually publishes information on the number of admitted students and matriculating students who self-report as belonging to certain racial or ethnic groups. *Id.* at ¶ 201. Harvard annually publishes information about applications to Harvard College. *Id.* at ¶ 204.

During the 2005-2006 academic year, 18% of the Harvard College student body self-reported as Asian-American. *Id.* at ¶ 301.

For the 2014-2015 academic year, Harvard College's tuition and fees were $43,938 per year, exclusive of financial aid, which many students receive. *Id.* at ¶ 326.

**B.    Defendant's Facts Established by Pleadings, Stipulations, or Admission of Counsel**

A substantial part of SFFA's mission is to end race-based admissions policies at American universities.  SFFA Opp. SMF ¶ 5.

Edward Blum, President of SFFA, is responsible for SFFA's launch, its day-to-day operations, membership recruitment, and efforts to publicize its mission.  Pltf.'s Supp. Objections and Responses to Deft.'s First Set of Interrogatories (Aug. 4, 2017) ("SFFA Supp. Interrogatory Responses"), Response to Interrogatory 1.

SFFA has no officers, directors, or employees other than the members of its Board of Directors.  SFFA Supp. Interrogatory Responses, Response to Interrogatory 2.

At the time this suit was filed, SFFA had a four-member Board of Directors, which was elected by the Board at its annual meeting.  SFFA Supp. Interrogatory Responses, Response to Interrogatories 3, 8.

Today, four members of SFFA's five-member Board of Directors are elected by the Board at its annual meeting, and the fifth Director is elected by SFFA's members.  SFFA Opp. SMF ¶¶ 8, 12; SFFA Supp. Interrogatory Responses, Response to Interrogatory 3.

SFFA required new members to pay a membership fee of $10 to join SFFA, beginning on July 30, 2015.  The Board determined that those who had joined SFFA prior to that date would not be asked to pay the membership fee.  SFFA Supp. Interrogatory Responses, Response to Interrogatory 8.

As of April 30, 2017, SFFA had a total of 21,766 members.  133 members had paid the membership fee, which constitutes 0.6% of the total membership.  SFFA Opp. SMF ¶¶ 2, 14; SFFA Supp. Interrogatory Responses, Response to Interrogatory 8.

As of April 30, 2017, SFFA had received only 790 contributions from its individual members (including the required membership fee for every member who joined after July 30, 2015). SFFA Opp. SMF ¶¶ 2, 14, 15; SFFA Supp. Interrogatory Responses, Response to Interrogatory 7.

Harvard conducts an in-person orientation and training process for all newly hired admissions officers.  During the multi-week orientation, new admissions officers are trained on how to read and score application files, they participate in mock committee discussions of the prior year's cases, and they simulate preparing for and presenting cases at subcommittee meetings.  New admissions officers also are provided with sample application files based on real cases from prior years for training and discussion.  New admissions officers also meet again in the early winter to discuss the Reading Procedures.  Pltf.'s Statement of Undisputed Material Facts (Dkt. 414) ("SFFA SJ SMF") ¶ 70.

Once this orientation is concluded, new admissions officers are normally required to share approximately the first 50 to 100 application files that they read with a more senior admissions officer, who provides feedback on the ratings assigned by the new admissions officer.  The work of

new admissions officers is monitored closely by more senior admissions officers during their first few years of employment.  SFFA SJ SMF ¶ 71.

Every January, after the close of the regular decision application deadline, the Admissions Office creates a total "target number," which represents the total number of students that Harvard intends to admit that admissions cycle.  SFFA SJ SMF ¶ 103.

The Admissions Office creates this "target number" to ensure it does not over-enroll its freshman class.  Harvard has a strict limit on the number of students it can enroll (typically around 1,662 students each year), which is limited by the total number of beds available for the incoming freshman class.  SFFA SJ SMF ¶ 104.

If too many students accept Harvard's offer of admission (*i.e.*, the yield rate is too high), Harvard would face real logistical problems because it must house and educate every student who accepts Harvard's offer of admission.  SFFA SJ SMF ¶ 105.

