# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF MASSACHUSETTS
# BOSTON DIVISION

STUDENTS FOR FAIR ADMISSIONS, INC.,

                       Plaintiff,

    v.

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE (HARVARD CORPORATION),

                       Defendant.

Civil Action No. 1:14-cv-14176-ADB

# HARVARD'S PROPOSED
# <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.  PROPOSED FINDINGS OF FACT ................................................................... 4

    A.  Harvard's Interest In Diversity ................................................................ 4

        i.   Diversity Of All Forms, Including Racial Diversity, Is Central To The Mission Of Harvard College ............................................................................. 4

        ii.  Trial Testimony Corroborated Harvard's Conclusions.............................. 5

        iii. Harvard Recognizes That Belonging And Inclusion Are Important .......... 6

    B.  Harvard's Recruiting Efforts.................................................................... 7

    C.  Harvard's Individualized Admissions Process ......................................... 9

        i.   Harvard's Applicant Pool ...................................................................... 10

        ii.  The Docket System ................................................................................ 11

        iii. Initial Evaluation Of Applicants .......................................................... 11

        iv.  Committee Meetings .............................................................................. 14

    D.  Harvard's Efforts To Admit And Enroll A Class That Is Diverse And Extraordinary Across Many Dimensions ................................................. 16

        i.   Harvard's Consideration Of Race .......................................................... 16

        ii.  Admissions Officer Training ................................................................. 18

        iii. Recruitment Of Matriculants And On-Campus Support ........................ 20

    E.  The Racial Composition Of Harvard's Class Varies Over Time...................... 20

    F.  Race Is Merely One Factor Among Many In The Admissions Process .......... 23

    G.  Harvard Does Not Discriminate Against Asian-American Applicants .......... 25

        i.   Statistical Modeling .............................................................................. 25

            a)  Dr. Card's Model Is More Reliable .................................................. 26

                (1) Exclusion of ALDC Applicants ................................................ 26

                (2) Pooling of Admissions Cycles ................................................. 28

                (3) Omission of Variables ............................................................. 29

            b)  Dr. Arcidiacono's Model Does Not Support An Inference of Intentional Discrimination.................................................................................... 35

        ii.  OCR's Investigations Found That Harvard Does Not Discriminate .......... 36

        iii. OIR Documents Do Not Suggest Discrimination ................................. 38

        iv.  Admissions Office Documents Do Not Suggest Discrimination.............. 44

        v.   Admissions Officer Testimony Does Not Show Discrimination.............. 46

    H.  Race-Neutral Alternatives........................................................................ 46

     i.   Ongoing Promotion of Diversity Through Race-Neutral Practices ........................... 46

     ii.  Consideration of Race-Neutral Practices ..................................................... 47

     iii. The Committee's Analyses of Race-Neutral Practices ............................... 49

         a)  Effect of Eliminating Race-Conscious Admissions Alone ................... 49

         b)  Effect of Eliminating Certain Practices ............................................ 50

         c)  Effect of Augmenting Certain Practices ........................................... 51

     iv. Mr. Kahlenberg's Analysis ..................................................................... 56

     v.  Committee's Conclusions ....................................................................... 58

  I.   SFFA's Standing ............................................................................................. 58

III. PROPOSED CONCLUSIONS OF LAW ..................................................................... 59

  A.  Harvard Does Not Discriminate Against Asian-American Applicants ......................... 59

     i.   Legal Standard ................................................................................... 59

     ii.  The Statistical Evidence Does Not Support An Inference Of Intentional
        Discrimination ................................................................................... 60

     iii. The Non-Statistical Evidence Does Not Support An Inference Of Intentional
        Discrimination ................................................................................... 62

     iv. SFFA's Unconscious Bias Theory Cannot Compensate For The Evidence It Lacks. 64

  B.  Harvard Considers Race In The Manner Permitted By Precedent ................................... 66

     i.   Harvard Has Established Its Educational Interests In Diversity ................................ 67

     ii.  Harvard Could Not Achieve Its Educational Objectives Without Considering Race  68

         a)  Harvard Has Undertaken Serious, Good Faith Consideration Of Race-Neutral
            Alternatives ................................................................................... 69

         b)  Harvard's Review Of Race-Neutral Alternatives Demonstrated That Harvard
            Could Not Achieve Its Educational Objectives Without Considering Race ........ 70

     iii. Harvard Considers Race In The Manner Permitted By The Supreme Court.............. 71

         a)  Harvard Does Not Consider Race As More Than A Plus Factor ........................ 72

         b)  Harvard Does Not Engage In Racial Balancing ................................................. 73

  C.  SFFA Lacks Standing ....................................................................................... 74

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018) ........................................................................................59

*Ahern v. Shinseki*,
   629 F.3d 49 (1st Cir. 2010) ................................................................................59

*Ahmed v. Johnson*,
   752 F.3d 490 (1st Cir. 2014) ..............................................................................64

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ...........................................................................................60

*Camel Hair & Cashmere Institute of America, Inc. v. Associated Dry Goods
   Corp.*, 799 F.2d 6 (1st Cir. 1986) ................................................................74, 75

*Diamond v. Charles*,
   476 U.S. 54 (1986) ......................................................................................74, 75

*Anderson ex rel. Dowd v. City of Boston*,
   375 F.3d 71 (1st Cir. 2004) ................................................................................59

*Ensley Branch, NAACP v. Seibels*,
   31 F.3d 1548 (11th Cir. 1994) ...........................................................................63

*Fisher v. University of Texas at Austin*,
   570 U.S. 297 (2013) ...............................................................................66, 69, 73

*Fisher v. University of Texas at Austin*,
   136 S. Ct. 2198 (2016) ................................................................................ *passim*

*Gomillion v. Lightfoot*,
   364 U.S. 339 (1960) ...........................................................................................60

*Gonzalez v. El Dia, Inc.*,
   304 F.3d 63 (1st Cir. 2002) ................................................................................62

*Goodman v. Bowdoin College*,
   380 F.3d 33 (1st Cir. 2004) ........................................................................1, 59, 64

*Gratz v. Bollinger*,
   539 U.S. 244 (2003) .....................................................................................66, 72

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ............................................................................................ *passim*

*Honadle v. University of Vermont*,
    56 F. Supp. 2d 419 (D. Vt. 1999) .......................................................................... 63

*Hunt v. Washington State Apple Advertising Commission*,
    432 U.S. 333 (1977) .......................................................................................... 74, 75

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .............................................................................................. 74

*McCleskey v. Kemp*,
    481 U.S. 279 (1987) .............................................................................................. 60

*McGuire v. Reilly*,
    386 F.3d 45 (1st Cir. 2004) .................................................................................. 60

*NAACP v. State of Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) .............................................................................................. 74

*United States v. Oregon State Medical Society*,
    343 U.S. 326 (1952) .............................................................................................. 69

*Peightal v. Metropolitan Dade County*,
    26 F.3d 1545 (11th Cir. 1994) ............................................................................. 63

*Personnel Administrator of Massachusetts v. Feeney*,
    442 U.S. 256 (1979) .............................................................................................. 64

*Pryor v. NCAA*,
    288 F.3d 548 (3d Cir. 2002) ................................................................................ 60

*Pullman-Standard v. Swint*,
    456 U.S. 273 (1982) .............................................................................................. 59

*Regents of the University of California v. Bakke*,
    438 U.S. 265 (1978) .................................................................................... *passim*

*Rodriguez-Morales v. Veterans Administration*,
    931 F.2d 980 (1st Cir. 1991) ................................................................................ 59

*Spath v. NCAA*,
    728 F.2d 25 (1st Cir. 1984) .................................................................................. 60

*Steir v. Girl Scouts of the USA*,
    383 F.3d 7 (1st Cir. 2004) .................................................................................... 70

*Straughn v. Delta Air Lines, Inc.*,
  250 F.3d 23 (1st Cir. 2001) ............................................................................................62

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
  2018 WL 4688308 (D. Mass. Sept. 28, 2018) ..................................................................75

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
  261 F. Supp. 3d 99 (D. Mass. 2017) ...............................................................................75

*Udo v. Tomes*,
  54 F.3d 9 (1st Cir. 1995) .................................................................................................59

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977) .............................................................................................59, 60, 61, 62

*Weser v. Glen*,
  190 F. Supp. 2d 384 (E.D.N.Y. 2002) ............................................................................63

*White v. Vathally*,
  732 F.2d 1037 (1st Cir. 1984) .........................................................................................59

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ........................................................................................................60

## CONSTITUTIONAL PROVISIONS AND STATUTES

42 U.S.C. § 2000d *et seq.* ........................................................................................ *passim*

U.S. Const. amend. I ...........................................................................................................66, 67

U.S. Const. amend. XIV ......................................................................................................66

## I.      INTRODUCTION

For decades, many of the Nation's leading colleges and universities—including Harvard College—have sought to admit student bodies that are diverse on many dimensions, including race.  They have concluded that diversity is essential to the undergraduate education it is their mission to provide—one that improves the educational experience of all students by exposing them to different perspectives, backgrounds, and life experiences and prepares all students to become active citizens and leaders in a pluralistic society.  In seeking to achieve diversity, these institutions consider race as one among many factors in the admissions process; without doing so, they could not fully achieve the educational benefits a diverse student body provides.

It is no accident that SFFA brought this suit against Harvard—the very institution whose race-conscious admissions practices the Supreme Court has repeatedly identified as a model of legality.  *See, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 334-339 (2003); *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 317-318, 321-324 (1978) (opinion of Powell, J.).  SFFA has taken this course because its ultimate grievance is with those precedents.  The evidence at trial, however, does not support SFFA's claims.

*First*, SFFA failed to show that Harvard intentionally discriminates against Asian-American applicants on the basis of their race.  To prevail on that claim, SFFA must prove Harvard acted with "racial animus toward" Asian-American applicants, *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 43 (1st Cir. 2004), but it offered no such proof.  By its own admission, SFFA relied almost entirely on its own statistical analysis in an attempt to show that Asian-American applicants are admitted at lower rates than similarly qualified White applicants.  But that statistical analysis is unreliable, and entirely rebutted by the analysis of Harvard's expert, which showed no statistically significant effect of Asian-American ethnicity on admissions outcomes.

Even if taken at face value, SFFA's statistical evidence would not support an inference of

intentional discrimination, because, among other things, SFFA's theory of discrimination is riven with inconsistencies.  SFFA alleges discrimination only against *some* Asian-American applicants, while conceding that other categories of Asian-American applicants are admitted at *higher* rates than White applicants with similar characteristics.  And although SFFA attributes ratings disparities that favor Asian-American applicants to factors outside the data, it offers the opposite interpretation—racial bias—for disparities that favor White applicants.  SFFA never offered a compelling or even a plausible explanation for those inconsistencies; there is none.

Nor did any of SFFA's non-statistical evidence supply the missing proof of intent to discriminate.  Harvard's admissions officers testified consistently and credibly that race is only considered as a *positive* factor and that they have never witnessed racial bias in the admissions process.  They explained that the process includes robust checks and balances to prevent bias, starting with the fact that admissions decisions are made by the collective judgment of a 40-person committee where a scheme to discriminate could hardly be concealed.  And SFFA did not identify a single document evincing Harvard's discrimination or animus.

SFFA tried to suggest that work conducted by Harvard's Office of Institutional Research (OIR) was somehow inculpatory, but every OIR witness testified that their work did not set out to assess whether the Admissions Office discriminated against Asian-American applicants and made no findings on that subject.  In its opening statement, SFFA faulted Dean Fitzsimmons for failing to respond appropriately to OIR presentations that the unrebutted evidence showed Dean Fitzsimmons *never saw*.  As for the OIR work he did see, unrebutted evidence showed that he reasonably understood it to confirm his understanding that Harvard considers far more than academic factors in admitting students to Harvard College.  His response was unremarkable.

Without proof of racial animus, SFFA tried to shift gears midway through trial and

insinuate that admissions officers might have been *unconsciously* biased against Asian-American applicants.  But SFFA presented no evidence, lay or expert, concerning unconscious bias, and it did not explain how a 40-person committee could collectively have borne unconscious bias, let alone directed it against only *some* groups of Asian-American applicants, while favoring others. SFFA's hypothesis is thus completely unsupported.

*Second*, SFFA fell far short of carrying its burden on its other claims; indeed, it made almost no effort to do so.  Harvard presented unrebutted evidence that it considers race in precisely the manner long permitted by the Supreme Court.  Expert testimony showed without contradiction that the racial composition of Harvard's admitted and matriculating classes varies meaningfully from year to year—variations inconsistent with racial balancing.  Harvard showed that it considers race as just one among many "plus factors" in assessing candidates; race matters only for candidates who would be highly competitive regardless of their race, and it matters no more than several other factors.  Finally, Harvard showed that no race-neutral alternatives could allow it to achieve a comparably diverse class without fundamentally compromising its mission.

SFFA has left little doubt about its end goal.  SFFA believes favorable consideration for minority applicants is "the same thing" as a "white penalty."  10/25 Tr. 177:13-17 (Arcidiacono). It asks this Court to forbid Harvard from considering race in the admissions process, and recognizes that the consequence would be to reduce the number of African-American and Hispanic students by roughly 1,000 (in a student body of 6,700).  PD38.40; 10/25 Tr. 131:14-132:14, 167:11-168:4.  And SFFA has made clear that it will in due course ask the Supreme Court to expand that prohibition nationwide.  SFFA believes that, in that world, White and Asian-American students would be the "winners" and "the losers would be African-Americans and Hispanics."  10/25 Tr. 165:5-7 (Arcidiacono).  But the real "losers" would be the people of

this Nation and the promise of opportunity that has long been represented by our institutions of higher education.  *See, e.g.*, 10/30 Tr. 54:9-55:15 (Simmons).

## II.   PROPOSED FINDINGS OF FACT

1.      These proposed findings reflect the evidence presented during the trial conducted between October 15 and November 2, 2018.  13 current and former Harvard employees and four experts testified live, five former Harvard employees testified by deposition, and eight Harvard College students and alumni testified as amici curiae.[1]  No witness affiliated with SFFA testified.

### A.   Harvard's Interest In Diversity

> *i.*   *Diversity Of All Forms, Including Racial Diversity, Is Central To The Mission Of Harvard College*

2.      Harvard College's mission "is to educate the citizens and citizen-leaders for our society … through … the transformative power of a liberal arts and sciences education." DX109.1; 11/1 Tr. 191:1-17 (Faust).  The Mission Statement recognizes that diversity is central to that objective: "Through a diverse living environment, where students live with people who are studying different topics, who come from different walks of life and have evolving identities, intellectual transformation is deepened and conditions for social transformation are created." DX109.1; *see also* 10/23 Tr. 23:11-25:6 (Khurana); 11/1 Tr. 192:3-16 (Faust).

3.      Harvard values diversity of all kinds.  10/17 Tr. 193:1-194:4, 212:25-213:11 (Fitzsimmons); 10/23 Tr. 24:13-20 (Khurana); 11/1 Tr. 192:17-25 (Faust); DX5.10.

4.      Racial diversity is among the forms of diversity that Harvard regards as crucial to achieving its educational objectives.  11/1 Tr. 193:1-10 (Faust); 10/23 Tr. 24:13-25:6 (Khurana); 10/24 Tr. 123:25-124:7 (Banks).

---

[1]      To the extent a proposed finding of fact is more properly a conclusion of law, or vice versa, Harvard asks the Court to adopt it in whatever manner it deems appropriate.

5.      Harvard has repeatedly articulated the importance of diversity, including in briefs filed with the Supreme Court.  DX26.8-9, 13-20, 29-34; DX53.14-19; DX55.12, 17-20, 47-48. In 1996, then-President Rudenstine submitted a report to the Board of Overseers explaining the importance of diversity to Harvard's mission.  DX40.  More recently, then-President Faust repeatedly underscored the importance of diversity.  11/1 Tr. 199:11-21.

6.      In 2015, Harvard established a Committee to Study the Importance of Student Body Diversity.  P302 at 22; 10/23 Tr. 34:12-22 (Khurana).  The committee examined how "diversity in the student body helps catalyze the intellectual, social, and personal transformations that are central to Harvard's liberal arts and science education," and issued a report describing how diversity benefits various dimensions of Harvard College's missions.  P302 at 7, 9, 11-14.

7.      The committee described measures the College takes to realize the educational benefits of diversity, including through its residential housing program.  P302 at 12-14.  The committee also examined data from student surveys, showing that "the benefits resulting from [Harvard College's] diverse student body are both real and profound."  P302 at 18.

8.      The committee determined that diversity "enhances the education of all of [Harvard College's] students, it prepares them to assume leadership roles in the increasingly pluralistic society into which they will graduate, and it is fundamental to the effective education of the men and women of Harvard College."  P302 at 22.  It "emphatically embrace[d] and reaffirm[ed] the University's long-held view that student body diversity – including racial diversity – is essential to [Harvard's] pedagogical objectives and institutional mission."  *Id.*

9.      Harvard's Faculty of Arts and Sciences voted unanimously to adopt the committee's report.  11/1 Tr. 198:18-23 (Faust).

ii.      *Trial Testimony Corroborated Harvard's Conclusions*

10.      Harvard witnesses credibly testified to the educational benefits that flow from

Harvard's diversity.  10/18 Tr. 87:20-88:2 (Fitzsimmons); 10/16 Tr. 29:8-30:17 (Fitzsimmons);

10/19 Tr. 67:12-24 (Bever); 10/23 Tr. 110:4-19 (Smith), 220:23-221:10 (Yong).

11.     Students and alumni also spoke about the benefits they have derived from

Harvard's diverse student body.  For example, Thang Diep—a Vietnamese-American senior—

testified he had learned "to work across differences and how to build meaningful connections

and collaborations."  10/29 Tr. 140:3-8, 156:2-19; *see* 10/29 Tr. 8:17-9:8, 23:5-11 (Vasquez-

Rodriguez), 107:8-24 (Ho), 124:25-125:11 (Nunez), 210:17-23 (Chen), 190:20-191:12 (Trice).

12.     Dr. Ruth Simmons, who has served as President of Smith College, Brown

University, and Prairie View A&M University, explained that "difference is one of the primary

means for students to test themselves, to test their background, to test their ideas, to challenge

assumptions."  10/30 Tr. 23:6-10.  She described the benefits of diversity to her own education

and to students, institutions, and society. 10/30 Tr. 23:13-25:10, 54:25-55:15.

13.     SFFA introduced no evidence calling into question the myriad benefits of a

diverse student body and did not challenge Harvard's assertion that it has a long-held and

fundamental institutional interest in obtaining those benefits.  *See, e.g.*, 10/15 Tr. 49:14-17.

### iii.     Harvard Recognizes That Belonging And Inclusion Are Important

14.     Diversity is the presence on campus of students who are different from each other

in many ways; inclusion and belonging occur when students feel that they are full members of

the campus community, able to take advantage of its many offerings.  Harvard recognizes that

the benefits of diversity cannot fully be realized in the absence of inclusion and belonging.  11/1

Tr. 206:3-16 (Faust); 10/23 Tr. 33:25-34:7 (Khurana); DX740.6-7.

15.     In 2014, Harvard College convened a Working Group on Diversity and Inclusion

to assess Harvard's progress toward that goal.  DX13.9.  In 2015, the Working Group produced a

report outlining progress the College has made and challenges it continues to face, and offering

recommendations.  DX13; 11/1 Tr. 208:6-209:2 (Faust).  The College immediately implemented several of those recommendations.  DX13.29; 10/23 Tr. 32:17-33:12 (Khurana).

