# UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS
## BOSTON DIVISION

|  |  |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC.,<br><br>        Plaintiff,<br><br>  v.<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>        Defendant. | Civil Action No. 1:14-cv-14176-ADB |

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Adam K. Mortara
Scott J. McBride
Krista J. Perry
BARTLIT BECK LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
312.494.4400
adam.mortara@bartlitbeck.com
scott.mcbride@bartlitbeck.com
krista.perry@bartlitbeck.com

John M. Hughes
Katherine L.I. Hacker
Meg E. Fasulo
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, CO 80202
303.592.3100
john.hughes@bartlitbeck.com
kat.hacker@bartlitbeck.com
meg.fasulo@bartlitbeck.com

Paul M. Sanford BBO #566318
BURNS & LEVINSON LLP
One Citizens Plaza, Suite 1100
Providence, RI 02903
617.345.3000
psanford@burnslev.com

December 19, 2018

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
703.243.9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com
cam@ consovoymccarthy.com

Patrick Strawbridge BBO #678274
CONSOVOY MCCARTHY PARK PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
617.227.0548
patrick@consovoymccarthy.com

Michael H. Park
CONSOVOY MCCARTHY PARK PLLC
745 Fifth Avenue, Suite 500
New York, NY 10151
212.247.8006
park@consovoymccarthy.com

# TABLE OF CONTENTS

PROPOSED FINDINGS OF FACTS ........................................................................................1

I.      The Parties ..............................................................................................................1

II.     Harvard's Admissions Process ...............................................................................1

      A.      Harvard's Profile, School Support, and Overall Ratings ..............................1

      B.      Harvard's Use of Race in the Admissions Process ......................................3

      C.      Admissions Preferences for ALDCs .............................................................4

      D.      Reviewing Applications and Making Admissions Decisions ........................4

III.    Intentional Discrimination Against Asian Americans .............................................6

      A.      Statistical Evidence Shows That Harvard Imposes an Asian-American Penalty. ...........................................................................................................6

            1.      Descriptive analysis reveals that Harvard's admissions system produces stark racial disparities that have a negative effect on Asian Americans. ...................................................................................7

                 a.      Descriptive analysis shows that Asian Americans, as a group, are the strongest in Harvard's applicant pool on multiple dimensions. ......................................................................7

                 b.      Descriptive analysis shows a stark racial disparity in the personal and overall ratings that has a negative effect on Asian Americans. ..................................................................8

                 c.      Descriptive analysis shows a stark racial disparity in admissions decisions that has a negative effect on Asian-American applicants. ...................................................10

            2.      Logistic regression demonstrates that Harvard imposes a penalty on Asian-American applicants. ....................................................11

                 a.      Harvard penalizes Asian Americans in the assignment of the overall rating. ...............................................................12

                 b.      Harvard penalizes Asian Americans in the assignment of the personal rating. ..............................................................13

                 c.      Harvard penalizes Asian Americans in its admissions decisions. .........................................................................16

            3.      Professor Card's criticism of the admissions models are unpersuasive. .........17

                 a.      Excluding the personal rating is proper and indisputably shows a statistically significant penalty against Asian Americans. ...................................................................17

                 b.      Excluding ALDCs is proper. ...............................................19

                 c.      Pooling data is proper. .........................................................21

|  |  | d. | Excluding parental occupation is proper. | 22 |
|  |  | e. | Excluding intended career data is proper. | 23 |
|  |  | f. | Excluding staff interviews is proper. | 23 |
|  |  | g. | Race and socioeconomic disadvantage should be interacted. | 24 |
|  |  | h. | Professor Card's modeling of certain Asian-American subgroups is not credible. | 24 |
|  | B. | Non-Statistical Evidence Shows That Harvard Discriminates Against Asian Americans | | 25 |
| IV. | Racial Balancing | | | 39 |
| V. | Harvard's Use of Racial Preferences to Benefit African Americans and Hispanics | | | 41 |
| VI. | Race-Neutral Alternatives | | | 44 |
|  | A. | Harvard's Failure to Consider Race-Neutral Alternatives. | | 44 |
|  | B. | The Availability of Race-Neutral Alternatives | | 45 |
| PROPOSED CONCLUSIONS OF LAW | | | | 46 |
| I. | Harvard Intentionally Discriminates Against Asian-American Applicants. | | | 49 |
|  | A. | Harvard Cannot Meet Its Heavy Burden of Proving That It Does Not Use Race To Discriminate Against Asian Americans. | | 49 |
|  | B. | It Is More Likely Than Not That Harvard Has Engaged In a Pattern or Practice of Discrimination Against Asian Americans. | | 49 |
|  |  | 1. | Harvard imposes a statistically significant penalty on Asian Americans. | 54 |
|  |  | 2. | SFFA's statistical case is buttressed by ample circumstantial evidence of discrimination against Asian Americans. | 58 |
|  |  | 3. | Harvard lacks a nondiscriminatory explanation. | 63 |
| II. | Harvard Engages in Racial Balancing | | | 66 |
| III. | Harvard's Use of Race Violates *Grutter*. | | | 69 |
|  | A. | Harvard Is Not Pursuing the "Diversity" Interest That *Grutter* Endorsed. | | 69 |
|  | B. | Harvard Uses Race As More Than a "Plus" Factor. | | 69 |
|  | C. | Harvard's Use of Race Has No Logical End Point. | | 71 |
|  | D. | Harvard's Use of Race Is Not Limited In Time. | | 72 |
| IV. | Harvard Failed To Consider or Implement Race-Neutral Alternatives. | | | 73 |
| CERTIFICATE OF SERVICE | | | | 77 |

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Ameritech Servs., Inc.,*
   231 F.3d 414 (7th Cir. 2000) .................................................................................52

*Adams v. City of Chicago,*
   469 F.3d 609 (7th Cir. 2006) .................................................................................61

*Adarand Constructors, Inc. v. Peña,*
   515 U.S. 200 (1995) ......................................................................................... 47, 48

*Adorno v. Port Auth.,*
   258 F.R.D. 217 (S.D.N.Y. 2009) ............................................................................63

*Aguilar v. U.S. Immigration & Customs Enforcement Div. of Dept. of Homeland Sec.,*
   510 F.3d 1 (1st Cir. 2007) .....................................................................................50

*Aiken v. City of Memphis,*
   37 F.3d 1155 (6th Cir. 1994) ........................................................................... 73, 74

*Alexander v. Louisiana,*
   405 U.S. 625 (1972) ...............................................................................................65

*Aman v. Cort Furniture Rental Corp.,*
   85 F.3d 1074 (3d Cir. 1996)...................................................................................51

*Antolok v. United States,*
   873 F.2d 369 (D.C. Cir. 1989) ...............................................................................58

*Bazemore v. Friday,*
   478 U.S. 385 (1986) ..................................................................................50, 52, 56

*Bhd. of Maint. of Way Emps. Div. of the Int'l Broth. of Teamsters v. Ind. Harbor Belt R. Co.,*
   No. 2:13 cv 18-PPS-APR, 2014 WL 4987972 (N.D. Ind. Oct. 7, 2014) ......................50

*Blackwell v. Thomas,*
   476 F.2d 443 (4th Cir. 1973) .................................................................................53

*Bolton v. Murray Envelope Corp.,*
   493 F.2d 191 (5th Cir. 1974) .................................................................................53

*Boykin v. Ga.-Pac. Corp.,*
   706 F.2d 1384 (5th Cir. 1983) ...............................................................................54

*Bush v. Vera,*
   517 U.S. 952 (1996) ...............................................................................................48

*Capaci v. Katz & Besthoff, Inc.,*
   711 F.2d 647 (5th Cir. 1983) .................................................................................57

*Castaneda v. Partida,*
   430 U.S. 482 (1977) ...............................................................................................53

*Cavalier ex rel. Cavalier v. Caddo Par. Sch. Bd.,*
   403 F.3d 246 (5th Cir. 2005) .................................................................................67

*Chadwick v. WellPoint, Inc.,*
 561 F.3d 38 (1st Cir. 2009) ...................................................................................51, 65, 66

*City of Canton v. Harris,*
 489 U.S. 378 (1989) .............................................................................................................60

*City of Richmond v. J.A. Croson Co.,*
 488 U.S. 469 (1989) .......................................................................................................48, 71

*Columbus Bd. of Educ. v. Penick,*
 443 U.S. 449 (1979) .............................................................................................................62

*Connecticut v. Teal,*
 457 U.S. 440 (1982) .............................................................................................................66

*Conway v. Electro Switch Corp.,*
 825 F.2d 593 (1st Cir. 1987) ..............................................................................................51

*Cox v. Am. Cast Iron Pipe Co.,*
 784 F.2d 1546 (11th Cir. 1986) .........................................................................................50

*Craik v. Minn. State Univ. Bd.*
 731 F.2d 465 (8th Cir. 1984) ..............................................................................................53

*Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n,*
 375 F.2d 648 (4th Cir. 1967) ..............................................................................................63

*Davis v. Califano,*
 613 F.2d 957 (D.C. Cir. 1979) ....................................................................................50, 56

*Desert Palace, Inc. v. Costa,*
 539 U.S. 90 (2003) ...............................................................................................................51

*Detroit Police Officers Ass'n v. Young,*
 989 F.2d 225 (6th Cir. 1993) ..............................................................................................72

*Diaz v. Am. Tel. & Tel.,*
 752 F.2d 1356 (9th Cir. 1985) ............................................................................................51

*EEOC v. Joe's Stone Crab, Inc.,*
 220 F.3d 1263 (11th Cir. 2000) .........................................................................................50

*EEOC v. Tex. Roadhouse, Inc.,*
 215 F. Supp. 3d 140 (D. Mass. 2016)...................................................................52, 53, 57

*Eisenberg ex rel. Eisenberg v. Montgomery Cty. Pub. Sch.,*
 197 F.3d 123 (4th Cir. 1999) ........................................................................................67, 68

*Eldredge v. Carpenters 46 N. Cal. Ctys. Joint Apprenticeship & Training Comm.,*
 833 F.2d 1334 (9th Cir. 1987) ............................................................................................52

*Fisher v. Univ. of Tex. at Austin (Fisher I),*
 570 U.S. 297 (2013) .....................................................................................................passim

*Fisher v. Univ. of Tex. at Austin (Fisher II),*
 136 S. Ct. 2198 (2016) .................................................................................................passim

*Franchina v. City of Providence,*
    881 F.3d 32 (1st Cir. 2018) .................................................................................65

*Gardner v. Simpson Fin. Ltd. P'ship,*
    963 F. Supp. 2d 72 (D. Mass. 2013) ....................................................................61

*Gill v. Thomas,*
    83 F.3d 537 (1st Cir. 1996) .................................................................................61

*Gratz v. Bollinger,*
    539 U.S. 244 (2003) .......................................................................... 47, 48, 69, 70

*Grewcock v. Yale-New Haven Health Servs. Corp.,*
    No. 3:16-c-00452 (JAM), 2018 WL 1156224 (D. Conn. Mar. 4, 2018) .........61

*Grutter v. Bollinger,*
    288 F.3d 732 (6th Cir. 2002) ..............................................................................55

*Grutter v. Bollinger,*
    539 U.S. 306 (2003) .....................................................................................passim

*Hamilton v. Geithner,*
    666 F.3d 1344 (D.C. Cir. 2012)..........................................................................53

*Hebert v. Mohawk Rubber Co.,*
    872 F.2d 1104 (1st Cir. 1989) .............................................................................51

*Hilchey v. City of Haverhill,*
    537 F. Supp. 2d 255 (D. Mass. 2008) .................................................................62

*Holcomb v. Iona Coll.,*
    521 F.3d 130 (2d Cir. 2008)................................................................................63

*Int'l Bhd. of Teamsters v. United States,*
    431 U.S. 324 (1977) ............................................................................ 50, 51, 54, 63

*Jauregui v. City of Glendale,*
    852 F.2d 1128 (9th Cir. 1988) .............................................................................53

*Jefferies v. Harris Cty. Cmty. Action Ass'n,*
    615 F.2d 1025 (5th Cir. 1980) .............................................................................66

*Johnson v. Board of Regents of University of Georgia,*
    263 F.3d 1234 (11th Cir. 2001) ..........................................................................70

*Jones v. City of Boston,*
    752 F.3d 38 (1st Cir. 2014) .................................................................................52

*Karp v. CIGNA Healthcare, Inc.,*
    882 F. Supp. 2d 199 (D. Mass. 2012).......................................................... 50, 52

*Kelly v. Bank Midwest, N.A.,*
    177 F. Supp. 2d 1190 (D. Kan. 2001) ................................................................50

*Kennedy v. City of Zanesville,*
    No. 2:03-cv-1047, 2008 WL 2036713 (S.D. Ohio May 9, 2008) ....................61

*Korematsu v. United States,*
   323 U.S. 214 (1944) ........................................................................................................58

*Lehman v. Yellow Freight Sys., Inc.,*
   651 F.2d 520 (7th Cir. 1981) .........................................................................................72

*Liberty Envtl. Sys., Inc. v. Cty. of Westchester,*
   No. 94 Civ. 7431 (WK), 2000 WL 1341403 (S.D.N.Y. Sept. 15, 2000)........................61

*Lilly v. Harris-Teeter Supermarket,*
   720 F.2d 326 (4th Cir. 1983) ....................................................................................52, 57

*Lowery v. Circuit City Stores, Inc.,*
   206 F.3d 431 (4th Cir. 2000) .........................................................................................62

*Lynn v. Regents of Univ. of Calif.,*
   656 F.2d 1337 (9th Cir. 1981) .......................................................................................52

*Lyoch v. Anheuser-Busch Cos., Inc.,*
   139 F.3d 612 (8th Cir. 1998) .........................................................................................53

*McReynolds v. Sodexho Marriott Servs., Inc.,*
   349 F. Supp. 2d 1 (D.C. Cir. 2004)................................................................................57

*Miller v. Johnson,*
   515 U.S. 900 (1995) ..................................................................................................50, 64

*Mozee v. Jeffboat, Inc.,*
   746 F.2d 365 (7th Cir. 1984) .........................................................................................54

*Murray v. S. Route Mar., S.A.,*
   No. C12-1854RSL, 2015 WL 540962 (W.D. Wash. Feb. 10, 2015)...............................61

*Norris v. Alabama,*
   294 U.S. 587 (1935) ..................................................................................................54, 64

*Palmer v. Shultz,*
   815 F.2d 84 (D.C. Cir. 1987)...............................................................................52, 53, 56

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
   551 U.S. 701 (2007) ......................................................................................47, 66, 67, 74

*Patterson v. Strippoli,*
   639 F. App'x 137 (3d Cir. 2016) ....................................................................................63

*Payne v. Travenol Labs., Inc.,*
   673 F.2d 798 (5th Cir. 1982) ....................................................................................60, 63

*Pegues v. Miss. State Emp't Serv. of Miss. Emp't Sec. Comm'n,*
   699 F.2d 760 (5th Cir. 1983) .........................................................................................59

*Pers. Adm'r of Mass. v. Feeney,*
   442 U.S. 256 (1979) ........................................................................................................48

*Phillips v. Martin Marietta Corp.,*
   400 U.S. 542 (1971) ........................................................................................................66

*Police Officers for Equal Rights v. City of Columbus,*
   644 F. Supp. 393 (S.D. Ohio 1985) ................................................................53

*Ravitch v. City of New York,*
   No. 90 Civ. 5752 (MJL), 1992 WL 196735 (S.D.N.Y. Aug. 3, 1992) .............................73

*Reeves v. Sanderson Plumbing Prods., Inc.,*
   530 U.S. 133 (2000) ................................................................63

*Regents of Univ. of Cal. v. Bakke,*
   438 U.S. 265 (1978) ................................................... 47, 49, 67, 69

*Rich v. Martin Marietta Corp.,*
   522 F.2d 333 (10th Cir. 1975) ........................................... 53, 61

*Robinson v. Metro-N. Commuter R.R. Co.,*
   267 F.3d 147 (2d Cir. 2001) ................................................................52

*Rowe v. Gen. Motors Corp.,*
   457 F.2d 348 (5th Cir. 1972) ................................................................53

*Royal v. Mo. Highway & Transp. Comm'n,*
   655 F.2d 159 (8th Cir. 1981) ................................................................59

*Santiago-Ramos v. Centennial P.R. Wireless Corp.,*
   217 F.3d 46 (1st Cir. 2000) ........................................... 53, 74

*SBT Holdings, LLC v. Town of Westminster,*
   547 F.3d 28 (1st Cir. 2008) ................................................................57

*Segar v. Smith,*
   738 F.2d 1249 (D.C. Cir. 1984) ........................................... 52, 54

*Shaw v. Reno,*
   509 U.S. 630 (1993) ................................................................47

*Smith v. Univ. of Wash.,*
   392 F.3d 367 (9th Cir. 2004) ................................................................69

*Stender v. Lucky Stores, Inc.,*
   803 F. Supp. 259 (N.D. Cal. 1992) ................................................................53

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,*
   No. 14-cv-14176-ADB, 2018 WL 4688308 (D. Mass. Sept. 28, 2018) ..........................47

*Sweeney v. Bd. of Trustees of Keene State Coll.,*
   604 F.2d 106 (1st Cir. 1979) ................................................................65

*Thomas v. Eastman Kodak Co.,*
   183 F.3d 38 (1st Cir. 1999) ........................................... 50, 51

*Thompson v. Ohio State Univ.,*
   990 F. Supp. 2d 801 (S.D. Ohio 2014) ................................................................62

*Tuttle v. Arlington Cty. Sch. Bd.,*
   195 F.3d 698 (4th Cir. 1999) ................................................................67

*U.S. Postal Serv. Bd. of Governors v. Aikens,*
  460 U.S. 711 (1983) ...................................................................................... 50, 51

*United States v. Bd. of Educ. of Twp. of Piscataway,*
  832 F. Supp. 836 (D.N.J. 1993) ..............................................................................72

*United States v. Mulkern,*
  854 F.3d 87 (1st Cir. 2017) ....................................................................................50

*United States v. Serrano,*
  870 F.2d 1 (1st Cir. 1989) ......................................................................................61

*Vega v. Hempstead Union Free Sch. Dist.,*
  801 F.3d 72 (2d Cir. 2015) ....................................................................................64

*Wessmann v. Gittens,*
  160 F.3d 790 (1st Cir. 1998) .......................................................................64, 67, 71

*Williams v. New Orleans S.S. Ass'n,*
  673 F.2d 742 (5th Cir. 1982) .................................................................................51

*Woods v. City of Greensboro,*
  855 F.3d 639 (4th Cir. 2017) .................................................................................66

*Yick Wo v. Hopkins,*
  6 S. Ct. 1064 (1886) ..............................................................................................58

**Rules**

Fed. R. Evid. 103 .......................................................................................................61

**Other Authorities**

*Civil Rights Issues Facing Asian Americans in the 1990s,*
  A Report of the United States Commission on Civil Rights (Feb. 1992) ("USCCR Report") ...59

Pat K. Chew, *Asian Americans: The "Reticent" Minority and Their Paradoxes,*
  36 Wm. & Mary L. Rev. 1 (1994) ...........................................................................59

Paul Brest & Miranda Oshige, *Affirmative Action for Whom?,*
  47 Stan. L. Rev. 855 (1995) ...................................................................................59

## PROPOSED FINDINGS OF FACTS

I.    **The Parties**

1.    SFFA is a voluntary membership association. It has members who applied to Harvard, who were denied admission, and who are ready and able to apply to transfer if Harvard ceased its discriminatory practices. Doc. 324 at 2-3, 6-7, 13, 17; Doc. 566 at 18-22.

2.    Harvard University is a private educational institution in Cambridge, Massachusetts. The President and Fellows of Harvard College (Harvard Corporation) ("Harvard") is the University's governing board. Harvard College is a component of Harvard University and educates undergraduates. Harvard accepts federal funds and thus is "covered by Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d." Doc. 421, Ex. 233 at 4; Doc. 566 at 3; Doc. 570 at 6-7; D26.9-10; D53.9.

3.    The Office of Admissions and Financial Aid ("Admissions Office") makes admissions decisions for Harvard College. The Dean of Admissions and Financial Aid, William Fitzsimmons, manages and operates the Admissions Office. Fitzsimmons has been Dean since 1986. The Director of Admissions, Marlyn McGrath, oversees the admissions process. McGrath has been Director since 1987. Harvard employs roughly 40 admissions officers who, under the supervision of Fitzsimmons and McGrath, handle most of the day-to-day operations of the Admissions Office. T1.125:20-21; T5.158:23-159:1; Doc. 566 at 3-4.

II.   **Harvard's Admissions Process**

   A.    **Harvard's Profile, School Support, and Overall Ratings**

4.    The Admissions Office assigns each applicant eight ratings: four "profile" ratings (academic, extracurricular, athletic, and personal), three "school support" ratings (an assessment of the applicant's two teacher recommendations and guidance counselor report), and an "overall" rating. Each year, Harvard issues Reading Procedures that set forth guidelines for the assignment of these ratings. P1.5-7; T14.121:18-21.

