**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **STUDENTS FOR FAIR ADMISSIONS, INC,** | ) ) ) | Case No. 1:14-cv-14176-ADB |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| **THE PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION),** | ) ) ) ) | |
| Defendant. | ) ) ) | |

*AMICI CURIAE* **BRIEF OF THE ASIAN AMERICAN COALITION FOR EDUCATION AND THE ASIAN AMERICAN LEGAL FOUNDATION, IN SUPPORT OF PLAINTIFF STUDENTS FOR FAIR ADMISSIONS, INC.**

**January 8, 2019**

TABLE OF CONTENTS

I.      The Interest of Amici Curiae ................................................................1

II.     Summary of Argument ........................................................................2

III.    THE EVIDENCE PRESENTED AT TRIAL DEMONSTRATES THAT HARVARD
        HAS A DE FACTO QUOTA FOR ASIAN AMERICANS, AND MAINTAINS THE
        QUOTA BY ASSIGNING LOWER PERSONAL SCORES TO ASIAN-AMERICAN
        APPLICANTS .....................................................................................4

        A.      As The Number Of Qualified Asian-American Applicants Has Risen Over The
                Years, Harvard Reduces The Asian Admission Rate By Assigning Asian-
                American Applicants Lower Personal Scores.............................................4

        B.      The Low Personal Ratings Given Asian American Applicants Are Baseless And
                Insulting, And Are Contradicted By Evidence Including Harvard's Own Alumni
                Interviewer Assessments ................................................................6

        C.      Asian-American Applicants Are The Most Discriminated-Against Racial Group,
                Even When Compared To White Applicants .............................................7

IV.     THE INJURY CAUSED BY HARVARD'S DISCRIMINATION AGAINST
        ASIAN-AMERICAN STUDENTS ........................................................8

        A.      The Burden Of Harvard's "Handicapping" of Asian Americans Falls Heaviest on
                Those Individuals Least Able to Bear It ................................................8

        B.      Imposing Higher Admissions Standards On Asian-American Children Leads To
                Unbearable Study Loads, Stress And Depression. and Other Psychological Harm 9

        C.      The Terrible Effect on the Dignity and Self Worth of Asian Americans Who
                Know They And Their Children Will Be Subjected To Unequal Treatment
                Because of Their Race ...................................................................10

V.      HARVARD IS USING THE SAME ODIOUS EXCUSES HISTORICALLY USED TO
        JUSTIFY DISCRIMINATION AGAINST ASIAN AMERICANS ................13

        A.      Persecution of Asian Americans Was the Norm Throughout Most of American
                History.........................................................................................13

        B.      The History of Discrimination Against Asian Americans in Education................14

        C.      The Chinese Exclusion Act..................................................................15

        D.      Internment of Japanese American Families .............................................16

VI.     THE HO CASE AND OTHER PRESENT-DAY BATTLES AGAINST
        DISCRIMINATION IN CALIFORNIA AND BEYOND ..................................................17

        A.      Discrimination Against Asian-American Children In The San Francisco Public
                School System.........................................................................................................17

        B.      Asian Americans as the "New Jews" in Higher Education. ..................................18

        C.      The Ongoing Battle Against Discrimination in Education ....................................20


VII.    HARVARD'S COVERT PROGRAM OF DISCRIMINATION HAS NO PLACE IN
        AMERICA AND SHOULD BE BROUGHT TO AN END ............................................21

        A.      Harvard Used Race First, Before Considering Race-Neutral Alternatives............21

        B.      Harvard Should Use Non-Discriminatory Methods To Advance Any Legitimate
                Societal Goals .......................................................................................................22

VIII.   CONCLUSION..................................................................................................................23

## TABLE OF AUTHORITIES

### CASES

Page

**Federal**

*Brown v. Board of Education*, 347 U.S. 483 (1954)....................................................*Passim*

*Fisher v. Univ. of Tex. at Austin,* 133 S. Ct. 2411 (2013)..................................................21

*Gong Lum v. Rice*,
   275 U.S. 78 (1927)........................................................................................................15

*Hirabayashi v. United States*,
   320 U.S. 81 (1943)........................................................................................................16

*Hirabayashi v. United States*,
   828 F. 2d 591 (9th Cir. 1987) ......................................................................................16

*Ho Ah Kow v. Nunan*,
   12 F. Cal. 252 (C.C.D. Cal. 1879) ...............................................................................14

*Ho v. San Francisco Unified Sch. Dist.*,
   147 F. 3d 854 (1998)........................................................................................*Passim*

*Ho v. San Francisco Unified Sch. Dist.,* 965 F. Supp. 1316 (1997) ..................................17

*In re Ah Chong*,
   2 F. 733 (C.C.D. Cal. 1880)..........................................................................................14

*In re Lee Sing*,
   43 F. 359 (C.C.D. Cal. 1890)........................................................................................14

*In re Tiburcio Parrott*,
   1 F. 481 (C.C.D. Cal. 1880)..........................................................................................14

*Korematsu v. United States*,
   584 F. Supp. 1406 (N.D. Cal. 1984) ............................................................................16

*Lee v. Johnson*,
   404 U.S. 1215 (1971).....................................................................................................15

*Parents Inv. In Comm. Sch. v. Seattle School No. 1*,
   551 U.S. 701, 127 S. Ct. 2738 (2007).................................................................. 4, 22

*Plessy v. Ferguson*,
    163 U.S. 537 (1896) ................................................................................ 15

*Rice v. Cayetano*,
    528 U.S. 495 (2000) ................................................................................ 22

*Richmond v. Croson*,
    488 U.S. 469 (1989) ................................................................................ 11

*San Francisco NAACP v. San Francisco Unified Sch. Dist.*,
    576 F. Supp. 34 (N.D. Cal. 1983) ............................................................. 17

*Shelley v. Kraemer,* 334 U.S. 1 (1948) ........................................................... 8

*United States v. Wong Kim Ark*,
    169 U.S. 649 (1898) ................................................................................ 14

*Wong Him v. Callahan*,
    119 F. 381 (C.C.N.D. Cal. 1902) ............................................................. 15

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ................................................................................ 14

**State**

*People v. Hall*,
    4 Cal. 399 (1854) .................................................................................... 6

*Tape v. Hurley*,
    66 Cal. 473, 6 P. 12 (1885) ..................................................................... 15

### CONSTITUTION, STATUTES, AND LEGISLATIVE MATERIALS

Cal. Const. Art. I § 31(a) ............................................................................... 20

United States Constitution, 14th Amendment ......................................... *Passim*

### TRIAL RECORD AND DOCKET

Docket in Case No. 1:14-cv-14176-ADB .................................................. *Passim*

Expert Report of Peter S. Arcidiacono ..................................................... *Passim*

Export Report of David Card ......................................................................................... 5-6

Office of Institutional Research [Harvard], May 30 2013 Report ............................ *Passim*

Plaintiff's Proposed Findings of Fact and Conclusions of Law ("PPF") ................... *Passim*

## MISCELLANEOUS

A Chinaman's Chance, The Free Dictionary, *available at*
https://idioms.thefreedictionary.com/ Chinaman%27s+chance ................................... 13

A Conversation on the Nature, Effects, and Future of Affirmative Action in
Higher Education Admissions, 17 U. Pa. J. Const. L. 683 (2015), *available at*
https://scholarship.law.upenn.edu/jcl/vol17/iss3/2 ...................................................... 6

Admission Considerations in Higher Education Among Asian Americans, Yii-
Chen (Jenny) Wu, American Psychological Association, *available at*
http://www.apa.org/pi/oema/resources/ethnicity-health/asian-american/article-
admission.aspx ......................................................................................................... 9-10

Affirmative Action and the Harvard College Diversity-Discretion Model:
Paradigm or Pretext, Alan M. Dershowitz and Laura Hanft, 1 Cardozo L. Rev.
379 (1979) ................................................................................................................... 18

Among Black Students, Many Immigrants, Cara Anna, found at
http://www.washingtonpost.com/wp-dyn/content/article/2007/
04/30/AR2007043000106.html ................................................................................. 22

Asian Americans: The "Reticent" Minority and Their Paradoxes, Pat K. Chew, 36
Wm. & Mary L. Rev. 1 (Oct. 1994) ........................................................................... 19

California Affirmative Action Revival Bill Is Dead, Kate Murphy (San Jose
Mercury News, March 18, 2014), *available at*
http://www.mercurynews.com/education/ci_25361339/california-affirmative-
action-challenge-is-dead? .......................................................................................... 20

California Senate Constitutional Amendment No. 5, *available at*
https://en.wikipedia.org/ wiki/Senate _Constitutional_ Amendment_No.5 ............... 20

Chinese Immigration and the Chinese Exclusion Acts, *available at*
https://history.state.gov/milestones/1866-1898/chinese-immigration ........................ 16

Diversity Dilemma, Nathan Glazer, The New Republic (June 22, 1998) ....................... 18

Group Preferences and the Law, U.S. House of Representatives Sub-Committee
on the Constitution Hearings, Lee Cheng (June 1, 1995), *available at*
http://www.archive.org/stream/grouppreferences00unit/
grouppreferences00unit_djvu.txt ................................................................................11

Group Rights, American Jews, and the Failure of Group Libel Laws, Evan P.
Schultz, 66 Brook L. Rev. 71 (Spring 2000) ............................................................18

Handicap (Horse Racing), Wikipedia, *available at*
https://en.wikipedia.org/wiki/Handicap_(horse _racing) ..............................................8

