**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
BOSTON DIVISION**

| | | |
|---|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14-cv-14176-ADB |
| | ) | |
| PRESIDENT AND FELLOWS OF HARVARD | ) | |
| COLLEGE (HARVARD CORPORATION), | ) | |
| | ) | |
| Defendant. | ) | |

**AMICI CURIAE HARVARD STUDENT AND ALUMNI ORGANIZATIONS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

### TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................................................. iii

I.  INTRODUCTION ................................................................................................. 1

II.  PROPOSED FINDINGS OF FACT ...................................................................... 3

    A.  Harvard's Limited Consideration of Race, as One of Many Factors in Its Holistic Admissions Process, Is Necessary to Reap the Educational Benefits of Diversity. .................................................................................... 3

        i.  Engagement With, and Exposure to, Students of Different Racial and Ethnic Backgrounds Are Critical to Achieving the Educational Benefits of Diversity. ............................................................................... 5

        ii.  A Diverse Student Body Is Necessary to Avoid Racial Isolation and Tokenism. ................................................................................................ 9

        iii.  A Diverse Student Body Encourages and Enables the Harvard Administration to Better Serve Its Students. ........................................... 11

        iv.  Student and Alumni Organizations, Many of Which Rely on Sufficient Numbers of Students of Color, are Critical in Generating the Educational Benefits of Diversity. ...................................................... 12

    B.  Due to the Lack of Workable Race-Neutral Alternatives, a Race-Blind Admissions Policy Would Decimate the Number of Black and Latinx Students, Resulting in Significant Harms to All Harvard Students. .................... 14

        i.  Race-Neutral Alternatives Would Not Foster a Level of Diversity Sufficient to Achieve the Educational Benefits of Diversity. ................... 14

        ii.  Removing All Considerations of Race in Harvard's Admissions Would Drastically Reduce the Number of Admitted Students of Color, Causing Harm to All Harvard Students. ...................................... 17

        iii.  A Significant Reduction of Students of Color Would Negatively Impact Minority Recruitment, Resulting in an Even Greater Reduction of Students of Color. ........................................................... 19

        iv.  A Significant Reduction in Students of Color Would Devastate Many of the Amici Organizations. ......................................................... 21

    C.  Race-Conscious Admissions Allows Harvard To Consider the Breadth of Many Students' Lived Experiences. .................................................................. 24

III.     PROPOSED CONCLUSIONS OF LAW .......................................................................29

      A.      Pursuant to Longstanding Supreme Court Precedent, Harvard Can Consider
           Race, as One of Many Factors, in College Admissions to Foster the
           Educational Benefits of Diversity. .....................................................................30

      B.      Harvard's Limited Consideration of Race in Its Holistic Admissions Policy
           Is Narrowly Tailored. .......................................................................................32

           i.      Harvard Conducts Individualized, Whole-Person Reviews of Each
                 Student Applicant, in Which Race Is Merely One of Many Factors
                 Considered. ...........................................................................................33

           ii.     None of the Race-Neutral Alternatives Proposed by Plaintiffs
                 Would Achieve Sufficient Levels of Diversity of Harvard Students,
                 Particularly Black Students. .................................................................34

CERTIFICATE OF SERVICE ................................................................................................40

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Barber v. Ponte*,
  772 F.2d 982 (1st Cir. 1985) ............................................................................26

*CFK Sports, Inc. v. Correa-Oppenheimer*,
  325 F.R.D. 30 (D.P.R. 2018) ...........................................................................26

*Fisher v. Univ. of Texas*,
  136 S. Ct. 2198 (2016) ...............................................................................*passim*

*Fisher v. Univ. of Texas*,
  570 U.S. 297 (2013) ....................................................................................*passim*

*Gratz v. Bollinger*,
  539 U.S. 244 (2003) ................................................................................. 29, 30

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ....................................................................................*passim*

*Kader v. Sarepta Therapeutics, Inc.*,
  2017 WL 72396 (D. Mass. Jan. 6, 2017)..........................................................26

*Lamers Dairy Inc. v. U.S. Dep't of Agric.*,
  379 F.3d 466 (7th Cir. 2004) ...........................................................................26

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015) .....................................................................................14

*Regents of Univ. of Calif. v. Bakke*,
  438 U.S. 265 (1978) ....................................................................................*passim*

## STATUTES & REGULATIONS

34 C.F.R. Part 100.................................................................................................29

42 U.S.C. § 2000d *et seq.* ................................................................................ 29, 30

## OTHER AUTHORITIES

Devon W. Carbado & Cheryl I. Harris, *The New Racial Preferences*, 96 CALIF. L.
  REV. 1139 (Oct. 2008)................................................................................ 14, 36

Nat'l Endowment for the Arts, A Decade of Arts Engagement: Findings from the
   Survey of Public Participation in the Arts, 2002–2012 (Jan. 2015),
   https://www.arts.gov/sites/default/files/2012-sppa-feb2015.pdf...........................................26

U.S. Census Bureau, 2011-2015 American Community Survey Selected
   Population Tables on American Fact Finder,
   https://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t ..................27

U.S. Comm'n on Civil Rights, Public Education Funding Inequity in an Era of
   Increasing Concentration of Poverty and Resegregation (Jan. 2018),
   https://www.usccr.gov/pubs/2018/2018-01-10-Education-Inequity.pdf...............................26

U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics, The Condition of Education
   2018 (May 2018), https://nces.ed.gov/pubs2018/2018144.pdf ...........................................28

U.S. Dep't of Educ. Office for Civil Rights, 2013-2014 Civil Rights Data
   Collection: A First Look (June 2016; Revised Oct. 2016), https://www2.ed.
   gov/about/offices/list/ocr/docs/2013-14-first-look.pdf ..................................................26, 28

U.S. Dep't of Educ., Office of Planning, Evaluation and Policy Development and
   Office of the Under Secretary, Advancing Diversity and Inclusion in Higher
   Education (2016), https://www2.ed.gov/rschstat/research/pubs/advancing-
   diversity-inclusion.pdf...........................................................................................................26

## I.    INTRODUCTION[1]

Amici Organizations[2] are 25 Harvard student and alumni organizations—which represent thousands of Asian American, Black, Latinx,[3] Native American, and white students and alumni—that contribute to, and benefit from, the educational benefits of diversity as a direct result of Harvard's limited consideration of race in its holistic admissions process. Thus, Amici Organizations are gravely concerned with SFFA's broader aim in this lawsuit: the wholesale elimination of race-conscious admissions in higher education, which would dismantle efforts to further diversity and educational opportunity in a society with significant racial inequities in primary and secondary education. No Asian American applicants, students, or alumni testified at trial in support of SFFA's claims or its goals. Instead, Harvard students and alumni who are members of the Amici Organizations, including Asian Americans, testified in support of Harvard's race-conscious admissions based on their own experiences with race, diversity, and education before, during, and after attending Harvard.

Amici Organizations support students and alumni of color, who are part of the Harvard community but may face racial isolation, false stereotypes, and racial harassment. Moreover,

---

[1] Local counsel for Amici Curiae in this action, the law firm of Sugarman Rogers Barshak & Cohen, P.C. also represents the defendant, President and Fellows of Harvard College ("Harvard"), in matters wholly unrelated to the legal and factual issues presented by this action. Neither Harvard nor its litigation counsel in this action have provided any financial support for the preparation of Amici Curiae's briefs or other court filings in whole or in part.

[2] Amici Organizations include 21 Colorful Crimson, Association of Black Harvard Women, Coalition for a Diverse Harvard, First Generation Harvard Alumni, Fuerza Latina of Harvard, Harvard Asian American Alumni Alliance, Harvard Asian American Brotherhood, Harvard Black Alumni Society, Harvard Islamic Society, Harvard Japan Society, Harvard Korean Association, Harvard Latino Alumni Alliance, Harvard Minority Association of Pre-Medical Students, Harvard Phillips Brooks House Association, Harvard South Asian Association, Harvard University Muslim Alumni, Harvard Vietnamese Association, Harvard-Radcliffe Asian American Association, Harvard-Radcliffe Asian American Women's Association, Harvard-Radcliffe Black Students Association, Harvard-Radcliffe Chinese Students Association, Kuumba Singers of Harvard College, Native American Alumni of Harvard University, Native Americans at Harvard College, and Task Force on Asian and Pacific American Studies at Harvard College. A description of Amici Organizations can be found in the Motion to Participate as Amici Curiae, ECF No. 455, and in the Motion of Additional Harvard Student and Alumni Organizations to Participate as Amici Curiae, ECF No. 503.

[3] The gender-neutral term "Latinx" is used herein to refer collectively to Latinos, Latinas, and non-binary persons of Latin American background.

Amici Organizations serve as the engines of cross-racial discourse for the benefit of *all* Harvard students, as well as Harvard's faculty and administration. This discourse takes many forms: formal events with experts speaking on myriad race-related issues; social gatherings that bring together students from diverse racial and ethnic backgrounds to engage in spontaneous, organic dialogue; and activism or organizing that raises public awareness on race-related incidents and concerns for which Amici Organizations seek to hold the Harvard administration accountable. Yet, SFFA asks the Court to endorse a Harvard undergraduate student body with more than a thousand fewer Black and Latinx students, thus undercutting the contributions of Black, Latinx, and other students of color to campus life and the educational experience of all students at Harvard. Amici Organizations make the educational benefits of diversity a reality at Harvard, but their sustainability depends on having sufficient student and alumni members to carry out their missions and execute their work.

