**UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF MASSACHUSETTS
BOSTON DIVISION**

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC, <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION), <br><br> Defendant. | Civil Action No. 1:14-cv-14176-ADB |

**AMICI CURIAE STUDENTS PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW**

## **TABLE OF CONTENTS**

**I.    Harvard's race-conscious admissions policy is both necessary and constitutional under well-settled Supreme Court precedent. ..................................................................... 3**

A.   Harvard's flexible appreciation of race is necessary to achieve its educational mission. 5

   i.    A flexible consideration of race is necessary for applicants to authentically portray themselves in whole person review. .................................................................................. 6

   ii.    The nuanced consideration of race is crucial for admissions officers to holistically and effectively evaluate applicants, especially ethno-racial minority applicants. ............... 9

   iii.   Race-conscious admissions remains necessary for cultivating the fullest depth and breadth of diversity which benefits all students. ............................................................... 12

      a.    Educational benefits of diversity are essential and flow to all students. ................ 12

      b.    A critical mass of students of color on campus is necessary to combat racial isolation and hostility. ...................................................................................................... 15

      c.    Race-neutral alternatives are insufficient to achieve benefits of diversity. ............ 19

      d.    Race-neutral alternatives may reduce diversity within each racial group. ............. 20

      e.    Benefits of racial diversity are unique from socioeconomic diversity. .................. 21

      f.    Statistical models underestimate the decrease in diversity produced by the elimination of race-conscious admissions. ..................................................................... 24

B.   Harvard engages in an individualized review process that appropriately considers race in a manner that is positive, contextual, and considers all pertinent elements of diversity... 25

   i.    Harvard's consideration of race does not use race as more than a "plus" factor for Black and Hispanic students. ........................................................................................... 26

   ii.    Harvard's consideration of race does not unduly harm Asian Americans ................ 32

   iii.   The record shows Harvard is not engaging in racial balancing but merely engaging in practices that have been approved by the Supreme Court. ................................................. 36

**II.   SFFA cannot satisfy its burden of proving intentional discrimination. ..................... 37**

**III.  The remedy SFFA seeks is unmoored from its legal claims. ....................................... 49**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Burgis v. New York City Dep't. of Sanitation*,
  798 F.3d 63 (2d Cir. 2015)....................................................................................41

*E.E.O.C. v. Tex. Roadhouse, Inc.*,
  215 F. Supp. 3d 140 (D. Mass. 2016) .....................................................................39

*EEOC v. Sears, Roebuck & Co.*,
  839 F.2d 302 (7th Cir. 1988) ..................................................................................40

*Fisher v. Univ. of Tex. at Austin*,
  136 S. Ct. 2198 (2016).......................................................................3, 4, 35, 49

*Fisher v. Univ. of Tex. at Austin*,
  570 U.S. 297 (2013)....................................................................................4, 10, 25

*Gratz v. Bollinger*,
  539 U.S. 244 (2003)................................................................................................50

*Grutter v. Bollinger*,
  539 U.S. 306 (2003)........................................................................................ *passim*

*Hassan v. City of New York*,
  804 F.3d 277 (3d Cir. 2015).....................................................................................38

*Int'l Bhd. of Teamsters v. United States*,
  431 U.S. 324 (1977)................................................................................................41

*Karp v. CIGNA Healthcare, Inc.*,
  882 F. Supp. 2d 199 (D. Mass. 2012) .....................................................................39

*Keyishian v. Bd. of Regents*,
  385 U.S. 589 (1967)..................................................................................................1

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015).............................................................................................6

*Palmer v. Shultz*,
  815 F.2d 84 (D.C. Cir. 1987)............................................................................39, 41

*Personnel Administrator of Massachusetts v. Feeney*,
  442 U.S. 256 (1979)................................................................................................37

*Regents of University of California v. Bakke*,
    438 U.S. 265 (1978)...............................................................................4, 33, 38, 50

*St. Mary's Honors Ctr. v. Hicks*,
    509 U.S. 502 (1993)..............................................................................................39

*Tex. Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981)..............................................................................................39

*United States v. Stokes*,
    124 F.3d 39 (1st Cir. 1997)....................................................................................50

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*,
    429 U.S. 252 (1977).................................................................................37, 38, 41

**Other Authorities**

Adam R. Pearson et al., *The Nature of Contemporary Prejudice*, Soc. &
    Personality Psychol. Compass, no. 3, 2009 ..........................................................51

Anthony L. Antonio et al., *Effects of Racial Diversity on Complex Thinking in
    College Students,* 15 Psychol. Sci. 507, 507-510 (2004).......................................22

Brief for Amicus Curiae Harvard University in Support of Respondents at 17*,
    Fisher v. Univ. of Tex. at Austin* (2015) (14-891), 2015 WL 6735848 ..................6

David L. Faigman, et al., *Implicit Bias in the Courtroom*, 59 UCLA L. Rev. 1124,
    1178-79 (2012).....................................................................................................36

Goodwin Liu, *The Causation Fallacy: Bakke and the Basic Arithmetic of
    Selective Admissions*, 100 Mich. L. Rev. 1045, 1046 (2002) .................................35

Jilali Luo & David Jamieson-Drake, *A Retrospective Assessment of the
    Educational Benefits of Interaction Across Racial Boundaries,* 50 J. of C.
    Student Dev. 67, 82 (2009) ...................................................................................13

Kristin Davies et al. , *Cross-Group Friendships and Intergroup Attitudes,* 15
    Personality and Soc. Psychol. Rev. 332, 345 (2011).............................................13

Maja Djikic et al., *Reducing Stereotypes Through Mindfulness: Effects on
    Automatic Stereotype-Activated Behaviors*, 15 J. Adult. Dev. 106, 110 (2008)......51

Mark C. Long, College Applications and the Effect of Affirmative Action, 121 J.
    of Econometrics 319, 340 (2004)...........................................................................24

Mitchell J. Chang et al., *The Educational Benefits of Sustaining Cross-Racial
    Interaction Among Undergraduates,* 77 J. of Higher Educ. 430, 430-55 (2006) ...................13

Nisha Gottfredson, et al., *The Effects of Educational Diversity in a National Sample of Law Students: Fitting Multilevel Latent Variable Models in Data with Categorical Indicators,* 44 Multivariate Behav. Res. 305, 326 (2009) ...........................13

Russell Pearce et al., *Difference Blindness vs. Bias Awareness: Why Law Firms with the Best of Intentions Have Failed to Create Diverse Partnerships*, 83 Fordham L. Rev. 2407, 2413 (2015)......................................................................................51

Sean F. Reardon, Rachel Baker & Daniel Kalsik, Race, Income and Enrollment Patterns in Highly Selective Colleges 1982-2004, at 2, Center for Education Policy Analysis, Stanford University (2012) ..........................................................................24

No party disputed at trial that race continues to matter in today's society, racial inequities persist, and racial diversity in higher education produces benefits.  In addition to the testimony from Harvard's witnesses, eight student witnesses—four *Student Amici*[1] and four *Student Organizational Amici*[2]—testified to these facts.  Strikingly, in a three-week federal trial alleging racial discrimination, SFFA presented no testimony from applicants who claimed to have been discriminated against.  The unrebutted accounts of *Students'* individual experiences highlight this failure and provide powerful evidence why, under Supreme Court precedent, Harvard must retain the right to consider race in a limited, flexible way.  A flexible appreciation of race is indispensable when evaluating college applicants to ensure "institutions are open and available to all segments of American society, including people of all races and ethnicities."  *Grutter v. Bollinger*, 539 U.S. 306, 331-32 (2003).  As *Students* affirmed, this limited use of race is also vital for many Asian American applicants heralding from diverse backgrounds.  It also fosters diverse environments which can train our nation's future leaders "through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues.'"  *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (citation omitted).

---

[1] *Students* are a racially and ethnically diverse group that includes prospective students, current students, and alumni of Harvard, all of whom are intimately impacted by Harvard's race-conscious policies.  *See* Dkt. 440, 440-1.  *Students* vary along numerous dimensions: representing no less than 8 different ethnicities, 8 different class years, and 13 different academic concentrations.  *Id.*  The four *Students* who testified at trial were Itzel Vasquez-Rodriguez (class of 2017: identifying as Xicana or Mexican American, and Latina more broadly, SA-3; 10/29 Tr. 9:3-8), Sarah Cole (class of 2016: identifying as Black American, SA-4, 10/29 Tr. 63:6-12), Thang Diep (class of 2019: identifying as Vietnamese American, SA-2, 10/29 Tr. 140:7-8), and Sally Chen (class of 2019: identifying as Chinese American, SA-1, 10/29 Tr. 199:18-23).  The trial transcript misspells the first name of Itzel Vasquez-Rodriguez and misspells the last name of Sally Chen.  *Students* have used the correct spelling in this brief.

[2] *Student Organizational Amici* are student and alumni organizations comprised of current and former Harvard students, who have an institutional interest in ensuring that Harvard College is an inclusive place of learning that provides students with the critically important benefits of diversity.  *See* Dkt. 471.  The four *Student Organizational Amici* who testified at trial were Margaret Chin (class of 1984: identifying as Chinese American 10/29 Tr. 26:10-27:16); Catherine Ho (class of 2021: identifying as Vietnamese American 10/29 Tr. 85:15-86:1); Madison Trice (class of 2021: identifying as African American 10/29 Tr. 166:7-20); Cecilia Nunez (class of 2020: identifying as African American and Mexican American 10/29 Tr. 113:13-114:1).

Harvard's right to consider race in admissions is firmly established both by the record and well-settled Supreme Court precedent.  *Students* emphasize that SFFA's two legal theories must be decoupled: SFFA's claim that Harvard's race-conscious policy is not narrowly tailored (Counts II, III, and V) is legally and factually distinct from its intentional discrimination claim (Count I).

*Section I* demonstrates that Harvard's consideration of race is both necessary and entirely lawful under Supreme Court precedent.  *Students*' unrebutted testimony confirms that a flexible consideration of race is necessary to perform a truly individualized, holistic assessment for applicants who ascribe importance to their ethno-racial identity.  It also remains necessary to fully appreciate the prior achievements and potential contributions of countless applicants whose lives have been shaped by race, including many Asian Americans.  As the record here confirms, eliminating race-conscious admissions would have devastating consequences for Harvard's campus climate.  *Student* testimony establishes that the breadth and depth of racial diversity on Harvard's campus would markedly decline, thereby exacerbating feelings of racial isolation and reducing educational benefits for all students.  Harvard's consideration of race through holistic, individualized review does not insulate individuals from comparison; it flexibly considers all pertinent elements of diversity, and it ensures race does not become the defining feature of an application.  Our *Students*' application files vividly illustrate these facts.

SFFA failed to carry its burden of demonstrating that Harvard's race-conscious policy is unconstitutional.  The criticisms that SFFA raised have already been considered, and dismissed, by the U.S. Supreme Court.  By challenging practices that have repeatedly been affirmed by the Supreme Court, SFFA reveals its true complaint is not with Harvard's policies but with the governing precedent itself.  This Court should reject SFFA's efforts to upend settled precedent

2

which recognizes that universities may consider race "to achieve that diversity which has the potential to enrich everyone's education." *Grutter*, 539 U.S. at 315 (citation omitted).

*Section II* of *Students'* brief demonstrates how SFFA failed to satisfy its burden of proving intentional discrimination because its evidence is both flawed and lacking. SFFA's statistical analysis places far too much emphasis on academic metrics, which are poor predictors of an applicant's potential and which are tainted by racial bias. Moreover, SFFA ignores entirely how our *Students'* application files illustrate that Harvard views Asian American heritage in a positive light. SFFA's proof is far too weak to sustain its burden.

Finally, *Students* note in *Section III* that, under either legal theory, SFFA would not be entitled to the remedy it seeks—which is unmoored from any bias Asian Americans may face in the admissions system. Since Harvard needs to consider race to achieve its educational mission, any violation of narrow tailoring would merely require Harvard to adjust its practices to comply with constitutional norms; it would not require an outright end to considering race. Similarly, any finding of discriminatory bias would require a remedy which addresses the root cause of the problem and research shows such remedies are race-conscious, not race-blind.

## I.     Harvard's race-conscious admissions policy is both necessary and constitutional under well-settled Supreme Court precedent.

For decades, the Supreme Court has recognized that student body diversity is a compelling interest that justifies race-conscious admissions in higher education. *See, e.g.*, *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2210-11 (2016) ("*Fisher II*"). This interest stems from diversity's numerous benefits within the academic environment and, more broadly, for our national progress and welfare. As recently as 2016, the Supreme Court reaffirmed that a diverse student body "'promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races.'" *Id.* at 2210 (quoting *Grutter*,

3

539 U.S. at 330).  It also facilitates "enhanced classroom dialogue and the lessening of racial

isolation. . . ." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 308 (2013) ("*Fisher I*").  These

benefits extend beyond the college campus by contributing to the broader goal of "preparing

students for work and citizenship" in our extraordinarily diverse society.  *Grutter*, 539 U.S. at

331.  As Justice Powell reflected nearly forty years ago in *Regents of University of California v.

Bakke*, nothing less than "the nation's future depends upon leaders trained through wide

exposure to the ideas and mores of students as diverse as this Nation of many peoples."  438 U.S.

265, 313 (1978) ("*Bakke*") (internal quotation and citation omitted).

The framework for evaluating the constitutionality of race-conscious admissions is also

well-established.  First, a university offers a "reasoned, principled explanation" for its pursuit of

the educational benefits of diversity, and that decision is entitled to deference.  *Fisher II,* 136 S.

Ct. at 2208 (citation omitted).  Next, the university must demonstrate that its consideration of

race is narrowly tailored to achieve the benefits of student body diversity.  *Grutter*, 539 U.S. at

333-34.

