1                        UNITED STATES DISTRICT COURT

2                        DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                 Plaintiff,      Civil Action
                                 No. 14-14176-ADB

6    v.
                                 October 15, 2018

7    PRESIDENT AND FELLOWS OF HARVARD
    COLLEGE, et al.,              Pages 1 to 187

8                 Defendants.

9    _____

10

11

              TRANSCRIPT OF BENCH TRIAL -- DAY 1
12       BEFORE THE HONORABLE ALLISON D. BURROUGHS
              UNITED STATES DISTRICT COURT
13           JOHN J. MOAKLEY U.S. COURTHOUSE
                ONE COURTHOUSE WAY
14               BOSTON, MA  02210

15

16

17

18

19

20

21

22

               JOAN M. DALY, RMR, CRR
23              Official Court Reporter
          John J. Moakley U.S. Courthouse
24        One Courthouse Way, Room 5507
               Boston, MA  02210
25           joanmdaly62@gmail.com

```
1    APPEARANCES:

2
     COUNSEL FOR THE PLAINTIFF:
3

4            ADAM K. MORTARA, ESQUIRE
             J. SCOTT McBRIDE, ESQUIRE
5            KRISTA J. PERRY, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
6            54 West Hubbard Street
             Suite 300
7            Chicago, Illinois 60654
             312.494.4400
8            adam.mortara@bartlit-beck.com
             scott.mcbride@bartlit-beck.com
9            krista.perry@bartlit-beck.com

10           JOHN M. HUGHES, ESQUIRE
             MEG E. FASULO, ESQUIRE
11           Bartlit Beck Herman Palenchar & Scott
             1801 Wewatta Street
12           Suite 1200
             Denver, Colorado 80202
13           303.592.3100
             john.hughes@bartlit-beck.com
14           meg.fasulo@bartlit-beck.com

15           KATHERINE L.I. HACKER, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
16           1899 Wynkoop Street
             Suite 800
17           Denver, Colorado 80202
             303.592.3100
18           kat.hacker@bartlit-beck.com

19           JOHN MICHAEL CONNOLLY, ESQUIRE
             THOMAS R. McCARTHY, ESQUIRE
20           WILLIAM S. CONSOVOY, ESQUIRE
             Consovoy McCarthy Park PLLC
21           3033 Wilson Boulevard
             Suite 700
22           Arlington, Virginia 22201
             703.243.9423
23           mike@consovoymccarthy.com
             tom@consovoymccarthy.com
24           will@consovoymccarthy.com

25
```

```
 1    APPEARANCES (cont.):

 2
              PATRICK STRAWBRIDGE, ESQUIRE
 3            Consovoy McCarthy Park PLLC
              Ten Post Office Square
 4            8th Floor, South, PMB #706
              Boston, Massachusetts 02109
 5            617.227.0548
              patrick@consovoymccarthy.com
 6
              MICHAEL H. PARK, ESQUIRE
 7            Consovoy McCarthy Park PLLC
              3 Columbus Circle
 8            15th Floor
              New York, New York 10024
 9            646.456.4432
              park@consovoymccarthy.com
10
              PAUL M. SANFORD ESQUIRE
11            BENJAMIN C. CALDWELL, ESQUIRE
              Burns & Levinson LLP
12            One Citizens Plaza
              Suite 110
13            Providence, Rhode Island 02903
              401.831.8330
14            psanford@burnslev.com
              bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17            WILLIAM F. LEE, ESQUIRE
              FELICIA H. ELLSWORTH, ESQUIRE
18            ANDREW S. DULBERG, ESQUIRE
              ELIZABETH C. MOONEY, ESQUIRE
19            SARAH R. FRAZIER, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
20            60 State Street
              Boston, Massachusetts 02109
21            617.526.6556
              william.lee@wilmerhale.com
22            felicia.ellsworth@wilmerhale.com
              andrew.dulberg@wilmerhale.com
23            elizabeth.mooney@wilmerhale.com
              sarah.frazier@wilmerhale.com
24

25
```

```
 1    APPEARANCES (cont.):

 2
            SETH P. WAXMAN, ESQUIRE
 3          DANIELLE CONLEY, ESQUIRE
            DANIEL WINIK, ESQUIRE
 4          BRITTANY AMADI, ESQUIRE
            PAUL R.Q. WOLFSON, ESQUIRE
 5          Wilmer Cutler Pickering Hale and Dorr LLP
            1875 Pennsylvania Ave, NW
 6          Washington, DC 20006
            202.663.6006
 7          seth.waxman@wilmerhale.com
            danielle.conley@wilmerhale.com
 8          daniel.winik@wilmerhale.com
            brittany.amadi@wilmerhale.com
 9          paul.wolfson@wilmerhale.com

10          DEBO P. ADEGBILE, ESQUIRE
            Wilmer Cutler Pickering Hale and Dorr LLP
11          7 World Trade Center
            250 Greenwich Street
12          New York, New York 10007
            212.295.6717
13          debo.adegbile@wilmerhale.com

14          ARA B. GERSHENGORN, ESQUIRE
            Harvard Office of the General Counsel
15          Smith Campus Center
            Suite 980
16          1350 Massachusetts Avenue
            Cambridge, Massachusetts 02138
17          617.495.8210
            ara_gershengorn@harvard.edu

18

19    COUNSEL FOR AMICI STUDENTS:

20          JON M. GREENBAUM, ESQUIRE
            BRENDA L. SHUM, ESQUIRE
21          GENEVIEVE BONADIES TORRES, ESQUIRE
            KRISTEN CLARKE, ESQUIRE
22          1500 K Street NW, Suite 900
            Washington, DC 20005
23          202.662.8315
            jgreenbaum@lawyerscommittee.org
24          bshum@lawyerscommittee.org
            gtorres@lawyerscommittee.org
25          kclarke@lawyerscommittee.org
```

1    APPEARANCES (cont.):

2

3            LAWRENCE CULLEEN, ESQUIRE
             EMMA DINAN, ESQUIRE
             Arnold & Porter LLP
4            555 Twelfth Street, NW
             Washington, DC 20004
5            202.942.5477
             gina.dean@aporter.com
6            emma.dinan@aporter.com

7

     COUNSEL FOR AMICI ORGANIZATIONS:

8

9            JENNIFER A. HOLMES, ESQUIRE
             CARA McCLELLAN, ESQUIRE
             JIN HEE LEE, ESQUIRE
10           MICHAELE M. TURNAGE YOUNG, ESQUIRE
             RACHEL N. KLEINMAN, ESQUIRE
11           NAACP Legal Defense and Educational Fund, Inc.
             700 14th Street NW
12           Suite 600
             Washington, DC 20005
13           jholmes@naacpldf.org
             cmcclellan@naacpldf.org
14           jlee@naacpldf.org
             myoung@naacpldf.org
15           rkleinman@naacpldf.org

16           KENNETH N. THAYER, ESQUIRE
             KATE R. COOK, ESQUIRE
17           Sugarman Rogers
             101 Merrimac Street
18           Suite 900
             Boston, Massachusetts 02114
19           617.227.3030
             thayer@sugarmanrogers.com
20           cook@sugarmanrogers.com

21

22

23

24

25

```
 1                     P R O C E E D I N G S

 2                (The following proceedings were held in open

 3   court before the Honorable Allison D. Burroughs, United

 4   States District Judge, United States District Court, District

 5   of Massachusetts, at the John J. Moakley United States

 6   Courthouse, One Courthouse Way, Boston, Massachusetts, on

 7   October 15, 2018.)

 8                THE CLERK:  All rise.  Court is in session.  Please

 9   be seated.  This is Civil Action 14-14176, Students for Fair

10   Admissions versus President and Fellows of Harvard College.

11                Will counsel identify yourselves for the record.

12                MR. MORTARA:  Your Honor, Adam Mortara for the

13   Students for Fair Admissions.  With me today are Kat Hacker,

14   John Hughes, and Scott McBride.  In the back row, Patrick

15   Strawbridge, Meg Fasulo, Krista Perry.  Behind them, Mike

16   Connolly, Will Consovoy, and Paul Sanford.  And behind them,

17   Tom McCarthy and Mike Park.

18                THE COURT:  I'm not going to remember that.  That's

19   a lot.  Mr. Consovoy, Mr. Strawbridge, I can't get used to

20   seeing you back there.

21                Good morning, Mr. Lee.

22                MR. LEE:  Good morning, Your Honor.  On behalf of

23   Harvard, you will hear from during the course of the trial

24   Felicia Ellsworth, Danielle Conley, Seth Waxman, and Ara

25   Gershengorn and me.  Thank you.
```

1              THE COURT:  I think we're ready to get right to
2      openings.  I have a couple of housekeeping matters.  The
3      first is, as you've no doubt noticed, we're being besieged by
4      media requests, and one of the things they want are copies of
5      the exhibits.  We're wondering if we can leave it to the
6      parties to take responsibility for distributing exhibits to
7      the media in some way.
8              MR. MORTARA:  That's no problem from our
9      perspective, Your Honor.
10             MR. LEE:  We're fine with that, Your Honor.
11             THE COURT:  We don't have the resources to do that.
12     The two amicus parties have proposed a schedule.  It seems
13     like Harvard was amenable to it as they didn't want their
14     case interrupted.  Is that right?
15             MS. HACKER:  That's correct, Your Honor.  We're
16     willing to be flexible with the amici and keep them up to
17     date about when we expect our case will close before
18     Harvard's case begins.
19             Right now we told amici that we anticipate that
20     being potentially next Thursday or Friday.  Of course as this
21     week goes along, we can update them.  But it's just difficult
22     to provide a date certain when that will happen.  I think
23     both sides here agree that it will make sense for the amici
24     to go between SFFA's case and Harvard's case.
25             THE COURT:  I agree that that makes sense.  And I

1    don't want to interrupt the presentation of your case, but I

2    understand they had one person that was only available on one

3    day.  So let's just let that go for a bit and we'll see where

4    we end up as we get closer to that one day.  Is it the 29th?

5            I have a request for judicial notice on some of the

6    historical stuff.  Are you going to respond to that, Mr. Lee?

7            MR. LEE:  No, Your Honor.  The motion that was

8    filed is something that we negotiated with SFFA.

9            THE COURT:  Okay.  The last thing is the schedule.

10   I'm just going to go a couple of days ahead.  I have a bunch

11   of other things scheduled at 3:00, so at close to 3:00 today

12   when we have a reasonable stopping point, we'll stop there.

13   I usually allow only half an hour and 45 minutes for a lunch.

14   I'm just thinking the cafeteria is going to be crazed today.

15   So I'm thinking of starting with an hour today.  If that

16   turns out to be too much, we can shorten it.  I don't want

17   anybody to not have time to eat.

18           Tomorrow, as you know, I can only sit until around

19   1:00.  And I think I had told you there was another day next

20   week.  I forget which day it was, Tuesday or Wednesday.  That

21   meeting has been changed to a week after.  So I'm planning on

22   going, depending on the rest of my schedule, somewhere

23   between 10:00 to -- somewhere between 3:00 and 4:00 this week

24   with the exception of tomorrow.  All right?  I'll give you

25   more specifics on that.

```
1              MR. LEE:  Your Honor, what time would you like to
2    start tomorrow?
3              THE COURT:  It's hard for me to start before 9:30.
4    If you want the extra half hour, we can do it.  Otherwise,
5    the regular start time.
6              MR. LEE:  10:00 is fine with us.
7              THE COURT:  I think 10:00 in terms of -- if we
8    start to need extra time, we can begin starting earlier.
9    Give me one second here.
10             MR. MORTARA:  Your Honor, may I proceed?
11             THE COURT:  Yes, you may.
12        OPENING STATEMENT OF STUDENTS FOR FAIR ADMISSIONS
13             MR. MORTARA:  Thank you, Your Honor.
14             The evidence in this trial will show that Harvard
15   College discriminates against Asian-American applicants,
16   specifically those applicants ineligible for Harvard's
17   sizeable preferences for recruited athletes, the children of
18   its alumni, major donors, and its faculty.
19             The evidence will show that senior officials at
20   Harvard, including Dean William Fitzsimmons, have been aware
21   of this discrimination since at least 2013.  And in short,
22   Harvard will deny both what its own internal research told it
23   in February 2013 and what common sense should tell us all,
24   that subjectively determining someone's personal qualities
25   from a stack of paper without any guidance, without any
```

1    warnings about using race, invites racial bias, explicit

2    bias, implicit bias, racial stereotyping, and that here has

3    added up to intentional discrimination in violation of

4    Title VI.

5            This is particularly true in the case of Harvard's

6    admissions process where the very first page of the very

7    first document an admissions officer reads about how to read

8    applications enjoins the admissions officer to focus on race.

9            Most of the evidence we will present in this trial

10   goes to Count I, our claims of anti Asian-American

11   discrimination because on this claim we have the least

12   disagreement with Harvard about the law.  Harvard agrees it

13   is against Title VI.  It violates Title VI for Harvard to

14   impose an Asian penalty in its admission process.  We

15   disagree about the facts.

16           As to the other counts, Your Honor, it's a bit of

17   the converse.  The facts are less in dispute.  Harvard uses

18   race in its admission process and says its purpose is

19   diversity.

20           By Harvard's own admission, race is determinative

21   in the admission of over half the African-Americans and about

22   the third of the Hispanics on Harvard's campus in the

23   college.  That's not our report.  That's Harvard's own report

24   on race-neutral alternatives, Plaintiff's Exhibit 316.

25           And as Director McGrath testified and will testify,

1    Harvard runs its preliminary admissions process and then

2    checks the racial numbers from the previous year.  If it sees

3    a group that's far behind or significantly behind, an

4    under-represented minority group, it explicitly goes back and

5    re-reviews those applications, balances it out.

6         And of course, as Your Honor observed in the

7    summary judgment ruling, Harvard did not convene or finish a

8    committee or seriously consider race-neutral alternatives

9    until nearly 15 years after the Supreme Court told Harvard it

10   needed to in the *Grutter* decision.

11        Your Honor, the future of affirmative action in

12   college admissions is not on trial here this next couple of

13   weeks.  The Supreme Court has held that race can be used in a

14   narrowly tailored way in college admissions.  Diversity and

15   its benefits are not on trial here.  Students for Fair

16   Admissions supports diversity on campus, and the Supreme

17   Court has held that race can be used in a narrowly tailored

18   way in a college admissions process to unlock the education

19   at benefits of diversity.

20        This trial is about what Harvard has done and is

21   doing to Asian-American applicants and how far Harvard has

22   gone in its zeal to use race in its admissions process.

23        Your Honor, I think you're already very familiar

24   with Harvard's admissions process from the summary judgment

25   briefing.  I want to focus on some elements of that process

1    and how important certain features of that process are to

2    admission to Harvard.

3            And the guidance, the written guidance to Harvard's

4    admissions officers about how to review that big stack of

5    paper that they get in the application, is contained in

6    documents like Plaintiff's Exhibit 1.  Plaintiff's Exhibit 1

7    is the reading procedures for the class of 2018.  They're

8    here on your screen right now, and all the reading procedures

9    will be introduced into evidence, Your Honor.

10           You can see what I told you at the outset.  The

11   very first thing that a reader of a Harvard application is

12   enjoined to do is check the race of the applicant and make

13   sure it's been properly transferred from the common

14   application.

15           Now, I know Your Honor knows, you ordered the

16   production of a significant quantity of data about how

17   Harvard applies the written guidance in documents like

18   Plaintiff's Exhibit 1, six years of admissions data from the

19   class years 2014 to 2019.  We have about 150,000 applicants.

20   We have about 10,000 offers of admission.  You can look at

21   that data and summarize it, and we've done that in Rule 1006

22   summaries of the voluminous evidence Harvard produced from

23   its own admissions decisions.

24           I want to show you one of those summaries now.

25   This is Plaintiff's Exhibit 620.  This is a lot of

1    information, Your Honor.  I'm not going to talk about all of

2    it today.  I want to orient you.  This is talking about

3    showing how Harvard uses its ratings.  I'm going to talk

4    about some of those ratings.

5           The first thing I want to focus the Court's

6    attention on is this notation down in the corner, so-called

7    baseline data set.  As Your Honor knows, we have significant

8    discussions about how to treat the athletes; legacies; dean's

9    list -- that's the list of people that take the attraction of

10   Dean Fitzsimmons, perhaps because he knows the person or

11   because Harvard's development office has asked for that

12   attention; and the children of faculty or staff.  They're not

13   included on the data you're seeing on the screen.  This is

14   the regular folk, the people with no connection to Harvard,

15   the non-ALDC applicants.

16          You see up here I'm going to focus on the ratings

17   Harvard applies, the first four here.  There you see.

18          Now, these ratings are important.  They are ratings

19   assigned by Harvard's admissions officers in their subjective

20   judgment, guided by the guidance you saw or are going to see,

21   Plaintiff's Exhibit 1.

22          The overall rating is quite important, but you're

23   not going to hear that much about it.  The overall rating is

24   the admissions officer's assessment of the likelihood that

25   the candidate will ultimately be admitted.  You won't hear as

1    much about it because Harvard admits that race directly

2    influences the overall rating itself.

3             And once Harvard made that admission, both sides'

4    experts agreed the overall rating could not be used as a

5    variable in an admissions model trying to measure the effect

6    of race.  That makes sense.

7             So I'm going to talk first about the academic

8    rating and how important it is to admissions.  To do that,

9    I'm going to blow up a portion of Plaintiff's Exhibit 620 so

10   we can all look at it more closely.

11            Here you see the academic rating here, and you're

12   going to start to see some patterns as I go through this.  1s

13   are the best rating and they're the rarest.  There's only 600

14   in the six years of data that we have, again for the regular

15   applicants, not the ALDC folks.  The admissions rate is very

16   high.  66.18 percent of those candidates were admitted.

17            Then you'll see the lion's share of the admissions

18   are at academic rating 2, 6,000.  The admissions rate is

19   lower, about 10 percent.

20            And then you'll an interesting phenomenon.  Lions'

21   share here, 2.  Then you'll see the steep drop off between 2

22   and 3 and then down to 4.  You see, 4 has a lower chance of

23   getting in if you get an academic 3, 2.4 percent admissions

24   rate, and then essentially no chance of getting in if you get

25   a higher rating; that is, a worse rating.

1          This is important.  It tells us that the academic

2     rating in getting a 2 or a 1 is very important to admission

3     to Harvard.  Since this is such an important rating, we can

4     take a look at the guidance to tell us exactly how admissions

5     officers are directed to assign the academic rating.

6          You can see this here.  This is from Plaintiff's

7     Exhibit 1.  It's from page 5 over to page 6.  This is the

8     guidance for the academic rating.  Guideposts, even for

9     academic 1.  Evidence of unusual creativity or original

10    scholarship.  You see it there.  And then down below in 2, 3,

11    and 4, you see score targets for the SAT and the ACT,

12    objective guidance for the assignment of this important

13    rating.

14          Now that we've seen the academics and the academic

15    rating are important to admission to Harvard, we can talk a

16    little bit about how it is that we came to be here today.

17          Well, members of the general public did not have

18    access to Harvard's database that Your Honor ordered

19    produced.  What the general public did know was that across

20    America, Asian-American high school students were

21    out-performing their white counterparts on the SAT, on the

22    ACT, on national awards, national merit scholar, all sorts of

23    these types of things.

24          But that wasn't necessarily borne out on Harvard's

25    campus.  There were more whites than Asians.  But now we have

1    Harvard's database and we can see maybe if the applicant pool
2    explains that.
3              To do that, I want to use an index Harvard uses
4    called the Harvard academic index.  That's a score between 60
5    and 240.  It's generated for every Harvard applicant for whom
6    Harvard can get the information.  It's composed of two-thirds
7    from the SAT or ACT and one-third from the GPA or class rank.
8    We can look at Harvard's own database to summarize the
9    information therein to look at characteristics of the
10   applicant pool.
11             I'm now going to show you Plaintiff's Exhibit 624.
12   This is another Rule 1006 summary of the database.  This is
13   not a calculation.  This is the data from the database
14   summarized here.
15             What's organized on the left, you see academic
16   index ranges.  And on the right, you can see that each one of
17   these ranges, each one of those rows, comprises approximately
18   10 percent of the applicants.  They're deciles.  And so now
19   we can compare white applicants and Asian-American applicants
20   by reference to these academic deciles.
21             The very first thing you see is that Asian-American
22   applicants are disproportionately present in the top
23   10 percent of Harvard applicants academically.  You see that
24   17.92 percent there.
25             You also see that they numerically outnumber white

1    applicants by quite a substantial number in that first decile

2    and again in the second decile.

3            In the third decile, you see that the situation

4    starts to reverse and now there's more white applicants than

5    Asian applicants and the same in the fourth decile.

6            I'll stop there and I'll tell you why.  This top

7    40 percent, by academics, of white and Asian applicants to

8    Harvard, again in the regular applicant pool, not ALDC, make

9    up 83 percent of the whites and Asians in the regular

10   applicant pool admitted to Harvard.  This is a very important

11   group.  It's the most, the lion's share, of the admittees.

12   But on Harvard's campus what we see is something quite a bit

13   different.

14           This is from Plaintiff's Exhibit 319.  It's

15   internal Harvard data, but it ends up with things that

16   everybody knew.  And what you see here are first the

17   admission rates, Asians being admitted at about half the rate

18   of whites.  You see that right there.  The percentage of

19   admits.  20 percent of the admits were Asians, 40 percent

20   whites, year in and year out, including years that overlap

21   with the data Your Honor ordered produced.

22           That's of course reflected in the faces on campus,

23   one Asian face for every two whites.  That's the result.  The

24   public knew that too, which is why the public started to ask

25   questions.

1            And Harvard has answers to those questions.  The

2    first answer Harvard gives is admission to Harvard is not all

3    about academics.  That is absolutely true, and Students for

4    Fair Admissions is not here to say that Harvard needs to

5    switch to an admissions model that focuses exclusively on

6    academics.

7            The problem with that first answer is

8    Asian-Americans do as well or better than white applicants to

9    Harvard on every single rating that matters to admission to

10    Harvard, including extracurriculars, with the exception of

11    the subjective personal rating I'm going to talk about in a

12    little bit.

13            Asians do better on extracurriculars.  That's what

14    the evidence will show.  I'll show you that in a little bit,

15    a few minutes.

16            First let's look at how important the

17    extracurricular rating is to Harvard admissions.  We'll go

18    back to the blowup of Plaintiff's Exhibit 620, here now

19    showing the extracurricular rating.  You see again the same

20    pattern.

21            1s are rare, and the admission rate is quite high,

22    45 percent.  All the action is with the 2s.  5,000 admittees

23    here, an admission rate of 15 percent.  Then you see again

24    very steep drop off from 2 to 3.  And comparing 2 to 4,

25    2.28 percent, 7 times lower chance of getting in if you get

1    an EC rating of 3.  This is a very important rating for

2    admission to Harvard.

3         Well, we can check again in Plaintiff's Exhibit 1

4    and see what kind of guidance is given Harvard admissions

5    officers on this important rating.  This is again from

6    Plaintiff's Exhibit 1.  This is over at page 6,

7    extracurricular.

8         You see some guidance.  In extracurricular 1, you

9    see possible national-level achievement or professional

10   experience.  In 2, you see examples:  class president,

11   newspaper editor, local or regional recognition, and so on.

12   5 and 6, as I think Your Honor probably knows, are special

13   cases for the EC rating:  5 is significant family obligations

14   that prevent participation, and 6 may be something like a

15   physical condition, as you can see on the screen.

16        So the extracurricular rating, also very important

17   to Harvard, also significant objective guideposts and

18   guidance given to its admissions officers on how to apply

19   that important and relevant rating.

20        The athletic rating is a little bit different, Your

21   Honor.  We'll blow up Plaintiff's 620 for the athletic rating

22   now, and the very first thing the Court will notice is that

23   there are no 1s.  That's because, as I've been telling you,

24   the ALDCs which include the recruited athletes are not

25   included here, and they are the only ones that receive an

1    athletic rating of 1.

2              An athletic rating of 1 is not actually a rating.

3    It's a message that comes from the coach to Harvard

4    admission, saying we would like this person admitted.  What

5    the evidence will show is it's not so much a message as it is

6    essentially a command.  Recruited athletes are admitted

7    86.6 percent of the time, the evidence will show.

8              I want to talk about the athletic rating for

9    everyone else.  They do get athletic ratings.  The difference

10   is it's quite unlike what you saw before with academic and

11   extracurricular.  See, athletic 2, it's not where the lion's

12   share of that admits are.  It's not where the action is, and

13   the admission rate is lower, a little bit lower than academic

14   2, substantially lower than extracurricular 2.

15             But that's not what's important here.  What's

16   important is no steep drop off, 3 and 4, and no difference at

17   all between 3 and 4.  In fact, the admit rate for 3 and 4 is

18   slightly higher.

19             When you turn to the admissions guidance, the

20   reading procedures, what you'll see is the difference between

21   4 and 3 is someone with an athletic 4 doesn't participate in

22   sports at all, and someone with athletic 3 is on the team.

23             You can take a look at the guidance.  You can see

24   it here on the screen, again from Plaintiff's Exhibit 1.  You

25   can see is that 4 is little or no interest in athletics, and

1   3 is active participation.  The athletic rating is just not

2   very important to admission to Harvard.

3         I want to pause here and talk about why did I

4   mention this.  Both experts have included the athletic rating

5   in their models.  So for whatever importance it has, it's

6   taken into account by both sides' experts.  I've included

7   this because I think Harvard might during the trial focus a

8   little bit and talk a little bit more about how important the

9   athletic rating is in defiance of what its database is

10  telling us.

11        The reason they're going to do that is we've

12  discovered that, for whatever reason, white applicants

13  receive higher athletic ratings than Asian applicants.  We're

14  not going to focus too much on that during the trial because

15  the athletic rating isn't very important to admissions.  I

16  only note it here in case Harvard makes a big deal out of

17  athletic participation.  You just saw the admissions rate for

18  4 and 3 is exactly the same.

19        The personal rating is a different story.  The

20  personal rating is crucial to admission to Harvard.  And what

21  do I mean by that?  Here is Plaintiff's Exhibit 620, enhanced

22  for the personal rating.  You see again 1s are the rarest for

23  the personal rating, only 39 for non-ALDC applicants in the

24  six years of data we have.

25        The admission rate is gigantic, 66.67 percent.  All

1    the action is with the 2s again, 6,000 of our under 8,000

2    admittees in this group come from the 2s, and they have a

3    21.71 percent chance of getting in, the highest of the

4    ratings you've seen.  Look at the drop off from 2 to 3, a

5    14 times lower chance, in Harvard's own database, of getting

6    into Harvard if you get a personal 3 compared to a

7    personal 2.  You see it right here.  A 1.51 percent chance of

8    getting in if you get a personal 3.

