1                UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                        Plaintiff,          Civil Action
                                             No. 14-14176-ADB
6    v.
                                             October 17, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                        Pages 1 to 230

8                        Defendants.

9    _____

10

11

12            TRANSCRIPT OF BENCH TRIAL - DAY 3
           BEFORE THE HONORABLE ALLISON D. BURROUGHS
13              UNITED STATES DISTRICT COURT
              JOHN J. MOAKLEY U.S. COURTHOUSE
                      ONE COURTHOUSE WAY
14                    BOSTON, MA  02210

15

16

17

18

19

20

21

22                 JOAN M. DALY, RMR, CRR
                    Official Court Reporter
23             John J. Moakley U.S. Courthouse
              One Courthouse Way, Room 5507
24                    Boston, MA  02210
                    joanmdaly62@gmail.com
25

APPEARANCES:


COUNSEL FOR THE PLAINTIFF:


        ADAM K. MORTARA, ESQUIRE
        J. SCOTT McBRIDE, ESQUIRE
        KRISTA J. PERRY, ESQUIRE
        Bartlit Beck Herman Palenchar & Scott
        54 West Hubbard Street
        Suite 300
        Chicago, Illinois 60654
        312.494.4400
        adam.mortara@bartlit-beck.com
        scott.mcbride@bartlit-beck.com
        krista.perry@bartlit-beck.com

        JOHN M. HUGHES, ESQUIRE
        KATHERINE L.I. HACKER, ESQUIRE
        MEG E. FASULO, ESQUIRE
        Bartlit Beck Herman Palenchar & Scott
        1801 Wewatta Street
        Suite 1200
        Denver, Colorado 80202
        303.592.3100
        john.hughes@bartlit-beck.com
        meg.fasulo@bartlit-beck.com
        kat.hacker@bartlit-beck.com

        JOHN MICHAEL CONNOLLY, ESQUIRE
        THOMAS R. McCARTHY, ESQUIRE
        WILLIAM S. CONSOVOY, ESQUIRE
        Consovoy McCarthy Park PLLC
        3033 Wilson Boulevard
        Suite 700
        Arlington, Virginia 22201
        703.243.9423
        mike@consovoymccarthy.com
        tom@consovoymccarthy.com
        will@consovoymccarthy.com

1     APPEARANCES (cont.):

2

3            PATRICK STRAWBRIDGE, ESQUIRE
             Consovoy McCarthy Park PLLC
             Ten Post Office Square
4            8th Floor, South, PMB #706
             Boston, Massachusetts 02109
5            617.227.0548
             patrick@consovoymccarthy.com
6
             MICHAEL H. PARK, ESQUIRE
7            Consovoy McCarthy Park PLLC
             3 Columbus Circle
8            15th Floor
             New York, New York 10024
9            646.456.4432
             park@consovoymccarthy.com
10
             PAUL M. SANFORD ESQUIRE
11           BENJAMIN C. CALDWELL, ESQUIRE
             Burns & Levinson LLP
12           One Citizens Plaza
             Suite 110
13           Providence, Rhode Island 02903
             401.831.8330
14           psanford@burnslev.com
             bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17           WILLIAM F. LEE, ESQUIRE
             FELICIA H. ELLSWORTH, ESQUIRE
18           ANDREW S. DULBERG, ESQUIRE
             ELIZABETH C. MOONEY, ESQUIRE
19           SARAH R. FRAZIER, ESQUIRE
             Wilmer Cutler Pickering Hale and Dorr LLP
20           60 State Street
             Boston, Massachusetts 02109
21           617.526.6556
             william.lee@wilmerhale.com
22           felicia.ellsworth@wilmerhale.com
             andrew.dulberg@wilmerhale.com
23           elizabeth.mooney@wilmerhale.com
             sarah.frazier@wilmerhale.com
24

25

```
1    APPEARANCES (cont.):

2
             SETH P. WAXMAN, ESQUIRE
3            DANIELLE CONLEY, ESQUIRE
             DANIEL WINIK, ESQUIRE
4            BRITTANY AMADI, ESQUIRE
             PAUL R.Q. WOLFSON, ESQUIRE
5            Wilmer Cutler Pickering Hale and Dorr LLP
             1875 Pennsylvania Ave, NW
6            Washington, DC 20006
             202.663.6006
7            seth.waxman@wilmerhale.com
             danielle.conley@wilmerhale.com
8            daniel.winik@wilmerhale.com
             brittany.amadi@wilmerhale.com
9            paul.wolfson@wilmerhale.com

10           DEBO P. ADEGBILE, ESQUIRE
             Wilmer Cutler Pickering Hale and Dorr LLP
11           7 World Trade Center
             250 Greenwich Street
12           New York, New York 10007
             212.295.6717
13           debo.adegbile@wilmerhale.com

14           ARA B. GERSHENGORN, ESQUIRE
             Harvard Office of the General Counsel
15           Smith Campus Center
             Suite 980
16           1350 Massachusetts Avenue
             Cambridge, Massachusetts 02138
17           617.495.8210
             ara_gershengorn@harvard.edu
18
19    COUNSEL FOR AMICI STUDENTS:

20           JON M. GREENBAUM, ESQUIRE
             BRENDA L. SHUM, ESQUIRE
21           GENEVIEVE BONADIES TORRES, ESQUIRE
             KRISTEN CLARKE, ESQUIRE
22           1500 K Street NW, Suite 900
             Washington, DC 20005
23           202.662.8315
             jgreenbaum@lawyerscommittee.org
24           bshum@lawyerscommittee.org
             gtorres@lawyerscommittee.org
25           kclarke@lawyerscommittee.org
```

```
 1    APPEARANCES (cont.):

 2
              LAWRENCE CULLEEN, ESQUIRE
 3            EMMA DINAN, ESQUIRE
              Arnold & Porter LLP
 4            555 Twelfth Street, NW
              Washington, DC 20004
 5            202.942.5477
              gina.dean@aporter.com
 6            emma.dinan@aporter.com

 7
      COUNSEL FOR AMICI ORGANIZATIONS:
 8
              JENNIFER A. HOLMES, ESQUIRE
 9            CARA McCLELLAN, ESQUIRE
              JIN HEE LEE, ESQUIRE
10            MICHAELE M. TURNAGE YOUNG, ESQUIRE
              RACHEL N. KLEINMAN, ESQUIRE
11            NAACP Legal Defense and Educational Fund, Inc.
              700 14th Street NW
12            Suite 600
              Washington, DC 20005
13            jholmes@naacpldf.org
              cmcclellan@naacpldf.org
14            jlee@naacpldf.org
              myoung@naacpldf.org
15            rkleinman@naacpldf.org

16            KENNETH N. THAYER, ESQUIRE
              KATE R. COOK, ESQUIRE
17            Sugarman Rogers
              101 Merrimac Street
18            Suite 900
              Boston, Massachusetts 02114
19            617.227.3030
              thayer@sugarmanrogers.com
20            cook@sugarmanrogers.com

21

22

23

24

25
```

P R O C E E D I N G S

                    (The following proceedings were held in open

court before the Honorable Allison D. Burroughs, United

States District Judge, United States District Court, District

of Massachusetts, at the John J. Moakley United States

Courthouse, One Courthouse Way, Boston, Massachusetts, on

October 17, 2018.)

                    THE CLERK:  All rise.  Court is in session.  Please

be seated.

                    THE COURT:  All right.  I have to apologize because

I did not look at this binder until I got home last night,

and then I realized I actually had no idea what I was

supposed to be it doing with it.  There's a bunch of

witnesses in here, right?

                    MS. HACKER:  That's correct, Your Honor.  There's

eight witnesses.

                    THE COURT:  Which ones was I supposed to be looking

at for today?

                    MS. HACKER:  We can give you an order of what we

expect to get to first.  Just to orient Your Honor, the

objections that you need to rule on are highlighted in there

so that you can just flip through easily and just find the

highlighting.

                    THE COURT:  So that's what I tried to do last

night.  I decided I was just going to do all of them because

1    I didn't know which one you wanted.  So I started with Cheng.

2    Do I have the larger deposition transcript for context?  Or

3    is this what you've given me?

4         MS. HACKER:  We've given you just the clips that

5    the parties have designated.  We can certainly provide the

6    larger transcripts.  I will warn you it will be a much larger

7    binder.

8         THE COURT:  Let me give you a for-instance on why

9    I'm asking.  Just for an instance, if you look at page 8 of

10   22 of Cheng.  So it starts off with the witness saying, "I

11   don't know what this document is," and then there's a series

12   of questions, all of which I think the objection should be

13   sustained to because the witness says she doesn't know what

14   the document is.

15        But then I get to the middle of that page 8 where

16   it says page 9, lines 1 to 4, and it says, "Back to the

17   spreadsheet."  And I can't tell if we're going back to the

18   same document or there's been a new document introduced

19   between the highlighting on the top of the page and that

20   highlighting.  Because if it goes -- just as an example, if

21   it goes back to the same document that she says she can't

22   identify, I'm going to sustain those objections.  But if

23   we're talk willing about a different spreadsheet that she has

24   some foundation for, I would overrule that objection.

25        MS. HACKER:  Understood.  I think the confusion may

1    be with the exhibits.  So we can provide Your Honor a binder

2    with all the exhibits that are referenced in these.  We

3    actually have those now, but we anticipated handing them out

4    as we read through and offer the exhibits individually, as

5    we've been doing with witnesses.  But that may help clear up

6    the confusion with, at least with Ms. Cheng's deposition.

7            THE COURT:  Right there, it wouldn't help me

8    because there's no exhibit number.  When it's "back to this

9    spreadsheet," is that the same exhibit that we've been

10   talking about or is it a different exhibit?

11           MS. ELLSWORTH:  It's the same spreadsheet, Your

12   Honor.

13           THE COURT:  The other one says it's a -- it looked

14   to me it was a survey monkey.

15           MS. ELLSWORTH:  From my memory from being in the

16   deposition, it was the same spreadsheet that was being

17   inquired about.

18           THE COURT:  When I started to confuse myself there,

19   I wondered if there was something else that I was supposed to

20   have to give myself some context on these.

21           Anyways, the long and short of it was I threw in

22   the towel on the whole project last night.  I will try and --

23   we can take a break if we need to.

24           Who is the next witness?  Is it Cheng?

25           MS. HACKER:  For priority order, I would say first

1    let's address Lucerito Ortiz and second Fabio Zuluaga.  I

2    believe those have less objections and less exhibits to deal

3    with, so hopefully those will go by quickly.  We don't

4    anticipate getting to those witnesses today.

5                  THE COURT:  Ortiz.  Who is the other one?  Zuluaga?

6                  MS. HACKER:  Exactly.

7                  MS. ELLSWORTH:  Your Honor, we object in full to

8    Mr. Zuluaga.  He's the principal or the designee from the

9    Thomas Jefferson High School.  We have objected in full to

10   the relevance of the testimony which doesn't relate to

11   Harvard admissions at all.  It relates to the ethnic makeup

12   of that particular high school and some numbers that

13   Mr. Zuluaga had no foundation to testify to.  We've also put

14   individual objections into some of the snips, to the extent

15   that Your Honor overrules the general relevance objection.

16                 THE COURT:  I'm happy to get to these either later

17   this afternoon or tonight and hope that I can get through the

18   whole binder.  But just as I started, it just occurred to me

19   that I might be missing something.

20                 MS. ELLSWORTH:  Your Honor, the other two witnesses

21   to whom Harvard objects in full is Ms. Pedrick and Ms. Lopez.

22                 THE COURT:  Okay.  And who is the next witness?  Is

23   it Ortiz?

24                 MS. HACKER:  Ortiz would work for us, Your Honor.

25                 THE COURT:  Who are you calling next?

1    MR. MORTARA:  Your Honor, the next live witness --

2    there will be no deposition testimony read today.  The next

3    live witness is senior admissions officer Christopher Luby.

4    THE COURT:  If I get through these tonight rather

5    than during the lunch break, that will suffice for everyone?

6    MR. MORTARA:  Yes.  And if we're not done at the

7    end of the day with live witness testimony, we'll be prepared

8    to start reading depositions at the end of live testimony

9    tomorrow and fill in that, if there's gap time at the end of

10   every day, until we finish with those.

11   What we'll start doing is advising you about what

12   deposition designation reading might go on on any particular

13   day so you're not faced with a massive binder not knowing

14   which one is which.

15   THE COURT:  These didn't look -- at least the ones

16   I went through, they didn't look overwhelming.  So I'll try

17   and get through them today.  How do you want my to convey the

18   information back to you?

19   MS. HACKER:  Whatever is most convenient for Your

20   Honor.  If you'd like to just rule on the record, we can keep

21   track as you go through.  If you'd like to hand us back

22   copies, we can look through them with our colleagues on the

23   other side.  We don't have a preference.  Whatever is easiest

24   on Your Honor.

25   THE COURT:  Do you all have a preference?

```
1              MS. ELLSWORTH:  No.  Whatever you prefer.
2              THE COURT:  Let me take a look at them tonight and
3   see exactly what we're talking about, and I will do at least
4   a chunk of it tonight if not all of it.  All right?  Okay.
5              MS. ELLSWORTH:  Thank you, Your Honor.
6              THE COURT:  Sorry about that.  I should have looked
7   at it before I left and I didn't.  Okay.
8              Where is the dean?
9              THE WITNESS:  Your Honor, good morning.
10             THE COURT:  You can resume your position.
11             MR. HUGHES:  Good morning, Dean Fitzsimmons.
12             Before we get started and resume the examination of
13   the dean, there's an evidentiary matter that I anticipate is
14   going to come up right away that I'd like to handle before we
15   get going.  I'd prefer actually to do that either at sidebar
16   or somehow outside the presence of the witness.  I'm just
17   concerned the discussion of the objections could be better
18   had not in front of the witness.
19             MR. LEE:  Sidebar would be fine, Your Honor.
20             THE COURT:  I'll see you at sidebar.
21             (The following was held at sidebar.)
22             [Sidebar redacted.]
23             THE COURT:  Dean Fitzsimmons, you remain under
24   oath.
25             THE WITNESS:  Thank you, Your Honor.
```

```
 1                  THE COURT:  Whenever you're ready, Mr. Hughes.
 2                  MR. HUGHES:  Thank you, Your Honor.
 3                  (WILLIAM FITZSIMMONS previously sworn by the Deputy
 4      Clerk.)
 5                  DIRECT EXAMINATION (resumed)
 6      BY MR. HUGHES:
 7      Q.   Good morning, Dean Fitzsimmons.  Hopefully we'll get
 8      through this morning without a fire alarm.
 9      A.   Let's hope.
10      Q.   Let's go to a new topic.  During each admission cycle,
11      the admissions office maintains something called the dean's
12      interest list, correct?
13      A.   That's correct.
14      Q.   The dean that's referred to on the dean's interest list
15      is you, right?
16      A.   It would be.
17      Q.   And that is a list that you use to make sure that you are
18      aware of what happens to particular applicants to Harvard,
19      correct?
20      A.   That's correct.
21      Q.   And so if there's going to be an action up or down on one
22      of the candidates on the dean's list, the people in your
23      office are supposed to keep you in the loop on that, right?
24      A.   Well, I'd be in the loop anyway.  But I would want to
25      know because I'm a member of the committee.
```

1  **Q.**  And one category of applicants that get on the admission

2  list or the dean's interest list are the children of donors,

3  correct?

4  **A.**  That's certainly some of the people on the list.

5  **Q.**  Not only just children of donors but relatives of donors,

6  other relatives of donors, correct?

7  **A.**  It could be.

8  **Q.**  And what is the Harvard development office?

9  **A.**  The Harvard development office is a part of Harvard that

10  tries to raise funds for the advancement of Harvard for all

11  the research purposes and all the other -- and our world's

12  scholarships, among other things.

13  **Q.**  And sometimes the development office communicates with

14  you about getting somebody on the dean's interest list,

15  correct?

16  **A.**  They'll communicate with me about individuals, and I will

17  sometimes put them on the list.

18  **Q.**  And sometimes you'll put them on the list if the

19  development office asks you to, regardless of whether they

20  are otherwise a strong candidate for admission, correct?

21  **A.**  Until we actually look at the applications, we certainly

22  don't know who will be a strong applicant, and they certainly

23  don't.

24  **Q.**  So does that mean you'll put candidates on the interest

25  list even if you don't know whether they're a strong

1   applicant?

2   **A.**   It could be well in advance of any of the application

3   deadlines.

4   **Q.**   Let's talk about your relationship with the donors at

5   Harvard.   Is part of what you do in your role as dean in the

6   admissions office, do you sometimes meet with Harvard donors?

7   **A.**   Yes, that's right.

8   **Q.**   Do you ever socialize with Harvard donors?

9   **A.**   Occasionally people I may know over the years.

10   **Q.**   Do Harvard donors ever take you out to dinner?

11   **A.**   No.

12   **Q.**   Do you have some kind of policy where you're not supposed

13   to have donors taking you out to dinner, taking you to Red

14   Sox games?

15   **A.**   That's --

16   **Q.**   Is that right?

17   **A.**   That's correct.

18   **Q.**   So is admitting the children and relatives of large

19   donors important to you and others at Harvard?

20   **A.**   It is important for the long-term strength of the

21   institution that we have the resources would we need to,

22   among other things, provide scholarships but also for all the

23   other purposes at the university.

24   **Q.**   Now, Dean Fitzsimmons, I'd like to walk through a few

25   exhibits with you.

1          MR. HUGHES:  Your Honor, some of these Harvard has

2     indicated -- P104, P106, and P111.

3          And these are all in the binder there, Mr. Lee, but

4     I believe they are exhibits that you've taken the position

5     should not be shown to the gallery.  We don't share that

6     position.  If you still maintain that, then I think I need

7     to take it up.

8          MR. LEE:  Yes, Your Honor.  Here would be my

9     suggestion, if Mr. Hughes is willing.  For each of these

10    where there's been some redaction, there's still enough

11    information in there if someone basically wanted to identify

12    who the person was, they could.  We can put the exhibit up.

13    We're not going to object to the admission of the exhibits.

14    We could put the exhibit on the screen for Your Honor,

15    witness, counsel, and he can be examined on it but without

16    eliciting for the public record the information that would

17    personally identify an applicant.

18         MR. HUGHES:  Your Honor, SFFA's position is that I

19    don't think there is personal identifying information in

20    these exhibits, and I don't believe that these should be kept

21    out of the public record.  They don't meet the high bar for

22    keeping evidence out of the public record.

23         We can, I suppose, however you'd like to handle it.

24    We can take them up one by one maybe at another sidebar.  But

25    our position is these should be part of the public record.

```
1          MR. LEE:  Your Honor, just by way of example, if
2   Your Honor considered P104.
3          THE COURT:  I have P104 in front of me.  We have
4   the ELMO here, so we're not restricted to the way you all --
5   maybe you can redact on the screen.  But we also have the
6   ELMO.  I'm wondering with 104 if we redact -- it says
7   "committed to a building."  If we redacted what came after
8   that in that sentence, if that sufficiently anonymizes it.
9          MR. LEE:  On that one, that would be fine, Your
10  Honor.  That's what would personally identify people.
11         MR. HUGHES:  I think I can do that on my trial
12  presentation software, but I guess we'd need to turn off the
13  gallery screen to give me 30 seconds to do that.
14         THE COURT:  That, we can easily do.  So you can fix
15  it on your screen.  You can also just black it out and use it
16  on the ELMO instead, whichever is easier for you.
17         MR. HUGHES:  I'm a little better at this than the
18  ELMO.
19         THE COURT:  Are you telling me my technology is
20  dated?
21         MR. HUGHES:  My first time in court with the ELMO
22  did not go well.  Is it off the gallery's screen?
23         THE COURT:  It's off everybody's screen including
24  mine.
25         Karen, is it off the gallery screen?
```

```
 1              THE CLERK:  I shut it off.

 2              MR. HUGHES:  It's off from the gallery.

 3              Mr. Lee, can you see what I've done?

 4              MR. LEE:  I will be able to in ten seconds.

 5              MR. HUGHES:  Your Honor, can you see?

 6              MR. LEE:  That would be fine, Your Honor.

 7              THE COURT:  Okay.

 8              MR. HUGHES:  I'll go ahead and offer P104 into

 9   evidence.

10              MR. LEE:  No objection.

11              THE COURT:  It's admitted.

12              (Plaintiff Exhibit No. 104 admitted.)

13              THE COURT:  On the screen for everybody.

14   BY MR. HUGHES:

15   Q.  Now we can get started, Dean Fitzsimmons.

16              Who is David Ellwood?

17   A.  David Ellwood was the dean of the Kennedy School.

18   Q.  And he is writing you an email here in June of 2013,

19   correct?

20   A.  That's correct.

21   Q.  And the title of the email is "My Hero," correct?

22   A.  It is.

23   Q.  He said, "Once again you have done wonders.  I am simply

24   thrilled about all the folks you were able to admit."

25              Then there are some redacted names.
```

1          He says, "Those are big wins, all big wins, and" --

2     a redacted name -- "has already committed to a building, and

3     building" -- and then we've got another redaction -- "and

4     other names have committed major money for fellowships before

5     the decision from you and all are likely to be prominent in

6     the future.  Most importantly, I think all of these people

7     will be superb additions to the class."

8          Do you see that?

9     **A.**  I do.

10    **Q.**  He's expressing his gratitude for children of significant

11    donors to Harvard getting admitted to Harvard, correct?

12    **A.**  That's correct.

13    **Q.**  Now I'd like to turn to P106, and I'll give Harvard a

14    moment.

15         MR. LEE:  Your Honor, if I could, I'll just give

16    Mr. Hughes a suggestion about what should be redacted.

17         THE COURT:  Yes.  I was just about to do the same,

18    but I would appreciate it if you would.

19         MR. HUGHES:  I can agree to everything that Mr. Lee

20    is suggesting except for he wants me to redact, and I won't

21    say it out loud, the number -- the dollar number.

22         MR. LEE:  That's fine.  No problem.

23         MR. HUGHES:  So now we'll need to go off that.

24    While I am doing this, I'll offer P106 into evidence.

25         Mr. Lee, can we confer momentarily?

```
 1              MR. LEE:  Is that all right with Your Honor, if we
 2    confer?
 3              MR. HUGHES:  If we confer about a redaction?
 4              THE COURT:  Yes, of course.
 5              MR. HUGHES:  I'd like to leave in that word, get
 6    rid of that word, put in that word.
 7              MR. LEE:  That's fine.
 8              MR. HUGHES:  Mr. Lee and Your Honor, I've got it
 9    redacted.  I don't know if you want to check it.
10              THE COURT:  Have Mr. Lee or whoever from that table
11    take a look at it.
12              MR. LEE:  Yes, that's right.
13              MR. HUGHES:  Thank you, Mr. Lee.  I think I've
14    already offered this, but I'm not sure it's been technically
15    admitted, Your Honor.  I offer P106.
16              MR. LEE:  No objection.
17              THE COURT:  I'm not sure it's been offered, but now
18    it has and there's no objection.  It's admitted.
19              (Plaintiff Exhibit No. 106 admitted.)
20    BY MR. HUGHES:
21    Q.  Dean Fitzsimmons, can you see on the screen P106?
22    A.  I can.
23    Q.  You see down below there's an email from -- it looks like
24    it's from -- it's to Roger Cheever from Alessandra Bouchard.
25              Do you see that?
```

1    **A.**   Yes.

2    **Q.**   Who are those people?

3    **A.**   Roger Cheever works in the development office, a

4    development officer, and Alessandra used to be his assistant.

5    **Q.**   What she's telling Roger, "One of the early non-lineage

6    cases we've been trying, the Virginia, is that of" -- and

7    then we've got a redacted name -- "is the grandson of who is

8    married to" -- redacted -- "to the late" -- redacted -- "gave

9    about $8.7 million to Harvard in his lifetime.  Dean

10   Fitzsimmons would like to receive your insight when you're

11   able to provide it of the relative standing of this case."

12          And then you get an email from Mr. Cheever on

13   November 15, 2013, there at the top, correct?

14   **A.**   Yes.

15   **Q.**   Okay.  And what Mr. Cheever tells you, he says, "Fitz" --

16   and there's a redacted name -- "was a devoted chair and a

17   generous donor.  His latter years were quite challenging

18   based on having" -- redacted.  Going forward, I don't see a

19   significant opportunity for further major gifts.  Had an art

20   collection which conceivably could come our way, more

21   probably will it will go to the," redacted, "museum.  I will

22   get Brad Voigt's perspective.  For the moment, I would call

23   it a 2.  I'll know more tomorrow.  Roger."

24          That's what Mr. Cheever said to you in that email,

25   correct?

1   **A.**   That's correct.

2   **Q.**   And when Mr. Cheever says "I would call it a 2," a 2 is a

3   number that would go on the dean's interest list, right?

4   **A.**   That's correct.

5   **Q.**   And what would that number reflect?

6   **A.**   It would be a reasonably serious donor.

7   **Q.**   So you keep track on the dean's interest list of whether

8   somebody is a reasonably serious donor, right?

9   **A.**   Yes.  And also again whether this person was an important

10  part of the Harvard community during his or her lifetime.

11  **Q.**   And it's the same kind of scoring system, at least

12  conceptually, as the 1 is a better score than a 2 is a better

13  score than a 3 and so forth, right?

14  **A.**   That's correct.

15          THE COURT:  Did I miss this?  Who is Mr. Cheever?

16  BY MR. HUGHES:

17  **Q.**   Dean Fitzsimmons?

18  **A.**   He's a development officer at Harvard.

19          MR. HUGHES:  I think we're now ready to move to

20  Plaintiff's Exhibit 111.

21          THE COURT:  These redaction problems get more

22  complicated as we go through the exhibits.

23          MR. LEE:  Yes.

24          MR. HUGHES:  This is all I have in my examination

25  for redactions.

1          May I confer with Mr. Lee, Your Honor?

2          THE COURT:  Of course.

3          MR. HUGHES:  Your Honor, I'm going to need to

4    redact.  Again, is the gallery screen off?

5          THE CLERK:  Yes.

6          MR. HUGHES:  If I may confer with Mr. Lee one more

7    time, Your Honor?

8          THE COURT:  You may.

9          MR. HUGHES:  Your Honor, I'd like to offer P111

10   into evidence.

11         MR. LEE:  No objection, Your Honor.

12         THE COURT:  Admitted.

13         (Plaintiff Exhibit No. 111 admitted.)

14   BY MR. HUGHES:

15   **Q.**  I've got the redacted version that we worked out with

16   Harvard on the screen.

17         Dean Fitzsimmons, this is pretty small.  Would you

18   prefer a hard copy to follow along?

19   **A.**  I've got a hard copy here.

20   **Q.**  Who is David Fish.  This is an email from David Fish to

21   you on October 2, 2014.

22   **A.**  He is our former tennis coach.

23   **Q.**  He is writing you, and he says, "Hi, Bill.  Thanks so

24   much for meeting with" -- redacted -- "during his visit.  He

25   was unsurprisingly thrilled with the chance to meet you and

1      really enjoyed it despite the usual nerves.  I know that you

2      are aware that Joe Donovan and Mike Smith have been in close

3      contact with the family for some time" -- redacted -- "who

4      donated" -- and then there's a redaction -- "to Harvard and

5      two full professorships and who over the last four years have

6      given us about $1,100,000."

7                And then there's some more redactions, and I want

8      to go down to the next paragraph.

9                "It would mean a great deal to" -- redacted -- "and

10     to" -- redacted -- "to see" -- redacted -- "at Harvard.  Thus

11     we rolled out the red carpet and we're all delighted that he

12     had a great time."

13               Do you see all that?

14     **A.**   I do.

15     **Q.**   And your response to him at the top is, "Dear Dave,

16     thanks for your email.  I had a terrific meeting with" --

17     redacted -- "It would be perfectly appropriate for him to be

18     considered for a likely on October 21."

19               Do you see that?

20     **A.**   I do.

21     **Q.**   So this is the son or daughter or a relative of

22     significant donors to Harvard, correct?

23     **A.**   That's correct.

24     **Q.**   And you're telling the tennis coach that he can expect a

25     likely letter in October, correct?

1    **A.**   I'm simply saying that he could be considered by the

2    committee in October for the possibility of a likely letter.

3    I could also have said to him that it would not be a good

4    idea and he wasn't a good candidate, for example.

5    **Q.**   What is a likely letter?

6    **A.**   A likely letter is given when we have an applicant who is

7    being pressured by another institution to commit to that

8    institution, either through a likely letter at that

9    institution or possibly by having the student apply binding

10   early decision to that institution.

11   **Q.**   Let's change topics now.

12        MR. HUGHES:  Your Honor, I want to make sure that I

13   offered P111.

14        THE COURT:  You did, and it's been admitted.

15   BY MR. HUGHES:

16   **Q.**   I want to shift topics now, Dean Fitzsimmons.  I want to

17   focus on a series of events that started towards the end of

18   2012.

19        You're familiar with an article published by Ron

20   Unz in The American Conservative in December of 2012,

21   correct?

22   **A.**   I am.

23   **Q.**   And among other things, he advanced an argument that

24   Harvard was discriminating against Asian-American applicants,

25   correct?

1    **A.**   Correct.

2    **Q.**   And the Unz article caught the attention of David Brooks

3    at the New York Times.  In fact, Mr. Brooks wrote an article

4    published on Christmas Eve of 2012 recognizing the Unz

5    article as one of the best magazine essays of the year,

6    correct?

7    **A.**   That's correct.

8    **Q.**   And the article caught the attention of you and others at

9    Harvard, correct?

10   **A.**   That's correct.

11   **Q.**   Both the Unz article and the magnified publicity it

12   received after Mr. Brooks' article was published on Christmas

13   Eve in the New York Times, correct?

14   **A.**   That's correct.

15   **Q.**   And the article also caught the attention of some Harvard

16   donors, correct?

17   **A.**   That's correct.

18   **Q.**   I'd like to show you Plaintiff's Exhibit 227.

19             MR. HUGHES:  Before we get started, I'd like to

20   offer it into evidence.

21             MR. LEE:  No objection.  I'm sorry.

22             THE COURT:  Admitted.

23             (Plaintiff Exhibit No. 227 admitted.)

24   BY MR. HUGHES:

25   **Q.**   Dean Fitzsimmons, this -- let me back up.  Here we go.

1              Start at the bottom.  You're getting an email --
2      first of all, who is Olesia.  With can you pronounce that
3      last name for me?  I'm afraid I'll get it wrong.
4      **A.**   Olesia Pacholok, my staff assistant.
5      **Q.**   And sometimes emails that are intended for you come
6      through her first, correct?
7      **A.**   Yes.  She and I have the same email.
8      **Q.**   You get an email and the subject of it is Ron Unz,
9      correct?
10     **A.**   That's correct.
11     **Q.**   And the date of the email is December 27, 2012, correct?
12     **A.**   That's correct.
13     **Q.**   It says, "Bill.  See letter to editor in New York Times."
14             Do you see that?
15     **A.**   I do.
16     **Q.**   And then you respond.  You say, "Dear" -- and we've got
17     the names redacted.  "It was great to talk with you
18     yesterday.  We clearly share many of the same perspectives on
19     Harvard and its history.  Thanks for the follow up on the
20     letters.  They will be helpful as we go through the process
21     of creating an institutional response.  I made some progress
22     on that front last night and today.  Given the sensitivity of
23     the issues, it will probably take some time to complete the
24     deliberations, and I will keep you posted.  Have a wonderful
25     holiday."

1              Do you see that?

2   **A.**  I do.

3   **Q.**  And what you're talking about there is preparation of an

4   institutional response within Harvard to the Unz article and

5   the accusations against Harvard contained in that article,

6   correct?

7   **A.**  That's correct.

8   **Q.**  You mentioned that the article caught your attention.  It

9   also caught the attention of the top leadership at Harvard,

10  correct?

11  **A.**  That's correct.

12  **Q.**  And do you recall receiving numerous emails over the

13  holidays concerning the Unz article?

14  **A.**  Yes.  I don't remember how many, but I get lots of emails

15  on lots of subjects.

16  **Q.**  I'd actually like to walk you through a number of emails

17  that you received and just create a timeline of when you

18  received them and who was on the email.

19          MR. HUGHES:  I think the easiest way to do that is

20  if I could use the privilege log that Harvard has provided to

21  refresh his memory on when he received certain emails, which

22  I think Your Honor ruled that we could do at the pretrial

23  conference.  We don't need necessarily to offer it into

24  evidence, but I think it would be useful to use with the

25  witness in that manner.

