1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3   _____

4   STUDENTS FOR FAIR ADMISSIONS, INC.,

5              Plaintiff,          Civil Action
                                   No. 14-14176-ADB
6   v.
                                   October 19, 2018
7   PRESIDENT AND FELLOWS OF HARVARD
    COLLEGE, et al.,               Pages 1 to 261
8
              Defendants.
9   _____

10

11

12          TRANSCRIPT OF BENCH TRIAL - DAY 5
       BEFORE THE HONORABLE ALLISON D. BURROUGHS
            UNITED STATES DISTRICT COURT
13        JOHN J. MOAKLEY U.S. COURTHOUSE
                 ONE COURTHOUSE WAY
14             BOSTON, MA  02210

15

16

17

18

19

20

21

22          JOAN M. DALY, RMR, CRR
         KELLY MORTELLITE, RMR, CRR
23          Official Court Reporter
        John J. Moakley U.S. Courthouse
24       One Courthouse Way, Room 5507
              Boston, MA  02210
25          joanmdaly62@gmail.com

```
 1    APPEARANCES:

 2
      COUNSEL FOR THE PLAINTIFF:
 3

 4            ADAM K. MORTARA, ESQUIRE
              J. SCOTT McBRIDE, ESQUIRE
 5            KRISTA J. PERRY, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
 6            54 West Hubbard Street
              Suite 300
 7            Chicago, Illinois 60654
              312.494.4400
 8            adam.mortara@bartlit-beck.com
              scott.mcbride@bartlit-beck.com
 9            krista.perry@bartlit-beck.com

10            JOHN M. HUGHES, ESQUIRE
              MEG E. FASULO, ESQUIRE
11            Bartlit Beck Herman Palenchar & Scott
              1801 Wewatta Street
12            Suite 1200
              Denver, Colorado 80202
13            303.592.3100
              john.hughes@bartlit-beck.com
14            meg.fasulo@bartlit-beck.com

15            KATHERINE L.I. HACKER, ESQUIRE
              Bartlit Beck Herman Palenchar & Scott
16            1899 Wynkoop Street
              Suite 800
17            Denver, Colorado 80202
              303.592.3100
18            kat.hacker@bartlit-beck.com

19            JOHN MICHAEL CONNOLLY, ESQUIRE
              THOMAS R. McCARTHY, ESQUIRE
20            WILLIAM S. CONSOVOY, ESQUIRE
              Consovoy McCarthy Park PLLC
21            3033 Wilson Boulevard
              Suite 700
22            Arlington, Virginia 22201
              703.243.9423
23            mike@consovoymccarthy.com
              tom@consovoymccarthy.com
24            will@consovoymccarthy.com

25
```

1    APPEARANCES (cont.):

2

3            PATRICK STRAWBRIDGE, ESQUIRE
             Consovoy McCarthy Park PLLC
             Ten Post Office Square
4            8th Floor, South, PMB #706
             Boston, Massachusetts 02109
5            617.227.0548
             patrick@consovoymccarthy.com
6
             MICHAEL H. PARK, ESQUIRE
7            Consovoy McCarthy Park PLLC
             3 Columbus Circle
8            15th Floor
             New York, New York 10024
9            646.456.4432
             park@consovoymccarthy.com
10
             PAUL M. SANFORD ESQUIRE
11           BENJAMIN C. CALDWELL, ESQUIRE
             Burns & Levinson LLP
12           One Citizens Plaza
             Suite 110
13           Providence, Rhode Island 02903
             401.831.8330
14           psanford@burnslev.com
             bcaldwell@burnslev.com
15

16   COUNSEL FOR THE DEFENDANT:

17           WILLIAM F. LEE, ESQUIRE
             FELICIA H. ELLSWORTH, ESQUIRE
18           ANDREW S. DULBERG, ESQUIRE
             ELIZABETH C. MOONEY, ESQUIRE
19           SARAH R. FRAZIER, ESQUIRE
             Wilmer Cutler Pickering Hale and Dorr LLP
20           60 State Street
             Boston, Massachusetts 02109
21           617.526.6556
             william.lee@wilmerhale.com
22           felicia.ellsworth@wilmerhale.com
             andrew.dulberg@wilmerhale.com
23           elizabeth.mooney@wilmerhale.com
             sarah.frazier@wilmerhale.com
24

25

```
 1    APPEARANCES (cont.):

 2
            SETH P. WAXMAN, ESQUIRE
 3          DANIELLE CONLEY, ESQUIRE
            DANIEL WINIK, ESQUIRE
 4          BRITTANY AMADI, ESQUIRE
            PAUL R.Q. WOLFSON, ESQUIRE
 5          Wilmer Cutler Pickering Hale and Dorr LLP
            1875 Pennsylvania Ave, NW
 6          Washington, DC 20006
            202.663.6006
 7          seth.waxman@wilmerhale.com
            danielle.conley@wilmerhale.com
 8          daniel.winik@wilmerhale.com
            brittany.amadi@wilmerhale.com
 9          paul.wolfson@wilmerhale.com

10          DEBO P. ADEGBILE, ESQUIRE
            Wilmer Cutler Pickering Hale and Dorr LLP
11          7 World Trade Center
            250 Greenwich Street
12          New York, New York 10007
            212.295.6717
13          debo.adegbile@wilmerhale.com

14          ARA B. GERSHENGORN, ESQUIRE
            Harvard Office of the General Counsel
15          Smith Campus Center
            Suite 980
16          1350 Massachusetts Avenue
            Cambridge, Massachusetts 02138
17          617.495.8210
            ara_gershengorn@harvard.edu

18
19    COUNSEL FOR AMICI STUDENTS:

20          JON M. GREENBAUM, ESQUIRE
            BRENDA L. SHUM, ESQUIRE
21          GENEVIEVE BONADIES TORRES, ESQUIRE
            KRISTEN CLARKE, ESQUIRE
22          1500 K Street NW, Suite 900
            Washington, DC 20005
23          202.662.8315
            jgreenbaum@lawyerscommittee.org
24          bshum@lawyerscommittee.org
            gtorres@lawyerscommittee.org
25          kclarke@lawyerscommittee.org
```

```
 1    APPEARANCES (cont.):

 2
              LAWRENCE CULLEEN, ESQUIRE
 3            EMMA DINAN, ESQUIRE
              Arnold & Porter LLP
 4            555 Twelfth Street, NW
              Washington, DC 20004
 5            202.942.5477
              gina.dean@aporter.com
 6            emma.dinan@aporter.com

 7
      COUNSEL FOR AMICI ORGANIZATIONS:
 8
              JENNIFER A. HOLMES, ESQUIRE
 9            CARA McCLELLAN, ESQUIRE
              JIN HEE LEE, ESQUIRE
10            MICHAELE M. TURNAGE YOUNG, ESQUIRE
              RACHEL N. KLEINMAN, ESQUIRE
11            NAACP Legal Defense and Educational Fund, Inc.
              700 14th Street NW
12            Suite 600
              Washington, DC 20005
13            jholmes@naacpldf.org
              cmcclellan@naacpldf.org
14            jlee@naacpldf.org
              myoung@naacpldf.org
15            rkleinman@naacpldf.org

16            KENNETH N. THAYER, ESQUIRE
              KATE R. COOK, ESQUIRE
17            Sugarman Rogers
              101 Merrimac Street
18            Suite 900
              Boston, Massachusetts 02114
19            617.227.3030
              thayer@sugarmanrogers.com
20            cook@sugarmanrogers.com

21

22

23

24

25
```

|   |   |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (The following proceedings were held in open |
| 3 | court before the Honorable Allison D. Burroughs, United |
| 4 | States District Judge, United States District Court, District |
| 5 | of Massachusetts, at the John J. Moakley United States |
| 6 | Courthouse, One Courthouse Way, Boston, Massachusetts, on |
| 7 | October 19, 2018.) |
| 8 | THE COURT:  How are you? |
| 9 | MR. McBRIDE:  Doing well.  How are you? |
| 10 | THE COURT:  I told Mr. Mortara yesterday my back is |
| 11 | starting to bother me.  I don't know if your backs are |
| 12 | starting to bother you, but you can all feel free to stand up |
| 13 | and back and move around a little bit if we're sitting too |
| 14 | long, and I may be back and forth doing the same. |
| 15 | In terms of this morning's schedule, I have a |
| 16 | conference in another case at noon.  I'm not doing it in this |
| 17 | courtroom.  I moved it to another courtroom so that we didn't |
| 18 | disrupt the function or the paperwork in here or whatever. |
| 19 | So I'm happy to go straight through to a few minutes before |
| 20 | 12:00.  I'm also happy to take a morning break, so do |
| 21 | whatever you all want.  But the afternoon break will be from |
| 22 | like five of 12:00 to, hopefully I can hold it to 45 minutes. |
| 23 | Okay.  But it might be a little bit longer.  So if you want a |
| 24 | break, go ahead and let me know and take one.  But if you |
| 25 | want to go straight through, that's fine, too. |

1          Just a reminder, you're still under oath okay.

2          THE WITNESS:  Yes.

3          (ERICA BEVER previously sworn by the Deputy Clerk.)

4                    EXAMINATION (resumed)

5    BY MR. McBRIDE:

6    **Q.**  Good morning, Ms. Bever.

7    **A.**  Good morning.

8    **Q.**  I want to move ahead from October of 2013 into 2014.

9          MR. McBRIDE:  And I'm going to put on the screen

10   Plaintiff's Exhibit 41.  And I'd like to offer that into

11   evidence, please.

12         MS. ELLSWORTH:  No objection.

13         THE COURT:  It's admitted.

14         (Plaintiff Exhibit No. 41 admitted.)

15   BY MR. McBRIDE:

16   **Q.**  And do you recall that in July of 2014, before you left

17   OIR, Dean Khurana took his current position as the dean of

18   Harvard College?

19   **A.**  Yes.

20   **Q.**  I have here Plaintiff's Exhibit 41 on the screen.  This

21   is an email from you to Erin Driver-Linn on July 10 of 2014.

22   **A.**  Yes.

23   **Q.**  And it copies your colleagues, John Scanlon and Liam

24   Schwartz?

25   **A.**  Yes.

1    **Q.**  This email, this was about a meeting that you had the

2    next day with Dean Khurana to introduce him to your office

3    and the work OIR had done relating to Harvard?

4    **A.**  Yes.

5    **Q.**  And you see here you've written, "Hi, Erin.  I've

6    attached a draft agenda for tomorrow's meeting with Dean

7    Khurana.  Does this look right to you?  I'm also attaching

8    the additional college-related materials we should probably

9    share with him."

10          Do you see that?

11    **A.**  I do.

12    **Q.**  The other people who attended the meeting with Dean

13    Khurana was your boss, Erin Driver-Linn, as well as the two

14    co-workers listed here, Mr. Scanlon and Mr. Schwartz?

15    **A.**  Yes, I believe that's correct.

16    **Q.**  And you see that the email list four attachments:  agenda

17    for Khurana, document low-income admission memo final,

18    factors in admission, and athletes project.

19          Do you see those attachments?

20    **A.**  I do.

21    **Q.**  If you page to the next page in Plaintiff's Exhibit 41 --

22    I'll blow it up here on the screen.  Is this the agenda

23    that's attached for the meeting with Dean Khurana the next

24    day?

25    **A.**  It appears to be, yes.

1    **Q.**  You see the three main points that you are proposing

2    discussing with Dean Khurana are additional OIR analysis on

3    Harvard College students?  That's the first bullet point?

4    **A.**  Yes.

5    **Q.**  And under there what you've written is --

6                THE COURT:  Mr. McBride, I have a bunch of redacted

7    pages.  Do I have the wrong exhibit?

8                MR. McBRIDE:  No, Your Honor.  You have the correct

9    exhibit.  But the very second page after the email is the

10   agenda I'm looking at.

11               THE COURT:  I see that double-sided.  Okay.  Go

12   ahead.  Sorry.

13   BY MR. McBRIDE:

14   **Q.**  Under the additional OIR analysis on Harvard College

15   students, the subpoints are athletes, evaluating factors in

16   admissions, and low-income admissions memo.  Do you see that?

17   **A.**  I do.

18   **Q.**  And then the next two main bullet points are trends in

19   higher education for the Harvard Corporation, and finally

20   discussion of OIR work and potential new projects.  You see

21   that?

22   **A.**  Yes.

23   **Q.**  And if you would page through with me, as Her Honor

24   noted, there's a number of redacted pages of the additional

25   attachments going back.  Do you see that?

1   **A.**  Yes.

2   **Q.**  But if you go to page 47 -- and we've provided some page

3   numbers there at the very bottom pages.  This one, for

4   example, is on page 24 of 66.  But if you go to page 47, we

5   have some unredacted pages.  Do you see that?

6   **A.**  Yes.

7   **Q.**  And this is the evaluating factors PowerPoint that

8   relates to that first agenda item, second subpoint,

9   evaluating factors in admission?

10   **A.**  Yes.

11   **Q.**  And these are familiar slides, correct?  We were looking

12   at these yesterday in Plaintiff's Exhibit 12?

13   **A.**  Yes.

14   **Q.**  And the third subpoint under that first bullet says,

15   "Low-income admissions memo on the agenda."

16          You attached slides for that as well, correct?

17          If you go to page 59, that might help you.

18   **A.**  Thank you.  Yes.

19   **Q.**  And here, page 59, you've attached the same May 1 memo

20   that we looked at yesterday, Plaintiff's Exhibit 26, that you

21   had previously prepared for Dean Fitzsimmons, right?

22   **A.**  Yes.

23   **Q.**  And that was what was meant by that third sub-bullet

24   point, low-income admissions memo?

25   **A.**  Yes.

1    **Q.**  Now, you don't recall Dean Khurana at your meeting on

2    July 11th criticizing the analyses that you had sent to him,

3    do you?

4    **A.**  My memory of that meeting does not discuss any specific

5    discussion of our work.

6    **Q.**  And so you don't have any specific discussion of or you

7    don't have any specific recollection of a discussion with

8    Dean Khurana where he criticized either of the analyses that

9    were P12 and P26 that you had sent to him, correct?

10   **A.**  No.  My memory of that meeting is that he shared sort of

11   his vision admission for the college and what he was planning

12   to do as dean.  And I don't remember discussing any of the

13   work we had shared with him that day.

14   **Q.**  And if you go back to the agenda, the third bullet point,

15   as we noted, was discussion of OIR work and potential new

16   projects.  You see that?

17   **A.**  Yes.

18   **Q.**  And you don't recall there being any discussion with Dean

19   Khurana at this July 2014 meeting about any new OIR project

20   to further investigate a possible Asian penalty in

21   admissions?

22            MS. ELLSWORTH:  I'm going to object on foundation

23   for that question.  I don't think it's been established.

24            MR. McBRIDE:  It was a "you don't recall" question.

25            THE COURT:  It's overruled.

1        THE WITNESS:  Can you repeat the question?

2   BY MR. McBRIDE:

3   **Q.**   Sure.  You don't recall there being any discussion with

4   Dean Khurana at this July 2014 meeting about a new OIR

5   project to further investigate a possible Asian penalty in

6   the admissions at Harvard?

7   **A.**   No.  Again, my memory of that meeting is we discussed

8   Dean Khurana's vision for his role at the college.

9   **Q.**   And you don't recall anyone taking any action with

10  respect to these reports after this meeting in July of 2014?

11  **A.**   I don't remember any subsequent discussion of these

12  analyses, no.

13  **Q.**   Or any subsequent action with respect to them?

14  **A.**   I don't remember any subsequent work, no.

15  **Q.**   Now, we can agree that OIR did some logistic regression

16  models of the Harvard admissions starting in at least

17  February of 2013 that we have reviewed, right?

18  **A.**   Yes.  They did a limited analysis with a limited number

19  of variables, yes.

20  **Q.**   And you forwarded those to your co-workers in Boston OIR

21  in February of 2013.  We saw that?

22  **A.**   We did.

23  **Q.**   And you sent a memo to Dean Fitzsimmons using those

24  models in May of 2013.  We saw that?

25  **A.**   We saw similar models and a new memo, yes.

1    **Q.**  And we also saw you sent additionally updated versions to

2    Dean Fitzsimmons in June of 2013?

3    **A.**  Yes.

4    **Q.**  And you collected them and sent them again to your boss,

5    Erin Driver-Linn, in October of 2013 just before the

6    scheduled meeting with respect to the *Fisher* case?

7    **A.**  Yes.

8    **Q.**  And ultimately you passed them along to the new Dean

9    Khurana in July of 2014 as part of orienting him to the OIR's

10   work?

11   **A.**  Yes.  It was part of a series of, you know, analyses we

12   shared with him.  I think we shared over 300 pages of our

13   work with Dean Khurana when he started as dean.

14   **Q.**  None of these times when you collected and drafted and

15   forwarded these models did you tell the recipients that the

16   models you were sending were incomplete or unreliable, did

17   you?

18   **A.**  No.

19   **Q.**  And you never told them anything other -- you never said

20   anything -- there was anything other than the accurate,

21   timely and digestible research that was your standard at OIR,

22   did you?

23   **A.**  Yes.  Although we often shared the limitations that we

24   knew of of our work.

25   **Q.**  And you don't have any specific recollection here of

1    having shared those limitations because you don't recall the

2    discussions and meetings in question?

3    **A.**   Well, we looked at some of the memos which lists the

4    limitations of our work.

5    **Q.**   Correct.  We looked at that in P26, right.  But

6    otherwise, you never told them this was anything other than

7    the accurate, timely, and digestible research that was your

8    standard at OIR.  Is that right?

9    **A.**   At the time of those communications we reviewed, that's

10   correct, yes.

11                  MR. McBRIDE:  No further questions, Your Honor.

12                            EXAMINATION

13   BY MS. ELLSWORTH:

14   **Q.**   Good morning, Ms. Bever.

15   **A.**   Good morning.

16   **Q.**   Ms. Bever, do you recall discussing your analysis in

17   Exhibit P12 with Mr. McBride yesterday?

18   **A.**   Yes.

19   **Q.**   And specifically the pages of that analysis that relate

20   to evaluating factors in Harvard College admissions?

21   **A.**   Yes.

22   **Q.**   You recall discussing the analysis in P26 relating to

23   low-income students and Harvard College admissions with

24   Mr. McBride?

25   **A.**   Yes.

1    **Q.**  Mr. McBride characterized that analysis as an analysis

2    about the extent to which the admissions process fell

3    negatively on Asian-Americans.  Do you recall that?

4    **A.**  I do.

5            THE COURT:  Can you bend that microphone down a

6    little bit more.

7            MS. ELLSWORTH:  Sure can.  Is that better?

8            THE COURT:  Yes, thank you.

9    BY MS. ELLSWORTH:

10   **Q.**  Do you agree with that characterization?

11           MR. McBRIDE:  Objection, Your Honor.  Can we have a

12   sidebar, please?

13           THE COURT:  Yes.

14           [Sidebar sealed and redacted.]

15   BY MS. ELLSWORTH:

16   **Q.**  I believe my question to you, Ms. Bever, was relating to

17   Mr. McBride's characterizations of the two exhibits

18   yesterday, P12 and P26.

19           Do you have that in mind?

20   **A.**  Yes.

21   **Q.**  Mr. McBride characterized the analysis in P12 as an

22   analysis about the extent to which the admissions process

23   fell negatively on Asian-Americans.  Do you recall that?

24   **A.**  Yes.

25   **Q.**  Do you agree with that characterization?

1    **A.**  No.  I would say the analysis shows the relationship

2    between a number of variables and their correlation with the

3    outcome of interest.

4    **Q.**  Was Mr. McBride's characterization of the work in P12 an

5    accurate characterization of the work that you did while you

6    were in OIR?

7    **A.**  I would not agree that it's an accurate characterization.

8    **Q.**  Could you speak up a little bit, please?

9    **A.**  I would not agree that it's an accurate characterization.

10   **Q.**  Thank you.

11         Mr. McBride also characterized the analysis as an

12   analysis that answers questions about the effect of Harvard's

13   use of race in admissions.  Do you recall that testimony

14   yesterday?

15   **A.**  I do recall that.

16   **Q.**  Do you agree with that characterization by Mr. McBride?

17   **A.**  No.  I would say the analysis that was done is missing a

18   number of the factors and cannot capture the process we use

19   in admissions, and so it's not doing that.

20   **Q.**  And Mr. McBride also this morning characterized the OIR

21   work that was shared with Dean Khurana as showing an Asian

22   penalty.  Do you recall that characterization?

23   **A.**  I do.

24   **Q.**  Do you agree with that characterization?

25   **A.**  I do not.

1    **Q.**   Is it an accurate characterization?

2    **A.**   No.

3    **Q.**   Ms. Bever, how long did you work at OIR?

4    **A.**   Seven years.

5    **Q.**   And during your seven years at OIR, how many of your

6    colleagues had experience working in the Harvard College

7    admissions office?

8    **A.**   None of us did.

9    **Q.**   And how many of your colleagues from OIR in the seven

10   years that you worked there had worked in any college

11   admissions office?

12   **A.**   I don't think any of us had ever worked in admissions.

13   **Q.**   Would you look, please, at Tab 1 in your binder that was

14   just provided to you by Harvard, which is Exhibit P12.

15   **A.**   Yes.  Just give me a moment.  You said Tab 1?

16   **Q.**   Yes.  Do you have P12 in front of you?

17   **A.**   I do.

18   **Q.**   All right.  Have you had a chance to review the analysis

19   in P12 in connection with this litigation?

20   **A.**   Yes.

21   **Q.**   Can you turn to Slide 33, please.

22   **A.**   Okay.

23   **Q.**   What does Slide 33 of Exhibit P12 show?

24   **A.**   It shows of the specifications for four models.

25   **Q.**   In the four models on Slide 33, which model includes the

1    most variables?

2    **A.**   Model 4.

3    **Q.**   And how many variables are included in Model 4?

4    **A.**   Eight.

5    **Q.**   Now, how long have you worked in the Harvard College

6    admissions office, Ms. Bever?

7    **A.**   Four years.

8    **Q.**   And in that time, have you -- you've participated in

9    three separate admission cycles, right?

10   **A.**   That's correct.

11   **Q.**   Approximately how many application files have you been

12   the first reader on?

13   **A.**   Over 2,000.

14   **Q.**   And approximately how many admissions files or -- and

15   applicants for admission have you discussed in subcommittee?

16   **A.**   I could not count.

17   **Q.**   Is it more than the files you've read?

18   **A.**   Yes.

19   **Q.**   More than a thousand?

20   **A.**   Certainly more than a thousand.

21   **Q.**   More than 2,000?

22   **A.**   Certainly more than 2,000.

23   **Q.**   How many application files have you discussed in the full

24   committee process in your three years in the Harvard College

25   admissions office?

1    **A.**  I could not count.

2    **Q.**  More than 2,000?

3    **A.**  Certainly more than 2,000.

4    **Q.**  Okay.  Since your time in admissions, have you come to

5    learn about the factors that are important to Harvard College

6    in assessing an applicant for admission?

7    **A.**  Yes.

8    **Q.**  And having the benefit of having worked in the admissions

9    office, are the factors that are important to evaluating

10   Harvard College admission reflected on page 33?

11            MR. McBRIDE:  Objection, Your Honor.  We're well

12   into leading territory now.

13            MS. ELLSWORTH:  I'll withdraw and retry.

14            MR. McBRIDE:  Also, Your Honor, again we are

15   eliciting undisclosed opinion testimony.

16            THE COURT:  Well, it's not undisclosed opinion

17   testimony.  She's agreed to rephrase the question, so . . .

18   BY MS. ELLSWORTH:

19   **Q.**  Based on your experience in admissions, how many factors

20   does the admissions office consider in evaluating an

21   applicant?

22   **A.**  Hundreds.  And lots of narrative text that can't be

23   captured in qualitative variables.

24   **Q.**  And how do those hundreds of factors compare to the

25   variables listed on Slide 33 of Exhibit P12?

1    **A.**   Certainly this is a very small subset of the things we

2    review when we review applicants.

3    **Q.**   What's an example of some factors that are admitted and

4    not listed on Slide 33 of Exhibit P12?

5    **A.**   There are a number of ratings we provide during our

6    process that are not captured here, such as ratings of the

7    school support, alumni interviews, staff interviews, music

8    evaluations, faculty evaluations, and things like that.

9    **Q.**   Are all of the factors that are considered by Harvard

10   College in admissions decisions quantified in data?

11   **A.**   No, not all of them are.

12   **Q.**   What are some examples of factors considered in Harvard

13   College admissions that are not quantified in data?

14   **A.**   So the personal essay comes to mind.  Often faculty

15   provide feedback that is not quantified.  The narrative piece

16   that is described in letters and things like that is rated

17   but not always quantifiable.

18   **Q.**   Are all of those factors you just listed important to the

19   admissions process?

20   **A.**   Very important.

21   **Q.**   Let's take a look at Slide 36 of P12, please.  What is --

22   what does Slide 36 show?

23   **A.**   Slide 36 shows -- it says what we have learned, and it

24   sort of describes what they have done and also what is

25   missing and what's not captured.

1  **Q.**   Did OIR list factors not included in the models in

2  Exhibit P12 on Slide 36?

3  **A.**   They did.

4  **Q.**   What factors are listed?

5  **A.**   Exceptional talent, parentheses, music, art, writing, the

6  role of context cases, the role of the personal statement

7  essay, measures of socioeconomic status such as HFAI flag,

8  low-income flag.

9  **Q.**   Knowing what you now know from your time in admissions,

10 are those factors important?

11 **A.**   Very, yes.

12 **Q.**   When you review an application to Harvard College, what's

13 the goal of your review of that file?

14 **A.**   To assess the overall strength of that particular

15 applicant and their likelihood of admission in comparison

16 with others.

17 **Q.**   And what are some of the examples of the types of forms

18 of strength an application could exhibit?

19 **A.**   Some of the things listed here, such as exceptional

20 talent or a passion for a particular type of community

21 service.  It can be athletic strength.  It can be overcoming

22 challenges and background.  It can be a variety of things.

23 **Q.**   And how does your assessment of those various forms of

24 strengths you just listed compare to the OIR model shown in

25 Exhibit P12?

1    **A.**   Some of those things are very difficult to capture in

2    data, and so they're just not included in that.  It would be

3    difficult to include them in a model.

4    **Q.**   Do you understand that Harvard has retained an economist

5    named David Card to conduct an analysis of Harvard's

6    admissions data in this litigation?

7    **A.**   Yes.

8    **Q.**   And you understand he created a model of the Harvard

9    admissions process?

10   **A.**   Yes.

11   **Q.**   Have you seen the list of factors included in Dr. Card's

12   model?

13   **A.**   I have.

14   **Q.**   Between OIR's model in P12 and Dr. Card's model, which

15   model captures more of the information you use in the

16   admissions office in making decisions?

17   **A.**   I believe Dr. Card's model has many more factors

18   included.

19   **Q.**   Have you seen any OIR analysis that models as many

20   factors in the admissions process as Dr. Card modeled?

21   **A.**   I have not.

22   **Q.**   Let's turn back to your background for a minute,

23   Ms. Bever.

24           Could you tell us a bit about your education,

25   beginning with college?

1   **A.**   I was educated at Wellesley College.

2   **Q.**   Do you have any degrees after --

3                THE COURT:  Can I interrupt for a second?

4           You say Model 4 sort of is very incomplete.  But it

5   still really closely approximates the actual, right?

6                THE WITNESS:  So it approximates, if I recall, the

7   demographics but not the actual students that would have been

8   selected for admission.  So we don't know who those students

9   are in that final bar.

10  BY MS. ELLSWORTH:

11  **Q.**   And I think if we look at Slide 34, is that the bar graph

12  that you're referring to?

13  **A.**   Yes.

14               THE WITNESS:  Is that what you mean?

15               THE COURT:  It is what I mean, but --

16               THE WITNESS:  So we don't know that the students

17  that are selected in this bar are the actual students who

18  were selected for admission, if that makes sense.

19               THE COURT:  I guess you're saying that Model 4 is

20  incomplete.  But it seems like whatever variables you did

21  include were good markers because they so closely reflected

22  actual.

23               THE WITNESS:  They so closely reflect the

24  demographic breakdown but not who was actually selected

25  for -- I don't know who was actually selected for admission

1   and how closely aligned those two things are.

2            THE COURT:  Okay.

3   BY MS. ELLSWORTH:

4   **Q.**  Ms. Bever, I'm sorry.  I believe my question was, after

5   Wellesley did you have any additional education?

6   **A.**  Yes.  I have a master's degree in education.

7   **Q.**  When did you start working at Harvard?

8   **A.**  In July of 2007.

9   **Q.**  Why did you decide to work at Harvard?

10  **A.**  I was interested in the work of institutional research,

11  and there was a one-year fellowship position that I felt

12  would give me a good introduction to Harvard.  I have some

13  family connections to Harvard, so I was in interested in

14  working there as well.

15  **Q.**  By "family connections," what are you referring to?

16  **A.**  My grandfather attended Harvard College.  He was the same

17  class as John F. Kennedy.

18  **Q.**  You had fond memories of Harvard from growing up?

19  **A.**  Harvard changed his life and I heard a lot about it as a

20  child.  No one else in my family went to Harvard, but it had

21  been very important to him.

22  **Q.**  And when you joined that fellowship program, that was in

23  the office of institutional research, right?

24  **A.**  It was.

25  **Q.**  How many -- withdrawn.

1          What positions have you held over your 11 years at

2    Harvard?

3    **A.**   So I began as a management fellow and then I served as a

4    research analyst and an assistant director in the office of

5    institutional research before joining the office of

6    admissions in my current role.

7    **Q.**   And what is your current role and title?

8    **A.**   I'm the director of research for Harvard College

9    admissions and financial aid.

10   **Q.**   And are you also a senior admissions officer?

11   **A.**   I am a senior admissions officer, yes.

12   **Q.**   You told Mr. McBride that you read 500 files in an

13   admission cycle.  Is that right?

14   **A.**   About that, yes.

15   **Q.**   Is that a lower number than other senior admissions

16   officers read?

17   **A.**   Yes.  I have about a quarter load of admissions files.

18   **Q.**   And why do you have a quarter load of admissions files?

19   **A.**   Because of the other duties I have in the office.

20   **Q.**   Remind me, please, when did you join the admissions

21   office?

22   **A.**   I joined the office in August of 2014.

23   **Q.**   And you're a member of the 40-person admissions

24   committee?

25   **A.**   I am.

1    **Q.**  So you have experience both in OIR and in the admissions

2    office, correct?

3    **A.**  Yes.

4    **Q.**  And do you still conduct research in the admissions

5    office relating to Harvard College admissions data?

6    **A.**  I do.

7    **Q.**  I'd like to ask you to turn to Tab 3, please, which is

8    Exhibit P17.  This is a document Mr. McBride didn't show you.

9    Do you have it in front of you?

10   **A.**  I do.

11   **Q.**  Do you recognize P17?

12   **A.**  Yes.

13   **Q.**  What is this document?

14   **A.**  It is an email from my former colleague Mark Hansen to

15   Elizabeth Yong.  The subject is "Admissions data."

16           MS. ELLSWORTH:  Your Honor, I'd move the admission

17   of P17.

18           MR. McBRIDE:  No objection, Your Honor.

19           THE COURT:  Admitted.

20           (Plaintiff Exhibit No. P17 admitted.)

21   BY MS. ELLSWORTH:

22   **Q.**  What is the date of the email in P17?

23   **A.**  It's Tuesday, February 26, 2013.

24   **Q.**  Can you please read the first sentence of the email in

25   P17?

1   **A.**  It says, "Hello, Elizabeth.  Thank you for coming over

2   and meeting with us yesterday."

3   **Q.**  Can you please read the sentence -- withdrawn, actually.

4        Who is Ms. Yong?

5   **A.**  I'm not sure what Ms. Yong's title was when she was in

6   admissions, but she was the person in admissions we would

7   contact about admissions data.

8   **Q.**  And Mr. Hansen worked for you at this time?

9   **A.**  Yes.

10  **Q.**  Can you please read the sentence beginning with "I've

11  attached."

12  **A.**  Where are you?  Thank you.

13       "I've attached the most recent file specification

14  so that you can see the most complete set of variables we

15  have."

16  **Q.**  And does Exhibit P17 have an attachment?

17  **A.**  It does.

18  **Q.**  And can you please turn to the attachment.  It's a little

19  hard to read so Mr. Lee has blown it up on the screen for you

20  there.

21       What does the attachment contain?

22  **A.**  It contains a list of -- looks like data from admissions

23  that includes demographics and family background, a lot of

24  SAT scores, some of the main ratings we use.

25  **Q.**  And are the factors listed in P17 the data that were

1    available to OIR in 2013?

2    **A.**   Based on this email, it appears so, yes.

3    **Q.**   Is the -- does the exhibit -- the attachment to

4    Exhibit P17 contain a comprehensive list of the factors

5    important to admissions decisions?

6    **A.**   No, it does not.

7    **Q.**   Can you turn back, please, to the first page of P17, to

8    the email.  Please read the sentence at the bottom of the

9    first paragraph that begins "In addition to."

10   **A.**   "In addition to the variables we have in the file

11   specification, we'd like to request the following variables

12   if they exist:  One, disadvantaged flag; two, HFAI search

13   flag; three, faculty staff flag; four, docket; five, some

14   kind of reader ID; six, veteran status; seven, language

15   spoken at home."

16   **Q.**   What does this portion of the email in P17 tell you about

17   the data sources to which OIR had access in 2013?

18   **A.**   They were limited, and they were aware that they were

19   incomplete.

20   **Q.**   And when you say they were aware, do you mean OIR?

21   **A.**   Oh, yes.

22   **Q.**   Do the factors that are listed or requested by Mr. Hansen

23   from Ms. Yong in P17 play a role in the admissions process?

24   **A.**   They can, yes.

25   **Q.**   Are the missing factors listed in P17 important to the

1    actual admissions process?

2              MR. McBRIDE:  Your Honor, I object.  We're getting

3    well into leading territory again.

4              THE COURT:  I don't think that's a leading

5    question.  It's overruled.

6              THE WITNESS:  Sorry.  Could you repeat the

7    question?

8    BY MS. ELLSWORTH:

9    Q.  Are the missing factors important to the actual

10   admissions process?

11   A.  Yes.

12   Q.  Can you please read the sentence after the list of seven

13   factors OIR was requesting, beginning "If you can think"?

14   A.  "If you can think of any other variables that are

15   important in making admissions decisions, please let me

16   know."

17   Q.  What does this Exhibit P17 tell you about OIR's

18   understanding of the Harvard College admissions process in

19   February 2013?

20   A.  So it seems that they were aware -- OIR was aware that

21   there were variables that were missing and that they still

22   didn't know all the things that admissions might be using in

23   the process.

24   Q.  Is there a difference between admissions data and the

25   admissions process?

1    **A.**   Yes.

2    **Q.**   What's the difference?

3    **A.**   The data reflects those things that can be quantified.

4    But it is difficult to capture the amount of time and

5    additional information that comes in throughout the process,

6    the committee procedures, the subcommittee meetings, full

7    committee meetings in which applications are discussed.

8    **Q.**   Is there information that is important in making

9    admissions decisions beyond what OIR had that we've reviewed

10   in these exhibits?

11   **A.**   Is there -- yes.

12   **Q.**   And based on the four years that you've been an

13   admissions officer, could you make an admissions decision as

14   to a particular applicant if you had only the information

15   listed in Exhibit P17?

16   **A.**   No, nor would I want to.

17   **Q.**   You recall speaking with Mr. McBride about the May 1st,

18   2013, memo that's Exhibit P26 relating to low-income

19   admissions?

20   **A.**   Yes.

21   **Q.**   You can take a look at it in your binder.  P26.  It might

22   be in Mr. McBride's binder.

23   **A.**   Okay.

24   **Q.**   I think it's Tab 4 in the binder we gave you.

25   **A.**   Where should I look?

1    **Q.**  Tab 4 in our binder.  Sorry.

2         Are you there at P26?

3    **A.**  Yes.  Sorry.

4    **Q.**  In this memorandum that was sent to Dean Fitzsimmons, did

5    OIR tell Dean Fitzsimmons that the analysis showed

6    discrimination against Asian-Americans?

7    **A.**  It did not.

8    **Q.**  Did the memorandum tell Dean Fitzsimmons that the data

9    showed bias against Asian-Americans?

