1                   UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3     _____

4     STUDENTS FOR FAIR ADMISSIONS, INC.,

5                    Plaintiff,          Civil Action
                                         No. 14-14176-ADB
6     v.
                                         October 30, 2018
7     PRESIDENT AND FELLOWS OF HARVARD
      COLLEGE, et al.,                   Pages 1 to 185

8                    Defendants.

9     _____

10

11

12
                    TRANSCRIPT OF BENCH TRIAL - DAY 12
13             BEFORE THE HONORABLE ALLISON D. BURROUGHS
                    UNITED STATES DISTRICT COURT
14              JOHN J. MOAKLEY U.S. COURTHOUSE
                      ONE COURTHOUSE WAY
15                   BOSTON, MA  02210

16

17

18

19

20

21

22              JOAN M. DALY, RMR, CRR
              KELLY MORTELLITE, RMR, CRR
23               Official Court Reporter
             John J. Moakley U.S. Courthouse
24           One Courthouse Way, Room 5507
                  Boston, MA  02210
25               joanmdaly62@gmail.com

1    APPEARANCES:

2
     COUNSEL FOR THE PLAINTIFF:
3

4            ADAM K. MORTARA, ESQUIRE
             J. SCOTT McBRIDE, ESQUIRE
5            KRISTA J. PERRY, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
6            54 West Hubbard Street
             Suite 300
7            Chicago, Illinois 60654
             312.494.4400
8            adam.mortara@bartlit-beck.com
             scott.mcbride@bartlit-beck.com
9            krista.perry@bartlit-beck.com

10           JOHN M. HUGHES, ESQUIRE
             KATHERINE L.I. HACKER, ESQUIRE
11           MEG E. FASULO, ESQUIRE
             Bartlit Beck Herman Palenchar & Scott
12           1801 Wewatta Street
             Suite 1200
13           Denver, Colorado 80202
             303.592.3100
14           john.hughes@bartlit-beck.com
             meg.fasulo@bartlit-beck.com
15           kat.hacker@bartlit-beck.com

16           JOHN MICHAEL CONNOLLY, ESQUIRE
             THOMAS R. McCARTHY, ESQUIRE
17           WILLIAM S. CONSOVOY, ESQUIRE
             Consovoy McCarthy Park PLLC
18           3033 Wilson Boulevard
             Suite 700
19           Arlington, Virginia 22201
             703.243.9423
20           mike@consovoymccarthy.com
             tom@consovoymccarthy.com
21           will@consovoymccarthy.com

22

23

24

25

```
1   APPEARANCES (cont.):

2
        PATRICK STRAWBRIDGE, ESQUIRE
3       Consovoy McCarthy Park PLLC
        Ten Post Office Square
4       8th Floor, South, PMB #706
        Boston, Massachusetts 02109
5       617.227.0548
        patrick@consovoymccarthy.com
6
        MICHAEL H. PARK, ESQUIRE
7       Consovoy McCarthy Park PLLC
        3 Columbus Circle
8       15th Floor
        New York, New York 10024
9       646.456.4432
        park@consovoymccarthy.com
10
        PAUL M. SANFORD ESQUIRE
11      BENJAMIN C. CALDWELL, ESQUIRE
        Burns & Levinson LLP
12      One Citizens Plaza
        Suite 110
13      Providence, Rhode Island 02903
        401.831.8330
14      psanford@burnslev.com
        bcaldwell@burnslev.com
15

16  COUNSEL FOR THE DEFENDANT:

17      WILLIAM F. LEE, ESQUIRE
        FELICIA H. ELLSWORTH, ESQUIRE
18      ANDREW S. DULBERG, ESQUIRE
        ELIZABETH C. MOONEY, ESQUIRE
19      SARAH R. FRAZIER, ESQUIRE
        Wilmer Cutler Pickering Hale and Dorr LLP
20      60 State Street
        Boston, Massachusetts 02109
21      617.526.6556
        william.lee@wilmerhale.com
22      felicia.ellsworth@wilmerhale.com
        andrew.dulberg@wilmerhale.com
23      elizabeth.mooney@wilmerhale.com
        sarah.frazier@wilmerhale.com
24

25
```

```
 1    APPEARANCES (cont.):

 2
              SETH P. WAXMAN, ESQUIRE
 3            DANIELLE CONLEY, ESQUIRE
              DANIEL WINIK, ESQUIRE
 4            BRITTANY AMADI, ESQUIRE
              PAUL R.Q. WOLFSON, ESQUIRE
 5            Wilmer Cutler Pickering Hale and Dorr LLP
              1875 Pennsylvania Ave, NW
 6            Washington, DC 20006
              202.663.6006
 7            seth.waxman@wilmerhale.com
              danielle.conley@wilmerhale.com
 8            daniel.winik@wilmerhale.com
              brittany.amadi@wilmerhale.com
 9            paul.wolfson@wilmerhale.com

10            DEBO P. ADEGBILE, ESQUIRE
              Wilmer Cutler Pickering Hale and Dorr LLP
11            7 World Trade Center
              250 Greenwich Street
12            New York, New York 10007
              212.295.6717
13            debo.adegbile@wilmerhale.com

14            ARA B. GERSHENGORN, ESQUIRE
              Harvard Office of the General Counsel
15            Smith Campus Center
              Suite 980
16            1350 Massachusetts Avenue
              Cambridge, Massachusetts 02138
17            617.495.8210
              ara_gershengorn@harvard.edu

18

19    COUNSEL FOR AMICI STUDENTS:

20            JON M. GREENBAUM, ESQUIRE
              BRENDA L. SHUM, ESQUIRE
21            GENEVIEVE BONADIES TORRES, ESQUIRE
              KRISTEN CLARKE, ESQUIRE
22            1500 K Street NW, Suite 900
              Washington, DC 20005
23            202.662.8315
              jgreenbaum@lawyerscommittee.org
24            bshum@lawyerscommittee.org
              gtorres@lawyerscommittee.org
25            kclarke@lawyerscommittee.org
```

```
 1    APPEARANCES (cont.):

 2
              LAWRENCE CULLEEN, ESQUIRE
 3            EMMA DINAN, ESQUIRE
              Arnold & Porter LLP
 4            555 Twelfth Street, NW
              Washington, DC 20004
 5            202.942.5477
              gina.dean@aporter.com
 6            emma.dinan@aporter.com

 7
      COUNSEL FOR AMICI ORGANIZATIONS:
 8
              JENNIFER A. HOLMES, ESQUIRE
 9            CARA McCLELLAN, ESQUIRE
              JIN HEE LEE, ESQUIRE
10            MICHAELE M. TURNAGE YOUNG, ESQUIRE
              RACHEL N. KLEINMAN, ESQUIRE
11            NAACP Legal Defense and Educational Fund, Inc.
              700 14th Street NW
12            Suite 600
              Washington, DC 20005
13            jholmes@naacpldf.org
              cmcclellan@naacpldf.org
14            jlee@naacpldf.org
              mturnageyoung@naacpldf.org
15            rkleinman@naacpldf.org

16            KENNETH N. THAYER, ESQUIRE
              KATE R. COOK, ESQUIRE
17            Sugarman Rogers
              101 Merrimac Street
18            Suite 900
              Boston, Massachusetts 02114
19            617.227.3030
              thayer@sugarmanrogers.com
20            cook@sugarmanrogers.com

21

22

23

24

25
```

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Allison D. Burroughs, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, One Courthouse Way, Boston, Massachusetts, on October 30, 2018.)

THE COURT:  Can I see counsel at sidebar, please.

[Sidebar sealed and redacted.]

THE COURT:  Okay.  When you're ready.

MR. WAXMAN:  Your Honor, Harvard calls President Ruth Simmons.

(RUTH SIMMONS, duly sworn by Deputy Clerk.)

COURTROOM CLERK:  Will you please state your name and spell your last name for the record.

THE WITNESS:  My name is Ruth Simmons, S-I-M-M-O-N-S.

EXAMINATION BY MR. WAXMAN:

**Q.**  Good morning, President Simmons.

**A.**  Good morning.

**Q.**  What is your current position and title?

**A.**  I'm currently president of Prairie View A&M University in Texas.

**Q.**  Have you been asked by Harvard to testify as an expert in this matter?

1   **A.**   I have.

2   **Q.**   Are you being compensated for your time and expertise in

3   this case?

4   **A.**   I am not.

5   **Q.**   Did Harvard offer to compensate you?

6   **A.**   Yes, they did.

7   **Q.**   Before we discuss the questions that you were asked to

8   address, could you please tell us something about your family

9   background and where you grew up?

10  **A.**   I was born the last of 12 children in Grapeland, Texas.

11  I was born in a sharecropper's shack on a plantation.   I

12  lived there with my family until I was seven years old, after

13  which my family moved to Houston.

14          We lived in Houston in the notorious Fifth Ward,

15  sometimes called "Bloody Fifth Ward," a segregated community

16  in the shadow of downtown Houston.   I went to elementary

17  school, middle school, and high school in the Fifth Ward in a

18  completely segregated environment.

19  **Q.**   Did you attend college?

20  **A.**   I did.

21  **Q.**   Where?

22  **A.**   I went to Dillard University in New Orleans.

23  **Q.**   And did you spend all four years at Dillard?

24  **A.**   No.   I went to Wellesley college my junior year, with a

25  junior year exchange program between Dillard and Wellesley.

1    **Q.**  Let me ask you a few questions about Dillard and then

2    Wellesley.

3            Tell us about your educational experience at

4    Dillard.

5    **A.**  Well, in the early '60s, mid-'60s, higher education was

6    still relatively segregated in the South.  Dillard was an

7    African-American institution, formed just after slavery and

8    supported by the Methodist church.  So all the students were

9    African-American.

10           However, many faculty, white faculty from the

11   North, interested in doing something to address the

12   inequities in education, either retired from their positions

13   in the universities in the North or decided to come South to

14   work in historically black universities.

15           And so for the first time in my life, I was exposed

16   to different races, mostly because of the white faculty who

17   had come to Dillard to teach.  And this had a profound

18   experience on me because for the most part, during my time at

19   Dillard, these were the faculty who nurtured me and who gave

20   me inspiration to do the things that I had done.

21   **Q.**  At the time that you were at Dillard, did you have the

22   opportunity to become exposed to other cultures?

23   **A.**  Certainly not through experiences with my peers, but

24   because of the faculty putting in front of me opportunities

25   to learn more about other cultures, I was inspired to go to

1    Mexico to study Spanish.

2            So at the end of my first year, I got on a bus and

3    went to Mexico to live with a Mexican family and to study --

4    and to study Spanish.  It was a -- the French have a term,

5    bouvsea (ph), completely overturned my world having the

6    opportunity to encounter this very different culture.

7    **Q.**   Was Mexico a segregated -- were you living in a

8    segregated environment in Mexico?

9    **A.**   Well, I wouldn't call it segregated.

10   **Q.**   I know, they were all Mexicans but --

11   **A.**   Yes.

12   **Q.**   Were you segregated?

13   **A.**   I don't even think that Mexico, at the time, thought in

14   terms of segregation.  Segregation at the time was a uniquely

15   American construct, I would say.  And so there were certainly

16   many different people who were in Saltillo, some of them as

17   tourists, some of them as students and so forth.  So there

18   were other students, white students in the Spanish program

19   that I was a part of, but I was living fundamentally with a

20   Mexican family.

21   **Q.**   So you mentioned that you spent your junior year at

22   Wellesley.  How did that come about?

23   **A.**   Well, I'm not sure whether or not Dillard wanted to get

24   rid of me, but at one point the president called me to the

25   president's house and told me that I had been designated as

1    the Dillard student to go to Wellesley that year.  And he

2    asked me if I would be willing to do that.  And he was a very

3    imposing figure, this president, and so of course I said yes.

4    Being terrified, nonetheless.

5            So I went to Wellesley and obviously for the first

6    time in this country, I was exposed to peers who were white

7    and it was a -- quite an experience for me.

8    Q.   Did you form relationships with your peers at Wellesley?

9    A.   I did.  I was the only African-American student on my

10   hallway.  Nevertheless, the students welcomed me quite

11   warmly, and I became very close to a number of the students

12   on the hallway.  All of whom I would say were white but who

13   came from different parts of the country.

14           One student in particular was from a farming

15   community in Connecticut, and she took me home with her when

16   we had long weekends or holidays.  I formed a relationship

17   with a Jewish girl from Philadelphia, and she took me home

18   with her to Philadelphia during holidays.

19           So it was a wonderful experience in that regard.

20   Q.   Did you continue your education after graduating from

21   Dillard?

22   A.   I did.  I received a Fulbright fellowship and went to

23   study in France at the University of Beaune.

24   Q.   What were you studying?

25   A.   I was reading Proust, which couldn't have been farther

1    afield from my background, actually.  Reading Proust.

2    **Q.**  When you completed Swann's Way or the entire cycle, what

3    did you do then?

4    **A.**  I came back to -- actually, I was in France during the

5    student riots and though it was very hard to get back, I

6    managed to get to Geneva and take a flight home.

7                I came back and I was married that summer that I

8    returned.  And my husband had intended a career in the

9    foreign service and wanted to be part of a program at

10   U.S.I.A.  So we went to Washington where he was part of that

11   program, and I took a job as an interpreter at the U.S.

12   Department of State and I enrolled in classes at George

13   Washington University.

14   **Q.**  Did you come to obtain a Ph.D.?

15   **A.**  I did.

16   **Q.**  Where did you earn your Ph.D.?

17   **A.**  I earned my Ph.D from Harvard in the Romance languages

18   and literatures department.

19   **Q.**  Why did you decide to study Romance languages, other than

20   having a year reading Proust?

21   **A.**  It's very hard to convey at this distance what it was

22   like to grow up in a deeply segregated environment in Texas.

23   But one of the things I can say is that that environment

24   shaped my thinking about the possibilities in life that

25   awaited me.  It shaped my thinking about what I was worth as

1    a person.  It shaped my thinking about who whites were, and

2    what their motives were in regard to me and my family.

3           And I somehow knew that one of the things that I

4    needed to do was to escape from the thinking that had been

5    imposed upon me by virtue of this trenchant segregation.  And

6    once I started studying language, and certainly once I went

7    to Mexico and saw that there was a different people there who

8    made no presumptions about me, I came to the conclusion that

9    my own view for the world was very narrow and one way for me

10   to resolve some of the presumptions that I had was to study

11   language.

12          And as -- the more I got -- more deeply I got into

13   the study of language, I found that it was extremely

14   beneficial to exploiting the assumptions that I grew up with.

15   And so I thought, well, why not do that for the rest of my

16   life and impart that to other young people.

17          So that's how I came to be in the career that I'm

18   in.

19   **Q.**  Let's turn now to your work in the field of higher

20   education.

21          Would you please turn to Tab 1 of your book, which

22   is Defense Exhibit 134?

23   **A.**  Yes.

24   **Q.**  What is this document?

25   **A.**  I believe that's an abbreviated CV.

1    **Q.**   Okay.  And Mr. Lee, could we have page 2 of the CV on the

2    screen.

3           President Simmons, I'm directing you now to the

4    part of your CV that describes your experience in the field

5    of higher education.  Does this fairly represent your

6    professional positions with universities?

7    **A.**   Yes, it does.

8    **Q.**   Now let's focus -- let's go through these one by one.

9           So with starting your work at Radcliffe, what did

10   you do there and for how long?

11   **A.**   Well, while I was a graduate student at Harvard, I was

12   surprised to be asked to serve as an admissions officer at

13   Radcliffe; and I agreed to do that, and so I worked for two

14   years in the Radcliffe admissions office.

15   **Q.**   And then going down under employment history to

16   Princeton, looking at your first role at Princeton, what did

17   you do and for how long?

18   **A.**   I was director of studies at Butler College, a

19   residential college at Princeton University, and I did that

20   for two years.

21   **Q.**   And what did you do next?

22   **A.**   I was asked to direct the Afro-American studies program

23   at Princeton, actually to build it.  And so I took that on

24   from 1985 to '87, and then was asked to become assistant dean

25   of the faculty at Princeton and then associate dean of the

1    faculty.

2    **Q.**   And after Princeton, what happened?

3    **A.**   Well, I decided that it might be useful for me to take my

4    experience to a minority-serving institution, and so I left

5    Princeton to go to Spelman College, where I became provost.

6    **Q.**   And can you just describe the characteristics of Spelman

7    College?

8    **A.**   Spelman College is an African-American college for women.

9    It is a liberal arts college, very small college.

10   **Q.**   And what were your duties there?

11   **A.**   Essentially to oversee academic affairs at the college.

12   **Q.**   And we're working our way up your employment history.  I

13   see that you then went -- you then returned to Princeton.

14   **A.**   Yes.

15   **Q.**   And what were your duties in the role of vice-provost?

16   **A.**   I was asked to return to Princeton, to become

17   vice-provost because of a change in the administrative

18   structure of the university, and I fulfilled that role as

19   deputy to the provost.

20   **Q.**   What did you do next?

21   **A.**   I was asked to become president of Smith College.

22   **Q.**   And I see here that you served for six years at Smith,

23   from 1995 to 2001?

24   **A.**   I did.  Yes.

25   **Q.**   Prior to your appointment, had Smith College ever had an

1   African-American president?

2   **A.**   No.

3   **Q.**   Let's go next up the line.  How did you get to Brown?

4   **A.**   How did I get to Brown?

5   **Q.**   I know, by Interstate 90, but --

6   **A.**   I wasn't going to say that, but it's clever.

7        I was asked to -- I was invited by the board of

8   trustees of Brown to serve as president of Brown.

9   **Q.**   And prior to your appointment, had Brown ever had a

10  permanent female president?

11  **A.**   No.

12  **Q.**   Prior to your appointment, had Brown ever had an

13  African-American president?

14  **A.**   No.

15  **Q.**   Prior to your appointment, had any Ivy league university

16  ever had an African-American president?

17  **A.**   No.

18  **Q.**   And I see that you served as president of Brown for 11

19  years, if my math is right?

20  **A.**   Yes.

21  **Q.**   And then there's a gap.  What did you do next?  An

22  uncharacteristic gap.

23  **A.**   I retired, very happily.

24  **Q.**   And what did you do in retirement?  Other than simply all

25  that Providence has to offer.

1    **A.**   Well, I actually went back to Houston and became involved

2    in some of the programs that were familiar to me as a young

3    person.   I started first with supporting a preschool program

4    for African-American children in a housing project in the

5    Fifth Ward.   And then I became involved with the community

6    center in my old neighborhood, and then I took on the

7    leadership of a new effort to support the improvement of

8    public schools in Houston.

9    **Q.**   So that sounds lovely.   How did you then come to leave

10   retirement and become president of Prairie View A&M?   How and

11   why?

12   **A.**   Quite unexpectedly.   The chancellor of the Texas A&M

13   system called me up and asked to meet with me to discuss

14   becoming interim president of Prairie View because the

15   president was leaving.   And I thought, of course, that this

16   was a foolish idea and -- but nevertheless assured him that I

17   would give it some thought.

18          I did for some period of time and then concluded

19   that, again, it was my responsibility, given all of the help

20   that I received as a young person, that it would be

21   appropriate for me to try to help the students at Prairie

22   View today, and so I agreed to take on the interim position.

23   **Q.**   And how did your interim status turn into a non-interim

24   status?

25   **A.**   They asked me to continue and I agreed to do so.

1    **Q.**  Looking back at the three institutions that you served as

2    president, Smith, Brown and Prairie View, do those

3    institutions have different educational missions?

4    **A.**  Distinctly so.

5    **Q.**  How so?

6    **A.**  Well, I mean, I suppose any institution is founded first

7    and continues on the basis of the mission that helped to

8    create it.

9         In the case of Prairie View, two ex-slaves, during

10   Reconstruction, put through legislation in the state -- in

11   the Texas legislature to create a school for black youth.

12   The truth is African-Americans were not permitted to be

13   educated, as you know, during slavery in the South.  And the

14   only way to assure that freed slaves would now have an

15   opportunity to be educated was to create schools for them,

16   which is how most HBCUs came into being.

17        At the same time, the legislature created a school

18   for white youth to ensure that never the twain shall meet.

19        So Prairie View was formed in that context and for

20   many, many years was the principal way for African-Americans

21   in Texas to gain a higher level education.

22   **Q.**  And how, if at all, has that manifested, that history

23   manifested in the mission of Prairie View today?

24   **A.**  It continues to prize that legacy and to believe that its

25   mission is to continue to make opportunities available for

1    African-American youth and others who come from

2    non-privileged backgrounds, let's say.  Over 80 percent of

3    the students at Prairie View are Pell-eligible students.  And

4    so it is very proud of that tradition and continues to

5    enforce that today.

6    **Q.**  And what percentage of the current undergraduate

7    population at Prairie View is African-American?

8    **A.**  Over 80 percent.

9    **Q.**  What about Smith?

10   **A.**  Well, Smith was formed at a time when people routinely

11   said that women were incapable of higher order intellection.

12   In fact, I remember reading that people argued that serious

13   intellectual study would somehow affect the reproductive

14   organs of women, and therefore it would be dangerous for

15   women to study at university because, I suppose, the species

16   would disappear, ultimately.

17            And so at a particular time in history, these

18   institutions were created not just so that women could be

19   educated but Smith was specifically created so that women

20   could be educated on a par with men in the best universities

21   in the country.

22            And so that was the origin of the college, and it

23   continued after that to insist on equality for women, the

24   ability of women, the proof, in a sense, that women had the

25   ability to do any order of thinking that a man could do.

1          And, in fact, when I was there as president, one of

2     the things that I did was to create a program for a -- a

3     program for women in engineering because of the problem that

4     women were having in gaining access to engineering degrees.

5          So it continues to have the same essential mission

6     today, to provide a place for women to be educated well.

7     **Q.**  Let's turn to Brown, which was created during the

8     Colonial era, and I'm willing to -- I'm ready to hear you say

9     that it is not rigidly continuing its original mission.

10          But leaving aside my asides, what about Brown?

11    **A.**  Well, it was created as the Baptist university for the

12    country at the time.  It has evolved, as other Colonial

13    universities have, to be a broad-ranging university that has

14    still as its aim to prepare students for leadership roles.

15          At the time that the country was formed, there were

16    many people very concerned about whether or not in this

17    nascent country there were people sufficiently fit to lead

18    this nation.  That, too, was part of what Brown leaders were

19    thinking at the time; that there was a desperate need for

20    leaders who had the breadth of education and the leadership

21    ability to provide for this nation a future that was secure.

22          And so Brown continues to do that today, to educate

23    young people for leadership positions, and in the broadest

24    liberal arts context.

25    **Q.**  Let's turn now to the questions that we asked you to

1  address.

2          And Mr. Lee, could we pull up Demonstrative 9.2.

3          What questions were you asked to testify about?

4  **A.**  I was asked to testify to, one, the question of what

5  benefits flow to students, institutions, and society from a

6  diverse undergraduate student body; and second, do certain

7  criticized admissions practices serve legitimate

8  institutional interests?

9  **Q.**  And we're going to go through these, each one of them,

10  separately in some detail.  But as to question number one, do

11  you have an opinion?

12  **A.**  I do.

13  **Q.**  And what is your opinion?

14  **A.**  My opinion is that benefits definitely flow to students,

15  institutions, and society from a diverse undergraduate

16  student body.

17  **Q.**  And turning to now question two, do you have an opinion

18  on the second question?

19  **A.**  My opinion on the second question, based on my decades of

20  experience and my first-hand observations of students and

21  alumni, that the criticized admissions practices serve

22  legitimate institutional interests.

23  **Q.**  Mr. Lee, please pull up the next demonstrative.

24          And President Simmons, could you just explain to

25  the court which admissions practices you will be offering,

1    you've discussed in your reports and will be discussing

2    today?

3    **A.**  Yes.  These practices include legacy status,

4    contributions to the university, children of faculty or

5    staff, athletic achievement, and early action.

6    **Q.**  And what is your opinion regarding those practices?

7    **A.**  My opinion, based on my experience, is that all of them

8    play a legitimate role in the admission process.

9            MR. WAXMAN:  Your Honor, I've been given a note to

10   remind me that I forgot to offer into evidence Defense

11   Exhibit 134, which is her CV.

12           MR. CONNOLLY:  No objection.

13           THE COURT:  It's admitted.

14           (Defendant Exhibit 134 admitted into evidence.)

15   **Q.**  In forming your opinions you'll be expressing today, did

16   you review the statement of Harvard's educational mission?

17   **A.**  Yes, I did.

18   **Q.**  Would you please turn to Tab 2 in your binder, which is

19   Defense Exhibit 109, I believe, in evidence.  And I want to

20   ask you to focus on the sentence that Mr. Lee is going to be

21   highlighting and ask you what that says.

22   **A.**  "The mission of Harvard College is to educate the

23   citizens and citizen-leaders for our society."

24   **Q.**  What do you understand that to mean?

25   **A.**  Well, it's very much as I said in regard to what John

1    Adams expressed on his way to the Constitutional Convention;

2    and that is, what are the needs of societies and how can

3    institutions like Harvard prepare its students to play the

4    roles they need to play to maintain our way of life as a

5    country.

6            So educating citizens who will play important roles

7    in all manner of endeavors, and especially leaders in our

8    country.

9    **Q.**   And did you conduct your analysis with that mission

10   statement in mind?

11   **A.**   I certainly did.

12   **Q.**   Let's turn to the next demonstrative, which is

13   Demonstrative 9.6, and look back at the first question.

14           Did you analyze the benefits that flow from

15   diversity?

