1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                   Plaintiff,          Civil Action
                                        No. 14-14176-ADB
6    v.
                                        November 2, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                   Pages 1 to 155
8
                    Defendants.
9    _____

10

11

12
                 TRANSCRIPT OF BENCH TRIAL - DAY 15
13                      CLOSING ARGUMENTS
           BEFORE THE HONORABLE ALLISON D. BURROUGHS
14              UNITED STATES DISTRICT COURT
               JOHN J. MOAKLEY U.S. COURTHOUSE
15                  ONE COURTHOUSE WAY
                    BOSTON, MA  02210
16

17

18

19

20

21              JOAN M. DALY, RMR, CRR
              KELLY MORTELLITE, RMR, CRR
22               Official Court Reporters
             John J. Moakley U.S. Courthouse
23            One Courthouse Way, Room 5507
                  Boston, MA  02210
24              joanmdaly62@gmail.com

25

APPEARANCES:

COUNSEL FOR THE PLAINTIFF:

        ADAM K. MORTARA, ESQUIRE
        J. SCOTT McBRIDE, ESQUIRE
        KRISTA J. PERRY, ESQUIRE
        Bartlit Beck Herman Palenchar & Scott
        54 West Hubbard Street
        Suite 300
        Chicago, Illinois 60654
        312.494.4400
        adam.mortara@bartlit-beck.com
        scott.mcbride@bartlit-beck.com
        krista.perry@bartlit-beck.com

        JOHN M. HUGHES, ESQUIRE
        KATHERINE L.I. HACKER, ESQUIRE
        MEG E. FASULO, ESQUIRE
        Bartlit Beck Herman Palenchar & Scott
        1801 Wewatta Street
        Suite 1200
        Denver, Colorado 80202
        303.592.3100
        john.hughes@bartlit-beck.com
        meg.fasulo@bartlit-beck.com
        kat.hacker@bartlit-beck.com

        JOHN MICHAEL CONNOLLY, ESQUIRE
        THOMAS R. McCARTHY, ESQUIRE
        WILLIAM S. CONSOVOY, ESQUIRE
        Consovoy McCarthy Park PLLC
        3033 Wilson Boulevard
        Suite 700
        Arlington, Virginia 22201
        703.243.9423
        mike@consovoymccarthy.com
        tom@consovoymccarthy.com
        will@consovoymccarthy.com

```
 1    APPEARANCES (cont.):

 2
             PATRICK STRAWBRIDGE, ESQUIRE
 3           Consovoy McCarthy Park PLLC
             Ten Post Office Square
 4           8th Floor, South, PMB #706
             Boston, Massachusetts 02109
 5           617.227.0548
             patrick@consovoymccarthy.com
 6
             MICHAEL H. PARK, ESQUIRE
 7           Consovoy McCarthy Park PLLC
             3 Columbus Circle
 8           15th Floor
             New York, New York 10024
 9           646.456.4432
             park@consovoymccarthy.com
10
             PAUL M. SANFORD ESQUIRE
11           BENJAMIN C. CALDWELL, ESQUIRE
             Burns & Levinson LLP
12           One Citizens Plaza
             Suite 110
13           Providence, Rhode Island 02903
             401.831.8330
14           psanford@burnslev.com
             bcaldwell@burnslev.com
15

16    COUNSEL FOR THE DEFENDANT:

17           WILLIAM F. LEE, ESQUIRE
             FELICIA H. ELLSWORTH, ESQUIRE
18           ANDREW S. DULBERG, ESQUIRE
             ELIZABETH C. MOONEY, ESQUIRE
19           SARAH R. FRAZIER, ESQUIRE
             Wilmer Cutler Pickering Hale and Dorr LLP
20           60 State Street
             Boston, Massachusetts 02109
21           617.526.6556
             william.lee@wilmerhale.com
22           felicia.ellsworth@wilmerhale.com
             andrew.dulberg@wilmerhale.com
23           elizabeth.mooney@wilmerhale.com
             sarah.frazier@wilmerhale.com
24

25
```

```
 1    APPEARANCES (cont.):

 2
           SETH P. WAXMAN, ESQUIRE
 3         DANIELLE CONLEY, ESQUIRE
           DANIEL WINIK, ESQUIRE
 4         BRITTANY AMADI, ESQUIRE
           PAUL R.Q. WOLFSON, ESQUIRE
 5         Wilmer Cutler Pickering Hale and Dorr LLP
           1875 Pennsylvania Ave, NW
 6         Washington, DC 20006
           202.663.6006
 7         seth.waxman@wilmerhale.com
           danielle.conley@wilmerhale.com
 8         daniel.winik@wilmerhale.com
           brittany.amadi@wilmerhale.com
 9         paul.wolfson@wilmerhale.com

10         DEBO P. ADEGBILE, ESQUIRE
           Wilmer Cutler Pickering Hale and Dorr LLP
11         7 World Trade Center
           250 Greenwich Street
12         New York, New York 10007
           212.295.6717
13         debo.adegbile@wilmerhale.com

14         ARA B. GERSHENGORN, ESQUIRE
           Harvard Office of the General Counsel
15         Smith Campus Center
           Suite 980
16         1350 Massachusetts Avenue
           Cambridge, Massachusetts 02138
17         617.495.8210
           ara_gershengorn@harvard.edu
18
19    COUNSEL FOR AMICI STUDENTS:

20         JON M. GREENBAUM, ESQUIRE
           BRENDA L. SHUM, ESQUIRE
21         GENEVIEVE BONADIES TORRES, ESQUIRE
           KRISTEN CLARKE, ESQUIRE
22         1500 K Street NW, Suite 900
           Washington, DC 20005
23         202.662.8315
           jgreenbaum@lawyerscommittee.org
24         bshum@lawyerscommittee.org
           gtorres@lawyerscommittee.org
25         kclarke@lawyerscommittee.org
```

```
1    APPEARANCES (cont.):

2
            LAWRENCE CULLEEN, ESQUIRE
3           EMMA DINAN, ESQUIRE
            Arnold & Porter LLP
4           555 Twelfth Street, NW
            Washington, DC 20004
5           202.942.5477
            gina.dean@aporter.com
6           emma.dinan@aporter.com

7
     COUNSEL FOR AMICI ORGANIZATIONS:
8
            JENNIFER A. HOLMES, ESQUIRE
9           CARA McCLELLAN, ESQUIRE
            JIN HEE LEE, ESQUIRE
10          MICHAELE M. TURNAGE YOUNG, ESQUIRE
            RACHEL N. KLEINMAN, ESQUIRE
11          NAACP Legal Defense and Educational Fund, Inc.
            700 14th Street NW
12          Suite 600
            Washington, DC 20005
13          jholmes@naacpldf.org
            cmcclellan@naacpldf.org
14          jlee@naacpldf.org
            mturnageyoung@naacpldf.org
15          rkleinman@naacpldf.org

16          KENNETH N. THAYER, ESQUIRE
            KATE R. COOK, ESQUIRE
17          Sugarman Rogers
            101 Merrimac Street
18          Suite 900
            Boston, Massachusetts 02114
19          617.227.3030
            thayer@sugarmanrogers.com
20          cook@sugarmanrogers.com

21

22

23

24

25
```

1     P R O C E E D I N G S

2     (The following proceedings were held in open

3 court before the Honorable Allison D. Burroughs, United

4 States District Judge, United States District Court, District

5 of Massachusetts, at the John J. Moakley United States

6 Courthouse, One Courthouse Way, Boston, Massachusetts, on

7 November 2, 2018.)

8     THE COURT:  Good morning, everyone.  Can I see the

9 parties at sidebar for one second.

10    [Sidebar sealed and redacted.]

11     THE COURT:  All right.  So for the audience, we

12 were just discussing scheduling up at sidebar.  Mr. Hughes is

13 going to close first.  He's going to reserve some time, so we

14 will take a break after his opening closing, and then we will

15 hear from Harvard.  That should take us right to the lunch

16 break.  We'll break for lunch, and then we'll come back for

17 SFFA's rebuttal and the two Amici closings.

18     Mr. Hughes, I know we discussed this yesterday, but

19 try and keep your voice up because you have a cast of

20 thousands wanting to hear what you say this morning.

21     MR. HUGHES:  I'll try to be very loud, Your Honor.

22     THE COURT:  Excellent.

23     MR. HUGHES:  Thank you, Your Honor.

24       **PLAINTIFF CLOSING ARGUMENT**

25     MR. HUGHES:  John Hughes for SFFA.

1          Your Honor, all of the claims here in this case are

2     important, but we're going to spend most, if not all, of our

3     time today in closing on Claim 1, the question of intentional

4     discrimination against Asian-Americans, and we'll give more

5     fulsome treatment to the other claims in our post-trial

6     briefing.

7          I want to start with what everyone knew going into

8     this case.  Asian-Americans continue to face racial bias and

9     are often falsely stereotyped as shy and reserved, book smart

10    and one-dimensional, perpetual foreigners or model

11    minorities.  How did that play out here at Harvard?

12         Harvard has a personal rating that is important to

13    admissions that is designed to measure how outgoing or

14    personable its applicants are, measuring subjective character

15    traits such as likability or effervescence.  And what the

16    undisputed evidence shows is that Harvard's system for the

17    years at issue in this case, the Harvard classes of 2014 to

18    2019, the Harvard admissions office awarded Asian-American

19    applicants statistically significantly lower personal scores

20    than it did for white applicants.

21         Harvard does not and cannot dispute this.  Lower

22    personal scores, statistically significant, critical to

23    admissions.

24         There are two possible explanations here.  There's

25    SFFA's explanation, that bias and stereotyping explain the

1    disparity, not a racist conspiracy, but bias and stereotypes

2    that even well-meaning people are susceptible to deploying.

3    And the law is clear, in a subjective process with proof of

4    statistical discrimination, evidence of bias and stereotyping

5    can suffice to show intentional discrimination.

6         This is particularly true in a system like

7    Harvard's that is not race-neutral.  And here, even though

8    Harvard has a race-conscious admission system where it claims

9    to consider the race of every applicant who provides it, it

10   did not provide bias training.  It did nothing to address or

11   debunk commonly held stereotypical beliefs about

12   Asian-Americans or other racial or ethnic groups.

13        And this remained true even after Harvard received

14   repeated warnings from the Harvard Office of Institutional

15   Research that its admissions system might be imposing an

16   Asian penalty.

17        And even if we give Harvard the benefit of the

18   doubt on the Office of Institutional Research, maybe this was

19   just a preliminary warning, its response is not what you

20   would expect from an institution committed to preventing

21   discrimination against Asian applicants.

22        Dean Fitzsimmons, despite receiving repeated

23   analysis from OIR showing an Asian penalty, told no one else

24   in the admissions, not Director McGrath, no one.  Didn't tell

25   his boss.  Didn't tell anybody.  Didn't follow up.  Just

1    plowed on ahead.  SFFA's explanation that intentional

2    discrimination is the reason for the undisputed disparity in

3    the personal score is the likely one.

4           Then we have Harvard's explanation.  Harvard's

5    explanation buys into these stereotypes that the Asian

6    penalty is the result of Asian-American applicants not being

7    sufficiently multidimensional:  the words of Dr. Card,

8    Harvard's expert.  Harvard suggests that Asian-American

9    applicants are a group of one-dimensional academic

10   superstars, many of whom Harvard has decided don't have the

11   right personal qualities for Harvard.  Book smart, not

12   personable.  That's Harvard's explanation based on the

13   ratings that Harvard's admissions officers determine.

14          Two possible explanations but only one persuasively

15   lines up with the evidence.  And what hopefully we all know

16   in our hearts, Asian-Americans do not have worse personal

17   qualities than any other group.  Harvard's explanations must

18   and should be rejected.

19          Now I want to turn to the evidence.  And it brings

20   us to the most important issue in the case in terms of both

21   the modeling and the statistical fight and the evidence

22   beyond that of intentional discrimination, and that is the

23   personal score.

24          It is important for two independent reasons, and I

25   want to make sure this is crystal clear.  First, if race

1    influenced the personal score in any meaningful way, even if

2    only as an avenue for Harvard to award preferences to

3    African-American and Hispanic applicants, it must come out of

4    Dr. Card's model.  Because at that point it is not

5    distinguishable from the overall rating.  I'll say more about

6    that in a minute.

7            And the reason why this is so important to the case

8    is that Dr. Card admits that if you take the personal rating

9    out of either the model that he reported in his original

10   report or the model that he or reported in his rebuttal

11   report, there is a statistically significant Asian-American

12   penalty.  So if you resolve that factual question in our

13   favor, it ends the statistical case.

14           And now I want to talk about how we need to compare

15   the treatment of the overall score, how Dr. Card and

16   Dr. Arcidiacono treated that, and then line that up with the

17   evidence about the personal score.  And what I'm hoping to do

18   is to connect the dots and show you that the way race is used

19   in the overall score, a score that's supposed to consider all

20   the information in the application and race is only a small

21   part of that; and even so, both experts agree it has to come

22   out.

23           The evidence is just as strong that race plays at

24   least a similarly powerful role in awarding the personal

25   score.  And once we connect those dots and win that factual

1    dispute, the statistical case is over.

2             So let's look in particular, before we get to the

3    evidence of the personal score, about what Dr. Card admitted

4    yesterday to Mr. Mortara about the overall score.

5             First of all, we just had some basic questions

6    about the overall score that Dr. Card admitted.  The overall

7    rating may be influenced by race; he agreed.  Can be affected

8    by race; he agreed.  Contain some potential race-based tips;

9    he agreed.

10            Then we followed up.  We asked him, "Since your

11   analysis seeks to isolate the incremental effect of race on

12   admissions decisions, it is inappropriate to include any

13   variable that themselves can be affected by race, correct?"

14   And he agreed, and that any variable admission applies

15   equally to the overall score as it does to the personal score

16   if we demonstrate that race is influencing the personal

17   score.

18            And the last piece I want to make sure that we

19   focus on is that Dr. Card agrees that if race is influencing

20   a score only where Harvard is administering its preferences

21   for African-American and Hispanic candidates, if it's doing

22   that, it has to come out, and Harvard is going to have no

23   answer that that is happening in both the overall and

24   personal scores and that is the testimony that I've got on

25   the screen that's at slide 4 in your binder where Dr. Card

1    agrees that if race is being used to administer preferences

2    in a particular rating, it's got to come out of the model.

3    That's what he agreed in his sworn testimony.

4         So now I want to focus on the evidence about

5    whether or not race is influencing the personal score, the

6    dispute relevant to the big modeling choice in this case.  I

7    want to start with Plaintiff's Trial Exhibit 631, which is

8    slide 5 in your binder, Your Honor.  This is a slide that

9    shows comparably qualified academic candidates to Harvard

10   stratified by academic decile.  We've talked about that a

11   number of times during the trial.  At the top of my chart are

12   the most competitive candidates by GPA and SAT score, and it

13   goes down from there.

14        And the first thing I want to draw Your Honor's

15   attention to is the total column over here on the right-hand

16   side, and we see that it is reasonable to look at the award

17   of high personal scores stratified by academic qualification

18   because there's a correlation between getting a high personal

19   score and academic qualification.  You can see it starts at

20   26.  2 percent for the top academically qualified candidates

21   and then marches down from there.  So that's the reason this

22   is a good way to look at evidence about the personal score.

23        And then we turn to the racial distribution of the

24   personal score and we see something very interesting.  We see

25   that for comparably qualified academic candidates to Harvard

1    at every single decile all along the way African-Americans

2    get the most personal scores of 2 or higher by a significant

3    percentage.  First place, every time.

4           Then if we look at the column for Hispanic

5    applicants to Harvard, they get on average -- they're in

6    second place in terms of getting a personal score of 2 or

7    higher every single time.  Then we turn to the white

8    applicants, third place every time.  And the Asian-American

9    applicants, dead last every single time.  We think this is

10   strong evidence that race is being used in the personal score

11   for all of these different ethnicities, and it's evidence of

12   an Asian penalty.  But I want to draw your attention to the

13   point that I've already made; that this is clearly a place

14   where Harvard is administering its racial preferences, the

15   tips that it gives to African-Americans and Hispanic.  And

16   remember, Harvard has admitted -- they agree in this case --

17   that African-American applicants to Harvard get more of a tip

18   than Hispanic applicants, and we can see that relationship

19   right here in the personal score data.

20          So now I want to turn to the comparison between the

21   overall rating and the personal score in terms of this

22   descriptive data that comes right of out of Harvard's open

23   database.  This is Plaintiff's Exhibit 38.  It's page 19 of

24   your deck, Your Honor.  What I've got at the top, I've

25   limited this to the top four academic deciles, the top 40

1   percent of the academically competitive candidates to

2   Harvard.  And I'm comparing the overall rating distribution

3   by race of a personal score of 2 or higher to the same thing

4   with the personal score.  And what we see is that there's a

5   very important lining-up of the distribution of these

6   personal scores.

7          So in the overall rating, where Harvard admits that

8   it uses race to give tips and preferences to African-American

9   and Hispanic candidates, we see that just like on the last

10   slide that we looked at in the overall rating,

11   African-Americans are leading the way.  They're getting the

12   highest overall ratings compared to similarly academically

13   qualified candidates.  Hispanics in second place.  Whites in

14   third.  Asians last every single time.  And we see that that

15   lines up with the personal rating in terms of the pattern of

16   that distribution, which is strong evidence that just like

17   race is used in the overall score to award preferences, it's

18   also used in the personal rating, and just like in the

19   overall score, Asian-American applicants are getting awarded

20   lower scores than similarly academically qualified applicants

21   from other groups, the same thing is turning up in the

22   personal score.

23          And the last thing I'll say on this slide is that

24   when Your Honor asked Professor Arcidiacono whether these

25   differences were statistically significant he explained that

1   they were, which is yet further evidence that we've got race

2   both in the overall score where they admit that it's used and

3   in the personal rating.

4            So now I want to turn to the last piece of data or

5   statistical evidence that supports our view that race is

6   influencing the personal score.  That is the model that Dr.

7   Arcidiacono ran to analyze this very issue.  And I want to

8   make sure Your Honor is clear.  Now I'm on slide 31, Your

9   Honor, Plaintiff's Demonstrative 38.  I want to be clear.

10  Dr. Arcidiacono ran a number of different models.  The one we

11  talked the most about was his preferred model, sometimes

12  referred to model 5, which looked at the ultimate admissions

13  outcome penalty on Asian-Americans.  What I'm talking about

14  here is a different model where he tried to determine whether

15  or not race was the thing that was driving the differences

16  that we just saw in the last two slides in the personal score

17  among the four different groups that the experts analyzed in

18  this case.

19           And so what Dr. Arcidiacono did is he ran a

20  logistic regression model that controlled for everything that

21  Harvard says explains the difference between Asian-Americans

22  and white applicants:  school rating support, teacher rating,

23  interview ratings and so forth, controlled for all of that

24  and yet found a statistically significant difference in the

25  awarding of personal scores based on race.

1          And he had a discussion about the explanatory

2     power.  That was the whole pseudo R-squared discussion that I

3     think Mr. Mortara resolved in his cross-examination.  His

4     model at a minimum has strong explanatory power for the

5     difference in the distribution of personal scores based on

6     race.

7          And what he found was that Asian-Americans in the

8     personal score have a penalty based on race based on his

9     model, and that just like Harvard admits that there are

10    preferences, there's a boost for African-American applicants

11    and there's a boost for Hispanic applicants, and that

12    relative boost, African-Americans doing better than

13    Hispanics, which Harvard admits, we see right here in the

14    evidence.

15         And Dr. Card, other lobbing criticisms about pseudo

16    R-squared, he doesn't have a model on the other side of this.

17    He didn't try to model and isolate whether or not race was

18    influencing the personal score.  Only SFFA's expert did that.

19    They basically got nothing on the other side.

20         Now I want to turn to the evidence from the

21    admissions office about whether or not race was influencing

22    the personal score.  But before I do that, I want to make two

23    last points.  Neither Dr. Card nor any Harvard witness gave

24    any testimony explaining, disproving or even attempting to

25    explain the differences that we see in terms of the racial

 1    distribution of the overall score and the personal score in

 2    terms of Hispanic and African-Americans doing significantly

 3    better than the white applicants and Asian applicants, which

 4    is alone sufficient to prove that race is infecting the

 5    personal score.

 6            Dr. Card has zero opinions on that.  No testimony

 7    on that.  And no Harvard witness came in to explain that.

 8    All the evidence has gone to trying to explain the difference

 9    between Asian applicants and white applicants.  And we'll

10    have more on that later.  But the fact dispute of whether

11    race influences the personal score, they've got nothing on

12    that point.

13            So now let's turn to the Harvard witness testimony

14    about whether or not race is influencing the personal score

15    and has to come out of Dr. Card's model.  Mr. Lee said in

16    opening that nothing has changed, nothing meaningful has

17    changed about Harvard's admissions process since the Supreme

18    Court blessed it in the <u>Bakke</u> decision back in the '70s and

19    certainly nothing changed since OCR did a two-year

20    investigation of Harvard's admissions office looking at the

21    issue of Asian-American discrimination in 1990 and issued a

22    50-some-odd- page report.

23            And then we had carefully studied OCR's finding and

24    wanted to make sure we understood Harvard's position on that.

25    So when Dean Fitzsimmons came to testify, I asked him, "Do

1    you think the description of how Harvard uses race in the

2    1990 OCR report is still accurate?"  And he said, "Certainly

3    the general description in the outlining, yes."  And then we

4    went one step further.  And I asked an improper question

5    about whether they'd ever stopped.  Then I rephrased and I

6    asked him, I said, "Since you've been dean, have Harvard

7    admissions officers ever used race in awarding personal

8    scores?"  And he answered, "Not to my knowledge."  We're

9    looking now, Your Honor, at the testimony on slide 9.

10           And the reason that was important, Dean Fitzsimmons

11   was dean way before the OCR investigation, and he's saying

12   not to my knowledge, no one's ever used race in awarding a

13   personal score, and his testimony is unequivocal.  But it

14   turns out that that's not what his own admissions officers

15   told the OCR investigators in the late 1980s and in 1990.

16   And we've looked at this portion of Plaintiff's Exhibit P555

17   many times.  What it says is that some readers would award --

18   consider race in the overall score in the committee process

19   while other readers indicated that ethnicity was a factor

20   considered throughout the entire admissions process.  They

21   stated that it could be reflected in the four reiterating

22   areas, which Your Honor knows includes the personal score.

