

# Yale Law School

ISSA KOHLER-HAUSMANN · *Associate Professor of Law*

August 20, 2019

Judical Clerks of Honorable Allison Burroughs
United States District Court
District of Massachusetts
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2300
Boston, Massachusetts 02210

Dear Judicial Clerks of Honorable Allison Burroughs,

I write to share a law review article that addresses some of the confusion in the statistical expert reports submitted in the case *SFFA v. Harvard*. The article does not advocate for one side or another. Rather, it points out important logical facts essential to interpreting the meaning of the statistical evidence offered by both experts. Despite the length and apparent complexity of the plaintiffs' and defendant's expert reports, there are some very basic issues that neither side seems to advise the Court about regarding what these quantitative analyses could possible mean.

I am writing you because I wanted to be sure it was proper for me to share this article directly with the Judge.

The article is forthcoming in the Northwestern Law Review Online, but it can currently be found on SSRN here:
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3439087.

If it is proper to share with Judge Burroughs, I have included a copy.

Thank you for your time,

*[signature]*

Issa Kohler-Hausmann*

# What's the Point of Parity? Harvard, Groupness, and the Equal Protection Clause

* Associate Professor Law & Sociology, Yale University. I am very grateful to Moritz Hardt, Sharad Goel, Gideon Yaffe, Elise C. Boddie, Lily Hu, Josh Cohen, and Robert Post for generous and helpful feedback. A special thanks to Arjun Mody for excellence and patient RA work over the past year.

**Two Readings of *Students for Fair Admissions, Inc. (SFFA) v. Harvard***

There are two readings of the case *Students for Fair Admissions, Inc. (SFFA) v. Harvard*, a challenge to the undergraduate admissions practices at (you guessed it) Harvard currently pending in a federal court in Massachusetts. Reading One proceeds from the premise that the case was brought with the express purposes of dismantling affirmative action in higher education and beyond, and that any victory for the plaintiffs will have that effect.[1] On Reading One, the real target of the case is affirmative action for African American and Hispanic applicants, and alleging discrimination against Asian applicants is a politically and legally clever means to achieve that end because the wide variety of people classified under the racial category "Asian" have also been discriminated against in this nation in many forms since the founding.[2] Reading Two proceeds from the premise that, although the political actors behind the case have long targeted affirmative action in general, the case raises real and serious issues about admissions practices that stereotype Asian applicants and discriminate against them in the form of limiting their enrollment at Harvard by appealing to "personal" characteristics of applicants at the expense of academic qualifications. On Reading Two, the real aim of the case is to remedy the artificial suppression of Asian enrollment vis-a-vis white applicants, and there is a road to victory for the plaintiffs whereby the Asian enrollment would increase, but affirmative action for African American and Hispanic applicants would be unaffected.[3]

The problem is that Reading Two is foreclosed under the plaintiff's theory of what makes something discrimination. SFFA's expert reports propose that evidence showing that applicants grouped by designated racial affiliation with similar observable credentials face different probability of admission is evidence of discrimination. Probing the limits of the plaintiffs' substantive theory of discrimination brings into relief what I think is a missing piece in *most*

---

[1] ASIANS ARE BEING USED TO MAKE THE CASE AGAINST AFFIRMATIVE ACTION. AGAIN. VOX, https://www.vox.com/2018/3/28/17031460/affirmative-action-asian-discrimination-admissions (last visited Jun 26, 2019); THE TRUE MISSION OF THE LAWSUIT AGAINST HARVARD - THE BOSTON GLOBE BOSTONGLOBE.COM, https://www.bostonglobe.com/opinion/2018/06/25/the-true-mission-lawsuit-against-harvard/5ESyvmBDmCxDvkbIdsxcrO/story.html (last visited Jun 27, 2019)

[2] See, e.g., *Takao Ozawa v. United States*, 260 U.S. 178, 195-96 (1922) (interpreting the first naturalization act of 1790 limiting citizenship to "free white persons" and holding that although it was adopted at the time "it was employed by them for the sole purpose of excluding the black or African race and the Indians then inhabiting this country," it should be interpreted to mean that "only free white persons shall be included," and therefore the "the brown or yellow races of Asia" are necessarily ineligible for citizenship.); *United States v. Bhagat Singh Thind*, 261 U.S. 204, 209-10 (1923) (holding that the racial designation "white" in naturalization statute was in fact a "popular" not "scientific" meaning of the word, which "for the practical purposes of the statute, must be applied to a group of living persons *now* possessing in common the requisite characteristics, not to groups of persons who are supposed to be or really are descended from some remote, common ancestor, but who, whether they both resemble him to a greater or less extent, have, at any rate, ceased altogether to resemble one another," in an action by the government to cancel the citizenship of someone of "high-caste Hindu stock, born in Punjab, one of the extreme northwestern districts of India, and classified by certain scientific authorities as of the Caucasian or Aryan race.").

[3] Jeannie Suk Gersen, *Anti-Asian Bias, Not Affirmative Action, Is on Trial in the Harvard Case*, Oct. 11, 2018, https://www.newyorker.com/news/our-columnists/anti-asian-bias-not-affirmative-action-is-on-trial-in-the-harvard-case (last visited Jun 25, 2019); WHAT STATISTICS CAN'T TELL US IN THE FIGHT OVER AFFIRMATIVE ACTION AT HARVARD BOSTON REVIEW, http://bostonreview.net/law-justice/andrew-gelman-sharad-goel-daniel-e-ho-what-statistics-cant-tell-us-fight-over (last visited Jun 25, 2019)

legal and social scientific concepts of discrimination. That same piece has been missing from the decades-old debate about how to give content to the Equal Protection Clause. This case also illustrates why missing that piece creates as incoherent legal doctrine, especially in the area of affirmative action. This essay will not take a position on whether there is or is not racial discrimination in the Harvard admissions process. Rather, it will put forward what—by my lights—would be necessary to address that question coherently.

