1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3      _____

4      STUDENTS FOR FAIR ADMISSIONS, INC.,

5                         Plaintiff,          Civil Action
                                              No. 14-14176-ADB
6      v.
                                              October 17, 2018
7      PRESIDENT AND FELLOWS OF HARVARD
       COLLEGE, et al.,                       Pages 1 to 241
8
                         Defendants.
9      _____

10

11             * * * * **SEALED TRANSCRIPT** * * * *

12              TRANSCRIPT OF BENCH TRIAL - DAY 3
             BEFORE THE HONORABLE ALLISON D. BURROUGHS
13               UNITED STATES DISTRICT COURT
                JOHN J. MOAKLEY U.S. COURTHOUSE
14                   ONE COURTHOUSE WAY
                     BOSTON, MA  02210
15

16

17

18

19

20

21

22

23                JOAN M. DALY, RMR, CRR
                     Official Court Reporter
24              John J. Moakley U.S. Courthouse
                One Courthouse Way, Room 5507
25                   Boston, MA  02210
                    joanmdaly62@gmail.com
           — SEALED -- ATTORNEYS' EYES ONLY —

1        MS. ELLSWORTH:  No.  Whatever you prefer.

2        THE COURT:  Let me take a look at them tonight and

3    see exactly what we're talking about, and I will do at least

4    a chunk of it tonight if not all of it.  All right?  Okay.

5        MS. ELLSWORTH:  Thank you, Your Honor.

6        THE COURT:  Sorry about that.  I should have looked

7    at it before I left and I didn't.  Okay.

8        Where is the dean?

9        THE WITNESS:  Your Honor, good morning.

10       THE COURT:  You can resume your position.

11       MR. HUGHES:  Good morning, Dean Fitzsimmons.

12       Before we get started and resume the examination of

13   the dean, there's an evidentiary matter that I anticipate is

14   going to come up right away that I'd like to handle before we

15   get going.  I'd prefer actually to do that either at sidebar

16   or somehow outside the presence of the witness.  I'm just

17   concerned the discussion of the objections could be better

18   had not in front of the witness.

19       MR. LEE:  Sidebar would be fine, Your Honor.

20       THE COURT:  I'll see you at sidebar.

21       (The following was held at sidebar.)

22       MR. HUGHES:  The dispute, I'll hand you the exhibit

23   to give you context.  It's over Plaintiff's Exhibit P513.

24   What this is is an email exchange between Dean Fitzsimmons

25   and Thomas Hibino, who is the gentleman at OCR who oversaw

1    the investigations that we've talked so much about.  And

2    Harvard produced a version of this email, P221, in the course

3    of discovery that did not have the attachment to the email.

4         We sent a FOIA request to the Department of

5    Education and ultimately, actually fairly recently, obtained

6    a version of the email with the attachment.  What the

7    attachment is, if you flip to the second and third pages, is

8    there's a handwritten note from Mr. Hibino to Dean

9    Fitzsimmons about a "smoking gun" joke document that he

10   prepared that he sent to Dean Fitzsimmons.  You can read what

11   it says there in the handwritten page.

12         And then the last page of the attachment is

13   something that --

14         THE COURT:  Hold me.  Let me read this one.

15         And the last page is?

16         MR. HUGHES:  The last page is, the documents will

17   ultimately show is something that actually Mr. Hibino

18   purloined Harvard admissions office stationery and wrote a

19   joke "smoking gun" letter, and he shares this with Dean

20   Fitzsimmons.  And as you can see from Exhibit P512, after

21   Dean Fitzsimmons reviews this, he indicates that it was

22   funny, because he actually thought was this --

23         MR. LEE:  Actually what he said is, "I'm stunned.

24   This person passed away a few years ago, and I had forgotten

25   she had such a sense of humor.  Will deconstruct at lunch.

1    Where should we go?"  And he said, "No, I actually purloined

2    this."

3              MR. HUGHES:  The reason we want this in is not to

4    offer it for the substantive truth for the fact in the

5    document but the fact that it was communicated.  And we

6    believe there are stereotypical statements in here about

7    another typical Asian-American CJer, which is code in Harvard

8    admissions office for somebody who wants to be a doctor, and

9    also a joke about a lightweight football player.

10             THE COURT:  Hold on let me read this.  What's AA?

11             MR. HUGHES:  Asian-American.

12             THE COURT:  CJer?

13             MR. HUGHES:  I will show evidence from the OCR

14   report that that refers to applicants who want to study

15   biology and have an interest in medicine.

16             THE COURT:  Why CJ?

17             MR. HUGHES:  He can explain.  It's an alphabetical

18   coding thing.

19             MR. LEE:  Your Honor, four things.  Something that

20   Mr. Hughes didn't tell you was these two pages you just spent

21   time reading were produced to them two days before the

22   pretrial conference.  They didn't give them to us.  At the

23   pretrial conference they never raised the issue of these

24   being exhibits.

25             They never told Your Honor that they'd been

1    produced not by us but by the Department of Education.  After

2    the close of business last Friday before the trial starts,

3    they send these over and say we're going to add them to our

4    list.  Of course no one from Harvard wrote these -- if they'd

5    been produced long ago, we could have had Mr. Hibino on the

6    witness list.

7            The critical point which I think Mr. Hughes has

8    respectfully and intentionally passed over is they had these

9    before the pretrial.  They never mentioned it to Your Honor.

10   They never mentioned it to us.  They didn't mention it the

11   day after.

12           There are three other problems with it.  This is

13   hearsay.  It's written by someone that's not at Harvard.

14   They want to go through it line by line.  It's hearsay.  The

15   second is, as Your Honor can see, Mr. Fitzsimmons gets it at

16   6:30 on a Friday night.  At 8:30 on a Friday night he

17   responds to what is obviously just a terribly bad joke by

18   saying "I'm stunned" and tries to blow it off.  And

19   Mr. Hibino responds two minutes later and says, "No, no, I'm

20   sorry, it's just a bad joke.  I stole your stationery."

21           Your Honor, I think there's a big production issue.

22   How can they have things in their possession and then add

23   them after the pretrial?  But more importantly, it's hearsay.

24           The third thing is it's not relevant.  The dean's

25   been on the stand for four and a half hours already.

1    Mr. Hughes curiously told me he's got another 90 minutes.
2    The only thing the dean has to do with this is sending back
3    an email that says, "I'm stunned."  It's not relevant.  It's
4    hearsay.  Walking through an attachment that wasn't produced
5    to us until after the pretrial is wrong.  And it really is a
6    diversion from what we should be talking about.
7              THE COURT:  Start with the hearsay because --
8              MR. HUGHES:  What the hearsay is, we're not
9    offering it for the substantive truth of the matter asserted.
10   He received these communications, and the reason that it's
11   relevant is he says, I'm stunned, I didn't realize that the
12   person he thought wrote it had such a great sense of humor.
13   We can did he construct over lunch -- such a sense of humor.
14   Doesn't say great.  And he writes back and you can see what
15   Hibino's response is.
16             These guys are joking about what was in this email.
17   It would only be hearsay if we were offering it for the
18   actual truth of what's in the attachment.  We're just
19   offering it for the fact of the communication and the
20   response of Dean Fitzsimmons.
21             THE COURT:  That doesn't get you there.
22             MR. HUGHES:  It certainly goes to his state of mind
23   how he responded.
24             THE COURT:  We can get to the issue of the late
25   disclosure in a minute.

1              MR. HUGHES:  I'd like to address that.

2              THE COURT:  What I see as the potential relevance

3    of this is the fact that he has a chummy relationship with

4    the person that's supposed to be doing an independent

5    relationship.  I would let you elicit the fact of that

6    relationship which I think is mostly illustrated here.  But

7    it is -- it's hearsay.  I don't think it's probative of much

8    of anything other than that they had a chummy relationship.

9    And he's not available to cross-examine.  His thoughts on

10   this, more than his thoughts on this are sort of critical.

11             MR. HUGHES:  The only thing I want to do is you've

12   received this, here's what it said, boom, boom.  And your

13   response was, I'm stunned, and this is his response and then

14   I'll move on because I think it both goes to the relationship

15   and his reaction to what I think are stereotypical comments

16   about Asian-Americans.  I'm not saying that he made them.

17   Obviously he didn't make them.

18             THE COURT:  It's clearly an inference that you want

19   me and the entire press corps in this courtroom to draw,

20   right?

21             MR. HUGHES:  I'm not suggesting that he wrote

22   these.  All I'm going to say is that this was his response.

23             THE COURT:  That he found Asian-American

24   stereotypes funny.  I don't think that's a fair reading of

25   this.  Without the other guy to cross-examine, I think it's

```
 1    just way more prejudicial than it is probative.
 2            So in terms of the late disclosure, you both know
 3    my feelings on this.  I want to develop as complete a factual
 4    record as I possibly can.  As much as I am enamored of my own
 5    brilliance, I don't think this case is going to stop here.
 6    I'll get it right or I'll get it wrong, but I want wherever
 7    it goes to have as fulsome a record as possible.  So I am
 8    inclined to give these disclosures as we talked about
 9    yesterday, but there are limits to it.  And you've reached
10    that limit.
11            MR. HUGHES:  If I may, Your Honor.  Because I
12    really do want to correct the record on this.
13            THE COURT:  That's fine.
14            MR. HUGHES:  We received just the attachment on the
15    Monday before the pretrial conference.  We went back to DOE
16    and had them reproduce it connected to the email.  We got
17    that on Wednesday, the day of the pretrial conference, and
18    then produced it two days later after we decided whether or
19    not we were going to use it at trial.  It wasn't like we sat
20    on this thing for weeks and weeks.
21            THE COURT:  It's not that you sat on it.  It's that
22    they are entitled to the witness on it.
23            MR. HUGHES:  I identified this way back when.  This
24    isn't a surprise as of today.
25            THE COURT:  From this they don't have any ability
```

1    to conclude that they need to call him.  This is innocuous,
2    right?  Until you see what's behind it.
3              MR. HUGHES:  We did not have the attachment in our
4    possession until two days before the pretrial conference.
5    That's all we had.  And then we got the full email Wednesday.
6              THE COURT:  Why are you just going to DOE now?
7              MR. HUGHES:  We went to DOE a long long time ago.
8    They produced a trove of things.  They did not produce the
9    attachment.  We appealed and they finally gave it to us two
10   days before the pretrial conference.  We've been very
11   diligent in trying to get this.
12             THE COURT:  I'm not so much faulting you here as I
13   am telling you what my views of this are.  I'm very forgiving
14   on the late disclosures because I think a factual record is
15   more important than any inconveniences.  Like yesterday with
16   the book and the things.  But there are limits to that
17   because it gets to a point where it's unfair.
18             And I take your point on it.  But it has the
19   potential to be explosively prejudicial, not to me because I
20   take it for what it is, but in terms of the external world's
21   response to this.  I'm going to let you -- you can talk to
22   him about the relationship, and we'll see what he says about
23   it.  If he says it's a hands-off, strictly professional,
24   never socialize, we'll revisit it.  But if he says, hey, we
25   were chummy, he lived in our offices for nine months, we had

```
1   lunches, we had dinners, whatever.
2           MR. HUGHES:  He's already testified to that
3   already.  He's already admitted that they became friends and
4   they went to dinner.  We're not going to make a big issue of
5   that.  What I do think that is relevant here, and again the
6   reason we only got it two days before the pretrial conference
7   has nothing to do with a lack of diligence on our part.  We
8   pursued this and pursued this and pursued this.
9           THE COURT:  I accept that.
10          MR. HUGHES:  Again I think the response to an
11  attachment that has stereotypical statements about
12  hypothetical Asian-American applicants that, I'm stunned and
13  I didn't realize my colleague had a great sense of humor.
14          THE COURT:  He doesn't say great sense of humor.
15          MR. HUGHES:  I'm sorry.  I keep on inserting that.
16          THE COURT:  Such a horrifying, such an
17  inappropriate?
18          MR. HUGHES:  Right.  And then we'll deconstruct
19  over lunch.  And then you can see -- we don't even have to
20  get into Hibino's responses.  That's obviously not relevant
21  to anything you have to decide.  I do think this is an
22  important part of the ultimate record.  I'd like to find a
23  way to at least have the exhibit in evidence even if we're
24  not cross-examining the dean on it in open court.
25          MR. LEE:  Let me say three things, Your Honor.  I
```

SEALED -- ATTORNEYS' EYES ONLY

1   agree with Mr. Hughes, Dean Fitzsimmons actually has said

2   they became friends after the investigation.  This is 23

3   years after the investigation, close to the time of

4   Mr. Hibino's retiring.  It's not inconsistent with what he's

5   testified about before.

6           The second thing is if you set aside the disclosure

7   issue, it is hearsay.  Walking through a hearsay document

8   when your response is "I am stunned" is for no purpose other

9   than to embarrass him and to put it in the outside world.  I

10  think on a Rule 403 basis it just isn't right.

11          THE COURT:  That I already said.

12          MR. LEE:  Yes.  I agree.

13          MR. HUGHES:  For the record I think the response of

14  "such a sense of humor" in response to receiving what I think

15  we can all agree was stereotypical comments about

16  Asian-American applicants in a trial where Count I is whether

17  or not there's statistical discrimination against

18  Asian-American documents, in a trial where we've already had

19  evidence from the OCR report that his admissions office made

20  stereotypical comments about Asian-American applicants, it's

21  very relevant to what his reaction is to receive that

22  communication from his regulator.  And I will say they are

23  still interacting on a regulated entity basis at this time.

24          THE COURT:  I am willing to sort of kick the can

25  down the road as whether there's some way for me to take

1    judicial notice of this as a sealed exhibit or whatever, but

2    it's not going to be part of the record on this case for this

3    witness right now.  It's not coming in.  You're not going to

4    question him on it.

5            MR. HUGHES:  Can we revisit the issue so we can

6    admit it in some way so it's part of the record?  I will make

7    an offer of proof at that point so as to not waste anybody's

8    time.

9            THE COURT:  I'm happy to revisit it.  If anybody

10   calls Mr. Hibino, that might be a different circumstance.  At

11   some point I feel for the guy, you get this kind of thing,

12   what are you supposed to say?

13           MR. HUGHES:  One thing is you can say, I reject the

14   stereotypes.  That's one thing you can say.

15           THE COURT:  He says, I'm stunned, let's talk about

16   it at lunch.

17           MR. LEE:  He doesn't even know whose joke this

18   awful joke is.  He thinks this is the woman who died and then

19   Hibino has to come back and say, no, no, no, I'm sorry, I

20   stole your stationery.

21           MR. HUGHES:  I think the fairest interpretation of

22   this is that they're laughing it up.  Other people can have

23   different interpretations.  That's why I think it's important

24   for the record.

25           THE COURT:  This just sounds super awkward to me.

1        MR. HUGHES:  That's one reading.  That's one

2  reading.

3        MR. LEE:  Yes.

4        THE COURT:  You can think about it at lunch about

5  how we can get that exhibit as part of the record if you want

6  it part of the record, and I'm not committing to that.  But

7  we're not going to do it here in this way with this witness.

8  I feel like that is designed for media consumption and not

9  for any great search for the truth.

10        MR. HUGHES:  With respect, I think you understand

11  why we think it is relevant in a trial about where there's

12  evidence of stereotypical comments about Asian-Americans.

13  And I think it's very relevant to the dean's response about

14  receiving that communication.  Of course I understand the

15  Court's view of this.  It will obviously not be part of this

16  morning's presentation.

17        THE COURT:  Good decision.  This bench conference

18  is sealed.

19            (End of sidebar.)

20        THE COURT:  Dean Fitzsimmons, you remain under

21  oath.

22        THE WITNESS:  Thank you, Your Honor.

23        THE COURT:  Whenever you're ready, Mr. Hughes.

24        MR. HUGHES:  Thank you, Your Honor.

25            (WILLIAM FITZSIMMONS previously sworn by the Deputy

1                     UNITED STATES DISTRICT COURT

2                       DISTRICT OF MASSACHUSETTS

3       _____

4       STUDENTS FOR FAIR ADMISSIONS, INC.,

5                       Plaintiff,          Civil Action
                                            No. 14-14176-ADB
6       v.
                                            October 18, 2018
7       PRESIDENT AND FELLOWS OF HARVARD
        COLLEGE, et al.,                    Pages 1 to 246
8
                        Defendants.
9       _____

10

11

                     TRANSCRIPT OF BENCH TRIAL - DAY 4
12          BEFORE THE HONORABLE ALLISON D. BURROUGHS
                     UNITED STATES DISTRICT COURT
13               JOHN J. MOAKLEY U.S. COURTHOUSE
                        ONE COURTHOUSE WAY
14                     BOSTON, MA  02210

15

16

17

18

19

20

21

22                      JOAN M. DALY, RMR, CRR
23                      Official Court Reporter
               John J. Moakley U.S. Courthouse
24              One Courthouse Way, Room 5507
                       Boston, MA  02210
25                  joanmdaly62@gmail.com

1    **A.**  Yes.

2    **Q.**  Did it tell you anything that was inconsistent with what

3    you had understood before the OCR investigation, after it,

4    right through the date you got those reports?

5    **A.**  No.  Perfectly consistent with everything we've known.

6                 MR. LEE:  Thank you, Your Honor.

7                 MR. HUGHES:  I have nothing further, Your Honor.

8                 THE COURT:  Dean Fitzsimmons, you are excused.

9                 THE WITNESS:  Thank you, Your Honor.

10                MR. MORTARA:  Your Honor, Adam Mortara.  Would you

11   remind me of the time you wanted to take lunch?

12                THE COURT:  I was planning on taking lunch from

13   quarter of 1:00 to 1:30.

14                MR. MORTARA:  I would suggest we do it right now

15   because I'm going to be right in the middle of my direct

16   examination of Christopher Looby.  I would be happy to do it

17   now.

18                THE COURT:  I need until 1:30 today.  Why don't we

19   do some of these deposition designations at sidebar before we

20   take a break.

21                (The following was held at sidebar.  Present are

22   Attorneys Katherine L.I. Hacker, Krista J. Perry, Meg E.

23   Fasulo, Denise W. Tsai, and Felicia H. Ellsworth.)

24                THE COURT:  Who do you want to start with?  Do you

25   want to start with Ortiz?

```
 1                  MS. HACKER:  Sure.

 2                  THE COURT:  I think the easiest way is page by

 3      page.

 4                  MS. ELLSWORTH:  That's fine.

 5                  MS. HACKER:  Yes.

 6                  THE COURT:  The first one is on page 2.  That's

 7      overruled.

 8                  MS. ELLSWORTH:  That's withdrawn.  Sorry about

 9      that.

10                  THE COURT:  Page 3 is overruled.  This one is

11      harder to do.  Everything on page 6 comes in.  This one I had

12      to stop because I wasn't sure -- the top half of page 7 comes

13      in.  So page 7 comes in.  Now, on page 8, I couldn't really

14      understand this without an email.  I don't really know what

15      it is and all this talk about planning on using it next week.

16      Using it for what?  I'm just not sure what this is about.

17                  MS. FASULO:  Your Honor, Meg Fasulo for SFFA.  This

18      is discussing an email chain between Ms. Ortiz and Ms. Bever

19      having to do with the distribution of SAT scores that

20      Ms. Ortiz was planning on using in a presentation to other

21      admission officers.

22                  THE COURT:  Other admissions officers at Harvard?

23                  MS. FASULO:  That's correct.

24                  THE COURT:  That comes in.

25                  MS. ELLSWORTH:  And I believe the exhibit came in.
```

1        MS. FASULO:  That's correct.  The exhibit was

2    unobjected to.

3        THE COURT:  Everything on page 8 comes in.  So then

4    on page 10, my highlighting at least starts right in the

5    middle of a question.  So I'm assuming that --

6        MS. FASULO:  That was a mistake.  The whole part

7    should be highlighted.

8        THE COURT:  You're objecting to the answer?  Start

9    on page 9.  Is that what's being objected to, that answer

10   that begins at line 18?

11       MS. ELLSWORTH:  The one that says, "Were I to

12   guess".

13       THE COURT:  That's sustained.  That question does

14   not come in.  The next question does come in, do you recall.

15   She says I don't recall.  That question and answer comes in.

16   And then the next question and answer, the objection is

17   sustained.

18            Page 11, that objection is sustained.  So on page

19   12, this kind of lost me again.  The answer comes in, I don't

20   recall.  The next question, the objection is sustained.  I

21   wasn't sure what you're objecting to.  The answer comes in,

22   but the question is out.

23       MS. ELLSWORTH:  I don't think the answer is the

24   next thing.  This is where it's confusing.  I'm not sure if

25   we objected to this or not.  I think it shouldn't come in

```
 1    because it's speculation.
 2              THE COURT:  What's in is "Would you have conveyed
 3    this information?".  That's a legitimate question.  She says
 4    she doesn't know.
 5              MS. ELLSWORTH:  It's the question that says what is
 6    the type of context that an admissions officer should have
 7    taken away --
 8              THE COURT:  That's sustained.
 9              MS. ELLSWORTH:  So the answer should not come in
10    either, right?
11              THE COURT:  Right.  The next objection that says it
12    was help for me.  That's overruled.  And then -- and that
13    last answer comes in which is on the bottom of page 12.
14              MS. ELLSWORTH:  Got it.
15              THE COURT:  The next one is -- do you want to talk
16    about Zuluaga here?  We can just do the objections here and
17    not hear the argument on who they want to keep out in their
18    entirety.
19              MS. HACKER:  I'm happy to do it all right now since
20    Your Honor has time before your lunch.
21              THE COURT:  Let met check my phone.  Okay.  There's
22    this one and another one.  One of them is from Stuyvesant and
23    the other is from Thomas Jefferson.  What I think on these, I
24    actually looked at Zuluaga and Pedrick.  My thinking on it
25    changed a little on it after I went back and did Pedrick.
```

1    Most of this stuff is not coming in through this witness,

2    right?  All the stuff about are Asians different, different

3    socioeconomic backgrounds, are they the same as each other,

4    that's just not coming in.

5            That being said, if you want to put in some

6    information about Thomas Jefferson, how many students they

7    have and what the gender is, what the ethnic breakdown is, I

8    can see letting that in if it's going to be linked up later.

9    It it's not going to be linked up, it's irrelevant.

10           MS. HACKER:  Whatever Harvard's position was going

11   into trial over the past few days, what we heard from Dean

12   Fitzsimmons is and this is a quote, "You know, the one thing

13   we do know, for example, and again speculation, and it's a

14   fact that the strength of the teacher recommendations and the

15   counselor recommendations for Whites is somewhat stronger

16   than those for Asian-Americans."

17           Dean Fitzsimmons is saying that the schools who

18   support these students do have a different belief, different

19   ratings for Whites versus Asians.  And what we're hearing

20   from these schools is directly relevant to contradict that

21   testimony.

22           THE COURT:  What I heard him say is that they're

23   looking at the evaluations and they're seeing that the

24   evaluations for White students are higher than for Asian

25   students.  So if you want to prove that up, you have to show

1    me some guidance counselor recommendations, not just this

2    like subjective kind of, oh, no, our recommendations would

3    never show anything like that.

4         MS. HACKER:  And we asked for those in discovery,

5    Your Honor, but we were denied --

6         THE COURT:  You were offered the opportunity to

7    come back and nobody ever did.  If you want to put this in

8    and then you have some other statistical breakdown later

9    about how kids from this high school are treated, that's one

10   thing.  But just this thing from the guidance counselor about

11   do we have too many Asians and are Asians different from each

12   other, it's not substantiated by anything.

13        MS. HACKER:  We will have data later that shows

14   there is no difference.  Whites are not better in school

15   support ratings than Asian-Americans.  This testimony

16   confirms that that is what these high school representatives

17   believe.  These were 30(b)(6) witnesses on behalf of these

18   high schools.

19        THE COURT:  It has to be an actual student.  It

20   can't be just general.  I don't even know which of these

21   people applied to Harvard.  And one of them says -- I think

22   one of them even equivocates -- I think the questions were

23   asked differently.  It's like are Asian students

24   well-rounded.  It was like more or less, basically, right?

25   It's like saying some are, some aren't which is probably

1    fair.  Some whites are -- the questions are asked

2    differently.  It doesn't link up to what Harvard is doing.

3          If you want to put in through these people the

4    demographic breakdown of the school, you can have that.  So

5    we can go through it and sort of -- but the rest of it just

6    doesn't come in.  So do you know the breakdown, how many

7    students, how many boys, how many girls, racial breakdown.

8    So that gets you to the top of page 2.

9          MS. ELLSWORTH:  I'm just getting the actual

10   subpoena served to Thomas Jefferson.  I think it's also

11   outside the scope of what they were to speak on.

12         THE COURT:  I didn't look at the scope.  My initial

13   take on this is it was coming out.  None of it was coming in.

14   I went back and looked at Pedrick, I thought if you're going

15   to link up those numbers later --

16         MS. ELLSWORTH:  This is the Thomas Jefferson

17   30(b)(6) notice.  Racial composition of applicants, admitted

18   persons, or enrollees to Harvard; Harvard's use of race in

19   the admissions process; communications to, from or copying

20   Harvard regarding the use of race in the admissions process;

21   alleged discrimination by Harvard against persons of Asian

22   descent from Thomas Jefferson High School for Science &

23   Technology in the college admissions process; and

24   communications concerning SFFA, the plaintiff, and its

25   representatives, including but not limited to Edward Blum or

1    the complaint or this action."

2              This is outside the scope.  I don't know that this

3    is actually competent evidence about the racial or ethnic

4    breakdown of Thomas Jefferson high school.  The witness

5    wasn't put forward on that.

6              MS. PERRY:  Krista Perry for SFFA, Your Honor.

7              THE COURT:  Hold on.  Let me just look at this.

8    She's right about the scope.  Let me what you say about that.

9              MS. PERRY:  I was just going to say that the

10   information about the schools themselves goes to the

11   foundation of the witness being a 30(b)(6) witness in the

12   first place.  To the extent they would have information about

13   discrimination against Asian-Americans to Harvard, it would

14   be through their experience with their students who apply.

15             THE COURT:  I think they are sort of foundational

16   questions on the 30(b)(6).

17             MS. ELLSWORTH:  We also requested documents which I

18   don't believe Thomas Jefferson agreed to provide.  Again the

19   documents are relating to enrollees to Harvard.  They just

20   didn't ask for this in the 30(b)(6) to get the breakdown.

21   I'm not sure these numbers are right.

22             THE COURT:  They're much vaguer here than they are

23   in Pedrick.

