```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF MASSACHUSETTS

 3   _____

 4   STUDENTS FOR FAIR ADMISSIONS, INC.,

 5                   Plaintiff,          Civil Action
                                         No. 14-14176-ADB
 6   v.
                                         October 26, 2018
 7   PRESIDENT AND FELLOWS OF HARVARD
     COLLEGE, et al.,                    Pages 1 to 134
 8                                       SEALED TRANSCRIPT
                    Defendants.
 9   _____

10

11

12

13
                 TRANSCRIPT OF BENCH TRIAL - DAY 10
14          BEFORE THE HONORABLE ALLISON D. BURROUGHS
                   UNITED STATES DISTRICT COURT
15              JOHN J. MOAKLEY U.S. COURTHOUSE
                      ONE COURTHOUSE WAY
16                    BOSTON, MA  02210
                           REDACTED
17

18

19

20

21

22             JOAN M. DALY, RMR, CRR
               KELLY MORTELLITE, RMR, CRR
23               Official Court Reporter
             John J. Moakley U.S. Courthouse
24           One Courthouse Way, Room 5507
                   Boston, MA  02210
25               joanmdaly62@gmail.com
```

1          THE COURT: We're going to recess for the day but
2     for the sidebar. We'll resume at 9:30 on Monday. We
3     actually have a quick status conference in here at 9:15 which
4     we will not do at your tables. We'll do it out back or
5     someplace so you can all get set up.
6          Monday is going to basically be Amici day. They
7     are eight witnesses limited to a half hour of direct each.
8     You all both have the opportunity to cross-examine to the
9     extent that you want to. I'm hoping those direct
10    examinations will be done by younger lawyers, but we'll see
11    how that plays out.
12         Then I assume given some of the rulings yesterday,
13    we'll have some other issues to discuss before you rest.
14    Assuming you do rest or we work out some other arrangement,
15    you all will begin your presentation on Tuesday. Does that
16    seem right?
17         MR. LEE: That seems right.
18         MR. HUGHES: Sounds like it to us, too, Your Honor.
19         THE COURT: Okay. Excellent. The case is recessed
20    for the day but for sidebar.
21         (The following was held at sidebar.)
22         THE COURT: Do you want to make an argument about
23    plaintiff's Exhibits 221, 512 and 513?
24         MR. HUGHES: What I'd like to do is make an offer
25    of proof for why they should be admitted as part of the

1    record in the case.  If not, I guess it would become my offer
2    of proof along with argument I'll make at the end.
3            THE COURT:  Okay.
4            MR. HUGHES:  I'm going to begin by explaining the
5    background of how we came into possession of P512 and P513.
6    During discovery Harvard produces P221 which is a December 1,
7    2012, email that Your Honor has, email chain between Dean
8    Fitzsimmons and Thomas.  As Your Honor knows from the record,
9    Thomas Hibino oversaw the OCR investigation that resulted in
10   the 1990 statement of findings and that's Exhibit P555.
11   Harvard's production did not include the attachment to P221.
12           As Your Honor knows from the prior sidebar and
13   reading this document, Mr. Hibino provided Dean Fitzsimmons
14   an attachment that we'll get to in a minute.  And then Dean
15   Fitzsimmons responded, and Your Honor can see the response
16   there in P221.  We asked Harvard to produce the attachment in
17   March of 2017.  Harvard informed us in July of 2017 that they
18   did not have the attachment even though they had produced
19   emails from Dean Fitzsimmons before and after this
20   December 1, 2012 date.
21           Meanwhile in June of 2017, we made a FOIA request
22   to the Department of Education for all communications between
23   Dean Fitzsimmons and Mr. Hibino.  In March of 2018 the
24   Department of Education produced some of those
25   communications, but it redacted the attachment to the

1  December 1 email.  So we appealed that decision in June 2018.
2  And at long last on October 1, 2018, the Department of
3  Education agreed to produce the attachment to the December 1,
4  2012, email.
5       We received the attachment by itself that day.  A
6  couple days later on October 3, we asked the Department of
7  Education to produce the full email chain which is I think
8  P513 or 512.  We identified P512 and P513 to Harvard on
9  October 5, 2018, as a trial exhibit for this case.
10       So then I'd like to go through P513 and discuss why
11  we think it is relevant.  P513 is the document we received
12  from the FOIA request that has the exchange between Dean
13  Fitzsimmons and Mr. Hibino on the first page that is included
14  in P221.  And then if we go to the second page of P513, we've
15  got a handwritten note from -- it says "To Fitz, From Tom",
16  and it's on Department of Education letterhead.  And it says,
17  "In gratitude for your late night efforts, I am returning the
18  'smoking gun' obtained during our review.  Besides, counsel
19  tells me that stolen evidence might not be usable in court.
20  I'm sure you'll agree that the document should be destroyed!"
21       Then we've got the other part of the attachment,
22  which is on Harvard Admissions Office and Financial Aids
23  letterhead and under the name of [REDACTED], who at
24  one time was the associate director of admissions.  And then
25  we've got a typed out message that says, "Note to WRF", and