The Admissions Office calculates the total target number based on two factors: (1) the number of students Harvard wants to enroll in the Fall, and (2) the Admissions Office's predicted yield rate (i.e., the percentage of applicants who will accept Harvard's offer of admission).  For example, in January 2013, the Admissions Office wanted to enroll 1,664 students for the upcoming class, and it believed, based on its applicant pool and prior yield rates, that 84% of admitted students would accept Harvard's offer of admission.  The Admissions Office thus set a total "target number" of 1,981 admitted students (1,981 admitted students x 84% yield = 1,664 matriculants).  SFFA SJ SMF ¶ 106.

There is no separate admissions process for recruited athletes, children of Harvard College and Radcliffe alumni, applicants on the Dean's or Director's interest list, or children of Harvard faculty or staff members.  Pltf.'s Response to Deft.'s Statement of Undisputed Material Facts (Dkt. 452) ("SFFA Opp. SMF"), Response to ¶ 228.

In 1988, the U.S. Department of Education, Office of Civil Rights (OCR) initiated a compliance review to determine whether Harvard was complying with Title VI of the Civil Rights Act of 1964.  SFFA SJ SMF ¶ 314.

In 1990, OCR wrote a letter to Harvard President Derek Bok that stated, "I am pleased to inform you that [OCR] has completed its review of Harvard University's undergraduate admissions program" and has "concluded that Harvard has not violated Title VI with respect to the admission of Asian American applicants to the undergraduate program." SFFA SJ SMF ¶ 315. OCR found no evidence of the existence or use of quotas; nor did it find that Asian Americans were treated differently than white applicants in the implementation of the admissions process. Pltf.'s Response to Deft.'s Statement of Material Facts that Deft. Contends Preclude S.J. for Pltf. (Dkt. 511) ("SFFA Reply SMF"), Response to ¶ 22.

In 2017, Harvard established a Committee to Study Race Neutral Alternatives in Harvard College Admissions. Michael Smith, then the Edgerley Family Dean of the Faculty of Arts and Sciences, chaired the Committee. The Committee's other members were William Fitzsimmons, the Dean of Admissions and Financial Aid; and Rakesh Khurana, the Dean of Harvard College, Marvin Bower Professor of Leadership at Harvard Business School, and Faculty Dean of Cabot House. SFFA Reply SMF, Response to ¶ 38.

The Smith Committee met seven times between August 2017 and April 2018. SFFA SJ SMF ¶ 831.

## III.     Contested Issues of Fact

### A.     Plaintiff's Contested Issues of Fact

Plaintiff's list of issues of fact below is not intended to be an exhaustive list of each and every contested fact in this case, but rather an identification of the key facts contested by the parties.

Whether Harvard intentionally discriminates against Asian-American applicants on the basis of race or ethnicity in its undergraduate admissions.

Whether Harvard has intentionally discriminated against Asian-American applicants on the basis of race or ethnicity based on prejudicial and stereotypical assumptions about their qualifications.

Whether Harvard's admission system has a disproportionately negative effect on Asian-American applicants that is not explainable on grounds other than intentional discrimination on the basis of race or ethnicity.

Whether Harvard's admission system discriminates against Asian Americans in the "personal rating" category.

Whether Harvard's admission system discriminates against Asian Americans in the "overall score."

Whether Harvard employs an undergraduate admissions policy that balances the class according to its racial or ethnic composition.

Whether there is any non-discriminatory reason that could justify admissions figures that are stable across all racial groups over a period of several years given the unique characteristics of each applicant for admission.

Whether Harvard is using race as more than a "plus" factor in admissions decisions.

Whether Harvard can achieve student body diversity without resorting to racial preferences.

Whether Harvard had a strong basis in evidence that a non-racial approach would not work as well as a race-based approach before using racial preferences.

Whether race-neutral alternatives can be implemented to achieve student body diversity without resorting to racial preferences.

**B.     Defendant's Contested Issues of Fact**

Defendant's list of contested issues of fact is intended not to be exhaustive but rather to identify the key facts contested by the parties.