16.     The student and alumni witnesses explained that some minority students continue to feel a sense of alienation or isolation.  10/29 Tr. 19:5-20:8 (Vasquez-Rodriquez), 138:13-139:2 (Nunez), 148:10-149:20 (Diep), 175:20-176:10 (Trice), 204:12-205:5 (Chen).

17.     In May 2016, then-President Faust convened a University-wide Task Force on Inclusion and Belonging, which built upon the recommendations of the College Working Group. DX100.2.  It was charged with recommending how Harvard can cultivate a campus that more fully realizes the educational benefits of diversity.  DX100.2-3; 11/1 Tr. 209:15-210:1 (Faust).

18.     The Task Force issued findings and recommendations in March 2018.  DX740; 11/1 Tr. 210:2-4, 211:6-13 (Faust).  In consultation with her successor, President Lawrence Bacow, President Faust adopted several of the Task Force's recommendations, DX83.2-4; 11/1 Tr. 211:6-212:10.  Implementation of the recommendations is ongoing.  11/1 Tr. 213:16-20.

**B.     Harvard's Recruiting Efforts**

19.     To pursue the benefits of diversity, the Office of Admissions and Financial Aid seeks to recruit, admit, and enroll a class that is diverse in many ways.  10/17 Tr. 193:1-194:4 (Fitzsimmons); 11/1 Tr. 199:25-200:9 (Faust); DX5.10-11.

20.     Each year, the Office sends approximately 100,000 letters to high-school students with standardized test scores and grades above certain thresholds.  10/17 Tr. 156:22-157:9 (Fitzsimmons).  These letters, and other recruiting communications, are directed at students of all demographic and socioeconomic backgrounds.  *See* P2, P50, P57.  Whether or not an applicant receives these letters has no effect on admissions decisions.  10/15 Tr. 132:20-24 (Fitzsimmons).

21.     Admissions officers also engage in an annual "joint travel" program with other institutions, visiting more than 120 locations to meet students, parents, and guidance counselors.

10/17 Tr. 190:3-24 (Fitzsimmons); 10/18 Tr. 67:22-69:11 (Fitzsimmons).

22.     Harvard works to recruit racial and ethnic minority applicants.  Since the 1970s, the Undergraduate Minority Recruitment Program ("UMRP") has recruited applicants who self-identify as Asian-American, African-American, Latinx, Mexican-American, and Native American.  10/24 Tr. 95:12-21, 98:15-99:12 (Banks); 211:1-4 (Ray).  It conducts outreach to potential applicants online, by mail, by phone, and in person.  P316 at 4; *see* DX47.2-4; 10/24 Tr. 95:25-97:11 (Banks), 212:19-218:9, 220:22-221:9 (Ray).

23.     The Admissions Office uses similar strategies to encourage students from modest socioeconomic backgrounds to apply.  For example, through programs including the Harvard Financial Aid Initiative ("HFAI") and the Harvard College Connection, undergraduates reach out to low-income high-school students by email, phone, and social media, and conduct in-person and virtual tours.  10/24 Tr. 103:21-104:19, 107:7-108:6 (Banks), 144:1-22 (Kim).

24.     Harvard also engages in a concerted effort to recruit and enroll students who are from the first generation in their family to attend a four-year college.  P316 at 4; 10/18 Tr. 72:14-20 (Fitzsimmons); 10/24 Tr. 143:2-10 (Kim).  The First Generation program has increased the diversity of undergraduates, 10/24 Tr. 155:11-22 (Kim); roughly 15% of current undergraduates are first-generation college students, 10/24 Tr. 155:6-10 (Kim).

25.     Harvard offers entirely need-based financial aid—among the most generous in the country—to ensure that finances will not prevent any admitted student from matriculating.  P316 at 5; DX106; 11/1 Tr. 201:25-202:11 (Faust); 10/24 Tr. 143:15-21, 147:9-16, 148:16-17 (Kim).

26.     The Harvard Financial Aid Initiative, launched in 2004, seeks to recruit and support strong low-income applicants.  11/1 Tr. 200:10-25 (Faust); 10/24 Tr. 102:10-103:1, 103:21-104:3 (Banks), 148:24-149:5 (Kim).  The program has expanded over time; today,

- 8 -

Harvard expects no financial contribution from families with incomes below $65,000 and typical assets, and a contribution of 10% or less of family income from families with incomes between $65,000 and $150,000 and typical assets.  P316 at 6; DX106; 11/1 Tr. 201:1-15 (Faust); 10/24 Tr. 103:2-20 (Banks), 149:21-150:2 (Kim).  Harvard does not require students to take out loans. 11/1 Tr. 201:1-5 (Faust); 10/24 Tr. 105:6-21 (Banks), 150:7-11 (Kim).

27.    Over the past decade, Harvard's spending on undergraduate financial aid has increased from roughly $90 million per year to nearly $200 million.  11/1 Tr. 201:16-24 (Faust). Roughly 55% of undergraduates now receive need-based aid (10/24 Tr. 150:3-6 (Kim); 11/1 Tr. 203:11-14 (Faust)), including roughly 20% who fall within the zero-contribution threshold (11/1 Tr. 203:7-10 (Faust); 10/24 Tr. 149:21-150:2 (Kim)).  Students who qualify for aid pay an average of $12,000 each year for tuition, room, and board.  11/1 Tr. 203:15-19 (Faust); DX106. Harvard publicizes its aid policies widely.  10/24 Tr. 145:13-145:17 (Kim); DX106; P316 at 4.

**C.    Harvard's Individualized Admissions Process**

28.    Harvard seeks to admit a class that serves all of its educational objectives. DX5.11; 10/17 Tr. 200:18-201:22 (Fitzsimmons).

29.    Harvard seeks to admit students who will significantly contribute to and benefit from the educational experience on campus, including students who show intellectual curiosity and potential, who are likely to participate meaningfully in Harvard's extracurricular life, who contribute to diversity, and who have displayed the kinds of personal qualities that will enable them to contribute at Harvard and beyond.  DX5.9-11; 10/17 Tr. 200:18-211:8 (Fitzsimmons).

30.    To admit a class that fulfills these objectives, Harvard employs a whole-person process that considers the full range of available information.  10/17 Tr. 150:9-16 (Fitzsimmons); 10/18 Tr. 181:20-24 (Looby); 10/19 Tr. 69:20-22 (Bever).  Admissions officers may provide a tip for highly qualified applicants whose applications reflect unusual intellectual ability; strong

personal qualities (such as outstanding capacity for leadership); outstanding creative or athletic

ability; the capacity to contribute racial, ethnic, socioeconomic, and geographic diversity; and

excellence in many other dimensions.  DX5.9-11; 10/17 Tr. 202:5-205:25, 212:18-214:3

(Fitzsimmons); 10/19 Tr. 23:24-24:9 (Bever).  Children of College alumni and Harvard faculty

or staff may also receive a "tip."  DX5.9-11; 10/17 Tr. 206:10-212:17 (Fitzsimmons).

 31. Admissions officers consider applicants' accomplishments in context, taking into

account socioeconomic circumstances and geography, parental education and occupation, the

quality of and opportunities available at the applicant's high school, and much more.  10/16 Tr.

16:15-22 (Fitzsimmons); 10/17 Tr. 106:8-15, 181:20-24, 182:19-183:7, 211:18-213:11, 215:16-

24 (Fitzsimmons); 10/18 Tr. 24:6-25:7, 32:20-33:8, 55:3-19 (Fitzsimmons); 10/22 Tr. 155:23-25

(McGrath); 10/24 Tr. 160:6-161:6 (Kim), 235:22-236:10 (Ray); 10/19 Tr. 50:13-16, 58:14-59:6

(Bever).  Officers also consider students' ability to grow and contribute after graduating from

Harvard.  10/16 Tr. 14:12-24 (Fitzsimmons); 10/17 Tr. 203:22-204:11 (Fitzsimmons).

  *i.* *Harvard's Applicant Pool*

 32. Each year, Harvard receives tens of thousands of applications from around the

world.  For example, more than 40,000 students applied to the Class of 2022.  DX97.2.

 33. A "substantial majority" of applicants to Harvard College are academically

qualified.  10/17 Tr. 194:12-195:18 (Fitzsimmons).  For example, more than 8,000 domestic

applicants to the Class of 2019 had perfect GPAs (using Harvard's standardized scale).  DX671.1

& DD10.3.  Roughly 3,500 had perfect SAT math scores; 2,700 had perfect SAT verbal scores;

2,300 had perfect SAT writing scores; and 15,000 had average SAT Subject Test scores of at

least 700 out of 800.  DX671.1 & DD10.3.

 34. In Harvard's applicant pool, academic strength is more abundant than other types

of strength and does not suffice to distinguish candidates.  DX671.3 & DD10.4; DX672 &

DD10.5; 10/30 Tr. 86:25-89:3 (Card).  Candidates with multiple strengths—extracurricular, academic, athletic, or personal—are admitted at higher rates.  DX672 & DD10.6, DD10.8; 10/30 Tr. 88:12-89:3, 90:18-92:12 (Card).  Even academically exceptional candidates are much more likely to be admitted if they have other strengths.  DX672 & DD10.7; 10/30 Tr. 92:16-93:14.

ii.      *The Docket System*

35.      The Admissions Office organizes application files into geographic regions referred to as "dockets," with roughly similar numbers of applications on each docket.  DX5.16; 10/16 Tr. 8:17-20 (Fitzsimmons).  A subcommittee of the full Admissions Committee is responsible for the initial evaluation of all candidates from a particular docket.  DX5.16-17.  Subcommittees "var[y] in size, but generally include[] three to six area representatives, a docket chair (a senior admissions officer), and the docket's faculty readers."  DX5.17.

36.      Area representatives, assigned to specific geographic areas within their dockets, are also referred to as the "area person" or "first reader" for those areas.  DX5.16-17.  They read all the applications from high schools in the area.  DX5.17; 10/17 Tr. 215:10-12 (Fitzsimmons).

37.      Admissions officers develop a deep understanding of the high schools in their assigned areas—including grading practices, academic rigor, and recommendation styles—which helps them evaluate applications fairly within each high school and across high schools.  DX5.17; 10/17 Tr. 215:10-216:2 (Fitzsimmons); 10/24 Tr. 110:17-111:17 (Banks).

iii.      *Initial Evaluation Of Applicants*

38.      Applicants may apply to Harvard College using the Common Application or the Universal College Application—standardized forms Harvard did not create.  *See* 10/17 Tr. 196:23-197:7 (Fitzsimmons); 10/26 Tr. 98:2-6 (Weaver).  A completed application file includes demographic information; information about the applicant's family; test scores; information about the applicant's extracurricular activities, honors, and prizes; the applicant's intended

academic concentration and career; multiple essays; information submitted by the applicant's high school, including an overview of the school, transcripts, and guidance counselor and teacher recommendations; and typically a detailed report from an alumni interviewer who met the applicant.  *E.g.*, DX195; DX262; DX276; DX293; DX527; SA-1; SA-2; 10/18 Tr. 22:15-30:16 (Fitzsimmons); 10/19 Tr. 177:1-18 (McGrath).  Files may also include additional information, such as a report from any staff interview that has taken place, additional recommendation letters, academic or artistic work submitted by the applicant, and an evaluation of that work by Harvard faculty.  DX276.41-42; DX293.42; 10/19 Tr. 177:1-18 (McGrath).

39.     After reviewing the materials then available in the application file, the first reader assigns ratings, including four "profile" ratings:  (1) academic; (2) extracurricular; (3) athletic; and (4) personal.  10/17 Tr. 217:21-23, 218:6-9, 219:22-220:5 (Fitzsimmons).  The first reader also rates the strength of recommendations written by the guidance counselor and at least two teachers and assigns a preliminary overall rating.  10/17 Tr. 217:15-218:9 (Fitzsimmons).

40.     The ratings reflect a preliminary assessment of the strengths and weaknesses of an applicant.  10/17 Tr. 232:7-16 (Fitzsimmons); 10/24 Tr. 155:23-156:6, 157:20-158:3 (Kim).  They are often assigned before the application file is complete.  10/17 Tr. 216:3-22, 231:15-24 (Fitzsimmons).  For instance, applications may be reviewed before the applicant has had an interview.  10/17 Tr. 216:3-22 (Fitzsimmons); 10/19 Tr. 65:16-24 (Bever).

41.     Students are not admitted or denied admission on the basis of these ratings.  10/17 Tr. 232:24-234:3 (Fitzsimmons); 10/24 Tr. 156:7-9 (Kim), 233:15-23 (Ray).  Admissions decisions are based on a consideration of, and group discussion about, the entire application file.  10/17 Tr. 234:9-236:12 (Fitzsimmons); 10/18 Tr. 98:17-99:5 (Fitzsimmons).

42.     The numerical ratings generally range between 1 and 4, 1 being the best.  10/16

Tr. 10:19-11:17 (Fitzsimmons).  Readers may also use a plus (stronger) or a minus (weaker).  *Id.*

43.     The academic rating reflects both quantitative and qualitative information and is not based on a formula.  10/17 Tr. 220:22-221:11 (Fitzsimmons).  It summarizes the applicant's academic achievement and potential based on factors including grades, standardized test scores, letters of recommendation, academic prizes, any submitted academic work, and the strength of the applicant's high-school academic program.  10/17 Tr. 220:13-21 (Fitzsimmons); 10/19 Tr. 57:16-21 (Bever); 10/24 Tr. 113:5-12 (Banks).

44.     The extracurricular rating reflects quantitative and qualitative information and is not based on a formula.  10/17 Tr. 223:1-23 (Fitzsimmons).  It summarizes the strength of the applicant's involvement in activities during high school and potential to contribute outside the classroom at Harvard.  10/17 Tr. 223:1-23 (Fitzsimmons); 10/19 Tr. 60:25-62:14 (Bever).  It may also account for family or personal circumstances that constrain the applicant in participating in traditional extracurricular activities.  *See* 10/17 Tr. 218:10-20 (Fitzsimmons).

45.     The athletic rating summarizes the strength of the applicant's potential contributions to athletics at Harvard, as well as the applicant's degree of participation in high school athletics.  10/17 Tr. 224:6-14 (Fitzsimmons).  Athletic strength influences admissions outcomes even for applicants who are not recruited athletes.  DX673 & DD10.11; 10/30 Tr. 98:4-100:12 (Card).  For example, a non-recruited applicant's athletic experience may show leadership, commitment, and the potential to contribute to a club team.  *See* 10/17 Tr. 224:6-14 (Fitzsimmons); 10/24 Tr. 113:13-114:24 (Banks).

46.     The personal rating reflects "an assessment of what kind of positive effect this person might have throughout his or her life based on what [the reader has] seen so far in the student's materials," including "what kind of contribution" the applicant would "make to the

dining hall conversation, to study groups, and to society as a whole after graduation." P633 at HARV00097940.  It is based on all parts of the application, including essays, letters of recommendation, and interview reports.  10/17 Tr. 224:19-226:23 (Fitzsimmons); 10/18 Tr. 39:1-25 (Fitzsimmons); 10/22 Tr. 167:10-170:9 (McGrath); 10/24 Tr. 115:13-119:6 (Banks).  It assesses qualities including but not limited to integrity, helpfulness, courage, kindness, reaction to setbacks, concern for others, self-confidence, leadership abilities, and maturity.  10/17 Tr. 224:19-225:16 (Fitzsimmons); 10/19 Tr. 228:24-229:17 (McGrath); 10/24 Tr. 117:4-24 (Banks).

47.    The ratings assigned to teacher and guidance counselor recommendation letters, known as "school support" ratings, characterize the strength of the recommendations.  10/18 Tr. 204:4-23 (Bever); 10/17 Tr. 228:12-229:7 (Fitzsimmons).

48.    The preliminary overall rating summarizes the strength of the application taking into account all available information.  10/19 Tr. 51:14-52:2 (Bever); 10/18 Tr. 186:12-16 (Looby).  It is not a formulaic combination of other ratings.  10/17 Tr. 232:17-20 (Fitzsimmons).

49.    After reviewing the application, the first reader may write comments about the applicant.  10/18 Tr. 46:4-11 (Fitzsimmons); DX293.

50.    The first reader may send the file to the docket chair for further review.  10/19 Tr. 252:5-20 (McGrath); 10/24 Tr. 119:7-25 (Banks).  In that event, the chair will also read the file closely, assigning ratings on the same dimensions as the first reader and providing additional written comments.  10/19 Tr. 252:5-20 (McGrath).  The first reader's and the chair's ratings are reflected in the file.  *E.g.*, DX195.2-3; DX262.1-2; DX276.1-2; DX293.1-2; DX527.1-2.

iv.    *Committee Meetings*

51.    Subcommittees then discuss applicants in meetings where first readers summarize applicants' strengths and weaknesses, acting as advocates for students they believe should be admitted.  10/17 Tr. 215:7-9; 10/18 Tr. 9:14-10:1 (Fitzsimmons); DX5.17.  Subcommittee

members discuss each case and determine what to recommend to the full committee.  10/18 Tr. 9:13-10:1, 12:14-15:5 (Fitzsimmons); DX5.17.  The subcommittee "examines the entire docket several times … to ensure standard scrutiny for all applicants."  DX5.17.

52.     All admissions officers have access to every application and all the supporting material.  10/18 Tr. 12:1-13 (Fitzsimmons); 10/24 Tr. 156:7-157:6 (Kim).  Thus, even where a first reader declines to recommend an applicant, another admissions officer may feel differently, and the subcommittee may recommend the applicant.  10/17 Tr. 237:16-238:1 (Fitzsimmons); 10/18 Tr. 10:8-14 (Fitzsimmons); 10/19 Tr. 64:17-66:22 (Bever).  The subcommittee decides by majority whether to recommend an applicant.  10/18 Tr. 12:14-13:5 (Fitzsimmons); DX5.17.

53.     After subcommittees have decided which applications to propose, the full Admissions Committee meets to decide which applicants to admit.  The committee includes all the admissions officers who read files—approximately 40 people each year.  10/18 Tr. 13:19-21 (Fitzsimmons); 10/19 Tr. 234:11-13 (McGrath).  The full committee considers not just the applicants recommended by the subcommittees but others whom admissions officers may wish to call to the committee's attention.  10/18 Tr. 16:7-17:5 (Fitzsimmons).

54.     In full committee meetings, the first reader presents each file being discussed, typically emphasizing the applicant's strengths.  10/17 Tr. 234:9-236:12 (Fitzsimmons).  The committee then discusses the candidate and decides, by a majority, whether to admit, reject, or waitlist the candidate (or, in Early Action, whether to defer the applicant to the regular decision phase).  10/18 Tr. 17:21-18:2, 124:9-21 (Fitzsimmons); DX39.1.  The full committee may admit an applicant whom a subcommittee did not recommend, and may not admit an applicant the subcommittee recommended.  10/18 Tr. 13:8-15 (Fitzsimmons).

55.     Subcommittee and full committee discussions focus on the underlying

information in application files, rather than on the ratings assigned to the applicant.  10/17 Tr.

232:7-16, 232:24-234:3 (Fitzsimmons); 10/24 Tr. 233:15-23 (Ray); 10/19 Tr. 64:13-16 (Bever).

### D.   Harvard's Efforts To Admit And Enroll A Class That Is Diverse And Extraordinary Across Many Dimensions

   *i.*   *Harvard's Consideration Of Race*

56.   The Common Application and Universal Application offer applicants the option

to disclose their self-identified race or ethnicity by checking one or more boxes.  *See, e.g.*,

SA3.8; SA4.13; 10/26 Tr. 98:2-6 (Weaver).  Applicants who identify their race may also identify

their ethnic background.  *See, e.g.*, SA-2.4; 10/18 Tr. 52:8-14 (Fitzsimmons).