5.      The Class of 2018 Reading Procedures for the academic rating (P1.5-6) were:

Academic
1.  Summa potential. Genuine scholar; near-perfect scores and grades (in most cases) combined with unusual creativity and possible evidence of original scholarship.
2.  Magna potential: Excellent student with superb grades and mid-to high-700 scores (33+ ACT).
3.  Cum laude potential: Very good student with excellent grades and mid-600 to low-700 scores (29 to 32 ACT).
4.  Adequate preparation. Respectable grades and low-to mid-600 scores (26 to 29) ACT).
5.  Marginal potential. Modest grades and 500 scores (25 and below ACT).
6.  Achievement or motivation marginal or worse.

6.      The Class of 2018 Reading Procedures for the extracurricular rating (P1.6) were:

Extracurricular, Community Employment, Family Commitments
1.  Unusual strength in one or more areas.  Possible national-level achievement or professional experience.  A potential major contributor at Harvard.  Truly unusual achievement.
2.  Strong secondary school contribution in one or more areas such as class president, newspaper editor, etc.  Local or regional recognition; major accomplishment(s).
3.  Solid participation but without special distinction. (Upgrade 3+ to 2- in some cases if the e/c is particularly extensive and substantive.)
4.  Little or no participation.
5.  Substantial activity outside of conventional EC participation such as family commitments or term-time work (could be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).
6.  Special circumstances limit or prevent participation (e.g. a physical condition).

7.      The Class of 2018 Reading Procedures for the athletic rating (P1.6) were:

Athletic
1.  Unusually strong prospect for varsity sports at Harvard, desired by Harvard coaches.
2.  Strong secondary school contribution in one or more areas; possible leadership role(s).
3.  Active participation.
4.  Little or no interest.
5.  Substantial activity outside of conventional EC participation such as family commitments or term-time work (could be included with other e/c to boost the rating or left as a "5" if it is more representative of the student's commitment).
6.  Physical condition prevents significant activity.

8.      The Class of 2018 Reading Procedures for the personal rating (P1.6) were:

Personal
1.  Outstanding.
2.  Very strong.
3.  Generally positive.
4.  Bland or somewhat negative or immature.
5.  Questionable personal qualities.

9.      The Class of 2018 Reading Procedures for the school support ratings (P1.7) were:

School Support
1.  Strikingly unusual support. "The best ever," "one of the best in x years," truly over the top.
2.  Very strong support. "One of the best" or "the best this year."
3.  Above average positive support.
4.  Somewhat neutral or slightly negative.
5.  Negative or worrisome report.
6.  Neither the transcript nor prose is in the folder.
8.  Placeholder.
9.  Transcript only. No SSR prose.

2

10.     The Class of 2018 Reading Procedures for the overall rating (P1.5) were:

Overall
1. Tops for admission:  Exceptional – a clear admit with very strong objective and
   subjective support (90+% admission).
2. Strong credentials but not quite tops (50-90% admission).
3. Solid contender: An applicant with good credentials and support (20-40%
   admission).
4. Neutral: Respectable credentials.
5. Negative: Credentials are generally below those of other candidates.
6. Unread.

**B.     Harvard's Use of Race in the Admissions Process**

11.     Harvard uses race as a factor in its admissions system and, hence, an applicant's race

can make "a difference in whether or not they [are] admitted." T2.38:10-14; T7.139:7-22; T4:17-22.

The use of race does not increase the number of Asian Americans that Harvard admits each year.

T2.45:8-21; T13.110.

12.     Harvard's official position is that race can be a factor in assigning the overall rating

and in making admission decisions. T2.22:18-21; T3.231:25-232:2; T5.255:3-6. According to Harvard,

race is used for the benefit of underrepresented minorities in the pursuit of "racial diversity." P316.8;

T2.45:18-46:16. Harvard will award this admissions preference to underrepresented minorities even

when it is aware of the applicant's race only from the checked box on the application. T2.26:14-29:7;

T10.91:13-92:1; T14.140:7-141:15.

13.     Harvard's official position is that race is not used in assigning any rating other than the

overall—including the personal. T5.50:23-52:6; T8.140:6-25. According to Harvard, however, that

does not mean an applicant's race is never a factor in assigning these other ratings. Harvard claims

that, on occasion, race can have an indirect role in assigning these ratings. For example, an applicant

may discuss her race in her essay, which then "informs [the] personal rating." T5.50:23-51:5. In these

rare instances, "a person's race could inform [Harvard] of characteristics that tell [Harvard] a bit about

their personality." T4.181:5-10. But unlike in Harvard's admitted use of racial preferences in assigning

the overall rating and in making admission decisions, Harvard claims that applicants do not get a

preference in any other rating because they "are a particular race." T5.50:23-51:10.

3

### C.  Admissions Preferences for ALDCs

14.    Harvard gives an admissions preference to applicants with certain family connections: children of alumni (legacies), children of donors or potential donors (which Fitzsimmons and McGrath track via the "Dean's Interest List" and "Director's Interest List"), and children of faculty and staff. P104, P106, P111, P316.16-17; T3.23:7-35:7; T3.209:19-21; T12:35:25-36:4; *e.g.,* P104, P106, P111. These preferences disproportionately benefit white and wealthy applicants. P634, T6.34:17-35:9; T7.98:18-24; T3.206:10-18. Harvard also gives an admissions preference to athletes recruited by Harvard's intercollegiate sports teams. P316.16. The parties refer to these applicants as the "ALDC" applicants. T9.27:2-25.

### D.  Reviewing Applications and Making Admissions Decisions

15.    Students apply to Harvard through the Common Application or the Universal Application; both applications ask applicants to identify their race. T10.98:2-6. Students apply to Harvard via "early action" or "regular decision." T3.15:5-10. Harvard recruits certain applicants (based on their race, high school GPA, and standardized test scores). T1.129:5-22, 142:24-143:13; P2, P50; P57. This allows Harvard to "consciously shape the makeup of [its] student body." *Id.*

16.    Most applicants receive an "alumni interview" with a Harvard alum. T5.179:5-12. A much smaller subset of applicants receives a "staff interview" with an admissions officer. *Id.* Although Harvard claims that staff interviews are strictly available on a first-come, first-served basis, T5.171:1-180:16, ALDC applicants are far more likely to receive a staff interview and are afforded them outside the published timeframe, T5.181:18-184:16; PD38.3. Applicants who receive a staff interview are admitted at a high rate. *Infra* ¶ 70.

17.    Applications are assigned to admissions officers based on geographic "dockets." One of the "first thing[s]" an admissions officer looks at is the applicant's race, T8.159:7-20, which appears on a "summary sheet" with the application, T8.128:12-16. The summary sheet also lists the applicant's

name, hometown, test scores, GPA, and "academic index," which is a formula the Ivy League created to represent a weighted average of an applicant's GPA and standardized test scores. P112; T9.43:11-19. After reviewing the summary sheet and the application, the admissions officer assigns Harvard's various ratings. *Supra* ¶¶ 4-10.

18.     Admissions officers then hold "subcommittee" meetings in their dockets to further evaluate applications. T4.9:9-10:1. Each subcommittee assigns tentative designations (admit, deny, or waitlist) to every applicant within its docket and tentatively admits a "target" number of applicants. T7.200:3-14. As the subcommittee evaluates applicants, their race is one item projected on a screen for everyone to see. T8.128:12-25, 191:19-192:4. The subcommittee records its decisions. T8.82:9-18. If the subcommittee is above its target number, it must remove applicants from the admitted class ("lop" them) until it hits its target number. T8.131:1-10.

19.     After the subcommittees meet, the Admissions Office assembles for "full committee." Over a series of days, the full committee discusses and assigns near-final decisions to each application (admit, deny, or waitlist). As in subcommittee, the race of the applicant being reviewed is one item projected on a screen for everyone to see. T8.193:23-194:4. Because the class is "always" over-subscribed after the full committee's initial review, the full committee must then remove applicants from the admitted class ("lop" them) until it hits its target number. T4.13:3-20; T8.131:1-10, 196:1-14. Admissions decisions are then mailed to the applicants. P68.

20.     After the deadline for applicants to accept their offers, the full committee meets again to fill additional spots through the waitlist. P68. In addition, the full committee admits applicants via the "Z-List." Harvard uses the Z-List to admit applicants for a subsequent class, rather than the class for which they applied. T5.169:18-25. Applicants who are related to donors or politicians are given an admissions preference in the Z-List process. T5.170:1-171:9; P257.

### III.    Intentional Discrimination Against Asian Americans

#### A.    Statistical Evidence Shows That Harvard Imposes an Asian-American Penalty.

21.    Harvard produced admissions data for the Classes of 2014 through 2019. T9.23:9-15, 217:14-16; P620; P622. The data included dozens of variables about each applicant, including race, gender, socioeconomic status, grades, and test scores; the overall, academic, extracurricular, athletic, personal, and school support ratings; alumni-interview ratings; and geographic data (including high school). T9.23:16-24:12; PD38.26. The experts limited the dataset to non-transfer, domestic applicants. T9.25:3-10; PD38.1; T14.44:15-48:12, 50:11-51:11. That excluded, *inter alia*, the roughly 5,000 foreign applications Harvard receives each year and those that were incomplete, or withdrawn. T14.50:11-51:11; PD38.1. This resulted in a sample of 150,112 applicants. T9.26:14-24; PD38.1.

22.    SFFA and Harvard retained economists to analyze the data and to offer expert opinion on Harvard's admissions system. T9.13:18-21. The experts used the same statistical methodology—logistic regression—though they disagreed over which data to include. T9.22:20-23:4; 216:22-217:20. Econometric modeling is the accepted industry standard for modeling complicated systems of choice like Harvard's admissions system. T9.15:10-16:5. The data permit reliable statistical analyses of Harvard's admissions system, including a descriptive analysis and a more sophisticated logistic regression analysis. T9.20:2-19, 21:11-22:17, 23:1-4, 46:2-9, 48:6-8, 49:24-50:5.

23.    Professor Peter Arcidiacono, SFFA's expert, is a tenured professor of economics at Duke University. T9.14:7-16. His work focuses on labor economics, with a specific interest in higher education and affirmative action. T9.14:22-24; T9.17:1-10. Virtually all his peer-reviewed publications involve creating and using econometric models. T9.15:5-13. Harvard's expert, Professor David Card, is a tenured professor in labor economics at the University of California at Berkeley. T12.73:7-17. He has published only one paper addressing race-conscious admissions and has not previously created models of this size and scope. T12.74:1-14; T14.10:14-11:6.

6

1. **Descriptive analysis reveals that Harvard's admissions system produces stark racial disparities that have a negative effect on Asian Americans.**

   a. **Descriptive analysis shows that Asian Americans, as a group, are the strongest in Harvard's applicant pool on multiple dimensions.**

24.     Asian-American applicants are substantially stronger than white applicants on nearly every measure of academic achievement—including SATs, high school GPA, and AP tests. T9.41:10-43:10; PD38.4-5. This academic strength of Asian-American applicants as a group is reflected in Harvard's academic index. When applicants are sorted by academic index into ten evenly sized groups ("deciles"), Asian Americans are clustered at the top; in fact, there are more Asian Americans in the top two academic deciles than whites, even though white applicants substantially outnumber Asian-American applicants. T9.43:23-47:8; PD38.7; P624; P626. More than 34% of all Asian-American applicants are in the top two academic deciles, which is more than the share of white applicants in the top three deciles (29.9%). T9.47:19-48:8; PD38.8.

25.     Asian Americans also are substantially stronger than white applicants on the academic rating. More than 60% of Asian Americans scored a 1 or a 2, as compared to 45% of white applicants. T9.49:17-50:3; PD38.9; P621. The academic rating is strongly correlated with admission to Harvard; more than 82% of admitted students had a 1 or a 2. *Id.*; T9.51:15-22; PD38.10; P621.

26.     Asian Americans are stronger than white applicants on the extracurricular rating. More than 28% of Asian Americans received a 1 or a 2, as compared to 24% of white applicants. T9.49:17-50:5; PD38.9; P621; P623. The extracurricular rating is strongly correlated with admission to Harvard; more than 69% of admitted students had a 1 or a 2. T9.52; PD38.10; P621; P623.

27.     Asian-American and white applicants receive similar school support ratings. T9:55:7-12; P.621; P.623. The exception is the alumni overall rating, where Asian Americans are stronger. *Id.*

28.     White applicants are stronger on the athletic rating than Asian Americans (*i.e.*, more likely to receive a 2 or a 3). T9:50:11-19; PD38.9; P621; P623. But outside of recruited athletes (who

receive an athletic rating of 1), this rating is not strongly correlated with admission. More than 39% of admitted students received a 4 or lower on this rating—a score associated with "little or no interest" in athletics. T9.53:1-22.; PD38.10; P621; P623; P1.6. By comparison, only 0.04% of admitted applicants receive a 4 or lower on the academic rating and 0.67% receive a 4 or lower on the extracurricular rating. PD38.10; P621; P623.[1]

> **b.     Descriptive analysis shows a stark racial disparity in the personal and overall ratings that has a negative effect on Asian Americans.**

29.     The overall and personal ratings are strongly correlated to admission. Less than 5% of applicants receive an overall rating of 1 or a 2, yet they represent 59% of the admitted class; by contrast, those who receive an overall rating of four or worse are only 0.04% of admitted students despite being 28% of the applicant pool. P621; P623. As for the personal rating, less than 20% of applicants receive a 1 or a 2, yet they represent 78% of the admitted class. T9.53:23-54:12; PD38.10; P621; P623. 0.00% of applicants receiving a personal rating of 4 are admitted. *Id.*

30.     Despite their superiority in academics, extracurriculars, and alumni overall ratings, as well as their parity with white applicants in school support and alumni personal ratings, Asian Americans receive lower personal ratings than white applicants and do not outperform them in the overall rating. More than 21% of white applicants receive a personal rating of 1 or 2, as compared to 17% of Asian Americans. T9.54:13-55:22; PD38.9; P621; P623. Whites and Asian Americans both receive an overall rating of 1 or 2 slightly less than 5% of the time despite the superior qualifications of Asian Americans. P621; PD38.9; P623.

31.     Descriptive analysis indicates that race influences the overall and personal ratings—in contrast to the academic and extracurricular ratings. To begin, there are wide disparities by race for

---

[1] Some of these and other figures cited below reflect the applicant pool excluding ALDCs, which is appropriate when comparing similarly situated candidates. In any event, SFFA presented evidence that the patterns were similar in the expanded admissions dataset. T9.45:18-21, P621, P623, P625, P626. Harvard's expert did not dispute this testimony or the accuracy of the related exhibits.

both the overall and personal ratings. African Americans and Hispanic have a substantially higher probability of receiving a 1 or 2 on the overall rating than similarly situated whites and Asian Americans; in fact, African Americans in the 7th decile have more than double the chances of receiving a 1 or 2 than Asian Americans in the top decile. T9.62:15-64:16; PD38.16. African Americans and Hispanics in the top four academic index deciles have a substantially higher probability of receiving a personal rating of 1 or 2 than whites and Asian Americans. T9.65:18-67:12; PD38.18-19; P628; P629; P630; P631. These disparities are statistically significant. T9.64:19-25.

32.     The similarity in racial patterns in the overall and personal ratings further suggests that race is influencing the personal rating. Harvard acknowledges that race influences the overall rating. *Supra* ¶ 12. When the distributions for the overall and personal ratings are compared side by side, the shapes are nearly identical: African Americans score the highest in each decile, followed by Hispanics, then whites, then Asian Americans. T9.66:16-67:12; PD38.19.

33.     Finally, the descriptive analysis suggests that race is the cause of the disparity between whites and Asian Americans in the overall and personal scores. There is a strong positive relationship between the academic index and the academic, extracurricular, personal, and overall ratings. In other words, having a high academic index is associated with a high academic rating, extracurricular rating, personal rating, and overall ratings. T9.57:11-21, T9.60:6-24, 61:16-62:14, T9.65:2-17; PD38.11, PD38.13, PD38.15, PD38.17.

34.     There is almost no racial variation in the academic and extracurricular ratings for applicants in the same academic index decile, which suggests that race is not influencing those ratings. T9.58:12-60:5; PD38.12; T9.60:25-61:15; PD38.14. Yet, despite having higher academic indexes than white applicants, Asian-American applicants have lower personal ratings than white applicants. *Supra* ¶¶ 29-33. This suggests that Asian Americans are being penalized in personal ratings compared to white applicants. T9.66:16-67:12; PD38.19; P628; P629; P630; P631. This holds true for the overall

9

rating. White applicants have a better chance of receiving an overall rating of 1 or 2 than similarly situated Asian Americans across all the top academic deciles. T9.64:1-6; PD38.16.

> c. **Descriptive analysis shows a stark racial disparity in admissions decisions that has a negative effect on Asian-American applicants.**

35.     Descriptive analysis shows that these stark racial disparities are not confined to the overall and personal ratings—they extend to the selection of applicants for admission. T9.70:10-71:13; PD38.21-22. These disparities have a negative effect on Asian Americans vis-à-vis white applicants. T9.73:24-74:9.

36.     From the class of 2014 through the class of 2018, whites and Asian Americans were admitted at about the same rate every year. T9.68:2-20; PD38.20. But that should not be the case. There is a positive correlation between the academic index and admission, meaning a high academic index increases the probability of being admitted to Harvard. T9.71:8-13; PD38.21. Yet, for Asian Americans, having a higher academic index than white applicants does not translate into more spots in the admitted class. T9.69:17-70:2. White applicants are admitted at a higher rate than Asian Americans in every academic decile. T9.72:12-18; PD38.21. This suggests that Asian Americans are being penalized vis-à-vis whites with similar qualifications at the point of admission. T9.73:24-74:9. The strength of Asian-Americans vis-à-vis white applicants is not just a function of academics. They also are stronger on the extracurricular rating and the alumni overall rating, and of comparable strength to white applicants on the school support ratings.

37.     The only year in the dataset where Asian Americans are admitted at a rate that is higher than whites, to a statistically significant degree, is for the class of 2019—the first admissions cycle after this lawsuit was filed. T9.68:17-69:1; PD38.20.

### 2. Logistic regression demonstrates that Harvard imposes a penalty on Asian-American applicants.

38.     Logistic regression is a widely accepted method of statistical analysis that can model the effects of multiple variables on a binary outcome. T9.15:14-16, 22:20-23:4; T12.101:16-102:2. It assigns probabilities to that outcome given different characteristics. T9.75:19-76:1.

39.     The parties agree that logistic regression is the appropriate statistical tool to analyze the effect of race and other factors on the probability of admission to Harvard. Both parties use white applicants as the control group. The parties' only disagreement is over the relevant set of applicants and the relevant controls to be included in the model. T9.22:20-23:4; T12.101:15-17.

40.     A logit model produces two relevant metrics. First, it assigns a "coefficient" to each variable, *i.e.*, a number that represents how much weight that factor receives in the model compared to the baseline. T9.76:22-77:2. In an admissions model, a "positive" coefficient means an applicant with that trait is more likely to be admitted; a "negative" coefficient means an applicant with that trait is less likely to be admitted. T9.77:3-78:23.

41.     Second, a logit model can determine the "marginal effect" of a variable, meaning the probability that the outcome will change if that trait is changed. For example, the model can calculate how an applicant's probability of admission would change if the effect of race were eliminated. T9.78:24-79:7. The "average marginal effect" takes the average of that change across all applicants. T9.21:18-22:17; T9.79:8-22; PD38.25.

42.     Both experts created logit models of the admissions system to determine if Harvard penalizes Asian-Americans applicants. T9.75:19-76:16; PD38.23-24; T12.101:5-17. But only Professor Arcidiacono independently modeled the academic, extracurricular, personal, overall, and school support ratings. T9.90:11-91:23, 150:2-6; PD38.28; T13.188:23-189:1; T14.76:3-18, 79:15-19.

11

43.     The experts agreed that if a variable is influenced by race, it should not be included as a control in an admissions model measuring the influence of race. That rating, in other words, should be removed from the model. T9.91:18-92:12; T14.78.22-79:5.

### a.     Harvard penalizes Asian Americans in the assignment of the overall rating.

44.     Professor Arcidiacono's regression analysis shows that race significantly influences the overall rating. "[L]arge tips are present in the overall rating for both African-Americans and Hispanics. And Asian-Americans face a penalty." T9.93:15-17. For all Asian-American male applicants and nondisadvantaged female applicants, that penalty is statistically significant. *Id.* 17-19; PD38.29. This means that being Asian American has a negative effect on an applicant's overall score as measured against the control—white applicants. African Americans and Hispanics, on the other hand, have positive coefficients for the overall rating that are statistically significant. *Id.* Being an underrepresented minority thus increases overall rating for African Americans and Hispanics. Among the four groups, controlling for other factors, African Americans have the highest coefficients for the overall rating and Asian Americans have the lowest. *Id.*

45.     Unobserved characteristics can neither explain this racial disparity nor the penalty that Asian Americans suffer. A general principle of economics is that if a group is strong on observable characteristics (criteria the dataset captures), they tend to be strong on unobservable characteristics (criteria the dataset does not capture). T9.103:11-13. For example, those applicants having observed characteristics associated with a high academic rating (*e.g.,* high SAT scores or GPA) tend to also be strong on the unobserved characteristics associated with a high academic rating (*e.g.,* taking college classes or AP exams). T9.105:6-17. Thus, if a racial group has observed characteristics associated with high scores on a rating but is being assigned low scores, it is likely that race—and not unobserved characteristics—is causing the disparity. T9.104:1-14; T9.105:6-17.