Harvard's Economic Diversity Problem, Marina N. Bolotnikova, found at
https://harvardmagazine.com/ 2017/01/low-income-students-harvard........................23

In Search of Equality, Charles McClain (Univ. of Cal. Press 1994) ..........................13, 15

Levine, David I., The Chinese American Challenge to Court-Mandated Quotas in
San Francisco's Public Schools: Notes from a (Partisan) Participant-Observer,
16 Harv. BlackLetter J. 39 (Spring 2000)...................................................................18

'Lopping,' 'Tips' and the 'Z-List': Bias Lawsuit Explores Harvard's Admissions
Secrets, The New York Times, July 29, 2018, Anemona Hartocollis, Amy
Harmon and Mitch Smith, found at https://www.nytimes.com/
2018/07/29/us/harvard-admissions-asian-americans.html...........................................4

Negative Action Against Asian Americans: The Internal Instability Of Dworkin's
Defense of Affirmative Action, Jerry Kang, 31 Harv. C.R.-C.L.L. Rev. 1
(Winter 1996) ...........................................................................................................18

No Longer Separate, Not Yet Equal: Race and Class in Elite College Admission
and Campus Life (Princeton University Press, 2009) ................................................19

President Embraces Minority Programs, Leo Rennert, Sacramento Bee (Metro
Final, April 7, 1995) ..................................................................................................19

Pressure to Build the Class: 2016 Survey of Admission Directors, Inside Higher
Education, Scott Jaschik (Sept. 22, 2016), *available at*
https://www.insidehighered. com/news/survey/pressure-build-class-2016-
survey-admissions-directors ......................................................................................20

Race-Neutral Alternatives in Postsecondary Education: Innovative Approaches to
Diversity, U.S. Department of Education Office for Civil Rights (March
2003), *available at* https://www2.ed.gov/ about/offices/list/ocr/edlite-
raceneutralreport.html ...............................................................................................22

Racial Quotas Didn't Work in SF Schools, Lawrence Sisking, op-ed San
    Francisco Examiner (July 6, 1994), *available at*
    http://heather.cs.ucdavis.edu/pub/ AffirmativeAction/Siskind.html ..........................18

S.F. School Race-Bias Case Trial Starts Soon, San Francisco Examiner (Feb. 14,
    1999) ..................................................................................................................11

The Anti-Chinese Movement in California, Elmer Clarence Sandmeyer (Univ. of
    Ill. Press 1991) ...................................................................................................13

The Founding Fathers Made Our Schools Public. We Should Keep Them That
    Way, The Washington Post (Aug. 20, 2017) *available at*
    https://www.washingtonpost.com/news/ made-by-
    history/wp/2017/08/20/early-america-had-school-choice-the-founders-
    rejected-it/?utm_term=.815adf5587ba........................................................................14

The Myth of American Meritocracy: How Corrupt are Ivy League Admissions?,
    Ron Unz (The American Conservative, Dec. 2012), *available at*
    http://www.theamericanconservative .com/articles/the-myth-of-american-
    meritocracy/ ................................................................................................*Passim*

The New Jews of Harvard Admissions, Jason P. Riley (Wall Street Journal, May
    19, 2015) ..............................................................................................................19

The Price of Admission: How America's Ruling Class Buys Its Way into Elite
    Colleges – and Who Gets Left Outside, Chapter 7: The New Jews, Daniel
    Golden, (Three Rivers Press, 2007) ...........................................................................19

The Unimpressible Race, Victor Low, (East/West Publishing Co. 1982)........................13

'This American Life' Reveals More Than You Might Expect About How Harvard
    Discriminates Against Chinese-American Applicants, Althouse, Dec. 18,
    2018, found at https://althouse.blogspot.com/2018/12 /this-american-life-
    reveals-more-than.html ..........................................................................................12

Tips From the Princeton Review: Act Less Asian, Add Pics if You're Black,
    Akane Otani, Bloomberg (Nov. 21, 2014), *available at*
    https://www.bloomberg. com/news/articles/2014-11-21/princeton-review-
    tells-asians-to-act-less-asian-and-black-students-to-attach-photos.............................12

To Get Into Elite Colleges, Some Advised To 'Appear Less Asian,' Bella
    English, The Boston Globe (June 1, 2015), *available at*
    https://www.bostonglobe.com/lifestyle/2015/06/01/ college-counselors-
    advise-some-asian-students-appear-less-asian/Ew7g4JiQMiqYNQ
    lIwqEIuO/story.html ..............................................................................................19

Too Many Asians: Challenge of Fighting Discrimination Against Asian-
    Americans and Preserving Affirmative Action, Selana Dong, 47 Stan. L. Rev.
    1027 (May 1995) ..........................................................................................................12

Why Are Asian Americans Kids Killing Themselves?, George Oiao, Plan A
    Magazine (Oct. 3, 2017), *available at*
    *https://planamag.com/why-are-asian-american-kids-killing-themselves-*
    *477a3f6ea3f2*.................................................................................................................9

I.        **THE INTEREST OF AMICI CURIAE.**

The outcome of this litigation is of critical importance to *amici curiae* and their constituents, who are Americans of Asian ethnic origin. Members and constituents of *amici curiae* went through admissions processes at institutions where their Asian ethnicity was considered less desirable because it was regarded as less "diverse," and many of them have children who may one day aspire to attend Harvard College or a school using similarly discriminatory admissions practices.  Asian Americans have followed this case throughout and have a special interest in its outcome.  They have historically faced discrimination in education in this country.  While the discrimination practiced by Harvard, one of America's most prestigious institutions, may be better hidden and more sophisticated, it is particularly pernicious because Harvard's reputation has encouraged countless other educational institutions to copy it as the gold standard for achieving skin-deep diversity.  Unfortunately, scrutiny reveals that underneath the thin layer of gilt lies nothing but gross and illegal racism.

The Asian American Coalition for Education ("AACE") is an apolitical, non-profit, national organization devoted to promoting equal rights for Asian Americans in education and education-related activities.  The leaders of AACE and its supporting organizations are Asian-American community leaders, business leaders and, most importantly, parents. They are not professional "civil rights advocates" and do not get funding from large corporations or multibillion dollar foundations, but were forced to become civil rights advocates to stop and prevent the discrimination against their children that the "professionals" ignore, downplay and facilitate.

In May 2015, the founders of AACE united more than 60 Asian-American organizations to file a complaint with the Department of Justice and the Department of Education regarding Harvard University's discriminatory practices against Asian-American applicants.  It was one of the largest joint actions ever taken by Asian-American organizations in pursuit of equal education rights.

In this *amici* filing, AACE represents the 269 affiliated Asian-American organizations listed in Exhibit A hereto and incorporated herein by reference.

The Asian American Legal Foundation ("AALF"), a non-profit organization based in San Francisco, was founded to protect and promote the civil rights of Asian Americans. Its focus is on a particular niche where, as here, Asian Americans are discriminated against for a purportedly benign purpose and where many famous and high profile groups and individuals deny that discrimination even exists. Members of AALF were instrumental in the struggle to end discrimination against Chinese American students in the San Francisco, California public school system that was also imposed for supposedly benign reasons. *See Ho v. San Francisco Unified Sch. Dist.,* 147 F.3d 854 (1998).

AALF and its members have been active in many cases and campaigns where the rights of Asian Americans were at issue, particularly in education. More information on AALF and its mission can be found on its website at http://www.asianamericanlegal.com.

The members and constituents of AALF and AACE are deeply concerned about the outcome of this case. They believe that it is vital that the Court understand their concerns and why it is so important to them that the Court uphold the right of Asian Americans to be treated as individuals and full Americans by Harvard College in the admissions process, rather than being judged by a separate standard.

## II.    SUMMARY OF ARGUMENT.

*Amici Curiae*, Asian American Coalition for Education ("AACE") and Asian American Legal Foundation ("AALF"), acknowledge that Harvard is considered one of the world's foremost institutions of higher education. However, *Amici* are outraged by Harvard's discrimination against Asian-American applicants in the college admissions process, which is contrary to the Constitution's mandate that all individuals enjoy equal protection of the laws.

The evidence presented at trial confirms that Harvard treats Asian-American applicants differently than candidates from other ethnic groups. Asian-American candidates are held to a higher and different bar based on their race in order to maintain illegal racial quotas.[1] Perversely,

---

[1] The percentage of Asian Americans applications admitted into each Harvard class has remained remarkably constant during a multi-decade period of time where the total number of Asian American applicants has grown dramatically. PFF ¶140; Ron Unz, *The Myth of American Meritocracy: How Corrupt are Ivy League Admissions?,* pgs. 17-22 (The American

Harvard even discriminates against Asian-American individuals who are in categories such as being from a disadvantaged socioeconomic background or living in an underrepresented ("sparse country") geographical area, which would qualify an applicant of any other race for preferential treatment in the admissions process.

Particularly troubling to *Amici* and their constituents is that the primary method Harvard uses to accomplish its racial balancing is to have its admissions officers, who have never even met the candidates, systematically assign Asian-American applicants significantly lowered "Personal" ratings in a secretive, "black box" process. This is done to counter their otherwise above-average academic and extracurricular achievements during a multi-decade period in which the number of highly-qualified Asian-American applicants has risen dramatically. While this may be a convenient method of controlling the number of Asian Americans admitted, it falsely and impermissibly labels all Asian Americans as somehow deficient in personal attributes, and echoes the negative stereotypes that were once used to justify persecution of members of this historically disadvantaged group.  It is a mirror image of what Harvard did in the more recent past to Jewish Americans, in order to maintain a very similar quota for that ethnic group.