Harvard has both considered and implemented many race-neutral alternatives in its admissions process, but those alternatives, standing alone, will not produce the educational benefits of diversity. Moreover, the race-neutral alternatives proposed by SFFA fail to achieve Harvard's stated educational goals of creating a sufficiently diverse student body while also maintaining its preferred academic standards. On the contrary, SFFA's proposed alternatives would significantly diminish racial diversity at Harvard—causing the greatest detriment to Black applicants and students, whose admission numbers would drop more than any other racial group.

SFFA essentially argues in favor of race-neutral alternatives that would harm some of the very students who are most disadvantaged by the pervasive racial disparities in our nation's primary and secondary school systems. Due to these inequities, applicants' opportunities to amass the credentials for a competitive college application are greatly affected by race. The loss of up to fifty percent of the Black and Latinx student body, as predicted by Harvard's expert, would be

devastating to Harvard's Black and Latinx communities, risking the functioning—and perhaps the very existence—of many Amici Organizations and threatening the educational benefits of diversity for all of Harvard's students.

Accordingly, Harvard's race-conscious admissions policy is lawful under Supreme Court precedent and should be allowed to continue to foster the crucially important educational benefits of diversity for the entire Harvard community. Given the absence of available and workable race-neutral alternatives, this Court must reject Plaintiffs' efforts to eliminate Harvard's limited consideration of race, as one of many factors, in its holistic review of student applicants.

## II.   PROPOSED FINDINGS OF FACT

### A.   Harvard's Limited Consideration of Race, as One of Many Factors in Its Holistic Admissions Process, Is Necessary to Reap the Educational Benefits of Diversity.

1.      The educational benefits of diversity flow to Harvard students of all races, Harvard College as an educational institution, and society as a whole. 10/30 Tr. 20:14-16, 22:24-23:20, 54:11-55:15 (Simmons). In order to ensure the educational benefits of diversity, the Harvard student body must be comprised of a diverse set of identities, perspectives, circumstances, and backgrounds—including, critically, diverse racial and ethnic backgrounds. P302.22; DX26.0008-09, 13-20, 29-34; DX53.0014-19; DX55.0012, 17-20, 47-48; DX40; 11/1 Tr. 198:24-199:21 (Faust).

2.      Harvard College's mission recognizes that "[t]hrough a diverse living environment where students live with people who are studying different topics, who come from different walks of life and have evolving identities, intellectual transformation is deepened and conditions for social transformation are created." DX 109. Racial and ethnic diversity is a necessary component of an educational environment that drives the intellectual and personal growth that Harvard seeks

to cultivate in its students. P302 at 22; DX26.0008-09, 13-20, 29-34; DX53.0014-19; DX55.0012, 17-20, 47-48; DX40; 11/1 Tr. 198:24-199:21 (Faust).

3.       Harvard's current holistic admissions process, which considers an applicant's race as a positive "tip" when evaluating highly competitive applicants of any race, enables Harvard to enroll a racially and ethnically diverse student body and thereby create a learning and living environment that improves the education of all its students. 10/16 Tr. 29:8-30:17 (Fitzsimmons); Defs.' Proposed Findings of Fact and Conclusions of Law ("Harvard FOF/COL"), ECF No. 619, ¶¶ 60-61.

4.       SFFA's expert agreed that race has no effect for the vast majority of applicants, that race makes a difference only for applicants who would otherwise be competitive, and that other factors are just as consequential as race in admissions decisions. 10/25 Tr. 200:1-17, 201:12-25 (Arcidiacono). Race may, however, provide a "tip" to an individual, highly competitive applicant of any race, including Asian Americans. *See infra* ¶¶ 66-67, 93-94.

5.       Race does not guarantee admission to any student. *See, e.g.*, 10/24 Tr. 234:6-8, 236:11-22, 237:21-238:18 (Ray) (describing Harvard's denial of a bi-racial, white and African American applicant, who had a perfect ACT score and a perfect SAT verbal score, but whose alumni interview was considered "flat" and possibly "rehearsed" and "coached").

6.       The limited consideration of an applicant's race helps Harvard see the full applicant—illuminating their experiences, contextualizing their achievements, and offering a window into their perspective and potential contributions to campus. 10/29 Tr. 202:3-203:1, 211:23-212:19 (Chen); 10/29 Tr. 90:12-91:4 (Ho); Harvard FOF/COL ¶¶ 28-31.  Indeed, Harvard recognizes that some college admissions criteria can undervalue the potential of some applicants of color. *See, e.g.*, SA-2 at 29; 10/29 Tr. 146:15-148:3 (Diep); *infra* ¶¶ 70-75.

4

7.     Race-conscious admissions are critically important to understand the full context of a student's accomplishments and achievements given the pervasive racial inequities in primary and secondary education, which create barriers to educational opportunities for many students of color, including some Asian Americans and Pacific Islanders.  *See infra* ¶¶ 70-75.

8.     Harvard would be unable to accomplish its educational mission without the diversity that comes from race-conscious admissions. *See* 10/30 Tr. 29:7-13 (Simmons); Harvard FOF/COL ¶¶ 2-13, 214-55. Indeed, analyses of race-neutral alternatives from both Harvard and SFFA's experts reinforce the conclusion that it is necessary to consider race to achieve sufficient racial diversity while maintaining Harvard's preferred academic standards. *See infra* ¶ 36-38, 45-46.

> i.   *Engagement With, and Exposure to, Students of Different Racial and Ethnic Backgrounds Are Critical to Achieving the Educational Benefits of Diversity.*

9.     A diverse student body "provides an opportunity to deepen . . . learning" by "giv[ing] students first-hand experience with difference." 10/30 Tr. 23:6-8 (Simmons). Racial diversity in higher education helps students develop critical thinking and challenge assumptions. 10/30 Tr. 22:24-23:12 (Simmons).

10.    Harvard students have experienced the educational benefits of diversity firsthand, through more nuanced and rewarding classroom discussions due to the participation of racially diverse students. *See* 10/29 Tr. 124:25-125:11 (Nuñez); 10/29 Tr. 209:10-13 (Chen). Harvard students "learn from other people, and . . . learn from listening to their stories, listening to their perspectives." 10/29 Tr. 109:21-23 (Ho). It has been "very powerful" for Harvard junior Cecilia Nuñez "to interact with students who don't share [her] ethnic identity" and with whom she "can have various conversations about what the differences are[.]" 10/29 Tr. 124:7-14 (Nuñez). "[B]eing around students from different ethnoracial backgrounds made [recent Harvard alumna

Itzel Libertad Vasquez-Rodriguez] a more critical thinker and a more independent thinker." 10/29 Tr. 17:8-10 (Vasquez-Rodriguez).

11.     Examples of these cross-racial conversations include: hearing thought-provoking comments from a Black classmate in a public health class about how medical studies can be skewed due to the insufficient inclusion of participants of color, 10/29 Tr. 153:2-154:15 (Diep); and a student contributing to classroom discussions by drawing on her lived experiences as a Black woman, 10/29 Tr. 78:25-79:13 (Cole).

12.     By contrast, a lack of racial diversity in the classroom can be detrimental to the learning experience of students. *See* 10/29 197:2-5 (Chen). For example, due to her high school's lack of diversity, Harvard senior Sally Chen missed out on "critical conversations that went beyond the strict curriculum," such as those about "current events and the issues that were facing [local] communities . . . like gentrification and displacement that really predominantly impact communities of color." 10/29 Tr. 197:2-13; 18-20 (Chen). The other resources at Ms. Chen's school, including extensive AP offerings, a robotics team, and many other opportunities, did not make up for this educational deficit. 10/29 Tr. 197:14-20 (Chen).

13.     A diverse student body imparts benefits to the educational experience beyond the classroom. "Education is not just what you learn in the classroom," and "Harvard really emphasizes the learning that goes on in dorms and dining halls." 10/29 Tr. 105:23-25 (Ho). This is especially true given that approximately 98% of Harvard undergraduates live on campus in the college's residential houses—an aspect of the Harvard experience that is designed to heighten the prospect of student engagement. 10/17 Tr. 194:8-10 (Fitzsimmons); 10/30 Tr. 31:25-32:10 (Simmons).

14.     An important part of Harvard students' educational experience is derived from conversations, interactions, and friendships with roommates of different backgrounds. *See* 10/29 Tr. 105:19-108:25, 110:4-22 (Ho); 37:18-38:8, 40:23-41:11 (Chin), 125:12-19 (Nuñez). Catherine Ho, a Vietnamese American Harvard sophomore, gained new perspectives about police abuse in the Black community through discussions with her Black roommate about an incident of police brutality against a Black Harvard student, and by personally witnessing the emotional response and organizational responsibilities that her roommate shouldered as a member of a Black student group in the wake of the incident. 10/29 Tr. 105:19-106:15 (Ho).

15.     Exposure to, and engagement with, a diverse student body helps break down stereotypes and challenge assumptions based on race. *See* 10/29 Tr. 40:23-41:9 (Chin); 100:5-17 (Ho). This process not only cultivates more open-minded students, but also creates an environment more conducive to learning, where false racial stereotypes or discrimination are more likely to be recognized and diminished. 10/29 Tr. 176:24-177:22 (Trice). For example, compared to her less racially diverse high school, Harvard sophomore Madison Trice, a Black student, experiences fewer racial slights at Harvard, allowing her to be more "able to really devote [her]self to academics, extracurriculars, and friendships without having to worry as much about the feeling of being represented or being distracted by the types of discrimination that [she] faced in high school." 10/29 Tr. 176:24-177:4 (Trice).

16.     A racially diverse student body also helps Harvard students "learn[] how they can best serve the world" and become engaged citizens and citizen-leaders of society, fulfilling part of the College's stated mission. DX 109. In addition, diversity in student service organizations enhances students' volunteer work and helps them better serve communities of color beyond Harvard's campus. *See* 10/29 Tr. 125:20-127:18 (Nuñez); 103:25-105:15 (Ho).