Narrow tailoring has two basic components.  First, the university must engage in

individualized review, meaning it "ensure[s] that each applicant is evaluated as an individual and

not in a way that makes an applicant's race or ethnicity the defining feature of his or her

application."  *Fisher I*, 570 U.S. at 312 (internal quotation omitted).  Second, the university must

show that the use of race is "'necessary" to achieve the educational benefits of diversity.  *Id.*

(quoting *Bakke*, 438 U.S. at 305).

The record demonstrates that Harvard's admissions process more than satisfies this

standard.  As discussed below, the "necessity" of considering race is established by unrefuted

*Student* testimony, and Harvard's use of "individualized review" is demonstrated by *Students'* application files.

### A. Harvard's flexible appreciation of race is necessary to achieve its educational mission.

Harvard College's mission "is to educate the citizens and citizen-leaders for our society … through … the transformative power of a liberal arts and sciences education." DX109.1. Harvard has determined that diversity is central to that objective. *Id.* According to Harvard, the college's goal is to "bring a diverse student body together from different backgrounds and experiences" because interactions across difference "catalyze the intellectual, social, and personal transformations that are central to Harvard's liberal arts and sciences education." 10/23 Tr. 11:21-23 (Khurana); P302 at 2.

To achieve these educational objectives, Harvard employs a whole-person review process, which considers all available information to identify the students who will contribute to and benefit from the educational experience on campus. 10/17 Tr. 150:9-16; 200:18-214:6 (Fitzsimmons). Harvard's admissions process is designed to "consider applicants' accomplishments in context" and also "consider students' ability to grow and contribute after graduating from Harvard." Dkt. 619 at ¶ 31. Harvard values diversity of all kinds, including racial diversity. DX5.9-11.

Harvard has articulated three independent reasons why the consideration of race is crucial to its whole person review process and mission: (i) it allows applicants to authentically portray themselves, (ii) it allows the university to more effectively evaluate an applicant's achievements and contributions, and (iii) it allows the university to develop a depth and breadth of diversity that benefits all students.

### i.     A flexible consideration of race is necessary for applicants to authentically portray themselves in whole person review.

Harvard has explained that considering race remains important to honor the experiences of many applicants who feel race is a "defining element" of how they "understand themselves and how they understand the experiences of their lives and what they bring to the Harvard college community."[3] 11/1 Tr. 193:6-10 (Faust).  This approach is consistent with the fundamental constitutional right for individuals "to define and express their identity."  *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593 (2015).  All eight of the *Students* testified that they disclosed their race when applying to Harvard because their ethno-racial identities are inextricably tied to their experiences, viewpoints, interests, and ambitions for the future.  10/29 Tr. 10:12-21, 12:19-25, 13:1-25, 14:1-2 (Vasquez-Rodriguez); 10/29 Tr. 32:21-33:8 (Chin); 10/29 Tr. 81:6-25, 82:1-15 (Cole); 10/29 Tr. 89:1-17 (Ho); 10/29 Tr. 115:9-25, 116:1-23 (Nunez); 10/29 Tr. 140:19-25, 141:1-25, 142:1-24 (Diep); 10/29 Tr. 170:1-21, 171:1-19 (Trice); 10/29 Tr. 200:1-9, 201:3-25 (Chen).[4]  Students also consistently testified that socioeconomic status is not a reliable proxy for

---

[3] *See also* 11/1 Tr. 254:10-16 (deposition testimony Walsh) (testifying that a student's race is one part of his or her story that he tries to honor in understanding them as fully as possible in rendering the best decision about their potential admission); DX19.0028 (admission officers should "[h]onor the nuance of both identity and context."); Brief for Amicus Curiae Harvard University in Support of Respondents at 17, *Fisher v. Univ. of Tex. at Austin* (2015) (14-891), 2015 WL 6735848  (that "forbidding the consideration of information that a student provides concerning race and ethnicity would . . . demean the worth of the individual applicant.").

[4] Additionally many of the *Student* amici that submitted declarations testified to the importance they ascribed to their ethno-racial identity in shaping their experiences, viewpoints, interests, and ambitions for the future." Dkt. 440-1, Exhibit 1.1, ¶¶ 5-7, (Declaration of A.A.); Dkt. 440-1, Exhibit 1.2, ¶ 4 (Declaration of A.Z.); Dkt. 440-1, Exhibit 1.3, ¶ 3 (Declaration of D.L.); Dkt. 440-1, Exhibit 1.4, ¶ 3 (Declaration of J.L.); Dkt. 440-1, Exhibit 1.5, ¶ 6 (Declaration of M.E.); Dkt. 440-1, Exhibit 1.6, ¶¶ 3, 5 (Declaration of Sally Chen); Dkt. 440-1, Exhibit 1.7, ¶¶ 3-7 (Declaration of S.N.); Dkt. 440-1, Exhibit 1.8, ¶¶ 3-5 (Declaration of T.D.); Dkt. 440-1, Exhibit 1.8, ¶¶ 3-4, 7 (Declaration of Y.Z.); Dkt. 440-1, Exhibit 1.9, ¶¶ 3, 6, 8 (Declaration of Sarah Cole); Dkt. 440-1, Exhibit 1.10, ¶¶ 3, 8 (Declaration of Fadhal Moore); Dkt. 440-1, Exhibit 1.11, ¶¶ 4-6, 10 (Declaration of Itzel Libertad Vasquez-Rodriguez); Dkt. 455-2, ¶¶ 10-12 (Declaration of Aba Sam); Dkt. 455-3, ¶ 10 (Declaration of Cecilia Nunez); Dkt. 455-5, ¶¶ 6-7 (Declaration of Catherine Ho); Dkt. 455-7 ¶¶ 5-8 (Declaration of Melissa Tran); Dkt. 455-8, ¶¶ 7-8, 10-11 (Declaration of Jasmine Parley);  Dkt. 455-9, ¶¶ 8-10 (Declaration of Fatima Shahbaz); Dkt. 455-11, ¶¶ 6-7, 10 (Declaration of Jesper Ke); Dkt. 455-12, ¶ 7 (Declaration of Rewan Abdelwahab); Dkt. 517-1, ¶¶ 9 (Declaration of James Mathew); Dkt. 517-4, ¶¶ 12-13 (Declaration of Madison Trice).

race.  *See* 10/29 Tr. 22:16-21 (Vasquez-Rodriguez); 10/29 Tr. 143:4-144:4 (Diep); 10/29 Tr.

80:3-12, 81:15-82:15 (Cole); 10/29 Tr. 172:5-18 (Trice).

For example, Itzel Vasquez-Rodriguez, identifying as Xicana (indigenous Mexican-

American) and more broadly Latina,[5] disclosed her ethno-racial identity in her application to

Harvard and wrote an entire essay devoted to her "experiences as a young Xicana in Southern

California."  10/29 Tr. 10:22-11:1 (Vasquez-Rodriguez).  Ms. Vasquez-Rodriguez explained that

she chose to write about her ethno-racial identity because it "was such a core piece of who I am"

and "had impacted every decision I had made, every experience that I had had…I felt like it was

something important and something of value that I could bring to a school like Harvard." 10/29

Tr. 12:25-13:6 (Vasquez-Rodriguez).

Thang Diep, who identifies as Vietnamese, also wrote about his ethno-racial identity in

his personal essay.  10/29 Tr. 142:22-143:3 (Diep).  Mr. Diep discussed how he distanced

himself from his Vietnamese identity when he first immigrated to the United States because he

was bullied for his limited English proficiency, his accent, and his ethno-racial identity.  10/29

Tr. 140:21-143:3 (Diep); SA-2.0010.  He shared how he ultimately re-connected with his

Vietnamese identity in high school when his magnet program helped him to embrace it.  10/29

Tr. 140:21-143:3; 145:14-18 (Diep); SA-2.0010.  Mr. Diep testified that:

> [T]o portray my growth authentically and really show . . . the admission officer who
> I really am . . . [it was] crucial for me to . . . share this journey of not just learning
> English, but this journey of rejecting and erasing my own [ethno-racial] identity
> [that] had become such a huge part of who I was when applying and still who I am
> now.

---

[5] *Students* use the term "Xicana" rather than Chicana based on the spelling preferred by Ms. Vasquez-Rodriguez.
*Compare* Dkt. 440-1 (Declaration of Vasquez-Rodriguez), *with* 10/29 Tr. 9:3-8 (Vasquez-Rodriguez). *Students* also
use the terms Hispanic, Latina/o, and Latinx interchangeably.  Likewise, *Students* use the terms Black and African
American interchangeably.

10/29 Tr. 145:22-146:4 (Diep).  Mr. Diep concluded: "[I]f I didn't write about this experience, I

don't know what I would have written about."  10/29 Tr. 146:5-6 (Diep).  Other students shared

similar sentiments.  *See, e.g.*, 10/29 Tr. 89:14-17 (Ho) ("So if race were to have been removed

and I couldn't have talked about that, I don't know what I would have written about because all of

my experiences are informed by the fact that I am Vietnamese-American."); 10/29 Tr. 171:2-19

(Tribe) ("I think that the way that I was bullied was kind of inextricable from my race. . . .  I

think that also the pride that I have in my culture and my drive for social justice and my drive for

encouraging others to love themselves is so deeply connected to my experiences, having been

mistreated for my race, that it would have been very difficult to articulate who I am without

being able to discuss it.");  10/29 Tr. 13:15-17 (Vasquez-Rodriguez) ("All of my life's ambitions

revolve around communities of color and my ethnoracial identity.").

      Sally Chen, who identifies as Chinese-American, wrote about her ethno-racial identity in

her personal statement despite advice from her college counselor that the "Asian immigrant story

was overdone," and that writing about it would hurt her chances for admission.  10/29 Tr.

200:17-23 (Chen).  Ms. Chen explained:

> Being Chinese-American, being the daughter of Chinese immigrants . . . how I
> navigated being a translator and advocate. That was so fundamental to my
> background and my story, my identity, that I don't think I could have left it out.

10/29 Tr. 201:11-15 (Chen).

      Although Sarah Cole, who identifies as African American, did not expressly discuss her

race as part of her essay, *see* SA-4, she identified her race through the common application's

demographic checkboxes. SA-4.13.  Ms. Cole was equally adamant that Harvard's recognition of

her race was important:

> Race-blind admissions is active erasure. To try to not see my race is to try to not
> see me simply because there is no part of my experience, no part of my journey, no
> part of my life that has been untouched by my race. And because of that, it would

be nearly impossible for me to try to explain my academic journey, to try to explain
my triumphs without implicating my race.

10/29 Tr. 83:24-84:5 (Cole).

SFFA never refuted *Students'* testimony that sharing their ethno-racial identity was
necessary to portray themselves authentically. Nonetheless, SFFA seeks to "prohibit[] Harvard
from using race as a factor in future undergraduate admissions decisions" and require "Harvard
to conduct all admissions in a manner that does not permit those engaged in the decisional
process to be aware of or learn the race or ethnicity of any applicant for admission." Dkt. 1 at
119. *Students'* testimony demonstrates this would deprive them of the opportunity to have their
full stories—and strengths—considered in college admissions and is inconsistent with the
principle of individual dignity enshrined in the Constitution.

ii.     **The nuanced consideration of race is crucial for admissions officers to
        holistically and effectively evaluate applicants, especially ethno-racial
        minority applicants.**

When an applicant discloses his or her race—either through demographic boxes, personal
statements, or listing leadership positions with cultural affiliations—admissions officers are better
equipped to identify those applicants most able to fulfill Harvard's educational mission. As the
Supreme Court recognized in *Grutter*:

> By virtue of our Nation's struggle with racial inequality, such [minority] students
> are both likely to have experiences of particular importance to the Law School's
> mission, and less likely to be admitted in meaningful numbers on criteria that ignore
> those experiences.

*Grutter*, 539 U.S. at 338. Race is never dispositive, nor is it viewed in isolation, but "in a society
. . . in which race unfortunately still matters," *Grutter*, 539 U.S. at 333, the knowledge of an
applicant's racial background, alongside various other attributes, may be invaluable to identify
who will best "contribute to and benefit from the educational experience on campus." Dkt. 619
at ¶¶ 29, 58-65.

Traditional admissions criteria systematically undervalue the potential contributions of racial minorities.  For example, Ms. Trice, Ms. Cole, and Mr. Diep all observed that teachers were less willing to identify African American students as gifted or offer them advanced coursework.  10/29 Tr. 144:7-11 (Diep); 10/29 Tr. 167:1-15 (Trice); 10/29 Tr. 82:3-10 (Cole).  As *Students* have noted in prior briefs, there is also extensive evidence that standardized tests are infected with racial bias and thereby underestimate the academic potential of Black, Latinx, Native, and other applicants.  *See* Dkt. 509 at 17; Dkt. 517 at 20-22.  The ability to consider race allows admissions officers to counterbalance the racial skew in admissions criteria and academic opportunities.  For example, knowing that Mr. Diep faced mockery for his Vietnamese accent, SA-2.0010, enables one to appreciate his linguistic achievements more accurately and places his "lower end" SAT score in context.  SA-2.0029.

Moreover, the consideration of race is necessary to identify applicants with diverse perspectives who are likely to expose other students to "new ideas, new ways of understanding, and new ways of knowing."  P302.7.  As the Court articulated in *Grutter*, "one's own, unique experience" of race "is likely to affect an individual's views" in light of present-day racial inequities.  539 U.S. at 333.  Race-conscious individualized review allows Harvard to value the full range of perspectives that can facilitate "enhanced classroom dialogue" on campus.  *Fisher I*, 570 U.S. at 308.  Indeed, Ms. Vasquez-Rodriguez testified to how her ethno-racial identity shaped her perspective by allowing her to understand "injustice first-hand at a really young age. . . and that made me want to fight for social justice."  10/29 Tr. 10:19-21 (Vasquez-Rodriguez).