9            And we found zero Harvard admittees from the

10   regular applicant group that got a personal 4 or higher.

11   Given that this is the most important rating that I've shown

12   you, we can all look at now what does Harvard tell its

13   admissions officers about how to assign the personal rating.

14           It's here on page 6, Plaintiff's Exhibit 1.  There

15   it is.  That's it.  That's all.  No objective guidance.  No

16   instruction or admonition about how to or how not to use race

17   in the assignment of the personal rating.  No enjoinment or

18   injunction against applying racial stereotypes or anything of

19   the kind when applying the personal rating.  That's it.

20           Harvard's witnesses in this trial will be nearly as

21   vague in their descriptions of what goes into the personal

22   rating as what you're seeing on the screen.  Is this person

23   likeable?  Are they sensitive?  Would they be a good roommate

24   or fit in at Harvard or contribute to the community or do

25   they have grit and integrity?

1          The personal score is dramatically important to

2     admissions to Harvard College.  It's a subjective assessment

3     with essentially no guidance about the applicant's

4     likability.

5          The undisputed evidence, Your Honor, will be that

6     Asian-American applicants to Harvard receive substantially

7     lower personal ratings than white applicants.  Harvard's own

8     expert, Professor David Card of Berkeley will sit to my left

9     next week or the week after and he will testify that he

10    cannot rule out racial bias as the explanation for why

11    Asian-American students receive substantially lower personal

12    ratings.  He'll say that when I talk to him.  He will call

13    this gap unexplained.

14         We have an explanation.  It's that when no one in

15    the admissions office ever even talks about how to properly

16    use race in admissions and there's definitely no written

17    guidance about how to do so and no one gets any guidance or

18    training about how to use race -- there is not -- and there's

19    no written guidance about how to assign the personal ratings,

20    you have let the wolf of racial bias in through the front

21    door.

22         Our evidence on the personal rating will include

23    the only statistical analysis of Harvard's personal rating

24    from its database performed by either expert.  Only Students

25    for Fair Admissions' expert, Professor Peter Arcidiacono,

1    actually modeled the personal rating and showed that race was

2    influencing it.  Harvard's expert, Professor Card, did not

3    construct his own model.

4         You can also see the influence of race on the

5    personal rating in Harvard's database, just looking at the

6    data.  You can see it with your own eyes.

7         I'm going to show you another 1006 summary of the

8    voluminous evidence, not an expert model, not a statistical

9    calculation, just Harvard's own decisions reflected in the

10   data that this Court ordered produced in this case.  This is

11   Plaintiff's Exhibit 629.  I'm going to mention it a lot.

12        It's again of the regular applicants, the

13   non-ALDCs, Your Honor, but the pattern repeats in another

14   exhibit we have when you include the legacies, dean's list,

15   and children of faculty or staff.

16        You see the academic index ranges on the left.

17   These are the same academic deciles I showed you before.

18   Then you see way on the right, it's that's the first thing I

19   want to talk to you about.

20        What's shown here in each of these cells is the

21   percentage in each academic decile that receives that

22   all-important 2 or 1 on the personal rating.  Remember you

23   need that 2 or 1 to be in that big, massive group of 6,000

24   from our just close to 8,000 numbers in the admit database.

25   And this shows you the percentage in each academic decile

1   that got that rating.

2        In the highest academic index, the highest decile

3   is 25.46 percent.  I'm pointing that out because it goes

4   steadily down, smoothly down as you go down the academic

5   index ranges.  And that's critically important because it

6   shows there's at lease an association between performing very

7   well in high school and on your SATs and ACTs and receiving a

8   high personal rating, for whatever reason.  That bears out in

9   all the subgroups you're going to see, too.

10        And then I'm sure Your Honor was looking at already

11   the quite remarkable difference between Asian-Americans and

12   whites on the personal rating.  In the top academic decile,

13   whites, nearly 30 percent of them get a 1 or a 2 on the

14   personal rating, the all-important personal rating.  This is

15   the regular applicants.  We're not talking about the ALDCs

16   yet.  Asians are down at 22 percent, and that persists.

17        Remember I talked about the top four academic

18   deciles, whites beating Asians in the second by nearly

19   8 percent, in the third by nearly 8 percent, in the fourth.

20   You see it right there all the way down the line.

21        And you can see also some relationships that are

22   interesting.  Asian-Americans in the top academic decile,

23   22 percent of them get that all important 1 or 2.  You've got

24   to go all the way down to the fifth academic decile to get

25   the same proportion of white applicants to Harvard.

1          That's a pretty stunning difference, and I'm going

2     to hazard a guess that Your Honor noticed another difference.

3     Asian-Americans don't just do more poorly than

4     African-Americans; they do dramatically and shockingly more

5     poorly than African-Americans, sometimes half the proportion

6     of Asians getting personal scores of 1 or 2 compared to the

7     percentage of African-Americans.

8          And I really do not think that Harvard is going to

9     come in here and say that the reason for this is that

10    African-American applicants to Harvard just seem on paper to

11    be more likeable, have greater integrity or sensitivity, or

12    have more grit.  I don't think they're going to say that.  I

13    don't know what they're going to say.  We'll ask.

14         You've also noticed Hispanics do more poorly than

15    African-Americans but wildly better than Asians as well, and

16    they do better than whites.

17         And now perhaps a more plausible explanation for

18    what you're seeing on the screen from Harvard's own database

19    emerges.  Harvard admits that it has an affirmative action

20    program in place for under-represented minorities, including

21    African-Americans and Hispanics.  Harvard will admit in this

22    trial that the tip, as Harvard calls it, for

23    African-Americans is significantly larger than the tip that

24    Hispanics receive, but they still do receive a tip over

25    whites.

1          And now you see the ordering here, the same

2    ordering in Harvard's admitted affirmative action program,

3    African-Americans receiving a very large boost on the

4    personal rating, Hispanics receiving a boost over whites but

5    not as large as African-Americans.

6          And then you see what's going on on the left side,

7    Your Honor, and that's the discrimination.  That's the use of

8    race Harvard will not admit to, which is Harvard pushing down

9    Asian-Americans on this all-important, subjective,

10   no-guidance personal rating.  You see it right here from

11   Harvard's own database.

12         But Harvard has repeatedly tried to tell this Court

13   in briefs, and they will do it again in this trial, that race

14   doesn't influence the personal rating.  They will tell you to

15   deny what you're looking at on the screen.  They will say

16   race is not involved here.

17         Harvard's trial witnesses, nearly to a man and

18   woman, will try to testify that they don't use race in the

19   personal ratings.  Some will do that with more conviction

20   than others, and of course it's the Court's job to judge the

21   credibility of that.

22         One senior admissions officer Christopher Looby,

23   our second trial witness, he'll tell the truth that he's been

24   using race in the personal rating for ten years.  And we know

25   from what we're seeing on the screen from the database that

1    Christopher Looby can't be alone.

2            Some group, a sizeable group of Harvard's 40 or so

3    readers of applications, has been using race as a factor in

4    the personal rating.  There's no other possible explanation

5    for what you're seeing on the screen in Plaintiff's 629.

6            As to whether Harvard's witnesses are credible on

7    the subject, we'll ask them questions.  They'll say there's

8    no correlation between race and the personal rating, in

9    defiance of what you're seeing.  They'll say Asian-American

10   applicants are no worse in their personal qualities than

11   others, including whites.  And they will be unable to explain

12   what you're seeing on the screen.

13           The truth is, Harvard has known for quite some time

14   that they have a problem with the personal rating and how

15   it's being applied to Asian-American applicants.

16           In December of 2012 when David Brooks of the New

17   York Times gave wide publicity to Ron Unz's critique of

18   Harvard on this subject, the evidence will show a near panic

19   set in at the Harvard admissions office, emails exchanged in

20   the wee hours of the mornings over the holidays.

21           Some of those emails went to the staff of Harvard

22   office of institutional research, including Dr. Erin

23   Driver-Linn, the head of OIR.  What is OIR?  We can see from

24   Plaintiff's Exhibit 465 what they say they are.  Their

25   objective is to offer accurate, timely, and digestible

research to, among others, senior university officials like Dean William Fitzsimmons, dean of admissions, that are responsible for mandatory reporting requirements to including the federal government.  This is a serious office with a serious mission staffed by serious people.

The testimony from Dr. Driver-Linn will be that she would never ever offer senior university officials research that she thought was shoddy or wrong.

So what did Dr. Driver-Linn and her colleagues offer Dean Fitzsimmons in February of 2013?  Your Honor knows.  A statistical analysis of ten years of admissions data that showed what?  That Asian-American applicants were better than or equal to white applicants to Harvard on every ranking except the personal score, and that there was a statistically significant Asian penalty in the Harvard admissions office.

And here's that report, Plaintiff's Exhibit 9.  And as Your Honor knows from before, it's got a mistype on the date.  It says February 2012; it's actually February 2013.

And on the fifth slide you can see the first thing I discussed.  The difference is in average test scores for ratings for white and Asian applicants.

First I want to orient you to something on the bottom.  This analysis excludes legacies and athletes. There's going to be a lot of discussion of this, Your Honor.

1    I've reserved my time on it.  Towards the end, you asked
2    about it at the pretrial hearing.  I want to save some to
3    talk about it.
4            But here is Harvard's own internal researchers
5    removing legacies and athletes from the database.  As I told
6    you before, Harvard has had an excuse about the
7    disproportionate or underrepresentation of Asians on its
8    campus, that the legacy and athlete preferences explain it,
9    which is why many researches have removed them from the data
10   set.  It's why Students for Fair Admissions expert did it.
11           Let's look at what the data shows on the screen.
12   Blow this up, you see in the middle is the zero line.  That's
13   where Asian-American and white applicants to Harvard are the
14   same.  And you see starting from the top what the public knew
15   that I mentioned, Asian-Americans vastly out performing
16   whites on the SAT 2, over .3 standard deviations.  Same on
17   the SAT, both math and verbal.
18           Then you see this alumni rating also outperforming
19   whites.  The next four are the same.
20           Then you see the personal rating on which Harvard
21   never gives anybody any training, there's no guidance, no
22   injunction against using race.  You saw the written
23   procedures.  There's almost nothing written in it.  It's
24   about how likeable you are.  And somehow, some way, white
25   applicants are deemed to be more likeable.

1          I told you Asian-Americans do better on
2   extracurricular.  There it is right there.  You can see it.
3          Because they do better on the SATs and they do
4   better in high school, Asian-Americans applicants are doing
5   better on the academic rating.  This is the accurate, timely,
6   and digestible research OIR gave Dean Fitzsimmons.
7          What they did next is they created a statistical
8   model.  It's called a logistic regression model.  And what
9   you do here is you gather variables plausibly related to the
10  admissions process and you use the data that you have.  Here
11  OIR was pooling ten years of application data and you try to
12  measure how important those variables are.
13         I have a demonstrative that sort of shows you what
14  you're talking about.  You have the admissions data.  You
15  know the outcomes.  You have the variables, the ratings and
16  such, and now you attempt to use a computer to tell you
17  whether these things are important or not.
18         On the next slide, I have a little picture of what
19  the equation that gets produced results in.  You see the
20  ratings there -- academic, extracurricular, and so on -- and
21  you compute these coefficients, the little colored letters.
22  And if they're high and positive, that tells you they're very
23  important to admissions.  Negative tells you it's a penalty,
24  it's a minus, penalty.  Statistical significance Your Honor
25  is familiar with, and that's what your model spits out.

1    If you're trying to measure race, the impact of
2    race, you can do that, too.
3    So did Dr. Driver-Linn and her colleagues tell Dean
4    Fitzsimmons something about this and what their model had
5    determined?  Yes.
6    That's slide 8 of Plaintiff's Exhibit 9.  We can
7    blow this up.  They expressed their findings in something
8    called odds ratios.  Odds ratios are how much more likely are
9    you to get into Harvard if you have this characteristic.
10   And you see the very most important thing in this
11   first model created by Harvard's own researchers, before
12   there was litigation, before there was a website called
13   Harvard Not Fair, before Harvard knew anything about this
14   case or any witness was retained or any expert retained to do
15   an analysis for either side's set of lawyers, Harvard's own
16   internal researchers told Harvard, told Dean Fitzsimmons,
17   that having a high personal rating was the most important
18   thing, a 9x higher chance ever getting in.
19   Also told them there's a big tip for
20   African-Americans.  You see it right there, also the legacy
21   tip about the same size.
22   Remember, we looked at the ordering, the hierarchy,
23   if you will, in Harvard's assignment of the personal rating
24   where you can see that African-Americans do better than
25   Hispanics, do better than whites, do better than Asians.  I

told you Harvard admits to using race in admissions.  You see
here the same hierarchy, the African-American tip bigger than
the Hispanic tip.  Right here.

Then Harvard's own researchers told Dean
Fitzsimmons something else, that there was a statistically
significant penalty on Asian-Americans applying to Harvard in
February 2013.  It's about a 20 percent hit on your
admissions chances.  That's what they showed him.  That's
what he knew about.

And this was not the only time this information was
conveyed to Dean Fitzsimmons.  The same analysis was given
again and again and again, including with updated and
improved models and including in a formal memorandum given to
Dean Fitzsimmons in May of 2013.

That's Plaintiff's Exhibit 26.

This is an email from Erica Bever.  She works at
OIR, and she is sending this memo to Dean Fitzsimmons,
including some others at OIR on the email.  Subject is
admissions memo.  It says, low income admission memo final.
You see that?  It's the attachment.

Now, Your Honor knows, but others may be wondering,
why am I talking about a memo describing a recent analysis of
low-income admissions in a case about discrimination against
Asians?  I'll explain.

Dean Fitzsimmons did not respond to Plaintiff's

1  Exhibit 9, the February 2013 PowerPoint, by saying our
2  process isn't reducible to a statistical model, I don't like
3  these models, they don't represent what we're doing, they're
4  incomplete or flawed, please never do them again.
5           No.  He asked Harvard's own researchers, before
6  there ever was a case here, to do more analysis, more
7  modeling to show that Harvard was giving a tip or a boost to
8  students from underprivileged backgrounds, and he asked for a
9  memo on that.
10          He also asked them to review literature to see if
11  their approach was consistent with what others have done.
12  And Ms. Bever is reporting here that it was.
13          Now there's a curious second paragraph.  Harvard's
14  own researchers want to get some other people involved,
15  including Jeff Neal and Christine Heenan.
16          Who are they?  They work for Harvard's public
17  relations department.  So why is it that Harvard's internal
18  researchers want to tell public relations about this?
19          Well, we can find out in the memo.  Here's the memo
20  to Bill Fitzsimmons from Bever, Driver-Linn, and Mark Hansen,
21  all working at OIR.  And if you look at the second page of
22  the memo, you see this model.  It's a table, logistic
23  regression.
24          The variables are what I told you, SAT or academic
25  rating or whatnot.  The coefficients are the numbers, the

1    little colored letters.  Positive is a boost and negative is

2    a minus.  Your Honor is familiar with what a P value is.

3         The next page we can find out what happened.  Here

4    in this model, OIR include the recruited athletes, and they

5    have this enormous positive coefficient.  Because as I said,

6    it's less of a rating than it is an instruction.  6.33, that

7    is gigantic.  They get in 86 percent of the time.

8         You see for the rest of us, the personal rating is

9    really important, the most important.  2.4.  Legacy the same,

10   2.4.  Remember that was translating to between a 7 and 10

11   times higher chance of getting in than the previous model.

12        Then you see the same hierarchy.  African-Americans

13   getting a big boost.  Hispanics less of a boost but still a

14   positive coefficient.  The same ordering you saw on

15   Plaintiff's 629 with the personal rating where Harvard denies

16   using race in assigning the personal rating.

17        Then you see what OIR was reporting to Dean

18   Fitzsimmons in an updated improved model.  He didn't say I

19   don't want any more models.  He got another one.  Here it is.

20        A statistically significant Asian penalty, P value

21   of zero.  It's right here.  Unless there be any doubt as to

22   why OIR was concerned enough to alert public relations or

23   wished to do so, it's right here at the bottom of the memo:

24   "We imagine that sharing any analysis of admission weights

25   will draw attention."

1            And in the lower highlighted section you see what

2      they're worried about attention being drawn to:  "Our

3      descriptive analysis and regression models also shows that

4      the tip for legacies and athletes is larger."

5            Harvard's always been somewhat sheepish about the

6      size of these preferences -- and we'll see why in a little

7      bit -- and "that there are demographic groups that have

8      negative effects."  I'm sure it wasn't lost on Your Honor,

9      even though it was on the screen only briefly, that the only

10     demographic group that has a negative effect in the table is

11     Asians.

12            And this wasn't the last time that Dr. Driver-Linn

13     and her colleagues presented this information.  They did it

14     again in October 2013.  They did it again in May and July

15     of 2014.

16            Now, Your Honor, you will never see any document,

17     any email, or any contemporaneous objective evidence

18     whatsoever that there was anything shoddy, flawed, or wrong

19     with these OIR analyses all warning Harvard they had a

20     problem, a red warning flag that they at least had a

21     potential problem with discrimination against Asians.

22            What you will see is that Dr. Driver-Linn and her

23     colleagues recognized in their own internal draft of this

24     memo that these findings were "realities."

25            They are realities, and Harvard and Dean

1    Fitzsimmons did nothing you would expect a reasonable

2    employer or university or institution to do, which would be

3    to investigate, deal with the problem, if the analyses were

4    incomplete, to complete them, to acknowledge fault, and

5    commit to doing better.  You see it right here.

6              And you'll see nothing from Harvard's documents

7    with all the criticism of this work that you're going to

8    hear.  You're going to hear a lot of vague memories that the

9    studies were incomplete or flawed, from Harvard's witnesses.

10             Part of the Court's job is to judge the credibility

11   of that against the objective contemporaneous written record

12   and against the accurate timely and digestible reports OIR

13   generated.

14             You're also going to hear from Harvard that these

15   OIR analyses were so terrible that no one bothered to discuss

16   it further or do any research.

17             Dean Fitzsimmons, for his part, told no one in the

18   chain of command about it.  He did not tell his immediate

19   superior, Dean Smith, the dean of the faculty of arts and

20   sciences, about these warning flags.  He did not tell

21   President Drew Faust, the president of Harvard, about these

22   warning flags about the treatment of Asians.  And he did not

23   tell Marlyn McGrath, the director of admissions that he'd

24   been working with for nearly 30 years, three decades.  He

25   didn't tell her.

1              The question we should all ask is what would this

2    have had to have said for Dean Fitzsimmons and Harvard to do

3    anything about it, to take one single further step, to talk

4    to admissions officers about how they're using the personal

5    rating, or how they might be engaging in racial stereotyping,

6    to give them training or written guidance, implicit bias

7    training, anything.

8              Instead, Dean Fitzsimmons and Harvard decided that

9    the system was working as they intended and perhaps had

10   always intended it to work.  And that adds up to intentional

11   discrimination in violation of Title VI.

12             The next expert to come along and model Harvard's

13   admissions process is Professor Peter Arcidiacono, Duke's

14   fair admissions expert from Duke University.

15             He took the six years of data that Your Honor

16   ordered produced and that we've been looking at and he did a

17   logistic regression analysis, creating an admissions model

18   similar in kind to the models that had been created before

19   there was ever any litigation by Harvard's own researchers.

20             And just like those prelitigation models created by

21   Harvard itself, Professor Arcidiacono found a substantial

22   penalty on Asian applicants to Harvard not in the ALDC group.

23   He found the Asian penalty results in a 20 percent reduction

24   in the admissions chances of an Asian-American applicant,

25   again about the same size of what you saw in OIR's very first

1    model.

2            And that translates into real numbers, Your Honor.

3    Professor Arcidiacono will tell you that compared to his

4    model without the Asian penalty, there would be at least

5    hundreds more Asian faces on campus in a four-year cohort.

6            And he'll also tell you his model is conservative.

7    If anything, it underestimates the size of the Asian-American

8    penalty.

9            What you will be able to see when experts testify,

10   Your Honor, and you look at particularly Professor Card's

11   yearly models, which he likes, you'll see some patterns in

12   the yearly data.  I wanted to point just two of them out for

13   you.

14           One is, and I think in one of Mr. Lee's slides you

15   see this if he uses it, is that the effect of Asian-American

16   ethnicity on admissions, even in Professor Card's model, goes

17   down -- the coefficient goes up a little bit -- in 2017.

18           And what's special about 2017?  Class year 2017,

19   most of those students were admitted in the spring of 2013

20   after the Unz article, after David Brooks.

21           After Unz and Brooks shined a flashlight on Harvard

22   admissions, Asian penalty or the effect goes down a little

23   bit.

24           Then you'll see something very interesting, which

25   is that in 2019, when Students for Fair Admissions had sued

1    Harvard in 2014, late 2014, and the admin cycle for the class

2    of 2019 had occurred right after that and this court was

3    going to turn a spotlight on Harvard, the Asian penalty goes

4    down substantially.  The effective Asian -- marginal effect

5    of Asians on admissions, the numbers go up, the coefficient

6    gets higher, gets more positive.

7            Why is that?  That's because when Harvard knew that

8    somebody was going to be looking into what was going on, they

9    exerted control.  They dialed down the Asian penalty.

10           This is powerful evidence, circumstantial evidence

11   of intentional discrimination.  They have the control, and

12   they react to this lawsuit by exercising that control.  And

13   just like an employer who for ten years does not promote

14   African-Americans on the shop floor and then is sued for

15   civil rights violation and magically promotes three after

16   that, that's not evidence that the employer wasn't

17   discriminating.  That's evidence the employer was.  So too

18   here, and you'll see it in some of the charts that the

19   experts will show you.

20           In fairness to Harvard, their expert, Professor

21   Card from Berkeley, he has his own model.  And the Court's

22   detailed summary judgment ruling outlined some of the many

23   disagreements that Professor Card and Professor Arcidiacono

24   have.

25           But how best to model Harvard admissions?  Should

1    we have the ALDCs?  Should we do a pooled model versus a

2    yearly model?  Oh, I already did pooled; Professor

3    Arcidiacono did pooled.  Professor Card prefers a yearly

4    model.

5           Should we include parental occupation?  Professor

6    Card really wants to.  Professor Arcidiacono says the data

7    quality is not good enough.

8           Should we do certain types of interactions?  The

9    list goes on.  There are many disagreements.  You'll hear

10   about them during the trial.

11          But, Your Honor, you can choose to assume the truth

12   of every single word that Professor Card, Harvard's expert,

13   utters.  And as long as you rule in our favor and decide one

14   thing our way:  Harvard's own model shows a statistically

15   significant Asian penalty, the model that they went to great

16   lengths to produce, hundreds of pages of expert reports.

17   Their own model shows a statistically significant Asian

18   penalty.

19          If you agree with us on one thing, what is it?  You

20   have to agree with us that what you're seeing here on

21   Plaintiff's Exhibit 629 reflects the influence of race on the

22   personal rating.  If you believe what every single person

23   listening to me can see right here on this screen that race

24   is influencing the personal rating, the acknowledged use of

25   race and the tip for African-Americans and Hispanics is right

there.

All you have to believe is that Harvard is using race in a way that it acknowledges it is using race in the ultimate outcomes but denies that they're doing it here with the personal rating.  If you believe that, that race has an effect here, then Harvard's own expert will agree that just like the overall ratings got to be pulled out, the personal ratings got to be pulled as because it's influenced by race.

What happens to his model if you do that?  This is not from Students for Fair Admissions expert report.  This is from Harvard's own expert report.  A statistically significant Asian penalty if you simply take out the subjective personal rating where no one gets any guidance.

And the evidence is going to show Harvard has to be using race.  Race has to be influencing it.  If you do that, Harvard admits there's an Asian-American penalty and it's statistically significant.

And a third of a percent doesn't seem like much, Your Honor, until you realize that the chances of getting into Harvard are about 5 percent.  That's actually quite sizeable.

Now we can turn to a big disagreement that Your Honor asked about, which is the exclusion of ALDCs from the data analysis.  You asked about this at the pretrial hearing.  And I didn't understand Your Honor to be asking how did it

1    come to pass that SFFA removed them from the data side.

2            In their analysis, you can see why that's true.

3    OIR did it, others have done it.  I thought you were really

4    asking why is it important.  I want to try to get into that

5    and show you how it changes the model.

6            To do that, I need to show you some facts about

7    Harvard's admissions of legacies, children of faculty or

8    staff, and those on the dean's list, children of donors, for

9    example, and athletes and the non-ALDC group.

10           And here you see admission rates stratified by

11   academic ratings similar to the blowups of 620 I showed you

12   before.  In the left column you see the same numbers I showed

13   you before, for non-ALDC 66, 10 percent, and 2.4 percent.

14   Remember the lion's share of the action is at academic 2.

15           Then you start to see how much better the legacy

16   list does here.  They do about 50 percent better.  Virtually

17   all of them get in at academic 1.  Of course the one athlete

18   in the six years of data we have got in.

19           Then you see something interesting here in

20   academic 2.  10 percent admission chance for the regular folk

21   with no connection to Harvard.  A 50 percent admissions

22   chance at academic 2 for the legacy, dean's list, and

23   children of faculty or staff.  It's a 5x difference.  Again

24   the athletes almost always get in.  I told you that; I'll

25   stop saying it.

1              At academic 3, 2.4 percent, really pretty low

2    chances for the regular folk.  But if your mom or dad went to

3    Harvard or your grandparent or uncle gave a lot of money to

4    Harvard, then your chances of getting in are seven and a half

5    times higher, 18 percent.

6              Down below at academic 4, almost nobody gets

7    admitted in the regular group.  But here we have the legacy,

8    dean's list, and children of faculty or staff, still

9    3.5 percent of them got in.

10             You can also see these relationships.  3.5 percent

11   at academic 4 for the legacy group.  That's 2.4 percent at

12   academic 3 for the regular group.  A whole academic

13   difference.  And the legacy group is a whole academic rating

14   better off.  Higher admissions chances.  Their admissions

15   chances at academic 3 are almost double what the regular

16   applicants are at academic 2.

17             But that's not what tells you how the model is

18   going to get distorted when you include the ALDCs.

19             Here's how to look at that.  You need to look down

20   the columns.  I told you have that the academic rating was

21   very important to admissions.  You see that here reflected in

22   this drop off and admissions chances as you go from 1 to 2 to

23   3 to 4.  There's large numbers, 6, 4, 120.