1              THE COURT:  You can use anything you want to
2      refresh recollection.
3              MR. HUGHES:  Thank you, Your Honor.  May I approach
4      the witness?
5              THE COURT:  Yes.
6      BY MR. HUGHES:
7      **Q.**  So, Dean Fitzsimmons, I've got the privilege log in front
8      of you, which is a document your lawyers provided us.  I
9      don't want to talk about the substance of what's contained in
10     any of these emails because it's privileged, but I just want
11     to walk through a number of emails that you were receiving on
12     this topic.
13             If you look starting with on December 27, do you
14     see I've got your name highlighted there?
15     **A.**  Yes.
16     **Q.**  So you received a couple of emails on December 27 from
17     Robert Iuliano, correct?
18     **A.**  It appears that I did.
19     **Q.**  And the subject was the Unz article, correct?
20     **A.**  Yes.
21     **Q.**  And who is Robert Iuliano?
22     **A.**  He is the general counsel of Harvard and is here today.
23     **Q.**  And if you go down, you actually received four emails it
24     looks like from him on the 27th, correct?
25     **A.**  Just adding them up.  It appears to be the case, yes.

1    **Q.**  All of those relate to The American Conservative article

2    or the Unz article, correct?  That's in the subject line.

3    **A.**  I'm not sure about Number 10, but I certainly -- yes.

4    **Q.**  And then you received on the 27th three more emails from

5    President Faust, correct?

6    **A.**  Yes.

7    **Q.**  And again, those relate to the subject line, American

8    Conservative article, correct?

9    **A.**  That's correct.

10   **Q.**  And then, in fact, if you go to the next page there are

11   three more emails from Mr. Iuliano to you, again on the 27th,

12   concerning The American Conservative article, correct?

13   **A.**  Yes.

14   **Q.**  And then a couple more from President Faust to you on

15   that same day, correct?

16   **A.**  Yes.

17   **Q.**  And then we get to the first time you send an email on

18   this list, and that is on the 28th of December, correct?

19   **A.**  That's correct.

20   **Q.**  And you send an email to Erin Driver-Linn on the 28th of

21   December, subject, Forward American Conservative article,

22   correct?

23   **A.**  That's correct.

24   **Q.**  And if we switch to the next page, you send two

25   additional emails on the 28th to Ms. Driver-Linn with the

1   same subject heading, correct?

2   **A.**  That would be correct.

3   **Q.**  And then she responds with emails back to you.  It looks

4   like there are four in a row on the 29th, emailing back to

5   you and others, correct?

6   **A.**  That's correct.

7   **Q.**  If you look at line 26, the first email that -- first of

8   all, who is Ms. Driver-Linn?

9   **A.**  She was the head of the office of institutional research.

10   She now works at the School of Public Health at Harvard in

11   the same sort of role.

12   **Q.**  So at this time when she's sending these emails, she's

13   the head of OIR, correct?

14   **A.**  That's correct.

15   **Q.**  On her first email, she copies Alan Garber.  Do you see

16   that?

17   **A.**  I do.

18   **Q.**  Who is Alan Garber?

19   **A.**  He's the provost of Harvard.

20   **Q.**  Who role does the provost have at Harvard?

21   **A.**  It's really sort of an administrative oversight of the

22   university, has a portfolio for all the different parts of

23   the university.

24   **Q.**  One of the top officials in the entire university,

25   correct?

1    **A.**   That's correct.

2    **Q.**   And then her next email includes someone named Erica

3    Bever, among others, correct?

4    **A.**   Yes.

5    **Q.**   Who is Erica Bever?

6    **A.**   She then, if I am looking at the date, worked with -- in

7    the office of institutional research.  She now works in our

8    office.

9    **Q.**   So these are all emails that we've been talking about, 1,

10   2, 3, 4 coming from Driver-Linn to you and others on the 29th

11   of December 2012, correct?

12   **A.**   Yes.

13   **Q.**   And then there's one email from Mr. Garber, Provost

14   Garber, to Ms. Driver-Linn to you after the ones we've just

15   discussed, also on the 29th of December, correct?

16   **A.**   Yes.

17   **Q.**   And then there are two more emails to Provost Garber and

18   you later on that day, on the 29th of December, again with

19   the title "American Conservative article," correct?

20   **A.**   That's correct.

21   **Q.**   And then there's yet another email from Provost Garber,

22   later on at 6:39 p.m. on the 29th of December, to

23   Ms. Driver-Linn, copying you again concerning The American

24   Conservative article, correct?

25   **A.**   I'm sorry.  Which document number is that?

1   **Q.**  We're looking at Number 29.

2   **A.**  29.

3   **Q.**  At the very bottom of page 3.  Do you see your name

4   highlighted there?

5   **A.**  It's not in the same order.  I'm trying to find it.

6   **Q.**  If you look at page 3, there's a --

7   **A.**  Page 3.  Okay.

8   **Q.**  On the very bottom.

9   **A.**  Okay.  Yes.

10  **Q.**  Do you see that?  There's an email from Provost Garber to

11  Ms. Driver-Linn and to you, correct?

12  **A.**  That's correct.

13  **Q.**  And then yet another email from the provost to

14  Ms. Driver-Linn and you on the 29th, at the top of the next

15  page, correct?

16  **A.**  Yes.

17  **Q.**  All right.  Now, I want to fast-forward to after the new

18  year.  If you turn to page 5 of the document that you've got

19  in front of you, starting kind of in the middle you can see

20  there's an email on the 2nd of January from Ms. Driver-Linn

21  at OIR to you and to the provost, again concerning The

22  American Conservative article?

23  **A.**  That's correct.

24  **Q.**  What I've done is I've counted up -- and you can look and

25  see.  If you start with Number 31, that's what we just talked

1    about, that's correspondence between you and Ms. Driver-Linn

2    on the 2nd of January.  You go down, you get to the second

3    piece of correspondence, again an email from Ms. Driver-Linn

4    to you also on the 2nd of January.  You drop down to what is

5    Document Number 91, there's an email from you to

6    Ms. Driver-Linn on the 3rd of January.  That's three

7    different pieces of correspondence, correct?

8    **A.**   Yes.

9    **Q.**   And then there are two emails from Provost Garber to you

10   and Ms. Driver-Linn.  And in fairness, those may be the same

11   thing; they've got the time stamp.  But at least that's

12   additional communication between the provost, you, and

13   Ms. Driver-Linn concerning The American Conservative article,

14   correct?

15   **A.**   That's correct.

16   **Q.**   And then we've got the bottom of page 4, two more emails

17   from Ms. Driver-Linn to you and Provost Garber, and also on

18   the 3rd of January at 1:56.

19   **A.**   I think you mean page 5, but I see them.

20   **Q.**   Two at the bottom there from Ms. Driver-Linn to you and

21   Provost Garber on the 3rd of January, correct?

22   **A.**   That's correct.

23   **Q.**   And then if we switch over -- we're almost finished with

24   this -- to page 6, you see there are several emails.

25   Starting with Number 33, there's three in a row there from

1    Elizabeth Yong to you and Ms. Driver-Linn, among others,

2    concerning demographic data, correct?

3    **A.**   That's correct.

4    **Q.**   Ms. Yong works in your office, correct?

5    **A.**   She was our institutional researcher for our office.

6    **Q.**   She doesn't work there still, but at that time she was

7    the institutional researcher, correct?

8    **A.**   That's correct.

9    **Q.**   And then down at the bottom of page 6 we've got another

10   from Ms. Yong to Ms. Driver-Linn -- or Dr. Driver-Linn,

11   excuse me, and you, Dean Fitzsimmons, again on the 3rd

12   of January, correct?

13   **A.**   Yes.

14   **Q.**   And two more emails from Dr. Driver-Linn, one to Ms. Yong

15   and to you and one to Mr. Iuliano and you, correct?

16   **A.**   That's correct.

17   **Q.**   All of this, these exchanges are happening kind of right

18   at the end of 2012 and right at the beginning of 2013, top

19   leadership at Harvard exchanging emails concerning The

20   American Conservative article, correct?

21   **A.**   That's correct.

22   **Q.**   I'd like to now show you Plaintiff's Exhibit 230.

23            MR. HUGHES:  And I'd like to offer it into

24   evidence.

25            MR. LEE:  No objection, Your Honor.

```
 1                THE COURT:  Admitted.

 2                MR. HUGHES:  Thank you, Your Honor.

 3                (Plaintiff Exhibit No. 230 admitted.)

 4   BY MR. HUGHES:

 5   Q.  And at the top, Dean Fitzsimmons, you can see this is an

 6   email chain from Kaitlin Howrigan.

 7                Do you see that?

 8   A.  I do.

 9   Q.  Who is she?

10   A.  She worked in our office at the time and helped with the

11   collection of data and research.

12   Q.  And the date of the email is January 8, 2013, correct?

13   A.  That's correct.

14   Q.  And you're copied on the email?

15   A.  Yes.

16   Q.  If we go to the bottom, you can see the part that I've

17   got highlighted.

18                Ms. Yong says, "Hi, Kaitlin.  We need access to the

19   RO data files for the last few years.  Is it all right with

20   you if I ask Eric to move that data into the ArchiveTwo

21   share.  We're in the middle of a study of Asian-Americans at

22   Harvard.  And rather than having to rerun all of the RO data,

23   it will be much faster just to use the ones you've already

24   created.  Also there's a meetings at Mass Hall tomorrow at

25   2:00 p.m. that I would like to at least have some preliminary
```

1    data for."

2              Do you see that?

3    **A.**   I do.

4    **Q.**   Do you agree that at this time, January 8, 2013, your

5    office was in the middle of a study of Asian-Americans at

6    Harvard?

7    **A.**   Yes.

8    **Q.**   And did you attend the meeting at Mass Hall that

9    occurred, it looks like, on January 9, 2013, at 2:00 p.m.?

10   **A.**   I don't remember exactly.

11   **Q.**   Is Mass Hall where the president and provost offices are?

12   **A.**   Yes.

13   **Q.**   Now I'd like to show you Plaintiff's Exhibit 236.

14             MR. HUGHES:  I'd like to offer it into evidence,

15   Your Honor.

16             MR. LEE:  No objection.

17             MR. HUGHES:  Thank you, Mr. Lee.

18             THE COURT:  Admitted.

19             (Plaintiff Exhibit No. 236 admitted.)

20             MR. HUGHES:  Thank you, Your Honor.

21   BY MR. HUGHES:

22   **Q.**   Dean Fitzsimmons, I've got Plaintiff's Exhibit 236 on the

23   screen.  This is another email from an alumni concerned with

24   Harvard's response to the Unz article.  So let me just read

25   the email.

1        On January 20, 2013, the alumni writes, "Dear Bill.

2  Have I missed a printed response from Harvard to the errors

3  and negative spin of these articles?  If not, what other

4  steps did Harvard take to correct the errors and seek

5  retractions?  E.g., was the public editor of the New York

6  Times ever advised?  Were the authors?  Uncorrected, the

7  impression is damaging to Harvard."

8        Do you see that?

9  **A.**   I do.

10  **Q.**   And the title of the email, the subject line that you can

11  see above is "Ron Unz and the David Brooks articles,"

12  correct?

13  **A.**   That's correct.

14  **Q.**   You write back do this donor, "Dear" redacted.  "There

15  have been a number of meetings already to consider how

16  Harvard should respond.  Both the researchers and the public

17  affairs staff are hard at work doing a variety of analysis.

18  Our office has been involved in the deliberations, and we

19  have provided data that will help to frame the decision.

20  Obviously we stand ready to help in any way we can.  Bill."

21        Do you see that?

22  **A.**   I do.

23  **Q.**   Was the information that you communicated in this email

24  on January 20, 2013, accurate?

25  **A.**   It appears accurate.

1    **Q.**   Okay.  So at this time you knew Harvard had already

2    deployed its researchers to look into the issues raised in

3    the Unz article, correct?

4    **A.**   Yes.

5    **Q.**   And those researchers would have been researchers at the

6    Harvard office of institutional research, correct?

7    **A.**   That's correct.

8    **Q.**   And your office was cooperating at this time, January 20,

9    2013, into the Harvard office of institutional research

10   analysis of the issues raised around the Unz article,

11   correct?

12   **A.**   That's correct.

13   **Q.**   And again, the issue raised by the Unz article was

14   potential discrimination by Harvard against Asian-Americans,

15   correct?

16   **A.**   Yes, among other things.

17   **Q.**   So now I'd like to show you Plaintiff's Exhibit 14 and

18   offer it into evidence.

19              MR. LEE:  No objection, Your Honor.

20              THE COURT:  Admitted.

21              (Plaintiff Exhibit No. 14 admitted.)

22              MR. HUGHES:  Thank you, Your Honor.

23              THE WITNESS:  I'm sorry.  Is this P14?

24   BY MR. HUGHES:

25   **Q.**   Yes, Dean Fitzsimmons, Plaintiff's Exhibit 14, P14.

1    **A.**  Thank you.

2    **Q.**  We're actually going to start on the second page.  I'll

3    blow it up to try to help us on the screen.  Can you see

4    that?

5    **A.**  Yes, I can.

6    **Q.**  So we just looked at an email exchange from January 20

7    with the donor.  Now we've moved ahead to February 18, 2013,

8    when you're getting an email from Dr. Driver-Linn on that

9    date, correct?

10   **A.**  That's correct.

11   **Q.**  She says, "Dear Fitz and Sally."  Who is Sally?

12   **A.**  Sally Donahue was our director of financial aid at the

13   time.  She now works part-time for us.

14   **Q.**  She starts -- Dr. Driver-Linn starts, "Dear Fitz and

15   Sally.  Hope all is going well.  I know this is a super busy

16   time of year for you, so advance apologies for the demands on

17   your time.  Just let me know if these are impossible because

18   we can probably come up with alternatives to meetings."

19              And then her first thing that she discusses in the

20   email is something called COFHE.  Do you see that?

21   **A.**  I do.

22   **Q.**  What does that stand for?

23   **A.**  That's the consortium on financing higher education.

24   **Q.**  I am interested in the second thing.  So Dr. Driver-Linn

25   says, "Second, the team has continued to work on a variety of

1    admissions and financial aid analyses, including follow-up on

2    some of those regressions and tracking down the discrepancy

3    in IPEDS numbers that came up around the Unz discussions."

4              Do you see that?

5    **A.**   I do.

6    **Q.**   And what Dr. Driver-Linn is talking about is she and her

7    colleagues at OIR, one of the things they've been working on

8    are regressions related to the concerns that have come up

9    around the Unz article, correct?

10   **A.**   That's correct.

11   **Q.**   And then at the bottom she's asking for a time for a

12   meeting.  "Just let me know what works for you.  Look forward

13   to seeing you sometime soon."

14             Do you see that?

15   **A.**   I do.

16   **Q.**   And then to fast-forward this, if you look at the top of

17   Plaintiff's Exhibit 14, you write Dr. Driver-Linn.  You say,

18   "Sally and I can make the 3:30 meeting on Monday at your

19   place."

20             Do you see that?

21   **A.**   I do.

22   **Q.**   She says, "Thanks, Fitz."

23             And you understand that that was a meeting that

24   occurred on February 25, 2013, correct?

25   **A.**   I think that's right.

1    **Q.**  Just to make sure we're all on the same page, the meeting

2    is proposed for February 25, and you say that you can make

3    it, correct?

4    **A.**  Yes.  I see.

5            MR. HUGHES:  Your Honor, may I approach the

6    witness?  I'd like to hand him a paper copy of Plaintiff's

7    Exhibit 602.

8            THE COURT:  Yes.

9    BY MR. HUGHES:

10   **Q.**  Dean Fitzsimmons, do you have the paper copy of

11   Plaintiff's Exhibit 602 in front of you?

12   **A.**  I do.

13   **Q.**  And do you see that there's a sticker in the middle of it

14   that has the number 17 and below it your name, on the very

15   first page, correct?

16   **A.**  It is correct.

17   **Q.**  So what that is, this was Exhibit 17 to your deposition,

18   correct?

19   **A.**  I think that's true.

20   **Q.**  Okay.

21   **A.**  I'm not a lawyer.

22   **Q.**  And you carefully and slowly looked through this document

23   at length at your deposition and testified that you had a

24   recollection of this document, correct?

25           MR. LEE:  Your Honor, I object for two reasons.

1    The first thing is --

2              THE COURT:  Sustained.

3              MR. HUGHES:  Your Honor, may we approach?

4              THE COURT:  Yes.  He hasn't -- you can approach,

5    but he hasn't denied any familiarity with the document.

6              MR. HUGHES:  Okay.  Try it again.

7    BY MR. HUGHES:

8    **Q.**  Dean Fitzsimmons, are you familiar with this document?

9    **A.**  I've seen it before or some of the document.  I'm not

10   quite sure, you know, exactly what you're asking, I guess.

11   **Q.**  Do you recall carefully paging through the document at

12   your deposition for six minutes and telling us that you

13   recognize this document?

14   **A.**  Yes.  As it turns out, it's clear that I remember some of

15   the parts of the document.  But there are clearly problems

16   with the document.

17             MR. LEE:  Your Honor, that's precisely the reason I

18   objected.  The deposition states, "You remember seeing this

19   document?

20             "ANSWER:  Some of the information is familiar."

21             That's perfectly consistent with what he said.

22             THE COURT:  He's not impeaching him at the moment.

23             MR. HUGHES:  Your Honor, if I may, he was asked --

24   he was handed the document.  He looked at it for six minutes,

25   page by page by page.  Then he was asked, "Do you recognize

1     this document?"

2              And he testified, "I have a recollection of it."

3              THE COURT:  The question was, do you recall

4     carefully paging through the document at your deposition for

5     six minutes and telling us that you recognize this document?

6              So let's go back and answer that question.

7              THE WITNESS:  Yes.  I mean I don't remember paging

8     through it for six minutes.  I looked at the document.  It

9     was clear that I had seen some of the stuff in the document

10    before.

11             MR. HUGHES:  Your Honor, I'd like to play the video

12    of exactly what happened at the deposition because his

13    familiarity with this document is something that was called

14    into question by Mr. Lee in opening.  And I understand

15    that -- I think that viewing that video and watching a

16    witness page through and then be asked whether he has a

17    recollection of this document and having him say "I have a

18    recollection of it" is an impeachment of the testimony that

19    we just heard.

20             THE COURT:  You're going to have to be more

21    specific with me about where you think the impeachment was.

22    Give me a second here.

23             MR. LEE:  Your Honor, I have extra copies of the

24    deposition right at this particular point.

25             THE COURT:  Tell me where you think the impeachment

1    on what he just --

2            MR. HUGHES:  Hold on.  You just said the question

3    was, do you recall carefully paging through the document at

4    your deposition for six minutes and telling us that you

5    recognize this document?

6            So -- this is you, Your Honor -- so let's go back

7    and answer that question.

8            "ANSWER:  Yes.  I mean, I don't remember paging

9    through it for six minutes.  I looked at the document.  It

10   was clear that I had seen some of the stuff in the document

11   before."

12           And I think the impeachment is he says he doesn't

13   remember.  I guess we can refresh his recollection by

14   watching the video.

15           THE COURT:  Are you disputing that he reviewed it

16   for six minutes?

17           MR. LEE:  No.

18           If I could give Your Honor, here's the deposition.

19           THE COURT:  At the moment, the only thing he said

20   is he's not sure that he looked at it for six minutes, right?

21           MR. HUGHES:  I just want to make sure that it's

22   clear for the record and the witness agrees that he paged

23   through the document for six minutes at his deposition and

24   then he was asked, "Do you recognize this document?"

25           And he answered, page 391, "I have a recollection

```
 1   of it."
 2            MR. LEE:  That's exactly why there's no
 3   impeachment.  We don't dispute that he looked at it for six
 4   minutes.  We don't say that -- and then the precise question
 5   that was asked, the portion that I gave you --
 6            THE COURT:  You say, "Do you recognize this
 7   document?"
 8            He says, "I have a recollection of it."
 9            I'm on 392 at line 7.
10            MR. LEE:  Right.
11            THE COURT:  Hold on a second.
12            MR. HUGHES:  That's exactly the exchange.
13            MR. LEE:  And then, Your Honor, if we go over to
14   393.
15            THE COURT:  Hold on.
16            MR. LEE:  Remember, Your Honor, with some of these
17   witnesses, in preparation for the deposition, the real
18   question is what happened to --
19            THE COURT:  Let me just read through it.
20            MR. LEE:  The question is --
21            THE COURT:  Hold on.  Let me read it.
22            MR. LEE:  Okay.
23            MR. HUGHES:  The impeachment/refreshing
24   recollection is that he just -- his testimony was that he
25   doesn't remember looking at it for six minutes.
```

1          When the witness flips through the whole thing,

2     looks at the pages page by page, and gives the testimony on

3     392, line 6, "Do you recognize this document?" and gives an

4     unqualified "I have a recollection of it," I think that is

5     important.  And what he's disagreed with is how carefully he

6     reviewed it before he gave that testimony.

7          THE COURT:  They're willing to stipulate that he

8     looked at it for six minutes.  I will accept for the record

9     that he looked at it for six minutes.

10         The questions that follow about how familiar he is

11    with it, he's pretty clear that he is familiar with parts of

12    it, and he remembers things about it.  So that's not

13    inconsistent.  He says he remembers parts of it.

14         You ask him questions about what you want to ask

15    him.  If it's a part that he remembers, he'll testify about

16    it.  If you need to refresh his recollection on something in

17    here that he used to have a recollection of that part but no

18    longer does, you can do that.

19         But let's get into the document and see what he

20    remembers and what he doesn't.  I will accept for the record

21    that he looked at it for six minutes.

22         MR. HUGHES:  Thank you, Your Honor.  What I'd like

23    to do is I'd like to offer P602 into evidence.

24         MR. LEE:  I object.  There's no foundation.  There

25    will be another witness who actually prepared the document

1    who will be here to testify.  But there's no foundation for
2    this witness.
3              THE COURT:  I can hold off on the admitting of the
4    exhibit, but I'm going to let him ask him questions about it.
5              MR. LEE:  I understand.
6              MR. HUGHES:  Just so Your Honor is clear, he
7    testified in his deposition he had a recollection of it
8    independent of his deposition preparation.  We'll get into
9    all of that.  What I would prefer to do is actually show him
10   the color version of this, which is Plaintiff's Exhibit 9,
11   which I'd also like to offer into evidence, which I assume
12   Mr. Lee has the same objection to.
13             THE COURT:  I assume this exhibit is going to come
14   in.  I'm going to let you ask questions of him about it now
15   so that he doesn't have to be recalled once it's admitted.
16   My guess is Mr. Lee is also expecting the document to come
17   in.
18             MR. LEE:  Yes.  At some point, Your Honor.  I think
19   having the color version is fine, and having him be examined
20   on the same basis Your Honor talked about, the non-color
21   version, is fine.
22             THE COURT:  So now it's not going to be admitted at
23   the moment.  I am going to let him be questioned about it.
24             What's your view on whether it's put up for the
25   studio audience here?  It's a not-admitted exhibit.

```
1              MR. LEE:  It's fine, Your Honor.
2              THE COURT:  Okay.  Karen, go ahead -- it's not
3    admitted at the moment, but we will put it up on the screen
4    so everybody can follow along.
5              MR. HUGHES:  Thank you, Your Honor.
6    BY MR. HUGHES:
7    Q.  Do you see, Dean Fitzsimmons -- I've got Plaintiff's
8    Exhibit 9 on the screen.
9              Do you see that?
10   A.  I do.
11   Q.  And this is the color version of what I just showed you,
12   which is Plaintiff's Exhibit 602, correct?
13   A.  Do I have this --
14   Q.  You have P9 in your binder.  Yes, sir.
15   A.  Okay.  Yeah.  Okay.
16   Q.  This is the color version of the document that you
17   testified you have a recollection of, correct?
18             MR. LEE:  I object.
19             THE COURT:  He has some recollection of.
20   BY MR. HUGHES:
21   Q.  Let's look at page 5.  Do you see I've got a blowup of
22   page 5 of Plaintiff's Exhibit 9 in front of you, Dean
23   Fitzsimmons?
24   A.  Yes, I do.
25   Q.  You're familiar with the information that's on page 5 of
```

1    Plaintiff's Exhibit 9, correct?

2    **A.**  I'm sorry.  Page 5?

3    **Q.**  Yes, sir.  You're familiar with it.  You can see on the

4    screen, I've got the information in front of you, this is

5    information, Mr. Lee, that you're familiar with, correct,

6    Dean Fitzsimmons?

7            MR. LEE:  Your Honor, I think the question is

8    whether he saw this page before.

9            MR. HUGHES:  Hold on, then.  I'll ask that

10   question.

11   BY MR. HUGHES:

12   **Q.**  Dean Fitzsimmons, is this part of the document that you

13   have a recollection of?

14   **A.**  I'm not sure what you mean.  I don't know whether it was

15   in this document or not.

16   **Q.**  Why don't you get your deposition exhibit out and turn to

17   page 5 of Plaintiff's Exhibit 602.  There's a loose copy

18   right in front of it you, Dean Fitzsimmons.  Right in front

19   of you, right there.

20   **A.**  Here?

21   **Q.**  Yeah.  Turn to page 5.

22           THE COURT:  Mr. Hughes, can you just follow up with

23   him?  I think he was about to say he's familiar with the

24   page, but he's not sure if it's from this document.  That

25   might save you.

1    BY MR. HUGHES:

2    **Q.**  Are you familiar with this page that I've got up on the

3    screen here with this kind of information in it?

4    **A.**  Again, at the time I'm not sure I saw it in this

5    document.

6    **Q.**  You don't know one way or the other.  That's your

7    testimony?

8    **A.**  I could have.  I see lots of documents.

9    **Q.**  This is something you could have seen?

10   **A.**  Pardon?

11   **Q.**  This is something that you could have seen in your role

12   as the dean of the Harvard admissions office, correct?

13   **A.**  Quite possible.

14   **Q.**  It was contained in a document that you've already told

15   us you reviewed for six minutes and you have a recollection

16   of the document.

17   **A.**  I have a recollection of a document.  I have a

18   recollection, though, that I'd seen some of it before.

19   **Q.**  I'd like to ask you questions about the information

20   that's on page 5 of Plaintiff's Exhibit 9.

21          MR. LEE:  I object.  There's not enough foundation

22   for this.  He actually was asked in his deposition whether he

23   had ever seen page 5 before, and he said, "I can't remember

24   seeing it five or six years ago."

25          THE COURT:  I'm going to let him ask the questions

1    about the data that's contained in this exhibit on this page.

2              MR. HUGHES:  Thank you, Your Honor.

3    BY MR. HUGHES:

4    **Q.**  So first of all, Dean Fitzsimmons, you see that the data

5    that OIR has put together here excludes legacies and

6    athletes.

7              Do you see that?

8    **A.**  I do.

9    **Q.**  And then I want to look at the chart that OIR has

10   prepared for -- the title of it is "Difference in Average

11   Test Scores and Ratings For White and Asian Applicants."

12             Do you see that?

13   **A.**  I do.

14   **Q.**  Do you see there's kind of a centerline here?  Do you see

15   that, the zero line?

16   **A.**  I do.

17   **Q.**  And if you go to the right of the zero line, that is

18   Asian higher, correct?

19   **A.**  That's correct.

20   **Q.**  And if you go to the left of the centerline, that is

21   white higher, correct?

22   **A.**  That's correct.

23   **Q.**  And the first two have to do with SAT II average and SAT

24   average, correct?

25   **A.**  That's correct.

1    **Q.**  And the bars on that are way out to the right.  Asians

2    are higher in those two categories, correct?

3              THE COURT:  What's the difference between SAT and

4    SAT II?

5              MR. HUGHES:  I think Dean Fitzsimmons can probably

6    answer that for us.

7              THE WITNESS:  The SAT II are now called the subject

8    test.  They are tests in particular subjects, chemistry,

9    European history, and so on.  So that would be the average of

10   whichever of the SAT II tests the students had taken.

11   BY MR. HUGHES:

12   **Q.**  And then the SAT is just the traditional verbal math SAT,

13   correct?

14   **A.**  That's correct.

15   **Q.**  In both those categories, the Asian students are doing --

16   the Asian applicants are doing better than the white

17   applicants, correct?

18   **A.**  That's correct.

19   **Q.**  And then we have alumni rating and alumni rating 2.  Is

20   alumni rating 2 the alumni personal rating?  Is that the

21   second box?

22   **A.**  I'm not sure how they lined that up, quite frankly.  I

23   presume -- I'm not entirely sure, to be honest -- one would

24   probably be the overall rating.  The other would be the

25   personal rating.

1    **Q.**   And one of these alumni -- there's only two alumni
2    ratings, correct?
3    **A.**   Yes, it would appear probably on our system.  But we ask
4    them to rate candidates in other respects as well.
5    **Q.**   Sure.  And here in OIR's chart we've got Asian applicants
6    doing better than white applicants in alumni rating 2, and
7    it's pretty close, slightly better for white applicants in
8    alumni rating 1, correct?
9    **A.**   That's correct.
10   **Q.**   And we talked actually yesterday about teacher
11   recommendations and guidance counselors.  Those are the next
12   three categories.  We've got a slight favoring white
13   applicants in some and a slight favor of Asians in the other,
14   they're pretty darn close to each other in this table,
15   correct?
16   **A.**   Well there, again, they are different obviously.
17   **Q.**   But there's not a significant difference here between the
18   white and the Asian applicants?
19   **A.**   I'm not sure what "significant" means.  And again, I'm
20   not entirely sure about this data, but it's consistent with
21   what we have talked about.
22   **Q.**   What you're seeing here is consistent with what you would
23   expect to see, given your experience as dean.  That's what
24   you just told me, correct?
25   **A.**   Certainly some of the things we discussed yesterday.

1    **Q.**  Those are consistent with what you're seeing in this
2    chart, correct?
3    **A.**  That's correct.
4              THE COURT:  What's Teacher 1 and Teacher 2?
5              THE WITNESS:  It would be the two teacher reports
6    that we require.  So we ask as part of the application each
7    student to submit a guidance counselor school report with a
8    transcript, and so on.  So that's what the guidance rating
9    is.
10             Then we ask for recommendations and information
11   from two teachers.  And I think it's just the way --
12   Teacher 1, Teacher 2 would just simply be I think how the
13   material had been ordered in the application.  But they're
14   just -- you could switch them.  There's no significance in
15   being, in other words, Teacher Number 1.
16   BY MR. HUGHES:
17   **Q.**  They don't get a prize?
18   **A.**  No, no prize.  And it's not our rating system.
19             THE COURT:  Tell me again, Alumni 1 and Alumni 2.
20             THE WITNESS:  I'm not sure.  One of them would be
21   the personal rating.  The other would be the overall rating.
22   But I'm not familiar enough with this data to know which
23   would be which.
24   BY MR. HUGHES:
25   **Q.**  And, Dean Fitzsimmons, just to be clear, the alumni

1    ratings --

2              MR. HUGHES:  I'm sorry, Your Honor.  Had you

3    finished?

4              THE COURT:  Yes.  Sorry.

5              MR. HUGHES:  I didn't mean to interrupt.

6    BY MR. HUGHES:

7    Q.  The alumni ratings, those are ratings that are awarded by

8    the interviewers who actually meet the applicants, correct?

9    A.  That's correct.

10   Q.  And for the most part, the admissions officers in your

11   admissions office when they give the personal score, the

12   extracurricular score, they haven't met the applicant in

13   person.  They're reading a paper file, correct?

14   A.  Mostly.  But remember we do interview a fair number of

15   people ourselves.  And we also meet people on the road

16   because we're out at 150 locations across the country every

17   year.  Occasionally I will meet some people I will put on my

18   dean's list, for example.

19   Q.  Some of the applicants are known to you, but most of them

20   are being judged on a paper file?

21   A.  Yes.  With all the information that is in the

22   application.

23   Q.  Then we get down to personal rating here, and here we see

24   that whites are doing better than Asians in the personal

25   rating, correct?

1    **A.**  Yes.  And again, this would be the staff person after

2    looking at all the information would make that rating.

3    **Q.**  That's a staff person in your admissions office, correct?

4    **A.**  Yes.  Whoever had read -- there might have been more than

5    one person.  Whoever read the application.

6    **Q.**  This shows -- and then we go on and we see that Asians

7    are getting better extracurricular ratings, better academic

8    rating, and the only rating that your staff members are

9    providing where the whites are doing better than the Asian

10   applicants is in the personal rating, correct?