10   **A.**  No.

11   **Q.**  Why did OIR draft the May 1st, 2013, memorandum?

12   **A.**  My recollection is that Dean Fitzsimmons left a voicemail

13   for either Erin or myself in which he asked us to look at

14   whether or not there was a low-income tip for -- in the

15   admissions process.

16   **Q.**  And did you recall that voicemail at the time you were

17   deposed in this case?

18   **A.**  No.  I remembered it after the fact.

19   **Q.**  What was OIR's conclusion in response to Dean

20   Fitzsimmons' question?

21   **A.**  That we could see a tip for low-income students in the

22   admissions process.

23   **Q.**  Let's take a look at the third page of P26, which is the

24   second page of the memo.  23549 is the Bates.  It's also in

25   front of you on the screen.

1    **A.**   Yes.

2    **Q.**   Can you please read the second paragraph starting with

3    "We implement"?

4    **A.**   Where are you?  Sorry.  Okay.

5              "We implement a logistic regression model to

6    predict the probability of admission, controlling for

7    demographic characteristics and a variety of metrics used to

8    assess qualification for admission.  Demographic

9    characteristics include gender and race ethnicity.

10   Qualifications used in admission include academic index,

11   academic rating, extracurricular rating, personal rating,

12   athletic rating, and legacy status."

13   **Q.**   Are the qualifications used in admissions that you just

14   read from P26 the same factors included in that February 2013

15   analysis that's in Exhibit P12?

16   **A.**   I think so, yes.

17   **Q.**   And does that list include all factors important to the

18   admissions process?

19   **A.**   No.

20   **Q.**   Are the factors listed in this paragraph in Exhibit P26

21   the only qualifications used in Harvard College admissions?

22   **A.**   No.  There are many others.

23             THE COURT:  I should have asked this of the dean

24   yesterday, but I didn't think of it until last night.  So

25   here you are.

```
1              THE WITNESS:  Okay.  Can I be dean for a day?
2              THE COURT:  So I take from this that you can have a
3    tip that's like a conscious tip, like, you know, economic
4    status or whatever.  And then you can have something that
5    turns out to be a tip but you don't realize it's a tip until
6    after you look at the data.
7              THE WITNESS:  You mean after we read the
8    application?
9              THE COURT:  No.  After you do a regression
10   analysis -- like he's asking -- he asked initially if there's
11   a tip for low income.
12             THE WITNESS:  Yeah.
13             THE COURT:  So is he trying to verify that you are
14   having the tip that he wants for low income, or is he trying
15   to figure out that there's a tip at all?
16             THE WITNESS:  So we had talked about this a lot,
17   sort of the low income, right.
18             He was asking whether the data would show that we
19   do -- his statement was:  We do give a tip for low-income
20   students in our process.  Can we show that?  Right?
21             It's hard to describe.  That's why we're here.
22   It's hard to describe, right, how the process works.  So we
23   wanted to be able to point to something to say, look, I'm
24   giving a tip for low-income students.  But I think he was
25   aware that that's what the process was doing.  And again, you
```

1    need to be in the discussion to get a tip, right?

2           THE COURT:  Well, are there times when you don't

3    realize that you're tipping for something or like

4    anti-tipping for something and then you go to the data and it

5    shows that there actually is a tip that you didn't really

6    intend or know about?

7           THE WITNESS:  That's a good -- I have never looked

8    at that.  I don't know if that's true.  Again, what we're

9    trying to do in our admissions process is assess the

10   strength, and sometimes the fact that a student comes from a

11   disadvantaged background and we can see that in their

12   application will make that case stronger than a student who

13   appears similarly situated but, say, didn't overcome that.

14   And so that's how that would play out in the actual process.

15   And maybe for that student, if we looked at the data, it

16   would show the strong correlation between their low-income

17   status and being admitted.

18          THE COURT:  Okay.  Sorry.

19          MS. ELLSWORTH:  That's fine, Your Honor.

20   BY MS. ELLSWORTH:

21   Q.  Ms. Bever, just following up on the Court's question, do

22   you all do data analysis in the admissions office to try and

23   see whether you're giving tips?

24   A.  No.  Not outside of this litigation.

25   Q.  Do you -- when you're considering an applicant for

1    admission, do you think about how that's going to end up

2    looking reflected in the data after the fact?

3    **A.**   No.

4    **Q.**   What are you trying to do when you consider an applicant

5    for admission?

6    **A.**   We're trying to admit a student who will use Harvard well

7    and benefit from Harvard and find the best class we can.

8    **Q.**   Looking back at this P26 that we have in front of you,

9    the factors that are listed here that you read off, are those

10   the same factors that were included in Dr. Card's model that

11   you reviewed?

12   **A.**   These factors at the bottom of this paragraph?

13   **Q.**   Yes.

14   **A.**   I believe he includes these factors.  But of course there

15   are many others in his model.

16   **Q.**   Dr. Card's model includes many more factors than this OIR

17   analysis in P26?

18   **A.**   Yes.

19   **Q.**   And were any of the three OIR individuals working on P26

20   Ph.D. economists?

21   **A.**   No.

22   **Q.**   Between OIR's model and P26 and Dr. Card's, which model

23   captures more of the information used in making admissions

24   decisions at Harvard College?

25   **A.**   I believe Dr. Card's model includes more.

1    **Q.**  And you looked at the listing of factors that are

2    included in his model, right?

3    **A.**  I have.

4    **Q.**  If you can, look, please, at the next paragraph down on

5    P26, beginning with "This approach," and if you could read

6    the first two sentences.

7    **A.**  "This approach has several limitations.  We picked a

8    small set of variables that would factor in admissions

9    decisions.  The selection of a wider set of variables might

10   result in a better fitting model, one that accounts for more

11   of the variation in individual applicants and their

12   potentially unique contributions to the entering class."

13   **Q.**  Is that true?

14   **A.**  I believe so, yes.

15   **Q.**  Mr. McBride asked you several questions about whether the

16   work of OIR he showed you was complete and reliable.  Do you

17   remember that testimony?

18   **A.**  Yes.

19   **Q.**  And you agree that OIR tried to do complete and reliable

20   work, right?

21   **A.**  I believe we did, yes.

22   **Q.**  Can work be complete and reliable and still be

23   preliminary?

24   **A.**  Yes.

25   **Q.**  Can work be complete and reliable and still be limited?

1   **A.**   Yes.

2   **Q.**   Let's look at the last sentence of the same paragraph,

3   beginning "In addition."  Could you please read that.

4   **A.**   "In addition, our model is limited to the main effects,

5   not examining interactions between variables.  Our analysis

6   should not be considered exhaustive."

7   **Q.**   Is that true?

8   **A.**   Yes.

9   **Q.**   The prior sentences that you were reading noted that the

10   model contained a small set of variables.  Do you see that

11   above?

12   **A.**   Yes.

13   **Q.**   And you've had a chance to review the chart that's in

14   Exhibit P26 on the next page?

15   **A.**   Yes.

16   **Q.**   Do you agree with the statement in the OIR memo that this

17   model uses a small set of variables?

18   **A.**   It does.

19   **Q.**   Why did OIR include a description of the limitations of

20   the analysis in this memorandum?

21   **A.**   I think it's fairly standard practice in doing this sort

22   of work where you would acknowledge the things that cannot be

23   measured in a model or that you don't have data for.

24   **Q.**   Do you recall yesterday just before we broke Mr. McBride

25   asking you questions about some earlier drafts of this

1   memorandum?

2   **A.**   I do.

3   **Q.**   He asked about some sentences that were edited in the

4   final version?

5   **A.**   Yes.

6   **Q.**   Did the drafts that you looked at yesterday, Exhibits P26

7   and P25, did those ever go to Dean Fitzsimmons?

8   **A.**   I don't think they did.

9   **Q.**   Did OIR conduct any follow-up analysis after P26 was sent

10   to him on May 1st, 2013?

11   **A.**   I believe we did, yes.

12   **Q.**   And what follow-up analysis did OIR conduct?

13   **A.**   I think Dean Fitzsimmons asked us to look at the

14   interaction between race, ethnicity, and low-income status.

15   **Q.**   Did that follow-up analysis include all the factors that

16   the actual admissions process involves?

17   **A.**   It did not.

18   **Q.**   Was that another example of OIR doing reliable work that

19   might still be limited?

20   **A.**   Yes.

21   **Q.**   And again, Ms. Bever, have you seen any OIR study that

22   models all factors in the admissions process?

23   **A.**   No.

24   **Q.**   Mr. McBride asked you this morning about the meeting you

25   had with Dean Khurana in July of 2014.  Do you remember that?

1    **A.**  I do.

2    **Q.**  And you referenced that you believed you had sent over

3    300 pages of work to Dean Khurana when he first became dean.

4    Do you recall that?

5    **A.**  I do.

6    **Q.**  Could you turn to Tab 9, please, which is Exhibit P288.

7    **A.**  Yes.

8    **Q.**  Do you recognize P288?

9    **A.**  I do.

10   **Q.**  What is P288?

11   **A.**  P288 is a cover memo that accompanied our -- the actually

12   fairly exhaustive set of work we shared with Dean Khurana

13   when he became dean.

14   **Q.**  And the date of the memo is?

15   **A.**  May 30, 2014.

16   **Q.**  It is from Ms. Driver-Linn, correct?

17   **A.**  It is.

18   **Q.**  Were you involved in drafting this memo?

19   **A.**  I think so.

20   **Q.**  Were you involved in compiling the exhibits that

21   accompanied this memo?

22   **A.**  I think so, yes.

23           MS. ELLSWORTH:  Your Honor, I move to admit P288.

24           MR. McBRIDE:  No objection Your Honor.

25           THE COURT:  It's admitted.

1      (Plaintiff Exhibit No. P288 admitted.)

2   BY MS. ELLSWORTH:

3   **Q.**  Can you just describe at a general level -- it's a large

4   exhibit -- what was included in the documents sent to Dean

5   Khurana in December of 2014?

6   **A.**  I think we were aiming for completeness, and we tried to

7   include as many examples of our work as we could.

8   **Q.**  Was all of OIR's work relating to Harvard College

9   attached to the memo?

10  **A.**  I can't say for certain that it was all, but it was

11  certainly most.

12  **Q.**  And you recall discussing with Mr. McBride this morning a

13  few additional analyses that were sent closer in time to

14  another meeting, right?

15  **A.**  Yes.

16  **Q.**  Did you -- withdrawn.

17      Why did you meet with Dean Khurana in July 2014?

18  **A.**  My recollection of that meeting is that the purpose was

19  to introduce him to our office and for us to be able to meet

20  him.

21  **Q.**  And you testified in response to Mr. McBride's questions

22  that you don't recall discussing with Dean Khurana any

23  specific analyses, right?

24  **A.**  I don't recall discussing our work with him in any

25  detail.

1    **Q.**   You do recall the meeting with Dean Khurana, right?

2    **A.**   I do.

3    **Q.**   And your memory is there was no discussion of the

4    substantive work provided by OIR?

5    **A.**   That's correct.

6    **Q.**   Was the purpose of the July 2014 meeting to show Dean

7    Khurana OIR's current works in progress?

8    **A.**   I don't think so, no.

9    **Q.**   Were you seeking Dean Khurana's input on any of the

10   analyses you showed him?

11   **A.**   No.

12   **Q.**   Were you seeking his reaction to any of the analysis you

13   showed him?

14   **A.**   I don't think we showed him anything, and I don't think

15   we were asking for feedback.

16   **Q.**   Are there -- is there more than one institutional

17   research office in Harvard University?

18   **A.**   There is.

19   **Q.**   Is there an institutional research department for Harvard

20   College as well?

21   **A.**   Yes.

22   **Q.**   And Dean Khurana is the dean of Harvard College, right?

23   **A.**   Yes.

24   **Q.**   The institutional research for Harvard College is

25   different than OIR, right?

1    **A.**   That's correct.

2    **Q.**   And is the difference between college research and the

3    office of institutional research some of what you were trying

4    to discuss with Dean Khurana in July 2014?

5    **A.**   It may have been.  I don't specifically recall.

6    **Q.**   Were you trying to alert Dean Khurana to any findings of

7    discrimination in sending him any of the material that you

8    did?

9    **A.**   I don't believe so.

10   **Q.**   Were you trying to alert Dean Khurana to any findings of

11   bias in sending him the information?

12   **A.**   No.

13   **Q.**   Let's switch gears and talk a little bit about your work

14   in the admissions office.  Okay?

15   **A.**   Okay.

16   **Q.**   Why did you want to move from OIR to admissions?

17   **A.**   The work I had done on the affordability initiative at

18   Harvard and the return to early action was some of the work I

19   most enjoyed.  So when I saw the job posting for the director

20   of research role, I decided I would like to try that.

21   **Q.**   And do you enjoy your work in admissions?

22   **A.**   I love my job.

23   **Q.**   You recall Mr. McBride asking you a little bit about

24   training that you received when you joined the office?

25   **A.**   Yes.

1    **Q.**  Can you describe the form of the training that you had

2    when you first joined admissions?

3    **A.**  I had a month-long orientation period where I met with

4    colleagues from across the office of admissions and financial

5    aid.

6    **Q.**  And who conducted the training, the orientation?

7    **A.**  Yeah.  I think it was Grace Cheng who organized the

8    training and conducted some of the sessions.  But I met with

9    colleagues from -- many colleagues from across the office who

10   performed different roles and work on different parts of our

11   process.

12   **Q.**  What types of information did you learn in your

13   admissions orientation?

14   **A.**  So everything from how our recruiting groups function to,

15   you know, how we read an application, to our yield

16   activities, to the subcommittee process, and things like

17   that.

18   **Q.**  And what specific training did you receive relating to

19   reading and reviewing application files?

20   **A.**  So we had a specific training where we were given some of

21   our case book files to read and review after going through

22   what's called the reading procedures that describes how to

23   read a file and talking about how we do that initial

24   assessment.

25          And then we did a mock committee where we presented

1    cases and discussed them as if we were actually in the

2    admissions process.

3    **Q.**   And why does the admissions office conduct its training

4    in the manner you just described?

5    **A.**   I think part of what we do is best learned by actually

6    doing it, actually reading an application file, seeing all

7    the pieces of information there are, trying to make an

8    initial assessment, using the ratings, and then figuring out

9    how you're going to share that information with your

10   colleagues and committee.

11   **Q.**   And you discussed with Mr. McBride a little bit the fact

12   that somebody read your initial files after you when you were

13   new in the admissions office.  Do you remember that?

14   **A.**   Yes.

15   **Q.**   What type of feedback did you receive from those second

16   reviewers?

17   **A.**   The second reviewers provide ratings of their own and

18   then often write up a narrative themselves of what they see

19   the particular strengths of that application are, any missing

20   pieces of information, whether they -- you know, some of them

21   might have agreed, just said I agree with everything you've

22   said here.  Some of them would have said, you know, we're

23   going to need the following pieces of information before we

24   might bring this further.

25              So it's written feedback mostly that helps me, as

1   the newer reader, understand how other colleagues might see

2   that file.

3   **Q.**   And did you take that feedback into account when

4   reviewing additional files after you received the feedback?

5   **A.**   Yes.

6   **Q.**   How so?

7   **A.**   Again, I think I went through every single file and read

8   how my colleagues either saw me, my own read.  And it helped

9   refine what I was doing, how I was -- refined what I wrote on

10   the application, and helped me think about what's going to

11   make a strong applicant.

12   **Q.**   Since that initial training that you've just described,

13   have you received additional on-the-job training?

14   **A.**   Yes.  We have ongoing sessions and things like that.

15   **Q.**   Have you received any training relating to the Supreme

16   Court's guidance on the use of race in college admissions?

17   **A.**   We have.

18   **Q.**   Who conducted those trainings?

19   **A.**   Our general counsel, Bob Iuliano.

20   **Q.**   How frequently do those trainings occur?

21   **A.**   Annually.

22   **Q.**   Without getting in the substance, what were topics of

23   Mr. Iuliano's annual trainings in the years that you've been

24   in the office?

25   **A.**   So they vary, but his discussion of considerations in the

1  admissions process.

2  **Q.**  Does the admissions office conduct any professional

3  development activities for admissions officers?

4  **A.**  It does.

5  **Q.**  What are some examples?

6  **A.**  So we often have professional development sessions where

7  we invite faculty or other senior leaders from the university

8  to come talk to us about things that are changing at Harvard.

9  Sometimes we have external speakers, people doing research

10  that's relevant to our work, things like that.

11  **Q.**  Have you had any professional development sessions

12  related to how files are reviewed and rated?

13  **A.**  Yes.  At our annual retreats.

14  **Q.**  And what is the -- what is an example of a professional

15  development session at your retreat relating to the topic of

16  reviewing and rating files?

17  **A.**  So we've done some joint reading of files and discussion

18  of how we use the ratings.  This past year we had a

19  discussion about how we used the top ratings and the idea

20  that perhaps we should be using the top ratings more than we

21  have been.

22  **Q.**  And by the "top ratings," you mean the 1s?

23  **A.**  The 1s, yes.

24  **Q.**  In those professional development activities you just

25  described, what have you learned?

1   **A.**   Again, I think some of them are just helpful to have the

2   discussion about how others see the ratings, how they use

3   them in the process, what they are trying to signal, and they

4   help inform my own reading of an application.

5   **Q.**   Who participated in those professional development

6   activities you just described?

7   **A.**   Generally it's all the staff in retreats.

8   **Q.**   And that means all 40 admissions officers who sit on

9   committee?

10  **A.**   Yeah, and more.

11  **Q.**   Let's turn quickly to the subject of how race is used in

12  the process.

13          So as a senior admissions officer, you're the first

14  reader on approximately 500 applications, right?

15  **A.**   Yes.

16  **Q.**   Can an applicant's race make his or her case for

17  admission more compelling?

18  **A.**   Again, it can be part of their case, yes.

19  **Q.**   And it can be a part of their case that might make their

20  application more compelling?

21  **A.**   Yes.

22  **Q.**   Is race the only factor that might make an application

23  more compelling?

24  **A.**   No.   There are many factors that make for compelling

25  applications.

1    **Q.**  What are some of the other factors that may make an

2    application more compelling for admission?

3    **A.**  Everything from geography to socioeconomic status to

4    exceptional talent.

5    **Q.**  When you're assigning ratings to an application file,

6    does race ever factor into an applicant's academic rating?

7    **A.**  It does not.

8    **Q.**  Does race ever factor into an applicant's extracurricular

9    rating?

10   **A.**  Not per se.

11   **Q.**  Does race ever factor into an applicant's personal

12   rating?

13   **A.**  Not per se.

14   **Q.**  When you say "not per se," what do you mean?

15   **A.**  I mean not the fact that they are a particular race, but

16   certainly students might write about their background and

17   things like that that would inform my personal rating or what

18   I give in the personal rating.

19   **Q.**  When a student writes about their background in a way

20   that informs the personal rating, it's not their racial

21   background that's informing the rating.  Is that your

22   testimony?

23   **A.**  That's my testimony.

24   **Q.**  Have you ever assigned an applicant a lower rating

25   because of his or her race?

1    **A.**   No.

2    **Q.**   Have you -- withdrawn.

3            Can you please describe the preliminary overall

4    rating?

5    **A.**   So we use -- I -- I should speak for me.

6            I use the preliminary overall rating to give my

7    assessment of how strong I think that particular applicant

8    is.  So it's intended to capture the whole, if one can, in a

9    rating.

10   **Q.**   And does the preliminary overall rating differ from the

11   four profile ratings?

12   **A.**   Yes.

13   **Q.**   How so?

14   **A.**   Again, it's trying to capture all of the pieces and give

15   an overall assessment of how strong that applicant is.

16   **Q.**   Does race ever factor into an applicant's preliminary

17   overall rating?

18   **A.**    Insofar as their race plays a role in how strongly I

19   might view a case, then yes.

20   **Q.**   Let's talk take a look, if we can, at an application

21   file.

22           MS. ELLSWORTH:  Your Honor, I'd like to show an

23   application that we'll be moving into evidence under seal, so

24   I'd like to ask the gallery monitors to be turned off,

25   please.

```
 1                  THE COURT:  That's fine.
 2    BY MS. ELLSWORTH:
 3    Q.  Let's pull up SA1, please.  That's at Tab 6 in your
 4    binder.  Do you have SA1 in front of you, Ms. Bever?
 5    A.  Yes.
 6    Q.  Do you recognize SA1?
 7    A.  I do.
 8    Q.  What is that?
 9    A.  It is an application file.
10    Q.  How do you recognize this exhibit?
11    A.  This is the summary sheet that appears at the beginning
12    of our application reader, which is an online tool we use to
13    read applications.
14    Q.  And did you read this application file?
15    A.  I did.
16    Q.  Were you the first reader?
17    A.  I was.
18    Q.  Now, this applicant's name is not redacted, correct?
19    A.  That's correct.
20    Q.  And you're aware that that applicant is a current Harvard
21    student who will testify in this case?
22    A.  I am.
23    Q.  What is the name of this student?
24                  THE COURT:  Where does it show on here that you
25    were the first reader?
```

1          THE WITNESS:  So there is certain information on

2    this particular page that is associated with where we are in

3    the process now, and there is certain information that's tied

4    to the applicant.  So my initials actually aren't here.  This

5    has been changed to reflect who currently reads this high

6    school.  But I remember this applicant.

7          MS. ELLSWORTH:  And if you look at SA1 0005, it may

8    have the correct reader information on it.

9          THE COURT:  Because normally it would have your

10   initials.  It would have your initials under that rating,

11   right, because you did it?

12         MS. ELLSWORTH:  Sorry.  It's not 5.  40 is where

13   the reader sheet is.

14         THE WITNESS:  Yes.  So you can see I was actually

15   the first rater who submitted the form.  The way our slate --

16   our CRM works is that this is being generated at the moment.

17   So because somebody else covers this high school now, her

18   initials are reflected, even though the data show my ratings

19   which happened in the past.

20   BY MS. ELLSWORTH:

21   **Q.**  And Ms. Bever, following up on Her Honor's question, are

22   there other aspects of the first page of this and other files

23   from the cycle that have incorrect information on them

24   because of the way they were pulled?

25   **A.**  Yes.

1    **Q.**   What are those?  What are the portions of the summary

2    sheet that have inaccurate information because of the way

3    they were pulled?

4    **A.**   So for example, it says "Harvard Class of 2022" at the

5    top of it, and then above that it says "2015, Regular

6    Action."

7            The regular action was when this student actually

8    applied, but it was pulled at the time at which we were

9    reviewing applications from the class of 2022.  So that's why

10   it says "Harvard Class of 2022."

11   **Q.**   Other than -- the reader initials are incorrect on the

12   first page of the summary sheets for some these files,

13   correct?

14   **A.**   Yes.

15   **Q.**   They're correct on the reader rating sheet at the back?

16   **A.**   Yes.  The first reader rating form at the back reflects

17   who actually submitted the form and the rating.

18   **Q.**   Did you pull these application files yourself to produce

19   them for purposes of this litigation?

20   **A.**   I did.

21   **Q.**   Are you aware, Ms. Bever, that SA1 is the application of

22   a current Harvard student who will testify in this case?

23   **A.**   Yes.

24   **Q.**   Who is this student's name?

25   **A.**   Sally Chen.

1   **Q.**  And you're aware Ms. Chen has agreed to have her

2   application file used in this litigation, right?

3   **A.**  Yes.

4          MS. ELLSWORTH:  I'd move to admit Exhibit SA1.

5          MR. McBRIDE:  No objection, Your Honor.

6          THE COURT:  It's admitted.

7          (Defendant Exhibit No. SA1 admitted.)

8   BY MS. ELLSWORTH:

9   **Q.**  Let's take a look at this, the reader rating sheet that's

10  at page 40 that has your actual initials on it.

11         What ratings did you provide to Ms. Chen on her

12  academic profile?

13  **A.**  I gave her a 2.

14  **Q.**  And what preliminary overall rating did you assign to

15  Ms. Chen?

16  **A.**  A 3+.

17  **Q.**  Ms. Chen attended Lowell High School; is that right?

18  **A.**  She did.

19  **Q.**  And you read all the application files from Lowell High

20  School?

21  **A.**  In that cycle, I read all the applications from Lowell

22  High School.

23  **Q.**  How did Ms. Chen's application compare to the academic

24  credentials of other applicants from Lowell High School?

25  **A.**  Lowell is a very strong school in the city of San

1  Francisco.  I think I got between 30 and 50 applications from
2  Lowell in any given year.
3          Her academic credentials, her scores were a little
4  bit lower than many of her peers, and I would have seen many
5  perfect transcripts, meaning straight As, all four years.
6  **Q.**  Let's take a look at page 22 of Exhibit SA1.  What's
7  shown on page 22?
8  **A.**  Page 22 is a teacher evaluation.
9  **Q.**  And does this teacher comment on Ms. Chen's academic
10  abilities?
11  **A.**  She does.  She writes a beautiful letter about her
12  academic qualifications.
13  **Q.**  Does she -- the final sentence in the first paragraph,
14  could you please read that, "I was happy."
15  **A.**  "I was happy to see that Sally fits the pattern her older
16  sisters had established, combining exceptionally strong
17  academic strengths with the commitment to the communities
18  around her, including, in Sally's case, by working for a
19  mentor in the school's peer resources program, a role she is
20  particularly well suited for."
21  **Q.**  Looking at the second paragraph of this teacher
22  recommendation, what does the teacher say about Ms. Chen's
23  academic work in the second paragraph?
24  **A.**  She writes a very nice description of Sally's academic
25  work.  The way she pulls ideas together, sort of her -- the

1    way she thinks about herself.  Her critical thinking and

2    writing skills were exceptional, she says.  So she sort of

3    rounds out her academic skills for us.

4    **Q.**   Did the information provided in this letter of

5    recommendation from a teacher factor into your academic

6    rating of Ms. Chen?

7    **A.**   I think this letter and others sort of showed the

8    academic strength Sally was bringing or would bring to

9    Harvard, yes.

10   **Q.**   Let's take a look back at page SA5 of this application.

11   What does page SA5 -- what is the information provided on

12   page SA5?

13   **A.**   It shows her family background.

14   **Q.**   Does it include information about her parents'

15   occupations?

16   **A.**   It does.

17   **Q.**   What were the occupations of Ms. Chen's parents?

18   **A.**   It says her father is a chef, employed, and her mother is

19   a homemaker.

20   **Q.**   Is that information that you take into account when

21   reviewing an application file?

22   **A.**   Yes.

23   **Q.**   Is that information you took into account when reviewing

24   and assigning ratings to Ms. Chen's application file?

25   **A.**   It certainly would have played a role, again, in sort of

1    my overall picture of her.

2    **Q.**   And why is this information that's taken into account in

3    the admissions process?

4    **A.**   Family background can play a role in sort of the choices

5    you are able to make, what you're doing.  She writes about

6    her family in her essay in a way that helps us understand

7    sort of what she has to do for them.  I think she talks about

8    translating for her family and her father working despite --

9    I think he had an injury.  And all of that plays a role in

10   sort of who she is and how strong, sort of all the things

11   she's been able to accomplish.

12   **Q.**   Does an applicant's parents' occupation provide

13   information just beyond the applicant's socioeconomic status?

14   **A.**   Yes.

15   **Q.**   What are some examples?

16   **A.**   Again, a parent can play a role in sort of the type of

17   opportunities a student can get.  Again, sort of what their

18   home duties might be, whether or not a student had access to

19   internships or other opportunities like that.

20   **Q.**   Where is the information that's shown on this page 5 of

21   SA1, where does that information come from relating to parent

22   occupation?

23   **A.**   It comes from -- in this case, it came from the common

24   app.

25   **Q.**   And the common application is a standard-form

1    application?

2    **A.**   Yes.

3    **Q.**   Does Harvard control the way the common application codes

4    its information?

5    **A.**   It does not.

6    **Q.**   Does the common application ever change the coding fields

7    relating to parent occupation?

8    **A.**   The common app makes changes to its application every so

9    often, yes.

10   **Q.**   Do those changes in the coding fields affect the

11   admissions office's ability to consider the information an

12   applicant provides via that application?

13   **A.**   No.  We use the information as we see it.

14   **Q.**   Have the changes made by the common application to the

15   parent occupation field affected -- prevented the admissions

16   office from considering an applicant's parents' occupation?

17   **A.**   No.  We would have used the information as it was

18   presented to us.

19   **Q.**   And so as an admissions officer, you would have used the

20   information on page 5 of SA1?

21   **A.**   Yes.

22   **Q.**   Let's turn back to page 40 where the reader rating form

23   is.

24            What extracurricular rating did you assign to

25   Ms. Chen?

1    **A.**  I gave her a 2.

2    **Q.**  And while we are on this page, what is the rating that

3    you assigned to Ms. Chen's teacher recommendation that you

4    were previously discussing?

5    **A.**  Was that teacher -- can I look?  Sorry.

6    **Q.**  Take your time.

7    **A.**  What page was that?  Do you remember?

8    **Q.**  22 and 23.

9    **A.**  Yeah, so I gave that a 1.

10   **Q.**  And that reflected your view that it was a strong --

11   excuse me -- a strong recommendation?

12   **A.**  Yes.

13   **Q.**  Keeping your 2 extracurricular rating in mind, please

14   turn to page 8 of Exhibit SA1.  What does page 8 show?

15   **A.**  So page 8 is what we call the extracurricular grid.  It

16   includes a list of the activities that she was participating

17   in, how much time she spent, what academic years she

18   participated in them, and a description of them.

19   **Q.**  And what does the information on page 8 of Ms. Chen's

20   application tell you about her extracurricular involvement?

21   **A.**  So the first thing she lists is she was the first

22   violinist, which is obviously an important role in the

23   orchestra.  She was also the Lowell student association

24   president.

25          So she had a number of research roles -- or

1  leadership roles.  I'm sorry.  She was doing research

2  mentoring.  She had found some roles doing some research

3  as -- or work as a web designer.  She was radio producer.

4  She had a lot of different interests.  She was doing a lot of

5  different things.

6  **Q.**  Can you turn please to page 20 of Exhibit SA1, which is

7  the guidance counselor recommendation.

8  **A.**  Yes.

9  **Q.**  Does this guidance -- are you there?

10  **A.**  Yes.

11  **Q.**  Does the guidance counselor's recommendation provide

12  information relating to Ms. Chen's extracurricular

13  involvement?

14  **A.**  Yes.

15  **Q.**  And what type of information?

16  **A.**  So it talks about her internship at UCSF Mission Bay.  It

17  provides some -- it actually -- I think this letter wasn't

18  the most helpful, but it does sort of describe some of the

19  things Sally had already described in her application.  So at

20  least it reaffirmed her participation in some of these

21  things.

22  **Q.**  I'm sorry.  I didn't catch the end of it.

23  **A.**  It just reaffirmed her participation in some of these

24  things.

25  **Q.**  Did you factor that information into the extracurricular

1    rating you assigned her?

2    **A.**   Yes.

3    **Q.**   You read all the files for Lowell High School that year,

4    correct?

5    **A.**   I did.

6    **Q.**   Did the guidance counselor provide a letter for every

7    single applicant?

8    **A.**   Lowell is a big school with just a few counselors, and so

9    they are unable to provide letters for every student, even

10   sometimes their top students.

11   **Q.**   But they did provide a letter for Ms. Chen, correct?

12   **A.**   They did provide a letter for her.

13   **Q.**   Did that provide you information about what the school

14   thought of Ms. Chen?

15   **A.**   Yes.

16   **Q.**   Did the fact that they wrote a letter in this case

17   provide you information about what the school thought of

18   Ms. Chen?

19   **A.**   Yes, that they knew her was important.

20   **Q.**   Looking back at page 40, the rating sheet, what personal

21   rating did you assign to Ms. Chen?

22   **A.**   I gave her a 2.

23   **Q.**   And looking back at page 20 which has the guidance

24   counselor recommendation, did the guidance counselor's

25   recommendation provide information about Ms. Chen other than

1    the extracurricular information you just discussed?

2    **A.**   Yes.  I mean, it talks at the very top, she's a

3    well-spoken, ambitious, and humorous person.  So throughout

4    the letters, there are descriptions of her personal

5    qualities.

6    **Q.**   Turning to page 27, please, of the application.

7              Is this another teacher recommendation letter?

8    **A.**   It is.

9    **Q.**   Can you please read the third paragraph from the bottom,

10   beginning "Sally"?

11   **A.**   It says.  "Sally fits no mold.  She is her own person and

12   pursues her interests with great vigor.  Sally manages to

13   master new skills and knowledge with ease."

14   **Q.**   Can you read the next sentence at the beginning of the

15   next paragraph?

16   **A.**   "Sally is truly an exceptional student in so many ways.

17   She is highly capable academically, clearly in the top few

18   percent of all college-bound students I have taught."

19   **Q.**   Did these recommendations inform the personal rating you

20   assigned to Ms. Chen?

21   **A.**   Yes.

22   **Q.**   Did the guidance counselor letter that you were just

23   discussing inform the personal rating that you assigned to

24   Ms. Chen?

25   **A.**   Yes.

1    **Q.**   The profile ratings we've just been discussing, are those

2    the only factors that the admissions office considered about

3    Sally's application?

4    **A.**   No.  We would have looked at all of her application.

5    **Q.**   Take a look back at the first page of the application

6    file, which is page 1.  Are there profile ratings from the

7    docket chair for Ms. Chen's case?

8    **A.**   There is just an overall rating.

9    **Q.**   Do you know why?

10   **A.**   Yes.

11   **Q.**   Tell us why, please.

12   **A.**   So my recollection of Sally is that we were in

13   subcommittee and we were going through all of the applicants

14   from Lowell High School.  And my colleague Roger Banks

15   stopped us and said, "Erica, you read this application quite

16   strongly, but it doesn't look like you passed it" -- there

17   would have been no 2 there.  "Can we take a closer look?"

18          And so in subcommittee we went through it page by

19   page, all of us reading it.  And when I read it, she was

20   missing an interview, which I was hoping would set her apart

21   and help further set her apart.

22          And we all read it together and agreed that it came

23   together quite nicely.  And again, I think at that point the

24   subcommittee made a preliminary recommendation to admit her,

25   and she hung on.

1          So Christine went back in and would have put an

2     overall.  But since she read it in committee, she may not

3     have put in all of the ratings.

4     **Q.**  You mentioned that the interview information had not come

5     in when you first read the file.  Do I have that right?

6     **A.**  Yes.

7     **Q.**  Is that a common occurrence?

8     **A.**  It very much depends on when your subcommittee is meeting

9     and when you're doing readings.  So it looks like I read this

10    on January 18, and that's pretty early in our process.  Our

11    interviewers probably had not read or interviewed most of our

12    students at that point.

13    **Q.**  When you're referring to the interviewer, you're

14    referring to the alumni interviewer?

15    **A.**  Yes.

16    **Q.**  If you look at page 29 of SA1, is there an alumni

17    interview report?

18    **A.**  Hold on.  Yes.

19    **Q.**  And did the Harvard alumnus who met with Sally write a

20    positive account of their interview?

21    **A.**  They did.  It was very helpful.

22    **Q.**  And did you take that into account in the subcommittee

23    process in discussing Ms. Chen's file?

24    **A.**  We would have, yes.

25    **Q.**  Did the subcommittee ultimately recommend Ms. Chen for

1  admission?

2  **A.**  Yes.

3  **Q.**  And ultimately she was admitted, right, and attends

4  Harvard?

5  **A.**  She was, yes.

6  **Q.**  Were you concerned that you had originally not passed

7  Ms. Chen's file on to your docket chair?

8  **A.**  I think I was.  But you know, that's why we have the

9  committee review process and we can all go through and see

10  and have someone else catch it.

11  **Q.**  Ms. Bever, in your time working in the admissions office,

12  how many times have you seen another admissions officer

13  demonstrate bias against an applicant because of the

14  applicant's race?

15  **A.**  I've never seen that happen.

16  **Q.**  When considering whether to admit an applicant, is an

17  applicant's race ever a negative factor?

18  **A.**  No.

19  **Q.**  Have you ever admitted an applicant because of his or her

20  race?

21  **A.**  I could not say that, no.

22  **Q.**  Have you ever rejected an applicant because of his or her

23  race?

24  **A.**  No.

25  **Q.**  In your view, is it important that Harvard has a diverse

1    student community?