16   **A.**   I did.

17   **Q.**   And looking at -- now at Demonstrative 9.7, can you

18   explain the categories of people in institutions who, in your

19   view, benefit from having a diverse undergraduate student

20   body?

21   **A.**   Those categories are students, institutions, and society.

22   **Q.**   Let's focus on individuals, students first.

23   **A.**   Okay.

24   **Q.**   How do individual students benefit from a diverse

25   university environment?

**A.**   Our greatest concern as educators is always for the depth
of learning that students have access to.  It is not enough
at our universities for students to come to sit in class, to
observe what they're told, and to leave with -- impoverished,
without having been deeply engaged in their learning.

Diversity provides an opportunity to deepen that
learning, to give students first-hand experience with
difference.  And we know that difference is one of the
primary means for students to test themselves, to test their
background, to test their ideas, to challenge assumptions.
And in that context, it is in coming in contact with
difference that we tend to deepen our learning.

**Q.**   So in referring to the benefits to students that you've
just described, are you limiting those -- do you limit those
benefits -- do your prior comments relate to the,
quote-unquote, diverse students who attend an institution,
say, the African-American, Hispanic and other
underrepresented minority students, or do your opinions apply
more broadly?

**A.**   They apply to both.

So first of all, in challenging our assumptions, I
don't mean picking up different books that have dialectic
around a particular subject.  I mean in every possible
respect coming in contact with difference.  And that
certainly applies to having different faculty, having

different students live on your hallway, encountering
different students who come from backgrounds that are so
different from yours that you have no choice but to learn
about the complexity of the world that you're going into when
you graduate.

**Q.**  Can you think of an example from your own undergraduate
experience that illustrates the point that you were just
addressing?

**A.**  Yes.  I use the example of my being in a classical
philosophy class at Wellesley at a time when apartheid was
probably the most important social, political issue around
the world; and naturally it came upon us to discuss apartheid
and the ethics surrounding that system.  And, of course, I
was quite passionate about the evil of apartheid and how it
needed to be overturned.

I was pleased to discover that most of the students
in class, all of whom were white, shared -- seemed to share
my view about apartheid, except there was one young woman who
toward the end of the discussion raised her hand and
identified herself as a South African.  I don't know if there
was an audible gasp in the room, but I certainly was
surprised.  And she then began a spirited defense of
apartheid from the perspective of a white South African.

I had never encountered anything like that before
and it threw me into a state, but here is what I garnered

1    from that experience; that I was forced to listen to a

2    different opinion about South Africa, one that I never, under

3    ordinary circumstances, would have heard.

4            Today, I can remember no one in that class but I

5    can remember her.  She had such an impact on me.  And I would

6    say I often think that the person that I became as a scholar

7    and as a leader prized that interaction because I learned to

8    listen to difference.  And I don't think I could have done

9    what I've done in my life, been the person I've been to my

10   students, if I had not had that experience.

11   **Q.**  President Simmons, have you familiarized yourself with

12   Harvard's experience with diversity and inclusion sufficient

13   to express an opinion about how -- whether Harvard students

14   benefit from diversity?

15   **A.**  I think I have.

16   **Q.**  How do you know that?

17   **A.**  Well, I've read many documents describing the way that

18   Harvard puts its students in touch with diversity.  It's very

19   thoughtful.  It's very deliberate, the way that students are

20   assigned to housing, which is quite something when you think

21   about it.  The idea that when you go off to college you have

22   no control, really, over your living circumstances; that

23   you're put into an environment where you are challenged to

24   adjust.  It's a powerful thing.

25           In the first year, students have no choice about

1    their living arrangements.  Thereafter, they are assigned to

2    houses also.  It's also the case that there are committees

3    that are responsible for intentionally creating an

4    environment in which students can learn from diverse others.

5    So I think -- I think that the university does a very good

6    job.

7            And by the way, I should say these actions are

8    fairly typical of what we have come to understand in

9    university life as being important to do so that our students

10   get that depth of learning that we're seeking.

11   **Q.**  Let's turn to the next category that you identify, the

12   benefits flowing from diversity to institutions.

13           How do institutions like universities benefit from

14   having a diverse student population?

15   **A.**  Well, one of the things that won't surprise you about

16   universities like Harvard and Brown is that we often think

17   that we are all-knowing.  And so without the inputs of a lot

18   of different people over time, with different backgrounds and

19   different perspectives, we'd hardly change, I think, as

20   institutions.

21           But because we are open to difference and because

22   we have inputs that vary over time, our institutions change

23   and I believe change for the better.  We make new

24   discoveries.  We teach new courses.  We create new fields.

25           And more than that, because we do all of those

1    things, our students all come to understand, in the course of

2    their lives, the great benefit that they have had by coming

3    to our institutions.  And so that is why we can't get rid of

4    them.  They come to our institutions and they stay on as

5    alumni forever, which is to our delight.

6            The standing that we enjoy around the world is

7    surely due to our diversity.  Imagine Harvard's footprint

8    around the world.  It's hard to imagine an institution that

9    is more prominent around the world than Harvard.  Oxford

10   might say they're equally so, Cambridge might say.  But I

11   don't know.  I rather think that Harvard has a bit of the

12   edge when it comes to that because of the way they've

13   admitted students over time and because of the fields that --

14   in which they have excelled.

15           So our stature as institutions depends on the fact

16   that we have systematically over time brought many different

17   types of people to our institutions.  They have gone back to

18   regions around the world and established a bigger footprint

19   for us.

20   **Q.**  So does having a diverse student body, I'm asking you now

21   based on your experience, long experience as a professor and

22   a leader of institutions with professors, in your experience,

23   does having a diverse, engaged, safe environment for students

24   have an effect on the faculty of an institution?

25   **A.**  Well, I would say it has an effect on the learning that

1    takes place in and out of the classroom.  I can tell you as a

2    professor that having a homogeneous group of learners sitting

3    around a seminar table is not as catalytic as having students

4    with different backgrounds and different opinions sitting

5    around the seminar table.  The discussion is more robust.

6    The depth of learning, as I said before, is more significant.

7    And the teacher probably gets better over time by having all

8    of these different scholars, students, available to them.

9    **Q.**  So I think you mentioned earlier, I tried to write this

10   down, that having a diverse student body affects the research

11   agenda or the research questions.

12        Could you explain to Her Honor what you mean by

13   that?

14   **A.**  Well, one of the -- one of the things that faculty

15   believe in American universities is that they have academic

16   freedom, and what that often suggests to them is that they're

17   free to pursue a course of research that is of interest to

18   them.  And naturally, what that means is that if you have a

19   diversity of scholars, you also have a diversity of interests

20   and those interests will lead you to pursue different

21   scholarship.

22        And so you have only to look at the vastly

23   different scholarship that exists today as a consequence of

24   women coming more into the center of academic life and as a

25   result of minorities coming into the center of academic life.

1       When I was at Smith, I created a journal called

2  "Meridians," and it is a journal to highlight the research

3  being done on women of color.  That would never exist, of

4  course, in the academic world if you didn't have people who

5  were varied and who were interested in the status of women in

6  India or the status of women in this country and so forth.

7  **Q.**  So in sum, is it your opinion that Harvard could

8  accomplish its educational mission without the diversity that

9  you described?

10  **A.**  It could accomplish a mission, but it would be an

11  impoverished mission that does not provide for its students

12  the kind of education that prepares them to live in the world

13  that we now have.

14  **Q.**  Let's turn to the third category in your demonstrative.

15       How does society benefit from having diversity in

16  university education?

17  **A.**  Well, I would say that we are bedevilled in society by

18  enduring schisms, schisms based on differences, political

19  differences, cultural differences, religious differences.

20  And those schisms sometimes break out and we're faced with

21  tragic circumstances.

22       Sorry.  I'm thinking about the shooting in

23  Philadelphia -- in Pittsburgh.  So -- so here is the thing.

24  What are you going to do in a society that is riven by

25  conflicts of all kinds?  How are you going to mediate them if

1   you don't have people capable of doing that?

2          When we go back to our enclaves, enclaves of

3   sameness, how are we going to get to the point where we can

4   mediate these conflicts and have a peaceful society that

5   advances?

6          I don't know a way to do that if we don't prepare

7   people who can lead in such a society.  And in my view,

8   places like Harvard, bringing people into the center of

9   learning, learning about difference, I don't know how we do

10  that unless we prepare them well and send them out to do just

11  that.

12  **Q.**  Let me switch topics slightly and ask you whether you are

13  familiar with the whole person admissions process?

14  **A.**  I am.

15  **Q.**  What is it?

16  **A.**  It is an admission process in which instead of doing a

17  kind of automatic admission based on test scores and GPA and

18  rank in class, that you consider every aspect of what a

19  person brings to a college.  You consider their life

20  experience.  You consider their cultural origins or their

21  racial origins.  You consider what they've done up to that

22  point.  You consider what their aspirations are.  And you

23  consider whether or not they are intent on contributing

24  something to society.  You consider everything.

25  **Q.**  At the time that Radcliffe employed you as an admissions

1    officer, did it employ a whole person admissions process?

2    **A.**   It did.

3    **Q.**   And in your opinion, does this whole person

4    individualized approach to admissions facilitate assembly of

5    a diverse student body?

6    **A.**   It did.

7    **Q.**   Let's talk about once students are admitted to the

8    college.

9         Did you examine whether Harvard has practices that

10   facilitate diverse interactions on campus?

11   **A.**   Yes.  My opinion is that they do.

12   **Q.**   Can we have, Mr. Lee, can we have Demonstrative 9.11?

13        At a high level, what did you find?

14   **A.**   Well, at a high level, I found that in numerous ways

15   Harvard has an intentional process of facilitating

16   interaction among different students.

17   **Q.**   And what do these -- what do these segments of the circle

18   on the demonstrative reflect?

19   **A.**   In extracurriculars, for example, students participate

20   not just in varsity sports but in club sports and other

21   extracurriculars; like theater or dance or any number of

22   different areas.  And when they are doing that, they have the

23   opportunity to spend time with different students from

24   different backgrounds in a common project.

25        I find that in housing, again, the way that housing

1    is assigned is intentionally designed to make sure that

2    students have the best chance of being in a living

3    environment in which they're exposed to difference.

4            And so as I said, the first year they are assigned

5    housing with a roommate not of their choice.  After that they

6    are randomly assigned to houses to make sure that that

7    mixture continues.  And, again, in terms of faculty and

8    staff, the intentionality extends there where students are

9    given the opportunity to interact with many faculty and staff

10   who come from different backgrounds.

11   **Q.**  I must confess, I hope that I'm not imagining this, but

12   did you, in your report, give an example of a particular

13   student housing arrangement, a freshman housing arrangement

14   between a particular white student and a particular

15   African-American?

16   **A.**  I think the only mention that I made was with Mark

17   Zuckerberg --

18   **Q.**  I didn't imagine it, okay.

19   **A.**  -- and his roommate who happened to be a Haitian

20   Olympian, Samyr -- I can't remember his last name, but yes.

21   **Q.**  Did you review Dean Khurana's testimony in this court?

22   **A.**  I did.

23   **Q.**  And is his testimony regarding the practices that Harvard

24   employs to facilitate diversity consistent with your

25   analysis?

1    **A.**   It is consistent with my analysis.

2    **Q.**   Do you recall Her Honor's question to Dean Khurana about

3    how to measure when there's enough diversity?

4    **A.**   I remember that.

5    **Q.**   And what is your response to that question?

6    **A.**   My response is that wouldn't it be marvelous if we had

7    the capacity to know when enough diversity is enough

8    diversity.

9            I have been doing this work for decades, and I have

10   never seen a moment when we are certain of that.  We are

11   constantly striving to make sure that we have the appropriate

12   mix of students.  But I don't think there is any university

13   in the country that has decided that it has the key to that.

14           So here is what we do know.  We know, because we've

15   been told over the decades by students who have experienced

16   it, that sometimes there are insufficient numbers of a -- of

17   particular groups on the campus for them to feel safe and

18   comfortable and for the learning that they have access to to

19   be equal to that of others on the campus.

20           So we're immensely sensitive to the fact that we

21   can have too few students in a particular group.

22           We also know, from what we've been told by

23   different groups, that our assumptions about diversity are

24   often too unsophisticated.  And so we might think that

25   because we have a black student that that's diversity.

1    Whereas, many students will say that you don't have enough

2    black students from a particular socioeconomic class or you

3    don't have enough students, black students, who are wealthy,

4    or you don't have enough black students who come from outside

5    the country.

6              So within different groups, their definition of

7    diversity is somewhat different from ours sometimes, and

8    we've learned over time to be much more variegated in the way

9    that we think about diversity.

10   **Q.**   President Simmons, we heard yesterday, all day yesterday,

11   from students and alumni of Harvard.

12             Did you manage to hear any of that testimony?

13   **A.**   I heard some of the testimony.

14   **Q.**   And do you recall some of the students expressing

15   concerns about inclusion?

16   **A.**   I do.

17   **Q.**   How do the concerns expressed by the students affect your

18   analysis?

19   **A.**   They're very much, as I have heard over the years, and

20   very much in keeping with my thinking about this -- about

21   these questions.

22   **Q.**   Are those concerns that we heard expressed yesterday an

23   indication that efforts to have diverse learning environments

24   are failing?

25   **A.**   Not at all.

1   **Q.**  Let's turn now to the --

2   **A.**  May I say a little more about that?

3   **Q.**  Yes.  You've got the floor -- chair.

4   **A.**  One of the things that I wrestle with as a university

5   president is trying to impart to my students the difference

6   between what they are experiencing now and what people

7   experienced decades ago.

8           I want to say that part of what I hear from the

9   students is all too familiar because, of course, I've heard

10  it for so long over the decades.  Nevertheless, the fact that

11  they are smarter about it, more aware of it, and in a sense

12  dealing with it so amazingly is, to me, a sign of progress,

13  frankly.  And so I just wanted to put that context on it.

14  **Q.**  Thank you.  Let's turn now to the second of the two

15  questions that Harvard asked you to address.

16          And Mr. Lee, yes, thank you.  Demonstrative 9.12.

17          Let's focus on whether the admissions practices

18  that you identified at the outset of your testimony in your

19  opinion serve legitimate institutional interests.  And let's

20  start by turning to Demonstrative 9.13.

21          And this, again, if you'd just remind us, these are

22  the practices that you have considered and expressed an

23  opinion about?

24  **A.**  Yes.

25  **Q.**  Do you agree that Harvard should cease providing what it

1    calls an admissions, quote, tip, to legacies, to applicants

2    whose parents have contributed to Harvard, to children of

3    Harvard faculty and athletes?

4    **A.**   I do not.

5    **Q.**   And do you agree that Harvard should end early action?

6    **A.**   I do not.

7    **Q.**   Let's start with legacies.  Look at Demonstrative 9.14.

8            What institutional interests are served by

9    considering legacy status?

10   **A.**   Our institutions are venerable, I think that's the right

11   word, because they are revered over many, many years by a

12   succession of alumni who come to love our universities and

13   what they provide.  It is entirely appropriate for them to

14   believe that it would be wonderful if their children could

15   also enjoy the same benefits that they enjoyed as students.

16           At the same time, because they are so involved with

17   our universities, and do so much for us -- and

18   parenthetically let me say, I do firmly believe that Harvard

19   today would not be Harvard without that involvement:  Alumni

20   who are advising Harvard, alumni who are giving to Harvard,

21   alumni who are challenging the university at all times to be

22   better.  Without that, Harvard would not be Harvard.

23           And so one of the distinct advantages that we enjoy

24   as institutions is that we've been made stronger by benefit

25   of that involvement.  And one of the ways that we signal to

1    alumni how important that is for us is that we consider their
2    children in the context of our admission process never, never
3    to admit them if they are not qualified on the same basis as
4    other students.  It's very important to say that.

5              And also, let me say, I hope it's a given that
6    people understand as educators one would never admit students
7    that you think cannot thrive at your institution.  It would
8    be considered highly unethical to do so.

9              And so in the admission process, when we're
10   thinking about students and comparing students, our final
11   question is whether or not that student will thrive because
12   they're perfectly capable of doing the work at a high level.

13             And so in that regard, we believe that it is
14   appropriate to give a tip to legacies, and that it is in
15   keeping with the tradition that we have as institutions where
16   there is strong identity of alumni with our institutions.
17   **Q.**  Thank you.

18             Let's turn now to item number two.  And looking at
19   that, can you explain to the court what institutional
20   interests are served by giving consideration to applicants
21   whose families make a contribution to the university?
22   **A.**  Well, first of all, let me say, you'd never, ever admit a
23   student because their family promises a contribution.  That
24   would be a quid pro quo.  It would be, again, completely
25   inappropriate to do that.

1          Nevertheless, there are occasions when individuals

2     who are prominent, who have expertise, who have all manner of

3     things that they can do to assist the university, might have

4     children apply and, in that regard, if it is possible that

5     their children are highly able and at the same time their

6     parents could make a difference for the institution, I don't

7     believe that it is problematic to admit those students.  The

8     number is infinitesimally small.  I couldn't even count on

9     one hand the times that I've seen this apply at Brown.  But

10    it is certainly possible that there are students who come

11    along whose families can do incredible things for an

12    institution.  We are, after all, private institutions.

13         How do we survive from generation to generation, to

14    be 400 years old?  I mean, how does one comprehend that?  A

15    private institution from era to era that not just survives

16    but becomes stronger in every era.  How does that happen?  It

17    doesn't happen because we sit on our hands and do nothing.

18    It happens because we are constantly looking for help, from

19    as many different corners as we can find it.

20    Q.   I just have one clarifying question.  You've spoken

21    eloquently about the different types of contributions that

22    parents or family of an applicant might make.  Can I assume

23    that you're including, among that panoply, very significant

24    financial contributions?  Not a quid pro quo, but either a

25    history of generosity with the university or the prospect

1    that perhaps there will be significant generosity.

2    **A.**   If there has been a history of contributions to the

3    university from someone, of course.  I can say that at Brown,

4    for example, in a couple of instances people who had made

5    very generous donations to the university who had children

6    apply, not -- not at the same time, we gave special

7    consideration to their children because they were, after all,

8    highly qualified on the basis of the rest of the pool.

9    **Q.**   Let me turn to item 3 on the demonstratives.

10            What institutions are served by considering whether

11   the applicant is the child of faculty or staff at the

12   university?

13   **A.**   Well, there are a lot of different ways to think about

14   the resources available to universities and every university.

15   I'm in a public university right now.  Every university has

16   access to different kinds of resources.  One resource that we

17   have is the admission of children of faculty or staff if

18   they're highly qualified.  Now, it also must be said that the

19   single most important factor in the quality of a university

20   is faculty quality.

21            The second most important factor in the quality of

22   an institution is faculty quality.  I could go on ad

23   infinitum.  Faculty are the determination of the standing of

24   a university.  They are at the heart of the learning of

25   students also.  But the representation of a university

1    depends mightily on what the faculty output is.

2              And so anything we can do to retain the most

3    outstanding faculty, certainly we would have to do.  It is

4    our competitive advantage.  There is a fierce, fierce battle

5    in this country for faculty, and trying to keep them is very

6    important to us.

7              And so I think it's perfectly legitimate if a child

8    is highly able to admit a faculty child or a senior person

9    staff person's child.  Let me say this is very rare.  I think

10   that it happens.  It's not a significant number in any given

11   class.

12   **Q.**  Let me ask you to turn next to athletic achievement.

13             What institutional interests are served by giving

14   what Harvard calls a tip, and I'm going to divide athletes

15   into two categories, first to recruited athletes?

16   **A.**  Well, we're in an athletic league.  How are we going to

17   field teams to play each other if we don't admit athletes for

18   those teams?  You know, there are a lot of people outside the

19   Ivy League that believe -- who believe that we're not serious

20   when it comes to athletics.  That's because they've never sat

21   around a table of Ivy League presidents fighting about

22   athletics.  We are very serious about athletics.

23             And so, again, one of the defining elements of

24   Harvard is actually, is actually its athletic program and

25   what it does for the campus in terms of building school

1    spirit, what it does when Harvard beats Yale, you know.   And

2    when Brown beat Harvard, it was -- it was a holiday, okay?

3    So these are serious matters.   They are taken absolutely

4    seriously.

5           And then the other thing that seems to me very

6    important is that the Council of Ivy League Presidents exists

7    for one purpose, and that is to monitor athletics, to make

8    sure there's no funny business when it comes to admitting

9    athletes.   And so it is the most regulated athletic

10   competition, in a sense, in the country.   Forget the NCAA.

11          Presidents sit on the council to determine whether

12   or not they're following all the guidelines.   And

13   importantly, at particular times, the presidents will decide

14   to ratchet up the requirements for athletes.

15          And I know during my time as president of Brown,

16   one of the things that I did was to cut back on the number of

17   recruited athletes in order to make more room for other

18   students in admission.   I believe that Harvard did the same

19   thing, actually.

20          So we take athletics seriously, but we believe that

21   it should be very strictly controlled.

22   **Q.**   Let me ask you:   You've spoken eloquently about the

23   ability and necessity of recruited athletes to allow, for

24   example, Harvard consistently to defeat Yale and Brown -- as

25   a Harvardian I will say surprisingly in somewhat a

1    demoralizing way to beat Harvard.  Do talented athletes like

2    this bring value to the campus more generally than just

3    bringing glory?

4    **A.**  Of course.  Of course they do.  I mean, none of us should

5    be cited as unidimensional individuals just because we have a

6    particular talent.  And so a cellist, even at the highest

7    level, is not just a cellist.  Nor is an athlete just an

8    athlete.

9            And so there have been famous examples of Ivy

10   League athletes who have been incredible leaders, who have

11   been CEOs, who have been in every sense of the word the

12   citizen leaders that Harvard has identified in its mission.

13   **Q.**  Let me ask you now about the non-recruited athletes.

14           Do university communities benefit from having avid,

15   skilled, non-recruited athletes on campus?

16   **A.**  Absolutely.

17   **Q.**  In what way?

18   **A.**  And in so many ways.  First of all, the average student

19   can find their way to a sport that they love.  And as you

20   know, that experience with sport can often lead to a lifetime

21   of enjoyment.  And so -- and I was visited recently in my

22   office by the rugby team on my campus, and it was glorious.

23   These -- the men's rugby team, although I had women's rugby

24   also at Smith, games that I couldn't watch.  It was too

25   painful to watch them -- but the men's rugby team.  And to

1    see them interact as athletes, doing it for the love of it,
2    was exhilarating.
3            They are working alongside individuals to
4    accomplish wins.  They're learning about people.  They're
5    becoming more disciplined in their lives because, as you
6    know, as educators, we always say that athletes are much
7    better students during the season than outside the season
8    because it lends more discipline to their total endeavors
9    when they do that.
10           So there are a lot of different things that
11   athletes contribute, non-varsity athletes contribute in the
12   environment.  And sometimes it's just as much fun watching a
13   club sport as it is a huge varsity athletic event.
14   Q.  Let's turn finally to early action and the --
15           THE COURT:  May I interrupt you for a second?
16           MR. WAXMAN:  Sure.
17           THE COURT:  I just have a couple of things I've
18   been thinking about and there's really been no one to ask but
19   here you are.  We'll see how relevant these things are.
20           But I have been told that these things that we've
21   just discussed, legacy, contributions, children of faculty
22   and staff and athletic achievement, are about 30 percent of
23   each class.  And it seems to me, and you can correct me if
24   I'm wrong, that that can be a way to tamp down diversity,
25   right?  Like, if all of your legacies are white and all of

1 your donors are white, then the larger that pool is, the less

2 diverse your school population becomes in some ways, right?

3     And I hear you saying that contributors and faculty

4 kids are a small percentages, or should be small percentages,

5 but I haven't seen a breakdown of that.  But if you take

6 those things together that I think can be a way of limiting

7 diversity, is there some number that's too much?

8     THE WITNESS:  I actually don't think of it that

9 way.  And here is why.  I've always been involved in my

10 career in the continuum of education.  A lot of people focus

11 on one institution, one admission cycle.  I didn't, I didn't

12 go to Harvard.  I'm not --

13     THE COURT:  Neither did I, as has been recently

14 published in the --

15     THE WITNESS:  So we can commiserate.

16     THE COURT:  That's not the adjective I'd use.

17     THE WITNESS:  So here I am, you know, I went to a

18 liberal arts college, 900 black students, and then I became

19 president of an Ivy League university over mostly white

20 students.

21     So the first thing I would say is that one

22 institution does not drive our opportunities, and that's

23 important to remember.  Because, as I say, I left to go to

24 Spelman because I thought Spelman had wonderful things to

25 offer.  I'm now at Prairie View because Prairie View has

1    wonderful things to offer.

2            So getting back to your question.  I believe, truly

3    believe, that the uniqueness of our institutions is actually

4    created by all these factors.  It is -- it is a series of

5    things that makes people want to be a part of us.  But now

6    people want us to abandon them because it may be inconvenient

7    to have them, or that might be their assessment.

8            I believe that the thing that makes this country,

9    especially higher education in this country, so phenomenal is

10   the fluidity.  And so I can go to a 900-student black college

11   that is nowhere on the radar screen for anybody and then end

12   up in a Ph.D. program at Harvard.

13           And so what I used to tell students when I was

14   interviewing them for Harvard, I used to say, you know, you

15   know you can ultimately go to Harvard from lots of different

16   routes.  You don't have to be an undergraduate at Harvard.