23   And then the other set of folks that talked to OCR said they

24   would only ever consider race or ethnicity if the candidate

25   indicated it was important somehow in their application.  So

1    people doing it different ways, but certainly people

2    admitting that they were using it in the personal score.

3           And Harvard's reaction to this is important.  They

4    didn't institute any new guidelines after this or make any

5    changes after this.  What they did is actually, years later,

6    doubled down on it in 2012 when the Harvard Office of General

7    Counsel went back to OCR in 2012 responding to a claim of

8    Asian-American discrimination and told OCR that the

9    description OCR had put in that statement of findings that we

10   looked at about how race is used in the Harvard admissions

11   process was still accurate as of 2012.

12          And I want to try to pause and see if we can make a

13   little sense of this incongruity about what Harvard says

14   today and about what Harvard told OCR in the past.  Harvard

15   wants to suggest today that it's had an iron-clad prohibition

16   on the consideration of race in the personal score from time

17   in memorial.  The OCR evidence just fundamentally disproves

18   that, as does Harvard's reaction to the OCR evidence.

19          And the reason this can make sense is that it would

20   not be, Your Honor, automatically unlawful for Harvard to use

21   race in the personal score if they did it in a defined and

22   narrowly tailored way.  If that's how they decided they

23   wanted to award their preferences for the candidates that

24   they have determined need tips, if they did it within the

25   confines of the law, they could do it that way.  And it turns

1   out the evidence shows that's what they've been doing.  We

2   see the substantial preferences for African-Americans and

3   Hispanic applicants in the personal score.

4           The reason that this has turned into such a big

5   deal in this case is because once the experts were hired and

6   everybody starting to crunch the numbers, people realized

7   that if Harvard admitted that it was using race both in the

8   overall score where it has admitted that it has done so

9   forever, and in the personal score, then they had a real

10  problem with the statistical analysis in this case.  So now

11  Harvard is trying to build this defense that race isn't used

12  in the personal score, but it's not consistent with the

13  things that it said in the past.  And I think that gives a

14  little explanatory power to what we've seen in term of the

15  evidence of OCR.

16          Now I want to turn to the evidence about what

17  Harvard's admissions officers said about the use of race in

18  the personal score.  And now I'm on slide 12, Your Honor.

19  And I've got some clips of testimony from some of the

20  witnesses that came to testify here at trial on this issue.

21  And I think we all remember Mr. Mortara's cross-examination

22  of Mr. Looby, who came in here and changed his testimony on

23  things from his deposition many times.  And I want to get

24  into the specifics of what he said on the personal score in a

25  minute, but I want to frame the credibility of what happened

1    with Mr. Looby, who went to a deposition, and all he had to

2    do was tell the truth about how he does his job, the thing he

3    does every day.  Not that hard to do.

4         And he was asked questions about how he considered

5    race, which is what this case is about, and other things

6    about how he did his job.  And he gave honest answers because

7    it's not hard to give honest answers about how you do your

8    job.  But some of the things he said were a real problem for

9    Harvard, like what we've got on the screen right here, where

10   we're impeaching him with his deposition at trial, and his

11   deposition testimony was, "You were asked whether you would

12   take a student's race into account when assessing his or her

13   personal qualities," and his answer was, "Just like with the

14   academic rating, it's one factor of many I consider."  And he

15   said it in other places, too, and Mr. Mortara had to impeach

16   him over and over again.

17        And what we learned is that even though he had an

18   errata and a chance to correct that testimony, that never

19   happened.  Instead he spent ten days with Wilmer lawyers for

20   three plus hours a day to come in and give the testimony that

21   he gave, and you can judge the credibility of what happened

22   there.

23        But then we get to the next witness, which is

24   Charlene Kim, and I thought she gave some pretty important

25   and interesting testimony on this issue which illustrates how

1    race is used in the personal score.  Mr. Strawbridge asked

2    her, "When considering the personal score, you also think

3    about how the applicant will add to the community, correct?"

4    She says, "Yes," and gave an explanation.  The very next

5    question we asked her, "You would agree, right, that a

6    student's race or ethnicity is part of how they can help add

7    to the community?"  And she says, "Yes."  So she's connecting

8    those dots between the things that she's considering in terms

9    of personal score, how will they add to the community, which

10   is consonant with all the subjective characterizations that

11   we've heard of what the personal score is trying to measure.

12          And one of those things that admissions officers at

13   Harvard have in mind is that the reason they use race in the

14   admission system is to add to their community in terms of

15   making a diverse campus.  And so it's hard, I think, to

16   disentangle the consideration of race and the considerations

17   that go into awarding the personal score.  And that's exactly

18   what we see from Charlene Kim's testimony.

19          And the last example that I've got here on the

20   slide is the testimony of Erica Bever.  And we asked her,

21   Mr. McBride asked her, "Does race ever factor into an

22   applicant's personal rating?"  And the answer we got was one

23   that you heard over and over again.  We, in our war room,

24   called it Harvard's slogan, was "No, not per se."  We heard

25   that from Dean Fitzsimmons, and even Dr. Card picked up on

it.  But what she explained was, she said, "I may not -- the
fact that they're a particular race but certainly students
might write about their background and things like that that
would inform my personal rating and what I give in the
personal rating."

And the reason this is important is remember back
to Dr. Card's admissions on the overall score, what we need
to demonstrate is that there's an influence of race on the
personal score one of the many things people are considering
in awarding that score, just like in the overall score.  And
if we connect those dots, it should come out of the model
because Dr. Card agrees any variable that's influenced has to
come out.

And the reason Ms. Bever's testimony is important
and other witnesses that gave testimony like it, is that we
know that many applicants to Harvard are writing about their
experiences facing discrimination, their identity in terms of
ethnicity or race, and we heard a lot of that testimony on
the day that we had the students testify, which is evidence
that that is in front of these admissions officers in many
instances and is necessarily, based on the kind of testimony
that we saw from witnesses like Ms. Bever, going to lead to
the consideration of race in the personal score.

And any doubt about all of this is resolved I think
by the testimony that Dean Fitzsimmons gave on both these

1    issues, on the overall score on the one hand and the personal

2    rating on the other hand.  And I've got that testimony on the

3    screen, and it's slide 13.  And he was asked about the

4    overall rating.  "How can race be considered in the

5    preliminary overall rating?"  And he answered, "If as the --

6    you're doing your preliminary overall rating, if you think

7    that this might be an additional little element that might be

8    helpful in terms of making a case that this person, as I say,

9    might be an unusual educator of others, the person might

10   decide to factor that into the preliminary overall rating."

11   So a very hedged view of how race might affect the

12   preliminary overall rating.  But that kind of relationship

13   between race and the preliminary overall rating was

14   sufficient for both experts to determine that variable was

15   influenced by race and it had to come out.

16           And we see the same kind of thing when he's asked

17   on the personal rating, "Can circumstances related to

18   someone's race or ethnicity result in facts, circumstances or

19   events that are useful in assigning the personal rating," he

20   answered, "Sure," and then goes on to give an answer similar

21   to Ms. Bever about people writing about overcoming

22   discrimination and other life experiences.

23           So there's really no way to differentiate the role

24   that race is playing in these two scores, which is why the

25   personal rating has to come out of Dr. Card's model, and the

1    statistical case is over once you resolve that factual

2    dispute in our favor.

3            And the last point that I'll make here is that

4    Harvard's new reading procedures that we talked about with

5    Director McGrath yesterday, we view, are remedial measures

6    prohibiting the use of race in the personal score, and that

7    evidence is probative of Harvard's use of race in the

8    personal score in the past.  I'll have more to say on the new

9    reading procedures in a bit.

10            So that brings us to Dr. Arcidiacono's model.  And

11   I've got the results of his admissions outcome model on the

12   screen.  And this is the model that he ran.  It was called

13   his preferred model, sometimes referred to as model 5, with

14   all of his variables to determine whether Asian-American

15   students were facing an admissions penalty, outcome penalty,

16   in applying to Harvard.  And he ran it on both the baseline

17   dataset which excluded the athletes, the legacies, the

18   children of faculty and staff and dean's list, ALDCs, and he

19   ran it on the expanded dataset which included everybody but

20   the 1300 athletes that were included in the dataset.  And in

21   both of those analyses he showed a statistically significant

22   outcome penalty on Asian-American students for admission to

23   Harvard.  And as Your Honor knows, this model leaves in the

24   preferences for African-American and Hispanics.  It's just

25   measuring the Asian penalty.

1          So then we get to Dr. Card's criticisms of this

2     model.  And I'm going to talk about how Dr. Arcidiacono

3     addressed those criticisms.  Dr. Card criticized Dr.

4     Arcidiacono for removing the personal rating for failure to

5     include parental occupation and intended career variables.

6     And, Your Honor, I'm on slide 15 right now, looking at

7     Plaintiff's Demonstrative 38.  And he had some other

8     criticisms.  And what Dr. Arcidiacono did is he did a

9     robustness check on his model and addressed most of the

10    criticisms that Dr. Card made, and he still found the

11    statistically significant Asian penalty.

12         And this now brings us to the issue of the ALDCs,

13    because this robustness check, the evidence that you have in

14    front of you, was only run on the baseline set.  It's where

15    the ALDCs were removed.  And so in terms of the statistical

16    case and the modeling choices, Your Honor, the ALDC issue is

17    really only relevant at this point, from our perspective, to

18    two things.  One is the reliability of the robustness check

19    because it's run without those in the group; and two, if you

20    decide that it's appropriate or at least a reasonable choice

21    to exclude the ALDCs from the pool, it increases the size of

22    the Asian penalty, but it's not required to get us there

23    under Dr. Card's model or under Dr. Arcidiacono's model

24    either.

25         So let me say, let me now try to address the ALDC

1    issue, which has been the subject of testimony and questions

2    from the court on a number of different instances.  And first

3    I've just got Plaintiff's Exhibit 634 up on the screen, which

4    just kind of sets the stage with some basic data about this

5    group, which is that, on average, the admission rates you can

6    see across the bottom, whites are admitted 43 percent of the

7    time, Asians 44, African-Americans 46 and so forth, the admit

8    rate amongst the groups is very similar, and the group is

9    overwhelmingly white.  5,000 white applicants.  Only 840

10   Asian applicants in the group.  So that's what we're seeing

11   in the group.

12          But there's been maybe some confusion or at least

13   some confusion on my part as I listened to the evidence on

14   this issue and how it relates to the issues in the case that

15   Your Honor needs to decide.  So let me see if I can clear up

16   what the experts had to say here.  First, the experts agreed

17   that the evidence in the case shows that Asian ALDCs are

18   awarded lower personal scores than white ALDCs; the bias and

19   stereotyping runs pool-wide.  Second, the experts agree,

20   including Dr. Arcidiacono, that there is not a statistically

21   significant admissions outcome difference for Asian ALDCs.

22   In other words, even though there's a penalty on the personal

23   score for Asians in this group, the models don't show that

24   the applicants from this group are facing a statistically

25   significant outcome penalty.  In other words, they're getting

1    admitted to Harvard.  And the way discrimination works in

2    this case is if you're not admitted to Harvard on the basis

3    of your race, which is why we're not claiming that there's

4    discrimination in that pool for this very small amount of

5    Asian-American applicants because we can't see a

6    statistically significant outcome penalty notwithstanding the

7    difference that we see in the personal score.

8            And let me try to put a little meat on the bone for

9    why that might be true.  We'll return to Dr. Card's "on the

10   bubble" demonstrative that's on slide 17 in your binder.  And

11   what he explained is that when you're up on the right-hand

12   side, up on the top of the bubble, that's when you've got a

13   really good chance of getting in, and that's when some of

14   these preferences can really help you.

15           And we've heard evidence about how very qualified a

16   lot of these ALDC applicants are, they're very strong.  And

17   what we see is they're going to be at the high end of that

18   bubble, many of them.  And we see on Dr. Card's next slide,

19   which is on page 18 of your binder, there's a very

20   significant bump-up for lineage for ALDCs, particularly at

21   the top of the bubble.  That's what we're seeing in the

22   eight, nine and ten columns in his bar graph.  And I think it

23   turns out that the boost of all the applicants in the ALDC

24   group, including the Asian-Americans, is overwhelming of

25   relatively smaller personal score penalty that we're seeing

1    for Asian-Americans in that group.  And there may be other

2    things going on as well.  As you can see from the

3    demographics slide, there's not that many Asian-Americans in

4    the ALDC group.  There may be other things about them.  But

5    for whatever reason, we're not seeing a statistically

6    significant outcome penalty in terms of admissions to

7    Harvard, which is why we're not claiming a discrimination for

8    that part of the applicant pool.

9           Now, turning to the modeling question, which is a

10   different question, whether it's appropriate to remove ALDCs

11   from the group and analyze the rest of the pool.  And the

12   reason we say that it is is that these applicants are

13   categorically different than the rest of the applicants to

14   Harvard.  They get in at about, on average, 45 percent admit

15   rate versus about a four and a half to five percent admit

16   rate to the rest of the pool.  Many of them have ties to the

17   college.  Many of them get a staff interview.  They're just

18   engaged.  They're a different group than everyone else.  And

19   what that means is by including them in the group in terms of

20   the modeling effect, Dr. Arcidiacono explained this, it

21   dilutes the power of Harvard's ratings because Harvard's

22   ratings turn out not to matter as much for this group that's

23   getting in at a wildly higher rate than the rest of the pool,

24   and removing them helps us to give an apples-to-apples

25   comparison for the vast majority of Asian applicants are not

1    in that part of the pool, and we want to compare them to

2    similarly situated applicants, not to the ALDCs, which are

3    kind of categorically different.

4              And the last thing I'll have to say on the modeling

5    choice is that Harvard's suggestion that this is somehow a

6    methodologically flawed approach is a bit in tension with how

7    it's treated the OCR report from 1990.  It's held that up as

8    exonerating them and is good evidence for them.  And what

9    happened there is that Harvard told OCR to look at and

10   analyze the question of Asian-American discrimination by

11   removing ALDCs from the group.  And this happened a long time

12   ago in the trial, but I want to remind Your Honor, looking at

13   slide 19, that what OCR did with its logistic regression

14   model is it ran one on the whole group and then another one

15   by removing ALDCs from the pool that it ran its logistic

16   regression model and conclusions from that, and Harvard has

17   touted those conclusions and even basically encouraged OCR to

18   take this approach, so the suggestion that there's some fatal

19   methodological flaw for doing that doesn't really hold up.

20   And as I've explained, at the end of the day, it turns out to

21   be not all that important for the modeling in this case.

22             So now I want to turn to our additional evidence of

23   intentional discrimination beyond the statistical evidence.

24   And here I want to start with the evidence from the Office of

25   Institutional Research.  I want to begin by putting that

1    evidence in context.  The evidence is important for two

2    reasons, Your Honor.  First and foremost, Harvard's lack of

3    response to evidence of potential discrimination against

4    Asian-American applicants is evidence of intentional

5    discrimination.

6            And we're not going to focus on the law much, at

7    least I'm not today, but I've got a case up on the screen,

8    Columbus Board of Education, that gets at that basic point.

9    "Actions having foreseeable and anticipated disparate impact

10   are relevant evidence to prove the ultimate fact, forbidden

11   purpose."  And the point is here that the OIR evidence is

12   evidence of intent, even if you concluded that it does not

13   definitively establish an Asian penalty in fact, even if it

14   doesn't ultimately answer the statistical evidence, because

15   it's evidence of a potential problem that Harvard knew about

16   in its admission systems.  And as we'll walk through in a

17   minute, the response of Dean Fitzsimmons and Harvard to that,

18   forging ahead, is evidence of intentional discrimination.

19           And the second reason it's relevant, we do think it

20   puts a thumb on the scale for the ultimate fact question on

21   whether there is an Asian penalty because they found one, as

22   we'll talk about in a moment, and that was done before any

23   lawsuits were filed or anybody with a point of view hired an

24   expert.  So it's something that was done before litigation

25   that happens to line up on our side with Dr. Arcidiacono,

1    done by a group that everybody, including President Faust,

2    admitted yesterday did solid, reliable work that's relied on

3    all the time by people at Harvard.

4           So now let's turn to the evidence about OIR.  We've

5    fought long and hard to get P9 into evidence, Your Honor.

6    Harvard says Dean Fitzsimmons didn't see it and that it was

7    an early draft.  We don't think that's particularly credible.

8    We think he did see it and that it does show an Asian

9    penalty, including in the personal score.  But we don't need

10   P9 to prove our case, so I'm not going to focus on it today.

11          I'm going to start with P12 in terms of what we're

12   going to focus on, and there's no dispute -- and now I'm on

13   slide 22, Your Honor -- that Dean Fitzsimmons saw this at the

14   February 25, 2013 meeting with the people from OIR, Erin

15   Driver-Linn, Erica Bever and Mark Hansen.  And I want to put

16   the timing of this meeting in context because, as Your Honor

17   knows, in late 2012 there was the Unz article and the David

18   Brooks article on Christmas Eve in the New York Times raising

19   the issue of whether or not Harvard is discriminating against

20   Asian-American applicants.  And that set off a firestorm

21   within Harvard, emails going to the provost, to the

22   president, to all the top deans, to Dean Fitzsimmons, to

23   people within OIR, emails flying back and forth all over the

24   holiday break and into the new year.

25          And we saw additional evidence that alumni and

1    donors were getting in touch with Dean Fitzsimmons, looking

2    for a response, asking what they were doing.  So the context

3    of the February 25 meeting has to be viewed in light of the

4    fact that there was significant focus amongst not only people

5    within Harvard administration but also from the alumni and

6    donor network focused on precisely this issue of whether or

7    not Harvard was discriminating against Asian-American

8    applicants to Harvard.

9          So I want to walk through P12.  But before we get

10   into what it says and go through it one last time together, I

11   want to show Your Honor how Harvard described this document

12   in its summary judgment papers and then what Dean Fitzsimmons

13   had to say about it when he came to testify here under oath

14   at trial.

15         In the summary judgment papers, Harvard said the

16   documents originated within OIR were not in response to a

17   request from the admissions office; that the analysis in

18   question was not directed to whether there is bias against

19   Asians in college admissions at Harvard; no person outside of

20   OIR asked OIR to conduct the analysis; the work done by OIR

21   employees was not intended to address whether Asian-American

22   applicants were experiencing discrimination, and did not

23   answer the question.

24         Then when I asked Dean Fitzsimmons about this

25   evidence at trial, he agreed that it was part of the work

1    that his office, the admissions office, was coordinating on

2    with Harvard's Office of Institutional Research at least in

3    part related to the concerns about, that came around the Unz

4    article and discrimination against Asian-Americans.  He said

5    that would certainly be part of it, and that OIR ran logistic

6    regressions model for the admissions office.  I'll leave you

7    to judge the credibility of the incongruity of these two

8    descriptions.  But we think it goes to the spin that Harvard

9    is trying to put on the OIR story, both back at the summary

10   judgment stage and here at trial.

11           So the question of whether or not this was a study

12   into whether Asians were being disadvantaged in Harvard's

13   admissions process is actually answered on the third page of

14   Plaintiff's Exhibit 12, which is slide 24 in your binder.

15   And one of the things that it analyzed in this document is

16   does the admissions process disadvantage Asians.  And the

17   interesting thing about this language is it was put into this

18   PowerPoint presentation by Mark Hansen, who came here to

19   testify.  And when I asked him questions on the stand here

20   about whether he was doing analysis about whether the process

21   disadvantaged Asians, he wouldn't give me answers that were

22   straight with his testimony.  I had to impeach him two times

23   with his deposition on language that came right out of the

24   document that he edited, which is just more evidence about

25   Harvard's credibility or lack thereof on this issue.

1           So what did P12 actually show?  Well, turn to page

2    34 of P12, and we've looked at this a lot.  And what it shows

3    is that Asians are disadvantaged by the personal score and

4    demographics.  That's because if you look at model 3, when

5    extracurricular and personal score are put into the model,

6    the Asian percentage of the class goes substantially down.

7    And when this evidence was provided to Dean Fitzsimmons, he

8    admitted on the stand that he knew that as a group

9    Asian-American applicants were doing better on the

10   extracurricular scores, so what was doing the work here was

11   the personal score operating as an Asian penalty.  And we see

12   that the Asian percent of the class goes down once ethnicity

13   and race is included in model 4.

14          So Dean Fitzsimmons understood what was happening

15   here.  He understood that OIR did serious reliable work.  And

16   if there were any doubt about what the results of this study

17   raised in terms of the possibility of whether Harvard's

18   process was biased against Asian-Americans, that doubt is

19   entirely put to rest by page 38 of P12, which questions

20   raised about admissions, is there bias against Asian in

21   college admissions.  That's the question that OIR is raising

22   here.

23          And Harvard's response to this document is not in

24   my mind credible.  First Harvard says the study was

25   preliminary.  It does say that with bold and underlined on a

1    page that we've seen many times.  And evidently, to Harvard,

2    that's a word that captures all sorts of unstated criticisms

3    to the model, even though no one wrote any of those

4    criticisms down at the time or can even remember anyone

5    verbalizing them today.  And of course we saw yesterday that

6    the word "preliminary" appears on lots of OIR work, including

7    work that potentially went to the board.

8            And Dean Fitzsimmons' response was not one you

9    would expect of an institution concerned with whether there

10   was an Asian penalty, especially in light of all the

11   attention this issue was getting -- this issue was getting at

12   Harvard at the time.  The response to a preliminary warning

13   would be at least to tell Director McGrath who he'd worked

14   with 30 years to try to see if there was a problem, but he

15   didn't do that or tell anyone else.  The only response is the

16   study merely confirmed what he already knew, but that's not

17   much of an answer at all because the study showed

18   Asian-Americans were being penalized in the admissions

19   process and raised the possibility of bias right here on the

20   screen.

21           So the suggestion that this lined up with

22   expectations is at best evidence of willful blindness to a

23   serious discrimination problem or worst evidence that Harvard

24   knew about the problem all along.  But even if you give Dean

25   Fitzsimmons and Harvard full credit, 100 percent credit for

1      their explanation to P12 and what was going on February 25

2      when this was delivered to Dean Fitzsimmons, and even if you

3      forgive the description of this document at summary judgment,

4      there is no way Harvard can get past the rest of the OIR

5      evidence that shows an Asian penalty.