My conceptual points can be summarized fairly succinctly and abstractly as follows. Many approaches in law and social science define racial discrimination as the dissimilar treatment of persons in different racial groups who are similarly situated, at least with respect to variables rationally relevant to the domain in question. The evidentiary logic of plaintiffs SFFA's statistical evidence track that definition. Plaintiffs proffer substantial evidence that such a principle is violated with respect to Asian vis-a-vis white applicants. But they proffer even more dramatic evidence that it is violated between Asian vis-a-vis Black and Hispanic applicants (which is the highlight of the plaintiffs' expert reports), and indeed between white vis-a-vis Black and Hispanic applicants. Therefore, if one wants to find a way to purse Reading Two in this case, one must reject the plaintiff's operationalization of equal protection as dissimilar odds of admission conditional on similar formal credentials. Furthermore, there is no good normative reason to adopt that principle as what equal protection demands in the context of higher education admissions (nor, indeed, in many other contexts). This principle will be violated almost anytime groups sit in some relation of material and social inequality to each other. In fact, I will argue that embracing this principle would render both the Supreme Court's line of cases allowing universities to value racial diversity and its entire graded scrutiny scale incoherent.

I propose that, prior to debating the content of a substantive principle of nondiscrimination/equal protection with respect to a particular form of groupness, we must first define what constitutes that form of social grouping. Only then can we ask: Given this is what the category *is*, what are fair or just ways of making decisions in this domain, what goals and interests ought to be recognized as legitimate, and are the currently employed means narrowly tailored in the right way? A relation of equality and fairness proposed by a principle of 'nondiscrimination' or 'equal protection' is only valid in light of what makes the social grouping what-it-is under current conditions.

**In search of content for equal protection: SFFA's proposal of conditional statistical parity**

As has been long recognized, the Fourteenth Amendment's commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws" is, like any other statement of formal equality, incapable of being applied without an independent principle that gives normative content to the equality demand.[4] The logic of the plaintiffs' statistical evidence

---

[4] Owen M. Fiss, *Groups and the Equal Protection Clause*, 5 Phil. & Pub. Aff. 107, 107–08 (1976); "The concept of 'discrimination,' like the phrase 'equal protection of the laws,' is susceptible of varying interpretations…" *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 284 (1978). The entire "equality of what" debate in egalitarianism is about this same issue. *See, e.g.*, G.A. Cohen, *Equality of What? On Welfare, Goods and Capabilities*, 56 LOUVAIN ECON. REV. 357, 357 (1990); Ronald Dworkin, *What Is Equality? Part 1: Equality of Welfare*, 10 PHIL. & PUB. AFF. 185, 185 (1981); Ronald Dworkin, *What Is Equality? Part 2: Equality of Resources*, 10 PHIL. & PUB. AFF. 283, 283 (1981); Amartya Sen, *Equality of What?*, in EQUAL FREEDOM: SELECTED TANNER LECTURES ON HUMAN VALUES

proposes one way to give content to this principle that I will call (borrowing form computer scientists) *conditional statistical parity*.[5]

It is helpful to have a formalization of what conditional statistical parity means in the context of Harvard admission, so consider the following: The university must identify all things that it says it values in applicants. Let's call these valued credentials the Xs. The plaintiffs propose that 'discrimination' is defined by a lack of statistical parity in admission probability *conditional on* having the same valued credentials between racial groups:

$$P(A=1|X=x, G=b) \neq P(A=1|X=x, G=w).$$

Meaning, this principle is violated when the probability of acceptance, $P(A=1)$, is not equal between racial groups (taken on discrete values of variable G labeled as b or w), conditional on having the same value for all variables rationally related to goals of the institution in question (the Xs).

It is hardly surprising that litigants would proffer this definition given some of the Supreme Court's elaborations of the Equal Protection Clause over the years such as, "[t]he Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike."[6] The Court has also put forward similar evidentiary requirements for equal protection claims in other contexts, such as requiring defendants alleging selective enforcement to come forward with evidence that people "similarly situated" with respect to rationally relevant enforcement criteria who differ only by race were treated differently by law enforcement.[7] Furthermore, some Justices in other affirmative action cases have discussed statistical facts about admissions in such a way that suggests at least those Justices endorse this operationalization of equal protection.[8]

The plaintiffs' expert report is organized around the definition of discrimination as conditional statistical parity between racial groups. There is a dizzying amount of data and ways of analyzing

---

307, 307 (Stephen Darwall ed., 1995). And for a brilliant critique of the terms in which this debate are framed, see Elizabeth S. Anderson, *What Is the Point of Equality?*, 109 ETHICS 287, 287 (1999).

[5] Cynthia Dwork et al., *Fairness Through Awareness*, ARXIV:1104.3913 [CS] (2011), http://arxiv.org/abs/1104.3913 (last visited Jun 18, 2019); Moritz Hardt et al., *Equality of Opportunity in Supervised Learning*, ARXIV:1610.02413 [CS] (2016), http://arxiv.org/abs/1610.02413 (last visited Jul 9, 2019); Sam Corbett-Davies & Sharad Goel, *The Measure and Mismeasure of Fairness: A Critical Review of Fair Machine Learning*, ARXIV:1808.00023 [CS] (2018), http://arxiv.org/abs/1808.00023 (last visited Jul 22, 2019).

[6] *City of Cleburne, v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

[7] Issa Kohler-Hausmann, *Eddie Murphy and the Dangers of Counterfactual Causal Thinking About Detecting Racial Discrimination*, 113 NORTHWESTERN UNIVERSITY LAW REVIEW 1163–1228 (2019) (citing cases where similarly situated test was applied).

[8] The discussing of dissimilar admission rates by race within given LSAT and GPA ranges by the dissent in *Grutter* illustrate perfectly why litigants might take conditional statistical parity to capture the meaning of discrimination in higher education admissions. *Grutter v. Bollinger*, 539 U.S. 306, 382-85 (2003) (JJ. Rehnquist, Scalia, Kennedy, and Thomas) (citing evidence of "admission of less qualified underrepresented minorities in preference to [Petitioner Grutter]" as evidence that "its alleged goal of 'critical mass' is simply a sham," and calling the "tight correlation between the percentage of applicants and admitted students of a given race," evidence that the law school is admitting students "based on the aspirational assumption that all applicants are equally qualified academically, and therefore that the proportion of each group admitted should be the same as the proportion of that group in the applicant pool."