24             MS. HACKER:  To be clear, Your Honor, on the data,

25   there was some discussion going into these depositions of

1    whether or not the schools needed to produce the data because
2    it was data we already had from Harvard.  So there was an
3    agreement that the schools didn't need to produce the data
4    separately.
5            MS. ELLSWORTH:  The data from Harvard is the data
6    of whoever applied.  It's not the actual breakdown of Thomas
7    Jefferson.
8            THE COURT:  For example, does the information about
9    the school that Harvard would have on these two schools
10   include the ethnic breakdown of the schools?
11           MS. ELLSWORTH:  Not the school.  Just the
12   applicants to Harvard.
13           THE COURT:  Just the applicants?
14           MS. ELLSWORTH:  Right.
15           THE COURT:  I think this is so marginal.
16           MS. HACKER:  The last thing I'd say on that, Your
17   Honor, given the low bar relevance, we do not plan on
18   spending much time on this.  Mr. Zuluaga's transcript is 10
19   minutes and Ms. Pedrick's is 20.  Given the low bar
20   relevance, and this directly contradicts what we've heard
21   from Dean Fitzsimmons, we do think it should come in.
22           THE COURT:  I know you think it should come in.
23   That's why we're standing here.
24           MS. ELLSWORTH:  It's not the timing to which we
25   object.

```
 1              THE COURT:  I didn't read anything except what's
 2    objected to.  You didn't object to everything.
 3              MS. ELLSWORTH:  We objected to it in its entirety.
 4              THE COURT:  I didn't read the whole testimony.  Or
 5    did I?  Let me see.
 6              MS. ELLSWORTH:  The ones we didn't object to
 7    related to actually topics of the 30(b)(6).  The suggestion
 8    that Thomas Jefferson did not have enough black and Latino
 9    students.  We think the entire designation and the entire
10    deposition is irrelevant.
11              THE COURT:  I'm going to exclude the testimony.
12    I'm going to exclude the witness.  What's next?
13              MS. HACKER:  Was that related to Mr. Zuluaga?
14              THE COURT:  Yes.  Zuluaga is all the way out.
15              MS. HACKER:  Casey Pedrick.
16              THE COURT:  I just want to look at the last pages.
17    This is -- what I was going to let in was, and we can discuss
18    this again in light of Zuluaga, everything on page 2,
19    everything on page 3, everything to "the most competitive
20    high school in the country."  I was going to let that in and
21    I was going to stop right there.  I was going to let in page
22    29 and stop at page 30.
23              MS. ELLSWORTH:  Your Honor, we have the same scope
24    objection.  The subpoena was identical in terms of didn't ask
25    for the admissions criterion or anything like that or
```

1    statistics related to applicants to Harvard.

2          THE COURT:  Once you're keeping out their

3    subjective impressions of the Asian population, the rest of

4    it just becomes sort of irrelevant.  If they were all

5    applying to Harvard and none of them are getting in, that

6    might be relevant.  But until you know who is applying and

7    who isn't and what percentage of them getting in, it's just

8    kind of floating out there.

9          MS. PERRY:  It seems to me just as an individual

10   student might be an instructive example, an individual

11   guidance counselor's impression and just as Dean

12   Fitzsimmons's general impressions of how the system works.

13   It's important to know whether the guidance counselor ratings

14   are objectively different or whether they're being scored

15   differently.

16         THE COURT:  I completely agree that that would be

17   admissible testimony.  So if you want to put it in, get a

18   guidance counselor on the stand and say this is the

19   application that I did for a White person and this is the

20   recommendation that I did for an Asian person, and I view

21   them to be equally strong, and they got different ratings,

22   that's a specific -- but this is like generally our Asian

23   students are great.  It doesn't get you to what Harvard --

24   You don't even know if all the Asian students she thinks are

25   great, you don't know if any of them applied to Harvard.

1    It's just not limited to their applicant pool in any way.

2    MS. PERRY:  Although she does describe her role as

3    a guidance counselor, and presumably she does know which set

4    of students does apply to Harvard.

5    THE COURT:  No recommendations were put in front of

6    her, at least from what I have in front of me.  So she could

7    look at them and say this is an Asian student that I thought

8    was fantastic and they didn't get in.  And this White student

9    that I thought was significantly less qualified did.  There's

10   no way to glean any of that from this.  So this one's out,

11   too.  Who's next?

12   MS. FASULO:  Grace Chang.

13   THE COURT:  Page 3, the objection is overruled.

14   Page 5, it's sustained.  Page 7, they're all sustained.  The

15   top one.  So page 8 is sustained.  The next ones are all

16   overruled on that page.  Overruled on page 9 and the top of

17   page 10.  On the bottom of page 10, so it's two questions and

18   two answers.  The first two answers and the first question

19   come in.  The last question, "Why did Dean Simmons ask you to

20   make that call?" is out.  Sustained on page 11.  Overruled on

21   page 12.

22   MS. ELLSWORTH:  Your Honor, just to be clear, the

23   top of page 11 comes out obviously.

24   THE COURT:  Yes.  The whole thing comes out.  Page

25   12, that top part is overruled.  The bottom part is

1    overruled.  Page 13, overruled.  Page 16, it's all overruled.

2    Page 17, it's all overruled.  Page 18 overruled.  So page 19

3    and 20 and 21, I was once again lost.  I can't see what we're

4    talking about.  It's a 50-page chart.

5             MS. ELLSWORTH:  If I may, Your Honor, a version of

6    the Dean's Interest List, one of which was just introduced

7    into evidence through Dean Fitzsimmons that the witness --

8             THE COURT:  Let's see.  Chance to review it.  Yes.

9    50-page chart.  She reviews the document.  So this is where

10   she says it's not familiar to her.  So I'm not really sure

11   what we're doing here.  You mark it.  She says she's reviewed

12   it.  Right?  You want that out where she says she's reviewed

13   it?

14            MS. ELLSWORTH:  What page are we on?

15            THE COURT:  19.

16            MS. FASULO:  On page 19 we have Exhibit 12 which is

17   actually an email that was sent from Ms. Chang.  And then on

18   page 20 starting at page 22, that's a separate exhibit which

19   is the Dean's List.

20            THE COURT:  But there's no question about

21   Exhibit 12.

22            MS. ELLSWORTH:  Let me just look for it, Your

23   Honor.

24            MS. FASULO:  We were just using Ms. Chang as a way

25   to bring Exhibit 12 into evidence.

1              MS. ELLSWORTH:  This is a document we've objected

2    to because it contains a lot of hearsay.

3              MS. FASULO:  Your Honor, this is not hearsay.  This

4    is an email that was written by Grace Chang about her

5    impressions and reactions to an alumni event.

6              THE COURT:  Do you have it?

7              MS. FASULO:  Yes, I can grab it.

8              THE COURT:  While she's getting that, so the next

9    one -- it's marked.  You ask her to look at it.  Her answer

10   is -- as far as I'm concerned she can look at it.  And then

11   she says -- It's not coming in through her, it's not familiar

12   to her.

13             MS. ELLSWORTH:  These are our counters.  That's why

14   it's not objected to.

15             THE COURT:  I see.  I guess I don't really get

16   this.  If I leave it in, the document's not coming in.  If I

17   leave it out, the document's not coming in.  Do you want to

18   just have her read that she's shown a document for

19   identification?

20             MS. HACKER:  And offer it into evidence, yes, Your

21   Honor.

22             THE COURT:  I'm not going to let it come into

23   evidence because she says it's not familiar to her.

24             MS. FASULO:  She was familiar enough with the

25   docket to be able to identify that it was a Dean's List.

```
 1            THE COURT:  No.  "I'd like to mark it as an
 2   exhibit.  It's a 50-page chart.  Witness reviews document."
 3   Then what happens?  The next thing that I have is you
 4   represent that the metadata indicates when it was created.
 5   "Have you seen documents in this format before?  No.  This is
 6   not familiar to you?  Correct.
 7            MS. FASULO:  That's fine.
 8            THE COURT:  So that one is out.  Let's just finish
 9   the last one, and then we'll go back to the one we just
10   skipped.  "Document 16 is an email chain marked for
11   identification.  Have you reviewed it?  Yes."
12            MS. FASULO:  Again Your Honor, this is an email
13   that Grace Chang sent and received.  We're just using Grace
14   Chang as a way to get this email in.
15            THE COURT:  Are you objecting to that.
16            MS. ELLSWORTH:  We are objecting in part.  There's
17   a lot of hearsay at the bottom of it.
18            THE COURT:  Let me see 16 and 12.
19            MS. FASULO:  This is 16 and this is 12.  Oh, my
20   gosh.  I need better glasses.  What are you objecting to,
21   that this is hearsay?
22            MS. ELLSWORTH:  It's further down, Your Honor.
23   It's on the third page.  Somebody wrote on the message board
24   called College Confidential.  It's right there.  And there's
25   discussions back and forth.
```

1          MS. FASULO:  Your Honor, these are discussions

2     between Ms. Chang and an alumni interviewer in her role as an

3     alumni interviewer.  We're offering this -- that is not

4     hearsay.  We're just offering this statement that

5     Ms. Ellsworth has pointed out for its effect on Ms. Chang.

6          THE COURT:  I'll let this come in but not for the

7     truth, just that that's what they're responding to.

8          MS. FASULO:  Yes.

9          MS. ELLSWORTH:  Your Honor, I think the alumni

10    interviewer statements also come in not for the truth.

11         THE COURT:  Yes.  They'll come in for context on

12    what she's saying.  And then this is 12.

13         MS. FASULO:  Your Honor, this is an email.  The

14    lower email is sent from Grace Chang.  She's recounting an

15    event, an alumni event, and all of her impressions of what

16    happened.  And then you can see at the top she's forwarded it

17    to another admissions officer.

18         MS. ELLSWORTH:  And it's the bottom part, the long

19    part of the email where she recounts various statements from

20    people.  It could come in not for the truth.

21         THE COURT:  That can come in not for the truth.

22         MS. ELLSWORTH:  And then the top part, that's her

23    statement as an employee.  That's fine.

24         THE COURT:  That should get us through today.  I

25    have to go and meet my husband.  Who does that leave?

```
 1              MS. HACKER:  It leaves us I believe with
 2    Ms. Howrigan, Ms. Weaver and Mr. Walsh.
 3              THE COURT:  Who does it leave?  Howrigan.
 4              MS. HACKER:  Mr. Walsh, Ms. Weaver.
 5              MS. FASULO:  And Ms. Lopez.
 6              MS. ELLSWORTH:  Lopez is the only one remaining
 7    that we have an objection in full to the witness.
 8              THE COURT:  I did a bunch of them last night, then
 9    got your email this morning and your email this morning and
10    tried to do a bunch more.  She's the one I haven't done.  So
11    I'll try and do it.
12              (End of sidebar.)
13              (Court recessed at 1:02 p.m.)
14                   ***  AFTERNOON SESSION  ***
15              MR. LEE:  Your Honor, Ms. Conley will be presenting
16    the witness for us.
17              THE COURT:  Whenever you're ready.
18              MR. MORTARA:  Your Honor, Students for Fair
19    Admissions calls Christopher Looby.
20              THE CLERK:  Can you please raise your right hand.
21              (CHRISTOPHER LOOBY duly sworn by the Deputy Clerk.)
22              THE CLERK:  Thank you.  You may be seated.  Can you
23    please state your name and spell your last name for the
24    record.
25              THE WITNESS:  Sure.  My first name is Christopher.
```

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                    Plaintiff,          Civil Action
                                         No. 14-14176-ADB
6    v.
                                         October 19, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                    Pages 1 to 263
8
                    Defendants.
9    _____

10

11
            TRANSCRIPT OF BENCH TRIAL – DAY 5
12      BEFORE THE HONORABLE ALLISON D. BURROUGHS
            UNITED STATES DISTRICT COURT
13         JOHN J. MOAKLEY U.S. COURTHOUSE
                ONE COURTHOUSE WAY
14              BOSTON, MA  02210

15

16

17

18

19

20

21

22            JOAN M. DALY, RMR, CRR
           KELLY MORTELLITE, RMR, CRR
23            Official Court Reporter
          John J. Moakley U.S. Courthouse
24        One Courthouse Way, Room 5507
                Boston, MA  02210
25            joanmdaly62@gmail.com

1   **Q.**  Mr. McBride characterized that analysis as an analysis
2   about the extent to which the admissions process fell
3   negatively on Asian-Americans.  Do you recall that?
4   **A.**  I do.
5           THE COURT:  Can you bend that microphone down a
6   little bit more.
7           MS. ELLSWORTH:  Sure can.  Is that better?
8           THE COURT:  Yes, thank you.
9   BY MS. ELLSWORTH:
10  **Q.**  Do you agree with that characterization?
11          MR. McBRIDE:  Objection, Your Honor.  Can we have a
12  sidebar, please?
13          THE COURT:  Yes.
14          (The following was held at sidebar.)
15          MR. McBRIDE:  Your Honor, I suspect that we're
16  about to have the elicitation of undisclosed expert opinion.
17  She's testified at length that she doesn't have specific
18  recollections of the analyses.  In fact, yesterday, on
19  page 232, she said, "You say you actually don't remember much
20  about the specific analysis that was done in this memo.  Is
21  that right?  I don't really remember the analysis of this
22  work, but I'd be happy to comment on it today."  She signaled
23  very clearly what was the plan, which is to go back and
24  elicit the new expert opinion on that analysis, not the
25  percipient knowledge she had at the time, which was Your

1    Honor's ruling.

2          THE COURT:  Well, she can ask the question, and if

3    she has knowledge or remembers it -- I mean, the work was

4    done in her office.  You had her commenting about it all day

5    yesterday.  So they're entitled to do the same.  She's not

6    going to offer expert opinion removed from her participation

7    in it.

8          MR. McBRIDE:  The point is, though, that she made

9    clear that she didn't have an understanding or recollection

10   of that analysis.

11         THE COURT:  She can see what she does remember and

12   what she --

13         MR. McBRIDE:  Now we're in dangerous testimony.

14   Now we're talking about recovered memory.  She's testified at

15   length about her lack of understanding.

16         THE COURT:  You can cross-examine her on her

17   recovered memory.  It's fair game to ask.  We'll see what the

18   questions are and what the answers are and see if there's

19   anything objectionable about it, but she's entitled to ask

20   the question.

21         MR. McBRIDE:  Your Honor, respectfully recovered

22   memory --

23         THE COURT:  When people say "respectfully," I know

24   that's exactly not what they mean.

25         MR. McBRIDE:  If I may say, Your Honor.

1          THE COURT:  Respectfully or otherwise.

2          MR. McBRIDE:  Is that we're in dangerous territory,

3     and we have someone who is giving testimony that is directly

4     contradicting the prior sworn testimony about not remembering

5     the analysis.

6          THE COURT:  That goes to her credibility, and you

7     can certainly poke at how that memory was recovered

8     overnight, if that's what happens.  But I don't know it's

9     going to happen at the moment.  All she's asked is if she

10    recollects discussing two exhibits with you yesterday.

11         MR. McBRIDE:  Actually, the question was do you

12    agree with that characterization.  She's then offering on

13    opinion on something where she's --

14         THE COURT:  To the extent it's consistent with her

15    job responsibilities and she was there and you can have back

16    at her on your director redirect or recross whatever you want

17    to call it.

18         MR. McBRIDE:  Just in terms of going forward,

19    should I be making additional objections?

20         THE COURT:  She hasn't asked an objectionable

21    question, nor has she given an objectionable answer.  If it

22    comes to that, you object.  If it looks like you should have

23    a continuing objection, we can visit that.  Let's see where

24    it goes.  I don't think there's anything that happened so far

25    that's objectionable.

1          MR. McBRIDE:  Thank you, Your Honor.

2          (End of sidebar.)

3    BY MS. ELLSWORTH:

4    **Q.**  I believe my question to you, Ms. Bever, was relating to

5    Mr. McBride's characterizations of the two exhibits

6    yesterday, P12 and P26.  Do you have that in mind?

7    **A.**  Yes.

8    **Q.**  Mr. McBride characterized the analysis in P12 as an

9    analysis about the extent to which the admissions process

10   fell negatively on Asian-Americans.  Do you recall that?

11   **A.**  Yes.

12   **Q.**  Do you agree with that characterization?

13   **A.**  No.  I would say the analysis shows the relationship

14   between a number of variables and their correlation with the

15   outcome of interest.

16   **Q.**  Was Mr. McBride's characterization of the work in P12 an

17   accurate characterization of the work that you did while you

18   were in OIR?

19   **A.**  I would not agree that it's an accurate characterization.

20   **Q.**  Could you speak up a little bit, please?

21   **A.**  I would not agree that it's an accurate characterization.

22   **Q.**  Thank you.

23          Mr. McBride also characterized the analysis as an

24   analysis that answers questions about the effect of Harvard's

25   use of race in admissions.  Do you recall that testimony

1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                        Plaintiff,          Civil Action
                                             No. 14-14176-ADB
6    v.
                                             October 22, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                        Pages 1 to 244
8
                        Defendants.          SEALED TRANSCRIPT
9    _____

10

11                       *** SEALED ***
                 TRANSCRIPT OF BENCH TRIAL - DAY 6
12         BEFORE THE HONORABLE ALLISON D. BURROUGHS
                  UNITED STATES DISTRICT COURT
13            JOHN J. MOAKLEY U.S. COURTHOUSE
                    ONE COURTHOUSE WAY
14                  BOSTON, MA  02210

15

16

17

18

19

20

21

22                    JOAN M. DALY, RMR, CRR
23                    Official Court Reporter
             John J. Moakley U.S. Courthouse
24            One Courthouse Way, Room 5507
                    Boston, MA  02210
25                joanmdaly62@gmail.com

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open
 3    court before the Honorable Allison D. Burroughs, United
 4    States District Judge, United States District Court, District
 5    of Massachusetts, at the John J. Moakley United States
 6    Courthouse, One Courthouse Way, Boston, Massachusetts, on
 7    October 22, 2018.)
 8              THE CLERK:  All rise.  Court is in session.  Please
 9    be seated.
10              THE COURT:  Good morning, everyone.  Karen just
11    gave me a copy of an email that you all had shared with her.
12    Do you want to discuss that at sidebar?
13              MR. LEE:  Briefly, sure.
14              THE COURT:  Come on up.
15              (The following was held at sidebar and is deemed
16    "sealed".)
17              THE COURT:  ███████████████████████████████████
18    ██████████████████████████████████████████████████████
19    ███████████████████████████████████████████████████████
20    ██████████████████████████████████████████████████████
21    ████████████████████████████████████████████████████
22    ███████████████████████████████████████████████████████
23    ███████████████████████████████████████████
24         ████████████████████████████████████████████
25    ███████████████████████████████████████████████
```



1
2
3
4
5
6          THE COURT:  As long as I have you here on a
7     completely different topic which I also don't want to raise
8     in open court.  My understanding from something that was said
9     earlier in the trial is that you all are not intending on
10    putting in the applications of the parties that you
11    represent.
12          MR. MORTARA:  That's correct, Your Honor.
13          THE COURT:  Again I'm not going to put this on the
14    open record because it's your case to try.  I am interested
15    in those applications if you have any interest in revisiting
16    that.  And the reason is that -- this case is largely about
17    sort of statistical analysis, but we've seen the applications
18    of some people that did get in.  And I suspect if the
19    application said on its face "not admitting another Asian"
20    you would have admitted it, right?
21          MR. MORTARA:  Absolutely, yes.
22          THE COURT:  I'm wondering if there's other things
23    that make it apparent in the application why they're not
24    being admitted as contrast with people that are being
25    admitted.

1           MR. MORTARA:  We have some type of that evidence

2     that will go in, Your Honor.  I assume this portion will

3     be sealed at sidebar.

4           THE COURT:  Yes.  We can seal this whole sidebar.

5           MR. MORTARA:  The reason that none of our students

6     are going to be testifying is it has happened that things

7     similar to what Your Honor is seeing in front of you, when

8     the names of our students have been made public, they have

9     been subjected to -- at least one of them has been subjected

10    to pretty vicious personal attacks on their person in this

11    similar vein of what you're seeing in front of Your Honor.

12          And we are unwilling to expose people to that type

13    of thing.  As you say it's mostly about the statistical

14    evidence.  However, I will consult with Mr. Consovoy and

15    discuss the possibility, with Mr. Lee's agreement, of

16    potentially putting in one of the applications under seal in

17    the way that they've gone about doing a couple of theirs.

18          THE COURT:  The way that redacts the personal

19    information.

20          MR. LEE:  There's only one of their standing

21    member's application filed on the entire exhibit list.  I was

22    wondering if they were going to put it in or not.  Actually

23    personally I think it helps us.  We didn't put it in much for

24    the same reason that Mr. Mortara said he didn't.

25          We understand why they might not want it in.  We

1    don't agree.  We've been trying to protect their

2    confidentiality.  There's only one member's application in

3    the entire exhibit list.

4             THE COURT:  I forgot who you're actually

5    representing at this point.  It's Asians that applied and

6    didn't get in, but it's also some student organizations that

7    are intending on applying, right?

8             MR. MORTARA:  Tens of thousands of members.

9             THE COURT:  I haven't looked at this in a while.

10   The last time I looked at it you had seven people.

11            MR. MORTARA:  Regarding Harvard's standing issue,

12   we went through that with the depositions and Your Honor

13   ruled.

14            THE COURT:  Wouldn't this have been easier if I

15   ruled differently on the standing issue?

16            MR. LEE:  We could be done by Halloween.

17            MR. MORTARA:  To be truthful, Your Honor, you would

18   be getting what it is if you're asking if you ruled the other

19   way on standing.  Of course in our view you followed the law

20   and reviewed the proper way on standing, negating the reason

21   for us to bring students in.  And frankly helping us in the

22   regard to which I alluded to earlier in the same sort of vein

23   of what's in front of you light now.

24            I can speak to Mr. Consovoy and we can come back to

25   you on this on a later sidebar.

```
 1              THE COURT:  How many of the people that you've
 2    identified for standing purposes are people that applied and
 3    didn't get in versus the people that are intending?
 4              MR. LEE:  I think I can help a little bit.  From
 5    the time that Your Honor originally ruled, my best memory is
 6    there were one or two who had applied not gotten in and still
 7    wanted to transfer.  I think by the time of the summary
 8    judgment rulings it was down to one.  When we did the exhibit
 9    list --
10              THE COURT:  I was expressing my view that I thought
11    it would be helpful to see the applications of the people
12    that you represent, not the high school people that are
13    intending on applying, but the people that applied and didn't
14    get in.  Then I was wondering how many there were.
15              MR. LEE:  Right.
16              THE COURT:  He was just going through -- it doesn't
17    matter to me if -- I'm not interested in the transfer
18    portion.  I'm not interested in the standing.  I'm interested
19    in how many applications of people that applied and didn't
20    get in.
21              MR. LEE:  I'm 100 percent sure there's only one
22    application on the exhibit list of a standing member.  I
23    think there were one or two of the people who were deposed
24    who had applied and not gotten in who are standing members.
25    There was another seven who were identified at summary
```

1    judgment time where we raised the standing issue.  I don't

2    have a clue about them because they were new.  Their

3    application files aren't on the list because no one's had a

4    chance to look at them.  I think it was one or two.

5              MR. CONSOVOY:  You're talking about two different

6    things.  Your Honor is talking about who among the members

7    throughout the course of the case have applied and been

8    rejected.  Mr. Lee is talking about who today is a standing

9    member going forward for the purposes of Article III

10   standing.

11             MR. LEE:  I'm talking about whose files.

12             MR. CONSOVOY:  There are a lot of files.

13   Throughout the case we've had many members.  Every member

14   that we've brought forward is one that's been rejected.

15             MR. LEE:  None of their files are an exhibit.

16             MR. CONSOVOY:  That's because it was a standing

17   member.

18             THE COURT:  At some point I ordered for them to be

19   given over to them, the applications.

20             MR. CONSOVOY:  Yes.  To establish standing.

21             THE COURT:  How many went over?

22             MR. CONSOVOY:  I'm estimating in the seven to ten

23   range.

24             THE COURT:  How about those seven to ten, is there

25   any way you guys can see your way clear to making those

available?  What I was sort of saying is the statistics are one thing, but let's say you have no Asians getting in, but then you look at their applications and they're all not good candidates, right?  The percentage doesn't sort of totally fill out the information, right?  You want to look at the application and be able to see that these Asians are as qualified as some of these other people that we've seen and they didn't get in.  Or that there's sufficient information in their applications that explains why they didn't get in.

MR. CONSOVOY:  My concern is, and of course we'll adhere to whatever Your Honor says to do here, is that in a case like this which essentially is alleging a pattern of practice of discrimination.  First Circuit law is clear, we don't have to establish that our particular individuals would or would not have gotten in.  *Grutter* says the process of injury is sufficient.  That is all they have to allege.

Now for damages, which we're not pursuing under *Bakke*, we would have to show that they didn't get in for a particular reason, those individuals.  If Your Honor is interested in anecdotal evidence, and you think that our applicants may or may not be emblematic of a broader class of people, that's something that could be discussed.  I want to be clear, whether anybody things that these kids would or would not get in is not legally pertinent.

MR. LEE:  If I could respond very briefly.  Number

1    one, to the extent -- first I think the comparison of the

2    files tells a lot.  The process is substance here.  Setting

3    aside that disagreement that we have on the legal issue, they

4    identified one file on the exhibit list.  If there were more,

5    the witness who would have explained them for us is Dean

6    Fitzsimmons, and he's come and gone without a chance to -- we

7    had him look at the one file that was on the exhibit list in

8    case they intended to cross-examine him on that.  But now to

9    drop another seven or eight on him, I'd have to recall him to

10   explain the reasons.

11           THE COURT:  I'm not telling you how to try your

12   case.  If this is not something that you want to do, I'm not

13   telling you how to do it.  I take your point about the

14   statistical evidence, and I understand that, but it doesn't

15   totally fill it out for me.

16           MR. CONSOVOY:  I think I agree with what Your Honor

17   is saying which is that there can be corroborating anecdotal

18   evidence.  I guess where I am disagreeing is that it has to

19   be our student's files as opposed to -- we've received a lot

20   of files.  Remember Your Honor ordered the production of a

21   larger set.  I'll put aside the difference of whether it was

22   statistically significant or not.  Those files are coming

23   into play.  There will be testimony about things in those

24   files.  I think where I'm getting concerned is it has to be

25   about these particular seven to ten.

1          THE COURT:  No.  It doesn't have to be.  They just
2     seem like a group that we've already identified.
3          MR. CONSOVOY:  I defer to counsel.
4          THE COURT:  It would be interesting to me to see
5     some files of Asian people that you think would have gotten
6     in but for whatever, and then I want to see what's in those
7     files that explains or doesn't explain why they didn't get
8     in.
9          MR. CONSOVOY:  That's why I defer to a trial
10    lawyer.
11         MR. MORTARA:  I think the message that you're
12    giving to us about trial presentation is received loud and
13    clear.  We will respond to the message.  As the week unfolds
14    we will get that evidence to you.
15         THE COURT:  I'm telling you it is of interest to
16    me.
17         MR. MORTARA:  When the trier of fact and decider of
18    law tells us they're interested in something ...
19         THE COURT:  We always instruct the juries you get
20    what you get and you don't -- and I understand that.  But if
21    I was a juror and had the ability to raise my hand and ask a
22    question, that's a question I would be asking.
23         MR. MORTARA:  We will answer.
24         THE COURT:  I'm just telling you it's on my mind.
25    I'm not telling you you have to produce it, and if you don't

1    I'm going to hold it against you.  Not at all.  It just seems

2    to me when you see the applications of people that get in,

3    it's hard to say -- I would like to see if the applications

4    of people didn't get in reflect discrimination or reflect

5    some other shortcoming in the applicant that would explain

6    it.

7            So the last thing, as long as we're all standing

8    here, I know you filed a motion for the admission of P9.  I

9    haven't read it.  So do we need to do this this morning?  I

10   can do it at lunch.

11           MR. HUGHES:  We can do it at lunch.

12           MR. LEE:  P9 is going to come in at some point.

13           THE COURT:  Isn't it coming in through Mark Hansen?

14           MR. HUGHES:  First of all, our view is it should be

15   admitted based on what we put in the motion, understanding

16   you haven't read that yet.  Secondly, we think we could skip

17   Mr. Hansen altogether.  From our perspective the only purpose

18   to have him come is to get P9 admitted because I think we've

19   been over the OIR evidence thoroughly already.

20           MR. LEE:  The reason I don't think we have to

21   respond now is if they don't call Mr. Hansen, we're likely to

22   call him because he's going to answer your question about

23   Model 4 and the actual.

24           MR. HUGHES:  If they're going to insist on calling

25   Mr. Hansen, we're going to insist on calling him in our case.