1  Your Honor knows those are the initials of Dean Fitzsimmons,
2  and the note says, "I must protest the favored treatment
3  afforded to a typical AA applicant from the unwashed masses
4  by some of my soft-hearted or is it soft-headed colleagues on
5  A docket.
6  "There's nothing special here.  Sure, Jose has been
7  his sole support of his family of 14 since his father, a
8  Filipino farm worker, got run over by a tractor.  But
9  remember, how high can their standard of living be?  Besides,
10  it can't be that difficult on his part-time job as a senior
11  cancer researcher.  Sounds to me like just another AA CJer."
12  And Your Honor knows that AA refers to
13  Asian-American, and we just heard on the video from Dean
14  Fitzsimmons about what CJer means.  That means an applicant
15  who intends to study biology and has medicine as a further
16  career.
17  It then goes to on to say, "As for the rest of the
18  folder, nothing.  While he was California's Class AAA Player
19  of the Year, it won't translate.  We just don't need a
20  132-pound defensive lineman.  He'll probably take the offer
21  from the Rams anyway.
22  "Lastly, I have to discount the Nobel Peace Prize
23  he received.  This is politics, not achievement.  After all,
24  they gave one to Martin Luther King, too.  No doubt just
25  another example of giving preference to minorities.  A clear

1     4."
2               The reason that we think this is relevant, and I
3     think we need to go back to P221, which is where we started
4     because this has the full unredacted response by Dean
5     Fitzsimmons to receiving the joke.  And his reaction is, "I'm
6     stunned.  ███  passed away a few years ago, and I'd
7     forgotten that she had such a sense of humor.  We'll
8     deconstruct at lunch.  Where should we go?"
9               For the sake of completeness, P512 is Mr. Hibino's
10    response back to Dean Fitzsimmons.  "No, no.  I did that from
11    purloined stationery from your system.  Pretty convincing,
12    huh?  I forgot.  Are we getting together here or there?"
13              Why we think it is relevant and why it should come
14    in is because we think the typed-up joke that Mr. Hibino sent
15    to Dean Fitzsimmons contains stereotypical racial language
16    regarding Asian-Americans.  The comment about "just another
17    AA CJer" is exactly the kind of stereotypical language that
18    was identify by OCR in Exhibit P555 that Dean Fitzsimmons
19    testified that he abhorred.  And then the comment about the
20    "132-pound lineman" we also think is stereotypical language.
21              The reason that all of this is relevant is for the
22    response in 221 that he's stunned and that he had forgotten
23    that his colleague had such a sense of humor.
24              Our view is that's him laughing along with a joke
25    that includes stereotypical language that he says he abhors.

1     I understand there's a different way that you can interpret
2     that response.  But I do think there are two fair
3     interpretations of that response, and that at a minimum these
4     exhibits should come in so that the fact that people looking
5     at the record can make their own judgment based on that.
6            And I'll stop there, but I'd have more to say about
7     why I would have liked to have confronted him on the stand.
8            MR. LEE:  So just three points, Your Honor.  I told
9     Mr. Hughes if Your Honor doesn't allow this in, then we would
10    have no objection to an offer of proof so it's part of the
11    record, including his explanation here.
12           The three points I would make is that, I can tell
13    you our reaction when we got the typewritten version finally
14    I think about a week before the trial or so.  It was
15    basically "What is this?"  And then we figured out exactly
16    what it was when we dug this out.  The first thing is it's
17    hearsay, particularly the very bad joke that Mr. Hibino did.
18    And without the substance, as Mr. Hughes just described to
19    you, you can't make the connection to what Dean Fitzsimmons
20    said.
21           The second thing, Your Honor, is there's a real
22    relevance question here.  How does this show his intent?  Now
23    that we know from Professor Arcidiacono what their
24    discrimination claim is, how does this relate to the animus
25    that they now claim?  And I think that it doesn't.

1              And equally, Your Honor, on that point, if you look
2     at his response, he gets the email at about 6:30 on a Friday
3     night.  He responds to it at 8:30 on a Friday night and
4     Mr. Hibino writes back two minutes later and says, No, no.
5     You're not reading this correctly.  By this point in time
6     █████ has died several years ago.  We're 23 years after the
7     OCR investigation.
8              Why Mr. Hibino is doing it at this point in time,
9     we have no idea because he's not going to testify.  So it's
10    irrelevant, I think, as a single matter.
11             The last thing I would say is as a 403 matter,
12    given everything that's come flying in in this case, this is
13    so tangentially related to anybody's credibility and more
14    important to anybody's discriminatory animus, it should be
15    excluded.
16             MR. HUGHES:  If I may, starting with the hearsay.
17    What we're offering this for is really -- P221 is his
18    reaction to the joke.  Of course the joke has to be included
19    in order to put the reaction in context.  We're obviously not
20    offering the joke for the truth of the matter, but his
21    reaction is directly relevant evidence in a case where we
22    have a finding from OCR about using racial stereotypes just
23    like the ones that are included in here.
24             And Mr. Hibino explains in 221 why he's forwarding
25    it along, because there's been a FOIA request in 2012, the

1       same month as the Unz article about Asian-American

2       discrimination.  He's sending it along at that time to Dean

3       Fitzsimmons, and we're getting his reaction at that time

4       which goes to whether he's got implicit bias.