Whether Harvard intentionally discriminates against Asian-American applicants on the basis of their race or ethnicity in the context of its whole-person admissions process.

Whether Harvard targets a specific racial composition of its admitted classes.

Whether Harvard's admissions process makes an applicant's race or ethnicity the defining feature of his or her application.

Whether Harvard could achieve a comparably diverse and comparably excellent class without considering race in the admissions process.

## IV.   Jurisdictional Questions

### A.   Plaintiff's Jurisdictional Questions

SFFA invoked the jurisdiction of this Court under 28 U.S.C. §§ 1331 and 1343.

### B.   Defendant's Jurisdictional Questions

As noted above, Harvard maintains that SFFA lacks standing and that this Court therefore lacks jurisdiction, but in light of the Court's summary-judgment ruling (Dkt. 566 at 18-22), Harvard does not intend to elicit evidence at trial as to the rights and responsibilities of SFFA's members or as to whether any of SFFA's standing members is genuinely willing and able to apply to transfer to Harvard if SFFA prevails.

## V.   Questions Raised by Pending Motions

### A.   Plaintiff's Pending Motions

SFFA has filed three motions in limine. In Motion in Limine No. 1, SFFA asks the Court to preclude Harvard from calling SFFA's President Edward Blum as a witness because he has no relevant information to offer concerning the issues remaining for trial. It appears that motion may be moot as Harvard has agreed to withdraw Mr. Blum from its witness list based on the Court's summary judgment ruling. In Motion in Limine No. 2, SFFA asks the Court to preclude Harvard from offering evidence or argument that portions of applications Harvard refused to produce explain the observed penalty on Asian Americans in the personal rating. In Motion for Limine No. 3, SFFA asks the Court to preclude Harvard from offering undisclosed expert testimony about the Office of Institutional Research's conclusion that Harvard's admissions system is biased against Asian Americans.

### B.   Defendant's Pending Motions

Harvard has filed two pending motions in limine.  Those motions ask the Court to preclude SFFA from offering evidence concerning Harvard's early twentieth-century admissions practices and

to preclude SFFA from offering evidence concerning Harvard's assertions of the attorney-client privilege or arguing for negative inferences based on those assertions.  Dkt. 547.

### C.   Other Pending Motions

The parties jointly moved to seal certain portions of their summary judgment filings (Dkt. 410), and the Court granted that motion (Dkt. 411). In accordance with the process agreed upon in the joint motion and approved by the Court, the parties have briefed the question whether certain summary-judgment materials that were filed under seal should remain under seal, which remains pending.  *See* Dkt. 422; Dkt. 427

Two groups of amici curiae have filed motions seeking leave to participate at trial.  Dkts. 518, 532.

## VI.   Issues of Law, Including Evidentiary Questions

### A.   Plaintiff's Issues of Law and Evidentiary Issues

Any issues of law, including evidentiary issues, are either already identified in SFFA's Motion for Summary Judgment or will be identified in SFFA's forthcoming Motions *In Limine* or objections to Defendant's exhibits and deposition designations.

### B.   Defendant's Issues of Law and Evidentiary Issues

Harvard has identified numerous issues of law, including evidentiary issues, in its pending motion for summary judgment, motions in limine, and objections to SFFA's proposed exhibits and deposition designations.

## VII.   Requested Amendments to the Pleadings

### A.   Plaintiff's Requested Amendments to the Pleadings

SFFA does not have any amendments to the pleadings at this time.

### B.   Defendant's Requested Amendments to the Pleadings

Harvard does not request any amendments to the pleadings.

## VIII.   Additional Matters to Aid in Disposition of Action

### A.      Witnesses

Pursuant to Local Rule 43.1(b)(2), the parties will identify the witnesses they expect to testify live or by deposition, and the order in which they will present testify, no later than 7:00 p.m. ET seven days before the trial day on which the testimony is expected.

The parties have agreed that if SFFA calls witnesses adversely, then Harvard can exceed the scope of the adverse direct examination so that the witness will only have to testify once at trial.