57.   Harvard does not require applicants to disclose their race.  10/18 Tr. 85:8-22

(Fitzsimmons); 10/26 Tr. 98:2-6 (Weaver).  If an applicant chooses not to disclose his or her

race, Harvard makes no attempt to determine it.  10/18 Tr. 85:8-22 (Fitzsimmons); P633 at

HARV00097936.  If an applicant chooses to disclose his or her race, Harvard does not attempt to

verify the information disclosed by the applicant.  P633 at HARV00097936.

58.   Whether or not applicants disclose their race or ethnicity by checking the boxes

on the application, they may discuss their race or ethnicity in other parts of the application, such

as an essay.  *E.g.*, SA-2.10; *see also* 10/16 Tr. 26:18-24 (Fitzsimmons).

59.   Consistent with Harvard's commitment to achieving racial and ethnic diversity,

admissions officers may consider the applicant's race or ethnicity as one factor.  10/16 Tr. 22:18-

23:4 (Fitzsimmons); 10/18 Tr. 170:1-10, 185:19-23 (Looby), 205:9-11, 207:6-10, 207:14-19

(Bever); 10/19 Tr. 50:9-12 (Bever), 255:3-6 (McGrath); 10/22 Tr. 147:24-148:14, 153:17-24

(McGrath); 10/24 Tr. 120:9-11, 120:23-121:20 (Banks), 134:18-135:6, 139:25-140:5 (Kim),

179:12-180:4, 192:17-24, 194:11-22, 208:4-10, 223:10-14, 236:18-22 (Ray); 10/26 Tr. 91:17-22

(Ortiz), 107:10-14 (Howrigan); 11/1 Tr. 249:10-13 (Weaver), 254:10-16 (Walsh).

60.     Racial or ethnic identity may thus function as a "tip," or a factor that contributes to the admission of an applicant.  10/16 Tr. 22:18-23:4 (Fitzsimmons); 10/18 Tr. 48:10-13 (Fitzsimmons), 186:20-187:1 (Looby); 10/19 Tr. 50:3-8 (Bever); 10/22 Tr. 147:24-148:25 (McGrath); 10/24 Tr. 121:2-20 (Banks), 140:18-25 (Kim), 207:19-208:3 (Ray).

61.     Admissions officers provide this "tip" only to applicants who would be highly competitive no matter what their race.  10/30 Tr. 80:1-23 (Card).

62.     When admissions officers provide a "tip" for applicants based on their self-identified race or ethnicity, that tip may be reflected in the preliminary overall rating, but not the other ratings.  10/18 Tr. 49:20-50:3 (Fitzsimmons), 186:17-19 (Looby); 10/19 Tr. 52:3-6 (Bever), 254:22-255:6 (McGrath); 10/24 Tr. 121:21-122:4 (Banks), 140:6-25 (Kim).

63.     An applicant's self-identified race or ethnicity can factor into a subcommittee or full committee's conversation about the applicant and the ultimate decision.  10/16 Tr. 52:16-53:2 (Fitzsimmons); 10/18 Tr. 49:10-16 (Fitzsimmons); 10/19 Tr. 232:25-233:13 (McGrath); 10/24 Tr. 192:21-24, 194:16-22 (Ray).  An applicant's self-identified race or ethnicity does not have a mechanical effect on the applicant's preliminary overall rating or admissions decision; admissions officers do not, for example, use a point system in which non-White applicants receive extra points.  10/16 Tr. 22:18-23:4, 55:21-56:10 (Fitzsimmons); 10/22 Tr. 164:15-24 (McGrath); 10/24 Tr. 223:10-14 (Ray); 11/1 Tr. 249:10-14 (Weaver).

64.     The flexible and non-mechanistic consideration of race has always been the practice of the Admissions Office, and that practice is now codified in written guidance provided to admissions officers.  P633 at HARV00097938; 11/1 Tr. 175:16-177:22 (McGrath).

65.     Admissions officers do not consider the fact of an applicant's race in assigning the academic, extracurricular, athletic, or personal rating.  10/17 Tr. 226:24-227:2

- 17 -

(Fitzsimmons); 10/18 Tr. 49:17-19 (Fitzsimmons), 184:6-17 (Looby); 10/19 Tr. 50:17-51:10

(Bever), 254:22-255:2 (McGrath); 10/24 Tr. 122:5-8 (Banks), 140:6-17 (Kim), 189:10-12,

189:21-23, 190:6-9, 191:1-3 (Ray); 11/1 Tr. 246:23-247:3 (Weaver), 253:17-24 (Walsh).

ii.     *Admissions Officer Training*

66.     New admissions officers participate in a weeks-long orientation during which

they learn how to read and evaluate files.  10/19 Tr. 45:13-46:14 (Bever), 256:17-24 (McGrath);

10/22 Tr. 149:7-23 (McGrath); 10/24 Tr. 222:8-223:2 (Ray); 10/18 Tr. 187:14-188:5 (Looby);

DX3.  During training, they review and discuss actual application files from a prior year, as well

as a "casebook" that includes lightly edited application files; that training includes guidance on

considering race.  DX2; DX24; 10/19 Tr. 46:5-14 (Bever); 10/18 Tr. 187:14-23 (Looby); 10/24

Tr. 139:7-24 (Kim), 222:12-223:14 (Ray); 10/22 Tr. 151:18-164:24, 179:16-180:7 (McGrath).

67.     New and experienced admissions officers receive annual training from Harvard's

Office of the General Counsel on lawful consideration of race.  DX4; 10/19 Tr. 48:2-13 (Bever);

10/24 Tr. 133:13-25 (Kim), 224:2-225:1 (Ray); 10/17 Tr. 146:16-25 (Fitzsimmons).

68.     The first 50 to 100 application files reviewed by new admissions officers are also

reviewed by more senior officers.  10/18 Tr. 187:14-188:19 (Looby), 201:15-202:6 (Bever);

10/24 Tr. 139:7-24 (Kim), 222:12-223:2 (Ray); 10/19 Tr. 256:25-257:20 (McGrath).  Based on

that review, new officers receive feedback, including on considering race.  10/19 Tr. 47:2-23

(Bever), 256:25-258:8 (McGrath); 10/18 Tr. 192:9-16 (Looby); 10/24 Tr. 139:7-140:5 (Kim).

69.     Admissions officers also receive training on racial diversity within racial and

ethnic groups and within Harvard's applicant pool to better understand the nuanced experiences

of applicants.  DX36; DX19; P099; 10/24 Tr. 227:12-230:10 (Ray).

70.     The Admissions Office holds annual staff retreats.  10/19 Tr. 48:23-49:22

(Bever); 11/1 Tr. 174:3-9 (McGrath).  The retreats provide opportunities for admissions officers

to discuss topics including the consideration of race and the consistent assignment of ratings. 10/19 Tr. 48:23-49:16 (Bever); 10/24 Tr. 134:1-17 (Kim); 11/1 Tr. 173:18-174:2 (McGrath).

71.     Each year, the Admissions Office distributes to all admissions officers a set of guidelines on how to review application files, known as reading procedures.  10/19 Tr. 230:19-231:8 (McGrath).  The reading procedures are updated every year.  11/1 Tr. 168:10-23 (McGrath); P1; P71; DX743; DX742; DX744; P633.

72.     Before 2018, the reading procedures did not explicitly discuss how to use race in evaluating applicants or assigning ratings.  *See* P1; 11/1 Tr. 142:2-25 (McGrath).  The reading procedures for the current admissions cycle explicitly address the consideration of race.  P633 at HARV00097938, 97940.  They state:  "In assigning the overall rating, readers may consider whether a student's background, including his or her race or ethnicity, may contribute to the educational benefits of diversity at Harvard College.  The consideration of race or ethnicity may be considered **only** as one factor among many."  P633 at HARV00097938.  They also state that "readers should not take an applicant's race or ethnicity into account in making any of the ratings other than the Overall rating," *id.*, and that "an applicant's race or ethnicity should not be considered in assigning the personal rating," *id.* at HARV00097940.

73.     These reading procedures codify longstanding practices and do not reflect any change in policy.  11/1 Tr. 175:16-177:23 (McGrath); 10/24 Tr. 206:19-207:6 (Ray).

74.     The review process contains many checks and balances to ensure that admissions officers give fair consideration to all applicants.  Officers openly discuss the applications they review and benefit from the experience of more senior officers.  10/19 Tr. 47:2-23 (Bever), 256:17-258:8 (McGrath); 10/18 Tr. 187:14-188:19 (Looby); 10/24 Tr. 225:2-11 (Ray).  During committee meetings, admissions officers can raise any applicant for discussion.  10/18 Tr. 10:8-

14, 11:4-25, 16:7-9 (Fitzsimmons); 10/19 Tr. 64:17-65:15, 66:18-22 (Bever).  Final decisions are made in open meetings by a majority.  10/18 Tr. 17:21-18:2 (Fitzsimmons).

<em>iii.    Recruitment Of Matriculants And On-Campus Support</em>

75.     Once students are admitted, Harvard engages in extensive efforts to ensure that a diverse group of students chooses to enroll.  For example, the Undergraduate Minority Recruitment Program ("UMRP") enlists current Harvard College students to call and congratulate every admitted minority student.  10/24 Tr. 218:10-219:2 (Ray).

76.     Each year, Harvard invites admitted students to campus for an event known as "Visitas," which allows them to meet professors and students and explore the campus.  P316 at 5; 10/24 Tr. 219:3-8 (Ray).  To ensure that low-income students are able to participate, Harvard provides need-based aid to cover the cost of attending Visitas.  P316 at 5; DX27.10.  The UMRP also works to recruit minority students during Visitas by matching them with undergraduate hosts and offering special programming.  10/24 Tr. 219:9-220:21 (Ray).

77.     Harvard also supports low-income students once they arrive on campus.  Students receiving financial aid are paired with a dedicated financial aid officer who works with them throughout their time at Harvard.  10/24 Tr. 151:6-13 (Kim).  And HFAI sponsors community building events, such as dinners and study breaks, and provides financial support to enable HFAI students to transition to college, participate in the first-year family weekend, and buy winter clothing.  10/24 Tr. 150:15-151:5, 152:3-15, 153:3-11 (Kim); DX27.10-13.

78.     Harvard's commitment to recruiting, enrolling, and supporting racial and ethnic minorities and low-income students has led to increases in racial and socioeconomic diversity.  *See* P316 at 4-5; 10/24 Tr. 100:23-102:3, 105:1-21 (Banks), 153:12-22 (Kim).

**E.    The Racial Composition Of Harvard's Class Varies Over Time**

79.     Harvard does not seek to maintain—and has not maintained—a consistent racial

composition of the student body.  *See* 10/18 Tr. 112:1-13 (Fitzsimmons), 197:17-20 (Looby);

10/19 Tr. 67:25-68:2 (Bever), 199:7-10 (McGrath); 10/24 Tr. 123:15-18 (Banks), 174:10-18

(Kim), 210:2-9 (Ray); 11/1 Tr. 249:23-250:5 (Weaver); DX711; DX713; DD10.100-104; 10/31

Tr. 118:15-124:5 (Card).

80.     Harvard presented expert testimony about the racial composition of the applicant

pool and admitted class from Professor David Card.  10/31 Tr. 118:15-124:5.  Dr. Card is the

Class of 1950 Professor of Economics at the University of California, Berkeley.  DX133.  He

holds a Ph.D. in economics from Princeton University, has published extensively on gender and

race discrimination, and has won numerous awards and prizes, including the John Bates Clark

Medal.  DX133; 10/30 Tr. 74:5-14, 75:14-76:2 (Card).  Dr. Card testified credibly.

81.     Dr. Card found meaningful year-to-year variations in the racial composition of

Harvard's admitted and matriculating classes.  DX711 & DD10.100-101; 10/31 Tr. 119:9-122:5.

Those variations are inconsistent with racial balancing.  10/31 Tr. 121:3-9, 122:1-5 (Card).

82.     Dr. Card also examined the racial composition of Harvard's applicant pool and

admitted classes since the Class of 1980, and found that there has been greater year-to-year

variation in the admitted class than in the applicant pool.  That is exactly the opposite of the

"pattern … one would expect to see if Harvard was trying to stabilize the admitted students

relative to the students who apply."  DX713 & DD10.102-104; 10/31 Tr. 122:6-124:5 (Card).

83.     Over the last few decades, the racial composition of Harvard's admitted class has

changed substantially.  DX713.2 (Classes of 1980 through 2019).  In the most recent decade

analyzed by the experts, the Asian-American share of admitted students grew by 17%, from

17.6% to 20.6%, the African-American share grew by more than 10%, from 10.5% to 11.6%,

and the Hispanic share grew by more than 40%, from 8.2% to 11.6%.  DX713.2.

84.     SFFA did not offer expert testimony in support of its claim that Harvard engages in racial balancing.  10/25 Tr. 13:18-19 (Arcidiacono).

85.     Instead, SFFA suggested that the Admissions Office engages in racial balancing because its leaders periodically review documents known as "one-pagers."  10/15 Tr. 48:18-49:8. One-pagers summarize a wide range of characteristics of Harvard's admitted class, including gender, geography, intended concentration, lineage, recruited athlete status, citizenship, race or ethnicity, and a variety of measures of socioeconomic and financial aid status.  P163 at HARV00016807; 10/18 Tr. 77:5-78:10 (Fitzsimmons); 10/23 Tr. 175:1-18, 214:11-16 (Yong).

86.     One-pagers are prepared periodically for the Dean of Admissions and Financial Aid, the Director of Admissions, and the Director of Financial Aid.  10/18 Tr. 78:14-17, 80:2-5 (Fitzsimmons); 10/23 Tr. 215:25-216:7 (Yong).

87.     They are not distributed to admissions officers.  10/18 Tr. 80:9-10 (Fitzsimmons).

88.     Admissions Office leaders who receive one-pagers use them to estimate the likely yield rate of the admitted class and manage the number of offers that can be extended.  Harvard is a residential college, meaning that nearly all students live on campus, and a finite number of beds are available for incoming freshmen.  10/17 Tr. 194:5-11 (Fitzsimmons).  Thus, each year, Harvard must admit a number of students that will result in roughly 1,660 students enrolling. 10/15 Tr. 160:17-20 (Fitzsimmons); 10/18 Tr. 78:19-24 (Fitzsimmons).  Yield rates vary by geography, race, and intended concentration, among other characteristics.  10/15 Tr. 160:25-161:19 (Fitzsimmons); 10/18 Tr. 79:9-12, 80:19-81:5 (Fitzsimmons).  Accordingly, in years in which a larger than expected number of admitted students fall in categories that tend to yield at lower rates, the office will make a greater overall number of offers of admission, and the inverse is also true.  10/15 Tr. 161:11-19 (Fitzsimmons); 10/18 Tr. 79:13-80:1 (Fitzsimmons).

89.     Admissions Office leaders who receive one-pagers also use them to understand how the class is "shaping up," compared to the previous year, along a variety of dimensions. 10/19 Tr. 197:23-198:9 (McGrath); 10/23 Tr. 175:8-18 (Yong).  That enables them to be aware of any dramatic changes in any of the categories reported on the one-pagers, which may inform the next year's recruitment efforts.  10/15 Tr. 160:3-16 (Fitzsimmons); 10/18 Tr. 81:20-82:18, 82:25-83:15 (Fitzsimmons); 10/19 Tr. 200:8-202:3 (McGrath).

90.     In some years, Dean Fitzsimmons has provided the Admissions Committee, at the outset of full committee meetings, with an overview of the array of information in the one-pagers.  10/18 Tr. 77:5-78:10, 80:6-18 (Fitzsimmons); 10/19 Tr. 198:2-9 (McGrath); 10/24 Tr. 129:12-25 (Kim).  He does not instruct the committee to admit more students from a particular category, nor does the committee attempt to do so.  10/18 Tr. 82:19-83:15 (Fitzsimmons); 10/19 Tr. 199:14-200:4 (McGrath); 11/1 Tr. 244:8-10 (Cheng); 11/1 Tr. 249:23-251:4 (Weaver).

91.     Admissions Office witnesses testified credibly and consistently that the office does not seek a class with any particular racial composition, through either one-pagers or any other means.  *See* 10/18 Tr. 112:1-13 (Fitzsimmons), 197:17-20 (Looby); 10/19 Tr. 67:25-68:2 (Bever), 199:7-10 (McGrath); 10/23 Tr. 219:9-12 (Yong); 10/24 Tr. 123:15-18 (Banks), 174:10-18 (Kim), 210:2-9 (Ray); 11/1 Tr. 242:10-12 (Cheng), 249:23-250:5 (Weaver).

**F.     Race Is Merely One Factor Among Many In The Admissions Process**

92.     Harvard has long employed a whole-person admissions process; for example, it did so at the time of *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), when a statement of Harvard's practices was appended to the amicus brief filed by Harvard and other universities and to Justice Powell's opinion.  DX55.47-50; 10/18 Tr. 62:19-64:13 (Fitzsimmons). That statement explained that race is "a factor in some admissions decisions" and that, for an otherwise competitive applicant, "race may tip the balance in his favor."  DX55.48.  Harvard's

admissions process is largely the same today as in 1978.  10/18 Tr. 65:18-66:2 (Fitzsimmons).

93.     Current and former admissions officers testified consistently and credibly that race is considered as just one factor among many, that it can make a difference only for applicants who would be highly competitive no matter what their race, and that it is considered in the context of the Admissions Committee's effort to understand each applicant as a whole person.  *See* 10/16 Tr. 22:18-23:4 (Fitzsimmons); 10/24 Tr. 121:8-20 (Banks), 139:25-140:5 (Kim), 179:15-19 (Ray); 11/1 Tr. 249:10-14 (Weaver).

94.     That testimony is corroborated by Dr. Card's analysis.  Numerous characteristics of applicants other than race—including, for example, parental occupation and intended career—explain more about the variation in admissions outcomes than race does.  DX715 & DD10.93; 10/31 Tr. 100:9-102:10 (Card).  And the data confirm that race has a meaningful effect on the likelihood of admission only for candidates who are highly qualified and would be highly competitive regardless of their race.  DX718 & DD10.97-98; 10/31 Tr. 107:14-108:2 (Card).

95.     For those highly qualified and competitive applicants for whom race may play a role, the effect of race is comparable to that of other factors.  DX718 & DD10.98; 10/31 Tr. 172:2-6, 110:14-111:20 (Card).  The magnitude of the effect of race and other factors for highly competitive candidates reflects the fact that any factor can have a large effect for such candidates because the process is so competitive.  DX670 & DD10.96; 10/31 Tr. 104:25-105:22 (Card).

96.     SFFA offered testimony on the effect of race in the Harvard admissions process from its statistical expert, Peter Arcidiacono.  Dr. Arcidiacono has published numerous articles on the "mismatch" theory, which posits that affirmative action results in minority students' being admitted to colleges at which they are less likely to succeed.  10/25 Tr. 168:5-23 (Arcidiacono).  In one article, he described a shift in the enrollment of minority students from more selective to

less selective institutions following the elimination of race-conscious admissions in California as "a more efficient sorting of minority students."  10/25 Tr. 173:18-25 (Arcidiacono).  Dr. Arcidiacono received approximately $50,000 for his work on the "mismatch" theory from an organization that also funds SFFA.  10/25 Tr. 160:1-15 (Arcidiacono).

97.     Regarding the role of race in the Harvard admissions process, Dr. Arcidiacono agreed that race has no effect for the vast majority of applicants, that race makes a difference only for applicants who would otherwise be competitive, and that other factors play a role similar to that of race in admissions decisions.  10/25 Tr. 200:1-17, 201:12-25.