46.     That is the case with the overall rating. Asian Americans are strong (positive) on observable factors in the overall rating model, but have a negative coefficient.  PD38.33; T9.110:22-111:18. Similarly, African Americans and Hispanics are weaker (negative) on the observable factors in the overall rating model, but have a positive coefficient. *Id.* This discrepancy between observables and coefficients, for all racial groups, demonstrates that the overall rating (as Harvard acknowledges) is affected by a "significant racial influence"—not by unobservables.T9.111:12-15;  T3.231:25-232:2; T9.91:18-92:2; T13:83:1-21; T14.75:18-24.

47.     Professor Arcidiacono is the only expert who analyzed the overall rating; Professor Card did not even model it. T9.93:15-25; PD38.29; T14.76:3-13. Neither Harvard nor Professor Card addressed Professor Arcidiacono's finding that Harvard penalizes Asian Americans vis-à-vis whites in assigning overall scores.

48.     Because race influences the overall rating, both experts agree that it should be excluded from any model estimating the effect of race in Harvard's admissions system. T9.91:18-92:12; T13:83:1-21; T14.77:22-78:4.

**b.      Harvard penalizes Asian Americans in the assignment of the personal rating.**

49.     Professor Arcidiacono's regression analysis shows that race significantly influences the personal rating, with Asian Americans receiving a statistically significant penalty. The coefficient for Asian-American status on the personal rating is negative and large in magnitude; indeed, it is statistically significant. T9.95:21-96:12; PD38.30; PD38.18-19. This means that being Asian American has a negative effect on an applicant's personal rating as measured against the control—white applicants. African Americans and Hispanics, on the other hand, have positive coefficients for the personal rating that are statistically significant. Being an underrepresented minority thus increases the personal rating for African Americans and Hispanics. Among the four groups, African Americans

13

have the highest coefficient for the personal rating and Asian Americans have the lowest. T9.95:2-96:12; PD38.30.

50.     This is the "exact same pattern" seen in the overall rating, which is influenced by race. T9.96:5-12; PD38.29-30; T3.231:25-232:2. It also follows the same pattern seen in the descriptive analysis of the personal rating. Compared to a similarly situated white applicant, an African American or Hispanic is more likely to receive a high personal rating (*i.e.*, a 1 or a 2). T9.95:2-96:12; PD38.18-19, 30. The preference for African Americans is larger than the preference for Hispanic applicants. *Id.* These consistent patterns reflect that Harvard's use of race affects the personal rating in the same way as it affects the overall rating. This is further exhibited in the interactions between race and disadvantage. *Infra* ¶¶ 90-91. Race and disadvantage behave similarly for the personal and overall ratings, which further demonstrates that race influences both. PD38.29-30.

51.     Professor Arcidiacono's model of the personal rating pinpoints the average marginal effect of race on the probability of receiving a high personal rating. Compared to a similarly situated white applicant, being Asian American results in a 17.6% decrease in the probability of receiving a high personal rating; being African American results in a 27% increase in the probability of receiving a high personal rating; and being Hispanic results in a 14.3% increase in receiving a high personal rating. T9.96:25-97:25; PD38.31.

52.     The negative coefficient for Asian-American applicants is consistent with a racial penalty—not Asian Americans being weaker on unobservables. PD38.33; T9.111:19-112:8. Asian-American applicants are strong (positive) on observable factors in the personal rating model, but have a negative coefficient. *Id.* Similarly, African-American and Hispanic applicants are weaker (negative) on the observable factors in the personal rating model, but have a positive coefficient. *Id.* This discrepancy between observables and coefficients, for all racial groups, demonstrates that the personal rating (like the overall rating) is significantly influenced by race. *Id.*

14

53.     With a Pseudo R-squared of 0.28, Professor Arcidiacono's logit model of the personal score is an "excellent fit" according to the teachings of Daniel McFadden (one of the leading experts on econometric modeling). T9.148:19-149:15. Harvard neither offered statistical analysis on whether race influences the personal score nor explained the substantial disparities in personal scores between similarly qualified African-American, Hispanic, white, and Asian-American applicants.

54.     Professor Card did not create his own personal rating model. T9.150:2-6; T13.188:23-189:1. He instead made changes to Professor Arcidiacono's model. But these changes do not eliminate the statistically significant penalty against Asian Americans in the personal rating. T9.150:2-10; PD40.

55.     The slight differences between white and Asian-American applicants in school support ratings cannot explain the racial penalty in the personal rating. T9.99:4-11. Professor Arcidiacono's model controls for school support ratings—*i.e.*, those ratings are variables in the model. T10.72:21-73:21. His personal rating model thus found a statistically significant racial penalty for Asian Americans in the personal rating even accounting for them. *Id.*

56.     Professor Card does not dispute that Harvard gives Asian Americans lower personal ratings than whites. T9.54:13-21; PD38.9; DD10.10. And he admits that racial bias cannot be ruled out as the explanation for that "unexplained" gap. T13.189:12-190:3.

57.     Professor Arcidiacono's analysis is consistent with other evidence in this case. *Infra* ¶¶ 94-128. Importantly, Harvard admissions officers uniformly denied that Asian Americans have worse personal qualities than other applicants. T2.82:10-14; T5.242:16-20; T7.204:1-4; T8.138:11-20. Harvard also concedes that none of the factors that go into the personal rating are correlated with race. T5.242:16-243:2. And no other evidence supports the stereotypical assumption that Asian Americans, as a group, are more likely to have less attractive personalities. T3.203:19-204:23; T14.253:17-21; D5.10.

58.     Because race influences it, the personal rating should be excluded for the same reasons that both experts excluded the overall rating. *Supra* ¶¶ 43, 48.

          **c.**       **Harvard penalizes Asian Americans in its admissions decisions.**

59.     Professor Arcidiacono's regression analysis shows that race significantly influences the admissions decisions themselves, with Asian Americans receiving a statistically significant penalty. T9.115:20-116:2; PD38.34. This result holds true under a wide variety of modeling choices. PD38.37; PD38.44; PD38.45; T9.155:24-156:2; T14.7:1-10:3, 81:2-13. The coefficient for Asian-American status in admissions decisions is negative and large in magnitude; indeed, it is statistically significant for all subgroups except those Asian-American applicants who are both female and disadvantaged. T9.117:5–23; PD38.34. This means that being Asian American has a negative effect on an applicant's chance of being admitted as measured against the control—white applicants. *Id.* African Americans and Hispanics, on the other hand, have positive coefficients that are statistically significant. Thus, being an underrepresented minority increases the probability of being admitted for African Americans and Hispanics. Among the four groups, African Americans have the highest coefficient at the admissions stage and Asian Americans have the lowest. T9.115:1-11; PD38.34; PD38.37. This is the same pattern as the overall and personal ratings. PD38.29-30, PD38.34, PD38.37.

60.     Professor Arcidiacono's model pinpoints the average marginal effect of race on the probability of being admitted. Under Professor Arcidiacono's preferred model, being Asian American results in a 16.1% decrease in the chance of admission compared to whites—from 6.2% to 5.2%; being African American results in a 324% increase in the probability of admission—from 2.25% to 9.54%; and being Hispanic results in a 141% increase in the probability of admission—from 2.97% to 7.16%. T9.115:20-118:10; PD38.35.

61.     Here too, unobserved characteristics cannot explain the penalty that Asian Americans suffer. T9.104:1-14; PD38.33. Asian Americans are strong (positive) on observable factors associated

with admission, but have a negative coefficient. T9.115:20–116:2. Similarly, African-American and Hispanic applicants are weaker (negative) on the observable factors associated with admission, PD38.33, but have positive coefficients for admissions. PD38.34. This discrepancy between observables and coefficients, for all racial groups, demonstrates that Harvard's admission decisions (like the overall and personal ratings) are significantly influenced by race. T9.111:12-15.

62.     If this penalty were eliminated, there would be a sizeable increase in the number of Asian Americans admitted each year. PD38.36. For the four-year period for the classes of 2015 through 2018, there were 183 fewer Asian Americans on campus than there otherwise would have been. *Id.* But these are conservative estimates. Professor Arcidiacono, for example, found that the school support ratings were influenced by race and negatively affected Asian-American applicants, a finding Professor Card did not rebut. T9.67:13-21; T9.101:23-102:17; T14.88:5-21. Had he excluded these ratings, the Asian-American penalty would have been even larger. T9.101:23-102:17.

### 3.     Professor Card's criticism of the admissions models are unpersuasive.

#### a.     Excluding the personal rating is proper and indisputably shows a statistically significant penalty against Asian Americans.

63.     The key difference between the experts is that Professor Card's findings depend on including the personal rating in his models. The experts, again, agree that if the personal rating is influenced by race, it should be excluded. *Supra* ¶¶ 43, 48. Professor Arcidiacono determined that the personal rating is influenced by race, and so he excluded it from his models. *Supra* ¶¶ 49-58. He was right to do so.

64.     Professor Card did not model the personal rating himself to verify that race was not influencing it, and every modification that he made to Professor Arcidiacono's personal rating model continued to show a statistically significant Asian-American penalty. T9.150:2-10; T13.188:23-189:1; PD40. Professor Card concluded that the personal rating is not influenced by race—and thus kept it in his model—because of a phone conversation he had with Dean Fitzsimmons as he was preparing

his rebuttal expert report. During that conversation, Dean Fitzsimmons told Professor Card that race was not influencing the personal rating. T14.80:19-81:1. Professor Card relied on that assertion despite taking no steps to verify it. *Id.*

65.     Professor Card suggested that instead of excluding the personal rating, the issue could be addressed by creating hypothetical ratings using Professor Arcidiacono's models for the academic, extracurricular, and personal ratings; removing the effect of race from them; and then estimating the admissions model using these "virtual" ratings. T13.80:13-21.

66.     This approach is unsound and, regardless, Professor Card's version of it is incomplete. First, Professor Card did not propose substituting a virtual overall rating, even though that rating is an important factor in admission decisions, and (as Professor Card conceded), it incorporates many of the same factors as the personal rating. T9.128:5-18; T14.71:1-75:24.  Second, Professor Card does not believe that the academic and extracurricular ratings are influenced by race. T14.87:16-88:4. Altering two sets of ratings that neither expert thinks are affected by race would erroneously diminish the size of the Asian-American penalty by discounting those achievements. T14.81:14-88:5. Third, Professor Card did not calculate a hypothetical race-free rating for any of the school support ratings. T14.75:25-76:18; T14.88:6-87:22. This is so even after Professor Arcidiacono found that the school support ratings show evidence of racial bias against Asian Americans. T9.101:17-102:3.

67.     In fact, Professor Arcidiacono provides the only model in which in all of the ratings assigned by Harvard admissions officers are excluded, which would address any concern that race influences all of them. T9.102:9-10. That model shows a statistically significant penalty against Asian Americans. PD38.34; PD38.37; T9.114:19-116:2, 119:22-120:22.

68.     The experts agree that if the personal score is excluded, every model shows a statistically significant Asian-American penalty. It is undisputed that removing the personal rating

from Professor Card's own model results in a "negative and statistically significant penalty against Asian Americans." T9.155:24-156:2; T14.7:1-10:3, 81:2-13.

### b.    Excluding ALDCs is proper.

69.    To conduct an "apples-to-apples" comparison between applicants, the dataset should exclude ALDCs. Professor Card erred by including them. They are only 5% of the applicant pool, yet they make up approximately 30% of the admitted class. T9.30:13-31:3; T9.237:15-17; T12.154:9-16. ALDCs also receive special treatment during the admissions process. Harvard's coaches recruit athletes and inform the Admissions Office who they want admitted. T1.163:19-164:1; P111; T3.224:11-14. The Admissions Office keeps track of applicants on the Dean's and Director's Lists, T3.23:7-17, and the development office communicates with Fitzsimmons about placing someone on those lists, T3.24:5-14. Fitzsimmons may be an extra reader for legacy applicants. P1.3.

70.    Staff interviews operate differently for ALDCs. T9.148:13-18; T9.38:11-20; T10.67:5-68:2; P619. More than 20% of ALDCs receive staff interviews, while only 1.26% of non-ALDCs do. P619. The Admissions Office also has a target number for athlete interviews. T5.184:3-11. Over half of applicants who receive staff interviews are admitted, and ALDCs who receive staff interviews are more than twice as likely to be admitted as non-ALDCs who receive them: 78.55% versus 29.48%. T9.37:6-38:20; P619; PD38.2. The evidence shows "that staff interviews mean something different for ALDC applicants versus non-ALDC applicants, which is not in the model." T10.23:22-25.

71.    That ALDCs receive special treatment is revealed most starkly in the "enormous tip" they receive and their "strikingly high" admission rates. T9:27:11-16, 29:20-30:7. Recruited athletes are admitted 86.0% of the time versus 6.0% for non-athletes; legacies are admitted 33.6% of the time versus 5.9% for non-legacies; applicants on the Dean's and Director's Lists are admitted 42.2% of the time versus 6.1% for those who are not; and the children of faculty or staff are admitted 46.7% of the time versus 6.6% for all others. T9.28:21-30:12; PD38.2.

72.     The preference for ALDCs is particularly stark once the applicant pool is stratified by academic rating. 96.67% of ALDCs who receive an academic rating of 1 are admitted. Yet only 66.18% of non-ALDCs with an academic 1 are admitted. For applicants who receive an academic rating of 2, 10.02% of non-ALDCs are admitted, 96.04% of athletes are admitted, and 49.01% of LDCs are admitted. For applicants who receive an academic 3, 2.4% of non-ALDCs are admitted, 87.21% of athletes are admitted, and 18.09% of LDCs are admitted. For applicants with an academic 4, 0.2% of non-ALDCs are admitted, 79.52% of athletes are admitted, and 3.49% of LDCS are admitted. 50% of athletes with an academic 5 are admitted. No non-athletes with an academic 5 are admitted. P618.

73.     Including ALDCs in the model thus distorts it, preventing an "accurate estimate[] for the 95 percent of applicants who are not in one of those groups." T9.30:8-31:3. Including ALDCs alters the coefficients of variables like the academic and extracurricular ratings, causing them to "shrink towards zero." T10.70:13-71:2. This gives the erroneous impression that academics and extracurriculars are less crucial to admission for non-ALDC applicants than they are. *Id.* Because Asian Americans excel on the academic and extracurricular ratings, *supra* ¶¶ 24-26, the erroneous undervaluing of those ratings caused by including ALDCs necessarily underestimates—and thus conceals—the true magnitude of the Asian-American penalty. *Id.*

74.     Professor Card agrees that there is nothing inherently wrong with removing a portion of the applicants from the model. Both experts omitted foreign applicants from the dataset in order to focus on the population in which discrimination is alleged to occur. *Supra* ¶ 21.

75.     It is unsurprising that the penalty is concentrated in the non-ALDC group. T9.120:23-121:3, T9.125:7-25. Harvard could limit or manage the number of Asian Americans it admits without penalizing ALDC Asian Americans. ALDCs are disproportionately white; 5,002 out of 7,384 (67.7%) of ALDCs are white, while only 841 (11.4%) ALDCs are Asian American. P619. Only 2% of the Asian American applicants are ALDCs. *Id.*; T9.31:4-17.

76.     Professor Arcidiacono is not alone in excluding ALDCs. Harvard's longstanding position is that athletes and legacies should be excluded from statistical analyses of its admissions process. When the Department of Education's Office of Civil Rights ("OCR") investigated whether Harvard discriminated against Asian Americans in admissions, it excluded legacies and athletes from its regression analysis. T1.172:7-174:3; P555.34. Harvard has praised the OCR report and pointed to legacy and athlete preferences in explaining the disparities in white and Asian-American admissions. T1.172:7-179:8; P509.2, 7. When Harvard's Office of Institutional Research ("OIR") conducts statistical analysis, it also often separates the legacies and athletes from "NLNA" or "non-legacy non-athlete" applicants. T8.39:23-40:9; P9.5. The Admissions Office also evaluates the class by looking only at NLNA applicants. T1.155:16-157:5; *e.g.,* P163.4; P319.5-10, 15-16.

77.     Even Professor Card's own model with ALDCs shows a statistically significant Asian-American penalty once the personal score is excluded. *Supra* ¶ 78. Professor Arcidiacono's models likewise show a statistically significant Asian-American penalty (and statistically significant preferences for African-American and Hispanic) even when he uses his expanded dataset, which includes legacies, applicants on the Dean's and Director's Lists, and children of faculty and staff. T9.119:15-120:22; *id.* 126:11-23; PD38.37-38.

### c.     Pooling data is proper.

78.     Professor Card incorrectly contends that separate models should be created for each year of admissions data, rather than pooling the data from all six admissions cycles into one unified model. T9.142:21-143:3. Pooling data into one model is common. T9.142:21-145:6. OIR has employed this approach. T5.118:21-119:11, 130:22-131:2, 138:7-17; T8.27:14-28:3; P12.32-35.

79.     A pooled model ensures a larger sample size, which increases the model's statistical power; splitting the data up annually can obscure the subtleties of how race operates. The purported benefit of breaking up the data into separate years is that it accounts for factors expected to vary from

year to year, like the competitiveness of each year's applicant pool. But Professor Arcidiacono's pooled model captures those same variations by including the application year as a control in addition to interacting year with many of the variables that Harvard tracks on its one-pagers. T9.142:21-145:6.

80.     Regardless, both pooled and year-by-year models show a statistically significant Asian-American penalty in admissions. T9.155:24-156:2; T14.7:1-10:3, 81:2-13.

### d.     Excluding parental occupation is proper.

81.     Professor Card incorrectly includes variables for the occupation of each applicant's parent(s) in his model. T9.145:21-146:6. Including too many control variables runs the risk of "overfitting" the model, which can reduce its explanatory power. T9.145:14-20; T12.179:22-23. And, because the parental occupation data varies in dramatic and unexplainable ways, it is unreliable. T9.146:4-147:18; PD38.42. For example, in the class of 2014, over 2,000 parents are identified as "low skilled," but in all other years the number drops below 80. *Id.*

82.     To try to solve this problem, Professor Card had to assign the many different parental occupations in Harvard's database to a smaller set of categories, which led to nonsensical results. For example, Professor Card's category for "self-employed" would code the owner of a small convenience store the same way as the owner of a large corporation. Harvard would not treat those occupations the same way. T14.29:13-32:10.

83.     Professor Card testified that parental occupation varies by race and is important to the admissions process. T13.11:6-12:21. And he agreed that an "interaction" could test whether a penalty is imposed on Asian Americans based on parental occupation, T14.68:7-69:5, given that interaction allows "the effect of a variable to vary across the different groups," T9.84:24-85:3. Yet he did not interact parental occupation with race to investigate whether parental occupation effects might be due to racial stereotyping. T14.68:7-69:23.

22

84. Regardless, including parental occupation as a variable does not eliminate the Asian-American penalty. T9.147:10-18; T9.151:2-154:6; PD38.44; T9.155:24-156:2; T14.7:1-10:3, 81:2-13.

**e.    Excluding intended career data is proper.**

85. Professor Card incorrectly contends that the model should include a variable for the applicant's intended career. T9147:19-21. Again, including too many variables risks overfitting the model. T9.145:14-20. Like parental occupation, Harvard's intended career data "vary substantially" in ways that make them unreliable. T9.147:19-148:12; PD38.43. For example, there is a "massive jump" in 2018 in the number of applicants who intend a career in "health," but a very low number for all other years. *Id.*

86. Professor Card also testified that intended career varies by race and is important to the admissions process. T13.19:22-20:9. He testified that Asian Americans are more likely to intend a career in medicine or health, that Harvard seeks diversity across intended careers, and that "having a large fraction of students who all intend to pursue, for example, a career in medicine . . . would not accomplish that goal." T13.22:6-23:2. But Professor Card did not interact intended career with race to investigate whether intended career had different effects for different races. T14.68:7-69:25.

87. Regardless, including intended career does not eliminate the Asian-American penalty. T9.151:2-154:6, 155:24-156:2; T14.7:1-10:3, 81:2-13; PD38.44;

**f.    Excluding staff interviews is proper.**

88. Professor Card criticized Professor Arcidiacono for excluding staff interviews as a control. T9.148:13-18; T13.25:7-26:11. He is mistaken. Whether an applicant receives a staff interview is clearly affected by other preferences such as ALDC status. *Supra* ¶¶ 16, 70. Staff interviews are therefore not properly included as a variable in the admissions model. T9.38:11-20; T9.148:13-18. Professor Card's premise that the staff interview is "entirely a process that's initiated by the student,"

T13.25:15-16, and not a product of any "special treatment" for ALDCs is refuted by the data and the testimony, T14:51:12-59:14; T14.97:17-98:11.

89.     Regardless, including staff interviews does not eliminate the Asian-American penalty. T9.155:24-156:2; T14.7:1-10:3, 81:2-13.

> ### g.     Race and socioeconomic disadvantage should be interacted.