Asian Americans have faced persecution and discrimination as long as Asians have been in America. Negative stereotypes were used to legitimize discrimination, such as calling Asians Americans faceless members of a "yellow horde" lacking the values and human attributes of other Americans.   Case after case in America's history bears witness to the long and often futile struggle of Asian Americans to obtain fair treatment.  It is disheartening to see Asian Americans once again subjected to negative stereotypes and inequality based on race--this time by one of America's most respected educational institutions.

Harvard's discrimination in education against Asian-American applicants is causing real and tangible harm. It causes Asian Americans to feel that they are not valued as much as other citizens.  It causes many young Asian Americans to feel a sense of inferiority, hopelessness and

---

Conservative, Dec. 2012), *at* http://www.theamericanconservative .com/articles/the-myth-of-american-meritocracy/ (last checked 7/27/2018). Significantly, each time Harvard has been subject to a complaint or investigation, the percentage of Asian American admitted has increased the following year.

anger. Asian-American students feel they have to work harder just to achieve the same outcomes as non-Asian students, leading to anxiety, depression and even increased rates of suicide.

Harvard's racial stereotyping and discrimination has no place in America today.  The Court should find Harvard's use of race unlawful and should order its immediate end.

## ARGUMENT

**III.     THE EVIDENCE PRESENTED AT TRIAL DEMONSTRATES THAT HARVARD HAS A *DE FACTO* QUOTA FOR ASIAN AMERICANS, AND MAINTAINS THE QUOTA BY ASSIGNING LOWER PERSONAL SCORES TO ASIAN-AMERICAN APPLICANTS.**

### A.     As The Number Of Qualified Asian-American Applicants Has Risen Over The Years, Harvard Reduces The Asian Admission Rate By Assigning Asian-American Applicants Lower Personal Scores.

The evidence presented at trial demonstrates that Harvard College has a quota for Asian Americans and maintains the quota by assigning artificially low "Personal" scores to Asian-American applicants.[2]  Incredibly, the low Personal score is assigned by staff who have never even met the candidate, and contradicts the assessment by alumni interviewers who have. Harvard is causing the harm of which the Supreme Court warned through its misguided and illegal efforts to maintain what it considers a "proper" balance of races in its student body. "We have many times over reaffirmed that '[r]acial balance is not to be achieved for its own sake.'" *Parents Inv. In Comm. Sch. v. Seattle School No. 1,* 127 S. Ct. 2738, 2757 (2007) (citing cases).

*Amici Curiae* and their constituents find it particularly disturbing that, in order to achieve the desired outcomes while ostensibly applying the same admissions criteria to everyone, Harvard's admissions staff who have never even seen the candidates devalue Asian-American

---

[2] Evidence reveals that the entire Harvard admissions process is preoccupied with race, and that Harvard maintains its racial quotas by assigning higher Personal scores to applicants from the desired races and then, at the end of the process, by "lopping" applicants of undesired races from the admit pool until it reaches its goals. Expert Report of Peter S. Arcidiacono ("Arcidiacono Rep.") [Dkt 415-1] at 49; Plaintiff's Proposed Findings of Fact and Conclusions of Law ("PPF") [Dkt 620] at ¶¶ 49, 138-140; *see* Anemona Hartocollis, Amy Harmon and Mitch Smith, *'Lopping,' 'Tips' and the 'Z-List': Bias Lawsuit Explores Harvard's Admissions Secrets,* The New York Times, July 29, 2018, found at https://www.nytimes.com/2018/07/29/us/harvard-admissions-asian-americans.html (last visited 1/4/2019).

applicants in the admissions process by assigning them a "Personal" rating--which is allegedly an assessment of character traits and human qualities--that is inexplicably on average significantly lower than the ratings given to applicants of all other ethnic groups. Arcidiacono Rep. [Dkt 415-1] at 49; PPF [Dkt 620] ¶¶ 31, 49-51. This method of counteracting Asian-American applicants' otherwise above-average admissions metrics allows Harvard to depress Asian-American admission and matriculation, but at the cost of reinforcing negative stereotypes about Asian Americans. Also, to put it bluntly, it violates basic Constitutional protections guaranteed to all Americans.

Through the low Personal scores assigned by Cambridge-based admissions officers who never meet the candidates, Harvard raises the bar higher for Asian-American applicants, requiring them to score much higher in other areas during the admissions process to stand any chance of being admitted. Arcidiacono Rep., *supra*, at 61. A 2013 internal investigation by Harvard's own Office of Institutional Research ("OIR") confirms the systematic discrimination against Asian-American applicants; yet, Harvard ignored and shelved the study. PPF 118-121. The effect on admission rates is not subtle. "As for the Personal rating, <u>less than 20% of applicants receive a 1 or a 2, yet they represent 78% of the admitted class.</u>" *Id.* at 29 (emphasis added). Only the top decile of Asian applicants are given a high "1" or "2" Personal rating by Harvard admissions staff, compared to the top *seven* deciles of Hispanic applicants and the top *eight* deciles of African American applicants. Dkt 414 ¶¶ 614-615. "African Americans in the 7th decile have more than double the chances of receiving a 1 or 2 than Asian Americans in the top decile." PFF ¶ 31. *Amici* make no claim that Asian Americans are special, but it defies logic that applicants from their community can be that much less interesting and personable than white, Hispanic and African-American applicants.[3]

At trial, Harvard was unable to present any credible evidence to show a race-neutral reason for the discrepancy in Personal scores. PPF ¶ 57. Instead, it used its expert, Dr. David

---

[3] It is also implausible that, during a multi-decade period in which the percentage of qualified Asian Americans in the applicant pool steadily increased, the personal attributes of Asian-American applicants deteriorated steadily, year-after-year, so as to keep the percentage of Asian Americans in the Harvard student body relatively constant.

Card, in an absurd attempt to show that Asian Americans really are deficient in Personal attributes and are less "multi-dimensional" than other candidates. Expert Report of David Card ("Card Rep.") ¶¶ 73-78. Harvard's attempt to dehumanize Asian Americans is appalling.

### B. The Low Personal Ratings Given Asian-American Applicants Are Baseless And Insulting, And Are Contradicted By Evidence Including Harvard's Own Alumni Interviewer Assessments.

*Amici Curiae* cannot accept that Asian Americans are deficient in character and human qualities compared with applicants from all other ethnic groups, a libel that finds no support in evidence.  Significantly, Harvard alumni interviewers, who actually meet with most applicants in person (unlike the internal admissions staff), rate Asian-American applicants on average as high as applicants of other ethnicities in terms of character and personal attributes. Arcidiacono Rep. 49; *see* PFF ¶ 16, 70.  That the in-person interview assessment is the correct one is supported by common sense, by Harvard's failure to provide credible evidence showing the purportedly deficient personalities of Asian Americans, and by outside studies, such as a study of 100,000 undergraduate applicants to UCLA over three years.  The UCLA study finds "essentially no correlation" between race and personal attributes. Peter Arcidiacono, Thomas Espenshade, Stacy Hawkins & Richard Sander, *A Conversation on the Nature, Effects, and Future of Affirmative Action in Higher Education Admissions,* 17 U. Pa. J. Const. L. 683, 694-695 (2015)., *located at* https://scholarship.law.upenn.edu/jcl/vol17/iss3/2 (lasted visited 1/3/2019).

Harvard admissions officers obviously find the institutionalization of lower Personal ratings for Asian-American applicants a highly effective method to control the overall score of applicants to support predetermined admissions outcomes, allowing Harvard to maintain a "proper" racial balance in its student body. However, because the Personal score supposedly reflects the personal attributes of the applicant, the use of it to devalue Asian-American applicants promotes the idea that Asian Americans are racially inferior and not as desirable as human beings when compared to applicants of all other races.

One hundred and sixty-four years ago, in *People v. Hall,* 4 Cal. 399, 404-05 (1854), the California Supreme Court invalidated the testimony of Chinese-American witnesses to a murder, explaining that Chinese were "a distinct people . . . whose mendacity is proverbial; a race of people whom nature has marked as inferior, and who are incapable of progress or intellectual development beyond a certain point, as their history has shown; differing in language, opinions, color, and physical conformation; between whom and ourselves nature has placed an impassable difference."  It is outrageous that Harvard is today projecting a very similar sentiment through the method it uses to "balance" its student body.

### C.     Asian-American Applicants Are The Most Discriminated-Against Racial Group, Even When Compared To White Applicants.

Harvard's quota system discriminates more heavily against Asian-American applicants than members of any other ethnic group, including whites.  As the evidence shows, Harvard's quota system essentially imposes a racial hierarchy, where blacks are the most preferred, followed by Hispanics, followed by whites, and with Asians at the bottom as the least preferred and the least likely to be admitted.  PFF ¶¶ 31-32; Arcidiacono Rep. 31, 49, 51, 109.

Tellingly, even when an Asian-American applicant is in a category of applicants that would normally receive preference in the admissions process--such as living in an underrepresented geographical ("sparse country") area, or coming from a disadvantaged socioeconomic background--the applicant receives no preference but is discriminated against because he/she is Asian.  Arcidiacono Rep. 31, 111-2. As Harvard's internal OIR investigation concluded, "While we find that low income students clearly receive a 'tip' in the admissions process, … we see a negative effect for Asian applicants." PFF ¶ 123.  This bias extends even to outreach. Questioning of Harvard's former Dean of Admissions William Fitzsimmons revealed that when Harvard sends letters inviting applications to socioeconomically disadvantaged students in underserved rural regions, the College sends letters to white students with PSAT scores of 1310 but not to Asian males with scores of 1370 or higher in the same geographic area.