7

17.     Diversity at Harvard informs the long-term career goals and competencies of students before they enter a global workforce. Madison Trice, who is pursuing a career in conflict resolution, learned from fellow Harvard students who have been impacted by social and political conflict in diverse parts of the world, which "helps [her] to better learn how to serve hopefully in conflict regions and in peace building . . . ." 10/29 Tr. 190:20-191:12 (Trice). Harvard senior Thang Diep's interactions with racially diverse students at Harvard gave him "a tool set to think about cultural sensitivity and cultural competency" that will inform his future work as a doctor serving "young people who all have very different liv[ed] experiences." 10/29 Tr. 156:1-157:5 (Diep). For Harvard junior Cecilia Nuñez, a student pursuing a degree in Latin American studies, being in classes that offer cultural diversity allows for conversations with people who "have a relationship to the subject matter" and better prepares her to succeed in her field. 10/29 Tr. 124:25-125:11 (Nuñez).

18.     The educational benefits of Harvard's diversity have proven invaluable to recent Harvard graduate, Itzel Libertad Vasquez-Rodriguez, who has worked for nonprofits in Peru and on state policy in the California Assembly, and those benefits would have been significantly diminished by a reduction in Black and Latinx students on campus. "[W]ith [her] work in Peru, it was really important that [she] had an understanding of the diversity within the Latinx or the Latin American experience because [she] was working with indigenous people in Peru who have a very different history and relationship with their country." 10/29 Tr. 23:11-15 (Vasquez-Rodriguez). With respect to her work in California, "working in a state that is so diverse and that is only becoming more ethnoracially diverse, it was important for [Ms. Vasquez-Rodriguez] to have had experience and to have had interactions with people from a variety of ethnoracial backgrounds." 10/29 Tr. 23:16-20 (Vasquez-Rodriguez).

8

19.     Beyond the workplace, students from diverse learning environments are better prepared to navigate and lead in a pluralistic society plagued with conflict because of their experiences learning in an environment with peers who are different. *See* 10/30 Tr. 29:14-30:11, 55:8-15 (Simmons).

        *ii.  A Diverse Student Body Is Necessary to Avoid Racial Isolation and Tokenism.*

20.     A racially diverse student body is necessary to craft a learning environment in which students from underrepresented minority groups do not feel isolated or like "tokens" in the classroom. 10/30 Tr. 33:2-21, 46:24-47:19 (Simmons).

21.     Some students of color continue to experience social isolation and, at times, hostility at Harvard. 10/29 Tr. 128:23-129:18 (Nuñez) (describing an instance where she and her peers were called racial slurs on campus); 181:9-182:11 (Trice) (describing an incident of police brutality against a Black student near campus).

22.     As some Amici witnesses testified, being one of only a few Black students can be an isolating experience. *See* 10/29 Tr. 67:20-68:20 (Cole); 115:4-116:2 (Nuñez); 168:7-21 (Trice). As one of a handful of Black students at their respective high schools, the Black Amici witnesses had feelings of not belonging, pressure to be "a representative for [their] entire race," and the solitary burden of challenging stereotypes. 10/29 Tr. 168:7-21 (Trice); 67:20-68:20 (Cole); 115:4-116:23 (Nuñez).

23.     Asian American students have also been impacted by racial isolation and insensitivity on campus, 10/29 Tr. 204:12-205:5 (Chen), and benefit from being able to respond and cope in coalition with other students of color. *See* 10/29 Tr. 157:17-158:4 (Diep) (describing shared experiences of racial prejudice and discrimination that create solidarity between Asian American students and other students of color); 18:12-21 (Vasquez-Rodriguez) (recounting cross-cultural efforts to establish an ethnic studies track that were led by Asian American students in

coalition with students from other minority groups); 74:2-17 (Cole) (recalling cross-cultural efforts to improve support for low-income students of color led by Asian American students in coalition with students from other minority groups). Harvard sophomore Catherine Ho, for example, benefits from speaking to Black and Latinx friends for affirmation when she experiences racially insensitive incidents because they have had similar experiences. 10/29 Tr. 110:10-22 (Ho). Harvard senior Thang Diep has "learned a lot about how to build coalition, how to collaborate with other communities of color, and how to be aware of class differences because of efforts made by [his] Black friends and Black students from organizations." 10/29 Tr. 154:24-155:3 (Diep).

24.     Considering race as part of its holistic admissions process also allows Harvard to be mindful of diversity within racial groups since all students of color are not interchangeable and all members of a racial group are not the same. *See* 10/30 Tr. 33:22-34:9 (Simmons). Thus, Harvard students encounter a range of multidimensional identities and experiences from students within the same racial group. *See* 10/29 Tr. 93:18-94:8 (Ho); 17:21-18:10 (Vasquez-Rodriguez).

25.     Indeed, Harvard may have a smaller percentage of Latinx students than Harvard junior Cecilia Nuñez's predominantly Mexican American high school, but it nevertheless "encompasses a lot of students from Central America, the Caribbean, South America. So . . . in that way it's a much more diverse group of students." 10/29 Tr. 123:11-124:4 (Nuñez). Moreover, at Harvard, Ms. Nuñez, who identifies as African American and Latina, "learned a lot more about what it means to identify as [B]lack or what it means to identify as Latinx in talking to students who . . . come at those identities from a very different way and who have had very different experiences with it." 10/29 Tr. 124:18-24 (Nuñez).

26.     For Harvard sophomore Madison Trice, "it's important for the broader Harvard community to be able to interact with a number of different Black people who have very different

experiences," and "the diversity of [the Harvard-Radcliffe Black Students Association ("BSA")]
does a really good job of making those things possible." 10/29 Tr. 176:16-177:5, 179:4-18 (Trice).
And Harvard senior Sally Chen found it "really critically changing" to "meet [other] Asian
Americans who are different from [her]" and to "have an Asian American population that is also
racially and ethnically diverse as well as socioeconomically diverse to really dispel these kinds of
overarching myths [about] what it means to be Asian American." 10/29 Tr. 209:14-210:16 (Chen).

>   ### iii. *A Diverse Student Body Encourages and Enables the Harvard Administration to Better Serve Its Students.*

27.     The contributions of diversity to Harvard's educational mission go beyond
classroom discussions and student interactions. A diverse student body encourages Harvard, as an
institution, to change for the better: spurring new areas of scholarship, sharpening faculty acumen,
and raising Harvard's profile in different communities and around the world. 10/30 Tr. 26:13-29:6
(Simmons).

28.     Diversity also challenges Harvard to better serve its students. Harvard could do
more to support students, especially students of color, and make the College a more inclusive
place. However, "a lot of the power and positive change at Harvard comes from student groups of
color," whose activism and engagement often push Harvard to improve. 10/29 Tr. 21:25-22:2 (Ho).

29.     For example, coalitions of students of color, including certain Amici Organizations,
successfully petitioned the College to establish an ethnic studies track, 10/29 Tr. 18:11-19:4
(Vasquez-Rodriguez); advocated for better institutional support for lower-income students of color
through the Diversity Report, 10/29 Tr. 73:25-74:17 (Cole); convinced Harvard to hire more
mental health clinicians of color, 10/29 Tr. 134:17-135:4 (Nuñez); lobbied for improved
interactions between Black students and Cambridge police, 10/29 Tr. 181:17-182:11 (Trice); and

provided training to foster awareness and understanding to support gender non-conforming students on campus, 10/29 Tr. 189:21-190:19 (Trice).

30.    In addition, students of color and cultural organizations play a crucial role in Harvard's recruiting efforts by contacting prospective students, hosting admitted students, and putting on events during Visitas, Harvard's official admitted students' weekend. 10/29 Tr. 173:10-174:8, 193:10-12 (Trice), 92:1-18 (Ho), 137:23-138:9 (Nuñez), 39:22-40:6 (Chin).

> *iv.  Student and Alumni Organizations, Many of Which Rely on Sufficient Numbers of Students of Color, Are Critical in Generating the Educational Benefits of Diversity.*

31.    Harvard's student and alumni organizations, such as the 25 Amici Organizations in this lawsuit, drive the educational benefits of diversity by hosting events, initiating dialogue, and educating the Harvard community about the lived experiences of Black, Latinx, Asian American, and Native people, as well as students of other identities. *See* 10/29 Tr. 36:7-37:4 (Chin); 17:3-20 (Vasquez-Rodriguez); 135:11-136:5 (Nuñez); 96:2-97:23 (Ho).

32.    For example, the Harvard-Radcliffe Asian American Women's Association ("AAWA"), the Harvard-Radcliffe Chinese Students Association, and the Harvard Vietnamese Association co-hosted a workshop on anti-Black racism in the Asian American/Pacific Islander community, for which attendance was capped after more than 600 people expressed interest. AO-06; 10/29 Tr. 99:7-100:17 (Ho). After an incident of police brutality against a Black Harvard student, members of the BSA and other Black student organizations coordinated a response campaign, including advocating on behalf of the student, engaging with Harvard and the Cambridge Police Department, and holding community events for students to reflect on and discuss the event. 10/29 Tr. 181:11-182:11 (Trice); 155:4-15 (Diep).

33.    Many of the events sponsored by Amici Organizations encourage cross-racial engagement, welcoming Harvard students from different backgrounds. *See* AO-17, 10/29 Tr.

96:16-97:4, 102:17-103:24 (Ho); 132:5-133:5, 136:18-25 (Nuñez); 189:8-18 (Trice). Organizations representing different racial and ethnic groups also co-sponsor events and partner on initiatives. *See* 10/29 Tr. 135:5-136:17 (Nuñez); 180:16-181:8 (Trice).