The "colorblind" system that SFFA seeks would systematically undervalue the achievements and contributions of ethno-racial minority applicants.  Purging race from Ms. Vasquez-Rodriguez's application file would excise, among other items: entire paragraphs of

her personal essay, such as her sharing her "life's ambition . . . to represent my heritage and inspire my fellow Latinos to embrace our culture" (SA-3.0013); her leadership positions in groups like "Spanish Club" and "Latino Club" (SA-3.0011); references to her "plans on majoring in either Chicano Studies or Economics" (SA-3.0022); her academic distinctions as a "National Hispanic Recognition Program Scholar" and "National Spanish Honors Society member" (SA-3.0011); interviewer notes that she is interested in "a potential career in business with a Latino focus" and how "she learned Spanish from her parents before English and has been increasingly engaged in Latino community and culture. . . ." (SA-3.0005); potentially even her surname "Vasquez-Rodriguez" and much more.  Importantly, Ms. Vasquez-Rodriguez testified that reference to race was necessary to share about her aspirations because "[a]ll of my life's ambitions revolve around communities of color and my ethnoracial identity."  10/29 Tr. 13:10-13:17 (Vasquez-Rodriguez).

Tellingly, SFFA's own expert on race-neutral alternatives, Mr. Kahlenberg, conceded that admissions officers should not completely disregard an applicant's racialized experiences.  10/22 Tr. 71:8-72:7 (Kahlenberg).  Mr. Kahlenberg agreed, for example, that colleges should be able to positively consider whether an applicant has overcome racial discrimination.  *Id.*  Mr. Kahlenberg acknowledged that the consideration of race is in fact the most efficient method of promoting racial diversity.  10/22 Tr. 82:4-10.  Consequently, Harvard's contextual consideration of race is both essential and the most effective means of pursuing the specific educational benefits associated with racial diversity.

In its post-trial brief, SFFA also suggests that Harvard should eliminate the demographic checkbox for race.  Dkt. 620 at ¶ 142.  Yet even this would impair Harvard's ability to view applicants holistically.  Ms. Cole's application provides a case-in-point.  In her personal essay,

Ms. Cole discussed how she committed herself to combatting gun violence in Kansas City after a close acquaintance lost his life to gun violence.  SA-4.0018.  Ms. Cole highlighted her leadership on Kansas City's Youth Board where she presented recommendations to the mayor to "slow down this losing cycle" in a city with "the second highest homicide rates in the nation."  *Id.* While she did not explicitly reference her race in her essay, she did mark the checkbox indicating that she is African American.  SA-4.0013.  Knowing this provides additional context for her advocacy.  As Ms. Cole testified, a race-blind admissions system would "not see me simply because . . . there has been no part of my life that has been untouched by race."  10/29 Tr. 83:24-84:2 (Cole).  Consequently, eliminating the demographic checkbox would also have a detrimental impact on Harvard's evaluation of applications that contain information that is more accurately appreciated when the applicant's race is disclosed in that way.

### iii.    Race-conscious admissions remains necessary for cultivating the fullest depth and breadth of diversity which benefits all students.

#### a.    *Educational benefits of diversity are essential and flow to all students.*

As noted above, Harvard regards racial diversity as crucial to achieving its educational objectives.  11/1 Tr. 193:1-10 (Faust); 10/23 Tr. 24:13-25:6 (Khurana); 10/24 Tr. 123:22-124:7 (Banks).  Student body diversity exposes students to new ideas, perspectives and ways of understanding.  DX109.1.  "[S]tudent body diversity – including racial diversity – is essential to our pedagogical objectives and institutional mission.  It enhances the education of all of our students, it prepares them to assume leadership roles in the increasingly pluralistic society into which they will graduate, and it is fundamental to the effective education of the men and women of Harvard College."  P302.22 (Harvard's Report of the Committee to Study the Importance of Student Body Diversity).  Research confirms that these benefits enhance learning for *all* students, including non-minority students.  Some of these shared benefits include reduced

prejudice;[6] improved cross cultural understanding, comfort, and engagement;[7] enhanced problem-solving and academic abilities;[8] and a developed capacity for teamwork and leadership.[9]

When diverse experiences and perspectives are represented in the classroom, *all* students benefit.  Ms. Cole testified: "I can't tell you how many times I've had professors email me thanking me for the contributions I've made in class or classmates stopping me outside of class thanking me for sharing my perspective."  10/29 Tr. 78:25-79:6 (Cole).  And she continued: "[T]he learning would be less if there were fewer black students" at Harvard.  10/29 Tr. 79:6-13 (Cole).  Similarly, Ms. Chen testified that, in addition to ethnic studies "recentering and uplifting the experiences and the histories of people of color and students of color who are coming from communities beyond Harvard," diversity is beneficial for all students.  10/29 Tr. 208:13-209:13 (Chen).

Itzel Libertad Vasquez-Rodriguez confirmed that learning with students from different ethno-racial backgrounds made her a more critical and independent thinker.  10/29 Tr. 17:7-20 (Vasquez-Rodriguez).  "I think having had experiences and relationships with people from different ethno-racial groups made me a much better listener, a more empathetic person, someone who is a more critical thinker, and whose [] perspective of the world is more broad."  10/29 Tr. 23:5-11 (Vasquez-Rodriguez).  Interactions with other classmates of color who come from different life experiences also benefitted Mr. Diep, who observed that he gained "[n]ew

---

[6] *See* Kristin Davies et al. , *Cross-Group Friendships and Intergroup Attitudes,* 15 Personality and Soc. Psychol. Rev. 332, 345 (2011); Nisha Gottfredson, et al., *The Effects of Educational Diversity in a National Sample of Law Students: Fitting Multilevel Latent Variable Models in Data with Categorical Indicators,* 44 Multivariate Behav. Res. 305, 326 (2009).
[7] *See* Mitchell J. Chang et al., *The Educational Benefits of Sustaining Cross-Racial Interaction Among Undergraduates,* 77 J. of Higher Educ. 430, 430-55 (2006).
[8] *See* Chang et al. *supra* note 7; Jilali Luo & David Jamieson-Drake, *A Retrospective Assessment of the Educational Benefits of Interaction Across Racial Boundaries,* 50 J. of C. Student Dev. 67, 82 (2009).
[9] *See* Chang et al, *supra* note 7; Luo and Jamieson-Drake, *supra* note 8, at 67.

perspectives on how to look at different issues" from his classmates at Harvard.  10/29 Tr. 153:2-
10 (Diep).  Ms. Ho agrees.  "[A]s an individual student, we learn from other people, and we learn
from listening to their stories, listening to their perspectives.  And if their perspectives and
stories aren't present on campus or aren't as present on campus, who are we supposed to be
learning from?"  10/29 Tr. 109:21-25 (Ho).

       The personal and social benefits of diversity at Harvard are just as profound.
"[E]ducation is not just what you learn in the classroom.  I think that Harvard really emphasizes
the learning that goes on in dorms and dining halls."  10/29 Tr. 105:19-25 (Ho).  Ms. Ho further
testified that living and learning alongside those with different experiences allowed her to see
that "there's so much out there in the world and that you should be a little more nuanced and
come from your own perspective."  10/29 Tr. 107:8-24 (Ho).  Ms. Nunez noted that being at a
diverse campus has been "really rewarding" and has allowed her to talk about her own identity.
10/29 Tr. 124:25-125:11 (Nunez).

       As intended, fostering these interactions helps prepare Harvard's students to assume
leadership roles in an increasingly diverse society.  Ms. Trice testified that "the diversity at
Harvard has helped me to learn about the different ways that I can be involved and the different
causes that I want to devote myself to."  10/29 Tr. 191:1-12 (Trice).  Ms. Vasquez-Rodriguez
recognized that ethno-racial diversity at Harvard has been important in her post-graduate work as
a legislative aide and California Assembly Fellow, particularly given California's increasing
demographic diversity.   10/29 Tr. 23:5-23 (Vasquez-Rodriguez).  "[H]aving had those
experiences made me a better policy maker, a better policy thinker and much better equipped for
this fellowship."  10/29 Tr. 23:20-23 (Vasquez-Rodriguez).  As an aspiring pediatrician, Mr.
Diep recognized that discussions with other students of color provided him with a "tool set to

14

think about cultural sensitivity and cultural competency."  10/29 Tr. 153:10-25, 156:12-14

(Diep).  Since then, he has reflected on how to design health studies that are inclusive of all

communities.  10/29 Tr. 156:1-157:5 (Diep).

Ms. Chen contrasted her experience at Harvard with her high school experience at

Lowell, a highly competitive public magnet school in San Francisco with a majority Asian

American student body and "very few" Black or Latinx students.  She would *not* describe her

high school as racially diverse, as its student demographic "did not really in any way reflect the

overall racial diversity of the Bay Area or San Francisco."  10/29 Tr. 196:7-25 (Chen).  She

found the lack of diversity "detrimental" to her overall learning experience.  10/29 Tr. 197:4-5

(Chen).

All students benefit from the opportunity to engage with underrepresented minorities

outside of the classroom, as well.  Many affinity and cultural groups intentionally include the

broader Harvard campus in their social and educational activities.  Ms. Ho testified that "it's

really important for us [Asian American Women's Association (AAWA)] as an organization to

express that it's not just for people who identify with the experiences of Asian-American

womanhood" and that AAWA is "not [an] exclusive space."  10/29 Tr. 96:19-97:4 (Ho).

Similarly, Ms. Nunez testified that Fuerza hosts "a lot of events that we [publish] out to the

larger kind of Harvard community" and are "more tailored to letting other people know about

these issues."  10/29 Tr. 132:15-:133:2 (Nunez).  Many events combine an educational aspect

with more cultural activities and are often attended by a more diverse population that views these

as "very welcoming spaces for other students as well."  10/29 Tr. 135:25-136:25 (Nunez).

### b.   *A critical mass of students of color on campus is necessary to combat racial isolation and hostility.*

Racial diversity is also necessary to combat the racial isolation and hostility that *Students* testified they experienced at Harvard.  For example, Ms. Nunez and her friends were called "a bunch of wetbacks" by another student.  10/29 Tr. 129:4-10 (Nunez).  Ms. Chen was accused of trespassing in the student lounge by a Harvard staff person.  "[I]t made me feel like I didn't belong there.  It made me feel foreign.  And it really, I think, triggered a kind of internal critique of myself."  10/29 Tr. 204:12-205:24 (Chen).  Ms. Cole testified that during her freshman year, a classmate published an article on affirmative action in the school newspaper that compared the admission of black students at Harvard to "teaching a blind person how to be a pilot" and recounted her experience of being "cursed at or physically assaulted" for marching through campus asserting that Black lives matter.  10/29 Tr. 72:24-73:24, 82:16-23 (Cole).  And Ms. Vasquez-Rodriguez testified that when she entered a classroom, she would "take note mentally of the number of people of color" and in a majority white class she would become "very nervous" and reluctant to speak.  "I didn't want to be seen or stereotyped as someone who [] is just talking about communities of color because that's where I came from."  10/29 Tr. 19:5-25 (Vasquez-Rodriguez).

In predominantly white, privileged environments like Harvard, students of color, if there are a sufficient number of them, can find belonging, inclusion, and community by bonding with one another.  Professor Margaret Chin explained that when she arrived at Harvard, "I felt like I needed to find people like me to feel comfortable, especially in the very beginning because I was intimidated.  I thought I could do well, but I was intimidated, especially in the classroom."  Consequently, she sought other people of color.  10/29 Tr. 34:7-15 (Chin).  Similarly, Ms. Vasquez-Rodriguez wanted to attend a campus where there were other people of color like herself "so that I could have a more safe environment . . . and a better [] learning environment."

10/29 Tr. 16:16-20 (Vasquez-Rodriguez).  Ms. Ho testified that having another roommate who is also a first-generation student and whose parents are also immigrants allowed her to process the pressure of being the first in her family to attend college and gender expectations within certain communities.  She observed, "I feel the same things, but I just never knew that they were so widespread."  10/29 Tr. 106:4-24 (Ho).

Harvard acknowledges that this is one of the many benefits of diversity. *See* 11/1 Tr. 206:3-16 (Faust); 10/23 Tr. 33:25-34:7 (Khurana).  Ms. Cole, who originally had no interest in accepting her offer of admission to Harvard, described how visiting the campus and seeing its diversity appealed to her.  10/29 Tr. 70:5-21 (Cole).  Sharing a meal and a wide-ranging conversation with other Black students made her think, "I actually can see myself here, and I feel like I could fit in here, and I feel like I could have community here in ways that I just never imagined I could have."  10/29 Tr. 70:13-21 (Cole).  Ms. Vasquez-Rodriguez described how racially and ethnically diverse spaces offered support, facilitated some of her closest friendships, and gave her the confidence and strength necessary to navigate Harvard every day.  10/29 Tr. 20:17-21:4 (Vasquez-Rodriguez).  As part of these ethno-racial student or cultural groups, Ms. Vasquez-Rodriguez found a place where she could "finally breathe" and "really be myself." 10/29 Tr. 20:19-20 (Vasquez-Rodriguez).  Ms. Nunez testified that when, as noted above, she and her friends were called "wetbacks" by a fellow student, "we were able to kind of laugh it off and keep going on with our night because we were a large group of students"—but had that not been the case she acknowledged that they may have felt more threatened.  10/29 Tr. 129:11-18 (Nunez).