24             For the legacy, dean's list, and children of

25   faculty or staff, those numbers are quite a bit lower.  What

1    that reflects is the academic rating is simply not as

2    important to admissions for this group.  It's not as

3    relevant.  It's not totally unimportant, but it's not as

4    important.

5          And this effect is most profoundly seen with the

6    athletes, where the numbers and the multipliers get close

7    to 1, reflecting the fact that the academic rating really

8    doesn't matter much at all for the admissions of athletes.

9    As I said, they almost universally get in.

10          So now how does that affect the model?  You can see

11    this from the chart I have in front of you, but actually one

12    of Mr. Lee's slides shows it best.  The legacy, dean's list,

13    children of faculty or staff, the ALDC group, they are only

14    5 percent of the applicants, Your Honor, but they are a

15    whopping -- I'll use Mr. Lee's slide for this.  They are a

16    whopping 29 percent of the admitted students.  5 percent of

17    the applicant pool, 30 percent of the admitted students.

18          So when you include this group for who academics

19    don't matter as much, what your model gets is distorted.  It

20    gets a distorted average effect where Harvard is saying

21    academics just aren't that important.  It's weighing down the

22    regular applicants.

23          Why are the regular applicants so important to us,

24    Your Honor?  I've kind of saved this towards the end.  I've

25    shown you have a lot of the baseline data set.

1          98 percent of the Asian applicants to Harvard are

2     in the non-ALDC group.  When Harvard chose, its expert chose

3     to include the ALDCs in the dataset, it had the effect of

4     weakening the importance of academics in a distortive way.

5          Academics are very important for the non-ALDC group

6     where most Asians are applying.  But if you include the

7     ALDCs, your model spits out kind of an average, a lower

8     number.

9          What does that do?  Well, that means that the

10    things that Asian-Americans are much, much better at,

11    academics, are less valued by the model.  When an Asian

12    applicant doesn't get in, your model explains it with

13    academics just aren't that important to Harvard in a

14    distortive way, instead of concluding that there's an Asian

15    penalty.

16         You can see that in an analysis of Professor Card's

17    model as well.  Because when you remove the personal rating,

18    you get that statistically significant effect, that's Card's

19    yearly model right there.  It's in his own report.  If you

20    remove the ALDCs, it gets bigger.

21         Here you see that.  Take out the personal rating,

22    get the statistically significant effect, and we win.  Just

23    believe that race influences the personal rating.

24         Take out the ALDCs, and the effect gets quite a bit

25    larger.  That's the point, and that's the answer to Your

1   Honor's question.

2           Now, Your Honor, Harvard has many, many times

3   positioned this case as if we have to prove more than a

4   statistically significant Asian penalty.  Harvard has sort of

5   suggested that we need to prove the existence of a 40-person

6   racist conspiracy.

7           We do not.  That's not the law.  That's not the law

8   in employment discrimination, and it's not the law here.  We

9   have shown a statistically significant Asian penalty, and

10  Harvard acknowledges that it uses race in its admissions

11  process.  The burden is on Harvard to explain these

12  differences and it will be unable to do so.

13          There's also significant circumstantial evidence,

14  as I've alluded to.  The nonresponse.  Frankly, the quietude

15  about OIR from Dean Fitzsimmons.  That's circumstantial

16  evidence.  The 2019 dialing down of the Asian penalty that

17  you'll see, circumstantial evidence.

18          It's not hard to see how Harvard got here, when you

19  look at its laser beam focus on race in its admissions

20  process.  And that gets to the rest of the case.  I'll spend

21  a very little time this morning talking about it.

22          As you know Harvard, said it has a holistic

23  admissions process harkening back to *Grutter* and *Bakke* and

24  the statements in those cases.  Harvard's own brief in the

25  *Bakke* case.

1          The evidence will show and allow the Court to test

2     the proposition whether Harvard is really treating everyone

3     as a whole person instead of as, first and foremost, the

4     member of a racial group.  And some of that evidence will be

5     the stunning regularity in the racial balance in Harvard's

6     class.  And you've seen this before, Your Honor.  It's ten

7     years of admissions data.  You see the sort of stability in

8     the numbers.

9          And Harvard doesn't like this.  They don't like the

10    rounding.  They want to point out the fact that the numbers

11    change plus 10 to 15 percent or minus 10 to 15 percent year

12    to year.

13         Our point is not that Harvard has a quota system

14    down to the last jot and tittle.  The point is that Harvard

15    achieves a rough racial balance.

16         And the second point is if Harvard was really

17    treating everyone as a whole person, wouldn't you expect this

18    to move around a little bit more?  It's just a commonsense

19    point.  I can also see, and the evidence will show, that

20    Harvard is very focused on this racial balance in its class

21    throughout its admissions process.

22         This is Plaintiff 146.  It's what's called a

23    one-pager.  These are generated routinely throughout the

24    admissions process, largely for Director McGrath and Dean

25    Fitzsimmons.  What you'll notice about these one-pagers --

1    I'll point out a couple of things.

2            Number one, race is always on them.  It's not that

3    race is the only thing on all of them or it's the only thing

4    on this one, but race is always present.  Last year is always

5    being compared to this year.  What possible reason is there

6    to do this unless you're trying to match up to last year and

7    not deviate too much from last year, which is the very

8    definition of racial balancing, which the Court has said is

9    per se illegal.

10           Then you'll notice, of course, something that

11   you've seen before is that Harvard likes to separate out the

12   non-legacy, non-athlete students just like Students for Fair

13   Admissions did and OIR did.  That's right there on the

14   one-pager.

15           Now, Your Honor, I mentioned earlier that

16   affirmative action in higher education is not on trial here,

17   and diversity is not on trial here.  Students for Fair

18   Admissions supports diversity on campus.  And our expert,

19   Mr. Rick Kahlenberg, is one the country's foremost supporters

20   of diversity on campus.

21           The problem for Harvard is that race dominates its

22   process.  By its own admission, race is determinative in

23   admissions for half the African-Americans and a third of the

24   Hispanics.  That's not our report.  That's Harvard's report

25   on race-neutral alternatives, Plaintiff's 316.  And that's

1    still with the personal rating included.

2            And so we took them at their word.  We have said we

3    won't change anything about your admissions system other than

4    what you admit to be the use of race, and we'll generate some

5    alternatives for you.  We'll take away what you admit to be

6    doing on race, and we'll generate some alternatives.  That's

7    what Mr. Rick Kahlenberg did.

8            Those alternatives required Harvard to do one thing

9    and stop doing another.  They had to increase socioeconomic

10   preferences.  They had to stop with the legacy and donor

11   children preferences.

12           Harvard steadfastly refuses to even contemplate

13   giving up those preferences, which themselves operate to

14   preserve Harvard as a bastion of privilege.  Putting aside

15   the moral valence of those preferences, which I think the

16   amici, some of them will get into.  If the choice is between

17   putting young Americans on racial registers or preserving

18   those preferences that almost universally benefit whites,

19   that is no choice at all.  Title VI does not contain a

20   Harvard Club exemption.

21           THE COURT:  Hold on a second.

22           (Off-record conversation)

23           MR. MORTARA:  It says right here, big finish.

24   Right after I said there's no Harvard Club exception for

25   legacy preferences.  And I thought you were going to stop me

1   and say really?

2           No big finish.  Here we go.  In all seriousness,

3   Your Honor, this is a serious matter.  I'm sorry to make

4   jokes.

5           Looking back at Plaintiff's 146, you're going to

6   see that Harvard uses these one-pagers.  And Harvard's

7   witnesses and its expert will admit Harvard doesn't need to

8   use race as a factor in admissions to enroll a significant

9   number of Asians, and everybody knows they don't need it to

10  enroll a significant number of whites.  It's simply not

11  necessary for them to achieve a diverse group of

12  Asian-Americans on campus.  They don't need any more whites.

13          The Court might reasonably ask why Harvard needs to

14  distinguish Asian-Americans from whites at all in its

15  process.  You see right here, Harvard is not -- is perfectly

16  happy to group together Filipinos and Japanese and Chinese

17  and Indonesians and Vietnamese and Cambodians and Pakistanis

18  and all these groups.

19          Why not just group them in with whites?  Why didn't

20  Harvard blind themselves to the difference between whites and

21  Asians after its own researchers pointed out these issues

22  with the personal rating and the existing of the Asian

23  penalty in admissions?  Why didn't Harvard do that?  Why is

24  Harvard so afraid of such a remedy, which is one that this

25  Court might conceivably and obviously order if there's a

1    finding of liability on our Count I.  Just treat Asians and

2    whites the same.

3            The evidence in this trial will provide the answer.

4    Harvard is engaged in and wishes to continue to engage in

5    intentional discrimination against Asian-Americans.

6            Thank you, Your Honor.

7            MR. LEE:  May I proceed, Your Honor?

8            THE COURT:  Yes.

9     OPENING STATEMENT OF PRESIDENT AND FELLOWS OF HARVARD COLLEGE

10           MR. LEE:  May it please the Court.  My name is Bill

11   Lee.  And together with my colleagues Seth Waxman, Felicia

12   Ellsworth, Danielle Conley, and Ara Gershengorn, and me.  I

13   represent Harvard.  With us today are Drew Faust, until

14   recently the president of Harvard University; Mike Smith,

15   until recently the dean of Harvard's faculty of arts and

16   sciences; Rakesh Khurana, the dean of Harvard College; Erin

17   Driver-Linn, the dean of education at the Chan School of

18   Public Health; Marlyn McGrath, the Harvard College director

19   of the admissions; and Bill Fitzsimmons, the Harvard College

20   dean of admissions.

21           These are the people, Your Honor, along with many

22   other admissions officers, that you'll hear from that SFFA,

23   the plaintiff, has spent the last hour and the last four

24   years of accusing of intentional discrimination.

25           To be clear, they do not discriminate and did not

1    discriminate against Asian-Americans.  Harvard does not

2    discriminate and has not discriminated against

3    Asian-Americans.

4         Now, as Your Honor knows, at the outset of this

5    case, the plaintiff's stated goal, publicly stated and its

6    purpose of the case, was to change the law and eliminate all

7    considerations of race in college admissions.  It brought

8    that very claim in this case.  Your Honor rejected that claim

9    in this case.  As the Court's order recognized, the claim is

10   precluded by an unbroken line of Supreme Court precedent,

11   most recently the second *Fisher* decision.

12        So what is the plaintiff left with?  The plaintiff

13   is left instead to claim that an admissions process that was

14   lauded by the Supreme Court in *Bakke* as an illuminating

15   example of a college admissions process and again years later

16   in *Grutter* that is expressly described in a manner in which

17   it's applied today in the appendix to *Bakke* that Justice

18   Powell appended.  And it was approved after a more than

19   two-year review by the Department of Education's office of

20   civil rights has somehow been manipulated in some clandestine

21   way by these folks to intentionally discriminate against

22   Asian-American applicants.

23        But, Your Honor, after four years of litigation,

24   the production of tens of thousands of documents, scores of

25   deposition pages, and the production of data of more than

1  200,000 applicants to Harvard over a six-year period, the

2  plaintiff cannot prove that Harvard discriminates against

3  Asian-American applicants.

4  Instead what the evidence will confirm is that, as

5  identified by the Supreme Court as an illuminating example,

6  race is considered as one factor among many in Harvard's

7  admissions process, that when it is considered it is

8  considered flexibly and not mechanically, and it is always

9  used as a plus factor.  To be clear, Your Honor, an

10  applicant's race never counts against an applicant in the

11  admissions process.

12  You will not hear differently from SFFA.  In fact,

13  you will not hear from a single fact witness from SFFA.  The

14  plaintiff concedes that its founder, Mr. Blum, who is in the

15  courtroom today, has nothing relevant to offer to the issues

16  that are before Your Honor now.  We couldn't agree more.  Not

17  a single one, as Your Honor knows, of the plaintiff's members

18  who were denied admission will appear and testify in that

19  witness box.

20  Instead the plaintiff has resorted into summary

21  judgment briefing and even this morning to invective,

22  accusation, and innuendo based upon -- I think I'll be able

23  to demonstrate to you even this morning misstatements of the

24  record and supposed facts that had been wrenched from

25  context.  The plaintiff attacks Harvard and other

institutions of higher education that are dedicated to
assembling diverse, inclusive, and vibrant communities and
educating those who will help an increasingly diverse
society.

The plaintiff, as you heard, attacks the
reputations and motives of Harvard's president, its deans,
and dozens of admissions officers and other employees who
have dedicated themselves to assembling just that kind of
diverse and inclusive class.

And the plaintiff has tried to silence the voices
of the students who have benefited from these efforts and who
can best explain to the Court the benefits of these
environments.

Now, the vast majority, by my computation, of the
opening from the plaintiff today was about statistics and
numbers.  I think it was almost 80 percent of it.  And the
plaintiff, for sure, offers an analysis of an economist who
has so manipulated the data that it led 16 leading
economists, including Janet Yellen, the former chair of the
federal reserve, and two noble prize winners to conclude --
and I quote here, Your Honor -- his models are, quote, simply
not reliable and his findings are, quote, implausible, closed
quote.

Your Honor will see they are.  They are living
proof that if you torture the data long enough, it will

1    confess to anything.

2         We are fortunate to have a system that adjudicates

3    controversies based upon real evidence and fact-based inquiry

4    on complete pictures rather than facts taken from context.

5    We're fortunate to have a system that decides cases on a set

6    of principles and the rule of law.

7         Those principles, that evidence, the facts, the

8    truth, Your Honor, will demonstrate unequivocally to Your

9    Honor that there has been no discrimination against

10   Asian-American applicants in the Harvard admissions process.

11   The Harvard admissions process is, as the Supreme Court said,

12   an illuminating example of how far to balance a variety of

13   competing interests.

14        So let me turn to the remaining claims in the case

15   and first address the legal principles which SFFA really

16   didn't address in its opening.  I will then turn to the facts

17   and describe what Harvard does, why Harvard does it, and what

18   Harvard does not do.

19        Now, the plaintiff's allegations of intentional

20   discrimination are serious.  They are certainly not something

21   humorous.  The bar to prove them is high, and the courts have

22   been clear about what the bar is.  The plaintiff must prove

23   that Harvard discriminated on the basis of race, that the

24   discrimination was intentional, and the discrimination was a

25   substantial and motivating factor for Harvard's actions.

1              In other words, the plaintiff must have show that a

2       committee comprised of roughly 40 people at any given time is

3       intentionally trying to discriminate against Asian-American

4       applicants because they are Asian-American.

5              Harvard's evidence and the lack of evidence that

6       the plaintiff has been able to muster will show this is

7       simply not true.

8              The plaintiff also claims that Harvard has engaged

9       in racial balancing.  To prove this, the plaintiffs must show

10      that Harvard has imposed a quota or otherwise taken steps,

11      and I quote, to assure within its student body some specified

12      percentage of a particular group merely because of race or

13      ethnic origin.

14             It is not enough, Your Honor, to simply show that

15      Harvard pays some attention to the racial and ethnic

16      diversity of its applicants during the admissions process.

17             In fact, the Supreme Court has specifically

18      endorsed the principle that paying some attention to the

19      numbers is permissible.  This is from *Grutter* at 336.  Were

20      it otherwise, Your Honor, there would be no way for the

21      admissions office and Harvard to know that it was, in fact,

22      assembling a diverse class.

23             Now, the plaintiff next claims that Harvard gives

24      undue weight to race.  But again, the Supreme Court has held,

25      and I quote, universities can consider race or ethnicity

1  flexibly as a plus factor in the context of individualized

2  consideration of each and every applicant, again from

3  *Grutter*.

4          In so ruling, Your Honor, the Supreme Court

5  specifically endorsed Harvard's flexible use of race as

6  described in the *Bakke* opinion as a model for how

7  universities can choose to consider race in admissions.  As

8  you will hear from Dean Fitzsimmons and several other

9  admissions officers that will testify, that process described

10 in the very appendix to *Bakke* is fundamentally the same

11 process that's used today.

12         It is a system that involves highly individualized

13 holistic review of an applicant's file, gives serious

14 consideration to all the ways an applicant might contribute

15 to a diverse educational environment, and it is a system full

16 of checks and balances, many of which were ignored by SFFA in

17 their opening today, and a system in which no single factor

18 is determinative.  It is exactly what the Supreme Court has

19 endorsed.

20         Finally, Your Honor, as you know, the plaintiff

21 alleges that Harvard could achieve its goals without

22 considering race.

23         For many years now, going back decades, Harvard has

24 used and will continue to use multiple initiatives to

25 increase the diversity of its applicant pool and admitted

1    class.  You will hear about them.  But at this time, Harvard

2    cannot achieve its educational goals without considering

3    race.  Either its classes would be radically less diverse or

4    they would suffer in other fundamental ways, including

5    academic excellence.  The Supreme Court again has made it

6    clear that universities cannot be forced to choose between

7    diversity and other educational objectives.

8          So let me turn, Your Honor, to what we do because

9    it's important.  Each year the Harvard admissions office

10   engages in a comprehensive iterative process with three goals

11   in mind:

12         The first is to admit a class of truly exceptional

13   students.  Harvard looks for students who excel in many, many

14   different ways and who will contribute to and benefit from

15   the community and all it has to offer.  As you will hear,

16   this does not mean only students who have the highest SAT

17   scores or the highest grade point averages.

18         The second goal, Your Honor, is to admit a class

19   that is diverse in many ways, including racially diverse, so

20   that students live and learn from a range of ideas,

21   perspectives, life experiences, and ways of thinking.

22         The final goal, Your Honor, is to admit a number of

23   students that Harvard has room for.  Harvard is a residential

24   college.  More than 98 percent of the students live on campus

25   in campus housing.  For the class of 2019, there were exactly

1 1,664 or so beds.  The admissions office manages the number

2 of offers it extends so that the number of students who

3 actually arrive does not exceed those for whom we have room.

4 　　　　　To accomplish those goals, the admissions work

5 starts long before any applications are received.  Through a

6 variety of initiatives, the office recruits essentially to

7 ensure that as many qualified applicants as possible consider

8 Harvard as an option.  For example, since 1971 -- so we're

9 going back now 50 years -- Harvard's had an undergraduate

10 minority recruitment program.  You will hear it referred to

11 UMRP.  It has sought to identify and encourage high school

12 students of different racial and ethnic backgrounds to apply.

13 This includes Asian-American students and has included

14 Asian-American students.

15 　　　　　The precise group that the plaintiff claims Harvard

16 is intentionally discriminating against is a group that we

17 are actively recruiting on a daily basis.

18 　　　　　You will also hear from admissions officers about

19 numerous other recruiting efforts.  These officers regularly

20 travel to all 50 states and visit approximately 150 cities.

21 Their purpose is to spread the message that Harvard's doors,

22 like many of its peer colleges and universities, are open to

23 students of all backgrounds and means, and Harvard wants

24 students of all backgrounds and means.

25 　　　　　These efforts have produced an increasingly large

1    and diverse pool of highly qualified candidates.  Harvard

2    currently receives approximately 40,000 applications each

3    year, and it's an incredibly accomplished group of students.

4            For the class of 2019, there were more than 2,700

5    applicants with perfect scores on the verbal section of the

6    SAT, more than 3,400 with perfect scores on the math section,

7    and more than 8,000 applicants with perfect GPAs.

8            But, Your Honor, Harvard has never admitted

9    students on the basis of grades or SAT scores alone and has

10   never defined academic, personal, extracurricular, or any

11   other excellence in that manner.  There are simply more

12   academically qualified applicants than there are spots.  The

13   ability to succeed academically is necessary to be admitted,

14   but it's not sufficient.

15           Once applications begin arriving, the admissions

16   office begins the difficult task of identifying the

17   approximately 2,000 applications who are offered admission.

18   The suggestion that everything is being done off of that one

19   page that the plaintiff showed you in its opening is at least

20   incorrect.

21           To do its work, the admissions office considers an

22   enormous amount of information provided by the applicants.

23   The material Harvard receives often runs for an application

24   to more than 50 pages, and we will walk you through a couple

25   of the applications so you can see them.  You will hear about

1    the parts of the applications in more detail, but they

2    include much more than transcripts and test scores.

3           It includes information about extracurriculars.  It

4    includes information about the applicant's high school and

5    the rigor of the program.  It includes information about the

6    applicant's parents, their education, their occupation.  It

7    includes the applicant's intended major and career

8    aspirations.  It includes personal statements and essays.

9    Critically, it includes a guidance counselor recommendation,

10   two teacher recommendations, and an alumni report.

11          And applicants may and often do submit supplemental

12   materials they would like the admissions officer to consider.

13   This includes academic papers, artwork, videos of theatre

14   performances.  The admissions officers consider all of these

15   materials in an effort to understand who the applicants are.

16          You will hear it referred to as the whole-person

17   approach, which has been sanctioned by the Supreme Court.

18   Admissions officers pore over the essays, the recommendation

19   letters, interview reports, and other materials to learn what

20   motivates an applicant, what makes an applicant unique, and

21   what the applicant would bring and take away from the Harvard

22   community.

23          Now, because of the wide range of information that

24   applicants submit and that may be submitted on their behalf,

25   it's impossible to list every factor that could contribute to

1    the decision to admit a candidate.  But there are several

2    factors that Harvard consistently values.  Admissions

3    officers and alumni interviews are expressly told in writing

4    what these factors are and that they should be considered in

5    evaluating a candidate.

6              On the screen now is DX 5 which will be in

7    evidence.  These factors are sometimes referred to as tips or

8    pluses.  They are listed in a handbook that's provided to all

9    admissions officers and all alumni interviewers.

10             The tips, the pluses, the things that Harvard is

11   looking for are outstanding and unusual intellectual

12   abilities, unusually appealing personal qualities,

13   outstanding capacity for leadership, creative ability,

14   athletic ability, Harvard and Radcliffe parentage, and

15   geographic, ethnic, and economic factors.

16             As you will hear, Your Honor, none of these tips on

17   their own will earn an applicant admission.  The purpose of

18   the whole review process is to ensure that no one aspect of

19   any applicant in isolation can alone tip him or her into the

20   admitted pool.  Nor, Your Honor, is this an exhaustive list

21   of all the things that may weigh in favor of a particular

22   candidate.  But these are some of the factors that Harvard

23   values that are considered by the admissions office and that

24   are set forth in black and white in detail, as Your Honor

25   will see.

1          Now, Your Honor is going to hear about the process

2     in detail because understanding the process puts the lie to

3     much of what SFFA contends.  For now, let me outline the

4     process because I think it's important and describes some of

5     the basic contours of a process that involves lots of people

6     considering lots of information over a long period of time.

7          When the application is received, as Your Honor

8     noted in your summary judgment ruling, they are grouped by

9     geographical areas known as the dockets.  Within each docket,

10    admissions officers are assigned to specific areas.  You will

11    learn that admissions officers are instructed to be advocates

12    for the applicants from their dockets.  Their job is to

13    identify and seek out information so they can make the best

14    case on behalf of competitive applicants throughout the

15    process.

16         Now, Your Honor heard a lot about the personal, the

17    four ratings.  Let me tell you where in the process they

18    occur and what they actually are.

19         Admissions officers conduct the initial review or

20    the first read of the applications from the high schools.

21    Based upon the initial review of the file before any

22    committee discussion, before my subcommittee discussion,

23    before the file is even complete, often, admissions officers

24    make preliminary assessments of applicants and assign ratings

25    in a number of different categories.

1        There are four ratings referred to as the profile

2    ratings:  academic, extracurricular, athletic, and personal.

3        The admissions officers also assign scores based

4    upon teacher and guidance counselor recommendations,

5    information that's coming to the admissions office from

6    outside of Harvard, from the teachers and guidance

7    counselors.

8        There are scores from any interviews for the

9    applicant.

10       And finally, the admissions officers assign each

11   applicant a preliminary overall rating.  Some applications

12   are assigned ratings by a second reader.  Some a third reader

13   who provide his or her own preliminary assessment and

14   ratings.  Applications may also be read, Your Honor, by a

15   member of the faculty.

16       Now, let me pause and say this.  The suggestion

17   that the only document at Harvard that discusses these

18   ratings is that one page that SFFA showed you in the opening

19   is simply not true.  There is a handbook for interviewers and

20   admissions officers.  There are case books with different

21   descriptions of different cases.  There are periodic updates

22   that go out from the admissions office.  And when a new

23   admissions officer comes in, they are trained, they go over

24   cases, and for their first 50 to 100 files they are read in

25   parallel with a senior admissions officer who can ensure that

1    the person is addressing all issues, including the ratings,

2    in the correct way.

3          Now, contrary to what SFFA has suggested, not a

4    single one of these ratings, not a single one is formulaic.

5    Every single one requires judgment by the admissions office,

6    and every single one involves quantitative and qualitative

7    information to some varying degrees.

8          So let me take the academic rating.  Some might

9    assume that the academic rating is a formula based on test

10   scores and GPAs.  Your Honor, the academic index that SFFA

11   refers you to is a formulaic determination.  It is an index.

12   It's not used in the admissions process.  It's not the

13   academic rating.  I'm not sure why it was even suggested to

14   you that it is.

15         Instead, the academic rating that's assigned by the

16   reader of a file is something that does take into account

17   grades.  It does take into account board scores, but it takes

18   into account whether the applicant has won any awards.  It

19   takes into account the strength of the school, the strength

20   of the academic program.  It will take into account

21   statements and the recommendations about the student's

22   academic curiosity or capability.  And when a Harvard faculty

23   member reads a file, it will include judgments on that basis

24   as well.  Nothing in the academic rating is formulaic.

25         The same is true of the extracurricular rating, and

1    the same is true of the personal rating.  The personal rating

2    captures a wide variety of things, including characteristics

3    such as leadership, determination, and compassion, the very

4    tips that are expressly described in the handbook.  They

5    capture the applicant's potential to contribute not just to

6    their college community but more broadly to society after

7    graduation.

8            Like the other ratings, Your Honor, the personal

9    rating is based in substantial part on information in

10   individual's outside the admissions office giving information

11   to the admissions office.  It is teachers; it is guidance

12   counselors; it is recommenders; it is alumni interviewers.

13           Critically, and something not mentioned by SFFA,

14   these ratings are all assigned very early in the process and

15   are very preliminary.  And I'm going to come back to this,

16   but Your Honor can see on the screen how the four profile

17   ratings are side by side by side by side.

18           I'd ask Your Honor to keep that in mind, and I'll

19   come back to it.

20           The ratings are intended to help the officers

21   triage among the hundreds and thousands of applications they

22   review, and they serve as rough reminders of the applicant's

23   strength.