11   **A.**  No.  That isn't actually the way it works.  Again, each

12   staff person goes through the application, as you know, in

13   great detail, looking at everything, trying to take all the

14   factors into account well beyond the numbers.  And the staff

15   person would -- based on that evidence, would assign an

16   extracurricular rating and in the same way would do the same

17   thing for the academic rating.

18         So it's really, again, looking at all three of

19   those -- the personal, the extracurricular, and the

20   academic -- is all the results of a staff person reading

21   carefully everything in the application and then making a

22   judgment about what the rating should be based on the

23   evidence.

24   **Q.**  Just so we're on the same page.  On page 5 of P2, the

25   three ratings that are -- never mind.  Strike that.  I'm

1    going to move on.  Let's go to the next page.

2            Dean Fitzsimmons, is the information contained on

3    page 6 of Plaintiff's Exhibit 2, is this information that

4    looks familiar to you from this document?

5    **A.**  I am not sure I remember seeing it in the document.

6    **Q.**  Let me ask you about some information and just see if you

7    can agree whether it makes sense in light of your experience

8    in the office of admissions.

9            MR. LEE:  Your Honor, I am going to object, but I

10   understand Your Honor's prior ruling.  But for a document he

11   doesn't recognize, at some point there's a limit.

12           THE COURT:  I'm going to let you do your direct

13   examination the way you want to do it.

14           I'll tell you what I'm interested in from this

15   witness and this document is when he sees this sort of data,

16   what's his reaction to it.  Does he have any explanation to

17   it.  I don't think he's in a position to verify the data or

18   say that it's accurate.  But when he sees a chart like this,

19   his response to it if he saw it.  I think he did, but -- I'd

20   rather hear his view of the data and how data could be like

21   that than actually verify the actual data, which I don't

22   think he's in a position to do.

23           MR. HUGHES:  I don't think I have asked him to

24   verify it.

25           THE COURT:  It's your direct examination.  It's a

1   bench trial.  I'll disregard what I think is not

2   appropriately before me.  But this is the kind of data that

3   in his position he would be familiar with, whether he's

4   actually familiar with this particular document or not.

5           So I'm interested in his reaction to the data,

6   including whether he thinks it's wrong.  His answers are what

7   they're going to be.  I think his response to this kind of

8   data is fair game.

9           MR. HUGHES:  Thank you, Your Honor.

10  BY MR. HUGHES:

11  **Q.**  So looking at page 6, Dean Fitzsimmons, we've got a table

12  or a chart called "Admit Rates by Academic Index For White

13  and Asian Applicants, Classes of 2007-2016."

14          Do you see that?

15  **A.**  I do.

16  **Q.**  And then along the bottom it says, "Standardized academic

17  index (zero equals average academic index)."

18          Do you see that?

19  **A.**  I do.

20  **Q.**  So what we have here is a chart that shows admit rates

21  for white applicants and admit rates for Asian applicants as

22  you move up the academic index, collect?

23  **A.**  That's what it appears to be.  I haven't studied the

24  document.

25  **Q.**  So at least OIR uses academic index as a metric when it

1   is evaluating the admissions chances for white and Asian

2   applicants, correct?

3   **A.**   Apparently they do.  It's not something that we use in

4   our office.

5   **Q.**   And what you can see here on the dotted line are the

6   admit rates for the applicants under consideration here.  The

7   darker line is for the white admit rate.  And I can't really

8   tell what color that is, but the lighter line is the Asian

9   admit rate, correct?

10   **A.**   That is correct.

11   **Q.**   And at every step of the way from the weakest spot on the

12   academic index to the strongest spot on the academic index,

13   white applicants are admitted at a higher rate than Asian

14   applicants, according to this chart, correct?

15   **A.**   That's what it shows.

16   **Q.**   Is that consistent with what you see in the dean's office

17   as the dean of admissions?

18   **A.**   I'm sorry.  Could you say that again?

19   **Q.**   Is that consistent with what you see, that comparably

20   academically qualified white applicants are admitted at a

21   higher rate than Asian applicants?

22   **A.**   It's certainly something we've always been concerned

23   about the admit rate, and it's certainly something that Susie

24   Chao and I covered really back in 1988, and it was certainly

25   an issue that was studied in depth by OCR in its 1990 report.

1       So it's always something we look at.  Certainly

2   we've continued to do NLNA, that kind of thing again as a

3   check.  So yeah, I'm familiar with it.

4   **Q.**  NLNA really is a measure of kind of the overall admit

5   rate.  Not the overall class admit rate, but if you take

6   everybody in the NLNA group, you're looking at what's the

7   admit rate for Asian-American applicants in the NLNA group,

8   what's the admit rate for white applicants, and so forth in

9   the NLNA group, correct?

10  **A.**  Just a, yeah, quick overview, I guess is the best way to

11  look at it.

12  **Q.**  It doesn't take and compare similarly academically

13  qualified candidates and compare admission rates of similarly

14  academically qualified candidates, correct?

15  **A.**  Not with that particular piece.

16  **Q.**  But the information that you see here isn't surprising

17  because you know, going back to OCR, that Harvard admits

18  similarly academically qualified white candidates at a higher

19  rate than Asian applicants, correct?

20  **A.**  I'm not sure exactly which part of the report you're

21  referring to.  But there was a difference in the admission

22  rate, which is something that they looked at very carefully

23  and then found that we did not discriminate against

24  Asian-Americans despite that evidence on the scores.

25  **Q.**  Dean Fitzsimmons, I'd like to turn to page 8 of the

1    Plaintiff's Exhibit 2.  Do you see that on the screen in

2    front of you?

3    **A.**   Yes.  I have it here, too.  Yes.

4    **Q.**   You understand that OIR ran -- you've seen in other

5    documents, which we're going to look at later, you understand

6    that OIR ran a logistic regression model in connection with

7    the Asian-American issue, correct?

8    **A.**   They certainly ran some models for us, yes.

9    **Q.**   In fact, we can just look at real quickly, you see on the

10   screen I've got page 11 of Plaintiff's Exhibit 2.  You've

11   seen these bars, this kind of model before, correct?

12   **A.**   Yes.

13   **Q.**   You've seen that in other documents different than the

14   document we're looking at, correct?

15   **A.**   Yes.

16   **Q.**   So I'd like to look at some information back on page 8

17   related to that logistic model.  This actually may not be the

18   same model, but this is the model being discussed here in P2.

19   And I'd like to ask you about the information that you see on

20   the screen.

21          And this is the odds of admission based on the

22   different categories that we see on the left.  Do you see

23   that?

24   **A.**   I do see that.

25          MR. LEE:  Your Honor, I understand he's going to be

1    allowed to ask, but can we at least have the foundation

2    question so I can preserve my objection of whether he's seen

3    this page before?

4              THE COURT:  Yes.

5    BY MR. HUGHES:

6    Q.  Dean Fitzsimmons, is this part of the document that you

7    testified you have had a recollection of?  Do you have a

8    recollection of page 8 of this document?

9    A.  I really don't.

10   Q.  So let's briefly move through it then.  Again, this is a

11   chart that shows the odds of getting into Harvard based on

12   the different categories on the left.  You see that, correct,

13   Dean Fitzsimmons?

14   A.  I again don't -- I'm reaching beyond the limits of my

15   statistical knowledge.  I'm surer Erin Driver-Linn could help

16   you or Dr. Card.

17   Q.  Would you agree that having, for example, a high personal

18   rating would increase the odds of an applicant getting into

19   Harvard?

20   A.  Again I don't know how this works, how they figured that

21   out from the logistic model.  It's not in my purview.

22             THE COURT:  I'm going to stop you there on this

23   line.  It sounds like he's going to be guessing, to me.

24             MR. HUGHES:  We're going to leave this momentarily.

25   BY MR. HUGHES:

1    **Q.**  So again, Dean Fitzsimmons, I'm showing you now page 11

2    of Plaintiff's Exhibit 2.  Is this part of the document that

3    you had a recollection of?

4    **A.**  I do recollect that -- --

5    **Q.**  Is page 11 of Plaintiff's Exhibit 2 -- page 11 of

6    Plaintiff's Exhibit 9 part of the document that you have a

7    recollection of seeing?

8    **A.**  It's -- page 11 is something that I remember, but I don't

9    know whether I remember it being in this document or not.

10   **Q.**  Is page 10 of Plaintiff's Exhibit 9 part of the

11   information you recall seeing in this document?

12   **A.**  I'm less sure of this one, quite honestly.

13            MR. HUGHES:  Let's move on to Plaintiff's

14   Exhibit 12.  And this is a document entitled "Admissions and

15   Final Aid At Harvard College," from the office of

16   institutional research, dated February 13.  I'd like to offer

17   this exhibit into evidence.

18            MR. LEE:  No objection.

19            THE COURT:  It's admitted.

20            (Plaintiff Exhibit No. 12 admitted.)

21   BY MR. HUGHES:

22   **Q.**  You were here on Monday for opening statements?

23   **A.**  I was.

24   **Q.**  And I think Mr. Lee said in his opening that this was a

25   presentation that was shown to you.  Is that -- did you, in

1  fact, see this presentation back in 2013?

2  **A.**  I did.

3  **Q.**  And was this presentation shown to you at that

4  February 25 meeting that you and Ms. Donahue agreed to attend

5  with Dr. Driver-Linn from OIR?

6  **A.**  I think so.  That's right.  Remember we're right in the

7  middle of regular action at that point and we have lots of

8  things going on, but I have a recollection of it.

9  **Q.**  We saw that email earlier about February 25th.

10  **A.**  Yeah.

11  **Q.**  Do you remember who else was at that meeting besides

12  Dr. Driver-Linn and Ms. Donahue?

13  **A.**  I'm not sure exactly.  I would speculate -- I can

14  speculate if you want.

15  **Q.**  I don't think we need speculation.  Let's go ahead and

16  look at page 3 of Plaintiff's Exhibit 12.  Again, this is a

17  document that was prepared by Harvard's office of

18  institutional research, correct?

19  **A.**  That's correct.

20  **Q.**  And is this part of the work that your office was

21  coordinating on with Harvard's office of institutional

22  research at least in part related to the concerns about --

23  that came around the Unz article and discrimination against

24  Asian-Americans?

25  **A.**  That would certainly be part of it, to the best of my

1   recollection.

2   **Q.**   There are obviously other subjects identified and

3   discussed in this document that don't relate to that,

4   correct?

5   **A.**   That's correct.

6   **Q.**   So we have at the top here of this OIR document, "Recent

7   admissions and financial aid questions raised."

8           Do you see that?

9   **A.**   I do.

10  **Q.**   And the first question is, "What is the effect on our

11  applicant pool and yield of reintroducing early action?"

12          That was something OIR was working on at the time

13  with your office?

14  **A.**   That's correct.

15  **Q.**   But that's one of the things that doesn't have anything

16  to do to do with Unz and claims of discrimination, correct?

17  **A.**   That's correct.

18  **Q.**   Okay.  And then the second thing is, "Is the shift and

19  gender balance at Harvard College due to increased interest

20  and recruitment for SEAS?"

21          Again, that's a topic that doesn't have to do with

22  the discrimination issue, correct?

23  **A.**   That would be correct.

24  **Q.**   Okay.  Then we have Number 3, "Does the admissions

25  process disadvantage Asians?"

1      That's the third topic, correct?

2  **A.**   That's correct.

3  **Q.**   And that's a topic your office was working on with the

4  office of institutional research at this time, correct?

5  **A.**   Certainly one of the things, correct.

6  **Q.**   Now, I want to look at the portion of this February 2013

7  presentation that relates to that question, the question of

8  whether the process disadvantages Asians.

9      So let's look at page 31 of Plaintiff's Exhibit 12.

10  I've got it up on the screen, Dean Fitzsimmons, but you're

11  welcome, of course, to follow along on paper or on the

12  screen.

13      Here on the screen, page 31 of P12, we've got

14  "Evaluating factors that play a role in Harvard College

15  admission."

16      Do you see that?

17  **A.**   I do.

18  **Q.**   Then if we turn to page 32, the next page, at the top of

19  the page it says, "Goal:  Using various admissions ratings,

20  how well can we approximate admit rates by race/ethnicity and

21  the demographic composition of the admitted students pool?"

22      Do you see that?

23  **A.**   I do.

24  **Q.**   That was a goal of the analysis that OIR was working on

25  in coordination with your office, correct?

1  **A.**   Yes.  That's the goal they were working with, and they

2  had a variety of inputs, I'm sure.

3  **Q.**   So then we've got strategy.  The strategy here is to fit

4  a series of basic logistic regression models using data from

5  classes of 2007 to 2016.

6          Do you see that?

7  **A.**   I do.

8  **Q.**   That's ten years of data, correct?

9  **A.**   Yes.

10  **Q.**   And then it says, "Generate fitted probabilities of

11  admission, given an applicant's characteristics, how likely

12  they are to be admitted?"

13          Do you see that?

14  **A.**   I do.

15  **Q.**   The basic goal is to try to build a model that predicts

16  whether or not you'll get in based on the different variables

17  in the model, correct?

18  **A.**   That's correct.

19  **Q.**   And then for each class, "Select the 2,100 applicants

20  with the highest probability of admissions as our simulated

21  admitted class."

22          Do you see that?

23  **A.**   I do.

24  **Q.**   And then you examine the resulting demographics and admit

25  rates by ethnicity.  That was the strategy here for this

1    analysis, correct?

2    **A.**   That's correct.

3    **Q.**   And then on the notes on the bottom, just to be complete,

4    students that didn't have an academic index weren't included,

5    correct?

6    **A.**   That's correct.

7    **Q.**   And this notes that the analysis was preliminary, bold

8    underlined, and for discussion.  Correct?

9    **A.**   That's correct.

10    **Q.**   Now, if we go to the next page, we've got -- you remember

11    we've already looked at that colorful bar graph, and there's

12    four different bar graphs, right?

13    **A.**   Maybe five.

14    **Q.**   Actually, you're right.  There's five.

15    **A.**   Yeah.

16    **Q.**   There's four different modeling choices, correct?

17    **A.**   That's correct.

18    **Q.**   And then the first one, academic only, the OIR starts

19    with the academic index and the academic rating, correct?

20    **A.**   Correct.

21    **Q.**   And then in the second model, OIR adds in the preferences

22    for legacies and athletes, correct?

23    **A.**   That's correct.

24    **Q.**   While keeping in academic index and academic rating,

25    correct?

1    **A.**   Correct.

2    **Q.**   And then in the third model keeps in academic index,

3    academic rating, legacy, athlete, and then adds in the

4    personal rating and the extracurricular rating, correct?

5    **A.**   Correct.

6    **Q.**   And then in the fourth model keeps everything that was in

7    the third model and adds gender and ethnicity, correct?

8    **A.**   That's correct.

9    **Q.**   And then if we look at page 34 of Plaintiff's Exhibit 12,

10   I just want to walk through kind of what happens in each of

11   those models.  Okay?

12   **A.**   Yes.

13   **Q.**   Just to orient everybody who maybe hasn't seen this

14   document, what we have on the screen, the first four bars

15   going from left to right, those are the first -- those are

16   the four models that you and I just discussed, correct?

17   **A.**   That's correct.

18   **Q.**   And then the fifth column is what the actual admitted

19   class would look like, correct?

20   **A.**   That's correct.

21   **Q.**   And the way the different colors in the bars here

22   represent different races or ethnicities, correct?

23   **A.**   That's correct.

24   **Q.**   And the bottom, which is I think the color black is for

25   white applicants, correct?

1    **A.**   That's correct.

2    **Q.**   And then the second color, which I guess is olive-green

3    or brown, whatever it is, that is for Asian applicants,

4    correct?

5    **A.**   Correct.

6    **Q.**   What would you call that color?

7    **A.**   I have no idea.

8    **Q.**   I'm not the only one.  Okay.

9              Then as we move up, we've got more of the maroon

10   color, and that is for African-American applicants, correct?

11   **A.**   You did unknown, right?

12   **Q.**   I'm sorry.  We've got unknown, which is a gray color,

13   correct?

14   **A.**   That's correct.

15   **Q.**   Right above Asian applicants?

16   **A.**   Yes.

17   **Q.**   And then we go up and the next color, maroon,

18   African-American applicants, correct?

19   **A.**   That's correct.

20   **Q.**   And then we've got going up, international, light gray;

21   Hispanic, pinkish; and then Native American, light pink.

22   Correct?

23   **A.**   That's correct.

24   **Q.**   Okay.  The first I want to focus on what happens to these

25   different demographic groups as we march through the models.

1            In the first model if Harvard -- according to OIR,

2    if Harvard only considered academics, the model predicts that

3    Harvard's admitted class would be over 43 percent

4    Asian-American, correct?

5    **A.**   That's correct.

6    **Q.**   And it predicts that the admitted class would be

7    38 percent white, correct?

8    **A.**   That's correct.

9    **Q.**   And .67 percent African-American, correct?

10   **A.**   Correct.

11   **Q.**   And 2.42 percent Hispanic, correct?

12   **A.**   Correct.

13   **Q.**   That's academics only.   That's not what Harvard does in

14   its admissions office, correct?

15   **A.**   That's right.   And as we said in the *Bakke* decision and

16   in OCR and lots of other times.

17   **Q.**   Then we move and we add in legacies and athletes.   That's

18   what's happening in Model 2, correct?

19   **A.**   That's correct.

20   **Q.**   And when we that happens, we see that the Asian-American

21   applicants go from 43 percent down to 31.4 percent, correct?

22   **A.**   That's correct.

23   **Q.**   Those preferences for legacies and athletes don't help

24   Asians as a group in terms of admission to Harvard, according

25   to this model, correct?

1    **A.**   According to the model, yes.

2    **Q.**   The fact that the Asian-American admission rate goes down

3    from Model 1 to Model 2 when we add in the legacies and

4    athletes is consistent with what Harvard has told OCR about

5    the effect of legacies and athletes on the relative admission

6    rates between white and Asian-American applicants, correct?

7    **A.**   Yes.  Those are two important institutional factors.

8    **Q.**   And then if we add in legacy and athlete preferences,

9    African-American admissions predicted to go up to 1.83, and

10   Hispanic stays basically the same, a little bump, to 2.62.

11             Do you see that?

12   **A.**   I do.

13   **Q.**   Those changes are consistent with what you know, based on

14   your experience as dean, that the legacy and athlete

15   preferences primarily -- at least at this time, and you've

16   told me yesterday that's changing -- at least at this time

17   primarily benefit white applicants, correct?

18   **A.**   That's right.  And you're right about "at this time."

19   **Q.**   Then we move to Model 3 where we add in the

20   extracurricular and personal ratings.

21             Do you see that?

22   **A.**   I do.

23   **Q.**   You've already told me yesterday that as a group

24   Asian-Americans are awarded on average higher personal

25   ratings -- I'm sorry -- higher extracurricular ratings than

1    white applicants.  That's correct, right?

2    **A.**  Yes.

3    **Q.**  So here we've got those two variables, extracurricular

4    and personal.  And so we see here when you add in those

5    variables that the predicted Asian admission to Harvard goes

6    from 31 percent to 26 percent, correct?

7    **A.**  That's correct.

8    **Q.**  And we know that Asian-Americans are doing better as a

9    group on the extracurricular score, so what is likely doing

10   the work here is lower personal ratings for Asian-Americans

11   as a group, correct?

12   **A.**  That sounds logical, yeah.

13   **Q.**  And then we see that when you add in extracurricular and

14   personal rating, African-Americans as a group, their

15   projected admission goes from 1.83 up to 2.36, correct?

16   **A.**  That's correct.

17   **Q.**  And Hispanic applicants as a group go up from 2.62 to

18   4.07, correct?

19   **A.**  That's correct.

20   **Q.**  And the white applicants go from 48 percent up to

21   50 percent, correct?

22   **A.**  That's correct.

23   **Q.**  So of the four groups that the experts have focused on --

24   white applicants, Asian-American applicants,

25   African-American, and Hispanic applicants -- only the

1    Asian-American applicants go down once you add in the

2    extracurricular and personal rating, correct?

3    **A.**   That's what this says, yes.

4    **Q.**   That's what was communicated to you when you received and

5    reviewed this document in February 2013, correct?

6    **A.**   That's correct.

7    **Q.**   The chance of Asian admission was going down when you

8    consider extracurricular and personal scores, correct?

9    **A.**   That's correct.

10   **Q.**   Then we move to the last -- sorry, not the last, the

11   fourth column.  And we keep all the other variables in and

12   then we add in ethnicity and gender, correct?

13   **A.**   That's correct.

14   **Q.**   And what happens when we do that is that Asian-American

15   applicants, their chance of admission to Harvard comes down

16   yet again, correct?

17   **A.**   That's correct.

18   **Q.**   It comes down -- it's highest in Model 1 and then it just

19   comes down, down, down, correct?

20   **A.**   That's correct.

21   **Q.**   And in Model 4, once you add in demographic factors, the

22   chance of Asian-Americans getting admitted to Harvard drops

23   from 26 to 18 percent, correct?

24   **A.**   That's correct.

25   **Q.**   There's also a drop for white applicants from 51 to

1    44 percent, correct?

2    **A.**   Correct.

3    **Q.**   And there's a significant increase for African-American

4    applicants from 2.36 to 11.12, correct?

5    **A.**   That's correct.

6    **Q.**   I want to correct something, Dean Fitzsimmons, that I was

7    getting wrong here.

8              What we're looking at here is the share of each

9    class by ethnicity, correct?

10   **A.**   What was the other dimension you thought?

11   **Q.**   I think I might have said "chance of admission."

12             But what we're at -- on a couple of questions.  But

13   what we're looking at from bar graph to bar graph is the

14   first one, the share of Asian-Americans in the class would be

15   43 percent.  Second one comes down to 31.  Third one comes

16   down to 26, right?  That's what you understand this to show?

17   **A.**   That's correct, yes.

18   **Q.**   So if we look at, going back to the demographics, once

19   you add in gender and race, again the share of the projected

20   class for Asians comes from 26 to 18, correct?

21   **A.**   Yes.  And I knew that's what you meant before.

22   **Q.**   Yes.  Sometimes it's hard to keep all the language

23   straight.

24             And again, the share of the class for white

25   applicants goes from 51 to 44, correct?

1    **A.**   That's correct.

2            THE COURT:  What does gender mean in this?  I'm

3    going to leave it to you, Mr. Hughes to sort out, but what

4    does gender mean in this category?  I take it the ethnicity,

5    we're talking about a tip one way or the other; is that

6    right?  But how does gender factor in?

7            MR. HUGHES:  It's not reported in these bars.  The

8    way that we know that it was factored in is that if we look

9    at page 33 in the fourth model, the two variables that are

10   factored in are gender and ethnicity.

11           THE COURT:  I see that.  But can you see if he

12   knows what it means to factor in gender on this?

13           MR. HUGHES:  It's a variable in the model.

14           THE COURT:  That cuts which way?  On gender why

15   would the number go up or down?

16           MR. HUGHES:  I think that the experts will agree

17   that it doesn't have a significant effect on way or the

18   other.

19           MR. LEE:  Whoa, whoa, whoa.

20           MR. HUGHES:  But I'm not the master of that part of

21   the case.

22           THE COURT:  That's my bad.

23           If you can elicit it from this witness, I would

24   appreciate the clarification.  If you can't -- and I leave it

25   to you whether you want to ask the question now or not.  If

1    it can't be elicited through this witness and you want to

2    elicit it through someone later, but I am curious about

3    whether -- which way -- most of these I understand how they

4    cut.  Right?  You get a higher personal rating and it makes

5    your chance of getting in -- the percentage of the class goes

6    up.  But the gender thing, I'm not sure what it means.  If he

7    can do it, fine; if he can't, we'll wait.

8              MR. HUGHES:  I have an idea.

9    BY MR. HUGHES:

10   **Q.**  Dean Fitzsimmons, does the Harvard admissions process

11   provide a tip for applicants based on gender?

12   **A.**  No.

13   **Q.**  So pretty much gender doesn't make a difference per se

14   one way or the other in terms of admission to Harvard?

15   **A.**  That would be correct.

16   **Q.**  And you can see that gender is a variable in this model.

17   Do you see that?

18   **A.**  It is.  It's a rough model.  For some reason they decided

19   not to give you more description of it.  But it is in the

20   model according to page 33, and then it doesn't show the

21   effect obviously on 34.

22   **Q.**  Given that your testimony is that gender per se doesn't

23   make a difference one way or the other, you wouldn't expect

24   that to change things in the model?

25   **A.**  Right.  It would simply -- I think you should ask the

1    experts on this, though, just for the definitive piece.  But

2    that's generally the case is that women and men get in at

3    about the rate at which they apply.  As with anything else,

4    there are certainly variations from year to year because the

5    individuals vary from year to year.

6    **Q.**  Okay.

7              MR. HUGHES:  Your Honor, did that address the

8    question?

9              THE COURT:  Yes.  Thank you.

10   BY MR. HUGHES:

11   **Q.**  So, Dean Fitzsimmons, let's keep talking here about

12   page 34.  We see that the share of the class that is

13   Asian-Americans once we add in personal score and

14   extracurricular goes down, goes down again once we add in

15   demographics.  We've reviewed that together, correct?

16   **A.**  That's correct.

17   **Q.**  Then when we compare the final model, Model 4, to the

18   actual admitted class, we see that Model 4 comes pretty close

19   to predicting the share of each ethnicity in the actual

20   admitted class.

21             Do you see that?

22   **A.**  I do.  And it's very consistent with what we've talked

23   about before, you know.  It's not simply a matter of looking

24   at test scores and grades or academics alone.  The more

25   factors you add in to try to predict admission, the closer

1    you will come to the class.  As rough a model as this is, it

2    was perfectly -- ultimately quite consistent with what the

3    actual class was and what we have known over of the decades.

4    **Q.**   So did the fact that Model 4 lined up pretty closely with

5    the actual model and what you've known over the decades, did

6    that -- that suggested that the model was reliable, right?

7    **A.**   It certainly came up with a -- in a very rough way with a

8    very small number of variables; for example, Professor Card

9    looked at 200 variables.  Here you've got obviously a very

10   small number of variables.  They're important variables,

11   obviously, but again very consistent with what we've known in

12   the past and very consistent with the actual class at the

13   moment.

14   **Q.**   Mr. Lee said on Monday that this analysis basically

15   confirmed what you already knew and it wasn't a cause for

16   concern.

17          Is that true, this analysis when it was presented

18   to you and you saw the impact of personal score and

19   demographics on Asian-American applicants, that wasn't a

20   concern to you?

21   **A.**   It's always a concern any time, you know, we have to turn

22   anybody down.  But I think if you were to go back even to the

23   *Bakke* decision and also certainly to the OCR decision, that

24   isn't simply how we do things.  And the idea is that all of

25   these factors are important factors.

1          Then of course there are many, many others

2     identified by Professor Card.

3          But our job is just to make sure that these factors

4     are applied in an evenhanded way to everybody who applies

5     regardless of background.  So that is quite consistent, when

6     you get down to the end of this, obviously quite consistent

7     with the actual Harvard class.

8     **Q.**  At least as of the time that you got this analysis from

9     OIR, you were aware that inclusion of the extracurricular and

10    personal score would drive down the share of a class that was

11    Asian-American and drive it up for white, African-American,

12    and Hispanic applicants, correct?

13    **A.**  Again just going back even to the *Bakke* decision, but

14    certainly to OCR, this is very, very consistent.  We've said

15    to people constantly over the years that our process does

16    include as factors legacy, athlete, extracurricular,

17    personal, and various demographic factors.

18         So you know, there will be changes as you go

19    through the models, but this is very consistent with what we

20    have said all along and been found to be certainly not any

21    indication of discrimination by OCR, among others.

22    **Q.**  With respect, sir, my question had nothing to do with

23    *Bakke* or OCR.  It had to do with what the model shows.

24         I want to focus on the difference between Model 2

25    and Model 3.  The things that are added in between those two

1    models, the things that drive all the change are

2    extracurricular and personal score, correct?

3    **A.**   They are certainly factors that made a difference, you're

4    correct, as you went from 2 to 3.

5    **Q.**   And what is being communicated to you here in February

6    of 2013, an analysis by OIR, is that when you factor in the

7    personal score and the extracurricular score, the share of

8    Asian-Americans in the projected class goes down, and the

9    other three groups that are being focused on here -- White

10   applicants, African-American applicants, Hispanic

11   applicants -- go up, correct?

12   **A.**   Right.   The numbers are what they are.   But again, those

13   are two very important factors in our process.

14   **Q.**   And you knew at the time that Asian-Americans were doing

15   better on the extracurricular rating.   You've told me that,

16   correct?

17   **A.**   That's correct.

18   **Q.**   And so did it concern you when you were provided this

19   information that your admissions process might be penalizing

20   Asian applicants because of the personal quality score?   Was

21   that a concern to you in February 2013?

22   **A.**   Well, it's always a concern.   But the personal quality

23   factor, you know, has been a factor we have talked about

24   consistently over time.   And it certainly is a part of what

25   we do.

1  **Q.**  Let's continue to look at this document.  Page 36 of

2  Plaintiff's Exhibit 12 is entitled "What Have We Learned?"

3  Correct?

4  **A.**  That's correct.

5  **Q.**  And what OIR says, "Once we account for ratings and

6  demographic factors, we can closely predict what the admitted

7  class will look like."  Correct?

8  **A.**  That's correct.

9  **Q.**  "With current data, we explain a significant amount of

10  the variation in admission, but further details (especially

11  around the personal rating) may provide further insight."

12          That's what OIR says, correct?

13  **A.**  That's correct.

14  **Q.**  And you didn't follow up with OIR to figure out further

15  details around the personal rating, correct?

16  **A.**  That's correct.  Because what we saw here was perfectly

17  consistent with what we've seen for decades, as I said

18  before.

19  **Q.**  And then it ends saying, "There are a variety of factors

20  that quantitative data is likely to miss or ratings do not

21  capture.  We'd like to understand exceptional talent, music,

22  art, writing, the role of context cases, the role of personal

23  statement/essay, measures of socioeconomic status," correct?

24  **A.**  That's correct.  Among other things.

25  **Q.**  You didn't follow up with OIR to figure out how those

1   things play a role after this, did you?

2   **A.**   We certainly were interested and followed up on

3   socioeconomic status, among other things.

4           But I think we've always had a very clear sense

5   that, again with exceptional talent or the other factors,

6   as -- I don't want to repeat myself.  But yesterday we talked

7   about how we really do look at everything when we go through.

8   So we've known that these have long been factors in our

9   process, and I think the world knows that.

10  **Q.**   The one thing that you followed up with OCR -- with OIR,

11  which we'll talk about in a minute, you did follow up and ask

12  for more research on socioeconomic -- low-income issues,

13  correct?

14  **A.**   Yes.  Not with OCR, but -- I'm just kidding.  OIR, yep.

15  **Q.**   Now, turning to page 37.  "Next steps.  Determining

16  priorities, timing, and audiences."

17          Do you see that?

18  **A.**   Yes.

19  **Q.**   It says, "Should this work be shared with additional

20  audiences (e.g., President Faust, Dean Smith, Dean Hammonds)?

21  What are your priorities?"

22          Do you see that?

23  **A.**   Yes, I do.

24  **Q.**   This a presentation that OIR is presenting to you on

25  February 25?

1   **A.**   Yes.  And obviously data that they have themselves now

2   knowledge of.

3   **Q.**   And you decided not to share the work with President

4   Faust, Dean Smith, and Dean Hammonds, correct?

5   **A.**   There's lots of information, as you indicated before, in

6   this very lengthy report.  But it was certainly good to have

7   the information about early admission, for example, and what

8   the effect was of bringing it back.  And it was obviously

9   good to have an understanding of what was going on with our

10   new and very, very rapidly growing School of Engineering and

11   Applied Sciences, especially as it relates to gender.

12          The third part of it, again, there was no

13   preliminary study.  It was very incomplete, as they said, and

14   it literally took us right to where the actual class was, and

15   again, very consistent with what we've always said over time.

16   So it was good to have this information.

17   **Q.**   It was good for you to have the information that we just

18   looked at, but you didn't share that information with

19   President Faust, Dean Smith --

20   **A.**   Not immediately at that point.  Of course, remember that

21   we were sitting in the middle of the busiest time of the year

22   in regular action looking at 40 -- no, at that time I guess

23   it was more like 35,000 applicants.