2    **A.**   It is.

3    **Q.**   Why?

4    **A.**   I think it's important that we as students learn from

5    each other, and students of different background bring

6    different perspectives to issues that are important.

7    **Q.**   In your view, does racial diversity have benefits?

8    **A.**   It does.

9    **Q.**   What are those benefits?

10   **A.**   Again, I think we learn from people who come from

11   different places and different perspectives, and that's part

12   of who we should be, as educated.

13   **Q.**   Have you ever been instructed to admit a target number of

14   students from any racial or ethnic background?

15   **A.**   No.

16   **Q.**   Based on your years working in the admissions office,

17   what is your view of the evaluation process employed by

18   Harvard in the admissions office?

19   **A.**   It's incredibly labor-intensive.  It takes incredible

20   care and time in order to find exceptional students.  There

21   are moments that are very difficult when we have to, you

22   know, reject students who are exceptional.  But we make

23   choices, and it always feels great when you get to see the

24   sort of final students who come through and meet us during

25   our visiting program.  It feels worth it.

1          MS. ELLSWORTH:  Thank you.  No further questions.

2                    FURTHER EXAMINATION

3    BY MR. McBRIDE:

4    **Q.**  Ms. Bever, just a few more questions for you.

5          You talked about parental occupation and admissions

6    with Ms. Ellsworth.

7    **A.**  Yes.

8    **Q.**  And I heard you talking about things that were in the

9    common application that you were relying on with relationship

10   to parental occupation?

11   **A.**  Yes.

12   **Q.**  And I understood you to be saying that you rely on the

13   category of occupation from the common application?

14   **A.**  So there's a number of things that are printed here.  It

15   includes often an actual category.  It includes an employment

16   status.  Sometimes there's more information.

17   **Q.**  The common application also allows an applicant to

18   identify, for example, the parents' employer.  Is that right?

19   **A.**  So at the moment, I'm not recalling.  That may be the

20   case.

21   **Q.**  Well, then that can come through to your summary sheet as

22   well, right, what's in the common application with respect to

23   the employer?

24   **A.**  I don't think it appears on our summary sheet.

25   **Q.**  So it doesn't appear on your summary sheet, who the

1  parents' employer is?

2  **A.**  I don't think so.  I think their education comes through.

3  And it's not on this one, yeah.  I'm not --

4  **Q.**  Does it matter to you, then, whether -- what the parents'

5  employer is if you do have that information on the summary

6  sheet?

7  **A.**  Again, I'm not sure it's on the summary sheet.

8  **Q.**  Well, let me ask you this.  You consider the whole person

9  when you're looking at these applicants; is that correct?

10  **A.**  That's correct.

11  **Q.**  And you're looking at the parental occupation associated

12  with that whole person's -- sorry, withdrawn.

13         You are looking at the whole person with respect to

14  what those parents do; is that right?

15  **A.**  Whole -- I'm not sure what you mean.

16  **Q.**  Withdrawn.

17         Just to clear up for the record, do you know

18  whether or not the parents' employer is included on the

19  common application?

20  **A.**  I'm sorry.  At the moment I can't remember whether the

21  employer is actually included.

22  **Q.**  If you get the information with respect to the parents'

23  employer off the common application or some other way, if

24  that appears on the summary sheet, would you consider that as

25  part of your whole person evaluation?

1    **A.**   Again, if we can see the information we might take it

2    into account, if it was important for that particular

3    applicant.

4    **Q.**   And would it be important if that parents' employer, for

5    example, were a small business owner, say the owner of a

6    small grocery store, as opposed to a business owner who owned

7    a large corporation?

8    **A.**   Again, if it was important to the student and the student

9    elevated that as a part of their experience, then it might

10   matter.

11                MR. McBRIDE:  No further questions.

12                MS. ELLSWORTH:  Nothing further, Your Honor.

13                THE COURT:  You're excused.

14                THE WITNESS:  All right.  Thank you.

15                MS. HACKER:  Your Honor, if we could have a few

16   minutes.  We can take our morning break if you want or --

17                THE COURT:  Either way.  Do you all want a break?

18   Either way is fine with me.

19                MS. ELLSWORTH:  I think we're fine to go ahead.

20                MS. HACKER:  Your Honor, at this time SFFA calls

21   Erin Driver-Linn.

22                (ERIN DRIVER-LINN duly sworn by the Deputy Clerk.)

23                COURTROOM CLERK:  Would you please state your name

24   spell your last name for the record.

25                THE WITNESS:  Erin Driver-Linn.  D-R-I-V-E-R hyphen

1    L-I-N-N.

2                              EXAMINATION

3    BY MS. HACKER:

4    **Q.**  Good morning, Ms. Driver-Linn.  My name is Kat Hacker.

5    We haven't had a chance to meet before.  Thank you for being

6    here today.  I want to start by talking about your background

7    that led you to become involved in the office of

8    institutional research.

9              You have a doctorate degree in social psychology,

10   right?

11   **A.**  Yes, I do.

12   **Q.**  You got that degree from Harvard?

13   **A.**  I did.

14   **Q.**  To get your doctorate, you took classes in statistical

15   analysis methods, correct?

16   **A.**  I did.

17   **Q.**  Let me take a step back for a second.

18              I understand you prefer to be called

19   Ms. Driver-Linn despite the fact that you have a doctorate?

20   **A.**  Yes.

21   **Q.**  I just want to make sure I'm using your preference.

22              Before joining OIR, you had almost a decade of

23   experience in statistical analysis, correct?

24   **A.**  Correct, roughly.

25   **Q.**  Then in 2008, you got the job as director of the office

1  of institutional research?

2  **A.**  That's right.

3  **Q.**  In that job, you were responsible for overseeing OIR?

4  **A.**  That's right.

5  **Q.**  You maintained that responsibility from 2008 until fairly

6  recently, right?

7  **A.**  Yes, that's correct.

8  **Q.**  So for about ten years, you were the person in charge at

9  OIR?

10  **A.**  That's correct.

11  **Q.**  Ms. Driver-Linn, before we get into talking about the

12  substance of your work with OIR today, I'd like to spend a

13  few minutes talking about a committee that you served on back

14  in 2014.

15  **A.**  Okay.

16  **Q.**  What I've put on the screen for you is Exhibit P299.

17  I'll blow it up so you can see it.

18       Do you recognize this as an email that you received

19  on June 13, 2014?

20  **A.**  I do.  Would it be okay if I look at the binder?

21  **Q.**  Of course.  Every exhibit we're going to look at today is

22  in that binder.  If you want to look at a hard copy, please

23  feel free.  It's P299.

24       Do you have that in front of you, Ms. Driver-Linn?

25  **A.**  I do.

1    **Q.**   Is this an email that you received on June 13, 2014?

2    **A.**   Yes.

3    **Q.**   And this was sent from Mr. Iuliano's assistant.  Is that

4    right?

5    **A.**   That's correct.

6    **Q.**   Mr. Iuliano is Harvard's general counsel?

7    **A.**   That's right.

8              MS. HACKER:  Your Honor, SFFA offers P299.

9              MS. ELLSWORTH:  No objection.

10             THE COURT:  It's admitted.

11             (Plaintiff Exhibit No. P299 admitted.)

12   BY MS. HACKER:

13   **Q.**   Now, you see the subject of this email is "Ryan

14   Committee," right?

15   **A.**   I do.

16   **Q.**   Then we're going to scroll down to the bottom, the first

17   email in this chain.  And it says, 'On behalf of President

18   Faust and Dean Ryan, thank you again for agreeing to serve on

19   the committee."  Do you see that?

20   **A.**   I do.

21   **Q.**   You did, in fact, serve on the Ryan Committee?

22   **A.**   Yes.

23   **Q.**   And then in this top email, it says, "Our first meeting

24   will be June 26, 2014."  Is that right?

25   **A.**   Yes.

1    **Q.**  So that is the first meeting of the Ryan Committee,

2    correct?

3    **A.**  To the best of my knowledge, yes.

4    **Q.**  Then do you remember there being a second meeting of the

5    Ryan Committee that occurred on August 27, 2014?

6    **A.**  I don't have a specific memory of that meeting.

7    **Q.**  Let me show you a document and see if it helps refresh

8    your recollection.  And you can flip to it if you want.  It's

9    P303.  And what I'd like you to look at I've highlighted here

10    on the screen.  That may help make things go a little bit

11    faster.

12         Do you see the entry that says "Ryan Subcommittee"

13    and the date is August 27, 2014?

14    **A.**  I do.

15    **Q.**  Does that refresh your recollection that there was a

16    meeting of the Ryan Committee on that date?

17    **A.**  No, it doesn't.

18    **Q.**  You don't remember having a meeting on that date?

19    **A.**  I don't have a specific memory.

20    **Q.**  Let's look together at P300 next, and I'd actually like

21    to start on the second page of this document, put it up on

22    our screen.

23         THE COURT:  You want to move to admit 299?

24         MS. HACKER:  No, Your Honor.  Just used it to

25    refresh her recollection.

1            THE COURT:  Okay.

2     BY MS. HACKER:

3     **Q.**  Are you with me, Ms. Driver-Linn?

4     **A.**  Sorry.  The second page.

5     **Q.**  You see here there's an email from James Ryan?

6     **A.**  Yes.

7     **Q.**  And that email gets sent to you and a number of other

8     people?

9     **A.**  Yes.

10            MS. HACKER:  Your Honor, SFFA offers P300.

11            MS. ELLSWORTH:  Your Honor, the first page of this

12     document this witness has no foundation for.  The second page

13     we don't object to.  I'm not sure how you'd like to handle

14     that.

15            MS. HACKER:  Let me just try to address this.

16     BY MS. HACKER:

17     **Q.**  Ms. Driver-Linn, do you see the first page of this

18     document?  I've blown it up on your screen.

19     **A.**  Yes.

20     **Q.**  And then down here at the bottom it says, "Attachments,

21     correspondence."  Do you see that?

22     **A.**  I do.

23     **Q.**  And the attachment is, in fact, this correspondence that

24     you received, correct?

25     **A.**  I assume so.  I don't know.

1    **Q.**  Do you assume you received these documents together?  Is

2    it typical to get memos with attachments within Harvard?

3            MS. ELLSWORTH:  Your Honor, this is

4    mischaracterizing the document.  It's a briefing for somebody

5    that is not Ms. Driver-Linn.  I have no objection to the

6    second page.  It's just the first page.

7            THE COURT:  Clearly you get the second page.  You

8    don't have the first page yet.  I don't know if you can get

9    her there or not.  But if you don't need the first page,

10   maybe you just want to move on.  But if you do need it,

11   you're going to have to keep working at her.

12           MS. HACKER:  That's fine.  Let's -- how about we

13   offer P300, the second page, Your Honor.

14           THE COURT:  Yes, admitted.

15           (Plaintiff Exhibit No. P300 admitted.)

16   BY MS. HACKER:

17   **Q.**  Let's focus on the second page.  Do you see this as an

18   email from James Ryan?

19   **A.**  I do.

20   **Q.**  And the subject of this email is "Diversity committee

21   meeting."  Do you see that?

22   **A.**  Yes, I do.

23   **Q.**  And we already went over this.  You're on this email and

24   there's a number of other people in the "To" and "CC" lines.

25   Do you see that?

1    **A.**  I do.

2    **Q.**  Were these other people in the "To" lines the other

3    members of the Ryan Committee as of December 3rd, 2014?

4    **A.**  I couldn't be sure.  I'd have to compare the names.  I

5    think so.

6    **Q.**  And Mr. Ryan was the chair of this committee, correct?

7    **A.**  Yes.

8    **Q.**  What I'm going to show you now is demonstrative.  It's

9    marked PD19.  Do you see that on your screen?

10   **A.**  Yes.

11   **Q.**  Now, you can see what I've done is I've taken all the

12   names -- and you have P300 in front of you on the hard

13   copy -- we've taken all of those names and we've put them

14   into this slide.

15          You see James Ryan there at the top, right?

16   **A.**  I do.

17   **Q.**  And back in December of -- he was the dean of Harvard's

18   graduate school of education?

19   **A.**  That's right.

20   **Q.**  And the people below it, are these the other people who

21   you served on the Ryan Committee with?

22          MS. ELLSWORTH:  Your Honor, I've already informed

23   Ms. Hacker we object to the demonstrative only to the extent

24   the witness is not able to verify whether these are, in fact,

25   members of the Ryan Committee, which she just testified to.

1    It's a demonstrative.  I'm fine to have her go to through it,

2    but I just wanted to lodge that objection.

3              THE COURT:  She's asked if these are the people who

4    are on the Ryan Committee, and her answer is going to be her

5    answer.  They're not moving to admit it, so it doesn't need

6    to be authenticated.

7    BY MS. HACKER:

8    Q.  Ms. Driver-Linn, do you recognize these people on this

9    slide as the people you served on the Ryan Committee with?

10   A.  I really am not sure.  I can't remember serving on a

11   committee with all of these people and being in a room

12   together with them.

13   Q.  That's fair.  So you just didn't meet with them enough to

14   be able to recognize all of these people now?

15   A.  I'm not sure that's how I'd characterize it.  I just

16   couldn't tell you for sure if this is the membership of the

17   Ryan Committee and if we were all in a room together meeting.

18   Q.  Now, we talked -- we saw in P300, the second page of it,

19   that there was a meeting of the Ryan Committee in December

20   of 2014.  Was the committee in fact disbanded after that

21   point?

22   A.  I'm not sure about being disbanded.  I know we stopped

23   meeting at some point.

24   Q.  And did you stop meeting at the end of 2014?

25   A.  I think so.

1   **Q.**  Did anyone ever explain to you why you stopped meeting

2   after that point?

3   **A.**  I don't think it was explained to me.

4   **Q.**  And the Ryan Committee met so few times you don't recall

5   whether you ever discussed race-neutral alternatives to the

6   admissions process, correct?

7   **A.**  I have a hazy recollection of a number of large committee

8   meetings right around that timeframe.  I don't feel confident

9   that I can say with certainty whether we discussed

10  race-neutral alternatives.

11  **Q.**  You don't recall specifically whether you discussed

12  race-neutral alternatives?

13  **A.**  I don't recall specifically.

14  **Q.**  And you don't recall ever being asked as part of the Ryan

15  Committee to do any analysis of the alternatives to using

16  race in the college admissions process?

17  **A.**  I'm sorry.  Could you repeat the question?

18  **Q.**  Sure.  You don't recall ever being asked as part of the

19  Ryan Committee to do any analysis of the alternatives to

20  using race in the college admissions process?

21  **A.**  I believe that the team did some work, under privilege.

22  **Q.**  The team did some work.  And I'm sorry I couldn't hear

23  you.

24  **A.**  Under direction of counsel.

25  **Q.**  But you don't recall ever being asked as part of the Ryan

1    Committee to do any analysis of the alternatives to using

2    race in the college admissions process?

3    **A.**  I don't recall that specifically.

4    **Q.**  Now, let's turn to talking about some of the work OIR did

5    in early 2013.  I first want to make sure we're on the same

6    page in terms of the context of that work.

7            You're familiar with the article that Ron Unz

8    wrote, called "The Myth of American Meritocracy," right?

9    **A.**  Generally.

10   **Q.**  One of the claims, among other things, that Unz's article

11   focused on was a claim that Harvard was capping

12   Asian-American admissions?

13   **A.**  I can't remember specifically if that was one of the

14   exact claims.

15   **Q.**  You don't remember whether Ron Unz's article discussed

16   whether Harvard caps Asian-American admissions?

17   **A.**  I remember that article making a number of claims.  I

18   remember that Harvard's name was in them.

19   **Q.**  And the Unz article was picked up by the New York Times

20   on Christmas Eve in 2012, right?

21   **A.**  Yes.

22   **Q.**  That got the attention of a number of people at Harvard,

23   including people at OIR?

24   **A.**  Yes.  I believe we were -- that was brought to our

25   attention in that timeframe.

1    **Q.**  Do you remember sending and receiving a number of emails

2    over the holidays concerning the Unz article?

3    **A.**  I don't have a specific memory of those email exchanges.

4    **Q.**  Well, Ms. Driver-Linn, what I'd like you to do is turn to

5    P460 in your binder in front of you and see if we can help

6    refresh your memory about the number and dates of those

7    emails so we can piece together a timeline of what was going

8    on back then.  Let me know when you have it.

9    **A.**  Okay.  I have it.  Yes.

10   **Q.**  Now, what you have in front of you is something called a

11   privilege log that Harvard's attorneys provided to us.  I

12   don't want to talk about the substance of any of these emails

13   because they're privileged.  But I'd like to walk through

14   just how many emails you were sending and receiving on this

15   topic back then.

16           So if you flip with me to the second page, we see

17   there is an email between you and Dean Fitzsimmons on

18   December 28, 2012.  Do you see that?

19   **A.**  I do.

20   **Q.**  And the subject of that email is "American Conservative

21   article."  Is that right?

22   **A.**  Yes, I see that.

23   **Q.**  You understand that to be referring to Mr. Unz's article

24   that was published in American Conservative?

25   **A.**  Yes, I do.

1    **Q.**  And then if you flip to the next page, page 3, at the

2    very top we see two more emails between you and Dean

3    Fitzsimmons on December 28, 2012.  Right?

4    **A.**  Yes, I see that.

5    **Q.**  Those are also about Unz's article?

6    **A.**  They also have "The American Conservative article" as the

7    file subject name.

8    **Q.**  And if we go down the page, there are 13 more emails back

9    and forth between you and other Harvard employees on

10   December 29, 2012?

11   **A.**  I see that.

12   **Q.**  All of those emails are also about Unz's article, right?

13   **A.**  They all have that same subject line.

14   **Q.**  And some of the people you were emailing with on this day

15   include Dean Fitzsimmons?

16   **A.**  Yes.

17   **Q.**  Some of these emails are between you and Alan Garber?

18   **A.**  I see that.

19   **Q.**  He's the provost at Harvard, right?

20   **A.**  That is correct.

21   **Q.**  He's one of the top officials in the entire university?

22   **A.**  Yes.

23   **Q.**  Is he -- was he at the time your boss's boss's boss?  Is

24   that right, three levels up?

25   **A.**  No.  Two.

1    **Q.**  How often did you email directly with Mr. Garber?

2    **A.**  It's difficult to answer that question with any

3    precision.  Can you be more specific?

4    **Q.**  Was it not that often that you'd email with Mr. Garber?

5    Were you emailing with him every day?

6    **A.**  I don't think every day.  I don't think it's unusual for

7    me to have emailed with him.

8    **Q.**  And you're also emailing around this time a number of

9    people within your office, OIR, right?

10   **A.**  That's correct.

11   **Q.**  Including Ms. Bever?

12   **A.**  Yes, I see that.

13   **Q.**  And Mr. Hansen?

14   **A.**  Yes.

15   **Q.**  And then on the next page we see some more emails you're

16   continuing to send and receive, again related to the Unz

17   article, right?

18   **A.**  Yes.  They still have that same subject line.

19   **Q.**  And it looks to me like there's about ten more emails

20   between December 29 and January 2 on this page?

21   **A.**  I see that the subject line does change.

22   **Q.**  Do you believe these emails were still related to the Unz

23   article?

24   **A.**  I can't be sure.

25   **Q.**  And if you look down to the entry that's number --

1    Document Number 20, you see that that is an email you sent to

2    the folks at OIR on New Year's Eve, 2012.  Is that right?

3    **A.**   December 31, yes.

4    **Q.**   And you sent it at about 9:20 p.m. on New Year's Eve?

5    **A.**   It looks like it.

6    **Q.**   I hope that's pretty unusual for you to be working that

7    late on a holiday.

8    **A.**   I'm not sure.

9    **Q.**   Did you try not to bother your employees on a holiday if

10   you didn't have to?

11   **A.**   I would typically try to not bother my employees on a

12   holiday.

13   **Q.**   And then if you flip with me through the next five pages,

14   pages 5 through 10.  I don't want to walk through each one

15   individually.  But now we're into the new year in 2013,

16   right?

17   **A.**   Yes.

18   **Q.**   And if you count pages 5 through 10, it looks to me like

19   you send or receive 61 more emails in January of 2013 related

20   to these issues.

21   **A.**   I see a number of highlights with my name.  And I think I

22   see the subject line changing some.

23   **Q.**   61 looks about right?  60?

24   **A.**   I'll take your word for it.

25   **Q.**   Some of those emails again were to Provost Garber?

1   **A.**  I don't see any others to Provost Garber.

2   **Q.**  Look with me on page 5, Ms. Driver-Linn.

3           You see about four entries from the top there's

4   another email, two emails between you and Dean Fitzsimmons

5   and Provost Garber?

6   **A.**  Yes.

7   **Q.**  Some of these emails are also back and forth between all

8   of the OIR employees, right?

9   **A.**  Yes.

10  **Q.**  And some of these emails, a few of them are with someone

11  named Elizabeth Yong.  Is that right, on page 6?

12  **A.**  Yes, I see that.

13  **Q.**  Part of her job at Harvard was to maintain the database

14  of admissions data, right?

15  **A.**  I don't -- I don't know what her job description is.  I

16  know she had some work that she did with admissions data in

17  the office of admissions and financial aid.

18  **Q.**  And when people at OIR needed admissions data, would you

19  often reach out to Ms. Yong?

20  **A.**  Ms. Yong was often our contact person for that.

21  **Q.**  Given all the emails we see going back and forth between

22  Christmas 2012 and January 2013, it's fair to say that this

23  article got some attention from Harvard's leaders, right?

24  **A.**  Sure.

25  **Q.**  So turning to 2013.  In the beginning of 2013, OIR was

1    doing work related to Harvard's admissions process that

2    concerned the question of Harvard's treatments of whites as

3    compared to Asian-American applicants, right?

4    **A.**   I'm sorry.  Could you repeat that question?

5    **Q.**   Sure.  In the beginning of 2013, OIR was doing work

6    related to Harvard's admissions process that concerned the

7    question of Harvard's treatment of white applicants versus

8    Asian-American applicants, right?

9    **A.**   No.  I don't think that's how I'd characterize it.

10   **Q.**   Well, the reason OIR was looking at that difference was

11   because there was a concern about Harvard potentially

12   treating those two groups, white applicants and

13   Asian-American applicants, differently, right?

14   **A.**   No.  At that time my understanding is we were doing some

15   work under direction of counsel, and we were -- the office

16   was doing other work that was not at the direction of

17   counsel.

18   **Q.**   I'm not focused on who directed the work.

19          But in early 2013, there was -- OIR was looking at

20   the difference between white and Asian-American applicants,

21   right?

22   **A.**   We did analytic work that included looking at different

23   groups and the admissions process.

24   **Q.**   And you were doing that work because there was a concern

25   about the difference between Asian and white applicants at

1    the time?

2    **A.**   My sense of what we were doing is, in the work that

3    wasn't under direction of counsel, was roughly in response to

4    the Unz article, that it was sort of in the ether at the

5    time.

6    **Q.**   It was in the -- that was a concern because it was in the

7    popular press at the time?

8    **A.**   That's correct.

9    **Q.**   So to take a look at the issue, OIR put together a

10   regression analysis, right?

11   **A.**   No.

12   **Q.**   OIR put together a logistic regression model?

13   **A.**   The part I was referring to is to address a particular

14   question.

15           I think, if I'm understanding what you're talking

16   about, the work that you're talking about, there were a

17   series of models that were being looked at to try to model

18   the admissions process.

19   **Q.**   And you're generally familiar with logistic regression

20   analysis?

21   **A.**   Generally.

22   **Q.**   OIR has used these types of analyses before?

23   **A.**   Yes.

24   **Q.**   And there are people in OIR who can competently execute

25   logistic regression analyses, right?

1    **A.**   I'd say the office can competently do logistic

2    regression.

3    **Q.**   Let's take a look together at P9.  It's also in your

4    binder if you'd like to take a look at the hard copy.

5              Ms. Driver-Linn, you recognize this document,

6    right?

7    **A.**   I do.

8              MS. HACKER:  Your Honor, SFFA offers P9.

9              MS. ELLSWORTH:  Your Honor, I think I need a little

10   more foundation on this.

11             THE COURT:  Isn't it already admitted?

12             MS. ELLSWORTH:  This is not admitted.

13             MS. HACKER:  This has been used with another

14   witness, Your Honor, so that we didn't have to recall Dean

15   Fitzsimmons.  But it actually hasn't been admitted into

16   evidence yet.

17   BY MS. HACKER:

18   **Q.**   Ms. Driver-Linn, you were designated as Harvard's

19   corporate representative to talk about OIR reports at your

20   deposition, right?

21   **A.**   That's right.

22   **Q.**   And this is one of the documents you reviewed to prepare

23   to testify on Harvard's behalf about OIR reports; is that

24   right?

25   **A.**   I'm sorry.  I can't quite remember which part of the

1    deposition was as the corporate representative and which part

2    was not.

3    **Q.**   Do you remember being designated as a corporate

4    representative to talk about OIR reports and this report

5    specifically at your deposition?

6    **A.**   I remember talking about this document specifically at

7    the deposition.

8              MS. HACKER:   Your Honor, SFFA offers P9.

9              MS. ELLSWORTH:   Your Honor, I'm not sure being a

10   corporate representative at deposition lays foundation.   The

11   witness testified at her deposition she didn't recall the

12   document from 2013.   She can certainly speak to it.   We don't

13   object it to being used in the same way with Dean

14   Fitzsimmons.   I'm just not sure that a foundation has

15   actually been laid.

16             THE COURT:   I am going to let her testify about it.

17             MS. HACKER:   If I may, just one more question on

18   this.   I think I may be able to clear this up.

19             THE COURT:   I'm wondering who is going to be able

20   to lay a foundation for them.   And the document seems fair

21   game.

22             MS. ELLSWORTH:   There is an individual who will be

23   testifying later who is the person who created the document

24   who would be the likely person to lay a foundation with.

25             THE COURT:   So you can get it now through her, or

1    we'll do it through a later witness.  But you can certainly
2    question her about it now.  If you want to try and get it in
3    through her, that's fine.
4    BY MS. HACKER:
5    **Q.**  Ms. Driver-Linn, you've seen this document or one very
6    much like it, correct?
7    **A.**  Yes, I have.
8         MS. HACKER:  Your Honor, this witness has
9    foundation.  She's seen the document.  She reviewed it for
10   her deposition.  She oversaw the office of institutional
11   research that created this document for ten years.  She
12   certainly has foundation to testify about it.
13        THE COURT:  Well, I'm going to let her testify
14   about it.  I'm not sure you've elicited -- you may be able to
15   elicit a foundation based on the fact that she oversaw the
16   work of the office during that time period and what her
17   responsibilities were in that way, but I don't think you've
18   laid it yet.  Or that you have a chance to lay it with her or
19   they're representing that the author of the document will be
20   on later.  So you can try it through her.  And if it doesn't
21   come in through her, it will come in later.  I don't think
22   they're objecting to you putting it up on the screen now, in
23   any event.
24        MS. ELLSWORTH:  No, and the witness can be
25   questioned on it.  No objection on that.  It's just a

1    foundation issue.

2    BY MS. HACKER:

3    **Q.**   Ms. Driver-Linn, let's start with the date on the first

4    page of this document.  You see that it says February 14,

5    2012, right?

6    **A.**   I do see that.

7    **Q.**   But this document was actually created in February

8    of 2013?

9    **A.**   I believe so.

10   **Q.**   And you believe it's likely that this document was

11   created by Erica Bever and/or Mark Hansen?

12   **A.**   No.  I believe it was Mark Hansen.

13   **Q.**   Ms. Bever -- I'm sorry.

14          Ms. Driver-Linn, you remember testifying in a

15   deposition in this case, right?

16   **A.**   I do.

17   **Q.**   You were under oath during that deposition?

18   **A.**   Yes.

19   **Q.**   In fact, the very same oath you're under today?

20   **A.**   Yes.

21          MS. HACKER:  Permission to approach, Your Honor?

22          THE COURT:  Yes.

23   BY MS. HACKER:

24   **Q.**   Ms. Driver-Linn, I'd like you to turn with me in your

25   deposition to page 99 where -- I've put it up here on the

1    screen if you'd like to take a look at that.  I'd like you to

2    look at with me lines 12 through 22.

3              "Who prepared this document?

4              "I'm not sure.

5              "QUESTION:  You don't have any idea who prepared

6    this document?

7              "ANSWER:  That's not what I said.

8              "QUESTION:  What do you know about who prepared

9    this document?

10             "ANSWER:  I think it likely involved Erica Bever

11   and/or Mark Hansen."

12             Were you asked those questions and did you give

13   those answers at your deposition?

14   **A.**  Yes.

15   **Q.**  Now let's go back to P9.  And in this document, OIR used

16   data from the classes of 2007 through 2016; is that right?

17   **A.**  Sorry, that's -- are we looking at a particular page?

18   **Q.**  You can look at the pages if you'd like.  I think page 3

19   shows those years.  Do you see those here at the bottom?

20   **A.**  Yes, I do.

21   **Q.**  So that's ten years of data, right?

22   **A.**  Yes.

23   **Q.**  And I'd like to look at page 5 together.  This page shows

24   us the difference in average test scores and ratings for

25   white and Asian applicants, right?

1    **A.**   That's the title on the graphic, yes.

2    **Q.**   I'd like to start here at the bottom in these notes.  We

3    see here that this excludes legacies and athletes, correct?

4    **A.**   Yes.  It also says OIR doesn't have the ratings for all

5    years.

6    **Q.**   But it does exclude legacies and athletes?

7    **A.**   Yes.

8    **Q.**   If we zoom in on this chart so we can all see it

9    together, we have a line going down right here at zero,

10   right?

11   **A.**   Yes.

12   **Q.**   And the way this works is anything to the right of the

13   line means that Asians are higher, on average, right?

14   **A.**   Yes.

15   **Q.**   And anything to the left of the line means whites are

16   higher?

17   **A.**   That's the way this graphic is labeled and how it's

18   organized.

19   **Q.**   We see for the first two variables that Asian-American

20   applicants do better on both SAT II averages and SAT

21   averages, right?

22   **A.**   They have a higher rating.

23   **Q.**   And then if we go down to the third variable,

24   Asian-American applicants have a higher rating on the alumni

25   rating 2, as well?

1  **A.**   Yes.   This particular graphic and this exercise, that's

2  what you see.

3  **Q.**   Is that the alumni personal rating versus the alumni

4  overall rating?

5  **A.**   I don't know what these ratings are.   I don't think we

6  can tell from this.

7  **Q.**   Then if we go down, the next four categories were pretty

8  close to even between white applicants and Asian-American

9  applicants, right?

10  **A.**   Those ratings are smaller.

11  **Q.**   And then if we focus down on this personal rating, here

12  we see this is the only variable where white applicants score

13  a good deal better than Asian-American applicants to Harvard,

14  right?

15  **A.**   This is a -- that's what you see on this chart.

16  **Q.**   And you don't believe that this difference between white

17  and Asian applicants on the personal rating is based on any

18  errors in analysis of data by OIR, right?

19  **A.**   I don't think this is a product that has errors, so to

20  speak.   But I do think it's a very exploratory and limited

21  graphic.

22  **Q.**   But you don't believe this chart is based on any errors

23  in analysis of the data?

24  **A.**   I don't have any reason to believe it's based on an

25  error.

1    **Q.** Now, let's move on to February of 2013.  You met with

2    Dean Fitzsimmons and some others from OIR on February 25,

3    2013, right?

4    **A.** Yes.

5    **Q.** And the work that OIR had done analyzing how race factors

6    into admissions at Harvard was shared with Dean Fitzsimmons

7    during that February 25 meeting?

8    **A.** I'm sorry.  Could you repeat the question?

9    **Q.** Sure.  The work that OIR had done analyzing how race

10   factors into admissions at Harvard was shared with Dean

11   Fitzsimmons during the February 25 meeting?

12   **A.** That's not how I'd characterize that, the work that was

13   shared with Dean Fitzsimmons that day.

14   **Q.** The work that OIR had been doing was shared with Dean

15   Fitzsimmons that day, right?

16   **A.** That's my understanding.

17   **Q.** And you would have reviewed that work and made any

18   comments you thought were appropriate before presenting it to

19   Dean Fitzsimmons?

20   **A.** I think that's likely.

21   **Q.** You certainly didn't knowingly share any analysis with

22   Dean Fitzsimmons that you believed to be incorrect?

23   **A.** No, I wouldn't share something we knew was incorrect.

24   **Q.** You wouldn't have shared work with Dean Fitzsimmons that

25   you considered shoddy?

1    **A.**   No.

2    **Q.**   And since you were the head of OIR, you doubt anyone

3    would have shared information with Dean Fitzsimmons if you

4    had objected to it?

5    **A.**   I don't think so.

6    **Q.**   You felt comfortable sharing OIR's analysis with Dean

7    Fitzsimmons because Dean Fitzsimmons loved to talk about

8    statistics?

9    **A.**   I think I felt comfortable sharing work with Dean

10   Fitzsimmons for a number of reasons.  One is that he did like

11   to talk about data.

12   **Q.**   During that February 25, 2013 meeting, you don't recall

13   Dean Fitzsimmons disagreeing with the models created by OIR,

14   right?

15   **A.**   I do not.

16   **Q.**   You don't recall anyone asking any follow-up questions

17   during or after that February 25 meeting?

18   **A.**   I don't have specific memories of that meeting.

19   **Q.**   You don't recall taking any steps after the February 25

20   meeting to correct anything in OIR's analysis that was shared

21   with Dean Fitzsimmons?

22   **A.**   I'm sorry.  Could you repeat that again?

23   **Q.**   Sure.  You don't recall taking any steps after the

24   February 25 meeting to correct anything in OIR's analysis

25   that was shared with Dean Fitzsimmons?

1    **A.**   I do remember that there were exchanges around trying to

2    refine and increase the variables that we might have in our

3    data.  So I do think there were steps taken to work on some

4    of the things that were presented that day.

5    **Q.**   But there were no steps taken to correct anything in the

6    reports shared with Dean Fitzsimmons, right?

7    **A.**   I'm not -- I don't think of this as a report, this kind

8    of work that we were sharing.  I think there may have been

9    work to try to improve and continue working on some of what

10   was shared that day.

11   **Q.**   Ms. Driver-Linn, if you could, turn to page 203 in your

12   deposition.  I've blown it up on the screen so you can see

13   it.

14          "QUESTION:  Did you take any steps after the

15   meeting on February 25 to correct anything in this report?

16          "ANSWER:  Not that I recall."

17          Were you asked that question and did you give that

18   answer at your deposition?

19   **A.**   Yes.

20   **Q.**   And you don't recall anyone from admissions asking you to

21   dig deeper into the issue of whether there was a bias in

22   Harvard's admissions process against Asian-Americans, right?

23   **A.**   I don't recall that.

24   **Q.**   So now we've gotten through the end of February 2013.

25   Let's fast-forward a month to April 2013.  I'm going to show

1  you P604.  You see this is an email from someone named

2  Christine Heenan to you, right?

3  **A.**  I do see that.

4  **Q.**  And this was sent to you on April 29, 2013?

5  **A.**  Yes.

6          MS. HACKER:  SFFA offers P604.

7          MS. ELLSWORTH:  No objection.

8          THE COURT:  It's admitted.

9          (Plaintiff Exhibit No. P604 admitted.)

10  BY MS. HACKER:

11  **Q.**  I'd like to start on the second page where the email

12  chain begins, and we can scroll down here to the bottom.

13  Ms. Heenan says to you -- sorry.

14          You say to Ms. Heenan, "Would like to give you a

15  heads-up about some analysis and correspondence we've been

16  having with Fitz."

17          Do you see that?

18  **A.**  Yes.

19  **Q.**  It goes on, "He's" -- and the "he" there is Dean

20  Fitzsimmons, right?

21  **A.**  Yes.

22  **Q.**  So, Dean Fitzsimmons -- "excited to share more broadly.

23  I believe is going to be in touch with Jeff Neal tomorrow,

24  but I'd like to make sure you've had a chance to think

25  through implications.  Not entirely straightforward."

1          Do you see that?

2    **A.**   I do.

3    **Q.**   And when you're emailing Ms. Heenan here -- by the way,

4    Ms. Heenan, she's involved in media relations, right?

5    **A.**   At that time I believe she was vice president for Harvard

6    public affairs and communications.

7    **Q.**   So she dealt with media relations generally?