17   Okay?  In fact, it's not always a good idea to go to Harvard

18   as an undergraduate if you're in this field, if you're in

19   that field.

20           So I think our country has become besotted with the

21   idea of getting into a narrow number of institutions.  But

22   the great thing that they miss is that our educational

23   opportunities are so much richer than that.

24           And so that's the way I think of it.

25           THE COURT:  All right.  Another one that might be

1    more unanswerable that I've been sort of wrestling with, and

2    I throw it out there to you because you seem to be the most

3    knowledgeable person I've seen on these subjects, is -- you

4    know, I'm sure that the Supreme Court says you can't have

5    quotas and you can't have floors.  So if you're talking about

6    a place -- and I'm going to use Harvard because here we

7    are -- that accepts 2,000 kids a year, looking for 1,600 -- I

8    mean, those two numbers are pretty fixed.

9              THE WITNESS:  Yes.

10             THE COURT:  Then if we can agree that one black

11   student on campus is not enough and five black students on

12   campus is not enough, if you're trying to get to a number

13   that's enough to meet the goals that you talked about, like a

14   group feeling safe and represented, how do you avoid a floor?

15             THE WITNESS:  Well, I think that's because of the

16   selectivity that you have access to.

17             When I was working at Radcliffe, there was a

18   plentiful supply of highly-able students.  That's not always

19   true for every university, but it's certainly true for

20   Harvard.  And so one of the things, as you look at what

21   you're trying to achieve across the entire university that

22   you're more concerned about, is that if you were to admit a

23   certain number of students, that the whole -- one whole part

24   of your campus would be devoid of any difference.  And so it

25   isn't so much a floor as it is an effort to make sure there's

1     sufficient numbers of students in your campus so that the

2     students who need that deep learning are exposed to it.  And

3     if it is too small, you'll get the feedback.

4             And one of the reasons that I say that that

5     feedback is important and we've had it over the decades, is

6     that when we first started this process, we had no idea what

7     we were doing.  So there were many tokens admitted into

8     programs like this.

9             So, for example, I was a token at Wellesley.  And

10    so Wellesley was not admitting African-American students in

11    any significant numbers, and what they did was to go to the

12    South to black colleges and invite black students from black

13    colleges to come to Wellesley.  But even when they did that,

14    it didn't make much of a difference because there were so few

15    on the campus.

16            So I think one of the things we've learned over the

17    years, because we've heard the feedback from our students,

18    this is what it feels like when it's like this.  And every

19    time we get the feedback, we tend to make adjustments.

20            And so I wrote a report at Princeton, for example,

21    about the consequences of having the -- either the wrong

22    mixture or the wrong policies, and we made adjustments to

23    that.

24            So universities are always trying to make

25    adjustments.  I don't ever see this as a fixed point, where

1    we're utterly satisfied that as a nation, we have figured

2    this out.  I don't see that happening because we are changing

3    constantly, different demographics are taking place.

4              And so how many of us are floored by what's

5    happening in the country today?  I know I am.  I didn't

6    expect to see it again.  But here we are.  And so we'll take

7    that in and we'll make our adjustments and we'll try to

8    improve.  And that's the way it's always going to be because

9    when you have so many different people involved, you cannot

10   predict what they are going to do in the future.  You can

11   only look at where you are now and try to come up with the

12   best solution.

13             THE COURT:  Thank you.

14             MR. WAXMAN:  Can I ask one follow-up question to

15   Your Honor's questions?

16             THE COURT:  You may.

17   **Q.**  I'll be perhaps a little more pointed than the Court was.

18             When you were president of Brown and when you were

19   president of Smith, did those institutions make a concerted

20   effort to value diversity and try and promote a diverse,

21   including racially diverse, learning environment in those

22   institutions?

23   **A.**  Of course.

24   **Q.**  Did those institutions, do you feel, that in order to

25   evaluate whether you have provided such an institution that

1    it is useful, necessary, or appropriate to identify a

2    particular percentage, like we need to have, I don't know, 20

3    percent African-American?

4    **A.**  No, never.

5    **Q.**  So how does --

6                    MR. WAXMAN:  I don't know whether I'm channeling

7    Your Honor's questions but --

8                    THE COURT:  I'm not sure there's an answer.

9    **A.**  See, that's the problem.  I have seen institutions with a

10   very different mix of ratios do it successfully, and I've

11   seen institutions with a much larger proportion of certain

12   groups and it's been difficult, if not disastrous.

13                    So here is what I tell my students, and this is

14   what I say to all the groups that I speak to scores of times

15   every year.  And I always say, Never expect -- Never tell

16   your campuses that there will be a point at which they will

17   be satisfied that we've achieved the right mix of diversity.

18   Never, never issue that promise because you will fail every

19   time.

20                    It is not scientific.  It just isn't.  And so I

21   think what I advise is that you don't pay attention to that

22   point.  Here is what you pay attention to.  You pay attention

23   to the striving.  That's what you pay attention to.  In every

24   year in every way, you're still striving to learn about

25   difference.  It's the striving that matters.  And as long as

1    you're doing that institutionally, and individually, you're

2    making progress undeniably.  But if you try to set these

3    false expectations, that there is a magic point at which it's

4    now functioning best, you'll be disappointed.

5         THE COURT:  That's the ceiling.  What about the

6    floor?

7         THE WITNESS:  The floor, again, I don't think of it

8    in terms of a floor.  I just don't.  I've seen so many

9    circumstances in which small numbers have worked, and I've

10   seen circumstances in which they are alleged not to have

11   worked.

12        You know, we are mired in a situation where all of

13   this is subject to interpretation and reaction and the

14   reaction of many different people.  And in such a

15   circumstance, it is impossible to come up with a formula that

16   we're going to be satisfied with.

17        And so I think we'll never get there in terms of

18   that floor.  I don't think we'll get there in terms of any

19   ceiling.  And I think that this whole idea of keeping

20   ourselves honest by narrowly interpreting what we are doing

21   and consistently doing that is a pretty good way of doing it.

22        I can only say that over a lifetime of trying to do

23   this in lots of different settings, I've never been in a

24   setting where people were satisfied that they were doing it

25   exactly the right way.  And that's been a vast array of

1    settings.

2            U.S.C. was right on the edge of the black

3    community, one of those venerated institutions.  And when the

4    riots occurred in Los Angeles, the riots went right up to

5    U.S.C. and stopped.  And it had nothing to do with the

6    diversity of U.S.C. in terms of numbers.  It had to do with

7    the fact that that community respected U.S.C. because of the

8    way U.S.C. had respected its athletes.

9            So there are so many different ways of looking at

10   this.

11           MR. WAXMAN:  Over to me?

12   **Q.**  Let's turn finally, President Simmons, to number five on

13   the slide, which is the proposal that Harvard eliminate early

14   action.

15           Could you please summarize your opinion about the

16   consequences to private universities like Harvard of

17   eliminating the criticized early action program?

18   **A.**  Well, I would say that when Harvard decided not to use

19   this competitive advantage, we were very happy at Brown.

20   Because any advantage we can enjoy in terms of recruiting

21   students, we want that advantage.

22           Early action provides a competitive advantage when

23   it comes to the most sought-after students.  And if you -- if

24   you abandon that and don't have access to those students,

25   there are consequences for it.

1          And so as a practical matter, I would say any

2     university that is competing at that top level for the very

3     best students will want to maintain that advantage, and early

4     action is such an advantage.

5     **Q.**  I was going to ask you about your experience at Brown and

6     Princeton, but I think you've testified about the

7     consideration at Brown.

8          Did Princeton -- does Princeton offer early action?

9     **A.**  It does.  It abandoned it for a time and went back to it.

10    And, again, there is a cluster of institutions that compete

11    fiercely.

12         I remember when I was at Princeton, I remember a

13    time at Princeton when Princeton was very annoyed, that they

14    didn't feel they were getting their fair share of the top

15    students who were applying to Princeton, Yale, and Harvard.

16    And they went to work to try to figure out how to overcome

17    what they saw as a deficit.

18         But in regard to early action, they restored early

19    action because those institutions that did abandon it

20    realized that they were giving up a substantial competitive

21    advantage by giving it up.

22    **Q.**  President Simmons, did you review Mr. Kahlenberg's

23    contention that early action programs disproportionately

24    benefit white and wealthy students?

25    **A.**  Yes.

1   **Q.**   Do you agree with him?

2   **A.**   Well, I looked at the process by which Harvard reaches

3   out to all income groups, to minorities, and so forth.  And

4   perhaps people don't understand this very well, but if you're

5   in a household in my old neighborhood, Bloody Fifth Ward in

6   Houston, Texas, and you are a high-performing student, you're

7   getting information from Harvard in your junior year telling

8   you, "Here are your options for applying."  That's how

9   extensive the marketing has become.  It wasn't always so.

10          But today, the outreach is aggressive and virtually

11   omnipresent, and so typically students of all incomes will be

12   aware of what their options are.

13          That's not to say that a student who has modest

14   scores and is in the middle of their class will get that.

15   They won't.  Because there are lists that are circulated of

16   the highest achieving students, and universities concentrate

17   on those lists and they go after those students.

18   **Q.**   Would an average student who is acquitting herself in the

19   middle of the class likely be an appropriate candidate for

20   early action in the institution --

21   **A.**   Would never be admitted.

22   **Q.**   Let's turn to Demonstrative 9.19.

23          And, President Simmons, can you please summarize

24   your opinion about the consequences to private universities

25   like Harvard of eliminating the criticized admissions

1   practices that we have discussed?

2   **A.**  I believe that eliminating the criticized admission

3   practices would undermine the ability of Harvard to continue

4   on its path of outperforming other universities.  These

5   practices have been responsible in, I think, large measure

6   for the success that Harvard enjoys today.  And if you really

7   admire that success, then undermining it by eliminating these

8   provisions would not make much sense to me.

9   **Q.**  In looking at number one on the demonstrative, what is

10  your bottom line on the importance of diversity at Harvard?

11  **A.**  It's very hard for me to overstate my conviction about

12  the benefits that flow to all of these areas from a diverse

13  undergraduate student body.

14          I know something about the lack of diversity in

15  one's education.  I know what it was like to live in a

16  society where that was the bedrock approach to education.  I

17  know what it was like to walk down the streets where random

18  people attacked us or issued slurs because they didn't

19  understand what my community was all about.  I understand

20  what it was like for African-Americans in this country not to

21  have access to professions.

22          My father was a janitor, my mother was a maid.

23  They had been sharecroppers, they had few opportunities.  I

24  lived through that.  I remember it.

25          So to me, the benefits that flow to students is

1   they get a better education, a deeper education, a truer

2   education to deal with what they're going to have to deal

3   with in life.

4          To the institution, it makes for not just an

5   enhanced learning environment but for the opportunity to be

6   unparalleled in their standing because they offer something

7   that is so indispensable for society.

8          And for society, my goodness, I've spoken about the

9   conflicts in society, how deeply they run, how they resurface

10  from time to time.  How can we imagine a world in which we

11  are not creating leaders and citizens who have the capacity

12  to mediate those differences?  I cannot imagine it.  And so

13  it's with great conviction that I say that we must continue

14  to offer diverse undergraduate education to our young people

15  to save our nation.

16  **Q.**  I have one final question, President Simmons:  Have you

17  ever testified in a trial before?

18  **A.**  No, and I hope never to again.

19          MR. WAXMAN:  Thank you.

20          THE COURT:  Why does everybody say that?

21          THE WITNESS:  It's unaccustomed, Your Honor.

22          THE COURT:  We could use a little diversity on that

23  perspective.

24          MR. WAXMAN:  If I may be so impertinent, has Your

25  Honor ever testified as a witness at trial?

```
 1              THE COURT:  Yes, I have.
 2              MR. WAXMAN:  Maybe that's the diversity.  Thank
 3    you.
 4              THE WITNESS:  Thank you.
 5              May I go now?
 6              THE COURT:  No.
 7              MR. CONNOLLY:  Could we have a few minutes to set
 8    up?
 9              THE COURT:  Yes, of course.  You can stand and
10    stretch for a minute if you want while he's getting set up.
11              THE WITNESS:  Okay.
12              MR. CONNOLLY:  May I approach the witness?
13              THE COURT:  Of course, yes.
14    EXAMINATION BY MR. CONNOLLY:
15    Q.  Good morning, President Simmons.
16    A.  Good morning.
17    Q.  My name is Michael Connolly.  We met at your deposition
18    in Houston.
19    A.  Yes.
20    Q.  Thank you for being here.
21              I want to start by talking about how you formed
22    your opinions in this case.  To form the opinions in your
23    reports, you did not conduct any studies or statistical
24    analyses, correct?
25    A.  No, I didn't.
```

1   **Q.**  And you also did not talk to anyone currently working in

2   Harvard's admissions office, correct?

3   **A.**  I didn't.

4   **Q.**  Now, in your report, you write about how diversity is

5   important because it helps people overcome bias and

6   stereotypes that we may have; is that correct?

7   **A.**  Yes.

8   **Q.**  I'd like to talk about some of the things you've done in

9   your career to address the issues of bias and stereotype.

10  And you mentioned this morning the report you did for --

11  while you were at Princeton.

12          There you were asked to investigate issues of

13  racial bias on campus and to see whether the university

14  needed to take actions to remedy this, correct?

15  **A.**  Yes.

16  **Q.**  And you wrote a report called "The Report on Campus Race

17  Relations."  That contained the findings of your

18  investigation, correct?

19  **A.**  Yes.

20  **Q.**  And it contained a number of recommendations for how

21  Princeton could address the concerns of bias and stereotypes

22  that many minority students had expressed to you, correct?

23  **A.**  Yes.

24  **Q.**  And the report that you wrote has been widely cited

25  around the country, correct?

1    **A.**   I think so.

2    **Q.**   Now, later in your career, while you were the president

3    of Brown, you served on a committee that was charged with

4    examining why women faced barriers being hired and promoted

5    in the science and engineering departments at colleges and

6    universities; is that correct?

7    **A.**   Yes, it is.

8    **Q.**   And the committee that was created was created by the

9    National Academies of Sciences, Engineering and Medicine,

10   correct?

11   **A.**   That's correct.

12   **Q.**   Now, the National Academies is an organization that has

13   members who are the top performer scientists in medicine,

14   science and engineering, correct?

15   **A.**   Yes.   The Academies.

16   **Q.**   The Academies.

17            And the Academies regularly work on policies to

18   improve the fields of science, engineering, and medicine,

19   correct?

20   **A.**   That's correct.

21   **Q.**   And the Academies committee did issue a report, correct?

22   **A.**   It did issue a report, correct.

23   **Q.**   And that report was called "Beyond Bias and Barriers,

24   Fulfilling the Potential of Women in Academic Science and

25   Engineering," correct?

1    **A.**   Yes.

2    **Q.**   Now, your committee put together a PowerPoint

3    presentation summarizing some of the findings, correct?

4    **A.**   I actually don't recall a PowerPoint presentation.  I

5    recall a report.

6    **Q.**   Well, it's been a while, so I've included the PowerPoint

7    in the binder.  You can refresh your recollection.  It's on

8    Tab C108.

9              THE COURT:  Mr. Connolly, do you have an extra copy

10   of that binder, please?

11   **Q.**   And we can also put it up on the screen if that's easier

12   for you.

13              So there's the title that we just mentioned.  And

14   if you turn to the second page, it's the first tab you see.

15   It lists the people that served on your committee.  About

16   two-thirds of the way down, there's your name, Ruth Simmons,

17   correct?

18   **A.**   That's correct.

19   **Q.**   And you were the president of Brown University when you

20   served on this committee, correct?

21   **A.**   Yes.

22   **Q.**   And the chair of the committee was Donna Shalala,

23   correct?

24   **A.**   Yes.

25   **Q.**   And I see a number of people on here, professors from

1    Berkeley and Harvard and Duke, Yale, MIT.  They served on the

2    committee with you, correct?

3    **A.**  Yes.

4    **Q.**  Now, if you turn to the second red tab.  I'll also put

5    this up on the screen for you.

6             Now, your committee --

7             MR. WAXMAN:  Your Honor, I don't think there's a

8    foundation yet to ask this witness a question.  I believe

9    that she earlier testified that she didn't recall a

10   PowerPoint.  And I think if counsel wants to ask her about

11   pages in the PowerPoint, he has to establish that, in fact,

12   she did see this.

13            MR. CONNOLLY:  I'm not trying to admit this in

14   evidence.  It was a PowerPoint that accompanied her report.

15   I'm just using it to, sort of as an aid to walk through

16   questions with her.

17            THE COURT:  All right.  So he's trying to refresh

18   her recollection.

19            But why don't you ask her about the substance of

20   what's on the slide rather than the slide itself.

21            MR. CONNOLLY:  Sure.

22   **Q.**  Did your committee find that a substantial body of

23   evidence establishes that most people, men and women, hold

24   implicit biases?

25   **A.**  I don't remember the exact language that way, but we

1    certainly discussed bias in academic life as with regard to

2    women.

3    **Q.**  And do you -- so you do not recall in particular whether

4    the committee found that a substantial body of evidence

5    establishes that most people, men and women, hold implicit

6    bias?

7    **A.**  Again, that's very specific.  This has been many years

8    ago, and I don't remember that language from the report.

9    **Q.**  Okay.  So I also have a copy of the executive summary of

10   the report in your binder.  It is identified as P450.  You

11   can turn there to refresh your recollection.

12   **A.**  450?

13   **Q.**  Mm-hmm.  Will you turn to page 4 in the report.  You see

14   the bottom right paragraph starting with "A substantial body

15   of evidence"?

16   **A.**  Okay, number five.

17   **Q.**  Number five, yeah?

18   **A.**  I see that.

19   **Q.**  If you could read that paragraph.  It starts there and

20   then finishes onto the next page.

21          Just let me know when you're finished.

22   **A.**  You want the whole paragraph?

23   **Q.**  Not aloud but just to yourself to refresh your --

24   **A.**  Just to myself.

25   **Q.**  -- recollection about what your committee found.

1          MR. WAXMAN:  Your Honor, if I can just ask that
2     since the witness is not being examined about the PowerPoint
3     that the slide be blanked, the screen be blanked.
4          THE COURT:  Why don't you take the slide down,
5     Mr. Connolly.
6     **A.**  I've finished.
7     **Q.**  Okay.  Thanks.
8          Now, after reading a summary of what your committee
9     found, would you now agree that your committee found that a
10    substantial body of evidence establishes that most people,
11    men and women, hold implicit biases?
12    **A.**  It's apparent that that's what the committee found.  I
13    didn't write the report.  The staff wrote the report, but
14    that's in their committee report.
15    **Q.**  And you served on the committee, correct?
16    **A.**  I did.
17    **Q.**  And the report of the committee reflects the findings of
18    the committee, correct?
19    **A.**  Let me describe how it works.
20         When a committee of this kind does this work, there
21    is usually a staff that collects the information, writes the
22    report, and the committee as a whole reacts to what the draft
23    is.  And so that might mean some of the things in the
24    committee report I agree with and some things I might not
25    agree with but that the majority might have agreed with.

1    So that's the way it actually works.

2    So in terms of bias, I certainly would agree that
3 many people hold biases and that it did affect the process
4 with regard to women in science and engineering.  But I don't
5 make broad statements about implicit bias.

6 Q.  If you could turn back one page to page 3.  Read the
7 bottom -- the first sentence of the bottom right paragraph
8 starting out with -- and just, again, read it to yourself to
9 refresh your recollection -- starting out, "The report
10 presents the consensus views."  Just read the first sentence
11 to yourself.

12 A.  (Witness reviews document.)  I've read it.

13 Q.  Now, again, would you agree that the report here, at
14 least according to the report, presents the consensus views
15 and judgment of the committee members?

16 A.  Consensus.

17 Q.  All right.  Now, would you also agree that what your
18 committee found, the consensus views of the committee, was
19 that decades of cognitive psychology research reveals that
20 most of us carry prejudices of which we are unaware but that
21 nonetheless play a large role in our evaluations of people
22 and their work?  Would you agree that that is what the
23 committee report found?

24 A.  Yes, I thought we just said that.

25 Q.  And would you also agree that the committee found that

1    every study that the committee evaluated found a significant

2    effect of bias based on the gender or race of the person

3    being evaluated?

4    **A.**   I don't think it was framed that way.  But -- would you

5    say that again?

6    **Q.**   Do you recall your committee finding that every study

7    that you examined, there was a significant effect of bias

8    based on the gender or race of the person being evaluated?

9    **A.**   Oh, being evaluated.

10   **Q.**   Yes.

11   **A.**   Yes.

12   **Q.**   Okay.  And did your committee also find that there was --

13   there was no significant effect of the gender or race of the

14   person doing the evaluation?

15   **A.**   Repeat that.

16   **Q.**   In other words, your committee did not find that bias

17   against women in the fields of science and engineering was

18   isolated to one race or one gender, correct?

19   **A.**   I don't remember that discussion at all in terms of

20   relating to race or gender.  I think at first you mentioned

21   gender and not race, but I don't recall a discussion of the

22   bias of women, for example, no.

23   **Q.**   You don't recall a discussion of bias of women from what

24   your committee found.  Is that -- I'm sorry, I don't

25   understand.

1  **A.**  I don't recall focusing on the bias of women in the

2  report.  It's been some time since I was part of this

3  committee.

4  **Q.**  Okay.  And after your committee found -- made these

5  findings, one of the recommendations your committee made was

6  that university leaders should educate all faculty members

7  and students about unexamined bias and effective evaluation;

8  is that correct?

9  **A.**  Yes.

10  **Q.**  Okay.  Now, one of the other things your committee found

11  was that there were many women qualified to be professors in

12  the science and engineering departments, correct?

13  **A.**  Yes.

14  **Q.**  And despite this large number of highly qualified women,

15  they were underrepresented in the science and engineering

16  departments of many universities in this country, correct?

17  **A.**  Yes, I believe so.

18  **Q.**  And one of the reasons these highly qualified women were

19  failing to advance is that they faced bias and discrimination

20  in the science and engineering departments of universities

21  when it came to hiring and promotion, correct?

22  **A.**  I would say one possible reason was that.  That's not the

23  only reason.

24  **Q.**  Again, could you turn to page 4 of the report that I have

25  in front of you.

1          Read the paragraph numbered four, just the very

2     first sentence.

3     **A.**   "Women are very likely to face discrimination in every

4     field of science and engineering."

5     **Q.**   And you would agree that is what your committee found,

6     correct?

7     **A.**   Yes, but that's not what I said.

8     **Q.**   Okay.  Now, at your deposition we talked about some of

9     the conclusions that you've formed and you've reached about

10    bias and stereotypes, and you believe that people can develop

11    biases through the ways in which they are socialized,

12    correct?

13    **A.**   Yes.

14    **Q.**   For example, we can develop biases from our parents, from

15    the communities we grow up in, and through the things that we

16    endure through our lives, correct?

17    **A.**   That's correct.

18    **Q.**   In fact, you've said before that we all have biases,

19    correct?

20    **A.**   Yes.

21    **Q.**   But the fact that we grow up in a certain way, that we're

22    conditioned in a certain way, that we experience life in a

23    certain way doesn't mean that we are held to that for all

24    times, correct?

25    **A.**   Correct.

1   **Q.** There are ways for us to overcome biases, correct?

2   **A.** Yes.

3   **Q.** And one of the ways to overcome bias is through education

4   and training, correct?

5   **A.** Yes.

6   **Q.** And this is because through education and training,

7   people can overturn the conditioning that they receive as a

8   consequence of their lived experience?

9   **A.** I'm not sure that I use the term -- are you quoting me

10  when you say "training"?  Are you quoting from my deposition?

11  **Q.** Let me -- this doesn't -- let me just ask you if this is

12  what --

13  **A.** Could you just tell me whether that that's -- I don't

14  have it in front of me.  Are you reading a quote from my

15  deposition?  Because I don't recall saying "training."

16  **Q.** I am reading part of a quote from your deposition.

17  **A.** Well, what specifically did I say in my deposition?

18  **Q.** I believe --

19  **A.** Okay.  That's okay.  I thought you had it in front of

20  you.

21  **Q.** I'll move on.

22  **A.** Okay.

23  **Q.** Last question on the subject.  You believe that

24  interrogation about our biases is a lifelong process for all

25  of us, correct?

1   **A.**  Yes.

2   **Q.**  Okay.  So I'd like to turn to how Harvard treats

3   applicants who are the children of Harvard alumni, what we

4   also know to be legacy applicants.

5   **A.**  Okay.

6   **Q.**  Now, you support Harvard's decision to give legacy

7   applicants a preference or a tip in the admissions process,

8   correct?

9   **A.**  I do.

10  **Q.**  And you also --

11  **A.**  Obviously not all legacy applicants.

12  **Q.**  I'm sorry, I didn't catch that?

13  **A.**  Not all legacy applicants, but the applicants that are on

14  a par with the top of the pool.

15  **Q.**  You also believe that if Harvard eliminated the

16  preferences or tips that it gives to the children of alumni,

17  that fewer people would donate to Harvard, correct?

18  **A.**  I personally believe so, yes.

19  **Q.**  Now, in your report, you cite a study from Coffman,

20  O'Neil and Starr.  It's entitled "Empirical Analysis of

21  Legacy Preferences on Alumni Giving At Top Universities,"

22  correct?

23  **A.**  I don't have it in front of me, but okay.

24  **Q.**  Sure.  Well, I'll put it up on the screen for you.

25  **A.**  Okay.