6              And I want to go to a timeline here that I've made

7      starting on page 28.  And what we've got here is that on

8      April 15 -- April 15, 2013, Dean Fitzsimmons is asking OIR to

9      analyze whether low-income applicants to Harvard are getting

10     a tip or a boost in admissions to Harvard, and that was kind

11     of similar to the Asian-American discrimination issue.  At

12     the same time there were articles in the press criticizing

13     elite institutions like Harvard for failing to do enough to

14     get low-income students admitted to their campuses.  So Dean

15     Fitzsimmons asked the same researchers at OIR that prepared

16     P12 to take a look and see whether low-income students were

17     getting a tip to Harvard.

18             And he got his answer on Plaintiff's Exhibit 21 on

19     April 22.  And he was supplied some slides, three slides in

20     that exhibit, Your Honor, including one that showed the

21     output of the logistic regression model.  And when I asked

22     him what this showed, and the testimony is here on the

23     screen, is that what these slides showed to him from the

24     logistic regression model, it's very similar to the model

25     that was in P12, is that it was in fact empirical proof of a

tip for low-income applicants.  No qualifications, no
hedging, empirical proof that there's a tip, which is just
the opposite of a penalty, and we'll get into that in a
minute.

And he was gratified.  He was happy to receive
these results because Harvard laudably does want to give a
tip to low-income students, and he wanted to share that
information more broadly, a fact that he shared with Erin
Driver-Linn.  But Dr. Driver-Linn, the director of OIR, had
some concerns about sharing that information more broadly, so
she got in touch with the top PR person, Christine Heenan, at
Harvard, one of the top PR people, on April 28.  And she said
that Dean Fitzsimmons is excited to share this information,
but there may be some concerns.  And she explains to
Christine Heenan that Fitz asked us to do some analysis of
thumb on the scale for low income.  It could be a positive
message but has implications for need-blind policy as well as
opening the door for Unz-like requests for information about
other thumbs on the scale.

So why was Ms. Driver-Linn concerned that the
information that Dean Fitzsimmons was providing on April
26 -- April 22, why was she concerned that would open up the
door to the Unz-like Asian-American discrimination requests?
We see that in the draft of the memo that was ultimately
provided to Harvard on May 1.  And I've got it here on the

1    screen, Your Honor, it's on slide 31 in your deck,

2    Plaintiff's Demonstrative 41.  And this is the draft that OIR

3    is writing.  And they say "On the flip side, we see a

4    negative effect for Asian applicants."  This is in the same

5    study about low income.  "These realities have also received

6    intense scrutiny from critics like Bowen or more recently Unz

7    as we have discussed at length.  To draw attention to the

8    positive benefit that low-income students receive may also

9    draw attention to the more controversial findings around

10   Asians or the expected results around legacies and athletes."

11   This is the draft memo by OIR addressed to Dean Fitzsimmons.

12           And when Dr. Driver-Linn came here to testify at

13   trial, she admitted the realities that were discussed at

14   length concerning the negative effect on Asian-American

15   applicants.  That discussion occurred at the February 25,

16   2013 meeting.  That's her testimony, and this is her

17   contemporaneous memorialization of what happened at the time,

18   which is considerably more credible than the explanations

19   we're getting now, is that no one saw the Asian penalty in

20   these documents.

21           Which brings us to the final memo that was

22   delivered to Dean Fitzsimmons on May 1, which is Plaintiff's

23   Exhibit 26.  And again it has -- this is the edits to that

24   narrative that we just looked at, but it still makes clear

25   that there are demographic groups that have negative effects,

1  and the only demographic group in P26, as we'll see in a

2  minute, that has a negative effect are Asian-Americans.

3          So what happened when we discussed this evidence at

4  trial?  I reminded Dean Fitzsimmons that he had agreed that

5  the logistic regression model here provided empirical

6  evidence of a low-income tip, and in asking him about Exhibit

7  26, I said, "It provides more empirical evidence about how

8  the Harvard admissions process works," and then he agreed

9  with that.  And then we went to look at that additional

10 empirical evidence, and this is the table in P26 that appears

11 just above the narrative about negative effects on certain

12 demographic groups, and Dean Fitzsimmons was ready to admit

13 he understood that the estimate coefficient that we have here

14 for the low income of .98 was positive associated with

15 admission to Harvard, unqualified yes testimony.

16          And then when I asked him whether the coefficient

17 for Asian, which has a negative sign in front of it, was a

18 sign that there was a negative relationship between being

19 Asian and admission to Harvard, he suggested that he couldn't

20 interpret that because he wasn't an expert in statistics.  I

21 don't think it requires that much expertise to interpret

22 that.  But we learned the next day after I went back and

23 reviewed his deposition is that he was reasonably

24 well-informed with modern statistical techniques.  He had

25 previously taught a course in statistics, admittedly a long

time ago, and that he had been part of studies at Harvard using logistic regression in the past.  He was very familiar with the term "logistic regression."  And we read some testimony in from Dr. Driver-Linn's deposition that's part of the record in this case, and she volunteered in her deposition that they felt comfortable showing preliminary work to Dean Fitzsimmons because he loved to talk about statistics and he presumably still does.

So the idea that that Asian penalty that's reported right there in P26 wasn't understood by Dean Fitzsimmons is not credible.  It's from the same regression model that they admit provides evidence of a tip for low income.  The same regression model shows a penalty, a negative association with being Asian to admission to Harvard.  And if there is any debate about what that negative coefficient means, it's fully resolved in the two paragraphs below the table which say it shows a negative effect on certain demographic groups.  The only demographic group that is there are Asians that are treated negatively.

And what Harvard says about this document is, well, it wasn't meant to study whether there was a negative effect of being Asian in the Harvard admissions process.  The assignment was to go out and study whether or not there was a tip for low income.  So we can I guess then just ignore the evidence about an Asian-American penalty.  But that excuse

1    doesn't add up.

2           If you tell OIR to do an assignment, and it finds

3    like what you like on the one hand with a tip for low income

4    and what you don't want to focus on that you don't like on

5    the other hand, you don't just get to ignore racial

6    discrimination because the original assignment had to do with

7    something else.

8           So here we have OIR communicating about the Asian

9    penalty.  And what happened next?  What happens next is that

10   Dean Fitzsimmons asked for a follow-up to see whether or not

11   there was a tip for low-income Asian-American applicants.

12   And that gets into P28.  And I think, Your Honor, something

13   in my mind pretty incredible that happened here at trial is

14   that Mr. Lee, in opening and then again when he was examining

15   Dean Fitzsimmons, they both represented to this court that

16   P28 shows a boost, a benefit, a tip for low-income Asian

17   applicants to Harvard.  And there are some ways to read that

18   document which suggests that that could be true.

19          But what the document also definitively

20   unquestionably shows from the same regression analysis

21   performed by OIR is that for 82 percent of the Asian

22   applicants to Harvard who are not low income -- and I've got

23   the demographic data right from that exhibit -- for those 82

24   percent in the same document where they say low-income Asian

25   applicants get a tip, it shows that the 82 percent that apply

1  get hammered with a penalty.

2        And there's no way they can have it both ways.  So

3  they knew there was a penalty.  They did nothing about it,

4  and that is alone sufficient for us to carry our burden and

5  have proof of intentional discrimination, especially in the

6  face of the reaction where no one in the admissions office

7  was told, not Director McGrath, not anybody, no further steps

8  were taken to look into this and dig into it deeper.  After

9  this, it was just business as usual.

10        So the OIR evidence shows there's a real

11  possibility of bias in the system, a statistically

12  significant penalty for Asian-Americans.  Harvard ignores it.

13        Now I'd like to review the evidence of bias in

14  Harvard's admissions process.  And I want to start with just

15  a brief touch-and-go on the law.  Now I'm on slide 32, the

16  Thomas Weisman Kodak case, which is that we don't have to

17  prove racist cabal.  I don't think the evidence would support

18  that.  What we have here is the ultimate question of whether

19  the employee has been treated disparately because of race.

20        This is regardless of whether the employer

21  consciously intended to base the evaluations on race or

22  simply did so because of unthinking stereotypes or bias.  And

23  that's what we think the evidence lines up with in this case.

24  So what I want to focus on now is the evidence of bias, both

25  implicit evidence of bias and explicit evidence of bias.  And

1    I want to start with explicit evidence of intentional

2    discrimination against Asian-American applicants that happens

3    in the recruiting process at the very front end.  And this

4    brings us back to where we started the trial:  to sparse

5    country.  And what happens here is that Harvard spends out

6    invitations to people to apply to Harvard as part of its

7    important recruitment techniques.  And Harvard admits that

8    these recruiting efforts are part of how Harvard consciously

9    shapes its class.

10          And here what Harvard does is that it invites white

11   applicants to apply to Harvard in sparse country with scores

12   as low as 1310, but Asian men and Asian women from those same

13   states, from those same schools, have to have a 1370 if

14   you're a man, 1350 if you're a woman to get applied.  And

15   there is no reason to do this, other than race.  It's the

16   only difference, and that is intentional race discrimination

17   plain and simple.  No other explanation.

18          And the interesting thing, when I confronted Dean

19   Fitzsimmons with this testimony, I actually thought he might

20   say, Gee, I didn't know about this.  We should take a look at

21   it.  There's not that many people in sparse country, although

22   there are significant Asian communities in Phoenix and Las

23   Vegas and New Orleans and other places, but instead he gave

24   an innocence answer that I thought was very interesting.  He

25   explained, when I confronted him with this evidence, that

1    there were some people in sparse country who have only lived

2    in a sparse country state for a year or two.  Let's say that

3    can happen.  Then on the other hand there are people who have

4    lived there for their entire lives.  And this is precisely

5    the kind of stereotyping and bias this case is about.

6    Because the new arrivals in this answer are the Asian

7    students, stereotyped as perpetually foreign, while the folks

8    who have lived in sparse country forever are the white kids

9    that Harvard is expressly preferring in this situation.

10          Now that brings us to the part of the process that

11   starts once applications are being reviewed.  Where do we see

12   the evidence of bias or stereotyping?  We come back to the

13   personal score.  We've talked about how it's important to the

14   statistical analysis, but it's also independently important

15   of evidence of discrimination within Harvard's admissions

16   process because it's at least in part based on subjective

17   determinations by the admissions office about personality.

18          And Mr. Mortara made a couple of demonstratives

19   with the witnesses on this subject during the testimony.

20   I've got the one that he made with Mr. Looby on the screen,

21   which I believe is slide 45 in your notebook, Your Honor.

22   And they went through that the personal rating gets at who

23   the person is, what the person brings to the community, which

24   I'll remind you connects right back to why Harvard uses race

25   in its admissions process, whether they work well with

1    others, meaningful relationships, likability, positive

2    personality, all subjective characteristics.  And then he

3    made a similar demonstrative with Director McGrath, same

4    kinds of things, likability, good person, integrity,

5    helpfulness, courage, kindness.

6            We've seen all of this, very subjective

7    determinations, that Your Honor knows by and large the

8    admissions officers in the Harvard admissions office are

9    awarding this personal score on a cold record, on paper,

10   without having met anybody.  And that's precisely where bias

11   can creep into a system where race is considered for every

12   applicant who provides it and throughout the process.  And we

13   actually heard testimony about this bias issue from several

14   of Harvard's witnesses.  We heard about it yesterday from

15   President Faust, and she agreed that research on implicit

16   bias shows that everybody has some implicit bias.  And she

17   even agreed that Harvard has a responsibility to ensure that

18   bias is not leaking into its admissions decisionmaking

19   process in any form.  She said Harvard should do its utmost

20   to address questions of bias.

21           And we also heard from Dr. Simmons, when she was

22   asked about some research that she and others had done on how

23   women were treated in higher education.  And we confronted

24   her with decades of cognitive psychology research reveals

25   that most of us carry prejudice of which we are unaware and

1    nonetheless plays a large role in our evaluation of people,

2    and that in every study that's been examined there's a

3    significant effect of bias based on the gender or race of the

4    person being evaluated.

5            So this is all true in our world.  And we know that

6    there are the stereotypes that we talked about at the

7    beginning.  And when you have a subjective process and we

8    know that bias is possible, bias around race, bias around

9    gender, the fact that Asian-American applicants face a

10   statistically significant penalty on the subjective personal

11   rating year after year is pretty strong evidence that bias

12   has crept into, leaked into the system.  And it's particular

13   true when you analyze that in the context of some of the

14   admissions officers that we asked about this issue.

15           We actually asked, Mr. Strawbridge asked Charlene

16   Kim when she came to testify.  She's been there eight or nine

17   years.  And he asked her, "You would have no explanation if

18   Asian-Americans were to receive year after year lower

19   personal scores than white applicants, for example, correct?"

20           "That's not what I see as a member of the

21   committee."

22           "That's not been your experience during your nine

23   years on the admissions committee, has it?"

24           "It has not."

25           And the reason that's important is we know there's

1    a statistically significant difference in that score.  Her

2    expectation is that she wouldn't see that.  She's not

3    pointing to personal scores or teacher supports or some kind

4    of difference that she observes kind of categorically about a

5    group by the data.  She says we wouldn't expect to see that.

6    And that's evidence that bias has crept into the system, even

7    if it's implicit or unconscious bias.  That's what we see

8    here.  And we've got similar testimony from Director McGrath

9    along the same lines that it wouldn't be her experience,

10   again, evidence of bias.  So when the empirical disparity is

11   incongruous with the expectations of long-time admissions

12   officers, that's when you know you might have a problem.

13          So what is the bias that is creeping into the

14   process?  We actually heard some interesting testimony on

15   this from Dr. Chin, who is an Asian-American studies

16   professor who is an alumni interviewer who came here to

17   testify on Monday.  And she actually wrote an article that

18   you may remember in 1983 looking at this issue of how bias

19   could affect personal ratings in admissions to Harvard.

20          And, she in that article, and we talked about it

21   with her on the stand, helpfully categorized some of those

22   stereotypes or biases that have been deployed over the years

23   against Asian-Americans.  And one of them was this concept of

24   over-representation, the idea that Asian-Americans are only 5

25   or 6 percent of the population as a whole but have a

1    significantly greater percentage of the admitted class at

2    elite institutions like Harvard.  That's one of the things

3    that she identified as a stereotype.

4         And it was interesting to us that Dr. Arcidiacono

5    was questioned on this very issue for reasons that were

6    unclear to us.  But again, this is the kind of thing that Dr.

7    Chin identified.  And then the other types of bias that we've

8    seen in this case, one is the idea that there is a

9    career-focus bias.  And we've seen that in this idea that

10   Asian-Americans are stereotyped as being overly interested in

11   math or science or doctors.  That's a bias that can creep

12   into the system and one that's potentially crept into Dr.

13   Card's analysis in his intended-career variable where he says

14   that explains the discrimination against Asian-Americans, and

15   yet we see that variable shows that a lot of Asian-American

16   applicants to Harvard do want to be scientists or doctors.

17        And then we've got the next stereotype that's been

18   identified both by Dr. Chin in her article and in the OCR,

19   this idea of passive personalities, shy and so forth, yet

20   another stereotype that's been identified.  And finally we've

21   got this idea of the model minority, which again was

22   identified both by Dr. Chin and in the OCR report.  And to

23   round it out, we connected the dots with Dr. Chin and we

24   asked her, you know, "Vestiges of this history remain.  Today

25   Asian-Americans continue to face racial bias and are often

1    falsely stereotyped as timid, exotic perpetual foreigners or

2    model minorities."  And we asked her what this means is that

3    Asian-American still face some of the same kinds of

4    stereotyping that you wrote about in your 1993 article, and

5    she said, "Some of them, yes."

6            So that's the kind of bias that can leak into the

7    system here.  And that brings us back to the new reading

8    procedures, which is an important piece of the evidence for

9    Your Honor to consider.  Of course we know now, Your Honor,

10   that there were some problems with the testimony of Dean

11   Fitzsimmons and Director McGrath on the existence of written

12   guidance around the use of race in the admissions office when

13   they came to testify the first time.

14           Your Honor is familiar with that testimony.  And

15   whether you ascribe a sinister motive or not to what happened

16   here, the fact of the matter is that the new guidance is

17   powerful evidence for our case for a couple of reasons.

18           I'll talk about why.  As we discussed, Charlene

19   Kim, Director McGrath, we just looked at the testimony, they

20   did not expect to see a personal score disparity, but it's in

21   the data nonetheless.  It's statistically significant.  So

22   what we had happen here is Harvard took corrective action.

23   It changed its reading procedures to ban the consideration of

24   race in the personal score and more importantly to the

25   stereotyping issue that we've been talking about, exhorting

1    readers not to overvalue extraversion.

2          And I've got here now on slide 57 at your deck,

3    reading procedures for the class of 2023 that Mr. Mortara and

4    Director McGrath talked about yesterday.  And again, it says,

5    "It is important to keep in mind that characteristics not

6    always synonymous with extraversion are similarly valued.

7    Applicants who seem to be particularly reflective, insightful

8    and/or dedicated should receive higher personal ratings as

9    well."  A corrective step to combat some of the bias and

10   stereotypes that leaked into the Harvard admissions office.

11   We know they leaked in because of the statistically

12   significant disparity in the personal score.

13         And Director McGrath, to her credit, admitted that

14   this instruction is designed to make sure that your

15   admissions officers do not fall prey to implicit bias or

16   racial stereotyping about Asians in part.  She said it would

17   have that effect and then went on to say that it's not a new

18   idea, it's been memorialized in the past.

19         But what I think we can see from a fair reading of

20   the evidence is that this bias did creep in.  We have the

21   statistically significant disparity.  There's no other good

22   explanation other than stereotyping and bias.  And to

23   Harvard's credit, they actually finally did something about

24   it in 2023.  It's a step in the right direction, and this I

25   think is an admission as much.  And this was a necessary step

1    because we did see some concrete instances of Harvard

2    admissions officers deploying the kind of stereotyping that

3    we talked about.

4            And I won't belabor the anecdotal evidence because

5    we don't think it's particularly important in a statistical

6    case with a bunch of data.  But we've got P116 on the screen.

7    I think you'll remember a discussion of this from Dr.

8    Arcidiacono's testimony that the person got a personal score

9    of 3, notwithstanding being a professional figure skater,

10   amazing life story, a lot of hardship, overwhelming teacher

11   support and alumni interviewer report, Asian applicant to

12   Harvard, given a personal score of 3, labeled a standard

13   strong, no evidence that the application was ever considered

14   again.

15           And then again we saw some evidence in the record

16   that Asian-American applicants to Harvard were labeled as

17   quiet or shy.  It's not that there's something inherently

18   wrong about labeling somebody as quiet or shy, but that's a

19   stereotype that's deployed against Asian-Americans that

20   doesn't really apply to other groups.  That's why it's a

21   stereotype.  And it's evidence that bias has leaked into the

22   system.

23           So Harvard took a small step in the right direction

24   with the new reading procedures to address this, but it

25   didn't even go as far as some of its supporters have

1    suggested in this case.  And we're back to the testimony of

2    Dr. Chin, the professor of Asian-American studies.  And she

3    says she exhorted Harvard to increase training on cultural

4    bias and to be educated on the stereotypes that work against

5    Asian-American applicants.  And the evidence that Harvard did

6    that in this case is minimal, no more, evidently, than

7    sending around an article on implicit bias years ago.

8            And the final piece of the puzzle in the new

9    reading procedures is something that came up many times

10   during the trial.  Before the new reading procedures, Harvard

11   had no written instructions on how or where to use race.  And

12   we go back here to a document that we visited many times.

13   I'm on slide 62 now.  This is Plaintiff's Exhibit 555, the

14   OCR report.  And we've got this sentence.  "There are no

15   formulas or specific criteria for measuring or assessing

16   ethnicity."  That's fine.  Next half of the sentence is

17   important.  "Nor are there instructions for determining how

18   much weight is given to ethnicity or where the weight is to

19   be applied in the admissions process."  This goes all the way

20   back to 1990.  And we saw in the same document admissions

21   officers were using race in different parts of the process,

22   assigning it different relative importance.  We saw that all

23   the way back in 1990, and that persisted all the way to

24   today.

25           And to the extent that Harvard -- well, didn't have

1    written instructions before September.  To the extent they

2    had oral instructions, the evidence in this case is that they

3    weren't that memorable, at least for the people who testified

4    at their deposition when they were testifying honestly about

5    how they do their job.  And we've got the admission here on

6    the screen from Chris Looby that he didn't recall anyone ever

7    teaching him how to use race.  We've got the testimony from

8    Lucerita Ortiz where she doesn't recall the specific

9    substance of any training.  And you can see the other

10   admissions that we've got here on the slide.

11          So to the extent that Harvard had oral training, it

12   wasn't memorable, and it certainly didn't provide the kind of

13   guidance that the new reading procedures had.  So Harvard had

14   a problem, and they tried to fix it with the new reading

15   procedures, which again, we think is evidence of a

16   recognition that there was bias and stereotypes and a problem

17   with the way Harvard used race in its admissions process.

18          Now, the last thing I want to do is address

19   Harvard's explanation for the new reading procedures, because

20   I think it just confirms our point.

21          What Harvard says happened here with the new

22   reading procedures is that a group of admissions officers got

23   together over this past summer in 2018 and made changes,

24   including to the directions of the personal score.  And the

25   people who did this work were led by Christine Mascolo, who

1   is the associate director of the admissions office, who has

2   been there for 17 years.  And she worked with others who have

3   been there for a while as well.

4          And they assembled reading procedures, and they

5   sent them out to everybody in the admissions office on

6   September 19, 2018, and they said, "Attached please find the

7   updated reading instructions for the year."  And they told

8   everybody to read the document thoroughly, and they thanked

9   everybody who had helped in the editing process, and they

10  didn't suggest there was any problem with the document they

11  circulated or that it was in any way incomplete.  And what

12  Harvard wants us to believe is that these experienced people

13  who had been there in some instances as long as 17 years,

14  they just went out to memorialize what everybody knew all

15  along about how Harvard used race in its admissions process

16  and in the personal score.

17          And what Harvard wrote, what these people wrote in

18  this draft was that in the directions on considering race in

19  the overall to score was to only consider it if an applicant

20  writes about it, makes an issue of it in its application,

21  just like they consider religion.  That's what the people who

22  were seeking to memorialize how to use race said in this

23  document.

24          Of course Harvard can't admit that that's true for

25  a number of reasons, and issued an updated guidance on

1    October 5 striking that language.  And Director McGrath

2    testified yesterday that the language that was included in

3    P720 and its attachment was dead-bang wrong.  But the reason

4    that's important for our case is because it shows that even

5    experienced people in the Harvard admissions office have no

6    idea how race had been used, how it's supposed to be used,

7    and when you have lack of controls in a system that's using

8    race, considering it with every applicant, and you have

9    evidence of statistical disparity for Asian-Americans in the

10   subjective personal score, those lack of controls are

11   evidence of yet further bias.