it in the 700-plus pages of expert reports in the case. Nonetheless, the plaintiffs' approach to adducing statistical evidence of discrimination comes down to a pretty straightforward exercise.[9] First, they seek to show that Asian applicants to Harvard are, as a group, more qualified than other applicants grouped by race at least on most observable characteristics.[10] They mainly focus on academic credentials, since Harvard is after all an elite academic institution, but they also look at things like extracurricular activities, athletics, high school recommendations, and "personal"[11] and "overall"[12] ratings from both the Harvard alumni interviewer and the admissions staff.[13] Second, they seek to show that the probability of admission differs between racial groups conditional on having the same levels of other observable valued credentials.[14] They also seek to show that Asian applicants have a lower probability of receiving a more favorable "personal" or "overall" ratings form Harvard admissions staff, which in turn, affect the probability of admission.[15]

Table 3 presents a stylized example of the plaintiffs' logic of proof. The table reflects the average distribution between the four largest applicant racial-ethnic groups by academic decile.[16]

---

[9] *See* Expert Report of Peter S. Arcidiacono at 17-20, Students for Fair Admissions, Inc. v. Harvard, No. 14-cv-14176-ADB (D. Mass. June 15, 2018) [hereinafter Plaintiff Expert Report] (describing why the expert believes the methods used, especially multinomial logistic regressions, are the correct way to detect discrimination). For example, "[b]y controlling for test scores, one can show that group A was being held to a higher standard than group B, all else equal." *Id.* at 18.

[10] See, e.g., Plaintiff Expert Report, *supra* note ## at 26 (Figure 1.2), which shows the average SAT scores of applicants and admits by racial groupings. The plaintiffs are clear that their evidence of discrimination is made by comparing all pairings of "race" groups. *See, e.g.*, Rebuttal Expert Report of Peter S. Arcidiacono at 20, Students for Fair Admissions, Inc. v. Harvard, No. 14-cv-14176-ADB (D. Mass. June 15, 2018) [hereinafter Plaintiff Rebuttal Report] ("Understanding Harvard's use of race in evaluating domestic applicants involves distinctions drawn across all four major racial groups in the applicant pool: Asian Americans, white, African Americans, and Hispanics.").

[11] While there is no single definition of the "personal" rating, it is a general assessment of "personal quality" and includes such factors such as whether an individual will "contribute to the class, classroom, [or] roommate group," as well as "integrity, helpfulness, courage, [and] kindness." Plaintiff Rebuttal Report, *supra* note ## at 14 n.8; *see also* Harvard Expert Report, *supra* note ## at 20 (noting that among the "personal qualities" Harvard looks for are "economic resources and family hardship, personal essays and interviews, artistic qualities, maturity and ability to balance multiple commitments, and the degree of parental involvement . . . .").

[12] The "overall" rating "is a score that purports to reflect Harvard's overall assessment of the applicant; it is not an average of [the other ratings] but it takes them into account." Plaintiff Expert Report, *supra* note ## at 4; *see also* Harvard Expert Report, *supra* note ## at 26 ("Deposition testimony indicates that the overall rating (a) takes into account the profile ratings but is not a formulaic summation or average of those ratings, and (b) can reflect other aspects of an application that the reviewer considered but that are not captured in the profile ratings (including race).").

[13] *E.g.*, Plaintiff Expert Report, *supra* note ## at 26, 33, 37, 41.

[14] The simplest way of understanding the logic of this evidence is simply descriptive, such as the figure on Plaintiff Expert Report Figure 1.2 at 30, but the same logic applies to more complex logistic models.

[15] *E.g.*, Plaintiff Expert Report Section 3.4, *supra* note ## at 35-40; *see also id.* at 59 ("Receiving a 2 or better on Harvard's overall rating is especially important for an applicant's chances of admission.").

[16] The distributions were made by averaging the 2014-2019 admissions data from Table B.5.7, and then applying those distributions to an applicant pool of 20,000, where roughly 2,000 students are admitted. Plaintiff Expert Report, *supra* note ## at 120. These numbers roughly correlate with the total size of the applicant pool and admitted class at Harvard. A similar table for the entire "baseline" dataset can be found in Table 5.1. *Id.* at 41; *see also id.* at 2 (In conducting his analysis, the plaintiff's expert separated applicants into two groups: (1) the "baseline," which was all domestic, regular decision applicants except (a) recruited athletes, (b) legacies, (c) Dean's or Director's List individuals, and (d) the children of Harvard faculty or staff, because these groups experience significantly higher admit rates; and (2) the "expanded" set, which was simply all domestic applicants). This is the clearest example of the plaintiff's proposed fairness selection rule: "[R]andomly drawing from the top academic index decile (in the

If Harvard exclusively valued academic credentials, saved money by dismissing its admissions staff and just admitted the top decile, it would admit the racial-ethnic diversity shown in the second to last row, as opposed to the average racial makeup of its admitted class shown in the last row. The plaintiffs adduce tables like this, and more sophisticated statistical exercises like multinomial logistic regression, to substantiate the claim that conditional statistical parity between racial groups is violated.

### Table 1

| | Applicant pool of 20,000 | | | | |
|---|---|---|---|---|---|
| | White | Af Am | Hispanic | Asian | Total |
| Top Decile | 726 | 15 | 54 | 1,023 | 1,818 |
| Bottom 9 | 8,012 | 2,366 | 2,710 | 5,095 | 18,182 |
| Total | 8,738 | 2,381 | 2,764 | 6,118 | 20,000 |
| | Admit class of 2,000 | | | | |
| % of each group if admit just top academic decile | 36.30% | 0.75% | 2.70% | 51.15% | |
| Actual share of admitted class (5.3) | 37.16% | 15.81% | 14.90% | 24.86% | |

They repeat this logic with the personal ratings.[17] Table 2, taken directly form the plaintiffs' expert report, shows the proportion of applicants in each academic decile who are given the personal rankings in the top tier, broken down by different racial groups.

### Table 2

---

baseline dataset) would cause Asian-American admits to more than double." Plaintiff Rebuttal Report, *supra* note ## at 13.

[17] *See, e.g.*, Plaintiff Rebuttal Report, *supra* note ## at 22. ("[S]imilarly situated African-American applicants receive much higher personal ratings than their Asian-American counterparts. African-American applicants in the third-worst decile receive higher personal ratings than Asian-American applicants in the *top* decile.") (emphasis in original).