```
1    If there's not bilateral disarmament on this issue, you may
2    not even need to think about.  Mr. Lee said he was going to
3    let me know about lunchtime about the Hansen issue.
4              MR. LEE:  My guess is there will be bilateral
5    disarmament.  It will not be an issue.
6              THE COURT:  I get a notice every night at 12:02
7    about what's been filed on the docket by that day.  I usually
8    stay up until 12:02 to read it.  Last night I didn't.  When I
9    was going to read that, I was handed this.  I'm aware that I
10   have it, and I could take a few minutes to read it right now
11   unless it can hold until lunch.
12             MR. HUGHES:  I think we should just keep moving
13   forward.
14             THE COURT:  I'll put on the record that I have the
15   motion, and I'll deal with it at lunch.  This whole sidebar
16   is all sealed.
17             (End of sidebar.)
18             THE COURT:  Sorry for the slightly late start this
19   morning.  As I just noted to the parties at sidebar, and I
20   will reiterate, I am in receipt of their motion to admit P9.
21   The parties tell me it doesn't need to be resolved
22   immediately, so I'll read the motion at lunch and we can take
23   it up thereafter.
24             Other than that, I think we're ready to get going.
25             Is Ms. McGrath here?
```

```
 1              THE COURT:  He can have it.
 2    A.  It's not how the admissions --
 3              THE COURT:  Last question.  I thought you only had
 4    one.  Let him have it.
 5              MR. MORTARA:  Last question.
 6    A.  That's not how the admissions process works.
 7    BY MR. MORTARA:
 8    Q.  Respectfully, sir, that wasn't my question.  So that's
 9    where we'll start tomorrow.
10              THE COURT:  All right.  Do you all want to start at
11    9:30 again tomorrow or do you want to push it until 10:00?
12    Whatever you want to do.
13              MR. MORTARA:  9:30.
14              THE COURT:  Can I see counsel at sidebar for a
15    minute before we recess.
16              (The following was held at sidebar and is deemed
17    "sealed".)
18              THE COURT:  It appears The New York Times is going
19    to run with this story on this email for tomorrow.  I just
20    want to make sure that I'm really crossing every "t" and
21    dotting every "i" on this.  As I told you a lot of the
22    information in there is inaccurate.  Some of it's accurate.
23    I looked at kind of poking around the case law at lunch and
24    the ethics rule.  I am comfortable after looking at the case
25    law, most specifically *Brody v. Harvard*, I can give you the
```

1    citation if you want it, that there isn't any structural

2    problem with me continuing on in this case.

3           The ethical rule requires that I disclose any

4    conflict on the record, and that I make sure that you have

5    the opportunity to the confer outside of my presence to

6    evaluate your position.  And then you need to agree in

7    writing or on the record that I can continue with the case.

8           It seems to me that you had your opportunity to

9    confer before you even brought it to my attention as you knew

10   about it before I did.  But if anybody has any problem with

11   it or has any questions about the email, I'm happy to respond

12   to it.  And we can revisit it tomorrow morning, and you can

13   make a decision about whether you're comfortable with me

14   continuing on the case or not.

15          MR. LEE:  We're 100 percent comfortable with you

16   continuing on the case.  We're not asking you to recuse

17   yourself.  The Globe and WGBH have it as well.  I think at

18   the end of the day we take the stance that we don't know who

19   the person is.  We're not asking anything of you.

20          THE COURT:  I'm not going to obviously muzzle you

21   in any way.  Just to be clear, do you feel you've had

22   adequate opportunity outside of my presence to discuss this

23   and evaluate it?

24          MR. LEE:  We have.

25          MR. MORTARA:  We have as well, Your Honor, and we

1    have no issues with this.  And we will make our one and only

2    statement to the press about this case on this subject.

3              THE COURT:  Okay.  If anybody feels I need to do

4    anything else in terms of the rule, the case, the record?

5              MR. MORTARA:  Not at all.

6              MR. LEE:  Not for Harvard.

7              THE COURT:  Okay.  I'll see you tomorrow.

8              (Court recessed at 4:48 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3      _____

4      STUDENTS FOR FAIR ADMISSIONS, INC.,

5                        Plaintiff,          Civil Action
                                             No. 14-14176-ADB
6      v.
                                             October 23, 2018
7      PRESIDENT AND FELLOWS OF HARVARD
       COLLEGE, et al.,                      Pages 1 to 234
8                        Defendants.         SEALED TRANSCRIPT

9      _____

10

11                     **** SEALED TRANSCRIPT ****

12              TRANSCRIPT OF BENCH TRIAL - DAY 7
             BEFORE THE HONORABLE ALLISON D. BURROUGHS
13               UNITED STATES DISTRICT COURT
                JOHN J. MOAKLEY U.S. COURTHOUSE
14                    ONE COURTHOUSE WAY
                      BOSTON, MA  02210
15

16

17

18

19

20

21

22                    JOAN M. DALY, RMR, CRR
                      Official Court Reporter
23              John J. Moakley U.S. Courthouse
                One Courthouse Way, Room 5507
24                    Boston, MA  02210
                      joanmdaly62@gmail.com
25

<pre>
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open
 3    court before the Honorable Allison D. Burroughs, United
 4    States District Judge, United States District Court, District
 5    of Massachusetts, at the John J. Moakley United States
 6    Courthouse, One Courthouse Way, Boston, Massachusetts, on
 7    October 23, 2018.)
 8              THE COURT:  Do you guys want a sidebar?
 9              MR. MORTARA:  Yes, Your Honor.
10              [The following was held at sidebar.  Sidebar
11    sealed.]
12              MR. LEE:  Your Honor, I asked for the sidebar.  I
13    raise this issue reluctantly, but I think that I have to.
14    There have been several cross-examinations that have begun by
15    going into the witness' personal backgrounds basically to
16    suggest I know something about you personally.  During a jury
17    trial I probably would have objected, but it's Your Honor,
18    it's a bench trial.
19              It happened again yesterday, and you may recall
20    that Dean Khurana was specifically asked about his parents
21    coming from India and his brothers.  If you Google Dean
22    Khurana once, you'll find out that one of his brothers
23    committed suicide just a few years ago.  I'm one of the
24    people who know about it.  And when he was asked the
25    question, let me show you the transcript:
</pre>

1        "Question:  And what dream were you referring to?

2        "Answer:  That my parents left home in India to

3    come to take their children to a place where they hoped there

4    would be more opportunity for them.

5        "Question:  And that proven to be true, right?

6        "Answer:  Yes.

7        "Question:  For you and your two brothers, correct?

8        "Answer:  Yes."

9    ███████████████████████████████

10   ███████████████████████████████████████████

11   ██████████████████  This case has lots of difficult

12   issues.  We understand that.  But there is no reason to do

13   this to a witness.  It's inappropriate.  It's wrong.  There

14   was no reason for his brother to come into this case, and I

15   wouldn't be doing my duty to Harvard, but I particularly

16   wouldn't be doing my duty to him, if I didn't mention it to

17   Your Honor.

18        THE COURT:  Look, I did not know the story about

19   Mr. Khurana yesterday.  And I assumed you were just trying to

20   ask some introductory questions to kind of relax the witness

21   the way we all sort of do, right?

22        MR. MORTARA:  That's absolutely, correct, Your

23   Honor.  May I go on?

24        THE COURT:  Sure.

25        MR. MORTARA:  As far as I'm concerned, the purpose

1    of this is to attack my integrity.  We informed Mr. Lee last

2    night I had no idea about this.  It is not the first thing

3    that comes up when you Google Rakesh Khurana.  I've actually

4    got all the Google printouts right here with me right now,

5    but that's beside the point.  My word as an Officer of this

6    Court was insufficient for Mr. Lee and his team.  No one on

7    our team knew anything about this.  And, Your Honor, that's

8    my word to you and to him as an Officer of this Court.

9            My integrity has been attacked, and there's a

10   record being made here which I will ask to be sealed when

11   this is concluded.  I would like an opportunity to explain my

12   side.

13           THE COURT:  That's fine.  We've been sealing as a

14   matter of course all of the sidebars.

15           MR. MORTARA:  May I proceed?

16           THE COURT:  If you want to make a record, go ahead.

17           MR. MORTARA:  I understand.  This is very important

18   to me.  Ms. Folan and Ms. Daly are listening, and I'd like to

19   make a record.

20           THE COURT:  That's fine.

21           MR. MORTARA:  This is the first page of my

22   cross-examination outline and I'll waive Word Product to see

23   the first page.  You will see absolutely nothing about his

24   brother on this page.  You see the thesis and the parents.

25   Why did I raise the thesis?  We told Mr. Lee last night why

1    we raised the thesis.  The acknowledgments here, which you'll

2    see on this page are actually quite touching about Dean

3    Khurana's family, and I was trying to humanize him to the

4    Court because, frankly, my efforts were to get him to admit

5    that his research and his whole life goal is to improve the

6    socioeconomic diversity at Harvard.

7            I found this passage about his parents deeply

8    moving.  Why did I bring up the thesis?  I did want him to

9    know that I was aware of the thesis.  Elsewhere in the thesis

10   he says things that are very important to our case including

11   he studied the effect of group size on decision making,

12   including that he's done research and cited research to

13   suggest that CEO's have a more difficult time controlling

14   larger boards.

15           This was the entire point of the Ryan committee and

16   the Smith committee.  That was my intended reference for

17   this.  That's why I used it.  Then we have the actual

18   testimony.  I wanted to get the parent thing out because

19   that's what I'm trying to do is to humanize him.  His own

20   family and their children.  I had remembered this passage,

21   had it in my head.  And the only reason I mentioned it is

22   because it's right here in this same paragraph.  I did not

23   know anything about this.  And I'm happy to take the oath for

24   the first time in my life.

25           MR. LEE:  Your Honor, let me respond as follows

1    because this is important, and as I said to you I raise it

2    reluctantly.  This is not about relaxing witnesses.  These

3    are our witnesses who have gotten up, three of them,

4    Mr. Looby, cross-examined by him; Director McGrath,

5    cross-examined by him.  They all started with suggestions

6    that he knew information about them that is that is not part

7    of the court record.  It's not to relax anybody.

8              It's an old trick that trial lawyers use sometimes

9    effectively to say I know something about you that you don't

10   know.  Right?  It wasn't to relax Dean Khurana.  You could

11   have elicited his background to relax him.  That's number

12   one.

13             I did call Mr. Hughes, who we've had a very good

14   relationship with, and raised the question.  In fairness to

15   Mr. Mortara, they came back and said this is where it came

16   from.  Honestly, Mr. Mortara is correct, we don't believe it.

17   And even if I did, I would still raise it with Your Honor

18   because we just don't need this in this case.

19             There is enough emotional baggage going around in

20   every direction including yesterday.  We don't need to take

21   witnesses and bring back their brother's suicide right at the

22   beginning of their examination.  The one thing I don't want

23   is I don't want to -- I've left him outside.  I don't want an

24   apology.

25             MR. MORTARA:  There will be no apology, Your Honor,

1    because --

2              THE COURT:  I'm going to accept at face value that

3    you didn't know, but there's not going to be an apology or

4    any reference to it. ████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████    I take

7    what you say, accept it.  This sidebar will be under seal.

8    We won't have any further reference to anyone in his family

9    during his testimony.

10             MR. MORTARA:  I won't even reference the thesis,

11   Your Honor.

12             THE COURT:  You can reference the thesis but

13   nothing about the dedication, nothing personal.  Nothing

14   about his own dreams.

15             MR. MORTARA:  Absolutely.

16             THE COURT:  In terms of going forward --

17             MR. MORTARA:  I don't have any witnesses left in

18   the case except Professor Card.

19             MR. LEE:  We all can agree that we'll keep

20   irrelevant personal information out for all of the witnesses.

21             THE COURT:  That's what I was going to say.

22             MR. MORTARA:  Your Honor, again, I have personal

23   family experience with suicide.  I take this extremely

24   seriously.  I take the attack on my word really seriously in

25   front of you, in front of Ms. Daly, in front of Ms. Folan,

```
 1    people I've known a short time.  In particular, two in here
 2    what I've grown to be quite friendly with.  I take this
 3    extremely seriously, Your Honor.
 4              THE COURT:  I don't fault him for bringing it up
 5    because it's such a sensitive matter.  So it's better to
 6    address it than let it lie.  I will also accept your
 7    representation that you didn't know anything about it.  He's
 8    right, there's plenty of baggage.  There's plenty of insults
 9    and whatever to go around.  If we can just kind of keep that
10    in mind and ratchet it down on the personal stuff unless it
11    appears to be relevant.
12              MR. MORTARA:  Thank you, Your Honor.
13              MR. LEE:  Thank you.
14              (End of sidebar.)
15              THE COURT:  Dean Khurana, I remind you you're under
16    oath.
17              (RAKESH KHURANA previously sworn by the Deputy
18    Clerk.)
19                        EXAMINATION (resumed)
20    BY MR. MORTARA:
21    Q.  Good morning, Dean Khurana, how are you?
22    A.  Good morning.
23    Q.  We left off yesterday talking about socioeconomic --
24    A.  Yes.
25    Q.  -- diversity at Harvard.  Do you remember that?
```

1    experience is what gets us do that point.

2              THE COURT:  Okay.

3              MS. CONLEY:  Thank you.

4              MR. MORTARA:  Your Honor, would you like to take a

5    short morning break or do you want me to get set up and go?

6              THE COURT:  Do you have more for him?

7              MR. MORTARA:  I do.

8              THE COURT:  It's up to you.  I'm happy to take a

9    break or I'm happy to forge forward, whatever you want to do.

10             MR. MORTARA:  Let's take a five-minute break.

11   Ms. Hacker I think wants to talk to you about depositions.

12             THE COURT:  Why don't we take a break until 11:00,

13   then.  And anyone who wants to talk about depositions, they

14   can do it over here.

15             (The following was held at sidebar.)

16             THE COURT:  The ones that we had not done are

17   Pedrick, Walsh, Weaver and Lopez.  Do you want to do some of

18   those now or do them all at the same time at the end of

19   lunch?  What do you want to do?

20             MS. HACKER:  Whatever is Your Honor's preference.

21   We can wait and do them all at the end of lunch if that would

22   be easiest.

23             THE COURT:  I'm ready to go.

24             MS. HACKER:  Let do it.

25             THE COURT:  Starting at page 8 on Howrigan,

1    overruled.  Page 11, all overruled.  Page 12, overruled.  Is

2    this --

3              MS. ELLSWORTH:  It's fixed now.

4              THE COURT:  Those are all overruled.  Page 15,

5    they're all overruled.

6              Lopez.

7              MS. ELLSWORTH:  Lopez is another objection in full.

8              THE COURT:  That's all out as far as I'm concerned.

9    I don't see what that -- I'm happy to hear you on it, but --

10             MS. HACKER:  As Your Honor knows, SFFA has a racial

11   balancing claim in this case.  Ms. Lopez is the sister

12   cochair of an organization called the Association of Black

13   Admissions and Financial Aid Officers of the Ivy League and

14   Sister Schools.  What they do is they get together twice a

15   year and have something called a round robin where all of

16   these schools sit a table and read the demographics of each

17   minority of racial and ethnic group in their admitted pool so

18   far, and they share that information with each other.  It

19   goes to the racial balance claim that SFFA has in this case.

20             THE COURT:  I just don't see it.  Unless you can

21   show that it influences what Harvard does.

22             MS. HACKER:  It is circumstantial evidence that

23   Harvard -- Harvard wouldn't want these numbers and take these

24   numbers if it didn't have some control over how it is

25   affecting its admitted class and the percentages of these

1   minorities in the admitted class.

2           THE COURT:  Out.  We have Walsh and Weaver.  Let's

3   start with Walsh.  Page 8, both sustained.

4           Weaver, so on page 1 --

5           MS. ELLSWORTH:  I might have a different version

6   here.  Is that the second Weaver?  Her deposition stopped and

7   restarted.  I'm there.  Sorry.

8           THE COURT:  That one sort of lost me.  This is

9   supposed to be the question, and then this is supposed to be

10  the answer?

11          MS. FASULO:  Yes, Your Honor.

12          THE COURT:  I think the question is fine which is

13  what you're objecting to.  The answer is nonresponsive, but I

14  guess they circle back to it.

15          MS. ELLSWORTH:  They get it later.

16          THE COURT:  I guess that I'll overrule that one.

17  Page 7, overruled.  Page 8, they're all overruled.  That's

18  it.

19          MS. HACKER:  We'll have two additional transcripts.

20  We'll probably get them to Your Honor tomorrow after we hear

21  from Harvard if there are any objections being withdrawn.

22          MS. ELLSWORTH:  The two transcripts are 30(b)(6)

23  transcripts testimony from Dean Fitzsimmons and

24  Ms. Driver-Linn both of which were here as you know.  So

25  we're going to take a look at them.  We just got them last

1    night.  We may be objecting to cumulative.

2              THE COURT:  I'm going to extend the break for five

3    minutes to give her a break.

4              (End of sidebar.)

5              (Off the record.)

6              THE COURT:  Mr. Mortara, any time you're ready.

7              MR. MORTARA:  I'm ready to proceed, Your Honor.

8              THE COURT:  Go ahead.

9                        FURTHER EXAMINATION

10   BY MR. MORTARA:

11   **Q.**  Okay, Dean Khurana, only a few more questions, I think.

12             Turning back to Plaintiff's 316, the report of the

13   committee to study race-neutral alternatives.

14             Very simple question, sir.  Who wrote the first

15   draft of this report?

16   **A.**  Could you just tell me what --

17   **Q.**  You have two binders in front you.  One is the one I gave

18   you.  One is the one your lawyers gave you.  It's got a lot

19   more in front of it.  It's got the case caption at the top.

20   It looks like this.  I'll grab it.

21   **A.**  Okay.  Thank you.

22   **Q.**  This is Harvard's binder, sir.

23   **A.**  I've got it.

24   **Q.**  And the other one is the binder I gave you, and mine is

25   labeled by plaintiff's exhibit number, so you can look at

1

2                    UNITED STATES DISTRICT COURT

3                     DISTRICT OF MASSACHUSETTS

4    _____

5    STUDENTS FOR FAIR ADMISSIONS, INC.,

6                      Plaintiff,        Civil Action
                                         No. 14-14176-ADB
7    v.
                                         October 24, 2018
8    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                    Pages 1 to 249
9                                        SEALED TRANSCRIPT
                      Defendants.
10   _____

11

12                    **** SEALED TRANSCRIPT ****

13              TRANSCRIPT OF BENCH TRIAL - DAY 8
            BEFORE THE HONORABLE ALLISON D. BURROUGHS
14              UNITED STATES DISTRICT COURT
               JOHN J. MOAKLEY U.S. COURTHOUSE
15                  ONE COURTHOUSE WAY
                   BOSTON, MA   02210

16

17

18

19

20

21

22              JOAN M. DALY, RMR, CRR
              KELLY MORTELLITE, RMR, CRR
23               Official Court Reporter
            John J. Moakley U.S. Courthouse
24          One Courthouse Way, Room 5507
                 Boston, MA   02210
25              joanmdaly62@gmail.com

1    **Q.**  And in those full committee meetings, about how many

2    applications would you say you discussed?

3    **A.**  Over six years, thousands.

4    **Q.**  In your six years at the admissions office, how many

5    times have you seen an admissions officer show bias against

6    an applicant because of his or her race?

7    **A.**  Absolutely never.

8    **Q.**  And when you're determining whether to admit an

9    applicant, have you ever seen any of your colleagues consider

10   an applicant's race as a negative factor?

11   **A.**  I have never seen that.

12   **Q.**  Ms. Ray, have you ever rejected an applicant because of

13   his or her race?

14   **A.**  Certainly not.

15   **Q.**  And in your six years in the admissions office, have you

16   ever seen anything to substantiate accusations of bias

17   against Asian-Americans in the admissions process?

18   **A.**  Never.

19            MS. CONLEY:  Nothing further.

20            MS. HACKER:  Your Honor, can we have a sidebar?

21            THE COURT:  Sure.

22            (The following was held at sidebar.)

23            MR. MORTARA:  As Your Honor knows, during a trial

24   we have repeatedly asked Harvard's witnesses again and again

25   whether there was any written guidance in the procedures

1    about how to use race to score in the applications.  On the

2    second day of the trial, Dean Fitzsimmons testifies as you

3    see highlighted on the screen.  Two weeks ago Charlene Kim

4    was deposed on October 11 and said that there was no written

5    guidance on how to use race.  Ms. Kim -- Ms. Conley was

6    attempting to rehabilitate her testimony, was talking about

7    when Ms. Hacker showed her the --

8            THE COURT:  I remember the testimony.

9            MR. MORTARA:  "I was referring to revised reading

10   procedures for class of 2022, recent reading procedures that

11   reinforced what we had already been doing in practice but

12   were created after the day of my deposition."

13           "You were referring to reading procedures that were

14   issued this year?

15           "Answer:  Yes, I was."

16           We do not have those.  We cannot cross-examine

17   Ms. Ray without them.  Frankly, this testimony and Dean

18   Fitzsimmons's testimony are deeply problematic from this

19   perspective, and we'd like them produced immediately and to

20   stay over the cross of Ms. Ray.

21           MR. LEE:  Your Honor, we're in a new admissions

22   cycle.  The instructions are regularly updated.  She answered

23   the question honestly as of this moment.  We're not going to

24   rely upon the new ones.  There will be new reading procedures

25   this year.  There will be new casebooks this year.  We're not

1    going to rely upon them for this phase of the trial.  She's
2    just explaining why she answered the way she did.  We're not
3    going to rely upon them.
4            MR. MORTARA:  Your Honor, we're going to rely upon
5    them if it changed.
6            THE COURT:  Just for clarification.  We obviously
7    don't have a final transcript yet, but my recollection is
8    that she couldn't actually do the math to figure out what
9    year the class was.  I don't think she said 2022.  I think
10   she fell back on the most recent.
11           MR. MORTARA:  Harvard's witnesses have testified
12   unequivocally --
13           THE COURT:  Hold on.  So I accept what you said
14   about you're not going to rely on it, but can you make that
15   available to him?
16           MR. LEE:  Yeah.  There are other changes that have
17   been made, too.  If you're going to put some of this in,
18   we'll have lots else to put in.
19           MR. MORTARA:  I want to see them before we decide
20   what to do next.
21           THE COURT:  He's going to show you the changes.
22   You understand that if you are allowed to rely on the
23   changes, they're going to be allowed to rely on the changes,
24   too?
25           MR. MORTARA:  Completely understood.  We need to

1    see them first.

2              THE COURT:  Okay.

3              MR. LEE:  Can I raise something?

4              THE COURT:  Hold on a second.  Let's just finish

5    with her.  So they want the ability to recall her if there's

6    something in those materials that they want to ask her about.

7              MR. MORTARA:  Or potentially other Harvard

8    witnesses.  We need to see it.

9              THE COURT:  We'll cross that bridge when we come to

10   it.  But I'm going to excuse her unless there's anything else

11   you wanted.

12             MS. HACKER:  Until we see the new procedures --

13             THE COURT:  You don't have anything else.  It's

14   your turn with her.  Nothing else you want to do?

15             MS. HACKER:  Correct, Your Honor.

16             THE COURT:  We'll excuse her today.  We'll cross

17   the bridge on recalling them when we come to it.  Yours.

18             MR. LEE:  We have someone in the back who thinks

19   he's the Red Sox color analyst who's providing a

20   play-by-play.  I'm not even sure on who's side.

21             MR. MORTARA:  It's the Law360 reporter.  He's

22   tweeting.

23             MR. LEE:  No.  There's a man at the back who's

24   providing color commentary.

25             THE COURT:  Is that the guy who came up here?  Did

1    you see what happened?  Judge Young came in with his class

2    and sat in the jury box.  Then the box got up and left and he

3    was still here.  Karen actually emailed Judge Young's session

4    and said you forgot one.  And they said we have no idea who

5    he is or how he got there.  So I don't know.

6              MR. LEE:  Could you get him to take him back?

7              MR. MORTARA:  Is he making noise for you?

8              MR. LEE:  No.  He's basically providing color

9    commentary on the witnesses as if he were an analyst in a

10   sporting event.

11             THE COURT:  How do you know that?

12             MR. LEE:  Someone sitting back there told me.  It's

13   like I don't believe this; oh, that's good; oh, that's no

14   good.  So he's driving people crazy in the audience.

15             MR. MORTARA:  Maybe a gentle admonishment.

16             THE COURT:  I actually understood from Karen that

17   he was --

18             THE CLERK:  Mumbling.

19             THE COURT:  -- mumbling throughout in the jury box.

20   That's what you're complaining about is the noise he's making

21   back there?

22             MR. LEE:  I would love to have been next to him

23   when he was mumbling to Judge Young.  It would have been

24   priceless.

25             THE COURT:  I couldn't hear it myself, but I did

1    come to understand that he was making the sorts of noises you

2    described.  We'll let it go for today.  Tomorrow morning

3    we'll just make a reminder to people if they're going to be

4    in the audience, they need to do it quietly.

5              Ms. Hacker, do you want back at her or should I let

6    her go?

7              MS. HACKER:  I think we can let her go for the

8    afternoon.

9              (End of sidebar.)

10             THE COURT:  Have you had enough, Mr. Hughes?

11             MR. HUGHES:  Ms. Hacker asked me the question,

12   which is whether we want to keep on trucking with reading

13   depositions.  I gave her the affirmative nod, but Ms. Daly is

14   shaking her head.

15             MR. MORTARA:  I would suggest we break for the day.

16             THE COURT:  Joan will clearly agree with you.  For

17   tomorrow, I don't have anything tomorrow afternoon either.

18   For tomorrow, we can also go as long as you want, with the

19   caveat that I have a quick status conference scheduled for

20   2:30.  So we will take at least a 15-minute break at 2:30.

21   Other than that, we'll start at 9:30 and we'll go as long you

22   want.  Okay?

23             MR. MORTARA:  Thank you, Your Honor.

24             MR. LEE:  Thank you, Your Honor.

25             (Court recessed at 4:35 p.m.)

<pre>
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF MASSACHUSETTS

 3    _____

 4    STUDENTS FOR FAIR ADMISSIONS, INC.,

 5                    Plaintiff,           Civil Action
                                           No. 14-14176-ADB
 6    v.
                                           October 25, 2018
 7    PRESIDENT AND FELLOWS OF HARVARD
      COLLEGE, et al.,                     Pages 1 to 268
 8
                      Defendants.          SEALED TRANSCRIPT
 9    _____

10

11

12                    *** SEALED TRANSCRIPT ***

13              TRANSCRIPT OF BENCH TRIAL - DAY 9
            BEFORE THE HONORABLE ALLISON D. BURROUGHS
14              UNITED STATES DISTRICT COURT
              JOHN J. MOAKLEY U.S. COURTHOUSE
15                 ONE COURTHOUSE WAY
                   BOSTON, MA  02210
16

17

18

19

20

21

22

23                 JOAN M. DALY, RMR, CRR
                    Official Court Reporter
            John J. Moakley U.S. Courthouse
24           One Courthouse Way, Room 5507
                   Boston, MA  02210
25               joanmdaly62@gmail.com
</pre>