5               One of the questions I would like to have

6       confronted him with on the stand is the same question that

7       Mr. Mortara confronted Director McGrath with when we read the

8       racist email from the alum which is, Would you have had the

9       same response if it had been referring to, for example, it

10      had racial stereotypes about African-Americans.

11              That's why we think this is relevant and it goes to

12      this issue of whether there is bias on the part of the

13      admissions office.  And this is, at least, some evidence

14      interpreted in the way that I think it should be interpreted.

15      And it certainly could be interpreted that goes to that,

16      which is why it should be part of the record in this case.

17              MR. LEE:  Your Honor, just two points, not to

18      belabor it.  The first thing is given what you heard the last

19      two days that their claim is based upon statistics, and the

20      statistical claim is that we discriminated against some

21      groups but not others.  So the question is what's the

22      evidence or the animus that demonstrates we discriminated

23      against one group of Asian-Americans but not another.

24              The question of whether implicit bias or

25      unconscious action could ever provide the evidence of the

```
 1    animus is what we all question.  This is so far removed, even
 2    if you assume that connection, this is so far removed.
 3              The second thing is this is a little bit like when
 4    Director McGrath was asked about those two emails.  They are
 5    calculated to be handed to the press and to embarrass people
 6    who have come and tried to do their best on the stand on the
 7    issues Your Honor has to decide.  This is something that's
 8    intended to embarrass Dean Fitzsimmons.
 9              The fact that someone writes, "I'm stunned", no
10    matter which interpretation you take, he was stunned.  The
11    idea that he's trying to blow it off on a Friday night, which
12    is exactly what happens, is not something that should come
13    into the record both as a matter of relevance but also as a
14    403 issue.
15              MR. HUGHES:  I think you've heard me on the
16    relevance, and I won't belabor the point.  We don't have a
17    plan to provide this to the press if it comes in.  We got it
18    from a FOIA request.  Anyone can go ask for it and get it.
19              THE COURT:  If they have a year and a half to
20    spare.
21              MR. HUGHES:  Now they've coughed it up, so they've
22    got to keep coughing it up if asked.  You've heard me on the
23    relevance.  I do think it goes to an important issue in the
24    case.  So that's what I have to say on the admissibility of
25    the evidence.  I'd offer them at this point into evidence.
```

1    THE COURT: I, at this point, am going to keep them
2    out. I think that his response is of extremely limited
3    relevance. And that the prejudice, whatever relevance there
4    is, is outweighed by the prejudice.
5         The only circumstance under which I would revisit
6    it is if Mr. Fitzsimmons ends up on the stand again. Even if
7    that happens, this part of it is not going to be presented in
8    open court in any way.
9         I think that the relevance is so tangential that
10   it's not worth admitting, it's not worth calling him back
11   for. But if he happens to come back on the other issue, I
12   may consider it again.
13        MR. HUGHES: Then I'm going to save my further
14   offer of proof on what I would do if I were able to confront
15   him about it if in case that happens because I don't want to
16   tell them all my secrets. So we'll reserve on that.
17        And then the other thing is I want to make these
18   part of the record in the sense of an offer of proof, but I'm
19   trying to think of a way I can do that without creating the
20   publicity concern that you have. It's very hard for us to
21   seal, to agree to sealing a document that, quite frankly, we
22   could do anything we want with, which we haven't done and
23   don't have a plan to do, but you understand the position
24   we're in on that issue.
25        THE COURT: We can kick the can down the road on

1   this.  Let me just clarify.  In terms of relevance I think
2   that it is not relevant because what the Dean responds is
3   wholly ambiguous, and the passage of time, and the fact that
4   Mr. Hibino is not testifying.  Why don't you call him?  Where
5   is he?
6            MR. HUGHES:  I don't know.  Again all we think is
7   relevant is the Dean's reaction to the joke.  That's what's
8   relevant.  I don't think Mr. Hibino has anything to add to
9   that.
10           THE COURT:  I don't see much relevance to it for
11  the reasons that Mr. Lee gives but honestly because the
12  statement itself is so ambiguous, the passage of time, and
13  the fact that he's dealing with a regulator who he may feel
14  like he has to kind of jolly along.  So I see it as having
15  very limited relevance.
16           I'm the decisionmaker here, so I don't have to
17  speculate what relevance a jury might assign to it.  I'm just
18  telling you that I see it to be irrelevant on that basis.
19  I'm going to keep it out.
20           MR. HUGHES:  It was never going to be part of my
21  closing.  I can assure you that.
22           THE COURT:  I'll hold onto these.
23           MR. HUGHES:  That's fine.  You can hold onto those.
24  We've got copies of those.  Now that we've concluded the
25  discussion of that issue, I think we're done for the day, I