### B.      Chalks

SFFA's chalks will be identified with PD numbers, starting with PD1.  Harvard's chalks will be identified with DD numbers, starting with DD1.

To help conduct this trial efficiently, the parties will exchange chalks to be used in opening statements by 7:00 p.m. ET two nights before opening statements. The parties will provide any objections to such chalks by 12:00 p.m. (noon) ET on the day before opening statements.  If those objections cannot be resolved, then the parties will raise the objections with the Court prior to the start of opening statements.

A party will provide chalks to be used in connection with examinations by 3:00 p.m. ET the day before their intended use, and objections will be provided no later than 7:00 p.m. ET the night before their intended use. If objections cannot be resolved, then the parties will raise the objections with the Court prior to the applicable witness being called to the witness stand.

The party seeking to use a chalk will provide a color representation of the chalk to the other side in PDF form. However, for video or animations, the party seeking to use the chalk will provide it to the other side on a DVD, CD, USB drive, or some other means. For irregularly sized physical exhibits, the party seeking to use the chalk will provide a color representation as a PDF of 8.5 x 11 copies of the exhibits.

Blow-ups or highlights of exhibits or parts of exhibits or testimony are not required to be provided to the other side in advance of their use, as long as the exhibit itself has been properly disclosed pursuant to the requirements set by the Court.

These provisions do not apply to chalks created during testimony or chalks to be used for impeachment only, neither of which need to be provided to the other side in advance of their use.

### C.   Exhibits

SFFA's trial exhibits will be identified with P numbers, starting with P001.  Harvard's trial exhibits will be identified with DX numbers, starting with DX001.

Any exhibit, once admitted, may be used equally by each party. The listing of an exhibit by a party on its exhibit list does not waive any evidentiary or other objections to that exhibit by the listing party should the opposing party attempt to offer it into evidence.

The parties agree that any date listed on the exhibit list is neither evidence of nor an admission of the date of the document, and that failing to list a date is neither evidence of nor an admission of whether the document is dated.

Each party reserves the right to use documents not set forth in its exhibit list for purposes of impeachment.

The parties agree that any description of a document on an exhibit list is provided for convenience only and shall not be used as an admission or otherwise as evidence regarding that document.

The parties agree to meet and confer in good faith regarding the authenticity and admissibility of the documents each party has produced. At the beginning of trial, the parties agree to provide the Court with a list of exhibits for which the parties have stipulated to admission.

For each witness that is called live, the party calling the witness will send a list of the exhibits not previously admitted that they anticipate offering into evidence with each witness by 9:00 a.m. ET the day before the witness is expected to testify.[2] The other party shall identify any exhibits not previously admitted that it anticipates offering into evidence by 3:00 p.m. the day before the witness

---

[2] As explained below in Section VIII(D)(3), SFFA believes that all exhibits that have not been objected to should be admitted at the start of trial before opening statements. Given that, SFFA does not believe these provisions for exhibit disclosures in advance of a witness's testimony should apply to exhibits that have not been objected to. To the extent that a party has a foundation objection to a particular exhibit being used with a particular witness, then that party can lodge its objection during the testimony and the Court can rule on it at that time.

is expected to testify. The parties agree that documents that will be used only for impeachment purposes do not need to be identified as part of this disclosure, but that any documents or things a party intends to introduce into evidence during cross-examination will be included. The parties will attempt to resolve any outstanding objections to the identified trial exhibits by 8:00 p.m. ET the evening before the witness is expected to testify. If objections to those exhibits cannot be resolved, then the parties will raise the objections with the Court prior to the applicable witness being called to the witness stand.

### D.      Plaintiff's Matters

#### 1.      Sequestration

SFFA invokes Federal Rule of Evidence 615 so that all fact witnesses need be sequestered until the witness completes his or her testimony. For clarity, SFFA does not intend for party representatives or expert witnesses to be sequestered during the trial.

#### 2.      Sealing

SFFA agrees that personally identifiable information, such as names of Harvard applicants or names of SFFA's members, shall not be disclosed in open court.