### G.     Harvard Does Not Discriminate Against Asian-American Applicants

98.     There is no evidence that Harvard intentionally discriminates against members of any racial or ethnic group, including Asian-American applicants.

#### i.     *Statistical Modeling*

99.     Both Dr. Card and Dr. Arcidiacono built multivariate logit regression models of the Harvard admissions process.  10/25 Tr. 216:22-217:3 (Arcidiacono); 10/30 Tr. 101:15-17 (Card).  Both agreed that a logit regression model should endeavor to reflect the process being modeled.  10/25 Tr. 215:12-15 (Arcidiacono); 10/30 Tr. 144:21-145:4, 158:19-159:14, 176:19-177:7 (Card); DD10.34.  Both experts testified that their models did not capture all of the actual inputs into the Harvard admissions process, which relies heavily on qualitative information. 10/25 Tr. 80:13-24 (Arcidiacono); 10/30 Tr. 114:10-23, 123:1-17 (Card).

100.     Both experts focused their analyses on domestic applicants, defined as U.S. citizens or permanent residents.  10/25 Tr. 25:3-10 (Arcidiacono); 11/1 Tr. 99:12-100:10 (Card). Foreign applicants were approximately 10% of admitted students in the classes analyzed by the experts.  PD38.1; 10/25 Tr. 26:22-27:1 (Arcidiacono); 11/1 Tr. 99:12-100:10 (Card).

101.     Dr. Card found no statistically significant difference in admissions outcomes

between Asian-American applicants and otherwise identical White applicants.  DX685 & DD10.30; 10/30 Tr. 129:9-16, 132:21-134:11 (Card).  Dr. Arcidiacono estimated a statistically significant negative effect of Asian-American ethnicity.  10/25 Tr. 115:1-11 (Arcidiacono).

102.    As explained below, Dr. Card's analysis is more reliable than Dr. Arcidiacono's.  Unlike Dr. Arcidiacono's, Dr. Card's model reflects Harvard's actual admissions process as closely as possible.  And even if Dr. Arcidiacono's analysis were reliable, it would not support a finding that Harvard intentionally discriminates against Asian-American applicants.

> a)    Dr. Card's Model Is More Reliable

103.    Dr. Card sought to account as fully as possible for the factors that actually play a role in the Harvard admissions process.  10/30 Tr. 144:21-145:4, 176:19-177:7 (Card); DD10.34.

104.    Dr. Card's model found no statistically significant effect of Asian-American ethnicity on the likelihood of admission to Harvard.  DX685 & DD10.30; 10/30 Tr. 132:24-134:11 (Card).  In other words, it showed that Asian-American applicants were as likely to be admitted as otherwise identical White applicants.  10/30 Tr. 136:3-7 (Card).

105.    Dr. Card found a slightly positive (though still statistically insignificant) effect of Asian-American ethnicity on the likelihood of admission for two large groups of Asian-American applicants: female applicants and applicants from California.  DX686.2-3 & DD10.31; 10/30 Tr. 138:19-139:4 (Card).  Together, those groups include nearly two-thirds of Asian-American applicants.  DX686.4 & DD10.32; 10/30 Tr. 139:8-12 (Card).

106.    Dr. Arcidiacono estimated a statistically significant negative effect of Asian-American ethnicity.  10/25 Tr. 115:20-116:2 (Arcidiacono).  But he generated that result only by making several unsound methodological choices.

> (1)    Exclusion of ALDC Applicants

107.    Dr. Arcidiacono excluded from his analysis applicants who were recruited

athletes, children of Harvard College or Radcliffe alumni, children of Harvard faculty or staff members, or on the Dean's or Director's interest lists—a group the experts have collectively referred to as ALDC applicants. 10/25 Tr. 27:2-8 (Arcidiacono). Approximately 30% of students admitted to the Classes of 2014 to 2019 were ALDC applicants. DX706 & DD10.38.

108.    Dr. Arcidiacono conceded that Asian-American ethnicity has a *positive* effect on the likelihood of admission for ALDC applicants. 10/25 Tr. 120:23-121:3, 126:1-9, 190:1-5 (Arcidiacono). Asian-American ALDC applicants are thus *more* likely to be admitted than otherwise identical White ALDC applicants. Among legacy applicants, that difference is statistically significant. DX707 & DD10.33; 10/30 Tr. 141:25-142:5 (Card).

109.    Had Dr. Arcidiacono included ALDC applicants in his analysis, his model would have estimated a lower negative effect of Asian-American ethnicity. 10/25 Tr. 238:4-7, 240:10-20 (Arcidiacono); 10/30 Tr. 147:12-15 (Card); DX695 & DD10.35.

110.    Dr. Arcidiacono claims to have excluded ALDC applicants because those applicants receive "tips" for their ALDC attributes. 10/25 Tr. 27:2-16, 228:11-230:17 (Arcidiacono). But that is not a legitimate basis to exclude ALDC applicants, for two reasons.

111.    ALDC applicants participate in the same admissions process as all other domestic applicants, and it is therefore appropriate to include them in the analysis even if they receive "tips" for ALDC status. 10/17 Tr. 214:16-19 (Fitzsimmons); 10/25 Tr. 222:24-234:3 (Arcidiacono); 10/30 Tr. 152:3-7, 153:11-19 (Card). A regression model allows comparisons across individuals who differ in many respects and receive "tips" for a wide variety of reasons. 10/30 Tr. 101:18-102:9 (Card). By controlling for those differences, the model estimates the effect of a given characteristic holding others equal. 10/25 Tr. 21:23-22:17 (Arcidiacono); 10/30 Tr. 102:3-17 (Card). That is why Dr. Arcidiacono does not exclude from his analysis applicants

who receive other kinds of "tips," *see infra* ¶ 115.  A model that includes ALDC applicants can control for the effect of ALDC attributes, as Dr. Card's does.  10/30 Tr. 157:24-158:14 (Card).

112.    The fact that ALDC applicants have higher-than-average rates of admission does not suggest they participate in a different process.  It reflects partly the tips that ALDC applicants receive—but also that such applicants tend to be stronger than the overall pool in many respects other than their ALDC attributes.  DX705.2-3 & DD10.40; 10/30 Tr. 161:3-5 (Card).

113.    ALDC applicants also constitute a large part of the admitted class—roughly 30%. DX706 & DD10.38.  And they include many of the strongest applicants.  DX705.2-3 & DD10.40; 10/30 Tr. 153:20-25, 161:3-5 (Card).  A model that excludes them thus does not account for a significant part of the admissions process and cannot accurately estimate the effect of other factors in the process.  10/30 Tr. 154:1-8, 158:19-159:14, 167:14-20 (Card).

114.    Although Dr. Arcidiacono claimed to have excluded ALDC applicants because they receive "tips," his decision appears to have been driven by the fact that excluding them made his model's estimate of the effect of Asian-American ethnicity more negative.

115.    ALDC applicants are not the only applicants who receive "tips."  10/25 Tr. 230:18-234:6 (Arcidiacono).  Yet Dr. Arcidiacono did not exclude applicants who receive other types of "tips"; nor did he exclude other applicants who are admitted at higher-than-average rates.  10/25 Tr. 230:18-20, 234:11-235:10, 243:13-244:24 (Arcidiacono).

116.    The proper way to estimate how Asian-American ethnicity affects admissions outcomes for the domestic applicant pool as a whole is to include ALDC applicants and control for their ALDC attributes and other attributes, as Dr. Card did.  10/30 Tr. 166:21-167:20 (Card).

(2)    Pooling of Admissions Cycles

117.    Dr. Arcidiacono analyzed the admissions process using a single model pooling all six admissions cycles for which data were produced.  10/25 Tr. 142:25-143:3 (Arcidiacono).

118.    Dr. Card, by contrast, modeled each cycle separately and then averaged the results.  10/30 Tr. 167:25-168:1, 171:18-22 (Card).  He took that approach because the process is conducted separately each year and may vary slightly from year to year, including as a result of changing institutional interests.  10/30 Tr. 168:2-170:15 (Card); DX703 (changes in intended major by year); DX704 (changes in application fee waivers by year); 10/17 Tr. 175:1-5 (Fitzsimmons) (creation of engineering school affected applicant pool).

119.    Although Dr. Arcidiacono stated that he pooled all six cycles to achieve a more precise estimate of the effect of Asian-American ethnicity, 10/25 Tr. 143:4-10 (Arcidiacono), Dr. Card's average of the year-by-year effects produced a slightly *more* precise estimate than Dr. Arcidiacono's model.  10/25 Tr. 220:25-221:11 (Arcidiacono); 10/30 Tr. 172:23-175:18 (Card).

120.    Dr. Arcidiacono's pooled approach produced a slightly more negative estimate of the effect of Asian-American ethnicity than Dr. Card's approach.  DX695 & DD10.35; 10/30 Tr. 147:7-11 (Card).  Dr. Card's year-by-year approach, which more closely approximates the actual admissions process, is more appropriate.

(3)    Omission of Variables

121.    Dr. Arcidiacono omitted from his model several factors that play a role in the admissions process, including the occupations of the applicant's parents, the applicant's intended career, whether the applicant interviewed with a member of the Admissions staff, and the personal rating.  10/25 Tr. 145:10-13, 146:4-6, 147:19-21, 148:13-15 (Arcidiacono).

122.    A regression model's estimate of the effect of a given factor (*e.g.*, race) on the outcome (*e.g.*, admission or rejection) will be biased when the model omits factors that are correlated with the factor of interest and that affect the outcome.  10/25 Tr. 102:23-103:13 (Arcidiacono); 10/30 Tr. 113:1-14 (Card).  That is known as omitted variable bias.  10/25 Tr. 103:2-5 (Arcidiacono); 10/30 Tr. 112:4-5 (Card).  Here, a regression estimate of the effect of

Asian-American ethnicity would be biased by the omission of any factor that is correlated with race (even if not actually based on race) and affects admissions outcomes.  10/30 Tr. 177:8-178:4 (Card); 10/31 Tr. 12:10-21 (Card).  As discussed below, that is true of the four factors Dr. Arcidiacono omitted.  10/30 Tr. 177:22-178:4 (Card); *see also infra* ¶¶ 124, 127, 131.

123.    The omission of those factors led Dr. Arcidiacono's model to estimate a more negative effect of Asian-American ethnicity on the likelihood of admission.  DX695 & DD10.35; 10/30 Tr. 146:18-147:6 (Card).

(a)    Intended Career and Parental Occupation

124.    As Dr. Arcidiacono agreed, intended career and parental occupation play a role in the admissions process.  10/26 Tr. 8:25-9:21, 10:17-11:6 (Arcidiacono).  Those factors are correlated with race among applicants to Harvard; in other words, applicants of different races tend on average to indicate different intended careers and parental occupations.  DX677 & DD10.54; DX681 & DD10.49; 10/31 Tr. 10:16-18, 11:15-12:4, 21:23-22:14 (Card).

125.    Dr. Arcidiacono's asserted basis for excluding those factors was that certain intended careers and parental occupations appear to be more prevalent in the data in some years than in others.  10/25 Tr. 145:21-25, 146:15-147:2, 147:25-148:12 (Arcidiacono).  But the fact that the data include year-to-year fluctuations does not justify excluding the parental occupation and intended career factors from the analysis.  The variations likely reflect changes in the options available to applicants and the way in which Harvard recorded those selections in its database. 10/31 Tr. 14:18-16:18, 23:14-24:24 (Card).  Such changes are "common in economic data," 10/31 Tr. 13:13-25 (Card), and do not call into question the integrity of the data, 10/31 Tr. 14:1-12, 16:10-17:10 (Card).  Nor do they pose an obstacle to including the intended career and parental occupation variables in a model (like Dr. Card's) that treats each admissions cycle separately.  10/30 Tr. 169:12-24 (Card); 10/31 Tr. 16:19-24 (Card).  Indeed, the intended career

and parental occupation fields in the database reflect the information that admissions officers actually see in each cycle.  10/31 Tr. 15:3-7, 16:10-17:10, 24:9-14 (Card).

(b)  Staff Interview Indicator

126. All applicants to Harvard College may request and obtain an interview with an admissions officer.  10/19 Tr. 177:1-7, 19-24 (McGrath).  And every application folder indicates whether or not the applicant had such an interview.  *E.g.*, DX293.1.

127. Staff interviews play a role in the admissions process.  10/25 Tr. 38:8-10 (Arcidiacono); 10/26 Tr. 15:21-16:6 (Arcidiacono).  And applicants of some races participate in staff interviews at a higher rate than others, 10/26 Tr. 67:24-68:2 (Arcidiacono), creating the potential for omitted variable bias if a regression model does not account for this factor.

128. Dr. Arcidiacono agreed that staff interviews can provide valuable information about an applicant.  10/25 Tr. 180:19-181:14 (Arcidiacono); 10/26 Tr. 15:21-16:6 (Arcidiacono).  Indeed, as chair of graduate admissions for the Duke Economics Department, Dr. Arcidiacono instituted an interview requirement.  10/25 Tr. 180:10-18 (Arcidiacono).

129. Dr. Arcidiacono's asserted basis for excluding the staff interview indicator was that applicants with certain characteristics—especially ALDC applicants—were more likely to participate in staff interviews and Asian-American applicants were less likely to participate. 10/25 Tr. 38:11-16, 40:1-5, 148:13-18 (Arcidiacono).  But the majority of applicants who participate in staff interviews are *not* ALDC applicants, and 16% of staff interview participants are Asian American.  10/26 Tr. 20:10-15 (Arcidiacono); 10/26 Tr. 18:3-16 (Arcidiacono).

130. The fact that staff interview participants are more likely to be ALDC applicants and slightly less likely to be Asian-American does not justify excluding the staff interview variable.  By controlling for the factors that may be associated with higher or lower rates of staff interview participation, Dr. Card estimated the effect of participating in a staff interview holding

- 31 -

those factors equal.  10/31 Tr. 26:12-27:8 (Card); 11/1 Tr. 104:2-15 (Card).

(c)     Personal Rating

131.    Finally, Dr. Arcidiacono agreed that the personal rating plays a role in the admissions process.  10/26 Tr. 24:11-14 (Arcidiacono).  And because applicants of different racial backgrounds received slightly different personal ratings, on average (P623; 10/25 Tr. 54:12-55:2 (Arcidiacono)), the omission of the rating can give rise to omitted variable bias.

132.    Dr. Arcidiacono's asserted basis for excluding the personal rating was his view that Harvard admissions officers consider an applicant's race in assigning the personal rating. 10/25 Tr. 67:3-8, 82:4-9, 84:12-19 (Arcidiacono).  That approach is incorrect for four reasons.

133.    *First*, Admissions Office witnesses testified credibly and uniformly that they do not consider an applicant's race in assigning the personal rating.  *Supra* ¶ 65.

134.    *Second*, the statistical evidence provides no basis to infer that the personal rating is informed by the applicant's race.  10/31 Tr. 34:6-35:14 (Card).

135.    Dr. Arcidiacono's models of the academic, extracurricular, and personal ratings showed that Asian-American applicants received *stronger* academic and extracurricular ratings than otherwise identical White applicants, while receiving weaker personal ratings.  DX688.1 & DD10.63; 10/26 Tr. 31:15-18, 33:25-34:3 (Arcidiacono); 10/31 Tr. 45:12-18 (Card).  Dr. Arcidiacono attributed the positive associations between Asian-American ethnicity and the academic and extracurricular ratings to factors he could not control for in the model.  10/25 Tr. 102:23-103:25 (Arcidiacono); 10/26 Tr. 35:21-36:8 (Arcidiacono).  But he attributed the negative associations between Asian-American ethnicity and the personal rating to racial bias. 10/25 Tr. 95:11-96:12 (Arcidiacono).  Those explanations are inconsistent, and his explanation for the inference of bias is inconsistent with the data.

136.    Dr. Arcidiacono's explanation for his inconsistent interpretations was that Asian-

American applicants were stronger than White applicants on academic and extracurricular factors captured in the data, so that it was reasonable to assume they were also stronger on academic and extracurricular factors outside the data.  In his view, that relative strength on factors outside the data could explain the estimated positive effect of Asian-American ethnicity on those ratings.  10/25 Tr. 102:18-104:11, 106:17-109:8, 110:3-17 (Arcidiacono); 10/26 Tr. 35:5-36:8 (Arcidiacono); 10/31 Tr. 44:23-46:24 (Card).

137.    For the personal rating, Dr. Arcidiacono claimed that Asian-American applicants were *also* stronger than White applicants on factors in the data that inform the rating.  Under Dr. Arcidiacono's claim, it might be reasonable to assume Asian-American applicants were also stronger on factors outside the data that inform the rating, and thus that factors outside the data could *not* explain the estimated negative effect of Asian-American ethnicity on the personal rating.  10/25 Tr. 111:19-112:8 (Arcidiacono); 10/31 Tr. 52:13-25 (Card).

138.    Dr. Arcidiacono's explanation is incorrect, however.  In fact, Asian-American applicants were *less* strong than White applicants on factors in the data that could affect the personal rating—and thus also presumably less strong on factors outside the data that could affect the personal rating.  That relative strength on factors outside the data could explain why Dr. Arcidiacono's model estimated a negative effect of Asian-American ethnicity on the personal rating, just as the relative strength of Asian-American applicants on academic and extracurricular factors outside the data could explain why Dr. Arcidiacono estimated a positive effect of Asian-American ethnicity on those ratings (as he himself recognized).  DX692 & DD10.67-75, DD10.77-78; 10/31 Tr. 52:13-62:17, 74:6-17 (Card); 11/1 Tr. 109:13-112:9 (Card).

139.    For example, Asian-American applicants were weaker than White applicants on ratings assigned by alumni interviewers for personal qualities and overall strength, as well as

ratings assigned by admissions officers to recommendation letters written by applicants' high school teachers and guidance counselors.  DX692 & DD10.67-75; 10/26 Tr. 37:18-40:17 (Arcidiacono); 10/31 Tr. 53:13-62:17, 69:9-74:17 (Card); 11/1 Tr. 109:13-112:9 (Card).  Those factors inform the personal rating.  10/17 Tr. 224:19-226:23 (Fitzsimmons); 10/22 Tr. 169:5-170:9 (McGrath); 10/24 Tr. 115:13-119:6 (Banks).  Asian-American applicants were also weaker, on average, across the full range of non-academic factors in the model.  DX692.1 & DD10.77-78; 10/31 Tr. 69:16-74:5 (Card).

140.    The most sensible interpretation is that factors outside the data—not racial bias—explain the associations Dr. Arcidiacono found between Asian-American ethnicity and the various ratings.  10/31 Tr. 44:23-46:24, 68:20-24 (Card).  There is no factual, logical, or statistical basis to conclude that factors outside the data explain the association between Asian-American ethnicity and stronger academic and extracurricular ratings, while racial bias explains the association between Asian-American ethnicity and weaker personal ratings.

141.    A group of leading economists, including former Federal Reserve Chair Janet Yellen and two Nobel Prize winners, concluded that Dr. Arcidiacono's inconsistent explanations for these three ratings were "implausible."  10/26 Tr. 49:12-51:23 (Arcidiacono).

142.    *Third*, the personal ratings of White ALDC applicants were stronger (on average) than those of Asian-American ALDC applicants—a group against whom SFFA and Dr. Arcidiacono do not claim Harvard discriminates.  10/31 Tr. 85:21-87:1, 117:9-118:12 (Card). That is a strong indication that the personal rating disparities do not reflect racial discrimination. 10/31 Tr. 86:21-87:1 (Card).