90.     Professor Card should have interacted race and socioeconomically disadvantaged status. T9.150:11-19. Professor Arcidiacono interacted them because this status affects different races differently. T9.84:20-90:10; PD38.27. African-American and Hispanic applicants receive a smaller preference for being disadvantaged than do white and Asian American applicants. T9.150:11-151:1; *id.* 151:23-153:4; P28.8.

91.     Professor Card saw no reason to perform this interaction. T9.150:11-17. But OIR had previously found that disadvantaged status operates differently for different racial groups. P28.8; T9.152:17-153:17. Failing to interact race and disadvantaged status diminishes the importance of that status for Asian-American and white applicants. It thus artificially diminishes the magnitude of the penalty against Asian Americans because they are "significantly more likely to be low income" than whites. T9.151:23-152:16; T14.97:8-16.

92.     Regardless, failing to interact race and disadvantaged status does not eliminate the penalty against Asian Americans. T9.155:24-156:2; T14.7:1-10:3, 81:2-13.

> ### h.     Professor Card's modeling of certain Asian-American subgroups is not credible.

93.     Professor Card claims that Professor Arcidiacono's finding of an admissions penalty is inconsistent with Card's conclusion that certain subgroups of Asian Americans—women and Asian-Americans from California—do not suffer a penalty. T9.154:7-15; T12.136:8-137:8. This is wrong. Professor Card's subgroup analysis has all the same flaws as his primary analysis: it depends upon the improper inclusion of the personal rating, T9.154:16-20; *supra* ¶¶ 63-68; the improper inclusion of

ALDCs and other variables that should be excluded from the model, T9.154:16-20; *supra* ¶¶ 69-77; and the use of yearly (rather than pooled) models, T9.154:21-155:3; *supra* ¶¶ 78-80. These flaws in Professor Card's subgroup analysis are exacerbated by the much smaller number of data points in these subgroups. His female analysis excludes all male applicants and thus has approximately half the data points but the same high number of variables. T9.154:21-155:3. This both increases the risk of overfitting and limits the explanatory power of his findings. *Id.*

### B. Non-Statistical Evidence Shows That Harvard Discriminates Against Asian Americans.

94.     The United States has a long and tragic history of racial discrimination against Asian Americans. T11.55:20-56:15. Today, Asian Americans continue to face explicit and implicit racial bias. *Id.*; T8.188:17-25; T11.35:2-6; *id.* 161:1-162:1. They are stereotyped as timid, quiet, shy, passive, withdrawn, one dimensional, hard workers, perpetual foreigners, and "model minorities." T11.51:20-56:15; T14.145:3-6; P555.24. "These views translate into barriers in the workplace, where Asian Americans are the group least likely to be promoted to management even in industries where they are employed in high numbers, such as the tech industry." T11.56:3-15.

95.     Asian Americans applying to college have not escaped this discrimination. T11.49:11-55:13. Many colleges, like Harvard, have employed some form of a "personal rating" that "hinges on the subjective evaluation of a particular admissions officer." T11.50:12-51:1. This subjective rating has been the "downfall of many Asian-American applicants" because "many admissions officers believe in stereotypes that work against Asian-American applicants." T11.51:2-11. Many admissions officers falsely believe that Asian Americans are "over-represented," have "narrow career interests," like medicine and science, are "passive," and are "model minorities." T11.49:11-55:13. Asian Americans are told that "writing an Asian immigrant story" is "overdone, … not compelling, not interesting." T11.200:15-23. Asian-American students have been held to an "impossible" standard, one that ignores

the "realities of discrimination, poverty, poor housing, [and] cultural repression" that Asian Americans face. T11.54:20-55:13.

96.     Yet Harvard takes the position that it is "impossible" for its admissions process to be used to penalize Asian Americans. T2.23:5-11. The history of Harvard's admissions process disproves that assertion. Harvard's current admissions process—including the evaluation of personal traits like "character and fitness"—was created for the specific purpose of limiting the number of Jewish students admitted each year. T6.208:9-14; Doc. 577; D13.7; D40.26.

97.     The use of race in college admissions is "a sensitive issue." T4.159:11-16. Yet, until just before trial, Harvard gave its admissions officers essentially no guidance on how and when race should be used, and nothing in writing. In 1990, OCR found that Harvard had no "specific criteria for measuring or assessing" race, no "instructions for determining how much weight" race should receive, and no instructions for "where the weight [of race] is to be applied in the admissions process." P555.8; T2.55:21-56:3. As recently as September 2018, there was "no written guidance provided to admissions officers that instructs admissions officers about how they are supposed to take race into account in the admissions process." T2.19:12-16; T8.132:8-17; T10.90:16-18.

98.     Admissions systems that rely on subjective criteria are susceptible to abuse, including racial stereotyping and other forms of racial discrimination. T6.208:9-14; Doc. 577; T11.49:11-55:13. Harvard's personal rating is especially susceptible to abuse because of its general subjectivity and because of Harvard's failure to take steps to guard against racial stereotyping. Though Harvard claims race is not supposed to be used in the personal rating, *supra* ¶ 13, Harvard had no written instructions, until just before trial, on whether admissions officers should consider an applicant's race in assigning the personal score. T14:122:17-123:16; T2.19:22-20:1, 47:2-7; T4.157:6-9; T8.133:8-12. Admissions officers received no instruction at all "about whether or not race should ever be incorporated into the personal score" during their training. T4.204:24-205:8.

99.     The Reading Procedures, until just before trial, also included no substantive guidance on how to score the personal rating, aside from descriptions like "very strong," "generally positive," and "bland." P1, HARV00000803. Admissions officers thus score the rating using highly subjective measures of their own choosing, such as "likability," "integrity," "helpfulness," "courage," "kindness," and if someone is "a good person" or has strong "human qualities." T5.228.24-229.20; T8.190:13-18; T10.110:4-8. Admissions officers then "sort of add it all up and get a feeling." T10.110:9-16.

100.    Harvard claims that its training for how and when to use race in admissions, until just before trial, was exclusively through "conversation." T5.257:25-258:4; T10.109:3-13. But many of Harvard's admissions officers could not recall any training, which indicates it either did not happen or was not meaningful. T4.160:5-21; T10.93:18-94:10; T10.100:6-100:10; T10.90:2-91:2.

101.    The lack of training has created confusion in the Admissions Office about how and when race may be used. T8.182:14-183:5; P99.1. Over time, many admissions officers have used race in ways that deviate sharply from Harvard's official position. *Supra* ¶¶ 12-13. OCR, for example, found that some admissions officers only used race in the overall score, but others used race "in the four reader rating areas," which includes the personal score, "as well as in the POR [*i.e.*, the overall rating], and during the subcommittee and committee meeting discussions." P555.15-16. "Still other readers stated that ethnicity was not a factor at all unless the effect of that ethnicity on the applicant was evident from the applicant's file. They indicated that ethnicity was only considered a 'plus' when the applicant wrote about or indicated the significance of his or her heritage, or when there was some other indicia in the file of the applicant's involvement with ethnic community organizations or groups." *Id.* Harvard confirmed in a 2012 letter to OCR that "the information that OCR gathered" in its earlier examination of its admissions process was "still accurate today." P509.2.

102.    This confusion persists today. Some readers say they only use race in the overall score. T8.79:21-81:15. Others, like Christopher Looby, take "a student's race into account when assessing

27

his or her personal qualities" and race is "one factor of many I consider" when scoring the personal rating. T4.182:8-183:6; T14.114:15-115:8; T5.236:17-242:6; D25.117-120. Still others believe that race may be used only "in connection with the application's discussion of the effect an applicant's race or ethnicity has had on the applicant, not simply the fact alone that an applicant has identified as a member of a particular race or ethnicity." P720; P721.3; P14.139:7-141:15, 150:1-154:20.

103.     There are other inconsistencies in how Harvard's admissions officers use race. Some recall giving a racial preference to an applicant, T4:60:12-15, while others cannot remember doing so, T4.205.21-206:25. Some say an applicant's race can be a "plus" factor, T3.198:2-3, while others "don't think of it that way," T4.208:22-209:3. Some say that an applicant's race is never "determinative" in in securing admission, T8.208:11-13, while others say that an applicant's race can be the "difference in whether or not they were admitted," T2.38:10-14; T7.139:13-22; T4:17-22, and still others say it is not possible to determine whether race "ever made a difference," T4.209:17-22.

104.     Harvard also has no implicit bias training for its admissions officers. T14.164:3-165:3; T8.136:24-137:2. Most people—regardless of their race or gender—hold implicit biases. T12.63:17-24, 66:8-20; T14.233:14-234:2. One of the "pernicious aspects of implicit bias is the person who is biased . . . may believe that they are not." T6.208:20-210:22. These "prejudices of which they are unaware" may "nonetheless play a large role in their evaluations of people and their work." T12.63:17-24. Although universities like Harvard "often think that we are all-knowing," T12.26:15-17, they are not immune to bias—as Harvard has acknowledged, D740.48 (recommending "blind grading" so as "not only to help remove bias, but also [to] give students who identify as marginalized confidence that they will be treated equitably"); D740.77 (recommending "anonymiz[ing] resumes for students, staff, and faculty to ensure unbiased selection processes"); T12.58:2-66:6 (recommending education for faculty about "unexamined bias and effective evaluation" in the hiring of women faculty in science and engineering). Though implicit bias can be overcome with education and training, T12.66:21-67:5,

28

Harvard has only shared an "article or two" on implicit bias with admissions officers "sometime within the past ten years." T14.164:3-165:3.

105.    It thus is unsurprising that Asian American stereotyping infects Harvard admissions. To start, Asian Americans must score higher on standardized tests than African Americans and Hispanics to be recruited. T1.138:24-139:20; P2; P50; P57. Though Fitzsimmons had no explanation for this policy at his deposition, T1.140:18-141:21, he now claims (without evidence) that Asian Americans come from a wealthier "economic background" than African Americans and Hispanics, do not face the "stark economic differences in opportunities" these groups confront, and have more of opportunity to "prepare well and to do well on standardized testing." T1.140:18-141:4; T3.157:23-158:6. Such reasoning is based on the "model minority" stereotype of Asian Americans and ignores the many obstacles they face. T11.54:17-56:15.

106.    Asian Americans from "Sparse Country"—which includes more than twenty states and cities like Las Vegas, New Orleans, and Phoenix—must score higher on standardized tests than whites to be recruited. T1.143:14-153:8; T4:121:2-122:9; P2; P50; P57. According to Fitzsimmons, Harvard is more interested in recruiting students who "have lived there for their entire lives" than those who "have only lived in the Sparse Country state for a year or two." T1.148:23-149:16. This reasoning stereotypes Asian Americans as perpetual foreigners. T11.56:3-16, 204:12-205:24.

107.    Harvard has been racially stereotyping Asian Americans for decades. In 1990, OCR found that admissions officers were invoking "several recurring characterizations attributed to Asian-American applicants," such as "quiet, shy, science/math oriented, and hard workers." P555.24-25; T2.59:17-63:2. One admissions officer, for example, described an Asian-American applicant as "quiet and of course wants to be a doctor." *Id.* Yet, in the aftermath of OCR's findings, Harvard never took any steps to identify who made these biased comments or to stop this racial stereotyping. T2.59:17-

63:2. Harvard instead warned admissions officers to be careful because their "comments may be open to public view at a later time." T4.165:20-166:17.

108.     Despite that admonition, stereotypical views about Asian Americans surface in written comments. Admissions officers, for example, refer to Asian Americans as being "very quiet," "quiet and strong," "███████████████," "███████," "██████" and "███████████." T4.125:11-129:4; D50.56; D50.186; D50.178; D50.693; D50.1040; D50.1062. Yet Harvard never took any steps to stop this racial stereotyping. It was not until just before trial, after SFFA's expert reports and other evidence was made public, that Harvard acknowledged this longstanding problem and took the first steps toward remedying it. *Infra* ¶¶ 113-114.

109.     Harvard does not treat claims of bias against Asian Americans as seriously as claims of bias against racial groups who are not "model minorities." Harvard officials casually mock concerns of bias against Asian Americans; they joke about Harvard alumni chapters that recommend too many Asian Americans for admission; and they respond politely to "thoughtful" letters calling for quotas on the number of "Orientals" Harvard admits. P268, P282, P225, P265, P279, P287, P461.

110.     Harvard discounts the academic achievements of Asian Americans, disproportionately identifying them as "standard strong"— the label given to someone who is a "strong applicant but not quite good enough for Harvard." T9.133:20-134:1; Doc. 597-1, 260:16-261:10. The Court allowed SFFA to search a random 10% of the applications for the class of 2018 for, among other things, the term "standard strong." T9.24:21-24; 133:7-19, 134:5-11. There were 255 files from the 10% sample of the 2018 applications where the applicant was identified by a Harvard admissions officer as "standard strong." T9.134:5-11. All 255 were rejected. T9.24:21-24, 133:20-135:18.

111.     Even this limited sample of applications shows that Asian American are more likely to be identified as "standard strong" than white applicants. T9.135:4-15. This occurred even though the Asian Americans who were labeled standard strong had significantly better qualifications than their

white peers on the academic index, the SAT Math score, and the academic rating. T9.135:19-136:15; PD38.41. This disparity is consistent with Asian Americans being stereotyped and held to a higher standard. T9.136:10-15.

112.     Some of these Asian-American stereotypes emerged at trial. Harvard's counsel argued that Asian Americans are overrepresented, as "they're applying to Harvard at a rate that's more than three times the representation of college-aged Asian Americans in the United States" T9.207:8-209:15. And Harvard's counsel suggested that Asian Americans are not "multidimensional" because, unlike their African-American, Hispanic, and white peers, they are merely "book smart," lacking "strengths in other areas." T10.45:3-45:19; T12.97:8-98:1. Harvard's expert even tried to give credence to these stereotypes, concluding that whites are more "multidimensional," "well-rounded[]," and "balanced" than Asian Americans. T12.90.21-23; T12.97:20-98:1; DD10.10.

113.     After this evidence of pervasive racial stereotyping of Asian Americans became public in the summer of 2018 when SFFA moved for summary judgment, a group of admissions officers recommended substantial changes to the Reading Procedures. P656; P657; P659; P705; T14.130:11-131:22, 135:4-16, 143:7-144:2. Harvard adopted many of these changes just weeks before the trial. P720, P721, P722, P723; T14.149:4-153:1.

114.     Three changes are notable. First, the Procedures now provide significantly more guidance on the criteria for assigning the personal rating. *Compare* P723.5, *with* D744.4 *and* P1.6. Second, the Procedures now provide written guidance—for the first time ever—on how and when admissions officers should use race: admissions officers "should not take an applicant's race or ethnicity into account in making any of the ratings other than the overall rating"; race should be "considered **only** as one factor among many"; and "an applicant's race or ethnicity should not be considered in assigning the personal rating." P723.3-5. Finally, the Procedures warn admissions officers not to downgrade applicants for personality traits that are often associated with Asian-

American stereotypes: "It is important to keep in mind that characteristics not always synonymous with extroversion are similarly valued. Applicants who seem to be particularly reflective, insightful, and/or dedicated should receive higher personal ratings as well." P723.5. These changes were designed to "make sure that [Harvard's] admissions officers do not fall prey to implicit bias or racial stereotyping about Asians." T14.145:18-146:23.

115.     The behavior of these admissions officers stands in stark contrast to Harvard leaders who, despite knowing for years about the penalty that Harvard imposes on Asian-American applicants, did nothing about it. In December 2012, Ron Unz, a Harvard alumnus, published an article that provided a wealth of statistical and anecdotal evidence that Harvard was discriminating against Asian Americans in admissions. P218; T3.35:13-36:11. On December 24, 2012, David Brooks of the *New York Times* promoted Unz's claim of bias against Asian Americans, calling his article one of "the best magazine essays of the year." *Id.*

116.     The allegations of discrimination in these articles sparked panic at Harvard. Over the Christmas and New Year's Holiday and into the following year, the top Harvard leadership, including President Faust, Provost Alan Garber, Fitzsimmons, and General Counsel Robert Iuliano, exchanged numerous emails concerning the articles. T3.38:15-45:18; T5.80:19-86:11. Alumni urged Harvard to respond to Unz's claims of discrimination. P227, P236; T3.47:19-48:22. And Fitzsimmons was "on a tear about this Asian American thing." P238; T7.208:7-209:8.

117.     Harvard instructed OIR, with the assistance of the Admission Office, to investigate whether the admissions system disadvantages Asian Americans. T3.45:19-49:13, 76:21-77:2; T5.87:6-20; T8.12:19-14:4; P230. OIR—Harvard's internal research arm—conducts statistical analysis, including logistic regressions, T5.88:9-14, to provide "accurate, timely, and digestible research," T4.210:10-211:24; P465. The OIR employees investigating this issue were highly qualified. T5.71:21-72:22; T4.215:10-23; T8.10:3-12:3; T4.200:9-201:4.

118.    OIR created two reports in early 2013. The first report, entitled "Admission Part II," performed descriptive and logistic regression analyses to determine whether Harvard was favoring white applicants over Asian Americans. P9. The report found "evidence that Asians are disadvantaged in the admissions process." T8.46:19-47:9. Specifically, it found that (1) Asian-American NLNA applicants performed significantly better than white NLNA applicants in multiple categories, including SAT scores and the academic rating, but performed significantly worse in the personal rating; (2) white NLNA applicants were admitted at a higher rate than Asian-American applicants with the same academic index and SAT scores; and (3) being Asian American was negatively associated with the likelihood of being admitted. P9.5-9; T3.61:16-74:9; T8.36:20-46:25. OIR determined that the personal rating was "driv[ing] some of the demographic differences we see," P9.17, and outlined various "possibilities" to explain the stark differences between whites and Asian Americans, *id.* 65757. OIR gave this report to Fitzsimmons. T3.53:5-57:18; *id.* 60:9-61:15; T8.47:12-17.

119.    OIR's second report, entitled "Admissions and Financial Aid at Harvard College," addressed the following question: "Does the admissions process disadvantage Asians?" P12.3. T3.75:17-77:2. To answer that question, OIR created four models that projected the racial demographics of the admitted pool under hypothetical admissions systems. These models showed that Harvard's preferences for legacies and athletes do not explain why white applicants were faring better in admissions than Asian Americans. P12.32-35; T3.81:21-90:22; T8.64:13-65:8; *id.* 73:20-78:9. OIR thus concluded that "with current data, we explain a significant amount of the variation in admission, but further details (especially around the personal rating) may provide further insight." P12.36. OIR suggested possible "next steps" of sharing the report with President Faust, Dean Smith, and Dean Hammonds and acquiring "more data" to do further research into these issues. P12.36-38.

120.    OIR presented this report to Fitzsimmons and others in the Admissions Office on February 25, 2013. T3.74:10-75:7; T10.112:6-17; P14; P15; P17. Fitzsimmons, who used to teach and

understood statistics, knew that OIR's findings meant Asian Americans were being penalized in the admissions process. T4.115:22-117:21; T5.96:18-23; T10.112:20-113:5. In particular, he knew that Asian Americans perform better than whites in the extracurricular rating, so their decline in admissions chances from Model 2 to Model 3 (in which the extracurricular and the personal score were added to the analysis) was being driven by the assignment of lower personal ratings. T3.83:16-85:3, 91:5-92:14.

121.    Fitzsimmons did nothing in response to this report. He did not request more research or ask OIR to further consult with the Admissions Office, despite OIR's suggestion that Harvard should more thoroughly investigate the personal rating and other admissions factors. T3.93:6-94:11, 119:1-120:16; T5.98:7-10. And he did not share this report with anyone, despite OIR's suggestion that he send the report to the highest levels of Harvard. T3.94:16-96:6.

122.    A few weeks later, Fitzsimmons asked OIR to investigate a different issue: whether it could provide "empirical proof" that Harvard gives an admissions "tip" to low-income applicants. T3.100:20-107:1; P19. Fitzsimmons was comfortable with OIR doing this analysis because OIR would provide "robust and reliable work." T3.103:5-7.

123.    On April 22, 2013, OIR sent Fitzsimmons charts from the memo it was drafting. P21. These charts provided the "empirical proof" Fitzsimmons wanted that Harvard was giving a "tip" to low-income applicants. P21; T3.106:8-108:13; id. 125:19-22. Although Fitzsimmons was "excited to share [the findings] more broadly," P604.2, OIR had yet to share its full memo with him. At the time, drafts of OIR's memorandum contained stark warnings about OIR's findings: "While we find that low income students clearly receive a 'tip in the admissions process, … we see a negative effect for Asian applicants. These realities have also received intense scrutiny from critics like Bowen, or more recently, Unz, as we have discussed at length. To draw attention to the positive benefit that low income students receive, may also draw attention to the more controversial findings around Asians." P24.3; P23.3; T4.229:9-230:25. A few days later, Erin Driver-Linn (the director of OIR) contacted Christine

34

Heenan (one of Harvard's top public-relations officials) to warn her about the dangers of publishing OIR's results and "opening the door to Unz-like requests for info about other thumbs on the scale." P604.1; T3.112:2-13. Fitzsimmons and Driver-Linn had similar discussions. T3.117:3-118:1

124.    On May 1, 2013, OIR shared a memorandum of its findings with Fitzsimmons. P26; T3.120:17-121:21. Using descriptive and regression analysis, OIR showed that low-income applicants receive a "tip," as do African Americans, those with a personal rating of 1 or 2, legacies, and Hispanics. P26.3-4; T3.127:23-130:25, 132:5-9. Strikingly, the chart identified only one racial group as negatively associated with being admitted: Asian Americans. P26.3-4; T3.132:13-135:8. OIR's finding that being Asian American is "negatively correlated with the admission rate" was statistically significant. T4.223:10-226:21 The memorandum also included a chart showing that Asian-American NLNA applicants with an academic rating of 1 or 2 were "admitted 12% of the time compared against an admit rate of 18% for non-Asian NLNA applicants." P26.4, 9; T3.132:13-135:8. OIR warned Fitzsimmons against "sharing these results publicly" because "there are demographic groups that have negative effects." P26.4. Asian Americans were the only "demographic group" with "negative effects." P26.4; T3.132:13-135:8.