*Amici* and their constituents are deeply disturbed by the nature and scope of Harvard's discrimination against members of their community.

IV.    **THE INJURY CAUSED BY HARVARD'S DISCRIMINATION AGAINST ASIAN-AMERICAN STUDENTS.**

A.    **The Burden Of Harvard's "Handicapping" of Asian Americans Falls Heaviest on Those Individuals Least Able to Bear It.**

The "rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the *individual*." *Shelley v. Kraemer,* 334 U.S. 1, 22 (1948) (emphasis added). The personal nature of the constitutional right to equal treatment is particularly relevant here, because Harvard's admissions program, although obviously focused on maintaining a "balance" of ethnic "groups," always impacts *individuals*.  In fact, perversely, the burden imposed by Harvard "handicapping" Asian Americans falls heaviest on the most disadvantaged individual candidates identified by Harvard as members of that ethnic group.[4] It can be no other way.

It would be a terrible mistake to reason that because Asian-American applicants on average apply with higher GPA's and test scores, conditions are merely being "equalized" by Harvard's discrimination and no one is really being "hurt."  First, of course, as the Supreme Court has explained, the constitutional injury lies in the absence of equal treatment. *Northeastern Fla. Ch. of the Associated Gen. Contractors v. City of Jacksonville,* 508 U.S. 656, 666 (1993). But here, what happens is that the best prepared, typically more socioeconomically advantaged Asian-American candidates may still gain entry to Harvard in spite of the ethnic handicap (by filling the "Asian quota"), but that many other less advantaged Asian-American candidates who are not as well prepared now stand little or no chance at all. That this is indeed what is happening is shown by the 2013 OIR study, which found that, while other socioeconomically disadvantaged applicants were given a "tip" in the admissions process, the reverse was true for Asian-American applicants, who were penalized. PFF ¶ 123; May 30 2013 OIR Report [Dkt 421-157] at 6-7.

---

[4] "A handicap race in horse racing is a race in which horses carry different weights, allocated by the handicapper," with the goal of equalizing chances of winning. *Handicap (Horse Racing),* Wikipedia, *found at* https://en.wikipedia.org/wiki/Handicap_(horse _racing) (last checked 1/3/2019). Leaving aside that horses are not protected by the Fourteenth Amendment, the situation at the race track is actually more equitable, because the horses are allocated weights based on prior individual performance in races, whereas at Harvard all Asian Americans are allocated the handicap.

Thus, while discrimination against individuals on the basis of race is always wrong, it is particularly unfair to Asian American *individuals* to justify their unequal treatment by assuming that all members of this ethnic group are advantaged and superbly well prepared and therefore somehow deserve to be given a "handicap."

       **B.**      **<u>Imposing Higher Admissions Standards On Asian-American Children Leads To Unbearable Study Loads, Stress And Depression. and Other Psychological Harm.</u>**

Preparing and applying for college is a daunting prospect for all American high school students. Harvard's *de facto* higher admissions standards for Asian Americans, which are emulated by other highly selective colleges, make the pressure even worse. Filled with despair because they have learned and know they will be judged by a different standard in the college admissions process, many Asian-American students undertake overwhelming study loads, literally working themselves into ill health. They suffer high rates of anxiety and depression, and even increased incidence of suicide. "Asian American college students are 1.6 times more likely than all others to make a serious suicide attempt." George Oiao, *Why Are Asian American Kids Killing Themselves?* Plan A Magazine, Oct. 3, 2017, *found at https://planamag.com/why-are-asian-american-kids-killing-themselves-477a3f6ea3f2* (last visited 1/4/2019); *see* Unz, Ron, *supra, The Myth of American Meritocracy*, at 21 ( "[T]hese leading academic institutions have placed a rather strict upper limit on actual Asian enrollment, forcing these Asian students to compete more and more fiercely for a very restricted number of openings. . . . When a far greater volume of applicants is squeezed into a pipeline of fixed size, the pressure can grow enormously.")

Many researchers have documented the pernicious effects that are felt throughout the Asian American community:

> The fear of self-identifying as Asian can affect one's racial/ethnic identity development and have an impact on one's mental health. Asians who did not possess a strong racial/ethnic identity rated lower scores on self-actualization and acceptance (Iwamoto & Liu, 2010), reported lower self-esteem (Tummala-Narra, Inman, & Ettigi, 2011), tended to have negative attitudes toward schooling, lower academic achievement (Lee, 2009), and could not manage race-related stress well

(Yoo & Lee, 2005; Yip et al., 2008; Tummala-Narra et al., 2011). The denial of Asian heritage may also lead to the denial of Asian values, which may create cultural gaps and intergeneration conflict between the students and their parents (Ahn, Kim, & Park, 2009; Park, Kim, Chiang, & Ju, 2010). The psychological effects of this type of conflict include emotional distance between parents and children, interpersonal problems, lack of self-confidence and assertiveness, high suicidal risk, and anxiety and depression (Lee, Choe, Kim, & Ngo, 2000; Lowinger & Kwok, 2001; Kuroki & Tilley, 2012).

Yii-Chen (Jenny) Wu, *Admission Considerations in Higher Education Among Asian Americans,* American Psychological Association, *found at* http://www.apa.org/pi/oema/resources/ethnicity-health/asian-american/article-admission.aspx (last checked 1/4/2019).

The situation creates a vicious cycle for Asian-American students: The higher the bar Harvard and other elite institutions raise for Asian Americans, the more they have to study and excel, relative to other applicants, in order to have the same chance at admission. It is a vicious, never-ending cycle.

Some supporters of determinative racial preferences in school admissions have suggested that Asian-American parents and students themselves are at fault for assigning so much value and worth to admission into selective colleges.  They state that Asian-American students should be satisfied with being admitted into less prestigious colleges, and should not aim high. That position is racist and absurd.  All children should be encouraged to set high goals for themselves, and no one, much less a child, should be subjected to higher and unequal standards for achieving the same outcome because of their race or ethnicity.

C.     **The Terrible Effect on the Dignity and Self Worth of Asian Americans Who Know They And Their Children Will Be Subjected To Unequal Treatment Because of Their Race.**

Discrimination against Asian Americans in education gives members of the Asian-American community the unfortunate and unavoidable perception that they are not considered as valuable as individuals of other ethnic groups--and this harm extends much further than just the Asian-American students who fail to get into Harvard.  If skin-deep diversity is the controlling virtue and determinant for "achievement" in admissions, and being "diverse" in that way is an automatic positive, then the opposite is also true.  If Asian-American children are not "diverse"

because they are Asian, then they are inferior based on their race.  Harvard and other selective admissions schools say this constantly—that they love and value "diversity," and that Asian-American applicants do not add as much to "diversity."

Classification by race, especially for the purpose of scoring Asian-American candidates as deficient in Personal characteristics, as happens at Harvard and certain other institutions, inevitably promotes feelings of "racial inferiority" and "racial hostility." *See Richmond v. Croson*, 488 U.S. 469, 493-94 (1989). Many of the members and constituents of *amici curiae* were forced to go through admissions processes where academic programs declared their Asian ethnicity less desirable because it was regarded as less "diverse."  They do not wish for their children to be viewed as, or regard themselves as, inferior for the same unlawful reason.

In the San Francisco *Ho* case, the pernicious effects of racial classification on schoolchildren was evident to all. As stated by the parent of one "Chinese" youth turned away because of his ethnicity, "He was depressed and angry that he was rejected because of his race. Can you imagine, as a parent, seeing your son's hopes denied in this way at the age of 14?" Julian Guthrie, *S.F. School Race-Bias Case Trial Starts Soon*, San Francisco Examiner, at C-2 (Feb. 14, 1999).

As Lee Cheng, Secretary of AALF, testified in a written statement for hearings held by the U.S. House of Representatives, Sub-Committee on the Constitution:

> Many Chinese American children have internalized their anger and pain, confused about why they are treated differently from their non-Chinese friends. Often they become ashamed of their ethnic heritage after concluding that their unfair denial is a form of punishment for doing something wrong.

Lee Cheng, *Group Preferences and the Law*, U.S. House of Representatives Sub-Committee on the Constitution Hearings (June 1, 1995), p. 241, *found at* http://www.archive.org/stream/ grouppreferences00unit/grouppreferences00unit_djvu.txt (last checked 7/27/2018).

With college admissions, the same byproducts of racial discrimination are evident in the Asian-American community--even more so. Mixed-race families have learned to try to hide the fact that one parent is Asian American, and college-admissions consultants openly tell their

clients that being Asian-American is today a liability in the admissions process and advise them

on stratagems they can use in an attempt to mask their race:

> "Brian Taylor is director of Ivy Coach, a Manhattan company that advises
> families on how to get their students into elite colleges. A number of his clients
> are Asian American, and Taylor is frank about his strategy for them. 'While it is
> controversial, this is what we do,' he says. 'We will make them appear less Asian
> when they apply.'"
> . . .
> Chen founded Asian Advantage College Consulting 20 years ago in response to
> what he considers bias against top Asian students in elite college admissions. His
> firm, which is based in Alameda, Calif., also has clients on the East Coast, he
> says, including Boston. "The admissions officers are seeing a bunch of people
> who all look alike: high test scores, high grades, many play musical instruments
> and tend not to engage in more physical sports like football," Chen says.  If
> students come to him early in high school, Chen will direct them to "switch to
> another musical instrument" or "play a sport a little bit out of their element." And
> for the college essay, don't write about your immigrant family, he tells them . . ."