34.     Amici Organizations have long provided academic, social, economic, and emotional support to students of color. 10/29 Tr. 20:9-21:4 (Vasquez-Rodriguez); 34:7-15 (Chin); 73:15-24 (Cole); 94:20-95:10 (Ho). Among other services, these organizations provide their members with mentoring, professional networking opportunities, academic advice, mental health support, social engagement, and a safe space to express themselves and gain support. *See* AO-04, AO-17, AO-28; 10/29 Tr. 178:8-25, 179:19-180:15, 183:17-184:1, 184:25-186:1 (Trice); 129:19-24, 131:9-13, 133:21-135:4 (Nuñez); 94:19-95:13 (Ho). For some students, the presence of these organizations makes Harvard feel like a "home," where they feel a sense of belonging. 10/29 Tr. 173:15-23 (Trice); 92:1-18 (Ho); *see also* 10/29 Tr. 20:11-13 (Vasquez-Rodriguez) ("I found my solace and relief in student groups on campus and . . . cultural groups."); 73:15-16 (Cole) (describing how "the [BSA] was a saving grace" in the face of racial hostility on campus); 182:12-23, 185:17-189:7 (Trice) (describing mentoring and other support that BSA and Association of Black Harvard Women ("ABHW") provides for students).

35.     These services are especially critical where Harvard's own support systems fall short or overlook the particular needs of students of color. *See* 10/29 Tr. 77:18-78:11 (Cole); 187:16-189:7 (Trice).

**B.      Due to the Lack of Workable Race-Neutral Alternatives, a Race-Blind Admissions Policy Would Decimate the Number of Black and Latinx Students, Resulting in Significant Harms to All Harvard Students.**[4]

    *i.      Race-Neutral Alternatives Would Not Foster a Level of Diversity Sufficient to Achieve the Educational Benefits of Diversity.*

36.      Despite studying and attempting many race-neutral alternatives, Harvard cannot achieve a sufficient level of diversity that would allow students to reap the educational benefits of diversity without an admissions policy that considers race, as one of many factors. The testimony of Plaintiff's expert, Richard Kahlenberg, did not provide any basis on which to conclude otherwise.

37.      *First*, Mr. Kahlenberg agreed that the best and most efficient way to promote racial diversity is to consider race itself. 10/22 Tr. 82:4-10 (Kahlenberg).

38.      *Second*, each of Mr. Kahlenberg's four simulations that estimated admissions rates based on various combinations of race-neutral alternatives showed a significant decline in the percentage of Black students admitted to Harvard. 10/22 Tr. 33:15-47:18 (Kahlenberg).

---

[4] SFFA seemingly acknowledges the extreme nature of its original request for a "permanent injunction requiring Harvard to conduct all admissions in a manner that does not permit those engaged in the decision process to be aware of or learn the race or ethnicity of any applicant for admission," Compl. at 119, ECF No. 1. *See, e.g.*, 10/22 Tr. 71:8-72:7 (SFFA's expert testifying that Harvard should be allowed to consider whether an applicant overcame racial discrimination). Without a finding of liability, the issue of remedies is not ripe for consideration. However, it is worth noting that the drastic, unworkable, and indefensible remedy proposed by SFFA reveals the true intentions with this lawsuit: the wholesale elimination of race conscious admissions in higher education. Indeed, not only would such an injunction fail to redress the alleged discrimination against Asian Americans, it would have an acute, foreseeable, and racially discriminatory impact on applicants of color, whose names, zip codes, high schools, awards, leadership roles, and community service often signal their race and whose personal statements and recommendation letters would be rendered unintelligible were references to race redacted. *See* 11/2 Tr. 23:15-23 (SFFA's lawyer admitting in closing arguments, "we know that many applicants to Harvard are writing about their experiences facing discrimination, their identity in terms of ethnicity or race, and we heard a lot of that testimony on the day that we had the students testify, which is evidence that that is in front of these admissions officers in many instances"). Furthermore, such an injunction would prevent Harvard from continuing to interview applicants in person and view applicants' athletic, drama, music, dance, or other performances. Such an injunction may also have a chilling effect on applicants of color, infringing their right to "define and express their identity." *See* Devon W. Carbado & Cheryl I. Harris, *The New Racial Preferences*, 96 CALIF. L. REV. 1139, 1162 (Oct. 2008) (discussing how difficult it would be for college applicants who racially identify to "come up with a meaningful account of [their] life without referencing race" and without "captur[ing] who [they] imagine[] [themselves] to be"); *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593 (2015) ("The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity.").

Additionally, in every single simulation, the racial group that bore the largest burden of race-neutral alternatives was Black applicants. *Id.* A campus with a greatly diminished Black student population—even where numbers of students of color as a whole remain the same—cannot reap the educational benefits of diversity. *See infra ¶* 62. Thus, Mr. Kahlenberg failed to identify race-neutral alternatives that achieve a sufficient level of diversity.

39.     Harvard already uses numerous race-neutral practices aimed at increasing diversity in admissions, such as substantial recruitment of prospective students of color through its Undergraduate Minority Recruitment Program ("UMRP"), 10/24 Tr. 95:12-21, 98:15-99:12 (Banks); 211:1-4 (Ray), and the Harvard Financial Aid Initiative, started in 2004, which seeks to recruit and support strong low-income applicants and to provide them with significant financial aid. 11/1 Tr. 200:10-25 (Faust); 10/24 Tr. 102:10-103:1, 103:21-104:3 (Banks), 148:24-149:5 (Kim).

40.     Despite these efforts, Black students are a relatively small portion of Harvard's applicant pool, averaging around 2,700 domestic applicants each year out of a total pool of more than 40,000 applicants. P623; P634; 10/17 Tr. 194:12-14 (Fitzsimmons). A similar pattern holds for Latinx applicants, who comprise only around 3,000 domestic applicants each year. P623; P634. By comparison, about 2.5 times as many Asian American students and nearly four times as many white students apply to Harvard each year. P623; P634.

41.     Harvard has studied various other combinations of race-neutral admissions practices, including those recommended by Mr. Kahlenberg, and concluded that none would produce a student body that is as broadly diverse and with similar academic qualifications as the students that Harvard admits with the limited consideration of race. *See* Harvard FOF/COL ¶¶ 203-55.

42.      The real-life experiences of Harvard students and applicants cannot be accurately captured by focusing solely on socioeconomic status in lieu of race in admissions. Recent Harvard alumna Itzel Libertad Vasquez-Rodriguez described her race and ethnicity as "visibly salient," but her low socioeconomic class is not. 10/29 Tr. 22:5-21 (Vasquez-Rodriguez). As a result, she does not feel judged because of her class, but does feel discrimination based on her race and ethnicity. *Id.* Without considering those aspects of her identity, Harvard would be unable to understand her full life experience. 10/29 Tr. 12:25-13:6, 13:13-17 (Vasquez-Rodriguez).

43.      For another recent Harvard graduate, Sarah Cole, the salience of her racial identity as a Black woman is distinct from the salience of her working-class identity. During Ms. Cole's childhood, her family's financial situation fluctuated widely, but even when her family was doing well enough to afford a vacation, they could never escape racial discrimination. 10/29 Tr. 80:20-15 (Cole).

44.      Other Harvard students have experienced racial discrimination in ways that were distinct from their socioeconomic status. Harvard junior Cecilia Nuñez, who identifies as African American and Latina, experienced racial isolation and false assumptions that she came from a low socioeconomic background, causing some of her friends' parents to refuse to allow their children to stay at her house, even though both of her parents are doctors. 10/29 Tr. 114:24-117:6 (Nuñez). Harvard sophomore Madison Trice's family is Black and upper-middle class, but she nevertheless experienced isolation, bullying, and teachers who underestimated her because of her race. 10/29 Tr. 168:14-21, 171:2-13, 167:1-13 (Trice); *see also supra* ¶ 7. Ms. Trice wrote about some of these experiences in her Harvard application, 10/29 Tr. 170:22-172:18 (Trice), and Harvard would not have known key aspects of her life experience if it could not consider her race.

ii. *Removing All Considerations of Race in Harvard's Admissions Would Drastically Reduce the Number of Admitted Students of Color, Causing Harm to All Harvard Students.*

45.    SFFA's expert admits that eliminating the consideration of race would reduce the number of Black and Latinx students on campus by roughly 1,100 students. 10/25 Tr. 131:14-132:14, 167:11-168:4 (Arcidiacono). Likewise, according to Harvard's expert, Dr. David Card, the share of Black students in Harvard's admitted class would drop from 14% to 6%, and the share of Latinx and "Other" underrepresented minority students would drop from 14% to 9%. 10/31 Tr. 126:21-129:2 (Card).

46.    Under Mr. Kahlenberg's analysis of his own proposed race-neutral alternatives, the share of admitted Black students would still drop from 14% to 10%. 10/22 Tr. 127:16-22 (Kahlenberg). That means there would be nearly one-third fewer Black students in each entering class. In each of Mr. Kahlenberg's simulations, the proportion of Black students at Harvard decreased more than any other racial group. 10/22 Tr. 128:14-20 (Kahlenberg).

47.    All of the student and alumni witnesses testified that a dramatic decline in the number of Black and Latinx students on campus resulting from a race-blind admissions process would prevent Harvard students from obtaining the educational benefits of diversity because there would be fewer opportunities for meaningful interactions and dialogue with racially diverse students. 10/29 Tr. 17:8-20, 21:10-11 (Vasquez-Rodriguez); 30:18-22 (Chin); 78:25-79:13 (Cole); 105:19-108:25 (Ho); 128:14-22 (Nuñez); 153:6-155:21 (Diep); 192:18-193:9 (Trice); 210:17-211:8 (Chen). For example, Harvard sophomore Catherine Ho "definitely [thought her] educational experience . . . would [be] worse off" without the "perspectives and stories" of Black and Latinx students because, without them, "who are [she and other students] supposed to be learning from?" 10/29 Tr. 109:21-110:3 (Ho).