Both parties' experts agree that eliminating race from the admissions process would lead to a precipitous drop in Black and Latinx enrollment, 10/25 Tr. 164:1-25, 165:1-6 (Arcidiacono);

10/31 Tr. 126:21-129:2 (Card), leaving those minority students vulnerable to "feel[ing] isolated or like spokespersons for their race." *See Grutter*, 539 U.S. at 318-19.  Students from underrepresented backgrounds may feel "that much more alone on campus" should the pool of minority students drop.  10/29 Tr. 138:14-139:2 (Nunez).  And, as Ms. Vasquez-Rodriguez testified, a reduction in minority students would have broader adverse impact on the Harvard campus:  "I think that there are so few students of color and under-represented minority groups at Harvard as it is that any sort of reduction in any of those groups would be really detrimental to the community at Harvard, both for students of color, but also just for students in general." 10/29 Tr. 21:5-22:3 (Vasquez-Rodriguez).

Ms. Cole testified that a reduction in Black representation at Harvard "would have a severely adverse impact on Harvard's racial climate."  10/29 Tr. 78:12-24 (Cole).  She emphasized that because Harvard's administration consistently failed to adequately support its students of color, students have had to do the work themselves "to create the community that allows us students of color to feel confident and able to thrive on its campus.  And if you have fewer students of color on Harvard's campus, then there's fewer people to do that work and that work becomes more exhausting."  10/29 Tr. 78:6-78:24 (Cole).  Moreover, a significant drop in either Black or Latinx enrollment undermines the benefits of diversity for *all* students.  As Ms. Cole testified: "[T]here is so much value that black students offer academically.  They make classes – the class and learning so much richer . . . There would be less learning if there were fewer black students."  10/29 Tr. 78:24-79:12 (Cole).  As Ms. Trice observed at trial, "I think when you're interacting with a critical mass of minorities, it's harder to have stereotypes about them."  10/29 Tr. 177:6-22 (Trice).  In addition to providing support and cover for those subjected to racial hostilities, a critical mass of students of color signals that "discrimination and

microaggressions are not something that the broader community would tolerate." 10/29 Tr. 177:11-22 (Trice).

### c. *Race-neutral alternatives are insufficient to achieve benefits of diversity.*

SFFA's expert opined that Harvard could implement a number of race-neutral alternatives through a combination of increasing socioeconomic preferences and eliminating admissions practices that predominantly favor whiter, wealthier applicants. PD27-34; 10/22 Tr. 33:19-47:18 (Kahlenberg). The record shows that eliminating race-conscious admissions may slightly increase the number of Asian American students at Harvard, but white students would be the greatest beneficiaries. 10/31 Tr. 127:24-128:15 (Card). Moreover, with race-neutral alternatives, the number of Blacks on campus would decline by approximately 60%, dropping from 14% to 6%. 10/31 Tr. 127:13-128:15 (Card). SFFA tries to gloss over this impact by noting that the *combined* share of Hispanics and African Americans would grow from 28% to 29%. Dkt. 620 at ¶ 158. But minorities are not fungible. Increasing the representation of one underrepresented minority group does not neutralize a decline in another. Each group's representation independently affects the benefits of diversity and the conditions for meaningful participation and cross-racial interaction. *Students* testified that a significant decline in the African American student population would substantially harm the educational environment for all *Students*. As Ms. Vasquez-Rodriguez explained, "I think, in particular, like a reduction in the number of black students at Harvard would be really problematic because black student groups on campus tend to be more established. . . I think that a lot of the power and positive change at Harvard comes from student groups of color . . . . [A] reduction in any of those groups is -- is awful." 10/29 Tr. 21:17-22:3 (Vasquez-Rodriguez). On this point, Mr. Diep testified that a significant reduction in African Americans "would hurt my education dramatically, not just education in the classroom but also outside the classroom." 10/29 Tr. 154:16-22 (Diep). The

*Student* testimony directly refutes SFFA's claim that an alternative resulting in significantly fewer Black students would work "about as well" as Harvard's race-conscious admissions policy.

### d. *Race-neutral alternatives may reduce diversity within each racial group.*

SFFA also ignores the fact that reducing the number of underrepresented students on campus threatens diversity within each racial group. *Students* believe that it is essential to recognize the diversity of experience within each racial and ethnic subgroup. Many have benefitted from the rich range of experiences within ethnoracial groups at Harvard. As Ms. Vasquez-Rodriguez testified, the degree of diversity she experienced at Harvard allowed her to interact with a group of people that she had not known much about before college, which was "mind-opening" in ways that allow her to better identify the "classism, and racism, and colorism within [her] own community." 10/29 Tr. 17:21-18:10 (Vasquez-Rodriguez). Ms. Nunez states that within racial groups, "there's a lot more diversity of ethnic background or family experience than I'm used to" at Harvard. 10/29 Tr. 123:11-124:4 (Nunez). Similarly, Ms. Trice testified that because the Black community is not a monolith, it is important for the broader Harvard community to interact with Black students with different experiences whether that is in terms of religion, class, politics or national origin. 10/29 Tr. 179:4-18 (Trice).

Reducing diversity within diversity would harm Asian American students at Harvard, not just other minorities. From Mr. Diep's perspective, Asian Americans have a fairly strong representation at Harvard when compared to Black or Latinx groups, but not a high level of intragroup diversity. "There are more East Asian students who are Chinese and Korean than Southeast Asian students like Vietnamese, Cambodian, Laotian." 10/29 Tr. 148:12-14 (Diep). Consequently, he testified that "when you don't see yourself represented, I think it's just like a sucky feeling to have," leaving him feeling "marginalized" and "erased." 10/29 Tr. 148:19-

149:3 (Diep).  Even without a specific intent to exclude or ignore the experiences or

contributions of various Asian subgroups, Mr. Diep testified that he "feel[s] erased when I just

don't see myself reflected in the greater Asian community on campus."  10/29 Tr. 148:17-149:20

(Diep).

The benefits of intraracial diversity are not abstract.  Ms. Chen testified that it was

"critically changing" for her to meet Asian Americans who are different from her.  10/29 Tr.

209:15-16 (Chen).  "[I]t was so important to me to meet and talk to other Asian Americans who

are different from me as kind of an impetus for me to learn more, for me to demand an education

that would discuss these differences that I would have in these one-on-one encounters."  *Id.* at

209:20-24 (Chen).  Prior to her experience at Harvard, in spite of growing up in San Francisco,

Ms. Chen had never met an undocumented Asian American.  "Despite the fact that Asian

immigrants are the fastest growing immigrant population in the United States, a lot of the public

media around immigration and immigration reform is often centered around Latinx

communities."  10/29 Tr. 210:2-5 (Chen).  She concluded that it is important to have these

different experiences and an Asian American population that is racially, ethnically and

socioeconomically diverse "to really dispel these kinds of overarching myths [about] what it

means to be Asian American."  10/29 Tr. 210:11-16 (Chen).

### e. *Benefits of racial diversity are unique from socioeconomic diversity.*

SFFA presumes that implementing a socioeconomic preference can increase both

socioeconomic and racial diversity, thereby producing sufficient educational benefits that negate

the need for race-conscious admissions.  Dkt. 620 at ¶¶ 231-233.  But in fact, socioeconomic

diversity offers distinct benefits that do not address the specific experiences—positive and

21

negative—that race plays in shaping personal identity.[10]  Moreover, the benefits associated with greater socioeconomic diversity are not offset by those lost with a reduction in racial diversity. Both matter, but a myopic focus on socioeconomic status will never cultivate the specific benefits that may be achieved through the limited consideration of race in admissions.  Student experiences confirm this.  Greater socioeconomic diversity in a classroom is helpful but "the benefits that come from socioeconomic diversity are different than the benefits that come from having ethnoracial diversity in a classroom."  10/29 Tr. 22:15-21 (Vasquez-Rodriguez).  Because ethnoracial diversity is "more visibly salient," Ms. Vasquez-Rodriguez testified, "I didn't feel judged or discriminated against because of my socioeconomic status.  I felt discriminated against because of my ethnoracial identity."  10/29 Tr. 22:16-21 (Vasquez-Rodriguez).

Consequently, even those who share a similar socioeconomic status but different ethnoracial backgrounds may have a wide range of experiences that shape the perspectives they bring to the classroom.  Based on his experience, Mr. Diep testified that children of different races are treated differently, even if they share the same low-income status.  Growing up, he observed "a lot of assumptions" related to his Black and Latinx friends as being "dangerous," yet "the same assumptions were not made about me."  10/29 Tr. 143:4-16 (Diep).  Without the burden of these racial stereotypes, Mr. Diep felt free to excel academically.  10/29 Tr. 143:23-144:4 (Diep).  On the other hand, Mr. Diep observed that the Black and Latinx friends who attended his middle school were not tapped for the same humanities magnet program that he was referred to in spite of being just "as smart and talented" as him.  10/29 Tr. 144:7-11 (Diep). Meanwhile, Mr. Diep struggled with feeling like a foreigner.  10/29 Tr. 144:12-19 (Diep).  Thus,

---

[10] As *Students* have previously noted, research shows that racial diversity contributes to small-group discussion in ways that enhances reasoning in ways that socioeconomic or geographic diversity may not.  *See* Anthony L. Antonio et al., *Effects of Racial Diversity on Complex Thinking in College Students,* 15 Psychol. Sci. 507, 507-510 (2004).

a low-income Asian American student like Mr. Diep has a very different lived experience and viewpoint than a low-income African American or Latinx student, even though both are low-income.

Similarly, Ms. Cole's experiences as "a working-class black person" motivated her to make the sacrifices and hard work of her parents worthwhile and produced "solidarity with lower-income people" and engendered a "strong commitment to fighting for a world where people don't have to endure the hardships of poverty." 10/29 Tr. 79:18-80:2 (Cole). Given her family's history of financial instability, Ms. Cole described the distinction between the challenges associated with socioeconomic status and race. "I can see where there's like that difference in experience and perspective that comes from being a person of color in addition to experiencing financial instability." 10/29 Tr. 81:15-19 (Cole). Ms. Cole distinguished the challenges faced by a white working-class father who is laid off and struggling to find work from the additional disadvantages and discrimination her father endured under the same circumstances. 10/29 Tr. 81:15-24 (Cole). Yet even when her family was doing better financially, they encountered racism. "And so regardless of whether we were struggling financially or not, our race has always shaped our experience, and that is a part of what I'm able to offer" or contribute to the learning environment. 10/29 Tr. 81:25-82:15 (Cole).

Ms. Cole recognizes that her experiences as a working-class Black markedly differ from the experiences of a working-class white, Asian or Latino. "The particular prejudices and stigmas and barriers that I face as a black working-class woman are simply different than those other groups." 10/29 Tr. 80:3-12 (Cole). Consequently, while socioeconomic diversity "makes Harvard's campus a richer place" it is just one aspect of a student's identity – like race – that adds benefits to Harvard's campus. 10/29 Tr. 80:15-81:5 (Cole). In Ms. Cole's experience, the

benefits associated with the intersection of race and class are unique as "it was the low-income students of color" who found themselves "more impacted by the racial barriers at Harvard" which led them to be among those "most likely to advocate for Harvard to do better by students of color." 10/29 Tr. 81:6-14 (Cole).

Similarly, Ms. Trice's experience shows the need to consider race separately from socioeconomic status in admission decisions. "Although I believe there are privileges that come with being upper middle class, I was discriminated against in spite of those." 10/29 Tr. 172:5-18 (Trice). Her upper middle class status may mask other oppressions or denials that she faced by virtue of her race. "And it mostly just wouldn't allow me to account for the ways that my [racial] identity has affected me." 10/29 Tr. 172:9-18 (Trice). It is therefore appropriate for Harvard to cultivate *both* socioeconomic and racial diversity, in recognition of the unique challenges and benefits that each offers.

### f. *Statistical models underestimate the decrease in diversity produced by the elimination of race-conscious admissions.*

SFFA's statistical models of race-neutral alternatives grossly underestimate the decrease in racial diversity that would ensue if Harvard stopped appreciating the racial background of students in the admissions process. Whenever race-consciousness is supplanted by socioeconomic considerations, both racial and socioeconomic diversity at the most selective universities may decline.[11] As *Students* have already noted, the end of affirmative action in Texas and the ban of race-conscious admissions in California reduced the likelihood that

---

[11] *See* Sean F. Reardon, Rachel Baker & Daniel Kalsik, Race, Income and Enrollment Patterns in Highly Selective Colleges 1982-2004, at 2, Center for Education Policy Analysis, Stanford University (2012).

minority students would request that their SAT scores be sent to in-state public colleges which is highly correlated with where those students might apply.[12]

Ms. Vasquez-Rodriguez testified: "Honestly I, probably would not have applied to Harvard if they didn't take race into account… I wanted to go to a school that reflected the diversity of the U.S. population and the world population." 10/29 Tr. 16:21-17:6 (Vasquez-Rodriguez). Ms. Chen speculated that if race were eliminated from the admissions process, she would not be at Harvard. "I could not see myself being part of an institution that didn't value me and my experiences when I was fighting so hard to articulate them." 10/29 Tr. 211:9-22 (Chen). She testified, "I think dismantling the race-conscious admissions policy would really rob students of that critical part of education where you learn from and with people who are different from you and have different experiences with you." 10/29 Tr. 210:20-23 (Chen). She would anticipate an "overwhelming pressure to buckle under the weight of assimilation" and expressed concern that "those different experiences would very much be pushed to the margins." 10/29 Tr. 210:20-211:8 (Chen). Ms. Cole testified that if race were not considered in the admissions process and Harvard enrolled fewer students of color, she likely would not have accepted her offer of admission. 10/29 Tr. 70:5-21, 83:17-84:16 (Cole).

**B. Harvard engages in an individualized review process that appropriately considers race in a manner that is positive, contextual, and considers all pertinent elements of diversity.**

Having established that Harvard's use of race is "necessary," strict scrutiny also requires Harvard to show that its "means" of considering race "ensure[s] that each applicant is evaluated as an individual." *Fisher*, 570 U.S. at 309 (citation omitted). The Supreme Court has indicated that an "admissions program cannot use a quota system," but it may consider race or ethnicity

---

[12] Mark C. Long, College Applications and the Effect of Affirmative Action, 121 J. of Econometrics 319, 340 (2004).