24           But, Your Honor, the ratings are assigned before

25   any applicant is discussed by the committee, before any

1   subcommittee meeting occurs.  They are assigned before

2   there's been any determination of whether an applicant

3   advances.

4        So what happens next?  What actually happens in the

5   process is after these ratings have been assigned, after the

6   individual officers have given it a first read, they actually

7   meet with a group of folks who have read files from the same

8   docket.  These meetings take place over several days.  They

9   are open.  There's an open discussion.  There's no one hiding

10  any information from anybody.

11       The application files, all of this information is

12  projected on a screen and available to every member of the

13  committee electronically.  Every single member can and does

14  assess for him or herself the strength of an applicant's

15  essay or the strength of the recommendation submitted by a

16  teacher or the strength of a recommendation submitted by a

17  guidance counselor.

18       Then there's a discussion, an open discussion.  And

19  after that discussion, a preliminary recommendation as to

20  whether an applicant should be admitted is made.  The

21  decisions are tentative.  They are recommendations, but

22  they're made collectively.  And critically, Your Honor, they

23  can and do change.

24       Your Honor will learn that the ratings assigned

25  that are the focus of SFFA's case do not determine whether an

applicant will be tentatively admitted or not.  An applicant
with lower ratings in all categories can be recommended for
admission while an applicant with better ratings, higher
ratings might not.  It is the collective review and
discussion of what the substance of the application is that
makes the determination.

After the subcommittee meetings are complete, Your
Honor, there's another step.  The full committee meetings
begin.

These meetings are attended by 40 members of the
admissions committee and span multiple weeks.  During these
meetings again, the full committee considers all of the
applicants who will be recommended for admission and who
might not be.  To do so, the committee collectively reviews
thousands of applications as they work together to put
together a class that is diverse in many different respects.

Again in the full committee meetings, the
applications are projected on a screen.  Again in the full
committee meetings, every admissions officer has electronic
access to the full file.

They also have a full list of all the applicants.
The admissions can and often do say, well, I know you're not
recommending this person, but I'd like us to look at their
file.  That occurs frequently.

At the end of this process, there's a full

discussion.  There's a full discussion of every single person

who will be recommended for admission.  The decision is then

made in the open meeting among 40 people, each with one

vote -- one vote, one person -- and either by consensus or

majority vote, the decision is made.

It is this decision that results from the process

I've just described and the 40-person vote or consensus and

not the numerical ratings that determine admission.

At every stage of the process, Your Honor, you'll

learn that applicants are evaluated as the multidimensional

people they are.  Harvard doesn't believe that any individual

is defined by their grade point average or their SATs.  All

of the information about an applicant is considered.

And for those applicants who have disclosed it,

that includes race.  To be clear, for Harvard and its

students to attain the educational benefits of a diverse

student body, Harvard believes that students of certain races

or ethnic backgrounds should receive a tip.  To be clear, for

most applicants, race makes absolutely no difference to the

admission decision.

There are some applicants who will be denied

admission no matter what the race.  And for many applicants,

they will be admitted no matter what the race.  Therefore,

however, highly qualified applicants on many, many

different -- in many, many different respects who without the

1    tip for race may otherwise not have been admitted.

2         But you will learn there are highly qualified

3    applicants who will not have been admitted, highly qualified

4    in many ways without the tip from being from a certain part

5    of the country, without the tip for being from a modest

6    socioeconomic background, without the tip for being

7    exceptionally creative in an artistic way.

8         A tip in isolation is never what makes the

9    difference.  And the files themselves will show that to Your

10   Honor.  Race alone is never the reason that a student is

11   granted admission.  And most importantly for the issues

12   remaining with Your Honor, race is never the reason that a

13   student is denied admission.

14        In fact, race by itself does not factor into the

15   four profile ratings.  And this is the place where,

16   respectfully, SFFA has engaged in a war of words.  The

17   self-identification of race by student is not factored into

18   the four ratings per se or in isolation.

19        But the readers are not blind.  If a student is an

20   African-American who grew up in a place or location where he

21   or she suffered substantial discrimination and had to

22   overcome that and took steps to help their community overcome

23   that, that's going to educate the personal rating.  That's

24   not race being considered.  That is the person and the

25   person's life story which does, in part, depend upon the race

1    being considered.

2            So the mere fact of race self-identified in

3    isolation does not make it into the four ratings.  The

4    person's life story, which may or may not relate to the race

5    in the same way that it may or may not relate to gender, it

6    may or he may not relate to modest socioeconomic background

7    are considered in the ratings.

8            Now, a student's race may be considered by the

9    individual admissions officers at any point during the

10   discussion.  It's considered one factor among many, and

11   within the context of each individual application.

12           This is what each of the admissions officers, the

13   folks who are really willing to come to take the stand, will

14   tell you.  It's exactly what *Grutter* says at page 337.

15           In keeping with the courts's holding in *Grutter*,

16   Harvard has no policy, either de jure or de facto, of

17   automatic acceptance or rejection based upon any single soft

18   variable.  Every student admitted to Harvard is qualified on

19   multiple dimensions and different dimensions, Your Honor,

20   including having the intellectual and academic ability to

21   thrive in the community.

22           This was true of the Harvard system at the time of

23   *Bakke*.  This was true of the Harvard system at the time of

24   *Grutter*.  It is true today.  Race is considered.  It can tip

25   an applicant who is qualified in multiple different ways into

1      the pool.  But the same is true of a variety of other

2      factors, as we say in black and white.

3              Now, as permitted by *Bakke*, Harvard's program

4      treats each applicant as an individual in the admissions

5      process, and an applicant will not be foreclosed from all

6      consideration of a seat simply because of race.

7              At the risk of being redundant, let me just restate

8      this because it's important to the claims that remain before

9      Your Honor.

10             Harvard never considers an applicant's race to be a

11     negative.  If it considers race, it's always considered in a

12     positive light.  The fact that one applicant is given a plus

13     or a tip doesn't mean that another who is not given that tip

14     is being discriminated against.  And if there's one thing

15     that's clear from the Supreme Court cases and the excerpts

16     that I've tried to show you during the opening, it is this:

17     The Harvard process for the last 50 years has been viewed as

18     lawful.  That is why the Supreme Court twice pointed to it as

19     illuminating.

20             We are actually not here because Harvard has failed

21     to comply with that unbroken line of Supreme Court precedent.

22     We're here because SFFA would like to change what the law is.

23             So having talked about what we do, let me talk

24     briefly about why we do it.  The suggestion this morning that

25     the issue of why we do it is not an issue was at least

1    surprising to me.  Why does Harvard -- why do so many

2    colleges and so many universities in the United States

3    consider race as one factor among many in the admissions

4    process?

5             Harvard itself determined long ago that diversity

6    of all kinds was in the best interest of the college and its

7    students.  And without considering, as I said, race as one

8    factor, Harvard did not believe it could fully realize the

9    educational benefits of a diverse student body.

10            Harvard's core mission statement, which is on a

11   slide now and will come into evidence, is to educate citizens

12   and citizen leaders to serve society in a variety of ways.

13            You will hear directly from President Faust, Dean

14   Khurana, and the other senior Harvard leaders that Harvard

15   has long regarded diversity in every dimension as essential

16   to its mission.

17            Harvard believes that its students learn as much

18   from each other as they do from their professors.  Because

19   they learn -- they live and learn surrounded by classmates

20   who have different backgrounds, different interests,

21   different factions, and who bring different perspectives to

22   the discussions occurring around them every day, our students

23   are able to challenge stereotypes and confront their own

24   assumptions.  They are better able to assess their own

25   values.  They are in a better position to succeed in our

1   increasingly diverse world.

2          Your Honor, these benefits flow to all students,

3   not just students of color.  You will hear directly from some

4   of those students who actually have asked themselves to

5   testify.  They are living proof that Harvard has a compelling

6   interest and a diverse student body.

7          I want to be clear on one thing.  This commitment

8   to diversity is not a mantra made for this litigation.

9   Justice Powell's opinion in *Bakke* includes an appendix, as I

10  said, specifically describing Harvard's process.

11          On the screen now is a statement from the appendix.

12  The appendix says, "If scholarly excellence were the sole or

13  even predominant criteria for admission, Harvard would lose a

14  great dealing of its vitality and intellectual excellence,

15  and the quality of the educational experience offered to all

16  students would suffer."

17          That was true before *Bakke*; that was true at the

18  time of *Bakke*; it was true at the time of *Grutter*; it is true

19  today.  And Harvard has said it in multiple reports that will

20  come into evidence.

21          On the screen now, Your Honor, is an excerpt from

22  the 1996 report by then President Neil Rudenstine, a lengthy

23  report that noted expressly that little, if anything, can

24  substitute for the experience of continued association with

25  others who are different from ourselves and who challenge us

1    even as we challenge them.

2            And in February of 2016, under Dean Khurana's

3    leadership, the faculty of arts and sciences at Harvard

4    unanimously adopted a report issued by a committee to study

5    the importance of student body veracity, a committee that

6    Dean Khurana chaired.  The committee embraced and reaffirmed,

7    as the slide suggests, "the university's long-held view that

8    student body diversity, including racial diversity, is

9    essential to our pedagogical objectives and institutional

10   mission."

11           Now, Harvard is not alone in this judgment and for

12   sure Harvard is not alone in making progress.  You will hear

13   from Dr. Ruth Simmons.  She is the current president of

14   Prairie View A&M University and the former president of Brown

15   and Smith.  She has spent her career learning what works and

16   what does not work in higher education.  And she will explain

17   diversity, including racial diversity, vastly enhances

18   educational opportunities and better prepares students for

19   the world after graduation.

20           Nothing, she will explain, can substitute from

21   learning that happens from direct personal interactions with

22   people who are different from us.

23           Now that I've discussed what we do and why we do

24   it, let me talk for a few minutes about what we don't do.

25           Before I address the plaintiff's allegations from

1   this century, let me briefly address the subject of Your

2   Honor's judicial notice of inquiry before we started today.

3   These are events from the 1920's.

4   As I said in open court last week, the fact that

5   Harvard restricted the number of Jewish students was not a

6   proud moment in Harvard's history.  Not a single Harvard

7   witness will tell you that it was.  Instead, they will tell

8   you that they've devoted their careers to making sure that

9   nothing like that ever happens again.

10   As I said in the pretrial conference, that policy

11   occurred 50 years before the *Bakke* decision, 50 years before

12   the Supreme Court said that the Harvard system was an

13   illuminating example.

14   So let's talk about this century and what SFFA has

15   from this century.  Each of the Harvard admissions officers

16   who will take the stand will tell you that they take

17   seriously the commitment to evaluate each student fully and

18   fairly, without bias, without prejudice.  They don't try to

19   keep personnel out.  They try to get people in.

20   Now, as I said, by my calculation, roughly

21   80 percent of the opening was about statistics.  To be sure

22   the plaintiff relies upon a complicated statistical analysis

23   of Harvard admissions data in an attempt to prove its claim.

24   But if we take a step back, the fact is that the percent of

25   Asian-American students in a Harvard's admitted class has

1    grown considerably over time.

2          By way of example, from the class of 2006 to the

3    class of 2019, the percentage of Asian-Americans in the

4    admitted class increased from 16.5 percent to almost

5    21 percent, an increase of 25 percent.  This representation

6    has continued to increase.  Last year, the class of 2022,

7    Asian-Americans were almost 23 percent of the admitted class.

8          Now, there are a variety of factors that contribute

9    to this increase.  But I would say respectfully the idea that

10   we got sued by SFFA is the reason that the numbers have gone

11   up simply isn't true.  It's an argument only a lawyer could

12   love.

13         These numbers simply do not support the plaintiff's

14   allegations.  And when you look at the right set of

15   comprehensive statistics, they don't support the allegations

16   either.

17         Professor David Card, who is also here with us in

18   the gallery today, is a world-renowned economist and

19   recipient of the John Bates Clark Medal, one of the field's

20   most prestigious awards.  He will tell you that any model of

21   the Harvard admissions process is imperfect.  And it is.

22         The admissions office makes a series of highly

23   individualized decisions each based on the quantitative and

24   qualitative information in the file.  And most of that cannot

25   be captured in quantifiable data.

1          Professor Card built a model that approximates

2     Harvard's admissions process as closely as possible.

3          As Your Honor is aware, there are differences in

4     how the experts model the data, but they actually all reduce

5     to one simple question:  Which model most accurately reflects

6     what actually happens in the Harvard admissions process?

7     Which one models the real world as opposed to a world that is

8     not consistent with what Harvard does?

9          Professor Card included all applicants in his

10    model.  He included athletes, legacies, children of faculty

11    and staff, applicants who have been brought to the attention

12    of the dean or director.  He included them, Your Honor,

13    because they are all competing in the same pool to gain

14    admission.

15          He also ran a separate model for each admissions

16    cycle because that's how the process works.  When the

17    admissions office makes its decision as to who to admit in

18    any given cycle, it is doing so in the context of who can

19    help make the best class from among that year's applicants.

20    It does not compare those students to students who applied

21    four years ago or those who might apply three or four years

22    from now.

23          Professor Card also included in his analysis all

24    the information that is quantifiable that the admissions

25    office considers.  This encompasses a wide variety of data,

1    but it includes the applicant's intended career, his or her

2    parent's occupation, and all the ratings assigned by the

3    admissions officer when the applications are read, not just

4    some of them.

5           When Professor Card modeled Harvard's admissions

6    process considering all the applicants, considering all the

7    quantifiable information that the admissions office itself

8    considers, and considering the information year by year the

9    way that the admissions office does, he found no statistical

10   evidence of discrimination.

11          Critically, Professor Card found that

12   Asian-American ethnicity is never statistically significant

13   in the admissions process.  In other words, Your Honor, at

14   the end in a model that considers all the data and all the

15   applicants in the manner in which admissions office does, it

16   is -- the result is not distinguishable from zero.

17          What his model found instead was that over the six

18   years of data that Your Honor had the parties focus upon,

19   Asian-American ethnicity had a positive effect, not

20   statistically significant but a modest positive effect in

21   three years and a modest but statistically significant

22   negative effect in three other years.  This would surely be

23   an odd result if we had this massive clandestine scheme to

24   discriminate against Asian-Americans.

25          But Professor Card also found more.  He found that

there was actually a slightly positive effect in the admissions process for Asian-American women.  He found that there was a slightly positive effect for Asian-American applicants from California.  Now, these results, too, he will tell you were not statistically significant.  But if you're trying to intentionally discriminate against Asian-American applicants, why would it only be males, and why would it only be males from outside of California?

Now, the plaintiff's expert did not come to this case without a point of view.  He has published papers endorsing the mismatch theory, with which Your Honor may be familiar.  But it posits that affirmative action harms minority students by admitting them to schools in which they are unable to succeed.  His own published work suggested African-American students for some reason gravitate to easy majors.  He came to this case as an opponent of affirmative action, and he then developed a model that would allow him to justify that result.

So how did he do that?  The way that he did it was not to include all the applicants, not to include all the information, not to do it cycle by cycle.

Instead, he kept taking out information.  He kept taking out factors and got further and further away from the admissions process.  It is the reason the amici describe his results as simply implausible.

1          So what did he do?  First he excluded from his

2     analysis whole categories of applicants, including athletes,

3     legacies, children of staff, and students on the dean's and

4     director's list.  The plaintiffs have suggested that this is

5     no big deal because these applicants are a small portion of

6     the applicant pool.  But as SFFA said in their opening, they

7     are a significant portion of the admitted class.

8          Now, I heard the suggestion today that the academic

9     profile of the legacies is somehow less than the applicant

10    pool itself.  That's 100 percent wrong.  It's actually

11    better.  And the suggestion that somehow giving legacies a

12    tip is an indication that Harvard has dispensed with

13    academics is simply wrong.

14         And the suggestion that the coaches order the

15    admissions office to accept people is simply wrong.  Before

16    the recruited athletes can be granted admission, they are all

17    reviewed by the admissions process for their academic,

18    extracurricular, athletic, and personal profiles.

19         Why does SFFA's expert exclude this information?

20    Your Honor, he does so because if you look at each of these

21    categories, the Asian-American applicants in these categories

22    are accepted at higher rates than white applicants.  So he

23    takes out a portion of the pool where Asian-Americans, while

24    a very small portion of that pool but an increasing portion

25    as every day passes, are actually admitted at higher rates.

1              Why would you do that?  Now, he removed them

2     because having those numbers in doesn't get you to the result

3     he want you to have.  He also pooled six years of data rather

4     than going year by year.  But the class -- applicants for the

5     class of 2014 do not complete with applicants for the class

6     of 2019.

7              He also excluded from his model parental

8     occupation, intended career, and whether the applicant had an

9     interview with a staff member on campus.

10             Now, that may sound like a random list to Your

11    Honor.  It is not.  As you will learn, the reason he removed

12    the specific variables is because only by removing them could

13    he reach the results he wanted.

14             And then finally, he came to the personal rating,

15    and he excluded the personal rating from his model.  Now, he

16    admits that the personal rating reflects information that is

17    important to the admissions office in evaluating candidates.

18    He admits that it reflects information that comes from

19    teacher recommendations, guidance counselor recommendations,

20    other recommendations, personal statements, and interview

21    reports.  He admits that he's unaware of any of the 200,000

22    applicants that he reviewed who was admitted without a

23    personal rating.  But he takes them from the model.  And he

24    takes them out of his model.

25             Now, the plaintiff has suggested to you that he had

1    to remove them from his model because there was a negative

2    effect for Asian-American ethnicity on the personal rating.

3    But that same model, Your Honor, shows a positive effect for

4    Asian-American ethnicity on the non completely quantitative

5    academic rating, on the non completely quantitative

6    extracurricular rating.  A positive effect.

7           So do you remember, Your Honor, when I showed you

8    the summary sheet and I said I would come back to the fact

9    that the four ratings are side by side by side by side?

10          You have a first reader sifting down with a sheet

11   in front of them.  They're reviewing the file.  To believe

12   SFFA, to credit their allegations, you would have to conclude

13   that a single reader sitting down with a file with that sheet

14   in front of them goes to box one, to the academic rating

15   which is not quantitative, but quantitative and qualitative,

16   and actually gives Asian-Americans a bump up.

17          You then come to the seconds box, which is

18   extracurriculars, which has a substantial portion of the

19   evaluation, not quantifiable, and gives Asians a bump up.

20          And yet the same reader filling out the same form

21   gets to the fourth box and says now I'm going to

22   discriminate, and I'm going to downgrade the same person I

23   just gave the bump up to twice to ensure they're not

24   admitted.

25          Does that make sense?  We would suggest it does

1    not.

2          Now, what that leaves SFFA with is a handful of

3    emails and letters among the tens of thousands of documents

4    that Harvard has produced.  I am not going to address them

5    now.  We will address them during the course of the evidence.

6          Most of them fall in the category like the letter

7    from the 90-year old alum which was racist, inappropriate.

8    There was a response that was polite.  Has nothing to do with

9    Harvard's admissions process.

10          Now, this allegation that Harvard's process

11    discriminates against Asian-Americans has been made before,

12    it has been investigated before, and it has been found to be

13    meritless before.

14          In 1988, Your Honor, the Department of Education's

15    Office For Civil Rights responded to the concern that there

16    was possible discrimination against Asian-Americans to

17    selective colleges.  Specifically the concern was described,

18    and I quote it here because it is so close to what you're

19    seeing today, "Despite superior academic credentials in terms

20    of high school performance and standardized test results,

21    Asian-Americans have been admitted to selective schools at a

22    lower rate."

23          Both Dean Fitzsimmons and Marlyn McGrath, director

24    of admissions, were there at the time.  They will explain

25    that while there have been, for sure, some changes to the

1    admissions process over the last 30 years, the basic

2    system -- the first readers, the docket system, the

3    subcommittees, the full committees, the vote of the 40

4    folks -- is fundamentally the same.

5             The office of civil rights investigated for two

6    years.  It reviewed 400 full applications and 2,000

7    application summary sheets.  It interviewed ten admissions

8    officers, and it reviewed admissions offices policies.  In

9    fact, it set itself up physically in the admissions office.

10   OCR even conducted its own statistical regression analysis on

11   a sample of 110,000 students from Harvard's data.

12            In the end, OCR found that there were some

13   differences in the aggregate statistics between white and

14   Asian-American applicants.  When you do averages, you're

15   growing to see some differences.  But it recognized that

16   those differences did not reflect discrimination.  The

17   conclusion, on the screen now, was that Harvard did not

18   discriminate against Asian-American applicants.

19            Significantly, Your Honor, OCR reached this

20   decision even though its own statistical model found that

21   white applicants on average had higher personal ratings than

22   Asian-American applicants.  The very finding or the very

23   proposition that the plaintiff here claims is the linchpin of

24   its case, OCR said we find there to be a difference.  There

25   is a difference.  Based upon our analysis, it's not evidence

1    of discrimination of any kind.

2              A decade later, an Asian-American individual filed

3    a complaint alleging much the same, that he or she had been

4    discriminated against by Harvard on the basis of their

5    Asian-American ethnicity.  OCR investigated again and again

6    confirmed there was no evidence of discrimination.

7              These allegations that SFFA makes today against

8    Harvard have been made before.  They've been investigated

9    before.  Even though they have been found to be meritless

10   before, Harvard takes those allegations seriously, as you

11   expect we would.

12             So let me give you an example.  In the report, OCR

13   recognized in 1990 that Harvard provides admissions tips for

14   athletes and legacies.  OCR concluded that those tips

15   explained, in its view, the disparity between whites -- the

16   admission rates between whites and Asian-Americans.  OCR also

17   said that those tips were completely proper, that the ability

18   to field competitive athletic teams and the ability to

19   develop a community with Harvard students, faculty, staff,

20   and alumni contributed to a sense of community in ways that

21   are important to the institution, Your Honor, just as it does

22   to other colleges and universities.  OCR found that those

23   tips, tips that we use today, were not used to discriminate

24   against Asian-Americans.

25             But nevertheless, following the issuance of the

1  findings, Dean Fitzsimmons periodically reviewed admission

2  rates for non-athletes, non-legacy applicants to confirm that

3  there were not significant differences between white and

4  Asian-American applicants.

5  The suggestion that he just put his head in the

6  sand and assumed an ostrich-like posture as information came

7  his way simply is not true.  He asked for this information as

8  the check or balance to ensure that the process that OCR said

9  didn't discriminate against Asian-Americans would not in the

10  future discriminate against Asian-Americans.

11  And as the bar chart on Slide 35 will show you, the

12  data report to him showed that there were no significant

13  differences.  Indeed, across the six years of data the

14  experts have studied in this case, not taking all the data

15  that Dean Fitzsimmons has received, but this case, the

16  admission rates for Asian-American applicants who were not

17  legacies or recruited athletes was 5.15 percent.

18  The admission rate for white applicants who were

19  not legacies or recruited athletes was 4.91 percent, a

20  quarter of a point lower.

21  Do I give you the numbers because I think there are

22  some dispositive determination by numbers?  No.  We give it

23  to Your Honor because it belies the suggestion that Harvard

24  just buried their head in the stand.  They could have just

25  said OCR said we don't discriminate, let's move on.  Instead

1     they took steps to ensure that for the non-legacy and

2     non-athlete populations they were being treated fairly and

3     squarely.

4           Now, Your Honor, I want to address what I think is

5     the heart of the 20th century information or 21st century

6     information that the plaintiff relies upon.  And it's these

7     OIR reports.

8           The plaintiff suggests that there was some internal

9     investigation that found discrimination, and that the dean

10    buried it.  There was no finding of discrimination I can show

11    you.  I, in fact, can show you that the documents they showed

12    you today and suggested the dean reviewed, he didn't review

13    and there was nothing to bury.

14          Now, this is entirely based upon work from the

15    office of institutional research.  It is a universitywide

16    office.  It is populated by good folks who are highly

17    qualified.  Ms. Driver-Linn then was a director of OIR.  You

18    will hear from her and others that the story behind these

19    documents, particularly if you look at all the documents, is

20    not what you heard earlier this morning.

21          You will learn instead that there's been some

22    cherry-picking, and what I'd like to do very quickly is give

23    you a fuller picture of the story.

24          So how does the story develop?  In late 2012, Ron

25    Unz, a Harvard alumnus, published an article about what he

1    called corrupt Ivy League admissions, in which he cast

2    aspersions on Harvard and other institutions and alleged

3    admissions policies were discriminating against

4    Asian-Americans.

5              Now, SFFA said this morning that it created a lot

6    of concern.  When Your Honor reads the article, it will cause

7    you a lot of concern.

8              Mr. Unz is an equal opportunity critic of racial

9    groups.  He criticizes Jews and their intellectual capacity.

10   He criticizes East Asians and their intellectual capacity.

11   He criticized Japanese-Americans and their work ethic.  And

12   he is most critical of blacks.

13             The article would get attention from anyone who is

14   in college admissions.  It would get attention because it had

15   a provocative thesis:  It was disparaging of multiple ethnic

16   groups, and it was based upon a highly suspect analysis.

17             Now, around the same time, Your Honor, at the end

18   of 2012 and 2013, there was another paper published by

19   researchers Caroline Hoxby and Chris Avery.

20             It, too, made a splash in higher education but for

21   a better and different reason.  Their thesis was that

22   universities like Harvard and others were not making

23   education accessible to a wide enough range of low-income

24   applicants.

25             It is against this background that OIR began

looking at a variety of issues in 2013.  Some of this work,
to be sure, was in response to Mr. Unz's provocative article.
Some addressed low-income students in response to the
Hoxby-Avery article and others.  And some addressed other
topics like early admissions, which Harvard had just
reinstituted, and gender balance at our engineering school,
which was relatively new.

Now, SFFA focused you on P9 -- and I'm going to put
it on the screen -- and suggested that this was presented to
the dean and he sat on the information.

Let me take you through what actually happened.
The dean has said he saw some of the information in P9 but
never all of it.  And let's look at what P9 is.

You can see that there's a cover page with no title
filled in.  You can see that the date is February 14, 2012.
It's wrong by a year.  When you get to the second and third
pages, you'll see that the data is actually flipped.  The
data for Asian-Americans is under the category of whites, and
the data for whites is under the category of Asian-Americans.

And when you get to the conclusion page, this is
what you will see.  When some Harvard witnesses testified
that this was preliminary and incomplete, they were not being
critical of Ms. Driver-Linn or any of the people working for
them.  They were just looking at what you're looking at and
could see with their four eyes, wrong date, no title, data

1  flipped, no conclusion.