24   **Q.**   You didn't share it with your boss, Dean Smith, or the

25   president -- or President Faust, right?

1    **A.**   That's correct.

2    **Q.**   And now I want to talk about who else you didn't tell.

3          MR. LEE:  Your Honor, just for clarity purposes, is

4    he talking about the entire report?  You didn't tell them

5    anything about the entire report?

6          MR. HUGHES:  I'm talking about the pages that we

7    were with just talking about, starting at page 31.  I think

8    the record is crystal clear on that.

9          MR. LEE:  That was my concern.

10   BY MR. HUGHES:

11   **Q.**   So, Dean Fitzsimmons, remember earlier we had a somewhat

12   laborious walk through the privilege log.  I have one more

13   time that I'd like to look at that with you.  Do you have

14   that handy?

15   **A.**   Let me see.  I have it handy.

16   **Q.**   And I've got a red tab --

17         MR. HUGHES:  Your Honor, would you like a copy of

18   the privilege log?

19         THE COURT:  If you're just going to have him do

20   what you've done, I don't need it.

21         MR. HUGHES:  Okay.  Thank you, Your Honor.

22   BY MR. HUGHES:

23   **Q.**   I've got a red tab that should be on page 10 of the log.

24   Do you see that?

25   **A.**   I do.  I was wondering what that red tab was.

1    **Q.**  It's to help us both move things along.  So here, just to

2    remind you, the document that we were just looking at was

3    from -- that's still up on the screen, Plaintiff's

4    Exhibit 12, was from February of 2013, correct?

5    **A.**  That's correct.

6    **Q.**  Showing it at a meeting on February 25, correct?

7    **A.**  That's correct.

8    **Q.**  And then now we're looking at the privilege log, do you

9    recall that there was an OCR request to your office in April

10   of 2013?

11   **A.**  I don't recall precisely to, be honest, but --

12   **Q.**  You do see on the privilege --

13   **A.**  I see it.  So I assume something came in at that point.

14   **Q.**  So there's two entries here between Ms. Yong and you,

15   subject matter:  First pass, OCR request, date April 10,

16   2013.  Correct?

17   **A.**  That's correct.

18   **Q.**  Okay.  And now I'd like to show you Plaintiff's

19   Exhibit 515, which is correspondence from the same time

20   between you and Mr. Hibino.  And I'd like to offer that into

21   evidence.

22           MR. LEE:  No objection.

23           THE COURT:  Admitted.

24           (Plaintiff Exhibit No. 515 admitted.)

25   BY MR. HUGHES:

1   **Q.**   Thank you, Your Honor.  And I've got it here on the

2   screen, Dean Fitzsimmons.

3   **A.**   It's a little blurry, so I think I'll just go with the

4   paper.

5   **Q.**   I've blown it up for you.  There we see, we've got an

6   email exchange between Mr. Hibino and you with a date of

7   April 10, 2013.

8        Do you see that?

9   **A.**   Excuse me.  I do.

10  **Q.**   It's P516.

11  **A.**   I have it.  Yes, I do.

12  **Q.**   And that's the same date we saw in the privilege log for

13  the email exchange between you and Ms. Yong, correct?

14  **A.**   That's correct.

15  **Q.**   And then I want to blow up part of that email from

16  Mr. Hibino to you.  Mr. Hibino is writing to your

17  assistant -- you're copied on this email right here, correct,

18  Dean Fitzsimmons?

19  **A.**   This is the one you have on the screen?

20  **Q.**   On the screen.

21  **A.**   Yes.

22  **Q.**   Okay.  He's talking to your assistant, but you received

23  these emails, correct?

24  **A.**   Yes.

25  **Q.**   We've got this email dated April 10, 2013.  "In case he

1    is not reading his emails, I wanted to ask him one other

2    question from our call this morning.  Regarding the impact of

3    legacy on Asian-American applicants, what proportion of

4    Asian-American applicants are legacies and what proportion of

5    white applicants are legacies?"

6            Do you see that?

7    **A.**  I can, yes.

8    **Q.**  And do you recall at this time that OCR was looking at a

9    potential claim of discrimination, an individual claim

10   against Asian-American applicant?

11   **A.**  I do have a recollection.  I'm not quite sure of the

12   precise details.

13   **Q.**  But it relates to that general issue, correct?

14   **A.**  Yes.

15   **Q.**  And that's what these documents concern, correct?

16   **A.**  That's correct.

17   **Q.**  And Mr. Hibino is asking you about legacy issues

18   surrounding that, correct?

19   **A.**  That's right.  Again, it's the cross-tab between

20   Asian-American and legacies and whites.

21   **Q.**  I want to go back to Plaintiff's Exhibit 12, page 34.

22           When you were having this dialogue and

23   correspondence with Mr. Hibino in April, just a little more

24   than a month after you'd been presented this information by

25   Harvard's Office of Institutional Research, did you tell

1    Mr. Hibino that even after you factor in the legacy and

2    athlete preferences that doesn't explain away all the

3    differences between white and Asian-American admissions to

4    Harvard?  Did you communicate to him what you'd learned from

5    OIR?

6    **A.**   I think he was just simply asking me about the numbers of

7    legacies who are Asian-American and white.  I don't think he

8    was asking me the question you just posed.

9    **Q.**   You didn't hell him, you know, we used to say legacies

10   and athletes explained everything.  OIR's now run some models

11   that might call that into question.  You didn't volunteer

12   that to Mr. Hibino, correct?

13   **A.**   Well, again, he simply asked me for some fairly limited

14   information.  Again, these were again very unremarkable

15   results here, again consistent with what we had done and what

16   they had looked at actually, what, 20-something years ago.

17   **Q.**   Let's keep moving on through 2013.  Later on in April

18   of 2013 after this dialogue with Mr. Hibino --

19   **A.**   Where are you now?

20   **Q.**   I'm sorry.  I'll take this off the screen.  I'm going to

21   ask you a question unrelated to a document.

22   **A.**   Okay.

23   **Q.**   In April of 2013, you asked the Office of Institutional

24   Research to look into the question of whether low-income

25   students receive a tip in the admissions process, correct?

1    **A.**  I did.

2    **Q.**  And I want to just look at -- show you Plaintiff's

3    Exhibit 19 and offer it into evidence.

4    **A.**  This is P19?

5    **Q.**  I'm waiting to see if we get it into evidence.

6             MR. LEE:  No objection.

7             THE COURT:  Admitted.

8             (Plaintiff Exhibit No. 19 admitted.)

9    BY MR. HUGHES:

10   **Q.**  Here we have an email from Erica Bever.  Do you see that?

11   **A.**  I do.

12   **Q.**  The date of the email is April 15, 2013, correct?

13   **A.**  That's correct.

14   **Q.**  At that time, Ms. Bever worked in -- she was the

15   assistant director, as we can see from her signature, of the

16   Office of Institutional Research, correct?

17   **A.**  That's correct.

18   **Q.**  And, Dean Fitzsimmons, Ms. Bever actually works for you

19   now in the admissions office, correct?

20   **A.**  That's correct.

21   **Q.**  But at this time she was with OIR, and she's writing you.

22   Subject is "Follow up," and copying Dr. Driver-Linn, Mark

23   Hansen.

24             She says, "Hi, Fitz.  Mark and I will be putting

25   together materials for the two requests you discussed with

1    Erin on Friday.  One, Dean Smith's tuition versus income

2    growth question; two, low-income students in admissions.

3    We're aiming to get you materials to review no later than the

4    end of the week."

5              Do you see that?

6    **A.**  Yes, I do.

7    **Q.**  And you recall asking for this work to be performed,

8    correct?

9    **A.**  I did.

10   **Q.**  The people that were performing this work,

11   Dr. Driver-Linn, Ms. Bever, were some of the same people that

12   worked on the work we just looked at in Plaintiff's

13   Exhibit 12, correct?

14   **A.**  That's correct.

15   **Q.**  When you asked him to do this additional work on

16   low-income students and admissions, you didn't tell them not

17   to run a logistic regression model, correct?

18   **A.**  Well, they had done the work, so I'm not sure what you're

19   asking me.

20   **Q.**  You weren't saying it's not a good idea to keep analyzing

21   our admissions process with logistic regression models.  You

22   were fine with them continuing to do that, correct?

23   **A.**  They had submitted the data.  We had discussed it.  And

24   again, the five models -- again, the four models were again

25   very consistent with the past.  But I'm not quite sure what

1    you were expecting me to ask here.

2    **Q.**   Just a very simple question.  You were perfectly

3    comfortable with them continuing to analyze admissions data

4    using the logistic regression models that they employed,

5    correct?

6    **A.**   Really, whatever they wanted to do.  Whatever they

7    thought could be helpful to us.

8    **Q.**   And you had confidence, of course, that your colleagues

9    at OIR would provide you robust and reliable work, correct?

10   **A.**   Yes.

11   **Q.**   That's a serious office that does serious work on behalf

12   of Harvard, correct?

13   **A.**   That's correct.

14   **Q.**   And remember we saw back in Plaintiff's Exhibit 12 that

15   one of the things that OIR was using in its model was the

16   academic index.

17         Do you recall that?

18   **A.**   Yes.

19   **Q.**   And you didn't suggest to them, hey, it's not a good idea

20   to use the academic index.  You trusted them to pick reliable

21   variables, correct?

22   **A.**   We trusted them to do good research.

23   **Q.**   Now I want to show you Plaintiff's Exhibit 21 and offer

24   it into evidence.

25         MR. LEE:  No objection.

```
1              THE COURT:  It's admitted.
2              (Plaintiff Exhibit No. 21 admitted.)
3              MR. HUGHES:  Thank you, Your Honor.
4    BY MR. HUGHES:
5    Q.  And here we've got an email from Ms. Bever, dated
6    April 22, 2013, to you, copying others, correct?
7    A.  That's correct.
8    Q.  And this is about a week after the email that we just
9    looked at, correct?
10   A.  That's correct.
11   Q.  And Ms. Bever says, "Dear Bill.  I'm attaching two sets
12   of slides for your review.  Number one, low-income exhibits.
13   This set of slides examines difference in admission rates for
14   low-income students and all other students."
15             Do you see that?
16   A.  Yes, I do.
17   Q.  Okay.  And then those low-income slides are attached to
18   this email, as she just said.  I've got the second page of
19   Plaintiff's Exhibit 21 on the screen.
20             Do you recall getting this information from OIR
21   concerning low income?
22   A.  I do.
23   Q.  Okay.  And what we've got here is we've got a chart that
24   shows income along the bottom, correct?
25   A.  That's correct.
```

1    Q.   And we've got SAT scores as the other metric, correct?

2    A.   That's correct.

3    Q.   And the title, the note here in the bullet point is that

4    income and SAT scores are positively related, correct?

5    A.   That's correct.

6    Q.   Okay.  Just the basic idea is the more resources you

7    have, that would be at least correlated with a likelihood of

8    getting a higher SAT score, correct?

9    A.   Yes.

10   Q.   Okay.  Then we go to the next slide.  And what OIR does

11   is uses SAT as a proxy for admissions qualifications.  We see

12   at every score level lower-income students have higher admit

13   rates.

14        Do you see that?

15   A.   I do.

16   Q.   Again, this was data that you asked for and was presented

17   to you by OIR, correct?

18   A.   That's correct.

19   Q.   You remember getting this data, correct?

20   A.   I do.

21   Q.   And what we've got along the bottom here are SAT scores

22   it looks like ranging from 600 up to 800, perfect, correct?

23   A.   That's correct.

24   Q.   Okay.  And here what we have is we have a comparison of

25   the likelihood of admission for similarly qualified academic

1    candidates, correct?

2    **A.**   Yes.   That's the analysis.

3    **Q.**   This is good analysis in the sense it makes sense

4    sometimes to look at similarly qualified academic candidates

5    when analyzing the Harvard admissions process, correct?

6    **A.**   It's certainly one way to do it.

7    **Q.**   And a way that OIR, your colleagues at OIR did, correct?

8    **A.**   That's correct.

9    **Q.**   The work that you asked for, correct?

10   **A.**   That's correct.

11   **Q.**   Okay.   And so what we see here actually is that even

12   though getting a higher SAT score is at least correlated with

13   more money, more resources, it turns out in the Harvard

14   admissions process, if you have people with similarly

15   academic qualifications, low-income socioeconomic applicants

16   are more likely to get in to Harvard than a similarly

17   qualified non-disadvantaged applicant, correct?

18   **A.**   Yes.   It could serve in a sense as a tip factor.

19   **Q.**   You were actually -- based on some things that had been

20   reported in the literature, you were actually looking into

21   whether the Harvard admissions process could provide a tip

22   for -- did provide a tip, in fact, for low-income applicants,

23   correct?

24   **A.**   Yes.   We wanted empirical proof of it.

25   **Q.**   And you asked OIR to get that empirical proof, correct?

1    **A.**   That's correct.

2    **Q.**   And that's what this is.  This was empirical proof of

3    that tip, correct?

4    **A.**   Yes.

5    **Q.**   And then we go to the next slide.  And again, these are

6    predicted and actual admit rates by income band.

7         Do you see that?

8    **A.**   I do.

9    **Q.**   And this is page 3 of the slides.  It's actually page 4

10   of Plaintiff's Exhibit 21.  And I want to just walk through

11   what this is showing.  If we look at the bottom, we have the

12   maroon is the predicted admit rate.

13        Do you see that?

14   **A.**   I do.

15   **Q.**   And then the white with the maroon outline around it is

16   the difference between the predicted and actual admit rates,

17   correct?

18   **A.**   Correct.

19   **Q.**   And then the diamond, black diamond is the actual admit

20   rate, correct?

21   **A.**   That's correct.

22   **Q.**   And then what we do here, they kind of explain what

23   they've done.  OIR says, "Predicted admit rates by income are

24   based on logistic regression models that control for academic

25   index, academic rating, athlete, legacy, extracurricular

1    rating, personal rating, ethnicity, and gender."

2            Do you see that?

3    **A.**  I do.

4    **Q.**  And then it describes the conclusions that are shown in

5    the bar graph here, that "low-income students are admitted at

6    higher rates than predicted.  Higher income students are

7    admitted at a lower rate."

8            Correct?

9    **A.**  That's correct.

10   **Q.**  And then it describes the pseudo R-squared of the model,

11   correct?

12   **A.**  That's correct.

13   **Q.**  This was more of the empirical evidence that OIR provided

14   to you showing that, in fact, there is a tip for low-income

15   applicants to Harvard, correct?

16   **A.**  That's correct.

17   **Q.**  Now I'd like to show you Plaintiff's Exhibit 604.

18           MR. LEE:  Are you going to offer it?

19           MR. HUGHES:  I'm sorry, Mr. Lee.

20           I offer Plaintiff's Exhibit 604 into evidence.

21           MR. LEE:  I would object because this witness is

22   not on this email chain.

23           THE COURT:  Hold on.  Let me look at it.

24           MR. HUGHES:  If I may be heard, Your Honor?

25           THE COURT:  Let me read it first and then you can

1    definitely be heard.

2          I'm not going to admit -- you can be heard, but let

3    me tell you what my preliminary thought is.  I'm not going to

4    admit the exhibit through this witness.  He's not on it, and

5    I don't know that he's ever seen it before.  But to the

6    substance that, for example, he -- it reflects that he has

7    some information he wants to share, if you want to ask him

8    about that, you can.

9          MR. HUGHES:  He was shown it in preparation for his

10   30(b)(6) deposition, but we can get that out here.

11         THE COURT:  Okay.  Any objection to it being on the

12   screen, Mr. Lee?

13         MR. LEE:  Pardon, Your Honor?

14         THE COURT:  Any objection to it being on the

15   screen?

16         MR. LEE:  No.

17         THE COURT:  It can be shown, Karen.

18   BY MR. HUGHES:

19   Q.  Now, Dean Fitzsimmons, do you have the paper version of

20   this in front of you?

21   A.  Is this still 604?

22   Q.  Yes, sir.  This is Plaintiff's Exhibit 604.

23   A.  Okay.

24   Q.  Sir, you see there's a sticker on there that has your

25   name on it, "Fitz," with the number 19 in the lower

1    right-hand corner?

2    **A.**   Yes, I do.

3    **Q.**   And you recall being shown this document during your

4    deposition?

5    **A.**   I don't, to be honest, but it was ten hours videotaped.

6    **Q.**   I just want to refresh your recollection on this because

7    it's not a memory contest.  If you want to pull out your

8    deposition and turn to page 417.

9    **A.**   Let's see.  It's the binder.  Okay.  417?

10   **Q.**   417.  I'll remind you that this was Exhibit 19 to your

11   deposition.  I just want you to read to yourself starting at

12   417, line 22, stopping at 418, line 8.  And let me know when

13   you've finished reading --

14   **A.**   So 417 from -- excuse me?

15   **Q.**   417, 22, to 418, line 8.

16   **A.**   I'm sorry.  How far down do you want me to read?

17   **Q.**   Line 8.

18   **A.**   Can I just finish?  One second.

19   **Q.**   Sure.  Take your time.

20   **A.**   Okay.

21   **Q.**   Now that you've refreshed your recollection, do you agree

22   that you saw this during your deposition and it was shown to

23   you in preparation for your deposition?  That's what you

24   testified to.

25   **A.**   That sounds right.

1    **Q.**   So now let's take a look at the document.   The second

2    page, let's orient everybody to the date.   We've got an email

3    from Dr. Driver-Linn to Christine Heenan, and the date is

4    Sunday, April 28, 2013, correct?

5    **A.**   That's correct.

6    **Q.**   And remember we just looked at those slides that provided

7    that empirical evidence that Harvard was giving a tip to

8    low-income students?   Do you remember looking at Plaintiff's

9    Exhibit 21 just a few minutes ago?

10   **A.**   I do.

11   **Q.**   And do you have in mind that the date of Plaintiff's

12   Exhibit 21 was just a few days before?   Plaintiff's

13   Exhibit 21 was April 22.   Do you have that in mind?

14   **A.**   I do.

15   **Q.**   Okay.   So this is an email exchange that you're not on,

16   but it concerns you, and it's occurring just a few days after

17   OIR has sent you its empirical data that establishes that

18   low-income students get a tip, correct?

19   **A.**   Yes.   That sounds right.

20   **Q.**   Okay.   And Dr. Driver-Linn works for OIR, correct?

21            MR. LEE:   No, Your Honor.   He's asked this question

22   20 times about Dr. Linn and OIR.   And I'm getting a little

23   worried about the time.

24            MR. HUGHES:   We all know who Dr. Driver-Linn is.

25   BY MR. HUGHES:

1    **Q.**  Who is Christine Heenan?

2         THE COURT:  The objection took longer than the

3    question would have.  Go ahead.

4    BY MR. HUGHES:

5    **Q.**  Who is Christine Heenan?

6    **A.**  Christine Heenan was our vice president for public and

7    community affairs, I think the title was at the time.  I

8    can't be exact.

9    **Q.**  She's no longer with Harvard.  But when she was, she was

10   one of the top PR people at Harvard, correct?

11   **A.**  That's correct.

12   **Q.**  Was she the very top PR person or just one of a handful

13   at the top?

14   **A.**  I think you could say that.  I'm not totally familiar

15   with the organizational structure of public and community

16   affairs, but she certainly -- you could make that case.

17   **Q.**  Dr. Driver-Linn is communicating with Ms. Heenan a few

18   days after you received the slides we just looked at.

19        And she says, "Hi, Christine.  Hope all is well.

20   Also would like to give you have a heads-up about some

21   analysis and correspondence we've been having with Fitz.

22   He's excited to share more broadly.  I believe he is going to

23   be in touch with Jeff Neal tomorrow, but I'd like to make

24   sure you've had a chance to think through implications, not

25   entirely straightforward."

1          Do you see that?

2    **A.**  I do.

3    **Q.**  And do you remember in the few days after you'd received

4    the information you'd asked for showing that there was

5    empirical evidence of a tip for low-income applicants being

6    excited to share that information?

7    **A.**  I'm not sure I would have used the word "excited," but

8    there's certainly been a great deal of discussion out in the

9    world about the issue.  And it was very good, frankly, for us

10   to see that it was confirmed.

11   **Q.**  There was some criticism that low-income applicants might

12   not be getting a tip.  OIR found they were, in fact, getting

13   a tip, empirical evidence, provided that to you.  Maybe you

14   wouldn't use the word "excited," but you thought that might

15   be something worth getting out there in the public, correct?

16   **A.**  Certainly to, at some point, have the public be aware

17   that contrary to some speculation or research that this is

18   something that we do.  Because I think we really wanted to

19   make sure we sent a message to people from poor and

20   modest-income backgrounds that Harvard was a real possibility

21   for them.  And we had put in place two rounds of a really

22   quite dramatic change in financial aid.  So it seems to me to

23   be something that we would -- if we were asked, for example,

24   we would want to let people know that poor people as well as

25   rich people should think about Harvard.

1    **Q.**  You wanted to send the message to low-income applicants

2    that Harvard would give them a favor shake, even a tip, based

3    on the OIR research, correct?

4    **A.**  Yes.  And again, it's following the process.

5    **Q.**  Now I want to look at the first page of P 604.

6              THE COURT:  How much longer do you think you have

7    with this witness?

8              MR. HUGHES:  Probably another 20 minutes or so.  If

9    it's a good time for a break, this is fine.

10             THE COURT:  I was thinking you would finish your

11   direct and we'd break and then start the cross at after

12   lunch.  It doesn't sound like we're going to get that far.

13             MR. HUGHES:  It just kind of depends on a couple of

14   things.  I'd really defer to Your Honor.

15             THE COURT:  Get to a good stopping place and we'll

16   take the lunch recess.

17             MR. HUGHES:  I think now is as good as any.

18             THE COURT:  Quarter of 1:00.  All right, everyone?

19             MR. LEE:  Your Honor, just if I could remind the

20   Court in the pretrial order we agreed to split the trial

21   time.  We know you've given us three weeks.  We've agreed to

22   split the trial time.  I'm a little worried because we're

23   five and a half hours for this witness, and they have 16

24   other witnesses to go.  And I haven't had a chance with him

25   yet.

1              THE COURT:  He told me yesterday the pace is going

2       to pick up dramatically after this witness.  And I will build

3       in what extra time I can for you in the next three weeks, or

4       you can make my next case settle and I'll give you the extra

5       time on the other end.

6              MR. LEE:  I don't think I can do the latter so

7       we're going to have to try for the former.

8              MR. MORTARA:  Your Honor, Adam Mortara for Students

9       for Fair Admissions.  A lot of the information that Harvard

10      presumably will elicit from Dean Fitzsimmons has been

11      elicited, so we're going to be efficient.  And I can

12      guarantee you, my direct -- my adverse direct of Senior

13      Admissions Officer Christopher Luby will be less than 30

14      minutes.

15             THE COURT:  I am not trying to rush you, although I

16      will try to point out that they have the right to elicit the

17      information from their witness in their own way.  Although

18      I'm sure they're appreciative of the efforts you're making on

19      their behalf.

20             I'm not trying to rush you.  I'm trying to give you

21      what time you need.  If just you tell me two weeks, then you

22      tell me three, and I've adjusted my schedule to accommodate

23      the third.  I will do what I can to give you the extra time.

24      We'll just keep track of it.

25             Can I ask you one favor before we go?  The

1    discussion that we had this morning, someone left me with a

2    copy of half of it but not the other half.  Can someone get

3    me a copy of the other half as well?  I have 513.

4                Take 45 minutes, so it's a little after a quarter

5    of.

6                (Court recessed at 12:05 p.m.)

7                     ***  AFTERNOON SESSION  ***

8                MR. HUGHES:  Welcome back, Dean Fitzsimmons.

9                THE COURT:  I'm sure he's happy to be here.

10   BY MR. HUGHES:

11   **Q.**  We're going to try to finish this up and then turn it

12   over to Mr. Lee.

13               Just to reorient where we were, we were marching

14   through April.  We looked at the April 22 slides that you got

15   from OIR that showed the tip for low income.  Then when we

16   took the break we were looking at an email exchange from

17   April 28 between Dr. Driver-Linn and Ms. Heenan, and we

18   talked about how at this time you thought it would be

19   worthwhile to share the empirical data that you had on low

20   income.

21               Do you recall that conversation?

22   **A.**  I do.

23   **Q.**  Okay.  And so then Ms. Heenan responds to

24   Dr. Driver-Linn's email.  She says, "Sounds good re Fitz."

25   She asks, "What's the issue?"

1          And then briefly on page 1 of 604, we're got

2    Dr. Driver-Linn's response to Christine Heenan.  This is now

3    the next day on April 2, 2013.  Let me just read this part of

4    Plaintiff's Exhibit 604 and I'll ask you a quick question and

5    we'll move on.

6          "Fitz asked us to do some analysis of the 'thumb on

7    the scale' for low income.  Could be a positive message but

8    has implications for need-blind policy as well as opening the

9    door to Unz-like requests for information about other thumbs

10   on the scale.  Team is putting together a memo to send to

11   Fitz, copy to you and Jeff, to put this in context, but I

12   guess I am aware that part of the wonderful thing about Fitz

13   is that he has lots of friends and he likes to talk about his

14   work."

15         And I'm sure we can agree with the last part,

16   right?

17   **A.**   That would not be unfair.

18   **Q.**   Okay.  My question here, in all seriousness, Dean

19   Fitzsimmons, is at this time, after you received those

20   low-income slides, you were thinking about sharing them more

21   broadly, were you in conversations with Driver-Linn about

22   potential implications or concerns with sharing that

23   information because it might lead to concerns around the Unz

24   Asian-American discrimination issue?

25   **A.**   I guess.  I mean, I think that's as good a guess as I

1    could give.

2    **Q.**   That's something you recall discussing with her around

3    that time, correct?

4    **A.**   Yes.

5    **Q.**   And you do -- and we'll look at it in a moment.  You do

6    recall ultimately getting a memo dated May 1 from OIR on the

7    low-income issue, correct?

8    **A.**   That's correct, yes.

9    **Q.**   We're going to look at that in one minute, but I reminded

10   myself over the break we forgot to look at one page of

11   Plaintiff's Exhibit 12.  So we'll do that briefly.  We'll go

12   back to Plaintiff's Exhibit 12, page 34.

13            We spent a long time -- I've got it on the screen,

14   Dean Fitzsimmons.  We spent a long time talking about what

15   these models and these bar graphs show.  You recall that,

16   correct?

17   **A.**   That's correct.

18   **Q.**   We're not going to revisit that discussion.  The record

19   is clear.  What I wanted to show you was page 38.  We looked

20   at page 35 -- actually we skipped 35.  We looked at 36 and 37

21   together.  I meant to show you, I forgot, page 38.  So just a

22   few pages after the model.  Page 38, Plaintiff's Exhibit 12.

23   Next steps.

24   **A.**   This is P12?

25   **Q.**   Yes.  I've got it on the screen.  You're welcome to get

1    it out from the binder.  Just let me know when you're ready.

2    **A.**  You're on page 38.

3    **Q.**  Right.  Of the slide.  What OIR is saying on page 38,

4    "Next steps.  Addressing questions raised about admissions

5    and financial aid."

6              Do you see that?

7    **A.**  I do.

8    **Q.**  And then we'll blow up the top of this document, and you

9    see one of the research questions, Question Number 3 is, "Is

10   there bias against Asians in college admissions?"

11             Do you see that?

12   **A.**  I do.

13   **Q.**  You said you were comfortable with what those bar graphs

14   showed that we talked about for so long.  But at least OIR is

15   asking the question, "Is there bias against Asians in college

16   admissions?"  That's the question they're asking here,

17   correct?

18   **A.**  The question they asked is part of the report, their

19   comprehensive report.

20   **Q.**  And then next steps they have on the right, they have,

21   "Who else should see this work?"

22             Do you see that?

23   **A.**  I do.

24   **Q.**  We've already agreed that this wasn't shared with others

25   in the admissions office or Dean Smith or President Faust,

1   correct, this part of the document, correct?

2   **A.**   That's correct.

3   **Q.**   Okay.  And then it says, "To further address the question

4   of bias, is there more data to elaborate our understanding of

5   the role of the personal essay and other factors?"

6           Do you see that?

7   **A.**   I do.

8   **Q.**   And there was no follow-up between OIR and the admissions

9   office on the personal essay issue, correct?

10  **A.**   That's correct.  Of course they are not admission

11  officers and we are, and we know that the personal essay

12  along with every other factor does play a role.  So that

13  might have been sort of interesting to them because perhaps

14  they didn't realize what we did with it.

15  **Q.**   So they were raising the question, "Is there bias against

16  Asians in college admissions?"  But you thought you knew the

17  answer at this time.  Is that what you're saying?

18  **A.**   Certainly their model and all the other things we looked

19  at suggested that there was no bias.

20  **Q.**   Let's go ahead and look at that May 1 memo, which is

21  Plaintiff's Exhibit 26.

22          MR. HUGHES:  And before I ask substantive

23  questions, I'd like to offer Plaintiff's Exhibit 26 into

24  evidence.

25          MR. LEE:  No objection.

1          THE COURT:  Admitted.

2          (Plaintiff Exhibit No. 26 admitted.)

3    BY MR. HUGHES:

4    **Q.**  Thank you, Your Honor.  So, Dean Fitzsimmons, I've got

5    the first page of Plaintiff's Exhibit 26 blown up on the

6    screen.

7          Do you see that?

8    **A.**  I do.

9    **Q.**  And you recall receiving this email with the May 1 memo

10   attached to it, correct?

11   **A.**  I do.

12   **Q.**  The email is from Ms. Bever on May 1, addressed to you,

13   correct?

14   **A.**  That's correct.

15   **Q.**  Copying your assistant and Dr. Driver-Linn and Mark

16   Hansen, correct?

17   **A.**  That's correct.

18   **Q.**  Subject, "Admissions memo," and the title of the

19   attachment is "Low-Income Admissions Memo Final," date of

20   May 1, 2013, correct?

21   **A.**  That's correct.

22   **Q.**  This is the final memo from OIR on the low-income

23   admission issue that you asked them to look into, correct?

24   **A.**  It looks like their final draft.

25   **Q.**  And then Ms. Bever writes to you, "Dear Fitz.  Attached

1    is a memo describing our recent analysis of low-income

2    admissions.  In the memo we describe our approach and

3    results.  At your suggestion, we reviewed a small sample of

4    literature to put this in context and realized our approach

5    was consistent with what others have done.  We'd appreciate

6    any comments or suggestions you have."

7              I'll stop there.  And I'll ask you, do you agree

8    that you suggested to OIR to look into the literature to

9    effectively validate their approach?

10   **A.**   That's correct.

11   **Q.**   And you agree that OIR did, in fact, do that and they

12   described what they did in the memo, correct?

13   **A.**   That's correct.

14   **Q.**   And then the next paragraph goes on to say, "We thought

15   based on our conversation last week that it would also make

16   sense to share this with Jeff Neal, Christine Heenan, Nina

17   Collins, and Sally Donahue.  Does that make sense?"

18              Do you see that?

19   **A.**   I do.

20   **Q.**   Do you know whether you ultimately shared this memo with

21   Jeff Neal or Christine Heenan?

22   **A.**   I suspect that maybe they shared the memo, but we would

23   certainly be open to having them share that information.

24   **Q.**   Again, this is just a few days after the email exchange

25   between Driver-Linn and Heenan on the Unz issue.

1          Were the conversations that Ms. Bever was referring

2    to here conversations about the potential considerations in

3    sharing this low-income information more broadly?

4    **A.**   I think so.  I'm not quite sure whether she was referring

5    to a conversation she had with me or perhaps with others in

6    her group.

7    **Q.**   The email is addressed to you, right?

8    **A.**   Yes.  But I'm just talking -- I understand what you're

9    saying.

10   **Q.**   Okay.  So we can go ahead, Dean Fitzsimmons, and look at

11   the memo.  This is where the actual attachment, the memo,

12   starts, right?

13   **A.**   That's correct.

14   **Q.**   Let's walk through parts of it.  We're not going to read

15   the whole thing.  On the first page, OIR says -- the memo is

16   addressed to you and only to you, correct?

17   **A.**   That's correct.

18   **Q.**   And OIR says, "At your request, we undertook an analysis

19   to determine if the chance of admission is any different for

20   low-income students, holding all other admissions

21   characteristics constant.

22          "Below we briefly describe the data used for our

23   analysis and its limitations, our approach, and our findings.

24   At the conclusion we outline some issues we believe are

25   important to consider prior to public dissemination of this

1    analysis."