8    **A.**   Among other things, yes.

9    **Q.**   Now let's take a look at what Ms. Heenan says in response

10   to your email.

11          She asks, "Re Fitz, what is the issue?"

12          And if we go back to the first page and see how

13   this conversation continues, you respond to Ms. Heenan, "Fitz

14   asked us to do some analysis of thumb on the scale for low

15   income.  Could be a positive message but has implications for

16   need-blind policy as well as opening the door to Unz-like

17   requests for info about other thumbs on the scale."

18          Do you see that?

19   **A.**   Yes, I do.

20   **Q.**   Then in the next sentence you say, "Team is putting

21   together a memo to send to Fitz, copy you and Jeff, to put

22   this in context."

23          And the team you're talking about there is OIR,

24   right?

25   **A.**   Yes, I think so.

1   **Q.**   Then Ms. Heenan asks you, "Thumbs on the scale meaning

2   extra weight we give to those students?  If so, you are

3   right.  There are upsides and downsides of being public about

4   that analysis."

5            Do you see that?

6   **A.**   Yes, I do.

7   **Q.**   You reached out to Harvard's media relations person,

8   Ms. Heenan, because you were concerned that there were

9   upsides and downsides of being public about admissions

10  decisions?

11  **A.**   My sense of reaching out to Christine was that Dean

12  Fitzsimmons wanted to make a public statement and that it

13  would be good for her to know about that.  And that when you

14  take admissions analysis and you look at it without the

15  context and without the nuance, it can get looked at

16  narrowly, and that could be problematic.

17  **Q.**   So there are upsides and potentially downsides of it

18  being public?

19  **A.**   Of it being looked at narrowly.

20  **Q.**   So in this April 29 email, you say, "OIR is working on a

21  memo to share with Dean Fitzsimmons, among others."

22            You believe that you've reviewed drafts of that

23  memo as it was being created, right?

24  **A.**   Yes, I do.

25  **Q.**   So let's look at a draft together.  And this is P24.  Do

1    you have P24 in front of you?

2    **A.**  Yes, I do.

3    **Q.**  And this is a draft of the memo that you and some others

4    sent to Dean Fitzsimmons, right?

5    **A.**  Yes.

6    **Q.**  You agree that it's possible you wrote some portion of

7    this memo?

8    **A.**  I do think it's possible.

9    **Q.**  And at the very least, you reviewed it before it went to

10   Dean Fitzsimmons?

11   **A.**  I think so.

12   **Q.**  Because you were ultimately responsible at OIR?

13   **A.**  That's correct.

14           MS. HACKER:  Your Honor, SFFA offers P24.

15           MS. ELLSWORTH:  No objection.

16           THE COURT:  It's admitted.

17           (Plaintiff Exhibit No. P24 admitted.)

18   BY MS. HACKER:

19   **Q.**  Now, we see in addition to Dean Fitzsimmons at the top,

20   this is also addressed to Jeff Neal and Christine Heenan.

21   They both are folks who deal with public relations for

22   Harvard?

23   **A.**  They're both -- they were both at that time in public

24   relations in communications.

25   **Q.**  We have Nina Collins.  She's in the dean's office, right?

1    **A.**   Yes.

2    **Q.**   Then we have Sally Donahue.  She was the financial aid

3    director at this time, right?

4    **A.**   That's correct.

5    **Q.**   So let's see what this says to Dean Fitzsimmons on page

6    3.  I want to start with this chart here.  Zoom in so we can

7    all see it.

8            Now, this chart shows us something called

9    coefficient estimates, right?

10   **A.**   Yes.

11   **Q.**   The higher the coefficient estimate means essentially a

12   stronger effect on someone's chances of admission?

13   **A.**   This is the output of a regression analysis looking at

14   the probability of admissions.  And the coefficient estimates

15   are looked at relative to one another in relationship to that

16   particular analysis.

17   **Q.**   And because they're relative to one another, the higher

18   the estimate means a stronger effect on someone's chances of

19   admission?

20   **A.**   This is really a modeling exercise.  It's not speaking

21   directly to a chance for admission.  But in this analysis,

22   you have a -- the probability of admission in this model, the

23   coefficient estimates, if they're higher, that it is a

24   stronger probability.

25   **Q.**   And that probability could either be positive or

1    negative, right?

2    **A.**   Yes.

3    **Q.**   A positive relationship would indicate that a student is

4    more likely to be admitted?

5    **A.**   Again, this is a sort of hypothetical modeling.  It's not

6    speaking to the actual admissions process.  But in this, if

7    it's a positive effect, it would be the probability is more

8    positive in this model.  And negative, it would be negative.

9    **Q.**   In this model, to be clear, negative means there's a

10   negative.  A student is less likely to be admitted to

11   Harvard, right?

12   **A.**   I just don't feel comfortable with the movement from this

13   model to the probability of getting admitted in the class

14   because it is a hypothetical.

15   **Q.**   But you understand that a negative in this model shows a

16   negative relationship between that variable and the chance of

17   a student's admission to Harvard, right?

18   **A.**   Yes, in this model.

19   **Q.**   And according to this model, if we look down here at the

20   bottom, there's a negative effect of being Asian on an

21   applicant's chance of admission, right?

22   **A.**   The coefficient estimate is negative .37.

23   **Q.**   And that means an applicant's chance of admission is

24   lower because of being Asian-American, right?

25   **A.**   I just -- the leap to an applicant's chance is lower in

1    this model, yes.

2    **Q.**   And then if we look at the text above this chart, let's

3    zoom in on that.  We see the same thing reflected in the

4    text.  On the flip side, we see a negative effect for Asian

5    applicants.

6              Do you see that?

7    **A.**   I see that sentence, yes.

8    **Q.**   And then it goes on to say, "These realities have also

9    received intense scrutiny from critics like Bowen or more

10   recently Unz, as we have discussed at length."

11             Do you see that?

12   **A.**   I do.

13   **Q.**   And you believe the reference to discussions at length

14   refers to the February 2013 meeting with Dean Fitzsimmons,

15   right?

16   **A.**   I'm not sure.

17   **Q.**   Well, let's see if we can refresh your recollection.

18   Turn to page 252 with me in your deposition, and read to

19   yourself lines 5 through 13.  Let me know when you've

20   finished.

21   **A.**   (Witness reviews document.)  I'm finished.

22   **Q.**   So you believe that the conversations being referred to

23   having been discussed at length, you expect that references

24   the meeting in February with Dean Fitzsimmons, right?

25   **A.**   Yes, I see the line here.

1    **Q.**  And whoever wrote this sentence described the negative

2    effect for Asian-American applicants as a reality?

3    **A.**  I'm sorry.  Could you point out what you're referring to?

4    **Q.**  You see this, "These realities"?

5    **A.**  Yes.  Yes, I do.

6    **Q.**  And then this continues, "To draw attention to the

7    positive benefit that low-income students receive may also

8    draw attention to the more controversial findings around

9    Asians."

10           Do you see that?

11   **A.**  Yes.

12   **Q.**  That was a concern that you had?

13   **A.**  I don't remember having that concern.

14   **Q.**  Ms. Driver-Linn, let's look at your deposition page 253.

15   And I'd like for us to look at lines 8 through 19 together.

16           "QUESTION:  It goes on to say to, 'To draw

17   attention to the positive benefit that low-income students

18   receive may also draw attention to the more controversial

19   findings around Asians or the expected results around legacy

20   and athletes.'  Did I read that correctly?

21           "ANSWER:  Yes.

22           "QUESTION:  Was that a concern you had?

23           "ANSWER:  Based on the preparation for today's

24   deposition, I do believe it was a concern I had."

25           Were you asked those questions and did you give

1    those answers?

2    **A.**   I do.  And it goes on to say that I was referring to the

3    Christine Heenan email as a way to --

4    **Q.**   Referring to your concerns about these issues?

5    **A.**   Yeah.  I think my sense of this is that in the deposition

6    exchange I was thinking back to the Christine Heenan email

7    and thinking of it being a concern that I had raised with

8    her.

9    **Q.**   Focusing back on this memo, P24, you didn't say anywhere

10   in here that the analysis is unreliable, did you?

11   **A.**   No.  In this draft memo, I don't remember saying that.

12   **Q.**   You didn't warn Dean Fitzsimmons in this memo that what

13   was sent to him, OIR's analysis, was inaccurate?

14   **A.**   I don't recall that in this draft or the other drafts.

15   **Q.**   Instead, you wrote about the concerns of negative effects

16   on Asian-American applicants and your concern about them

17   getting publicized?

18   **A.**   I'm sorry.  Could you repeat the question?

19   **Q.**   Instead of writing about how OIR's analysis might be

20   inaccurate, you wrote about the concerns of negative effects

21   on Asian-American applicants getting publicized?

22   **A.**   I don't think these memos talk about the concern.  I

23   think the concern was in the previous email.

24   **Q.**   You don't remember looking at page 3 right here and

25   talking about these concerns about drawing attention to the

```
 1   more controversial findings around Asians?
 2   A.   I just don't see the word "concern" there.
 3   Q.   So after sending this memo to Dean Fitzsimmons, you don't
 4   recall him expressing any concerns about the findings in this
 5   memo regarding Asian-Americans and Harvard's admissions
 6   process, do you?
 7   A.   I don't think this is a memo that went to Dean
 8   Fitzsimmons.
 9   Q.   Let's look at the final memo that's P26.  It's already in
10   evidence.
11           Do you see that this is an email from Ms. Bever to
12   Dean Fitzsimmons?
13   A.   Yes.
14   Q.   And you see the memo is included there as an attachment?
15   A.   It's an edited version of the draft we were looking at.
16   Q.   After sending this final memo, P26, to Dean Fitzsimmons,
17   you don't recall him expressing any concern about the
18   findings in this memo regarding Asian-Americans and Harvard's
19   admissions process?
20   A.   No, I don't.
21   Q.   You don't recall Dean Fitzsimmons raising any criticisms
22   about the implications of OIR's analysis with respect to
23   being Asian and how it was negatively associated with
24   admissions outcomes?
25   A.   I don't recall any criticisms.
```

1    **Q.**  And you don't remember any requests for further follow-up

2    research on that particular question about the negative

3    effect on Asian applicants, right?

4    **A.**  This memo was about low-income students, and there was a

5    follow-up request related to low-income students, low-income

6    analysis.

7    **Q.**  But there was no follow-up request on the particular

8    question about the negative effect on Asian applicants,

9    right?

10   **A.**  There was not a follow-up question.  That was not the

11   subject of this analysis.

12   **Q.**  I understand that you believe that was not the subject of

13   this analysis.  But what my question is, is directed not on

14   the low-income analysis.

15          But you don't remember any requests for further

16   follow-up about the question of the negative effect on

17   Asian-American applicants after this memo was sent to Dean

18   Fitzsimmons?

19          MS. ELLSWORTH:  Your Honor, I object.  I think this

20   question has been asked and answered about two or three times

21   now.

22          THE COURT:  I'll let her have it.  I'm sure it's

23   been asked.  I'm not totally sure it's been answered.

24          THE WITNESS:  I'm sorry.  Could you repeat it?

25   BY MS. HACKER:

1    **Q.**  Of course.  You don't remember any requests for further

2    follow-up research on the particular question about the

3    negative effect on Asian applicants, right?

4    **A.**  I don't recall a request for that particular question.

5            MS. HACKER:  Pass the witness.

6            MS. ELLSWORTH:  Your Honor, what time to you need

7    to break?

8            THE COURT:  Five of 12:00.

9            MS. ELLSWORTH:  Five of?  Okay.

10                              EXAMINATION

11   BY MS. ELLSWORTH:

12   **Q.**  Good morning, Ms. Driver-Linn.

13   **A.**  Good morning.

14   **Q.**  Ms. Hacker was just asking you about a question of the

15   negative effect of Asian-American ethnicity on admission.  Do

16   you recall that phrasing?

17   **A.**  Yes, I do.

18   **Q.**  Is that the question that the low-income memo, Exhibit

19   P26, was attempting to address?

20   **A.**  No, it is not.

21   **Q.**  What was the subject of the P -- Exhibit P26 memorandum?

22   **A.**  The -- whether or not low-income students, we had any

23   evidence of highly rated low-income students having a tip in

24   the admissions process.

25   **Q.**  And that was a question Dean Fitzsimmons had asked OIR to

1  look into?

2  **A.**  Yes.

3  **Q.**  And that was the question you answered in the P26?

4  **A.**  That is correct.

5  **Q.**  You testified that Dean Fitzsimmons did ask for follow up

6  on the subject matter of that memorandum, the low-income

7  analysis, right?

8  **A.**  Yes, he did.

9  **Q.**  And what did he ask OIR to follow up on?

10 **A.**  He asked to follow up on whether or not there was an

11 interaction between low income and Asian ethnicity.

12 **Q.**  And did OIR conduct that follow-up work?

13 **A.**  Yes, it did.

14 **Q.**  And what did OIR conclude?

15 **A.**  OIR, I don't know that we would say concluded, but we

16 looked at the relationship between low income and other kinds

17 of ethnicities, and we saw that low-income Asian students did

18 receive a positive tip toward the probability of admission.

19 **Q.**  And were the results of that analysis passed on to Dean

20 Fitzsimmons?

21 **A.**  Yes.

22 **Q.**  Ms. Hacker was asking you several questions about whether

23 the work that you performed at OIR you considered it to be

24 reliable.  Do you recall that?

25 **A.**  Yes.

1  **Q.**  She asked whether you considered it to be complete or

2  correct.  Do you recall that?

3  **A.**  Correct, yes.  I'm not sure about complete.

4  **Q.**  You recall her asking you whether OIR's work was

5  generally correct when it was passed along, right?

6  **A.**  Yes.

7  **Q.**  And do you agree that OIR tried to do correct work when

8  you were the leader of the office?

9  **A.**  I think the office tried to do the best work it could

10  under time pressures, data limitations.  We always tried to

11  do our best.

12  **Q.**  And OIR always tried to do reliable work as well, right?

13  **A.**  Yes.

14  **Q.**  Can work be correct and reliable and still be

15  preliminary?

16  **A.**  Yes.

17  **Q.**  Could OIR's work be correct and reliable and still be

18  preliminary?

19  **A.**  Yes.

20  **Q.**  Could OIR's work be correct and reliable and still be

21  limited?

22  **A.**  Yes.

23  **Q.**  And what are some of the limitations to the work that OIR

24  is able to do, in a general sense?

25  **A.**  Data completeness, data quality, the other kind of work

1    that might be going on in the office.  I think also we could

2    do analytic work that didn't take into account the kind of

3    subject matter expertise of what it might be we were looking

4    at.

5    **Q.**  Is that how you would characterize the work that was in

6    Exhibit P26?

7    **A.**  Yes, I think that's fair.

8    **Q.**  And is that how you would characterize the work that's in

9    Exhibit P12 that Ms. Hacker showed you briefly?

10   **A.**  I'm sorry.  P12 is the --

11   **Q.**  Actually, Ms. Hacker may not have shown you P12, so let's

12   take a look at it.  It is in your binder at Tab 1.  Do you

13   have P12 in front of you?

14   **A.**  I do.

15   **Q.**  Do you recall discussing with Ms. Hacker a meeting in

16   February of 2013 with Dean Fitzsimmons?

17   **A.**  Yes.

18   **Q.**  And what prompted that meeting?

19   **A.**  I think I reached out to Dean Fitzsimmons and asked for a

20   meeting.

21   **Q.**  And is Exhibit P12 a version of the slide deck that was

22   shown at that meeting?

23   **A.**  Yes.

24   **Q.**  Ms. Hacker asked you about Exhibit P9.  Do you recall

25   that?

1   **A.**   Yes.

2   **Q.**   And could you take a look, please, at Exhibit P9, which

3   is in your binder at Tab 2?

4   **A.**   I see it.

5   **Q.**   Were you involved in creating Exhibit P9?

6   **A.**   No.

7   **Q.**   Do you recall reviewing Exhibit P9 in or around January

8   of 2013?

9   **A.**   No.

10   **Q.**   Have you reviewed it since then?

11   **A.**   Yes.

12   **Q.**   Have you reviewed it outside of the context of this case?

13   **A.**   No.

14   **Q.**   Was P9 ever shared outside of the office of institutional

15   research?

16   **A.**   Not to my knowledge.

17   **Q.**   Did OIR ever show Exhibit P9 to Dean Fitzsimmons?

18   **A.**   No.

19   **Q.**   How do you know that?

20   **A.**   I know that we showed P12 to him during that February 25

21   meeting, and there's just no record of P9 being shown to

22   anyone outside of the office, and I have no memory of it.

23   **Q.**   Are there other aspects of Exhibit P9 that contribute to

24   your conclusion it was not shown outside of the office of

25   institutional research?

**A.**   Yes.

**Q.**   And what are those?

**A.**   It's just so preliminary in the formatting.  It's the --
you know, the title is off.  Some of these exhibits have the
data flipped.  There's pages that are blank.  It seems to me
to be a very -- like an internal document of people working
out what they were looking at.

**Q.**   So let's take a look at some of those pages.  We have the
title page up on the screen.  You've already responded in
response to Ms. Hacker's questions that the title of this
exhibit is Admissions Part II subtitle.  Do you recall that?

**A.**   Yes.

**Q.**   And is that the type of title of a work product that
would have been shared outside of the office of institutional
research?

**A.**   No.

**Q.**   Why not?

**A.**   Even though we would maybe not get things perfect, the
typical -- even with -- even with people we might meet with
to have working meetings would be to have had someone check
and complete things like the title, not have blank pages.

**Q.**   And the date on this document, is that the correct date?

**A.**   No.

**Q.**   You testified earlier that it's a 2013 document, not a
2012, right?

1    **A.**   That's correct.

2    **Q.**   Take a look at Slide 3 of Exhibit P9, please, and focus

3    in particular on the chart at the bottom of the page, if you

4    could.

5           Do the labels on this chart accurately reflect the

6    data shown in the graph?

7    **A.**   They do not.   The graphic doesn't match with the table

8    below.

9    **Q.**   Did OIR have a practice for how to check the accuracy of

10   work before it was finalized?

11   **A.**   Typically a member of a team who might put together

12   something like this might ask for other members of the team

13   to review and help catch errors.   But even that -- I don't

14   think this would have been gotten -- I don't even think this

15   would have gotten to that stage of having someone double

16   check it.   I think someone who created this would have caught

17   these errors before sharing it.

18   **Q.**   And to the extent that work had been checked, would it

19   have errors like this with the data being mislabeled?

20   **A.**   I don't think so.

21   **Q.**   You mentioned some blank slides in this presentation.

22   Can you look please at Slides 13 and 14.

23           Are those the blank slides you were referring to?

24   **A.**   Yes.

25   **Q.**   Take a look back, please, at Slide 5 of Exhibit P9.   You

1    discussed this with Ms. Hacker.

2              Does Slide 5 show the output from a model of any

3    sort?

4    **A.**  I don't think so.

5    **Q.**  Is there any logistic regression analysis going on in

6    Slide 5?

7    **A.**  No.

8    **Q.**  Is Slide 5 descriptive statistics?

9    **A.**  Yes, I believe so.

10   **Q.**  And you pointed out, when Ms. Hacker was questioning you

11   about this slide, some labels on the bottom.  Do you recall

12   that?

13   **A.**  Yes, I do.

14   **Q.**  And what was the -- what does the second bullet at the

15   bottom of Slide 5 say?

16   **A.**  "OIR doesn't have all ratings for all years, so number of

17   applicants differs for each rating test score."

18   **Q.**  Do you recall ever reviewing Slide 5 when you worked in

19   the office of institutional research?

20   **A.**  No.

21   **Q.**  Do you recall reviewing Slide 5 in 2013?

22   **A.**  No.

23   **Q.**  When is the first time you remember --

24              THE COURT:  P12 went to the dean, though?

25              THE WITNESS:  P12, yes, Your Honor.

1          THE COURT:  Okay.

2   BY MS. ELLSWORTH:

3   **Q.**  Why don't we turn to P12 right now.  It is Tab 1 in your

4   binder.  And in particular, can you look at the slides

5   beginning on 31.

6   **A.**  I'm there.

7   **Q.**  Actually, let's look at 32, please.  Does this describe

8   the analysis that's being shown in Exhibit P12?

9   **A.**  This is a methods page describing the subsequent models.

10  **Q.**  And can you describe what the models that are shown on

11  the subsequent pages were attempting to do?

12  **A.**  Yes.  They were attempting to -- in a highly simplified

13  way try to look at whether we understood the admissions

14  process by doing a series of logistic regressions that would

15  be a modeling exercise to kind of look at the probability of

16  admissions with very limited factors, sort of one at a time,

17  to see whether or not we understood the admissions process in

18  a simplified way.

19  **Q.**  Let's take a look at Slide 34, which has the output from

20  the model.

21          MS. ELLSWORTH:  And can we zoom in on that a

22  little, please, Mr. Lee?

23  **Q.**  Do the models on Slide 34 measure the effect of any

24  particular factor on an applicant 's chance of admission?

25  **A.**  No.

1    **Q.**  Do the models on Slide 34 show the effect of any tip in

2    the Harvard's admission process?

3    **A.**  No.

4    **Q.**  Do the models that are shown on Slide 34 reflect a

5    hypothetical admitted student pool?

6    **A.**  Models 1 through 4 are a simulation, and it's not meant

7    to actually be an analysis of a tip or anything.  The -- I'm

8    sorry.

9    **Q.**  If we can go back a slide to Slide 33, which describes

10   the inputs for the models, and looking first at Model 1, can

11   you explain, please, how Model 1 operates in the context of

12   this logistical regression?

13   **A.**  What I think was done here is you took the pooled set of

14   applicants for the years that were being looked at.  And in

15   Model 1, you look just at those two variables, academic

16   index, academic rating, and you do a logistic regression to

17   get the probabilities of admission just with those two

18   variables and then take an arbitrary cutoff of 2,100

19   applicants that had the highest probability in this

20   simulation.

21           And then in the graphic on page 34, it would be

22   taking the output of that 2,100 -- the 2,100 with the highest

23   probability and saying what was the race ethnicity breakdown

24   of them.

25           MS. ELLSWORTH:  Your Honor, I know we have

1    questions on these slides, but I do see it's five of.  We can

2    resume after the break.

3              THE COURT:  I would like to resume at quarter of

4    1:00.  It might be a little ambitious, so head for quarter of

5    1:00 but walk slowly.  Okay?

6              (Recess taken 11:55 a.m.)

1           *** AFTERNOON SESSION ***

2               THE COURT:  Whenever you're ready, Ms. Ellsworth.

3               MS. ELLSWORTH:  Thank you, Your Honor.

4     BY MS. ELLSWORTH:

5     **Q.**  Ms. Driver-Linn, can you turn to Tab 11 in your binder,

6     please.  Do you have in front of you Exhibit P13?

7     **A.**  Yes, I do.

8     **Q.**  What do you recognize Exhibit P13 to be?

9     **A.**  A version of the presentation that we were looking at

10    before.  I believe it was P12.

11    **Q.**  Is this a version of the presentation that was shown to

12    Dean Fitzsimmons in February of 2013?

13    **A.**  Yes.

14    **Q.**  Does this version have your handwritten notes on it?

15    **A.**  Yes, it does.

16              MS. ELLSWORTH:  Your Honor, I'd move to admit P13.

17              MS. HACKER:  No objections.

18              (Plaintiff Exhibit No. P13 admitted.)

19    BY MS. ELLSWORTH:

20    **Q.**  You can put that to the side, Ms. Driver-Linn.  We were

21    talking about Exhibit P12 before we broke for lunch.  I'd

22    like you to open your binder to Exhibit P12, which is Tab 1,

23    and look back at Exhibit P9, which is what Ms. Hacker was

24    discussing with you this morning.  So keep your binder open

25    and we'll put P9 up on the screen.  And we'll just do P9.

1    Thank you.

2            Do you know who created Exhibit P9?

3    **A.**   I believe Mark Hansen.

4    **Q.**   Do you know why Mr. Hansen created this document?

5    **A.**   I think he was interested in learning more about

6    modelling statistics.  Prior to this particular era in the

7    office, he had been more involved in kind of data collection,

8    data architecture, and he was teaching himself a lot of

9    things about statistics and additional kinds of analytic

10   techniques.  And I believe he did it because he was aware of

11   the kind of Unz-like issues that had been discussed.

12   **Q.**   If we can look at Slide 5 of Exhibit P9.  You can keep

13   P12 open in front of you.  We'll keep 5 on the screen.  You

14   recall discussing this slide with Ms. Hacker?

15   **A.**   Yes.

16   **Q.**   Does Slide 5 show the output of a logistic regression

17   model?

18   **A.**   No.

19   **Q.**   Does Slide 5 show what you would term descriptive

20   statistics?

21   **A.**   Yes.

22   **Q.**   What is the difference between descriptive statistics and

23   logistic regression?

24   **A.**   A descriptive statistic tends to be just showing a

25   number, an average, or a trend.  Logistic regression is a

1    technique, a modelling technique where you output a number of

2    different variables in using this technique, look at them

3    relative to one another and the outcome.

4    **Q.**   Slide 5 that's shown here does not show the output of the

5    model like the one you just described, right?

6    **A.**   I don't think so.

7    **Q.**   Looking at the version of P12 or P12 which you have in

8    your binder, is Slide 5 from Exhibit Plaintiff's 9, does that

9    appear anywhere in P12?

10   **A.**   No.

11   **Q.**   Turn, if you would, please, to Slides 8 and 9 of

12   Exhibit P9.  Do you recall seeing Slides 8 and 9 in

13   Exhibit 13?

14   **A.**   No.

15   **Q.**   Are Slides 8 and 9 of Exhibit P9 contained within P12,

16   the version shown to Dean Fitzsimmons?

17   **A.**   No.

18   **Q.**   Had you seen Slides 8 or 9 of Exhibit P9 prior to your

19   deposition in this case?  I'll withdraw the question to make

20   it clear.

21           Prior to this litigation?

22   **A.**   No.

23   **Q.**   What is your reaction to the information on Slides 8 and

24   9 in Exhibit P9?

25   **A.**   I think that Mark was using these in an exploratory way

1    to try to understand the relationship of variables with one

2    another, kind of as an understanding the data.  And I find

3    them, in terms of an analysis that you would look at to try

4    to interpret, very difficult to interpret.

5              THE COURT:  What do the class years on there mean?

6              THE WITNESS:  I believe that they are the variables

7    that represent the students in this applicant pool that were

8    applying for that class year.

9              And, Your Honor, this is one of the reasons I find

10   this confusing as output to try to determine is that it's

11   difficult to imagine that you're looking at the class of 2012

12   and saying you're more likely to get in if you're in the

13   class of 2012 than these other years.  They're not the same

14   as the other kinds of variables.

15   BY MS. ELLSWORTH:

16   Q.  Ms. Driver-Linn, looking at the information shown on

17   Slides 8 and 9 in Exhibit P9, does the information in those

18   slides show any discrimination against Asian-Americans in the

19   Harvard College admissions process?

20   A.  No.  These exploratory models are looking at data, a kind

21   of data set, and trying to understand the variables in

22   relationship to one another.  They are not meant to show

23   anything about the admissions process.

24             MR. LEE:  Your Honor, we've lost the realtime.

25             (Off the record.)

1    BY MS. ELLSWORTH:

2    **Q.**  Ms. Driver-Linn, which slides in Exhibit P9 are included

3    in Exhibit P12, which is the version that was shown to Dean

4    Fitzsimmons?  And I'll have Mr. Lee flip through them on the

5    screen.

6    **A.**  A version of this but not this exact.

7    **Q.**  Of Slide 10?

8    **A.**  Slide 10.

9    **Q.**  Let's look at Slide 11, please.

10   **A.**  A version of this but not this exact exhibit.

11   **Q.**  And Slide 12?

12   **A.**  A version of this but not this exact exhibit.

13   **Q.**  And what's the next slide, Slide 13?

14   **A.**  No.

15   **Q.**  Slide 14?

16   **A.**  No.

17   **Q.**  Slide 15?

18   **A.**  No.

19   **Q.**  Slide 16?

20   **A.**  No.

21   **Q.**  Slide 17?

22   **A.**  No.

23   **Q.**  Slide 18?

24   **A.**  Some of the same information on Slide 17 might be.  I

25   don't remember.

1    **Q.**  Slide 18?  Is that the last slide?  Okay.

2           How would you describe the information in

3    Exhibit P9?

4    **A.**  I think it's exploratory, trying to work out what the

5    analyst was exploring and trying to see.

6    **Q.**  So I'm going to turn our attention back to Exhibit P12.

7    Before I ask you any more questions about that exhibit,

8    though, I'd like to just understand a little built more about

9    the Office of Institutional Research.

10          Does OIR receive requests for analysis from outside

11   of the office?

12   **A.**  Yes.

13   **Q.**  And from whom does OIR receive requests?

14   **A.**  The office receives requests from people across the

15   university and outside of the university.

16   **Q.**  And does OIR ever initiate an analysis on its own?

17   **A.**  Yes.

18   **Q.**  Under what circumstances?

19   **A.**  Often we would do an analysis or do analytic work when we

20   knew that the university was going to be needing that kind of

21   work.

22          For example, when we knew that the institution was

23   going to be experiencing the comprehensive accreditation

24   visit, the office decided to do work related to student

25   outcomes across the university, knowing that that work would

1    need to be looked at.

2    **Q.**   And are there times when OIR initiates analysis on its

3    own that are different from the circumstance you just

4    described?

5    **A.**   Yes.

6    **Q.**   And what are some examples of that?

7    **A.**   Well, we would do additional work if we had the capacity

8    in the office to explore our understanding of particular data

9    sets.  We would do work -- mostly it would be imagining that

10   someone in the university would need it at some point.

11   **Q.**   In your time as the director of OIR, did you ever count

12   or track the unable of separate analyses being conducted at

13   OIR in a given period?

14   **A.**   We did at one time.  I asked the team to keep track of

15   the number of requests we got.  We call them ad hoc requests.

16   And in that year, we had 750 requests.

17   **Q.**   At any given time during the time that you led the

18   office, how many ongoing projects did OIR have?

19   **A.**   A typical sort of project list would include 30 or so

20   projects of different sizes and lengths in time.

21   **Q.**   Could you describe the approach that OIR takes to its

22   analytic work?

23   **A.**   We often describes our work as always iterative, always

24   trying to refine.  We would explore questions from multiple

25   angles, trying to look at it from different points of view.

1          We often would approach our work by scoping out

2     questions and then inviting what we would call content

3     experts or subject-matter experts to talk with us so that we

4     would understand the background of what we were trying to

5     look at, ask them more questions.

6     **Q.**   Who outside OIR might you consult with as a content

7     expert, as you just mentioned?

8     **A.**   Many people would typically be those on the ground who

9     had some expertise.  So for example, if we were doing a

10    project related to the staff across the university, we would

11    ask members of HR, who understood the full sort of work force

12    data, to come and talk with us.

13    **Q.**   Who would be the context experts in connection with work

14    being doing relating to Harvard College admissions data?

15    **A.**   Dean Fitzsimmons, Dean Donahue.  We had Janet Irons, I

16    believe, someone who deeply understood the financial aid

17    data.  We might consider someone like Elizabeth Yong, a

18    content expert, but much less about the process, much more

19    about understanding the data.

20    **Q.**   At what point in the analytic process would you typically

21    consult with people outside of OIR?

22    **A.**   Usually multiple points.  We might early in a process, as

23    I was just mentioning, and then periodically as we were

24    iterating to get their feedback on what we would be doing.

25    **Q.**   So let's focus again on P12 and in particular Slide 5 of

1    Exhibit P12, please.  What does Slide 5 show?

2    **A.**   It's a kind of outline.  It's entitled "Part 1 Access,"

3    and it has the three sort of chapters in this set of

4    exhibits.

5    **Q.**   Does Slide 5 show all three topics that were discussed

6    with Dean Fitzsimmons at the February 2013 meeting?

7    **A.**   Yes.

8    **Q.**   Focusing just first on the first topic, who requested the

9    analysis that OIR performed relating to the return to early

10   action?

11   **A.**   I think of this one as -- we would have always known that

12   we wanted to come back to that.  We had done some earlier

13   work on early action.  And then as the policy was reinstated,

14   that we would want to look at the data again.  We may have

15   discussed it as a request from Dean Fitzsimmons and others,

16   but I think the team imagined we would be doing this, and we

17   might not have actually gotten a question.

18   **Q.**   What is the second topic on Slide 5 of P12?

19   **A.**   Shift in the gender balance and impact of concentration

20   choice.

21   **Q.**   Who requested the analysis on gender balance and

22   concentration choice?

23   **A.**   Dean Fitzsimmons.

24   **Q.**   And what's the third topic?

25   **A.**   Evaluating factors that play a role in Harvard College

1  admission.

2  **Q.**  Who requested the work on evaluating factors that play a

3  role?

4  **A.**  No one.

5  **Q.**  What is the origin of the evaluating factors analysis?

6  **A.**  Mark Hansen did this work, and we brought it forward to

7  discuss it with Dean Fitzsimmons.

8  **Q.**  Do you recall discussing earlier in response to some

9  questions from Ms. Hacker the entries on Harvard's privilege

10  log relating to Mr. Unz's article?

11  **A.**  Yes, I do.

12  **Q.**  Did OIR conduct an analysis at the direction of Harvard's

13  counsel that arose out of those privilege log entries?

14  **A.**  Yes.

15  **Q.**  Is that the analysis shown in Exhibit P12?

16  **A.**  No.

17  **Q.**  Was the analysis contained in Exhibit P12 concerning

18  evaluating factors that play a role in Harvard College

19  admission part of an investigation into discrimination

20  against Asian-American applicants?

21  **A.**  No.

22  **Q.**  Were all three topics shown on Slide 5 discussed at the

23  meeting with Dean Fitzsimmons?

24  **A.**  To the best of my understanding, yes.

25  **Q.**  Let's take a look at the evaluating factors portion of

1    this deck, and Slide 32 in particular, please.  The last

2    bullet point on Slide 32 says, "The following analysis is

3    preliminary and for discussion."

4              Do you see that?

5    **A.**   I do.

6    **Q.**   And "preliminary" is bolded and underlined?

7    **A.**   Yes.

8    **Q.**   Does that underlining and bolding signify anything it?

9    **A.**   I think we meant to convey that it was very preliminary,

10   as we were getting ready to show this to the content experts.

11   **Q.**   And why did OIR want to convey the fact that this

12   analysis was very preliminary in this deck?

13   **A.**   I believe because we understood that it was a highly

14   simplified version of the way that someone who was a content

15   expert like Dean Fitzsimmons and others would think about

16   their admissions process.

17   **Q.**   Why did you share your work with Dean Fitzsimmons at this

18   stage of the analysis?

19   **A.**   I think we wanted to get his feedback, and I think we

20   wanted to see if we could ask about further variables that we

21   could look at and see if there were other ways of thinking

22   about the process that we could use.

23   **Q.**   Look, please, at the second bullet under "Strategy" on

24   this Slide 32, beginning with "Generate."  Could you please

25   read that?

1    **A.**   "Generate fitted probabilities of admissions.  Given an

2    applicant's characteristics, how likely are they to be

3    admitted (0 or 1)?"

4    **Q.**   And can you describe how OIR constructed the model to

5    generate these fitted probabilities of admissions?

6    **A.**   I think the way that this was done was to take this pool

7    of data from 2007 to 2016 and step by step in these models

8    look at just those variables that are listed and generate the

9    probabilities.

10           And then, as I was saying earlier, taking a kind of

11   arbitrary 2,100 and designating those applicants that had the

12   highest probabilities in that 2,100 up and then looking at

13   the demographics of those.

14           Some of those in this modelling exercise may have

15   actually been admitted, and many of them may not have been

16   admitted.

17           THE COURT:  How do you get the 2,100?

18           THE WITNESS:  I think that the reason for the 2,100

19   cutoff would have been --

20           THE COURT:  No, not the cut off, but how do you

21   identify the 2,100?

22           THE WITNESS:  Oh.  I believe that as you did the

23   logistic regression and you got the probability, you take the

24   highest probability 2,100 and above.

25   BY MS. ELLSWORTH:

1    **Q.**  We talked before the break about how that would have

2    worked in the context of Model 1.  So if you can look at

3    Slide 33 which has the inputs to the model.  Are you there?

4    **A.**  Yes.