1    **Q.**  This is the -- this is your rebuttal report on page 6.

2    It's also in your binder.

3    **A.**  Oh, it is.  Okay.

4    **Q.**  I'm referencing the Coffman study.  You write, "It finds

5    that schools with legacy preferences on average have 35.7

6    percent higher alumni giving than non-legacy preference

7    schools before controlling for family wealth.  The study also

8    acknowledges that its model suggests that abolishing legacy

9    preferences would have a deleterious impact on the finances

10   of universities that currently consider legacy status in

11   admissions.  In my opinion, such an outcome would be harmful

12   for many private universities whose financial resources

13   affect their ability to sustain the excellence of their

14   offerings and provide resources for low-income students of

15   all races to afford the costs of their education."

16           That is what you wrote, correct?

17   **A.**  Yes.

18   **Q.**  Now I'd like to turn to look at the rest of the Coffman

19   study, and that is also in your binder at Defendant's Exhibit

20   132.  I believe it's the first one.

21           If you turn to page 114 and see the quote from your

22   brief, "The coefficient of 0.357 implies that schools with

23   legacy preferences, on average, have 35.7 percent higher

24   alumni giving than non-legacy preference schools before

25   controlling for wealth.  But the authors continue and what

1    they write is, 'What does this tell us?'  This suggests that

2    schools with legacy preferences have higher alumni giving,

3    but it can be explained entirely by the wealth of their

4    admitted students.  The fact that legacy preference schools,

5    on average and holding all else equal, have wealthier

6    admitted students is consistent with the notion that elite

7    schools achieve higher giving simply by selecting

8    disproportionately from families of their own wealthy alumni,

9    not that giving legacy preferences somehow changes giving

10   behavior."

11           Did I read that right?

12   **A.**  Yes.

13   **Q.**  And the authors continue further down on page 115.  And

14   they wrote, "Thus, it is not that these elite institutions

15   are simply lucky enough to have wealthier families in their

16   student body; instead, the preference policy itself allows,

17   contributes to, and perpetuates overselection from the upper

18   class.  Once we control for whatever wealth differences there

19   are, whether exogenous to the selection process or exogenous

20   to the applicant pool, there is no evidence suggesting legacy

21   preference policies contribute to greater giving."

22           Did I read that right?

23   **A.**  Yes.

24           MR. CONNOLLY:  Thank you.  No more questions.

25           MR. WAXMAN:  If those hearsay statements are being

1    offered for the truth, we object.  Obviously he's done an

2    accurate reading of those two sentences.

3              THE COURT:  They haven't been admitted at all.

4              MR. CONNOLLY:  This is a study that she relied on

5    in her report and I'm asking her questions about it.

6              THE COURT:  It's fair game to ask her about it, but

7    I think he's objecting to their admission and they haven't

8    been admitted.

9              MR. WAXMAN:  I just will correct the record.

10             MR. CONNOLLY:  And that's fine.  We're not seeking

11   to admit.

12             THE COURT:  Okay.

13             MR. WAXMAN:  This is not a study that she offered

14   in her report.  This is a study relied upon by Mr. Kahlenberg

15   to which she responded.

16             MR. CONNOLLY:  And we read into the record what she

17   said about the report, so I think it's clear.

18             THE COURT:  Yes.

19             MR. CONNOLLY:  Thank you.

20             THE COURT:  Redirect?

21             MR. WAXMAN:  No, thank you.

22             THE COURT:  Now you are excused.

23             THE WITNESS:  Thank you, Your Honor.

24               THE COURT:  So we're early for the lunch break.

25   Do you want to start on your next witness?  Do you --

1          MR. WAXMAN:  Sure.  I mean, if -- needless to say,

2     I haven't had the opportunity to confer with anybody about

3     anything, but I think we can probably get started.  I mean,

4     other than Your Honor.

5          MR. LEE:  He has our permission if he has your

6     permission.

7          MR. WAXMAN:  It will take us a couple of minutes to

8     set up.  Among other things I need to retrieve the book that

9     has my list of questions.

10          Your Honor, just one -- I know it's housekeeping, I

11     don't know if it's housekeeping, technical issue.  Professor

12     Card has even an older back than Your Honor and has asked

13     that if at some point in discussing --

14          THE COURT:  That seemed very backhanded somehow.

15     Even older than me.

16          MR. WAXMAN:  I'm sorry.  Professor Card himself, to

17     a point that we will testify about, has described himself as

18     on the bubble of retirement and has asked -- we've procured a

19     lapel mic and asked whether if periodically during his

20     testimony we have a large projection screen that has -- that

21     displays what is also on the screens, if he can stand up at

22     appropriate points to illustrate his testimony.

23          THE COURT:  That's fine.  Even if he wasn't even

24     older than me, that would be fine.

25          MR. WAXMAN:  That was an unforced error.

1          THE COURT:  Agreed.

2          (DAVID CARD duly sworn by Deputy Clerk.)

3          COURTROOM CLERK:  Can you please state your name

4     and spell your last name for the record.

5          THE WITNESS:  My name is David Card, C-A-R-D.

6     EXAMINATION BY MR. WAXMAN:

7     Q.   Good morning, Professor Card.  Have you been retained as

8     an expert by Harvard in this case?

9     A.   I have, yes.

10    Q.   And what is your current position?

11    A.   I'm the class of 1950 professor at U.C. Berkeley.

12    Q.   And what is your educational background?

13    A.   I got my undergraduate degree in Canada at Queens

14    University in 1978, and I completed my Ph.D. at Princeton.

15    The degree was awarded in 1983.

16    Q.   And what is your field of specialization?

17    A.   Labor economics.

18    Q.   And what courses do you teach?

19    A.   For undergraduates I teach advanced econometrics and for

20    graduate students I teach topics in labor economics.

21    Q.   What is econometrics?

22    A.   Econometrics is the application of statistical methods to

23    problems in economics, generally.

24    Q.   And what is labor economics?

25    A.   Labor economics is the field of economics that deals with

1     individual decision-making, mostly how people make choices

2     over things like what job to take, what level of education to

3     get.  So it deals broadly with issues of wages,

4     discrimination, immigration, things like that.

5     **Q.**   Has your research been published?

6     **A.**   Yes, I have over 100 book chapters and publications.

7     **Q.**   And have you published any work focused on

8     discrimination?

9     **A.**   Yes.  So over the course of my career, I've written a

10    number of articles on both gender discrimination and race

11    discrimination issues.

12    **Q.**   Have you also published a study of the effects of

13    race-conscious admissions?

14    **A.**   I did one study of that, yes.

15    **Q.**   Please turn to Tab 48 of Volume 2 and take a look at what

16    has been marked as Defense Exhibit 133.

17          Do you recognize that document?

18    **A.**   Yes.

19    **Q.**   And what is it?

20    **A.**   It's my CV as of December 2017.

21          MR. WAXMAN:  Your Honor, we offer Defense Exhibit

22    133.

23          MR. MORTARA:  No objection, Your Honor.

24          THE COURT:  It's admitted.

25          (Defendant Exhibit 133 admitted into evidence.)

1    **Q.**  Professor Card, since the time of your report, have there

2    been any significant changes in your CV?

3    **A.**  I've stepped down, my term as director of labor studies

4    program at the NBR ended.  And I've had a number of new

5    publications and new working papers and so on, yeah.

6    **Q.**  Please turn to page 2 of Defense Exhibit 133, and if we

7    could have this highlighted, Mr. Lee.

8         Does this fairly list your professional

9    accomplishments, awards, and publications?  I guess we only

10   have the awards and prizes first.

11        Does that fairly list the awards that you've

12   received for your professional work?

13   **A.**  Yes, some of them, yes.

14   **Q.**  Now, we've heard quite a bit already about the John Bates

15   Clark Prize.  So let me focus you on the Frisch Medal and ask

16   you if you can explain what the Frisch Medal is.

17   **A.**  The Frisch Medal is an award that's given every second

18   year for a paper published in the Journal of Econometrica,

19   which is, I guess, the foremost journal for research studies

20   in econometrics, and I won that award with my coauthor, Dean

21   Hyslop, in 2005.

22   **Q.**  And what is the IZA Prize in Labor Economics?

23   **A.**  Well, IZA is a research institute in Germany, a large

24   institute, and the Prize in Labor Economics, it specializes

25   in labor economics.  And the prize is an award they give

1    every year, sort of a lifetime achievement award, I guess.

2    And I won that award with Alan Krueger in 2006.

3    **Q.**  Have you ever testified in a trial before?

4    **A.**  No, I have not.

5            MR. WAXMAN:  All of my expert witnesses.

6            THE COURT:  I know.  They're all happy to be here,

7    too.

8    **Q.**  And what were you asked to do, Professor Card, as an

9    expert in this case?

10   **A.**  I was principally asked to look at four main questions.

11   **Q.**  And have you prepared a set of demonstratives to assist

12   you in your testimony today?

13   **A.**  I have, yes.

14   **Q.**  So let's look first at Demonstrative 10.2, and let me

15   have you explain what questions you were asked to address.

16   **A.**  So the first question is whether statistical evidence

17   supports the plaintiff's claim that Harvard discriminated

18   against Asian-American applicants.

19           THE COURT:  Can I stop you?

20           Do I have this?  Is it in one of the binders?

21           MR. WAXMAN:  Have I not given a set of

22   demonstratives to the court?  You certainly should and you

23   will.

24           THE COURT:  Old people like me do better with

25   paper.

1          MR. WAXMAN:  Somebody even older than Your Honor

2    will provide it.

3          THE COURT:  If there is such a person in the

4    courtroom.

5          Is it in one of the binders?

6          MR. WAXMAN:  Yes, it's in a binder.

7          THE COURT:  One of the binders I have?

8          MR. WAXMAN:  I believe we provided it to Karen.

9          COURTROOM CLERK:  Yes, I gave it to her.

10         MR. LEE:  Tab 63.

11         MR. WAXMAN:  And we're at Tab 63.  Tab 63 has all

12   the demonstratives.

13         THE COURT:  Excellent.  Thank you.

14   **Q.**  So what questions were you requested to address?

15   **A.**   The first was whether statistical evidence supports the

16   plaintiff's claim that Harvard has discriminated against

17   Asian-American applicants in its admissions decisions.

18         The second question was to what extent does race

19   affect admissions decisions at Harvard.

20         The third question is, is there statistical

21   evidence that Harvard has engaged in racial balancing.

22         And the fourth question I was asked to examine, how

23   Harvard's admitted class would change if it were to eliminate

24   the consideration of race and pursue some of the race-neutral

25   alternatives that have been proposed.

1    **Q.**   Now, Professor Card, we're going to be spending some

2    considerable time examining your analysis on each question.

3    But can we begin by just asking at a high level what you

4    concluded with respect to each?

5    **A.**   Yes.

6              So with respect to the first question, my

7    conclusion is that the statistical evidence does not support

8    the claim that Harvard has discriminated against

9    Asian-American applicants.

10             With respect to the second question, my conclusion

11   is that race is a factor in admissions at Harvard.  It's one

12   of the factors that is valued in some candidates.  It has a

13   comparable effect to other positive tips or awards that

14   Harvard gives or preferences that Harvard gives to different

15   students.  And it's never a situation where race alone is

16   individualistically determinative of a student's admission.

17             On the issue of racial balancing, my conclusion is

18   there's no statistical evidence that Harvard has engaged in

19   racial balancing.

20             And finally on the issue of race-neutral

21   alternatives, my conclusion, which is very consistent with

22   large existing research data, is that Harvard, if it were to

23   eliminate directly the consideration of race and use

24   race-neutral alternatives, it would face a trade-off in that

25   using race-neutral alternatives would necessarily, to achieve

```
 1    higher levels of diversity close to or roughly similar to the
 2    levels of a diversity, it would involve a reduction in the
 3    quality of the class.
 4              So there's a trade-off there.
 5    Q.   Dr. Card, were you here for Dr. Arcidiacono's testimony?
 6    A.   I was, yes.
 7    Q.   Did you hear him testify about a, quote, Asian penalty?
 8    A.   Yes.
 9    Q.   What did you understand him to mean by "penalty"?
10    A.   Well, my interpretation of what he was saying is that
11    there are really three components of that.  The first
12    component is that if there is, in the admissions process, if
13    there is, for example, a positive preference for, say,
14    Hispanic and other types of people in the admissions process,
15    that that necessarily is a disadvantage or discrimination
16    against Asians and, I guess, non-Hispanic white candidates.
17    So that was one component of what he said.
18              The second was he was directly asserting that
19    relative to white applicants, white domestic applicants,
20    Asian-American applicants face a negative disadvantage in
21    admissions.
22              And the third assertion I think he was making was
23    that the mechanism for that was largely through
24    discrimination or negative assessment of the personal rating
25    of Asian-Americans.
```

1    **Q.**  Do you agree with him?

2    **A.**  No, I disagree on all three issues.

3    **Q.**  Why not -- or why?

4    **A.**  Well, first, with respect to the issue of a positive

5    benefit for one, say, underrepresented minority group is

6    equivalent to a negative discrimination or discrimination

7    against other groups, I disagree with that.  I don't think

8    that's the right way to think of the issue, and I certainly

9    don't think that's the way that Harvard does it.

10         The way they're thinking of it is there's a way for

11   well-qualified candidates who have a level of academic

12   qualification and extracurricular qualifications and so on,

13   for those candidates race then can be an additional tip; just

14   like being an accomplished musician can be a tip or being

15   from a sparse country, as the dean would say the other day,

16   or having, say, a strong athletic record.

17         And so I don't think it's appropriate to think of

18   there being discrimination against people who don't play the

19   cello as well as Yo-Yo Ma just because Yo-Yo Ma is so

20   accomplished in that.  And similarly, I don't think it's

21   appropriate to think of a positive benefit for an

22   underrepresented group as necessarily representing negative

23   discrimination against others.

24         Secondly, on the issue of the difference between

25   Asian-American applicants and white applicants in the

1    admissions rates, I think that the statistical evidence is

2    very clearly not a showing of evidence of discrimination.

3    And I think a proper analysis of the overall admissions

4    procedure does not show that.

5            And finally, with respect to personal rating, I

6    also think that an evaluation of all of the evidence,

7    including the other ratings that are awarded, and a

8    consideration of all of the available evidence definitely

9    does not support the claim that there's discrimination in the

10   personal rating.

11   **Q.**  Let's turn to the work that you did in this case.

12           Did you review documents and data about Harvard,

13   the Harvard admissions process in the course of forming your

14   opinions?

15   **A.**  I did, yes.

16   **Q.**  What did you review?

17   **A.**  Well, I started with a lot of material that Harvard uses;

18   for instance, training admission officers.  There's publicly

19   available material on the Internet about their admissions

20   process.  By the time I was working on my report, some of the

21   admissions officers had already been deposed, and so I read

22   some of those depositions.

23           So I looked at that kind of material.

24   **Q.**  Did you also examine data from the Harvard admissions

25   database?

1    **A.**   I did.  I was given access to data for a series of

2    classes, admissions classes for the classes of 2014 to 2019.

3    And these data are coming from the NEVO database that Harvard

4    uses to store information and process it about the

5    characteristics of admitted applying students.

6    **Q.**   Did you also evaluate material that had been provided to

7    you or provided in this litigation from the college board?

8    **A.**   Yes.

9           So an additional supplemental set of data comes

10   from the college board, and that contains a lot of background

11   information about the schools and neighborhoods of the places

12   where the students are coming from who are in the application

13   database.

14   **Q.**   Now, over the course of my examination of you, we're

15   going to be reviewing a range of data regarding Harvard

16   admissions, correct?

17   **A.**   Yes.

18   **Q.**   And some of the data is going to relate to racial groups.

19          Do you understand that?

20   **A.**   Yes.

21   **Q.**   And to be clear, we're going to be looking at average

22   group data, correct?

23   **A.**   Yes, by nature of a statistical analysis, I'll be

24   reporting data about averages of differences between groups,

25   for example.

1    **Q.**  But does the data itself show variation among individuals

2    within any particular group?

3    **A.**  Yes, certainly.  In fact, there's enormous variation

4    within any of the groups, within any racial group.  So

5    there's, in fact, substantially more variation within, say,

6    the white population or the Asian-American population than

7    there is in the small difference between their averages.

8    **Q.**  So if I refer to any racial group, will you understand me

9    to be referring to average group data?

10   **A.**  Yes.

11   **Q.**  And will you understand I'm not referring to every single

12   individual, just the average group data?

13   **A.**  Yes, certainly.

14   **Q.**  Please turn to Tab 1 in Volume 2 of your binder, which is

15   Exhibit 669.  What is this document?

16   **A.**  This is an exhibit that shows the number of domestic

17   applicants per year in the database that both Professor

18   Arcidiacono and I analyzed, the number of admitted students

19   and average admission rate.

20   **Q.**  Is this a summary that you created?

21   **A.**  Yes.

22   **Q.**  Did you prepare this summary using data extracted from

23   Harvard's admission database?

24   **A.**  Yes.

25   **Q.**  And is that data maintained in the ordinary course of

1    Harvard's business, to your knowledge?

2    **A.**   Yes.

3    **Q.**   Approximately how many fields of data did you analyze

4    from Harvard's database?

5    **A.**   Well, certainly I would say over 200 because there's 200

6    variables used in most of my models.

7    **Q.**   Did you rely on this summary in forming your opinion in

8    this case?

9    **A.**   Yes, I certainly did.

10   **Q.**   Does this summary fairly and accurately reflect your

11   review and analysis of the data we've discussed?

12   **A.**   Yes.

13   **Q.**   Now, over the course of your examination, will we be

14   looking at other summary exhibits?

15   **A.**   Yes, quite a few.

16   **Q.**   I may ask you these tedious questions again, but does

17   each reflect your review and analysis of the Harvard

18   admissions data?

19   **A.**   Yes.

20           MR. WAXMAN:   Your Honor, we offer Defense Exhibit

21   669.

22           MR. MORTARA:   No objection.

23           THE COURT:   It's admitted.

24           (Defendant Exhibit 669 admitted into evidence.)

25   **Q.**   Professor Card, please turn to Tab 3 in Volume 2.

1              Do you see defense Exhibit 671?

2    **A.**  Yes, I do.

3    **Q.**  What is it?

4    **A.**  So this is an exhibit, number of applicants to the class

5    of 2019.

6                   MR. WAXMAN:  Your Honor, we offer Defense

7    Exhibit 671.

8                   MR. MORTARA:  No objection, Your Honor.

9                   THE COURT:  It's admitted.

10                  (Defendant Exhibit 671 admitted into evidence.)

11   **Q.**  Please turn to Volume 4, Professor Card, and look at

12   Defense Exhibit 672.

13                  Do you have that?

14   **A.**  Yes.

15   **Q.**  What is it?

16   **A.**  It's a tabulation, applicants and admitted students by

17   profile ratings combinations.

18                  MR. WAXMAN:  Your Honor, we offer Defense

19   Exhibit 672.

20                  MR. MORTARA:  Also no objection, Your Honor.

21                  THE COURT:  Admitted.

22                  (Defendant Exhibit 672 admitted into evidence.)

23   **Q.**  Let's look, Professor Card, at Defense Demonstrative

24   10.3.

25                  What is this showing?

1    **A.**   So this is data for the class of 2019 admittees, and this

2    is some characteristics of the applicant pool, so that -- the

3    set of students who have applied, and what I'm showing is an

4    extremely important characteristic of the applicant pool at

5    Harvard.

6             The applicant pool at Harvard, as I think everyone

7    knows, is extremely well qualified, but in particular,

8    they're extraordinarily well qualified on academic

9    dimensions.

10            And so for benchmark purposes, the green line along

11   the axis shows the number of domestic admitted students in

12   the class of 2019.  So that was 1,756 students in total.  And

13   just to understand the overwhelming abundance of academic

14   excellence, for that class, there was 2,741 students who had

15   a perfect SAT verbal score.  There was 3,450 who had a

16   perfect SAT math score, so roughly twice as many as there

17   were total domestic slots.  There was around 8,200 who had a

18   perfect GPA.  And there would be something around 5,000

19   students who would be in the top two deciles of what

20   Professor Arcidiacono was calling the academic index, which

21   is an index of SAT and GPA and class rank.  And that would be

22   equivalent to students who essentially have nearly perfect

23   SATs and nearly perfect GPAs and so would be considered on

24   the basis of SAT and GPA to be extremely highly accomplished.

25   **Q.**   Professor Card, let's turn to Demonstrative 10.4.  And

can you please explain to the court what this shows?

**A.**   Yes.  So this is now showing on average across the six admission cycles that I'm going to be talking about extensively, this is showing the fraction of students on average who achieve a rating of 1 or 2 on each of four key dimensions.

So key dimension one would be their academic rating; second would be their extracurricular rating; third would be their personal rating; and fourth would be their athletic rating.

So these are the profile ratings that we've heard a lot about in the case so far.

And just as a reminder, 1 or 2 is actually quite a high level of accomplishment.  A 1 is an extremely high level of accomplishment, but 2 is very, very solid.  I'm not sure I would have ever gotten any 2s myself.

So this shows that in this on average amongst all of these four dimensions of strength, I'm going to call these strengths, these four dimensions of strength, academic strength is by far the most common dimension of strength.  So 42 percent, roughly, of all applicants to Harvard, all domestic applicants, have an academic 1 or 2, which means they're extremely well qualified academically.

By comparison, the other three attributes are much less common.  So only 24 percent have an extra-curricular 1

1  or 2.  Only 21 percent have a personal 1 or 2, and only

2  around 10 percent have an athletic 1 or 2.

3          So emphasizing the relative abundance of academic

4  strength, there are substantially more students who are

5  highly qualified on an academic dimension than on these other

6  dimensions.

7          And I should say this is not to say that these are

8  the only dimensions of strength that Harvard cares about.

9  These are just the four profile ratings.  There are, of

10  course, other dimensions of strength like extraordinary music

11  skill or things like that that would be on top of this.

12  **Q.**  How does the abundance of academic strength affect

13  Harvard's admissions process?

14  **A.**  Well, in my view, it's really one of the most important,

15  if not the most important thing, to understand about the

16  admissions pool at Harvard, and also to understand this case.

17          Because one can see by the previous slide, for

18  example, if one was just focusing on SAT and GPA, there's

19  just an incredible numbers of students with virtually perfect

20  scores and virtually perfect GPAs.  So academic strength is

21  not really sufficient to distinguish amongst this huge pool

22  of academically qualified students, and that's not what they

23  do.  Instead, what they're looking for is students who have

24  multidimensional strengths.  A student who is well-qualified

25  academically but in addition has extracurricular strength and

1    a personal strength, and, if possible, athletic strength.

2            So they're looking for what I would call a

3    multidimensional accomplishments.

4    **Q.**  How much of the Harvard applicant pool is strong on

5    multiple dimensions?

6    **A.**  A relatively low fraction.  Something like only 7 percent

7    have actually got a 1 or 2 on three of these categories.  So

8    the relative importance of that is quite low.

9            MR. MORTARA:  Your Honor -- Your Honor, I don't

10   want to be interrupting Mr. Waxman's examination.  Subject to

11   the discussion that we had earlier, about wedges and noses,

12   I'm going to not object to this.  I'll let you know when I'm

13   going to have an objection, if that's okay.

14           THE COURT:  Okay.

15           MR. WAXMAN:  Is this the camel's nose?

16           MR. MORTARA:  I think it was a nose in the tent and

17   a wedge in a door.

18           MR. WAXMAN:  Got it.  Okay.

19   **Q.**  Looking at Demonstrative 10.5, what does this show?

20   **A.**  So this is more of a complete characterization of the

21   applicant pool.  So it's a bit confusing because there are

22   applicants and admissions and admitted pools and so on.  So

23   this is the overall number of people who apply to Harvard,

24   domestic applicants over these six years.  So that's about

25   150,000 students.

1          And looking at that group, about three-quarters

2    have only one dimension of strength.  So that would be the

3    vast majority of students while well-qualified in many

4    senses, when we look at these four ratings would only have 1

5    or most 1 of those ratings of a 2 or better.  A much smaller

6    fraction of students would be like around 20 percent, would

7    have two strengths.  So they might have say an academic 2 and

8    an extracurricular 2 or academic 2 and an athletic 2.

9          Then as I mentioned before, the set of students

10   with three or more strengths, so these would be very strongly

11   multidimensional students, students who have an academic 2, a

12   personal 2 and an athletic 2, that's only 7 percent.  And

13   these groups with two or more strengths represent about 7,000

14   applicants per year.

15         So even focusing on this sort of multidimensional

16   group, there's still a big process of winnowing that down to

17   get to the 1,700 or so that are going to be admitted.

18   **Q.**  Mr. Lee, please show Demonstrative 10.6.

19         And let me ask Professor Card whether you can

20   explain what this shows?

21   **A.**  Yes.  So this is a simple demonstration of this extreme

22   importance of well-roundedness or multidimensionality to the

23   admissions process at Harvard.

24         So focusing at the left of the graph on the

25   fraction of -- so on the students, this is the three-quarters

of students who have one strength or not even that.  Their
admission rate is only around three percent.  So having one
dimension of strength is only going to give you an admission
rate of about three percent.  The overall average admission
rate is around 7 percent, so this is much below average.

If we go to students that have two strengths,
that's the yellow bar, that second strength is having a big
effect on their probability of admission.  So whereas the
first strength gave them a three percent probability of
admission, second strength is going to raise their
probability of the admission by 11 percentage points, up to
14 percent.

So the second strength is more valuable than the
first.