12           I'm going to wrap up now, Your Honor, and save some

13   time for Mr. Mortara to come back later.  Before I do, I'd

14   just like to thank you for all the effort and attention that

15   you've put into this case and everybody else here.  Thank you

16   very much.

17           THE COURT:  All right.  Finished right on time,

18   Mr. Hughes.  Why don't we take a 15-minute break and we'll

19   come back at 11:00.

20           (Recess taken, 10:45 a.m.)

21           MR. LEE:  Thank you, Your Honor.  May I proceed,

22   Your Honor?

23           THE COURT:  You may.

24                   **DEFENDANT CLOSING ARGUMENT**

25           MR. LEE:  On behalf of the faculty, students,

1    administration and staff and the many members of the Harvard

2    community, I begin by thanking the Court and all of the court

3    staff for the opportunity to address the very serious

4    accusations by SFFA.  We thank you for your close attention

5    to what has been at times very detailed evidence, and we

6    thank you for your patience.

7            SFFA began its opening statement by contending

8    that, and I'm quoting, the wolf of racial bias is at

9    Harvard's door.

10           On this, we agree.  The wolf of racial bias is at

11   Harvard's door and at the door of this courthouse.  That wolf

12   is not intentional discrimination by anybody in the Harvard

13   admissions office.  That wolf comes in the form of SFFA and

14   its experts.  It is those who would turn back the clock.  It

15   is those who would eviscerate the progress we have made by

16   pursuing not just sanctioned but lauded, race-conscious

17   admissions policies.  It is those who would reduce

18   dramatically the number of African-American students and

19   Hispanic students on our college and university campuses

20   today.

21           Now, to be sure, Your Honor, the vehicle SFFA has

22   manufactured to pursue its goal is a claim that Harvard

23   intentionally discriminates against Asian-American

24   applicants.  As we said at the outset of our opening, Harvard

25   does not discriminate against Asian-American applicants.

1    Harvard has not discriminated against Asian-American

2    applicants.

3            What the evidence has demonstrated is that Harvard

4    has worked over the years tirelessly to create a vibrant

5    educational environment that includes students from all walks

6    of life.  We do not admit simply GPAs and board scores.

7            We admit people.  We admit people from a variety of

8    backgrounds who bring to the campus a range of experiences,

9    talents, and perspectives.  This effort to create a community

10   that is diverse, including, to be sure, racially diverse, is

11   very much deliberate.  It is very much intentional and, as

12   Your Honor has heard, it is critical to Harvard's mission of

13   preparing students to contribute to our increasingly diverse

14   society.

15           Now, Your Honor has heard directly from the people

16   that SFFA has accused of discrimination.  And as I'll come to

17   later, the precise claim of discrimination has been a moving

18   target over a long period of time.

19           But you heard from President Faust, Dean

20   Fitzsimmons, Dean Khurana, Dean Smith, Director McGrath, and

21   current and former admissions officers Roger Banks, Erica

22   Bever, Chris Looby, Charlene Kim, Tia Ray, and Elizabeth

23   Yong.

24           These folks came to court.  They sat in that

25   witness chair.  They subjected themselves to the crucible of

1    cross-examination and explained just why SFFA's accusations

2    are not only wrong but unfounded and very unfair.

3            You heard those admissions officers explain how

4    they carefully and thoroughly evaluate each and every

5    applicant and how they take into account a multitude of

6    factors when making admissions decisions.  You heard that

7    race can make a highly competitive applicant's application

8    even more compelling, continuing that applicant into the

9    admitted pool, just as being from Sparse Country or being an

10   extraordinary musician or being an extraordinary intellect

11   could tip you into the applicant pool.

12           And, Your Honor, you heard from some of the

13   remarkable students and alumni who were admitted as a result

14   of this holistic and comprehensive process.  You heard how

15   diversity inside and outside the classroom at Harvard has had

16   a profound impact on their educational experience.

17           In contrast to all of this, what did you hear from

18   SFFA?  The next slide are the fact witnesses representing the

19   plaintiff.  It's blank.  Not a single member of SFFA took the

20   stand.

21           In fact, Your Honor, no one who testified, no one

22   who took the oath had ever met with or spoken with any one of

23   the SFFA members who claim to have been denied admission at

24   Harvard.  Not one of their application files was introduced

25   into evidence.  Dr. Arcidiacono had them all, and not a

1    single file was introduced into evidence for any of their

2    standing members.

3              If there was an application file after all of this

4    that showed discrimination, wouldn't we have seen it?  The

5    fact that none was introduced actually leads to the contrary

6    conclusion there is none.

7              So where does that leave SFFA?  It leaves it, Your

8    Honor, candidly, with an illogical, contradictory, meritless

9    discrimination claim.

10             The evidence has made clear just what you would

11   have to believe from SFFA to credit their claim of

12   discrimination.  You would have to conclude that Harvard

13   actively recruits Asian-American students only to

14   discriminate against them once they apply.  You would have to

15   conclude that the process that involves multiple readers of

16   applications, multiple subcommittee reviews, multiple full

17   committee reviews, and decisions made openly by a group of 40

18   people is somehow being manipulated to discriminate against

19   Asian-Americans.

20             You would have to conclude that Harvard's

21   admissions office is favoring Asian-Americans who happen to

22   be athletes, legacies, faculty children, staff children, on

23   the dean's list or the director's list.  But then for some

24   inexplicable reason, the same admissions officers are

25   discriminating against Asian-American applicants who are not

1    in these categories.

2          You would have to conclude that Harvard is not

3    discriminating against Asian-American women or

4    Asian-Americans in California but are discriminating against

5    other Asian-Americans.

6          And you would have to conclude that to carry out

7    this bizarre scheme of discriminating against some but not

8    all Asian-Americans, the admissions officers assigning the

9    academic and extracurricular ratings which are on the screen

10   now, ratings, Your Honor, that everyone agrees reflect

11   subjective judgment, are giving Asian-American applicants

12   better scores on those ratings than the objective or the mere

13   quantifiable data would justify.

14         To be clear, it is not that Asian-Americans are

15   being scored higher on these ratings just because they have

16   better board scores or better GPAs or because they have more

17   extracurricular activities.  The admissions officers who are

18   reading these files are scoring Asian-Americans higher in

19   these categories on the nonobservable, nonquantifiable

20   factors.

21         But to believe SFFA, that same admissions officer

22   then moves two boxes down on the same form, as we've shown on

23   the next slide.  And then for some reason -- and according to

24   SFFA, it is to discriminate against that applicant -- it

25   gives that person a lower personal rating.  That would be a

1    peculiar form of intentional discrimination.

2         And you would have to conclude, Your Honor, that

3    the admissions officer managed to implement this complicated

4    scheme, a scheme with inconsistencies and illogical

5    consequences without leaving behind a single indication, a

6    single email, a single memo, a single presentation that would

7    tell the 40 admissions officers just how to navigate these

8    contradictions and these illogical inconsistencies.

9         But the problems with the plaintiff's

10   discrimination claim don't end there.  There are a host of

11   other inconsistencies.

12        For instance, as the trial progressed we moved from

13   intentional discrimination and at the end we're coming to

14   something that seems to be focusing on implicit bias.  And

15   I'll come back to implicit bias because there's been

16   virtually no evidence of that.

17        But the fact that SFFA now resorts to implicit bias

18   demonstrates yet another inconsistency.  It's entirely

19   inconsistent with the proposition that Harvard is

20   discriminating against some Asian-Americans but favoring

21   others.  How do you implicitly discriminate for someone and

22   then implicitly discriminate against someone?  Another

23   logical inconsistency.

24        And then to focus on SFFA's primary focus on the

25   personal rating, the personal rating which they say is a

1      vehicle to carry out the intentional discrimination.  The

2      very same differences in the personal rating, on average --

3      now, we're just talking about averages here because there are

4      some Asian-Americans with spectacularly good personal

5      ratings.

6             But the very same difference they're focusing on on

7      average is the difference that the ALDC Asian-American

8      applicants also have.  Their personal ratings are also on

9      average lower, yet they concede there's no discrimination.

10     Again just another logical inconsistency.

11            Why would they sponsor such a claim?  It's a claim

12     predicated on data mining.  It's a claim omitting variables.

13     It is a claim just ripe with self-defeating inconsistencies.

14            But now the answer is clear, and I would suggest

15     much clearer than it was at the outset.

16            The answer is that the goal of SFFA is to eliminate

17     all consideration of race in admissions.  The founder of SFFA

18     pursued that goal in *Fisher* 1.  He was unsuccessful.  He

19     pursued that goal on behalf of white plaintiffs in *Fisher* 2.

20     He was unsuccessful.

21            So what did he do?  Mr. Kahlenberg told us.  He

22     advertised for Asian-American plaintiffs, but the goal

23     remained the same, and that became manifest during the

24     evidence.

25            Your Honor, the plaintiff's own slides, one that

1    Mr. Hughes didn't show you, tell the entire story.  Here is

2    Plaintiff's Demonstrative 38, Slide 40.

3              You may recall that we cross-examined

4    Dr. Arcidiacono on this slide.  This tells the entire story.

5    If we were to accept SFFA's proposition that race be

6    eliminated from consideration, the number of

7    African-Americans would decrease by 150 a class or 600 over

8    four-year classes.  If we were to accept their analysis, the

9    number of Hispanics would decrease by 125 per class or about

10   500.  To accept their analysis, the number of

11   African-American and Hispanic students of color would be

12   reduced by 1,000 on Harvard's campus.

13             How does SFFA address this?  What it says is in

14   their analysis, and I'm now quoting from Dr. Arcidiacono, the

15   winners are the Asian-Americans and whites, and the losers

16   are the African-Americans and Hispanics.

17             Your Honor, he could not be more wrong.

18             If that is the circumstance, we all lose, every

19   single one of us loses.

20             Now, before we turn to each of SFFA's claims, let

21   me address why diversity, including racial diversity, is so

22   critical to the educational experience at Harvard and other

23   colleges and universities.

24             The plaintiff suggested in its opening that

25   diversity and its benefits is not on trial here.  But as that

1    chart I just showed you indicates it is.  If you accept their

2    proposition, it couldn't be more on trial.

3              In fact, Dr. Arcidiacono spent as much of his time

4    attacking the tips for African-American and Hispanic students

5    as he did trying to move the Asian-American penalty.

6              To the plaintiffs, Your Honor, these things are two

7    sides of the same coin.  As their expert said, a tip for

8    African-Americans and Hispanics is a penalty for

9    Asian-Americans.  That's his use of the word "penalty."

10             But he went one step further.  He said a tip, a tip

11   for whites, for African-Americans, and Hispanics is a white

12   penalty.  That's how they're using these terms.

13             Now, as an initial matter to suggest that one

14   student is being penalized because another student is

15   receiving a tip based on her or Hispanic racial background

16   assumes that the student who received the tip was not

17   qualified.

18             Nothing could be further from the truth.  As the

19   evidence established, every single student admitted to

20   Harvard is quite qualified.  And as the evidence showed, the

21   applicant's race may provide a boost only to those very

22   highly qualified competitive candidates in the pool.

23             That is like many other boosts like geography, like

24   socioeconomic status, like a music talent.  None of these

25   boosts is imposing a penalty on someone else.  And the racial

1    boost benefits everyone on the Harvard campus.

2         Harvard, as you've heard, has long recognized that

3    the quality, and I'm now quoting from Dean Fitzsimmons'

4    testimony in *Bakke*.  Harvard has long recognized that the

5    quality of the educational experience of all the students at

6    Harvard College depends in part on the differences in

7    background and outlook that the students bring with them to

8    campus.

9         That was true in 1977 at the time of *Bakke* and is

10   true today.  That is why in 2016, Your Honor, Harvard's

11   faculty of arts and sciences unanimously endorsed the

12   conclusion of a committee chaired by Dean Khurana that

13   reaffirmed, and I quote, "The university's long-held view

14   that student body diversity, including racial diversity, is

15   essential to our pedagogical objectives and institutional

16   mission."

17        This commitment to diversity is shared at the

18   highest level of the university.  But more importantly, Your

19   Honor, it is lived by the Harvard students.  You heard

20   firsthand from those Harvard students who have experienced

21   firsthand both the benefits and some of the burdens of a

22   diverse student body.

23        Their testimony on Monday was powerful.  They were

24   people who volunteered to take the stand and be examined and

25   cross-examined.  They told us why the diversity of Harvard

1   was important to their decision to apply to and attend

2   Harvard and to their learning while on campus.

3          And most importantly, Your Honor, if we go to the

4   next slide, Slide 13, they shared how devastating it would be

5   if the reduction in the diversity, racial diversity, that

6   would result from plaintiff's so-called alternatives would

7   come to pass.

8          These students are living proof that Harvard has a

9   compelling interest in student body diversity.  These

10  students are living proof that taking a thousand

11  African-American, Hispanic students off the campus in the

12  guise of an illogical discrimination claim is not the right

13  result.

14         And as you know, Your Honor, Harvard does not stand

15  alone on this issue in American higher education

16  institutions.  You heard from President Ruth Simmons, whose

17  life's story and life's work embodies the meaning, the

18  importance, the benefits, and the triumph of racial

19  diversity.

20         As she put it, and I quote, "Diversity provides an

21  opportunity to deepen that learning, to give students

22  firsthand experience with difference.  Which allows students

23  to test themselves, to test their background, to test their

24  ideas, and to challenge assumptions."

25         So with that in mind, let me turn to SFFA's claims.

1        And I'll turn first to the intentional discrimination claim.

2                The law on what's required is clear.  And this was

3        not among Mr. Hughes' slides.  The burden is on SFFA to prove

4        first that Harvard discriminated on the basis of race, to

5        prove second that the discrimination was intentional, and to

6        prove third that the discrimination was a substantial and

7        motivating factor for Harvard's actions.

8                SFFA must prove racial animus, prove it as a

9        necessary component of the claim.  In other words, the

10       plaintiffs must show that a committee comprised of roughly 40

11       people at any given time is intentionally trying to

12       discriminate against some but not all Asian-Americans because

13       some of those folks are Asian-Americans.

14               Now, SFFA suggests in its opening because Harvard

15       considers one factor in its admissions process, once the --

16       and I'm quoting now -- statistically significant Asian

17       penalty has been shown, the burden is on Harvard to explain

18       these differences.

19               Quite honestly, Your Honor, that's not the law.

20       It's confusing the burden of production with the burden of

21       persuasion.  The law is perfectly clear that the ultimate

22       burden of persuasion remains with SFFA.

23               Now, on the intentional discrimination claim, there

24       are fundamentally two questions.  The first is -- and I'm

25       going to take them in the order that Mr. Hughes took them --

1    has plaintiff proven discrimination.  Because if it's not,

2    the rest becomes irrelevant.

3              And the second is, has the plaintiff proven the

4    discriminatory animus required by the law.

5              The answer to both is no.

6              Mr. Waxman will address the evidence that

7    demonstrates the plaintiff has failed to prove

8    discrimination, and then I'll return to address the second

9    question in the remaining claims.

10             I'm going to hand the mic off now.

11             [Microphone technical issues.]

12             MR. WAXMAN:  I could see Joan's face.

13             MR. LEE:  I realize that folding my arms was a bad

14   idea.

15             THE COURT:  I'll even give you permission to take

16   your jacket off, if that would help you, if you could talk

17   without a jacket.

18             MR. WAXMAN:  I don't know if I can talk in a court

19   without a jacket.

20             [Microphone technical issues.]

21             MR. WAXMAN:  May I proceed?

22             THE COURT:  You may.

23             MS. HACKER:  As Your Honor is aware, the plaintiff

24   relies on statistics to prove its claim of discrimination.

25   Mr. McBride, in the passage here, even said that there's no

1    question that the central issue in this case is being

2    determined on the basis of statistical analysis.  That's

3    plaintiff's claim because it has nothing else.

4            Of course it is not true that statistics can decide

5    the question of either discrimination or intentional

6    discrimination because, as Professor Card explained and

7    Dr. Arcidiacono did not disagree, the most that statistics

8    and statistical modeling can prove is a correlation.  It can

9    never prove causation in the real world.

10           But even the bloodless statistics don't support

11   SFFA's claim.

12           Now, the experts agree that any statistical

13   analysis can only go so far in modeling Harvard's admissions

14   process.  There are many, many factors that admissions

15   officers and the admissions committee consider in the process

16   that simply can't be reduced to numbers and thus can't be

17   accounted for in any statistical analysis.

18           But as you heard from Professor Card, he tried to

19   get as close as possible.  He included all domestic

20   applicants in his model, and he included all the relevant

21   data that he had.  And when he did that, he found that

22   Asian-American ethnicity had no statistically significant

23   effect in the Harvard admissions process.  It had no effect

24   in any of the six years he looked at or even when he averaged

25   the six years.

1              Professor Card also found that for applicants who
2      are female or applicants from California, there was actually
3      a positive effect associated with being Asian-American.  Now
4      again, these results aren't statistically significant, but
5      they would surely be a bizarre outcome for an admissions
6      office trying to discriminate against Asian-Americans.
7              Now, Dr. Arcidiacono reached a different
8      conclusion.  He testified that for some, but not all,
9      Asian-American applicants he found a penalty.  There is a
10     simple explanation for why two economists using the same type
11     of model and the same data reached different conclusions, and
12     it is this:  For one methodological issue after another,
13     Professor Card made the choice that allowed his model of the
14     admissions process to resemble the actual admissions process
15     as closely as possible.
16             Dr. Arcidiacono, on the other hand, made choices
17     that took him further and further away from Harvard's actual
18     process.  He made the choices that instead allowed him to
19     find the result the plaintiff was looking for.
20     Dr. Arcidiacono, a proclaimed proponent of the mismatch
21     theory, who believes, in his own words, in a "more efficient
22     sorting of minority students" manipulated the data to support
23     his desired result.
24             Now, let me start with the issue of which
25     applicants are included in the model.  Professor Card

1     included all domestic applicants, which is the group that

2     both sides agree is relevant here.

3              Dr. Arcidiacono threw out of his model a group that

4     accounts for almost 30 percent of admitted students:  the

5     recruited athletes, the legacy applicants, the applicants who

6     are on the dean or director's list, and the children of

7     Harvard faculty and staff, the so-called ALDC applicants.

8              Now, there are two important questions to ask about

9     why Dr. Arcidiacono made that choice.  The first, why did he

10    claim to do it.  The answer you heard him give is that the

11    ALDC applicants received tips in the admissions process.  But

12    of course so many other groups receive tips, and yet he

13    didn't exclude any of those applicants from his model.

14             Dr. Arcidiacono also said that he excluded ALDC

15    applicants because they have high admission rates.  He told

16    Your Honor that he needed to exclude the ALDCs so he could

17    compare "apples to apples."

18             That is nonsense.  One might as well say that

19    people with low SAT scores can't be compared as apples to

20    apples with people with high SAT scores.

21             The whole point of a regression is to allow

22    apples-to-apples comparisons among people with different

23    characteristics by controlling for those characteristics.

24             Now, the second question is why did Dr. Arcidiacono

25    actually choose to exclude ALDC applicants.  And I think here

1    the answer is pretty clear.  He did it because doing so

2    produced the result he wanted.  He did it because among ALDC

3    applicants he agrees that Asian-American applicants are

4    admitted at a higher rate than white applicants.

5           That is why the first sentence of the plaintiff's

6    opening statement in this case is what you see on the screen.

7    The evidence in this trial will show that Harvard College

8    discriminates against Asian-American applicants, specifically

9    those applicants ineligible for Harvard's sizeable

10   professions for recruited athletes, the children of its

11   alumni, major donors, and its faculty.

12          As Your Honor recognized, Asian-Americans are not

13   only not being discriminated against in these categories,

14   they're actually being favored.

15          As Professor Card testified, for legacy applicants,

16   the largest component of the ALDC group by far, that

17   advantage is a statistically significant one.

18          That is a fact that Mr. Hughes tried deftly to

19   obscure in his statements this morning.  Were there any doubt

20   about Dr. Arcidiacono's motives for removing the ALDC

21   applicants from his file, that issue was put to rest when

22   Mr. Lee asked him about the early action applicants.

23          You may recall that Dr. Arcidiacono said that the

24   reason he removed ALDC applicants was their high admission

25   rates.

1          Now, early action applicants also have high

2     admission rates, between six and seven times higher than

3     regular applicants.  And in fact, Dr. Arcidiacono initially

4     excluded those applicants from his model for that very stated

5     reason.  But then he put those early action applicants back

6     into his model after he realized that Asian-Americans were

7     not being admitted at higher rates within that group.

8          He quite simply went looking across the data.  He

9     saw some groups where Asian-Americans did better than white

10    applicants.  He saw some groups where they did worse.

11         And rather than analyzing all of those groups

12    together, as Professor Card did, he decided to throw out the

13    groups where the Asian-American applicants did better.

14         That is unabashed data mining, and the result is

15    that because Dr. Arcidiacono excluded ALDCs from his

16    analysis, SFFA has no statistical evidence of discrimination

17    against Asian-Americans in the applicant pool as a whole.

18    Absolutely none.

19         The sole theory of discrimination that SFFA has

20    advanced is that Harvard discriminates against only those

21    Asian-Americans who are not athletes, not legacies, not on

22    the dean's or director's list, and not children of Harvard

23    faculty or staff.

24         As Your Honor's questions to Dr. Arcidiacono

25    recognized, that theory makes no sense.  If Harvard really

1    bore discriminatory animus or even implicit bias towards

2    Asian-American applicants, a premise on which SFFA's theory

3    depends, why would it discriminate against only

4    Asian-Americans who are not ALDCs?  That is a fatal weakness

5    in SFFA's case.

6            And indeed, if as it now appears from Mr. Hughes'

7    statement this morning, the plaintiff is relying only on a

8    theory of implicit bias in admissions, its concession that

9    admissions officers do not discriminate against ALDC

10   applicants renders that theory incoherent.

11           Now, before I move on, I want to address something

12   else we've heard from the plaintiff, which is the suggestion

13   that ALDCs are not as strong as other applicants or that

14   academic or other success matters less for their admissions

15   chances.

16           That is simply not true.  ALDCs as a group are

17   rated higher, much higher on every dimension in the data.

18           Now let me turn briefly to the issue of pooling;

19   that is, the question of whether it's proper to run a single

20   model for all six years of data or to model each year

21   separately.