6

Table 5.6R: Share Receiving a Two or Higher on the Personal Rating and Alumni Interview Personal Rating by Race/Ethnicity and Academic Index Decile, Baseline Sample

| Academic Index Decile | Personal | | | | | Alumni Personal | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Whites | African American | Hispanic | Asian American | Total | Whites | African American | Hispanic | Asian American | Total |
| 1 | 8.11% | 9.49% | 8.48% | 8.01% | 8.81% | 26.33% | 30.96% | 26.29% | 28.13% | 28.25% |
| 2 | 12.58% | 15.75% | 13.16% | 12.91% | 13.57% | 33.72% | 39.83% | 33.42% | 32.03% | 34.89% |
| 3 | 16.25% | 23.35% | 17.77% | 13.46% | 17.16% | 39.77% | 46.84% | 38.59% | 36.35% | 40.06% |
| 4 | 18.62% | 28.95% | 20.39% | 14.24% | 18.91% | 44.27% | 55.56% | 43.86% | 40.66% | 44.64% |
| 5 | 20.40% | 33.89% | 25.60% | 15.69% | 20.56% | 48.43% | 59.98% | 50.32% | 44.24% | 48.28% |
| 6 | 22.72% | 35.04% | 28.41% | 16.46% | 21.69% | 51.84% | 62.20% | 54.50% | 46.96% | 51.18% |
| 7 | 22.59% | 40.00% | 30.03% | 18.11% | 22.01% | 54.08% | 69.89% | 56.90% | 51.93% | 54.07% |
| 8 | 26.10% | 39.57% | 32.20% | 17.93% | 23.20% | 58.20% | 67.48% | 62.44% | 53.78% | 56.77% |
| 9 | 28.23% | 40.31% | 30.24% | 20.87% | 24.74% | 62.20% | 70.92% | 62.89% | 57.46% | 60.18% |
| 10 | 29.62% | 46.97% | 34.21% | 22.20% | 25.46% | 64.98% | 73.48% | 71.05% | 63.61% | 64.49% |
| Average | 21.29% | 19.01% | 18.69% | 17.65% | 19.52% | 49.79% | 42.79% | 41.25% | 50.21% | 48.09% |

*Note that those who do not have an alumni interview are coded as not having received a 2 or higher on the alumni overall rating

Although they seek to show that conditional statistical parity is violated when comparing Asian and white applicants, their most dramatic claims of violation are made when comparing Asian and Black applicants:

> Race plays a significant role in admissions decisions. Consider the example of an Asian-American applicant who is male, is not disadvantaged, and has other characteristics that result in a 25% chance of admission. **Simply changing the race of the applicant to white—and leaving all his other characteristics the same**—would increase his chance of admission to 36%. **Changing his race to Hispanic** (and leaving all other characteristics the same) would increase his chance of admission to 77%. **Changing his race to African-American** (again, leaving all other characteristics the same) would increase his chance of admission to 95%.[18]

I have no idea what metaphysical or empirical meaning the proposition "simply changing the race of the applicant" could have.[19] But the above quote does have a clear *statistical* meaning, which is simply that conditional on having some set of observable credentials, white, Hispanic, and Black applicants have some [X, Y, and Z respectively] higher probability of admission compared to Asian applicants.[20]

---

[18] Plaintiff Expert Report, *supra* note ## at 3.
[19] See generally, Issa Kohler-Hausmann, *Eddie Murphy and the Dangers of Counterfactual Causal Thinking About Detecting Racial Discrimination*, 113 Nw. U. L. Rev. 1163, 1205 (2019). In another bewildering statement of counterfactual nonsense: "Absent racial preferences, African-American applicants would be treated as white applicants." Plaintiff Rebuttal Report, *supra* note ## at 47.
[20] *See, e.g.*, Plaintiff Rebuttal Report, *supra* note ## at 46. ("Professor Card's own models show that racial preferences are responsible for tripling the number of African-American admits and doubling the number of Hispanic admits."). Here, and in many other places, the plaintiffs' expert describes statistical relation that obtains between numbers in a data set as either an obvious instantiation of either subjective mental states (i.e. "preferences") or psychological causal relations (i.e. "racial bias").

7

Harvard's defense expert, for the most part, implicitly accepts the plaintiffs' definition of discrimination by dedicating most of their report to trying to make evidence of unequal conditional statistical parity go away—at least with respect to comparing Asian and white applicants—basically by adding more conditions (more Xs) into their model.[21] First, they argue that, "it is difficult to quantify and include in a statistical model many of the non-academic and contextual factors that Harvard's admissions process values."[22] Second, they argue that if we could observe and quantify all of qualitative factors about applicants, then evidence of unequal conditional statistical parity would go away.[23] As will be explained below, my beef is not with the methods used to substantiate whether conditional statistical parity is violated with respect to particular racial groups. My beef is with using that as the definition of what constitutes denial of equal protection.

**So what's wrong with conditional statistical parity?**

I want to focus on two things that are wrong with adopting something like conditional statistical parity to define denial of equal protection on the basis of race in admissions. First, it means one has foreclosed Reading Two because the principle demands the same relation of equality no matter what relations of inequality constitute the groups in question. Second, it would not only be inconsistent with the Supreme Court's line of cases allowing universities to value racial diversity, it would also be inconsistent with the entire logic of the graded scrutiny scale in equal protection doctrine. The second point is just another way of saying that the entire moral reason we have to care so much about establishing some to-be-specified relation of equality between *these* groups (i.e. people grouped by the concept of 'race') is that they have in the past and continue to sit in some relation of inequality to each other.