```
1                    P R O C E E D I N G S
2              (The following proceedings were held in open court
3    before the Honorable Allison D. Burroughs, United States
4    District Judge, United States District Court, District of
5    Massachusetts, at the John J. Moakley United States
6    Courthouse, One Courthouse Way, Boston, Massachusetts, on
7    October 25, 2018.)
8              THE CLERK:  All rise.
9              THE COURT:  Good morning, everyone.
10             THE CLERK:  Court is in session.  Please be seated.
11             THE COURT:  I have what Mr. Mortara submitted this
12   morning.  Do you want to discuss that at sidebar?
13             MR. LEE:  That would be fine, Your Honor.
14             THE COURT:  Come on up.
15             (The following was held at sidebar and sealed.)
16             THE COURT:  We have been just as a matter of course
17   sealing all the sidebars.
18             MR. LEE:  Right.
19             THE COURT:  Your tech guy has asked for copies of
20   them?
21             MR. LEE:  We understand it would be after Your
22   Honor has a chance to consider them, right?
23             THE COURT:  The only one I looked at -- so after
24   the anonymous letter, my thought had been that if you guys
25   decided not to make statements or your statements didn't put
```

1    the issue to bed, that I would release that sidebar.  She

2    gave me a copy of that one.  It needs some minor edits that I

3    haven't bothered to make because it didn't seem necessary to

4    release that sidebar.  So they're all under seal, including

5    that one.

6                    MR. LEE:  Okay.

7                    THE COURT:  That's the only one I looked at.  For

8    all I know, the others need edits, too.  But I don't normally

9    kind of worry about it, but I will make the edits to that

10   one.  I want to hear your position on it.  I don't have any

11   objection to the sidebars being released to the parties.

12                   MR. MORTARA:  No objection.

13                   MR. LEE:  No objection.

14                   THE COURT:  Do you guys want them, too?

15                   MR. MORTARA:  Yes.

16                   THE COURT:  You can release them to the parties but

17   not to anybody else.

18                   MS. ELLSWORTH:  That's fine.

19                   THE COURT:  And then this.  I've read it.

20                   MR. MORTARA:  Your Honor, I think you can

21   understand the level of our concern.  We've literally asked

22   just about every Harvard witness on the subject, but not just

23   every Harvard witness, Dean Fitzsimmons and Director McGrath

24   who have testified that she is responsible for the reading

25   procedures.  And you saw the question and answer up here.  It

1    couldn't have been broader.  And the suggestion that she does

2    not know about this update that occurred on October 5 is not

3    on its face credible.

4           And we'd like an opportunity to inquire into her,

5    Fitzsimmons, and also Charlene Kim who, when Mr. Hughes

6    deposed her two weeks ago, we couldn't figure out why she was

7    so resistant to answering this question.  I have the

8    deposition here.  Mr. Hughes gave up because we knew they

9    didn't have any written guidance on the use of race.

10          THE COURT:  That's surprising.

11          MR. MORTARA:  I have the deposition if you want to

12   see it.  What we have here is we've got pretty good evidence

13   that at least three of Harvard's witnesses likely knew about

14   these reading procedures and did not tell the truth in this

15   court.  Now, I will say Mr. Lee has suggested that they may

16   not have known in his letter to me of last night.  That is

17   not in any way a denial that they did know.  We'd like to

18   explore that.

19          On top of that, substantively, I don't know if you

20   looked at the document, it is a wild, major change.  It is

21   not minor changes.  We have reading procedures, we have the

22   1993 reading procedures.  They're no different in form than

23   the ones from 2019.  This is a radical change.  I don't know

24   if you saw the part that I underlined.

25          THE COURT:  I did.

1          MR. MORTARA:  As you can tell, this is a dramatic
2     and influential change.
3          THE COURT:  I did read it.  It seemed -- I read
4     your letter.  I read your letter.  And I read them.  It
5     seemed to me that it's kind of a codification or whatever of
6     what they've been saying is their practices.  But I will hear
7     you on it.
8          MR. MORTARA:  If you give me a chance on that just
9     briefly.
10          THE COURT:  Yes.
11          MR. MORTARA:  Mr. Lee went through with Dean
12     Fitzsimmons the alumni interviewer handbook.  I don't know if
13     you recall that testimony where it talks about good personal
14     qualities include effervescence.  And now we're faced with
15     reading procedures that say you can get a good personality
16     score if you're reserved and an introvert.  This is not
17     consistent with the testimony.
18          THE COURT:  But that's the alumni one, right?  In
19     terms of the admissions officers --
20          MR. MORTARA:  They've represented to you numerous
21     times that the alumni interviewer handbook represents a
22     faithful representation of how they go about these things.
23     They've brought the alumni interviewer handbook into these
24     issues.
25          THE COURT:  That seems to me a separate issue of

1    what the admissions people have testified to on the stand.

2              MR. MORTARA:  In terms of written guidance,

3    absolutely, Your Honor.  The last thing I'll say is when a

4    witness testifies in error, whether or not the witness knows,

5    testifying factually in error, and the lawyers know it is

6    wrong, the lawyers have a responsibility to inform the other

7    side and the Court that that testimony was false.

8              Whatever her state of knowledge, Director McGrath's

9    testimony, Dean Fitzsimmons's testimony and Charlene Kim's

10   testimony was false.  And there was a responsibility to let

11   us know, to let you know.

12             THE COURT:  Hold on.  I'm going to give you a

13   chance.  Charlene Kim --

14             MR. MORTARA:  She testified an hour before.  It's

15   in my letter.  The exact question and answer pair.  Here it

16   is.  This is in court.  "It's true, is it not, in your nine

17   years in the admissions office you've never received any

18   written instructions on how to evaluate race when considering

19   applicants?"

20             "I don't think the explicit instructions are in the

21   reading procedures."

22             This is an hour before to you --

23             THE COURT:  Sorry.  I thought you were talking

24   about Ray.  I take it back.

25             MR. MORTARA:  They go to Director McGrath, Dean

1    Fitzsimmons.  The idea that Director McGrath was not involved
2    in the redraft here, we cannot accept it right now.
3              THE COURT:  Your turn.
4              MR. LEE:  Your Honor, here's the oddity of the
5    situation.  The testimony that these witnesses gave that they
6    now claim is untruthful, they elicit it as if it is good for
7    their case.  We never until yesterday when there was one
8    question asked elicited these reading procedures from our
9    witnesses for these reasons:  The discovery period for
10   documents ended in August 2014.  The fact discovery period
11   ended in 2017.  If I had tried to elicit this, there would
12   have been a nuclear explosion and Your Honor would have
13   rightfully excluded it.  When each of these people was asked
14   this question, we never elicited this.  The only reason it
15   was elicited yesterday is there was a precise question Are
16   you saying this is incorrect.
17             Now, to the extent that Mr. Mortara suggests that
18   somebody knew, I knew.  But when I listened to Dean
19   Fitzsimmons, what I heard was, first, he was -- they tried to
20   impeach him, Mr. Hughes, on holding him to the deposition and
21   the time period.  Then they put Exhibit 1 in front of him.
22   And if I could, Your Honor, so I could fill out -- I got
23   Mr. Mortara's letter at about 11:00 last night.  So I thought
24   we deserved a response, which we got out right after the Red
25   Sox game was over.  So it may not be the most coherent.  Let

1    me show you just so you have some idea.  We're happy to put

2    this in a letter for Your Honor.

3          With Dean Fitzsimmons, if you go to the first day

4    of his cross, he's being asked a series of questions holding

5    him to the time period of his deposition.  Now, that time

6    period would include documents through August of 2014.  Then

7    when you get to the portion right before when Mr. Mortara,

8    the entire examination is on Exhibit 1 which is the reading

9    procedures from 2013 to 2014.

10          Now, I think having looked at the transcript,

11    Mr. Hughes brought in the question.  Honestly I missed it.  I

12    think the Dean likely was focusing on the documents that were

13    at issue.  The same for Charlene Kim, never opened the

14    October 5 email.  That's when the reading procedures were

15    sent around.  Chris Looby, never opened the email.  If you

16    want to know why, they were with us getting ready to testify

17    here.

18          If what they want to do is come back and say, yes,

19    these are the reading procedures that were put in place,

20    that's fine.  But I think we get to say it's a codification

21    of what we were doing before.

22          But I think the most important thing here is I

23    think we were honoring the discovery period when they asked

24    these questions.  We didn't try to basically offer the

25    contrary substantive testimony that we could have if we were

1    doing what he's suggesting.  And the fact that they're now

2    trying to impeach the testimony that they elicited that's

3    good for them says an awful lot about why we are where we

4    are.

5              For each of these people, as I said it went out

6    October 5.  Your Honor, in the four years that the case has

7    been pending it's not like the clock has stopped.  So there

8    have been four different reading procedures that have been

9    issued.  There are a host of changes beyond what you see

10   here.

11             So, for instance, you may recall that a couple of

12   years ago there was a controversy about whether SATs have

13   gotten easier or not.  The whole portion of it, the rating

14   procedures on that change in the document that was issued on

15   October 5, there's a host of other changes.  The clock hasn't

16   stopped.

17             As I said, Your Honor, we're not offering any of

18   that substantively because I don't think we have a right to

19   under the discovery rules.  And I think for that reason I

20   think this is actually a bit of a manufactured issue.  It's

21   one thing if the testimony that they were trying to impeach

22   was good for us and bad for them, this would be a different

23   situation.

24             This is testimony they elicited affirmatively.  We

25   didn't object to.  It actually, Your Honor, was correct for

1    the discovery period.  It was correct through the pretrial

2    period.  It was correct through October 5.  And then we never

3    elicited anything after.

4            MR. MORTARA:  Okay.  So let's begin with the OCR

5    finding that there were no written instructions on the use of

6    race.  A central theory of our case is that if you're going

7    to play with this fire, you should probably have some written

8    instructions.  We have been absolutely -- you've been bored

9    to tears by it I'm sure.  Then, I'm sorry, sometimes you go

10   into court --

11           THE COURT:  You have no idea what I sit and listen

12   to other days in this courtroom.

13           MR. MORTARA:  Sometimes you go into court and you

14   ask the broad questions, you ask the open-ended questions not

15   knowing what you're going to get.  The idea that if we had

16   had these things we wouldn't have been thrilled to use

17   them -- Your Honor has seen them.  They establish both --

18   they are probative that the need was felt to add

19   instructions, particularly about not using race in the

20   personal rating but also not deploying traditional, you can

21   take judicial notice of, traditional stereotypes about Asians

22   in the personal rating.  That's right there in the underlined

23   section I gave you.

24           So the idea that Director McGrath -- he did mention

25   Dean Fitzsimmons.  you have Dean Fitzsimmons' testimony.  I

1    gave it to you this morning.  The idea that Director McGrath
2    did not understand this question or thought it was limited to
3    a time period, that's just not true.  She drafts these
4    things.
5                MR. LEE:  She did not draft these things.
6                MR. MORTARA:  I want to know who did.  I'd like to
7    see the transmittal email.  I'd like to see the drafts.
8                THE COURT:  Hold on a second.  So I am not going to
9    ascribe bad motive to anybody at this point.
10                By the way, speaking of bad motive, the other night
11    I did go back to -- I went back to Google Dean Khurana on the
12    suicide issue, and even knowing what I was looking for, I had
13    trouble finding it.  It's not the first thing that pops up by
14    any means.  So to the extent you want to --
15                MR. MORTARA:  Thank you, Your Honor.
16                THE COURT:  So I'm not going to ascribe any bad
17    motive on this.  You know my commitment to the record in this
18    case, and I want to make sure that the record stays perfectly
19    clear.  So you want to recall some witnesses and go through
20    this with them.  Who?
21                MR. MORTARA:  Here's what we'd like:  We would like
22    document production on the drafting of these reading
23    procedures, the email transmissions, and a privilege log
24    because I'm suspicious that OGC and Wilmer were involved
25    here.  Privilege log, document production and the drafting of

1    these new reading procedures.  If they were in 2022, I'd like

2    to know that, too.  I seriously doubt that they were, given

3    what Mr. Lee has said.  Drafts, emails, and we would like to

4    recall Kim, McGrath, Dean Fitzsimmons, and Mr. Looby.

5              I want to be clear about something.  Mr. Looby was

6    impeached quite aggressively on the issue of whether anyone

7    had ever taught him not to use race in the personal rating.

8    And he sat there and he took it with his deposition sitting

9    right there.  I believe that he was prepared with the 2023

10   reading procedures.  I would like to ask him about that.  And

11   before these people come back in here, I think we should have

12   some depositions.

13             So I'd like the documents.  I'd like depositions in

14   the evenings, and I'd like to recall those four witnesses.

15             THE COURT:  We're not having depositions in the

16   evening.  What's your position on that?

17             MR. LEE:  Your Honor, a couple of things.  For

18   Mr. Looby and Ms. Kim, we can represent to them if they'd

19   like a five-minute deposition outside of Your Honor's

20   presence so they can tell them they didn't see these reading

21   procedures, that's fine.  I think if they want to recall

22   Director McGrath or Director Fitzsimmons, I'd say two things.

23   First thing, I don't think they need a lot of document

24   discovery.  They've got these.  They've asked for the reading

25   procedures for the other years.  We'll give them to them.

1    They come back, the testimony goes in substantively.  And

2    they'll come back and they'll say, yes, that's what it says,

3    yes, it's a codification, this is what we always have done.

4    And then it goes in.

5              I want to be clear on that because I have not

6    offered that yet.  If they come back, we're going to offer

7    it, and we think it's good for us.  So what's good for the

8    goose is good for the gander.  If they come back it goes in

9    substantively.

10             MR. MORTARA:  I absolutely agree.  As you know and

11   I can tell -- I believe it is atrocious for them.  So I'm

12   absolutely fine with it all coming in substantively to

13   challenge the credibility of the previous testimony.

14             THE COURT:  Okay.

15             MR. MORTARA:  I need the drafts and the emails.

16             MR. LEE:  Can I say one thing?

17             THE COURT:  The transmittal email gives him the

18   day.

19             MR. LEE:  Yes.

20             THE COURT:  So he's going to get that.

21             MR. MORTARA:  I'd like the drafts because if

22   Director McGrath or Dean Fitzsimmons are copied on drafts of

23   these things and they say we're making big changes in the

24   personal rating, the testimony I they didn't know about this

25   when I testified the other day, it's gone.  And this is a

1    trial about credibility where they bring in every witness to
2    say nothing is going wrong in the Harvard admissions office.
3    This is central to our case.
4          MR. LEE:  Your Honor, you can make a trial all
5    about credibility if your client isn't putting a witness on
6    the stand.  Mr. Blum is sitting back there in row one.  He's
7    not going to get on the stand.  These students who you found
8    justify standing are not going to get on the stand.  You can
9    toss bombs at people.  You can call me atrocious.
10         THE COURT:  I don't think he called you atrocious,
11   so we're clear.
12         MR. MORTARA:  I have not, in fact, called Mr. Lee
13   atrocious.  Just like I didn't know about Dean Khurana.  Your
14   Honor, I have some patience for this.
15         THE COURT:  You really don't have a lot.
16         MR. MORTARA:  I don't have a lot of patience,
17   you're right, Your Honor, I don't have a lot of patience for
18   the kind of things that are being said.
19         THE COURT:  I hear you, Mr. Mortara.
20         MR. LEE:  We'll give them the email.  We'll give
21   them the reading procedures.  We'll give them the three other
22   years so he can see how much it changes from year to year.
23   But I don't think we should open up discovery beyond that.
24   Your Honor, if we open up discovery for the whole four-year
25   period, there have been some other things in training that

```
 1   have changed in four years that we could bring in to rebut
 2   some of the changes they've made.
 3            MR. MORTARA:  This is mostly about the credibility.
 4   When she says she didn't see this thing, I need to know
 5   whether she was involved in the drafting.  I'm sorry.  But
 6   just the direct question to him and to her, were you involved
 7   in the drafting of this --
 8            THE COURT:  If there are emails that say things
 9   like this is a monstrosity change in our approach, he's going
10   to be entitled to those.
11            MR. LEE:  There aren't any.
12            THE COURT:  But he gets to be the judge of that.
13            MR. MORTARA:  Emails about the drafts,
14   communications about the drafts.
15            THE COURT:  Emails about the drafts.
16            MR. MORTARA:  Privilege log.
17            MR. LEE:  But if they're privileged, they go in the
18   privilege log.
19            THE COURT:  Yes.  They go in the privilege log.  If
20   for whatever reason you choose to waive privilege on that,
21   that's your prerogative, but you certainly don't have to.  So
22   emails about the nature of the changes on the portions that
23   he's highlighted, right?
24            MR. MORTARA:  Sure.
25            THE COURT:  You can recall those four witnesses if
```

1  you want.  If you want to do it by deposition you can, but

2  I'm not going to require depositions at night.

3          MR. MORTARA:  Can we do it on the weekends?

4          THE COURT:  I'm not going to require depositions,

5  but if you want to -- if you by agreement want to do a

6  deposition instead of calling the witness live as a way of

7  obviating the need to call the witness live, but I'm not

8  ordering depositions.  If you want to recall them, you recall

9  them and put them on the stand and whatever happens, happens.

10 Once they're on the stand, you ask your questions, he gets to

11 come back.  He's not going to be limited by the scope.

12         MR. MORTARA:  Sure.

13         THE COURT:  Because it's cross examination and

14 direct examination.  In terms of the drafts, so it's hard for

15 me to make a ruling on the drafts without seeing them.  But

16 to the extent that people write notes in the text as they're

17 doing it that sort of discuss the changes, things like that,

18 if there are those sorts of things, he gets the drafts, too.

19 It just might be easier to produce the drafts.  But without

20 being able to see them, I can't really -- it's hard to know

21 what's in them.

22         MR. HUGHES:  The number of drafts and the times

23 these things are getting circulated go directly to the

24 credibility of the testimony that we heard in court.

25         THE COURT:  You're getting the emails.  The drafts

1    themselves, I just don't know what they look like.  If other

2    people make notes or comments in the thing, they're going to

3    be entitled to that.  It might be easier to produce it all,

4    but I leave that to you.

5              MR. LEE:  Okay.

6              THE COURT:  You can recall the witnesses.  Once

7    they're on, they're on.  I'm not going to require

8    depositions.  You can do it if you want to.  You'll get the

9    transmittal emails, the privilege log, and you'll look at the

10   drafts.  To the extent that there's anything substantive in

11   the drafts that go to the issues we're discussing, they get

12   those, too.

13             MR. MORTARA:  Document production by tonight?

14             MS. ELLSWORTH:  That's not going to be possible.

15             THE COURT:  Today's Thursday, right?  Let's give

16   them the weekend.  Document production by Monday morning.

17             MR. LEE:  When the witness is on, Your Honor,

18   they're on.  If the evidence goes in, they go in

19   substantively.

20             MR. MORTARA:  The very first thing I'm going to do

21   when we're out of this sidebar, I'm going to move Plaintiff's

22   633.  I assume it's going to be without objection.

23             THE COURT:  He says in the letter it's without

24   objection.

25             MR. MORTARA:  Your Honor, one more thing.  Our

1   witness, Professor Arcidiacono, his mother is going into

2   quadruple bypass surgery today.  Mr. Lee has agreed to try to

3   get him off today.  Joan has said we can try to stay late.

4   We're going to do our best.  I understand Mr. Lee thinks it's

5   not going to be likely, but I want to make sure you knew

6   that.

7          MR. LEE:  What I said, I was told about 9:15, we'll

8   do our best.  This is one of the two people they're offering

9   affirmatively.  I think it wouldn't be fair to you, to them,

10  to Joan, if we're here at like 5:15 and I'm trying to squeeze

11  in the end of the cross.

12          THE COURT:  Where does he live?

13          MR. MORTARA:  Raleigh-Durham.

14          THE COURT:  Where does his mother live?

15          MR. MORTARA:  Where does the mother live?

16          MR. McBRIDE:  I don't know.  I'll find out.

17          THE COURT:  I sympathize with the situation, but --

18          MR. MORTARA:  We understand Mr. Lee's position.

19          THE COURT:  A quadruple bypass is not the biggest

20  deal in the world today.  Of course when it's your mother, it

21  feels like it's the biggest deal in the world.  What I will

22  let you do is we'll get as far as we get today without

23  anybody feeling rushed, and that includes me because I know

24  this testimony is going to be dense.  And I'd like to think I

25  can go on and go on, but maybe I can't.

1          MR. MORTARA:  His mother is in Oregon.

2          THE COURT:  If we don't finish him today, can we

3     recess him and call him some time next week?

4          MS. ELLSWORTH:  Subject to the time issues.

5          MR. MORTARA:  We'll let him decide what he wants to

6     do.  It could be it's more important for him to get to the

7     convalescence than it is to come back.

8          THE COURT:  We can take him out of order and give

9     him some days to go and be with his mother.  I was just going

10    to say something about the evidence and I forget what it was.

11    I can't remember.  Anyways.  So we will make accommodation.

12    Assuming I can and she can, I can go as late as you need

13    today.  We can shorten up the lunch break, I guess, if you

14    can do it.

15         MR. MORTARA:  We will confer with Professor

16    Arcidiacono to the limited extent as to inquiring as to his

17    preferences on this towards the end of the day.

18         THE COURT:  We'll make it work within reason for

19    everybody.  The case that I have going to trial after this

20    one, there's 11 pending motions in limine which I'm going to

21    ruthlessly rule on in the next 24 hours.  And hopefully that

22    discourages all of them from going to trial.  If it settles

23    or resolves itself in some way, you can go into the next

24    week.

25         MR. MORTARA:  We have a lot of reasons we wouldn't