#### 3.      Exhibits

SFFA proposes that the Court admit into evidence all exhibits that have no objections at the beginning of trial before openings. Given that this is a bench trial, SFFA believes this is the most efficient approach to admitting exhibits that are not objected to.

For exhibits that the parties have served objections to, SFFA proposes the following disclosure provisions for opening statements. The parties will identify exhibits with outstanding objections to be shown in opening statements by 7:00 p.m. ET two nights before opening statements. As stated above, blow-ups or highlighting of exhibits (without more) are not required to be provided to the other side as long as the exhibit itself is identified if it is objected to. The parties will attempt to resolve the outstanding objections to such exhibits by 8:00 p.m. ET on the day

before opening statements. If those objections cannot be resolved, then the parties will raise the objections with the Court prior to the start of opening statements.

### 4. Deposition Designations

Given that this is a bench trial, SFFA proposes that all deposition designation testimony be presented to the Court electronically in transcript form or on a disc with video for the Court to review in its own time. The transcripts will also be filed on the docket or lodged with the Court for the record. The parties have designated deposition testimony for 20 different witnesses. Seventeen of these depositions were not videotaped. Reading or playing all the deposition designation testimony in Court would significantly increase the length of this trial. There is simply no need to do this in a bench trial as Harvard suggests.

The exhibit procedure that Harvard proposes instead of pre-admitting exhibits that are not objected to and the exercise of reading or playing all deposition designations that Harvard requests will decrease the efficiencies that SFFA expected to gain from this being a bench trial. SFFA is concerned that if the parties follow those procedures, then the trial may need to be extended to four weeks.

### E. Defendant's Matters

### 1. Sequestration

Pursuant to Federal Rule of Evidence 615(b), Harvard will designate a party representative who is not subject to sequestration.  For the avoidance of doubt, expert witnesses are not excluded from the courtroom for either fact or expert testimony.

### 2. Sealing

Certain of the trial exhibits and portions of the deposition testimony the parties will seek to introduce have been designated Confidential or Highly Confidential-Attorneys' Eyes Only pursuant to the June 25, 2015 Protective Order.  In the course of summary judgment briefing, the parties permitted many documents containing information that they designated Confidential and Highly Confidential to be filed publicly.  At trial, to the extent either party wishes to show a witness an

exhibit or read into evidence any testimony that has become public, Harvard agrees the party may do so notwithstanding its designation under the Protective Order.

As to exhibits and testimony that are not already public and that a party has designated Confidential or Highly Confidential, Harvard proposes at the time a party identifies its intent to use any such exhibits or testimony, or identifies objections to the other party's intended use of such exhibits or testimony, it shall also notify the other party if the document includes any Personally Identifiable Information, Sensitive Personal Information, or other highly confidential information such that the document should not be shown publicly. Harvard proposes that such exhibits be shown to the Court, the witness, and counsel, but not the gallery. To the extent the parties have a dispute regarding whether such information may or may not be shown publicly, Harvard proposes those issues be raised with the Court at the start of the day on which it is expected that the exhibit or testimony may be introduced.

### 3.     Exhibits

The parties have identified over 1,300 potential exhibits for use at trial.  While Harvard agrees that preadmission of certain exhibits is warranted to promote efficiency in trial proceedings, Harvard disagrees that it would be appropriate or in the interest of the Court to admit into the record the over 750 exhibits to which no objections have been currently raised—a majority of which may never be discussed by a witness.  The parties are conferring to identify exhibits for which preadmission would be appropriate, which may include, for example, exhibits that both parties intend to rely on and for which foundation can undoubtedly be established.

Harvard proposes that the parties will identify any exhibits they have not agreed to preadmit and that are to be shown in opening statements by 7:00 p.m. ET two nights before opening statements. As stated above, blow-ups or highlighting of exhibits (without more) to be used in opening statements are not required to be provided to the other side as long as the exhibit itself is identified. The parties will identify any objections to the use of such exhibits in the opening statements by 12:00 p.m. (noon) ET on the day before opening statements and will attempt in good

faith to resolve those objections. If those objections cannot be resolved, then the parties will raise
the objections with the Court prior to the start of opening statements.