143.    *Fourth*, even if Dr. Arcidiacono's models could be construed to suggest race *does* affect the academic, extracurricular, and personal ratings, the proper approach would be not to

exclude those ratings from the model but to adjust them to remove the estimated race effect. That is because, even if the ratings are affected by race, they contain much information that does *not* reflect any effect of race; if the ratings are excluded, the model cannot account for that unbiased information.  10/31 Tr. 78:10-79:2 (Card); 11/1 Tr. 100:16-101:2 (Card).

144.    When Dr. Card adjusted the ratings in that way, and used the adjusted ratings in his model, he continued to find no statistically significant effect of Asian-American ethnicity on the likelihood of admission, either in any individual admissions cycle or on average across all six cycles in the model.  DX694 & DD10.83; 10/31 Tr. 80:13-81:17 (Card).

145.    Dr. Arcidiacono's exclusion of the parental occupation, intended career, staff interview indicator, and personal rating variables had the effect of increasing the estimated bias against Asian-American applicants from -0.08 percentage points (and not statistically significant) to -0.79 percentage points.  DX695 & DD10.35; 10/30 Tr. 146:14-147:6 (Card).

b)    Dr. Arcidiacono's Model Does Not Support An Inference of Intentional Discrimination

146.    Even if Dr. Arcidiacono's analysis were reliable, it still would not support an inference that Harvard intended to discriminate against Asian-American applicants.

147.    *First*, a regression model based on real-world data cannot prove that the effect attributed to a given factor is *actually* due to that factor.  10/30 Tr. 114:10-23; 11/1 Tr. 112:17-20 (Card) ("Q. Can any statistical analysis of real world data as opposed to a randomized experiment actually show or disprove bias?  A. No, never.").  Rather, the effects attributed to any factor might be biased by the omission of other factors.  10/30 Tr. 114:10-23 (Card).

148.    The difficulty of estimating causal effects is significant here because the admissions process relies heavily on information that cannot be quantified and included in a regression model.  10/30 Tr. 123:1-17 (Card).  For example, an applicant's essays, the content of

recommendation letters (as opposed to the ratings given to those letters), and faculty evaluations of a student's academic or artistic work play central roles in the admissions process but cannot be included in a regression model.  10/17 Tr. 200:2-11, 229:4-13 (Fitzsimmons); 10/18 Tr. 26:17-23, 95:13-96:3 (Fitzsimmons); 10/19 Tr. 22:21-23:7, 64:6-12 (Bever); 10/24 Tr. 232:21-233:6 (Ray); 10/30 Tr. 123:1-17 (Card).  Nor did the data include the plus and minus modifiers of most ratings.  10/26 Tr. 32:14-21 (Arcidiacono); 10/30 Tr. 125:8-15 (Card).  Dr. Arcidiacono's models of the academic, extracurricular, and personal ratings accounted for only a fraction of the information that informs the ratings.  DX688.2 & DD10.61; 10/31 Tr. 40:14-43:17 (Card).

149.    *Second*, Dr. Arcidiacono claims Harvard discriminates against only non-ALDC Asian-American applicants.  10/25 Tr. 187:16-188:11 (Arcidiacono).  Asian-American ALDC applicants are admitted at a higher rate than otherwise identical White ALDC applicants, he admits.  10/25 Tr. 121:7-122:4 (Arcidiacono).  And for applicants who are the children of Harvard College or Radcliffe alumni, Asian-American ethnicity has a statistically significant positive effect.  DX707 & DD10.33; 10/30 Tr. 141:25-142:5 (Card).  Yet, if Harvard intended to discriminate against Asian-American applicants on the basis of race, such discrimination would presumably extend to all Asian-American applicants and not just to non-ALDC applicants.

150.    Dr. Card's analysis more accurately reflects the actual admissions process and is therefore more reliable than Dr. Arcidiacono's.

151.    The statistical evidence does not support a finding of intentional discrimination.

ii.    *OCR's Investigations Found That Harvard Does Not Discriminate*

152.    In 1988, the Department of Education's Office for Civil Rights ("OCR") initiated an investigation of the Admissions Office based on "the concern … that, despite superior academic credentials in terms of high school performance and standardized test scores, Asian Americans have been admitted to selective schools at a rate lower than white applicants and

other minority group applicants." P555 at 1. Over a two-year period, OCR reviewed ten years
of admissions data; interviewed current and former Admissions Office staff, students who had
worked in the Admissions Office, alumni interviewers, and Asian-American community leaders;
reviewed 400 complete application files and 2,000 additional summary sheets; and analyzed the
Admissions Office's implementation of its policies and procedures. P555 at 3-6, 9-10, 19.

153.    OCR issued a Statement of Findings in 1990. P555. It found that Harvard did not
discriminate against Asian-American applicants. P555 at 43-46.

154.    OCR found that Asian-American applicants received, on average, lower personal
ratings than White applicants. P555 at 21. OCR then conducted an audit of application files and
summary sheets to investigate the cause of the difference, P555 at 23, something SFFA never did
(or at least never reported). OCR concluded that a "comparison of the personal qualities ratings
to the supporting material in the applicant files revealed no apparent inconsistencies between the
ratings and the underlying documentation"—in other words, that the personal ratings fairly
assessed each individual application file. P555 at 22.

155.    Although OCR found a few comments in application files consistent with "the
stereotyping of Asian American applicants," it found that those comments "could not be shown
to have negatively impacted the ratings given to these applicants." P555 at 26. OCR also noted
that "[i]n some cases these comments actually originated from the interviews, teacher or
counselor recommendations, or self-descriptions given by the applicant." P555 at 25.

156.    OCR found that consideration of legacy and recruited-athlete status explained the
disparate admission rates of Asian-American and White applicants, and that the "tips" for
legacies and athletes served legitimate goals. P555 at 31-46.

157.    Following OCR's findings, Dean Fitzsimmons began to review statistics on the

admission rates of White and Asian-American non-legacy, non-athlete ("NLNA") applicants, and he continues to do so today to ensure that Asian-American applicants are treated fairly in the process. 10/18 Tr. 101:11-16, 105:6-12 (Fitzsimmons). In many admissions cycles between 1990 and the present, the admission rate of Asian-American NLNA applicants has been higher than that of White NLNA applicants. DX42; 10/18 Tr. 101:19-105:5 (Fitzsimmons).

158.    The Admissions Office still uses largely the same process for evaluating applications as it did in 1990 and, in particular, still considers race in essentially the same way as in 1990. 10/18 Tr. 93:11-13, 100:10-17 (Fitzsimmons); P555 at 6-7, 10-13, 16-19.

159.    In 2001, OCR investigated an allegation that Harvard discriminated against an individual Asian-American applicant on the basis of race and national origin. DX44.1. OCR concluded that Harvard did not discriminate against the applicant. DX44.5.

### iii.    OIR Documents Do Not Suggest Discrimination

160.    Harvard University's Office of Institutional Research ("OIR") assists with Harvard's mandatory reporting requirements and provides research support to schools and departments across the University, including Harvard College. P465; 10/19 Tr. 124:24-125:8 (Driver-Linn). OIR relies on individuals within Harvard's schools and departments to help OIR employees understand the subject matter of its research. 10/19 Tr. 126:14-23 (Driver-Linn).

161.    In early 2013, following the publication of an article by Ron Unz (P218), then-OIR employee Mark Hansen created four models that attempted to simulate the racial composition of the admitted class if the admissions process considered only a limited set of factors. P12 at 32-35; 10/24 Tr. 13:2-9, 21:19-22:1, 22:16-26:5, 50:23-51:3, 55:2-7 (Hansen); 10/19 Tr. 18:8-15 (Bever); see also P9 at 10-12. At the time, OIR did not have data on many factors important to the admissions process. P17; 10/19 Tr. 30:12-18 (Bever).

162.    Model 1 simulated the racial composition of the admitted class if the process

considered only the academic rating and the Ivy League's Academic Index.  P12 at 33.  (The Admissions Office uses the Academic Index only for Ivy League athletic reporting purposes; it is not considered in the admissions process.  10/17 Tr. 176:2-8 (Fitzsimmons).)  Model 2 added legacy status and whether an applicant was a recruited athlete.  P12 at 33.  Model 3 added the personal and extracurricular ratings.  *Id.*  Model 4 added gender and race.  *Id.*

163.    Models 1 through 3 showed that the share of Asian-Americans in the simulated admitted class decreased as additional factors, such as whether an applicant is a legacy or recruited athlete, were considered.  P12 at 34.  That finding was consistent with OCR's 1990 findings.  *See supra* ¶¶ 154-156; P555 at 33-34.

164.    In creating Model 4, Mr. Hansen used the racial composition of the actual admitted class to estimate that of the simulated class.  P12 at 33; 10/24 Tr. 28:7-14, 32:11-33:18, 60:5-16 (Hansen); 10/19 Tr. 134:20-135:2 (Driver-Linn).  In other words, the input of the model was the same as the output; Model 4 was essentially "circular."  10/24 Tr. 28:7-14 (Hansen).  That is why the racial composition of the class simulated by Model 4 closely approximated that of the actual admitted class.  P12 at 34.  The numbers do not match precisely for multiple reasons, including that Model 4 assumes Harvard admits 2,100 students per class, whereas the actual number of admitted students varies from year to year.  10/24 Tr. 33:6-18 (Hansen).

165.    The four models did not estimate the effect of any particular factor on an applicant's chance of admission.  10/19 Tr. 18:8-19:6 (Bever), 118:13-20, 146:1-3 (Driver-Linn).  Nor were they designed to simulate the actual admissions process.  10/24 Tr. 63:22-25 (Hansen).

166.    In developing the four models, Mr. Hansen did not receive input from any Admissions Office employee.  10/24 Tr. 48:7-12, 54:24-55:1 (Hansen).  No OIR employee had worked in the Admissions Office.  10/19 Tr. 19:17-24 (Bever).

167.     The actual admissions process includes numerous factors not included in Mr. Hansen's analysis, as OIR recognized at the time.  10/17 Tr. 82:10-13 (Fitzsimmons); 10/19 Tr. 22:6-24:15 (Bever); 10/24 Tr. 55:15-23, 59:5-7 (Hansen); P12 at 36.  The data Mr. Hansen used in creating the four models excluded information considered important in admissions.  P12 at 36; P17 at 2; 10/17 Tr. 178:10-19 (Fitzsimmons); 10/19 Tr. 31:3-6, 31:21-23, 32:4-10 (Bever).

168.     The four models were not designed to investigate bias or discrimination against Asian-American applicants and did not show bias or discrimination.  10/19 Tr. 136:21-137:3 (Driver-Linn); 10/24 Tr. 64:1-6, 66:9-24 (Hansen); P16.

169.     On February 25, 2013, at OIR's request, Dean Fitzsimmons met with Mr. Hansen, OIR director Erin Driver-Linn, and OIR employee Erica Bever to discuss various OIR analyses relating to admissions: an analysis relating to the return of Early Action, an analysis of the gender balance in various concentrations, and the four models described above.  P12 at 5; P14; 10/17 Tr. 96:23-97:4 (Fitzsimmons); 10/19 Tr. 113:8-10, 127:23-25 (Driver-Linn).

170.     A slide deck entitled "Admissions and Financial Aid at Harvard College" (P12) was shown during that meeting.  10/17 Tr. 96:23-97:4 (Fitzsimmons); 10/19 Tr. 114:4-9, 120:1-8 (Driver-Linn); P13 (Ms. Driver-Linn's notes from meeting).  It included the four models.

171.     In presenting the four models to Dean Fitzsimmons, OIR described them as "preliminary and for discussion" to convey that the analysis was highly simplified and did not reflect input from the Admissions Office.  P12 at 32; 10/19 Tr. 129:18-130:9 (Driver-Linn).

172.     Dean Fitzsimmons understood the four models to be consistent with his understanding of the admissions process, in the sense that as the models included additional factors considered in the process, the racial composition of the simulated class more closely reflected that of the actual class.  10/17 Tr. 89:14-25, 90:11-91:4, 177:19-178:6 (Fitzsimmons).

173.     Nobody from OIR told Dean Fitzsimmons or any other Admissions Office employee that the four models showed bias or discrimination against Asian-American applicants. 10/17 Tr. 183:8-18 (Fitzsimmons); 10/19 Tr. 136:17-20, 146:25-147:3, 154:18-155:8 (Driver-Linn); 10/24 Tr. 65:17-66:4 (Hansen).

174.     Before the February 25, 2013 meeting with Dean Fitzsimmons, Mr. Hansen also created a 17-page slide deck (P9) with some of his working notes relating to admissions data, including a preliminary version of the four-model analysis.  10/24 Tr. 49:25-50:4 (Hansen); 10/19 Tr. 122:16-22, 123:9-16 (Driver-Linn).  At the time, Mr. Hansen was trying to learn how to conduct statistical modeling, 10/19 Tr. 120:22-121:4 (Driver-Linn), and he had never previously created a logistic regression model, 10/24 Tr. 52:5-17 (Hansen).

175.     Nothing in Mr. Hansen's working notes establishes the causal effect of any factor in the admissions process on admissions outcomes.  10/24 Tr. 47:6-11, 51:19-22 (Hansen); 10/19 Tr. 121:5-24, 123:9-16 (Driver-Linn).

176.     Mr. Hansen's working notes were not a final work product of OIR and were not intended to be given as a presentation.  10/24 Tr. 50:5-8 (Hansen).  They contain numerous errors and blank pages, *e.g.*, P9 at 1, 13, 14, which would not have been included in final OIR work product, 10/19 Tr. 115:21-116:7 (Driver-Linn).

177.     Many pages (pp. 2-9, 13-17) of Mr. Hansen's working notes were never incorporated into work product shared outside OIR.  *Compare* P9 at 2-9, 13-17 *with* P12, P26, P28.  The only portion of Mr. Hansen's working notes that was ultimately revised and shared outside OIR was the four-model analysis.  *Compare* P9 at 10-12 *with* P12 at 32-35.  Nobody other than Mr. Hansen saw his working notes before this litigation.  10/24 Tr. 50:9-14, 53:16-54:1 (Hansen); 10/17 Tr. 172:18-173:4 (Fitzsimmons); 10/19 Tr. 113:14-114:19 (Driver-Linn).

178.     In April 2013, following publication of an article by Professors Caroline Hoxby and Christopher Avery suggesting that elite colleges were not doing enough to attract students from low-income backgrounds, Dean Fitzsimmons asked OIR to evaluate the statistical effect of an admissions tip Harvard provides to low-income applicants.  P26 at HARV00023548; 10/17 Tr. 170:8-16, 183:19-184:24 (Fitzsimmons); 10/19 Tr. 35:25-36:13 (Bever), 148:6-14 (Driver-Linn).  In response, OIR conducted a regression analysis and prepared a memorandum summarizing its findings.  P26.  OIR concluded that "applicants with incomes below $120K are admitted at higher rates than … expected" based on their other attributes, *id.* at HARV00023549, consistent with the testimony that Harvard provides a tip to low-income students.

179.     The regression analysis also showed a negative and statistically significant coefficient for Asian-American ethnicity.  P26 at HARV00023550.  That analysis did not, however, consider many factors relevant to the admissions process.  P26 at HARV00023549; 10/19 Tr. 148:15-149:17 (Driver-Linn).

180.     The memo explained that OIR's approach had "several limitations" and "should not be considered exhaustive."  P26 at HARV00023549.  And the OIR employees involved in drafting the memo had a limited understanding of the admission process at the time.  10/18 Tr. 227:21-25 (Bever); 10/19 Tr. 19:17-24 (Bever).

181.     OIR sent a version of the memo to Dean Fitzsimmons on May 1, 2013.  P26.  Earlier versions were not shared outside OIR.  10/19 Tr. 151:23-152:3 (Driver-Linn).

182.     Dean Fitzsimmons did not understand the memo to show bias or discrimination against Asian-American applicants.  10/17 Tr. 120:12-16 (Fitzsimmons).  Nobody from OIR told Dean Fitzsimmons in 2013 that the memo showed bias or discrimination against Asian-American applicants, and no OIR witness testified that he or she regarded the memo as showing bias or

discrimination.  10/19 Tr. 33:16-22 (Bever), 151:20-22, 155:4-8 (Driver-Linn).

183.    After receiving the memo, Dean Fitzsimmons asked OIR to examine whether the low-income tip was being applied "in an evenhanded manner for students from all ethnic backgrounds" and, specifically, whether low-income Asian-American applicants received a tip. P28; P29; P46; 10/17 Tr. 138:19-24, 142:1-13 (Fitzsimmons); 10/19 Tr. 40:21-41:1 (Bever), 152:4-17 (Driver-Linn).   OIR shared with Dean Fitzsimmons a follow-up analysis, which showed that low-income Asian-American applicants were admitted at a rate of 10%, compared to a rate of 7% for other Asian-American applicants.  P28 at 6.

184.    Dean Fitzsimmons understood that analysis to mean low-income Asian-American applicants receive a tip.  P28 at 6; 10/17 Tr. 143:21-144:10, 185:17-21 (Fitzsimmons).  The analysis showed that low-income Asian-American applicants received a greater tip for their low-income status, as measured by the difference in admission rates between higher- and lower-income applicants, than applicants of some other racial backgrounds.  10/17 Tr. 185:22-186:7 (Fitzsimmons).  The analysis "reassured" Dean Fitzsimons "that we were treating Asian-Americans in an evenhanded manner."  10/17 Tr. 144:25-145:8, 186:8-13 (Fitzsimmons).

185.    More than a year later, in May 2014, shortly before Dean Khurana became Dean of Harvard College, Ms. Driver-Linn sent him a memo enclosing examples of OIR's recent work relating to Harvard College.  P288; 10/19 Tr. 41:20-25 (Bever).  The May 2014 memo did not include the four-model analysis.  P288.

186.    Ms. Driver-Linn and Ms. Bever met with Dean Khurana in July 2014 to introduce him to OIR.  10/23 Tr. 45:6-10 (Khurana).  The purpose of the meeting was not to show Dean Khurana ongoing OIR work or receive feedback on it, and no OIR work product was discussed at the meeting.  10/19 Tr. 43:15-44:2 (Bever); 10/23 Tr. 45:11-13 (Khurana).

187.     Separately from the May 2014 memo, OIR also shared with Dean Khurana a version of the four-model analysis.  P41; 10/23 Tr. 45:6-46:17 (Khurana).  Dean Khurana recognized at the time that the four models oversimplified the admissions process and were not an appropriate way to analyze the factors that affect admissions decisions.  10/23 Tr. 45:14-46:17, 49:2-18, 50:7-15.  He did not believe the models suggested bias or discrimination in the admissions process.  10/23 Tr. 50:16-23.  Dean Khurana did not review any other OIR analyses relating to admissions before this litigation.  10/23 Tr. 46:18-21.

188.     OIR's admissions-related work analyzed only a few of the hundreds of factors considered in admissions and omitted factors important to admissions decisions.  10/19 Tr. 22:6-23:7 (Bever).  There is no evidence that anybody at Harvard interpreted the analyses to show evidence of bias or discrimination against Asian-American applicants.

       *iv.*    *Admissions Office Documents Do Not Suggest Discrimination*

189.     SFFA introduced no evidence establishing that any particular applicant to Harvard College had been rejected on the basis of his or her race or ethnicity.

190.     SFFA introduced no evidence relating to any of its "standing members," including their application files.  Dr. Arcidiacono had access to the application files of all SFFA standing members but offered no testimony concerning them.  10/26 Tr. 56:3-13 (Arcidiacono).