125.    Fitzsimmons did nothing in response to OIR's finding that being Asian American is a "negative effect" in Harvard admissions; he asked no questions, requested no additional research, and told no one. T3.136:7-137:20, 139:10-22. Fitzsimmons only asked OIR to research whether the same low-income "tip" was being given across racial groups. T3.142:1-13. He shared OIR's finding on low-income applicants with staff, but did not share its findings about Asian Americans. T3.136:7-137:20.

126.    A few weeks later, OIR sent Fitzsimmons a follow-up report that, once again, showed a statistically significant negative coefficient for being Asian American—*i.e.*, there was a "negative chance of getting into Harvard by virtue of being Asian." P28.8; P29; T3.143:7-15; T4.235:24-237:20. Fitzsimmons once again did nothing in response to OIR's finding of a negative effect of being Asian

American in the admissions process. T3.144:21-24. Fitzsimmons did not ask any questions, he did not request additional work from OIR on this subject, and he did not share OIR's troubling findings with anyone else. T3.144:21-24, 148:8-19, 149:15-21.

127.     When the next admissions cycle (for the Class of 2018) commenced, Harvard had not changed its admissions process in response to OIR's reports. T3.146:16-147:5; T8.49:4-9. It had not taken any other steps to address racial stereotyping of Asian Americans. T3.147:6-14. It had not hired outside statisticians to examine OIR's findings or found any errors in any of OIR's reports. T3.147:16-18; T5.13:1-14:11, 96:1-13; T8.48:2-12. And it had not formed any committee to study the problem. T2.145:9-149:21; T8.48:17-23; *compare with* T7.28:2-18 (committee formed in response to "I Too Am Harvard" film concerning African Americans); T7.122:1-3.

128.     It was business as usual at Harvard until November 17, 2014, when SFFA filed this lawsuit. In the next admissions cycle (for the class of 2019), there was a sharp uptick in the Asian-American admit rate, while the admit rates for all other racial groups dropped. PD38.20; *see also* T9.68:17-25; T9.118:11-119:148; PD38.36.

C.     **Harvard's Witnesses Lacked Credibility.**

129.     Instead of addressing this evidence, Harvard asks this Court to accept its assertions of good faith. Harvard says that it employs people who have "the very highest integrity … and honesty," who "believe in values above all," who are "thoughtful people," and who would "never be part of a process that would discriminate against anybody." T8.175:12-23; T14.225:21-226:16. But Harvard's witnesses lacked credibility.

130.     Harvard has no coherent explanation for why Fitzsimmons took no action in response to the OIR reports. Before trial, Harvard's position was that OIR "lacked far too much information … to draw reliable conclusions about the admissions process," Harvard S.J. Reply 5, and that Fitzsimmons had recognized the "shortcomings" and "limitations" of the reports, *id.* 6; P467. But, at

trial, Fitzsimmons testified that he "trusted [OIR] to do good research" and provide "robust and reliable work," and that the work he received from OIR on Asian Americans was "perfectly consistent with everything we've always said about our admissions process." T3.102:24-103:19, 147:19-148:1. Fitzsimmons also testified that the same OIR report showing an Asian-American penalty provided "empirical proof" of a low-income tip. T3.106:16-107:1, 132:5-9. Harvard says that OIR's work was "preliminary," T5.39:9-13, yet can identify no reason why the reports never became "final," T4.228:4-16. The February OIR report defines the issue being investigated as "Does the admissions process disadvantage Asians?", P12.3, yet Harvard insists that the report was merely a study of "admissions preferences" in general, T8.13:14-17:23. Harvard concedes that OIR provides "robust and reliable work," T3.103:5-7, yet it tries to paint the February OIR report as flawed and "circular," T8.28:7-24. Fitzsimmons admits he knew that the May OIR Memorandum provided empirical evidence of a low-income admissions tip and that he, in fact, shared this finding with the Admissions Office, T3.106:16-107:1, 132:5-9, 136:7-137:20, yet he claims confusion about the Asian-American penalty OIR identified in the same chart, T3.131:24-132:18.

131.    OIR is not the only issue as to which Harvard witnesses lack credibility. Harvard has no credible explanation for why it imposes a higher standard for recruiting Asian Americans in Sparse Country, T1.147:16-153:8; why it needs to give preferences to legacies and the children of donors and faculty, T12.36:13-15, 38:1-7, 40:7-9; and a host of other issues, *see, e.g.,* T3.181:9-182:17 (Harvard's reasons for admitting "context cases"); T3.232:21-23 (the assertion that none of the eight ratings is "given more weight than others"); T4.207:6-208:13 (whether race is more or less relevant than an applicant's birthday). And although Fitzsimmons claimed that the personal rating does not measure an applicant's "personality," T3.227:16-20, multiple witnesses confirmed that an applicant's "personality" is precisely what they measure, T4.180:24-181:1; T8.190:19-22, 205:13-17; T5.257:22-258:4; P72.10.

132.    Nearly all of Harvard's witnesses had their testimony impeached, many of them multiple times. *See, e.g.,* T3.136:7-137:3; T4.170:7-177:19, 205:21-206:25, 211:7-214:6; T5.91:22-93:1, 97:17-98:6; T6.196:3-19; T7.203:9-205:15; T8.14:20-15:14, 195:1-25; T14.122:8-123:16, 229:12-231:15. The testimony of Christopher Looby was notable. On issue after issue, Looby changed his sworn answers, including whether he used race in the personal rating, T4.182:18-19, how he was trained to use race in admissions process, T4.170:7-19, and numerous other relevant issues, T4.171:17-177:19. Looby's new trial testimony was derived after spending more than 24 hours with Harvard's lawyers over eight to ten days. T4.172:23-174:20, 182:8-183:7. Other witnesses, too, recovered memories that they were previously unable to recall after extensive preparation time with Harvard attorneys. T7.205:10-207:2; T5.33:24-34:5.

133.    Worse still, several Harvard witnesses gave false and misleading testimony. Just weeks before the trial, the Admissions Office received (on multiple occasions) revised Reading Procedures containing new instructions that race should not be used in the personal rating. P720, P721, P722, P723; T14.123:19-124:11, 148:14-151:20. Yet Fitzsimmons, McGrath, and Charlene Kim all testified that no such instructions existed. T2.18:3-7, 19:18-20:1, 47:2-7; T5.231:12-22; T8.132:14-133:12. For example, when asked whether he could "think of anywhere where Harvard provides written guidance telling its admissions officers not to use race or ethnicity in awarding the personal score," Fitzsimmons answered, "I have not seen any written guidance." T2.47:2-7. When McGrath was asked "Does it say anywhere in the admissions office, in any written form, training material, memo, email, or any kind of writing down to a Post-it on the coffee maker, that race should not be used in the personal rating? Is it written anywhere?" she answered, "In written form, no." T5.231:12-22. And when asked whether it would be "a good idea to develop written guidance so you could ensure the consistency of people using race in Harvard's admissions process," she said that she did not "think that the right remedy for

that is more written guidance." T5.233:25-234:6. The repeated misstatements make it impossible to chalk this up to a simple misunderstanding. T14.125:5-11.

## IV.    Racial Balancing

134.    Harvard begins its admissions cycle with race-based recruiting that holds each racial group to a different academic standard. *Supra* ¶¶ 15, 105-106. Once the applications arrive, the Admissions Office calculates how many applicants to admit. P177.1-2; T7.217:3-6. The Admissions Office creates this "target number" because Harvard does not have "room for more than 1,660 people roughly in each class." T3.194:5-11. The Admissions Office calculates the target number based on the projected yield rate. P177; T5.199:14-200:7. To calculate the yield rate, the Admissions Office predicts the final racial makeup of the admitted class because different racial groups have different yield rates (*e.g.*, Asian Americans yield at a higher rate than African Americans). P177; P182; T1.161:25-162:2; P324.1-2; T4.80:19-25; Doc. 597-1, 323:25-324:13. The Admissions Office predicts the final racial makeup of the class based, in part, on the application and admission numbers by race for that year and the year before. P177.4-5; T5.199:14-200:7; T7.200:3-10; Doc. 597-1, 293:11-25, 323:25-324:13. As a result, Harvard's racial makeup does not fluctuate significantly from year to year, *infra* ¶ 140, because the target number presumes that Harvard will admit a class that is demographically similar to the prior year. If Harvard deviates from the prior year it could overenroll the class (*e.g.,* if it admitted significantly more Asian Americans who yield at a higher rate). Doc. 597-1, 331:9-24, 336:16-337:7; T1.161:20-24.

135.    To achieve these goals, Fitzsimmons, McGrath, and a few others regularly receive and review "one-pagers." T4.80:2-5. A one-pager is a document that compares select statistics (including the percentage of the admitted class by race) for the current year to the prior year. T7.178:24-179:10; *e.g.,* P165. Because Harvard's database is updated daily to reflect the tentative subcommittees and full committee decisions, a one-pager provides a real-time assessment of the current racial makeup of the

tentatively admitted class. T7.182:14-186:4. For the 2013-2014 admissions cycle, the Admission Office

created at least 21 one-pagers. T7.184:12-194:10. The leaders of the Admissions Office received them

during key points of the admissions cycle, including after the early action deadline, at the start of early

action full committee meetings, during early action full committee meetings, the day after the regular

decision application deadline, the day before the start of regular decision full committee meetings, and

during regular action full committee meetings. *See* P148, P149, P150, P152, P153, P154, P155, P156,

P157, P163, P164, P165, P167; PD20.22; T7.184:12-194:10.

136.    On the first day of full committee meetings, Fitzsimmons announces the racial makeup

of the tentatively admitted class, which he reads from a one-pager. T5.197:14-17; T10.104:23-106:15;

T8.83:2-16. Fitzsimmons also reads aloud the admissions statistics by race of the prior year's class.

T10.104:23-106:15; *compare* P95.1 (handwritten notes from admissions officer), *with* P163.2 (March 2,

2014 one-pager); P68; P96.1. If there is a particular racial group that is "underrepresented" at that

time, Fitzsimmons and McGrath will "talk about it and give it attention." T5.198:2-9.

137.    As the full committee meetings progress and decisions are made, Fitzsimmons and

McGrath continue to review the updated one-pagers, T7.190:2-191:15; *e.g.,* P164, and Fitzsimmons

continues to share the racial breakdown of the class with the full committee, T10.104:23-106:15. If

the full-committee process is nearing the end and the share of a certain racial group is "surprisingly or

notably underrepresented," the full committee will "go back and look at those cases." T5.198:24-

199:13. The goal is "to make sure that we're not having a dramatic drop-off in some group who we

did at a certain level with last year." T5.200:22-202:3.

138.    Because the class is "always" oversubscribed after the full committee's initial review,

the committee must "lop" applicants from the admitted class until it hits the "target number." T4.18:6-

20; T7.191:1-14; T8.130:20-132:1; T5.198:10-23. Applicants removed in this process are recorded on

40

a "lop list," which includes only five items about each applicant: name, legacy status, race, recruited athlete status, and eligibility for financial aid. T8.131:12-132:1; T8.196:1-200:16; P200.

139.    Before the full committee begins lopping, Fitzsimmons again reads aloud the class's current racial composition. T8.196:1-14; *compare* P95.6 (handwritten notes from admissions officer) *with* P164 (March 14, 2014 one-pager); P68. Fitzsimmons' focus on the class's racial makeup continues until final decisions are made. P164, P165, P167; P68. On March 19, 2013, for example, Fitzsimmons asked for "a one pager and his ethnic stats" because the full committee needed to lop 28 more applicants. P147; T7.179:22-182:1.

140.    Given all this, it is unsurprising that the racial makeup of the admitted class varies little year-to-year. For the Classes of 2010 through 2017, each minority group's share of the admitted class was remarkably stable: the African-American share was between 10% and 12%; the Hispanic share was between 9% and 11%; and the Asian-American share was between 18% and 20%. P319.3-4.

## V.    Harvard's Use of Racial Preferences to Benefit African Americans and Hispanics

141.    Harvard claims that it considers an applicant's race as part of "whole person" review in which "all aspects of each application," are taken into account in order to achieve the "educational benefits of diversity." P316.1-2; *supra* ¶¶ 12-13. This is untrue.

142.    Educational benefits flow from religious diversity. T5.193:15-17. Someone's religion can be important to who that person is, to what they can teach others, and to what they can bring to a community; someone's religion can be as or even more important to that person than their race. T5.186:3-187:24. Yet Harvard does not track the religious identity of applicants. T5.187:25-189:15. In fact, although applicants identify their religion on their application, Harvard removes that information so that admissions officers are blind to it. *Id.*; T5.194:21-25. Harvard thus can only indirectly consider an applicant's religious identity as part of its "whole person" review when the applicant writes about it elsewhere in the application. T5.191:6-10. Harvard is aware of each applicant's race, by contrast,

41

because it has "a practice of giving special consideration to ethnic identity as submitted on those check box materials." T5.193:1-14. Notably, Harvard claims that it can achieve religious diversity without knowing which box the applicants check. T5.191:6-10, 248:18-249:10.

143.    Educational benefits flow from socioeconomic diversity. Yet those benefits are "deeply lacking" at Harvard. T6.17:16-22. The percentage of households in America that have an income above $150,000 a year is around 5 percent, but these individuals account for 30 percent of Harvard's class. T6.223:2-228:4. There are 23 times as many wealthy students on campus as poor students. T6.17:16-22; *see also* T7.10:9-14:19.

144.    Educational benefits flow from geographic diversity. Yet those benefits are lacking too at Harvard. T6.17:18-25.

145.    Harvard claims that race is merely "one factor among many that might lead our 40-person admissions committee to vote yes." T2.22:18-21. This also is not true. The role of race is "quite substantial for African Americans and Hispanics." T9.128:25-129:4; PD38.35. Race is a "determinative factor" that changes their admissions outcomes "in a very substantial way." T9.133:2-6. African Americans and Hispanics with the same academic qualifications are substantially more likely to be admitted than whites and Asian Americans. African Americans in the top academic decile are admitted 56.1% of the time; which is substantially higher than Hispanics (31.3%), whites (15.3%), and Asian Americans (12.7%) in this decile. T9.70:10-73:23; PD38.21; PD38.22. This pattern holds at every academic decile. *Id.*

146.    The average marginal effect of being African American or Hispanic on the probability of admission is "quite substantial." T9.117:24-118:10; PD38.35. Without racial preferences, the non-ALDC African-American admit rate would be 2.3%; racial preferences increase it to 9.5%—a 324 percent increase. *Id.* Without racial preferences, the non-ALDC Hispanic admit rate would be 3.0%;

racial preferences increase it to 7.2%—a 141 percent increase. *Id.* Similar results occur when ALDC applicants are included. T9.120:11-22; PD38.37.

147.     According to Harvard, "the number of African-American and Hispanic students on campus would decline dramatically" if Harvard eliminated racial preferences and did not replace them with race-neutral alternatives. P316.8; T13.127:1-128:15. Harvard says the proportion of African-American students in the Class of 2019 would have dropped from 14% to 6% and the proportion of Hispanic or Other students would have dropped from 14% to 9%. *Id.*

148.     According to Harvard, the average marginal effect of being African American on the probability of admission is 6%. From a base rate of approximately 3%, jumping to 9% is a massive increase in the chances of admission attributable solely to race. T13.175:12-176:25. Harvard also finds that the average marginal effect of being Hispanic on the probability of admission is 3.73%; again, given the tiny base rate, this equates to approximately doubling a Hispanic applicant's chance of admission solely because of his or her race. *Id.* For highly competitive applicants, the effect of race is even larger. Being African American or Hispanic increases the average marginal effect on their probability of admission by as much as 50 percentage points and as much as 30 percentage points, respectively. T13.113:21-114:6; DD10.97-98. Harvard concedes that this is a "big increase in the probability of admission" for these groups. T13.113:21-114:6.

149.     According to Harvard, the average marginal effect of race for African-American applicants in the two most competitive academic deciles is approximately 40 to 50%. That is a massive effect—on par with the boost an applicant would receive for moving from a 3 to a 1 on the personal, academic, or extracurricular rating. DD10.98. What's more, the racial preference afforded to African-American applicants has much broader effect than a perfect score on any one of these ratings. A personal rating of 1 is so rare that only 0.03% of applicants—fewer than ten each year—receive this score. P623; P621. Only 0.45% of applicants—slightly more than 100 each year—receive an academic

43

rating of 1; and only 0.31% of applicants—fewer than 100—receive an extracurricular rating of 1. By contrast, more than 2,500 African Americans apply each year to Harvard. P623.

150.    Harvard's racial preferences are massive. PD38.39. Yet Harvard has not articulated "what level of diversity [it] would like to achieve in order to get the educational benefits of diversity." T6.18:17-19:4; T7.140:16-22; T12.33:1-8. Harvard believes it is impossible to do so. T2.31:4-10. Harvard does know, however, that it will "never" be satisfied that it has "achieved the right mix of diversity." T12.49:9-51:1. Indeed, the Court pointedly asked multiple Harvard witnesses when the university would reach a level of minority enrollment sufficient to achieve the educational benefits of diversity. The answers were nonresponsive. T7.61:12-23; T12.46:10-51:10.

151.    Harvard does not use—and has never used—race in admissions to achieve a "critical mass" of underrepresented minorities in its student body. Doc. 597-1, 153:10-154:13.

152.    Harvard also has not established a date on which its use of race will sunset. P316.19; Doc. 597-1, 134:14-135:6. Harvard merely promised in April 2018 that it will "reevaluate" the use of race in admissions in five years. P316.19. Harvard believes that an applicant's race is—and always will be—essential to understanding who that applicant is. T14.193:4-10, 228:1-9. Since 2003, Harvard has not diminished in any way the role that race plays in its admissions system. T5.196:15-21.

## VI.    Race-Neutral Alternatives

### A.    Harvard's Failure to Consider Race-Neutral Alternatives.

153.    Before 2014, Harvard never considered whether it could achieve the educational benefits of diversity without using racial classifications. T5.195:21-196:8; Doc. 597-1, 180:10-181:9.

154.    In early 2014, a website called "Harvard Not Fair" was launched to identify applicants who had been denied admission to Harvard on account of race. T6.14:16-15:3; P340. Shortly thereafter, Harvard created a committee (chaired by Dean James Ryan) to examine the availability of race-neutral alternatives, P316.2; P299. The Ryan Committee comprised 29 people from across

44

Harvard, including "serious education scholars" who had written extensively on race and class in higher education. PD19; P299; P300; T5.73:5-79:4; T6.13:10-15:3, 201:16-203:19. But the Ryan Committee met only three times, never issued any work, and was disbanded in December 2014, within weeks of this lawsuit being filed. T2.68:4-70:14; T6.13:10-15:3. By 2015, Harvard did not even "have a hunch" about whether "race-blind admissions process would be beneficial or detrimental to diversity on campus." T5.195:21-196:8.

155.    In June 2017, Harvard formed a new committee chaired by Dean Michael Smith to study race-neutral alternatives. The Smith Committee—unlike the Walton or Ryan Committee—had only three members: Smith, Fitzsimmons, and Khurana. T2.70:10-15. Harvard's lawyers "participated in all the conversations" of the Smith Committee, took notes at meetings, and wrote the first draft of the report. T7.65:23-66:4, 123:24-124:15. The Smith Committee did not collect data, take testimony, or run simulations, but instead based its decisions primarily on the expert reports. P316; T7.76:20-77:18. The small size of the committee, the fact that its report was intended "to be used as part of this lawsuit," and the fact that one of its members (Fitzsimmons) was evaluating his own practices and policies made it highly unlikely that the report would deviate from Harvard's position in this case. T6.197:13-199:20; 206:12-19, 213:12-214:12. In April 2018, the Smith Committee, predictably, found that there were no workable race-neutral alternatives. P316.18. It fully endorsed Harvard's current admissions policy, wholesale adopted the views of Harvard's expert, and recommended no changes (large or small) to Harvard's system. P316.18-19.

### B.    The Availability of Race-Neutral Alternatives

156.    Richard Kahlenberg, SFFA's expert, is a senior fellow at The Century Foundation, a non-profit, progressive research organization. Kahlenberg is a graduate of Harvard College and Harvard Law School. He has spent decades studying and writing about race-neutral alternatives, affirmative action, and college admissions; he is one the nation's leading experts on these subjects.