Bella English, *To Get Into Elite Colleges, Some Advised To 'Appear Less Asian,'* The Boston

Globe, June 1, 2015, *found at* https://www.bostonglobe.com/lifestyle/2015/06/01/ college-

counselors-advise-some-asian-students-appear-less-asian/Ew7g4JiQMiqYNQ

lIwqEIuO/story.html (last visited 7/30/2018). The Princeton Review advises Asian students

applying to selective colleges: "If you're given an option, don't attach a photograph to your

application and don't answer the optional question about your ethnic background. This is

especially important if you don't have an Asian-sounding surname. (By the same token, if you

do have an Asian-sounding surname but aren't Asian, do attach a photograph)." Akane Otani,

*Tips From the Princeton Review: Act Less Asian, Add Pics if You're Black,* Bloomberg, Nov. 21,

2014, *found at* https://www.bloomberg.com/news/articles/2014-11-21/princeton-review-tells-

asians-to-act-less-asian-and-black-students-to-attach-photos (last visited 1/7/2019). Applicants

later shown their Harvard application files have been disturbed to learn that just about everything

about them or their family considered "Asian" was viewed as a negative. *See 'This American

Life' Reveals More Than You Might Expect About How Harvard Discriminates Against Chinese-

American Applicants,* Althouse, Dec. 18, 2018, found at https://althouse.blogspot.com/2018/12

/this-american-life-reveals-more-than.html (last visited 1/2/2019).

Only Asian kids have to avoid being great violinists or pianists, or wanting to be doctors or scientists, for fear of appearing "too Asian." Only they are told that it might be fatal to their chances to provide a photograph that shows their race, and advised to change their surnames, if possible. This cannot be right. In the twenty-first century, American children should not need to feel that they will be discriminated against in college admissions unless they hide their ethnic heritage like it is some sort of terrible defect or disease.

## V.      HARVARD IS USING THE SAME ODIOUS EXCUSES HISTORICALLY USED TO JUSTIFY DISCRIMINATION AGAINST ASIAN AMERICANS.

### A.      Persecution of Asian Americans Was the Norm Throughout Most of American History.

Appallingly, Harvard is today using the same odious stereotypes that were historically used to justify discrimination against Asian Americans.  Unfortunately, members of this ethnic group have been the target of racial discrimination throughout most of American history. *See, e.g.,* Charles McClain, *In Search of Equality* (Univ. of Cal. Press 1994); Elmer Clarence Sandmeyer, *The Anti-Chinese Movement in California* (Univ. of Ill. Press 1991); Victor Low, *The Unimpressible Race* (East/West Publishing Co. 1982).  Often forced into dangerous work that nobody else wanted and denied the opportunities open to other Americans, their treatment was so dismal it gave rise to the expression "a Chinaman's Chance," a term meaning, "Little or no chance at all; a completely hopeless prospect."  The Free Dictionary, *found at* https://idioms.thefreedictionary.com/ Chinaman%27s+chance (last visited 1/4/2019).[5]

Discrimination against Asian Americans was often supported by luminaries and *the* "experts" of the times who proffered justifications ranging from the supposedly inferior personal qualities of Asians, to national security interests. The many court cases in which Asian Americans struggled for equal treatment provide a historical record that is tragic, outrageous and impossible to refute.

---

[5] "There have been several explanations about the origin of this phrase, all arising from Chinese immigrants working in the American West. One is that they were given the most dangerous jobs, such as setting and igniting explosives. Another is that judges and juries routinely convicted Chinese defendants on the flimsiest of evidence. A third is that Chinese miners were allowed to work gold claims only after others had taken the best ore." *Id.*

In *Ho Ah Kow v. Nunan,* 12 F. Cal. 252 (C.C.D. Cal. 1879) (No. 6,546), a district court invalidated San Francisco's infamous "Queue Ordinance" on equal protection grounds.

In *In re Ah Chong,* 2 F. 733 (C.C.D. Cal. 1880), the court found unconstitutional a law forbidding Chinese Americans from fishing in California waters.

In *In re Tiburcio Parrott,* 1 F. 481 (C.C.D. Cal. 1880), the court declared unconstitutional a provision of California's 1879 constitution that forbade corporations and municipalities from hiring Chinese American workers.

In *Yick Wo v. Hopkins,* 118 U.S. 356 (1886), the Supreme Court ruled that Chinese were "persons" under the Fourteenth Amendment and could not be singled out for unequal burden under a San Francisco laundry licensing ordinance.

In *In re Lee Sing,* 43 F. 359 (C.C.D. Cal. 1890), the court found unconstitutional the "Bingham Ordinance," which had mandated residential segregation of Chinese Americans.

In *United States v. Wong Kim Ark,* 169 U.S. 649 (1898), the Supreme Court ruled that a Chinese American boy, born in San Francisco, could not be prevented by San Francisco officials from returning to the city from a trip abroad.

These and many other cases bear witness to a struggle for equal protection that is, unfortunately, still not finished.

**B.      The History of Discrimination Against Asian Americans in Education.**

After the 1776 Revolution, Americans quickly came to agree with Thomas Jefferson "that the future of the republic depended on an educated citizenry," and that universal public education should be provided to all citizens. Johann N. Neem, *The Founding Fathers Made Our Schools Public. We Should Keep Them That Way,* The Washington Post, Aug. 20, 2017, *found at* https://www.washingtonpost.com/news/ made-by-history/wp/2017/08/20/early-america-had-school-choice-the-founders-rejected-it/?utm_term=.815adf5587ba (last visited 1/7/2019). Alas, the sentiment did not extend to Asian Americans. For most of the nation's history, they have faced formidable discrimination in education. The discrimination began with outright exclusion, then tracked the evolution of the "separate but equal" doctrine as applied to education, and finally evolved into racial balancing schemes such as the one at issue here.

*In Tape v. Hurley,* 66 Cal. 473, 6 P. 12 (1885), it took a court battle to force San Francisco public schools to admit a Chinese-American girl who was denied entry because, as stated by the State Superintendent of Public Instruction, public schools were not open to "Mongolian" children. *See McClain, supra,* at 137. In response, the California legislature authorized "Chinese" schools to which Chinese-American schoolchildren were restricted by law until well into the twentieth century. *See Ho,* 147 F.3d at 864; *see also Kuo, supra,* at 207-208.

It is not widely known, but Asian-American schoolchildren were among the first targets of the "separate-but-equal" doctrine created in *Plessy v. Ferguson,* 163 U.S. 537 (1896). The Supreme Court created the *Plessy* doctrine in a case where a black passenger attempted to board a "white" railway car. *Id.* In *Wong Him v. Callahan,* 119 F. 381 (C.C.N.D. Cal. 1902), this doctrine was applied to schools when a district court ruled that Chinese-American children in San Francisco could be barred from "white" schools because the "Chinese" school in Chinatown was "separate but equal."

In *Gong Lum v. Rice,* 275 U.S. 78 (1927), the Supreme Court affirmed that the separate-but-equal doctrine applied to schools, finding that a nine-year-old Chinese-American girl residing in Mississippi could be denied entry to the local "white" school because she was a member of the "yellow" race. *Id.* at 87.

Recognizing this history, in *Lee v. Johnson,* 404 U.S. 1215, 1215-16 (1971), Supreme Court Justice Douglas wrote that: "Historically, California statutorily provided for the establishment of separate schools for children of Chinese ancestry. That was the classic case of *de jure* segregation involved in *Brown v. Board of Education* [347 U.S. 483 (1954)]. . . *Brown v. Board of Education* [which abolished the separate-but-equal doctrine] was not written for blacks alone. It rests on the Equal Protection Clause of the Fourteenth Amendment, one of the first beneficiaries of which were the Chinese people of San Francisco." Harvard appears either to disagree with or disregard Justice Douglas' assessment.

C.    **The Chinese Exclusion Act.**

In 1882, in an extraordinary and shameful attack on equal protection, Congress passed the Chinese Exclusion Act, the first national law enacted to prevent an ethnic group from

immigrating to the United States.  *See Chinese Immigration and the Chinese Exclusion Acts,* at

https://history.state.gov/milestones/1866-1898/chinese-immigration (last visited 1/7/2019).

Fueled by anti-Chinese hysteria and supported by a broad spectrum of leaders and society of the

time, it prohibited all entry of Chinese laborers. *Id.*

As aptly described by opponent Republican Senator George Frisbie Hoar in 1882, this

Act was "nothing less than the legalization of racial discrimination." *Id.*

The Act was not repealed until 1943, during World War II, when China was an ally of the

United States in the war against Japan. *Id.*

### D.        Internment of Japanese-American Families.

One of the most egregious modern infringements of the constitutional rights of Asian

Americans occurred during World War II when, pursuant to presidential and military orders,

entire families of Japanese Americans were removed from their West Coast homes and placed in

internment camps.[6] Backed up by the statements of authorities and experts, who solemnly stated

the measure was necessary, the internment of Americans on American soil was allowed by the

United States Supreme Court. *See Hirabayashi v. United States*, 320 U.S. 81 (1943).

Today, of course, it is universally acknowledged that there was no justification for this

abrogation of the rights of American citizens. *See Korematsu v. United States,* 584 F. Supp.