17

48.     SFFA did not present evidence that counters this testimony. Neither Mr. Kahlenberg nor any other trial witness presented evidence rebutting the fact that the decrease of Black students—estimated by Mr. Kahlenberg himself—would detrimentally affect the social and emotional well-being of students of color, specifically Black Harvard students, and the educational benefits of diversity to all students. In fact, Mr. Kahlenberg declined to explore this question; he did not speak to any Harvard students or faculty about the effect that a decrease in Black students would have on the educational experience at Harvard. 10/22 Tr. 127:24-128:8 (Kahlenberg).

49.     A significant decrease in racial diversity resulting from the elimination of race-conscious admissions would greatly reduce Harvard students' exposure to intercultural experiences that prepare them for their future work as citizen-leaders in a global society. *See supra* ¶¶ 16-18.

50.     Without race-conscious admissions, there also would be less diversity within racial groups on campus and fewer opportunities to challenge bias and monolithic understandings of Black and Latinx identity. *See supra* ¶¶ 15, 24-26.

51.     The elimination of race-conscious admissions, and the resulting reduction in Black and Latinx students on campus, would increase the feeling of isolation for students from underrepresented backgrounds. 10/29 Tr. 19:5-20:8 (Vasquez-Rodriquez); 78:12-24 (Cole); 138:18-139:2 (Nuñez); *see also supra* ¶¶ 20-22. This harm extends to Asian American students. *See supra* ¶ 23.

52.     The level of inclusivity that currently exists at Harvard, while far from perfect, is directly related to having a significant population of students of color on campus to collectively insist on nondiscriminatory treatment in social interactions. 10/29 Tr. 177:6-22 (Trice). For

example, when Harvard junior Cecilia Nuñez was in the company of significant numbers of Latinx students on campus, she felt safe in responding to racial bigotry—a feeling she would not have possessed if she were alone or one of only a few Latinx students. 10/29 Tr. 129:11-18 (Nuñez). Thus, the loss of race-conscious admissions, and the resulting loss of Black and Latinx students on campus, would significantly exacerbate the social isolation and racial hostility already experienced by Harvard's students of color.

53.     The Asian American students and alumni who testified at trial seek the continuation of race-conscious recruitment and admissions. 10/29 Tr. 48:9-11 (Chin); 112:6-8 (Ho); 157:10-158:12 (Diep); 210:20-23 (Chen). While SFFA attempts to find support for a race-blind remedy in a 1983 article written by Harvard alumna, Professor Margaret Chin, and 25 other students at that time, Professor Chin herself testified that her "article was written to support race conscious admissions" and to promote the "inclu[sion] of [Asian Americans] in the minority recruitment process and affirmative action." 10/29 Tr. 43:25-44:4 (Chin). By contrast, no Asian Americans testified in support of SFFA.

> iii. *A Significant Reduction of Students of Color Would Negatively Impact Minority Recruitment, Resulting in an Even Greater Reduction of Students of Color.*

54.     Harvard works to attract future students of color through the UMRP and other targeted recruitment efforts. 10/24 Tr. 95:12-21, 98:15-99:12 (Banks); 211:1-4 (Ray). During Visitas, admitted students of color are matched with student hosts and explore the campus through programming that targets diverse students. 10/24 Tr. 219:3-220:21 (Ray). Students of color play a key role in recruiting other students of color. "Typically the leaders of various minority groups and communities on campus bec[o]me [recruitment] coordinators" and host students during Visitas to allow them to see "what it[']s like as a student of color at Harvard." 10/24 Tr. 97:12-18, 99:13-24 (Banks); 10/29 Tr. 39:2-21 (Chin).

19

55.     The UMRP influenced the decisions of many of the student and alumni witnesses to attend Harvard. 10/29 Tr. 92:8-18 (Ho) (explaining that the UMRP was helpful in providing her with a sense of school culture and climate). Through Visitas, Harvard showcases the campus diversity that attracts many students of color to Harvard. 10/29 Tr. 70:6-21 (Cole) (explaining that the UMRP arranged a visit that allowed her to meet other Black students and to "feel like I could have community here in ways that I just never imagined I could have"); 118:6-14 (Nuñez) (explaining how interacting with student and service organizations during her visit convinced her that Harvard "had the diverse . . . and welcoming student body that I was looking for"); 173:13-174:8 (Trice) (describing how, during Visitas, her interactions with Black affinity groups impacted her decision to attend Harvard).

56.     The elimination of race-conscious admissions, and the resulting decline in Black and Latinx students, would make Harvard less appealing to prospective students, particularly students of color—which would, in turn, depress the number of applicants of color and further exacerbate the decline in Harvard's diversity. For example, while Harvard sophomore Madison Trice enthusiastically recruits Black students to attend Harvard today, a significant reduction in Black and Latinx students would dampen her enthusiasm because the racial climate at Harvard could change in ways that harm students of color, as it did in her much less diverse high school. 10/29 Tr. 93:13-194:9 (Trice). In addition, without race-conscious admissions, there would be fewer students of color on campus to support the UMRP and to host Visitas events, limiting those recruitment efforts.

57.     Racial diversity was a crucial factor in the Amici witnesses' decisions to apply to, and ultimately attend, Harvard; without this diversity they might not have made the same decisions. *See, e.g.*, 10/29 Tr. 172:19-174:5 (Trice) (explaining that "the critical mass that Harvard

20

has of minority students was really important" in her decision to attend Harvard). Harvard junior Cecilia Nuñez considered it immensely "important to be in a school that had a very diverse student body" and believed that if Harvard "hadn't felt like it was a space that would be welcoming to people of color and it hadn't felt like a very diverse space, it probably would have affected [her] ultimate decision to go." 10/29 Tr. 117:21-24, 119:16-18 (Nuñez).

58.     The elimination of race-conscious admissions would impede Harvard's efforts to recruit students who seek an institution that values diversity and inclusion. Itzel Libertad Vasquez-Rodriguez "probably would not have applied to Harvard if they didn't take race into account." 10/29 Tr. 16: 23-24 (Vasquez-Rodriguez). If a school did not employ race-conscious admissions, Cecilia Nuñez "would have questioned maybe the motives of the school and if the school was really that dedicated to diversity and to its students of color if it was failing to recognize them from the get-go." 10/29 Tr. 122:22-25 (Nuñez). "If Harvard adopted race-blind admissions, that would signal to students of color," like Sarah Cole, "that Harvard was disinterested in [them]. Race-blind admissions is an act[ of] erasure." 10/29 Tr. 83:22-24 (Cole). Under race-blind admissions, "there [would be] fewer students of color applying to Harvard" and "fewer students of color accepting the chance to go to Harvard." 10/29 Tr. 83:17-84:13 (Cole).

> iv. *A Significant Reduction in Students of Color Would Devastate Many of the Amici Organizations.*

59.     The Amici Organizations create opportunities for students of all backgrounds to engage in cross-racial exchange. 10/29 Tr. 38:9-39:1 (Chin); 96:16-103:21 (Ho); 132:24-133:5, 135:5-136:25 (Nuñez); 180:16-181:8, 189:8-16 (Trice); *see also supra* ¶¶ 31-33. However, without race-conscious admissions, the subsequent reduction in the number of Black and Latinx students would cause many organizations, including certain Amici Organizations, to suffer a decline in their membership ranks. *See* 10/29 Tr. 130:2-25, 138:13-21 (Nuñez); 191:13-192:13 (Trice), 21:5-

22:3 (Vasquez-Rodriguez). Because "there are so few students of color and under-represented minority groups at Harvard as it is[,] . . . any sort of reduction in any of those groups would be really detrimental to the community at Harvard, both for students of color, but also just for students in general." 10/29 Tr. 21:11-16 (Vasquez-Rodriguez).

60.     Some student organizations would have to reduce the size of their leadership boards or the programming they offer. 10/29 Tr. 191:23-192:5 (Trice) (A significant reduction in the presence of Black students "would be a huge loss for [the BSA's] ability to put together programming and also for us to learn and grow together."). If some organizations suffer a sizable reduction in their membership, they could cease to exist or no longer have the capacity to be effective. 10/29 Tr. 138:18-21 (Nuñez) ("[T]he idea that there could be a much smaller pool of Latinx students . . . on campus is concern[ing]" as it calls into question whether Fuerza Latina "as an organization [can] continue to exist.").

61.     Even organizations that do not lose members would be less able to provide quality programming and experiences for their members and for the larger Harvard community due to a reduction in Black and Latinx students on campus, who are integral to these events. 10/29 Tr. 192:9-17 (Trice) ("There are so many ways that BSA touches other communities that I think the general community would lose out."). For example, AAWA "does a lot of events with other organizations of color. And obviously, if those organizations of color have fewer members . . . that's going to be detrimental to AAWA." 10/29 Tr. 109:15-20, 111:2-10 (Ho).

62.     As one of the older, more established organizations, the BSA hosts events that serve the greater community, such as the Minority Career Fair, and inspires and paves the way for other identity groups. *See* 10/29 Tr. 179:19-180:15, 192:6-17 (Trice). Indeed, other affinity groups model their programming after the BSA and depend on the existence of this organization for

support. 10/29 Tr. 21:17-22:2 (Vasquez-Rodriguez). A significant reduction of Black students, therefore, would be devastating for Harvard students beyond the Black Harvard community.