"as a 'plus' in a particular applicant's file" as long as the applicant is not "insulat[ed] . . . from comparison with all other candidates." *Grutter*, 539 U.S. at 334 (citations omitted).  The process should employ a "highly individualized, holistic review" which flexibly considers "all pertinent elements of diversity . . . although not necessarily according them the same weight." *Id.* at 309 (citation omitted).  Individualized review ensures that an applicant's race is not the "defining feature of his or her application." *Id.* at 337.

The record is clear that Harvard's process exemplifies the hallmarks of individualized review as endorsed by the Supreme Court.  Harvard's admissions officers explained that an applicant's self-identified race may help contextualize the facts, circumstances, or events which shed light on an applicant's achievements or contributions.  Tr. 10/17 227:3-15 (Fitzsimmons). Additionally, an admissions officer may positively view an applicant's ethno-racial identity when assigning an overall score if the file suggests the applicant's distinct viewpoint would enrich campus diversity.  Tr. 10/16, 22:18-23:6 (Fitzsimmons).  This latter treatment of race was frequently referred to as a "tip" or "per se" consideration of race.

### i.   Harvard's consideration of race does not use race as more than a "plus" factor for Black and Hispanic students.

SFFA alleges that race is the "predominant factor" in the decision to admit African American and Hispanic students.[13]  Dkt. 620 at ¶¶ 215-220.  Our *Students'* application files are arguably the best direct evidence that SFFA's assertion lacks merit.  The admissions files of Ms. Cole (who identifies as Black) and Ms. Vasquez-Rodriguez (who identifies as Latina) are

---

[13] Indeed, SFFA's suggestion that Black and Latinx students are academically underqualified and admitted to Harvard predominantly on the basis of their race is both offensive and directly countered by the experiences of our *Students,* whose impressive academic careers in high-school were followed by their equally impressive performance at Harvard.  Ms. Vasquez-Rodriguez graduated from Harvard cum laude with a 3.7 GPA with the highest honors in sociology, a minor in economics, a citation in Spanish and a certificate in Latin American studies and has since been awarded a California Assembly Fellowship.  10/29 Tr. 8:17-23, 22:22-23:4 (Vasquez-Rodriguez).  Ms. Cole graduated from Harvard with a 3.6 GPA and received a master's degree from the Harvard School of Education.  She is currently a fifth grade teacher in the District of Columbia.  10/29 Tr. 61:22-62:17 (Cole).

predominantly characterized by commentary about their stellar academic credentials, their

recommenders' effusive comments, their leadership through extracurriculars, and their

socioeconomic status.

More specifically, Ms. Cole's file reflects that admissions officers noted her

extraordinary academic achievements including:

- Comments about her "All A[s]". SA-4.0001. Ms. Cole's transcript reflects how she earned all As and A+s at Pembroke Hill School, one of the best private college prep schools in Kansas City. SA-4.0006; 10/29 Tr. 65:1-3 (Cole).

- Comments about her "warm school support." SA-4.0006. Ms. Cole's Counselor recommendation shared that "Academically, Sarah is virtually unparalleled at our school" and praised her "scholastic prowess" among other accolades. SA-4.0030.

Ms. Cole's file also contains extensive commentary and notes about her extracurriculars,

including:

- Notes underscoring her leadership on the Board of Engage KC. SA-4.0001. In this role, Sarah developed recommendations for Kansas City's leadership to combat youth violence. 10/29 Tr. 72:1-10. (Cole).

- Notes on her "term-time work" adding up to approximately 7-8 hours a week. SA-4.0001-0002. In addition to earning straight-As, Ms. Cole worked at TJ Maxx during the school year. 10/29Tr. 67:8-10 (Cole).

- Notes on her participation in Debate. SA-4.0001. Ms. Cole was identified as the best Novice Debater in 9th grade and serves as Vice President of the Debate Team in 11th grade. SA-4.0016.

Admissions officers also commented upon her impressive character attributes, including:

- Comments about her "determination, drive, and admirable work ethic." SA-4.0002.

- Underlines and markups throughout her glowing school recommendation, including the counselor's comment that Sarah is "one of the most thoughtful, and reflective, adolescents with whom I have ever worked." SA-4.0030.

Finally, admissions officers appreciated the context of Ms. Cole's success beyond race, across a wide range of attributes including:

- Comments about her geographic ties through her "love of and devotion to Kansas City." SA-4.0002.

- Notes about her low socioeconomic status (possible HFAI status).  SA-4.0002.

- Notes on her parents' occupation working at ADT Security and the IRS.  SA-4.0001.

Throughout the various comments and markups, admissions readers do not make any comment about her race.  Ms. Cole's file provides powerful evidence that Harvard does not treat race as the defining feature of a minority student's application, but seriously considers each applicant's individual qualifications and various diversity attributes.  Indeed, it strains credulity to suggest race was the predominant reason Ms. Cole was admitted.

Similarly, Ms. Vasquez-Rodriguez's file reflects that admissions officers noted her extraordinary academic achievements including:

- Comments on her "strong sets of AP scores."  SA-3.0002.  When Ms. Vasquez-Rodriguez applied, Ms. Vasquez-Rodriguez had taken six AP courses and received the highest score on five of tests.  10/29 Tr. 12:1-7 (Vasquez-Rodriguez).  By the end of high school, she had completed 10 AP tests.  *Id.*

- Notes underscoring her class rank, her GPA, and how "my goodness Itzel is a <u>hard</u> worker!" SA-3.0001-0002.  Ms. Vasquez-Rodriguez graduated from high school with a 4.5 GPA; she was ranked first in her class of about 500 students from grades ten to 12; during the summers, she took community college courses. 10/29 Tr. 12:8-12 (Vasquez-Rodriguez).

The file also includes notes about Ms. Vasquez-Rodriguez's extensive extracurricular activities including:

- Comments about her being a "2 season runner and 4x © [captain]" who has "earned athletic success."  SA-3.0002.

- Comments about her serving "as E [editor] of a paper, link leader and volunteer."  SA-3.0002.

- Markups to underscore her being a President of the Spanish Club and Secretary of the Latino Club.  SA-3.0001.

The admissions officers also commented extensively on Ms. Vasquez-Rodriguez's demonstrated personal qualities that will enable her to contribute to Harvard and beyond, including:

- Comments about her being "positive, respected, and kind." SA-3.0002.

- Comments about her being "resilient and determined to succeed." SA-3.0002.

- Comments about how her "GC [guidance counselor] let us know she has an 'electric personality.'" SA-3.0002.

Finally, there are comments that appreciate the context of Ms. Vasquez-Rodriguez's success beyond race, across a wide range of attributes including:

- Notes that her "Dad is unemployed, Mom an admin. . . Itzel has lived [between] 2 homes for years." SA-3.0002.

- Comments that her scores are especially impressive out of her high school "where only 25% [of students] go onto 4[-]year colleges." SA-3.0002.

- Notes about her low socioeconomic status (fee waiver application and possible HFAI status). SA-3.0002

- Markups to underscore her intended concentration in the Humanities. SA-3.0001.

Comparatively, there are only two notations related to Ms. Vasquez-Rodriguez's ethno-racial identity, and these comments contextualize the information she shared in her personal essay, noting "she's connected w/ her heritage after a period of disconnect (see PE [personal essay])" and "PE [personal essay]: Latino heritage." SA-3.0001-0002. These reader notes and comments reflect how Harvard's process predominantly considers non-racial factors, how it appreciates non-racial forms of diversity, and how any consideration of race is applied in an individualized context and alongside the consideration of other factors. The extensive commentary affirms that there are no automatic points being awarded based on race. Perhaps most importantly, Ms. Vasquez-Rodriguez's file reflects how her admission to Harvard is based on her exceptional qualifications and strengths across multiple areas: academics, extracurriculars,

athletics, and impressive character attributes.  Her file discredits any claim that race is the "predominant" factor for admitting Hispanic applicants.[14]

To be clear, race may have played a limited role in the admissions of Ms. Cole and Ms. Vasquez-Rodriguez, but there is absolutely nothing suspect about a university ascribing value to an applicant's ability to contribute to campus diversity based, in part, on their race.  Indeed, both Ms. Cole's and Ms. Rodriguez's applications reflected how they could meaningfully contribute to Harvard's diversity goals.  Specifically, Ms. Vasquez-Rodriguez expressly shared in her personal essay: "I will undoubtedly carry [my Xicana heritage] with me to college."  SA-3.0013. Ms. Cole's application also reflected her capacity to dismantle stereotypes, as her guidance counselor shared Ms. Cole's prior statement:

> I think my most significant contribution to [my high school] community would be providing [students and faculty] with a personal example of an African American who does not come from a financially stable family, but [who] still strives for academic excellence….   [My presence] has helped loosen the stronghold of stereotypes placed on African Americans, at least among my peers here.

SA-4.0030.  Indeed, Ms. Vasquez-Rodriguez and Ms. Cole both substantially contributed to Harvard's diversity goals while in college. For example, Ms. Cole actively led work on a diversity report, served as President of the Black Students Association, guided classmates and administrators to grieve "the deaths of black people at the hands of the police," and was repeatedly thanked by classmates and professors for sharing her perspective as a Black woman.

---

[14] Furthermore, Harvard's 2012 casebook also demonstrates that race is not a defining feature in Harvard's admissions process.  The cases in the casebook are actual applicant cases with the applicants' identifiers removed and are used for training of Harvard admissions personnel.  10/22 Tr. 151:23-152:9 (McGrath).  The casebook includes an example of "Peter Duran," who identified himself as Hispanic in his application and had very good grades and SAT scores.  DX2.101-10.  Harvard noted his ethnicity as an appealing factor, but ultimately decided not to admit him.  10/22 Tr. 163:14-164:14 (McGrath).  As in *Grutter*, where the Court observed that the Law School frequently accepted nonminority applicants with grades and test scores lower than underrepresented minority applicants (and other nonminority applicants) who were rejected, 539 U.S. at 339, Harvard's admissions office does not automatically accept or reject candidates based on their race and rejects underrepresented minority applicants who have grades and test scores higher than nonminority applicants who are admitted.

10/29 Tr. 74:9-75:22, 78:15-79:13 (Cole).  Ms. Vasquez-Rodriguez participated in numerous

affinity groups and co-led a cross-cultural, cross-ethnic coalition which successfully established

an ethnic studies track at Harvard.  10/29 Tr. 17:3-19:4 (Vasquez-Rodriguez).

Viewed in their entirety, *Students'* application files demonstrate that Black and Hispanic

students are not receiving an oversized boost based on race, and that any role that race is playing

is more than justified based on the tangible contributions such students make to campus.

Moreover, SFFA's bald assertion that race is a "predominant" factor relies upon

inapposite case law and flawed analysis.  Dkt. 620 at ¶ 220.  SFFA only introduced two

admissions files, and neither file demonstrated that race was the defining feature of Harvard's

admissions decision.[15]  Instead, SFFA proffers two, equally flawed arguments which

misinterpret prior case law.  First, SFFA draws an analogy between Harvard's race-conscious

policy and programs in Michigan and Georgia that were struck down for automatically awarding

a substantial number of points to qualified minority applicants.  Dkt. 620 at ¶ 220.  SFFA asserts

that "[r]ace plays an equally outsized (if not greater) role at Harvard compared to Michigan and

Georgia."  *Id.*  To support this assertion, SFFA cites to its analysis of Harvard's process showing

that the marginal effects of race are greatest for highly competitive minority applicants.  Dkt. 620

at ¶ 148.  But Harvard's program is readily distinguishable, and clearly defensible.

Unlike the institutions in Michigan and Georgia, Harvard does not award any pre-

determined points based on race as it only considers race in an individualized context.

Moreover, SFFA is wrong to equate the marginal effect of race with a mechanical point system.

The marginal effect of race actually varies depending on the competitiveness of the candidate

confirming that Harvard's process is neither mechanical, nor automatic.  Nor does race have an

---

[15] *See* P112 and P117.  Neither file proves Harvard failed to satisfy the narrow tailoring standard.  *See* 10/26 Tr.
55:10-61:22 (Arcidiacono).

inappropriately "massive" role as SFFA claims.  The data shows that the most competitive

candidates experience the greatest marginal effects of race.  Rather than suggesting a massive

preference, this actually suggests the opposite: race plays little to no role unless the applicant

demonstrates an abundance of strengths that are not associated with race.  The large marginal

effect for the most qualified applicants merely reflects that any desirable trait—whether race, or

geography, or socioeconomic status, or artistic ability—can make the ultimate difference in a

highly competitive process.  Dr. Card's data analysis likewise confirms race does not play an

outsized role: numerous characteristics other than race—including, for example, parental

occupation and intended career—explain more about the variation in admissions outcomes than

race does.  DX715 & DD10.93.[16]

### ii.   Harvard's consideration of race does not unduly harm Asian Americans

SFFA conflates its intentional discrimination claim with its challenge to Harvard's race-

conscious admissions program by inappropriately relying upon *Grutter's* recitation that

"[n]arrow tailoring . . . requires that a race-conscious admissions program not unduly harm

members of any racial group."  Dkt. 620 at ¶ 165 (citing *Grutter* 539 U.S. at 341).  But this

language must be placed in its proper context.  *Grutter* clearly stated that the parameters of

individualized review—requiring that a university value all pertinent elements of diversity

without insulating candidates from review—also ensured a program did not impose undue harm

on any racial group.  *Grutter*, 539 U.S. at 341.  The *Grutter* Court explained:

---

[16] SFFA also claims that race is a "predominant" factor because Harvard has stated that eliminating racial considerations will cause the number of Black and Hispanic students to decline dramatically.  Dkt. 620 at ¶ 220.  But this type of decline merely demonstrates that race plays some role in admissions (as it must for a university to show race-neutral alternatives are not available).  It surely does not demonstrate that  race unconstitutionally plays a predominant role.  Similar facts were presented in *Grutter*, where the Law School's expert explained that eliminating the consideration of race would result in a substantial decline in underrepresented minority enrollment: from 14.5% to 4%.  *Grutter* 539 U.S. at 320.  The Supreme Court recognized this fact and did not conclude it proved race was the predominant factor in admissions; rather, it upheld the Law School's holistic, individualized review program as consistent with constitutional principles.