2          Now, let me take you to the next slide into P12.

3  P12 is a presentation that was presented to the dean.  It was

4  presented on February 25, 2013.  It has, as he said, some at

5  the end, you'll see, data that is the same as P9 but not all

6  of the data.  As you can see, this presentation has the

7  correct date.  As you will see, it does not have blank pages.

8  As you will see, it does not have data in the wrong columns.

9  And at the end, it does contain some but not all the slides

10  from P9.

11          The first roughly 30 pages of this presentation

12  address issues regarding the return of early action, which

13  Harvard had recently reinstituted.  It also examines, as I

14  said, issues of gender balance at the engineering school

15  because Harvard had just recently launched an engineering

16  school.

17          Starting at page 31 of P12, there is a section

18  entitled "Evaluating Factors That Play a Role in Harvard

19  College Admissions."

20          Now, as you will see, OIR itself specifically said

21  at the bottom of the page that the following analysis is

22  preliminary and for discussion.

23          Now, Ms. Driver-Linn will be here herself to

24  explain to you that the models were exploratory, preliminary,

25  and incomplete in the data they modeled.  That's why they're

 1    described as preliminary.

 2          To give you an idea, Your Honor, on Slide 44 is a

 3    listing of all the variables that Dr. Card modeled.  He

 4    admits that these aren't all the variables considered in the

 5    process, but he modeled all these variables.

 6          On the next slide, Slide 45, here are the variables

 7    that were modeled in the OIR analysis.  So let me return to

 8    the OIR analysis and to P12 and to the pages that Dean

 9    Fitzsimmons, in fact, did see.

10          In model 1, which is on the screen right now, OIR

11    considered what would happen to the class if it was admitted

12    only on the basis of academic criteria and found that the

13    class would have more Asian-American students than it does.

14    Now, this model actually used the academic index even though

15    the academic index isn't used in admissions.

16          Models 2, 3, and 4, as Your Honor moves from left

17    to right, adds additional factors at each step.

18          THE COURT:  Can you blow up that a little bit?  I

19    can't see it.

20          MR. LEE:  Is that better, Your Honor?

21          THE COURT:  Yes.  Much better.  Thank you.

22          MR. LEE:  If you move from left to right, you'll

23    see that as you add in additional factors, legacies,

24    athletes, personal qualities, and demographics, the makeup

25    you have of the class changes, and you actually get very

 1    close to what the class looks like.

 2         When the dean and others saw this analysis at a

 3    high level, even in a preliminary analysis it told them what

 4    they knew already, which is if Harvard admitted just on

 5    quantitative academic indications, the class would be more

 6    Asian-American.  It would.  But if you added more and more

 7    factors in, you get closer and closer to the actual class.

 8         Now, I think I heard SFFA saying that Dean

 9    Fitzsimmons should have sounded an alarm in response to

10    something that basically confirmed what he knew already.

11         There was no reason for alarm for several reasons.

12    First, he's been in the trenches.  He's been at these

13    meetings.  He's been there when the 40 people have voted.  He

14    knows what the models show.  If they just went by test scores

15    and grades, the composition of the class would be different.

16    But that's not the class that they want.

17         And the dean, he will tell you, continued to do

18    what he had done before this, after this, to ensure that

19    there was no prejudice or bias working against anybody in the

20    process.

21         Now, he also asked, after this, OIR to do some

22    additional research regarding the tip for students from

23    low-income families.  He wanted to know whether they were

24    getting a plus in response to the Hoxby-Avery letter.  On the

25    screen now is PX29.  He specifically asked for this

1    information and he specifically asked for that information

2    for Asian-Americans.  And he got a response:  Low income

3    Asian-Americans, like other ethnicities, were getting a tip.

4          And, in fact, Your Honor will see that the tip

5    received by Asian-Americans was as high as or equal to the

6    highest tips that were being given.  If the dean was involved

7    in that nefarious plan to bury OIR and discriminate against

8    Asian-Americans, why would he be concerned in ensuring and

9    confirming that low-income Asian-Americans were getting a tip

10   and a benefit in the process?

11         Before I briefly return to the other claims -- and

12   it will be briefly -- let me say this:  To believe there is

13   intentional discrimination, SFFA would have you conclude that

14   a process involves multiple readers, multiple subcommittee

15   meetings, multiple committee meetings, and a decision by

16   40 folks year after year after year has been somehow used to

17   intentionally discriminate against a group of folks,

18   Asian-Americans, on the basis of their race.

19         You would have to conclude that to carry out this

20   scheme the readers assigned to the academic and

21   extracurricular ratings -- ratings that I said are

22   quantitative and qualitative -- are giving Asian-Americans

23   better scores but then moving to the last box and saying now

24   I'm going to discriminate and I'm going to lower the score in

25   the last box.

1          You would have to conclude that the admissions

2     office did not discriminate against Asian-Americans who are

3     legacies, athletes, children of faculty, children of staff,

4     on the dean's list or Asian-American women or Asian-Americans

5     from California but that Harvard is somehow intentionally

6     discriminating against all the Asian-Americans, all other

7     Asian-Americans.

8          And you would have to conclude that the admissions

9     office managed to execute this, what I would say is a

10    nonsensical scheme, without leaving behind an email, a

11    document, a single presentation that would indicate that this

12    is what they're trying to do.

13         Now, briefly on the other claims, one of the claims

14    is that Harvard uses race as more than a plus factor with

15    greater weight than is permissible.

16         As Dr. Card will tell you looking across the full

17    applicant pool, there are many factors that explain

18    admissions decisions better than the applicant's race.

19         There on the screen now in Slide 48 it includes

20    everything, and it's commonsensical.  The teacher

21    recommendations, the guidance counselor recommendations, the

22    information about the student's high school and its program,

23    even the applicant's intended career, actually tells you more

24    about whether a student will get admitted than race.

25         Now, SFFA says, and it is true, Your Honor, that

1  for certain African-American and Hispanic applicants, those

2  whose files demonstrate real strength in multiple dimensions,

3  the tip for race can mean a great deal.

4         But in this pool of applicants who are otherwise on

5  the bubble, as you'll hear, the presence of any one factor

6  could tip the balance in.  For some it's race, and that's

7  permissible.

8         Now, SFFA also suggested that Harvard engages in

9  racial balancing.  You will hear there are no quotas; I think

10  they conceded that this morning.  You will hear that there

11  are no formulas; I think they conceded that this morning.  In

12  fact, you'll see, I think, I hope, that the process is as

13  I've described and results in substantial variation in the

14  composition of the admitted class.

15         So on the screen now is Slide 49, which has

16  Asian-American, African-American, and Hispanic admission

17  rates over years.  You can see an increase for all three but

18  wide variations year by year by year.

19         Now, the plaintiffs suggests this is somehow racial

20  balancing.  I think the chart speaks for itself.

21         And the one-pagers that SFFA described to you are

22  somehow what's being used to racially balance.  As Your Honor

23  said in your summary judgment ruling, the one-pagers, if I go

24  to the next slide, have a host of information:  gender,

25  geography, legacy status, financial aid, disadvantaged

1    status, intended concentration, and yes, race.

2         They are not provided to all the admissions

3    officers, just to the dean and the director of admissions.

4    It is used for two reasons:  to help manage the yield, to

5    ensure that the number of kids who are admitted are folks for

6    whom we have beds.  And it is to see how the class is shaping

7    up in terms of diversity across all of these different

8    dimensions.

9         And that is precisely what *Bakke* in the appendix

10   blessed.  Some attention to the numbers so that you could

11   understand whether you're achieving the benefits of a diverse

12   class.

13        Race-neutral alternatives.  Harvard has taken

14   seriously its obligation to evaluate in good faith whether

15   there are other ways to achieve meaningful racial diversity.

16   Long before *Grutter* says or made the phrase "racial neutral

17   alternatives" as popular it's it might be today, Harvard

18   actually, you will learn, was aggressively pursuing many of

19   these things.  I talked about the minority recruitment

20   program.  You'll learn about Harvard's effort to have early

21   action and the decision that it had been not the right

22   decision.

23        You will also learn about one of the most ambitious

24   financial aid programs to help increase diversity.  Today

25   over half the students at Harvard are on financial aid.

1    20 percent of the class has no parental contribution.  And

2    for that portion of the class receiving some financial aid,

3    the average cost of attending Harvard all in -- tuition,

4    room, and board -- each year is $12,000.  That is our effort

5    at a race-neutral alternative to increase diversity.  And

6    16 percent of the incoming class is first generation in their

7    family to go to college.

8          Harvard will continue to pursue these alternatives,

9    but it also has evaluated the question of whether race needed

10   to be considered at this time.  It took up the charge in

11   2017.  Dean Smith, Dean Khurana, and Dean Fitzsimmons, each

12   of who will testify, will tell you that they met on multiple

13   occasions.  They will tell you that they reviewed literature.

14   They will tell you that they reviewed the expert reports of

15   the plaintiff's expert and Dr. Card's.  And they came to the

16   conclusion that at this moment in time Harvard still needed

17   to consider race.

18         Now, SFFA claims that somehow the fact that lawyers

19   were involved in this process makes the process a sham or in

20   less than good faith.

21         Your Honor, this concept of pursuing race-neutral

22   alternatives comes from a Supreme Court decision.  It comes

23   from a legal decision.  How you comply with that is something

24   that lawyers are going to be involved in, unless it's done

25   poorly.

1          Let me end, Your Honor.  42 years ago I walked into
2     a courtroom at Post Office Square, my first time in the
3     United States District Court for the District of
4     Massachusetts.  I remember it as if it were yesterday.  With
5     the exception of the courtroom deputy, every single person in
6     the room was male.  With the exception of me, every person in
7     the room was a white male.  Even the gallery, which like
8     today had interest from the press, looked the same.

9          I'd ask Your Honor just to look around the
10    courtroom today.  It could not look more different.  The
11    demographics of those sitting in the courtroom today and
12    enormous progress we have made in becoming a diverse and more
13    inclusive legal system in society are manifest.

14         Many institutions, many people have contributed and
15    worked tirelessly to make this happen.  Among them are our
16    colleges and universities.  Those colleges and universities,
17    including Harvard but not Harvard on its own or not Harvard
18    in a way that is different from so many other colleges and
19    universities, have realized the benefits, the very real
20    benefits to our students, to our communities, and ultimately
21    to society that come from a diverse community.

22         Those colleges and universities recognize that
23    fostering diversity and broad inclusion in higher education
24    through tested and constitutionally approved measures like
25    the Harvard system have been an engine, not the only engine,

1    but an engine for democracy itself.  The result is what you

2    see in the courtroom behind me and in front of me.

3              This progress was a result of concerted efforts by

4    lots of folks to do the right thing.  For Harvard, it meant

5    implementing and adhering to the very admissions program the

6    Supreme Court has twice blessed.  For Harvard, it meant an

7    admissions process that considers not just what students have

8    done, for admission to any college is not a reward for what

9    you have done but, more importantly, what they'll bring to

10   their peers and their communities and the world beyond.

11             This progress, Your Honor, is not the result of

12   intentional discrimination.  This progress is not the result

13   of racial balancing.  It is not the result of using race as

14   more than a tip.

15             The progress we have made in considering race as

16   one of many factors is what has led us to the more diverse,

17   more inclusive, and more robust society that we have today.

18   We have made much progress, but there remains, as the

19   students will tell you, much left to be done.

20             This, of all times -- this of all times is not the

21   time to go backwards.  This is the time to build upon the

22   progress we have made and carry ourselves further.

23             Thank you, Your Honor.

24             THE COURT:  If it's all right with everyone, I

25   would like to go on to the two remaining openings before we

```
 1    break for lunch?  Can everyone manage or do we need a break?
 2              MR. LEE:  It's fine for us, Your Honor.
 3              MR. MORTARA:  It's great, Your Honor.
 4              THE COURT:  I'm Mostly concerned with my court
 5    reporter, and she says she's good to go, so I'd like to go
 6    forward.
 7              Are both amici groups going to open orally?
 8              MS. TORRES:  Yes.
 9              THE COURT:  When you're ready.
10              MS. TORRES:  I have some slides, and I do have a
11    copy.
12              OPENING STATEMENT FOR AMICI STUDENTS
13              MS. TORRES:  May it please the Court.  My name is
14    Genevieve Bonadies Torres, and I represent the student amici
15    in this case who are a diverse group of current and
16    prospective Harvard students and recent graduates who stand
17    together to defend Harvard's right to appreciate race and
18    racial diversity in admissions.  Our students appreciate the
19    opportunity to share how this policy has intimately impacted
20    their lives.
21              As this Court is well aware, plaintiffs bring two
22    separate claims.  Students are here to defend one and show
23    the other is disconnected.
24              The first challenges Harvard's race-conscious
25    admissions policy, which values racial and ethnic diversity.
```

1    The second claims that Harvard intentionally discriminates

2    against Asian-Americans by giving white applicants an

3    admissions advantage.  The plaintiff's evidence may blend

4    these claims together, but they must be distinguished.

5         The first involves race-conscious holistic review,

6    which the Supreme Court has repeatedly upheld because the

7    benefits of diversity are both constitutional and profound.

8         The second involves a white admissions advantage

9    which, if found, does not justify a blanket ban on valuing

10   race in admissions.

11        I will mainly focus on the first claim, which asks

12   whether Harvard when engaging in whole-person review may

13   appreciate an applicant's race.  The answer is yes.  Our

14   students humanize the reasons why, and there are three.

15        First, race and racial diversity matter in

16   present-day America, on Harvard's campus, and in admissions.

17   Ethnoracial identity also matters for many Asian-American

18   applicants who vary widely in their cultural backgrounds.

19        Take Thang.  2060 out of 2400, that was Thang's

20   total SAT score, a high score that is surely impressive at

21   most schools but not at Harvard.

22        Indeed, Thane's admission file notes that his SAT

23   scores were at the lower end of the Harvard average.  But the

24   file will also show that Harvard did not reduce Thang to a

25   number.  There is not just a raw academic score but comments

about his intellectual curiosity.  Not just a raw score for
extracurriculars, but comments about his genuine commitment
to social impact and the arts.  Not just a raw personal score
but comments about his infectiously happy personality.

And on top of all this, there will be information
about Thane's socioeconomic status, his parents' occupation,
his intended concentration, and much more.  And in this
multitude of contextual information is Thane's ethnicity.
It's listed once, but it shines through in his essay, his
interview, and his recommendation.

Notes from one of the readers states, Immigrant,
Vietnamese identity, pencils as tools.

This comment is a reference to Thang's essay where
he shared about how his family emigrated from Vietnam in
2006, how he struggled with English, how he was ridiculed,
how he was called racial slurs.  For a year he put a pencil
between his teeth and read hundreds of books out loud to
improve his pronunciation.

And he shared all of this with Harvard, and Harvard
listened.  This note, though short, Vietnamese identity and
pencils as tools, reflects how Harvard's whole-person review
process appreciates how ethnicity can shape our prior
achievements and future potential.  Indeed, Thang's 2060 SAT
score takes on a different hue after realizing that he faced
racial slurs and struggled with English.

1       His contribution to discussions on Harvard's campus

2   takes on new light once you know that he can weigh in on

3   race-based hurdles faced by many immigrant communities.

4       Thang is not alone in having his ethnoracial

5   identity play some role in his experiences and contributions.

6       You'll also hear from Itzel Vasquez-Rodriguez,

7   class of 2017.  Itzel will share that her application

8   highlighted her strength as a Latina growing up in California

9   and how her extracurriculars included Spanish club, Latino

10  club, and volunteer work on behalf of native and Latino

11  youth.

12      The Supreme Court itself has observed that race

13  remains relevant in evaluating applicants since it remains

14  relevant in our society.  As the Court observed in *Grutter*,

15  which involves Michigan law school, by virtue of our nation's

16  struggle with racial inequality, underrepresented minority

17  students are both likely to have experiences of particular

18  importance to the law school's mission and less likely to be

19  admitted in meaningful numbers on criteria that ignore those

20  experiences.

21      Harvard's race-conscious policy recognizes these

22  experiences, and its flexible policy applies to all racial

23  groups, including many Asian-Americans.

24      As you'll hear from our student Sally Chen, she was

25  pleased -- Sally Chen.  She was pleased that when she

1    reviewed her admissions file she saw praise for her academic

2    interests which drew from her Chinese heritage.

3            Now, just as race continues to matter, so does

4    racial diversity.  As you'll hear from Itzel, racial

5    diversity on campus eased her sense of isolation.  And as

6    you'll hear from Sarah Cole, other students of color were her

7    saving grace when correcting biases felt exhausting and gave

8    her the support to share her voice and perspective.

9            You will hear from all of our students how the

10   racial diversity on campus resulted in better discussions and

11   learning.  And two aspects of this diversity make it

12   particularly rewarding:  First, by seeking diversity across

13   all dimensions, Harvard cultivates diversity within each

14   racial group, interracial diversity.  And this breaks down

15   stereotypes.

16           Second, the benefits students derive from

17   ethnoracial diversity is distinct from that of socioeconomic

18   diversity.

19           As you will hear from Itzel, she felt isolated in

20   classrooms because of the color of her skin, her name, and

21   her features.  Race is visually salient and culturally

22   distinct.  The lawfulness of Harvard's race-conscious

23   admissions policy will be based on these sound facts.

24           And plaintiff's evidence cannot disturb these

25   justifications.  Plaintiff's attack primarily relies on their

1   expert, Dr. Arcidiacono.  Their expert concludes that black

2   and Hispanic applicants receive an unfair advantage in the

3   admissions process.

4           There are many problems with their expert's

5   analysis, but one stands out.  He fixates on academic scores

6   which are primarily determined by grades and test scores.

7           This brings us to the second problem with

8   plaintiff's evidence.  Merit is more than a number.  First,

9   equating merit with academics overlooks every other strength

10  of an applicant.

11          But second, it ignores that those receiving an

12  average academic score, what plaintiff's counsel called a 3,

13  rather than a 1 or 2, are still academically exceptional.

14  This is because Harvard's applicants pool is a highly

15  competitive one, full of high academic credentials.

16  Admitting students with more average academic scores is not

17  unfair when the evidence will show that such students are

18  more than academically qualified and their other strengths

19  make them stand out.

20          Take Sarah Kohl.  Sarah earned a scholarship to one

21  of the best college prep schools in Kansas City, where she

22  earned straight A's with several A pluses.  Her school letter

23  said that academically Sarah stood out and was virtually

24  unparalleled.  With all of those stellar credentials, Sarah

25  earned a 3 plus for her academic score, what plaintiffs would

1    call a not cutting edge score, not a 1 or a 2.

2          A narrow focus on academics also overlooks Sarah's

3    other strengths, such as the fact that she worked part-time

4    while maintaining her grades or the fact that she served on

5    Kansas City's Engage KC Leadership Board.  Kansas City, which

6    had the second highest homicide rate in the nation where she

7    focused her efforts on combatting gun violence because a

8    close acquaintance was murdered, where she presented six

9    recommendations to the Kansas City mayor on how to combat gun

10   violence, and she shared about these things in her

11   application.

12         Now, this is a compelling application on its own.

13   But knowing that Sarah is an African-American woman adds

14   texture.  She was combatting violence in a city notorious for

15   its own violence against the African-American community.

16         This brings me to the third problem with

17   plaintiff's evidence, the impacts of eliminating race in

18   admissions.  Harvard expert calculated this impact on the

19   admitted class, and it's captured through this graph.

20         Three things jump out.  First, white students will

21   benefit the most from removing the consideration of race, not

22   Asian-Americans.

23         Second, eliminating the consideration of race will

24   have a drastic negative impact on the number of

25   African-American, Hispanic, and other minority students

1    admitted to Harvard's campus.  In terms of their numbers,

2    they will be cut by 50 percent about.

3          Third, the proportion of Asian-Americans changes

4    slightly from 24 to 27 percent.  But importantly, this has a

5    minimal impact on the likelihood of admission for

6    Asian-American applicants.  And it's shown in the data.

7    While the number admitted does rise slightly, the number of

8    Asian-Americans applying is still over 7,800.  As such, the

9    actual admissions rate hardly changes at all, only moving

10   1 percentage point from 5.1 to 5.8 percent, less than

11   1 percentage point.

12         And recall there's a substantial impact on the

13   number of black, Hispanic, and other ethnoracial minorities

14   on Harvard's campus.  This is a reduction among the students

15   who already feel a heightened sense of isolation, who also

16   lead many of the efforts which improve the campus racial

17   climate for all students of color.

18         Plaintiffs will claim that race-neutral

19   alternatives can achieve the same levels of diversity.

20   Students' testimony will focus on two reasons that this has

21   problems.  And it's not on the slide.

22         But the first reason is that our student Itzel will

23   testify that it was important to her that Harvard valued race

24   and racial diversity on campus.  And she may not have applied

25   if that were not the case.  The admissions pool may actually

1    change if Harvard no longer considered race.

2           Second, the parties' experts have put forth several

3    race-neutral alternatives.  There are primarily three in

4    play.  But under all three, there is a reduction of

5    approximately 30 percent of the number of African-American

6    students on campus.  Again, a group that already feels

7    racially isolated.

8           Now, I'll turn very briefly to plaintiff's second

9    claim of a white admissions advantage.  Again, students are

10   here to show that it's disconnected from a policy that

11   appreciates ethnoracial identity and promotes diversity.

12   This disconnect is shown by the fact that banning

13   race-conscious admissions predominantly benefits white

14   students.

15          But this disconnect is also shown by the data which

16   suggests that any white admissions advantage is due to

17   Harvard's preferences for ALDC applicants, athletes, legacy

18   applicants, those on the dean or director's list, and

19   children of faculty or staff.  These preferences, as we saw,

20   are substantial.  And two pieces of evidence suggest it is

21   these preferences, not race-conscious admissions which

22   explain the white admissions advantage.

23          Now, first, I don't have a slide for this, but it's

24   in the reports that we've heard about several times.

25   Harvard's own internal report notes athletes and legacies

1    explain the difference in raw admit rates for Asian-American

2    and white applicants.  You'll see that come out during the

3    trial.

4        And then second, the raw numbers.  A table in

5    plaintiff's expert report provides the following breakdown of

6    admitted students over six years.  It shows the total admits

7    broken down by race.  It also shows the total admits

8    receiving special ALDC preferences by race.

9        It's immediately apparent that the number of white

10   students receiving these preferences dwarfs those of all

11   other racial groups.

12       Adding them up makes it even clearer.  A totaling

13   of 2,678 white admittees are associated with ALDC

14   preferences.  To put this in perspective, that's roughly

15   equal to all the Asian-American applicants admitted and

16   roughly equal to all the Hispanic and black students admitted

17   combined.

18       Numerically any disadvantage Harvard faces is more

19   likely attributable to these ALDC preferences and

20   race-conscious admissions.  As such, any remedy that

21   addresses a white admissions advantage would not involve

22   banning race-conscious admissions but addressing the actual

23   underlying issue.

24       Now, we all know that this case has national

25   significance, but it also has personal significance to our

1    students and the countless other prospective, current, and

2    other former students of Harvard and beyond.  Race

3    consciousness is critical for campus diversity, and it's

4    critical for viewing the whole person.

5              Our student Sarah Kohl will perhaps state it best.

6    To not see my race is to not see me at all.

7              Thank you.

8              Good morning, Your Honor.  I have the unenviable

9    position of standing between everyone and lunch, so I will

10   try to be brief.

11             THE COURT:  I'm not that hungry.

12              OPENING STATEMENT OF AMICI ORGANIZATIONS

13             MS. HOLMES:  My name is Jennifer Holmes from the

14   NAACP Legal Defense and Educational Fund.  We represent 2,500

15   Harvard student and alumni organizations that joined this

16   lawsuit as amici in support of Harvard's ability to consider

17   race as one of many factors in its holistic admissions

18   process.

19             Collectively, these organizations represent

20   thousands of Harvard students and alumni.  They are black,

21   white, Latino, Native American, and Asian-American.  In fact,

22   ten of the organizations that we represent are Asian or

23   Asian-American affinity groups.  Our clients are the children

24   of immigrants, those who can trace their lineage back to

25   antebellum slavery and before, and those whose ancestors were

1    indigenous to this country.  Many of them were the first in

2    their families to attend Harvard, and some of them were the

3    first in their family to attend any college at all.

4         They are doctors, public servants, professors,

5    entrepreneurs, and many are students still figuring out what

6    the future holds for them and just trying to make it through

7    this semester of organic chemistry.

8         The 25 organizations that we represent are

9    emblematic of Harvard's diversity and play a crucial role in

10   helping Harvard realize the benefits of that diversity.  They

11   join this case because their racial identities matter both to

12   who they are and how they shape Harvard.

13        SFFA ignores this reality.  As Harvard's counsel

14   mentioned, SFFA's stated goal in this case was to change the

15   law and make race-conscious admissions illegal.  That claim

16   was dismissed.

17        But in its summary judgment papers, SFFA continued

18   to argue that Harvard should no longer be permitted to

19   consider race.  So when Your Honor hears that affirmative

20   action is not on trial and that diversity is not on trial,

21   the Court need only review the record in this case and SFFA's

22   ultimate goal in this lawsuit.

23        SFFA wants Harvard to create an admissions system

24   where we can't acknowledge racial identity, where race gets

25   redacted, erased, and ignored, applicants can't talk about it

1   or reveal it, and Harvard can't consider it.

2        But allowing universities to consider race in

3   admissions as one of many factors is a necessary part of

4   achieving the constitutional goal of pursuing the educational

5   benefits of diversity.

6        As the Supreme Court recognized in *Fisher*, a

7   diverse student body promotes enhanced classroom dialogue and

8   the lessening of racial isolation and stereotypes.  Diverse

9   learning environments improve critical thinking skills and

10  prepare students for careers in an increasingly global work

11  force.

12       We also can't forget that race affects the

13  opportunities that students receive even before they apply to

14  college with bias and structural barriers imbedded in school

15  discipline, standardized tests, and whether a student is

16  selected for advanced courses or even the cheerleading team.

17       An admissions process that considers race, along

18  with academics, extracurriculars, civic engagement, career

19  goals, socioeconomic economic status, parental occupation,

20  geography, and many other factors allows for a truly

21  individualized and equitable assessment of students that

22  examines the whole person.

23       You will hear testimony from three Harvard students

24  and one alumni whose life experiences offer real-world

25  examples of the concepts I just described.  They are

1    Catherine Ho, a Vietnamese-American student; Madison Trice, a

2    black student; Cecelia Nunez, a Latina and African-American

3    student; and Margaret Chen, a Chinese-American alumna.