2              That's part of the memo, correct?

3    **A.**  That's correct.

4    **Q.**  Again done at your request, correct?

5    **A.**  That's correct.

6    **Q.**  And then if we go to the second page, they describe in

7    the memo the approach and the process that they took,

8    correct, Dean Fitzsimmons?

9    **A.**  That's correct.

10   **Q.**  And I've got the second page of the memo, which is the

11   third page of Plaintiff's Exhibit 26, up on the screen.  And

12   you can see I've highlighted a paragraph where OIR identifies

13   some of the limitations associated with the approach they've

14   taken, correct?

15   **A.**  That's correct.

16   **Q.**  Do you see that up on the screen?

17   **A.**  I do.

18   **Q.**  And then OIR goes on to say, "In spite of these

19   limitations, the logistic regression model results are

20   consistent with the descriptive analysis described above and

21   shown in Exhibits 1 and 2.  Exhibit 3 illustrates the

22   difference between the predicted admission rate and actual

23   admission rate for students at each income level."

24              Do you see that?

25   **A.**  I do.

1    **Q.**   They walk through the limitations and they say we

2    compared the output of our model to some descriptive

3    analysis.   They match up.   That's a measure of reliability.

4         Would you agree?

5    **A.**   That's correct.

6    **Q.**   So now I want to look at Exhibits 1, 2, and 3.   I think

7    they will look familiar.   So here is Exhibit 1 to the May 1

8    memo.   This was also an exhibit to Plaintiff's Exhibit 21,

9    the slides that you received on April 22 that we looked at

10   earlier.   It's the same slide, correct?

11   **A.**   Looks identical.

12   **Q.**   And Exhibit 2, again, is the same thing we looked at that

13   you got on April 22, correct?

14   **A.**   That's correct.

15   **Q.**   And Exhibit 3 is, again, the same thing that you got on

16   April 22 in Plaintiff's Exhibit 21, correct?

17   **A.**   That's correct.

18   **Q.**   And again, this Exhibit 3 actually shows some of the

19   results of the logistic regression model that was performed

20   by OIR, correct?

21   **A.**   That's correct.

22   **Q.**   You agreed that that logistic regression model provided

23   empirical evidence of that low-income students applying to

24   Harvard were receiving a tip, correct?

25   **A.**   That's correct.

1  **Q.**  Okay.  So now I want to go back to where we were on

2  page 2 of the memo.  The first paragraph describes Exhibits 1

3  and 2, agree?  That I've got highlighted, culled out?

4  **A.**  Yes.

5  **Q.**  And then I want to go to the paragraph before, which

6  says, "To get a sense of the size of the admissions advantage

7  conferred to low-income applicants relative to other groups

8  of applicants, the so-called 'thumb on the scale,' we include

9  low-income status in a second logistic regression model.  The

10  table below is sorted based on the effect size of each of the

11  variables included in the model.  The variables with the

12  largest effects on the probability of admission are athletic

13  rating, personal rating, and legacy status.  Compared to

14  athletes and legacies, the side of the advantage for

15  low-income students is relatively small."

16        Do you see that?

17  **A.**  I do.

18  **Q.**  And you know from looking at this document before that

19  the reports of that logistic regression model are reported --

20  the results of it are reported on the next page, correct?

21  **A.**  Yes, and with their -- yes.

22  **Q.**  But those results provide more empirical evidence about

23  how Harvard's admissions process works, correct?

24  **A.**  It gives you another way to look at it perhaps.

25  **Q.**  It builds on the first logistic regression model that was

1    in Slide 3 that we just looked at, right?

2    **A.**   Right.

3    **Q.**   And it provides more empirical evidence about how the

4    Harvard admissions process works, correct?

5    **A.**   Yes.  In the sample that they used, yes.

6    **Q.**   And then if we go to the third page, the next page, we've

7    got the output of that logistic regression model, correct?

8    **A.**   That's correct.

9            THE COURT:  What does "constant" mean?  Do you know

10   what "constant" means?

11           THE WITNESS:  I'm in over my head on this kind of

12   stuff.  These are always very hard to gauge, Your Honor.

13   It's probably better to look at the actual chart that they

14   created.  But it comes out of, I guess, weightings in the

15   equation.  But I'm not quite sure what the "constant" is, to

16   be honest.

17           MR. HUGHES:  We'd probably be better have some

18   other experts do that.

19           THE COURT:  We'll get it tomorrow.  Thank you.

20   BY MR. HUGHES:

21   **Q.**   In any event, what OIR has described to you in this memo

22   is that the higher the number here, the greater your chances

23   are of getting into Harvard, correct?

24   **A.**   Yes.  But it's very hard for a non-statistical expert to

25   figure out actually what these things mean.

1    **Q.**  I just want to make sure we read what OIR told you, and

2    I'll highlight it.  We just went over this, but again, OIR is

3    telling you that the variable with the largest effects on the

4    probability of admission, and then it describes what those

5    are and then it has the table, correct?

6    **A.**  Yes.

7    **Q.**  OIR is communicating to you what the basic meeting of

8    these variables and the numbers associated with them are,

9    right?

10   **A.**  That's what they're trying to do.

11   **Q.**  And then if we go to the next page and we see what OIR

12   told you about the variables that are included, we see the

13   athletic rating of 1, you've got a really good chance of

14   admission to Harvard, correct?  Highest number on the list?

15   **A.**  I'm not sure that's exactly how to read that.  It is a

16   factor that can be very helpful.  I think it's probably the

17   way you look at it.  Again, I'm not entirely sure what these

18   numbers actually mean, and I would certainly defer to the

19   statistical experts when the time comes.

20   **Q.**  So you understood what Table 3 in Plaintiff's Exhibit 21

21   meant which was based on a version of this logistic

22   regression model.

23          Are you saying that you don't understand that OIR

24   is telling you the higher the number here the more likely

25   chance of admission to Harvard?

1    **A.**   I think, again, it's what the -- effect the factor would

2    have.  But how you calibrate that with a real candidate is a

3    little bit unclear to me and I think to most people probably

4    in the room.

5            But I understand what you're saying.  And I think

6    there's no question, for example, that if you have an

7    athletic rating of 1, that would perhaps increase your

8    chances of getting in.

9    **Q.**   You would agree that having an athletic rating of 1

10   significantly increases your chances of getting into Harvard,

11   correct?

12   **A.**   Yes.

13   **Q.**   And you also agree that having a high personal rating

14   also increases your chances of getting into Harvard, correct?

15   **A.**   That's correct.

16   **Q.**   And you also agree that African-Americans receive a tip

17   in the admissions process.  We talked about that yesterday,

18   correct?

19   **A.**   That's correct.

20   **Q.**   And you also agree that Hispanic applicants, we see down

21   here, also get a tip in the admissions process at Harvard,

22   correct?

23   **A.**   That's true.

24   **Q.**   Remember we looked at your report, Plaintiff's

25   Exhibit 31, where you adopted Dr. Card's analysis, and it

1    showed as a group African-Americans get more of a tip than

2    Hispanic applicants to Harvard, correct?

3    **A.**   Yes.

4    **Q.**   And that relative relationship --

5    **A.**   At least in terms of the way that worked out in that

6    sample.

7    **Q.**   And that relative relationship holds true in this report

8    that you received from --

9              MR. LEE:  I'm objecting to this now, having him

10   draw conclusions on this chart.  He said repeatedly he's not

11   quite sure how it works.  I don't have any problem with him

12   going back to the charts that he testified about, but we're

13   now -- he said four or five times he's not quite sure how

14   these numbers work.

15             MR. HUGHES:  Your Honor, he received this memo --

16             THE COURT:  I don't understand the question even.

17             MR. HUGHES:  I will withdraw that question.

18             THE COURT:  All right.

19   BY MR. HUGHES:

20   **Q.**   If we look down at the low income here is that

21   self-reported income less than or equal to $60,000, correct?

22   **A.**   That's correct.

23   **Q.**   That was the definition of low income in both these

24   regression models, correct?

25   **A.**   Yes.

1    **Q.**  And that's positively associated with admission to

2    Harvard, correct?

3    **A.**  That's correct.

4    **Q.**  And what we see down the next --

5            THE COURT:  Hold on a second, Mr. Hughes.

6            MR. LEE:  Your Honor, I object.  The witness who

7    prepared this chart is going to testify.  She's on their

8    witness list.  She's going to come in.  He said a number of

9    times he's not the person to do it.

10           MR. HUGHES:  Your Honor, he asked for this

11   analysis.  This is just showing the size of the tip for low

12   income.

13           MR. LEE:  It's --

14           THE COURT:  Stop.  I'm going to let him -- he's

15   just going through the information in the chart.  So we get

16   down to the Asians so he can comment on that, I assume is the

17   purpose of the exercise.  It's not prejudicing you in any

18   way.  I'm going to overrule the objection.

19           MR. LEE:  Can I say one more thing, Your Honor?

20           THE COURT:  Yes.

21           MR. LEE:  I understand where Your Honor is going.

22   This doesn't say anything about the tip and how a tip

23   correlates to any of this, which is the last question.

24           THE COURT:  All right.  He's right about that.  So

25   why don't you rephrase it without the word "tip."

BY MR. HUGHES:

Q.  The variable self-reported income less than or equal to $60,000 is positively associated with admission to Harvard, correct?

A.  Again, it's not a cause and effect.  It would be one factor among many, I think is the way to think about it with anything.

Q.  You understand this is a refinement of the logistic regression model that you've told me 20 times provided empirical evidence that low-income applicants were getting a tip.  You understand that, right?

A.  I do.

Q.  Now, the next variable I want to ask you about is Asian, and under Asian the number is negative, correct?

A.  That's correct.

Q.  The variable Asian is negatively associated with your chance of getting into Harvard.  That's what you were told on May 1, 2013, correct?

A.  That's -- again, I'm not quite sure what these numbers mean.  You have to ask an expert, but I understand the drift of your question.

Q.  Now, we're just going to March down the same page of Plaintiff's Exhibit 26, this memo that you requested and OIR delivered.  I'll read it into the record.

            "The relative sizes of the admissions advantage

1    conferred on different groups can be seen by looking at the

2    differences in actual admit rates as well.  In Exhibit 4, we

3    limit our analysis to students with high academic ratings, 1

4    or 2, and examine the differences between athletes and

5    non-athletes, legacy students and others, Asian students and

6    all other students, and low-income students and all other

7    students.

8              "An athlete that is also an academic 1 or 2 has an

9    admit rate of 83 percent compared against 16 percent for

10   non-athletes with an academic 1 or 2.  55 percent of legacies

11   who are academic 1s and 2s are admitted compared with

12   15 percent of all other academic 1s and 2s.  Asian applicants

13   with an academic 1 or 2 are admitted 12 percent of the time

14   compared against an admit rate of 18 percent for non-Asian

15   applicants.  By comparison, low-income applicants with an

16   academic 1 or 2 have an admit rate of 24 percent compared

17   against 15 percent for all other applicants."

18             That's what was reported to you in the May 1 memo,

19   correct?

20   A.   That's correct.

21   Q.   If we look at Slide 4, this is the bar graph that relates

22   to that paragraph that we just read, correct?

23   A.   That's correct.

24   Q.   And on the right-hand side, it shows that Asian-American

25   applicants with an academic 1 or 2 are less likely to get

1  into Harvard than everybody else who has an academic 1 or 2,

2  correct?

3  **A.**  Yes.

4  **Q.**  And it also shows a low-income tip, correct?

5  **A.**  That's correct.

6  **Q.**  Okay.  Low-income tip that -- I'll withdraw that

7  question.

8         Let's go back to the page we were just looking at.

9  This is the last paragraph of text in the memo that OIR

10  delivered to you on May 1.

11         "Issues to consider before sharing these results

12  publicly.  We imagine that sharing any analysis of admission

13  weights will draw attention to the variety of factors that

14  compete with one another in the admissions decision.  To

15  state the obvious, with only approximately 2,200 spaces for

16  admitted students per year, implicit trade-offs are made

17  between athletes and non-athletes, legacy admits and those

18  without affiliation, low income, and other students.

19         "We know that many are interested in the analysis

20  of the relative trade-offs.  While we find that low-income

21  students clearly receive a tip in the admissions process, our

22  descriptive analysis and regression models also shows the tip

23  for legacies and athletes is larger and there are demographic

24  groups that have negative effects."

25         That's what OIR told you, correct?

1    **A.**   That's correct.

2    **Q.**   And the only demographic group in the chart above that

3    has a negative effect are Asians, correct?

4    **A.**   Yeah.  I think that's right.  Well, slight difference for

5    unknown and other, but I see your --

6    **Q.**   Asians have a negative effect, correct?

7    **A.**   Then there's unknown and other that apparently have a

8    slight negative association.

9    **Q.**   But no question Asians are included in the demographic

10   groups that have negative effects, correct?

11   **A.**   Correct.

12   **Q.**   Do you recall once you got this memo discussing with

13   Dr. Driver-Linn, Ms. Bever, Christine Heenan, whether it

14   would be a -- the concerns about sharing the low-income

15   information that you had told me earlier you thought was

16   worth sharing, but the concern on the other hand that it

17   might release information about negative effects on certain

18   demographic groups like Asians?

19   **A.**   You know, that, I'm not sure again.  I wasn't in their

20   minds, you know, for what set of concerns they might have

21   had.

22         I was interested in something very straightforward,

23   and that was to find out whether or not we actually gave a

24   tip, because many didn't think we did, for people from low-

25   and modest-income backgrounds.  And so that's what I wanted.

1    And I think that information was good for us to have in the

2    event that the issue would come up either on the road or in

3    other ways.

4    **Q.**   So you asked OIR to look at the issue of whether

5    low-income applicants get a tip.  They provided you analysis,

6    including a regression model, that showed a tip, and you

7    thought that was reliable empirical evidence of a tip for

8    low-income applicants, correct?

9    **A.**   It certainly -- yes.  Yup.

10   **Q.**   When OIR refined that regression model and showed a

11   negative effect on Asian-Americans, you didn't tell anyone in

12   the admissions office about that, did you?

13   **A.**   I'm not sure frankly exactly what we talked about as we

14   talked about the findings.  But again, the focus was a simple

15   one; and that is, whether or not we give a tip for people

16   from low- and moderate-income backgrounds.  So that as we

17   were actually out on the road already recruiting for next

18   year at that moment, because we do a lot of traveling, we

19   visit 150 locations across the United States.  Every year we

20   do a chunk of those in May.  So the idea that at least if

21   someone were to ask, they would have this new information

22   that we could corroborate.

23   **Q.**   I'm going to put up page 427 of your deposition, line 14.

24            "QUESTION:  Did you share the information about the

25   effect of being Asian in this study with anyone else in the

1    admissions office?

2           "ANSWER:  I don't recall sharing that specific

3    finding or other findings."

4           Were you asked that question?  Did you give that

5    answer?

6    **A.**  I'm sure I did because it's here in the record.  But

7    again, I'm not sure exactly, you know, the complexity of the

8    discussion that I eventually had with staff.  But the idea

9    was that we had this information about low- and

10   moderate-income students, which was of the whole point of the

11   exercise.  But I don't remember when I did that sharing the

12   complexity of apparently some concerns about other tips.

13   **Q.**  You did share with your staff the information about

14   low-income tips, correct?

15   **A.**  Yes.  To be honest, I'm not exactly sure, for example,

16   the date or anything of that sort because we have lots of

17   things going on.  But the staff certainly knows that there is

18   a tip.

19   **Q.**  But you didn't share the information from this memo about

20   the effect of being Asian with the admissions office,

21   correct?

22   **A.**  That would be correct, I think, but I don't honestly

23   remember the complexity of the discussion.

24   **Q.**  And you didn't ask -- you did not do anything to follow

25   up on the May 1 memo, correct?

1    **A.**  That's not correct.

2    **Q.**  Well, the very next question:

3            "Did you do anything to follow up on it?

4            "ANSWER:  No."

5            Did you give that testimony in your deposition?

6            MR. LEE:  Your Honor, if you go back to preceding

7    questions, this is a very narrow focus.  Not the memo in its

8    entirety.

9            THE COURT:  I agree.  I agree.  That's sustained.

10   BY MR. HUGHES:

11   **Q.**  Dean Fitzsimmons, tell us what you did do to follow up on

12   the May 1 memo.

13   **A.**  One of the things that, again, the various concerns,

14   including the one your just raised and the Ron Unz article

15   and lots of concern in the world certainly over the past

16   30 years about Asian-American admissions, one of the things

17   that I was concerned about when we looked at the findings

18   that we just went through was that I wanted to make sure that

19   if we give a tip for low-income background that we do it as

20   we do everything else, in an evenhanded manner for students

21   from all ethnic backgrounds.

22   **Q.**  So, sir, are you telling me that after you got this May 1

23   memo, you asked OIR to dig into the issue of the effect of

24   being Asian?

25   **A.**  Yes.  Relative, again, to what we were interested in, and

1    that is the -- at this particular point was low-income and

2    moderate-income applicants.

3    **Q.**  You'd seen the negative impact of being Asian in

4    Plaintiff's Exhibit 26, and so you went and you asked OIR to

5    take another look at it.  That's your testimony, correct?

6    **A.**  That's what we ended up getting, yes.

7    **Q.**  And you asked OIR to do that because you wanted them to

8    dig deeper on the effect of being Asian in your process,

9    correct?

10   **A.**  That would be the best of my recollection.  Again, we are

11   always busy at that time of year.  There's lots of things

12   going on, but that's the best of my recollection.

13   **Q.**  Same page back up on the screen, starting line 14.

14          "Did you share the information about the effect of

15   being Asian in this study with anyone else in the admissions

16   office?

17          "ANSWER:  I don't recall sharing that specific

18   finding or other findings.

19          "QUESTION:  Did you do anything to follow up on it?

20          "ANSWER:  No.

21          "QUESTION:  Did you ask to dig into it and ask OIR

22   to take another look at it?

23          "ANSWER:  Not that I recall."

24          Did you give that testimony?

25   **A.**  Yes.  And I would -- again for that particular thing, no.

1    I was concerned about if we have a tip for low- and

2    moderate-income students, I wanted to make sure that that tip

3    applied to all ethnic groups in the same evenhanded manner.

4    **Q.**  So, Dean Fitzsimmons, let's now talk about what you now

5    remember.  Let's look at Plaintiff's Exhibit 29.

6              MR. HUGHES:  I offer this into evidence.

7              MR. LEE:  What number are we?

8              MR. HUGHES:  Plaintiff's Exhibit 29.

9              MR. LEE:  No objection.

10             THE COURT:  Admitted.

11             (Plaintiff Exhibit No. 29 admitted.)

12   BY MR. HUGHES:

13   **Q.**  Dean Fitzsimmons, is Plaintiff's Exhibit 29 the result of

14   the follow-up that you say you asked for about whether

15   Asian-Americans receive a low-income tip?

16   **A.**  Again, to look at, make sure that it went across all

17   ethnic groups.

18   **Q.**  And do you remember -- we'll look at it together in a

19   moment.  I just want to test your memory.  Do you remember

20   what OIR found?

21   **A.**  Is this a memory test?

22   **Q.**  No.  If you want to look at the document, if you prefer

23   to do that, we'll do that.  Would you prefer that?

24   **A.**  Yeah.  It might be good for the Court.

25   **Q.**  So now we need to look at what I believe is the

```
1    attachment or the link for this email which is Plaintiff's
2    Exhibit 28.
3              And I'll offer that into evidence.
4              MR. LEE:  No objection, Your Honor.
5              THE COURT:  Admitted.
6              (Plaintiff Exhibit No. 28 admitted.)
7    BY MR. HUGHES:
8    Q.  Thank you, Your Honor.  Is this, Dean Fitzsimmons --
9    looking at the first page here, is this the OIR information
10   that you got as a result of the follow-up that you asked for?
11   A.  It looks like the beginning of -- it's a draft, but it
12   looks like the beginning of it.  Sorry.  My Boston accent
13   again.  Sorry.
14   Q.  So now I want to look at page 8 of Plaintiff's
15   Exhibit 28.
16              Do you see that?  And I've got it on the screen, if
17   it's easier.
18   A.  Yeah.  It's a little bit easier to read here.
19   Q.  Here we have the coefficients for logistic regression
20   modeling predicting probability of admissions, classes
21   2009-2016, includes interaction terms for all race/ethnicity
22   and low income.  Correct?
23   A.  That's what it says, yes.
24   Q.  Actually I want to go back to Plaintiff's Exhibit 29 for
25   one minute and ask you a question.
```

1    **A.**   Should I hold this?

2    **Q.**   Just look at the screen Plaintiff's Exhibit 29.

3    **A.**   All right.  Thank you.

4    **Q.**   What precisely did you ask OIR to do?  Did you just give

5    them a general request to look at the low income, or did you

6    ask them to interact the variable low income with ethnicity?

7    **A.**   Again, I don't remember the conversation exactly.  But at

8    first it was just the general, let's see if we give a tip.

9          And I don't remember exactly how I phrased it.  It

10   was a long time ago, but I did want to make sure -- we've

11   talked yesterday and the day before about safeguards.  We're

12   always trying to be vigilant and always trying to make sure

13   we are treating everybody in an evenhanded way.  So I

14   probably phrased it let's just make sure that we're looking

15   at this across -- giving the same kind of tip across all

16   ethnic backgrounds.

17   **Q.**   So now we'll go back to where we were, Plaintiff's

18   Exhibit 28, page 8.  And we'd read everything down to the

19   parenthetical, "Includes interaction terms for all

20   race/ethnicity and low income."

21          Do you see that?

22   **A.**   I do.

23   **Q.**   Okay.  And we've got three things that are in bold here,

24   correct?

25   **A.**   That is correct.

1   **Q.**  We've got low income, Asian and low income, and Asian.

2   Correct?

3   **A.**  That's correct.

4   **Q.**  Can you explain to us what OIR -- actually I withdraw

5   that question.

6            Let's go to the very bottom, the lowest bolded

7   thing.  There we have Asian.  Do you see that?

8   **A.**  I do.  Right next to an even stronger thing for

9   African-American and low income.

10  **Q.**  I want to ask you about that in a moment.  But what we

11  see here for Asian -- so that's Asian and not low income --

12  negative .418 coefficient, a negative chance of getting into

13  Harvard by virtue of being Asian, correct?

14  **A.**  That's correct.

15  **Q.**  That's actually a lower coefficient, a worse chance of

16  getting into Harvard than we saw in Plaintiff's Exhibit 26

17  where the coefficient was a negative .37, correct?

18  **A.**  That's correct.  But again, it's very hard for me to do

19  this.  This is a very kind of strange statistic that I don't

20  fully understand.  But especially if you just look at the

21  African-American low income which has an even greater

22  negative loading, I'm not sure how to interpret that.  I

23  really would prefer to have the experts.

24  **Q.**  Okay.  When you looked at Asian and low income, what was

25  your reaction to that, or did you just not understand?

1    **A.**  I don't think I fully understood it because a lot of

2    non-statisticians don't quite know how this stuff works.  But

3    if you look at the chart in this, it gives you a pretty clear

4    sense.  Obviously -- I guess you're the one asking the

5    questions, but there's another chart here on page --

6    **Q.**  I tried to read your mind and put the clarity on the

7    screen.

8    **A.**  Oh, you did it.  There it is.  Thank you.

9    **Q.**  Here we've got low income in maroon and then not low

10   income in gray, and we see that everybody gets some kind of a

11   tip for being low income versus not, correct?

12   **A.**  That's correct, yup.  This is an easier way to understand

13   it.

14   **Q.**  I just want to show one last thing here.  Again low

15   income here is defined by an income of $60,000 or less,

16   correct?

17   **A.**  That's correct.

18   **Q.**  And this, page 4 of Plaintiff's Exhibit 28, has the

19   percentages of the applicant pool for the different

20   ethnicities that fall into that low-income category, correct?

21   **A.**  Yes.  Yeah, for that group of people they were studying.

22   **Q.**  And for Asians, that's 18 percent, correct?

23   **A.**  Yes.

24   **Q.**  And after this, you didn't do any further follow-up on

25   the Unz issue related to discrimination against

1    Asian-Americans, correct?

2    **A.**   We did not directly.  Harvard didn't directly do that.

3    **Q.**   Okay.  And when you got this, did this satisfy you that

4    Unz was wrong and that the negative penalty that we saw in

5    the May 1 memo wasn't a concern?  Did this put all your

6    concerns to bed about potential discrimination against

7    Asian-Americans when you got this?

8    **A.**   I think we felt reassured that we were treating

9    Asian-Americans in an evenhanded manner, giving of the same

10   kind of tip that we gave for low-income students from all

11   ethnic backgrounds.

12   **Q.**   All right.  So we've now looked at a number of documents

13   from OIR.  We looked at the admissions 2 document which you

14   were less familiar with.  We looked at the February 2013

15   presentation that was shown to you at the February 25

16   meeting.  We looked at the May 1, 2013, memo that was shown

17   to you.

18          All of those showed information that indicated at

19   least the possibility of disadvantage of being Asian in terms

20   of a chance of getting into Harvard, correct?

21   **A.**   Again, I'm not sure I would phrase it that way, but I

22   understand the thrust of your question.

23   **Q.**   And you agreed that there's data points in those -- the

24   25th or the February 20 presentation raises concerns of bias.

25   The admissions 2 shows a negative effect for being Asian.

1    The May 1 memo we just looked at shows a negative coefficient

2    for being Asian, gets even lower when we get to the P28,

3    doesn't it?

4              MR. LEE:  Your Honor, this is all compound.

5              THE COURT:  Sustained.

6    BY MR. HUGHES:

7    **Q.**  Did you ever share any of this information with Director

8    McGrath?

9    **A.**  I'm sorry.  Which information?

10   **Q.**  Any of the information OIR supplied to you concerning the

11   effect of being Asian in the admissions process.

12   **A.**  I am sure that she eventually learned, along with others

13   on the staff, about the fact that we in fact do give a tip

14   for people from poor and modest income backgrounds.  I don't

15   remember.  She and I see each other all the time.  Her office

16   is right across from mine, so we share lots of information.

17   It certainly wouldn't have been kept from her.  That's for

18   certain.

19   **Q.**  After you got this information from OIR in 2013, you

20   didn't change anything about your admissions process,

21   correct?

22   **A.**  Well, we certainly continued to be vigilant in all the

23   ways I've talked about before and continued -- especially

24   given the climate, legal issues and so on, continued to have

25   the office of the general counsel meet with our staff every

1    year.  We certainly continued our strong training program for

2    new people.  And we remained especially vigilant in our

3    committee process where the actual decisions were made.

4    **Q.**  In response to the May 1 memo, did you make changes to

5    your admissions process?

6    **A.**  Not to the fundamental admissions process that we again

7    have had in place for a very, very long time and has been

8    studied in lots of different ways.

9    **Q.**  And you didn't seek bias training for your admissions

10   staff, correct?

11   **A.**  Again, we certainly had lots of discussion in the staff

12   and the training periods about making sure that every single

13   person regardless of ethnic background was considered fairly

14   and thoroughly.

15   **Q.**  You didn't bring somebody in to give bias training, did

16   you?

17   **A.**  Not that I recall.  But again, remember we've been

18   dealing with this issue for three or four decades.

19   **Q.**  You didn't bring in Cornerstone or Dr. Card to analyze

20   your admissions process, correct?

21   **A.**  Again, we had OIR, which we thought was very, very good.

22   **Q.**  Okay.  And you think your reaction to these OIR reports

23   is consistent with your statement you gave me just now, that

24   you are vigilant concerning claims of discrimination,

25   correct?

1    **A.**  Yes.  I think your word "consistent" is just right

2    because what you saw when we looked at the five, four models

3    in the actual class, that was perfectly consistent with

4    everything we've always said about our admissions process and

5    everything that was said about our process in *Bakke* and

6    coming out of the OCR review.

7    **Q.**  And you think it was consistent with vigilance not to

8    send any of this information to anyone else in the admissions

9    office.  Do you agree with that?

10   **A.**  I'm not sure that's actually true.

11   **Q.**  You think that you ultimately sent some of this

12   information to people in the admissions office?

13   **A.**  We certainly shared the idea that there is a tip for low-

14   and modest-income-background students which was, I think, a

15   vitally important thing for us to be able to say to a country

16   that is in many ways less and less equal almost every year in

17   terms of economic background.

18   **Q.**  Do you think it was consistent with vigilance not to

19   share the information concerning the negative effect on

20   Asian-Americans with the admissions office?

21   **A.**  Again, I think the materials that were viewed I think

22   were vetted thoroughly.

23   **Q.**  And do you think that it was consistent with the exercise

24   of vigilance after you got this last report from OIR not to

25   ask OIR to do further work on these reports?

1    **A.**  Well, they did do some further work, obviously, and they

2    had access to all the information.

3    **Q.**  Sir, I'm asking you about the last document we looked at,

4    P28 and P29.  Do you think it was consistent with vigilance

5    for you --

6    **A.**  I'm sorry.  I need to look at that.  P28?

7    **Q.**  This one.  I've got it on the screen.  Do you think it

8    was consistent with the exercise of vigilance not to ask OIR

9    to do further work on these reports?

10   **A.**  I just want to make sure I've got the right one.  Okay,

11   this is the one on ethnicity.

12           I think again page 6 gave us the answer, I think,

13   that we and others who -- you know, who would need the

14   information would have, that we're giving a tip for low- and

15   moderate-income-background students and we're doing it

16   evenhandedly for everyone regardless of ethnicity.

17   **Q.**  I'm not focused on the low-income tip.

18           Let me ask you again.  Do you think it was

19   consistent with vigilance for any allegation of

20   discrimination against Asian-Americans not to ask the Office

21   of Institutional Research to do further work on these

22   reports?

23   **A.**  Yes.  I think we considered everything as carefully as we

24   could.

25           MR. HUGHES:  No further questions.

```
 1                 MR. LEE:  Could we have a minute to set up, Your
 2     Honor?
 3                 THE COURT:  Yes.  Five minutes, ten minutes.
 4                 MR. LEE:  Five minutes and we're ready to go.
 5                 THE COURT:  Fine.
 6                 (Off the record.)
 7                 THE COURT:  When you're ready, Mr. Lee.
 8                           CROSS EXAMINATION
 9     BY MR. LEE:
10     Q.   Good afternoon, Dean Fitzsimmons.
11     A.   Good afternoon.
12     Q.   You've told us a number of times that the Harvard
13     admissions process is a whole-person process where you
14     consider all the information about the person, correct?
15     A.   Correct.
16     Q.   To understand the Harvard admissions process, would it be
17     important to understand the entire process and not just parts
18     of it in the same way?
19     A.   Absolutely.  Beginning to end on each person.
20     Q.   And I'm going to take you through the process in detail,
21     but I want to complete the picture on some of the things that
22     Mr. Hughes asked you about for the last six hours or so.
23                 There's a notebook before you, and if you would,
24     turn the notebook to Tab 27.  Tell me when you're there.
25     A.   I have it, I believe.
```

1    **Q.**   Do you have Tab 27 before you?

2    **A.**   Is it P88?

3    **Q.**   It's P88.  It's the interviewer handbook from 2013 to

4    2014.

5    **A.**   Yes.

6    **Q.**   Mr. Hughes asked you some questions about the guidance

7    provided on the personal rating in the document.

8              Do you recall that?

9    **A.**   I do.

10   **Q.**   And he blew up on the screen one paragraph and asked if

11   this was all the information about how do you set a personal

12   rating in the guide book.

13             Do you recall that?

14   **A.**   I do.

15   **Q.**   So let's look at some of the pages that he did not show

16   you.  Turn, if you would, to page 38, and tell me when you're

17   there.

18   **A.**   I'm there.

19   **Q.**   Now, this is a portion of the same book that he put in

20   front of you, correct?

21   **A.**   That's correct.

22   **Q.**   And in this portion of the book, what do you find?

23   **A.**   These are our sample interview reports.  And many times

24   alums find these extremely helpful in understanding a bit

25   more of the nuance and the whole-person approach that we

1    have.

2    **Q.**   These interview guides go out to how many interviewers?

3    **A.**   There are about 10,000.

4    **Q.**   And how many admissions officers receive these?

5    **A.**   About 40.

6    **Q.**   And all 10,000 plus 40 people would receive the sample

7    interview reports in this exhibit, correct?

8    **A.**   That's correct.  And of course also the trainees as they

9    go through the process as new employees.