5    **Q.**  To the models, I should say.  In connection with Model 2,

6    what are the factors of the variables that were included?

7    **A.**  Academic index, academic rating, legacy, athlete.

8    **Q.**  How did the model that you just described operate in the

9    context of Model 2?

10    **A.**  The same as I just described.  But the variables that

11    would be used to fit the probabilities would include all four

12    of those as opposed to just the two in the prior model.

13    **Q.**  And then looking at Slide 34, which has the bar charts,

14    and particularly focusing on Model 2, what is Model 2 showing

15    in terms of -- what is Slide 34 showing in terms of the

16    results of Model 2?

17    **A.**  You take that hypothetical, the highest probability is

18    the 2,100, and then look at what were the race/ethnicities of

19    those in that 2,100 and look at the percentages.

20    **Q.**  And the percentage is broken down by ethnic group,

21    correct?

22    **A.**  Correct.

23    **Q.**  And looking back at Slide 33 for Model 3, would you add

24    in these two additional ratings into the modelling process?

25    **A.**  Yes.

1    **Q.**  And so can you once again describe how Model 3 works in

2    the context of this particular regression analysis?

3    **A.**  So you'd do the same modelling exercise, add in those

4    additional variables, and then again get the probabilities

5    and take the top 2,100.  And then in the next page show the

6    racial ethnicity, the race and ethnicity of those that were

7    in that 2,100.

8    **Q.**  Back to Slide 33, please.  And focusing again on Model 3

9    which you were just discussing, does Model 3 show the effect

10   of any of those six factors on the probability of admission

11   to Harvard College?

12   **A.**  No.  And we don't see the coefficients or any one of

13   these -- any one of these variables in these exhibits.

14   **Q.**  You've mentioned that the models create a hypothetical

15   admitted class.  Do I have that right?

16   **A.**  That's correct.

17   **Q.**  And can you please just explain what that means, a

18   hypothetical admitted class.

19   **A.**  So we're fitting these probabilities as a kind of

20   simulation.  And then you take this cutoff of 2,100 and look

21   above, but it's not necessarily the actual students that were

22   admitted.

23   **Q.**  And so does it mean that there are students who may have

24   had other factors that contributed to their admission to

25   Harvard that are not measured by these models and that the

1    impact of those factors is not demonstrated in these models?

2    **A.**   Definitely these are a very limited number of factors.

3    **Q.**   Are there more factors that are considered in the Harvard

4    admissions process than the factors included in Model 4,

5    which is the model that includes the highest number of

6    factors in this exercise?

7    **A.**   Many more.

8    **Q.**   Does the modelling exercise shown on Slides 33 and 34

9    take into account any impact of socioeconomic status on

10   Harvard College admissions?

11   **A.**   No.

12   **Q.**   And when you say that there are different individuals who

13   may have been actually admitted than are shown in these

14   models, does the identity of the individuals who may have

15   been admitted, would that be impacted by the way in which

16   Harvard College considers or weights factors for admission?

17   **A.**   I'm sorry.  Could you repeat that again?

18   **Q.**   Sure.  The fact that there are -- there's a difference

19   between those who are actually admitted and those shown in

20   the results of Model 4.  What contributes to that difference?

21   **A.**   It could be any number of things.  I mean, many different

22   things could have contributed to the way that the actual

23   admissions process works.  Here, we're just looking at with

24   this limited number of variables can we get to a kind of

25   demographic -- not demographic, but race/ethnicity background

1    that is close to the actual admitted classes.

2    **Q.**   And in Model 4, the gender and ethnicity of applicants is

3    included in the modelling process, correct?

4    **A.**   Yes.

5    **Q.**   And does inclusion of the gender and ethnicity of the

6    applicants in Model 4 contribute to the fact that Model 4 is

7    the closest approximation of the gender and ethnic breakdown

8    of the actual admitted class?

9    **A.**   Yes.

10   **Q.**   Do the models on Slides 33 and 34 show the effect of any

11   particular tip that may be given in Harvard's admissions

12   process?

13   **A.**   No.

14   **Q.**   And even as to the eight factors that are showing on

15   Slide 33, do the models on Slides 33 and 34 show the effect

16   of any one of those factors on or around admissions outcomes?

17   **A.**   No.   They don't show this year.

18            THE COURT:  Are you saying is it a coincidence that

19   Model 4 and actual are the same, or are you saying that

20   you're trying to build a model that approximates actual?

21            THE WITNESS:  Your Honor, I don't think it's a

22   coincidence.   I think we were trying to model something to

23   see if we could get as close as we could to the actual.

24   BY MS. ELLSWORTH:

25   **Q.**   And can you explain why you were trying to do that?

1     **A.**   To understand the -- to understand the admissions process

2     and to understand the way that these different variables may

3     as a whole contribute to the probability of admission.

4     **Q.**   Why did you present the results of these models to Dean

5     Fitzsimmons in February of 2013?

6     **A.**   To show him what we were doing and to get his input and

7     feedback and to ask questions about additional variables that

8     could be used in a modeling exercise like this.

9     **Q.**   Do you recall testifying in response to Ms. Hacker's

10    question that OIR had, in fact, obtained some additional

11    information from admissions after attending this meeting with

12    Dean Fitzsimmons?

13    **A.**   Yes.

14    **Q.**   And was OIR able to work with the additional data that it

15    received?

16    **A.**   I think we were able to use the additional data for

17    different strands of work for admissions and financial aid,

18    but I don't think we did anything more with these modeling

19    exercises.

20    **Q.**   When you first saw the models contained on Slides 33 and

21    34 of Exhibit P12 in 2013, did you interpret them to show

22    evidence of bias or discrimination?

23    **A.**   No.

24    **Q.**   Did you tell Dean Fitzsimmons in 2013 that you thought

25    the modeling exercise on Slides 33 and 34 showed evidence of

1    bias or discrimination?

2    **A.**   No.

3    **Q.**   Do you interpret them today to show evidence of bias or

4    discrimination?

5    **A.**   No.

6    **Q.**   Why not?

7    **A.**   They weren't designed to look for evidence of bias or

8    discrimination.   They were trying to model in a highly

9    simplified way the admissions process so that we could

10   understand.

11   **Q.**   Are you aware that both Harvard and SFFA have retained

12   experts to give testimony in this case?

13   **A.**   Yes.

14   **Q.**   And are you aware that both parties' experts conducted

15   statistical analyses of Harvard's admissions data?

16   **A.**   Yes.

17   **Q.**   Have you reviewed some of that analysis?

18   **A.**   Yes, I have.

19   **Q.**   How many factors did the experts include in their

20   analysis?

21   **A.**   I didn't count them.  Many, many more than are here.

22   **Q.**   And what does that fact tell you about OIR's modelling

23   analysis on Exhibit P12?

24            MS. HACKER:  Objection, Your Honor.  This is

25   improper undisclosed expert opinion testimony.

1          MS. ELLSWORTH:  Your Honor, I think the witness,

2     being the head of OIR at the time of these documents, which

3     have been the subject of extensive questioning from SFFA, is

4     entitled to provide some reactions to how they compare.

5          THE COURT:  I'll give you some latitude on it.  But

6     let me just interrupt you because I'm probably embarrassed to

7     be asking this question, because I'm sure I'm being thick

8     about this.

9          I don't understand.  You pick 2,100 random people,

10    right?  Hypothetical people, right?

11         THE WITNESS:  No, Your Honor.  Let me just say I

12    think these are very hard to understand.

13         THE COURT:  You're being very kind.

14         THE WITNESS:  What I believe is that you take the

15    full applicant pool from 2007 to 2016, and that's the kind of

16    data set.  And in the data set, we know who was actually

17    admitted.  But you use all the applicants and you kind of

18    leave aside knowing whether they were admitted or not.  You

19    do a logistic regression to kind of understand the

20    probabilities of these individual factors and then draw a

21    cutoff line.  Look at those probabilities and then show what

22    is the demographic -- or the race/ethnicity makeup of those

23    one by one as a modelling exercise.  I don't know if that

24    answers your question.

25         THE COURT:  It doesn't.  I'm sure it does, but I

1    still can't understand it.

2              You have the actual class.  You take a bunch of

3    variable that come up with the ones most likely to be

4    admitted, right?  Is that what you're saying, that the

5    hypothetical class is the 2,100?

6              THE WITNESS:  The 2100 would be the hypothetical.

7              THE COURT:  Most likely to be admitted based on

8    what criteria?

9              THE WITNESS:  On just those variables.  So for

10   example, in Model 1 it would be the highest likelihood,

11   highest probability of admission just based on academic index

12   and academic rating.  And that might be -- I'm sure it would

13   be a very different -- not very, but it would be a different

14   2,100 than the 2,100 after you add in legacy and athlete.

15             THE COURT:  So it's not the same 2,100.

16             THE WITNESS:  No.  It would be different.  You'd

17   get these different probabilities based on each of these

18   modelling exercises, draw the cutoff.  And then on this

19   exhibit with Model 4, that particular exercise is shown right

20   next to the actual admitted students in that pool.

21             THE COURT:  How does it come out that actual ends

22   up being -- so actual -- demographics is --

23             MS. ELLSWORTH:  If you look at Slide 33, I think

24   that provides a little information.  Maybe it would be

25   helpful, Your Honor, if I could have Ms. Driver-Linn try and

1    walk through an example using the model of how it was done.

2         THE COURT:  That's fine.  I guess I don't

3    understand how actual and the last model come out so close to

4    each other if you're dealing with a random 2,100,

5    hypothetical 2,100.

6         THE WITNESS:  I don't think of them as random.

7    Once you put in the eight variables in this data set in

8    Model 4 and then you take that resulting 2,100 that is this

9    hypothetical and you look at their race/ethnicity breakdown,

10   the percentages mapped on pretty nicely to the actual.

11        And if you look at the difference between Model 3

12   and Model 4, the two variables that are being added in are

13   gender and ethnicity.  So that made a difference to get it

14   closer to the actual.

15        THE COURT:  I have to think about that.

16   BY MS. ELLSWORTH:

17   Q.  Let me try this.  Ms. Driver-Linn, let's take a look at

18   Model 3 and on Slide 33.  What are the six factors that were

19   included in Model 3?

20   A.  Academic index, academic rating, legacy, athlete,

21   personal rating, extracurricular rating.

22   Q.  How did those -- how were those six variables used in

23   constructing the output of Model 3?

24   A.  The variables would be included in the regression model.

25   You get an algorithm that creates the kind of probability.

1    The probabilities are used to then rank those in the pool --

2    not rank -- yeah, rank -- rank them in the pool and then take

3    that 2,100 and say let's now look at the race/ethnicity of

4    that arbitrary class.

5    **Q.**   And so looking at the output from the model on Slide 34,

6    which takes those rank-ordered 2,100, right?

7    **A.**   Yes.

8    **Q.**   And it identifies the racial and ethnic breakdown of that

9    rank-order 2,100, right?

10   **A.**   Yes.

11   **Q.**   Could the output from Model 4 be shown using some

12   different breakdown?  For example, any one of the variables

13   as opposed to ethnicity?

14   **A.**   I'm sorry?

15   **Q.**   Could the output of Model 3 be shown in a way that shows

16   those who have an academic rating of X, Y, or Z?

17   **A.**   I don't know.  The academic rating was used in all of

18   these models.

19   **Q.**   So the depiction on Slide 34 is just showing those 2,100

20   schools cut along racial or ethnic lines, right?  The 2,100

21   applicants.  Excuse me.

22   **A.**   Yes.

23   **Q.**   So the 2,100 applicants could be cut on any other lines

24   that are available in the data, right, to show how that

25   makeup would have been?

1   **A.**   Yes.

2          THE COURT:  Why wouldn't you do that with the

3   actual admitted students?

4          THE WITNESS:  That's what was done in that line

5   that says "actual."

6          THE COURT:  Okay.

7          THE WITNESS:  And then we compared with the model

8   that was hypothetical, Hypothetical 1 through 4.

9          THE COURT:  The actual has all those other

10  variables built into it, too, or just the race and ethnicity?

11         THE WITNESS:  Just race/ethnicity.

12         THE COURT:  Couldn't you do this with taking the

13  actual instead of 2,100?

14         THE WITNESS:  So this would take the students that

15  were actually admitted in those years and then look at the

16  race/ethnicity breakdown without looking at any of the

17  factors and how they might have been used.  I guess as a

18  modelling exercise it's just trying to understand how these

19  particular simplified factors result in a class.

20  BY MS. ELLSWORTH:

21  **Q.**   So the fact that the Model 4 output and the actual look

22  similar, they're similar in terms of racial breakdown,

23  correct?

24  **A.**   Correct.

25  **Q.**   Are there any other similarities that you can discern

1   between the results of Model 4 and the actual class from this

2   exercise?

3   **A.**   From this exercise, you cannot.

4   **Q.**   Could the applicants shown to be the highest probability

5   of admission in Model 4 be all male or all female, for

6   example?

7   **A.**   Hypothetically they could.

8   **Q.**   Could the applicants shown in the output of Model 4 be

9   all from a high socioeconomic status and not low

10  socioeconomic status?

11  **A.**   They could.

12  **Q.**   Could the applicants in the output of Model 4 be all from

13  the State of Montana?

14  **A.**   I don't think so.

15          MR. HUGHES:  Come on.

16          MR. WAXMAN:  Counsel doesn't have enough kids yet.

17  BY MS. ELLSWORTH:

18  **Q.**   Could the applicants from the output of Model 4 be all

19  from the Northeast?

20  **A.**   Yes.

21          THE COURT:  The first thing he said during the

22  entire week, you know.

23          MS. ELLSWORTH:  Your Honor, do you have any more

24  questions about the slides?

25          THE COURT:  Not that I'm willing to admit.

1    BY MS. ELLSWORTH:

2    **Q.**  Let's look at Slide 36 of this exhibit.  What is Slide 36

3    summarizing?

4    **A.**  It's saying from this exercise, from this modelling

5    exercise, here's what we've learned.  And then there's a

6    variety of factors that are missing or that ratings do not

7    capture, and in particular at this time saying we'd like to

8    better understand exceptional talent, role of context cases,

9    role of the personal statement/essay, measures of

10   socioeconomic status.

11   **Q.**  And are those all -- is that all information that was not

12   included in the modelling process that OIR conducted?

13   **A.**  It was not included.

14   **Q.**  That information that may play a role in the Harvard

15   College admissions process?

16   **A.**  Yes, I believe so.

17   **Q.**  Are applicants to Harvard College who may have exhibited

18   exceptional talent, which was the reason for their admission,

19   are those applicants necessarily going to be included in that

20   output of Model 4 that we were just looking at?

21   **A.**  No.

22   **Q.**  Applicants to Harvard College who wrote a compelling

23   personal statement that may have played a role in their

24   admission, would they necessarily be included in that output

25   to Model 4 that we were just looking at?

1    **A.**  Not necessarily.

2    **Q.**  And applicants to Harvard College who may have come from

3    a more modest socioeconomic background and that may have

4    played a role in their admission to Harvard College, would

5    they be reflected in that output of Model 4 we were just

6    looking at?

7    **A.**  Not necessarily.

8    **Q.**  What does the information on this Slide 36 tell you about

9    OIR's modelling analysis in 2013?

10   **A.**  That we were wanting to get further insight from having

11   additional factors and variables and trying to ask questions

12   of the content experts to see if there were things we weren't

13   capturing and wanted to -- would help us to understand the

14   admissions process.

15   **Q.**  Can you draw any conclusion from the modelling exercise

16   in Exhibit P12 about the effect of race on Harvard College

17   admissions decisions?

18   **A.**  No.

19   **Q.**  Did you draw any conclusion in 2013 from Exhibit P12

20   about the effect of race on admissions decisions?

21   **A.**  No.

22   **Q.**  Did you tell Dean Fitzsimmons in 2013 that the models

23   contained in Exhibit P12 provided any information about the

24   effect of race on admissions decisions?

25   **A.**  No.

1    **Q.**  Can you draw any conclusion from Exhibit P12 about the

2    effect of the personal rating on admissions decisions?

3    **A.**  No.

4    **Q.**  Did you tell Dean Fitzsimmons in 2013 that you could draw

5    any conclusion from P12 about the effect of the personal

6    rating on admissions decisions?

7    **A.**  Not that I recall.

8    **Q.**  Can you draw any conclusions from the modelling exercise

9    in P12 about the effect of any single factor on admissions

10   decisions?

11   **A.**  No, you cannot.

12   **Q.**  You discussed the meeting you had in February 2013 with

13   Ms. Hacker.  Do you recall that?

14   **A.**  Yes.

15   **Q.**  Did Dean Fitzsimmons tell you during that meeting to stop

16   working on the modelling analysis?

17   **A.**  No.

18   **Q.**  At any point after the meeting did Dean Fitzsimmons tell

19   you to stop working on the modelling analysis?

20   **A.**  No.  No one has ever told us to stop working on anything.

21   **Q.**  Did anyone ever tell you to stop working on this

22   particular analysis?

23   **A.**  No.

24   **Q.**  In fact, you testified earlier that OIR did try and do

25   some additional work on this analysis, right?

1     **A.**   I think the team did some additional work on things that

2     were in this presentation.

3     **Q.**   Did you believe in 2013 that the analysis in Exhibit P12

4     showed discrimination against Asian-Americans in the Harvard

5     College admissions process?

6     **A.**   No.

7     **Q.**   Did you tell Dean Fitzsimmons in 2013 that you thought

8     the modelling exercise in P12 showed discrimination against

9     Asian-Americans?

10    **A.**   No.

11    **Q.**   Do you believe today that this analysis in P12 shows

12    discrimination against Asian-Americans in the Harvard College

13    admissions process?

14    **A.**   No.

15    **Q.**   Let's look, please, at Exhibit P26, which is Tab 3 in

16    your binder.  You discussed some earlier drafts of this memo

17    with Ms. Hacker.  Do you remember that?

18    **A.**   I do.

19    **Q.**   If you can, take a look at the second and third page of

20    Exhibit P26.  The discussion in P26 relates to a logistic

21    regression model, correct?

22    **A.**   I'm sorry.  Could you repeat the question?

23    **Q.**   Sure.  There's a discussion in the bottom of the first

24    page of P26 about a logistic regression model.

25    **A.**   Yes.

1    **Q.**   Is this the same regression model as the one we were

2    discussing in P12?

3    **A.**   No, I don't -- no, it's not.

4    **Q.**   Is this a different model?

5    **A.**   This is a different modelling exercise, yes.

6    **Q.**   Is the modelling exercise in Exhibit P26 a refinement of

7    the model in P12?

8    **A.**   No.  I don't see it that way.

9    **Q.**   Does the modelling exercise in Exhibit P26 rely on the

10   same data set as Exhibit P12?

11   **A.**   No.  It says this is classes 2009 through 2016.  Those

12   aren't the same exact years.

13   **Q.**   Was the analysis in P26 conducted at Dean Fitzsimmons'

14   request?

15   **A.**   Yes.

16   **Q.**   And what was the purpose of the analysis in Exhibit P26?

17   **A.**   He had been interested in some of the popular press

18   around being able to get highly qualified low-income students

19   to apply for admissions and wanted to understand whether in

20   the Harvard College admissions process there was a tip given

21   to low-income students.

22   **Q.**   On page 23549 of this memo, which is the second page of

23   the actual memo, in the middle of the third paragraph does

24   OIR point out any limitations to the analysis?

25   **A.**   Yes.

1    **Q.**  And beginning with "this approach," can you please read

2    some of the limitations that were pointed out in this

3    memorandum?

4    **A.**  "This approach has several limitations.  We picked a

5    small set of variables that would factor in admissions

6    decisions.  The selection of a wider set of variables might

7    result in a better-fitting model, one that accounts for more

8    of the variation in individual applicants and their

9    potentially unique contributions to the entering class.

10            "For example, the model does not capture

11   exceptional talent in art or music explicitly, although

12   ratings may capture some aspect of these attributes.  In

13   addition, our model is limited to main effects, not in

14   examining interactions between variables.

15            "Our analysis should not be considered exhaustive."

16   **Q.**  Do you agree with those limitations that you've just laid

17   out in that memo?  Are those correct?

18   **A.**  Yes, I do.

19   **Q.**  Did those limitations affect the analysis that OIR

20   conducted in Exhibit P26?

21   **A.**  Yes.

22   **Q.**  How so?

23   **A.**  They were limited and not including the factors, as we

24   listed here.

25   **Q.**  And how does that affect the extent to which conclusions

1  can be drawn from this analysis?

2  **A.**  I think of these as being able to show some signal of the

3  variables relative to one another, not beyond just the

4  modelling exercise.

5  **Q.**  Why did you list the limitations to the methodology and

6  data sources in the memo sent to Dean Fitzsimmons?

7  **A.**  I think we wanted to make sure he understood that this

8  was a limited modelling exploration to try to answer his

9  question.

10  **Q.**  Do you recall speaking earlier with Ms. Hacker about an

11  email exchange you had with Ms. Heenan around the time of

12  this memo?

13  **A.**  I do.

14  **Q.**  And if you could look, please, at the first page of the

15  memorandum, the first sentence.  If you can please read "As

16  you have discussed with us.

17  **A.**  "As you have discussed with us, there may be value in

18  responding to recent press about the rate of admission for

19  low-income students at elite institutions and in particular

20  for Harvard College."

21  **Q.**  So was it your understanding that the analysis you were

22  conducting was potentially to be released publicly?

23  **A.**  Yes.

24  **Q.**  And Ms. Heenan, you testified in response to Ms. Hacker's

25  questions, was involved in Harvard public affairs and

1    communications at the time?

2    **A.**   Yes.

3    **Q.**   Why did you discuss this analysis with Ms. Heenan?

4    **A.**   I think you would want, if there was something to be made

5    public, for them to be involved.  And in addition, I think I

6    was aware that taking any individual factor and not having it

7    in context could be construed in narrow ways and in ways that

8    could be problematic.

9    **Q.**   Does the analysis in Exhibit P26 evaluate whether Harvard

10   discriminates against Asian-Americans in its admissions

11   process?

12   **A.**   No.

13   **Q.**   What was of the main focus of this memo?

14   **A.**   The main focus was on understanding the so-called tip for

15   low-income students.

16   **Q.**   When you sent this memorandum to Dean Fitzsimmons in

17   2013, did you believe it showed discrimination against

18   Asian-American applicants?

19   **A.**   No.

20   **Q.**   And when you reviewed the memo yourself in 2013, did you

21   believe it showed discrimination against Asian-American

22   applicants?

23   **A.**   No.

24   **Q.**   In 2013, did you believe this analysis showed bias

25   against Asian-American applicants?

1   **A.**   No.

2   **Q.**   Did you tell Dean Fitzsimmons that you thought this

3   memorandum showed bias against Asian-American applicants?

4   **A.**   No.

5   **Q.**   Do you recall Ms. Hacker asking you some questions about

6   earlier drafts of this memorandum?

7   **A.**   Yes.

8   **Q.**   Did you or anyone else at OIR show those earlier drafts

9   to Dean Fitzsimmons?

10   **A.**   No, I don't think so.

11   **Q.**   Did Dean Fitzsimmons request follow-up on the analysis in

12   this memo?

13   **A.**   Yes, he did.

14   **Q.**   Let's take a look at Exhibit P29, which is already in

15   evidence.

16   **A.**   Sorry, where --

17   **Q.**   I'm sorry.  It's at Tab 5.  Are you there?

18   **A.**   I am.

19   **Q.**   What is P29, please?

20   **A.**   P29 is a cover email and an attached exhibit or set of

21   exhibits entitled "Demographics and Income."

22   **Q.**   Is this the follow-up analysis that Dean Fitzsimmons

23   requested?

24   **A.**   Yes.

25   **Q.**   And this email was sent to Dean Fitzsimmons, correct?

1    **A.**   It is.

2    **Q.**   What information did Ms. Bever include in her email to

3    Dean Fitzsimmons about that follow-up analysis?

4    **A.**   She describes that "In these slides you'll see low-income

5    applicants are more diverse than all applicants to Harvard

6    College.  Likewise, a greater share of minority applicants

7    are low income than white applicants.  Across all

8    race/ethnicity groups, low-income students are admitted at a

9    higher rate."

10   **Q.**   Let's take a look, please, at Exhibit P28, which is Tab 6

11   in your binder.  Is this the slide deck that was transmitted

12   via P29?

13   **A.**   Yes.

14   **Q.**   Take a look at page 2, please, of P28.

15          And does page 2 of P28 contain the same general

16   information as Ms. Bever had included in her email to Dean

17   Fitzsimmons?

18   **A.**   Generally, yes.

19   **Q.**   Let's take a look at page 3 of P28, please.  What does

20   page 3 show?

21   **A.**   It shows two pie charts.  The first is all applicants by

22   ethnicity for the classes of 2009 through 2016.  And the

23   second, applicants with incomes less than 60K by ethnicity.

24   **Q.**   And what does page 3 show with respect to Asian-American

25   applicants to Harvard during the years in question?

1    **A.**   In the first with all applicants, Asians represent

2    23 percent of the total and in the second represent

3    31 percent of the total.

4    **Q.**   And can we look, please, at slide -- I believe it's

5    Slide 3 or 4 of P28 -- the next slide, sorry, 5 -- 6.  Sorry.

6              Can we look at Slide 6, please, Mr. Lee?   What

7    does this slide show?

8    **A.**   Admit rates by ethnicity and income broken -- these bar

9    charts are broken down by low income and then income greater

10   than 60K.

11   **Q.**   And does this Slide 6 of Exhibit P28 show the admit rate

12   for low-income Asian applicants as Dean Fitzsimmons had

13   requested?

14   **A.**   Yes.

15   **Q.**   And is that admit rate higher for low-income

16   Asian-American applicants than it is for non-low-income Asian

17   Americans?

18   **A.**   Yes.

19   **Q.**   Was that the analysis Dean Fitzsimmons had requested?

20   **A.**   Yes.  He had, I think, not requested a specific analysis

21   but us to be responsive to that general question.

22   **Q.**   And these slides were sent to Dean Fitzsimmons in

23   Exhibit P29, correct?

24   **A.**   Correct.

25   **Q.**   Ms. Driver-Linn, do you think that any of the OIR

1    analyses that we've looked at today or that Ms. Hacker showed

2    you showed discrimination or bias against Asian-Americans in

3    the Harvard College admissions process?

4    **A.**   No.

5    **Q.**   Why not?

6    **A.**   I don't believe that they -- I believe all of them are

7    explorations and models that can't speak to the actual

8    admissions process.  They are trying to be informing,

9    understanding, and all of them were very limited in the

10   number of variables and factors that were used.

11   **Q.**   Did you ever tell Dean Fitzsimmons in 2013 or any time

12   after that you thought any of OIR's modelling analyses showed

13   any sort of discrimination or bias against Asian-Americans in

14   the admissions process?

15   **A.**   No.

16   **Q.**   Did Dean Fitzsimmons ever ask you to stop any analysis

17   that you were conducting related to Harvard College

18   admissions process?

19   **A.**   No.

20   **Q.**   Did anyone ever ask OIR to stop conducting any analysis

21   relating to Harvard College admissions process?

22   **A.**   No.

23   **Q.**   If you thought that any OIR analysis showed evidence of

24   discrimination or bias, what steps would you take?

25   **A.**   I'm not sure exactly, but I would definitely go up the

1    food chain and try to let people know.

2    **Q.**  When you say "go up the food chain," what do you mean by

3    that?

4    **A.**  I mean talk with those who are higher than me in the

5    hierarchy of the university.

6    **Q.**  And to whom do you directly report or did you as the head

7    of OIR?

8    **A.**  As the head of OIR, it was to the deputy provost who then

9    reported to the provost.

10   **Q.**  Did you contact either the deputy provost or the provost

11   in 2013 to alert them about any analysis you thought showed

12   discrimination or bias?

13   **A.**  No.

14   **Q.**  Why not?

15   **A.**  I wasn't concerned.  I didn't feel that there was a need

16   to raise any alarm.

17            MS. ELLSWORTH:  Thank you.  I have no further

18   questions.

19            MS. HACKER:  Your Honor, SFFA has no further

20   questions for this witness.

21            THE COURT:  You're excused.

22            MR. MORTARA:  Your Honor, Students for Fair

23   Admissions will call Director Marlyn McGrath.

24            Can we have a five-minute break to set up?

25            THE COURT:  Sure.

1          (Court recessed at 1:45 p.m.)

2          THE CLERK:  Can you please stand and raise your

3    right hand.

4          (MARLYN McGRATH duly sworn by the Deputy Clerk.)

5          THE CLERK:  Thank you.  You may be seated.  Can you

6    please state your name and spell your last name for the

7    record.

8          THE WITNESS:  My name is Marlyn McGrath,

9    M-C-G-R-A-T-H.

10         THE COURT:  I'm ready when you are.

11                          EXAMINATION

12   BY MR. MORTARA:

13   Q.  Good afternoon, Director McGrath.  My name is Adam

14   Mortara.  It's nice to meet you.

15         I think you might have answered my first question

16   already, which is what do I call you.  Sometimes in my head I

17   call you Director McGrath.  Sometimes I call you Director

18   McGrath Lewis, sometimes I call you Ms. McGrath, Dr. McGrath.

19   A.  You can call me anything you like.  Marlyn is fine.

20   Q.  Don't go that far, ma'am.  I'm going to stick to Director

21   McGrath most of the time.  I just want to make sure I got it

22   the way you want.

23         I understand you're a Harvard graduate yourself or,

24   more technically maybe, a Radcliffe graduate.  Is that right?

25   A.  Yes.

1    **Q.**  What's the difference, for slightly younger people

2    like --

3    **A.**  How much time do you have?  There's no difference.  I am

4    from an era when the degree was granted originally by

5    Radcliffe College.  I have a Harvard degree.

6    **Q.**  You have a master's and a Ph.D. from Harvard, right?

7    **A.**  Correct.

8    **Q.**  When did you get those?

9    **A.**  My Ph.D. was in 1978.

10   **Q.**  That's in English literature, if I remember right?

11   **A.**  In Celtic languages and literatures.

12   **Q.**  Can you tell us what you did after you got all these

13   degrees up until you became director of admissions in I think

14   it's 1987.  If I got that wrong, correct me.

15   **A.**  I was various kinds of dean.  I was a residential dean.

16   I was a lecturer in Celtic languages, and I worked in

17   academic departments in academic planning in the faculty of

18   arts and sciences.  In 1987, I became director of admissions

19   for Harvard College -- Harvard and Radcliffe College.

20   **Q.**  Residential dean at Harvard.  Is that right?

21   **A.**  Yes.

22   **Q.**  What does a residential dean do?  Do you live amongst the

23   students?

24   **A.**  Yes.

25   **Q.**  You so you got to know the students very well.  What

1    years were those?

2    **A.**   1978 to 1981.

3    **Q.**   Did you enjoy it?

4    **A.**   I loved it.

5    **Q.**   So your job as director of admissions today and going

6    back to 1987 -- and if it's different, let me know -- is to

7    oversee the work of the admissions office, correct?

8    **A.**   Yes.

9    **Q.**   And in addition to that -- withdrawn.

10           To explain, Director McGrath, I've read about a

11   thousand of your documents.  What I perceive is that in

12   addition to that, you have an internal university role in

13   that many Harvard personnel, including faculty and

14   administrators, turn to you with questions about the

15   admissions process.  Is that right?

16   **A.**   That is correct.

17   **Q.**   And you also I think have, from what I've seen, a

18   public-facing role that you've spoken externally to groups

19   about Harvard admissions, correct?

20   **A.**   Yes.

21   **Q.**   For instance, I think you went to England in 2013 and

22   spoke at something called the Suffolk Institute.  Is that

23   right?

24   **A.**   The Sutton Trust.

25   **Q.**   Sutton Trust.  That's it.

1          The public-facing role also sometimes concerns

2     responding to people from the outside world, no connection to

3     Harvard, with inquiries about Harvard admissions?

4     **A.**  Yes, that's true.

5     **Q.**  That can even be students who email the admissions office

6     with questions about how it works?

7     **A.**  Yes.

8     **Q.**  And part of your job in sort of a mix of that

9     internal-external role is receiving inquiries from alumni

10    about Harvard admissions; is that right?

11    **A.**  Yes.

12    **Q.**  And you respond to those, too, right?

13    **A.**  Yes.

14    **Q.**  Now, we've talked -- you weren't here because you weren't

15    here, but you heard about -- you were here for my opening,

16    right?

17    **A.**  I was, yes.

18    **Q.**  And you listened to it?

19    **A.**  Yes.

20    **Q.**  I hope it wasn't boring.  But we've heard a lot -- to

21    give you a narrative, we've heard a lot about the Unz

22    article.  You read the Unz article when it came out in 2012,

23    right?

24    **A.**  Yes.

25    **Q.**  I'm not sure you remember, but I think you might have

 1    read it between about 1:00 and 8:00 p.m. on November 28,

 2    2012.  Does that sound about right?

 3    **A.**  I can't challenge that.

 4    **Q.**  I'm going to help you remember that.  If you would, turn

 5    in your binder that's in front of you there.

 6              Or did anybody get you the binder?

 7    **A.**  Do I have a binder?  I don't think I do.

 8    **Q.**  I'll get you a binder, Director McGrath.  There's a few

 9    things I can be helpful with.

10              MR. MORTARA:  Your Honor, may I approach the

11    witness?

12              THE COURT:  Of course, yes.

13    BY MR. MORTARA:

14    **Q.**  For the record, Director McGrath, there's some tabs here.

15    You can turn to all the document.  They're labeled by

16    plaintiff's and defendants's numbers, and I'll use P and D.

17    If you have trouble finding something, just let me know.

18    **A.**  I will.

19              THE COURT:  Mr. Mortara, I have another

20    not-very-smart question.

21              Dean of admissions versus director of admissions?

22              THE WITNESS:  I work for Bill Fitzsimmons.  There

23    is on the other side of the house a director of financial

24    aid.  It's not explainable much beyond that.  We divide work.

25    BY MR. MORTARA:

1    **Q.**  Let me see if I can help.  There's an office that's the

2    office of admissions and financial aid or financial aid and

3    admissions.  Which is it?

4    **A.**  Admissions and financial aid.

5    **Q.**  Dean Fitzsimmons is the head of that unit, correct?

6    **A.**  Yes.

7    **Q.**  And then underneath there's admissions and then there's

8    financial aid, right?

9    **A.**  Yes.

10   **Q.**  And you're in charge of admissions?

11   **A.**  I oversee the office, yes.

12   **Q.**  All right.  Now, if you would, turn to Plaintiff's

13   Exhibit 220.  Plaintiff's Exhibit 220 is a series of emails

14   to and from you.  I want to see if this refreshes your

15   recollection first about whether you read the Unz article

16   sometime on November 28, 2012.

17   **A.**  Yes, I see this.

18          MR. MORTARA:  I'm going to offer Plaintiff's

19   Exhibit 220.

20          MR. LEE:  I would object if it's being offered for

21   its truth.  There's hearsay within the document itself, for

22   which there's no exception.

23          MR. MORTARA:  Your Honor, you're looking at the

24   email, I hope.

25          THE COURT:  I have the email in front of me.

```
 1              MR. MORTARA:  I can go through with you right now.
 2    There's plenty of statements in here from Director McGrath
 3    herself.  She's a party.  There those are party admissions.
 4    There's an inquiry coming in form somebody else at Harvard;
 5    she's answering it, talking about the Unz article.
 6              THE COURT:  I'm just reading this quick, but
 7    there's no -- I don't see any hearsay on the first page.
 8              MR. LEE:  It would be the third page, Your Honor.
 9    The bottom half of the third page is the hearsay within the
10    document.  I'm not objecting to Director McGrath's
11    statements.
12              THE COURT:  Are you talking about Ted Gilman?
13              MR. LEE:  It's a summary of Unz's article that's at
14    the bottom half under the RD.
15              MR. MORTARA:  I'm not going to ask her about it,
16    Your Honor.
17              MR. LEE:  But it shouldn't come in for its truth.
18              MR. MORTARA:  I'm not offering it for its truth.
19    It's the entire email chain that she saw and responded to.
20              THE COURT:  The email chain is admitted.  To the
21    extent that there's hearsay in it, I won't consider it for
22    the truth of the matter asserted.
23              MR. LEE:  That's fine, Your Honor.
24              (Plaintiff Exhibit No. 220 admitted.)
25    BY MR. MORTARA:
```

1    **Q.**  With that out of the way, let's talk about Plaintiff's

2    Exhibit 220.  This is an email chain.  When you get to the

3    end of it, it starts with somebody called Robert Dujarric.