And when we go to the third strength, so students
with the three strengths I mentioned before, this is now only
7 percent of the applicant pool, but you can see now that
group has a 46 percent admission rate on average.

And you can see that compared to the second -- the
group with only two strengths, the value of that third
strength is really large so that we're going from 14 to 46 or
we're increasing the probability of admission by 32
percentage points with that third strength.

And even among students with three strengths, if we
go all the way to 4, that fourth strength is also extremely

1    valuable.  You're going from 46 to 70 percent admission rate,

2    so you're going to increase the probability of admission by

3    25, 24 points.

4            So one can see this very important feature, that

5    it's not -- one strength alone really doesn't do much for

6    you.  You're below average.  And if we focus in particular

7    amongst the one strength group is the group that are strong

8    just on academic and their probability of admission is even

9    below three percent, a little bit lower than that.

10           So a group of students that are strong academically

11   but have no other strengths have below average admission

12   rates.

13   **Q.**  So what if you're a superstar on academics?  I assume

14   that the left-hand bar includes the academic 1s?

15   **A.**  Yes, it does.

16   **Q.**  What if you're a superstar; is that enough to be admitted

17   to Harvard?

18   **A.**  Yes, I think the next demonstrative will show that.

19   **Q.**  In that case, please, let's have the next demonstrative.

20           What does Demonstrative 10.7 show?

21   **A.**  So let me remind you, the academic 1 is an extraordinary

22   level of accomplishment, so this is not really like just good

23   SAT and GPA.  This is only 100 students or 150 students a

24   year that have extraordinarily high level of accomplishment.

25   So they would be students that have virtually perfect scores

1    in most cases but in addition have competed in national

2    contests and math contests or science contests and won.  So

3    this would be an extraordinarily high level of

4    accomplishment.

5             So amongst that group of students, with no other 2

6    rating, so this is like academic superstars, their

7    probability of admission of 40 percent.  So that's quite good

8    considering that's only a single strength.  But for that

9    group of students, adding one additional strength increases

10   their probability of admission by 35 percentage points, from

11   40 to 75.  And even among that group, the third strength

12   increases probability of admission by another 20 percent.

13            So even amongst somebody who is an academic

14   superstar, additional strengths are quite important.

15   **Q.**  Let's turn now to Demonstrative 10.7 and let me ask you

16   what this shows.

17   **A.**  Yes.  So this is a side-by-side comparison of the

18   composition of the applicant pool.  So this is the group of

19   students who apply to Harvard on the left versus the admitted

20   students.  So those are the ones who actually get

21   accomplish -- get admitted.

22            And a reminder that strength represents a profile

23   rating of 1 or 2 on any of these four dimensions.  So the

24   applicant pool is sort of one-dimensional.  73 percent have

25   one or fewer strengths.  Only 20 percent have two strengths,

1    and only 7 percent have three or more strengths.

2         When we look at the admitted pool, the set of

3    students who actually get admission, almost half have three

4    or more strengths.  So they're going from 7 percent of the

5    admitted pool to nearly half -- excuse me, 7 percent of the

6    application pool to nearly half of the admitted pool.  So

7    their representation in the admitted pool is seven times

8    larger than their representation in the application pool.

9         Similar in the 2 strength group, their

10   representation is about double, so they're 20 percent of the

11   application pool, 38 percent of the admitted pool, and only

12   15 percent of all students admitted have only one strength.

13   **Q.**  Now, to set the stage for the next slide, Dr. Arcidiacono

14   testified, did he not, that Harvard's admissions office

15   discriminates against Asian-American applicants as compared

16   with white applicants, correct?

17   **A.**  Yes.

18   **Q.**  How did Dr. Arcidiacono characterize the strength of the

19   average Asian-American applicant as compared to the average

20   white applicant?

21   **A.**  Well, throughout his presentation, at trial the other

22   day, he was emphasizing the academic index.  So many of his

23   charts had deciles of the academic index.

24        The academic index is a construction used to

25   monitor compliance with Ivy League athletics rules.  So it

1    has a formula that takes SAT and GPA and constructs an index.

2    And he was using that as an index and focusing on differences

3    across academic index.

4    **Q.**   So do you agree with his conclusion that -- his

5    characterization that applicants -- that Asian-American

6    applicants are much stronger than white applicants?

7    **A.**   I agree with his characterization that they're stronger

8    on the academic dimension.  I think there's no doubt about

9    that.  But I would not use the academic index as a measure of

10   strength because as we see in this chart, having one

11   strength, just being strong academically, as we saw in the

12   previous chart, even being a superstar academically is not

13   really sufficient to guarantee admission.

14   **Q.**   Did you examine whether white applicants and

15   Asian-American applicants differ again on average in how many

16   strengths they have?

17   **A.**   Yes, I did, yes.

18   **Q.**   Let's look at the next demonstrative, and let me ask you

19   what Demonstrative 10.9 shows.

20   **A.**   So this is focusing on presence of three or four

21   strengths, which I've emphasized that's about half of the

22   overall set of students who end up getting admitted.  And

23   this is comparing between white applicants on the right in

24   red and Asian-American applicants on the left in blue.

25               So there's about 7.6 percent of Asian-American

1    students have three or more strengths versus 8.8 percent of

2    white students, white domestic students have that.  So that's

3    equivalent to something like 500 students per year Asians

4    versus 900 students per year whites.

5            And so that difference, the 900 versus 500, is a

6    very important thing to keep in mind when looking at the

7    overall characterization of the set of students who are

8    admitted because, of course, there's nine versus five,

9    nine-to-five ratio in terms of the relative representation in

10   this three-strength group.

11   **Q.**  So is that difference that you've just described

12   meaningful?

13   **A.**  I think it's extraordinarily meaningful and helpful in

14   understanding many aspects of the case, yes.

15           THE COURT:  When you get a good spot for lunch, I'm

16   hungry and Kelly has been going all morning.

17           MR. WAXMAN:  I believe that I'm just about to --

18   well, I can stop at any time.  I have about maybe ten minutes

19   to go before a logical break.

20           THE COURT:  Okay.  Go ahead.

21   **Q.**  Did you examine whether white and Asian-American

22   applicants have different relative strengths across the four

23   dimensions that you've been discussing?

24   **A.**  I did, yes.

25   **Q.**  And what does Demonstrative 10.10 show?

1    **A.**   So this is showing, I think, a point that we just talked

2    about to some extent if we look at these four dimensions of

3    strength.

4            Now, again, I would emphasize that these are not

5    the only dimensions of strengths that are important, but

6    these are the four profile rating measures so they're quite

7    important in the process.

8            Asian-Americans are more likely to have academic

9    strengths so they're -- 60 percent of overall set of Asian

10   students who apply to -- domestic students who apply to

11   Harvard get an academic 1 or 2 versus 46 percent.  So this is

12   a very important fact that Asian-American students are, in

13   fact, better qualified on the academic dimension than white

14   students or other groups, in fact.

15           When we look at the extracurricular dimension,

16   they're not too different than the white students.  And then

17   when we look at the other two dimensions, you can see that on

18   the personal dimension there's a gap.  And on the athletic

19   strength dimension 1 or 2, there's also a gap.

20           And so when you put these three, four pieces

21   together, the multidimensional advantage coming for the white

22   students is coming because although there's a higher academic

23   strength in the Asian students, there's a higher personal and

24   higher athletic strength in the white students and that adds

25   up to a multidimensional strength, a more balanced set of

1    students.

2    **Q.**   Were you here during the opening statements in this case?

3    **A.**   I was, yes.

4    **Q.**   Did you hear Mr. Mortara say that the athletic rating

5    does not matter for anyone who is not a recruited athlete?

6    **A.**   I did, yes.

7    **Q.**   You agree with that?

8    **A.**   No, not at all.

9    **Q.**   Please turn in Volume 2 to Tab 5 and look at Defense

10   Exhibit 673.

11          Do you have it?

12   **A.**   Yes.

13   **Q.**   What is it?

14   **A.**   Probability of admission for applicants with different

15   profile ratings.

16          MR. WAXMAN:  Your Honor, we offer Defense Exhibit

17   673.

18          MR. MORTARA:  No objection.

19          THE COURT:  It's admitted.

20          (Defendant Exhibit 673 admitted into evidence.)

21   **Q.**   Let's turn now -- thank you.

22          Let's turn now to the next demonstrative, Mr. Lee,

23   10.11.

24          What does this show?

25   **A.**   Well, contrary to the opening statement, this is an

illustration of the importance of an athletic rating of 2.
So this is not an athletic rating of 1, these are not looking
at recruited athletes, this is looking at the importance of
having an athletic rating of 2, which would be the kind of
students who would be strong, expected to participate, say,
in the club level as President Simmons was talking about in
her testimony a minute ago.

So if we look at admission rates on the vertical
axis for applicants with one other strength, so suppose
they've got an academic strength, so that means they've got a
1 or 2 academically, their probability of admission as we saw
before was quite low, 2 percent.  If we then combine that
with an athletics rating of 2, their probability of admission
goes up to 8 percent.  So there's a significant gain in the
probability of admission, four times higher.

If we take applicants with two other strengths, so
suppose a student that has an academic 1 or 2 and an
extracurricular 1 or 2, that's already a pretty good group,
so their probability of admission is around 13 percent, twice
the average for the overall pool.  But if we combine that
with an academic -- excuse me, with an athletic 2, their
probability of admission rises from 13 percent to 32 percent.
So there's a very large -- almost a 20 percentage point
increase in their probability of admission from having
athletic 2.

1          And similarly for students, even for students with

2    three other strengths on the far right, so they've got an

3    academic 2, an extracurricular 2, and a personal 2, which is

4    a pretty high level, going to the -- completing the set by

5    having an academic -- or excuse me, an athletic 2 would raise

6    their probability of admission by another 18 percentage

7    points.

8          So across the board, having an athletic rating of 2

9    is extremely important and valuable in the process.

10   **Q.**  So to sum up, is it fair to say that athletics matters in

11   the admission process?

12   **A.**  I think it's fair to say that, yes.

13   **Q.**  And is it fair to say that multidimensionality matters?

14   **A.**  I don't think it's possible to emphasize too much just

15   how important multidimensionality is.  It's really the

16   defining feature of the admissions process.

17          MR. WAXMAN:  Your Honor, this is an appropriate

18   stopping point.

19          THE COURT:  All right.  Why don't we come back at

20   1:15.  Does that work for everybody?  Okay.

21          MR. WAXMAN:  Yes, Your Honor, thank you.

22          (Recess taken, 12:28 p.m.)

23

24

25

1                 **** AFTERNOON SESSION ****

2            [Sidebar sealed and redacted.]

3            THE COURT:  When you're ready, Mr. Waxman.

4   BY MR. WAXMAN:

5   **Q.**  The good afternoon, Dr. Card.  Did you construct a

6   statistical model of Harvard's admissions process?

7   **A.**  Yes, I did.

8   **Q.**  And why did you do that?

9   **A.**  That would be completely the standard type of model to

10   use in analyzing something like an admissions decision which

11   is -- in the context of a case like this with many different

12   attributes of candidates that need to be taken into

13   consideration and making a determination about one particular

14   feature like ethnicity.

15   **Q.**  And what kind of model did you construct?

16   **A.**  So just like Professor Arcidiacono, I used a multivariate

17   logistic regression model.

18   **Q.**  What is a regression?

19   **A.**  So a regression is a statistical technique, widely used

20   in economics and other fields, where you try to statistically

21   describe the relationship between a series of inputs or

22   factors, sometimes called.  So those would be -- in the

23   context of the admissions case, those would be things like

24   gender of a student or where they're from, characteristics of

25   their high school, their transcript, and so on, and relate

1    those to an output.  In this case the output would be are you

2    admitted or not.

3    Q.  When you call something a multivariate logit regression,

4    what does that refer to?

5    A.  Unpacking the first part, "multivariate" means that it's

6    going to try and simultaneously take account of multiple

7    factors.  The interpretation that arises in a multivariate

8    regression means it shows the effect of any one of those

9    factors, holding constant the other factors.

10           So for instance, if I was looking at a model of,

11   say, retirement, which I'm going to present as a

12   hypothetical, and I was trying to look at the effect of

13   higher and lower salary on the effect of retirement, I would

14   be trying to simultaneously do that while holding constant

15   other factors like a person's age.  Multivariate regression

16   allows one to isolate the effect of one factor, holding

17   constant the other factors.

18   Q.  What does it mean to say that a multivariate regression

19   is logit or logistic?

20   A.  Logit or logistic is a special form of regression model

21   that's specially designed to handle a situation where the

22   output that you're modeling is a yes/no type of output, in

23   this case admissions decision.  So you're either admitted or

24   not.  So it's going to give rise to -- for each person, it's

25   going to assign a probability that they are admitted.

**Q.**   And did Dr. Arcidiacono also construct a multivariate

logit regression model?

**A.**   Yes, he did.

**Q.**   Have you prepared an illustration of how a multivariate

logit regression works?

**A.**   I have, yes.

**Q.**   Can you please describe what illustration you're going to

be using for the Court?

**A.**   Well, as I just mentioned, I'm going to try and explain

some of the concepts in a multivariate regression model and

some of the specific concepts that arise in a logistic

regression model with reference to a very simple example

abstracted from the terms of the case completely to try and

keep it isolated on the concepts rather than any particular

slant.

I'm going to try and use a set of people who are

working at a company, observed at a point in time.  And over

the next year, some of them are going to retire and some of

them are not.  So imagine 5 percent of these people are going

to retire.  So that's the output variable, yes or no, do you

retire or not.

And I'm going to be thinking about a situation, at

least to begin with, where there are potentially two

important characteristics of people:  their age, which

obviously is important, and also their salary.  To keep it as

1    simple as possible, I think it would be helpful to have a

2    situation where their salary could either be high or low.

3            So each person will differ depending on -- about

4    their ages, which say could be between 25 and 75.  Then in

5    addition they'll have a high or low salary.

6            I want to think of a scenario where, as is true in

7    real life, on average older people have a higher salary.  But

8    it isn't strictly so.  So there's young people and, on

9    average, most young people have low salaries.  But some young

10   people, the high performers, I guess, have higher salaries.

11           And then in the older group on average the salaries

12   are higher, so the average fraction of people in the older

13   group is higher for them, but there's also lower salary

14   people in that group.

15   Q.  So suppose that you now -- we have in mind a simplified

16   hypothetical in which the outcome is retire or not in the

17   next year.  And the model has available to it, I think you

18   explained two variables:  age and whether they have a lot of

19   money or -- or a high salary or a low salary.

20           Now, suppose you omit from your regression the

21   worker's age and just the model now only knows salary.  What

22   might happen to the model's calculation of the estimated

23   effect of salary?

24   A.  Right.  So what would happen, and the way a regression

25   model works is if you exclude variables or they're not

1    available to the model, the model does the best job it can in

2    trying to explain the outcome.

3           In the case where I only had data on salary and the

4    only information that's available to predict who retires and

5    who doesn't and make this assessment is just their salary,

6    not their age.  And imagine, for example, that age is a

7    strong determinant of retirement; salary may or may not be.

8           But in the absence of this information about age,

9    the model is going to see, well, on average the people who

10   had high salaries seemed to be the ones who were retiring.

11   People who had lower salaries were not so likely to retire.

12   So it's going to derive an estimate of the effect of salary

13   which suggests that salary has a positive effect on

14   retirement.

15          And the way that's usually thought about is in

16   terms of -- there's two parts of it:  a coefficient in the

17   model, and then an effect for each person.

18   **Q.**  Let me just stop you there.

19          We've heard testimony in this case both about

20   coefficients from a model and also about something called the

21   average marginal effect or marginal effect.

22          Can you explain the two?

23   **A.**  Yes.  I'll try.  It's an important difference between

24   these two.  The way the model is going to work is it's going

25   to -- after the estimation is finished, there's going to be a

1    set of coefficients which represent the relative weights of

2    each of these characteristics or features or variables in the

3    probability of retirement.

4           And actually Professor Arcidiacono referred to

5    those coefficients in his demonstrative.  So he was able to

6    show -- discuss this in a demonstrative and show there's some

7    coefficients associated with each factor.

8           Now, once the model is constructed, there's going

9    to be a predicted probability for each person given their

10   characteristics that they retire.  And what one does when

11   one's looking at the effect of an individual characteristic,

12   so imagine in general -- not in the specific case we're

13   talking about with only the information on salary, but

14   imagine in general that one has a lot of different

15   characteristics, and for any given characteristic, one can

16   imagine, for example, the probability of retirement from the

17   model when that characteristic is present, and then the

18   probability from the model for the same person when that

19   characteristic is absent.

20          And that difference in probability is the marginal

21   effect for that person of that characteristic.  So for

22   example, in my simple hypothetical, I could imagine in the

23   absence of other information that having a high salary might

24   lead to a predicted probability of retirement that might be

25   like 4 percentage points higher than for other people that

1  have low salaries.

2        And so there's a very important characteristic of a

3  logistic model, and this can be -- will be, in fact, very,

4  very important in understanding a lot of different dimensions

5  of this case.

6        And that is that that effect, the marginal effect

7  for any one person will depend on their other attributes.  So

8  in general, the coefficient is not enough information to tell

9  what the effect is.  One needs to know all the other

10  characteristics to say when I take one individual

11  characteristic like, for instance, higher salary and then

12  turn that on and turn it off, is the lingo we would use, or

13  make it happen and make it not happen, that marginal effect

14  can differ.

15        The way that it's usually summarized, and we've

16  summarized it throughout this case, is in terms of the

17  average marginal effect.  And the average marginal effect is

18  the average of this marginal effect, for example, of higher

19  salary across all the people in the sample.  And it can be

20  quite different for different people in the sample, and this

21  summarizes it in a very important and useful statistic.

22  **Q.**  So for example, just so make sure that Her Honor

23  understands this, the simple model that -- let's say we now

24  have both variables, age and high salary and low salary.  The

25  model would, if I understand you, calculate a coefficient for

1  each of those two variables, correct?

2  **A.**  Yes, it would.

3  **Q.**  But again, if I understand your testimony, the marginal

4  effect that that factor, either an additional year of age or

5  a higher salary has will vary across the population depending

6  on, for example, what their age is, whether they will be 25

7  in the next year or 65?

8  **A.**  Yes.  Would it be helpful for me to use the whiteboard to

9  try to explain the difference in these two?

10  **Q.**  It would be.  I don't know if it would be helpful to Her

11  Honor, but I think it might be helpful to you.

12              THE COURT:  Or you.

13              MR. WAXMAN:  Yes.  It would be very helpful to me.

14  Not as helpful as the little animations about people

15  retiring, but . . .

16  **A.**  So after the model is estimated, say the sparse model.

17  So over here I'm going to have, say, the sparse model.  And

18  it's going to have an average marginal effect for salary, and

19  that could be, like, 4.0.  And there might be a star.  Okay?

20              And so the way to interpret that in the sparse

21  model, that there's no other factors in that model, but the

22  way to interpret it in general is holding constant everything

23  else about the person.  On average, going from a low salary

24  to a high salary across everybody increases their probability

25  of retirement by 4 percentage points.  So the 4.0 is the

1    extra percentage points in the probability.

2    **Q.**   If a worker with a relatively low salary had a 2 percent

3    probability of retiring in the next year, what would that

4    sparse model predict?

5    **A.**   This model would predict on average that the increment of

6    probability across everybody is 4 percentage points.  But for

7    somebody who is, say, relatively young -- now, not in the

8    sparse model because the sparse model can't distinguish

9    between people.  So the sparse model, having no other

10   information, essentially assumes that everybody gets the same

11   average marginal effect.

12           And the star is the convention that we use to

13   indicate statistical significance at the 5 percent level.

14   **Q.**   We've heard about this at least once, but could you

15   explain what that means?

16   **A.**   Yes.  So if you have a sample of data and you estimate a

17   model, the particular estimate that you get can vary a little

18   bit from sample to sample.  And you might have a situation

19   where there's truly no effect, where there really is no

20   effect of salary on retirement.  But in some particular

21   sample you would have an estimate that might be a positive or

22   a negative.  And so the statistical significance gives an

23   indication of how likely the estimate you got could have

24   occurred by chance when the true answer was zero.

25           So it says -- when you see a star, it means it's

quite unlikely.  It's less than 5 percent chance; that's why
the 5 percent significance level.  It's less than 5 percent
chance that you would have got this number when the truth was
there was no effect.  So it gives a sense is this really
different than zero, given the data you have.  So people say
it's statistically significantly different than zero at the
5 percent level, for example.

**Q.**  Is it possible to construct a graph showing how average
marginal effect works in this very sparse example only
looking at the age of the workers?

**A.**  If it's possible, I'd like to go on and talk about the
richer model now and allow us to discuss the concept of
omitted variable.

THE COURT:  Hold on.

You're saying on that model, if all you have is
salaries, it's going to be like a straight correlation
between age and retirement, right?

THE WITNESS:  It's going to do this kind of crazy
thing of saying everybody with higher salary is more likely
to retire because it doesn't have any other information to
make the prediction.  So it's only going to make two
predictions.  Everybody that has high salary, like we could
imagine that -- let's suppose in the data, the average
probability of retirement for people with low salary was
2.0 percent per year.  This would say the average probability

1    of retirement for people with high salary would be

2    6.0 percent per year.  And that difference is the average

3    marginal effect.  And that's the only thing it has in the

4    model, so that's the only thing it can distinguish people by.

5              THE COURT:  Okay.

6              THE WITNESS:  So now let's consider the richer

7    model.

8              So in a richer model, I would have both -- I have

9    two AMEs, AME for salary and AME for age.  I'm thinking of

10   the age case as the average marginal effect of each

11   additional year of age.  So no one wants to do this, but we

12   could all get one year older, and we could see whether that

13   increased that probability of retirement.

14   BY MR. WAXMAN:

15   **Q.**  Not Her Honor.

16   **A.**  None of us want to get older.

17             So in this case, I'm going to imagine if the model

18   had access to both salary and age, I'm going to imagine a

19   scenario where age is actually quite an important driver of

20   retirement.

21             So this could have -- let's imagine this effect is,

22   say, a 2.0, and that's statistically significant.  So that

23   says each additional year of age increases your probability

24   of retirement on average across all the people by 2

25   percentage points.  And then in this case, I'm going to

1    imagine that once you control for age then this falls to 0.6

2    and it no longer has a star.

3    **Q.**   Why does that happen?

4    **A.**   Yes.  So this is the important concept of an

5    omitted-variable bias.  So this sparse model doesn't have

6    access to information by age.  So this model, only having

7    information on salary, is making the best prediction it can,

8    given salary, and says, well, if you only tell me salary,

9    people with higher salary are more likely to retire.  And

10   that's a true fact.  And that difference is statistically

11   significant.

12           However, the richer model now with access to two

13   pieces of information, the interpretation of this variable is

14   what's the average marginal effect; in other words, the

15   effect on average across all people of giving a higher salary

16   when you control for age.

17           So in the multivariant model now, there is not a

18   statistically significant effect and it is actually positive,

19   but it's not statistically different than zero, so we could

20   think of it as roughly zero.  So that says in a model that

21   has access to both salary and age, there isn't a difference.

22   There is a difference by age.  And this difference, the

23   difference between the 4.0 and the 0.6, that's the

24   omitted-variable bias.  So the omitted-variable bias is the

25   fact that this is different than that.

1    **Q.**   And when does the omission of a variable cause bias?

2    **A.**   So this is extremely important, too.  Remember the

3    setting for my scenario is kind of a somewhat realistic work

4    force where older people earn more.  So if you don't have

5    information on salary -- excuse me -- if you don't have

6    information on age and you only see salary but the true

7    effect is driven by age, there will be a problem.

8        So you'll have a problem when the omitted variable

9    is correlated with the included variable.  So older people

10   have higher salaries.  And that variable is important, so you

11   need two things to be true.  You need an omitted-variable

12   bias as driven by the omission or exclusion of a very

13   important variable that is correlated with some of the

14   factors that are included in the model.

15   **Q.**   So for example, if we made your model even richer and

16   included -- we knew everybody's hat size, is it likely that

17   including the hat size would demonstrate that there was, in

18   fact, omitted-variable bias in the model with two factors?

19   **A.**   No.  A good feature of regressions and actually why

20   they're used by economists and social scientists and many,

21   many other researchers, is if you have a set of factors and

22   there's some factor such as, let's say, hat size or eye color

23   or something like that, it really isn't a driver.  It's just

24   some variable that is different across people.

25        The regression model will find that that has a zero

1    effect on average almost all the time.  The regression will

2    successfully sort out the factors that matter and the factors

3    that don't matter.

4            So in this particular richer model, it's saying,

5    well, on average, age is an important factor.  Once you

6    control for age, salary is not an important factor.  If you

7    put it into the model, hat size, it should have a

8    statistically insignificant effect or not a statistically

9    effect, close to zero most of the time.

10   Q.   Professor Card, when economists and econometricians are

11   studying real world outcomes, for example, whether a worker

12   will or won't retire, is it ever possible to avoid

13   omitted-variable bias?

14   A.   Unfortunately, no.  The reason is in realistic data

15   settings, the kind where you're observing real data like I'm

16   observing people at a company and seeing whether they retire

17   or not, in those settings you can never be 100 percent sure

18   that you've got all of the real relevant factors in the

19   model.

20           In all of those models, there's inevitably an

21   important unexplained component in the model.  So the model

22   does not perfectly describe who retires and who doesn't.  It

23   can't perfectly classify people.