22           Professor Card, as Your Honor will recall, ran his

23   model separately for each admissions cycle because that's how

24   the process works.  The applicants in each year compete

25   against other applicants in that year.  They don't compete

1    against applicants in other years.  And running a model

2    year-by year, Dr. Card explained, also allows him to examine

3    the effect of early action because for some years Harvard did

4    have early action.  For others it did not.  And with respect

5    to changes in the coding of parental occupation categories,

6    it also allows his model to see exactly what the admissions

7    officers saw in each year as opposed to a pool model which

8    does not.

9         Now, the only reason that Dr. Arcidiacono gives for

10   his approach is he says it gave his model more statistical

11   power or made it more precise.

12        But as you heard Professor Card explain, that's

13   just not true.  Professor Card doesn't just use his

14   year-by-year models, he also averages the results from those

15   models across all six years.  And when he does that, his

16   estimates are actually more precise and his model actually

17   has more statistical power than Dr. Arcidiacono's.

18        Let me turn next to the issue of omitted variables,

19   and I'll ask by -- I'll start by asking Your Honor to think

20   back to the hypothetical that Professor Card described on the

21   whiteboard about the likelihood that somebody will retire in

22   the next year.

23        The point that example was trying to illustrate is

24   that if a regression does not include every variable that

25   would affect the outcome, then you can't infer from any

1    regression estimate that the factor in question actually

2    caused the estimated change.  That is why it is so important

3    that Professor Card includes in his model so many of the

4    factors for which data exists.

5         By contrast, Dr. Arcidiacono did not.  He omitted

6    four factors:  intended career, parental occupation, whether

7    the applicant received a staff interview, and the personal

8    rating.  Those four factors have one thing in common.  They

9    turn out to make a big difference in the results.

10        Let me talk first about the parental occupation and

11   intended career.  Dr. Arcidiacono admits that parental

12   occupation and intended career are factors that are

13   considered by the admissions office.  They're on the summary

14   sheet.  And so here, too, by choosing to omit those variables

15   he was taking his model farther away from the actual process.

16        His supposed reason for excluding those factors was

17   the fact that some of the data vary from year to year.  But

18   other categories also vary from year to year, but

19   Dr. Arcidiacono did not exclude them.  He excluded those

20   other ones.

21        And as you heard Professor Card explain,

22   year-to-year variation is a commonplace feature of data like

23   this.  It is no reason to exclude these factors which the

24   evidence shows are important factors in the admissions

25   decision.

1          Now, Dr. Arcidiacono also excluded the fact of

2     whether an applicant had a staff interview.  His reason for

3     doing that was that ALDC applicants are more likely to

4     receive staff interviews than non-ALDC applicants.

5          But that's not a reason to exclude the factor any

6     more than it's a reason to exclude any other factor that is

7     correlated with ALDC status, because it is a reason to

8     include that factor so that the ALDC effect can be controlled

9     and because the fact of a staff interview does affect

10    admissions decisions.

11         The effect of pulling each of these variables out

12    of his model was that it allowed Dr. Arcidiacono to find an

13    increasingly negative effect of Asian-American ethnicity.

14         And now let me turn to the personal rating, which

15    it now appears is all of the plaintiff's case here.

16         Mr. Hughes has suggested that the differences

17    between average ratings of applicants by race indicates bias.

18    But as our demonstrative 10.10, which is on the screen,

19    shows, there are differences in all four ratings, and that

20    does not mean there is bias.

21         By removing the personal rating, Dr. Arcidiacono

22    was able to make the negative effect even greater.

23         Now, the personal rating has obviously been a focus

24    for both parties from the start, and the reason is that it is

25    important.  As you've heard from all of the admissions

1  officers, one of the things that they are trying to assess is

2  what type of classmate or roommate an applicant might make.

3  What qualities does she or he bring to the campus.

4       The admissions officers pour over essays,

5  recommendation letters, alumni interview reports, and other

6  materials in an effort to learn more about who the applicants

7  are.  The personal qualities expressed in those materials and

8  reflected in the personal rating and nowhere else are

9  critically important to deciding who will be admitted.  And

10  because the information reflected in the personal rating is

11  so important to the process, it makes a big difference to the

12  result of the model whether or not that rating is included.

13       Removing the personal rating means depriving the

14  model of a plethora of information about what admissions

15  officers actually consider.

16       But by removing the personal rating from his model,

17  Dr. Arcidiacono was able to find the Asian penalty he was

18  looking for.  There is no justification for removing it.

19       Both experts agree that if race is directly taken

20  into account in determining a variable, that variable should

21  be excluded in a model that is trying to assess the effect of

22  one's race.  That is why both experts excluded the

23  preliminary overall rating in constructing their models

24  because admissions officers have clearly stated that race

25  itself may be considered in that factor.

1          That is emphatically not true of the personal

2     rating.  Every single admissions officer testified that an

3     applicant's race itself is not considered when assigning the

4     personal rating.  That testimony was consistent and

5     undisputed.

6          The personal rating does not reflect the fact that

7     an applicant has self-identified as belonging to a particular

8     race.

9          The fact that admissions officers may consider

10    whether an applicant has overcome discrimination or other

11    things when assigning the personal rating is not considering

12    the applicant's race when assigning that rating.  It's

13    considering qualities such as the applicant's determination,

14    perseverance, grit, and many other personal qualities that

15    are revealed in that instance.

16         Now, Dr. Arcidiacono says he removed the personal

17    rating because he inferred that the rating itself reflected

18    bias against Asian-Americans.  To be clear, what he found was

19    that Asian-American ethnicity was associated with slightly

20    lower personal ratings on average.  He found on average a

21    negative correlation.

22         That is decidedly not the same thing as finding

23    that the correlation he observed could properly be attributed

24    to bias, as OCR's own report which noticed the same negative

25    correlation and nonetheless concluded that there was no

1    evidence of bias in the admissions process against

2    Asian-Americans.

3            Importantly, Dr. Arcidiacono also found that

4    Asian-American ethnicity was associated with better academic

5    and extracurricular ratings, controlling for the factors in

6    his model.  That means that his rating models show that

7    Asian-Americans are getting higher academic ratings, higher

8    extracurricular ratings than equally situated white

9    applicants, but slightly lower personal ratings.

10           The question is whether the correlations

11   Dr. Arcidiacono found in these ratings are attributable to

12   racial bias or just reflect factors that aren't controlled

13   for in the model.

14           So let's think for a moment about what it would

15   mean if the correlations really did reflect the consideration

16   of race.

17           As Mr. Lee showed you earlier and Dr. Arcidiacono

18   agreed, this means that admissions officers are giving

19   Asian-American applicants better ratings in the first two

20   boxes than can be explained by any data in the model.

21   Remember, it's the same admissions officer filling out all

22   four boxes.

23           Dr. Arcidiacono would have you believe that the

24   same admissions officer is deliberately -- or exercising some

25   stereotypical bias, deliberately giving Asian-American

1   applicants a better academic rating, a better extracurricular

2   rating only to move two boxes over and give them a worse

3   personal rating than the data can explain.

4          16 leading economists, including two Nobel Prize

5   winners and Janet Yellen, the former chair of the federal

6   reserve, agreed that that conclusion is nonsense.  They

7   explained in a brief to this Court, and I'm quoting,

8   "Dr. Arcidiacono's finding are implausible because they would

9   indicate that Harvard discriminates against Asian-American

10  applicants on one subscore only to turn around and

11  discriminate in their favor on two others.

12          "The better and more plausible explanation of these

13  findings," they conclude, "is that Dr. Arcidiacono's

14  regression models are simply not reliable enough to measure

15  most of the applicant qualities that drive Harvard's

16  assignment of these ratings."

17          And that indeed is the very interpretation that

18  Dr. Arcidiacono himself gave for the positive correlations he

19  found in his models of the academic and extracurricular

20  ratings.  He didn't attribute the better academic and

21  extracurricular ratings that admissions officers give to

22  Asian-American applicants as an Asian preference.  He said

23  simply that those better scores reflect factors that aren't

24  captured in the data.

25          And the reason he said that is because that

1    Asian-American applicants are stronger than white applicants

2    on measures of academic and extracurricular excellence in the

3    data like SAT scores.  As he explained, economists generally

4    operate under the assumption that observable characteristics

5    operate in a similar manner to unobservable characteristics.

6            So because he found that Asian-American applicants

7    were stronger on measures of academic and extracurricular

8    strength in the data, he assumed they must also be strong on

9    measures of strength in those areas outside the data which

10   would account for the positive correlations he found.

11           He was right about that.  Professor Card doesn't

12   disagree.  And Dr. Arcidiacono should have interpreted the

13   personal rating regression in the same way.

14           But instead, Dr. Arcidiacono interpreted the

15   negative effect of Asian-American ethnicity that he found in

16   his personal rating regression to be the result of bias.

17           Now, what reasons did he give for those

18   inconsistent interpretations?  He said that for the personal

19   rating, like the academic and extracurricular ratings,

20   Asian-American applicants are stronger on the factors in the

21   data that affect the rating.  So they're presumably also

22   stronger on the many factors admissions considers that are

23   outside the data.

24           That is just not true.  Asian-American applicants,

25   as Dr. Card painstakingly demonstrated, are not stronger on

the non-academic factors in the data that affect the personal rating.  Professor Card showed you slide after slide explaining how the data disproved Dr. Arcidiacono on this point.  He showed you that Asian-American applicants have weaker school support ratings, the teacher and guidance counselor ratings, than white applicants of equal academic strengths.

Those teacher and guidance counselor ratings inform the personal rating.  The same holds true if you add alumni ratings to the school support ratings.  Asian-American applicants do slightly less well than white applicants.  And he showed you that if you look across all of the observable non-academic factors in the model, Asian-American applicants are less strong than white applicants of equal academic strength.

Now let me reiterate.  Dr. Arcidiacono's explanation for why he concluded the personal rating was bias, why he threw it entirely out of his model, was his conclusion that Asian-American applicants are stronger on the factors in the data that inform the personal rating.

And he therefore inferred that only bias, not factors outside the data, could explain the negative association between Asian-American ethnicity and the personal rating.

But Asian-American applicants are not stronger on

1    the factors in the data that inform the personal rating.

2    Applying the same generally accepted economic principle that

3    he applied to the academic and extracurricular ratings, the

4    conclusion that Dr. Arcidiacono should have drawn, the one

5    that Professor Card properly drew, is that the explanation

6    for why Asian-Americans do less well on the personal rating

7    is not bias.  It is the many, many factors considered by

8    admissions that the model cannot control for.

9         But finally, as Dr. Card explained, let's just

10   suppose he is wrong about this and suppose that the

11   correlations that Dr. Arcidiacono found for the three ratings

12   actually are attributable to race, racial bias, or racial

13   stereotyping and not simply factors outside the data.  Would

14   the ratings have to be thrown out of the model?  The answer

15   is no.

16        You repeatedly heard Mr. Hughes tell you this

17   morning that the answer is yes.  That is just not correct.

18        As Professor Card explained, throwing out the

19   ratings would discard a great deal of helpful information

20   about the applicant that both experts agree is important to

21   the process.  Is the applicant a leader?  Does she offer

22   assistance to her peers?  Does he have a determined spirit?

23        Rather than throwing out that information, the

24   right approach is to simply remove the effect of race found

25   in Dr. Arcidiacono's models from the ratings, keeping the

1    remainder of the ratings intact.

2            When Professor Card did that and used the adjusted

3    ratings in his admissions model, the results were entirely

4    consistent with those of his main model.  He still found no

5    evidence of bias.

6            Now, let me emphasize two -- before I turn the

7    podium over to Mr. Lee, emphasize two additional points

8    regarding the personal rating.

9            Number one, Mr. Hughes and Dr. Arcidiacono hinged

10   their claim of personal rating bias on the charts that showed

11   that Mr. -- that Mr. Hughes showed again this morning,

12   comparing the personal ratings to the academic index.

13           But as Dr. Card explained conclusively, the

14   personal rating has almost no correlation at all to the

15   academic index or to academics at all.  And that is revealed

16   on, I believe, our demonstrative 65.

17           One additional point -- yes, here it is.  The

18   correlation that his misleading charts purported to show

19   between the academic index decile and the personal rating, in

20   fact, when revealed on the proper same scale shows almost no

21   correlation whatsoever between the personal rating and the

22   academic index or academics more generally.

23           Now, one additional point that Dr. Card raised

24   regarding the personal rating, and that is the fact that for

25   both the ALDC and the non-ALDC applicants, Asian-American

1    applicants have lower personal ratings than white applicants.

2    Mr. Lee touched on this, and let me just expand a little bit.

3         The difference in the gap on personal ratings

4    between Asian-American applicants and white applicants is --

5    not only exists in the ALDC group, it is greater for the ALDC

6    group.  In other words, the Asian-American ALDCs are farther

7    behind the white ALDCs in terms of the personal rating than

8    is true for the non-ALDC applicants.

9         That again drains any coherence from SFFA's claim

10   that the personal rating is the vehicle being used to

11   discriminate against Asian-American applicants.  It's simply

12   inconceivable to think that the personal rating is being used

13   as an engine for discrimination.  When Asian-Americans who

14   are ALDCs, a group that SFFA concedes Harvard does not

15   discriminate against -- that was Mr. Mortara's very first

16   sentence in this trial -- they are also getting even lower

17   personal ratings than their white counterparts.

18        Now, I acknowledge, and I'm sure both parties

19   regret the fact that a lot of data has been thrown at Her

20   Honor in this case.  But all you really need to take away is

21   that one expert was trying to model the process and the other

22   was not.

23        Professor Card is the expert who tried to model the

24   process.  The result was a durable finding that there was no

25   evidence of discrimination.

1           Dr. Arcidiacono, on the other hand, made choice
2    after choice after choice after choice designed to move
3    further away from the actual admissions process in order to
4    find evidence of discrimination.  His findings would not be
5    sufficient to support a finding of intentional discrimination
6    or discrimination even if they were reliable.
7           But they are not reliable.  They are manipulated.
8    Dr. Arcidiacono selectively, purposefully eliminated
9    legitimate factors in the admissions process in order to
10   suggest an illegitimate outcome.
11          MR. LEE:  I promise not to fold my arms.
12          Your Honor, now that Mr. Waxman has explained that
13   the evidence is not sufficient for SFFA to carry its burden
14   to show that Harvard is discriminating, let me turn to the
15   question of discriminatory intent.
16          Now, to state the obvious, if there was
17   discriminatory animus, why would it be directed only to
18   certain categories of Asian-American applicants?  Why would
19   athletes, legacies, dean's list, director's list, faculty
20   children, children of staff, Asian-American women,
21   Asian-Americans from California, why would they not be
22   discriminated against but others are?
23          Probably more importantly, where is the evidence
24   that shows that this bizarre scheme was implemented in any
25   intentional or even unintentional way.  We would suggest that

1    having seen the witnesses you've seen, you've seen the

2    opposite of intentional discrimination.

3              The officer, the admissions officers took the

4    stand.  They have testified unequivocally that they have

5    never witnessed any discrimination or bias in the admissions

6    process.  These admissions officers, everyone from Ms. Bever

7    who's been in the office for four years to, say, Mr. Banks

8    who's been there for closer to 40, described an open,

9    collaborative, iterative process designed to ensure that each

10   applicant gets a full and fair review.

11             Every one of the 40,000 applicants can be put back

12   into play at any point in the process.  Any admissions

13   officer can at any point in the process request that any

14   application be discussed.  And when they are, they're

15   discussed in subcommittee and committee openly with all of

16   the information, quantitative and qualitative, available to

17   everyone.

18             In fact, you heard Ms. Bever describe just what

19   happened with Ms. Sally Chen's application.  In the interests

20   of time I'm not going to go through the details, but it was a

21   wonderful example of the consideration of an application by a

22   group of people who ultimately came to the correct decision

23   and admitted Ms. Chen.  But it was only the result of an

24   iterative and open process.

25             This is not a process where discrimination and

1    racial animus could go unnoticed.  It is a process replete

2    with checks and balances.  It is a process that relies upon

3    transparency and open discussion.  It is a process that

4    relies upon 40 votes of individuals, many of whom Your Honor

5    saw and got to see testify.

6          Now, as part of this process, the admissions office

7    considers all the information available.  If the applicant

8    chooses to provide information about his or her race, that

9    fact is considered alongside all the other pieces of

10   information in the file.  Race is considered as one of many

11   factors.

12         For some competitive applicants, the tip of race

13   may make a difference.  The admissions officers were

14   consistent.  But race is never used to deny admission to

15   anyone.  Race is never a negative factor.  The admissions

16   officers don't think in Dr. Arcidiacono's terms of winners

17   and losers.

18         This very process was praised in *Bakke* by the

19   Supreme Court as an illuminating example.  Now, I understand

20   that SFFA thinks that this is somehow humorous or a joke, but

21   it's not.  It's law of the land.  They might want it to be

22   different, but it is our law.  This process is the same

23   process that was examined by the Department of Education's

24   Office For Civil Rights in 1990.

25         Now, SFFA has yanked from context a sentence here,

1    a sentence there, and tried to tie it to deposition testimony

2    and suggest something other than what the document says.

3              Your Honor has it.

4              What the document is, is this:  OCR reviewed 400

5    application files, they reviewed 2,000 application summary

6    sheets, they interviewed 10 admissions officers, and they had

7    data on 110,000 applicants and even did their own regression

8    analysis.

9              After all that, at the end of the document which

10   had the statements that Mr. Hughes relied upon, what did it

11   find?  Harvard did not discriminate against Asian-Americans.

12             Now, to be clear, OCR's analysis found, just as the

13   experts have found in this case, that there was on average a

14   slight difference in the personal ratings for Asian-American

15   and white applicants.  On average, Asian-Americans received a

16   slightly lower personal ratings, the difference between 25

17   and 20 percent.

18             But then, Your Honor, OCR did what SFFA didn't

19   bother to do.  OCR didn't just notice a negative coefficient

20   of Asian-American ethnicity and then say we assume bias.  It

21   conducted an audit of hundreds of admissions files, hundreds

22   of summary sheets, looking for actual evidence of bias.  It

23   found none.

24             They compared the ratings assigned to the

25   application materials they reviewed, and here's their

finding:  "Our comparison of the personal qualities ratings
to the supporting material in the applicant files revealed no
apparent inconsistencies between the ratings and the
underlying documentation."

That is the way to investigate a claim of bias, not
to simply jump to the conclusion that bias is the answer.

When OCR did the real work, it concluded, just as
Dr. Card did, that there is no evidence that this discrepancy
was the result of any discrimination.

To reiterate, Your Honor, they had the files that
Your Honor ordered produced.  They had the files for their
standing members.  If they wanted to do this audit to support
their claim, they could have done it.

Dr. Arcidiacono could have put those files into
evidence.  They did not.  And there's only one inference that
can be drawn from that is that those files would not support
the convoluted claim they're offering you today.

Now, Harvard's current admissions process is, in
general, the same process that's described as we said
repeatedly.  It's the same process that was examined again in
2001 when there was another complaint.  It's the same process
that was mentioned favorably in *Grutter*.  And it is largely
the same process today.

Now, confronted with this unbroken line endorsement
of Harvard's process over 50 years, where does that leave

1    SFFA?  It's left with the suggestion that Harvard's process

2    is not formulaic enough.  It's not specific enough.  They're

3    not stringent written directives.

4         I would suggest that if they had stringent written

5    directives, they would be making the other claim, which is

6    they're too mechanical and not flexible enough.

7         For two weeks, the plaintiffs asked admissions

8    officer after admissions officer about the fact that there

9    were no specific guidelines to take into consideration as

10   part of Harvard's whole-person review.

11        For the discovery period, Your Honor, which

12   extended though August 2014 and the class of 2019, everybody

13   testified consistently and it's consistent with the record.

14   There was nothing addressed in this specific issue.  At the

15   very end, the reading procedures for the class of 2023 became

16   an issue.

17        It is true that after SFFA sued, the admissions

18   office did not go out of business.  It is true that they

19   continued to review applications.  It is true, as Your Honor

20   learned yesterday, that every year the reading procedures

21   were revised.

22        And it's true that on October 5 of this year a new

23   set of reading procedures were issued that said that race can

24   be considered in the preliminary overall rating as one factor

25   among many but that it cannot be considered in the personal

1    rating.

2                It is nothing more than a codification of what Your

3    Honor heard the admissions officers testify had been the

4    practice before.

5                Now, I just want to say one additional thing about

6    the reading procedures.  For the first time today in this

7    case, there was argument that somehow the reading procedures

8    are relevant to liability.

9                Your Honor allowed the recall of witnesses to the

10   extent it might demonstrate some indication of a witness'

11   credibility.

12               Rule 407 precludes the very argument they made

13   today.  They cannot make that argument.  It's an argument

14   that is precluded by the rules of evidence that govern this

15   case.

16               But the reading procedures at the end are only a

17   small part of the admissions officer's training.  You've

18   learned a lot about it.  You've learned that the new

19   admissions officers receive training at the outset, that

20   their first 50 to 100 files are reviewed by another reader.

21   You learned about the casebook and the casebook guidance.

22               And we walked you through an example in the

23   casebook, two examples, one of a student named Grace, who is

24   on Slide 54, and one who is a student named Peter, on

25   Slide 55.

1          I'm not going to walk through them today because we

2     did it during the course of the evidence.  But the suggestion

3     that these casebook examples and the casebook guidance don't

4     provide the instruction on how to employ the multifactor test

5     is simply incorrect.

6          In fact, for all of us as lawyers, we largely learn

7     by case studies.  We learn from looking at specific case

8     studies and drawing conclusions from them.  That is precisely

9     what happens at the Harvard admissions office.  These are

10    real cases drawn from real applicants with their names

11    changed.  And then the casebook allows the admissions

12    officers to determine just how the multifactor test should be

13    applied.

14         The admissions officers also receive the

15    interviewer handbook which have the tips that they are to be

16    looking for.  And each year the entire office receives

17    training from the Harvard office of the general counsel

18    concerning the legal limitations on how race can properly be

19    considered in the admissions process.

20         And in addition, Your Honor, periodically the

21    office gives trainings like those discussed by Ms. Ray in her

22    testimony that provide information to admissions officers

23    giving the experience of students of color in the United

24    States so they have the benefit of their context of the

25    discussions.

1          It is through all of these materials and all of

2     this training and all of this collaborative work that the 40

3     individuals would do the admissions process come together to

4     vote and admit each of the incoming Harvard classes.

5          Now, the one thing that SFFA points to as evidence

6     of discrimination are the search lists.