*Conditional statistical parity will be violated between any two groups where one has a lower average credential rakings than the other, and Harvard seeks to increase admissions of the lower-mean group beyond what would be produced by simply admitting on the basis of those credentials alone.*

---

[21] *See generally* Report of David Card, Ph.D. at 25-45 Students for Fair Admissions, Inc. v. Harvard, No. 14-cv-14176-ADB (D. Mass. June 15, 2018) [hereinafter Harvard Expert Report]. For a clear statement of this principle, see *id.* at 39. Many of the "contextual factors" that Harvard's expert adds to his model to make evidence of unequal conditional statistical parity go away are things that are partially constitutive of racial categories, things such as "the quality of the applicant's high school, the socioeconomic characteristics of the applicant's high school and neighborhood, and the applicant's family background." *Id.* at 33; *see also* Rebuttal Report of David Card, Ph.D. at 15-17, Students for Fair Admissions, Inc. v. Harvard, No. 14-cv-14176-ADB (D. Mass. June 15, 2018) [hereinafter Harvard Rebuttal Report]. As the plaintiffs point out, defendants do not claim that there is conditional statistical parity when comparing Asian and Black or Hispanic applicants. Instead, the defendants argue that race only has an "effect" for those who already have a high probability of admission, Harvard Expert Report, *supra* at 81, 84, and that "race is less important than unmeasured, individualized factors," *id.* at 85.

[22] Harvard Expert Report, *supra* note ## at 32, para 65.

[23] Harvard Expert Report, *supra* note ## at 32 ("[T]here may well also be racial differences in the many other non-academic factors (like the personal essay) that are not observable in the database and that are important to the admissions process given the large pool of applicants with extraordinary academic achievement."). Harvard's approach to making the racial differentials go away is similar for personal ratings, largely arguing that, first, alumni ratings are not based on the full record that Harvard admission staff personal and ratings are based on, and second that the plaintiffs models are "quite low in predictive accuracy and do not reliably control for the many hard-to-measure factors that are likely very important to the determination of the ratings." *Id.* at 74.

First, the plaintiffs' proposed content for the Equal Protection Clause gives us no way to *normatively* differentiate between the following *statistical* facts (taken from Table 2): Within the top academic decile of applicants, (1) Harvard staff awards Black applicants the top two personal ratings 112% more often than Asian applicants; (2) Harvard staff awards Black applicants the top two personal ratings 59% more often than white applicants; (3) Harvard staff awards white applicants the top two personal ratings 33% more often than Asian applicants. Reading Two (preserving affirmative action for some groups) is foreclosed if equal protection of the law is violated *whenever* the relation of conditional statistical parity is violated between people grouped by race. That is, there is no logical way for a court to find (3) to be evidence of discrimination against Asian applicants in favor of white applicants, while at the same time declining to find (1) and (2) evidence of discrimination against Asian applicants in favor of Black and Hispanic applicants, and thereby preserving affirmative action for the latter groups.

Second, if equal protection in higher education admissions is defined by the relation of conditional statistical parity, then all sorts of groups are being denied equal protection by Harvard, such as groupings based on "disadvantage" versus "not disadvantaged" background, or coming from an under-served, non-elite, or low-income geographic region versus coming from a well-resourced, elite, rich geographic region. Why? Because those groupings are characterized by the same statistical differentials as racial groupings: they apply to Harvard at different rates with different average academic and other valued credentials.

Consider the groupings based on "disadvantage" versus "not disadvantaged" background, which according to the plaintiffs is a designation assigned by the admissions staff "if the reader believes the applicant is from a very modest economic background."[24] The plaintiffs report that 12.87% of the applicants in their "preferred dataset" are classified as disadvantaged by Harvard admissions staff.[25] For purposes of illustrating the point, assume 129 of the 2,000 entering freshman would be "disadvantaged," or roughly 6.4%. Admitting strictly on the basis of being in the top academic decile would produce a pattern of admissions with respect to the "disadvantaged" grouping. That pattern is simply a feature of the conditional distribution of "disadvantaged" within the top decile, which is a fancy way of saying that a higher proportion of candidates in the top academic decile are "not disadvantaged."

Table 2

**Applicant pool of 20,000**

| All Applicants - # Academic | Total #: Not disadvantaged | Disadvantage | Total | % Not disadvantaged | Disadvantage |
|---|---|---|---|---|---|
| Top decile* | 1,871 | 129 | 2,000 | 93.57% | 6.44% |
| Bottom 9 | 15,555 | 2,445 | 18,000 | 0 | 0 |
| Total | 17,426 | 2,574 | 20,000 | | |

---

[24] Plaintiff Expert Report, *supra* note ## at 3 n.3.
[25] Table A.7 reports the percent of applicants designated as "disadvantaged." Plaintiff Expert Report, *supra* note ## at 93. The publicly available portions of the expert reports do not report cross-tabulations of disadvantage and academic rankings, so the stylized example below was constructed assuming that a higher percentage of applicants categorized as "not disadvantaged" were in the top academic decile (roughly 10%), compared to the percentage of applicants categorized as "disadvantaged" (roughly 5%).

If Harvard believes that its educational mission can't be served when only 6.4% of the entering class come from "disadvantaged" economic backgrounds and if they accordingly purposefully increase the number of "disadvantaged" admits—which is what it *means* to be free to value socioeconomic diversity—they will have to draw from the lower 9 academic deciles in order to admit those extra "disadvantaged" applicants. How many? Who knows. That is a subject to debate. But certain mathematical facts are just going to be true if they increase the number by even one. Namely, the relation of conditional statistical parity will be violated: $P(A=1|X=\text{high academic}, G=\text{Not disadvantaged}) < P(A=1|X=\text{high academic}, G=\text{Disadvantaged})$, and $P(A=1|X=\text{low academic}, G=\text{Not disadvantaged}) < P(A=1|X=\text{low academic}, G=\text{Disadvantaged})$. It is a feature of applicant distribution that there are more "not disadvantaged" applicants than "disadvantaged" (by a factor of almost 7 to 1), and within the top academic decile there are significantly more "not disadvantaged" versus low "disadvantaged" (by a factor of roughly 15 to 1). This does not tell us *which* of the candidates in the underrepresented group will be admitted, but the group-based conditional probabilities will necessarily be uneven when the group-based conditional distributions of the other valued factors are different.

One might look at this and say: "Well, these tradeoffs are contingent on the relative proportions of each group that are in the subgroup (e.g., the respective proportions of "disadvantaged" vs. "not disadvantaged" applicants within the top academic decile). If you changed those, then you would not face that tradeoff." Yes, that is true. And that is why one needs a theory of the relevant form of groupness *before* one can propose a substantive principle of equality *with respect to that form of groupness*.