```
 1     want to do that.  We're going to do our best to get it done.
 2     That includes being conservative about calling back witnesses
 3     once we get the document production.  The sooner we get the
 4     document production, the sooner we can make a decision.
 5              THE COURT:  We'll try to give you as much time this
 6     week and next week.  I'll take a look at my calendar for next
 7     week.  And instead of stopping at 3:30 or quarter of 4, we
 8     can push on.  I'll try to accommodate that as well.
 9              (End of sidebar.)
10              MR. MORTARA:  Your Honor, the plaintiffs move
11     Plaintiff's Exhibit 633, the class of 2023 reading
12     procedures.
13              THE COURT:  Those are admitted.  I assume there's
14     no objection.
15              MR. LEE:  No objection.
16              THE COURT:  Those are admitted.
17              (Plaintiff Exhibit No. 633 admitted.)
18              MR. McBRIDE:  Your Honor, SFFA calls Professor
19     Peter Arcidiacono to the stand.
20              THE CLERK:  Can you please raise your right hand.
21              (PETER ARCIDIACONO duly sworn by the Deputy Clerk.)
22              THE CLERK:  Thank you.  You may be seated.  Can you
23     please state your name and spell your last name for the
24     record.
25              THE WITNESS:  Peter Arcidiacono,
```

1                    **** AFTERNOON SESSION ****

2              THE CLERK:  Court is in session.  Please be seated.

3              MR. McBRIDE:  Your Honor, if we could have a quick

4    sidebar to address the administrative matter with respect to

5    Professor Arcidiacono.

6              THE COURT:  Yes.

7              (The following was held at sidebar and sealed.)

8              MR. MORTARA:  Professor Arcidiacono would prefer to

9    stay and finish this tomorrow morning, subject to the

10   possibility if his mom has the surgery this afternoon and

11   something were to go terribly wrong, he'd like to have the

12   option to pull out.

13             THE COURT:  That's fine.  As long as you guys work

14   out your schedule.  I'm just looking at the rate we're going.

15   I don't think we'll finish him.

16             MR. MORTARA:  I'll finish him today.

17             THE COURT:  You understand Mr. Lee is entitled to

18   his cross?

19             MR. MORTARA:  Begrudgingly.

20             THE COURT:  I thought if you might be finished

21   before lunch, you might be able to finish on the second half

22   of the day.  And from the number of slides it doesn't seem

23   like it's that close to finishing.

24             MR. LEE:  I also told Mr. McBride, Dr. Card has

25   been here quite a while.  Next Thursday -- from Tuesday,

1    Wednesday, and Thursday, we should be able to get him on and

2    off in those times.

3              (End of sidebar.)

4              THE COURT:  Go ahead.

5              MR. McBRIDE:  Your Honor, in response to your

6    questions, our team pulled together some data for you.  We've

7    already handed these out to the witness as well as to

8    opposing counsel.  But it has the data from the database on

9    these particular issues.

10             THE COURT:  Thank you very much.  I appreciate

11   that.

12   BY MR. McBRIDE:

13   **Q.**  Professor Arcidiacono, I want to turn to the other

14   ratings models.  We've talked about the overall and the

15   personal rating model.  You examined and did analysis with

16   other ratings models as well, specifically on school support

17   and the alumni measures?

18   **A.**  That's correct.

19   **Q.**  What did you find with respect to the teacher, the

20   counselor, and alumni personal rating?

21   **A.**  That there was a negative penalty against Asian-Americans

22   and some boost for African-Americans, but that was much

23   smaller than what we were seeing in the overall and personal

24   rating.

25   **Q.**  So why is it that you didn't take those out of the model

1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                    Plaintiff,          Civil Action
                                         No. 14-14176-ADB
6    v.
                                         October 26, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                    Pages 1 to 134
8                                        SEALED TRANSCRIPT
                    Defendants.
9    _____

10

11
                     **** SEALED TRANSCRIPT ****
12

13
                 TRANSCRIPT OF BENCH TRIAL - DAY 10
14         BEFORE THE HONORABLE ALLISON D. BURROUGHS
                 UNITED STATES DISTRICT COURT
15             JOHN J. MOAKLEY U.S. COURTHOUSE
                     ONE COURTHOUSE WAY
16                    BOSTON, MA  02210

17

18

19

20

21

22                  JOAN M. DALY, RMR, CRR
                  KELLY MORTELLITE, RMR, CRR
23                   Official Court Reporter
                 John J. Moakley U.S. Courthouse
24               One Courthouse Way, Room 5507
                     Boston, MA  02210
25                  joanmdaly62@gmail.com

1              THE COURT:  We're going to recess for the day but

2    for the sidebar.  We'll resume at 9:30 on Monday.  We

3    actually have a quick status conference in here at 9:15 which

4    we will not do at your tables.  We'll do it out back or

5    someplace so you can all get set up.

6              Monday is going to basically be Amici day.  They

7    are eight witnesses limited to a half hour of direct each.

8    You all both have the opportunity to cross-examine to the

9    extent that you want to.  I'm hoping those direct

10   examinations will be done by younger lawyers, but we'll see

11   how that plays out.

12             Then I assume given some of the rulings yesterday,

13   we'll have some other issues to discuss before you rest.

14   Assuming you do rest or we work out some other arrangement,

15   you all will begin your presentation on Tuesday.  Does that

16   seem right?

17             MR. LEE:  That seems right.

18             MR. HUGHES:  Sounds like it to us, too, Your Honor.

19             THE COURT:  Okay.  Excellent.  The case is recessed

20   for the day but for sidebar.

21             (The following was held at sidebar.)

22             THE COURT:  Do you want to make an argument about

23   plaintiff's Exhibits 221, 512 and 513?

24             MR. HUGHES:  What I'd like to do is make an offer

25   of proof for why they should be admitted as part of the

1    record in the case.  If not, I guess it would become my offer

2    of proof along with argument I'll make at the end.

3         THE COURT:  Okay.

4         MR. HUGHES:  I'm going to begin by explaining the

5    background of how we came into possession of P512 and P513.

6    During discovery Harvard produces P221 which is a December 1,

7    2012, email that Your Honor has, email chain between Dean

8    Fitzsimmons and Thomas.  As Your Honor knows from the record,

9    Thomas Hibino oversaw the OCR investigation that resulted in

10   the 1990 statement of findings and that's Exhibit P555.

11   Harvard's production did not include the attachment to P221.

12        As Your Honor knows from the prior sidebar and

13   reading this document, Mr. Hibino provided Dean Fitzsimmons

14   an attachment that we'll get to in a minute.  And then Dean

15   Fitzsimmons responded, and Your Honor can see the response

16   there in P221.  We asked Harvard to produce the attachment in

17   March of 2017.  Harvard informed us in July of 2017 that they

18   did not have the attachment even though they had produced

19   emails from Dean Fitzsimmons before and after this

20   December 1, 2012 date.

21        Meanwhile in June of 2017, we made a FOIA request

22   to the Department of Education for all communications between

23   Dean Fitzsimmons and Mr. Hibino.  In March of 2018 the

24   Department of Education produced some of those

25   communications, but it redacted the attachment to the

1    December 1 email.  So we appealed that decision in June 2018.

2    And at long last on October 1, 2018, the Department of

3    Education agreed to produce the attachment to the December 1,

4    2012, email.

5         We received the attachment by itself that day.  A

6    couple days later on October 3, we asked the Department of

7    Education to produce the full email chain which is I think

8    P513 or 512.  We identified P512 and P513 to Harvard on

9    October 5, 2018, as a trial exhibit for this case.

10        So then I'd like to go through P513 and discuss why

11   we think it is relevant.  P513 is the document we received

12   from the FOIA request that has the exchange between Dean

13   Fitzsimmons and Mr. Hibino on the first page that is included

14   in P221.  And then if we go to the second page of P513, we've

15   got a handwritten note from -- it says "To Fitz, From Tom",

16   and it's on Department of Education letterhead.  And it says,

17   "In gratitude for your late night efforts, I am returning the

18   'smoking gun' obtained during our review.  Besides, counsel

19   tells me that stolen evidence might not be usable in court.

20   I'm sure you'll agree that the document should be destroyed!"

21        Then we've got the other part of the attachment,

22   which is on Harvard Admissions Office and Financial Aids

23   letterhead and under the name of ████████████, who at

24   one time was the associate director of admissions.  And then

25   we've got a typed out message that says, "Note to WRF", and

1    Your Honor knows those are the initials of Dean Fitzsimmons,

2    and the note says, █████████████████████████████

3    ███████████████████████████████████████████████

4    ███████████████████████████████████████████████████

5    ████████

6          █████████████████████████████████████████████

7    ████████████████████████████████████████████

8    ████████████████████████████████████████

9    ███████████████████████████████████████████████████

10   ████████████████████████████████████████████

11   █████████████████████████████████████████████

12         And Your Honor knows that AA refers to

13   Asian-American, and we just heard on the video from Dean

14   Fitzsimmons about what CJer means.  That means an applicant

15   who intends to study biology and has medicine as a further

16   career.

17          █████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████

20   █████████████████████████████████████████████

21   ███████████████████

22          ███████████████████████████████████████████

23   █████████████████████████████████████████████████

24   ████████████████████████████████████████████

25   █████████████████████████████████████████████

1   ▮

2          The reason that we think this is relevant, and I

3   think we need to go back to P221, which is where we started

4   because this has the full unredacted response by Dean

5   Fitzsimmons to receiving the joke.  And his reaction is, "I'm

6   stunned.  ▮▮▮▮  passed away a few years ago, and I'd

7   forgotten that she had such a sense of humor.  We'll

8   deconstruct at lunch.  Where should we go?"

9          For the sake of completeness, P512 is Mr. Hibino's

10  response back to Dean Fitzsimmons.  "No, no.  I did that from

11  purloined stationery from your system.  Pretty convincing,

12  huh?  I forgot.  Are we getting together here or there?"

13         Why we think it is relevant and why it should come

14  in is because we think the typed-up joke that Mr. Hibino sent

15  to Dean Fitzsimmons contains stereotypical racial language

16  regarding Asian-Americans.  The comment about "just another

17  AA CJer" is exactly the kind of stereotypical language that

18  was identify by OCR in Exhibit P555 that Dean Fitzsimmons

19  testified that he abhorred.  And then the comment about the

20  ▮▮▮▮▮▮▮▮▮▮  we also think is stereotypical language.

21         The reason that all of this is relevant is for the

22  response in 221 that he's stunned and that he had forgotten

23  that his colleague had such a sense of humor.

24         Our view is that's him laughing along with a joke

25  that includes stereotypical language that he says he abhors.

1    I understand there's a different way that you can interpret

2    that response.  But I do think there are two fair

3    interpretations of that response, and that at a minimum these

4    exhibits should come in so that the fact that people looking

5    at the record can make their own judgment based on that.

6          And I'll stop there, but I'd have more to say about

7    why I would have liked to have confronted him on the stand.

8          MR. LEE:  So just three points, Your Honor.  I told

9    Mr. Hughes if Your Honor doesn't allow this in, then we would

10   have no objection to an offer of proof so it's part of the

11   record, including his explanation here.

12         The three points I would make is that, I can tell

13   you our reaction when we got the typewritten version finally

14   I think about a week before the trial or so.  It was

15   basically "What is this?"  And then we figured out exactly

16   what it was when we dug this out.  The first thing is it's

17   hearsay, particularly the very bad joke that Mr. Hibino did.

18   And without the substance, as Mr. Hughes just described to

19   you, you can't make the connection to what Dean Fitzsimmons

20   said.

21         The second thing, Your Honor, is there's a real

22   relevance question here.  How does this show his intent?  Now

23   that we know from Professor Arcidiacono what their

24   discrimination claim is, how does this relate to the animus

25   that they now claim?  And I think that it doesn't.

1        And equally, Your Honor, on that point, if you look

2   at his response, he gets the email at about 6:30 on a Friday

3   night.  He responds to it at 8:30 on a Friday night and

4   Mr. Hibino writes back two minutes later and says, No, no.

5   You're not reading this correctly.  By this point in time

6   ███████  has died several years ago.  We're 23 years after the

7   OCR investigation.

8        Why Mr. Hibino is doing it at this point in time,

9   we have no idea because he's not going to testify.  So it's

10  irrelevant, I think, as a single matter.

11       The last thing I would say is as a 403 matter,

12  given everything that's come flying in in this case, this is

13  so tangentially related to anybody's credibility and more

14  important to anybody's discriminatory animus, it should be

15  excluded.

16       MR. HUGHES:  If I may, starting with the hearsay.

17  What we're offering this for is really -- P221 is his

18  reaction to the joke.  Of course the joke has to be included

19  in order to put the reaction in context.  We're obviously not

20  offering the joke for the truth of the matter, but his

21  reaction is directly relevant evidence in a case where we

22  have a finding from OCR about using racial stereotypes just

23  like the ones that are included in here.

24       And Mr. Hibino explains in 221 why he's forwarding

25  it along, because there's been a FOIA request in 2012, the

1    same month as the Unz article about Asian-American

2    discrimination.  He's sending it along at that time to Dean

3    Fitzsimmons, and we're getting his reaction at that time

4    which goes to whether he's got implicit bias.

5            One of the questions I would like to have

6    confronted him with on the stand is the same question that

7    Mr. Mortara confronted Director McGrath with when we read the

8    racist email from the alum which is, Would you have had the

9    same response if it had been referring to, for example, it

10   had racial stereotypes about African-Americans.

11           That's why we think this is relevant and it goes to

12   this issue of whether there is bias on the part of the

13   admissions office.  And this is, at least, some evidence

14   interpreted in the way that I think it should be interpreted.

15   And it certainly could be interpreted that goes to that,

16   which is why it should be part of the record in this case.

17           MR. LEE:  Your Honor, just two points, not to

18   belabor it.  The first thing is given what you heard the last

19   two days that their claim is based upon statistics, and the

20   statistical claim is that we discriminated against some

21   groups but not others.  So the question is what's the

22   evidence or the animus that demonstrates we discriminated

23   against one group of Asian-Americans but not another.

24           The question of whether implicit bias or

25   unconscious action could ever provide the evidence of the

1   animus is what we all question.  This is so far removed, even

2   if you assume that connection, this is so far removed.

3          The second thing is this is a little bit like when

4   Director McGrath was asked about those two emails.  They are

5   calculated to be handed to the press and to embarrass people

6   who have come and tried to do their best on the stand on the

7   issues Your Honor has to decide.  This is something that's

8   intended to embarrass Dean Fitzsimmons.

9          The fact that someone writes, "I'm stunned", no

10  matter which interpretation you take, he was stunned.  The

11  idea that he's trying to blow it off on a Friday night, which

12  is exactly what happens, is not something that should come

13  into the record both as a matter of relevance but also as a

14  403 issue.

15         MR. HUGHES:  I think you've heard me on the

16  relevance, and I won't belabor the point.  We don't have a

17  plan to provide this to the press if it comes in.  We got it

18  from a FOIA request.  Anyone can go ask for it and get it.

19         THE COURT:  If they have a year and a half to

20  spare.

21         MR. HUGHES:  Now they've coughed it up, so they've

22  got to keep coughing it up if asked.  You've heard me on the

23  relevance.  I do think it goes to an important issue in the

24  case.  So that's what I have to say on the admissibility of

25  the evidence.  I'd offer them at this point into evidence.

1           THE COURT:  I, at this point, am going to keep them

2    out.  I think that his response is of extremely limited

3    relevance.  And that the prejudice, whatever relevance there

4    is, is outweighed by the prejudice.

5           The only circumstance under which I would revisit

6    it is if Mr. Fitzsimmons ends up on the stand again.  Even if

7    that happens, this part of it is not going to be presented in

8    open court in any way.

9           I think that the relevance is so tangential that

10   it's not worth admitting, it's not worth calling him back

11   for.  But if he happens to come back on the other issue, I

12   may consider it again.

13          MR. HUGHES:  Then I'm going to save my further

14   offer of proof on what I would do if I were able to confront

15   him about it if in case that happens because I don't want to

16   tell them all my secrets.  So we'll reserve on that.

17          And then the other thing is I want to make these

18   part of the record in the sense of an offer of proof, but I'm

19   trying to think of a way I can do that without creating the

20   publicity concern that you have.  It's very hard for us to

21   seal, to agree to sealing a document that, quite frankly, we

22   could do anything we want with, which we haven't done and

23   don't have a plan to do, but you understand the position

24   we're in on that issue.

25          THE COURT:  We can kick the can down the road on

1    this.  Let me just clarify.  In terms of relevance I think

2    that it is not relevant because what the Dean responds is

3    wholly ambiguous, and the passage of time, and the fact that

4    Mr. Hibino is not testifying.  Why don't you call him?  Where

5    is he?

6            MR. HUGHES:  I don't know.  Again all we think is

7    relevant is the Dean's reaction to the joke.  That's what's

8    relevant.  I don't think Mr. Hibino has anything to add to

9    that.

10           THE COURT:  I don't see much relevance to it for

11   the reasons that Mr. Lee gives but honestly because the

12   statement itself is so ambiguous, the passage of time, and

13   the fact that he's dealing with a regulator who he may feel

14   like he has to kind of jolly along.  So I see it as having

15   very limited relevance.

16           I'm the decisionmaker here, so I don't have to

17   speculate what relevance a jury might assign to it.  I'm just

18   telling you that I see it to be irrelevant on that basis.

19   I'm going to keep it out.

20           MR. HUGHES:  It was never going to be part of my

21   closing.  I can assure you that.

22           THE COURT:  I'll hold onto these.

23           MR. HUGHES:  That's fine.  You can hold onto those.

24   We've got copies of those.  Now that we've concluded the

25   discussion of that issue, I think we're done for the day, I

1    just want to kind of update Your Honor on the issue --

2    They've identified a number of custodians that they're going

3    through to produce documents, and we're working together to

4    make sure that we're comfortable with the scope.

5            So far, based on the representations of

6    Ms. Ellsworth and Mr. Lee we are; that they're gathering the

7    relevant custodians, including people involved in drafting

8    the changes to the reading procedures; and we've also asked

9    to make sure that their search includes any responses by

10   people in the admissions office to the receipt of the 2023

11   reading procedures even if those people aren't custodians.

12   And Ms. Ellsworth has explained they're doing searches that

13   will attempt to capture such communications.

14           MR. LEE:  If I could just amplify a little so Your

15   Honor has the background.  We have produced the four reissued

16   reading procedures for the four years after discovery closed.

17   Each one of them has a number of changes, a lot of changes

18   honestly, quite apart from the changes we've focused upon.

19           The last version, which is the focus, actually has

20   a lot of changes that deal with things Your Honor has heard

21   about but aren't in controversy.  But to get to all the

22   people who suggested those changes and to see what comments

23   were made is taking a little bit of time.  But that's what

24   we're doing.

25           THE COURT:  Okay.  So we have Amici day on Monday,

```
 1    which should actually be a nice breather for all of you,
 2    right?  And then you have Card?
 3              MR. LEE:  We have Dr. Simmons, Dr. Card, President
 4    Faust.  I think Dr. Simmons will be here Tuesday morning.
 5              MS. ELLSWORTH:  Start with her on Tuesday.
 6              MR. LEE:  We'll probably go right to Card because
 7    he has to get back to Berkeley on a plane Thursday night.
 8    And I think I have some room to adjust President Faust.
 9              THE COURT:  Okay.
10              MR. HUGHES:  And we just, in terms of timing, I
11    don't know how long you have with Simmons, but we won't have
12    long and we won't have -- I think our cross of Card will be
13    no longer than your cross of Arcidiacono, perhaps shorter.
14    So we may be able to keep this thing moving along.  Even if
15    we do end up recalling a witness or two, at least our team's
16    strong, strong preference is to close by Friday if it can
17    happen.
18              THE COURT:  I'm amenable to trying to push off next
19    week's trial, but we have a schedule and I will do everything
20    I can to make sure we'll stick to it.  Have a good weekend.
21              (Court recessed at 1:50 p.m.)
22
23
24
25
```

1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                    Plaintiff,          Civil Action
                                        No. 14-14176-ADB
6    v.
                                        October 29, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                    Pages 1 to 236
8
                    Defendants.
9    _____

10

11          * * * * SEALED TRANSCRIPT * * * *

12

13          TRANSCRIPT OF BENCH TRIAL - DAY 11
        BEFORE THE HONORABLE ALLISON D. BURROUGHS
13                UNITED STATES DISTRICT COURT
              JOHN J. MOAKLEY U.S. COURTHOUSE
14                 ONE COURTHOUSE WAY
                  BOSTON, MA  02210
15

16

17

18

19

20

21

22            JOAN M. DALY, RMR, CRR
           KELLY MORTELLITE, RMR, CRR
23            Official Court Reporter
          John J. Moakley U.S. Courthouse
24         One Courthouse Way, Room 5507
              Boston, MA  02210
25            joanmdaly62@gmail.com

1          P R O C E E D I N G S

2               (The following proceedings were held in open

3     court before the Honorable Allison D. Burroughs, United

4     States District Judge, United States District Court, District

5     of Massachusetts, at the John J. Moakley United States

6     Courthouse, One Courthouse Way, Boston, Massachusetts, on

7     October 29, 2018.)

8               MR. MORTARA:  Good morning, Your Honor.

9               THE COURT:  This is a surprise, Mr. Mortara.

10              MR. MORTARA:  It could be a pleasant one.  Could we

11     see you at sidebar, please?

12              THE COURT:  Who gets to decide if it's a pleasant

13     one?

14              MR. MORTARA:  I think Harvard's lawyers.

15              THE COURT:  Sure.

16              (The following was held at sidebar.)

17              THE COURT:  I assume you are calling this meeting.

18              MR. MORTARA:  Yes.  Good morning, Your Honor.  We

19     have a couple of issues.  The first relates to witness order.

20              THE COURT:  I'm sorry.  I need a different pen.

21              MR. MORTARA:  The first issue relates to witness

22     order.  We would like to start recalling Harvard's admissions

23     officers in regard to the updated review procedures issue

24     tomorrow.  We've been informed by Harvard's lawyers that

25     Harvard's experts need to get on and off the stand Tuesday,

1    Wednesday.  We're happy to accommodate them, but our case is
2    not closed.  We would like to recall these witnesses, and we
3    would like to question them first.  Harvard disagrees.
4              MR. LEE:  I can help with this, Your Honor.
5              THE COURT:  Hold on.  Which witnesses?
6              MR. MORTARA:  Right now we haven't reviewed the
7    documents yet.  I can tell you for sure we will call back
8    Fitzsimmons and McGrath.  We just received the privilege log.
9    Director McGrath is all over these drafts and the privilege
10   log months ago, and you know the testimony about the coffee
11   maker.  I don't need to show it to you again.  So we had
12   false testimony given here.  It was erroneous.  Whether it
13   was knowingly or intentionally false or whether it was
14   procured at the direction of prep about not disclosing
15   something, we're going to explore that with her, but we are
16   entitled to explore that first back in our case.
17             THE COURT:  How long do you anticipate having each
18   on the stand?
19             MR. MORTARA:  I can't imagine more than 30, 45
20   minutes each.
21             THE COURT:  So I get the time parameters, your
22   expert, I thought Card needed to be out of here by Thursday
23   night.
24             MR. LEE:  Yeah, as we've told them, two things,
25   Your Honor, and I'm not going to respond to the accusation

1    about false testimony, particularly since he said he hasn't

2    even reviewed the documents yet.

3              Simmons and Card have to start tomorrow morning so

4    we can be sure to get Dr. Card out by Thursday.  The real

5    disagreement here is for Dean Fitzsimmons, Director McGrath

6    and a couple of other people they have accused of not being

7    honest, we intend to call them in our case now.

8              Now, the real question is they're not available

9    until Thursday anyway.  Do they get to examine them first, or

10   do we get to examine them first?

11             THE COURT:  Why are they not available until

12   Thursday?

13             MR. LEE:  Just because of other commitments and

14   travel.  We won't have a chance to see them until tomorrow.

15   Right.  So Professor Simmons has to go tomorrow.  She's the

16   President of Prairie View Texas A&M now, so she needs to get

17   on and off.  If we start Dr. Card, we'll probably get him

18   done by Thursday morning, and then these folks will be

19   available.

20             We would -- as I said, Your Honor, I would have

21   loved to have put this in in our direct case.  Now that

22   they've put it in, I intend to put it in in our direct case.

23   But it's Your Honor's discretion.  If you want them to

24   examine first, fine.

25             THE COURT:  What I'd like to do just for

1    expedience's sake is I would like to have their experts go
2    first and then you can recall your witnesses and you can have
3    at them first.
4              MR. MORTARA:  Thank you, Your Honor.
5              THE COURT:  Does that make sense?
6              MR. LEE:  That's perfectly fine.
7              MR. MORTARA:  The next issue has to do with the
8    privilege log we received this morning.  Two issues.  This is
9    the log.  Number one is, the only lawyer listed on the log is
10   Ara Gershengorn.  We're doing the research tonight, but as
11   Your Honor may be aware, communications with in-house counsel
12   are not presumptively privileged as opposed to outside
13   counsel.  So we may be filing a short brief tonight on that.
14   We're doing the research.
15              The more salient issue is there are a number of
16   communications on the log that we'd ask for in camera review.
17   There's a number of draft-reading procedures.  The drafts may
18   or may not contain requests for legal advice and may or may
19   not contain legal advice coming back in return, and, as you
20   know, forwarding a draft business document to a lawyer
21   doesn't make the draft privileged.  It only is if it has
22   other requests for legal advice in it or if it has legal
23   advice in return.  Those items on the log as far as we can
24   identify are 3, 5, 16, 17, 20, 38 and 41, in my little box
25   here.  We'd ask for in camera review of those.

1          Then there are a bunch of communications with no
2     lawyer on them where it appears to be forwarding -- it says
3     "forwarding legal advice."  We'd like redacted versions of
4     those.  13 -- sorry, this is going out of order.  10, 12, 13,
5     14, 24, 26 and 27.  And we'd ask for Harvard to submit those
6     to you for in camera review, and then subject to our bench
7     brief potentially coming tonight about in-house counsel.
8          The last thing may be the most important, I don't
9     know, is that Ms. Gershengorn is not a custodian of Harvard.
10    Therefore, we have nothing on the log between Harvard and
11    Wilmer.  Now, this is important because I'm going to discuss
12    with Director McGrath why is it she said when she had known
13    for months that there was writing about use of race, we have
14    it back for months on these drafts, why it is she told me
15    there was no such thing.  I suspect the answer is she worked
16    with her lawyers to come up with a way to rationalize my
17    question in her head so it had no relation to the question I
18    was asking.
19         I would like to see the log with Wilmer to
20    establish there were communications between Wilmer and I
21    guess Ms. Gershengorn about these drafts and Wilmer knew
22    about them.  Mr. Lee has already said he knew about them.
23    But I think Ms. Gershengorn is a custodian and a short log of
24    communications with Wilmer is probably appropriate.  Wilmer
25    is nowhere on this log, except I think in the last entry

1   there's a sort of hint that Wilmer was involved.  Do you see

2   that?  "WH comments."  So we'd ask for Ms. Gershengorn to be

3   added as custodian.

4               MS. ELLSWORTH:  Can I be heard, Your Honor?

5               THE COURT:  Sure.

6               MS. ELLSWORTH:  On the documents Mr. Mortara just

7   mentioned, I don't believe either Mr. Mortara or Mr. Hughes

8   have actually had a chance to look at the production to see

9   whether they in fact feel that things have been withheld that

10  they are entitled to.  We're happy to take a look at them,

11  and if there are attachments that don't have legal advice or

12  convey legal advice, we can produce those.

13              THE COURT:  You'll look at those first.

14              MS. ELLSWORTH:  I'll take a look at those, and I'll

15  take a look at the items that Mr. Mortara has indicated he'd

16  like in redacted form to see if there would be anything to

17  produce.  I believe they were put on the log because they

18  would have been wholly redacted, and so it would just be the

19  same information that's on the log in terms of To, From,

20  Date.  We'll take a look.  If there's something to produce,

21  we will do so.

22              MR. MORTARA:  What I suggest is that you jointly

23  email Ms. Folan later on today to reduce the size of the in

24  camera review request.

25              THE COURT:  I suspect we'll be here all day.

1        MR. MORTARA:  I can email Mr. Hughes, and he can
2    let you know.
3        THE COURT:  That's fine.
4        MR. LEE:  Your Honor, can I say one thing which
5    doesn't require you to resolve anything additional?  But I
6    really feel compelled to defend Director McGrath's integrity.
7    What you're going to see, if you want to see these documents,
8    is they go back into earlier in the year, but it has nothing
9    to do with that excerpt that they showed you the other day.
10   What you'll see is back in June or so, the admissions
11   officers decided to look at all the ratings.  So there's a
12   series of meetings where they're discussing all the ratings.
13   It has nothing to do with the use of race in the personal
14   rating.  And when they get to look at the documents, they
15   will see there are a host of changes being discussed and some
16   implemented that have nothing to do with this.
17       The personal rating and race comes in much later in
18   the day.  There's virtually nothing with Director McGrath's
19   name on it or otherwise.  So I think just we have to be
20   careful before we impugn the integrity of people when we
21   haven't even looked at the documents.
22       THE COURT:  I'm not drawing any conclusions about
23   anybody's integrity at this point.  I just want to, as you
24   know, move this along and make sure that the factual record
25   is appropriate.  So I'm going to let him recall them.  He's

1    going to have the first shot at them.  You're going to review

2    the documents and see what there is left to fight about.  If

3    there's anything left that we're fighting about, I'll take a

4    look at them.

5              I think the witness order accommodates everybody to

6    the extent that I can.  In terms of Ms. Gershengorn as a

7    custodian, do you want to give him the privilege log on her?

8              MS. ELLSWORTH:  No.  We'd like to do our own

9    research on this.  I'm not familiar with the suggestion that

10   any of those communications would not be privileged.  I'm

11   happy to look at the -- it's my turn to talk right now,

12   Mr. Mortara.

13             I think we're happy to look at that.  And if we

14   think there's some reason we should provide a log, we will

15   consider it.  But right now we don't think -- I think they

16   should look at the documents.

17             THE COURT:  You take a look at it.  I mean, you

18   take a look at it first, and we'll see where we are in the

19   middle of the day or end of the day to see where we are on

20   that.  I'm not ruling out the possibility of giving them the

21   privilege log.  We'll take it in baby steps and --

22             MR. MORTARA:  To be clear, two separate issues.

23   One is that communications with in-house counsel under law

24   are not presumptively privileged and the burden is on

25   Harvard.  That's basically their entire log.  Two is we would