Exhibits to be admitted through live witnesses will be disclosed in accordance with the
provisions set forth above.

### 4.      Deposition Designations

Harvard has designated deposition testimony of four former admissions officers who no
longer live in the area.  SFFA has designated voluminous testimony for 11 different witnesses, three
of whom will be testifying live at trial.  All of the deposition designations are listed as "may call" on
both parties' witness lists.  Given the large volume of testimony designated by SFFA, Harvard
believes that any deposition testimony a party believes should be made part of the trial record and
considered by the Court in rendering its decision should be read into evidence or played by video.
By way of example, SFFA has designated testimony from over 230 pages of the deposition of
William Fitzsimmons, even though SFFA is also calling Dean Fitzsimmons to testify live, adversely,
in its case-in-chief.  That this is a bench trial (as dictated by the relief SFFA is seeking) does not
warrant inflating the record with marginally relevant and potentially cumulative materials.  Requiring
the parties to present the deposition testimony in Court will ensure that both parties are judicious
with their designations, thereby reducing the number of objections that will need to be ruled on and
the ultimate burden on the Court.

Whether deposition testimony is read or played by video, Harvard proposes that the time
available for each party's presentation of evidence shall be reduced by the length of its designations
and counter-designations as played or read.

## IX.      Probable Length of Trial

The parties anticipate that trial will last three weeks.  To facilitate efficient proceedings, the
parties propose that opening statements be limited to 1 hour per party, that closing arguments be
limited to 1 hour per party, and that each party be limited to half of the available trial time, excluding

any time the Court allots to amici participation, to be discussed with the Court at the pretrial conference.

## X.   Names and Addresses of Witnesses

### A.   Plaintiff's Witness List

Attached as Exhibit A1 is SFFA's witness list. Attached as Exhibit A2 are Harvard's objections to SFFA's witness list.

### B.   Defendant's Witness List

Attached as Exhibit B is Harvard's witness list.

## XI.   List of Proposed Exhibits

### A.   Plaintiff's Exhibit List

Attached as Exhibit C is SFFA's exhibit list, including Harvard's objections.

### B.   Defendant's Exhibit List

Attached as Exhibit D is Harvard's exhibit list, including SFFA's objections.

## XII.   Testimony by Deposition

Attached as Exhibit E are SFFA's deposition designations, including Harvard's objections and counter-designations and SFFA's objections to those counter-designations.

Attached as Exhibit F are Harvard's deposition designations, including SFFA's objections and counter-designations and Harvard's objections to those counter-designations.

The parties will provide transcripts of these designations to the Court closer in time to when a party anticipates calling a witness by deposition so that the Court may rule on any outstanding objections.

No deposition testimony not already designated, whether designated as affirmative or counter-designations, may be later added, absent good cause shown.

If a party designates deposition testimony, and the other party counter-designates, then the designations and counter-designations will be presented in chronological order.

All irrelevant and redundant materials such as objections and colloquies between counsel will be eliminated when the deposition designation testimony is presented.

Any party may use testimony that is designated by another party, to the same effect as if it had initially designated the testimony as its own, subject to all objections.

The parties may offer some or all of the deposition testimony set forth within the disclosed deposition designations at trial.

Any deposition testimony may be used at trial for the purpose of impeachment, regardless of whether a party identified that testimony on its list of deposition designations, if the testimony is otherwise competent for such purpose.