191.     SFFA introduced no document in which any Harvard employee expressed animus against Asian-American applicants.

192.     SFFA identified two handwritten notes in a 1,591-page docket binder describing individual Asian-American applicants as "quiet," 10/18 Tr. 127:16-129:4 (Fitzsimmons), a term SFFA suggested is consistent with stereotypes of Asian Americans.  In one of those instances, Dean Fitzsimmons's notes indicated that the applicant was "strong" as well as "quiet."  10/18 Tr. 129:2-4 (Fitzsimmons).  SFFA introduced no evidence that those descriptions reflected

stereotypes as opposed to unbiased assessments of the applicants.  SFFA also did not show that any such comments were widespread or systematic.  Indeed, the docket binder SFFA relied upon includes descriptions of African-American, Hispanic, and White applicants as "quiet," as well as "shy" and "understated."  DX50.620, DX50.0975, DX50.1054.

193.    SFFA's cursory approach stands in notable contrast to that of the 1990 OCR investigation, which included a thorough audit of application files to determine whether there was evidence of actual discrimination, and found none.  P555 at 26.

194.    SFFA also suggested that thresholds used for the mailing of recruitment letters to students in certain states in certain years, *supra* ¶¶ 194-197, showed discrimination.  10/15 Tr. 152:15-25, 253:1-3 (Fitzsimmons).  The evidence does not support that argument.

195.    For the Classes of 2014 through 2016, the PSAT thresholds for letters were 1100 for African-American and Hispanic students and 1300 for Asian-American students nationwide, 1310 for White students in states referred to as "sparse country," and 1360 for White female students and 1380 for White male students in other states.  P50 at HARV0007771.

196.    For the Class of 2017, the Admissions Office adjusted the non-sparse-country thresholds for White and Asian-American applicants to be identical:  Instead of sending letters to Asian-American students with lower scores than White students, the Office sent letters to Asian-American and White students at identical thresholds (1350 for women and 1380 for men).  The Office did not alter the sparse-country thresholds.  *Compare* P50 at HARV0007771 (Classes of 2014-2016) *with* P2 (Classes of 2017-2018) *and* P57 (Class of 2019).  As a result, for the Classes of 2017 through 2019, the PSAT score threshold for receiving a letter was lower for White students in the sparse country states than for Asian-American students in those states.

197.    However, the recruitment-letter thresholds for the ACT were identical for Asian-

American and White students in sparse country states.  P2.  And the ACT is the more common test in those states.  10/17 Tr. 159:5-7 (Fitzsimmons).

198.    There is therefore no consistent or systematic pattern of differential recruitment-letter thresholds between White and Asian-American applicants.  Nor is there any evidence that the differences noted above reflected animus toward Asian-American applicants.

<em>v.    Admissions Officer Testimony Does Not Show Discrimination</em>

199.    Admissions officers testified credibly and without contradiction that they have never employed quotas, ceilings, floors, or targets based on race or ethnicity.  10/18 Tr. 82:19-24, 112:5-13 (Fitzsimmons), 197:17-20 (Looby); 10/19 Tr. 67:25-68:2 (Bever), 247:8-9 (McGrath); 10/24 Tr. 87:22-24, 123:15-18 (Banks), 174:10-18 (Kim), 210:2-9 (Ray); 11/1 Tr. 242:10-12, 242:17-23 (Cheng), 249:23-250:5 (Weaver); 10/26 Tr. 107:19-24 (Howrigan).

200.    Admissions Office witnesses testified credibly and without contradiction that the admissions process is free of discrimination or bias.  10/18 Tr. 108:3-11 (Fitzsimmons), 197:6-16 (Looby); 10/19 Tr. 66:23-67:2 (Bever); 10/22 Tr. 175:2-7 (McGrath); 10/23 Tr. 218:23-219:5 (Yong); 10/24 Tr. 123:11-14 (Banks), 173:12-17 (Kim), 241:4-7 (Ray).  An applicant's race is never a negative factor in an admissions decision.  10/17 Tr. 214:2-6 (Fitzsimmons); 10/18 Tr. 197:10-16 (Looby); 10/19 Tr. 51:11-13, 67:3-5, 9-11 (Bever); 10/22 Tr. 149:1-2 (McGrath); 10/24 Tr. 123:19-21 (Banks), 173:24-174:1 (Kim), 208:14-19, 241:8-11 (Ray).

201.    The testimony of Harvard's witnesses is consistent, credible, and unrebutted.

**H.    Race-Neutral Alternatives**

<em>i.    Ongoing Promotion of Diversity Through Race-Neutral Practices</em>

202.    Harvard employs, and has long employed, numerous race-neutral practices to pursue diversity.  *Supra* ¶¶ 19-27, 75-78; P316 at 4-6.

ii.      *Consideration of Race-Neutral Practices*

203.    Over the last four decades, Harvard has articulated in Supreme Court amicus

briefs the view that it could not realize the benefits of diversity without considering race.

DX55.20-22; DX53.29-30; DX26.23-24; 11/1 Tr. 214:11-217:20 (Faust).

204.    In 2014, Harvard convened a committee chaired by James Ryan, then-Dean of the

Graduate School of Education.  DX12.1; P316 at 2; 11/1 Tr. 217:21-218:6 (Faust).  That

committee had two charges: examining the importance of diversity and assessing race-neutral

alternatives.  P316 at 2; DX12.2-3; 11/1 Tr. 219:3-8 (Faust).  Its work encompassed the entire

University.  DX12.1; 11/1 Tr. 189:9-21 (Faust).  The committee paused its work when this

litigation began, recognizing that discovery in the litigation would produce relevant and useful

analysis.  P316 at 2; 10/23 Tr. 114:5-9 (Smith); 11/1 Tr. 219:9-13 (Faust).

205.    The College then convened its own committees to address both questions initially

posed University-wide to Dean Ryan's committee.  First, from 2015 to 2016, a committee

chaired by Dean Khurana assessed the importance of diversity for the College.  *Supra* ¶¶ 6-9.

206.    Second, from 2017 to 2018, the Committee to Study Race-Neutral Alternatives

assessed whether the College could achieve its educational objectives without considering race in

admissions.  P316 at 3; 11/1 Tr. 220:4-7 (Faust); 10/23 Tr. 124:16-125:1 (Smith).

207.    Dean Smith chaired the latter committee, at President Faust's request.  10/23 Tr.

117:20-24 (Smith); 11/1 Tr. 220:4-14.  Dean Smith selected the committee's members in

consultation with President Faust.  10/23 Tr. 117:25-118:18 (Smith); 11/1 Tr. 220:15-17, 221:6-

222:6 (Faust).  Dean Smith and President Faust chose Dean Fitzsimmons based on his

experience with the admissions process and with race-neutral practices; they chose Dean

Khurana based on his responsibility for student life at the College and his training as a social

scientist.  DX60; 10/23 Tr. 118:9-120:9 (Smith); 11/1 Tr. 221:6-222:6 (Faust).  Those choices

were reasonable given the nature of the work the committee was to undertake.

208.    The committee began its work in the summer of 2017 by reviewing SFFA's complaint and the literature on race-neutral alternatives.  P316 at 3; 10/22 Tr. 214:2-12 (Khurana); 10/23 Tr. 126:6-24 (Smith).  It met seven times between August 2017 and April 2018, and reviewed and discussed literature and expert reports prepared by Dr. Card and Mr. Kahlenberg.  10/23 Tr. 54:11-55:2 (Khurana), 127:7-128:5, 129:3-130:3 (Smith); DX76; DX79; DX80; DX81; DX82; P312; DX84.

209.    The committee considered every practice Mr. Kahlenberg proposed, as well as two he did not (eliminating athletic preferences and consideration of test scores).  P316 at 6-7; 10/23 Tr. 126:25-127:6 (Smith); 10/22 Tr. 133:21-134:15 (Kahlenberg).

210.    In assessing race-neutral practices, the committee considered the estimated effect of those practices on diversity, their anticipated effect on other institutional goals (including the excellence of the class), and the feasibility of adopting the practices.  10/23 Tr. 138:11-139:6 (Smith); *see also* P316 at 3.  Mr. Kahlenberg agreed those were appropriate considerations. 10/22 Tr. 47:4-18, 134:16-138:18.

211.    In assessing the effect of race-neutral alternatives on diversity, the committee did not set a target for the racial composition of the class.  10/23 Tr. 140:16-141:17 (Smith).

212.    In assessing the effect of race-neutral alternatives on the academic excellence of the class, the committee considered the anticipated proportion of students receiving an academic rating of 1 or 2, as opposed to the average Academic Index.  10/23 Tr. 169:9-170:13 (Smith). The Academic Index reflects only GPAs and test scores, limited measures on which many Harvard applicants cluster near the top, and is not a measure the College considers in admissions decisions.  10/16 Tr. 84:9-13 (Fitzsimmons); *supra* ¶ 162.  The academic rating reflects

important non-quantitative measures—including, as appropriate, input from Harvard faculty—and better differentiates students.  10/25 Tr. 204:15-205:3 (Arcidiacono); *supra* ¶ 43.

213.    The committee memorialized its conclusions in an April 2018 report.  P316.

### iii.    *The Committee's Analyses of Race-Neutral Practices*

214.    The committee's analysis was informed by the analyses conducted by Harvard's and SFFA's experts.  DX720-730 & DD10.105-141; 10/23 Tr. 54:11-55:2 (Khurana); 10/23 Tr. 127:7-128:5 (Smith).  With the benefit of those analyses, the committee assessed the effect of three categories of changes: (1) eliminating consideration of race, (2) eliminating consideration of race and eliminating certain practices, and (3) eliminating consideration of race and augmenting certain practices.  The committee also considered Mr. Kahlenberg's proposals.

### a)    Effect of Eliminating Race-Conscious Admissions Alone

215.    Dr. Card estimated that if Harvard stopped considering race but continued its other current practices, the African-American share of the class would fall from 14% to 6%, and the Hispanic share from 14% to 9%.  DX721 & DD10.107; 10/31 Tr. 126:21-129:2 (Card).

216.    Dr. Card performed this and similar simulations using the Class of 2019 data and model; his simulations produced similar results in other years.  10/31 Tr. 128:16-129:2 (Card).

217.    The committee concluded that declines of that magnitude "would prevent Harvard from achieving its diversity-related educational objectives," because students would have diminished opportunities to learn from peers who come from different backgrounds.  P316 at 8; 10/16 Tr. 36:24-37:25 (Fitzsimmons); 10/23 Tr. 56:24-57:22 (Khurana); 10/23 Tr. 139:10-22 (Smith).  Mr. Kahlenberg agreed that the simulated "level of racial and ethnic diversity" if Harvard were to stop considering race was "not an acceptable level."  10/22 Tr. 32:20-33:5.

218.    Harvard could not achieve its educational objectives if it were to eliminate the consideration of race and make no other changes to its admissions practices.

b)  Effect of Eliminating Certain Practices

219. *Early Action*.  Dr. Card and the committee each assessed the likely effect of eliminating Early Action.  P316 at 15; DX728 & DD10.114; 10/31 Tr. 133:20-136:20 (Card).  In 2007, Harvard eliminated Early Action based on concerns that it disadvantaged low-income and minority students.  DX39.2-4; P316 at 5-6, 15; 10/23 Tr. 156:17-157:3 (Smith).  By 2011, however, it found that the elimination of Early Action caused the matriculation rate of African-American and Hispanic students to decline.  DX39.4; DX39.25; DX728.3 & DD10.114; 10/22 Tr. 105:25-106:14 (Kahlenberg); 10/23 Tr. 157:4-22 (Smith).  President Faust and Dean Smith therefore recommended reinstating Early Action, and the Corporation took that step.  DX39; P316 at 5-6, 15; 10/23 Tr. 157:23-158:7, 160:14-19 (Smith).  Given that history, Dr. Card and the committee each concluded that eliminating Early Action again was unlikely to have a different result.  P316 at 15; 10/31 Tr. 136:14-20 (Card); 10/23 Tr. 160:22-161:6 (Smith).

220. Eliminating Early Action would not allow Harvard to achieve its educational objectives without considering race.

221. *ALDC Consideration And Deferred Admission*.  Dr. Card assessed the effect of eliminating practices alleged to inhibit diversity, including the consideration of ALDC attributes and the practice of deferred admission.  DX720 & DD10.112; 10/31 Tr. 132:15-133:19 (Card).  He found that if Harvard were to take those steps, and eliminate the consideration of race, the African-American share of the admitted class would decline from 14% to 5% and the Hispanic share would decline from 14% to 9%.  DX720 & DD10.112; 10/31 Tr. 132:16-133:19 (Card).

222. The committee determined that those declines were "reason enough" to conclude that eliminating deferred admission and the consideration of ALDC attributes was not a viable race-neutral alternative.  P316 at 16; 10/23 Tr. 163:8-17 (Smith).

223. After making that determination, the committee went on to consider whether

- 50 -

ALDC consideration and deferred admission serve important institutional interests, and it concluded that they did.  P316 at 16-17; 10/23 Tr. 164:4-167:2 (Smith).  President Simmons's testimony corroborated that conclusion.  10/30 Tr. 20:17-21:8, 35:14-45:24, 53:23-54:8.

224.    Eliminating deferred admission and the consideration of ALDC attributes would not allow Harvard to achieve its educational objectives without considering race.

225.    *Standardized Tests*.  Dr. Card examined the effect of eliminating consideration of standardized test scores, combined with eliminating consideration of race and ALDC attributes, eliminating deferred admission, and increasing preferences for socioeconomically disadvantaged applicants (as discussed below).  DX722 & DD10.120-121; 10/31 Tr. 143:24-146:12 (Card).  He found that under that set of practices, Harvard could achieve a combined share of African-American and Hispanic students comparable to that of the Class of 2019, but the excellence of the admitted class would decline; for example, 17% fewer students would be expected to have received academic ratings of 1 or 2.  DX722 & DD10.120-121; 10/31 Tr. 145:14-146:12 (Card).

226.    The committee concluded that such a decline would be "incompatible with Harvard's educational objectives."  P316 at 17-18.  And, although the committee recognized that standardized tests are "imperfect measures," it noted that the Admissions Office considers such scores "in light of an applicant's background and ability to prepare."  P316 at 18.

227.    Eliminating deferred admission, the consideration of ALDC attributes, and the consideration of standardized test scores would not allow Harvard to achieve its educational objectives without considering race.

c)    Effect of Augmenting Certain Practices

228.    *Socioeconomic Preferences*.  The Admissions Office already provides a tip for low-income applicants, *supra* ¶ 30, but the committee considered the likely effect of expanding such preferences, on the basis of analysis from Dr. Card.

229.    Dr. Card modeled the effect of applying an additional "boost" of various magnitudes for lower socioeconomic status ("low SES").  A 1x boost, for example, would increase the likelihood of admission to 36% for a low-income applicant with 7% likelihood of admission; likewise, a 4x boost would increase the likelihood of admission for such an applicant to 100%.  DD10.116-117; 10/31 Tr. 136:23-140:6 (Card).

230.    Dr. Card found that if Harvard were to eliminate consideration of race and ALDC attributes, and eliminate deferred admission, then it would need to award a 4x low-SES boost to achieve a combined share of African-American and Hispanic students comparable to that of the Class of 2019—and to achieve a comparable share of African-American students, it would have to award a 10x low-SES boost.  DX721.1 & DD10.118; 10/31 Tr. 141:20-142:18 (Card).  If Harvard applied a 4x low-SES boost, the class would see declines in the share of students receiving top (1 or 2) ratings on the academic (-13%), extracurricular (-9%), personal (-11%), and athletic (-33%) ratings.  DX721.3 & DD10.119; 10/31 Tr. 143:10-20 (Card).  Under a 10x low-SES boost, those declines would be even larger.  10/31 Tr. 143:21-23 (Card).

231.    The committee determined that such declines would be contrary to Harvard's educational goals.  Such large low-SES preferences would overwhelm other considerations in the admissions process, depriving Harvard of the ability to select the most excellent applicants. They would also reduce the socioeconomic diversity of African-American and Hispanic students. P316 at 13-15; 10/23 Tr. 152:10-153:4 (Smith).

232.    Thus, eliminating deferred admission, eliminating the consideration of ALDC attributes, eliminating the consideration of standardized test scores, and affording a preference to low-SES applicants would not allow Harvard to achieve its educational objectives without considering race.

233.    *Recruitment*.  As detailed above, Harvard makes significant efforts to recruit diverse students.  *Supra* ¶¶ 19-27; P316 at 4-6, 9.  Mr. Kahlenberg suggested that if Harvard were to increase its efforts, it could double the number of low-income applicants without diminishing the quality of the low-income applicant pool.  10/22 Tr. 47:19-48:6, 87:8-10 (Kahlenberg); 10/23 Tr. 145:22-146:1 (Smith).  Dr. Card simulated the class that would result if Harvard eliminated consideration of race and ALDC attributes, eliminated deferred admission, adopted low-SES preferences as discussed above, and doubled the number of low-income applicants.  DX723 & DD10.126; 10/31 Tr. 153:5-14 (Card).  He found that under that set of practices, Harvard could admit a class with a combined share of African-American and Hispanic students comparable to that of the Class of 2019, but the share of admitted students receiving top academic ratings would fall by 17%.  DX723.3 & DD10.127; 10/31 Tr. 153:15-154:25.

234.    The committee concluded that, given Harvard's extensive recruitment efforts, doubling the number of low-income applicants without loss of quality was unrealistic.  P316 at 9-10; 10/23 Tr. 145:22-146:20 (Smith).  It also concluded that the anticipated decline in the most exceptional students would compromise Harvard's educational objectives.  P316 at 9-10.

235.    Thus, eliminating deferred admission, eliminating the consideration of ALDC attributes, eliminating the consideration of standardized test scores, affording a preference to low-SES applicants, and undertaking additional recruiting efforts would not allow Harvard to achieve its educational objectives without considering race.

236.    *Partnerships*.  The committee considered Mr. Kahlenberg's proposal that Harvard expand its existing strategy of partnering with organizations that assist underserved high school students.  P316 at 10; 10/23 Tr. 144:11-145:19 (Smith); 10/24 Tr. 214:1-14 (Ray).  The committee determined that, since Harvard already engages in significant partnerships, additional

efforts would not likely "yield more than an incrementally small number of applicants who would be admitted to Harvard and would not otherwise have applied," and that favoring such applicants would be inconsistent with attracting a wide array of applicants.  P316 at 10.

237.   *Financial Aid*.  As detailed above, Harvard has one of the nation's most generous financial aid programs, and it has significantly increased aid in recent years.  P316 at 5-6; 10/31 Tr. 155:9-156:22 (Card); 11/1 Tr. 200:12-201:24, 203:7-24 (Faust); *supra* ¶¶ 25-27.  Dr. Card found that although earlier increases in financial aid (for the Classes of 2008 and 2010) increased the African-American and Hispanic share of the applicant pool, recent increases (for the Classes of 2012 and 2016) did not have that effect.  DX727.1 & DD10.131-133; P316 at 10-11; 10/23 Tr. 146:21-148:10 (Smith); 10/31 Tr. 158:16-159:23 (Card).  Accordingly, Dr. Card and the committee each concluded that further increases were unlikely to increase the diversity of applicants.  P316 at 10-11; 10/23 Tr. 146:21-148:10 (Smith); 10/31 Tr. 159:24-160:23 (Card).  The committee also noted that "even Harvard has limits to the amount of financial aid it can offer" without compromising other priorities.  P316 at 11.

238.   *Transfer Admissions*.  Dr. Card found that transfer applicants to Harvard are on average less diverse, and less qualified on several dimensions, than applicants to the freshman class.  DX730 & DD10.124-125; 10/31 Tr. 146:24-149:21 (Card).  The committee concluded that increasing transfer admissions would be inconsistent with Harvard's commitment to a four-year residential experience and would have a negligible or negative effect on the diversity and excellence of the admitted class.  P316 at 12-13.