T6.7:15-12:10; T2.34:16-22. Kahlenberg offered expert opinion testimony on whether Harvard has workable race-neutral alternatives that can achieve the educational benefits of student body diversity. T6.8:2-5.

157.     With these principles in mind, Kahlenberg, with Professor Arcidiacono's assistance, designed several "simulations" of race-neutral admissions policies to demonstrate the likely results of adopting race-neutral strategies at Harvard. He testified about four simulations (Simulations A, B, C, and D), including one designed by Professor Card. T6.15:23-16:14; PD32. All four simulations show there are viable race-neutral alternatives that would increase socioeconomic diversity, maintain or increase racial diversity, and maintain Harvard's academic excellence. T6.33:19-47:18; PD27, PD29, PD31, PD3.

158.     For example, under Simulation D, which is based on Professor Card's model, Harvard could achieve the educational benefits of diversity by: (1) eliminating racial preferences; (2) eliminating the legacy, donor, and faculty/staff preferences; and (3) increasing socioeconomic preferences to roughly one-half the size of athlete preferences. T6.41:3-42:3, 43:7:19-45:8, 46:5-12. African Americans and Hispanics would make up a larger share of the class (29%) than they do now (28%), while Asian Americans would rise from 24% of the class to 31%; socioeconomic diversity would improve greatly, with the advantaged/disadvantaged ratio going from 82%/18% to 51%/49%; academic characteristics would remain superb, with high school GPA remaining the same and SAT scores falling only slightly (from the 99th percentile to the 98th percentile); and there would be no financial barrier to increasing the number of non-wealthy applicants that Harvard admits. PD25; PD33; Doc. 597-1, 46:5-47:4; T6:46:2-47:3, 56:7-58:25.

## PROPOSED CONCLUSIONS OF LAW

159.     Title VI forbids Harvard from engaging in "discrimination that [would] violate[] the Equal Protection Clause of the Fourteenth Amendment." *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23

(2003).[2] The Equal Protection Clause outlaws any policy that "distributes burdens or benefits on the basis of individual racial classifications" unless it can satisfy strict scrutiny. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). That is because race-based policies "stigmatize individuals" and "'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *Shaw v. Reno*, 509 U.S. 630, 643 (1993). Application of strict scrutiny thus "is not dependent on the race of those burdened or benefited." *Gratz*, 539 U.S. at 270 (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995)).

160.    To survive strict scrutiny, a university must "demonstrate with clarity that its purpose or interest is both constitutionally permissible and substantial, and that its use of the [racial] classification is necessary ... to the accomplishment of its purpose." *Fisher v. Univ. of Tex. at Austin (Fisher II)*, 136 S. Ct. 2198, 2208 (2016) (quotation and citation omitted). Specifically, "a university must make a showing that its plan is narrowly tailored to achieve the only interest that [the Supreme] Court has approved in this context: the benefits of . . . student body diversity." *Fisher v. Univ. of Tex. at Austin (Fisher I)*, 570 U.S. 297, 314-15 (2013). Strict scrutiny is "demanding" and "searching." *Id.* at 303, 311. "'[R]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification.'" *Gratz*, 539 U.S. at 270.

161.    The defendant shoulders the burden of proving that it meets strict scrutiny. *Fisher I*, 570 U.S. at 310. The point of strict scrutiny, after all, is to force the defendant to dispel all doubts that it is misusing this suspect classification: "[T]he purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the [defendant] is pursuing a goal important enough to warrant use of a

---

[2] Harvard has not "identif[ied] any specific reasons for distinguishing public universities from federally-funded private universities, or explain[ed] how the analytical framework would differ for private versus public litigants." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, No. 14-cv-14176-ADB, 2018 WL 4688308, at *11 n.16 (D. Mass. Sept. 28, 2018). That is because controlling precedent does not recognize this distinction. If the correct interpretation of Title VI is revisited, SFFA will argue that Title VI is "colorblind" and forbids the use of race by *any* federally-funded university. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 415-18 (1978) (Stevens, J., concurring in the judgment in part and dissenting in part).

highly suspect tool. The test also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989); *accord Adarand*, 515 U.S. at 228; *Bush v. Vera*, 517 U.S. 952, 984 (1996) ("[W]e subject racial classifications to strict scrutiny precisely because that scrutiny is necessary to determine … whether they misuse race and foster harmful and divisive stereotypes without a compelling justification.").

162.     Because Harvard classifies applicants based on race, *supra* ¶ 11, its admissions system is "presumptively invalid." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). Harvard must satisfy strict scrutiny in order to comply with Title VI. *Gratz*, 539 U.S. at 275. Harvard cannot carry its burden by pointing to the portions of *Bakke* and *Grutter* that discussed the Harvard Plan. While those decisions favorably cited Harvard's description of its admissions process, no court has ever evaluated whether Harvard's process "meets strict scrutiny in its *implementation*." *Fisher I*, 570 U.S. at 311 (emphasis added). Harvard was not a party in *Bakke* or *Grutter*, and no evidence was taken or submitted in those cases about how Harvard's process actually works. Now that SFFA has lifted the curtain on Harvard's admissions process, this Court will be the first—and perhaps the last—to give "close analysis to the evidence of how" it "works in practice." *Id.* at 313.

163.     Harvard fails strict scrutiny because it: (1) intentionally discriminates against Asian Americans; (2) engages in racial balancing; (3) uses race in ways that *Grutter* prohibits; and (4) has not seriously considered or implemented workable race-neutral alternatives. Each of these reasons is an independent basis for imposing liability under Title VI.[3]

---

[3] Throughout this litigation—including during discovery, in granting Harvard judgment on the pleadings, and in denying summary judgment—the Court has rejected certain claims (Counts IV and VI of the complaint) and certain legal arguments that SFFA made. SFFA respects those rulings as law of the case and will not press those arguments again. But SFFA is not abandoning any of those claims and legal arguments and preserves them for appeal.

## I.      Harvard Intentionally Discriminates Against Asian-American Applicants.

### A.      Harvard Cannot Meet Its Heavy Burden of Proving That It Does Not Use Race To Discriminate Against Asian Americans.

164.     If Harvard discriminates against Asian-American applicants vis-à-vis white applicants, it automatically fails strict scrutiny. That would be "discrimination for its own sake," which lies at the heart of what "the Constitution forbids." *Bakke*, 438 U.S. at 307 (Powell, J.).

165.     Because the absence of intentional discrimination is a requirement of strict scrutiny, Harvard bears the burden of proving that it does not discriminate against Asian-Americans vis-à-vis white applicants. It does not matter that Harvard claims that its process is race neutral as between white and Asian-American applicants. Harvard considers the race of *every* applicant, including whites and Asian Americans, in deciding whether to admit them. *Supra* ¶ 11-12. Considering race as "a factor" is what triggers strict scrutiny. *Fisher I*, 570 U.S. at 300, 310. Regardless, the Supreme Court has never suggested that race-conscious admissions decisions can be segmented, reviewing only some under strict scrutiny. It instead has held that "strict scrutiny must be applied to any admissions *program* using racial categories or classifications." *Id.* (emphasis added); *see also Grutter v. Bollinger*, 539 U.S. 306, 341 (2003) ("Narrow tailoring . . . requires that a race-conscious admissions *program* not unduly harm members of *any* racial group." (emphases added)).

166.     Harvard fails strict scrutiny. Harvard cannot prevail even under the preponderance standard, *infra* ¶¶ 167-206, let alone *disprove* that it uses race to discriminate against Asian Americans vis-à-vis white applicants.

### B.      It Is More Likely Than Not That Harvard Has Engaged In a Pattern or Practice of Discrimination Against Asian Americans.

167.     Even if strict scrutiny does not apply to Count I, the "only issue to be decided . . . is whether" SFFA has "actually proved discrimination," *i.e.*, whether SFFA has "demonstrated a pattern or practice of discrimination by a preponderance of the evidence." *Bazemore v. Friday*, 478 U.S. 385,

398 (1986). The burden-shifting rules that apply at summary judgment "'drop[] from the case.'" *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). The preponderance standard "is a more-likely-than-not rule." *United States v. Mulkern*, 854 F.3d 87, 90 n.2 (1st Cir. 2017).

168.    A pattern-or-practice of discrimination exists when "racial discrimination was the [defendant's] standard operating procedure—the regular rather than the unusual practice." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). If that is demonstrated, the plaintiff "need not establish individual injury to establish liability and obtain injunctive relief." *Karp v. CIGNA Healthcare, Inc.*, 882 F. Supp. 2d 199, 210 (D. Mass. 2012); *Teamsters*, 431 U.S. at 359-60 & n.45.[4]

169.    Racial discrimination "come[s] in many different forms." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 58 (1st Cir. 1999). Racial stereotyping is one. *Miller v. Johnson*, 515 U.S. 900, 928 (1995). That is because "unlawful discrimination can stem" not just from "conscious animus," but "from stereotypes and other types of cognitive biases." *Thomas*, 183 F.3d at 59. Hence, "'ill will, enmity, or hostility are not prerequisites of intentional discrimination.'" *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1284 (11th Cir. 2000) *see Goodman v. Lukens Steel Co.*, 482 U.S. 656, 668-69 (1987). In fact, the defendant's "'state of mind'" is irrelevant. *Thomas*, 183 F.3d at 59. "[S]ince 'unwitting or ingrained bias is no less injurious or worthy of eradication than blatant or calculated discrimination,'" the fact that defendants "'may have been unaware of that motivation, *even within themselves*, neither alters the fact of its existence nor excuses it.'" *Id.* at 60 (emphasis added); *accord Kelly v. Bank Midwest, N.A.*, 177 F. Supp. 2d 1190, 1206 (D. Kan. 2001). "The ultimate question is whether the [plaintiff] has been treated disparately 'because of race.' This is so regardless of whether the [defendant] consciously intended to

---

[4] Because the pattern-or-practice theory "is not a freestanding cause of action but merely a method of proving an underlying legal violation," *Aguilar v. U.S. Immigration & Customs Enforcement Div. of Dept. of Homeland Sec.*, 510 F.3d 1, 16 (1st Cir. 2007), it is not limited to class actions or any other type of case, *Davis v. Califano*, 613 F.2d 957, 962-63 (D.C. Cir. 1979); *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1559 (11th Cir. 1986). Even if individuals may not employ this approach, however, associations and unions can use it on behalf of their members. *See, e.g.*, *Bhd. of Maint. of Way Emps. Div. of the Int'l Broth. of Teamsters v. Ind. Harbor Belt R. Co.*, No. 2:13 cv 18-PPS-APR, 2014 WL 4987972 (N.D. Ind. Oct. 7, 2014).

base the evaluations on race, or simply did so because of unthinking stereotypes or bias." *Thomas*, 183 F.3d at 58.

170.    Like intentional discrimination itself, proof of intentional discrimination also "come[s] in many different forms." *Id.* While such proof can be "'direct or circumstantial,'" *Aikens*, 460 U.S. at 714 n.3, "circumstantial evidence is to be expected in discrimination cases given the complexity of the issues and the difficulty, in this rights conscious era, of producing direct evidence." *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1115-16 (1st Cir. 1989). "[C]ircumstantial evidence" is crucial because, all too often, discrimination is "of . . . a subtle, insidious character." *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir. 1987). Given the realities of modern-day discrimination, plaintiffs must be able to prove it any way they can:

> It has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior. In other words, while discriminatory conduct persists, violators have learned not to leave the proverbial 'smoking gun' behind. As one court has recognized, '[d]efendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it.' … The sophisticated would-be violator has made [courts'] job a little more difficult. Courts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct, and 'a plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled . . . because of crabbed notions of relevance . . . .'

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996) (citations omitted). "A plaintiff," in fact, "is entitled to prove discrimination by circumstantial evidence alone." *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 46 (1st Cir. 2009); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

171.    Statistics are one "'frequently relied upon'" form of circumstantial evidence. *Teamsters*, 431 U.S. at 340 n.20. Statistical imbalances are "a telltale sign of purposeful discrimination." *Id.* Statistics are "an important and useful tool in civil rights litigation," *Williams v. New Orleans S.S. Ass'n*, 673 F.2d 742, 749 (5th Cir. 1982), as they "provide otherwise unavailable indications of [a defendant's] conscious or unconscious motives." *Diaz v. Am. Tel. & Tel.*, 752 F.2d 1356, 1363 (9th Cir. 1985); *accord Teamsters*, 431 U.S. at 340 n.20 ("'In many cases the only available avenue of proof is the use of racial

statistics to uncover clandestine and covert discrimination'"). That is why "general statistical data" are "particularly helpful" in cases alleging discrimination by universities, which require courts to review decisions that are "highly subjective" and "necessarily involve[] academic judgments." *Lynn v. Regents of Univ. of Calif.*, 656 F.2d 1337, 1342 & n.3 (9th Cir. 1981).

172.    Importantly, while statistics are "'part'" of the evidence in cases alleging "'individual disparate treatment,'" they are "'the core'" of the evidence in cases, like this one, alleging a "'pattern [or] practice'" of discrimination. *Karp*, 882 F. Supp. 2d at 210; *accord EEOC v. Tex. Roadhouse, Inc.*, 215 F. Supp. 3d 140, 169 (D. Mass. 2016) ("[S]tatistics are generally considered central to pattern-or-practice cases."); *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 168 (2d Cir. 2001) (same).

173.    A pattern or practice of discrimination exists when there is a "statistically significant disparity" in the selection rate for a particular racial group. *Palmer v. Shultz*, 815 F.2d 84, 91 n.6 (D.C. Cir. 1987); *accord Bazemore*, 478 U.S. at 402-03 & n.14; *Eldredge v. Carpenters 46 N. Cal. Ctys. Joint Apprenticeship & Training Comm.*, 833 F.2d 1334, 1340 & n.8 (9th Cir. 1987). A statistically significant disparity is sufficient "alone" to demonstrate a pattern or practice, so long as the "statistical analysis has properly defined the pool of eligible candidates." *Palmer*, 815 F.2d at 91-92 & n.6; *accord Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 424 (7th Cir. 2000); *Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 336 & n.20 (4th Cir. 1983). To measure statistical significance in this context, courts (like social scientists and the Department of Justice) use a p-value of .05—meaning a 5% probability (or one in twenty odds) that the observed racial disparity is attributable to chance. *Palmer*, 815 F.2d at 92; *Segar v. Smith*, 738 F.2d 1249, 1282 (D.C. Cir. 1984); *Adams*, 231 F.3d at 424; *cf. Jones v. City of Boston*, 752 F.3d 38, 43-44, 46-47 & n.9 (1st Cir. 2014) (explaining the general acceptance of the .05 p-value as sufficient "to reject the hypothesis that members of [racial] groups truly had an equal chance of receiving the outcome at issue").

174.     Only a "diminished" statistical disparity is needed, moreover, to establish a pattern or practice of discrimination when "the disparity proceeds from the application of subjective [policies]." *Blackwell v. Thomas*, 476 F.2d 443, 447 n.7 (4th Cir. 1973); *accord Bolton v. Murray Envelope Corp.*, 493 F.2d 191, 195 (5th Cir. 1974) (subjectivity "magnifie[s]" the "significance" of statistical evidence of discrimination); *Castaneda v. Partida*, 430 U.S. 482, 496-97 (1977) (subjectivity "[s]upport[s]" statistical evidence of discrimination). This "lighter burden" reflects the fact that it is "'particularly easy'" for a defendant to use "subjective criteria" to "'mask discrimination.'" *Lyoch v. Anheuser-Busch Cos., Inc.*, 139 F.3d 612, 615 (8th Cir. 1998); *accord Hamilton v. Geithner*, 666 F.3d 1344, 1356 (D.C. Cir. 2012); *Rowe v. Gen. Motors Corp.*, 457 F.2d 348, 359 (5th Cir. 1972). Because subjective policies are hard to falsify and encourage racial stereotyping, courts must "closely scrutinize[]" them. *Jauregui v. City of Glendale*, 852 F.2d 1128, 1136 (9th Cir. 1988).

175.     Even a nonsignificant "statistical disparity" can demonstrate a pattern or practice "if buttressed by other evidence." *Police Officers for Equal Rights v. City of Columbus*, 644 F. Supp. 393, 435 (S.D. Ohio 1985); *accord Palmer*, 815 F.2d at 96-97; *Craik v. Minn. State Univ. Bd.*, 731 F.2d 465, 476 n.13 (8th Cir. 1984); *Police Officers*, 644 F. Supp. at 432 n.13. This "other evidence" can include the defendant's "knowledge of problems of underrepresentation," "evidence of discriminatory attitudes and stereotyping by [the defendant]," other denigrating "comments by decisionmakers," "a history of discrimination practiced by the [defendant]," and "opportunities to discriminate that exist in the [defendant's] decision-making processes." *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 335 (N.D. Cal. 1992); *Tex. Roadhouse*, 215 F. Supp. 3d at 168 ; *Payne v. Travenol Labs., Inc.*, 673 F.2d 798, 817 (5th Cir. 1982). "'[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons'" also suggest discrimination. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000). Likewise, "post filing conduct" can show "the existence of prior discrimination," *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 346 (10th Cir. 1975).

Because "[a]ll evidence that a plaintiff presents can contribute" to identifying a pattern or practice of discrimination, it "should therefore be considered as cumulative." *Segar*, 738 F.2d at 1278.

176.    To disprove a pattern or practice of discrimination, the defendant must either show that the identified statistical disparity is "inaccurate or insignificant" or provide "a nondiscriminatory explanation" for it. *Teamsters*, 431 U.S. at 360 & n.46; *accord Boykin v. Ga.-Pac. Corp.*, 706 F.2d 1384, 1393 (5th Cir. 1983) ("In order to combat a [pattern-or-practice] case . . . based upon statistical evidence, defendant must either show flaws in the plaintiffs' statistics or provide a non-discriminatory explanation for the result."). Trying to disprove a pattern or practice with anecdotal examples of nondiscrimination is "doomed to failure." *Boykin*, 706 F.2d at 1393. So is making "general assertions . . . of [selecting] only the best applicants" or "affirmations of good faith in making individual selections." *Id.*; *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972). If "mere general assertions by officials . . . were to be accepted as [an] adequate justification," the command of racial equality "would be but a vain and illusory requirement." *Norris v. Alabama*, 294 U.S. 587, 598 (1935). Harvard cannot disprove a pattern or practice of discrimination by "mere ritual invocation" of its mantras that its admissions system is holistic, it uses unquantifiable "subjective factors," or admission decisions are "conducted on a case-by-case basis and involve[] a wide variety of [factors]." *Mozee v. Jeffboat, Inc.*, 746 F.2d 365, 371-72 (7th Cir. 1984).

## 1.    Harvard imposes a statistically significant penalty on Asian Americans.

177.    SFFA has satisfied its burden. The preponderance of the evidence shows that Harvard imposes a statistically significant penalty on Asian-Americans applicants. To begin, the descriptive analysis exposes a stark statistical disparity. In particular, it shows racial disparities in the personal and overall ratings with African Americans faring the best, followed by Hispanics, then whites, and then Asian Americans last. This pattern holds for the overall score—though Harvard admits that race

influences that rating. These disparities have a negative effect on Asian Americans being admitted to Harvard. *Supra* ¶¶ 24-37.

178.    Professor Arcidiacono's regression analysis confirms that these statistical disparities are attributable to race—not some non-racial factor that just so happens to correlate with race—and that the racial penalty imposed on Asian-American applicants vis-à-vis white applicants is statistically significant. First, it shows a statistically significant Asian-American penalty in the "overall" score. Second, it shows a statistically significant Asian-American penalty in the "personal" score. Third, it shows a statistically significant Asian-American penalty in the admissions decisions themselves. *Supra* ¶¶ 38-62.

179.    The burden thus shifts to Harvard to prove that Professor Arcidiacono's regression analysis is "inaccurate" or "statistically "insignificant." But Harvard neither identified mathematical flaws in the analysis nor tried to argue that the penalty Professor Arcidiacono identified through his regression model is insignificant. Harvard instead argues, first, that its admissions system is effectively immune from expert analysis; second, and alternatively, Harvard argues that Professor Card's findings should be accepted because he made better modeling choices. T1.78:21-24; *supra* ¶¶ 63-92. Neither criticism is a basis for rejecting Professor Arcidiacono's findings.

180.    The notion that Harvard's admissions system cannot be modeled through regression analysis is meritless. Subjective systems are not immune from statistical analysis—subjectivity makes statistical analysis more vital. *Supra* ¶¶ 171, 174. Most employers make hiring and promotion decisions using a mix of objective and subjective factors. Yet there are myriad decisions applying statistical analysis to those decisions. That is why, in *Grutter*, "the Law School and the unsuccessful applicants presented expert testimony regarding the Law School's use of race in admissions decisions." *Grutter v. Bollinger*, 288 F.3d 732, 737 (6th Cir. 2002).

181.    Nor must the regression model include every factor that Harvard considers in making admissions decisions. No model could satisfy that unrealistic standard. The plaintiff "need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination by a preponderance of the evidence." *Bazemore*, 478 U.S. at 400. Accordingly, "a regression analysis that includes less than 'all measurable variables' may serve to prove a plaintiff's case." *Id.*; *e.g.*, *Davis*, 613 F.2d at 964. Any claim that SFFA's analysis cannot be trusted because "many factors go into" Harvard admissions decisions is factually wrong and legally untenable. *Bazemore*, 478 U.S. at 404 n.14; *Palmer*, 815 F.2d at 101 ("[M]ere conjecture or assertion on the defendant's part that some missing factor would explain the existing disparities . . . generally cannot defeat the inference of discrimination created by plaintiffs' statistics.").