1406, 1420 (N.D. Cal. 1984); *Hirabayashi v. United States*, 828 F.2d 591 (9th Cir. 1987). The

1980 Commission on Wartime Relocation and Internment of Civilians found that exclusion

orders had been motivated by "racism" and "hysteria" and not "military necessity."  *See*

*Korematsu*, 584 F. Supp at 1416. "[T]he government deliberately omitted relevant information

and provided misleading information in papers before the court." *Id*. at 1420.

---

[6] Executive Order No. 9066 was issued on February 19, 1942. It authorized the Secretary of War
and certain military commanders "to prescribe military areas from which any persons may be
excluded as protection against espionage and sabotage." Congress enacted § 97a of Title 18 of
the United States Code, making it a crime for anyone to remain in restricted zones in violation of
such orders. Military commanders then, under color of Executive Order No. 9066, issued
proclamations excluding Japanese Americans from West Coast areas, and sending them to
internment camps. *See Korematsu v. United States*, 584 F. Supp. 1406, 1409 (N.D. Cal. 1984).

The lesson taught, time and again, is that, in cases such as the one before this Court now, courts should be wary of the statements of "luminaries" and "experts" who line up to support a program of racial discrimination. Harvard trots out its armies of such luminaries and experts to justify its racism just as similar people with impressive titles and pedigrees were trotted out by those who defended slavery, segregation, the exclusion of Chinese immigrants and the internment of Japanese Americans.  Even when the opinions of such personages were sincerely held, their proffered justifications for the infringement of individual rights have never stood the test of time.  History has always exposed their prejudice and ignorance.

VI.     **THE *HO* CASE AND OTHER PRESENT-DAY BATTLES AGAINST DISCRIMINATION IN CALIFORNIA AND BEYOND.**

A.      **Discrimination Against Asian-American Children In The San Francisco Public School System.**

The use of race in education did not end with *Brown v. Board of Education.* Today, schools at all levels use supposedly "benign" racial balancing or diversity programs to discriminate against Asian Americans. The most striking modern example of such "good-intentioned" discrimination occurred in San Francisco—in the state where, ironically, much of the historical discrimination against Asian Americans had taken place. Late in the supposedly enlightened 20th century, San Francisco's Chinese-American schoolchildren were forced to turn to the courts in order to end the school district's policy of assigning them to the city's K-12 schools on the basis of their race. *See Ho v. San Francisco Unified Sch. Dist.,* 147 F.3d 854; *Ho,* 59 F. Supp. 2d 1021 (on remand).

Without any finding of a constitutional violation to remedy, pedagogical experts set up a racial balancing scheme with the goals of preventing "racial isolation" and providing "academic excellence." *See Ho v. San Francisco Unified Sch. Dist.,* 965 F. Supp. 1316, 1322 (1997); *see also Ho,* 147 F.3d at 859; *San Francisco NAACP v. San Francisco Unified Sch. Dist.,* 576 F. Supp. 34, 40-42, 58 (N.D. Cal. 1983). The proponents ignored that the San Francisco school district was already one of the most ethnically diverse in the nation. "Caps" were imposed at each school on arbitrarily-defined racial groups, one of which was "Chinese." *See id.; see also*

*Ho,* 147 F.3d at 856-58. The burden fell heaviest on students identified as "Chinese," who were most likely to be "capped out" at neighborhood schools or at magnet schools. *See* David I. Levine, *The Chinese American Challenge to Court-Mandated Quotas in San Francisco's Public Schools: Notes from a (Partisan) Participant-Observer,* 16 Harv. BlackLetter J. 39, 55-56 (Spring 2000).

After five years of vigorous litigation, having failed to provide any justification for their use of race, the defendants were forced to agree to stop using race to assign students to schools. *See Ho,* 59 F. Supp 2d at 1025 (approving settlement).

### B.  Asian Americans as the "New Jews" in Higher Education.

Harvard's present discrimination against Asian-American applicants finds an eerie parallel with the quota system Harvard maintained for Jewish Americans during the first half of the 20th century. Beginning in the 1920s, Harvard College and other prominent colleges and universities reacted to the perceived "over-representation" of Jews in their student bodies by setting up quotas for applicants of the Jewish faith that persisted through the 1950s. *See* Evan P. Schultz, *Group Rights, American Jews, and the Failure of Group Libel Laws*, 66 Brook. L. Rev. 71, 111-12 (Spring 2000); Alan M. Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385-399 (1979); Nathan Glazer, "Diversity Dilemma," *The New Republic* (June 22, 1998). The result was that, "[i]n the 1930s, it was easier for a Jew to enter medical school in Mussolini's Italy than in Roosevelt's America." Lawrence Siskind, *Racial Quotas Didn't Work in SF Schools,* op-ed, San Francisco Examiner (July 6, 1994), *found at* http://heather.cs.ucdavis.edu/pub/ AffirmativeAction/Siskind.html (last visited 1/7/2019).[7]

---

[7] The arguments supporting the historical and modern-day racial balancing schemes are virtually identical. "President Lowell of Harvard called [the Jewish quota] a 'benign' cap, which would help the University get beyond race." Jerry Kang, *Negative Action Against Asian Americans: The Internal Instability Of Dworkin's Defense Of Affirmative Action*, 31 Harv. C.R.-C.L. L. Rev. 1, 36 (Winter 1996). In the *Ho* case, proponents argued: "[T]he Chinese are the largest group at most of the best schools in the city. They can't have it all. If anything, I'd say lower the caps, don't raise them—otherwise we're headed back to segregated schools, only all Chinese instead of all white." Selana Dong, *"Too Many Asians": Challenge of Fighting Discrimination Against Asian-Americans and Preserving Affirmative Action*, 47 Stan. L. Rev. 1027, 1057 n.36 (May 1995) (citation omitted) (quoting Lulann McGriff, former president of San Francisco NAACP); *see also* Levine, *supra*, at 138 (observing that to some, "the *Ho* case is about

Quotas for Jewish students have since been eliminated, but similarly discriminatory admissions programs have been implemented with Asian Americans as the disfavored group. Many researchers have determined that Asian-American applicants apply with the highest academic credentials of any identified ethnic group to most top American universities, but meet with by far the lowest acceptance rates, strongly suggesting the existence of *de facto* quotas for Asian-American applicants. *See* Jason P. Riley, *The New Jews of Harvard Admissions* (*Wall Street Journal*, May 19, 2015); Daniel Golden, *The Price of Admission: How America's Ruling Class Buys Its Way into Elite Colleges—and Who Gets Left Outside*, *Chapter 7: The New Jews* (Three Rivers Press, 2007); Ron Unz, *The Myth of American Meritocracy: How Corrupt are Ivy League Admissions?*, pgs. 14-51 (The American Conservative, Dec. 2012), *at* http://www.theamericanconservative .com/articles/the-myth-of-american-meritocracy/ (last checked 7/27/2018). Examining admissions data from three elite public and four elite private colleges, Princeton researchers found that Asian-American applicants have 67% lower odds of admission than white applicants with comparable test scores. *See* Thomas J. Espenshade and Alexandra Walton Radford, *No Longer Separate, Not Yet Equal: Race and Class in Elite College Admission and Campus Life* (Princeton University Press, 2009).

The discrimination against Asian-American applicants is widespread. According to a 2016 survey conducted by Inside Higher Education, 42% of admissions officers from private colleges and 39% of admissions officers from public colleges said that some colleges held Asian-American applicants to higher standards, and 30% and 41%, respectively, indicated that was true of their college. Scott Jaschik, *Pressure to Build the Class: 2016 Survey of Admissions Directors,* Inside Higher Education, September 22, 2016, *found at* https://www.insidehighered.com/news/

---

how much is 'enough' for one racial or ethnic group"). And, today, the same arguments are used to justify turning away Asian American individuals from the nation's universities. *See* Glazer, *supra*; Dong, *supra*, at 1057, nn.4-5; Leo Rennert, *President Embraces Minority Programs*, Sacramento Bee (Metro Final) at A1 (April 7, 1995) (reporting that former President Clinton said that without race-based admissions "there are universities in California that could fill their entire freshman classes with nothing but Asian Americans"). "Today's 'damned curve raisers' are Asian Americans . . . ." Kang, *supra*, at 47 n.189 (cites and internal quotation marks omitted). Again, mandated "diversity" is seen as the answer. *See* Pat K. Chew, *Asian Americans: The "Reticent" Minority and Their Paradoxes*, 36 Wm. & Mary L. Rev. 1, 61-64 (Oct. 1994) (university quotas limit Asian-American enrollment).

survey/pressure-build-class-2016-survey-admissions-directors (last visited 1/4/2019) (results from 339 admissions directors or equivalent, responding in complete anonymity).

#### C.      The Ongoing Battle Against Discrimination in Education.

Asian Americans have been fighting against the widespread discrimination in higher education. In 1996, founding members of *amici* and their constituents worked to help pass Proposition 209, a voter initiative that added language to the California Constitution prohibiting the use of race in education. Cal. Const. Art. I § 31(a).

In 2006, Jian Li, a Chinese-American student filed a complaint against Princeton University. In 2012, an Indian-American student filed complaints against Harvard University and Princeton University. In 2013, Michael Wang, another Chinese-American student, filed a complaint against Yale University and Princeton University.