63.     Affinity groups provide needed support to students of color on Harvard's campus. *See supra* ¶¶ 34-35. Without race-conscious admissions, affinity groups would have reduced capacity because "if you have fewer students of color on Harvard's campus, then there's fewer people to do" the work of creating "support systems" for students of color, "and that work becomes more exhausting." 10/29 Tr. 78:6-11 (Cole).

64.     Without race-conscious admissions, affinity groups would have reduced capacity to advocate for institutional change and more inclusion on campus that benefits not only students who share the same racial identity, but the larger Harvard community as well. 10/29 Tr. 22:1-2 (Vasquez-Rodriguez) (explaining that "positive change at Harvard comes from" advocacy led by "student groups of color"); *see also supra* ¶ 29.

65.     Public advocacy led by affinity groups "tend[s] to make other spaces on campus more inclusive" and would be reduced if race-conscious admissions were to end. 10/29 Tr. 190:18-19 (Trice). For example, BSA provided education and "improved the campus climate" for all students in the wake of the police brutality incident. 10/29 Tr. 155:4-15 (Diep). This helped an Asian American student, Harvard senior Thang Diep, "understand a bit better about issues affecting a different community[]" and also understand how "the issues affecting [his] own communit[y] are "inherently [] tied to issues affecting other communities of color." 10/29 Tr. 155:11-21 (Diep).

C.     **Race-Conscious Admissions Allows Harvard to Consider the Breadth of Many Students' Lived Experiences.**

66.     Race-conscious admissions allow Harvard to more fully evaluate applicants, including Asian American applicants. For example, in order for Harvard to fully evaluate his application, senior Thang Diep believed it was "crucial" for him to share his ethnic identity and experiences with racial prejudice "in order to portray [his] growth authentically and really show . . . the admission officer who [he] really [was.]" 10/29 Tr. 145:21-146:6 (Diep). Although Harvard noted that his "SAT score [wa]s on the lower end of the Harvard average," his compelling discussion about his Vietnamese identity and his experiences overcoming the adversity he encountered as an immigrant stood out to admissions officers. 10/29 Tr. 146:19-148:3 (Diep); SA-2 at 29.

67.     When Harvard senior Sally Chen reviewed her admissions file, she "appreciated the ways in which [her] admissions reader saw what [she] was trying to say when [she] was talking about the significance of growing up in a culturally Chinese home, of the kinds of work and responsibility that [she] took on from that." 10/29 Tr. 202:5-9 (Chen). Through holistic admissions, Ms. Chen's ethnic and racial background provided context to help the admissions committee understand her achievements and provide "a more cohesive narrative of the kind of person" that she would be "in college and beyond." 10/29 Tr. 204:4-9 (Chen).

68.     For some applicants, memories of discrimination or ethnic and racial pride are at the root of what motivates them to work hard and advocate for change. 10/29 Tr. 13:13-17 (Vasquez-Rodriguez) (commenting that "[a]ll of [her] life's ambitions revolve around communities of color and [her] ethnoracial identity"); 170:11-171:19 (Trice) (explaining how her experience with racial discrimination led to her interest in social justice work); 202:14-203:1, 212:13-19 (Chen) (discussing how "the kinds of cultural-linguistic[] barriers that [her] parents

24

faced because of their race" shaped her personal and academic interests and her future leadership goals). Race-blind admissions would disproportionately impact applicants of color who are more likely to have formative experiences related to race, which Harvard must consider to fully understand their potential contributions to the classroom and campus life.

69.     SFFA's requested remedy would prohibit Harvard from considering an applicant's experiences with race and ethnicity—and the contributions of those experiences to the Harvard community—while, at the same time, recognizing every other manifestation of identity, such as socioeconomic status, religion, gender, sexual orientation, or disability. This would place applicants who racially identify (namely, applicants of color) at a significant disadvantage by not having important aspects of their life considered in the admissions process. For recent graduate Sarah Cole, "[t]o try to not see my race is to try to not see me simply because there is no part of my experience, no part of my journey, no part of my life that has been untouched by my race." 10/29 Tr. 83:24-84:2 (Cole). As a result, "it would be nearly impossible for me to try to explain my academic journey, to try to explain my triumphs without implicating my race." 10/29 Tr. 84:3-5 (Cole).

70.     Race-conscious admissions allows Harvard to fully evaluate individual applicants in the context of the inequality that may have shaped their educational opportunities. Race systematically impacts the opportunities and resources that applicants can access before they apply to college, such as access to advanced course offerings, 10/29 Tr. 167:1-15 (Trice), access to magnet schools, 10/29 Tr. 144:5-11 (Diep), standardized test preparation, 10/29 Tr. 66:13-67:5 (Cole), and the decision to apply for and attend college, 10/29 Tr. 68:22-69:17 (Cole). *See also* U.S. Dep't of Educ. Office for Civil Rights, 2013-2014 Civil Rights Data Collection: A First Look (June 2016; Revised Oct. 2016) ("CRDC First Look") (surveying public school districts across the

country and concluding that Black and Latinx students have less access to advanced course work, experienced teachers, and school counselors), https://www2.ed.gov/about/offices/list/ocr/docs/2013-14-first-look.pdf; Nat'l Endowment for the Arts, A Decade of Arts Engagement: Findings from the Survey of Public Participation in the Arts, 2002–2012 1, 66 (Jan. 2015) (finding that children of Black and Latinx parents were less likely to receive music and art instruction in school), https://www.arts.gov/sites/default/files/2012-sppa-feb2015.pdf.[5]

71.     Racial and ethnic isolation in primary and secondary schools limits students' experiences before graduating from high school and fuels the racial gap in educational opportunities. *See* U.S. Dep't of Educ., Office of Planning, Evaluation and Policy Development and Office of the Under Secretary, Advancing Diversity and Inclusion in Higher Education at 14-18 (2016), https://www2.ed.gov/rschstat/research/pubs/advancing-diversity-inclusion.pdf. Moreover, Black and Latinx students are more likely to attend schools that are under-resourced with students who are low-income; *see* U.S. Comm'n on Civil Rights, Public Education Funding Inequity in an Era of Increasing Concentration of Poverty and Resegregation 13 (Jan. 2018), https://www.usccr.gov/pubs/2018/2018-01-10-Education-Inequity.pdf.

72.     Standardized test scores too often reflect students' resources and background, which would include their racial and ethnic background, as much as their academic ability. Harvard FOF/COL ¶ 248 (noting that SAT scores and GPAs have "limited value in identifying applicants

---

[5] The Court may take judicial notice of government records, including agency reports. *See, e.g.*, *Barber v. Ponte*, 772 F.2d 982, 998-99 & nn.4-16 (1st Cir. 1985) (taking judicial notice of statistics from the U.S. Bureau of the Census and reports from the Centers for Disease Control); *Kader v. Sarepta Therapeutics, Inc.*, No. 1:14-CV-14318-ADB, 2017 WL 72396, at *2 n.3 (D. Mass. Jan. 6, 2017) (Burroughs, J.) (taking judicial notice of an FDA press release), *aff'd*, 887 F.3d 48 (1st Cir. 2018); *accord Lamers Dairy Inc. v. U.S. Dep't of Agric.*, 379 F.3d 466, 471 n.8 (7th Cir. 2004) ("This court may take judicial notice of reports of administrative bodies."); *CFK Sports, Inc. v. Correa-Oppenheimer*, 325 F.R.D. 30, 33 n.3 (D.P.R. 2018) ("Documents contained in the public record, including the records and reports of administrative bodies, are proper subjects of judicial notice." (citing *Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005)).

with strong academic potential"); P316 at 18 (concluding in the report of Harvard's Committee to Study Race-Neutral Alternatives that standardized tests are "imperfect measures" affected by an applicant's background and ability to prepare); 10/29 Tr. 198:14-199:3 (Chen).

73.    Even in wealthy, high-performing schools, students of color face racial bias that can limit academic opportunity. Harvard sophomore Madison Trice experienced isolation and tokenization as one of the only Black students in her private high school despite her upper-middle class upbringing. 10/29 Tr. 168:7-21 (Trice). Moreover, as an elementary school student, Ms. Trice was not admitted to a gifted class, despite her stellar academic performance, until her parents intervened on her behalf—after which she was the only Black student in the gifted class. 10/29 Tr. 166:19-167:15. According to Director of Admissions Marlyn McGrath, many students of color who apply to Harvard demonstrate "persistence, courage, [and] self-confidence" by overcoming discrimination and racial isolation. 10/19 Tr. 255:21 (McGrath).

74.    Through its race-conscious admissions program, Harvard considers the differences in experiences and opportunities among applicants from different Asian American ethnic groups as well. *See* 10/18 Tr. 51:20-53:1; 60:9-61:7 (Fitzsimmons); 10/24 Tr. 228:20-230:7 (Ray) ("[G]iven that students and populations of people who identify as Asian-American are so diverse, we wanted to really highlight the fact that there's a lot of diversity within that population in terms of country of origin, cultural identity, and other items as well."); *see also supra* at ¶ 26.

75.    This approach acknowledges that many Asian Americans of certain ethnic backgrounds may have faced particular hardships or disadvantages compared to their peers. *See* 10/18 Tr. 60:9-61:7 (Fitzsimmons) (discussing, as an example, certain Hmong applicants and other recent immigrants from Southeast Asia who came from "extremely impoverished rural backgrounds"); U.S. Census Bureau, 2011-2015 American Community Survey Selected

Population Tables on American Fact Finder, https://factfinder.census.gov/faces/nav/jsf/pages/ searchresults.xhtml?refresh=t (indicating 26% of Hmong Americans, 20% of Cambodian Americans, 17% of Laotian Americans, and 15% of Vietnamese Americans live below the poverty line); U.S. Dep't of Educ., Nat'l Ctr. For Educ. Statistics, The Condition of Education 2018 82 (May 2018), https://nces.ed.gov/pubs2018/2018144.pdf (concluding that a quarter of Pacific Islander students attend a high-poverty school, while only 8% of white students do so); CRDC First Look, at 9 (finding that while more than one-third of Native Hawaiian or other Pacific Islander students attend schools where more than half of the teachers were absent for more than 10 days, only 12% of white students do so).