> [S]o long as a race-conscious admissions program uses race as a "plus" factor in the context of individualized consideration, a rejected applicant "will not have been foreclosed from all consideration for that seat simply because he was not the right color or had the wrong surname. . . . His qualifications would have been weighed fairly and competitively, and he would have no basis to complain of unequal treatment under the Fourteenth Amendment."

*Id.* at 341 (quoting *Bakke*, 438 U.S. at 318).  While *Grutter* squarely states that providing a "plus" to minority applicants does not pose an undue burden when paired with individualized review, Dr. Arcidiacono stated that any favorable consideration on the basis of race is "the same thing" as a "white penalty."  10/25 Tr. 177:13-17 (Arcidiacono).  Dr. Arcidiacono would also view a "plus" for an African American or a Hispanic applicant as a relative penalty for an Asian American student.  But that is not the law for judging a race-conscious admissions policy as articulated by *Grutter*.  Nor is it the standard for discrimination. Dr. Card succinctly captured the problems with Dr. Arcidiacono's approach by explaining:

> I don't think it's appropriate to think of there being discrimination against people who don't play the cello as well as Yo-Yo Ma just because Yo-Yo Ma is so accomplished in that.  And similarly, I don't think it's appropriate to think of a positive benefit for an underrepresented group as necessarily representing negative discrimination against others.

10/30 Tr. 80:17-23 (Card).  Indeed, the current record reflects that Harvard's race-conscious admissions program does not unduly burden Asian American students for four primary reasons.

First, Harvard engages in the type of holistic, individualized review which *Grutter* held prevented any concerns over undue burdens.

Second, race-conscious admissions allows Harvard to positively appreciate the ethno-racial identities of Asian American applicants.  Under Harvard's policy, no applicant is excluded from discussing how race or ethnicity has influenced his or her interests, goals, or experiences.  10/16 Tr. 26:14-27:10 (Fitzsimmons).  *Students'* testimony and application files reveal that all applicants, including Asian Americans, may have their race considered as a positive factor.

33

Indeed, both Mr. Diep and Ms. Chen discussed their ethnicities in the application process and both saw that Harvard's admissions process viewed their ethno-racial identity positively.  Reader comments show an appreciation for Mr. Diep's ethno-racial identity by making a note of his "immigrant Vietnamese identity" and his experience with using "pencils as tools," a reference to Mr. Diep's personal essay about overcoming language barriers and racial slurs to excel academically and embrace his identity.  SA-2.0002, 0010.  In reviewing these experiences tied to race, the admissions officer praised Mr. Diep for being "very committed to pushing himself."  SA-2.0034.  These notes reaffirm that Harvard positively views the ethno-racial identities of Asian Americans, and does not reduce them to a monolith, but recognizes their distinct ethnicities and immigration histories.  Ms. Chen also referenced her ethno-racial identity throughout her essays and interview for Harvard.  Her application file similarly reflects a positive, contextual treatment of Ms. Chen's ethno-racial identity.  The interview report praises Ms. Chen for her academic potential by sharing that, because Ms. Chen is "low-income and with Taiwanese-speaking parents, [Ms. Chen] relates to the plight of outsiders in Ralph Ellison and William Faulkner."  Ms. Chen's interviewer also praised her personal qualities by noting that her upbringing in a "culturally Chinese home" where she served as a translator reflected positively on her responsibility to take care of others.  SA-1.0029-SA-1.0030

These comments reflect how Harvard only considers race in a manner that is positive and highly contextual.  Ms. Chen and Mr. Diep's files undercut any suggestion that Harvard's race-conscious policy hurts Asian Americans; instead, the files suggest that some Asian Americans are helped by such a policy.  Indeed, this flexible appreciation of race allows Harvard to be sensitive to the diversity among Asian Americans who vary widely in their ethnic, cultural, linguistic, socioeconomic, political and religious backgrounds.

Third, Asian Americans as a community benefit from race-conscious admissions because it fosters the breadth of diversity that positively impacts the learning environment for all students.  As Mr. Diep explained, his interactions with classmates from different racial backgrounds are "very beneficial" because "we all have different life experiences.  So when I interact with students who are black and Latinx, I gain new perspectives." 10/29 Tr. 153:6-8. Mr. Diep is not alone.  As discussed above in *Section I.A.iii.a.*, the *Students* of Asian American heritage all confirmed that they benefitted from Harvard's racial diversity.

Fourth, Harvard's race-conscious admissions policy has a notably small impact on the percentage of Asian American applicants admitted to Harvard.  Because far fewer Black, Latinx, and Native American students apply to elite colleges and universities, as compared to white applicants, the decrease in their admissions due to the elimination of race considerations would not greatly benefit Asian American student applicants.  *See* Goodwin Liu, *The Causation Fallacy: Bakke and the Basic Arithmetic of Selective Admissions*, 100 Mich. L. Rev. 1045, 1046 (2002).  In fact, according to Harvard's expert, eliminating all considerations of race would increase the Asian American share of the admitted class by 3 percentage points—from 24% to 27%.  This would represent a change in admissions rate of less than 1% for the average Asian American who would only see his or her chances increase from 5.1% to 5.9%.  Dkt. 509 at 21-22.  Narrow tailoring is especially evident when, as here, the number of impacted seats is notably small.  As *Fisher II* reflected: "The fact that race consciousness played a role in only a small portion of admissions decisions should be a hallmark of narrow tailoring, not evidence of unconstitutionality."  136 S. Ct. at 2212.

### iii.    The record shows Harvard is not engaging in racial balancing but merely engaging in practices that have been approved by the Supreme Court.

SFFA alleges Harvard is engaging in racial balancing based on two primary pieces of evidence: (i) Harvard engages in race-conscious recruiting and (ii) Harvard's leaders periodically review documents known as "one-pagers" which summarize a wide range of characteristics of Harvard's admitted class, including gender, geography, intended concentration, lineage, recruited athlete status, citizenship, race or ethnicity, and a variety of measures of socioeconomic and financial aid status.  Dkt. 620 at ¶ 134-35; Dkt. 620 at ¶ 85-88.  With respect to both points, SFFA attacks Harvard for practices that have been confirmed to be valid by prior court decisions. As Harvard's post-trial brief observes, courts regularly identify the recruitment of minority candidates as permissible and classify it as a "race-neutral" practice.  Dkt. 619 at ¶ 280 (citing cases).  Harvard's use of one-pagers has also been validated by the Supreme Court in *Grutter*.[17] There, the Law School similarly consulted "daily reports," which keep track of the racial and ethnic composition of the class (as well as of residency and gender).  The Supreme Court held that consulting such reports did not demonstrate racial balancing since the Law School's admissions officers testified without contradiction that they never gave race any more or less weight based on the information contained in these reports and there was notable variance in the enrollment of underrepresented minorities over the span of five years.  *Grutter*, 539 U.S.at 335-36.

This case presents nearly identical facts.  Harvard's admissions officers periodically consult demographic reports and sometimes this information is shared with admissions staff. 10/18 Tr. 77:5-78:10 (Fitzsimmons).  Similar to *Grutter*, admissions officers consistently

---

[17] *See also* David L. Faigman, et al., *Implicit Bias in the Courtroom*, 59 UCLA L. Rev. 1124, 1178-79 (2012) (encouraging judges to track their own statistics in "domains such as bail, probable cause, and preliminary hearings" to help judges identify and correct implicit biases).

affirmed that such information did not change the individualized review process or make them try to admit more students from a particular group.  10/18 Tr. 197:17-20 (Looby); 10/19 Tr. 67:25-68:2 (Bever); 10/23 Tr. 219:9-12 (Yong).  As a final parallel to *Grutter,* there have been meaningful year-to-year variations in the racial composition of Harvard's admitted and matriculating classes, trends which are inconsistent with racial balancing. DX711, DD10.100-01; 10/31 Tr. 119:9-122:5 (Card).[18]  By criticizing Harvard for practices that so closely parallel those approved by *Grutter*, SFFA reveals that its true complaint is with the governing precedent itself. But SFFA's claims must be judged by the law as it now stands.

## II.     SFFA cannot satisfy its burden of proving intentional discrimination.

SFFA's intentional discrimination claim (Count I) focuses on the treatment of Asian American applicants vis-à-vis white applicants.  Dkt. 620 at 58.  SFFA is unable to meet its burden of proving Harvard is intentionally treating Asian American applicants differently than white applicants and that this negatively impacts Asian American admissions.

The Supreme Court set forth the basic standard for proving intentional discrimination in *Personnel Administrator of Massachusetts v.  Feeney*:

> "Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. *See United Jewish Organizations* v. *Carey*, [430 U.S. 144, 179] (concurring opinion).  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

 442 U.S. 256, 279 (1979) (footnote omitted).  As in most intentional discrimination cases, this case is one where the plaintiff lacks direct evidence of discriminatory intent.  In *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, the Supreme Court set

---

[18] The record shows, for example, a year-over-year increase in the number of Asian American admitted students of up to 19% and a decrease of up to 11%; showing a year-over-year increase in the number of African American admitted students of up to 14% and a decrease of up to 13%; showing a year-over-year increase of white matriculating students of up to 18% and a decrease of up to 9%; showing a year-over-year increase of Hispanic matriculating students of up to 28% and a decrease of up to 20%.  DX711; DD10.100-01.

forth a framework for proving discriminatory intent through circumstantial evidence.  429 U.S.

252, 265-68 (1977).  "The impact of the official action [and] whether it bears more heavily on

one race than another . . . may provide an important starting point."  *Id.* at 266 (internal quotation

and citation omitted).  Other relevant factors include: "[t]he historical background of the decision

. . . , particularly if it reveals a series of official actions taken for invidious purposes";

"[d]epartures from the normal procedural sequence"; "[s]ubstantive departures [from the norm] .

. ."; and "the legislative or administrative history . . . , especially where there are contemporary

statements by members of the decisionmaking body, minutes of its meetings, or reports."  *Id.* at

267-68.

SFFA tries to evade this burden in two ways, neither of which has merit.  SFFA begins

by trying to import the strict scrutiny standard applicable to race-conscious admissions programs

to its claim of intentional discrimination.  Dkt. 620 at ¶¶ 159-61.  This is incorrect because it

inverts the order of operations.  SFFA must first prove that Harvard actually does discriminate

against Asian American applicants on the basis of race vis-à-vis whites, and only then does the

question of a standard of review such as strict scrutiny becomes relevant.  *See, e.g.*, *Hassan v.

City of New York*, 804 F.3d 277, 298 (3d Cir. 2015) ("Once a plaintiff demonstrates treatment

different from others with whom he or she is similarly situated and that the unequal treatment is

the result of intentional discrimination, the adequacy of the reasons for that discrimination are ...

separately assessed at equal protection's second step under the appropriate standard of review,"

e.g., strict scrutiny (internal quotation omitted)).  Here, Harvard has articulated that its race-

conscious admissions policy is intended to materially increase the admissions rates of

underrepresented minorities.  *See, e.g., Bakke*, 438 U.S. at 321-24 (Harvard Plan); 10/18 Tr.

65:18-66:2 (Fitzsimmons).  Harvard's open acknowledgment that it may treat underrepresented

minorities differently than other applicants is what invokes strict scrutiny because it racially

classifies these students.  *See Grutter*, 539 U.S. at 318, 326-27.  In contrast, Harvard denies that

it systematically treats Asian American applicants differently than white applicants because of

their race.  *See, e.g.*, 10/18 Tr. 108:6-109:2 (Fitzsimmons); 10/22 Tr. 175:2-16 (McGrath); Dkt.

619 at 7-8.  This makes SFFA's intentional discrimination claim analytically distinct from its

other claims.  As with any other intentional discrimination case, SFFA maintains the burden of

proving that Harvard intentionally discriminates against Asian American applicants vis-a-vis

white applicants.[19]

Additionally, SFFA tries to sidestep its burden by invoking the "pattern or practice"

theory of discrimination which includes a burden-shifting framework.  Dkt. 620 at 167-76.

Mostly modeled on disparate treatment employment cases under Title VII and other statutes, the

"pattern or practice" theory does not change the fact that SFFA carries the burden of persuasion

at all times.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The ultimate

burden of persuading the trier of fact that the defendant intentionally discriminated against the

plaintiff remains at all times with the plaintiff."); *see also St. Mary's Honors Ctr. v. Hicks*, 509

U.S. 502, 511 (1993).