4            If you take nothing else from their testimony, know

5    that these witnesses are the ones who have firsthand

6    experience with student life at Harvard.  They have spent

7    many days learning at Harvard and contributing their talents

8    to its campus.  They're the ones collaborating in the

9    library, at the laboratory, at the late-night study sessions,

10   or sometimes feeling excluded from those spaces because even

11   at Harvard real inclusion is still a work in progress.

12           Our witnesses' voices and perspectives and stories

13   cannot be accounted for in statistical modeling.  And unlike

14   any of the witnesses that SFFA or Harvard will put on, these

15   witnesses will offer a window into the student experience,

16   including going through the application process and learning

17   in the diverse environment that Harvard strives to cultivate.

18           You will hear a few common themes from our

19   witnesses.  They will share personal stories about how their

20   racial and ethnic identities figured prominently into their

21   experiences growing up and continue to shape their experience

22   at Harvard.  Race is just not something they can separate

23   from who they are.  And being unable to share that with a

24   college admissions officer would place students like them at

25   a significant disadvantage.

1          Second, cultural organizations played a meaningful

2     role in enhancing their college and alumni experiences.  The

3     educational benefits of a school like Harvard are not just

4     found in the classroom.  These organizations serve as support

5     systems, hubs of civic and intellectual engagement, inclusive

6     social spaces, and voices that challenge the Harvard

7     administration when it needs to do better.

8          They rely on a diverse student body for their

9     membership.  And if the number of students of color on campus

10    declined, some of these organizations would cease to exist or

11    would operate at a diminished capacity.

12         Catherine Ho will testify about how her identity as

13    a Vietnamese-American was front and center in her admissions

14    application.  Ms. Ho's parents were refugees who were

15    resettled in the U.S. during the Vietnam War.  In her

16    personal essay, Ms. Ho wrote about the idea that the

17    Vietnamese language has no past tense, so everything is

18    expressed in the present tense.  She explored the concept

19    that this structural aspect of the language helped her

20    parents not to dwell on hardships of the past but to focus on

21    pursuing a better life in the present, which for Ms. Ho

22    included extensive volunteer work at the same refugee

23    organization that helped her mother years before she was

24    born.

25         SFFA claims that Asian-American applicants are

1    primarily a collection of strong SAT scores and academic

2    credentials.  Although Ms. Ho's scores were impressive, SFFA

3    couldn't be more wrong that those scores represented the sum

4    total of her life by the end of high school.  If SFFA

5    prevails in this case, students like Ms. Ho will be forced to

6    erase the formative experiences that shaped their lives when

7    they apply to college.  Applicants of color, in particular,

8    will be at a disadvantage because they will not be able to

9    share compelling stories of adversity or identity that relate

10   to race.

11          And Harvard, whose mission is to educate the

12   citizen leaders of tomorrow, will be forced to adopt a

13   definition of "merit" that is blind to the people behind the

14   numbers.

15          Although Harvard now strives to create a class of

16   high achieving students of diverse racial, geographic, and

17   socioeconomic backgrounds, that was not always the case.

18   Until the late 1970s, Harvard was a bastion of the white,

19   privileged, and male.

20          This has changed, to a large degree.  But as

21   Harvard's expert will testify, the remedies sought by SFFA

22   threatens to slash the number of students of color on campus

23   and turn back the clock to a time when the halls of Harvard

24   were predominantly white and difference was not welcome or

25   celebrated.

1      Our witness Madison Trice will testify about her

2 experience in an educational environment -- in a similar

3 educational environment as one of the few black students at a

4 predominantly white high school.  Despite excellent grades,

5 she faced classmates who doubted her abilities and her

6 intellect and teachers who steered her away from gifted and

7 talented courses until her parents intervened.

8      She felt isolated in the classroom, treated as an

9 other, an anomaly, and a curiosity because of her skin tone

10 and her hair.  Seeing new black students enter the high

11 school in lower grades each year was a bittersweet experience

12 for Ms. Trice.  She was happy to see more representation but

13 feared that their experience, like her own, would be painful,

14 marked by isolation and tokenism, and carrying the burden of

15 being a symbol and a spokesperson of their race.

16      Ms. Trice will testify that when she came to

17 Harvard in 2017, discovering a school more significant than

18 her high school was a revelation.  Through her involvement in

19 the Association of Black Harvard Women and the Black Students

20 Association, Ms. Trice found a rich, supportive network of

21 black students.  She now helps organize events that encourage

22 campus engagement with issues that affect communities of

23 color and provide a social and intellectual hub for students

24 from all backgrounds.

25      For example, the black students union -- Black

1   Students Association hosted a panel on police brutality after

2   a black student was assaulted by the police.

3          Ms. Trice, like other Harvard students, can also

4   take advantage of a range of events put on by other

5   organizations such as "walk tails" or a women of color

6   cocktail and discussion night hosted by the Asian-American

7   women's association.  Or the Harvard Pow Wow, hosted annually

8   by the Native Americans of Harvard College.  Or Brown Sugar,

9   a massive dance party hosted Fuerza Latina and other cultural

10  groups and one of the few parties where you will hear Spanish

11  music on campus.

12         Ms. Trice will testify that when new black faces

13  arrive at Harvard each year on move-in day, she no longer

14  feels bittersweet but instead is joyful about the diverse,

15  vibrant community that awaits them.

16         SFFA's goal of eliminating race-conscious

17  admissions threatens this community and the organizations

18  that help it thrive.

19         So far I've painted a rosy picture of Harvard, but

20  you will hear testimony that Harvard is not perfect.  The

21  organizations we represent often challenge the Harvard

22  administration to support and include students of color.

23  Margaret Chen has spent decades advocating for

24  Asian-Americans at Harvard, first as a student and minority

25  recruiter, then as an alumni interviewer, and now as an

1    active member of various alumni organizations.

2           Experiencing firsthand the transformative impact of

3    Harvard's diverse environment on her own life and career,

4    Ms. Chen has pushed the administration to hire more

5    Asian-American professors and admissions officers, to offer

6    an ethnic studies program, and to increase training on

7    cultural bias and stereotypes.

8           She knows from personal experience that advocating

9    for Asian-Americans does not mean wiping away race altogether

10   or, as SFFA suggests, lumping Asian-Americans in with white

11   students, as if their unique life experiences have no value.

12          You will hear that even as diversity has grown on

13   campus, some students still face racial isolation or episodes

14   of racial insensitivity.

15          The organizations we represent play an important

16   role in supporting students who face these challenges,

17   especially when Harvard's own support system falls short.

18          Cecelia Nunez will testify about how she has been

19   called racial slurs on campus when just trying to enjoy a

20   night out with friends.  Her organization, Fuerza Latina,

21   conducts mental health check-ins with its members and

22   successfully lobbied the administration to hire more mental

23   health counselors with experience on issues of race and in

24   particular Latino identity to better serve students on

25   campus.

1          Harvard has made great strides over the years, but

2     there's still a pressing need for more diversity and

3     inclusion.  Being able to consider race as part of a holistic

4     admissions process is necessary for Harvard to continue to

5     pursue these goals.  Eliminating race altogether would make

6     the existing challenges faced by Harvard students of color

7     far worse.

8          SFFA wants you to believe that none of these

9     experiences matter and there's no value in Harvard's

10    consideration of race.  They want you to believe that Harvard

11    should ignore race and that applicants should erase their

12    racial identity when they present themselves for admission.

13    But a colorblind approach to college admissions means that

14    you close your eyes to the realities of racial inequities.  A

15    colorblind approach means that you close your eyes to the

16    full, lived experience of each applicant.  A colorblind

17    approach means that you close your eyes to the value of a

18    campus where students of different backgrounds learn

19    alongside each other, challenge each other, overcome

20    stereotypes, and shape the campus into a place that is

21    increasingly inclusive and intellectually stimulating.

22          The diversity on Harvard's campus is a foundational

23    part of the student experience, and the organizations we

24    represent are the engines that bring that diversity to life.

25          Creating supportive networks is fostering outreach

1    and exchange and holding Harvard accountable on issues that

2    affect communities of color.  The law recognizes Harvard's

3    right to foster that kind of campus, and our witnesses will

4    make clear why it is imperative that Harvard continue to do

5    so.

6            Thank you.

7            THE COURT:  All right.  Thanks very much, everyone.

8    We'll recess for lunch and be back at ten of 2:00.

9            THE CLERK:  Court is adjourned.

10           (Court recessed at 12:50 p.m.)

11                  ***  AFTERNOON SESSION  ***

12           THE COURT:  Do you want to call your witness?

13           MR. MORTARA:  SFFA calls Dean William Fitzsimmons.

14           THE CLERK:  Can you please raise your right hand.

15           (WILLIAM FITZSIMMONS duly sworn by the Deputy

16   Clerk.)

17           MR. HUGHES:  Your Honor, before I get started with

18   the witness, I've got a binder of the exhibits that we may

19   get to with him during his examination.  Would you like a

20   copy of that binder or would you prefer just to follow along

21   on the screen?

22           THE COURT:  I'll take a binder.  I'm going to

23   confess to still using a paper calendar too.  I like paper.

24                      DIRECT EXAMINATION

25   BY MR. HUGHES:

1    **Q.**   Good afternoon, Dean Fitzsimmons?

2    **A.**   Good afternoon.

3    **Q.**   We haven't met yet.  My name is John Hughes.  I'll be

4    examining you today.  Nice to meet you.

5    **A.**   Good to meet you.

6    **Q.**   I'd like to start with some background about your

7    experience in the Harvard admissions office.  You began

8    working in the Harvard admissions and financial office in

9    1972, correct?

10   **A.**   That's correct.

11   **Q.**   What were your job title?  What were your

12   responsibilities at that time?

13   **A.**   It was a long time ago, but I think it was assistant

14   director of admissions.

15   **Q.**   I understand you did that job for two or three years, and

16   then you shifted to some different responsibilities within

17   Harvard, with the Harvard fund for about a year and a half;

18   is that right?

19   **A.**   That's not quite the sequence, no.  I then became

20   director of admissions.  That other position you mentioned

21   didn't occur until about the mid '80s.

22   **Q.**   You were with the Harvard fund for about a year and a

23   half, correct?

24   **A.**   Yes.

25   **Q.**   What did you do when you were working for the Harvard

1  fund?

2  **A.**   It was a job that was mostly designed to raise gifts for

3  financial aid.  It's annual gifts, small gifts, to try to

4  inspire classmates mostly through reunions to make gifts that

5  we thought were critically important to us.

6  **Q.**   And after you finished working for the Harvard fund, what

7  was your next position with Harvard?

8  **A.**   It was dean of admission and financial aid.

9  **Q.**   And that's a position that you've held ever since,

10  correct?

11  **A.**   That's correct.

12  **Q.**   And you got that position, to be clear, in 1986, right?

13  **A.**   That's right.

14  **Q.**   So for the last 32 years, you've been the person in

15  charge of Harvard's admissions office, correct?

16  **A.**   That's correct.

17  **Q.**   And you have a number of folks that report and work with

18  you in the admissions office, right?

19  **A.**   That's correct.

20  **Q.**   One of those is Director McGrath, right?

21  **A.**   Yes.

22  **Q.**   How long has Director McGrath worked with you in the

23  admissions office?

24  **A.**   She came on board very shortly after I became dean.  I

25  would say maybe within the year perhaps.

1   **Q.**  So you've been working with her at least approximately
2   30 years?
3   **A.**  Yes.
4   **Q.**  And how many people do you have in the admissions office
5   that are reading applications to Harvard?
6   **A.**  About 40 people.
7   **Q.**  Does that include you?
8   **A.**  Yes.
9   **Q.**  So all of you read applications and participate in the
10  admissions process that we've heard described this morning,
11  correct?
12  **A.**  Yes.
13  **Q.**  You were here this morning for the opening statements,
14  right?
15  **A.**  I was.
16  **Q.**  And would you agree that you are ultimately responsible
17  for the way the Harvard admissions process is administered?
18  **A.**  I'm not sure I would say that.  It really is a team
19  effort.  I have one of the 40 votes, but it's really the
20  responsibility of everyone.
21  **Q.**  You agree that you lead the admissions office, correct?
22  **A.**  Yes.
23  **Q.**  Do you agree that you have a responsibility to make sure
24  that the admissions process is fair?
25  **A.**  Yes.  I'm one of, as I said, really 40 people and more.

1    **Q.**   Do you agree that you have a responsibility to make sure

2    that each applicant that is applying to Harvard is treated

3    fairly?

4    **A.**   That is certainly one of my responsibilities but also the

5    responsibility of everyone on the committee.

6    **Q.**   Something that you would expect everybody in the

7    admissions office to do as the leader of the office, correct?

8    **A.**   That's correct.

9    **Q.**   Now I'd like to shift gears a little bit and talk about

10   the Harvard admissions process, about the part that we only

11   heard a little bit about this morning.  And that's the

12   beginning of the cycle, recruitment.  You heard Mr. Lee talk

13   about recruitment, right?

14   **A.**   I did.

15   **Q.**   And recruiting prospective students is a very important

16   part of the work done by you and your colleagues in the

17   admissions office, correct?

18   **A.**   That's correct.

19   **Q.**   I'd like to look at some things that the admissions

20   office has said about recruiting.  I'm going to show you on

21   the screen Plaintiff's Exhibit 83.

22          Before I do that, Dean Fitzsimmons, I'm going to

23   let you know I put a binder in front of you that has numbered

24   tabs which each of the exhibits that we may discuss in our

25   time together over the course of the next couple of days -- I

1    can't promise we'll get to all of those, but if you ever want

2    to see a paper copy, see more context, please do so.  It will

3    be right in front of you.

4    **A.**   But it's going to be on the screen.

5    **Q.**   It will be on the screen.  Hopefully we can follow along

6    on the screen.  I'm going to show you Plaintiff's Exhibit 88.

7            MR. LEE:  Can I have a hard copy?

8    BY MR. HUGHES:

9    **Q.**   I've got on the screen, Dean Fitzsimmons, the third page

10   of Plaintiff's Exhibit 88.  Do you recognize this as a

11   document from your admissions office?

12   **A.**   I do.

13   **Q.**   What this document is, it's the interviewer handbook,

14   correct?

15   **A.**   That's correct.

16   **Q.**   And the interviewer handbook is something that you supply

17   to your alumni interviewers, correct?

18   **A.**   Among other things, correct.

19   **Q.**   Is it also supplied to the folks working in the

20   admissions office?

21   **A.**   That's correct.

22   **Q.**   And the information that's contained in here is an

23   accurate description of how the admissions process at Harvard

24   works, correct?

25   **A.**   Yes.  It's kind of a thumbnail sketch, as it were, but

1    it's an overview.

2    **Q.**   Alumni interviewers are important to the process because

3    virtually every applicant to Harvard interviews with an

4    alumni of Harvard who lives in their geographic area,

5    correct?

6    **A.**   The majority do.

7    **Q.**   So now I want to see what the alumni interview handbook,

8    Plaintiff's Exhibit 88, has to say about recruitment.  So I'm

9    going to turn to page 15.

10           MR. LEE:  Your Honor, I have no objection.  But I

11   think before we start asking witnesses about exhibits, we

12   ought to offer them.

13           THE COURT:  Do you have exhibits that are agreed

14   upon or are you going to admit each one as we go?

15           MR. LEE:  We're admitting them as we go.

16           MR. MORTARA:  That's fine.  I thought we might wait

17   for a break and do a bunch at the same time.

18           But Your Honor, I offer Plaintiff's Exhibit 88.

19           MR. LEE:  No objection, Your Honor.

20           THE COURT:  Admitted.

21           (Plaintiff Exhibit No. 88 admitted.)

22   BY MR. HUGHES:

23   **Q.**   Dean Fitzsimmons, I'm going to blow up a part that I want

24   to take a look at with you together.  These screens are a

25   little small.  I want to make sure you can see what's on the

1    screen in front of you.

2    **A.**   I can.

3    **Q.**   This is the part of the alumni interviewer handbook that

4    has to do with recruiting prospective students, correct?

5    **A.**   That's correct.

6    **Q.**   And it starts by saying, "Many people often ask why,

7    given the thousands of applications Harvard receives every

8    year, we must invest such time, effort, and resources to

9    recruit talented students.  Vigorous recruitment, however,

10   has been instrumental to our success."

11              Do you see that?

12   **A.**   I do.

13   **Q.**   Do you agree with that statement?

14   **A.**   I do.

15   **Q.**   And then down below you see I've got some additional

16   language highlighted that says, "Active recruitment helps

17   sustain the critical opportunity to 'consciously shape the

18   makeup of our student body' as colleges compete intensely for

19   the best students."

20              Do you see that?

21   **A.**   I do.

22   **Q.**   Do you agree with that statement?

23   **A.**   I do.

24   **Q.**   So recruiting is part of how Harvard consciously shapes

25   the makeup of Harvard's student body, right?

1  **A.**   It's certainly one of the most important beginnings.

2  **Q.**   Now I've just highlighted the next paragraph down below

3  what we've just looked at.  I want to read this into the

4  record and ask you a few questions about it.

5         "Direct mail.  Virtually all college-bound students

6  take the PSAT by their junior year.  High school juniors and

7  seniors also take SATs and the ACT which survey students

8  about their academic experiences and interests.  With

9  students' permission, the College Board and the American

10  College Testing company sell colleges this information.

11  Harvard has identified accomplished students with these

12  searches for many years.  We send letters and view books to

13  searched students, and we share student lists with schools

14  committee chairs to craft recruitment plans and to identify

15  students to invite to local presentations.  Our research

16  shows that students who qualify for this search are about

17  twice as likely to be admitted as other applicants."

18         Do you see that?

19  **A.**   I do.

20  **Q.**   Does that accurately describe how Harvard uses the

21  information that it purchases from the College Board?

22  **A.**   It's a partial explanation.

23  **Q.**   To make sure we unpack what's happening here, Harvard

24  gets information from the College Board, which administers

25  the PSAT, about certain students, correct?

1    **A.**   Yes.

2    **Q.**   Based on things like SAT scores, ACT scores, PSAT scores,

3    geography, and race or ethnicity, correct?

4    **A.**   Yes.

5    **Q.**   And then what Harvard does with that information is it

6    generates a list of students to invite to apply to Harvard,

7    correct?

8    **A.**   Yes.   It's one of the ways we recruit.

9    **Q.**   It not only uses those names to create the mailing list,

10   so to speak, those searched student lists are provided to

11   underrepresented minority recruitment programs, correct?

12   **A.**   That's true.

13   **Q.**   And they're used when you go out on the road.   You go all

14   over the country every fall meeting prospective students,

15   right?

16   **A.**   Yes.

17   **Q.**   One of the ways the list is used to identify people to

18   invite to come to meet with you and your staff when you go

19   out on the road, correct?

20   **A.**   Yes.   It's what we call a good start.

21   **Q.**   And you also supply the list to the schools committee,

22   correct?

23   **A.**   We do.

24   **Q.**   Tell us what that is.

25   **A.**   The schools committee.   There are about 10,000 alumnae

1  and alumni around the country and around the world who help

2  us recruit, first of all, which is what we're talking about

3  here.  But then they will interview all of the local

4  candidates in their local areas.  Then afterwards they have

5  another job.  When the students are admitted, we also ask

6  them to do everything they can to encourage the students to

7  come to Harvard.

8  **Q.**  So getting back to our -- thank you for that.

9      But getting back to our search list, the last

10  sentence I have highlighted here says, "Our research shows

11  that students who qualify for this search are about twice as

12  likely to be admitted as other applicants."

13      That's a true statement, right?

14  **A.**  I believe it was at the time, yes.

15  **Q.**  And whether or not a student is searched is actually

16  something the admissions office keeps track of during the

17  admissions cycle, correct?

18  **A.**  We do.

19  **Q.**  Getting on the list is a good thing if you're a high

20  school student who wants to go to Harvard, correct?

21  **A.**  The fact that you are on the searched list would not make

22  a difference in terms of the decision the committee might

23  make, but it's a good thing for us to know in terms of

24  whether or not our outreach through the search program is

25  helpful.

1    Q.  Now I'd like to look at an example of the letter that you

2    send to searched students, and that's going to be Plaintiff's

3    Exhibit 55.

4            MR. HUGHES:  Before I get started, Your Honor, I'd

5    like to offer Plaintiff's Exhibit 55.

6            MR. LEE:  No objection, Your Honor.

7            THE COURT:  Admitted.

8            (Plaintiff Exhibit No. 55 admitted.)

9    BY MR. HUGHES:

10   Q.  So, Dean Fitzsimmons, I've got again blown up on the

11   screen.  Will you just let me know if at any time you can't

12   see what's on the screen in front of you?  Otherwise I'll

13   just assume that you can.

14   A.  I will.

15   Q.  So I've got on the screen the first page of Plaintiff's

16   Exhibit 55.  You're one of the people this email is addressed

17   to, correct?

18   A.  Yes.

19   Q.  It's for fall 2013.  You can see that down below in

20   attachments, correct?

21   A.  Yes.

22   Q.  And one of the attachments is the search letter, correct?

23   A.  That's correct.

24   Q.  And the search letter is the way the admissions office

25   refers to this letter that goes out to the names that you get

1    from the College Board and the ACT, correct?

2    **A.**   Yes.  It's the first communication of many.

3    **Q.**   Based on your mailing list, you communicate more than one

4    time with these potential applicants?

5    **A.**   That's true.

6    **Q.**   Now I'd like to show you -- I'm on page 2 now of

7    Exhibit 55.  I'll blow up -- part of what you tell students

8    in the letter is that "Your strong grades and standardized

9    test scores indicate to us, to Harvard, that Harvard and

10   other selective institutions may be possibilities for you."

11              That's part of what you communicate in the letter,

12   correct?

13   **A.**   That's right.

14   **Q.**   And whether a high school student receives this letter

15   depends on whether they're on your list, right?

16   **A.**   That's right.

17   **Q.**   Now, Dean Fitzsimmons, I'd like to show you Plaintiff's

18   Exhibit 2.

19              MR. HUGHES:  Before we proceed, I'd like to offer

20   Plaintiff's Exhibit 2 into evidence.

21              MR. LEE:  Can we at least have the foundation as to

22   whether he's seen it?  Otherwise no objection.

23   BY MR. HUGHES:

24   **Q.**   Dean Fitzsimmons, you've seen this document before.  We

25   showed it to you in your deposition, right?

1    **A.**  Yes.  I think I recall it.

2            MR. LEE:  No objection, Your Honor.

3            THE COURT:  Admitted.

4            (Plaintiff Exhibit No. 2 admitted.)

5    BY MR. HUGHES:

6    **Q.**  What I'd like to focus on -- and I'll blow this up at the

7    top here.  PSAT is the basis for -- let me back up.

8            What this document, this Plaintiff's Exhibit 2,

9    shows searches that are done in 2013 for the class of 2018,

10   correct?

11   **A.**  That's correct.

12   **Q.**  It has data that about searches that occur in 2018, and

13   it also has information about the preceding class year, 2017,

14   correct?

15   **A.**  Where would that be?  I'm sorry.  Oh, I see.  Yes.  Yes.

16   **Q.**  Agreed?

17   **A.**  Agreed.

18   **Q.**  The PSAT is the source of, in 2017, 92,510 letters,

19   correct?

20   **A.**  That's correct.

21   **Q.**  And in 2018, 95,119, correct?

22   **A.**  That's correct.

23   **Q.**  Let me show you the rest of the document.  That is the

24   majority of the total of the letters sent.  I've got the

25   totals here at the bottom, correct?

1  **A.**  They sound right.

2  **Q.**  The PSAT is the primary source of names for the list,

3  correct?

4  **A.**  Yes.

5  **Q.**  Okay.  So now I want to go back up and look at what we

6  have for the PSAT.

7        So in the left-hand column we have, it says PSAT

8  and we've got some different categories of people in that

9  column, correct?

10  **A.**  That's correct.

11  **Q.**  I want to start with the first two, "High Scores Men" and

12  "High Scores Women."  Do you see that?

13  **A.**  I do.

14  **Q.**  And up at the top of the -- in the second column we've

15  got an SAT score range.  Do you see that?

16  **A.**  I do.

17  **Q.**  For men, that's 1380 to 1600, correct?

18  **A.**  Correct.

19  **Q.**  And for women, that's 1350 to 1600, direct?

20  **A.**  Correct.

21  **Q.**  These are some of the people that will be getting the

22  search letter we just looked at, right?

23  **A.**  That's correct.

24  **Q.**  And the next column, that column is entitled

25  "ETH/States."  Do you see that?

1    **A.**   I do.

2    **Q.**   ETH stands for ethnicity, correct?

3    **A.**   That's correct.

4    **Q.**   And "States" stands for geographic states, correct?

5    **A.**   Correct.

6    **Q.**   And the ethnicity for high scores, men and women, is KOW.

7    Do you see those codes there?

8    **A.**   Yes.

9    **Q.**   W stands for white, correct?

10   **A.**   That's correct.

11   **Q.**   O stands for other, correct?

12   **A.**   Probably.  Because these things change.  Probably.

13   **Q.**   And K stands for unknown when you don't fill it out?

14   **A.**   I think it's essentially everyone, when all is said and

15   done.

16   **Q.**   I'm sorry?

17   **A.**   I think it would be everyone, it sounds like.  In other

18   words -- I'm not 100 percent sure, but just looking at this,

19   it would be all high scores no matter, of all states and all

20   ethnicities.

21   **Q.**   Let's look down the test data.  Let me ask you this.

22            Who is Elizabeth Young?

23   **A.**   She used to be our data person and computer interface

24   person and research person.

25   **Q.**   She'd be very familiar with this date, correct?

1    **A.**   Yes.

2    **Q.**   And she testified that K is unknown.  It's when somebody

3    doesn't fill it out on the common app.  You'd have no reason

4    to dispute that, right?

5    **A.**   I would take her word for it.

6    **Q.**   If she testified that O means "other" on the common app,

7    you'd take her word for it, too, correct?

8    **A.**   I would.

9    **Q.**   Just to kind of clear things up, you said it might be

10   referring to everyone.  Here we have down here -- we'll come

11   back to sparse country in a minute, but we've got these

12   categories down here which are high scores Asian men, high

13   scores Asian women, females, right?

14   **A.**   Yes.

15   **Q.**   And those are additional people who are getting letters,

16   correct?

17   **A.**   That's correct.

18   **Q.**   They're not included in that KOW category, correct?

19   **A.**   It's the same range, but that would be technically

20   correct.

21   **Q.**   They're different people, right?

22   **A.**   Yeah.

23   **Q.**   It's the same SAT range, correct?

24   **A.**   Yes.