10   **Q.**   Now, when you were asked questions about how the personal

11   rating is set by Mr. Hughes, and I think I wrote it down

12   correctly, you said there is the other information and

13   training provided.

14          Do you recall that?

15   **A.**   I do.

16   **Q.**   Now, in this handbook itself, how many sample interview

17   reports are there?

18   **A.**   I haven't counted them up yet.

19   **Q.**   I can represent to you in the interest of time --

20   **A.**   There are quite a few.

21   **Q.**   -- there are approximately five.  Do you see those?

22   **A.**   Yes.

23   **Q.**   And for each one of the five, they actually have a

24   section called "Personal Qualities," correct?

25   **A.**   That's correct.

1    **Q.**  So by way of example if I pick the first interview report

2    on page 38.  Do you have that?

3    **A.**  I do.

4    **Q.**  Tell me when you're there.

5    **A.**  Or I will.  Let's see.  I do.

6    **Q.**  If I take you about halfway down the page in the sample

7    interview report, you see a "Personal Qualities" caption?

8    **A.**  Yes.

9    **Q.**  And a rating, correct?

10    **A.**  That's correct.

11    **Q.**  And then there are comments below in this sample

12    interview report, correct?

13    **A.**  That's correct.

14    **Q.**  Now, for each of these five samples, there's a section on

15    personal qualities, correct?

16    **A.**  That's correct.

17    **Q.**  For each of these five, there is a "Comments" section,

18    correct?

19    **A.**  That's correct.

20    **Q.**  What is the purpose of the "Comments" section?

21    **A.**  It's really to try to critique each one of the sample

22    interviews and to try to let our interviewers know that we

23    need more than a number.  In fact, the number is interesting,

24    but the more important thing than the number is the

25    description and the complexity of the description.

1   **Q.**   Turn, if you would, to page 46.  And let's just take a

2   look at one of the five examples in this same exhibit.  Do

3   you have that before you?

4   **A.**   I do, yep.

5   **Q.**   If you go to the top of the page, page 46, this is for a

6   hypothetical applicant named Wilbur, correct?

7   **A.**   That's correct.

8   **Q.**   Now, if we could scroll down, is there a section on

9   personal qualities?

10  **A.**   There is.

11  **Q.**   And just take a minute to read to yourself what is said

12  about the personal qualities.

13           Do you see that?

14  **A.**   I do.

15  **Q.**   And the ratings that was given is what in this sample?

16  **A.**   Is a 4.

17  **Q.**   Now, there are comments that indicate why this is the

18  appropriate rating, correct?

19  **A.**   That's correct.

20  **Q.**   Turn, if you would, to page 47.

21  **A.**   I have it.

22  **Q.**   And would you tell us in this training document, the

23  document that Mr. Hughes had in front of you, what do the

24  comments tell interviewers and admissions officers about the

25  manner in which you go about assessing personal qualities?

1    **A.**   I'll just read, if you wish, just a little bit.  But

2    we're trying to let people know what a helpful report is.

3    The fact that that person went through and had so much detail

4    was extremely helpful but also a little bit of a qualifier

5    because the interviewer felt perhaps he hadn't seen Wilbur

6    quite at his best.  But I think it did give a vivid picture.

7            And again, this is one factor that we could look at

8    and go back in to see what the rest of the application looked

9    like and see, in a sense, what kind of corroborating evidence

10   there might be for those comments.

11   **Q.**   In addition to materials like these materials which are

12   the second half of Mr. Hughes' exhibit, are there case books

13   with case studies at the admissions office?

14   **A.**   Yes.

15   **Q.**   Are those case books and case studies used to train your

16   admissions officer?

17   **A.**   Yes, they are.

18   **Q.**   And what kind of information, generally?  We're going to

19   have Ms. McGrath talk about them in some detail, but what

20   kind of information do they give about the personal qualities

21   you're looking for and how to use the personal rating?

22   **A.**   Well, to go through the cases -- and again it's a real

23   application, probably not everything, but close to

24   everything.  We allow the new people -- and we also of course

25   use these with alumnae and alumni.  We go out across the

1    country and across the world and do case books with them as

2    well.

3            And we have the leaders of what we call schools and

4    scholarship committees come to Cambridge three times a year,

5    and we will often do case books with them.  So it's looking

6    at real people and then the complexity of the real person and

7    then in a sense giving them a clearer sense of what might be

8    helpful to our committee.

9    Q.  So when Mr. Hughes asked you whether that one paragraph

10   was the only guidance you gave and you said there are other

11   things, did you have in mind the case books?

12   A.  Among other things, yes.

13   Q.  Did you have in mind the case studies?

14   A.  Yes.

15   Q.  Did you have in mind the training?

16   A.  Yep.

17   Q.  Did you have in mind these three-time-a-year visits when

18   people came to get trained?

19   A.  Yes.

20   Q.  Now let's go to another topic he talked to you about, and

21   let me see if I can fill in the picture.

22           Do you recall him asking you some questions about

23   search lists?

24   A.  Yes.

25   Q.  And to remind Her Honor, what is a search list and what

1   is your purpose in getting a search list?

2   **A.**   The search list are the names we buy from the ACT and the

3   College Board.  We buy maybe 100,000 -- depends on the

4   year -- names, and these are people who have done well in the

5   PSAT or various other standardized tests, and also people who

6   report high grades, usually an A or A minus.

7          And it's a pretty good start.  We send information

8   to these students.  And then in these days, we follow up with

9   as many as 40 or 50 electronic communications -- emails,

10  Snapchat, Instagram, you name it -- to try to make sure that

11  they consider Harvard as a place for them over the next four

12  years.

13  **Q.**  And approximately, using the search list, how many

14  applicants do you reach out to?

15  **A.**   With the search list it varies from year to year, but

16  well in excess of 100,000 usually.

17  **Q.**  Now, Mr. Hughes asked you whether for African-American

18  high school students you purchased information for a wider

19  range of scores.

20          Do you remember that?

21  **A.**   Yes.

22  **Q.**  And he asked you whether for Hispanic students you

23  purchased information for a wider range of scores.

24          Do you recall that?

25  **A.**   I do.

1   **Q.**   Would you explain to Her Honor why for students for

2   African-American or Hispanics you purchase a wider range of

3   scores?

4   **A.**   It really comes down to the economic disadvantage

5   associated, again in general, with both of those ethnic

6   groups.   These are students who have less of an opportunity,

7   on average at least, to prepare well and to do well on

8   standardized testing because of the lack of opportunity often

9   in their schools and their communities.

10   **Q.**   So you're trying a get a broader cross-section of

11   African-American students?

12   **A.**   That's right.

13          MR. HUGHES:   Your Honor, I'm going to object to the

14   leading.   I'm trying to give some leeway to keep us going.

15          THE COURT:   It is leading.

16          MR. LEE:   I'm just trying to move us along.

17   BY MR. LEE:

18   **Q.**   Let's go to Exhibit P2, which is at Tab 26.   Do you

19   recall Mr. Hughes talking to you about this exhibit?

20   **A.**   Yes, I do.

21   **Q.**   And he asked you about the top half of the page, correct?

22   **A.**   That's correct.

23   **Q.**   Let me draw your attention to the bottom half of the same

24   page, and you'll see something that says "ACT Search"?

25   **A.**   Correct.

1    **Q.**   Do you see that?

2    **A.**   I do.

3    **Q.**   What is the ACT?

4    **A.**   The ACT is a test very much like the SAT, and it's

5    available in all parts of the country, but particularly

6    historically certainly in the Midwest and the sort of heart

7    of the country, in some respects the Sparse Country.

8    **Q.**   In Sparse Country, as you discussed with Mr. Hughes, is

9    the SAT or the PSAT the test most likely to be taken?

10   **A.**   It would be usually more likely to be the ACT.

11   **Q.**   So let's look at what the ranges are for the ACT.  Can

12   you tell us what the range is for Asians in the search list

13   request?

14   **A.**   That would be 30 to 32.

15   **Q.**   And what is the range for Sparse Country in the same

16   document?

17   **A.**   30 to 32.

18   **Q.**   So how does the range for Sparse Country and Asians

19   compare on the exhibit that Mr. Hughes asked you about?

20   **A.**   They're obviously very similar, here obviously identical.

21   **Q.**   Now, for white students, what is the ACT range?

22   **A.**   It would be 33 plus.

23   **Q.**   Let's look at a couple of other documents that deal with

24   the search, with search lists.  Would you turn to Tab 25,

25   which is P50.

```
1    A.   Tab 25, okay.
2    Q.   Tab 25 in the notebook before you.
3    A.   I see.  Okay.  Sorry.
4              THE COURT:  On P2 for a minute, if you can just
5    help me out here.  High scorers men, 1380 to 1600, and then
6    high scorers Asian men 1380 to 1600.
7              THE WITNESS:  Yes.
8              THE COURT:  What's the difference?  Why are they
9    listed out separately?
10             THE WITNESS:  Simply to get more Asian and more
11   Sparse Country, lower it to 30 for Asians and for Sparse
12   Country because of where the ACT is located.
13             THE COURT:  Up on the PSAT.
14             THE WITNESS:  On the PSAT?  Okay.  I'm sorry, Your
15   Honor.  What's the question?
16             THE COURT:  Do you see on PSAT high scorers men?
17             THE WITNESS:  Yes.
18             THE COURT:  1380 to 1600?
19             THE WITNESS:  Yes.
20             THE COURT:  And then if you go down four lines,
21   high scorers Asian men is the exact same range?
22             THE WITNESS:  Yes.
23             THE COURT:  Why are Asians broken out separately?
24   Wouldn't they be subsumed in high scorers men?
25             THE WITNESS:  Yes.  I think it's the way you order
```

1    them from the College Board.  And then you can also -- one of

2    the things, remember we have the undergraduate minority

3    recruitment coordinators.  These are students who help us

4    with recruiting, including one of the UMRP groups is the

5    Asian-American student group.  It's a very old group.  So

6    they'll help us.  So it's probably just simply the way they

7    ordered it from the College Board.

8              But you're right; it's identical.

9    BY MR. LEE:

10   Q.  So let's turn, if we could, to Tab 25.  Let me know when

11   you're there.

12   A.  I have it.

13   Q.  Do you have P50 in front of you?

14   A.  I do.

15   Q.  What is it?

16   A.  This just gives you a little sense of the early action

17   applicants for the class of 2017.

18   Q.  Now, let's --

19              MR. LEE:  Your Honor, we would offer P50.

20              MR. HUGHES:  No objection, Your Honor.

21              THE COURT:  Admitted.

22              (Plaintiff Exhibit No. 50 admitted.)

23   BY MR. LEE:

24   Q.  Now, if we turn to the last page of P50 --

25   A.  Yes.

1   **Q.**   -- do you have that before you?

2   **A.**   I do.

3   **Q.**   Can you tell us what it is?

4   **A.**   It's a memo to Marlyn and to me from Elizabeth Yong.  And

5   she's just describing -- again, it's always complex for

6   whoever is ordering the search because it's -- sometimes

7   there are uneven numbers who take various test

8   administrations.  But she's just giving us a sense of what's

9   happening with this year's PSAT search.

10  **Q.**   Now, there is a category of high scorers.  Do you see

11  that?

12  **A.**   Yes, I do.

13  **Q.**   What is the range for Sparse Country?

14  **A.**   Sparse Country appears to be 1310 to 1370.

15  **Q.**   Now, there are two Asian levels.  Do you see those?

16  **A.**   I do.

17  **Q.**   What is Asian level 1?

18  **A.**   1380 to 1600.

19  **Q.**   What is Asian level 2?

20  **A.**   1300 to 1370.

21  **Q.**   And as you move from left to right, is the number of

22  students in each of these categories for 2014 and 2015

23  listed?

24  **A.**   Yes.

25  **Q.**   For 2014 and 2015, was Harvard sending letters to

1    students in Asian level 1 and Asian level 2?

2    **A.**  Yes.

3    **Q.**  So how does Asian level 2 compare to the high scorers?

4    **A.**  You know, it is somewhat lower.

5    **Q.**  Now, do the cutoffs that the admissions office uses on a

6    year-to-year basis vary?

7    **A.**  I'm sorry?

8    **Q.**  I'm sorry.  I'll state it again.

9             Do the cutoffs that you use in your search list

10   vary from year to year?

11   **A.**  It can, but there's some continuity over time.  We don't

12   want to send out too many search letters simply because if

13   you send out too many search letters to people who have less

14   of a chance of getting in, it can actually have a negative

15   effect.  First of all, you don't want to turn more people

16   down.  And second of all, long term within that high school,

17   it may send a discouraging message in the future.  So I think

18   we try to be very realistic with these levels.

19   **Q.**  Now, the dates for the columns when there's an Asian

20   level 2, which is lower than high scorers are 2014 and 2015.

21             Do you see that?

22   **A.**  Yes, I do.

23   **Q.**  And approximately when were you implementing your

24   low-income initiatives across a variety of ethnicities?

25   **A.**  The low-income piece of it started in 2003, 2004, right

1    in that range.  It was originally 60,000.  We have raised the

2    low-income piece to 65, but that's when it started.

3    **Q.**  So let me go to a third issue that Mr. Hughes talked to

4    you about and see if I can fill in a blank.  Turn, if you

5    would, to Tab 12, which is the OCR findings.

6    **A.**  Yes.

7    **Q.**  Do you have that before you?

8    **A.**  I do.

9    **Q.**  And I want to turn you to page 26.

10           MR. HUGHES:  Mr. Lee, could we get an exhibit

11   number?

12           MR. LEE:  555.

13   BY MR. LEE:

14   **Q.**  Could you tell me when you're there?

15   **A.**  I'm there.

16   **Q.**  Turn, if you would, to page 26.

17   **A.**  26.

18   **Q.**  Do you see the second paragraph on page 26?

19   **A.**  I do.

20   **Q.**  Now, do you recall yesterday Mr. Hughes asking you some

21   questions about stereotyping?

22   **A.**  I do.

23   **Q.**  And reading to you a sentence or two from the report that

24   talked to you about stereotyping?

25   **A.**  Yes.

1    **Q.**  And I think you referred to the findings of OCR.  Do you
2    remember that?
3    **A.**  I did.
4    **Q.**  Would you read to us what OCR found in the second
5    paragraph on page 26.
6    **A.**  "OCR found that while some reader comments could be
7    construed to negatively affect the case of Asian-American
8    applicants, the ratings given to the applicant where these
9    comments did occur did not reflect a lower-than-expected
10   score.
11           "For example, in the aforementioned interviewer's
12   comment on 'hard worker' versus the 'outstanding potential
13   scholar,' the reader rated the applicant's academic area a 2,
14   consistent with his test scores and class standing.
15           "Similarly, applicants who were deemed to be
16   'quiet/shy' were often rated 3 or better in the preliminary
17   over all rating."
18   **Q.**  And what did OCR conclude in the next paragraph, after
19   having considered these comments and the ratings that
20   resulted in?
21   **A.**  "OCR concluded that while descriptions of Asian-American
22   applicants were found that could have implications for the
23   stereotyping of Asian-American students, they could not be
24   shown to have negatively impacted the ratings given to these
25   applicants."

1    Q.   Now, the fourth area I want to go into before I take you

2    through the admissions process is the whole question of the

3    Unz article and OIR, which Mr. Hughes talked to you about

4    today.

5             Do you have those in mind?

6    A.   I do.

7    Q.   Turn, if you would, to -- let's make sure I get the right

8    number tab -- 22.

9    A.   Okay.  I have it.

10   Q.   Do you have that before you?

11   A.   I do.

12   Q.   Did you find P14?

13   A.   I did.

14   Q.   First let me ask you this:  You were asked several

15   questions about OIR.  Is OIR involved in the admissions

16   process as it's implemented and executed at Harvard?

17   A.   No.

18   Q.   Does OIR participate in the admissions committee

19   decisions in any way?

20   A.   No.

21   Q.   So now if you're at Tab 22, P14, what is P14?

22             THE WITNESS:  Your Honor, P14 is a memo from Sally

23   Donahue, our director of financial aid, to me about getting

24   together.

25             MR. LEE:  And, Your Honor, we offer P14.  It's in.

1    I'm sorry.  I think it went in already.

2           Could I just have a second, Your Honor?

3           THE COURT:  Yes.

4    BY MR. LEE:

5    **Q.**  So let me now talk to you a little bit about the Unz

6    article that Mr. Hughes talked to you about.  Turn in your

7    notebook to Tab 23.

8    **A.**  23, yes.

9    **Q.**  Do you have that before you?

10   **A.**  I do.

11   **Q.**  What is it?

12   **A.**  It's the article by Ron Unz, the "Myth of American

13   Meritocracy."

14   **Q.**  Now, Mr. Hughes described it as criticizing Harvard's

15   admissions process.

16          Do you recall that?

17   **A.**  I do.

18   **Q.**  Did he say something about more than just Harvard's

19   admissions process?

20   **A.**  Yes.  Certainly he was talking well beyond Harvard.

21   **Q.**  Let's see what he said about some other ethnic groups.

22          In PX218, would you turn to page 26?

23   **A.**  I have it.

24   **Q.**  Do you see the -- and I'll bring it up on the screen.

25          Do you see the section that's called "The Strange

1    Collapse of Jewish Academic Achievement"?

2    **A.**   I do.

3    **Q.**   Turn, if you would, to the next page, and I'm going to

4    ask you to go to the right hand column.

5            Do you see the sentence that begins "This pattern"?

6    **A.**   "This pattern"?  Yes, I do.

7    **Q.**   Would you read that sentence for us, please.

8    **A.**   "This pattern of third- or fourth-generation American

9    students lacking the academic drive or intensity of their

10   forefathers is hardly surprising, nor unique to Jews.

11   Consider the case of Japanese-Americans who mostly arrived in

12   America during roughly the same era.  America's Japanese" --

13   **Q.**   I'll stop you there because the exhibit is in.  Let's see

14   what he had to say about some of these ethnic groups.  Turn,

15   if you would, to the next page, page 28.

16   **A.**   Okay.

17   **Q.**   And look at the bottom of the left-hand column of

18   page 28.

19   **A.**   Yes.

20   **Q.**   Do you see the sentence that begins "We should"?

21   **A.**   How far down are you?

22   **Q.**   The bottom.

23   **A.**   Okay.  Yes.

24   **Q.**   "We should also remember that Jewish intellectual

25   performance tends to be quite skewed," and then it goes on?

1    **A.**   Yes.

2    **Q.**   Do you recall when you read the Unz article in 2012

3    considering the comments about ethnic groups other than

4    Asian-Americans?

5    **A.**   Yes.

6    **Q.**   Was there any controversy about Mr. Unz's comments about

7    groups other than Asian-Americans?

8    **A.**   I think many of us thought it was profoundly

9    anti-Semitic.

10   **Q.**   You were asked about this flurry of phone calls that you

11   received when the article came out.  Were some of them from

12   Jewish alumni at Harvard?

13   **A.**   That's correct.

14   **Q.**   Were they concerned about the anti-Semitic nature of the

15   article?

16   **A.**   Very much so.

17   **Q.**   Let's turn to the next page, bottoms of page 29.  Do you

18   see the last sentence that says "Meanwhile"?

19   **A.**   The last sentence on the left-hand column, yes.

20   **Q.**   Now, would you read the sentence that says "Meanwhile"?

21   It goes up until the top of the next column.

22   **A.**   "Meanwhile, blacks are substantially out numbered by

23   Hispanics, and they have much weaker academic performance, so

24   they would produce far fewer very high-scoring students.

25   Therefore, we can approximate the number of whites by merely

1    subtracting the number of Asian and Hispanic names as well as
2    an estimated black total based on the latter figure and then
3    determine the number of white gentiles by also subtracting
4    the Jewish total."
5    **Q.**  Now, Dean Fitzsimmons, in December of 2012 when this
6    article was published, what was your personal reaction to the
7    article?
8    **A.**  My personal reaction was that it was profoundly
9    anti-Semitic and inaccurate and stereotyping and had lots of
10   logical lapses.
11   **Q.**  At or about the same time, was there a publication by
12   Professors Hoxby and Avery?
13   **A.**  That's correct.
14   **Q.**  What was the thesis of the Hoxby-Avery publication?
15   **A.**  The thesis was that colleges needed to do more to reach
16   out to students from modest and poor economic backgrounds,
17   especially those who come from what they called one-off
18   schools, schools that rarely would send people out of state,
19   say, to a regional or a national institution.
20   **Q.**  So now let's go back to the OIR analysis in February
21   of 2014.
22           THE COURT:  Mr. Lee, P218 at Tab 23, the article
23   you've just been discussing, it's not admitted.  Did you
24   intend to admit it?
25           MR. LEE:  Actually I thought it was.  I apologize.

1    We offer it.

2              MR. HUGHES:  We don't object, Your Honor.

3              THE COURT:  It's admitted.

4              (Plaintiff Exhibit No. 218 admitted.)

5    BY MR. LEE:

6    **Q.**  Would you turn back to Tab 22 in your notebook, which is

7    P14.

8    **A.**  Yes.

9    **Q.**  Just to anchor us, what is the date of the email chain

10   between you, Ms. Driver-Linn, and some others?

11   **A.**  February 20.

12   **Q.**  In the middle of the page, literally right in the middle,

13   and I'll ask Mr. Lee to highlight it, there's reference to a

14   meeting on the 25th of February at 2:00 p.m.

15             Do you see that?

16   **A.**  I do.

17   **Q.**  Did such a meeting occur?

18   **A.**  Yes, I believe.

19   **Q.**  Now, I want to ask you some questions about the

20   presentation that was made to you at that meeting.  First

21   turn, if you would, to Tab 17, which is P12.

22   **A.**  Yes.

23   **Q.**  Do you have that before you?

24   **A.**  Yes.

25   **Q.**  Is this the document that was presented to you in

1  February of 2013?

2  **A.**  Yes.

3  **Q.**  Now, I want to ask you a couple of questions about P9,

4  which is not yet in evidence, but Mr. Hughes asked you about

5  it.  So turn back to Tab 16.  Did you find P9?

6  **A.**  I do, P9, yes.

7  **Q.**  What is the date on this document?

8  **A.**  February 14, 2012.

9  **Q.**  What was the date of your meeting with OIR?

10  **A.**  It was February 25, I guess, 2013.

11  **Q.**  And the date of P12, I'm not going to have you flip back,

12  is February 2013, correct?

13  **A.**  Yes.

14  **Q.**  Okay.  Now, you told Mr. Hughes that you recall seeing

15  some of the information that's in P12?

16  **A.**  Yes, I did.

17  **Q.**  I'm sorry.  Withdrawn.

18        You saw some of the information that was in P9,

19  correct?

20  **A.**  Yes.  Yes.

21  **Q.**  With P9 in front of you, can you tell Her Honor what

22  portion of P9 you recall seeing in some form in some

23  presentation?  Do you have P9 before you?

24  **A.**  I do.

25  **Q.**  And you can flip through the pages, if it would help.

1    **A.**  Yes.  Let me do that.  Let me pull this up.

2    **Q.**  It's at Tab 15, Dean Fitzsimmons.

3    **A.**  I have it.  You want me to flip through and --

4    **Q.**  Just flip through and tell Her Honor which pages you

5    recall seeing.

6    **A.**  Well, the one I know I recall really was the one on

7    page 11.

8    **Q.**  Could we have page 11 from P9 on the screen.

9            This is the four models plus actuals that you

10   discussed with Mr. Hughes, correct?

11   **A.**  That's correct.

12   **Q.**  All right.  Now, let's turn back to P12 at Tab 17.

13   **A.**  Okay.

14   **Q.**  Turn, if you would, to page 5.

15   **A.**  Page 5.

16   **Q.**  What are the subjects that are being considered in the

17   presentation that was actually made to you?

18   **A.**  This is the statement of findings.

19   **Q.**  I'm sorry.  I'm on page 5.  Do you see contents?

20   **A.**  I'm sorry.  Which one are we on?

21   **Q.**  Page 5 of P12 at Tab 17.

22   **A.**  P12.  What tab is that?

23   **Q.**  Tab 17.

24   **A.**  Tab 17, okay.

25   **Q.**  I've been having you jump back and forth.  We'll stay

1    now.

2    **A.**   Okay.  So my assignment is to go through and --

3    **Q.**   No, no.  No assignment quite yet.

4            Do you see the title of this page, which is

5    "Contents"?

6    **A.**   Yes.

7    **Q.**   What is the first question posed?

8    **A.**   "A first look at the return of early action."

9    **Q.**   And would you explain to Her Honor why you were looking

10   at the return of early action at this point in time?

11   **A.**   Well, we had given up early action for four classes.  And

12   we made the decision on our own, hoping that others would

13   join us.  We were only joined, as it turned out, in terms of

14   some of our colleagues, as it were, by Princeton and then

15   University of Virginia.  But we were hoping that more

16   institutions would think about giving up early action for a

17   whole variety of different reasons.

18   **Q.**   And what decision did you make, did Harvard make, on

19   early action?

20   **A.**   Well, we had -- we always -- we did not have binding

21   early decision.  It was not binding if you get into Harvard,

22   never has been.  It was if you got in, you were free to apply

23   elsewhere.

24           But we did make that decision.  We gave it up for

25   four years, but then we felt that we really needed -- had to

1    go back.

2    **Q.**   Now, the second question is a shift in gender balance.

3    Briefly, what was that issue at the time?

4    **A.**   It really had to do with the founding of the new School

5    of Engineering and Applied Science.  And that ended up

6    attracting lots of new applicants, which was terrific.  But

7    the downside was that a large percentage of them were men,

8    overwhelmingly really in some of the areas.

9             So we wanted to look at that to see what was

10   actually going on.

11   **Q.**   And the third category you discussed with Mr. Hughes, and

12   that portion of the presentation begins on page 31, correct?

13   **A.**   That's correct.

14   **Q.**   So let's turn back to page 31 to this portion of the

15   presentation.  "Evaluating factors that play a role in

16   Harvard College admission."

17   **A.**   That's great.  I'll go along with the screen here.

18   **Q.**   If you turn to page 32, Mr. Hughes asked you about the

19   goal of analysis.

20            Do you recall that?

21   **A.**   I do.

22   **Q.**   He asked you about the strategy.  Do you recall that?

23   **A.**   I do.

24   **Q.**   And he asked you about the notes, correct?

25   **A.**   That's correct.

1    **Q.**  I'm not going to repeat any of that, but I want to ask

2    you this:  There's a reference to the academic index, and

3    Mr. Hughes asked you about the academic index?

4    **A.**  Yes.

5    **Q.**  What use does the admissions committee make of the

6    academic index in its admissions decision making?

7    **A.**  The only use, really, is for reporting purposes to the

8    Ivy Athletic League literally.

9    **Q.**  Is the academic index the same thing as the academic

10   rating?

11   **A.**  No, not at all.

12   **Q.**  Turn, if you would, to page 33.  On page 33, you see the

13   list of the four models, correct?

14   **A.**  Yes.

15   **Q.**  And Mr. Hughes asked you about these in detail, so I'm

16   not going to ask you about them again except this:  The

17   academic model is based upon the academic index and the

18   academic rating, correct?

19   **A.**  That's correct.

20   **Q.**  Now turn, if you would, to Slide 34.  Do you have that

21   before you?

22   **A.**  I do.

23   **Q.**  And he asked you about that in some detail, correct?

24   **A.**  He did.

25   **Q.**  Now I'd like to ask about your reaction and your

1    understanding of these models when you first saw it in 2013.

2    Do you have that in mind?

3    **A.**   I do.

4    **Q.**   First, do you recall seeing these results in February

5    of 2013?

6    **A.**   I do.

7    **Q.**   Did you see the four models plus the actual?

8    **A.**   Yes.  I saw the four models.

9    **Q.**   And what was your reaction to the information provided in

10   the four models plus the actuals?

11   **A.**   Very much as I responded to Mr. Hughes.  And that is that

12   there are -- these are some of the factors certainly that go

13   into our admissions process.  It's never been test scores and

14   grades alone, you know, going all the way back to the *Bakke*

15   decision.

16           It's interesting, you know, with a small number of

17   factors to see at the end after Model 4 that it was very

18   close to the class size -- to what was actually true in the

19   class itself.  So it was certainly perfectly consistent,

20   nothing new, perfectly consistent with everything we'd known

21   before.

22   **Q.**   Now I just want to ask you a couple of questions, not to

23   go over ground that Mr. Hughes covered with you, but let me

24   focus you just for a second on Model 1.

25           Model 1 suggested if you just went on the academic

1    index and academic rating, you would have more

2    Asian-Americans in the class, correct?

3    **A.**   That's correct.

4    **Q.**   Have you ever doubted that?

5    **A.**   No.   That was certainly part of everything we've talked

6    about, Susie and I, and the OCR report.   And again just going

7    back even to the appendix in the *Bakke* decision, it was

8    always the case that Harvard was never simply about looking

9    at somebody's test scores and grades only.

10   **Q.**   And of the four models, which is the model that actually

11   takes into account the most factors?

12   **A.**   Well, Model 4.

13   **Q.**   If we flip back a page, how many factors does Model 4

14   take into account?

15   **A.**   It really takes into account eight.   Really seven, if you

16   think about it, because it has academic as 1.   But let's say

17   seven or eight factors.

18   **Q.**   Is this a comprehensive list of the factors used in

19   Harvard's admissions process?

20   **A.**   Not in the real world of actually doing admissions at

21   all.   Because in there, you're really looking at every single

22   human talent.

23   **Q.**   Go back to Slide 34.   When you saw these results, I think

24   you told Mr. Hughes they were consistent with what you had

25   understood before, correct?

1    **A.**   That's correct.

2    **Q.**   In what way were the results consistent?

3    **A.**   Well, in the sense that you ended up with -- they came

4    fairly close to the shares in the actual class itself.  So

5    that's a pretty good start.  But of course the reality is

6    it's much more complicated than this.

7              MR. LEE:  So if we could, Mr. Lee, could we blow up

8    the statistics on Model 4 and actual so we could all see a

9    little bit better?  If you could, just blow up the numbers at

10   the bottom.

11   BY MR. LEE:

12   **Q.**   When you said to Mr. Hughes that the numbers were pretty

13   close to the admitted class, were these numbers the numbers

14   you were referring to?

15   **A.**   Absolutely.

16   **Q.**   Turn, if you would, to Slide 36 in the same exhibit.

17   **A.**   I have it.

18   **Q.**   And the title of the slide is?

19   **A.**   "What Have We Learned?"

20   **Q.**   And what is the first bullet of what we have learned?

21   **A.**   "Once we account for ratings and demographic factors, we

22   can closely predict what the admitted class will look like."

23   **Q.**   Now, this is what OIR said, correct?

24   **A.**   That's correct.

25   **Q.**   Was this consistent or inconsistent with your reactions

1   to the models?

2   **A.**   Consistent.

3   **Q.**   Was this consistent or inconsistent with what you

4   understood to have been the result of the Harvard admissions

5   process over the years?

6   **A.**   Very consistent.

7   **Q.**   Was it consistent or inconsistent with your experience as

8   an admissions officer?

9   **A.**   Very consistent.

10  **Q.**   Let's look at the second bullet point on what we have

11  learned.  Would you read that to us.

12  **A.**   "With current data, we explain a significant amount of

13  the variation in admission, but further details especially

14  around the personal rating may provide further insight."

15  **Q.**   And the next bullet point, would you read that to us.

16  **A.**   Yes.  "There are a variety of factors that quantitative

17  data is likely to miss or ratings do not capture.  We'd like

18  to better understand exceptional talent; for example, in

19  unusual music, art, and writing, the role of context cases,

20  the role of the personal statement and essay, and then

21  measures of socioeconomic status, the HFAI" -- that's the

22  Harvard financial aid initiative active flag -- "and the

23  low-income flag."

24  **Q.**   Would you explain to Her Honor what the HFAI flag and the

25  low income flag are?

**A.**   The HFAI flag is when a reader is going through an application, the reader would try to indicate whether or not that person would be eligible for the lowest-income scholarship.  So, for example, $60,000 and under or $65,000 and under now.

The low-income flag is very similar.  It's the whole idea of trying to make sure that we are, at least as we open up the application and do the preliminary stuff, that if we think there's something going on with either HFAI or the low-income flag, we want it to be noticed.

THE COURT:  Excuse me.  Context cases?

THE WITNESS:  Context cases are a little more complicated.  Just to give you an example, suppose you found a wonderful low-income student who had all kinds of great things, you know, in the application beyond obviously just simply the fact the person is low income.  Could be a very attractive applicant of all kinds, of any kind, that might be well down in the class.