4    Am I pronouncing that correctly?  Do you even know him?

5    **A.**  I do not know him.

6    **Q.**  Neither one of us will know if we're pronouncing his name

7    correctly unless you know how it's pronounced.  Do you?

8    **A.**  I have no idea.

9    **Q.**  So we're just going to call him Robert D so that if he

10   reads the transcript someday neither one of us --

11          MR. LEE:  Your Honor, if we could have a little

12   less of the commentary and just have questions?  We're going

13   to be here until Thanksgiving.

14          MR. MORTARA:  I heard about Mr. Lee's cousin

15   yesterday.  I'm going to try to be conversational, if that's

16   okay.

17          THE COURT:  Don't you want to wait for my answer?

18          MR. MORTARA:  I said if that's okay.

19          THE COURT:  And you kept right on going.

20          MR. MORTARA:  You're right.

21          THE COURT:  It would be fine for this afternoon.

22          I take your point, Mr. Lee, but it does help break

23   up the day.

24          MR. MORTARA:  Thank you, Your Honor.  I'll try to

25   keep it limited.

1    BY MR. MORTARA:

2    **Q.**  And it starts off with this email from Robert D, and he's

3    writing to Ted Gilman and some others.

4            Who is Ted Gilman?

5    **A.**  Ted Gilman is an administrator at the Reischauer

6    Institute For Japanese Studies At Harvard.

7    **Q.**  He's forwarding some concerns about the Unz article.  I

8    don't want to get into what other people said.  I kind of

9    want to get into what you said.  So let's delete that and

10   come back up.  We'll go to the previous page.

11           Now you can see Ted Gilman's email to you.  Let's

12   get where you get involved here.  All right?  Do you see

13   that?

14   **A.**  Yes.

15   **Q.**  November 28, 2012, 8:46 a.m.?

16   **A.**  Yes.

17   **Q.**  Are you with me?

18   **A.**  Yes.

19   **Q.**  "Dear Marlyn.  I hope your fall term is going smoothly.

20   How did December get here so quickly?  An alum and friend,

21   Robert D, '83 below, sent the following email.  The sniff

22   test suggests the piece is a witch hunt.  It's written by Ron

23   Unz, college '83, and is published in The American

24   Conservative, full text link below."

25           And then he goes on with some criticisms that he

1   has of the Unz piece, correct?

2   **A.**  Yes.

3   **Q.**  I take it that means that Mr. Unz is, in fact, a graduate

4   of Harvard College as well?

5   **A.**  I can't confirm or deny that.  We have what we have in

6   front of us.  I have no reason to doubt it.

7   **Q.**  Is that what you understood Mr. Gilman to be saying here,

8   that Unz was a graduate of the college?

9   **A.**  That is what I understood.

10  **Q.**  Up at the top, we have your response.  I'll try to blow

11  it up just a little bit more.  It comes in at 1:36 p.m.  Do

12  you see that?

13  **A.**  Yes.

14  **Q.**  And it says, "Ted, I shook my head at this, too."

15          Do you see that?

16  **A.**  I do.

17  **Q.**  And then, "We are in the throws of EA committees" --

18          That's early action committees, right?

19  **A.**  Right.

20  **Q.**  -- "and can't be helpful with deconstruction or comment

21  but will do in due course."

22          Do you see that?

23  **A.**  Yes.

24  **Q.**  "Thanks so much for looking out for us all.  M."

25          That's you, right, Marlyn McGrath?

1    **A.**   Yes.

2    **Q.**   Then right above that, Mr. Gilman or Dean Gilman responds

3    and says, "I apologize for bothering you."

4             Do you see that?

5    **A.**   I do.

6    **Q.**   And now let's go back to the second page.  I'm going to

7    try to blow up your email there.  Here we go.  And you then

8    at 8:33 p.m. on the same day respond to Ted Gilman, correct?

9    **A.**   Yes.

10   **Q.**   Your first statement to Ted in your response is, "Just

11   had a chance to read this," right?

12   **A.**   Yes.

13   **Q.**   Now, we know you probably read the article sometime on

14   the afternoon or evening of November 28, right?

15   **A.**   This probably refers to that document, yes, I would

16   assume.

17   **Q.**   The Unz article.  Okay.  And "After I emerged from

18   committee and it is what I thought, a hodgepodge of old

19   chestnut arguments."

20            Do you see that?

21   **A.**   Yes.

22   **Q.**   I want to talk to you about a lot of what's written here.

23   And I think that Mr. Lee will have a chance to talk about it

24   if he wants to as well.  I'm going to come back to this

25   several times.  We'll use it as a kind of launching-off point

1    for discussions.  The first thing I wanted to talk about was

2    a comment you make at the bottom.

3           When faculty and other stakeholders of Harvard ask

4    you questions or engage you with questions about the

5    admissions process, do you try to be accurate and truthful in

6    your responses?

7    A.  Yes, I do.

8    Q.  And so I want to ask you about the highlighted statement

9    on the screen at the end of your email to Mr. Gilman.  And it

10   says, "We look for the people with the most promise for the

11   future and we make every decision on the basis of

12   achievement, in the context of what the applicant has done

13   with what he has had, etc."

14          Is that statement accurate?

15   A.  You read it correctly, and I -- yes.

16   Q.  It's an accurate statement about how Harvard admissions

17   at Harvard College works?

18   A.  Yes.

19   Q.  Director McGrath, I want to take this off the screen and

20   I just want to ask you a general question.

21          Is it true that sometimes when you speak to people

22   about admissions like when you're at the Sutton Trust --

23          Is it in England?

24   A.  Sutton Trust, yes.

25   Q.  You spoke about admissions.  I actually watched --

1    anyway.  Spoke about admissions at the Sutton Trust, correct?

2    **A.**  Yes.

3    **Q.**  And it's true sometimes when you speak to people about

4    Harvard admissions, you do so in generalities that might not

5    be completely accurate.  Is that fair to say?

6    **A.**  Do you have an example in mind?

7    **Q.**  I think we're going to get to one.  What I'm trying to

8    help you with -- what I'm trying to say is, do you sometimes

9    speak about Harvard admissions at sort of a level of

10   generality, like maybe what we just saw with Mr. Gilman, that

11   doesn't tell the complete truth or the complete picture?

12   **A.**  When I speak about Harvard admissions, I speak about it

13   accurately in the context of the people -- as I understand

14   the context of the people I'm speaking with.

15   **Q.**  And that includes the statement to Ted Gilman, "We look

16   for the people with the most promise for the future, and we

17   make every decision on the basis of achievement."

18         You believe that Harvard College makes every

19   admission decision on the basis of achievement; is that

20   right?

21   **A.**  We make every admission decision on the basis of

22   achievement and a good many other factors as well.  I think

23   there's no decision we make to admit someone that does not

24   include a measure of achievement.

25   **Q.**  What's the Z list?

1    **A.**   The Z list is shorthand for a list of people for whom at

2    the end of each cycle -- this has been true in recent years;

3    I can't tell you when it began -- are people who we wish to

4    admit and for whom we do not offer a place for the coming

5    year.  We may not have room.

6              It is a list of people who are admitted but for a

7    subsequent year.

8    **Q.**   And about how many people get in off the Z list each

9    year?

10   **A.**   Several dozen.  It has varied somewhat from year to year.

11   I can't tell you precise numbers.

12   **Q.**   Is one factor considered on whether to admit an applicant

13   under the Z list is whether they're a child or relative of a

14   major donor?

15   **A.**   We take lots of things into account in decisions not just

16   for the Z list but at other times, and that may be in a given

17   case something that is considered by the committee, yes.

18   **Q.**   You take lots of things into account.  But one of the

19   things you might take into account in putting somebody on the

20   Z list is whether the applicant is a child or relative of a

21   major donor; is that correct?

22   **A.**   It may be part of a strong case, and it may help us

23   decide to admit the person.

24   **Q.**   Can it be part of a terrible case?

25   **A.**   It could be part of a terrible case.  But that person is

1    unlikely to be admitted, in my experience.

2    **Q.**  We'll talk about that in a second.

3              Can somebody's being a celebrity or the daughter or

4    son or relative of a celebrity be a reason that they get on

5    the Z list?

6    **A.**  What do you mean by "celebrity"?

7    **Q.**  Oh, I don't know.  Movie star or somebody who is big in

8    business, whatever you think.

9    **A.**  I can recollect no such case.  But I can't tell you that

10   it's never happened.

11   **Q.**  Could somebody's relationship to perhaps a politician be

12   a reason that they get on the Z list?

13   **A.**  Not in and of itself.

14   **Q.**  Could it be one of the many things you look at when

15   deciding to put somebody on the Z list?

16   **A.**  Without having a case in mind, I suppose it could.

17   **Q.**  Now I need to get into some subjects, some things out of

18   the way, and they're going to involve some of your other

19   emails.  And I want to get something clear.  I am sure that

20   sometimes you've written emails never ever thinking they were

21   going to come out in a public setting like this.  Isn't that

22   right?

23   **A.**  That's true.

24   **Q.**  I think that's true frankly of all of us.  So what I'm

25   going to try to do is we're going to turn off the gallery

1    screen now, if that's okay, Your Honor, and I'm going to talk

2    to you about Plaintiff's Exhibit 257 in your binder.

3           MR. LEE:  Your Honor, we have no objection to the

4    screen being turned on.  I think it suggests more with the

5    screen off than to let --

6           THE COURT:  Hold on a second.  Let me just read it.

7           MR. MORTARA:  I'm happy to turn the screen on if

8    Director McGrath wants it on.

9           THE COURT:  Why don't we leave that up to Director

10   McGrath.  I'm fine with it on the screen.  You're fine with

11   it on the screen.  Why don't you take a look at it and see

12   what your preference is.

13          THE WITNESS:  Thank you for that, Your Honor.  I

14   will take the advice of my counsel.

15          MR. MORTARA:  And you would like it displayed.

16          THE WITNESS:  I would defer to their advice.  I

17   have no objection.

18          THE COURT:  Displayed?

19          MS. ELLSWORTH:  Yes.

20          THE WITNESS:  Thank you.

21   BY MR. MORTARA:

22   Q.  Director McGrath, now what we have on the screen, in the

23   middle of the screen is an email written I think by you,

24   July 24, 2013, at 8:44 a.m.  Do you see all that?  And it's

25   signed "X, Mum."  Do you see that?

1  **A.**  I do.

2  **Q.**  I'm going to get into the content of this.  This is an

3  email exchange you had with your daughter; is that right?

4  **A.**  That's correct.

5  **Q.**  And your daughter is involved in the Harvard D.C. Club;

6  is that right?

7  **A.**  Yes.

8  **Q.**  She interviews candidates for admission as part of

9  Harvard's alumni interviewing program, right?

10  **A.**  Yes.

11  **Q.**  And down at the bottom, this starts off with a forwarded

12  message from David Evans to a bunch of redacted email

13  address, subject line, "Wait-list applicant offered a Z."

14          Do you see that?

15  **A.**  Yes, I do.

16  **Q.**  Who is David Evans?

17  **A.**  David Evans is my colleague who was one of the admissions

18  officers who handles candidates from D.C., from the greater

19  D.C. area.

20  **Q.**  "Just a note to inform you that the admissions offered

21  so-and-so of so-and-so a Z; that is, a place in the class of

22  2018."

23          That's a notification that someone was offered a Z

24  list acceptance, correct?

25  **A.**  Yes.

1   **Q.**  And then up above, from context I think you can tell this

2   is an email from your daughter to you.  Can you tell that

3   from context?

4   **A.**  Yes, I can tell that from context.

5   **Q.**  Your daughter says, "This is interesting.  I am not a

6   huge fan of the mother who just started interviewing for us a

7   couple of years ago.  Harvard really cleaned up even before

8   this at" -- redacted -- "and I'm not sure he was terribly

9   strong."

10          Do you see that?

11  **A.**  I do.

12  **Q.**  And then you respond to your daughter right here.  And

13  the first thing, very first thing you say is what?

14  **A.**  "Terrible case."

15  **Q.**  This is a terrible case that got admission off the Z

16  list, right?

17  **A.**  Well, "terrible case" may refer to the case itself.  I

18  don't recall doing this email, though I have no doubt that

19  it's mine.

20  **Q.**  You were asked about -- excuse me.  Go ahead.

21  **A.**  It may also have referred to the terrible situation of a

22  mother on the inside but not on the inside.  But I actually

23  don't know.  But yes, I see those words and that's what I

24  wrote.

25  **Q.**  And to be fair to you, you saw this document at your

1   deposition, right?

2   **A.**   I did, yes.

3   **Q.**   And the next sentence says, "We did it entirely for

4   contingent reasons" -- "We did it for entirely contingent

5   reasons."  Do you see that?

6   **A.**   I do.

7   **Q.**   What were the entirely contingent reasons, if you

8   remember them?

9   **A.**   I don't remember them from memory.  I think that it was

10  what was described in the email below, an alum mother who was

11  also involved in the schools committee.

12  **Q.**   So it was the influence of a Harvard alum got this

13  terrible case admitted that your daughter said was not sure

14  he was terribly strong; is that right?

15  **A.**   It may have been taking into account the mother's

16  involvement.  I don't know for certain.

17  **Q.**   Director McGrath, I really hate to do this.  Did you

18  suggest earlier that the "terrible case" comment may have had

19  something to do with this applicant's mother or the

20  situation?

21  **A.**   I don't remember what it was referring to.  I was giving

22  you a sense of what it might refer to.

23  **Q.**   Your daughter then criticizes the mother of this

24  applicant, correct?

25  **A.**   I only have in front of me her email, and that's what she

1    seems to be doing.

2    **Q.**  And you respond to that criticism at the top, correct?

3    **A.**  Yes.

4    **Q.**  All right.  I'll put that down.

5           Do you agree that what's being communicated here is

6    that Harvard has let in a candidate who was not terribly

7    strong, for whatever you described as contingent reasons,

8    correct?

9    **A.**  I don't see anything here that suggests that the

10   candidate had no strengths.

11   **Q.**  Your daughter told you that her belief was that the

12   candidate was not terribly strong, correct?  She said that?

13          MR. LEE:  Your Honor, I'm going to object.  This

14   has gone way beyond the point of being relevant.  It has

15   nothing to do with discrimination against Asian-Americans.

16          MR. MORTARA:  Your Honor --

17          THE COURT:  I think he's trying to impeach the

18   witness.

19          MR. MORTARA:  There is that.

20          MR. LEE:  With her daughter's statement.

21          MR. MORTARA:  That's not being offered for the

22   truth.  It's being offered for what it said.

23          And Your Honor, part of our case is that Harvard is

24   not entirely truthful about its admissions process, including

25   that it is totally meritocratic.

1          THE COURT:  I will give you some latitude on it,

2    but you are pushing the edges of it.  I think you made your

3    point with this email.

4          MR. MORTARA:  I'm going to move on, then, Your

5    Honor.

6          THE COURT:  Go ahead.

7    BY MR. MORTARA:

8    Q.  I want to talk to you about staff interviews.  How are

9    staff interviews offered to applicants?

10   A.  How are staff interviews offered to applicants?  In

11   several ways.  They are offered or have been in some years on

12   a first-come, first-serve basis typically during the summer.

13   They are also offered from time to time in certain

14   circumstances.  Shall I describe one?

15   Q.  Sure.

16   A.  A candidate who's coming from a long distance or an area

17   of the country where we think there will not be an alumni

18   interview available.  We interview people or speak with

19   people sometimes when they have parents who are involved and

20   they would like their child to come by and meet an admissions

21   officer.

22          There are various other kinds of times when we see

23   candidates interviewed by staff in our office.  Also they can

24   be interviewed elsewhere; when staff are traveling, often we

25   meet people.

1   **Q.**  Would it be particularly accurate to say staff interviews

2   come on a first-come, first-serve basis?

3   **A.**  The first case I mentioned, yes.  We post a certain

4   number of available interviews and members of the public may

5   sign up for them in advance.  That was the first example I

6   gave.

7   **Q.**  About how many of these staff interviews take place in a

8   given admit cycle, in a given year?  Would 500 sound about

9   right?

10  **A.**  To be honest, I don't -- I can't give you a number and I

11  can't confirm that one.

12  **Q.**  So who organizes all the staff interviews?  That's under

13  admissions, right, where you're in charge?

14  **A.**  It is under admissions.  And my staff use their judgment

15  about people from their area visiting.  Sometimes we have to

16  assign someone who happens to be in the office and available.

17  I keep no tally, and I don't arrange most of them myself.

18  **Q.**  Do you do any of them?

19  **A.**  I don't do interview-interviews.  I do meet people from

20  time to time, but I don't substitute for an official

21  interview.

22  **Q.**  How about this:  Are there thousands of staff interviews

23  in an admit cycle?

24  **A.**  I don't think so, but I don't -- I can't confirm that.  I

25  can't deny it.  I don't know.

1    **Q.**  Would you be comfortable with maybe there's hundreds?

2    **A.**  Probably.

3    **Q.**  All right.  It's going to be a small percentage of the

4    applicants that get a staff interview, right?

5    **A.**  Thousands or tens of thousands of people have an official

6    interview, an alumni interview, as part of the application

7    process.  So that would be a much larger number, yes.

8    **Q.**  I'm talking about staff interviews.

9    **A.**  I understand.  But you said a percentage of, which is why

10   I mentioned the larger number that includes -- that adds up

11   to the large number of interviews we offer.

12   **Q.**  Sure.  Let me try to make sure we're getting a clear

13   record here.

14          Most people, the vast majority of applicants to

15   Harvard do some kind of interview, right?

16   **A.**  Most people who apply have an alumni interview.

17   **Q.**  A very small portion of the applicant pool interview with

18   a member of your staff, right?

19   **A.**  Yes.  A much smaller number.

20   **Q.**  And on your website, you talk about staff interviews,

21   right?

22   **A.**  I think we do.

23   **Q.**  Do you want me to refresh your recollection?  I have it

24   right here.

25   **A.**  Fine.

1          MR. MORTARA:  Your Honor, may I approach the

2    witness?

3          THE COURT:  Of course, yes.

4    **A.**  Thank you.

5    BY MR. MORTARA:

6    **Q.**  And this is just from your website, and I'm putting it up

7    on the screen.  And it says "Have a conversation with an

8    alumni interviewer."

9          Do you recognize this from your website?

10   **A.**  Yes, now that I see it, I do.

11   **Q.**  And it says, "We also offer a limited numbered of

12   on-campus interviews from September through November."

13         Do you see that?

14   **A.**  Yes.

15   **Q.**  And does that refresh your recollection about how you

16   advertise interviews?

17   **A.**  Yes.

18   **Q.**  And you see here that there's an encouragement to do the

19   official local interview.  Do you see that?

20   **A.**  Yes.

21   **Q.**  And that's because space is scarce for the staff

22   interview, right?

23   **A.**  Yes.

24   **Q.**  What's the admission rate for somebody that gets one of

25   these scarce staff interviews?

1    **A.**  I have no idea, I'm sorry to say.

2    **Q.**  Would it surprise you in any way if I told you the

3    admission rate for people who come on campus and interview

4    with one of your staff is over 50 percent?

5    **A.**  No.

6    **Q.**  Do you have any reason to dispute that that might be the

7    rate, that it might be over 50 percent?

8    **A.**  I have no reason to dispute that.

9    **Q.**  And that would sort of make sense, right, if you meet

10   somebody on the admissions staff and impress them, then you

11   kind of have an internal advocate within the process, right?

12   **A.**  I don't think that's the effect.  I don't think that's

13   the explanation.

14   **Q.**  What's your general admission rate, Director McGrath?

15   **A.**  About 5 percent.

16   **Q.**  So if I'm right -- and we'll put on the evidence later in

17   the case.  I don't want to bother you with it now if you

18   don't have it off of the top of your head.

19         But if the evidence shows that people who get staff

20   interviews get admitted 50 percent of the time and your

21   general admit rate is 5 percent, it means doing a staff

22   interview is pretty helpful, right?

23   **A.**  I don't think you can conclude that it was the having of

24   the interview that made the difference.

25   **Q.**  Let's talk about the people that get interviews.  You

1    were here for my opening, right?

2    **A.**   I was.

3    **Q.**   And you heard me say, and I think you might have heard

4    Mr. Lee say something similar, about 5 percent of your

5    applicant pool are in the recruited athletes, legacies,

6    dean's list, and children of faculty or staff group.  Would

7    you agree with that?

8    **A.**   Yes.

9    **Q.**   And they make up about 30 percent of the admitted class.

10   You agree with that, too, right?

11   **A.**   I have no reason to doubt that.

12   **Q.**   What percentage of the people that get staff interviews

13   are in that ALDC group?

14   **A.**   I don't know.

15   **Q.**   You don't know if they're overrepresented in the group

16   that do staff interviews?

17   **A.**   If who --

18           MR. LEE:  I'm going to object to the question

19   because I don't know what "overrepresented" means.

20           MR. MORTARA:  I was about to explain.  Can I

21   explain, Your Honor?

22           THE COURT:  Yes.

23   BY MR. MORTARA:

24   **Q.**   So they're 5 percent of the general applicant pool.  Are

25   they more than 5 percent of the people that get staff

1    interviews?

2    **A.**   I don't know what the number is.

3    **Q.**   Would it surprise you that nearly half of the staff

4    interviews your office does are from athletes, legacies,

5    dean's list, and the children of faculty or staff?

6    **A.**   I think that's possible.  I can't dispute that.

7    **Q.**   And you wouldn't have any reason to dispute that

8    20 percent of all the ALDC applicants get these staff

9    interviews.  Would you have any reason to dispute that?

10   **A.**   No.

11   **Q.**   And that would be compared to about 1 percent of the

12   regular non-ALDC applicants.  You wouldn't have any reason to

13   dispute that either, would you?

14   **A.**   I would not.

15   **Q.**   Does that seem like a first-come, first-serve system to

16   you?

17   **A.**   What's described here on this website is one group of

18   on-campus interviews which are available to the general

19   public.  Earlier I tried to suggest that we do, in addition

20   to that, a number of in-person interviews as needed, in their

21   broad definition for that, of people who are in town who we

22   need to see or who wish to see us and who we're able to see.

23           That's not the same thing as the thing that I think

24   is being described on this website.

25   **Q.**   This is kind of what I meant earlier.  What you put on

1  your website is a general statement to the public about

2  interviews, right?

3  **A.**  Yes.

4  **Q.**  Then there's something else.  There's interviews you can

5  get in other ways that are not advertised, correct?

6  **A.**  Yes.  There are interviews we do in other ways?

7  **Q.**  And some of the other ways that you can get interviews is

8  if you're the child or relative of a donor; is that right?

9  **A.**  That may happen.  It does happen.

10  **Q.**  And some of the other ways you can get interviews are,

11  for instance, you set aside a quota of interviews for

12  recruited athletes for each team.

13  **A.**  We do interview a number of athletes for each team, and

14  we do have a target number for that, yes.

15  **Q.**  You have a set-aside number of interview slots for

16  recruited athletes?

17  **A.**  Yes.  We have a number we agree on not doing more than,

18  yes.

19  **Q.**  And you can even get an interview outside of the

20  September-to-November timeframe that you tell the world on

21  the website you can get one if you're in one of these special

22  categories, right?

23  **A.**  Yes.

24  **Q.**  I want to talk more about your holistic admissions.  And

25  that word comes in part from Supreme Court opinions.  You

1    recognize the word, right, Director McGrath?

2    **A.**  Yes.

3    **Q.**  Harvard's been a part of making that word into our

4    Supreme Court law, I think.

5    **A.**  Yes.  I do recognize the word.

6    **Q.**  We've heard a lot -- I wish I wasn't going to say the

7    word *Bakke* because I almost think I'm going to have a

8    response to it, but we've heard a lot about *Bakke* and you've

9    read *Bakke*, haven't you?

10   **A.**  Yes.

11   **Q.**  I understand you're not a lawyer.  I'm not going to try

12   to test your legal acumen, but you've also read the *Grutter*

13   decision, right?

14   **A.**  Yes.

15   **Q.**  I want to just read you a sentence from *Grutter*, not to

16   ask for legal view but to ask you if it reflects Harvard's

17   college admissions.  This is about the Michigan law school.

18          "The law school engages in a highly individualized

19   holistic review of each applicant's file, giving serious

20   consideration to all the ways an applicant might contribute

21   to a diverse educational environment."

22          Does Harvard consider all the ways an applicant

23   might contribute to a diverse educational environment?

24   **A.**  We consider all the ways that we're aware of in which

25   that would be true.

1    **Q.**   Right.  Because of course something that somebody never

2    tells you and is internal to them and you don't know, and

3    they might contribute in some way you never expected, right?

4    **A.**   That's right.

5    **Q.**   One of the aspects of a person that you consider when

6    you're looking at all the ways you can that an applicant

7    might contribute to a diverse educational environment is that

8    person's race or ethnicity, right?

9    **A.**   Yes.

10   **Q.**   Now, Director McGrath, you would agree with me that

11   someone's religion can be as or even more important than

12   their race, wouldn't you?

13   **A.**   Important for what purpose?

14   **Q.**   Important to them.  Important to what they'll teach

15   others.  I'll get into a few examples in a second.

16             But you agree it can be as important to them, for

17   example?

18   **A.**   It certainly could, yes.

19   **Q.**   For instance, I'm white, I'm of somewhat Italian

20   extraction, but I'm also Roman Catholic.  And it might be

21   more important to me that I'm Roman Catholic than it is what

22   my skin color is, right?

23   **A.**   Yes.

24   **Q.**   Now I want to talk about religious diversity.  An

25   applicant might not choose to mention their religious

1     background in their essays, but it still might be something

2     they would bring to Harvard's pluralistic community, right?

3   **A.**   Yes.  Right.

4   **Q.**   I want to use an example based on me.

5          So imagine a young white gentleman from -- young

6     man from Milwaukee.  He goes to college where his best

7     friends are a Muslim, Hindu, and a Catholic.  You agree it's

8     possible that both the identity of those three friends as

9     well as their religious background could really add to this

10    suburban Milwaukee boy's experience, don't you?

11  **A.**   Yes.  I would agree.

12  **Q.**   And this would be true even though the three friends just

13    checked boxes on their application and didn't mention their

14    own ethnicity or their religious preferences anywhere, right?

15  **A.**   Yes.

16  **Q.**   And the Muslim fellow for instance could be a Pakistani

17    or Arab, but maybe the most profound way in which he was an

18    educator of the young boy from Milwaukee is that he was a

19    Muslim.  That's not implausible, is it?

20  **A.**   No, it's not implausible.

21  **Q.**   He's Pakistani, by the way.

22          The Catholic fellow could be Polish-American or

23    Filipino, but maybe the most profound way in which he was an

24    educator of me was that he was Catholic and my confirmation

25    sponsor when I converted in college.  Is that possible?

1    **A.**   Yes, that's possible.

2    **Q.**   He's Filipino.

3            So religion can be very important to who someone is

4    and what they bring to the community and whether they'll be a

5    great educator of others.  Would you agree with that?

6    **A.**   I would agree that that's possible.

7    **Q.**   But Harvard does not track the religious identity of

8    applicants, do you?

9    **A.**   No, we do not track them.

10   **Q.**   And your paper and online application systems do not

11   allow you to even see the self-proclaimed religious identity

12   of an applicant, correct?

13   **A.**   Correct.

14   **Q.**   That's the case even though there's a place on the common

15   application for religion, self-proclaimed religion, correct?

16   **A.**   Correct.

17   **Q.**   There's a place for it on the application.  Some

18   applicants provide their religious information, and you

19   choose to ignore it by not even having it transfer to your

20   system, correct?

21   **A.**   We have done that on the advice of counsel in

22   Massachusetts.  We are in Massachusetts.

23   **Q.**   Are you suggesting to me that the reason that Harvard

24   does not look at the religious persuasion of its applicants

25   is because its lawyers told them it might be illegal to do

1    so?

2    **A.**  I did not say that Harvard does not look at the religious

3    persuasion of our applicants.

4    **Q.**  Harvard chooses to ignore the self-proclaimed religious

5    affiliation of applicants who provide that information on the

6    common application because that's the advice of counsel.  Is

7    that what you said?

8    **A.**  I would not say that we ignore what we do know, which

9    will not be the information on that box you're referring to.

10            We do take into account, as we say we do,

11   everything we can learn about an applicant.  We do not track

12   or preserve the answer given to that opportunity to check a

13   box.

14   **Q.**  It's not just track or preserve, ma'am.  You don't even

15   allow it to transfer to your system.  Your admissions

16   officers don't see it.

17            MR. LEE:  It's been asked and answered and she said

18   it was on advice of counsel because of Massachusetts law.

19   BY MR. MORTARA:

20   **Q.**  I just want to clear up one thing, which is that it's not

21   just that you don't retain it.  It's that you don't see it.

22   **A.**  We don't see it.

23            MR. LEE:  Right.

24   BY MR. MORTARA:

25   **Q.**  How is that looking at the whole person if you can't see

1    something that's as important as religion?

2              MR. LEE:  Your Honor, on the checking the box, she

3    said why they don't transfer the information.  She just said

4    three times they'll look at the information if they find it

5    out otherwise.  There's no foundation for this question.

6              THE COURT:  That's what I understand she's saying.

7    They don't transfer it from the common app.  They don't track

8    it from the common app.  But if it appears elsewhere in the

9    application, they --

10             MR. MORTARA:  They can look at it.  That's

11   completely my understanding to that --

12             THE COURT:  If you're trying to make that point,

13   I've already got the point.  If you're trying to make a

14   different point, ask the question and then I'll decide

15   whether or not it's going to be --

16             MR. MORTARA:  All right.  I'll try to make the

17   point through a question rather than directly to Your Honor.

18             THE COURT:  Perfect.

19   BY MR. MORTARA:

20   Q.   Is this a significant obstruction in looking at whole

21   applicants that you're not able to see their self-proclaimed

22   religious identity in the box checking?  Not in an essay.  I

23   understand if somebody writes "I'm a Catholic and it's really

24   important to me," for instance, I would have written "I'm an

25   atheist and maybe I'm going to meet somebody that's going to

1    convert me to become a Roman Catholic" or whatever.

2            You can take into account what they're writing

3    about themselves in their essays.  You do that, right?

4    **A.**  Yes.

5    **Q.**  Okay.  I'm just talking about the fact that you're not

6    allowed to, for whatever reason, look at someone's

7    self-identified religion, I am Roman Catholic, I am Muslim.

8    I am Hindu.  Just in the checking of a box or filling out of

9    a form, that's the common app.  You got that distinction in

10   your head?

11   **A.**  Yes.  I want to be sure that I understand your question

12   when it comes to, again --

13   **Q.**  Do you consider that to be a significant obstacle in

14   evaluating whole people, that you are not allowed to think

15   about their self-proclaimed religious identity unless they've

16   written about it elsewhere in their application?

17   **A.**  We have not considered that to be a disadvantage.

18   **Q.**  Would you consider it to be a disadvantage if you

19   couldn't consider their race?

20   **A.**  Would I consider it to be a disadvantage if we couldn't

21   consider their race?

22   **Q.**  It's the exact same question.  So I just asked you about

23   religion in the box and if you can't consider that is that an

24   obstacle.  And you said we haven't considered it a

25   disadvantage.

1    **A.**   We find it an advantage to be able to consider race.

2    **Q.**   Right.  But you said it's not a disadvantage that you

3    can't do religion the same way, right?

4              MR. LEE:  No.

5    **A.**   I did say that.

6              MR. LEE:  I object to "in the same way."  What are

7    we talking about?  Checking the box or what's in the

8    application now?

9              MR. MORTARA:  Your Honor, that's not even an

10   objection.  I got instructed on this yesterday.

11             THE COURT:  Yes.  It's not an objection.

12             MR. LEE:  I object.  The question is vague and

13   ambiguous because we don't know what he's talking about.

14             THE COURT:  You can just rephrase the question.

15   BY MR. MORTARA:

16   **Q.**   We'll keep working on this until we get it right.

17             MR. LEE:  You know, Your Honor, there is a limit.

18             THE COURT:  Skip the narrative.  Ask the question.

19   BY MR. MORTARA:

20   **Q.**   There is a box or there's a form on the common

21   application where someone can say "I am Roman Catholic."  Do

22   you understand that?

23   **A.**   Yes.

24   **Q.**   Harvard doesn't look at that answer.  They're not -- they

25   don't do it, for whatever reason, right?

1    **A.**  Correct.

2    **Q.**  Forgetting about what people say on their essays and all

3    that, I asked you do you find it to be a disadvantage that

4    Harvard doesn't get that information about self-proclaimed

5    religious identity from the common application.  And you said

6    we don't find it to be a disadvantage.  Do you remember that?

7    **A.**  Yes.

8    **Q.**  My question is, would Harvard find it to be a

9    disadvantage if they couldn't consider race?

10   **A.**  I think we would.

11   **Q.**  In the same way, on the box in the application.  So it's

12   different between religion and race.  That's your testimony?

13   **A.**  Yes.

14   **Q.**  Why is it different?

15   **A.**  Because we have, as you're aware, a practice of giving

16   special consideration to ethnic identity as submitted on

17   those check box materials.

18   **Q.**  But you have that special practice of considering ethnic

19   identity in order to get the educational benefits that flow

20   from racial diversity, right?

21   **A.**  That's correct.

22   **Q.**  Are there educational benefits that flow from religious

23   diversity?

24   **A.**  Yes.

25   **Q.**  So why isn't it a disadvantage that you can't consider

1    the self-proclaimed religious identity of someone who puts

2    that in on the common application?

3    **A.**   When we know it as provided through the other aspects of

4    the candidacy, we may well consider it.

5    **Q.**   This is my point.  You say it's not going to be a

6    disadvantage that you don't get to see what someone puts in

7    the box on religion, right?

8    **A.**   Yes.

9    **Q.**   But it is going to be a disadvantage if you can't see

10   their race?

11   **A.**   We have found it helpful to know what racial identity a

12   student has given us.

13   **Q.**   Would you find it helpful to know the religious identity

14   a student give you?

15   **A.**   When it is disclosed to us in the application, we often

16   find it helpful.

17   **Q.**   Would you find it helpful if you carried through the

18   information from the common application, just like you carry

19   through the information about race from the common

20   application?

21   **A.**   I can't tell you whether we would or not, but we don't.

22   **Q.**   You could choose not to carry through the information

23   about race on the common application, just like you've

24   elected to not carry through the information about religion,

25   right?

1    **A.**   We have made that choice with the advice of counsel.

2    **Q.**   I don't want to know why you made the choice.

3           My point is you could make the choice not to carry

4    through that information about race, just like you've made

5    the choice for whatever reason not to carry through that

6    information about religion, correct?

7    **A.**   Yes, that choice could be made.

8    **Q.**   You don't even have a hunch as to whether or not a

9    race-blind admissions process would be beneficial or

10   detrimental to diversity on campus at Harvard; isn't that

11   right?

12   **A.**   I have a hunch that we would have a different college

13   without taking that factor into account.

14   **Q.**   You don't have a hunch as to whether it would be

15   beneficial or detrimental, do you?

16   **A.**   I do.

17   **Q.**   Could you please turn to your deposition?  I'm going to

18   get it for you because you don't have it yet.

19           MR. MORTARA:  Your Honor, may I approach?

20           THE COURT:  Yes.

21           MR. LEE:  Which one?

22           MR. MORTARA:  We've got it all in one.  It's

23   consecutive.  When I use a page, you'll know which one.

24   BY MR. MORTARA:

25   **Q.**   Would you turn to page 255, Director McGrath, and let me

1    know when you're there, ma'am.

2    **A.**   I'm there.

3    **Q.**   At line 21 it says, "Do you have a view as to whether or

4    not a race-blind admissions process would be beneficial or

5    detrimental to diversity on campus?"

6            Your lawyer objected.  Go ahead and answer if you

7    can.

8            You asked your own question, "As the director of

9    admissions?

10           "QUESTION:  Yes."

11           And this is your answer to the question.  "I don't

12   know whether it would.  I can't -- I don't have a hunch on

13   that."