24   Q.   So thinking about your retirement example, can you give

25   from your experience some example of factors that are omitted

1  from this two-variable model that would be thought to be

2  relevant to a decision of a worker whether to retire in the

3  next year?

4  **A.**  So I've had a number of students who have done research

5  on retirement, and I've done a couple of papers on that

6  myself.

7           One of the most important drivers of retirement is

8  health, and so less healthy people are much more likely to

9  retire.  And unfortunately health is correlated with age, so

10 one -- even with this richer model, since it doesn't control

11 for health, one might be concerned that health is actually

12 the culprit, is really the driver.  And this 2.0 percent here

13 is itself affected by omitted-variable bias.

14 **Q.**  So would, for example, the climate that you live in be

15 expected to be a variable that might correlate with the

16 probability of retirement?

17 **A.**  Yes.  Lots of other factors.  You could imagine, for

18 instance, the situation of your family, is your spouse

19 retired or working?  A situation with your children, are they

20 still living with you?  Did you manage to get them out of the

21 house?

22 **Q.**  Or grandchildren.

23 **A.**  Or grandchildren would be a good example.

24           Climate -- and some factors like that might be

25 quantifiable.  And other factors it would be very difficult

1    to quantify but might be important, like, for instance, the

2    relationship with your coworkers.

3            It's thought that a very important driver of

4    retirement is job satisfaction, which may be driven by do you

5    get along with your boss or something like that.  Ordinarily

6    there's many of these unquantifiable factors as well as some

7    quantifiable potentially.

8    **Q.**  I believe you answered my next question, but let me just

9    ask it anyway.

10           If you include in your regression every variable

11   for which you have data, does that mean that there's no

12   omitted-variable bias?

13   **A.**  Unfortunately not, no.  That's a huge problem in all

14   kinds of research, any research projects that I've worked on.

15           So one can never be certain that the factors that

16   you've omitted or can't measure aren't available.  Sometimes

17   they're either not available in the data set or they're just

18   not quantifiable.  One can never be certain that they not

19   correlated, say, with age, one of the included variables, and

20   therefore are leading to some sort of omitted-variable bias.

21           So ordinarily it's a matter of understanding the

22   process that you're working with, trying to document

23   carefully, and think carefully about what's omitted and make

24   some assessment.

25   **Q.**  So the Court was asking you when we were back on the

1    exceedingly sparse model as opposed to the very sparse model,

2    the relationship between -- what the average marginal effect

3    curve would look like for the population.

4         Can you now demonstrate that for us?

5    **A.**  Yes, I can.

6    **Q.**  On a model?

7    **A.**  Yes.  So I'm going to do an example of this.  So imagine

8    on this axis I'm going to have -- I apologize.  I could never

9    draw a straight line.

10        This is age, and this is the probability of

11   retirement, and that can range from zero to 100 percent.  So

12   I've got, say, people down here.  The youngest person in my

13   sample might be 25.  Let me draw a benchmark at 60, another

14   benchmark at 70, and I might have people as old as 75 in my

15   sample.

16        What will come out of the model is a set of

17   predictions by age.  And they will ordinarily look something

18   like this.  Like that.  So the shape of this curve, this

19   S-curve, that's actually called a logistic curve.  So the

20   reason why this is called a logistic regression has to do

21   with this logistic shape.

22        In the range down here, I'm imagining in my model

23   that on average there's a two-year -- a 2.0 percentage point

24   effect of retirement.  Which means if I was to go all the way

25   from age 25 to all the way to 75, that 50 years would change

1  my probability of retirement from zero to 100 percent.  So

2  that's kind of a scaling factor.

3          But for many, many people, people say below

4  something like 55 or something like that, even though I've

5  got one coefficient in the model which represents the effect

6  of age, so it's the same coefficient, even though there's

7  only one coefficient in the model, the probability of

8  retirement down here is so low that the average marginal --

9  the marginal effect for one of these people, say somebody

10  down here who's like 40, going from 40 to 41 actually will

11  have almost no effect on their probability of retirement.  So

12  these people will have a very low probability.

13          And if you look at the graph, you can see the same

14  kind of pattern at the top.  Up at the top, this is a group

15  of people that are very close to retirement.  And so an

16  additional incremental effective age, so going from 75 to 76,

17  isn't going to have much of an effect.  All of the marginal

18  effect in the model, almost all of it, is attributable to

19  this group which you can think of as being on the bubble.

20          And the important thing about this logistic curve

21  is if you have that situation for people in that group, one

22  more year of age, going from 70 to 71, for that group of

23  people could have a much bigger effect than just a 2.  It

24  could have like a 5 or a 6 or a 7 percentage point effect.

25          So in these logistic-type settings where there's

1    lots of people who are kind of out of the money for

2    retirement, they're too young, and a lot of people who are

3    very, very close or almost surely going to retire in the next

4    year, all of the effects are concentrated in that group of

5    people on the bubble.

6            I think that's all I have, actually.  I think I can

7    sit down.

8    **Q.**  I can't remember any other points we were going to

9    demonstrate.

10   **A.**  Let me sit down.  If I could, I might have wanted to add

11   one more point, which is if we have this situation and we had

12   other characteristics like, for example, health, then the

13   effect of health would also have this property that younger

14   people -- even though health can be a very powerful predictor

15   of retirement, its average marginal effect would be

16   concentrated for the people on the bubble.

17           So the characteristic of a logistic model is that

18   any factor has kind of a multiplied or a much more powerful

19   effect, once you get into the range where the probability

20   starts to be, say, between 5 percent and 90 percent or

21   something.  So that group of people in the bubble, all of the

22   variables in the model have a magnified marginal effect in

23   there.

24   **Q.**  So if what we were looking at is not the average marginal

25   effect but the coefficient associated with the variable,

1   would that tell you -- could that tell you what the shape of

2   the curve was like or the effect of --

3                [Alarm system goes off in Federal Courthouse]

4   **Q.**  I'd like to have him give that answer and then we can

5   move on, but if that puts people in harm's way --

6                THE COURT:  Now I can't remember the question.

7   Please head out.

8                (Off the record)

9                THE COURT:  Whenever you're ready, Mr. Waxman.

10               MR. WAXMAN:  For the record, we've marked the

11  whiteboard as DD 10.A and 10.B.

12               (Defendant Exhibit DD 10.A. and 10.B admitted.)

13               MR. WAXMAN:  I honestly don't recall the question

14  at all.  Could I ask the court reporter --

15               THE WITNESS:  I know what the question was.  You

16  asked me, Mr. Waxman, to once again explain the difference

17  between the coefficient and the marginal effect.

18  BY MR. WAXMAN:

19  **Q.**  Oh, yes.  Would you please.

20  **A.**  Yes.  So this is just a hypothetical.  It isn't totally

21  representative.  In general what would be true in a logistic

22  regression model is that one could have, for example, a

23  single coefficient on age.  And yet the marginal effect will

24  differ across people in the pattern shown here.  So that's

25  why I was emphasizing before that distinguishing between the

1    marginal effect and how it differs across different ranges of

2    people versus the coefficient is extremely important in

3    understanding these kind of models and how they imply things.

4              As I was saying before, for people in the bubble

5    range, all of the different factors are magnified.  One

6    additional factor, for instance, health or age or presence of

7    grandchildren, those factors sort of have a multiplicity

8    effect in the bubble range.

9    **Q.**  Let's now talk about the model that you prepared in this

10   case.  What data did you use to construct your model?

11   **A.**  As I mentioned before, the data consists of two sources

12   of information.  One is information on the application files

13   in the NEVO system for the class of 2014 to 2019.  And the

14   second source of data is information from the College Board,

15   which basically sells information to colleges constructed

16   from different sources providing information about

17   characteristics of groups of high schools that are sort of

18   grouped together and for groups of neighborhoods that are

19   grouped together.  And so I've matched that data on as a type

20   of contextual factor.

21   **Q.**  In constructing your model, how did you determine which

22   variables to include?

23   **A.**  Well, I followed basically the same procedure as I would

24   in any kind of research enterprise.  So it's a combination of

25   trying to understand what factors are important in the

1    admissions process through reading documents in the case and
2    some of the testimony.
3            I knew something of the literature on admissions.
4    A number of my Ph.D. students have written papers on
5    admissions, so I knew generally about that.  And then looking
6    at the data that's available and thinking about which aspects
7    could be quantified and what was available and what wasn't
8    and so on.
9    **Q.**  Would you turn to Volume 2, Tab 17, and tell me when you
10   have Defense Exhibit 693.
11   **A.**  I have it, yes.
12   **Q.**  What is that?
13   **A.**  It's a six or seven-page list of the variables used in my
14   model and Professor Arcidiacono's model of admissions.
15           MR. WAXMAN:  Your Honor, we offer 693.
16           MR. MORTARA:  Your Honor, we object.  It's not a
17   Rule 1006 summary.  It's an assemblage of demonstratives
18   created by the expert.  It is not a summary of the database.
19           MR. WAXMAN:  Your Honor, this information is in
20   verbatim form in Mr. Card's rebuttal Appendix C and his
21   original report Appendix E.  It is simply a listing of the
22   variables that each expert --
23           THE COURT:  The objection is overruled.
24           (Defendant Exhibit No. 693 admitted.)
25   BY MR. WAXMAN:

1    **Q.**   Looking at these variables, Dr. Card, does your model

2    capture everything about the Harvard admissions process?

3    **A.**   Certainly not, no.

4    **Q.**   What kinds of data does it not include?

5    **A.**   Well, it excludes a lot of information that would be

6    directly observed by the admissions officers, information

7    coming from, for example, essay or a personal statement that

8    a student submits, information coming from the letters that

9    are written on behalf of a student by the two teachers and

10   the guidance counselor, information that's summarized in the

11   reports from the alumni interviewer.

12           And my understanding is that many, many files these

13   days have multiple additional letters from community members

14   and things like that.

15           So that kind of qualitative information is

16   completely missing from the database, and that's an important

17   limitation of what I can do with the data.

18   **Q.**   Did you hear or review testimony about how the profile

19   ratings are used as an applicant proceeds into subcommittee

20   and committee discussions?

21   **A.**   I did, yes.

22   **Q.**   And what do you understand from your review of the

23   materials and the testimony?

24   **A.**   So my understanding is that the profile ratings, for

25   example, would be assigned by the first reader based on

1    reading the file and looking at both the quantitative and

2    qualitative information that they have.  And then it might be

3    updated by a second reader.

4          But once the file gets to the subcommittee level

5    where they're reviewing files from the same docket -- and my

6    understanding is they would often be looking at files -- all

7    the students from the same school at once, my understanding

8    in that case is that the individual officers would be looking

9    at the materials themselves, not necessarily concentrating at

10   all on the ratings.  Because at that point they then have the

11   materials to look at.

12         And similarly my understanding is that at the

13   committee level where there's a group of 40 people and

14   they're going to take a vote, that they're actually reviewing

15   material on slides and overheads and evaluating the

16   individual material.

17         And in some cases, for example, I guess there was

18   an example of this earlier in the trial where there was an

19   application where clearly information came in after the

20   original first profile ratings were assigned.  And my

21   understanding is that in most cases that late information, if

22   it's in time for the committee, would be reviewed and

23   interpreted.

24   Q.   So would any of the text of -- the substance of any of

25   the subcommittee or committee discussions be reflected in the

1    database?

2    **A.**  No, it's not.

3    **Q.**  What about the note -- we've seen a bunch of admissions

4    files now.  What about the notes that are taken by one or

5    more admissions officers?  Are they reflected in the

6    database?

7    **A.**  No, they're not.

8    **Q.**  Did you hear testimony that the ratings or see evidence

9    that the ratings that individual first readers or second

10   readers provide include not only whole numbers but pluses and

11   minuses?

12   **A.**  Yes.

13   **Q.**  Is that information included in the database?

14   **A.**  Unfortunately not.  So the database only allows the whole

15   number for the profile ratings.

16   **Q.**  So in terms of what the model does, it has -- correct me

17   if I'm wrong.  I'm not trying to provide your testimony.

18          It has no way to distinguish someone whom a reader

19   has assigned a 2+ on a particular factor to a 2-?

20   **A.**  Right.  And my understanding is that that actually is a

21   fairly big gap, to tell you the truth.

22   **Q.**  Now, in Dr. Arcidiacono's model, did he omit any of the

23   variables that you included?

24   **A.**  Yes.

25   **Q.**  Which ones?

1    **A.**   Well, the most important ones are first -- I'm speaking

2    now of his preferred admissions model.

3    **Q.**   Yes.

4    **A.**   The most important ones would be indicators for the

5    so-called ALDC categories because he doesn't include that

6    group of students in -- or applicants in his model.

7              Another set of variables would be variables

8    representing the intended careers of individual applicants.

9              Another set of variables that he excludes would be

10   variables representing the mother's and the father's

11   occupations, categorizations of those occupations.

12             Another variable he excludes is an indicator for

13   whether the student had an interview with the staff prior to

14   admissions season.

15             And then he also excludes the personal rating

16   entirely from his preferred model.

17   **Q.**   Now, let's -- Mr. Lee, if we could put up demonstrative

18   10.2, and focus on the first question that you addressed.

19             What is your opinion as to whether statistical

20   evidence supports SFFA's claim that Harvard discriminates

21   against Asian-American applicants?

22   **A.**   In my opinion, the statistical evidence does not support

23   that claim.

24   **Q.**   How did you reach that conclusion?

25   **A.**   Well, I reached that conclusion by a combination of

1    looking at the statistical evidence and thinking about that

2    statistical evidence in the context of available information

3    about the admissions process.

4    **Q.**   And in your model evaluating the effect of Asian-American

5    ethnicity, what racial group did you use as a baseline?

6    **A.**   In every case, I used white domestic students.

7    **Q.**   And why did you choose that baseline?

8    **A.**   Well, my understanding is that that is in some sense the

9    proper reference group for thinking about these issues.  Some

10   other racial groups, for example, underrepresented minority

11   groups, could potentially receive some kind of a tip in the

12   admissions process in some cases.  And so I don't want to use

13   that group as the reference group.  I use the group that's

14   kind of baseline representation of the admissions pool.

15            THE COURT:  Can I ask one question?

16            Just thinking back on the missing variables.  Could

17   you have and then did you take in the profile ratings, like

18   kind of your initial pass, and then compared profile ratings

19   above a certain number to who actually got in?  Like could

20   you figure out who got in but didn't look like they would

21   have made it in on the profile scores and then broken that

22   down by ethnicity?

23            THE WITNESS:  I think, Your Honor, I have never

24   actually done that.  One could do that.  And there are

25   certainly cases, for example, I showed in my slide early on

```
 1    there are some students who are admitted who have only one
 2    strength.  And I suspect that in some cases that may be this
 3    kind of student.
 4          Oftentimes it might represent this late
 5    information, I think.  I'm not entirely sure.  I don't
 6    believe that I've done that.  I think it's possible we could
 7    have some tabulations of that overnight if you wanted to see
 8    it.
 9          THE COURT:  I don't think anyone is going to allow
10    me to do that, but it would be interesting to see.
11          MR. WAXMAN:  We --
12          THE COURT:  No.
13          MR. WAXMAN:  Not that I'm in a position to allow
14    you to do anything, Your Honor.
15          THE COURT:  I'm just curious about whether there's
16    a way to sort of -- both you and the other expert talked
17    about missing variables and the missing-variable bias.  And
18    I'm just thinking that by seeing who looks like they should
19    have gotten in on the numbers and then who actually got in,
20    it's a way to account for the size of that missing-variable
21    bias.  Do I have that wrong?
22          THE WITNESS:  Your Honor, no.  That's actually --
23    I'm going to show something very much along those lines.
24    That's a very good insight.  That's a general point that when
25    the factors in the data are relatively sparse or unable to
```

1    explain the phenomenon, then the concern about these omitted

2    variables is much larger.  And that differs across -- well,

3    first of all, it differs between different models, and it

4    also differs in terms of, for instance, Professor Arcidiacono

5    fit some models of the program ratings and some of them, they

6    differ in terms of how much unobserved content there is in

7    his models.

8    BY MR. WAXMAN:

9    **Q.**  I think you were just explaining why you used white

10   applicants as the baseline in evaluating discrimination,

11   alleged discrimination against Asian-Americans.  Let me ask

12   you now what your model showed.

13   **A.**  So relative to that benchmark, so relative to white

14   domestic students, my model shows that there's no

15   statistically significant difference in admission rates

16   between Asian-Americans and white applicants.

17   **Q.**  Would you turn in your Volume 2 of exhibits to Tab 13,

18   please.

19   **A.**  Yes.

20   **Q.**  What is this?

21   **A.**  So this is a summary exhibit from my rebuttal report,

22   showing average marginal effect of Asian-American ethnicity

23   and confidence intervals.

24           MR. WAXMAN:  Your Honor, we offer Defense

25   Exhibit 685 into evidence.

1          MR. MORTARA:  Your Honor, I object.  To be clear, I
2     do not object to the witness discussing this.  I object to it
3     as a 1006 summary of the database.  It is his opinion.  It's
4     from his report.  His report is not evidence.
5          MR. WAXMAN:  Your Honor, this is in the report.  It
6     was disclosed.  It represented his conclusions.  I could ask
7     him to read all these numbers into the record if Your Honor
8     doesn't admit it, but there's nothing undisclosed about this.
9     And it is the result of his regression model.
10          MR. MORTARA:  Your Honor, my objection is not a
11     failure of disclosure.  It goes to what goes into evidence
12     versus what is a 611 demonstrative, as we discussed this
13     morning.
14          THE COURT:  I thought we had agreed they were all
15     coming in.
16          MR. MORTARA:  The demonstratives of slides, yes,
17     Your Honor.  This is one of the exhibits that we discussed
18     this morning.  This is an exhibit that is not a 1006 summary
19     of the database.  It is, in fact, a portion of the expert's
20     report which is being used here, I guess now as a
21     demonstrative.  It's now being offered into evidence.
22          I am absolutely fine with the Court taking it into
23     evidence as long as our demonstratives that were used with
24     our experts would also come into evidence.  And as I
25     mentioned this morning, this is angels on a head of a pin.

1    There's no problems here as long as there's equal treatment
2    on both sides.
3            THE COURT:  I thought we had agreed this morning
4    that all the demonstratives would come in.
5            MR. MORTARA:  For use of the demonstratives.  I'm
6    sorry I was not clear, Your Honor.  I have no more objections
7    to use of any demonstratives.  I have objections to the
8    admissibility.  This goes to the jury bench issue we
9    discussed this morning.
10           THE COURT:  I understand the issue.  I just thought
11   we had agreed this morning that they were all going to be
12   treated equally and that we had agreed they would all be
13   admitted into evidence.
14           MR. MORTARA:  That was not what I was
15   communicating, Your Honor.  But if they're fine with that,
16   that's absolutely fine.
17           MR. WAXMAN:  That's fine.  The next demonstrative
18   shows this precisely.
19           MR. MORTARA:  Then, Your Honor, at the end of the
20   day, we'll offer our demonstratives as well with no
21   objection.
22           THE COURT:  Is this a new concept or is this not
23   what we agreed to this morning?
24           MR. LEE:  I think to the extent he's talking about
25   Dr. Arcidiacono, that's what we agreed to this morning.  I

1  assume that we're talking about the demonstratives that we

2  used during his testimony.

3          MR. MORTARA:  Yes, of course.  We're just talking

4  about now what is going to be admitted.

5          THE COURT:  Right.

6          MR. MORTARA:  The disclosure issues on the

7  demonstratives for Professor Card with the ruling this

8  morning have been completely resolved.  There are no

9  disclosure issues.

10          We're now only talking about what's going to be

11  admitted.  We've now reached a secondary additional

12  agreement.  And I will sit down now, if that's okay.

13          THE COURT:  You can sit down.  I thought we had

14  agreed this morning that that secondary agreement was already

15  agreed to.  Had we?

16          MR. LEE:  We had.

17          MR. WAXMAN:  It was my understanding and it's also

18  fine with us.

19          THE COURT:  So whether or not we agreed to it this

20  morning, we'll admit all of the demonstratives.

21          MR. WAXMAN:  In that case, Mr. Lee, can you pull up

22  Demonstrative 10.30.

23  BY MR. WAXMAN:

24  **Q.**  Professor Card, what does this show?

25  **A.**  So this summarizes the results of my model estimation.  I

1    estimate my admissions model separately by year, as I'll be

2    discussing in some detail later on.

3            And so the result of the estimation in each year is

4    an average marginal effect for Asian-American ethnicity.  And

5    what that represents is the difference in admission rates in

6    percentage points between Asian students and white students,

7    holding constant all the characteristics of the students that

8    are in the model.

9            So for example, in the 2016 admissions cycle, Asian

10   students have a 0.09 or 9/100 of a percentage point higher

11   probability of admission than white students, holding

12   constant all their other characteristics.

13           And you can see at the bottom there's a number

14   overall, and that's a weighted average.  It's essentially an

15   average.  There's roughly the same number of students per

16   year, but it's a weighted average reflecting the slight

17   differences in the number of students per admissions cycle,

18   of those effects across years.

19           And let me point out a couple of characteristics of

20   these estimated average marginal effects.  First of all, the

21   average value is very small and close to zero, not

22   statistically significant.  There's no star.

23           So the average gap, once you take account of all

24   the factors on average across these six years, is only 5/100

25   of a percentage point difference between whites and Asians.

1              Secondly, year to year there's some positives and
2      some negatives.  None of them are statistically significant
3      either.  That's exactly the kind of pattern you would expect
4      if the true effect was zero.
5              And from year to year there's some differences
6      arising from just statistical differences that are by chance.
7      So you would expect a pattern that's distributed around zero,
8      a positive and negative.
9              And so my conclusion of no statistical evidence of
10     discrimination in admissions is largely and fundamentally
11     coming from this analysis.
12             THE COURT:  I'm sorry.  Would Dr. -- I'm never
13     going to get his name right -- Arcidiacono.
14             MR. MORTARA:  Arcidiacono.
15             THE COURT:  Would his numbers have been the same if
16     he had done a year-by-year analysis instead of doing all six
17     together, or does this take into account the variables that
18     you're including that he didn't?
19             THE WITNESS:  Thank you, Your Honor.  This takes
20     account of the -- this is my model which has these extra --
21     first of all, it has the ALDCs in it.  Secondly, it has the
22     extra variables.  So his estimate is year by year, which he
23     has in his report someplace for some version of his model.
24     They would be different.
25     BY MR. WAXMAN:

1  **Q.**  So before we leave this, just let me as you, just to

2  understand -- I understand none of these percentages are

3  statistically significant; that is, they could very well have

4  occurred by chance.

5           But if you look at, for example, in the overall,

6  the weighted overall, assuming that the average admission

7  rate for white applicants were 8 percent, what would the

8  model predict the admission rate for -- in the overall model

9  be for Asian-American applicants?

10  **A.**  So what it would predict is if Asian-Americans had the

11  same average characteristics as whites, which they don't, but

12  if they did, then their admission rate would be 7.95

13  percentage points.  So it says that controlling for

14  characteristics, there's a 5/100 of a percentage point gap.

15  **Q.**  For 2016, which is the first example you used, if white

16  applicants even then had an 8 percent probability of

17  admission, what would that predict, all other things equal,

18  the Asian-American rate of admission would be?

19  **A.**  If they had the same characteristics as whites in that

20  year, then it would have been 8.09.

21  **Q.**  Now, so you testified that these are all statistically

22  insignificant.  And again, am I correct that that means that

23  the effects that you're observing here in any year and

24  overall are not statistically different than zero?

25  **A.**  Yes.  That's exactly what the statistical significance

1   means, that these effects could have occurred by chance with

2   some probability, yes.

3   **Q.**   In other words, could the expected admission probability

4   of Asian-American applicants be the same as that of otherwise

5   identical white applicants, according to the model?

6   **A.**   Yes.  According to my model, in fact, my interpretation

7   is that seems to be quite likely.

8   **Q.**   Professor Card, did you conduct any other analyses to

9   test your results?

10  **A.**   Yes.  So one analysis that is often done in professional

11  research is -- to try and understand what's driving the

12  results and how they vary and so on would be to try and

13  estimate the model on a subset, a larger subset of data.

14          I should emphasize my model has -- in any given

15  year has a couple hundred variables in it, 200 or so.  So I

16  need to use a larger subset.  So I looked at two large

17  subsets of students where there's a significant Asian

18  population.  One is just females and one is students from

19  California.

20  **Q.**   Would you please turn to -- well, let me ask you first.

21          When you did that analysis, what did you find?

22  **A.**   What I find in those cases is very similar kind of

23  pattern as we see in the overall sample, which is quite

24  reassuring from my interpretation, I think.

25          So what we see is, in fact, on average the marginal

1  effects in both of those samples are slightly positive, but

2  again not statistically different than zero.

3          Year by year none of the estimates are

4  statistically significant than zero.  So for both Asians and

5  whites from California and for Asian and white females, the

6  gap between Asian students and white students, controlling

7  for other characteristics, is not statistically different

8  than zero.

9  **Q.**  Would you please turn to Tab 14 in Volume 2 of your

10  binder.

11  **A.**  14?

12  **Q.**  14.  It should be Defense Exhibit 686.

13  **A.**  Yes.

14  **Q.**  What is that?

15  **A.**  So it's a series of exhibits, percentage of

16  Asian-American applicants with profile rating of 2 or better

17  by gender, summary of Asian-American effect for female

18  applicants, a summary of Asian-American effects for

19  California, and a pie chart of the shares of students in

20  those categories.