7          It's a really -- respectfully, and I respect

8     Mr. Hughes a great deal.  It's a disingenuous argument.

9          The exhibit that they gave you has a top and a

10    bottom.  The bottom has the ACT cutoff levels.

11         As Dean Fitzsimmons testified, for people in Sparse

12    Country, particularly in rural portions of Sparse Country,

13    the ACT is the more common test.  On the very same document

14    that they claim is discriminatory, the ACT cutoff is the same

15    at 30.

16         And in the document that Dean Fitzsimmons talked

17    about that followed, we saw another year where the cutoff

18    actually for Asian-Americans was lower than whites in Sparse

19    Country.  This is no evidence of discriminatory intent.

20         So let me now turn to a big focus of what SFFA has

21    focused on, and that's OIR.  Now, to be clear, Your Honor,

22    this has been a moving target.  And I think the fact that

23    it's been a moving target speaks volumes.

24         In opening statements, SFFA showed you these pages

25    from Exhibit 9.  They pointed you to these two slides in

1   opening.  These are the same pages that SFFA cross-examined

2   Mr. Hansen about.

3          And in opening, this is what SFFA said about these

4   pages.  "Harvard's own researchers told Dean Fitzsimmons that

5   there was a statistically significant penalty on

6   Asian-Americans applying to Harvard," referring to these

7   specific pages.

8          We now know that's simply not true.  Dean

9   Fitzsimmons never saw these pages.  That is undisputed.

10          Mr. Hughes's conjecture about other evidence that

11   might have indicated that he did is simply that.  The

12   information on the very slides that was the core of their

13   opening never got to the dean.  Period.

14          Now, there are models that were, in fact, shown to

15   Dean Fitzsimmons, and Your Honor has seen them and we've

16   talked about them repeatedly.  The work that OIR did was work

17   regarding the demographics of Harvard's admitted class, and

18   it was to be sure, in part, prompted by the Unz article.

19          That article, as Your Honor now knows, was very

20   controversial.  It criticized people of all ethnic,

21   religious, and racial backgrounds equally.

22          As Dean Fitzsimmons explained, he heard from many

23   alumni who were particularly upset and concerned about the

24   deeply anti-Semitic comments in the article.  Many of the

25   privilege log entries are dealing not with just

1    Asian-American penalties on their face, but the Unz article,

2    and the Unz article had broader implications.

3          Now, OIR did do some work.  And what it found, as

4    Your Honor now knows, is that Model 1 demonstrated if

5    admissions decisions were based only on academic factors, the

6    admitted class would have a higher percentage of

7    Asian-American students than it does.  No one has ever

8    disagreed with that or disputed that.

9          Models 2 and 3 show that the more factors that are

10   added, the representation -- the more factors that are added

11   results in the representation of Asian-Americans decreasing.

12   No one has ever disputed that as well.

13         Now, Model 4 got a lot of attention, but I think at

14   the end of the day we realize that that model itself is a

15   little circular.  Its input is demographics, its output is

16   demographics, and that's the reason, as was explained to Your

17   Honor, that the results are so close to the actual class.

18         But as Dean Fitzsimmons said, when he saw this, it

19   was not inconsistent with what he understood before, which is

20   if it were just grade point averages and board scores, there

21   would be more Asian-Americans.  He's never disagreed with

22   that, and he said it on the stand.

23         But he also said that the more factors you add

24   in -- and this is only a handful of factors -- the closer you

25   get to the class that Harvard has.

1          Against the backdrop of *Bakke*, the OCR

2     investigation, the second OCR investigation, and everything

3     else that had occurred, this didn't tell Dean Fitzsimmons

4     something that he didn't know before.  And as he's testified

5     and as even Mr. Kahlenberg, their expert, has acknowledged,

6     Dean Fitzsimmons has a reputation for having been a pioneer

7     in opening up the admissions office of educational

8     institutions to people of different ethnicities and different

9     socioeconomic backgrounds.

10          The idea that he would take this and have an alarm

11     bell go off and do nothing is simply implausible.

12          In fact, what he did do is in late 2013 he asked

13     OIR to do an analysis to confirm that the admissions office

14     was giving a tip to low-income applicants.  He got that.

15          But then he went another step.  After receiving

16     that analysis, he specifically asked for follow-up regarding

17     whether the tip for low-income applicants was being applied

18     consistently across all racial and ethnic groups.  The answer

19     was it was.

20          In fact, the results showed that Asian-Americans

21     were getting as large a tip for being low income as almost

22     any group.  As Slide 64 demonstrates, the admit rates for

23     low-income Asian-Americans was 10 percent as compared to

24     7 percent for non-low-income Asian-Americans, a 3 percent

25     increase.

1          Now, we can quarrel about who got the larger

2     increase and who didn't, but this is just another place that

3     demonstrates the illogic in SFFA's claims.  If Harvard were

4     trying to discriminate against Asian-Americans, why would it

5     give the largest percentage tip to low-income

6     Asian-Americans?

7          Now, SFFA has suggested Dean Fitzsimmons should

8     have done more, that he should have commissioned or requested

9     the full analysis that Dr. Card has now done.

10         There are three responses to this.  Dean

11    Fitzsimmons testified that he has been vigilant about

12    ensuring that his process is not infected by bias and

13    discrimination.

14         When he got this information, he knew that what he

15    needed to do was to continue what he had done before, and he

16    told you that he did.  No one suggested to him that these

17    results showed discrimination.  No one suggested that these

18    results proved discrimination.  No one involved in the

19    process sounded the alarm bell that SFFA seems to think

20    should have gone off.

21         The second thing is that to the extent SFFA wants a

22    more thorough analysis, it's been done now.  It was done by

23    Dr. Card.  And Dr. Card concluded that there is no evidence

24    of discrimination against Asian-Americans.

25         But the third is this:  This effort to cobble

1    together a line from a deposition here, a line from a

2    document here over a period of 10 or 15 years and suggests

3    that, ah-ha, this is evidence of intentional discrimination

4    just doesn't work.

5         This is Monday morning quarterbacking looking back

6    at a series of events that occurred before and saying I can

7    ignore the context, I can ignore what the dean knew.

8         I can pull out a sentence or two here and say he

9    should have done more.  Or he should have done more, even if

10   they're right, isn't intentional discrimination.

11        Let me briefly address two issues that the

12   plaintiff has raised late in the trial.  The first is

13   implicit bias.  Mr. Waxman and I both touched on this.  Let

14   me say three things:

15        First, there was no evidence to suggest that anyone

16   in Harvard's admissions office harbored any implicit bias

17   against Asian-Americans.  There are experts in implicit bias.

18   We didn't hear one.  The only person to basically bring

19   together the implicit bias case was Mr. Hughes.  But that's

20   insufficient to carry their burden of showing implicit bias.

21        Second, the claim makes no sense.  How do you

22   implicitly bias yourself against some Asian-Americans but

23   implicitly or explicitly bias yourself in favor of other

24   Asian-Americans?  If it sounds like it doesn't make sense,

25   it's because it doesn't.

1            Now, third, the law that they've showed you

2    actually is incorrect.

3            Mr. Hughes put on the screen a citation from the

4    *Columbus Board of Education v Penick*.  He argued that actions

5    having a foreseeable despaired impact are relevant to proving

6    an unconstitutional purpose.

7            What you didn't hear, Your Honor, is on the very

8    same page of that case, at 443 U.S. 464, the Supreme Court

9    reemphasized that disparate impact in foreseeable

10   consequences without more do not establish a violation.

11           And the court, the Supreme Court, made the very

12   same in the same year in *Massachusetts v Feeney*.  There

13   aren't slides because we didn't quite know this was coming

14   up, but it's 442 U.S. 254 where the Supreme Court stressed

15   that intentional discrimination occurs only when the

16   decision-maker acts -- and I now quote -- "because of, not

17   merely in spite of, adverse effects on an identifiable

18   group."

19           In other words, it's not enough for SFFA to show

20   Harvard might have been aware of differential outcomes or

21   even that someone has suggested that they could be

22   differential outcomes.  SFFA needs to prove that Harvard

23   acted for the deliberate purpose of obtaining that result,

24   and they cannot do that.

25           The last point, Your Honor, on intentional

1    discrimination is this:  I want to turn to the attack on the

2    credibility that we've heard this morning of the Harvard

3    leadership, of the Harvard admissions officers, and near as I

4    can tell, Harvard's lawyers.

5           There's an old saying among trial lawyers, which

6    Her Honor as heard before, if the facts are on your side,

7    argue the facts.  If the law is on your side, argue the law.

8    If you have neither the facts or the law, attack, attack,

9    attack.

10          And that's what we've had today and for three

11   weeks.  It's what the plaintiff has done at every turn.  It

12   is easy to attack when you yourself are never going to get on

13   the stand and be cross-examined.  It has attacked Harvard, it

14   has attacked Harvard's witnesses, and apparently now counsel.

15          But, Your Honor, again, if you trace the history,

16   the attacks speak volumes themselves.  In its summary

17   judgment filings, the plaintiff accused Dean Khurana of

18   killing the work done by OIR, and I quote, "burying the

19   reports."  But as Your Honor now knows, it turns out not to

20   be true.

21          At the pretrial conference, the plaintiff claimed

22   that President Faust's credibility was in doubt and could not

23   be trusted because of a statement she made about Jewish

24   discrimination in the 1920s.  That too was a meritless attack

25   on the reputation of a dedicated academic leader.

1            It alleged that Dean Smith led a sham committee, to

2      quote them.  I think the evidence demonstrates that's false

3      as well.

4            And then yesterday it was the suggestion that

5      Marlyn McGrath didn't bring out facts about the October 5

6      email and reading procedures, reading procedures that are

7      good for Harvard, that demonstrate in this case which

8      requests only prospective relief that Harvard is acting just

9      as it said it has acted.

10            And you've heard the plaintiff attack Dean

11      Fitzsimmons, whom SFFA has accused of intentionally

12      discriminating against Asian-Americans.

13            Now, before SFFA was formed, before *Fisher* 2 was

14      law, Mr. Kahlenberg actually had something to say about Dean

15      Fitzsimmons.  And what did he say?  He said, "This is a

16      leader in higher education who has," and I quote, "worked

17      doggedly to open the doors of higher education to individuals

18      from a broader range of racial and ethnic background."

19            This is the person they're now attacking.  As

20      President Faust said yesterday, no one in the 15 years that

21      she's been working with Dean Fitzsimmons has ever questioned

22      his honesty, has ever questioned his integrity, has ever

23      questioned his truthfulness.  No one until SFFA decided to

24      make its claims.

25            Your Honor saw the witnesses.  The credibility of a

1    witness is not determined by how many times I can impeach a

2    witness with a deposition.  Certainly two times doesn't make

3    a lack of credibility.  It depends upon their overall

4    testimony and the manner in which they communicated to you.

5              Your Honor saw it.  We trust Your Honor's

6    assessment of the credibility of these folks.  They were

7    honest.  They were straightforward.  They admitted when

8    things weren't good for us.  They were clear when things were

9    good for us.

10             The attack on the credibility is just an effort to

11   cobble together and support an illogical claim.

12             Now I am going to briefly address the other claims

13   that Mr. Hughes didn't.  Let me say this on racial balancing.

14   Slide 66 has the legal framework, and I'm not going to go

15   into it.

16             This claim in some ways is easier to resolve for

17   this reason.  If we just look at the experts on racial

18   balancing, Dr. Arcidiacono conceded that he had an opinion in

19   his report on racial balancing.  He conceded that he was not

20   giving that testimony in this case, and he didn't.

21             So as a consequence, the only expert to testify on

22   this issue of racial balancing was Professor Card, who showed

23   you what is now Slide 67, DD 10.100, which showed that there

24   had been significant variations year to year in the racial

25   composition of Harvard's admitted students.

1          As Professor Card put it, if Harvard is trying to

2     racially balance year to year, it's not doing a very good

3     job.  There are significant variations year to year.  And,

4     Your Honor, this is precisely what you would expect from the

5     process that I've described to you and that you've heard

6     about repeatedly.

7          When you look at the side by side -- when you look

8     side by side at the composition of the applicant pool on the

9     left-hand side of Slide 69 and the admitted class pool on the

10    right-hand side, the composition of the admitted class has

11    fluctuated more than the composition of the applicant pool.

12    That's exactly the opposite of what you would expect.

13         Now, I think the argument that should be made here

14    on rebuttal is about the one-pagers.  I'm just going to say

15    this:  During the course of the examination of Elizabeth

16    Yong, there was a demonstrative instruction that had a series

17    of one-pagers, and the suggestion seems to be that's too many

18    one-pagers.  That doesn't make a racial balancing claim.

19         The one-pagers, as Your Honor now knows, if we go

20    to Slide 70, contain more information than just race.  They

21    have information about gender and geography, intended major

22    and race.  The one-pagers are not used, if I move to

23    Slide 72, to set quotas or floors on any group, racial or

24    otherwise.

25         On this point, Harvard's evidence is

1    uncontroverted.  Each and every one of the officers who came

2    to court, as shown in Slides 73 and 74, testified that there

3    are no targets, there are no floors.

4            Instead what the undisputed evidence demonstrated

5    was that these one-pagers are distributed to three people --

6    Dean Fitzsimmons, Director McGrath, and at the time Sally

7    Donahue -- during the course of the process so that they can

8    evaluate the likely yield of the class.  To the extent the

9    information is useful, it's communicated orally to the

10   admissions officers during the full committee process.

11           But as Your Honor now knows, at the tend of the

12   process in every admissions cycle, in every year, if I go to

13   Slide 76, the committee goes through the lop process.

14           And they've been directed explicitly by Dean

15   Fitzsimmons in a memo written to guide them.  I doubt he ever

16   thought it would see the light of day in a federal

17   courthouse.  What he says is at the end of the day, at the

18   end of the day the quality of the case is what counts.

19           Now, I'm just going to very quickly address race is

20   more than a plus factor.  I don't think there's any dispute

21   about what *Grutter* and *Bakke* says.  Race can be used.  It can

22   be used as a plus factor.  It can be used as a tip.

23           Now, this is interesting particularly given that

24   the fundamental predicate of Dr. Arcidiacono's opinion is

25   that a tip for someone is a penalty for someone else.

1           Harvard's process, Harvard's admissions process

2     meet the standards set forth on Slide 77.  In that process,

3     race may be a factor to a particular candidate's admission.

4     It is never the factor.  Tips for race come into play only

5     for candidates that are otherwise highly competitive.

6     Candidates who are qualified and not just academically, but

7     across a wide series of dimensions.

8           Once again, the testimony to Your Honor was

9     consistent.  Race can make a difference, but it's just one of

10    many tips in the process that can make a difference.

11          And, Your Honor, if I would bring you to Slide 80,

12    the data confirmed that.  First the experts agreed that race

13    does not make a difference in the admissions decision for a

14    majority of applicants.  A large number of applicants to

15    Harvard would be rejected without ever having their race

16    considered.  And there is a group that are so qualified

17    they'll be admitted without the race being considered.

18          Second, if I move to Slide 81, Your Honor, when

19    race does come into play, it's only for applicants who are

20    highly qualified and highly competitive.  This is the chart,

21    and it demonstrates that race matters but only to candidates

22    who have a high probability of admission to begin with.

23          Now, Your Honor, to be sure, there are some

24    African-American applicants for whom the tip of race can make

25    a difference.  And I want to pause here for a minute to

1    emphasize something that at least to me personally is very

2    important.

3            Contrary to Dr. Arcidiacono's charts and

4    implications, all the students that are admitted to Harvard

5    are qualified.  All the African-American students admitted to

6    Harvard are eminently qualified, all the Hispanic students

7    are eminently qualified, and so too are the Asian-Americans

8    and whites.

9            The suggestion that African-American and Hispanic

10   students at Harvard are somehow less qualified or were

11   admitted only because they got a tip of race is not true.

12   It's actually offensive.  For highly competitive candidates

13   race can make a difference, but only if you have many other

14   factors that get you there first.  Dr. Card explained that

15   yesterday.

16           Every dimension of the candidate matters.  Multiple

17   dimensions matter.

18           The fact is that Harvard's pool is, fortunately for

19   Harvard, highly competitive on many dimensions.  In this

20   competitive pool, the presence of any additional factor,

21   including race for some candidates, can make a difference.

22           Lastly, race-neutral alternatives, which Mr. Hughes

23   didn't address.  So let me try to summarize our position so

24   Your Honor has it.  And we'll brief it more fully.

25           First, the process.  While there was some

1    discussion of the Ryan committee, my bet is you've heard more

2    about the Ryan committee than you might want to hear.  So

3    let's talk about the committee that did do the work.

4            I would say this on the Ryan committee:  The idea

5    that you have a committee and then you get sued and someone

6    is making precisely the claim that the committee is going to

7    consider, suspending the work of the committee is not a

8    illogical thing to do.

9            But the committee was -- for the college was

10    reconvened later, and it had three people:  Dean Smith, Dean

11    Khurana, Dean Fitzsimmons.  They were the right people for

12    the job because they were the people responsible for

13    precisely the alternatives that might be considered.

14            Dean Smith described to you the work of the

15    committee.  They met seven times.  They worked outside of the

16    committee room.  They reviewed literature.  They reviewed

17    expert reports from this case.  They considered and evaluated

18    every race-neutral alternative Mr. Kahlenberg proposed and

19    more.  They considered, for instance, elimination of the

20    consideration of SATs.

21            And at the end, it was the judgment of these three

22    senior leaders of Harvard, after looking at all of this

23    material, after looking at simulations from both expert

24    witnesses, that at this time race-neutral alternatives could

25    substitute no -- no race-neutral alternative could substitute

1    for the consideration of race as one consideration among
2    many.
3              They looked.  They reached this conclusion by
4    looking at what would happen in those simulations.  Not just
5    to racial diversity, Your Honor, but to all kinds of
6    diversity on the Harvard campus and what it would do from an
7    intellectual and excellence point of view.
8              And they found that the plaintiff's suggested
9    alternatives resulted in decreases in the student body
10   excellence, decreases in diversity, decreases that were
11   simply not acceptable to Harvard.
12             Now, as Your Honor now knows, Harvard has had a lot
13   of experience with race-neutral alternatives.  It addressed
14   the issues with the Supreme Court back as far as *Bakke*.  Dean
15   Fitzsimmons is one of the people who has been working on
16   race-neutral alternatives for socioeconomically disadvantaged
17   folks.
18             Here is what I referred to earlier on Slide 88 that
19   Mr. Kahlenberg said in 2010, four years before the complaint
20   was filed, about what Dean Fitzsimmons has done.
21             You've also heard about the Harvard financial aid
22   initiative.  You've also heard about the extensive
23   recruitment effort, including the efforts to recruit
24   Asian-American students.  You've heard about the increase in
25   tenured faculty on the campus, Asian-American tenured faculty

1   by 50 percent.

2          Now, Mr. Kahlenberg was the one witness who came in

3   to address this issue.  He's never worked in a college

4   administration.  He's never implemented a minority

5   recruitment program.  He never implemented a financial aid

6   program.  He never worked in a college admissions office.

7   He's never been retained by a college or university anywhere

8   to consult on any of these things.  But he said, I've got

9   some alternatives for you to consider.

10         But Harvard has considered financial aid in its

11  expansion.  Harvard has considered eliminating early action.

12  Harvard has increased its effort to recruit socioeconomically

13  disadvantaged students.  Harvard has increased its efforts to

14  recruit students of color.

15         With all this backdrop, Dean Smith's committee

16  determined that the impact of the simulations which would

17  have resulted in a decrease in African-Americans on campus by

18  close to 40 percent was unacceptable.

19         Now, I want to say just another word or two about

20  Mr. Kahlenberg.  Mr. Kahlenberg was paid to consult on the

21  complaint in this case.  He was paid to work on a complaint

22  that alleged that Harvard should be using race-neutral

23  alternatives instead of race.

24         As Your Honor now knows, the day after the

25  complaint was filed, before Harvard had even been served,

1    he's giving an interview and he's pronouncing judgment that

2    Harvard should lose.  This is not the work of an independent

3    expert.  It's not the work of someone who's gone through a

4    deliberative process.  It's the work of an advocate.

5            He had a result in mind when the complaint was

6    filed.  He had a result in mind the next day when he gave his

7    interview.  And by coincidence, his opinion four years later

8    happened to be the same one he gave to Fox News.

9            Now, what do we know about his opinion?  We now

10   know that, to Mr. Kahlenberg, considerable racial and ethnic

11   diversity means a decrease of African-American representation

12   on the Harvard campus by at least 30 percent.

13           And, Your Honor, as you go back to this, we would

14   ask you not to be fooled by his charts.  What he did is he

15   grouped African-Americans and Hispanics in an effort to show

16   that the decrease was less than might worry folks.  Only if

17   you separate out the two do you see the true implications for

18   what he is suggesting.

19           To be clear, a drop of 14 percent to 10 percent

20   would mean 340 fewer African-American undergraduates on the

21   Harvard campus.  Now, Dean Smith told you that he could not

22   overestimate the harm that change would have to the student

23   experience.

24           But, Your Honor, you don't need to take Dean

25   Smith's word for it, and I wouldn't take his word alone.

1          Because we heard from the students themselves.  We
2     heard from the students who are living diversity every day.
3     We heard them tell us the importance of the current levels of
4     diversity.  And even with those levels of diversity that have
5     increased in the last decade or two, there are still feelings
6     of isolation, discomfort, and the lack of inclusion.
7          The impact that the plaintiff's alternatives, as
8     they call them, would have on these students, if they even
9     got to remain on campus and be part of the student body,
10    would be, to quote one of the students, devastating.
11         Let me conclude our closing, Your Honor, as I did
12    our opening.  Then I reflected on how much had changed since
13    I walked into this District Court for the first time 42 years
14    ago.  That change was manifest in the courtroom that day.
15    That change was manifest when the students came to testify.
16    That change is manifest in the crowd behind me today.
17         The demographics of those here with us today as
18    this trial ends reflect the enormous progress we have made in
19    becoming a more diverse and inclusive society and community.
20         The plaintiff wants to turn back that clock.  The
21    plaintiff thinks, as they told us under oath, in terms of the
22    efficient allocation of minority students and winners and
23    losers.  Those are not my words, Your Honor.  Those are the
24    words of Dr. Arcidiacono, winners and losers.
25         But the institutions and people who have

1    contributed to the enormous progress and the positive changes

2    that we witnessed in this courtroom and that we see on the

3    university campuses today don't think in terms of winners and

4    losers.