By examining what the groupness of "disadvantaged" *is*, we see that some tradeoff between admitting on the basis of academic ratings and representativeness of "disadvantage" in admissions is unavoidable. To be in the category "disadvantaged" is to be ranked with respect to things like household financial resources, social prestige of parents' or head of households' occupations where children are reared, cultural opportunities, access to elite networks, etc. Those classified in the group "disadvantaged" have less of those things than those classified in the "not disadvantaged" *by definition*. Therefore, the fact that applicants designated "not disadvantaged" have a higher proportion of persons that score in the top academic decile compared to those designated "disadvantaged" is not a random statistical correlation. Having access to high quality schools, private tutors, adults (parents or paid childcare workers) who have the time and resources to monitor and promote the child's academic success, and cultural capital interpreted as intellectual potential is constitutive of *what-it-is* to be in the category "not disadvantaged." There might be some things that are randomly correlated (i.e. without a social mechanism to explain it) or not correlated at all with the category—consumption of mayonnaise, thinking Ariana Grande's new album is good (it's not), addresses that start with a prime number—but scoring well on academic measurements is not one of them.[26] This has nothing to do with the

---

[26] In fact, if the correlation between the status "disadvantaged" and academic rankings were merely random (like the one we may find between mayo consumption and academic rankings), it would mean there are no existing social mechanisms to *justify* accepting some trade off between admitting strictly on the basis of academic ranking and representativeness of persons designated "disadvantaged."

inherent potential of persons grouped in "disadvantaged," it is a reflection of the social mechanisms that constitute what socioeconomic stratification *is*.[27]

The same is true for race. By examining what the groupness of "race" *is*, one sees that it does not group merely on the basis of obvious natural biological or genetic facts. Rather, it groups on the basis of social and economic differentiation that has made certain biological and genetic facts emerge as salient social designations. This take on *what-it-is* to have racial categories is often referred to as the "social constructivist" view, which holds that bodily markers of race currently have social meanings only *by virtue of* the specific social, political, cultural, legal, economic, etc. arrangements in this particular society. Here in the United States, the history of racial group formation in is a history of inequality, subjugation, exclusion, and in many cases horrific exploitation. The category of "white," for example, has been forged by enslaving, excluding, or legally limiting the life chances of persons defined in contradistinction to "whiteness" with practices from chattel slavery, naturalization law limiting citizenship to "free white person of good character," the Chinese Exclusion Act, to violent subjugation of Mexican, Central and South American migrants.[28] There is nothing *inherent* to the groups that we know of as 'races' that created these relations of inequality; these practices were historical contingencies. But they are the historical contingencies that in fact unfolded.

Those historical facts explain the contemporary relations of inequality that currently constitute racial groupings.[29] Persistent relations of inequality are reflected in countless social science studies of racial disparities—from prenatal care to end of life palliative care, and including disparities in primary and secondary academic measures.[30] As shown in Table 1, there are fewer African American and Hispanic applicants relative to white and Asian applicants, and a much smaller proportion of the former are in the top academic decile relative to the latter. One reason

---

[27] This logic is reflected in the College Board's decision to include an "adversity score" for college admissions officers including factors such as, "including the relative quality of the student's high school and the crime rate and poverty level of the student's neighborhood." Anemona Hartocollis, *SAT's New 'Adversity Score' Will Take Students' Hardships Into Account*, THE NEW YORK TIMES, May 16, 2019, https://www.nytimes.com/2019/05/16/us/sat-score.html (last visited Jun 14, 2019)

[28] Kitty Calavita, *The Paradoxes of Race, Class, Identity, and "Passing": Enforcing the Chinese Exclusion Acts, 1882-1910*, 25 LAW & SOCIAL INQUIRY 1–40 (2000); MATTHEW FRYE JACOBSON, WHITENESS OF A DIFFERENT COLOR (Harvard University Press) (1999); IAN HANEY LOPEZ, WHITE BY LAW: THE LEGAL CONSTRUCTION OF RACE (NYU Press) (2006).

[29] This is why Justice O'Connor's optimistic sunsetting of the use of race-conscious admissions policies in *Grutter* seemed so out of touch with the actual reality of persistent and entrenched racial equality. *Grutter v. Bollinger*, 539 U.S. 306, 341–42 (2003). "[W]e are nowhere close to the kind of sustained improvement in opportunities for people of color that would justify" Elise C. Boddie, *The Future of Affirmative Action*, 130 Harv. L. Rev. F. 38, 43 (2016). The Court's own limits on policies explicitly dedicated to achieving racial equality are one of the main impediments to achieving that world. See, e.g. Kimberly Jenkins Robinson, *Fisher's Cautionary Tale and the Urgent Need for Equal Access to an Excellent Education*, 130 Harv. L. Rev. 185, 188 (2016).

[30] Alexander K. Smith et al., *Racial and Ethnic Differences in End-of-Life Care in Fee-for-Service Medicare Beneficiaries with Advanced Cancer*, 57 JOURNAL OF THE AMERICAN GERIATRICS SOCIETY 153–158 (2009); Melissa A. LoPresti et al., *End-of-Life Care for People With Cancer From Ethnic Minority Groups: A Systematic Review*, 33 AMERICAN JOURNAL OF HOSPICE AND PALLIATIVE MEDICINE® 291–305 (2016); William A. Grobman et al., *Racial and ethnic disparities in maternal morbidity and obstetric care*, 125 OBSTETRICS AND GYNECOLOGY 1460–1467 (2015); Linda Villarosa, *Why America's Black Mothers and Babies Are in a Life-or-Death Crisis*, THE NEW YORK TIMES, Apr. 11, 2018, https://www.nytimes.com/2018/04/11/magazine/black-mothers-babies-death-maternal-mortality.html (last visited Jul 10, 2019); KATHERINE MAGNUSON & JANE WALDFOGEL, STEADY GAINS AND STALLED PROGRESS: INEQUALITY AND THE BLACK-WHITE TEST SCORE GAP (Russell Sage Foundation) (2008)

for that is because race and ethnicity groupings are highly correlated with "disadvantaged" status. According to the plaintiff's expert report, about 6% of the white applicants are categorized as "disadvantaged," compared to 11% of the Asian applicants, almost 30% of the African American applicants, and 25% of the Hispanic applicants. Said in the language of constructivism: to be in a designated racial category in America is not merely to have some set of physical features or genetic markers. It also includes standing in a particular probabilistic relation to academic achievement *by virtue of* certain social, cultural, or economic arrangements.[31] The strong correlation between "disadvantaged" status and African American and Hispanic designation is not a random surprising co-occurrence. For a constructivist, the racial patterns in academic ranking do not reflect anything about biological or genetic facts, much less inherent capacity for academic excellence. They reflect the very social facts that make racial groupings what they *are* in the United States.