```
 1    like an actual log of communications that are likely
 2    privileged, which would be between Harvard and outside
 3    counsel, completely separate categories.  I just want to make
 4    that clear, Your Honor.
 5              THE COURT:  You're trying to nail down the dates
 6    that Ms. Gershengorn would have been talking to people about
 7    this?
 8              MR. MORTARA:  Yes.
 9              THE COURT:  So if you go through this preliminary
10    set of documents and it's apparent that they're not talking
11    about it until whenever, August, versus if they have been
12    talking about it since Christmas, that is different, so let's
13    see where we are on that.
14              MR. MORTARA:  We should be able to come back to you
15    this afternoon.
16              THE COURT:  So are you going to -- I take it you
17    put on a suit for your ten minutes.  Now you're going to put
18    your pajamas back on.
19              MR. MORTARA:  That is exactly correct.  We've got
20    some superstar lawyers to take care of today.  They don't
21    need me.
22              MR. LEE:  That's a vision I'm not going to --
23              THE COURT:  I was just thinking that.
24              MS. ELLSWORTH:  Thank you, Your Honor.
25              (End of sidebar.)
```

1    thought that far ahead.  I'm just trying to get through the

2    week, but I will think about that.  Thank you for raising it.

3          All right.  Anything else before we reconvene at

4    sidebar?  Okay.

5          [The following was held at sidebar.]

6          MR. HUGHES:  We are going to file a motion tonight

7    related to Harvard's assertion of privilege over some of the

8    documents on the privilege log that we were provided with

9    this morning where Ms. Gershengorn is working with members of

10   the Harvard admissions office.  We think Harvard has the

11   burden to prove those are privileged.  We'll file our brief

12   tonight.

13         We understand Ms. Ellsworth is going to provide the

14   Court I think now with a copy of all of the documents that

15   were identified on the privilege log, and I think she will

16   agree that you should review those motions in camera.  We've

17   also identified some documents that were produced to us where

18   there are redactions on the documents, and Ms. Ellsworth has

19   represented that those redactions are related to claims of

20   privilege.

21         And I would ask if Harvard doesn't have the

22   unredacted versions of those to provide this afternoon, that

23   they be in court tomorrow because I think we will also ask

24   for review of some or all of those documents.  I want to try

25   to keep this moving.  Then there was a retreat with the

1   admissions office in June where the person's score was

2   discussed.  We've asked for documents related to that retreat

3   to be produced to us, and Ms. Ellsworth has represented that

4   they're doing a search to try to provide these documents that

5   hopefully we'll get tonight.

6           And then my last issue is this morning we asked for

7   Harvard to produce a privilege log of communications between

8   Ms. Gershengorn and Wilmer Hale related to obviously this

9   limited issue of modifications to the reading procedures.

10  I'm sure there's a ton of communications that would take

11  forever to log.

12          I do think getting that is important, first of all,

13  to put in context if there's privilege of Ms. Gershengorn's

14  work, when did Wilmer come on the scene in terms of the

15  changes to the 2023 reading procedures.  And it also goes to

16  what Wilmer knew in terms of some of the representations that

17  were made to the courts.  We'd ask they go ahead and provide

18  us with that.  That's our request.

19          MS. ELLSWORTH:  I'm going to go in backwards order

20  because I don't have anything to write with.  I'm not sure

21  what the reason is for a privilege log between us and

22  Harvard, I don't know what the basis for that is.  I know

23  you've been sitting in court like I have, I know Mr. Hughes

24  hasn't reviewed many of the documents.  I don't think I ever

25  have suggested that Wilmer Hale was not aware to any -- I'm

1    not sure it goes to any issue in this case or any issue.

2              We're not agreeing to that right now.  I'm not sure

3    what the authority is or what the reasons are for that.  We

4    can talk about it.  That's our sort of initial review on

5    that.  We have removed a few items from the privilege log,

6    and we are producing those to SFFA this afternoon.  Some are

7    being produced in full, some are being produced in redacted

8    form.

9              What I have here is everything that remains on the

10   privilege log that is being withheld in full.  If Your Honor

11   wants to do it in camera -- We don't think it's required at

12   this point, but I have it here.

13             THE COURT:  I'm wondering if the quickest thing to

14   do rather to have motion practice is just to review this.  If

15   you don't object to that as a procedure, it seems most

16   efficient.  Am I going to be able to figure out what's what?

17             MS. ELLSWORTH:  This is the privilege log and the

18   tab numbers relate to this.

19             THE COURT:  Have you held out the whole document or

20   just redacted portions of it?

21             MS. ELLSWORTH:  Those are documents that are

22   withheld in full.  Though don't have any of it.

23             THE COURT:  So they don't have any of this?

24             MS. ELLSWORTH:  They don't.  They have the log.

25   We're going to update the log for them after court so it's

1    clear what is taken off of it.  We're going to keep the

2    numbers the same.

3              THE COURT:  This seems like more numbers than

4    Mr. Mortara gave me this morning.

5              MR. HUGHES:  There are 40 some odd entries.

6              THE COURT:  Didn't he give me like 10?

7              MS. ELLSWORTH:  He asked for a few for in camera.

8    Most of those, say two or three, were given to them in

9    redacted or in full.  This is everything else.  I don't know

10   whether you're challenging the entire log.  Honestly I think

11   it's faster for you to take a look at them.  I know you have

12   nothing better to do tonight.

13             MR. HUGHES:  Briefly --

14             MS. ELLSWORTH:  Can I?  We have a couple different

15   cases that may clear that in-house counsel privilege attaches

16   to communications with in-house counsel so long as they serve

17   in the role of the lawyer, which Ms. Gershengorn does

18   exclusively.  It's not like the cases I'm thinking which are

19   from D.Mass and the First Circuit where if you have a joint

20   business and legal role, there was some discussion.

21   Ms. Gershengorn only serves in that capacity.  She's

22   obviously providing legal advice in connection with this

23   case.  She's appeared in this case.  I don't know what cases

24   they're talking about on presumption.  I'm just happy to have

25   you review that.

```
1            THE COURT:  Let's see if I can do that, I will.
2            MR. HUGHES:  We may still file something that gets
3    the law on this.
4            THE COURT:  My recollection is largely the same as
5    hers.  If you have in-house counsel, they can serve in a
6    business capacity or they can serve in a legal capacity.  To
7    the extent they're giving business advice, it's not
8    privileged.  To the extent they're giving legal advice, it's
9    privileged.  So obviously there's the gray area.  Someone of
10   counsel can do business.  Let me take a look at these.
11           MR. HUGHES:  I will report back to the team.
12           THE COURT:  I'm going to look at these.  I'm sure
13   you have better things to do tonight than write a brief.  If
14   you want to write a brief, go ahead.
15           MS. ELLSWORTH:  With regard to the additional
16   documents that were requested this morning, we scrambled a
17   lot of bodies in the past couple of days.  We pulled ten
18   mailboxes over a four and a half month period.  We searched
19   them, we reviewed them, we produced them.  At the request
20   from an e-mail from Mr. Mortara today, we did some additional
21   searching and found I think there's five more documents that
22   are being produced tonight that relate to reworking of the
23   personal rating discussion in general.
24               They don't actually relate to any of the portions
25   of the reading instructions that were highlighted by SFFA
```

1    last week when they brought them to your attention.  But

2    we're happy to produce them.  That's what we've done.

3              MR. HUGHES:  The other thing that I've already

4    raised, but I'll raise it again so it doesn't get lost in the

5    shuffle.  There are documents that have redactions, some of

6    which are communications between nonlawyers, and they're

7    claiming that the redacted portion is privileged.  And I

8    think we should have -- I don't think that Harvard has those

9    here, but if they could get them here tomorrow for review, I

10   think that would be prudent if you determine that you'd like

11   to do that.

12             Then I guess the unresolved issue is whether we're

13   entitled to a privilege log of communications between

14   Ms. Gershengorn and Wilmer Hale concerning only the issue of

15   the modifications to the reading procedures.  Obviously we

16   don't care about the rest.

17             THE COURT:  Are you trying to do something beyond

18   the date of her involvement with this?

19             MR. HUGHES:  We know when Wilmer comes on the

20   scene.

21             THE COURT:  All you're looking for is to date that?

22             MR. HUGHES:  To date it and to know the extent of

23   her involvement in the process.

24             THE COURT:  I'm going to hold that one off because

25   they're going to look at that tonight.  We can see where we

1    stand on that tomorrow.  I think they're behaving very

2    reasonably in all of this.  If you want to bring in those --

3    I'm assuming you're going to want to bring in those extra

4    documents he's talking about tomorrow morning, and I'll

5    review them in camera if they need to be reviewed.

6               MS. ELLSWORTH:  We can if that's what Your Honor

7    would like.

8               THE COURT:  I'm leaving it to you.  It just seems

9    that is most efficient.  They could file a motion.  You could

10   respond to the motion.  We could litigate it.  If you want to

11   bring them in, I'll look at them.  I'm not telling you what

12   to do.  I'm not even expressing a preference.  I'm just

13   offering to do it that way if that makes the most sense.

14              MR. HUGHES:  That's makes the most sense to us.

15              MS. ELLSWORTH:  A lot of them would be things that

16   they have in an unredacted form, so there won't be a lot of

17   additional work.

18              MR. LEE:  Can I ask one question now that you've

19   had part of the documents for part of the day, who are the

20   witnesses you'd like us to have?

21              MR. HUGHES:  I need to talk to my team.  I know for

22   sure Director McGrath, and when I go back I'll let you guys

23   know tonight.

24              MR. LEE:  Okay.

25              MR. HUGHES:  As we try to get this done on Friday,

1    if we end up with time left on Wednesday afternoon, are you

2    still planning to call Faust?

3              MR. LEE:  I think what we'll do is -- Wednesday

4    afternoon is Halloween, too, so it's shorter.  I think the

5    likelihood is that we'll get President Simmons, Card, and we

6    have a couple very very short deposition excerpts, which I

7    understand Waxman and I are going to revisit is what we were

8    told yesterday.

9              THE COURT:  Karen, what time tomorrow is ITyX?

10             THE CLERK:  4:00.

11             MR. LEE:  I think we can get it all done even if we

12   have early dismissal on Wednesday.  That will give us

13   Thursday to do whatever we have to do, and we'll have

14   President Faust at the end, but from our point of view, the

15   direct is 30 minutes maybe.

16             THE COURT:  You think Card is going to be?

17             MR. LEE:  I think President Simmons will be an hour

18   and 15 minutes.  We'll start right with her.

19             MR. HUGHES:  We'll be very short with her.

20             MR. LEE:  She can be on and off.

21             THE COURT:  Then you'll go to --

22             MR. LEE:  Dr. Card.  It will probably take most of

23   the rest of the day.  Basically if they have a two to

24   three-hour cross --

25             MR. HUGHES:  Now that we got your 141 slides, that

1   may extend.

2          MS. ELLSWORTH:  We will still be on direct

3   Wednesday morning.

4          MR. HUGHES:  That will be our hope.  If you can get

5   that finished Wednesday.  If you do the deps, then we'll move

6   on to the recalling of the witnesses, and then we'll let you

7   know tonight.

8          THE COURT:  Do I have anything scheduled tomorrow?

9          THE CLERK:  9:15.

10          THE COURT:  I have a criminal thing that I hope is

11   quick tomorrow at 9:15, and then the final pretrial for the

12   week after at 5.  You have all my time between.  So 9:30 to

13   4.  What time would you like to stop on Wednesday?

14          MR. HUGHES:  I'd like to go -- I recognize that

15   it's Halloween.

16          THE COURT:  I'm going to let them choose.  Does

17   3:30 work?

18          MR. LEE:  Yes.

19          THE COURT:  This is like a national holiday.

20          MS. ELLSWORTH:  The Red Sox parade is going to be

21   Friday at 11.

22          THE COURT:  I'm very willing to accommodate this.

23          MR. LEE:  Can we do 3?

24          THE COURT:  We can do 3.  We can start a little bit

25   early.  We can shorten up lunch if you want to try and make

1    back your hour.

2              MR. HUGHES:  I'm not trying to be the Grinch.

3              THE COURT:  Spending too much time with

4    Mr. Mortara, becoming Grinch-like.

5              MR. LEE:  If things are going slowly tomorrow and

6    we need to go a little bit longer, we can.

7              THE COURT:  Let's plan on 3.  I don't have anything

8    Wednesday morning, right?

9              THE CLERK:  No, we have nothing else.

10             THE COURT:  Let me see what's going on at home.

11   Maybe on Wednesday we can start a little bit earlier to try

12   to beat the Red Sox.  I'm happy to take a shorter lunch.

13   We've really been knocking off around 3:30 anyway.  We'll all

14   bring you a little bit of candy the next day and hopefully

15   that will improve your mood.  That's what we'll try and do.

16             If the Amici close we're talking about an extra

17   half an hour.  I'd like to try and give that to them.

18             MS. ELLSWORTH:  We had talked about doing 90

19   minutes per side.

20             THE COURT:  Do you think you'll be ready to close

21   at 9:30 on Friday?

22             MR. LEE:  Yes.

23             THE COURT:  So then they can close.

24             MR. HUGHES:  I get to go first and last?

25             THE COURT:  Are you going to go first and last?

```
 1              MR. LEE:  That's okay with us as long as rebuttal
 2     is not 89 minutes.
 3              MR. HUGHES:  No.  I plan to go 70 to 75 and save
 4     some of my 90.
 5              THE COURT:  Do you want to do your rebuttal after
 6     the Amici as well?
 7              MR. HUGHES:  No.  Just after Mr. Lee.
 8              MR. LEE:  If it's all right with Your Honor,
 9     Mr. Waxman and I are going to split the 90 minutes.
10              (Court recessed at 4:08 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                  UNITED STATES DISTRICT COURT

 2                    DISTRICT OF MASSACHUSETTS

 3    _____

 4    STUDENTS FOR FAIR ADMISSIONS, INC.,

 5                     Plaintiff,          Civil Action
                                           No. 14-14176-ADB
 6    v.
                                           October 30, 2018
 7    PRESIDENT AND FELLOWS OF HARVARD
      COLLEGE, et al.,                     Pages 1 to 201
 8                                         SEALED TRANSCRIPT
                     Defendants.
 9    _____

10

11            * * * * SEALED TRANSCRIPT * * * *

12

13            TRANSCRIPT OF BENCH TRIAL - DAY 12
           BEFORE THE HONORABLE ALLISON D. BURROUGHS
14               UNITED STATES DISTRICT COURT
                JOHN J. MOAKLEY U.S. COURTHOUSE
15                   ONE COURTHOUSE WAY
                     BOSTON, MA  02210

16

17

18

19

20

21

22              JOAN M. DALY, RMR, CRR
                KELLY MORTELLITE, RMR, CRR
23                 Official Court Reporter
              John J. Moakley U.S. Courthouse
24             One Courthouse Way, Room 5507
                   Boston, MA  02210
25                 joanmdaly62@gmail.com
```

P R O C E E D I N G S

1

2              (The following proceedings were held in open

3      court before the Honorable Allison D. Burroughs, United

4      States District Judge, United States District Court, District

5      of Massachusetts, at the John J. Moakley United States

6      Courthouse, One Courthouse Way, Boston, Massachusetts, on

7      October 30, 2018.)

8              THE COURT:  Can I see counsel at sidebar, please.

9              [Sidebar sealed and redacted.]

10             THE COURT:  I have read almost nothing that you

11     filed this morning, okay?  But I was going to try and,

12     without reading this, I'm going to tell you where we are, and

13     then you can tell me if I need to read it.

14             MR. MORTARA:  Absolutely.

15             THE COURT:  I read this first paragraph.  So let me

16     tell you about what's in here.  These are the documents that

17     were withheld.  They're all privileged.  The only possible

18     exception, and I'm willing to show you this, the very first

19     one, number one is an email from a father to Professor

20     Khurana.  His daughter is about to start high school.  She's

21     a junior.  This is where she goes.  As far as the application

22     process, we really want her to go to Harvard, basically.

23             Okay.  The admissions office drafts a response,

24     which is like exactly like you would expect, work hard,

25     interests change, hope to hear from you soon.  And then they

```
 1    send it on to the Office of the General Counsel for review.
 2    So theoretically, the only part that's not privileged are
 3    these two, but I doubt it was responsive to what you asked
 4    for.
 5              MR. MORTARA:  Not at all.
 6              THE COURT:  Okay.  So that's the only thing in all
 7    of this that's not privileged.
 8              MR. MORTARA:  Since Your Honor has reviewed it, I
 9    think Your Honor has resolved it.
10              THE COURT:  Let me review with you a little more
11    because you know I'm all about making a good record in this
12    case.  You have suggested that she was involved in the
13    drafting.  She was not at all.
14              MR. MORTARA:  Okay.
15              THE COURT:  Based on what I have in here.  Now, I
16    know you've said --
17              MR. MORTARA:  There was an email --
18              THE COURT:  You attached a document.  So she is
19    reviewing.  When she reviews, she makes some edits.  Even
20    when she makes those edits, it's like if there's a word that
21    she doesn't like, she says find another word.  She doesn't
22    even actually replace the word.
23              MR. MORTARA:  Understood.  Got it.
24              THE COURT:  So there's a little bit of editing in
25    there, but she's also not getting these things for
```

1    simultaneous review.  She's getting them after.  And in one
2    case they actually forget to send it to her and she's getting
3    it quite a bit after.
4           So I will read all of this, but these are -- and
5    I'm going to go one step further and tell you that there's
6    nothing in here that you would be interested in.  It's just,
7    it's all like -- it's not interesting.
8           MR. MORTARA:  Your Honor, with that --
9           THE COURT:  It's largely repetitive.
10          MR. MORTARA:  With that review, for which we thank
11   you for spending the time, we withdraw the suggestion that we
12   need to see it.
13          THE COURT:  Okay.  So these aren't even long.  This
14   is not even -- it's a lot of -- I want to say one other thing
15   about Harvard.  I've never seen an organization be so
16   unfailingly polite to each other.  I'm sorry to ask you to do
17   this; I know how busy you are; I'm always happy to help you;
18   thank you; thank you; thank you.  It's a nice culture.  They
19   seem to agree there.
20          MR. LEE:  Very academic.
21          THE COURT:  A little obsequious.  And I am no
22   privilege expert.  I sometimes wrestle with privilege areas.
23   I think there's a lot in the grey.  We're not close to the
24   grey area.
25          MR. MORTARA:  Thank you for your time.  I think

1    we're satisfied with the production Harvard has made.  We

2    don't have any additional requests.  We're ready to move

3    forward with Director McGrath on Thursday followed by Dean

4    Fitzsimmons.

5         We're still considering as to Charlene Kim, Chris

6    Looby, we have an agreement with Harvard.  There are

7    documents that only Ms. Mascolo could really provide

8    foundation for, but if Harvard will allow us to admit those

9    without Ms. Mascolo, we will not need to call her.  We're

10   ready to go on Thursday now.

11        THE COURT:  Okay.  That's fine.  Your letter I

12   haven't read yet and I take it it's not related to this

13   issue.

14        MR. WAXMAN:  It's related to the brief, the bench

15   brief that they filed a few minutes earlier, maybe an hour

16   earlier this morning, and it relates to their objections to,

17   number one, several of the summary exhibits that we intend to

18   introduce through Dr. Card.  And number two, last night they

19   lodged several objections to some of the demonstratives that

20   we intend to show Dr. Card in the course of his testimony.

21   As to the exhibits, I mean, there are lots and lots of

22   different kinds of exhibits and different reasons for

23   concluding that they are summary exhibits under 1006 and

24   alternatively admissible under 611A and 703.  It probably

25   makes sense to go through these as we go through them so Your

1    Honor can see the document and hear the context.

2              As to the demonstratives, I must say, I mean, they

3    are just demonstratives.  I don't think that the objections

4    are well taken.  I know Mr. Mortara feels strongly, as usual,

5    the other way.  I think we probably --

6              THE COURT:  He's complementing your passion.

7              MR. MORTARA:  I don't actually feel that strongly

8    about some of these things, and I have a potential solution,

9    but I want to let Mr. Waxman finish.

10             MR. WAXMAN:  I just, you know, we raise it now

11   because if we're going to have to pull some of the

12   demonstratives, I think we need to create a new deck for when

13   he comes.  I'm happy to discuss them with Your Honor now.  I

14   realize this is like --

15             THE COURT:  Let me read what you've submitted

16   first, which I'll try to do if we take a morning break or

17   during lunch.  When is he expected to take the stand, before

18   lunch or after lunch?

19             MR. WAXMAN:  I have about an hour and a quarter

20   with President Simmons.

21             MR. HUGHES:  He'll be on before lunch.

22             MR. MORTARA:  Since we're all here, let me try to

23   help.  There's two completely separate issues.  One is the

24   ordinary issue of is it disclosed in the expert report?

25   Several of the demonstratives have numbers and analysis not

1    in his reports.  It's kind of a standard problem.

2            Putting that to one side, both parties created

3    proposed Rule 1006 summaries.  All of ours went in with

4    Professor Arcidiacono.  Some of them were just summaries of a

5    database that he didn't even talk about his report.  We

6    provide foundation.  We move them into evidence.  They're in

7    evidence.  Typical 1006 summaries.

8            Harvard provided a bunch of summaries that are

9    really the analysis of Professor Card.  And what would

10   ordinarily be demonstratives under 611, this is not a jury

11   trial where we care about what goes back into the jury room.

12   I am completely fine with disclosed, what Harvard calls

13   summaries, that in fact were in his expert reports.  He can

14   talk about them just fine.  I'm fine with true summaries of

15   the database that he didn't talk about in his expert reports

16   that he can provide foundation for and move those into

17   evidence.  I'm fine with all of it coming in evidence,

18   disclosed demonstratives, true summaries, as long as our

19   expert demonstratives would also go into evidence.  To me,

20   this is kind of angels on the head of a pin, Your Honor,

21   because you are the finder of fact.  You have our

22   demonstratives.  We've handed them up to you.  But if theirs

23   go in, ours go in.  If theirs don't go in -- we didn't move

24   ours in because they're demonstratives and we sort of planned

25   like it's a jury trial.  There's no jury room to go back to.

1    It doesn't really matter.

2              THE COURT:  I mean demonstratives are not usually

3    admitted as evidence.

4              MR. WAXMAN:  That's right.  And we were not

5    planning to admit them, but I'm happy to agree with

6    Mr. Mortara, and I think having them does assist the court

7    that both his demonstratives and our demonstratives will go

8    into evidence and he can testify about them to the extent

9    that Mr. Mortara wants to challenge the witness about, you

10   know, whether that's really something that he disclosed or

11   before or something like --

12             MR. MORTARA:  No.  That's not for cross.  That's

13   for direct.  If it's not in his report, he doesn't get to

14   talk about it.  There's about eight of these demonstratives

15   that have numbers found nowhere in these reports and nowhere

16   in the spreadsheets they gave us.  That is not fair game.

17   You can't recut the data, put new numbers up there that I

18   never saw in his reports.

19             MR. WAXMAN:  Your Honor, if there are really a

20   handful of these, it probably would make sense to do it

21   before we put Professor Card on so we know what we can move

22   forward on.  I don't agree with those characterizations.

23   There are demonstratives, and some of them will come up early

24   in his testimony, that illustrate for example that Dr. Card's

25   opinion, expressed in both of his reports and that he'll

1    express today is that what Harvard is valuing is

2    multidimensionality, that is, multiple strengths.  That is an

3    opinion that was fully expressed, fully disclosed, the

4    subject of his deposition.

5           We introduced as -- we offered as a summary exhibit

6    just the series of statistics from the Harvard database as a

7    summary exhibit.  They did not object to it.  And we prepared

8    a demonstrative in which he'll offer the same opinion that

9    he's offered in his reports with reference to simply the data

10   from the database, a summary of the data from the database

11   that allows us to prepare a demonstrative.  And I'm not aware

12   of any principle of law that does this.

13          And in fact, the SFFA is attempting now, long after

14   Dr. Arcidiacono has left the stand, to introduce its own

15   summary exhibit concerning a question that the court had

16   asked and an opinion that he gave in which he is producing

17   descriptive data that comes from the files.  And other than

18   the fact that we have an objection to its accuracy, that's

19   fine, and that's all we're trying to do.

20          MR. MORTARA:  Your Honor, I'm sorry to belabor

21   this.  This is kind of exactly the point.  Virtually

22   everything Mr. Waxman just said is true.  There is an opinion

23   about multidimensionality.  The report has tables.  If he

24   wanted to use the tables from the report, I'm A-okay with

25   that.

1        They then went and created a completely admissible

2    and acceptable Rule 1006 summary from the database that he

3    never talked about in his reports.  Now they want to recut

4    the data, use numbers that were not in his reports and have

5    him testify about it.  That's not disclosed.  They can admit

6    the summary, and you can look at it.  They can use the charts

7    from the expert report.  No problem, it's disclosed.  They

8    can't pull things that were not discussed in the expert

9    report out of the summary and talk about them when they

10   weren't in the report.  That's my position.

11        THE COURT:  Okay.  So this is a uniquely difficult

12   thing for me to rule on in a vacuum because I'm not nearly as

13   facile with the expert reports as you guys are.  So for you

14   to say it's in there and you to say it's not, I'm not in a

15   good position --

16        MR. MORTARA:  We have a binder with the

17   demonstratives, and where they say things are disclosed, we

18   can give you them.

19        THE COURT:  Okay.  So I guess I would rather take

20   them as they come, but if you feel strongly that it needs to

21   be done before he takes the stand, we can try and figure that

22   out.

23        MR. MORTARA:  Mr. Waxman and I could also go in the

24   hallway and try to work some of these out.

25        THE COURT:  Okay.  So let's get the first witness

1    on.  I know she needs to get in and out.  If we need to take

2    a break, we will.

3              MR. WAXMAN:  Realistically, the number of these

4    disputed demonstratives that we're going to get to today

5    is -- I think pretty clearly, Dr. Card is going to be back on

6    direct examination tomorrow morning.

7              THE COURT:  I'm just -- I'm listening to this,

8    again, unencumbered by the expert reports, and it seems like

9    this concept of multidimensionality is really not contested.

10             MR. MORTARA:  No, and I don't mind if he uses a

11   chart from his report.  What he's done is re-sliced the data

12   in a way that I have no way to really assess on the fly what

13   is in his report.  I prepare for my crosses based upon the

14   reports.

15             MR. WAXMAN:  Hold on one second.  The opinion we

16   were giving in multidimensionality, he gave an opinion in his

17   report about multidimensionality, and he included some

18   tables.

19             MR. MORTARA:  Use his tables, fine.

20             MR. WAXMAN:  Adam, I heard you twice about this.  I

21   think I've got it.  Let me finish my point.  He gave an

22   opinion.  He explained what his opinion was.  He explained

23   that his opinion was based on the data.  This is not

24   modeling.  This is the data that is in the Harvard database.

25   We prepared as a summary exhibit just that data, the data

1    that relates to multidimensionality.  We produced it two

2    months ago.  They did not object to that exhibit until

3    yesterday -- well, actually this morning.

4              THE COURT:  Well, I mean, we can take it as it

5    comes and I'll look at it, but it seems like we're fighting

6    over the demonstrative that goes with an uncontested fact.

7              MR. MORTARA:  That is effectively the case.

8    However, to me, when you get further into these things, there

9    is a lot of new analysis that there was just no opportunity

10   to have reviewed a report and cross-examined the witness at

11   his deposition.  The multidimensionality thing, yeah, you can

12   look at the summary exhibit to which we don't object to its

13   admissibility and glean the same information; completely

14   true.  But I have to hold the line on what's being

15   disclosed --

16             THE COURT:  So let's get the first witness on and

17   we'll see where we are.  This just sounds like a little bit

18   of a tempest in a teapot to me.  I know you're challenging

19   many things about their case, but you're not really

20   challenging their case on multidimensionality --

21             MR. MORTARA:  Not in the way it's being presented.

22   The summaries we completely --

23             THE COURT:  You're just saying all these Asian

24   applicants have the same multidimensionality as everybody

25   else, right?

1          MR. MORTARA:  Sure.  But when you get further on

2     along in these demonstratives, for instance, a good example

3     is Professor Card has no real response to Professor's

4     Arcidiacono's -- no specific response to the decile and

5     personal rating.  He wants to talk about that today.  If he

6     wanted to talk about that, there's a rebuttal report for

7     that.  You can't go and pull something from a summary exhibit

8     and then say I'm now going to give you a brand new opinion.

9     The multidimensionality thing, you're basically correct;

10    that's kind of a tempest in a teapot, but I've got to hold

11    the line against the stuff that comes later.  This is like,

12    what do they call?  The wedge under the door or nose in the

13    tent or --

14          MR. WAXMAN:  All of those things.

15          MR. MORTARA:  We'll try to work it out.

16          THE COURT:  Let's get the witness on and off and

17    then see where we are.

18    (End of sidebar.)

19          THE COURT:  Okay.  When you're ready.

20          MR. WAXMAN:  Your Honor, Harvard calls President

21    Ruth Simmons.

22          (RUTH SIMMONS, duly sworn by Deputy Clerk.)

23          COURTROOM CLERK:  Will you please state your name

24    and spell your last name for the record.

25          THE WITNESS:  My name is Ruth Simmons,