If deposition designations are going to be played or read in Court as Harvard proposes, then the parties will identify witnesses expected to testify by deposition three days before the day during which that deposition testimony is expected to be read or played in court. At the same time, the calling party shall identify whether it is withdrawing any of the already disclosed deposition designations that it expects to read or play during trial as well as any trial exhibits to be offered through that witness' deposition testimony. Any counter-designations associated with affirmative designations being withdrawn will also be removed. The other party shall identify for each such witness any objections to the identified trial exhibits and any trial exhibits to be offered through that witness's counter-designated deposition testimony by 9:00 a.m. ET the day before the deposition testimony is expected to be read or played in Court. By 7:00 p.m. ET the day before the deposition testimony is expected to be read or played in court, the first party shall identify any objections to the trial exhibits to be offered through that witness' counter-designated deposition testimony. Then the parties will confer on all outstanding objections to the designated testimony and trial exhibits to be offered through such testimony. If good faith efforts to resolve the objections fail, the objecting party will raise the objections with the Court before the testimony is read or played.

Dated: October 1, 2018                    Respectfully submitted,

                                          /s/ Adam K. Mortara
                                          _____

                                          Patrick Strawbridge (BBO #678274)
                                          CONSOVOY MCCARTHY PARK LLP
                                          Ten Post Office Square
                                          8th Floor South PMB #706
                                          Boston, MA 02109
                                          617-227-0548
                                          patrick@consovoymccarthy.com

                                          William S. Consovoy
                                          Thomas R. McCarthy
                                          J. Michael Connolly
                                          CONSOVOY MCCARTHY PARK PLLC
                                          3033 Wilson Boulevard, Suite 700
                                          Arlington, Virginia 22201
                                          703-243-9423
                                          will@consovoymccarthy.com
                                          tom@consovoymccarthy.com
                                          mike@conosovoymccarthy.com

                                          Michael H. Park
                                          CONSOVOY MCCARTHY PARK PLLC
                                          745 Fifth Avenue, Suite 500
                                          New York, NY 10151
                                          212-247-8006
                                          park@consovoymccarthy.com

                                          Adam K. Mortara
                                          J. Scott McBride
                                          Krista J. Perry
                                          BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
                                          54 West Hubbard Street, Suite 300
                                          Chicago, IL 60654
                                          312-494-4400
                                          adam.mortara@bartlit-beck.com
                                          scott.mcbride@bartlit-beck.com
                                          krista.perry@bartlit-beck.com

                                          John M. Hughes
                                          Katherine L.I. Hacker
                                          Meg E. Fasulo
                                          BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
                                          1801 Wewatta Street, Suite 1200
                                          Denver, CO 80202
                                          303-592-3100
                                          john.hughes@bartlit-beck.com
                                          kat.hacker@bartlit-beck.com
                                          meg.fasulo@bartlit-beck.com

                                          Paul M. Sanford (BBO #566318)

BURNS & LEVINSON LLP
One Citizens Plaza, Suite 1100
Providence, RI 02903
617-345-3000
psanford@burnslev.com

*Counsel for Plaintiff Students for Fair Admissions, Inc.*

_/s/ Felicia H. Ellsworth_

William F. Lee (BBO #291960)
Felicia H. Ellsworth (BBO #665232)
Andrew S. Dulberg (BBO #675405)
Elizabeth Mooney (BBO #679522)
Sarah R. Frazier (BBO #681656)
    WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6687
Fax: (617) 526-5000
william.lee@wilmerhale.com
felicia.ellsworth@wilmerhale.com
andrew.dulberg@wilmerhale.com
elizabeth.mooney@wilmerhale.com
sarah.frazier@wilmerhale.com

Seth P. Waxman (*pro hac vice*)
Paul R.Q. Wolfson (*pro hac vice*)
Danielle Conley (*pro hac vice*)
Brittany Amadi (*pro hac vice*)
Daniel Winik (*pro hac vice*)
    WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Tel: (202) 663-6800
Fax: (202) 663-6363
seth.waxman@wilmerhale.com
paul.wolfson@wilmerhale.com
danielle.conley@wilmerhale.com
brittany.amadi@wilmerhale.com
daniel.winik@wilmerhale.com

Debo P. Adegbile (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street

24

New York, NY 10007
Tel: (212) 295-6717
Fax: (212) 230-8888
debo.adegbile@wilmerhale.com

*Counsel for Defendant President and
Fellows of Harvard College*

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 1st day of October, 2018.

_/s/ Adam K. Mortara_