239.   *Place-Based Preferences*.  As Mr. Kahlenberg conceded, admissions policies based on admitting top students by ZIP code or high school would be impracticable for Harvard, because there are far more ZIP codes and high schools than places in Harvard's freshman class.

DX724 & DD10.135; DX725 & DD10.136; P316 at 11-12; 10/22 Tr. 107:6-108:25 (Kahlenberg); 10/23 Tr. 149:17-150:19 (Smith); 10/31 Tr. 161:15-165:22 (Card).

240.    Mr. Kahlenberg proposed that Harvard adopt quotas based on College Board neighborhood clusters, which are constructed to a large degree based on racial demographics. DX139.6, DX139.13; 10/22 Tr. 36:6-16, 110:6-112:14 (Kahlenberg).  Dr. Card modeled an admissions process under which Harvard eliminated consideration of race, ALDC attributes, and standardized test scores; eliminated deferred admission; doubled the number of low-income applicants through increased recruiting; applied a 1x low-SES boost; and instituted quotas based on College Board clusters.  DX726 & DD10.137; 10/31 Tr. 165:23-168:17 (Card).  He found that although those practices would result in a class with a combined share of African-American and Hispanic students comparable to that of the Class of 2019, the class would have 17% fewer students with top academic ratings.  DX726 & DD10.137-138; 10/31 Tr. 165:23-168:17 (Card).

241.    The committee concluded that the admission of an equal number of students across College Board neighborhood clusters would unacceptably compromise the excellence of Harvard's admitted class, both because "[e]xcellence in all of the dimensions Harvard seeks is not equally distributed" by geography and because Mr. Kahlenberg's proposal "would replace a global search for excellence with a mechanical system of admission by numbers."  P316 at 11-12; see 10/23 Tr. 150:20-152:7 (Smith).

242.    Thus, eliminating deferred admission, eliminating the consideration of ALDC attributes, eliminating the consideration of standardized test scores, affording a preference to low-SES applicants, undertaking additional recruiting efforts, entering into new partnerships; increasing financial aid, increasing transfer admissions, and employing place-based preferences would not allow Harvard to achieve its educational objectives without considering race.

iv.     *Mr. Kahlenberg's Analysis*

243.    The committee also considered specific combinations of practices proposed by Mr. Kahlenberg as viable options, including the four he discussed at trial.

244.    Mr. Kahlenberg has long advocated the use of class, rather than race, to achieve diversity in college admissions.  10/22 Tr. 63:7-15 (Kahlenberg).  He has known SFFA's President, Edward Blum, for 15 years.  10/22 Tr. 60:17-24 (Kahlenberg).  Mr. Kahlenberg acknowledged that he and Mr. Blum have a "mutual interest in affirmative action," and that Mr. Blum's interest is to "eliminate affirmative action in all programs that consider race."  10/22 Tr. 62:5-24 (Kahlenberg).

245.    Mr. Kahlenberg has never worked in a college or university admissions office, has never worked in college or university administration, and has never been retained by a college or university to evaluate race-neutral alternatives.  10/22 Tr. 64:1-65:19 (Kahlenberg).

246.    Mr. Kahlenberg's opinions are premised upon the view that Harvard has taken insufficient steps to promote socioeconomic diversity.  10/22 Tr. 20:5-22:20 (Kahlenberg).  Yet the New York Times College Access Index, on which Mr. Kahlenberg relied in his report, identifies Harvard as one of the top three private colleges in America for promoting social mobility.  DX119.8; 10/22 Tr. 97:8-100:1 (Kahlenberg).  And in 2010 and 2013, before this litigation, Mr. Kahlenberg praised Harvard's—and specifically Dean Fitzsimmons's—efforts to promote both racial and socioeconomic diversity as "dogged[]," as "a blueprint for the future of affirmative action," and as "a big step forward in making affirmative action more inclusive of socioeconomic status."  10/22 Tr. 89:14-90:16 (Kahlenberg).

247.    In 2014, Mr. Kahlenberg was paid to consult on SFFA's Complaint.  10/22 Tr. 67:10-21 (Kahlenberg).  One day after the Complaint was filed, and before any discovery or expert analysis, Mr. Kahlenberg told Fox News that Harvard "could produce considerable racial

and ethnic diversity without resorting to racial preferences."  10/22 Tr. 68:7-23, 70:7-71:1

(Kahlenberg).

248.     At trial, Mr. Kahlenberg presented data on the excellence of the admitted class

based only on SAT scores and GPAs, two measures that have limited value in identifying

applicants with strong academic potential, rather than on the multi-dimensional measures used

by Harvard to assess the excellence of its applicants.  PD27; PD29; PD31; PD33; *supra* ¶ 212.

249.     In every combination of race-neutral alternatives Mr. Kahlenberg proposed—

including several that maintained preferences for athletes but eliminated preferences for other

ALDC applicants—the African-American share of the class would drop from 14 percent to 10

percent.  PD26-33; 10/22 Tr. 127:16-22 (Kahlenberg).  Mr. Kahlenberg agreed that in each of his

simulations, "the racial group that bore the burden of [his] race-neutral alternatives ... was

African-American students."  10/22 Tr. 128:14-20.  The committee determined that such

declines in the African-American share of the class were "a bridge too far," especially in light of

evidence that many African-American students already feel a sense of "alienation and isolation"

on campus.  10/23 Tr. 154:24-156:7 (Smith); *see also* P316 at 8.

250.     The committee also concluded that Mr. Kahlenberg's proposals would entail

unacceptable declines in the quality of the admitted class.  P316 at 14; 10/23 Tr. 168:17-171:2

(Smith).  For example, the committee noted that a "combination of race-neutral alternatives that

Mr. Kahlenberg deems workable for Harvard would, if adopted, result in a 19% drop in the

proportion of admitted students with the highest academic ratings."  P316 at 14; *see* DX729.11 &

DD10.141 (results for Kahlenberg "Simulation 6," which was also referred to as "Simulation C,"

10/22 Tr. 33:15-18, 43:3-6, 47:4-6, 109:8-10, 120:2-3 (Kahlenberg)); 10/31 Tr. 170:6-16 (Card).

251.     Thus, none of Mr. Kahlenberg's proposed practices would allow Harvard to

achieve its educational objectives without considering race.

v.     *Committee's Conclusions*

252.    The committee concluded that at present no combination of race-neutral practices would allow Harvard to achieve its educational and institutional goals.  P316 at 9, 18; 10/23 Tr. 134:8-14, 172:4-19 (Smith).  The committee recommended that Harvard reexamine the issue in five years.  P316 at 18-19; 10/23 Tr. 134:15-19 (Smith).

253.    Summarizing the committee's conclusions on the effect of eliminating the consideration of race, Dean Smith testified that he "can't overestimate the harm that this kind of a change would have to Harvard College's educational program, to the student experience on [Harvard's] campus, and to the institution's mission and goals."  10/23 Tr. 172:25-173:3.

254.    Testimony from current and former Harvard students corroborates the committee's judgment.  10/29 Tr. 21:5-22:3 (Vasquez-Rodriguez); 78:12-79:13, 83:17-84:20 (Cole); 109:1-110:3 (Ho); 128:14-22 (Nunez); 154:16-155:21 (Diep); 191:13-193:9 (Trice); 210:17-211:8 (Chen).  President Simmons's testimony also corroborates the committee's judgment.  10/30 Tr. 29:7-13, 54:9-55:15.

255.    Harvard has shown that it could not, at this time, achieve its educational and institutional objectives without considering race as one factor in its admissions process.

**I.    SFFA's Standing**

256.    A substantial part of SFFA's mission is to end race-based admissions policies at American universities.  Joint Pretrial Memorandum (Dkt. 570) at 8.

257.    Edward Blum, President of SFFA, is responsible for SFFA's launch, its day-to-day operations, membership recruitment, and efforts to publicize its mission.  *Id.*

258.    SFFA has no officers, directors, or employees other than the members of its Board of Directors.  *Id.*  Four of five members of SFFA's Board of Directors are elected by the

Board; only one is elected by SFFA's members.  *Id.* at 9.

259.    Beginning on July 30, 2015, SFFA required new members to pay a membership fee of $10.  Between July 30, 2015 and April 30, 2017, only 133 members had paid the fee, representing just 0.6% of SFFA's members.  *Id.*

## III.    PROPOSED CONCLUSIONS OF LAW

### A.    Harvard Does Not Discriminate Against Asian-American Applicants

#### i.    *Legal Standard*

260.    Count I alleges that Harvard intentionally discriminates against Asian-American applicants, in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*

261.    To prove a violation of Title VI, SFFA must show that Harvard "discriminated on the basis of race, the discrimination was intentional, and the discrimination was a substantial or motivating factor for [Harvard's] actions." *Goodman v. Bowdoin Coll.*, 380 F.3d 33, 43 (1st Cir. 2004) (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001)).  In other words, SFFA must prove that Harvard acted with "racial animus toward" Asian-American applicants.  *Id.*

262.     "[T]he burden of proving intentional discrimination never shifts; it remains with the plaintiff throughout." *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010); *see also, e.g.*, *Udo v. Tomes*, 54 F.3d 9, 12 (1st Cir. 1995); *White v. Vathally*, 732 F.2d 1037, 1040 (1st Cir. 1984).

263.    Whether a defendant intended to discriminate is an issue of fact.  *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2326 (2018); *Pullman-Standard v. Swint*, 456 U.S. 273, 289-290 (1982); *Rodriguez-Morales v. Veterans Admin.*, 931 F.2d 980, 982 (1st Cir. 1991).

264.    In determining under Title VI whether a facially neutral policy or practice in fact reflects the intent to discriminate on the basis of race, courts must consider evidence of the sort discussed in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  *See Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 83 (1st Cir. 2004); *see*

*also, e.g.*, *Pryor v. NCAA*, 288 F.3d 548, 562-564 (3d Cir. 2002).

265.     As a private party, SFFA cannot establish a Title VI violation based on proof of racially disparate outcomes.  *Alexander v. Sandoval*, 532 U.S. 275, 280-281, 293 (2001).

266.     Racial outcome disparities are at most a "starting point" in determining whether a defendant intended to discriminate on the basis of race.  *Arlington Heights*, 429 U.S. at 266.  In rare cases, "a clear pattern, unexplainable on grounds other than race," may permit an inference of intentional discrimination.  *Id.*  That was true in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)—which involved a facially race-neutral ordinance under which laundry operating permits were granted to almost no Chinese-American applicants but to virtually all others who applied, *id.* at 374—and *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), in which the boundaries of Tuskegee, Alabama were redrawn "from a square to an uncouth twenty-eight-sided figure" that "remove[d] from the city all save only four or five of its 400 Negro voters while not removing a single white voter or resident," *id.* at 340-341.  *See Arlington Heights*, 429 U.S. at 266; *McCleskey v. Kemp*, 481 U.S. 279, 293 n.12 (1987) (*Yick Wo* and *Gomillion* are "examples of those rare cases in which a statistical pattern of discriminatory impact demonstrated a constitutional violation").

267.     "[C]ourts have been loathe," however, "to infer intent from mere effect." *McGuire v. Reilly*, 386 F.3d 45, 63 (1st Cir. 2004).  "Absent a pattern as stark as that in *Gomillion* or *Yick Wo*," disparities in outcomes "alone [are] not determinative, and the Court must look to other evidence" in attempting to discern intent.  *Arlington Heights*, 429 U.S. at 266; *see also, e.g.*, *Spath v. NCAA*, 728 F.2d 25, 28 (1st Cir. 1984) ("[G]enerally courts must look to evidence other than statistical impact to support a finding of discriminatory purpose.").

      *ii.*    <u>The Statistical Evidence Does Not Support An Inference Of Intentional Discrimination</u>

268.     Even though courts have recognized that statistical evidence generally cannot

prove discriminatory intent, SFFA has repeatedly conceded that statistical evidence is the core of its intentional discrimination claim. *See, e.g.*, 10/25 Tr. 9:11-14; SFFA's Reply in Support of Admission of P438 and P588 (Dkt. 605) at 1.

269.    The statistical evidence here does not show discrimination, much less the sort of "clear pattern, unexplainable on grounds other than race," *Arlington Heights*, 429 U.S. at 266, that could suffice to establish intentional discrimination.  That is true for two reasons.

270.    *First*, Dr. Card's model is more reliable than Dr. Arcidiacono's.  *See supra* ¶¶ 103-145.  Dr. Card's model shows no statistically significant effect of Asian-American ethnicity on the likelihood of admission, controlling for all relevant factors in the data.  *See supra* ¶¶ 101-105.  That defeats SFFA's discrimination claim.

271.    *Second*, even if Dr. Arcidiacono's analysis were reliable, it would not support an inference that Harvard intentionally discriminates against Asian-American applicants.

272.    As Dr. Card explained, a regression model based on real-world data cannot prove that the effect attributed to a given factor is *actually* due to that factor.  *See supra* ¶¶ 147-148.  Here, for example, a regression model cannot prove that an effect attributed to race by the model is in fact "unexplainable on grounds other than race," *Arlington Heights*, 429 U.S. at 266.  That is because, as discussed above, the effects estimated by a regression may be biased by the researcher's inability to include all relevant factors in the model.  *See supra* ¶ 122.

273.    Indeed, Dr. Arcidiacono himself conceded that one could not infer intent—or therefore intentional discrimination—from his analysis.  10/26 Tr. 48:8-10 (Arcidiacono).

274.    Furthermore, Dr. Arcidiacono and SFFA have themselves argued that Harvard discriminates against *only* those Asian-American applicants who are not ALDC applicants.  *See supra* ¶¶ 107-108.  If Harvard intended to discriminate against Asian-American applicants on the

basis of their race, such discrimination would presumably extend to *all* Asian-American applicants, not just those who are not ALDC applicants.  SFFA offered no account of why Harvard's animus would have extended only to a subset of Asian-American applicants.

275.    The statistical evidence thus provides no basis to conclude that Harvard intended to discriminate against Asian-American applicants on the basis of their race.  It does not show any discrimination, much less the sort of "clear pattern" of disparate admissions outcomes that is "unexplainable on grounds other than race," *Arlington Heights*, 429 U.S. at 266.

*iii.    The Non-Statistical Evidence Does Not Support An Inference Of Intentional Discrimination*

276.    SFFA must therefore adduce "other evidence" that Harvard intended to discriminate against Asian-American applicants.  *Arlington Heights*, 429 U.S. at 266.

277.    None of the "other evidence" SFFA has offered is any more probative of an intent to discriminate against Asian-American applicants on the basis of their race.  Indeed, SFFA has made clear that it regards the non-statistical evidence as largely irrelevant.  *See* 11/2 Tr. 52:4-6.

278.    No Admissions Office witness stated that he or she had seen any evidence of racial discrimination in the admissions process, and SFFA identified no application file or other document revealing even stray discriminatory comments.  *See supra* ¶¶ 189-192, 200.  In any event, it is well established in the context of employment discrimination that "'stray workplace remarks' … normally are insufficient, standing alone, to establish … discriminatory animus," *Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 69 (1st Cir. 2002), and that any "probativeness" of "such 'stray remarks' … is circumscribed if they … were not related to the … decision in question," *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir. 2001) (emphasis omitted).

279.    SFFA has emphasized that in certain years, Harvard sent recruitment letters to White students in certain regions of the country with lower test scores than Asian-American

students in the same regions of the country.  As discussed above, however, there were no consistent or meaningful differences in the score thresholds.  *See supra* ¶¶ 195-198.

280.    In any event, Title VI does not limit the consideration of race in recruiting in the way that it limits the consideration of race in admissions.  *See, e.g.*, *Weser v. Glen*, 190 F. Supp. 2d 384, 399 (E.D.N.Y. 2002), *aff'd*, 41 F. App'x 521 (2d Cir. 2002) (even if law school's "recruiting and outreach efforts were 'race conscious' … such efforts would not constitute discrimination" and "do not implicate the Equal Protection Clause"); *Honadle v. Univ. of Vermont*, 56 F. Supp. 2d 419, 428 (D. Vt. 1999) (similar).  Indeed, courts regularly identify the recruitment of minority candidates as a "race-neutral" practice.  *See, e.g.*, *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1571 (11th Cir. 1994); *Peightal v. Metro. Dade Cty.*, 26 F.3d 1545, 1557-1558 (11th Cir. 1994).  SFFA and Mr. Kahlenberg agree.  *See* Complaint (Dkt. 1) ¶ 340 ("Harvard could achieve its student body diversity without the use of racial preferences by improving its recruitment of … high-achieving minorities[.]"); 10/22 Tr. 23:22-24:1.

281.    SFFA has argued that Harvard should have taken action in response to work by employees in Harvard's Office of Institutional Research (OIR).  But as discussed above, there is no basis to conclude that Dean Fitzsimmons understood the OIR analyses as suggesting the possibility of racial bias in the admissions process.  *See supra* ¶¶ 171-173, 177, 181-184.  Nothing in OIR's analyses—or the responses of those at Harvard who viewed them—suggests Harvard intended to discriminate against Asian-American applicants.

282.    To the extent SFFA's argument is simply that the OIR analyses made Dean Fitzsimmons aware of certain racial disparities in admissions outcomes, that too is no basis to infer an intent to discriminate.  One cannot infer from a decisionmaker's awareness of race- or gender-based disparities that the decisionmaker intended to discriminate on the basis of one of

those protected classifications.  In *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), for example, the Supreme Court considered a Massachusetts law granting veterans a preference in state employment.  Although the legislature surely knew "that most veterans are men," *id.* at 278, the Court held that "'[d]iscriminatory purpose' … implies more than intent as volition or intent as awareness of consequences"; rather, "[i]t implies that the decisionmaker … selected or reaffirmed a particular course of action at least in part '*because of*,' not merely '*in spite of*,' its adverse effects upon an identifiable group."  *Id.* at 279 (emphases added).

    iv. *SFFA's Unconscious Bias Theory Cannot Compensate For The Evidence It Lacks*

 283. SFFA repeatedly suggested at trial (for the first time in this case) that Harvard might have acted with "implicit" or "unconscious bias" toward Asian-American applicants, even if it did not act with racial animus toward them.  *See, e.g.*, 10/15 Tr. 9:19-10:4; 10/22 Tr. 208:23-210:2; 11/1 Tr. 145:13-146:23, 164:3-165:3; 11/2 Tr. 47:25-48:12.

 284. The First Circuit has held that plaintiffs must prove "racial animus" to establish a violation of Title VI.  *Goodman*, 380 F.3d at 43.

 285. In the Title VII context, the First Circuit has observed that "'unlawful discrimination can stem from stereotypes and other types of cognitive biases, as well as from conscious animus.'"  *Ahmed v. Johnson*, 752 F.3d 490, 503 (1st Cir. 2014) (quoting *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 59 (1st Cir. 1999)).

 286. To the extent those observations might apply in the Title VI context, and to the extent the sort of bias SFFA has suggested would constitute "cognitive bias[]" under First Circuit law, there would still be no basis for a finding that Harvard intentionally discriminates against Asian-American applicants on the basis of race.  SFFA has not proven that the roughly 40 members of Harvard's Admissions Committee, themselves a diverse group, acted with an

aligned and common cognitive bias against Asian-American applicants any more than it has proven those admissions officers acted with racial animus toward Asian-American applicants.

287.    Cognitive bias is no more reasonable an inference from the statistical evidence than animus is.  Dr. Card's analysis shows *no* statistically significant difference in admissions outcomes between Asian-American applicants and otherwise similar White applicants.  *See supra* ¶¶ 104-105.  And even Dr. Arcidiacono's negative estimate of the effect of Asian-American ethnicity cannot reliably be imputed to racial discrimination (conscious or otherwise), given the factors that cannot be accounted for in a statistical model.  *See supra* ¶¶ 146-149.