182.    Indeed, Harvard has touted OCR's regression analysis. *Supra* ¶ 101. And, through OIR, Harvard itself has conducted a litany of regression studies to evaluate its admissions system. *Supra* ¶¶ 118-119, 124, 126. None of those studies included every variable that might affect an applicant's chances of admission. Harvard nevertheless considered those studies to be accurate, credible, and sufficiently reliable to ground key institutional decision on them. Indeed, when it suited Harvard's interests—as it did with the low-income analysis and others—the university touted those studies as "empirical evidence" that accurately depicted its admissions system. *Supra* ¶¶ 123, 125.

183.    Instead of broadly decrying the value of regression models, Harvard must prove that any "missing factor" from Professor Arcidiacono's model "can explain the disparities as a product of a legitimate, nondiscriminatory selection criterion." *Palmer*, 815 F.2d at 101. Harvard cannot make this showing. Harvard did not even try to rebut Professor Arcidiacono's regression finding that Harvard discriminates against Asian-American applicants vis-à-vis white applicants in the overall score. *Supra* ¶ 47. That should be the end of the matter. Imposing a racial penalty on Asian Americans *anywhere* in the process violates Title VI. "A plaintiff in a university discrimination case need not prove intentional

discrimination at every stage of the decisionmaking process; impermissible bias at any point may be sufficient to sustain liability." *Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1561-62 (9th Cir. 1994) (citing *Fields v. Clark Univ.*, 817 F.2d 931, 933-35 (1st Cir. 1987)); *Turner v. Fouche*, 396 U.S. 346, 360 (1970).

184.    Even setting the decisive issue aside, Professor Card's many objections miss the mark. To begin, he disagrees with Professor Arcidiacono's exclusion of the ALDC applicants from his preferred regression model. That criticism is misplaced, however. Not only was that the appropriate analytical choice, *supra* ¶¶ 69-77, it comported with controlling law. Because the Court's task is to see whether "similarly situated" applicants have been treated differently on the basis of race, "apples should be compared to apples." *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 34 (1st Cir. 2008). SFFA claims that non-ALDC Asian Americans suffer an admissions penalty. That proposition must be tested by comparing their treatment to similarly-situated applicants, *i.e.*, non-ALDC white applicants. Nor is Harvard in a position to dispute this approach. It was Harvard that claimed that the negative effect on Asian Americans was a result of its preferences for athletes and legacies and asked OCR to exclude them from its regression analysis. *Supra* ¶¶ 76.

185.    Professor Card also complains about other modeling choices Professor Arcidiacono made. Those complaints are erroneous too. *Supra* ¶¶ 78-92. To take one example, Harvard's criticism of Professor Arcidiacono for "pooling" the data is unfounded. *Supra* ¶¶ 78-80. Courts prefer pooled data. *See, e.g.*, *Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 654-56 & n.4 (5th Cir. 1983); *Lilly*, 720 F.2d at 336 n.17; *Tex. Roadhouse*, 215 F. Supp. 3d at 171; *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 1, 14-17 (D.C. Cir. 2004).

186.    But all of these expert disagreements—save one—are irrelevant. The one dispute that does matter is whether the personal score should be included in the model. That is because once the personal score is removed, even Professor Card's regression model shows a statistically significant Asian-American penalty. *Supra* ¶ 68. Thus, the Court must reach and decide all of these other disputes

only in rejecting Professor Arcidiacono's findings. It need not resolve any of them—including the ALDC dispute—to validate Professor Arcidiacono's findings of a statistically-significant Asian-American penalty. *Id.*

187. Professor Card agrees that any rating that race influences must be removed from the model—that is why he removed the overall rating. *Supra* ¶¶ 43, 48. Setting aside whether the personal rating shows bias against Asian Americans, which it clearly does, the rating is plainly influenced by race. There is no other plausible explanation for why the scoring follows the same racial pattern as the overall score. *Supra* ¶¶ 31-34. Harvard has never tried to offer a neutral explanation for why a rating that measures an applicant's "personal qualities" would follow a racial pattern from top to bottom. That is because there is none. *Supra* ¶¶ 57. The personal score, accordingly, must be excluded. Once it is, the experts agree that Harvard's admissions system imposes a statistically significant penalty on Asian-American applicants vis-à-vis white applicants.

## 2. SFFA's statistical case is buttressed by ample circumstantial evidence of discrimination against Asian Americans.

188. Asian Americans have been the targets of discrimination in this country for more than a century. *Supra* ¶ 94-95; *Yick Wo v. Hopkins*, 6 S. Ct. 1064, 1066 (1886); *Korematsu v. United States*, 323 U.S. 214, 218 (1944); *Antolok v. United States*, 873 F.2d 369, 387 (D.C. Cir. 1989) (Wald, J., concurring in the judgment) ("Asians have, through most of our country's history, been subjected to repeated racial discrimination."). "The reality is that Asian Americans have been the target of both historical and ongoing discrimination." Pat K. Chew, *Asian Americans: The "Reticent" Minority and Their Paradoxes*, 36 Wm. & Mary L. Rev. 1, 8 (1994).

189. This "long history of discrimination against Asian Americans" has persisted "especially in education." *Fisher II*, 136 S. Ct. at 2228 (Alito, J., dissenting) (citations and quotations omitted). The "'model minority' stereotype" has existed for decades. *Supra* ¶¶ 94-95; *Civil Rights Issues Facing Asian Americans in the 1990s*, A Report of the United States Commission on Civil Rights, at 19 (Feb. 1992)

("USCCR Report"). "According to this stereotype . . . Asian Americans are hardworking, intelligent, and successful." *Id.* Yet they also are disgracefully stereotyped as quiet, shy, math-focused students with less attractive personalities. *Supra* ¶ 94-95; USCCR Report at 20-21 ("Asian Americans, while viewed as intelligent and talented at mathematics and science, are considered unaggressive and lacking in good communication skills."); Paul Brest & Miranda Oshige, *Affirmative Action for Whom?*, 47 Stan. L. Rev. 855, 893-94 (1995) ("According to this stereotype, which has both positive and negative elements, Asian Americans have a good work ethic and a strong commitment to education, leading to great educational and economic success. But while skilled in math and science, they have low verbal abilities and communication skills; they are one-dimensional 'grinds,' docile and lacking in personality and individuality." (citations omitted)). The issue, then, is *not* whether the racial stereotype exists; it clearly does. *Supra* ¶¶ 94-95. The issue is whether Harvard has uniquely escaped its infiltration. The non-statistical evidence confirms what the expert analysis shows.

190.    Harvard's use of the highly subjective personal score invites racial stereotyping. *Supra* ¶¶ 95, 99. "Selection processes which rely on subjective judgments, despite the corralling by objective standards, provide the opportunity for … intentional discrimination" and "'lend themselves to racially discriminatory abuse.'" *Pegues v. Miss. State Emp't Serv. of Miss. Emp't Sec. Comm'n*, 699 F.2d 760, 765 (5th Cir. 1983); *Hamilton v. Geithner*, 666 F.3d 1344, 1356 (D.C. Cir. 2012); *accord Royal v. Mo. Highway & Transp. Comm'n*, 655 F.2d 159, 164 (8th Cir. 1981). The notion that Harvard's system is not susceptible to this kind of abuse is defied by logic and history, and it is disproven by the testimony in this case. *Supra* ¶ 96, 98.

191.    Harvard's failure to properly instruct admissions staff—in writing or even orally—as to when and how race should be used in evaluating applicants made matters worse. *Supra* ¶¶ 97-102. Nor has Harvard trained its admissions staff about the dangers of racial stereotyping and implicit bias. *Supra* ¶¶ 102, 108, 113-114. Harvard's failure to guide its admissions staff on how—and how not—to

59

use race likewise opened the door to racial stereotyping and supports an inference of intentional discrimination. *See Payne v. Travenol Labs., Inc.*, 673 F.2d 798, 819 (5th Cir. 1982) (defendant's failure to "give its personnel managers written instructions on standards to apply" when running a subjective hiring process was evidence of a pattern or practice of discrimination). Put simply, "the need for more or different training is so obvious" that "the inadequacy" is "likely to result in the violation of [federal] rights." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

192.    Harvard's failures have led to its admissions officers deploying racial stereotypes against Asian Americans for decades. That is what OCR found, *supra* ¶ 107, and it is what the evidence shows today, *supra* ¶¶ 105-106, 108-112. This has led to Asian-American achievements being discounted, to stereotyping them as academically-minded and one dimensional, and to the assumption that they have less vibrant personalities than their white, African-American, and Hispanic peers. *Id.* Stereotyping is reflected in, *inter alia*, Harvard recruitment policies, reader comments, the behavior and attitude of Harvard leadership, casual indifference to anti-Asian racism, and disproportionate and unequal use of "standard strong" to downgrade Asian Americans. *Supra* ¶¶ 108-111. These stereotypes even surfaced at the trial. *Supra* ¶ 112. It is legally irrelevant whether this racial stereotyping results from conscious bias, implicit bias or, more likely, a combination of both. *Supra* ¶ 169. It is racial discrimination—period.

193.    The recent changes to the Reading Procedures confirm that racial stereotyping infects Harvard's admissions system. Once this record became public, a group of admissions officers pushed for changes designed to counteract Asian-American stereotyping. Those changes included a new written instruction on how and when to use race that Harvard's leadership adamantly claimed was unnecessary, as well as revisions to the criteria for assigning the personal rating that is sensitive to the stereotype that Asian Americans are introverted. *Supra* ¶¶ 113-114, 133. That these individuals—unlike Harvard's leadership—recognized the need to takes these steps speaks volumes. *See Rich,* 522 F.2d at

346 ("post filing conduct" can "tend to show the existence of prior discrimination"); *Liberty Envtl. Sys., Inc. v. Cty. of Westchester*, No. 94 Civ. 7431 (WK), 2000 WL 1341403, at *2 (S.D.N.Y. Sept. 15, 2000) ("post-event evidence" can "demonstrate intentional discrimination" and "can prove 'highly probative' of a pre-existing illegal custom or practice"). This "subsequent conduct," *id.* at *3, is likewise highly probative of intentional discrimination.[5]

194.    The conduct of Fitzsimmons and McGrath also supports an inference of intentional discrimination. After OCR found that several admissions officers had engaged in racial stereotyping, Fitzsimmons and McGrath could have addressed it. They did nothing. *Supra* ¶ 107. Fitzsimmons and McGrath also could have made changes to the Reading Procedures years—if not decades—ago. But, again, they did nothing; McGrath even opposed making changes that others in the Admissions Office recognized as necessary to begin to remedy racial stereotyping. *Supra* ¶¶ 113-114, 133. Time after time, Harvard's leadership bypassed opportunities to confront this discrimination.

195.    The most obvious example is Fitzsimmons's response to OIR's findings. On multiple occasions, OIR informed Fitzsimmons that the admissions system was penalizing Asian Americans. The question OIR posed was: clear "Does the Admissions Process Disadvantage Asians?" It gave an

---

[5] Any suggestion that Federal Rule of Evidence 407 prohibits use of this evidence is misplaced. First, any objection is waived because the evidence was introduced without objection or qualification on its use. T14.127:14-157:16; *Gardner v. Simpson Fin. Ltd. P'ship*, 963 F. Supp. 2d 72, 84-85 (D. Mass. 2013). Harvard stated on the record that the new reading procedures are ▮▮▮▮▮▮ and Harvard expressly clarified that this evidence ▮▮▮▮▮▮ T9.16:17-17:13 (sealed transcript). Harvard, "as a consequence, ... 'opened the door' to [this evidence] and thereby eliminated any potential evidentiary error. Moreover, having offered the [evidence] [it]self and having received the strategic benefit therefrom, [Harvard] cannot now be heard to complain that [its] own offer of such evidence was . . . error." *Gill v. Thomas*, 83 F.3d 537, 541 (1st Cir. 1996). Harvard also forfeited any objection by raising it, not when the new reading procedures were admitted, but a week later during closing argument. *See* Fed. R. Evid. 103(a); *United States v. Serrano*, 870 F.2d 1, 7 n.5 (1st Cir. 1989); *Murray v. S. Route Mar., S.A.*, No. C12-1854RSL, 2015 WL 540962, at *1 (W.D. Wash. Feb. 10, 2015). Finally, Rule 407 is inapplicable in any event. Harvard cannot seek the protection of the rule because it does not concede that the changes were in fact a remedial measure. *See Grewcock v. Yale-New Haven Health Servs. Corp.*, No. 3:16-c-00452 (JAM), 2018 WL 1156224, at *3 (D. Conn. Mar. 4, 2018). Further, Rule 407 states that subsequent remedial measures are admissible "for another purpose" besides "culpable conduct." Thus, the new reading procedures can be used to prove Harvard's discriminatory intent, *Kennedy v. City of Zanesville*, No. 2:03-cv-1047, 2008 WL 2036713, at *4 & n.1 (S.D. Ohio May 9, 2008), and to rebut Harvard's testimony that better reading procedures were not feasible, *Adams v. City of Chicago*, 469 F.3d 609, 612 (7th Cir. 2006).

equally clear answer: being Asian American had a "negative effect" on admission and that its finding that being Asian American was "negatively correlated with the admission rate" was statistically significant. OIR could not have put it more plainly: there is a "negative chance of getting into Harvard by virtue of being Asian." *Supra* ¶¶ 118-119, 124, 126. Yet Fitzsimmons did nothing. He did not ask questions, instruct OIR to investigate further, discuss it with anyone in the Admissions Office, share OIR's findings with superiors, or hire an outside consultant to conduct an independent inquiry. *Supra* ¶¶ 125-127. This is powerful evidence of intentional discrimination. Employing a policy that has a disproportionate effect on Asian Americans is bad. "Adherence to a . . . policy or practice," however, "with full knowledge of the predictable effects of such adherence" is far worse. *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 465 (1979); *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 439 (4th Cir. 2000).

196.    Harvard is responsible for this pattern or practice of racial discrimination. Under § 1983, the employer is liable when the discrimination results from a "policy or custom" or where the "policy maker was at least deliberately indifferent to the possibility that the policy in question would lead to a deprivation of federally-protected rights." *Hilchey v. City of Haverhill*, 537 F. Supp. 2d 255, 263 (D. Mass. 2008). That standard has been applied to Title VI claims, *e.g., Thompson v. Ohio State Univ.*, 990 F. Supp. 2d 801, 817 (S.D. Ohio 2014), and is met here. A pattern or practice of discrimination is, by definition, a policy or custom. *Port Auth. Police Asian Jade Soc. of N.Y. & N.J. Inc. v. Port Auth. of N.Y. & N.J.*, 681 F. Supp. 2d 456, 464 (S.D.N.Y. 2010); *Branch v. Guilderland Cent. Sch. Dist.*, 239 F. Supp. 2d 242, 253 (N.D.N.Y. 2003); *Guzman v. N. Illinois Gas Co.*, 2009 WL 3762202, at *3 (N.D. Ill. Nov. 6, 2009). Indeed, racial stereotyping over a multi-decade period easily qualifies as a custom under any legal test. Regardless, there is overwhelming evidence of Harvard's deliberate indifference to this illegal discrimination against Asian Americans.

197.    The sudden increase in admission of Asian Americans once this lawsuit put a spotlight on the issue eliminates any doubt that the penalty is a product of intentional discrimination. *Supra* ¶¶

37, 128. When civil-rights defendants are confronted with their discriminatory actions, especially in highly public litigation, they often take remedial steps that are "motivated" by a desire "to conceal past discrimination." *Adorno v. Port Auth.*, 258 F.R.D. 217, 233 (S.D.N.Y. 2009); *Holcomb v. Iona Coll.*, 521 F.3d 130, 143 (2d Cir. 2008); *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 658 (4th Cir. 1967); *Patterson v. Strippoli*, 639 F. App'x 137, 143 (3d Cir. 2016); *Payne*, 673 F.2d at 818-19. That is precisely what happened here.

198.     Finally, Harvard pleads for the Court to ignore all of this evidence and instead take its word that it acted in good faith. Even if the Court could, *but see supra* ¶ 176, there is no basis for doing so. Harvard has no credibility. Harvard offered an everchanging story for why Fitzsimmons took no action in response to OIR's findings and for why Asian Americans in Sparse Country are held to a higher standard than their white classmates. *Supra* ¶ 130-131. McGrath's testimony that she would have sent the same "polite response" to a letter using racial slurs about African Americans is not believable. T5.227:5-228:13. Witness after witness changed their story or conveniently recovered their memory after spending hour upon hour with Harvard's lawyers; indeed, Harvard witnesses had to be impeached over and over. *Supra* ¶ 132. Worst yet, several witnesses—including Fitzsimmons and McGrath—testified falsely as to whether Harvard had written guidelines on the use of race and concealed that Harvard had made substantial revisions on the eve of trial. *Supra* ¶ 133. The factfinder may "infer the ultimate fact of discrimination from the falsity of the [defendant's] explanation. . . . Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). It is persuasive here.

### 3.     Harvard lacks a nondiscriminatory explanation.

199.     Harvard has *never* offered a "nondiscriminatory explanation for [this] apparently discriminatory result." *Teamsters*, 431 U.S. at 360 n.46. At times, Harvard has suggested that Asian

Americans are less "multidimensional" than their white peers. *Supra* ¶ 112. But Harvard has been unwilling to commit to that argument because no evidence supports it. *Supra* ¶¶ 57.

200.     Any assertion that Asian Americans—based on their race—are less multidimensional than white applicants would only confirm that Harvard is engaged in illegal stereotyping. *Norris*, 294 U.S. at 598-99. Such assertions are themselves based on Asian-American stereotypes; they "suggest[] that race or ethnic background determines how individuals think or behave." *Wessmann v. Gittens*, 160 F.3d 790, 799 (1st Cir. 1998). It would be the height of irony to accept Harvard's stereotyping of Asian Americans as a defense of its illegal stereotyping of Asian Americans. *Miller*, 515 U.S. at 920 ("We may not accept as a defense to racial discrimination the very stereotype the law condemns."). Yet it would be required to accept the shameful "multidimensionality" explanation.

201.     Instead of forthrightly offering a nondiscriminatory reason for why Asian Americans suffer an admissions penalty, Harvard criticizes SFFA for failing to produce smoking-gun evidence. Again, however, no such evidence is required. *Supra* ¶ 170. No court would—or should—hold another civil-rights plaintiff to that discredited legal standard. Harvard must offer a nondiscriminatory reason for the intentional discrimination suggested by the statistical and other circumstantial evidence. *Supra* ¶ 176. It may not avoid liability by invoking rules of litigation from the Jim Crow era in which the absence of direct evidence allowed violators to escape judicial rebuke. When it comes to intentional discrimination, "'clever men may easily conceal their motivations.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015).

202.     Harvard further tries to undermine the coherence of SFFA's assertions, arguing that it would be implausible for Harvard to penalize only non-ALDC Asian Americans. But that is not SFFA's argument. ALDC Asian-American applicants do not suffer an admissions outcome penalty— *i.e.*, racial stereotyping against Asian Americans does not diminish their admission chances. But that should be unsurprising. That small cohort of applicants is off-the-charts academically, excels in

extracurriculars, and—unlike 98% of Asian-American applicants—receives the enormous (and highly coveted) ALDC preference. *Supra* ¶¶ 71-72. These factors simply overwhelm the penalty that racial stereotyping imposes.

203.    This critique also depends on the strawman argument that SFFA claims Harvard's goal is to exclude Asian Americans altogether. Not so. SFFA's claim has always been that Harvard penalizes Asian-American applicants in a way that makes it more difficult for them to gain admission and thereby reduces their share of the admitted class. It is obvious why athletes, legacies, children of donors, and children of faculty and staff fare better than other Asian Americans in such a system. A system that limits or reduces the presence of a racial minority, but does not eliminate it entirely, is still intentional discrimination. *Alexander*, 405 U.S. at 629. The same is true of a policy that merely subjects a racial group "to higher standards of evaluation." *Sweeney v. Bd. of Trustees of Keene State Coll.*, 604 F.2d 106, 114 (1st Cir. 1979). That members of the disfavored minority group with "admittedly outstanding credentials" overcame discrimination does not undermine the claim of discrimination made by other members of that minority group. *Id.*

204.    Harvard cannot prevail by showing that "not all members of [the] disfavored class are discriminated against." *Chadwick*, 561 F.3d at 43. The law "'is not to be diluted because discrimination adversely affects only a portion of the protected class,'" and "'discrimination against one [minority] cannot be remedied solely by nondiscrimination against another [minority] in that same group.'" *Franchina v. City of Providence*, 881 F.3d 32, 53 (1st Cir. 2018). Antidiscrimination laws protect *individual* rights:

> It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group.… [I]rrespective of the form taken by the discriminatory practice, an employer's treatment of other members of the plaintiffs' group can be of little comfort to the victims of discrimination. Title VII does not permit the victim of a facially discriminatory policy to be told that he has not been wronged because other persons of his or her race or sex were hired.