In 2014, California's citizens of Asian descent were forced to mobilize to defeat California Senate Constitutional Amendment No.5 ("SCA-5"), which would have again allowed use of race in public education. *See* https://en.wikipedia.org/wiki/Senate _Constitutional_ Amendment_No.5 (last checked 1/7/2019). The unexpected groundswell of opposition resulted in State Senator Ed Hernandez, the author of SCA-5, withdrawing the bill from consideration on March 17, 2014. *Id. See also* Kate Murphy, *California Affirmative Action Revival Bill Is Dead* (San Jose Mercury News, March 18, 2014) *at* http://www.mercurynews.com/education/ci_ 25361339/california-affirmative-action-challenge-is-dead? (last checked 1/7/2019).

On May 15, 2015, founding members of *amicus* AACE united 64 Asian-American organizations and jointly filed a civil-rights complaint against Harvard University with the Departments of Justice and Education, alleging that Harvard engaged in discriminatory admissions practices.

In July 2015, on behalf of his daughter, an Asian-American father in New England filed a complaint with the Department of Education against Yale University, Columbia University, Duke University, the University of Pennsylvania, Brown University, Dartmouth University, Cornell University, the University of Chicago and Amherst College.

In September 2015, on behalf of his son, another Asian-American father filed a complaint against Harvard University.

On May 23, 2016, *amicus* AACE, representing 132 Asian-American organizations, filed civil-rights complaints against Yale University, Brown University and Dartmouth College.

Since 2016, three additional Asian-American students have filed civil rights complaints against Harvard and other Ivy League Colleges.

In response to the complaints of discrimination, the Department of Justice has launched ongoing investigations of both Harvard University and Yale University for civil-rights violations, and the Department of Education is investigating Yale University for suspected violations.

In the present, as in the past, Asian Americans stand ready to do their part to protect the civil rights of all Americans against encroachment by those who believe that constitutional rights can be limited based on skin color or ethnicity.

## VII.   HARVARD'S COVERT PROGRAM OF DISCRIMINATION HAS NO PLACE IN AMERICA AND SHOULD BE BROUGHT TO AN END.

### A.   Harvard Used Race First, Before Considering Race-Neutral Alternatives.

*Amici Curiae* and their constituents do not object to Harvard's desire to engage with and admit more African-American and Hispanic students, which seems to be Harvard's objective, provided Harvard does so without discriminating against individual applicants of other races. Unfortunately, Harvard did not really even consider alternatives to its use of race until this case was filed.  PFF ¶¶ 153-155. As Supreme Court jurisprudence teaches, even where racial diversity is a lawful goal, the use of race to achieve that goal is allowed only where race-neutral alternatives have first been explored. "[S]trict scrutiny imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice." *Fisher v. Univ. of Tex. at Austin,* 133 S. Ct. 2411, 2420 (2013).

Harvard's failure is especially outrageous given its unmatched resources, which should have enabled it to do what less well-endowed institutions have done. *See Race-Neutral Alternatives in Postsecondary Education: Innovative Approaches to Diversity, U.S. Department*

*of Education Office for Civil Rights,* March 2003, *found at* https://www2.ed.gov/ about/offices/list/ocr/edlite-raceneutralreport.html (visited 7/29/2018). Instead of discriminating by race, Harvard could have effectively utilized socio-economic based preferences to increase both racial *and* economic diversity on its campus, while positively influencing the social mobility of students of all races coming from poor and disadvantaged backgrounds. PFF ¶¶ 156-158.  Instead, largely for expedience, Harvard chose to use race in the first instance rather than as a last resort, and in a manner that degrades Asian-American applicants.

While Harvard's motives may be lofty, its methods are unconstitutional and harmful. As the Supreme Court warned, "it demeans the dignity and worth of a person to be judged by ancestry instead of his or her own merit and essential qualities." *Rice v. Cayetano,* 528 U.S. 495, 517 (2000). Harvard's imposition of low Personal scores to devalue Asian-American applicants is both demeaning and injurious to Asian-American applicants and to their community. Harvard's use of race to maintain its view of a balanced student body is unlawful racial engineering. *Parents Inv. In Comm. Sch., supra,* 127 S. Ct. at 2757.  It must end.

### B.     Harvard Should Use Non-Discriminatory Methods To Advance Any Legitimate Societal Goals.

Harvard's use of race in college admissions is misguided and ineffective, even in the context of the goal of increasing racial diversity on its campus. It is at best a "Band-Aid" that conceals rather than addresses the deep-rooted societal problems that Harvard presumably wants to address, such as the abysmal state of K-12 education in many poverty-stricken and disadvantaged communities.  A 2007 study found that 41% of black students enrolled in Ivy League colleges come from new immigrant families. Cara Anna, *Among Black Students, Many Immigrants, found at* http://www.washingtonpost.com/wp-dyn/content/article/2007/ 04/30/AR2007043000106.html (last visited 1/3/19).  By contrast, only 4.5% of Harvard College's students come from the bottom 20% of the income distribution. Marina N. Bolotnikova, *Harvard's Economic Diversity Problem, found at* https://harvardmagazine.com/ 2017/01/low-income-students-harvard (last visited 1/3/19). The use of racial preferences to favor students from immigrant- and well-off families fails to help children growing up in America's

disadvantaged communities. According to a *New York Times* article published on August 24, 2017, "Even with Affirmative Action, blacks and Hispanics are more underrepresented at top universities than 35 years ago."

To the extent that Harvard really wants to address America's societal problems, it should do so directly and honestly. *Amici* and their constituents would wholeheartedly support efforts by Harvard to use its tremendous resources to improve K-12 education in disadvantaged communities. Such efforts would be much more likely to bear worthwhile fruit than its present unlawful use of race in college admissions, which at best conceals the underlying problems while causing harm to Asian Americans and promoting racial hostility.

## VIII.  <u>CONCLUSION.</u>

The evidence presented at trial demonstrates unmistakably that Harvard discriminates against Asian-American applicants in order to maintain unlawful racial quotas.  Adding insult, it does so by having admissions officers who have never even met the candidates assign significantly lower "Personal" ratings to Asian-American applicants. Harvard's use of race stigmatizes and causes harm not only to applicants but to the entire Asian-American community. At the same time, it fails to address the root cause behind the lack of racial diversity on college campuses—failing K-12 education in all too many black and Hispanic communities.  Instead, Harvard's racial quota system creates racial tension and perpetuates discrimination.

Harvard may claim benign motives for its admissions policies, but the end result is still unlawful and immoral racial engineering. Over 60 years ago, in *Brown v. Board of Education*, 347 U.S. 483, the Supreme Court recognized the inherent injury to individuals when schools assigned students on the basis of race and found that it was unlawful, whatever the stated purpose.  That same reasoning should apply here today, to bring a halt to this blatant discrimination against members of a historically disadvantaged community.

Accordingly, the Court should find that Harvard unlawfully classifies Asian-American applicants by race for unequal treatment; and should order an immediate end to Harvard's discriminatory practices.

Dated:  January 8, 2019                    Respectfully submitted,

/s/ Lee C. Cheng                           /s/ Gordon M. Fauth, Jr.
Lee C. Cheng  (admitted *pro hac vice*)    Gordon M. Fauth, Jr. (admitted *pro hac vice*)
Asian American Legal Foundation            Litigation Law Group
11 Malta Street                            1801 Clement Avenue, Suite 101
San Francisco, CA 94131                    Alameda, CA 94501
Tel: (510) 238-9610                        Tel: (510) 238-9610
Fax: (510) 473-0603                        Fax: (510) 473-0603
leechcheng@gmail.com                       gmf@classlitigation.com

Counsel for *Amicus Curiae* Asian American   Counsel for *Amici Curiae* Asian American
Legal Foundation                             Legal Foundation and Asian American
                                             Coalition for Education

# Exhibit A

**Asian American Associations and Educational Entities**

1. 1441 Manufactured-Home Residents Association
2. 80-20 Initive DC Chapter
3. Allstar Institute
4. America Earlier Education Center LLC
5. America GanSu Friendship Association
6. American Asian Contractor Association
7. American Chinese Art Collector Association
8. American Chinese Culinary Foundation
9. American Chinese Medicine Association
10. American Coalition for Equality
11. American Fujian Hinhou Association
12. American Hindu Coalition
13. American Langqi Student Association
14. American Society of Engineers of Indian Origin-NCC
15. American Sports Development Committee
16. American WZ Education Foundation
17. Asian American Civic Engagement Alliance
18. Asian American Cohesion Foundation
19. Asian American Community Association
20. Asian American GOP Coalition
21. Asian American Rights Association
22. Asian American Women Empowerment
23. Asian Americans Against Affirmative Action
24. Asian Americans for Equal Rights
25. Asian Culture Alliance
26. Asian Parents for Educational Excellence
27. AsianAmericanVoters.org
28. Association for Education Fairness
29. Austin Chinese Professional Association
30. Bay Area Homeowner Network
31. Beijing Association of Northen California
32. Boston Forward Foundation
33. Brookline Asian American Foundation
34. Brooklyn On Fun Association U.S.A.
35. Cambridge Center For Chinese Culture
36. Carolinas Asian American Alliance
37. Cast Vote
38. CeeHuang Daoist RC
39. Center for Chinese Learning at Stony Brook