76.     Not a single Asian American applicant, student, or alumni testified at trial in support of SFFA. In contrast, multiple Asian American Harvard students and alumni testified about how they benefited from race-conscious admissions. Thang Diep "personally . . . believe[s] that [he] benefited from affirmative action. . . [because] it allows [his] immigration history to be taken into account. It allows . . . [his] racial identi[t]y . . . to really be portrayed." 10/29 Tr. 158:5-11 (Diep). If race were not considered in admissions, Sally Chen "do[es]n't think [she] would be [at Harvard]." 10/29 Tr. 211:11 (Chen). Similarly, removing the consideration of race from Catherine Ho's admissions assessment would make her "story . . . not complete. The story can't really even be told" because "all of [her] experiences are informed by the fact that [she is] Vietnamese-American." 10/29 Tr. 89:14-90:3 (Ho).

77.     Based on her experiences before, during, and after her time at Harvard in the 1980s, Professor Margaret Chin believes that "race matters in everyday life" for Asian American applicants and racial differences "have impacted [applicants'] lives up to the application." 10/29 Tr. 48:1-8 (Chin). As a Harvard student and minority recruiter, Professor Chin was concerned

about the underrepresentation of, discrimination against, and lack of support for Asian American students at Harvard. 10/29 Tr. 42:7-11 (Chin). However, Professor Chin and her fellow students at that time advocated for *race consciousness*, not race blindness, in Harvard's admissions to address these concerns, 10/29 Tr. 43:23-44:4, contrary to SFFA's mischaracterizations of Professor Chin's student writings, *see* Pl.'s Proposed Findings of Fact and Conclusions of Law, ECF No. 620, ¶¶ 94-95.

## III.   PROPOSED CONCLUSIONS OF LAW

78.     As the Supreme Court has repeatedly reaffirmed, colleges and universities may lawfully pursue the educational benefits of diversity by considering race, in a narrowly tailored manner, when selecting applicants for admission. *See generally Regents of Univ. of Calif. v. Bakke*, 438 U.S. 265 (1978); *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Grutter v. Bollinger*, 539 U.S. 306 (2003); *Fisher v. Univ. of Texas*, 570 U.S. 297 (2013) ("Fisher I"); *Fisher v. Univ. of Texas*, 136 S. Ct. 2198 (2016) ("Fisher II").

79.     Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.,* and its implementing regulations, 34 C.F.R. Part 100, prohibit discrimination based on race, color, or national origin by recipients of federal financial assistance, including many colleges and universities.

80.     To comply with Title VI and be constitutionally permissible, racial classifications must pass strict scrutiny; that is, they must be narrowly tailored to achieve a compelling state interest.[6] *Bakke*, 438 U.S. at 299; *Gratz*, 539 U.S. at 270; *Grutter*, 539 U.S. at 326; *Fisher I*, 570

---

[6] As noted by Harvard, the Supreme Court's precedents concerning race-conscious admissions policies involve public universities, which, as state actors, are subject to the Equal Protection Clause of the Fourteenth Amendment. Harvard FOF/COL ¶ 294 n.2. As set forth in this brief, Amici Organizations maintain that Harvard's limited consideration of race to increase diversity would clearly satisfy strict scrutiny if that standard were applied to

U.S. at 307-08 & 310; *Fisher II*, 136 S. Ct. at 2208.

      **A.**    **Pursuant to Longstanding Supreme Court Precedent, Harvard Can Consider Race, as One of Many Factors, in College Admissions to Foster the Educational Benefits of Diversity.**

     81.    "[A]cademic freedom," which has "long been viewed as a special concern of the First Amendment," includes "[t]he freedom of a university to make its own judgments [about] the selection of its student body." *Bakke*, 438 U.S. at 312; *see also Grutter*, 539 U.S. at 329. In its own judgment, Harvard has decided that the educational benefits of diversity are an important component of a Harvard education. Harvard FOF/COL ¶¶ 2-13. Harvard's "educational judgment that such diversity is essential to its educational mission is one to which [courts] defer" pursuant to the Supreme Court's "tradition of giving a degree of deference to a university's academic decisions, within constitutionally prescribed limits." *Grutter*, 539 U.S. at 328.

     82.    The Supreme Court "has long recognized that 'education . . . is the very foundation of good citizenship.'" *Grutter*, 539 U.S. at 331 (quoting *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954)). Education is "pivotal to 'sustaining our political and cultural heritage' with a fundamental role in maintaining the fabric of society." *Id.* (quoting *Plyler v. Doe*, 457 U.S. 202, 221 (1982)).

     83.    "The atmosphere of 'speculation, experiment and creation'—so essential to the quality of higher education—is widely believed to be promoted by a diverse student body." *Bakke*,

---

Harvard, a private university, in the analysis for Title VI, as opposed to federal constitutional, liability. However, Amici Organizations reserve the right to argue on appeal that strict scrutiny is inapplicable here. By its plain language, Title VI does not prohibit admissions policies that permit the limited consideration of race, as one factor among many, in a holistic admission process designed to promote *inclusion* by mitigating the effects of racial discrimination in K-12 educational opportunities and in standardized testing. *See* Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.").

438 U.S. at 312 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (concurring in result)); *accord Fisher I*, 570 U.S. at 308.

84.     "Just as growing up in a particular region or having particular professional experiences is likely to affect an individual's views, so too is one's own, unique experience of being a racial minority in a society, like our own, in which race unfortunately still matters." *Grutter*, 539 U.S. at 333.

85.     Given this, "nothing less than the 'nation's future depends upon leaders trained through wide exposure to the ideas and mores of students as diverse as this Nation of many peoples.'" *Grutter*, 539 U.S. at 324 (quoting *Bakke*, 438 U.S. at 313). Thus, as recognized by the Supreme Court, the educational benefits of diversity at Harvard "are substantial," "important and laudable." *Grutter*, 539 U.S. at 330 (internal quotation marks and citations omitted).

86.     The diversity of Harvard's student body "promotes 'cross-racial understanding,' helps to break down racial stereotypes, and 'enables [students] to better understand persons of different races,'" thereby making for "livelier, more spirited, and simply more enlightening and interesting," classroom discussion. *Id.* (internal quotation marks and citations omitted); *accord Fisher I*, 570 U.S. at 308; *Fisher II*, 136 S. Ct. at 2210; *see also*, *supra*, ¶¶ 9-19, 23, 25-26, 32; Harvard FOF/COL ¶¶ 2-13.

87.     In addition, Harvard's "student body diversity promotes learning outcomes, and 'better prepares students for an increasingly diverse workforce and society, and better prepares them as professionals.'" *Grutter*, 539 U.S. at 330 (citations omitted); *accord Fisher I*, 570 U.S. at 308; *Fisher II*, 136 S. Ct. at 2210; *see also*, *supra*, ¶¶ 9-19, 23, 25-26, 32; Harvard FOF/COL ¶¶ 2-13.

88.     Importantly, the educational benefits of diversity cannot be accomplished "with only token numbers of minority students." *Grutter*, 539 U.S. at 333; *see Bakke*, 438 U.S. at 323 (citing, with approval, Harvard's admissions plan and acknowledging that "there is some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted."); *see also Grutter*, 539 U.S. at 336 (same). Concerns about tokenism are warranted given the experiences of the students and alumni who testified at trial. *See supra*, ¶¶ 21-23, 51-52; Harvard FOF/COL ¶¶ 14-18.

89.     The pursuit of the educational benefits of diversity, therefore, is a compelling state interest that justifies the narrowly tailored use of race in admissions. *Bakke*, 438 U.S. at 311-12; *Grutter*, 539 U.S. at 325 ("[T]oday we endorse Justice Powell's view that student body diversity is a compelling state interest that can justify the use of race in university admissions."); *Fisher II*, 136 S. Ct. at 2210; *see also Fisher I*, 570 U.S. at 308-09 ("In *Grutter*, the [Supreme] Court reaffirmed [Justice Powell's] conclusion [in *Bakke*] that obtaining the educational benefits of 'student body diversity is a compelling state interest that can justify the use of race in university admissions.'" (citation omitted)).

**B.      Harvard's Limited Consideration of Race in Its Holistic Admissions Policy Is Narrowly Tailored.**

90.     As the Supreme Court has explained, "[t]o be narrowly tailored, a race-conscious admissions program cannot use a quota system . . . . Instead, a university may consider race or ethnicity only as a 'plus' in a particular applicant's file, without insulat[ing] the individual from comparison with all other candidates for the available seats . . . ." *Id.* at 334 (quoting *Bakke*, 438 U.S. at 315, 317) (internal quotation marks omitted).

91.     "In other words, an admissions program must be 'flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight.'" *Id.* (citation omitted).

       *i.*  *Harvard Conducts Individualized, Whole-Person Reviews of Each Student Applicant, in Which Race Is Merely One of Many Factors Considered.*

92.     The limited consideration of race in Harvard's admissions process—which has been cited with approval multiple times by the Supreme Court, *see Bakke*, 438 U.S. at 317; *Grutter*, 539 U.S. at 337—is part of a holistic review that examines each applicant individually on the basis of multiple factors, of which race is but one. Harvard FOF/COL ¶¶ 316-18. Thus, race is not the defining characteristic of a student's application, but instead is merely a "plus factor" that allows Harvard to be flexible enough to consider the applicant on multiple dimensions and compare all applicants with each other. *Id.* ¶¶ 322-23.