Nor does the "pattern or practice" theory materially change this Court's ultimate calculus

in weighing all the evidence to determine whether SFFA has proven intent.  By selectively

quoting from several cases, SFFA misleadingly suggests that a statistically significant disparity

proves that a discriminatory policy "exists."  Dkt. 620 at ¶ 173.  But the cases cited by SFFA

---

[19] Under SFFA's theory, any non-Black or non-Hispanic ethnicity could sue Harvard for discriminating against them vis-à-vis any other non-Black or non-Hispanic ethnicity, obtain the burden-shifting advantages of strict scrutiny, and—given the difficulties of surviving strict scrutiny—likely succeed. This strange outcome would be consistent with SFFA's goals of eliminating all racial considerations from college admissions but inconsistent with the Supreme Court's precedent from *Bakke* to *Fisher II*.

stand for the proposition that statistics can establish a *prima facie* case of disparate treatment;

they do not suggest statistics dispositively prove the ultimate issue of liability.[20]  SFFA also

implies that its statistical evidence may only be rebutted by statistics.  Dkt. 620 at ¶ 176.  This

effort to underrate the probative value of non-statistical evidence is convenient: after reviewing

480 admissions files, SFFA submitted only two individual files (which it did not substantively

discuss in its post-trial brief), no files for any of its standing members, and no individual

testimony of racial discrimination.[21]  But courts have been clear that nonstatistical evidence and

specific counterexamples of discriminatory treatment are highly probative, especially where the

statistical evidence is highly disputed.  When "experts disagree, . . . the court may need the help

of live witnesses to relate their actual experiences." *EEOC v. Sears, Roebuck & Co.*, 839 F.2d

302, 311 (7th Cir. 1988).   Individual victim testimony is useful to bring "cold numbers

convincingly to life."  *Id.* at 311 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324,

339 (1977)).  Moreover, "when the statistical evidence does not adequately account for 'the

diverse and specialized qualifications necessary for [the positions in question],' strong evidence

---

[20] *See, e.g.*, *Palmer v. Shultz*, 815 F.2d 84, 91 & n.6 (D.C. Cir. 1987) (discussing the type of statistical evidence which will create an inference of discrimination and satisfy plaintiffs' prima facie case but also acknowledging "[s]tatistics, however, cannot entirely rule out the possibility that chance caused the disparity.  Nor can statistics determine, if chance is an unlikely explanation, whether the more probable cause was intentional discrimination or a legitimate nondiscriminatory factor in the selection process.") (citation omitted); *Karp v. CIGNA Healthcare, Inc.*, 882 F. Supp. 2d 199, 210 (D. Mass. 2012) ("In a pattern and practice disparate treatment case, statistical evidence constitutes the core of a plaintiff's prima facie case.  Within the . . . individual disparate treatment model, however, statistical evidence is only one small part of a substantial web of evidence indicating pretext.") (emphasis added) (quoting *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 158 & n. 5 (2d Cir. 2001)); *EEOC v. Tex. Roadhouse, Inc.*, 215 F. Supp. 3d 140, 169 (D. Mass. 2016) ("'[G]ross statistical disparities . . . alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination.' . . .  An important caveat is that statistics are not irrefutable and the context and circumstances determine the evidentiary weight that the statistics provide.") (internal quotation omitted) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977)).
[21] SFFA took extensive discovery in this case, including 24 depositions, and Harvard produced more than 97,000 pages of documents to SFFA, including 480 anonymized application files, along with detailed anonymized database information about more than 200,000 individual applicants.  Dkt. 418 at 16; *see also* 10/25 Tr. 24:21-25 (Arcidiacono). At trial, SFFA only introduced two applicants' files through Dr. Arcidiacono: P112 and P117. Neither file proves discriminatory intent against Asian Americans or that Harvard failed to satisfy the narrow tailoring standard articulated by the Supreme Court.  *See* 10/26 Tr. 55:10-61:22 (Arcidiacono).  SFFA largely acknowledged this—its post-trial brief only makes one reference to P112 and only references it for non-substantive matters. Dkt. 610 at ¶ 17.

of individual instances of discrimination becomes vital to the plaintiff's case." *Id.* (quoting

*Valentino v. U.S. Postal Serv.*, 674 F.2d 56, 69 (D.C. Cir. 1982)).

Contrary to SFFA's assertions of an Asian American "penalty," *Students'* application

files provide probative proof that Harvard is not intentionally discriminating against Asian

Americans.  The application files of Ms. Chen and Mr. Diep reflect positive references to their

race by admissions officers.  SA-1.0029-0030; SA-2.0002.  Indeed, the same reader who

commented on Mr. Diep's "Vietnamese identity & pencils as tools" also effusively praised him

for "pushing himself academically and personally."  SA-2.0002.  Unable to rebut such evidence,

SFFA instead suggests that anecdotal examples are "doomed to failure."  Dkt. 620 at ¶ 176.

Certainly, it would be of limited probative value if Ms. Chen or Mr. Diep were cherrypicked

exceptions to a general rule.  But that is not what happened here.  Harvard had no role in

determining who the members of the *Student Amici* group are and which *Student Amici* would

testify.[22]  Moreover, Ms. Chen and Mr. Diep are not merely "anecdotal examples"—they are

among the only direct evidence of how Harvard evaluates Asian American applicants given

SFFA's overreliance on statistics as opposed individual applicants.  *C.f. Int'l Bhd. of Teamsters*,

431 U.S. at 337 (proving disparate impact through statistical disparity which was bolstered

through testimony of individuals who recounted over 40 specific instances of discrimination).

At best, the statistical evidence SFFA offered at trial goes to the discriminatory *impact* of

Harvard's practices rather than discriminatory *intent*.  Statistical disparity is an important factor

but rarely sufficient to establish discriminatory intent.  *Arlington Heights*, 429 U.S. at 266.  In

order to prevail in a typical pattern or practice disparate treatment case, plaintiffs must prove that

there is a disparity in selection rates (meaning that the selection rate of the group alleging

---

[22] In fact, *Student Amici* did not have the full admission files of any of the students at the time the trial witness designations were made.

discriminatory treatment is lower than that of the group allegedly receiving preferential

treatment) and that the disparity was caused by an unlawful bias against members of the

disadvantaged group.  *Palmer v. Shultz*, 815 F.2d 84, 90 (D.C. Cir. 1987); *Burgis v. New York*

*City Dep't. of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015).  But on the issue of selection rates,

SFFA's own expert Dr. Peter Arcidiacano reports that his preferred dataset (which excludes

ALDC applicants) shows no statistically significant disparity between white applicant acceptance

rates and Asian American applicant acceptance rates.  Dkt. 419, Ex. 31 at 35.  The difference is

two-tenths of one percentage point (4.0% compared to 4.2%).  *Id.*  Thus, SFFA's claim fails to

meet the traditional statistical analysis test used for Title VII cases.

SFFA tries to get around the lack of statistical disparity in overall selection rates by

essentially arguing that Asian American applicants, as a group, are more qualified than students

of other races on "objective" criteria.  Dkt. 620 at ¶¶ 24-28.  SFFA relies on this assumption to

argue Asian Americans should have *higher* acceptance rates than white students, rather than a

rate that is relatively equal.  Dkt. 620 at ¶ 36.  SFFA tries to prove this point in two ways:

through Dr. Arcidiacono's descriptive statistics and his regression analysis.

SFFA's descriptive statistics include a number of charts showing that when students are

arranged by academic decile (which is entirely based on standardized test scores and grades),[23] a

lower proportion of Asian American applicants receive admissions offers, top overall scores, and

top personal scores.  PD38 at 16, 18, 21; Dkt. 620 at ¶¶ 24-37.  But these descriptive charts do

not provide meaningful information because they are predicated on a faulty presumption that

academic scores should determine who is worthy of admission.  It is wrong to conflate academic

scores with merit.  As discussed above and in *Students'* prior briefs, such scores are not purely

---

[23] 10/16 Tr. 84:9-13 (Fitzsimmons).

"objective" as SFFA suggests but subject to their own biases that systematically undervalue the

potential of African American, Hispanic, and other groups of students with less privilege and

educational opportunity (including certain Asian American students).  Dkt. 509 at 16-20; *see*

*also* Dkt. 471 at 16-22; Dkt. 517 20-35. Nor are such academic scores an accurate predictor of

college performance.  *Id*.  Moreover, it is unsurprising that academic scores alone do not

determine admissions because Harvard's applicant pool is full of academically excellent

candidates. DX671.3 & DD10.4; DX672 & DD10.5; 10/30 Tr. 86:25-89:3 (Card).  Due to the

abundance of academically stellar applicants, applicants distinguish themselves through non-

academic factors and by having multiple strengths.[24]  DX672 & DD10.6, DD10.8; 10/30 Tr.

88:12-89:3, 90:18-93:14 (Card).

     It is similarly incorrect to presume there should be a meaningful correlation between

applicants' academic scores and their personal scores.  The personal score assesses "what kind of

positive difference this person had made to others in her school, outside her school, to her

family. . . [how does this person] maximiz[e] the experiences of everyone around her."  10/17 Tr.

224:23-225:2 (Fitzsimmons).  It assesses qualities such as integrity, helpfulness, courage,

kindness, reaction to setbacks, concern for others, self-confidence, leadership abilities, and

maturity.  10/19 Tr. 228:24-229:17 (McGrath); 10/24 Tr. 117:4-24 (Banks).  Logically, the

presence of these personal qualities is not dependent on high academic scores; and statistically,

there is a negligible relationship between them.  10/31 Tr. 51:12-52:9 (Card).  In fact, *Students*

have previously noted that a growing body of research shows that character skills (such as grit

and conscientiousness) rival cognition in predicting educational attainment, and such skills *do*

---

[24] For example, 42 percent of applicants receive high academic ratings (1 or 2), whereas only 24 percent have high extracurricular ratings, only 21 percent have high personal ratings and only 10 percent have high athletic ratings. 10/30 Tr. 87:17-88:6 (Card).

*not* necessarily move in the same direction as academic factors.  Dkt. 509 at 17-18.  Our *Students* provide further proof that academic scores alone do not define merit: Mr. Diep's ability to "push his own boundaries" and his "infectiously happy personality" could not be captured by his "lower end" SAT scores.  SA-2.0002, 0029.

Dr. Arcidiacono's regression analyses fare no better.  Both experts performed multivariate regression to evaluate the role of race in Harvard's admissions process while holding all other variables constant. 10/25 Tr. 216:22-217:3 (Arcidiacono); 10/30 Tr. 101:15-17 (Card).  Importantly, a regression analysis will inaccurately estimate the effect of race if it fails to include an input which impacts admission and correlates with race.  10/25 Tr. 102:23-103:13 (Arcidiacono); 10/30 Tr. 113:1-14 (Card).  This problem—also known as omitted variable bias— poses a particular limitation for admission systems such as Harvard's where there is a substantial amount of relevant information that is not captured by the dataset.  10/25 Tr. 80:13-24 (Arcidiacono); 10/30 Tr. 114:10-23, 123:1-17 (Card).  The regressions that Dr. Arcidiacono performed on each rating likely suffer from this issue of omitted variables.  The models showed each rating had some correlation with race: Asian Americans received stronger academic and extracurricular ratings than otherwise identical white applicants, while receiving weaker personal ratings.  DX688.1& DD10.63; 10/26 Tr. 31:15-18, 33:25-34:3 (Arcidiacono); 10/31 Tr. 45:12-18 (Card).  But since there are so many variables missing in the models, these variations may be attributable to a factor outside of the model rather than race. 10/31 Tr. 40:14-43:17 (Card). Dr. Card confirmed the low explanatory power of Dr. Arcidiacono's regressions of the ratings: the models could only explain 29% of the student-to-student variation in the personal score, 57% of variation in the academic score, and 13% of the variation in the extracurricular score.  *Id.* Consistent with these models' low explanatory power, Dr. Arcidiacono concluded that factors

outside of the model—not race—explained the positive association between Asian American ethnicity and the academic rating.  10/25 Tr. 102:23-103:25 (Arcidiacono); 10/26 Tr. 35:21-36:8 (Arcidiacono).  He reached the same conclusion for the extracurricular rating's positive association with Asian American ethnicity.  *Id.*  But then he concluded that race—not factors outside the model—explained the negative association with Asian American ethnicity.  10/25 Tr. 95:11-96:12 (Arcidiacono).  On this basis he removed the personal score entirely from his regression model.  10/25 Tr. 67:3-8, 82:4-9, 84:12-19 (Arcidiacono).

*Students* acknowledge that bias may manifest itself in different ways.  But the fundamental problem with Dr. Arcidiacono's approach is that it is inconsistent.  All three models had relatively low explanatory power and all three showed some variation by race.  There is no compelling reason to view the personal score as any more or less influenced by race than any of the other ratings, and thus no reason to treat it differently by removing it but leaving the academic and extracurricular ratings in the model.[25]  It is the removal of the personal score which allows Dr. Arcidiacono to find a statistically significant negative effect of Asian American ethnicity.  Dkt. 620 at 26.  Total exclusion of the personal score from the model is not appropriate.[26]

---

[25] SFFA tries to differentiate the personal rating from the other ratings to show it is influenced by race.  First, SFFA argues that race must influence the personal rating because its regression analysis shows the same pattern as the overall score.  Dkt. 620 at ¶ 52.  SFFA reasons that since the overall score considers race, the personal score must too.  *Id.*  But the fact that there is a similar pattern between the personal and overall rating is not suspect on its own.  There are many non-racial reasons for why applicants who receive high personal scores would also receive high overall scores given that applicants often have to distinguish themselves through non-academic attributes. 10/31 Tr. 33:16-34:1 (Card).  SFFA also argues that the personal score must be influenced by race because it is positively associated with African American and Hispanic ethnicity, but African American and Hispanic applicants have lower "observable" attributes.  Dkt. 620 at ¶ 52.  SFFA jumps to the conclusion that only race can explain the "discrepancy" between the direction of the personal rating and the direction of "observables."  *Id.*  But this automatic presumption is not warranted.  Many of the "observables" that Dr. Arcidiacono measures are academic. PD38.26; *see also* Dkt. 419, Ex. 35 at 83 n.44.  As described previously, academic observables do not necessarily move in the same direction as personal attributes.