25   **Q.**   And if we go down here to BCHNP.  That's -- BCHNP stands

1    for black, Chicano, Hispanic, Native American, and Puerto

2    Rican, correct?

3    **A.**   That's correct.

4    **Q.**   All of the states, United States and Puerto Rico, those

5    applicants are invited to apply if they have an SAT score of

6    1100 up to 1600, correct?

7    **A.**   That's correct.

8    **Q.**   So in Harvard's view, a student in this BCHNP category

9    with the PSAT of 1100 could be admitted and succeed at

10   Harvard, correct?

11   **A.**   Just simply -- that isn't technically correct.  It would

12   simply be these are people who we hope would consider

13   Harvard, in looking at that range.

14   **Q.**   And you tell them in the letter that you send them that

15   their SAT scores indicate that they could be a good candidate

16   to apply to Harvard, right?

17   **A.**   That's right.  That they could be.

18   **Q.**   And Harvard does not invite white or Asian students to

19   apply unless they have a 1350 for women or a 1380 for men,

20   correct?

21   **A.**   That's correct.

22   **Q.**   Even though you agree that an Asian student with an 1100,

23   depending on the individual case, could be successful at

24   Harvard, correct?

25   **A.**   It's possible that any student could be.

1  **Q.** And of course you must admit that Asian-American

2  applicants are treated very differently than all other

3  minority applicants in terms of receiving an invitation to

4  apply to Harvard based on information provided by the College

5  Board, correct?

6  **A.** Again, it is really exactly the same parameters as was

7  the case for white students.

8  **Q.** My question is the Asian-American applicants were treated

9  very differently in terms of getting the letter based on the

10  information from the College Board than other minority

11  potential applicants, correct?

12  **A.** Again, there's a slightly lower range for the other

13  minorities.

14  **Q.** So you would describe an 1100 on the PSAT as slightly

15  lower than 1350?

16  **A.** Yes.

17  **Q.** And slightly lower than 1380?

18  **A.** Yes.

19  **Q.** And the last time we asked you questions under oath, you

20  had no explanation for why Asian applicants who score 1100

21  and above are not being reached out to through this

22  particular recruiting method, correct?

23  **A.** It's simply with all of the outreach that we do for all

24  these categories, what we're trying to do, for example, with

25  the minority students who are not Asian is to get a sense of

1    to what extent economic background might make a difference in

2    their ability to score at higher levels on the SAT or the

3    PSAT.  So it really comes down to the rather stark economic

4    differences and opportunities that are available for the

5    BCHNP.

6    **Q.**  Dean Fitzsimmons, I'd like you to pick up your transcript

7    of your deposition that's in the coil-bound binder to your

8    right, on the far right of the desk.  If you could open that

9    to page 73, please.  If you could look at page 73, line 13.

10   Do you see that?

11   **A.**  Yes, page 73.

12   **Q.**  Line 13.  Are you there?

13   **A.**  Yes.

14   **Q.**  "QUESTION:  So my question is, why aren't Asian males who

15   score 1100 to 1370 being reached out to through this

16   particular search method?

17           "ANSWER:  I don't have a precise answer.

18           "QUESTION:  Do you have any answer?

19           "ANSWER:  No."

20           Were you asked those questions?  Did you give that

21   testimony?

22   **A.**  If this says I did, I did.  But again, I think it would

23   come down, at least in my mind, to having a precise answer.

24   **Q.**  So when you're sending letters out to the people that are

25   on the list that you generate from the College Board, you

1  have three pieces of information:  the score, geography,

2  race/ethnicity, correct?

3  **A.**   There are some additional.

4  **Q.**   Those are the ways the data is getting sorted here,

5  correct?

6  **A.**   There's also self-reported grades.

7  **Q.**   So you've got grades, SAT score, geography,

8  race/ethnicity, correct?

9  **A.**   Yes.

10  **Q.**   You don't have the information you need to do a

11  whole-person review, correct?

12  **A.**   I'm sorry.  Could you repeat that question?

13  **Q.**   When you're sending these letters out, you don't have the

14  information that you need to do the kind of holistic review

15  that you say you do once these people apply, correct?

16  **A.**   Certainly not.  Just one of the most basic set of

17  components.

18  **Q.**   Is the reason Harvard makes substantial racial

19  categorical distinctions in terms of who's getting invited to

20  apply based on this list, is that part of how Harvard

21  consciously shapes its student body?

22  **A.**   No.  It's simply trying to reach out to people from all

23  backgrounds, and especially those who have experienced

24  disproportionate effects of economic disadvantage.

25  **Q.**   Do you remember the interview or handbook and the

1    language that we read that you agreed was accurate that said

2    recruitment is part of how Harvard consciously shapes its

3    student body?  You remember that, right?

4    **A.**  Yes.

5    **Q.**  And are you saying that this is somehow an exception to

6    that, that the way you've sliced and diced the data here for

7    in terms of who gets an invitation to apply to Harvard is

8    somehow not part of how Harvard is consciously shaping its

9    student body?

10   **A.**  No.  It's certainly one of the things we do to recruit.

11   **Q.**  And one of the things that you do to recruit to

12   consciously shape your student body is to differentiate who

13   you invite based on race or ethnicity, correct?

14   **A.**  You're technically correct.

15   **Q.**  Now I want to focus on the last category here, Sparse

16   Country, near and dear to my heart because that's where I'm

17   from.

18   **A.**  Which state?

19   **Q.**  Montana, a great state.

20        Dean Fitzsimmons, we look at Sparse Country.  In

21   Sparse Country you get invited to apply if you get a score

22   between a 1310 and a 1370, correct?

23   **A.**  That's correct.

24   **Q.**  And the people who are invited to apply from Sparse

25   Country are the unknown, other, and white, correct?

1 **A.** Yes.

2 **Q.** Asians are not included in that list, correct?

3 **A.** Not in that particular list.

4 **Q.** Okay.  And the score, again, is 1310 to 1370, correct?

5 **A.** That's right.

6 **Q.** Now, I want to see if you would help me build a map of

7 Sparse Country.  You'll probably need to turn to the actual

8 paper Exhibit 2 because I'm going to switch it off of the

9 screen.  Let me know when you're there.

10 **A.** It's P2?

11 **Q.** Yes.

12 **A.** Okay.  I have it.

13 **Q.** I'm going to show you a map that your lawyers I think

14 plan to use with you in your examination.  I want to see if

15 we can use it in mine.  I've got that up on the screen.  It's

16 a map of the United States divided up by docket, correct?

17 **A.** That is correct.

18 **Q.** The we'll take a little detour here.

19    Dockets are the way you kind of break down the

20 applicant pool in terms of your process in the admissions

21 office, correct?

22 **A.** It's a beginning of the committee process.

23 **Q.** And the geographic breakdown, right?

24 **A.** More or less.

25 **Q.** So now if you've got P2 in front of you, I want to walk

1  through the states and we'll mark them here on your map.

2  Okay?

3           So the first one is AL.  That's Alabama, right?

4  **A.**  That is correct.

5  **Q.**  And I've got an X on Alabama on the screen, correct?

6  **A.**  Very good.  Yes.

7  **Q.**  The second one is Alaska, correct?

8  **A.**  Yes.

9  **Q.**  And now we've got an X on Alaska, correct?

10  **A.**  That's correct.

11  **Q.**  And we've got Arizona, and I've got that correct on the

12  screen, right?

13  **A.**  Yes.

14  **Q.**  Arkansas?

15  **A.**  Yes.

16  **Q.**  Idaho?

17  **A.**  Yes.

18  **Q.**  Louisiana?

19  **A.**  Yes.

20  **Q.**  Maine?

21  **A.**  Yes.

22  **Q.**  Mississippi?

23  **A.**  Yes.

24  **Q.**  Montana?

25  **A.**  Yes.

1    **Q.**   Nebraska?

2    **A.**   Yes.

3    **Q.**   Nevada?

4    **A.**   Yes.

5    **Q.**   New Hampshire?

6    **A.**   Yes.

7    **Q.**   New Mexico?

8    **A.**   Yes.

9    **Q.**   North Dakota?

10   **A.**   Yes.

11   **Q.**   Oklahoma?

12   **A.**   Yes.

13   **Q.**   South Dakota?

14   **A.**   Yes.

15   **Q.**   Utah?

16   **A.**   Correct.

17   **Q.**   Did I get that right?

18   **A.**   Yes.

19   **Q.**   Vermont?

20   **A.**   Yes.

21   **Q.**   Kind of crowded up there.

22            West Virginia?

23   **A.**   Yes.

24   **Q.**   And Wyoming, right?

25   **A.**   Yes.

1    **Q.**   Okay.  20 states, right?

2    **A.**   Correct.

3    **Q.**   And there's some pretty big population centers in some of

4    these states, like Las Vegas and Phoenix, New Orleans,

5    Oklahoma City, all metropolitan areas with significant

6    populations, correct?

7    **A.**   There are certainly some large metropolitan areas within

8    those states.

9    **Q.**   And turning back to Exhibit 2, which I'll put back on the

10   screen so everybody can see it, you invite -- so all of the

11   BCHNP candidates are invited to apply in Sparse Country.

12   Because every single state, anybody in that category that

13   gets 1100 or above gets invited to apply out of the black,

14   Chicano, Hispanic, Native American or Puerto Rican category,

15   they get invited to apply in those states, correct?

16   **A.**   That would be correct.

17   **Q.**   The only distinctions you have for Sparse Country are

18   white, other, and unknown.  No Asians.  We've already agreed

19   on that, correct?

20   **A.**   Yes.  Obviously they're included in the other searches.

21   **Q.**   My question to you is, what is Harvard's explanation for

22   why in Sparse Country in 20 states, states that some of them

23   have big population centers, a white applicant with a 1310 is

24   invited to apply to Harvard, but an Asian male who lives in

25   any of those states with a 1370 is not?  What are all the

1   reasons Harvard does that?

2   **A.**   Again, we're looking for candidates from all different

3   kinds of backgrounds.  In the Sparse Country states, there

4   are -- certainly there are some cities, but there are lots of

5   very rural areas.  Again, we're trying to apply the same

6   standards for the different kinds of searches that we have.

7   **Q.**   You're not suggesting that there aren't significant

8   Asian-American populations in Sparse Country, are you?

9   **A.**   There are certainly some Asian-American populations in

10  Sparse Country.

11  **Q.**   And what you're doing is -- you could have kids in Las

12  Vegas where there's a significant Asian-American population

13  at the same school, white kid, 1310, gets a letter that says

14  his scores qualify him to apply to Harvard.  Asian kid

15  sitting next to him in class gets a 1370, they're comparing

16  notes.  The Asian boy does not get invited to apply.  The

17  white student does.

18          What is the possible explanation for that?

19  **A.**   Well, again, we're looking for a diverse student

20  population, for all the reasons that was discussed in the

21  opening statement this morning.  And we simply want to make

22  sure in those schools that we send encouraging messages to

23  people along our normal search parameters.

24  **Q.**   Is part of how you achieve the diversity that Mr. Lee

25  discussed this morning is to put a thumb on the scale for

1    white students who you invite to apply from Sparse Country?

2    **A.**   The fact that a person applied from Sparse Country might

3    be one of, again, many, many factors that could possibly go

4    into a decision.  But there are people who, let's say, for

5    example, have only lived in the Sparse Country state for a

6    year or two.  Let's say that can happen.  And then on the

7    other hand there are people who have lived there for their

8    entire lives under very different settings.

9            So what we're trying to make sure we do, in an

10   even-handed way, is to reach out to what lots of people would

11   say is the heartland of America.  And many of these states

12   that you have on your map are states where Harvard is not on

13   anyone's radar scope at all.

14           And one of the things we love to do is to get

15   students from any background, really, from those states who

16   could bring something special to Harvard that would help

17   educate fellow classmates.

18           One of my roommates was from Mitchell, South

19   Dakota, home of, you probably know, the Corn Palace, which

20   you may not know.  But he was an amazing person.  And the

21   thing that he brought to me and to everybody in our dorm was

22   a tremendous appreciation for what was happening in a state

23   where we get very few people.  So he was a great ambassador.

24           We also of course will visit all of these states

25   every year.  So we do everything we can to reach out to a

1  much broader range of people than certainly was the case at

2  Harvard when I was an undergraduate.

3  **Q.**  I want to just try to focus on what we've got before us.

4  And that is in Sparse Country if you're an Asian male, you've

5  got to score 1380 to get an invitation from Harvard, correct?

6  **A.**  Yes.  And we would hope that that student would apply.

7  **Q.**  In Sparse Country if you're white, either gender, you are

8  get invited to apply at 1310, correct?

9  **A.**  That's correct.

10  **Q.**  And all the stuff you just told me about some people have

11  lived there longer and some people just arrived one or two

12  years ago, you have no idea who that applies to at the time

13  that you're sending out these letters, correct?

14  **A.**  That's correct.

15  **Q.**  You don't know whether the recipient of the letter is

16  going to be like your roommate from South Dakota.  You have

17  none of that kind of information when you send out the

18  letter, correct?

19  **A.**  That's true.  But people talk among themselves.  So there

20  are times when a search letter will go out to someone, say,

21  with a lower search parameter.  People start talking.  People

22  start considering whether or not they might consider Harvard.

23  And that's one of the ways Harvard has changed, why it's

24  changed so dramatically in terms of its geographic

25  distribution over the past 35 or 40 years.

1    Q.   So I get it.  So when you have send a letter out to

2    somebody to recruit them, part of what you're doing is

3    sending a message, you said, with a lower search parameter.

4    They might start talking and get other people interested in

5    Harvard.  Is that the gist of what you just said?

6    A.   Yes.  And that's exactly what has happened over the

7    years.

8    Q.   And is the flip side of that message to the Asian student

9    from Sparse Country with a 1370 whose white pals tell him

10   they got invited to apply at 1310 and he didn't, what's the

11   message that student is supposed to receive?

12   A.   I guess the general message would be, say within a high

13   school class and sometimes -- you're from Montana, and I know

14   there are large high schools in Montana, and there are some

15   very, very small high schools in Montana.

16            But the idea is to try to break the cycle, to try

17   to get people from a much broader array of states and

18   backgrounds to think about Harvard.  So the idea at least is

19   to get Harvard on the map, just given the fact, remember,

20   that most students will end up going to college within about

21   one hour's drive of their home.

22   Q.   Between the Asian student in Sparse Country with 1370 who

23   doesn't get the letter and the white student with the 1310

24   who does, the only difference between those two students, the

25   only different information that you have when you decide

1    whether or not to send that letter is race.  Correct?

2    **A.**   In terms of that letter, yes.

3    **Q.**   And that's race discrimination, plain and simple, isn't

4    it, Dean Fitzsimmons?

5    **A.**   It's reaching out to people who might be good applicants

6    for Harvard and hoping that these applicants will again talk

7    to their friends and think about whether or not Harvard could

8    be an option.

9    **Q.**   Respectfully, sir, you're not answering my question.

10          The only different information you have between the

11   white applicant who you invite to apply with the 1370 and the

12   Asian --

13          MR. HUGHES:  May I finish my question before you

14   object?  I'll try again.

15   BY MR. HUGHES:

16   **Q.**   My question is, the only reason that Harvard doesn't

17   invite the Asian student with the 1310 from Sparse Country

18   and does invite the white student with the 1310 is race?

19          MR. LEE:  Asked and answered twice before.

20   Identically.

21          THE COURT:  I'll let him answer it this time.  It

22   has been asked and answered.  You might want to move it

23   along.

24          THE WITNESS:  On the search parameter, that very

25   small number of points is the difference.

1  BY MR. HUGHES:

2  **Q.**  And that's race discrimination, plain and simple, isn't

3  it, Dean Fitzsimmons?

4  **A.**  It is not.

5  **Q.**  And is the decision to invite white students with lower

6  scores than Asian students from Sparse Country part of how

7  Harvard consciously shapes the makeup of its class?

8  **A.**  We're simply trying to reach out to people from all over

9  the nation.

10  **Q.**  I'm going to change topics now, talk about how athletes

11  and legacies are treated in the admissions process, okay?

12  **A.**  Sure.

13  **Q.**  To establish some common ground, I think you will agree

14  that, as a whole, the legacy applicant pool is on average

15  less ethnically diverse than the non-legacy applicant pool,

16  correct?

17  **A.**  At the moment it is, but it's fast changing.

18  **Q.**  But at the moment that holds true, right?

19  **A.**  That's correct.

20  **Q.**  Okay.  And Harvard is very competitive.  Most of your

21  applicants are turned away, correct?

22  **A.**  Unfortunately, yes.

23  **Q.**  And I'd like to talk to you about the admission rates,

24  the likelihood of admission to Harvard.  That's something

25  that you and your colleagues in the Harvard admissions office

1    keep track of, correct?

2    **A.**   That's correct.

3    **Q.**   And I'd like to take a look at Plaintiff's Exhibit 163.

4    **A.**   Will it be up on the screen, too?

5    **Q.**   It should be.

6    **A.**   I have 163.

7            MR. MORTARA:  Before we get started, I'd like to

8    offer P163.

9            MR. LEE:  No objection, Your Honor.

10           THE COURT:  Admitted.

11           (Plaintiff Exhibit No. 163 admitted.)

12   BY MR. HUGHES:

13   **Q.**   Do you see that, Dean Fitzsimmons?

14   **A.**   This is the Sunday, March 2?

15   **Q.**   Yes, sir.

16   **A.**   Yes, I do.

17   **Q.**   And you're getting at the bottom here an email from

18   Elizabeth Young, attaching certain statistics for a meeting I

19   guess on March 3, correct?

20   **A.**   It sounds that way, yes.

21   **Q.**   And at what point in the admissions process is early

22   March?

23   **A.**   This is probably just as we were going into full

24   committees, and that's when the actual decisions are made.

25   **Q.**   And so let's look at the fifth page of this document, the

1    fourth page of the document.  I've got it blown up on the

2    screen, Dean Fitzsimmons.  Do you see that in front of you?

3    **A.**   I do.

4    **Q.**   What we've got here, harkening back to the first page of

5    the email, we're in 2013.  We're selecting the class of 2018,

6    correct?

7    **A.**   Yes.

8    **Q.**   And what we've got on the right-hand side of the screen

9    is information related to the class of 2018, correct?

10   **A.**   That's correct.

11   **Q.**   And on the left-hand side of the screen we've got

12   information related to 2017, correct?

13   **A.**   That's correct.

14   **Q.**   And you've got information that relates in both years

15   both to the overall applicant pool, correct?

16   **A.**   Yes.

17   **Q.**   And you've also got information that relates to the NLNA

18   portion of the applicant pool, correct?

19   **A.**   That's correct.

20   **Q.**   NLNA is non-legacy, non-athlete, correct?

21   **A.**   That's correct.

22   **Q.**   Why does Harvard, Harvard admissions office, separate out

23   the applicant pool by NLNA?

24   **A.**   It's really a safeguard, in a sense, to make sure we're

25   going along the way Susie Chow and I stated before the OCR

1    investigation where we said that the difference between the

2    admission rate of whites and Asian-Americans had to do with

3    essentially lineage and athletics.

4            And then it actually relates back to the OCR report

5    itself, which found that we did not discriminate against

6    Asian-Americans.  But it is a -- it's a thing that we have

7    done ever since then to provide another safeguard, another

8    check and balance on this, another way of trying to make sure

9    that we're being even-handed with Asian-Americans and white

10   students.

11   **Q.**  So that the safeguard or check that the Harvard

12   admissions office does to ensure that there is not

13   discrimination against Asian-American applicants is to take

14   the athletes and the legacies out of the pool and look at the

15   portion of the pool that remains?

16   **A.**  No.  It's not the safeguard.  There are many, many

17   safeguards.  It's one of the things that we did even prior,

18   just to sort of let the public know prior to the OCR

19   investigation.

20           But then after the finding, we just wanted to make

21   sure we continued to take a look at this as one way of many

22   where we would make sure that we're treating every applicant

23   in a fair and even-handed way.

24   **Q.**  And do you still do that today?

25   **A.**  Yes.

1   **Q.**  So a safeguard, one of many, you say, that Harvard

2   admissions office employs to check to make sure there's not

3   discrimination against Asian-American applicants is to take

4   the legacies and the athletes out of the applicant pool and

5   then analyze the remaining applicant pool, correct?

6   **A.**  Yes.  It's a very quick and simple thing to look at, but

7   it's one -- remember there are -- Professor Card identified

8   200 variables of factors in admission.  Certainly grades and

9   scores are factors, as we know from this morning.  And also,

10  though, it's also true that alumnae/alumni sons and daughters

11  and athletics are also factors, one of many factors in the

12  admissions process.

13  **Q.**  So let's look at some admissions rates together.  I've

14  got them highlighted at the top.

15          So the admission rate if you're not a legacy or not

16  an applicant in these class years is about 4 1/2 percent,

17  correct?

18  **A.**  That would be correct.  In a very rough kind of way.

19  **Q.**  That sounds right to you, right?

20  **A.**  Yes.

21  **Q.**  And then if you add the legacies and applicants back into

22  the pool because they're admitted at such a higher rate, the

23  overall admit rate jumps up to 5.7 in 2018 and 5.8 in 2017,

24  correct?

25  **A.**  Overall, yes.

1  **Q.**  And I'd like to look at one other thing on here.  This is

2  something you referred to in the admissions office as a

3  one-pager, correct?

4  **A.**  That's part of it, yes.

5  **Q.**  Although sometimes the one-pagers are more than one page,

6  correct?

7  **A.**  Occasionally.  They're usually one page.

8  **Q.**  So this one that we're looking at has information all the

9  way up and down.  The information that's being compared

10  between the class of 2017 and the class of 2018 is the racial

11  or ethnic makeup of the class, correct?

12  **A.**  That would be correct.

13  **Q.**  And sometimes, to be fair, Dean Fitzsimmons, there are

14  one-pagers with other information like geography and so

15  forth, correct?

16  **A.**  Yes.  It could be occasionally.

17  **Q.**  I'll show you that in a minute.  Focusing on this page 4

18  of Plaintiff's Exhibit 63, why does the admissions office

19  compare the racial or ethnic makeup of the current year's

20  class to the racial or ethnic makeup of the preceding year's

21  class?

22          MR. LEE:  Your Honor, if I could.  This is just to

23  make the record clear.  The second page of this exhibit is

24  the actual one-pager.

25          MR. HUGHES:  We're going to look at that in a

1   moment.

2          MR. LEE:  Which is part of the confusion.  The

3   fourth page is something different.  I think if we're going

4   to refer to the one-pager, we'll should refer to the

5   one-pager.

6          MR. HUGHES:  Mr. Lee, I asked him if it was the

7   one-pager.  He told me it was.

8          THE WITNESS:  I'm sorry.  I did not.  I said that's

9   part of the one-pager.  The one-pager is usually is one page.

10  And usually at the bottom it has the thing that you had

11  selected out for page 4.  What you just showed with all the

12  information, that's the one-pager.

13  BY MR. HUGHES:

14  **Q.**  There's no doubt that the Harvard admissions office

15  created page 4, correct?

16  **A.**  As part of the one-pager.

17  **Q.**  And now let's look at the other part of the one-pager.

18  I'll ask my question again.

19          Here at the bottom, like you were just telling us,

20  Dean Fitzsimmons, there is information at the bottom of the

21  one-pager comparing the racial or ethnic makeup of the

22  current class that you're working to admit to the prior

23  year's admitted class, correct?

24  **A.**  That's correct.

25  **Q.**  And the question is why does the Harvard admissions

1   office, when it's trying to decide who to admit to Harvard,

2   compare the racial makeup of the prospective admitted class

3   to the admitted class of the prior year?

4   **A.**   There are a couple of reasons.  One is, remember, I think

5   you said it was March 3 or something like that.  We've

6   already started the recruiting for the next year.  And we'll

7   be going out on the road.  We actually visit about 60-70

8   cities in the spring or locations in the spring and then 60

9   or 70 more in the fall.

10          But one thing you can do is just simply to give you

11   have a rough idea perhaps of how far effective your

12   recruiting has been this year versus last year.  Keeping in

13   mind that in America usually there isn't a huge change from

14   one year to the next in of the talent pool, as it were, in

15   America.  So one year will be more like the next one but can

16   often be very different, say, from five years ago or five

17   years into the future.

18          But the other thing, the other reason you do this

19   is that we have to be really, really careful that we do not

20   come in with too many students.  We try to shoot for about

21   1,660 every year.

22          And we are -- as Mr. Lee said this morning, we're

23   at 98 percent residential.  All the first-year students

24   actually have to live in the dorms, so we cannot be

25   overcrowded.

1          So this information is actually very useful to --

2     for us to try to prevent being overcrowded.  Because, for

3     example, if you went through the whole one-pager, there are

4     expected differential yields by -- on the part of really a

5     lot of different kinds of people.

6          For example, your Sparse Country often has a

7     relatively lower yield than some other parts.  So in other

8     words, what we're trying to do is to -- at that point, we

9     probably have until about March 20 to try to make some final

10    decisions before we let people know around April 1 what's

11    going to happen.

12         But if you found yourself, for example, with lots

13    of engineers admitted, that -- we know that historically

14    engineers will yield a considerably lower rate than most

15    other students.  So that would give us -- in other words,

16    they're less likely to choose Harvard if admitted.  So that

17    would give us at least a little bit more room, knowing that a

18    whole bunch of them probably won't come to, once we're trying

19    to figure out that last number around March 20, that we would

20    be able to perhaps admit a few more people generally.

21    **Q.**  Are yield rates something that can factor into admission

22    to Harvard?

23    **A.**  Just in terms of the number of admissions that we send

24    out on April 1.  If we miscalculate, which we did one year

25    since the '70s, it can create a really big set of problems.

1    **Q.** Are there differences in yield rates amongst different

2    races or ethnicities?

3    **A.** Yes.

4    **Q.** Do you keep track of that?

5    **A.** Generally speaking. Quite a bit of variation from year

6    to year. It's kind of unpredictable, but in general terms,

7    yes.

8    **Q.** And is that something you take into account when making

9    certain admissions decisions to Harvard?

10   **A.** Not any particular decisions, but it's just in terms of

11   the number you would feel confident about sending out so that

12   you would not be overcrowded. The best thing for us is --

13   obviously we cannot be overcrowded. There's no place to put

14   people. So the other thing we typically would then be able

15   to take perhaps 50 or 100 people off the waiting list.

16   **Q.** All right. Let's get back to our admission rate

17   discussion. I'm going to try to blow up part of this page.

18   Can you see that, Dean Fitzsimmons?

19   **A.** I do.