Because sometimes, say, for example -- I'll speak personally as a person from a low-income background who had, shall we say, a very unsuccessful first ninth grade.  You can tell how unsuccessful that was.

So sometimes you'll have somebody who has done not quite as well perhaps for economic reasons or other reasons early in high school who then picks up speed and does

1    extraordinarily well.  And we might just say this is great.

2    We really want to have this person.

3            There might, on the other hand, at the same school

4    be another very attractive applicant who may be very

5    different, but you might want to go in and consider --

6    remember we're trying to create relationships with schools.

7    You know the old Tip O'Neill, all politics is local, as they

8    say, and we're trying to create 100-year relationships with

9    them.

10           So when we go in and take somebody out of the --

11   lower in the class or down further in the class and we've got

12   some other very attractive people at the upper end of the

13   class, sometimes you can make an argument to take them both

14   because they're both terrific, they both look as though they

15   would be great at Harvard.  And it's also a very good message

16   to that school that you may be trying to develop that you're

17   looking for all kinds of different people.

18           But that's one example.  Does that suffice or more

19   confusing?

20           THE COURT:  I got it.

21   BY MR. LEE:

22   Q.  The factors that are listed by OIR that are not likely to

23   be included in its analysis, are these the only other factors

24   that the admissions process considers?

25   A.  No.  No, there are so many others.  Back in the real

1   world, you know, every time you open up an application, there

2   are all kinds of reasons why you might want to do it.  We

3   talk about Sparse Country, for example.  You might make an

4   argument, say if you're covering Montana, that this is a

5   great state, you would like to get somebody from there.

6           But we also -- not as well known is that we -- a

7   real geographic tip we give are for Cambridge and Boston

8   students and for Massachusetts generally because we want to

9   do what we can to educate future leaders from our home

10  community.  But there's so many other factors.

11  Q.  Now, at this February 25, 2013, meeting, did anyone at

12  OIR report to you that they had uncovered discrimination or

13  bias against Asian-Americans?

14  A.  Not at all.

15  Q.  Did anybody tell you that this presentation showed

16  discrimination or bias against Asian-Americans?

17  A.  Not at all.

18  Q.  If they had, would you have remembered?

19  A.  I think so.

20  Q.  And would you have done something about it?

21  A.  Yes.

22  Q.  Now, in the month or two that followed, you did ask OIR

23  to do another analysis for you, as you told Mr. Hughes,

24  correct?

25  A.  That's correct.

1   **Q.**   And that was on what issue?

2   **A.**   On low-income students.

3   **Q.**   Turn, if you would, to Tab 18.

4   **A.**   Tab?

5   **Q.**   Tab 18.  I apologize.

6   **A.**   18.  Okay.

7   **Q.**   Do you find P26?

8   **A.**   I do.

9   **Q.**   Can you tell us what this is?

10   **A.**   This is a memo from Erica Bever, who was working then at

11   OIR, to me regarding low-income issues.

12   **Q.**   And Mr. Hughes discussed this with you a little bit.

13   What was the bottom line on Ms. Bever's analysis in response

14   to your question, are we giving low-income applicants a tip?

15   **A.**   That we are, would be the bottom line.

16   **Q.**   And after you received this report, did you ask OIR to do

17   any additional analysis?

18   **A.**   I did.

19   **Q.**   On what subject?

20   **A.**   On the subject of the low-income tip across ethnic

21   groups.

22   **Q.**   Mr. Hughes asked you some questions about that, too.  So

23   I'm going to take you to Tab 20, which is P29.  Do you have

24   that?

25   **A.**   Tab 20, yes, I do, P29.

1    **Q.**   Do you recall receiving that?

2    **A.**   I do.

3    **Q.**   This was a follow-up to your conversation on low-income

4    applicants in admissions, correct?

5    **A.**   That's correct.

6    **Q.**   And if you would, turn to the third bullet.

7    **A.**   Yes.  "Across all race/ethnicity groups, low-income

8    students are admitted at a higher rate."

9    **Q.**   Was this a question you specifically asked of her?

10   **A.**   Yes.

11   **Q.**   Turn to Tab 21, which is P28.

12   **A.**   Yes.

13   **Q.**   Do you have those before you?

14   **A.**   I do.

15   **Q.**   Mr. Hughes discussed this with you.  Turn to page 6,

16   which is the chart.

17   **A.**   Okay, yes.

18   **Q.**   Did OIR specifically consider Asian-American applicants?

19   **A.**   Yes, they did.

20   **Q.**   What were the results of OIR's analysis on Asian --

21   low-income Asian-American applicants?

22   **A.**   That low-income Asian-Americans were admitted at a

23   10 percent rate while other above $60,000 income were

24   admitted at 7 percent rate.

25   **Q.**   How did the incremental tip, how did the higher admission

1    rate for Asians compare to the tip or the higher admission

2    rate given to any other ethnicity?

3    **A.**   It was certainly among the highest.  The Native American

4    difference was slightly greater.  That's a very, very small

5    number in terms of individuals, so that can fluctuate quite a

6    bit.

7    **Q.**   So among the different ethnicities, the tip or the

8    benefit given to Asian-Americans, low-income Asian-Americans,

9    was among the highest given, correct?

10   **A.**   That's correct.

11   **Q.**   Now, what was your reaction to this chart when you

12   received it?

13   **A.**   I think this is the information that I wanted.  Because

14   again, we want to make sure that any criterion, any factor at

15   that might affect admissions would be administered in an

16   evenhanded way across ethnic groups.

17   **Q.**   Now, Mr. Hughes asked you some questions about the

18   information you received based upon OIR's models, the models

19   you recall seeing.

20            Do you recall those?

21   **A.**   Yes.

22   **Q.**   He asked you whether you reported that information to

23   President Faust, to Dean Smith, or to Dean Khurana.

24            Do you recall that?

25   **A.**   I do.

**Q.**   Based upon those models, was there anything to report?

**A.**   There was absolutely nothing to report.

**Q.**   Why?

**A.**   Everything was absolutely consistent with everything else we already knew.  And literally, even that very preliminary incomplete model came up with, you know, by the time they get through with the fourth model, it was really almost identical with the actual class.  No news, nothing to report.

**Q.**   Let me take you back to the beginning here and walk through the admissions process in a little bit of a disciplined way than I have so far.

        Dean Fitzsimmons, where did you go to high school?

**A.**   Archbishop Williams in Braintree, Massachusetts.

**Q.**   The what did your parents do for a living?

**A.**   We all ran a gas station and a mom-and-pop store in Weymouth.

**Q.**   Did your parents attend college?

**A.**   They did not.

**Q.**   Were you the first in your family to attend college?

**A.**   All four of us were the first in our generation to attend college.

**Q.**   Where did you attend college?

**A.**   Harvard College, fully accredited in Cambridge.

**Q.**   I hope so.  What year --

**A.**   1967.

1    **Q.**   What year did you graduate?

2    **A.**   1967.

3    **Q.**   How did you finance your education at Harvard?

4    **A.**   Two ways.  Almost entirely with Harvard's scholarship

5    funding because our family was expected to pay virtually

6    nothing.  And the other thing is that I worked term time and

7    summers as dorm crew, research, all kinds of different jobs.

8    And I -- like many low-income students, I actually paid my

9    parents' contribution because they couldn't afford it.

10   **Q.**   And how much was the parental contribution for you back

11   then?

12   **A.**   It's hard to remember exactly.  I would say maybe a

13   couple of hundred dollars.

14   **Q.**   Now, did your experience as a first-generation financial

15   aid student influence or educate your views on financial aid

16   as you became involved in the Harvard admissions process?

17   **A.**   Absolutely.  It totally transformed my life.  It opened

18   up possibilities I had no idea -- you know, growing up in

19   Weymouth, I had never even seen Harvard until my senior year

20   in high school.

21   **Q.**   Now, were you involved in activities while you were in

22   college?

23   **A.**   I was.

24   **Q.**   What activities were you involved in?

25   **A.**   With ice hockey, with the Catholic Students Association,

1    and with the thing called Phillips Brooks, which is sort of

2    an organization that does community service, social service.

3    **Q.**   What was the composition, the demographic composition of

4    the Harvard-Radcliffe classes when you were there?

5    **A.**   It was something out of generations ago.  It was 4 to 1

6    male to female.  And of course my high school had been

7    60 percent female, so I thought that was really strange,

8    quite frankly.  There were almost no students of color.

9    There were almost no international students.  There were

10   extremely few first-generation students.  Only about probably

11   a quarter of our class was on financial aid of any kind.  It

12   was a totally different world.

13   **Q.**   What did you do after you graduated?

14   **A.**   I went to the graduate school of education and got a

15   master's and a doctorate.

16   **Q.**   Now, what did you do after that?

17   **A.**   While in grad school, I was a freshman proctor in the

18   Harvard Yard, and I also taught at Holy Cross college in

19   Worcester part-time and then one year full-time right after I

20   got the doctorate and then came to work at Harvard admissions

21   in 1972.

22   **Q.**   How long have you worked at Harvard?

23   **A.**   Whatever that difference is, 48 years.

24   **Q.**   Since 1972?

25   **A.**   46 years, yeah.

1    **Q.**   What year did you become dean of admissions at Harvard?

2    **A.**   In 1986.

3    **Q.**   Have you held that position continuously since that time?

4    **A.**   I have.

5    **Q.**   I don't think you've been asked this yet, so I will.

6         Would you explain to Her Honor what are your duties

7    and responsibilities of dean of admissions?

8    **A.**   I'll make it quick.  So including number one, you've

9    heard all the various ways we recruit.

10        It is worth mentioning, though, that it is quite an

11   amazing outreach.  And we travel with Georgetown, Penn, Duke,

12   and Stanford to 120 locations in the United States every

13   year, doing evening meetings and then counselor breakfasts in

14   the morning.  And then travel to another 20 or so cities with

15   UVA and Princeton, who became our partners after they gave up

16   early admissions.  Then I asked Wellesley and Yale to come

17   with us in that group.  So there's another 20 cities there.

18   And then we do additional outreach with other colleges.

19   Probably brings it up -- and sometimes by ourselves to about

20   150 or 160 locations just in the U.S.  So a lot of

21   recruiting.

22   **Q.**   I'm going to come back to the recruiting just a little

23   bit.  We've talked about some of it.  The search lists are

24   part of recruiting.  Is that correct?

25   **A.**   That's correct.

1    **Q.**   The joint visits are part of recruiting?

2    **A.**   Students, everything.

3    **Q.**   Let me ask you first how many employees are in the

4    admissions office?

5    **A.**   Total of about 70, I would say.

6    **Q.**   How many admissions officers are there?

7    **A.**   About 40.

8    **Q.**   How many admissions officers are actually involved in

9    reviewing applications?

10   **A.**   About 40.

11   **Q.**   How many admissions officers vote or participate in every

12   admissions decision every admissions year?

13   **A.**   Every single one of the 40.

14           MR. LEE:  Your honor, if this is a good time to

15   take a brief break, we can take it.

16           THE COURT:  That's fine.  I'm good to go.  I'm also

17   happy to take a break.  We moved everything to quarter of

18   4:00.  We're good to go to quarter of 4:00.  If you want to

19   take a break, that's fine.  How long?  Ten minutes.

20           MR. LEE:  Ten minutes is great.

21           THE COURT:  Ten minute break.

22           (Court recessed at 2:40 p.m.)

23           THE COURT:  When you're ready.

24   BY MR. LEE:

25   **Q.**   Dean Fitzsimmons, I'd like to take you through the

1    admissions process in some detail so we can understand it.

2                MR. LEE:  Could I have on the screen DD 1.2,

3    Demonstrative 1.2?  Do you see the slide entitled "Objective

4    of" --

5                THE COURT:  Where is this?  Where do I find it?  Is

6    it a demonstrative?

7                MR. LEE:  It's just a demonstrative.  I think Your

8    Honor has them.  Tab 2, Your Honor.

9    BY MR. LEE:

10   **Q.**  Are you with us, Dean Fitzsimmons?

11   **A.**  I am.

12   **Q.**  Would you take us briefly through each of the three

13   objectives that are on DD 1.2?

14   **A.**  Well, ever so briefly.  So a little over 42,000

15   applicants, and we're going to admit about 2,000 people, so

16   truly exceptional students are -- who knows exactly how many.

17   But there might only be two or 300 admitted in every class

18   that would be truly unusual.

19               So these would be people who not only have terrific

20   test scores and grades and all those kinds of things --

21   because lots of people have them.  They'd be people who had

22   truly exceptional recommendations, let's say from not just

23   their teachers but perhaps from people they'd worked with in

24   the summer or say national or international competitions.

25               They also very often would have had a faculty

1    reading, expertise reading from one of our faculty members on

2    whatever it is.  That's a rough idea of who is truly

3    exceptional.

4    **Q.**  And are you also looking for students who are exceptional

5    in ways other than academically?

6    **A.**  Yes.  Really in every way that one could imagine,

7    actually.  And we're looking -- I think the whole idea of

8    having a great educational environment and having people who

9    truly will educate each other and inspire each other we

10   actually hope over the four years, that diversity really

11   matters.  And it's diversity in all its forms, not just

12   simply ethnic diversity or economic diversity.  Religious

13   diversity, you name it.  The more diverse the students are,

14   the richer the education.

15   **Q.**  You've gone to the second objective.

16   **A.**  Yes.

17   **Q.**  I think you've hit on some, but what are the types of

18   diversity that you're looking for in a Harvard College class?

19   **A.**  It really would go right down the line.  The easy ones

20   we've talked a lot about would be ethnic diversity and

21   economic diversity.  But we're also looking -- and to some

22   extent certainly geographic diversity, things -- very

23   standard things that people think about.

24          But it's much more than that.  It's diversity of

25   thinking.  It's diversity of academic interests.  I think one

1    of the things we hope with all of our new students who are

2    coming into the School of Engineering and Applied Science is

3    we want them to live with and learn from humanities students

4    and social science students and maybe take some of those

5    courses themselves.

6            So it's diversity in every possible way you can

7    think of it.

8    **Q.**  What is the third objective?

9    **A.**  Very simple.  No more students than beds.  We have

10   typically a 97, 98 percent graduation rate for all of our

11   students.  And all of our freshmen are required to live in

12   the dorms, and about 98 percent of all of our students live

13   in the dorms.  We simply cannot -- we don't have room for

14   more than 1,660 people roughly in each class.

15   **Q.**  Approximately how many applications does Harvard receive

16   in a year?

17   **A.**  A little over 40,000 in recent years.

18   **Q.**  Of that approximately 40,000, how many are academically

19   qualified to do the work at Harvard?

20   **A.**  A majority, I would say, perhaps a substantial majority

21   of the people who apply.  Because they're very self-selecting

22   in some ways, despite all of our recruiting.  A very large

23   percentage could do the work at Harvard.

24   **Q.**  To prepare yourself to testify, did you review some

25   information about the Harvard class of 2019?

1  **A.**  Yes.

2  **Q.**  Approximately how many applications did you receive for

3  the Harvard class of 2019?

4  **A.**  It was probably around 35,000.

5  **Q.**  Could I have on the Exhibit DD 1.3.

6          MR. LEE:  This is a demonstrative, Your Honor,

7  which I think is the next slide in Tab 2.

8  BY MR. LEE:

9  **Q.**  Do you have DD 1.3 before you?

10  **A.**  I do.

11  **Q.**  Is this a chart with some of the information you obtained

12  for your testimony?

13  **A.**  Yes.

14  **Q.**  For the class of 2019, how many domestic applicants had

15  perfect scores on the verbal section of the SAT?

16  **A.**  About 2,700.

17  **Q.**  How many had perfect scores on the math section of the

18  SAT?

19  **A.**  About 3,400.

20  **Q.**  Approximately how many had perfect grade point averages?

21  **A.**  A little over 8,000.

22  **Q.**  How many students did you admit to the Harvard class of

23  2019?

24  **A.**  Sent out about 2,000 admissions tickets.

25  **Q.**  Is the number 2,000 a typical number?

1    **A.**   It's typical.

2    **Q.**   Why is the number 2,000 a typical number?

3    **A.**   Simply because we have a pretty good sense, based on whom

4    we've admitted that year, how many of them are likely to show

5    up because there are so many great places out there beyond

6    Harvard.  Some of the students, you know, will look at it and

7    decide they want to go to the great state university nearby,

8    or they might decide to go to a beautiful small college.  All

9    kinds of different reasons why people would turn us down.

10           And typically almost 20 percent in recent years of

11   the students roughly will turn us down to go elsewhere.

12   **Q.**   Now, let's go from the numbers to the materials that you

13   considered.  And I think on a number of occasions you told

14   Mr. Hughes that the admissions office considers all the

15   information in the file.  Is that what you said?

16   **A.**   That's correct.

17   **Q.**   We're going to go through the information in some detail,

18   but let me ask you this:  Who submits the information that

19   ultimately ends up in the file?

20   **A.**   The student submits quite a bit of information, but then

21   there's a lot of other information coming in from outside

22   sources such as the teachers and the counselor.  People maybe

23   with whom the student had worked over the summer or

24   employers.  There's loads of information coming in from the

25   outside.

1    **Q.**   What information is submitted by the student him or

2    herself?

3    **A.**   It would really be the common application.  We were

4    actually the first of our kind to get into the common

5    application in the mid '90s.  And the idea was to --

6    especially for a busy, stressed-out student and especially

7    those who perhaps are facing economic obstacles at home, we

8    felt it would be good to go to the common application because

9    it's easy for them to fill that out and then apply to a whole

10   variety of other good places at the same time.

11   **Q.**   Now, just in general terms, because we're going to look

12   at it specifically, what information is submitted by others

13   other than the student?

14   **A.**   We require the two teacher reports, and of course we

15   require the guidance counselor report along with a

16   transcript.  But you could just about get anything.  Lots of

17   students will work term time or during the summer or they'll

18   do research or other kinds of things in the school year or

19   the summer.  So that information comes in.  Just about

20   everything you can imagine.

21   **Q.**   Now, let's, before we get to the specifics of the files,

22   I want to ask you something about this concept of tips that

23   Her Honor and the rest of us have heard about.  What is a

24   tip?

25   **A.**   A tip would be a factor that might influence our readers

1    to vote yes in the end.  You'd look at something and say,

2    well, gee, that would make this particular person a

3    particularly interesting educator of others and classmate.

4    But it could be anything.

5    **Q.**  Is it also sometimes referred to as a plus factor?

6    **A.**  Yes.

7    **Q.**  Is a tip ever a negative factor?

8    **A.**  Never.

9    **Q.**  Now, turn, if you would, to Tab 3 in your notebook.  Do

10   you have that before you?

11   **A.**  Would this be the application review process?

12   **Q.**  No.

13   **A.**  Tab 3.  I'm sorry.

14   **Q.**  Tab 3 should be DX5.

15   **A.**  Yes.

16   **Q.**  This is the interviewer handbook.  Do you see that?

17   **A.**  I do.

18   **Q.**  We saw excerpts of the interviewer handbook for 2013-2014

19   when Mr. Hughes examined you.  I'll represent to you that

20   this is a complete version of the interviewer handbook.

21         Do you recognize it?

22   **A.**  I do.

23   **Q.**  What is it used for?

24   **A.**  We use it, of course, for our 10,000 interviewers.  We

25   also use it for our own staff, obviously for their training.

1    It's a very useful, quick kind of summary of what we do.

2              MR. LEE:  Your Honor, we offer DX5.

3              MR. HUGHES:  No objection, Your Honor.

4              THE COURT:  Admitted.

5              (Defendant Exhibit No. DX5 admitted.)

6    BY MR. LEE:

7    Q.  Turn, if you would, to the page at the bottom that says

8    DX005.0009.

9              Do you have that before you?

10   A.  I am one page away.  Yes.

11   Q.  Just remind us.  This is something that you send out to

12   the 10,000-plus people involved in the admissions process?

13   A.  That's correct.

14   Q.  Is it available to your 40 admissions officers each year?

15   A.  Yes.  And it's used obviously in the training as well.

16   Q.  Now, there's a category called "The Search For

17   Distinguishing Excellences."

18             Do you see that?

19   A.  I have it.

20   Q.  What is a distinguishing excellence in the Harvard

21   admissions process?

22   A.  Well, if I could read just a little bit of it.  We talk

23   about our goal is to attract the best students to the

24   college.

25   Q.  Dean Fitzsimmons, you are going to have to go slower if

1   you're going to read or the court reporter will kill both of

2   us.

3   **A.**   Sorry.  I'll make sure the Boston accent is correctly

4   applied.

5   **Q.**   You don't have to read it because it's in evidence.  But

6   just in general terms, what's a distinguishing excellence?

7   **A.**   It would really be excellences of all kinds.  It could be

8   academic.  It could be, for example, musical.  You know,

9   Yo-Yo Ma, the cellist, went to Harvard.  In recent years we

10  might get 2,200 music CD's and resumes sent in, and we'll

11  take a look at them, and then we'll pass the best ones on to

12  faculty.  And then they'll tell us again on a 1 through 4

13  scale who might be truly excellent musically.  So it could be

14  anything, really.

15  **Q.**   Now, turn, if you would, to the next page.  Do you see

16  the first sentence of the first full paragraph?

17  **A.**   Yes.

18          MR. LEE:  I'm going to ask Mr. Lee to highlight

19  that.

20  BY MR. LEE:

21  **Q.**   And I am this time going to ask you to read it to us.

22  **A.**   "The admissions committee values objective criteria but

23  holds a more expansive view of excellence."

24  **Q.**   Is that true?

25  **A.**   That's very true.

1  **Q.**  And is it an accurate description of the real process

2  that's used to admit students at Harvard?

3  **A.**  Absolutely.

4  **Q.**  All right.  Then there's a reference to test scores and

5  grades indicating academic aptitude and achievement.

6          Do you see that?

7  **A.**  Yes.

8  **Q.**  That's true, is it not?

9  **A.**  It is.

10  **Q.**  Then would you read to us the next sentence from the

11  handbook.

12  **A.**  "The committee also scrutinizes applications for

13  extracurricular distinction and personal qualities."

14          Keep reading?

15  **Q.**  Yes, please.

16  **A.**  "Students' intellectual imagination, strength of

17  character, and their ability to exercise good judgment.

18  These are other critical factors in the admissions process,

19  and they are revealed not by test scores but by students'

20  activity outside the classroom, the testimony of teachers and

21  guidance counselors, and by alumnae/alumni interview

22  reports."

23  **Q.**  Let's stop there.  Is that an accurate description of

24  what the admissions office is looking for, at a high level?

25  **A.**  Yes.

1    **Q.**   Now, in the handbook you specifically identify some

2    things that you're positively looking for in applicants.

3    **A.**   Yes.

4    **Q.**   Now, turn, if you would, to page 10 of DX5.  And I'm

5    going to draw your attention to the third paragraph of this

6    page.  Do you have it before you?

7    **A.**   Page 10, yes.

8    **Q.**   There's a sentence that begins "Tips."  Would you read

9    that sentence for us.  Mr. Lee will highlight it for you.

10   **A.**   Yes.  "Tips come into play only at a high level of merit.

11   The committee never gives enough of a tip to admit an average

12   candidate at the expense of a first-rate one.  These are

13   among the most common tips by which applicants presenting

14   distinguished academic and extracurricular records might

15   distinguish themselves for admission."

16   **Q.**   I want to ask you about that first sentence, "Tips come

17   into play only at a high level of merit."

18            First, is that true?

19   **A.**   Absolutely true.

20   **Q.**   What does it mean?

21   **A.**   It really means that you have to be highly competitive

22   really across the board before you really will be in

23   contention for a place in the class, at which point having a

24   tip of one kind of another might help you get in, all other

25   factors substantially equal.

1    **Q.**   There was a lot of reference to tips for race or ethnic

2    background during Mr. Hughes' examination you.

3             Do you remember that?

4    **A.**   I do.

5    **Q.**   Let's see what the list of tips is that's listed in the

6    notebook.  What is the first tip?

7    **A.**   "Outstanding and unusual intellectual ability."

8    **Q.**   Now, given the academic success of the applicant pool as

9    you've just described to us, what makes someone outstanding

10   and unusual enough to get this tip from that very, very

11   qualified applicant pool?

12   **A.**   It's really the ones at the very tip-top who will get,

13   for example, Harvard faculty reads that will say this is one

14   of the most promising poets in this generation or one of the

15   most promising mathematicians in this generation.

16            But it would be based on they perhaps would be

17   looking at, say, the person's poetry or the person's original

18   math.  Then they'd look at the entire application to see the

19   recommendations and to see what other -- perhaps in the math

20   world, for example, this person was on either the national or

21   the international Math Olympiad team.

22   **Q.**   What is the next tip that is expressly described in the

23   handbook?

24   **A.**   "Unusually appealing personal qualities."

25   **Q.**   And what are -- can you give us an example of an

1    unusually appealing personal quality?

2    **A.**   Well, I'd say in a general kind of way we're looking at

3    people who have really made everyone around them better, say,

4    in their high school, in their family perhaps, in their

5    community.  People who literally have in some cases really

6    made a difference, positive, big positive difference in other

7    people's lives so far, at least in terms of what the

8    application indicates from the reports.

9          And then we're also though -- we're in the futures

10   business.  So the idea, too, is, okay, maybe they'll be great

11   roommates and make a huge difference over the four years

12   based on what they've done so far.  But we're also trying to

13   do the impossible, I suppose, and trying to project them out

14   into the world later.

15   **Q.**   Now, under this paragraph it says, "In certain cases

16   teacher recommendations, the secondary school report,

17   personal statement, and the alumnae/alumni interview report

18   offer consistent testimony of an applicant's unusual

19   effervescence, charity, maturity, or strength of character in

20   addition to academic and extracurricular accomplishments.  A

21   residential community with strong emphasis on extracurricular

22   participation.

23         "As a residential community with strong emphasis on

24   extracurricular participation, Harvard prizes these

25   qualities."  Is that true?

1    **A.**   Very much so.  Yes, it's true.

2    **Q.**   And the next tip is what?

3    **A.**   Outstanding capacity for leadership.

4    **Q.**   The next tip is what?

5    **A.**   Creative ability.

6    **Q.**   And let's go to the next page.  What is the next tip?

7    **A.**   Athletic ability.

8    **Q.**   There's been a lot of discussion about athletes.  Why

9    does Harvard give a tip for athletes?

10   **A.**   For a couple of reasons.  One is having people, having

11   all of our students gather together, you know, for athletic

12   contests builds a spirit of community that I think many

13   students expect and I think they deserve.  It really unifies

14   the institution in quite a specific and vital way,

15   remembering, of course, that Harvard has changed a lot since

16   my era.

17           So now our biggest state often is California.  Our

18   fourth biggest is Texas.  Our sixth biggest is Florida.  So

19   if you're a kid coming from some of these areas, you want to

20   go to a place that is collegiate in the way Americans often

21   think of colleges.  So having a vibrant athletic tradition

22   and ability to rally people around makes a big difference in

23   our ability to attract all kinds of students.

24           The other part of it is that people who have

25   achieved high levels of athletic expertise, if you want to

1    use that word, often have a commitment, a drive, and an
2    energy that often serves them well during college and then
3    well beyond.
4    **Q.**   I'm going to ask you some more about the athletes and the
5    athletic ratings when we get to that.
6              But I want to ask you one thing.   In SFFA's
7    opening, they suggested that the coaches or the athletic
8    department basically order you who to admit.   Is that true?
9    **A.**   Hardly.
10   **Q.**   Does every athlete that gets admitted to the class get
11   reviewed and voted on by the 40-person admissions committee?
12   **A.**   Absolutely.
13             THE COURT:   Can I ask a question?   This says about
14   tips that they come only into play at a high level.   The
15   committee never gives a tip to admit an average candidate at
16   the expense of a first-rate on.
17             But didn't we see a chart earlier that said that
18   there's a big chunk of athletes and of legacies that wouldn't
19   get in but for that tip?
20             THE WITNESS:   There are some who needed a tip to
21   get in.   That's true.
22             But if you look at it in any sort of a national
23   sense, they're all very, very competitive in a national
24   sense.   Our applicant pool, you saw the 8,000 people with
25   perfect grades and so on that you just saw.   It's quite a

1    rarified pool in the end.

2              But there's room in lots of different ways for

3    people with lots of different abilities and skills to be

4    successful.  And one of the things that is very important for

5    people who come from a variety of different backgrounds is

6    that they have -- in addition to their academic work, they

7    have extracurricular or maybe athletic niches where they can

8    meet other people and have a sense of identity.  And in some

9    ways that helps achieve our usually 97-98 percent graduation

10   rate.

11             So it's a little different.  You know, the athletic

12   academic credentials are somewhat lower.  But the lineage of

13   the alumnae/alumni sons and daughters, their academic

14   credentials look almost exactly like the rest of the class.

15   So it's two very different pools.

16   BY MR. LEE:

17   **Q.**  That was going to be my next question.

18             There's been a suggestion is that if you look at

19   the children of Harvard and Radcliffe alums, they're somehow

20   academically less qualified than either the rest of the pool

21   or the admitted pool.  Is that accurate?

22   **A.**  That's not accurate, actually.

23   **Q.**  How does the lineage pool compare to the overall pool and

24   to the admitted pool?

25   **A.**  Just simple kinds of things.  The pool itself, they are

1  stronger than the average applicants certainly in the pool.

2  So they are certainly on academic credentials.  When they're

3  admitted, the test scores and grades and things like that

4  literally are identical to the average for the Harvard class.

5  So indistinguishable.

6           THE COURT:  I'm sorry.  This is the perils of

7  having me do the summary judgment motions and all the other

8  motions as I sit on this trial.

9           Didn't I read someplace that the legacies are the

10 lowest-performing demographic at Harvard?

11          THE WITNESS:  I don't think so.

12          MS. ELLSWORTH:  I don't believe you did, Your

13 Honor.

14          THE COURT:  I know you're like the collector of

15 facts over there.

16          MR. LEE:  The answer is?

17          MS. ELLSWORTH:  I'm not familiar with that as a

18 fact.

19          MR. LEE:  And I actually think it's not the fact.

20 BY MR. LEE:

21 **Q.**  Do you know, Dean Fitzsimmons?

22 **A.**  What we know is this, and you would expect it:  These are

23 a very self-selecting group because lots of them will not

24 apply if they're -- because for two reasons.

25          One, some of them don't want to go where their

1    parents went.  Another is that they are -- many of them go to
2    very good public and private schools.  They're very well
3    prepared.  And oftentimes their guidance counselors are very
4    good at telling them not to apply to Harvard even if they may
5    well be able to get in, especially if they may be a better
6    match for a different kind of school; for example, for a
7    smaller school, as often happens.  I think you yourself,
8    Mr. Lee, have seen that with two of your children.
9            And so it's a very -- by the time they get through
10   thinking about whether or not they're going to apply to
11   Harvard, they're a very, very strong group.  This is true at
12   similar institutions as well, not just at Harvard.
13   **Q.**  And from where you sit in the process, if you look at the
14   lineage applicants and compare them to the rest of the
15   applicants who are admitted, are they, as SFFA suggested,
16   academically weaker?
17   **A.**  No, no.  A very large percentage of them -- again,
18   because there is self-selection and good advice coming to
19   them, a very large percentage of them would have gotten in
20   without the tip.  And that's the way a lot of these so-called
21   tips work.  Many times you don't need the tip, actually.
22   **Q.**  Why does Harvard give a tip to children of alumni?
23   **A.**  I have think there are several reasons, and some of which
24   have been touched upon already.
25            One of them is, of course, just think of our 10,000

1    alumnae/alumni who help us with what we call schools and
2    scholarship work.  They interview a very, very large, well
3    over half the students who apply to Harvard each year.
4           They often will go to college nights for us.  In
5    recruitment they'll visit secondary schools for us.  They
6    hold parties for admitted students.  They do all kinds of
7    good things in that world.  So that's one piece of it.  So
8    when their sons and daughters apply, we're going to look very
9    carefully.
10          Another piece is that many of the alumnae/alumni,
11   again feeling a very special part of the Harvard community,
12   they will be part of Harvard Club activities that promote
13   Harvard across the country and across the world and put loads
14   of time into it.
15          The third part is people who give money and raise
16   money for Harvard.  I certainly would not have been able to
17   go to Harvard without the -- obviously the scholarship, the
18   need-based scholarship I had.  And this is a huge part of --
19   Harvard is trying very hard -- we've expanded our financial
20   aid program dramatically over the past 15 years.  We still --
21   we're always a work in progress.
22          So we would like to do even better.  You think that
23   after the capital campaign we'd be all set, and we're not.
24   We're only about two-thirds endowed for financial aid.
25          So there's lots of other things obviously our

1    alumnae/alumni are interested in helping us.  And our faculty

2    conduct cutting-edge research and create an academic

3    environment that will make the most of these talents of the

4    students who come to Harvard.  So that's certainly a part of

5    what we do.