14           Do you see that?

15   **A.**   I do.

16   **Q.**   That was your sworn testimony in this case, right?

17   **A.**   That's right.

18   **Q.**   I want to talk to you about Harvard's historical use of

19   race, just very briefly.  Does Harvard use race in its

20   college admissions process more than it did 15 years ago?

21   **A.**   I don't think so, no.

22   **Q.**   Does Harvard use race less today in its admissions

23   process than it did 15 years ago?

24   **A.**   No, I would not say that.

25   **Q.**   So the use of race in Harvard's admissions process has

1    maintained a steady state over the last 15 years.  Is that

2    about right?

3    **A.**   That is my sense.

4    **Q.**   I want to shift focus now to other aspects of the

5    admissions process.

6           Before the full committee, the docket subcommittees

7    have already decided who to affirmatively bring up in full

8    committee; is that right?  Correct my language if I'm wrong.

9    **A.**   Would you mind repeating the question?

10   **Q.**   Sure.  There's something called a docket subcommittee.

11   Dean Fitzsimmons was here.  There's something called a docket

12   subcommittee.

13   **A.**   Yes.

14   **Q.**   They produce a list of candidates they want to bring up

15   at full committee.  Is that kind of the way to say it?

16   **A.**   Yes.

17   **Q.**   And before the full committee, those docket subcommittees

18   have decided who they're going to bring up in the full

19   committee, right?

20   **A.**   Yes.

21   **Q.**   Now, at the beginning of the full committee meeting, you

22   discuss the relative breakdown of applicants by race,

23   correct?

24   **A.**   Yes.

25   **Q.**   And at the same time, you and Dean Fitzsimmons actually

1    know the racial makeup of not just the applicant pool but

2    also of those who have been passed out of the subcommittee,

3    right?

4    **A.**   Yes.

5    **Q.**   And the reason you get that information is that it's

6    interesting to you and Dean Fitzsimmons to see what the shape

7    of the group appears to be as it's shaping up, right?

8    **A.**   Yes.

9    **Q.**   And if you or Dean Fitzsimmons saw the numbers coming out

10   of subcommittee showed a particular racial group was

11   underrepresented, you'd talk about it and give it attention,

12   right?

13   **A.**   Yes.  But our typical practice is at that juncture and

14   with that information in hand to give the entire committee an

15   overview of the proportions, the shape of the class as it's

16   shaping up along several dimensions, including race.

17   **Q.**   Now, after the full committee has voted, there's some

18   fine-tuning of the decisions because you'll still have too

19   many admits, right?

20   **A.**   Typically at the beginning of the full committee process,

21   we have some number of applicants in various categories,

22   physical sciences, geography, race and so on.  And those are

23   usually the total number and the total -- we're adding a lot

24   of people, and we're also taking away a lot of people.  So

25   those are very preliminary numbers, and we typically end up

1    at the end of the process with more people than we have total

2    in front of you us in that one-pager.

3    **Q.**   And so there's some fine-tuning that has to take place,

4    right?

5    **A.**   You can call it fine-tuning, yes.

6    **Q.**   If there was a group that was surprisingly or notably

7    underrepresented, you'd go back and look at those cases,

8    whether it be engineers or whether it be a racial group,

9    correct?

10   **A.**   We might or might not.  Depending on the strength of the

11   cases and the area people's sense of their own cases that

12   might not at that point have yet been admitted or proposed

13   for admission.

14   **Q.**   What's the sufficient level of specificity the office

15   uses for what constitutes good representation of the class?

16   **A.**   Well, we don't have a formula or numbers, and we don't

17   have a formulaic way of describing that.  We mostly want

18   people to understand where we are then and to take a look at

19   where we are going ahead.  It doesn't necessarily change the

20   proportions.  It may.

21   **Q.**   When you say where we're going then and where we're going

22   ahead, that's last year's numbers were X and this year's

23   numbers look like it's Y.  Let's look carefully the these

24   people?

25   **A.**   No.  What I meant is that people have a sense of where

1   the class is headed at the moment in the context, often, of

2   last year's numbers.  And they're at this moment going back

3   and preparing cases to present again or to strengthen, to

4   confirm to keep in the class.  It's a piece of information

5   that may help area people.

6            And it also helps us as we fine-tune the final

7   total target number.  We do have one target number in our

8   process which is the number of beds in the freshman class.

9   And to yield that number we have to determine or project a

10  total number of candidates to admit.  And that chart may help

11  us do that.

12  **Q.**  And that clarity is the one-pagers that show all sorts of

13  information, including race?

14  **A.**  Yes.

15  **Q.**  Now, your goal is to make sure that you're not having a

16  dramatic drop-off in some group from a certain level that you

17  had last year, right?

18  **A.**  That's not really a goal.  It's something we would like

19  to be aware, but it's not a goal to prevent it.

20  **Q.**  Could you look at your deposition at page 269, Director

21  McGrath.

22  **A.**  Yes.

23  **Q.**  And at line 11 there's a question and quite a lengthy

24  answer, and I will read the entire answer.  I want to start

25  with the question and the beginning part of the answer.

1          "Is there anything specific about last year's

2     statistics that makes sense, or is the goal to simply ensure

3     there is not too great a deviation from year to year?

4          "ANSWER:  The goal is to make sure -- the goal

5     is -- a goal is to make sure that we're not having a dramatic

6     drop-off in some group who we did at a certain level with

7     last year.  And because the numbers I referred to tell you

8     how many applicants that there are this year, if we're not,

9     you know, underconsidering, as it were, applicants who seem

10    to be admitted or at a higher level this year than we seem

11    likely to do.  We're looking at dramatic differences in a

12    short period of time.  Just as we think about hearing cases

13    at the end, we're talking about this in the context of

14    individual cases, just how members of" -- I think that should

15    be "this" -- "his ethnic group are doing, is this a strong

16    case or perhaps underweighted."

17         Do you see that?

18    **A.**  Yes.

19    **Q.**  And that was your sworn testimony?

20         MR. LEE:  Actually, I think you misread it.  It

21    says "we're looking for dramatic differences."

22         MR. MORTARA:  Thank you, Mr. Lee.

23         MR. LEE:  And you missed the end of the answer

24    which says "is this a strong case that was perhaps

25    underweighted," and the rest is "or is it just not a very

1    good case, period."

2    BY MR. MORTARA:

3    **Q.**  And then the next question is, "The goal at the end of

4    the day is to avoid a dramatic drop-off among minority

5    representation within a particular class on any given year?

6                "ANSWER:  A goal would be to avoid it by

7    inadvertence or lack of care.  Some things can't be avoided."

8                Do you see that?

9    **A.**  And that's what I should have said in the first place to

10   your question, your initial question, previous question.

11   **Q.**  That's no problem, Director McGrath.

12               You remember we were talking about the Unz article,

13   and it was published in late 2012, right?

14   **A.**  Yes.

15   **Q.**  And you remember that David Brooks mentioned it in the

16   New York Times in December 2012, do you?

17   **A.**  Yes, I do.

18   **Q.**  And you got some email and some discussions about Unz.

19   We've already looked at one of them.

20               But you also got some emails and discussions about

21   the Unz article in the early 2013 timeframe, right?

22   **A.**  Yes.

23   **Q.**  We'll get into that in a little bit.

24               But in that early 2013 timeframe, data about

25   whether Harvard's admissions process was discriminating

1   against Asian-Americans would have been interesting to you?

2   **A.**   The press coverage of it was of interest to us.

3   **Q.**   But would data about whether or not Harvard's admissions

4   process was discriminating against Asian-Americans been

5   interesting to you at that time?

6   **A.**   It would be of interest to us to know what was being

7   published.  Yes.

8   **Q.**   I don't mean to quibble with you.

9   **A.**   Yes.

10  **Q.**   I'm just talking about you.  I want to just talk about

11  you.

12          Would data about whether or not Harvard's

13  admissions process was discriminating against Asian-Americans

14  been interesting to you in early 2013?

15  **A.**   If I understood the data, yes.  I'm always interested to

16  look at data.

17  **Q.**   And of course, in the course of this case you became

18  aware that in 2013 Harvard's 's Office of Institutional

19  Research had done some work related to this topic, correct?

20  **A.**   No, I was not aware of that.

21  **Q.**   Are you aware today of work that the Office of

22  Institutional Research was doing in January, February of 2013

23  to analyze whether Harvard's admissions process was biased

24  against Asian-Americans?

25  **A.**   I have become aware of those data and that work during

1    the course of preparation for this trial.

2    **Q.**   And to be clear, you did not see reports or PowerPoints

3    or memos from OIR on this subject matter in 2013, did you?

4    **A.**   I have seen from time to time and had seen from time to

5    time data they had produced for various questions.  I frankly

6    don't remember on what topics.  They have done research for

7    the president for a long time.

8    **Q.**   But you did not see -- you personally did not see any

9    reports or PowerPoints or memos from OIR purporting to

10   analyze the question of Asian-American discrimination in

11   early 2013, did you?

12   **A.**   You know, I'm not sure what I saw in what year, but I

13   don't recollect that.

14   **Q.**   And you don't remember having any discussions with Dean

15   Fitzsimmons about that work back in early 2013, do you?

16   **A.**   About which?  About OIR's work?

17   **Q.**   About the work that you've become aware of through the

18   course of preparing for this trial that OIR did on the

19   subject of Asian-American discrimination.

20   **A.**   I do not recollect anything back then that we discussed.

21   **Q.**   Can you think of any reason today why Dean Fitzsimmons

22   would not have included you in the loop with respect to work

23   that OIR was doing on admissions?

24   **A.**   I don't know why he didn't.

25   **Q.**   I want to go back to that November 28 email chain,

1    Plaintiff's Exhibit 220.

2            MR. MORTARA:  And I haven't offered it yet, Your

3    Honor.  I am going to offer Plaintiff's 220 now.

4            MR. LEE:  I thought it was offered.  This is the

5    one with the hearsay within the hearsay.

6            MR. MORTARA:  That's my fault.  I forgot it's been

7    offered and admitted against the hearsay uses that I said I

8    wasn't going to make.  Sorry about that, Mr. Lee.

9            THE COURT:  I'm not sure it ever was moved in.

10           THE CLERK:  Yes, it was.

11           THE COURT:  I didn't have it marked off either.

12   Karen did.

13   BY MR. MORTARA:

14   Q.  And looking back at your email -- thank you, Ms. Folan.

15           Looking back at your email, we can agree it's a

16   fair thing to say in your email response to Mr. Gilman that

17   the thrust of your email is you don't agree with what Unz is

18   saying, right?

19   A.  I don't take the question of the data on directly in that

20   email.  I introduce some variables that I think would make it

21   hard to interpret them very simply.  I certainly don't

22   provide other data that are better or more accurate.

23   Q.  I perhaps made the question a little bit more complicated

24   than I should.

25           You don't agree with the thesis of the Unz article,

1    do you?

2    **A.**   No, I don't.

3    **Q.**   Right.  And now I want to clear up something that's in

4    the email.

5            It says, "The only numbers we disclose to the

6    public are in our regular press releases, and we furthermore

7    provide to IPEDS and to the census bureau and related federal

8    offices.  None of them would support the more crazy

9    speculations here, though some of it is correct."

10           And I wanted to give you an opportunity and maybe

11   the next couple sentences would help to explain what you

12   thought was correct about the Unz article.

13   **A.**   You know, I actually don't remember it.  I do remember it

14   was a busy time, and I remember reading this quite quickly.

15   I probably should not have seemed to confirm that it was

16   correct.  I did say that.

17   **Q.**   Thanks for that clarification.  I want to focus you on

18   the paragraph above where you say, "One can argue endlessly,

19   and people do, about the criteria they wish to use for

20   Harvard admission."

21           Do you see that?

22   **A.**   Yes, I do.

23   **Q.**   Sorry.  Were you finished?

24   **A.**   Yes.

25   **Q.**   You said several times that many, many people attempt to

1    lecture Harvard about how they should be deciding who gets

2    in.  I think you said that several times, haven't you?

3    **A.**  Yes, I think I have.

4    **Q.**  Do you consider Students for Fair Admissions to be

5    lecturing Harvard about how it should do its admissions

6    process?

7    **A.**  I'm not sure that I would be quick to use the word

8    "lecturing," but I do know that people have various opinions.

9    **Q.**  And you say, "As you know, these criteria have also been

10   of interest to the OCR and the courts."

11              Do you see that?

12   **A.**  Yes.

13   **Q.**  And the OCR refer to the Office of Civil Rights, right?

14   **A.**  Yes.

15   **Q.**  And down at the bottom it says, "And we have been

16   examined by OCR most fully about 22 years back when we had a

17   full compliance review about Asian-American bias which

18   resulted in a very gratifying finding of approbation.  It

19   appears that that chapter is known to the author."

20              Do you see that?

21   **A.**  Yes.

22   **Q.**  One of the reasons you were comfortable conveying to

23   Mr. Gilman that you thought little of the Unz allegations was

24   that OCR had cleared Harvard previously, right?

25   **A.**  That was part of my context, yes.

1    **Q.**  And you frequently relied on the OCR investigation in

2    discussing the question of Asian-American discrimination with

3    others internally to Harvard and externally.  Is that fair?

4    **A.**  Yes.  From time to time I do.

5    **Q.**  I'd like you to turn now to Plaintiff's Exhibit 225.

6    Plaintiff's Exhibit 225 is another email chain on which you

7    are participating.  Do you see that?

8    **A.**  Yes.

9            MR. MORTARA:  We are going to offer

10   Plaintiff's 225.

11           MR. LEE:  Same thing.  Second page has hearsay

12   embedded in the email.  I assume it's not being offered for

13   its truth.

14           MR. MORTARA:  It is not.

15           THE COURT:  Okay.  With that caveat, it's admitted.

16           (Plaintiff Exhibit No. 225 admitted.)

17   BY MR. MORTARA:

18   **Q.**  And it starts off with an email from our previous

19   participant, Robert D.  Do you see him?

20   **A.**  I do.

21   **Q.**  And he writes to Kathryn Vidra.  Who is she?

22   **A.**  She is a colleague of mine who is in financial aid and

23   admissions and may have, although I can't be certain, been an

24   admissions area person for some area that this Robert D is

25   concerned.  She knows him somewhere, but she's a colleague of

1    mine, a senior colleague of mine in the admissions office.

2    **Q.**  This is occurring in December 2012.  Do you see that?

3    **A.**  Yes.

4    **Q.**  Is it a fair characterization to say Robert is emailing

5    Ms. Vidra, again passing along the Unz article and asking

6    questions?

7    **A.**  Yes.

8    **Q.**  And then Ms. Vidra forwards the email to you and Dean

9    Fitzsimmons.  It says, "Hi, WRF" --

10             That's Dean Fitzsimmons, right?

11   **A.**  Yes.

12   **Q.**  -- "/Marlyn.  Do we have a response?  Thanks for any

13   advice."

14             Do you see that?

15   **A.**  Yes.

16   **Q.**  You don't have any reason to doubt you got this email,

17   right?

18   **A.**  I have no reason to doubt that.

19   **Q.**  And then at the top is your response which also copies

20   Dean Fitzsimmons, right?

21   **A.**  Yes.

22   **Q.**  Do you see that?  And it says, "Kitty, I have been

23   telling people that that set of views is nothing new, etc.  I

24   often mention that we have had opportunities to show the OCR,

25   the courts, and others how our process works and that the OCR

1    has found us in compliance with the law and with general

2    principles of fairness."

3              Do you see that?

4    **A.**   I do.

5    **Q.**   And again, there you're mentioning the Office of Civil

6    Rights review, right?

7    **A.**   Yes.

8    **Q.**   And down below it says, "Fitz may have more specific

9    talking points to offer, but I have found that a pretty

10   simple response seems to shut up anyone not already loaded

11   for bear, and one can do little with the latter except point

12   out that many people have views about how we should do

13   admissions."

14             Do you see that?

15   **A.**   I do.

16   **Q.**   Did you ever see any talking points that Dean Fitzsimmons

17   drafted in response to the Unz article?

18   **A.**   Did I ever see any?  I don't remember when or what they

19   were, but I think yes, I did.

20   **Q.**   Now I want to talk to you about some correspondence that

21   you were involved with with somebody from outside of Harvard.

22   And I'm going to use Plaintiff's Exhibit 279 which is in your

23   binder.

24             And you recognize this letter to Drew Faust, right,

25   Director McGrath?

1    **A.**  I'm looking at it.  If I could have just a moment.  I'm

2    sorry.  I'm slow here.  I want to be sure that --

3            MR. MORTARA:  Your Honor, could we have an

4    afternoon break?  Because now would be a perfect time.

5            THE COURT:  I could use the break myself.  So why

6    don't we take a 10- or 15-minute break.  What do you want?

7            MR. MORTARA:  15 would be great.

8            THE COURT:  Five past 3:00.

9            MR. LEE:  Your Honor, how late are we going today?

10           THE COURT:  We've done a lot today.  So I am

11   available until 4:00, but I'm happy to stop earlier if you

12   want.

13           MR. MORTARA:  I've got about, I'm going to guess,

14   25 to 30 minutes left.

15           MR. LEE:  I just have to talk to her about her

16   expectations.  She was supposed to get on and off today.  It

17   looks like that's not going to happen.

18           THE COURT:  He says he has another -- say he goes

19   to something like 3:30.  How long do you all think you have

20   with her.

21           MR. LEE:  Can I talk to her?

22           THE COURT:  Yes.  Let me tell you this:  If her

23   schedule, if it means something to her to get off today and

24   we take a break now, I can sit past 4:00.

25           MR. LEE:  Let me talk to her and I'll see what I

1    can do.

2              MR. MORTARA:  Your Honor, just for the record, if

3    we can clear up right now, I'd want to move P257 into

4    evidence.  That was the Z list email.

5              THE COURT:  257, the emails between her and her

6    daughter.

7              MR. LEE:  I'm not sure it's relevant, but we'll

8    deal with it on cross.

9              THE COURT:  He's just moving to admit it.  Now it's

10   been shown and discussed.  So I think the prudent thing is to

11   admit it.

12             MR. LEE:  Fine.

13             THE COURT:  I can go as long as we need to today if

14   it's important for her to get off the stand today.

15             MR. LEE:  Can I confer with her about that at the

16   break?

17             THE COURT:  Yes.  Do it at the break and we'll come

18   back at five past, which is now 13 minutes.

19             (Court recessed at 2:53 p.m.)

20             (Plaintiff Exhibit No. P257 admitted.)

21   BY MR. MORTARA:

22   Q.  Hello again, Director McGrath.  When we left, I had asked

23   you to turn to --

24             THE COURT:  Hold on one a second.

25             What do you want to do about scheduling?

1          MR. LEE:  Your Honor, I think we'll see how long

2    SFFA goes.  Then I'll make a judgment.

3          THE COURT:  That's fine.  And as I say, I have some

4    flexibility.  I'll say 5:00 is my outside limit or Joan will

5    shoot me.

6          MR. LEE:  I think the likelihood is I won't be able

7    to get through it, but I'll tell you that as soon as I get

8    up.  If I can't, we'll suspend at 4:00.  I think she can come

9    back Monday afternoon.

10         THE COURT:  As I say, I'm happy to go another

11   couple of hours if that makes anybody's life easier.

12   BY MR. MORTARA:

13   Q.  Dr. McGrath, before you left, I asked you to turn to

14   P279, which is a letter from a redacted name to Draw Faust.

15         And my first question is, do you recall having this

16   letter in your files?

17   A.  From preparation for the trial, I recall the letter.  I

18   mean I've seen the letter.  I don't recall it, but I see it

19   now and I've seen it in preparation.

20   Q.  And I'm just going to point out some elements of the

21   letter.  Just first, you understand that this is a letter

22   from what appears to be a self-identified Asian-American high

23   school student to President Faust on the subject the Unz

24   article and the possibility that Harvard was discriminating

25   against Asians, correct?

1  **A.**  Yes.  I see that that's the topic.

2  **Q.**  It says, "My name is" -- redacted -- "and I am a junior

3  at" -- redacted.  "Part of our AP English curriculum includes

4  drafting an activism letter inspired by Thoreau's 'Civil

5  Disobedience' and Dr. Martin Luther King Jr's 'Letter From

6  Birmingham Jail.'  I have chosen to write to you, the

7  president of the Harvard Corporation, because I believe you

8  may have some authority and can address my concerns about

9  inequality in Ivy League admissions."

10         Do you see that?

11  **A.**  Yes.

12  **Q.**  And it goes on to discuss concerns about Asian-American

13  discrimination, doesn't it?

14  **A.**  Yes.

15  **Q.**  And this is from April 2014, correct?

16  **A.**  Yes.

17  **Q.**  Would you agree with me this is a very well-written and

18  thoughtful letter?

19  **A.**  Yes.

20  **Q.**  And you were involved in discussing the response to this

21  letter, correct?

22  **A.**  Yes.

23         MR. MORTARA:  And I would offer Plaintiff's 279,

24  Your Honor.

25         MR. LEE:  I'd object to it as it's offered for its

```
 1    truth.  The fact that it was sent is fine.
 2              MR. MORTARA:  I'm not offering it for the truth.
 3              THE COURT:  That's fine.
 4    BY MR. MORTARA:
 5    Q.  Can you turn now to Plaintiff's 287?
 6    A.  Yes.
 7    Q.  This is an email chain which includes Robin Bernhard and
 8    you and several others.  Do you see that?
 9    A.  Yes.
10    Q.  And it's also from April 2014, correct?
11    A.  Yes.
12    Q.  Do you recognize it?
13    A.  I do from preparation for the trial.
14              MR. MORTARA:  Your Honor, we offer Plaintiff's 287.
15              MR. LEE:  No objection.
16              THE COURT:  Admitted.
17              (Plaintiff Exhibit No. 287 admitted.)
18    BY MR. MORTARA:
19    Q.  And on the second page you can see the first email is
20    from Robin Bernhard to Jeff Neal.  You ultimately are copied
21    in on the chain.  The subject is, "Letter to President Faust
22    from high school student re admissions diversity, April 14."
23              Do you see that?
24    A.  Yes, I do.
25    Q.  "Dear Jeff.  I'm working on a response to the attached
```

1    letter, and Marilyn McGrath suggested that I get in touch

2    with you as you are already dealing with the issue" --

3    blank -- "writes about."

4             Redacted there is, I believe, the student's name.

5    Do you see that?

6    **A.**  Yes.

7    **Q.**  You suggested to Robin Bernhard that she get in touch

8    with Jeff Neal about how to respond to this high school

9    student's essay and letter to President Faust on

10   Asian-American discrimination?

11   **A.**  That's what this is, I have no reason to doubt it.

12   **Q.**  And Jeff Neal, he works in public relations for Harvard,

13   right?

14   **A.**  He did, yes, at this time.

15   **Q.**  And now you can see Mr. Neal's response, which starts on

16   the previous page.  And I'll split it over two on my screen

17   here.

18            Do you see the response from Mr. Neal?

19   **A.**  Yes, I do.

20   **Q.**  At the top he says, "Hi, Robin.  This is a tough one.

21   Seems extraordinarily well-written for a high school

22   student."

23            Do you understand this to be a compliment to the

24   letter?

25   **A.**  I'm only seeing what I'm reading.  I have no idea what he

1   meant.  I can't read his mind.

2   **Q.**  And you see down at the bottom he says, "Frankly, I worry

3   that this letter is a bit of a straw man for the folks

4   seeking to stage anti-affirmative action lawsuit against

5   Harvard."

6           Do you see that?

7   **A.**  Yes, I do.

8   **Q.**  Did you have those same feelings, or did you take the

9   letter at face value?

10  **A.**  I don't remember.  I probably took it at face value.

11  **Q.**  And then in the middle you see Mr. Neal making a comment,

12  "More broadly, Harvard was, in fact, investigated by OCR for

13  just this allegation in the 1980s."

14          Do you see that?

15  **A.**  Yes.

16  **Q.**  That's the Office of Civil Rights again, right?

17  **A.**  I assume so, yes.

18  **Q.**  "OCR found that adjusting for legacy and athletics, the

19  percentage of Asian-American students admitted to Harvard

20  College was in line with what would be expected."

21          Do you see that?

22  **A.**  I do.

23  **Q.**  "That is not a fact that we point to regularly.  Largely

24  many folks would also disagree with our policies around

25  admitting athletes and giving a tip to sons and daughters of

1    alums."

2              Do you see that?

3    **A.**  Yes.

4    **Q.**  It goes on to say, "But it is true that we have been

5    exonerated of these charges that our athletic and legacy

6    admissions policies are perfectly legal and nothing has

7    substantially changed since then."

8              Do you see that?

9    **A.**  Yes.

10   **Q.**  And here, I just want to ask you about "That is not a

11   fact that we point to regularly."

12             Is this an example of what I was getting at in the

13   beginning of our discussion together about how Harvard talks

14   about its admissions process but sometimes doesn't highlight

15   certain features of it?

16   **A.**  I have no idea whether this is an example of that.

17   **Q.**  When you have spoken about Harvard's admissions process,

18   for instance when you were at the Sutton Trust in England,

19   did you talk about Harvard's preferences for legacies?

20   **A.**  I don't remember.  I may have.

21   **Q.**  Do you know whether Mr. Neal had seen anything from the

22   Office of Institutional Research on Asian-American

23   discrimination when he was writing these things in 2014?

24   **A.**  I'm sorry.  I don't know that either.

25   **Q.**  Now, we're just going to get to the part where you get

1     directly involved in the chain.  The bottom email comes from

2     Robin Bernhard.  Who's she?

3     **A.**   She was in the president's office, and she was one of the

4     personnel who handled a good deal of President Faust's

5     correspondence.

6     **Q.**   And she says, "Dear Marlyn.  I'm writing to share Jeff

7     Neal's response below with you in case" -- blank -- "contacts

8     admissions after she gets our letter.  I'll also BCC you on

9     the outgoing."

10          Do you see that?

11    **A.**   I do.

12    **Q.**   You have no reason to doubt you were blind-carboned on

13    the outgoing, right?

14    **A.**   I have no reason to doubt that.

15    **Q.**   In the middle, I want to get to this.  You say, "Sounds

16    just right.  No going on the record.  And we are always happy

17    to give our own dumb answer if she contacts us.  Thanks very

18    much for your care with this.  Best, M."

19          Do you see that?

20    **A.**   I do.

21    **Q.**   And by "dumb answer", you don't mean stupid.  You mean a

22    stock answer to these types of inquiries?

23    **A.**   I mean our simple, basic answer, yes.  Stock answer, yes.

24    **Q.**   Form or stock answer?

25    **A.**   Probably.

1    **Q.**  Did that stock answer when you gave it sometimes include

2    a mention of the OCR investigation by the Department of

3    Education?

4    **A.**  Yes.  And it may in any stock answer.  It certainly was

5    an available idea that was helpful to us.

6    **Q.**  I want you now to turn to Plaintiff's Exhibit 265.

7            MR. MORTARA:  Your Honor, did I offer 287?

8    Ms. Hacker said I did, so I did.

9            THE COURT:  Yes, you did.

10   BY MR. MORTARA:

11   **Q.**  Plaintiff's Exhibit 265 is another email course exchanged

12   between you and your daughter, correct?

13   **A.**  Yes.

14   **Q.**  You were e-mailing your daughter here in her capacity as

15   an alumni interviewer for Harvard, correct?

16   **A.**  Yes.

17           MR. MORTARA:  Your Honor, we offer Plaintiff's 265.

18           MR. LEE:  No objection.

19           THE COURT:  Admitted.

20           (Plaintiff Exhibit No. 265 admitted.)

21   BY MR. MORTARA:

22   **Q.**  And here you are forwarding to your daughter an email,

23   which you see at the bottom, from the Utah schools committee.

24   Do you see that?

25   **A.**  I do.

1   **Q.**  Let's just take a look.  This is a January 25, 2014, to

2   Ian Anderson, copy -- is that your email address?

3   **A.**  Yes.

4   **Q.**  Who is Ian Anderson other than the lead singer of Jethro

5   Tull?

6   **A.**  That's new information to me.  The information that I

7   have is my Ian Anderson is my colleague who at this time was

8   serving as area person for the state of Utah.

9   **Q.**  All right.  And what happens here is the Utah schools

10  committee sends you a list of applicants that they have

11  ranked in their order of perception of the applicant's

12  quality for admission to Harvard, correct?

13  **A.**  Yes.

14  **Q.**  And we can see that there's a lot of redactions here.

15  The names are redacted, but the applicants are grouped.  Do

16  you see that?

17  **A.**  Yes.

18  **Q.**  And down below, the committee makes special

19  recommendation of several specific students.  Do you see

20  that?

21  **A.**  Yes.

22  **Q.**  And you forwarded on to your daughter.  "Sending this

23  along for your amusement.  Pure Utah."

24          Do you see that?

25  **A.**  Yes.

1    **Q.**   What was so funny about this?

2    **A.**   It's part -- this exchange was part of a continuing

3    discussion I've had with the people in Utah actually who run

4    a very elaborate ranking process and a couple of other

5    schools committee chairs around the country who have been

6    trying to learn from Utah's experience.  Elizabeth, my

7    daughter, was one of them.  And I thought it was a good

8    example of what the end product of that was.  So there was a

9    certain continuation of a correspondence in this exchange.

10   **Q.**   And your daughter responds to you, "Ha, ha, ha.  Very

11   thorough," which you probably took to be a recognition of

12   that ongoing conversation you were having with her, right,

13   about the thoroughness?

14   **A.**   Yes, I think so.

15   **Q.**   And then it says, "I also love that the top-tier list is,

16   as you've told me before, all Asians except for a couple."

17            Do you see that?

18   **A.**   I do.

19   **Q.**   You have remarked to your daughter that the Utah

20   committee ranks as their top-tier candidates predominantly

21   Asians, correct?

22   **A.**   I probably have.  I know that I have pointed out

23   repeatedly that the group from Utah is more diverse than

24   people expect it will be.

25   **Q.**   But you know that, for instance, Salt Lake City has a

1    significant Asian population, don't you?

2    **A.**   I do.

3    **Q.**   But you thought your daughter would find it amusing, in

4    part, that the Utah committee had put all Asians at the top

5    of their list?

6    **A.**   I thought it would be notable, yes.

7    **Q.**   Why did you think it would be okay to remark to your

8    daughter on the ethnicity of the top tier of the Utah

9    committee recommendations based exclusively on their race?

10   **A.**   Because it confounds the stereotype that many people have

11   of the population of Utah.

12   **Q.**   Could you now turn to Plaintiff's Exhibit 461.

13   **A.**   Yes.

14   **Q.**   In April of 2012, you were involved in responding to

15   another letter sent to President Faust, weren't you?

16   **A.**   Yes.

17   **Q.**   And before we look at your response which is here in

18   Plaintiff's Exhibit 461, the actual letter is also in the

19   back.   It comes after your response, attached to an email

20   from Andrea Balian.

21              Do you see that?

22   **A.**   Yes.

23   **Q.**   And so Ms. Balian, who is she?

24   **A.**   She's my staff assistant.

25   **Q.**   And you were sent this by Rachel Partin.   Do you see

1    that?

2    **A.**   Yes.

3    **Q.**   From the office of the president?

4    **A.**   Yes.

5    **Q.**   It says, "Hi, Marlyn.  President Faust received the

6    attached letter from an alumnus regarding admissions

7    practices.  Given the nature of the suggestions, I was

8    wondering if your office wouldn't mind responding on behalf

9    of the president.  Let me know what you think."

10           Do you see that?

11   **A.**   I do.

12   **Q.**   What follows from that is a letter from a fairly elderly

13   alum of Harvard, correct?

14   **A.**   Yes.

15   **Q.**   And you recognize all these documents, both your response

16   the email and the letter from the alum?

17   **A.**   I recognize them from preparation for this trial.

18           MR. MORTARA:  Your Honor, we move Plaintiff's 461.

19           MR. LEE:  As long as it's not for the truth.  The

20   Harvard response is fine.  The letter from the alum is

21   definitely not for its truth.

22           THE COURT:  Yes.

23           (Plaintiff Exhibit No. 461 admitted.)

24   BY MR. MORTARA:

25   **Q.**   Let's turn to the letter from the alum.  His name has

```
1   been redacted.  It's dated April 4, 2012.  Do you see that?
2   A.  Yes.
3   Q.  It's to President Faust.  And the writer first says that
4   he's from the Harvard class of 1942.  Do you see that?
5   A.  Yes.
6   Q.  And on the second page -- he has a variety of suggestions
7   about Harvard in the two-page letter, right?
8   A.  He does, yes.
9   Q.  And on the second page, I want to blow up some of the
10  suggestions he has.  And he says he's got -- "The reason for
11  my letter is to make comments with regard to the college's
12  admissions policy."
13              Do you see that?
14  A.  Yes, I do.
15  Q.  And down below he says, "Another aspect of the admissions
16  policy should, in my mind, be based on informal quotas."
17              Do you see that?
18  A.  Yes.
19  Q.  And he says, "I think it is also important to have a
20  quota based on religious affiliation and skin color."
21              Do you see that?
22  A.  Yes.
23  Q.  And in a sentence prior to that he says, "I would limit
24  the number of Japanese students to a certain percentage or
25  number."
```

1              Do you see that?

2    **A.**  Yes.

3    **Q.**  And he says, "None of this, of course, has to go beyond

4    the confines of the dean's office."

5              That's the suggestion from this alum?

6    **A.**  Yes.

7    **Q.**  Then he says, "The last time I was in Cambridge it seemed

8    to me that there were a large number of Oriental students,

9    for example.  I think they probably should be limited to

10   5 percent, as should other criteria."

11             Do you see that?

12   **A.**  I do.

13   **Q.**  You would not call Asian-American students at Harvard

14   Oriental students, would you?

15   **A.**  I never have.  I wouldn't.

16   **Q.**  Neither would I, if I weren't reading this.  So we'll

17   stop doing that now.

18             I want to talk about how you responded to this alum

19   at President Faust -- was it at President Faust's direction

20   or her office's direction that you responded?

21   **A.**  Yes.

22   **Q.**  And I want to talk about your response.  Here it is.

23   April 19, 2012.

24             And you start off with, "President Faust has asked

25   me to respond to your April 4 letter in which you offer many

1    thoughtful observations about Harvard College students and

2    the results of the admissions process."

3           Do you see that?

4    **A.**   I do.

5    **Q.**   And this wasn't your true thinking about it.  You were

6    being polite, right?

7    **A.**   Thank you.  Yes, it was a polite response to an elderly

8    alumnus.

9    **Q.**   And elderly alumnus making what we I think can all agree

10   are shocking suggestions, correct?

11   **A.**   Yes.

12   **Q.**   And at the end of the letter you say, "All of us at

13   Harvard appreciate your thoughtful letter, as well as your

14   loyalty over the years."

15          Do you see that?

16   **A.**   Yes, I do.

17   **Q.**   Ms. McGrath, I want to explore this only in minor detail.

18   In your view, this was an appropriate response, correct?

19   **A.**   I thought it was of the polite response that I would

20   send.

21   **Q.**   I want to talk about this.  This is just something that I

22   want to just ask you, and I want to do it -- I'm going to try

23   and do it this way:  Do you think in our culture we're more

24   polite about stereotypes about Asians and Asian

25   discrimination than we would be about stereotypes or comments

1    made about other minority groups?  Do you think that that's

2    true in American society?

3    **A.**   I don't.

4    **Q.**   You think we react just as negatively to the use of

5    "Oriental" as we would to the use of the N word?

6    **A.**   Yes.

7    **Q.**   Would this have been an appropriate response if the alum

8    had complained about the number of N words on campus, to

9    thank him for his thoughtful comments?

10   **A.**   I might have sent the same response.  I don't know that

11   it would be a more or less appropriate response.

12   **Q.**   Would you have sent the same response if the alum had

13   complained about the number of Jewish students on campus?

14   **A.**   I can't tell you what I would have done, but I don't know

15   that I wouldn't have also tried to end the correspondence

16   with a perhaps too-polite response.

17   **Q.**   Do you think that we as a society are less sensitive to

18   stereotypes or archaic words being used to describe

19   Asian-Americans than we are to other minority groups?

20   **A.**   I don't think that.

21   **Q.**   I'm going to shift focus now.  I think you've told us

22   about a lot of things that can go in the personal rating in

23   your deposition, right?  And I want to talk to you about some

24   of those.