21  **Q.**  And are these pages of this exhibit identical to the

22  information provided in your report, Exhibit 24, and your

23  rebuttal Exhibits 19, 20, and Footnote 108?

24  **A.**  To the best of my knowledge, yes.

25          MR. WAXMAN:  Your Honor, we'd offer defense

1    Exhibit 686.

2              MR. MORTARA:  No objection, Your Honor.

3              THE COURT:  Admitted.

4              (Defendant Exhibit No. 686 admitted.)

5    BY MR. WAXMAN:

6    Q.  Let's turn now, please, to defense demonstrative 10.31.

7    And what does this show?

8    A.  So this is a summary of the estimation results when I

9    estimate the model separately for only females and then

10   separately for only applicants from California.

11             And again, the format is the same as the table we

12   were looking at before.  So the model is estimated year by

13   year, and each year there's an average marginal effect which

14   represents any difference between the admission rate of

15   Asian-Americans and white Americans, for example, in the

16   first column for females only and in the second column for

17   applicants from California only.  And then a summary at the

18   bottom.

19   Q.  And what does this show?

20   A.  Well, as I mentioned, we discussed just before, on

21   average across both of these -- looking across each of these

22   groups, none of these estimates are statistically

23   significant.

24             For females, the average across all six years is

25   0.14 positive but not statistically significant.

1          For Californians, the average is a little bigger.

2     It's 0.32, but again, not statistically significant.  And

3     none of the individual year-by-year estimates is

4     statistically significant.

5     **Q.**  And is this subgroup analysis consistent with your

6     overall analysis of the Asian-American applicant pool?

7     **A.**  Yes.

8     **Q.**  Looking at the next demonstrative, can you tell us what

9     percentage of Asian-American applicants to Harvard fall

10    within one of those two groups, women or Californians or

11    women from California?

12    **A.**  64 percent.

13    **Q.**  Do you recall Dr. Arcidiacono's testimony that

14    Asian-American applicants are favored in the ALDC categories?

15    **A.**  Yes.

16    **Q.**  Do you recall him testifying that he found a positive

17    estimated effect for being Asian-Americans for the group of

18    applicants who are ALDCs?

19    **A.**  Yes.

20    **Q.**  What does that mean?

21    **A.**  So what that means, if one looks with his model, he

22    doesn't estimate the model separately for different groups.

23    He estimates a separate effect for Asian-Americans for

24    different groups in his analysis, and he doesn't estimate the

25    model separately year by year.  So he comes up with a single

1   summary measure.

2          But if one takes his model, it shows that

3   controlling for other characteristics amongst the ALDC

4   population -- or did he say the LDC population.  I'm not

5   precisely remembering which of the two he did say.  So either

6   amongst the ALDC or the LDC, one of those two, there was a

7   positive difference for Asian-Americans, which means in that

8   group they're more likely to be admitted than whites,

9   controlling for their characteristics.

10  **Q.**  We'll get into your model in a minute.

11         But do you agree with that conclusion?

12  **A.**  I do, yes.

13  **Q.**  Did you analyze the effect of Asian-American ethnicity

14  for legacies, children of faculty and staff, and applicants

15  on the dean's or director's interest list in

16  Dr. Arcidiacono's model?

17  **A.**  Yes.  One of the things I did in one of my reports was

18  look at that, yes.

19  **Q.**  Would you please turn to Tab 2 in Volume 2.  Do you find

20  Defense Exhibit 707?

21  **A.**  I do, yes.

22  **Q.**  And what is that?

23  **A.**  It's a summary of average marginal effects of

24  Asian-American ethnicity on the likelihood of admission for

25  LDC applicants from Professor Arcidiacono's preferred model.

1    **Q.**  And is this Defense Exhibit 707 replicating the results

2    from your rebuttal report and Footnote 93?

3    **A.**  Yes.

4            MR. WAXMAN:  We offer Defense Exhibit 707.

5            MR. MORTARA:  Your Honor, I have ultimately no

6    objection but one minor point.

7            Harvard lawyers and I had negotiated a change to

8    the title of this one because it is not Professor

9    Arcidiacono's preferred model.  It is Professor Arcidiacono's

10   model when Professor Card adds back in the athletes, so he

11   made a change to it.  It is not, in fact, Professor

12   Arcidiacono's model.

13           MR. WAXMAN:  I have no objection to altering the

14   title of the model.  First of all, we'll change the title.

15           May it be admitted?

16           THE COURT:  Yes.  Someone will give me a new one of

17   these?

18           MR. WAXMAN:  Yes, indeed.

19           (Defendant Exhibit No. 707 admitted.)

20   BY MR. WAXMAN:

21   **Q.**  Let's look now, Professor Card, at defense demonstrative

22   10.33.  And what do you find here?

23   **A.**  Well, this is the results of that analysis, so using

24   Professor Arcidiacono's model with athletes.

25           In that model, the average marginal effect of

1    Asian-American ethnicity for lineage applicants is 3.12

2    percentage points.  So it's 3.12 percentage points higher

3    admission rate for lineage applicants who are Asian than for

4    white applicants who are white lineage applicants.  And that

5    is statistically significant.

6            And then the estimate for applicants on dean's and

7    director's list and children of Harvard faculty as a group

8    together is 3.15 percentage points.  That estimate is not

9    statistically significant.

10   **Q.**   Roughly what proportion of admitted students are ALDCs?

11   **A.**   Just under 30 percent of all admitted students are ALDCs.

12   **Q.**   Did you hear Dr. Arcidiacono testify that the positive

13   estimated effects of Asian-American ethnicity were not

14   statistically significant?

15   **A.**   I believe I did, yes.

16   **Q.**   Was that correct?

17   **A.**   No, not as this exhibit shows.

18   **Q.**   And are you referring to the star of statistical

19   significance next to the positive average marginal effect of

20   Asian-American ethnicity at 3.12 percent?

21   **A.**   Yes, I am.

22   **Q.**   So what conclusion do you draw from these findings, the

23   findings that ALDC applicants, whether lineage applicants or

24   LDC applicants, have a higher marginal effect of being

25   admitted than white applicants in the same group?

1    **A.**   Well, I find -- I think there's a perfect possible

2    explanation for this, but I find it totally inconsistent with

3    the idea that on the Harvard application process is

4    discriminating against Asian students.

5           Because in this set of students, there's actually

6    positive, and certainly among the lineage, which is the

7    largest group of the ALDC by far, there's a statistically

8    significant effect.

9           So I find it hard to reconcile the idea of

10   discrimination against Asian students with this finding of a

11   positive effect here.

12          THE COURT:  To come to that conclusion, what if the

13   Asian legacies were much better or much worse qualified than

14   the white legacies?  Do you have to somehow look at the

15   profile ratings to have that statistic mean anything?

16          THE WITNESS:  Thank you, Your Honor.  These models

17   have a fairly extensive list of controls for all of those

18   things.  So profile ratings, SAT scores, and so on.  So the

19   average marginal effects are always other things equal or

20   controlling for anything that we can observe.

21          Now, of course, they don't control for the

22   unobserved things, and so another alternative interpretation

23   for differences across groups is that.  But this is

24   controlling for everything that's in his model when his model

25   was extended to the ALDC population.

1          THE COURT:  Thank you.

2    BY MR. WAXMAN:

3    **Q.**  Now, Dr. Arcidiacono thinks that the statistical evidence

4    shows discrimination against Asian-Americans, right?

5    **A.**  Yes, he does, yeah.

6    **Q.**  How can two models of the same process reach different

7    conclusions?

8    **A.**  Well, I think there's primarily two main explanations for

9    that.  One is that he's excluded the ALDC group for whom

10   there's this positive effect.  So he's focusing on a subset

11   of applicants, in particular a subset of applicants who are

12   highly represented in the overall admission pool, admitted

13   pool.  So 29 percent of all admitted students are ALDCs.

14          And secondly, he's made a set of choices about

15   variables to exclude from his analysis, so these parental

16   option variables, whether the student had an interview with

17   the staff, their intended careers.

18          And that combination of choices to exclude

19   variables and exclude the ALDCs I think directly accounts for

20   the difference in our findings.

21   **Q.**  So let's look at the next demonstrative 10.34 and ask you

22   to explain to the Court what is reflected here.

23   **A.**  So this is meant to be a schematic summary of three main

24   sets of differences.  I'm showing my understanding and my

25   belief of what the actual admissions process is at Harvard in

1    the first column, the way that that particular issue is

2    handled in my model in the second column, and the way that

3    that issue is handled in Professor Arcidiacono's model in the

4    third column.

5            MR. WAXMAN:  Your Honor, we'd offer Exhibit 695

6    into evidence.

7            MR. MORTARA:  No objection, Your Honor.

8            THE COURT:  695, what tab?  Is that 10.34?

9            MR. WAXMAN:  That is Volume 2, Tab 19.  Is it also

10   at 10.34?  Yes, it's also at 10.34.

11           THE COURT:  I don't think those are the same, but

12   all right.  It's admitted.

13           (Defendant Exhibit No. 695 admitted.)

14   BY MR. WAXMAN:

15   **Q.**  Let's look at the next demonstrative, 10.35.

16           And looking at this, what does this show?

17   **A.**  Well, this is meant to be -- I know there's a lot of

18   numbers on this chart, but it's meant to be a helpful summary

19   of the differences between my model, starting on the left,

20   and the average marginal effect for Asians ethnicity relative

21   to white students for my model, which is minus 0.05 across

22   all the years.

23           And it shows what happens as one moves further and

24   further along the route, getting to Professor Arcidiacono's

25   model which is on the far right.  In his model, the average

marginal effect of Asian-American ethnicity relative to whites is minus 1.02 percentage points and is also statistically significant.

So this is meant to help us understand the steps involved in getting from my model to his model.

**Q.**   And can you just take us through those steps at a high level?  We're going to stop on almost each one of those boxes.

**A.**   Yes.  So the first step here is -- so Professor Arcidiacono includes a set of interaction variables, and actually discussed at some detail in his testimony various features of those interactions.  So interactions like gender and race, gender by race.

If you take my model and include all the interactions that Professor Arcidiacono includes in his model, the average marginal effect changes a tiny bit, from minus 0.05 to minus 0.08.

If in addition to that you exclude intended career and staff interview indicator, which Professor Arcidiacono does, the average marginal effect rises to a magnitude to minus 0.19.  It's still not statistically significant.

If one in addition to that set of exclusions further excludes parental occupation -- so there's parental occupation variables for mother and parental occupation variables for the father -- then the average marginal effect

rises to minus 0.38.  So around a third of a percentage point differential and statistically significant.

If on top of that in addition you exclude the personal rating variable, then the average marginal effect rises in magnitude to minus 0.79.  So roughly doubles in magnitude and it remains statistically significant.

If in addition to that you estimate that class of model, so excluding all those variables and including these interactions but estimate it in single model rather than year by year, the marginal effect gets a little bit more negative. It's not a huge difference.

And then finally if one takes that model and then finally excludes the ALDC group, which has been included of course in my model, then the average marginal effect rises to minus 1.02 and remains statistically significant.

THE COURT:  I'm sorry.  I hate to keep interrupting you, but I just want to make sure I get this while he's here.

Between the two of you, you've given like a hodgepodge, like an a la carte menu of things you can include or exclude, right?  So here you've put them back in, in a certain order?

THE WITNESS:  One way to they about it -- yes, thank you, Your Honor.

One way to think about it is you start with my model and you make some exclusions.  So you do this

1    interaction thing, which doesn't make too big of a

2    difference.  Go from minus .05 to minus .08.

3           And after that, you start making some exclusions,

4    so you exclude the intended career and staff interview.  You

5    exclude the parental occupation.  You exclude the personal

6    rating.  You pool the data, which one could think about

7    excluding the fact that the model differs from year to year a

8    little bit.  And then finally, you exclude the ALDCs.

9           With respect, my interpretation is you start with

10   my recipe and then you take out some parts of it.  You take

11   out parts.

12          THE COURT:  I'm interested in the order in which

13   you take out the ingredients, what the effect is.

14          So what if I thought the you first four things

15   should be in but I wanted to do it by single year and I

16   wanted to include the ALDCs?  Is there any way to look at

17   these numbers and have it correlate back to that?  Could I

18   figure out what that is from looking at this?

19          THE WITNESS:  Not directly.  Roughly speaking, the

20   magnitudes would stay the same.  But not directly.  Yeah, so,

21   for instance starting with -- the difference between the

22   pooled and unpooled model is not usually very large.

23          But starting from the pooled model without the

24   ALDCs and adding the ALDCs makes the effect minus two or

25   minus something in that kind of magnitude.  So you could

1    argue that that's about -- that would be somewhat similar.

2              THE COURT:  Can you add those two numbers together

3    and get the effect?

4              THE WITNESS:  Not quite.  If Your Honor has a

5    particular set order that she'd like, I'm sure we could get

6    that for you.

7              THE COURT:  We can't do that either.  I'm just

8    trying to understand if there's a way to extrapolate that

9    data from not just you but what he's given me too.

10             Sorry.  Go ahead, Mr. Waxman.

11             MR. WAXMAN:  I'm guessing that you don't want the

12   explanation for why it's not always arithmetically similar.

13             THE COURT:  No.  Because it looks like -- I mean,

14   you're going from, for example, excluding the personal rating

15   to the pooling data thing, it's a very small change.  But

16   that change could be much larger if you put it at the other

17   end of the graph, right?

18             THE WITNESS:  That particular change wouldn't be

19   too much larger at the other end of the graph.  It would be a

20   little bigger but not much larger.

21             THE COURT:  How can I figure that out from looking

22   at this?

23             THE WITNESS:  I apologize, Your Honor.  You can't.

24             That particular exercise, I remember.  I mean, I've

25   certainly done all kinds of different permutations, and I'm

1    sure Professor Arcidiacono has too.  So I have a vague sense
2    of it.  The precise magnitudes, it's not strictly the same in
3    the order.  But roughly speaking, it would stay the same.
4           THE COURT:  So not to be cynical about this, but
5    are you guys ordering the data the way you put it in and take
6    it out?  Because he did these same sorts of analysis.  I'm
7    sort of asking this on behalf of statisticians all over.  Are
8    you guys -- do you guys -- wouldn't it be a way to manipulate
9    the data by the order in which you choose to put the
10   variables in and out?
11          THE WITNESS:  Not -- well, actually I believe that,
12   Your Honor, that the chart that he showed was actually from
13   my report.  So I believe that there was a slightly different
14   order or something, but I think the general tenor of it would
15   be the same.
16          THE COURT:  Okay.
17          THE WITNESS:  It's possible that -- I assume I'll
18   be here tomorrow.  It's possible that I could --
19          THE COURT:  That's likely.
20          THE WITNESS:  It's possible I could have a clearer
21   statement for you tomorrow morning.
22          THE COURT:  I'm not looking for extra data.  I just
23   want to understand the data you have here.  No criticism
24   intended, but I assume that you're both presenting the data
25   in the way that's most efficacious for your models.  I'm just

1  wondering if I want to buy into the some variables but not

2  others, if there's any way to look at his models or your

3  models and figure out what that would look like.

4         THE WITNESS:  I would say, Your Honor, that in my

5  report there are versions of this type of analysis done in

6  slightly different orders.  That's the best I've got, off the

7  top of my head.

8         MR. MORTARA:  Your Honor, maybe I can help.  We

9  would be absolutely fine, and we would invite Professor Card

10  to take just the personal rating out of what he's showing as

11  his preferred model here and see if that's statistically

12  significant.

13         MR. WAXMAN:  I believe we're going to come to this,

14  Your Honor, in the fullness of time.  If for some reason I

15  miss, I'm highly confident that my friend will direct his

16  attention to that question.

17  BY MR. WAXMAN:

18  **Q.**  Let's turn now to demonstrative 10.36 and start with the

19  first difference that you identified between your model and

20  Dr. Arcidiacono.  And that is just to summarize what?

21  **A.**  So the first difference is whether the ALDCs are included

22  as part of the model or are dropped before we start

23  estimating the model.

24  **Q.**  You included them and he excluded them, correct?

25  **A.**  That's correct, yes.

1   Q.   Does that make any sense to you?

2   A.   To tell you the honest truth, no.

3             I think all of the evidence I've seen and all of

4   the testimony and so on suggests that this group is part of

5   the process.  The ALDCs are evaluated, they all have

6   admissions folders, they all -- they're evaluated against

7   other candidates in the year.

8             The ALDC group is a highly competitive group, as

9   I'm going to show, along lots of other dimensions besides

10  just the fact that they're ALDCs.

11            So to exclude, they're almost 30 percent of the

12  overall group.  So excluding this highly competitive group

13  who are 30 percent of the admissions in my mind would be kind

14  of like estimating a model for retirement and excluding all

15  the people over 65 or something like that.

16  Q.   Could you please turn to Tab 28 in Volume 2 and tell me

17  when you've found Defense Exhibit 706.

18  A.   706?

19  Q.   I believe it's 706.  Either that or I've written it down

20  wrong.

21  A.   Yes.

22  Q.   What is this?

23  A.   So this is a simple summary of the share of admitted

24  students in ALDC categories.

25            MR. WAXMAN:  Your Honor, we offer Defendant's

1    Exhibit 706.

2              MR. MORTARA:  No objection.

3              THE COURT:  Admitted.

4              (Defendant Exhibit No. 706 admitted.)

5    BY MR. WAXMAN:

6    **Q.**  Please turn now to demonstrative 10.37.  Using this

7    demonstrative, Professor Card, could you explain the reasons

8    that you included the ALDC applicants?

9    **A.**  Yes.  So reiterating some of the same points I've already

10   raised, the three main reasons are the following:

11             First, ALDCs are part of the same process, so

12   they're evaluated against each other.  And if ALDCs -- more

13   ALDCs get in, fewer of other people get in, exactly as we

14   understand the whole process to work.  So understanding the

15   process as a whole or understanding Harvard admissions and

16   understanding whether that's, in my view, a bias against

17   Asians would necessarily take account of the fact that some

18   Asians are ALDC and many admitted students are ALDCs and so

19   on.

20             Second point related to that is that 30 percent of

21   the admitted students are ALDCs.  So as I said, ignoring this

22   highly competitive group who are fairly likely to get in and

23   comprise almost a third of the overall admitted pool seems

24   completely nonsensical to me.  It seems like you're ignoring

25   a very big subgroup of people.

1        And finally, the ALDCs have very strong

2   characteristics.  So I'm going to show in a couple of slides

3   that they have higher characteristics than other students in

4   terms of many, many features.  And so their presence in the

5   model helps to pin down just how valuable some combinations

6   of these skills are or these attributes are.  And that's

7   important in understanding the competitive process for

8   getting into Harvard.

9   **Q.**  Turning to demonstrative 10.38, what does that show?

10  **A.**  This is a simple comparison of the share of ALDCs in the

11  overall applications pool, which is 5 percent.  So it's a

12  little bit smaller than the set of students that have three

13  strengths.  Remember, it was around 7 percent.  But like that

14  group, they are substantially overrepresented in the pool of

15  admitted students.  So they're 29 percent or six times more

16  likely to be admitted than other students.

17       MR. WAXMAN:  Please turn, Mr. Lee, to the next

18  demonstrative, 10.39.

19  **Q.**  What does this show?

20  **A.**  So this shows at a very high level differences between

21  ALDC and non-ALDC applicants and the comparison within ALDC

22  category and within non-ALDC category between whites and

23  Asians.

24       And I believe this is responsive to a question that

25  Her Honor raised some time ago in the trial which was --

1    **Q.**  Very prescient of you.

2    **A.**  The first column shows the overall admission rate for

3    ALDCs and non-ALDCs.  And so overall ALDCs as a group have

4    about a 44 percent admission rate, non-ALDCs about 5.5.

5            Amongst white applicants, 8 percent of white

6    applicants are ALDC, 92 percent are non-ALDC.  The admission

7    rate for white ALDCs is about 43.6 percent.

8            If we go over to Asian-American applicants, the

9    current share of Asian-American applicants on average in my

10   sample is 2 percentage points.  And the admission rate for

11   Asian-American ALDCs is 44.1 percent.  So consistent with

12   some of the stuff we were talking about before, even without

13   controlling for other factors, Asian students have a slightly

14   higher admission rate than white students if they're ALDC.

15           And looking now at the bottom row for non-ALDCs, in

16   the Asian group that's a larger fraction.  So 98 percent of

17   Asian students are there.  But again within the non-ALDC

18   group, one sees Asian admission rates are actually higher

19   than white admission rates.

20   **Q.**  And what implication does this have?

21   **A.**  Well, the most important implication I think is that in

22   understanding the Harvard admissions process and

23   understanding differences at a high level between these

24   groups, whites and Asians, it's very important to understand

25   the differences between ALDC and non-ALDC status.  So there

1    are very large differences between ALDC students and non-ALDC

2    students, not just their tips because of the process but

3    actually because of some other characteristics.

4            And I think that's a thing that Harvard itself has

5    known for a very long time.  In fact, it's one of the main

6    conclusions that came out of the Office of Civil Rights

7    analysis that was done back in the 1990s.  One of their main

8    conclusions was that this difference was very important in

9    understanding the process.

10   Q.  Would you please turn to Volume 2, Tab 9, and tell me

11   when you have Defense Exhibit 679.

12   A.  Yes.

13   Q.  What is it?

14   A.  It's two tables.  The first is ALDC attributes for

15   Asian-American and white students, and the second is

16   admission rates of ALDC applicants by race.

17           MR. WAXMAN:  Your Honor, we offer Defense

18   Exhibit 679.

19           MR. MORTARA:  No objection, Your Honor.

20           THE COURT:  Admitted.

21           (Defendant Exhibit No. 679 admitted.)

22   BY MR. WAXMAN:

23   Q.  Have these dynamics -- I'm sorry.  You answered that

24   question.

25           Now please turn to Tab 6 in Volume 2, which is

1  Defense Exhibit 674.

2  **A.**  Yes.

3  **Q.**  What is that?

4  **A.**  This is a summary, admission rates for applicants who are

5  non-athletic recruits, lineage applicants, on dean's or

6  director's list, children of Harvard faculty and staff,

7  ALDCs.

8          MR. WAXMAN:  Your Honor, we offer Defense

9  Exhibit 674.

10          MR. MORTARA:  No objection, Your Honor.

11          THE COURT:  This is the admission rate for

12  non-ALDCs.

13          THE WITNESS:  Yes.  Thank you, Your Honor.  My

14  apologies.  The titles get long in some of these things.

15          (Defendant Exhibit No. 674 admitted.)

16  BY MR. WAXMAN:

17  **Q.**  Earlier in the trial, did you hear or review testimony

18  about similar calculations done in the admissions office

19  known as NLNA admission rates?

20  **A.**  Yes.

21  **Q.**  Is it useful to calculate a non-legacy, non-athlete

22  admission rate or a non-ALDC admission rate?

23  **A.**  I certainly think it can be informative, yes.

24  **Q.**  Does that mean that you need to take legacy and athletes

25  out of your regression model?

**A.**   No, not at all.  My understanding is there is a large difference in admission rates between ALDCs and non-ALDCs, just as there's a large difference between admission rates of students with two or three strengths and other students or students with lots of other dimensions.

And my understanding is that Harvard has been aware of the difference in admission rates between ALDCs and non-ALDCs for a long time, and that might be one reason it would make sense to keep track of it.

**Q.**   And does your regression model control for legacy and athlete status?

**A.**   Yes, certainly.  All of my models would control for any tip that that individual student gets on top of whatever characteristics they have, yes.

**Q.**   Is it fair to say that including them in the model and controlling in this way is basically a more elaborate way of doing the simple descriptive comparison?

**A.**   Yes.  In my view, yes.

**Q.**   Now, let me ask you whether in your view there is a downside in taking legacies and athletes completely out of the model?

**A.**   Yes.  In my view, as I mentioned on my overview slide, one downside of that is you're not really looking at the actual applicant pool anymore when you try and fit your model.  So your model is trying to evaluate who got in

1    without reference to this other 30 percent of the group that

2    got in.

3            So if you're trying to look at the relative value

4    of certain characteristics like are you intending to major in

5    humanities or something like that, and obviously the

6    admissions people are thinking about how many people are

7    going to be taking humanities this year, understanding, okay,

8    how many people in the ALDC group are going to take

9    humanities versus how many people in the non-ALDC are

10   intending to major in humanities or engineering or any of

11   these things would be extremely important.

12           Without that information in the model, the model

13   can't contextualize a lot of these other concerns for Harvard

14   correctly.

15   **Q.**   Professor Card, you mentioned that the ALDC applicants

16   are more likely to be admitted than other applicants.  Is

17   that just because they're ALDC applicants?

18   **A.**   No, not at all.

19   **Q.**   Please turn in your binder to Tab 27.  That's Volume 2,

20   Tab 27.

21   **A.**   Yes.

22   **Q.**   What is this?

23   **A.**   It's a set of slides -- tables showing predicted

24   probability of admission for ALDC and non-ALDC, a proportion

25   of ALDC and non-ALDC receiving ratings of 1 and 2.

1              MR. WAXMAN:  Your Honor, we move defense

2    Exhibit 705 into evidence.

3              MR. MORTARA:  No objection, Your Honor.

4              THE COURT:  Admitted.

5              (Defendant Exhibit No. 705 admitted.)

6              MR. WAXMAN:  Please turn now, Mr. Lee, to

7    demonstrative 10.40.