5            They are thinking, as President Faust told you

6    yesterday, about taking steps to ensure that everybody is a

7    winner; that our communities win; that societies win; that

8    it's not a situation like Dr. Arcidiacono would like to have

9    where whites and Asian-Americans are winners and

10   African-Americans and Hispanics are, to use his term, losers.

11           Dr. Simmons put it the best, and I would just quote

12   her.  "How can we imagine a world in which we are not

13   creating leaders and citizens who have the capacity to

14   mediate differences?  I cannot imagine it.  And so it's with

15   great conviction that I say that we must continue to offer

16   diverse undergraduate education to our young people to save

17   our nation."

18           The wolf of racial bias is indeed at our door.  We

19   ask the Court to turn the wolf out.  As we said, much

20   progress has been made.  There remains much to be done.

21           Thank you, Your Honor.

22           THE COURT:  All right.  Thank you all.  We will

23   break for lunch.  How long a break would you all like?

24           MR. MORTARA:  However long works for Your Honor.

25   30 minutes works.

```
1              THE COURT:  Why don't we come back how about at
2     like -- let's just make it 1:30.  We probably only have about
3     an hour left, right?
4              MR. MORTARA:  We only have 20 minutes.
5              THE COURT:  We have two more after you.
6              MR. MORTARA:  Plus the 30 from amici.
7              THE COURT:  About an hour.  Let's come back at
8     1:30.  That will give everyone a break.
9              (Court recessed at 12:38 p.m.)
10             THE CLERK:  Court is in session.  Please be seated.
11             MR. MORTARA:  Your Honor, I have a couple of
12    additional slides for you here.  Your Honor, you'll know when
13    you get to those.  There's only two.
14             THE COURT:  You're going back to the first
15    notebook?
16             MR. MORTARA:  Yes, sure.  I might use some of
17    Harvard's, but we'll muddle through.
18             THE COURT:  Do you have that microphone on,
19    Mr. Mortara?
20             MR. MORTARA:  I believe it is.
21             THE COURT:  When you're ready.
22                   PLAINTIFF REBUTTAL CLOSING ARGUMENT
23             MR. MORTARA:  Thank you, Your Honor.  It's been
24    three weeks since I was here in front of you the last time,
25    and it's been an experience, to say the least.
```

1          I want to just briefly begin with the class of 2023

2     reading procedures and Mr. Lee's late assertion of Rule 407.

3     That was waived when they relied on it.  We will brief it.

4     Rule 407 has been waived here.

5          The law is absolutely clear that application of

6     racial stereotypes is intentional discrimination, and that is

7     our claim.  And we heard that sort of bias over the weeks,

8     suggestions that Asians are one-dimensional or just book

9     smart or are recent arrivals, as Mr. Hughes pointed out.

10          I want to address first the supposed

11     inconsistencies as to racial stereotyping with respect to the

12     ALDCs.  Yes, the evidence is the ALDC Asians received

13     somewhat lower personal ratings than white ALDCs.  That is

14     absolutely consistent with the idea that racial stereotypes

15     are at work.

16          But we don't see discriminations in admissions

17     outcomes.  That's what discrimination means.  You were denied

18     admission.  Lower personal scores, but they weren't denied

19     admission, at least not in a statistically significant sense

20     in the small population of Asians that are ALDCs.

21          Why is that?  No one has ever said that Harvard

22     wants zero Asian-Americans on campus.  That's not their goal.

23     They just don't want overrepresentation, too many.

24          If you're going to let in some Asian-American

25     students, where do you pick first?  You go to your donor

1      base, the children of your alumni, the children of your major

2      donors.  So it makes sense that being a legacy overcomes the

3      personal rating hit that the Asian-Americans ALDCs take

4      because of racial stereotyping.

5              I'm going to put up on the screen a slide that the

6      defendants used.  Here you see very high marginal effect for

7      the lineage applicants.  You see 30 percent boost, over

8      30 percent boost when they're in the higher chances of

9      getting in.  Very high effects that swamp out the minor

10     effect or the more minor effect, if you will, of the personal

11     rating hilt.

12             And there's been some suggestion that you can't

13     make a claim of discrimination as to a subgroup, as if

14     there's something wrong with that.  I think Your Honor may be

15     familiar with or we will make you familiar with, through the

16     briefing, the so-called sex-plus case law where subsets of

17     women are discriminated against because they have children or

18     because they behave in a gender nonconforming way.  That's

19     the PriceWaterhouseCoopers case.  We will get to all that in

20     briefing.

21             But it absolutely is possible to discriminate on

22     the basis of race against a subset just like it's possible to

23     discriminate on the basis of sex against a subgroup.

24             I want to get back to what matters, which is the

25     personal rating.  Dr. Card admitted that if you take the

1    personal rating out of his model, both his model from his

2    opening report and his model from his rebuttal report -- we

3    walked through these numbers in the transcript; that's the

4    extra slide I just gave you, Your Honor -- he admitted that

5    you find a statistically significant Asian penalty.

6              He admits that if race is involved, you've got to

7    take it out.  We've proven race is involved in the personal

8    rating.  Take it out.  Statistically significant penalty.

9              But let's deal with his proposed alternative first

10   that Mr. Waxman talked about, the virtual ratings analysis.

11             This is where he tried to remove race from the

12   academic and extracurricular and personal ratings.  But

13   Dr. Card admitted that race isn't what causes the observed

14   difference in academic and extracurricular ratings.  He did

15   that under oath when I was talking to him.

16             And just to be clear, you don't think race is

17   influencing the academic or extracurricular ratings, right?

18             ANSWER:  I think the most likely -- correct, my

19   most likely explanation is unobserved characteristics.

20             This is day 14 at 87.

21             And then Professor Card admitted he didn't even

22   finish the job on his virtual ratings analysis because

23   Professor Arcidiacono had pointed out that race affects the

24   overall rating and that race affects the teacher ratings as

25   well.

1          And yet when I asked him, on the very next page,

2     page 88, Professor Card said -- I said:  You were here when

3     Professor Arcidiacono talked about his findings that race

4     influenced those ratings, weren't you?

5          He said he was here.

6          Your modified rating analysis did not deploy the

7     teacher ratings, didn't change them.

8          Correct?

9          And one other thing about your virtual rating

10    analysis, the overall rating, you didn't use that either?

11         No.

12         So you either have to have it one way or the other.

13    You do it the way he said it in his first report, which is

14    that race influences the personal rating.  You yank it out

15    just, like you did with the overall rating, or you do a

16    complete virtual ratings analysis where you remove the effect

17    of race from all the ratings.  He did not do that.  He didn't

18    even try.  He did half a loaf.  And just like the SAT, your

19    first answer is best.  Pull the rating out if race influences

20    it.

21         And I want to get a little bit to this idea that

22    there's something funny about Professor Arcidiacono's

23    analysis because the same reader is giving Asians a boost on

24    academic and extracurricular and then punishing them through

25    racial stereotyping on the personal score.

1          That's not true, and Professor Arcidiacono

2     explained as much.  He pointed out that unobservables track

3     the observables.  So what you see on the right with the

4     academic and EC ratings is what Professor Card admitted to.

5          All the bumps and arrows, the observable goes in

6     one direction, the race influence goes in the same direction.

7     You see it on the right.

8          On the left you see the opposite effect in the

9     overall rating and the personal rating.  You see the

10    observables go one way for Asian-Americans in the overall

11    rating, but they go -- but the coefficient goes the other

12    way.  That's what's proving the Asian penalty.

13         And simultaneously you see it for African-Americans

14    and Hispanics, proving the existence.

15         Tips, the tips that are admitted in the overall

16    rating.  And Harvard has still -- despite the fact Mr. Hughes

17    was talking for a while about it, Harvard has still said

18    nothing about the tips that are blatantly apparent in the

19    personal rating.

20         I want to go there now and talk about Harvard's

21    denials that race is used in the personal rating.

22         Mr. Hughes went over OCR and Mr. Looby and the

23    comparison between that evidence and what Harvard's witnesses

24    said in court.

25         I want to also point out what Director McGrath said

1  to me the first time she was here.  I talked to her about a

2  bunch of people that worked in the admissions office, and I

3  said, Do you know whether this person had used race in the

4  personal rating?

5  She said she didn't.  One of the reasons she didn't

6  is that they didn't have any written guidance.  No one could

7  be sure what anyone was doing.  I rattled off 29 people or

8  something from the spring of 2011 in our dataset, in our

9  dataset those people, 29 of those people are gone.  And

10  Director McGrath had no idea whether they used race in the

11  personal rating.  One reason she had no idea is because no

12  one had written anything down about how to do it.

13  We've shown you the data where African-Americans

14  and Hispanics trounce whites and Asians in the personal

15  rating.  Harvard has yet to explain how it is that racial

16  preferences are not being applied in the personal rating.

17  And Mr. Hughes showed you those stunning differences in his

18  slide and showed you the same pattern as the personal rating.

19  That was Slide 19 or 6.  I can't tell.  I think 6.

20  All Harvard and Professor Card want to talk about

21  is admitted variable bias and how it might explain the

22  differences between whites and Asians.  You've heard

23  absolutely nothing about African-Americans and Hispanics with

24  respect to the personal rating.

25  And that's important both because if you pull the

1    rating out, we win, but also because Harvard's failure to

2    dispute the African-Americans and Hispanics get tips proves

3    that Harvard isn't telling the whole truth about the use of

4    race in the personal rating.

5            If Harvard dissembles and says race is not used at

6    all and we can see that it is, how can we trust them when

7    they say that stereotyping is not lowering the personal

8    ratings of Asians?

9            And I want to just briefly go through Dr. Card's

10   histograms.  I'm showing you DD 10.69.  I'm trying to show

11   you DD 10.69.  These histograms were used.  And I don't know

12   if you notice, this is the school support.  This is

13   Dr. Card's cherry-picked set of observables.  Not all of

14   them.

15           Mr. Waxman said all.  It's not.  I don't know if

16   you noticed, he never put African-Americans or Hispanics on

17   these charts, never once.  Because if he did, he would see

18   that his cherry-picked observables do not explain that

19   African-Americans and Hispanics do significantly better than

20   whites on the personal rating.  He never once did it.

21           And Harvard only has one document, the backup

22   document to Dr. Card's slides, Defendant's 692.  This is the

23   only document anywhere where they compared anything that

24   might be related to the personal rating for African-Americans

25   and Hispanics.

1          And when you take a look at it, Your Honor, you can
2     see that in any of these quadrants there is absolutely no
3     explanation when you look at these percentages for why
4     African-Americans and Hispanics do better than whites.  They
5     do about the same or sometimes a little bit worse than
6     Asians.  They never do better than whites.  These data do not
7     explain the racial distribution in the personal rating.  And
8     that's because they don't use all the observables.
9          Professor Arcidiacono created a model that used
10    more of the data.  You see this here in Plaintiff's
11    Demonstrative 40, which I used with Professor Card.  Model 5
12    has all the ratings in it, has the teacher ratings, has the
13    school support, has the alumni interview ratings.
14         And then Professor Card went out and he added every
15    single variable he could possibly find, and he still couldn't
16    make this go away.  He couldn't make the gap disappear.  He
17    told me it was statistically significant.
18         So when you combine on one hand evidence from OCR
19    through the 2012 Harvard letter to OCR saying some readers
20    use race in the personal rating with Mr. Looby telling the
21    truth at his deposition before he spent ten days getting
22    prepped to testify here, and then with Director McGrath's
23    testimony that she had no idea how these 29 people who had
24    left the admissions office who were applying the ratings that
25    are in our dataset used race or not in the personal rating.

1           And then the sudden need for written prohibitions
2      on using race in the personal rating after 28 years of
3      refusing to write anything down.  You combine all that with
4      the powerful statistical evidence Professor Arcidiacono
5      assembled, the evidence is inescapable that race is used in
6      the personal rating.

7           And if race is used in the personal rating, the
8      statistical battle, Your Honor, is over.  There is a
9      statistically significant Asian penalty.

10          This is a model Professor Card did.  It has all the
11     ALDCs.  It has parental occupation, intended career.  It has
12     every single variable Professor Card wanted to throw in here.
13     It has every interaction he wanted to do, excludes every
14     interaction he didn't want to do.  It's a model in every
15     respect the way that Professor Card wants it except one:
16     pull the personal rating out because the evidence is
17     overwhelming that race is influencing it.

18          Harvard didn't even answer us on how the racial
19     tips be are being applied in the personal rating.  Didn't
20     even respond.

21          I want to touch briefly on Harvard's anecdotal
22     evidence.  The war of summary sheets and applications is not
23     helpful to the Court because it doesn't represent an
24     even-handed sampling or cross-section of what looking at all
25     the applications would give us.

1              Your Honor will recall that each side got to pick

2    applications that were produced.  And of course you know we

3    picked based on just the database and the numbers you can see

4    in the database.

5              Harvard got to look at the applications before they

6    picked them.  Got to fully vet and pick out everything it

7    wanted to put in front of you.  And then Harvard also got to

8    work with its admissions personnel in the same respect that

9    they worked with Mr. Looby so they worked with them to

10   remember every single detail of these applications that were

11   just a couple of the thousands these admissions officers had

12   reviewed over the past six years.

13             Anecdotes are not persuasive evidence when Harvard

14   has had the opportunity to cherry-pick and set up testimony

15   on rails about what they got to select for you to see.  And

16   even to the extent that anecdotes are relevant, you know, I

17   want to remind you of the professional figure skater in

18   Plaintiff's 116.  This is an Asian student that was so

19   cursorily and shabbily treated by Harvard's admissions

20   officers, she was awarded a standard strong and a personal

21   rating of 3, almost as if her application wasn't even read.

22             I'm going to wrap up pretty soon, Your Honor.  And

23   I want to take this opportunity to thank the Court, Joan,

24   Kelly, Karen, the law clerks, Mr. Dereau and the IT staff,

25   and I want to even thank the CSOs and the people down in the

1    cafeteria.  We have never been treated better in any

2    courthouse in America trying a case than we have here.  I

3    don't know that I'll ever be treated better again.  The

4    experience has been absolutely tremendous.

5            My partners and co-counsel have given me the

6    privilege of talking last, for which I also thank them.

7            And I want to talk a little bit about why I am

8    here.  I've alluded to it a few times in my more

9    conversational moments.  Count I in this case speaks to me

10   because of my personal experience.  I'm here because of my

11   three best friends in college:  Mike Gomez, Kalpesh Patel,

12   and Saleem Zafar.

13           They have all have kids my daughter's age.  I'm

14   here because of my daughter Juliet's godmothers, Sharon and

15   Diya.  They have children my daughter's age, Asian children.

16   Asian children who deserve the same chance to go to Harvard

17   that my white daughter has.

18           I'm here because of an incredible young

19   Chinese-American, my friend Rebecca Kuang who was in our

20   dataset but did not get to attend Harvard.  To meet her is to

21   know that her personal qualities deserved a 1.  And that's

22   before you learn that she wrote her first novel at 19,

23   recently published.

24           I am here because I spent a significant chunk of my

25   formative years in China and studying Mandrin back in the

1  early 1990s when few suburban boys from Milwaukee did such

2  things.

3            And I'm here on behalf of 20,000 members of

4  Students For Fair Admissions and our standing members who

5  brought this suit.

6            And even with all that, in another part of my life

7  I have personal experience reviewing paper applications and

8  assessing people based on a written record.  People every bit

9  as astounding as those who are on the bubble in applying to

10  Harvard.  I look at grades, test scores, recommendations, and

11  I know how hard it is to judge someone's personality from the

12  written record.  You have to be vigilant about implicit bias

13  and stereotyping well beyond e-mailing an article around once

14  every few years.

15            Harvard has not been vigilant and Asian-American

16  applicants paid the price.

17            Your Honor, I don't envy the job in front of you.

18  I have no idea how I'd respond to the historic task you have.

19  But what I do know is that in our judicial system this Court

20  may have the first and last word as a factual matter on what

21  happened here at Harvard, and that's because no one knows

22  what changes in the law are ahead of us as the case moves on.

23            Your Honor may remember I mentioned in my first

24  cross-examination of Director McGrath the perception that

25  racially charged language, stereotypes, or even

1    discrimination may be perceived in our country as less

2    important or less harmful when they're directed at

3    Asian-Americans than when directed at other minorities.  At

4    some level, this is because of the model minority stereotype

5    and the overrepresentation canard we saw deployed during

6    Professor Arcidiacono's examination.

7             The question is whether Asian-Americans will be

8    told some time next year that, yes, this did happen here,

9    that racial stereotyping and bias led to a penalty at

10   Harvard, or whether they get the news that even though

11   Harvard's own researchers found an Asian penalty before there

12   ever was a lawsuit, Harvard can pay for enough variables to

13   make it all go away as long as you pretend the personal

14   rating has nothing to do with race that is.

15            Some day this will be written about in the history

16   books, and those books will say there was Asian

17   discrimination at Harvard.  Of that, I'm confident.  Those

18   books might say that Harvard let the wolf of racial bias in

19   through the front door, as I put it a few weeks ago and

20   Mr. Lee paraphrased.  They might point out that this summer

21   Harvard took a small step to start to close that door.

22            We hope those books will say this Court slammed the

23   door shut.  Thank you, Your Honor.

24            THE COURT:  Thank you, Mr. Mortara.

25            The Amici closings.

**AMICI STUDENT CLOSING ARGUMENT**

1
2          MS. TORRES:  Hi.  Genevieve Bonadies Torres, and I

3     represent the --

4          THE COURT:  Voice way up.  I can barely hear you

5     and you're facing me.

6          MS. TORRES:  I represent the student Amici in this

7     case.  This case may involve Harvard's admissions policy, but

8     the impacts are felt most directly by students.  The outcome

9     impacts what students can express and have considered by

10    Harvard and elite colleges across the country.  It impacts

11    whether students' experiences will be valid, and it impacts

12    the educational environment students will encounter.

13          Students are at the heart of the issues in this

14    case, and their testimony is telling both for what the

15    students say and for where they are silent.

16          The Court did not hear from any of SFFA's students

17    nor review any of their files.  The only testimony came from

18    student amici and student organization amici on Monday.  And

19    this student testimony and their application files speak to

20    both sets of claims before this Court.

21          As this Court knows, the first set of claims

22    challenges Harvard's appreciation of race and ethnicity to

23    promote diversity.  Here, the students' testimony and

24    application files provide proof that Harvard's use of race is

25    both constitutionally acceptable and wise.

1        With regard to plaintiff's claim of intentional

2   discrimination, the students' application files illustrate

3   that Harvard's admissions officers view Asian-American

4   ethnicity in a positive light, not a negative one.

5        I'm going to focus nearly entirely on plaintiff's

6   challenge to race-conscious admissions.

7        Three weeks ago the plaintiff's counsel stood

8   before you and stated diversity and its benefits are not on

9   trial here.  But make no mistake, diversity is what is at

10  stake in this case.  That's because SFFA is seeking a remedy

11  where race would be erased in the application process.

12        This type of erasure threatens to ignore diverse

13  experiences that applicants offer, and it also threatens to

14  suppress diversity on campus.  The students spoke to these

15  troubling consequences, and their application files show why

16  such an outcome is not constitutionally required.

17        Specifically they affirmed that Harvard more than

18  satisfies two aspects of the narrow tailoring standard.

19        First, individualized review.  Our four students'

20  files arguably are the best illustration of what Harvard's

21  admissions officers have said again and again.  One, our

22  students and all admitted students to Harvard are

23  exceptional; two, to the extent race is considered, it is one

24  of many factors, and it is only viewed as a positive,

25  including for Asian-American students; three, it is flexibly

1    applied and not formulaic.

2          All four of our student amici -- Itzel Libertad

3    Vasquez-Rodriguez, Sarah Cole, Thang Diep, and Sally Chen --

4    discuss why their racial and ethnic background throughout the

5    application process was important to them.  Why?  Because

6    it's inextricably intertwined with their experiences and

7    can't be extricated.  It's critical to appreciate their

8    achievements and contributions.

9          Take Thang.  He has a strong GPA and commitment to

10   social justice.  But in his words "I don't think they can be

11   necessarily understood without taking into account the fact

12   that I moved here when I was eight, I didn't speak English,

13   and I excelled despite the racial prejudice I encountered."

14         All four of the application files show that race

15   was only considered alongside a multitude of other factors

16   and never provided any preset advantage or disadvantage.

17         Take Itzel's application.  The extensive comments

18   in her file make it clear that her admission was based upon

19   having multiple strengths.  Her file was marked up with notes

20   about how she has a strong set of AP scores, how she was

21   demonstrably a hard worker with a nearly perfect GPA, how she

22   was editor of her newspaper, how she had athletic success as

23   a runner, and how her guidance counselor highlighted her

24   "electric personality."

25         While there is reference to her ethnicity, she is,

quote, connected with her heritage after a period of disconnect.  This appears alongside the variety of other strengths Itzel offers.

Importantly, our students' files show that this limited, positive consideration of race is equally applied to students of Asian-American heritage.  Like Itzel, Sally and Thang also received positive comments by Harvard's reviewers associated with their racial and ethnic backgrounds.

For Thang, the same reviewer who noted his Vietnamese identity and use of pencils to improve his English also positively noted his commitment to pushing himself academically and socially.

For Sally, the interviewer noted how her upbringing in a culturally Chinese home where she served as a translator reflected positively on her responsibility to take care of others.

The students' files and testimony also show that having a relatively lower academic score does not make an applicant academically unqualified or undeserving in admission.

Three of our four students received an academic rating of a 3 or a 3+ despite stellar accomplishments.  Sarah received straight As and A-pluses at a premiere prep school. Itzel took 10 AP tests and scored the top score on 7.  And Thang was valedictorian at an intensive magnet program.

1  Proof that they were academically qualified, they thrived at

2  Harvard and beyond, becoming, in Harvard's words, citizen

3  leaders.

4  Sarah graduated with a 3.6 GPA and has committed

5  herself to serving our public school system.  Itzel graduated

6  cum laude with a 3.7 and now serves as a California assembly

7  fellow.  Indeed, our students are a reminder that merit

8  cannot be measured by academic ratings.  Their contribution

9  to Harvard's campus were extensive, and some of those

10  contributions did flow from their perspectives as ethnoracial

11  minorities.

12  For example, Sarah led the Black Students

13  Association during a time when Harvard, like our country, was

14  grieving the slew of police shootings of black people.  In

15  this role, she worked with Harvard's administrators and white

16  student groups, Latino student groups, and others to help

17  them, quote, think through just what was black lives matter

18  and how they could be better allies.