Therefore, if race is a category made possible by, among other things, social and economic stratification, then there is no good normative reason to adopt conditional statistical parity as the principle of what equal protection demands for *these* groups in *this* domain.[32]

This brings me to the second reason to reject conditional statistical parity to define denial of equal protection on the basis of race in admissions: it is irreconcilable with the doctrine of strict scrutiny for racial classifications and the Supreme Court's tolerance of a university's prerogative to pursue "the educational benefits that flow from student body diversity."[33]

*Conditional statistical parity can't be reconciled with the doctrine of strict scrutiny and the freedom to value racial diversity*

It's hard to fight with the mathematical fact that conditional statistical parity will be violated between any two groups whenever one group has a lower average ranking than the other on valued credentials (the Xs), and Harvard seeks to increase admissions of the former beyond what would be produced by simply admitting on the basis of those credentials. But race is a special form of groupness under the Equal Protection Clause. The Supreme Court has interpreted the Equal Protection Clause to mean that, the "government may treat people differently because of their race only for the most compelling reasons."[34] So it's one thing if conditional statistical parity is violated between the groups "rural Kentucky applicants" and "Upper East Side Manhattan applicants" or "disadvantaged applicants" and "not disadvantaged applicants"

---

[31] As the entire field of "neighborhood effects" has shown, individual-level disadvantage designations fail to capture the true social meaning of concentrated, intergenerational disadvantage especially for African Americans. See, e.g. PATRICK SHARKEY, STUCK IN PLACE: URBAN NEIGHBORHOODS AND THE END OF PROGRESS TOWARD RACIAL EQUALITY (University of Chicago Press) (2013); ROBERT J. SAMPSON, GREAT AMERICAN CITY: CHICAGO AND THE ENDURING NEIGHBORHOOD EFFECT (University Of Chicago Press) (2012).

[32] Few constructivists would hold that racial categories exists *only* by virtue of economic inequality, as opposed to existing also by virtue of cultural practices including how symbolic practices construct designations as having social value and meanings.

[33] *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003). I say "tolerance" because recognition of this value as a compelling state interest has been narrowly eked out over the years. See, e.g. *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 310 (2013) (holding that "the decision to pursue the educational benefits that flow from student body diversity,' that the University deems integral to its mission is, in substantial measure, an academic judgment to which some, but not complete, judicial deference is proper...") (internal citations omitted).

[34] *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

because those groupings are only subject to rational basis review. It's another thing when it's violated between racial groups because the Supreme Court has held that, "all racial classifications are categorically prohibited unless they are '"necessary to further a compelling governmental interest"' and "narrowly tailored to that end."[35]

But SFFA can't have it both ways. Equal protection doctrine starts from the premise that the state can use all sorts of groupings and classifications—such as on the basis of cognitive or mental disability[36] or number of years operating a food pushcart in the French Quarter of New Orleans.[37] Although the "wholly arbitrary act" can feasibly be struck down under rational basis review,[38] the deference expressed by that doctrine presumes that classifications *as such* are not problematic and, accordingly, not properly policed by the federal judiciary for rationality or random meanness. If racial groups *only* reflected groupings on the basis of physical features presumed to have some link to ancestral geographic origin or common genetic structure, then there would be no reason to subject this grouping to strict scrutiny as opposed to rational basis review. And if what's wrong with the state using a particular form of grouping is *merely* that a state actor (or private actor with state funding) is being irrational or even mean by differentiating between people so grouped, then why care *more* when the grouping is race than years of owning a pushcart?

The graded scrutiny scale in equal protection doctrine tracks social categories where our moral reasons for being extra concerned about state action have everything to do with the social history and current social facts that make those groupings *what-they-are*, namely a grouping of past and current stratification, oppression, and inequality. Only when the groupness has a certain quality do we think there is good reason to overcome other reasons to defer to legislative prerogatives and federalism.[39]

SFFA wants to have it both ways. They rely on the doctrine of strict scrutiny to get mad discovery from Harvard about its admissions practices because it uses the racial status of applicants to make admissions decisions and to demand narrow tailoring of the use of racial classifications. But they then want to ignore the moral reasons *why* the doctrine exists for the

---

[35] *Fisher v. Univ. of Texas at Austin (Fisher I)*, 570 U.S. 297, 316 (2013) (J. Scalia concurring).

[36] Holding that, because "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest," the Court of Appeals "erred in holding mental retardation (sic) a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 42 (1985).

[37] Holding that the "grandfather provision" of a New Orleans statute banning pushcarts that have not been in operation for more than 20 years from the historic French Quarter was not was a "totally arbitrary and irrational method of achieving the city's purpose," which was "to preserve its distinctive charm, character, and economic vitality," notwithstanding the fact that the categorization differentially harmed pushcart operators on the basis of a grouping that was not necessarily going to assure the preferred operators would respect the traditions or preserve the distinctive historical character any more than the disfavored operators. *City of New Orleans v. Dukes*, 427 U.S. 297, 299 (1976).

[38] The "the wholly arbitrary act, [] cannot stand consistently with the Fourteenth Amendment." *City of New Orleans*, 427 U.S. at 304.

[39] "In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *City of New Orleans*, 427 U.S. at 303.

classification of race but not years of pushcart ownership when debating *which* substantive principle should give content to equal protection between groups classified in this domain (i.e. what purposes are legitimate and which means are sufficiently narrowly tailored in the right way). My argument is simply that one needs to take account of what the relevant form of groupness *is* when making arguments about what the correct relation of equality ought to be for those particular groups.

Adopting my argument does not dictate the content of what equal protection demands in college admissions. But it does, as the class example above, mean that we can't have the debate about what criteria are fair vis-a-vis different groups or what adequately narrow tailoring ought to look like by assuming *away* the current social facts that constitute the groups about which a party is charging discrimination. Just as one can't debate what selection criteria would be fair vis-à-vis the groups "disadvantaged" and "not disadvantaged" by assuming equal average resources between members of different groups, one can't debate what selection criteria would be fair vis-a-vis groups designated as "races" by assuming equal social and economic resources because the latter, like the former, is a social classification system partially constituted by some form of stratification.