```
 1                    **** AFTERNOON SESSION ****

 2              (The following was held at sidebar.)

 3              MR. MORTARA:  I'm delighted to report to Your Honor

 4    that this is a happy sidebar, bar one thing.  We've resolved

 5    I think all the demonstrative objections.  With the one

 6    change that I negotiated with Ms. Ellsworth, I'm going to let

 7    everything else go.

 8              MS. ELLSWORTH:  Great.

 9              MR. MORTARA:  There is one remaining.  That

10    involves many many slides.  And it's all in service OF the

11    same objective.  There is a tutorial plan I gather it's being

12    used as an illustration of regressions on retirement.  It

13    goes on for quite a significant amount of time.  There is no

14    disclosure of any tutorial, background teaching of

15    regressions, anything like that in the expert reports

16    anywhere.  There's no tutorial exception to Rule 26.

17              So I think we should skip the tutorial, and if he

18    wants to teach you about that, he should do so in the context

19    of his models.

20              MR. WAXMAN:  Your Honor, I'm mindful of some of the

21    comments in your summary judgment papers both before and at

22    the start of trial about understanding concepts that are not

23    familiar.  We asked Dr. Card if he could outside the facts of

24    this case just provide in the context of a pure hypothetical

25    in this case a model that predicts whether somebody, a
```

worker, will or won't retire in the next year.  Explain the
concepts of how a regression works, what it does, what the
average effect is, what omitted-variable bias is, what
statistical significance is.

We thought it would be easier for the Court to do
it in the context of these slides.  He's going to do, unless
the Court is not interested in this, he's going to do any way
he can.  He can do it on a whiteboard.  It's up to Your
Honor.  This is not expert opinion.  This is just a
hypothetical.

MR. MORTARA:  It absolutely is expert opinion.  I'm
sure, I'm absolutely positive, it would be helpful and
interesting.  I'm also positive it will be an advocacy piece
that I have never seen before, and I am not an expert in
statistics or econometrics, and I took weeks and months to
get ready to take apart whatever is misleading or I feel is
misleading about such a presentation which is why we have
Rule 26.

I agree it would probably be awesome.  Professor
Arcidiacono's presentation, which was also not disclosed,
which would be an awesome tutorial about these awesome things
would also likely have been awesome.

MR. WAXMAN:  Let me just say, Professor Arcidiacono
did a shorter version in which he had the regression machine
slides with the cogs and the coefficients yielding down to

1    what the athletic calculation --

2              MR. MORTARA:  Involving Harvard's rating and the

3    Harvard database.

4              THE COURT:  So I would like to say this probably

5    would have been helpful and awesome, but I take your point.

6    If you're going to object to it, he can leave it out.

7              MR. WAXMAN:  So can he do the tutorial without the

8    slides?

9              THE COURT:  He can certainly explain regression

10   analysis, right?

11             MR. MORTARA:  I think it would be most helpful for

12   it to be done in the context of his actual models in the

13   case.  If he wants to do a general not example with the

14   retirement and the average marginal effect, whatever, if he

15   wants to give a 20-minute speech on it, I guess that's okay

16   with me.  I don't want whatever comparison is being made

17   between this and our case, I don't know what it is.

18             THE COURT:  I think he's saying there's no

19   comparison.

20             MR. WAXMAN:  Let me just make a representation.

21   He's not going to refer to this case.  He's not going to

22   advocate for one thing or another.  It's a way to examine

23   what happens in a regression when you add a variable and what

24   coefficients are.  There's no advocacy at all.

25             MR. MORTARA:  I am sure that there are nothing but

1    pure motives in trying to assemble this.  I'm also sure it's

2    not the tutorial I would have assembled.  I object.

3            THE COURT:  Given the purpose of demonstratives and

4    the fact that you object, despite the fact that we agree it

5    might be helpful and interesting, we will keep it out.  He

6    can explain his methodology without the benefit of these

7    demonstratives.

8            MR. MORTARA:  Thank you, Your Honor.

9            MR. WAXMAN:  If it's useful for him in the

10   teaching, can we at least put up a whiteboard and have him

11   explain some basic things?

12           MR. MORTARA:  Sure.

13           MR. WAXMAN:  Do you mind if I advise him of that?

14           THE COURT:  No.  I mean no, I don't mind.

15           (End of sidebar.)

16           THE COURT:  When you're ready, Mr. Waxman.

17   BY MR. WAXMAN:

18   Q.  The good afternoon, Dr. Card.  Did you construct a

19   statistical model of Harvard's admissions process?

20   A.  Yes, I did.

21   Q.  And why did you do that?

22   A.  That would be completely the standard type of model to

23   use in analyzing something like an admissions decision which

24   is -- in the context of a case like this with many different

25   attributes of candidates that need to be taken into

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3      _____

4      STUDENTS FOR FAIR ADMISSIONS, INC.,

5                     Plaintiff,          Civil Action
                                          No. 14-14176-ADB
6      v.
                                          October 31, 2018
7      PRESIDENT AND FELLOWS OF HARVARD
       COLLEGE, et al.,                   Pages 1 to 212
8                                         SEALED TRANSCRIPT
                     Defendants.
9      _____


11               **** SEALED TRANSCRIPT ****

12            TRANSCRIPT OF BENCH TRIAL - DAY 13
13         BEFORE THE HONORABLE ALLISON D. BURROUGHS
                UNITED STATES DISTRICT COURT
14           JOHN J. MOAKLEY U.S. COURTHOUSE
                  ONE COURTHOUSE WAY
15                BOSTON, MA  02210


22              JOAN M. DALY, RMR, CRR
               KELLY MORTELLITE, RMR, CRR
23                Official Court Reporter
             John J. Moakley U.S. Courthouse
24           One Courthouse Way, Room 5507
                  Boston, MA  02210
25                joanmdaly62@gmail.com

1          P R O C E E D I N G S

2               (The following proceedings were held in open

3     court before the Honorable Allison D. Burroughs, United

4     States District Judge, United States District Court, District

5     of Massachusetts, at the John J. Moakley United States

6     Courthouse, One Courthouse Way, Boston, Massachusetts, on

7     October 31, 2018.)

8               THE COURT:  Good morning, everyone.  Happy

9     Halloween.  Give me two seconds.

10              MR. MORTARA:  We have a very short issue Mr. Waxman

11    and I would like to raise.

12              THE COURT:  That is fine.

13              (The following is held at sidebar.)

14              MR. WAXMAN:  So Your Honor in the summary judgment

15    ruling and a couple of places indicated with respect to these

16    or reports that the court was looking forward to hearing what

17    the experts had to say about them, I don't know whether

18    that's still true.  I have a series of 10 or 15 questions

19    that I could ask if the court is interested.  The objection

20    from my friend is that --

21              MR. MORTARA:  I've got everything he said about OIR

22    in his reports, and it's kind of the same thing --

23              THE COURT:  If it's not in the reports I could do

24    that.

25              MR. MORTARA:  I would like to say the

1    professionalism with which Mr. Waxman addresses it is

2    meaningful to me, and he came to me and told me he was going

3    to do this and we had a discussion.  We've now resolved it,

4    and we can get started.

5              THE COURT:  Excellent.

6              MR. WAXMAN:  So I shouldn't ask.

7              THE COURT:  If he's going to object because it's

8    not in the report -- I've heard a lot about it.

9              MR. WAXMAN:  He's prepared to answer whatever

10   questions I have, whether I sponsor the testimony or not.

11             THE COURT:  Thanks.

12             (End of sidebar.)

13             THE COURT:  When you're ready, Mr. Waxman.

14             MR. WAXMAN:  Thank you, Your Honor.

15             Just one housekeeping matter.  I am not clear -- we

16   had offered Defense Exhibit 685, which is at Tab 13, Volume

17   2.  My records don't indicate whether the Court admitted it

18   or not.

19             MR. MORTARA:  Your Honor, to the extent there needs

20   to be any record on this, no objection.

21             THE COURT:  All right.  My record shows it's been

22   admitted.  Karen's records.

23             MR. WAXMAN:  Thank you.

24   EXAMINATION BY MR. WAXMAN: (Continued)

25   **Q.**  Good morning, Professor Card.

 1    **A.**   Good morning.

 2    **Q.**   I believe that the last question I asked you was whether

 3    or not you were concerned that your model was overfitted, and

 4    that you said -- do you have any concern, and you said, I

 5    don't, no.  Which was then clarified as, I don't, period, no.

 6             THE COURT:  I like the whole Oxford comma debate.

 7             MR. WAXMAN:  Yes.

 8    **Q.**   Why do you have no concern that your model is overfitted?

 9             MR. MORTARA:  Your Honor, I object.  We have to

10    return to the sidebar.

11             THE COURT:  Okay.

12             (The following was held at sidebar.)

13             MR. MORTARA:  It's not in his report.  Literally

14    the word overfitting is not in his report.  There's been

15    absolutely no -- Professor Arcidiacono did not say Professor

16    Card's model was overfitted.  We have no disclosure of that

17    opinion, candidly, so we didn't give it.  I'm not going to --

18    I will let my cross-examination discuss of issue of that with

19    Professor Card, but there is no disclosure in his reports to

20    any analysis about whether his model overfits.  The word

21    isn't even used.

22             MR. WAXMAN:  Which is simply because the word was

23    not ever used in Professor Arcidiacono's report, but he

24    testified that he had a concern with overfitting, and I

25    simply want to complete the question by asking why he's not

1    concerned.

2            MR. MORTARA:  I'll just be very clear.  I let that

3    last answer go; and if that's the end of it, that's the end

4    of it.  I could have objected even when he said it at the end

5    of the day yesterday, I did not.

6            THE COURT:  I hear you.  It seems to me that he's

7    allowed to describe his model and why he thinks it's a good

8    model.  Then asking whether it's overfitted or not, it's not

9    an opinion.  It's just a description.

10            MR. MORTARA:  Well, I have no idea what he's going

11   to say, Your Honor.

12            THE COURT:  You don't?  I could probably tell you

13   what he's going to say.

14            MR. MORTARA:  The fact is there are accepted

15   statistical tests for testing overfitting.  He didn't do any

16   of them, and that's a big deal.  And now I'm going to hear

17   about how --

18            THE COURT:  I'm going to let him have the question.

19   I don't see this issue of overfitting or not overfitting as

20   being dispositive in any way.  But I'm going to give him -- I

21   take your point on the scope of the expert report, but I'm

22   going to give him some latitude in talking about his report.

23            (End of sidebar.)

24   BY MR. WAXMAN:

25   Q.  Professor Card, do you recall my last question?

1    multidimensionality, taking account of the way it uses

2    information and so on, using all of the data, so including

3    the ALDCs, my model shows that year by year there's no

4    statistically significant difference in the admission rate

5    between Asian-Americans and whites.

6              On average across the six years, three of the

7    estimates are positive, three of them are negative.  And then

8    if one looks averaging across the years, the average of these

9    effects is minus 0.05, this average marginal effect, which

10   means that the difference between the admission rates of

11   Asian-Americans and whites, controlling for all the

12   observable factors in my model, is about 5/100 of a

13   percentage point, not statistically significant.

14             So I believe the evidence strongly supports the

15   view that there's no statistical evidence of discrimination.

16             MR. WAXMAN:  Thank you, Dr. Card.  Pass the

17   witness.

18             THE WITNESS:  Could I take a break?

19             MR. MORTARA:  No problem for me, Your Honor.  We

20   can get set up.  Ten minutes?

21             THE COURT:  Ten minutes.

22             (Court recessed at 2:11 p.m.)

23             (The following was held at sidebar.)

24             THE COURT:  Before we get to this, how are we on

25   our timing?

```
 1              MR. MORTARA:  I'll continue into tomorrow.  We'll

 2    be okay.  We'll get through at least McGrath and Fitzsimmons

 3    tomorrow.  Our exams for them -- McGrath will be longer than

 4    Fitzsimmons.  And they've got Faust they want to call

 5    tomorrow.

 6              THE COURT:  And then you still think we'll be able

 7    to close on Friday even if we don't do it first thing in the

 8    morning?

 9              MR. MORTARA:  I think so.  We still haven't decided

10    whether we're calling Professor Arcidiacono back.

11              MS. ELLSWORTH:  We're not so sure about that, Your

12    Honor, in terms of Friday.

13              THE COURT:  If the difference between being able to

14    finish on Friday or not are the Amici, I don't want to tell

15    them they can close, if that hour makes a difference.

16              MS. ELLSWORTH:  Mr. Hughes and I conferred at

17    lunch.  I understand that there's an hour planned for each

18    Director McGrath and Dean Fitzsimmons, which I think includes

19    our time as well.

20              MR. HUGHES:  That was my best estimate.

21              MR. MORTARA:  I don't think there's any way that --

22    it depends on how long they're going to go with McGrath.  I'm

23    going to have her for at least 45 minutes.

24              MR. HUGHES:  I anticipate -- we're conferring with

25    each other in front of you.  I anticipated when I said that.
```

1    Fitzsimmons will necessarily be less time, and that the total

2    will hopefully be around two hours.  If we had a long day

3    tomorrow, we could hopefully get through Card, McGrath,

4    Fitzsimmons and potentially Faust.  Our cross of Faust is

5    extraordinarily short.

6              We may have a short direct with a surrebuttal case

7    with Dr. Arcidiacono, which we could do quickly first thing

8    Friday and then close.

9              THE COURT:  We'll just leave things there.  I

10   begged those people for next week to settle yesterday and

11   they stared at me very blankly.

12             MS. ELLSWORTH:  It's not clear to us that a long

13   day tomorrow is going to be feasible with our witnesses and

14   the various people who are handling things.  We'll just see

15   how long it goes.  We're available to go into Monday if we

16   have to.

17             THE COURT:  Okay.

18             MR. LEE:  My concern is we got a disclosure for

19   Ms. McGrath of 150 exhibits.  There have only been 190 total

20   exhibits produced.

21             MR. MORTARA:  I'm going to do my best to cut it

22   down tonight.

23             THE COURT:  Is this the punch line of the joke

24   you're starting with?

25             MR. MORTARA:  Absolutely not.

```
1              MR. LEE:  Can I finish?
2              THE COURT:  Sorry.  That was my fault.
3              MR. LEE:  It's fine.  I'm going to be the examiner
4     on all 150.  There's no choice.  It's going to take some time
5     and will take us into Monday.
6              THE COURT:  We'll see where we are.  At this point
7     in time I need to pick a jury on Monday morning, so we'll
8     finish at 1 on Monday.  We may resume at 1:300 on Monday.
9              MR. MORTARA:  I think we could get the exhibits
10    pared down.
11             THE COURT:  I want to go home.
12             MR. HUGHES:  What it is is there's many many
13    duplicates of the same email.  Suggesting there's 150 things
14    is not quite -- we can pare down the list.
15             THE COURT:  I was just trying to get a sense of
16    where we are.  I am not trying to rush anybody.  We just may
17    have to juggle a little bit unless these other people take my
18    very wise counsel and settle their ridiculous case.  It's not
19    a ridiculous case.  It's just not well-suited to a jury.
20             MR. WAXMAN:  So, Your Honor, this Plaintiff's
21    Demonstrative 39, of which that is page 22, with the
22    exception of page 22 was produced to us yesterday at 3:00
23    under our agreement.  We did not have page 22 which was added
24    some time last evening.  We objected to them on the basis of
25    all of these very puzzling things.
```

```
1              THE COURT:  Is this the punch line?

2              MR. MORTARA:  No.  You're going to love it so much,

3    Your Honor.

4              MR. WAXMAN:  We objected to these on multiple

5    grounds, including the fact that we have literally no idea

6    what they purport to be.  We did not receive a response.  We

7    do object to using these because, number one, we don't know

8    what they purport to be.  I don't know, for example, whether

9    these are hypotheticals to which Mr. Mortara successfully

10   objected yesterday, or whether they're based on some data

11   which we haven't been allowed to test.

12             There are no axes here.  There are no scales.

13   Dr. Card obviously has never seen them, has no idea what they

14   are, and we think they're not proper for cross-examination.

15             MR. MORTARA:  It's cross.  It's a hypothetical.  It

16   comes from the Wikipedia page for overfitting.

17             THE COURT:  Is that the punch line?

18             MR. MORTARA:  No.  Your Honor, no.

19             THE COURT:  It's cross-examination.  I have no idea

20   what you're going to do with these because I also have no

21   idea what they mean.  Ask the question.  You can object if

22   it's appropriate.

23             MR. MORTARA:  It's not that important either.  This

24   is the only one I want to use.  I'm sorry it didn't get

25   produced earlier.  I came back to the court, I looked at the
```

```
 1    line and one of my squiggle lines on it.
 2              MR. WAXMAN:  We're not using the whole slide show?
 3              MR. MORTARA:  No.  This is the only one I want to
 4    use.
 5              THE COURT:  I'm not saying yes.  I'm not saying no.
 6    I'm going to give him plenty of latitude on cross.
 7              MR. WAXMAN:  Thank you, Your Honor.
 8              (End of sidebar.)
 9              MR. MORTARA:  Whenever you're ready, I think I'm
10    ready, Your Honor.
11              THE COURT:  I am ready when you are.
12                           EXAMINATION
13    BY MR. MORTARA:
14    Q.  Good afternoon, Professor Card.  My name is Adam Mortara.
15    It's really nice to meet you.  I'm hoping that we'll spend a
16    few hours together getting to know each other.
17              I got to get a few questions out of the way I was
18    genuinely surprised Mr. Waxman didn't ask you.
19              You've been in court on and off a lot for the last
20    couple of weeks, right?
21    A.  Yes, I have.
22    Q.  And you know about the Bakke decision, don't you?  You
23    actually mentioned it in one of your articles?
24    A.  I know a little bit about it.  I am in no way an expert
25    on the law.
```

```
 1                    UNITED STATES DISTRICT COURT

 2                    DISTRICT OF MASSACHUSETTS

 3   _____

 4   STUDENTS FOR FAIR ADMISSIONS, INC.,

 5                    Plaintiff,          Civil Action
                                         No. 14-14176-ADB
 6   v.
                                         November 1, 2018
 7   PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                    Pages 1 to 277
 8                                       SEALED TRANSCRIPT
                     Defendants.
 9   _____

10

11                 **** SEALED TRANSCRIPT ****

12

13            TRANSCRIPT OF BENCH TRIAL - DAY 14
          BEFORE THE HONORABLE ALLISON D. BURROUGHS
14               UNITED STATES DISTRICT COURT
              JOHN J. MOAKLEY U.S. COURTHOUSE
15                  ONE COURTHOUSE WAY
                    BOSTON, MA  02210
16

17

18

19

20

21               JOAN M. DALY, RMR, CRR
               KELLY MORTELLITE, RMR, CRR
22               Official Court Reporter
              John J. Moakley U.S. Courthouse
23            One Courthouse Way, Room 5507
                   Boston, MA  02210
24                joanmdaly62@gmail.com

25
```

1    deposition.

2            MR. MORTARA:  That's the answer.  I didn't ask for

3    undisclosed expert opinion, Your Honor.

4            THE COURT:  Well, I don't think he was giving you

5    an undisclosed expert opinion.  I think he was trying to take

6    your question which did not have a timeframe and say this was

7    then and that was at a different time.  Either you can ask a

8    follow-up question or they can ask it when it's their turn.

9    **Q.**  Go ahead, sir.

10   **A.**  I'll stay with that answer if you want.

11   **Q.**  Tell me whatever it is that you wanted to tell me.

12   **A.**  I was going to say I've looked at the issue in much

13   greater detail since then.

14           MR. MORTARA:  Your Honor, could I have a sidebar?

15           THE COURT:  Yes.  Do you guys want a morning break,

16   or do you want to keep going until noon?  How about a

17   15-minute break so we can talk for five minutes and then you

18   can have a ten-minute break, so we'll be back at 11:25.

19           (The following was held at sidebar.)

20           MR. MORTARA:  I don't know how careful I have to

21   be.  The question immediately prior, I read him a question

22   verbatim from his deposition, which is the only way to do

23   pure impeachment.  I did not open the door here and I

24   really --

25           THE COURT:  I don't think anyone's claiming that

1    you opened the door.

2              MR. MORTARA:  I'll leave it where it is.  I just

3    don't want to hear about it on redirect.

4              THE COURT:  Not because you opened the door --

5              MR. MORTARA:  It's not in his report.  It's not in

6    his deposition.  It's not disclosed.  It can't come in.

7              THE COURT:  Why was he still doing research on the

8    overall ratings?

9              MR. MORTARA:  Because he didn't do anything.  And

10   that's the whole point of this cross.  I'm being extremely

11   careful, Your Honor.

12             THE COURT:  Let me --

13             MR. WAXMAN:  Do you want me to answer?

14             THE COURT:  I'm going to let you answer.  As long

15   as we're up and it's just us, the objections -- I mean, you

16   need to ratchet down the narrative in your questions.

17             MR. MORTARA:  I'm trying.

18             THE COURT:  But to object at the difference between

19   "confess" and "admit."  It's just me.  It's just me.  So if

20   it's an occasion to make a speech, we can skip it.  If you

21   think it's going to make a difference to me whether it's

22   "confess" or "admit," it's not.

23             So let's keep it going.  Let me hear you on the

24   overall rating issue.  If that was an error on his part, it

25   would an error on his part that I backed him into.