288.    Nor did SFFA present any document or the testimony of any admissions officer from which the Court could infer that cognitive bias influenced the admissions process.  SFFA's reference to isolated comments on a docket binder and comments in correspondence from admissions officers do not support an inference of stereotyping or cognitive bias, and SFFA did not attempt to conduct any rigorous review of the sort conducted, for example, by the late-1980s OCR investigation.  *See supra* ¶¶ 191-193.

289.    Nor did SFFA present any expert testimony concerning cognitive bias, the likelihood that it might be found among Harvard's admissions officers, or the likelihood that cognitive bias on the part of some subset of the 40-member Admissions Committee could have affected the decisions rendered by that committee as a whole.

290.    Finally, SFFA made no attempt to reconcile its unconscious-bias theory with its claim that Harvard discriminates against *only* those Asian-American applicants who are not ALDC applicants, while Asian-American ALDC applicants are if anything *more* likely to be admitted than otherwise identical White applicants.  If Harvard's admissions officers bore unconscious bias against Asian-American applicants, it is hard to imagine why that bias would

be manifested only against a subset of Asian-American applicants, while others are if anything favored relative to White applicants.

291.    In short, SFFA's unconscious bias theory is nothing but a hypothesis, devoid of supporting evidence, that SFFA has offered in an attempt to compensate for its lack of proof that anyone at Harvard intended to discriminate against Asian-American applicants.

292.    For all the reasons discussed above, SFFA has not established that Harvard discriminated against Asian-American applicants in violation of Title VI.

### B.    Harvard Considers Race In The Manner Permitted By Precedent

293.    Counts II, III, and V of SFFA's Complaint allege that Harvard violates Title VI by considering race in a manner not permitted by Supreme Court precedent.

294.    The Supreme Court has held that universities are entitled to deference when they articulate their educational interests in pursuing diversity and that they may consider race in the admissions process if doing so is necessary to achieve those educational interests, so long as they evaluate applicants as individuals and not in a way that makes race the defining consideration. *See Fisher v. Univ. of Texas at Austin* (*Fisher II*), 136 S. Ct. 2198 (2016); *Fisher v. Univ. of Texas at Austin* (*Fisher I*), 570 U.S. 297 (2013); *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Bakke*, 438 U.S. at 272-320 (opinion of Powell, J.).[2]

---

[2]    The Supreme Court has articulated those requirements in suits against public universities brought under the Equal Protection Clause of the Fourteenth Amendment.  The Court has not considered, however, whether the weighty academic freedom interest protected by the First Amendment, *see infra* ¶ 297, would warrant applying Title VI to private universities in a manner that would preserve a university's ability to admit a class that would allow it to achieve its educational objectives.  Although Harvard assumes for purposes of these proposed conclusions of law that Title VI incorporates the Supreme Court's equal protection standard—and believes its practices satisfy that standard—Harvard reserves the right to argue that serious reliance concerns would be impaired, and serious constitutional concerns would arise, if Title VI were interpreted to prevent private universities from realizing the educational benefits of diversity that are essential to their mission.

295.    Harvard's process complies with those requirements.  Harvard has articulated its educational interests in pursuing diversity, it has shown that it cannot achieve those interests without considering race, and it considers race in the manner permitted by the Supreme Court.

### i.    Harvard Has Established Its Educational Interests In Diversity

296.    The Supreme Court has repeatedly held that "the decision to pursue the educational benefits that flow from student body diversity … is, in substantial measure, an academic judgment to which some, but not complete, judicial deference is proper."  *Fisher II*, 136 S. Ct. at 2208 (internal quotation marks omitted).  "Once … a university gives a reasoned, principled explanation for its decision" to pursue the educational benefits of diversity, "deference must be given to the University's conclusion, based on its experience and expertise, that a diverse student body would serve its educational goals."  *Id.* (internal quotation marks omitted).

297.    That deference reflects the Supreme Court's longstanding recognition "that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition."  *Grutter*, 539 U.S. at 329 (citing *Wieman v. Updegraff*, 344 U.S. 183, 195 (1952) (Frankfurter, J., concurring); *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *Shelton v. Tucker*, 364 U.S. 479, 487 (1960); and *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967)).  In particular, the Court has recognized "a constitutional dimension, grounded in the First Amendment, of educational autonomy"; and it has recognized that "[t]he freedom of a university to make its own judgments as to education includes the selection of its student body."  *Id.* (internal quotation marks omitted).

298.    The Supreme Court has recognized that "[e]ffective participation by members of all racial and ethnic groups in the civic life of our Nation is essential if the dream of one Nation, indivisible, is to be realized," and that "[i]n order to cultivate a set of leaders with legitimacy in

the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity."  *Grutter*, 539 U.S. at 332.

299.    Harvard has articulated its view that diversity serves important educational interests, in exactly the "reasoned, principled" manner, *Fisher II*, 136 S. Ct. at 2208—and with the degree of specificity and concreteness, *id.* at 2211—envisioned by the Supreme Court.

300.    Harvard did so most recently in the form of the report authored by the Committee to Study the Importance of Student Body Diversity, and unanimously adopted by the Faculty of Arts and Sciences.  P302.  The committee report is consistent with views Harvard had long expressed—in amicus briefs and presidential statements.  DX40; *see supra* ¶ 5.

301.    The interests articulated in the committee report are comparable in specificity and concreteness to those articulated by the University of Texas at Austin in *Fisher II*.  There, the Supreme Court approved as sufficiently "concrete and precise" the goals of "the destruction of stereotypes, the promotion of cross-racial understanding, the preparation of a student body for an increasingly diverse workforce and society, and the cultivation of a set of leaders with legitimacy in the eyes of the citizenry."  136 S. Ct. at 2211 (brackets and internal quotation marks omitted).

302.    Because Harvard has given "a reasoned, principled explanation for its decision" to pursue the educational benefits of diversity, "deference must be given to [its] conclusion, based on its experience and expertise, that a diverse student body would serve its educational goals."  *Fisher II*, 136 S. Ct. at 2208 (internal quotation marks omitted).  Harvard's judgment is also amply supported by other evidence.  *See supra* ¶¶ 10-12.

ii.    *Harvard Could Not Achieve Its Educational Objectives Without Considering Race*

303.    The Supreme Court has further held that a university that wishes to consider race in admissions must show that "a nonracial approach would not promote its interest in the

educational benefits of diversity about as well and at tolerable administrative expense." *Fisher II*, 136 S. Ct. at 2208 (internal quotation marks omitted).

304.    The university need not, however, "exhaust[] … every conceivable race-neutral alternative" to a race-conscious admissions process. *Fisher II*, 136 S. Ct. at 2208 (internal quotation marks omitted).  Its burden is to show "that race-neutral alternatives that are both *available* and *workable* do not suffice."  *Id.* (emphases added; internal quotation marks omitted).

305.    Nor must a university "choose between maintaining a reputation for excellence [and] fulfilling a commitment to provide educational opportunities to members of all racial groups." *Fisher II*, 136 S. Ct. at 2208.  A university may deem a race-neutral approach unavailable or unworkable not only if it would compromise the university's "reputation for academic excellence," but also if it would compromise the university's commitment to pursuing "all … aspects of diversity" other than racial and ethnic diversity. *Fisher II*, 136 S. Ct. at 2213.

> a)      Harvard Has Undertaken Serious, Good Faith Consideration Of Race-Neutral Alternatives

306.    Harvard undertook "serious, good faith consideration of workable race-neutral alternatives," *Fisher I*, 570 U.S. at 312 (internal quotation marks omitted).

307.    *First*, Harvard has honored its obligation to consider race-neutral means of pursuing diversity.  It has for decades engaged in a wide variety of race-neutral efforts to increase the diversity of its applicant pool and its student body. *See supra* ¶¶ 19-27, 75-78.  And it regularly reviews its practices with an eye toward increasing diversity; for example, it eliminated and then reinstated Early Action for that reason. *See supra* ¶ 219.

308.    *Second*, since SFFA seeks forward-looking relief, Complaint (Dkt. 1) ¶ 487, the relevant question is whether Harvard has *now* undertaken "serious, good faith consideration" of race-neutral alternatives, *Grutter*, 539 U.S. at 339. *See United States v. Oregon State Med. Soc.*,

343 U.S. 326, 333 (1952) ("The sole function of an action for injunction is to forestall future

violations."); *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 16 (1st Cir. 2004) (similar).

309.    *Third*, the evidence shows that the study of race-neutral alternatives undertaken

by the Committee to Study Race-Neutral Alternatives in Harvard College Admissions, beginning

in 2017, was a "serious, good faith" process, *Grutter*, 539 U.S. at 339.

310.    SFFA suggested that Harvard failed to consider race-neutral alternatives in good

faith because it curtailed the work of a committee that had launched in 2014, shortly after the

Supreme Court's decision in *Fisher I*, to consider diversity-related educational interests and the

availability of race-neutral alternatives on a University-wide basis.  But Harvard's decision is

reasonable given that SFFA commenced this litigation shortly after the 2014 committee had been

created.  Two other committees took up that work, with respect to Harvard College, at a time and

in a manner that made sense in the context of the litigation and with the benefit of expert analysis

generated in this litigation.  *See supra* ¶¶ 6-9, 204-213.

311.    SFFA's suggestion that the Committee to Study Race-Neutral Alternatives was

not a serious body because it included only three members is equally unpersuasive.  As the

committee members and President Faust credibly testified, the composition of the committee

reflected both the particular expertise of the three members and the fact that the committee

would have the benefit of the considerable work already undertaken by both parties' experts in

the context of this litigation.  *See supra* ¶ 207.

> b)    Harvard's Review Of Race-Neutral Alternatives Demonstrated
> That Harvard Could Not Achieve Its Educational Objectives
> Without Considering Race

312.    As discussed above, Harvard has long pursued diversity in numerous ways other

than considering race in admissions; the committee nonetheless showed that, even given those

practices, the representation of African-American and Hispanic students on campus would

considerably decline if race were not considered; that such a significant decline in African-American and Hispanic representation would undermine Harvard's educational objectives; and that no set of race-neutral practices could achieve a comparable degree of racial and ethnic diversity without severely compromising the excellence of the class. *See supra* ¶¶ 214-255.

313.    The testimony of SFFA's expert on race-neutral alternatives, Richard Kahlenberg, provides no basis to doubt the substance of the committee's conclusions.  Mr. Kahlenberg acknowledged that the committee considered a comprehensive set of race-neutral alternative practices.  *See supra* ¶ 209.  And he agreed that the committee had applied reasonable criteria in evaluating the availability and workability of the practices it considered.  *See supra* ¶ 210.

314.    Mr. Kahlenberg's testimony addressed four combinations of race-neutral practices that in his opinion were available and workable means for Harvard to achieve the educational benefits of diversity without considering race.  *See supra* ¶¶ 243, 249.  None would allow Harvard to admit a comparably diverse and comparably excellent class.  *See supra* ¶ 249-250.

315.    The record demonstrates that Harvard could not achieve its educational objectives without considering race.

### iii.    Harvard Considers Race In The Manner Permitted By The Supreme Court

316.    The evidence further showed that Harvard considers race in the admissions process in the manner permitted by the Supreme Court.  Harvard considers each applicant as a whole person, in an intensive process of individualized review that accounts for the full breadth and depth of what the applicant would bring to campus.

317.    Harvard's admissions process today is substantially similar to the process Justice Powell held up as an "illuminating example" of legality in *Bakke*, 438 U.S. at 316.  Justice Powell appended a copy of the Harvard College Admissions Program to his opinion, *id.* at 321-324, and identified it as a model of legality because it "treats each applicant as an individual" and

"is flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant." *Id.* at 317-318 (opinion of Powell, J.).

318.    In *Grutter*, the Supreme Court again invoked Harvard's process as a model of legality.  539 U.S. at 334-339.  The Court repeatedly compared the Harvard process as discussed in *Bakke* to the practices of the University of Michigan Law School, in explaining why the Michigan practices complied with the Constitution.  *Id.*  Likewise, in *Gratz*—which invalidated the University of Michigan's undergraduate admissions program—the Court contrasted that program with the Harvard process.  539 U.S. at 271-273.

319.    SFFA's claims that Harvard considers race in a manner not permitted by Title VI are, in effect, criticisms of the Supreme Court decisions that have endorsed those practices.

a)      Harvard Does Not Consider Race As More Than A Plus Factor

320.    The Supreme Court has held that universities "may consider race or ethnicity only as a 'plus' in a particular applicant's file, without insulat[ing] the individual from comparison with all other candidates for the available seats.  In other words, an admissions program must be flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight." *Grutter*, 539 U.S. at 334 (citation and some internal quotation marks omitted).

321.    The Court has further required that, "[w]hen using race as a 'plus' factor … , a university's admissions program must remain flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Grutter*, 539 U.S. at 336-337.  Universities may not, for example, "award[] … mechanical, predetermined diversity 'bonuses' based on race or ethnicity." *Id.* at 337; *cf. Gratz*, 539 U.S. at 271-272 (invalidating the use of automatic bonuses,

and distinguishing that program from Harvard's). The Court has described "this individualized consideration in the context of a race-conscious admissions program" as "paramount" in importance. *Grutter*, 539 U.S. at 337. "So long as the university proceeds on an individualized, case-by-case basis, there is no warrant for judicial interference in the academic process." *Bakke*, 438 U.S. at 381 n.53 (opinion of Powell, J.). Race may, however, "make a difference to whether an application is accepted or rejected." *Fisher II*, 136 S. Ct. at 2207.

322.    Harvard's admissions process satisfies the requirements set forth by the Supreme Court. Current and former admissions officers testified consistently and credibly that race is considered in the process as just one factor among many that can make a difference for highly competitive applicants, and that it is considered in the context of the Admissions Committee's effort to get to know each applicant as a whole person. *See supra* ¶¶ 28-31, 56-65, 92-93. Dr. Card's analysis confirmed as much. *See supra* ¶¶ 94-95.

323.    The evidence shows that Harvard "consider[s] race or ethnicity only as a 'plus' in a particular applicant's file, without insulat[ing] the individual from comparison with all other candidates," *Grutter*, 539 U.S. at 334 (some internal quotation marks omitted). Harvard's process is "flexible," evaluates each applicant "as an individual," and does not "make[] an applicant's race or ethnicity the defining feature of his or her application," *id.* at 336-337.

b)      Harvard Does Not Engage In Racial Balancing

324.    "A university is not permitted to define diversity as some specified percentage of a particular group merely because of its race or ethnic origin. That would amount to outright racial balancing, which is patently [unlawful]." *Fisher I*, 570 U.S. at 311 (citation and internal quotation marks omitted). But "[a]s the Harvard plan described by Justice Powell recognized, there is of course some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for

those students admitted." *Grutter*, 539 U.S. at 336 (internal quotation marks omitted).  "Some

attention to numbers, without more, does not transform a flexible admissions system into a rigid

quota."  *Id.* (brackets and internal quotation marks omitted).

325.    SFFA presented no evidence that Harvard engages in impermissible racial

balancing, rather than—at most—the sort of "attention to numbers" that the Supreme Court held

was permissible in *Grutter*, 539 U.S. at 336.  *See supra* ¶¶ 79-91.  To the contrary, the evidence

showed that the racial composition of the student body has varied meaningfully from year to year

for all racial and ethnic groups; SFFA presented no contrary evidence.  *See supra* ¶¶ 79-84.

### C.    SFFA Lacks Standing

326.    Federal subject-matter jurisdiction extends only "to 'Cases' and 'Controversies'"

brought by parties with a genuine interest in their resolution.  *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 559-560 (1992).  The requirement of standing is thus "an essential and unchanging part

of the case-or-controversy requirement of Article III."  *Id.* at 560.  It serves to ensure that the

federal judicial power is invoked only by "those who have a direct stake in the outcome," rather

than by "concerned bystanders, who will use it simply as a vehicle for the vindication of value

interests."  *Diamond v. Charles*, 476 U.S. 54, 62 (1986) (internal quotation marks omitted).

327.    When individuals create an association by "pool[ing] their interests, activities and

capital under a name and form that will identify collective interests," *Camel Hair & Cashmere

Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 11 (1st Cir. 1986), courts may

permit the association to sue on the individuals' behalf, because the association "and its members

are in every practical sense identical," *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449,

459 (1958).  SFFA bases its claim to standing on this theory.

328.    In determining whether an association may be permitted to sue on its members'

behalf, courts have examined the "indicia of membership" set forth in *Hunt v. Washington State*

*Apple Advertising Commission*, 432 U.S. 333, 344-345 (1977). They have considered whether an association's members have the power to control its conduct and whether the members finance the association's activities. *See id.*[3]

329.    Under that standard, SFFA cannot show that it genuinely represents its members' interests. SFFA's members have the right to elect just one of the five members of its Board of Directors, they pay no ongoing membership dues, and virtually none have paid *any* membership dues or otherwise helped fund the organization. *See* Joint Pretrial Memorandum (Dkt. 570) at 9.

330.    SFFA therefore cannot genuinely be regarded as a vehicle by which its members join "under a name and form that will identify collective interests," *Camel Hair & Cashmere Inst.*, 799 F.2d at 11. It is instead a vehicle for the interests of its founder, Edward Blum, and the other controlling members of SFFA's Board of Directors, Richard and Abigail Fisher—all of whom lack a concrete stake in the outcome and therefore would not have been permitted to sue on their own behalf. Allowing SFFA to maintain this suit transforms this Court into a "vehicle for the vindication of value interests," *Diamond*, 476 U.S. at 62, in violation of Article III.

---

[3]    This Court has held that *Hunt*'s indicia-of-membership standard does not apply to voluntary membership organizations like SFFA. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 2018 WL 4688308, at *11 (D. Mass. Sept. 28, 2018); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 261 F. Supp. 3d 99, 106-109 (D. Mass. 2017). Harvard presents proposed conclusions of law concerning the application of that standard for the purposes of potential further review.

Respectfully submitted,

/s/ Seth P. Waxman

| | |
|---|---|
| William F. Lee (BBO #291960) | Seth P. Waxman (*pro hac vice*) |
| Felicia H. Ellsworth (BBO #665232) | Paul R.Q. Wolfson (*pro hac vice*) |
| Andrew S. Dulberg (BBO #675405) | Danielle Conley (*pro hac vice*) |
| Elizabeth Mooney (BBO #679522) | Brittany Amadi (*pro hac vice*) |
| Sarah R. Frazier (BBO #681656) | Daniel Winik (*pro hac vice*) |
| WILMER CUTLER PICKERING | WILMER CUTLER PICKERING |
|    HALE AND DORR LLP |    HALE AND DORR LLP |
| 60 State Street | 1875 Pennsylvania Ave. NW |
| Boston, MA 02109 | Washington, D.C. 20006 |
| Tel: (617) 526-6687 | Tel: (202) 663-6800 |
| Fax: (617) 526-5000 | Fax: (202) 663-6363 |
| william.lee@wilmerhale.com | seth.waxman@wilmerhale.com |
| felicia.ellsworth@wilmerhale.com | paul.wolfson@wilmerhale.com |
| andrew.dulberg@wilmerhale.com | danielle.conley@wilmerhale.com |
| elizabeth.mooney@wilmerhale.com | brittany.amadi@wilmerhale.com |
| sarah.frazier@wilmerhale.com | daniel.winik@wilmerhale.com |

Debo P. Adegbile (*pro hac vice*)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 295-6717
Fax: (212) 230-8888
debo.adegbile@wilmerhale.com

Dated:  December 19, 2018

*Counsel for Defendant President and Fellows of Harvard College*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Seth P. Waxman

Seth P. Waxman