*Connecticut v. Teal*, 457 U.S. 440, 454-55 (1982) (quotations and citations omitted).

205.    If Harvard discriminates against a subgroup of Asian-Americans—say, applicants who are Asian-American "plus" non-ALDC—then Harvard has engaged in racial discrimination. *Chadwick*, 561 F.3d at 43-44; *e.g.*, *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (discrimination against women with preschool children, but not women without preschool children or men, is discrimination under the "sex plus" rubric); *Lam*, 40 F.3d at 1562 (discrimination against Asian American women, but not white women or Asian men, is race discrimination); *Jefferies v. Harris Cty. Cmty. Action Ass'n*, 615 F.2d 1025, 1034 (5th Cir. 1980) (similar).

206.    In sum, there is nothing anomalous about Asian Americans who are athletes and legacies evading the racial stereotyping that plagues the 98% of Asian Americans who are not lucky enough to be in the club. A "defendant may not discriminate consistently against *every* [member of the racial group] under *all* conditions." *Woods v. City of Greensboro*, 855 F.3d 639, 651 (4th Cir. 2017). "Indeed, it is unlikely today that an actor would explicitly discriminate under all conditions." *Id.* History is littered with examples of discriminators pointing to a few fortunate minorities who received fair treatment, holding up these isolated examples as exculpatory. It did not work then, and it should not work now. It is more likely than not that Harvard has intentionally discriminated against Asian-Americans applicants.

## II.    Harvard Engages in Racial Balancing.

207.    A university cannot engage in racial balancing—a practice that is "facially invalid" and "patently [illegal]." *Parents Involved*, 551 U.S. at 730 (plurality opinion). Racial balancing contradicts the "repeated recognition that '[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals.'" *Parents Involved*, 551 U.S. at 730. Allowing it would "effectively assur[e] that race will always be relevant in American life, and that

the 'ultimate goal' of 'eliminating entirely from ... decisionmaking such irrelevant factors as a human being's race' will never be achieved." *Id.*

208.    A university engages in racial balancing if it uses quotas, set-asides, or any other measure that "insulat[es]" a category of applicants "from competition with all other applicants." *Grutter*, 539 U.S. at 334. Indeed, Justice Powell endorsed the Harvard Plan in *Bakke* only after Harvard promised that it did "not set target-quotas for the number of [any group] to be admitted in a given year." 438 U.S. at 323. A university also engages in racial balancing if it tries "to achieve a racial/ethnic 'mix' that it consider[s] desirable." *Wessmann*, 160 F.3d at 798; *accord Grutter*, 539 U.S. at 329 (explaining that a school engages in racial balancing if it seeks "to assure within its student body some specified percentage of a particular [racial] group").

209.    Racial balancing does not require the use of "hard and fast quotas." *Eisenberg ex rel. Eisenberg v. Montgomery Cty. Pub. Sch.*, 197 F.3d 123, 131 (4th Cir. 1999). A university can engage in racial balancing even if it tolerates fluctuations in each racial group. *E.g.*, *Parents Involved*, 551 U.S. at 712, 729 (racial balancing where deviations of "10 percentage points" were tolerated); *Cavalier ex rel. Cavalier v. Caddo Par. Sch. Bd.*, 403 F.3d 246, 248, 269 (5th Cir. 2005) (racial balancing where the school tolerated deviations of "plus or minus 15 percentage points"); *Tuttle v. Arlington Cty. Sch. Bd.*, 195 F.3d 698, 707 (4th Cir. 1999) (racial balancing via lottery). What matters is that the university has the "goal of keeping certain percentages of racial/ethnic groups within each [class]." *Eisenberg*, 197 F.3d at 131.

210.    While a university can pay "'some attention to numbers'" under *Grutter*, 539 U.S. at 336, "[r]acial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" *Fisher I*, 570 U.S. at 311. Thus, it is a "fatal flaw" if the University "work[s] backward to achieve a particular type of racial balance, rather than working forward from some demonstration of the level of diversity that provides the purported benefits." *Parents Involved*, 551 U.S. at 729.

211. The burden is on Harvard to prove that it is not engaged in racial balancing. *See Fisher I*, 570 U.S. at 311; *supra* ¶¶ 161-162. Harvard cannot meet that burden.

212. Harvard's focus on achieving a preordained racial balance begins when it establishes recruitment criteria that differ by race. This allows Harvard to "consciously shape the makeup of [its] student body." *Supra* ¶ 15. This process continues through the creation of admission "targets" that are assembled based, in part, on the projected racial makeup of the admitted class. That projection is based on the prior year's demographic breakdown. Because different races "yield" at different rates, Harvard will not have enough beds for the admitted class if its projections are off. *Supra* ¶ 134. In other words, Harvard cannot deviate from these projections.

213. Harvard uses "one pagers" to fulfill its goal of racially balancing the class. *Supra* ¶¶ 135-139. Throughout the admissions cycle, Fitzsimmons and McGrath check the racial numbers and, at key junctures, share that information with the rest of the Admissions Office. *Id.* And, if certain racial groups are "surprisingly or notably underrepresented," the full committee will "go back and look at those cases." The goal is "to make sure that we're not having a dramatic drop-off in some group who we did at a certain level with last year." *Supra* ¶ 137. Fitzsimmons and McGrath use the "lopping" process to ensure that the admitted class has the desired racial balance, consulting one-pagers and "ethnic stats" from beginning to end. *Supra* ¶¶ 135-139.

214. The admissions data confirm that Harvard is racial balancing. *Supra* ¶ 140. SFFA is not required to show that Harvard has pursued racial balance with mathematical precision. Harvard's objective is to keep each racial group with a certain range year over year, and it does just that. Harvard's admissions system "is administered with an end toward maintaining [a] percentage of racial balance in each [class]. This is, by definition, racial balancing." *Eisenberg*, 197 F.3d at 131.

**III.   Harvard's Use of Race Violates *Grutter*.**

**A.   Harvard Is Not Pursuing the "Diversity" Interest That *Grutter* Endorsed.**

215.   *Grutter* held that universities may use race in admissions to unlock the "educational benefits that flow from student body diversity." 539 U.S. at 330. The burden is on Harvard to prove that it is actually pursuing that interest. *Fisher I*, 570 U.S. at 311-12; *supra* ¶¶ 161-162. Harvard cannot meet that burden.

216.   The interest the Supreme Court endorsed as compelling is one in which the university gives "serious consideration to *all* the ways an applicant might contribute to a diverse educational environment." *Grutter*, 539 U.S. at 337 (emphasis added); *e.g.*, *Smith v. Univ. of Wash.*, 392 F.3d 367, 376 (9th Cir. 2004) ("These applicants were measured against each other, taking into account all the ways that an applicant might contribute to a diverse educational environment, including that applicant's racial or ethnic minority status."). But Harvard does not pursue religious diversity, socioeconomic diversity, or geographic diversity in the same way that it pursues racial diversity. *Supra* ¶¶ 142-144. Harvard thus has not proven that it actually pursues student-body diversity as *Grutter* defines, rather than using race as a factor "for its own sake." *Bakke*, 438 U.S. at 307 (Powell, J.).

**B.   Harvard Uses Race As More Than a "Plus" Factor.**

217.   Harvard must prove that its admissions process "consider[s] race or ethnicity only as a "'plus' in a particular applicant's file.'" *Grutter*, 539 U.S. at 334; *Fisher II*, 136 S. Ct. at 2207 ("'factor of a factor of a factor'"). An admissions process must "remain flexible enough to ensure that each applicant is evaluated as an individual" and cannot "make[] an applicant's race or ethnicity the defining feature of his or her application." *Grutter*, 539 U.S. at 337. The burden is on Harvard to prove that it uses race in this way. *Fisher I*, 570 U.S. at 311-12; *supra* ¶¶ 161-162. Harvard cannot meet that burden.

218.   Michigan could not carry this burden in *Gratz*. Michigan would score its applicants on a 150-point scale, where a score above 100 was enough to get in. *See* 539 U.S. at 255. Applicants could

earn 20 points for being a recruited athlete, 10 points for being a Michigan resident, 4 points for being a legacy, up to 110 points for academics, up to 3 points for the personal essay, and up to 5 points for extracurriculars. *Id.* at 277-78 (O'Connor, J., concurring). Being an underrepresented racial minority was worth 20 points. *Id.* at 255 (majority opinion). Michigan failed strict scrutiny not only because it "automatically distribute[d] 20 points to every single applicant from an 'underrepresented minority' group,'" but also because its "use of race [was] decisive in practice." *Id.* at 271-72 & n.19. The 20 points that Michigan awarded for race represented "one-fifth of the points needed to guarantee admission" and far outweighed other factors that contribute to diversity. *Id.* at 270-73. "[T]he effect of automatically awarding 20 points" was that "virtually every qualified underrepresented minority applicant is admitted." *Id.* at 273.

219.    Georgia had its admissions process declared unconstitutional for similar reasons in *Johnson v. Board of Regents of University of Georgia.* After automatically accepting and rejecting most students based on academics alone, Georgia would assign the remaining students a score out of 8.15. *See* 263 F.3d 1234, 1240-41 (11th Cir. 2001). That score would be based on twelve factors: three academic factors (worth up to 5.4 points); five other factors including extracurriculars, legacy status, and parental education (worth up to 1.5 points); and three demographic factors (worth up to 1.25 points). *Id.* at 1241. For nonwhites, race was worth 0.5 points—10% of the points needed for admission and the same value as being a Georgia resident or a first-generation college student. *Id.* The Eleventh Circuit held that Georgia's admissions process failed strict scrutiny. One reason it failed was that the 0.5 points awarded for race was "disproportionate[ly]" high compared to other "diversity-related factors." *Id.* "Among the non-academic factors that correspond to diversity, *no* single factor is worth more, and the 0.5 point racial bonus accounts for almost 20% of the *maximum* points available on those factors." *Id.* at 1257.

220.     Race plays an equally outsized (if not greater) role at Harvard compared to Michigan and Georgia. The parties describe the size of the racial preference differently. But those descriptions all show that race is a "predominant factor," *Grutter*, 539 U.S. at 320, in the decision to admit African-American and Hispanic applicants. The racial preference that Harvard grants to African Americans and Hispanics is massive. *Supra* ¶¶ 145-149. And since the preference can be as valuable in securing admission as receiving a coveted "1" on the academic, extracurricular, or personal rating, *supra* ¶ 149, Harvard had no choice but to admit that "the number of African-American and Hispanic students on campus would decline dramatically" without them, *supra* ¶ 147. In short, a racial preference that is given equivalent weight to having "summa potential," being a "genuine scholar," and having "near-perfect scores and grades . . . combined with unusual creativity and possible evidence of original scholarship," *supra* ¶ 5, is far more than a "plus" factor.

### C.     Harvard's Use of Race Has No Logical End Point.

221.     Strict scrutiny also requires Harvard to prove that its use of race has a "logical end point." *Grutter*, 539 U.S. at 342. "[A]sserting an interest in the educational benefits of diversity writ large is insufficient. A university's goals cannot be elusory or amorphous—they must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." *Fisher II*, 136 S. Ct. at 2211. While a university's goals should not "be reduced to pure numbers," *id.* at 2210, the university must at least show that it has a definition of "meaningful representation" that is sufficiently measurable to permit judicial review, *Grutter*, 539 U.S. at 318; *accord Wessmann*, 160 F.3d at 800 (explaining that a university must submit "solid and compelling evidence" on "whether a particular percentage . . . is sufficient or insufficient for individual students to avoid isolation and express ideas").

222.     Relatedly, Harvard cannot justify its use of race on grounds that would "[e]nshrin[e] a permanent justification for racial preferences." *Grutter*, 539 U.S. at 342.; *accord Croson*, 488 U.S. at 498 (rejecting any rationale that "'has no logical stopping point'" or that "could be used to 'justify' race-

based decisionmaking essentially limitless in scope and duration"). After all, "it defies common sense that an affirmative action plan adopted for . . . the permissible purpose of increasing diversity . . . could be permitted to exist without end. If the goal of the plan is to enrich the educational experience of students . . . , this goal will be achieved at some point." *United States v. Bd. of Educ. of Twp. of Piscataway*, 832 F. Supp. 836, 850 (D.N.J. 1993). Thus, a university must specifically define what it means to attain "meaningful representation"; assess whether it has attained that goal already; if not, identify the point at which it will be achieved; and communicate all of this to its admissions officers. *Id.*; *Detroit Police Officers Ass'n v. Young*, 989 F.2d 225, 228 (6th Cir. 1993); *Lehman v. Yellow Freight Sys., Inc.*, 651 F.2d 520, 527 (7th Cir. 1981).

223.    The burden is on Harvard to make this showing. *Fisher I*, 570 U.S. at 311-12; *supra* ¶¶ 161-162. It has not come close to doing so. Harvard has no conception of what level of racial diversity will achieve its interest. Despite repeated questioning from the Court, Harvard was unable to articulate any measure of racial diversity that would permit meaningful judicial review; the explanations were, frankly, incomprehensible. *Supra* ¶ 150. Harvard is thus operating "without any idea of a goal for which [its use of race] should reach nor with any idea of when such a level was reached." *Lehman*, 651 F.2d at 527. That is no accident or oversight. Harvard honestly believes that race should always be a factor in admissions. *Supra* ¶ 152. But the Supreme Court disagrees. *Grutter*, 539 U.S. at 343. A system of racial preferences designed to operate permanently—*i.e.*, one in which there is no level of African American and Hispanic enrollment that could make Harvard racially diverse enough to render the use of race unnecessary—cannot be narrowly tailored.

### D.    Harvard's Use of Race Is Not Limited In Time.

224.    Finally, Harvard's use of race is not narrowly tailored because it is not "limited in time." *Grutter*, 539 U.S. at 342; *see Detroit Police Officers Ass'n*, 989 F.2d at 228 ("Limiting the duration of a race-conscious remedy … is a keystone of a narrowly tailored plan"). The Equal Protection Clause

(and thus Title VI) imposes a "durational requirement" on the use of race in admissions because one of the "'core purpose[s] of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race.'" *Grutter*, 539 U.S. at 341-42. "The requirement that all race-conscious admissions programs have a termination point 'assure[s] all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself.'" *Id.* at 342.

225.    A university can satisfy this durational requirement with "sunset provisions in race-conscious admissions policies *and* periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity." *Id.* (emphasis added). But Harvard does not do this. While it recently promised to review its race-based admissions process every five years, Harvard has not adopted any "sunset provisions" to enforce that promise. *Supra* ¶ 152; *Ravitch v. NYC*, No. 90 Civ. 5752 (MJL), 1992 WL 196735, at *7 (S.D.N.Y. Aug. 3, 1992) (invalidating a race-conscious policy because it made "no provision whatsoever for its termination"); *Aiken v. City of Memphis*, 37 F.3d 1155, 1164 (6th Cir. 1994) (en banc) (similar). Nor is Harvard's promise of periodic review very reassuring, since it was not made until *after* SFFA filed this lawsuit. That Harvard was not reviewing the necessity of using race for decades, and that it agreed to do so only after being sued, strongly suggests that its periodic "review" will always yield the same answer: keep using race. *Aiken*, 37 F.3d at 1164.

## IV.    Harvard Failed To Consider or Implement Race-Neutral Alternatives.

226.    Race-based admissions are not narrowly tailored unless "it is 'necessary' for the university to use race to achieve the educational benefits of diversity." *Fisher I*, 570 U.S. at 312. Race is not necessary if "a university could achieve sufficient diversity without using racial classifications." *Id.*

227.    First, the university must *consider* race-neutral alternatives, *Grutter*, 539 U.S. at 339, "*before* turning to racial classifications," *Fisher I*, 570 U.S. at 312 (emphasis added); *accord Fisher II*, 136

S. Ct. at 2211 ("[A] university bears a heavy burden in showing that it had not obtained the educational benefits of diversity *before* it turned to a race-conscious plan" (emphasis added)); *Parents Involved*, 551 U.S. at 735 ("[R]acial classifications [are] permitted only 'as a *last* resort'" (emphasis added)). And, that consideration must be "serious" and in "good faith." *Grutter*, 539 U.S. at 339.

228.     Second, the university must prove that "no workable race-neutral alternatives would produce the educational benefits of diversity." *Fisher I*, 570 U.S. at 312. A race-neutral alternative does not need to be perfect; it only needs to achieve benefits of diversity "about as well and at tolerable administrative expense." *Id.*

229.     Harvard has the burden of proving that it gave serious, good-faith consideration to race-neutral alternatives and that those alternatives would not work about as well and at tolerable administrative expense; Harvard gets "no deference" on either question. *Fisher I*, 570 U.S. at 312; *supra* ¶¶ 161-162. Harvard fails both requirements.

230.     Harvard has not considered race-neutral alternatives in good faith. Harvard has known for *decades* that it was obligated to consider racial-neutral alternatives. Yet Harvard never even considered them until this litigation was threatened. *Supra* ¶ 153. Harvard is subject to the same legal obligations as every other university, and it has no excuse for its blatant refusal to follow the Supreme Court's instructions. Harvard eventually formed a committee, quickly abandoned it, and then formed a new committee at the close of discovery that, almost comically, was comprised of only three people and whose work was almost entirely outsourced to counsel. *Supra* ¶¶ 154-155. Putting this in the hands of Fitzsimmons, Khurana, and Smith ensured that Harvard would never identity workable alternatives to racial preferences. *Supra* ¶ 155. This was not serious consideration of race-neutral alternatives. *Aiken*, 37 F.3d at 1164; *Santiago-Ramos.*, 217 F.3d at 56.

231.     In fact, Harvard does have workable alternatives to racial preferences that can achieve the educational benefits of diversity. Harvard can maintain racial diversity—and increase diversity

more broadly—by increasing socioeconomic preferences and eliminating preferences for legacies, donors, and relatives of faculty and staff. Adopting this alternative would make Harvard even more racially diverse, more socioeconomically diverse, and bring more African Americans and Hispanics from disadvantaged communities onto Harvard's campus. And it can be implemented at a tolerable expense. *Supra* ¶¶ 157-158.

232.    The notion that this approach places too much emphasis on socioeconomic status is untenable; the preference would be half the size of the one that recruited athletes receive. *Supra* ¶ 158. Nor would it undermine academic excellence. *Supra* ¶¶ 157-158. And, any claim that this approach is unworkable because the admission of African Americans might decrease slightly misses the mark. Harvard does not have a compelling interest in preserving a precise number of spots for any racial group—that would be a quota. *Supra* ¶ 208. The issue is whether the alternative works "about as well" as racial preferences at achieving racial diversity. It clearly does.

233.    Harvard's refusal to employ this workable alternative confirms that its moral compass is broken. It would increase socioeconomic diversity—the number of first-generation college students admitted would more than triple, and the number of disadvantaged students would more than double. It would make Harvard more racially diverse; indeed, the number of Hispanic applicants admitted to Harvard would increase. And, it would open the door of opportunity to disadvantaged minorities who Harvard's current system shuts out in favor of wealthier minorities from elite schools. Harvard would truly become the broadly diverse community that it professes to be. Harvard is uninterested in any of that, however, because it would mean that Harvard would no longer be in the business of classifying people on the basis of their race. As the record establishes, Harvard cannot begin to imagine what that world might look like.

Dated: December 19, 2018

Respectfully submitted,

/s/ *William S. Consovoy*

Adam K. Mortara  
Scott J. McBride  
Krista J. Perry  
BARTLIT BECK LLP  
54 West Hubbard Street, Suite 300  
Chicago, IL 60654  
312.494.4400  
adam.mortara@bartlitbeck.com  
scott.mcbride@bartlitbeck.com  
krista.perry@bartlitbeck.com  

John M. Hughes  
Katherine L.I. Hacker  
Meg E. Fasulo  
BARTLIT BECK LLP  
1801 Wewatta Street, Suite 1200  
Denver, CO 80202  
303.592.3100  
john.hughes@bartlitbeck.com  
kat.hacker@bartlitbeck.com  
meg.fasulo@bartlitbeck.com  

Paul M. Sanford BBO #566318  
BURNS & LEVINSON LLP  
One Citizens Plaza, Suite 1100  
Providence, RI 02903  
617.345.3000  
psanford@burnslev.com  

William S. Consovoy  
Thomas R. McCarthy  
J. Michael Connolly  
Cameron T. Norris  
CONSOVOY MCCARTHY PARK PLLC  
3033 Wilson Boulevard, Suite 700  
Arlington, Virginia 22201  
703.243.9423  
will@consovoymccarthy.com  
tom@consovoymccarthy.com  
mike@consovoymccarthy.com  
cam@consovoymccarthy.com  

Patrick Strawbridge BBO #678274  
CONSOVOY MCCARTHY PARK PLLC  
Ten Post Office Square  
8th Floor South PMB #706  
Boston, MA 02109  
617.227.0548  
patrick@consovoymccarthy.com  

Michael H. Park  
CONSOVOY MCCARTHY PARK PLLC  
745 Fifth Avenue, Suite 500  
New York, NY 10151  
212.247.8006  
park@consovoymccarthy.com

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be electronically sent to all counsel of record via the CM/ECF system.

*s/ William S. Consovoy*
William S. Consovoy