40. CHESSanity
41. China Rainbow Network
42. Chinese American Alliance
43. Chinese American Alliance For Trump
44. Chinese American Association of Bedford
45. Chinese American Association of Orange County
46. Chinese American Association of the Andovers
47. Chinese American Association of Tulsa
48. Chinese American Citizens Alliance (CACA Boston Lodge)
49. Chinese American Citizens Alliance Greater New York
50. Chinese American Citizens Alliance-Greater San Gabriel Valley Lodge
51. Chinese American Economic & Culture Association
52. Chinese American Equalization Association (HQH)
53. Chinese American Heritage Association
54. Chinese -American Nail Salon Association
55. Chinese American Parent Association of Howard County
56. Chinese American Parents Association of Montgomery County
57. Chinese American Pofessional Development Association
58. Chinese American Republicans of Massachusetts
59. Chinese Americans of Lexington (CALex)
60. Chinese Americans Sport Shooting Club
61. Chinese Association for Progress and Equality
62. Chinese Association of Northwest Arkansas
63. Chinese Association of Science, Education and Culture of South Forida (CASEC)
64. Chinese Association, Inc.
65. Chinese Civil Rights League, Inc.
66. Chinese Freemasons (NY)
67. Chinese Freemasons in Las Vegas
68. Chinese School Andover
69. Chinese Social Service Center
70. Chinese Soprts Association Brooklyn
71. Coalition of Asian Americans for Civil Rights
72. Columbus Chinese association
73. Confucius Foundation
74. Councils of Maryland Korean Churches
75. Dallas Fort Worth Chinese Alliance (DFWCA)
76. Dallas Fort Worth Political Action Committee (DFWPAC)
77. Denver Chinese School
78. Eastern Art Academy
79. Emerald Parents Association
80. Evergreen Chinese American Association
81. Excellent Chinese School

82. Florida Acupuncture Association
83. Flying Fox Chinese Sports Council
84. Fujian Business Association
85. Fuzhou Tingjiang Huaqiao Alumni Associated USA
86. Gang Chen for City Council 2018
87. Global Exchange Education Center
88. Global Minority women Empowerment Organization
89. Global Organization of People of India Origin (GOPIO)
90. Greater Boston Fudan Alumni Association
91. Greater Charlotte Chinese American Conservatives
92. Greater Orlando Chinese Professionals Association
93. Greater San Antonio Chinese Society of Professionals
94. Greater Shanghai Alliance of American
95. Guangxi University Alumni Association of America
96. HaiNan Association of America
97. Harrison Chinese Association
98. Hotel Chinese Association of USA
99. Houston Chinese Alliance
100. Houston Guangxi Association
101. Huaxia Chinese School of Greater New York
102. Huaxie Edison Chinese School
103. HuaYi Education
104. Huazhong University of Sci and Tech Alumni Association of Southern California
105. Hubei Association of Florida
106. Hubei Fellow Association of Washington Metropolitan Area
107. Hunan Benevolent Association of America
108. INDOUS  Chamber of Commerce of NE  Florida
109. Inland Chinese-American Alliance
110. International Society for Environmental Education
111. Ivy Prep
112. Jilin Jilin Fellowship Group
113. Korean American Association of Arkansas
114. Korean American Association of Austin
115. Korean American Association of Chicago
116. Korean American Association of Cleveland
117. Korean American Association of Flushing
118. Korean American Association of Huston
119. Korean American Association of Killeen
120. Korean American Association of Los Angeles
121. Korean American Association of Michigan
122. Korean American Association of Minnesota
123. Korean American Association of Nevada

124.  Korean American Association of New Jersey
125.  Korean American Association of New Mexico
126.  Korean American Association of New Orleans
127.  Korean American Association of Ohio
128.  Korean American Association of Peninsula, VA
129.  Korean American Association of Pennsylvania
130.  Korean American Association of Richmond
131.  Korean American Association of Texas
132.  Korean American Association of Washington
133.  Korean American Association of Washington Metropolitan Area
134.  Korean American Chamber of Commerce of San Diego County
135.  Korean American Community of Metro Detroit
136.  Korean American Greater Philadelphia Scholarship Foundation
137.  Korean Association of Capital Region
138.  Korean Association of Maryland
139.  Korean Association of San Francisco CA
140.  Korean Association Savannah
141.  Lawrence Chinese Christian Fellowship
142.  Lead for Future Academy
143.  Livingston Chinese Association
144.  Long Island Chinese American Association (LICAA)
145.  Long Island School of Chinese
146.  Maryland Chinese American Network (MD-CAN)
147.  Massachusetts Beijing Chinese Language School
148.  Michigan Chinese Alliance
149.  Michigan Chinese Conservatives Alliance
150.  Mid-Missouri Chinese Association
151.  Millburn Institute of Talent
152.  Minnesota Chinese Association
153.  Montgomery County GOP Asian American Association (MCGOP-AAA)
154.  Montgomery County Korean Association
155.  Morris Chinese Academy
156.  Nanjing University Alumni Association Florida Chapter
157.  National Council of Chinese Americans (NCCA)
158.  National Federation of Indian American Associations
159.  New Hyde Park Chinese Association
160.  New Jersey Chinese Community Center
161.  New Jersey Double Eagle Shooting Team
162.  New York Chinese United League
163.  New York City Residents Alliance
164.  New York Fushan Association Inc.
165.  New York Hai Nan Townsmen

166.   New York Shandong Association
167.   Newton Alliance of Chinese Americans
168.   North America Nanning Association
169.   North American Maple Cultural Center of Florida
170.   Northern California Chinese Culture Athletic Federation (NCCCAF)
171.   Northern California Shaanxi Association
172.   Northern New Jersey Huaxia Chinese School
173.   Orange County Chinese Ladies Group
174.   Orange County Herald Center
175.   Orange international Kindergarten
176.   Orlando Chinese Association
177.   Overseas Alumni Association of Shanghai Second Medical University (SJTUMS)
178.   Pakistan Policy Institute
179.   Pakistani American Volunteers
180.   Palm Beach Chinese Academy
181.   Philadelphia Tristate Chines American Association (PTCAA)
182.   Phoenix Us-China Arts and Educatipn Exchange Center
183.   Plano Table Tennis Club
184.   Rotary Club of Huaren in Silicon  Valley
185.   San Antonio Chinese American Citizens Alliance
186.   San Diego Asian Americans For Equality
187.   SCV Chinese School
188.   Shangder Academy of Classical Chinese
189.   Shanxi  Association of Silicon Valley
190.   Silicon Valley Foundation for Better Environment
191.   Silicon Valley Women Alliance
192.   Sino -America New York Brooklyn Archway Association Corp.
193.   South Florida Chinese Business Association
194.   Student Partner In Learning
195.   Sunshine Chinese Language and Art School
196.   Sunshine Homes of Ohio
197.   SVCA Foundation
198.   Texas Guizhou Association
199.   The American Chinese School of Great Detroit
200.   The Chinese Nail Salon Association of East American
201.   The Federation of World Korean Woman Assoication
202.   The Midwest Hunan Chamber of Commerce
203.   The Orange Club
204.   The Shanghai Association of America, Inc.
205.   Tingling Hign School Alumnus Association of America
206.   TLG Family Foundation
207.   U.S. Bei Shuang Association

208.   U.S.Min Hou General Association
209.   United Chinese Association of Brooklyn
210.   United Chinese Association of Utah
211.   United Federation of Indo Americans of California
212.   United for a Better Community (UBC)
213.   University of California Alumni Association
214.   Urban United Association
215.   US Chinese Learning Fundation
216.   USTC Alumni Association SoCal
217.   UTPGE Chinese Alumni Association
218.   Venus Chinese School
219.   Virginia Korean American Society
220.   Washington DC Chinese Network
221.   Washington RiZing Economics And Fintech Educational Organization
222.   Wei Bo Learning Organization
223.   WEL Education Group
224.   West Windsor-Plainsboro Education Support Association
225.   Westlake Chinese Culture Association
226.   Women's  Charity Foundation
227.   Xiangtan University Alumni Association of North America
228.   Youth American Chinese Commerce Association
229.   Youth Education Success
230.   Zhengyuan Culture Bridge


**I.     Other Asian American Organizations**

231.   AE & LY MEDICAL ASSOCIATES, PLLC
232.   ANJ International
233.   Bergen Chinese Group
234.   Bowen Capital LLC
235.   D4Sue Inc
236.   DMC DMC  Corporation
237.   Environment Online Instruments LLC
238.   Epoch Investment LLC
239.   Globalhanin Yendai Inc
240.   Green Bees Multicultural LLC
241.   Harrison Station LLC
242.   iNegotiate LLC
243.   Jade  Springs
244.   J-Cheng Gene LLC

245.    JYC holdings, LLC
246.    KAJI  & ASSOCIATES
247.    LAVA Electronics Inc.
248.    Law Offices of Michael W. Lu, LLC
249.    Lonma Leather LLC
250.    Metro Star Media
251.    New Jersey Interational Stydents Service, LLC
252.    NJ  Chinese Media LLC
253.    Noah Decoration LLC
254.    Noble Tree Publishing Inc.
255.    North Ameircan Economic Herald
256.    Pacific Vision LLC
257.    Preventive Medicine Institute
258.    Project and Knowledge Concepts
259.    Promising Analytical Consisting
260.    Queenberry, Inc
261.    Redwood Technique
262.    Resources International Care of America inc
263.    Sally's Group
264.    The First Wang, Inc
265.    Tift Gymnastics
266.    V Care Home Health Services
267.    Welcome Family Medicine, PA
268.    Wen's Pearls
269.    Yi-radio

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served on all counsel for all parties of record on January 8, 2019 via the Court's CM/ECF system.


Date:  January 8, 2019        By:  _____/s/ Gordon M. Fauth, Jr._____.
                                   Gordon M. Fauth, Jr.