93.     Harvard's holistic admissions process considers race as a positive "tip" when evaluating applicants who are already highly competitive regardless of race. 10/16 Tr. 29:8-30:17 (Fitzsimmons); Harvard FOF/COL ¶¶ 60-61. This "tip" can apply to an individual, highly competitive applicant of any race, including Asian Americans. *See supra* ¶¶ 66-67, 70-75.

94.     For example, Harvard admitted an Asian American applicant whose "SAT score is on the lower end of the Harvard average," but who stood out because of his experiences overcoming the adversity that he encountered due to his Vietnamese identity. 10/29 Tr. 146:19-148:3 (Diep). Meanwhile, Harvard denied admission to an applicant who identified as white and African American despite having perfect ACT and SAT verbal scores, but whose alumni interview seemed flat because she appeared somewhat rehearsed and perhaps coached. 10/24 Tr. 234:6-8,

236:11-22, 237:21-238:17 (Ray). Neither student was admitted or denied admission to Harvard due primarily to their race. *See supra* ¶¶ 4-5.

95.     Because Harvard considers race as merely one "plus" factor (or positive "tip") in an individualized, whole person review, because all applicants are compared against each other, and because applicants are not admitted or denied based primarily on their race, Harvard's race-conscious admissions policy is sufficiently narrowly tailored to satisfy strict scrutiny.

> ii.   *None of the Race-Neutral Alternatives Proposed by Plaintiffs Would Achieve Sufficient Levels of Diversity of Harvard Students, Particularly Black Students.*

96.     "Narrow tailoring also requires that the reviewing court verify that it is 'necessary' for a university to use race to achieve the educational benefits of diversity. . . . This involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications." *Fisher I*, 570 U.S. at 312 (citing *Bakke*, 438 U.S. at 305).

97.     "Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative. Nor does it require a university to choose between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups." *Grutter*, 539 U.S. at 339; *see also Fisher I*, 570 U.S. at 314 (noting that "strict scrutiny must not be strict in theory, but fatal in fact" (quotation marks and citations omitted)).

98.     "Narrow tailoring . . . does impose 'on the university the ultimate burden of demonstrating' that 'race-neutral alternatives' that are both 'available' and 'workable' 'do not suffice.'" *Fisher II*, 136 S. Ct. at 2208 (2016) (citations omitted).

99.     Harvard presently utilizes race-neutral practices to foster the racial diversity of its students, including its UMRP, which engaged in significant efforts to recruit prospective students of color, 10/24 Tr. 95:12-21, 98:15-99:12 (Banks); 211:1-4 (Ray), and the Harvard Financial Aid

Initiative, which recruits low-income applicants and provides them with significant financial aid, 11/1 Tr. 200:10-25 (Faust); 10/24 Tr. 102:10-103:1, 103:21-104:3 (Banks), 148:24-149:5 (Kim).

100.    Harvard has also studied other combinations of race-neutral admissions practices, including those proposed by SFFA's expert, but found that none of these race neutral alternatives are workable due to a substantial reduction in either the racial diversity or its preferred academic qualifications of admitted students. *See supra*, ¶¶ 41, 45-46; Harvard FOF/COL ¶¶ 203-55.

101.    Thus, SFFA has not identified any available and workable race-neutral alternatives that would produce the educational benefits of diversity. As in *Grutter*, the race-neutral alternatives presented by SFFA's expert "would require a dramatic sacrifice of diversity, the academic quality of all admitted students, or both." *Grutter*, 539 U.S. at 340.

102.    "By virtue of our Nation's struggle with racial inequality, [minority] students are both likely to have experiences of particular importance to the [college's or university's] mission," including its pursuit of the educational benefits of diversity, "and less likely to be admitted in meaningful numbers on criteria that ignore those experiences." *Grutter*, 539 U.S. at 338.

103.    For many applicants of color, their formative experiences, achievements, community involvement, and other aspects of their identity are often inextricably intertwined with race and overcoming racism. *See* Carbado & Harris, *supra*, at 1152-62 (illustrating why it is impossible and unethical to disregard race); *see also*, *supra*, ¶¶ 42-44, 66-77.

104.    Furthermore, federally-funded colleges and universities (as well as public colleges and universities) should not be compelled, as a matter of law, to disregard race, while, at the same time, acknowledging every other aspect of an applicant's identity and life experiences. Such a policy would disadvantage applicants who racially identify—namely, applicants of color—vis-à-

vis other applicants, and thus single out Black, Latinx, Asian American, Native American, and other applicants of color for disfavored treatment.

105.    Harvard's expert estimated that if all consideration of race were eliminated from the current admissions process, the percentage of Black admitted students would drop from 14% to 6%, and the percentage of admitted Latinx and "Other" underrepresented minority students would drop from 14% to 9%. 10/31 Tr. 126:21-129:2 (Card). SFFA's expert admits that this would reduce the number of Black and Latinx students at Harvard College by roughly 1,100 students. 10/25 Tr. 131:14-132:14, 167:11-168:4 (Arcidiacono).

106.    Even if race-neutral alternatives were incorporated into admissions, under SFFA's own analysis, the share of Black students in Harvard's entering class would still decrease by approximately one-third (14% to 10%). 10/22 Tr. 127:16-22 (Kahlenberg). The proportion of Black students at Harvard would decrease more than any other racial group in each of SFFA's four proposed race-neutral alternatives. 10/22 Tr. 128:14-20 (Kahlenberg).

107.    Such a significant reduction in Latinx and Black students, as demonstrated by both Harvard and SFFA's analyses, would be devastating for not only the Black and Latinx communities at Harvard, but also for the entire student body due to the inability for students to reap the educational benefits of diversity.

108.    A significant decrease in admitted Black and/or Latinx students would: reduce their voices and perspectives in student discussions and interactions both inside and outside the classroom; increase the racial isolation of Black and Latinx students (which would also inhibit their participation in cross-racial discussions and interactions); reduce the diversity within Black and Latinx student communities; provide fewer students of color to support Harvard's minority recruitment efforts; hinder the ability of Black and Latinx student organizations from supporting

their members and sponsoring cross-racial dialogues on campus; and increase the likelihood of tokenism and stereotyping of the Black and Latinx students who are admitted to Harvard.  *See supra,* ¶¶ 47, 49-65.

109.    Given that "universities . . . represent the training ground for a large number of our Nation's leaders, . . . it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity." *Grutter*, 539 U.S. at 332. Access to higher education "must be inclusive of talented and qualified individuals of every race and ethnicity, so that all members of our heterogeneous society may participate in the educational institutions that provide the training and education necessary to succeed in America." *Grutter*, 539 U.S. at 332-33.

110.    For access to educational opportunities to be truly equal, it is incumbent upon colleges and universities like Harvard to acknowledge and consider applicants' experiences overcoming the racially discriminatory barriers to education that continue to pervade our nation's primary and secondary schools.

111.    The lack of available and workable race-neutral alternatives that would achieve the educational benefits of diversity establishes that Harvard's race-conscious admissions process is narrowly tailored.

Dated: January 9, 2019

Respectfully submitted,

/s/ Jin Hee Lee
_____

Sherrilyn Ifill*
Janai Nelson*
Samuel Spital*
Jin Hee Lee*
Rachel Kleinman*
Cara McClellan*
NAACP Legal Defense

37

and Educational Fund, Inc.
40 Rector Street, 5th floor
New York, NY 10006
Tel: (212) 965-2200
Fax: (212) 226-7592

Michaele N. Turnage Young*
Jennifer A. Holmes*
NAACP Legal Defense
  and Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Tel: (202) 682-1300
Fax: (202) 682-1312

/s/ Kenneth N. Thayer
Kenneth N. Thayer, BBO #61029
thayer@sugarmanrogers.com
Kate R. Cook, BBO #650698
cook@sugarmanrogers.com
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street (9th floor)
Boston, MA 02114-4737
(617) 227-3030

*Counsel for Amici Curiae 21 Colorful
Crimson, Association of Black Harvard
Women, Coalition for a Diverse Harvard,
First Generation Harvard Alumni, Fuerza
Latina of Harvard, Harvard Asian
American Alumni Alliance, Harvard Asian
American Brotherhood, Harvard Black
Alumni Society, Harvard Islamic Society,
Harvard Japan Society, Harvard Korean
Association, Harvard Latino Alumni
Alliance, Harvard Minority Association of
Pre-Medical Students, Harvard Phillips
Brooks House Association, Harvard South
Asian Association, Harvard University
Muslim Alumni, Harvard Vietnamese
Association, Harvard-Radcliffe Asian
American Association, Harvard-Radcliffe
Asian American Women's Association,
Harvard-Radcliffe Black Students
Association, Harvard-Radcliffe Chinese
Students Association, Kuumba Singers of*

38

*Harvard College, Native American Alumni of Harvard University, Native Americans at Harvard College, and Task Force on Asian and Pacific American Studies at Harvard College.*

*\*Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 9th of January 2019, a copy of the above and foregoing

AMICI CURIAE HARVARD STUDENT AND ALUMNI ORGANIZATIONS' PROPOSED

FINDINGS OF FACT AND CONCLUSIONS OF LAW was filed electronically with the Clerk

of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record by

operation of the court's electronic filing system.

/s/ Jin Hee Lee
Jin Hee Lee*
NAACP Legal Defense &
  Educational Fund, Inc.
40 Rector Street, 5th floor
New York, NY 10006
(212) 965-2200

*Admitted Pro Hac Vice