[26] Students focus on the dispute over the personal score because SFFA has asserted "[t]he key difference between the experts is that Professor Card's findings depend on including the personal rating in his models."  Dkt. 620 at ¶ 63.  On the remaining statistical disputes between the experts, *Students* observe that their application files lend further support to Dr. Card's contention that variables such as parent occupation, the athletic score, and an applicant's intended career should be included in the model because admissions officers consider it.  Dkt. 619 at ¶ 121.  The admissions officer's comments about Ms. Vasquez-Rodriguez specifically note her parents' occupation

First, it seems likely that differences in the personal score are explainable by factors outside the model (rather than race) because the variables in the dataset bear little relevance to the personal score.  10/25 Tr. 23:16-24:12; PD38.26 (variables in model).  As explained previously, the dataset's academic variables are poor measures of personal attributes.  The dataset's non-academic variables also do not have a strong connection to particular character attributes (capturing information such as "docket indicators" and "intended major").  *See* PD38.26.  Moreover, the data cannot capture the very concrete but unquantifiable strengths reflected by an applicant's essays, non-required recommendations, and the extensive written commentary from teachers and interviewers.  10/30 Tr. 123:1-17 (Card).  For example, the model does not account for Ms. Vasquez-Rodriguez expressing in her essay that she "crave[s] success in every aspect of my life because I want to be a role model for my community," SA-3.0013; or Mr. Diep sharing in his essay about "his drive to chase after my dreams even if it meant facing hardships."  SA-2.0007.  Yet, this non-quantitative evidence importantly factors into the personal score.

But perhaps more importantly, removing the personal score from the model altogether is problematic and unnecessary. That is because the personal score captures critical information about applicants' strengths which is not captured by any other rating, such as their "integrity, helpfulness, . . . reactions to setbacks" and much more.  Dkt. 619 at ¶ 46.  It reflects important contributions that a student can make to campus and to the world; it also plays a large role in distinguishing candidates.  *Id*; 10/31 Tr. 33:16-34:1 (Card).  Instead, it is appropriate to adjust the model by removing the estimated effect of race from all ratings, including the personal

---

and her athletic success even though she was not a recruited athlete.  SA-3.0002.  *See also* SA-2.0005 (interviewer report commenting on Ms. Vasquez-Rodriguez's career interests); SA-4.0001 (admissions officer's commentary about Ms. Cole's participation in tennis and her parents' work with the IRS and ADT).

rating. 10/31 Tr. 78:10-79:2 (Card); 11/1 Tr. 100:16-101:2 (Card).  Dr. Card made such an adjustment and found there is no statistically significant effect of Asian American ethnicity on admission.  DX694; DD10.83; 10/31 Tr. 80:13-81:17 (Card).[27]

Beyond its statistical analysis, SFFA's proof of discriminatory intent is weak.  Much emphasis is placed on Harvard's OIR reports.  Dkt. 620 at ¶¶ 118-27.  It is true that data about racial differences should prompt investigation and reflection.  However, these reports did not show anything new.  From 1988-1990 the Office for Civil Rights performed a thorough investigation into concerns similar to those raised here: Asian Americans had "superior academic credentials" but their overall admissions rates and personal scores were lower than white applicants.  P555.1, 21.  The investigation concluded that Harvard was not discriminating against Asian Americans in the personal score or in its admissions process.  P555.21-22, 25-26, 43-46.  OCR concluded the difference in selection rates between white and Asian Americans could be explained by Harvard's preferences for legacy students and athletes.  P555.31-36.  From this, Dean Fitzsimmons understood that the differences observed in the personal score and admissions rates for Asian Americans could be explained by factors other than intentional discrimination.  10/17 Tr. 91:5-18, 10/18 Tr. 130:23-131:5 (Fitzsimmons).  Nevertheless, Dean Fitzsimmons did take steps to monitor the admissions rates for bias.  Following OCR's findings, Dean

---

[27] The data does indicate that Asian American applicants may receive, on average, lower personal scores than white applicants.  10/18 Tr. 109:19-110:8 (Fitzsimmons).  *Students* do not summarily conclude that Asian Americans are less strong on non-academic factors.  Rather, it may be the case that admissions' officers have less access to non-academic information about Asian Americans.  *See id.*  Consistent with the model minority myth, which both helps and harms Asian Americans, teachers and guidance counselors may unwittingly focus more on the academic qualifications of Asian American applicants and give short shrift to their personal attributes.  Moreover, Asian American applicants themselves may avoid discussing the very experiences that would shed light on their personal qualities.  Sally Chen testified that a counselor at her predominantly Asian high school told Asian American students that "writing an Asian immigrant story was overdone; that it was not compelling, not interesting, and would ultimately hurt . . . our applications."  10/29 Tr. 200:18-23 (Chen).  Although Ms. Chen disregarded this unsound advice, other students may take it to heart and deprive admissions officers of the very information they need to adequately assess applicants' personal qualifications.  After all, students like Ms. Chen and Mr. Diep who told their immigrant Asian stories authentically received strong personal ratings.  SA-1, SA-2.

Fitzsimmons began to review statistics on the admission rates of white and Asian American non-legacy, non-athlete ("NLNA") applicants, and he continues to do so today to ensure that Asian American applicants are treated fairly in the process.  10/18 Tr. 101:11-16, 105:6-12 (Fitzsimmons).  The record shows that in many admissions cycles between 1990 and the present, the admission rate of Asian American NLNA applicants has been higher than that of White NLNA applicants. DX42; 10/18 Tr. 101:19-105:2 (Fitzsimmons).  Therefore, the OIR reports, which showed that Asian Americans had lower personal scores and admission rates, did not provide any new information.[28]  *See* Dkt. 509 at 16-20; *see also* Dkt. 471 at 16-22; Dkt. 517 at 20-35.

SFFA's remaining evidence, and lack thereof, does not prove discriminatory bias.  Not only did SFFA fail to produce any live fact witnesses, it produced little from the hundreds of applicant files from which it had access.  SFFA notes that a significant number of applications had the notation "standard strong."  But there is no material difference in the term's application to Asian American versus white applicants.  "[A]mongst the students who are labeled as standard strong, the sum of the ratings for Asian-American and white students is essentially the same." 10/31 Tr. 95:24-96:2 (Card).  SFFA also identified two instances where Asian applicants were referred to as "quiet" and "quiet and strong."  10/18 Tr. 127:16-129:4 (Fitzsimmons).  SFFA never links such references to racial discrimination, particularly when some African American, Hispanic, and White applicants are also described as "quiet," as well as "shy" and "understated." Dkt. 619 at ¶ 192 (quoting DX50.620, DX50.0975, DX50.1054).  To further underscore that "quiet" is not an inherently pejorative term, *Students* note that the admissions officer reviewing

---

[28] *Students* urges Harvard to continue its efforts monitoring for bias. This includes ongoing efforts to monitor for bias in the personal score and it should also include serious reflection about the well-documented racial differences in SAT scores and other academic criteria which systematically disadvantage African American, Latinx, and other underrepresented minority students (including many Asian American subgroups).

Ms. Cole's application file underlined the counselor's comment that Ms. Cole (who is African American) possessed leadership "of the quieter, more subtle, variety." SA-4.0031.

SFFA also never shows how Harvard's admissions officers are actually implementing a plan to penalize Asian students. SFFA's primary argument now appears to be that Harvard is acting with an unconscious bias against Asian American students. But SFFA has left this allegation underdeveloped. Surprisingly, it did not bring forth any witness to explain what an unconscious bias is, how it operates, or how the evidence here demonstrates that Harvard is acting with an unconscious bias that favors white applicants to the detriment of Asian American applicants.[29]

Altogether, SFFA's intentional discrimination claim fails because it ignores probative evidence offered by our *Students'* files, relies on faulty statistics and assumptions, and offers no persuasive evidence that Harvard is intentionally discriminating against Asian American applicants in favor of whites based on their race.

**III.     The remedy SFFA seeks is unmoored from its legal claims.**

As described above, the record is clear that some consideration of race remains "necessary" for Harvard to achieve its educational objectives. Accordingly, well-settled precedent establishes that Harvard is entitled to consider race in admissions so long as certain conditions are met. *See, e.g., Fisher II*, 136 S. Ct. at 2210-11. Even if SFFA prevailed under either legal theory, it would not compel Harvard to entirely eliminate race-conscious admissions.

---

[29] Perversely, SFFA's section on "Non-Statistical Evidence Show[ing] that Harvard Discriminates Against Asian Americans" provides an out-of-context quote from Ms. Chen's high school counselor—not Harvard—that "writing an Asian immigrant story" is "overdone . . . not compelling or interesting." Dkt. 620 at ¶ 95 (quoting 10/29 Tr. 200:15-23 (Chen)). The effort to associate this statement with Harvard is blatantly misleading and altogether false. In fact, it was Harvard's race-conscious admissions policy which helped counteract the negative messaging Ms. Chen received. As Ms. Chen shared, "when I wrote about my experiences growing up Chinese-American . . . I was, I think, very much seen and my story was heard. . . . I think that it's truly incredible to have been seen and been heard for who I am and valued for it." 10/29 Tr. 212:1-19 (Chen).

Supreme Court precedent confirms that a narrow tailoring violation would not permanently enjoin Harvard from considering race.  In *Bakke*, the majority of justices struck down U.C. Davis Medical School's race-conscious practice of reserving a certain number of seats for minority applicants because racial quotas offended the Constitution. 438 U.S. at 319-320.  But the majority also held that the lower courts had erred by enjoining the medical school from "ever considering the race of any applicant".  *Id.* at 320.  The Supreme Court reversed this permanent injunction on the grounds that the institution "has a substantial interest [in diversity] that legitimately may be served by a properly devised admissions program involving the competitive consideration of race."  *Id.*  Similarly, in *Gratz v. Bollinger*, the Supreme Court struck down the University of Michigan's race-conscious practice of automatically awarding 20-points to certain minority applicants, but notably refrained from permanently enjoining Michigan's consideration of race.  539 U.S. 244 (2003).  *Bakke* and *Gratz* illustrate that even if some aspect of Harvard's race-conscious program offends the Constitution, it would not be prospectively prohibited from considering race given its substantial interest in diversity.

The same limitation applies to SFFA's intentional discrimination claim: it would not justify a blanket ban on considering race in admissions.  Bedrock remedial principles establish that relief "should be tailored to the injury suffered . . . and should not unnecessarily infringe on competing interests."  *United States v. Stokes*, 124 F.3d 39, 44 (1st Cir. 1997) (quoting *United States v. Morrison*, 449 U.S. 361, 364 (1981)).  The prevailing consensus among leading social scientists is that countering racial bias requires fostering greater self-awareness and reflection around race, not "blindness" to it in a world where racial inequities are pervasive.[30]  *See* Dkt. 509

---

[30] SFFA cannot seriously contest that race-conscious measures would be the appropriate way to counter any systemic bias. It offered no witness testimony on countering bias, whether implicit or explicit. SFFA's post-trial brief selectively quotes from Harvard's Report on "Pursuing Excellence on a Foundation of Inclusion" to suggest Harvard could engage in practices similar to "blind grading" and "anonymiz[ing] resumes" to counteract bias. Dkt.

at 34-35 (discussing and referencing prevailing research on countering racial bias).  As discussed in *Students'* prior brief, SFFA's intentional discrimination claim definitively does not warrant ending race-conscious admissions.  Such an injunction would be both factually illogical and legally impermissible.  *See* Dkt. 509 at 34-37.

Dated: January 9, 2019

Respectfully Submitted,

/s/ Oren M. Sellstrom
Oren M. Sellstrom (BBO #569045)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
AND ECONOMIC JUSTICE
61 Batterymarch Street, Fifth Floor
Boston, MA 02110
Tel: 617-988-0608
osellstrom@lawyerscom.org

/s/ Genevieve Bonadies Torres
Genevieve Bonadies Torres (*pro hac vice*)
Kristen Clarke
Jon M. Greenbaum (*pro hac vice*)
Brenda Shum (*pro hac vice*)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
UNDER LAW
1500 K Street, NW
Washington, DC 20005
Tel: (202) 662-8600
gbonadies@lawyerscommittee.org

/s/ Nicole K. Ochi
Nicole K. Ochi (*pro hac vice*)
ASIAN AMERICANS ADVANCING JUSTICE
1145 Wilshire Boulevards

---

620 at ¶ 104.  But these selective quotations are taken entirely out of context, and bear limited relevance to a holistic admissions policy.  Researchers have concluded that holistic processes such as admissions are ill-suited to race-blind practices. Russell Pearce et al., *Difference Blindness vs. Bias Awareness: Why Law Firms with the Best of Intentions Have Failed to Create Diverse Partnerships*, 83 Fordham L. Rev. 2407, 2413 (2015) (finding that "overemphasizing individual outcomes without paying attention to the surrounding interactional and institutional processes that produce them" renders holistic evaluations "both incomplete and unjust"); *see also* Adam R. Pearson et al., *The Nature of Contemporary Prejudice*, Soc. & Personality Psychol. Compass, no. 3, 2009, at 13 ("[E]fforts to be colorblind can sometimes produce 'rebound effects,' causing biases to become activated even more."); Maja Djikic et al., *Reducing Stereotypes Through Mindfulness: Effects on Automatic Stereotype-Activated Behaviors*, 15 J. Adult. Dev. 106, 110 (2008) (finding that encouraging people to actively think about the characteristics of certain groups of people reduced "stereotype-activated behavior" and, over time, could reduce discriminatory behavior).

Los Angeles, CA 90017
Tel: (213) 241-0211
nochi@advancingjustice-la.org

<u>/s/ Lawrence Culleen</u>
Lawrence Culleen (*pro hac vice*)
Nancy Perkins (*pro hac vice*)
Steven Mayer (*pro hac vice*)
Emma Dinan (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
Tel: (202) 942-5477
Lawrence.Culleen@arnoldporter.com

COUNSEL FOR *AMICI CURIAE*

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Local Rule 5.2(b), I hereby certify that this document filed through the ECF system on January 9, 2019 will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

<u>/s/ Lawrence Culleen</u>

Lawrence Culleen