20   **Q.** We're still on page 2. Here we have the overall admit

21   rate at the top of page 2, Dean Fitzsimmons?

22   **A.** Yes.

23   **Q.** 5.8 and 5.7. Do you see that?

24   **A.** I do.

25   **Q.** Down below, the Harvard admission office keeps track of

1    the admit rates for a category called "Lineage."  Do you see

2    that?

3    **A.**   I do.

4    **Q.**   What does that category refer to?

5    **A.**   That refers to applicants where either the mother or

6    father or both went to Harvard College.

7    **Q.**   And the admission rate for legacy candidates in 2017 was

8    35.4 and in 2018 was 33.3, correct?

9    **A.**   Yes.  Except I think, again, 2018 I believe was still a

10   work in progress.

11   **Q.**   2018 was --

12   **A.**   Right.

13   **Q.**   We looked before on page 4 that the non-legacy,

14   non-athlete admission rate was about 4 1/2 percent, correct?

15   **A.**   Yes.

16   **Q.**   So a legacy candidate is many, many, many times more

17   likely to get into Harvard than a non-legacy, non-athlete,

18   correct?

19   **A.**   That would be true for many reasons.

20   **Q.**   If we look down at athletes, 1 athletes, those are

21   athletes that receive an athletic rating of 1, correct?

22   **A.**   That's correct.

23   **Q.**   And again, that is a result of a request from a coach who

24   is trying to recruit an athlete to come to Harvard

25   communicates that request to the admissions office, correct?

A.   That would be a person the coach has rated as an athlete

desired for his or her team.

Q.   And the admission rate for 1 athletes is even higher than

legacies, 76.6 for the class of 2017, correct?

A.   That's correct.

Q.   The number is close for 2018 as well?

A.   That's correct.

Q.   So what that means is that athletes are many, many, many

times more likely to get in than the non-legacy, non-athletes

who are admitted at 4.5 percent, correct?

A.   That would be correct.

Q.   Now, you talked to me a minute ago and said that Harvard

started carving out the non-legacy, non-athlete rating as a

result of -- or in connection with OCR's investigation of

claims of Asian-American discrimination in the late 1980s?

A.   Well, it was really prior to that because there had been

much speculation in the press and from our students, is it,

you know, why the admission rate was different.  So that's

why Susie and I just sat down and did, again, a very simple

calculation.  But I think it was somewhat illuminating

because it certainly was something that was noted by OCR as

it conducted its investigation and in doing so found that we

had not discriminated against Asian-Americans.

Q.   I'd like to talk with you a little bit more about that

OCR investigation.  Dean Fitzsimmons, you were the dean when

1    that investigation occurred in the late '80s, correct?

2    **A.**   That's correct.

3    **Q.**   It ultimately culminated in a statement of findings in

4    1990, right?

5    **A.**   That's correct.

6    **Q.**   And before OCR issued that statement of findings, it

7    conducted a comprehensive investigation.  We heard Mr. Lee

8    tell us this morning they actually set up shop in your

9    office, right?

10   **A.**   Among other things.  They did quite a few things.  They

11   interviewed ten of us.  They did their own regressions with

12   lots of data.  They looked at 400 applications.  They looked

13   at 2000 summary sheets or reader sheets.  So it was a very,

14   very comprehensive investigation.

15   **Q.**   And I know that -- and Mr. Habeno was the gentleman at

16   OCR who was in charge of that investigation, correct?

17   **A.**   That's correct.

18   **Q.**   You ultimately became friends with Mr. Habeno, correct?

19   **A.**   We have over the years.

20   **Q.**   Eaten at Ruth's Chris together, right?

21   **A.**   Yes.  Once, as I recall.

22   **Q.**   Exchanging jokes over email, correct?

23   **A.**   That, I wouldn't say at all.

24   **Q.**   Okay.  We'll get to that tomorrow.

25   **A.**   We'll get to that, I'm sure.

1    **Q.**  I assumed that even through you developed a friendly

2    relationship with Mr. Habeno that you and everyone in the

3    admissions office was professional and forthright with

4    Mr. Habeno during the OCR investigation.

5    **A.**  Yes.  And with all his colleagues, both here in Boston

6    and in Washington.

7    **Q.**  And I think you already told me you thought that

8    investigation was comprehensive and thorough, correct?

9    **A.**  I do.

10   **Q.**  And your admissions officers and you all told the truth

11   when you talked to the OCR folks, correct?

12   **A.**  Yes.

13   **Q.**  And you believe OCR used a reliable approach and

14   methodology to investigate the claims that Harvard was

15   discriminating against Asian-Americans, correct?

16   **A.**  It certainly was comprehensive.

17   **Q.**  And reliable.  Mr. Lee relied on it this morning, right?

18   **A.**  Yes.  And we've relied on its base, especially given its

19   correlation to the *Bakke* decision and then ultimately to

20   *Grutter* and others.

21   **Q.**  And you don't have any criticisms of OCR's approach.

22   You're comfortable with the statement of findings, correct?

23   **A.**  Yes.

24   **Q.**  So now I'd like to look at some portions of the statement

25   of findings with you, which is Plaintiff's Exhibit 555.

1    MR. HUGHES:  Before I do, I'd like to offer that

2  into evidence.

3    MR. LEE:  No objection.

4    THE COURT:  Admitted.

5    (Plaintiff Exhibit No. 555 admitted.)

6  BY MR. HUGHES:

7  **Q.**  I've got it on the screen here, Dean Fitzsimmons.

8  **A.**  Are you going to highlight?

9  **Q.**  I will do my best.  You're familiar with this document

10  and you've reviewed it before, right?

11  **A.**  I have.

12  **Q.**  I'd like to turn to page 2.  And here we've got -- I'll

13  just read it.

14    In January of 1988, Harvard, through the dean of

15  admissions and financial aid, issued a statement on

16  Asian-American admissions at Harvard-Radcliffe which in part

17  responded to concerns raised about underrepresentation of

18  Asian-Americans at Harvard and rumors of quotas.

19    Do you see that?

20  **A.**  Yes.  Susie and I put that together.

21  **Q.**  You remember issuing that statement, correct?

22  **A.**  I do.

23  **Q.**  You've got the statement block quoted below, correct?

24  **A.**  It looks like it, yes.

25  **Q.**  I'll read what the OCR said in the block quote.

1     "The difference in admission rates for Asians and

2     whites, about 3.7 percent, 13.3 versus 17.0 over a 10-year

3     period including the classes of 1982 through 1991, was

4     explained as follows."

5          And then we've got the block quote.  The block

6     quote says, "While Asian-Americans are slightly stronger than

7     white candidates on academic criteria, they're slightly less

8     strong on extracurricular criteria.  In addition, there are

9     very few Asian-Americans in our applicant pool who are alumni

10    children or prospective varsity athletes.  When all these

11    factors are taken into account, the difference in admission

12    rates for the two groups disappears."

13         Do you see that?

14    **A.**  I do.

15    **Q.**  And that's what you told OCR back in the late 1980s,

16    correct?

17    **A.**  That's certainly what our data told us.

18    **Q.**  In fact, we can look at this tomorrow.  It's no longer

19    true that Asian-Americans are slightly less strong on

20    extracurriculars, correct?

21    **A.**  Yes.  In fact, our readers rate them stronger than whites

22    on extracurriculars.

23    **Q.**  Just to make sure the record is clear --

24    **A.**  Yes.  Based on the evidence that we see in the

25    applications.

1   **Q.**  Currently the Asian-Americans have scored better on

2   extracurricular criteria than white applicants to Harvard,

3   correct?

4   **A.**  Yes.  That's certainly what our staff believes when it

5   goes through all the applications one at a time and then

6   assigns a strong extracurricular rating, slightly stronger

7   for Asian-Americans and whites.

8   **Q.**  I think you've already told me that OCR performed a

9   statistical analysis as part of its work here, correct?

10   **A.**  Yes.

11   **Q.**  I'd like to look at some of that with you.  I'm going to

12   turn to page 33.

13         THE COURT:  Mr. Hughes, I see you looking at your

14   watch.  I pushed everything later.  We can go until 3:30, if

15   that's all right with you.  I don't want to surprise you.  We

16   can go until 3:30.

17         MR. HUGHES:  I think I'm going to hit a logical

18   breaking point between 3:15 and 3:30.

19         THE COURT:  That's fine.

20         MR. HUGHES:  Thank you very much, Your Honor.

21   BY MR. HUGHES:

22   **Q.**  Dean Fitzsimmons, I've got on the page here the narrative

23   that OCR put together relating to some of its statistical

24   analysis.  Do you see that?

25   **A.**  I do.  You've highlighted a number of things.

1   **Q.**   OCR says, "Our first task was to determine whether the

2   Asian-American and white applicant pools were similarly

3   qualified.  If the white applicants were, on average,

4   superior to Asian-American applicants, then it is reasonable

5   to expect that whites would be admitted at a higher rate."

6            Do you see that?

7   **A.**   I do.

8   **Q.**   Then we've got a table and the OCR says, "As shown in

9   Table 5 below, while the two groups were found to be

10  significantly different on many of the variables, they appear

11  overall to be comparably qualified when viewing their means."

12           Do you see that?

13  **A.**   I do.

14  **Q.**   And then we've got some comparisons between Asian and

15  white applicants in Table 5.  Do you see that?

16  **A.**   I do.

17  **Q.**   So one of them is academic rating.  Do you see that?

18  **A.**   I do.

19  **Q.**   For that variable, Asian-Americans scored higher,

20  correct?

21  **A.**   That's correct.

22  **Q.**   The athletic rating, white higher, correct?

23  **A.**   Yes.

24  **Q.**   And personal rating, which was the discussion discussed

25  at length this morning, at least at this time whites were

1  getting higher personal scores than Asian applicants,

2  correct?

3  **A.**   Yeah.  Again, it's pretty slight.  Yes.  The one before

4  it was not significant statistically.

5  **Q.**   That was on extracurricular?

6  **A.**   Right.

7  **Q.**   The white applicants were being awarded higher personal

8  scores than Asian-American applicants at this time, correct?

9  **A.**   Yes.  By a very small margin.

10  **Q.**   And the other area where white applicants were performing

11  better was on the SAT verbal, correct?

12  **A.**   That's correct.

13  **Q.**   And that was true maybe back in 1990, but that's not true

14  today, correct?

15  **A.**   I would have to look at it, but I believe that could be

16  correct.

17  **Q.**   And it's also the case that Asian-American applicants to

18  Harvard score better on the SAT writing test than white

19  applicants, at least today, correct?

20  **A.**   We actually no longer use the writing, actually.

21  **Q.**   For the time period that you did, in recent times the

22  Asian-American applicants were doing better?

23  **A.**   That, I did not know that.  But we found the test to be

24  quite unreliable, so we actually dropped it this past year.

25  **Q.**   Now, you wouldn't have any reason to dispute your own

1  internal admissions data that showed what I just said to be

2  true.  It just doesn't come to mind, correct?

3  **A.**  Excuse me.  Table 5's data?

4  **Q.**  Your own recent data from the Harvard admissions office

5  showing Asian-Americans applicants scored better on the SAT

6  writing.  You don't have any reason to --

7  **A.**  I don't have any data at all on it.

8  **Q.**  So now, I think you also mentioned that OCR ran a

9  statistical or regression analysis.  You're familiar with

10  that, correct?

11  **A.**  I am.

12  **Q.**  Let's look at what they had to say about that.  It's on

13  page 34.

14      OCR says, "We then employed logistic regression to

15  try to identify which of the ten admissions variables could

16  account for the admit rate disparity.  Through this

17  technique, we identified six variables which appeared to

18  negatively impact Asian-Americans; that is, those variables

19  on which Asian-Americans received less benefit in the

20  admit/reject decision than white applicants with similar

21  scores.  These were three of the reader ratings:  academic,

22  extracurricular, and personal, along with the counselor and

23  alumni ratings and SAT math.

24      "Since Harvard asserted that the preference given

25  to legacy and recruited athlete applicants explained the

1    admit rate disparity, we next reran the logistic regressions

2    without these two groups.  When recruited athletes and

3    legacies were removed from the analysis, all of these race

4    effects disappeared with the exception that one variable, the

5    reader academic rating, continued to have a small adverse

6    effect on Asian-Americans."

7              Do you see that?

8    **A.**  I see that.

9    **Q.**  Back in 1990, Harvard was asserting that legacy and

10   athlete preferences explained the difference in admit rates

11   between White and Asian applicants.  And based on that

12   explanation, OCR removed the legacy and athlete applicants

13   from their regression analysis, correct?

14   **A.**  I see that.

15   **Q.**  And again, you don't have any criticism with what OCR did

16   here, correct?

17   **A.**  That's correct.  The only thing I would just say -- and

18   maybe I'm misunderstanding your question.  I think when Susie

19   and I did our little NLNA, I'm not sure which data we

20   actually used.  It might have been one year.  It might have

21   been five years.  I don't know.  Their data was -- I think it

22   was ten years, I think.  So they're not directly comparable,

23   I would say.

24   **Q.**  Right.  But what OCR did, which Harvard has relied on, is

25   when OCR was analyzing claims of discrimination against

1    Asian-Americans and running a logistic regression model, it

2    decided to take out the legacies and the athletes from its

3    logistic regression model data set, correct?

4    **A.**   It did.   That's what they say, yes.

5    **Q.**   You understand both the experts in this case have run

6    logistic regression models, correct?

7    **A.**   Yes.   As I understand it.

8    **Q.**   I want to look at a more recent document between Harvard

9    and OCR.   Before I do, let's just ask you a few questions.

10            You work with, from time to time, Harvard's office

11   of general counsel, correct?

12   **A.**   Yes.

13   **Q.**   And when you communicate with Harvard's office of general

14   counsel about what's going on in the admissions office,

15   you're careful to be truthful and accurate, correct?

16   **A.**   Yes.

17   **Q.**   And you expect, I'm sure, that when Harvard's office of

18   general counsel communicates with your regulators like the

19   Department of Education Office of Civil Rights, that it

20   provides accurate information, correct?

21   **A.**   That sounds fair.

22   **Q.**   So now I want to jump forward in time to see what Harvard

23   has to say in more recent times about whether athletes and

24   legacies should be removed from the data set when analyzing

25   claims of discrimination against Asian-Americans.

1          I'm going to show Plaintiff's Exhibit 509.

2   **A.**   Will you be putting this on the screen?

3   **Q.**   Yes, sir.  I was just providing a copy to Mr. Lee.

4          MR. LEE:  Thank you.

5          MR. HUGHES:  So what we have here -- before I do,

6   I'd like to offer this into evidence, Plaintiff's

7   Exhibit 509.

8          MR. LEE:  No objection, Your Honor.

9          THE COURT:  Admitted.

10         (Plaintiff Exhibit No. 509 admitted.)

11  BY MR. HUGHES:

12  **Q.**   Mr. Lee, this is a February 2, 2012, letter, correct?

13         MR. LEE:  I think you mean Mr. Fitzsimmons, not

14  Mr. Lee.  I can't testify.

15         MR. HUGHES:  You and I both.

16  BY MR. HUGHES:

17  **Q.**   Dean Fitzsimmons, this is a February 2, 2012, letter from

18  the Harvard office of the general counsel, correct?

19  **A.**   It appears to be.

20  **Q.**   And it's to Ms. Nicole Merhill at the Office of Civil

21  Rights for the Department of Education, correct?

22  **A.**   Yes.

23  **Q.**   Turning to page 11, the last page of the document, you

24  were copied at least on this document, correct?

25  **A.**   Yes.

1   **Q.**  If we go back to the first page, I think that this -- I

2   think Mr. Lee talked about this this morning, this letter

3   related to an individual claim of discrimination against

4   Asian-American students, correct?

5   **A.**  Yes, I believe so.

6   **Q.**  So now I want to see what Harvard told OCR in 2012,

7   turning to page 7.

8           So Harvard tells OCR, "Enclosed as attachment 8 is

9   a chart labeled "Class of 2015-NLNA Overall."  Again limited

10  as described above to data for self-identified

11  Asian-Americans and white Americans, this chart shows the

12  applicant numbers and admissions rates for non-legacy and

13  non-athlete candidates, in other words; for those applicants

14  who would not be eligible for a tip either because one of

15  their parents went to Harvard or Radcliffe or because of

16  their exceptional athletic ability.  These data show that,

17  consistent with OCR's previous findings about Harvard's

18  admissions practices, once applicant data is limited to

19  non-legacy/non-athlete candidates, the admit rates between

20  Asian-Americans and white Americans are far closer."

21          Do you see that?

22  **A.**  I do.

23  **Q.**  So what we have here is the Harvard office of general

24  counsel in 2012, concerning a claim of Asian-American

25  discrimination, telling the government to remove the

1  legacy/athletes from the data, correct?

2  **A.**  That's what it says.

3  **Q.**  So now I want to make sure we're on the same page about

4  this athlete and legacy issue.

5        1990, OCR, at Harvard's invitation, removes the

6  athletes and legacies from their logistic regression model.

7  We just looked at that, right?

8  **A.**  As one of many things they did in the very comprehensive

9  investigation.

10  **Q.**  And then in 2012, much more recent times, we have the

11  Harvard office of general counsel telling the government that

12  when they're analyzing claims of discrimination against

13  Asian-Americans, the way to do that is by removing athletes

14  and legacies from the data set, correct?

15  **A.**  I don't think I would read it that way.

16        I guess what I would need to know is the context of

17  who this applicant was and what this person was like relative

18  to other applicants.

19        Certainly in our real admissions process, certainly

20  legacy and athletic expertise, certainly some of the many

21  tips that could perhaps get somebody admitted.  But I'd have

22  to see exactly how they were applying this to this particular

23  case.  I would need to see literally what this complainant's

24  application was all about before I would try to figure out

25  exactly how this description was applied.

1    **Q.**  We can get into those details, if you'd like to, in a
2    minute.

3          But what I'm just focusing on here is, here we have
4    the office of general counsel enclosing attachment 8, which
5    is a chart like the charts we've looked at, 2015-NLNA
6    Overall, and then telling the government that the data shows
7    that consistent with OCR's previous findings about Harvard's
8    admissions practices, once applicant data is limited to
9    non-legacy/non-athlete candidates, the admit rates between
10   Asian-Americans and white Americans are far closer.

11         Harvard is still taking the same position it took
12   in 1990 here in this letter, correct?

13   **A.**  Yes.  And I think if I understand it correctly, following
14   OCR's guidelines.

15   **Q.**  OCR took the athletes and legacies out in 1990.  Harvard
16   is still encouraging OCR to take them out in 2012.  That's
17   what this document says, correct?

18   **A.**  I'm not quite sure it says that.  I just think that -- it
19   was certainly one thing that OCR looked at is one way of all
20   the different things they did, reading all those
21   applications, reading all the reader sheets, all the other
22   things they did.

23         And another thing they did, I suppose, was take a
24   look at what Susie and I had postulated, just a very simple
25   way to look at it.  And this is another one way to try to get

1  to the truth.  But I'd have to see what this person looked

2  like.

3  **Q.**  And Harvard is still taking the position that one way to

4  look at potential discrimination against Asian-American

5  athletes is to take out the athletes and legacies from the

6  data set.  That's what it says right here on the screen.  One

7  way?

8  **A.**  It's one way to look at, depending on the issue that

9  you're dealing with.

10  **Q.**  I want to fast-forward to even more recent times.

11         You're aware that Harvard has sent out emails to

12  its alumni updating them on this very case, correct?

13  **A.**  There have been emails sent out, I know, by Harvard.

14  **Q.**  In fact, you sent one out over the weekend, right?

15  **A.**  Our office did.

16  **Q.**  Under your name?

17  **A.**  I believe that's right.  To our interviewers.

18  **Q.**  And that encouraged the people receiving that email to

19  look at the portion of Harvard's website that provides

20  Harvard's -- information by Harvard about this case, correct?

21  **A.**  Yes.  We have referred people who are interested in the

22  case to our website.

23  **Q.**  And I'd like to take a look at that.  This is Plaintiff's

24  Exhibit 467.

25         MR. HUGHES:  I'd like to offer that.

```
 1              MR. LEE:  I can't read it.  Sorry.  Old eyes won't
 2    do it.  No objection, Your Honor.
 3              THE COURT:  Admitted.
 4              (Plaintiff Exhibit No. 467 admitted.)
 5    BY MR. HUGHES:
 6    Q.  You can see up at the top here, Dean Fitzsimmons, this is
 7    part of Harvard's website that relates to the Harvard
 8    admissions lawsuit, correct?
 9    A.  That's correct.
10    Q.  And I'm going to turn to page 3 of that.
11    A.  I guess the date is 8/21, I think, as I see it.
12    Q.  This is likely the date that we printed it out to make it
13    an exhibit.
14    A.  Okay.
15    Q.  I'll represent to you it's still the same.  I'd like to
16    look at page 3 of Plaintiff's Exhibit 467.  Do you see that?
17    A.  I do.
18    Q.  And what Harvard says today on its website, it's entitled
19    "A Faulty Statistical Model."
20              "Mr. Blum's case hinges on a statistical model that
21    deliberately ignores essential factors such as personal essay
22    or teacher recommendations, and omits entire swaths of the
23    applicant pool (such as recruited athletes or applicants
24    whose parents attended Harvard) to achieve a deliberate and
25    pre-assumed outcome."
```

1             Do you see that?

2     **A.**   I see that.

3     **Q.**   You understand that our expert, like your expert, ran a

4     logistic regression model, correct?

5     **A.**   That's correct.

6     **Q.**   And in 1990, Harvard and OCR's position was that the

7     right way to run a logistic regression model was to remove

8     athletes and legacies from the data set, correct?

9     **A.**   I am not sure that's correct.  I think we certainly were

10    in no position to tell OCR how to conduct its own

11    investigation in any way.  Because both the Boston office and

12    the Washington office did look at all kinds of different

13    factors.  So we certainly had no leverage at all to tell them

14    how to conduct their own logistical statistical procedures.

15    They happened to do the NLNA, but that's one of many, many

16    things they did.

17    **Q.**   I've got the portion of Plaintiff's Exhibit 555, the

18    statement of findings from OCR, page 34, back on the screen.

19             Do you see that?

20    **A.**   Yes, I do.

21    **Q.**   This is the paragraph we looked at a moment ago, talking

22    about the logistic regression model run by OCR.  Correct?

23    **A.**   Yes.

24    **Q.**   And it says -- do you see where I've got it

25    underlined? -- "Since Harvard asserted that the preference

1    given to legacy and recruited athlete applicants explained

2    the admit rate disparity, we next reran the logistic

3    regressions without these two groups."

4              You see that, correct?

5    **A.**   I do.   They obviously made their own decision on that,

6    but they certainly decided to do it.

7    **Q.**   You've already told me you guys had no problem with OCR's

8    methodology and are relying on it in court today.   Mr. Lee's

9    opening, correct?

10   **A.**   Yes.   But you have to understand I am no statistical

11   expert.   So I would certainly refer to Professor Card for any

12   statistical expertise.

13   **Q.**   And we saw that in 2012 the Harvard OGC office is still

14   talking about removing athletes and legacies from the data,

15   correct?

16   **A.**   It certainly was there, yes.

17   **Q.**   What you told all your alumni on the website is when our

18   expert did the same thing that OCR did, which was to remove

19   athletes and legacies in a logistic model regression set,

20   that that was fatally flawed.

21              That's what it says on your website.

22              MR. LEE:   I object.   Particularly with this on the

23   screen.   This actually says the analysis was run twice, and

24   once with legacies in and once without.   The foundation for

25   all these questions is just inconsistent with the document,

1  Your Honor.

2          MR. HUGHES:  I think he can answer the question.

3          MR. LEE:  That's up to Her Honor, I think.

4          THE COURT:  I actually get to decide that.

5          He makes a good point about the foundation.  So why

6  don't you rephrase the question and try it again.

7  BY MR. HUGHES:

8  **Q.**  You understand that OCR ran a logistic regression model,

9  correct?

10  **A.**  Yes.

11  **Q.**  You understand they ran it two times.  They ran it once

12  with the legacies and athletes and once without them,

13  correct?

14  **A.**  Yes.  But I know they also did quite a few other things.

15  Again I don't know, since I obviously wasn't on their team,

16  exactly what they did over that two and a half period of

17  time.  They may have done many, many different things with

18  the data.

19  **Q.**  One thing we know for sure that they did was run their

20  logistic regression model without the legacies and athletes.

21  That's what we can see right here, correct?

22  **A.**  Yes, we can see that.

23  **Q.**  We also know for sure that in 2012 the Harvard office of

24  general counsel told OCR again that one way to look at claims

25  of Asian-American discrimination is to take the legacies and

1    athletes out of the data set.  That's what we looked at in

2    P509, correct?

3    **A.**   It's one way.  But you really have to look at it

4    comprehensively, I think in the way Professor Card did.

5    **Q.**   What you're saying, what Harvard is saying on its website

6    today -- I'll put it back up on the screen -- is that

7    omitting recruited athletes and legacies is not the way to

8    go.  That's what Harvard says today, correct?

9    **A.**   Yes.  And I would agree with that.

10         MR. HUGHES:  Your Honor, I think I'm actually at a

11   really good transition point, if that's okay with you.

12         THE COURT:  It's fine.  I usually like to go right

13   up to the end of the day.  But I did mislead you today and

14   tell you that we'd be done by 3:00 and then I baked in a

15   little bit of extra time.

16         We can recess for the day today.  We'll start again

17   at 10:00 tomorrow.  I have another meeting at about 1:30, so

18   maybe we can go to like 1:15 or so.  We'll take a 15-minute

19   break in the morning, if that helps you for planning

20   purposes.  But other than that, we'll go straight through.

21         Thanks, everyone.  Case is recessed.

22         (Court recessed at 3:16 p.m.)

23

24

25

1                  - - - - - - - - - - -

2                     CERTIFICATION

3

4          I certify that the foregoing is a correct

5    transcript of the record of proceedings in the above-entitled

6    matter to the best of my skill and ability.

7

8

9

10   /s/ Joan M. Daly                 October 15, 2018

11   _____            _____

12   Joan M. Daly, RMR, CRR           Date
     Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF WITNESSES

2       <u>WITNESS</u>                                          <u>PAGE</u>

3

4       WILLIAM FITZSIMMONS

            Direct Examination By Mr. Hughes................... 122
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              E X H I B I T S

2

3

Plaintiff Exhibit                                      Admitted

4

2      .....................................      135

5

55     .....................................      133

6

88     .....................................      128

7

163    .....................................      154

8

467    .....................................      180

9

509    .....................................      175

10

555    .....................................      167

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25