6              And I think the moment you're admitted to Harvard,

7    and I would guess this is true at lots of different colleges,

8    you're part of our community forever.  And we hope you have a

9    special feeling about the place.  And many people because of

10   this special feeling will continue to help Harvard in various

11   ways throughout their lives.

12   **Q.**  Do the lineage applicants go through a different

13   admissions process?

14   **A.**  Not at all.

15   **Q.**  Are they reviewed by the same committee?

16   **A.**  Absolutely.

17   **Q.**  And I think you said this in partial answer to

18   Her Honor's question.  For many of the lineage candidates who

19   are admitted, do they need the tip?

20   **A.**  No.

21   **Q.**  Now, does Harvard also give a tip to children of Harvard

22   faculty and staff?

23   **A.**  We do.

24   **Q.**  Why?

25   **A.**  Because one of the most important things -- they always

1    say Henry Rosovsky, one of our former great deans, still

2    going strong, always said there are only two things you need

3    to do to have a great university.  One is to have great

4    students, and the other is to have great faculty.

5              And so this is -- the idea is that try to attract

6    faculty to Harvard, the best faculty in the world is

7    obviously critically important to our institutional goals.

8              So that when -- and again, it's not just that they

9    teach.  A lot of them help around our houses.  The faculty

10   deans of our houses, Doug Melton, who is one of the great

11   researchers in the world for stem cell research, runs one of

12   our houses in addition to doing world-class research.

13             I think one of the things -- they're a huge part of

14   our community.  And when their sons and daughters apply, we

15   feel it's important to look very carefully at them and, if we

16   can, try to act positively.  But if not, not admit them and

17   do it in a very sensitive way.

18   **Q.**  Now, do the children of faculty and staff go through a

19   separate admissions process from other applicants?

20   **A.**  Not at all.

21   **Q.**  The last tip listed here is geographic, ethnic, and

22   economic factors.  Do you have that in mind?

23   **A.**  I do.

24   **Q.**  Now, you've talked about geographic factors already, so

25   I'm not going to ask you about those.  Is the economic tip

1   the socioeconomic or low-income tip that you've described

2   before?

3   **A.**   Yes.  And I think it's one of the things in a country

4   that is so segregated economically, and in some ways with our

5   social classes even coming further apart, one from the other,

6   I think it's more important than ever to have people from

7   low- and modest-income backgrounds, from blue collar

8   backgrounds, from first-generation backgrounds, to be at

9   Harvard and to -- first of all, to have an opportunity to

10  make a difference in the world with the education.  But also,

11  frankly, to make sure that their classmates understand what

12  America is really like.  And it will make their classmates

13  better, and I think it will make them better for mixing with

14  people from all economic backgrounds.

15  **Q.**   Now, the last tip that I haven't discussed with you is

16  ethnic or race, correct?

17  **A.**   Yes.

18  **Q.**   And Mr. Hughes asked you why Harvard gave a tip for race,

19  and you answered that yesterday, so I'm not going to ask you

20  again.

21          Let me ask you this:  Is this list of tips a

22  complete list of tips?

23  **A.**   No, not really.

24  **Q.**   Does any one tip guarantee admission to a candidate?

25  **A.**   Not at all.

**Q.**  Go to Her Honor's question.  Can the presence of a tip
make a difference in admission?

**A.**  It can, again among fully qualified students, all other
factors substantially equal.

**Q.**  Is race or ethnicity ever a negative tip?

**A.**  Never.

**Q.**  Is anyone ever excluded from the class because of their
race?

**A.**  Never.

**Q.**  Turn, if you would, to DD 1.4, which is at Tab 2, which
is demonstrative Number 4.  Let's put a little more meat in
the bones around the actual process that results in this
class of 1,600 or so.

          Do you see DD 1.4?

**A.**  I do.

**Q.**  What is it?

**A.**  It gives a quick overview of the phases of the admissions
process.

**Q.**  And every applicant -- athlete, legacy, children of
staff, children of faculty, dean's list, someone not on those
lists -- they're going to go through this process, right?

**A.**  Exactly the same process.

**Q.**  Now, what is the first step in the process?

**A.**  It's just a very simple one, and that's to try to get our
applicants into manageable subcommittees or dockets, as we

1    call them.

2    **Q.**  So if I go to demonstrative 1.5, let's see if we can take

3    us to -- actually demonstrative 1.6, in the interest of time.

4            What does that show us?

5    **A.**  This gives you a rough idea of what the docket's like.

6    **Q.**  Are admissions officers assigned to specific dockets?

7    **A.**  Yes, they are.

8    **Q.**  How many are assigned to each docket?

9    **A.**  Typically five to seven with a chair.

10   **Q.**  And when an application comes in, is it assigned to

11   someone in a docket?

12   **A.**  Yes.  And that someone has the job of being the advocate.

13   **Q.**  Does that someone read all the applications from the same

14   high school?

15   **A.**  That's correct.

16   **Q.**  And why are those applications assigned in that manner?

17   **A.**  Partly because we want to understand -- it's a little bit

18   like Her Honor's contacts case question, actually.

19           And that is it's important for us to always

20   understand the context of we have an applicant, but the

21   applicant from this kind of a family background goes to this

22   particular school in this kind of community.

23           We also are looking how others at the school have

24   done based on the profile in the secondary school report.

25   But we also can see the other applicants from the school and

1    get a sense of what kinds of people at least their school is

2    sending our way this year.

3             So it's important that the advocate and the other

4    people, including the chair of the docket, have a good sense

5    of that area and perhaps even that particular school.

6    **Q.**   Turn, if you would, to Slide 1.7, DD 1.7.

7             Once the applications are assigned, what's the next

8    step?

9    **A.**   The next step is for the advocate to do the first read.

10   I won't bring you through the whole process because I think

11   we're going to see -- I don't know whether we will.  I don't

12   want to take too long.

13            The idea is that as first reader you are supposed

14   to look at that application in its entirety and then do a

15   bunch of ratings and so forth and then a write-up at that

16   point.  One of the issues that first readers always face is

17   that there's often lots of information that comes in after

18   they do their profile, after they do their preliminary

19   overall rating, and so on.

20            For example, the interview might not be there.  The

21   second teacher report might not be there.  The outside

22   recommendations from the employer or the research and so

23   forth.  So it's a moving target.  The first time is a first

24   look with what's in the folder then, and it kind of sets it

25   up at least with what we see so far.

1   Q.  I'm going to go into the information in a little bit more
2   detail.  Can the application be reviewed by anyone in
3   addition to the first reader?
4   A.  Yes.  Very much so.  Often the chair will do what we call
5   a third reading.  But if you're a -- let's say you're new to
6   this area and you would like to get a second reading, we
7   would call it from a person who had covered that area before
8   who might know the school a little bit better.  You can do
9   that before it goes on to the third reader.
10          You could often have -- often will have a faculty
11   reading either in terms of having an expertise reading or
12   simply a faculty member who would be interested in reading,
13   let's say, I don't know, eastern Massachusetts applicants.
14   Q.  So now let's talk about what happens during the first
15   reading.  I think you told me at that moment in time the file
16   may not be complete.
17   A.  That's correct.
18   Q.  So let's turn to DD 1.9, and let's look at the ratings.
19          Mr. Hughes asked you about some of them but I don't
20   think about all of them.  So I'm going to take you through
21   them.  There are three different categories of ratings on the
22   summary sheet, correct?
23   A.  That's correct.
24   Q.  So what are the profile ratings?
25   A.  The profile ratings would be the academic,

extracurricular, athletic, and personal ratings.

**Q.**   What are the school support ratings?

**A.**   These would be the two teacher recommendations and the counselor recommendation.

**Q.**   What are the other ratings?

**A.**   It would be the interview ratings, whether it was staff and/or alumnae and alumni.  And then finally there would be the preliminary overall rating.

**Q.**   And these are completed during this first read, if possible, correct?

**A.**   That's right.  Each reader, no matter whether first, second, third, fourth, whatever, should fill these out.

**Q.**   And remind us the scale is -- except for extracurriculars, what is the scale for the profile ratings?

**A.**   It's 1 to 4.  Extracurricular you can have a 5 if work or family obligations get in the way.

**Q.**   So the 5 rating for extracurriculars is to allow for the circumstance where family or personal circumstance might not allow you to participate in the extracurriculars that someone might otherwise do?

**A.**   Or could be a disability of one sort.  It's actually a very positive rating because it does imply something a little bit out of the norm.

**Q.**   All right.  So let's talk about what goes into the academic rating.

1          MR. LEE:  Could I have slide DD-10, please.

2     BY MR. LEE:

3     **Q.**  Now, do you see that we've highlighted the box in red and

4     then highlighted them in yellow?  Do you see that?

5     **A.**  I have.

6     **Q.**  On this summary sheet -- so Her Honor knows, how many

7     readings have there been?

8     **A.**  There have been two readers so far.

9     **Q.**  One is EJB on November 6 and one is CGM on November 8,

10    correct?

11    **A.**  That's correct.

12    **Q.**  And the four profile ratings are the ones that begin with

13    the two plus box that's highlighted, correct?

14    **A.**  That's right.  That's the academic rating.

15    **Q.**  Now, what are the factors that can be considered in the

16    academic rating?

17    **A.**  There are many.  Obviously test scores and grades --

18          THE COURT:  What's that box to the left?

19          THE WITNESS:  That's the preliminary overall

20    rating.  So EJB gave a two plus and then the chair, CGM, gave

21    it a 1.  So this is a very outstanding application, according

22    to their profiles.

23          So anyways, you wanted the academic.

24    BY MR. LEE:

25    **Q.**  Yeah.  Just to level -- is it right if I start with two

1    plus that's highlighted, that's the academic rating, the next

2    1 is the extracurricular rating, the next 4 is the athletic

3    rating, and the 2 plus is the personal rating?

4    **A.**   That's correct.

5    **Q.**   And just to be clear, when someone is sitting down as the

6    first reader to fill out these boxes, it's the same person

7    that's filling out these four boxes, isn't it?

8    **A.**   That's correct.

9    **Q.**   It's not someone filling out the first two and someone

10   filling out the fourth, right?

11   **A.**   That's correct.

12   **Q.**   Okay.  Back to the academic rating, in general terms.  I

13   don't want to go too far into the details given the hour of

14   the day.

15   **A.**   Yes, I understand.

16   **Q.**   In general terms, what goes into the academic rating?

17   **A.**   It really is, the simple thing is the test scores and

18   grades at the beginning.  But then you read really carefully

19   about what teachers and counselors have to say about things

20   such as creativity, love of learning, things of that sort,

21   how unusual in the context that person might be.

22            Then you would look at any outside academic

23   evaluations, researchers and so on, and then perhaps faculty

24   evaluation.

25   **Q.**   Is the academic rating based upon a formula?

1    **A.**  No, not at all.

2    **Q.**  Are there factors that go into the academic rating that

3    are not quantitative?

4    **A.**  Many.

5    **Q.**  And are some of them the examples that you just gave us?

6    **A.**  Very much so.  And also just because you are also -- it's

7    not just looking at what the person has done so far.  You're

8    trying to project, I guess, future potential, growth.  And

9    that's a big piece of it.  Love of learning, a person who's

10   demonstrated an ability to grow and learn and make absolutely

11   the most of academic opportunities.  People who would love to

12   talk to you for hours about their love of physics, for

13   example.  It's that kind of a thing that probably is going to

14   produce that upward growth curve during college and beyond.

15           THE COURT:  Can you blow up the left-hand side of

16   the screen for me just so I can see it?  I can't see it on

17   the screen.  Further left.  Can you blow it up a little bit

18   more?

19           MR. LEE:  Your Honor, if it's all right with you --

20           THE COURT:  I can't see it on the paper or on my

21   book.

22           MR. LEE:  We can get a hard copy.

23           THE COURT:  Bigger than the hard copy that I

24   already have?

25           MR. LEE:  That, I don't know.

```
1              MS. ATTORNEY:  It's at Tab 6 of her binder.
2              THE COURT:  I just wanted to see what it is.  Thank
3    you.  Go ahead.
4              THE WITNESS:  I'm sorry, Your Honor.  Did you have
5    questions on that?
6              THE COURT:  No.  I just wanted to be able to see
7    it.
8              THE WITNESS:  It's a little bit of a test for my
9    reading glasses.
10             MR. LEE:  I think Her Honor wanted to see what was
11   on the left.
12             THE COURT:  I have it.  They don't give you this
13   job until you're old enough for your eyesight to fail and you
14   can't see it.
15   BY MR. LEE:
16   Q.  Dean Fitzsimmons, does the fact that an applicant has
17   identified a certain race or ethnicity per se or in isolation
18   factor into the academic rating?
19   A.  No, not at all.
20   Q.  All right.  What is the next profile rating?  So if we
21   move from left to right, there are two 1's here.
22   A.  Yes, there are two 1's.
23   Q.  What rating is that for?
24   A.  That's the extracurricular rating.
25   Q.  And you told me the scale for that is 1 to 5, correct?
```

1    **A.**   That is correct.

2    **Q.**   Is there a formula for the extracurricular rating?

3    **A.**   No, not at all.

4    **Q.**   In general terms, what are the factors that are going

5    into the extracurricular rating?

6    **A.**   In conventional terms in this particular one, if your

7    eyesight is working well you can -- this is a very good

8    dancer, as an example.  And also somebody who had been really

9    a leader across the board.  She's just an absolute dynamo, it

10   appears.  Anybody with a 1 extracurricular is really

11   something special.

12          But it could be anything.  There are any number of

13   conventional extracurricular activities you could think of I

14   think in any high school, but there are also other kinds of

15   things.  Suppose you were active say in your local temple or

16   your local church or community organization or had been

17   active in some regional or national organization.

18          So extracurricular covers the -- I suppose you'd

19   say the energy, drive, and commitment this person puts into

20   nonacademic things.  But it could be anything.

21   **Q.**   Would it include commitment to community organizations,

22   for instance, outside of school?

23   **A.**   Absolutely.

24   **Q.**   Now, the factors that go into this rating, are they

25   qualitative as well as quantitative?

1    **A.**   Yes.

2    **Q.**   Does the race, self-identified race of an applicant in

3    isolation per se factor into the extracurricular rating?

4    **A.**   Not at all.

5    **Q.**   Now, the next rating is the athletic rating?

6    **A.**   Yes, it is.

7    **Q.**   And there's a 4 and a 5 here?

8    **A.**   Yes.

9    **Q.**   Setting aside the numbers here, what is the athletic

10   rating attempting to measure?

11   **A.**   It would be, I guess, again the energy, drive, and

12   commitment put into athletics.  We've already talked about

13   what a 1 is, I think.  So I won't go over that.

14   **Q.**   I actually wanted to ask you because I'm not sure it's

15   100 percent clear.  Who gets a 1 on the athletic rating?

16   **A.**   That would be someone who's identified by one of our

17   coaches as a potential varsity participant.

18   **Q.**   Now, the fourth rating which goes 2 plus 2 plus --

19   **A.**   Yes.

20   **Q.**   -- is what rating?

21   **A.**   Is the personal rating.

22   **Q.**   And Mr. Hughes asked you some questions about it, and

23   because it's been a focus, I want to ask you about it.  What

24   is the personal rating?

25   **A.**   Again, if you had read through this application and you

1    had sort of tried to figure out what kind of a positive

2    difference this person had made to others in her school,

3    outside her school, to her family, across the board, what

4    kind of a person is this as far as, I would say, maximizing

5    the experiences of everyone around her.

6              That's kind of what you're looking for.  There's no

7    formula to it.  It could be almost in any setting.  I'll give

8    you an example because I used to work dorm crew, so it's near

9    and dear to my heart.

10             Probably the best recommendation, one of the best

11   I've ever read was from the janitor at a high school because

12   this person had worked in the school's work program to help

13   pay tuition.  And what this person said about how the student

14   just lit up a room.  At the end of the day, everybody's tired

15   and they've got a lot of stuff to do to clean the school --

16   anyway, it was brief.  But you said to yourself on a dismal

17   day, this is the kind of person you want with you and the

18   kind of person you'd want with you, as they say, in any tough

19   situation.

20   Q.  Is the information that goes into the personal ratings

21   supplied in part by the student?

22   A.  You can get a sense sometimes, yes, from -- first of all

23   not just what the person says, for example, in the essay or

24   essays, because that can help obviously.  But also by what

25   the person does and what the person has actually

1    accomplished.

2          It's one thing to say what you're doing in an

3    essay.  It's another thing to look at what this person has

4    accomplished just in terms of action.  So it's a whole

5    variety of different things.

6    **Q.**  Is some of the information provided by school guidance

7    counselors and teachers?

8    **A.**  Very much so because they've usually spent a lot of time

9    with the student.  In some cases the teachers have taught the

10   student for two or three, sometimes four classes.  So they

11   get to know the student very well on a day-to-day basis.  And

12   some of the counselors really go out of their way to get to

13   know the students well.

14         And they also have, in a sense, a bit of a

15   comparative perspective sometimes because they can calibrate

16   again what kind of a difference -- how unusual this student

17   is in this particular high school.

18   **Q.**  And do you also consider information provided by other

19   recommenders and other sources?

20   **A.**  Very much so.  We're in the information business.  So

21   whatever comes in, we're going to look at it.  And that

22   information, for example, the one from the janitor, can be

23   really, really helpful.  And again, part of it is

24   corroborating all the pieces of the application.

25         So it's like anything else, no one thing is going

1    to do it.  But it's really in combination.

2    **Q.**  Now, does the fact that an applicant has self-identified

3    as a specific race or ethnicity factor in isolation or per se

4    to the personal rating?

5    **A.**  No, not at all.

6    **Q.**  Can circumstances related to someone's race or ethnicity

7    result in facts, circumstances, or events that are useful in

8    assigning the personal rating?

9    **A.**  Sure.

10   **Q.**  Can you give us an example?

11   **A.**  There are plenty of examples of students who have faced

12   enormous prejudice in all kinds of different ways in their

13   secondary school setting or in their communities.  And what

14   they have done as a result with this issue, what they've done

15   to overcome the challenges or the challenge or whatever it

16   might be, can illuminate what kind of a person this is in

17   terms of how that person would again perhaps face any kind of

18   an obstacle in college and later.

19   **Q.**  There's been a suggestion that the personal rating is a

20   personality rating.  Have you heard that?

21   **A.**  I have.

22   **Q.**  Is it right?

23   **A.**  It is not.

24   **Q.**  What's the difference?

25   **A.**  It's really -- I guess I'd go back to the doing as

1    opposed to self-promotion.  There are plenty of people who

2    can stand up and give a wonderful speech who might actually

3    not be very good people in the long term.  I'm just using a

4    stark example there.

5            Where it's really much more what a person has done

6    and evidence, say, from everything in that application that

7    would indicate that this person has made everyone around him

8    or her better and has the potential to do that throughout the

9    rest of his or her life.  So it really is -- it's really a

10   set of demonstrated achievements along with real testimony

11   across the board from people who know the student well.

12   **Q.**  Let's go to the next couple of ratings.  Turn, if you

13   would, to DD 1.14 in Tab 2.  Do you have those?

14   **A.**  Yes.

15   **Q.**  What do these ratings reflect?  And perhaps you can

16   explain to Her Honor why one of them has four ratings rather

17   than three.

18   **A.**  Yes.  So here we have -- again, I think Your Honor had a

19   question before about Teacher 1, Teacher 2.  It just simply

20   happens to be which one was read first by the reader.

21           The first teacher considered by EJB was an

22   off-the-charts 1, one of the best students I've ever had kind

23   of thing.  The second teacher, she rated as a 2 plus.  Again

24   very good, one of the best perhaps in five or ten years.

25           The secondary school counselor report is the third

1    one, and that's a -- it's usually from the guidance

2    counselor.  It can be from others at the school representing

3    the school.  And that's -- again, that's the one there.

4         And then the additional one was from an outside

5    recommendation.  So we've got space there at least to code a

6    couple of outside recommendations.

7    **Q.**  Now, are these teacher recommendations, counselor

8    recommendations, outside recommendations important to your

9    process?

10   **A.**  They're very important.

11   **Q.**  Are they important to setting the academic rating, the

12   extracurricular rating, as well as the personal rating?

13   **A.**  Absolutely.

14   **Q.**  And any of these pieces, any of these recommendations or

15   letters have information relevant to any of those ratings?

16   **A.**  They almost always have information about all three.

17   **Q.**  Now, do some applicants also interview with a Harvard

18   alum?

19   **A.**  They do.

20   **Q.**  And do the alumni interviewers assign ratings in the same

21   profile ratings we've just discussed?

22   **A.**  They do.

23   **Q.**  And do they also assign an overall rating?

24   **A.**  They do.

25   **Q.**  Now, when the alumni are doing the ratings and the

1    interviews, do they have all of the information that your

2    readers have?

3    **A.**   They don't.

4    **Q.**   What do they not have, in general?

5    **A.**   Just about everything.  They get a chance to meet the

6    student and talk for 45 minutes or an hour and then fill out

7    the form.  They get trained, but they don't have teacher

8    reports, counselor reports, transcripts, or anything like

9    that.

10   **Q.**   And where on this form is the rating for the interview

11   rating?

12   **A.**   It would be over on the right.  It's the person the alum

13   had given her a 1 personal and a 1 overall.

14   **Q.**   Now, do some applicants also interview with a member of

15   the admissions staff?

16   **A.**   Yes.

17   **Q.**   Is any applicant able to request an interview with the

18   admissions staff?

19   **A.**   Yes.

20   **Q.**   Is anyone who asks for an interview ever denied an

21   admission?

22   **A.**   Once the spaces fill up, the answer is yes.  But the

23   spaces are open, and then we do our best.  Remember we're on

24   the road a lot in the fall.  Then we're right into early

25   action, which the deadline is coming up actually November 1.

1    **Q.**   Does the staff ever request an interview with an

2    applicant?

3    **A.**   Yes.

4    **Q.**   In what circumstances would you ask to see an applicant?

5    **A.**   I chair the local subcommittee, eastern Massachusetts.

6    If you're looking on your materials, that's P docket.  So we

7    will -- let's say we find somebody very interesting and a

8    real possibility, but sometimes it might be useful for one or

9    more of us to see the applicant in the office.  So we'll

10   invite the person in.

11              We'll sometimes travel, actually have a staff

12   person travel to other places to do this.

13   **Q.**   Now, the final rating is a preliminary overall rating,

14   correct?

15   **A.**   That's correct.

16   **Q.**   And that's on the far left-hand side; is that correct?

17   **A.**   That's correct.

18   **Q.**   Is the preliminary -- it's called the preliminary overall

19   rating, correct?

20   **A.**   That's correct.

21   **Q.**   Why is it called preliminary?

22   **A.**   Because it is incredibly preliminary because we haven't

23   even talked about this person yet in committee and even in

24   the subcommittee.  The real decision is going to be made by

25   the 40 people in the full committee.  And we also know there

1    will probably be lots of additional information coming in, as
2    there often is.
3    **Q.**   Can the preliminary overall rating take into account the
4    self-identified race of an applicant?
5    **A.**   It can.
6    **Q.**   If an application is passed on for additional reviews,
7    does each additional reader rate the application according to
8    these same categories?
9    **A.**   Yeah, that's correct.
10   **Q.**   And as the application moves through the process, how are
11   these ratings used in general?
12   **A.**   They're used as kind of a starting point.  You know, in
13   Weymouth where I come from, we call it jacks are better to
14   open, in poker.
15          But the idea is that it's a place to start.  This
16   is what the reader saw when they first laid eyes on the
17   application.  But typically there's a lot that's going to
18   happen, a lot that's going to happen as the committee
19   meetings evolve.
20   **Q.**   Are the other ratings summed or basically put into some
21   formula that find their way into the preliminary overall
22   rating?
23   **A.**   Not at all.
24   **Q.**   Is any one of these eight ratings that we've looked at
25   given more weight than others?

1    **A.**   No.

2    **Q.**   Do the ratings themselves dictate admissions decisions?

3    **A.**   No.  And they kind of fade into the background.  Because

4    remember, when people are actually looking at making

5    decisions in subcommittee and full committee, every single

6    piece of the application, common application,

7    recommendations, everything go up on a screen for all -- say

8    in the subcommittee five to seven people, literally they're

9    all going to read the application.  Literally everybody reads

10   the application with any new information in it.  Then they'll

11   discuss.  Then they'll vote.  And then you kind of go from

12   there.

13          It's the same thing in the full committee.  All 40

14   people get a chance to read the application and then to make

15   a decision.

16          MR. LEE:  One final question and then, if it's all

17   right with Your Honor, it would be a good breaking point.

18   BY MR. LEE:

19   **Q.**   In your experience, has an applicant with lower, meaning

20   worse, preliminary ratings and profile ratings actually

21   gotten admitted to Harvard while an applicant with higher or

22   better profile ratings did not?

23   **A.**   It happens all the time.  Because again, unless the

24   committee -- the committee is really looking at the materials

25   when they're making a decision.  The preliminary stuff gets

1    left in the background.  They can make up their own minds,

2    for example, when they're looking at all the material whether

3    or not that counselor report really was a 1 because they're

4    going to see it.

5         They know that the reader suggested it was a 1, but

6    they're actually going to look at the stuff.

7    Q.  Do admissions officers from time to time simply disagree?

8    A.  Disagree?

9    Q.  Disagree on what a particular recommendation is?

10   A.  Absolutely.

11        MR. LEE:  This would be a good stopping point.

12        THE COURT:  One more question.  If all 40 people

13   look at 40,000 applications, there must be some chunk at the

14   bottom that gets lopped off.

15        THE WITNESS:  That's correct.  But not lopped off.

16   So when we get to -- let's say in full committee we'll come

17   to, let's say, P docket, the docket I chair.  So everybody

18   will have the paper docket.  We call official number 1 and

19   official number 2 that recorded what we did, and it's up on

20   the screen.

21        So let's say we come to High School A, for example,

22   without getting -- and we'd say, okay, I'm the area person.

23   I'd say, okay, well, here's the slate for you to look at.

24   Here are the people that applied from High School A.  You can

25   see what their profiles look like.  Because we actually do

1   the profiles and a lot of information about each of the

2   candidates in each of the schools we see.

3            So of the 10 applicants, you can see here that four

4   or five of them based on the information are not very strong.

5            So what I'm going to do is I'm going to talk to you

6   about two of them, and I need to get the late interviews for

7   three of them.  But I'm now going to talk about the two of

8   them.

9            So then you would put -- for those two, you'd start

10  off by putting this reader sheet up on the screen, and then

11  you'd begin the discussion.  You'd go right through the

12  entire application.

13           And what you have to do as the advocate is to

14  convince the members of the subcommittee to vote for the

15  person.  Literally sometimes you will spend -- I know it

16  sounds not true, but sometimes you can spend an hour on a

17  single case in subcommittee before you can get to a tentative

18  decision.  But even that is not even close to the final

19  decision because you know you're going to have to defend it

20  in the full committee.

21           So you're right.  The way it works is you keep

22  winnowing down.  Let's say for one of the people, the five

23  you weren't even thinking of, it didn't look very good on the

24  profiles.  Suppose you get a whole new thing.  Let's say you

25  get a great interview.  Let's say you get now a terrific

1    music rating from our faculty or some other additional

2    information.  Because people change and grow a lot senior

3    year in high school.

4              So by the time you get even to the end of the

5    subcommittee or certainly by the time you get into full

6    committee, that's an entirely different case.  And the

7    advocate and the subcommittees have the responsibility of

8    making sure that everybody from their docket and from the

9    schools they cover get the best possible case made.

10             But it's a moving target all the way up to the last

11   day because you're comparing the kid from School A on P

12   docket to the kid from Ulaanbaatar in Mongolia or the kid

13   from the school in London.  It's all a matter of comparing

14   and then voting on applicants, the ones you think are going

15   to be the best educators of others.

16             THE COURT:  Each first reader is reading something

17   like a thousand applications?

18             THE WITNESS:  It could be as many as 1,700.  It

19   could be that high.  Some of our staff members also do

20   financial aid.  Some of them do anywhere from maybe 500 to up

21   to 1,100 applications.  Full-time admission officer would

22   read usually in the neighborhood of 14 to 17 or 1,800,

23   depending on what other responsibilities they have.  So you

24   do a lot of reading, and so you get lots of experience.

25             And as much as we love each other, though, we all

1    know that it's our job to make the best case for all of the

2    people we're presenting.

3                And so it is a matter of -- and you may vote for a

4    case -- all hear the case and you might vote for the case for

5    a couple of different reasons.  You have vote for the case

6    for another different set of reasons.  You never quite know

7    because you've got 40 people in the room.  It is the most

8    thorough process that you could possibly devise.

9                We're also not just watching what each other did

10   with the ratings and whether or not somebody was too soft,

11   let's say, with a 1 rating.  You're also making sure that

12   people are -- making sure they're presenting the case in the

13   best possible way.

14               I don't know if that answers your question.

15               MR. LEE:  Can I ask one more question to follow up

16   on that?

17               THE COURT:  Yes.

18   BY MR. LEE:

19   Q.   To go to Her Honor's question.  If someone is basically

20   saying I'm going to discuss two cases from P docket, if one

21   of the 39 other admissions officers says, "But I actually

22   want to discuss this person you're not recommending," can you

23   do that?

24   A.   It happens all the time.  And that's what the chair's

25   responsibility is, but also the other people who sit on the

1    docket.  But even all 40 people, you can say, well, why

2    aren't we hearing this case, you know, that kind of thing.

3    So it's a very thorough -- and frankly, we're all checking

4    and balancing each other all the time.

5              MR. LEE:  Thank you, Your Honor.

6              THE COURT:  So the case is recessed for today.

7    We'll see you again tomorrow.  Would you like to start at

8    9:30 again tomorrow?

9              MR. LEE:  I think that would be great if we could.

10             THE COURT:  I have a dispositive motion hearing at

11   3:30.  I just can't push it any later and still have time to

12   do it.  We'll end at 3:30 tomorrow.  That's what we'll do.

13             MR. LEE:  Thank you, Your Honor.

14             (Court recessed at 3:55 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    - - - - - - - - - - -

2                       CERTIFICATION

3

4         I certify that the foregoing is a correct

5    transcript of the record of proceedings in the above-entitled

6    matter to the best of my skill and ability.

7

8

9

10   /s/ Joan M. Daly                October 17, 2018

11   _____       _____

12   Joan M. Daly, RMR, CRR          Date
     Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         INDEX OF WITNESSES

2    WITNESS                                              PAGE

3
     WILLIAM FITZSIMMONS
4
       Direct Examination (Resumed) by Mr. Hughes.........   12
5      Cross Examination by Mr. Lee......................  139

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    E X H I B I T S

2

         Defendant Exhibit                    Received
3
             DX5        . . . . . . . . . . . . . . . . . . . .        188
4

5

6        Plaintiff Exhibit                    Received

7            12         . . . . . . . . . . . . . . . . . . . .         63

8            14         . . . . . . . . . . . . . . . . . . . .         38

9            19         . . . . . . . . . . . . . . . . . . . .         90

10           21         . . . . . . . . . . . . . . . . . . . .         93

11           26         . . . . . . . . . . . . . . . . . . . .        110

12           28         . . . . . . . . . . . . . . . . . . . .        130

13           29         . . . . . . . . . . . . . . . . . . . .        129

14           50         . . . . . . . . . . . . . . . . . . . .        150

15          104         . . . . . . . . . . . . . . . . . . . .         17

16          106         . . . . . . . . . . . . . . . . . . . .         19

17          111         . . . . . . . . . . . . . . . . . . . .         22

18          218         . . . . . . . . . . . . . . . . . . . .        160

19          227         . . . . . . . . . . . . . . . . . . . .         25

20          230         . . . . . . . . . . . . . . . . . . . .         35

21          236         . . . . . . . . . . . . . . . . . . . .         36

22          515         . . . . . . . . . . . . . . . . . . . .         86

23

24

25