25           You weren't here, Director McGrath, yesterday,

1  where we had an episode where I had to walk across the

2  courtroom, and I promised the court that I was going to use

3  the computer because my handwriting was terrible.  It was a

4  big waste time in terms of the walking back and forth, at

5  least.

6            I want to ask you if the following list of things

7  are included in analysis of the personal rating.  All right?

8  **A.**   Sure.

9  **Q.**   Is like likability something you look at for the personal

10  rating?

11  **A.**   That might be a factor.

12  **Q.**   What about whether that person is a good person to be

13  around?

14  **A.**   That's possibly part of the consideration.

15  **Q.**   You told us it was part of the consideration, right?

16  **A.**   Yes.

17  **Q.**   What about integrity?

18  **A.**   Yes.  Very important.

19  **Q.**   And helpfulness?

20  **A.**   Yes.

21  **Q.**   What about courage?

22  **A.**   Yes.

23  **Q.**   And kindness?

24  **A.**   Yes.

25  **Q.**   And those are some of the things you told us were

1    involved in the personal rating in your deposition, right?

2    **A.**   Yes.

3    **Q.**   Now, I know you told us that a person's race or ethnicity

4    should not be included in one of the factors that would weigh

5    into the personal rating, right?

6    **A.**   Yes.

7    **Q.**   Your words were "should not," right?

8    **A.**   Should not in itself.

9    **Q.**   You also told us that race or ethnic background is not

10   supposed to be considered in assessing the scores in any of

11   these areas, right?

12   **A.**   Yes.

13   **Q.**   Now I'm going to ask you to refer to Plaintiff's

14   Exhibit 1.

15        MR. MORTARA:  Your Honor, we're going to mark this

16   as plaintiff's demonstrative 22.  We're going to provide a

17   copy just so it's a record of what I put up on the

18   demonstrative.

19        THE WITNESS:  I'm sorry.  Which one are you

20   directing me to?

21   BY MR. MORTARA:

22   **Q.**   Plaintiff's Exhibit 1.

23   **A.**   I got it.

24   **Q.**   Right at the beginning.

25   **A.**   Yes.

1    **Q.**   This is your reading guidance, right?

2    **A.**   That's what it's called.  It's called "Reading

3    Procedures."  It really, in fact, is, as you will have seen,

4    I think, a guide to coding.  It's what you take from reading

5    the application and make sure it gets put into the electronic

6    records system.  But it's called "Reading Procedures."

7    **Q.**   And it's got a little bit more than that.

8    **A.**   It does.  But its fundamental thing is it's a how-to

9    note.

10   **Q.**   And also it's got some guidance on how to score things?

11   **A.**   Yes, it does.

12   **Q.**   And you're responsible for the content of this document

13   ultimately?

14   **A.**   Yes, I am.  A group of us develop it every year, change

15   it every year.

16   **Q.**   Please go to the section of the personal rating that's on

17   page 5.

18   **A.**   Yes.

19   **Q.**   Does it say anywhere in this document that race should

20   not be used in assessing the personal rating?

21   **A.**   I do not think so.

22   **Q.**   Now I've got a broader question.

23            Does it say anywhere in the admissions office, in

24   any written form, training material, memo, email, or any kind

25   of writing down to a Post-it on the coffee maker, that race

1      should not be used in the personal rating?  Is it written

2      anywhere?

3      **A.**   In written form, no.  It is the subject of a great deal

4      of discussion and attention in our training process.

5      **Q.**   Did you finish, ma'am?  Sorry.

6      **A.**   I'm finished.

7      **Q.**   And we talked about OCR and your reliance on OCR in

8      communications several times today, right?

9      **A.**   Yes.

10     **Q.**   You reviewed the OCR findings when they cleared Harvard

11     in 1990, correct?

12     **A.**   Yes.

13     **Q.**   Please turn to Plaintiff's Exhibit 555.  Are you there,

14     ma'am.

15     **A.**   I am.

16     **Q.**   Plaintiff's Exhibit 555 is the statement of findings.

17     You're familiar with this document, right?

18     **A.**   Yes.

19     **Q.**   And over on page 15 I want you to focus on the statement

20     at the bottom that is now not displaying properly.  Oh.

21     **A.**   Yes.

22     **Q.**   We'll do our best here.  There we go.  And it carries

23     over -- putting ing on the screen.  Oh, I did it again.  Not

24     as good as Ms. Hacker with this thing.  There we go.

25                There's a statement highlighted on the screen.  I'm

1    going to read the whole thing.  This is part of the OCR

2    investigation.  OCR actually interviewed a bunch of people

3    that worked in the admissions office, right?

4    **A.**  Yes, they did.

5    **Q.**  Were you interviewed?

6    **A.**  Yes, I think I was.

7    **Q.**  And here's one of OCR's findings.  "We found that the

8    readers had several different views as to where and whether

9    Asian-American ethnicity was given positive weight or a tip

10   in the admissions process.  Some readers explained that when

11   ethnicity was deemed to be a significant factor in an

12   application, it was reflected in the POR and during

13   discussions at subcommittee and committee meetings."

14          Do you see that?

15   **A.**  I do.

16   **Q.**  And I understand that to be Harvard's position about how

17   it works today, is that right, that ethnicity or race is

18   reflected in the preliminary overall rating and in

19   discussions?

20   **A.**  Yes.  That it may be, yes.

21   **Q.**  Then it says, "Other readers indicated that ethnicity was

22   a factor considered throughout the entire admissions process.

23   They stated that it could be reflected in the four reader

24   rating areas as well as in the POR and during the

25   subcommittee and committee meeting discussions."

```
 1                You see that, right?
 2    A.   I see that, yes.
 3    Q.   And that is in part a reflection of what you say should
 4    not happen which is people using race in assigning the
 5    personal rating, correct?
 6    A.   Yes.
 7    Q.   Now, do you think -- after you read the OCR findings that
 8    maybe it would have been a good idea to develop written
 9    guidance so you could ensure the consistency of people using
10    race in Harvard's admissions process?
11    A.   I did not I think react at the time nor would I now to
12    think that the right remedy for that is more written
13    guidance.
14    Q.   Did you suggest the development of written guidance?
15    A.   I don't believe I did.  I don't remember.
16    Q.   Did anyone?
17    A.   I don't remember following this.
18    Q.   Now, there is approximately 40 members of the admissions
19    committee year in and year out; is that right?
20    A.   Yes.
21    Q.   You do the hiring in the admissions office, right?
22    A.   Yes.
23    Q.   And a lot of your hires are recent college graduates,
24    right?
25    A.   Yes.
```

1    **Q.**  In fact, most of your hires in recent years have been

2    recent college graduates?

3    **A.**  Yes.  The majority probably these days.

4    **Q.**  Now, since you're in charge of hiring, can you give the

5    Court an idea of what the turnover is like in the people that

6    read applications?

7    **A.**  Yes.  We have some very long serving members of our

8    committee.  We also have a cohort of more junior people who I

9    would say typically stay three to six or seven years.  It's

10   hard to generalize, but there's a range.

11   **Q.**  I want to go through -- I want to do a who's still left

12   from the spring of 2011 with you.  If you turn to defendant's

13   Exhibit -- it's not a memory test, Director.  Don't worry.

14   **A.**  Good.  Because I won't get it right.

15   **Q.**  Defendant's Exhibit 25, we're going to go through some

16   together.  And the first thing on defendant's Exhibit 25 is

17   actually a letter.

18   **A.**  I'm sorry.  I want to make sure.  Defense 25.  Yes.

19   **Q.**  I'm trying to move it along because I know you want to be

20   somewhere and I want to be somewhere.  I'm sorry, Director.

21   Please take your time.

22   **A.**  You're sending many he to D25.

23   **Q.**  D25.

24   **A.**  I have that.

25   **Q.**  The first thing is actually a letter.  This document is a

1    massive collection of things.  I'm just going to zoom through

2    it.  It's actually I think from your files and consists of

3    several manila folders.  Do you have recognize some of these

4    documents?

5    **A.**  Yes, I do.  And from preparation for this trial.

6            MR. MORTARA:  Your Honor, we're going to offer

7    Defendant's 25.

8            MR. LEE:  It's in evidence already.

9            MR. MORTARA:  Sorry.

10           THE CLERK:  No.

11           MR. LEE:  Okay.  Then no objection.

12           (Plaintiff Exhibit No. DX 25 admitted.)

13   BY MR. MORTARA:

14   **Q.**  I'd like you to find, it make take you a little while,

15   page 117 of this file of yours.

16   **A.**  Can you tell me on what part of the page the number

17   appears?

18   **Q.**  It's at the bottom, the very bottom.  Do you see DX 025

19   dot and there's a number.

20   **A.**  What's the last number?

21   **Q.**  117.

22   **A.**  That's fine.  I'll have it in a moment.  I have it now.

23   Thank you.

24   **Q.**  What you see here is Admissions Committee Members Spring

25   2011.

1    **A.**   Yes.  Good.  Yes.

2    **Q.**   I want to go through some of these with you.  And we

3    don't have to go through them one by one.  I've tried to do

4    my best to identify who's there and who isn't.  Ian Anderson.

5    He was on the committee in 2011, correct?

6    **A.**   Yes.

7    **Q.**   He's still at the admissions office, correct?

8    **A.**   Yes.

9    **Q.**   Roger Banks was on the admissions committee in 2011,

10   correct?

11   **A.**   Yes.

12   **Q.**   He's still at the admissions office, correct?

13   **A.**   Yes.

14   **Q.**   Valerie Bielensen was on the committee in 2011 but is no

15   longer at Harvard admissions, correct?

16   **A.**   Correct.

17   **Q.**   Okay.  I'm going to cross her name off.  Jessica Clark

18   was on the committee in 2011.  She is still there, correct?

19   **A.**   Yes.

20   **Q.**   Now we go through Monica Del Toro Brown was on the

21   committee in 2011 but is no longer there, correct?

22   **A.**   Correct.

23   **Q.**   The same is true of Sarah Donahue, no longer there,

24   recently retired?

25   **A.**   Yes.

1   **Q.**   And then Devery Doran also no longer there?

2   **A.**   Correct.

3   **Q.**   Danielle Early also no longer there?

4   **A.**   Correct.

5   **Q.**   Precious Eboigbe also no longer there?

6   **A.**   Correct.

7   **Q.**   Ellis Eckhard also no longer there?

8   **A.**   Correct.

9   **Q.**   Bronwyn Evans also no longer there?

10  **A.**   Correct.

11  **Q.**   Now we'll turn to the second page.  Okay?

12  **A.**   Yes.

13  **Q.**   At the top is David Evans.  In 2011 according to this

14  chart he had been there for 41 years; is that right?

15  **A.**   Yes.

16  **Q.**   And he's still there, isn't he?

17  **A.**   He is.

18  **Q.**   Still at the admissions office.  He was around for the

19  OCR investigation, correct?

20  **A.**   Yes.

21  **Q.**   Chad Faeber, he's no longer there, correct?

22  **A.**   Yes.

23  **Q.**   William Fitzsimmons, who is he?

24  **A.**   I think you met him yesterday or I should say Monday.

25  **Q.**   That was my poor attempt at a joke.  Natalie Galindo,

1    she's no longer there?

2    **A.**   Correct.

3    **Q.**   Jennifer Gandi no longer there?

4    **A.**   Correct.

5    **Q.**   Rosemary Green, she's no longer there, but she was around

6    for the OCR investigation, correct?

7    **A.**   Correct.

8    **Q.**   Sally Harty is still there, correct?

9    **A.**   Yes.

10   **Q.**   She was around for the OCR investigation?

11   **A.**   Yes.

12   **Q.**   I'm going the wrong way.  Marcy Homer is no longer there?

13   **A.**   Correct.

14   **Q.**   Kaitlin Howrigan is no longer there?

15   **A.**   Correct.

16   **Q.**   Janet Irons still works there, correct?

17   **A.**   Yes.

18   **Q.**   And she was around for the OCR investigation, right?

19   **A.**   Yes.

20   **Q.**   Jonathan Kaufman and Charlene Kim still work in the

21   office, correct?

22   **A.**   Yes.

23   **Q.**   On the next page we start off at the top, Amy Crilcaldi,

24   she's no longer there?

25   **A.**   Correct.

1    **Q.**   Sean Logan is no longer there?

2    **A.**   Correct.

3    **Q.**   Christopher Looby is still working at the admissions

4    office today?

5    **A.**   Yes.

6    **Q.**   Mary Magnuson is still at the admissions office?

7    **A.**   Yes.

8    **Q.**   Christine Mascolo is still at the admissions office?

9    **A.**   Yes.

10   **Q.**   Then there's you?

11   **A.**   Yes.

12   **Q.**   Sophia Meeze is still at the admissions office?

13   **A.**   Yes.

14   **Q.**   She's gone, I think, sorry.

15   **A.**   She's gone, yes.

16   **Q.**   My fault.

17   **A.**   She's been gone.

18   **Q.**   Dwight Miller is still at the admissions office and has

19   been there for 44 years in the spring of 2011; is that right?

20   **A.**   That's right.

21   **Q.**   And he was around when the OCR investigation happened,

22   correct?

23   **A.**   He was.

24   **Q.**   Lucerito Ortiz is no longer there?

25   **A.**   Right.

1  **Q.**  The Elizabeth Pabst is no longer there?

2  **A.**  Right.

3  **Q.**  James Pautz is no longer there?

4  **A.**  Right.

5  **Q.**  And on the last page Rick Rice is still at the office,

6  correct?

7  **A.**  He is.

8  **Q.**  Margaret Swift is no longer there?

9  **A.**  No longer.

10  **Q.**  Kathryn Vidra had been there for 27 years in 2011.  She's

11  still there, correct?

12  **A.**  Yes.

13  **Q.**  And she was around for the OCR investigation, right?

14  **A.**  She was.

15  **Q.**  And Paris Woods is no longer with the office, correct?

16  **A.**  Yes.

17  **Q.**  So we've been through the whole list --

18  **A.**  And Robin Worth, the last person.

19  **Q.**  Sorry.  Robin Worth is it still there?

20  **A.**  Yes.

21  **Q.**  Sorry.  We've been through the whole list.  There's been,

22  would you agree, a fair amount of turn over in those seven

23  years.  I think I counted 22 out of 39 people are no longer

24  there from seven years ago?

25  **A.**  Right.

1   **Q.**  You'd agree with me there's a fair amount of turnover,

2   right?

3   **A.**  Yes.

4   **Q.**  I just have a few questions.  Going back to the first

5   page.  Are you certain whether or not Precious Eboigbe was

6   using race in her assignment of the personal rating?

7   **A.**  I cannot be certain of that.

8   **Q.**  You also can't be certain whether Monica Del Toro-Brown

9   was using race in the personal rating?

10  **A.**  I can't be certain.  I have no reason to believe that in

11  either case.

12  **Q.**  But you can't be certain, can you?

13  **A.**  I can't.

14  **Q.**  One of the reasons you can't be sure whether these

15  individuals and others considered race in the personal rating

16  is Harvard had no written guidance on whether to use race in

17  the personal rating?

18  **A.**  No.  The reason I can't be sure is that I haven't seen

19  evidence of it one way or another.

20  **Q.**  You've been reading applications for nearly 40 years,

21  right?

22  **A.**  Yes.

23  **Q.**  Going back to our list of things you told us go into the

24  personal rating.  In your experience do Asian-Americans as a

25  group lack attractive personal characteristics compared to

1    other applicants?

2    **A.**   Not in my experience.

3    **Q.**   And none of the characteristics that we've talked about

4    have any correlation with race, do they?

5    **A.**   No.  Not per se.  They may be revealed in a racial

6    context, but they have nothing to do with race per se.

7    **Q.**   None of these characteristics we've talked about have any

8    correlation with race, do they?

9    **A.**   No.

10   **Q.**   Thank you.  I have no further questions, Director

11   McGrath.

12            MR. LEE:  Your Honor, in answer to your question I

13   think what I'll do is start and then go until 4:00.

14            THE COURT:  Okay.  If you decide at 4 you're

15   feeling energized and wish to push on, just let me know.

16            MR. LEE:  Okay.

17            THE COURT:  I just missed some of these names.

18   Natalie Galindo still at the office?

19            THE WITNESS:  No, she is not.

20            THE COURT:  What about Marcy Homer?

21            THE WITNESS:  She is not.

22            THE COURT:  Irons?

23            THE WITNESS:  Yes.

24            THE COURT:  Kaufman?

25            THE WITNESS:  Yes.

```
1              THE COURT:  And Kim.
2              THE WITNESS:  Yes.
3              THE COURT:  Sorry.  I just missed a couple.
4              THE WITNESS:  Not at all.  Thank you.
5                          EXAMINATION
6    BY MR. LEE:
7    Q.  Actually let me provide one more question.  May I
8    proceed, Your Honor?
9              THE COURT:  Yes.
10   BY MR. LEE:
11   Q.  Mr. Mortara suggested Sally Donahue was no longer
12   involved in admissions; is that correct?
13   A.  She has retired from her professional role.  She will
14   help us in admissions not as a regular staff member, I think.
15   So I just let that go.
16   Q.  And is she still reading folders?
17   A.  I think she will be this fall.
18   Q.  Now, Mr. Mortara began his conversation by suggesting,
19   and I have a quote, "I've read about a thousand of your
20   documents."
21              Do you remember he said that at the beginning?
22   A.  Of my documents is what he said.  I may have misheard.
23   Q.  Documents.  Now, let's see what he came up with after he
24   read these thousands of documents.  He came up with PX257
25   which is an email chain between you and your daughter,
```

1    correct?

2    **A.**   Correct.

3    **Q.**   And he came up with PX265 which is another email with

4    your daughter, correct?

5    **A.**   Correct.

6    **Q.**   And he came up with a letter to a 90-year old alum who

7    was making completely inappropriate comments.  That's what he

8    came up with, correct?

9    **A.**   Yes.  Correct.

10   **Q.**   Let's talk about the three things he came up with from

11   these thousands of documents.  The emails between you and

12   your daughter, do you recall PX257, the first one?

13   **A.**   I'll have to remind myself which one it was.

14   **Q.**   It would be on the screen.

15   **A.**   257.  I'd rather look at the -- yes, I see it.

16   **Q.**   This is a document he discussed with you about the Z list

17   email?

18   **A.**   Yes.  Yes.

19   **Q.**   This email exchange between you and your daughter, did

20   you ever expect it to see the light of day in a federal

21   courthouse?

22   **A.**   No, I did not.

23   **Q.**   Now, does the email concern discrimination against any

24   Asian-American applicant at all?

25   **A.**   Not that I can see.

1   **Q.**   Does it concern an Asian-American applicant period?

2   **A.**   Not that I can see.

3   **Q.**   So that's number one of his list.  Let's look at number

4   two, PX265.

5   **A.**   Yes.

6   **Q.**   Do you have that before you?

7   **A.**   I do.

8   **Q.**   This is another email with your daughter, correct?

9   **A.**   Yes.

10  **Q.**   And this is the one on the Utah schools committee,

11  correct?

12  **A.**   Yes.

13  **Q.**   And he asked you specifically about the word "amusement".

14  Do you recall that?

15  **A.**   Yes.

16  **Q.**   Were you criticizing or casting aspersions on any of the

17  applicants mentioned in those emails?

18  **A.**   No, I was not.

19  **Q.**   Did you criticize or cast aspersions on any individual

20  applicant in any of the two emails with your daughter?

21  That's a poor question because it has both.

22          Let's just stay focused on 265.  Did you cast

23  aspersions or criticize any applicant in the emails that are

24  P265?

25  **A.**   No.

1    **Q.**  Do you understand that SFFA contends and has suggested
2    these emails somehow suggest that you have a bias against
3    Asian-Americans.  Are you aware of that?
4    **A.**  I'm aware of that.
5    **Q.**  Is that true?
6    **A.**  No.
7    **Q.**  Now, let's look at his third document from your thousands
8    of documents.  It's PX461.  Do you have that?
9    **A.**  I do.
10   **Q.**  Now, this is a letter from an elderly alum, correct?
11   **A.**  Yes.
12   **Q.**  And do you condone his criticisms of different racial or
13   ethnic groups?
14   **A.**  I do not.
15   **Q.**  Do you condone his suggestion of quotas?
16   **A.**  No.
17   **Q.**  Do you condone the views he expressed about what the
18   Harvard campus should look like?
19   **A.**  No.
20   **Q.**  Would you tell us why you decided to give a 90-year old
21   alum a polite response rather than getting into a war of
22   words with him?
23   **A.**  Because he is a 90-year old alum, and I thought it was a
24   polite institutional thing to do.  And I took a mild and
25   modest stab in paragraph three of my own letter to provide a

1    context in which we do admissions knowing that it wouldn't

2    make any difference to him.

3    **Q.**   In fact, I wanted to ask you about that.  Would you look

4    at the paragraph that you talked about and go to the third

5    paragraph.  What you say to him is, "Our ambition to educate

6    future leaders has made Harvard appealing to the most

7    talented and ambitious students across America.  As a result

8    the college has been more representative of the ethnic and

9    economic diversity of the country and, the university

10   believes, better positioned to make significant contributions

11   to the country.  We have been pleased by our graduates'

12   success and their leadership in their communities and

13   professions following college."

14           That was part of your response, correct?

15   **A.**   Yes, it was.

16   **Q.**   The polite response that you provided, correct?

17   **A.**   Yes.

18   **Q.**   Now, so we've looked at the three documents that

19   Mr. Mortara asked you about.  Two emails with your daughter

20   and a polite response to an alum, correct?

21   **A.**   Yes.

22   **Q.**   And incidentally, did the alum's letter have anything to

23   do with an Asian-American applicant to Harvard College?

24   **A.**   I do not think so.

25   **Q.**   Let me ask you about a different topic he asked you about

1    now which is religious diversity.  If an application

2    discloses an applicant's religion and discusses the

3    importance of the religion, as Mr. Mortara discussed his with

4    us, would you take that into account in evaluating the

5    application?

6    **A.**   I think we would.  Normally we would.

7    **Q.**   Do students, in fact, disclose that type of information?

8    **A.**   Quite often.

9    **Q.**   Is the Harvard campus a religiously diverse campus today?

10   **A.**   It is very diverse.

11   **Q.**   And have you been able to assemble a religiously diverse

12   class?

13   **A.**   I think we have.  We do not have data on religion.

14   **Q.**   To the extent you have information, is it because

15   applicants have self-disclosed and described the importance

16   themselves, correct?

17   **A.**   Yes.

18   **Q.**   Next topic, and I'm going to come back to going through

19   some of the issues I want to go through with you on a

20   discipline basis.  But I want to before the end of the week

21   take care of a few things Mr. Mortara asked you about.

22          Mr. Mortara asked you about your deposition about

23   alternative ways to achieve racial diversity.  Do you

24   remember that?  The date of the deposition was June 18, 2015?

25   **A.**   Yes.

1    **Q.**   And your answers were correct as of that time?

2    **A.**   Yes.

3    **Q.**   Has there been the issuance of a report by race neutral

4    alternatives committee after the date of your deposition?

5    **A.**   I have heard that there was, yes.

6    **Q.**   And that was by the college, correct?

7    **A.**   Yes.

8    **Q.**   Now, let me go and ask you to look at PX220 which

9    Mr. Mortara also asked you about.  I just want to talk about

10   a couple of things that he didn't review with you.  Tell me

11   when you're there.

12   **A.**   220, yes.

13   **Q.**   220.  Do you have that before you?

14   **A.**   I do.

15   **Q.**   Now, he covered some portion of this.  I'd like to sort

16   of complete the picture if we could.  In the email that you

17   actually drafted yourself, that's in the second half of the

18   first page, correct?

19   **A.**   Yes.

20   **Q.**   And I want to be sure first we have the correct reading

21   of the sentence that refers to the OCR report.  Do you see

22   the sentence that reads, "And we have".  We'll highlight it

23   here.

24   **A.**   Yes.  I see that sentence.

25   **Q.**   And would you read that sentence?

1   **A.**   "And we have had been examined by OCR most fully about 20

2   years back when we had a full compliance review about

3   Asian-American bias which resulted in a very gratifying

4   finding of approbation.   It appears that that chapter is

5   known to this author."

6   **Q.**   The word is approbation rather than probation, correct?

7   **A.**   Correct.

8   **Q.**   Now, go to the next paragraph.

9   **A.**   Yes.

10  **Q.**   I'm going to bring your attention to the last sentence of

11  your email, and this follows a sentence or two that

12  Mr. Mortara asked you about.   Do you see the portion that

13  reads, "We do not run a single-factor admissions system.   Nor

14  do we have any interest in inner and outer rings, etc.   We

15  look for the people with the most promise for the future and

16  we make every decision on the basis of achievement in the

17  context of what an applicant has done and what he has had,

18  etc."

19          Have I read that correctly?

20  **A.**   Yes.

21  **Q.**   Is that, in fact, true?

22  **A.**   Yes.

23  **Q.**   And has it been consistently true during the period of

24  time that you have been the director of admissions?

25  **A.**   During my time, yes.

1  **Q.**  Director McGrath, you began working at Harvard in what
2  year?
3  **A.**  My first professional job began in 1978.
4  **Q.**  And when did you become the director of admissions?
5  **A.**  In 1987.
6  **Q.**  Do you serve as the chair of any dockets today?
7  **A.**  Yes.  Two dockets.
8  **Q.**  Which dockets are you the chair of?
9  **A.**  B which is the Mountain West, not California.  And the
10  other docket is T which is New York City and Westchester
11  County and Rockland County.
12  **Q.**  What are your duties and responsibilities as the docket
13  chair?
14  **A.**  The chairman of the docket organizes and leads the review
15  of candidates.  I'm the final reader, at least the senior
16  reader, of all of the candidates who will be discussed in the
17  committee.  I do a good deal of work with the alumni who in
18  New York City especially do a lot of recruitment, and we're
19  trying to do more of that in the west.
20          And I also organize and chair and lead the
21  committee discussions of candidates for admission and various
22  other duties as well.
23  **Q.**  When you read applications as the docket chair, do you
24  assign ratings?
25  **A.**  Yes.

1    **Q.**   Has a first reader also assigned ratings?

2    **A.**   Yes.

3    **Q.**   Now, Her Honor has heard a great deal about the ratings

4    from Dean Fitzsimmons.  Let me just ask you a few questions

5    that go to questions Mr. Mortara asked you about.

6              Does Harvard consider the personal qualities and

7    characteristics of the candidates in the admissions process?

8    **A.**   Yes, we do.

9    **Q.**   And why?

10   **A.**   Well, we're aware, for one thing, that we will be

11   bringing into Harvard individual people, not records of

12   achievement.  We want to invest our opportunities in people

13   who have -- seem likely to us -- of course this is a

14   projection.  Who seem likely to us to use their talents and

15   education for the benefit of society.

16             We're really firm about hoping for that and hoping

17   to identify those people.  Personal qualities are part of

18   that calculation on our part.

19   **Q.**   What are the sources of information you use to make that

20   judgment?

21   **A.**   Well, there are a number of sources.  The first one is

22   chronologically in reading a folder, the first one you

23   encounter is the student's own self-presentation, whatever

24   she said in her essay, what whatever she says about her

25   interests, whatever she characterizes as important.  She

1   starts the reading process for us or he, we start where the

2   candidate is.

3          In addition to that there are a number of other

4   sources or voices in the folder.  There are teacher letters,

5   a couple typically, maybe more.  There is a letter from

6   somebody representing the school.  It could be the guidance

7   counselor, the headmaster, whoever writes for students who

8   are heading out.

9          We often have letters in the folder from the rabbi

10  or the boss or the grandfather's best friend or godfather.

11  We have lots of people who feel encouraged to write to us

12  about candidates for admission.  We may have the opinions of

13  coaches, either their coach or our coach, or the music

14  teacher.

15         And we normally have also, we always have, some

16  kind of report from the interviewer, typically the alumni

17  interviewer who helped us.  There may be other voices, too.

18  But there are lots of people from outside the Harvard world

19  who are giving us their impression of any aspect they want to

20  talk about about any candidate.

21  **Q.**  Now, Mr. Mortara asked you some questions about the role

22  of race in the different ratings.  Do you recall that?

23  **A.**  Yes.

24  **Q.**  And I think I wrote down correctly your answer was "race

25  alone" is or is not a factor?

1    **A.**   Yes.

2    **Q.**   The phrase you used was "race alone", correct?

3    **A.**   That was of the phrase I used.

4    **Q.**   Let me ask you these questions.  Does the applicant's

5    race alone factor into the personal rating?

6    **A.**   No, it should not.

7    **Q.**   The does an applicant's race alone factor into any of the

8    profile ratings?

9    **A.**   No, it should not.

10   **Q.**   Does an applicant's race alone factor into the

11   preliminary overall rating?

12   **A.**   It may be a factor, in a good case we may be adding that

13   into our consideration in the overall rating, yes.

14   **Q.**   Now, can experiences of an applicant that are related to

15   race be reflected or believe considered in assigning a

16   profile rating?

17   **A.**   Yes.

18   **Q.**   Can you give us an example?

19   **A.**   Yes.  I'm making this up as I go.  A candidate who was

20   the, let's say, only member of his or her race in a school

21   that was predominantly something else and had felt himself --

22   we actually see a number of these candidates -- who felt

23   himself to be marked throughout his school experience as

24   different from other people, and yet, making up this

25   fictional case, may have been elected school body president,

1    might have been valedictorian and felt watched as he achieved

2    those things, may write about it and help us understand

3    persistence, courage, self-confidence.

4            Sometimes the situation that a student was born

5    into is in his narrative part of his explanation of who he is

6    and who he hopes to be and what he's done already.

7    **Q.**   Now, Mr. Mortara asked you along the same lines whether

8    there were written directives of precisely how to use race in

9    the process.

10           Do you remember that?

11   **A.**   I do.

12   **Q.**   He also asked you some questions about whether you were

13   familiar with some of the Supreme Court decisions?

14   **A.**   Yes.

15   **Q.**   I know you're not a lawyer, but are you familiar with the

16   concept of race being used flexibly and not mechanically?

17   **A.**   Yes, I am.

18   **Q.**   As opposed to according to some directive?

19   **A.**   Right.  Yes, I am familiar with that.

20   **Q.**   So I want to ask you about that.  When you were asked

21   those questions you said to Mr. Mortara that you discussed

22   this quite a bit in training, correct?

23   **A.**   Yes.

24   **Q.**   Does the admissions office provide training for new

25   admissions officers?

1   **A.**   Yes.

2   **Q.**   When does that training start?

3   **A.**   Well, it starts at the beginning.  Their first day of

4   work they're hit with about a month of training in a kind of

5   series of meetings accompanied by an enormous amount of

6   reading.  The first month there is intense.

7   **Q.**   Are there different phases of the training?

8   **A.**   Yes.  So the first month is reading and meeting with

9   people and mastering the various aspects of our business.  I

10  think of the training period -- I think of the first year as

11  being an apprentice year.  I think the first year really does

12  extend -- the first training extends through the year because

13  in a way, our new hires know this, they don't get to do much

14  alone.

15          They read folders, the first 50 folders or so they

16  read are always read by another person after they had read

17  them even if they thought they might not be worthy of further

18  consideration.  During the times that they're in committee

19  that first year, they're pretty intensely monitored by the

20  chair of the committee, perhaps by other committee members as

21  well.

22          When they begin to do their group sessions, which

23  is group information sessions where we recruit people who

24  come to Cambridge and we speak with them in groups, we always

25  make sure at the beginning that there's another staff member

1    there to watch and give feedback.  It's a feedback-giving

2    process.

3    **Q.**  Go ahead.

4    **A.**  So some of the most important parts of what people learn

5    in what I think of as an apprentice year are not the kind of

6    thing that we think can be very effectively taught in

7    something in a handbook.  Things like the handling of race or

8    the handling of character and personality, the interpretation

9    of family circumstances of various kinds, the assessment of

10   very granular skills, that's stuff that we teach people in

11   conversation over that first year.

12           Staff meetings, subcommittee meetings, specific

13   meetings on topics.  We also send around, perhaps too much,

14   but a lot of material to people on topics that are salient to

15   our work.  The first year there is a supervised experience.

16   **Q.**  We're getting close to 4:00.  I want to ask you just a

17   few questions, and then we'll be at a good stopping point for

18   the week.

19           The first is this:  There are written materials

20   that you use for the training, correct?

21   **A.**  Yes.

22   **Q.**  And they include among them the exhibit that Mr. Mortara

23   showed you on how to fill in the numbers, correct?

24   **A.**  Yes, they could.

25   **Q.**  Is there also an interview handbook?

1    **A.**  There is.

2    **Q.**  Is there also case books?

3    **A.**  Yes.

4    **Q.**  Now, as lawyers we're accustomed to being trained by case

5    books.  Are they used to train admissions officers?

6    **A.**  Yes.  They're important.

7    **Q.**  Are there guides to how you use the case books?

8    **A.**  Yes.  There are guides to how to use the case books so

9    that whoever is doing the training can hit all the notes.

10   Yes, there are guides.

11   **Q.**  I'm going to next week take you through each so Her Honor

12   can see the training.

13            Are there written guidelines for admissions

14   officers on how to judge someone's integrity?

15   **A.**  No written guidelines that I can recall.

16   **Q.**  Is there any written guideline on how to judge someone's

17   creativity?

18   **A.**  There are guidelines on the process for getting

19   assessments of that which includes faculty reviews, for

20   example.

21   **Q.**  But in terms of guidelines that tell you specifically how

22   to judge someone's creativity and incorporate it in the

23   process, is there a written guideline?

24   **A.**  Well, my favorite yes response to that, and the only one

25   I can really offer, is a letter that's part of the packet

1    that we give to new people to discuss is a letter from a

2    member of our faculty, Helen Vendler who writes about less

3    tangible creative aspects.  And that's a very important

4    document forever for our staff to come to grips with.

5    **Q.**  Is there any portion in the handbook that tells someone

6    how to judge someone's grit?

7    **A.**  I don't think so specifically directly.

8              MR. LEE:  Your Honor, this would be a good place to

9    stop and then I can move to the documents on Monday.

10             THE COURT:  Yes, that's fine.  Do you want to start

11   at 9:30 or 10 on Monday?

12             MR. LEE:  9:30 would be great if it's possible.  I

13   know they want to get Mr. Kahlenberg off and on.

14             MR. MORTARA:  9:30 would be preferable.

15             THE COURT:  9:30 is fine.  I think we've moved

16   everything to our afternoon beginning at 3:30.

17             MR. LEE:  I think what's going to happen,

18   Mr. Hughes is going to talk about this briefly.  We'll

19   interrupt Director McGrath, let Mr. Kahlenberg go on and off,

20   and then we'll bring her back to finish.  If that's all right

21   with Your Honor.

22             THE COURT:  That's fine with me.

23             (Court recessed at 4:00 p.m.)

24

25

```
 1                  - - - - - - - - - - -

 2                     CERTIFICATION

 3

 4         I certify that the foregoing is a correct

 5  transcript of the record of proceedings in the above-entitled

 6  matter to the best of my skill and ability.

 7

 8

 9

10  /s/ Joan M. Daly                October 19, 2018

11  _____            _____

12  Joan M. Daly, RMR, CRR          Date
    Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX OF WITNESSES

WITNESS                                                    PAGE

ERICA BEVER

    Examination (Resumed) By Mr. McBRIDE................   7
    Examination By Ms. Ellsworth.......................  14
    Further Examination By Mr. McBRIDE.................  66

ERIN DRIVER-LINN

    Examination By Ms. Hacker..........................  69
    Examination By Ms. Ellsworth....................... 107

MARLYN MCGRATH

    Examination By Mr. Mortara......................... 155
    Examination By Mr. Lee............................. 242

1                              E X H I B I T S

2

     Defendant Exhibit                                    Received
3
        SA1            ...................................      53
4

5

6

7    Plaintiff                                             Received
     Exhibit
8
        P13            ...................................     118
9
        P17            ...................................      26
10
        P24            ...................................      99
11
        41             ...................................       7
12
        220            ...................................     161
13
        225            ...................................     206
14
        P257           ...................................     210
15
        265            ...................................     218
16
        287            ...................................     213
17
        P288           ...................................      40
18
        P299           ...................................      71
19
        P300           ...................................      74
20
        461            ...................................     222
21
        P604           ...................................      96
22

23

24

25