8    BY MR. WAXMAN:

9    **Q.**  What does this show?

10   **A.**  So this is a simple comparison of ALDC and non-ALDC

11   applicants in terms of their probabilities of receiving

12   ratings of 1 or 2.

13             The first four sets of bars concern the profile

14   ratings that we've talked about before:  the academic rating,

15   personal rating, extracurricular rating, and athletic rating.

16             The next set of five bars refer to the teacher

17   ratings.  So each student has recommendation letters from two

18   teachers and a guidance counselor and there's a rating

19   assigned to them.

20             Then there's two ratings signed by alumni

21   interviewers.  One is alumni personal rating and one is the

22   alumni overall rating.

23             And then finally on the right, far right, I've

24   shown the fraction of the ALDC and non-ALDC who have three or

25   more strengths.  So in other words, three or more of these

1    profile ratings of 2 or better.  And as I noted before,

2    that's a very, very strong correlate of being admitted.

3          And you can see when you look across all of these

4    different categories that the ALDC group is substantially

5    stronger than the non-ALDC group.

6          And I would point out one thing you might be

7    concerned about in this comparison is the athletic rating.

8    Obviously the ALDC group includes athletic 1s, and so there's

9    a certain set there.  But even if one excludes the As, so

10   only looks at LDCs, the pattern looks the same.

11         In fact, on most of the other ratings, the LDCs are

12   substantially better than the As, so that comparison looks

13   quite good.  And this general pattern of higher ratings in

14   multidimensionality is very strongly true of the LDCs as well

15   as the ALDCs.

16   **Q.**  Just to be entirely clear, do any of these bars reflect

17   any admissions tip that is given to ALDC applicants?

18   **A.**  No.

19   **Q.**  Now, Dr. Arcidiacono excluded all of the ALDC applicants

20   from his model, correct?

21   **A.**  Yes.

22   **Q.**  Did he suggest a way in his report of dealing with ALDC

23   attributes other than excluding the ALDC applicants from the

24   model?

25   **A.**  Yes, he did.

1    **Q.**  Please turn to Tab 54 in your volume binder 2, and tell

2    me when you've found Plaintiff's Exhibit 435.

3    **A.**  Yes.

4    **Q.**  Do you see that this is Dr. Arcidiacono's rebuttal

5    report?

6    **A.**  Yes.

7             MR. WAXMAN:  Mr. Lee, can we zoom in on page 36,

8    the sentence beginning, "It is thus essential."

9    **Q.**  Professor Card, can you just read us the sentence, that

10   sentence.

11   **A.**  Yes.  The sentences that follow are when he says "these

12   applicants," he's talking about ALDCs.

13            "It is thus essential to either, one, remove these

14   applicants from the analysis; or two, allow for the

15   possibility that the effect of race is different for these

16   applicants, i.e., interacting these variables with race."

17   **Q.**  Okay.  And you didn't remove the ALDC applicants from

18   your analysis, correct?

19   **A.**  Correct.  I did not.

20   **Q.**  Did you instead try Dr. Arcidiacono's alternative

21   suggestion?

22   **A.**  Yes, I did.

23   **Q.**  And what did you do?

24   **A.**  Well, exactly following his suggestion, what I did was I

25   took the model that I used, my main or preferred model, and I

1    included a set of interactions for each of the A and the L

2    and the D and the C category that allow those tips to vary by

3    race.

4           So for example, if one was concerned that the

5    legacy tip applied differently to African-Americans than to

6    other groups and that somehow was causing problems for my

7    model, then this would be one way to get at that.

8    **Q.**  Please turn to Tab 21 in Volume 2.  Do you find Defense

9    Exhibit 697?

10   **A.**  Yes.

11   **Q.**  What does it show?

12   **A.**  This is a summary exhibit, average marginal effect of

13   Asian-American ethnicity in Professor Card's model

14   interacting ALDC attributes with race.

15   **Q.**  Is that the attributes you just described?

16   **A.**  Yes.

17          MR. WAXMAN:  Your Honor, we offer Defendant's

18   Exhibit 697 into evidence.

19          MR. MORTARA:  No objection.

20          THE COURT:  Admitted.

21          (Defendant Exhibit No. 697 admitted.)

22          MR. WAXMAN:  Mr. Lee, let's now turn to

23   demonstrative 10.41.

24   BY MR. WAXMAN:

25   **Q.**  What does this show?

**A.**   This is the estimation results from following that procedure.  Now I'm doing exactly what Professor Arcidiacono suggested, which is to interact each of A and L and D and C, each of the tips associated with those four categories with all the different racial groups from the model.

And I'm showing the average marginal effects of Asian-American ethnicity year by year and on average in my model.

And it's really quite remarkable how similar these are to the estimates from my baseline model.  So they're essentially identical.  So none of them are statistically significant.  Three are negative and three are positive on a year-by-year basis, again none statistically significant.  And the average is minus 0.05 and is not statistically different than zero.

**Q.**   And so what does this tell you about the statistically significant negative effect of Asian-American ethnicity in the admissions process, allowing for the effect of being an ALDC applicant to vary by race?

**A.**   It says that it makes no difference at all in the assessment of the average marginal effects year by year on average.

**Q.**   Did you in your analysis try excluding any group of the ALDC applicants from your model?

**A.**   Yes.  Professor Arcidiacono in his rebuttal, second

1    report, basically fits what he calls an extended sample but

2    now excluding athletes.  So he's made a special case that

3    athletes should be excluded in some sense no matter what.

4           And so what I did was I took my model and simply

5    excluded athletes to see how different the results would be.

6    **Q.**   Would you please turn to Tab 20 in Volume 2.  Do you find

7    Defense Exhibit 696?

8    **A.**   Yes.

9    **Q.**   What is this document?

10   **A.**   The first table is average marginal effect of

11   Asian-American ethnicity in Professor Card's model when

12   recruited athletes are excluded.  And the second is a summary

13   table that shows the average marginal effect comparing

14   different choices between my model and his model when

15   athletes are excluded.

16          MR. WAXMAN:  Your Honor, we offer defense

17   Exhibit 696 into evidence.

18          MR. MORTARA:  No objection.

19          THE COURT:  Admitted.

20          (Defendant Exhibit No. 696 admitted.)

21          MR. WAXMAN:  Let's turn, Mr. Lee, to the next

22   demonstrative 10.42.

23   BY MR. WAXMAN:

24   **Q.**   And let me ask you, Dr. Card, to please explain what this

25   is looking at and what you found.

1    **A.**   So this is the results of estimation from my model, now

2    excluding recruited athletes entirely from the analysis.

3           And I'm showing estimated average marginal effects

4    year by year and on average across the six years, exactly in

5    the format of all the other tables that I've presented.

6           And you can see that the average marginal effects

7    year by year are very similar to the ones that we've seen in

8    previous tables.  The average marginal effect across all the

9    years is minus 0.02 versus minus 0.05, so it's a tiny bit

10   different but not in any important way different.

11          None of these are statistically significant, just

12   as in my main model.

13   **Q.**   So is it fair to say that even excluding recruited

14   athletes, as Professor Arcidiacono does even in his expanded

15   model, shows no statistically significant average marginal

16   effect of Asian-American ethnicity on admissions

17   probabilities?

18   **A.**   Yes.

19          MR. WAXMAN:  So let's put up, Mr. Lee, please,

20   DD 10.37 again.

21   **Q.**   So just to recap, can you summarize again why you

22   included ALDCs in your model?

23   **A.**   Yes.  So just to summarize, my understanding of the

24   process, the results of reading a lot of depositions and

25   listening to the trial and so on as well as documentary

1    materials put together by Harvard itself, including like web

2    questions about who's included in the process and not, all of

3    that to me says that ALDCs are, in fact, part of the process.

4         Secondly, they are a very important part of the

5    overall admitted pool.  So it's true that they're

6    underrepresented in the set of applicants, but like other

7    students who are strong -- and I've shown these students are

8    particularly strong in many, many dimensions -- they're more

9    likely to be admitted than other students.  So they end up

10   representing 30 percent of the admissions pool.

11        And so I think it's important to understand the

12   process and the composition of the class to understand that

13   group and include them in the analysis.

14        And finally, as I emphasized, the third point, if

15   you're trying to understand the way that Harvard's admissions

16   committee is evaluating different factors in some kind of

17   context vis a vis the rest of the class, then throwing away a

18   third of the people who will be admitted just is not going to

19   work because you're not going to be able to look at who was

20   being compared to who in that evaluation process.

21   Q.  Let's now turn to defense demonstrative 10.43.  And now

22   let's go to the second line of your demonstrative showing the

23   major differences in modeling, how you dealt with six years

24   of data in your -- the six years of data at issue here.

25        Did you run your model on a year-to-year basis?

**A.**  I did, yes.

**Q.**  And why did you do that?

**A.**  Well, there's a variety of reasons.  I'm going to summarize them at a high level in the next slide, I believe. Yes.

**Q.**  Let's by all means see the next slide.

MR. WAXMAN:  Mr. Lee.  Thank you.

**A.**  So one reason just conceptually is that the process is year by year and so fitting a year-by-year model seems a straightforward way to deal with that, and very intuitive and obvious.

A second reason is that in the early years of the sample, Harvard had dropped early action, as we heard President Simmons talking about, when they experimented with getting rid of early action and then brought it back.

So the process was somewhat different.  So different issues were at play, I think, in terms of understanding admissions decisions potentially.  And so I want to have a year-by-year model to allow things to be different in the early action in different years.

A third issue is that over time, my understanding -- and I think the evidence shows this is true. My understanding is that Harvard is gradually having different priorities for who it would like to look for.

For example, just before my sample got started,

they opened up the School of Engineering and Applied Science, a major initiative for them.  So they are looking for building up the computer science department, which is many, many top departments are trying to do that over this period. So their priorities are changing.

Related to that but somewhat different is the applicants are changing.  So an example I think that's important, certainly at my university and I believe at Harvard as well, is fewer and fewer applicants each year are applying for certain fields like humanities.  So the characteristics of the students are changing.

A fifth reason is that there's different codings of different variables in different years.

So for instance, Harvard has a so-called docket system.  And they actually changed the docket system and introduced a new docket from the first year to the later years of the sample.  So it's I think important to think about that kind of coding.

And that kind of coding difference affects quite a few different variables.  It affects the fraction of students who are, for instance, coded as disadvantaged changed from year to year.  And as I'll show below, the fractions are coming -- fractions of students who are classified with different parental occupation and so on changes.

Finally, not shown on the slide, but there's a

1    sixth set of reasons.  So purely from a statistical point of

2    view, not substantive -- I would think of these as

3    substantive reasons.

4              But purely from a statistical point of view,

5    there's a couple of important features of a year-by-year

6    model.  So first I'm going to show that fitting a

7    year-by-year model gives rise to a model that has more

8    explanatory power.  So that's usually considered a superior

9    feature.  I'm going to show it gives rise to an estimated

10   marginal effect that's more precise or more powerful.  So

11   it's got higher statistical power.

12             And finally, as I showed in my report, there's a

13   formal statistical way to see whether a year-by-year model is

14   preferred over a model that's pooled.  And that kind of

15   statistical test prefers the year-by-year model.

16   **Q.**  Would you please turn, Professor Card, to Tab 25 in the

17   same volume, Volume 2, and tell me when you've found Defense

18   Exhibit 703.

19   **A.**  Yes.

20   **Q.**  What is Defense Exhibit 703?

21   **A.**  So this is an exhibit showing graphically proportion of

22   applicants by intended concentration in different years.

23             MR. WAXMAN:  We offer defense Exhibit 703, Your

24   Honor.

25             MR. MORTARA:  No objection.

```
 1                    THE COURT:  Admitted.

 2                    (Defendant Exhibit No. 703 admitted.)

 3    BY MR. WAXMAN:

 4    Q.   Turn to Tab 26, please, in the same volume.

 5    A.   Yes.

 6    Q.   Do you find Defense Exhibit 704?

 7    A.   I do, yes.

 8    Q.   And what does this show?

 9    A.   It's two exhibits, one showing the number of Harvard

10    applicants receiving an application fee waiver by year, and

11    one showing the number of Harvard applicants identified as

12    disadvantaged by year.

13                    MR. WAXMAN:  We offer defense Exhibit 704.

14                    MR. MORTARA:  No objection.

15                    THE COURT:  Admitted.

16                    (Defendant Exhibit No. 704 admitted.)

17    BY MR. WAXMAN:

18    Q.   And, Professor Card, did you also calculate an average of

19    the year-by year results?

20    A.   Oh, yes, certainly.  That's what I'm always doing in the

21    bottom row of my tables.  I'm always showing an average

22    across all the years.

23    Q.   And can you explain to the Court why you do that?

24    A.   Yes.  So my understanding is that these six years are the

25    issues -- are the years under contention.
```

1          So what's important to understand would be the

2    average difference between Asian students and white students

3    that remain on average across these eight years.  So finding

4    the average marginal effect across those six years would be

5    the appropriate thing to do, and that's what I tried to do.

6    **Q.**  Did you hear Dr. Arcidiacono testify that his model

7    allows for more "statistical power" for some of the

8    coefficients?

9    **A.**  Yes.

10   **Q.**  Do you agree with that?

11   **A.**  I agree that it potentially allows statistical power for

12   certain kinds of coefficients.  But for the coefficient

13   that's fundamental to this case, which is the average

14   marginal effect for Asian-American applicants as a whole, the

15   average across all Asian and other students and assessing

16   that average effect, it's not correct.

17          In fact, if you look at and compare the statistical

18   power, precision of the estimates from his model versus my

19   model, my model is superior.  It has a higher statistical

20   power.

21   **Q.**  Did you examine how the precision of you -- I think you

22   answered this, but let me just make it clear.

23          Did you examine the precision of your model and how

24   it compares to the precision of Dr. Arcidiacono's model?

25   **A.**  I did.  I did that directly, yes.

1  **Q.**  Would you please turn to or can we now have defense
2  demonstrative 10.45.
3              And using demonstrative 10.45, can you explain what
4  you found?
5              THE COURT:  Are you going to now explain about what
6  you mean by "statistical power"?
7              THE WITNESS:  Yes.  Yes, Your Honor, I'm going to
8  try.
9              THE COURT:  If you think you've already done it,
10 you've lost me.  So keep going.
11             MR. WAXMAN:  And the examiner.
12             THE WITNESS:  Yes.  What the term means, it has a
13 formal and statistical meaning, but I'm not going to try and
14 explain that because that's hopeless and not very useful.
15             What I'm going to do instead is what it's used to
16 kind of mean informally.  It means that what you're trying to
17 do is get an estimate of something like, for instance, the
18 average marginal effect that you can say is as precisely
19 estimated as possible.
20             So "precisely estimated" means that when you get
21 that estimate it's less likely to have occurred by chance,
22 given the estimate that you got.  And so it means that for a
23 given estimate if both of us have an average marginal effect
24 of 2, say an estimate, one of those could be statistically
25 significant and one might not be.

1          The one that is statistically significant, the

2     reason why it's statistically significant is because that

3     model had more power.  It was able to say, well, this given

4     estimate, this 2 percentage point difference is different

5     than zero.  The other model, the weaker model is not able to

6     do that.

7          Does that help answer it?

8          THE COURT:  How do you get to the power

9     measurement?

10         THE WITNESS:  Okay.  Thank you.  That's what this

11    slide is meant to do.  So the way that we assess statistical

12    power is by something called a standard error, which is an

13    assessment of the range of values that could have

14    generated -- very closely related to the range of values that

15    could have estimated the estimate that you got by chance.

16         So if the standard error is large, it means that I

17    have an estimate.  That particular estimate could have come

18    about even though the truth is in a very wide range,

19    including, for instance, zero, which is always an important

20    reference point.

21         So having a small standard error, on the other

22    hand, means that I've got an estimate and the range of

23    possible values of the truth that could have given rise to

24    that estimate is quite narrow.

25         So a powerful model has a small standard error,

1  which means that you went into the data, you estimated your

2  model, you had a lot of power, you were able to get an

3  estimate that when you see that estimate, you know the range

4  of possible values of the truth that could have estimated it

5  is quite small.

6          And I apologize.  The way statisticians think about

7  these problems is completely unintuitive for many people,

8  including all of my students for six, seven years.  But

9  that's what it means.

10          THE COURT:  Is this .14 and .15, is that

11  statistically significant or are you telling me the two

12  models are of equal strength?

13          THE WITNESS:  Actually that's a separate issue.  I

14  don't actually know if it's statistically significant.

15          I would say that my model is slightly more

16  powerful.  It's certainly not less powerful.  There would be

17  a potential way to assess whether it's significantly more

18  powerful, but I am not asserting that.

19          MR. WAXMAN:  Your Honor, I'm about to move to

20  another subtopic.  I don't know what Your Honor's pleasure is

21  in terms of scheduling today.

22          THE COURT:  Just for my own brain power, I'd rather

23  not stop in the middle of a topic.  Is your next topic going

24  to be more or less than ten minutes?

25          MR. WAXMAN:  I think that it will be --

```
 1              THE COURT:  And what's the statistical strength of
 2       your estimate?
 3              MR. WAXMAN:  Exceptionally weak.  It's barely
 4       statistically -- it's barely confidently above zero.  Yes, it
 5       is -- I can do it in ten minutes.
 6              THE COURT:  I'm happy to take the ten minutes.
 7              MR. WAXMAN:  I have to say that I'm feeling the
 8       burden of yet another fire drill, so I'm happy to press on.
 9              THE COURT:  It's been a long day.  Are you okay
10       keeping going ten more minutes?
11              THE WITNESS:  Yes, Your Honor.
12              THE COURT:  Anybody else have any serious
13       objections to ten more minutes?  Let's go.
14       BY MR. WAXMAN:
15       Q.  Professor Card, please turn to --
16              MR. WAXMAN:  Or Mr. Lee, please put up defense
17       demonstrative 10.46.
18       Q.  And going back to this, what is the third line showing?
19       A.  So this line is summarizing the set of variables that are
20       included as part of the -- in my view, are included as part
21       of the actual admissions process.
22              So this would be parental occupation, intended
23       career, staff interview, personal rating.  Included in my
24       model but excluded from Professor Arcidiacono's model.
25       Q.  And why did you include these variables in your model?
```

1    **A.**   Well, as I said, my understanding is that each of these

2    variables is, in fact, used by admission officers in

3    evaluating candidates.  I think there's substantial testimony

4    from officers in previous depositions.  There's also, for

5    example, in some of the case studies that were talked about

6    as part of the training materials for admissions officers,

7    many of these issues are mentioned.

8    **Q.**   Now, you mentioned earlier when you were talking about

9    should I or should I not retire, since I'm on the bubble,

10   that omitting factors can cause bias.

11           Can you just remind us what that concern is?

12   **A.**   Yes.  The concern is that there's some characteristic of

13   one group of students relative to another that's somewhat

14   different and that that characteristic is evaluated or valid

15   in the admissions process.

16           And if you don't take account of the difference in

17   that characteristic, then it will become part of the

18   unobserved component of the model.  And the model, not

19   knowing what's going on, will essentially assign that

20   difference as part of the average marginal effect between the

21   two groups.

22   **Q.**   And is omitted-variable bias a concern with the variables

23   that Dr. Arcidiacono has omitted from his model?

24   **A.**   Yes.  In each case I believe that there's a substantial

25   concern with omitting each of these variables because each of

1    them is, in fact, part of the admissions process and has some

2    power in the statistical model of the admissions process.

3    And each of them differs somewhat between Asian and white

4    students.

5    **Q.** I see. And my next question was why.

6          Is the why that these factors vary by race?

7    **A.** Yes, somewhat.

8    **Q.** And they can be associated with admissions outcomes?

9    **A.** Yes.

10   **Q.** What is the effect of omitting the intended career,

11   parental occupation, and staff interview factors in

12   Dr. Arcidiacono's model?

13   **A.** Well, I think as we showed in the walk-through slide

14   where we go from his model to my model, if one starts with my

15   model and excludes that three sets of variables, then it

16   makes a minor technical adjustment for the interactions.

17   Then the effect of estimated average marginal effect of

18   Asian-American ethnicity becomes negative and statistically

19   significant.

20   **Q.** I think there are many factors. I think your model

21   accounts for 200 factors every year.

22         Among those factors, are there other factors which

23   if omitted from your model would have produced the opposite

24   effect?

25   **A.** Yes, certainly.

1   **Q.**  Did you exclude any variables, any factors that would

2   have produced the opposite effect?

3   **A.**  I didn't, no.

4   **Q.**  Did you hear Dr. Arcidiacono -- let me ask you, did

5   Dr. Arcidiacono exclude any factors which if omitted would

6   have produced the opposite effect?

7   **A.**  Not to the best of my knowledge, no.

8   **Q.**  Did you hear Dr. Arcidiacono refer to "overfitting a

9   model"?

10   **A.**  Yes.

11   **Q.**  What does "overfitting" mean?

12   **A.**  So overfitting is an issue that arises particularly when

13   one has a relatively small sample and one is concerned that

14   when one adds a spurious set of variables, a set of variables

15   that isn't really part of the process, like hat size or eye

16   color, those kind of variables, variables that don't really

17   belong in the model, including those variables in the model

18   can lower the statistical power of the model and lead to a

19   situation where when they're included in the model, an effect

20   won't necessarily change very much, the estimated effect, but

21   it could become statistically insignificant.

22        So overfitting arises when these extra variables

23   are included and kind of reduce the power of the model.

24   **Q.**  Do you have any concern that your model was overfitted?

25   **A.**  I don't, no.

```
 1              MR. WAXMAN:  Did I make my ten minutes?

 2              THE COURT:  Was that -- I don't?

 3              THE WITNESS:  Yes, I don't.

 4              THE COURT:  Was that K-N-O-W or I don't, no.

 5              THE WITNESS:  Your Honor, I apologize.  I don't

 6    have any concern that my model is overfitted.

 7              MR. WAXMAN:  Your Honor, that's the end of this

 8    little mini segment.

 9              THE COURT:  This seems like a good place to stop

10    then.  9:30 tomorrow?  Karen, is that good for us?  9:30

11    tomorrow.  Do you want to try and start a little earlier to

12    account for the earlier recess, or do you think we're on

13    track?

14              MR. WAXMAN:  I would have loved to be another half

15    an hour, 45 minutes beyond.  If Your Honor wants to start at

16    9:00, it's totally fine with me.

17              MR. MORTARA:  Completely fine with me, Your Honor.

18    I know we're leaving early tomorrow, so it would be more than

19    fine for me.

20              THE COURT:  That's exactly why I'm trying to build

21    in the extra time.  I'm not sure I can effectively do 9:00.

22    Why don't we shoot for 9:15 and then we can shorten up the

23    lunch break a little bit, too, and get back to the number of

24    minutes.

25              MR. WAXMAN:  Thank you.
```

```
 1              MR. MORTARA:  Your Honor, I have one more thing,
 2     which is we've resolved, I think, all the issues with the
 3     exhibits with the demonstrative exhibit except for one where
 4     I asked for some changes to be made.  It's Defendant 692.
 5     We'll talk about it in the evening.  Hopefully there will be
 6     nothing tomorrow.
 7              THE COURT:  I'll get out here as close to 9:00 or
 8     9:15 as I can tomorrow.  If we need a sidebar first, we'll
 9     take it.
10              MR. MORTARA:  Your Honor, I'd offer plaintiff's
11     demonstratives 23 to plaintiff's demonstrative 38.  Those are
12     demonstratives used for Kahlenberg's and --
13              THE COURT:  I'm sorry.  23 to 28?  Is that what you
14     just said?
15              MR. MORTARA:  PD23 to PD38.
16              THE COURT:  Mr. Waxman, I take there is no
17     objection to those?
18              MR. WAXMAN:  No objection.
19              THE COURT:  So those are all admitted.
20              (Plaintiff Exhibit Nos. PD23 to PD38 admitted.)
21              MR. WAXMAN:  Just to be clear, those are only the
22     ones that went in.  Mr. Kahlenberg testified --
23              THE COURT:  Take a look at them tonight, 23 to 38.
24              (Court recessed at 4:00 p.m.)
25
```

1                    - - - - - - - - - - -

2                        CERTIFICATION

3

4         I certify that the foregoing is a correct

5    transcript of the record of proceedings in the above-entitled

6    matter to the best of my skill and ability.

7

8

9

10   /s/ Joan M. Daly                    October 30, 2018

11   _____                 _____

12   Joan M. Daly, RMR, CRR              Date
     Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF WITNESSES

WITNESS                                                          PAGE

RUTH SIMMONS

    Examination By Mr. Waxman .........................    6
    Examination By Mr. Connolly .......................   56

DAVID CARD

    Examination By Mr. Waxman .........................   73

E X H I B I T S

Defendant Exhibit                                    Received

    133      .....................................      74

    134      .....................................      21

    669      .....................................      84

    671      .....................................      85

    672      .....................................      85

    673      .....................................      98

    674      .....................................     157

    679      .....................................     156

    686      .....................................     138

    693      .....................................     122

    695      .....................................     145

    696      .....................................     165

    697      .....................................     163

    703      .....................................     171

    704      .....................................     171

    705      .....................................     160

    706      .....................................     153

    707      .....................................     141


^ Government ^ Plaintiff Exhibit                     Received

    PD23     .....................................     181
             .....................................     181

1     PD24      ....................................
2     PD25      ....................................      181
3     PD26      ....................................      181
4     PD27      ....................................      181
5     PD28      ....................................      181

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25