19  She responded to calls from Dean Khurana to draft

20  emails for the entire student body to guide them and console

21  them in the aftermath of yet another shooting.  Her actions

22  took time and represent tangible contributions.  Indeed, she

23  recounted how countless classmates and professors thanked her

24  for sharing her perspective shaped by her race.

25  There is nothing wrong with an admissions system

1   valuing this along with the myriad of other contributions
2   Sarah offered.
3          Our students' files put on full display that
4   Harvard is genuinely engaged in an individualized review that
5   values all ethnoracial backgrounds, whether Chinese or
6   Chicana, and that it does so in a limited, flexible way to
7   develop a class that is diverse across a range of dimensions.
8          Moving on to the second aspect of narrow tailoring
9   that students affirm, there is no workable race-neutral
10  alternative available because such alternatives reduce the
11  depth of diversity on Harvard's campus.  This is clear from
12  what's undisputed at trial.
13         Harvard's counsel talked about this briefly, but
14  I'll just restate because it's important to the students that
15  there is no dispute that if you ended the consideration of
16  race, the number of black, Latinx, and other minority
17  students would plummet by about 50 percent in terms of sheer
18  numbers.
19         Plaintiffs have tried to soften the blow with their
20  proposed race-neutral alternatives, but even their preferred
21  alternative would cause the number of admitted
22  African-American students to drop by about 30 percent in
23  terms of numbers.
24         More than this, the students have offered
25  undisputed testimony that these projections likely

1     underestimate the actual decline.  The students testified

2     that if Harvard stopped considering race, it's likely that,

3     one, fewer students of color would apply.

4           You heard Itzel forthrightly state, "Honestly I

5     probably would not have applied to Harvard if they didn't

6     take race into account."  And Sarah Cole affirmed that this

7     type of likelihood by saying that it would signal to students

8     that they weren't welcome and reduce applications from

9     students of color.

10          Two, testimony also suggested that fewer students

11    of color would accept.  Sarah testified that her choice to

12    accept Harvard's offer was substantially influenced by

13    encountering a strong presence of other black students on

14    Harvard's campus.  If that presence declined, there's a

15    substantial risk that the acceptance rate would decline, too.

16          The plaintiff's expert on race-neutral

17    alternatives, Richard Kahlenberg, tried to downplay this

18    decline in two ways:  First, he emphasized how his

19    alternative would yield greater socioeconomic diversity.  But

20    all four student amici testified that the educational

21    benefits that flow from socioeconomic diversity cannot be

22    equated with those flowing from racial diversity.

23          As Itzel expressed, ethnoracial diversity is

24    something that's more visibly salient.  "When I walked

25    through campus, I didn't feel judged or discriminated against

1   because of my socioeconomic status.  I felt discriminated

2   against because of my ethnoracial identity."

3            Itzel shared that it was only in spaces with Latinx

4   and Native American students that she felt that she could,

5   quote finally breathe.  Socioeconomic diversity does not on

6   its own provide that space.

7            Second, Kahlenberg downplayed this decline by

8   emphasizing how the overall numbers of black, Latinx, and

9   other minority students stayed relatively steady, but this

10  ignores other dimensions of diversity.

11           Overall representation is important, but so is the

12  representation of each particular racial group.  A decline in

13  any one group can be problematic, and this is particularly

14  true when that group is already marginalized and relatively

15  low in numbers.

16           Take Sarah Cole's experience.  When Harvard's

17  newspaper published an article saying that, quote, admitting

18  black students to Harvard is like teaching a blind person to

19  be a pilot.  At that moment and the many others when Sarah

20  encountered racial prejudice specifically targeted at the

21  black community, it was the strong presence of other black

22  students on Harvard's campus that mattered to Sarah.  There

23  needed to be enough in terms of numbers for her to, quote,

24  lean on and form a true community.

25           And it was this support system that allowed Sarah

1    and other black students to, quote, remain steadfast in our

2    confidence and thrive, despite bigoted comments that they and

3    an entire race of people did not deserve to be at Harvard.

4            Interracial diversity represents another concern.

5    As the amici organization member Madison Trice reflected, she

6    and other students have benefited from having, quote, every

7    nearby of black identity celebrated, and so it has a space on

8    campus.  It's this diversity within the black students that

9    makes it, quote, harder to have stereotypes because you can

10   learn about the different shapes that blackness can take.

11           A 30 percent reduction in the number of black

12   students would likely reduce such interracial diversity, as

13   would Kahlenberg's mechanical race-neutral preferences across

14   all racial groups.

15           And the harms would flow to all students, including

16   white and nonwhite students.  Such a reduction would, even if

17   limited to the black community, be, in the words of Itzel,

18   fairly catastrophic.

19           As a Vietnamese student, Thang similarly shared a

20   30 percent decline in the black student population would,

21   quote, hurt his education dramatically, as the efforts led by

22   black students have allowed him to better, quote, understand

23   issues affecting a different community and better understand

24   his own.

25           Turning very briefly to plaintiff's claim that

Harvard intentionally discriminates against Asian-Americans, the student amici observed that Sally and Thang's admissions files strongly indicate Harvard is only considering race in a positive light.

Both Sally and Thang openly and extensively discussed their ties to their Asian heritage.  Both files contain comments indicating their ethnic identities were seen as a strength, and both received personal scores of 2 or a 2-, relatively high scores.

Sally and Thang's files show that Harvard's policy of appreciating race in admissions is not discriminating against Asian-Americans.  In fact, it oftentimes helps such applicants and can cultivate diversity within the admitted group of Asian-American students by appreciating distinctions in their immigration and cultural histories.

Sally's testimony serves as a reminder that a policy that appreciates race is one of many factors is just as important for applicants from culturally Chinese homes. As Sally stated, quote, I decided to write about being Chinese-American and being from a working-class immigrant family precisely because I felt like stories like mine were fading under this model minority myth.

She continued, "I think that there was no way in which flat numbers and a resume could have gotten across how much of a whole person that I am.  And I that that it's truly

1  incredible to have been seen and have been heard for who I am
2  and valued for it."
3          On behalf of all of our students, I thank this
4  Court for letting them share their stories about how this
5  policy has positively impacted them and better prepared them
6  to positively impact others.  Thank you.
7          THE COURT:  Thank you, Ms. Torres.
8          MS. McCLELLAN:  May I proceed, Your Honor?
9          THE COURT:  Yes.  Get that microphone right up to
10  your mouth.

**ORGANIZATION AMICI CLOSING ARGUMENT**

12          MS. McCLELLAN:  Good afternoon, Your Honor,
13  counsel.  My name is Cara McClellan, and I represent 25
14  Harvard student and alumni organizations as amici curiae in
15  support of Harvard's ability to consider race as one of many
16  factors in its holistic admissions process.
17          In the words of Dean Fitzsimmons, race is one part
18  of a person's life that may lead that person to be a great
19  educator of others, about how to be a good citizen and
20  citizen leader, not just at Harvard, but later.
21          During this divisive time for our country, the need
22  for citizen leaders, educated in diverse settings, remains as
23  urgent as ever.  My clients include thousands of Harvard
24  students and alumni who are black, white, Latinx, Native
25  American, and Asian-American.  Some grew up in public housing

1      and were the first in their families to attend college.

2      Others come from families that have achieved financial

3      success and impressive educational credentials yet still

4      experience the effects of persistent racial discrimination in

5      our country.

6              You have heard from:  Professor Margaret Chin, a

7      Chinese-American alumna, a founding board member of the

8      Coalition For a Diverse Harvard, and a member of the Harvard

9      Asian-American Alliance.

10             Catherine Ho, a Vietnamese-American sophomore and

11     copresident of the Harvard-Radcliffe Asian-American woman's

12     association.

13             Madison Trice, a black sophomore, political action

14     chair of the Association of Black Harvard Women, and a member

15     of the Harvard-Radcliffe Black Students Association.

16             And Cecilia Nunez, a black and Mexican-American

17     junior, vice president of Fuerza Latina, and a board member

18     of the Phillips Brooks House Association.

19             You have also heard from four additional Harvard

20     students and alumni:  Itzel Libertad Vasquez-Rodriguez, Sarah

21     Cole, Thang Diep, and Sally Chen.

22             In contrast, no students have come forward to

23     testify in support of ending race-conscious admissions.

24             SFFA has not met its burden of proving that Harvard

25     can fulfill its educational admission which requires that it

1    put together an exceptional, racially diverse class without
2    considering race.
3            Instead the stories that you heard this past Monday
4    from Harvard students and alumni first demonstrate that race
5    is an indelible part of their lives, their educational
6    experiences, and their long-term professional goals.
7            Second, each witness described how black, Latinx,
8    and Asian-American students and alumni and the organizations
9    they form are indispensable to Harvard's ability to reap the
10   educational benefits of diversity.
11           And third, their testimony also made clear that the
12   dramatic reduction of black and Latinx students on campus
13   from the loss of race conscious admission estimated at
14   50 percent would be devastating for all Harvard students.
15           As one of my clients, Catherine Ho, put it,
16   diversity allows for more opportunities to organically learn
17   from other people, listening to their stories and listening
18   to their perspectives.
19           But if their perspectives and stories aren't
20   present on campus, who are we supposed to be learning from?
21           First, the evidence unequivocally shows that
22   race-conscious admissions must be preserved to completely and
23   holistically evaluate individual student applicants.
24           For many students of color, early experiences
25   related to race are a formative part of their identity, and

1    they include this in their application.

2          For some, memories of discrimination or observed

3    inequality are at the root of what motivates them to work

4    hard and to advocate for change.  This is evident in the

5    amici witnesses testimony about their educational experiences

6    in college application essays.

7          Catherine Ho testified that her ethnoracial

8    identity is a core part of who she is and became the focus of

9    all three personal essays she submitted to Harvard.  In one

10   essay, the Vietnamese language, a language that has no past

11   tense, provided a metaphor for how she understands her

12   parents don't-look-back attitude.  As refugees from Vietnam,

13   her parents overcame many barriers.  Their strength is what

14   drives her to push forward despite obstacles.

15         When Catherine viewed her application file and

16   learned that her Vietnamese heritage was an aspect of her

17   identity that Harvard valued, she rushed to tell her father.

18   Although her father's refugee story is not always

19   appreciated, she believes she carries important lessons

20   because of this history, a contribution the Harvard

21   admissions committee recognized she would bring before she

22   even arrived.

23         In addition to impacting the development of

24   applicants' individual identity, race systematically impacts

25   the opportunities and resources that applicants can access

before they apply to college.  Too often the resources available in a school correlate with the racial makeup of the school.

Sarah Cole described how her predominantly white college prep school included standardized test prep in its curriculum, while her friends at the majority black local public high school were offered no such opportunities.

As Tia Marie Ray, director of the undergraduate minority recruitment program, explained, Harvard recognizes that resources impact students' performance on SATs.  Even in wealthy, high-performing schools, students of color face bias that can limit academic opportunities.

Madison Trice testified about facing the bigotry of low expectations.  Her elementary school teacher discouraged her from entering her school's gifted program, despite her excellent grades, until her parents intervened to challenge an arbitrary entrance examination and requirement that only seemed to apply to her, the so-called 10 perfect score rule.

Once enrolled in more advanced courses, Madison spent most of her academic life as one of the only black students in her class, facing bullying and social isolation because she was different.

As Dean Fitzsimmons' testimony made clear, Madison's experience is not uncommon.  Many students of color who apply to Harvard come from academic environments where

they feel isolated as minorities and write about this experience to help the admissions office contextualize the, quote, persistence, courage, and self-confidence that went into their remarkable achievements.

Indeed, Madison wrote in her personal essay that the different treatment she endured led to her aspirations to pursue a career in foreign service and work on behalf of marginal communities experiencing oppression abroad.

Preventing her from speaking about her race would inhibit her ability to fully describe what motivates her intellectual and professional ambitions.

SFFA would prohibit universities from considering race as part of a holistic review while allowing colleges to consider other aspects of an applicant's identity such as socioeconomic status, gender, sexual orientation, or their disability.  However, pretending to be race blind when reviewing applications will only disadvantage applicants of color, including Asian-American students whose full stories would be ignored.

Second, amici witnesses' testimony provides real life validation for why the Supreme Court has repeatedly affirmed that the pursuit of the educational benefits of diversity is a compelling interest that colleges and universities may seek.  As the Supreme Court recognized in *Fisher*, a diverse student body promotes cross-racial

1    understanding and the lessening of racial isolation and

2    stereotypes.

3         At Harvard, student affinity groups help facilitate

4    these benefits by advocating for inclusivity and creating

5    opportunities for students of all backgrounds to engage in

6    cross-cultural exchange.  Affinity of groups provide critical

7    support that allow students of color to feel comfortable

8    being their authentic selves.  This happens when a student

9    who was once bullied for being different opens the

10   Association of Black Harvard Women survival guide and reads

11   that black hair is beautiful and versatile.

12        Cultural organizations also challenge the broader

13   Harvard community to become more culturally literate and

14   respectful of difference.  Like when La Fuerza successfully

15   advocated for more culturally competent mental health

16   providers on campus or when the Asian-American Women's

17   Association hosted a workshop to address anti-black bias.

18        Diversity within the vibrant affinity groups on

19   campus matters.  It relieves students of color from feeling

20   like representatives of their entire race and allows

21   flexibility to explore different aspects of their identity

22   and culture.  It combats stereotypes as students see multiple

23   representation of what it means to be a particular race.

24        Importantly, diversity within groups requires a

25   holistic approach that considers the multifaceted identities

of applicants beyond just checking a box.  By serving Harvard
for decades in this way, affinity groups and the individual
students who form them improve the community's critical
thinking skills, communication skills, and civic engagement,
among other things.

Unfortunately, without race-conscious admissions, a
substantial reduction in black and Latinx students would
threaten the continued existence of cultural organizations
and the benefits they provide.  Some organizations would have
to reduce the size of their leadership boards or the
programming they offer.

Other organizations and their subgroups would
suffer such a stark reduction in their membership that they
would cease to exist or no longer have the capacity to be
effective.

Because collaboration across organizations is
essential, even organizations whose membership ranks are not
significantly reduced would no longer be able to provide the
same experiences for their members and for the larger Harvard
community.

As Cecilia Nunez testified, the idea that there
would be a much smaller pool of Latinx students on campus is
concerning as it calls into question whether Fuerza Latina as
an organization can exist.  In addition, she continued, it
would impact the well-being of our constituents.  That could

1    mean even more students feeling that much more alone on

2    campus.

3              As student amici pointed out, the witnesses we

4    heard from explained that racial diversity was a crucial

5    factor in why they applied to and ultimately decided to

6    attend Harvard.

7              For Professor Margaret Chin, Harvard was not even

8    on her radar until she attended a college fair in Chinatown

9    and heard from Asian-American Harvard students that she

10   should apply.

11             Roger Banks, who served as director of the

12   undergraduate minority recruitment program for 20 years,

13   explained that, quote, typically the leaders of various

14   minority groups and communities on campus became recruitment

15   coordinators and host students during Visitas, a prospective

16   student weekend.  This allows students to, quote, really see

17   what its like as a student of color at Harvard.

18             Cecilia Nunez considered it very important to be in

19   a school that had a diverse student body.  Visiting Harvard

20   during Visitas weekend affirmed that Harvard would be a good

21   fit.

22             While the undergraduate minority recruitment

23   program is a key tool, what ultimately attracts many students

24   of color to Harvard is the diversity itself.  Without this

25   diversity, admissions officers and student ambassadors could

1    not be as persuasive and successful in their recruitment

2    efforts.

3            As Cecilia explained, "If Harvard hadn't felt like

4    it was a space that would be welcoming to people of color and

5    if it hadn't felt like a very diverse space, it probably

6    would have affected my decision to go."

7            The diversity attained through race-conscious

8    admissions must be preserved in order to attract future

9    classes of diverse students.

10           Finally, our witnesses' testimony makes clear that

11   Dr. Kahlenberg is wrong.  Race-neutral alternatives cannot

12   provide meaningful full diversity, and the educational

13   benefits currently conveyed would be lost under an admissions

14   program that does not actually consider race.

15           In all of Kahlenberg's simulations of race-neutral

16   alternatives, the racial group that bore the greatest burden

17   was black students.  The percentage of black students

18   declined dramatically in each simulation.  And in some, the

19   result was a 40 percent reduction of the number of black

20   students on campus.

21           Dr. Kahlenberg did not talk to a single Harvard

22   student or faculty member about how a reduction of black

23   students would affect the quality of a Harvard education.

24           But Your Honor has had the benefit of hearing from

25   eight amici witnesses, each of whom testified that a loss of

1     black students of this magnitude would fundamentally alter

2     the educational experience for all students.

3              In addition, each amici witness testified that

4     while socioeconomic status is important, it is not a

5     substitute for understanding and addressing race.

6              Race remains a visible marker that cannot be

7     ignored.  Cecilia Nunez described how she faced bias growing

8     up that was based on race and entirely unrelated to her

9     socioeconomic status.  She grew up in an upper middle class

10    family, her parents are both doctors, yet people often

11    assumed that her family wasn't educated or -- and I'm

12    quoting -- that they were in some way less than other

13    families in their city.

14             In elementary and middle school, classmates were

15    not allowed to come over to play at her house because their

16    parents made false assumptions that her family would be a bad

17    influence.  Assumptions like these are wrong regardless of a

18    family's socioeconomic status, but Cecelia's experience show

19    how these assumptions persist for families of color, even

20    when they've achieved financial comfort.

21             Importantly, Dr. Kahlenberg parts ways with SFFA.

22    It acknowledges that racial discrimination faced by

23    applicants of color should be considered as part of the

24    admissions process, and he further concedes that employing

25    race is, by definition, the most efficient method of

1    promoting racial diversity.  On this point, we agree.

2         Behind the dueling statistical models in this case

3    are real people directly impacted by Harvard's race-conscious

4    admissions policy.  Students and alumni for whom diversity

5    and inclusion that it fosters remain a pressing concern that

6    cannot be taken for granted.

7         We heard painful stories that show the harsh ways

8    race continues to impact the experiences of Harvard students.

9    A Chinese-American student assumed to be a tourist and asked

10   to leave the common room.  A black student labeled

11   threatening and treated violently by Cambridge police.  A

12   group of Latinx students called wetbacks while walking around

13   campus with friends.

14        The stereotypes and prejudice experienced by these

15   students varied, but the hostile and alienating message was

16   always clear.  Students and alumni who have been committed to

17   diversity and inclusion for decades, like Professor Chin,

18   advocate for race conscious solutions.

19        Plaintiffs mention Dr. Chin's article from 35 years

20   ago but failed to mention its conclusion that race-conscious

21   solutions are necessary to address any bias against

22   Asian-American applicants.

23        Your Honor has also heard stories of the

24   transformation that happens when some of our country's

25   brightest young people have the opportunity to engage with

1    classmates who are different from them, sometimes for the
2    first time in their lives.

3              The benefits of diversity can be found in the
4    late-night conversations between two roommates.  One black
5    whose family is from Ghana, one Asian-American whose family
6    is from Vietnam, assigned to live together in a dorm room
7    where they fall asleep talking to each other at night.

8              For Catherine Ho, the experience of living with her
9    roommate opened her eyes to how police brutality impacts
10   black students, making her personally connected to a social
11   problem from which she previously had the privilege of being
12   relatively removed.

13             Harvard has embraced its educational mission of
14   preparing the future citizen leaders of our country to
15   address the enduring schisms and problems that plague our
16   society.  How, Dr. Ruth Simmons asked, can we expect our
17   future leaders to remediate these schisms if we don't prepare
18   them to do so?

19             Similarly, as a leader in the Phillips Brooks House
20   Association, Cecilia Nunez explained that, quote, it's very
21   important that we have people who understand our
22   constituents' diverse experience.  Her comments referred to
23   her volunteer activities, but the same principles apply to
24   the future work of citizen leaders after college.

25             Harvard's diversity puts students in an environment

1    where people of different backgrounds stop being faceless

2    others and become classmates, teammates, lab partners, and

3    friends.  In this process, stereotypes are undermined,

4    cross-cultural relationships grow, and deeper understandings

5    of complex social problems are formed.

6               The testimony you have heard makes clear, racial

7    diversity is one of the most meaningful aspects of the

8    preparation that Harvard students receive.  Harvard must be

9    permitted to pursue the benefits of diversity if it is to

10   fulfill its educational mission.  Thank you.

11              THE COURT:  All right.  Thank you all.

12              I think what remains is a schedule for findings of

13   fact and conclusions of law.  Do you want to submit that in

14   the next few days?  Does that make the most sense?

15              MS. ELLSWORTH:  Yes, Your Honor.  We can confer

16   with SFFA and submit something in writing if that works for

17   you.

18              THE COURT:  Welcome back, Mr. Consovoy.  Your voice

19   has been missing.

20              So we have finished.  I know I said this at the

21   midpoint, but I really want to thank you all.  To echo

22   something that Mr. Mortara said, I really feel privileged to

23   have participated in a trial where the lawyering by

24   everybody, the lawyer for both parties and the amici, has

25   been so exceptional.

1          I don't know if I will have another case in my

2     career where I can say that the presentation has been as

3     exceptional and professional and thoughtful as it has been in

4     this case.  So I want to thank you for all of that.

5          Obviously the issues raised by this case are

6     incredibly important both for the parties to the case but

7     also sort of for the world, or at least for students in the

8     United States.  And I take the charge seriously and will wait

9     for your findings of fact and conclusions of law.

10          And we'll have another closing session.  I suspect

11     that most of you know in this courtroom how difficult it is

12     to try the hours we've been trying and keep the rest of the

13     docket afloat.  So my thanks also to Joan and Karen and the

14     law clerks who have all been exceptional throughout this.

15          But again, I really can't compliment you enough for

16     the job that's been done throughout this trial.  It's really

17     been a privilege.  And I hope that our final work product on

18     it is worthy of the effort that you all have put into it.  So

19     thank you very much.

20          We will reconvene, but in the meantime the case is

21     recessed.

22          (The Court adjourned at 2:25 p.m.)

23

24

25

1                      - - - - - - - - - - - -

2                         CERTIFICATION

3

4           I certify that the foregoing is a correct

5      transcript of the record of proceedings in the above-entitled

6      matter to the best of my skill and ability.

7

8

9

10     /s/ Joan M. Daly                    November 2, 2018

11     _____         _____

12     Joan M. Daly, RMR, CRR              Date
       Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25