There was a glimmer of recognition of this fact in *Fisher II*, where the Court held that "a university may institute a race-conscious admissions program as a means of obtaining 'the educational benefits that flow from student body diversity.'"[40] If Harvard believes that it can't reap "the educational benefits that flow from a diverse student body,"[41] by relying on just academic credentials to produce a freshman class that consists of .075% Black and 2.7% Hispanic students, then the only candidates that can "diversify" the freshman class along racial lines are the ones classified in the underrepresented groups under a scheme valuing only academic credentials in the example above (or whatever other valued credentials are unequal by racial groupings). As shown in Table 1, any steps taken towards that end—even as small as admitting one additional black or Hispanic student—will violate conditional statistical parity.

What's more, the only facts that the Court has recognized as justifying the continued use of "race conscious" admissions plans are the facts that place people classified into different racial groups in social circumstances that cause the unequal distribution of other valued credentials. *Fisher II* put universities on notice that they, "must continue to use [admissions] data to scrutinize the fairness of its admissions program; to assess whether changing demographics have undermined the need for a race-conscious policy."[42] Meaning, the social inequality that produces the unequal distribution by race within the top academic decile that the plaintiffs' rely on to prove conditional statistical parity in probability of admissions by racial groups is violated, are the very same social inequalities that *justify* the continued use of race to produce racial diversity.[43]

---

[40] *Fisher v. Univ. of Texas at Austin (Fisher II)*, 136 S. Ct. 2198, 2210 (2016) (internal citations omitted).
[41] *Fisher I*, 570 U.S. at 297.
[42] *Fisher II*, 136 S. Ct. at 2214–15.
[43] "Postsecondary institutions consider the race of applicants in substantial part because of the racial achievement gap between applicants on standardized test scores and the systemic disparities within elementary and secondary education that cause these gaps." Kimberly Jenkins Robinson, *Fisher's Cautionary Tale and the Urgent Need for Equal Access to an Excellent Education*, 130 Harv. L. Rev. 185, 187 (2016).

14

The mathematical upshot of pursuing racial diversity given the distribution of the academic credentials by group is similar for the personal and overall ratings as it was for the probability of admission. Admissions officers may indeed harbor and reply on stereotypes about Asian applicants. But in terms of what underlying processes are consistent with the statistical evidence, if one group makes out a very high proportion of the top ranking along one dimension—namely academic ratings—and if ordinal ranking on the other rankings is done to *narrow* the class of eligible candidates in order to award a scarce resource (admission), those rankings must necessarily reflect other diversity criteria the institution purports to value including race. That is, one would expect that some of the other metrics used to quantify the value that "personal" dimensions would add to Harvard's diversity goal to be positively correlated with membership in the groups that would be underrepresented if Harvard just relied on academic metrics.[44] In fact, one might even see the personally demeaning character of having to value racial diversity through assignment of some amorphous thing called "personal rating" the upshot of the Supreme Court's disjointed doctrine in the area of affirmative action that disallows universities from pursuing a "quota or a goal,"[45] in racial composition, or engaging in "racial balancing,"[46] but does allows for consideration of race as "but a 'factor of a factor of a factor' in the holistic-review calculus."[47] As foreshadowed by the dissenting Justices in *Gratz*, the Court's prior decisions demand admissions procedures that necessarily suffer from the "disadvantage of deliberate obfuscation."[48] In this case, there is a dignitary distortion to applicants on the basis of race when the only way to pursue the laudable and constitutional goal of diversity involves devaluing other applicants on the basis of an assessment of unnamed "personal" traits.[49]

Which leads to a final question: Is there no way Harvard can achieve racial diversity using race-neutral means? By posing the question that way I hope to expose the absurdity of the proposal.[50] There is no "race-neutral" means of achieving the end of racial diversity. For the life of me, I have never understood what courts could possibly mean by the designation of certain factors as "race neutral" in the context of exploring mechanisms distinct from knowing and using the racial status of applicants in admissions for the purposes of achieving racial diversity. If the factor is *not* correlated with race and there is no social mechanism connecting race and the factor, then it will not, by definition, serve any function whatsoever towards the goal of achieving racial diversity. If the factor *is* correlated with race and if there is a social mechanism that produces that correlation (as opposed to it being a random statistical fluke), then I can't think of any sensible definition by which it can be designated "race-neutral." To insist on individualism,

---

[44] This is conceptually distinct from the argument that Harvard's expert emphasizes, which is that the administrative data is an imperfect quantification of an irreducible array of qualitative differences between candidates and, therefore, the most important differences are not observable.

[45] *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 289 (1978).

[46] *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003).

[47] *Fisher II*, 136 S. Ct. at 2207.

[48] *Gratz v. Bollinger*, 539 U.S. 244, 298, 123 S. Ct. 2411, 2442 (2003) (JJ. Stevens and Souter dissenting).

[49] "If honesty is the best policy, surely Michigan's accurately described, fully disclosed College affirmative action program is preferable to achieving similar numbers through winks, nods, and disguises." *Gratz*, 539 U.S. at 305 (JJ. Ginsberg and Souter dissenting).

[50] *Gratz*, 539 U.S. at 298 (JJ. Stevens and Souter dissenting) ("The 'percentage plans' are just as race conscious as the point scheme (and fairly so), but they get their racially diverse results without saying directly what they are doing or why they are doing it."); *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 335 (2013) (J. Ginsberg dissenting) ("only an ostrich could regard the supposedly neutral alternatives as race unconscious…Texas' percentage plan was adopted with racially segregated neighborhoods and schools front and center stage.).

colorblindness, race neutrality, and the like in the face of a charge of racial injustice is nonresponsive. It can mean one of two things: either the speaker does not understand what the form of groupness called "race" references in our society; or the speaker understands, and nevertheless thinks zero weight should be given to that form of groupness in moral and political affairs. The only way to argue about what racial equality or nondiscrimination requires is to first inquire into how that form of social groupness is currently constituted, and then to debate, given those facts, what is fair and just in a specific domain.