```
 1              MR. WAXMAN:  So I'm not intending to, unless it
 2    comes up, sponsor any testimony about subsequent thinking he
 3    did about this.
 4              MR. MORTARA:  So we don't have a problem --
 5              MR. WAXMAN:  Can I finish?
 6              MR. MORTARA:  Sure.  I'm sorry.
 7              MR. WAXMAN:  Professor Arcidiacono prepared the
 8    first report, and Professor Card's first report responded to
 9    that.  Professor Arcidiacono was clear in his report that he
10    excluded the preliminary overall rating because Harvard
11    acknowledges that in evaluating -- when the first reader
12    evaluates the likelihood of admission, that reader is
13    factoring in any race tips or other tips that may be
14    appropriate.
15              What Professor Card said in his report is, I agree
16    with Professor Arcidiacono that the preliminary overall
17    rating is not properly included in the model.  That's the
18    end.
19              THE COURT:  That's what I've understood the state
20    of play to be.
21              MR. MORTARA:  Your Honor, and I'm not saying
22    Mr. Waxman -- you are the factfinder, and there's a lot of
23    previewing going on here of the way things are going to go.
24    I don't want to preview my whole cross because it ruins it
25    for me.  I don't know if it ruins it for you.
```

1              But everything Mr. Waxman said is 100 percent okay.

2      But I sort of feel compelled to say, Professor Arcidiacono

3      testified cleanly and without cross that the overall rating

4      itself has an Asian penalty in it.  We have nothing back from

5      Professor Card who did the last report in the case.

6              THE COURT:  My recollection of the testimony is not

7      that he said there's an Asian penalty embedded in it but that

8      what he said is that race is factored into it.  So if you're

9      trying to see if there's an Asian penalty, that rating needs

10     to be ignored.

11             MR. MORTARA:  That is also true.  I'm going to get

12     to that with the witness.  I think what Mr. Waxman said

13     resolves my issue completely.

14             THE COURT:  Okay.  Because that's what I understand

15     it to be.  I just don't understand the overall rating to be a

16     part of it, and that's my understanding of the explanation of

17     why it isn't.

18             MR. MORTARA:  And when you see where this is going,

19     no previews, you'll understand exactly why I'm doing what I'm

20     doing.

21             MR. WAXMAN:  Your Honor, I want to put one more

22     thing on the record with respect to Harvard confessing

23     something.  This case is of course being tried to Your Honor.

24     There are important public concerns for Harvard in a

25     characterization of a press account of this in which the

```
1    question embeds a confession and the witness is obliged to
2    adopt that characterization.  And that was the basis, and if
3    it happens again and Your Honor's ruling, I'll ask for a
4    sidebar.
5             THE COURT:  That's fine.  You can stand up and
6    object to it if you want.  Just be selective about when you
7    do it.  Because for me that word doesn't make any difference.
8    If you feel there's something particularly loaded that you
9    need to object to, that's fine.  But your speech can cause a
10   lot more attention to it than his initial use of the word.
11            MR. WAXMAN:  I'll be much precise.  At least I will
12   try to be much more precise.
13            THE COURT:  That whole -- and we will call it a
14   speech.  Maybe it wasn't a speech.  Maybe like confession,
15   admission, you want to call it something else, but that was
16   clearly meant for the studio audience.  And, you know, I'm
17   not letting him make speeches for the benefit of the studio
18   audience, so I'm not going to let you make it either.
19            MR. WAXMAN:  I don't intend to do that, and I
20   won't.
21            MR. MORTARA:  Thank you, Your Honor.  Apologies for
22   my exhaustion which led to over-animation yesterday.  I'm
23   trying to keep it more under control today.  If you'll
24   notice, I have my phone up there with me.  Mr. Hughes is
25   sock-puppeting me over Instant Messenger, so I think you're
```

1   receiving a better version of me, thanks to Mr. Hughes.

2           MR. HUGHES:  I'll take all the credit.

3           MR. MORTARA:  I want to say there is absolutely no

4   ill will going on --

5           THE COURT:  Sometimes I would just really like to

6   meet your wife.

7           MR. LEE:  Before we leave sidebar, can we talk

8   timing?  We've got two witnesses sitting out there.

9           THE COURT:  How much longer?

10          MR. MORTARA:  I'm in the windup.  I think maybe 30

11  minutes.

12          THE COURT:  So we'll finish before lunch.  I won't

13  break for lunch until he finishes.  So if he goes over, you,

14  I assume, have some redirect?

15          MR. WAXMAN:  Right now I would say my redirect is

16  15 minutes.

17          THE COURT:  Maybe we'll try to get off before lunch

18  one way or another.  You don't have to -- all I'm saying is

19  if we can reasonably extend the lunch break a little bit

20  later and get him done, we will.  If we can't, we can't.

21  Okay?  I think Karen told you I don't have anything scheduled

22  this afternoon.

23          MR. WAXMAN:  His flight is not of such urgency.

24          THE COURT:  If it looks like we're getting close to

25  the end --

```
1              MR. WAXMAN:  I know that Mr. Hughes is motivated to
2      get him.
3              MR. MORTARA:  I have some timing updates.  My
4      adverse direct of Director McGrath should last at most 40
5      minutes, and I think Mr. Hughes' adverse direct is the --
6              MR. HUGHES:  Much shorter than that.
7              MR. LEE:  Here is the problem.  We have both of
8      them sitting out in the hallway.  We have President Faust
9      sitting back at the office.  They said they're going to
10     recall Professor Arcidiacono.  There was no disclosure of
11     exhibits this morning, so maybe the answer is no.  I think,
12     Your Honor, if he's going to come back and testify tomorrow
13     and I have to cross him, I think closing on the same -- and
14     recross would be a little bit fairly difficult.
15             MR. MORTARA:  We are not calling him.  After what
16     just happened in the cross, we are not recalling Professor
17     Arcidiacono.
18             MR. LEE:  So we should be able to finish everybody
19     today.
20             MR. HUGHES:  If we had to run over tomorrow with
21     Faust for some reason, I assume that does not create the same
22     problem for you?
23             MR. LEE:  It creates a problem for her.  She's
24     basically -- we've sort of moved her four different times
25     now.
```

```
1              THE COURT:  We will try and get everybody done
2    today.
3              MS. ELLSWORTH:  Your Honor, one thing on the
4    closings, Amici have asked whether you have a further ruling
5    whether they will be participating live --
6              THE COURT:  If we're going to close tomorrow and
7    start at 9:30 or whatever, there's going to be plenty of time
8    for them to go.  If we get everything done today, and it's
9    just closings tomorrow, they can do an oral closing.  And you
10   wanted them at the end, right?
11             MS. ELLSWORTH:  We should actually talk about that.
12             MR. HUGHES:  I would prefer to have it be us, you,
13   us, and then the Amici, but I don't know.
14             THE COURT:  That seems the fairest because it's
15   sort of awkward to have you be able to respond to the Amici
16   but not them.  And I view them to be a little bit separate,
17   so let's do the central case closings, and then have the --
18   they're limited to 15 minutes each, right?
19             MR. LEE:  That's fine, that's fair.
20             THE COURT:  I think that seems the most fair in
21   terms of direct responses of the parties to each other.
22             MR. HUGHES:  That sounds good to us.
23             MR. LEE:  That would allow you to go back to sparse
24   country tomorrow night.
25             MR. HUGHES:  I live in Denver now.
```

```
1              THE COURT:  I want to give Kelly a break.
2              (End of sidebar.)
3              (Recess taken.)
4   BY MR. MORTARA:
5   Q.  Professor Card, you did not include the overall rating in
6   any of the admissions models in your expert reports, correct?
7   A.  Correct, yes.
8   Q.  And that's since your analysis seeks to isolate the
9   incremental effect of race on admissions decisions, it is
10  inappropriate to include any variables that themselves can be
11  affected by race, correct?
12  A.  Yes.
13  Q.  You agree that if one of Harvard's ratings, such as the
14  overall rating, may be influenced by an applicant's race,
15  then it should not be included in any model that is
16  attempting to estimate the effect of race, correct?
17  A.  Not precisely, no.
18  Q.  Could you turn to your first expert report.  At page 63,
19  sir.
20             (Pause.)
21  Q.  Are you there?
22  A.  Yes.
23  Q.  And over to the top of 64 in paragraph 132, it says, The
24  second row also relies on Professor Arcidiacono's model six
25  but removes the overall rating.  Do you see that?
```

```
1    sidebar?

2            MR. LEE:  I just don't want to say anything in

3    front of the witness.  I'm happy to have him ask another

4    question.

5            MR. MORTARA:  I want to ask the question I asked.

6            MR. LEE:  I'll object.

7            MR. MORTARA:  I can ask it from 2014 forward.

8            THE COURT:  Let me see the exact wording of the

9    question.  Hold on.

10           MR. MORTARA:  Maybe we should sidebar this, if you

11   don't mind.

12           THE COURT:  Let me just look at the last question.

13   If you rephrase the question with the time period, that will

14   be fine.

15   BY MR. MORTARA:

16   Q.  Okay.  Director McGrath, has the admissions office or

17   anyone in the admissions office conducted or taken bias

18   training in the last year?

19           MR. LEE:  I object.

20           MR. MORTARA:  Could we have a sidebar, Your Honor?

21           THE COURT:  Are you objecting because it's beyond

22   the scope of her knowledge?

23           MR. LEE:  No.

24           THE COURT:  Then come to sidebar.

25           (The following was held at sidebar.)
```

```
1              THE COURT:  Your issue is that you think she's just
2    being recalled to explore anything that might have been said
3    under oath that wasn't true.
4              MR. LEE:  Yes.
5              MR. MORTARA:  My issue is our questions to many
6    Harvard witnesses were clearly confusing to them in believing
7    things about time.  Ms. Kim testified she never received
8    implicit bias training.  I'm going to bet you a lot that they
9    got bias training in the last two months.  We asked these
10   witnesses over and over again, have you ever received
11   implicit bias training, and they haven't.
12             MR. LEE:  Your Honor, if we're going to reopen
13   discovery, I can tell you that in the last four years lots
14   have happened since August of 2014.  I am going to take you
15   through several of them to show how many changes were made
16   that he hasn't addressed at all.  He's here to address did
17   people not testify truthfully.
18             THE COURT:  Did you ask her whether or not she's
19   had any bias training?
20             MR. MORTARA:  I don't think I asked her the last
21   time.  We have to bring Charlene Kim back if I don't get an
22   answer to this question.  She said she never got any.  A
23   bunch of their witnesses who said they never got any.  It's
24   exactly the same thing.  She's the director of admissions.
25   If there's been --
```

```
1            THE COURT:  If he can't ask it of her, and if he
2      asked the question of Kim, and he has reason to believe that
3      the answer is different now, he can recall Kim on that topic.
4            MR. LEE:  He has no reason to believe the answer is
5      different.  The difference is Tia Ray who was doing training
6      gave an honest answer.  She saw the October 5 guidelines.
7      Your Honor, we opened discovery for the purpose of
8      demonstrating that people had not testified truthfully.  If
9      we were to open discovery more broadly, I can tell you that a
10     ton has occurred.
11           MR. MORTARA:  Your Honor, this is obviously
12     extremely serious to us.  We asked numerous witnesses have
13     you ever received implicit bias training, including Charlene
14     Kim, who was deposed one week before this trial.  We asked
15     trial witnesses this question.
16           Now I'm hearing that Director McGrath was confused
17     about the timing of my questions, about writings about race
18     in the personal rating.  I accept what she says.  She may
19     have been confused.  Other witnesses may have been confused
20     about this issue.  If we ask them and then to find out the
21     honest answer on the instructions about race they were not
22     honest, if I had gotten the present tense accurate answer, I
23     would have followed up with questions about bias training --
24           MR. LEE:  And I would have objected.
25           MR. MORTARA:  -- if they've done it in the last
```

1    three months.  We're about to find out.  It's actually
2    probative to our case.
3            MR. LEE:  Your Honor, I would have objected.  As I
4    said, Your Honor, before when some of these questions were
5    asked, I thought people were talking about the prior period.
6    I didn't know we were going to reopen discovery, which is
7    apparently what we're trying to do now.  I don't doubt that
8    he thinks this is serious, but this was a limited recall.
9    And we've tried to let it go broader beyond that.
10           Your Honor, just to put this in context, you have a
11   specific discovery period.  You have six years of data to go
12   through 2019, which means at the end of 2014 the record
13   before you is done.  What he's asking you to do now is to
14   take questions that were asked of folks, they claim they
15   interpreted them incorrectly and didn't testify truthfully,
16   and imply a racial animus for six years before from what's
17   happening today.  This is so far removed.
18           But the other thing is, Your Honor, if we're going
19   to open up the last four years, we've got a lot to say.  It's
20   not like we stopped, and it's not like when you get sued you
21   don't make changes.
22           MR. MORTARA:  Your Honor, there's no close of
23   discovery exception to getting truthful answers in court.
24           THE COURT:  Did you ask her the question about
25   bias?

 1            MR. MORTARA:  No.  But I would have if she told me
 2    that they'd written something down.
 3            MR. LEE:  But he didn't.  This is a recall of a
 4    witness that he had on the stand at the very beginning of the
 5    trial.
 6            MR. MORTARA:  We asked Charlene Kim this question
 7    on October 11.
 8            THE COURT:  You could have asked this witness the
 9    question and then she could have limited her answer to 2014
10    to 2019, and then it would be fair game here.
11            MR. MORTARA:  But, Your Honor, I don't know to ask
12    Harvard witnesses questions --
13            THE COURT:  What if they have done implicit bias in
14    the last two months?  What's your argument?
15            MR. MORTARA:  I think it's highly probative that
16    it's responsive to our case and everything their expert has
17    been saying.
18            THE COURT:  What are you going to argue?  You're
19    going to argue if they did implicit bias training in the last
20    two months, that's acknowledgement that they had a problem
21    before then?
22            MR. MORTARA:  Correct.  Correct.  It's highly
23    probative.  I haven't heard yet an objection to --
24            MR. LEE:  You have my objection.  Your Honor, I
25    would say the more logical reference is this:  If you have a

1    practice that you've been following for years and years and

2    years, and then someone sues you and the real complaint is

3    it's not in writing, it would be illogical not to put it in

4    writing.  That's all that's occurred here.

5           MR. MORTARA:  That's exactly why this writing/not

6    writing thing gives way if they started doing implicit bias

7    training this summer because the admissions office got ahold

8    our expert reports, saw the problem and did something.

9    That's exactly why I need to ask it.  The answer is clearly

10   yes.

11          MR. LEE:  Your Honor, two things.  One is they had

12   Charlene Kim's sworn testimony that there hasn't been

13   implicit bias training.  We're not going to contradict that

14   at all.  No one has contradicted that at all.

15          The second thing is the world doesn't revolve

16   around SFFA.  We have 40,000 kids applying to school every

17   year.  The idea that we're doing everything just because of

18   this lawsuit is just not common sensical.  This is well

19   beyond the scope that this witness has been called for.

20          MR. MORTARA:  If there was implicit bias training

21   that was received any time before October 11, Charlene Kim

22   did not tell the truth at her deposition, and that is a

23   serious issue.  Why can't I just get an honest answer to my

24   question?

25          THE COURT:  I am going to short-circuit this

1    because I don't want to call Charlene Kim back unless we need

2    to.  I'd like to end this evidence today, if it's possible.

3              You may ask her if there's been official admissions

4    officer implicit bias training, when they did it the first

5    time, how often they've done it, and then we're going to

6    leave it at that.

7              MR. MORTARA:  Okay.  Thank you.

8              (End of sidebar.)

9              MR. MORTARA:  Your Honor, may I proceed?

10             THE COURT:  You may.

11   BY MR. MORTARA:

12   Q.  Director McGrath, has there been official admissions

13   office implicit bias training?

14   A.  Not formally.

15   Q.  Has there been informal admissions office implicit bias

16   training?

17   A.  Yes.

18   Q.  When did that happen for the first time?

19   A.  I can't tell you for the first time.  When I took this

20   job 30-something years ago, there was already much discussion

21   about the importance of not stereotyping candidates.  I think

22   we didn't have the language "implicit bias" in those days.

23   We certainly had the language for bias.  That's been, in my

24   whole experience, a subject of training and a subject of

25   staff discussion.

1    **A.**   Good heavens.  You will have a better view than I will.

2         Probably an introvert.

3    **Q.**   Thank you.

4         MR. MORTARA:  Your Honor, could we have a

5    ten-minute break to confer?

6         THE COURT:  Yes.  Ten minute break.  We'll be back

7    at five of.

8         MR. LEE:  Your Honor, can the witness be excused?

9         THE COURT:  I'm sorry.  You're excused, Director

10   McGrath.

11        (Court recessed at 2:44 p.m.)

12        THE COURT:  Next witness, please.  Mr. Hughes,

13   you're standing up.

14        MR. HUGHES:  Your Honor, can we have a brief

15   sidebar.

16        THE COURT:  Yes.

17        (The following was held at sidebar.)

18        MR. HUGHES:  So we've agreed not to call Dean

19   Fitzsimmons.  They're not going to call Dean Fitzsimmons.  So

20   we're going to rest in a moment, but I wanted to do two quick

21   things to make sure the record is clear.

22        First, I want to make sure that I've officially

23   proffered that there would be no Dean Fitzsimmons exchange

24   that's been a subject of a couple of sidebars.  I thought it

25   was a little bit ambiguous the way I left it last time.  So I

1    formally proffer P221, P512, and P513.  Those are the emails

2    we've reviewed many times about the joke and the purloined

3    stationery.

4             We made a pretty good record then this last time,

5    but I thought it was a little ambiguous about whether I

6    actually offered those and you actually fully denied their

7    admission.  So I want to make sure I make my record.

8             THE COURT:  Yes.  I have fully denied their

9    admission.  Just in the last couple of days I know you've

10   also filed -- I think both of you, I know at least you filed

11   paperwork on the database exhibits which I just haven't had a

12   chance to read.  I sort of forgot about reading them.

13            MR. HUGHES:  We're not giving up anything on that

14   by resting.

15            THE COURT:  No.  That's right.  That's right.

16            MR. HUGHES:  So we've cleared that, P221, P512 and

17   P 513.  The only thing I would want to proffer on that is had

18   I been permitted to confront him with those documents, you

19   could have judged the credibility of his response of what we

20   say was a laughing-along with the joke.  That's my proffer.

21            THE COURT:  Okay.

22            MR. HUGHES:  The only other thing we have before we

23   rest is I thought I heard day one of the trial you came out

24   and granted our motion for judicial notice about the

25   historical stuff.

1          THE COURT:  I did.  It was agreed upon, right?

2          MR. LEE:  Agreed upon.

3          MR. HUGHES:  It just isn't clear from the record.

4     So I wanted to make sure.

5          THE COURT:  Okay.

6          MR. HUGHES:  The only other thing related to that

7     is basically I need to ask this witness a couple of questions

8     on that topic.  I know Your Honor's feelings on the topic,

9     and I don't want to end up in the doghouse the day before

10    closing.

11         THE COURT:  There's so many stronger candidates for

12    the doghouse than you that I think you're all right.

13         MR. MORTARA:  I can hear you over here.

14         THE COURT:  What makes you think I was talking

15    about you?

16         MR. HUGHES:  So I'll keep it brief.

17         THE COURT:  That's fine.  You've been very

18    restrained.  Let me make clear on the record, the documents

19    that they asked me to take, the historical documents that

20    they asked me to take judicial notice of, it was in a motion.

21    I can't remember the number of the motion, but that motion is

22    granted.  And the ^ Noveno documents are out.

23         And I will take a look at the database, what you

24    submitted on the database tonight and make a ruling on that

25    tomorrow morning before closing.  It obviously isn't going to

```
1    influence your closing.
2              MR. HUGHES:  No.  It won't.  We'll go back off the
3    sidebar and we'll rest, and then you'll have the last
4    witness.
5              MR. LEE:  We'll call Professor Faust, and we have
6    like five minutes of depositions.
7              MS. ELLSWORTH:  We're going out with a bang.
8              (End of sidebar.)
9              THE COURT:  Joan was just reminding me that the
10   sidebars have been sealed throughout as a matter of course
11   except for the parties.
12             Just so it is clear to everybody, I can't recollect
13   the number of the motion, but the agreed upon motion that
14   concerned judicial notice of historical documents is granted.
15             And Exhibits -- what's been marked for
16   identification as Exhibits 221, 512, and 513 are not
17   admitted.
18             MR. HUGHES:  Thank you, Your Honor.  Those are
19   P221, P512, and P513.
20             THE COURT:  Yes.  P221, P512, and P513.  And I have
21   under advisement the last two exhibits, and I'll give you the
22   ruling on that in the morning because I know you both have
23   submitted writings on that, and I haven't had a chance to
24   read them.
25             MR. HUGHES:  Thank you, Your Honor.  The plaintiffs
```

```
1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3    _____

4    STUDENTS FOR FAIR ADMISSIONS, INC.,

5                   Plaintiff,          Civil Action
                                        No. 14-14176-ADB
6    v.
                                        November 2, 2018
7    PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                   Pages 1 to 160
8                                       SEALED TRANSCRIPT
                   Defendants.
9    _____

10

11

12                 **** SEALED TRANSCRIPT ****

13
             TRANSCRIPT OF BENCH TRIAL - DAY 15
14                   CLOSING ARGUMENTS
         BEFORE THE HONORABLE ALLISON D. BURROUGHS
15            UNITED STATES DISTRICT COURT
            JOHN J. MOAKLEY U.S. COURTHOUSE
16                ONE COURTHOUSE WAY
                  BOSTON, MA  02210
17

18

19

20

21
                 JOAN M. DALY, RMR, CRR
22              KELLY MORTELLITE, RMR, CRR
                 Official Court Reporters
23            John J. Moakley U.S. Courthouse
             One Courthouse Way, Room 5507
24                 Boston, MA  02210
                joanmdaly62@gmail.com
25
```

1                    P R O C E E D I N G S

2                    (The following proceedings were held in open

3     court before the Honorable Allison D. Burroughs, United

4     States District Judge, United States District Court, District

5     of Massachusetts, at the John J. Moakley United States

6     Courthouse, One Courthouse Way, Boston, Massachusetts, on

7     November 2, 2018.)

8                    THE COURT:  Good morning, everyone.  Can I see the

9     parties at sidebar for one second.

10                   (The following was held at sidebar.)

11                   THE COURT:  Two things, first of all, 438 and 588,

12    I'm going to keep them out.  I know I can admit them.  They

13    contain a lot of sensitive information.  They're

14    inaccessible.  There's been no dispute about the reports

15    derived from the evidence, and I just think the prudent thing

16    is to keep it out.

17                   So I understand that I could, but I think the

18    prudent thing, given the nature of the information and the

19    size of the database and the inaccessibility of the database,

20    is to keep it out.

21                   One other thing I wanted to raise with you, and I

22    don't need an answer now, actually, given where the

23    courthouse is located has markedly little to do with Harvard,

24    but I have two friends that teach at the law school, and I am

25    scheduled to speak every year in front of each of their law

1   school classes.  One of them was supposed to be this week.  I

2   canceled it.  One is coming up at the end of November.

3          So if you would like me to cancel that, I'm happy

4   to do it.  Let me know.

5          MR. MORTARA:  Absolutely not, Your Honor.  I also

6   have friends on the Harvard law faculty.  I don't think it's

7   a problem at all.

8          THE COURT:  The other thing is, there's a retired

9   judge named John Cratsley.  He teaches a course there.  And

10  the students are required to do three months in either State

11  or Federal Court.  I take one of his students every semester.

12  I also have B.C. and B.U.  I do it from all the schools.  But

13  he basically places a student with every chambers willing to

14  receive one every winter into the spring.  Would you like me

15  to cancel that?

16         MR. MORTARA:  Absolutely not, Your Honor.

17         THE COURT:  You're sure?

18         MR. MORTARA:  Absolutely not.  I assume they're

19  subject to all the usual rules about interns and clerks and

20  confidentiality?

21         THE COURT:  They're law school students so they're

22  not Harvard College students.  And they don't weigh in on the

23  weighty issues.  They think they do, and their resumes say

24  they do, but that's not actually the way it works.

25         MR. HUGHES:  I used to think that, too, Your Honor.

```
 1              THE COURT:  So do you want me as -- I just realized
 2    when you said that you didn't want your next argument until
 3    February that we have sort of a long stretch here.  So I
 4    don't have anything to do with the college, I haven't.  I do
 5    do some things with the law school.
 6              Do you want me to run those by you?  Those are the
 7    only two I can foresee, but if there's anything else --
 8              MR. MORTARA:  From SFFA, I don't think you need to
 9    run anything by us that you want to do with Harvard Law
10    School.
11              THE COURT:  I just wanted to make sure.  We have
12    this traditional retreat next week, and there's this Carol --
13    she runs like this criminal --
14              MR. WAXMAN:  Steiker.
15              THE COURT:  Carol Steiker runs this criminal
16    justice thing out of the law school, and she's coming to
17    speak.  I'm happy to absent myself from that presentation.
18              MR. MORTARA:  We don't see any reason for things
19    like that, Your Honor.
20              THE COURT:  Okay.  And as I say, I haven't had
21    anything to do with the college.  I just touch base with the
22    law school now and again.
23              MR. MORTARA:  Your Honor, we appreciate the
24    disclosures in an abundance of caution.
25              THE COURT:  I'm happy to come to Chicago to do it
```

1    for you, too, but they really haven't asked.

2              MR. HUGHES:  He could make that happen.

3              MR. MORTARA:  I will get you an invite to the

4    University of Chicago Law School after the case is fully

5    decided and fully closed.

6              THE COURT:  So in about eight years.

7              MR. WAXMAN:  Springtime would be much better --

8              THE COURT:  It's been on my mind, and I just have

9    forgotten --

10             MR. WAXMAN:  Your Honor, while we're here, can I

11   also add one thing?  I mean, the job that the court reporters

12   have done in this case is absolutely extraordinary.  And of

13   course each side will be reviewing the record and will be

14   submitting some corrections.

15             There's one correction that I think probably ought

16   to be taken care of earlier rather than later.  It's

17   yesterday's transcript.  Page 82, at line 3, Mr. Mortara

18   says, "I want to say that there's absolutely no ill will

19   going on."

20             MR. MORTARA:  I think it was talking about --

21             MR. WAXMAN:  And the Court's statement as reported

22   is, "Sometimes I would just really like to be your wife."

23             MR. MORTARA:  Instead of "meet your wife."

24             MR. WAXMAN:  And I thought, before this gets out

25   there, perhaps it would be better to get that out.

1          THE COURT:  I'm not even sure what you could have

2     been thinking.

3          COURT REPORTER:  I apologize.

4          THE COURT:  Now I'm impressed with the attention

5     with which they're reading the transcripts.

6          MR. LEE:  Careful attention to the transcript.

7          THE COURT:  So now everything is all set?  This is

8     my thought:  SFFA, 15-minute break, which I'm guessing gets

9     us to about 11:00.

10         MR. HUGHES:  I'm going to take about 70 minutes, I

11    hope.

12         THE COURT:  9:30 to, say, you'll be done at quarter

13    of 11:00.  We'll break until 11:00.  You'll close to 12:30.

14    We'll break for lunch, and then you'll have your rebuttal and

15    will have your lunch to think about and the two Amici

16    closings.

17         (End of sidebar.)

18         THE COURT:  All right.  So for the audience, we

19    were just discussing scheduling up at sidebar.  Mr. Hughes is

20    going to close first.  He's going to reserve some time, so we

21    will take a break after his opening closing, and then we will

22    hear from Harvard.  That should take us right to the lunch

23    break.  We'll break for lunch, and then we'll come back for

24    SFFA's rebuttal and the two Amici closings.

25         Mr. Hughes, I know we discussed this yesterday, but